## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Donald Peterson, Special Agent of the Federal Bureau of Investigation ("FBI"), being duly sworn, depose and state under penalty of perjury that the following is true to the best of my information, knowledge and belief.

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a criminal complaint alleging that United States National LAWRENCE RUDOLPH murdered his wife, United States National Bianca Rudolph (Finizio), outside the United States and in the jurisdiction of Zambia, on October 11, 2016 as part of a scheme to defraud life insurance companies and to obtain money and property from them through the false and fraudulent pretense, representation, and promise that the death was an accident.

2.      I am currently employed as a Special Agent of the FBI assigned to the Denver Division's Rocky Mountain Safe Streets Task Force (RMSSTF).  I have been an FBI Special Agent for nearly 17 years since graduating from the FBI Academy in Quantico, Virginia in January of 2005.  Since graduating from the Academy, I have participated in numerous criminal investigations.  These investigations have utilized physical and electronic surveillance, financial analysis, interviews, surreptitious recordings, undercover operations, search warrants, arrests, confidential human sources, seizure and analysis of computer and cellular telephone information, and various other techniques.  During my career with the FBI, I have investigated violent criminal enterprises, gangs, drug offenses, weapons violations, civil rights matters, robberies, homicides, and other federal crimes.  I am one of the primary Case Agents for this investigation, and as such, I am familiar with the facts of the case.

3.      For the reasons set forth in more detail below, I submit that there is probable

cause to believe LAWRENCE RUDOLPH murdered his wife Bianca Rudolph, with

premeditation, while the two were on a hunting trip in Zambia on October 11, 2016, in such a

manner that he could falsely claim the death was the result of an accident.

4.      The facts set forth in this affidavit are based on my personal knowledge as a Case

Agent, knowledge obtained from other individuals including law enforcement personnel, and my

review of documents, reports and other evidence.  Except as explicitly set forth below, I have not

distinguished in this affidavit between facts of which I have personal knowledge and facts of

which I have hearsay knowledge.  The information contained within this affidavit does not

represent every fact learned by law enforcement during the course of the investigation.  Rather, I

have only included information sufficient to establish probable cause for the requested criminal

complaint.

## THE RUDOLPHS' MARRIAGE

5.      LAWRENCE RUDOLPH (LAWRENCE) and Bianca Rudolph (Bianca) were each

born in the United States and were at all times material to this affidavit, citizens of the United

States as defined by the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(22).

6.      LAWRENCE RUDOLPH first met Bianca Finizio when LAWRENCE was in

dental school and Bianca was in an undergraduate program at the University of Pittsburgh.  They

were married in approximately 1982.  LAWRENCE started a dental practice at approximately the

same time.  Bianca initially worked in the dental office, but later had less involvement in the

practice after the couple had two children.  After becoming disabled in approximately 2006,

LAWRENCE separated from his partners and started a new group of dental offices known as Three

Rivers Dental.  These offices are still in business and an adult child of the RUDOLPHS now works

2

at the offices as a dentist.

7.　　LAWRENCE RUDOLPH and Bianca Rudolph often spent time traveling and hunting.  As time went by these trips became more frequent, with hunting trips to Africa and other countries being common for them.  Prior to meeting LAWRENCE, Bianca did not have hunting experience.  As Bianca's relationship with LAWRENCE developed over the years, she began hunting with him and she became a well-respected international hunter.  Friends and relatives interviewed by the FBI said Bianca appeared to enjoy hunting and was an accomplished hunter.  During their marriage, the RUDOLPHS were both active members of a prominent hunting organization.  At times Bianca would travel and hunt without LAWRENCE present.

8.　　Approximately four years prior to Bianca Rudolph's death, the RUDOLPHS moved from Pennsylvania to Arizona.  The dental practices of LAWRENCE RUDOLPH remained in Pennsylvania.  LAWRENCE traveled back and forth between Pennsylvania and Arizona regularly for business.

### BIANCA RUDOLPH'S DEATH
### AND THE INVESTIGATION BY THE ZAMBIAN POLICE SERVICE

9.　　During 2016, the RUDOLPHS traveled to Zambia multiple times.  Their final trip to Zambia was scheduled to take place between September 27, 2016, and October 11, 2016.  Bianca Rudolph's goal during the trip was to kill a leopard.  She was unsuccessful in killing a leopard but did kill numerous other animals during the trip.  LAWRENCE RUDOLPH was present for the hunt, but he was not actively hunting.  The RUDOLPHS took two guns with them for the hunt: a Remington .375 Rifle and a Browning 12-gauge shotgun.

