IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 21-mj-209

UNITED STATES OF AMERICA,

vs.

LAWRENCE RUDOLPH,

_____/

**LAWRENCE RUDOLPH'S RESPONSE IN OPPOSITION TO THE GOVERNMENT'S MOTION FOR PRETRIAL DETENTION**

Pre-trial detention for Dr. Larry Rudolph is, to be blunt, absurd. Dr. Rudolph is turning 67 this week, is a well-known and well-respected dentist, has no criminal history, and is suffering from serious medical issues that put him at extreme risk (particularly with COVID running rampant in the jails). He also has known about this investigation for 5 years and hasn't fled and has not transferred his assets to other individuals or overseas locations. But perhaps most importantly – <u>he is innocent. He did not murder his wife of 34 years</u>. The Court need not take our word for it – the country in which this tragedy occurred did its own investigation and determined that Bianca Rudolph died accidentally. The insurance companies who paid the life insurance in this case investigated and agreed that Bianca Rudolph died accidentally. For good reason: there is no physical evidence—**none**—that support the Government's speculative theories. Larry Rudolph is not a risk of flight and he is not a danger to the community. He should be released on a reasonable bond.

The Government filed its motion the afternoon before the detention hearing. We will do our best to correct some gross misstatements concerning the facts and the law in this response, but respectfully request that the Court hear us on these issues at the detention hearing.

1. **The Government is wrong to suggest that there is a rebuttable presumption against bail in this case.** Motion at 13. The Government cites to 18 U.S.C. 3142(f)(1), but that section explains that the Court should conduct "a hearing to determine whether any condition or combination of conditions ... will reasonably assure the appearance of such person as required and the safety of any other person and the community." No presumption against bail exists under this section. The presumption section is Title 18 U.S.C. Section 3142**(e)**, which contains three categories of criminal offenses – **none of which are present here (even the government will agree on this)** – that give rise to the rebuttable presumption.

Although the Government cites to the unpublished case of *United States v. Gonzalez*, 149 F.3d 1192 (10th Cir. 1998), it fails to inform the Court that Gonzalez, unlike Dr. Rudolph, actually met the requirements of 18 U.S.C. 3142(e).

2. **The Government is wrong that the "weight of the evidence is heavy." Motion at 9, 13.** We will address this point in detail at the hearing. Needless to say, the authorities from another country determined that this tragic death was not a homicide and that it was an accident. The insurance companies concurred after conducting their own independent investigation and paid the claims. The FBI has

been investigating for 5 years. It failed to inform this Court that it hired a blood spatter expert who viewed the pictures and determined that the evidence was inconclusive. In fact, there is **no** physical evidence to support the Government's claims. The Government also failed to inform this Court that it interviewed numerous witnesses who actually participated in the various hunts with the Rudolphs and those people informed the Government that Bianca Rudolph was absolutely not an expert with guns, did not load or unload guns, was not familiar with shotguns, and although she "pointed and shot" hunting rifles when they were handed to her, she was anxious about this particular hunt. The Government withheld from this Court that the gun at issue in this case malfunctioned during the hunt and jammed. Weak isn't a sufficient adjective to describe this case. It is appallingly lacking in **any** evidence. There are no eye-witnesses, no fingerprints, no blood spatter on Dr. Rudolph, no gun-shot residue. There is nothing to support the great speculative and theoretical leaps that the Government wants to engage in -- that Dr. Rudolph fired a shotgun with premeditation **through a gun case** within feet of numerous witnesses, none of whom heard an argument or scream prior to the shot, and who had only witnessed a loving relationship between the couple in the 2 weeks prior to the tragedy (and on previous trips). Forget about "heavy," there is **no** evidence in this case that demonstrates that Dr. Rudolph was the shooter.

3. **The Government is wrong that "[t]here are few deep and meaningful connections requiring the defendant to remain in the United States."**

Motion at 13. This is a real head-scratcher. Dr. Rudolph's two children live here in the United States. His son, Julian, is a lawyer in Miami. And his daughter, AnaBianca, is a dentist at his practice in Pittsburgh. In fact, AnaBianca is getting married in April and is looking to quickly have children. Dr. Rudolph lives with his significant other in Arizona, where he owns his home. Not only is Dr. Rudolph willing to pledge his home and other property as collateral, his children (also the decedent's children) are also willing to post their homes as collateral. Dr. Rudolph has known about this investigation for 5 years. He has never fled. Just the opposite – he engaged counsel, who reached out to the Government so that we could present evidence of Dr. Rudolph's innocence. The Government refused to meet with us. They did not want to hear about the exculpatory evidence. They were on a mission to charge. And they were on a mission to charge here in Denver, which has no connection to the events in Zambia, Bianca Rudolph, or Dr. Rudolph.[1]

