```
 1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF COLORADO
 2

 3   UNITED STATES OF AMERICA,    .   Case No.  21-mj-00209-MEH
                                  .
 4            Plaintiff,          .
                                  .
 5   vs.                          .
                                  .
 6   LAWRENCE RUDOLPH,            .   Alfred A. Arraj Courthouse
                                  .   901 19th Street
 7                                .   Denver, CO  80294
              Defendant.          .
 8                                .   January 4, 2022
                                  .   10:15 a.m.
 9   . . . . . . . . . . . . . . .
```

10          **TRANSCRIPT OF PROCEEDINGS HELD BEFORE THE HONORABLE**
            **KRISTEN L. MIX, UNITED STATES MAGISTRATE JUDGE**

11   APPEARANCES:

12
     For the Plaintiff:              United States District
13                                      Attorney's Office-Denver
                                     By:  Edwin Garreth Winstead,
14                                   III*
                                     By:  Kurt Bohn
15                                   1225 17th Street
                                     Suite 700
16                                   Denver, CO  80202
                                     (303) 454-0322
17
     For the Defendant:              Markus/Moss PLLC
18                                   By:  David Oscar Markus
                                     By:  Anita Margot Moss
19                                   40 NW Third Street
                                     Penthouse One
20                                   Miami, FL  33128
                                     (305) 379-6661
21
     Court Recorder:                 Clerk's Office
22                                   U.S. District Court
                                     901 19th Street
23                                   Denver, CO  80294

24   Also Present:                   Carlos Morales

25
```

1    Transcription Service:              AB Litigation Services
                                         216 16th Street, Suite 600
2                                        Denver, CO  80202
                                         (303) 296-0017
3

4    *By phone.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25   Proceedings recorded by electronic sound recording;
     transcript produced by transcription service.

1                                    INDEX

2

      WITNESS                    Direct    Cross   Re-Direct   Re-Cross
3
      DONALD PETERSON
4
      By Mr. Winstead      12
5     By Mr. Markus                        82

6


7     EXHIBITS:          IDENTIFIED           ADMITTED

8     GOVERNMENT'S:
      No. 4                --                   16
9     No. 1                --                   71
      No. 2                --                   71
10    No. 3                --                   71
      No. 5                --                   71
11

12    DEFENDANT'S:

13    A                  87                     90
      B                 123                    123
14

15

16

17

18

19

20

21

22

23

24

25

4

1              (Time Noted:  10:15 a.m.)

2              THE COURT:  Case Number 21-mj-00209, the *United*

3    *States of America versus Lawrence Rudolph*.

4              Let's have counsel enter appearances, please.

5              MR. WINSTEAD:  Good morning, Your Honor.  Garreth

6    Winstead for the United States.  With me in spirit at counsel

7    table is Kurt Bohn, also from our office.  He is the attorney

8    handling the forfeiture portion of this case.

9              THE COURT:  All right.

10             MR. BOHN:  Good morning, Your Honor.

11             THE COURT:  Good morning.

12             And good morning, Mr. Winstead.

13             Let me ask defense counsel to enter their

14   appearances, please.

15             MR. MARKUS:  Good morning, Your Honor.  My name is

16   David Markus.  My partner, Margot Moss, is to my left, and

17   our client, Doctor Rudolph, is here.  Good morning.

18             THE COURT:  Good morning.

19             MR. MARKUS:  Also here is his son, Julian Rudolph,

20   his significant other, Lori Milliron.

21             THE COURT:  All right.  Good morning.

22             All right.  We are here for a detention hearing

23   with respect to, Doctor Rudolph.  I have received and

24   reviewed a pretrial services report, as well as the

25   government's --

 1                    THE COURT CLERK:  Your Honor?

 2                    THE COURT:  Yes?

 3                    THE COURT CLERK:  I apologize for interrupting.

 4  It's my understanding that this case is still sealed.

 5                    THE COURT:  Yes.

 6                    THE COURT CLERK:  I don't know if Your Honor wants

 7  me to clear the courtroom.

 8                    THE COURT:  I was going to do that in just a

 9  moment.

10                    THE COURT CLERK:  Okay.

11                    THE COURT:  Let me just --

12                    THE COURT CLERK:  Sorry.

13                    THE COURT:  That's all right.  Let me just

14  continue saying what I've received and reviewed in addition

15  to the pretrial services report.

16                    The government's motion for the order of detention

17  and the exhibits, and Doctor Rudolph's response in opposition

18  to the government's motion for detention.

19                    The case is still under seal, Mr. Winstead, and is

20  it the government's intention to move to lift the seal or

21  not?

22                    MR. WINSTEAD:  Your Honor, the previous motions to

23  seal, our motions to seal the documents within the case that

24  contain, you know, substantial recitations of facts, and the

25  basis for those motions, was that there was an ongoing

1   investigation and that preventing interference with the

2   investigation by making those facts publicly available

3   warranted further restriction of those documents.

4          I don't believe that there is a basis for the

5   hearing to be sealed.  We were planning on requesting that

6   potential witnesses be sequestered during the presentation of

7   evidence.  But, otherwise, I believe that the sealing was

8   relevant to the recitations of facts in the documents within

9   the case.

10         THE COURT:  All right.  So then I'll take that as

11  the government's motion to unseal the case for purposes of

12  the hearing only at this juncture.

13         Is there any objection to that from defense

14  counsel, Mr. Markus?

15         MR. MARKUS:  No, Your Honor.

16         THE COURT:  All right.  Thank you.  Then the

17  hearing is unsealed.  Thank you.

18         And, Mr. Winstead, are you prepared to proceed?

19         MR. WINSTEAD:  Yes, Your Honor.

20         THE COURT:  All right.  I'm going to ask you to

21  reserve arguments until the end.  As I said, I have read the

22  briefing filed by the parties.  I have an understanding of

23  what the parties' respective positions are from the briefs,

24  so let's proceed with witnesses.

25         If the government would please call its first

1  witness?

2          MR. WINSTEAD:  Okay.  Thank you, Your Honor.  The

3  government would call Special Agent Donald Peterson.

4          THE COURT:  All right.  Special Agent Peterson,

5  good morning.  If you could come forward and please stand in

6  front of the witness stand and raise your right hand?

7          Do you solemnly swear or affirm under the penalty

8  of perjury that the testimony you will give in this matter

9  today will be the truth, the whole truth, and nothing but the

10  truth?

11          MR. PETERSON:  I do.

12          THE COURT:  Thank you.  Please be seated.  Speak

13  into the microphone.

14          And whenever you're ready, Mr. Winstead.

15          MR. WINSTEAD:  Thank you, Your Honor.  And as I

16  had mentioned previously, we would like to move for

17  sequestration of potential witnesses.

18          THE COURT:  Yes.

19          MR. WINSTEAD:  I'm not exactly sure who is in the

20  courtroom, but I know that there is one potential government

21  witness, Special Agent Dahlstrom (phonetic), and I believe

22  that the Defendant's son and significant other also fall

23  within that category.  Would it be possible to have them

24  sequestered for Agent Dahlstrom's (sic) testimony?

25          THE COURT:  All right.  Let me ask Defense Counsel

1  if there is an objection to that motion, as well.

2        MR. MARKUS:  Yes, Your Honor.  We would object to

3  having the son and his significant other excluded.  They want

4  to be here to support their dad and their significant other,

5  and so they would like to be present.

6        I would also say that I think the government has

7  informed the son that he is a victim in the case.  We don't

8  agree with that, of course, but the government has taken

9  that, and I think victims have certain rights to be present,

10 including at a bond hearing.

11        THE COURT:  Mr. Winstead, do you want to respond

12 to the argument that the son is a victim and, therefore, has

13 a right to be present?

14        MR. WINSTEAD:  It is true that he is a victim and,

15 therefore, has victim's rights, and is also potentially a

16 witness.  And so those are -- those are all true, yes, Your

17 Honor.

18        THE COURT:  All right.  Well, what I'm inclined to

19 do is I am inclined to exclude witnesses other than victims.

20 And to the extent that the son, whose name, I'm sorry, I

21 don't have in front of me immediately, is represented by the

22 government to be a victim, he may remain in the courtroom.

23 However, all other witnesses expected to testify on behalf of

24 either the government or the defendant, must step outside the

25 courtroom.

1          You can use the witness rooms which are

2  immediately outside this set of double doors.  You may

3  certainly remain in the hallway.  But I'd like you to step

4  out of the courtroom until called.

5          MR. MARKUS:  And, Your Honor, just to be clear.

6  We don't intend to call either of these individuals here.  I

7  don't know if the government intends to, but we do not.

8          THE COURT:  All right.

9          Does the government intend to call the significant

10 other, Defendant's significant other?

11         MR. WINSTEAD:  No, Your Honor.

12         THE COURT:  All right.

13         Then you may remain as well, ma'am.

14         All right.  And what about the other special

15 agent?

16         MR. WINSTEAD:  I'm sorry, I may have misunderstood

17 you.  We're not intending to call them at this hearing.  We

18 do believe that they are witnesses in the larger -- or that

19 she's a witness in the larger case.

20         THE COURT:  I'm not going to deal with

21 sequestration for the purposes of potential future hearings,

22 Mr. Winstead, only for this hearing.

23         MR. WINSTEAD:  Okay.

24         THE COURT:  If you don't intend to call her as a

25 witness in this hearing, she may remain.

1              What about the special agent?

2              MR. WINSTEAD:  Okay.

3              THE COURT:  Is the other special agent already

4    outside, Mr. Bohn?

5              MR. BOHN:  Yes.

6              THE COURT:  All right.  Thank you.

7              All right.  I think we're all good, then, with

8    respect to sequestration, and you may proceed, Mr. Winstead.

9              MR. WINSTEAD:  Thank you, Your Honor.

10             And, Your Honor, in order to determine how best to

11   provide the Court with what the Court would like to have in

12   order to make this decision, obviously this is a relatively

13   complex case and there is a large amount of information.  As

14   of right now, as the Court mentioned, there is a motion for

15   detention with a factual proffer.  That motion also

16   incorporates the complaint affidavit, both of which contain

17   substantial facts about the case.

18             It's the United States' view that the relevance of

19   a lot of those details about the case primarily go to the

20   assessment of the strength of the evidence which was heavily

21   relied upon in the Defense's response in requisition to

22   detention.  I believe that, you know, the government

23   obviously has a responsibility to put on all of the evidence

24   that we believe necessary for the Court to consider, but this

25   could be a extremely long hearing, or it could be a shorter

1  hearing, depending upon how -- if the Court wanted to sort of

2  give any guidance about whether you were expecting us to be

3  relatively short on those facts, or what do you anticipate us

4  going in depth.

5              THE COURT:  Well, I appreciate the heads-up, Mr.

6  Winstead.  I want you to make your record, and I leave it to

7  you in your wisdom, and based on your experience, to do that

8  as you see fit.  Also, of course, the same goes for

9  Defendant.  The Defendant may make its record as it sees fit.

10             The attorneys who are local know that I do like to

11 take a lunch.  Occasionally, it's a bad thing for me not to

12 eat on time.  So we'll see how it goes.  It's 10:25.  If, you

13 know, we're running closer to noon or 12:30 and we feel that

14 we all need a break and need to break for lunch then that's

15 what we'll do.  But let's just play it by ear and please put

16 your record on.

17             Also, let me ask Ms. Galera, do we have a note on

18 the door outside the courtroom as to sequestration?

19             THE COURT CLERK:  No, Your Honor.  But I'll put

20 that up.

21             THE COURT:  If you would put that up, I would

22 appreciate it.

23             We have some folks in the back of the room.  I

24 recognize Mr. Kirsch (phonetic).  And is that Mr. Rowling,

25 (phonetic) as well?

1          UNIDENTIFIED MALE:  Yes, Your Honor.

2          THE COURT:  All right.  Thank you.  These

3    gentlemen are from the United States Attorney's Office and

4    are not, I don't think, going to be witnesses in the case,

5    so.

6          But if you could put a sign up, Ms. Galera, I

7    would appreciate that.

8          THE COURT CLERK:  Certainly, Your Honor.

9          THE COURT:  All right.  Thank you.

10          All right.  And, Mr. Winstead, I think we are

11   ready to proceed, then.

12          MR. WINSTEAD:  Thank you very much, Your Honor.

13      Whereupon,

14                     DONALD PETERSON

15      was duly sworn.

16                    DIRECT EXAMINATION

17      BY MR. WINSTEAD:

18      Q.   Special Agent Dahlstrom (sic), can you hear me?

19          THE COURT:  It's Special Agent Peterson.

20          MR. WINSTEAD:  Oh, excuse me.  Sorry about that.

21   Dahlstrom is out special in the (unintelligible).

22      BY MR. WINSTEAD:

23      Q.   Special Agent Peterson, can you hear me?

24      A.   Yes, I can.

25      Q.   Can you please say your name and spell your last

1    name for the record?

2         A.    Yes.   My name is Donald Peterson.   The last name

3    is P-E-T-E-R-S-O-N.

4         Q.    Where do you work?

5         A.    I am a special agent with the FBI assigned to the

6    Denver Division Safe Streets Task Force.

7         Q.    What are your duties there?

8         A.    I am responsible for investigating violent crime

9    in the area of responsibility of the Denver division.

10        Q.    Were you involved with investigating the

11   particular case that we're dealing with today?

12        A.    Yes, I am.

13        Q.    Can you tell me -- can you tell me what event

14   happened in 2016 that has spawned this case?

15        A.    Yes.   In 2016, Bianca Rudolph was on a hunting

16   trip with her husband, Lawrence Rudolph.   And at the

17   conclusion of that hunting trip, she died as a result of

18   hemorrhagic shock to the heart and lungs that were caused by

19   a shotgun.

20        Q.    Do you recall the date that that happened?

21        A.    Yes.   It was the 11th of October.

22        Q.    In 2016?

23        A.    That's correct.

24        Q.    What country was that in?

25        A.    It was in Zambia.

1    Q.   Are both the victim and this defendant U.S.
2  citizens?
3    A.   Yes.  They were, and they are.
4    Q.   All right.  Now, were you able to determine in
5  your investigation whether you believe that the victim's
6  death was accidental?
7    A.   Yes.  I was able to --
8    Q.   What do you believe --
9    A.   -- make that determination.
10    Q.   What do you believe about the cause of the
11  victim's death?
12    A.   I believe the victim's death was the result of a
13  homicide.  It was not an accident or a suicide.
14    Q.   All right.  So I'd like to ask you a little bit
15  about the particular circumstances of the death.  What were
16  you able to learn as far as how the death occurred and who
17  was around and things of that nature?
18    A.   Yes.  The death occurred in a small hunting lodge.
19  It's essentially a studio that is comprised of a bedroom with
20  an adjacent attached bathroom facility.  And like I said, it
21  was the conclusion of a hunting trip.  It was the last
22  morning of the trip.  The Rudolph's were packing and
23  preparing to leave Africa and return to the United States.
24  And Bianca Rudolph was killed by a shotgun that was inserted
25  fully into a soft-sided gun case and zipped partially,

1   approximately, halfway.

2          She was shot directly in the heart, on the left

3   side of her torso, and the directionality was neither left

4   nor right, not significantly up or down.

5          Q.   So would you say the angle of the firearm was at

6   about a 90 degree angle to the victim's chest?

7          A.   Correct.  Approximately perpendicular to the

8   torso.

9          Q.   Were you able to determine what sort of weapon was

10  used?

11         A.   Yes.

12         Q.   And we'll go more in depth on that in a minute.

13  But, just in general, what sort of firearm was used?

14         A.   It's a Browning A-5, which is a semi-automatic

15  shotgun.  It's a rare model, 1991, Wild Turkey Federation

16  shotgun of the year, of which only 500 were manufactured.

17         Q.   All right.  Once the shot happened -- was this in

18  a remote location?

19         A.   Yes.  At a hunting camp in the Mumbwa District.

20         Q.   What happened after she was shot?

21         A.   As soon as the shotgun was discharged Bianca

22  Rudolph died almost immediately after being shot in the

23  chest, at which point two support staff, one professional

24  hunting guide and the one camp tracker, came into the lodge

25  and observed Mr. Rudolph and -- and Mrs. Rudolph, who was on

1    the floor at the time.

2              MR. WINSTEAD:  At this point I'd like to move to

3    admit Government's Exhibit 4, which has already been

4    submitted to the Court in conjunction with the government's

5    detention memo.

6              THE COURT:  Any objection to 4?

7              MR. MARKUS:  No objection.

8              THE COURT:  Thank you.

9              MR. MARKUS:  No objection.

10             THE COURT:  Exhibit 4 is admitted.

11        (Government's Exhibit 4 was admitted into evidence.)

12             MR. WINSTEAD:  Would it be possible to pull that

13   up on the screen?

14             THE COURT:  We're working on it.

15        BY MR. WINSTEAD:

16        Q.   And while that's happening, sir, have you viewed,

17   previously, Government's Exhibit 4?

18        A.   Yes, I have viewed Exhibit 4.

19        Q.   Can you tell me what it is?

20        (Brief pause)

21             THE COURT:  Do you have it in front of you?

22        BY MR. WINSTEAD:

23        Q.   Can you tell me what the exhibit depicts?

24        A.   Yes.  I do have it in front of me.  It's a

25   photograph taken from inside the hunting lodge that shows the

1  shotgun in the soft-sided case in the foreground, with the

2  larger travel case to the left, and the deceased, Bianca

3  Rudolph, near the bathroom at the far side of the room.

4      Q.   And would you please flip to Page 2 of the

5  exhibit?  What is that?

6      A.   This is another image taken from inside the

7  hunting lodge that shows the deceased, Bianca Rudolph, on the

8  floor, near the bathroom, of the hunting lodge.

9      A.   All right.  The next page.  This is Page 3.

10          THE COURT:  Let me ask just for a moment -- excuse

11  me, Mr. Winstead.  I don't know if you can see these

12  exhibits, but they're coming up on the screen in a sideways

13  fashion.  I don't know whether we have the ability to rotate

14  them so that they're oriented more toward the way they should

15  be.  Thank you.

16          All right.  Go ahead, Mr. Winstead.

17      BY MR. WINSTEAD:

18      Q.   All right.  Can you tell me what's in that

19  picture?

20      A.   Yes.  This is a digital image that shows the soft-

21  sided gun case through which the shotgun was fired.

22      Q.   And what can you see from my tip of the case?

23      A.   I can see that the firearm was discharged while it

24  was inside the case, causing damage to the end of the case,

25  which is consistent with the projectiles being fired through

1   the end of the case causing the damage.

2       Q.   All right.  The next page, please.  This is Page

3   4.  What's on this page?

4       A.   This is an image, again that's taken from inside

5   the hunting lodge.  It shows the shotgun inside the soft-

6   sided, damaged case in the foreground, the packing case to

7   the left.  And towards the rear of the room, it shows the

8   decedent, Bianca Rudolph, covered in a white and black

9   blanket with Mr. Lawrence Rudolph near -- kneeling near the

10  body.

11      Q.   And towards the butt end of the case, is the

12  shotgun visible, present with the case?

13      A.   Yes, it is.

14      Q.   Can you describe what part of the shotgun is

15  visible?

16      A.   It is the butt of the shotgun that's protruding

17  from the end of the case, the part of the shotgun that you

18  would rest in your shoulder pocket when firing.

19      Q.   All right.  And then could you please go to the

20  next page?  What is this a picture of?

21      A.   This is an image of a Browning Auto 5 shotgun, one

22  of the 500 National Wild Turkey Federation 1991 shotguns of

23  the year that I obtained from a private seller in

24  Mississippi.

25      Q.   So, and we can discuss the details a little bit

 1   later, but we were able to determine that this -- the shotgun

 2   pictured here that you obtained was identical to the shotgun

 3   that resulted in the victim's death?

 4        A.   Yes.   It's the same make and model of the shotgun,

 5   one of the 500 that were manufactured.

 6        Q.   All right.   Thank you.

 7             MR. WINSTEAD:   All right.   You can take that

 8   exhibit down now.

 9        BY MR. WINSTEAD:

10        Q.   Sir, you said earlier that you were able to

11   determine in your investigation that she was not killed

12   accidentally.   I'd like to ask you --

13             MR. MARKUS:   That's not what he said.   He said he

14   believed it, not that he determined it.

15             THE COURT:   All right.   Well, to the extent that

16   the question erroneously relates any facts, then I'll expect

17   the witness to respond appropriately.   The objection is

18   overruled.   Go ahead.

19             Will you ask the question again, please?

20             MR. WINSTEAD:   Thank you, sir.

21        BY MR. WINSTEAD:

22        Q.   I'd like to discuss that part of your

23   investigation.   And the first thing I would like to ask is,

24   was there an investigation that was done by Zambian officials

25   in the aftermath of Bianca Rudolph's death?

1    A.   I wouldn't characterize it as an investigation.   I

2  would say there was an initial inquiry that was done upon

3  which conclusions were based.

4    Q.   All right.  Can you tell me -- can you tell me how

5  that inquiry began?

6    A.   Yes.  After Bianca Rudolph's death the

7  professional hunting guide, Mr. Rudolph, and a tracker,

8  traveled together from the scene of her death to the police

9  department to report her death.  And then the police and

10  investigators returned to the cabin, hours later, with Mr.

11  Rudolph and the professional hunting guide, to begin their --

12  their inquiry.

13    Q.   Did the investigators take pictures of the scene?

14    A.   Yes, they did.

15    Q.   Were those pictures a thorough documentation, in

16  your opinion?

17         MR. MARKUS:  Objection.  Leading, Your Honor.

18         THE COURT:  Overruled.  He may answer yes or no.

19         THE WITNESS:  No.  The photos that were taken by

20  the Zambian investigators initially, none of them were in

21  focus, none of them contained a scale, and none of them were

22  taken appropriately perpendicular to the subject of the image

23  that would allow for analysis or investigation to be

24  conducted.

25         BY MR. WINSTEAD:

1    Q.   Was the scene treated in a manner consistent with

2   forensic investigation?

