IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

CASE NO. 22-CR-00012-WJM

UNITED STATES OF AMERICA

vs.

LAWRENCE RUDOLPH
_____/

**LAWRENCE RUDOLPH'S REPLY TO RESPONSE
TO MOTION FOR RELEASE UNDER 18 U.S.C. § 3142(*i*)**

Following the death of Dr. Rudolph's late wife while the couple was visiting Africa, the Zambian government investigated and ruled the death accidental. The life insurance companies the government calls "victims" paid on the policies. Refusing to accept this, Colorado-based FBI agents spent five years crisscrossing the country and traveling to Africa to come up with a nefarious narrative they hope to present to a Denver jury. Extensive travel was necessary because nothing about this case has any real connection to Colorado. Unsurprisingly, this profligate exertion has yielded a circumstantial case built entirely on the surmise of former law enforcement agents, who will testify about what they infer could have happened. Recognizing the weakness of its case, the government sought and obtained Dr. Rudolph's confinement in Denver, 865 miles away from the Rudolph home in Phoenix and thousands of miles away from their children's homes in Miami and Pittsburgh. To achieve this, they deliberately made no effort to apprehend Dr. Rudolph until he traveled to Mexico. This artifice supposedly voids Dr. Rudolph's constitutional venue rights. The present question is only whether Dr. Rudolph's contrived isolation during a global pandemic is consistent with the presumption of innocence and the ability to prepare for a fair trial.

The government's response never squarely addresses whether pre-trial detention is, given the pandemic and the government's unprecedented machinations, consistent with ensuring that Dr. Rudolph has a full and fair opportunity to mount a meaningful defense. Instead, it conflates three separate questions, engendering confusion. Specifically, the government fails to distinguish between whether detention is authorized, whether detention is appropriate, and whether venue is established.

The response is further flawed for pretending that indicting this murder case in Colorado was perfectly routine because there is a "Colorado victim." DE35:10–11. The government refers not to Bianca Rudolph, but to a foreign insurance conglomerate with a Colorado office. Mrs. Rudolph had no connection to Colorado. The FBI harassed the other victims, her children, for years after their mother's death and subpoenaed them to a Colorado grand jury after they repeatedly asked to be let alone to grieve in peace. The government's dogged concern for a multi-national insurance company belies its contention that confining Dr. Rudolph in Colorado does not unfairly hamper his defense.

**I.      The government's unprecedented effort—during an ongoing and accelerating pandemic—to create venue in a district with no connection to the primary charge warrants temporary release from custody to prepare to answer the charges.**

The government does not deny that it contrived to manufacture venue over the principal charge with the aim of crippling Dr. Rudolph's ability to defend himself. *See* DE35:10–11. Nor could it, given the agent's testimony at the detention hearing:

> Q. He wasn't arrested at the Phoenix airport, was he?
> A. He was not.
> Q. Why not?
> A. Because we wanted the case to be tried in Denver with the primary case agent.
> Q. Okay. So the only way to have it tried in Denver was to wait for him to travel overseas and have him appear for the first time here in Denver, correct?
> A. That is my —
>     [*Prosecution's overruled objection omitted.*]

2

> Q. The only reason we are here in Denver is because you waited to arrest him in Mexico and flew him to Denver where he could be arrested, correct?
> A. We did arrest him, or detain him in Cabo, so that we could bring him directly back to Denver, yes.
> Q. In fact, I mean, you had determined much earlier that you were going to proceed with a murder charge, correct?
> A. We had made the —
>> [*Prosecution's overruled objection omitted.*]
>
> A. We were working to the point — working up to the point of a murder charge, yes.
> Q. And you had determined prior to the date that he traveled to Cabo that you were going to proceed with a murder case, right?
> A. Yes.
> **Q. But you waited because you wanted venue in Denver, correct?**
> **A. Correct.**

DE37:119–20 (emphasis added). The Constitution's two venue provisions are squarely aimed at overbearing tactics to sequester defendants in remote places. *See United States v. Cabrales*, 524 U.S. 1, 6 (1998) ("Proper venue in criminal proceedings was a matter of concern to the Nation's founders."). This Court can best protect Dr. Rudolph's rights by affording the temporary release Congress has expressly authorized for situations like this one, where the government contrived to manufacture venue in a distant district for its own advantage during an accelerating pandemic.

