IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 22-CR-0012-WJM

UNITED STATES OF AMERICA,

vs.

LAWRENCE RUDOLPH,

_____/

## LAWRENCE RUDOLPH'S MOTION
## TO REVOKE ORDER OF DETENTION AND REQUEST FOR HEARING

Lawrence Rudolph respectfully moves to revoke the order of pretrial detention. 18 U.S.C. § 3145(b). In support, Dr. Rudolph squarely addresses each of the magistrate judge's bases for ordering detention and demonstrates that the facts and the law require his release pending trial. These considerations, discussed in greater detail throughout the motion, include:

- Dr. Rudolph is not a risk of flight. Dr. Rudolph, a 67-year old father of two with no criminal history, had every opportunity to flee when he learned of the investigation five years ago, but took no steps to abscond. The notion that he could flee to a foreign country during a pandemic, without a passport, while being GPS monitored is fanciful.

- Not only is Dr. Rudolph willing to pledge his home and other property as collateral, his children are also willing to post their homes. *See* attached exhibits.

- Dr. Rudolph is not a danger to anyone. The government's actions support this. Agents had no qualms over letting Dr. Rudolph remain at large, and travel internationally, even after obtaining a warrant to arrest him. The government has not shown clear and convincing evidence of any identifiable danger or why home-confinement does not eliminate any danger.

- Perhaps most importantly, Dr. Rudolph is innocent. He did not murder his wife of 30 years. The magistrate judge gave the government's weak evidence far too much weight and the evidence rebutting it next to no weight. Zambian authorities and five insurers determined that Bianca Rudolph died accidentally. Witnesses told the FBI that Dr. Rudolph did nothing to interfere in the investigation. No physical evidence supports the government's murder theory.

Dr. Rudolph vehemently maintains his innocence and is committed to defending himself. He wants nothing more than to appear in court to fight the outrageous allegations against him. His

detention rests primarily on conjecture, and there are other means short of imprisonment of reasonably ensuring his presence, including strict home confinement with electronic monitoring, surrender of all travel documents, financial monitoring, and a bond co-signed by his children. He is amenable to private 24-hour security if the Court believes that is necessary to secure a senior citizen with a pacemaker. Dr. Rudolph proposes a comprehensive set of bail conditions that fully addresses any concern, no matter how speculative, that he will abscond or that he poses a danger to anyone.

## BACKGROUND

On October 11, 2016, Bianca Rudolph died in a tragic accident while packing her shotgun on the last day of an African hunting trip with her husband of over 30 years. Zambian authorities and the insurance companies that paid the policies in this case investigated and concluded that Bianca died accidentally. For years since, Larry Rudolph has known he is under investigation for murder, as the FBI made no secret about it. Agents demanded that Larry and Bianca's children answer painful questions about their mother's demise, surprising one at his home early on a Sunday morning and serving both with subpoenas at their offices. Despite his awareness of the FBI's tactics and investigation, Dr. Rudolph never attempted to flee the country, hide assets, or hinder authorities in any way. On the contrary, he retained counsel with every intention of defending his innocence.

Agents believed they had probable cause to Dr. Rudolph no later than December 16, 2021. They deliberately chose not to arrest him. At some point, they learned he would be traveling to Mexico for a vacation on December 21, 2021. The agents had been investigating Dr. Rudolph for years and were not at all concerned. They were so confident that he was neither dangerous nor a flight risk that they let him fly to Mexico to test a novel legal theory that arresting him outside the country would circumvent all limits on venue. DE37:119. Dr. Rudolph did not resist arrest.

