IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 22-cr-00012-WJM

UNITED STATES OF AMERICA,

 Plaintiff,

v.

LAWRENCE RUDOLPH

 Defendant.

## GOVERNMENT'S RESPONSE TO MOTION TO REVOKE ORDER OF DETENTION

  After thoroughly analyzing lengthy written briefs, hours of testimony and evidence, and argument, United States Magistrate Judge Kristen L. Mix concluded that the defendant is both a flight risk and a danger to the community. Pretrial services also recommended detention. Det. Hrg. Tr. at 152. But the defendant simply offers the same arguments now that he brought then, while continuing to cryptically reference evidence of innocence—such as a post-nuptial agreement—that he refuses to provide or show.

  This Court should affirm Judge Mix's order of detention:

- **The defendant is a flight risk.** Rudolph plotted to kill his wife in a remote area of a foreign country where both government and private investigators would lack means and resources to gainsay his claim of accident. He had no reason to flee while he believed that plot successful. But, as Judge Mix found, he now faces the prospect of life in prison when a jury asks whether an experienced hunter incredibly shot herself in the heart by accident with a nearly four-foot shotgun. The illusion that he got away with murder has been shattered by Judge Mix's comments and the grand jury's determination of probable cause. He has a reason to take the money and run.

- **The defendant has resources to flee.**   Rudolph self-reported almost $27 million in assets, much of which can continue to generate wealth no matter where he goes. Det. Hrg. at 155. He can make co-signers whole, absorb any losses, and pay for family and friends to visit him anywhere in the world.

- **Rudolph is a danger to the community.** The detention hearing revealed an expert hunter with considerable expertise in firearms who threatens killing or hiring others to kill when confronted with consequences for his actions. Now—when cornered by witnesses who he'd rather not testify—is when he is most dangerous.

- **The weight of the evidence is heavy.** The magistrate judge found that the evidence against Rudolph is strong. A day later, a grand jury found probable cause that he had murdered his wife of 30 years and defrauded life insurers out of millions. Witnesses told the FBI that Rudolph rushed to cremate his wife's body and delayed reporting the death to any family who could have immediately asked questions. Physical evidence shows the impossibility of the defendant's wife shooting herself in the heart with a long shotgun. Meanwhile, Rudolph would have this court rely upon a group of Zambian investigators who interviewed only three witnesses and then concluded that they could not disprove an accident before even receiving ballistics evidence or the autopsy report. The ballistics expert he cites concluded the death was a suicide. And the insurance companies simply relied upon the Zambian police reports.

As found by the magistrate judge—and as explained in the government's original motion for detention (ECF 14)—there are no conditions short of detention that will ensure the defendant faces justice in this case without endangering the community.

## LEGAL STANDARD

This Court's review of Judge Mix's detention order is *de novo*. *United States v. Cisneros*, 323 F.3d 610, 616 (10th Cir. 2003). Because Rudolph is charged with shooting his wife in the heart with a shotgun, there is a statutory presumption in favor of *detention*—not a presumption of release as he implies in his motion. The plain text of the Bail Reform Act states that the conditions for detention are presumed "if the judicial officer finds that there is probable cause to believe that the person committed … (B) an offense under section 924(c) … of this title." 18 U.S.C. § 3142(e)(3). Judge Mix made that finding here. Det. Hrg. Tr. at 152-53.

Judge Mix also cited numerous cases showing that the government is not required to bring *pro forma* charges to invoke the presumption at 18 U.S.C. § 3142(e)(3). As these cases recognize, the plain text of the statute focuses on a finding by the judicial officer, not upon the

charges brought. *United States v. Bess*, 678 F. Supp 929, 932 (D.D.C. 1988); *United States v. Farguson*, 721 F. Supp. 128, 130-31 (N.D. Tex. 1989); *United States v. Lee*, 206 F. Supp. 3d 103, 110 (D.D.C. 2016)). In response, the defendant offers one case that says nothing about this question (*United States v. Payden*, 759 F.2d 202, 205 (2d Cir. 1985)) and another that reached its conclusion by mistakenly looking to the text in (a)(4), which triggers the start of the detention or release process, rather than the text of (e)(3) defining when the presumption applies (*United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985)). *See Bess*, 678 F. Supp. at 932 (recognizing the Second Circuit's error).[1]

The defendant requests a new hearing. But he offers no new evidence he wishes to add and no explanation of the utility to such a hearing. This Court has a full record on the matter, including a hearing where both parties had the opportunity (and incentive) to make their case.

