IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 22-CR-0012-WJM

UNITED STATES OF AMERICA,

vs.

LAWRENCE RUDOLPH,

_____/

### REPLY MEMORANDUM RE: REVOCATION OF PRE-TRIAL DETENTION

Predictably, the government's response begins by emphasizing what the magistrate judge decided. DE45:1, 4–5. Deference to the magistrate judge is neither owed nor appropriate under 18 U.S.C. § 3145(b). A motion to revoke a magistrate judge's detention order requires the district court to review the evidence *de novo* and to hold an additional hearing if the court believes justice requires. *See United States v. Cisneros*, 328 F.3d 610, 616 (10th Cir. 2003). The questions are (1) whether a preponderance of the evidence establishes a "*serious* risk of flight" or (2) whether a super-preponderance of the evidence clearly and convincingly establishes that the accused poses an "an *identified and articulable threat* to an individual or the community." 18 U.S.C. § 3142(f)(2); *United States v. Salerno*, 481 U.S. 739, 751 (1987) (emphases added).

The government has not shown that Dr. Rudolph poses any more of a risk of flight today than he did when they were surveilling him and allowed him to travel internationally: "*[H]e has always returned from his trips.*" DE37:93. It has also failed to identify or articulate a specific danger Dr. Rudolph poses. As *Salerno* said, detention is an extreme measure and cannot be based on conjecture. Claiming that a presumption applies makes no

difference in this case. Speculation aside, *all* the evidence demonstrates that Dr. Rudolph will not and cannot flee and that he poses no danger to anyone. The government claims there is no evidence, DE45:13, but that is plainly wrong. The evidence is that Dr. Rudolph has no convictions. The evidence shows he has never been in so much as a fist fight. He has deep community and family ties. He is 67 years old and has a heart condition. He has shown no inclination to flee or harm anyone. He hired counsel to defend himself. The case against him is based on dubious, circumstantial evidence.

The government disputes none of this but accuses Dr. Rudolph of wanting to "try this case before trial." DE45:13. That is the government's effort to get around the fact that the weight of its evidence is a statutory factor that *must* be considered. Indeed, on page one it asked the Court to give weight to its claim that the "magistrate judge found that the evidence ... is strong," but by page 14 decides that it "will not respond to every argument the defendant makes about the case ... ."

The responses it does give are all equivocal. DE45:14–15. There is mixed testimony about the condition of the gun Mrs. Rudolph used. The agent, whose testimony about the wound was hearsay, "remained firm" on cross-examination. Of course, the reason hearsay is generally inadmissible at trial is because cross-examination is much less effective against hearsay witnesses because they have no first-hand knowledge. The gun manual is supposedly lying about the risk of dropping a firearm, but that nothing more than a self-serving unsupported guess. Cremation in accordance with Mrs. Rudolph's wishes did not "destroy evidence" because it took place *after the Zambian investigation* was concluded and there was no other pending investigation. Dr. Rudolph acted entirely legally and appropriately. The

government faults Dr. Rudolph for not providing the post-nuptial agreement but that is just a distraction from the fact that the burden is on the government to show detention is *necessary*. The magistrate judge may not need to reference every fact but the fact remains that the detention order glaringly omits *highly relevant* facts that severely undermined her ultimate conclusion. The government does not deny that.

### New Factual Developments

Events since the motion for revocation of detention was filed bear on whether Dr. Rudolph's detention is authorized under § 3142(f) and whether, even if it is, it is consistent with his rights under all the circumstances, *see* § 3142(*i*). On January 19, 2022, a defense investigator went to visit Dr. Rudolph but was turned away and told that Dr. Rudolph had contracted COVID. He is under quarantine and no personal visits will be permitted until January 27 at the earliest. Two defense attorneys had scheduled separate trips to meet with Dr. Rudolph counsel on January 20 and January 25, but both trips have now had to be canceled. Just this morning, another video call was canceled.

Phone and video conferences have continued to prove ineffectual.  Video calls are being canceled because the detention facility can bring Dr. Rudolph to the room with the equipment only if no one else is then using the system to prevent further spread of the COVID contagion. Because COVID is rampant in the prison, video calls, which can last no more than 30 minutes and cost $10 per call (raising questions about the constitutionality of a detention regime that is meant to extract profits from those subjected to it), often get canceled or cut short. When calls do happen, the attorneys, we have to shout to be heard. We can only see the top of his head and can't share documents.

**Argument**

The government's response utterly fails to meet its burden of demonstrating that Dr. Rudolph's appearance cannot be reasonably assured short of jailing him. Because the prosecution cannot satisfactorily or rationally explain why home confinement would prove ineffectual, Tenth Circuit law requires his conditional release.

