**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Criminal Case No. 22-cr-012-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

LAWRENCE RUDOLPH,

      Defendant.

---

**ORDER DENYING DEFENDANT'S MOTION FOR TEMPORARY RELEASE**
**PURSUANT TO 18 U.S.C. § 3142(i) AND DEFENDANT'S MOTION TO REVOKE**
**ORDER OF DETENTION AND REQUEST FOR HEARING**

---

The Government charges Defendant Lawrence Rudolph with one count of foreign murder in violation of 18 U.S.C. §§ 1119 and 1111, and one count of mail fraud in violation of 18 U.S.C. §§ 1341 and 2.  (ECF No. 26.)  On January 4, 2022, United States Magistrate Judge Kristen L. Mix ordered that the Defendant be detained pending trial.  (ECF No. 23.)  He is currently detained at the Denver Downtown Detention Center.  (ECF No. 38 at 8.)

Currently before the Court is the Defendant's Motion for Temporary Release Pursuant to 18 U.S.C. § 3142(i) ("Motion for Temporary Release"), filed on January 6, 2022.  (ECF No. 31.)  Also before the Court is the Defendant's Motion to Revoke Order of Detention and Request for Hearing ("Motion to Revoke"), filed on January 17, 2022. (ECF No. 42.)

No hearing is necessary to resolve the Motion for Temporary Release and

Motion to Revoke.  For the reasons explained below, the Court affirms Judge Mix's detention order and finds that Defendant's request for temporary release is unavailing under the circumstances.  Therefore, the Court leaves Judge Mix's January 4, 2022 detention order in place.

## I.  LEGAL FRAMEWORK

### A.   Initial Standard

The Court "shall order the detention of the [defendant] before trial" if it finds, after a hearing, "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e)(1).

"Subject to rebuttal by the [defendant], it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the [defendant] as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed . . . an offense under section 924(c), 956(a), or 2332b of this title."  *Id*. § 3142(e)(3)(B).

"Once the presumption is invoked, the burden of production shifts to the defendant.  However, the burden of persuasion regarding risk-of-flight and danger to the community always remains with the government.  The defendant's burden of production is not heavy, but some evidence must be produced."  *United States v. Stricklin*, 932 F.2d 1353, 1354–55 (10th Cir. 1991).

"The facts the judicial officer uses to support a finding . . . that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence."  18 U.S.C.

§ 3142(f)(2).  As for risk of flight, the burden is preponderance of the evidence.  *United States v. Cisneros*, 328 F.3d 610, 616 (10th Cir. 2003).

The factors the Court "shall" consider when deciding whether to grant pretrial release are:

> (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, . . .;
>
> (2) the weight of the evidence against the person;
>
> (3) the history and characteristics of the person, including—
>
>> (A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and
>>
>> (B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and
>
> (4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release. . . .

18 U.S.C. § 3142(g).  Additionally, the presumption of detention, even if countered by the defendant with adequate evidence, "remains a factor for consideration by the district court in determining whether to release or detain."  *Stricklin*, 932 F.2d at 1355.

## B.    Reopening Detention Order

If a court detains the defendant, the defendant may ask that court to revisit that conclusion under certain circumstances.

First, the defendant can argue that relevant information, not previously known, has come to light:

> The [detention] hearing may be reopened, before or after a determination by the judicial officer, at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure the appearance of such person as required and the safety of any other person and the community.

18 U.S.C. § 3142(f)(2).

Second, the defendant may argue that preparation of a defense or other "compelling" circumstances justify "temporary release":

> The judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason.

*Id*. § 3142(i).

**C.     Review**

"If a person is ordered detained by a magistrate judge, . . . the person may file, with the [district court], a motion for revocation or amendment of the order." *Id.* § 3145(b).  The district judge then reviews the magistrate judge's decision *de novo*. *Cisneros*, 328 F.3d at 616 n.1.

> *De novo* review, however, does not necessarily mean holding an evidentiary hearing.  Although a district court may start from scratch and take evidence, it may also review the evidence that was before the magistrate judge and make its own independent determination as to whether the magistrate judge's findings and detention order are correct.  This is a matter of discretion for the district court.

*United States v. Romero*, 2010 WL 11523871, at *2 (D. Colo. May 17, 2010) (internal quotation marks and citations omitted).

4

## II.  BACKGROUND

Defendant was charged by complaint on December 16, 2021 and charged by a superseding criminal complaint on December 22, 2021.  (ECF Nos. 1, 4.)  In the superseding criminal complaint, Defendant was charged with violations of 18 U.S.C. § 1341 (mail fraud), and 18 U.S.C. §§ 1119 and 1111 (foreign murder).  (ECF No. 4.)

