IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 22-CR-0012-WJM

UNITED STATES OF AMERICA,

vs.

LAWRENCE RUDOLPH,

_____/

## MOTION TO DISMISS COUNT 1 FOR LACK OF VENUE
## AND REQUEST FOR HEARING

Lawrence Rudolph moves to dismiss Count 1 of the superseding indictment for lack of venue and requests a hearing on this issue. The government brazenly engaged in a calculated effort to defy a statute written to deny prosecutors their choice of venue, and no court can countenance that.

Count 1 charges that Dr. Rudolph killed his wife in Zambia in 2016. DE53:1. Although Zambian officials and several insurance companies concluded that Bianca Rudolph's death was accidental, federal agents investigated for five years. By December 16, 2021, the government believed probable cause existed to arrest Dr. Rudolph for murder. *See* DE1-2:2 ("I submit that there is probable cause to believe Lawrence Rudolph murdered his wife ... ."). It could have immediately arrested Dr. Rudolph in Phoenix, Arizona, where he lived, but the government did not want to have to try its case there. It knew that the law limited venue over foreign crimes to the place of arrest or the place where the accused first arrived in the country after the alleged crime—in this case, Atlanta, Georgia. That venue statute dates to the nation's founding. It has the same purpose and effect as the venue restrictions in Article III and the Sixth Amendment—barring prosecutorial forum-shopping. Yet, instead of arresting Dr. Rudolph and trying its case in Arizona, the government launched a scheme to defy and circumvent the limits Congress imposed on the prosecution's venue options.

The first step was to obtain an arrest warrant in Colorado, the prosecution's chosen venue, predicated only on a domestic mail-fraud charge, over which venue exists in several districts. Because the supposed fraud was claiming to insurers that Mrs. Rudolph's death was accidental, the supporting affidavit had to admit that probable cause existed to believe Dr. Rudolph murdered his wife. DE1-2:2. However, it was crucial to the government's plan to omit the murder allegation from the complaint itself, and it tellingly did so. DE1.

The second step was to arrest Dr. Rudolph in Arizona and claim the arrest was only for mail fraud, not the underlying murder, based on the intentional omission of the murder allegation from the complaint. The third step was to transport Dr. Rudolph to Colorado to answer the fraud charge, and then claim to arrest him there for murder. Finally, the government would insist that, because Dr. Rudolph was arrested for murder in Colorado, venue lay there under the statute.

The plan changed once the agents learned that Dr. Rudolph planned a short trip to Mexico. They filed a new complaint in Colorado including the murder charge, DE4, supported by the same affidavit as the original, DE4-2. They somehow arranged for Mexican authorities to arrest and jail Dr. Rudolph, though he was not then indicted for any crime. They had him sent to Denver against his will, expecting to establish venue by claiming that Dr. Rudolph was brought and arrested there.

Presumably, the government reasoned that arresting Dr. Rudolph in Mexico would better obscure its defiance of the statutory limits on venue. This Court might not accept that Dr. Rudolph was arrested in Arizona for fraud predicated on murder but not murder itself. Basing venue on such a formalistic technicality made it too obvious that the government was trying to do what Congress had forbidden. Arresting him in Mexico on both charges would make its scheme to circumvent the law less conspicuous. This is also why Count 1 improperly fails to allege any facts regarding venue.

The government's attempt to undermine Congress and circumvent the statute was exposed during Dr. Rudolph's detention hearing in Colorado. The testifying agent admitted that the FBI delayed Dr. Rudolph's arrest only to manufacture venue in the government's cherry-picked district:

> Q. He wasn't arrested at the Phoenix airport, was he?
> A. He was not.
> Q. Why not?
> A. Because we wanted the case to be tried in Denver with the primary case agent.
> \*       \*       \*
> Q. And you had determined prior to the date that he traveled to Cabo that you were going to proceed with a murder case, right?
> A. Yes.
> **Q. But you waited because you wanted venue in Denver, correct?**
> **A. Correct.**

DE37:119–20 (emphasis added). This shows a dangerous disregard for the rights of defendants, especially given that neither Dr. Rudolph nor Count 1 has any connection to Colorado at all.

As the Tenth Circuit explained, letting prosecutors pick their venue has consistently been recognized, from the Constitutional Convention to the present day, as greatly unfair and oppressive:

> Venue is not a mere technicality. ... ***The Supreme Court has pointed out that failure to treat venue rights seriously not only may impose unfairness and hardship on the accused, but might also encourage forum-shopping by federal prosecutors.*** "Questions of venue in criminal cases, therefore, are not merely matters of formal legal procedure. They raise deep issues of public policy ... ."

