IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martinez

Criminal Case No. 22-CR-0012-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.    **LAWRENCE RUDOLPH**,
2.    LORI MILLIRON,

      Defendants.

_____/

**LAWRENCE RUDOLPH'S MOTION TO DISMISS
THE SUPERSEDING INDICTMENT FOR IMPROPER JOINDER
OR, ALTERNATIVELY, TO SEVER LORI MILLIRON**

Lawrence Rudolph moves to dismiss the superseding indictment for "improper joinder," Fed. R. Crim. P. 12(b)(3)(B)(iv), restoring the original indictment. Joinder of criminal defendants is proper only when "they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). That condition is not met in this case, making the superseding indictment fatally defective. *See* Fed. R. Crim. P. 12(b)(3)(B)(iv). Alternatively, Ms. Milliron should be severed because her joinder as a defendant will unfairly prejudice Dr. Rudolph. *See* Fed. R. Crim. P. 14(a).

**FACTS**

Dr. Rudolph was arrested at the direction of the prosecution in Mexico on December 21, 2021, and made his initial appearance in this Court on December 23, 2021. He has been in continual custody since then. On January 5, 2022, Dr. Rudolph, the sole defendant at the time, was indicted for murder in violation of 18 U.S.C. § 1119 and mail fraud in violation of 18 U.S.C. § 1341. DE26. The alleged murder purportedly occurred on October 11, 2016. DE53:1 ¶ 1. The acts underlying the

fraud charge are alleged to have occurred between October 11, 2016, and March 16, 2017. *Id.* at ¶ 2. Dr. Rudolph pled not guilty to both charges. DE29.

On February 9, 2022, the government brought a superseding indictment. As far as the charges against Dr. Rudolph are concerned, there is no difference between the original and superseding indictments. Unlike the original, the superseding indictment charges Lori Milliron, Dr. Rudolph's partner, with making false statements during her January 5, 2022, grand jury appearance. The two defendants are not charged together in any count.

Both defendants were arraigned on February 23, 2022. DE72. Trial is currently scheduled for May 23, 2022, DE52, but there is a pending motion to continue Dr. Rudolph's trial to July 2022. Ms. Milliron has objected to a continuance and has invoked her right to a speedy trial. A severance is not only appropriate but legally required.

## MEMORANDUM OF LAW

Federal Rule of Criminal Procedure 12(b)(3)(B)(iv) lists "improper joinder" among the "defect[s]" that subject an indictment to dismissal. Joinder is permissible only when two or more defendants "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). Rule 8 is a rule of judicial economy. Where "the government will recite a single factual history, put on a single array of evidence, and call a single group of witnesses," a single trial is preferred. *United States v. Tranakos*, 911 F.2d 1422, 1426 (10th Cir. 1990). But, considerations of judicial economy "cannot be elevated to the point where they impair a defendant's rights under the Constitution ... ." *United States v. Pepe*, 747 F.2d 632, 651 (11th Cir. 1984). A defendant is entitled to severance "[i]f the joinder of offenses or defendants in an indictment ... appears to prejudice" that defendant. Fed. R. Crim. P. 14(a).

Lori Milliron is not a proper defendant in this case because, as the government concedes, the charges against her arise from facts separate and distinct from the facts underlying the charges against Dr. Rudolph. Consequently, the superseding indictment must be dismissed under Rule 12(b)(3)(B)(iv). Even if her joinder were lawful, it should not be allowed under Rule 14 because it will unfairly prejudice Dr. Rudolph's defense. The government's circumstantial murder case depends on two alleged conversations in which Ms. Milliron participated. Her first-hand knowledge, detailed in the attached affidavit, contradicts the government's contentions about what was said. Without her testimony refuting the government's distortions, the jury will be misled by a one-sided version of events.

**I.      The superseding indictment must be dismissed because the charges against Dr. Rudolph and those against Ms. Milliron arise from distinct and separate acts and joinder is therefore not permitted.**

The superseding indictment charges Lori Milliron in Counts 4 through 9 with obstruction of justice and perjury arising from her grand jury testimony on January 5, 2022. Additionally, it charges her in Count 3 with being an accessory after the fact to the murder charged in Count 1, also based on her grand jury testimony. DE87:2 ¶ 1 ("The last charge is based on the obstruction and perjury counts occurring because of Milliron's efforts to assist Rudolph in escaping culpability for the murder after she knew that he had committed it.").

