IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 22-cr-00012-WJM

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. **LAWRENCE RUDOLPH** and
2. LORI MILLIRON,

    Defendants.

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS THE SUPERSEDING INDICTMENT FOR IMPROPER JOINDER OR, ALTERNATIVELY, TO SEVER LORI MILLIRON [ECF NO. 97]

Lori Milliron found out that her lover, Lawrence Rudolph, murdered his wife to be with her. After his arrest, she listened to several hours of evidence and argument about the case against him — including the motive of their relationship — at a detention hearing. A day later, she walked into the grand jury room, took an oath, and intentionally lied to help him avoid indictment. The evidence of the murder, the defendants' relationship, the way it motivated the murder, and the lifestyle that the murder provided them afterwards is common to both cases. A joint trial will properly avoid the waste of two long—and almost entirely duplicative— proceedings. The Defendant's Motion to Dismiss the Superseding Indictment for Improper Joinder or, Alternatively, to Sever Lori Milliron, ECF No. 97 (Def. Mot.) should be denied.

## FACTUAL BACKGROUND

Lori Milliron and Lawrence Rudolph carried on a lengthy affair before Rudolph killed his wife Bianca in 2016. During the affair, Milliron lived a secretive, second-fiddle life: untraceable

cash payments concealed from marital bank statements by Rudolph, trysts in her small Pittsburgh-area condominium, and isolation from Rudolph's Arizona lifestyle. But, after Bianca's death, she moved into the marital mansion, replaced Bianca on Rudolph's credit card, and drove Bianca's Mercedes. She risks losing it all if Rudolph is convicted.

Milliron was with Rudolph in Mexico when he was detained by the Mexican authorities. Upon her return to the United States, she was served with a grand jury subpoena and a notice advising her (1) that the Grand Jury was investigating violations of 18 U.S.C. § 1119, (2) she could refuse to answer questions on grounds of self-incrimination, (3) that if she did answer, the answers could be used against her, and (4) that if she wanted to obtain counsel, any such lawyer would be permitted to consult with her.

A week later—on January 4, 2022—Lori Milliron attended the defendant's detention hearing where she heard a detailed account of the evidence and disputes between the parties. Tr. of Det. Hearing, ECF No. 38, at 4; 8-9. She knew that Rudolph had been charged with murder, that one of the alleged motives was his desire to live with her openly (rather than keeping their affair secret), and that the two had siphoned cash from dental practices to finance their life together. *Id.* at 57-58. She also knew (from its subpoena) that the grand jury was seeking information from her as part of its decision-making process.

Milliron testified before the grand jury the day after the detention hearing. The grand jury had not yet evaluated charges against Rudolph, so she could potentially salvage her new life by convincing them not to return an indictment. Under oath, she confirmed that she understood the grand jury was investigating a foreign murder. The prosecutor also read the advisement attached to her subpoena that informed her that her testimony could be used against her by that grand jury

or another grand jury. She acknowledged that she understood. She then offered testimony that the same grand jury found incredible by returning the Superseding Indictment:

(1) that she didn't recall the source of her substantial cash income while working in Rudolph's dental practice—$20K in 2014 and $60K in 2015 (all cash from Rudolph),

(2) that she didn't know why Rudolph was so generous to her,

(3) that she was placed on Rudolph's credit card after his wife died as a job "perk,"

(4) that she did not give Rudolph an ultimatum to leave his wife before Bianca died, and

(5) that he had previously proclaimed his innocence to her.

ECF No. 53. After hearing and assessing Milliron's credibility, the grand jury nevertheless returned an indictment that same day charging Lawrence Rudolph with foreign murder and mail fraud. While she now forthrightly states in her affidavit that she was "romantically" involved with Rudolph before his wife's death,  Milliron was more than just ▇▇▇ with Rudolph when his wife died in Zambia of a shotgun blast to the chest.

Two weeks after her testimony, the government learned that Milliron had made the above statements after Rudolph had confessed to her about murdering Bianca. On January 19, 2022, an employee at an Arizona restaurant called the FBI's National Tip Hotline. The employee reported that Rudolph and Milliron were regulars at the restaurant's back bar. The employee relayed that a colleague—a longtime bartender—had heard Rudolph confess to the murder during a heated argument with his "wife" in 2019, but the bartender was afraid to come forward. The FBI interviewed the bartender after it confirmed through financial records that Rudolph made many transactions at the restaurant.

