IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Judge William J. Martinez

Criminal Case No. 22-CR-0012-WJM

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. **LAWRENCE RUDOLPH**,
2. LORI MILLIRON,

    Defendants.

_____/

## LAWRENCE RUDOLPH'S MOTION
## FOR ISSUANCE OF RULE 17(c) SUBPOENAS TO CBS BROADCASTING

Lawrence Rudolph, by and through undersigned counsel, respectfully submits this request for the issuance of Rule 17(c) subpoenas to CBS Broadcasting, Inc., which produces the show *48 Hours*. *See* Ex. A. We respectfully request that the material in the subpoena be produced to the defense at least 30 days before trial. Once received, we will produce that material to the government. The government takes no position on this motion.

### Facts

The government's case against Dr. Rudolph is circumstantial. There are no witnesses to Bianca Rudolph's untimely death. Although Zambian officials and private insurers all ruled the death accidental, the government contends that she was murdered based mostly upon its experts' conjecture that it probably was not an accident. Trial is set for July 11, 2022. DE105.

The case has garnered national and international publicity, including the recent airing of a *48 Hours* episode produced and broadcasted by CBS called "Death on Safari." During production of this episode, numerous witnesses were interviewed on camera. This motion seeks the issuance of a subpoena for the raw footage of the interviews of only two of those witnesses, both of whom reside in Africa: Spencer Kakoma and Roston Yeyenga. The footage sought is not voluminous and contains no confidential or privileged information but only on-the-record statements made with full knowledge that they could be broadcast across the United States and Canada.

Before bringing this motion, counsel contacted CBS to request the raw footage sought. A CBS senior vice president and associate general counsel responded that

> pursuant to CBS News policy, [CBS] will not release these outtakes, which were created in the course of our newsgathering. We rely on the reporters' privilege and state shield laws, which protect this material from the demands of third parties, such as Dr. Rudolph.

Dr. Rudolph's counsel responded that all corporations, including news outlets, have a common law duty to provide non-confidential information needed by litigants and that the asserted privilege at most covers only confidential sources and information and not footage created for broadcast but ultimately edited out.

This Court's intervention is thus necessary to obtain this discoverable information.

## Legal Standard

Federal Rule of Criminal Procedure 17(c) codifies the procedure for either party to a prosecution to obtain "books, papers, documents, data, or other objects" before trial. Generally, the movant must "clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity." *United States v. Nixon*, 418 U.S. 683, 700 (1974). Specifically, the moving party must show:

> (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general "fishing expedition."

*Nixon*, 418 U.S. at 699–700 (footnote omitted). With respect to "admissibility," there is no requirement "that the materials thus subpoenaed must actually be used in evidence. It is only required that a good-faith effort be made to obtain evidence." *Bowman Dairy Co. v. United States*, 341 U.S. 214, 219–20 (1951).

The government has taken the position that a lower burden applies when a subpoena is directed, as in this case, to a non-party rather than a party. *See Nixon*, 418 U.S. at 699 n.12. This remains an open question. The rule, however, must be interpreted to further its purpose of upholding the "very integrity of the judicial system and public confidence in the system" which "depend on full disclosure of all the facts ... ." *Id.* at 709. "To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense." *Id.*

**Argument**

Lawrence Rudolph's requested subpoena seeks a narrow and specific category of admissible, relevant evidence. Specifically, he asks the Court to require *48 Hours* to produce the full interviews of just two fact witnesses: Spencer Kakoma and Roston Yeyenga. CBS News dispatched their South African correspondent, Debora Patta, to interview them. On the program, Kakoma made statements that contradict what he purportedly told the FBI and Yeyenga made statements that are not in the FBI's report. Patta herself paraphrased statements that the witnesses allegedly made to her and were not broadcast that also materially differ from the FBI reports. This could mean that (i) the witnesses embellished their stories for the television crew, (ii) CBS's reporting was inaccurate, perhaps because Patta reported unsupported inferences to beef up her story, or (iii) the FBI reports are incomplete. It is impossible for Dr. Rudolph to have a fair trial if his legal team cannot investigate the significant discrepancies detailed herein and get to the true facts.

Kakoma is a park ranger at Kafue National Park in Zambia. He accompanied the Rudolphs on their 2016 hunting trip and was among the first people to enter the cabin after Mrs. Rudolph's fatal injury occurred. His broadcast statements differed in several significant ways from the information contained in the FBI reports produced in discovery. Examples of the discrepancies include:

• Kakoma claimed on TV (but apparently not to the FBI) that he suspected foul play:

PATTA: Were you surprised that a shot had gone off?

> KAKOMA: Yeah. That's one of the thing which made me to suspect. ... I saw Bianca Rudolph removing the ammunition from the—their guns.
> PATTA: So, how do you think ammunition got into the shotgun?
> KAKOMA: I think there must be just someone who loaded it.
> PATTA: Somebody loaded that gun ...
> KAKOMA: Yes.
> \*       \*       \*
> PATTA: From the beginning, Spencer says he had questions about Larry's version of events, including when Larry told him he was in the bath when he heard the gunshot, and raced out to find Bianca dead.

The FBI reports of their interviews with Kakoma never state that he suspected foul play.

• Patta claimed on the air that Dr. Rudolph told Kakoma that his wife had committed suicide and later changed his story—but the FBI's report of its interview with Kakoma makes no mention of that assertion:

> PATTA: Spencer says Larry first claimed Bianca died by suicide, shooting herself intentionally, while he was in the bathroom. And he says Larry was so distraught, that he ran to a nearby river saying he wanted to jump in and kill himself. Spencer says he calmed Larry down and they went back to the cabin. But now, Larry had a different version of events. It was no longer a suicide, but that Bianca accidentally shot herself packing up the gun.

