IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 22-cr-00012-WJM

UNITED STATES OF AMERICA,

     Plaintiff,

v.

   1.  LAWRENCE RUDOLPH and
   2.  LORI MILLIRON,

     Defendants.

---

### GOVERNMENT'S NOTICE OF RULE 404(b) EVIDENCE

---

Lawrence Rudolph intentionally killed his wife at the Chinyembe hunting camp outside Zambia's Kafue National Park in 2016. He then collected about $4.8 million from several life insurers by fraudulently claiming she had died in an accident. This was not the first time he'd profited by staging an accident at Chinyembe. He chose this remote camp in Zambia because ten years earlier he had successfully defrauded insurers of at least $3.5 million by intentionally shooting off the tip of his thumb at the same camp and claiming that a crocodile had bitten it off.

In less than one trial day (of a three-week trial), the government plans to introduce this staged 2006 crocodile incident to show that Rudolph knew he could get away with killing his wife, as part of his 2016 fraud scheme, due to the remoteness of Chinyembe and the limited investigative resources of both the local Zambian authorities and his insurers. That knowledge is probative of his malice aforethought, premeditation, and plan to murder his wife and defraud insurers again. Because of the charged case's circumstantial nature, the probative value of this

1

404(b) evidence is high.[1]  In the event that Rudolph moves to exclude this evidence, the court

can determine its admissibility (as explained below) without an evidentiary hearing.

## BACKGROUND

Rudolph has been charged with the willful and premeditated murder of his wife Bianca in

violation of 18 U.S.C. §§ 1119 & 1111. Doc. 53 at 1. He has also been charged with a scheme to

obtain about $4.8 million by fraudulently claiming to seven life insurance companies that Bianca

died as the result of the accidental discharge of a firearm. Doc. 53 at 1-2. The government will

offer the following evidence at trial.

I.      **Lawrence Rudolph collects $4.8 million by claiming that his wife died from the accidental discharge of a firearm when he, in fact, murdered her.**

The Chinyembe hunting camp is a remote bush camp 130 kilometers from the nearest

Zambian town of Mumbwa and 288 kilometers from Zambia's major city of Lusaka. Getting to

Mumbwa from Chinyembe requires a 31-kilometer drive on a tumbling, four-wheel-drive jeep

track that winds through lion country, over several muddy streams, and past swarms of tsetse

flies. It is then another 99 kilometers of asphalt road through Kafue National Park to Mumbwa,

where there is a clinic and a police station. The Mumbwa police station had only three vehicles

and one holding cell in 2016 to cover the hundreds of kilometers in its district. Drinking water

for the police station is pumped by hand from an outdoor well.

Before the sun touched the rural Zambian bush on October 11, 2016, a shot rang out

along the Kafue River. It had not come from the downriver portion of the Chinyembe hunting

camp where the local workers lived, worked, and skinned animals during the hunting season.

Rather, it came from the other side of camp—an upriver area demarcated by a grass fence and

---

[1] The government has previously provided discovery of the Rule 404(b) acts discussed herein to defense counsel.

exclusive to guests. Except for the camp's room attendant, waiter, and waiter's assistant, the rest of the camp workers were not allowed in the guest area.

Two guests were in Chinyembe that week: Lawrence and Bianca Rudolph. October is late in the Zambian hunting season, but the couple were there for Bianca to hunt leopard. The two experienced hunters were staying in a cabin in the guest part of the camp, well away from the downstream workers' compound and skinning shed. Beyond their upstream cabin lie only thick brush, dense forest, and the darkness of pre-dawn hours. After a fortnight of unsuccessfully hunting for the leopard, the couple were returning to the United States. They had discussed staying longer, but Bianca was excited to return home for a family wedding.

With the Rudolphs' planned return home, the camp waiter and room attendant stopped by the couple's cabin on the edge of camp around 4:00 in the morning. Lawrence sent both men away. He told the staff that he and his wife were still packing their bags. And he said that he would come find the room attendant when they were ready for him. (Lawrence later told the professional hunter that it was Bianca who sent the two men away.)

It was an hour later when the shotgun blast from the couple's cabin echoed through camp.

Because Lawrence had sent the waiter and attendant away, the nearest bystanders were a Kafue National Park game scout and the professional hunter who had guided the Rudolphs' hunting that week. They were in the camp dining hall at least 30 yards away from the cabin, recording the animals killed that week as bait for Bianca's leopard hunt.

