IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Judge William J. Martinez

Criminal Case No. 22-CR-0012-WJM

UNITED STATES OF AMERICA,

v.

1. **LAWRENCE RUDOLPH**,
2. LORI MILLIRON,
_____/

**LAWRENCE RUDOLPH'S RESPONSE IN OPPOSITION TO THE GOVERNMENT'S NOTICE OF 404(B) EVIDENCE (Doc. 118)**

Recognizing the "circumstantial nature" of its case, Doc. 118:1, the government seeks to introduce uncharged and unproven conjecture that Dr. Rudolph did not lose part of his thumb to a crocodile bite on safari 16 years ago but instead deliberately blasted it off with a gun. But the government's theory is simply not true—Dr. Rudolph did not shoot his own thumb off. Regardless, the government's theory does not "establish intent, preparation, plan, knowledge, and lack of accident," Doc. 118:10. Instead, it invites a forbidden propensity inference under Rule 404. The government's proffered theory also violates Rule 403. This so-called evidence should be excluded.

In furtherance of this unnecessary and improper mini-trial, the government will seek to prove its case using two of three witnesses it disclosed. Clint Burton, a hunter who guided Dr. Rudolph on the 2006 safari, maintained then and for years later (as shown in government-produced correspondence) that a crocodile bit the thumb off, but he will now say he doubts his own account. And Denver medical examiner Jim Caruso will, if he survives *Daubert* vetting, say that based on two photos the government

showed him, the injury could not have been a bite. Jay Young, who runs a Colorado reptile park, told the FBI that "[t]he thumb injury looks like it could be a [crocodile] bite," FD-302 (19 Jan 2022), so the government decided not to call him. The defense expects to call three rebuttal witnesses including a medical expert. In sum, this hotly contested mini-trial will consume two or three trial days and yield only speculative innuendo of no legitimate probative value.

Lawrence Rudolph moves to exclude this evidence. First, the government's assertion that the 2006 injury was self-inflicted is barely supported speculation. Second, the incident is too remote in time to be probative of preparation or planning for the crimes charged. Third, the government's theory asks the jury to find Dr. Rudolph guilty through a forbidden propensity inference. Finally, its potential to unfairly prejudice the accused, confuse the issues, mislead the jury, and waste substantial time on a tangential mini-trial greatly outweighs any probative value.

### Legal Standards

As the proponent of other-act evidence, the government has the burden of laying a foundation that establishes relevancy. The government must adduce enough reliable evidence to allow the jury to "reasonably conclude that the act occurred and that the defendant was the actor." *Huddleston v. United States*, 485 U.S. 681, 689 (1988). Because other-act evidence often invites the jury to draw improper inferences about the accused's character, the inquiry "is not a simple evidentiary one, but rather goes to the fundamental fairness and justice of the trial itself." *United States v. Burkhart*, 458 F.2d 201, 205 (10th Cir. 1972).

To be relevant, such evidence must make a material fact more or less likely as a matter of logical reasoning that at no step relies on Dr. Rudolph being a person of bad character. *See Old Chief v. United States*, 519 U.S. 172, 178–79 (1997); *United States v. Henthorn*, 864 F.3d 1241, 1249, 1251 (10th Cir. 2017). Its "relevance cannot 'depend on a defendant likely acting in conformity with an alleged character trait' or require the jury to draw a 'chain of inference dependent upon a conclusion' about the defendant's character." *Henthorn*, 864 F.3d at 1251–52 (citing *United States v. Commanche*, 577 F.3d 1261, 1267, 1269 (10th Cir. 2009)).

To ensure that relevance is not dependent on an improper propensity inference, the 2020 amendment to Rule 404(b) requires the government to "articulate ... the permitted purpose for which the prosecutor intends to offer the evidence ***and the reasoning that supports the purpose***." Rule 404(b)(3)(B) (emphasis added). This was added to codify what some courts of appeals had already required:

> [I]t's not enough for the proponent of the other-act evidence simply to point to a purpose in the "permitted" list and assert that the other-act evidence is relevant to it. Rule 404(b) is not just concerned with the ultimate conclusion, but also with the chain of reasoning that supports the non-propensity purpose for admitting the evidence. In other words, the rule allows the use of other-act evidence only when its admission is supported by some propensity-free chain of reasoning.

