IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 22-cr-00012-WJM

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. LAWRENCE RUDOLPH and
2. LORI MILLIRON,

    Defendants.

## GOVERNMENT'S REPLY IN SUPPORT OF ITS RULE 404(b) EVIDENCE

The United States replies in support of admitting its Rule 404(b) evidence.

### I. The government's proposed 404(b) evidence is sufficient for a jury to conclude by a preponderance that Rudolph shot off his thumb at Chinyembe in 2006.

Rudolph first argues that the government has not provided sufficient evidence to conclude that he shot off his thumb in 2006. ECF 130 at 4–5. He reaches that conclusion by challenging the credibility of the government's witnesses. *Id.* (discussing Burton's changed story and Dr. Caruso's work with law enforcement). But that is not a proper inquiry for admissibility. As the government's notice explained (ECF 118 at 12–13), credibility inferences must be drawn in its favor when assessing the sufficiency of the evidence under Rule 104(b). His claim that the government offers only "barely supported speculation" (ECF 130 at 2) is rebutted by the facts proffered in the government notice and his failure to engage with that proffer. ECF 118 at 5–8, 13–14.

Credibility is a jury question. And Rudolph is free to challenge the credibility of the government's witnesses at trial. Rudolph also misunderstands the standard for admissibility

1

when he suggests certainty about the accident is required. ECF 130 at 5 ("[t]hat is well short of an assertion that he knows what caused the injury"). The combination of Dr. Caruso and Mr. Burton's testimony is sufficient evidence for a reasonable jury to conclude that Rudolph shot off his thumb under a preponderance standard. ECF 118 at 12–14 (discussing standard).

Rudolph misstates the potential testimony of Jay Young. He claims that Young "told the FBI the injury was caused by a crocodile." ECF 130 at 5. That is not what Young said. He said that "[t]he thumb injury looks like it *could* be a [crocodile] bite, but [he] could not say for sure." He described Rudolph's narrative—based on the pictures alone—as "plausible." But, if it was a crocodile, he said that it would have been four feet long and only able to pull an adult person into the river if that person was off balance. That makes it unlikely such a crocodile had the strength to roll Rudolph over as Rudolph testified it did. See ECF 118-2 at 3. Young also told the FBI: (1) that the tears in jeans from a crocodile bite would not be surgical, but jagged (compare ECF 118 at 7, 14 (discussing jeans)), and (2) if they bite for food, they don't let go.

Rudolph is free to call Mr. Young at trial. But given what Young has *actually said*, doing so may—like his fictional crocodile—come back to bite him.

## II. The government's theory does not rely on an improper character inference.

Rather than engaging with the theory of relevance carefully laid out by the government's logic chain in its 404(b) notice (Doc 118 at 11–12), Rudolph sets up a straw-man theory of relevance. He claims that the government's theory is that "he has a propensity to commit insurance fraud at Chinyembe" (ECF 130 at 8) or that whenever he commits insurance fraud, he has a propensity to go to Africa to stage an accident. ECF 130 at 9. And because propensity is involved, he claims that an impermissible inference is being drawn.

He's wrong.

2

First, the government's theory is not that he has a character for committing insurance fraud at Chinyembe. (Such a theory fails to understand what character even means. See below.) As laid out in its logic chain, the government's theory is that because Rudolph knew he could get away with insurance fraud at Chinyembe—due to his prior success—it is more likely that he chose that exact same location when he later decided to kill his wife for insurance. It's not that he has a character for choosing Chinyembe. It's that he deliberately chose Chinyembe because he knew its unique attributes had made his previous fraud successful. And that is evidence of a plan, preparation, knowledge, intent, and lack of accident.

Rudolph cannot substitute his own theory of the government's 404(b) evidence to impose a character inference on it. It doesn't matter if he can put forth a theory for the same evidence that does rely on character. Evidence is admissible, even if it can also be used to show a character inference, as long as it establishes an independent 404(b) purpose that does not rely on a character assessment. *Henthorn*, 864 F.3d at 1252 ("Evidence remains admissible even if it has the potential 'impermissible side effect of allowing the jury to infer criminal propensity,' so long as the jury '[i]s not required to make any such inferences in order to also'" reach the permissible theory of relevance.); *Huddleston*, 485 U.S. at 685 (Rule 404(b) "prohibits the introduction of evidence of extrinsic acts that might adversely reflect on the actor's character, *unless* that evidence bears upon a relevant issue in the case such as motive, opportunity, or knowledge.") (emphasis added).

