IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martinez

UNITED STATES OF AMERICA,

v.  Criminal Case No. 22-CR-0012-WJM

1.  **LAWRENCE RUDOLPH**,
2.  LORI MILLIRON.
_____/

**LAWRENCE RUDOLPH'S MOTION IN LIMINE**

Lawrence Rudolph files this motion in limine to bar three items at trial.

**I.   Images of hunting trophies are irrelevant and will substantially and unfairly prejudice the jury against Dr. Rudolph.**

The government has advised that, although it will not introduce any depictions of Dr. Rudolph with hunting trophies, it will seek to admit photographs of his late wife posing with slain animals. The government contends that these images demonstrate Mrs. Rudolph's hunting proficiency, which in turn makes it unlikely that her death was accidental. In fact, the photographs are not probative of Mrs. Rudolph's skill but misrepresent it. They suggest that she hunted independently when she in fact only hunted under the constant guidance of professional hunters, who helped her handle and use her weapon. Consequently, the photographs are more misleading than probative. Additionally, they evoke a strong feeling of revulsion in many people, making them far more unfairly prejudicial to Dr. Rudolph than probative on the cause of Mrs. Rudolph's fatal injury.

**A.   Photographs of hunting trophies are irrelevant to this case.**

Photographs taken of Mrs. Rudolph on safari do not show that she developed any hunting proficiency or expertise. Mrs. Rudolph hunted only as a tourist. She took only

occasional trips—the way people from Florida go skiing once or twice a year—and never hunted alone. Professional hunters always helped her with everything from loading her weapon to butchering and skinning the slain prey—the way fishing charters do everything for tourists from baiting hooks to releasing or cleaning fish. The photographs give no reason to believe that Mrs. Rudolph did more than aim, pull the trigger, and pose for a picture. In these photographs, the hunting expert is not in the frame but behind the lens.

Additionally, the government's argument depends on the implicit premise that most hunting accidents are due to inexperience rather than momentary carelessness. That is no more self-evidently true than it is that most car accidents are caused by inexperienced drivers rather than the momentary carelessness or inattention of experienced drivers. Because anyone can have an accident, Mrs. Rudolph's hunting experience is not relevant to this case and neither are photographs of her with slain animals.

To lay a proper foundation for admitting these photographs, the government would have to show (i) that Mrs. Rudolph did not depend on the professional hunters who accompanied her for constant help and (ii) that it is extremely unlikely for a tourist-hunter to accidentally discharge a weapon. Without *independent* evidence of those two as yet completely unsupported assumptions, the photographs have no tendency to show that Mrs. Rudolph's death was not accidental.

Moreover, if the government did have independent evidence on those necessary premises, the probative worth of the photos would be minimal *in light of that other evidence*. The probative value that counts under Rule 403 is *marginal* or *additional* probative value. *See Old Chief*, 519 U.S. at 185. Without evidence that Mrs. Rudolph was capable of hunting

2

without professional help *and* that hunters of her skill level very rarely accidentally discharge their weapons, the photographs are not at all probative. With that independent evidence, the photographs have only minimal probative value—but tremendous tendency to horrify jurors.

### B. Images of slain animals will mislead the jurors into drawing an unsupported conclusion and cause them to despise the accused unfairly.

Mrs. Rudolph's hunting photos must be excluded under Rule 403 because they will mislead the jury into thinking that she was more capable than she actually was and because the pictures are certain to have "an undue tendency to suggest decision on an improper basis," *Old Chief*, 519 U.S. at 180 (quoting Notes to Fed. R. Evid. 403)—*i.e.*, that people who hunt animals in the wild (like Dr. Rudolph) are repugnant. Many people find photographs of hunted animals gruesome, distressing, or enraging. Because the jury will necessarily be reminded again and again that Mrs. Rudolph always hunted with Dr. Rudolph, it is a foregone conclusion that the photographs will make some jurors want to punish Dr. Rudolph for hunting big game. This is a textbook example of unfair prejudice—a strong emotional desire by some jurors to punish the accused for uncharged innocent conduct.

