IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 22-cr-00012-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

    1.  LAWRENCE RUDOLPH and
    2.  LORI MILLIRON,

      Defendants.

---

**GOVERNMENT'S RESPONSE TO LAWRENCE RUDOLPH'S MOTION IN LIMINE**

---

Lawrence Rudolph moves to exclude three categories of evidence: hunting photos of his wife posing with animals *she* killed, opinion testimony from a U.S. consular official and former marine about the distance between the victim and the shotgun muzzle, and statements the victim made to Rudolph's personal assistant.

## ARGUMENT

### I.    The victim's hunting pictures are probative of her familiarity and skill with a firearm and not unfairly prejudicial.

Rudolph asks this court to exclude pictures of his late wife posing with animals that she killed under Rules 401 and 403. He argues that the pictures could inflame the jury and are misleading as to her skill, because she was guided by professional hunters.

The pictures satisfy Rule 401. "Evidence is relevant if: (1) 'it has any tendency to make a fact more or less probable than it would be without the evidence'; and (2) 'the fact is of consequence in determining the action.'" *United States v. Henthorn*, 864 F.3d 1241, 1249 (10th Cir. 2017). Rudolph told numerous people that his wife died from an accidental discharge of the

shotgun she was handling. The photos tend to make it more probable that she was familiar with firearms, which makes an accident less probable. His contention that she was not actually proficient does not go to the photos admissibility, but rather to their weight. The photos show that she handled and fired a gun many times. Rudolph is free to offer contrary evidence to undermine that conclusion, but the weight given to the photos and that competing evidence is for the jury to decide.

The photos also satisfy Rule 403, where exclusion "is an extraordinary remedy and should be used sparingly." *Henthorn*, 864 F.3d at 1256. Rudolph argues that the photos could inflame those opposed to hunting. But "it is not enough that the risk of unfair prejudice be greater than the probative value of the evidence; the danger of that prejudice must *substantially* outweigh the evidence's probative value." *Id.* (emphasis in original). In balancing the probative value and prejudice, the court must give the evidence "its maximum reasonable probative force and its minimum reasonable prejudicial value." *Id.*

The risk of unfair prejudice here is low for four reasons. One, the parties have agreed to a jury questionnaire that asks three questions about hunting, including whether jurors find it immoral. ECF # 113-1 at 5 (questions 36-38). Two, the parties will hear from several witnesses that the Rudolphs were passionate hunters. No one will be led to believe that she showed up in rural Zambia at the age of 56 to hunt a dangerous great cat with no prior hunting experience. It is not unfair for the jury to see with their own eyes what Bianca was capable of. Third, the pictures are of the victim hunting—not the defendant. It is unlikely that jurors will convict the defendant of murdering his wife because *she* hunted big game animals. And four, this is Colorado. Hunting and hunting pictures are prevalent. While some jurors may object to hunting—many won't—voir dire can determine if those jurors will unfairly hold an anti-hunting view against the defendant.

The challenged photos are far less gruesome than the highly-probative photos of his wife in the morgue.

## II.    Testimony from witnesses about what they saw is not expert testimony.

Otto Westhassel peeled back the death shroud covering Bianca's body and saw a gaping hole, about 6 cm wide, where her heart should be. That hole was surrounded by smaller pellet-sized holes. Like anyone who has ever fired a shotgun, Westhassel can explain what is easily observable with the naked eye: buckshot spreads the further it gets from the barrel. If describing the rational bases for his personal perception of a wound—admitted numerous times by the defendant himself as indisputably caused by a shotgun—makes Westhassel an expert, then *anyone* who has ever seen a wound or fired a shotgun is an expert. Rule 701 is not so broad. See, e.g., *State v. Holley*, 175 A.2d 514, 610 (Conn. 2018) ("We conclude that it was within the trial court's broad discretion to determine that Olson, as a lay witness, was competent to testify regarding the appearance of wounds that he had observed.").

Westhassel is not going to render an opinion connecting facts together. He will not tell the jury that "Rudolph is guilty beyond a reasonable doubt." Def. Mot. at 6. And he will not tell them how far the shotgun was from any wound because he didn't personally see what happened. But he will describe what he personally observed while standing over Bianca's body, separately describe what he has seen buckshot do after leaving the barrel of a shotgun, and let the jury make up its own mind after the defense conducts a thorough cross-examination of his bases of knowledge.

