IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Judge William J. Martinez
Criminal Case No. 22-CR-0012-WJM

UNITED STATES OF AMERICA,

v.

1. **LAWRENCE RUDOLPH**,
2. LORI MILLIRON,

_____/

**LAWRENCE RUDOLPH'S MOTION TO EXCLUDE EXPERT TESTIMONY
AND REQUEST FOR HEARING**

Lawrence Rudolph moves to exclude two of the government's 12 expert witnesses and requests a hearing to voir dire them. These witnesses are meant to paper over a conspicuous, factual hole in the government's case: Lawrence Rudolph had no reason to kill his wife.

The prosecution has sought to paint Dr. Rudolph as a profligate spender who could not afford to just file for divorce. It charged him with murder based only on weak circumstantial evidence and salacious innuendo—like that he cremated his wife's remains against her wishes to destroy evidence. But at Dr. Rudolph's detention hearing the government learned for the first time that Bianca Rudolph left a will directing that she be cremated *and* that she and Dr. Rudolph reached a post-nuptial agreement 16 years before her death, entitling her to $2 million of their $15 million marital estate if they divorced. DE37:85–91, 117.

Instead of reconsidering its theory as the assumptions supporting it crumbled, the government set out to prove that the will and post-nuptial agreement were forgeries—and that effort backfired. The government learned from an Arizona lawyer that Mrs. Rudolph's will was perfectly genuine and that she and that lawyer discussed her wish to be cremated.

The original post-nuptial agreement is likewise genuine and has been kept for years in a reputable Pennsylvania law firm's storage facility. The firm's records show that its attorneys drafted the agreement, attached a schedule of the couple's assets for full transparency, and arranged for Mrs. Rudolph to have separate counsel. It was executed in the year 2000, and the firm kept two originals for its files. After comparing those originals to exemplars of Mrs. Rudolph's signature, a handwriting expert has opined that Mrs. Rudolph's signature on both original post-nuptial agreements is genuine.

Because there is (still) no evidence that Dr. Rudolph had any motive to kill his wife, the government proposes to call two expert witnesses to conjure one up from sheer speculation and faulty arithmetic. Former judge and current family-law attorney James Padish claims to know how a hypothetical divorce between the Rudolphs would have unfolded in an alternate 2016. He even claims to know that his imaginary judge, like our actual prosecutors, would hardly even entertain the idea that the post-nuptial could be authentic and would not enforce it. What Padish will not and cannot say is that Dr. Rudolph had any reason at all to believe that the post-nuptial agreement would not be enforced. The evidence shows he expected it would be. FBI accountant Erin Newton proposes to testify that the Rudolphs' net worth was about $7 million in 2016 and that they overspent, but she admits that she is unqualified to assess the Rudolphs' finances, relied on partial data, and departed from accepted accounting methods: She did not include their largest asset (their Pennsylvania dental practice), drastically undervalued their real estate holdings, and treated using savings to retire debt as a recurring expense. The result is an inaccurate financial picture designed to support the prosecution's theory, distort the facts, and mislead the jury.

**Legal Standards**

"[A]n expert witness's testimony must be helpful to the trier of fact, based on sufficient facts, and the result of 'reliable principles and methods.'" *Tudor v. Southeastern Oklahoma State University*, 13 F.4th 1019, 1029 (10th Cir. 2021) (quoting Fed. R. Evid. 702). The rules "grant expert witnesses testimonial latitude unavailable to other witnesses on the assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148 (1999). "[T]he word 'knowledge' connotes more than subjective belief or unsupported speculation." *Daubert v. Merrell Dow Pharmaceutricals, Inc.*, 509 U.S. 579, 590 (1993). Even an expert with impeccable credentials cannot testify if, "despite those qualifications, ... the methodology employed by the expert in analyzing the data" is unreliable either "in general" or as applied to "the particular matter to which the expert testimony was directly relevant." *Kumho*, 526 U.S. at 153, 154.

