IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 22-cr-00012-WJM-2

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. **LAWRENCE RUDOLPH** and
2. LORI MILLIRON,

Defendants.

---

**GOVERNMENT'S MOTION TO EXCLUDE TESTIMONY FROM DEFENDANT RUDOLPH'S PROPOSED HANDWRITING EXPERT**

---

The defendant provided signatures to an expert document examiner that, with few exceptions, only the defendant can authenticate. Then he provided that same examiner with two originals of a one-sided, post-nuptial agreement to which he is the only living witness. Filtering what amounts to nothing more than defendant's unchallenged assertions about what Bianca signed through the avatar of an "expert" is not a scientific inquiry. It's exactly what Bianca feared and exactly what the defendant hoped for: a circumstance where Rudolph can—without cross-examination or challenge—offer a one-sided and unrebuttable assertion that he owed his wife very little after decades of marriage.

**I.   THE CIRCUMSTANCES OF THIS CASE MAKE HANDWRITING EXPERTISE PARTICULARLY FRAUGHT**

The government objects to the defendant's proposed handwriting expert for two reasons. First, the circumstances of this particular case amplify all of the concerns that have made federal courts lukewarm, at best, in their evaluation of handwriting testimony. All of the "specimen

1

documents" contain the proviso that they are "described as the uncontested signature of Bianca T. Rudolph." Attachment 1 at 3-4. Uncontested by whom? The fundamental problem here is that of the 31 signatures, only 10[1] are truly uncontested. Of those ten, only two are "wet" signatures where an examiner could actually see impressions of how the signature was created and those two are signed years after the purported post-nuptial agreement. The other eight are machine copies. The defendant is the only witness who can authenticate the other signatures, most of which relate to life-insurance policies that made the defendant the prime beneficiary of Bianca's death. The sample size here is poor and essentially amounts to the defendant's assertions about what Bianca signed.

That brings up the second problem. The defendant wants to rely entirely on the hearsay statements of declarants contained in documents that cannot be cross-examined to make the extraordinary claim that his dead wife signed a one-sided, post-nuptial agreement that no one had heard of before this litigation. The probative value of this pile of hearsay is slight and the risk of prejudice extreme: the defendant's proposal would turn this trial into a vehicle for civil litigation over the meaning of a decades-old document, without a meaningful opportunity for cross examination, all in circumstances in which he seeks to exclude what the government has asserted are the admissible statements of the only person who was in a position to challenge that document: the alleged murder victim in this case.

A.       The proffered handwriting expert does nothing more than repackage the hearsay assertions of the defendant

When it empowered district courts with wide discretion to exercise a "gatekeeping"

---

1 K20 – K-29 & K6.  K21 – K28 are machine copies of the April 25, 2016 signatures witnessed by a notary that the government was able to interview, K20 is a fuzzy photograph from Bianca's driver's license, and K6 and K29 are from her passport. Only three machine-copy signatures are even within the same decade as the purported post-nuptial agreement.

function, the Supreme Court emphasized the traditional guardrails that make courts effective arenas for the truth-seeking process: "vigorous cross-examination" and the "presentation of contrary evidence." *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 596 (1993). The defendant's proffer of expert testimony here leaps over those guardrails. The expert will do little more than convey the defendant's hearsay assertions that his wife signed documents, but without any ability by the government to cross-examine the basis for those assertions. And the defendant has moved to prevent the government from presenting its contrary evidence that the defendant routinely forged his wife's signature on documents, was good at it, and had been holding a fake post-nuptial agreement over her head for years as a means of control. Compare ECF 150 at 7–10 with ECF 162 at 5–15. These concerns are amplified by the other evidence the defendant will seek to offer, as described below.

