IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 22-cr-00012-WJM-1

UNITED STATES OF AMERICA,

     Plaintiff,

v.

   1. **LAWRENCE RUDOLPH** and
   2. LORI MILLIRON,

     Defendants.

---

## GOVERNMENT'S RESPONSE TO DEFENDANT LAWRENCE RUDOLPH'S MOTION TO EXCLUDE EXPERT TESTIMONY AND REQUEST FOR HEARING

---

The defendant told the court in January that he had been hiring his own experts and putting together his own evidence. Detention Hrg. Tr. at 142. On Wednesday—months after the discovery deadline—he provided a 70-page expert accounting report built on voluminous records produced only today and has asked to exclude the government's accountant largely on the basis that her report fails to reference all the records he wants to use. This is not a valid basis for exclusion.

The defendant also seeks to exclude expert testimony related to a dispute over the validity of a post-nuptial agreement unknown to any living witness until this litigation while offering his own expert to do the same. But the arguments he makes to exclude the government's expert apply with equal or more force to the handwriting expertise he wants to admit. If the handwriting expert comes in to evaluate the post-nuptial agreement, so should the divorce expert. The defendant's Motion to Exclude Expert Testimony and Request for Hearing, ECF No. 168, should be denied.

I.    **Applicable Law**

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993), the

Supreme Court held that Rule 702 imposes a dual obligation upon a trial judge to ensure that

scientific testimony is both relevant and reliable. *Id.* at 589. The Supreme Court subsequently

extended these requirements for experts with "technical" and "other specialized" knowledge and

established a standard of evidentiary reliability for all expert witnesses. See *Kumho Tire Co. v.

Carmichael*, 526 U.S. 137, 147–48 (1999). Following *Kumho*, the trial judge is required to

"inquire into the areas of relevance and reliability whether the expert testimony is 'scientific' or

otherwise." *United States v. Majors*, 196 F.3d 1206, 1215 (11th Cir. 1999).

"[F]ederal district courts . . . perform [this] important gatekeeping function by screening

the reliability of all expert testimony, but they have substantial discretion in deciding how to test

an expert's reliability and whether the expert's relevant testimony is reliable." *Majors*, 196 F.3d

at 1215 (quotation omitted). Rule 702 states that an expert may give opinion testimony "if (1) the

testimony is based upon sufficient facts or data; (2) the testimony is the product of reliable

principles and methods; and (3) the witness has applied the principles and methods reliably to the

facts of the case." Fed. R. Evid. 702; see also *Allison v. McGahn Med. Corp.*, 184 F.3d 1300,

1306 (11th Cir. 1999) (stating that scientific expert testimony is admissible when "the expert is

qualified to testify competently regarding the matters he intends to address," "the methodology

by which the expert reaches his conclusion is sufficiently reliable as determined by the sort of

inquiry mandated in *Daubert*," and "the testimony assists the trier of fact, through the application

of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact

in issue") (citation omitted).

Under the *Daubert* reliability prong, parties "do not have to demonstrate to the judge by a

preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that their opinions are reliable." *In re Paoli* R.R. *Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994) (emphasis in original). "The evidentiary requirement of reliability is lower than the merits standard of correctness." *Id.* "As long as an expert's scientific testimony rests upon 'good grounds, based on what is known,' it should be tested by the adversary process—competing expert testimony and active cross-examination— rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies." *United States v. Mitchell*, 365 F.3d 215, 244 (3d Cir. 2004) (quotation omitted).

Under Rule 702, the court must determine whether an expert's opinion on the subject will "assist the trier of fact," or, in other words, be helpful to the jury. See, e.g., U*nited States v. DiDomenico*, 985 F.2d 1159, 1163 (2d Cir. 1993). This helpfulness requirement calls for a "common sense inquiry into whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute." *United States v. Locascio*, 6 F.3d 924, 936 (2d Cir. 1993) (internal quotation marks omitted); *United States v. Onumonu*, 967 F.2d 782, 788 (2d Cir. 1992). "Expert witnesses are often uniquely qualified in guiding the trier of fact through a complicated morass of obscure terms and concepts." *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994). Therefore, in this regard, the "Rules of Evidence provide a liberal standard for the admissibility of expert testimony." *United States v. Dukagjini*, 326 F.3d 45, 52 (2d Cir. 2003).

