IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Criminal Case No. 22-cr-012-WJM

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. LAWRENCE RUDOLPH, and
2. LORI MILLIRON,

    Defendants.

## ORDER ON DEFENDANTS' MOTIONS *IN LIMINE*

As set forth in the Superseding Indictment, a grand jury has charged Defendant Lawrence Rudolph with one count of foreign murder in violation of 18 U.S.C. §§ 1119 and 1111 ("Count 1"), and one count of mail fraud in violation of 18 U.S.C. §§ 1341 and 2 ("Count 2"). (ECF No. 53.) Also set forth in the Superseding Indictment, a grand jury has charged Defendant Lori Milliron with one count of being an accessory after the fact to homicide in violation of 18 U.S.C. § 3, one count of obstruction of a grand jury proceeding in violation of 18 U.S.C. § 1503, and five counts of perjury before a grand jury in violation of 18 U.S.C. § 1623(a). (*Id.*) This matter is currently set for a 13-day jury trial beginning on July 11, 2022. (ECF No. 105.)

This case is before the Court on: (1) Rudolph's Motion *in Limine* ("Rudolph MIL") (ECF No. 150), to which the Government responded (ECF No. 162); and (2) Milliron's Motion *in Limine* ("Milliron MIL") (ECF No. 158), to which the Government responded (ECF No. 179).

The Court presumes familiarity with the facts of the case, as well as the Court's prior orders. For the following reasons, Rudolph's MIL is granted in part and denied in part, and Milliron's MIL is granted in part and denied in part.

## I. LEGAL STANDARDS

"The admission or exclusion of evidence lies within the sound discretion of the trial court . . . ." *Robinson v. Mo. Pac. R.R. Co.*, 16 F.3d 1083, 1086 (10th Cir. 1994); *see also United States v. Golden*, 671 F.2d 369, 371 (10th Cir. 1982) ("Trial judges have discretion to decide whether an adequate foundation has been laid for the admission of evidence.").

Under Federal Rule of Evidence 401, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would without the evidence; and (b) the fact is of consequence in determining the action." Relevant evidence is generally admissible and should only be excluded "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. "Irrelevant evidence is not admissible." Fed. R. Evid. 402.

The movant "has the burden of demonstrating that the evidence is inadmissible on any relevant ground," and a court "may deny a motion *in limine* when it lacks the necessary specificity with respect to the evidence to be excluded." *Pinon Sun Condo. Ass'n, Inc. v. Atain Specialty Ins. Co.*, 2020 WL 1452166, at *3 (D. Colo. Mar. 25, 2020) (quoting *First Sav. Bank, F.S.B. v. U.S. Bancorp*, 117 F. Supp. 2d, 1078, 1082 (D. Kan. 2000)).

Federal Rule of Evidence 404(b)(1) provides that "[e]vidence of any other crime,

wrong, or act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." It may, however, be admissible for other purposes, such as "proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). The Tenth Circuit "instructs courts to consider four factors in weighing the admissibility of evidence under Rule 404(b): (1) whether the evidence is offered for a proper purpose, (2) its relevancy, (3) that the probative value of the evidence is not substantially outweighed by its prejudicial effect, and (4) a limiting instruction is given if the defendant so requests." *United States v. Mares*, 441 F.3d 1152, 1156 (10th Cir. 2006) (citing *Huddleston v. United States*, 485 U.S. 681, 691 (1988)).

## II. ANALYSIS

**A.    Rudolph's MIL**

   1.    <u>Images of Bianca Rudolph with Hunting Trophies</u>

Rudolph requests that the Court exclude images of Bianca Rudolph ("Bianca") posing with slain animals. (ECF No. 150 at 1.) According to Rudolph, these images are irrelevant because they do not show that she developed any hunting proficiency or expertise. (*Id.*) He argues that professional hunters always helped Bianca with everything from "loading her weapon to butchering and skinning the slain prey" and that the photographs give no reason to believe Bianca did more than "aim, pull the trigger, and pose for a picture." (*Id.* at 2.) Therefore, Rudolph contends that these images will mislead the jurors into drawing the unsupported conclusion that Bianca was more capable with firearms than she actually was. (*Id.* at 3.) Additionally, Rudolph argues that the photographs will cause unfair prejudice under Rule 403 because jurors may find them "gruesome, distressing, or enraging" and punish Rudolph for uncharged innocent

