

INEX Litigation Support Services

**40 Stark Street**
**Manchester, NH 03101-1934**
**Phone:  (603) 665-6000**
**Fax:  (603) 626-5015**
**www.inex.com**

May 27, 2022

Bryan Fields
Assistant United States Attorney
U.S. Attorney's Office
1801 California Street, Suite 1600
Denver, CO 80202

(303) 454-0100
Bryan.Fields3@usdoj.gov
Attorney for the Government

**Re: Inquiry Regarding Life Insurance Policies**

Dear Attorney Fields:

You have requested that I provide an opinion relative to the following topics:

1.  What are the purposes of life insurance?
2.  To what extent do the policies purchased by Lawrence and Bianca Rudolph fulfill the typical purposes of life insurance?
3.  What, if anything, about the policies is consistent or inconsistent with the typical market behavior of life insurance consumers?

I have outlined my opinions and the bases thereon below.

**Basis for Opinion, Materials Reviewed and Relied Upon:**

In forming opinions in this matter, I have relied upon my extensive experience in the insurance industry, my knowledge of industry custom and practice as it relates to standards and methods governing the conduct appropriate between retail insurance agents, their clients, carriers and wholesaler relationships, management, valuation, mergers, acquisitions and sales of insurance agencies.

I have further reviewed and considered the materials listed on Exhibit A.

While the opinions contained herein are issued within the bounds of my professional opinion, in the event additional material is made available to me, I reserve the right to amend this report.

Bryan Fields, US Attorney's Office – Denver, CO
Life Insurance Inquiry – Lawrence Rudolph – 5/27/2022

**Professional Qualifications:**

I have worked continuously in the retail brokerage industry for over 40 years.  I am experienced in a wide variety of areas related to insurance brokerage, including placement of insurance, agency mergers and acquisitions, agency due diligence, and agency operations, and have reviewed, placed and handled thousands of insurance policies over the course of my career.

As outlined in more detail in the curriculum vitae attached hereto as <u>Exhibit B</u>, I have taken a leading role in the insurance and financial services industry, nationally and in New Hampshire.  I served as an executive with United States Insurance Services ("<u>USI</u>"), currently the nation's eighth largest insurance brokerage firm, including filling roles as the former Chairman of USI New England and the former President of The Insurance Exchange, Inc.  These positions entailed direct personal activity selling and servicing insurance clients as well as oversight of a variety of administrative, sales, underwriting and financial functions, including coverage issues, claims resolution and the placement of risks in insurance arenas ranging from personal insurance, commercial insurance, self-insurance and risk management.  I hold a New Hampshire resident producer's license.  I previously operated an independent claims adjusting firm known as Etter and Rogers and continue to hold a license as an insurance adjuster.

Currently, I am the President and CEO of Optisure Risk Partners, LLC (currently ranked as top 100 US private brokers), Chairman of INEX Capital & Growth Advisors, INEX Properties, INEX Litigation Support Services and a Director of The Marketing Alliance (a publicly trade (MAAL) independent life insurance marketing organization (IMO).  I am also the Chairman of Virtual Insurance Pro.  I am a Chartered Property & Casualty Underwriter (CPCU) as well as a Certified Insurance Councilor (CIC).  I have held insurance licenses (Property and Casualty, Life, Accident and Health, Licensed Insurance Advisor (LIA)) since the mid-1980s. I am a director and board member of various insurance agencies and an advisor to numerous others.  Furthermore, I have extensive experience and expertise in the insurance industry in general, including significant transactional experience in the valuation of and mergers and acquisitions of insurance agencies, and I am intimately familiar with custom and practice within the insurance industry, coverage interpretation, claims practices, insurance procurement, client relationships and the obligations of agents and brokers to their clients and to the insurance companies they may represent.  I have been admitted as an expert witness in multiple states and have testified in court or by deposition numerous times over the course of my career.

