<u>**ILLUSTRATED REPORT**</u>

**of**

**June 28, 2022**

**in the matter of**

**The U.S.**
**vs.**
**LAWRENCE RUDOLPH**
**U.S. DISTRICT COURT – DENVER, CO**
**Case No. 22-CR-00012-WJM**

**FSSI Case No. 20/09CR**

**prepared for**

**David Markus**
**Attorney at Law**
**Markus/Moss PLLC**
**40 NW Third Street PH1**
**Miami, FL 33128**

**by**

**Lucien C. Haag**
**Criminalist/Firearms Examiner**
**FORENSIC SCIENCE SERVICES**
**P.O. Box 5347**
**Carefree, AZ 85377**

# Illustrated Report of Lucien C. Haag

INTRODUCTION
This file was first opened in October of 2020, upon a request to view several photographs and documents submitted by attorney Woody Thompson of the Phoenix firm of Gallagher & Kennedy. This matter was subsequently taken over by the Florida firm of Markus and Moss resulting in more materials submitted to this writer in February of 2022. These materials consisted of a large number of documents and images as individual pdf files. Additional documents continued to be received at the time of this Illustrated Report.

CASE OVERVIEW – MATTERS NOT LIKELY TO BE in DISPUTE
This case involves the fatal shooting of Bianca Rudolph which occurred on October 11, 2016 in a small cottage at the Chinyembe Game Camp in Zambia. The firearm involved was a Browning Auto-5 Magnum 12-gauge shotgun. The spent shotgun shell recovered at the scene was a 3-inch Federal Premium marked by the manufacturer as containing 00 buckshot. The limited scene photographs show the butt of the shotgun partially extended from a fabric gun case, the forward end of which is clearly blown out by blast effects. The decedent can be seen nearby in the same room at the end of a blood trail.

PARTIAL LIST of DOCUMENTS and PHOTOGRAPHS REVIEWED
- The autopsy report of Dr. Daniel Maswahu conducted at the University Teaching Hospital.
- A Forensic Ballistics Report by V.R. Chibesa.
- Several scene photographs believed to have been taken by Mark Swanepoel and the Zambian Police Service depicting the decedent, the gun case with a partially extended/removed butt stock, and a spent shotgun shell on the floor.
- Some general photographs of the exterior and interior of the cabin in which the fatal incident occurred.
- Several post-autopsy photographs depicting the entrance wound in the decedent's upper right chest.
- The February 12, 2020, interview of Mark Swanepoel regarding his observations and conduct upon entering the scene.
- Numerous photographs of pellet patterns in cardboard produced at various standoff distances with an exemplar Browning Auto-5 shotgun, Federal 3-inch Premium 12-gauge shotgun shells with and without the introduction of exemplar gun cases. A large number of additional tests were received on June 23, 2022.
- The May 25, 2021 Report of Dr. Steve Cina.
- The 3 Reports of FBI Special Agent Steve DeFrance (most recent June 22, 2022).
- The Reports of Steve Rodgers and Ryan Cook.

SCOPE and PURPOSE of this REPORT
This writer's mission was to address the shooting reconstruction aspects of this shooting.

**Page 2  Illustrated Report of Lucien Haag**

OBSERVATIONS REGARDING the SCENE
The photographs of the scene presently known to this writer are those taken by Mark Swanepoel who was a hunting camp employee and the Zambian Police Service. These very limited scene photographs

only allowed this writer to see that the buttstock of the shotgun was protruding some unknown and unmeasured distance from the damaged gun case. The shotgun can be seen to be in the gun case in the inverted orientation (not the orientation that makes maximum use of the available space), but it was purportedly removed and re-inserted by an employee prior to being photographed. No subsequent scene diagram or listing of scene measurements were found amid the numerous documents sent to this writer.

A spent shotgun shell also appears in one of Mark Swanepoel's photographs at an unknown and unmeasured distance from the shotgun, or from any reference point in the room.

These omissions and concerns are completely compromised when one reads Mark Swanepoel's February 12, 2020, interview in which he states that a fellow employee, Spencer LNU, picked up the gun case and gun, apparently removed and checked the gun to see if it was loaded and then attempted to replace these items in their original position when directed to do so by Mark Swanepoel. When asked by Swanepoel, Spencer LNU could not remember to what degree or position the zipper was before he removed the shotgun from the gun case. It is also unclear from the language below if the shotgun was *separated* from the gun case or still *in* the gun case when Spencer LNU first enter the scene.

