IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martinez

Criminal Case No. 22-CR-0012-WJM

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.   **LAWRENCE RUDOLPH**,
2.   LORI MILLIRON,

    Defendants.

_____/

**LAWRENCE RUDOLPH'S MOTION
FOR NEW TRIAL PURSUANT TO RULE 33**

Lawrence Rudolph has been wrongly convicted; he did not murder his wife. In order to right the iniquity of this verdict, the interest of justice requires a new trial pursuant to Federal Rule of Criminal Procedure 33.

The prosecution did not prove what happened to Bianca Rudolph on October 11, 2016, much less that her husband intentionally shot her with malice aforethought and premeditation. There were no eye-witnesses and no physical evidence to prove that Larry Rudolph murdered his wife. As hard as the Government tried to create evidence of guilt, its efforts failed. Dr. Rudolph repeatedly maintained that Bianca's death was a horrible and tragic accident. And the people closest to him—who know him best and saw his genuine grief in reaction to his wife's death—believe him.

Knowing its case was lacking, the Government engaged in a strategy of repeatedly poisoning and inflaming the passions of the jury with testimony and

argument that should never have been permitted. It began with admitting unduly prejudicial, irrelevant, and inadmissible hearsay against Dr. Rudolph—including multiple damaging, alleged statements by Lori Milliron to others and a mountain of false tales by an admittedly biased and hateful Cassandra Olmstead. Newly discovered evidence—emails between Olmstead and Bianca Rudolph—demonstrate conclusively that Olmstead lied to the jury.

Then, not only was the jury permitted to hear unreliable, untested, and unduly prejudicial evidence which was admittedly not admissible in a trial against Dr. Rudolph, he was prevented from presenting exculpatory testimony that was important for the jury to hear to render a fair and just verdict. By trying this case with Ms. Milliron, Dr. Rudolph was prevented from calling a witness that, in a fair trial, would have testified. Dr. Rudolph could not compel Milliron to testify at a joint trial. Consequently, the jury was kept from hearing from Ms. Milliron that there was never an ultimatum to get rid of his wife and never any confession.

Additionally, the prosecution misled the jury regarding the post-nuptial agreement, suggesting time and again it was not signed by Bianca Rudolph when it knew that it was.

Finally, the jury received, as part of its instructions, an excluded Government fantastical theory for consideration during its deliberations.

Dr. Rudolph renews his motion for judgment of acquittal here on all elements of the charges and preserves and renews all pretrial motions and objections and

motions made during the trial, including but not limited to venue. We additionally move for a new trial based on a number of decisions by this Court which improperly tipped the scales for the prosecution.

## STANDARD OF REVIEW

Under Fed. R. Crim. P. 33, "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The standard for granting a new trial are not as strict as the standards for granting judgment of acquittal. *United States v. Hohn*, 2013 WL 6796428, at *2 (D. Kan. Dec. 20, 2013). The decision to grant a new trial is a matter of discretion for the trial court, and it will not be disturbed on appeal absent a "plain abuse of discretion." *United States v. Troutman*, 814 F.2d 1428, 1455 (10th Cir. 1987) (citation omitted); *see also United States v. Patterson*, 41 F.3d 577, 579 (10th Cir. 1994). Unlike the analysis in a Rule 29 motion, a motion for a new trial pursuant to Rule 33 allows the Court to weigh the evidence and to evaluate witness credibility. *United States v. Quintanilla*, 193 F.3d 1139, 1146 (10th Cir. 1999) (citation omitted). A new trial is warranted if, "after weighing the evidence and the credibility of the witnesses, the court determines that 'the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred.'" *United States v. Gabaldon*, 91 F.3d 91, 93–94 (10th Cir. 1996) (quoting *United States v. Evans*, 42 F.3d 586, 593 (10th Cir. 1994)). Any error that would require reversal may justify a new trial. *United States v. Walters*, 89 F. Supp. 2d 1206, 1213 (D. Kan. 2000) (citation and quotation marks omitted).

The Tenth Circuit based its Rule 33 standard of review on *Tibbs v. Florida*, 457 U.S. 31, 37 (1982). *Tibbs* established the proposition that in ruling on a motion for new trial, a trial court is allowed, perhaps for the only time, to sit as a thirteenth juror and disagree with "jurors' weighing of the evidence." *Id.* at 42. The Supreme Court distinguished between a ruling based on insufficient evidence which requires the trial court to review the evidence in the light most favorable to the prosecution, with a ruling based on the weight of the evidence which allows the court to sit as the thirteenth juror. *Id.* at 38, 42. ("A reversal on this ground, unlike a reversal based on insufficient evidence, does not mean that acquittal was the only proper verdict. Instead, the appellate court sits as a 'thirteenth juror' and disagrees with the jury's resolution on the conflicting testimony.").

The Tenth Circuit has an established standard for new trials based on newly discovered evidence. To prevail on a motion for a new trial based on newly discovered evidence, a defendant must show that: (1) the evidence was discovered after trial; (2) the failure to learn of the evidence was not caused by his own lack of diligence; (3) the new evidence is not merely impeaching; (4) the new evidence is material to the principal issues involved; and (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal. *United States v. Herrera*, 481 F.3d 1266, 1270 (10th Cir. 2007) (citing *United States v. Sinclair*, 109 F.3d 1527, 1531 (10th Cir. 1997)).

I.   **THE COURT SHOULD ORDER A NEW TRIAL IN THE INTERESTS OF JUSTICE AND BASED ON NEWLY DISCOVERED EVIDENCE BECAUSE CASSANDRA OLMSTEAD'S TESTIMONY WAS COMPRISED OF FALSE AND INADMISSIBLE STATEMENTS.**

A.   **Newly discovered emails show that Cassandra Olmstead lied about one of the most pivotal issues in the case: Bianca Rudolph's alleged ultimatum to her husband.**

The Court should grant a new trial because recently discovered evidence demonstrates that one of the Government's key witnesses perjured herself. Cassandra Olmstead was the *only* witness who gave the prosecution something they desperately needed—a supposed ultimatum from Mrs. Rudolph to Dr. Rudolph which propelled him from becoming a respected dentist into a cold-blooded murderer. Olmstead weaved a tale of a suffering and wronged wife and a cornered husband. Olmstead's testimony about alleged conversations with Bianca Rudolph in the spring of 2016 was the linchpin of the Government's theory of motive. It turns out, however, that while it was Netflix-worthy drama, the testimony was also a pack of lies.

