IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 22-cr-00012-WJM

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1. **LAWRENCE RUDOLPH** and
2. LORI MILLIRON,

    Defendants.

## GOVERNMENT'S STATEMENT REGARDING SENTENCING OF LAWRENCE RUDOLPH AND MOTION FOR AN UPWARD VARIANCE

    Lawrence Rudolph shot his wife, Bianca, in the heart with a shotgun in Zambia as part of a carefully calculated plot to get away with murder, pocket a nearly $5,000,000 windfall, and live in opulent retirement with his long-time mistress, Lori Milliron. He lied about the circumstances of the death to his closest family, stole from insurance companies, and cheated in his dealings with those he professed to care about. Then, when confronted with the consequences, he lied about his lying, cheating, and stealing. Rudolph deserves what the law requires: life in prison.

    Rudolph's substantial wealth gave him the means to commit the crime and an aura of impunity inspiring the belief that he'd be able to get away with it. Greed pushed him to reap every dollar he could from his victim's death. The court's punishment here should be measured against the financial depravity of Rudolph's crime and sufficient to deter anyone seeking to profit from the tragedies they impose on others. At his arrest, Rudolph claimed to be worth $27,000,000 and he argued throughout the trial that he was so rich that he had no need for more

1

money. He can afford to pay a fine and the circumstances of his crime support the maximum punishment: twice his gain. 18 U.S.C. § 3571. In this case that would be $9,785,577.86: twice the life insurance proceeds ($9,755,489.86), plus twice the proceeds he obtained after taking the jewelry that Bianca was wearing when he murdered her ($30,088).

## I. Rudolph must be sentenced to life in prison for murdering his wife.

Rudolph's conviction for the premeditated first-degree murder of his wife in Zambia requires that he be punished as set forth at 18 U.S.C. § 1111. The mandatory sentence is life imprisonment. 18 U.S.C. § 1119(b); *United States v. Sands*, 968 F.2d 1058, 1066 (10th Cir. 1992) (noting that § 1111 imposes a statutory minimum sentence of life); *see also* U.S.S.G. 2A1.1 app. note 2A ("In the case of premediated killing, life imprisonment is the appropriate sentence if a sentence of death is not imposed.").

## II. All of the factors that must be considered by the court support the maximum sentence of 20 years imprisonment and a fine of $9,755,489.86 for his fraud.

While the murder charge carries a statutory minimum, the mail fraud charge can be separately punished with anywhere from zero to twenty years. In fashioning a sentence for that count, the court must address each of the factors set forth at 18 U.S.C. § 3553(a), including the kinds of sentences and the range established by the United States Sentencing Guidelines; the nature, circumstances, and seriousness of the offense; the history and characteristics of the defendant; the need to promote respect for the law; the need to justly punish the offense; and the need to adequately deter criminal conduct and protect the public from further crimes. These factors support the maximum sentence: 240 years' imprisonment and a fine of $9,785,832.93. Attached for reference is a proposed statement of facts summarizing information presented at trial and at other times during this litigation (Attachment 1).

A. **The Guidelines recommend the statutory maximum sentence of 20 years (18 U.S.C. § 3553(a)(4)(A)).**

One of the factors the Court must consider is the range recommended by the Guidelines. The jury found beyond a reasonable doubt that Rudolph murdered his wife and then falsely represented that it was an accident as part of a scheme to defraud insurance companies out of $4,877,744.93. In these circumstances — where the defendant is convicted under a statute prohibiting false or fraudulent representations generally, but the described conduct in that conviction establishes another offense specifically covered by another guideline — the court must apply the more specific guideline. U.S.S.G. § 2B1.1(c)(3); *United States v. Surtain*, 519 F. App'x 266, 26 (5th Cir. 2013); *United States v. Poole*, 415 F. App'x 298, 308 (4th Cir. 2011).

