IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 22-cr-00012-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

    1.  LAWRENCE RUDOLPH and
    2.  LORI MILLIRON,

      Defendants.

---

**GOVERNMENT'S RESPONSE TO RUDOLPH'S MOTION FOR A NEW TRIAL**

---

Rudolph's motion for a new trial should be denied. He has been in possession of his "new" Cassandra Olmstead evidence ever since the month that he killed his wife in 2016, almost six years ago. Ms. Olmstead's colloquial use of "eons" and failure to memorize the Rudolphs' busy travel schedule does not mean she lied to the jury.

His third attempt at severance fares no better than his first two motions for it.

His claim that the undersigned prosecutors committed misconduct by refusing to concede the post-nuptial agreement's validity based on last-minute hearsay statements from the attorney of a close friend who had helped him embezzle money in the past, who refused to speak directly with agents or prosecutors, and who he could have subpoenaed months earlier is not only frivolous but insulting to the jury fact-finding process. The agreement's validity was properly left to the jury who heard *all of the evidence* about it. Despite Rudolph's disagreement with their position, the prosecutors did not make false statements, conceal evidence, or leave the jury with a false impression about the agreement.

And although a stricken portion of the indictment made it into the jury instructions, the instructions themselves rendered that error harmless.

## I.      Rudolph's "new" evidence regarding Cassandra Olmstead doesn't warrant a new trial. It isn't even new.

Rudolph first argues that he should be given a new trial based on an email chain that he claims is proof that witness Cassandra Olmstead committed perjury. ECF 130 at 4-5. His "new" evidence shows no such thing. Nor has he met his burden of establishing the five prongs required for a trial based on such evidence.

To warrant a new trial based on new evidence, a defendant must establish:

> (1) the evidence was discovered after trial,
>
> (2) the failure to learn of the evidence was not caused by the defendant's lack of diligence,
>
> (3) the new evidence is not merely impeaching,
>
> (4) the new evidence is material to the principal issues involved, and
>
> (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

*United States v. Jordan*, 806 F.3d 1244, 1252 (10th Cir. 2015).

Despite Rudolph's suggestion, there is not a separate "interests of justice" test for newly-discovered evidence. See ECF 268 at 12 ("under either the interest of justice standard or under the newly discovered evidence standard"); *id.* at 14 ("even if the Court finds that the newly discovered evidence standard has not been met, the interests of justice require a new trial"). Rather, when it comes to newly discovered evidence, the interests of justice are weighed by application of the five-prong test. *United States v. Quintanilla*, 193 F.3d 1139, 1147 (10th Cir. 1999). If the five-

prong test were not applied to all new-trial motions, "defendants would have no diligence obligation and could keep an evidentiary trump card in the event of a conviction." *Id.*

The evidence here is not newly discovered. That alone warrants denial. *Quintanilla*, 193 F.3d at 1147 ("This evidence clearly does not warrant a new trial as it was not 'newly discovered.'"). On its face, the email was forwarded to Rudolph's email from Bianca's email the week after she died in October 2016. ECF 268-1 at 2. Not only was it in his possession for six years before trial but, as Bianca was dead when it was forwarded, he is most likely the one who forwarded it to himself.

The defense has not met its burden of showing that the failure to discover the email is not due to their lack of diligence. Due diligence is measured by an objective standard. See *In re M & L Bus. Mach. Co., Inc.*, 75 F.3d 586, 591 (10th Cir. 1996) ("due diligence is measured by objective standard"); *Madrid v. Wilson*, 590 F. App'x 773, 776 (10th Cir. 2014) (unpublished) (same); *Folks v. State Farm Mut. Ins. Co.*, 299 F. App'x 748, 755 (10th Cir. 2008) (quoting *Sulca v. Allstate Ins. Co.*, 77 P.3d 897, 900 (Colo. App. 2003)) ("The requirement that a plaintiff use due diligence in discovering the relevant circumstances or events imposes an objective standard and does not reward denial or self-induced ignorance.")). Due diligence asks "whether the petitioner should be expected to take actions which would lead him to the information." *Starns v. Andrews*, 524 F.3d 612, 618 (5th Cir. 2008). Defense counsel represented at the detention hearing in January—seven months before trial—that he had known about the investigation for years and spent that time "putting together our own evidence" and "hiring our own people." Detention Hr'g Tr. at 138 and 142. Failing to search through Rudolph's own emails (or hiring someone to do it for him) from the very month that his wife died—October 2016—is hardly due diligence. Nor is it diligence to not search his accounts for emails

