IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martinez

Criminal Case No. 22-CR-0012-WJM

UNITED STATES OF AMERICA,

    Plaintiff,

v.

1.    **LAWRENCE RUDOLPH**,
2.    LORI MILLIRON,

    Defendants.
_____/

**LAWRENCE RUDOLPH'S REPLY IN SUPPORT
OF HIS MOTION FOR NEW TRIAL**

Lawrence Rudolph respectfully files his Reply in support of his Motion for New Trial, and states:

**I.    The emails between Cassandra Olmstead and Bianca Rudolph are newly-discovered and demonstrate conclusively that Olmstead lied to the jury about one of the most critical issues in the case: Bianca Rudolph's alleged ultimatum to Larry Rudolph.**

The Government offers no plausible argument to combat the fact that the email chain devastates a central premise of their case and shows that the only statement introduced at trial against Dr. Rudolph detailing a personal motive and imminent reason to commit murder was from this witness who has now been caught lying on the stand. The Government seems to concede that it had not seen the email at issue here—and its key witness failed to tell them about it before getting on the stand and knowingly testifying inconsistently with it. After learning about the revealing email in Dr. Rudolph's Motion for New Trial, instead of questioning its witness about its meaning, the Government tries mightily to ascribe its own benign interpretation to the email. The Court could: 1)

adopt the Government's semantic gymnastics; 2) adopt the unequivocal plain meaning of the email; or 3) conduct a hearing and have Ms. Olmstead herself attempt to squirm her way through an explanation of the email. Recognizing that option 1) is not all that appetizing, the prosecution tries to get out of this jam with procedural arguments that (1) Dr. Rudolph, who has been incarcerated with no access to his email accounts, deliberately "[held] back" a six-year-old email about his alarm code; or (2) the defense did not "search for [the email]" until after trial. Doc. 273 at 4-5. Both these arguments fail.

First, undersigned counsel dedicated substantial effort and resources to investigate this complex overseas murder case in the few months they had to prepare for trial. Despite reaching out to Olmstead multiple times, she refused to communicate with defense counsel, including hanging up on counsel and failing to respond to emails. As the Court knows, Dr. Rudolph was detained in another state from his home, his lawyers, his children, and his electronics, making preparation extremely burdensome. The defense did not have access to this six-year-old email and had no reason to know of its existence until it was provided to us after the trial.

Further, there was no reason for Dr. Rudolph to have thought this was an important email or to have even remembered it six years after the fact. It appears that Dr. Rudolph forwarded and printed this email in 2016 to document the details of his home's alarm code as he was trying to get his affairs in order after his wife's death. The Government points to the years that Dr. Rudolph knew he was being investigated and suggests that the defense had ample time to analyze all of his email accounts. But Dr. Rudolph and the defense team had no idea that Cassandra Olmstead was a witness and would come out with vicious lies about the Rudolphs until shortly before trial. Although she claimed to have had key information in 2016 about Dr. Rudolph's motive to murder his wife and was

given a stack of emails with a lover in case anything should happen to Bianca Rudolph, Olmstead never bothered to reach out to law enforcement, the FBI, family, or any life insurance companies. It was only after the FBI heard about her in 2022 that they reached out to speak to her.

Even if the defense had access to this email before trial, it would have no reason to pinpoint a seemingly benign email between Dr. Rudolph's wife and his assistant that Dr. Rudolph forwarded himself about an alarm code. At first glance, there would have been nothing about this old email regarding home alarm systems that would seem significant until after the trial unfolded and Olmstead took the stand and lied to the jury. The defense took every possible action to diligently obtain relevant evidence under the constrains of time and unavailability of their client to actively assist in his defense. As such, the newly-discovered email chain fits squarely within the prong required for a trial based on such evidence.

