1

1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLORADO
2
     Case No. 22-cr-00012-WJM
3    _____

4    UNITED STATES OF AMERICA,

5          Plaintiff,

6    vs.

7    1. LAWRENCE RUDOLPH,

8          Defendant.

9    _____

10           Proceedings before JAMES P. O'HARA, United States

11   Magistrate Judge, United States District Court for the

12   District of Colorado, commencing at 2:31 p.m., October 25,

13   2022, in the United States Courthouse, Denver, Colorado.

14   _____

15           WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS

16   ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED. . .

17   _____

18                       APPEARANCES

19           BRYAN FIELDS, Attorney at Law, appearing for the

20   Plaintiff.

21           JOHN DILL, Attorney at Law, appearing for the

22   Defendant.

23   _____

24                     MOTION HEARING

25

2

```
 1                    P R O C E E D I N G S

 2            (Whereupon, the within electronically recorded

 3   proceedings are herein transcribed, pursuant to order of

 4   counsel.)

 5            THE COURT:  At this time we will call United

 6   States of America vs. Lawrence Rudolph, Case Number

 7   22-cr-12.  My I please have appearances of counsel.

 8            MR. FIELDS:  Good afternoon, Your Honor.  Ryan

 9   Fields for the United States and I'm joined by my colleague

10   Bishop Grewell.

11            MR. DILL:  Good afternoon, Your Honor.  John Dill

12   representing Lori Milliron, who is present in the courtroom.

13            THE COURT:  And the record should reflect that

14   we're here today for hearing on the (indiscernible - audio

15   cut out) to the Government's motion for revocation of

16   Ms. Milliron's (indiscernible - audio cut out) ECF document

17   256.

18            Before we get to the (indiscernible - audio cut

19   out) and additional process of evidence, Mr. Dill, let me

20   ask you:  (Indiscernible) all of the evidence that's

21   referred to in the motion?

22            MR. DILL:  Yes, Your Honor.

23            THE COURT:  Including the recordings?

24            MR. DILL:  Yes, Your Honor.

25            THE COURT:  Okay.  Mr. Fields, you may proceed.
```

3

1          MR. FIELDS:  Thank you, Your Honor.  I'll begin by

2     incorporating by reference the Government's proffer at ECF

3     256 and I'll also formally move into evidence the exhibits

4     attached to that motion at this time.

5          THE COURT:  Any objection, Mr. Dill?

6          MR. DILL:  No, Your Honor.

7          MR. FIELDS:  Your Honor, I'll begin with --

8          THE COURT:  Hold on, I haven't (indiscernible)

9     exhibits.

10          MR. FIELDS:  Sorry, Your Honor.

11          THE COURT:  In addition to the exhibits that are

12     referenced in the -- in the written motion, I've been

13     provided a binder of the government's exhibit notebook.  Has

14     a duplicative copy that's been provided to Mr. Dill?

15          MR. DILL:  Yes, Your Honor.

16          THE COURT:  And the cover sheet indicates that

17     this contains Exhibits 1 through 22.  Does it, in fact,

18     contain all of those exhibits?

19          MR. FIELDS:  It does, Your Honor.  The digital

20     exhibits are -- they're on a CD, so those are not physically

21     there, but all of the exhibits are in that notebook.

22          THE COURT:  So I believe exhibits that are on the

23     CD or the flash drive of some kind, you just referred to,

24     Mr. Fields, those that were filed conventionally with the

25     Court previously?

4

1          MR. FIELDS:  Correct, Your Honor.  So those, for

2    example, that include Exhibits 15, 16.  You see the gaps in

3    the binder there.

4          THE COURT:  Specifically it would include Exhibit

5    2A, 2B, 2D, 3, 11A, 11B, 11C, 11D, 11E, 11F, 11G, 15, 16,

6    17, 18, 19 and 20, correct?

7          MR. FIELDS:  Correct, Your Honor.

8          THE COURT:  Okay.  With that understanding, the

9    Government Exhibits 1 through 22 inclusive are all hereby

10   admitted for purposes of today's proceeding.  Go ahead,

11   Mr. Fields.

12          (Government Exhibits 1 through 22 admitted.)

13          MR. FIELDS:  Your Honor, and I actually should

14   have began, would you rather have me at the podium or here?

15          THE COURT:  Wherever you're most comfortable.

16          MR. FIELDS:  Thank you, Your Honor.  So I'll begin

17   with the overall legal context that finds us here.  This is

18   post-conviction.  Ms. Milliron was convicted at trial this

19   past July on four counts:  Accessory to murder, obstruction

20   and two counts of perjury.  So the operable statute here is

21   18 United States Code Section 3143, which puts the burden on

22   her to show by clear and convincing evidence that she's not

23   a flight risk or a danger to the community.

24          THE COURT:  Is that, in fact, the standard of

25   being -- in other words, is that the standard we would have

5

1    applied when you were visiting with Judge Martinez right

2    after the jury returned its verdict?

3          MR. FIELDS:  Your Honor, I believe that by the

4    plain terms of the statute, it applies to someone who is

5    awaiting sentencing, and that is the posture that we find

6    ourselves in, even --

7          THE COURT:  Yeah, but Judge Martinez was dealing

8    with that situation, and for whatever reason, for good or

9    bad, he determined that Ms. Milliron should remain in the

10   conditions of release that had been set prior to trial.

11   True?

12         MR. FIELDS:  Yes, Your Honor.

13         THE COURT:  And so aren't we -- and as indicated

14   by the first page of your motion, we're here under section

15   3148 of the Bail Reform Act, instead 3143.  True?

16         MR. FIELDS:  Yes, Your Honor.  It's -- the way the

17   detention statutes all sort of fit together in this context

18   can be interesting.

19         THE COURT:  That's a mild statement.

20         MR. FIELDS:  Yeah.  And not free from any

21   controversy.  I think the Court's right about that, but 3143

22   very specifically refers to someone who has already been

23   convicted, and I think the reason for that, Your Honor, is

24   that the presumption of innocence no longer applies.  So

25   that is, I think, very clear no matter how you slice it.

6

1         And 3143 I think reflects the fact, and not only

2    does the presumption of innocence no longer apply, but

3    you're dealing with someone who has already been found

4    guilty by a jury and who is already going to be more of a

5    flight risk than someone who is just sort of awaiting trial.

6         THE COURT:  So help me out, because the filed

7    record on ECF is not eliminated on this point, but after the

8    jury returned a verdict and after the Government requested

9    that Ms. Milliron be detained pending sentencing, was a

10   discussion between the Court and counsel about whether

11   release pending sentencing would be appropriate under

12   3143 --

13        MR. FIELDS:  Yes.

14        THE COURT:  -- of the Bail Reform Act?

15        MR. FIELDS:  Yes.

16        THE COURT:  And did Judge Martinez make a specific

17   finding at that time that there was clear and convincing

18   evidence that her release was (indiscernible) as known to

19   him at the time propose neither a flight risk or a danger to

20   the community?

21        MR. FIELDS:  Yes, Your Honor.

22        THE COURT:  Okay.  And if I'm understanding the

23   thrust of your motion is that there are more facts available

24   now that shed light on whether that was an informed decision

25   by Judge Martinez, correct?

7

1        MR. FIELDS:  Correct, Your Honor.

2        THE COURT:  Okay.

3        MR. FIELDS:  Further illuminating this point, I

4  would analogize to supervisory release hearings.  Supervise

5  release hearings are also subject to 3143, despite the fact

6  that, you know, that context there isn't immediately

7  posttrial, but it is presentencing.  And the 3140 -- in that

8  context, the Tenth Circuit, and there are plenty of cases

9  saying that 3143 is the operable statute there.

10       So I think the burden here is clear and convincing

11 evidence.  She needs to show that she's not a flight risk or

12 danger to the community based on the evidence here.

13       In addition, Your Honor, 3148 comes into play as

14 you've already referenced.  And 3148 says that bond can be

15 revoked under two circumstances.  First, probable cause:  Is

16 there a fear probability that there has been a violation of

17 federal, state or local statutes?  And if the answer to that

18 is yes, then there is a rebuttable presumption that there

19 are no conditions that would allow the defendant to remain

20 free.

21       THE COURT:  (Indiscernible - audio cut out)

22 presumption (audio cut out)?

23       MR. FIELDS:  I think it would be an evidentiary

24 presumption, Your Honor, so, yes, I agree with that.

25       THE COURT:  Okay.

8

1           MR. FIELDS:  And then the next part is, under

2    3148, if there is probable cause, you consider the factors

3    in the 3142, so you consider safety to others and flight,

4    but uniquely in this context, 3148 adds a third sort of

5    reason to the mix to deny someone their freedom, and that

6    is, are they unlikely to abide by the conditions of their

7    release.

8           So here the Court could find that it should revoke

9    her bond because she's a danger to the community, because of

10   a flight risk, but also because she's unlikely to continue

11   to abide by any conditions the Court might impose.  So

12   that's the probable cause prong of 3148.

13          3148 also says if there is clear and convincing

14   evidence of any other violation, then the same things.  You

15   consider safety to others, flight, and whether or not the

16   defendant is unlikely to abide by any conditions of release.

17          So I'll begin here with probable cause to believe

18   that there was a federal, state or local crime.  The motion

19   itself doesn't quite frame things this way, but I think it's

20   fair to say that they're -- I'll call them sort of four

21   counts.  Count 1 would be theft of money from the trust

22   account before conviction.  Count 2 would be certain theft

23   of some high value items from a safe.  Count 3 would be

24   conversion of funds after the trial, and then Count 4 would

25   be the telephone calls, talking to Rudolph in violation of

1   these conditions.

2          Those first three, the allegation is that those

3   are violations of the Arizona omnibus theft statute, so I'm

4   going to start there.

5          Let's start with the Count 1, so this would be

6   theft of the money from the trust account before the

7   conviction.

8          So the evidence submitted with the Government's

9   proffer shows that the defendant did have access to some of

10  her co-defendant's wealth through a power of attorney.  It

11  was a limited power of attorney.  She only had authority to

12  do certain things with certain thresholds.

13         If you look at Government's Exhibit 6, you'll see

14  that the defendant wrote several checks from a trust account

15  she otherwise would not have had access to very much in

16  above that threshold without any authorization.  That's been

17  the representation from the victim's family here, the

18  victim -- the murder victim's son, who is a co-power of

19  attorney and daughter.

20         THE COURT:  Well, let me stop you.  I want to make

21  sure I'm understanding the way these (indiscernible) were

22  set up.  Aside from the power of attorney appointing

23  Ms. Milliron and the defendant's son Julian as attorneys in

24  fact, did Ms. Milliron have any powers conferred upon her as

25  a trustee under a trust instrument?

1          MR. FIELDS:  She did not, Your Honor.  The

2    evidence at the trial showed only the trustees to that trust

3    were Lawrence Rudolph and the murder victim Bianca Rudolph.

