IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martinez

Criminal Case No. 22-CR-0012-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

**1.    LAWRENCE RUDOLPH**,
2.    LORI MILLIRON,

      Defendants.

_____/

**LAWRENCE RUDOLPH'S CONSOLIDATED RESPONSE TO MOTION FOR MANDATORY RESTITUTION AND FORFEITURE AND MOTION FOR PRELIMINARY ORDER OF FORFEITURE**

Lawrence Rudolph files this consolidated Response to the Government's Motions for Mandatory Restitution and Forfeiture (Doc. 296) and Preliminary Order of Forfeiture (Doc. 309). The Government's factual and legal theories for restitution, forfeiture, and fine are all flawed and should be rejected by this Court.

**I.    DEMAND FOR HEARING**

Rudolph denies the factual allegations made in the Government's Motions (Doc. 296 and 309). Although a jury found Rudolph guilty of Count 2, the Government makes numerous factual assertions and argues numerous legal theories that are beyond the jury's verdict and not supported by the trial evidence. Accordingly, pursuant to Rule 32.2, Rudolph requests a hearing where the Government is required to prove its assertions and theories, including on forfeiture tracing. *See* Rule

32.2(b)(1)(B) ("If the forfeiture is contested, on either party's request the court must conduct a hearing after the verdict or finding of guilty."). Even the Government's deficient Notice of Forfeiture Hearing (Doc. 228) concedes that there be a forfeiture hearing and that it should be conducted at sentencing, not before. *Id.* ("[T]he parties have elected to have any necessary hearing addressing the issue of forfeiture to be determined at the time of sentencing by the Court.").

## II.   RESTITUTION

The Government has correctly explained that an order of restitution is not appropriate for Rudolph's conviction in Count 1. There is no claim for lost or future income and Rudolph paid for all of his wife's funeral expenses. Doc. 296 at 8, 20. Therefore, no order of restitution should be entered on Count 1.

The Government's analysis with respect to the restitution regarding Count 2, however, is incorrect and should be rejected by the Court because the insurance companies are not victims. *See id.* at 1; 6 (arguing that "restitution to the insurance companies who were directly and proximately harmed is mandatory.").

The insurance companies are not "victims" in this case because they did not suffer a financial loss. No matter their findings at the time, the insurance companies would still have made disbursements according to Mrs. Rudolph's insurance policies; they would have paid the death benefit to the contingent beneficiaries—Mrs. Rudolph's children—pursuant to each state's Slayers Statute. Several of the insurance companies, in fact, have expressly made clear that they are not victims in this case and are not seeking restitution, which would render the entry of a

restitution order to the companies for the Government's listed amount of $4,877,744.93 illegal. *United States v. Arutunoff*, 1 F.3d 1112, 1121 (10th Cir. 2007) (holding that a restitution order in an "amount greater than the total loss" caused by the offense is "an illegal sentence"). Because the insurance companies would have paid the death benefit to someone regardless of whether Mrs. Rudolph's death was caused by accident or murder, there is no financial loss to the companies, and they cannot be deemed victims in this case.

The insurance companies in this case are not "victims" under the Mandatory Victim Restitution Act ("MVRA"), which requires that payment be made to "an identifiable victim or victims [who] suffered...pecuniary loss." 18 U.S.C. § 3663A(c)(1)(B). The MVRA defines a victim as "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." *Id.* at § 3663A(a)(2). For a victim to be "directly harmed" under the MVRA, and thus entitled to restitution, the Government bears the burden of proving that the harm to the "victim" resulted in "actual loss." *United States v. Serawop,* 505 F.3d 1112, 1123 (10th Cir. 2007). Because "a restitution order must be based on actual loss," the Government cannot meet its burden of proving harm to the insurance companies where the insurance companies would have properly paid the claims to someone regardless of Rudolph's conviction. *United States v. Quarrell*, 310 F.3d 664, 678, 680 (10th Cir.2002).

