IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Criminal Case No. 22-cr-012-WJM

UNITED STATES OF AMERICA,

  Plaintiff,

v.

1. LAWRENCE RUDOLPH, and
2. LORI MILLIRON,

  Defendants.

## ORDER DENYING DEFENDANTS' MOTIONS FOR NEW TRIAL

Before the Court are: (1) Defendant Lawrence Rudolph's Motion for New Trial Pursuant to Rule 33 ("Rudolph's Motion") (ECF No. 268), to which the Government filed a response (ECF No. 273), and Rudolph filed a reply (ECF No. 292); and (2) Defendant Lori Milliron's Motion for New Trial And for Judgment of Acquittal ("Milliron's Motion") (ECF No. 269), to which the Government filed a response (ECF No. 274), and Milliron filed a reply (ECF No. 294).[1]

The Court finds that it need not conduct a hearing on either motion to resolve the issues therein. For the following reasons, Rudolph's Motion and Milliron's Motion are denied.

### I. LEGAL STANDARD

Rule 33(a) of the Federal Rules of Criminal Procedure provides that "[u]pon the

---

[1] For clarity in this Order, the Court refers to Lawrence Rudolph as "Rudolph" and Bianca Rudolph as "Bianca Rudolph."

defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." "[I]n deciding a motion for new trial, the court may weigh the evidence and consider the credibility of witnesses in determining whether the verdict is contrary to the weight of the evidence such that a miscarriage of justice may have occurred." *United States v. Evans*, 42 F.3d 586, 593 (10th Cir. 1994) (internal quotation marks and citation omitted). "The Court's broad discretion empowers it to grant relief based not only on the sufficiency *vel non* of the evidence at trial but on any other circumstance that might render the trial 'essentially unfair,' including trial errors." *United States v. D'Amelio*, 636 F. Supp. 2d 234, 238 (S.D.N.Y. 2009).

However, "[d]istrict courts view motions for new trials with disfavor." *United States v. Lamy*, 521 F.3d 1257, 1266 (10th Cir. 2008). "[A] litigant is entitled to a fair trial but not a perfect one, for there are no perfect trials." *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548, 553 (1984) (alteration, internal quotation marks, and citation omitted). "[T]he authority to grant a new trial should be exercised sparingly and with caution." *United States v. Sturdivant*, 513 F.3d 795, 802 (8th Cir. 2008); *see also Richins v. Deere & Co.*, 231 F.R.D. 623, 625 (D.N.M. 2004) (an "alleged error by the trial court constitutes grounds for . . . a new trial only where the trial court concludes that, absent the alleged error, a jury would likely have reached a contrary result").

## II. ANALYSIS

**A.     Rudolph's Motion for New Trial**

    1.     <u>Cassandra Olmstead's Testimony</u>

        a.     *Newly Discovered E-mails*

Rudolph argues that newly discovered evidence entitles him to a new trial. (ECF No. 268 at 5.) In the Tenth Circuit, to obtain a new trial based on new evidence, a

defendant must establish:

    (1) the evidence was discovered after trial,

    (2) the failure to learn of the evidence was not caused by the defendant's lack of diligence,

    (3) the new evidence is not merely impeaching,

    (4) the new evidence is material to the principal issues involved, and

    (5) the new evidence is of such a nature that in a new trial it would probably produce an acquittal.

*United States v. Jordan*, 806 F.3d 1244, 1252 (10th Cir. 2015).  When it comes to newly discovered evidence, federal courts apply this five-prong test to weigh the interests of justice.  *United States v. Quintanilla*, 193 F.3d 1139, 1147 (10th Cir. 1999).  If the five-prong test were not applied to all new-trial motions, "defendants would have no diligence obligation and could keep an evidentiary trump card in the event of a conviction."  *Id.*

Here, Rudolph argues that because he recently discovered e-mails that purportedly show that Olmstead lied about Bianca Rudolph's ultimatum to her husband, the Court should grant a new trial.  (ECF No. 268 at 5.)  He requests a hearing on the matter.  (*Id.* at 14.)