10.　　On October 11, 2016, at approximately 5:30 a.m. local time, the RUDOLPHS were packing to leave their hunting camp in Kafue National Park, Zambia, when Bianca Rudolph

was shot in the chest with the Browning shotgun.  The Zambian Police Service was notified of the death and performed an investigation that included interviewing LAWRENCE RUDOLPH, PROFESSIONAL HUNTING GUIDE, whose identity is known to me, and ZAMBIAN GAME SCOUT, whose identity is also known to me.

11.     LAWRENCE RUDOLPH told Zambian Police in sum and substance and in pertinent part that he was in the bathroom of their cabin and Bianca Rudolph was in the bedroom area when LAWRENCE heard a gunshot.  LAWRENCE came out of the bathroom to find Bianca lying on the floor bleeding from the chest.  LAWRENCE tried to resuscitate Bianca but was unsuccessful.  LAWRENCE told the Zambian Police he suspected the shotgun had been left loaded from the hunt the previous day and that the discharge occurred while she was trying to pack the shotgun into its case.

12.     PROFESSIONAL HUNTING GUIDE told the Zambian Police in sum and substance and in pertinent part that on the morning of Bianca Rudolph's death he was completing paperwork related to the hunt in the camp's dining hall.  When he heard a gunshot from the cabin shared by the RUDOLPHS he rushed there with others, including ZAMBIAN GAME SCOUT, and found Bianca Rudolph laying on the floor bleeding from the chest. LAWRENCE RUDOLPH was shouting for help.  PROFESSIONAL HUNTING GUIDE ran to get a medical kit and gave it to LAWRENCE, but LAWRENCE was unable to stop the bleeding. PROFESSIONAL HUNTING GUIDE recalled seeing the shotgun and an expended shotshell on the ground.  The shotgun was inside a partially zipped gun case.

13.     ZAMBIAN GAME SCOUT — a village game scout who had been escorting the RUDOLPHS during their hunt — told the Zambian Police in sum and substance and in pertinent part that he was in the dining hall with PROFESSIONAL HUNTING GUIDE when he

4

heard the gunshot from the cabin shared by the RUDOLPHS.  When he heard it, he ran to the cabin with PROFESSIONAL HUNTING GUIDE and saw Bianca Rudolph lying on the floor with blood coming out of the left side of her chest.  ZAMBIAN GAME SCOUT said he saw the shotgun laying near the door.  ZAMBIAN GAME SCOUT saw LAWRENCE RUDOLPH trying to lift Bianca up.  ZAMBIAN GAME SCOUT said Bianca's body was taken outside and covered with a blanket.[1]

14.     According to the investigation conducted by the Zambian Police Service, only one round was in the shotgun when Bianca Rudolph was shot, and the shotgun was in a soft-sided gun case that was partially zipped when the gun was fired.  Zambian police confiscated the shotgun to perform a ballistics examination of the weapon.  BALLISTICS EXPERT, a Zambian Police Officer and Forensic Ballistics Expert whose identity is known to me, stated he did a drop test with the shotgun from one and one and one-half meters onto cement.  BALLISTICS EXPERT stated the gun did not misfire during the tests.  PROFESSIONAL HUNTING GUIDE was present when this shotgun was later returned to LAWRENCE RUDOLPH.

15.     ZAMBIAN FORENSIC PATHOLOGIST, whose identity is known to me, conducted an examination of Bianca Rudolph's body.  The report he completed after the exam identified the Cause of Death as, "(a) Haemorrhagic shock (b) Macerated left side of heart and perforated lung (c) gunshot injury."

16.     A summary of the investigative findings prepared by the Zambian Police

---

[1] No other witnesses reported the body being moved outside and later photos of the body taken by the Zambian Police Service show Bianca's body inside the cabin. There are also other accounts from bystanders near the hunting cabin with statements that diverge in small respects from one another, including whether Bianca screamed around the same time the gunshot was heard.

5

Service states, "Findings further suggested that the firearm was loaded from the previous hunting activities and the Normal Safety Precautions at the time of packing the firearm were not taken into consideration causing the firearm to accidently fire."