4.     **The Government is wrong that he "has previously taken steps to obstruct investigation into this crime."** Motion at 13. It is important to remember that Dr. Rudolph only proceeded with the cremation *after* the Zambian investigation

---

[1] The Government manufactured venue in Denver by waiting for Dr. Rudolph to travel to Mexico, having him arrested there, and transporting him directly to Denver. They did so under the theory that venue lies for a foreign murder case in the District in which the defendant is "found." If they had arrested him at his home in Phoenix or at work in Pittsburgh, they would have been stuck in those districts. Instead, they had agents hop on a plane with Dr. Rudolph over the holidays when he was traveling for vacation and had him arrested when he landed in Mexico, so that they could "find" him in Denver when he was returned there. It's really outrageous.

had concluded and determined that this was an accident. There was no U.S. investigation occurring or even contemplated. The Government ascribes sinister motives to wanting to bring a spouse's ashes back to the United States instead of a body with self-inflicted bullet holes and that was cut open and sewn back together by Zambian authorities after an autopsy. The Government's assumptions about the motives for cremation are just that – assumptions that are unsupported by any actual evidence. We will address this in more detail in Court at the hearing.

5. **The Government is wrong that Dr. Rudolph is "a danger to the community."** Motion at 13. Even assuming that the disgruntled employees that have a bone to pick with Dr. Rudolph could be trusted and believed (they should not be!), the assertion that he has a temper at work or got into a fight with an employee over 6 years ago does not make him a danger to the community. Certainly there are conditions that can be set that will assure he will have no contact with any potential witness in this case. And during the pendency of the FBI's probe, Dr. Rudolph has not attempted to obstruct the investigation. In any event, the Government has known about the allegations regarding employees for years and has done nothing about them. It must not have believed that Dr. Rudolph was a danger during this time. The truth is that he is not a violent person. Not one witness ever saw Dr. Rudolph violent with his wife (and the FBI asked every single witness about this). The Government has alleged that Dr. Rudolph killed his wife so that he could have an affair and collect insurance. As we have said, this is the weakest case we have

seen, but how could these allegations under this theory make him a danger to others. Under the Government's theory, he was only a danger to his wife, not others. In any event, the Government's theory is not supported.

6. **The Court should also consider granting bail because of the risks of COVID-19 to Dr. Rudolph and because preparing for a murder trial during COVID-19 with a detained defendant is virtually impossible.**

> For many during the pandemic, the only way out of federal prison has been in an ambulance…Prisoners say that during the pandemic, they became de facto nurses—with no training or protective gear—caring for men "going in and out of consciousness, throwing up, trembling, cold sweats, fever, spitting up blood when they cough,"…"I begged them to let me die."[2]

Dr. Rudolph's medical conditions – he has a severe heart problem that requires 24-hour monitoring by an app on his phone that is connected to the Mayo clinic – put him at great risk to die if he contracts COVID-19. In addition, the pandemic has made it extremely difficult for pretrial detainees to prepare for trial (this case is certainly a trial) especially for out-of-town lawyers.

There are not sufficient words to describe COVID-19 and its effects on our society and our prison system. But the lethal global pandemic certainly is an "exceptional reason" under the bail statute. Throughout the pandemic, prisons have been some of the most contagious hotspots in the country. Inmates have experienced COVID-19 at rates more than triple that of their non-incarcerated peers and died of

---

[2] The Marshall Project, *"I Begged Them To Let Me Die": How Federal Prisons Became Coronavirus Death Traps* (June 18, 2020).

the virus at a rate more than twice as high. *See* UCLA Law, *Covid Behind Bars Data Project*, available at: https://uclacovidbehindbars.org/. Last winter was especially dangerous in prison facilities: from the middle of December through February alone, more than 100,000 incarcerated people tested positive for COVID-19 and at least 727 people were reported to have died of the virus. As the Omicron variant has reignited the pandemic this winter, the surge in infections and fatalities for inmates is imminent.

The Omicron variant now makes up a majority of COVID-19 cases in the United States according to the Centers for Disease Control and Prevention. This spike is a daunting increase from 12.6 percent of cases just one week earlier and shows how rapid the spread of the variant is. The Omicron variant is highly transmissible, with officials bracing for a large wave of infections in the coming weeks, prison inmates remain particularly vulnerable.

Federal courts have recognized that one way to mitigate the rampant spread of the virus and death toll in prisons is to decrease the prison population by granting bail and release where, like here, the law allows. Federal courts across the country are granting bail and other relief based on the serious threat COVID-19 poses for inmates, as well as the unfairly arduous and overly-punitive conditions inmates incarcerated during the pandemic must endure:

· *In re Manrigue*, 2020 WL 1307109 (N.D. Cal. Mar. 19, 2020) ("The risk that this vulnerable person will contract COVID-19 while in jail is a special circumstance that warrants bail.").