3    A.   No, it was not.

4    Q.   Can you explain how the scene was treated?

5    A.   Yes.  In the images provided by the Zambian police

6   service there are a number of individuals standing in the

7   scene, standing on or near blood spatter patterns.  There

8   were no booties, there was no gloves.  There was no

9   consideration for forensic evidence during that initial

10  inquiry.

11   Q.   Were the original locations of items within the

12  scene documented?

13   A.   Yes, they were documented.

14   Q.   Were they documented in a manner that allowed you

15  to re-create precisely how and where things were when the

16  investigation began?

17   A.   No, they weren't, because items had been moved.

18  Obviously the body had been covered, and like I mentioned

19  previously, the images that were provided to us as part of

20  that inquiry were inadequate at best.

21   Q.   To your knowledge, during the several hours of

22  time between the incidence and the beginning of the

23  investigation, was the scene secured?

24   A.   Not secured in the sense that we would consider

25  secured.  It's documented that they closed and locked the

1    door and left the property.

2         Q.   Were there any forensic examinations done or

3    fingerprints collected, things of that nature?

4         A.   There was an exam done by a forensic firearms

5    examiner.  There were no fingerprints collected.

6         Q.   Was anything checked for gunshot residue or blood

7    stains or DNA, things like that?

8         A.   Not to my knowledge, no.

9         Q.   Are you aware of whether this defendant's hands

10   were tested for gunshot residue?

11        A.   They were not.

12        Q.   Were this defendant's clothes that he was wearing

13   that day gathered and preserved for evidence?

14        A.   No, they were not.

15        Q.   Was Bianca Rudolph's clothes preserved in any way?

16        A.   No.  They were not collected or analyzed.

17        Q.   Aside from the firearms examination that you

18   mentioned before, which I'll ask you about in a moment, was

19   there any other scientific or technical examination done?

20        A.   I would say the only scientific forensic or

21   technical type examinations that were done were the ballistic

22   firearms examination and the postmortem.

23        Q.   With regard to the postmortem, did the individual

24   conducting the postmortem examination have a camera or take

25   any pictures?

1       A.   No.

2       Q.   All right.  You mentioned the firearms, the

3  ballistic forensic examination.  Can you explain what that

4  was?

5       A.   Yes.  The firearm, as well as the expended shot

6  shell and unspent shotgun ammunition, was provided from the

7  scene to the police.  There was an investigator, an examiner,

8  by the last name of Turbasa (phonetic), who conducted the

9  exam to determine that that was, in fact, the firearm that

10 fired the fatal shot.  And during a subsequent interview with

11 Agent Dahlstrom, he also talked about the drop test that he

12 conducted of the shotgun.

13      Q.   Was is a drop test?

14      A.   A drop test is a process during which a forensic

15 firearms examiner uses or takes a loaded firearm and drops it

16 from varying heights, say six inches, one foot, two foot,

17 drop it onto the ground, loaded, so that the butt can impact

18 the ground, to determine if that firearm discharges under

19 those circumstances.

20      Q.   During that drop test, did this firearm discharge?

21      A.   It did not.

22      Q.   All right.  With regard to the pathological

23 examination, can you give me any more details about how that

24 examination went and any conclusions that were arrived at?

25      A.   It was an autopsy conducted by a pathologist, in-

1  country, by the name of Muswahoo (phonetic).  And he, like

2  you said, did not collect photos.  He didn't have a camera at

3  the time so there were no pre-autopsy or photos taken during

4  the course of the autopsy.  And he did issue a final report

5  that described the injury, the damage done to Bianca

6  Rudolph's body, externally as well as internally, and

7  described the entrance wound as being approximately six

8  centimeters in diameter.

9       Q.   Did that report make any conclusions about the

10  nature of the death?

11       A.   The report, the medical examiner's report and the

12  police reports, ruled that the death was accidental.  The

13  firearms report ruled the death as suicidal.  If that's what

14  you're asking.

15       Q.   All right.  Yes, it is.  Thank you.

16            So as far as how that conclusion was come to, you

17  mentioned to Mr. Turbasa, did he provide any information

18  about how and when they decided to conclude that the death

19  was an accident?

20       A.   They were a number of individuals involved in the

21  investigation that provided the timeline as to when they made

22  that determination.  Probably the most significant is the

23  lead investigator on the case by the name of Sidney Chirwa,

24  which is C-H-I-R-W-A, in an interview with Special Agent

25  Dahlstrom said that the determination that this was an

1   accidental death was made on-scene, when they first observed

2   the decedent at the hunting lodge.

3       Q.   And was that before they had received either of

4   the report of the -- the pathological report or the firearms

5   forensic report?

6       A.   Yes.   That was prior to the autopsy being

7   performed and the firearms investigator obtaining the

8   ammunition or the firearm.

9       Q.   Did they conduct any particular investigation

10  beyond the examination of the scene and those two reports, to

11  your knowledge?

12      A.   No.

13      Q.   Did they conduct any interviews?

14      A.   The Zambians did conduct interviews following the

15  death.

16      Q.   Do you know who they interviewed?

17      A.   Yes.

18      Q.   Who was that?

19      A.   Mr. Rudolph was interviewed, the professional

20  hunting guide was interviewed, and the tracker who entered

21  the lodge with the professional hunting guide was also

22  interviewed, initially.

23      Q.   And you have referenced a professional hunting

24  guide, what's his name?

25      A.   His name is Mark Swanepoel.

1    Q.   Was there any investigation into any potential

2  motives for a crime, or anything else of that nature, to your

3  knowledge?

4    A.   No.

5    Q.   All right.  So moving on beyond that

6  investigation.  Can you tell me, aside from the drop test

7  done by them, have you done further investigation into the

8  likelihood that this was an accidental death?

9    A.   Yes.

10    Q.   All right.  So I'd like to ask you a little bit

11  about the investigation you did about the rifle.  So as to

12  that particular rifle, is there some witness testimony that

13  there were -- excuse me, shotgun.  As to that particular

14  shotgun, was there some testimony that it may have been

15  malfunctioning during the hunting trip?

16    A.   Yes.

17    Q.   Do you recall which witness mentioned something

18  about that?

19    A.   Yes, I do.

20    Q.   Who was that?

21    A.   It wasn't Leanne Romm (phonetic), who was the wife

22  at the time, of the professional hunting guide.

23       MR. MARKUS:  Your Honor, I'm sorry to interrupt,

24  but could I make a request?  My client is shackled at the

25  wrist and he's having difficulty writing notes to us.  I

 1  think we're going to be for a while.  Could I ask the

 2  Marshals to undo his wrists so he could write notes to us?

 3          THE COURT:  Does the government have a position on

 4  that, Mr. Winstead?

 5          MR. WINSTEAD:  No objection to that, Your Honor.

 6          THE COURT:  All right.  Thank you.

 7          MR. MARKUS:  Thank you.

 8          THE COURT:  Could somebody from the Marshal's

 9  Service take care of that for us, please?

10          MR. MARKUS:  Thank you, Marshal.  Thank you, Your

11  Honor.

12          THE COURT:  Just a moment, then.  We'll let you

13  know, Mr. Winstead, when we're ready.

14      (Brief pause)

15          THE COURT:  All right.  Whenever you're ready, Mr.

16  Winstead.  Thank you.

17          MR. WINSTEAD:  Thank you, Your Honor.

18      BY MR. WINSTEAD:

19      Q.  All right.  Sir, so the actual shotgun -- oh, no,

20  I'm sorry, going back.  I lost my train of thought.

21          So you said that Mr. Swanepoel's wife at the time

22  made remarks about that shotgun malfunctioning at some point

23  during the hunt?

24      A.  That is correct.

25      Q.  Did you ask Mr. Swanepoel if he recalled any

1   similar things?

2          A.    Yes.

3          Q.    What did he say?

4          A.    He did not recall any similar or any malfunctions

5   at all regarding the shotgun.

6          Q.    Did he have any knowledge about whether the

7   shotgun was functioning properly?

8          A.    Yes, he did.

9          Q.    Well, how did he know that?

10         A.    It's standard practice for Mr. Swanepoel, at the

11  beginning of any safari hunt, to assist the clients with

12  sighting-in, or test firing, the weapons that they bring with

13  them for the hunt, just to determine that they were not

14  damaged during transport and that the weapons are sighted-in

15  correctly.

16              So at the beginning of this safari Mr. Mark

17  Swanapoel, assisted by his father, Peter Swanepoel, fired the

18  shotgun, as well as the rifle, that the Rudolphs had with

19  them to make those determinations.

20         Q.    Did they make any modifications to the shotgun?

21         A.    They did.

22         Q.    What did they do?

23         A.    This particular shotgun, and a lot of similar

24  shotguns, have a preventative block in the tube which

25  prevents more than three rounds of ammunition from being

1    loaded into the weapon, and that's a regulation that's

2    basically required during certain types of hunting, like bird

3    hunting.  So Mr. Mark Swanepoel asked his father, Mr. Peter

4    Swanepoel, to remove that preventative block from the tube to

5    allow additional rounds of ammunition to be loaded into that

6    shotgun.

7         Q.   Why would they want more ammunition in the

8    shotgun?

9         A.   The purpose of the shotgun being on this trip,

10   which is supported by an experience they had on a previous

11   trip, is to provide protection against a wounded leopard

12   specifically, which this group had encountered during a

13   previous hunt during which Ms. Bianca Rudolph shot a leopard

14   but didn't successfully kill it.  So then when the trackers

15   and the guides and the hunters have to go back out to finish

16   killing that animal, you have a wounded leopard that is

17   highly volatile and dangerous.  So the reason to have that

18   shotgun is for protection against those type of instances.

19   So it's better to have more ammunition than three rounds.

20        Q.   Now, during the leopard hunt -- oh, I'm sorry,

21   just really quickly.  You said that it was removed so that

22   five shells could fit in the tube?

23        A.   Correct.  Additional rounds, other than the three

24   that's limited for bird hunting.

25        Q.   On the date of the accident, are you aware of

1  whether the shotgun was fully loaded with those five shell

2  casings, or shells?

3       A.   At the time Bianca Rudolph was shot and killed, it

4  was only loaded with one round of ammunition.

5       Q.   And was that one round of ammunition the one that

6  was discharged?

7       A.   That is correct.

8       Q.   Okay.  All right.  So going back to this.  Did

9  Swanepoel tell you whether there would be a reason to be

10 firing the shotgun on a leopard hunt, except in that

11 emergency situation you just discussed?

12      A.   Yes.  I did speak with Mr. Mark Swanepoel about

13 that.

14      Q.   And what did he -- what did he say?  Would one be

15 shooting a shotgun during the hunt?

16      A.   No.  He said specifically that he prohibits his

17 clients from firing shotguns during a leopard hunt because

18 that would scare the animal out of the area.  So he provided

19 an example of bird hunting with a shotgun in celebration

20 potentially after the hunt was completed, but he specifically

21 told me that he would not allow his clients to discharge a

22 shotgun during a leopard hunt prior to successfully killing

23 the leopard so as to prevent the animal from being scared

24 off.

25      Q.   Was a leopard successfully killed on this hunt?

1         A.    No.

2         Q.    So were you able to obtain the actual shotgun that

3    was -- that was used in this incident?

4         A.    No.

5         Q.    Were you able to determine -- well, you mentioned

6    previously, can you give me a brief recitation of how you

7    obtained a similar or identical shotgun?

8         A.    Yes.  I used the serial number as provided by Mr.

9    Turbasa on his forensic firearms exam to identify the shotgun

10   that caused the death of Bianca Rudolph.  I provided that

11   serial number to legal counsel with Browning Firearms, at

12   which point I was informed by legal counsel of the nature of

13   that weapon, specifically that it was the 1991 commemorative

14   shotgun, and only 500 were manufactured.

15              At that point, I started researching looking for

16   the same make and model shotgun.  I found one at Steve

17   Barnett's Fine Guns in West Point, Mississippi.  I

18   coordinated with agents there in the resident agency to go

19   and purchase the firearm.

20        Q.    All right.  Once you had that, what else did you

21   have to do in order to do a re-creation of this event?

22        A.    We had to match the ammunition that was used, the

23   specific round of ammunition that caused Bianca Rudolph's

24   death.

25        Q.    How did you do that, briefly?

1          A.    Sure.  I provided the photos of the spent hole,

2     which is the plastic piece, as well as the brass cap with the

3     expent primer on the bottom, as well as the head stamp, which

4     is the bottom side of the spent shotshell, to the folks at

5     Federal Ammunition.  Based on the printing, the label on the

6     side, they were able to verify the specific ammunition that

7     that was, and they provided me with approximately 75 rounds

8     of the same ammunition.

9          Q.    All right.  And then was there a final piece to

10    re-create the scene?

11         A.    Yes.  We needed to match and secure the soft-sided

12    case.

13         Q.    How did you do that?

14         A.    We --

15         Q.    Oh, well, sorry.  First, were you able to obtain

16    the actual case from the incident?

17         A.    No.

18         Q.    Okay.  So how did you find the matching one?

19         A.    We contacted ALLEN Company, which fortunately is

20    located -- was located on the west side of Denver.  We took

21    scene images to them.  Their representatives confirmed that

22    it was, in fact, their soft-sided case.  They took us to the

23    manufacturing floor, walked us through that specific case,

24    how it was manufactured, and then provided us with, I want to

25    say over 100 matching soft-sided cases, to be used for

1   testing.

2        Q.   All right.  So I'd like to ask you what testing

3   you did with those things, and I'd like to start with the

4   testing that you did in order to determine the relative

5   locations of the shotgun, the case, and the entry wound.  So

6   can you briefly describe what methodology you used in order

7   to set that test up?

8        A.   Sure.  It was a test that was designed and

9   administered by a Special Agent Steven DeFrance (phonetic),

10  who's a former firearms examiner at the FBI laboratory and

11  the current senior evidence response team leader here in the

12  Denver Division.  And basically what we did is used a fixed

13  location target of cardboard with a shotgun affixed to a rest

14  amount on a table.  And we loaded the shotgun with one round

15  of ammunition each time, placed it inside the soft-sided

16  case.  And the first part was to determine where the shotgun

17  was located inside of the soft siding case.  So was the

18  shotgun 12 inches from the end of the case, or was it in

19  contact with the end of the case, or somewhere between?

20            So we fired several rounds with the shotgun

21  through soft-sided cases to determine where it was located

22  inside that bag.  And we were able to use the scene images to

23  compare to the results we were receiving, and the damage to

24  the bag, to show that the shotgun was fully inserted in the

25  bag at the time of discharge.

1      Q.   All right.  And then what was the second part?

2      A.   The second part after we determined where the

3   shotgun was located in the bag was to make a distance

4   determination from muzzle to target.  So as I described, we

5   used that target with the shotgun affixed to the rest on a

6   stationary table, and we fired from contact all the way out

7   to nine feet.  Collected those patterns, and Special Agent

8   DeFrance generated a report showing that linear progression

9   of shot patterns as distance increased.

10     Q.   Can you just very briefly explain what you mean by

11  "shot patterns" and how, sort of, the nature of the tip of

12  the shotgun goes and how you sort of controlled for the

13  different kinds of breaks that might be on a shotgun, and

14  things like that?

15     A.   Sure.  In this case, because we didn't have the

16  actual shotgun that was involved in Bianca Rudolph's death, a

17  shotgun at the end of the barrel, the very end, the muzzle,

18  often has what's referred to as a "choke," and that choke is

19  screwed into the end of the shotgun barrel.  And the purpose

20  of that choke is sort of a restrictor and it restricts the

21  muzzle diameter, and that causes the projectiles, or the

22  propellants, the pellets exiting the end of the shotgun to

23  either maintain a smaller or wider pattern at exit, depending

24  on the nature of that choke.

25     Q.   In general, does a pattern from a shotgun expand

1   as one moves away from the tip of the muzzle?

2        A.   Yes.   The farther the shotgun is away from the

3   target, in general, the larger the diameter of the pattern of

4   impact.

5        Q.   What is the most open, sort of, choke?

6        A.   I couldn't say what the most open choke is.   I

7   know that Steven documented that in his report.   I don't know

8   what that's called.

9        Q.   Did you take that into account when you were doing

10  your patterning, the possibility that it could be the most

11  open it could be in forming the widest pattern?

12       A.   Yes.   So when Steven designed the test he used a

13  full choke on one end of the spectrum, and then the opposite

14  choke to represent the other end of the spectrum, because we

15  didn't -- we had information from the manufacturer of the

16  type of choke that was on the shotgun but we couldn't be sure

17  so we used both ends of the spectrum for that test.

18       Q.   What general distances did you do in the test?

19       A.   The tests started at contact with the end of the

20  bag in contact with the target.   And I would have to refer to

21  his report, but I believe it went out to nine feet.

22       Q.   All right.   Once you had the analysis of the

23  patterns and all those various instances with those different

24  chokes, did you provide that data to anyone?

25       A.   Yes.

1        Q.    Who did you provide it to, and who are they?

2        A.    So once Special Agent DeFrance completed his study

3   and his report and his results, we met with Doctor Steven

4   Sina (phonetic) who we asked for consultation on this case,

5   and Steven provided Doctor Sina with his results.  We also

6   brought the shotgun and the soft-sided case to that meeting.

7        Q.    And did you provide him with what photographs you

8   have of Bianca Rudolph?

9        A.    Yes.  We provided him with the photographs, as

10  well as the corner's -- the pathologist's report.

11       Q.    Did he make any determinations about the likely

12  distance from the tip of the muzzle to the wounds on Ms.

13  Rudolph?

14       A.    He did.

15       Q.    What were his conclusions?

16       A.    Based on the pattern analysis and the report he

17  was provided, he concluded that it was not a contact injury.

18  That the size of the entrance wound was not consistent with

19  the patterns collected at contact in the study.

20       Q.    And did he make a determination from the likely

21  distance based on those patterns?

22       A.    He did.  I don't have that in front of me, but I

23  believe his was two feet to three-and-a-half feet are the

24  patterns that he felt were most consistent with her entrance

25  wound.

1    Q.   All right.  Anything else about that particular

2    study that would be pertinent before we move on to the

3    trigger reach study?

4    A.   I don't believe so.  I think there are other

5    results in that, but for this purpose I think that that was

6    the gist of the report.

7    Q.   All right.  Thank you.

8         So moving on to the second study that you did.

9    Can you describe how you began to determine whether it would

10   be possible for Ms. Rudolph to have (unintelligible) herself?

11   A.   Yes.  So we wanted to conduct what we called a

12   "reach study test".  So the first step in that process was to

13   determine Bianca Rudolph's what we call "static arm

14   measurement".  So we wanted to know the measurement from Mrs.

15   Rudolph's top of shoulder to end of the finger.  And that was

16   the first phase of that test.

17        THE COURT:  Mr. Winstead, I think you may be

18   muted.

19        MR. MARKUS:  No objection.  No, just kidding.

20        MR. WINSTEAD:  Sorry about that.

21   BY MR. WINSTEAD:

22   Q.   So I'm afraid, sir, my audio dropped out briefly.

23   Did you -- you described the first phase?

24   A.   I described the objective of the first phase.

25   That we wanted to determine Bianca Rudolph's static arm

1    measurement.

2         Q.   How did you do that?

3         A.   I contacted Richard Vorder Bruegge in the FBI lab

4    and asked him for ideas on how this could be done.  I had a

5    couple known photographs of Bianca Rudolph that were provided

6    to me by her friends.  And what we needed first was a known

7    measurement inside those images to compare to Bianca

8    Rudolph's arm.

9              So based on Mr. Vorder Bruegge's directions, I

10   traveled to Phoenix.  I met with a friend of Bianca Rudolph

11   who I had a picture of Bianca Rudolph standing next to her

12   friend from a fundraiser.  And fortunately, the friend still

13   had the hat, the dress, the bracelet, and the shoes that she

14   was wearing in the photo with Bianca Rudolph.

15             So I inserted a scale on plane with the friend's

16   arm, took those images, provided those with the photograph to

17   Richard Vorder Bruegge at the lab, and he used those known

18   measurements collected to scale to the image of Bianca

19   Rudolph to examine the pixels in the image to determine her

20   static arm measurement.

21        Q.   And what is a static arm measurement?

22        A.   What was the result?

23        Q.   What is a static arm measurement?

24        A.   A static arm measurement is a measurement that Mr.

25   Vorder Bruegge took from the image of top of shoulder of

 1   Bianca Rudolph to the tip of her fingers, which were hanging

 2   next to her as she stood.

 3        Q.   Do you recall about how long he found the

 4   measurement to be?

 5        A.   Yes.  His conclusion was that her static arm

 6   measurement was 27 and three-quarter inches, and then he

 7   provided a variable allowance of one inch each way.  So 26

 8   and three-quarters to 28 and three-quarter inches.

 9        Q.   All right.  Armed with that knowledge, what did

10   you do next?  What was phase two?

11        A.   Next, we wanted to determine if a female with

12   dimensions similar to or matching Bianca Rudolph would be

13   able to reach the trigger of this shotgun inside this case.

14        Q.   So what did you do in order to begin determining

15   that?

16        A.   We initially canvassed for female volunteers, both

17   within the FBI and the Lakewood Police Department, and we

18   came up with 15 volunteers who were willing to participate in

19   the study.

20        Q.   Did you measure their static arm measurements?

21        A.   Yes.  Both left and right arms.

22        Q.   And what were you looking for in their static arm

23   measurements?

24        A.   I wanted to make sure that we had a representative

25   pool of volunteers that were consistent with Bianca Rudolph's

1   static arm measurement.  So we knew going in that Bianca

2   Rudolph was 26 and three-quarters to 28 and three-quarters,

3   obviously I didn't want to use folks who had a 24 or a 36.

4        Q.   All right.  What did you have them do?

5        A.   There were three phases of the reach test.  So the

6   first phase consisted of collecting those static arm

7   measurements.  So while I didn't administer the test, I was

8   present when the test was administered.  And the test

9   administrators took the static arm measurements using the

10  point that Richard Vorder Bruegge provided in his study to

11  collect left and right arm measurements from each of the 15

12  volunteers.