While the government now claims to be gravely concerned that Dr. Rudolph will abscond, the facts betray its disingenuousness. Dr. Rudolph was in the country for years after the tragedy underlying the indictment—including on the very day he was arrested. Precisely because he never tried to flee and always returned from trips abroad, agents let him board an international flight, passport and return ticket in hand. They admittedly had ample chance to arrest him in the United States, but their case is weak. So, they lay in wait for weeks or months, plotting to gain an unfair advantage by gambling on a novel and dubious reading of the statute setting venue for extraterritorial federal crimes in the district where the accused "is arrested or is first brought." 18 U.S.C. § 3238.

Congress, of course, never contemplated that federal prosecutors and agents would deliberately fail to arrest a suspected criminal in the United States and instead wait for him to cross the border for a holiday, claiming they could then choose *any* district. The government's complaint that Dr. Rudolph "has not cited a single case," DE35:8, holding that its reading of the statute is flawed underscores how unprecedented its conduct is. Not only did Congress never imagine federal authorities would engage in such tactics but apparently no other prosecutors have ever even tried.

The government's justification for the irregular venue is that Count 2 "involves [a] Colorado victim." DE35:1. This is unconvincing. There is not really a "Colorado victim," and Colorado has no real interest in the case. Upon information and belief, this purported victim is a Canadian insurance conglomerate operating on three continents and based in Winnepeg, Manitoba, Canada. It is apparently the only one of five insurance companies from which the Rudolphs bought policies with an office in Colorado. Whether venue over Count 2 is technically lawful is also irrelevant to this motion. This is a murder case, not a simple mail-fraud case. The lack of an adequate justification for bringing it in a place with no connection to the alleged act, the decedent, or the accused is material to whether Dr. Rudolph can prepare for trial. It suggests that the government orchestrated remote detention to compensate for its weak case and gain a potentially decisive advantage.

Preparing a murder trial during a pandemic while the accused is in custody in a distant place where no one he knows can visit him without taking a long flight is so difficult as to render the trial fundamentally unfair. The government claims the defense's concerns are overblown and minimizes COVID's impact on trial preparation because in its view vaccines have already practically ended the pandemic. DE35:5. However, the prosecutors themselves declined to physically appear for the detention hearing last week because of the pandemic. Additionally, the Court can judicially notice

that vaccines appear ineffective against the Omicron variant: "A growing body of preliminary research suggests the Covid vaccines used in most of the world offer almost no defense against becoming infected by the highly contagious Omicron variant." *See* "Most of the World's Vaccines Likely Won't Prevent Infection From Omicron." *New York Times* (19 Dec. 2021); *see also* Centers for Disease Control and Prevention, "Omicron Variant" (20 Dec. 2021) ("CDC expects that anyone with Omicron infection can spread the virus to others, even if they are vaccinated or don't have symptoms."). These reports do not take into account the squalid conditions facing prisoners during the pandemic. Dr. Rudolph has been wearing the same cloth mask for 10 days. He is not provided hand sanitizer. He is on lock-down 23 hours a day. The phones he uses to speak with counsel and family are not disinfected between calls. The government's claim that "anxiety about COVID was at its height" in early 2020, DE35:6, is not true. *See* "Some metro Denver courts suspend jury trials — again — due to COVID-19," *Denver Post* (3 Jan 2022) (explaining that for the first time since the beginning of the pandemic, many Colorado courts have suspended jury trials ); "Many Colorado courts suspend jury trials due to COVID," *9News* (3 Jan 2022) (explaining that "trials in at least nine judicial district in Colorado" have been impacted by COVID).