2

In Denver, a place with no connection to the alleged murder, Dr. Rudolph was charged with foreign murder and mail fraud. *See* 18 U.S.C. §§ 1119, 1341. On January 4, 2022, the magistrate judge heard evidence of Dr. Rudolph's family ties, lack of criminal record or history of violence, poor health, and the blatant weaknesses in the government's case. Ultimately, the magistrate judge erroneously denied bail, relying on factors that relate more to rebutting the inviolable presumption of innocence, *see* 18 U.S.C. § 3142(j), than demonstrating that no means short of imprisonment can reasonably assure Dr. Rudolph's appearance and incapacity to harm anyone:

- Dr. Rudolph is "charged with murdering his wife while on safari in Zambia." *Id.*

- Dr. Rudolph "is wealthy, owns property in Mexico, has traveled extensively internationally, and has considerable experience with firearms." *Id.*

- The government's forensic testing showing the "implausibility" that the fatal wound resulted from an accident; Dr. Rudolph supposedly made "inconsistent statements about his whereabouts at the time of the incident"; he "rush[ed] to cremate the decedent's body"; he made "misrepresentation[s]" to family about extending the safari and to foreign authorities about "immediately" notifying his children allegedly stating "the decedent was not their biological mother." *Id.*

- The government "offered proof of the defendant's volatile personality and threats of physical harm to others." *Id.*

- Dr. Rudolph faces a "lengthy sentence" if convicted.

DE23:3. These factors support detention only when wedded to a lot of conjecture—and only when other facts are minimized or disregarded.

**ARGUMENT**

**I.  The magistrate judge erred in failing to explain why house arrest with electronic monitoring and financial sureties were insufficient in the circumstances.**

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). The Bail Reform Act thus

3

states that an accused person *must be* conditionally released pending trial unless no conditions of release could mitigate a demonstrated "serious risk" of flight or there is "clear and convincing evidence that an arrestee presents an *identified and articulable threat* to an individual or the community." *Id.* at 751 (emphasis added); 18 U.S.C. § 3142(b) & (f); *see United States v. Byrd*, 969 F.2d 106, 109 (5th Cir. 1992) ("There can be no doubt that this Act clearly favors non-detention.").

As a recent Tenth Circuit decision reaffirms, the district court should consider every reasonable alternative to pre-trial detention and must articulate why a proposed comprehensive plan will not suffice to reasonably allay any legitimate concerns. *See United States v. Mobley*, 720 F. App'x 441 (10th Cir. 2017). Bogdana Mobley was a dual Russian and U.S. citizen. She was charged with taking her children from Kansas to Russia during a custody battle. As in this case, a magistrate judge concluded that Mobley was a flight risk "with very little supporting analysis and no discussion of why the proposed release conditions could not assure Mobley's appearance at trial." *Id.* at 444. The Court of Appeals noted that, like in this case, the order failed to consider Mobley's "'comprehensive release plan' under which she would live with her parents in the United States and surrender her passports to the probation office." *Id.* at 443. The magistrate judge failed to consider Mobley's affirmative defense, *id.*, just as the order in this case did not consider that the government's case is entirely circumstantial and based on dubious inferences, as explained *infra*. Dr. Rudolph has never disregarded a court order, but Mobley had a "history of noncompliance with court orders." *Id.* at 445. Yet, the Tenth Circuit reversed the detention order because the district court "did not consider whether any release conditions would assure Mobley's appearance at trial—even though she offered to submit to electronic monitoring, to have her parents pay a bond, and to turn in both her American and Russian passports." *Id.* Dr. Rudolph has surrendered his American passport.

4

As *Mobley* makes clear, detention is authorized only as a last resort, when release is plainly impracticable. That standard has not even been arguably met here. For that reason, Dr. Rudolph requests that, as part of its *de novo* review of the detention order, the Court convene its own hearing. "'When the district court acts on a motion to revoke or amend a magistrate's pretrial detention order, the district court acts *de novo* and must make an independent determination of the proper pretrial detention or conditions for release.'" *United States v. Cisneros*, 328 F.3d 610, 616 (10th Cir. 2003) (quoting *United States v. Reuben*, 974 F.2d 580, 585–86 (5th Cir. 1992)). "[T]he court may hold a hearing, if it so chooses." *United States v. Oaks*, 793 F. App'x 744, 747 (10th Cir. 2019).