## FACTUAL BACKGROUND

The defendant's wife died in a remote area of Zambia after she was shot with a shotgun in the cabin she shared with the defendant. Rudolph distanced himself from the scene of the death when he told his brother-in-law that he was outside the cabin when the shot rang out. Det. Hrg. Tr. at 52. But he told others that he was in the bathroom or shower. Those who arrived immediately after the shot found him in the cabin. *Id.* at 51.

Resource-strapped Zambian investigators told the FBI that they couldn't disprove the defendant's claim of accident. They agreed with his suggested conclusion before they had

---

[1] Defense counsel previously argued that there is no presumption when a firearm is used on foreign soil. Det. Hrg. Tr. at 128. It appears that he has wisely abandoned that argument. Even if the extraterritoriality of 18 U.S.C. § 924(c) had a bearing on whether its elements are met, courts have concluded that § 924(c)'s reach is coterminous with the underlying statute. *United States v. Mardirossian*, 818 F. Supp. 2d 775, 776-77 (S.D.N.Y. 2011); *United States v. Reumayr*, 530 F. Supp. 2d 1210, 1219 (D.N.M. 2008); *Cf. United States v. Ali*, 718 F.3d 929, 939 (D.C. Cir. 2013)(noting extraterritorial reach of aiding and abetting, another ancillary offense).

received the autopsy report, ballistics evidence, or any information about motive. They interviewed just three people. *Id.* at 24-25. The ballistics expert reached a completely different conclusion: death by suicide. *Id.* at 50. A private investigative firm for the insurance companies collected the Zambian authorities' documents, confirmed the death of Rudolph's wife, and didn't interview anyone new or investigate the death's circumstances. *Id.* at 62-64. The nearest police station in this remote area of Zambia was two hours away. *Id.* at 65.

      The FBI fortunately had considerably more resources and expertise. Its agents tried to interview everyone with information about the defendant and his wife. That inevitably led to the defendant learning that the FBI was asking questions. Still, the concern that Rudolph might use his wealth to flee or seek to harm witnesses if he became aware of what they were uncovering led the FBI to avoid taking actions that might lead the defendant to deviate from his patterns after his seemingly successful effort to claim that his wife's death was an accident.

      Rudolph was arrested in Colorado at the end of December—one of the districts where he sent claims for life insurance money. With their substantial evidence of Rudolph's guilt in what would soon be a public affidavit, the arresting agents immediately placed him in custody to prevent his flight and interference with those who provided information in the affidavit. The government asked for detention.

      Magistrate Judge Mix ordered the defendant detained. She concluded that Rudolph was both a flight risk and a danger to the community. She concluded that the Bail Reform Act's presumption applied. Det. Hrg. Tr. at 152-153. And she then considered the nature of and seriousness of the charge of murder, which carries a possible life sentence; the defendant's history and characteristics as a savvy international traveler with millions of dollars; the weight of the evidence; the defendant's threats to others; and the strength of the evidence. ECF 23; 18

U.S.C. § 3142(g)(1)-(4); *see also* Det. Hrg. Tr. at 154 ("And I understand why the Defendant wants to say that this is a weak case and wants the Court to reach that conclusion, but I cannot."); *id.* at 155 ("[T]his may be, in the 14 years I've been on the bench, the case involving the most international travel by an accused person that I have had in my courtroom."); *id.* ("[V]ast sums" of money and intimate familiarity with international travel "make it impossible . . . to conclude that he is not a serious flight risk."); *id.* at 156 ("Threats higher [sic] hitmen, threats to put a bullet in someone's head . . . and the Defendant's incredible familiarity with firearms again, in my view, make this defendant a danger to the community."). The factors pointed to detention.