I.   **Although murder is a crime of violence, the first factor the Court must consider does not weigh in favor of detention.**

The charged murder in this case is a crime of violence, DE45:12, but the allegations pertain to domestic as opposed to random violence. The government's response is characteristically vague—"Murder is among the most serious, violent, and dangerous crimes," DE45:12. Tautologies cannot satisfy the government's burden. While a domestic murder is as serious as any other, this is relevant to whether the first statutory factor weighs in favor of or against detention. *"This is not the sort of defendant where we're making an argument like he's a gang member and he's going to be going around, you know, perpetrating random violence."* DE37:130. There is absolutely no evidence—much less clear and convincing evidence—that, despite years' worth of opportunities, Dr. Rudolph ever attempted to threaten, harm, or in any way influence any prospective witness or anyone else.

II.  **The government's case is entirely circumstantial and the so-called "forensic" tests on which it relied are of dubious admissibility.**

The government's allegations are serious but its evidence is extremely weak. It avers that the FBI "had considerably more resources and expertise" than the Zambian investigators, DE45:4, but we are never told that this supposed advantage yielded *any hard evidence*. Rather, the entire case is built on "tests" that have yet to be vetted. However, we

know at this stage that those tests relied on unjustified, counterfactual suppositions. This is relevant because expert testimony does not make it to a jury unless it is absolutely, not merely relatively, reliable and helpful in understanding *what actually happened* and not *what might possibly have happened*. The case may not even be *admissible.* That's weak.

The government assumes that its experts will be able to assure jurors that its tests are reliable, notwithstanding all the unwarranted assumptions on which they depend. As the Supreme Court has made clear, however, it is not enough for an expert to just declare that his or her data, whether derived from "forensic" tests are otherwise, is relevant and reliable. Experts have to *demonstrate* that their suppositions are logically justifiable in the context of the case. *See General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert."). This showing must be convincingly made before such evidence can be brought to the jury: "[W]hile the Federal Rules of Evidence allow district courts to admit a somewhat broader range of scientific testimony than did pre-existing law, they leave in place the trial judge's 'gatekeeper' role of screening such evidence to ensure that it is not only relevant, but reliable." *Id.* at 136.

While this case is not at the stage where the admissibility of the prosecution's expert testimony is ripe for decision, the serious obstacles to its admissibility, combined with the total lack of any physical or other direct evidence suggesting murder, make this a very weak case. The second factor weighs in favor of release because this case is extraordinarily weak, and the government does not deny not with specifics, but only with conclusory assertions.

### III.   Dr. Rudolph's personal history weighs in favor of release.

The government's arguments for detention are directed at some hypothetical "typical murder defendant" the way tort law imposes a hypothetical "reasonable person" standard. To paint its hypothetical killer, the government makes assertions that are true only in the most general sense and then hopes the Court will, as the magistrate judge did, fill the gaps in its proof with conjecture and speculation. Supposedly, Dr. Rudolph has "vast wealth" and "extensive overseas contacts" as well as "foreign property" and "intimate familiarity" with living abroad. DE45:5. Those assertions are as vague and general as can be because the specifics do not remotely support the government's speculative risk-of-flight argument. Dr. Rudolph's supposedly "vast wealth" is largely frozen and *entirely* monitored by the government. His "overseas contacts" are unidentified but we know that the government does not claim he is part of any criminal organization. So, these "contacts" are—what?—waiters, conceirges, tour guides? We are never told. His "foreign property" is a house in Mexico, the country where he was arrested. The government neither claims that he is likely to flee there nor otherwise explains why owning "foreign property" is relevant. The government just throws out ominous phrases and invites conjecture.

While pretending that "[n]o one is arguing that the defendant's wealth alone justifies detention," DE45:7, the government cites a series cases in which wealthy people were detained. DE45:7–8. The relevance of those cases to any other point is never explained.

It then asserts that *United States v. Mobley*, 720 F. App'x 441 (10th Cir. 2017), is not relevant. *Mobley* held that a district court cannot order detention without explaining why the defendant's proffered plan of release is insufficient to reasonably assure his appearance and

incapacity to cause harm. *Id.* at 443. The government never addresses that because it has no response. Instead, it again cites to the magistrate judge, ignoring that review is *de novo*. But, it is undisputed that the magistrate judge's order does not comply with *Mobley*. DE45:9–10 (explaining that the magistrate judge "did not err" but without showing where the magistrate judge's detention order sets out the required explanation). It throws out casual assertions that guards could not stop a 67-year-old with a heart condition and that "secured bonds … would mean little in this case." DE45:10. In contrast, Dr. Rudolph has explained in detail the consequences of absconding. He would have to figure out how to deal with his pacemaker without contacting his long-time cardiac specialists. His daughter would lose her home. The business he built intending to hand it over to her would be put at risk. His son, a lawyer, would lose his home (regardless of who paid the down payment). His career would be put in jeopardy. Those are real consequences and the government has completely ignored them.