On January 4, 2022, Judge Mix conducted a detention hearing and subsequently issued an order of detention (the "Detention Order").  (ECF Nos. 23, 37.)  In the Detention Order, Judge Mix noted that the Defendant was charged with murdering his wife while on safari in Zambia, is wealthy, owns property in Mexico, has traveled extensively, and has considerable experience with firearms.  (ECF No. 23 at 3.)  She further noted the strength of the case against Defendant, as well as the Government's proof of "the [D]efendant's volatile personality and threats of physical harm to others, including his efforts to hire a 'hit man' to either scare or injure others."  (*Id.*)  Based on the record, Judge Mix concluded that "no condition or combination of conditions of release will reasonably assure the appearance of the [D]efendant and the safety of the community."  (*Id.*)

The next day, on January 5, 2022, a grand jury charged Defendant with violations of violations of 18 U.S.C. § 1341 (mail fraud), and 18 U.S.C. §§ 1119 and 1111 (foreign murder).  (ECF No. 26.)

On January 6, 2022, Defendant filed the Motion for Temporary Release.  (ECF No. 31.)  The Government responded on January 10, 2022 (ECF No. 35), and Defendant replied on January 11, 2022 (ECF No. 38).

On January 17, 2022, Defendant filed the Motion to Revoke.  (ECF No. 42.)  The

Government responded on January 20, 2022 (ECF No. 45), and the Defendant replied on the same day (ECF No. 46).

### III.  ANALYSIS

**A.     Review of Judge Mix's Detention Order**

     1.     <u>Whether a Presumption of Detention Applies</u>

During the Detention Hearing, Judge Mix concluded that a rebuttable presumption of detention applied because there is probable cause to believe that the Defendant committed an offense under 18 U.S.C. § 924(c). (ECF No. 37 at 152.)  In coming to this conclusion, Judge Mix relied on the language of the Bail Reform Act, § 924(c), and two cases addressing the interaction between the Bail Reform Act and § 924(c) in cases involving foreign crimes, *United States v. Mehanna*, 669 F. Supp. 2d 160 (D. Mass. 2009) and *United States v. Lee*, 206 F. Supp. 3d 103 (D.D.C. 2016). (ECF No. 37 at 153–54.)

In his Motion to Revoke, the Defendant argues that "[t]he presumption does not apply in this case because [he] has not been charged with a § 924 offense."  (ECF No. 42 at 6 (citing *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985); *United States v. Payden*, 759 F.2d 202, 205 (2d Cir. 1985)).)

In response, the Government argues that the statutory presumption of detention applies because "the plain text of [18 U.S.C. § 3142(e)(3)] focuses on a finding by the judicial officer, not upon the charges brought."  (ECF No. 45 at 2–3 (collecting cases).) The Court agrees with the Government.

The plain language of the Bail Reform Act provides that a presumption of detention applies upon a judicial officer's determination that the necessary predicate for

invoking the presumption has been established:

> Subject to rebuttal by the person, it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if *the judicial officer* finds that there is probable cause to believe that the person committed . . . an offense under § 924(c) . . . .

18 U.S.C. § 3142(e)(3)(B) (emphasis added).

Likewise, numerous courts have concluded that a defendant need not be charged with a violation of § 924(c) for the judicial officer to conclude that a presumption of detention applies. *See Lee*, 206 F. Supp. 3d at 110 (concluding presumption of detention applies under § 3142(e)(3)(B) notwithstanding fact that defendant was not charged with a violation of § 924(c)); *United States v. Farguson*, 721 F. Supp. 128, 129–31 (N.D. Tex. 1989) (same); *United States v. Bess*, 678 F. Supp. 929, 932 (D.D.C. 1988) (same).

To be sure, in *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985), the Second Circuit concluded that the presumption of detention did not apply to a defendant because the government had not yet charged that defendant with a violation of § 924(c).  In reaching this conclusion, the Second Circuit held that § 3142(e) could not apply except in accordance with § 3142(a)(4), which provides that "[u]pon the appearance before a judicial officer of a person charged with an offense, the judicial officer shall issue an order that, pending trial, the person be . . .  detained under subsection (e)."  *Id.* at 405.  However, as the District Court for the District of Columbia points out in *Bess*:

> With due deference to the Court of Appeals for the Second Circuit, this Court does not read the "plain language of the statute" as indicating that the presumption "was intended to

arise only after a defendant has been charged with the particular offense by a valid complaint or indictment." [*Chimurenga,* 760 F.2d at 405.] The "plain language" of § 3142(e) states that the presumption applies upon a finding by "*the judicial officer*" that there is probable cause to believe that the person committed an offense under 18 U.S.C. § 924(c). Section 3142(a), upon which the Second Circuit relied, speaks of a person charged with *an* offense, a necessary first step to determining whether a particular person is properly before the court, and if so whether he should be released or detained pending further proceedings. It is undisputed that Defendant was charged with an offense.

678 F. Supp. at 932 (emphasis in original). This Court agrees with the construction of

§§ 3142(a) and 3142(e)(3) followed in *Bess*.