*United States v. Miller*, 111 F.3d 747, 749 (10th Cir. 1997) (emphasis added) (quoting *United States v. Johnson*, 323 U.S. 273, 276 (1944)). *Johnson* emphasized that the Constitution reflects the Founders' outrage over Britain's use of tactics like those used in this case. 323 U.S. at 275 ("Aware of the unfairness and hardship to which trial in an environment alien to the accused exposes him, the Framers wrote into the Constitution" not one, but two, venue provisions "[a]s though to underscore the importance of this safeguard ... .").

3

Rather than specifying a venue for extraterritorial crimes, the Constitution expressly directed Congress to do so by statute. *See* Article III, § 2, cl. 3 ("The trial of all crimes ... shall be held in the state where the said crimes shall have been committed; but when not committed within any state, the trial shall be at such place or places as the congress may by law have directed."). Answering this directive less than two years after ratification, the First Congress enacted the venue provision that governs this case. Because the First Congress included several signatories of the Constitution, the statute, like the Constitution's venue restrictions, reflects the Founding Fathers' firm belief that giving prosecutors their choice of venue is inherently unfair. The venue statute can be understood correctly only by keeping its overriding purpose in sight.

The part of the statute that applies in this case has been substantially unchanged since its enactment in 1790. The original version provided: "'The trial of crimes committed on the high seas or in any place out of the jurisdiction of any particular state shall be in the district where the offender is apprehended or into which he may first be brought.'" *Kerr v. Shine*, 136 F. 61, 62 (9th Cir. 1905) (quoting 1790 statute).[*] In 1963, Congress amended the statute to address joint crimes and to prevent the statute of limitations from expiring before arrest by creating a venue for indicting a suspect who never came to the United States. *See United States v. Lozoya*, 982 F.3d 648, 655 (9th Cir. 2020). It now states in its entirety:

---

[*] From 1825 to 1874, it provided: "And the trial of all offences which shall be committed upon the high seas or elsewhere out of the limits of any state or district, shall be in the district where the offender is apprehended, or into which he may be first brought." *United States v. Baker*, 24 F. Cas. 962 (C.C.S.D.N.Y. 1861) (quoting then current version).

From 1874 to 1963, it provided: "'The trial of all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district where the offender is found, or into which he is first brought.'" *United States v. Provoo*, 215 F.2d 531, 537 (2d Cir. 1954) (quoting then current version).

4

> The trial of all offenses begun or committed upon the high seas, or elsewhere out of the jurisdiction of any particular State or district, shall be in the district in which the offender, or any one of two or more joint offenders, is arrested or is first brought; but if such offender or offenders are not so arrested or brought into any district, an indictment or information may be filed in the district of the last known residence of the offender or of any one of two or more joint offenders, or if no such residence is known the indictment or information may be filed in the District of Columbia.

Because the government chose to effect Dr. Rudolph's arrest in Mexico, Count 1 can be tried only where he was "first brought" from Zambia—which is Georgia. Any other result nullifies the statute.

**I.**      **Under the circumstances, the pertinent venue statute requires the government to charge Count 1 in the Northern District of Georgia, and the government's claim that it can forum-shop despite the statute does violence to its text and defeats its purpose.**

The important issue this case raises is whether a statute intended to ban prosecutorial forum-shopping can be read to mean exactly the opposite —that the government can bring Count 1 in any district it wants. Upon its enactment in 1790, the statute achieved its intended effect of denying prosecutors control over the venue for trying foreign crimes. Before the 20th century, the federal government did not have the capability to manufacture venue by timing arrests to occur in one place rather than another. Beginning in the mid-20th century, modern technology, combined with the vast expansion of federal law-enforcement capabilities, made it possible for prosecutors to exploit judicially-created loopholes in the statute. The government's plan in this case is the latest flagrant escalation in a long line of prosecutorial schemes to subvert the venue statute. As explained herein, the government's erroneous gloss on the statute suffers from three fatal defects: (1) The government's reading contravenes the statute's plain text. (2) It renders a key phrase in the statute surplusage. (3) It utterly defeats the statute's purpose of barring prosecutorial forum-shopping. Applying the statute according to its plain text, in light of its undeniable purpose, establishes venue for Count 1 only in the Northern District of Georgia. This Court must therefore dismiss Count 1.

**A.    The venue statute for foreign crimes was deliberately phrased to make prosecutorial forum-shopping impossible because the Founders well knew how abusive and unfair this practice is.**

Section 3238 is carefully worded to bar prosecutorial forum-shopping. The clause that governs this case requires the accused to be tried where he "is arrested or is first brought." In 1790, when this part was enacted, prosecutors could not control where those events occurred. The 1963 amendment reaffirmed Congress' commitment to barring prosecutorial forum-shopping. It permits indicting a suspect who remains abroad only in the district where he last lived. Significantly, Congress did not allow prosecutors to choose a venue even when the accused never lived in any district. Rather, adhering to Article III's directive, Congress provided for venue in such cases *only* in the District of Columbia. The whole statute reflects Congress' unwavering goal of precluding prosecutorial forum-shopping, which "leads to the appearance of abuses, if not to abuses, in the selection of what may be deemed a tribunal favorable to the prosecution." *Johnson*, 323 U.S. at 275.