The government concedes that the obstruction and perjury charges against Ms. Milliron arise from allegations separate and distinct from those underlying the charges against Dr. Rudolph. DE87:8 ¶ 8 ("Trial on the obstruction and perjury counts … would … involve separate witnesses … ."). Those counts fail to meet the legal standard for joinder because they do not arise from "the same act or transaction, or in the same series of acts or transactions," Fed. R. Crim. P. 8(b), as the charges against Dr. Rudolph.

The accessory-after-the-fact charge was added specifically to circumvent Rule 8. As the government points out, "[t]hat charge requires the government to prove that the murder did, in fact, occur." DE87:4 ¶ 5. But, the law is not so ridiculous that every charge arising from Ms. Milliron's grand jury testimony is improperly joined *but one*. The government's ploy to neutralize Ms. Milliron as a defense witness overlooks that there is *nothing* Ms. Milliron could have said on January 5, 2022, to become an accessory to the charge in Count 1.

The superseding indictment must be dismissed. Fed. R. Crim. P. 12(b)(3)(B)(iv) & (v).

## A.   The government has admitted facts that conclusively establish that Counts 4 through 9 were improperly joined to Dr. Rudolph's case.

Joinder is proper only when two or more defendants "are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). Dr. Rudolph and Ms. Milliron are not charged together in any count of the superseding indictment. His charges are based on acts said to have occurred in 2016 and 2017. Hers are based on acts that occurred on January 5, 2022. No conspiracy or concerted action of any kind is so much as insinuated. This is such a poor case for joinder that it is a wonder the government tried it at all.

Even more suspiciously, the government seems to already know that this Court cannot allow the charges against Ms. Milliron to be joined to those against Dr. Rudolph. It conceded as much in a recent filing noting that the charges against Ms. Milliron "would … involve separate witnesses" and can be "separate[d] from" the charges against Dr. Rudolph without trouble. DE87:5 ¶ 8. In fact, it was *so* foreseeable that these counts would have to be severed that, a week before this motion was even written much less filed, the government had already practically conceded its merit—with regard to all but one count. DE87:6 ¶ 8 ("[I]f the Court is inclined to grant the defendant's motion, the government asks that the court grant a partial severance with regard to Counts 4–9."). Plainly,

4

Counts 4 through 9 were improperly joined—they don't even come close to satisfying the rule—which begs the question of why the government would deliberately bring all these counts improperly, only to concede the severance of all but one even before a severance was formally requested.

Adding to the intrigue is the glaringly weak nature of the charges against Ms. Milliron. Nearly every one of the allegedly false statements undergirding every charge against her was expressly qualified as pertaining to an entirely *subjective* belief—*e.g.*, "I don't recall," "I don't know exactly why," "I don't think I did," "I don't remember." The only arguable statements of fact came after the prosecutor, unwilling to accept Ms. Milliron's statement that she did not remember whether she had ever in the past several years "threaten[ed] to break off the affair," demanded that she unequivocally answer "yes or no" to whether she ever told a co-worker that she was "thinking about leaving Mr. Rudolph" or "ever g[a]ve him an ultimatum." DE53:6 ¶ 10. Being premised on subjective statements and on statements concerning Ms. Milliron's feelings about her affair with Dr. Rudolph, this is a suspiciously weak case of perjury and obstruction of justice that just happens to target a witness.

Lori Milliron is an important defense witness. The government's circumstantial case against Dr. Rudolph is premised on its idea that he could not afford to divorce his wife and that Ms. Milliron, his mistress at the time, demanded that he do so. *See generally* DE38. The government plans to call at trial a disgruntled former (and fired) employee who will claim that Ms. Milliron said she was thinking about ending her affair unless Dr. Rudolph got a divorce. The government also plans to call a bartender who will claim to have overheard a conversation between Dr. Rudolph and Ms. Milliron in which he supposedly admitted the murder. The prosecution knows these gross

distortions cannot be refuted if Ms. Milliron does not testify. The government's solution to keeping her off the witness stand is to charge her with something—*anything*—together with Dr. Rudolph.