3

The bartender confirmed that Rudolph and Milliron were regulars who often paid in cash, left large tips, and gave holiday gifts to the staff. He described in detail an incident at the back bar when Rudolph exclaimed to Milliron during a break between songs "I killed my fucking wife for you" loud enough for the bartender and a nearby family to overhear. The statement was so shocking that the bartender immediately told his colleagues. At the time, the staff did not know that Rudolph had been previously married: they assumed that Milliron was his wife. In text exchanges after overhearing the statement, the group learned that Rudolph had been previously married and that his prior wife had allegedly died in a hunting accident.

The grand jury evaluating the case against Rudolph was due to expire on February 10, 2022. The day before that expiration, it was asked to consider Milliron's statements in the context of the new evidence. It returned a superseding indictment charging her with accessory-after-the-fact, obstruction, and several counts of perjury. ECF No. 53.

## ARGUMENT

Rudolph has moved to dismiss the Milliron counts or sever them. None of his reasons justifies two three-to-four-week trials. The factual connections between the two defendants' charges are manifold and enmeshed. His argument that joinder is improper because Milliron's accessory charge is legally insufficient misunderstands the facts and federal caselaw. (He also lacks standing to challenge a count against her.) His argument that joinder will deprive him of her testimony is based on speculation of the sort that does not support severance in the Tenth Circuit. His argument that two trials will have little cost to judicial economy has no basis in the evidentiary record. And his argument that certain evidence is admissible only in a joint trial can be handled by instructions. The government also moots part of that argument with its contemporaneous motion to this filing to strike part of an allegation against Milliron.

Nothing presented by the defendant warrants severance.

**I.    Joinder is proper because of the hand-in-glove factual overlap between proof of Bianca's murder and Milliron's efforts to help Rudolph escape punishment.**

The trial here will require a jury to consider whether Lawrence Rudolph murdered his wife to be with his mistress and whether that mistress, Lori Milliron, knew about the murder and took steps to prevent her lover from being indicted for it. The means by which Milliron accomplished that objective—obstruction and attendant perjury—are directly connected to concealing the murder and her role as raw motive for Rudolph's appetite to carry it out.

Our court system presumes that joint trials "serve the interests of justice by avoiding inconsistent verdicts and enabling more accurate assessment of relative culpability." *Richardson v. Marsh*, 481 U.S. 200, 209 (1987). The Federal Rules of Criminal Procedure broadly permit joinder where parties are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8. The rule is "construed broadly to allow liberal joinder to enhance the efficiency of the judicial system." *United States v. Janus Indus.*, 48 F.3d 1548, 1557 (10th Cir. 1995) (quotations and citation omitted). And the Tenth Circuit has held that accessory-after-the-fact charges are based upon "transactions constituting parts of a common scheme" that can be properly joined under Rule 8. *United States v. Van Scoy*, 482 F.2d 347, 349 (10th Cir. 1973).

But even if *Van Scoy* were not enough, "the test for a proper joinder is a common thread to each of the defendants," which can be "established by common evidence as to the various counts." *United States v. Rogers*, 921 F.2d 975, 985 (10th Cir. 1990). In this case, there is a whole spool of common evidence on which their guilt is based. The overlapping evidence of Rudolph's motive to murder his wife and Milliron's motive to help him get away with it includes the following that would be presented at a stand-alone trial against Rudolph: (1) records of his

substantial financial support for Milliron over many years, including cash payments, payments for rent, payments for vacations, and payments to relatives; (2) testimony from former employees and coworkers that Rudolph and Milliron were having an affair, as evidenced by their coming and leaving together, observations of Rudolph outside of Milliron's residence in the early mornings, and statements from Rudolph, and (3) testimony and records showing that Milliron moved into the marital residence with Rudolph just weeks after Bianca's funeral. This category of evidence was broadly discussed at the detention hearing and is precisely what Milliron dissembled during her grand jury testimony.

Evidence at a standalone trial of Milliron would include the same evidence, with the only difference being that it would show Milliron's lies instead of Rudolph's motives. Put simply, the evidence of Rudolph's motives and Milliron's lies is the same.