• Kakoma said that Dr. Rudolph said he wanted to kill himself just after his wife died.

> KAKOMA: He's crying, crying, "Let me just kill myself because my wife, she has committed suicide. She has killed herself. Want to kill myself also."

The FBI report says, "Larry never said that he wanted to kill himself but Officer Kakoma was concerned about him" because he was so distraught.

Roston Yeyenga is the commanding officer at Mumbwa Police Station in Zambia. His interview with the FBI said nothing about a scream but he said on the air that Dr.

5

Rudolph had told Yeyenga that he heard a scream. He also told CBS that the initial investigation was not rushed and that no one suspected foul play, but this is not in the FBI report.

### A.   The documents are relevant and admissible.

The relevancy of these witnesses' knowledge is conceded. They were interviewed by the government, and their FBI 302s have been produced.

The subpoenaed interviews are evidentiary because they bear directly on what supposedly happened in Africa. Additionally, because the government waited years to bring this case, comparing what these witnesses said to the FBI closer to the time of Mrs. Rudolph's death with what they said for television cameras is essential for separating fact from embellishment. This is especially important given that the government's case is largely circumstantial. Dr. Rudolph cannot have a fair trial unless his counsel is able to effectively cross-examine the witnesses about what they actually remember and what they suppose or imagine. Additionally, the defense may determine after viewing the complete raw footage to call one or both of these witnesses in the defense case.

Although statements admissible solely for impeachment generally need not be produced in advance of trial, production is required when, as in this case, "there are other valid potential evidentiary uses for the same material, and the analysis and possible transcription of the tapes may take a significant period of time." *Id*. at 701–02.

### B.   Only CBS possesses the complete footage of the interviews.

In undersigned counsel's correspondence with CBS's associate general counsel,

CBS conceded that it possesses the requested footage. That footage cannot be obtained from any other source, and there is no other reasonable means for discovering what those witnesses said before the cameras. Having access to the raw footage is the only practical way for the defense to investigate the discrepancies and omissions between the television broadcast and the FBI reports.

## C.     Pre-trial production will avoid trial delays.

Knowing what these crucial witnesses said in advance of the July trial setting will make the trial more fair as well as more efficient. Because the government took years to build its case, witnesses claims about what they remember are crucial. The discrepancies between what these witnesses told the FBI years ago and what they said for the media years later are highly relevant both to getting an accurate, unembellished picture of what these witnesses actually know and to gauging their credibility.

## D.     This is a good-faith and targeted request for crucial statements that are not protected by any applicable privilege.

The subpoena will not unduly burden CBS. This motion seeks very targeted footage of just two interviews recorded for one television episode. The footage is not voluminous.

Neither is it protected by any privilege. Federal Rule of Evidence 501 states that privileges in federal court are a matter of federal common law. The Senate Report accompanying the 1975 adoption of the Rules states that Rule 501 "should be understood as reflecting the view that the recognition of a privilege *based on a*

*confidential relationship* ... should be determined on a case-by-case basis." S.Rep. No. 93–1277, p. 13 (1974), U.S. Code Cong. & Admin.News 1974, pp. 7051, 7059 (emphasis added). *A fortiori*, no privilege applies because the statements sought were on-the-record and for publication by sources whose identity was always known.

The leading case in the Tenth Circuit concerning the asserted reporter's privilege confirms that the privilege applies only to confidential or off-the-record information, particularly the names of anonymous and vulnerable sources. *See Silkwood v. Kerr-McGee Corp.*, 563 F.2d 433 (10th Cir. 1977). *Silkwood* concerned a documentary filmmaker who "refused to answer questions which called for disclosure of confidential information. He did, however, respond to questions which sought information ... which he did not regard as confidential." 563 F.2d at 434. This follows from the Supreme Court's unequivocal holding that the First Amendment does not exempt news organizations from generally applicable laws, like Rule 17.

> It is clear that the First Amendment does not invalidate every incidental burdening of the press that may result from the endorsement of civil or criminal statutes of general applicability. Under prior cases, otherwise valid laws serving substantial public interests may be enforced against the press as against others, despite the possible burden that may be imposed.

*Branzburg v. Hayes*, 408 U.S. 665, 683 (1972).

## CONCLUSION

As set forth above, the information sought from *48 Hours* is relevant, admissible, available only from CBS, not privileged or confidential, and easy to produce. Dr. Rudolph seeks this specific and narrow category of raw footage in good faith to prepare

to examine these witnesses fully but efficiently. CBS has not claimed that it would be difficult to locate and produce this footage. Accordingly, Mr. Rudolph respectfully requests that this Court enter an order authorizing him to issue the proposed Rule 17(c) subpoenas to 48 Hours.

The government advises that it takes no position on this motion.

**Certificate of Service**

This motion was filed using CM/ECF and served on the prosecution through that system on May 16, 2022. In addition, a copy was emailed to CBS associate general counsel Gayle Sproul.

Respectfully submitted,

MARKUS/MOSS PLLC
40 N.W. Third Street
Penthouse One
Miami, Florida 33128
Tel: (305) 379-6667
Fax: (305) 379-6668
markuslaw.com

By:   /s/ David Oscar Markus
David Oscar Markus
dmarkus@markuslaw.com

/s/ A. Margot Moss
A. Margot Moss
mmoss@markuslaw.com