The hunter and scout ran to the cabin. Inside, they found Bianca lying on the floor near the bathroom door with blood everywhere, a gaping wound in her chest, a shotgun on the floor inside a soft gun case with the end blown out, and Lawrence standing in the bathroom doorway (in a golf shirt, jeans, and shoes) just staring at his wife. A spent shotgun shell was on the floor.

When the professional hunter entered the cabin, Lawrence yelled for help. The hunter put pressure on the gunshot wound directly over Bianca's heart while Lawrence simply stood there. Bianca was gasping for air and blood came out of her mouth when the hunter gave her mouth-to-mouth resuscitation. The hunter yelled at Lawrence to get his medical bag.

Lawrence left the cabin and went to the porch looking for the bag. When he finally returned, the hunter told him that Bianca was dead. The hunter covered the body with a zebra print blanket, exited the cabin, and threw up.

Different people heard different stories from Lawrence about what had happened. It was a suicide. It was an accident. His wife must have killed herself by banging the gun on the ground to jam it into the soft case. He was in the bathroom with "the shits" when it happened. He was taking a shower when it happened. He was outside of the cabin and ran inside when it happened. When submitting claims for $4.8 million in life insurance, he stuck with more general "accidental discharge of firearm." He used the same clinical phrase with the guests who later attended Bianca's funeral.

After the Zambian police did what they could to investigate with limited resources, Lawrence Rudolph quickly cremated his wife's body in Zambia on October 14—just three days after her death—and returned home to the United States the next day. He cremated her even before telling his children of their mother's death. Four days after his return to the United States, he reached out to a trust attorney to ask for a recommendation of someone who could help him process the life insurance. To the surprise of Bianca's friends and family, he then rushed through a small cheap funeral for Bianca on October 22, 2022, and, within the next month, began living together with his long-time mistress Lori Milliron.

4

Bianca's death was not the first time that an alleged accident at the Chinyembe hunting camp had enriched Lawrence Rudolph with significant insurance proceeds.

## II.      Ten years earlier, Rudolph defrauded his disability insurers of at least $ 3.5 million by intentionally shooting off the tip of his thumb at the same hunting camp in remote Zambia and telling the insurers that a crocodile bit it off.

Back in October 2006, Lawrence Rudolph went to the Chinyembe hunting camp to hunt water buffalo. The trip was scheduled for ten to twelve days. At the time, a buffalo hunt cost between $10,000 and $15,000 for the hunt, not including the substantial costs of travelling to Zambia and Chinyembe's difficult-to-access hunting grounds.

The first several days of the hunt were odd. Despite the hunt's cost, Rudolph didn't seem interested in hunting. He simply sat in camp drinking wine and smoking marijuana with the local camp workers. The professional hunter kept pushing Rudolph to hunt. He even called his boss to express frustration that Rudolph wasn't hunting. (During the hunting season, the camp workers partially rely on meat from the hunts for food.)

Several days into the scheduled hunt, the professional hunter convinced Rudolph to go hunting. Because it was Zambian Independence Day (October 24), the professional hunter wanted to provide fresh meat for the holiday celebration. But after Rudolph shot a non-trophy animal for the camp staff to eat, the professional hunter and Rudolph returned to camp where Rudolph returned to drinking.

One night in the middle of the ten-day hunt, the professional hunter and Rudolph were sitting around the campfire when the hunter finally convinced Rudolph to hunt for his trophy buffalo the next morning. But Rudolph did not prepare for a hunt. Instead, Rudolph continued drinking and began talking obsessively about crocodiles. The hunter shined a flashlight in the Kafue River running by below to illuminate the eyes of several crocs. When Rudolph kept going

on and on about the crocodiles, the hunter told him to avoid the area downstream from the camp's skinning shed where the camp staff clean and prepare the game animals killed during the season by the camp's guests. He informed Rudolph that a large number of crocodiles gather there. Rudolph continued drinking heavily that night and smoking marijuana with the workers.

When the camp attendant went to wake Rudolph for the hunt in the four o'clock hour the next morning, Rudolph refused to get up because he was hungover from the night before. Frustrated, the professional hunter decided to do maintenance on his vehicle, which was parked down by the skinning shed on the opposite end of camp from the guest area.