*United States v. Gomez*, 763 F.3d 845, 856 (7th Cir. 2014) (*en banc*) (citations omitted).

Otherwise admissible evidence must be excluded when, as here, the risks of unfairly prejudicing the accused, confusing the issues, wasting time, or misleading the jury far outweigh its legitimate probative value. *See* Fed. R. Evid. 403. In this context, probative value refers to *marginal* probative value—the additional persuasive force of

3

the evidence compared with any other evidence on the same point. "The probative worth of any particular bit of evidence is obviously affected by the scarcity or abundance of other evidence on the same point." *Old Chief*, 519 U.S. at 185 (citation omitted). "'Unfair prejudice' ... means an undue tendency to suggest decision on an improper basis," which "certainly include[s] ... generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged (or, worse, as calling for preventive conviction even if he should happen to be innocent momentarily)." *Id.* at 180–81 (1997) (citation omitted).

## Argument

### I. The government's proffer is insufficient to support a rational finding that Dr. Rudolph shot off the top of his own thumb.

As already explained, the government plans to call two witnesses. The first, Burton, consistently maintained for years, including in a sworn statement, that Dr. Rudolph was injured by a crocodile bite. He changed his story only recently, which shows only that the unfair and scandalous media coverage surrounding the indictment in this case influenced his thinking. The second, Dr. Caruso, is not an expert on crocodile bites specifically but a medical examiner in Denver who sees his job as "assisting law enforcement...." Caruso Q&A Donor Alliance (https://www.donoralliance.org/newsroom/donation-essentials/coroners-corner-dr-james-caruso-denver-co-medical-examiner/) (3 Apr 2017). He concludes only that the wound is "consistent with a gunshot wound" and that he "did not believe a crocodile would leave the tip of the thumb attached under these circumstances." FD-302 (21 Mar

4

2022). That is well short of an assertion that he knows what caused the injury and fails to afford a sufficient basis for a jury conclusion as to the cause under *Huddleston*, *supra*.

Especially when considered in light of other available evidence, including that crocodile expert and frequent bite victim Jay Young told the FBI the injury *was* caused by a crocodile, it is clear that the jury could not conclude with any rational confidence that Dr. Rudolph shot off his the top of his own thumb. All evidence of the 2006 incident is thus inadmissible under *Huddleston*. Furthermore, because the proffer of the doctor's testimony amounts to nothing more than *ipse dixit*, if the testimony were deemed admissible under Rule 404(b), Dr. Caruso would have to be vetted in a preliminary hearing to determine how he can know what caused an injury that occurred 16 years ago, wasting even more time on a tangential matter. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) ("[W]here [proffered expert] testimony's factual basis, data, principles, methods, or their application are called sufficiently into question, the trial judge must determine whether the testimony has "a reliable basis in the knowledge and experience of the relevant discipline."). This conjecture is not the product of "well-known techniques routinely used" to determine whether a crocodile attacked a person, such that a hearing on the doctor's methodology would be unnecessary. *United States v. Nichols*, 169 F.3d 1255, 1263 (10th Cir. 1999).

## II. No evidence indicates that Dr. Rudolph was planning or preparing to murder his wife in 2006, so the evidence is not admissible for those pretextual purposes.

The proffered evidence, assuming it to be true, is not relevant to any preparation or plan. The government never claims that in 2006 Dr. Rudolph was thinking of committing murder (much less preparing or planning to do so) ten years later. Instead, it tries to draw an *ex post* connection between the incidents by asserting that "[t]he 2006 staged accident ... *proved to be* a dry run ... ." DE118:12 (emphasis added). That carefully couched phrasing fails to clearly articulate, as required, how the 2006 incident entailed any preparation or planning for the alleged 2016 murder. *See* Fed. R. Evid. 404(b)(3)(B) (requiring greater specificity).