Second, Rudolph fundamentally misunderstands what is meant by the evidence of "character or character trait" prohibited by Rule 404(b). The government's theory cannot be that Rudolph has a character for committing insurance fraud at Chinyembe or a character for choosing Chinyembe, because it isn't possible to have such a character trait. Rudolph creates this

3

confusion by simply substituting the word "propensity" in for "character." It is true that the case law often uses propensity and character interchangeably, but character refers to general propensities, like violence or greed, not specific propensities like repeatedly choosing a unique location or using a particular modus operandi.

The Tenth Circuit follows this distinction between general and specific propensities. In *United States v. Moran*, 503 F.3d 1135, 1145 (10th Cir. 2007), it recognized that it was relying on "a kind of propensity inference" to admit evidence of the defendant's past criminal offense. But that was not a problem because "the inference is *specific* and does not require a jury to first draw the forbidden *general* inference of bad character or criminal disposition." *Id.* (emphasis added); see also *Henthorn*, 864 F.3d at 1252:

> While the use of *Moran's* prior conviction to help prove the only challenged element of the charged offense (i.e., that Moran "knowingly possessed" the firearm) "involve[d] a kind of propensity inference (i.e., because he knowingly possessed a firearm in the past, he knowingly possessed the firearm in the present case)," we explained that the inference did "not require a jury to first draw the forbidden general inference of bad character or criminal disposition."

Accord *United States v. Commanche*, 577 F.3d 1261, 1267 (10th Cir. 2009) (identifying problem as one of "*general* character or propensity . . . .") (emphasis added).

Rule 404(b) is concerned with using repeated behavior to assume a defendant acted based on a certain predisposition. It is not concerned with using repeated behavior to establish that a defendant acted based on a specific, deliberative process. That latter inference is the sort that Rule 404(b) welcomes. Motive, intent, preparation, plan, knowledge, and lack of accident all rest on the assumption that the defendant is making decisions based on an active deliberative process, rather than on inherent tendencies.

The distinction between actions based on a deliberative process and those based on inherent tendencies is why it makes no sense for Rudolph to claim that the government violates Rule 404(b) by relying on "a propensity to commit insurance fraud at Chinyembe." ECF 130 at 8. A person cannot have a character trait for committing insurance fraud at a particular location. Such actions are the product of deliberation, not predisposition. The problem arises for 404(b) evidence when the only inference that can be drawn from the repeated behavior is that the defendant acted based on "a natural inclination; innate or inherent tendency." *United States v. Jones*, 389 F.3d 753, 757 (7th Cir. 2004), vacated on other grounds by 545 U.S. 1125 (2005); *United States v. Pollock*, 926 F.2d 1044, 1048 (11th Cir. 1991). That is what the courts mean when they talk about propensity under Rule 404(b). *Pollock*, 926 F.2d at 1048.

The difference between specific and general propensities under Rule 404(b) is illustrated by substituting the "character" forbidden by Rule 404(b) whenever Rudolph uses the word propensity. It doesn't make sense to have a "character to commit insurance fraud at Chinyembe" or a "character" of "go[ing] to Africa to stage an accident" or a "character to commit similar crimes in the same place for the same reasons." ECF 130 at 8, 9, 11. Indeed, his misunderstanding of the nature of character evidence leads him to incorrectly assert that the forbidden character inference in *Commanche* was that "[w]henever Commanche assaults someone, he uses a sharp object." ECF 130 at 10. The forbidden inference wasn't about using sharp objects. The forbidden inference was Commanche's "propensity for violence," 577 F.3d at 1267, 1271—a general character trait.

Rudolph references *United States v. Burkhart*, 458 F.2 201, 205 (10th Cir. 1972). But in *Burkhart*, the only similarity between the prior acts evidence and the charged crime was a violation of the same statute. *Id.* at 203–04; see also *United States v. Naranjo*, 710 F.2d 1465,

1468 (10th Cir. 1983) (recognizing "no similarity or connection" in *Burkhart* between the prior acts evidence and the charged act). Likewise in *United States v. Varoudakis*, 233 F.3d 113, 118 (1st Cir. 2000), and *United States v. Utter*, 97 F.3d 509, 513 (11th Cir. 1996), there was no similarity between a prior act of arson and a later act of arson, so the only inference was that defendants had a "propensity to commit arson."[1] But here there is a glaring similarity that suggests a plan rather than a criminal propensity: the exact same location—a location that Rudolph knew from his prior fraud was particularly susceptible to avoiding witnesses and substantial investigation by law enforcement and U.S. insurers.