While most news outlets covering this prosecution disabled reader comments, a tiny sampling from *Inside Edition*'s report[*] leaves no doubt that Dr. Rudolph cannot receive a fair trial if the government publishes even one photograph of a slain animal: "You don't want me on that jury, I'll push guilty just for killing the animals regardless." "Despicable … a man with this hobby is capable of anything!!!" "Should be in jail for murdering those animals." "Why would you want to kill a leopard? Just for that he should go to jail." "How people make a 'fun'

---

[*] *https://www.youtube.com/watch?v=94mykPk1e4I*

hobby out of traveling to kill beautiful animals, I'll never know. Of course he's a murderer, he's BEEN one." This unfair prejudice thus far outweighs the minimal probative value of the photographs.

II. **Some of the proffered testimony of Otto Westhassel is based on specialized knowledge and is therefore inadmissible as lay opinion.**

The government plans to call Otto Westhassel, the U.S. consular section chief in Zambia when Mrs. Rudolph died, to testify that her fatal injury was caused by a shot fired from 10 meters' distance. As the government's FBI 302 form makes explicit, this conclusion is "[b]ased on his training and experience" as "a U.S. Marine for more than 20 years."

> Westhassel said the injury was not caused by "a tight group." He expected a contact wound to be smaller and consistent with a tighter group of pellets. The injury was approximately six centimeters in diameter. Westhassel did not observe any gas burns or obvious tissue expansion around the primary wound. ***Based on his training and experience,*** he expected a contact injury to show these common characteristics.
> 
> Westhassel also observed what he believed was a second injury to Bianca's chest caused by an impact from the "wadding" from the shotgun cartridge. Based on the characteristics of the primary injury and the spacing between the primary injury and the wadding injury, Westhassel believed the distance between the muzzle and Bianca's chest at the time the shotgun was fired was approximately two to two-and-one-half meters. Based on his observations, Westhassel said, "She (Bianca Rudolph) could not have pulled the trigger."

FD-302 at 3–4 (19 May 2020) (emphasis added). Westhassel could claim to know this only by invoking *highly* specialized knowledge developed through years of using guns as well as "reading and researching about firearms." *Id.* (emphasis added).

An inference based even in part on "training and experience" or "reading and researching" is necessarily expert opinion. Lay witnesses—including government officials —can testify only to what they personally observed and to everyday inferences they drew

4

from those observations using common knowledge: "A person may testify as a lay witness only if his opinions or inferences do not require any specialized knowledge and could be reached by any ordinary person." *United States v. Bishop*, 926 F.3d 621, 627 (10th Cir. 2019) (quoting *United States v. Yeley-Davis*, 632 F.3d 673, 684 (10th Cir. 2011)).

Rule 701 confirms this fundamental, black-letter distinction. Lay opinion testimony must be "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. "Perception" as used in Rule 701 means the same as personal knowledge in Rule 602: "Limitation (a) is the familiar requirement of first-hand knowledge or observation." 1972 Advisory Committee Note to Fed. R. Evid. 701. Congress added requirement (c) in 2000 to make clear that lay witnesses cannot be used to skirt the rules governing expert testimony:

> Rule 701 has been amended to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing. Under the amendment, a witness' testimony must be scrutinized under the rules regulating expert opinion to the extent that the witness is providing testimony based on scientific, technical, or other specialized knowledge within the scope of Rule 702. By channeling testimony that is actually expert testimony to Rule 702, the amendment also ensures that a party will not evade the expert witness disclosure requirements set forth in Fed. R. Civ. P. 26 and Fed. R. Crim. P. 16 by simply calling an expert witness in the guise of a layperson.

Notes to Fed. R. Evid. 701 (2000) (citations omitted).

Westhassel's proffered opinion testimony fails all three prongs of the rule. His conclusion is not rationally based on his own observations but on specialized knowledge. He did not see the gun discharge. He claims to know how far away it was when it fired only by virtue of his decades of professional military training, experience, and research. "'Rule 701

5

does not permit a lay witness to express an opinion as to matters which are beyond the realm of common experience and which require the special skill and knowledge of an expert witness.'" *United States v. Draine*, 26 F.4th 1178, 1188 (10th Cir. 2022) (quoting *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1214 (10th Cir. 2011)).