The committee notes to Rule 701 make clear that this type of percipient witness testimony is quintessentially the kind that can be offered by regular people doing exactly what the jury will be asked to do: make inferences based on their past life experiences. The committee

notes cite to *United States v. Westbrook*, 896 F.2d 330 (1990), where two drug users were permitted to testify that a substance was amphetamine. Fed. R. Evid. 701 Advisory Committee Notes. That kind of testimony is not expert testimony because it is based on a layperson's personal knowledge. But it might become expert testimony if, say, the witness "were to describe how a narcotic was manufactured or to describe the intricate workings of a narcotic distribution network."

Westhassel can describe in detail a wound he saw in someone's chest—he just can't (and won't) say how it was "manufactured" (i.e., how far away a shotgun would have been to make such a wound). Likewise, he can say—because he knows—that a shotgun blast spreads from its point of origin and that buckshot expels pellets. He just can't (and won't) say exactly how far or how much at certain distances. Likewise, just as a lay witness can describe a substance as blood, he can describe a wound as being wide in one place, with small pinpricks in others; but a lay person would have to qualify as an expert to say that "bruising around the eyes is indicative of skull trauma" and Westhassel would have to qualify as an expert to say "this wound was caused by a shotgun blast from 3 meters." Cf. Fed. R. Evid. 701 Advisory Committee Notes. Westhassel will do the former; but not the latter. He will, as one leading treatise summarizes "(1) rely on a generalization developed through personal experience" and (2) rely on "personal knowledge of the case-specific fact." See 1 *McCormick on Evidence*, § 11 (8th ed. Jan. 2020 update).

The government notes that other witnesses will offer similar lay opinions. Vincent Chibesa will testify that he fired the shotgun at the scene and that her personally observed it to do what he's seen many shotguns do: expel buckshot. Likewise, he personally saw the shotgun dropped from heights onto a concrete floor without discharging. That's no different than someone driving a friend's car and saying "it worked fine when I drove it"—the kind of lay

"testimony" that people use in their personal relationships every day. Nor is it any different than saying "I drove the car in adverse conditions and it still worked." The same is true of testimony from Pieter and Mark Swanepoel — professional hunters who fired and examined the shotgun before relying on it for protection during a hunt.

These is no reason the jury should be prevented from hearing primary, first-hand accounts of what was seen and observed about Bianca's body or the shotgun that was laying nearby. See *Randolph v. Collectramatic, Inc.*, 590 F.2d 844, 847-48 (10th Cir. 1979) ("There is uniformity among the courts that the testimony of witnesses, both in civil and criminal cases, is admissible if predicated upon concrete facts within their own observation and recollection that is facts perceived from their own senses, as distinguished from their opinions or conclusions drawn from such facts."). Any expert opinions about inferences that can be drawn from those facts through the use of specialized knowledge will be elicited from the government's noticed forensic medical examiners, blood spatter specialists, and ballistics experts.

III.   **Many of the victim's statements to her husband's executive assistant are admissible, because they are either not hearsay or qualify under a hearsay exception.**

Rudolph has moved to exclude four categories of statements that Bianca Rudolph made to Cassandra Olmstead in May or June of 2016—only months before Bianca died:

1. That he signed many documents in her name and was good at it,

2. That she was afraid of divorcing him because she could not take care of herself and was afraid of losing the children,

3. That she gave him an ultimatum about his affair with Lori Milliron, and

4. That she knew he might try to kill her on a hunting trip but she needed to go anyway to save their marriage.

ECF # 150 at 7.

He admits that these statements are not testimonial (ECF # 150 at 7), so the Confrontation Clause does not apply to them. *Giles v. California*, 554 U.S. 353, 376, 128 S. Ct. 2678, 2692, 171 L. Ed. 2d 488 (2008) ("only *testimonial* statements are excluded by the Confrontation Clause"). The statements are admissible then as long as they are (a) not hearsay or (b) subject to a hearsay exception. As set forth below, the statements the government will offer fall into both of those categories.