Courts must keep juries from being exposed to opinions not shown to satisfy these criteria: "[T]he discretion [the majorty opinion] endorses—trial-court discretion in choosing the manner of testing expert reliability—is not discretion to abandon the gatekeeping function." *Id.* at 158–59 (Scalia concurring). The proponent must prove the foundational facts by a preponderance of the evidence. *Daubert*, 509 U.S. at n. 10 (citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)). The proponent must also show that the opinion does not depend on hearsay unless it is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." *Daubert*, 509 U.S. at 595 (quoting Fed. R. Evid. 703). Finally, Rule 403 must be applied with greater exactitude to opinion based on specialized knowledge because such testimony has far greater capacity to mislead jurors

because it is challenging for lay people to assess or second-guess: "'Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.'" *Daubert*, 509 U.S. at 595 (citation omitted).

## Argument

I. **James Padish's guesses about how a hypothetical divorce suit would be resolved are irrelevant, based on faulty data, and reached by an unspecified method, and his thoughts on the authenticity and meaning of a contract are inadmissible legal conclusions that invade the jury's critical function.**

The government proffers James Padish, a family law lawyer and former judge, to speculate about what Dr. Rudolph might have had to pay Mrs. Rudolph had they divorced. Padish sketches two "scenarios," one in which the Rudolphs' post-nuptial agreement is enforced and one in which it is not. He asserts that, if the agreement were not enforced, "Bianca would likely have received" half the couple's net assets and "may also have been awarded spousal support, as this was a marriage of significant duration … ." Padish Report at 7. On the other hand, "the post-nuptial agreement would have still provided Bianca $2,058,000," plus "her vehicle, personal property and furniture or jewelry." *Id.* at 9. Additionally, relying only on limited, self-serving information conveyed to him by the prosecutors, Padish guesses "that the post-nuptial agreement's authenticity—and enforceability—is unlikely" and that a judge would decide this legal question summarily against Dr. Rudolph. *Id.* at 10. Finally, Padish speculates how allegations of infidelity might have impacted what he terms "the hypothetical Rudolph divorce in 2016." *Id.* at 12.

Presumably, the government intends this to show that a divorce would have cost Dr. Rudolph money, especially if the post-nuptial agreement were unenforceable. Padish's testimony is not admissible for that purpose for several reasons, any one of which requires its exclusion: (1) Padish's predictions as to how "the hypothetical Rudolph divorce in 2016" would have unfolded are irrelevant, particularly in light of other evidence, and a needless waste of time. (2) Padish's prediction regarding what a hypothetical judge would do is based on incomplete, one-sided evidence. (3) Padish's methodology for predicting a hypothetical judge's evidentiary rulings is unexplained. (4) It is common knowledge that divorces result in a division of assets; it is not helpful to tell jurors that.

### A. Padish's predictions are irrelevant.

What would have happened in "the hypothetical Rudolph divorce" fails the test for relevance: It does not make any consequential fact any more or less likely. *See* Fed. R. Evid. 402. It does not matter what a lawyer thinks would have *actually* happened. The only evidence even arguably relevant to whether Dr. Rudolph had a motive to commit murder is what Dr. Rudolph *believed* would happen if he divorced his wife. Padish does not and cannot assert that Dr. Rudolph had any reason to believe the post-nuptial agreement he and his wife signed would not be enforced; in fact, he fully expected it to be. Padish's testimony is therefore irrelevant because he does not claim to know anything about Dr. Rudolph's expectations. *Cf. United States v. Greene*, 239 F. App'x 431, 442 (10th Cir. 2007) ("[T]he defense could not show Mr. Greene's subjective good faith by the testimony of an expert who had no dealings with Mr. Greene at the relevant time.").

The government has a fact witness who *does* claim to have personal knowledge about Dr. Rudolph's subjective beliefs regarding a potential divorce. As a government filing details, that witness, "a personal friend" in whom "Rudolph ... confided," states that he had one or more conversations with Dr. Rudolph that made him think Dr. Rudolph was "thinking about divorce" in 2009 and that they discussed a post-nuptial agreement in a way that made the friend think none existed. DE162:6–7. This witness saps whatever probative value Padish's speculation about a hypothetical divorce may have had. *See Old Chief v. United States*, 519 U.S. 172, 185 (1997) ("The probative worth of any particular bit of evidence is obviously affected by the scarcity or abundance of other evidence on the same point."). In light of it, Padish's testimony is needless and a waste of time. *See* Rule 403.