Courts have concluded that handwriting analysis may be admissible in specific circumstances. It would be going too far to say it is *per se* unreliable. *Crew Tile Distribution, Inc. v. Porcelanosa Los Angeles, Inc.*, No. 13-cv-3206-WJM, 2016 WL 8608447, at *9 (D. Colo. 2016) (Martinez, J.). But the abstraction that it may be admissible in *some* unique circumstances does not mean that it should be admissible in all or most cases. This court has recognized that the admissibility of such evidence must be made on a case-specific basis. *Id.* Because the testimony here would not have a reliable basis in knowledge, experience, or fact, it should be excluded.

The defendant, as the proponent of the handwriting evidence, has the burden of establishing by a preponderance of the evidence that the expert evidence should be admitted. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2000). Federal Rule of Evidence 702 adopts a flexible standard, but "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the

*ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

Handwriting analysis "bears none of the indicia of science and suggests, at best, a form of subjective expertise." *Almeciga v. Center for Investigative Reporting, Inc.*, 185 F. Supp. 3d 401, 419 (S.D.N.Y. 2016). In *Almeciga* the Court dove deep into the history of the development of document analysis as an expert field and its application in federal courts around the country. Its conclusion? "[N]o studies . . . have evaluated the reliability or relevance of the specific techniques, methods, and markers used by forensic document examiners to determine authorship." *Id.* "Precisely what degree of variation falls within or outside an expected range of natural variation in one's handwriting—such that an examiner could distinguish in an objective way between variations that indicate different authorship and variations that do not—appears to be completely unknown and untested." *Id.*

The methods used by handwriting experts are "virtually untestable, rendering it an unscientific endeavor." *Id.*

All of these criticisms are even more true here where the expert relies primarily on machine-copies of signatures (so impressions of the pen and analysis of the ink are impossible to read) and has no "wet" signatures within a decade of the purported post-nuptial to compare or analyze. For the most part, the expert here is doing exactly what the defendant would do if he took the stand: asserting that certain signatures are Bianca's and then using photographs of signatures to argue that they are similar and thus hers. That is not "expert" testimony. *Id.* at 416–417 (discussing history of field and its notable mistakes).

Other *Daubert* factors like peer review and publication and the "error rates" of handwriting analysis fare no better. "[N]umerous courts have found that [t]he field of handwriting comparison . . . suffers from a lack of meaningful peer review by anyone remotely

disinterested." *Id.* (citation and internal quotation omitted). "There is no peer review by a competitive, unbiased community of practitioners and academics, as would be expected in the case of a scientific field. *Id.* (citation and internal quotation omitted). Studies on error rates are mixed at best and "cannot be said to have 'established' the validity of the field to any meaningful degree." *Id.*

The fourth *Daubert* factor likewise fails to support admission in this particular case. "[T]he field of handwriting comparison appears to be entirely lacking in controlling standards." *Id.* at 422. As the last pages of the report by Rudolph's   expert indicates, it amounts to little more than looking at photographs of signatures and seeing if they seem similar. That is something the jury itself could do.

In *Crew Tile*, this Court noted that it might take up the *Almeciga* criticisms in "an appropriate case" and noted that the result in *Almeciga* rested on a case-specific analysis under *Kumho Tire*. 2016 WL 8608447, at *8-*9. This is the appropriate case to take up those criticisms. It involves the most problematic concern of the National Academy of Sciences' 2009 report: "there may be a scientific basis for handwriting comparison, at least in the *absence of intentional obfuscation or forgery*." *Almeciga*, 185 F. Supp. 3d at 423 (emphasis added).

This court recognized that it was critical to the exclusion of the handwriting evidence in *Almeciga* that the plaintiff had altered the "known" signatures provided for analysis. *Crew Tile*, 2016 WL 8608447, at *9. And there is good reason to question the validity of the signatures reviewed here. With the few exceptions described earlier, the *only* person alive who can authenticate signatures for comparison by an expert in this case is the defendant himself. He is also the only person alive in a position to authenticate the purported post-nuptial agreement.