## II.   Padish's testimony will help the jury navigate the regulatory landscape confronting the defendant before his wife's death.

The defendant makes four arguments to exclude the government's divorce expert: (1) that it is irrelevant, (2) that it is based on incomplete evidence, (3) that the methodology used is unexplained, and (4) that it accords with common knowledge. None of these reasons are a proper basis to exclude Padish's testimony.

### A.   Evidence regarding the procedures, standards, and possible outcomes of a divorce proceeding is relevant to the defendant's motive.

Does the *fact* that a husband could lose a significant amount of money in a divorce make it more or less probable that he had a motive to kill his wife instead of facing that consequence? Legal reporters are stuffed with gruesome stories giving the unfortunate answer: yes. *Bricker v. Commonwealth*, 102 S.W. 1175, 1175 (Ky. 1907) ("Appellant's motive for the crime was clearly established by the evidence, which shows that he and his wife were not living upon amicable terms; that she had filed a suit for divorce against him, and they were having trouble over their property rights, with respect to which she had but a day or two before the murder especially excited his indignation by refusing to unite with him in a deed conveying his land, which had prevented his selling it."); *Samuels v. State*, 11 So. 3d 413, 418 (Fla. Dist. Ct. App. 2009) ("Documents from the child custody case were relevant to the state's theory that the shootings were the culmination of a litigious battle over child custody and child support. The documents were inextricably intertwined with the state's case in showing motive."); *Com. v. Carriere*, 470 Mass. 1, 13, 18 N.E.3d 326, 337 (2014) ("The evidence of the defendant's motive to kill his wife hinged on her refusing to give him a divorce or to accept money to "just go away," and the defendant's belief that his wife would take everything he owned in a divorce."); *United States v. Tokars*, 95 F.3d 1520, 1535 (11th Cir. 1996) ("Tokars knew of the change in Sara's state of mind

when he asked Lawrence to kill her. The fact that she wanted to divorce him and take all of his money is what apparently prompted him to have her killed."); *People v. Covlin*, 205 A.D.3d 578 (N.Y. App. Div. 2022) ("While defendant and the victim were in divorce proceedings, defendant had a motive to kill his wife in order to inherit her money before she modified her will, as well as to access money defendant's children would inherit from the victim, their mother.").

The defendant asserts that fact is only relevant if there is evidence he knows about it. He cites no cases for that principle, instead citing an inapposite case where a defendant tried to establish his own good faith with an expert he had not consulted with. Testimony about the process, standards, and possible outcomes of a divorce is plainly relevant in a proceeding where one of the many motives established by the evidence is the defendant's desire to avoid a divorce proceeding. It would be relevant even in the absence of any evidence the defendant knew it. But in this case, as the defendant himself references, there *is* evidence that the defendant knew the contours of a potential divorce proceeding.

The defendant references one of the witnesses who will testify that he was worried about the financial outcome of a divorce. ECF No. 168 at 6. Another witness who was dating Lori Milliron's son will testify that she heard Milliron and Rudolph arguing. Milliron told Rudolph he needed to divorce his wife. Rudolph responded to the effect of, "I can't divorce her, I'll lose everything." Another—a woman who carried on an affair with Rudolph before he was with Milliron—will, if necessary, testify that Rudolph routinely explained he didn't want a divorce because he didn't want to lose money.

Testimony about the legal landscape, the applicable procedures, the potentially precarious status of the prenuptial agreement, and the fact that divorce likely would have been devastating

to Rudolph's finances helps explain why he chose murder instead of divorce. Motive is a fact of extreme consequence. Padish's testimony is relevant.

### B. Padish's opinion is based upon sufficient facts and will be supplemented based upon newly-disclosed defense evidence.