3

conduct.  (*Id.*)

In response, the Government argues that the photographs are probative of Bianca's familiarity and skill with a firearm and are not unfairly prejudicial.  (ECF No. 162 at 1.)  Specifically, the Government posits that the photographs tend to make it more probable that Bianca was familiar with firearms, which makes an accident less probable.  (*Id.* at 2.)  Moreover, any contention by Rudolph that Bianca was not proficient with firearms goes to the weight of the photographs, rather than their admissibility.  (*Id.*)

Regarding Rudolph's Rule 403 argument, the Government argues that there are four reasons why the risk of prejudice is low, including: (1) the parties have agreed to a jury questionnaire that asks three questions about hunting, including whether jurors find it immoral; (2) the parties will hear from several witnesses that the Rudolphs were passionate hunters, and therefore, no juror will be led to believe that Bianca went to Zambia in 2016 to hunt a large cat without prior hunting experience; (3) the photographs are of Bianca, not Rudolph, and therefore it is unlikely that jurors will convict Rudolph of murder because his wife hunted large cats; and (4) "this is Colorado," where "hunting and hunting pictures are prevalent."  (*Id.*)

Upon due consideration, the Court will permit the Government to introduce images of Bianca posing with slain animals.  The Court agrees with the Government that such evidence tends to make it more probable that Bianca was familiar with firearms, which makes the likelihood of her shooting herself by accident less probable. Additionally, the Court finds that Rudolph is protected from undue prejudice under Rule 403 in light of the jury questionnaire, the circumstances of the couple's trip to Zambia (to

4

hunt), and the fact that the photos are of Bianca, and not Rudolph. Therefore, the Court denies this portion of Rudolph's MIL.

      2.      <u>Otto Westhassel's Testimony</u>

Rudolph requests that the Court exclude what he argues is expert opinion testimony from the Government's lay witness, Otto Westhassel. (ECF No. 150 at 4.) He states that the Government plans to call Westhassel to testify that based on his training and experience as a United States Marine for more than 20 years, Bianca's fatal injury was caused by a shot fired from 10 meters' distance. (*Id.*) According to Rudolph, such testimony violates Rule 701, which requires lay opinion testimony to be "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701.

In response, the Government argues that Westhassel will not render an opinion connecting facts together or tell the jury that Rudolph is guilty beyond a reasonable doubt. (ECF No. 162 at 3.) Further, he will not tell the jury how far the shotgun was from any wound because he did not personally see what happened. (*Id.*) Rather, the Government states that Westhassel will provide percipient witness testimony and "describe what he personally observed while standing over Bianca's body, separately describe what he has seen buckshot do after leaving the barrel of a shotgun, and let the jury make up its own mind after the defense conducts a thorough cross-examination of his bases of knowledge." (*Id.*)

The Court grants this portion of Rudolph's MIL only to the extent that it will hold the Government to its representations that Westhassel will offer solely lay opinion

5

testimony.  Westhassel may offer primary, first-hand accounts of what he saw and observed about Bianca's body and the shotgun lying nearby.  However, as the Government states, "any expert opinions about inferences that can be drawn from those facts through the use of specialized knowledge" must be elicited from the Government's noticed forensic medical examiners, blood spatter specialists, and ballistics experts.  (ECF No. 162 at 5.)

      3.    <u>Bianca Rudolph's Statements to Cassandra Olmstead</u>

Rudolph states that the Government intends to introduce under Federal Rule of Evidence 804(b)(6)[1] statements made by Bianca to Cassandra Olmstead in May or June 2016.  (ECF No. 150 at 7.)  According to Rudolph, Olmstead claims that Bianca told her that:

> (1) Dr. Rudolph signed her name on a lot of documents and was good at it; (2) she was afraid of divorcing Dr. Rudolph because she could not take care of herself and was afraid of losing the kids; (3) she gave Dr. Rudolph an ultimatum about his affair; and (4) she knew Dr. Rudolph might try to kill her during the first hunting trip of 2016 but went anyway to try to save her marriage.