Bryan Fields, US Attorney's Office – Denver, CO
Life Insurance Inquiry – Lawrence Rudolph – 5/27/2022

**Compensation:**

INEX Litigation Support Services is being compensated, without regard to the opinion rendered herein, for work performed on an hourly basis per the attached rate schedule. INEX's overall compensation and support from the firm is provided at the rates shown on Exhibit C attached hereto.

**Prior Publications & Testimony:**

Within the past ten years, I have published no articles.

Within the last five years, I have testified by deposition or in trial on the following matters:

John Mezzalingua Associates, LLC v. Marsh USA Inc, et al.: Deposed as an expert for the Defendant regarding policy presentation, proposal, 'comparable' coverages. (NY 2021)

101 Ocean Blvd., LLC v. The Hanover Insurance Company and Foy Insurance Group, Inc.: Deposed as an expert for the Defendants regarding whether Foy Insurance Group, Inc. had a "special relationship" with the Plaintiff. (NH 2017)

**What are the purposes of life insurance?**

Life Insurance, similar to most insurance products, trades a small known loss (the premium) for a large loss (the death benefit), by spreading risk over a large number of policyholders' premiums. It is a unique insurance product in that it also confers significant tax benefits in that proceeds paid as a death benefit are income tax free under the current (and historical) US tax code. While the death benefit itself is income tax free, it is important to note that to the extent those proceeds are retained by an individual, they are included in determining the overall value of an individual's estate at their death and therefore may be subject to estate taxes. In addition, for certain types of life insurance products, to the extent that value builds up inside the policy, it is not subject to current taxation. The cost of the product is typically ultimately determined by a combination of mortality rates, an administrative fee or load and investment income earned on premiums collected. These attributes make it a powerful tool with numerous potential uses in today's society.

Typical purposes of procuring life insurance include:

1. Liquidity needs in the event of death

page

Bryan Fields, US Attorney's Office – Denver, CO
Life Insurance Inquiry – Lawrence Rudolph – 5/27/2022

2. Income Replacement or general Expense Coverage in the event of a breadwinner's death (Bianca did not appear to be a significant income contributor)

3. Estate Planning (coverage of Estate Taxes on the Estate value in excess of the then current exemption amount at the time of death.)

4. Final Expenses (no need as income / assets clearly were sufficient to cover)

5. Charitable Donations (no evidence noted)

6. Buy-Sell funding (note: it appears separate insurance existed to fund a Buy-Sell Agreement related to the death of a partner in L. Rudolph's dental partnership)

7. Split Dollar Funding (no evidence)

8. Key Man Insurance (no evidence)

9. Debt Coverage (Mortgage redemption or credit insurance required by a lending institution) (no evidence)

10. Tax Deferred / Tax Free Investment funds (no evidence)

In short, Life Insurance is a versatile and tax advantaged funding mechanism which can address a variety of needs. Of particular note, large amounts of life insurance are frequently secured in conjunction with more sophisticated estate planning for wealthy individuals or for business funding purposes.

**Claims Payments on Bianca Rudolph Policies**

| Company | Policy | Approx Claim Date | Approx. Paid Date | Amount Paid |
|---|---|---|---|---|
| Metlife Insurance Company USA | Policy No. 215 150 755 UT | 11/7/16 | 3/6/17 | $772,901.17 |
| Fidelity Life Association | Policy No. 0100382288 | 10/31/16 | 2/27/17 | $100,973.41 |
| AAA Life Insurance Company | Policy GT8107 Certificate 4019648262 | 11/7/16 | 2/3/17 | $200,000 |
| Transamerica Life Insurance Company | Policy 42728878 | 11/7/16 | 3/7/17 | $503,438.85 |
| Transamerica Life Insurance Company | Policy 42186233 | 11/7/16 | 3/7/17 | $500,840.86 |

Bryan Fields, US Attorney's Office – Denver, CO
Life Insurance Inquiry – Lawrence Rudolph – 5/27/2022

| Great-West Life & Annuity Insurance Company | Policy 104 TLP Certificate 105665 | 11/7/16 | 03/16/17 | 1,000,157.54 |
|---|---|---|---|---|
| Genworth Life and Annuity Insurance Company (Formerly First Colony) | Policy 1308458 | 11/7/16 | 1/9/17 | $44,533.88 |
| Ameritas | Policy T00017578A | 11/14/16 | 03/09/17 | $1,003,049.90 |
| Ameritas | Policy U00013758A | 11/14/16 | 03/09/17 | $751,849.32 |
| TOTAL | | | | $4,877,743.93 |