**From the Mark Swanepoel Interview**

```
    Spencer LNU picked up the shotgun with the gun case, made sure the
shotgun was clear, and then moved it to another location. Swanepoel advised
Spencer LNU to move the gun back to it's original location and tell police
what he did in case they checked for fingerprints on the gun. Swanepoel saw
one ejected shotgun round from the gun and it was the only round in the gun
at the time it was fired. Swanepoel asked Spencer LNU if the gun case was
open or closed when he picked it up and Spencer LNU could not remember.
```

*If the foregoing is true, this is a disturbed scene and very little meaningful or useful insofar as firearms evidence can be derived from it, other than the shotgun was at some position in the gun case when the discharge occurred as evidenced by the blast effects.*

The photos *do* allow a somewhat distant view of the decedent and an apparent blood trail across the floor of the cabin. This photograph is useful to the extent that the decedent was wearing a black sweater of some sort and a black bra. [See **Figure 1**] The subsequent autopsy description of the entry wound revealed that it occurred in an area that would have been covered by the black sweater and possibly the black bra.

*The clothing is of absolute critical importance with any close-range gunshot wound.* This is especially true with shotgun fatalities, yet there is no mention of the clothing in Dr. Maswahu's autopsy. An examination of a gunshot victim's clothing at the time of autopsy

**Page 3  Illustrated Report of Lucien Haag**

is a well-known and recognized standard for reasons that should be obvious. Moreover, no record was found by this writer showing that the decedent's upper body clothing was impounded and retained. *The loss or discarding of this important evidence is yet another hindrance to shooting reconstruction efforts in this case.*

OBSERVATIONS REGARDING the AUTOPSY

None of the customary and needed photographs of the decedent's upper, anterior torso depicting the entry wound were found among the materials sent to this writer. Nor were any close-up photographs found of the entry wound before and after clean-up, with and without an appropriately positioned scale.

Such images are fundamental to the documentation of a gunshot wound and are especially important with close-range shotgun wounds involving buffered shotgun shells. [Ref. 1]

The plastic buffer material in the 3-inch, 12-gauge, Federal Premium shotgun shell adds another important parameter for range-of-fire in this case that is unavailable here due to the lack of the necessary autopsy photographs and the retention of the clothing.

Doctor Steve Cina, in his May 25, 2021, Report at point 2 of his "Expert Opinions" section describes the Zambian autopsy report as "- -offering very little additional information with respect to the details of her (Bianca Rudolph's) wounds. The autopsy was not performed to the standards of the National Association of Medical Examiners (N.A.M.E.). No photographs were taken at the time of autopsy."

The post-autopsy photographs taken by Chad Eversgerd (a non-medical, non-forensic person) are of limited value to this writer, but they *do* show a near-circular wound in the upper left breast with sharp margins and *no* scalloping from any 00 buckshot pellets separated from the main, 15 pellet charge in the 3-inch, 12-gauge, Federal Premium shotgun shell. The presence or absence of pellet scalloping around the margins of a shotgun entry wound are of special importance for range-of-fire estimates in cases where the muzzle-to-entry-wound is a matter of inches to several feet. [Ref. 2]

A satellite injury can also be made out in the right breast near the midline. This wound will be addressed later in this Illustrated Report.

THE FIRED EVIDENCE SHOTGUN SHELL

This item was/is in the possession of American law enforcement which identified the shell as a Federal Premium, 3-inch, 00 buckshot load containing 15, copper-plated, and buffered lead pellets. This was the type of ammunition employed in the numerous patterning tests carried out by S.A. Steve DeFrance in 2020 and 2021 then again on June 15, 2022. A disassembled example of one of these shotgun shells is depicted in **Figure 2**. Newly loaded shotgun shells were assembled by the manufacturer and provided to the government in June of 2022. These 'new' shells purportedly contained the type and form of propellant and plastic wadding that was in the evidence shell. According to Steve Rodgers, Product Safety Manager for Federal/Vista Outdoors, the ballistic performance of the Federal 12-gauge shells used in the 2021 series of tests and the most recent June 15, 2022 tests by Steve DeFrance is the same. Moreover, Mr. Rodgers reports that the shot cup in which the 00B pellets are nested is the same in both versions of this product

**Page 4  Illustrated Report of Lucien Haag**

(P 158 00). He goes on to report that the only difference in the plastic wadding is the over-powder (O/P) wad which is located immediately above the powder charge and under the shot cup.