The Government plainly believed that Olmstead was a crucial witness to its case; it waited to call her until the very end of its case in a three-week trial, on the next-to-the-last-day of its case. On the stand, Olmstead claimed that she had frequent contact with Bianca Rudolph in the few months before her death where the two had long conversations in which Mrs. Rudolph disclosed intimate details regarding her marriage. The Government called Olmstead to say that in the spring of 2016 she allegedly met with Bianca Rudolph and had a 4-hour long conversation where Mrs. Rudolph said she found a hair clip in her bed; Olmstead revealed to Mrs. Rudolph for

the first time that Dr. Rudolph was having an affair with Ms. Milliron; Mrs. Rudolph discussed whether she could divorce Dr. Rudolph; the two role-played how she would confront him about the affair; Mrs. Rudolph devised a plan to present Larry Rudolph with an ultimatum telling him to end his affair and fire Ms. Milliron or she would divorce him; Mrs. Rudolph told Olmstead about a handwritten document Dr. Rudolph had drafted years ago and signed her name to so that she would receive nothing in a divorce; Mrs. Rudolph never discussed having an open marriage; Mrs. Rudolph confessed to having only one previous affair that Dr. Rudolph held over her head; and Olmstead told Mrs. Rudolph about salacious emails between Dr. Rudolph and Ms. Milliron that proved they were having an affair. Following this alleged lengthy conversation, Olmstead claimed that Mrs. Rudolph figured out the passwords to Dr. Rudolph's email accounts, printed nearly 200 pages of emails between Ms. Milliron and Dr. Rudolph, and gave these printed emails to Olmstead to hold in case something happened. Olmstead also testified that Mrs. Rudolph told her that she had confronted Dr. Rudolph a few weeks later; he agreed to end the affair and fire Ms. Milliron. Olmstead allegedly called the dental office twice and found out that Ms. Milliron was not fired and was still working for the practice. She then purportedly told Mrs. Rudolph that Dr. Rudolph lied about firing Lori. Olmstead also alleged that she knew Mrs. Rudolph was going on the 2016 safaris to Africa because that was the only time she and Dr. Rudolph got along and she wanted to save her marriage.

But <u>none</u> of this was true.

The truth is that Cassandra Olmstead and Bianca Rudolph did not meet or discuss any of these things. And we can prove it.

The defense has recently been made aware of an email chain from August 2016 between Bianca Rudolph and Cassandra Olmstead where, contrary to her trial testimony, it is clear that Olmstead had not seen Bianca Rudolph in a very long time and that she knew nothing about the Rudolphs' upcoming 2016 safari trips—meaning the soul-bearing conversations Olmstead claimed she had with Bianca Rudolph **never happened**. *See* Exhibit A, August 2016 Email Chain.

For starters, it had been "eons" since they had communicated with each other. *Id.* at 2. On August 8, 2016, Mrs. Rudolph wrote to Olmstead in an email asking if Olmstead was going to be around while she and Dr. Rudolph went on a big trip so that she could put Olmstead's name on a call list for the alarm company for their house.

From: GmailBTR [mailto:biancafiniziorudolph@gmail.com]
Sent: Monday, August 8, 2016 7:54 AM
To: Cass Olmstead< cass@compbussol.com>
Subject: a few things


Hi there -

  First of all, I am so sorry I didn't get to come with Larry the day he met you.  I would have loved to see you, but

I had some appointments I couldn't change.  I hope all is well.  All good here, just crazy busy, and now we are

getting ready for a big trip.

*Id.* at 2.

Olmstead responded the same day and asked where the Rudolphs were going. Olmstead added, "Let's try to get together when you get back. **It has been eons!**" *Id.* (emphasis added). Clearly, the two women had not been in any, much less frequent, contact for a long time.

From: Cass Olmstead
Sent: Monday, August 08, 2016 10:16 AM
To: GmailBTR
Subject: RE: a few things

Where are you going? And yes, you can put me down with the alarm company. We told him we would a long time ago. Don't leave without setting it. It's not worth the worry. I will be around if something happens with them. Just make sure you give me the security code and the password for when they call.

Let's try to get together when you get back. It has been eons!

*Id.*

Bianca wrote back the next day about the home alarm, telling Olmstead in a postscript that they were "headed to Zambia." *Id.* And Mrs. Rudolph does not even respond to Olmstead's suggestion that they get together after Mrs. Rudolph's trip.

From: "GmailBTR" <biancafiniziorudolph@gmail.com>
Date: August 9, 2016 at 10:36:36 AM MST
To: "Cass Olmstead" <cass@compbussol.com>
Cc: "Bianca Rudolph" <biancafiniziorudolph@gmail.com>
Subject: Re: a few things

Ok, so here is the deal with the house alarm -

<div style="border:1px solid black; padding:8px">
<mark>PS - headed to Zambia</mark> - will have a data kit for emails (dependent on a satellite) and I think there is some cell service in the area.
</div>

*Id.* at 1.