The more specific guideline is the guideline for premediated murder, which has a base offense level of 43 and a recommended sentence of life. But the statutory maximum sentence of mail fraud is 20 years. U.S.S.G. § 2A1.1. When the Guideline sentence exceeds the statutory maximum, the Guidelines provide that the recommended sentence *is* the statutory maximum. U.S.S.G. § 5G1.1. The Guidelines thus recommend a sentence of 240 months' imprisonment for the fraud committed in this case.

B. **The nature and circumstances of the offense support the recommended sentence (18 U.S.C. § 3553(a)(1)).**

Murder is among the worst things any human being can do to another. But even among murderers, Rudolph's crime stands out for its callous and deliberate plotting:

- Rudolph lured his wife into a remote part of Zambia under the pretense that he was working to save their marriage. Instead, he ended their marriage by shooting her in the heart. He killed her at one of their special shared places, rich in memory, because he knew she'd let down her guard.

- He killed Bianca in his greed and lust for control, to avoid any financial pain of divorce and to advance a petty, spiteful sham lawsuit against his social enemies.

3

- Contemptuous of his native hosts in Zambia, he deliberately chose to make it the scene of his crime. He planned the murder in Zambia because he had little regard for its people, government, or law enforcement personnel, and thought he'd be able to get away with it there. He knew that his crime would be difficult to investigate in Zambia, where he would be surrounded by people relying on him for their financial livelihood. He knew that under-funded investigators would not have access to evidence from the United States and would lack the investigative means or motivation to unravel his meticulously planned "accident."

- More aware of the emotional consequences than anyone else could be, he still chose to intentionally take away his children's mother so that he could replace her. Bianca's children would never be able to celebrate their marriages with their mother, introduce their children to her, or create any new memories of their progress into adulthood. None of this mattered to Rudolph.

- He took immediate steps to profit from his crime as quickly as possible, inquiring about how to cash in life insurance policies on only his second full day in the United States. Not content with nearly $5 million, he wrung out every dollar he could from Bianca's death, filing a false insurance claim to profit from the jewelry she was wearing when he shot her.

The murder was over in minutes. But the defendant's misprision and obstruction lasted for years. From the time of the murder right up and through his time on the stand in this trial, Rudolph acted out his disdain for courts and justice by constantly reinforcing the fiction that Bianca was responsible for her own death. Heedless of the crime's emotional toll, he lied to his closest family, obstructed their efforts to obtain closure, and otherwise sought to diminish Bianca by claiming she wasn't a very good hunter at all and had carelessly shot herself with a nearly four-foot-long shotgun. He offered a bribe to a Zambian mortuary manager for help calling off his wife's autopsy. He used veiled threats and intimidation to try to get incriminating evidence — photos of his wife's injuries — destroyed. He paid money to key witnesses to maintain their favor. Fully aware that the murder weapon would be of interest to investigators he took steps to dispose of it using untraceable means that would ensure it could never be forensically analyzed by the FBI. Then he cynically represented to the jury that he was actually cooperating with law enforcement and, as a key part of his defense, attacked the FBI's failure to analyze the murder

weapon that he made unavailable.

The defendant capped it all off by lying to the jury and the court during his testimony.

After taking an oath to tell the truth, he made the following false statements

- He told the jury that the death was an accident. The jury's verdict is proof beyond a reasonable doubt that it was not and that Rudolph continued until the bitter end to execute his premeditated plan to get away with murder by making it look like one.

- He told the jury that his professional hunter somehow logged into his "LinkedIn" account and then sent an invitation to the consular official. In fact, he was trying to intimidate that official as part of an effort to discourage investigation into his wife death.

- He claimed that he didn't tell his children about his wife's death from 8,000 miles away and that he wanted to do it in person where he could hug them, hold them and grieve with them. But he booked his return ticket to Arizona on October 13, 2016, while he was in Africa, and never had any intention of breaking the news in person. He told his son over the phone and then made his son be the one to break the news to his sister.