mentioning Cassandra Olmstead. The defense offers no explanation for why they didn't have access to his emails before trial, but now they do, nor an explanation for why they searched for this evidence after trial, but not before. ECF 268 at 13-14, n.1.

Third, the email chain is *at best* merely impeaching. Impeachment evidence is evidence used to "attack the witness's credibility." Fed. R. Evid. 607. Rudolph offers the email chain to show that Bianca and Cassandra Olmstead were not close and had not had conversations in the months leading up to the trip. But the email chain doesn't even show that. Indeed, the fact that Bianca was trusting Olmstead as the person to respond to an alarm at her house and told her where the housekey was hidden indicates that they did have a trusting relationship.

Rudolph points to Olmstead writing that it has been "eons" since she and Bianca had seen each other. Of course, people speak colloquially in email all the time. She didn't mean literal eons. After several intimate conversations in the April-to-June 2016 time period, not seeing each other for the whole month of July may well have been "eons" to two close friends worried about a difficult situation.

Rudolph also exaggerates the import of Olmstead asking where Bianca and Larry were going. He argues that it means Bianca and Olmstead never discussed the trip to Africa. But, as Gov't Exhibit 501 showed at trial, Bianca and Larry traveled frequently in 2015 and 2016. That Olmstead asked where they were going simply indicates that she didn't know (or had momentarily forgotten) which of their many trips was next. It doesn't mean that she and Bianca had never discussed the upcoming hunting trip to Zambia.

Had Rudolph mentioned this email chain to his attorneys before trial (or had they searched for it), they could have asked Olmstead about it at trial. But Rudolph should not be

rewarded for holding it back, nor should the defense be rewarded for failing to search for it until *after* trial.

Finally, the email chain isn't the smoking gun of perjury that Rudolph would have it be, either. It doesn't meet his high burden of showing that it *would probably* produce an acquittal at a new trial. See *Jordan*, 806 F.3d at 1252; accord *United States v. Evans*, 42 F.3d 586, 593-94 (10th Cir. 1994) (new trial requires that evidence "preponderates heavily against the verdict"). First, Olmstead's testimony was important, but it was far from the only piece of evidence. And the weak impeachment offered by the email is not weighty enough to discredit her.

Rudolph spends several pages of his new trial motion attempting to argue *for a third time* why Bianca's statements to Olmstead should not have come in under the forfeiture-by-wrongdoing doctrine. ECF 268 at 14-19. In that respect, his motion is nothing more than a motion for reconsideration that challenges the district court's finding at trial that he was partly motivated to kill Bianca to prevent her testimony in a future divorce proceeding as well as in his then-ongoing defamation litigation with Safari Club International. "A motion to reconsider should not be used to revisit issues already addressed or advance arguments that could have been raised earlier." *United States v. Christy*, 739 F.3d 534, 539 (10th Cir. 2014) (quotation marks and citation omitted). Because Rudolph offers nothing new, the court should reject this argument for the third time. The government has addressed the evidence supporting the court's correct findings on this matter in its earlier filings. ECF 232 at 5-7; ECF 162 at 6-10, 13-15.

## II.    The court correctly denied Rudolph's repeated motions for severance.

Like his challenge to the admission of Olmstead's testimony, Rudolph's new trial motion is the third time that he has raised severance to the court. After his earlier motion to sever was denied (ECF 103 denying ECF 97), he moved for reconsideration shortly before trial. ECF 200.

Because Rudolph has once again failed to satisfy the requirements for reconsideration, this court should deny his motion again. ECF 206 at 2-3.