The Government unpersuasively—and insincerely—attempts to minimize the significance of what the email chain reveals by relegating it to mere impeachment evidence. But contrary to her trial testimony, the email chain makes clear that Olmstead had not seen Bianca Rudolph in a very long time and that she knew nothing about the Rudolphs' upcoming 2016 safari trips—meaning the soul-bearing conversations Olmstead claimed she had with Bianca Rudolph **never happened**. It was Olmstead's testimony regarding a fictitious ultimatum from Mrs. Rudolph to Dr. Rudolph which left him with no choice but to kill his wife. This was the Government's only evidence that Mrs. Rudolph ever gave such an ultimatum or that Dr. Rudolph had any demands to end his relationship with Ms. Milliron. There was no other evidence to corroborate Olmstead's testimony. As the prosecutor emphasized in his closing argument where he used her testimony to build a timeline of the case, "her facts are so important." Transcript of Jury Trial, Day 14 at 8.

The Government claims that Olmstead was using the word "eons" colloquially, and that "not seeing each other for the whole month of July may well have been 'eons' to two close friends worried about a difficult situation." Doc. 273 at 4. That is quite a bit of speculation from the prosecution—guesswork that it has not even tried to confirm with its witness. And it does not make a lot of sense when read in conjunction with Olmstead's other testimony. The plain import of the email is clear, but if the Court has questions about it, the best course would be to conduct an evidentiary hearing to hear from Olmstead without the Government having an opportunity to prepare her.

Further, there was absolutely nothing in the email chain to even suggest that the two women were "worried about a difficult situation" involving Larry Rudolph. In fact, the email chain shows that Olmstead was still socializing with Dr. Rudolph without reservation. Doc. 268-1 at 3. The email also shows that, contrary to what the Government tries to suggest, it was Larry that first asked Olmstead to be on the call list for the alarm, not Bianca. Doc. 268-1 at 3-4 (Bianca to Olmstead: "I know Larry talked to you about being on the call list."). The Government misrepresents the email; it was not Bianca Rudolph entrusting her close friend with the house alarm codes, it was Larry enlisting his former assistant with the task and his wife following up with the details.

Finally, the fact that Olmstead had no idea about the Rudolphs' trip to Africa was not a "failure to memorize the Rudolphs' busy travel schedule." Doc. 273 at 1. It demonstrates that contrary to her testimony, Olmstead had no idea that the Rudolphs were going to Zambia, one of only two trips to Africa they took that year, let alone Mrs. Rudolph's motivation for going on the trip—to allegedly save her marriage. If Olmstead's testimony was truthful, then she certainly knew about the safari trip and would have spoken to Mrs. Rudolph about their recent conversations. The

private emails between Bianca Rudolph and Olmstead do not mention divorce, an affair, role-playing, printed emails, a hair clip, Lori Milliron, a recent long conversation, seeing each other recently, or confrontations.

These are lies that the jury should have been made aware of and the defense could have used to demonstrate that Olmstead perjured herself in an effort to "bury" Larry Rudolph. *See* Transcript of Jury Trial, Day 10 at 73, 75. This evidence extends far beyond impeachment material; it completely eviscerates the Government's central theory that Larry Rudolph killed his wife because she was pressuring him with an ultimatum.

Even if the Court finds that the newly discovered evidence standard has not been met, "[t]he 'interest of justice' standard applies to all motions for new trials, including those predicated on newly discovered evidence." *United States v. Quintanilla*, 193 F.3d 1139, 1147 (10th Cir. 1999) (emphasis added). We respectfully renew our request for a hearing, where Ms. Olmstead is compelled to explain under oath the newly discovered email that renders her critical testimony patently false.

## II. The Court's repeated denials of Dr. Rudolph's motions for severance prevented a fair trial.

The defense's pretrial concerns about a strategically-planned joint trial materialized and were proven correct as several witnesses testified to inflammatory material that was only admissible against Ms. Milliron, but not Dr. Rudolph. The limiting instruction, as the defense anticipated, was no match for the repeated inadmissible testimony, which was highlighted in the Government's opening and closing arguments. Exacerbating this problem, the Court expressed obvious annoyance in the presence of the jury when the defense requested the stipulated limiting instruction be read to the jury.