4    Upon her passing of Lawrence Rudolph, became the sole

5    trustee.

6          THE COURT:  Okay.

7          MR. FIELDS:  So this -- whether or not there was a

8    power of attorney -- so even assuming that there is some

9    issue with a power of attorney, Lawrence Rudolph himself in

10   one of the calls, that's Government's Exhibit 17 -- and the

11   time stamp is 3 minutes and 2 seconds into that call, 3

12   minutes and 40 seconds, which I can play for the Court, but

13   I'm going to assume that the Court is familiar with the

14   evidence.  Mr. Rudolph himself acknowledges that he did not

15   authorize any payments above that $15,000 threshold in this

16   particular instance.

17          And then shortly before we -- proceedings today,

18   defense counsel also showed me a letter dated March 27 from

19   Ms. Milliron requesting this money, and then there is a

20   little handwritten notation in blue ink that defense counsel

21   has represented is Lawrence Rudolph's handwriting where he

22   specifically denies making any payment.  And he says, Hold

23   for now.

24          So I think there is clear evidence, I think there

25   is a fair probability that Ms. Milliron, despite not having

1    the authority to use these funds, used them anyways and

2    converted them to her own use, which would be a violation of

3    the Arizona statute.

4            Remember, the threshold here is only probable

5    cause, so fair probability is what we're talking about.

6            For Count 2, we're talking about theft of items

7    from -- from a safe.  So Government's Exhibit 21 is a letter

8    from Lawrence Rudolph to co-counsel discussing items that

9    were located in a safe, some very high value items, $200,000

10   in cash.

11           THE COURT:  When you say co-counsel, you mean

12   defense counsel?

13           MR. FIELDS:  Sorry, yes.  I mean defense counsel.

14   Thank you, Your Honor.  So $200,000 gold, jewelry.  The only

15   people with that -- the combination to that safe were

16   Lawrence Rudolph and the defendant, Lori Milliron.  The

17   children have tried to get access to that safe, and when

18   they looked inside that safe, it is empty.  I think there is

19   a fair probability, given that Mr. Rudolph has been detained

20   since December of 2021, that it was Lori Milliron who took

21   the items from that safe without authorization, which again,

22   would be a violation of the Arizona statute.

23           Count 3 would be the conversion of funds after

24   trial, and there I'll refer the Court to Exhibits 1A and 22,

25   which pretty clearly show that Ms. Milliron did not have

1    authorization to use funds from Lawrence Rudolph's business

2    for her personal benefit, but Exhibits 1B and 1C show that

3    she did, in fact, even after she knew she was fired from her

4    job, no connection to the business at all, put $6,000 on

5    that business credit card.

6            Now, the $6,000 for her personal use, she should

7    have put on the business credit card anyways, but if there

8    was any doubt about that, she certainly knew that after she

9    was fired from her position.  So in sort of the parlance of

10   the Arizona Revised Statute, she converted for an

11   unauthorized use property of another entrusted to her or

12   placed in her possession for a limited authorized term.  And

13   again, we're talking about probable cause here.  So I think

14   there is probable cause to believe that each of those

15   violations occurred.

16           On the clear and convincing prong, the recordings

17   speak for themselves, Your Honor.  You can listen, you can

18   hear the defendant's voice in Exhibits 15, 16, 17 and 18.

19   She acknowledges that she is Lori Milliron, she identifies

20   herself, she talks about facts that only she would know

21   related to their relationship and the trial, so it's clearly

22   her own.  I don't think there is any dispute over that.  I

23   don't think there is also any dispute that that is a

24   violation of the terms of her release.

25           So then we get to the 3142 factors and whether or

 1    not this defendant is a danger to the community, a flight

 2    risk or again, grafting on 3148, unlikely to abide any

 3    conditions of release.

 4            I'll start with the nature and circumstance --

 5            THE COURT:  Before you go through those factors,

 6    refresh my memory in terms of the state of the record.  Did

 7    the Government seek detention of Ms. Milliron when she was

 8    first apprehended in Arizona?

 9            MR. FIELDS:  We did not, Your Honor.

10            THE COURT:  Did the Government change its position

11    when she first arrived here in Colorado?

12            MR. FIELDS:  No, Your Honor.

13            THE COURT:  Did the Government seek revocation of

14    her pretrial release conditions at any time prior to trial?

15            MR. FIELDS:  No.

16            THE COURT:  Okay, go ahead.

17            So first, the nature and circumstances of the

18    offense.  This is obviously an extremely serious offense.

19    It's accessory after the fact, which is a generic offense,

20    but the accessory that she's -- you know, the crime to which

21    she's an accessory is murder among the most serious crimes,

22    and then obstruction and perjury.

23            So all of these together show no respect for the

24    law, and I think our factor the Court can consider in

25    whether or not it's looking to whether or not she is

1    actually going to abide by any conditions that the Court

2    might impose.

3            In addition, the likely penalty for these crimes,

4    the guidelines are 121 to 151 months, because of the murder,

5    and then you get an obstruction bump on top of that, so I

6    think it's approximate level 32.

7            The Government has already filed its sentencing

8    brief in this case.  Sentencing is set for February and the

9    Government is asking for 15 years based on the seriousness

10   of the conduct.  That alone provides a strong incentive to

11   flee.  That is something, again, that the Court should

12   consider.

13           The other 31 --

14           THE COURT:  Is that (indiscernible) recognized

15   under the statute?

16           MR. FIELDS:  It's nature and circumstance -- I

17   think it's incorporated in nature and circumstances, Your

18   Honor.  The statute itself doesn't speak to that, but case

19   law certainly does.

20           THE COURT:  Go ahead.

21           MR. FIELDS:  In addition, the weight of the

22   evidence.  This particular factor here I think we can all --

23   we can say that the weight of the evidence is beyond a

24   reasonable doubt, because of the convictions in this case.

25           And then let's talk about history and

1    characteristics, and this is where I think, you know, we'll

2    sort of get into the flight risk, the danger to the

3    community and whether or not she's likely to abide by her

4    conditions.

5            So first of all, this defendant has a history of

6    deceitful and manipulative conduct, especially when it comes

7    to the Courts.  So first of all, you have her convictions:

8    Obstruction of a grand jury investigation and perjury in

9    front of a grand jury.  But in addition, this is not a

10   filing that the Court would have reviewed before coming to

11   the bench, but ECF Number 270-1 at pages 12 through 13

12   contains an extensive proffer of the facts, including the

13   fact that the defendant testified in civil deposition in

14   2016 and lied repeatedly.  She claimed that she was a

15   citizen of Houston during this deposition.  She was not.

16   She was a resident of Pennsylvania.

17           She also claimed that she had had no

18   communications with Lawrence Rudolph related to -- to the

19   case.  That wasn't true.  She had actually been in Cabo San

20   Lucas with him just a few weeks prior to her deposition.

21   She also said that she had never had a sexual relationship

22   with Lawrence Rudolph.  That was also not true and that was

23   established through extensive evidence at trial.  It was

24   extensively after lie to distance herself from Lawrence

25   Rudolph to help him in a sham lawsuit that she was well

1    aware of.  Basically the same conduct that she was found

2    guilty -- or similar conduct to which she was found guilty

3    just a few months ago.

4           So that's a history of sort of deception and a

5    history of not taking the law very seriously.

6           Interestingly, I would also draw the Court's

7    attention to ECF Number 86, which is the bail report.  Bail

8    reports can be used in this conduct as evidence against her,

9    and in that bail report she said she had been employed with

10   Three Rivers Dental Group since 2009.  In her deposition in

11   2006, she actually said she was, quote, retired from Three

12   Rivers Dental Group in 2011.

13          So this is a defendant who provides facts that she

14   thinks are going to benefit her at certain times that are

15   just not true.  She has a history of manipulating the court

16   system and a failure to abide by the law or the conditions

17   of release as set forth here.

18          Also in ECF Number 86, she said she had been a

19   resident of Arizona since 2018.  Again, that was an effort

20   to distance herself from Lawrence Rudolph.  Testimony at

21   trial and evidence at trial showed that she moved in with

22   Lawrence Rudolph in early 2017 just after the murder of

23   Bianca Rudolph.

24          In addition to that, while we're considering

25   history and characteristics, I think the Court should take

1    into account a pattern of abuse and cruelty towards Bianca's

2    children, the victims in this case.  So those are Exhibits

3    9A1 through 9A5, a series of text messages that she sent to

4    the son of the murder victim here, sort of taunting him,

5    talking about how she was going to cut him off financially,

6    he wasn't a real man, she had all the money.  It was cruel,

7    Your Honor, in the context of a trial that's going to take

8    place regarding his mother's debt.

9            Also around this same time her daughter, Stephanie

10   Moroz, was sending around -- well, around this time.  This

11   is sort of postverdict -- was sending around photographs of

12   the murder victim that were shown at trial.  These are

13   pretty gory, bloody photographs, Your Honor, of the -- of

14   the victim.  Were sent around to employees of this dental

15   group where the daughter still works.  She is a dentist of

16   that group.  This was -- she found out about it and, of

17   course, she was very accept, very like concerned about this,

18   and this just goes to sort of a pattern of cruelty and

19   abuse.

20           These are the same people that on the phone calls

21   with Lawrence Rudolph, she calls them brats, pieces of shit,

22   assholes.  This is a defendant who's exhibited nothing but

23   cruelty towards those victims and whose sort of financial

24   manipulation here control the money is part of sort of her

25   danger to the community.

1          In terms of danger, we usually think of that as

2    physical danger, but that's not always the case.  The Courts

3    have recognized that economic harm can also be danger and

4    that principal comes from the Bernie Madoff case and SDNY,

5    which is a particularly extreme example, but it just

6    illustrates sort of the basic point here that harm to the

7    community doesn't always just means physical harm.

8          In addition, you have her manipulation of the

9    cremains of the victim which were entrusted to her care.

10   Now, eventually she turned over those cremains, but only

11   after the Government got involved and FBI agents and

12   prosecutors asked her specifically about them.  Before that,

13   if you listen to the phone calls, you'll see that she's sort

14   of using them as sort of a bargaining chip to either get

15   Lawrence Rudolph to put her back on the power of attorney or

16   help her move into the mansion that she was hoping to live

17   in.

18         That is, again, part of like the pattern of

19   cruelty here and part of her conduct and her history and

20   characteristics.

21         We've already talked about her contempt for the

22   legal system a little bit, but I'm going to go back to that

23   again, because you see that in Exhibit 16, where she's

24   ridiculing a trial witness, calling her an evil bitch,

25   exhibiting no remorse at all.

1         And then, of course, you know, in terms of

2    contempt for the legal system, the ultimate one here is

3    she -- Judge Martinez gave her a chance to sort of go and

4    sort of prepare herself for sentencing.  It took her only

5    five days before she willfully violated the order of the

6    Court.  She knew that she shouldn't be talking to Lawrence

7    Rudolph.  In fact, she acknowledges that on the last phone

8    call, Exhibit 19.