Here, the seven insurance companies that paid out on Bianca Rudolph's life insurance policies did not suffer any loss. We expect that the insurance companies

will concede at the sentencing hearing that they were obligated to pay the claim under any circumstance other than suicide. If Rudolph was ineligible to receive the benefits, his children would have received the payments. Bianca Rudolph designated her children as contingent beneficiaries, entitled to receive the death benefits from her policies if Rudolph predeceased her or was otherwise disqualified as a beneficiary.[1]

Pursuant to state Slayer Statutes, if Rudolph were disqualified from benefitting from Bianca Rudolph's life insurance policies, the proceeds would have been paid to Mrs. Rudolph's contingent beneficiaries. *See, e.g.*, Ariz. Rev. Stat. Ann. § 14-2803.[2] As a result, the insurance companies would have paid out the claims regardless of Rudolph's alleged offense, and none of the companies suffered an actual loss or any "direct harm."[3] *See United States v. Sharma*, 703 F.3d 318 (5th Cir. 2012)

---

[1]Depending on the terms of each individual insurance policy, the proceeds from Bianca Rudolph's death benefits would either flow to the Rudolph Trust to which her children were beneficiaries (AAA Life Insurance, Fidelity Life, Genworth First Colony Life, Great-West Life & Annuity, and Transamerica Life) or directly to Julian and AnaBianca as the specifically identified contingent beneficiaries (Ameritas Life Insurance Corp and MetLife Insurance).

[2]All of Bianca Rudolph's policies fall under state Slayer Statutes. The Arizona Slayer Statute governs the following policies: AAA Life Insurance Company, Fidelity Life, Genworth First Colony, and MetLife Insurance. The policies issued by Ameritas Life Insurance and Transamerica Life Insurance are governed by the Pennsylvania Slayer Statutes. 20 Pa. S.C.A. § 8801. The policies issued by Great-West Life & Annuity Insurance Company are governed by the Illinois Slayer Statute. 755 ILCS 5/2-6.

[3]It should be noted that even the accidental death policies for Mrs. Rudolph (issued by Fidelity Life and Great-West Life) would still be required to pay the death benefits even if there was a homicide conviction. As Fidelity Life's website explains, "accidental death benefits are typically paid out for accidents including car accidents,

(reasoning that that under MVRA, "actual loss" must not include compensation for that which insurers would have paid in absence of the crime) ("[A]n insurer's actual loss for restitution purposes must not include any amount that the insurer would have paid had the defendant not committed the fraud."); *United States v. Klein*, 543 F.3d 206, 208–09 (5th Cir.2008). Because there was no pecuniary loss, the insurance companies are not "victims" entitled to restitution under the MVRA.

The evidence in this case, presented both during trial by insurance witnesses and after trial in statements from the insurance companies, demonstrates that the insurance companies would have ultimately paid out Mrs. Rudolph's insurance claims, regardless of the alleged offense. During trial, insurance company witnesses called by the Government contemplated the implications of the Slayer Statute on the policies. For example, Greg Mirabelli, who testified on behalf of Brighthouse Financial and MetLife Insurance Company, spoke about the implications of the Slayer Statute and who would be entitled to the death benefits. Transcript of Jury Trial, Volume 6, at 55-56. Because the operation of the Slayer Statutes would have disqualified Rudolph from receiving insurance proceeds if a homicide was disclosed, the benefits should have been paid to the contingent beneficiaries of those policies.[4]

---

fire-related injuries, falls, accidental firearm deaths, and **homicide**." https://fidelitylife.com/life-insurance-basics/life-insurance-101/accidental-death-benefit-insurance/ (emphasis added).

[4] To be clear, it is still very much our position that Rudolph is innocent and did not murder his wife or commit wire fraud. The jury's verdict was against the great weight of the evidence. We already have filed a motion for new trial. If that is denied, we intend to appeal.

After trial, several of the insurance companies rightfully made clear that they do not view themselves as victims in this case and are not requesting restitution because of their contractual obligation to pay Bianca Rudolph's death benefits regardless of Rudolph's conduct. For example, Andrea D. Snowden, Second Vice President and Assistant General Counsel for Ameritas (the insurance company that paid out $1,754,899.22) explained that the company is "**not a victim**" and the "'Slayer Rule' applies to their policies which would cause the defendant to be ineligible for receipt of any payout; however…**the payout of the policies defaults to any contingent beneficiary or the estate.**" Doc. 287-3 at 2; PSR at paragraph 116 (emphasis added).