With respect to the first and second prongs of the test, Rudolph states that the defense was recently made aware of an e-mail chain from August 2016 between Bianca Rudolph and Olmstead which, according to Rudolph, makes it "clear that Olmstead had not seen Bianca Rudolph in a very long time and that she knew nothing about the Rudolphs' upcoming 2016 safari trips—meaning the soul-bearing conversations Olmstead claimed she had with Bianca Rudolph **never happened**." (*Id.* at 7 (emphasis

in original).)  He relies on language in an e-mail in which Olmstead states that it has been "eons" since she and Bianca had communicated.  (*Id.* at 8.)  He also emphasizes that Olmstead asked where the Rudolphs were going, which he believes shows that if Olmstead's testimony was truthful, she would have known about the safari trip and would have spoken about it with Bianca Rudolph.  (*Id.* at 9.)

Further, Rudolph argues that the defense only learned of the e-mails after the trial, and the failure to learn of the evidence was not caused by a lack of diligence.  (*Id.* at 13.)  He states that Olmstead refused to speak with his defense team, which "did not have access to this six-year old email until it was provided to us after the trial." (*Id.* at 13–14 n.1.)

For the following reasons, the Court concludes that the e-mails that Rudolph describes as "newly discovered evidence" do not warrant a new trial.  Critically, as the Government points out, the evidence in question is not new.  (ECF No. 273 at 2.)  This fact alone warrants denial, as the Tenth Circuit has stated that evidence that was not newly discovered "clearly does not warrant a new trial."  *Quintanilla*, 193 F.3d at 1147.  Based on a review of the attached e-mails, the Court notes that they were forwarded from Bianca Rudolph's e-mail account to Rudolph's e-mail account on October 19, 2016, the week after she died in October 2016.  (ECF No. 268-1.)  As the Government emphasizes, the e-mails were in Rudolph's possession for six years before trial, Bianca Rudolph was dead when the e-mails were forwarded, and it is a reasonable assumption that Rudolph is "most likely the one who forwarded it to himself."  (ECF No. 273 at 3.)

Additionally, Rudolph has not established that the failure to learn of the e-mails was not caused by his lack of diligence.  Due diligence is measured by an objective

standard. *See In re M & L Bus. Mach. Co., Inc.*, 75 F.3d 586, 591 (10th Cir. 1996) (citing *In re United Ins. Mgmt., Inc.*, 14 F.3d 1380, 1385 (9th Cir. 1994)); *Folks v. State Farm Mut. Ins. Co.*, 299 F. App'x 748, 755 (10th Cir. 2008) (quoting *Sulca v. Allstate Ins. Co.*, 77 P.3d 897, 900 (Colo. App. 2003)) ("The requirement that a plaintiff use due diligence in discovering the relevant circumstances or events imposes an objective standard and does not reward denial or self-induced ignorance."). According to the Government, at the detention hearing in January 2022, defense counsel represented that he had known about the investigation into Rudolph for years and spent that time putting together their own evidence and hiring their own people. (ECF No. 273 at 3 (citing Detention Hr'g Tr. at 138, 142).) With years to perform research or hire others to do so, it can hardly be described as diligent to only closely search Rudolph's e-mails months *after* his conviction. Moreover, knowing the emphasis the Government would likely place on Olmstead's testimony, it is even further from being diligent for Rudolph's defense team not to search his e-mail accounts for correspondence specifically involving Olmstead.

In his reply, Rudolph attempts to explain the lack of due diligence, stating that his attorney "dedicated substantial effort and resources to investigate this complex overseas murder case in the few months they had to prepare for trial." (ECF No. 292 at 2.) He complains that Olmstead refused to communicate with his defense counsel and that his own detention made preparation for trial "extremely burdensome." (*Id.*) He states that the "defense did not have access to this six-year-old e-mail and had no reason to know of its existence until it was provided to us after the trial." (*Id.*) Again, Rudolph uses the passive voice to explain that the e-mail was "provided to him," but he

5

does not explain who provided it or when.

Having considered both parties' positions, in addition to the foregoing reasons, the Court also finds that the e-mails are merely impeaching and do not satisfy the third prong of the newly discovered evidence test. It is true that the e-mails could be used at trial to question Olmstead with respect to her assertions that she and Bianca Rudolph had seen each other recently and her general relationship with Bianca Rudolph. But it is possible that by using the phrase it has been "eons" since she had seen Bianca Rudolph, Olmstead was speaking colloquially. And given that Bianca Rudolph and her husband traveled frequently, it is not surprising that Olmstead asked where Bianca Rudolph and her husband were going.