## LAWRENCE RUDOLPH'S INTERACTIONS WITH U.S. EMBASSY PERSONNEL

17.     CONSULAR CHIEF, whose identity is known to me, was a Consular Section Chief at the U.S. Embassy in Lusaka, Zambia in October 2016.  He told the FBI the following, in sum and substance and in pertinent part:

a.     LAWRENCE RUDOLPH called the embassy late in the afternoon on October 11, 2016, at around 4:30 Central African Time[2].  The call was eventually passed to CONSULAR CHIEF.  LAWRENCE identified himself and said his wife, Bianca Rudolph, had died that morning of an accidental gunshot wound.  CONSULAR CHIEF reported that LAWRENCE quickly turned the conversation to the issue of cremating Bianca's body and leaving the country.  CONSULAR CHIEF obtained contact information for LAWRENCE and explained the documentation the embassy would need to allow LAWRENCE to leave the country with Bianca's remains.

b.     CONSULAR CHIEF was in contact with LAWRENCE RUDOLPH again on October 12, 2016.  The two discussed options for funeral homes and mortuaries.  At that time, Bianca Rudolph's body was being maintained at Ideal Funeral Home in Lusaka.  CONSULAR CHIEF provided information for Ambassador St. Ann's Funeral Home, which was one of the few in the area capable of performing a cremation.

---

[2] Unless otherwise specifically noted, times described in this affidavit are in Central African Time.

6

c.      On October 13, 2016, CONSULAR CHIEF was informed that Ambassador St. Ann's was waiting for the report from the pathologist — the ZAMBIAN FORENSIC PATHOLOGIST referenced above — before accepting the body for cremation. Approximately an hour later, CONSULAR CHIEF received a call from Ideal Funeral Home saying the body was scheduled for cremation the next day.  CONSULAR CHIEF told the FBI he had a bad feeling about the situation, which he thought was moving too quickly.  As a result, he traveled to Ideal Funeral Home with two others from the embassy to take photographs of the body and preserve any potential evidence.

d.      CONSULAR CHIEF arrived at Ideal Funeral Home on the afternoon of October 13, 2016 to observe Bianca Rudolph's body.  He took several pictures and used a scale to measure the primary wound in her chest, which CONSULAR CHIEF described as being "straight on the heart."  CONSULAR CHIEF observed that the wound was not caused by a "tight group" of pellets and was approximately six centimeters in diameter.  CONSULAR CHIEF, familiar with firearms and firearm injuries from approximately 20 years in the United States Marine Corps, did not observe the gas burns or obvious tissue expansion he would expect of a contact wound.  He also observed what he believed to be a second injury to Bianca's chest caused by the "wadding" from the shotgun cartridge.[3]  Based on his observations, CONSULAR CHIEF believed the distance between the muzzle of the shotgun and Bianca's chest when the shotgun was fired was approximately two to two and a half meters (approximately 6.5 to 8 feet).

---

[3] I know, from my training and experience and from the training and experience of others with whom I have consulted, that "wadding" is a component of a shotgun shell.  Modern wadding is typically plastic.  Wadding sits inside of a shotgun shell, separating the shot from the powder and providing a seal that helps propel the shot out of the barrel.  Wadding leaves the barrel with the shot when a shotgun shell is fired.

   e. When CONSULAR CHIEF returned to the office after visiting Ideal Funeral Home, he received a call from LAWRENCE RUDOLPH.  CONSULAR CHIEF described LAWRENCE as "livid" over the fact that CONSULAR CHIEF had observed Bianca Rudolph's body and taken photographs.  CONSULAR CHIEF offered to meet with LAWRENCE at the embassy, but he declined.

   f. CONSULAR CHIEF met LAWRENCE RUDOLPH in person for the first time on the morning of October 14, 2016, at Ambassador St. Ann's Funeral Home to collect Bianca Rudolph's passport and other documents necessary for the cremation to occur. LAWRENCE was there with PROFESSIONAL HUNTING GUIDE.  During the meeting, LAWRENCE declined offers of assistance in contacting family members and told CONSULAR CHIEF he wanted to personally inform family members of the death.  LAWRENCE claimed he had been married previously, that his children were from that marriage, and that the children were not Bianca's biological children.  LAWRENCE repeatedly asked about the Privacy Act and its applicability to Zambia.  More specifically, he asked questions about who would be able to access information about Bianca's death, including the police reports.  LAWRENCE did not have the firearm that killed Bianca, but he expected it would be returned to him by Zambian law enforcement.  When asked what kind of firearm it was, LAWRENCE claimed not to know and described it as an antique.  When asked what had happened to Bianca, LAWRENCE told CONSULAR CHIEF he was in the shower at approximately 5:00 a.m. while Bianca was packing to leave.  LAWRENCE heard the discharge and came running out of the shower, where he was almost immediately joined by PROFESSIONAL HUNTING GUIDE and others.

g. CONSULAR CHIEF told the FBI that either before or after Bianca Rudolph's cremation LAWRENCE told him Bianca may have committed suicide by shooting herself with the shotgun.