- *United States v. Mcrae,* No. 17 Cr. 643, 2021 WL 142277, at *4-5 (S.D.N.Y. Jan. 15, 2021) (granting release: "[The defendant's] term in custody has proven more arduous than the Court intended—or anyone could have anticipated. That is because, for the past 10 months, [the defendant] has been incarcerated during the unprecedented worldwide pandemic…[A] day spent in prison under extreme lockdown and in well-founded fear of contracting a once-in-a-century deadly virus exacts a price on a prisoner beyond that imposed by an ordinary day in prison. While such conditions are not intended as punishment, incarceration in such circumstances is, unavoidably, experienced as more punishing.").

- *United States v. Ciprian*, No. 11 Cr. 1032-74 (PAE), 2021 U.S. Dist. LEXIS 18698, at *8 (S.D.N.Y. Feb. 1, 2021) (granting release: "The crowded nature of federal prisons in particular presents an outsized risk that the COVID-19 contagion, once it gains entry, will spread. In that respect, COVID-19 poses a heightened health risk to all inmates. Beyond the risks to health, the pandemic has also subjected all inmates…to far more restrictive conditions of confinement…far beyond what could have been expected at sentencing. For these reasons…various courts…have ordered the temporary release of inmates held in pretrial or presentencing custody and the compassionate release of high-risk inmates serving federal sentences.").

- *United States v. Rodriguez*, 492 F.Supp.3d 306, 311 (S.D.N.Y. 2020) (granting release: "[T]he pandemic, aside from posing a threat to [a defendant's] health, has made [the defendant's] incarceration harsher and more punitive than would otherwise have been the case. This is because the federal prisons, as 'prime candidates' for the spread of the virus…have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal.").

- *United States v. Abovyan*, No. 18-80122-cr-Middlebrooks, Dkt. No. 325 (S.D. Fla. July 23, 2020) (granting bond pending appeal on motion for reconsideration and finding that, "The situation is extremely grave with thousands of cases reported daily and the number of deaths rapidly increasing…There is little ability to socially distance and…a shortage of protective equipment...These circumstances constitute an exceptional reason for release pending appeal").

- *United States v. Creek*, Case No. 20-4251, Dkt. No. 18 (4th Cir. Apr. 15, 2020) (remanding denial of bail for the "purpose of having the district court consider in the first instance the severity of the risk that the COVID-19 virus poses to the defendant").

- *United States v. Chavol*, No. 20-50075(9th Cir. Apr. 2, 2020) (granting bail).

- *United States v. Ramirez-Rodriguez*, Case No. 20-cr-28, Dkt. No. 42 (D. Minn. Apr. 14, 2020) (releasing 53-year-old undocumented diabetic immigrant with 15 prior removals from jail with no confirmed COVID-19 cases because "it is just a matter of time before the first case is identified").

- *United States v. Sharp*, No. 19-cr-03, Dkt. No. 45 (D. Mont. Apr. 14, 2020) (extending deadline for self-surrender by 90 days "in light of the COVID-19 pandemic and the rapidly evolving public health situation in federal detention facilities").

- *United States v. Cole*, No. 2:08-cr-102-SRB, Dkt. No. 87 (D. Ariz. Apr. 13, 2020) ("[E]ven with all recommended precautions, residents and staff at a facility [] are at a higher risk for spread of the virus. Solely based on this increased risk of harm to Defendant, the Court finds that the previously ordered 180 day confinement in a residential re-entry center should not be implemented at this time[.]").

- *United States v. Mahan*, Case No. 1:19-cr-233-DCN, Dkt. No. 67 (D. Idaho Apr. 10, 2020) (releasing 36-year-old asthmatic defendant with significant criminal history, including aggravated assault and parole violations, charged in 10-year mandatory minimum drug case due to compelling risk posed by COVID-19).

- *United States v. Avenatti*, Case No. 19-0610JVS; Dkt. No. 140 (C.D. Cal. Apr. 10, 2020) (granting bail for celebrity lawyer after bond revoked and after losing federal fraud trial in another district).

- *Rose v. Baker,* No. 17-15009, Dkt. No. 62 (9th Cir. Apr. 9, 2020) (granting bail pending resolution of habeas case and noting that COVID-19 is "a global crisis...that is heightened for [] prisoners" one of "the most vulnerable groups among us" (quoting *Coleman v. Newsom*, 2020 WL 1675775 (E.D. Cal / N.D. Cal. 2020)).

- *United States v. Nkanga*, 18-cr-713, Dkt. No. 120 (S.D.N.Y. Apr. 7, 2020) (granting bail pending adjudication of habeas petition in light of "the precise timing of the sentencing proceeding...in relation to the emerging COVID-19 pandemic").