13           I don't remember the range offhand, but the

14  average for left and right was approximately 28-and-a-half

15  inches for all of our volunteers.  So our volunteers were at

16  the top end of the range for Bianca Rudolph's static arm

17  measurement.

18           After we collected those measurements -- after we

19  collected those measurements we asked each volunteer to use a

20  yardstick over their heart, perpendicular to their torso, and

21  we asked them to measure their maximum reach on the

22  yardstick.  So to fully roll their shoulder forward and reach

23  as far as they could with their right arm, and their left

24  arm, on the yardstick to determine their maximum reach

25  potential.

1    Q.   Was that reach greater than the static arm

2    distance, or less?  Or how did that relate?

3    A.   Surprisingly, it was not.  No one had a greater

4    reach potential measurement than they did static arm

5    measurement.

6    Q.   All right.  What did you do after determining

7    that?

8    A.   After that, we went into the second phase of the

9    study which brought each volunteer into a room individually

10   and provided them with a basic set of instructions.  So the

11   test administrator read the instructions that basically said,

12   you're going to be given a shotgun and you're going to be

13   given a soft-sided case.  Insert the shotgun inside the case

14   and zip the case closed.  At which point I handed each

15   volunteer the shotgun and the soft-sided case and got out of

16   the way and let them proceed.

17   Q.   Were these the same shotgun and the same type of

18   case that you had used and described for the previous test?

19   A.   Yes.

20   Q.   All right.  What happened when you asked them to

21   do that?

22   A.   There were a variety of methods that each person

23   used to insert the shotgun into the case and then to fully

24   zip the case closed.  Of significance no one put the butt of

25   the shotgun on the ground, no one pointed the shotgun at

1    themselves, and certainly no one put the butt of the shotgun

2    on the ground, put the muzzle to their heart and zipped in a

3    downward fashion to put the shotgun inside the case.

4         Q.   All right.  Did anyone have difficulty with

5    tightness or with having to force the shotgun into the case?

6         A.   No.  No one -- no one struggled to zip the case

7    fully closed.

8         Q.   All right.  After that phase of the test, did you

9    do any further testing?

10        A.   Yes.  So the third and final phase, again each

11   volunteer was brought into the room individually, they were

12   provided with a set of instructions that essentially said:

13   You're going to be handed a shotgun inside a soft-sided case

14   that is partially zipped, while keeping the muzzle of the

15   shotgun on your heart, and keeping a shotgun approximately

16   perpendicular to your torso, try to zip the case closed and

17   see if you can reach the trigger.

18        Q.   What happened with that test?

19        A.   I think initially, based on the instructions of

20   keeping the shotgun perpendicular to the torso, nearly every,

21   possibly every, but at least nearly every, volunteer tried to

22   hold the shotgun and the case out in front of them, and they

23   tried to maintain the shotgun in this position over their

24   heart and zip it closed at the same time.  And that --

25        Q.   And how did that go?

1     A.   It was a train wreck.  It didn't work for anyone.

2  No one was able to hold the shotgun in this position, because

3  of the weight of the shotgun, while simultaneously trying to

4  zip it or reach the trigger.

5     Q.   All right.  Then what did you do?

6     A.   So after that, to continue with phase three of the

7  test the administrator would prompt the subjects to:  Okay,

8  since that didn't work, and you're not able to maintain the

9  shotgun in that position, try putting the butt of the shotgun

10  on the ground and zip it and see if you can reach the

11  trigger.

12     Q.   And what happened then?

13     A.   We had a variety of results.  We had people take

14  off their shoes and try to reach the trigger with their toes.

15  We had people that sat down and contorted their bodies around

16  the shotgun.  We had individuals who tried to kneel over the

17  shotgun and zip it closed.  But none of our participants were

18  able to reach the trigger of the shotgun while keeping the

19  muzzle on their heart in a perpendicular angle to their

20  torso.

21     Q.   Do you recall about what the distance is from the

22  muzzle of the shotgun to the trigger?

23     A.   Yes.  So this --

24     Q.   How long was it?

25     A.   This particular shotgun has a muzzle to trigger

1    distance of just over 31 inches.  I believe it's 31.1 inches.

2    And that's the shotgun outside of the bag, which obviously

3    the bag, and the end of the bag, increases that distance.

4         Q.   And when the case is partially zipped, does it

5    additionally make it difficult to reach the trigger?

6         A.   Absolutely.

7         Q.   With a muzzle to trigger distance of 31 inches or

8    more, does someone who has a 28-inch-long static arm

9    measurement, is that person likely to be able to reach the

10   trigger with the muzzle against their chest?

11        A.   No.

12        Q.   All right.  Any other components of that study or

13   any other details that are pertinent to this hearing?

14        A.   I don't think so.

15        Q.   All right.  So going back to what you were able to

16   learn about the situation from Mr. Swanepoel.  Did you ask

17   Mr. Swanepoel in any of his interviews about how Bianca

18   Rudolph related to firearms?

19        A.   Yes.  I asked him specifically about her weapons

20   handling ability and comfort with firearms.

21        Q.   And you said previously he was the professional

22   hunting guide that was with them on this hunting trip, right?

23        A.   That is correct.

24        Q.   Are you aware of whether he had been on previous

25   hunting trips with the Defendant and Mrs. Rudolph?

1      A.   Yes.  He had hunted with Mr. and Mrs. Rudolph

2   multiple times.

3      Q.   What did he say as far as how she treated weapons?

4      A.   He described Bianca Rudolph as being cautious, not

5   being confident, but he did not have any concerns about her

6   weapon handling abilities.

7      Q.   And when you're talking about her weapon handling

8   abilities, did he think that she was unsafe with weapons?

9      A.   No.

10      Q.   Is that something that as a professional hunting

11   guide he would pay attention to?

12      A.   Absolutely.

13      Q.   Did he say anything about who usually did most of

14   the firearms handling in relation to her hunting?

15      A.   Yes.

16      Q.   And can you tell me what --

17      A.   Sure.

18      Q.   -- what he said about that?

19      A.   He said that Bianca Rudolph didn't typically

20   handle, manipulate, load, unload, or pack the firearms.  So

21   the way he described it that was handled by himself, one of

22   the other support staff, or Mr. Rudolph.

23          So Mr. Swanepoel provided an example that he would

24   build the blind, he would set up the chairs, he would set up

25   the stable shooting platform, and Bianca Rudolph would

1    essentially sit and she would be handed the firearm.  They

2    would help her locate or site on the animal, she would pull

3    the trigger, and then someone else would take the firearm for

4    handling.

5         Q.   Now, you said that she was cautious with firearms.

6    Was she an inexperienced or an experienced hunter?

7         A.   She was a very experienced hunter.

8         Q.   Can you tell me how you know that?

9         A.   Sure.  She was a previous president of the

10   Pittsburgh chapter of Safari Club International.  According

11   to one also former president of the chapter, she was once

12   considered for the Diana award which is one of the most

13   prestigious international hunting awards for women.  And the

14   same witness had participated in, maybe not target shooting,

15   but firing of firearms during SCI events with Mrs. Rudolph,

16   so she had an occasion to observe her with firearms.  And

17   like Mr. Swanepoel, she had no concerns about her weapons

18   handling ability or safety.

19        Q.   Do you know whether -- do you have any records

20   about particular hunts that Ms. Rudolph was on?

21        A.   Yes.  We do have Fish and Wildlife documents for

22   Ms. Bianca Rudolph, as well as Mr. Rudolph, recognizing that

23   that set of records is not complete, but we do have several

24   records related to their hunts.

25        Q.    And had Mrs. Rudolph done a number of

1    international hunts and brought large game animals back to

2    the United States according to those records?

3         A.   Yes.  She had experience hunting big game,

4    including the Big Five, leopards and those types of things,

5    in a number of countries around the world.

6         Q.   Just for clarity's sake, what do you mean when you

7    say the "Big Five"?

8         A.   I was hoping you weren't going to ask that.

9              The Big Five, and I may not be the best person to

10   answer that, is a collection of animals that trophy hunters,

11   or big-game hunters, target.  And the Big Five includes

12   lions, leopards, a type of hippopotamus, and I believe an

13   African Buffalo.  I don't know the fifth.

14        Q.   Do you recall whether an elephant is one of the

15   Big Five?

16        A.   It may be.  I don't recall.

17        Q.   Do you recall, are there any records that Ms.

18   Rudolph had actually killed an elephant?

19        A.   There is a licensing permit and return of an

20   animal described as an elephant under Bianca Rudolph's name

21   in the Fish and Wildlife records.

22        Q.   All right.  I'd like to go back to the scene of

23   the -- of Ms. Rudolph's death.  In various interviews has

24   this defendant provided any explanations about how he

25   believes the accident occurred?

1    A.    Information came.  I can't specifically remember

2    if it was in the Defendant's written statement or if they

3    were from Mr. Swanepoel's interviews and written information.

4    Q.    Can you tell me, if you recall, what the Defendant

5    told Mr. Swanepoel while they were driving back to notify

6    authorities?

7    A.    Sure.  They discussed a number of potential

8    scenarios that could have contributed to an accidental

9    discharge of the firearm.  As described by Mr. Swanepoel, she

10   could have been zipping up the gun case and touched the

11   trigger.  He said that she had very long fingernails and

12   could have contacted the trigger.

13        Also during his ride with Mr. Rudolph to get the

14   police they discussed and/or speculated about the fact that

15   the shotgun was a really tight fit inside the case and that

16   she may have been slamming it on the ground, maybe holding

17   the case or slamming it on the ground, to get the shotgun

18   inserted into the case.

19   Q.    Having obtained a matching shotgun and a matching

20   case, is it accurate that it was very difficult to get the

21   gun into the case?

22   A.    No.

23   Q.    Does it seem plausible that that particular thing

24   would have occurred, that she would be banging the butt on

25   the floor while the muzzle was pointed at her chest?

1       A.   No.

2       Q.   Did any of the individuals in your study do

3  anything of that nature?

4       A.   No.

5       Q.   Did Mr. Rudolph tell anyone else any other

6  theories about how she may have died?

7       A.   Yes, he did.

8       Q.   Do you recall if he told anything to the consular

9  officials in Zambia?

10      A.   Yes.  He spoke with an Embassy official after

11 Bianca's death and he speculated that she may have died by

12 suicide.

13      Q.   Did Mr. Rudolph tell that particular theory to

14 anyone else that you recall?

15      A.   Yes, he did.  There was a, following the memorial

16 service for Bianca Rudolph in Arizona, Mr. Rudolph hosted a

17 gathering at his residence following that service, and he

18 told one of Bianca's friends that she may have died by

19 suicide.

20      Q.   I'll return to the suicide question in a moment.

21 But was there any other theory that you recall at some point

22 Mr. Rudolph saying about the potential accident?

23      A.   Not that I can recall.

24      Q.   Okay.  All right.

25           As far as suicide, had suicide been noted on any

1   of the Zambian reports?  I believe you mentioned this before,

2   but can you remind me?

3       A.   Yes.  Mr. Turbasa's forensic firearms exam listed

4   suicide as the manner of death on his report.

5       Q.   Is that the same conclusion that the other reports

6   came to?

7       A.   No.

8       Q.   What did they list as the cause of death again?

9       A.   The lead investigator, as well as the

10  investigative supervisor, considered the manner of death to

11  be accidental.

12      Q.   Okay.  Was there any indication that you were able

13  to find in your investigation that it would likely have been

14  a suicide?

15      A.   No.

16      Q.   Now, setting aside some of the practical

17  impossibilities that you've already talked about with your

18  studies, just from a knowledge of the situation and Bianca

19  Rudolph, was there anything that led you to believe that

20  suicide would be implausible?

21      A.   Yes.  Mrs. Rudolph was very excited to return from

22  this hunting trip to attend her nephew's wedding in New York,

23  so they were traveling from Zambia back to the states to

24  attend his wedding, and she had several family members from

25  Italy coming to the United States for the wedding in the days

1  immediately following her death.  And because she wasn't

2  successful in killing a leopard during this hunt, Mr. Rudolph

3  and Mr. Swanepoel asked her the night before her death if she

4  wanted to extend the trip or she wanted to stay longer to

5  hopefully be successful in killing the leopard, and Mrs.

6  Rudolph made statements to the effect of:  Don't even think

7  about it, boys, we're going to New York.  She was very

8  excited by all accounts to get to New York and go to the

9  wedding.

10      Q.   All right.  Now, moving back to the Defendant's

11  statements about the events surrounding her death.  Did he

12  give different accounts to different people about where he

13  was at the time of the shotgun firing?

14      A.   Yes.

15      Q.   Do you recall what he told Mark Swanepoel about

16  where he was and what he was doing?

17      A.   He told Mark Swanepoel that he was in the bathroom

18  using the restroom.  Mr. Swanepoel described him as having a

19  nervous traveler's stomach, so he was dealing with those

20  matters.

21      Q.   Did he tell something different to the consular

22  official in Zambia when he was speaking to him about the

23  events?

24      A.   Yes.  He told individuals there on-scene, and

25  shortly after her death, that he was in the shower at the

 1  time of the discharge.

 2       Q.   Did he give any other different accounts of where

 3  he was to anyone else that you recall?

 4       A.   Yes.  When speaking with Bianca Rudolph's one, or

 5  both of her brothers, at the gathering at his residence

 6  following the memorial service in Arizona, he indicated to

 7  them that he was outside the lodge at the time of the

 8  discharge.

 9       Q.   Now, are you aware of whether or not -- well, I

10  guess let's talk about first, what happened to Bianca

11  Rudolph's body?

12       A.   Her body was cremated.

13       Q.   Do you know when that happened?

14       A.   Yes.  She was cremated on the 14th.

15       Q.   How long was that after her death?

16       A.   Her death was on the 11th, her body was cremated

17  the 14th.

18       Q.   In that process are you aware of whether the

19  Defendant -- I guess, let me ask you this.  Did the Defendant

20  have any conversations with consular officials in Zambia

21  during the process of preparing her body for cremation?

22       A.   Yes, he did.

23       Q.   And did he take them up on any offers that they

24  made to him to notify family members of her death?

25       A.   Not that I'm aware of and not that that they were

1   aware of.

2       Q.   What was his answer when they offered to notify

3   family members?

4       A.   He repeatedly declined those requests, initially

5   saying that he wanted to tell the children in person and not

6   over the phone.  And then, later, after continued prompting,

7   he said that they were not her biological children and that

8   he would take care of it.

9       Q.   Are you aware of whether that was a true statement

10  about them not being her biological children?

11      A.   I have no information that they are not her

12  biological children.  By all witness accounts they are, in

13  fact, her biological children.

14      Q.   Did the counselor officials have any concerns

15  about the accident and about the short period of time between

16  the accident and the cremation?

17      A.   Yes.

18      Q.   Did they take any steps in particular with regard

19  to those concerns?

20      A.   Yes, they did.  In response to the expedited

21  process that they felt uncomfortable with, they traveled to

22  the mortuary to take pictures, or digital images, of Bianca

23  Rudolph's body in an effort to preserve any potential

24  evidence.

25      Q.   Did the Defendant find out that they had done

1  that?

2       A.   He did.

3       Q.   What did he do?

4       A.   What did the Defendant do in response?

5       Q.   Right.

6       A.   The Defendant was in contact with the consular

7  official who went and took the photos, and the consular

8  official described Mr. Rudolph as being livid, that he had

9  violated his privacy by taking pictures of his deceased wife.

10      Q.   Before that, had privacy rules been a topic of

11 conversation that the Defendant had asked consular officials?

12      A.   Yes.  The Defendant, Mr. Rudolph, had previously

13 asked the consular officials about privacy, privacy act in

14 Africa, and how that applied to police records or autopsy

15 records related to this case.

16      Q.   You had spoken earlier about a witness, Mr.

17 Swanepoel's wife at the time, I believe you said whose name

18 is Ms. Romm.  Was she involved in the process of cremation?

19      A.   Yes, she was.

20      Q.   Did she have any concerns?

21      A.   Yes, she did.

22      Q.   Can you describe what her concerns were?

23      A.   Yes.  Leanne Romm was on the hunt initially.  She

24 was present and met the Rudolph's when they arrived in

25 country, and was she stayed with them as they went to Mumbwa

1   for the first several days at which point she had to return

2   to handle some work.  And then she was notified by Mark

3   Swanepoel of Bianca's death, immediately following her death.

4   So in an effort to assist with the process and to assist her

5   husband at the time Leanne Romm returned to Lusaka to

6   participate, or to assist, in this process.

7            Like the Embassy official, Ms. Romm thought that

8   the process was being rushed.  She didn't understand why

9   there was such a rush.  She thought that Bianca's wishes were

10  being ignored and discounted.  She knew Bianca Rudolph to be

11  of Catholic faith and she thought that Ms. Rudolph should be

12  cremated in certain clothing with certain items of jewelry,

13  and she was very concerned that no one was paying attention

14  to this and that Mr. Rudolph was only concerned with

15  expediting the process.

16       Q.   To your knowledge, did Mr. Rudolph tell any family

17  members of Ms. Rudolph that the hunt was being extended?

18       A.   I know that there was an exchange of emails during

19  which he said that the hunt was being extended.  I don't

20  remember the specific circumstances of those emails.

21       Q.   Do you recall whether those emails were to her

22  family members?

23       A.   Yes.

24       Q.   Were they?

25       A.   Can you ask that?

1      Q.   Sure.  Were they to her family members?

2      A.   Yes.

3      Q.   At that point, had he told those family members

4  that she had died?

5      A.   I don't believe so.

6      Q.   All right.  Were you able to obtain the

7  photographs that the consular officials took of Ms. Rudolph's

8  body?

9      A.   Yes, I did.

10      Q.   Were those, in fact, used in Doctor Sina's

11  analysis to determine the distance of -- the likely distance

12  of the shotgun to the wound?

13      A.   Yes, they were.

14      Q.   And, in fact, were those -- I guess, would you

15  characterize those as pretty much the only useful photographs

16  of the wound?

17      A.   I would consider those to be the best photographs

18  of the wound, acknowledging that there were photographs from

19  the scene that showed the wound, but not nearly as useful or

20  forensically valuable as the ones taken by the consular

21  official.

22      Q.   All right.  I'd like to -- I'd like to go now to

23  whether or not the Defendant would have had any motive to

24  kill his wife.

25           Are you aware of any relationships that the

1  Defendant had, extramarital relationships, that the Defendant

2  had?

3       A.   Yes.  I'm aware of multiple extramarital affairs,

4  or interactions, Mr. Rudolph had.

5       Q.   The Defendant's current significant other, are you

6  aware of whether they had a romantic relationship while Mrs.

7  Rudolph was alive?

8       A.   Yes, I am aware.  And, yes, they did.

9       Q.   Are you aware of any witness statements that --

10 that -- well, sorry.  Can you tell me her name?

11      A.   Her name is Lori Milliron.

12      Q.   Can you tell me any witness statements about any

13 ultimatums that Ms. Milliron may have given?

14      A.   Yes.  We interviewed a former employee of Three

15 Rivers Dental Group, which is Mr. Rudolph's dental practice,

16 and the former employee had an occasion to have multiple

17 conversations with Ms. Milliron.  During one of those

18 conversations, in approximately the summer of 2015, Ms.

19 Milliron reportedly confided in the former employee saying

20 that she had given Mr. Rudolph an ultimatum of a year to sell

21 the dental practices and inform Bianca Rudolph that the

22 marriage was over and that they were going to be together.

23      Q.   Did that witness say anything about any financial

24 relationship between Mr. Rudolph and Ms. Milliron?

25      A.   Yes.  That witness said that essentially Mr.

1   Rudolph and Ms. Milliron were siphoning cash funds out of the

2   dental practices and saving the money for their life

3   together.

4        Q.   And was Mr. Rudolph paying for anything in general

5   related to Ms. Milliron's living expenses?

6        A.   Yes.  There are multiple witnesses that provided

7   information related to Mr. Rudolph paying for Ms. Milliron's

8   condo, vehicles, and potentially college expenses of one of

9   her children.

10       Q.   Going to another witness, a former colleague --

11  well, is there a witness named Doctor Tiano that you've

12  spoken to?

13       A.   Yes.

14       Q.   Can you tell me what his relationship to Mr.

15  Rudolph was?

16       A.   Yes.  Doctor Tiano was a partner of Mr. Rudolph

17  and other dentists in the practice, which at the time I

18  believe it was known as The Dentistry, which was the dental

19  practice prior to Three Rivers Dental Group.

20       Q.   Do you know approximately the time frame of that

21  relationship?

22       A.   Early 2000's.

23       Q.   Did Doctor Tiano tell you anything that the

24  Defendant told you about his relationship with Ms. Milliron?

25       A.   Yes.  He didn't tell me, but he told interviewing

1    agents, that Doctor Rudolph had confided in him that he and

2    Ms. Milliron were involved in a relationship that included

3    taking vacations together.

4          Q.   And did that -- what was the time frame of that

5    statement by the Defendant?

6          A.   I believe that was in approximately 2004.

7          Q.   And did Doctor Tiano also say that the Defendant

8    said he was paying for things for Ms. Milliron at that point?

9          A.   Yes.  He was one of the witnesses that said that

10   Doctor Rudolph was paying for -- and I don't remember if he

11   said specifically the condo or the vehicle or the college.

12   That was a combination of multiple witnesses that provided

13   that information.

14         Q.   All right.  Was there any other witness -- or, I'm

15   sorry.  Did Doctor Tiano tell you anything about whether the

16   Defendant told him about his relationship with Bianca

17   Rudolph?

18         A.   I don't remember the specifics of that information

19   from the report.

20         Q.   Do you recall anything about the Defendant saying

21   there were any -- there was any trouble in that relationship?

22         A.   Yes.  And I did look at that report this morning.

23   So, yes, I do remember that he told investigators that Mr.

24   Rudolph had confided in him that Bianca Rudolph was

25   potentially seeking a divorce.