Furthermore, the government's generalizations about vaccinations, DE35:5, do not hold up against Dr. Rudolph's specific maladies. Dr. Rudolph, who is 67, has a documented serious congenital heart condition. He depends on a Medtronic pacemaker and has had one implanted in 2000, 2010, and 2020. He has had multiple major cardiac surgeries, including two aortic valve replacements in 2006 and 2021 and one tricuspid valve repair. Dr. Rudolph relies on monitoring his pacemaker and 20-year-old leads through a Medtronic application on his cellular phone. Failure of any one of the leads, without immediate medical attention, could result in death. His doctors have

prescribed him several medications, including Telmistartan for chronic high blood pressure, which the prison has replaced with an ineffective "substitute"; the beta-blocker Metoprolol Succinate, for his heart conditions and blood pressure; and Repatha injections for high cholesterol.

The government took years to prepare its circumstantial case. It is only fair that the defense be afforded minimal consideration to answer the charges and that Dr. Rudolph be placed under house arrest during trial preparation. Notwithstanding the government's surmise, "phone and video conference technology" is totally ineffective for answering the charges leveled in this case. DE35:6. As a proffer, counsel submits the attached Exhibit detailing the very real challenges entailed in meeting with Dr. Rudolph for even the most basic purpose. Dr. Rudolph's sequestration will, by design, make impossible the protracted, constant, intensive preparation this case requires.

The government further assumes that the statute's requirement that the accused remain "in the custody of a United States marshal or another appropriate person" means the physical custody of a law enforcement officer. DE35:2. The government ignores that GPS monitoring is court-supervised and that home-detention enforced by such technology amounts to custody. DE35:3. It also ignores that courts understand the statute to permit house arrest whenever necessary to ensure each defendant can prepare to answer the charges against him. *See, e.g.*, *United States v. Weigand*, 492 F. Supp.3d 317, 319–20 (S.D.N.Y. 2020) (relying in part on the pandemic and § 3142(*i*) to release a defendant to an apartment watched by private security guards because "it seems almost certain that the facility would not be able to provide the kind of full access needed here for proper preparation."); *United States v. Stephens*, 447 F. Supp.3d 63, 68 (S.D.N.Y. 2020) (holding that "family members may constitute 'appropriate persons' where the defendant is released to relatives and placed under house arrest" and releasing accused "to the custody of his mother ... subject to ... electronic location

monitoring as directed by the Probation Department."); *United States v. Chandler*, No. 1:19-CR-867 (PAC), 2020 WL 1528120, at *3 (S.D.N.Y. Mar. 31, 2020) ("Chandler may be released on his own signature and to his home in Brooklyn with his mother ....").

## II.     There are viable alternatives to detention pending trial preparation.

The motion suggested that Dr. Rudolph be confined to his house in Phoenix with Lori Milliron, with whom he has lived for three years. However, the government speculates that "she is perhaps the most likely person to flee with the defendant to avoid the case." DE35:3. There is no basis for supposing that Ms. Milliron would commit a federal crime just to keep a boyfriend. But, to assuage any concerns, Ms. Milliron will surrender her passport. If that does not suffice to reassure the Court, Dr. Rudolph is willing to hire private security guards, as the *Weigand* court approved.

Alternatively, Dr. Rudolph could be confined to his son's condominium in Miami. Julian Rudolph is a Florida lawyer. He and his sister have agreed to put up their assets to secure their father's release. Julian is not going to risk both their assets *and* disbarment to aid a flight from justice. This alternative would have the added benefits of Dr. Rudolph living with an officer of the court and being close to his legal team.

The government is incorrect that temporarily releasing Dr. Rudolph "would undermine the purposes of the detention statute." DE35:2. As the Tenth Circuit recently explained, relief under § 3142(*i*) presupposes that a detention order has been lodged. "When a defendant is subject to a detention order, the judicial officer may issue a 'subsequent order' temporarily releasing an individual in custody 'to the extent that the judicial officer determines such release to be necessary for the preparation of the person's defense or for another compelling reason.'" *United States v.*

*Robertson*, 852 F. App'x 331, 336 (10th Cir. 2021) (quoting § 3142(*i*)); *accord United States v. Rosa-Calderon*, No. 20-CR-036-WJM, 2020 WL 4227477 at *3 (D. Col. July 23, 2020).