In this case, a *de novo* hearing is important because Dr. Rudolph has no criminal history and no history of violent acts, and he has proposed various conditions to reasonably assure his appearance and incapacity to harm anyone—yet, as in *Mobley*, those proposals have not been seriously considered. One alternative is for him to live with his son, an attorney in Miami, who was present at the first hearing and will be present at any subsequent one. *See* attached exhibit. As *Mobley* emphasized, a release plan must be considered and given effect or its rejection must be explained, and the Court should hear from Dr. Rudolph's son. Additionally, the agents' own conduct, as well as Dr. Rudolph's health and age, establish that whatever risk of flight exists in this case falls well short of "serious." Likewise, the threat Dr. Rudolph suddenly poses has not been identified or articulated, much less clearly and convincingly proven. On the contrary, Dr. Rudolph has done absolutely nothing—despite being aware of the investigation and its indecent behavior toward his children in the wake of their mother's death—to thwart justice. Finally, the government's evidence is far weaker than the magistrate judge appreciated. A hearing would help illuminate these points on the detention issue, which is crucial to achieving a just result in this case.

## II. There is no presumption favoring detention in this case.

The magistrate judge erroneously suggested at the hearing that a presumption applied. *See* DE37:152 ("[T]he Court concludes that there is a rebuttable presumption in this case that the Defendant is not a suitable candidate for release."). In her view, there was probable cause to believe that Dr. Rudolph committed a § 924(c) violation. DE37:152; *see* 18 U.S.C. § 3142(e)(3)(B). This matter was disputed, and the detention order ultimately did not expressly rely on the presumption. DE23. However, the government argued in favor of one, DE37:125–26, and the magistrate judge may have been influenced by the confusion.

The presumption does not apply in this case because Dr. Rudolph has not been charged with a § 924(c) offense.

> [T]he rebuttable presumption [does] not apply because the government had not yet charged defendant with the offense. The plain language of the statute and the legislative history shows that the presumption was intended to arise only after a defendant has been charged with the particular offense by a valid complaint or indictment.

*United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985); *see also United States v. Payden*, 759 F.2d 202, 205 (2d Cir.1985).

## III. Even if there were a presumption, the great weight of the evidence shows that there is no serious risk of flight and no clear and convincing proof of an articulable danger.

### A. Dr. Rudolph poses no actual risk of flight, much less a serious one.

For a district court considering whether a defendant is a serious flight risk, "the standard is *reasonably assure* appearance, not 'guarantee' appearance, and ... detention can be ordered on this ground only if 'no condition or combination of conditions will reasonably assure the appearance.'" *United States v. Fortna*, 769 F.2d 243, 250 (5th Cir. 1985); *accord United States v. Orta*, 760 F.2d 887, 889–90 (8th Cir. 1985) (en banc) ("In this case, the district court erred in interpreting the

'reasonably assure' standard set forth in the statute as a requirement that release conditions 'guarantee' community safety and the defendant's appearance.").

The case agent's testimony at the detention hearing shows that the government does not really believe Dr. Rudolph can or will flee. As the agent testified, Dr. Rudolph has known about this case for years. DE37:92. "[H]e could have" just stayed in Zambia or Mexico if he wanted, but "he has always returned from his trips." DE37:93. This explains why the FBI let him travel to Mexico as part of a scheme to manufacture venue for this case in Denver. Unlike many defendants, Dr. Rudolph did not merely fear a *potential* investigation. On the contrary, it was an actual, persistent, invasive, and tormenting force in his grieving family's life. The FBI callously harassed Larry and Bianca's children—who, according to the prosecution itself, are victims of a terrible loss, DE37:8 (PROSECUTOR: "It is true that [Larry and Bianca's son] is a victim ... .")—for years after their mother's death, refusing to respect their privacy. Despite this aggressiveness, Dr. Rudolph, confident in his innocence, made no effort to flee or hide assets. Just the opposite—he engaged counsel, who reached out to the government offering to present evidence of Dr. Rudolph's innocence.