## ARGUMENT

I.  **The defendant is a flight risk.**

    a.  **The risk of flight and the danger presented is greater here than other murders resulting in detention.**

The hearing established the following:

- The defendant has accumulated vast wealth of up to $27 million dollars. Det. Hrg. at 155. The detention statute recognizes financial resources as a factor (18 U.S.C. § 3142(g)(3)(A)) and courts routinely recognize that vast wealth creates opportunities to flee. *See Matter of Extradition of Ricardo Alberto Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1304 (S.D. Fl. 2017) (citing numerous cases in multiple jurisdictions across the United States holding that defendants with financial means to flee are flight risks).

- The defendant has spent two to three months abroad every year since 2009. Det. Hrg. Tr. at 63. He has extensive overseas contacts, foreign property, and intimate familiarity with what it takes to live long periods outside the country. Det. Hrg. at 65.

- The defendant believed that he was exonerated by the Zambian authorities and insurance companies and that the government's case was "as weak of a murder case as you can get." ECF 19; Det. Hrg. Tr. at 142. But the detention hearing showed that authorities know the Zambian investigation was superficial, the insurance companies did little more than confirm death, and the case is strong. A grand jury has found probable cause. Rudolph has more incentives to flee now than he has ever had.

- The defendant has threated to kill people—or use his wealth to hire others to kill or intimidate people—when he is challenged. Det. Hrg. Tr. at 70; ECF No. 14-1, 14-2.

14-3. He can also use his wealth to pay witnesses. Det. Hrg. at 6-67; ECF No. 14-5.

The evidence above is more extensive that the evidence of flight and danger offered in *United States v. Henthorn*, 14-cr-448-RBJ. There, as here, the defendant claimed that his wife died in an accident (as he had done with a previous wife, a fact discussed during the detention hearing). There, as here, the defendant filed life-insurance claims with the claim of an accident. There, as here, the defendant had no prior criminal history. Despite hotly contested issues of fact regarding the weight of the evidence, the Court easily found that the murder charge and Henthorn's wealth—several hundred thousand dollars—gave him the means and reason to flee. *Henthorn*, 14-cr-448-RBJ, ECF No. 13; ECF No. 21 at 31. If Henthorn was a flight risk, the far wealthier, more cosmopolitan, and more volatile Rudolph certainly is. And, *unlike* Henthorn, Rudolph is an expert hunter charged with using a firearm to murder and alleged to have threatened others with the use of firearms. Det. Hrg. at 73 and 156. He is also subject to a rebuttable presumption of detention that Henthorn was not.

The government has found no case where a defendant facing a foreign murder charge has been granted bond. By its nature, foreign murder typically involves defendants using exotic locales to conceal their crime. In *United States v. Brimager,* the government charged that a former honor student, community volunteer, and decorated marine killed his girlfriend in Panama. 2014 WL 6632787 (S.D. Cal. 2014). Despite his polished history and the contested nature of the charges (the medical examiner could not determine the cause of death), the court detained Brimager and rejected nearly the same arguments raised by defense here. *Id.* at *9 -10 (rejecting that not fleeing while under investigation predicts conduct post-indictment, finding lengthy sentence created incentive to flee, finding that bond secured by others was insufficient, noting that GPS can be removed and no passport is necessary to cross a border). Rudolph has

6

more disposable wealth, an expertise with firearms, a history of violent threats, and considerably more international travel. It is hard to see why Brimager would be detained but he would be released. *See also United States v. Wharton*, 320 F.3d 526, 536 (5th Cir. 2003) (detention of defendant on fraud related to life insurance even before murder charges could be filed); *United States v. Gardazi*, No. 2:07-cr-541-JMV, ECF No. 5 (D.N.J. June 21, 2007) (detaining defendant suspected of murder for insurance money).

    b.  **Rudolph has enough resources to flee and live abroad in comfort.**

Nothing in Rudolph's motion undermines the magistrate judge's conclusion that he can use his vast wealth to flee. Det. Hrg. at 155. The magistrate judge was aware that at least some of the defendant's wealth has been seized as part of a forfeiture action. Det. Hrg. Tr. at 155. But the hearing also made clear that Rudolph retains substantial liquid assets, *id.* at 67-68, a $10-million business, *id.* at 115, and the ability to siphon cash from his businesses, *id.* at 57-58.