At bottom, the government wants this Court to just *presume* that the plan of release is "unworkable" or "insufficient," DE45:9–10, but it offers no *factual* explanation of why that is in fact the case. Under *Mobley*, conditional release in this case is therefore required.

Most importantly, the government's response is aimed only at trying to show that "Rudolph has more incentives to flee now that he has ever had." DE45:5. The government does *not* explain why the plan of release does not eliminate or minimize that incentive nor does it explain how Dr. Rudolph has the *ability* to flee. Because it cannot show that, it cites to other cases where bail was denied and claims that there is no foreign murder case where conditional release was granted. DE45:5–7. But caselaw is not *evidence*, and evidence is what the statute requires. Neither is it relevant given that Dr. Rudolph's relevant specific

characteristics demonstrate clearly and apparently irrefutably that he cannot, as a practical as opposed to purely theoretical matter, actually flee.

The facts of *this* case show there is no serious risk of flight. Dr. Rudolph is dependent on a pacemaker, is under constant treatment and monitoring by the Mayo Clinic, has his life's work—and now his daughter's work—to lose by fleeing. Not only would his flight destroy the business at the very point when his daughter is about to get married and start a family of her own, it would also cripple his son's legal career by wiping out the bulk of his assets. The facts all show Dr. Rudolph's resolve to fight the charges. He has every reason to do so and has done nothing to avoid trial, even though the agents allowed him every possible opportunity.

Dr. Rudolph has no criminal record and made no attempt to flee or harm anyone in the five years agents worked openly and with his complete knowledge to build a murder case against him. Witnesses told government agents that the Rudolphs were "happy" on their trip to Africa and were "having a good time." DE37:106–07. No one reported to the agents any hint of domestic discord. He has the *complete moral and financial support* of the two children he and his deceased wife raised together. He is an American citizen with deep ties and a successful business in Pennsylvania that he intends to pass on to his dentist-daughter.

Additionally, Dr. Rudolph is in no condition to abscond. He suffers from a documented congenital heart disease and depends on a pacemaker. He has had several heart surgeries. He has now—because of the challenged order of detention apparently contracted COVID—and the effects of that in his particular case are yet unknown but they are certainly of great concern. He has never avoided any official or court proceeding.

The third factor weighs heavily in favor of release.

IV. **The government fails to identify and articulate a specific, credible danger inherent in Dr. Rudolph's home-confinement plan, much less *prove* one with clear and convincing evidence.**

As stated in Part I, *supra*, because the alleged crime in this case is a domestic one, the agent conceded in court that Dr. Rudolph has no propensity for random violence. DE37:130. The government's arguments that he is nonetheless generally dangerous rely only on supposition peppered with character disparagement. He is "an expert hunter with considerable firearms experience who is pone to paroxysms of anger ... ." DE45:11. That is classic character assassination. The *facts* are that Dr. Rudolph has never been shown to have killed *anyone*, including his late wife. He has never even been shown to have been in a physical alteration ever in his entire life. Those are facts.

Most importantly, the agents' own actions in allowing Dr. Rudolph to remain at large for the trivial, petty purpose of manufacturing a venue convenient to them is compelling evidence that he poses no danger to anyone and that the government's contention that he does is disingenuous. In this regard, it bears emphasizing that agents refused to arrest Dr. Rudolph in Arizona or Pennsylvania despite every opportunity to do so *because that was not convenient*. The agents wanted to have a trial in *their* hometown. And they were willing to wait as long as it took for an opportunity to bring that about to materialize. *See* DE37:120.

The fourth factor weighs heavily for release.

## CONCLUSION

To justify detention, the prosecution had to present evidence that Dr. Rudolph, not a hypothetical defendant, will more likely than not both *try to flee* and *succeed*. That is what a "serious risk" of flight is. There is no evidence that he wants and the evidence shows that,

given his age and poor health, he could not get far. He could get no where, in fact, under the proposed conditions of release. **The government never explains why home confinement with his son does not provide all necessary assurance. They do not even mention this proposal.** The prosecution never details any specifically identified and articulated threat of danger to some specific person (which is necessary given that the government does not contend there is any risk of random violence). Even if it had been, the support would have to be clear and convincing. Here, the evidence is that Dr. Rudolph has no criminal record or history of violent acts.

The government's case for detention rests impermissibly on speculation and innuendo. The detention order should be revoked immediately so that Dr. Rudolph can get the medical attention and treatment he needs and prepare to meet the government's case.

### CERTIFICATE OF SERVICE

The foregoing was filed by CM/ECF on January 20, 2022.

Respectfully submitted,

MARKUS/MOSS PLLC
40 N.W. Third Street
Penthouse One
Miami, Florida 33128
Tel: (305) 379-6667
markuslaw.com

By:    /s/ David Oscar Markus
David Oscar Markus
Florida Bar Number 119318
dmarkus@markuslaw.com