Here, the Court concludes that there is probable cause to believe that Defendant

committed a violation of § 924(c).[1] After all, a grand jury has concluded there is

---

[1] Section 924(c)(1)(A) provides that:

> Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime--
>
> (i) be sentenced to a term of imprisonment of not less than 5 years;
>
> (ii) if the firearm is brandished, be sentenced to a term of imprisonment of not less than 7 years; and
>
> (iii) if the firearm is discharged, be sentenced to a term of imprisonment of not less than 10 years.

A "crime of violence" is defined as an offense that is a felony and: (1) "has as an element the use, attempted use, or threatened use of physical force against the person or property of another," or (2) "that by its nature, involves a substantial risk that physical force against the

probable cause to believe that the Defendant committed the crime of foreign murder—a crime of violence—by killing his wife, Bianca Rudolph.  (ECF No. 26 at 1.)  Moreover, there is evidence that Ms. Rudolph was shot in the chest with a shotgun.  (ECF No. 4-2 at 3–4, 7 ¶¶ 10, 17.)  As such, the Court concludes that there is probable cause to believe that the Defendant committed violation of § 924(c), thus triggering the presumption of detention under § 3142(e)(3).

      2.    <u>Risk of Flight</u>

Acknowledging that the Defendant is "wealthy, owns property in Mexico," and "has traveled extensively internationally," Judge Mix concluded that "no condition or combination of conditions of release will reasonably assure the appearance of the [D]efendant."  (ECF No. 23 at 3.)

The Defendant argues that he "poses no actual risk of flight, much less a serious one."  (ECF No. 42 at 6.)  He emphasizes that he made no efforts to flee or hide assets despite being aware of the Government's investigation and the possibility of a lengthy sentence, and that there is no link between his financial resources and any tendency to flee.  (*Id.* at 7, 9–10.)  For support, he cites numerous cases in which courts have noted that the mere opportunity for flight is not sufficient grounds for pretrial detention.  (*Id.* at 7–8 (citing *United States v. Himler*, 797 F.2d 156, 162 (3d Cir. 1986); *United States v. Hoover*, 2014 WL 2094201, at *11 (D. Ariz. May 20, 2014); and *United States v. Chen*, 820 F. Supp. 1205, 1208 (N.D. Cal. 1992)).)

The Defendant further argues that the fact that he owns property in Mexico and has traveled extensively internationally does not demonstrate that he is a flight risk

---

person or property of another may be used in the course of committing the offense."  *Id.* § 924(c)(3).

given that he has surrendered his passport and "always returned from his trips," and because the Government does not contend that it ever advised the Defendant not to leave the country.  (*Id.* at 8–9.)  He points out that he has no criminal history (*see id.* at 10), and that he is "no condition to abscond" as he is a 67-year-old man who "suffers from a documented congenital heart disease," "depends on a pacemaker," "is under constant treatment and monitoring by the Mayo Clinic," and "has had several heart surgeries" (ECF No. 46 at 8).

In response, the Government emphasizes that the Defendant has accumulated vast wealth of up to $27 million in assets, and has "extensive overseas contacts, foreign property, and an intimate familiarity with what it takes to live long periods outside the country."  (ECF No. 45 at 5–7.)  The Government further argues that the Defendant has more incentive to flee now that he has been indicted by a grand jury, faces a potential life sentence, and has insight into the strength of the Government's evidence.  (*Id.* at 11; *see id.* at 8 (arguing there is a "enormous difference between the *possibility* of charges and their reality" (emphasis in original)).)

After carefully considering the parties' arguments, the Court concludes that the Government has established that Defendant is a clear flight risk and that there is no condition or combination of conditions that will reasonably assure his appearance.

To be sure, the Defendant lacks any criminal history and has returned from his prior international trips despite knowing that he was under federal investigation. However, in the Court's view, there is a significant difference between the Defendant knowing he is under investigation and knowing he has been indicted by a grand jury for foreign murder, a charge that potentially carries a life sentence.  *See* U.S. Sentencing

Guidelines Manual § 2A1.1 & cmt. 2(A); *see also United States v. Madoff*, 316 F. App'x 58, 59 (2d Cir. 2009) (holding that the district court did not clearly err in concluding that the defendant's age (70 years old) and length of his potential sentence were incentives to flee); *Matter of Extradition of Ricardo Alberto Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1305 (S.D. Fla. 2017) (recognizing in extradition case that fact that 66-year old defendant faces a potential 21 year sentence contributes to a determination that he poses a serious risk of flight); *United States v. Brimager*, 2014 WL 6632787, at *7 (S.D. Cal. Nov. 21, 2014) (recognizing that "[t]he prospect of up to 20 years in custody if there are convictions provides strong incentive for Defendant to flee"); *Duran v. United States*, 36 F. Supp. 2d 622, 628 (S.D.N.Y. 1999) (noting that the petitioner's potential term of imprisonment, which may outlast his remaining years of life, is a "significant incentive to flee").