An early case by Justice Joseph Story authoritatively explained the statute's plain text and rationale. The case concerned a crewman on a whaling ship charged with attempting mutiny and confining the captain. *United States v. Thompson*, 28 F. Cas. 102, 103 (C.C.D. Mass. 1832). Justice Story explained that the statute's text created, at most, two possible venues for trial—where the accused was "apprehended" or where "he shall first be brought," *i.e.*, where he first arrived in the country after the alleged crime. In most cases, including *Thompson* itself, these places would be one and the same. However, the accused might escape before arrest or, if brought ashore without being restrained, might just wander off. If he were then arrested in another district, it might be preferable to have the trial where the ship, *with all the witnesses and evidence*, was docked. Thus, it made sense to set venue at *either* the place of arrest *or* the place of arrival, as Justice Story explained:

6

> [T]he language of the crimes act of 1790 is, that "the trial of crimes committed on the high seas, or in any place out of the jurisdiction of any particular state, shall be in the district, where the offender is apprehended, or into which he shall first be brought." The provision is in the alternative; and therefore the crime is cognizable in either district. And there is wisdom in the provision; for otherwise, if a ship should, by stress of weather, be driven to take shelter temporarily in any port of the Union, however distant from her home port, the master and all the crew, as well as the ship, might be detained, and the trial be had far from the port to which she belonged, or to which she was destined. And if the offender should escape into another district, or voluntarily depart from that, into which he was first brought, he would, upon an arrest, be necessarily required to be sent back for trial to the latter.

*Thompson*, 28 F. Cas. at 102–03.

Significantly, Justice Story's contemporaneous interpretation of the statute recognized that the phrase "is first brought" does not mean *is first brought in the custody of law enforcement*, as some later courts assumed. In his explanation, even if the suspect was brought ashore only because the ship bringing him had to seek "shelter temporarily" from the "stress of weather," that became a possible venue for trial. Custody did not enter into it because the concern was over the location of *the ship*. The statute provided a choice between the place of arrest and the place of arrival because of the "general convenience" of trying a crime committed aboard ship wherever the ship, with all the witnesses and other evidence, was docked. *Id.* at 103. Without that provision, the trial of a shipboard crime might prove impossible if the accused were arrested far away from the ship. This authoritative reading of the statute makes sense of its plain text and also explains how, like its constitutional counterparts, it intentionally denies prosecutors an unfettered choice of venue for trial.

Justice Story's interpretation naturally takes it for granted that criminal suspects will be apprehended *as quickly as possible*. It would never occur to anyone in the 18th or 19th centuries that agents would refrain from arresting a suspect just to manufacture venue, as they did in this case. The risk that the suspect could abscond would be so great that it would defy all common sense to put off

arrest just to forum-shop. That fact controls the meaning of the statute today because courts must interpret § 3238 to accomplish, not defeat, its constitutional purpose: "If an enactment of Congress equally permits the underlying spirit of the constitutional concern for trial in the vicinage to be respected rather than to be disrespected, construction should go in the direction of constitutional policy even though not commanded by it." *Johnson*, 323 U.S. at 276.

Justice Samuel Nelson, sitting as circuit justice, agreed with Justice Story's interpretation. *United States v. Baker*, 24 F. Cas. 962 (C.C.S.D.N.Y. 1861), concerned Confederate rebels who ambushed and sacked Union ships. They were captured at sea by Union military officers and sent to New York for prosecution, which entailed their "being transferred to another vessel" at Hampton Roads, Virginia. *Id.* at 964. Once in New York, they were "arrested by the civil authorities." *Id.* Adopting Justice Story's view, Justice Nelson held: "The court is of opinion that the clause conferring jurisdiction is in the alternative; and that jurisdiction may be exercised either in the district in which the prisoners were first brought, or in that in which they were apprehended under lawful authority for the trial of the offence." *Id.* Whether the rebels were in custody did not affect where they were *first brought*. They were *apprehended* once the "civil authorities" with power to prosecute them took them into custody. *Id.* Thus, venue was lawful in New York as well as Virginia.