That is why the government set a perjury trap and brought a litany of charges against her *in the same superseding indictment* as the charges against Dr. Rudolph. *See United States v. Chen*, 933 F.2d 793, 796 (11th Cir. 1991) ("A perjury trap is created when the government calls a witness before the grand jury for the primary purpose of obtaining testimony from him in order to prosecute him later for perjury."). Her joinder to this case makes it highly unlikely that Dr. Rudolph can call her to testify as to her first-hand knowledge of these conversations, as the prosecution well knows. Even if she were to testify, her status as a co-defendant will significantly diminish her credibility in the eyes of the jury. Had the government tried charging her as an accessory after the fact without *also* including a litany of charges that have no place in this case, its ploy would be utterly transparent. The additional six counts of adornment do little to mask what is really going on.

The government is trying, yet again, to gain an unfair advantage. This time it is by denying Dr. Rudolph his right to call witnesses in his defense. By pretending to concede that six counts should be severed, when they were never in fact properly joined in the first place, the government hopes to appear reasonable and stand a better of chance of keeping Count 3 in the case. Once again, the government's ignominious attempt to convict Dr. Rudolph by denying him his constitutional rights runs up against the law. Just as Counts 4 through 9 are improperly joined, Count 3 also has no place in this case because it fails to state an offense.

**B.    Count 3 fails to state an offense for being an accessory after the fact to the murder charged in Count 1 and therefore provides no legal basis for joining Ms. Milliron to Dr. Rudolph's case.**

There are three elements to being an accessory after the fact. First, the person must know that another person committed a particular federal crime. Second, the person must "receive, relieve, comfort, or assist" the perpetrator of that crime. Finally, the person must intend for his act to "hinder or prevent [the offender's] apprehension, trial, or punishment."

The government has cherry-picked from the statutory text the verbs having the broadest possible application and charged Ms. Milliron with "comfort[ing] and assist[ing]" Dr. Rudolph "to hinder his trial and punishment." DE53:2 ¶ 5. Those words do not carry the broad meaning the government seeks to give them. They have a specific common-law meaning that this Court must apply: Ms. Milliron can be an accessory after the fact only if she intended to "hinder or prevent" the incarcerated Dr. Rudolph from being arrested, standing trial, or serving an existing sentence. The allegations supporting Count 3, which "is based on the obstruction and perjury counts," DE87:2 ¶ 1, cannot, as a matter of law, have been made with that intent because Ms. Milliron's grand jury testimony was absolutely incapable of causing Dr. Rudolph's escape or release from custody. Count 3 fails to state an offense because the allegations, even if proven, do not make out the charge.

Before 1948, the federal code did not define "accessory after the fact" but only specified such a person's maximum sentence. *See United States v. Ervin*, 3 F. Supp. 903, 903 (S.D. Ala. 1933) ("The definition is left to the common law and is well known."). This paralleled the statute, now 18 U.S.C. § 2, which provided that anyone who aided or abetted a federal crime is subject to the same penalties as the perpetrator. These statutes were written this way because neither describes a crime but rather types of *liability* for another's crime. "Accessory after the fact" is not a crime one commits but rather a person one becomes —*i.e.* a type of accomplice to another's crime. The 1948

revision of the U.S. Code rectified this by incorporating the common-law definition of accessory after the fact in the first sentence of 18 U.S.C. § 3, with the original version of the statute following. Section 3 now states:

> Whoever, knowing that an offense against the United States has been committed, receives, relieves, comforts or assists the offender in order to hinder or prevent his apprehension, trial or punishment, is an accessory after the fact.
>
> Except as otherwise expressly provided by any Act of Congress, an accessory after the fact shall be imprisoned not more than one-half the maximum term of imprisonment or (notwithstanding section 3571) fined not more than one-half the maximum fine prescribed for the punishment of the principal, or both; or if the principal is punishable by life imprisonment or death, the accessory shall be imprisoned not more than 15 years.