The overlap doesn't end there. At a solo trial for Rudolph, the government would present the bartender's testimony that Rudolph told Milliron he killed his wife for her. The government would present the same testimony at a solo trial for Milliron to show that she knew Rudolph had committed the murder when she later tried to influence the grand jury's investigation of it.

Indeed, all of the murder evidence is entirely subsumed in proving the accessory charge against Milliron. To find that someone was an accessory-after-the-fact, the jury must determine the underlying fact to which she lent her assistance. A joint trial thus has considerable efficiency because a trial against both Rudolph and Milliron will involve the same presentation of evidence proving the murder beyond a reasonable doubt. That is part of why courts consistently find no error in joining accessories with principals. *See, e.g., Van Scoy*, 482 F.2d at 348-49 (rejecting argument of improper joinder where accessory named in separate count from underlying bank

robber); *United States v. Dorsey*, 2019 WL 3804113 (D. Md. Aug. 13, 2019) (joinder proper where defendant was charged as accessory for lying to grand jury about underlying murder).

  II.  **That Rudolph's longtime paramour now offers in vague terms that she might provide testimony contradicting two potential witnesses against her and Rudolph if severance is granted does not justify two trials of the same evidence.**



Now, she alleges that she recalls enough to know that her memory is the opposite of two government witnesses. Milliron Aff. ¶ 6. How and in what respects, she does not explain. *Id.*

  "[I]n most instances, if a codefendant's proposed testimony lacks sufficient exculpatory content or would suffer from serious credibility problems at trial, severance is not required." *United States v. Pursley*, 577 F.3d 1204, 1218 (10th Cir. 2009). This is one of those instances. Rudolph is asking for two lengthy trials with over a dozen international witnesses because Milliron says she could testify (pointedly, not that she will) in a generally contradictory fashion after suddenly mustering a better ability to recall past events. This does not meet the "heavy burden" of "real" prejudice, *United States v. Martin*, 18 F.3d 1515, 1518 (10th Cir. 1994): that is, either a 'serious risk' of actual prejudice to a specific protected right or a likelihood that a jury

7

would be unable to make a reliable decision in a joint trial." *United States v. Yurek*, No. 15-cr-394-WJM, 2017 WL 2834545, at *1 (quoting *Zafiro v. United States*, 506 U.S. 534, 539 (1993)).

### A. Milliron has not provided sufficient assurances that she will testify.

Rudolph's motion is timely. But none of the remaining factors for severance support his motion. *See United Sates v. McConnell*, 749 F.2d 1441, 1445 (10th Cir. 1984) (identifying factors). The first factor is the likelihood that Milliron will actually testify. She does not say that she will testify, only that she "would be able to testify," *if* there was a severance. Milliron Aff. ¶ 9. Her conditional statement — "I'll testify, but only if I get to pick the order of the trials" — is insufficient. *McConnell*, 749 F.2d at 1445 ("the original motion filed August 9, 1982, would not have met the initial requirement of a showing of willingness to testify because [codefendant] conditioned his offer of testimony on his being tried first"); *see also United States v. Espinosa*, 771 F.2d 1382, 1408 (10th Cir. 1985) (conditional offers are insufficient). The reason is obvious: conditional statements allow codefendants with mutual interests to use "severance to obtain benefits that they would not have but for their joint indictment" and makes justice dependent on gambles between codefendants about trial outcomes. *United States v. Becker*, 585 F.2d. 703, 706 (4th Cir. 1978); *see also United States v. Bari*, 750 F.2d 1169, 1177 (2d Cir. 1984) (noting that such a condition "smacks of bad faith"); *United States v. Pingaro*, 784 F. Supp. 2d 77 (D. Mass. 2011) (rejecting similar affidavit as basis for severance in case involving husband and wife).

Even if her statement wasn't conditioned on severance, Milliron doesn't say she is going to testify, only that she would feel able to do so. That sort of affidavit is of doubtful utility. *United States v. Clark*, 717 F.3d 790, 819 (10th Cir. 2013) (criticizing affidavit with only conclusory assertions and no explanation as to whether codefendant would actually testify); *United States v. Utley*, 62 F. App'x 833, 836 (10th Cir. 2003) (rejecting as unhelpful an affidavit

from codefendant that he "may wish" to testify at a trial with his preferred severance); *United States v. Green*, 818 F.3d 1258, 1280 (11th Cir. 2016) ("[S]tatements concerning the testimony that would become available by severing trials must be specific and exonerative, rather than conclusory or self-serving, in order to justify severance. And a codefendant's proffered testimony in favor of the moving defendant is of "dubious credibility" when "it was in no way contrary to the [codefendant's] own interests.") (alterations in original) (citation omitted).