When the hunter returned to the main part of the camp a few hours later, the camp staff told him that Rudolph had recently walked straight out of camp through the main gate, in the opposite direction of the river with a fishing pole and a rifle. The hunter was panicked. He had told Rudolph not to leave the camp without him. Rudolph was his responsibility, and there were dangerous animals in the area. Indeed, Rudolph knew from prior visits to the camp that he was not supposed to leave the camp without a professional hunter.

The hunter sent a scout and a tracker downstream to search for Rudolph. But the hunter went upstream with another tracker. He was confident that Rudolph wouldn't be fishing downstream given their discussions about crocodiles and the skinning shed the night before. Because he had been told that Rudolph had just left camp, he did not expect him to be far away. He walked about a mile when he heard a single gunshot.

Downstream.

The hunter rushed back to camp where he found Rudolph calmly bandaging his left hand. Rudolph was "quite relaxed." He told the hunter that he had gone fishing alone. When he caught a fish, he had reached down to "lip" it—sticking his thumb in the fish's mouth to get it out of the

river—when a crocodile grabbed the fish and his hand, pulling him into the water. According to Rudolph, the crocodile released him before biting his calf and pulling him back into the water. But he had kicked the crocodile and was able to escape before firing his rifle to signal for help.

Several things didn't add up. Rudolph's jeans were a bit wet, but not like he had been dragged into the river. He wasn't muddy or dirty. The rip in his jeans looked like it had been cut horizontally and then pulled down to create a hanging flap. The jean damage didn't seem to correspond with the various marks on Rudolph's leg, which looked like small cuts made by a pocketknife jammed into the leg rather than a crocodile bite. The hunter was confused. The marks ran in a straight line up and down the leg, instead of matching the pattern of a crocodile's mouth grabbing a fleeing limb. And there didn't appear to be blood associated with the marks on the leg. It was also strange that Rudolph was so relaxed if he had just been attacked by a crocodile and pulled into the river twice.

The hunter used a satellite phone to medevac Rudolph out of camp. Rudolph had a specific hospital in South Africa where he wanted flown instead of the nearest large hospital in Lusaka. But the medevac pilot requested proof of medical necessity, so the hunter asked Rudolph to let him take photographs of the injuries. Rudolph refused and said no photos were necessary. By then, he had wrapped his index finger in thick gauze, preventing any examination of it.

After the hunter explained that the pilot would not fly without proof of injury, Rudolph eventually relented. The hunter took two photographs of the injury to Rudolph's thumb, which are attached as Exhibit A. The photographs were taken after Rudolph had cleaned his hand with water and peroxide, so the red spots on his hand are not dried blood. The hunter will testify that these marks had not been on Rudolph's hands before that morning.

7

An expert will testify that the red marks on Rudolph's hand and the burned area at the base of the bandaged index finger in the photos are consistent with blisters and powder burns from a gun discharge. He will testify that the injury to the thumb is consistent with Rudolph shooting his thumb with a rifle. Indeed, it is unlikely that a crocodile could pull Rudolph into the water by the tip of his thumb and yet leave that tip attached. In a deposition about the incident several years later, Rudolph even said that the crocodile not only pulled him into the water, but rolled him over. See Exhibit B.

Tragic "accidents" at Chinyembe seemed to accrue to Rudolph's benefit. Just as with his wife's death at Chinyembe, there was a significant financial and personal upside to Rudolph losing the tip of his thumb. In 2016, Rudolph profited from several insurance policies on Bianca's life and used freedom from his marriage to pursue life with his mistress. In 2006, he profited from at least three separate personal disability policies and used freedom from practicing dentistry to pursue his big game hunting around the world. Because Rudolph could not practice dentistry without the tip of his thumb, one insurer paid him approximately $14,500 per month, another paid about $8,750 a month, and the third paid him approximately $6,000 per month. Since 2006, Rudolph has collected at least $3.5 million in disability insurance from the crocodile "accident." The "accident" led to probably the best outcome imaginable: the injury specifically disabled Rudolph from working—he could no longer physically practice dentistry in an office— but he could continue to draw profits from his ownership interests in dental businesses from anywhere in the world while continuing to pursue his passion for hunting without impairment.

## ARGUMENT

To prove foreign murder, the government must prove (among other things) that the defendant killed his victim with malice aforethought and premeditation. *See* Pattern Crim. Jury

Instr. 10th Cir. 2.52. "Malice aforethought" requires that Rudolph acted "deliberately and intentionally" or "with callous and wanton disregard for human life." *Id.* Premeditation demands that the killing was "the result of planning or deliberation." *Id.* And the accessory-after- the-fact charge against Milliron requires proof that Rudolph killed Bianca with those same mental states.