Not only is there no suggestion or evidence that Dr. Rudolph undertook the alleged 2006 fraud with any thought about what he might do a decade later but, as common sense dictates, the ten-year gap itself indicates that he did not. *See United States v. Lynn*, 856 F.2d 430, 435 (1st Cir. 1988) (holding that six-year gap between extrinsic act and charged crime "suggests even more strongly that the two acts" were not part of a common scheme or plan). Unlike in *Henthorn*, *supra*, in which the accused's second wife died in an incident bearing "marked similarities" to how his first wife died, 864 F.3d at 1249–51, the only similarity between the extrinsic and charged acts in this case is that both occurred during a hunting trip and both occasioned insurance claims. The first incident, the government asserts, was a self-inflicted injury while the second, the government alleges, constituted murder. Given the lack of

similarities, the ten-year "temporal distance," *id.* at 1251, between the two incidents weighs heavily against admitting the proffered evidence.

The claim that both incidents were motivated by a desire to collect insurance proceeds does not mean they were part of a plan or that one was preparation for the other. The First Circuit rejected the government's identical argument in *United States v. Varoudakis*, 233 F.3d 113 (1st Cir. 2000). George Varoudakis was indicted for hiring someone "to burn down his failing restaurant, Destinations, in order to collect the insurance proceeds." *Id.* at 116. The government introduced "testimony by Varoudakis's long-time girlfriend and co-conspirator in the Destinations arson, Cheryl Britt, that she saw Varoudakis set fire to his leased car sixteen months before the Destinations fire." *Id.* The Court agreed "that the evidence should have been excluded under Rule 403, and that the error was not harmless" and vacated the conviction. *Id.* Finding that "Britt's testimony does not suggest a plan connecting the car fire to the Destinations fire," the court concluded that no evidence suggests that 'a continuing or connected scheme linked the car fire and the Destinations fire." *Id.* at 119. Likewise, there is nothing to support that the 2006 injury and the alleged 2016 murder were part of a progression of acts comprising a single plan or that one was a rehearsal for the other.

### III. Any other use of the evidence regarding the 2006 injury depends on a forbidden propensity inference, rendering it inadmissible.

Evidence relevant to intent, knowledge, or lack of accident only on the supposition that a person who acted intentionally, knowingly, or deliberately before is likely to do so again is barred by Rule 404(a), notwithstanding Rule 404(b). The prosecution's claim that the 2006 injury is relevant to intent, knowledge, or lack of accident impermissibly depends on Dr. Rudolph and would impermissibly "require the jury to draw a 'chain of inferences dependent upon a conclusion' about the defendant's character," *Henthorn*, 864 F.3d at 1251 (quoting *Commanche*, 577 F.3d at 1267, 1269)—specifically that he has a propensity to commit insurance fraud at Chinyembe.

"Spotting a hidden propensity inference is not always easy." *Gomez*, 763 F.3d at 856. "[T]he district court should not just ask *whether* the proposed other-act evidence is relevant to a non-propensity purpose but *how* exactly the evidence is relevant to that purpose—or more specifically, how the evidence is relevant without relying on a propensity inference." *Id.*

Indeed, the Tenth Circuit reached different conclusions in *Henthorn* and *Commanche* by analyzing exactly ***how***, not whether, the 404(b) evidence was relevant to each case. In *Commanche*, the court overturned a conviction for felonious assault because the district court allowed prosecutors to introduce evidence of two prior similar assaults. Those assaults were relevant only to show something about Commanche—that he was disposed to violence: "That Commanche has twice been convicted of battering people in the past using a sharp object has no direct bearing on

whether he acted in self defense in this particular instance." 577 F.3d at 1268. *Henthorn* distinguished *Commanche* because the acts at issue in that case were so similar in every pertinent detail, that together they gave rise to an inference that it is nigh impossible that both were accidents: "Our case is thus more akin to a hypothetical version of *Commanche* in which the defendant was involved in several fights and always claimed self-defense. At some point, the court may reasonably begin to question whether the defendant actually acted in self-defense and whether his use of force was justified." 864 F.3d at 1253.