The evidence here isn't being offered to show it's likely he committed insurance fraud again in 2016, because he committed insurance fraud in 2006.[2] It's being offered to show that he chose Chinyembe to kill his wife in 2016 as part of his fraud scheme, because he got away with fraud at the *exact same location* in 2006. Unlike in *Varoudakis, Gomez,* and *Utter*, the 404(b) evidence is not relevant because it shows a propensity to commit the crime charged. It's relevant because it shows an active choice of the same location based on knowledge of that site's superior advantages in evading detection. That inference is similar to the permissible inference discussed in *Varoudakis*, 233 F.3d at 120:

> Contrast this forbidden inference with the permissible inference to be drawn in a case in which the prior bad act—say, a botched robbery by the

---

[1] A second 404(b) arson (the Kentucky fire) was also excluded in *Utter*, because the government offered insufficient proof that the defendant had committed it. 97 F.3d at 514.

[2] That also distinguishes this case from *United States v. Gomez*, 763 F.3d 845, 850-52 (7th Cir. 2014). In *Gomez*, the government sought to prove that the defendant was part of a conspiracy to sell cocaine a block away from his home based on his possession of a small amount of cocaine when he was arrested four week later. The defendant tried to blame the conspiracy on another man who lived at the same residence. *Id.* at 852. The theory was that his commission of one crime meant he likely committed the other—an argument that rested "on pure propensity: Because Gomez possessed a small quantity of cocaine at the time of his arrest, he must have been involved in the cocaine-distribution conspiracy." *Id.* at 863.

>    defendant that was frustrated by the ineptitude of his cohort—provided the
>    motive for the defendant's subsequent assault on his cohort. There the
>    prior bad act would provide circumstantial evidence of the commission of
>    the assault without the involvement of any propensity inference.

As with a botched robbery explaining why the defendant subsequently chose to assault his cohort, the successful fraud at Chinyembe explains why Rudolphy subsequently chose the same location when planning a crime again ten years later.

Section 404(b)'s text does not ban all inferences based on propensity, but rather inferences based on "character." Fed. R. Evid. 404(b)(1). (The word propensity appears nowhere in the text of Rule 404.) The government's logic chain shows how its theory of relevance does not rely on an underlying character inference. ECF 118 at 11–12. It is up to Rudolph to show how the government's theory—not some other theory he would impose on the evidence—relies on character. He has not done so.

### III. The government is relying on a prior knowledge theory and an identical similarity between Rudolph's crimes, rather than a *Henthorn* doctrine of chances/probability theory that relies upon general similarities.

Rudolph is correct on two points. He is correct that it is not the government's theory that he was planning his wife's 2016 demise back when he was engaged in the 2006 fraud. ECF 130 at 6 ("The government never claims that in 2006 Dr. Rudolph was thinking of committing murder (much less preparing or planning to do so) ten years later."). Rather, its theory is that he relied on the knowledge of his successful fraud in 2006 to pick the location for killing his wife when he later developed the plan to kill her at Chinyembe some years later.

He is also correct that the *Henthorn* "doctrine of chances" theory "has no application in this case." ECF 130 at 9. The government is not making a doctrine of chances argument. That is why the length of time between the two incidents—ten years—matters little and why the critical similarity here is different than the similarities in *Henthorn*. "[T]he degree to which factors such

7

as temporal distance and geographical proximity are important to a determination of the probative value of similar acts will necessarily depend on the unique facts of each case's proffered evidence." *Henthorn*, 864 F.3d at 1249. And there is "no absolute rule regarding the number of years that can separate offenses." *Id.* & n. 7 (collecting cases in excess of ten years).

In *Henthorn*, the theory was that two incredibly bizarre and similar acts—the death of one wife under a car and another falling from a cliff—were not likely to happen to the same person as the result of chance. See Exhibit A (logic chain used in Henthorn). Timing is important under that sort of "doctrine of chances" theory, because it goes to how improbable it is that similar events would occur in close temporal proximity to one another. In *Henthorn*, the length of time between the two acts—17 years—was balanced against the similarity between the acts in determining how improbable the acts would be. 864 F.3d at 1251–52 (discussing "logic of improbability" and weighing similarities against time).

But in this case the government is not relying on a doctrine of chances theory where reasonableness is tied to general similarities and a relative closeness in time of two events. It is relying on a knowledge theory: that Rudolph chose the location for killing his wife based on his experience with its remoteness and minimal investigation that allowed him to get away with fraud a decade earlier.

Under that theory, the temporal distance is not that relevant unless it would affect Rudolph's memory of how little investigation there was, the remoteness of the area, and the paucity of witnesses at the time he pulled off his first fraud. The only similarity that matters is that it was the *exact same* remote hunting camp with the same unique attributes that allowed him to get away with the prior insurance fraud. In contrast, *Henthorn* involved two different locations: a cliff in the mountains of Rocky Mountain National Park and a "a remote highway

8

approximately thirty miles from . . . southwest Denver." 864 F.3d at 1245, 1249. Because of the different locations, theory of relevance, and 17-year gap in *Henthorn*, many more similarities had to be established.