Additionally, his testimony is not "helpful" to the jury in understanding the facts because all it does is tell the jury that Westhassel believes Dr. Rudolph is guilty beyond a reasonable doubt. Far from being helpful, this usurps the jury's function and thus violates not only Rule 701 but Rule 403 as well: "Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would *merely tell the jury what result to reach*, somewhat in the manner of the oath-helpers of an earlier day." 1975 Advisory Committee Note to Rule 704 (emphasis added); *see also United States v. Christian*, 673 F.3d 702, 710 (7th Cir. 2012) ("[A] witness should not be allowed to put an 'expert gloss' on a conclusion that the jurors should draw themselves."); *United States v. Grinage*, 390 F.3d 746, 751 (2d Cir. 2004) (rejecting the argument that a DEA agent could place three recordings admitted into evidence "in context" by testifying about recordings not played for the jury because, "rather than being helpful to the jury, it usurped the jury's function"); *United States v. Riddle*, 103 F.3d 423, 429 (5th Cir. 1997) (holding it was an abuse of discretion to allow an OCC examiner "to describe sound banking practices in the abstract" or to tell "the jury how the OCC viewed certain complex transactions" because "[h]e functioned not as a witness relaying his own observations so much as a knowledgeable bank examiner who could provide the jury with an overview of banking regulations and practices

6

and who could authoritatively condemn Riddle's actions.").

Westhassel's testimony must be confined to facts he personally observed and not any inferences he drew based on experience and research, particularly given that those inferences serve only to usurp the jury's role as the finder of the facts.

### III. Mrs. Rudolph's purported statements to a friend are inadmissible hearsay.

The government intends to introduce under Federal Rule of Evidence 804(b)(6) statements made by the decedent that the parties agree are hearsay. The hearsay statements at issue were made by Mrs. Rudolph to Cassandra Olmstead. Ms. Olmstead claims that Mrs. Rudolph told her that: (1) Dr. Rudolph signed her name on a lot of documents and was good at it; (2) she was afraid of divorcing Dr. Rudolph because she could not take care of herself and was afraid of losing the kids; (3) she gave Dr. Rudolph an ultimatum about his affair; and (4) she knew Dr. Rudolph might try to kill her during the first hunting trip of 2016 but went anyway to try to save her marriage.

None of these hearsay statements is admissible because the Supreme Court has made clear that the forfeiture-by-wrongdoing doctrine has no application in a homicide case like this one, where the accused is not alleged to have killed the declarant with the specific design of keeping her from testifying. *Giles v. California*, 554 U.S. 353 (2008). Although Mrs. Rudolph's purported statements are not testimonial, the *Giles* decision—as well as Tenth Circuit precedent—expressly state that there is only one forfeiture-by-wrongdoing doctrine that applies the same way to testimonial and non-testimonial hearsay.

The prosecution claims that Dr. Rudolph killed his wife for financial reasons—to collect insurance proceeds and avoid a purportedly costly divorce—not to prevent her from

7

testifying in any proceeding. These allegations are similar in every pertinent regard to those in *Giles* and the forfeiture-by-wrongdoing doctrine does not apply to this case any more than it did in *Giles*. Giles was similarly charged with homicide after he shot his ex-girlfriend while they were alone in the garage of his grandmother's house. 554 U.S. at 356. Three weeks earlier, the decedent had called the police and claimed that Giles had attacked her, and the prosecution introduced her un-confronted statements at trial. *Id.* The Supreme Court overturned the conviction, holding that the forfeiture-by-wrongdoing doctrine applies *only* when the accused killed the decedent with the specific aim of preventing her from testifying:

> The manner in which the rule was applied makes plain that unconfronted testimony would *not* be admitted without a showing that the defendant intended to prevent a witness from testifying. In cases where the evidence suggested that the defendant had caused a person to be absent, but had not done so to prevent the person from testifying—as in the typical murder case involving accusatorial statements by the victim—the testimony was excluded unless it was confronted or fell within the dying-declarations exception.