### A. Bianca's revelations about Rudolph's affairs exposed him to extraordinary legal risks

Larry Rudolph was intensely concerned about his legal position in any divorce. In 2011 or 2012 — towards the end of Rudolph's time as president of a prominent hunting organization — he called a personal friend. Rudolph had already confided in that friend that he was having an affair with Lori Milliron. He had also explained to the friend how he was able to use his frequent travel to hide the affair from Bianca. That friend will testify that, during the call, Rudolph confessed to thinking about divorce. Because the friend had been through his own divorce a few years prior, Rudolph asked for some advice about how to manage it. "I can't afford to live with what I'm going to have left," he told his friend. The friend, who had been through divorce a couple years before, told Rudolph that his experience was different because he and his wife had signed a pre-nuptial agreement.

Rudolph called his friend again. This time, he asked his friend about post-nuptial agreements. The friend laughed and asked why Bianca would sign one. The friend also expressed skepticism that a court would find one to be valid. When the friend told Larry that, no matter what, he owed some responsibility for taking care of a wife of several decades, Rudolph again expressed concern over losing money and justified a post-nuptial agreement on the grounds that

he was the one who had created his business and made it what it was. Rudolph said he thought he would be able to get Bianca to sign one, because Bianca understood that Rudolph had built the business, and that he thought she would be willing to do something. At no point in either conversation did Rudolph allude to the existence of a valid post-nuptial agreement.

Around this same time, Rudolph faced allegations from his former friends that, among other things, he had abused his position as an officer in the hunting club to carry on extramarital affairs. Rudolph sued his former friends in the hunting organization. Among the evidence were text messages with the woman, exchanged in the fall of 2011, that he had two houses and was in "mutual exclusion" with his wife. When the group kicked Rudolph out of the club, he sued them for, among other things, defaming him with allegations of adultery.

In this same time period—roughly 2010 to 2012—Rudolph rapidly intensified his relationship with Milliron. He exchanged numerous emails in which they expressed their reciprocal love for one another. And he bought a house in Mexico where the two of them could conduct their affair without Bianca's knowledge, under the guise of his frequent travel.

Between 2012 and 2016, Rudolph steadily but substantially increased his financial support to Milliron as a sign of his intentions, using untraceable cash transactions that would not draw scrutiny if Bianca looked at their bank statements. This is also the time period in which he continued to represent as part of his civil lawsuit that even mere allegations of adultery were a hostile assault on his marriage. Instead of trying to make do "with what I'm going to have left" after divorce, he tried to juggle everything all at once: travelling everywhere he wanted to conduct his affairs, but also maintaining enough plausible deniability to avoid a divorce that would substantially curtail the lifestyle he wanted.

In 2016, this juggling routine became too much to manage. Rudolph faced the real

Case 1:22-cr-00012-WJM   Document 162   Filed 06/17/22   USDC Colorado   Page 8 of 17

possibility that his wife would be a witness against him in both his civil case against former

colleagues in the hunting club and in a civil divorce proceeding.

### B.  Bianca asks Olmstead if her husband is having an affair.

In approximately May of that year, Bianca met with Olmstead in Phoenix. Bianca told

Olmstead she had found another woman's hairclip in her bed. She asked Olmstead if her husband

was having an affair and whether it was with Lori Milliron. She later asked Olmstead how she

knew that Rudolph was having an affair with Milliron. When Olmstead mentioned emails

between Milliron and Rudolph, Bianca asked how she could access them. Rudolph has not

sought to exclude any of these statements. ECF#150 at 7.

The government is not using the hairclip comment for the truth of the matter asserted,

only as background for why Bianca approached Olmstead. And Bianca's various questions to

Olmstead are not hearsay, because they were not assertions. *United States v. Jackson*, 88 F.3d

845, 848 (10th Cir. 1996) (noting as well that "the burden upon the party claiming that the

intention [to make an assertion] existed; ambiguous and doubtful cases will be resolved against

him and in favor of admissibility".).

### C.  Bianca tells Olmstead that she does not want to get divorced due to her religion and the financial consequences.

During their conversation, Bianca told Olmstead that she did not want to get divorced

because of her Catholic faith and a fear of being left without money. At various times in their

conversation, she went back and forth between saying she would never divorce Rudolph and

later saying that she would divorce Rudolph.

These statements are properly admitted under Federal Rule of Evidence 803(3) as

Bianca's then existing state of mind regarding her future plans, rather than to prove that divorce

was actually contrary to her faith or that it would leave her without any money. Indeed, it is the

8

government's position that she would have received a fair bit of money from a divorce.