### B. Padish's proffered opinion is not based on sufficient facts.

Rule 702(b) requires expert opinion to be "based on sufficient facts or data." Padish relied only on some evidence disclosed to him by the prosecution to conclude that the Rudolphs' post-nuptial agreement would be summarily held to be unauthenticated. Padish does not claim to have reviewed all the available evidence regarding the document's authenticity or even to have done anything to obtain it. Additionally, he relied in large part on inadmissible hearsay statements attributed to Mrs. Rudolph six years after she purportedly made them by witness Cassandra Olmstead.

The government contends that Olmstead's proffered testimony is not hearsay under the forfeiture-by-wrongdoing doctrine, DE162:9, but its argument is flawed. If Dr. Rudolph forged that instrument, as the government contends, he necessarily did so intending to introduce it in a divorce proceeding, for which his wife would necessarily have to be *alive*. Dr.

6

Rudolph did not kill his wife to keep her from testifying in a non-existent divorce action about the post-nuptial agreement because that agreement would be useful to him *only in that divorce proceeding*, and she had to be alive for it to take place. Nor did he kill her to keep her from testifying about his infidelity in a non-existent divorce action because Arizona is a no-fault divorce state, meaning that "marital infidelity is of no relevance to a divorce proceeding in Arizona." Padish Report at 12. Nor did he kill her to keep her from testifying in some slander suit because Arizona's marital privilege law already kept her from testifying against him in any civil case. *See* Ariz. Stat. § 13-4062. So, the government's forfeiture theory holds no water, and Padish's data set for predicting this ruling is both over- and under-inclusive.

     **C.**     **Padish has not explained his methodology for predicting how judges would have ruled in hypothetical lawsuits.**

Rule 702(c) requires that an expert opinion be "the product of reliable principles and methods." Padish's qualifications as a jurist do not explain how he can predict, based on partial evidence, how a judge would decide a particular evidentiary issue in a hypothetical divorce trial that has been only sketched for him (*i.e.*, there are no hypothetical transcripts of hypothetical testimony, just hypothetical generalities and abstractions). "It is axiomatic that an expert, no matter how good his credentials, is not permitted to speculate." *Goebel v. Denver & Rio Grande Western Railroad Co.*, 215 F.3d 1083, 1088 (10th Cir. 2000).

Especially given that evidentiary questions turn on the nature and weight of all the evidence in the case, including credibility assessments, it seems highly unlikely that Padish has a reliable method for making such predictions. *See Pioneer Centres Holding Co. Employee Stock Ownership Plan v. Alerus Financial*, 858 F.3d 1324, 1333 (10th Cir. 2017)

(affirming exclusion of opinions that "would require the experts to 'read the mind' of Land Rover, predict how Land Rover would have weighed factors it deemed relevant, and find that Land Rover would not only reach the conclusion that it must consent but also do so" and "offered impermissible legal conclusions"). It seems more likely that he is just speculating off-the-cuff about what *he* might do if he were still a judge, given the prosecution's one-sided partial summary. If Padish *does* have a reliable method for predicting judges' evidentiary rulings based on one side's sketch of the gist of some of the evidence, he has not explained it.

### D. Padish's testimony is misleading and confusing rather than helpful.

Rule 702(a) requires expert testimony to "help the trier of fact to understand the evidence or to determine a fact in issue," and Rule 403 requires otherwise admissible evidence to be excluded if it will unduly mislead or confuse the jury. Padish's opinion fails these requirements for the same reasons the Tenth Circuit gave for holding that "[t]he credibility of witnesses is generally not an appropriate subject for expert testimony. ... Such testimony: (1) usurps a critical function of the jury; (2) is not helpful to the jury, which can make its own determination of credibility; and (3) when provided by impressively qualified experts on the credibility of other witnesses is prejudicial and unduly influences the jury." *United States v. Hill*, 749 F.3d 1250, 1258 (10th Cir. 2014).