Meanwhile, Bianca was killed in a manner that prevents her from disputing the

defendant's version of events—exactly what the government has asserted in another filing as one of the objectives of the murder. As the Court is aware, a government witness is available to testify that before she was killed, Bianca said that Larry routinely signed her name to documents and was "good at it." Bianca specifically said that Larry had falsely created a post-nuptial agreement, had signed her name to it, and was holding it over her head as a means of control. ECF 162 at 9. And in her 2016 deposition, co-defendant Lori Milliron testified that the defendant signed her name to a document. Attachment 2 (INV_00012425, Lines 23-25).

The post-nuptial agreement that the defendant seeks to offer is over 20 years old. It bears the signatures of no attorneys. Attachment 3. There is an indecipherable scrawl above a notation for a "witness," but this person cannot be identified. The agreement lists individuals who might be consulted about it. Of those still alive, none can testify to its authenticity. No other legal documents or decisions jointly undertaken by the defendant and Bianca indicate that a post-nuptial agreement was part of their mutual expectations. Indeed, the defendant made no mention of it in a lawsuit in which he claimed adultery would work substantial hardship on him. And he told a personal friend in 2012 that he had no post-nuptial agreement but thought that Bianca might sign one. The *only* witnesses who claim to have heard about a post-nuptial are the ones with the most to gain from the existence of one: the defendant and Lori Milliron, who testified in the grand jury that Larry told her of its existence.

> **B.** **There is no probative value to be had in hosting a mini-trial disputing the validity of what purports to be a twenty-year-old contract with only the unexamined assertions of the defendant to evaluate and there is a high danger of unfair prejudice, confusion, misleading the jury, and wasting time.**

The entire thrust of the defendant's proposal has the air of a dry English serial in which interested parties unearth a decades-old, previously unknown document from the dusty files of a long-dead solicitor to enhance a litigating position. Watching that drama unfold in federal court

would be unfairly prejudicial, confusing, misleading, and a waste of time. It should be excluded under Rule 403.

The government expects that the defendant will offer the handwriting analysis to show that over twenty years ago Bianca purportedly signed a post-nuptial agreement with no identifiable witness. He will also seek to show that the post-nuptial agreement existed by offering his own statements, as documented in correspondence with a lawyer that he (but not Bianca) consulted. That lawyer-declarant is deceased and none of his contemporaries are available to provide any context. The defendant is the only witness. The handwriting analysis will thus be the culmination of a cascade of self-serving hearsay that is only relevant if you beg the question of authenticity by assuming the defendant's assertions of it.

Nor do his communications with a law firm about a post-nuptial agreement change anything. There is a reason that the hearsay exception in 801 for admissions by party opponents conspicuously allows only the *opposing* party to admit the statement of their opponent, not the opponent himself. 2 McCormick on Evidence, § 254 (8th ed. Jan. 2020 update) ("A party can hardly object that he had no opportunity to cross-examine himself or that he is unworthy of credence save when speaking under sanction of an oath."). Otherwise, witnesses would routinely be able to inject their unexamined statements into court without the meaningful scrutiny provided by cross examination. *United States v. Quansah*, 171 F. App'x 51, 52 (9th Cir. 2006) ("Self-serving statements are not exempted from the hearsay rule . . . or any other exemption or exception, and are thus inadmissible hearsay."); *United States v. Cunningham*, 194 F.3d 1186, 1199 (11th Cir. 1999) (affirming district court's preclusion of self-serving hearsay testimony because "a defendant cannot attempt to introduce an exculpatory statement made at the time of his arrest without subjecting himself to cross-examination"); *Auto-Owners Ins. Co. v. Jensen*,

667 F.2d 714, 722 (8th Cir. 1981) (citations omitted) (emphasis added) ("An admission must be offered against a party, not for him . . . An admission must be contrary to a party's position at trial.").