The government endeavored to obtain expert opinions well in advance of the expert disclosure deadline to avoid any last-minute delays. It advised the defendant it would seek an expert in divorce law back in April and provided the expert with what the defendant had produced to the government at that time: the purported post-nuptial agreement. Last Wednesday—the day expert disclosures were due—the defendant produced 18 previously undisclosed letters comprising correspondence between Rudolph and a deceased attorney showing Rudolph's desire to obtain a post-nuptial agreement and a handwriting analysis based on documents that were available to the defendant since at least February. It is not fair to hold back the evidence that he wants to use to authenticate the post-nuptial agreement until the last minute and then accuse the government of giving its expert insufficient data when it didn't have that data in the first place. The government intends to obtain a revised opinion based on the new information provided and will provide its expert with any information the defendant requests.

But in the meantime, the defendant's claim that Padish had insufficient facts or data is overbroad. There can be no doubt that he has sufficient facts and data to describe for the jury the regulatory framework that governed the defendant's marriage and any efforts to dissolve it.

The rest of the defendant's insufficiency claim is dedicated to arguing the matters surrounding Bianca's statements, which is irrelevant to this context. If the court rules that the statements are admissible, they are proper for the government's expert to take into account. If they are inadmissible, the government will not attempt to bring them in through Padish's testimony.

In short, the defendant's "sufficiency" argument is either the product of his own evidentiary disclosure schedule or just the cross-examination he could give at trial. It is not a reason to exclude testimony altogether. *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co., Ltd.*, 769 F. Supp. 2d 269, 285 (S.D.N.Y. 2011) ("Questions over whether there is a sufficient factual basis for an expert's testimony may go to weight, not admissibility.") (internal quotation marks omitted).

> **C.**   **Padish's testimony is based upon proper bases of specialized legal knowledge and experience, as well as principles of law.**

"The goal of a Rule 702 analysis is to make certain that an expert, whether basing testimony on professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Stone v. High Mountain Mining Co., LLC*, No. 19-CV-1246-WJM-STV, 2022 WL 79861, at *1 (D. Colo. Jan. 7, 2022) (citation omitted). Padish's opinion is precisely the sort of opinion, analysis, and advice that the practice of an expert in this legal field would involve. It is no more than empty rhetoric to say that a lawyer is trying to "read the mind" of a court, or is just "speculating," when he or she offers analysis and advice. Lawyers, like all experts, gather information and render opinions based on their knowledge and experience with how courts behave and react. The defendant's arguments are proper for cross-examination, but are not a reason to exclude the expert.

> **D.**   **Testimony from a divorce expert about the consequences of divorce would be helpful to a jury considering whether the defendant sought to avoid those consequences by finding another way to end his marriage.**

There is no danger, such as in *United States v. Hill*, 749 F.3d 1250, 1258 (10th Cir. 2015), that the government's expert will usurp the role of the jury by making a credibility finding about a witness. There are no witnesses to the defendant's purported post-nuptial agreement

besides the defendant. Also, the defendant conflates two facts: whether the post-nuptial agreement actually bears Bianca's signature, and how that document would be treated, along with the procedure and likely outcome, at a divorce proceeding were it to be challenged by Bianca. Those two facts, while related, are not the same. Expert testimony about the second will be helpful to the trier of fact, and will not usurp the role of the jury in determining the first.

Lawyers testify as experts all the time about collateral factual issues relevant to a larger legal determination. "Merely being a lawyer does not disqualify one as an expert witness. Lawyers may testify as to legal matters when those matters involve questions of fact." *Askanase v. Fatjo*, 130 F.3d 657, 672-673 (5th Cir. 1993). It would be one thing if Padish was going to offer a legal opinion about the elements of foreign murder or mail fraud. He's not doing that. He's going to describe the *fact* that divorce in Arizona results in equitable distribution. He will describe the fact that marriage is governed by a regulatory framework with rules, norms and customs that are not within the ken of most lay people. In that respect, it is no different than an expert in a Medicare fraud trial who testifies about Medicare rules and regulations that help determine whether a claim is permitted, *United States v. White*, 492 F.3d 380, 403–04 (6th Cir. 2007), an expert in a misbranding case who testifies about how the FDA reacts to new devices, see, e.g., *United States v. Barile*, 286 F.3d 749, 759 (4th Cir. 2002), or an expert in securities law who testifies about how boilerplate language is interpreted, *Huddleston v. Herman & MacLean*, 640 F.2d 534, 552 (5th Cir. 1981).