(*Id.*)  Rudolph argues these statements are hearsay.[2]  (*Id.*)  He concedes the statements are not testimonial.  (*Id.*)  However, Rudolph argues that the statements are inadmissible because "the Supreme Court has made clear that the forfeiture-by-

---

[1] Rule 804(b) provides that the following "are not excluded by the rule against hearsay if the declarant is unavailable as a witness," and Rule 804(b)(6) states: "Statement Offered Against a Party That Wrongfully Caused the Declarant's Unavailability.  A statement offered against a party that wrongfully caused--or acquiesced in wrongfully causing--the declarant's unavailability as a witness, and did so intending that result."

[2] Rudolph states that the parties agree the statements are hearsay.  (ECF No. 150 at 7.)  However, in its response, the Government argues that the statements are admissible as long as they are (a) not hearsay or (b) subject to a hearsay exception.  (ECF No. 162 at 6.)  Further, the Government states that the statements it will offer "fall into both of those categories," which apparently contradicts Rudolph's statement that the parties agree the statements are hearsay.

6

wrongdoing doctrine has no application in a homicide case like this one, where the accused is not alleged to have killed the declarant with the specific design of keeping her from testifying." (*Id.* (citing *Giles v. California*, 554 U.S. 353 (2008)).) Specifically, Rudolph argues that the Government's theory is that he killed Bianca for financial reasons—"to collect insurance proceeds and avoid a purportedly costly divorce"—not to prevent her from testifying in any proceeding. (*Id.*)

In response, the Government argues that Bianca's revelations about Rudolph's affairs exposed him to "extraordinary legal risks." (ECF No. 162 at 6.) The Government describes conversations between Rudolph and his friend concerning the fact that Rudolph was concerned about his legal position in any divorce because he and Bianca had no prenuptial agreement. (*Id.*) According to the Government, Rudolph and the friend also discussed the possibility of a postnuptial agreement. (*Id.*)

The Government also explains that around the same time, Rudolph faced allegations from his former friends that "he had abused his position as an officer in the hunting club to carry on extramarital affairs," and as a result, Rudolph sued his former friends in the hunting organization for defaming him with allegations of adultery. (*Id.* at 7.) Further, the Government explains that around this time, Rudolph and Milliron's relationship had "rapidly intensified." (*Id.*) Given these circumstances, over the years and around 2016, the Government states that "Rudolph faced the real possibility that his wife would be a witness against him in both his civil case against former colleagues in the hunting club and in a civil divorce proceeding." (*Id.* at 7–8.)

The Government goes on to explain in great detail the circumstances surrounding the challenged hearsay statements, the substance of which the Court will

not reiterate here.  (*Id.* at 8–16.)  Moreover, the Government states that to find that Rule 804(b)(6) applies, the Court must make a finding by a preponderance that the elements of the rule are satisfied: that Rudolph wrongfully prevented Bianca from being a witness, and that he did so, in part, intending to make her unavailable as a witness.  (*Id.* at 15 (citing *United States v. Cherry*, 217 F.3d 811, 815 (10th Cir. 2000) ("The usual Rule 104(a) preponderance of the evidence standard has been adopted in light of the behavior new Rule 804(b)(6) seeks to discourage.")).)  As this is a Rule 104 determination, the question is whether there is sufficient evidence to meet that preponderance standard.  *See Huddleston v. United States*, 485 U.S. 681, 690 (1988) (discussing standard for conditional facts).