## Individual Rudolph Policies and Timeline

### See Exhibit D for legibility



Bryan Fields, US Attorney's Office – Denver, CO
Life Insurance Inquiry – Lawrence Rudolph – 5/27/2022

### See Exhibit E for legibility



---

**Professional Analysis**

In developing the analysis of the policies purchased by the Rudophs and applying that analysis to the typical uses of life insurance noted above, I reviewed and relied upon information in Exhibit A attached hereto, the research cited herein, and my professional experience derived from being a licensed insurance producer for over 40 years.

In applying this analysis and information, I considered the likelihood that the policies purchased were driven by the listed potential uses noted above.  In my opinion, the most likely possible uses would have been for 1(Liquidity), and/or 2 (Income replacement / expense coverage) and/or 3 (Estate Planning).

Significant liquid assets were held by the Rudophs during the time periods examined and therefore it is unlikely that use 1 listed above was a reason that insurance was purchased.

Again, based upon the NEWTON_00000001 analysis, and the description of Bianca as not being the primary breadwinner in the family, use 2 listed above also seems like an unlikely rationale for carrying life insurance at the level shown, at least relative to Bianca.

Bryan Fields, US Attorney's Office – Denver, CO
Life Insurance Inquiry – Lawrence Rudolph – 5/27/2022

Accordingly, that would leave use 3 listed above, the structuring of policies for Estate Planning purposes as the most likely scenario for carrying large sums of life insurance. Further discussion of this purpose and effective structuring of policies, their ownership and beneficiary designations are explored in more detail below.

**Taxes:**

**Income Taxes:** As noted above, life insurance policies enjoy advantageous treatment under the US tax code. Death proceeds payable under a life insurance policy generally pass to the beneficiary free of income tax. (This assumes that premiums for the policy are paid with post tax dollars.)

**Estate Taxes: I**n general terms, for the last several decades, a deceased taxpayer has been able to exclude a certain amount of net worth below an exclusion amount (or an exemption). The exemption allows estates under a certain value to pass property to heirs free from estate taxes. The threshold for when the tax kicks in has increased consistently since 1997, while the estate tax rate has decreased or held steady. However, the value of an estate, including life insurance proceeds that come into that estate, above certain levels are subject to an Estate Tax.

**Estate Tax Exemption History:**

For 1987 – 1997 the Exemption amount was $600,000 with a maximum rate of 55%

| Year | Estate Tax Exemption | Top Estate Tax Rate |
|------|----------------------|---------------------|
| 1997 | $600,000 | 55% |
| 1998 | $625,000 | 55% |
| 1999 | $650,000 | 55% |
| 2000 | $675,000 | 55% |
| 2001 | $675,000 | 55% |
| 2002 | $1,000,000 | 50% |
| 2003 | $1,000,000 | 49% |
| 2004 | $1,500,000 | 48% |
| 2005 | $1,500,000 | 47% |
| 2006 | $2,000,000 | 46% |
| 2007 | $2,000,000 | 45% |
| 2008 | $2,000,000 | 45% |
| 2009 | $3,500,000 | 45% |
| 2010 | $5,000,000 or $0 | 35% or 0% |
| 2011 | $5,000,000 | 35% |
| 2012 | $5,120,000 | 35% |
| 2013 | $5,250,000 | 40% |
| 2014 | $5,340,000 | 40% |
| 2015 | $5,430,000 | 40% |
| 2016 | $5,450,000 | 40% |

.Estate tax in the United States - Wikipedia and
https://www.thebalance.com/exemption-from-federal-estate-taxes-3505630

Bryan Fields, US Attorney's Office – Denver, CO
Life Insurance Inquiry – Lawrence Rudolph – 5/27/2022

When the exemption levels are compared to the amounts of insurance purchased, in particular during the early years of policy acquisition by the Rudolphs, the Exemption was significantly lower.