EXAMINATION and TESTING of the EVIDENCE GUN CASE
The evidence gun case and an accompanying exemplar gun case were received from the Markus/Moss law firm on March 23, 2022. The evidence gun case was received folded in half and contained in a black plastic bag which was removed from a sealed shipping box.

This writer's first view of this item is shown in **Figure 3a**. The markings in red, barely visible in this figure, were present upon the receipt of the gun case. **Figure 3b** provides a side-by-side comparison of the evidence and the exemplar gun case. Of special interest was the fact that the hanging loop and associated steel rivet circled in red on the exemplar gun case has been blow away in the evidence gun case. This was also true for the numerous exemplar gun cases subjected to the firing of an exemplar shotgun by S.A. Steve DeFrance while inside these gun cases. This was true for the 2020 and 2021 tests as well as the recent June 15, 2022 tests. **Figure 3c** depicts a close-up view of the internal, front area of the evidence gun case with an enlarged view of the label describing the fabric composition. **Figure 3d** shows this same area with a scale. The muzzle position at the moment the shotgun discharged was approximately 4-inches from the closed end of the gun case.
An 'L-shaped' tear was observed on one side of the opened gun case which was 25.75-inches from the rear edge of the blast hole. [See **Figure 3e**] A close-up view of this defect appears in **Figure 3f**. This defect constitutes a possible snag site for the operating handle on the Browning Auto 5 shotgun. **Figure 3g** shows the results for a chemical test for vaporous lead- a product of near-contact gunshot residue.
The location and pattern of the vaporous lead deposits confirms the blast damage to the forward, interior of the evidence gun case was due to the discharge of the shotgun while inside the gun case and with the muzzle approximately 4 inches back from the forward end of the gun case. Thermal effects were also noted forward of the blast hole. Infrared photography was only partially successful and indicated a general 'fog' of gunshot residue in the area of the blast hole.

The evidence gun case was taken to the ERT section of the Phoenix FBI facility on April 28, 2022 where it was examined and photographed by Government representatives. Various areas on the gun case were also presumptively tested for traces of blood by Tom Griffin with negative results. Following these tests, the evidence gun case was returned to Forensic Science Service's evidence locker later that same day. An overall Luminol test of the exterior surface of this gun case was carried out the next day with negative results.

BUCKSHOT PELLET PATTERNING TESTS by S.A. STEVE DEFRANCE
A large number of test-firings to produce pellet patterns in cardboard witness panels were carried out by S.A. Steve DeFrance and his assistants in 2020 and 2021. Most of these involved discharges of the Federal Premium, 3-inch, 15-pellet, 00 buckshot ammunition

**Page 5  Illustrated Report of Lucien Haag**

in an exemplar Browning Auto-5 shotgun with the shotgun and gun case secured in an apparatus. In his Report of February 26, 2021, he describes his experimental setup as shown in **Figure 4** excerpted from that Report. His worksheets (notes) also provide a hand-drawn illustration of the test-firing setup. [See **Figure 5**]

A re-examination of **Figure 3d** will quickly reveal S.A. DeFrance's experimental design is seriously flawed from the onset in that he has selected his gun position (muzzle at 0.5-inches) in gun cases contrary to where it actually was located when the fatal discharge occurred (approximately 4 inches from the end of the evidence gun case). The 1.8-inch position for all the June 15, 2022 tests is also inappropriate insofar as any effort to duplicate the decedent's entry wound and thereby the separation distance between the front of the evidence gun case and the entry wound at the moment of discharge.

BUCKSHOT PELLET PATTERNING TESTS by S.A. STEVE DEFRANCE

The presence of the gun case material (cloth, zipper, hanger and steel rivet) clearly interferes and produces considerable variances in the otherwise consistent and predictable spread of buckshot pellets and associated wadding over distance. Even with the use of the incorrect positioning of the exemplar shotgun in exemplar gun cases, erratic pattern results are present and can be seen in S.A. DeFrance's Table 1 on page 5 of this same February 26, 2021 Report. The anomalous (contradictory) results, underlined in red, black, green and purple, have been annotated in this table and republished here as **Figure 6**.