Contrary to her testimony, Olmstead did not have frequent contact with Bianca Rudolph in the months before her death, was not close friends with her, and had no idea about her upcoming trips with Dr. Rudolph. In fact, she did not even meet with Bianca Rudolph prior to the 2016 safaris, let alone discuss affairs, divorce, or ultimatums. Additionally, the new Olmstead emails demonstrate that Olmstead was not previously aware that Bianca and Larry Rudolph were going to Zambia, let alone Mrs. Rudolph's motivation for going on the trip. *Id.* at 2. ("Where are you going?"). If Olmstead's testimony was truthful, then she certainly would have known about the safari trip and would have spoken to Mrs. Rudolph about their recent conversations. The private emails between Bianca Rudolph and Olmstead do not contain any information about divorce, an affair, role-playing, printed emails, a hair clip, Lori Milliron, a recent long conversation, seeing each other recently, or confrontations.

This is something that the jury should have been made aware of and the defense could have used to demonstrate that Olmstead perjured herself in an effort to "bury" Larry Rudolph. *See* Transcript of Jury Trial, Day 10 at 73, 75. If, as the emails show, the women were not close and had not seen each other for a long time, then it is completely <u>untrue</u> that:

- Mrs. Rudolph and Olmstead saw each other frequently in the months before Mrs. Rudolph's death;

- Mrs. Rudolph and Olmstead had a 4-hour conversation in the spring of 2016;

- Mrs. Rudolph told Olmstead that she found another woman's hair clip in her bed;

- Mrs. Rudolph questioned Olmstead whether her husband was having an affair;

- Olmstead revealed to Mrs. Rudolph that Dr. Rudolph had been having a long-term affair with Lori Milliron;

- Olmstead told Mrs. Rudolph that she had seen numerous emails between Dr. Rudolph and Ms. Milliron;

- Mrs. Rudolph and Olmstead discussed the ramifications of a divorce;

- Mrs. Rudolph told Olmstead that Dr. Rudolph drew up a document for Bianca to sign that stated she would not receive any money if they got divorced;

- Mrs. Rudolph claimed that Dr. Rudolph forged her name on many documents and he was very good at signing her name;

- The two women acted out how Mrs. Rudolph would confront Dr. Rudolph about the affair;

- Olmstead explained that Mrs. Rudolph should guess the passwords to Dr. Rudolph's email accounts so that she could see the emails with Ms. Milliron;

- Mrs. Rudolph gave Dr. Rudolph an ultimatum that he had to stop seeing Ms. Milliron, fire her, and begin marriage counseling, or Mrs. Rudolph would divorce him;

- Mrs. Rudolph said that she was going to Africa to try to fix her marriage; and

- Mrs. Rudolph gave Olmstead a stack of 2010 and 2011 emails to hold onto while she went to Africa in 2016 with Dr. Rudolph in case anything should happen to her.

If the jury had seen this newly discovered evidence, it is likely that the result of the trial would have been different because Olmstead would have been revealed to

be a liar. This evidence more than raises reasonable doubt as to Dr. Rudolph's guilt because the only statement introduced at trial against Dr. Rudolph detailing a personal motive and imminent reason to commit murder was from this witness who lied on the stand.

According to the Government, it was Olmstead's testimony regarding a fictitious ultimatum from Mrs. Rudolph to Dr. Rudolph which left him with no choice but to kill his wife. This was the Government's *only* evidence that Mrs. Rudolph ever gave such an ultimatum or that Dr. Rudolph had any demands to end his relationship with Ms. Milliron. Olmstead was a Government star witness. As the prosecutor said in his closing argument, "her facts are so important." Transcript of Jury Trial, Day 14 at 8. The Government relied heavily on Olmstead's testimony to create a demonstrative timeline used in its closing argument:

> [S]ometime in May, Bianca goes to Cass Olmstead and tells her the story about the hair clips. [FALSE] They rehearse what she's going to do. [FALSE] And what they rehearse is Bianca is going to give Larry an ultimatum. [FALSE] She's going to say, "You need to leave Lori and fire her or else I'm going to seek a divorce." [FALSE] And she confirmed to Cass Olmstead that that conversation happened. [FALSE] Now thinking of this ultimatum, remember the details. She finds the hair clip [FALSE], she reads the emails [FALSE], she confronts Larry. [FALSE] And he denies it at first. [FALSE]

*Id.* at 7 (brackets and text added). The Government also connected her testimony to several other demonstratives and summary charts during closings in an attempt to bolster her claims, when the truth is that her claims were lies.

Although this email chain devastates a central premise of the Government's

case, which is the sort of evidence that can be the basis for a motion for a new trial under either the interest of justice standard or under the newly discovered evidence standard:

> In some situations … the newly-discovered impeachment evidence may be so powerful that, if it were to be believed by the trier of fact, it could render the witness' testimony totally incredible. In such a case, if the witness' testimony were uncorroborated and provided the only evidence of an essential element of the government's case, the impeachment evidence would be "material" . . . Moreover, Rule 33 permits the granting of a new trial motion "if required in the interest of justice." Fed. R. Crim. P. 33.

*United States v. Davis*, 960 F.2d 820, 825 (9th Cir. 1992); *see also United States v. Wallach*, 935 F.2d 445 (2d Cir. 1991) (as amended) (concluding that new evidence impeaching the government's central witness was powerful enough to require a new trial); *United States v. Taglia*, 922 F.2d 413, 415 (7th Cir. 1991) (holding that a new trial would be warranted under Rule 33 if it were discovered after trial that the government's star witness was "utterly unworthy of being believed because he had lied consistently in a string of previous cases"); *Balestreri v. United States*, 224 F.2d 915, 917 (9th Cir. 1955) ("To deny in every case a motion for a new trial on the ground of newly discovered evidence for the sole reason that the evidence was 'merely impeachment' might often lead to injustice.").