- In his recounting of a trip to Las Vegas a few days after his wife's funeral, Rudolph tried to portray himself as a grieving husband who went there to take long walks and drink at bars. He deceptively omitted the fact that he had booked a ticket for a female companion and when forced to admit it on cross-examination, said that he did not spend any time with her.

- He told the jury that the professional hunter told him he was under investigation in January, 2020, before his outburst at Steak 44. But the professional hunter testified he did not and all of the other evidence presented at trial shows that Rudolph was reminded of an FBI investigation only in August 2020, after his son told him about an attempted FBI interview.

Our system of justice was established specifically to thwart and deter crimes like Rudolph's. His cynical efforts to manipulate that system and avoid accountability so that he could gratify his petty grudges and vices deserve the maximum punishment.

### C. The defendant's history and characteristics further justify a 240-month sentence and the maximum fine, which is also necessary to promote respect for the law (18 U.S.C. §§ 3553(a)(1) and (2)(A)).

This is the defendant's first criminal conviction, but that does not mean his history or

5

characteristics warrant leniency. The murder was the culmination of a lifetime spent seeking domination and control over others through wealth and power.

Witness after witness described the defendant as a bully who sought to intimidate, manipulate, and otherwise use the people around him as means to advance his own interests, not as ends worthy of independent respect. As the court already determined at the detention hearing, Rudolph threatened to hire hitmen to kill people who challenged him and terrorized his employees.

The defendant also built his considerable wealth on a foundation of fraud. As set forth in the government's extensive 404(b) notice, the defendant shot off his own thumb in Zambia — where he knew it was unlikely anyone would ever be able to question what happened — and then claimed millions in disability insurance, which he used to finance his lifestyle and business. Even then, the money from operating a respectable dental practice with integrity was not enough. Multiple witnesses described instances in which the defendant systematically bilked his patients by taking steps that would encourage the need for root canals (not doing fillings) or artificially create the need for those root canals by intentionally drilling holes into patients' teeth while they were asleep.[1]

---

[1] Consistent with the broad statutory authority at 18 U.S.C. § 3661, the court can and should consider for sentencing all relevant information without regard to its admissibility under the rules of evidence. U.S.S.G. § 6A1.3. *United States v. Magallanez,* 408 F.3d 672, 684 (10th Cir. 2005) ("[A] sentencing court [has] broad discretion to consider information concerning the defendant's life and characteristics, including conduct on which he had not been convicted." (*citing Williams v. New York*, 337 U.S. 241, 247 (1949) and *United States v. Watts*, 519 U.S. 148, 117 (1997)). Detailed information about the defendant's separate disability fraud scheme is set forth in the Government's Notice of Rule 404(b) Evidence, ECF No. 118. Evidence of the defendant's separate dental fraud has been submitted to the Probation Office for consideration in drafting the presentence investigation report. *United States v. Beaulieu*, 893 F.2d 1177, 1180 (10th Cir. 1990); *see also United States v. McBrayer*, 546 F. App'x 803, 805 (10th Cir. 2013) ("the district court could consider the police reports during sentencing, as hearsay evidence may be considered if it bears a minimal indicia of reliability . . . ." and the district court gave such

Finally, as he admitted on the stand, the defendant used our system of justice as a cudgel to bludgeon his social enemies and rivals. He filed a sham lawsuit in 2012 under the false pretense he had been defamed, fraudulently seeking civil damages from former friends in a hunting club. In the course of pursuing that lawsuit, he committed the crime of perjury to extort a nuisance settlement. Ultimately, the leverage Bianca gained when she found out about the sham premises of his suit became one of the many pressures that caused him to kill her.

Nothing about his history or characteristics suggests he is eligible for anything less than the maximum sentence.

### D. A prison sentence of 240 months will promote respect for the law and is just punishment for using murder as a means of committing fraud.   (18 U.S.C. § 3553(a)(2)(A)).