It should be noted that Rudolph improperly misconstrues the government's earlier filing when he suggests that "the Government argued in no uncertain terms that the evidence at separate trials would be no different than at a joint trial. ECF 100 at5-6." ECF 268 at 21. As it pointed out in its response to Rudolph's prior reconsideration motion making this same assertion (ECF 205 at 1-2), the government never said that the evidence at separate trials and a joint trial would be exactly the same. Rather, it stated that there would be overlapping evidence that would be the same. ECF 100 at 5-6. That was true. In its filing, the government referenced the financial records showing Rudolph's contributions to Milliron, the testimony about their ongoing affair, the evidence that Milliron moved in with Rudolph shortly after Bianca's funeral, and Rudolph's confession at Steak 44. *Id.* All of that evidence (and more that was properly admissible against both of them) came in against both of them at the joint trial, just as it would in individual trials. He also offers no support for his assertion that the government blurred the lines between the evidence against Rudolph and Milliron in its opening statement and closing argument. ECF 268 at 19. Indeed, he did not object to the opening or the closing—most likely because the government took great pains to separate when it was talking about Rudolph and when it was talking about Milliron.

Rudolph offers two primary arguments for severance: (1) testimony was admitted against him that was inadmissible absent Milliron's presence as a co-defendant and (2) their joint trial prevented him from calling Milliron as a witness. He offered both these arguments in his prior motions that were denied. ECF 97 at 13-18 (Milliron as witness); ECF 200 at 2-3 (admission of statements only appropriate against Milliron).

The court correctly mitigated any prejudice from testimony admissible against only one defendant by issuing a corrective instruction each time an instruction was requested or the objection was raised.[1]  That prevents any error as explained in the government's prior filings. ECF 197 at 1-2, ECF 205 at 3-4. Rudolph makes much of the court's comment "here we go again." ECF 268 at 20. But the court orally remedied that comment, which was simply an attempt at levity, and added a jury instruction specifically telling the jury not to hold the lawyers' objections or the court's rulings on those objections against the parties, ECF 240 at 25.

Even without the corrective of the limiting instructions, the statements challenged by Rudolph are harmless. He first challenges the admission of Anna Grimley's statement that Milliron told her she gave Rudolph an ultimatum to leave Bianca. The jury's verdict makes plain that the jurors did not find Grimley's testimony, by itself, sufficient to influence their decision. The jury found Milliron guilty of two perjury counts but acquitted her of three others. Specifically, the jury acquitted Milliron on Count 8, which charged her with lying about whether she told a fellow worker that she gave Rudolph an ultimatum to leave his wife. ECF 53 at 6. That means that the jury didn't find Grimley's testimony about an ultimatum sufficient to sway their verdict on that count, so Rudolph wasn't prejudiced by it. Although the count included more than one allegation of falsity, the jury instructions made clear that the jury should find Milliron guilty if the government met its burden on even one of the allegations of falsehood—including the ultimatum. ECF 240 at 36-37.

---

[1] To the extent that Rudolph seeks to challenge the admission of specific statements as evidentiary issues (rather than as simply showing prejudice from the denial of his severance motion), the instructions cured any error when he objected. And when he failed to object, he bears the burden of establishing the four prongs of plain-error review, which he has not attempted to do here.

He also challenges testimony from Rachel Anders that (1) he constantly provided money to Lori and her kids, (2) he "couldn't get divorced because he'd lose his money," and (3) he and Milliron planned to retire and travel the world together. ECF 268 at 22. But Anders' testimony about Rudolph's generosity to Milliron and her children didn't prejudice him. He freely admitted providing money to Milliron and her children during his own testimony. Trial Transcript, Day 13 at 273-77, 280-81. The jury also saw bank statements establishing the payments. It is also unclear how a statement that the two planned to retire and travel the world together was prejudicial in light of evidence of their extensive travel before Bianca's death—see, e.g., emails of their Cabo vacations and his own testimony (Trial Tr. Day 13 at 269-71), his admission to the Alaska trip (Trial Tr. Day 13 at 224-25)—and their living together after Bianca's death.