The Government used witnesses like Anna Grimley and Rachel Anders to introduce

narratives about Larry Rudolph that would never have been heard by a jury in a separate trial. No other witnesses could provide the Government the essential pieces to the puzzle it wanted the jury to put together about Larry Rudolph: the story of a gold-digging mistress who needed her lover to get rid of his wife who stood in the way of endless wealth, where a divorce was not sufficient because her lover would have lost all of his money. The Government knew that even with a curative instruction, the jury would not be able to separate out those statements given that they went directly to the Government's central theory in the case, that Dr. Rudolph committed murder to be with Lori Milliron.

The Government misses the mark when it argues that because Milliron was not convicted on Count 8, any prejudice suffered by the statements made by Anna Grimley is harmless. First, the Government well-knows that nothing can be read into a split verdict. It may have simply been a compromise by the jury regarding Ms. Milliron. And even if Grimley's testimony may not have secured a conviction on that specific count against Milliron, it does not follow that the jury did not take Grimley's inflammatory statements about ultimatums and "getting rid" of Bianca Rudolph into consideration when convicting Dr. Rudolph of her murder. This evidence, which would have been inadmissible against Dr. Rudolph in a joint trial, was the only evidence of a supposed ultimatum by Milliron.

Similarly, the only uncorroborated evidence that Dr. Rudolph would not divorce his wife because "he would lose all his money," came from Rachel Anders' testimony that would have been excluded in a separate trial. As the Government points out, based on the valid postnuptial agreement, there was certainly evidence that Dr. Rudolph would have to pay a sum of money if he and Bianca Rudolph were to divorce. But there was no evidence, other than Anders' improper testimony, that

the prospect of this payment deterred a divorce, or that a divorce was even contemplated by the Rudolphs.

Not only was the jury permitted to hear unreliable and prejudicial evidence which was admittedly not admissible in a trial against Dr. Rudolph, he was prevented from presenting exculpatory testimony that was crucial for the jury to hear to render a just verdict. The defense is not, as the Government claims, making "post-trial promises of testimony from Milliron...when she wasn't willing to make those promises pre-trial." Doc. 273 at 9. The defense has already offered an affidavit by Ms. Milliron explaining that: (1) her recollection "flatly contradicts and is entirely inconsistent with what Ms. Grimley and the bartender claim;" and (2) "If the allegations and charges against [her] were tried separately from Larry's case, [she] would be able to testify at Larry's trial to correct Ms. Grimley's and the bartender's false, misleading, and confused recollections of what they think they heard..." Doc. 97-1. There are no new "promises;" Ms. Milliron's position has always been that she would have testified in a separate trial, that there was never an ultimatum to get rid of his wife and, importantly, there was <u>never</u> any confession to murder. The fact remains that by trying this case with Ms. Milliron, Dr. Rudolph was prevented from calling an exculpatory witness that, in a fair trial, would have testified and directly refuted the Government's theory and evidence.

**III.    The representations about the alleged invalidity of the postnuptial agreement made by the prosecution amounted to misconduct because there was no credible evidence presented that the agreement was forged.**

Even after handwriting experts from both the Government and the defense confirmed that Bianca Rudolph signed the agreement, and even after a witness made clear to the FBI that he witnessed Bianca Rudolph sign the agreement, the prosecution still suggested to the jury that the agreement was forged. During questioning of witnesses and closing arguments, the Government

continued to perpetuate a false representation on a key piece of evidence it knew to be authentic in order to mislead the jury.

There was no "last-second gotcha" defense strategy when the defense questioned Dr. Rudolph about details and witnesses surrounding the postnuptial agreement that had already been authenticated by two handwriting experts and a well-established law firm. Doc. 273 at 9. Contrary to the Government's assertion, the defense "denied" the Government of nothing. *Id*. at 13. The Government bears the burden of proof when it charges an individual with murder and the defense was under no obligation to call Mr. Langell as a witness or to identify his role to the Government. In any case, the defense provided the Government with billing slips from the law firm that drafted the agreement, which include Frank Langell's name as part of the file. The firm's billing slips listing Langell's name were introduced into evidence at trial as exhibit RU. *See* Exhibit RU at 2. There was no "gotcha" defense strategy; the Government had Langell's name all along in the materials regarding the postnuptial agreement that the defense produced.