9         THE COURT:  What was the -- the nature of the

10   discussion, if any, between Ms. Milliron and Judge Martinez

11   when he ultimately concluded that she ought to remain on

12   release pending sentencing?

13        MR. FIELDS:  She had followed the conditions of

14   her bond up to that point and that she agreed that she would

15   continue to abide by those conditions.

16        THE COURT:  Let me ask it a different way.  I know

17   every judge handles this a little bit differently, but if I,

18   in my whole district, am accepting a guilty plea, and if the

19   parties are in agreement that the defendant should remain on

20   release pending sentencing, I typically would have a pretty

21   direct, some might say, brutally blunt discussion with the

22   defendant about the need to stay in strict and complete

23   compliance with the conditions of release pending

24   sentencing.

25        So my question is:  Did Judge Martinez do anything

1    in that regard to reiterate or impress upon Ms. Milliron

2    that she better tow the line pending sentencing?

3         MR. FIELDS:  He did, Your Honor.  The Government

4    moved for detention right after the trial, and so we were

5    fighting very hard to get detention.  In order for her, you

6    know, to meet her burden there, she -- Judge Martinez was

7    very strict and talked to her about exactly what the Courts

8    just advised and she promised the Court that she would abide

9    by those conditions and that she had been abiding by those

10   conditions.

11        Now, we now know that that wasn't true for all the

12   reasons that I've sort of set forth about probable cause,

13   the fact that she had been sort of -- she had been using

14   funds without authorization.  So the answer to that is yes,

15   Your Honor.

16        THE COURT:  Okay.

17        MR. FIELDS:  In terms of the other 3142 factors,

18   and we're looking at history and characteristics, another

19   factor is employment.  The defendant is no longer employed,

20   so she has no source of income, which I think again is

21   probably one of the motives behind the financial

22   manipulation here and just gives her further inducements to

23   do that.

24        And here I'll note that this is a defendant,

25   because she was Lawrence Rudolph's sort of paramour and also

1  the executive administrator of his business who has intimate

2  knowledge of all the finances related to that family and

3  who, if she desires, is in a position to sort of -- to

4  gather those funds to steal, to continue to sort of be a

5  thorn in the side of that family at a very, very difficult

6  time in their lives.

7         Family ties, she does have children who are here

8  in the country, but they don't --

9         THE COURT:  Go back.  I apologize for interrupting

10  you, but with regard to the -- the money that's at issue

11  that the Government has expressed concerns about protecting,

12  is all of that money owned by co-defendant Lawrence Rudolph?

13         MR. FIELDS:  Yes.

14         THE COURT:  Do either of the adult children have

15  any legal interests at this time, other than perhaps

16  (indiscernible) expectation that they might inherit from

17  their father at some point?

18         MR. FIELDS:  Julian Rudolph is -- he has sole

19  power of attorney, so there is that, but in terms of sort of

20  a property interest, it would be an inheritance, Your Honor.

21         THE COURT:  Okay.

22         MR. FIELDS:  They -- there is one pending legal

23  issue and that has to do with, among the allegations of the

24  trial, was that Lawrence Rudolph had lied to several

25  insurance companies to get about $5 million in proceeds.

1    The way slayer statutes work, Lawrence Rudolph could not get

2    that money, but the insurance company is going to have to

3    pay it out no matter what, and depending on the operation of

4    Arizona law, the children might be entitled to that

5    approximately $5 million.

6              THE COURT:  Okay.

7              MR. FIELDS:  In terms of her family ties, she does

8    have ties to family.  She has children here in the United

9    States, but they don't live with her.  If she were to flee,

10   and this is defendant with extensive international travel as

11   detailed in ECF Number 86 and at trial, she's very familiar

12   with -- with foreign environments, has no problem traveling

13   abroad and would have no trouble, if she wanted to,

14   establishing a life for herself there.  And actually

15   witnesses talked about how she dreamed of living abroad and

16   her children could then visit her abroad if they wanted to.

17             So I don't think that the children being here in

18   the United States is something that sort of weighs against a

19   desire to flee.

20             And then finally, danger to others.  I've

21   elaborated on that a little bit throughout my presentation

22   here, but the danger to others here is really the danger to

23   the family, the way she sort of characterized them and the

24   way she's sort of cavalierly treated their money, taunted

25   them.  All of that makes her an ever present danger to the

1   children and their financial and emotional well-being going

2   forward.

3           So for all of those reasons, the Government does

4   not believe the defendant could show by clear and convincing

5   evidence, now that there is a fair probability she's

6   committed the state crime and clear and convincing evidence

7   she's already not abided by the conditions, that she'll

8   continue to abide.  She's not a flight risk and that she's

9   not a danger to the community.  And so we would ask that the

10  Court revoke her bond.

11          THE COURT:  Thank you, Mr. Fields.  Mr. Dill, you

12  have the floor.

13          MR. DILL:  Yes, Your Honor.  I do have a witness I

14  would like to call.  It's Ms. Stephanie Moroz, who is her

15  daughter, but I would like to, if I could, just before

16  putting her up, I kind of want to lay the timeline in

17  context of this.

18          Ms. Milliron was charged with a superseding

19  indictment.  All of the charges against her had to do with

20  one day of testimony before the grand jury, including the

21  accessory after the fact.  There was no over act accessory.

22  It all had to do with the alleged perjury, which the

23  Government -- which she was found guilty of the accessory

24  after the fact by her testimony, obstruction by her

25  testimony, and then was acquitted of three of the five

1    perjury counts against her.

2            So it all stems from her actual testimony as

3    opposed to somehow aiding or abetting and helping

4    Mr. Rudolph at any time.  She was arrested on a superseding

5    indictment, self-surrendered to Arizona, was placed on home

6    confinement while in Arizona, abided by that without any

7    violations at all.  When she came here for rearraignment in

8    Denver, the same conditions were put in place as far as home

9    confinement to be monitored in Arizona.

10            An additional condition, and I think this is

11    important to the context of the violation here, additional

12    condition is that the prosecutor insisted upon was that

13    there be no contact between Lori Milliron and Lawrence

14    Rudolph, and the reason given is because there was a concern

15    apparently by the prosecutors that Dr. Rudolph had

16    physically abused Ms. Milliron.  In fact, they had even

17    offered to help her as a battered woman if that was an

18    issue.  So ostensibly for her safety they wanted no contact

19    between the two.  However, we had to prepare a defense, so

20    we made it so the contact came through the attorneys, which

21    is what was covered all the way through.

22            The -- at the end of the trial when she was found

23    guilty, and Judge Martinez did have a colloquy with her

24    about the conditions, the conditions that he set in place

25    were the same ones previously.  That would include the home

1    monitoring, which he abided by, and then didn't ever mention

2    that condition, but it was in there about the contact

3    between Lawrence Rudolph and Lori Milliron.  Ostensibly the

4    reason for that was no longer present, because now the case

5    has already gone forward and there is no intimidation

6    things, but as far as the violation of the phone calls which

7    took place, which were calls made by Lawrence Rudolph to my

8    client, those all took place again after the fact.

9            THE COURT:  But (indiscernible - audio cut out)

10   the conditions that were imposed by Judge Wang upon

11   Ms. Milliron's arrival here in Denver remained in place per

12   the order of Judge Martinez after the jury returned its

13   verdict?

14           MR. DILL:  That's correct, Your Honor.

15           THE COURT:  And --

16           MR. DILL:  And it is her on the calls, yes.

17           THE COURT:  And is the fact of the six calls that

18   are detailed in the Government's motion disputed at all?

19           MR. DILL:  The fact that -- the calls themselves

20   is not disputed.  The circumstances of the calls and the

21   fact that that is being used to show she's now somehow a

22   danger to the community, that is what I'm trying to put it

23   context.

24           THE COURT:  Does the defense, specifically

25   Ms. Milliron, dispute the Government's characterization of

1     the subjects discussed and the statements made on

2     Ms. Milliron during those six calls?

3             MR. DILL:  Well, Your Honor, I do -- as far as

4     what is in those calls, I do dispute, and obviously the call

5     will speak for itself, that Lawrence Rudolph said to her

6     that payments were not authorized.  That is not what he said

7     in the call.

8             As far as what her statements to him were, that

9     was her voice and she did have those conversations, but if

10    the Court listens to those calls, and we can -- I can pull

11    them up, there is none of this vitriol that they're talking

12    about and certainly none of this bargaining with the remains

13    of Bianca Rudolph.

14            THE COURT:  But (indiscernible - audio cut out)

15    knew, didn't she, that she shouldn't be talking to

16    Mr. Rudolph regardless of who placed the calls?  True?

17            MR. DILL:  Yes, Your Honor.

18            THE COURT:  I mean, she specifically acknowledges

19    that at one point, doesn't she?

20            MR. DILL:  I think she does, and mainly because

21    she had been calling her.  We were supposed to go through a

22    process to where I would be involved or one of the other

23    attorneys.  He had actually told his attorneys he didn't

24    want to use that anymore and called her, but nonetheless,

25    that is her on the call.  She did take those calls, so that

1    is a violation of her conditions of release.

2            My point would be that it's not -- that that

3    wasn't somehow a separate crime or offense, but it

4    definitely was a violation and she's been in jail now for 30

5    days after being arrested and -- on the 19th of September.

6            THE COURT:  (Indiscernible - audio cut out) where

7    the Government's papers or heard Mr. Fields argue in court

8    today that those telephone calls were criminal violations.

9    As I understand where they're coming from, is those calls

10   constituted violations of the Court's order --

11           MR. DILL:  Absolutely, yes.

12           THE COURT:  -- and puts into question the ultimate

13   issue of whether your client is willing to or able to comply

14   with any conditions the Court could set at this point.

15   That's the way I've heard it, but Mr. Fields could

16   straighten me out if I'm misapprehended that.  I apologize

17   for interrupting you.

18           MR. DILL:  Certainly.  I, just before calling

19   Ms. Moroz, kind of give some context of the situation.  I

20   did want to point out some things I don't think are quite

21   accurate as far as the Government's exhibits.  Exhibit 9A,

22   which is text messages, it seemed from the argument that

23   this was following the trial.  This undated text message

24   exchange was well before the trial, and I don't think there

25   is any argument that there has been a long-standing

 1    contentious disagreement between Dr. Rudolph's children.

 2    Anna Bianca was actually an employee and there was a lot of

 3    difficulties with her and Ms. Milliron as far as her being

 4    an employee at Three Rivers Dental Group.

 5            But as far as the cruelty that was alleged, these

 6    texts -- series of text messages was not posttrial and

 7    certainly not during the time that -- right before she got

 8    her bond revoked.  And again, there was no prohibition on

 9    her having any contact with Julian or Anna Bianca.  As a

10    matter of fact, she worked with Anna Bianca and Julian was a

11    cotrustee with her.