Ultimately, if Rudolph were disqualified from receiving Mrs. Rudolph's death benefits, the insurance companies would have still paid the claims, and the proceeds would have flowed to Bianca Rudolph's children, Julian and AnaBianca. Entering an order of restitution as requested by the Government would mean ordering millions of dollars to be paid to institutions who have unequivocally denied being victims in this case, have suffered no financial loss, and are not legally-identifiable victims under the MVRA. "[A] court may not order a defendant to pay restitution to a person who was not a victim of the offense of conviction." *United States v. Kieffer*, 596 F. App'x 653, 665 (10th Cir. 2014); *United States v. Reifler*, 446 F.3d 65, 120–21 (2d Cir. 2006). Such an order would be invalid.

As the Government correctly points out, the purpose of restitution "is not to punish defendants or to provide a windfall for crime victims but rather to ensure that

victims, to the greatest extent possible, are made whole for their losses." *United States v. Hudson,* 483 F.3d 707, 710 (10th Cir. 2007) (quoting *United States v. Arutunoff,* 1 F.3d 1112, 1121 (10th Cir. 2007)). Consequently, a district court that "order[s] restitution in an amount greater than the total loss caused by" the offense thereby "exceed[s] its statutory jurisdiction and impose[s] an illegal sentence." *Id.*

Even if the insurance companies were somehow victims, only one of the seven insurance companies has submitted a Declaration of Victim Losses requesting $203,200.00. Doc. 287-4 at 3.[5] AAA Life Insurance improperly requested restitution for (1) death benefits it would have paid out to the contingent beneficiaries regardless of the alleged offense because the policy falls under the Arizona Slayer Statute (Ariz. Rev. Stat. Ann. § 14-2803); (2) payments it was reimbursed for by reinsurers; and (3) investigative fees. Doc. 287-4 at 3; PSR at ¶ 118. On information and belief, no other insurance company has submitted a victim declaration. Accordingly, the Government will be unable to satisfy its burden on restitution. *United States v. James*, 564 F.3d 1237, 1248 (10th Cir. 2009) ("The burden of demonstrating the amount of the loss sustained by a victim as a result of the offense shall be on the attorney for the Government.") (quoting *United States v. Barton*, 366 F.3d 1160, 1165 (10th Cir. 2004)) (quoting 18 U.S.C. § 3664(e)).

The Probation Office concedes that "a portion of restitution owed would not be payable to the life insurance companies." Rather, it would be owed to Rudolph's

---

[5] Ameritas has rightfully explained to the U.S. Probation Office that it is **not** a victim in this case and claims no financial loss. Doc. 287-3.

children, who currently control his unseized finances and assets. PSR at 119. It appears that the Probation Office does not consider the restitution amount listed in the PSR as definitive, let alone the complete accounting that is statutorily mandated, as it acknowledges that it is still working "to determine the appropriate restitution and payees." PSR at 120.

There is no basis in fact or law to impose a monetary sum for the purposes of restitution to the insurance companies in this case. Because Bianca Rudolph's life insurance policies would have been paid regardless of whether her death was caused by an accident or a homicide, the insurance companies did not suffer a pecuniary loss and an order of restitution to them is not appropriate.

## III. FORFEITURE

The Government is unjustly seeking forfeiture of two properties, two vehicles and three bank accounts and the interest, dividends, and appreciation of the real property earned on these assets, even though it was shown at trial that Rudolph did not need or spend the insurance proceeds to obtain these assets. The Government's theory of entitlement to millions of dollars over the $4,877,744.93 of insurance proceeds goes beyond common law and statutory concepts of fraud forfeiture and is based on readily distinguishable case law.