Finally, while the e-mails are arguably material to the central issues involved in the case, the Court concludes that Rudolph has not met his burden to establish that they would probably produce an acquittal at a new trial. *See Jordan*, 806 F.3d at 1252; *accord United States v. Evans*, 42 F.3d 586, 593-94 (10th Cir. 1994) (new trial requires that evidence "preponderates heavily against the verdict"). As the Government highlights, while Olmstead's testimony was important, it was "far from the only piece of evidence." (ECF No. 273 at 5.) Moreover, the potential impeachment value of the e-mails is not necessarily so significant that it would even necessarily discredit Olmstead. Because Rudolph fails to convince the undersigned that he has met the high standard of likely producing an acquittal at a second trial based on the Olmstead e-mails, the Court concludes that a new trial is not warranted. Therefore, this portion of Rudolph's Motion is denied.

    b.    *Bianca Rudolph's Statements to Olmstead*

Rudolph argues for a third time that Bianca Rudolph's statements to Olmstead

should not have been admitted at trial under the forfeiture by wrongdoing doctrine. (ECF No. 268 at 14–19; *see also* ECF Nos. 150, 231.)  Milliron echoes his arguments. (ECF No. 269 at 7–8.)  The Government contends this portion of Rudolph's Motion is nothing more than a motion for reconsideration that challenges the undersigned's finding at trial that he was partly motivated to kill his wife to prevent her testimony in a future divorce proceeding as well as in his then-ongoing defamation litigation with Safari Club International.  (ECF No. 273 at 5.)

On July 25, 2022, the Court denied Rudolph's motion to exclude such testimony in a lengthy explanation on the record and reincorporates that reasoning here.  The Court has considered and reconsidered Rudolph and Milliron's arguments, both old and new, and finds no basis on which to reconsider its ruling admitting Olmstead's testimony reiterating Bianca Rudolph's statements to her.  Therefore, this portion of Rudolph's Motion and Milliron's Motion is denied.

  2. <u>Denial of Rudolph's Motions for Severance</u>

For the third time, Rudolph raises the issue of severance to the Court.  The Court denied his first motion to sever and his motion for reconsideration.  (ECF Nos. 103, 200.)  Rudolph raises primarily the same arguments as he did in his previous motions, adding some specific grievances related to the trial testimony of Anna Grimley and Rachel Anders.  (ECF No. 268 at 19–28.)  He again asserts that the denial of severance kept Milliron's crucial testimony from the jury and denied him the right to call a critical witness.  (*Id.* at 24.)

The Court has considered his arguments, both old and new, and finds no basis on which to reconsider its ruling denying severance.  Therefore, this portion of Rudolph's Motion is denied.

### 3. Signature on Post-Nuptial Agreement

Rudolph argues that the Government wrongfully suggested to the jury that the post-nuptial agreement was not signed by Bianca Rudolph even after learning that it was. (ECF No. 268 at 28.) According to Rudolph, the Government "misled the jury even though the forensic document examiner retained by Dr. Rudolph, Dianne Flores, reached the same conclusion as FBI forensic document examiner Rachel Clay." (*Id.*) He points out that each expert independently concluded that the signatures on Defense Exhibits RW and RX, originals of the post-nuptial agreement, were signed by Bianca Rudolph. (*Id.*) He posits that "because the post-nuptial agreement destroyed the Government's theory of the case, they attempted to discredit their own FBI handwriting expert on the stand and called a biased witness to introduce false hearsay statements about Dr. Rudolph allegedly forging Mrs. Rudolph's signature." (*Id.*) Rudolph also takes issue with the fact that the Government sent agents to Frank Langell's (who witnessed the signing of the post-nuptial agreement) home to allegedly "try to discredit the post-nuptial agreement." (*Id.*) In sum, Rudolph argues that although the Government could have "corrected its previous representations to the jury that the agreement was forged," it did not do so. (*Id.* at 29.)

In response, the Government argues that the authenticity of Bianca Rudolph's signature on the post-nuptial agreement remained a factual issue for the jury to decide, even after the defense offered its "Frank Langell surprise." (ECF No. 273 at 9.) The Government contends that the defense's decision to reveal Langell as the witness to the alleged post-nuptial agreement for the first time during Rudolph's testimony did not render the post-nuptial agreement indisputably authentic. (*Id.*)

The Court agrees. The Government points to competing trial testimony from

which the jury could reach different conclusions about the authenticity of Bianca Rudolph's signature on the post-nuptial agreement. For instance, Olmstead testified that Bianca Rudolph told her that Rudolph forged her signature on a document where she would get nothing from the divorce, and Alain Smith testified that Rudolph sought information about post-nuptial agreements long after the one in question had been signed. Moreover, Langell refused to speak to the Government when it sent local police to his house after learning he had witnessed the post-nuptial agreement. (*Id.* at 10.) The Government asserts that it learned from interviews with Rudolph's former dentistry partners that Langell had been fired for helping Rudolph embezzle money from the business and that he was loyal to Rudolph; this knowledge gave the Government reason to question the authenticity of Langell's assertion that he witnessed Bianca Rudolph sign the post-nuptial agreement. (*Id.*) And the Government does not dispute the testimony of its own forensic handwriting expert.