**LIFE INSURANCE POLICIES AND THE PRIVATE INVESTIGATION**

18. The FBI has reviewed documents associated with life and accidental death policies covering Bianca Rudolph at the time of her death on October 11, 2016. The earliest identified life insurance policy was purchased in approximately 1987. The policies were then updated and adjusted into 2016. The policies and the life insurance companies, whose identities are known to me, are referenced in the table below, along with the approximate date on which LAWRENCE RUDOLPH began the process of claiming the benefits of those policies, the amount paid out on those policies, and the approximate date the policy was paid. The primary beneficiary of each of these policies was a revocable trust established by the RUDOLPHS on or about April 25, 2016. The terms of that trust made LAWRENCE the ultimate beneficiary and recipient of each of the payments identified below:

| Company | Policy | Approx Claim Date | Approx. Paid Date | Amount Paid |
|---------|--------|-------------------|-------------------|-------------|
| INSURANCE COMPANY 1 | Policy No. 215 150 755 UT | 11/7/16 | 03/6/17 | $772,901.17 |
| INSURANCE COMPANY 2 | Policy No. 0100382288 | 10/31/16 | 02/27/17 | $100,973.41 |
| INSURANCE COMPANY 3 | Policy GT8107 Certificate 4019648262 | 11/7/16 | 02/3/17 | $200,000.00 |
| INSURANCE COMPANY 4 | Policy 42728878 | 11/7/16 | 03/7/17 | $503,438.85 |
| INSURANCE COMPANY 4 | Policy 42186233 | 11/7/16 | 03/7/17 | $500,840.86 |
| INSURANCE COMPANY 5 | Policy 104 TLP | 11/7/16 | 03/16/17 | 1,000,157.54 |

| | Certificate 105665 | | | |
|---|---|---|---|---|
| INSURANCE COMPANY 6 | Policy 1308458 | 11/7/16 | 01/9/17 | $44,533.88 |
| INSURANCE COMPANY 7 | Policy T00017578A | 11/14/16 | 03/09/17 | $1,003,049.90 |
| INSURANCE COMPANY 7 | Policy U00013758A | 11/14/16 | 03/09/17 | $751,849.32 |
| **TOTAL** | | | | $4,877.744.93 |

19.     LIFE INSURANCE COMPANY 5 had addresses in Denver, Colorado, Englewood Colorado, and Greenwood Village, Colorado.  Records provided by LIFE INSURANCE COMPANY 5 show that LAWRENCE RUDOLPH caused attorneys, on or about January 18, 2017 to send LIFE INSURANCE COMPANY 5 a packet of documents in support of his claim for insurance policies on the life of Bianca Rudolph. The packet was directed to an address in Englewood, Colorado.  Those documents were sent from Arizona to Colorado via Federal Express, a commercial interstate carrier.

20.     After LAWRENCE RUDOLPH filed the above claims, several of the listed insurance companies, including INSURANCE COMPANIES 1, 3, 6, and 7, retained Diligence International, a private investigation firm, to conduct due diligence related to the circumstances of Bianca Rudolph's death.  Diligence recovered Bianca's death certificate as well as documents related to her cremation, which LAWRENCE authorized and paid for on October 14, 2016.

21.     Diligence also interviewed LAWRENCE RUDOLPH in the presence of his attorneys on or about December 22, 2016, in connection with the policy provided by INSURANCE COMPANY 1.  Diligence's report includes the following statements made by LAWRENCE in sum and substance and in pertinent part:

   a.  The RUDOLPHS left for their hunting trip in Zambia on September 27 or 28, 2016, intending to return on October 12, 2016.

   b.  Bianca was the only one hunting during the trip because they had only one permit to hunt a leopard.

   c.  During the trip, the RUDOLPHS stayed in a cabin with one bedroom and one bathroom.