- *United States v. Tovar*, No. 1:19-cr-341-DCN, Dkt. No. 42 (D. Idaho Apr. 2, 2020) (releasing defendant previously detained in presumption case after finding COVID-19 a compelling basis for release under § 3142(i)).

- *United States v. Campos*, No. 4:20-cr-56, Dkt. No. 22 (D. Ariz. Apr. 2, 2020) (finding that COVID-19 is a changed circumstance justifying pretrial release for defendant where defendant face a 20-year mandatory minimum and had ties to foreign country, accused of trafficking 24 kilograms of cocaine).

- *United States v. Davis*, No. 1:20-cr-9-ELH, Dkt. No. 21 (D. Md. Mar. 30, 2020) (releasing defendant due to the "urgent priority" of decarcerating, to protect both the defendant and the community, and to preserve Sixth Amendment rights in this perilous time).

- *United States v. Mclean*, No. 19-cr-380, Dkt. No. (D.D.C. Mar. 28, 2020) ("As counsel for the Defendant candidly concedes, the facts and evidence that the Court previously weighed in concluding that Defendant posed a danger to the community have not changed – with one exception. That one exception – COVID-19 – however, not only rebuts the statutory presumption of dangerousness, see 18 U.S.C. § 3142(e), but tilts the balance in favor of release.").

- *United States v. Hector*, Case No. 2:18-cr-3-002, Dkt. No. 748 (W.D. Va. Mar. 27, 2020) (granting release pending sentencing after Fourth Circuit remanded detention decision requiring court to specifically consider extraordinary danger posed by COVID-19 to inmates in prison).

- *United States v. Kennedy*, No. 5:18-cr-20315, Dkt. No. 77 (E.D. Mich. Mar. 27, 2020) (post-plea presentence release of defendant whose pretrial release was revoked because "the COVID-19 pandemic constitutes an independent compelling reason" for temporary release).

- *United States v. Jaffee*, No. 19-cr-88 (D.D.C. Mar. 26, 2020) (releasing defendant with criminal history in gun and drug case, citing "palpable" risk of spread in jail and "real" risk of "overburdening the jail's healthcare resources;" "the Court is . . . convinced that incarcerating the defendant while the current COVID-19 crisis continues to expand poses a greater risk to community safety than posed by Defendant's release to home confinement").

- *United States v. Harris*, No. 19-cr-356 (D.D.C. Mar. 26, 2020) ("The Court is convinced that incarcerating Defendant while the current

MARKUS/MOSS PLLC
–10–

> COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on . . . strict conditions.").

- *United States v. Michaels*, 8:16-cr-76-JVS, Dkt. No. 1061 (C.D. Cal. Mar. 26, 2020) ("Michaels has demonstrated that the Covid-19 virus and its effects in California constitute 'another compelling reason'" justifying temporary release under § 3142(i).).

These decisions have recognized that home confinement is "significantly better" than custody "where despite the BOP's best efforts, [an inmate] is constantly at risk from contamination both from within and without the prison walls, and where access to [personal protective equipment] for inmates is essentially nonexistent." United *States v. Resnik*, 2020 WL 1651508 at 14 (S.D.N.Y. Apr. 2, 2020). As explained by one district judge who granted bond pending a habeas petition:

> Those detained in jails and prisons face particularly grave danger. Realistically, the best — perhaps the only — way to mitigate the damage and reduce the death toll is to decrease the jail and prison population by releasing as many people as possible. Many jurisdictions have begun doing just that. So, too, have judges begun granting bail in individual cases where the law allows them to do so.

*Nkanga*, No. 18-CR-713 (JMF) (S.D.N.Y. Mar. 31, 2020) (internal citations omitted); *see also "A Storm is Coming": Fears of an Inmate Epidemic as the Virus Spreads in the Jails,* N.Y. Times (Mar. 20, 2020), (quoting the New York City jail system Chief Medical Officer: "A storm is coming ... Please let as many out as you possibly can.").

Rather than contributing to the already-crowded prison system, Dr. Rudolph is the ideal candidate for bail; he is a 66-year old doctor being charged on a 5-year old, weak case. The potentially lethal threat that COVID-19 poses to prison inmates

weighs heavily in favor of his release.

For the foregoing reasons, Larry Rudolph respectfully requests reasonable bail.

                                                Respectfully submitted,

**MARKUS/MOSS PLLC**
40 N.W. Third Street
Penthouse One
Miami, Florida 33128
Tel: (305) 379-6667
Fax: (305) 379-6668
markuslaw.com

By:   <u>/s/ David Oscar Markus</u>
       David Oscar Markus
       Florida Bar Number 119318
       dmarkus@markuslaw.com