1      Q.   Do you know the approximate time frame of that

2   communication?

3      A.   Again, that would be in the early 2000's when they

4   had this relationship.   Prior to 2006.

5      Q.   Do you know what the Defendant's approximate net

6   worth was in 2016?

7      A.   Yes.

8      Q.   Can you give me an approximation of what that was

9   back then?

10     A.   Yes.   According to records the Defendant's net

11   worth, which is derived from assets minus liabilities, was

12   just over $5 million.

13     Q.   Now, I'm not asking you to opine about divorce

14   law, but assuming that there was some sort of a divorce and

15   some sort of equal division of those assets, what would his

16   net worth have dropped to, approximately?

17     A.   Because it was just over 5 million, if that was

18   cut in half, it would be 2.6 or 2.7 million.

19     Q.   Do you know at the time of her death how much

20   (unintelligible) Bianca Rudolph had or was insured for?

21     A.   If you could repeat that?   I think you went

22   digital there in the middle.

23     Q.   Sorry about that.   Do you know approximately how

24   much life insurance there was on Bianca Rudolph at the time

25   of her death?

1    A.   Yes.   There were approximately nine policies with

2    seven different companies for approximately $4.8 million.

3    Q.   So after receiving that insurance money, what did

4    the Defendant's net worth become?

5    A.   The Defendant's net worth approximately the

6    following the year, in 2017, after those deposits, was just

7    over $10 million.

8    Q.   All right.   Thank you.   Just one moment.

9    (Brief pause)

10   Q.   All right.   Now, speaking of those life insurance

11   policies, was there also an insurance company investigation

12   into her death?

13   A.   Yes.   There was a privately contracted entity

14   known as Diligence International that was hired by multiple

15   insurance companies to conduct an investigation.

16   Q.   Well, did that group conduct an investigation?

17   A.   They did.

18   Q.   Now, what was the -- what was the primary purpose

19   of that investigation?   Were you able to determine that, or

20   could you characterize it?

21   A.   Yeah.   The primary purpose of the investigation

22   was to confirm that Bianca Rudolph, the insured party, was in

23   fact the individual who was deceased in Africa.

24   Q.   What did they conclude about that?

25   A.   By obtaining police reports and medical records,

1  they determined that Bianca Rudolph, the insured party, was

2  in fact the decedent.

3      Q.   Was the purpose of the insurance investigation by

4  that group investigating whether a crime had been committed?

5      A.   I think that was an ancillary or a secondary part

6  of the investigation, but primarily it was to confirm the

7  decedent's identity as the insured party.

8      Q.   Did the report of that investigation make any

9  conclusions about whether a crime had occurred?

10     A.   The conclusion of the report was that there was

11 insufficient information not to pay the claims.  So the

12 recommendation of the report, although they acknowledged they

13 had outstanding questions and unresolved issues related to

14 the police investigation, was that the claims should be paid.

15     Q.   Did that final conclusion suggest that further

16 investigation might be warranted?

17     A.   Yes.

18     Q.   To your knowledge, was much further investigation

19 done by the insurance companies themselves?

20     A.   Not to my knowledge, no.  In speaking with the

21 representatives some did online searches looking for

22 newspaper articles, but the Diligence International

23 investigation was the primary investigation conducted by the

24 insurance companies.

25     Q.   Did any of the insurance companies do any of the

1   sorts of investigation that you did?  And what I'm meaning is

2   forensic testing, any expert analysis, anything like that, to

3   your knowledge?

4        A.   No.

5        Q.   All right.  I'd like to ask you in general, you've

6   discussed this before a little bit, but in general, does

7   (unintelligible) travel internationally regularly?

8        A.   Can you repeat the name that you are asking about?

9        Q.   Sure.  Does the Defendant travel internationally

10  regularly?

11       A.   Yes.  He travels internationally extensively.

12       Q.   Can you give me sort of a ballpark understanding

13  of how much international travel he does in a given year?

14       A.   Yes.  Based on travel records back to 2009, with

15  the exception of the most recent COVID-impacted year, the

16  Defendant spends between two to three months every year

17  traveling internationally.

18       Q.   Do you know what sort, just from the travel

19  records, does it appear that he does any particular sorts of

20  traveling?

21       A.   Yes.  I would say there are two different types of

22  traveling.  There is what I would consider traditional

23  vacation traveling to more developed countries, and then

24  there is very clearly hunting travel to less-developed areas

25  of the world.

1   Q.   With regard to the less-developed -- well, the

2   hunting traveling, do you have the Fish and Wildlife records

3   with regard to Mr. Rudolph that you were describing with

4   regard to Bianca Rudolph?

5   A.   Yes.  I have reviewed those records from Fish and

6   Wildlife related to Mr. Rudolph.

7   Q.   Does that show him to be a relatively frequent

8   international hunter?

9   A.   Yes.

10   Q.   Can you give me a ballpark of what that means?

11   A.   The spreadsheet I reviewed most recently provides

12   Fish and Wildlife records for Mr. Rudolph back to 2002.  Now,

13   those records go through 2011, and then there is a gap all

14   the way to 2016.  So acknowledging that those records are

15   incomplete, there were approximately 80 animals in different

16   countries that Mr. Rudolph was licensed through a safari

17   company to hunt and bring back -- well, potentially bring

18   back to the United States.

19   Q.   Are those primarily in less-developed countries?

20   A.   Yes.  Primarily in Africa.  There was one in

21   Mongolia, one in an area of Russia, but primarily Africa.

22   Q.   Are those animals -- are many of them what you

23   were describing before as big game and the Big Five?

24   A.   Yes.

25   Q.   Is it dangerous going on hunts for the Big Five?

1      A.    According to Mark Swanepoel, who is a professional

2   hunting guide, it is very dangerous.

3      Q.    Do those hunts usually take place in more remote

4   areas?

5      A.    Yes.

6      Q.    In fact, the hunt where Bianca Rudolph died, was

7   that in a remote area?

8      A.    I would consider that to be a remote area based on

9   the fact that they had to drive hours to contact the police

10  to bring them back to the scene of her death.

11     Q.    Has the Defendant gone on any recent hunts that

12  you're aware of?

13     A.    Yes.

14     Q.    When was the last hunts that you're aware of that

15  he went on?

16     A.    According to travel records and a recent interview

17  with Mr. Swanepoel, I believe Mr. Rudolph traveled to

18  Ethiopia on or about May 22nd of 2021.  He was scheduled to

19  participate in a 14-day leopard hunt with Mr. Swanepoel.

20  According to Mr. Swanepoel they were successful in killing

21  the leopard within seven to nine days, so the trip was cut

22  short.  Or at least the safari component of the trip was cut

23  short.

24     Q.    Do you know if the Defendant possesses any

25  property in other countries?

1       A.    Yes.   I believe that he owns a condo in Cabo.

2       Q.    All right.   I'd like you to please bring up

3  Government's Exhibit 5.   Can you tell me what this exhibit

4  is?

5       (Brief pause)

6       A.    Yes.   This is a copy of a check that was obtained

7  during the parallel financial investigation in this case that

8  shows $15,000 going from Mr. Rudolph's account to Swanepoel

9  Safari Outfitters with a notes line of "Clippers and Clutch".

10      Q.    Can you go to Page 2 of that exhibit, please?

11      (Brief pause)

12      Q.    Can you tell me what this is?

13      A.    This is Page 4 of 8 of a Wells Fargo Bank

14 statement related to the Rudolph Trust account that shows a

15 transfer of $30,000 from Mr. Rudolph's account to Clippers

16 and Clutch.

17      Q.    Can you go to the third page, please?   What is

18 this?

19      A.    This is a note of wire transfer that shows $23,000

20 going from Mr. Rudolph's Camelback Consulting account to a

21 business called Champagne Nails.

22      Q.    Can you tell me where those businesses that are

23 the recipients of these transfers or payments are located?

24 Just in general, not specifics.

25      A.    Yeah.   Those businesses are in Africa.

1      Q.   And would you characterize these payments as

2   investments in those foreign businesses?

3      A.   Yes.  Based on interview statements, Mr. Rudolph

4   did invest in these two companies owned and operated by Mark

5   Swanepoel and his wife at the time, Leanne Romm.

6      Q.   If you're not aware, that's fine, but are you

7   aware of whether those particular businesses are still in

8   business?

9      A.   I don't know the status of those businesses today.

10     Q.   Okay.  I'd like to ask you a couple of questions

11  -- you can put that exhibit down, please.

12     (Brief pause)

13     Q.   I'd like to ask you a couple of questions about

14  the Defendant's current financial position.  Were some

15  seizures conducted in this case by the government?

16     A.   Yes.

17     Q.   So before any of those seizures, can you give me a

18  ballpark of what the Defendant's net worth was based on the

19  most recent records?

20     A.   Yes.  The estimated net worth based on the most

21  recent records was just over $16 million.

22     Q.   And is that again assets minus liabilities?

23     A.   Yes.  That's approximately 21 million in assets,

24  minus liabilities, which had some loans as well as mortgages.

25     Q.   So do you know approximately how much was seized

1   from the Defendant?

2         A.   Yes.  So between the bank account, the two

3   Vanguard accounts, and the two vehicles, it's approximately

4   5.3 million.

5         Q.   So after those particular seizures, what is his

6   net worth?

7         A.   It's estimated to be around 10.8 million.

8         Q.   Now, are there two other real properties that are

9   also the subject of ongoing forfeiture proceedings?

10        A.   Yes, there are.

11        Q.   Do you know approximately how much those are

12  worth?

13        A.   Those are valued at approximately 4.6 million.

14        Q.   So if you take those out of the 10.8 million, what

15  does that take his net worth down to?

16        A.   Approximately 6.2 million.

17        Q.   Now, that 6.2 million, are you aware of whether

18  that is in a form that he would have access to?

19        A.   Based on the analysis done by the forensic

20  accountants and the financial analysts, I believe there is

21  money within those assets that he does have access to.

22        Q.   Do you know what sort of vehicles or assets that

23  that worth is in largely?

24        A.   Investment accounts.

25        Q.   And --

1    A.   There are some checking accounts and savings

2  accounts, as well.

3    Q.   So as far as those investment accounts, are you

4  aware of whether the Defendant frequently draws money out of

5  those accounts?

6    A.   My knowledge of the Defendant's ability to

7  withdraw money from those accounts is based on two sets of

8  circumstances, really.  The first is, financial records show

9  that between 2012 and 2014 the Defendant provided money from

10  Morgan Stanley investment accounts to Lori Milliron in the

11  amount of just over $51,000, leading me to believe that that

12  money is available.  The Defendant also took out a loan

13  against investment accounts to purchase the property in Cabo.

14    Q.   And so are you aware of whether there is a current

15  line of credit against at least some of those accounts?

16    A.   I know there is a line of credit, with a balance.

17    Q.   And so in theory, would that line of credit allow

18  him to access money against the balance of those accounts?

19    A.   To the best of my understanding, yes.

20    Q.   Do you know about how much the residence in Mexico

21  that he owns is worth?

22    A.   I believe the purchase price was approximately

23  $700,000.

24    Q.   All right.  I'd like to ask you about whether this

25  defendant has ever made any threats or things of that nature.

1    Would it be possible -- would it be possible to bring up

2    Government's Exhibit --

3                MR. WINSTEAD:  Actually, Your Honor, may I ask,

4    was the Court able to access the -- I know that there was

5    some delay with getting the conventional exhibits filed, was

6    the Court able to access those recordings?

7                THE COURT:  Yes.  And I think Defense Counsel --

8    or Government Counsel, excuse me, is referring to Exhibits 1,

9    2, and 3 to the government's motion.  Those are in the forms

10   of audiotape.  Those audiotapes were provided to me on a

11   flash drive which the Court listened to almost in their

12   entirety last night and this morning.  I was unable to get to

13   about 20 minutes of Exhibit 1 at the conclusion of the

14   interview.  However, I did review the entirety of the other

15   two exhibits and the portions of Exhibit 1 that Government

16   Counsel referenced in the brief as being most significant.

17               MR. WINSTEAD:  Okay.  Thank you.  In that case, I

18   would just move that Government's Exhibit 1, 2, 3, and I

19   forgot to do this before, but Exhibit 5, be entered for the

20   record on this case.  But I won't be playing those at the

21   moment, if that's all right?

22               THE COURT:  Any objection to 1, 2, 3, and 5?

23               MR. MARKUS:  No objection.

24               THE COURT:  Thank you.  Exhibits 1, 2, 3, and 5

25   are admitted.

1          (Government's Exhibits 1, 2, 3, and 4 were admitted

2     into evidence.)

3               MR. WINSTEAD:  All right.  Thank you, Your Honor.

4          BY MR. WINSTEAD:

5          Q.   So, sir, are you aware of any witnesses -- well,

6     you spoke previously about Ms. Romm.  Did she tell

7     investigators anything about any steps the Defendant was

8     trying to take to intimidate people?

9          A.   Yes.

10         Q.   Can you just very briefly tell me what that was?

11         A.   Yes.  She said she was present for a conversation

12    between her husband at the time, Mark Swanepoel, and Mr.

13    Rudolph, during which Mr. Rudolph was asking Mr. Swanepoel to

14    put him in contact with a Nigerian who could travel to the

15    United States to threaten or intimidate folks to help him

16    with an issue he was having.

17         Q.   Did you ask Mr. Swanepoel about that?

18         A.   Yes.

19         Q.   What did he say?

20         A.   He was reluctant to talk about it.  He

21    acknowledged that those types of conversations had been had

22    over the years, possibly while drinking.  And when I asked

23    him further about it he said he -- to say it never happened

24    would allow someone to say that that wasn't true, is what he

25    told me.  And that he would want to consult with his attorney

1   to answer any additional questions because he may be exposed

2   to some type of criminal liability in that.

3        Q.   Did you speak to a former colleague

4   (unintelligible) mentioned anything similar to those

5   discussions?

6        A.   Yes.

7        Q.   Can you tell me about that conversation?

8        A.   Yes.  I interviewed, I don't know if he's a

9   doctor, or Mr. Speca, who was an anesthesiologist who was

10  employed by Mr. Rudolph at Three Rivers Dental.

11       Q.   And what did he -- what did he tell you?

12       A.   During the course of that conversation he relayed

13  an event during his very brief employment.  He said that he

14  was in the office working with a sedated patient.  Ms.

15  Milliron was telling the female dentist how to characterize

16  the procedure and how to proceed with the procedure.  When

17  the female dentist refused to comply, she consulted with the

18  Mr. Speca on the case.  They both agreed it was

19  inappropriate.

20          Once the female dentist refused to comply, she

21  reportedly was assaulted by Ms. Milliron.  And everyone left

22  except for Mr. Speca who was there with the sedated patient,

23  and Mr. Speca started being contacted by both Ms. Milliron

24  and Mr. Rudolph telling him what to put in the chart and what

25  to say that he thought was inappropriate and was not -- was

1  not suited for the case.

2          At one point during this conversation Mr. Speca

3  said that Mr. Rudolph told him he would hire a Nigerian to

4  shoot him in the head.  And then as the conversation went

5  forward, Mr. Rudolph said he would just shoot him himself.

6          Q.   Are you aware of any relationship or familiarity

7  between Mr. Speca and Ms. Romm or Mr. Swanepoel?

8          A.   I am not familiar with any relationship between

9  Mr. Speca and Ms. Romm, or between Mr. Speca and Mr.

10 Swanepoel.

11         Q.   Was there also a conversation with another former

12 employee of the Defendant about a similar nature to the

13 conversation with Mr. Swanepoel?

14         A.   Yes.

15         Q.   Can you tell me about that?

16         A.   Yes.  Well, I also spoke with another former

17 employee of Three Rivers Dental Group and he relayed an

18 occasion during which Mr. Rudolph contacted him while he was

19 working in one of the back rooms of the practice.  And

20 according to this witness Mr. Rudolph asked him -- or Mr.

21 Rudolph offered him what he characterized as a "generous

22 commission" of approximately $25,000 if he could take care of

23 something for him.  This individual understood that to mean

24 that Mr. Rudolph was offering him $25,000 if he could

25 facilitate or make arrangements to have someone killed.  And

1    Mr. Rudolph reportedly went on to ask this individual, who

2    appears to be Hispanic, if any of his hombres could come up

3    from Mexico to facilitate this.

4         Q.   Did that person understand that interaction to be

5    some sort of joke?

6         A.   No.

7         Q.   Do you know about when that conversation happened?

8         A.   Approximately 2015.

9         Q.   All right.  All right.  I'd like to ask one more

10   thing.  Are you in the process of doing any sort of blood

11   spatter analysis in relation to this case?

12        A.   Yes.

13        Q.   Can you tell me what part of the process you're in

14   with that?

15        A.   Yes.  We did an initial blood spatter pattern

16   analysis with an expert that we hired for consultation on

17   this case to review the images from the scene and let us know

18   if any determinations could be made regarding the blood

19   patterns on Bianca Rudolph's person, potentially on the case,

20   as well as the carpet at the foot of the bed, and the floor,

21   of the exposed floor.

22             During the course of that review we determined

23   that additional analysis would be needed so we are in

24   conversations with that expert now trying to figure out the

25   best way to impact a pressurized blood source to get the most

1  accurate bloodstain pattern analysis available.

2      Q.   So would you characterize that part of your

3  investigation as concluded at this point?

4      A.   No.

5      Q.   All right.

6          MR. WINSTEAD:  If I may have just a moment?

7      (Brief pause)

8          MR. WINSTEAD:  All right.  The government passes

9  the witness, Your Honor.

10          THE COURT:  Thank you.

11          I have some follow-up questions for you, Special

12  Agent Peterson.  And I'll allow both Government Counsel and

13  Defense Counsel, of course, to follow up on these questions

14  to the extent you give any additional testimony here.

15          Are you aware of what happened to the gun that was

16  actually involved in the shooting?

17          THE WITNESS:  The gun and the case were returned

18  by the Zambian police services to Mr. Rudolph in the days

19  following Bianca Rudolph's death.

20          THE COURT:  Do you have any further knowledge of

21  what happened to them after that point?

22          THE WITNESS:  No.

23          THE COURT:  If I could ask the courtroom deputy to

24  please put up Exhibit 4, Page 4?

25      (Brief pause)

1          THE COURT:  Can you make that bigger on my screen?

2      (Brief pause)

3          THE COURT:  There it is.  Thank you.

4          You described this briefly for us, Special Agent

5   Peterson.  My question for you is, do you know whether the

6   gun case that's shown in the foreground of this photograph

7   was moved after the fatal shooting and before the photograph

8   was taken?

9          THE WITNESS:  It was, in fact, moved, yes.

10          THE COURT:  Do you know where it was moved from?

11          THE WITNESS:  According to the witness who moved

12   it, he moved it from the position where he found it on the

13   floor to the front porch for safekeeping, and then Mr.

14   Swanepoel directed him to put it back in its location to

15   preserve the scene.

16          THE COURT:  So it's your understanding from that

17   statement that the gun case as represented in Exhibit 4, Page

18   4, is in the location that it was when people first entered

19   the room after the gunshot was heard?

20          THE WITNESS:  That approximate location.  Yes,

21   Your Honor.

22          THE COURT:  All right.  Thank you.

23          Do you know how long the hunt was prior to the

24   fatal shooting?  In other words, how long had they been on

25   the hunt?

1            THE WITNESS:  I believe the hunt was --

2            THE COURT:  On the safari.

3            THE WITNESS:  -- scheduled for 14 days, and they

4    completed the entire -- the entire hunt before she died.

5            THE COURT:  This may be a question that's more

6    related to my curiosity than anything else.  But you

7    testified at some length about the pattern test that was

8    performed, and I think you described the target as being

9    cardboard.  Is that right?

10            THE WITNESS:  That's correct.

11            THE COURT:  Were the conclusions from that test

12   based on the markings on the cardboard?

13            THE WITNESS:  Yes.  The original cardboard was

14   preserved and photographed and measured, correct.

15            THE COURT:  Is there any account -- well, let me

16   strike that.

17            Do you know whether cardboard reacts differently

18   to gunshots from human flesh?

19            THE WITNESS:  I don't know what those differences

20   might be specifically.

21            THE COURT:  All right.  And as I understood your

22   testimony with respect to the static arm measurement tests,

23   were you operating on the assumption that both of the

24   decedent's arms should be measured and that she might have

25   used either one according to this theory of some problem with

1   zipping the gun in the case?

2            THE WITNESS:  Yes.  Because we didn't know

3   specifically which arm she may have been using, I chose to

4   measure both arms.

5            THE COURT:  In the course of your investigation,

6   did you learn anything about whether it is common for

7   hunters, experienced hunters, to check whether a gun is

8   loaded before they pack it into a travel case?

9            THE WITNESS:  Yes.  Multiple witnesses were

10  surprised that an experienced hunter would be handling or

11  packing a loaded weapon, which leads me to believe that an

12  experienced hunter would not manipulate a loaded weapon in

13  that way.

14           THE COURT:  Did you learn anything about whether

15  the decedent had experienced packing weapons for travel prior

16  to her death?  Other than this incident.

17           THE WITNESS:  Yeah.  There was no one specifically

18  that we were able to speak with about her packing guns from

19  safaris, other than the guns being in a soft-sided case

20  coming on and off the vehicles, which again the witnesses

21  said she wasn't involved in that process.

22           THE COURT:  Thank you.  Those are my questions.

23           All right.  Well, I see by the courtroom clock

24  that it's 12:15, and I think we could all probably benefit

25  from a break.

1              Let me consult with Counsel and try to get a

2    handle on where we're going here.  I know there must be some

3    cross-examination, Mr. Marcus.

4              MR. MARKUS:  Yes, Your Honor.

5              THE COURT:  Do you have any idea roughly how long

6    you think you might spend?

7              MR. MARKUS:  I'm always so bad at this.  I'll try

8    to be as brief as I can.  I would definitely say under an

9    hour, Your Honor.