In *Rosa-Calderon*, a drug conspiracy prosecution with direct video evidence of criminal acts, this Court denied Wesley Pappas' motion for temporary release because (1) Pappas' claimed lung problem was unsupported by evidence, unlike Dr. Rudolph's congenital heart problems, (2) "FCI Englewood ha[d] only 7 cases of the virus," unlike the Downtown Detention Center where COVID is running rampant, and (3) the government made significant concessions to the defense. *See id.* at *5. Conversely, in this case, the government has taken the unsupported position that the pandemic is no longer a problem. Far from making any concessions, it deliberately arranged Dr. Rudolph's arrest to put hundreds of miles between him and everyone he knows. Section 3142(*i*) is made for cases like this one. Releasing Dr. Rudolph temporarily is necessary to counteract the prosecution's effort to gain an unfair edge at the expense of Dr. Rudolph's rights and his health.

**III.   The government is incorrect that the filing of this motion implies anything about whether the pre-trial detention order will be appealed or venue will be challenged.**

The instant question is whether the government calculated to incarcerate a 67-year-old defendant with cardiac problems far from his home, his children, and everyone he knows to demoralize him to the point where is unable to cooperate in preparing his own defense and to erect as many practical barriers as possible to defense counsel's work. The government assumes that Dr. Rudolph "is conspicuously not appealing" the detention order. DE35:1. That assumption is wrong. In this motion, Dr. Rudolph assumes but does not concede that the magistrate judge's detention ruling was correct. Now that the hearing transcript is available, Dr. Rudolph will appeal the detention order. Likewise, the prosecution's claim to be unable to imagine why "trial here in Colorado would

be any *more* difficult than trial in almost any other jurisdiction" misses the point. DE35:8. The present issue is not where the trial takes place. It is whether, in light of Dr. Rudolph's health, the global pandemic, and the government's machinations, the Court must intervene to ensure that Dr. Rudolph is not convicted only because his rights were trampled and his health disregarded.

That said, several facts that came out during the detention hearing are relevant not only to whether venue is proper but also to whether the government's true motive in manufacturing venue is to cripple an otherwise viable defense by making trial preparation unduly onerous. Dr. Rudolph has known he is under investigation for years, as the FBI made no secret about it. Agents demanded that his children answer painful questions about their mother's demise, surprising one at his home early on a Sunday morning and serving both with subpoenas at their offices to embarrass them among their co-workers. Yet, these agents refused to speak to Dr. Rudolph's counsel, who would have shared exculpatory information, much of which the agents did not know. For example, the supposed financial motive for the alleged crime is undermined by their undercounting of his assets, which excluded his dental practice in Pennsylvania, worth $8 million. DE37:115, 147. A post-nuptial agreement, which the government did not know about, further undermines the supposed motive; a divorce would not have been as costly as the agents supposed. DE37:117. The agents' belief that Dr. Rudolph cremated his wife's remains to destroy evidence was proven false as her will expressly directed cremation. DE37:84–89. Additionally, the government's contention that Dr. Rudolph plotted to "escape rigorous scrutiny and maintain control of evidence," DE35:1, is flatly false. The Zambian investigators, who ruled the death accidental, maintained that Dr. Rudolph did nothing to improperly influence the investigation or to obstruct justice.

The government is incorrect that Dr. Rudolph contemplates indefinite release. Based on the discovery the government has disclosed to date, counsel estimates that 180 days will be needed to prepare this case, which the government has been preparing for years. The government had absolutely no qualms about letting Dr. Rudolph remain at large for as long as it took to manufacture venue in Colorado:

> Q. So you must not have thought he was a danger to the community between the time you decided to go forward with the case and when he was arrested. You let him stay out during that time, right?
> A. We did allow him to stay out during that time.

DE37:120. There is thus no legitimate obstacle under these singular circumstances to the Court allowing Dr. Rudolph to remain on house arrest for a reasonable period to prepare a defense.

Respectfully submitted,

**MARKUS/MOSS PLLC**
40 N.W. Third Street
Penthouse One
Miami, Florida 33128
(305) 379-6667
markuslaw.com

By: _____
DAVID OSCAR MARKUS
Florida Bar Number 119318
dmarkus@markuslaw.com

## CERTIFICATE OF SERVICE

This motion was filed on January 11, 2022, through CM/ECF.

_____
DAVID OSCAR MARKUS