The factors listed to support detention do not establish a serious risk of flight. First, the magistrate judge found that Dr. Rudolph "is wealthy." DE23:3; DE37:155. The order, however, overlooks that the government immediately seized a large share of Dr. Rudolph's assets, more than the value of the life insurance proceeds at issue in Count 2. Also, the order draws no link between Dr. Rudolph's resources and a tendency to flee. Neither the government nor the magistrate judge have explained where Dr. Rudolph—who depends for his life on a pacemaker and various prescriptions— can go to evade justice without a passport. A financial ability to flee is not equivalent to an inclination to flee and does not justify detention. *See United States v. Himler*, 797 F.2d 156,

162 (3d Cir. 1986) ("Mere opportunity for flight is not sufficient grounds for pretrial detention."); *United States v. Hoover*, 2014 WL 2094201, at *11 (D. Ariz. May 20, 2014) ("[T]he mere opportunity to flee is not enough to justify detention as the Act does not require ironclad guarantees against flight."); *United States v. Chen*, 820 F. Supp. 1205, 1208 (N.D. Cal. 1992) ("Section 3142 does not seek ironclad guarantees, and the requirement that the conditions of release 'reasonably assure' a defendant's appearance cannot be read to require guarantees against flight.").

Furthermore, the magistrate judge gave no weight to Dr. Rudolph's offer to pay for private security guards to police his home confinement, should this Court believe that round-the-clock electronic monitoring is insufficient to incapacitate a 67-year-old cardiac patient. Courts have found that where a well-off defendant is denied bail in circumstances when one of "lesser means ... might have been granted bail in the first place," the defendant may be released if he bears the cost of paying guards to assure his presence. *United States v. Sabhnani*, 493 F.3d 63, 78 n.18 (2d Cir. 2007); *United States v. Boustani*, 932 F.3d 79, 82 (2d Cir. 2019) ("[T]he private-security condition ... may be appropriate where the defendant is deemed to be a flight risk primarily *because* of his wealth."). Even if Dr. Rudolph's wealth had any weight in his particular case, his willingness to pay for private guards would entirely offset its relevance, especially given his poor health. The magistrate judge's reliance on wealth as a consideration was unjustified in the circumstances.

Next, the magistrate judge observed that Dr. Rudolph "owns property in Mexico" and "has traveled extensively internationally." DE23:3; DE37:155 ("This may be, in the 14 years that I've been on the bench, the case involving the most international travel by an accused person that I have had in my courtroom ... . [T]hat he owns property outside of the country in Mexico make it impossible for the Court to conclude that he is not a serious flight risk."). These facts made a deep

impression on the magistrate judge but did not worry the agents who thoroughly investigated Dr. Rudolph for years. Dr. Rudolph's vacations are simply not at all probative of his ability or inclination to live a life fleeing justice without a passport. Certainly, it is inconceivable that Dr. Rudolph would flee to his house in Cabo, the first place where the authorities would look for him, in a country that routinely extradites fugitives to the United States and where Dr. Rudolph was already arrested in this very case. There is no rational link between a vacation home in Mexico and a *serious* risk of flight.

Even if there were a logical connection, the magistrate judge's concern was rebutted by the agent's testimony that the government had no fear that Dr. Rudolph would remain in Cabo San Lucas: *"[H]e has always returned from his trips."* DE37:93. The case agent also assured the magistrate that he had found no overseas bank accounts. *Id.* Rather than considering the importance of that testimony, the magistrate judge made an inferential leap from the premise of a dentist who earned a good living and used it to see the world with his wife of 30 years to the unjustified conclusion that this dentist can inexplicably cross borders sans passport and with much of his assets frozen, like a character in a Hollywood movie. The requirement that a flight risk be serious is meant to keep such conjecture from forming the basis of a detention order.

Notably, the government does not contend that it ever advised Dr. Rudolph not to leave the country. Indeed, Dr. Rudolph's whereabouts were well known to the agents, who *wanted* him to leave the country so that he could be arrested abroad. The magistrate judge did not explain why an electronic monitoring device would not provide sufficient assurance in these circumstances. The order just assumes (as in *Mobley*) that Dr. Rudolph—a dentist from Pittsburgh, not an international drug trafficker or foreign mobster with access to a powerful network of confederates—would have to somehow cut off his ankle monitor without law enforcement reacting on time, disconnect his

phone so that the Mayo Clinic monitoring his pacemaker cannot locate him, secure travel with no access to unmonitored financial resources, and somehow cross the border with no passport to—well, we are never told where Dr. Rudolph can even go. Unlike the accused in *Mobley*, he is not a Russian citizen. The naked implausibility of any escape scenario demonstrates clearly that his appearance in court can be reasonably assured short of incarceration in a Denver prison.