No one is arguing that the defendant's wealth alone justifies detention; nor did Judge Mix rule on that basis. But the defendant's cases on that point support detention here. The *Hoover* court concluded detention was appropriate after it considered that the serious nature of the charges created an incentive to flee, 2014 WL 2094201 at *7-*8; noted that the strength of the evidence supported detention, *id.* at *8-*9; rejected that the otherwise unassuming defendant with no criminal history would meekly comply with pretrial conditions when he could simply walk across a border to evade accountability, *id.* at *10, and concluded that a wealthy defendant with international travel experience was a flight risk, *id.* at *11. The defendant released in *Himler* was charged only with identity theft and did not face the same penalties for guilt. Nor was there anything suggesting that he had this defendant's wealth or extensive international travel experience. 797 F.2d 156 161-62 (3d Cir. 1986).

And the *Chen* defendants were only released after it became clear appellate issues would

7

potentially cause their "indeterminate length of pretrial detention." 820 F. Supp. 1205, 1209-10 (N.D. Cal. 1992). The court also noted that the evidence presented a "shallow case" and that "conviction might be an uphill struggle." *Id.* at 1211. And it was concerned that detention had made one of the defendant's three children wards of the state who might be permanently placed with another family if detention continued. *Id.* at 1212. None of these factors is present here.

*United States v. Mobley*, 720 F. App'x 441 (10th Cir. 2017) (unpublished), cited throughout the defendant's motion, provides no additional support for detention here. The Tenth Circuit did not have the transcript of the proceedings and the judge had only "checked a box" that the government had met its burden with "very little supporting analysis and no discussion of why the proposed release conditions could not assure Mobley's appearance at trial." *Id.* at 444. There was also "no mention of Mobley's affirmative defense." *Id.* at 445. In contrast, the order here *did* consider Rudolph's arguments about the circumstantial nature of the case. It just didn't agree with him. Det. Hrg. Tr. at 154 ("I understand why the Defendant wants to say that this is a weak case and wants the Court to reach that conclusion, but I cannot."). And it should be noted that Mobley was again found to be a flight risk on remand. *United States v. Mobley*, 6:17-cr-10142-EFM, ECF No. 91 (D. Kan, Nov. 20, 2018).

  **c.**  **The defendant's post-investigation actions do not support release.**

The defendant argues that because he has not previously fled and the United States did not immediately arrest him, he should be released. But courts recognize (as the United States and Magistrate Judge did here) that there is an enormous difference between the *possibility* of charges and their reality. That is even more true here where Rudolph's successful evasion of suspicion by the Zambian authorities and the insurance companies gave him reason to believe he would avoid charges. *See, e.g.*, *Brimager*, 2014 WL 6632787 at *9; *United States v. Kachkar*, 701 F. App'x 744, 747 (11th Cir. 2017) (finding no error in district court's rejection of

8

defendant's claim that knowledge of investigation meant he would not flee after indictment).

        **d.**        **The defendant's health does not support release.**

The defendant's health—including his reliance on a pacemaker—was thoroughly discussed at the hearing and rejected as a basis for release. The defendant has never explained why his health issues are so serious that he must be released, but not so serious as to reconsider hunting some of the most dangerous animals on earth in remote foreign countries with limited access to advanced cardiac care. The defendant also has not explained why the care available to him in detention is inadequate, nor made any requests for additional care either in court or in pleadings.

        **e.**        **The defendant's bond proposals are unsupported and unworkable.**

Judge Mix did not err in concluding that Rudolph's proposals are insufficient to reasonably assure his presence. "[H]ome detention with electronic monitoring does not prevent flight; at best, it limits a fleeing defendant's head start." *United States v. Maxwell*, 510 F. Supp. 3d 165, 177 (S.D.N.Y. 2020) (citation omitted); *see also United States v. Muhtorov*, 702 F. App'x 694, 698 (10th Cir. 2017) (reversing release order and finding flight risk even where defendant would be subject to GPS ankle monitoring, a 24–hour home lockdown, had surrendered his passport, and would not be allowed access to internet-capable devices); *United States v. Wassendorf*, 2012 WL 4793366, at *3 (N.D. Iowa, Oct. 9, 2012) (detaining wealthy fraud defendant whose family was in United States, noting possibility of flight even without passport).