The Defendant understandably contests the strength of the Government's evidence; however, the Court agrees with Judge Mix's conclusion that there is significant probative evidence against Defendant.  (*See* ECF No. 37 at 154 (JUDGE MIX: "And I understand why the Defendant wants to say that this is a weak case and wants the Court to reach that conclusion, but I cannot.").)  As Judge Mix recognized in the Detention Order:

> [T]he [G]overnment provided evidence of a lengthy evidence investigation into the circumstances underlying the charges, which includes forensic testing showing the implausibility that the decedent's fatal wound resulted from an accident or suicide attempt, [D]efendant's inconsistent statements about his whereabouts at the time of the incident, [D]efendant's rush to cremate the decedent's body, [D]efendant's misrepresentation to family members about extending the safari as well as his misrepresentation to foreign authorities that he need not immediately notify his children of the fatality

because the decedent was not their biological mother.

(ECF No. 23 at 3.)[2]  Given the nature of his charges and the strength of the

Government's evidence (*see* ECF Nos. 4-2, 14, 37), the Court concludes that the

Defendant has a strong incentive to flee.

Moreover, even though some of Defendant's wealth has been seized as part of a

forfeiture action, the Defendant still has more than adequate funds to arrange flight from

the pending charges and has substantial funds for his living expenses if he flees.  (ECF

No. 37 at 67–68 (estimating Defendant's net worth to be around $6.2 million, not

including property that has been seized or is subject to ongoing forfeiture proceedings);

*see id.* at 155 (recognizing that Defendant reported over $27 million in assets to Pretrial

Services).)

To be sure, the fact that Defendant has significant assets alone does not

demonstrate that he is a risk of flight or justify detention.  *See Himler*, 797 F.2d at 162

("Mere opportunity for flight is not sufficient grounds for pretrial detention.").  However,

when considering the Defendant's wealth in combination with the other factors that

render the Defendant a flight risk, the Court cannot ignore that Defendant's substantial

resources provide him means to flee.  *See e.g.*, *United States v. Maxwell*, 510 F. Supp.

3d 165, 174 (S.D.N.Y. 2020) (recognizing that "the Defendant's extraordinary financial

resources also continue to provide her the means to flee the country and to do so

---

[2] In the Motion to Revoke, the Defendant cites case law stating that weight of the evidence is the "least important" § 3142(g) factor and speculates that "[t]he detention order . . . shows that the magistrate judge gave [the factor relating to the strength of the evidence] *the most* weight, devoting the order's lengthiest paragraph to a summary of the [G]overnment's circumstantial evidence."  (ECF No. 42 at 13 (emphasis in original).)  This argument is baseless. After all, the length of a paragraph has no bearing on the weight that Judge Mix gave this factor.

undetected," which in combination with her substantial international ties, foreign connections, and experience avoiding detection, "bear[s] significantly on the flight risk analysis"); *United States v. Boustani*, 356 F. Supp. 3d 246, 255 (E.D.N.Y. 2019), *aff'd,* 2019 WL 2070656 (2d Cir. Mar. 7, 2019) ("[T]he combination of Defendant's alleged deceptive actions, access to substantial financial resources, frequent international travel, complete lack of ties to the United States, and extensive ties to foreign countries without extradition demonstrates Defendant poses a serious risk of flight."); *United States v. Zarrab*, 2016 WL 3681423, at *8 (S.D.N.Y. June 16, 2016) (recognizing that defendant's significant wealth, extensive international travel, and strong ties to foreign countries "provide [the defendant] with the incentive and the wherewithal to flee and render him a flight risk"); *Hoover*, 2014 WL 2094201, at *12 (concluding wealthy defendant is a risk of flight based, in part, on his connections to his foreign property and money, and his international travel experience).

Likewise, although Defendant contends that he is not a risk of flight based on his health conditions (ECF No. 46 at 8), the Court notes that Defendant fails to provide any *evidence* demonstrating the severity of his purported medical conditions and instead merely relies on attorney argument on this point. *See United States v. Ramos-Caballero*, 2021 WL 5176051, at *2 n.1 (10th Cir. Nov. 8, 2021) (recognizing that attorney argument is not evidence). Moreover, there is evidence that the Defendant's health conditions are not so serious such that they prevent him from traveling to remote foreign countries to hunt big game animals. (*See also* ECF No. 37 at 63 (SPECIAL AGENT PETERSON: "Based on travel records back to 2009, with the exception of the most recent COVID-impacted year, the Defendant spends between two to three months

every year traveling internationally."); *see id.* at 65 (SPECIAL AGENT PETERSON: "According to travel records and a recent interview with Mr. Swanepoel, I believe Mr. Rudolph traveled to Ethiopia on or about May 22nd of 2021.  He was scheduled to participate in a 14-day leopard hunt with Mr. Swanepoel.").)  Just as the Defendant's health conditions did not lessen his ability to travel, the Court cannot conclude that the Defendant's health conditions lessen his risk of flight.