Nearly a century after *Baker*, the Second Circuit agreed that being captured by the military generally does not amount to being "arrested" under the statute when the military lacks jurisdiction to prosecute the charged crimes. *United States v. Provoo*, 215 F.2d 531, 535 (2d Cir. 1954). However, the *Provoo* court made an exception to that general rule because the Army detained and transported John Provoo *at the Justice Department's behest* as part of a scheme to manufacture venue in virtually any district in the country—just as the prosecution in this case seeks to do. *Provoo*

8

concerned a former U.S. Army sergeant charged with committing treason while a Japanese prisoner

of war from 1942 to 1945. In 1949, the Army jailed him pending court-martial on unrelated charges.

> At the request of the Department of Justice which was investigating the possibility of his having committed acts of treason while a prisoner of war, the Army delayed for four months court-martial proceedings on the sodomy charge, finally dropped this charge, and brought Provoo to New York to effectuate here an undesirable military discharge and to turn him over to F.B.I. agents in order that he might be arrested, indicted and tried for treason in the southern district of New York.

*Id.* at 535. Venue depended on whether Provoo was arrested in New York. The government argued,

in line with *Baker*, that Provoo was not arrested until after the Army turned him over to the FBI.

Provoo argued that he was arrested at Fort Meade, Maryland, when the Army delayed his discharge

to accommodate the Justice Department's desire to try him in New York rather than Maryland.

Specifically to avoid reading § 3238 as giving federal prosecutors their choice of any district, the

Second Circuit held that Provoo was arrested in Maryland because the Army was acting for DOJ:

> We cannot blind our eyes to the fact that the real purpose in bringing him to New York was to meet the wish of the Department of Justice to have him tried for treason under the indictment subsequently filed here. ... *To hold otherwise would mean that the Army, acting in cooperation with the Department of Justice, can select any federal district in the United States as the place for trial of a soldier charged with treason or any other offense committed abroad.*

*Id.* at 538 (emphasis added).

Just as DOJ got the Army to help it manufacture venue in *Provoo*, the government got

Mexico to help it manufacture venue in this case. *Provoo* correctly held that courts cannot allow

legal formalisms to defeat Congress' aim of barring prosecutorial forum-shopping. For venue

purposes, Dr. Rudolph was arrested in Mexico, outside of any federal district, on behalf of the U.S.

government. He can be tried only where he was "first brought," the Northern District of Georgia.

**B.      This Court should not be misled into allowing the prosecution to pick its venue by decisions that have departed from the statute's plain text.**

While Justices Story and Nelson both held that "the clause ... is in the alternative," *Baker*, 24 F. Cas. at 964, and creates venue both where the accused first arrives and where he is arrested, other courts have mistakenly decided that "is first brought" means *is first brought while in custody*. This effectively makes "is first brought" redundant with "is arrested" and creates only one possible venue in every case. *United States v. Bird*, 24 F. Cas. 1148 (D. Mass. 1855), took that view, refusing to read the statute as giving the government *any* venue option. Its one-paragraph opinion decided, without analysis, citation, or textual support, that "brought" meant *brought while in custody*:

> By being brought within a district, is not meant merely being conveyed thither by the ship in which the offender may first arrive; but the statute contemplates two classes of cases, one in which the offender shall have been apprehended without the limits of the United States, and brought, in custody, into some judicial district; the other, in which he shall not have been so apprehended and brought, but shall have been first taken into legal custody, after his arrival within some district of the United States, and provides in what district each of these classes shall be tried. *It does not contemplate, that the government shall have the election, in which of two districts to proceed to trial.*

*Id.* (emphasis added). *Bird* disregarded Justice Story's hypothetical of the ship taking shelter from inclement weather in the storm. His explanation made clear that "brought" was deliberately left broad and unqualified in the statute for the practical purpose of creating an alternative venue. *Thompson*, 28 F. Cas. at 102–03. *Bird* erred in rendering the phrase surplusage.

Nonetheless, *Bird*'s mistake proliferated. In 1973, the Fourth Circuit stated that the phrase "is arrested or is first brought" means nothing more than "is arrested," rendering "is first brought" surplusage and creating the loophole the government now seeks to exploit. *United States v. Erdos*, 474 F.2d 157, 160–61 (4th Cir. 1973) ("We think the phrase in the current version of the statute that

10

venue shall be in the district in which the offender "is arrested or is first brought" means simply 'arrested' ... ."). Other courts assume that "brought" denotes some form of official custody short of a "formal arrest," although it is far from clear what that means. *See United States v. Han*, 199 F.Supp.3d 38, 46 (D.D.C. 2016) (identifying 16 factors bearing on the question of "custody").