### 1.    Two canons of interpretation govern the statute's meaning.

Because this statute incorporates a term with a settled meaning at common law, the statute incorporates that meaning. "It is a settled principle of interpretation that, absent other indication, Congress intends to incorporate the well-settled meaning of the common-law terms it uses." *Sekhar v. United States*, 570 U.S. 729, 732 (2013).[1] There is no doubt the term has a well settled meaning. As Justice Nathan Clifford noted, the same key verbs defining an accessory after the fact in 18 U.S.C. § 3—"receives, relieves, comforts, or assists"— trace all the way back to Blackstone's *Commentaries on the Laws of England* and Matthew Hale's *Pleas of the Crown*:

> An accessary, says Blackstone, is he who is not the chief actor in the offence nor present at the time, but is in some way concerned therein, either before or after the

---

[1] *Accord Neder v. United States*, 527 U.S. 1, 23 (1999) ("It is a well-established rule of construction that 'where Congress uses terms that have accumulated settled meaning under the common law, a court must infer ... that Congress means to incorporate the established meaning of these terms.'"); *Morissette v. United States*, 342 U.S. 246, 263 (1952) ("And where Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed."); *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 59 (1911) ("[W]here words are employed in a statute which had at the time a well-known meaning at common law or in the law of this country, they are presumed to have been used in that sense").

> fact committed. 4 Bl. Comm. 34. Accessaries before the fact are those who, being absent at the time the crime is committed, yet procure, counsel, or command another to commit it. 1 Hale, P. C. 615. The absence of the party also is necessarily implied in the definition of an accessary after the fact, who is defined to be one who, knowing a felony to have been committed, receives, relieves, comforts, or assists the felon. 4 Bl. Comm. 37; 1 Hale, P. C. 618.

*United States v. Hartwell*, 26 F. Cas. 196, 199 (C.C.D. Mass. 1869) (Clifford, J.).

Additionally, the statute's verbs must be read with reference to each other: "Under the familiar interpretive canon *noscitur a sociis*, 'a word is known by the company it keeps.' While 'not an inescapable rule,' this canon *'is often wisely applied where a word is capable of many meanings in order to avoid the giving of unintended breadth to the Acts of Congress*.'" *McDonnell v. United States*, 136 S. Ct. 2355, 2368 (2016) (quoting *Jarecki v. G.D. Searle & Co.*, 367 U.S. 303, 307 (1961)).

The government's reading of the statute ignores these canons, which the Court must apply. Rather, by plucking the broadest verbs from the statute, the government hopes to mislead the Court into broadening its reach, as though it were similar to the modern concept of obstruction of justice. But such judicial broadening of a statute's scope is exactly what the canons of interpretation are created to preclude.

### 2. An accessory is one who personally aids a criminal to prevent his arrest, his trial, or his serving an already imposed sentence.

"Hinder," particularly when considered together with "prevent," means "to keep back, delay, or stop in action; to put obstacles in the way of; to impede, deter, obstruct, prevent." *Oxford English Dictionary* (1971; unabridged). "Hinder and prevent," when read together, naturally mean to delay, impede, or altogether preclude. Thus, to hinder a trial is not to *influence its outcome*, as the government seems to suppose, but to delay or entirely prevent it from happening. To hinder a punishment, a sentence must have already been imposed, such as when one helps another escape

from prison. The verbs "comforts" and "assists," considered together with "receives" and "relieves," denote help *personally* rendered to the criminal. The Virginia Supreme Court, for one, explained this long ago:

> As to the receiving, relieving and assisting, one known to be a felon, it may be said in general terms, that any assistance given to one known to be a felon in order to hinder his apprehension, trial or punishment, is sufficient to make a man accessory after the fact; as that he concealed him in the house, or shut the door against his pursuers, until he should have an opportunity to escape; or took money from him to allow him to escape; or supplied him with money, a horse or other necessaries, in order to enable him to escape; or that the principal was in prison, and the jailer was bribed to let him escape; or conveyed instruments to him to enable him to break prison and escape. ***This and such like assistance to one known to be a felon, would constitute a man accessory after the fact.***