### B.     Milliron's affidavit is fatally vague and conclusory.

The second, third, fourth, and fifth factors consider the extent to which codefendant statements would be exculpatory in the context of the remaining evidence while also considering how those statements would be impeached. *McConnell*, 749 F.2d at 1446. Here, just as in *McConnell*, the affidavit purports to offer *something* that might be exculpatory, but without substance. She simply says that she has first-hand knowledge (she doesn't say what it is) and that whatever her testimony will be, it contradicts other witnesses. This is insufficient. *Id.* (rejecting affidavit that was "little more illuminating than a simple assertion that [codefendant] was innocent."); *Rogers*, 925 F.2d at 1288 (finding joinder to be proper where codefendant's testimony lacked substance, was contradicted by testimony from many other witnesses, and amounted to little more than an assertion that the codefendant was not involved in offenses); *Cf. Green*, 818 F.3d at 1282 (discounting affidavit of codefendant who stated he was "in a position to testify to facts that would establish [codefendant's] state of mind] but did not identify what those facts were"). The defendant's offer to supplement the affidavit *ex parte* should be rejected.

Even Milliron's two vague statements relate to only two witnesses in a larger trial that will involve potentially dozens of witnesses and substantial evidence in many forms, much of which was set forth in the extensive submissions regarding detention. ECF No. 14 at 9 – 10.

Evidence at trial will show (1) the defendant was the primary user of the shotgun during the hunt, (2) protocols during a hunt like this made it unlikely that the shotgun was loaded before it was put on trucks tumbling on rugged roads back to camp, (3) Bianca was an experienced hunter who knew proper safety protocols and was unlikely to shove a loaded shotgun into a case with the muzzle against her heart, (4) the 3'7" shotgun had a trigger that was over two feet from the muzzle — Bianca could not have reached the trigger from the muzzle end even if she wanted, (5) tests showed the shotgun that killed Bianca had no defects, and (6) the shot pattern of the wound in Bianca's chest was most likely fired from about two to three-and-a-half feet way.

It will further show that (7) Rudolph gave vague and even then, varying and contradictory accounts of his whereabouts and the circumstances of the death, (8) Rudolph took substantial steps to limit scrutiny of the death, avoiding contact with next of kin until the body could be cremated and holding a cheap funeral thousands of miles from Bianca's network of friends in Pennsylvania, (9) Rudolph profited from the death by filing claims for about $4.8 million in life insurance shortly after the death, (10) the death gave Rudolph the opportunity to live openly with Milliron — just weeks after his wife's funeral — without the costs of divorce, and (11) Rudolph declared during an argument with Milliron that he killed his wife for her. Only the last two items are implicated by Milliron's affidavit, and she has declined to provide even the slightest detail as to how they are affected. Rudolph's blanket assertions that the case will collapse if Milliron testifies are self-serving litigation hype.

The court can and should also consider impeachment evidence. *Pursely*, 577 F.3d at 1218 (severance is not required where "codefendant's proposed testimony lacks sufficient exculpatory content or would suffer from serious credibility problems at trial"). It is already baked into Milliron's affidavit that two witnesses will gainsay whatever it is she might tell a jury. Rudolph

dismisses them as, respectively, a "disgruntled" and fired employee with an ax to grind (whose ax, why it needs ground these many years later, and how sharply is unsaid) and a confused or malicious eavesdropper. But those witnesses have no stake in this dispute and their testimony is corroborated by the observations and statements of others. *Cf. Rogers*, 925 F.2d 1285 (finding no basis for severance where codefendants testimony was "contradicted by several witnesses). In contrast, Milliron has incentives to protect Rudolph as her sole financial support and romantic partner. Milliron will also face cross-examination for irreconcilable statements — her affidavit says she was "romantically involved" with Rudolph, Milliron Aff. ¶ 2, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓ She made incredible statements about not remembering the amount, circumstances, motives, logistics, or context of cash transactions amounting to tens of thousands dollars a year. *Cf. United States v. Appel*, 211 F. 495 (S.D.N.Y. 1913) (containing Judge Learned Hand's rejection of notion that witness who got $940 (about $25,000 today) could not honestly remember what he'd done with it). ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Her numerous statements about her general inability to recall during her grand jury testimony will be contrasted with her newfound powers of recollection for trial after conversations with lawyers. Milliron Aff.¶ 6.