The mail fraud charges against Rudolph require proof that, with specific intent to defraud, he devised (or intended to devise) a fraudulent scheme to obtain money or property through means of materially false or fraudulent pretenses, representations, omissions, or promises. *See generally* Pattern Crim. Jury Instr. 10th Cir. 2.56. The government's theory is that Rudolph devised a scheme to kill his wife in remote Africa and then claim the life insurance proceeds by lying and omitting the truth about how she died. Because the only people in the cabin when Bianca died were she and Rudolph, the proof that Rudolph murdered her and defrauded insurers must rely on the circumstances leading up to her death, as well as prior and subsequent actions suggesting that her death was planned.

The evidence that Rudolph previously succeeded in defrauding insurers with an accident at Chinyembe is exactly the sort of probative evidence that Rule 404(b) is designed to admit. "Extrinsic acts evidence may be critical to the establishment of the truth as to a disputed issue, especially when the issue involves the actor's state of mind and the only means of ascertaining that mental state is by drawing inferences from conduct." *Huddleston v. United States*, 485 U.S. 681, 685 (1988) (discussing 404(b) evidence).

Rule 404(b) is a rule of inclusion. *United States v. Henthorn*, 864 F.3d 1241, 1248 (10th Cir. 2017). It admits "all evidence of other crimes or acts except that which tends to prove *only* criminal disposition." *United States v. Merritt*, 961 F.3d 1105, 1112 (10th Cir. 2020) (emphasis in original). Other acts evidence is admitted unless solely used to prove that the charged crime

conforms to the defendant's character. Fed. R. Evid. 404(b)(1). It is admissible to prove "intent,

preparation, plan, knowledge [and] lack of accident." Fed. R. Evid. 404(b)(2).

The four prerequisites for admission of other acts evidence are:

(1) the evidence must be offered for a proper purpose under Rule 404(b);

(2) the evidence must be relevant;

(3) the probative value of the evidence must not be substantially outweighed by
its potential for unfair prejudice under Rule 403; and

(4) if requested under Rule 105, the court must instruct the jury that the evidence
is to be considered only for the purpose for which it was admitted.

*Henthorn*, 864 F.3d at 1247-48.

When those prerequisites are met, the evidence must be admitted. *United States v. Davis*,

636 F.3d 1281, 1298 (10th Cir. 2011) ("[I]f the other act evidence is relevant and tends to prove

a material fact other than the defendant's criminal disposition, it is offered for a proper purpose

under Rule 404(b) and may be excluded only under Rule 403.").

Those prerequisites are met here.

### III. The evidence that Rudolph shot off his thumb at the Chinyembe hunting camp in 2006 to defraud insurers out of millions is admissible Rule 404(b) evidence.

The evidence that Lawrence Rudolph successfully defrauded his disability insurers by

shooting off his own thumb at Chinyembe in 2006 should be admitted under Rule 404(b) to

establish intent, preparation, plan, knowledge, and lack of accident. His knowledge that the

remote nature of Chinyembe, the limited resources available to local law enforcement, and the

site's inherent expense and difficulty to any American insurer's claim investigation, made it

possible for him to defraud his insurers in 2006 makes it more likely that he intentionally chose

Chinyembe to kill his wife in 2016 as part of his plan to avoid detection and defraud insurers

once more. That the 404(b) evidence makes it more likely that his wife's death at Chinyembe is

the result of such a plan also reduces the likelihood that her death was an accident. These are

proper 404(b) purposes for admitting the evidence.

### A. The crocodile incident is relevant for several proper purposes that do not rely upon any character inferences.

It is the government's burden to establish an evidentiary hypothesis by which the

defendant's earlier acts are relevant. *United States v. Harrison*, 942 F.2d 751, 759 (10th Cir.

1991). It must set out a clear and logical connection between the earlier act and the case being

tried. *Id.* Evidence is relevant if it ends to make a necessary element of an offense more or less

probable. *Henthorn*, 864 F.3d at 1241. The following evidentiary hypothesis establishes the

relevance of Rudolph's earlier fraud to the present case:

Rudolph successfully defrauded insurers of millions of dollars by shooting off the tip of his own thumb at the Chinyembe hunting camp in the remote bush of Zambia and falsely claiming that the lost tip was the result of a crocodile attack.