Thus, in *Henthorn*, the argument was, *To believe that Henthorn's second wife died accidentally, you have to believe he is almost singularly unlucky because his first wife not only also died in a freak accident but died in extraordinarily similar one.* This argument does not depend on any propensity inference, only on the extreme unlikelihood that two nearly identical, uncommon tragedies befell the same person twice. *See* 864 F.3d at 1252 & n.8 (discussing the doctrine of chances which "'tells us that highly unusual events are highly unlikely to repeat themselves. The man who wins the lottery once is envied; the one who wins it twice is investigated.'" (citation omitted)). That argument has no application in this case.

The government's argument here, in contrast, is just a straight propensity argument: *Whenever Dr. Rudolph commits insurance fraud, he goes to Africa to stage an accident.* In the government's phrasing, the 2006 injury "showed [Dr. Rudolph] that he could get away with defrauding U.S. insurers of significant proceeds by staging an accident at Chinyembe" because it revealed the obvious fact that Chinyembe is remote:

9

"Witnesses were few, local investigative resources limited ... ." DE118:11. But that is still the same argument the Tenth Circuit rejected in *Commanche*: *Whenever Commanche assaults someone, he uses a sharp instrument.* Whether this use is labeled "intent" or "knowledge" or something else, it reduces to a quintessential propensity argument because its relevance depends on a supposed propensity to commit similar crimes in the same place for the same reasons. In *Varoudakis*, discussed *supra*, the First Circuit detailed why such arguments fail Rule 404:

> When prior bad act evidence is offered to prove a motive for the crime, courts must be on guard to prevent the motive label from being used to smuggle forbidden evidence of propensity to the jury. That is the problem here. As proof of motive, the car fire testimony is offered as circumstantial evidence that Varoudakis committed the Destinations fire. It involves an inference of propensity as a necessary link in the inferential chain. Put most simply, the government argues that Varoudakis's commission of the car fire arson in response to financial stress makes it more likely that he committed the restaurant arson in response to financial stress. Contrast this forbidden inference with the permissible inference to be drawn in a case in which the prior bad act—say, a botched robbery by the defendant that was frustrated by the ineptitude of his cohort—provided the motive for the defendants subsequent assault on his cohort. There the prior bad act would provide circumstantial evidence of the commission of the assault without the involvement of any propensity inference.
>     In a case that also involved arson of a restaurant owned by the defendant, the Eleventh Circuit excluded evidence that the defendant, in a separate incident, threatened to "burn out" a tenant after she did not pay a full month's rent. *See United States v. Utter*, 97 F.3d 509, 514 (11th Cir.1996). As in this case, the government argued that the tenant's testimony would show "how the defendant reacts to financial stress." The court rejected this rationale, stating: "This is the type of character and propensity evidence prohibited by Rule 404(b)." *See also Lynn*, 856 F.2d at 436. For the same reason, we find error in the district court's financial motive rationale.

233 F.3d at 120 (citations omitted); *see also Utter*, 97 F.3d at 515 ("Given that this was an extremely close case built entirely upon circumstantial evidence, we cannot conclude that the district court's error in admitting evidence of the Kentucky fire and Utter's threat to burn out his tenant constitutes harmless error.").

The proffered other-act evidence is nothing more than evidence of bad character—*i.e.* a supposed tendency to commit insurance fraud in Chinyembe—and is inadmissible.

### IV. Even if the evidence had relevance independent of a propensity inference, Rule 403 requires excluding the 2006 injury from this trial.