The government's theory of relevance isn't that this was all part of one big scheme or that the two crimes are uniquely improbable. It's that when Rudolph decided to kill his wife, he relied on his knowledge from the 2006 event to pick the location.

### IV.   The 404(b) probative value is not substantially outweighed by unfair prejudice.

Rudolph also argues that the evidence should be excluded under Rule 403 because (1) it will be unfairly prejudicial and (2) it will entail a mini-trial that will waste time and confuse the jury. ECF 130 at 11–12. Neither is true. And exclusion of evidence under Rule 403 "is an extraordinary remedy" that "should be used sparingly." *Henthorn*, 864 F.3d at 1256.

The proposed evidence is not unfairly prejudicial. Just as in *Henthorn*, if the jury views the first incident as an accidental crocodile bit, it will present no prejudice. And if they view it as an intentional act, then the prejudice will not come "wholly apart" from its judgment as to his guilt or innocence in the crime as a whole:

> As with the [tire-changing] incident, . . . the probative value of [the Grand Lake deck incident] is not substantially outweighed by the danger of unfair prejudice. If it were viewed by the jury as an accident, the deck incident would not reasonably provoke an emotional response adverse to Mr. Henthorn. If viewed by the jury as not having been an accident, then the deck incident presumably would adversely affect the jury's attitude toward Mr. Henthorn, but . . . not [ ] wholly apart from the jury's judgment as to his guilt or innocence of the crime charged.

864 F.3d at 1256. Indeed, the risk of unfair prejudice was much greater in *Henthorn* where a jury might find guilt based solely on the 404(b) that he had already killed one woman. There is not a similar risk that a jury will find Rudolph guilty of murder solely due to his prior disability fraud.

Nor is a confusing mini-trial required. The government seeks to offer five unique witnesses devoted to the 2006 incident and to elicit short segments of testimony from witnesses it had already planned to call regarding other relevant matters to testify about one 404(b) event. In contrast, *Henthorn* involved two different 404(b) events: the death of his first wife and an incident where he dropped a beam on his second wife. *Id.* at 1249–51.

A review of the *Henthorn* trial transcripts (District of Colorado docket: 1:14-cr-00448-RBJ) shows that those two events involved roughly two days of an eight-day trial.[3] Half of day five, all of day six, and a quarter of day seven involved 12 witnesses solely devoted to the *Henthorn* 404(b) evidence (Shockey, Murray, Burns, Devries, Montoya, Anderson, Kennedy, Bredehoeft, Duffy, McMahon, Weaver, Bowman). Roughly another half day of the trial involved other witnesses who had some 404(b) testimony in addition to testimony about the case in chief. The risk of confusing issues and wasting time here is tiny by comparison.

Nor should Rudolph be allowed to veto the 404(b) by arguing that he will need two days to rebut the government's one day of 404(b) evidence (with little support for his inflated assertion). But even three of 14 scheduled trial days (21.5%) is less than the 25% of trial used for 404(b) in *Henthorn*. And Dr. Caruso is but one of three medical witnesses and one of the approximately 12 experts the government anticipates testifying during the course of the trial, so the *Daubert* assessment burdens his testimony would bring are also minimal.

## CONCLUSION

The government's Rule 404(b) evidence should be admitted at trial.

Respectfully submitted,

---

3  Closing arguments started day nine, but could have been done on day eight, which ended at 11:30 am. See Doc. 145 & 147 in 1:14-cr-00448-RBJ. (Jury selection took the whole first day of the Henthorn trial.)

10

COLE FINEGAN
United States Attorney

By:   */s Bryan Fields*
Bryan Fields
Assistant United States Attorney
U.S. Attorney's Office
1801 California St. Suite 1600
Denver, CO 80202
(303) 454-0100
Bryan.Fields3@usdoj.gov
Attorney for the Government

By:   /s *E. Garreth Winstead*
E. Garreth Winstead
Assistant United States Attorney
U.S. Attorney's Office
1801 California St. Suite 1600
Denver, CO 80202
(303) 454-0100
Garreth.Winstead@usdoj.gov
Attorney for the Government

By:   /s *J. Bishop Grewell*
J. Bishop Grewell
Assistant United States Attorney
U.S. Attorney's Office
1801 California St. Suite 1600
Denver, CO 80202
(303) 454-0100
Bishop.Grewell@usdoj.gov
Attorney for the Government

**CERTIFICATE OF SERVICE**

I hereby certify that on 31st day of May, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to any and all counsel of record.

*s/ J. Bishop Grewell*
United States Attorney's Office