*Id.* at 361–62. *Giles* leaves absolutely no doubt that Rule 804(b)(6) codifies the same forfeiture-by-wrongdoing doctrine that inheres in the Confrontation Clause and that mere knowledge that a murder victim will not be able to testify is not tantamount to a specific intent to prevent her from testifying:

> In 1997, this Court approved a Federal Rule of Evidence, entitled "Forfeiture by wrongdoing," which applies only when the defendant "engaged or acquiesced in wrongdoing that was intended to, and did, procure the unavailability of the declarant as a witness." Fed. Rule Evid. 804(b)(6). We have described this as a rule "which codifies the forfeiture doctrine." *Davis v. Washington*, 547 U.S. 813, 833 (2006). Every commentator we are aware of has concluded the requirement of intent "means that the exception applies only if the defendant has in mind the particular purpose of making the witness unavailable." 5 C. Mueller & L. Kirkpatrick, Federal Evidence § 8:134, p. 235 (3d ed.2007); 5 J. Weinstein & M. Berger, Weinstein's Federal Evidence § 804.03[7][b], p. 804–32 (J. McLaughlin ed., 2d ed.2008); 2 K. Broun, McCormick on Evidence 176 (6th ed.2006). *The commentators come out this way because*

> *the dissent's claim that knowledge is sufficient to show intent is emphatically not the modern view.*

554 U.S. at 367–68 (emphasis added).

Even before *Giles*, binding Tenth Circuit cases, as well as the advisory committee notes to Rule 804(b)(6), made clear that the rule applies only when the opponent of the evidence made the declarant unavailable specifically to deprive the court of her testimony. *See United States v. Bolano*, 618 F.2d 624, 629 (10th Cir. 1979); *United States v. Cherry*, 217 F.3d 811, 815 (2000). *Bolano* applied forfeiture-by-wrongdoing to the hearsay objection of a defendant who made death threats to an immunized conspirator to keep him off the witness stand. Like *Giles*, *Bolano* expressly stated that the same forfeiture-by-wrongdoing doctrine applies under the Constitution and the Federal Rules of Evidence: "Because we find a waiver of confrontation rights, we need not consider whether the testimony met the standards for admission under Rule 804(b)(5). A valid waiver of the constitutional right is *a fortiori* a valid waiver of an objection under the rules of evidence." 618 F.2d at 626. The cases the drafters cited to support promulgation of Rule 804(b)(6) included *Bolano*, leaving no doubt that the doctrine is the same under the Constitution and the rules. *See* Notes to Fed. R. Evid. 804(b)(6) (1996). Four years later in *Cherry*, the Tenth Circuit reaffirmed that the doctrine is the same in both contexts: "The recently-promulgated Rule 804(b)(6) of the Federal Rules of Evidence represents the codification, in the context of the federal hearsay rules, of this long-standing doctrine of waiver by misconduct." 217 F.3d at 815.

In 2011, the rule was revised purely for stylistic reasons. *See* 2011 Advisory Committee Note to Fed. R. Evid. 804(b)(6) ("These changes are intended to be stylistic only. There is no intent to change any result in any ruling on evidence admissibility."). The new rule again

expressly requires a specific intent to keep the witness from testifying. *See* Fed. R. Evid. 804(b)(6); *Smith v. Archuleta*, 658 F. App'x 422, 435 (10th Cir. 2016) ("Statements are admissible under the forfeiture doctrine only where the defendant's 'wrong' was designed to prevent a witness from testifying."); *Meeks v. McKune*, 354 F. App'x 348, 351 (10th Cir. 2009) (*Giles* "held that the Confrontation Clause did not allow testimonial statements by a murder victim under the doctrine of forfeiture by wrongdoing unless the defendant specifically intended to silence the victim to prevent his testimony.").

The forfeiture-by-wrongdoing doctrine under the Rules and the Confrontation Clause is the same doctrine that has existed under the common law for hundreds of years. The prosecution's attempt to expand the doctrine for this case relies on the very arguments already rejected in *Giles*.

WHEREFORE the Court should exclude from trial (1) the introduction of any photographs depicting slain animals, (2) the improper lay opinion testimony of Otto Westhassel, and (3) hearsay statements attributed to Bianca Rudolph.

**Certificate of Service**

This motion was served on all counsel of record through CM/ECF on June 10, 2022.

        Respectfully submitted,

        MARKUS/MOSS PLLC
        40 N.W. Third Street, PH1
        Miami, Florida 33128
        Tel: (305) 379-6667
        markuslaw.com

        By:    /s/ David Oscar Markus
                    David Oscar Markus
                    Florida Bar Number 119318
                    dmarkus@markuslaw.com

                    /s/ A. Margot Moss
                    A. Margot Moss
                    Florida Bar Number 091870
                    mmoss@markuslaw.com