> **D. Bianca tells Olmstead that she previously had her own affair and that Rudolph forged her name on an agreement he had written up where she would get nothing in a divorce.**

As part of her fear of divorce, Bianca explained to Olmstead that she had previously had an affair, which Rudolph had discovered. She said that he responded by writing up an "agreement" at their kitchen table where she would get nothing in a divorce and that Rudolph signed her name. She told Olmstead that he often signed her name on documents and was good at it. And she said that she had tried to find the forged agreement for years and was worried about it. Olmstead will also testify that Bianca did not mention the existence of any other *legitimate* pre-nuptial or post-nuptial agreement.

The statement about Bianca's affair is not hearsay, because it is not being offered for the truth of the matter asserted, but rather for its effect on Rudolph. He does not challenge the admissibility of this statement, but he does assert that the statements about the forged agreement should not be admitted, because there is no evidence that he killed her to prevent her from offering these statements as testimony. That is incorrect.

The statements about the forged agreement are all properly admitted under Rule 804(b)(6) as statements that are no longer available because Rudolph murdered Bianca with the intent, among others, of making such statements unavailable. Fed. R. Evid. 804(b)(6) ("A statement offered against a party that wrongfully caused . . . the declarant's unavailability as a witness, and did so intending that result."); *United States v. Dhinsa*, 243 F.3d 635, 654 (2d Cir. 2001) (The government need not, however, show that the defendant's sole motivation was to procure the declarant's absence; rather, it need only show that the defendant was motivated *in part* by a desire to silence the witness.) (citation and quotation omitted).

The statements would have been offered against Rudolph in a divorce proceeding to invalidate any pre-nuptial, post-nuptial, or other agreement allegedly signed by Bianca Rudolph as to the allocation of their estate. As discussed below, Bianca also gave Rudolph an ultimatum that he had to leave Milliron or she would divorce him. By pretending that he had ended his relationship with Milliron (see below) and then killing Bianca a few months later, he carried out a plan to prevent her from testifying in a divorce proceeding as to these matters.

For 804(b)(6), there is no requirement that the proceeding where the witness would have testified be the same as the proceeding in which the statements are offered. See *United States v. Emery*, 186 F.3d 921, 926 (8th Cir. 1999) ("Mr. Emery contends that these principles should apply only in a trial on the underlying crimes about which he feared Ms. Elkins would testify, not in a trial for murdering her. We believe that both the plain meaning of Fed. R. Evid. 804(b)(6) and the manifest object of the principles just outlined mandate a different result. The rule contains no limitation on the subject matter of the statements that it exempts from the prohibition on hearsay evidence. Instead, it establishes the general proposition that a defendant may not benefit from his or her wrongful prevention of future testimony from a witness or potential witness. Accepting Mr. Emery's position would allow him to do just that."); see also *United States v. Johnson*, 495 F.3d 951, 970 (8th Cir. 2007); *United States v. Gray*, 405 F.3d 227, 241 (4th Cir. 2005); *United States v. Jordan*, No. CRIM. 04-CR-229-B, 2005 WL 513501, at *5 (D. Colo. Mar. 3, 2005) ("An archetypical example of the exception at work is a defendant's murder of a witness who was scheduled to testify against the defendant in an upcoming case unrelated to the case in which the defendant is charged with the witness' murder.").

Olmstead will also testify that Bianca did not mention the existence of any other

*legitimate* pre-nuptial or post-nuptial agreement. That Bianca failed to make a statement is by definition not hearsay. Fed. R. of Evid. 801 (statement "means a person's oral assertion, written assertion, or nonverbal conduct").

### E.   Bianca decided to give Rudolph an ultimatum to leave Lori Milliron or she would divorce him.

Near the end of her conversation with Olmstead, Bianca decided that she would give Rudolph an ultimatum that he had to stop seeing Lori Milliron and fire her from his business or she would seek a divorce. She then rehearsed that ultimatum with Olmstead.