First, a jury performs the identical "critical function" when it decides to credit authentication evidence as when it credits any other testimony. Whether the post-nuptial agreement is authentic is a fact question for the jury to resolve by weighing the testimony and other evidence on that point. *Id.*

8

Second, Padish's testimony is not helpful because the rules themselves presuppose that juries can decide for themselves whether a document is authentic. Once the Court determines that there is "evidence sufficient to support a finding that the item is what the proponent claims it is," Fed. R. Evid. 901, the jury weighs that evidence to decide whether it is in fact authentic. To be sure, a handwriting expert might assist the jury in making that determination, but Padish can no more tell the jury how a hypothetical judge would have ruled on the question than he can tell them what legal conclusion he, a former judge, would reach. *See Dow Corning Corp. v. Safety National Casualty Corp.*, 335 F.3d 742, 751–52 (8th Cir. 2003) ("The court acknowledged the [former-judge] expert's indisputably distinguished career and expertise but concluded that it would not consider legal opinions that 'attempt to tell the court what result to reach.'").

Far from being helpful, Padish's testimony will only mislead and confuse the jurors into abandoning their duty to independently determine authenticity. Expert testimony about what the law is or how to apply it is generally barred because it "'violate[s] the basic concept'" that the trial judge tells the jurors the law and they apply it to the facts. *Specht v. Jensen*, 853 F.2d 805, 807–08 (10th Cir. 1988) (*en banc*); *see also A.E. v. Independent School District No. 25*, 936 F.2d 472, 476 (10th Cir. 1991) ("[A]n expert may not state legal conclusions drawn by applying the law to the facts."); *United States v. Jensen*, 608 F.2d 1349, 1356 (10th Cir. 1979) ("[A]n expert witness cannot state legal conclusions by applying law to the facts, passing upon weight or credibility of the evidence, or usurping the province of the jury by telling it what result should be reached."); *RLJCS Enterprises v. Professional Benefit Trust*, 487 F.3d 494, 498 (7th Cir. 2007) ("Argument about the meaning of trust indentures, contracts, and

mutual-to-stock conversions belongs in briefs, not in experts' reports."); *Burkhart v. Washington Metro Area Transit*, 112 F.3d 1207, 1213 (D.C.Cir. 1997) ("Each courtroom comes equipped with a 'legal expert,' called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards."); *Marx & Co. v. Diners' Club Inc.*, 550 F.2d 505, 510 (2d Cir. 1977) ("'The question of interpretation of the contract is for the jury and the question of legal effect is for the judge. In neither case do we permit expert testimony.'").

Allowing a partisan former judge to tell the jury how to resolve a contested factual question would unduly influence their views on a material issue in the case. *See* Fed. R. Evid. 403. The powerful sway former judges have on jurors is such that, when they do offer relevant testimony, courts do not permit them to be referred to by any honorific, such as "judge" and "your honor." *See In re: Epi Pen Antitrust Litigation*, No. 17-MD-2785, 2022 WL 226130 at *10 (D. Kan. 2022) (collecting cases).

The government can argue at closing the non-hearsay reasons Padish gives for speculating that the agreement is inauthentic, including that the "signatures are not notarized" and that "no attorney signatures appear on it." Padish Report at 10–11. But it cannot call a former judge to argue its case from the witness stand.

**II.     Erin Newton's testimony is not helpful, is admittedly based on insufficient data, admittedly deviates from basic accounting methods, and will only waste time, confuse the issues, and mislead the jury.**

The government offers FBI forensic accountant Erin Newton to testify as to the Rudolphs' net worth and cash flow. However, she admits that she lacks sufficient expertise and information to make these calculations and that she did not follow a reliable methodology.