But that is what the defendant seeks to do here. *Cf. United State v. Smalls*, 6054 F. 3d 765, 781 (10th Cir. 2010) ("Self-exculpatory statements are exactly the ones which people are most likely to make even when they are false; and mere proximity to other, self-inculpatory, statements does not increase the plausibility of the self-exculpatory statements."). While the government does not question the authenticity of the attorney letters—there is no reason to doubt the integrity of the law firm—all the letters do is record the defendant's statements. Simply shipping self-serving statements to a law firm to keep in its files does not render them no longer hearsay.

Allowing the defendant to work an end-run around the adversarial system to insert his own un-cross-examinable statements would inflict maximum unfair prejudice on the government. Precisely because the statements in the letters cannot be cross-examined or corroborated by any witness, they would have low probative value. That the *defendant* sought a post-nuptial agreement does not make it any more or less probable that *Bianca* actually signed one.

Inserting what amounts to an entire civil controversy over the authenticity of what purports to be a twenty-two-year-old contract into a criminal case could take over the trial. Entire dockets get consumed with these kinds of disputes, which involve very different principles of civil contract law. Asking the jury to determine whether a post-nuptial agreement was valid under principles of civil law based only on the hearsay assertions of the defendant himself is bound to be confusing in the context of a case involving an alleged murder committed 16 years

later. All the more so when the probative value of the hearsay evidence the defendant seeks to admit can be evaluated against the much more probative alternative of testimony from the defendant himself, should he choose to testify. *Old Chief v. United States,* 519 U.S. 172, 185 ("[T]he Rule 403 "probative value" of an item of evidence, as distinct from its Rule 401 "relevance," may be calculated by comparing evidentiary alternatives.")

There is also a grave possibility that the jury will be misled. First, the defendant's evidence here would come in under the guise of a handwriting expert or through the filter of a lawyer. That unfairly bolsters his statements by cloaking them in the prestige of others. Second, the defendant seeks to admit his own hearsay declarations without cross-examination, while also seeking    to exclude the statements of the only witness who was in a position to challenge them: Bianca through the testimony of Cassandra Olmstead. See ECF 162 at 5–15.

## II.    CONCLUSION

Handwriting analysis is controversial and, in many specific cases, of dubious utility. This case presents a confluence of factors that amplify the concerns expressed in *Almeciga*. See *Daubert*, 509 U.S. at 595 ("Expert evidence can be both powerful and quite misleading because of the difficult of evaluating it. Because of the risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses"). A previously unknown document unearthed over twenty years later at a time of critical importance. No living witnesses to ask about the circumstances of its creation. And only the hearsay assertions of a defendant to evaluate. The defendant does not have to take the stand. But he can if he wishes. Only then would his assertions be subject to the cross-examination that John Henry Wigmore called "the greatest legal engine ever invented for the discovery of truth." And only then could the authenticity of the purported post-nuptial agreement

be fairly and accurately evaluated by the jury.

Respectfully submitted,

COLE FINEGAN
United States Attorney


By:     */s Bryan Fields*
Bryan Fields
Assistant United States Attorney
U.S. Attorney's Office
1801 California St. Suite 1600
Denver, CO 80202
(303) 454-0100
Bryan.Fields3@usdoj.gov
Attorney for the Government

By:     /s *E. Garreth Winstead*
E. Garreth Winstead
Assistant United States Attorney
U.S. Attorney's Office
1801 California St. Suite 1600
Denver, CO 80202
(303) 454-0100
Garreth.Winstead@usdoj.gov
Attorney for the Government

By:     /s *J. Bishop Grewell*
J. Bishop Grewell
Assistant United States Attorney
U.S. Attorney's Office
1801 California St. Suite 1600
Denver, CO 80202
(303) 454-0100
Bishop.Grewell@usdoj.gov
Attorney for the Government

## CERTIFICATE OF SERVICE

I hereby certify that on the 22nd day of June, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to any and all counsel of record.

s/ Bryan Fields
United States Attorney's Office

11