Even the defendant admits that this is ultimately a fact question. His complaint is not about a legal opinion, but instead that the expert will help the jury resolve a "contested factual question," Def. Motion. at 10, and that the expert's credentials are too powerful. The government

will elicit testimony from the witness about his credentials but it will call him "Mr. Padish."

Only one person in the courtroom will be called "judge" and "your honor."

### III.   The government's accounting expert should be permitted to revise her report based on the voluminous records the defendant offered only yesterday and an opinion on the financial ramifications of the defendants' crimes is relevant.

The defendant does not challenge the government expert's credentials. He does not

challenge the use of accounting methodologies. Instead, he criticizes the expert for not having

access to information—like the valuation of his businesses—that he conspicuously avoided

providing during the relevant time period.

The defendant has made arguments about the defendant's wealth and its relevance to

motives since January. On Wednesday, several months after the discovery disclosure deadline,

he produced a 70-page expert report relying extensively on what the defendant has characterized

as "voluminous" business records and documents that the government only received today. The

government has provided them to its expert for a review. To the extent the criticism is that the

government's expert had insufficient data, review of that information will remedy this

deficiency. It is also likely to change her opinion and, for that reason, a decision on the matter

should be deferred until her final report can be completed.

The defendant criticizes the government's expert for not having the "necessary expertise

to assess Rudolph's most significant assets." Def. Mot. at 11. But this is just another way of

criticizing the government for not assessing the information he provided to his own expert but

only today provided to the government. Significantly, the defendant's accountant is not an expert

in valuing real property either:   he had access to a real estate appraisals by an outside expert,

which he then evaluated under traditional accounting methods. Now that the government has this

information, its accountant can do likewise. The same is true of the business valuation.

The defendant uses a dictionary to quibble with the government expert's use of the word "spending" in her cash flow analysis, cutting down a tree in the middle of the forest. "Spend" also means "to use up or pay out" *Merriam-Webster Online Dictionary*, https://www.merriam-webster.com/dictionary/spend (last visited June 24, 2022), and paying out *cash* does in fact mean that one has less cash, even if the balance sheet is the same. That is, the defendant is conflating *cash flow* with *net worth*: a person can conduct transactions that leave his net worth the same, while reducing the amount of cash on hand. That the Rudolphs were wealthy, but spending more cash than they brought in is helpful to the jury. Professional hunters, tour guides, and airlines don't take houses and businesses as payment. If the defendant wanted to keep financing his lifestyle without making other decisions about his assets, he needed more cash. Almost $4.8 million in insurance proceeds before starting a new life with his mistress fixed that problem.

The government is assessing the information the defendant provided and will produce a revised expert accounting report. His motion should be denied, with leave to renew if the government's expert reaches different conclusions than his own after having access to the same materials.

Respectfully submitted,

COLE FINEGAN
United States Attorney

By:    */s Bryan Fields*
Bryan Fields
Assistant United States Attorney
U.S. Attorney's Office
1801 California St. Suite 1600
Denver, CO 80202
(303) 454-0100
Bryan.Fields3@usdoj.gov
Attorney for the Government

By:    */s E. Garreth Winstead*
E. Garreth Winstead
Assistant United States Attorney
U.S. Attorney's Office
1801 California St. Suite 1600
Denver, CO 80202
(303) 454-0100
Garreth.Winstead@usdoj.gov
Attorney for the Government

By:    */s J. Bishop Grewell*
J. Bishop Grewell
Assistant United States Attorney
U.S. Attorney's Office
1801 California St. Suite 1600
Denver, CO 80202
(303) 454-0100
Bishop.Grewell@usdoj.gov
Attorney for the Government

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 24th day of June, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to any and all counsel of record.


*<u>s/ Garreth Winstead</u>*
United States Attorney's Office