  According to the Government, it will call Olmstead late in its case.  (ECF No. 162 at 15.)  By that time, the Government predicts that the Court will have heard all of the evidence necessary to determine if there is sufficient evidence (under Rule 104's preponderance standard) to conclude that Rudolph killed his wife.  Then, upon a proffer of Olmstead's testimony (or after a brief recess during trial when Olmstead could testify to the Court about Bianca's statements), the Court may determine whether Rudolph did so in part to make Bianca unavailable to offer the statements that she made to Olmstead at a future proceeding.  (*Id.*)

  The Court determines that the Government has the stronger argument on these points, and it will proceed in the manner suggested by it and outlined above.  Therefore, the Court denies this portion of Rudolph's MIL, but it does so without prejudice. Rudolph may raise these arguments again as objections at trial, if appropriate given the evidence that has or has not been introduced at that point in the trial, and before

Olmstead testifies.

**B.     Milliron's MIL**

    1.     Healthcare Fraud

Milliron requests that the Court exclude evidence about alleged healthcare fraud during her employment with Three Rivers Dental Group. (ECF No. 158 at 1.)

In response, the Government states that to prove Count 5[3] against Milliron, it will offer testimony "that Rudolph gave a lot of cash to her," but clarifies that the "testimony will be offered without reference to fraud." (ECF No. 179 at 1.) The Government states that the healthcare fraud allegations will only become relevant "if Rudolph opens the door by making arguments about the high value of his business at trial." (*Id.*) Further, the Government states that it "would be difficult to sell a business generating large amounts of cash under questionable circumstances." (*Id.*)

The Court will hold the Government to its representation that it will not introduce the healthcare fraud evidence related to Milliron at trial unless Rudolph or Milliron opens the door. Therefore, based on the Government's representations, the Court denies this portion of Milliron's MIL as moot. However, Milliron may raise her objections again at trial, if necessary.

    2.     Arson

Milliron requests that the Court exclude evidence related to a small fire at Milliron's abandoned former residence in 2010. (ECF No. 158 at 2.) Specifically, Milliron wishes to exclude such evidence because she suggests the Government will

---

[3] Count 5 is a charge of perjury before the grand jury against Milliron related to other substantial sources of cash income while she worked at Three Rivers Dental Group. (ECF No. 53 at 3–4.)

9

introduce allegations of arson.

In response, the Government states that it "will not introduce the arson evidence at trial." (ECF No. 179 at 1.)

The Court will hold the Government to its representation that it will not introduce the arson evidence related to Milliron at trial. In light of the Government's representation, the Court denies this portion of Milliron's MIL as moot.

3. <u>Propofol</u>

Milliron requests that the Court exclude evidence from Three Rivers Dental Group employee Sherry Houk, which shows that Houk purchased propofol—a general anesthetic which is administered intravenously—for Rudolph at Milliron's request close in time to Bianca's death. (ECF No. 158 at 2.) Milliron states that the Government has not alleged that Milliron ever obtained the propofol, nor that the drug played any part in Bianca's death. Further, Milliron argues that the mention of the alleged purchase of propofol will confuse the jury and create prejudicial speculation on their part as to the reason for its alleged purchase in a dental practice.

In response, the Government explains that it will introduce evidence from an expert witness that propofol is an anesthesia drug that causes loss of consciousness and in higher doses, its suppression of the nervous system causes death. (ECF No. 179 at 1.) The Government states that the fact that Rudolph took an "additional murder weapon (a vial of propofol) with him before the fatal hunt in 2016—and that Milliron took special care to help him procure it—is relevant to premeditation and to Milliron's knowledge of that premeditation before her 2022 testimony." (*Id.* at 2.) As such, the Government argues, the propofol is evidence of Milliron's guilt regarding Counts 3, 4, and 9. (*Id.*)

The Government explains that a witness who worked for Milliron and Rudolph between 2014 and 2022 is expected to testify that just before Rudolph and Bianca left for Zambia, Milliron gave the witness "unusual and particular instructions for an upcoming special delivery: a vial of propofol." (*Id.*)  The witness was instructed to give the vial to Rudolph, though the Government states that Rudolph's dental practice used outside anesthesiologists and did not keep sedation drugs in the office. (*Id.*)  Given the foregoing evidence, the Government argues that the fact that Milliron helped Rudolph procure the propofol for the Zambia trip is evidence that he planned a murder and Milliron was aware of those plans before she testified before the grand jury. (*Id.*)

The Court agrees with the Government and will allow it to introduce evidence of Milliron's role in obtaining propofol for Rudolph.  Based on the Government's detailed description of the witness's forthcoming testimony regarding the unusual procurement of propofol for Rudolph through Milliron, as well as the timing of such procurement, the Court concludes that such evidence is relevant to the charges against Milliron and will not exclude this evidence on a motion *in limine*.  The Court also determines that the introduction of such evidence in context at trial will not confuse the jury, nor does it risk unfair speculation in violation of Rule 403.  Therefore, this portion of Milliron's MIL is denied.