**Portability of the Estate Tax Exemption**

The American Taxpayer Relief Act of 2012 (ATRA), which was signed into law by President Obama on January 2, 2013, made two important estate and gift tax laws permanent.

First, it set the exemption amount a citizen and noncitizen resident can exempt from federal estate and gift taxes at five million dollars, indexed for inflation.  As can be seen in the previous chart, in 2016, the exemption amount was $5,450,000 for both citizens and noncitizen residents.  Any amount over the exemption amount is taxed at 40%.

In addition to the increased exemption amount that has been made permanent, a married couple has an unlimited marital deduction that allows them to pass an unlimited amount of assets between spouses; however, all of the assets passing to the surviving spouse would be subject to estate and gift taxes upon his or her passing.  Essentially, the unlimited marital deduction allows a married couple the ability to delay paying estate and gift taxes until the second spouse has passed away.  The entire tax on the estate would then become due.

Second, it made Portability permanent.  Portability allows a surviving spouse the ability to transfer the deceased spouse's unused exemption amount (DSUEA) for estate and gifts taxes to a surviving spouse, so long as the Portability election is made on a timely filed federal estate tax return (IRS Form 706).

Portability of the Estate Tax Exemption — Drobny Law Offices, Inc.

**Impact of an Irrevocable Life Insurance Trust (ILIT) and the use of an ILIT in Estate Planning**

When insurance is used for traditional estate planning purposes for wealthy individuals it typically involves finding a way to keep any insurance proceeds from being included in the estate since those proceeds increase the size of the estate and push more of the estate value over the exemption and therefor subject the estate to an increase in taxes required to be paid.  In order to remove something of value from one's estate, you must relinquish control over the item, hence the usual process is to form an 'irrevocable' trust (cannot be changed by the grantor as it is recognized as a separate legal entity from the grantor) and have the trust be administered by an independent trustee.  In addition, there are tax rules which seek to pull back into the estate of the grantor any items recently contributed to the trust.  In other words, the IRS frowns upon the idea of an individual

Bryan Fields, US Attorney's Office – Denver, CO
Life Insurance Inquiry – Lawrence Rudolph – 5/27/2022

setting up a trust which they control and transferring in assets in contemplation of their passing.  A properly structured ILIT solves this problem.  Typically, the ILIT would be set up and be the direct purchaser of the policy.  Examples can be found at [Your Guide to Irrevocable Life Insurance Trusts (ILITs) (stpetelawgroup.com)](#)

**Insurance Efficiency:**

If the purpose of the life policy is to ensure liquidity during a finite and relatively short period of time, term insurance can be used as a potential and least expensive funding option.  However, if the insurance is designed to stay in force until the death of the second spouse, to take advantage of the portability / combine exemption, then the most efficient type of insurance to buy is what is called a 'second to die' policy.  This covers both spouses and is usually priced based on the younger / healthier spouse.  This solves the expense problem associated with the health or age of a given spouse.

**The Right Way to Structure the Use of Insurance in Estate Planning (putting the pieces together):**

An ILIT is set up by the grantor with an independent trustee.  The trustee causes the life insurance to be purchased with the life of the grantor being the insured.  (Not just move an existing policy owned by the grantor into the trust). The trust is the owner and beneficiary. This then brings the death benefit into the trust tax free and excludes those proceeds from the grantor's estate.  This also has the advantage of providing creditor protection for the funds relative to the grantor as the proceeds are not an asset of the grantor and therefore cannot be attacked or attached.  Ideally the insurance purchased would be based on a 'second to die' policy thereby potentially eliminating or mitigating medical, age or other insurability or cost issues on one spouse.  If funding the premiums was initially problematic, less expensive or a lessor amount of insurance might be purchased but because the policy ultimately should be designed to stay in force until the death of the second spouse, a permanent form of insurance such as whole life or universal life should be chosen.  The Second to Die death benefit amount would be targeted to cover the tax burden on amounts in excess of the expected estate tax exemption threshold, desired amount to pass on to heirs or to satisfy any other liquidity needs.