The recent (June 15, 2022) test-firings by S.A. Steve DeFrance now employ a muzzle position of 1.8-inches for fourteen (14) test shots through gun cases at standoff distances of 0, 1, 2, 3, 4 and 5 feet using the same exemplar shotgun and the newly assembled Federal brand shotgun shells.

Shot and buckshot patterns in the absence of intervening objects follow a very regular and predictable spread over distance. This fact was the basis for Figure 13.16 on page 310 in the third edition of this writer's textbook, Shooting Incident Reconstruction, reproduced here as **Figure 7**. This same figure was also used in the first and second editions of this textbook. If one keeps the ammunition, barrel length and distance the same, the pellet pattern diameter will be *larger* with a cylinder bore as compared to a full choke. A re-inspection of DeFrance's annotated Table 1 (**Figure 6**) shows this to be the opposite situation for the underlined results from the 2021 DeFrance tests. Assuming that the pattern diameters were properly and accurately measured, these contradictory results can only be explained by an unpredictable, interfering influence by the intervening gun case, which it should be recalled, was positioned incorrectly in the 2020 and 2021 tests and again in the recent June 2022 tests. This problem will only increase if test shots were carried out with the muzzle positioned 4 inches back from front of the gun cases.

DOCTOR STEVE CINA REPORT of MAY 25, 2021

**Figure 8a** through **Figure 8f** have been excerpted from Doctor Cina's Report. From the text of **Figure 8a**, Dr. Cina reports having reviewed all of S.A. Steve DeFrance's 2021 targets (witness panels). In **Figure 8b** Dr. Cina sets the range of fire as 2-feet to 3-feet (rounding to even feet values), and describes DeFrance pattern 1-15 (from the 2021 tests) as the best 'fit' in **Figure 8c**.

**Page 6  Illustrated Report of Lucien Haag**

In **Figure 8d** he points out that the 6cm entry wound could easily have been smaller than 6cm due to the stretching and gaping of breached skin. **Figures 8e** and **8f** address the apparent satellite injury in the right breast which he attributes to a shotshell component.

This writer's **Figure 9** consists of an annotated, post-autopsy photograph with this wound circled in yellow. The shotshell components (shot cup and over-powder wad shown in **Figure 2** can be excluded as the source of this injury. These items were reportedly removed from the gunshot wound. This satellite injury is totally explainable as having been produced by the blown-off hanging loop and steel rivet shown in **Figure 3b**. It is missing from the evidence gun case and all photographic examples of S.A. Steve DeFrance's gun cases from the 2020 and 2021 shooting tests and the June 15, 2022 shooting tests. The nominal 1100 feet per second exiting mass of the 00B pellets in the shot cup and muzzle blast will accelerate these objects to high velocity where they are easily capable of producing such an injury.

OBSERVATIONS – OPINIONS RE: DR. CINA'S MAY 25, 2021 REPORT
Aside from the foregoing regarding the satellite injury, Dr. Cina is trusting to the validity of S.A. Steve DeFrance's 2020 and 2021 test patterns and the entry wound diameter noted, but not documented, in Dr. Maswahu's autopsy report.
This writer has previously pointed out the flawed nature of the 2020 and 2021 and June 2022 shotgun+gun case pellet patterning tests. But there are additional and presently insurmountable problems with Dr. Cina's 2021 range-of-fire opinion. **Figure 10a**, **10b** and **10c** depict three consecutive DeFrance 2021 shots fired through exemplar gun cases at a standoff distance of two (2) feet. Each of these witness panels contain multiple holes produced by individual 00 buckshot pellets distributed around the central entry hole. The diameters of the minimum circles to enclose these pellet patterns were determined to be 11.5cm, 16cm and 16cm respectively- far beyond the purported 6cm diameter of the entry wound. But these dimensional differences become moot when one understands that there are *no* individual 00B injuries around the decedent's entry wound [See **Figure 9**]. These three test shots from the 2021 tests, all of which are within the minimum distance of 2 feet set by Dr.Cina, possess numerous, obvious individual 00B pellet strikes.
The recent June 15, 2022 tests offer no improvement for an estimate of the separation distance between the forward end of the evidence gun case and Mrs. Rudolph at the moment of discharge. Only 1 test shot (Shot 3-4) was carried out at the 3-foot standoff distance. The pattern produced by this shot is shown in **Figure 11a** and **11b**. A study of these two annotated illustrations reveals that the maximum diameter of this pattern is 4.3cm and both pellet scalloping and satellite pellet strikes are present. Both of these results are at odds with the decedent's smooth, essentially circular 6cm entry wound.
The three, June 15, 2022 test shots at a standoff distance of 2 feet are depicted here as **Figure 12a**, **12b** and **12c** with annotations added by this writer. Although the standoff distance is *less* than that in **Figure 11a** and **11b** (2 feet rather than Dr. Cina's 3-foot range-of-fire), the scattering of the 00B pellets is *greater*, much greater, and very erratic. This can only be due to greatly varying and disrupting effects of the gun case on the emerging buckshot pellets and the plastic shot cup in which they are nested. Such