The Third Circuit Court of Appeals, in considering whether this type of evidence is enough to warrant a new trial, explicitly stated that the correct question for a court to ask itself is: "was there a strong exculpatory connection between the newly discovered evidence and the facts that were presented at trial or did the newly

discovered evidence strongly demonstrate that critical evidence at the trial against the defendant was very likely to have been false?" *United States v. Quiles*, 618 F.3d 383, 392-93 (3d Cir. 2010). *See also Alvarez v. United States*, 808 F.Supp. 1066 (S.D.N.Y. 1992) (granting new trial based on newly discovered evidence of prior instances of perjury committed by the informant, which was more than "merely impeaching" and called into question the integrity of the verdict); *United States v. Ramsey*, 726 F.2d 601, 604 (10th Cir. 1984) (district court abused its discretion in denying defendant's motion for new trial where chief prosecution witness had recanted his testimony; recantation was not "merely impeaching" because the new version of his testimony is substantive evidence); *United States v. Briola*, 465 F.2d 1018, 1022 (10th Cir. 1972) ("We recognize that a new trial should be granted where the court is convinced that a witness has committed perjury at the trial."); *United States v. Harris*, 462 F.2d 1033 (10th Cir. 1972) (judgment reversed and new trial granted based on newly discovered evidence of failure of prosecution to advise defense counsel of plea bargain of accomplice, where accomplice's reason for testifying for the prosecution was premised squarely on plea bargaining and his hope for leniency).

In the instant case, the newly discovered evidence demonstrates that the information presented by the Government's key witness, Olmstead, was both material and false. The defense learned of the emails after trial and the failure to learn of the evidence was not caused by our own lack of diligence.[1] This evidence

---

[1] Undersigned counsel did everything they could to investigate this complex overseas

extends far beyond impeachment material; it completely eviscerates the Government's central theory that Larry Rudolph killed his wife because she was pressuring him with an ultimatum. Olmstead's testimony about her conversations with Bianca Rudolph is completely uncorroborated and provided the <u>only</u> evidence of this crucial component of the Government's case. The new evidence is so powerful that it would render Olmstead's testimony so unbelievable that the jury likely would have acquitted. And even if the Court finds that the newly discovered evidence standard has not been met, the interests of justice require a new trial. *United States v. Quintanilla*, 193 F.3d 1139, 1147 (10th Cir. 1999) ("The 'interest of justice' standard applies to all motions for new trials, including those predicated on newly discovered evidence."). We respectfully request a hearing, where Ms. Olmstead is compelled to explain under oath the newly discovered email that renders her critical testimony patently false.

### B. Bianca Rudolph's purported statements to Cassandra Olmstead were also inadmissible hearsay that should have been excluded.

Putting aside that Cassandra Olmstead's outlandish testimony would have unraveled as an imaginary story, the Government should never have been allowed to call her and elicit the fountain of improper hearsay that she spouted. Through

---

murder case in the few months they had to prepare. Ms. Olmstead refused to speak with us and we did not have access to this six-year old email until it was provided to us after the trial. As the Court knows, Dr. Rudolph was detained in another state from his home, his lawyers, and his electronics, making preparation extremely difficult.

Olmstead, the Government was improperly permitted to use Federal Rule of Evidence 804(b)(6) to introduce hearsay statements made by the decedent, Bianca Rudolph. Olmstead claimed at trial that in the spring of 2016, Mrs. Rudolph told her in part that: (1) she found a hairclip in her bed that did not belong to her, Transcript of Jury Trial, Day 10 at 9; (2) she asked Olmstead if Dr. Rudolph was having an affair and who it was with, *Id.* at 10; (3) she would have to file for divorce if Dr. Rudolph did not end his affair but feared she would not get any money in a divorce, *Id.* at 13; (4) Dr. Rudolph signed her name on documents "quite often" and was "very good" at it, *Id.* at 14; (5) after she had an affair, Dr. Rudolph "drew up" an agreement at the kitchen table saying she would get no financial aid in a divorce and signed her name to it, *Id.*; (6) she looked for the document for months so that she could "destroy" it, but never found it and it continued to worry her, *Id.* at 15; (7) she was going to give Dr. Rudolph an ultimatum and rehearsed the conversation with Olmstead, *Id.* at 16; (8) she ultimately confronted Dr. Rudolph and gave him an ultimatum about his affair, *Id.* at 23; (9) she asked Olmstead for Dr. Rudolph's emails with Milliron, for his email account passwords, and how to search through his emails, *Id.* at 18; and (10) she went on the 2016 hunting trips to try to save her marriage. *Id.* at 51.

As briefed in Dr. Rudolph's pretrial Motion in Limine, Doc. 150, and Renewed Objection Related to Cassandra Olmstead, Doc. 231, none of these hearsay statements were admissible because the Supreme Court has made clear that the forfeiture-by-wrongdoing doctrine has no application in a homicide case like this one,

where the accused is not alleged to have killed the declarant with the specific design of keeping her from testifying. *Giles v. California*, 554 U.S. 353 (2008). Although Mrs. Rudolph's purported statements are not testimonial, the *Giles* decision—as well as Tenth Circuit precedent—expressly state that there is only one forfeiture-by-wrongdoing doctrine that applies the same way to testimonial and non-testimonial hearsay.

The prosecution's theory has always been that Dr. Rudolph killed his wife for financial reasons—to collect insurance proceeds and avoid a purportedly costly divorce—not to prevent her from testifying in any proceeding. Then, in its successful attempt to expand the doctrine for this case, the prosecution alleged during trial that the hearsay statements regarding divorce and the post-nuptial agreement satisfied the forfeiture-by-wrongdoing exception because Dr. Rudolph killed Bianca to keep her from testifying in a hypothetical divorce proceeding or in the 2012 civil defamation action. But there was **no evidence** presented to support either Government assertion. The Court should have excluded the hearsay statements attributed to Bianca Rudolph.

There was no evidence that Dr. Rudolph killed his wife with the intent to keep her from testifying in a divorce proceeding or the civil SCI lawsuit. There was no divorce proceeding, no evidence presented about a *possible* divorce proceeding in 2016, and no credible evidence that Bianca threatened Larry Rudolph with a divorce. In fact, the evidence at trial showed the exact opposite—that the Rudolphs were

planning for their future together, engaged in estate planning, preparing for retirement, traveling the world together, and investing together in vacation properties abroad and domestically. Even if a divorce proceeding had been initiated, he would not have any reason to kill her to keep her from testifying about his infidelity because Arizona is a no-fault divorce state, meaning that "marital infidelity is of no relevance to a divorce proceeding in Arizona." Padish Report at 12.