This was no "ordinary" fraud scheme. The defendant abused his position of trust as Bianca's husband and betrayed her in the most sinister way possible. The maximum sentence here "reflects the gravity of the offense" and "takes into account the cost of the Defendant's criminal conduct and the cost society must undertake to punish that offense." *Simon v. United States*, 361 F. Supp. 2d 35, 44 (E.D.N.Y. 2005) (interpreting this § 3553(a) factor with support from legislative history and circuit precedent).

### E. Deterrence requires the sentence recommended by the government.

General deterrence supports the recommended sentence. "Defendants in white collar

---

reports, which "alleged unadjudicated conduct . . . their proper weight in evaluating Mr. McBrayer's risk to public safety"); *United States v. Marsh,* 486 F.Supp. 2d 150, 156 (D. Mass. 2007) ("disregarding reliable information from police reports would run directly contrary to both 18 U.S.C. § 3661 and its guideline counterpart [U.S.S.G.] § 1B1.4," and it "would be anomalous, indeed, if during the sentencing process the Court could consider self-serving and often unverifiable information from a defendant (for example, statements concerning childhood abuse or trauma), but not an official record from a law enforcement agency concerning conduct that led directly to a criminal charge (and conviction, albeit later vacated)").

crimes often calculate the financial gain and risk of loss, and white collar crime can therefore be affected and reduced with serious punishment." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006). Recent studies provide support for the common-sense notion that criminals rationally weigh benefits against costs; raising the cost of crime (i.e., higher sentences) thus deters it. *See* Loughran et al., *Can Rational Choice Theory Be Considered a General Theory of Crime? Evidence from Individual-Level Panel Data*, 54 Criminology 86, 107 (2016) (finding that criminals "act in accordance with anticipated rewards and costs of offending"); Stephanos Bibas, *White-Collar Plea Bargaining and Sentencing After Booker*, 47 Wm. & Mary L. Rev. 721, 724 (2005).

Failing to impose a fine that the defendant can afford to pay would undermine, rather than realize the purpose of § 3553(a)(2)(A). *Gaind v. United States*, 871 F. Supp. 186, 188 (S.D.N.Y. 1994) ("Where financial gain is the motive for crime having substantial adverse effects on the public, reallocating the loss to the wrongdoer by means of an adequate financial sanction is vital to the purposes of sentencing under 18 U.S.C. § 3553."). Other would-be Rudolphs who think they can devise the perfect crime would calculate the huge rewards of success against the low odds of being caught and the lower odds of conviction and conclude that crime really might pay. Imposing the recommended sentence here would change that calculation and promote general deterrence. *United States v. Sample*, 901 F.3d 1196, 1200 (10th Cir. 2018) (citing cases and Congressional findings supporting the deterrent effect of prison on white collar crime).

**F. A fine is especially important to advance the goals of criminal justice in this case.[2]**

All of the factors above supporting 240 months' imprisonment — the maximum sentence — also support the maximum fine. U.S.S.G. § 5E1.2(d)(1); *Id.* app. note 4 ("Where, however, two times either the amount of gain to the defendant or the amount of loss caused by the offense exceeds the maximum of the fine guideline, an upward departure from the fine guideline may be warranted.").

The Guidelines recommend that defendants who can afford to pay a fine "shall" pay one up to the maximum authorized by statute. U.S.S.G. §§ 5E.12(a) and 5E.12(c)(4). Fines are intended to be punitive. To determine the amount of the fine the Guidelines point to the same factors the court must use to determine the length of a prison sentence as well as the defendant's ability to pay the fine, the burden of a fine on the defendant and his dependents relative to alternative punishments, any restitution the defendant must make, collateral consequences of conviction, like civil obligations, any prior fines, the expected costs of imprisonment, and any other pertinent considerations. U.S.S.G. §§ 5E1.2(d)(1)-(8).