Nor is it clear that the statement that "he couldn't get divorced because he'd lose his money" is hearsay against him. He may have been present for the statement. There was no objection when this question was asked and the curative instruction had been given earlier in Anders' testimony, so no context was called for. Similarly, no context was provided when Anders was first asked about Milliron calling Bianca unpleasant names—just before the discussion of divorce—but she later made clear that the statement was made in Rudolph's presence. Compare Trial Tr. Day 8 at 16-17 (name-calling and divorce discussion) with 21 (name-calling in Rudolph's presence). But even if it were hearsay against him, there was plenty of other evidence that Rudolph would lose money if he divorced Bianca. Even the post-nuptial agreement meant that he would be out $2 million in a divorce.

As for the claim that Milliron would provide favorable testimony absent a joint trial, Rudolph has offered less to meet that burden now than in his original motion that was denied. Before trial, he offered an affidavit from Milliron that this court correctly found inadequate. ECF

97-1. He offers no such affidavit now. But any post-hoc, post-trial promises of testimony from Milliron about what she would have testified to after she was found guilty at their joint trial are hardly credible when she wasn't willing to make those promises pre-trial.

In its earlier ruling, the court correctly went through the factors laid out by the Tenth Circuit for determining whether severance is appropriate based on a defendant's assertion of the need for a co-defendant's testimony. ECF 103 at 7-12. Milliron did not unequivocally state in her affidavit that she would testify, her offer to testify was impermissibly conditioned on her being tried and acquitted first, and she failed to offer a sufficiently detailed account of facts to which she would testify. *Id.* at 9-11. In contrast, there were significant judicial economies to a joint trial given the complexities of the trial, the logistical difficulties of international witnesses, and the scheduling problems against a backdrop of Covid-19. *Id.* at 12. Because Rudolph did not establish any real prejudice from Milliron's unavailability to him at a joint trial, the judicial economies of denying severance outweighed any benefits to severance. *Id.* at 13.

Rudolph has given the court no reason to reconsider its ruling.

### III.    The authenticity of Bianca Rudolph's signature on the post-nuptial agreement remained a factual issue for the jury to decide, even after the defense offered its Frank Langell surprise.

Rudolph makes the spurious accusation that the undersigned prosecutors engaged in misconduct by continuing to question the validity of the post-nuptial agreement when they knew it was valid. ECF 268 at 28-31. That is simply false. The defense's last-second gotcha of revealing Frank Langell as the witness to the alleged agreement for the first time during Rudolph's testimony didn't suddenly render the post-nuptial indisputably authentic. Indeed, it only raised more questions.

Frank Langell refused to speak to the government when it sent local police to his house after learning that he was the person who had witnessed the post-nuptial agreement. Through his attorney, he said that if pressed he would sign an affidavit agreeing that he witnessed Bianca sign the document. But, contrary to the defense's new trial motion, that didn't settle the matter.

Against Olmstead's testimony that Bianca told her that Rudolph had forged her signature on a document where Bianca would get nothing in a divorce and Alain Smith's testimony about Rudolph seeking information about post-nuptial agreements long after the one in question had allegedly been signed, the government now had unconfronted hearsay from Frank Langell's counsel. From its interviews with Rudolph's former dentistry partners, the government knew that Langell had been fired for helping Rudolph embezzle money from the business and that he was loyal to Rudolph. See Exhibit A, B, and C (Tiano, Runco, Edmonds 302s). Langell's history with Rudolph gave the prosecution every reason to question the authenticity of Langell's claim that he saw Bianca sign the agreement.

So the prosecution told defense counsel what came of the government's efforts to contact Langell. And the defense counsel then presented that information to the jury in its redirect of Lawrence Rudolph:

> Q. Now, are you aware that, after you mentioned Frank Langell's name yesterday as signing the postnup, the prosecutor sent all of their FBI agents to try to get in touch with Mr. Langell? Are you aware of that?
>
> A. No, sir.
>
> Q. Are you aware that they actually spoke with Mr. Langell's lawyer?
>
> A. No, sir.
>
> Q. Are you aware that Mr. Langell's lawyer told the FBI that Mr. Langell witnessed Bianca signing that agreement?