The Government's contention that Langell's confirmation of the agreement's validity is not credible because Dr. Rudolph's disgruntled former partners supposedly alleged that he embezzled money from the practices 7-8 years after the signing of the agreement is a distraction. First, the allegations of embezzlement are not before the Court, are not in evidence, and are uncorroborated. No evidence was introduced at trial on these points. And for good reason—no criminal action was taken against Langell or Dr. Rudolph for this alleged embezzlement. Doc. 273-2 at 3. What's more, Langell was brought back to work for the accusing former partner, Dr. Tiano, after the alleged embezzlement incident. *Id.* at 4. Clearly, the partners found Langell trustworthy enough to allow him access to the business again after his alleged wrongdoing. Again, these allegations, that have

absolutely nothing to do with Langell witnessing the agreement, are simply a distraction from the fact that Langell, through his attorney, confirmed to the Government that he saw Bianca Rudolph sign the postnuptial agreement. And had Langell told the FBI agents knocking on his door the night of Dr. Rudoph's testimony that he had not witnessed the agreement, the Government was prepared to have a private plane transport him to Denver to testify. So, the Government's now-claimed issue with his credibility is only being raised because they did not like what he had to say.

The prosecutors continued to make misrepresentations to the jury, even after determining that Bianca Rudolph signed the agreement. The Government knew that Olmstead's testimony that Dr. Rudolph "drew up a document at their kitchen table" and signed Bianca's name to it was false and was certainly not a reference to the postnuptial agreement at issue, which was a 31-page, the type-written document prepared and certified by an esteemed law firm. Transcript of Jury Trial, Day 9 at 14. Similarly, there can be no serious argument made that Alain Smith's testimony that Dr. Rudolph was asking questions about postnuptial agreements was a valid basis for the prosecution to continue to argue that the agreement at issue was forged.

There was simply no evidence presented at trial that Bianca Rudolph was forced into signing the agreement, and there was no evidence to suggest that she did not sign the postnuptial agreement, but the Government continued to push this deceitful suggestion throughout its closing argument. The prosecutors' continued false representations to the jury, even after determining that the postnuptial agreement was valid, require a new trial.

**IV.    The jury instructions' improper inclusion of a prejudicial reference to a stricken portion of the indictment related to a crocodile incident that was previously excluded by the court was not harmless.**

The Government agrees that it was error to include the stricken language in the indictment

portion of the instructions that was sent back to the jury. Doc. 273 at 13. However, the Government asserts that because "the jury had no real evidentiary context for it, the language about the accident where Rudolph lost his thumb was harmless." *Id*. at 14. The Government undermines its own argument by pointing out that the context of the incident actually *was* available to the jury because Milliron was questioned about the incident in her grand jury testimony, which was admitted as Gov't Exhibit 71. There, Milliron was asked, and the jury was able the read, about the crocodile incident, whether Dr. Rudolph actually "shot off his thumb," and whether he collected "insurance money" after the injury. Of course, none of this should have been admitted against Dr. Rudolph and is another reason the above-requested severance should have been granted.

Ultimately, the prohibited character inferences that this Court held would mislead the jury and unfairly prejudice Dr. Rudolph, tainted the trial when the jury was inadvertently improperly exposed to reference of this incident. Because this Court expressly found that the introduction of this incident was not in the "interest of justice," and the Rule 33 standard allows for "a new trial if the interest of justice so requires," this issue falls squarely within errors warranting a new trial. Fed. R. Crim. P. 33(a).

WHEREFORE, Lawrence Rudolph respectfully requests that this Court grant him a new trial.

Respectfully submitted,

MARKUS/MOSS PLLC
40 N.W. Third Street
Penthouse One
Miami, Florida 33128
Tel: (305) 379-6667
Fax: (305) 379-6668
markuslaw.com

By:   /s/ David Oscar Markus
      David Oscar Markus
      Florida Bar Number 119318
      dmarkus@markuslaw.com

      /s/ A. Margot Moss
      A. Margot Moss
      Florida Bar Number 091870
      mmoss@markuslaw.com

      /s/ Lauren I. Doyle
      Lauren I. Doyle
      Florida Bar Number 117687
      ldoyle@markuslaw.com