12            Additionally, as far as the allegations of theft,

13    that it was -- it was represented that this was money taken

14    from a trust account, that is not accurate.  If you see the

15    government's exhibits, Lori Milliron is a signatory of these

16    checks.  Actually, these checks were all in Camelback

17    Consulting, LLC, not in a specific trust account.  There

18    are -- we have provided that -- the Government notes here

19    about Dr. Rudolph knowing what -- it's my fee that they're

20    disputing apparently at this point, although nothing was

21    said about it any time prior to the trial.  Dr. Rudolph had

22    the fee agreement, Julian Rudolph had the fee agreement.

23    There is written requests here for funds to be paid.  Those

24    were paid.

25            What Dr. Rudolph says in the phone call was that,

1    Oh, I didn't know it was -- I didn't know it was 750 for the

2    fee, I thought it was 500.  She goes, No, it's been 750.

3    That's on the fee agreement.

4            THE COURT:  No, that thousands of dollars, right?

5            MR. DILL:  Yes, sir.

6            THE COURT:  I just want make sure the record is

7    clear.

8            MR. DILL:  Yes, sir, understood.  I'm not going to

9    say what Mr. Markus was paid.  But, yes, anyway, that

10   conversation about that it was not authorized or I never

11   authorized payment of that, that is not what the

12   conversation says at all.  Additionally, as I said, all of

13   these checks were written on her account, or rather account

14   that she's a signatory on.  So this isn't taking or

15   misappropriating or taking funds of any of these payments

16   before the trial, okay.

17           Additionally, the power of attorney that was --

18           THE COURT:  Wait a second.  I want to make sure

19   I'm following what you're trying to communicate to me.  So

20   on the Camelbank account, how did your fees in defense of

21   Ms. Milliron be related to the corporate objectives of the

22   funds being drawn?

23           MR. DILL:  Well, the sole -- again, the sole owner

24   of the corporation, Camelback Consulting, would be Lawrence

25   Rudolph, who approved her paying the fees to me and paying

1    the fees to -- from these same accounts to his attorney,

2    Markus, and also paying Julianne and Anna's attorney here

3    locally from those same accounts.  That was -- the sole

4    shareholder of the company is the one who authorized that.

5    And again, Dr. Rudolph was the sole shareholder of Three

6    Rivers Dental Group, which held the title -- or actually a

7    corporation of his holds the title to the house in Paradise

8    Valley, as well as the house in Cranberry, which there are

9    some allegations --

10           THE COURT:  What I'm trying to understand better,

11   and help me out here is, how would a corporation that is

12   solely owned by Dr. Rudolph have any interest in having any

13   amount of money, let alone that amount of money, to a lawyer

14   defending somebody other than the corporation?

15           MR. FIELDS:  Your Honor, again, I can't speak to

16   how he wants to pay funds out of corporations that he's the

17   controller of -- that he controls, but Ms. Milliron is not a

18   fiduciary to that company.  Again, she's a signatory on

19   their account, has the permission to write checks from that

20   account.

21           So, you know, whether there is some sort of

22   ultravirus as far as the corporation really isn't the issue.

23   The issue is whether she's doing something she's not

24   authorized to do.  And the fee agreements, the riotings, the

25   course of conduct all say that she was in fact authorized.

1   And now after the fact, after this -- the guilty verdict,

2   now that Julian is the sole co-power of attorney has gone

3   back and found fault with those situations, but as far as

4   the time in the course of dealing between Ms. Milliron and

5   myself and also Ms. Milliron paying these funds on behalf of

6   Dr. Rudolph, there was no objection or dispute at the time.

7            As far as the co-power of attorney, they were

8   co-powers of attorney. As you'll see on here, this was a

9   power of attorney executed by Lawrence Rudolph. Actually,

10  unbeknownst to Ms. Milliron that power of attorney was

11  revoked four days before our trial started. So during the

12  entire balance of the trial, she believes she had power of

13  attorney, she believed that she was able to spend money as

14  authorized on the American Express Card for Three Rivers

15  Dental Group as she had been instructed, and I can represent

16  to the Court had been approved by -- by Lawrence Rudolph.

17           It wasn't until within a few minutes of the guilty

18  verdict that we received, she received an e-mail from

19  Julian, and I received a phone call from Julian Rudolph,

20  saying that the power of attorney had been revoked, she is

21  now terminated from Three Rivers Dental Group. That

22  afternoon at this point Ms. Milliron has her ankle bracelet

23  on, she's got to report back to Arizona that night, used her

24  credit card, which she still had access to, had not been

25  told specifically, Hey, don't use this credit card to book a

1   flight now back to Phoenix and to find a place to stay

2   because she could not stay at the Paradise Valley house,

3   which was not (indiscernible).

4            So that's kind of the timeline of events as far as

5   those things go, as far as when the power of attorney was

6   revoked and that type of thing.

7            Subsequent to that, Ms. -- Ms. Milliron was cut

8   off all of the bank accounts, including this bank account,

9   the Camelback bank account.  The credit cards that she had

10  access to with permission of Dr. Rudolph, she was taken off

11  of all of those.  Her termination -- her employment was

12  terminated.  She had up until the time she was arrested and

13  today no way to access any funds that belonged to

14  Dr. Rudolph.  So the argument that she had some sort of

15  economic influence is so much less true today than it was

16  when Judge Martinez, who had heard the entire trial and all

17  the allegations about prior testimony or anything else, it's

18  a lot more so now that she's even less of a flight risk and

19  certainly is not a danger to the community economically

20  speaking or otherwise, because now she has zero income or

21  access to any of Dr. Rudolph's funds.

22            So, Judge, if I could speak to the theft part of

23  this, I would like to call her daughter, Stephanie Moroz to

24  give some context as to the time.

25            THE COURT:  Go ahead.  Ma'am, if you would come

1    forward and be sworn, please.

2                         STEPHANIE MOROZ,

3    having been first duly sworn, was examined and testified as

4    follows:

5            MR. DILL:  Judge, can I do it here or would you

6    like me at the podium?

7            THE COURT:  Pardon?

8            MR. DILL:  Can I sit here or would you like me at

9    the podium?

10           THE COURT:  Wherever you are most comfortable.

11           MR. DILL:  Thank you, sir.

12           THE WITNESS:  Stephanie Moroz, S-T-E-P-H-A-N-I-E,

13   Moroz, M-O-R-O-Z.

14                      DIRECT EXAMINATION

15       Q.   Okay.  Ms. Moroz, are you related to Lori

16   Milliron?

17       A.   I am.

18       Q.   Tell us how.

19       A.   She's my momma.

20       Q.   Do you have any brothers or sisters?

21       A.   I do.  I have an older brother and a younger

22   sister.

23       Q.   And what is your older brother's name?

24       A.   My older brother's name is Adam.

25       Q.   Where does he live?

1     A.   He lives in New Castle, Pennsylvania.

2     Q.   Hold that a little bit closer if you don't mind.

3     A.   Oh, sorry.  He lives in new Castle, Pennsylvania.

4     Q.   And how about your sister?

5     A.   Jessica, and she lives in Daytona Beach, Florida.

6     Q.   Okay.  Was -- where does Jessica work currently?

7     A.   She's unemployed.

8     Q.   Prior to being unemployed, where did she work?

9     A.   She worked at Three Rivers Dental Group.

10    Q.   How long did she work there?

11    A.   A few years.

12    Q.   Was it -- how did she end her employment there at

13 Three Rivers Dental Group?

14    A.   She was fired at the same time as my mom without

15 any cause.

16    Q.   And did that -- was her access to Three Rivers

17 Dental Group caught off then too?

18    A.   Yeah, everything was caught off immediately.

19    Q.   Where do you currently reside?

20    A.   I live in Houston, Texas.

21    Q.   And what do you do for a living?

22    A.   I'm an investment principal.

23    Q.   Okay.  Just so the Court is aware, can you

24 describe for us, as far as the relationship between your

25 mother Lori Milliron and Lawrence Rudolph?

1       A.   Yeah.  My mom is Larry's fiance.  They've been

2   together for over a decade, and they've owned or shared

3   multiple homes and residences in the United States together.

4       Q.   As far as the residences, ones that they shared,

5   can you tell us where those would have been?

6       A.   There is one in Cranberry Township, Pennsylvania,

7   one in Victor, Idaho and another in Paradise Valley,

8   Arizona.

9       Q.   Now, let's talk about the Cranberry address,

10  because there was some issues on that.  That Cranberry

11  address, when was the last time, to your knowledge, that

12  your mother had ever gone to Cranberry?

13      A.   November 2021.

14      Q.   How do you know that?

15      A.   Because that was for Thanksgiving, and then after

16  Larry was arrested, she never went back and then she was

17  arrested, so she didn't have any chance.

18      Q.   And while she was arrested, while she was -- was

19  she on home confinement when she was arrested?

20      A.   She was, yes.

21      Q.   Home confinement in Arizona?

22      A.   Correct.

23      Q.   Okay.  Did she ever travel in violation of her

24  home confinement to Arizona -- I mean, to Cranberry at any

25  time?

1      A.    Never.

2      Q.    Okay.  As far as that house, the Cranberry house,

3  are her belongings there?

4      A.    They are, yes.

5      Q.    Okay.  Describe for us what's there at the

6  Cranberry house.

7      A.    She has clothing in the closet.  All of our baby

8  pictures of me and my siblings are there.  Excuse me, I'm

9  sorry.  And all of our holiday stuff, yeah, everything that

10  we use when we get together.

11     Q.    At any time prior to the end of this trial, were

12  you ever told by anyone that you were not allowed to go to

13  that house?

14     A.    Prior to the end of the trial?

15     Q.    Right.

16     A.    No.

17     Q.    In fact, when was the last time you were there?

18     A.    The last time I was in Cranberry was in March with

19  you.

20     Q.    Okay.  And that was because we were -- I was out

21  there to investigate the offices?

22     A.    To look at the businesses, yes.

23     Q.    Okay.  There were some things in here about Adam,

24  your brother, somehow going to that house without

25  permission.  Is that -- do you know anything about him going

1   to the house without -- without permission or trespassing at

2   that house?

3       A.   No, absolutely not.  He was assigned kind of the

4   caretaker of the property.  Both Larry and my mom asked him

5   to look after it since they weren't there that often.  I

6   think they would go back maybe once every five weeks or so.

7   So he would get to the mail for them, set it out, throw away

8   the junk, and yeah, sometimes he would go there for lunch

9   since his business is close to it.

10      Q.   And the exhibits that are in here, and it looks

11  like there is, I don't know, a Quiznos or Jimmy Johns in --

12  or in June and July of 2022 --

13      A.   Uh-huh.

14      Q.   -- had you ever been told to during that time

15  period, or to your knowledge, had Adam ever been told that

16  he wasn't allowed to go that house?