First, the Government cannot reasonably allege that Rudolph spent the insurance proceeds in order to obtain the assets subject to forfeiture, or that "but for" the alleged fraud, he would not have obtained the assets. An expert financial witness, Mitchell Hoffman, explained to the jury at trial that the insurance proceeds did not

impact Rudolph's ability to maintain his lifestyle or obtain assets. Mr. Hoffman performed an analysis regarding Rudolph's net worth and certain levels of assets, without regard to the insurance proceeds, for the years of December 31, 2016 through 2020. *See* Mitchell Hoffman Expert Report at 6. He analyzed Rudolph's asset levels without including the proceeds from the insurance policies in order to determine whether or not he needed and utilized these funds. In examining Rudolph's investment and retirement assets, his total liquid assets, his total assets, and his net worth, Mr. Hoffman found that cumulatively over the four-year period, without taking the insurance proceeds into account, total assets increased more than $4.38 million, and the other three categories each increased more than $2.07 million. *Id.* Based on his extensive analysis performed after the insurance proceeds had been removed from consideration, Mr. Hoffman concluded:

> [D]espite the declines in 2017 and 2018, Dr. Rudolph had total liquid assets remaining of $5.99 million and $4.82 million, respectively, without regard to the insurance proceeds…[I]n my opinion, it cannot reasonably be alleged that Dr. Rudolph needed or spent the approximately $4.88 million of proceeds received from Bianca Rudolph's life insurance policies.

*Id.* at 6-7. The Government cannot prove that the actual funds used to purchase the assets subject to forfeiture were "tainted" funds because Rudolph was clearly able to finance the purchases without the insurance proceeds.

<u>Second</u>, the Government is not entitled to the interest, dividends, and appreciation from the payments of the insurance proceeds or real properties. The Government's theory of entitlement to the appreciation and interest on Rudolph's assets is not: If you steal $1 and use that tainted dollar to buy a $1 lottery ticket, then

you must forfeit the lottery winnings. The Government's theory appears to be: If you steal $1, deposit it into your bank account that has a legitimate $100, and then buy a $1 lottery ticket using money from that account, you must forfeit all the winnings. That theory is not supported by logic, or even by the cases the Government cites in its motion. The Government's tracing theory is in fact a tainting theory barred by statute. To be clear, there are **<u>no</u>** Tenth Circuit cases that support such a theory.

The non-binding cases relied on in the Government's forfeiture motion are easily distinguishable and in fact bolster Rudolph's position. For example, the Government cites *United States v. Afriyie*, 929 F.3d 63 (2d Cir. 2019) to say that traceable property includes the appreciated value of the initial proceeds. The Government fails to point out, however, that the *Afriyie* court came to that conclusion based on the Government's argument that "these funds were [] directly forfeitable as proceeds because '[the defendant] never could have made those later investments without the initial illegal [] profits.'" *See* Brief of Appellant, 2018 WL 1790511 at 51. The reasoning in *Afriyie* is inapplicable here, where Rudolph could have obtained the assets without the insurance proceeds.

The Government's reliance on the non-binding conclusion in *United States v. Betancourt*, 422 F.3d 240 (5th Cir. 2005), where lottery winnings from a ticket purchased with drug proceeds were forfeitable, is similarly misplaced. In *Betancourt,* the court found that the $5.4 million in lottery winnings were subject to forfeiture because the winning ticket was purchased *entirely* from illegal drug proceeds: "Because there is no evidence that Betancourt had any <u>legitimate</u> income with which

he could have acquired his interest in the lottery ticket, it follows as a matter of logic that the money used to acquire the interest came from drug sales." *Betancourt*, 422 F.3d at 252 (emphasis added). That is not the case here, obviously, where Rudolph had legitimate income from which he could, and did, acquire his interests in the two properties in question.

To support its theory of entitlement to the appreciation of real property, the Government cites to yet another non-binding case that actually cuts in favor of Rudolph. In *United States v. Real Prop. Identified as: Parcel 03179-005R*, 287 F. Supp. 2d 45 (D.D.C. 2003), the court found that because "the government [] demonstrated by a preponderance of the evidence that [the defendant] utilized funds ***exclusively*** acquired from [the offense] to purchase and make payments on the [] property, the entire property, including its appreciated value, is subject to forfeiture." *Id.* at 59-60 (emphasis added). In stark contrast to the facts here, the court found that no evidence "even suggest[ed] that any part of the down payment used to purchase the [] property was from legally acquired funds" and that no money other than the proceeds from the offense was deposited into the account used for the down payment. *Id.* at 59. This is not factually similar to the purchase of the Cranberry Township and Paradise Valley properties, which were funded with "legally acquired funds."