While there was competing trial testimony on the issue of the authenticity of Bianca Rudolph's signature on the post-nuptial agreement, at the very least, the Court finds that the Government had a reasonable belief that Bianca Rudolph's signature was a forgery, based on the testimony of Olmstead, Smith, and even Langell. Therefore, the Court finds that the Government did not fail to correct knowingly false representations to the jury and denies this portion of Rudolph's Motion.

   4.   Jury Instructions

Rudolph argues that the jury instructions improperly included a prejudicial reference to a stricken portion of the Superseding Indictment related to a crocodile incident that the Court previously excluded. (ECF No. 268 at 31.) For the purposes of this Order, the Court assumes the parties are familiar with the facts related to the

crocodile incident. In its Order Excluding Evidence Proffered by the Government Pursuant to Its Rule 404(b) Notice ("Rule 404(b) Order"), the Court explained that

> the introduction of evidence concerning the crocodile incident would impermissibly require the jury to make prohibited inferences about Rudolph's character, as well as to conclude that he has a propensity to commit insurance fraud at Chinyembe. . . . [T]he Court agree[d] with Rudolph that the introduction of the crocodile incident [would] confuse the issues and mislead the jury in contravention of Rule 403.

(ECF No. 153 at 7, 8.)

The challenged portion of the jury instructions is:

> MILLIRON provided false and misleading testimony to a grand jury sitting in the District of Colorado regarding . . . the circumstances of the accident that caused LAWRENCE RUDOLPH to lose part of his thumb.

(ECF No. 240 at 46.) Rudolph argues that because the Court only gave the parties 15 minutes to review the jury instructions prior to the charging conference, they did not catch this error. (ECF No. 268 at 31.) Milliron echoes Rudolph's arguments concerning the jury instructions' reference to Rudolph losing part of his thumb. (ECF No. 269 at 4.)

In its response, the Government agrees that it was an error to include the stricken language in the Superseding Indictment portion of the jury instructions. (ECF No. 273 at 13.) However, because the error is harmless, the Government contends that it does not warrant a new trial. (*Id.*)

For the following reasons, the Court agrees with the Government that the error was harmless as to both Rudolph and Milliron and does not warrant a new trial.

First, the prefatory language in the jury instruction reproducing the Superseding Indictment unambiguously explains to the jury that the indictment *is not evidence* and that the jury may not rely on anything said in it in determining guilt or weighing the

10

evidence:

> Remember, the Superseding Indictment is not evidence. You may not rely on anything said in the Superseding Indictment to find the defendants guilty on any charge, and you must not let the Superseding Indictment influence your weighing of the evidence. You are receiving the Superseding Indictment simply to help you understand what you are deliberating about when you consider each count.

(ECF No. 260 at 43–44.)

Second, and most important in the Court's view, because the jury had no evidentiary context for it, the language in the jury instructions about the incident in which Rudolph lost his thumb was harmless. The jury instructions do not discuss the crocodile incident at all, nor do they make any reference to Rudolph's application for and receipt of professional disability payments, or any of the circumstances and evidence demonstrating the allegedly fraudulent nature of the accident that were excluded in the Rule 404(b) Order. As the Court thoroughly explained, it was the risk of prejudice from the jury hearing detailed evidence of the crocodile incident that resulted in the exclusion of that evidence in the "interest of justice." (ECF No. 153 at 7–9.) No evidence concerning the crocodile evidence was introduced at trial to give the jury any possible context for the meaning behind the challenged language in the indictment, rendering the error harmless.