   d.  On the morning of Bianca's death, October 11, 2016, LAWRENCE and Bianca got up early to finish packing for their return.  Bianca told LAWRENCE she intended to pack the firearms while he was in the bathroom.  Packing the firearms consisted of placing them in a soft-sided gun case and then into a larger hard-sided gun case.

   e.  Bianca had two firearms with her.  LAWRENCE identified one as a Remington rifle and the other as a 12-gauge Browning shotgun but notes in parentheses "it may have been a Beretta."

   f.  Between 5:15 and 5:30 a.m., while LAWRENCE was in the bathroom, he heard a gunshot and then heard his wife scream.  He ran into the bedroom, found her lying on the floor, and performed CPR.  LAWRENCE did not remember whether PROFESSIONAL HUNTING GUIDE called the police from the camp or if, instead, they were called on the two-hour trip to the nearest town.

   g.  The Zambian law enforcement investigation ruled it an accidental discharge, not a suicide, and noted that the RUDOLPHS had been looking forward to attending a wedding the following week.

   h.  Once Bianca's body was released from the coroner's office it was transported to Ambassador St. Ann's for cremation.  LAWRENCE said he and Bianca had

always planned to be cremated.  He also explained that it was "challenging" to transport a body from another country to the United States because it required the purchase of a lead-lined coffin. He said that since he and Bianca had talked about and planned on cremation, he decided to have her cremated in Zambia.

22.     Diligence also interviewed PROFESSIONAL HUNTING GUIDE on March 2, 2017.  Diligence's report provides that PROFESSIONAL HUNTING GUIDE made the following statements, in sum and substance and in pertinent part:

      a.     Bianca Rudolph was an experienced hunter.

      b.     The shotgun that killed Bianca was owned by LAWRENCE RUDOLPH and LAWRENCE carried the shotgun during the hunt.

      c.     LAWRENCE unload and cleaned the shotgun the night before Bianca's death.

      d.     PROFESSIONAL HUNTING GUIDE speculated that it was "probably" difficult for a person of Bianca's size to reach the trigger of a shotgun from the end of a full-length sporting barrel, but that he didn't know the exact length of the barrel and didn't want to speculate.  He did, however, also speculate that Bianca may have leaned over to push the shotgun into its soft-sided case, which was a "tight fit."

      e.     The zipper of the soft-sided gun case was pulled down close to the trigger guard and that Bianca may have touched the trigger while zipping the case closed.  He said Bianca had long fingernails and the trigger on a shotgun was "light."

      f.     The shotgun may have discharged if Bianca had hit the butt of the shotgun on the ground to try to push it further into the case.

g.      The shotgun was moved sometime after Bianca was shot. PROFESSIONAL HUNTING GUIDE noticed it on a travel trunk outside the cabin.  ZAMBIAN GAME SCOUT told PROFESSIONAL HUNTING GUIDE he had moved it outside for safety. After hearing that, PROFESSIONAL HUNTING GUIDE told ZAMBIAN GAME SCOUT to put it back where he had found it.

23.      Each of the insurance companies listed above ultimately concluded that the relevant policy should be paid, including the companies that retained Diligence.  However, for the reasons set forth in this affidavit, I submit there is probable cause to believe the claims LAWRENCE RUDOLPH filed in connection with these life insurance policies were part of a scheme to defraud those companies and to obtain money through false and fraudulent pretenses, representations and promises.  Specifically, LAWRENCE claimed, either explicitly or implicitly through the submission of his account of the death in the Zambian Police Service reports that Bianca's death was the result of an accident.  In each case, the communications from LAWRENCE to the insurance companies were made through fax or some kind of interstate postal carrier, such as the United States Postal Service or Federal Express.  For example, on or about December 16, 2016, LAWRENCE, via his attorneys, caused to be mailed from Phoenix, Arizona to Denver, Colorado a packet of documents in furtherance of an accidental death insurance claim that included a statement that he had not withheld any material facts from Great Western.

## THE FBI'S DEATH INVESTIGATION

24.      On or about October 27, 2016, FRIEND, whose identity is known to me, called the FBI legal attaché in Pretoria, South Africa to report that she wanted the FBI to investigate the death of her friend, Bianca Rudolph.  FRIEND reported, in sum and substance

13

and in pertinent part, that she suspected foul play because LAWRENCE RUDOLPH had been involved in prior extramarital affairs and had been having an affair at the time of Bianca's death. FRIEND said LAWRENCE had been verbally abusive in the past and that the two had had fights about money. In a subsequent interview, FRIEND elaborated that the RUDOLPHS' children did not find out about the death of their mother until about one week after it occurred and that some of Bianca's friends and family did not know about the death until the funeral.  FRIEND also said she believed the cremation to have been against Bianca's wishes because Bianca was a strict Catholic who had once expressed disapproval that FRIEND's husband was cremated. Similarly, FRIEND stated, "Larry is never going to divorce her because he doesn't want to lose his money, and she's never going to divorce him because of her Catholicism."