10             THE COURT:  All right.  Fair enough.

11             And then does the government have additional

12   witnesses, Mr. Winstead?

13             MR. WINSTEAD:  No additional witnesses.

14             THE COURT:  All right.

15             And does the Defendant have witnesses?

16             MR. MARKUS:  No, Your Honor.

17             THE COURT:  All right.

18             So I think it would be pushing it to have

19   everybody continue for another hour without at least a short

20   break.  I don't know how much we can do to get food in our

21   systems in 30 minutes, but I'm inclined to limit the break to

22   30 minutes for this reason, I have an afternoon docket at I

23   think 2:00 p.m. that I have to try to take as quickly as I

24   can.  So for that reason, why don't we take a break now until

25   12:45.

1             For the benefit of counsel from out-of-state,

2    there are a number of places in the immediate area of the

3    courthouse where you can pick up a quick sandwich, including

4    some right across the street in the 1999 building.

5             And so I'll ask you to step down, Special Agent

6    Peterson.  And we will resume at 12:45.  Thank you.

7             MR. MARKUS:  Thank you, Your Honor.

8             THE COURT:  We'll be in recess.

9             THE COURT CLERK:  All rise.  Court is in recess.

10            MR. WINSTEAD:  Thank you, Your Honor.

11            MR. MARKUS:  Can we leave materials in the court,

12   Your Honor?

13            THE COURT:  You may.

14            MR. MARKUS:  Thank you.

15        (Recess from 12:14 p.m. until 12:50 p.m.)

16            THE COURT CLERK:  All rise.  Court is in session.

17            THE COURT:  Thank you.  Please be seated.

18            All right.  Special Agent Peterson, if you would

19   re-take the witness stand, please?  And you're still under

20   oath.

21        (Brief pause)

22            THE COURT:  And let me begin by asking, Mr.

23   Winstead, did you have any follow-up questions based on my

24   questions?

25            MR. WINSTEAD:  I did.  Thank you, Your Honor.

1  Just very briefly.

2          THE COURT:  Yes.

3                  DIRECT EXAMINATION (RESUMED)

4      BY MR. WINSTEAD:

5      Q.   Special Agent Peterson, can you hear me?

6      A.   I can.

7      Q.   The Court asked you a couple of questions about

8  any differences between shotgun patterns in cardboard and in

9  flash.  Are you aware of what Doctor Sina's areas of

10  expertise are and whether he took that into account in his

11  analysis and his ultimate conclusions about the distance from

12  the barrel to the wound?

13      A.   I know that Doctor Sina is a forensic pathologist

14  with a lot of experience doing autopsies and death

15  investigations.  He was provided with the original materials,

16  being the images of the cardboard backing, so he did know

17  what material was shot into and what those patterns looked

18  like when he made his conclusions.

19      Q.   And specifically, did he also take into account

20  how shotgun wounds in flesh, how they appear and how that

21  relates to distance?

22      A.   Yes.  He did talk about the expulsion of gases and

23  materials from the shotgun and the flash expansion.  That's

24  well beyond my area of expertise.

25      Q.   Thank you.

 1          MR. WINSTEAD:  No further follow-up questions,

 2   Your Honor.

 3          THE COURT:  Thank you.

 4          And whenever you're ready for cross-examination,

 5   Mr. Markus.

 6          MR. MARKUS:  Thank you, Your Honor.  And, good

 7   afternoon.

 8                    CROSS-EXAMINATION

 9      BY MR. MARKUS:

10      Q.   Good afternoon, Agent.

11      A.   Good afternoon, sir.  Good to see you, sir.

12      Q.   You, too.

13          I want to talk and break it down about what you've

14   testified to.  To start out, we can agree no eyewitnesses,

15   correct?

16      A.   No eyewitnesses to Bianca Rudolph's death?

17      Q.   Yeah.

18      A.   And none that have spoken with us.

19      Q.   Okay.  And no physical evidence that you were able

20   to obtain that would show Larry Rudolph was the shooter,

21   correct?

22      A.   I think the evidence based on what I've outlined,

23   that they were the only two people in the room, and this was

24   not an accident or suicide, indicates that to me.

25      Q.   That wasn't my question.  I understand you've done

1    a bunch of expert reports, we're going to talk about those in

2    a minute.  My point is, you went through, there were no

3    fingerprints, no gunshot residue, no physical evidence that

4    would tie Mr. Rudolph to the shooting, correct?

5         A.   There were no fingerprints and no gunshot residue

6    analysis, correct?

7         Q.   And so what you had to do in this investigation

8    was try to piece together different things to try to show

9    that it wasn't an accidental shooting, correct?

10        A.    I wouldn't characterize it as we were trying to

11   show that it wasn't an accidental shooting.  We were trying

12   to determine the circumstances of the shooting.

13        Q.   Well, for instance, you talked about cremation,

14   right?

15        A.   Yes.

16        Q.   And you viewed that as suspicious, I think you

17   said, right?

18        A.    I do view that as suspicious, yes.

19        Q.   Okay.  And one of the reasons you viewed it as

20   suspicious was because you spoke to her friends and other

21   folks who said she didn't want to be cremated, right?

22        A.   That was one of the indications, yes --

23        Q.   And --

24        A.   -- that made me consider that to be suspicious.

25        Q.   You found that to be suspicious?

1    A.    Sure.

2    Q.    And you took that into account in coming to your

3 conclusion that it wasn't, that's just one piece that it

4 wasn't an accident, correct?

5    A.    Sure.  That was part of the calculation, yes.

6    Q.    Okay.  Because, you know, one of the things you

7 concluded was if Bianca didn't want to be cremated and her

8 husband did something against her wishes, that's a red flag

9 to you?

10    A.    Sure.

11    Q.    Okay.  Did you get a copy of Ms. Rudolph's will?

12    A.    I have not seen the will.

13    Q.    I mean, how many murder investigations have you

14 done, sir?

15    A.    Several.

16    Q.    Okay.

17    A.    I've been involved in gang shootings.  I am a ERT

18 team leader, so I was the lead case agent for the Evidence

19 Response Team for the Boulder King Soopers, so I've dealt

20 with a lot of murder investigations.

21    Q.    Okay.  Have you done a murder investigation

22 anything like this one before, a foreign murder overseas,

23 anything like that?

24    A.    I have never investigated a foreign murder

25 overseas.

1      Q.   Okay.  Your experience is limited to gang

2   shootings I think.  Is that correct?  Any other kind of

3   shootings that you've investigated?

4      A.   Yeah.  I've investigated homicides.  I've

5   investigated suicides, I've investigated mass casualty

6   events.  I was the case agent, unfortunately, for the STEM

7   school shooting.  So I have experience with shooting

8   incidents, unfortunately.

9      Q.   Okay.  But you didn't think to obtain Ms.

10   Rudolph's will in this case?

11      A.   I don't know if there were steps taken to obtain

12   that or not.  I couldn't speak to that.

13      Q.   Well, you and I were in touch throughout this

14   investigation, correct?

15      A.   We were in touch.

16      Q.   I asked to speak to the prosecutors in this case,

17   correct?

18      A.   You did.

19      Q.   Because I wanted to present to them evidence to

20   show Mr. Rudolph was innocent.  Do you remember me telling

21   you that?

22      A.   No.

23      Q.   Okay.  Do you remember me asking specifically to

24   meet with prosecutors?

25      A.   No.  You asked me for the names of the

1  prosecutors, and then you told me that you would make

2  arrangements for me to interview Mr. Rudolph.

3      Q.   Did you ever provide to me the name of the

4  prosecutor?

5      A.   I did not.

6      Q.   Okay.  And did the prosecutors tell you that they

7  weren't interested in speaking with me?

8      A.   At that point in the investigation, yes.

9      Q.   Okay.  I'm going to show you what I'm going to

10  mark as Defense Exhibit A.

11          THE COURT: Mr. Markus, I think we have some

12  stickers available.  If you wouldn't mind using a sticker,

13  that's helpful to the Court.

14          MR. MARKUS:  Thank you, Your Honor.

15          THE COURT:  And the courtroom deputy can hand you

16  some to use.

17          MR. MARKUS:  And I can hand up a copy of this

18  exhibit for the Court.

19          THE COURT:  Thank you.

20      (Brief pause)

21          MR. WINSTEAD:  Your Honor, would it be possible

22  for me to get a copy of it in some form or fashion?

23          THE COURT:  And, Mr. Markus, let's talk about that

24  a little bit.  How can you get a copy to Mr. Winstead, given

25  that he's not in the room?

 1            MR. MARKUS:  There's only one small portion of it

 2    I'm going to use.  I'll email it to him, but I can put it on

 3    the ELMO so he can see it.

 4            THE COURT:  All right.

 5            MR. MARKUS:  And I'll hand a copy up to --

 6            THE COURT:  You may approach.  That's fine.  And

 7    if you would email it to him, as well?  Thank you.

 8        (Brief pause)

 9        (Defendant's Exhibit A was marked for identification.)

10            THE COURT:  Mr. Winstead, do you have access to

11    your email?  Are you able to receive email?

12            MR. WINSTEAD:  I do.  Yes, Your Honor.

13            MR. MARKUS:  I'm going to just show the one

14    portion that I wanted to use of this so that the witness can

15    see it, and so that the prosecutor can see it.

16        BY MR. MARKUS:

17        Q.   Agent, can you see Section 7.03 there?

18        A.   Yes, I can.

19            THE COURT:  Let me make sure Mr. Winstead can see

20    that.

21            MR. MARKUS:  Can you see that, Mr. Prosecutor?

22            MR. WINSTEAD:  I'm sorry, it looked as -- it looks

23    like it's loading.

24            MR. MARKUS:  Okay.

25            MR. WINSTEAD:  But it's still a blue screen.

1          (Brief pause)

2               MR. WINSTEAD:  I'm sorry.  It just came up.

3               MR. MARKUS:  Okay.  Well, why don't I just -- I'm

4    going to take a quick picture of it and text it to you.

5               THE COURT CLERK:  Counsel, go ahead and try it

6    again.

7          (Brief pause)

8               MR. MARKUS:  How about now, sir?

9               MR. WINSTEAD:  Unfortunately, I think I can just

10   see the -- our computer screen.

11              MR. MARKUS:  Okay.  Standby.

12         (Brief pause)

13              MR. MARKUS:  I just texted it to you.  Tell me if

14   you can see it.

15         (Brief pause)

16              MR. MARKUS:  Can you see it, sir, on your phone?

17   Or did it come through?

18              MR. WINSTEAD:  It just came through.

19              MR. MARKUS:  Oh, okay.

20              MR. WINSTEAD:  It just came through.

21              MR. MARKUS:  Great.

22         (Brief pause)

23         BY MR. MARKUS:

24         Q.   Okay.  So do you see that, Agent?

25         A.   I do.

1    Q.   You weren't aware of that before today, were you?

2    A.   I have not seen her will, no.

3    Q.   Is that surprising to you?

4    A.   I don't think it's surprising to me.  It's a piece

5    of information that's valuable to the investigation.

6    Q.   It is valuable?

7    A.   Sure.

8    Q.   Okay.

9         MR. MARKUS:  Your Honor, I would move in Defense

10   Exhibit A.

11        THE COURT:  Any objection to Defendant's A?

12        MR. WINSTEAD:  Would it be possible to get a

13   little bit of foundation, either by proffer or otherwise,

14   just about how, you know, it's -- what it's supposed to be?

15        MR. MARKUS:  Sure.  I'm happy to do that if you

16   don't --

17        THE COURT:  All right.  Go ahead, Mr. Markus.

18        MR. MARKUS:  Sure.  Could we switch back to the

19   ELMO, please?  Thank you so much.

20   (Brief pause)

21   BY MR. MARKUS:

22   Q.   Do you see Ms. Rudolph's signature there on the

23   last page, Agent?

24   A.   I do see a signature, yes, on the Bianca Rudolph

25   line.

1        Q.   Okay.  And do you see a notary on the next page in

2    Arizona from a notary public called Whitney Passey

3    (phonetic)?

4        A.   I do.

5        Q.   All right.

6             MR. MARKUS:  We now move in Defense Exhibit A.

7             THE COURT:  Any objection to A again, Mr.

8    Winstead?

9             MR. WINSTEAD:  No objection.

10            THE COURT:  All right.  Thank you.  Defendant's A

11   is admitted.

12        (Defendant's Exhibit A was admitted into evidence.)

13        BY MR. MARKUS:

14        Q.   You also mentioned, Agent, that it was suspicious

15   to you that Doctor Rudolph did not speak to his children

16   right at the time that it happened, correct?

17        A.   I said I didn't know when he spoke with his

18   children.

19        Q.   Okay.  Do you think it --

20        A.   It was --

21        Q.   Do you think it's strange that he would want to

22   tell them in person?

23        A.   I think it's strange that he would wait an

24   extended period of time, being multiple days, to talk to them

25   in person, yes.

1    Q.   Well, you said he was moving as quickly as he

2    could to get the body cremated and moved back to the United

3    States, right?

4    A.   That's fair.

5    Q.   And so he was trying to act quickly, correct?

6    A.   Yes.  By witness accounts, he was.

7    Q.   And he had said that he wanted to tell the

8    children in person, correct?

9    A.   That is one of the things he said about telling

10   the children, yes.

11   Q.   Okay.  And you also mentioned that it was

12   suspicious that he told other folks that the trip had been

13   extended.  Do you remember that?

14   A.   I do remember talking about the emails.

15   Q.   Yeah.

16   A.   I don't think I used the word "suspicious" but --

17   Q.   Well, you raised them because that was something

18   that you thought was important that he told people something

19   that wasn't true, correct?

20   A.   Sure.  Sure.

21   Q.   Now, you discussed there was a big wedding that

22   they were trying to get back to, correct?

23   A.   That's correct.

24   Q.   Is it possible that Mr. Rudolph didn't want to

25   ruin everybody's wedding and so he didn't tell him about Ms.

1   Rudolph's death but tried to explain it as extending the trip

2   so the wedding wouldn't be ruined?  Is that something you

3   considered?

4        A.   I didn't think in those terms of him being

5   considerate of the wedding attendees.

6        Q.   No.  So let's talk, then, about when I spoke to

7   you and how long Doctor Rudolph has known about this

8   investigation.  You've been interviewing folks for years now,

9   correct?

10       A.   That's correct.

11       Q.   And you know that those people have spoken to

12  Doctor Rudolph, correct?  Like Mark Swanepoel and others.

13       A.   That's correct, yes.

14       Q.   So Doctor Rudolph has known about this

15  investigation for a long time, hasn't he?

16       A.   I think that's fair.

17       Q.   Okay.  He hasn't fled the country, has he?

18       A.   No.  He's here today.

19       Q.   Yeah.  He's always returned from his -- you talked

20  about his extensive travel.  He's always returned knowing

21  that you were investigating, correct?

22       A.   Uh-huh.  Sure.

23       Q.   Okay.  And of course he hired counsel last August,

24  over a year-and-a-half ago, correct?

25       A.   I believe that is true, yes.

1    Q.    Okay.  And you've talked about his assets and his

2    apartment in Cabo and his travel to Zambia.  I mean, if he

3    thought that he was responsible for this he could have just

4    stayed in Mexico or in Zambia, correct?

5    A.    He could have.

6    Q.    But he's always returned?

7    A.    He has always returned from his trips, yes.

8    Q.    Okay.  By the way, the forfeiture attorney is

9    sitting here, there's been a number of seizures involved in

10   this case that the prosecutor asked you about, remember that?

11   A.    I do.

12   Q.    Since learning of this investigation, has Doctor

13   Rudolph tried to hide any money, transfer things overseas, or

14   anything like that?

15   A.    I know there's been a lot of movement of money.  I

16   couldn't speak to where it was moved or how or if that's

17   suspicious or not, that's --

18   Q.    You've been able to see all his assets in what's

19   called the Rudolph Trust, correct?

20   A.    Correct.

21   Q.    And he hasn't set up some overseas bank account to

22   try to hide money, has he?

23   A.    Not that I know of.

24   Q.    Okay.  Let's talk about other activity that Doctor

25   Rudolph has done.  You talked about the Zambian investigators

1    who approached the scene.  You asked, I think at least seven

2    people, whether Doctor Rudolph offered to pay them money to

3    come to a certain result with their investigation.  Do you

4    remember asking those witnesses those questions?

5         A.   I did not ask those witnesses, but those witnesses

6    were asked that question, yes.

7         Q.   All right.  I think your colleague was sitting

8    here before, but either by you or your colleague or someone

9    involved in the investigation, right?

10        A.   That is correct, yes.

11        Q.   Because you wanted to see if the Zambian officials

12   were paid any money to reach the conclusion that this was an

13   accident, right?

14        A.   Yes.

15        Q.   And what did you find out?

16        A.   None of them reported having been paid money.

17        Q.   Okay.  So you thought it was important to ask that

18   question to the witnesses, and your answer that you received

19   from all of them universally was that Doctor Rudolph didn't

20   offer anybody any money?

21        A.   That's accurate.

22        Q.   Okay.  Did he try to prevent the autopsy by the

23   Zambian coroner?

24        A.   I don't believe he tried to prevent an autopsy.  I

25   don't know if he could have, or how he could have done that.

1      Q.   Well, the fact is an autopsy went forward, right?

2      A.   It did go forward, yes.

3      Q.   Okay.  Did he try to stop or pay off any Zambian

4  investigators from doing ballistic reports?

5      A.   Not that I'm aware of.

6      Q.   Okay.  Did he stop anybody from taking pictures at

7  the scene?

8      A.   Not that I'm aware of.

9      Q.   Okay.  There were a number of photos that we saw

10  in your Exhibit Number 4, those were all taken at the scene,

11  correct?

12      A.   Yes, they were.

13      Q.   Okay.  By the way, Doctor Rudolph was interviewed,

14  wasn't he?

15      A.   He was interviewed.

16      Q.   Did he say, I'm not talking to you, or did he give

17  an interview to the Zambians?

18      A.   Well, both.  He gave an interview to the Zambians

19  and he told the FBI he wasn't talking.

20      Q.   Okay.  But I'm talking about at the scene right

21  now.  He was interviewed by the Zambians and cooperated with

22  them, correct?

23      A.   He did provide a statement, yes.

24      Q.   Okay.  And one of the things that he told them was

25  that he was in the bathroom when the shooting occurred,

1    correct?

2         A.    That's correct.

3         Q.    Okay.  And that was written down in a Zambian

4    report, correct?

5         A.    Yes.

6         Q.    By the way, the threats that you mentioned by this

7    Doctor Speca, that's not related to this case, is it?

8         A.    The Doctor Speca threat was not related to this

9    case.

10        Q.    Nothing was ever done regarding that threat.  I

11   mean, you talked about hiring a Nigerian, I think you said

12   that was discussed over drinks in Zambia, or something like

13   this?

14        A.    I didn't say that.  That's what Mark Swanepoel

15   said that that may have been the conversation.

16        Q.    When I say you said it, you testified about it?

17        A.    Yes, sir.

18        Q.    Okay.  So no Nigerian was ever hired, correct?

19        A.    I have no idea.

20        Q.    Do you have any evidence to support a fact that a

21   Nigerian was hired?

22        A.    No.

23        Q.    Okay.  Doctor Rudolph didn't just speak to the

24   Zambians, he spoke to the insurance officers, correct?

25        A.    He did interview with the insurance company, yes.

1    Q.   Okay.  By the way, you mentioned a 90 degree

2  angle.  Where did you get that from?

3    A.   I got that from Doctor Sina talking about the

4  directionality, or the trajectory, of her entrance wound.

5    Q.   Was that an assumption that your expert made, or

6  did he conclude that that was the entry angle?

7    A.   He concluded based on the images that the state

8  department officials provided, as well as the autopsy report,

9  that talked about the destruction to her heart in which

10  specific ribs were impacted.

11    Q.   Okay.  By the way, there were a number of people

12  who responded immediately to the scene at the shooting,

13  correct?

14    A.   Yes.

15    Q.   It wasn't just Mark Swanepoel?

16    A.   That's correct.

17    Q.   A number of people did?

18    A.   Yes.

19    Q.   And those people all said that they believed that

20  this was an accident, correct?

21    A.   As far as I know, yes, they all said that.

22    Q.   And one of the reasons -- you didn't discuss this

23  during your testimony, but one of the reasons they all

24  concluded that, including the Zambians, was because they saw

25  how Doctor Rudolph reacted to what had happened, correct?

1    A.   I can't tell you why they concluded that it was an

2    accident.

3    Q.   Well, his reaction was noted in all of the

4    different reports and in all of the interviews that you and

5    your team did, correct?

6    A.   In some of the interviews, yes, his reaction was

7    documented.

8    Q.   Can you tell the judge about the reaction?

9    A.   There was a variety of accounts of what happened

10   and Doctor Rudolph's reaction initially.  He had told some

11   people that he administered care to her, in other cases it

12   had been Mr. Swanepoel that administered the care and asked

13   Doctor Rudolph for assistance with that.  People described

14   him as being crying, distraught.

15        One individual was concerned about him walking

16   near the river, because although he acknowledged that there

17   was no indication that he would commit suicide, that it was a

18   thought that it was on his mind.

19   Q.   In other words, people said that he was so

20   distraught -- at least one person said he was so distraught

21   he looked like he might commit suicide?

22   A.   It was a concern that the individual had because

23   he was near the river, yes.

24   Q.   In fact, they moved the gun away from him

25   immediately because they thought he might do something with

1  the gun?

2      A.   That, I don't know.  He said he moved the gun out

3  of the area for safety.  Was that so someone wouldn't trip on

4  it, touch it, or did that relate to Doctor Rudolph?  I don't

5  know.

6      Q.   And a number of witnesses described Mr. Rudolph as

7  hysterical when this happened, right?

8      A.   Some did, yes.

9      Q.   Okay.  Now, I want to talk to for a moment about

10 the drop test that was supposedly done by the Zambians.  One

11 of the reasons they did a drop test was because another

12 theory that you didn't mention was that the gun may have

13 dropped and gone off, right?