Lastly, the magistrate judge relied on the possibility of a "lengthy sentence that could be imposed if the defendant is found guilty of the charged offense." DE23:3. The magistrate judge, however, ignored the fact that the possibility of a long sentence was not news to Dr. Rudolph, who knew for months that the FBI was turning over every stone trying to find evidence to build a case. Dr. Rudolph responded in an exemplary manner: He hired counsel who tried without success to engage the prosecution in reasoned discussion. Furthermore, federal courts require "more than evidence of the commission of a serious crime and the fact of a potentially long sentence to support a finding of risk of flight." *United States v. Friedman*, 837 F.2d 48, 50 (2d Cir. 1988); *Sabhnani*, 493 F.3d at 65, 76–77 (reversing detention order where defendants agreed to significant physical and financial restrictions, despite the fact that they faced a "lengthy term of incarceration").

Larry Rudolph has no criminal history. His son, Julian, is a lawyer in Miami. His daughter, AnaBianca, is a dentist in Pittsburgh. Unsurprisingly, Dr. Rudolph has the full support of his children, *see* attached affidavits. Although the government claims their father murdered their mother, both children are confident that their father did no such thing and that he will not flee. As the attached exhibits show, they are willing to put their homes and resources to secure their father's release. Dr. Rudolph's son is willing to have his father be confined to his home in Miami. Yet, the magistrate judge did not consider this, even though Julian Rudolph attended the hearing.

As the agent admitted, Dr. Rudolph could have left the United States and stayed away if he wanted to avoid prosecution. He never intended to do that and did not do that. Instead, he hired counsel to refute the allegations. The government cannot explain how Dr. Rudolph could flee. He will have no unmonitored assets. No travel documents. His family's financial future will be at risk, meaning he'd have no help. He will be constantly monitored. The government simply has not come close to proving that "no conditions" exist that will reasonably assure Dr. Rudolph's presence. It has not articulated with any evidence, let alone specific and credible evidence, how Dr. Rudolph could manage to flee under the proposed bail conditions.

**B.** **Dr. Rudolph is not a clear and convincing danger to the community.**

After preparing this case for years, agents had no reservations about letting Dr. Rudolph remain at large for as long as it took to manufacture venue in Colorado:

> Q. So you must not have thought he was a danger to the community between the time you decided to go forward with the case and when he was arrested. You let him stay out during that time, right?
> A. We did allow him to stay out during that time.
> Q. And you had determined prior to the date that he traveled to Cabo that you were going to proceed with a murder case, right?
> A. Yes.
> Q. But you waited because you wanted venue in Denver, correct?
> A. Correct.
> Q. So you must not have thought he was a danger to the community between the time you decided to go forward with the case and when he was arrested. You let him stay out during that time, right?
> A. We did allow him to stay out during that time.

DE37:120. If Dr. Rudolph were truly dangerous and violent, the agents would have arrested him at the earliest opportunity.[1]

---

[1] The magistrate judge also referred to Dr. Rudolph's "considerable experience with firearms" as a basis for detention. DE23:3. Putting aside the constitutional issue of predicating a dangerous finding on the lawful possession of firearms, this concern easily could be dispelled with a condition that Dr. Rudolph surrender all firearms he could potentially have access to.

In the detention order, the magistrate judge incorrectly found that the government "offered proof of the defendant's volatile personality and threats of physical harm to others." DE23:3; DE37:156. This refers to hearsay complaints of disgruntled employees and comments between friends over drinks about completely unrelated events. One of those employees worked with Dr. Rudolph for only a few months and has a criminal record. But, even if these statements were credible, having a temper at work or words with an employee over six years ago does not make one dangerous. Mere talk is not relevant to detention because it is not evidence of a real threat to anyone. DE37:96. It was legal error to deem an abrasive personality a factor favoring incarceration.