Nor did she err in not considering the proposal that he put private security guards on his payroll to detain him in an otherwise unstructured environment. *United States v. Banki* 369 F. App'x 152, 153-54 (2d Cir. 2010) (noting that it is "not legal error" for a court to decline private security in lieu of detention and noting it was "troubled" by this possibility). This is true even

under the rubric established by *Boustani,* which soundly rejected the notion of a "two tiered" justice system "in which defendants of lesser means are detained pending trial while wealthy defendants are released to self-funded private jails." 932 F.3d 79, 82 (2d Cir. 2019). Such a consideration might be appropriate only where a defendant is being detained solely because of his wealth. *Id*. But, as here, that was not the case in *Boustani*: the defendant had considerable international travel, the evidence "appeared strong," and the serious charge created the possibility of a lengthy sentence. *Id.* at 82-83.

The defense has now had almost a month to prepare a detailed proposal regarding exactly the type of security, its costs, how such a proposal would be judicially administered and why, if at all, private guards without the same training (and legal authority) as U.S. Marshals would in any way be adequate and able to prevent Rudolph's flight using legal means, how such a program could be administered in a densely populated and uncontrollable urban environment, how any liability issues would be handled if the use of force is required, how such a proposal would not undermine the public perception of the justice system as tilted towards the wealthy, or any of the other countless practical issues that have caused courts to reject such proposals as unworkable. *United States v. Epstein*, 425 F. Supp. 3d 306, 324-25 (S.D.N.Y. 2019); *United States v. Zarrab*, 2016 WL 3681423, at *9-13 (S.D.N.Y. June 16, 2016.).

The magistrate judge also had good reason to reject the proposal for secured bonds, which would mean little in this case. Homes would simply be collateral that can be fulfilled by providing money. A bond simply sets the cost the defendant would have to pay to escape justice and is not a means of reasonably assuring his presence in this case. *See, e.g., United States v. Benatar*, 2002 WL 31410262, at *2 (E.D.N.Y. Oct. 2, 2002) (rejecting proposed release package involving bonds on homes of friends as inadequate); *United States v. Weigand*, 2020 WL

2037052, at *2 (S.D.N.Y. April 27, 2020) (noting, in order detaining defendant entered before later reconsideration, that defendant's wealth gave him means to absorb collateral and to make co-signers whole). Indeed, the defendant provided a $129,883 cash down payment for his son's home in Miami in 2018 and paid the mortgage on it from December 2018 through June 2020. And he put $30,000 into the down payment for his daughter's home and had paid the mortgage on it to at least September 2021—a pretty good down-payment on fleeing these obligations. The United States can provide financial records should the defendant choose to contest these facts.

   **f.** **The flight risk must be assessed in its totality.**

The defendant's motion attacks each individual factor in isolation. ECF 42 at 6-11. But the law requires considering the evidence—as Magistrate Judge Mix did—in its totality. While it may be true that (1) wealth *alone* is not enough, *id.* at 7, (2) foreign property *alone* is not enough, *id.* at 8, and (3) the prospect of a substantial sentence *alone* is not enough, *id.* at 10, when taken together with (4) the defendant's deceptive conduct—lying to consular officials about the parentage of his children, telling his wife's brother he wasn't even in the cabin, moving quickly to cremate the body—(5) the strength of the evidence, (6) the many incentives to flee a possible life sentence, (7) the extraordinary resources available to make that escape and live comfortably, and (8) the ease with which the defendant moves, travels, and invests abroad, the evidence here aggregates to far more than the preponderance necessary to establish his risk of flight.