For the reasons stated above, the Court concludes that the Government has met its burden of persuasion by a preponderance of the evidence that the Defendant presents a risk of flight.

3.   Danger to the Community

In the Detention Order, Judge Mix determined that "no condition or combination of conditions of release will reasonably assure . . . the safety of the community."  (ECF No. 23 at 3.)  In making this determination, Judge Mix noted the Defendant's charges, as well as evidence regarding the "[D]efendant's volatile personality and threats of physical harm to others."  (*Id.*)

The Defendant argues that the Government has failed to establish that he presents an "identified and articulable threat to an individual or the community," such that he should be detained pending trial.  (ECF No. 42 at 13 (citing *United States v. Salerno*, 481 U.S. 739, 751 (1987)).)  For support, emphasizes that the case against him is weak and that he did not murder Ms. Rudolph, that the Government waited to arrest him, and that the evidence regarding his volatile personality includes mere "hearsay complaints of disgruntled employees and comments between friends over drinks about completely unrelated events."  (*Id.* at 11–18 (arguing "[i]t was legal error to

14

deem an abrasive personality a factor favoring incarceration").)

However, as explained in Part III.A.2, the Court cannot agree that the evidence against Defendant is weak.  The Defendant is charged with the violent crime of murdering his wife with a shotgun.[3]  Moreover, the Defendant's history specific threats of violence go beyond a mere "abrasive personality."  To the contrary, Special Agent Peterson testified about the Defendant's specific threats, including requests that an individual "put him in contact with a Nigerian who could travel to the United States to threaten or intimidate folks to help him with an issue he was having," as well as threats that the Defendant "would hire a Nigerian to shoot [a coworker] in the head" and that the Defendant "would just shoot [the coworker] himself."  (ECF No. 37 at 71–73.)  Special Agent Peterson also recounted an interview with another former employee of the Defendant's dental practice in which the former employee stated that the Defendant

> offered [him] what [the Defendant] characterized as a 'generous commission' of approximately $25,000 if he could take care of something for him.  This individual understood that to mean that [the Defendant] was offering him $25,000 if he could facilitate or make arrangements to have someone killed.  And [the Defendant] reportedly went on to ask this individual, who appears to be Hispanic, if any of his hombres could come up from Mexico to facilitate this.

(*Id.* at 73–74.)[4]  The serious nature of these threats, supported by the specific factual

---

[3] While the Defendant emphasizes that "[n]ot one witness ever saw [the Defendant] be violent with his wife" (*see* ECF No. 42 at 12 (citing ECF No. 37 at 109)), this testimony has little impact on the Court's dangerousness analysis given that a grand jury has concluded that there is probable cause to believe that the Defendant later *murdered* Ms. Rudolph.

[4] To the extent that the Defendant emphasizes that the threats discussed at the Detention Hearing are "hearsay complaints," the Court notes that the Defendant cites no case law suggesting that the district court cannot consider hearsay statements during a detention hearing. *Cf. United States v. Valdez*, 682 F. App'x 684, 686 (10th Cir. 2017) ("[N]umerous courts have held that hearsay is permissible in a detention hearing."); *United States v. Reed*,

details of those threats, weigh heavily in the Court's determination that the Defendant, who faces a life sentence if convicted of foreign murder, poses a danger to the community and the specific witnesses who may testify against him at trial.

To the extent that the Defendant contends that "the agents would have arrested him at the earliest opportunity" "[i]f [Defendant] were truly dangerous and violent" (ECF No. 42 at 11), the Court is unpersuaded.  There are numerous reasons why the Government might wait to finish its investigation before arresting the Defendant, including the fact that his arrest begins the speedy trial clock for the Government to present the case to the grand jury and obtain an indictment.  *See* 18 U.S.C. § 3161(b) ("Any information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which such individual was arrested or served with a summons in connection with such charges.").

The Court therefore concludes that the Government has demonstrated by clear and convincing evidence that the Defendant is a danger to the community.

\* \* \* \*

After carefully weighing and considering  the relevant § 3142(g) factors, the Court concludes that the presumption in favor of detention, the nature and characteristics of the charged offenses, the weight of the evidence, and the history and characteristics of the Defendant all weigh in favor of detention.

Even assuming arguendo that the presumption of detention did not apply in this case, the Court would nonetheless conclude that the Government has met its burden in establishing that the Defendant is a flight risk and a danger to the community, such that

---

2021 WL 321262, at \*4 (D. Colo. Jan. 30, 2021) (recognizing that "hearsay evidence is generally admissible in proceedings held under the Bail Reform Act").

the Defendant should be detained.

The Court next turns to the question of whether is any condition or combination of conditions of release that would reasonably assure the Defendant's appearance and guarantee the safety of the community.