Distinguishing between custody and formal arrest, creates a loophole in the statute that prosecutors will naturally try to exploit. The government tried just that in *Han*. Jeong Seon Han, chief engineer of a commercial fishing vessel suspected of violating anti-pollution laws, was detained in American Samoa and flown to Washington, D.C., with a layover in Honolulu. *Id.* at 40–41, 44. The government claimed that Han was never arrested before indictment, and it could therefore charge him in the District of Columbia because he had never lived in the United States. Han, however, argued that he was "first brought" to the District of Hawaii and had to be tried there. Mistakenly agreeing with the parties that being "brought" entailed custody, the court slogged through a dizzying array of evidence, weighing 16 separate factors, to determine whether Han was technically in custody in Honolulu. *Id.* at 44–55. The court ultimately concluded correctly that venue lay only in Hawaii. Under *Thompson* and *Baker*, that would not have depended on Han being in custody. The court's belief that it did risked letting the government choose its venue despite the statute.

Justice Story's and Justice Nelson's plain-text reading simplifies the venue analysis in every case. Other interpretations, as *Han* shows, turn a basic threshold question into a complex puzzle.

*Erdos* provides another illustration. American diplomat Alfred Erdos was brought to the United States on suspicion of having killed a fellow American employee of the U.S. Embassy for Equatorial Guinea. "The commercial airplane in which Erdos returned to the United States was scheduled to make its initial landing in the United States at Dulles International Airport—located

in the Eastern District of Virginia. Instead, it made an unscheduled intermediate stop in Boston, Massachusetts." *Id.* at 161. Because the court wrongly equated being "brought" with arrest, it had to decide whether Erdos was arrested before the flight, in which case trial could be only in Massachusetts, or after the flight, in which case trial could be only in Virginia. The Fourth Circuit affirmed the district court's determination "that Erdos was not in custody ... when his flight landed in Boston and, therefore, that venue was appropriate in the Eastern District of Virginia since that was the district in which he was first arrested." *Id.* Under the plain-text reading of the statute, the "unscheduled landing" neatly fit Justice Story's hypothetical of a ship forced into port by harsh weather, and venue thus lay in *either* the District of Massachusetts (where Erdos was brought albeit not in custody) *or* the Eastern District of Virginia (where he was arrested).

*Erdos*, to which most modern decisions trace their view of the statute, recognized that its reading violated the statute's plain text. It did not apply the statute as written because it thought the text had another settled meaning: "Obviously, 'first brought' could plausibly be interpreted to mean what it says, so that wherever an offender (traveling by air) touches down in the United States, that is the place where trial must be had. But it is settled otherwise." 474 F.2d at 160–61. In elaborating on its understanding of the statute, the Fourth Circuit inadvertently in dicta further limited "brought," misleading later courts. It implied, without analysis or authority, that arrest had to formally relate to the foreign offense: "We think the phrase in the current version of the statute that venue shall be in the district in which the offender 'is arrested or is first brought' means simply 'arrested'—*i.e.*, that venue is in that district within the United States where the offender is first restrained of his liberty *in connection with the offense charged*." *Id.* (emphasis added). There was no reason for the italicized words because there was no question that Erdos was arrested only for manslaughter.

12

Nonetheless, prosecutors found in *Erdos*' dictum an opportunity to exploit new forum-shopping opportunities. They succeeded in convincing the Second Circuit to seize on the formalism of where technical arrest on a passport offense occurred to permit prosecutors to manufacture venue in New York. *United States v. Catino*, 735 F.2d 718, 724 (2d Cir. 1984) ("Since the Southern District was the district where Catino was actually restrained in connection with the passport charge, venue lay exclusively within that district."). The Fifth Circuit likewise relied on *Erdos*' dictum to enable prosecutorial forum-shopping in the case that inspired the government's tactics in this case, *United States v. Wharton*, 320 F.3d 526 (5th Cir. 2003).

Curtis Wharton was suspected of having murdered his wife in Haiti to collect on insurance policies he had obtained on her life. Rather than charging him with any crime, prosecutors filed a fraud complaint against him in his home district, the Western District of Louisiana, just as the prosecutors filed a fraud complaint against Dr. Rudolph in Colorado. Wharton was then arrested in the Middle District of Florida. The court believed it was "important to note that Defendant was not yet charged with foreign murder." *Id.* at 536. Wharton was then taken to Louisiana where, while in custody, he was charged with foreign murder, creating venue there: "The Western District of Louisiana is the district where Wharton was 'first restrained' on the foreign murder charge and, therefore, venue properly rests in that district." *Id.* at 537. Under the plain-text reading, the government would not have been able to choose its venue. Wharton, according to his brief, returned from Haiti following the alleged murder on a flight to Miami, Florida, making the Southern District of Florida a possible venue. Federal agents arrested him in Fort Myers, Florida, making the Middle District of Florida the only other possible venue. Trial in Louisiana was illegal, and the Fifth Circuit's approval of the prosecution's chosen venue defeated the point of the statute.