*Wren v. Virginia*, 67 Va. 952, 956–57 (1875) (emphasis added). As this makes clear, an accessory after the fact is a person who helps a criminal avoid *the legal process* by providing personal help. Thus, in *United States v. Balano*, the indictment correctly alleged that the defendant "did knowingly relieve, receive, comfort and assist [others] in order to hinder or prevent their ***apprehension for*** trial and punishment." 618 F.2d 624, 625–26 n.1 (10th Cir 1979) (emphasis added). That is the correct way to read the statute. Balano became an accessory by providing "new clothing" and "shaving equipment and lavatory facilities" to help criminals alter their appearance and thus avoid legal process. *Id.*

For this reason, most lies told to the authorities do not make one an accessory after the fact. *See, e.g.*, *Farmer v. Oklahoma*, 40 P.2d 693, 694 (1935). Marvin Farmer was convicted of being an accessory after the fact to an assault based on evidence "that when the sheriff was investigating who the probable guilty parties were that the defendant told the sheriff a falsehood in that he told the sheriff he did not know who they were ... ." *Id.* The Attorney General of Oklahoma confessed error because "'in order to constitute a person an accessory after the fact some overt *active* assistance *rendered to the felon personally* is necessary.'" *Id.* (quoting Oklahoma's brief with emphasis added).

10

After surveying decisions from three other states, the court agreed. "There is no evidence in the record to show that the defendant rendered any *active assistance personally* to the party charged with the felony. The confession of error of the Attorney General is approved." *Id.* (emphasis added); *see also Street v. Texas*, 45 S.W. 577, 578 (Tex. Crim. App. 1898) ("[I] in order to be guilty of this offense, the person charged must give some personal help to the offender, in order that he may evade an arrest or trial for the offense committed.").

Whether a lie to the authorities can ever make one an accessory after the fact is not a question that needs to be resolved in this case because there is no possible way that Ms. Milliron is an accessory after the fact to Dr. Rudolph's alleged crimes. Nothing she said or could have said in the grand jury on January 5, 2022, could have done anything to delay or prevent Dr. Rudolph from standing trial because he was already in custody at the time. Nor could it prevent him from serving a sentence because he has not been convicted of anything, much less sentenced.

### 3. The common-law meaning of "accessory after the fact" furthers the aim of reaching conduct that would be innocent but for the fact that it was undertaken to keep a criminal from facing the judicial process.

The accessory theory of liability is as practical as it is ancient and makes perfect sense. While it does not, unlike the obstruction-of-justice statute, reach conduct meant merely *to influence* the outcome of a trial or the imposition of a sentence, that is only because it is meant to reach conduct that is typically *not otherwise criminal*. Many statutes already cover lying or otherwise interfering with an official proceeding and always have. The accessory theory of criminal liability does something else. It reaches the innumerable acts that would be entirely innocent in and of themselves if they were done for a purpose other than to help a criminal avoid being arrested, standing trial, or serving a duly imposed sentence. *See, e.g.*, *United States v. Oxendine*, 36 F. App'x 511 (4th Cir. 2002) (bailing a fugitive arrested under an alias out of jail to prevent discovery of his

true identity); *United States v. Quackenbush*, 9 F. App'x 264, 265 (4th Cir. 2001) ("Daniel Quackenbush was convicted ... as an accessory after the fact to a bank robbery after he assisted three bank robbers, post-robbery, by driving them to and from various locations, harboring them, and helping them travel and spend the proceeds of the robbery."); *United States v. Brown*, 49 F.3d 1162, 1164 (6th Cir. 1995) ("Brown purchased spray paint and helped Patton paint his car—the one used during the shooting—from white to black. He then provided Patton with a license plate from one of his trucks and cash to help Patton flee the state. Brown later wired additional funds to Patton in Las Vegas. Approximately five months after leaving, Patton returned to Brown's farm and stayed for a month.").

Bailing someone from jail, giving people rides, helping to paint a car, and the like are innocent acts—unless done to help a criminal escape legal process (*i.e.*, apprehension, trial, and punishment). Then those acts become criminal. That is all "accessory after the fact" covers. Being an accessory after the fact is thus a narrower concept than the modern idea of obstruction of justice. It extends only to acts meant to help someone *escape* arrest and legal proceedings—not, as the government would have it, to acts like perjury meant only to *influence the outcome* of the legal process.