      Even if the probability that Milliron might testify were greater than shown here, ordering two separate trials to accommodate it is "greatly outweighed by the expense and administrative inconvenience of conducting two lengthy trials involving numerous witnesses rather than one consolidated trial." *Pursley*, 577 F.3d at 1210 (Tenth Circuit jurisprudence "confirm[s] the propriety of the district court's decision to deny severance based at least in part" on judicial

economy being thwarted by severed trials grounded in conclusory affidavits from witnesses subject to considerable impeachment).

### C. Judicial economy favors one joint trial.

It makes little sense to have two trials involving many of the same witnesses discussing the same topics to prove the same murder and its reverberations. Even a showing by the defendant that there is some probability of prejudice is insufficient. It is not enough to show that separate trials would result in a better chance of acquittal—the defendant must show that the jury will somehow be unable to make a reliable judgment about guilt or innocence. *United States v. Dirden*, 38 F.3d 1131, 1141 (10th Cr. 1994); *Zafiro*, 506 U.S. at 539; c*f. United States v. Burgos*, 254 F.3d 8, 13 & 14 (1st Cir. 2001) (noting that "garden variety prejudice" is insufficient to overcome preference for joinder and that severance is a "difficult battle for defendants to win").

The defendant's characterization of the government's response to Milliron's request for a speedy trial as a concession of improper joinder or favoring two trials is not accurate. Def. Mot. at 3 & 18. Parties frequently account for worst-case outcomes and seek measures to mitigate them: considering the possibility that the Court might rule against it and making a request that the Court rule in a way that avoids forcing the government to fly dozens of international witnesses for two separate trials was not a concession regarding joinder. Having one trial is by far the most efficient way for the Court to resolve this case. Separating the two trials might make *one* of them somewhat shorter for *one* of the defendants—but at the great expense of taking up much more of this Court*'s* overall time.

### III. A person is an accessory after the fact when she lies to a grand jury to stop it from indicting someone she knows committed a crime.

Lori Milliron found out that her lover murdered his wife to be with her. After service with a subpoena to testify before the grand jury investigating that murder, she attended a hearing

where the evidence and arguments implicating Rudolph were thoroughly discussed. She then took an oath to tell the truth before giving intentionally false and misleading testimony to undermine one possible motive for the murder by distancing herself from Rudolph's money, affection, and company. She did so to comfort and assist Rudolph by hindering and preventing an indictment that would result in his trial and possible punishment. She is an accessory-after-the-fact to the murder and there is no basis for dismissing the grand jury's indictment.

"An indictment is sufficient if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges against which he must defend, and enables the defendant to assert a double jeopardy defense." *United States v. Welch*, 327 F.3d 1081, 1090 (10th Cir. 2003). The court should test the indictment "solely on the basis of the allegations made on its face" and must take the allegations as true. *United States v. Todd*, 446 F.3d 1062, 1067 (10th Cir. 2006). There can be no doubt that the allegation in the indictment—which tracks the statutory language setting forth the elements and puts Milliron on notice that she knew about the murder and then took action to stop Rudolph from being tried or punished for it—meets this test.

Rudolph's motion is premised on a misunderstanding of the timeline. When Milliron testified to the grand jury, it had not yet decided whether to indict Rudolph for the murder. He was being held on a complaint. Milliron's grand jury testimony was not "absolutely incapable of causing Dr. Rudolph's escape or release from custody." Def. Mot. at 7. Absent an indictment, he could not have been held more than 30 days or tried and punished for a felony in federal court.

In this respect, the government does not disagree with Rudolph's definitions of "hinder," "comfort," or "assist." Nor does it suggest that hinder simply means "influence." Rather, it has charged hinder to mean delay or prevent from happening. Offering false testimony to stop a felony indictment is a hindrance to trial and punishment. The government agrees that "an

accessory after the fact is a person who helps a criminal avoid *the legal process*." Def. Mot. at 10. That is exactly what Milliron is accused of doing: helping Rudolph avoid the legal process of trial by avoiding the indictment required to call for such a trial.