That fraud showed him that he could get away with defrauding U.S. insurers of significant proceeds by staging an accident at Chinyembe. Witnesses were few, local investigative resources limited, and the remote location not only hindered outside investigation, but rendered it cost prohibitive. A staged accident at Chinyembe would be investigated less thoroughly.



His knowledge that he could more readily get away with staging an accident at Chinyembe made it more likely that the shooting of his wife at the same location ten years later was not an accident, but part of his plan to kill her at that specific location and defraud insurers once more.



Planning and preparation are evidence of the essential elements of malice aforethought and premeditation required to convict Rudolph of murder. That his wife's death was the result of murder, and not an accident, is an essential element to the foreign murder, mail fraud, and accessory-after-the-fact charges.

The 2006 staged accident to defraud his insurers proved to be a dry run for another lifestyle-enhancing payoff years later. Because the above logic chain does not rely upon Rudolph acting in conformity with any alleged character trait, it is permissible 404(b) evidence. *Henthorn*, 864 F.3d at 1251-52 (discussing logical independence from character inferences).

### B. A jury could find by a preponderance of the evidence that Rudolph shot off his thumb tip at Chinyembe in 2006 to defraud insurers.

The government's logic chain necessarily depends on the conditional fact that Rudolph was not attacked by a crocodile in 2006, but rather staged the injury by shooting off his own thumb. Whether that conditional fact for admission—that he did shoot off his thumb—has been established is governed by Federal Rule of Evidence 104. *See Henthorn*, 864 F.3d at 1254; *Huddleston*, 485 U.S. at 689-91. While proof beyond a reasonable doubt is required to establish Rudolph's guilt, the standard for admissibility under Rule 104 is much lower.

The government needs to show only that "a jury could reasonably" conclude that Rudolph defrauded insurers by shooting off his thumb. *Id.* at 689-90. In that sense, this court acts in the same capacity that it does in deciding a Rule 29 motion. It is deciding whether "sufficient evidence" exists to find the earlier events occurred, which does not entail deciding the credibility of witnesses. *Id.* at 685, 690; *see also United States v. York*, 933 F.2d 1343, 1351 (7th Cir. 1991)

(recognizing inquiry is no different than sufficiency challenge), overruled on other grounds by *Wilson v. Williams*, 182 F.3d 562, 567 (7th Cir. 1999); *Huddleston*, 485 U.S. at 690 ("the trial court neither weighs credibility nor makes a finding that the Government has proved the conditional fact by a preponderance of the evidence"). Rather, under sufficiency review, any inferences must be drawn in the government's favor. *United States v. Hooks*, 780 F.2d 1526, 1531 (10th Cir. 1986).

The lone difference between a Rule 104 ruling here and a Rule 29 decision is that the Rule 104 standard for admission is lower. Rule 29 requires sufficient evidence to support a finding beyond a reasonable doubt. But Rule 104(b) needs only sufficient evidence to meet a preponderance standard. *Huddleston*, 485 U.S. at 690. Once this low threshold for admissibility is met, it is for the jury to decide whether Rudolph shot off his thumb and what weight to give that finding in answering whether his wife's death at Chinyembe was part of a plan to murder her so that he could finance a lavish lifestyle with his mistress.

Challenging the sufficiency of evidence is a "heavy burden," *York*, 933 F.2d at 1352, which Rudolph cannot meet. He walked *away* from the river to go fishing, because walking along the river downstream would have taken him past the professional hunter, who would not have let him leave camp alone. He went to the specific fishing site the professional hunter told him to avoid because of crocodiles. He did so after obsessively talking about crocodiles the night before. Instead of going on his high-cost buffalo hunt, he spent the week drinking and smoking marijuana in the bush while working up the courage to shoot his thumb. He already had a specific hospital in mind for treatment. And the observable facts don't suggest a crocodile attack:

- His injuries were more consistent with a bullet and self-inflicted stab wounds— powder burns on his hand and small leg cuts—than with a crocodile attack.

- His clothes were damp and clean, rather than drenched and dirty.

- His jeans were not ripped in a jagged manner, but were cut in clean lines.

- It was implausible that a crocodile drug him in by his thumb without detaching it.

- He was oddly calm for twice being allegedly taken violently into the water.

- And he was uninterested in taking photographs of the immediate injury that could be used to substantiate his claim and aid any later medical treatment.