Any probative value that the proffered evidence relating to the 2006 injury has is substantially outweighed by the risks of unfair prejudice, waste of time, and misleading or distracting the jury from the evidence directly pertinent to the charges. Even if it had relevance independent of a propensity inference, the proffered evidence nonetheless carries tremendous risk that the jury will impermissibly, despite any limiting instructions, assume that Dr. Rudolph's earlier insurance claims in connection with an injury on safari mean that he is an inveterate fraudster. "Rule 403 does much of the heavy lifting in the admissibility analysis by excluding other-act evidence that may be slightly probative through a non-propensity theory but has a high likelihood of creating unfair prejudice by leading a jury to draw conclusions based on propensity." *Gomez*, 763 F.3d at 857.

A limiting instruction is not going to fix that problem in this case. "Prosecutors sometimes argue that we need not worry because district judges give limiting

11

instructions. Most of these are formulaic, however, and of little help—and they may make things worse. Telling juries not to infer from the defendant's criminal record that someone who violated the law once is likely to do so again is like telling jurors to ignore the pink rhinoceros that just sauntered into the courtroom." *United States v. Jones*, 455 F.3d 800, 811 (7th Cir. 2006) (Easterbrook dissenting). That reasoning applies here even though the government's evidence resulted in no prosecution. The jury will see the propensity inference that the government wants them to draw as the *only* possible relevance of this evidence.

Indeed, the evidence will only confuse the issues in the case and mislead the jury into thinking the 2006 incident coupled with the allegations in this case leave little reason to focus on the details of the evidence directly pertinent to the charged crimes. The fact that the 2006 injury occurred a full 10 years before the charged conduct allegedly occurred exacerbates the unfairness. *See United States v. Mothershed*, 859 F.2d 585, 590 (8th Cir. 1988) ("[Even] if the evidence were relevant to intent, its relevance would be so slight, when compared with the devastatingly prejudicial impact of such evidence in the mind of a jury, that to admit it would be an abuse of discretion under Rule 403, especially in view of the great age of the conviction.").

Because the other-act evidence will entail at least two trial days (and more likely three), take at least five witnesses to cover, and involve difficult credibility issues particularly with regard to Burton who only recently changed his story to accord with the prosecution's conjecture, it will overwhelm the jury's capacity to compartmentalize it to any proper purpose it might serve. In discussions with the government, it appears

that it intends to call at least 30 witnesses (including over 10 expert witnesses), not including this incident. The defense also intends to put on a case, including rebuttal experts. The parties are working to fit the trial into the allotted time by this Court. But litigating this mini-trial within the larger murder trial will be an enormous waste of time. It does not even take account of the *Daubert* hearing necessary to vet Dr. Caruso's methods— all purportedly to show that Chinyembe is a remote place with a limited police presence. This fact is beyond reasoned debate and the defense hereby offers to stipulate to it, reducing the probative worth of this proffered evidence to nothing. *See Old Chief*, 519 U.S. at 185 (requiring court to consider other evidence on the same point, including an offer to stipulate, in assessing marginal probative value under Rule 403).

## Conclusion

The government seeks to bridge the notable gaps in its murder case built on expert conjecture with yet more expert speculation about an unrelated incident that occurred 16 years ago. The probative force of this innuendo depends entirely on the jury drawing the impermissible propensity inference the government's other-act evidence overtly invites. This will consume about 20% of the trial days allocated to this cause—only to confuse the issues, mislead the jury into believing that this 16-year-old event has any legitimate relevance to this murder prosecution, and unfairly prejudice Dr. Rudolph by inviting jurors to convict him based on an impermissibly implied propensity to commit insurance fraud. This evidence is inadmissible.

**Certificate of Service**

This motion was served on all counsel of record through CM/ECF on May 26, 2022.

        Respectfully submitted,

        MARKUS/MOSS PLLC
        40 N.W. Third Street
        Penthouse One
        Miami, Florida 33128
        Tel: (305) 379-6667
        Fax: (305) 379-6668
        markuslaw.com

        By:   /s/ David Oscar Markus
              David Oscar Markus
              Florida Bar Number 119318
              dmarkus@markuslaw.com

              /s/ A. Margot Moss
              A. MARGOT MOSS
              Florida Bar Number 091870
              mmoss@markuslaw.com