The ultimatum is admissible under Rule 803(3). It is a classic statement of her then existing state of mind as to her future intent. It can be used to prove that she did what she stated that she intended to do. As the Rule's commentary makes clear, "[t]he rule of *Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285 [](1892), allowing evidence of intention as tending to prove the doing of the act intended is, of course, left undisturbed" and "the Committee intends that the Rule be construed to limit the doctrine of [*Hillmon*] so as to render statements of intent by a declarant admissible only to prove his future conduct, not the future conduct of another person." Fed. R. Evid 803(3) advisory committee notes (1972 Proposed Rules and 1974 enactment).

The ultimatum rehearsal is not a statement by Bianca, but rather testimony by Olmstead of what they did, so it is not hearsay.

### F.   Bianca agreed with Olmstead that it was dangerous for her to go on an African hunt with Rudolph, but said she had to try to save her marriage.

At one point in the conversation, Olmstead told Bianca that it was dangerous for Bianca to go with Rudolph on an upcoming hunt in Africa. She told Bianca that Rudolph was capable of killing Bianca on the hunt or having someone else do it. Bianca said that she knew that, but that

going on hunts was her only chance to win Rudolph back, because that was when they got along the best.

The United States does not seek to admit this part of their conversation.

### G. Bianca gave Olmstead hard copies of emails between Milliron and Rudolph documenting their affair and told her that she was returning to Pennsylvania to confront Rudolph and give her ultimatum.

A few days after this conversation, Bianca called Olmstead while she was trying to guess the password to her husband's email. When she succeeded in getting into his files, she then provided hard copies of emails documenting his affair with Milliron to Olmstead. She told Olmstead that she didn't want to have the hard copies at her house in case Rudolph found them. She also wanted Olmstead to have them in case anything happened to her and that Olmstead would "know what to do with them." She then told Olmstead that she was going to confront Rudolph with the affair and give him her ultimatum.

The United States does not seek to offer the statement as to why Bianca gave Olmstead the emails or that Olmstead would know what to do with them, but it will ask Olmstead to testify that Bianca provided her with the emails. It will also seek to offer her statement of intent to confront Rudolph about the affair, and deliver her ultimatum under Rule 803(3), per *Hillmon*, as proof that she did just that.

### H. Bianca tells Olmstead that she did confront Rudolph and he agreed to end the affair with Milliron.

A few weeks after their conversation about the ultimatum, Olmstead spoke to Bianca on the phone and asked if she had followed up on her plan. Bianca confirmed that she had confronted Rudolph with the affair, he denied it, but then admitted it after she told him that she had the emails proving the affair. Bianca also told Olmstead that Rudolph agreed to break off the affair with Lori Milliron and fire her.

Rudolph's statements to Bianca are not offered for the truth of the matter asserted. And even if they were, they are admissible as statements of a party opponent. And Bianca's recounting of the conversation for Olmstead is admissible under Rule 804(b)(6). The conversation was potential testimony in *two different* proceedings where it would have been damaging to Rudolph. First, it could have been admitted in a divorce proceeding between Rudolph and Bianca when he ultimately refused to end the relationship with Milliron. Second, at the time of these conversations in spring 2016, Rudolph was still engaged in his lawsuit against Safari Club International and several individuals where one of his primary allegations was that he had been defamed by allegations of adultery. See Exh. 1 (Amended Complaint) at ¶¶ 29-30, 58, 77, 84–86, 139, 142. He had just been deposed in May—within a month of the conversations at issue—and had lied about the nature of his relationship with Milliron. Exh. 2. Bianca's revelation that she had the emails proving he had lied would have been a devastating blow to his SCI case—as well as proof of his lies—that Bianca could then hold over him. The timing of that case, the conversations, and Bianca's death in October 2016 when the SCI litigation was still ongoing[1] is sufficient evidence that Rudolph also intended to make Bianca unavailable to testify with respect to these statements.

## I. Bianca later told Olmstead that Rudolph had broken off the affair, but was told it would take some time before Milliron could be fired.

Not long after this conversation, the next time Bianca and Olmstead met in person, Bianca told Olmstead that Rudolph had followed through on breaking off his affair with Milliron. After Olmstead told Bianca that she had learned Milliron was still working for Rudolph, Bianca admitted that Rudolph told her firing Milliron would take some time because

---

[1] The court may take judicial notice of that case's docket and that the matter was still ongoing. See 2:12-cv-01710-CRE (Western District of Pennsylvania).

Milliron was a partner in the business.