10

**A.     By her own admission, Newton is unqualified to evaluate the Rudolphs' finances because she lacks the necessary expertise.**

Newton admits that she lacks the necessary expertise to assess the Rudolph's most significant assets. It is common knowledge that "*Net Worth = Assets – Liabilities*," Newton Report at 3, but Newton herself admits that she deliberately undervalued the Rudolphs' real estate holdings and made no attempt to value their Pennsylvania dental practice. She admits that real estate should be valued at "current fair market valuations," but she deliberately deviated from the correct methodology and undervalued the Rudolph houses by using their "purchase price or historic cost" because her "professional expertise does not include real estate valuation." *Id.* at 3–4, 14. Similarly, she made no attempt to value the dental practice because "I do not have the business' books and records, nor do I have expertise in valuing dental practices." *Id.* at 4.

Rule 702(a) requires that only a witness qualified "by knowledge, skill, experience, training, or education may testify" as an expert. Because Newton, by her own admission, lacks "expertise in valuing dental practices" and in "real estate valuation," she is not qualified to analyze the Rudolphs' finances or to testify in this case. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) ("The trial court had to decide whether this particular expert had sufficient specialized knowledge to assist the jurors in deciding the particular issues in the case."); *United States v. Arney*, 248 F.3d 984, 991 (10th Cir. 2001) (affirming exclusion of opinion of CPA and former IRS agent because "his expertise did not extend to knowing the types of documents on which banks rely when extending credit.").

### B. Newton's analysis is unreliable because it admittedly is based on insufficient data and admittedly deviates from accepted methods.

Newton's testimony must be "based on sufficient facts or data" and must be "the product of reliable principles and methods." Rule 702(b) & (c). By her own admission, it meets neither of these requirements.

Because of her confessed lack of expertise, Newton disregarded or wildly undervalued the Rudolphs' most substantial assets. She totally excluded from her calculations their largest asset—the dental practice—because she lacked both the information and the skill to value it. She undervalued their houses because she made no effort to research their historical fair market value. She lacked "supporting information for some deposits made to and checks written from the Rudolph's checking and investment accounts" so she made blind guesses about what they were for. Newton Report at 13.

These are very significant departures from the accepted accounting methods Newton herself describes. Yet, she cannot explain or justify them. She admits that "real estate is usually presented at current fair market value." *Id.* at 4. Nonetheless, she makes little effort to explain why she "did not use these valuations in [her] net worth analysis." *Id.* Nor does she claim that she could not have researched the fair market value of houses over the last decade. She explains that she "did not include a valuation of Rudolphs' dental practice" even though she admits it is impossible to calculate net worth without valuing *all* assets. *Id.* at 3. She "assumed" without justification or explanation that checks for which there was no information "were business related expenses" rather than, say, satisfaction of debt or capital investment. *Id.* at 9, 11.

Newton's unjustified and unjustifiable failure to adhere to accepted accounting methods render her analysis and conclusions a work of fiction that distorts the Rudolphs' finances to manufacture support for the prosecution's theory. Undervaluing the real estate and disregarding the dental practice make it appear that the insurance payments resulted in a much higher percentage increase in Dr. Rudolph's net worth—66.90%—than they actually did. An accurate computation, one that properly valued the real estate and the business, would yield a far lower figure. But an accurate computation would not lend any credence to the prosecution's theory, despite the evidence, that Dr. Rudolph had financial problems. Exposing the jury to this patent misrepresentation under the guise of "expert opinion" violates both Rule 702 and Rule 403. Newton's opinion can only mislead the jury into giving the government's circumstantial case more weight than the true facts allow.

### C. Newton's testimony will mislead and confuse the jury, not help them, and unfairly prejudice Dr. Rudolph.

Rule 702(a) also requires that expert opinion be helpful to the jury. "[W]here as here expert testimony is offered on an issue that a jury is capable of assessing for itself, … it would not even marginally 'assist the trier of fact,' while it must be viewed as a 'needless presentation' (Fed. R. Evid. 403) … ." *Thompson v. State Farm Fire & Casualty Co.*, 34 F.3d 932, 941 (10th Cir. 1994); *accord Hill*, 749 F.3d at 1258; *Greene*, 239 F. App'x at 441.