    4.    <u>Deposition</u>

Milliron seeks to exclude her August 3, 2016 deposition testimony (ECF No. 179-1) from Rudolph's civil litigation against Safari Club International ("SCI"). (ECF No. 158 at 4.)  Milliron believes that the Government will attempt to identify evasive or untruthful statements in her deposition to show a propensity for lying under oath. (*Id.*)  She argues that such evidence violates Rule 404(b) because it is propensity evidence,

though she concedes the transcript could be used for impeachment on any alleged inconsistent statement with her trial testimony. (*Id.*) Therefore, she argues that the deposition should be excluded pending a proffer as to its relevance. (*Id.* at 5.)

In response, the Government explains that in 2016, Milliron lied in the deposition to conceal her financial and romantic relationships with Rudolph. (ECF No. 179 at 2.) The Government argues that Milliron's concealment of her financial relationship with Rudolph is direct evidence of her knowledge of its importance, her intent to conceal it, and her coordination with Rudolph to conduct that concealment. (*Id.*) Additionally, the Government argues the concealment illustrated in the deposition is direct evidence of Milliron's "working as an accessory to take action to preserve their [Milliron and Rudolph's] life together." (*Id.* at 3.)

Regarding the romantic relationship the Government argues that Milliron's concealment of the relationship in her deposition is direct evidence refuting her 2022 testimony that the Rudolphs had an open marriage and that Milliron and Rudolph did not hide their relationship from Bianca. (*Id.*) Further, the Government argues that the deposition is evidence that Milliron intentionally sought to stop the jury from indicting Rudolph by obstructing the grand jury's investigation with false testimony in 2022 that she and Rudolph were friends who traveled together. (*Id.* at 3–4.)

The Government responds to Milliron's Rule 404(b) argument by contending that the deposition is "not 'other' acts evidence covered by Rule 404(b)" because it "provides 'contextual and background information' about their relationship to the jury." (*Id.* at 5 (citing *United States v. Kupfer*, 797 F.3d 1233, 1228 (10th Cir. 2015) (laying out test for determining whether evidence is intrinsic, and thus not covered by Rule 404); *United*

*States v. Williams*, 934 F.3d 1122, 1133–34 (10th Cir. 2019) (concluding that prior statements by defendant were not 404(b) evidence where they explained earlier relevant circumstances and presaged later testimony about the same subject); *United States v. Irving*, 665 F.3d 1184, 1212–13 (10th Cir. 2011) (concluding that prior events helping explain motives for why defendant would want someone dead were intrinsic)).) Without it, the Government argues that the jury "will be left with a large gap in both Milliron's and Rudolph's motivation and knowledge." (*Id.*)

The Court notes that the Government did not include Milliron's deposition in its Notice of Rule 404(b) Evidence. (ECF No. 118.) Nonetheless, the Court agrees with Milliron that the Government's use of the deposition in its case in chief would constitute evidence of her propensity to lie under oath, in violation of Rule 404(b). Of course, even Milliron concedes that should she testify at trial, the Government may use the deposition for impeachment purposes. Therefore, the Court grants this portion of Milliron's MIL.

### III. CONCLUSION

For the reasons set forth above, the Court ORDERS:

1. Rudolph's Motion *in Limine* (ECF No. 150) is GRANTED IN PART AND DENIED IN PART to the extent set forth above; and

2. Milliron's Motion *in Limine* (ECF No. 158) is GRANTED IN PART AND DENIED IN PART to the extent set forth above.

Dated this 27th day of June, 2022.

BY THE COURT:

_____
William J. Martinez
United States District Judge