**CONCLUSION:**

**In summary, I reviewed the Rudolph life insurance portfolio against common uses of life insurance as indicated above and noted why I felt most of those uses were not applicable in the Rudolph's situation.  The most likely scenario to fit the Rudolph's circumstances would favor an estate planning use of life insurance.**

Bryan Fields, US Attorney's Office – Denver, CO
Life Insurance Inquiry – Lawrence Rudolph – 5/27/2022

However, in my professional opinion, the life insurance structure and policies carried by the Rudolphs and their subsequently formed trust does not comport with the usual and customary use and manner of life insurance for this purpose. This could result from an aggressive life insurance agent interested primarily in selling polices, rather than engaging in estate planning, coupled with the lack of an experienced estate tax planning attorney being incorporated into and guiding the process, along with a buyer that is either unsophisticated and/or inexperienced relative to their tax situation. Alternatively, it could be a sign of building a life insurance portfolio intended to cover the death of a spouse for financial gain.

Of Note:

- The purchasing pattern does not appear to be tied to a coherent estate planning strategy.

- The Trust established in April 2016 does not appear to qualify as an ILIT.

- The insurance on Lawrence capped out (potentially because of medical issues?) but could have been resolved with a second to die policy if a liquidity need was not immediate and the overall goal was estate tax coverage (see discussion of spousal portability of exemption)

- Other than when a non-breadwinner spouse is providing an unpaid essential service for a family (e.g. childcare), significant insurance on a non-breadwinner spouse is unusual unless tied to a 2nd to die approach in conjunction with an ILIT or as a way to provide a replacement for other unpaid essential services within the family.

- I was not able to discern a reason for the approximately $2 million spike in the amount of life insurance on Bianca from 2010 to 2012 nor the additional $1 million spike from the 2012 level to 2014 while there was no further increase in Lawrence's life insurance amount after 2005.

- As noted in the Bill Gorman interview, multiple brokers were used to purchase the policies. While not unusual in and of itself, in general, if people have an ongoing relationship with one broker, they tend to rely on that broker for their knowledge of the existing policies and integrating new purchases with those existing policies. Pursuing other brokers for coverage can indicate a desire to not disclose the overall extent of coverage. Note the application (Ameritas) where other life insurance is indicated as none.

- The Newton analysis may not fully reflect the asset value of the Rudolph's real estate and business values. The likely result of including the full market value of all assets would be to put the Rudolph's estate value well over the estate tax exemption meaning they would have needed even more insurance

**coupled with effective structuring to neutralize their ultimate potential estate tax burden.**

Sincerely,

INEX Litigation Support Services

Peter R.  Milnes, CPCU, CIC
Chairman
PRM/act

Bryan Fields, US Attorney's Office – Denver, CO
Life Insurance Inquiry – Lawrence Rudolph – 5/27/2022

## Exhibit A

## Materials Reviewed & Relied Upon

| Description of Materials Reviewed | Bates Numbers |
|---|---|
| Tax Materials | IRS_00000001 – IRS_00002272 |
| Financial Summary | NEWTON_00000001 |
| Records from Ameritas | AMERITAS 00000001 – AMERITAS_00002127 |
| Rudolph Trust | AMERITAS_00000344 - 369 |
| Interview of Ameritas Claim Examiner | INV_00000839 – INV_00000841 |
| Records from Brighthouse (Successor to Metlife) | BRTH_00000001 – BRTH_00001343 |
| Records from Metlife | METLIFE_00000001 – METLIFE_00000512 |
| Records from Fidelity Life Association | FIDELITY_00000001 – FIDELITY_00000101 |
| Interview of Fidelity Clams Manager | INV_00000836 – INV_00000838 |
| Records from Genworth | GENWORTH_00000001 – GENWORTH_00000240 |
| Interview with Genworth Manager of Customer Care Claims | INV_00001006 – INV_00001007 |
| Records from Great West Life & Annuity Insurance Company | GRTW_00000001 – GRTW_00000876 |
| Interview of Great West Claims Specialist | INV_00000463 – INV_0000465 |
| Records from TransAmerica | TRANSAM_00000001 – TRANSAM_0000966 |
| Interview of Transamerica Senior Claims Examiner | INV_00000866 – INV_00000868 |
| Interview Insurance Broker report | |
| Recording of Interview with Insurance Broker | |
| Insurance Broker emails | Files Provided by William Gorman |
| Letter re Expert Review (Milnes) v3 | April 25,2022 |