**Page 7  Illustrated Report of Lucien Haag**

disruptive effects on the otherwise normal pellet behavior only stand to worsen with a nominal *4-inch* journey through gun case material before emerging.

As of this date (June 28, 2022), no supplemental or revised report by Dr. Cina has been received addressing the June 15, 2022 DeFrance tests.

CONCLUDING COMMENTS and OBSERVATIONS

There is a severe paucity of reliable information and physical evidence in this case at the time of this writing (June 28, 2022), to allow for any meaningful reconstruction of this fatal shooting incident. The scene and evidence were altered, the entry wound and wound path were not photographically documented during the actual autopsy, the satellite injury was overlooked, the responsible object(s) causing it were not recovered, the decedent's clothing was lost or discarded, the evidence firearm was not available, the test-firing setups in 2020, 2021, and again in 2022 were flawed in that it did not duplicate the position of the evidence shotgun in the evidence gun case when it discharged, and the presence of the gun case as an intervening object produces erratic pellet patterning results.

The only matters that are certain is that Bianca Rudolph's gunshot wound cannot be self-inflicted as the result of her pulling or depressing the trigger, and that the standoff distance is sufficiently close that the fifteen 00 buckshot pellets entered her body en-mass producing *no* scalloping or recognizable individual, satellite pellet injuries.

The existing and very limited information in this case leaves three choices for the cause of Bianca Rudolph's fatal gunshot wound:

1) a misadventure of some sort (such as an impactive jar-off) with the Browning shotgun about 4 inches short of being fully inserted in the gun case.
2) a careless mishandling of the shotgun by Mr. Rudolph (such as decocking the internal hammer with a live round in the chamber) while engaging in the final seating of the gun in the gun case in preparation for transport back to the U.S.
3) an intentional shooting of his wife, made to look like an accident.

_____

Lucien C. Haag

This Report stands to be supplemented if a revised report is obtained from Dr. Cina, or if additional, forensically useful information is received.

Current CV attached

References

[1] Haag, L.C., *"Range of Fire Determination from the Pseudo-stippling of Skin by Shotshell Buffer Material",* <u>Am Jour For Med & Pathology</u>**,** Vol. 34, No. 1 (April 2013), pp.56-62

[2] Haag, L.C. and M.G. Haag, <u>Shooting Incident Reconstruction</u>, 3rd Ed. (2021), Chapter 13

**FIGURE 1**



**FIGURE 2**



**FIGURE 3a**



**FIGURE 3b**



**FIGURE 3c**



**FIGURE 3d**



**FIGURE 3e**
**'L-Shaped' Defect in the Interior Surface**



**FIGURE 3f**
**Closer View of the 'L-Shaped' Defect in the Interior Surface**



**FIGURE 3g**
**Results of the Transfer Method for Vaporous Lead**



## FIGURE 4
## From Page 4 of the February 26, 2021 DeFrance Report

**Results**

Phase 1 – Case position and muzzle-to-case gap distance

Phase 1 testing focused on determining the approximate location of the shotgun within the soft case at the time of discharge. This was accomplished by comparing the results of various test conditions with images of the soft case from the scene. Based on these tests, it was determined that the conditions that best replicated the evidence were with the muzzle 0.5 inch back from the outside edge of the soft case and with the barrel shifted 1.25 inch from the folded edge of the soft case. Other tested orientations of the shotgun in the soft case produced results that were inconsistent or less consistent with the evidence soft case. All subsequent Phase 2 testing was conducted with this positioning.

## FIGURE 5

### DeFrance Notes RE: Setup



**FIGURE 6**
**Annotated DeFrance Table from the 2021 Tests**

Table 1: Summary of measured pattern diameters for each muzzle-to-target distance tested using the soft case position determined in Phase 1 testing. Results shown for both full and cylinder (cyl) chokes.