Indeed, there was powerful evidence—put forward by the prosecution through its own expert (and corroborated by the defense expert)—that the Rudolphs had an authentic post-nuptial agreement, which would resolve their assets in the event of a divorce. The post-nuptial agreement demonstrated that there was no reason for Dr. Rudolph to kill his wife to keep her from testifying in a divorce proceeding. Pursuant to the post-nuptial agreement that was analyzed and confirmed to be signed by Bianca Rudolph by both a defense expert and the prosecution's own FBI expert, Dr. Rudolph would have been able to divorce his wife with minimal financial impact to his estate.[2] After Dr. Rudolph testified during trial, the Government went so far as to send agents to the home of Frank Langell, the witness to the post-nuptial agreement, who confirmed he saw Bianca Rudolph sign the agreement that removed

_____

[2] In addition to the experts from both sides who concluded that Bianca Rudolph signed the post-nuptial agreement, the defense presented the jury with a handwritten letter authored by Mrs. Rudolph where she references signing the agreement. *See* Trial Exhibit RB, Handwritten Letter from Bianca Rudolph to Lawrence Rudolph ("I tried to begin some responsibility with signing the paper..."); *see also* Transcript of Jury Trial, Day 12 at 30.

any conceivable need for Dr. Rudolph to make her unavailable in a divorce proceeding. There was no evidence presented before the jury that Bianca Rudolph (a) threatened Dr. Rudolph with divorce, or (b) that Dr. Rudolph killed Bianca Rudolph to keep her from testifying in some hypothetical divorce proceeding.

Additionally, there was literally **no proof** that Dr. Rudolph tried to prevent his wife from testifying in a civil defamation proceeding. Paul Babaz testified briefly, over defense objection, about Dr. Rudolph's lawsuit against SCI. The evidence at trial showed not only that Bianca Rudolph had already testified in the SCI lawsuit, but that she testified *positively and in full support* of Dr. Rudolph. Thus, there was no attempt or any need for Dr. Rudolph to engage any act to make Bianca Rudolph unavailable to testify because she already testified—and testified favorably for Dr. Rudolph. The lawsuit was subsequently settled resulting in a substantial payment to Dr. Rudolph. There was not a single piece of evidence presented that Bianca Rudolph was threatening to change her testimony in the civil case, nor that she had any reason to, or that Dr. Rudolph had any such concerns. This is all speculation.

The Government did not present any evidence, much less enough evidence to make it more probable than not, that Dr. Rudolph murdered his wife for the purpose of keeping her from testifying in a specific proceeding. At trial, the Government offered only speculation about two different proceedings, a hypothetical divorce proceeding and a civil defamation action. Because there was simply no evidence that Dr. Rudolph killed Bianca Rudolph with the intent to silence her testimony in a

divorce or civil proceeding, the Government failed to show, and the Court erred in ruling, that the hearsay statements satisfied the forfeiture-by-wrongdoing exception. There was no way that Cassandra Olmstead could legally testify to what Bianca Rudolph purportedly told her.

## II.  BECAUSE THE COURT DENIED DR. RUDOLPH'S REPEATED MOTIONS FOR SEVERANCE, HE WAS DENIED A FAIR TRIAL.

The Court's denial of Dr. Rudolph's Motion to Sever, Doc. 97, Motion for Reconsideration of Severance, Doc. 200, and standing objection for severance throughout trial cost Dr. Rudolph a fair trial on numerous fronts. The defense's concerns about a joint trial were proven correct as numerous witnesses testified to inflammatory material that was only admissible against his co-defendant, but <u>not</u> Dr. Rudolph. The limiting instruction read by the Court could not possibly cure the prejudice in these instances, especially where the Government's opening and closing arguments completely blurred the line between the evidence against Dr. Rudolph and his co-defendant. To exacerbate this problem, the Court vocalized palpable and inappropriate annoyance with the defense in the presence of the jury when the defense requested the agreed-to and necessary limiting instruction be read to the jury. Forced to withstand a joint trial, even the Government recognized that the instruction was necessary to explain to the jury which statements it could <u>not</u> consider against him. It was also important to read it each and every time evidence which was inadmissible against Dr. Rudolph was introduced. How else would the jury know what evidence to consider against him and which testimony it should have

completely ignored? Yet, at one point, when the instruction was requested by the defense, the Court complained to the jury, "here we go again," which inappropriately sent the message to the jury that the instruction was not important and that the defense was doing something wrong by asking for it. After objection, the Court explained to the jury that it should not read anything into the Court's unwarranted remarks.

Moreover, because his severance motions and objections were denied, Dr. Rudolph was not able to call the co-defendant, who was a critical defense witness on the central two theories of the Government's case—that Dr. Rudolph confessed to a murder and that the co-defendant issued an ultimatum to him that served as a motive for murder. The co-defendant, Lori Milliron, would have provided critical exculpatory testimony on both of these issues, but was not able to do so because of the joint trial. At a new trial, the Court could sever the defendants, which would allow for a fair trial.

## A. Denial of severance allowed the Government to introduce evidence that was inadmissible against Dr. Rudolph in his trial.