General deterrence is, again, worthy of great consideration here. Defendants in the mature phase of their life should not be left with the impression that they can commit heinous crimes in order to wield power with a large financial legacy or by using their wealth to otherwise retain influence and power. Taking away every financial motive to commit a crime encourages less crime. *See, e.g.*, *United States v. Ferranti*, 928 F. Supp. 206, 220 (E.D.N.Y. 1996) (imposing upward departure to double amount of loss caused to victims for wealthy defendant who burned

---

[2] Consistent with their role as a criminal remedy that seeks to provide tort-like remedies to institutions, communities, and victims who suffer the consequences of criminal conduct, collected criminal fines are deposited into the Crime Victims Fund established by Congress. 34 U.S.C. § 20101.

down his store to collect insurance proceeds, causing a death, and who then took steps to obstruct the investigation).

Once the government proves the amount of the gain — which it did, at trial, beyond a reasonable doubt — the burden is on the defendant to show an inability to pay. U.S.S.G. § 5E1.2(e) ("If the defendant establishes that . . . he is not able and . . . is not likely to become able to pay all or part of the fine . . . the court may impose a lesser fine or waive the fine."); *United Sates v. Vigil*, 644 F.3d 1114, 1123 (10th Cir. 2011) ("[D]efendant bears the burden of demonstrating an inability to pay a fine.").

The defendant can clearly pay a fine. He argued throughout the trial that he was so wealthy that he could not possibly be motivated by even almost $5,000,000. He disclosed $27,000,000 in wealth to pretrial services and offered to build himself a private prison before trial so that he could be released. *See United States v. Morrison*, 778 F.3d 396, 400 (2d Cir. 2015) ("We conclude that a district judge's use of otherwise confidential pretrial services information in determining a sentence is not barred by § 3153(c)(1) because the judge's receipt and use of such information for sentencing purposes is contemplated by the § 3153(c)(2)(C) exception."). Even *after* paying forfeiture and restitution the defendant will still have millions—more than most people will be able to acquire in several lifetimes. He has no dependents and his children are financially independent. The fine would also take into account the costs of the defendant's imprisonment, taxpayer-provided medical care, and any other expenses society must bear to impose justice in this case.

To the extent the defendant's assets are illiquid, he should be required to supply the United States Attorney's Office with a detailed financial disclosure that will enable it to satisfy the monetary components of his sentence. *See United States v. Tocco*, 135 F.3d 116, 133 (2d Cir.

1998) ("[W]e cannot allow a defendant's lack of disclosure at the sentencing phase of the criminal proceedings against him to work to his advantage on an appeal from that sentence.); *United v. Hairston*, 46 F.3d 361, 376 (4th Cir. 1995) ("The defendant cannot meet his burden of proof by simply frustrating the court's ability to assess his financial condition.").

### III.     RESTITUTION AND FORFEITURE

The government respectfully requests permission to file a supplemental statement regarding restitution and forfeiture after the victims have provided Probation with an accounting of losses, as contemplated by the process at 18 U.S.C. § 3664.

Respectfully submitted,

COLE FINEGAN
United States Attorney

| By: */s Bryan Fields* | By: /s *E. Garreth Winstead* | By: /s *J. Bishop Grewell* |
|---|---|---|
| Bryan Fields | E. Garreth Winstead | J. Bishop Grewell |
| Assistant United States Attorney | Assistant United States Attorney | Assistant United States Attorney |
| U.S. Attorney's Office | U.S. Attorney's Office | U.S. Attorney's Office |
| 1801 California St. Suite 1600 | 1801 California St. Suite 1600 | 1801 California St. Suite 1600 |
| Denver, CO 80202 | Denver, CO 80202 | Denver, CO 80202 |
| (303) 454-0100 | (303) 454-0100 | (303) 454-0100 |
| Bryan.Fields3@usdoj.gov | Garreth.Winstead@usdoj.gov | Bishop.Grewell@usdoj.gov |
| Attorney for the Government | Attorney for the Government | Attorney for the Government |

## **CERTIFICATE OF SERVICE**

  I hereby certify that on this 7th day of October, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to any and all counsel of record.

                *s/ Bryan Fields*
                United States Attorney's Office