A. That doesn't surprise me.

Q. Why doesn't it surprise you?

A. Because he signed the agreement.

Q. So all of this stuff by the prosecutor trying to suggest that you were some master forger that could trick two document examiners, last night they tried to disprove that with Frank Langell. Do you know they fell flat with that?

A. I do now.

Trial Transcript, Day 13 at 314-15. The jury heard about Frank Langell. They heard from Rudolph that Bianca signed the document. They heard from the forensic handwriting expert. And they heard defense counsel highlight each of those points in closing arguments.

But they also heard from Cassandra Olmstead and Alain Smith. And they found Olmstead and Smith more credible. Or they concluded from the testimony of former Arizona judge Jim Padish that, even with Bianca's signature, Rudolph had reason to worry about the document's enforceability. Or they determined—as the government argued in closing—that ultimately it didn't matter. The post-nuptial agreement was a red herring, because even if it was valid, it would cost Rudolph $2 million in a divorce. And that with the $4.8 million in life insurance was sufficient motive. Regardless of what they decided, they heard everything.

This case is nothing like *United States v. Alzate*, 47 F.3d 1103 (11th Cir. 1995), where the prosecutor never corrected implicit factual representations that he made to the jury (and explicit ones that he made to the court at a sidebar) after he learned those representations were unquestionably false. The defendant in *Alzate* raised a duress defense to a charge of possessing and importing cocaine. When the government countered that defense with testimony from an agent that Alzate had admitted to being paid $8,000 for transporting the cocaine, the defense responded with its own evidence that there was a language barrier and Alzate was simply

referring to what he thought was a question about the value of a box of cocaine sitting outside the interview room from another drug bust. 47 F.3d at 1105-06. The prosecutor countered that argument by leaving the jury with the false impression that there hadn't been an unrelated cocaine seizure and so there wasn't another box of cocaine outside the interview room. *Id.* at 1106-07. When the prosecutor learned that wasn't true from the agent who conducted the interview, he concealed that information from the defense and never corrected the false impression left with the jury. *Id.* at 1107-09. As the defense argued, the prosecutor's "failure to disclose the truth had made the defense position appear to be a fabrication." *Id.* at 1108.

Unlike the AUSA in *Alzate*, the undersigned prosecutors did not fail to correct knowingly false representations made to the jury. Because of the testimony from Olmstead and Alain Smith (as well as statements in discovery from Rachel Anders and others regarding Rudolph's fears about the cost of divorce), the prosecutors had good reason to believe that Bianca's signature on a one-sided post-nuptial agreement purporting to allocate millions of dollars without any attorney signatures—presented to the outside world (including those identified as contacts in the agreement, such as Ralph Finizio and William Gorman) for the first time just when it might help secure a litigation advantage—was a forgery. (They still do.) And given his refusal to speak with the government and his prior criminal collusion with Rudolph, Frank Langell's claim (through his attorney) that he saw Bianca sign the document did not change that. Because Langell acted criminally for Rudolph before, there is plenty of reason to think that he would do so again.

Also significantly different from *Alzate*, the prosecution did not hide the statements of Langell's attorney from the defense. The defense was able to present the attorney's statements through counsel's redirect of Rudolph the day after the incident and again in closing argument. The government didn't challenge the defense's representation of what Langell's attorney claimed

that he would say. Indeed, the defense got the benefit of introducing Langell's hearsay without any examination from the government of Langell's checkered past with Rudolph.

The defendant obviously knew about Langell's role in any purported post-nuptial agreement for over twenty years. He could have subpoenaed Langell for trial, put him on a witness list, and identified him as the post-nuptial witness months before trial. He even could have asked the Court for time to summon him for trial before he rested his case. But—without knowing what he would be like on the stand, subject to cross-examination—he instead chose to hedge his risks and play the game of identifying Langell's role for the first time through his own testimony. That gambit denied the government, the court, and the jury an opportunity to vet Langell's credibility on the matter, and he should not be rewarded for that gamesmanship with a new trial.