17      A.   No.

18      Q.   When was the first time you found out that you or

19  Lori or anybody else would not be welcome in that house?

20      A.   After trial.

21      Q.   Okay.  Have you ever had access to the safe, you

22  personally?

23      A.   No.

24      Q.   Do you know the combinations?

25      A.   I do not.

1      Q.   To your knowledge, does your brother or sister

2   know the combinations to the safe?

3      A.   No.

4      Q.   Now, as far as the trial, let's just fast forward,

5   were you present -- I think you were there the whole time,

6   but were you present during the trial here with us in

7   Denver?

8      A.   For most of it, yes.

9      Q.   Where did you stay when you were here?

10      A.   I stayed at an Airbnb with my mom and you.

11      Q.   And after the guilty verdict came in, were you

12   here with us when Judge Martinez approved her to remain on

13   bond?

14      A.   I was, yes.

15      Q.   What happened immediately afterwards?  Did we

16   leave right way or did we have to get the ankle monitor at

17   that point?

18      A.   No.  We had to wait for, I think it's pretrial

19   services.  They had to find somebody who was very, very

20   close to 5 p.m., so they were making calls and then we had

21   to wait for somebody to come so they could put a new ankle

22   monitor on my mom.

23      Q.   And what was your understanding of where -- where

24   your mom had to go to get the monitoring?  Was it here in

25   Denver or was it somewhere else?

1       A.   She did go to Phoenix where she lived.

2       Q.   Okay.  And was she supposed to be there the

3  following day?

4       A.   She was, yes.

5       Q.   Okay.  What happened when we left the courthouse

6  that afternoon?

7       A.   I know your phone just kept going off nonstop, and

8  it turns out it was Julian, and then my mom had received an

9  e-mail saying, You're terminated, you're cut off from

10 everything, and, Oh, by the way, you're no longer power of

11 attorney.

12      Q.   And is that when, to your knowledge, she found out

13 for the first time that the power of attorney had been

14 revoked --

15      A.   Yes.

16      Q.   -- four days before the trial actually started?

17      A.   Absolutely, yeah, she was in complete shock.

18      Q.   As far as her ability to try to get back to

19 Phoenix, what was -- were you there when she was attempting

20 to do that?

21      A.   She was.  She, you know, tried typical credit card

22 that she had and it wouldn't work.  She tried another one.

23 It might work.  It was difficult.

24      Q.   Okay.  When she came back to Phoenix, do you know,

25 where was it that she stayed in Phoenix?

40

1      A.    It was another Airbnb.

2      Q.    Okay.  At that Airbnb, did there come a time that

3  you ever went and visited her?

4      A.    I did, yes.

5      Q.    Okay.  Now, just so the judge understands, it

6  might not be clear from the record, there is a Paradise

7  Valley house that was being built; is that correct?

8      A.    Correct.

9      Q.    All right.  Was it finished yet?

10      A.    It was not, no.

11      Q.    Prior to living in that Airbnb, where was it that

12  your mother resided in Phoenix before the trial?

13      A.    She was at, I think, Mountain -- she was at a

14  hotel waiting for the house to be built.

15      Q.    And did she live in a condo also at some point?

16      A.    She did, yes.

17      Q.    Okay.  Now, did some of the items from the

18  condominium up going to storage?

19      A.    They did, yes.

20      Q.    Did you come to find out that that included the

21  ashes of Anna Bianca?

22      A.    Yes.

23      Q.    Okay.  Do you know, did -- to your knowledge, did

24  your mom ever have possession of those ashes herself?

25      A.    No, absolutely not.

1      Q.   Okay.  And to your knowledge, where were they

2  during the times after the trial when the family members

3  were trying now after six years to find the ashes, where

4  were the ashes?

5      A.   They were somewhere in the storage unit.  It was

6  packed completely tight, so knowing exactly where they were,

7  how to access them, we only figured out once we moved things

8  out.

9      Q.   Okay.  When -- how was it, then, that the ashes

10  ended up getting to the Government?

11      A.   I was helping my mom move and we had FBI agents

12  come, and I showed them the box.  I didn't touch it or open

13  it.  I asked them -- the FBI agents if they could open it

14  and confirm that it was an urn and ashes and then take

15  possession.

16      Q.   Okay.  And did the box -- can you describe for us

17  what the box said on it?

18      A.   It said:  Do not open.  Private.

19      Q.   And to your knowledge, had your mom ever opened it

20  or tried to do something or disturb the ashes or anything

21  like that?

22      A.   No, absolutely not.  I mean, she was assuming that

23  that was where they were, because it would make sense, but

24  she didn't know for sure.

25      Q.    Okay.  After that time period, did you assist your

1   mom at all in helping her move or get some possessions out

2   of -- into the storage or out of that Airbnb?

3        A.   Yeah, absolutely.

4        Q.   What was involved in that?

5        A.   So we had movers come.  They moved all the heavy

6   things out of the storage unit into her -- her new

7   apartment, and then I was there the entire time and I helped

8   her unpack everything, organize stuff and go through.

9        Q.   Okay.  Did you -- did there come a point in time

10  when -- well, first all, at the Paradise Valley house, was

11  there a safe in the house that was under construction?

12       A.   There was, yes.

13       Q.   Okay.  Do you know if anything was in it?

14       A.   I don't believe so.

15       Q.   Okay.  Did you ever open it or see your mother

16  open it?

17       A.   I know I didn't open it.  I think I may have seen

18  her open it, but I'm not certain.

19       Q.   Okay.  As far as the allegations of there being

20  gold and $200,000 in cash, when you were there, had you ever

21  seen that in your mother's possession?

22       A.   No.

23       Q.   Had you ever seen that it, in fact, existed?

24       A.   No.

25       Q.   Okay.  So -- and then as far as Cranberry, did you

1    ever see the safe in Cranberry and see what was in there at

2    any time?

3         A.   I actually have never even seen where that safe

4    is.

5         Q.   As far as the safe, and I think we shared this

6    with the prosecutor earlier, after your mom's arrest and her

7    arraignment -- or rearrest or most recent arrest and her

8    arraignment, did you go to her house in Phoenix or

9    apartment?

10        A.   I did, yes.

11        Q.   Okay.  And what was the purpose of going there?

12        A.   I went to get her personal items from the marshals

13   and move her car from the parking garage to -- back to her

14   apartment and just clean out her refrigerator, make sure

15   that I brought in her mail, lower the temperature, and we

16   had just got some files for her and that was it.

17        Q.   Okay.  Did you see, in fact, there is a safe in

18   the apartment?

19        A.   Oh, yes, there is.  It's -- it's a tiny little

20   safe about -- sorry, about this big, about that deep.  It

21   looks like a little kid's safe that they would have at a

22   concession stand or something.

23        Q.   And so while your mother was in jail at this point

24   in Phoenix --

25        A.   Uh-huh.

1      Q.   -- did you look inside the safe?

2      A.   I did, yes.

3      Q.   I think we showed a photograph to counsel.

4   Describe for us what was inside the safe.

5      A.   There is about $6,000, a picture key chain of my

6   nephew.  I think there is a little wristlet in there of my

7   mom's -- I think some keys.

8      Q.   Okay.  And have you ever seen any of the items

9   that they're alleging that she has stolen --

10      A.   Not.

11      Q.   -- in that safe or anywhere else?

12      A.   Never.

13      Q.   And just as far as your her home confinement, it

14   was your understanding, was she confined to her house as

15   part of the her conditions of release unless she got

16   permission to leave?

17      A.   Yes.  I think she was only allowed out three hours

18   a week.

19      Q.   And as far as, did you yourself also help her move

20   things from the Paradise Valley house as part of that?

21      A.   I did, yes.

22      Q.   Okay.  All right.  Now, just as far as some

23   paperwork that you got for us, some of her files, did you

24   look in those files and see certain banking documents as

25   well?

45

1      A.   I did, yes.

2      Q.   Okay.  Did you see -- and I think we shared it

3 with the Government -- authorizations for wire transfers for

4 Julian Rudolph directly from the Lawrence Rudolph Trust

5 accounts?

6      A.   Yes.

7      Q.   And how much were those for?

8      A.   I think one was for 450,000 and another was for

9 100,000 or 150,000.

10     Q.   And to your knowledge, was your -- did your mom

11 get prior notice of that taking place?

12     A.   No.

13     Q.   All right.  Now, as far as your mother being a --

14 let me start with danger to the community.  Have you ever

15 known your mom to be violent towards anybody?

16     A.   Absolutely not.

17     Q.   Have you ever known her to physically threaten

18 somebody with violence or to harm anybody?

19     A.   No, absolutely not.

20     Q.   As far as being a flight risk, did your mom

21 surrender her passport as part of the original detention?

22     A.   She did.

23     Q.   Did she comply with her conditions as far as

24 wearing the monitor?

25     A.   She did.

1      Q.   Okay.  Were you present at all when Dr. Rudolph

2    called the house?

3      A.   I was, yes.

4      Q.   Okay.  Based on hearing the conversation, what was

5    your impression of what Dr. Rudolph was telling her as far

6    as the financial situation?

7      A.   He said he had no idea what was going on and that

8    he was going to work in trying to figure out, you know, how

9    to make it right and how to change the power of attorney or

10   to get her some income.  I have no idea why this is

11   happening.

12         MR. DILL:  All right, that's all I have.  Thank

13   you.

14         THE COURT:  Thank you.  Cross-exam.

15                   CROSS-EXAMINATION

16   BY MR. FIELDS:

17     Q.   Good afternoon, Ms. Moroz.

18     A.   Hi.

19     Q.   I want to start with this safe.  So you say you

20   were able to look inside the safe?

21     A.   Which safe?

22     Q.   This safe in the condominium in Arizona.

23     A.   In the condo?  No.

24     Q.   You referenced a safe we were able to take

25   photographs of?

1        A.    Yes, it's in her apartment that she just signed

2    the lease for.

3        Q.    Okay.  Where did the items in that safe come from?

4        A.    I'm not sure.

5        Q.    Who put those items in that safe?

6        A.    I'm not sure.

7        Q.    Where did they come from?

8        A.    I'm not sure.

9        Q.    So your testimony earlier about the contents of

10   the safe --

11       A.    Uh-huh.

12       Q.    -- what do you believe to be the importance of the

13   contents of that safe?

14       A.    Well, the picture of my nephew because he's the

15   love of my mom's life.  I mean, he's her -- his second mom

16   or his sole mom now.  And yeah, just some cash.

17       Q.    But the allegations here that she took money from

18   a different safe, you don't know anything about those

19   allegations, do you?

20       A.    I've heard them, yes.

21       Q.    Do you know whether or not she took items from

22   that safe?