Similarly, the Government mistakenly relies on *United States v. Gardenhire*, 2017 WL 6371362, (W.D. Pa. Dec. 13, 2017) to argue that appreciation in value of property after renovations is subject to forfeiture. In *Gardenhire*, the district court held that the increased value of a property was subject to forfeiture where "the

purchase of [the property] was effectively a cash transaction and since the cash was *all* generated through heroin trafficking, the Court holds that the house was procured with drug proceeds…***To this end, the [defendant] did not have sufficient money in [] bank accounts to purchase [the property].***" *United States v. Gardenhire*, 2017 WL 6371362, at *10 (W.D. Pa. Dec. 13, 2017) (emphasis added). Rudolph's circumstances are distinctly different; Rudolph did have sufficient money in his bank accounts that was legitimately earned and acquired to purchase the real properties.   The *Gardenhire* court found that the property was purchased and improved with tainted drug proceeds as opposed to untainted and legitimately obtained funds, rendering the residence and its increased value subject to forfeiture. *Id*. at 11. The court further reasoned that the evidence supported a finding that property was subject to forfeiture as it was also "involved in" the offense and was the "situs of drug trafficking activities," *id,* which is not true for Rudolph.

Another case relied on by the Government to support its attempt to seize the gains from the subject assets, dealt with an entirely different concept of the interest proceeds from opening an illegal bank account, rather than depositing to a legally-opened bank account like in this case. *United States v. Cekosky*, 171 Fed. Appx. 785 (11th Cir. 2006). In *Cekosky*, the defendant pleaded guilty to illegally opening bank accounts with stolen identities. The Eleventh Circuit found that the interest gained on the accounts was forfeitable because the defendant was only able to open the bank accounts, and earn interest from these accounts, by committing the offense. *Id*. at 788. Thus, the court found that it was appropriate to divest the defendant of the

interest he earned while committing the charged crimes. Like the other cases the Government cites to, *Cekosky* is not analogous to this case, where Rudolph legally opened the bank accounts in question, deposited legitimate earnings, and acquired untainted property.

The Government's tracing theory is statutorily unsupported and is inconsistent with the Supreme Court's understanding of what forfeiture is. *Bennis v. Michigan*, 516 U.S. 442 (1996). The "derived from proceeds traceable" language in § 981(a)(1)(C) is intended to allow for forfeiture where criminal proceeds are directly used to acquire property, but that language is not intended to allow the seizure of funds that were lawfully invested and appreciate in value. Where tainted assets are used to purchase other assets, the new assets may be forfeitable, but only to the extent of the tainted assets. For example, in *United States v. Walsh*, 712 F.3d 119, 124 (2d Cir. 2013), the Court described the applicable approach as one which "consider[s] 'traceable proceeds' to be any one withdrawal, or any asset purchased with such withdrawal, *to the extent of the amount of the deposited tainted funds*." *Id.* at 124 (emphasis added) (quoting *United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1159 (2d Cir.1986)). If the Government wanted to reach the assets under its tainted funds theory, it could have charged money laundering. But guesswork is insufficient and inconsistent with forfeiture law. *See United States v. Annamalai*, 939 F.3d 1216, 1238 (11th Cir. 2019) (finding that extrapolation based upon speculation is unacceptable for sentencing). Although the Government can potentially claim to have a legitimate interest in the insurance proceeds in this case, there is no such

possible interest to forfeit the appreciation and interest in assets that Rudolph could have, and did, obtain lawfully.