Finally, the Court turns to Milliron's specific objections to the introduction of the reference to the crocodile incident. While it is true that Milliron answered questions about the incident in her grand jury testimony, which was admitted at trial as Government Exhibit 71, as the Court just explained above, it is equally true that the incident was never discussed during testimony or in counsel's arguments; the Rule

11

404(b) Order prohibited any such discussion. Moreover, the Government correctly points out that even if a juror took the time to consider Government Exhibit 71 and hypothesize that Rudolph lied about the crocodile incident to earn insurance money—all of which is highly unlikely—that conclusion is no more harmful than Rudolph's own testimony in which he admitted to lying for money in his Safari Club International lawsuit. (ECF No. 273 at 14–15.) Defense counsel did not seek redaction of Government Exhibit 71; to the contrary, Milliron agreed to the admission of the exhibit, and the Court read a limiting instruction to the jury that the evidence could not be used against Rudolph.

Given the foregoing, the Court concludes that the inclusion of the reference to the crocodile incident in the jury instructions was harmless error and does not warrant a new trial.

**B.     Milliron's Motion for New Trial**

    1.     <u>Jury Instructions</u>

Milliron also argues that the inclusion of the unredacted reference to the crocodile incident mandates a new trial. (ECF No. 269 at 4–6.) For the same reasons explained in Part II.A.4, this portion of Milliron's Motion is denied.

    2.     <u>Counts 6 and 9</u>

Milliron concedes that her arguments concerning Counts 6 and 9 are merely a reassertion of her previous motions to dismiss and for judgment of acquittal. (ECF No. 269 at 6.) She again argues that the questions the Government asked her in front of the grand jury were ambiguous and required the jury to speculate about Rudolph's intent. (*Id.*) With respect to Count 6, she argues that the count charged that Milliron lied by not knowing "exactly why" Rudolph was generous to her. According to Milliron,

the question asked her to speculate on Rudolph's intent, and the jury received no evidence that she specifically was aware of "exactly why" Rudolph was generous to her. (*Id.*)  The Court has considered her arguments, both old and new, and finds no basis on which to reconsider its ruling denying dismissal of Count 6.  (ECF No. 111 at 7–10; ECF No. 152 at 7–9.)

With respect to Count 9, the Court denied Milliron's motion to dismiss Count 9 where she argued that her answers to the grand jury questions were literally true.  (ECF No. 111 at 12–13; ECF No. 152 at 10–11.)  In Count 9, she was charged with lying in response to questions that asked whether Rudolph proclaimed his innocence to her and what he said when he spoke to her about the FBI's investigation of his wife's death. Now, Milliron argues that the count alleged that she was untruthful by stating that Rudolph "probably did" proclaim his innocence.  (ECF No. 269 at 7.)  She contends that Count 9 further required her to speculate as to Rudolph's state of mind that he was "irritated that there was an FBI investigation because he felt he was innocent."  (*Id.*) Because, as Milliron argues, the question itself called for speculation by Milliron as to what Rudolph felt, it was improper and does not form the basis for a conviction.  (*Id.*)

In the Court's view, Milliron's arguments are without merit.  The questions in Count 9 do not call for her to speculate about how Rudolph felt; rather, they asked her to state what he said to her.  Such a response requires no speculation.  The Court finds that there was ample evidence from which the jury could conclude that she lied when she told the grand jury that Rudolph probably proclaimed his innocence to her and that he was irritated because he felt he was innocent.  Given the foregoing, the Court denies this portion of Milliron's Motion.

### 3. Cassandra Olmstead's Testimony

Milliron joins Rudolph's arguments for a new trial based on the alleged perjury of Olmstead. (ECF no. 269 at 7.) For the same reasons explained in Part II.A.1, this portion of Milliron's Motion is denied. Additionally, to the extent Milliron's arguments rely on the fact that Rudolph—not Milliron—possessed the e-mails for six years before trial, her arguments are similarly without merit.[2] While Milliron may satisfy the newness and due diligence prongs of the new trial test, she nonetheless fails to satisfy the third and fifth prongs of the test for the same reasons explained above—the e-mails are merely impeaching and would likely not lead to an acquittal if introduced at a new trial.

## III. CONCLUSION

For the reasons explained above, the Court ORDERS:

1. Defendant Lawrence Rudolph's Motion for New Trial Pursuant to Rule 33 (ECF No. 268) is DENIED; and

2. Defendant Lori Milliron's Motion for New Trial And for Judgment of Acquittal (ECF No. 269) is DENIED.

Dated this 10th day of April, 2023.

BY THE COURT:

_____
William J. Martínez
Senior United States District Judge

---

[2] Milliron does not raise this argument in her motion, and therefore the Court considers it waived. (ECF No. 269 at 7.) However, the Government raises the issue in its response, and the Court briefly addresses it for the sake of thoroughness. (ECF No. 274 at 1–2.)