25.     Additional witnesses interviewed by the FBI corroborated FRIEND's belief that LAWRENCE RUDOLPH was having an affair, providing a possible motive for murder in addition to the substantial insurance proceeds described above.

26.     While LAWRENCE RUDOLPH said it was "challenging" to send Bianca Rudolph's body to the United States, as opposed to rapidly cremating her, investigators learned that LAWRENCE frequently arranged for the transportation of animals hunted on his trip to be transported back to the United States.  Investigators learned, from speaking to a United States Fish and Wildlife Service Office of Law Enforcement Special Agent who specializes in the investigation of crimes related to wildlife trafficking, that sending such animals back to the United States is often cumbersome, expensive, and time-consuming.

27.     I and other investigators also interviewed PROFESSIONAL HUNTING GUIDE's EX-WIFE, whose identity is also known to me.  In sum and substance and in pertinent part, she relayed the following:

14

a.    She was first introduced to LAWRENCE RUDOLPH and Bianca Rudolph at a hunting convention in 2010.  She then regularly met with the RUDOLPHS in South Africa before their safaris in Zambia and considered both of the RUDOLPHS to be friends.

b.    She traveled to Zambia in late September 2016 to meet with PROFESSIONAL HUNTING GUIDE and the RUDOLPHS during the hunt in Zambia. She stayed with the group until October 8, 2016.  She relayed that Bianca seemed nervous because of a prior failed leopard hunt but that she had no concerns about Bianca's handling of firearms. She remembered that the RUDOLPHs brought several firearms, including a shotgun. The shotgun may have been customized to alter its ammunition capacity, repeatedly jammed, and was not functioning properly.

c.    She relayed that the RUDOLPHS appeared to be having a good time in Zambia.  She did not notice any problems between them and told us they seemed to be a very strong couple who were happy together.  She said LAWRENCE was very attentive to Bianca's needs.

d.    She learned that Bianca died on October 11, 2016, after a call from PROFESSIONAL HUNTING GUIDE. She returned to Zambia on October 12 and met with LAWRENCE the next day, October 13, 2016.  LAWRENCE appeared to be distraught. LAWRENCE told her that he had been using the bathroom while Bianca was putting guns into the cases when the shotgun discharged and killed her.

e.    She relayed that the process of making arrangements for Bianca's body seemed rushed.  She felt there was a sense of urgency in getting the body cremated that she did not understand.  LAWRENCE said he would tell the children about Bianca's death but did not take their calls. She felt that the children should have been given an opportunity to travel to

15

Zambia to say goodbye.  LAWRENCE later told her that he contacted their son to tell him that Bianca died in an accident.

      f.   She was uncomfortable with the proceeding to cremate Bianca because Bianca was Catholic, and religion was important to her.  She asked LAWRENCE about traditions like dressing the body in black and placing a cross around the decedent's neck, but LAWRENCE did not pay attention to these concerns.  She, rather than LAWRENCE, provided clothes to the crematorium and put a necklace on Bianca's body. LAWRENCE suggested that Bianca desired to be cremated.

      g.   She told us that money was exchanged to expedite Bianca's cremation.  She said she personally witnessed LAWRENCE pay an official to expedite the process, though she did not know the person's name or precise role.  Although familiar with bribes being paid in other contexts as the normal way business is conducted, she thought that these payments were odd under the circumstances.

28.      FORMER EMPLOYEE, whose identity is known to me, was interviewed on or about October 19, 2019.  FORMER EMPLOYEE worked at Three Rivers Dental, the practice owned by LAWRENCE RUDOLPH, between approximately February 2015 and February 2016. FORMER EMPLOYEE may not have left employment at Three Rivers Dental under favorable circumstances, which means that FORMER EMPLOYEE may have a bias towards her former employer.  FORMER EMPLOYEE came to know GIRLFRIEND, whose identity is known to me.  GIRLFRIEND was a manager for Three Rivers Dental.  During their time working together, GIRLFRIEND disclosed to FORMER EMPLOYEE that she had been involved in a long-term relationship with LAWRENCE for approximately 15 to 20 years.  GIRLFRIEND disclosed several things about her relationship with LAWRENCE, including that GIRLFRIEND had given

16

LAWRENCE an ultimatum of one year to sell his dental offices and leave Bianca.