14     A.   No one ever mentioned that theory that I'm aware

15 of that the gun was dropped.  The drop test is pretty

16 standard practice in a forensic firearms review.  I'm not

17 aware of anyone saying that the gun dropped.

18     Q.   Okay.  Have you ruled out in this case that the

19 gun dropped?

20     A.   Yes.

21     Q.   Okay.  Tell me how you've ruled that out.

22     A.   Right.  So the forensic examiner conducted a drop

23 test from multiple distances and determined that, in fact,

24 the weapon did not discharge when being dropped.

25          Additionally, when looking at the angle, or

1   trajectory for lack of a better term, that it's straight on

2   Bianca Rudolph's heart, with no left or right, very little up

3   or down angle to it.  Someone who is 5' 3" would have to be

4   standing on a ladder to drop a shotgun that's that length,

5   have it hit the ground, and discharge and hit her in the

6   heart.

7        Q.   Where do you get that, that she would have to be

8   standing on a ladder?

9        A.   Well, a person of my height, which is 6' 1" would

10  have a hard time standing over the top of a shotgun and

11  placing it at a 90 degree angle over my heart.  So someone

12  who is 5' 3" cannot stand over a shotgun and place it in that

13  position on their heart, let alone have a distance for it to

14  drop and then shoot her in the chest.

15       Q.   How long is the gun?

16       A.   I don't remember specifically the dimension.

17  Maybe 47 inches, or so.  But I don't have that in front of

18  me.

19       Q.   How many times was the gun drop tested?

20       A.   There was one drop test conducted with multiple

21  drops.

22       Q.   How many drops?

23       A.   I know at least two, because he listed two

24  different distances at which he dropped it.

25       Q.   And was this -- did anybody take a picture or a

1   videotape of this?

2        A.   No.

3        Q.   Okay.  Was the gun loaded when they did the drop

4   test?

5        A.   Yes.  That's how a drop test is conducted.

6        Q.   How do you do a drop test safely with a loaded

7   gun?

8        A.   Well, with a shotgun what you would do is you

9   would put it in a glass container and you would drop it, so

10  it's basically like a discharge on an unloading chamber, and

11  you can drop it in that and see if it discharges when it

12  impacts the round.

13       Q.   Okay.  Do you know if they did that in this case?

14       A.   I don't know the Zambians' procedure for doing a

15  drop test.  I can't tell you if he did it safely or not.

16       Q.   By the way, I think you mentioned the gun, you

17  were discussing whether it had a choked on it or it didn't

18  have a choke on it, correct?

19       A.   That is correct.

20       Q.   Okay.  So one variable we don't know about with

21  the gun is the choke, right?

22       A.   That is correct.

23       Q.   You said the gun was modified to take out -- to

24  make it so that it could have an extra shell, right?

25       A.   That is correct.

1      Q.    Okay.  Do you know whether there were any other

2   modifications to the gun?

3      A.    Mr. Swanepoel did not -- he said he did not make

4   any modifications and he did not observe any modifications to

5   the gun.

6      Q.    This wasn't Mr. Swanepoel's gun, was it?

7      A.    It was not.

8      Q.    Okay.  It was Doctor Rudolph's gun, right?

9      A.    It was.

10     Q.    Okay.  Do you know whether Doctor Rudolph had made

11  any modifications to it?

12     A.    I don't know.

13     Q.    Okay.  So the tests that your experts did are

14  dependent on the fact that this gun was not modified in any

15  other way, correct?

16     A.    Any other way in terms of the choke?

17     Q.    In terms of anything.

18     A.    Well, I would say that distance determinations,

19  those variables were covered by the choke modifications.  Any

20  other variables or modifications I couldn't speak to.

21     Q.    Okay.  By the way, do you know how much the bag

22  was zipped?

23     A.    Eyewitness accounts, the bag was approximately

24  halfway zipped.

25     Q.    Okay.  So help me with that.  Does the zipper

1    start at the top where the muzzle is?

2         A.    Yes, it does.

3         Q.    And then it goes all the way to the bottom?

4         A.    Yes.   It goes all the way down the side of the bag

5    and around the butt.

6         Q.    Okay.   And how long was the bag?   How many inches?

7         A.    We took those measurements.   I couldn't tell you

8    as I sit here today.

9         Q.    You took those measurements from where?

10        A.    We measured each bag prior to doing the shot test.

11        Q.    Oh, I know you did that.   I'm talking about the

12   bag that was at the scene.

13        A.    No, we did not have that bag available to us to

14   measure.

15        Q.    Okay.   And another assumption that your experts

16   made was that the bags that you got from the company were the

17   exact same make as the bag at the scene, correct?

18        A.    Well, there were two different models of that

19   specific ALLEN Company bag, so when we visited with ALLEN

20   Company we went through those options and identified which

21   bag was the one used in this case.

22        Q.    How did you do that?

23        A.    We used the scene photos and showed those photos

24   to the manufacturers of that bag.

25        Q.    And did the manufacturer tell you that that bag

1  was out of -- out of -- they weren't making that bag anymore?

2       A.   Yes.

3       Q.   And did they tell you they were out of stock of

4  that bag?

5       A.   I don't remember if they said they don't have any

6  in stock, but they definitely were not manufacturing those

7  bags actively.

8       Q.   And so the 100 bags you got actually were slightly

9  different than the bag that was at the scene, correct?

10      A.   I don't believe so.

11      Q.   Was that --

12      A.   According to the manufacturer's they used the --

13  they showed us the exact cut mold that they used for the

14  bags, and that's what they used to create those bags.

15      Q.   Did they create them specifically for you?

16      A.   Yes, they did.

17      Q.   Oh, they made 100 new bags for you?

18      A.   They actually made more than 100 bags.  There was

19  an initial run but there was a problem with them, and so they

20  ran them again.  So they made well over 100 bags for us.

21      Q.   So they -- I didn't understand this.  So they had

22  to create -- because the bags were out of stock and they

23  weren't making them anymore, they had to create these bags

24  again?

25      A.   That's correct.  We purchased a number of them

1    initially, maybe 8 to 10, online, to look at them and kind of

2    work with those initially before we met with ALLEN Company.

3    And then we went and we showed them the scene photos and they

4    helped us identify the bag and manufactured those to the

5    exact specifications.

6        Q.   Okay.  And when you say "the exact specifications"

7    you're talking about you just asked them for the mold of the

8    bag that was used, correct?

9        A.   Yes.  We asked them to reproduce a number of these

10   bags for us for testing.

11       Q.   Okay.  And when you -- when your expert did the

12   tests, these bags were all basically in mint condition,

13   brand-new, correct?

14       A.   Yes.  They were unused bags.

15       Q.   Okay.  The bag that was with Doctor Rudolph and

16   Bianca Rudolph, do you know how long that bag had been used?

17       A.   I don't.

18       Q.   It had been a while since that bag had even been

19   made, right?

20       A.   It had been a while since it was manufactured,

21   yes.  I have no idea how much use the bag had.

22       Q.   Do you know how many trips it had been on

23   overseas, how many guns had been stored in it, and so on?

24       A.   I do not.

25       Q.   Okay.  Those are all different variables that

1  would affect, possibly, a test shooting through the bag,

2  correct?

3       A.   I don't know how it would affect them.  I couldn't

4  speak to that.  I don't know how that would affect the

5  variable of the shotgun pattern coming through the end of the

6  bag.

7       Q.   Okay.  By the way, just speaking about the gun for

8  a second.  You mentioned you interviewed Ms. Romm, remember

9  that?

10      A.   I do.

11      Q.   Ms. Romm told you that the gun was not functioning

12  correctly, correct?

13      A.   She did say that, yes.

14      Q.   She said the gun repeatedly jammed, didn't she?

15      A.   That is what she said.

16      Q.   That's an important fact, correct?

17      A.   It is an important fact from her perspective, yes.

18      Q.   Okay.  And from your perspective?

19      A.   It is.  It's one piece of data used to make an

20  analysis, yes.

21      Q.   Okay.  And you also interviewed -- well, just to

22  stick with Ms. Romm's interview for a second.  She also told

23  you that the Rudolphs appeared to be a happy couple, correct?

24      A.   She did say that.

25      Q.   She didn't observe any red flags during the trip,

1    correct?

2          A.    That is correct.

3          Q.    She said that Ms. Rudolph was nervous during the

4    hunt, correct?

5          A.    She did say that.

6          Q.    She said Ms. Rudolph was not a -- was not very

7    confident during the trip about the guns, correct?

8          A.    She said she was not a confident hunter, yes.

9          Q.    Okay.   The Rudolph's appeared to have a great time

10   together in Zambia and that Larry was very attentive to her

11   needs, correct?

12         A.    That is what Ms. Romm said, yes.

13         Q.    They appeared to be a strong couple and were happy

14   together, correct?

15         A.    That is correct.

16         Q.    And that when Ms. Romm met with Mr. Rudolph he was

17   crying, appeared distraught, and he was even struggling to

18   speak, correct?

19         A.    That is what she said, yes.

20         Q.    That he appeared to be in shock, correct?

21         A.    If you're reading from my report, I will take your

22   word for it that that's what she said.

23         Q.    Well, I'm reading from my notes.   But do you

24   remember her saying that?

25         A.    I remember her saying all those types of things.

1      Q.   Okay.

2      A.   Specific words I can't recall, but yes.  That is

3 her characterization, yes.

4      Q.   All right.  And it wasn't just Ms. Romm who said

5 that Bianca Rudolph was feeling nervous during the hunt, Mark

6 Swanepoel said that as well, correct?

7      A.   That is true, yes.

8      Q.   And he also said, I think you used these words,

9 that she was, quote, "Not competent with the gun," correct?

10      A.   No, I've never used that term, ever.

11      Q.   On your direct, did you say that?

12      A.   Not at all.

13      Q.   Okay.  She would be handed the gun, and shoot, and

14 hand it back, correct?

15      A.   Yes.  According to Mark, that is the type of

16 hunting she did.

17      Q.   Did she, to your knowledge, know how to load and

18 unload that shotgun?

19      A.   I don't know.

20      Q.   Okay.  Do you know whether that shotgun had ever

21 been used before this hunt before?

22      A.   I don't know if they had ever shot that specific

23 shotgun or not.

24      Q.   Okay.  By the way, speaking of threats and

25 everything else, there's been no evidence at all of a history

1 of domestic violence in this case, correct?

2         A.    No.

3         Q.    You asked a lot of people about that?

4         A.    Yes.

5         Q.    Okay.  And every single person to a T said no

6 violence between Mr. Rudolph and Bianca Rudolph, correct?

7         A.    That is correct.  No physical violence between the

8 couple.

9         Q.    Okay.  The tests that were done by the experts

10 assume a six-inch spread on Ms. Rudolph's chest, correct?  A

11 six centimeter spread.

12        A.    Yes.

13        Q.    Sorry.

14        A.    The initial report was six centimeters, during a

15 subsequent -- six centimeters.  During a subsequent interview

16 with Agent Dahlstrom the pathologist said it was eight

17 centimeters.

18        Q.    Okay.  You know, in a lot of these cases that we

19 see we see pictures taken with a ruler so we can see exactly

20 the measurement, that wasn't done in this case I think you

21 said, right?

22        A.    That was not done by the pathologist, but there

23 was a scale in the images taken by the State Department

24 official.

25        Q.    And how many centimeters did that show?

1        A.    Approximately six.

2        Q.    What does that mean "approximately"?  Do we know

3    exactly how many centimeters it was?

4        A.    I couldn't tell you if it was slightly over or

5    slightly more, but it was consistent with his assessment of

6    six centimeters.

7        Q.    What does that mean, "It was consistent with his

8    assessment"?  Whose assessment?

9        A.    The pathologist in his initial report said that

10   the entrance wound was six centimeters in diameter.

11       Q.    Okay.

12       A.    And the images taken by the State Department

13   official with the scale was consistent with that.  It wasn't

14   obviously two centimeters, it wasn't obviously 10

15   centimeters.  But I will caveat that by saying when those

16   pictures were taken the scale was not taken on a

17   perpendicular plane as it should be to conduct a distance or

18   a size analysis based on those images.

19       Q.    And that's important because the expert relies on

20   that six centimeters to reach his conclusions, right?

21       A.    Yes.  The --

22       Q.    If those six centimeters are off, the distances

23   would change, correct?

24       A.    Potentially.

25       Q.    Well, it would.  I mean, the calculations used six

1  centimeters, so if six centimeters changes, the distance

2  changes, right?

3       A.   No.  Because a shot pattern doesn't change

4  drastically between, say, four inches and six inches.  So

5  when you say it would change, it potentially could change

6  based on the difference of the distance.

7       Q.   Okay.  And those six centimeters that you're

8  talking about were after the autopsy was done, right?

9       A.   No.  He characterized the entrance wound at the

10 time of autopsy.

11      Q.   I'm talking about the pictures that were taken

12 after the fact, right?

13      A.   Yes.  The State Department official's photos were

14 taken after the autopsy, that's correct.

15      Q.   And during the autopsy do you know whether the

16 wound was examined?

17      A.   Based on his report, it was examined.

18      Q.   Okay.  So it's possible that that six centimeters

19 was smaller before those pictures were taken?

20      A.   I wouldn't want to speculate as to that.  I trust

21 the --

22      Q.   Well, we are doing --

23      A.   -- pathologist when he --

24      Q.   -- a lot of speculating in this case.  So, I mean,

25 go with me for a second.  Is it possible that the six

1   centimeters was smaller before the autopsy and the

2   examination of that wound was done?

3          A.   I don't know.

4               MR. WINSTEAD:  Objection.  Calling for

5   speculation.

6               THE COURT:  Overruled.  The witness can testify as

7   to possibilities.

8               MR. MARKUS:  One moment.

9          (Brief pause)

10       BY MR. MARKUS:

11         Q.   By the way, you asked Mr. Swanepoel about the

12   morning that Ms. Rudolph and Doctor Rudolph were packing

13   their things, correct?  Before the shooting occurred.

14         A.   That is correct.

15         Q.   And what he told you is that people were in that

16   room that morning, correct?

17         A.   I don't know that he said people were in the room.

18   He said that the baggage handlers went to the cabin, I

19   believe, to check and see if they were ready.  I don't

20   remember if people went inside or not.

21         Q.   Okay.  And that's significant, isn't it?

22         A.   If somebody went inside?

23         Q.   Yeah.

24         A.   I don't know how significant.  I guess it depends

25   on what they saw and what happened, but --

1   Q. Well, let's paint the picture for the Court.  I

2 mean, what's going on here that morning is that they're

3 packing their things to catch a flight to go home, correct?

4   A. That is correct.

5   Q. Okay.  And people were coming to collect the bags,

6 correct?

7   A. Yes.

8   Q. And Ms. Rudolph tells them, we're not done packing

9 yet, come back, right?

10   A. That's correct.

11   Q. And so they were due back shortly, right?

12   A. Yes.

13   Q. And so the government's theory is that between the

14 people coming and -- coming back, Doctor Rudolph seized that

15 particular moment?  Is that your theory?

16   A. Yes.  Between the time people came to collect the

17 bags and the time they came back after the shot was fired, he

18 fired the shot, yes.

19   Q. Okay.  By the way, this goes -- probably goes

20 without saying, but if tests had been done in Zambia on his

21 hands and showed no gunshot residue, how would that have

22 affected your investigation?

23   A. Well, it would have been an important piece of

24 information --

25   Q. What would you --

1        A.    -- to determine --

2        Q.    -- have concluded?

3        A.    Well, it would depend on what was done after that,

4   how the exams were conducted, how the material was collected.

5   I don't know that I could make a conclusion based on one

6   piece of information --

7        Q.    What if --

8        A.    -- but it would have been important.

9        Q.    What if her fingerprints were found on the gun and

10  not his, how would that have affected your investigation?

11       A.    Again, it would be a piece of information that we

12  would use as part of the investigation.  It depends on where

13  the fingerprints were found, what condition they were in.

14  There are a lot of variables.

15       Q.    Certainly.  I agree with you.

16             Let's talk for a moment about resources.  I think

17  you talked about Doctor Rudolph's net worth back in 2016.

18  How did you come up with those numbers?

19       A.    We have a forensic -- well, multiple forensic

20  accountants and financial analysts assigned to the case who

21  are conducting a parallel financial investigation, and they

22  essentially obtained records related to his accounts, looked

23  at those accounts, determined his assets minus his

24  liabilities, and determined that to be his net worth.

25       Q.    One of the things that those financial analysts

1    did not take into account was the worth of his dental

2    practice, correct?

3         A.   The funds on hand were in that calculation, but I

4    --

5         Q.   I understand the funds on hand.  But did you take

6    in -- did your people take into account how much he could

7    sell his dental practice for?

8         A.   No.  That was not on the spreadsheet.

9         Q.   Are you aware that his dental practice -- are you

10   aware that he's received offers to sell his dental practice

11   for $10 million?

12        A.   I am not aware of that.

13        Q.   That would greatly affect the financial analysis

14   that has been done, correct?

15        A.   If he opted to sell it, sure, that would affect

16   his net worth, yes.

17        Q.   And did you analyst take into account the money

18   that the practices were generating on a year-to-year basis?

19        A.   I don't think in addition to the funds on hand

20   that was a number that was added to the calculation.

21        Q.   Okay.  So is it fair to say that the analysis that

22   was done of his net worth at the time of Ms. Rudolph's death

23   could be artificially low based on what you testified?

24        A.   I guess it could be lower if he was considering

25   selling those practices and that $10 million offer was not

1   calculated, sure.

2        Q.   Well, you mentioned during your testimony that

3   that was one of the things that had been discussed, selling

4   the practice and moving to Arizona, right?

5        A.   It was selling the practice, I believe, and moving

6   out of the country, but yes.

7        Q.   Okay.  So that was something that was discussed,

8   correct?

9        A.   Sure.  I know that there have been discussions

10  that have been ongoing regarding selling the practice and

11  licensing some to Doctor Fammartino.  I'm aware of those

12  conversations.

13       Q.   Very good.  And you're also aware that the

14  insurance proceeds in this case were about 4.8 million,

15  correct?

16       A.   I am.

17       Q.   And you're aware that the government's been able

18  to seize assets that total more than 4.8 million in this

19  case?

20       A.   That's correct.

21       Q.   Isn't it true to say that Doctor Rudolph, I mean,

22  has barely even touched that money?

23       A.   No, I don't -- I wouldn't make that assessment.

24  I'm not a forensic accountant, but I have seen where the

25  money has moved and in ways the money has been used, so I

1    wouldn't characterize it has barely touched.

2         Q.    How about this:  Would you agree with me that

3    there was enough money for the government to seize in excess

4    of $4.8 million to satisfy any potential forfeiture in this

5    case?

6         A.    Yes.  There were additional funds in excess of the

7    amount we seized, yes.

8         Q.    Okay.  Now, you talked about motive in the case,

9    Agent.  One of the motives you said was Doctor Rudolph would

10   not have wanted to go through a divorce because he would lose

11   a lot of money.  Do you remember that?

12        A.    There were individuals that testified that that

13   was his mindset, yes.

14        Q.    Okay.  Are you aware that there was a postnuptial

15   agreement in this case?

16        A.    I am not.

17        Q.    Would that affect your motive theory?

18        A.    It would be a piece of information that would be

19   helpful.

20        Q.    Okay.  Thank you.

21              I want to talk about why this case is in Denver.

22   Of course, the events all occurred in Zambia, right?

23        A.    That's correct.  The death occurred in Zambia.

24        Q.    Okay.  And you've known that Doctor Rudolph has

25   been living in Phoenix and traveling to Pittsburgh for a long

1   time now, right?

2       A.    I am aware of that, yes.

3       Q.    Okay.  You didn't arrest him at his home in

4   Phoenix, did you?

5       A.    No.

6       Q.    Can you didn't arrest him when he was traveling to

7   Pittsburgh, did you?

8       A.    We did not.

9       Q.    Okay.  You waited until he was traveling to the

10  home in -- to the apartment in Cabo, right?

11      A.    Yes.

12      Q.    You knew about that travel, right?

13      A.    Knew about the travel?

14      Q.    Yes.

15      A.    Yes.

16      Q.    In fact, agents got on the plane with him in

17  Phoenix going to Mexico, right?

18      A.    No.

19      Q.    Okay.

20      A.    There were no agents on the plane from Phoenix to

21  Mexico.

22      Q.    Okay.  Putting that aside, as soon as he landed in

23  Mexico he was arrested, right?

24      A.    He was detained by the immigration officials in

25  Mexico, yes.

1    Q.   He wasn't arrested at the Phoenix airport, was he?

2    A.   He was not.

3    Q.   Why not?

4    A.   Because we wanted the case to be tried in Denver

5    with the primary case agent.

6    Q.   Okay.  So the only way to have it tried in Denver

7    was to wait for him to travel overseas and have him appear

8    for the first time here in Denver, correct?

9    A.   That is my --

10             MR. WINSTEAD:  Objection.  Relevance, Your Honor.

11             THE COURT:  Well, I'm going to allow a little

12   leeway here.  Overruled.

13             You may answer the question, Special Agent

14   Peterson.

15             THE WITNESS:  Could you re-ask it?  I think I did

16   answer it, but if you will re-ask it?

17             MR. MARKUS:  Sure.

18        BY MR. MARKUS:

19   Q.   The only reason we are here in Denver is because

20   you waited to arrest him in Mexico and flew him to Denver

21   where he could be arrested, correct?

22   A.   We did arrest him, or detain him in Cabo, so that

23   we could bring him directly back to Denver, yes.

24   Q.   In fact, I mean, you had determined much earlier

25   that you were going to proceed with a murder charge, correct?

1        A.   We had made the --

2             MR. WINSTEAD:  Objection, Your Honor.  That's

3   relevance.  That's --

4             MR. MARKUS:  I'm going to tie it up, Your Honor,

5   to danger to the community.