The government's reliance on this shaky evidence is itself telling. Dr. Rudolph built a successful pediatric dental practice to pass on to his daughter. If he had created a tense work environment ruled by threats of violence and was throwing syringes at assistants, there would inevitably have been some sort of official complaint—*i.e.*, real, hard evidence of the sort that the clear-and-convincing standard demands. There is none. In fact, the testimony cut against a finding of violence, despite the seriousness of the charge. Not one witness ever saw Dr. Rudolph be violent with his wife—and the FBI asked every single witness about this. The agent confirmed to the magistrate judge that he asked many people, and every single one said there was no evidence at all of a history of domestic violence: "No physical violence between the couple." DE37:109.

Nor does the government satisfy *Salerno*'s command that it explicate a specific threat of danger. This is not a defendant, like a drug trafficker or mobster, who might resume a life of crime upon posting bail. The government acknowledged as much: "This is not the sort of defendant where we're making an argument like he's a gang member and he's going to be going around, you know, perpetrating random violence." DE37:130. Yet, the magistrate judge did not insist on an explanation

of the threat Dr. Rudolph supposedly poses. There is no "identified and articulable threat to an individual or the community" as *Salerno* requires, 481 U.S. at 751, just vague insinuations wrapped in unreliable character disparagement. That is neither clear nor convincing evidence.

IV.  **The magistrate judge gave the government's case far too much weight, in contravention of law and in disregard of the case's serious flaws and weaknesses.**

At the detention hearing, the agent confirmed that there are no eye-witnesses, no fingerprints, no blood spatter on Dr. Rudolph, no gunshot residue—absolutely no physical evidence. DE37:83. Not only that, what hard evidence *does* exist cuts against the government. The Zambian government investigated Bianca Rudolph's death and ruled it accidental. The life insurance companies the government calls "victims" likewise ruled her death accidental and paid on the policies. The detention order shows that the magistrate judge failed to appreciate the weakness of this case, which is built entirely on untested inferences, piling assumption on top of assumption.

The weight of the government's evidence is the least important that the Court can consider because the Court cannot make a pretrial determination of guilt. *See United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990) ("The weight of the evidence against the defendant is a factor to be considered but it is 'the least important' of the various factors.") (citation omitted); *United States v. Montamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985) ("[T]he weight of the evidence is the least important of the various factors."); *Friedman*, 837 F.2d at 50 ("[W]e have required more than evidence of the commission of a serious crime and the fact of a potentially long sentence to support a finding of risk of flight."); 18 U.S.C. § 3142(j). The detention order, however, shows the magistrate judge gave this *the most* weight, devoting the order's lengthiest paragraph to a summary of the government's circumstantial evidence. DE23:3. The government's evidence is much less convincing than the magistrate judge supposed.

*First*, the "forensic testing" that supposedly showed the "implausibility" that the fatal wound resulted from an accident is not nearly as ironclad as the word "forensic" is calculated to suggest. The government did not have the shotgun from the accident, so it used a substitute gun for its testing. It is undisputed, however, that the actual gun was modified during the hunting trip. DE37:101–02. There is no way to know what other modifications were made to it by previous owners. In fact, a witness told the agents that the shotgun from the accident "was not functioning correctly" and "repeatedly jammed" during the couple's trip. DE37:106. The tests that the government's experts performed on the substitute gun assumed, contrary to fact, that the gun was not modified in any way and was not defective. The government has not yet established that this evidence is even *admissible*, yet it wants this Court to incarcerate a presumptively innocent person in reliance on it.