**II.** **A murder suspect who has threatened to kill endangers the community.**

A grand jury found probable cause that the defendant murdered his wife with a shotgun. The defendant is an expert hunter with considerable firearms experience who is prone to paroxysms of anger and who has threatened to kill people in the past. Det. Hrg. Tr. 71-74, ECF Nos. 14-1 to 14-3. That is clear and convincing evidence that he should not be released into the community while facing the prospect of life imprisonment. *Cf. Brimager*, 2014 WL 6632787, at

*9 (finding former marine defendant charged with murder was danger).

The detention statute requires that the Court consider the nature and seriousness of the charged crime. 18 U.S.C. § 3142(g)(1). Murder is among the most serious, violent, and dangerous crimes. Its very nature is evidence that this defendant is dangerous. *Cisneros*, 328 F.3d at 618.

The Court should also consider the defendant's familiarity with firearms. While the Court could order the defendant to remove firearms from any residence, this would not substantially lessen the threat. It is unfortunately not hard to obtain a firearm. Rudolph suggests his legal possession and familiarity with firearms is an improper consideration. But "a legally possessed weapon [can] present[] just as great a danger to [] safety as an illegal one." *United States v. King*, 990 F.2d 1552, 1561 (10th Cir. 1993)

The Court can likewise consider the defendant's history and characteristics, which include threats to kill and violent spasms of anger in the workplace. By the very text of the statute, it *is* legally appropriate and proper for the judge to consider whether a defendant has an abrasive personality. 18 U.S.C. § 3142(g)(3)(requiring consideration of person's "history and characteristics); 18 U.S.C. § 3142(g)(3)(A)(further noting consideration of "mental condition" and "past conduct"). The defendant's belief that workplace conduct would inevitably have led to some kind of complaint ignores the economic reality that the defendant was the owner of a business on which others relied for their livelihood.

## III.    Applying the presumption reinforces that the defendant should be detained.

The government has argued so far that the defendant is a flight risk and a danger even without reference to the presumption. Applying that presumption adds legal weight to the conclusion the defendant should be detained. Once the presumption is invoked, the burden of

production shifts to the defendant, even if the burden of persuasion remains with the government. *Muhtorov*, 702 F. App'x at 698; *United States v. Stricklin*, 932 F.2d 1353, 1354 (10th Cir. 1991). The defendant does not bear a heavy burden, but he must produce *some* evidence. *Id.* Even then, the Court can consider this presumption as a factor in favor of detention. *Id.*

The defendant has not identified what evidence he has produced to rebut the presumption in favor of detention. There is no dispute that the defendant has vast wealth, no dispute that he takes frequent trips abroad, and no dispute that the charge here is a serious one that has a penalty of life imprisonment. Rather, the defendant's motion attempts to re-characterize the existing evidence of flight or attack the evidence supporting the underlying charge. This is insufficient. It is similarly insufficient for the defendant to answer the presumption that there are no conditions that will assure his release by simply rejecting that premise and offering conditions anyways.

What is true for the presumption regarding risk of flight is true for the presumption regarding danger. The defendant has offered no evidence regarding the threats, no evidence about the angry outbursts at work, and no evidence that would undermine his facility with firearms. Applying the presumption here requires that the defendant provide *some* evidence that he is not a temperamental firearms expert who has threatened to kill and now faces a murder charge that greatly increases the likelihood of desperate acts.

**IV.   The strength of the evidence supports detention.**

The defendant himself recognizes the caselaw that at this very early stage of the proceedings, the weight of the evidence should be considered, but is not the most important fact. *See, e.g., United States v. Townsend*, 897 F.2d 989, 994 (9th Cir. 1990). He nevertheless uses his additional briefing space to try this case before the trial. There is no reason to do so. It is enough for the court to recognize that evidence is strong enough to create a substantial risk of a jury

verdict against him and, therefore, a substantial risk to flee or endanger a witness.

The government will not respond to every argument the defendant makes about the case and, instead, relies on the affidavit (ECF 4-2), the proffer in its original brief (ECF 14), and the considerable evidence elicited at the detention hearing. But a couple of items for consideration:

- The defendant's claim that the shotgun was "modified" is misleading. Shotguns commonly have a plug that limit ammunition to the amount allowed on hunts in the United States. The plug was removed, but nothing was done to the action or barrel. Det. Hearing Tr. at 101. One witness claimed that the shotgun jammed, but the professional hunters who tested it said that it did not. There is no reason to believe that the defendant put himself in front of real leopards with a defective gun.