3.      Consideration of the Defendant's Proposed Bail Package

The Defendant argues that Judge Mix erred by failing to consider and properly weigh any "reasonable alternative" to pre-trial detention, including his proposal for conditions of pretrial release that include:

- a $5 million personal recognizance bond, co-signed by his two children and secured by the Defendant's home and the homes of both children;

- house arrest in custody of either: (1) his girlfriend, Lori Milliron, in Phoenix, Arizona; (2) his son in Miami, Florida, or (3) his daughter in Cranberry, Pennsylvania, with "travel only for court appearances, meetings with counsel, visits with medical providers, with approval of Pretrial Services and subject to electronic monitoring";

- a directive that any visitors are to be approved by Pretrial Services, with counsel and family members to be pre-approved;

- surrender of all travel documents with no new applications;

- surrender of all firearms;

- no contact with any potential witness in this case;

- a directive that the Defendant will not encumber any property or use his resources, other than for basic living expenses and for legal counsel, and/or "any other financial monitoring that the Court deems necessary";

- if necessary, a directive that the Defendant pay for on-premises, round-the-clock private security guards that "could report to Pretrial Services if the Court so orders"; and

- such other terms as the Court may deem appropriate.

(ECF No. 42 at 3–11, 18.)  In proposing these conditions of pretrial release, the Defendant points out that the Second Circuit has recognized in *United States v. Sabhnani*, 493 F.3d 63 (2d Cir. 2007) and *United States v. Boustani*, 932 F.3d 79 (2d Cir. 2019) that a private-security condition may be appropriate where a defendant is deemed to be a flight risk primarily because of his wealth.  (*Id.* at 8.)  The Government responds that Defendant's bond proposals are "unsupported and unworkable."  (*See* ECF No. 45 at 9–11.)

The Court concludes that the Defendant's proposed conditions of release would not, alone or in combination, reasonably assure the Defendant's appearance or guarantee the safety of the community.  The GPS system, "while technologically sophisticated, is ultimately just another form of electronic surveillance, and 'monitoring equipment is easily rendered inoperative or becomes so by mechanical failure.'"  *United States v. Benatar*, 2002 WL 31410262, at *3 (E.D.N.Y. Oct. 10, 2002) (quoting *United States v. Gotti,* 776 F. Supp. 666, 673 (E.D.N.Y. 1991)).  Moreover, as other courts have observed, "home detention with electronic monitoring does not prevent flight; at best, it limits a fleeing defendant's head start."  *Maxwell*, 510 F. Supp. 3d at 177 (quoting *United States v. Zarger*, 2000 WL 1134364, at *1 (E.D.N.Y. Aug. 4, 2000)).  Defendant's surrender of his passport likewise does not prevent his flight.[5]  *United*

---

[5] The Court notes that wealthy defendants facing serious charges have been able to use their substantial financial resources to leave the country from which they face charges.  *See,*

*States v. Wasendorf*, 2012 WL 4793366, at *3 (N.D. Iowa Oct. 9, 2012) ("Although

'fleeing' is typically associated with fleeing ab[ro]ad, fugitives flee with the United States'

[borders] successfully as well.  Moreover, it is possible—although difficult—to flee

abroad without a passport.").

While the Defendant represents that he is willing to be released to the custody of

his girlfriend or a family member and produces affidavits from his children stating that

they are willing to secure the Defendant's bond with their homes (ECF Nos. 42-1, 42-2),

such promises provide little assurances of Defendant's appearance given Defendant's

substantial financial resources.  *See, e.g.*, *Maxwell*, 510 F. Supp. 3d at 176–77

(recognizing that third party pledges supporting defendant's bond "do[ ] not meaningfully

mitigate the possibility of flight" where the defendant would retain significant assets and

future income streams that would "plausibly enable her to compensate [the third

parties], in part or in full, for their losses"); *Benatar*, 2002 WL 31410262, at *2

(recognizing that if the court accepted the defendant's proposed bond secured by his

ex-relatives and friends' homes, the wealthy defendant "could simply reimburse his ex-

---

*e.g.*, Justin McCurry, *Ex-Nissan boss Carlos Ghosn talks of daring escape from Japan*, The Guardian, July 14, 2021, https://www.theguardian.com/business/2021/jul/14/ex-nissan-boss-carlos-ghosn-talks-of-daring-escape-from-japan (detailing how Carlos Ghosn was smuggled out of Japan in a large musical instrument case and flown to Lebanon in a private plane while awaiting trial on charges of financial misconduct).  While the cost of chartering a private jet undoubtedly varies, Defendant certainly has the financial means to do so even using the most conservative estimates of his net worth.  *See* Dori Zinn, *How much does a private jet cost?*, Bankrate, https://www.bankrate.com/loans/personal-loans/how-much-does-a-private-jet-cost/ (recognizing that "[t]he typical cost [to charter a private jet] is between $2,000 and $23,000 per hour").