The needless complexity that courts have introduced into a simple threshold inquiry over venue underscores the superiority of Justice Story's and Justice Nelson's plain-text reading. Under their view, being "brought" means being carried by any ship or vessel. Being "arrested" means being detained by or on behalf of the authorities tasked with prosecuting the crime—as Justice Nelson held in *Baker* and the Second Circuit held a century later in *Provoo*. In both cases, arrest by the military did not count because the military lacks power to arrest or prosecute people for civilian crimes. Nonetheless, mindful of the obligation courts have to interpret the venue statute in light of its anti-forum-shopping purpose, the Second Circuit treated the Army's detention of John Provoo at DOJ's request as a civilian arrest because that is what it realistically was, formalities aside. 215 F.2d at 535. The *Wharton* court, on the other hand, erred in letting federal agents' self-serving, formalistic claims to have arrested the defendant for one crime and not another control the venue analysis. That allowed the government to circumvent the statute and defeat its purpose. Wharton's trial at least took place somewhere he had lived. This district, in contrast, has no connection to Dr. Rudolph or Count 1.

### C. The statute can and should be interpreted according to the plain and ordinary meaning of its text, without creating surplusage or undermining its purpose.

The judicial elaborations on the plain meaning of § 3238 must be rejected because they overcomplicate the otherwise straightforward task of identifying a proper venue and because they violate accepted, long-established rules of statutory construction. First, the modern judicial gloss conflicts with the plain meaning of the statutory text, which can be given its natural effect in every case as easily today as it was in *Thompson* and *Baker*. Second, they render "is first brought," a critical statutory phrase, redundant surplusage. Third, they make the statute self-defeating by giving prosecutors their unfettered choice of any district in the country, as this case shows.

14

First, the judicial gloss deviates significantly from the plain text, as the Fourth Circuit admitted in *Erdos*. That court departed from the text not because of any ambiguity but only because it followed errant precedent. *See* 474 F.2d at 160–61. This was wrong because, as the Supreme Court has repeatedly held, courts *must* apply an unambiguous statute as Congress wrote it:

> [I]n interpreting a statute a court should always turn first to one, cardinal canon before all others. We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there. When the words of a statute are unambiguous, then this first canon is also the last: "judicial inquiry is complete."

*Connecticut National Bank v. Germain*, 503 U.S. 249, 253–54 (1992) (citing *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241–42 (1989); *United States v. Goldenberg*, 168 U.S. 95, 102–03 (1897); *Oneale v. Thornton*, 6 Cranch 53, 68 (1810)). In this case, the plain text's meaning is exactly what Justice Story explained in *Thompson*, as *Erdos* itself agreed a century and a half later:

"***Obviously, 'first brought' could plausibly be interpreted to mean what it says***, so that wherever an offender (traveling by air) touches down in the United States, that is the place where trial must be had." 474 F.2d at 160–61 (emphasis added). Likewise, Justice Story in *Thompson* explained that "is arrested" means just that—seized by the proper authorities—and "is first brought" is where the accused *first* arrived in the United States after the alleged foreign crime occurred, regardless of whether he was in custody. He explained that the latter provision would be highly useful in the case of a crime committed aboard ship if the accused happened to be arrested far from where the ship docked. Courts have no license to disregard that clear, contemporaneous explanation of the plain text, later adopted by Justice Nelson, especially when doing so enables prosecutorial forum-shopping. "[W]e cannot give the text a meaning that is different from its ordinary, accepted meaning, and that disfavors the defendant." *Burrage v. United States*, 571 U.S. 204, 216 (2014).

The statute's plain text is undoubtedly quite workable, as the government itself argued in *Kerr v. Shine*, 136 F. 61, 63–65 (9th Cir. 1905). John Kerr, an Army officer, was suspected of assaulting a crewman aboard a transport ship. The government argued that the statute's plain text allowed trying Kerr where his transport ship docked, the District of Hawaii—"the first district and jurisdiction into which said vessel has come since" the assault. 136 F. at 61. It did not matter that Kerr "was not placed in custody on the vessel, nor was he brought into the District of Hawaii in the custody of any person or officer." *Id.* Kerr had left Hawaii and had been arrested in the Northern District of California. *Id.* The court acknowledged that it was "suggested by Mr. Justice Nelson in the *Baker* Case and by Mr. Justice Story in the *Thompson* Case, that the clause conferring jurisdiction is in the alternative, and that jurisdiction may be exercised" in either district. *Id.* at 65. But, wary of allowing prosecutors any choice of venue, the Ninth Circuit rejected the plain-text reading and adopted the stilted view that Kerr was not "brought" to Hawaii because he was not in custody, and it required the government to try him in the Northern District of California. *Id.*

On the other hand, deviating from the text needlessly complicates prosecutions. *Han* analyzed 16 factors to decide, needlessly, whether the accused was in technical custody while in Hawaii. *Erdos* undertook a fact-intensive inquiry of whether arrest occurred before take-off or after landing. *Wharton* analyzed the government's procedural machinations to create venue in Louisiana, and got venue wrong. *Kerr* wrongly limited venue to only one possibility. It is unreasonable to suppose that the First Congress in 1790 made venue, a threshold issue, such an intricate legal conundrum.