Nothing Ms. Milliron said, whether true or not, "[o]n or about January 5, 2022, in the State and District of Colorado" could "hinder or prevent" the incarcerated Dr. Rudolph from standing trial and serving any punishment that might be ultimately imposed. It follows that she cannot be, as a matter of law, an accessory after the fact to the murder in Count 1, and  Count 3 therefore fails to charge an offense.

**II.    Even if joinder were proper, the Court should sever the charges against Ms. Milliron to afford Dr. Rudolph his constitutional right to present crucial defense testimony and prevent unfairly prejudicial innuendo from reaching the jury.**

Even if the charges against Ms. Milliron were properly joined in this case, the Court must sever them to afford Dr. Rudolph a fair trial on the serious charges against him. Otherwise, Dr. Rudolph will be denied his constitutional right to call a crucial witness in his defense. Additionally, failure to sever will give the government an opening to introduce unfairly prejudicial innuendo that would be excluded from a separate trial. *See* Fed. R. Crim. P. 14(a) ("If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant ..., the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."). Lori Milliron has submitted the attached affidavit, which demonstrates that she is a critical witness who is unavailable at a joint trial but available at Dr. Rudolph's separate trial.

**A.    Joinder of the charges against Lori Milliron will keep her crucial testimony from the jury, denying Dr. Rudolph his right to call a critical witness and risking his false conviction based on one-sided evidence.**

"Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). Preventing a defendant from calling witnesses who can counter the government's version of events subverts the adversary system because the point of a jury trial is for the jury is to hear and consider ***both*** sides of the case, not just the prosecution's. "Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14, 19 (1967).

The Tenth Circuit has identified seven germane considerations.

[W]here a defendant bases his motion for severance upon a claim that he needs a co-defendant's testimony, an analysis of the cases from several circuits discloses some incongruity with respect to the considerations deemed necessary to the evaluation of such a motion. Considering the cases together, however, the following factors appear relevant: 1) the likelihood that the co-defendant would in fact testify at the movant's severed trial and waive his Fifth Amendment privilege; 2) the significance of the testimony in relation to the defendant's theory of defense; 3) the exculpatory nature and effect of such testimony; 4) the likelihood that the co-defendant's testimony would be impeached; 5) the extent of prejudice caused by the absence of the testimony; 6) the effect of a severance on judicial administration and economy; 7) the timeliness of the motion.

*United States v. McConnell*, 749 F.2d 1441, 1445 (10th Cir. 1984). Each of these factors weigh in favor of a severance, which we will address in turn.

> **1.    *Ms. Milliron will testify at a severed trial and waive her right to silence but not at a joint trial.***

When the government indicted Ms. Milliron, it knew she was highly likely to testify for Dr. Rudolph. Ms. Milliron is alleged to have been a participant in two critical conversations. One prosecution witness will claim that Ms. Milliron said she had threatened to end her affair with Dr. Rudolph unless he left his wife. Another prosecution witness will claim that he overheard Dr. Rudolph admit to the charged murder while he was conversing with Ms. Milliron at a bar. Because Ms. Milliron's recollection of these conversations conflicts with what the prosecution witnesses will say, the prosecution does not think the jury should hear from her. For that reason, she was called to the grand jury and then slapped with a litany of weak charges. Ms. Milliron has invoked her right to a speedy trial to put these trumped-up charges behind her and restore the *status quo ante*. Once that happens, she will again have nothing to fear from testifying truthfully and refuting the testimony of the disgruntled former employee and the eavesdropping bartender on which the government plans to hinge its case. Her testimony will corroborate every other statement made by Larry Rudolph (to police, to the insurance company, and to friends and family) that his wife died from an accident.

There was no confession. As she explains in the attached affidavit, Ms. Milliron would not testify in a joint trial but would be available in Dr. Rudolph's severed trial if it proceeds after her trial.