To the extent Rudolph is arguing that "mere" lying to help someone avoid criminal liability does not make someone an accessory after the fact, he is wrong. In *United States v. White*, 771 F.3d 225 (4th Cir. 2014), a defendant faced an accessory charge for making false statements to an insurance agent about a duplex fire the defendant had commissioned others to start. The defendant challenged the evidence on the third element of the crime—that someone act for the purpose of "preventing apprehension, trial or punishment"—but the Fourth Circuit found the element satisfied by the defendant's lying to the agent to help the arsonists avoid detection because it would help those arsonists avoid scrutiny and the legal process. *Id.* at 234. And in *United States v. Rux*, 412 F.2d 331 (9th Cir. 1969), the defendant went to the FBI and provided false information tending to show that his brother did not rob a bank. The overwhelming evidence that defendant had gone to the FBI specifically to throw them off his brother's trail and prevent his brother's apprehension and trial satisfied the accessory elements.   See *id.* at 333-34.

If White could be an accessory for lying to a private citizen to cover up a crime and if Rux could be an accessory for lying to authorities to throw off their investigation, it is surely sufficient for the indictment to accuse Milliron of lying to a grand jury to cover up the motives for a murder and otherwise hinder its investigation. *See also United States v. Day*, 533 F.2d 524, 526 (10th Cir. 1976) (finding evidence sufficient to support accessory-after-the-fact conviction where defendant lied to an FBI agent investigating murder he had helped plan).

Rudolph asserts that accessory-after-the-fact is meant to reach conduct that is otherwise not criminal. Def. Mot. at 11. That's not correct. The defendant in *United States v. De La Rosa*

14

was convicted for obstruction *and* for being an accessory after the fact to drug trafficking, because he knew about a drug smuggling operation, learned that a friend's juror was an old classmate, and offered that juror a bribe. 171 F.3d 215, 218-19, 221 (5th Cir. 1999). It is common in the criminal law that the same body of facts is punished by different statutes with different elements. If Milliron had endeavored to corruptly influence the grand jury out of a misbegotten sense of duty or love, that would be only obstruction. But she *knew* about a murder and tried to help the murderer get away with it so that she could continue to live in romantic bliss in his mansion, on his vacations, and surrounded by the luxuries available to a multi-millionaire.

The foregoing is academic. Milliron has not moved to dismiss the charge. And while Rudolph has standing for severance, he doesn't have standing to challenge Milliron's charges.

### IV. If the government seeks to introduce evidence of the "crocodile incident," it will not do so based on the charges against Milliron.

In 2006, Rudolph claimed that a crocodile in Zambia bit off just the tip of his thumb, making him eligible for millions in disability insurance. In a contemporaneous motion to this response, the government moves to strike that portion of the charges against Milliron in the Superseding Indictment. To the extent it seeks to introduce this evidence against Rudolph, it will establish an appropriate evidentiary record aside from the charges against his co-defendant, so severance is not needed to address that evidentiary question.

### CONCLUSION

Rudolph's motion should be denied.

Respectfully submitted,

COLE FINEGAN
United States Attorney

| By: */s Bryan Fields* | By: /s *E. Garreth Winstead* | By: /s *J. Bishop Grewell* |
|---|---|---|
| Bryan Fields | E. Garreth Winstead | J. Bishop Grewell |
| Assistant United States Attorney | Assistant United States Attorney | Assistant United States Attorney |
| U.S. Attorney's Office | U.S. Attorney's Office | U.S. Attorney's Office |
| 1801 California St. Suite 1600 | 1801 California St. Suite 1600 | 1801 California St. Suite 1600 |
| Denver, CO 80202 | Denver, CO 80202 | Denver, CO 80202 |
| (303) 454-0100 | (303) 454-0100 | (303) 454-0100 |
| Bryan.Fields3@usdoj.gov | Garreth.Winstead@usdoj.gov | Bishop.Grewell@usdoj.gov |
| Attorney for the Government | Attorney for the Government | Attorney for the Government |

**CERTIFICATE OF SERVICE**

  I hereby certify that on 28th day of March, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to any and all counsel of record.

               *s/ Bryan Fields*
               United States Attorney's Office