Even if a reasonable jury could conclude that a crocodile did attack Rudolph, what matters is that it could also find by a preponderance standard that he actually shot off his thumb for the disability insurance. *Accord Henthorn,* 864 F.3d at 1254 ("[w]hen the relevance of evidence depends on whether a fact exists," Rule 104(b) requires proof "sufficient to support a finding that the fact does exist"); *Lisenba v. California*, 314 U.S. 219, 225, 227-28 (1941) (admitting evidence that first wife drowned in bathtub); *see also United States v. Mayle*, 334 F.3d 552, 562-63 (6th Cir. 2003) (sufficient evidence that Newman was murdered even though no direct evidence of murder or that he was even dead).

It should be noted that an evidentiary hearing is not necessary to determine the admissibility of the proposed 404(b) evidence. A proffer of the evidence is sufficient to determine the question of admissibility. Fed. R. Evid. 104(b) ("The court may admit the proposed evidence on the condition that the proof be introduced later."); *see also* Fed. R. Evid. 104(a); 1101(d)(1) (the rules of evidence do not apply to a preliminary question of fact regarding admissibility); see also *Henthorn*, 864 F.3d at 1254 (reviewing "proffered evidence" in considering whether conditional fact was proved for purposes of Fed. R. Evid. 104(b)).

### C. The probative value of the evidence is not substantially outweighed by unfair prejudice.

Exclusion of evidence under Rule 403 "is an extraordinary remedy and should be used sparingly." *Henthorn*, 864 F.3d at 1256. "[I]t is not enough that the risk of unfair prejudice be

greater than the probative value of the evidence; the danger of that prejudice must *substantially* outweigh the evidence's probative value." *Id.* (emphasis in original). In balancing the probative value and prejudice, the court must give the evidence "its maximum reasonable probative force and its minimum reasonable prejudicial value." *Id.*

Rudolph cannot show that introducing evidence of the staged 2006 accident is unfairly prejudicial. To be unfair, the prejudice must come from an emotional response or adverse effect on the jury's attitude that is *wholly apart* from the jury's judgment as to the defendant's guilt or innocence. *Henthorn*, 864 F.3d at 1256. As in *Henthorn*, if the jury views the crocodile incident as an accident, then it will have no adverse prejudicial effect on him. *Id.* Indeed, it may even garner sympathy for him. But if the jury concludes that he staged an accident at Chinyembe, the prejudice is tied to its probative value—namely that Rudolph learned Chinyembe could be an effective location for getting away with insurance fraud by staging such an accident.

The probative value of the 404(b) evidence here is quite high. Given the absence of direct witnesses to Bianca's shooting, the value of the crocodile fraud in establishing that Rudolph chose remote Chinyembe as a location to murder his wife is highly probative of his intent, planning, preparation, and lack of accident. *Old Chief v. United States,* 519 U.S. 172, 184–85 (1997) (scarcity of evidence on point increases its probative value in Rule 403 balancing)).

The final prerequisite for admission of the evidence—a 404(b) instruction—will be satisfied by giving the Tenth Circuit's pattern instruction at trial if requested by the defense.

## CONCLUSION

The government notifies this court and the defendant that it intends to offer evidence at trial of the circumstances surrounding Rudolph's insurance fraud scheme at Chinyembe in 2006 when he falsely claimed that he was attacked by a crocodile.

Respectfully submitted,

COLE FINEGAN
United States Attorney


By:    */s Bryan Fields*          By:    /s *E. Garreth Winstead*          By:    /s *J. Bishop Grewell*
Bryan Fields                      E. Garreth Winstead                      J. Bishop Grewell
Assistant United States Attorney  Assistant United States Attorney         Assistant United States Attorney
U.S. Attorney's Office            U.S. Attorney's Office                   U.S. Attorney's Office
1801 California St. Suite 1600    1801 California St. Suite 1600           1801 California St. Suite 1600
Denver, CO 80202                  Denver, CO 80202                         Denver, CO 80202
(303) 454-0100                    (303) 454-0100                           (303) 454-0100
Bryan.Fields3@usdoj.gov           Garreth.Winstead@usdoj.gov               Bishop.Grewell@usdoj.gov
Attorney for the Government       Attorney for the Government              Attorney for the Government


## CERTIFICATE OF SERVICE

I hereby certify that on 16th day of May, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to any and all counsel of record.


*s/ J. Bishop Grewell*
United States Attorney's Office