Most of these statements are not offered for the truth of the matter asserted. Bianca's statement that Rudolph had followed through on ending the affair with Milliron is not offered for the truth of the matter asserted. Indeed, the statement is plainly false: the affair was still ongoing. Olmstead's statement that Milliron was still working for Rudolph is offered for its effect on Bianca, not its truth, as it explains Bianca's response.

When Bianca admitted that Rudolph said firing Milliron was moving slowly, his statement to her is offered for its effect on her. And her relaying of that statement to Olmstead is proof of her then existing state of mind under Rule 803(3), which is not offered to prove the truth of the fact believed, i.e. it's not offered to prove that the process *actually* would be slow because of Milliron's partnership, but only to show Bianca's belief of that fact. It explains why Bianca continued to believe that Rudolph would follow through on his agreement to end the affair and fire Milliron.

### J.  The court can assess the admissibility of Bianca's statements to Olmstead near the end of the government's case.

When Bianca gave him her ultimatum after talking with Olmstead, she put Rudolph in a dilemma. Either leave Lori, the "love of [his] life" according to one of the emails Bianca printed, or go through a divorce with Bianca. If he went through a divorce, Bianca would testify that he forged her signature on his post-nuptial agreement. Likewise, when he received the ultimatum, he had recently testified under oath that Lori Milliron was simply his medical aide, who had stayed with him in an Alaska cabin in a purely innocent and professional capacity. Now he was confronted by a wife who had documentary proof that he had been having a torrid affair with Milliron. Bianca knew about that lawsuit and the degree to which it turned on allegations of his affairs. If Rudolph refused her ultimatum, he could expect that she would testify about his affairs

14

and forgery at a divorce proceeding, and also to provide evidence that he had lied in his deposition.

What he decided to do in the short term was pretend that he would break off his affair with Milliron. But there was no long-term solution that would allow him to maintain his relationship with Milliron and also prevent Bianca from testifying against him either in his civil suit or a divorce case.

No solution, that is, besides killing Bianca to permanently remove the legal risks she posed to his preferred lifestyle.

To find that 804(b)(6) applies, the Court must make a finding by a preponderance that the elements of the rule are satisfied: that Rudolph wrongfully prevented Bianca from being a witness, and that he did so, in part, intending to make her unavailable as a witness. See *United States v. Cherry*, 217 F.3d 811, 815 (10th Cir. 2000) ("The usual Rule 104(a) preponderance of the evidence standard has been adopted in light of the behavior new Rule 804(b)(6) seeks to discourage."). As this is a Rule 104 determination, the question is one of whether there is sufficient evidence to meet that preponderance standard. See *Huddleston v. United States*, 485 U.S. 681, 690 (1988) (discussing standard for conditional facts).

The government plans to call Ms. Olmstead late in the case. By that time, the court will have heard all of the evidence necessary to determine if there is sufficient evidence (under Rule 104's preponderance standard) to conclude that Rudolph killed his wife. It can then upon a proffer of Ms. Olmstead's testimony (or after a brief recess during trial when Ms. Olmstead could testify to the court about Bianca's statements) determine whether he did so in part to make Bianca unavailable to offer the statements that she made to Olmstead at a future proceeding.

## CONCLUSION

The court should deny Rudolph's motion in limine.

Respectfully submitted,

COLE FINEGAN
United States Attorney

By:     */s Bryan Fields*
Bryan Fields
Assistant United States Attorney
U.S. Attorney's Office
1801 California St. Suite 1600
Denver, CO 80202
(303) 454-0100
Bryan.Fields3@usdoj.gov
Attorney for the Government

By:     */s E. Garreth Winstead*
E. Garreth Winstead
Assistant United States Attorney
U.S. Attorney's Office
1801 California St. Suite 1600
Denver, CO 80202
(303) 454-0100
Garreth.Winstead@usdoj.gov
Attorney for the Government

By:     */s J. Bishop Grewell*
J. Bishop Grewell
Assistant United States Attorney
U.S. Attorney's Office
1801 California St. Suite 1600
Denver, CO 80202
(303) 454-0100
Bishop.Grewell@usdoj.gov
Attorney for the Government

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 17th day of June, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to any and all counsel of record.

<u>*s/ E. Garreth Winstead*</u>
United States Attorney's Office