Newton reaches two conclusions, neither of which is of any help in this murder prosecution. First, she concludes that, after the life insurance carriers paid on the policies for Mrs. Rudolph's accidental death, Dr. Rudolph's wealth increased by the amount of the insurance payments. Newton Report at 14 ("The increase of approximately $4.7 million [in

net worth] is due to payouts from Bianca's life insurance policies, approximately $4.9 million, received in early 2017."). That a person's wealth increases by the amount of payments he receives is self-evident without a CPA's help.

Second, Newton concludes that "the Rudolphs had a net cash outflow from June 1, 2014 to December 31, 2016 of approximately $564,850. That means the Rudolphs spent more money than they brought in." *Id.* It is inaccurate and misleading to say that a negative cash flow means that the Rudolphs "spent more money than they brought in," and Newton's own report entirely refutes her flatly false claim. According to Newton, the Rudolphs' second-largest "personal expense" during the 31-month period she examined was to pay down a line of credit at Morgan Stanley by a little more than their negative cash flow for the period. *Id.* at 4 ("The most significant expenses were hunting related expenses ($696,095); payments on Rudolph's Morgan Stanley [Portfolio Loan Account] ($579,200); and taxes and fees ($311,551)."). Paying down the principal of a loan is *not* an expense and is *not* spending. To spend means "to pay out (money) *in buying or hiring goods or services*." *New Oxford American Dictionary* (2022) (emphasis added). Paying down a loan is not "spending" because it does not decrease one's net worth the way "buying or hiring goods or services" does. Using savings to eliminate debt only shifts dollars from one side of the balance sheet to the other and usually yields a net increase in wealth over time. The fact is that the Rudolphs spent only about as much as they brought in, and also used savings to reduce an outstanding loan balance. Newton's insinuation that they overspent is plainly calculated to create support for the prosecution's preconceived narrative, notwithstanding the true facts.

Certainly, the deficiencies in Newton's qualifications, methods, data, and inferences would be exposed during cross-examination were Newton permitted to testify, but that would serve only to waste the substantial time she would be on the witness stand. The only points her analysis legitimately supports are (1) that checks from insurance companies increase one's net worth by the amount of the checks and (2) that the Rudolphs were fiscally responsible by spending within their means and using savings to eliminate debt. This is not helpful; it gets the jury no closer to a verdict in this case. Jurors can figure out Newton's first point without any help and her second point has no bearing on any material issue. *See* Fed. R. Evid. 702(a) & 403. She is being called only to mislead the jury by lending false support to the prosecution's theory through unreliable, irregular accounting methods applied to incomplete data. Testimony like hers is meant to stay outside the gate: "The district court serves as a gatekeeper, shutting the door on unreliable expert testimony." *Petersen v. Raymond Corp.*, 994 F.3d 1224, 1225 (10th Cir. 2021).

Additionally, the speculative innuendo throughout Newton's report that Dr. Rudolph may have committed financial crimes—*e.g.*, Newton claims that he "overstated his net worth by at least $1 million" on loan applications, speculates that he may not have "paid any business income tax related to [the dental practice] despite receiving over $3 million in distributions," and implies that personal travel was deducted as business travel, *id.* at 4, 9, 13—are wholly irrelevant and unfairly prejudicial. This other-acts evidence was not noticed in the government's Rule 404 disclosure and is inadmissible.

WHEREFORE the proffered testimony of James Padish and Erin Newton is inadmissible and must be excluded from the trial of this action.

**Certificate of Service**

This motion was filed and served on all parties on 22 June 2022 using CM/ECF.

        Respectfully submitted,

        MARKUS/MOSS PLLC
        40 N.W. Third Street
        Penthouse One
        Miami, Florida 33128
        Tel: (305) 379-6667
        Fax: (305) 379-6668
        markuslaw.com

        By:    <u>/s/ David Oscar Markus</u>
                    David Oscar Markus
                    Florida Bar Number 119318
                    dmarkus@markuslaw.com

                    <u>/s/ A. Margot Moss</u>
                    A. Margot Moss
                    Florida Bar Number 091870
                    mmoss@markuslaw.com