Bryan Fields, US Attorney's Office – Denver, CO
Life Insurance Inquiry – Lawrence Rudolph – 5/27/2022

**EXHIBIT B**



**Office:**
40 Stark Street
Manchester, NH 03101
603.665.6100

pmilnes@inex.com

**Residence:**
2 Riddle Drive
Bedford, NH 03110

# Peter R. Milnes

Over the past 35 years, Peter Milnes has taken a leading role in the insurance and financial services industry, nationally and in New England. Milnes has founded numerous insurance entities and provided strategic advisory services ranging from pro-typing a minority interest acquisition program for a national insurance carrier, providing business valuation analysis of insurance entities, and consummating the acquisition, sale or perpetuation of numerous insurance agencies.

As co-founder and CEO, in 2015, Milnes initiated the development of Optisure Risk Partners, a multi-state retail insurance brokerage firm conceived to provide an expertise based, locally oriented group of insurance professionals interested in converting their passion and excellence in the insurance business into equity opportunities in building a top ranked US broker.

In 2011, he undertook development of Virtual Insurance Pro, an onshore business process outsourcing company (BPO) providing home based, virtual insurance customer service representatives to insurance agencies and oversaw the sale and wind-down of HLI Services, Inc., a Risk Purchasing Group.

Milnes created INEX Capital & Growth Advisors in 2000, to provide advisory services to insurance carriers, agencies, insurance aggregators, financial institutions and private equity groups. INEX has since represented clients in each of these areas. Since its inception, Milnes has served as Chairman & CEO, responsible for the vision of the organization, long term planning, new business development, and all financial aspects of the company. Milnes utilizes his financial acumen and extensive experience in mergers and acquisitions to create value by structuring opportunities, strategies, and solutions that are unique and customized to meet each client's financial goals and objectives. INEX clients have access to Milnes' extensive national experience and network in agency operations, mergers and acquisition, deal structure, due diligence, and capital funding as well as a group of ancillary related services and products. He also provides leadership for INEX Properties, a private equity real estate and management company focused on a portfolio of New England properties.

From 1995 through 1999, Milnes served as Chairman of USI New England. His responsibilities included oversight of a variety of administrative, sales, acquisition, underwriting and financial functions for USI Services Corp. (USIH), then the world's 6th largest property and casualty broker. He served as a member of USI's Executive Committee and Leader Team, as well as chairman of The Insurance Exchange, Inc.

As a principal of The Insurance Exchange, he built the largest independent insurance agency in New Hampshire and negotiated its merger with USI Insurance Services Corp as one of the founding institutions of that entity. Active in real estate development and a variety of business ventures, he was also a founder and director of New England Insurance Co., Ltd (NEICO)

A Chartered Property and Casualty Underwriter (CPCU) and Certified Insurance Counselor (CIC), Mr. Milnes has contributed to a variety of publications regarding insurance topics and has participated as a faculty member of the NH Bar Association's Continuing Legal Education series. He has been personally responsible for the sale, merger or acquisition of well over 200 insurance transactions, and conducted due diligence on numerous other opportunities. He developed the NH Bar Association Insurance Agency and continues to provide insurance support to the legal community as the principal in INEX Litigation Support Services. He founded INEX Alternative Program Administrators to provide turnkey self-insurance workers compensation programs to commercial insureds. He founded Insurance Premium Finance Corp. Inc. and served on the board of that entity until the sale of the business to New England Acceptance Corporation.