"—the cylinder choke *should* produce a *larger* pattern."

FULL   CYL.
2.59 > 2.42

4.60 > 4.28

5.61 > 5.56

8.69 > 7.69

The cylinder choke has produce a *smaller* pattern for these shots.

| Muzzle-to-target Distance (ft in) | Choke FULL | Choke CYL | Test Specimen | Pattern Diameter (cm) |
|---|---|---|---|---|
| 0 ft 0.5 in | × | | 1-12 | 1.81 |
| 1 ft 0.5 in | × | | 1-13 | 2.59 |
| 2 ft 0.5 in | × | | 1-14 | 3.38 |
| 3 ft 0.5 in | × | | 1-15 | 4.60 |
| 4 ft 0.5 in | × | | 1-16 | 5.61 |
| 5 ft 0.5 in | × | | 1-9, 1-17 | 6.58, 5.80 |
| 6 ft 0.5 in | × | | 1-10, 1-18 | 7.59, 6.26 |
| 7 ft 0.5 in | × | | 1-19 | 8.69 |
| 8 ft 0.5 in | × | | 1-20 | 7.76 |
| 9 ft 0.5 in | × | | 1-11 | 9.31 |
| 0 ft 0.5 in | | × | 1-21 | 2.68 |
| 1 ft 0.5 in | | × | 1-22 | 2.42 |
| 2 ft 0.5 in | | × | 1-23 | 4.19 |
| 3 ft 0.5 in | | × | 1-24 | 4.28 |
| 4 ft 0.5 in | | × | 1-25 | 5.56 |
| 5 ft 0.5 in | | × | 1-26 | 6.95 |
| 6 ft 0.5 in | | × | 1-27 | 7.67 |
| 7 ft 0.5 in | | × | 1-28 | 7.69 |
| 8 ft 0.5 in | | × | 1-29 | 8.78 |
| 9 ft 0.5 in | | × | 1-30 | 10.48 |

**FIGURE 7**
**Reproduced from <u>Shooting Incident Reconstruction</u>, 3rd Ed.**



## FIGURE 8a

7. Mr. DeFrance's report includes the results of test firing a Browning 12-gauge Auto-5 shotgun shooting Federal 12-gauge, 3-inch magnum, premium, 00 buckshot. Test firing was conducted at 10 ranges of fire between 0.5 inches and 9 feet and 0.5 inches using both cylinder and full choke settings. Photos of each target were reviewed by me.

## FIGURE 8b

8. In my opinion, the test firing results that most closely approximated Ms. Rudolph's 6 cm entrance wound, which was either a single round or scalloped defect without multiple individual buckshot entrances were:
   A. Full choke at 3 feet and 0.5 inches;
   B. Cylinder at 2 feet and 0.5 inches; and,
   C. Cylinder at 3 feet and 0.5 inches.

## FIGURE 8c

9. In my opinion, of these options, the target that most closely resembles Ms. Rudolph's injuries was test specimen 1-15. This was a full choke test fire through a carrying case. The muzzle was 0.5 inches from the end of the carrying case which was centered 3 feet from the target. This created a defect that was 4.6 cm across with a single small defect adjacent to the larger defect.

## FIGURE 8d

10. Skin is an elastic structure. A 4.6 cm defect on a target could easily equate with a 6 cm defect in the skin. Skin is prone to stretching and gaping when its integrity has been breached.

## FIGURE 8e

4. Based on statements provided by persons who viewed the body after the autopsy, there was a satellite wound on the left side of the front of the chest several inches from the main wound possibly containing a plastic fragment, likely part of the shotgun shell. This injury is suboptimally depicted in the photos taken after the autopsy.

## FIGURE 8f

5. The scene photos and post-autopsy photos also appear to show an abraded and contused wound on the right breast that is not described in the autopsy report. This was also likely caused by a component of the discharged shell.

**FIGURE 9**



## FIGURE 10a



## FIGURE 10b



## FIGURE 10c



## FIGURE 11a  June 15, 2022 TEST



## FIGURE 11b  June 15, 2022 TEST



## FIGURE 12a  June 15, 2022 TEST



## FIGURE 12b  June 15, 2022 TEST



## FIGURE 12c  June 15, 2022 TEST