At Dr. Rudolph's and Milliron's joint trial, the Government introduced evidence that would have been barred were he tried alone. However, evidence which was only permissible against Milliron, but nevertheless unduly prejudicial to Dr. Rudolph, could never be successfully detached and considered separately by the jury. The Government knew this very well despite its promises to the contrary. Initially, in its pretrial response to Dr. Rudolph's motion for severance, the Government stated

that the defendants should be joined because the jury will be asked "to consider whether Lawrence Rudolph murdered his wife to be with his mistress." Doc. 100:5. The Government also stated pretrial, and the Court accepted as true, that the evidence on this point would be "overlapping." Doc. 100:5. Equally, the Government argued in no uncertain terms that the evidence at separate trials would be no different than at a joint trial. Doc. 100:5-6. Then (less than two weeks before trial and nearly six months after indictment), after the Court denied the first motion to sever, the Government admitted that there would be evidence—namely alleged statements by Lori Milliron—that would not be admissible against Dr. Rudolph. Doc. 205:3-4 (arguing that the jury can "separate out statements admissible against one defendant but not another" and that a statement had been identified by the defense that raised "concern"). Because the Court again denied severance on Dr. Rudolph's motion for reconsideration, Doc. 206, the Government was free to introduce unfairly prejudicial testimony and innuendo that would have been excluded in a separate trial.

In one clear example of how Dr. Rudolph was prejudiced and a jury instruction was not sufficient to cure: Anna Grimley testified that Lori Milliron issued an ultimatum in 2015 to Dr. Rudolph that she would end their affair if he did not get rid of his wife. This testimony was hearsay and excluded as it related to Dr. Rudolph but was admitted against Ms. Milliron. At trial, the jury not only heard this statement, but Dr. Rudolph could not call Milliron, who would have testified that Grimley's testimony was false, or she was completely mistaken. *See* Doc. 97: Addendum. This

put Dr. Rudolph at an unfair disadvantage—the jury heard inadmissible hearsay that there was an ultimatum and Dr. Rudolph was not permitted to call the only witness who could say that the Government's witness had it wrong.

The same thing occurred with Government witness Rachel Anders. Anders was allowed to testify, under the guise that the evidence was only to be used against Milliron, that she "heard a lot about Larry from Lori"—that Dr. Rudolph provided money constantly at Milliron's request for her and her children, he allegedly couldn't get divorced because he'd lose his money, and he and Milliron supposedly planned to retire and travel the world together. These were all narratives important to the Government's case against Dr. Rudolph that a jury would never have heard and considered in a proper trial solely against Dr. Rudolph. Yet, testimony from these two witnesses alone (Grimley and Anders) permitted the jury to hear a story (which the defense disputes) about a money-hungry mistress who needed her lover to get rid of the one person that stood in her way of endless money and living out her dream life and that a divorce was not sufficient because her lover would have lost all of his money. No other witnesses could provide the Government these essential pieces to the puzzle it wanted the jury to put together about Larry Rudolph. The Government suggested, and the Court accepted, that each time one of these damning statements was made, a simple curative instruction would fix the prejudice. But it knew the jury would not be able to separate out those statements given that they went directly to the Government's central theory in the case, that Dr. Rudolph committed murder to

be with Lori Milliron. And they were right.

It was impossible for Dr. Rudolph to receive a fair trial when the Government was permitted to introduce statements that bore on the central issue in the case but were inadmissible against him. The prejudice was heightened because Dr. Rudolph could not call Lori Milliron at trial, and she was the <u>only</u> witness who could rebut those statements. Under these circumstances, the curative instruction, with which the Court voiced cleared annoyance in front of the jury, was wholly inadequate. Only granting a severance would have obviated the many evidentiary problems inherent in trying these totally unrelated cases together and would have sufficed to afford Dr. Rudolph a fair trial.

On top of the improper spillover of evidence against Dr. Rudolph, the Government also knew that a trial against Dr. Rudolph <u>and</u> Lori Milliron (facing completely different charges) would infect the jury with improper innuendo concerning Dr. Rudolph's guilt. Here, too, the Government's plan worked. The obvious implication was that Ms. Milliron would not have committed perjury and obstruction unless she had some reason to think Dr. Rudolph was guilty of murder and fraud. Jurors simply had no reason to suspect or believe that prosecutors sometimes charge people for ulterior reasons. The only way to prevent a conviction from being obtained on this additional totally improper basis was to grant the severance.

Finally, by having a joint trial, the Government got a decided advantage in its closing argument by getting 66% more time than Dr. Rudolph did to close. The

Government said it needed this extra time to address arguments raised by Milliron. But over 90% of the Government's 40-minute rebuttal was used to attack Dr. Rudolph. *See* Transcript of Jury Trial, Day 14 at 106-128 (20 pages of the Government's 22-page rebuttal was used to address the arguments raised by Dr. Rudolph; only 2 pages were used to address the charges against Milliron).

### B.    Denying severance kept Lori Milliron's crucial testimony from the jury, which denied Dr. Rudolph of his right to call a critical witness and resulted in a false conviction based on one-sided evidence.

Dr. Rudolph was denied his constitutional right to call a crucial witness in his defense. Lori Milliron previously submitted an affidavit to this Court, which demonstrated that she would have been a critical defense witness who was unavailable at a joint trial but available at Dr. Rudolph's separate trial. *See* Doc. 97: Addendum. "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). Preventing a defendant from calling witnesses who can counter the Government's version of events subverts the adversary system because the point of a jury trial is for the jury is to hear and consider both sides of the case, not just the prosecution's. "Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." *Washington v. Texas*, 388 U.S. 14, 19 (1967).

When the Government indicted Ms. Milliron, it knew she was highly likely to

testify for Dr. Rudolph. Ms. Milliron was alleged to have been a participant in two critical conversations that were at the epicenter of the prosecution's case against Dr. Rudolph. One prosecution witness, Anna Grimley, claimed at trial that Ms. Milliron said she had threatened to end her affair with Dr. Rudolph unless he got rid of his wife. Another prosecution witness, Brian Lovelace, claimed that he overheard Dr. Rudolph allegedly confess to killing his wife while he was conversing with Ms. Milliron at a bar. Because Ms. Milliron's testimony of these conversations would have conflicted with what the prosecution witnesses said and what it wanted to believe, the prosecution did not want the jury to hear from her. For that reason, she was called to the grand jury and slapped with a number of perjury and obstruction charges in the <u>same</u> indictment with Dr. Rudolph. Her testimony would have corroborated every other statement made by Larry Rudolph (to police, to the insurance company, and to friends and family) that his wife died from an accident. There was no confession. That is why the prosecution resorted to concocting a way to have its witnesses' testimony go to the jury unrebutted. Of course, the only way to do that was to indict Ms. Milliron as a co-defendant. The prosecution also knew that jurors are naturally less likely to believe someone who has been accused of perjury. Most people wrongly assume that prosecutors are too forthright to set a perjury trap for a witness or unfairly try two people together to admit tainted evidence.