**IV.     The jury instructions' reference to Rudolph losing his thumb is harmless.**

Rudolph's final claim is that the jury instructions erroneously included language in the obstruction of justice count (Count 4) about the excluded 404(b) incident where Rudolph lost his thumb. ECF 268 at 31-32. After identifying numerous instances of Milliron providing false and misleading testimony to the grand jury, the indictment language concluded with an assertion that she also provided false testimony about "(vi) the circumstances of the accident that caused LAWRENCE RUDOLPH to lose part of his thumb." ECF 240 at 46. The government moved to strike that language (ECF 101), the court granted that motion (ECF 103 at 14-15), and the government agrees that it was an error to include the stricken language in the indictment portion of the instructions. Because the error is harmless, however, it does not warrant a new trial.

First, the prefatory language in the instruction reproducing the indictment unambiguously—even strenuously—tells the jury that the indictment is not evidence and that the jury may not rely on anything said in it in determining guilt or weighing the evidence:

> Remember, the Superseding Indictment is not evidence. You may not rely on anything said in the Superseding Indictment to find the defendants guilty on any charge, and you must not let the Superseding Indictment influence your weighing of the evidence. You are receiving the Superseding Indictment simply to help you understand what you are deliberating about when you consider each count.

Because juries are presumed to follow their instructions, *United States v. Miller*, 891 F.3d 1220, 1231 (10th Cir. 2018), this prefatory language made the erroneous inclusion of the accident language harmless.

Second, because the jury had no real evidentiary context for it, the language about the accident where Rudolph lost his thumb was harmless. The language doesn't discuss the crocodile, Rudolph's disability payments, or any of the circumstances and evidence demonstrating the fraudulent nature of the accident that were excluded by this court's 404(b) ruling. It was the risk of prejudice from the jury hearing about *the evidence* of this incident that led this court to conclude that exclusion was in the "interest of justice." ECF 153 at 7-9. And that evidence has remained excluded.

It is true that Milliron was briefly questioned about the incident in her grand jury testimony, which was admitted as Gov't Exhibit 71. But that incident was never highlighted or discussed during any testimony at trial or in arguments. And no testimony or documentary evidence establishing the accident's fraudulent nature was presented to the jury.

If a juror bothered to review and think about that limited discussion of the incident in Gov't Exhibit 71 at 48-49, he or she might surmise that Rudolph may have lied about his thumb

injury to earn money. But the possibility that Rudolph lied to earn money is no more harmful than his own admission on the stand to lying for money in his SCI lawsuit. Moreover, the defendants are not complaining about the admission of Gov't Exhibit 71. Defense counsel never sought redaction of that portion of the exhibit. Milliron agreed to the exhibit's admission and Rudolph received an instruction that none of it could be used against him. They are complaining only about the erroneous inclusion of one line in an indictment that the jury was plainly told to ignore in its deliberations.

## CONCLUSION

Rudolph's motion for a new trial should be denied.

Respectfully submitted,

COLE FINEGAN
United States Attorney

By:  */s Bryan Fields*
Bryan Fields
Assistant United States Attorney
U.S. Attorney's Office
1801 California St. Suite 1600
Denver, CO 80202
(303) 454-0100
Bryan.Fields3@usdoj.gov
Attorney for the Government

By:  */s E. Garreth Winstead*
E. Garreth Winstead
Assistant United States Attorney
U.S. Attorney's Office
1801 California St. Suite 1600
Denver, CO 80202
(303) 454-0100
Garreth.Winstead@usdoj.gov
Attorney for the Government

By:  */s J. Bishop Grewell*
J. Bishop Grewell
Assistant United States Attorney
U.S. Attorney's Office
1801 California St. Suite 1600
Denver, CO 80202
(303) 454-0100
Bishop.Grewell@usdoj.gov
Attorney for the Government

### CERTIFICATE OF SERVICE

I hereby certify that on 21st day of October, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to any and all counsel of record.

*s/ Bryan Fields*
United States Attorney's Office