23       A.    I mean, I know my mom and I know that she would

24   never steal, period.

25       Q.    Do you know if she had access to that safe?

1       A.    I believe so, yes.

2       Q.    Who else would have had access to that safe?

3       A.    Larry.

4       Q.    So if items were missing from that safe, who would

5    have been able -- who would have taken them?

6       A.    I'm sorry, and again, we're talking about the

7    Paradise Valley house?

8       Q.    The Paradise Valley house.

9       A.    Yeah.  I don't know if there were any contents

10   ever in there, because it was a house under construction, so

11   there were multiple crews of people coming in to build the

12   home.  I don't think they actually put anything in there.

13      Q.    So let's actually just clarify the record here in

14   terms of like houses in Arizona.  So you mentioned this

15   Paradise Valley house.

16      A.    Yes.

17      Q.    Where is that located?

18      A.    I think that's the 7000 39th Place, the one that's

19   under construction okay.

20      Q.    So that was under construction?

21      A.    Correct.

22      Q.    While that was under construction, where did your

23   mom live?

24      A.    Her and Larry shared a condo together that's also

25   in Scottsdale/Paradise Valley.

49

1      Q.    Did that condominium have a safe?

2      A.    I don't -- I don't know.

3      Q.    Do you know anything about the contents of that

4  safe?

5      A.    I do not.

6      Q.    So with regard to allegations by Bianca's

7  children, that items may have been taken from that safe, you

8  don't know anything about that?

9      A.    I don't know where they would go.

10     Q.    Okay.  You also referenced -- well, let's talk

11 about after the trial, was your mom able to find a place to

12 live?

13     A.    Yes.

14     Q.    Where did she find a place?

15     A.    She -- I guess her temporary place or her

16 apartment?

17     Q.    Where did she live after the trial?

18     A.    So she was in an Airbnb and then she found an

19 apartment, which she signed a six-month lease for, and I

20 helped her move in about a week before she was arrested.

21     Q.    How did she pay for that lease?

22     A.    I think she had some savings, some money in her

23 bank account, and then she -- she just turned 65, so she

24 started getting social security.

25     Q.    So by the time the trial ended, she had her own

1    money in a personal bank account?

2        A.   She's always had her PNC bank account.   I think

3    you highlighted that in trial.

4        Q.   So when we were talking about using credit cards

5    after the trial --

6        A.   Uh-huh.

7        Q.   -- there would have been no reason for her to use

8    a business credit card, because she had her own personal

9    funds, right?

10       A.   I don't know which credit card it was that she

11   tried.   I wasn't looking over her shoulder, unfortunately.

12       Q.   I'm sorry, Ms. Moroz, that wasn't my question.

13            She didn't need to use a credit card at all?   She

14   could have used her own money, right?

15       A.   I know she has personal credit cards.   Like I

16   said, I don't know which ones she chose to use.

17       Q.   And she wouldn't have needed to use a business

18   credit card, because she had her own money, right?

19       A.   I -- you could say that.

20       Q.   Well, did she?

21       A.   I think that's a personal choice, if you want to

22   use your debit card or, you know, correct card.

23       Q.   I'm sorry, Ms. Moroz, that wasn't my question.

24   Did she have her own personal funds?

25       A.   I think she had a small amount.

1          MR. FIELDS:  Your Honor, may I pull up an exhibit

2    real quick?

3          THE COURT:  You may.

4          MR. FIELDS:  Thank you.  Your Honor, do you mind

5    if I conduct the rest of the examination here where I have

6    access to the laptop?

7          THE COURT:  Comfort is the key.  Go ahead.

8          MR. FIELDS:  Thank you very much.  And if we

9    could, can we show the witness Government's Exhibit 21.

10       Q.   (By Mr. Rabner) Ms. Moroz, have you ever seen this

11   letter?

12       A.   I have, yes.

13       Q.   To whom is it directed?

14       A.   To Mr. Dill.

15       Q.   And if we could go here to the next page.  Do you

16   recognize the signature there?

17       A.   Whose signature?  I'm sorry.

18       Q.   Do you recognize the signature?

19       A.   Oh, yes.  It looks like Larry's signature.

20       Q.   All right.  And do you see that first paragraph

21   there?

22       A.   Yes.

23       Q.   Does it reference personal items belonging to

24   Dr. Rudolph?

25       A.   Yes.

1       Q.    Now, when we're talking about safes -- so there is

2   a reference to this safe at the condominium in Arizona.  I

3   just want to make sure that the reference is clear, because

4   you've referenced another safe that you were able to see and

5   you had photographs of.

6           This safe at the condominium in Arizona, did you

7   ever see the contents of that safe?

8       A.    No.

9       Q.    So -- and Mr. -- Dr. Rudolph here says that the

10   only people that had access to that safe were your mom and

11   him.  Do you have any reason to believe that's not true?

12      A.    No.

13      Q.    When we were talking about seeing your mom access

14   the safe earlier, were you talking about the safe at the

15   condominium in Arizona or were you talking about a different

16   safe?

17      A.    Like I said, I've never seen that safe at the

18   condominium.  I saw the condo at one time on the day that

19   she was moving out.

20      Q.    Okay.  So just to make it clear, then, I guess,

21   you -- your testimony today has nothing to do with that safe

22   at the condominium in Arizona?

23      A.    Correct.

24      Q.    Okay.

25           MR. FIELDS:  I have no further questions, Your

1      Honor.

2                  MR. DILL:  Your Honor, redirect?

3                  THE COURT:  Yes.

4                        REDIRECT EXAMINATION

5      BY MR. DILL:

6          Q.   As far as the contents of the condominium --

7          A.   Uh-huh.

8          Q.   -- that were in the condominium --

9          A.   Yes.

10         Q.   -- where did the contents, including the safe of

11     the condo, where did they end up?

12         A.   In the storage unit.

13         Q.   Has the FBI ever requested to enter the storage

14     unit to a find out if the contents that they're saying were

15     stolen are actually in the safe and the storage unit, to

16     your knowledge?

17         A.   No, they haven't.

18         Q.   In fact, was the only time that you had, with

19     their request, went there was to find the ashes; is that

20     right?

21         A.   Yes, that's the only time they were there.

22         Q.   All right.  And so aside from Dr. Rudolph saying

23     these items were in the safe, do you have any information

24     that they, in fact, were at any time?

25         A.   No.

1      Q.   Okay.  And as far as where the safe is now, do you

2  know where that is, assuming that it's likely the condo

3  storage unit?

4      A.   Correct.

5         MR. DILL:  Thanks, Your Honor.

6         THE COURT:  You may step down.  Thank you.  Do you

7  have live testimony, Mr. Dill?

8         MR. DILL:  No, Your Honor.

9         THE COURT:  Do you have any additional proffer?

10        MR. DILL:  No, Your Honor, except for, again, I've

11  represented the transfers that were done by Julian Rudolph.

12  I provided those with copies of those to the Government.

13  I'll make copies of them to supplement the record, but I

14  only had the originals here, but we are in possession of

15  those.

16      So as far as the additional information, that

17  would be the extent of it.  Again, the storage unit, just so

18  the record is clear, is -- contains -- the possessions of

19  Lawrence Rudolph are all still in that storage unit in

20  Arizona.  In fact, the bill was coming in to Ms. Milliron

21  and we forwarded it to her lawyer, or rather, to

22  Dr. Rudolph's lawyer because we don't want whatever is in

23  there belonging to Dr. Rudolph, including a bunch of

24  (indiscernible) and everything else, and potentially the

25  safe and all of his personal items, we don't want those

1    being auctioned off or sold.

2              But nonetheless, Ms. Milliron, the only time she

3    went to that particular -- or actually, I guess it was

4    Ms. Moroz was the one who went to storage unit.  So my

5    statement would be, Your Honor, as far as this alleged

6    theft, we don't know what was -- that anything was actually

7    taken.  We don't know where it was.  We say it was in

8    this -- the contents of the safe, which have -- the safe

9    apparently has not been located, even though the Government

10   is alleging that these items were stolen from the safe, and

11   certainly the evidence is that Ms. Milliron does not have

12   possession of them, did not have possession of them and

13   they're not in her apartment.

14             So as far as there being an argument that this is

15   a presumption of theft, I would -- I find it challenging to

16   find out that there was, in fact, a theft that took place.

17   Just because the children went to Cranberry, a place which

18   Ms. Milliron has not been to since November of 2021, and

19   certainly not since February of 2022, because she was on

20   home confinement, she -- there is no way that she went there

21   and accessed it or got into the safe or took any of these

22   items.

23             As far as the -- I think I said before, as far as

24   the power of attorney, when she found out about the power of

25   attorney being cut off, that's when her bank accounts also

1    were cut off.  There was no misappropriation of any funds

2    after that.  And clearly by the record, no misappropriation

3    of any funds before that.

4           So it comes down to flight risk, which as I said

5    before, Your Honor, I believe I would submit she's even less

6    of a flight risk than she was.  Now not having access to any

7    funds, certainly not access to a passport, and having been

8    compliant with her home confinement that she was compliant

9    with, there is no indication that she has any means to -- to

10   flee the country or flee the jurisdiction.

11          Additionally, it all comes back to those two

12   prongs, the second one again being a danger to the

13   community.  Absolutely no evidence of that, certainly no

14   financial evidence of danger to the community.  Altercations

15   with essentially stepchildren does not -- months before

16   trial does not mean that now she is somehow harassing or

17   bothering these children, these adult children.

18          And again, if there was a conditions of release, I

19   think she has no reason to talk to the children again.  Same

20   with Larry Rudolph, that if the Court saw fit to allow those

21   conditions to go forward, we would be willing to modify them

22   to any degree.

23          I don't know if she can post a cash bond to

24   appear.  Again, her next court date is in February for

25   sentencing, but in light of the fact that all of the factors

1   that were spoken of here, with the exception of the theft

2   issue, was all covered and heard by Judge Martinez in the

3   three and a half week trial, and he still found that she was

4   not a flight risk or danger to the community.

5          On the third prong, Your Honor, that was a

6   violation and we're not going to say it wasn't a violation

7   for her to talk on the phone, the circumstances being that

8   her funds had been cut off and now she's been called by the

9   person, who is explaining to her, all right, let me look

10   into it and fix it.  Nonetheless, she should not have done

11   that.

12          But as I said, Your Honor, she has been in jail

13   now for, I guess, 32 days or so, and I would submit that no

14   contact at all with any of these, any of the family members

15   of the Rudolphs is something absolutely she could abide

16   with.  But I think just in light of what has happened, in

17   light of what she's gone through financially, her daughter

18   being fired, her being fired after many, many years working

19   there, her fiance cutting her off financially, there is no

20   situation, I believe, Your Honor, where she is going to be

21   engaging with them again.