Third, even under the preponderance standard, the assets and appreciation subject to forfeiture in this case cannot be considered "traceable to" the proceeds of the alleged offense. Because the insurance proceeds were commingled with legitimate funds and were not needed or used to purchase the assets, it cannot be said, more probably than not, that the assets are traceable to the offense. In *United States v. Voigt*, 89 F.3d 1050 (3d Cir. 1996), the court held that "the government must prove by a preponderance of the evidence that the property it seeks under § 982(a)(1) in satisfaction of the amount of criminal forfeiture to which it is entitled has some nexus to the property 'involved in' the money laundering offense." *Id.* at 1087. The court found that the burden of showing that an item purchased is "traceable to" an offense is "difficult, if not impossible" to satisfy where property "is commingled in an account with untainted property." *Id.* The court rejected the government's effort to forfeit items of jewelry "purchased with funds from an account into which money laundering proceeds had been commingled with other funds, and after numerous intervening deposits and withdrawals." *Id.* at 1087–88. The court held that, in such a situation, funds cannot be traced as a matter of law, and therefore "the government must satisfy its forfeiture judgment through the substitute asset provision." *Id.* at 1088 (emphasis added). This is plainly a case where commingled proceeds "c[ould not] be divided without difficulty" and that therefore the Government is required to proceed to seek a forfeiture money judgment, including the option to pursue collection under the

substitute property provisions, 21 U.S.C. § 853(p). To conclude otherwise would "render the substitute asset provision a nullity," *Voigt*, 89 F.3d at 1087.

<u>Fourth</u>, the Government should be limited to a forfeiture money judgment because the supposed waiver of Rudolph's right to a jury determination of forfeiture in the Government's Notice of Forfeiture Hearing (Doc. 228) is ambiguous and insufficient. The vague document is unsigned by Rudolph and even defense counsel, and misstates Rule 32.2's language. The Court did not make an inquiry at trial of the defendant, which was required because it was an individual right to trial by jury that was being waived. Thus, because the waiver of jury trial is inadequate under Rule 32.2, it should be read as the Government relying on a money judgment alone. The Court's forfeiture order should be limited to a money judgment, where no jury determination is necessary.

<u>Fifth</u>, as discussed in detail above, even if the Government's conviction stands, then Julian and AnaBianca Rudolph are the true beneficiaries of their mother's insurance policies because of the applicable Slayer Statutes. While the intention of forfeiture is meant to punish the defendant, it should not equally act to harm the victims – which it would do here. Given that the children should have received the insurance proceeds and would have invested the funds and profited from the gains, forfeiture of the assets and their appreciation would only punish those who the Government has stated are the victims of the alleged murder. By virtue of the fact that the proceeds of the alleged offense were placed in trusts, and because the Slayer Statutes rendered the Rudolph children beneficiaries of those proceeds, Government

possession of the funds would be inequitable and should not be allowed to stand. By pursuing a forfeiture action, the Government is attempting to take possession without recognizing the rights of the victims and true beneficiaries. The Government's absurd reading of the forfeiture statute penalizes the victims who would otherwise be entitled to the insurance proceeds and their gains. *See Paroline v. United States*, 572 U.S. 434, 445 (2014) (discussing compensation to victims for losses because harm to the victims is paramount concern). This approach violates the nonpunitive purposes of civil forfeiture, makes the Government a financial accomplice to the alleged murder-fraud, and violates the Due Process and Takings Clauses.

Finally, the Government is only entitled to seek forfeiture for the offense the jury found was proved at trial. Here, Rudolph was charged with executing and completing the fraud against only one insurance company ("LIFE INSURANCE COMPANY 1." *See* Doc. 53 at 2. Because the jury found Rudolph guilty of the execution of fraud against one insurance company, the Government's forfeiture demand for insurance proceeds from all seven insurance companies exceeds the limits created by the conviction. *Apprendi v. New Jersey*, 530 U.S. 466, 483 (2000) ("The judge's role in sentencing is constrained at its outer limits by the facts alleged in the indictment and found by the jury."). While the Indictment references a scheme to defraud seven insurance companies, forfeiture, *unlike restitution*, does not encompass "schemes" and only covers counts of conviction. There is no such thing as a count of conviction for a scheme. And the Government did not charge conspiracy or file

separate counts of fraud for each of the other six insurance companies. There is no Tenth Circuit case that holds that the entire scheme's proceeds and not the execution's proceeds are forfeitable. This is because a scheme is not a crime, and thus there can be no forfeitable proceeds from a mere scheme. An execution of a scheme is a crime and only the execution of the scheme can produce forfeitable proceeds. As such, the conviction in this case is for an execution that involved only one of the seven companies. A correct application of the forfeiture statute would go no farther than the proceeds of that single execution. Because forfeiture cannot be imposed on a crime that Rudolph was not convicted of, allowing the Government to reach beyond the limits of the offense the jury found proved at trial would violate the Sixth Amendment.