29.　　　FBI investigators also spoke with COMMUNITY ASSOCIATION EXECUTIVE DIRECTOR, whose identity is known to me.  COMMUNITY ASSOCIATION EXECUTIVE DIRECTOR reported that on January 3, 2017, LAWRENCE RUDOLPH instructed her to change the records to reflect his email instead of the one that was on the account.  Subsequently, COMMUNITY ASSOCIATION EXECUTIVE DIRECTOR learned that a new woman, GIRLFRIEND, was living with LAWRENCE and had been since at least January of 2017.  COMMUNITY ASSOCIATION EXECUTIVE DIRECTOR also learned that LAWRENCE and GIRLFRIEND offered $3.5 million cash to purchase a different home in the same subdivision.  Within the interview, GIRLFRIEND was at one-point referenced as LAWRENCE's new wife, however, investigators do not have information confirming their marriage.

30.　　　As part of the investigation, I have reviewed financial records, border crossing records, and business records related to travel by the LAWRENCE RUDOLPH, Bianca Rudolph, and GIRLFRIEND.  Among other things those records show:

　　　a.　LAWRENCE and GIRLFRIEND travelled to Cabo San Lucas, Mexico, in 2010, 2011 (twice), 2013, 2014, 2015, in July 2016 before Bianca's death, and in 2017 a few months after Bianca's death.  Bianca did not travel on any of those trips.

　　　b.　Other business and travel records show LAWRENCE and GIRLFRIEND travelling and staying with one another, without Bianca, on several occasions.

　　　c.　On or about October 23, 2016 — the day after Bianca's funeral — LAWRENCE purchased a ticket for GIRLFRIEND to travel from Pittsburgh to Phoenix on October 24, 2016.  Records show that the ticket for GIRLFRIEND was cancelled the same day;

however, LAWRENCE also purchased a ticket on October 23, 2016, for another woman to travel

to Las Vegas on October 26, 2016, and that ticket was not canceled.  LAWRENCE also

purchased a ticket for himself on October 23, 2016, to fly from Phoenix to Las Vegas between

October 26, 2016, and October 28, 2016.  Financial records show LAWRENCE paid for a hotel

room in Las Vegas from October 26, 2016, through October 28, 2016, and a car service in

Pittsburgh on or about October 27, 2016.  On October 24, 2016, a ticket was purchased for

GIRLFRIEND to fly from Pittsburgh to Phoenix on October 31, 2016.

31.     In addition to the evidence of motive — the insurance proceeds and the

possible desire to live openly with GIRLFRIEND — additional evidence gathered during the

investigation supports my conclusion that there is probable cause to believe that Bianca Rudolph

did not die by accident and was, rather, killed by LAWRENCE RUDOLPH.

a.     ZAMBIAN BALLISTICS EXPERT identified the shotgun that killed Bianca

Rudolph as a Browning Shotgun with serial number WT15100116.  The FBI obtained a

Browning shotgun of the same make and model from a private seller, a soft-sided gun case

matching the one seen in photographs taken at the death scene in Zambia, and ammunition

matching descriptions of the ammunition used in Zambia.

b.     The Browning shotgun obtained by the FBI that is the same make and model

of the shotgun that killed Bianca Rudolph is approximately 45.25 inches (approximately 3.7 feet)

long, with a barrel that is approximately 26 inches (approximately 2.16 feet) long, with a muzzle

to trigger distance of approximately 31.1875 inches.  Medical records list Bianca's height as 5'4"

tall without shoes and 5'5" tall with shoes.

c.     The soft-sided gun case provided by Allen Company, which matches the one

seen in photographs of the death scene, is not a tight fit.  Rather, the shotgun slides easily into the

case, with the trigger facing toward the zipper and the top of the shotgun flush against the inside. Based on an examination of the shotgun and the case, there would be no need to force the case over the shotgun by using body weight or by hitting the bottom of the shotgun on the floor.

      d.   The FBI Digital Evidence Laboratory conducted a forensic examination of a photograph showing FRIEND and Bianca Rudolph.  FRIEND posed for a photograph wearing the same dress she was wearing in the photograph with Bianca.  This photograph was then used to determine the approximate length of the dress to serve as a reference, from which an FBI analyst was able to provide a static measurement of Bianca's right arm, which was determined to be between 26.75 inches and 28.75 inches.