6             THE COURT:  Again, I'm going to allow a little bit

7   of leeway here.  Overruled.

8             Go ahead and answer.

9             THE WITNESS:  We were working to the point --

10  working up to the point of a murder charge, yes.

11       BY MR. MARKUS:

12       Q.   And you had determined prior to the date that he

13  traveled to Cabo that you were going to proceed with a murder

14  case, right?

15       A.   Yes.

16       Q.   But you waited because you wanted venue in Denver,

17  correct?

18       A.   Correct.

19       Q.   So you must not have thought he was a danger to

20  the community between the time you decided to go forward with

21  the case and when he was arrested.  You let him stay out

22  during that time, right?

23       A.   We did allow him to stay out during that time.

24       Q.   And he certainly wasn't a danger to the community

25  during that time, right?

1      A.   I think he is a danger to the community based on

2  his --

3      Q.   He wasn't a danger during that time, was he, sir?

4  You wouldn't have let a dangerous person stay out on the

5  street because of a venue decision, would you?

6      A.   I mean, unfortunately while we're building

7  investigations there are dangerous people on the street every

8  day.

9      Q.   Would you have let a dangerous person stay out to

10  make a venue decision?

11      A.   I don't know.  That wasn't my decision to make

12  regarding the venue decision.  But it took us a while to

13  build the investigation and get to this point of a murder

14  charge.

15      Q.   I understand that.  But my question is different.

16  I think we can move on.

17      (Brief pause)

18      Q.   You interviewed the plant manager at the ALLEN

19  Company, correct?

20      A.   Yes.

21      Q.   And the rifle case, the plant manager told you,

22  was 46 inches, correct?

23      A.   I don't have that in front of me, but if that's

24  what the report says that the manager said, I'll take your

25  word for it.

1        Q.   In fact, the bag itself is called a 341-46,

2   correct?

3        A.   I don't know the model number.

4        Q.   Okay.  If that is a model number, does the 46

5   refer to 46 inches?

6        A.   I don't know.

7        Q.   All right.  And the gun in this case I think you

8   said was 47 inches long?

9        A.   I'm estimating that.  I don't have those

10  dimensions in front of me.

11       Q.   Okay.

12            MR. MARKUS:  Your Honor, may I have a moment,

13  please?

14            THE COURT:  Certainly.

15       (Brief pause)

16            MR. MARKUS:  One moment, Your Honor, if I may?

17            THE COURT:  Certainly.

18       (Brief pause)

19       BY MR. MARKUS:

20       Q.   Agent, in the discovery that's been provided to

21  the Defense one of the items is the manual for the shotgun in

22  this case.  Have you reviewed that manual?

23       A.   I have seen the manual, yes.

24            MR. MARKUS:  I'm going to mark that manual as

25  Defense Exhibit B.

1          (Defendant's Exhibit B was marked for identification.)

2               MR. MARKUS:  And for the prosecutor's convenience,

3    that's located at discovery at INV-142.

4               Your Honor, I'm sorry this isn't stapled, but can

5    I hand it up to the Court?

6               THE COURT:  You may.  We're going to need a copy

7    for the witness, as well.  Do you have another copy for the

8    witness?

9               MR. MARKUS:  Yes, (unintelligible).

10              THE COURT:  All right.  Okay.  Thank you.

11              Mr. Winstead, do you have a copy of this document

12   available?

13              MR. WINSTEAD:  I do.  I'm pulling it up now, Your

14   Honor.  Thank you.

15              MR. MARKUS:  Well, before I put it on the screen,

16   I move in Defense Exhibit B, which is from the government's

17   discovery and is the firearm manual in this case.

18              THE COURT:  Thank you.  Any objection to B, Mr.

19   Winstead?

20              MR. WINSTEAD:  No objection.

21              THE COURT:  Thank you.  Defendant's B is admitted.

22         (Defendant's Exhibit B was admitted into evidence.)

23         BY MR. MARKUS:

24         Q.   And I think you said, Agent, that you've reviewed

25   this, correct?

1      A.   I have seen it, yes.

2      Q.   And you testified earlier that one of your experts

3  said that the gun would not have gone off it dropped,

4  correct?

5      A.   That's what the Zambian ballistic report says,

6  that the drop test was conducted and it did not discharge.

7      Q.   But that's not what the manual says, correct?

8      (No audible response)

9      Q.   I'll turn your attention to Paragraph 16 of the

10 manual.  Can you read that for me, please?

11     A.   Sixteen says, "Dropping a loaded gun can cause an

12 accidental discharge even if the safety in the -- is in the

13 on safe position.  Be extremely careful while hunting or

14 during any shooting activity to avoid dropping any firearm."

15     Q.   Thank you.

16          MR. MARKUS:  I have nothing further, Your Honor.

17          THE COURT:  Thank you.

18          Is there any redirect, Mr. Winstead?

19          MR. WINSTEAD:  No.  No redirect, Your Honor.

20          THE COURT:  All right.  Thank you.

21          Thank you, Mr. Peterson.

22          THE WITNESS:  Thank you.

23          THE COURT:  You may step down.

24     (Witness excused.)

25          THE COURT:  I asked the government once before our

1  break whether there were any additional witnesses, but let me

2  just confirm that now.  , Mr. Winstead, does the government

3  have any additional witnesses?

4           MR. WINSTEAD:  No additional witnesses.

5           THE COURT:  All right.  Thank you.

6           And again, I'll ask Defense Counsel, Mr. Markus,

7  if the Defendant has any witnesses.

8           MR. MARKUS:  No, Your Honor.  We have no witnesses

9  at this time.

10          THE COURT:  All right.  Thank you.

11          Let me ask Government Counsel to please make an

12 argument with respect to detention.

13          MR. WINSTEAD:  Thank you, Your Honor.

14          So I'd like to first address the legal question,

15 if I may, about the appropriateness of the presumption of

16 detention.

17          THE COURT:  Yes.  Please.

18          MR. WINSTEAD:  All right.

19          So basically, the statute says that if a judicial

20 officer finds probable cause to believe that the person

21 committed an offense under Section 924(c) that the

22 presumption applies.

23          (Unintelligible) that there was some precedent

24 that said it must be a formal charge because the plain

25 language of that statute doesn't require a formal charge.  It

1   just requires a probable cause and there was a violation of

2   924(c).

3           That's the position that we take, Your Honor.

4   That there is no requirement of an actual charge of 924(c),

5   and that in this case we have established probable cause that

6   could have underlied a charge under that section.  This is a

7   violent crime that was committed with a firearm and,

8   therefore, all of the elements of 924(c), there is probable

9   cause for them.

10          With regard to the precedence.  It looks like

11  there's an old Second Circuit case, *U.S. versus Chimurenga*,

12  760 F2.d 400, again the Second Circuit decision from 1985,

13  that concludes that a formal charge is required, not just a

14  probable cause finding.

15          But subsequently, there's a decent number of

16  decisions by various district courts from the 80s and from

17  more recently that evaluate the logic of that decision and

18  that basically say that doesn't comport with the plain

19  reading of the statute.  That the plain reading of the

20  statute does not require any formal charge of 924(c), and

21  they happen to generally be situations where it's a violent

22  crime where 924(c) in particular could have been charged.

23          Those decisions are *U.S. versus Bess*, 678 F. Supp.

24  929, that's the District Court of the District of Columbia

25  from 1988, which has a pretty thorough analysis of the

1    *Chiumurenga* decision and disagrees with it.

2          *U.S. versus Farguson*, F-A-R-G-U-S-O-N, that's 721

3    F. Supp. 128.  That's the district of -- the Northern

4    District of Texas from 1989.

5          And then most recently, *U.S. versus Lee*, 206 F.

6    Supp. 3d 103, which is, again, the District Court of D.C.

7    from 2016.

8          And all of them just basically (unintelligible)

9    the plain reading of the statute which requires only that

10   there be a judicial officer that finds there is probable

11   cause to support a 924(c) charge, not that there be an actual

12   924(c) charge.

13         And again, in this case, it could have been 924(c)

14   charge because this is a violent -- a federal violent crime

15   committed with a firearm.

16         THE COURT:  Let me ask a question with respect to

17   that portion of your argument, Mr. Winstead.  I'm looking at

18   18 U.S.C. Section 3142(e), and in particular (e)(3)(b).  And

19   as I read the statutory language of the Bail Reform Act it

20   appears that, in my view, to unequivocally say that, "It

21   shall be presumed that no condition, or combination of

22   conditions, will reasonably assure the appearance of the

23   person as required and the safety of the community if the

24   judicial officer finds that there is probable cause to

25   believe that the person committed an offense under Section

1  924(c)."

2              That's the plain language of the statute, right?

3              MR. WINSTEAD:  Yes.

4              THE COURT:  Well, what was the basis for the

5  decision in the Second Circuit that that language required a

6  formal charge and not just a probable cause finding?

7              MR. WINSTEAD:  Yes, Your Honor.  So that analysis

8  was that at the beginning of the Section 3142(a)(4) it has an

9  overarching discussion of detention for a person who has been

10 charged with a crime.  And so the logical link that the

11 *Chimurenga* court found was that that section should be read

12 to limit the language of Section E to require that whatever,

13 you know, whatever the offense would be comes from an actual

14 charge.

15             And again, that is an analysis which subsequent

16 courts have basically said that's stretching what the statute

17 says too much.  That the general situation of detention

18 doesn't logically follow that every single subsection would

19 require the actual charge.

20             MR. MARKUS:  Judge, I hate to interrupt, but I

21 think I could short-circuit this.  You cannot commit 924(c)

22 in Africa, so there is no probable cause for a 924(c) case.

23             Unlike foreign murder the statute charged here --

24 the reason they didn't charge 924(c) is there's no -- they

25 could not charge it.  It's impossible in this case.  So there

1    is no probable cause for a 924(c) charge in this case.

2              THE COURT:  Do you want to address that, Mr.

3    Winstead?

4              MR. WINSTEAD:  Sure.

5              Well, the jurisdictional hook of 924(c) is that a

6    federal crime was committed, a federal violent crime.  There

7    is no requirement of -- there's no jurisdictional,

8    territorial jurisdictional or other sort of requirements that

9    would make 924(c) un-chargeable.

10             If a federal crime was committed, which we are

11   obviously here for, and it's a violent crime, I don't see

12   what in 924(c) would prevent the charge in this case, the

13   foreign murder charge, to be a predicate for 924(c).

14             And I don't -- I'm afraid I haven't researched

15   that issue.  If Defense Counsel has any case law supporting

16   that, I'm happy to address it.

17             MR. MARKUS:  No, there's no cases, because no

18   prosecutor has ever charged 924(c) in connection with a

19   foreign murder.

20             THE COURT:  No prosecutor in the history of the

21   United States, Mr. Markus.  That's your point of view?

22             MR. MARKUS:  As far as I've found, Your Honor, no.

23             THE COURT:  All right.  Fair enough.

24             Mr. Winstead, do you have further argument on

25   detention?

1          MR. WINSTEAD:  I do, Your Honor.

2          So with regard to this particular defendant, I

3   think obviously Defense Counsel, I anticipate, will make an

4   argument that, number one, we have sat on the case for years

5   during this whole investigation and, you know, making

6   charging decisions based on sort of a strange venue provision

7   and that that shows that we don't think he is a danger.

8   Likewise, we have let him leave the country.  In fact, he

9   left the country immediately before the onset of this case.

10  And, you know, we've seen him leave the country many times

11  over the course of the years and he always comes back, and he

12  has been aware of the case for at least a year-and-a-half, or

13  two years, or something like that.

14          The 100 percent difference now is that there is an

15  actual case.  That there are actual charges.  There has been

16  actual seizures of money.  There is the, you know, the

17  prospect of life in prison, and that just is a completely

18  different situation.

19          This is not the sort of defendant where we're

20  making an argument like he's a gang member and he's going to

21  be going around, you know, perpetrating random violence.  All

22  of this (unintelligible) violence and risk of flight comes

23  from a very calculated way of going about his affairs.

24          The cost of avoiding potential charges that may

25  come at some point in the future, or a nebulous of FBI

1   investigation, the costs of leaving the country, of selling

2   the practice, of uprooting, you know, life, all of those

3   sorts of things, common sense would say no one would do that

4   when they feel as though they have gotten away with a crime.

5   When they feel as though they were -- they got past the

6   initial Zambian investigation which was incredibly cursory,

7   they got past the insurance investigation, and it's been

8   years now.

9           It would be one thing if there was a hot and heavy

10  FBI investigation immediately when it occurred; it's years

11  later.  I think that it's 100 percent reasonable that now

12  he's in a position that he just absolutely was not in a month

13  ago.  And so what we're maintaining is that now, now that

14  there is an actual charge, now that he's actually aware of

15  the nature of the investigation and the potential of a

16  conviction, now he has massive incentives to flee or to do

17  some kind of witness intimidation or (unintelligible) other

18  -- something else that he's shown some level of proclivity to

19  do.

20          Now, many of those sorts of facts that we are

21  relying on to show that he is a danger seem very outlandish.

22  The whole episode that we provided to the Court by proffer,

23  in 2006 where it appears that he committed insurance fraud by

24  faking an alligator attack so that he could -- so that he

25  could receive insurance payments for his disability, that was

1    widely thought out in the hunting community and among his

2    other contacts to be a fraud.  That's a test run, right?

3              That's an example in his head where he's done this

4    completely outlandish thing and had a big financial benefit

5    from it and has capitalized on the fact that it's very

6    difficult to do an investigation when something happens in

7    the bush of an undeveloped -- of a less developed country

8    without the same kinds of law enforcement resources and

9    investigatory resources.

10             Ten years later, he's got another problem and he

11   takes a similarly outlandish approach to it.

12             Then many of the facts that Defense Counsel relies

13   on to imply that our theory of the case are implausible, that

14   they weren't fighting, that the shot came from within a

15   shotgun case, that, you know, those are consistent with

16   premeditation.  Those are consistent with someone who does a

17   cold calculation about how to make a problem go away.  And

18   likewise, with trying to higher hitmen, or trying to higher

19   Nigerians to frighten people and threatening people with

20   that.

21             It's not a question of whether that seems

22   outlandish in the light of day to rational people.  The

23   question is this defendant is the sort of person to whom that

24   is clearly a real possibility.  It's clearly something that

25   he has touched on with many people over time, and it's

1   something that is consistent with his lifestyle.

2          He's an international jet setter that spends an

3   enormous amount of money doing these international hunts,

4   traveling, vacationing.  It's a larger-than-life sort of

5   lifestyle that he is living.  And these conversations that

6   he's having just show he is not someone who is going to be

7   rational, who is going to think about the cost benefits of

8   obeying a court order.  He is the sort of person who has

9   already had real conversations with people about hiring

10  someone from another country to murder someone or to

11  intimidate someone.

12         The context, of course, in Government's Exhibit 1

13  is of Ms. Romm talking about those things where she was

14  asking -- she was asking him if he knew about the case.  She

15  was obviously expressing some sort of anxiety that, you know,

16  he's had these conversations.  Am I at risk?

17         So, again, the real question is not whether they

18  seem outlandish, but whether this defendant is the sort of

19  person who would do those kinds of outlandish things.

20         Likewise, with the international travel, massive

21  financial resources.  And despite the seizures, there remain

22  massive financial resources he can access, including real

23  property in other countries that he can use if he needed to

24  leverage financial resources to set himself up with a life in

25  some other country.

1          In this case -- well, I guess I'll come back to

2    that.

3          But the final thing that the Defendant relies on

4    to not be detained is that he has medical issues and is at

5    risk in detention for COVID-19.  And I think that the

6    Defendant's own (unintelligible) show that that's something

7    he would rely on in trying to get released but is not at all

8    concerned with when he's arranging his affairs by traveling.

9    He goes to remote locations, he's doing dangerous hunts, he's

10   traveling during the pandemic, taking flights to Third World

11   countries.  And so, again, that's something that he has shown

12   he does not consider himself to be at serious risk for when

13   it's his decision to arrange his affairs.

14         The final point, Your Honor, is basically, this

15   case is, as we cited in our filing, this a case is very

16   similar to the *Henthorn* case.  The main differences are that

17   this particular defendant has far greater financial resources

18   than *Henthorn* did.  He has a huge amount of international

19   contacts, he invests in foreign businesses, he owns foreign

20   property, which *Henthorn* did not have.

21         THE COURT:  Well, let me just interrupt you for a

22   second, Mr. Mr. Winstead, with respect to that.  I think you

23   remember that I was the magistrate judge assigned on the

24   *Henthorn* matter as well.  And at the time of the government's

25   contention that Mr. Henthorn should be detained, the

1   government had developed evidence that he also killed his

2   first wife.  Isn't that right?

3           MR. WINSTEAD:  Yes, Your Honor.

4           THE COURT:  And that's a pretty big difference,

5   isn't it?

6           MR. WINSTEAD:  Very true, Your Honor.  There was

7   obviously evidence that he had done it twice in that case.

8           But again, with regard to danger and flight risk,

9   that case didn't have any sort of strange attempts to higher

10  hitmen.  It didn't have a firearm.  It didn't have a person

11  who is an expert hunter using long-range, high-powered

12  firearms, and it doesn't have anyone who has, you know, made

13  explicit threats to people.

14          And so, anyway, again, obviously in a case there

15  were two murders.  Two murders are worse than one.  But in

16  this case there is a huge amount of additional risk of

17  flight, and there is additional evidence that there wasn't in

18  that case that he will take some sort of violent action to

19  try to undermine the case or intimidate witnesses.

20          THE COURT:  Why can't the flight risk be minimized

21  by the fact that apparently the Defendant has already

22  surrendered his passport, as reflected in the pretrial

23  services report, but also by more conventional measures like

24  wearing an ankle bracelet and GPS monitoring?

25          MR. WINSTEAD:  Well, Your Honor, obviously those

1    are mitigations.

2              The ultimate question is whether given the

3    Defendant's financial resources he couldn't still find a way

4    to get out of the country, and whether somehow if he were to

5    cut his ankle monitor, we would be able to respond in time to

6    be able to catch him.  And I think in the government's

7    position the answer is no.  It's still a significant risk

8    that he would leverage his financial resources to figure out

9    a way to get out of the country, even if he doesn't have his

10   passport, and that he is likely to -- if he decides to run

11   and cut his ankle bracelet, he'll do it in a way that will

12   make it extremely difficult for us to catch him before he

13   escapes.

14             THE COURT:  All right.  Thank you.  Anything

15   further?

16             MR. WINSTEAD:  No.  Thank you very much, Your

17   Honor.

18             THE COURT:  Thank you.

19             Mr. Markus, I'll hear (unintelligible).

20             MR. MARKUS:  Your Honor, thank you for hearing us.

21   I know the hearing has been long, and I appreciate the time

22   you've given to this.  This is a really important moment in

23   this case, and I am going to plead with you --

24             UNIDENTIFIED FEMALE:  Hello?

25             MR. MARKUS:  Oh.

1          THE COURT:  I believe we may have someone on the

2    line for hearings that are set to begin at 2:00 p.m.

3          Hello.  This is the judge.  Can you tell me who

4    you are?

5          (Judge conducts unrelated business briefly.)

6          THE COURT:  Sorry for the interruption.

7          MR. MARKUS:  No, of course.

8          THE COURT:  Go ahead, Mr. Markus.

9          MR. MARKUS:  Life in the time of Zoom court, Your

10   Honor.

11         THE COURT:  Yeah.

12         MR. MARKUS:  We're all getting used to it, and

13   getting used to these masks.  So thank you for all of the

14   attention today.

15         As I was saying, this is a critical moment in the

16   case.  Because to prepare for a murder case with the

17   defendant in a foreign jurisdiction from where he's from and

18   from where the counsel's from, in a time of COVID, is

19   stretching the limitations of our system.  And so I am going

20   to be asking for a bond today that will assure his presence

21   in court, will assure that he's not a danger to the

22   community.  And I'd like to address those issues, if I can.

23         First, let me talk about risk of flight and danger

24   to the community.

25         Whether there is a presumption or not, I think we

1  can show that he can -- that there are conditions in this

2  case.  He's turning 67 years old and a few days.  No criminal

3  history.  He is a well-known dentist with two children, one

4  of which is here, who's a lawyer.  His son, Julian, is a

5  lawyer in Miami.

6          His daughter is a dentist.  She had surgery a few

7  days ago.  She went to the airport yesterday, despite her

8  surgery she was going to come, and was in so much pain at the

9  airport I instructed her to go home because I just, I felt it

10 wasn't right to have her travel while she was in pain.  But

11 she wished she could be here.  And she and Julian are both

12 willing to sign onto a bond and to put up their homes, Your

13 Honor.  Doctor Rudolph's children believe he is innocent, and

14 I think that's pretty important in this case.

15         They're also willing to put their houses and their

16 resources on the line because they know their dad will show

17 up to court.

18         Doctor Rudolph has known about this investigation

19 years.  He hired counsel.  We tried to reach out and meet

20 with the government so that we could provide some of these

21 materials.  I only mentioned a fragment of them.  The

22 government refused to meet with us.  Refused to even give us

23 their names.  Refused a phone call.  Very strange if they had

24 an open mind about this case.

25         We could have given them information, for example,

1   of things like the alligator attack that the government now

2   wants to jump to conclude was some sort of fraud without any

3   evidence.  We have so much evidence to show that that was a

4   legitimate, real alligator attack on his thumb.

5           Doctor Rudolph, hold up your thumb.  Show the

6   Court it's missing.

7           It was bitten off by an alligator in 2006.  It's

8   really quite outrageous for the government to claim, without

9   presenting any witnesses or anything else, that this was some

10   sort of fraud.