Another example of the government's "forensic tests" relying on unfair surmise and inaccurate measurements was the agent's testimony that the expert pathologist found that the firearm was fired at a "90-degree angle to the victim's chest." DE37:15; 97. The agent explained that, based on that specific angle, someone of Bianca's size "cannot stand over a shotgun and place it in that position on their heart." DE37:100. But the expert pathologist actually said ***nothing*** about a 90-degree angle in his report. His opinion is simply that the "wound path was directed predominantly front to back." *See Report of Dr. Cina*, INV_2079. If the government's pathologist did not identify the angle of discharge, then the conclusions drawn from its scene reconstructions are likely inadmissible and cannot support Mr. Rudolph's detention.

Another unknown variable was thrown into the "forensic tests" when agents learned that the gun bag involved in the accident was no longer manufactured. The government had the supplier make a custom batch of new bags with similar estimated measurements for testing. DE37:103. Those

new bags however, were not heavily used and run down with wear-and-tear like the Rudolphs' bag, which would of course affect the testing. DE37:105. Also, the government hired a blood spatter expert who viewed the pictures and determined that the evidence was inconclusive. DE37:74.

There was also a discrepancy about the measurement of the fatal wound because the photos of the wound were taken incorrectly during the autopsy. DE37:110. A precise measurement of the size of the wound is vital because it can show the shot pattern, angle, and distance of the gun when it discharged. If the measurements are not exact, as here, the shot pattern "potentially could change based on the difference of the distance." DE37:111. Worse, the photos of the wound that were used to scale for the expert were taken after the autopsy, after the wound was manipulated and probed. This makes it likely that the initial wound was smaller before the photos the government relied on were taken, potentially leading to a prejudicially inaccurate conclusion.

The government's evidence even failed to refute the conclusion that the Zambian authorities and insurance companies reached—that Mrs. Rudolph's death was a tragic accident. The government's claim that the gun would not have discharged if dropped was refuted with clear and convincing evidence—*i.e.* the gun manual, which reads: "Dropping a loaded gun can cause an accidental discharge even if the safety is in the safe position. Be extremely careful while hunting or during any shooting activity to avoid dropping any firearm." DE37:124. Additionally, though the government suggested that Bianca Rudolph was an avid hunter who knew how to handle a firearm and would not had this sort of accident, the hearing revealed that several witnesses made clear that Bianca "was not a confident hunter." She was nervous about handling the hunt on this particular trip. She was usually just handed the gun ready to shoot and handed it right back to the guide. The agent conceded that he had no idea whether she could even load and unload a firearm. DE37:107–08.

*Second*, the theory that Dr. Rudolph quickly cremated his wife's body to cover up evidence was eviscerated at the hearing. The magistrate judge's reliance on this evidence was improper. The agents' belief that Dr. Rudolph cremated his wife's remains to destroy evidence was proven false as her will *expressly* directed cremation. DE37:84–89. The testifying agent admitted that Bianca's will directing her cremation was "valuable" information unknown to the government. DE37:89. Additionally, the contention that Dr. Rudolph plotted to "escape rigorous scrutiny and maintain control of evidence," DE35:1, is flatly false. The Zambian investigators maintained that Dr. Rudolph did nothing to improperly influence their investigation or to obstruct justice. The government repeatedly asked the Zambian camp staff members and investigators about bribes being paid: "None of them reported having been paid [or offered] money." DE37:94. The agent also confirmed that there was no sign that Dr. Rudolph attempted to prevent an autopsy, a ballistic report, photographs of the scene, witness statements, or any other investigative action. DE37:94–95. In fact, Dr. Rudolph cooperated with the Zambian authorities and gave a voluntary statement without counsel present.

Relatedly, the government's supposed financial motive for the crime unraveled when it came out that agents undercounted Dr. Rudolph's assets by excluding his dental practice worth $10 million. DE37:115, 147. Additionally, the government's theory that murder was cheaper than divorce was undermined by a post-nuptial agreement that came to light at the hearing, which the government did not know about. DE37:117. The testifying agent conceded that the agreement would have been "helpful" in the discussion regarding motive. *Id.*

*Third*, assuming it is true that Dr. Rudolph made inconsistent statements, that is not especially probative under the circumstances. The government spent a significant amount of time interviewing individuals who interacted with Larry and Bianca Rudolph during their trip. Those

16

witnesses all described the couple as "happy," having a good time, and said they saw no "red flags." DE37:106–07. None reported seeing even a trace of hostility or discord. Witnesses recounted that the morning of the accident, camp staff was coming in and out of the couple's room, bringing coffee and collecting luggage. DE37:112. All the witnesses who immediately responded to the room after the gun discharged told the government that they believed it was an accident. DE37:97. The magistrate judge did not give those facts due consideration.