- There are no real discrepancies about the measurement of the wound. The Zambian forensic pathologist measured six centimeters. Det. Hrg. Tr. at 110. On cross, the defendant tried to question the six centimeters, but the agent—consistently and accurately describing the evidence—remained firm. *Id.* at 11. The later photos, taken post-autopsy, may show a larger wound, but still within parameters that would make accident impossible. The forensic medical examiner saw these photos, but it is wrong to say they were the only ones considered. His report clearly and unambiguously references the original Zambian forensic pathologist's measurement.

- The fact that a manual warns users to avoid dropping a shotgun, a common-sense and liability-focused message, is not the same as a test to determine the likelihood or feasibility of a particular occurrence.

- It is not correct to say that "several witnesses" made clear Bianca was not a "confident hunter." There was one witness who said that; and not being confident that she would get an animal on a hunt is different from safely handling firearms. The witness had no concerns on that score. Det. Hrg. Tr. at 45.

- The fact that the defendant offered a never-before-seen will directing cremation does not undermine any of the evidence that the defendant—after interacting with U.S. officials expressing unease with the circumstances—moved to cremate the body as quickly as possible, which destroyed evidence.

- The defendant referenced a post-nuptial agreement but has refused repeated requests to provide it. Despite the claim that he's known about this case for years, has been hiring his own experts and has been putting together his own evidence of innocence, Det. Hrg. Tr. at 142, the defendant has denied pre-indictment offers for the government to evaluate that evidence, has delayed his disclosure deadlines into *March*, and otherwise refused to use any of that evidence to rebut the presumption in this case.

14

- That the magistrate judge did not reference every fact presented at the hearing is not evidence they were unconsidered or ignored. It would be proper, as a fact finder, to compare the defendant's histrionics in front of Zambian investigators to his coldly calculating interactions with consular officials, to consider and compare his varying statements, and then reach the conclusion that she need not weigh in on every particular controversy to find that the evidence, overall, was still strong.

- The defendant denies his statement to a consular official that Bianca was not the mother of his children. A witness is expected to testify to the contrary at trial and the jury can make up its mind. The magistrate judge rejected the defendants' characterization of the evidence as "weak." While the Court does not need to adopt the same characterization, it should recognize that such disagreements—and the defendants' evaluation of whether he should risk the jury finding one over the other—is such that a person might reasonably choose to flee or take other action rather than face the possible consequences.

- The defendant ignores the substantial evidence of motive here, including the financial windfall that came on his wife's death and the personal windfall that allowed him to live openly with his long-time girlfriend just weeks after the funeral. The girlfriend is a possible witness, the person most likely to flee with the defendant, and not an appropriate suretor. Det. Hrg. Tr. at 57 – 61;

## CONCLUSION

Magistrate Judge Mix found that the defendant is a flight risk and a danger after three-and-a-half hours of extensive testimony, exhibits, and detailed arguments from counsel. This Court should review the extensive record and reach the same conclusion.

Respectfully submitted,

COLE FINEGAN
United States Attorney

By:  /s Bryan Fields
Bryan Fields
Assistant United States Attorney
U.S. Attorney's Office
1801 California St. Suite 1600
Denver, CO 80202
(303) 454-0100
Bryan.Fields3@usdoj.gov
Attorney for the Government

By:  E. Garreth Winstead
E. Garreth Winstead
Assistant United States Attorney
U.S. Attorney's Office
1801 California St. Suite 1600
Denver, CO 80202
(303) 454-0100
Garreth.Winstead@usdoj.gov
Attorney for the Government

By:  J. Bishop Grewell
J. Bishop Grewell
Assistant United States Attorney
U.S. Attorney's Office
1801 California St. Suite 1600
Denver, CO 80202
(303) 454-0100
Bishop.Grewell@usdoj.gov
Attorney for the Government

## CERTIFICATE OF SERVICE

       I hereby certify that on 20th day of January, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to any and all counsel of record.

                                           *s/ Bryan Fields*
                                           United States Attorney's Office