Moreover, if an individual has substantial funds—like the Defendant does here—he can purchase foreign citizenship and a passport.  *See, e.g.*, Taylor Borden, *9 countries where you can easily buy citizenship and how to do it*, Business Insider, Oct. 1, 2020 https://www.businessinsider.com/second-passport-cost-dual-citizenship-by-investment-caribbean-europe-2020-1 (listing several countries from which individuals can purchase foreign citizenship by making a direct investment in the country and thereby receive a foreign passport).

relatives and friend for the $740,000 cost of his jumping bail").

Moreover, the Court rejects Defendant's offer to hire private security guards. Although the Second Circuit recognized in *Boustani* that a defendant may "be released on such a condition only where, *but for* his wealth, he would not have been detained," 932 F.3d at 82 (emphasis in original), the risk of flight factors in this case extend beyond Defendant's extensive wealth.  The Court is also deeply troubled by any suggestion that the Defendant, by virtue of his wealth, should be able to buy his way out of detention by constructing a private jail from the comfort of his girlfriend or relative's home.[6]  *See Boustani*, 932 F.3d at 82 (recognizing that "the Bail Reform Act does not permit a two-tiered bail system in which defendants of lesser means are detained pending trial while wealthy defendants are released to self-funded private jails"); *United States v. Agnello*, 101 F. Supp. 2d 108, 115 (E.D.N.Y. 2000) ("Congress did not intend that a dangerous individual should be released because that individual was sufficiently affluent to be able to pay the cost of extravagant release conditions monitored by private security officers."); *United States v. Bellomo*, 944 F. Supp. 1160, 1167 (S.D.N.Y. 1996) ("The government is not obligated to replicate a jail in [the defendant's] home so that he can be released.").

---

[6] Moreover, as numerous courts have recognized, a private security condition add additional administrative burdens on the court system and could embroil the Court in numerous issues relating to the private security firm's enforcement ability.  *See United States v. Epstein*, 425 F. Supp. 3d 306, 325 (S.D.N.Y. 2019) ("The Defense package components would embroil the Court in issues, among others, relating to the level of force that may be used to secure the Defendant . . . ."); *United States v. Valerio*, 9 F. Supp. 3d 283, 295 (E.D.N.Y. 2014) ("The questions about the legal authorization for the private security firm to use force against defendant should he violate the terms of his release, and the questions over whether the guards can or should be armed, underscore the legal and practical uncertainties—indeed, the imperfections—of the private jail-like concept envisioned by defendant, as compared to the more secure option of an actual jail.").

For the reasons set forth above and after considering the § 3142(g), the Court affirms Judge Mix's assessment that no condition or combination of conditions will reasonably assure the appearance of the Defendant as required and the safety of any other person and the community.  Accordingly, the Court finds that Defendant's detention was proper and denies Defendant's Motion to Revoke.

**B.     Consideration of § 3142(i) Factors**

Having found that Defendant must be detained, the Court now evaluates whether it will nonetheless "permit [him] temporary release" because it is "necessary for preparation of [his] defense or for another compelling reason."  18 U.S.C. § 3142(i).

In his Motion for Temporary Release, Defendant argues that "[t]he combination of the pandemic, the measures imposed to address it, and [the Defendant's] detention in a jurisdiction foreign to him—where he lacks the support of any friends or family who could visit him and assist him in organizing his affairs to mount his defense—makes preparing for a murder trial nearly impossible and provides not merely sufficient but compelling grounds for his temporary release."  (ECF No. 31 at 1.)  The Court considers each argument below.

1.     <u>Risk of Contracting COVID-19 and the Defendant's Health Conditions</u>

The Defendant argues that he suffers from serious medical issues that "render him particularly vulnerable to contracting and succumbing to COVID[-19]."  (ECF No. 31 at 5.)  Specifically, the Defendant argues that his medical conditions include "a severe heart problem that required heart surgery less than a year ago, a pacemaker implant, and 24-hour monitoring by an app on his phone that his connected to Mayo Clinic."  (*Id.*; *see also* ECF No. 38 at 5–6.)  In response, the Government argues that Judge Mix had

already considered, and rejected, Defendant's arguments relating to his vulnerabilities to COVID-19 and that the Defendant has not met his burden to show that "he uniquely deserves temporary release because of COVID-19."  (ECF No. 35 at 4.)

The Court finds that the Defendant has failed to demonstrate that his medical conditions place him at a serious risk if he contracts COVID-19, such that he should be released from detention.  As the Court noted in Part III.A.2, the Defendant has not provided any *evidence* demonstrating the severity of his purported medical conditions. Nor has he provided evidence of his vaccination status.[7]  Moreover, because the Defendant has now tested positive for COVID-19 in jail (ECF No. 46 at 3), the Court finds that the Defendant's arguments that he should be temporarily released from detention based on his specific risk factors to contracting COVID-19 are now moot.