Second, reading "is first brought" to mean *brought while in custody* makes that phrase into surplusage, as *Erdos* acknowledged, because it then becomes redundant with "is arrested." *See* 474 F.2d at 160–61 ("We think the phrase in the current version of the statute that venue shall be in the

16

district in which the offender 'is arrested or is first brought' means simply 'arrested'... ."). This violates the canon against surplusage, which provides "that a statute should be interpreted so as not to render one part inoperative." *Colautti v. Franklin*, 439 U.S. 379, 392 (1979). The surplusage canon creates a "presumption that each word Congress uses is there for a reason" and requires courts to "'give effect, if possible, to every clause and word of a statute.'" *Advocate Health Care Network v. Stapleton*, 137 S.Ct. 1652, 1659 (2017) (quoting *Williams v. Taylor*, 529 U.S. 362, 404 (2000)). The plain-text reading advanced by Justices Story and Nelson proves that it *is* possible to give effect "to every clause and word" of § 3238 and that it is also simple to do. Consequently, this Court must apply that interpretation. *See Jarecki v. G. D. Searle & Co.*, 367 U.S. 303, 307–08 (1961) ("The statute admits a reasonable construction which gives effect to all of its provisions. In these circumstances we will not adopt a strained reading which renders one part a mere redundancy.").

Third, the prevalent judicial view defeats the statute's purpose of denying the prosecution the ability to choose its venue. As *Wharton* shows, reading the statute formalistically and not plainly so that it requires a formal arrest "in connection with" the foreign crime gives prosecutors exactly what Congress meant to deny them—a virtually unfettered choice of venues. That is what the government seeks to achieve in this case, but reading the statute to defeat its purpose is not allowed.

The Supreme Court has repeatedly held that courts cannot interpret a statute to be self-defeating. "In construing a statute, penal as well as others, we must look to the object in view, and ***never adopt an interpretation that will defeat its own purpose***, if it will admit of any other reasonable construction." *The Emily*, 22 U.S. 381, 388 (1824) (emphasis added); *accord Department of Homeland Security v. MacLean*, 574 U.S. 383, 393 (2015) (rejecting "a broad interpretation of the word 'law'" because it "could defeat the purpose of the whistleblower statute"); *Maryland Cas.*

*Co. v. Cushing*, 347 U.S. 409, 414 (1954) ("[W]e must read the statute in the light of its expressed purposes."); *American Fire & Cas. Co. v. Finn*, 341 U.S. 6, 12 (1951) ("By interpretation we should not defeat [Congress'] purpose."); *Nardone v. United States*, 308 U.S. 338, 340–41 (1939) ("A decent respect for the policy of Congress must save us from imputing to [a statute] a self-defeating, if not disingenuous purpose."); *United States v. Raynor*, 302 U.S. 540, 547 (1938) ("A construction that creates an inconsistency should be avoided when a reasonable interpretation can be adopted which will not do violence to the plain words of the act, and will carry out the intention of Congress."). Because Justice Story's plain-text reading is the only one that furthers the aim of barring prosecutorial forum-shopping, that is the only legal interpretation of the statute.

The original interpretation is the only correct one. Most importantly, it applies the text as written, without judicial embellishment. That plain meaning is as easily applied to this case as it could have been in those that came before. It creates no surplusage. It alone furthers, rather than frustrates, Congress' undeniable aim of precluding prosecutorial forum-shopping. On the other hand, the government's formalistic reading will in this case effectively nullify the statute by allowing the prosecution an entirely unfettered choice of venue. Approving that egregious circumvention of the venue statute will reward the government with the unfair advantage Congress sought to deny it. The government's position is consequently absurd. The venue statute's restrictions do not completely evaporate because a suspect who has been openly living in the United States for years just happens to leave the country. "[I]nterpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982).

18

### D. The only lawful venue for Count 1 is the Northern District of Georgia.

Section 3238 applies straightforwardly to this case. Because Dr. Rudolph returned to this country from Zambia years before he was indicted, only the first clause of the statute—the one dating to 1790—applies. That part of the statute creates venue where Dr. Rudolph was "arrested" or was "first brought." As Justices Story explained, these phrases mean different things for a sound, practical reason. His construction must be given preference over any interpretation that renders "is first brought" surplusage, particularly when such an interpretation would foster rather than discourage prosecutorial forum-shopping.