> **2.      As the government well knows, Ms. Milliron's testimony will directly refute its contentions regarding Dr. Rudolph's supposed motive to kill his wife and his supposed confession.**

Ms. Milliron's testimony is crucial given the circumstantial nature and weakness of the government's case. She can show that Dr. Rudolph had no reason to kill his wife. He was already wealthy enough to afford exotic vacations, among other luxuries. His wife knew about his affair with Ms. Milliron. They had been married for 34 years and had two children together. Neither his son nor his daughter has ever believed that he murdered their mother. Ms. Milliron will also explain that she had no desire to re-marry, that she did not give an ultimatum, and that she was not going to leave Dr. Rudolph if he continued in his marriage.

Motive is especially important in this case because the government has no physical evidence that any murder occurred. Its case is built on conjecture and speculation by supposed "experts"—former law enforcement officers taking a guess as to what *might* have happened. Ms. Milliron's failure to testify would itself be a windfall to the government and taint the trial. It would falsely and misleadingly communicate to the jurors that the government's witnesses—the disgruntled former employee and the eavesdropping bartender—are testifying to *undisputed* facts. That misrepresents reality to Dr. Rudolph's great prejudice.

Were Dr. Rudolph tried separately, Ms. Milliron's testimony would carry great weight. As the government knows, Ms. Milliron's testimony would decimate the credibility of its less-than-ideal witnesses. She has personal knowledge not only about the critical conversations but also about her own relationship with Dr. Rudolph and what they each wanted from the affair at the time in

15

question. Additionally, she is not encumbered by any axe to grind against a former boss. Nor is her knowledge of the conversation at the bar based on overheard snippets. She has the complete picture.

### 3. *Without unrebutted evidence of motive, the government's case will very likely collapse.*

Once Ms. Milliron explains to the jury that the government's witnesses do not know what they are talking about and that the Rudolphs had an open marriage, the case will very likely collapse. The government will have a few supposed "experts" who will not be able to definitively say what happened, at least not with any credibility, because they will necessarily be able only to speculate about possibilities. The jury will weigh that against the independent conclusion of the Zambian authorities that the death was accidental. It will also consider that the insurance companies that paid on the policies on Ms. Rudolph's life also concluded her death was accidental. Given those facts and the lack of any apparent motive for murder, it is unlikely that this case can survive a Rule 29 motion for judgment of acquittal.

That is why the prosecution resorted to concocting a way to have its witnesses' testimony go to the jury *unrebutted*. Of course, the only way to do that was to indict Ms. Milliron as a co-defendant. Even if none of the charges against her stick (which seems like a very good bet given the nature of her supposedly perjurious statements), jurors are naturally less likely to believe someone who has been accused of perjury. Most people wrongly assume that prosecutors are too forthright to set a perjury trap for a witness.

A trial court has broad discretion to determine the method by which it will consider the proposed exculpatory testimony of a co-defendant. A proffer from counsel is sufficient. *See United States v. Martinez*, 486 F.2d 15, 22 (5th Cir. 1973); *United States v. Shuford*, 454 F.2d 772, 775 n.1 (4th Cir. 1971); *Taylor v. Singletary*, 122 F.3d 1390, 1393 (11th Cir. 1997).  An affidavit is not

required, but Ms. Milliron has provided one. In addition, the representations contained in this motion were reviewed by Ms. Milliron and her counsel. This is plainly sufficient to satisfy Dr. Rudolph's burden of establishing the substance of her anticipated testimony at a severed trial. If additional information is required, Ms. Milliron can provide it *ex parte*.

### 4. Ms. Milliron's testimony is ironclad because it is true.

The prosecution is keenly aware of the substance of Ms. Milliron's anticipated trial testimony. She was very aggressively questioned at the grand jury. The prosecution was so confounded by her failure to corroborate their pre- and ill-conceived notions about Mrs. Rudolph's untimely death that they felt they had to eliminate her testimony by indicting her right away. They realized that, if the jury heard her testimony, she would be believed. She and Dr. Rudolph had no need to hide their relationship because Mrs. Rudolph knew of his extramarital relations. She did not demand or expect that Dr. Rudolph would leave his wife. Additionally, Ms. Milliron has an immaculate record having never received so much as a traffic ticket and has not made any prior inconsistent statements. The government has gone to such lengths to keep her testimony from the jury because she is very credible.

### 5. Without Ms. Milliron's testimony, the jury will get only a one-sided, incomplete, and misleading picture that risks a false conviction.