A graduate of St. Paul's School, Bucknell University, the Aetna Commercial Insurance School for Agents, PIA's insurance school at Oberlin and a variety of other insurance courses, Mr. Milnes has served on numerous insurance company advisory boards, including those of New Hampshire, Hartford, Peerless, Hanover and SEACO Insurance Companies. He holds Insurance Producer and Consultant licenses in various states, as well as previously holding Real Estate, Claims Adjuster and Registered Representative (Stockbroker – Series 7) licenses.

He currently holds Director positions with the Currier Museum of Art, The Marketing Alliance (MAAL), Primary Bank NH and a variety of insurance entities. Mr. Milnes has completed the Harvard Business School Owner/President Management Program, Leadership New Hampshire 1996 and Leadership Manchester 1991. He has served as a member of the IIANH's education committee, and the Manchester City Government Task Force Survey. His past leadership roles include Director & Executive Committee Member of the Salem Cooperative Bank, Vice President & Treasurer of The New Hampshire Center for Non Profits, Executive Board Member of the Whittemore School of Business (WSBE) at the University of New Hampshire, Treasurer of the Greater Manchester YMCA, Chairman of Hartford Insurance's Manchester Regional Office Jonathan Trumbull Council, a Director of the Bedford Rotary Club and the NH Audubon Society, as well as Treasurer of the Greater Manchester Chapter of the American Red Cross, a charter member and Vice President of the Londonderry Rotary Club, and President of the Derry Visiting Nurse Association. Prior licenses include NH Real Estate Broker, Insurance Adjuster, FINRA Series 7,6,63.

Bryan Fields, US Attorney's Office – Denver, CO
Life Insurance Inquiry – Lawrence Rudolph – 5/27/2022

# Peter R. Milnes

2 Riddle Drive, Bedford, NH 03110        pmilnes@inex.com        603.665.6100

**Employment Overview:**

**2015 – Present**   **Optisure Risk Partners – Co-Founder & CEO –** developing US Insurance & Risk Management firm

**2011 - Present**   **Virtual Insurance Pro – Chairman –** virtual outsourced insurance agency services

**2000 – Present**   **INEX Capital & Growth Advisors, INEX Properties, INEX Litigation Support Services -- Chairman & CEO**
As the entrepreneurial founder of the company group, Milnes is responsible for client interaction, the vision of the company, long term planning, new business development, and all financial aspects of the organization. He provides support to insurance carriers, agencies, private equity groups and other financial institutions relative to insurance distribution, due diligence, mergers and acquisitions and insurance aggregation opportunities. He acts as the lead principal on all acquisition opportunities and has been qualified as an expert witness for insurance issues with courts in Maine, New Hampshire, Connecticut, Massachusetts, and Washington, DC. He has been deposed as an expert or provided litigation support in over 80 matters. Milnes handles all acquisition, financing and strategic positioning of the INEX Properties portfolio. In addition, his expertise has provided guidance to clients nationally with a concentration in New England, New York and Florida.

**2018 – Present**   **Primary Bank NH – Director – ALCO, Audit**

**1995 – 2018**   **Salem Cooperative Bank – Board of Directors - Secretary –** Executive Comm., ALCO, Audit Chair, Tech Chair

**2012 - 2015**   **HLI Services, Inc. - President –** Risk Purchasing Group

**2000 – 2001**   **USI New England – Sr. Consultant –** Supported USI New England in the areas of automation, administration, carrier relations, and large commercial account development.

**1995 - 2000**   **USI New England - Chairman & CEO –** Participated in the founding of USI Insurance Services, Corp as a new national broker. Achieved listing as 6th largest US Property & Casualty Broker as ranked by *Business Insurance*. Grew the New England Regional office of USI Insurance Services Corp. more than 100% through acquisitions and internal growth. Broadened USI's client base through delivery of integrated insurance and financial services. Responsible for development and execution of regional business plans, legal and capital issues and insurance carrier relationships. Operated at a national level on USI's internal Executive Board, Leader Team, insurance committee, and automation committee. Direct counseling of property, casualty, life, employee benefits and financial services to large account division clients.