As she explained in the affidavit previously submitted to the Court, Ms. Milliron would not testify in a joint trial but would have been available in Dr.

Rudolph's severed trial. *See* Doc. 97: Addendum. This, of course, is what the Government was counting on and exactly how the circumstances played out at trial. At a joint trial, Dr. Rudolph did not have the ability to call a witness to give important, exculpatory evidence. Ms. Milliron's testimony would have been crucial given the circumstantial nature and weakness of the Government's case. Ms. Milliron's testimony would have directly refuted the Government's contentions regarding Dr. Rudolph's supposed motive to kill his wife and his supposed confession. To the contrary, Ms. Milliron's testimony would have shown that Dr. Rudolph had no reason to kill his wife. Ms. Milliron would directly contradict Grimley's false testimony, as she would have explained that she had no desire to re-marry, that she did not give an ultimatum, and that she was not going to leave Dr. Rudolph if he continued in his marriage. Motive was especially important in this case because the Government presented no physical evidence that any murder occurred.

Ms. Milliron would have also refuted false "motive" testimony from witnesses like Cassandra Olmstead, by explaining that she never spent time in the Rudolphs' home where Bianca allegedly found a hair clip. She would have explained that Bianca Rudolph knew about Ms. Milliron's relationship with Dr. Rudolph for many years and even knew about trips they took together. Ms. Milliron would have told the jury about the non-exclusivity of her relationship with Dr. Rudolph, and how they both had relationships with others during their time together. Critically, she would have walked the jury through the argument she had with Dr. Rudolph at Steak 44 that

was partially overheard by Brian Lovelace and explained the full context and scope of Dr. Rudolph's statements—which was not a confession—corroborating Dr. Rudolph's testimony.

Ms. Milliron's inability to testify at a joint trial was itself a windfall to the Government and tainted Dr. Rudolph's trial. It falsely and misleadingly communicated to the jurors that the Government's witnesses—the disgruntled former employees and the bartender—were testifying to undisputed facts. Were Dr. Rudolph tried separately, Ms. Milliron's testimony would have refueled the now-unrebutted testimony about Dr. Rudolph. Milliron has personal knowledge not only about the critical conversations but also about her own relationship with Dr. Rudolph and what they each wanted from the relationship at the time in question. If Ms. Milliron had the opportunity in a separate trial to explain to the jury that the Government's witnesses were wrong and that the Rudolphs had an open marriage, the case very likely would have collapsed.

To Dr. Rudolph's great prejudice, the Government succeeded in giving the jury a one-sided version of conversations Ms. Milliron had with a bitter former employee of Dr. Rudolph's and of part of a conversation she had with Dr. Rudolph that a bartender overheard. As the Sixth Amendment presupposes, a fair trial can be had only if the jury hears from both parties, which is why it guarantees defendants the right to call witnesses in their defense. The prejudice to Dr. Rudolph's defense because the Government was allowed to present only one side of conversations could

not have been greater.

## III.   THE GOVERNMENT WRONGFULLY SUGGESTED TO THE JURY THAT THE POST-NUPTIAL AGREEMENT WAS NOT SIGNED BY BIANCA RUDOLPH EVEN AFTER LEARNING THAT IT WAS.

Throughout the trial, the prosecution suggested to the jury that the post-nuptial agreement between Bianca and Larry Rudolph was not actually signed by Bianca Rudolph. The Government misled the jury even though the forensic document examiner retained by Dr. Rudolph, Dianne Flores, reached the same conclusion as FBI forensic document examiner Rachel Clay. Using the same methodology described during Ms. Clay's testimony, as well as additional testing, each expert independently concluded that the signatures on defense exhibits RW and RX, originals of the post-nuptial agreement, were signed by Bianca Rudolph. Because the post-nuptial agreement destroyed the Government's theory of the case, they attempted to discredit their own FBI handwriting expert on the stand and called a biased witness to introduce false hearsay statements about Dr. Rudolph allegedly forging Mrs. Rudolph's signature. *See above* Section I.

After Dr. Rudolph testified at trial that the post-nuptial agreement was witnessed and signed by Frank Langell, the Government sent agents to Mr. Langell's residence that very night to try to discredit the post-nuptial agreement once again. To the Government's huge disappointment, it learned that Mr. Langell <u>confirmed</u> that he signed the agreement as a witness and did, in fact, observe Bianca Rudolph sign the post-nuptial agreement.

When the agreement's validity became clear during trial, the prosecution could have corrected its previous representations to the jury that the agreement was forged. It did not. The prosecution also could have refrained from improperly implying that the agreement was invalid during closing arguments. It did not.

Rather, it continued to perpetuate a false representation on a key piece of evidence it **knew** to be authentic in order to mislead the jury. Even after handwriting experts from both sides confirmed that Bianca Rudolph signed the agreement, and even after a witness made clear to the FBI that he witnessed Bianca Rudolph sign the agreement, the prosecution still suggested to the jury that the agreement was forged.

In fact, in its closing argument, the Government continued to argue that Bianca Rudolph may not have signed the post-nuptial agreement even though it knew she did:

> [I]t's difficult to tell whether Bianca signed it or not. Some things show that it might have been signed, some things that maybe it wasn't, or maybe there was some sort of compulsion. It's very difficult to tell.