22          And again, going back to my original point, the

23   purpose of the no contact had to do with Dr. Rudolph

24   allegedly intimidating her somehow as a witness in the case,

25   but we're not shying away from the fact that that was a

1    violation.

2              THE COURT:  Mr. Dill, with regard to this safe and

3    the condominium in Paradise Valley, Arizona, am I to

4    understand that it's a portable safe as opposed to one

5    that's built in?

6              MR. DILL:  Yes, Your Honor, because it had been in

7    a condo -- I think it's a large -- I haven't seen it, but my

8    understanding it was a larger safe, but I do know that all

9    the possessions -- because she subsequently took out her

10   possessions to move into the apartment, leaving all of Dr.

11   Rudolph's possessions in the -- in the condo storage.

12   That's when Ms. Moroz was there with her.

13             So I believe that what he's looking for, if

14   anything, is likely in the storage, which is in his name and

15   which he has access to.

16             So --

17             THE COURT:  But everything that was moved from the

18   condominium that the parties your client and Mr. Rudolph

19   shared was moved from the condominium to the storage unit by

20   your client, correct?

21             MR. DILL:  Well, by movers, Your Honor.  At that

22   point in time she was out on home confinement in that condo.

23   The condo lease came up about two months before trial.  All

24   those moved in were moved by movers into the storage unit,

25   and then she went to a hotel for like the two weeks, I

1    think, before our trial here in Denver.

2            Then we ended up -- we were here for three tweaks

3    or nearly a month in Denver.  So it was less and less, but

4    all the -- all those possessions, all the furniture,

5    everything that was not already in storage from the

6    previous, you know, move now went into storage.

7            THE COURT:  Did your client ever physically become

8    present at the storage facility?

9            MR. DILL:  No, Your Honor, I don't believe so.  I

10   think it was, she went and there was a reason for that.

11           THE COURT:  She meaning --

12           MR. DILL:  I'm sorry.

13           THE COURT:  -- your client's daughter?

14           MR. DILL:  Yeah, Ms. Moroz went.  And another

15   reason for that is because there were firearms in the

16   storage unit.  Dr. Rudolph was a big hunter.  And I

17   instructed her not to go anywhere near firearms may be, and

18   the firearms that had been in the house had been all moved

19   out and put in different gun clubs, but there were some

20   firearms in that storage unit, so that's why Ms. Milliron

21   did not go to the unit.

22           THE COURT:  With regard to the revocation of the

23   power of attorney that appointed both Ms. Milliron and

24   Mr. Rudolph's son Julian as the co-attorneys in fact, your

25   position is that did not become known to your client until

1    jury trial; is that correct?

2              MR. DILL:  It didn't become known until after the

3    verdict, Your Honor.

4              THE COURT:  So that even before that, am I correct

5    that by the terms of that power of attorney that had been

6    executed by Mr. Rudolph, that any expenditures or transfers

7    in excess of $15,000 had to be signed off on by both

8    attorneys in fact?

9              MR. DILL:  That is what the power of attorney,

10   again, written by -- by Dr. Rudolph, not countersigned by my

11   client says.

12             THE COURT:  It doesn't have to be --

13             MR. DILL:  I understand.

14             THE COURT:  -- countersigned?

15             MR. DILL:  I'm not saying she wasn't aware of it;

16   however, through the course of conduct, Dr. Rudolph himself

17   was approving various transfers, again, without the

18   signature of either of the two attorneys in fact.  That's

19   why I did point out, in fact, the 450,000, I think it's

20   $600,000 transfer by -- from a Morgan Stanley account in the

21   Rudolph trust by Julian Rudolph which was not signed off by

22   my client.

23             So as far as the course of conduct, as the way the

24   parties handled this course of conduct through multiple

25   times, it's only now after the fact that this is becoming an

1    issue from Julian's point of view.

2            Certainly it was not followed by him many times,

3    because he felt he had permission, I believe, from Rudolph.

4    And same with Ms. Milliron, she had permission.  Julian

5    has -- you know, again, I've shown this to the Government --

6    has a text message asking for my fee agreement since her

7    father is paying for it.  We have the checks, we have,

8    again, him agreeing that the funds will be paid.

9            So it appears that that tenet of the power of

10   attorney document was not adhered to by both sides.

11           THE COURT:  Let me make sure I'm understanding

12   what you're saying.  With regard to the transfers that were

13   authorized directly by Dr. Rudolph as the principal

14   identified in the power of attorney document, that's nothing

15   unusual, true?

16           MR. DILL:  That's correct.

17           THE COURT:  Irrespective of the power of attorney

18   that a principal confers to one or more attorneys, in fact,

19   the principal would retain the power, no pun intended, to

20   transfer money, true?

21           MR. DILL:  That's correct.

22           THE COURT:  Okay.  Thank you, Mr. Dill.

23   Mr. Fields, what -- what's your reply as it relates to this

24   issue that the course of performance under the power of

25   attorney by the principal of the two attorneys, in fact,

1    were such that they would, at least on some occasions, allow

2    one attorney in fact to make a transfer without the

3    signature of the other?

4          MR. FIELDS:  Two responses, Your Honor.  The first

5    is that the fact that maybe the parties -- maybe Julian was

6    not abiding by the terms of the power of attorney

7    irrelevant.  He's not on terms of supervised release.

8          I think what this demonstrates is the defendant,

9    who is very cavalier about sort of legal norms and about

10   sort of the letter of the law, she is not a rule follower.

11   In fact, the course of conduct by this particular defendant

12   shows nothing but a contempt for the rules and sort of a

13   willingness to where she can violate them to her own

14   advantage.

15         The second thing I would like to do is actually --

16         THE COURT:  Wait a second.  Before you leave that

17   point, I am mindful that Ms. Milliron is the one under a

18   court order and Julian Rudolph is not, but wouldn't it still

19   be a defalcation by the attorney in fact, Julian, if you

20   took money without getting Ms. Milliron's signature?

21         MR. FIELDS:  Not knowing anything else about sort

22   of the context, Your Honor, potentially.

23         THE COURT:  Okay, go ahead.

24         MR. FIELDS:  The second item, I would just like

25   to -- I will actually for the Court.  If we're sort of

1    dealing with the principal here, Government's Exhibit 17,

2    and this is one of the jail calls between Dr. Rudolph and

3    Ms. Milliron.  I'm going to play from minute 3:02 to 3:04.

4                THE COURT:  Okay.

5                (Call played.)

6                MR. FIELDS:  Sorry, there is another point where

7    this comes up at that call.  This is -- I'm going to play at

8    9 --

9                (Call played.)

10               MR. FIELDS:  So, Your Honor, I think the evidence

11   is very clear here of no matter what you think of the power

12   of attorney, that the principal, Dr. Rudolph, did not

13   authorize this, and that Ms. Milliron converted funds for

14   her own use.  And remember, we're talking about probable

15   cause here:  Is there a fair probability?  I think there is.

16               One thing I would like to point out to the Court

17   is defense counsel represented that some of this money came

18   from Camelback Consulting.  The actual allegation, and the

19   Government was very careful here, it's Government Exhibit

20   6B.  One of those checks, in fact, one of the largest ones,

21   is from a trust account that Ms. Milliron would not have had

22   access to and could not have used absent the power of

23   attorney or absent some sort of authority for Dr. Rudolph.

24   And we have Dr. Rudolph on tape saying he didn't authorize

25   that.

1          All of this just goes, Your Honor, to a defendant

2   who doesn't care about legal niceties, who is not likely to

3   abide by a court order, just as though she's unlikely to

4   abide by sort of any of the other strictures that are

5   imposed on her.  When she can, she manipulates and she

6   deceives and she does things to her own personal

7   advantage -- or her own personal use and advantage without

8   regard to the consequences.  That's why we're here and

9   that's why the Government is seeking revocation of her bond.

10          THE COURT:  Mr. Fields, with regard to the larger

11   check that was written on the trust account, what is the

12   nature of the trust?  Specifically, was it a revocable

13   trust --

14          MR. FIELDS:  It was --

15          THE COURT:  -- at which Dr. Rudolph was the

16   grantor?

17          MR. FIELDS:  It was, Your Honor.  Well, Bianca,

18   the murder victim, and Lawrence Rudolph were both grantors

19   and the trustees of that revocable trust.

20          THE COURT:  Mr. Dill, do you wish to clarify?

21          MR. DILL:  Yes.  I just want to clarify, Exhibit

22   6B is -- again, it's not a trust account.  The amount of

23   that check was to my firm for $35,000.  So if you're talking

24   about the larger checks, I don't believe that's the one

25   you're referring to.  The other ones were all ones with her

1    signatory.

2              MR. FIELDS:  It's page 3 of that exhibit, Your

3    Honor, Check 113, for $200,000 on March 8, 2022 from the

4    trust account.  Okay.  And so on March 27, there was a

5    letter to Larry.  And again, I've shown this to defendant's

6    counsel.

7              THE COURT:  Larry who?

8              MR. FIELDS:  Larry Rudolph, Your Honor, sorry.

9    And this is from -- this is through the attorneys from my

10   client to Larry.  She talks about there is difficulty with

11   the trustee certifications, putting everything in trust is

12   the worse idea, but I have an idea.  I'm getting funds

13   together from my attorney, John Dill.  The fee is 750,000.

14   I paid to date 420,000.  And he writes after that, Please

15   holds for now at 420,000.  Then she says, I need 320,000 and

16   it will come from the funds of Morgan Stanley.  Hold for

17   now.  That was in March.

18             THE COURT:  Who did you (indiscernible), Mr. Dill?

19             MR. DILL:  Actually, I -- I'm going to go ahead

20   and -- I'll go ahead and add it, Your Honor.  I just have

21   the original document.

22             THE COURT:  Is it not included among Exhibits 1

23   through 22?

24             MR. FIELDS:  It is not, Your Honor.  I have no

25   objection to its admission in evidence.

66

1          THE COURT:  Okay.  The Court will get that marked

2     as Defense Exhibit 1.  Actually, let's mark it Defense

3     Exhibit A just to have separate identification procedures.

4          MR. DILL:  And again, Your Honor, that wasn't the

5     sum total of the issues.  As you see there, the fee is 750.

6     He's saying -- and again, there is a fee agreement that I

7     provided -- the Government provided to Julian, provided to

8     Dr. Rudolph, signed by my client.  Dr. Rudolph is not a

9     signatory to that, but that is the fee, plus cost.  And he

10    is obviously acknowledging hold for now at 420.  Subsequent

11    to that, I was paid the balance of it through that.  I don't

12    have the writings on that, but once again, if he's saying,

13    oh, it was only 500, nobody ever told me that it was 750,

14    well, that's obviously not true as far as even his own

15    writing.

16         THE COURT:  Okay.  Hold on just a minute.  For the

17    record, Defendant's Exhibit A is admitted into the record

18    without objection by the Government.

19         (Defendant's Exhibit A admitted.)