## IV.    FINE

Larry Rudolph does not have the ability to pay a fine of $9,785,577.86, which is excessive in any event, and we respectfully request a hearing on this issue at sentencing.

The Government is demanding restitution, forfeiture and fine payments totaling **<u>over $25 million</u>** even though they claim Rudolph only received $4.8 million in insurance proceeds. As a result of the conviction, Rudolph is facing a life sentence, has almost no assets, owes significant debts, no longer controls his dwindling dental practice, and will never earn a salary for the rest of his life. As part of the forfeiture proceedings, the Government has placed liens on his most significant assets. Rudolph owes legal fees for the upcoming appeal and owes the Internal Revenue Service.

The imposition of any fine would also serve to punish the Rudolph children, who the Government has claimed are victims. Doc. 256 at 9. The Government demands that these children—since they now control Rudolph's finances, should be forced to: (1) pay $4,877,744.93 of insurance proceeds (that the children are entitled to) in restitution to non-victims; (2) forfeit millions more in assets that far exceed the insurance proceeds paid; and (3) pay almost $10 million dollars in a criminal fine consisting of twice the insurance proceeds ($9,755,489.86) and twice the proceeds of jewelry insurance claims, which was uncharged and unproven ($30,088).

The Sentencing Guidelines provide that "[t]he court shall impose a fine in all cases, **except** where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a) (emphasis added); *see also United States v. Vigil*, 644 F.3d 1114, 1123 (10th Cir. 2011) (reversing imposition of fine where the court did not address the defendant's ability to pay and did consider whether the imposition of the fine might impair the ability to pay the restitution ordered); *United States v. Foote*, 413 F.3d 1240, 1253 (10th Cir. 2005) (remanding with instructions to make findings on defendant's ability to pay where although "[d]istrict courts are not required to make specific findings in cases where uncontested evidence establishes the defendant's ability to pay," the defendant "disputed his ability to pay and presented evidence in support of his position"); *United States v. Gonzalez*, 541 F.3d 1250, 1256 (11th Cir. 2008) (per curiam) ("[Defendant] objected at sentencing and the court therefore had notice of the need to provide some reasoned basis for imposing the fine. Because the record provides no explanation

regarding the basis upon which the court imposed the fine, we vacate the sentence imposed by the district court and remand this case for resentencing."); *United States v. Rowland*, 906 F.2d 621, 624 (11th Cir. 1990) (holding that the fine imposed was excessive; though defendant had $35,000 in his possession at time of arrest, authorities had seized that money and defendant thus no longer had access to it).

"If the defendant establishes that...he is not able and, even with the use of a reasonable installment schedule, is not likely to become able to pay all or part of the fine..., the court may impose a lesser fine or waive the fine." *Id.* § 5E1.2(e). 18 U.S.C. § 3572(a) sets forth factors that must be considered by a district court "[i]n determining whether to impose a fine, and the amount, time for payment, and method of payment of a fine." Section 5E1.2(d) of the Guidelines sets forth similar factors to be considered in determining the amount of a fine. Both sections include the defendant's ability to pay as one factor that the district court is required to consider in setting the amount of a fine. *See* 18 U.S.C. § 3572(a)(1)–(2); U.S.S.G. § 5E1.2(d)(2)–(3). In addition, under 18 U.S.C. § 3572(b), a "court shall impose a fine or other monetary penalty only to the extent that such fine or penalty will not impair the ability of the defendant to make restitution." *See also id.* at § 3572(a)(4) (providing that a court shall consider "whether restitution is ordered or made and the amount of such restitution"); U.S.S.G. § 5E1.2(d)(4) (providing that a court shall consider "any restitution or reparation that the defendant has made or is obligated to make").