      e.   On September 1, 2021, the FBI conducted a reach study to determine whether fifteen female volunteers from the Lakewood Police Department and the FBI could reach the trigger of the Browning shotgun obtained by the FBI.

      i.   During the first phase of the test, each of the volunteers submitted themselves to be measured.  The subjects ranged in height from 61 inches to 66.125 inches. Static right arm measurements ranged from 27.125 inches to 31.625 inches with an average of 28.575 inches.  Static left arm measurements ranged from 27.25 inches to 32.0 inches with an average of 28.56 inches.  The participants were then asked to roll their shoulders forward and extend their arms, hands and fingers to determine their maximum reach on a yardstick.  No test subject had a reach measurement greater than their static arm measurement.

      ii.   In phase two of the test, subjects were brought into a room and handed the Browning shotgun obtained by the FBI and the Allen soft case.  They were then instructed to "please place the shotgun in the back and zip the bag closed."  None of the subjects placed the butt of the shotgun on the ground with the muzzle pointed at their chest to complete

19

the task.  None of the subjects pointed the muzzle at themselves at all.  And none of the subjects struggled to fit the shotgun in the case or to zip the case closed with the shotgun inside.

              iii.      In phase three of the test, the subjects were given the partially zipped Allen soft case with the shotgun inside. The subjects were asked to keep the shotgun fully inserted in the bag, put the barrel of the shotgun at their heart and, keeping the shotgun at a 90-degree angle, continue to zip the bag closed and determine whether they could reach the trigger. None of the subjects were able to maintain the shotgun in that position while zipping the case. None of the fifteen subjects was able to reach the trigger of the shotgun while zipping the case without significantly changing the angle of the muzzle to their chest.

        f.    An FBI Special Agent conducted testing to determine, by comparison to photographs from the scene of the death, the approximate position of the shotgun muzzle within the soft case at the time of discharge, as well as the resulting shot patterns created by firing the shotgun with the case over the barrel at various distances.  These patterns were then provided to an expert forensic medical examiner, who determined that the patterns most likely matching the wound observed in photographs of the body were created by a shot from a distance of between two and three and one-half feet.  At that distance, there is reason to believe that Bianca Rudolph was not killed by an accidental discharge as stated by LAWRENCE RUDOLPH.

        g.    COLORADO MEDICAL EXAMINER, whose identity is known to me, is a medical doctor board-certified in anatomic and forensic pathology who has performed over 7,000 autopsies while serving as a medical examiner in several jurisdictions.  COLORADO MEDICAL EXAMINER reviewed, among other materials, photographs of Bianca Rudolph at the scene of her death, the photographs taken by CONSULAR CHIEF, the report of the ZAMBIAN FORENSIC PATHOLOGIST, and the analysis referenced in the prior paragraph.

COLORADO MEDICAL EXAMINER concluded as follows:

> *In my opinion, it would be physically impossible to accidentally fire this shotgun in its carrying case and produce the entrance defect noted on the body of Ms. Rudolph.  The tip of the carrying case was most likely at least two feet from Ms. Randolph when the weapon was discharged regardless if it was on cylinder or full choke settings.  Further, it would be extremely difficult, if not impossible, for Ms. Rudolph to reach the trigger of this weapon even if it was placed in the case with the muzzle pressed against her chest*

## **STATEMENT OF PROBABLE CAUSE**

For the reasons set forth above, I submit there is probable cause to believe that on or about January 18, 2017, LAWRENCE RUDOLPH, having devised and intended to devise a scheme and artifice to defraud and to obtain, by means of material false and fraudulent pretenses, representations and promises, money and property, for the purpose of executing such scheme and artifice, did deliver and cause to be delivered by means of commercial interstate carrier, namely Federal Express, according to the direction thereon, a matter and thing, namely a package containing documents related to a life insurance claim, all in violation of 18 U.S.C. § 1341.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Respectfully Submitted,

*s/ Donald Peterson*
Donald Peterson
Special Agent
Federal Bureau of Investigation

Sworn to before me this 16th day of December 2021.

*Michael E. Hegarty*
Hon. Michael E. Hegarty
United States Magistrate Judge

**Reviewed and submitted by Bryan David Fields, Assistant United States Attorney.**

21