11           In any event, let me talk about Doctor Rudolph's

12   health for a moment.  We outlined some of this in a motion

13   yesterday, but he has a very serious heart issue at 66,

14   turning 67 years old.  He's had a pacemaker for 20 years.  He

15   got a pacemaker in his late 40s.  It's been replaced three

16   times.  But they haven't been able to replace the wires, the

17   leads that go from the pacemaker to the heart.  They said it

18   would be too dangerous to take those wires out and replace

19   them.  Instead, what the doctors have recommended is that he

20   be on 24-7 monitoring through his cell phone.  He has an app

21   that monitors his heart and the pacemaker.

22           Anytime there is an alert the Mayo Clinic monitors

23   that app 24-7.  We have been in touch with the jail, they are

24   not going to monitor the app.  And his doctors say that that

25   is necessary because those wires can fail at any moment, and

1  he's got a serious heart issue, obviously.

2          The government makes a strange argument in

3  response.  They say, well, he travels so that shows he's

4  strong.  But when he travels, of course, the app is still

5  monitored.  Everywhere he goes there's Wi-Fi and the app is

6  monitored.  And, I mean, I'm not sure if the government

7  recognizes this, but being at the downtown detention center

8  is much different than being at a chalet overseas.

9          So he is in really bad shape at the jail.  Not

10  only is it not being monitored, but it's much more stressful.

11  He is not getting the medication that he is supposed to be

12  getting.  For example, his blood pressure medication the jail

13  told him they don't have what he is supposed to get so they

14  give him some other medication, which has shot through the

15  roof.

16          He's at extreme risk because of COVID.  Ms. Moss

17  and I went to visit Doctor Rudolph yesterday at the jail.

18  They told us that this in-person visit was crazy because we

19  were going into a COVID wing at the jail and they recommended

20  against it.  But we did it anyway because it's so important

21  to be able to meet with our client during a murder

22  investigation in preparation for a bond.

23          We only have about, when we set up a call through

24  secures (phonetic), 30 minutes at a time to do it.  And even

25  here (unintelligible) --

1          (Music playing into the speaker)

2               THE COURT:  Hello.  Whoever's calling in, you're

3   going to need to silence your phone, or either get off the

4   line.  We're not ready for your hearing yet, and we're in the

5   middle of another hearing, and we can hear your music in the

6   background.

7               Anything you can do about that?

8               THE COURT CLERK:  Just a moment.

9               THE COURT:  Thank you.

10      (Brief pause)

11              THE COURT CLERK:  Okay.

12              THE COURT:  Thank you.

13              MR. MARKUS:  Thank you.

14              Your staff has been great with us, by the way, as

15  well.

16              So I failed to mention, he's also had two surgical

17  valve replacements on his heart.  And not only does the

18  government argument (sic) that he would flee, it's just

19  contrary to the evidence, but it would have to mean that he

20  would turn off his app for monitoring his heart.  Because

21  obviously the Mayo Clinic would know exactly where his phone

22  is.

23              So for the government's argument to be correct he

24  would have to somehow cut off his bracelet, without the

25  government reacting in time, somehow get to an airport

1  without a passport, travel without a phone, turn off his

2  phone.   Honestly, I don't know how you get overseas these

3  days without a passport, ID, phone.

4           We're willing to do any condition the Court sees

5  fit, and I'll get to that in a moment.

6           Let me talk for a second about the strength of the

7  case.

8           Your Honor, it's rare to have a murder case in

9  federal court, of course, but this is as weak of a murder

10 case as you can get.   There is no physical evidence.   There's

11 no eyewitnesses.   They've tried to re-create things.   They

12 assume the worst.   For example, the cremation which we showed

13 in her will, but they assumed that because he was trying to

14 get home to tell his kids in person about this, that that was

15 somehow an evil motive.   They're trying to re-create

16 something that is not re-createable.

17          The evidence was there that showed that this was

18 an accident.   It's not our fault that that wasn't taken.

19 Gunshot residue, fingerprints, and so on.

20          The government's argument is, well, now he faces

21 life in prison.   That was always there.   I mean, we knew

22 about this murder investigation for years, so we've known

23 about the prospect of life in prison.   We have been hiring

24 our own experts.   We have been hiring our own people.   We've

25 been putting together our own evidence, because we believe

1    that he is innocent, and so does he.

2              If the government's argument was right that the

3    prospect of life in prison means no bond, that would mean in

4    any case where there was a maximum of life you wouldn't get

5    bond.  This case, because of the weakness of the case, the

6    extreme weakness of the case, shows -- cuts in favor of

7    granting a bond, Your Honor.

8              In addition to that, I've mentioned the two

9    children who are here.

10             The motive that they mentioned, there was no

11   motive here.  As you heard, they interviewed all the people

12   from the trip.  They were getting along, the husband and

13   wife.  They had a good relationship.

14             The affairs that both the husband and wife were

15   having were both known to each other.  This was not something

16   that was a secret.  This was a long-term thing that Doctor

17   Rudolph had with numerous people that the wife knew about,

18   and we have so much evidence to support that.

19             So let me talk for a moment -- oh, just really

20   quickly about the witness intimidation.

21             First of all, there are no witnesses.  That's a

22   big point of this.  But the few people who ran on to the

23   scene, we've known about those people.  They were so

24   concerned that some of them were paid off they have asked

25   them multiple times, they've done an investigation into money

1    transfer.  No obstruction.  No, even, hint of obstruction by

2    Doctor Rudolph in all of these years that he's known about

3    this investigation.

4         We can set up no -- as part of the conditions of

5    bond, no transfer of money without approval of the Court over

6    $1000, or something like this, so that we can assure that no

7    money is going to go out, if that's the concern.

8         The fact that he got into fights years ago with

9    some of the employees that left.  First of all, there was

10   never any physical fight with anybody, no physical violence

11   with anybody, no police reports with anybody.  A couple of

12   disgruntled employees said that he made threats in passing.

13   It has nothing to do with this case, Your Honor.  Absolutely

14   nothing, and --

15        THE COURT:  Well, wait a minute.  There was a

16   police report, as I understood the testimony in Exhibit -- or

17   excuse me, the statement, in Exhibit 3 by Doctor Steven

18   Speca.  He said in his statement that he was threatened by

19   the Defendant and that he did report the threat to the

20   police, and that he reported text messages which were

21   threatening to the police, and that the police followed up on

22   that report and that the police advised him to obtain a gun,

23   which he did, to protect himself.

24        MR. MARKUS:  Judge, from our investigation we

25   found that both sides called the police because there were

1    threats going back and forth like two kids saying "we're

2    going to beat you up," both from Speca and Rudolph back to

3    each other.  Both sides called the police and the police

4    said:  We're not going to do anything in this case.  Both

5    sides stay away from each other.  We're not filing a report,

6    we're not doing anything.  Both sides were upset.

7            And it was a disgruntled employee who lasted at

8    the office about two months, something like this, three

9    months, and they were both yelling at each other and the

10   police didn't get involved.  They said, we're not getting

11   involved.

12           And, of course, that's from many, many years ago

13   related to an office incident that has nothing to do with

14   whether he would obstruct justice, or whether there are

15   conditions -- I guess the question really, Your Honor, is:

16   Are there conditions that we can set that would assure the

17   safety of the community?

18           And so what I'm proposing in this case is that we

19   have an ankle monitor, no firearms are permitted at the home

20   or anywhere else around Doctor Rudolph, that he is on -- that

21   he stay at his residence unless he's meeting with a lawyer or

22   a preapproved leaving of the residence, that he not have any

23   contact with any witness.

24           The government can give me a list of whoever they

25   -- all the people that they have interviewed.  We will agree

1    that Doctor Rudolph will not speak to any of those people

2    while out on bond.  It would be a violation of bond and

3    another offense.  We would agree to that.

4              We would agree that he can't encumber any property

5    or do anything with his resources, other than higher counsel.

6    I've got to make sure I put that in there.

7              And he would stay at his home, Your Honor.

8              So I think there are conditions that we can set

9    here that would assure his presence in court, number one, and

10   that he is not a danger to the community.

11             I will say, it is quite odd that the venue

12   decision in this case took precedence over any potential

13   danger.  I mean, if they were really concerned about danger

14   they would have arrested him at the moment the case

15   investigation was concluded.  They wouldn't have waited for

16   him to travel numerous weeks.

17             Sorry.

18             THE COURT CLERK:  I apologize for interrupting for

19   the third time, but I think that we have lost

20   (unintelligible).

21             THE COURT:  I'm sorry?

22             THE COURT CLERK:  It appears that our video

23   (unintelligible).

24             MR. WINSTEAD:  No.  I'm still here.  I can't see

25   anything, but I can still hear.

1          MR. MARKUS:  I'm about to finish, so I don't know

2    if that's okay.

3          THE COURT CLERK:  Okay.

4          THE COURT:  All right.  Mr. Winstead, are you

5    alright with being able to hear but not see for the -- there

6    we go.  We have him back on the screen.  All right.  Thank

7    you.

8          MR. MARKUS:  It's weird to make the argument with

9    his face right in front of me, but, you know --

10          THE COURT:  Tell me.

11          MR. MARKUS:  So those are the conditions, Your

12    Honor.

13          We're willing to post assets, as well.  He is

14    willing to -- the government has seized so much already, much

15    more than the value of the insurance, but if the Court wants

16    some assets posted we're happy to secure the bond with his

17    home.  He has a $6.5 million home in Phoenix that has a

18    mortgage on it, but I think in equity he has about 4 million,

19    and we're willing to post that as security, Your Honor.

20          His business has been valued between 8 and $10

21    million, we're willing to secure the bond with that business

22    in Pittsburgh.

23          But I'm really pleading with the Court to issue a

24    bond in this case so that we can prepare for the trial of his

25    life, obviously.  He's going to be 67 years old, and with him

1  here in a foreign jurisdiction, with us in Miami, with COVID,

2  with his health conditions, I mean, the deck would be -- the

3  deck's already stacked against us, even though we believe in

4  his innocence.  But it would pretty much be insurmountable.

5  So I am asking for a reasonable bond in this case.

6            Thank you, Your Honor.

7            THE COURT:  All right.  Thank you.

8            Mr. Winstead, I'll give you the last word.  Do you

9  have any additional argument?

10            MR. WINSTEAD:  I did, just very briefly, Your

11  Honor.

12            I'm sorry that it's come up several times, but I

13  just wanted to clarify.  I don't think that it's accurate,

14  the characterization of the communications between defense

15  and the government as us refusing to speak with them.

16            In the conversations with Special Agent Peterson

17  there were many discussions about interviewing both of the

18  Defendant's children and the Defendant, and ultimately it was

19  on their side that they decided not speak with us.  That was

20  obviously based on their analysis of how much information

21  they were willing to get from us.

22            I'm seeing Defense Counsel shaking their head, but

23  I'm just -- and again, I don't like getting into

24  communications.  But the specific language was, "Thanks,

25  Agent Peterson.  Julian and Anabianca respectfully decline

1   your request right now.  As for Mr. Rudolph, we cannot agree

2   to the interview without it being a two-way street and we

3   share in your materials, or at least us seeing the Zambian

4   materials."

5          Which, again, throughout the case we have been

6   very interested in hearing from their perspective.  Of course

7   the main thing that Agent Peterson didn't tell them was the

8   contact info for government counsel.  But, again, that's not

9   a refusal to speak with them.

10          And when this case was initiated we, again, had

11   been open to speaking with them and receiving any of this

12   information.

13          MR. MARKUS:  Judge, this is a minor point,

14   obviously, but they're talking about whether the Defendant

15   himself would go in.  What I was talking about was whether

16   Counsel could speak to the prosecutors.  And I asked for the

17   prosecutor's name and number, they refused.  And I assume

18   they refused because the prosecutor didn't want to speak to

19   us.  I said we would sit down, putting aside Rudolph and the

20   kids, that we, counsel, would sit down with the prosecutors,

21   and were turned away.

22          THE COURT:  All right.  Thank you.

23          I'm going to get to the bottom of this rebuttal

24   presumption issue.  And unfortunately, that's going to

25   require that I step down from the bench and go back to my

 1    chambers and take a look at some of the law that's been cited

 2    by counsel.

 3                So we're going to be in recess.  It's now 2:20.  I

 4    understand that we're behind on the 2:00 p.m. docket, and I'm

 5    sorry for that, and I ask everybody's patience on that.  But

 6    I am going to step off the bench until 2:45, and at that time

 7    I'll come back in and give you my decision with respect to

 8    detention.

 9                MR. BOHN:  Your Honor?

10                THE COURT:  We're in recess.

11                MR. BOHN:  Your Honor?

12                THE COURT:  Yes?

13                MR. BOHN:  I have another matter (unintelligible).

14    May I be excused for (unintelligible)?

15                THE COURT:  You may be excused, Mr. Bohn.

16                MR. BOHN:  Thank you, Your Honor.

17                THE COURT:  You're welcome.  All right.

18                THE COURT CLERK:  All rise.  Court is in recess.

19          (Recess from 2:21 p.m. until 2:48 p.m.)

20                THE COURT CLERK:  All rise.  Court is in session.

21                THE COURT:  Thank you.  Please be seated.

22                We are back on the record in 21-mj-00209, the

23    *United States of America versus Lawrence Rudolph*.  This is a

24    detention hearing.  The Court has heard testimony from

25    witnesses and arguments of counsel.

1          The Court has jurisdiction over the subject matter

2   of the action and over the parties.

3          The venue is proper in the District of Colorado,

4   and each party has been given a fair opportunity to be heard

5   on the issue of detention.

6          There are certain factors under the Bail Reform

7   Act that I must consider in making a decision as to whether

8   there is -- there are, excuse me, conditions of release that

9   I can impose that will reasonably assure the Defendant's

10  appearance in court in the future as required, and the safety

11  of the community.

12         Those factors include:

13         The nature and circumstances of the offense

14  charged;

15         The weight of the evidence against the defendant;

16         And the defendant's history and characteristics,

17  including his character and physical and mental condition,

18  his family ties, his employment, his financial resources, his

19  length of residence in the community and community ties, his

20  past conduct, his history relating to drug or alcohol abuse,

21  his criminal history, his record concerning appearances at

22  court proceedings, whether he was on some form of release at

23  the time of commission of the alleged incident offense;

24         I must also consider the nature and seriousness of

25  the danger to any person or to the community that will be

1    posed by the defendant's release.

2            I have considered the pretrial services report,

3    which I take judicial notice of.  The pretrial services

4    report recommends that the Defendant be retained.  I've also

5    considered the issue of the rebuttable presumption that's

6    been raised and discussed by counsel.  And the Court

7    concludes that there is a rebuttable presumption in this case

8    that the Defendant is not a suitable candidate for release.

9            I draw that conclusion based on my reading of the

10   Bail Reform Act, 18 U.S.C. Section 924(c), and at least two

11   District Court cases that interpret the interaction between

12   the Bail Reform Act and 18 U.S.C. Section 924(c) in cases

13   involving foreign crimes.

14           In *United States versus Mehanna*, at 669 F. Supp.

15   2d 160, a 2009 case from the District of Massachusetts, the

16   defendant was charged with crimes relating to terrorism in a

17   foreign country, specifically under 18 U.S.C. Section 956 and

18   18 U.S.C. Section 2332.

19           In reviewing the issue of the rebuttable

20   presumption the court concluded that the rebuttable

21   presumption of detention was applicable, quoted the language

22   of 18 U.S.C. Section 3142(e)(3)(b) and (c), which we've been

23   discussing, from the Bail Reform Act, and concluded that

24   because there was probable cause that the defendant, although

25   uncharged with a crime under 18 U.S.C. Section 924(c), had

1  nevertheless committed such a crime, even though these were

2  foreign acts alleged to have occurred in a foreign

3  jurisdiction, the rebuttable presumption applied.

4          The same is true of the case cited by the

5  government, the *United States versus Lee*, 206 F. Supp. 3d

6  103, a 2016 decision of the District Court for the District

7  of Columbia.  There Judge Jackson concluded again that the

8  rebuttable presumption was in effect because there was a

9  judicial finding that there was probable cause to believe

10  that the defendant committed the offense of using or carrying

11  a firearm during and in relation to a crime of violence under

12  18 U.S.C. Section 924(c)(1)(a).

13          I note that the language of Section 924(c)(1)(a)

14  essentially indicates that it applies to, "Any crime of

15  violence for which the person may be prosecuted in a court of

16  the United States."

17          The crime of violence alleged here is one for

18  which the Defendant may be prosecuted in a court of the

19  United States, and is, in fact, being prosecuted in a court

20  of the United States.  So by the plain language of the Bail

21  Reform Act, as well as 18 U.S.C. Section 924(c)(1)(a), the

22  Court finds that the rebuttable presumption against release

23  applies in this case.

24          What that means for purposes of the decision the

25  Court has to make today is, as outlined in some detail in the

1    cases that I've just cited, the Defendant has to come forward

2    with some evidence that essentially he's not a flight risk

3    and he's not a danger to the community.

4          The Court has listened very carefully to all of

5    the evidence provided and considered it.  And I understand

6    that Defendant's position that this is a weak case.  The

7    Court does not agree that the evidence at this stage of the

8    case demonstrates that it is a weak case.

9          The Court is particularly struck by the evidence

10   provided relating to the implausibility of the gun having

11   been discharged accidentally or, frankly, in some sort of a

12   suicide situation.  You know, the Court understands that it

13   is the government's position that the testing that the

14   government has conducted demonstrates that it's implausible

15   that the decedent put the shotgun either on the floor, or on

16   the ground, or against her chest, to zip the case, and that

17   in the course of doing that the shotgun went off.  There is

18   other evidence here, too, which convinces the Court that this

19   is not as Defendant would like to call it, a weak case.

20         The reason why I mention that is because one of

21   the elements that the Court must consider under the Bail

22   Reform Act is the strength of the evidence against the

23   Defendant.  And I understand why the Defendant wants to say

24   that this is a weak case and wants the Court to reach that

25   conclusion, but I cannot.

1          I also, based on other information, adduced both

2    today, and in part in the Bail Reform -- or, excuse me, in

3    the pretrial services report, cannot find that there is a

4    combination of conditions that I can impose that will

5    reasonably assure this Defendant's appearance in court in the

6    future and the safety of the community.

7          My concerns relate to the Defendant's apparent

8    wealth.  Although there was plenty of testimony today about

9    how the government has calculated the Defendant's wealth, and

10   about the government's seizure of certain assets of the

11   Defendant, it nevertheless remains clear that whether you go

12   with what the Government says about the Defendant's current

13   net worth, or whether you go with the assets that he reported

14   in the pretrial services report to the tune of $27,740,000,

15   the Defendant is a very wealthy person.

16         It's also clear that the Defendant is incredibly

17   familiar with international travel.  This may be, in the 14

18   years that I've been on the bench, the case involving the

19   most international travel by an accused person that I have

20   had in my courtroom.

21         Those things, the fact that this defendant has

22   vast sums of money at his disposal, that he is intimately

23   familiar with international travel, that he owns property

24   outside of the country in Mexico, make it impossible for the

25   Court to conclude that he is not a serious flight risk.

1          I am also troubled, and I must say so, by the

2    evidence that relates to, what I will call for lack of a

3    better phrase, the Defendant's volatile nature.  I have heard

4    nothing that rebuts some of the evidence provided by the

5    government that this defendant has made meaningful threats to

6    others about differences that arose between the Defendant and

7    other persons.  Threats to higher hitmen, threats to put a

8    bullet in someone's head.  Those kinds of threats and

9    statements, and the Defendant's incredible familiarity with

10   firearms, again, in my view, make this defendant a danger to

11   the community.

12          I am not insensitive to the arguments made by the

13   Defendant relating to his age and his medical conditions, but

14   at the end of the day the law requires that the Defendant

15   rebut the presumption that he is not a suitable candidate for

16   release and I cannot find that he has done so.  Therefore,

17   the Defendant is remanded to the custody of the United States

18   Marshals.

19          Counsel, Mr. Winstead, do we need to do anything

20   further to set this matter for a further hearing on the

21   magistrate judge's docket?  Or, what is your position on

22   that?

23          MR. WINSTEAD:  It's currently set for a hearing on

24   Thursday.  I don't believe anything else is required at this

25   point.

1          THE COURT:  All right.  Thank you.

2          Anything further, then, from the defense counsel,

3  Mr. Markus?

4          MR. MARKUS:  Your Honor, obviously we object for

5  the record.

6          Regarding Thursday's hearing, is that before Your

7  Honor?

8          THE COURT:  It is, I believe.  Is that right, Mr.

9  Winstead?  I haven't looked that far ahead on my docket, to

10  be honest with you, but I assume it is.

11          Is that right, Mr. Winstead?

12          MR. WINSTEAD:  Yes, I believe it is.

13          THE COURT:  Okay.

14          MR. MARKUS:  Your Honor, we're traveling back to

15  our district this evening.  Can we appear via video for the

16  arraignment?  I think that's what it's set for.

17          THE COURT:  Yeah.  You can, and I'll give you

18  permission to do that now.  I'm going to leave it to you to

19  check with Ms. Galera, the courtroom deputy, to make sure you

20  have whatever instructions you need to accomplish that.

21  That's not my area of expertise.  But you do have permission

22  to appear via video for the hearing on Thursday, should you

23  wish to do so.

24          MR. MARKUS:  Thank you, Your Honor.

25          And do we know what time that's set?  I apologize.

1           THE COURT:  If I can ask Ms. Galera, if she has

2   the calendar available, if she could look for me?

3           THE COURT CLERK:  10:00 a.m., Your Honor.

4           THE COURT:  10:00 a.m.  Obviously Mountain Time.

5           All right.  Thank you.  There being nothing

6   further, then, with respect to this matter, we're in recess

7   on this matter.

8                   (Time Noted:  3:00 p.m.)

9                       *  *  *  *  *

10                        CERTIFICATE

11      I, RANDEL RAISON, certify that the foregoing is a

12   correct transcript from the official electronic sound

13   recording of the proceedings in the above-entitled matter, to

14   the best of my ability.

15

16

17   _____          January 10, 2022

18   Randel Raison

19

20

21

22

23

24

25