After the tragic death of his wife, the case agent testified that the witnesses described Dr. Rudolph as "distraught," "crying," "hysterical," and according to the agent, "one person said he was so distraught, he looked like he might commit suicide." DE37:98-99. Based on the government's own evidence of Dr. Rudolph's compromised mental condition after the horror of having found his wife of 30 years with a fatal wound in her chest, it stands to reason that he may not have been clear-headed when recounting his exact location immediately preceding the trauma.

Similarly, when it comes to how Dr. Rudolph communicated with his children and other family, the government assumes the worst, and does not consider that perhaps he thought it was best to have the hardest conversation of his life face-to-face with loved ones. Dr. Rudolph never made the statement to anyone that Bianca was not the biological mother of the children. The government assumes an evil motive because he was trying to get home to his family to grieve with them in-person. The government is not entitled to dictate the orthodox response to a shocking tragedy and draw speculative inferences about anyone who deviates from the acceptable reaction.

The magistrate judge erred in finding that the weight of the evidence presented by the government supported denial of pretrial release. As much as the government would prefer that Dr. Rudolph not have a fair fight, this Court can recognize the glaring weaknesses in the government's

case, and level the playing field by granting pretrial release, so that the presumption of innocence is more than mere words on a page.

## CONCLUSION

Dr. Rudolph should not be detained. He poses no danger and no serious risk of flight. Additionally, as detailed in the separate motion for relief under 18 U.S.C. § 3142(*i*), which we incorporate here, his detention poses a grave threat to his health and his ability to prepare for trial.

To reasonably assure his apperance, Dr. Rudolph proposes:

- $5 million personal recognizance bond, co-signed by his two children and secured by Dr. Rudolph's home and the homes of both children.

- House arrest in the custody of either (1) Lori Milliron, with whom he lives in Phoenix, a Unites States citizen who has lived in the United States her entire life, (2) his son, Julian Rudolph, who is a lawyer and lives in Miami, Florida, or (3) his daughter, AnaBianca Rudolph, who is a dentist and lives in Cranberry, Pennsylvania, with travel only for court appearances, meetings with counsel, visits with medical providers, with approval of Pretrial Services and subject to electronic monitoring.

- Visitors are to be approved in advance by Pretrial Services, with counsel and family members to be pre-approved.

- Surrender of all travel documents with no new applications. Dr. Rudolph has already has surrendered his passport.

- No contact with any potential witness in the case.

- Dr. Rudolph will not encumber any property or use his resources, other than for basic living expenses and for legal counsel. He is willing to comply with any other financial monitoring that the Court deems necessary.

- Surrender of all firearms.

- If the Court believes it is necessary, Dr. Rudolph will pay for on-premises, round-the-clock private security guards. The guards could report to Pretrial Services if the Court so orders.

- Such other terms as the Court may deem appropriate.

Even though a guarantee of appearance is not necessary, the bail package proposed in this case is as close to a guarantee as one can get. There is no legally permissible basis to deny bail.

WHEREFORE, Lawrence Rudolph respectfully requests this Court convene a hearing to revoke the order of detention imposed and set a reasonable bond.

Respectfully submitted,<br>
**MARKUS/MOSS PLLC**<br>
40 N.W. Third Street<br>
Penthouse One<br>
Miami, Florida 33128<br>
(305) 379-6667<br>
markuslaw.com<br>
<br>
By: _____<br>
DAVID OSCAR MARKUS<br>
Florida Bar Number 119318<br>
dmarkus@markuslaw.com

**CERTIFICATE OF SERVICE**

This motion was filed on January 17, 2022, through CM/ECF.

_____
DAVID OSCAR MARKUS