2.    Preparation of His Defense

The Defendant further argues that "being forced to defend himself in a place far away from his lawyer, his family, and his friends will be enormously burdensome under the circumstances."  (ECF No. 31 at 5.)  He points out that "[t]o see [the Defendant] in person to review discovery and prepare for trial, counsel will need to travel (both risking exposure to COVID[-19] and needlessly wasting time and resources) and then visit [the

---

[7] The Court notes that many of the cases cited by the Defendant in which temporary release was granted based on the COVID-19 pandemic occurred in early stages of the pandemic when the disease's scope and effects were not clear and there was no vaccine available.  (*See* ECF No. 31 at 2.)  The present stage of the pandemic is different due to the availability of vaccines that have proven effective at reducing the severity of COVID-19. Moreover, there is a "'growing consensus' that either receiving or refusing COVID-19 vaccination 'weighs against a finding of extraordinary and compelling circumstances'" within the analogous compassionate release context.  *United States v. Hald*, 8 F.4th 932, 936 n.2 (10th Cir. 2021) (quoting *United States v. Baeza-Vargas*, 532 F. Supp. 840, 843–46 (D. Ariz. 2021) (collecting cases)).

Defendant] in the jail (which has numerous COVID[-19] outbreaks at present)." (*Id.*) Defense counsel also attaches an affidavit in support of the Defendant's reply brief in which he outlines the numerous issues in which counsel has encountered in attempting to communicate with the Defendant.  (*See* ECF No. 38-1.)

The Court is unpersuaded by the Defendant's argument that the conditions of his confinement are uniquely onerous or interfere with his ability to participate in his defense, and thus justify his release.[8]  The Court does not dispute that many of the Denver Downtown Detention Center's COVID-19 policies—which were implemented to enhance the safety of detainees and the jail staff—may present challenges to communication with counsel.  It appears likely that the policies implemented may make it more difficult for detained defendants to communicate with counsel in the short term.

However, many of the difficulties cited by defense counsel also appear to be connected with the Defendant's COVID-19 exposure (and subsequent positive test), which will likely resolve once the Defendant recovers from COVID-19.  The Court further concludes that the Defendant fails to adequately allege that the facility's alternative methods of telephonic or video-communication deprive him of his right to effective counsel or pose such an onerous burden on the Defendant that his release from detention is appropriate.  To the extent the Defendant and his counsel require additional

---

[8] The Defendant's arguments regarding the burdens associated with counsel traveling to communicate with the Defendant fall flat.  If the Court were to accept the Defendant's argument on this topic, defendants who are able to afford to retain counsel would be placed in the privileged position over defendants with appointed counsel by being released from detention because they are able—and choose—to retain out-of-state counsel.  Moreover, the Court notes that at the time he filed his Motion for Temporary Release, the Defendant was requesting to be released to "24-hour lockdown at his house in Phoenix under the supervision of a GPS monitor." (ECF No. 31 at 6.)  Defense counsel, who resides in Florida, would still have to travel to communicate with the Defendant in person in Arizona, with the costs and duration of such travel from Florida comparable to travel from there to Colorado.

time to confer, review discovery, and/or prepare his defense, he may make an application to the Court for a further extension of time.

Finally, to the extent that the Defendant attempts to argue that the District of Colorado is an improper venue for this action or that government agents acted in an unconstitutional manner (*see* ECF No. 31 at 3–5; ECF No. 38 at 2–4), the Court notes that this is not the proper juncture to consider those arguments.  If the Defendant wishes to raise such arguments, he may do so at an appropriate time through properly filed motions.  For purposes of this order, the Court finds that the Defendant has failed to convincingly establish that his detention in Colorado provides the Government with a tactical advantage warranting the Defendant's pretrial release.[9]

After careful consideration of the parties' arguments and the factors justifying Defendant's detention, the Court is unable to conclude that Defendant's temporary release from detention is necessary for the preparation of his defense or for another compelling reason.[10]  Accordingly, the Court denies the Motion for Temporary Release.

## IV.  CONCLUSION

For the reasons set forth above, the Court ORDERS as follows:

1.    Defendant's Motion for Temporary Release Pursuant to 18 U.S.C. § 3142(i) (ECF No. 31) is DENIED;

2.    Defendant's Motion to Revoke Order of Detention and Request for Hearing (ECF

---

[9] The Defendant states that Special Agent Peterson testified at the detention hearing "that the prosecution deliberately set out to gain an unfair advantage by isolating [the Defendant] from his children, his friends, and his lawyers."  (ECF No. 31 at 2.)  This statement is unsupported by the record, and the Court will not consider it further.

[10] Because the Court denies the Motion for Temporary Release, the Court need not address the Government's arguments that the Defendant's request for indefinite release is impermissible under § 3142(i).  (*See* ECF No. 35 at 2.)

No. 42) is DENIED; and

3.      Judge Mix's January 4, 2022 detention order (ECF No. 23) is AFFIRMED.

Dated this 27th day of January, 2022.

BY THE COURT:

William J. Martínez
United States District Judge