First, Dr. Rudolph was not arrested in any federal judicial district for purposes of determining venue. He was arrested in Mexico. The government deliberately chose not to arrest Dr. Rudolph in Arizona, despite every opportunity. Instead, it had Dr. Rudolph arrested in Mexico as part of a plan to circumvent the law and manufacture venue in its chosen district. That is the plain truth.

The government will likely argue that the arrest in Mexico doesn't count for some legalistic reason and that Dr. Rudolph was "formally" arrested in Colorado. However, as *Provoo* held, any formalistic arguments regarding venue cannot be approved because that would give the government an unfettered choice of venue, which is just what the statute is meant to preclude. The government's formalisms cannot trump substance because that would serve only to undermine the statute and reward the government's audacious flouting of the law. The substantive reality is that, at the behest and on behalf of the U.S. government, Mexican authorities arrested Dr. Rudolph in Mexico before he was indicted for any crime. He was held overnight in a Mexican jail and shipped to Denver against his will. For purposes of venue under § 3238, then, the U.S. government had Dr. Rudolph arrested in Mexico and, consequently, he can be tried only where he was "first brought."

19

Second, the cases are clear that "first brought," plainly read, means the first arrival after the alleged crime. Justice Story explained it that way. *Thompson*, 28 F. Cas. at 102–03. Justice Nelson agreed. *Baker*, 24 F. Cas. at 964. So did the government in *Kerr*. *See* 136 F. at 61. And so did the Fourth Circuit in *Erdos*: "Obviously, 'first brought' could plausibly be interpreted to mean what it says, so that wherever an offender (traveling by air) touches down in the United States, that is the place where trial must be had." 474 F.2d at 160–61. That is the meaning the Court must apply.

After his wife's death in Zambia in 2016, Dr. Rudolph was first brought to the United States by a commercial airliner transporting passengers from Johannesburg, South Africa, to Atlanta, Georgia. That plainly makes the Northern District of Georgia the place where he was "first brought" and, under the circumstances, the only lawful venue for Count 1.

The government will urge a different reading and claim that Dr. Rudolph was "first brought" to the United States not in 2016 when he returned from Zambia but six years later, after his arrest in Mexico. It will rely on the cases discussed herein and others that interpret "brought" to mean *brought in custody* and "arrest" to mean *arrest in connection with the foreign crime*. But the government will not be able to show that any of those cases interpreted the statute properly. They did not apply the plain text. Their interpretations create surplusage. They complicate an otherwise simple inquiry. They undermine the statute's purpose. No amount of precedent can justify construing a statute written to strictly limit the government's venue options to no more than two places as instead granting it a choice of any district in the country. That is what the government asks this Court to do by attempting to charge Count 1 here.

Dr. Rudolph's trip to Mexico years after returning from Zambia could not change the place where he was *first brought* in 2016. Count 1 can be brought only in the Northern District of Georgia.

**II.      Count 1 is improperly pled because it fails to allege any facts concerning venue.**

Count 1 fails to allege any facts that, if proven, would establish venue over the charged crime in this district. DE53:1. "An indictment alleges proper venue when it alleges facts which, if proven, would sustain venue." *United States v. Bohle*, 445 F.2d 54, 59 (7th Cir. 1971); *accord United States v. Ruetas–Arreguin*, 219 F.3d 1056, 1060 (9th Cir. 2000); *see, e.g.*, *Jones v. United States*, 137 U.S. 202, 204 (1890) ("The indictment, after charging the murder in usual form, alleged that the district of Maryland was the district of the United States into which the defendant was afterwards first brought from the island of Navassa."). Because it entirely fails to allege venue, Count 1 is fatally defective and must be dismissed. *See United States v. Johnson*, 323 U.S. 273, 278 (1944) (affirming quashing of information that failed to properly allege venue); *Bratton v. United States*, 73 F.2d 795, 798 (10th Cir. 1934) ("[A]n indictment failing to allege venue is demurrable.") (collecting cases).

WHEREFORE the law requires the dismissal of Count 1.

**CERTIFICATES OF SERVICE AND CONFERRAL**

The government objects to this motion, which was filed by CM/ECF on February 22, 2022.

Respectfully submitted,

MARKUS/MOSS PLLC
40 N.W. Third Street
Penthouse One
Miami, Florida 33128
Tel: (305) 379-6667
markuslaw.com

By:      /s/ David Oscar Markus
David Oscar Markus
Florida Bar Number 119318
dmarkus@markuslaw.com

21