As already explained, the government considers it very important to give the jury a one-sided version of conversations Ms. Milliron had with a bitter former employee of Dr. Rudolph's and of a conversation she had with Dr. Rudolph that a bartender claims to have overheard. *Ex parte* presentations are notoriously unreliable. As the Sixth Amendment presupposes, a fair trial can be had only if the jury hears from *both* parties, which is why it guarantees defendants the right to call witnesses in their defense. The prejudice to Dr. Rudolph's defense if the government is allowed to

present only one side of conversations is about as great as can be. Ms. Milliron's failure to testify would alone be devastating because it would falsely suggest to the jury that the government's witnesses version of events is undisputed.

> **6.      Severance will have a minimal, if any, effect on judicial economy.**

The government has already admitted that—with the exception of Count 3, which is fatally defective for failing to charge an offense—the charges against Ms. Milliron have no overlap with the charges against Dr. Rudolph. "Trial on the obstruction and perjury counts—Counts 4–9—does not require proof of the underlying murder and would instead involve separate witnesses relating to the grand jury testimony ... ." DE87:5 ¶ 8.The government has practically conceded that those charges should be severed by inviting the Court to "grant a ... severance with regard to Counts 4–9." *Id.* It has even conceded that severance would ***promote*** effiency by making Dr. Rudolph's trial "somewhat shorter," *id.*, underscoring that joinder was improper in the first place.

> **7.      The motion is timely because this case is still in its early stages.**

There is no doubt that the motion is timely, given that the superseding indictment was filed only a few weeks ago and a firm trial date has not yet been set. *See also* DE89 (setting deadline). So, the final factor weighs in favor of severance.

> **B.      Severance is also necessary to prevent the government from introducing at trial evidence that would be barred from Dr. Rudolph's trial but is relevant to the perjury charges against Ms. Milliron.**

The government's indictment of Ms. Milliron is intended not only to sideline her from a trial in which her first-hand knowledge is indispensable to the jury's fair consideration of the evidence but also to infect the jury with improper innuendo concerning Dr. Rudolph's guilt. The obvious implication is that Ms. Milliron would not have had to commit perjury unless she had some reason to think Dr. Rudolph was guilty of murder and fraud. Jurors simply have no reason to suspect or

believe that prosecutors sometimes charge people for ulterior reasons. Any limiting instruction is more likely to exacerbate this improper and unfounded innuendo than to ameliorate it. The only way to prevent a conviction from being obtained on this totally improper basis is to grant the severance.

Additionally, the government has indicated that it plans to introduce certain evidence against Dr. Rudolph that would be barred from trial were he tried alone. For example, Count 4 alleges that Ms. Milliron gave misleading testimony regarding "the circumstances of the accident that caused [Dr.Rudolph] to lose part of his thumb." DE53:3 ¶ 6. How Dr. Rudolph lost his thumb is not in any way relevant to this case; it is relevant only to a supposed propensity to behave in accordance with bad character traits and therefore expressly barred by Rule 404(a). The government likely knows that and may have asked Ms. Milliron about that in the grand jury to create a reason to introduce it at a joint trial.  The defense also recently learned that the government consulted an expert witness who undermined the government's theory on the thumb injury.

Granting the severance would obviate that and many similar evidentiary problems inherent in trying these totally unrelated cases together. Denying the severance will only require the continual reexamination of whether a severance is not, in fact, necessary: "Of course, a trial court has a continuing duty to insure that prejudice does not occur, and if it does to sever defendants or offenses." *McConnell*,  749 F.2d at 1445 (citing *Schaffer v. United States*, 362 U.S. 511 (1960)).

*   *   *

19

WHEREFORE the superseding indictment must be dismissed. Alternatively, the trial of Lori

Milliron should be severed from the trial of Lawrence Rudolph.

Respectfully submitted,

MARKUS/MOSS PLLC
40 N.W. Third Street, PH1
Miami, Florida 33128
Tel: (305) 379-6667
markuslaw.com

By:      /s/ David Oscar Markus
         David Oscar Markus
         Florida Bar Number 119318
         dmarkus@markuslaw.com