**1985 – 1995**   **The Insurance Exchange – President -** Actively involved in the daily operations of one of New England's largest Independent Insurance Agencies, a multi-location, $90+ million financial services organization. Oversaw strategic planning, acquisitions, financial, and agency operations. Negotiated for, conducted due diligence on, and ultimately acquired two dozen individual insurance agencies, then integrated them into one cohesive entity.

**1978 - 1985**   **The Insurance Exchange - Vice President -** Direct responsibility for all management, personnel and financial functions. Risk Management for major accounts, insurance education, automation development, personal production.

**1977**   **The Insurance Information Institute - Washington, DC -** Economic Research

| | |
|---|---|
| **Professional Designations:** | • Chartered Property & Casualty Underwriter (CPCU)<br>• Certified Insurance Counselor (CIC) |
| **Licenses:** | • Resident New Hampshire Insurance Producer – Property & Casualty, Life, A&H, Surplus Lines<br>• Non-Resident Producer – most US States<br>• Private Pilot - Instrument Rated |
| **Education** | • Harvard Business School, 2000-2002          Owner/President Management Program (OPM 31<br>• Bucknell University, Lewisburg, PA, 1975–1978    BA Econ, Business Concentration<br>• American University, Washington, DC, 1977     (Economic Policy Semester)<br>• St. Paul's School, Concord, NH, 1971-1975<br>•                Barcelona, 1973-1974          Ambassador Biddle Duke Spanish Prize<br>• Aetna Commercial Insurance School for Agents, Hartford, CT – Class Rank # 1 – 1979<br>• PIA Insurance School, Oberlin University, Oberlin, OH - 1978 |
| **Professional Activities** | • The Marketing Alliance, Inc.          Director, Audit Committee Chair<br>• Various Insurance Entities          Director & Board Member |
| **Languages:** | • English & Spanish |
| **Avocations:** | • Sailing, Flying, Kayaking, SCUBA |

Bryan Fields, US Attorney's Office – Denver, CO
Life Insurance Inquiry – Lawrence Rudolph – 5/27/2022

## INEX Litigation Support Services - Fee Structure

| INEX Staff | Fee |
|---|---|
| Professional Time (including Travel Time) | Typically billed in .25 hour increments |
| Principal Consultant | $350 per hour |
| Senior Consultant | $350 per hour |
| Research / Financial Consultant | $295 per hour |
| Associate Consultant | $225 per hour |
| Assistants / Clerical | $75 per hour |
| **Normal Business Hours** | Telephone and in person meetings outside of INEX's standard business hours of 8:00 a.m. to 6:00 p.m. on Weekdays shall be subject to a 50% surcharge |
| **Other Expenses** | Case Setup - $500 |
| Long Distance Calls | At cost + billing time |
| Facsimile | At cost + billing time |
| Copies | Generally no charge – printing at cost |
| Postage / Overnight / Out of Pocket | At cost |
| Travel | Time spent plus cost of travel (current IRS rate for auto reimbursement) Flights over 2 hours shall include cost of 1st class upgrade. |
| Reserved Days | Due to our scheduling demands, any day(s) reserved for appearance that is cancelled or revised with less than 30 days' notice will incur a change fee equal to 8 hours of Professional time for those individuals involved. |
| Appearances | To the extent any INEX personnel shall be required to testify (or to be available to testify) in any court, arbitration or administrative proceeds, or in oral depositions relating to our engagement, such time will be charged at 150% of the then current applicable rate billed in minimum of 4 hour increments and Travel & Meetings and Reserved Day policies shall apply. |

Bryan Fields, US Attorney's Office – Denver, CO
Life Insurance Inquiry – Lawrence Rudolph – 5/27/2022

**Exhibit D – Landscape Life Insurance Stack – Bianca Rudolph**



Bryan Fields, US Attorney's Office – Denver, CO
Life Insurance Inquiry – Lawrence Rudolph – 5/27/2022

**Exhibit E - Landscape Life Insurance Stack – Lawrence Rudolph**