Transcript of Jury Trial, Day 14 at 9. Even though there was no evidence presented at trial that Bianca Rudolph was coerced into signing the agreement, and there was no evidence to suggest that she did not sign the agreement, the Government continued to promulgate this insincere suggestion throughout its closing argument. *See e.g. Id.* at 8 ("[T]he defense has and will likely argue the postnup is real…"); *Id.* ("[E]ven if that postnup were valid…"); *Id.* at 9 ("[I]f the postnup is real, then Cass

Olmstead must be lying. But it was Bianca, not Olmstead, that talked about the forged signature."); *Id.* at 111 ("[Dr. Rudolph's] story made absolutely no sense…she threatens divorce and he is threatening her back and says, 'I'll give you a divorce or a postnup where you get even less'? None of that is plausible. None of that makes any sense."); *Id.* at 112 ("[E]ven if the postnup was valid…"); *Id.* at 113 ("Supposedly even after this postnup, he said, 'Yeah, I did have those conversations with Al Smith. Yeah, I was worried about the divorce.'"). The Government doubled down on this argument to the jury even knowing that what they were asserting was false and unsupported by the evidence, a witness to the signing of the agreement, and their own handwriting expert.

In *United States v. Alzate*, 47 F.3d 1103, 1104 (11th Cir. 1995), the Eleventh Circuit reversed the denial of new trial motion because before the case was submitted to the jury, the prosecutor learned that his representations had been false, but he failed to correct them. In reversing the denial, the Court reasoned:

> It may be that Alzate's…defense does not amount to much, but **he is entitled to put his defense forward free of the prosecutorial misconduct that occurred in this case**. *See United States v. Nash*, 910 F.2d 749, 759 (11th Cir.1990) (Hill, J., dissenting) ("In the eyes of many, that defense rested on a slender reed indeed, but that reed was all that [the defendant] had to sustain him."). It may be that Alzate will be convicted after a fair trial.   We do not know, but we do know that he has not yet had one.

*Id.* at 111 (emphasis added).

Similarly, here, based on the evidence known to the Government and presented at trial, the misrepresentations about the post-nuptial agreement made by the

prosecutors were knowingly false. The representations about the alleged invalidity of the post-nuptial agreement made during the questioning of witnesses and the closing arguments amounted to misconduct because there was no credible evidence presented that the agreement was forged or forced. The prosecutors' continued false representations to the jury, even after determining that the post-nuptial agreement was valid, require a new trial. Like Alzate, Dr. Rudolph "is entitled to put his defense forward free of…prosecutorial misconduct" to ensure he has a fair trial. *Id.* Because we know that he did not have one here, we respectfully request that the Court order a new trial.

## IV. THE JURY INSTRUCTIONS IMPROPERLY INCLUDED A PREJUDICIAL REFERENCE TO A STRICKEN PORTION OF THE INDICTMENT RELATED TO A CROCODILE INCIDENT THAT WAS PREVIOUSLY EXCLUDED BY THE COURT.

Due to the fact that the parties were only permitted 15 minutes to review and analyze the Court's 51 pages of proposed jury instructions, an enormous error occurred—the excluded 404(b) evidence regarding a crocodile incident was not redacted from the indictment. The indictment that was sent back with the jury stated:

> "MILLIRON provided false and misleading testimony to a grand jury sitting in the District of Colorado regarding...*the circumstances of the accident that caused LAWRENCE RUDOLPH to lose part of his thumb*."

Doc. 240 at 46 (emphasis added). Due to the extremely short time frame that was allotted to review the lengthy instructions, the parties did not catch this grave error. Counsel understood that a corrected version of the indictment would be sent back with the jury. But to Dr. Rudolph's detriment, that was not the case.

In excluding the evidence of the crocodile incident proffered by the prosecution, the Court explained how prejudicial the introduction of this incident would be to Dr. Rudolph:

> Despite the Government's arguments to the contrary, the Court concludes that the proposed Rule 404(b) evidence concerning the crocodile incident would impermissibly require the jury to make prohibited inferences about Rudolph's character...Even if the Court were to give the jury a detailed and strongly-worded limiting instruction, the fact remains that evidence of the crocodile incident disproportionately risks unfairly prejudicing Rudolph...[E]ven more critically, the Court agrees with Rudolph that the introduction of the crocodile incident will confuse the issues and mislead the jury in contravention of Rule 403... In the end, *the risk of prejudice to Rudolph...is simply too great for the Court to accept.* While a close call, the Court concludes that the *interest of justice* is best served by excluding the Government's proffered Rule 404(b) evidence.

Doc. 153 at 7-9 (emphasis added).

Ultimately, the "prohibited inferences about Rudolph's character" which would "confuse the issues and mislead the jury" and lead to "unfairly prejudicing Rudolph" was realized when the jury was inadvertently improperly exposed to reference of this incident. *Id.* Because this Court expressly found that the introduction of this incident was not in the "interest of justice," and the Rule 33 standard allows for "a new trial if the interest of justice so requires," this issue falls squarely within errors warranting a new trial contemplated by the rule. Fed. R. Crim. P. 33(a).

<div align="center">***</div>

Because of all the errors occurring during his case, Dr. Rudolph, who had every right to a fair trial, did not get one.

WHEREFORE, Lawrence Rudolph respectfully requests that this Court grant him a new trial.

Respectfully submitted,

**MARKUS/MOSS** PLLC
40 N.W. Third Street
Penthouse One
Miami, Florida 33128
Tel: (305) 379-6667
Fax: (305) 379-6668
markuslaw.com

By:     /s/ David Oscar Markus
        David Oscar Markus
        Florida Bar Number 119318
        dmarkus@markuslaw.com

        /s/ A. Margot Moss
        A. Margot Moss
        Florida Bar Number 091870
        mmoss@markuslaw.com

        /s/ Lauren I. Doyle
        Lauren I. Doyle
        Florida Bar Number 117687
        ldoyle@markuslaw.com