20         THE COURT:  And once we're done, Mr. Dill, I'll

21    have our courtroom deputy make a copy of this.  We'll keep

22    it for the record and return the original to you.  Let me

23    read this and make sure I'm understanding exactly what

24    you're trying to communicate.

25         Mr. Dill, there is a sticker at the top of Exhibit

1   A that says, if I'm reading it correctly:  3/24 John paid to

2   date 420, presumably referring to 420,000.  In whose

3   handwriting is that sticker?

4           MR. DILL:  I don't want to talk out of school.

5   I'm not positive if that's -- Stephanie has been doing those

6   for me on that or not.  I think that's from Stephanie, Your

7   Honor, so we can disregard that sticker.

8           THE COURT:  Okay.  Well, before we admit the

9   exhibit in, any objection by the Government to the Court

10  removing that pink sticker?

11          MR. FIELDS:  No, Your Honor

12          MR. DILL:  It was a sticky note for reference,

13  Your Honor.

14          THE COURT:  Ms. (indiscernible - audio cut out).

15  I didn't think so.  Okay.  Separately, Mr. Dill, with regard

16  to the handwriting that appears on Defense Exhibit A, whose

17  writing is that?

18          MR. DILL:  That's Dr. Rudolph's writing, Your

19  Honor.  We would just -- just so the Court understands, we

20  send those messages through our attorneys to make sure

21  everything was -- and then they would handwrite responses

22  and go back and forth.

23          THE COURT:  This is dated March 27, I presume,

24  2022, correct?

25          MR. DILL:  Yes, sir.  Yes, sir.  And the reason I

1   had made up that point, that would have been after -- after

2   the alleged thing read -- or the check written -- an

3   authorized check.

4           THE COURT:  The $200,000?

5           MR. DILL:  The 200,000.  That would have been --

6   the check would have have been written before this, and he's

7   been put on notice that 420,000 has been paid.  Then he says

8   holds for now, and then there is -- I have more documents

9   from him to hold on my payment until more money comes in

10  from a life insurance and some other funds.

11          So it was eventually -- it did eventually come in

12  and over time I was paid my fee.

13          THE COURT:  When was the date of the 200,000

14  payment to your firm?

15          MR. DILL:  Do you have -- I didn't see it in here.

16  Which one is it?

17          MR. FIELDS:  Your Honor, that one -- that check is

18  dated March 8, 2022.

19          MR. DILL:  March 8, yes, Your Honor.

20          MR. FIELDS:  There are a couple of other checks,

21  some for over $200,000, written after that date.

22          THE COURT:  Okay.  Mr. Fields, do you have

23  additional argument to present?

24          MR. FIELDS:  Yes, Your Honor.  With regard to that

25  specific exhibit, I think it just confirms what we've

1    already been saying.  The money here was not authorized and

2    the defendant was using money that she wasn't entitled to

3    for her personal benefit.  That's the probable cause of

4    determination.  I mean, Mr. Rudolph's handwritten statement

5    there is, Hold for now, which is don't pay.

6              The Government doesn't dispute, maybe there was an

7    agreement between John Dill and Ms. Milliron.  The question

8    here is:  Did Lawrence Rudolph authorize payment on it?  And

9    he pretty clearly says in the phone call he did not.  It

10   pretty clearly says in that letter right there that he's

11   not.

12             THE COURT:  Okay.  But by that time, the time of

13   the March 27 letter, the money is already out the door,

14   correct.

15             MR. FIELDS:  Without Julian's authorization, which

16   is again what Rudolph actually says in the phone call,

17   right.  You were supposed to talk to Julian and you didn't

18   and that's what got everyone sort of upset.  So there again,

19   you've got Rudolph on this call confronting Ms. Milliron

20   with the fact that she was using his money without

21   authorization.  And she doesn't deny it.  She says, Oh,

22   well, you know, like a fee was supposed to be $750,000, but

23   it's pretty clear on the phone calls that he did not

24   authorize it.

25             So that's -- that's one of the counts, Your Honor.

1        The other one is -- and this reflects some of the

2    testimony we've heard today from Ms. Moroz, Ms. Milliron

3    used $6,000 of money from the dental practice the day after

4    she was fired.  Ms. Moroz said she already had a source of

5    personal funds, but she didn't use that.  She used the money

6    from the children's business.  Anna Bianca works there,

7    Lawrence Rudolph's children work there, Julian Rudolph has

8    complete power of attorney over that business.  She's using

9    those funds, right, when she is not authorized to do so.

10        So I think there is also a fair probability there

11    of a violation, and this all just goes, Your Honor, to the

12    very cavalier nature with which this defendant approaches

13    the law.  And in regards to her use of sort of money that

14    potentially will go to the children, her cruelty and sort of

15    her -- her ability to harm them.

16        So again, for all those reasons, the Government is

17    seeking revocation.

18        Before I sit down, there is two clarifications I

19    want to make to the record.  First, the Government's brief

20    references Stephanie Moroz as distributing a photograph of

21    Bianca Rudolph.  It was actually Jessica Moroz.

22        THE COURT:  Say that again, please.

23        MR. FIELDS:  It was Jessica Moroz.

24        THE COURT:  Okay.

25        MR. FIELDS:  And then the filing also references

1   Ms. Milliron finding out about her firing shortly after the

2   verdict.  It was actually about two hours after the verdict

3   that she found out.

4           THE COURT:  Okay.  Anything else, Mr. Dill?

5           MR. DILL:  No, Your Honor, but -- except for as

6   far as the Jessica Moroz, that allegation, obviously there

7   is no indication of that being a fact or that Lori Milliron

8   had anything to do with it if it, in fact, took place.  And

9   as far as the two hours after, that is probably correct,

10  because we're here for about an hour waiting on an ankle

11  bracelet.  It wasn't until we left that we got the e-mail

12  about her being fired.  At that point it was nothing about

13  don't use the credit card that I've been using this entire

14  time and trial.  It wasn't until subsequent to her returning

15  to Arizona sometime later that we got a message from Mark

16  Schneider, who is the attorney for Three Rivers Dental Group

17  setting for the those conditions.

18          THE COURT:  I guess to that point, though,

19  Mr. Dill, is there any culpable basis that Ms. Milliron

20  would have to use the dental practice, credit card, after

21  she's fired?  When would that be?

22          MR. DILL:  Well, I'm not positive as far as those

23  payments.  I believe one was made before she was actually

24  clarified as to whether she was fired or not.  It wasn't

25  until subsequent to that --

1          THE COURT:  If she charged a single penny after

2    being fired from the dental practice, what would be the

3    legal or business basis on which she would do that?

4          MR. FIELDS:  I can only say that Lawrence Rudolph

5    communicated to her to use the cards to go move into

6    Paradise Valley, which turned out to not be accurate.  That

7    was subsequent to the trial, Your Honor.

8          THE COURT:  Well, she knew at the time that she

9    got fired that Lawrence Rudolph wasn't going to continue to

10   support her at that point?

11         MR. FIELDS:  I think that's the issue, Your Honor.

12   She was getting messages from Lawrence Rudolph through her

13   attorneys and also in his calls that he was going to

14   continue to support her.  I don't know what's going on, who

15   did this.  There is also a call where he has a call with his

16   daughter where he tells his daughter and Bianca that it was

17   good, that the house in Cranberry has been locked up, but

18   then in one of those calls a few minutes later with

19   Ms. Milliron says, Oh, I have no idea why that's locked up.

20   It must be the FBI doing it.

21         So he was giving her information through this

22   entire time period until the communication was totally cut

23   off, that he didn't know that this was happening, that he

24   was working on it.  And again, he's the principal of this

25   company.  It hasn't been divested from him.

1              So if he is telling me, for instance, or telling

2    Stephanie or telling Lori that, Oh, no, you're going to get

3    paid, use the credit cards, those type of things, then

4    obviously she has mixed messages coming from the -- from the

5    alleged power of attorney and the principal.

6              THE COURT:  But is there anything in the

7    documentary or testimony of record of today's contention

8    hearing that Dr. Rudolph told Stephanie Moroz or you that

9    the defendant was entitled to continue to use a corporate

10   credit card after she's fired?

11             MR. FIELDS:  Specifically not using the corporate

12   credit card, he didn't say that, Your Honor.  It was --

13   again, I'm happy to be a witness, but I had a conversation

14   with Dr. Rudolph before I left Denver about this very issue.

15   So -- but as far as her being cut off and those type of

16   things, the idea was that she would be able to move into the

17   Paradise Valley house.  Subsequent her attorney, that Three

18   Rivers Dental Group Mark Schneider, send a letter saying,

19   You cannot go to those houses, you cannot contact Three

20   Rivers Dental group, no more e-mails, no more credit card.

21   That all came subsequent to these payments.

22             THE COURT:  Okay.  Okay.  Anything else from

23   either side of the aisle for the good of the order today?

24             MR. FIELDS:  Just one sort of housekeeping matter,

25   Your Honor.  The Government's filing 256 remains under

1   restriction.  I don't think there is any reason for it to

2   remain under restriction now that she's -- she's been

3   arrested, and so I would move the Court to unrestrict that

4   filing and the exhibits.

5           MR. DILL:  Which one?

6           MR. FIELDS:  The motion for revocation.

7           THE COURT:  Any objection, Mr. Dill?

8           MR. DILL:  No, Your Honor, not now.

9           THE COURT:  And I would (indiscernible - audio cut

10  out) all of the exhibits that were then tendered

11  conventionally to the Court.

12          MR. FIELDS:  The exhibits that were tendered

13  conventionally to the Court might need some redaction, Your

14  Honor, but the exhibits that were presented in court today

15  have been redacted and I can refile those on ECF in redacted

16  form so they can comply with rule (indiscernible).

17          THE COURT:  I think that would make sense.  I

18  guess the -- the motion for restriction is deemed I guess

19  denied at this point, is moot, but with the understanding

20  that you'll file a complete appropriately redacted version.

21          Okay.  The motion -- well, strike that.  First of

22  all, I want to commend counsel on both sides.  This has been

23  a very good presentation, it's helpful to the Court.  There

24  are a lot of, as in many cases involving physicians and

25  money, a lot of loose ends to -- to deal with here, but I

1   want to think about the record a little bit more.

2           So the motion by the Government to revoke the

3   defendant's conditions or release is taken under advisement

4   at this time.  I will enter a written order once I've

5   marshaled my thoughts and reduced them to coherent form.

6   With that, we're adjourned.  You all have a good evening.

7           (Whereupon, the hearing concluded at 4:07 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    TRANSCRIBER'S CERTIFICATE

2           I certify that the foregoing is a correct

3    transcript, to the best of my knowledge and belief (pursuant

4    to the quality of the recording) from the record of

5    proceedings in the above-entitled matter.

6

7    /s/Dyann Labo                    December 22, 2022

8    Signature of Transcriber              Date

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25