Based on Rudolph's offense level, the Sentencing Guidelines recommend a fine between $50,000 and $500,000. U.S.S.G. § 5E1.2(c)(3); *United States v. Kellogg*, 494

Fed. Appx. 888, 894 (10th Cir. 2012) (noting that "a within-guideline fine is entitled to a presumption of reasonableness"). The Government is asking the Court to depart **20 times** over the maximum recommended fine. An upward departure is not warranted in this case where: (1) the Government is already requesting restitution and forfeiture; (2) Rudolph is "unable to pay and is not likely to become able to pay any fine" as he faces life imprisonment, no longer has significant assets, and no longer controls the assets that his family does have (*Id.* at § 5E1.2(a)); (3) a fine is not necessary to "afford adequate deterrence" because Rudolph's likely sentence of life in prison is more than sufficient to accomplish these sentencing goals (*Id.* at § 5E1.2(d)(1)); and (4) the "burden that the fine places" on Rudolph's children who control his remaining assets is insurmountable considering the Government is also seeking restitution and forfeiture. *Id.* at § 5E1.2(d)(3). The Government has cited no similar case where such a fine, on top of restitution and forfeiture, has been ordered. No doubt because it would be excessive. *United States v. Bajakajian*, 524 U.S. 321 (1998).

Attempting to establish ability to pay, the Government wrongly relies on Rudolph's prior estimates to Pre-Trial Services before the bond hearing that he was worth $27 million and that, as the Government puts it, "he was so rich he had no need for more money." Doc. 270 at 1-2, 10. The Government's own trial expert argued that Rudolph's net worth at the time of the offense was $7,030,098. *See* Erin Newton Expert Report at 5. Similarly, if we exclude the value of the dental practice that is essentially worthless after the murder conviction, the defense's expert calculated

Rudolph's net worth to be $10,818,565.7. *See* Mitchell Hoffman Expert Report at 3, 6. Even these numbers no longer accurately reflect Rudolph's financial status after his conviction. Regardless of what numbers are used, there is no question that Rudolph's assets are not anywhere close to what they used to be. Based on the actual numbers, and not Rudolph's estimates at the time of the bond hearing and before the consequences of a murder conviction affected his financial portfolio, Rudolph cannot afford to pay the triple loss amount that the Government is demanding.

The PSR alleges, based on the Government's calculations, that Rudolph's current net worth is over $15 million. PSR at paragraph 205. But that calculation includes an outdated valuation of his dental practice, Three Rivers Dental Group, that is no longer accurate after his arrest. Rudolph's former dental practice—which was once one of his largest assets valued at $5,063,000 in 2016—is now practically worthless. Some of the locations have been forced to close and the head of the company, Dr. AnaBianca Rudolph, is no longer able to run the business. Many of Rudolph's other assets are tied up in the criminal and civil forfeiture proceedings.

The purpose of a fine is to punish the defendant and to deter others from committing similar offenses. This is inapplicable here where Larry Rudolph will likely receive a sentence of life imprisonment. The truth is that such a fine would serve only to punish and bankrupt the Rudolph children, not Rudolph himself. Doc. 256 at 9.

## V.     CONCLUSION

The Government is taking the extreme and unjustified position that it is entitled to collect **over $25 million**. The Government improperly demands: (1) $4,877,744.93 in restitution to pay entities that are not victims and have suffered no financial loss; (2) forfeiture of $4,775,604.59 in bank accounts on top of millions of dollars in real property and vehicles, which far exceeds the loss in this case; and (3) almost $10 million in excessive criminal fines from Rudolph who has no ability to pay and whose drastically diminished finances are now controlled by his children. The Court should reject the Government's unwarranted and unsupported demands as they have no basis in law or fact and would only serve to harm and bankrupt the Rudolph children.

Respectfully submitted,

**MARKUS/MOSS PLLC**
40 N.W. Third Street, PH1
Miami, Florida 33128
Tel: (305) 379-6667
markuslaw.com

By:     /s/ David Oscar Markus
        David Oscar Markus
        Florida Bar Number 119318
        dmarkus@markuslaw.com

        /s/ A. Margot Moss
        A. Margot Moss
        Florida Bar Number 091870
        mmoss@markuslaw.com

        /s/ Lauren I. Doyle
        Lauren I. Doyle
        Florida Bar Number 117687
        ldoyle@markuslaw.com