No. _____

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

IN RE JULIAN RUDOLPH; ANABIANCA RUDOLPH; and THE ESTATE OF
BIANCA RUDOLPH,

Petitioners

Petition for a Writ of Mandamus Relating to An Order of the
U.S. District Court for the District of Colorado,
No. 1:22-cr-00012-WJM (The Honorable William J. Martinez)

**PETITION FOR WRIT OF MANDAMUS**

**Christopher P. Hotaling**
**Andrew A. Kaplan**
NIXON PEABODY LLP
70 West Madison, Suite 5200
Chicago, IL 60602-4378
Tel: 312.977.4418

**John R. Sandweg**
NIXON PEABODY LLP
799 9th Street NW, Suite 500
Washington, DC 20001-5327
Tel: 202.585.8189

*Attorneys for Petitioners*

# TABLE OF CONTENTS

Pages

**STATEMENT OF RELATED APPEALS** ........................................................1

**STATEMENT OF JURISDICTION** ...........................................................1

**STATEMENT OF ISSUE PRESENTED** .....................................................1

**STATEMENT OF THE RELIEF SOUGHT** .................................................1

**STATEMENT OF FACTS** ......................................................................3

**STANDARD OF REVIEW** .....................................................................9

**STATEMENT OF REASONS WHY THE WRIT SHOULD ISSUE** ..............10

**I.   The District Court Erred When It Determined that the Petitioners Were Not Victims.** ....................................................................................11

  A.   Dr. Rudolph's Conduct Directly and Proximately Deprived Petitioners of Their Mother's Life Insurance Proceeds. ...........................................11

  B.   The District Court's Reliance Entirely on the Indictment and Jury Verdict Was Erroneous. ..................................................................................13

  C.   The Universe of Victims of Fraud Is Larger Than Those Parties to Whom Specific Misrepresentations Are Made. ...............................................16

  D.   The District Court's Victim Analysis is Internally Inconsistent. ............19

**II.  The District Court Clearly Erred in its Reliance on the MVRA's Complexity Provision.** ......................................................................20

  A.   The District Court Cannot Rely on the "Complexity Provision" to Satisfy Its Duty to Analyze Petitioners' Victim Status. ....................................20

  B.   The District Court Did Not Engage in the Required Fact Finding or Balancing. ............................................................................................24

  C.   The Relevant Facts Are Not Complex. ................................................25

**III. The District Court's Conclusion that Petitioners Have Not Suffered a Loss Because There Is a Possibility that They Will Receive Funds from the Insurance Companies Was Also Clear Error.** ................................................29

**CONCLUSION** ........................................................................................31

**CERTIFICATE OF SERVICE** ..............................................................33

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS** ...35

**MANDAMUS APPENDIX** ....................................................................36

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Allied Chem. Corp. v. Daiflon, Inc.*,
   449 U.S. 33, 35 (1980) ........................................................................9

*In re Antrobus*,
   519 F.3d 1123 (10th Cir. 2008) .............................................................9

*Bittner v. United States*,
   143 S. Ct. 713 (2023) .........................................................................22

*In re Brown*,
   932 F.3d 162 (4th Cir. 2019) ........................................................24, 30

*Castro v. Ballesteros-Suarez*,
   213 P.3d 197 (Ariz. Ct. App. 2009)................................................12, 28

*Cont'l Bank and Trust Co. v. Maag*,
   285 F.2d 558 (10th Cir. 1960) ...........................................................12

*In re Doe*,
   57 F.4th 667 (9th Cir. 2023) ..............................................................10

*Eskridge v. Farmers New World Life Ins. Co.*,
   621 N.E.2d 164 (Ill. App. Ct. 1993) ..............................................12, 28

*Gallardo By and Through Vassallo v. Marstiller*,
   142 S. Ct. 1751 (2022)........................................................................22

*In re McNulty*,
   597 F.3d 344 (6th Cir. 2010) ..............................................................22

*Mut. Life Ins. Co. v. Armstrong*,
   117 U.S. 591 (1886)............................................................................12

*Provident Mut. Life Ins. Co. of Philadelphia v. Camerlin*,
   566 F. Supp. 1517 (W.D. Pa. 1983)...............................................12, 28

*In re Stewart*,
   552 F.3d 1285 (11th Cir. 2008) ..........................................................15

*United States v. Alisuretove*,
788 F.3d 1247 (10th Cir. 2015) .......................................10, 15, 16, 17

*United States v. Barton*,
366 F.3d 1160 (10th Cir. 2004) ................................................24

*United States v. Chin*,
965 F.3d 41 (1st Cir. 2020) ......................................................17

*United States v. Gallant*,
537 F.3d 1202 (10th Cir. 2008) ..........................................24, 25, 29

*United States v. Gushlak*,
728 F.3d 184 (2d Cir. 2013) ....................................................24

*United States v. Maldonado-Passage*,
4 F.4th 1097 (10th Cir. 2021) .................................................11

*United States v. Martinez*,
690 F.3d 1083 (8th Cir. 2012) .............................................25, 26

*United States v. Reifler*,
446 F.3d 65 (2d Cir. 2006) .....................................................26

*United States v. Speakman*,
594 F.3d 1165 (10th Cir. 2010) ...........................................11, 13

*United States v. Williams*,
10 F.4th 965 (10th Cir. 2021) ............................................17, 18

*In re Wild*,
994 F.3d 1244 (11th Cir. 2021) (*en banc*).................................10

**Statutes**

18 U.S.C. § 3231 .....................................................................1

18 U.S.C. § 3663 ....................................................................24

28 U.S.C. § 1651 ...................................................................1, 2

Ariz. Rev. Stat. Ann. § 14-2803(A)........................................28

Crime Victims' Rights Act, 18 U.S.C. § 3771 ................. 1, 2, 7, 8, 9, 11, 14, 22, 23

iv

Mandatory Victim Restitution Act, 18 U.S.C. § 3663A....... 3, 14, 21, 22, 24, 25, 26

**Other Authorities**

150 CONG. REC. S10910 (Oct. 9, 2004)...............................................10

Federal Rule of Appellate Procedure 21 ...............................................1, 2

**STATEMENT OF RELATED APPEALS**

No appeals related to the instant petition are pending.

**STATEMENT OF JURISDICTION**

The United States District Court for the District of Colorado had jurisdiction over this matter pursuant to 18 U.S.C. § 3231. Defendant Lawrence Rudolph and Defendant Lori Milliron were both convicted after a jury trial of offenses ranging from first degree overseas murder and wire fraud to being an accessory after the fact and perjury.

This writ of mandamus is brought pursuant to the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771(d)(3), Federal Rule of Appellate Procedure 21, and 28 U.S.C. § 1651.

**STATEMENT OF ISSUE PRESENTED**

Whether the district court erred when it concluded Petitioners were not the "victims" of defendant Dr. Lawrence Rudolph's crimes and thus precluded them from asserting and enforcing their right "to full and timely restitution as provided in law" before the district court. 18 U.S.C. §§ 3771(a)(6) and (d)(1).

**STATEMENT OF THE RELIEF SOUGHT**

Petitioners Julian Rudolph, AnaBianca Rudolph, and the Estate of Bianca Rudolph (hereinafter collectively "Petitioners") request that this Court, pursuant to

1

the CVRA, 18 U.S.C. § 3771 *et seq.*, the All Writs Act, 28 U.S.C. § 1651, and Fed. R. App. P. 21, issue a writ of mandamus directing the United States District Court for the District of Colorado to recognize their status as "victims" of the mail fraud offense for which their father, Dr. Lawrence Rudolph, stands convicted in the case of *United States v. Lawrence Rudolph, et al.*, 22 CR 12 (D. Colo.), and order the district court to allow Petitioners to assert and enforce all of the rights enumerated in that statute, including, but not limited to, the "right to full and timely restitution as provided in law." 18 U.S.C. § 3771(a)(6).

As established below, after their father murdered their mother Bianca Rudolph (an offense for which Dr. Rudolph also stands convicted), Dr. Rudolph deliberately obscured his role in her death and fraudulently submitted claims for, and then collected, over $4.8 million in life insurance proceeds on policies issued in Mrs. Rudolph's name. Had his role in Mrs. Rudolph's death been truthfully disclosed to the insurance companies, Dr. Rudolph would have been disqualified from enjoying the proceeds of those policies and the funds would instead have flowed properly to Petitioners as the contingent beneficiaries of those policies.

Despite their clear status as victims of their father's insurance fraud offense (and also undoubtedly his first degree murder offense), the district court erred when it found that Petitioners suffered no harm as a result of their father's fraud schemes against the various insurance companies, it failed to recognize them as

2

victims, and it denied them the right to request restitution from their father for improperly converting the proceeds of their mother's insurance policies. In doing so, the district court deprived Petitioners of their rights under both the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A, and the CVRA. Issuing the requested writ of mandamus will permit this Court to both preserve and protect Congress' long-stated goal of protecting the rights of crime victims and ensure that Petitioners have the right in the district court, through the restitution process, to seek to recover those assets their mother intended to serve as their lawful inheritance.

## STATEMENT OF FACTS

On or about October 11, 2016, Bianca Rudolph died from a single shotgun round to the chest while on a hunting trip with Dr. Rudolph in Zambia. Appx. to Mandamus Petn.[1] at 6-7. The news of Mrs. Rudolph's death devastated Petitioners Julian and AnaBianca, the Rudolphs' adult children, both of whom had always shared an incredibly close bond with their mother and were deprived of the opportunity to be with her when she passed or to say goodbye in the way they would have wanted. This pain was compounded when they later learned that Dr. Rudolph was under investigation for the murder of Mrs. Rudolph.

---

[1] References to the documents relevant to this petition will hereinafter be cited as "Mandamus Appx." Pinpoint citations refer to the page number in the consecutively paginated appendix attached hereto.

3

Throughout the investigation, which lasted approximately five years, Dr. Rudolph claimed to have played no part in Mrs. Rudolph's death. *Id.* at 7, 9, 11, 14. Almost immediately after Mrs. Rudolph's death, Dr. Rudolph began submitting claims for payment to seven life insurance companies in relation to nine policies in force on her life between October 31, 2016, and November 14, 2016. *Id.* at 12. Although Mrs. Rudolph largely designated Dr. Rudolph, or a family trust (the "Rudolph Trust"),[2] as the primary beneficiary on these insurance policies, she made sure her children were also specifically designated as the contingent beneficiaries on multiple of these policies, such that they became entitled to receive the proceeds on them should Dr. Rudolph predecease her or otherwise be disqualified (like what happened here). *See* Mandamus Appx. at 167; *see also, e.g.*, Mandamus Appx. at 292. Additionally, the Rudolph Trust, which is the primary beneficiary on five of the seven policies, provides for distribution of the trust property to Julian and AnaBianca in the event that Mrs. Rudolph and Dr. Rudolph are deceased or are otherwise prohibited from acting as beneficiaries. Mandamus Appx. at 199.

---

[2] Petitioners note that, Dr. Rudolph's disqualification as a result of his murder of Mrs. Rudolph notwithstanding, as the sole Trustee of the Rudolph Trust after Mrs. Rudolph's death, he was able to "distribute all of the net income" and "distribute as much of the principal … as he … request[ed]" of the Rudolph Trust to himself. Mandamus Appx. at 193-94.

4

In submitting the claims for payment, Dr. Rudolph again affirmed that Mrs. Rudolph's death was an accident. Mandamus Appx. at 16. Based on those representations, the insurance companies paid Dr. Rudolph, or the Rudolph Trust that Dr. Rudolph controlled, the proceeds of the various policies between January and March of 2017. *Id.* at 12. In total, Dr. Rudolph and/or the Rudolph Trust he controlled received approximately $4,877,744.93 from the seven life insurance companies. Mandamus Appx. at 32-33.

Nearly five years after murdering his wife and fraudulently submitting claims for the proceeds of her life insurance policies, Dr. Rudolph was arrested by federal law enforcement. On January 5, 2022, a federal grand jury returned an indictment against Dr. Rudolph charging him with one count of first degree overseas murder, in violation of 18 U.S.C. §§ 1111 and 1119, and one count of mail (insurance) fraud, in violation of 18 U.S.C. § 1341, Mandamus Appx. at 27-28; a superseding indictment was filed approximately one month later, Mandamus Appx. at 32-33.[3] A jury convicted Dr. Rudolph of both counts on August 1, 2022. Mandamus Appx. at 44.

After the jury trial was over, the Government moved the district court to order that Dr. Rudolph: (1) forfeit property identified as proceeds of his insurance

---

[3] The Superseding Indictment added Lori Milliron, Dr. Rudolph's girlfriend, as a co-defendant. She was charged with being an accessory after the fact as well as multiple counts of committing perjury and making false statements.

fraud offense and (2) pay mandatory restitution to the victims of his crimes. Motion for Mandatory Restitution and Forfeiture, Mandamus Appx. at 62-63. Paradoxically, although the U.S. Attorney's Office for the District of Colorado has expressly stated in publicly filed pleadings that Petitioners are "the victims of the crime," Mandamus Appx. at 57, in its Motion for Mandatory Restitution and Forfeiture the government mysteriously pivoted 180 degrees and improperly argued that the only victims of the mail fraud count charged in Count Two of the Superseding Indictment were the insurance companies that paid out on the claims submitted by Dr. Rudolph back in 2017, Mandamus Appx. at 69. On this point, the government is incorrect – the Petitioners also suffered a financial loss as, but for Dr. Rudolph's fraud, they would have received the proceeds of the life insurance policies and, as such, are also victims of this offense.

In an effort to remedy this serious error, Petitioners contacted the district court on January 9, 2023, seeking information as to how Petitioners could appear before the court and assert their rights as crime victims for restitution under the CVRA. The following day, the district court issued an order "question[ing] whether [Petitioners] … have standing to participate in the restitution portion of these proceedings" and instructing Petitioners "to file a motion requesting leave to file a response to the Government's Motion for Mandatory Restitution and

6

Forfeiture [] explain[ing] the legal basis for them to do so." Mandamus Appx. at 121-22.

Petitioners timely filed the requested motion on January 18, 2023, explaining how they were "directly and proximately harmed as a result of the commission of a Federal offense," 18 U.S.C. § 3771(e)(2)(A), because Dr. Rudolph's false statements diverted the life insurance proceeds to him and away from Petitioners. Mandamus Appx. at 125. The government filed its response on February 1, 2023, Mandamus Appx. at 256, and Petitioners filed their reply on February 8, 2023, Mandamus Appx. at 264.

On April 23, 2023, the district court issued a written opinion finding that, although the Petitioners were the victims of Count One, they were not victims of the insurance fraud offense in Count Two. Mandamus Appx. at 275. The district court's ruling with respect to Petitioners' crime victim status on Count Two is clearly erroneous.

In reaching this inaccurate conclusion, the district court reasoned that both the Superseding Indictment and its Final Jury Instructions "identify only the insurance companies as the victims of Rudolph's mail fraud" and that "there was no evidence presented at trial that Rudolph schemed to defraud [*Petitioners*]." *Id.* at 278-79 (emphasis in original). The district court further stated that it could not "extrapolate that the jury's verdict also contemplates that Rudolph intended to

defraud [Petitioners]" because Petitioners "did not receive fraudulent claims in the mail from Rudolph, nor did they make any payments to him based on the false claims." *Id.* at 279. The district court then found – summarily and without explanation – that it was "not the proper forum in which to" analyze the choice of law provisions of the applicable life insurance policies, "review, interpret, and apply the proper state 'slayer laws' to ascertain the proper beneficiaries of each policy," and "mak[e] a legal determination concerning whether [Petitioners] are indeed the proper beneficiaries of the insurance policies in question." *Id.* Finally, the district court incorrectly found that the Petitioners had not suffered a loss because "[t]hey can bring a claim against the insurers for any proceeds to which they believe they are entitled" and the government had posited that "there is nothing to suggest that the insurers will not provide those funds to the proper beneficiaries." *Id.* at 280.

Based on the foregoing, Petitioners file this petition, as specifically authorized by the CVRA. 18 U.S.C. § 3771(d)(3). In so doing, Petitioners request that this Court reverse the district court's order and direct the court below to provide them the recognition as crime victims they deserve and the right to seek the restitution that is rightfully theirs. The fraudulent misrepresentations that Dr. Rudolph made to the insurance companies did not change the fact that those companies were contractually obligated to pay out the proceeds on the policies in

8

Mrs. Rudolph's name. Instead, those misrepresentations simply changed to whom the funds were sent. But for Dr. Rudolph's conduct, Petitioners would have received the funds from the life insurance companies in the first instance; they are therefore "victims" under the plain language of the CVRA.

Petitioners have stipulated with the government to a period of seven (7) days for consideration by this Court, which stipulation the parties submit for approval to the Court.

## STANDARD OF REVIEW

As specifically provided in the clear language of the CVRA, Petitioners are seeking a writ of mandamus directed to the district court below. 18 U.S.C. § 3771(d)(3) ("If the district court denies the relief sought, the movant may petition the court of appeals for a writ of mandamus."). A writ of mandamus is appropriate "to confine an inferior court to a lawful exercise of its prescribed jurisdiction or *to compel it to exercise its authority when it is its duty to do so*." *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 35 (1980) (*per curiam*) (emphasis added). Although normally "mandamus is a 'drastic' remedy that is 'to be invoked only in extraordinary situations,'" *In re Antrobus*, 519 F.3d 1123, 1124 (10th Cir. 2008), Congress revised 18 U.S.C. § 3771(d)(3) in 2015 to expressly state that, unlike other mandamus actions, "the court of appeals shall apply ordinary standards of appellate review" to mandamus petitions filed pursuant to the CVRA. This revision

is certainly in keeping with the original intent of the statute, which is to "broadly defend the victims' rights" and to allow appellate courts "to remedy errors of lower courts" and "require[] them to do so for victim's rights." 150 CONG. REC. S10910, S10912 (Oct. 9, 2004) (statement of Sen. Kyl).

Because the district court's order turns on whether the Petitioners "suffered a loss directly or proximately caused by Rudolph's mail fraud," Mandamus Appx. at 281, the question raised by this request for a writ is a legal one. *See United States v. Alisuretove*, 788 F.3d 1247, 1256 (10th Cir. 2015) ("We review the district court's application of the MVRA *de novo*.") (quoting *United States v. Gallant*, 537 F.3d 1202 (10th Cir. 2008)). The "ordinary standard of appellate review" is therefore *de novo*. *See, e.g.*, *In re Doe*, 57 F.4th 667, 672 (9th Cir. 2023); *In re Wild*, 994 F.3d 1244, 1254 n.10 (11th Cir. 2021) (*en banc*).

## STATEMENT OF REASONS WHY THE WRIT SHOULD ISSUE

This Court should issue the requested writ of mandamus because the district court deprived Petitioners of their statutory rights by erroneously concluding that they are not "victims," as defined in the CVRA, of the mail fraud charged in Count Two of the Superseding Indictment of which Dr. Rudolph was convicted. As detailed below, contrary to the district court's decision, Dr. Rudolph's fraud directly and proximately deprived Petitioners of the proceeds of the life insurance

10

policies to which they were, and are, legally entitled, proceeds that the insurance companies were, and are, legally and contractually obligated to pay out.

## I. The District Court Erred When It Determined that the Petitioners Were Not Victims.

### A. Dr. Rudolph's Conduct Directly and Proximately Deprived Petitioners of Their Mother's Life Insurance Proceeds.

The CVRA defines a "crime victim" as any "person directly and proximately harmed as a result of the commission of a Federal offense." 18 U.S.C. § 3771(e)(2)A). This Court has looked to MVRA precedent when interpreting the CVRA because the definitions of "victim" are "virtually identical." *See United States v. Maldonado-Passage*, 4 F.4th 1097, 1102–03 (10th Cir. 2021) (citing *United States v. Speakman*, 594 F.3d 1165, 1171 n.3 (10th Cir. 2010)). Under both the MVRA and the CVRA, then, a victim is directly harmed where "a particular loss would not have occurred but for the conduct underlying the offense of conviction," and proximately harmed where "the causal connection between the conduct and the loss is not too attenuated (either factually or temporally)." *Speakman*, 594 F.3d at 1171.

Here, there can be little doubt that, but for Dr. Rudolph's misrepresentations to the insurance companies regarding the nature of his wife's death and his role in it, the proceeds of Mrs. Rudolph's policies would have been paid to Petitioners and not Dr. Rudolph. This is so because, under straightforward and longstanding

11

interpretations of both state "slayer" statutes and federal common law, Dr. Rudolph was immediately disqualified from benefitting from his wife's life insurance policies and Petitioners' interests were immediately elevated to benefit in his place. *See, e.g.*, *Mut. Life Ins. Co. v. Armstrong*, 117 U.S. 591, 600 (1886) ("It would be a reproach to the jurisprudence of the country if one could recover insurance money payable on the death of the party whose life he had feloniously taken."); *Cont'l Bank and Trust Co. v. Maag*, 285 F.2d 558, 560 (10th Cir. 1960) ("[E]xcept in instances involving controlling statutory provisions, [] when a beneficiary murders the insured he may not collect the policy proceeds."); *Castro v. Ballesteros-Suarez*, 213 P.3d 197, 205 (Ariz. Ct. App. 2009) ("[T]he Arizona Legislature specifically provided that a killer cannot profit from her wrong."); *Eskridge v. Farmers New World Life Ins. Co.*, 621 N.E.2d 164, 169 (Ill. App. Ct. 1993) ("Under section 2-6 of the [Illinois] Probate Act (section 2-6), a beneficiary is not entitled to the proceeds of a life insurance policy when he or she intentionally and unjustifiably causes the death of the insured."); *Provident Mut. Life Ins. Co. of Philadelphia v. Camerlin*, 566 F. Supp. 1517, 1521 (W.D. Pa. 1983) ("When the primary beneficiary has killed the insured, there is a strong public policy against allowing the killer to profit from the crime. It would also seem to be appropriate that the act of the killer not destroy the interest of the contingent beneficiaries who are the

12

*contemporary second choice* of the insured to receive the insurance proceeds.")
(emphasis in original).

There are also "no intervening causes" between Dr. Rudolph's conduct and
the harm suffered by Petitioners. *Speakman*, 594 F.3d at 1172. The causal chain
between Dr. Rudolph's misrepresentations to the insurance companies and loss
suffered by the Petitioners – not receiving the life insurance proceeds to which they
are legally entitled – is entirely unbroken. Dr. Rudolph failed to disclose his role in
the death of Mrs. Rudolph. Because Dr. Rudolph did not disclose this, the
insurance companies paid Dr. Rudolph the proceeds of those policies. If Dr.
Rudolph had disclosed his role in Mrs. Rudolph's death, those proceeds would
have flowed to Julian and AnaBianca Rudolph, either directly or through the
Rudolph Trust. There are thus no intervening causes, and Petitioners clearly meet
the definition of "victims" under the CVRA.

> **B.     The District Court's Reliance Entirely on the Indictment and Jury
> Verdict Was Erroneous.**

In its ruling below, the district court observed that "there was no evidence
presented at trial that Rudolph schemed to defraud [*Petitioners*]," that they "did not
receive fraudulent claims in the mail from Rudolph, nor did they make any
payments to him based on the false claims," and, as a result, erroneously concluded
that Petitioners are not victims of Dr. Rudolph's mail fraud because it could not

"extrapolate that the jury's verdict also contemplates that Rudolph intended to defraud [Petitioners]." Mandamus Appx. at 279, 281. The district court could not have gotten it more wrong as it hopelessly blurred the lines between questions surrounding a defendant's guilt or innocence of charges contained in an indictment and questions of victim status under the CVRA. While there is no doubt the jury was required to determine at trial whether Dr. Rudolph defrauded the insurance companies when he submitted false statements indicating his wife died by accident, the issue of whether Dr. Rudolph submitted false claims to Petitioners or whether they were fraudulently induced to make payments to their father is of no moment. In fact, it is nonsensical. Of course, they were not. But that is not the relevant or proper inquiry.

Under the MVRA, a "victim" is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered," 18 U.S.C. § 3663A(a)(2), regardless of whether they are named in a criminal indictment or identified in a court's jury instructions. The CVRA similarly defines "crime victim" to mean "a person directly and proximately harmed as a result of the commission of a Federal offense." 18 U.S.C. § 3771(e)(2)(A). The district court's decision, then, to deny that Petitioners are "victims" under both statutes because of its untethered indictment/jury instruction inclusion argument not only

flies in the face of the plain language of these laws but also this Court's controlling precedent.

Specifically, this Court addressed this very question in *United States v. Alisuretove*. Addressing the unambiguous language of the MVRA, this Court stated, "[q]uite clearly, this language does not limit the term 'victim' to any person or entity specifically listed in the charging document." *Alisuretove*, 788 F.3d at 1257 (citing *United States v. Dickerson*, 370 F.3d 1330, 1339 (11th Cir. 2004) ("[T]he courts have held that restitution may be ordered to a victim not named in the indictment, provided that the victim was 'directly harmed by the defendant's criminal conduct in the course of a scheme or conspiracy.'")); *see also In re Stewart*, 552 F.3d 1285, 1289 (11th Cir. 2008) (rejecting argument that petitioners were not victims because they were not named in charging documents because "[t]his argument implicitly and mistakenly assumes that any CVRA victim must be mentioned in the indictment or information."). Instead, "the term 'victim' encompasses 'any person directly harmed by the defendant's criminal conduct in the course of the scheme [or] conspiracy,'" regardless of whether or not the victims were identified by name in the superseding indictment. *Alisuretove*, 788 F.3d at 1257 (quoting 18 U.S.C. § 3663A(a)(2)).

Similarly, as in *Alisuretove*, the insurance companies named in the indictment are not the only parties directly harmed by the scheme for which Dr.

15

Rudolph was convicted. Indeed, the district court acknowledges this in its decision below. *See* Mandamus Appx. at 278 ("[T]he Superseding Indictment does not allege that Movants were victims with respect to Count 2; this, of course, is not dispositive of the instant issue.") (citing *United States v. Whipple*, 155 F. Supp. 3d 321, 324 (W.D.N.Y. 2015). Unfortunately, the district court did not follow its own counsel when it decided to base its victim status analysis almost entirely on what was included in the indictment, proven to the jury at trial, and argued by the government below. The district court does not appear to have engaged in the connected, but still distinct, analysis of the causal connection between Dr. Rudolph's *conduct* and the loss suffered by Petitioners. If it had, the district court would have concluded that it was "certainly conceivable" that Dr. Rudolph's scheme harmed not only the insurance companies named in the charging documents, but Petitioners as well. *See Alisuretove*, 788 F.3d at 1257-58. Instead, the district court's decision is based entirely on what was, and was not, presented to the jury at trial. The district court's analysis was therefore clearly in error.

C.   The Universe of Victims of Fraud Is Larger Than Those Parties to Whom Specific Misrepresentations Are Made.

Relatedly, the fact that "[Petitioners] did not receive fraudulent claims in the mail from Rudolph," Mandamus Appx. at 279, is not dispositive of whether Dr. Rudolph's conduct harmed Petitioners. As explained immediately above, the

"restitution analysis focuses on the causal relationship 'between the conduct and the loss,' not between the nature of the statutory offense and the loss." *United States v. Chin*, 965 F.3d 41, 59 (1st Cir. 2020); *see also Alisuretove*, 788 F.3d at 1257 ("Quite clearly, [the MVRA] does not limit the term 'victim' to any person or entity specifically listed in the charging document."). Accordingly, the universe of victims in fraud cases is often larger than simply the parties to whom specific misrepresentations were made and proven at trial. *Chin*, 965 F.3d at 58-59 (reversing lower court determination that restitution was not available to "patients and insurers" based on fact that "'misrepresentations' were made 'to the hospitals and clinics that purchased the drugs,' not to 'end-users and patients.'").

Indeed, this Court recently approved an order of restitution to Wells Fargo Bank, despite the defendant in that case having made no misrepresentations, or indeed, having no apparent relationship at all with that bank. *See United States v. Williams*, 10 F.4th 965, 969-70 (10th Cir. 2021). In *Williams*, the two victims, WebBank and Wells Fargo, were apportioned $936,828.28 and $210,000.00 in restitution, respectively. Wells Fargo received this amount even though defendant Williams made misrepresentations only to, and appears to have received money solely from, WebBank. *Id.* at 967-69. Further, Williams' "Plea Agreement [did not] identify by name any entities that qualify as a victim under the MVRA." *Id.* at 975. This Court nevertheless approved restitution to Wells Fargo because the

17

defendant's conduct proximately caused Wells Fargo to "suffer[] pecuniary losses totaling $210,000 ...." *Id.* at 969-70.

Petitioners certainly agree that the seven insurance companies in this case were defrauded by Dr. Rudolph, and that they may have been harmed as a result. For instance, the insurance companies may have incurred costs as a direct and proximate result of Dr. Rudolph's fraudulent conduct, such as legal and administrative fees. However, many of the insurance companies have expressly stated that the jury's verdict on Count Two of the Superseding Indictment did not alter their financial and contractual obligations to pay out the proceeds of Mrs. Rudolph's insurance policies to a lawful beneficiary. More specifically, undersigned counsel for Petitioners have attempted to make contact with all seven of the insurance companies who issued policies on Mrs. Rudolph's life. Of the seven, four companies have engaged in either oral or written discussions with counsel regarding their position as putative "victims" for purposes of receiving restitution in this matter. Most of the companies that have responded to Petitioners' queries have confirmed they were contractually required to make the payments under any circumstances other than suicide. *See, e.g.*, Mandamus Appx. at 148 Such statements clearly suggest that the payment of the $4,877,744.93 in insurance proceeds (or portions thereof) to Dr. Rudolph instead of Petitioners was not a harm

18

suffered by the insurance companies as a direct and proximate result of Dr. Rudolph's conduct as contemplated by the MVRA and the CVRA.

D.    The District Court's Victim Analysis is Internally Inconsistent.

Finally, the district court's analysis of victim status suffers from a fatal inconsistency of logic. On the one hand, the district court posits that only the insurance companies (and not Petitioners) are victims of Count Two of the Superseding Indictment because those companies are referenced in the language of the indictment as well as part of the court's charge to the jury. Mandamus Appx. at 279. Yet, in the same order, the district court states that Petitioners are identifiable victims of the murder offense charged in Count One of the Superseding Indictment. Mandamus Appx. at 275 n.1. But, under the district court's own logic, that cannot be the case because Petitioners are neither named as victims in the body of Count One of the Superseding Indictment, nor are they part of the court's instructions to the jury with respect to Count One. The district court cannot have it both ways. Either Petitioners are victims of Dr. Rudolph's crimes or they are not. The district court was correct on Count One, but incorrect on Count Two and no amount of mental gymnastics are enough to remedy the district court's statutory and analytical error.

Additionally, Petitioners note that the district court's decision creates a fundamental practical problem with regards to the insurance companies that

expressly do not view themselves as victims. These companies are not, and do not

feel, entitled to restitution because of their contractual obligation to pay these

claims regardless of Dr. Rudolph's conduct. *See, e.g.*, Mandamus Appx. at 148. As

a result, several of these companies have signaled that they have no intention to file

a claim for restitution, which begs the question to whom the district court intends

to return the seized insurance proceeds from these particular companies. It does not

belong to the government and Petitioners are best suited to advocate for the proper

disposition of these proceeds.

Therefore, this Court should grant the writ of mandamus and order the

district court to recognize Petitioner's rights as crime victims.

## II.    The District Court Clearly Erred in its Reliance on the MVRA's Complexity Provision.

### A.    The District Court Cannot Rely on the "Complexity Provision" to Satisfy Its Duty to Analyze Petitioners' Victim Status.

The district court's decision that Petitioners are not victims of Dr. Rudolph's

fraud appears to rest entirely on the fact that the charging documents and jury's

verdict did not reference Petitioners. For the reasons laid out immediately above,

that decision is clearly erroneous. However, having apparently determined that

Petitioners are not victims, the district court, without explanation, goes on to state

that:

> making a legal determination concerning whether [Petitioners] are indeed the proper beneficiaries of the insurance policies in question would require the Court to review and interpret those policies and answer various choice of law questions, so it can then review, interpret, and apply the proper state "slayer laws" to ascertain the proper beneficiaries of each policy.

Mandamus Appx. at 279.

It is unclear to Petitioners why the district court included this language, much less its note that "[Petitioners] concede that the Court might have to make such determinations without acknowledging that this is not the proper forum in which to do so." *Id.* at 279 n.5.

Petitioners' best guess is that the district court is referring to section (c)(3)(B) of the MVRA, which provides that restitution is not mandatory where "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3)(B). However, to the extent that the district court relied on this "complexity provision" for support of its determination that Petitioners are not "victims" as defined in the CVRA and MVRA, such reliance is entirely unfounded.

As detailed above, in determining whether someone is a "victim," a district court must examine the facts underlying the conduct for which the defendant was convicted and then "determine, based on those facts, whether any person or

persons were 'directly and proximately harmed as a result of the commission of [that] Federal offense.'" *See, e.g.*, *In re McNulty*, 597 F.3d 344, 351 (6th Cir. 2010). Nothing in the CVRA permits a district court to forego this analysis simply because it might have to review insurance policies and analyze state laws. The district court's attempt to justify its failure to conduct even the merest of inquiries into Petitioners' status as victims cannot be excused.

The absence of language in the CVRA mirroring the MVRA's "complexity provision" further evinces the district court's error in referencing that provision. It is well settled that "[w]hen Congress includes particular language in one section of a statute but omits it from a neighbor, we normally understand that difference in language to convey a difference in meaning (*expressio unius est exclusion alterius*)." *Bittner v. United States*, 143 S. Ct. 713, 720 (2023). Courts "must give effect to, not nullify, Congress' choice to include limiting language in some provisions, but not others." *Gallardo By and Through Vassallo v. Marstiller*, 142 S. Ct. 1751, 1759 (2022). Here, Congress chose to include language limiting mandatory restitution in the MVRA in cases of extreme complexity, 18 U.S.C. § 3663A(c)(3)(B), and but it chose to *not* include such limiting language in the CVRA, 18 U.S.C. § 3771, which affords victims a panoply of rights including, *but not limited to*, restitution. Indeed, the only provision that could reasonably be considered "limiting language" in the CVRA is section (d)(2), which provides that

22

"[i]n a case where the court finds that the *number* of crime victims makes it impracticable to accord *all* of the crime victims the rights described in subsection (a), the court shall fashion a reasonable procedure to give effect to this chapter that does not unduly complicate or prolong the proceedings." 18 U.S.C. § 3771(d)(2) (emphasis added). The utter lack of any reference to complexity in the CVRA, particularly when compared to the MVRA's "complexity provision," clearly establishes that the district court erred in relying on that provision to excuse its failure to thoroughly analyze whether Petitioners were directly and proximately harmed as a result of Dr. Rudolph's fraud.

The district court's vague decision also forces Petitioners to speculate as to why the court below felt it "is not the proper forum in which to" analyze the insurance policies from which defendant Dr. Rudolph benefitted in violation of the applicable state "slayer laws." Mandamus Appx. at 279 n.5. To the extent that the district court relies on the "complexity provision" of the MVRA to deny Petitioners their rights as "victims" under *both* the MVRA and the CVRA, such reliance is in error. The district court cannot be allowed to hide its failure to conduct the requisite inquiry behind the limited language of the MVRA's "complexity provision."

B.    The District Court Did Not Engage in the Required Fact Finding or
Balancing.

Assuming, *arguendo*, that the district court could rely on the MVRA's
"complexity provision," it nevertheless failed to conduct the required balancing
test. Before denying a victim restitution due under the MVRA, district courts must
analyze the potential burden on the sentencing process presented by complex facts
and then balance that burden against the need to provide restitution to a victim.
*Gallant*, 537 F.3d at 1254 ("Section 3663A(c)(3)(B) directs sentencing courts to
weigh the victim's need for restitution against the burden on the sentencing
process."); *In re Brown*, 932 F.3d 162, 173-74 (4th Cir. 2019) ("[A] court must (1)
make fact findings specific to two statutory factors—'the need to provide
restitution to a victim,' and 'the burden on the sentencing process posed by
determining complex issues of fact'—and (2) then explicitly balance these two
factors.");[4] *United States v. Gushlak*, 728 F.3d 184, 193 (2d Cir. 2013)
(3663A(c)(3)(B) analysis "requires a detailed understanding of and sensitivity to
the facts of each case"); *c.f. United States v. Barton*, 366 F.3d 1160, 1166 (10th
Cir. 2004) (where defendant did not object to restitution request by victim, there
was "no need under the MVRA for a district court to engage in any additional fact

---

[4] We note that 18 USC § 3663A(c)(3)(B), the statutory subsection applicable in the
instant case, contains substantively the same language as 18 U.S.C. §
3663(a)(1)B)(ii), the statute cited by the Fourth Circuit in *In re Brown*.

24

finding with respect to the proper amount or type of restitution" and "invoke the §

3663A(c)(3)(b) exception") (internal quotations omitted).

The district court's mere handwaving that it would need to "review and

interpret [the relevant life insurance] policies and answer various choice of law

questions, so that it can then review, interpret, and apply the proper state 'slayer

laws' to ascertain the proper beneficiaries of each policy," Mandamus Appx. at

279, clearly does not suffice. The district court plainly failed to weigh the

Petitioners' "need for restitution against the burden on the sentencing process," let

alone conduct any serious inquiry into the potential burden on the sentencing

process. *Gallant*, 537 F.3d at 1254. This failure constitutes a fundamental error that

further dooms this portion of the district court's ruling below.

C.    The Relevant Facts Are Not Complex.

Moreover, had the district court actually engaged in the balancing required

by 18 U.S.C. § 3663A(c)(3)(B), it surely would have concluded that Petitioners'

need for restitution vastly outweighs any burden on the sentencing process. The

"complexity provision" is used quite infrequently by courts, and generally only in

cases of extreme complexity. For example, in *United States v. Martinez*, the Eighth

Circuit affirmed the district court's decision to apply the "complexity provision" in

a case where Martinez, the Chief Financial Officer of a food company, "used

various nefarious methods to enhance the apparent financial status" of the

company in order to borrow increasing sums of money from U.S. Bank. 690 F.3d 1083, 1085 (8th Cir. 2012). By the time U.S. Bank discovered the fraud and froze the line of credit, Martinez's company "owed U.S. Bank in excess of $55 million." *Id.* at 1086. When the company eventually filed for bankruptcy, "it owed U.S. Bank a little over $28 million," all but approximately $2.8 million of which U.S. Bank was able to recover from collateral. *Id.* The district court found, and the Eighth Circuit agreed, that the calculation of the amount the defendant owed to U.S. Bank was too complex because the company "was going out of business regardless of Martinez's fraud and [] U.S. Bank would have had the same difficulty recovering funds lent to [the company] absent the fraud." *Id.* at 1089. Further, the "district court stated that it would be necessary to subpoena numerous additional witnesses in order to determine what amount of the unrecovered loan proceeds were attributable to the fraud." *Id.* Similarly, the Second Circuit in *United States v. Reifler* suggested that § 3663A(c)(3)(B) may apply in a case "ar[ising]out of a lengthy securities-fraud investigation … culminating in the [] arrests of approximately 120 persons … and the filing of more than a score of indictments and criminal complaints." 446 F.3d 65, 71 (2d Cir. 2006). The defendants in *Reifler* "engaged in a scheme to bribe officials of unions to invest pension fund assets in corrupt investment vehicles" that included pocketing "substantial sums from excessive commissions generated by the churning of securities in a corrupt

26

hedge fund" and covering the fact that they "retain[ed] some 10–20 percent of the amount that each pension fund meant to invest" using a Ponzi scheme. *Id.* at 71. The Second Circuit concluded that the "complexity provision" might be applicable to certain victims because of the extreme difficulty in determining when, and why, those victims bought and sold the applicable securities. *Id.* at 135-36.

Unlike the above examples, the life insurance policies at issue in this matter are straightforward, industry standard contracts that clearly require the insurance companies to pay out the proceeds of the policies under any circumstances other than suicide.[5] The policies also contain simple choice of law provisions that point to specific states, namely Arizona, Illinois, and Pennsylvania. *See, e.g.*, Mandamus Appx. at 291 ("This policy is subject to the laws of the state where the application is signed."). Each of those states has nearly-identical Slayer Statutes that expressly prohibit Dr. Rudolph from benefitting from his wife's life insurance policies and, more importantly, provide for Petitioners to step in to benefit in his place. For example, Arizona's Slayer Statute states that a person "who feloniously and intentionally kills the decedent forfeits all benefits ... with respect to the decedent's estate, including an intestate share, an elective share, an omitted

---

[5] As noted above, Petitioners sought to introduce information about the insurance policies and the underlying contracts into the record but were precluded from doing so due to the nature of the district court's order requiring them to explain specifically why they had "standing to participate in the restitution portion of [the] proceedings." *See* Mandamus Appx. at 121-22.

spouse's or child's share, a homestead allowance, exempt property and a family allowance." Ariz. Rev. Stat. Ann. § 14-2803(A).

Moreover, the analysis necessary to conclude that the Petitioners are entitled to the proceeds of these insurance claims is neither difficult nor without precedent. Numerous federal and state courts have drawn similar conclusions. *See Castro*, 213 P.3d at 205 ("[T]he Arizona Legislature specifically provided that a killer cannot profit from her wrong."); *Eskridge*, 621 N.E.2d at 169 ("Under section 2-6 of the [Illinois] Probate Act (section 2-6), a beneficiary is not entitled to the proceeds of a life insurance policy when he or she intentionally and unjustifiably causes the death of the insured."); *Provident Mut. Life Ins. Co. of Philadelphia*, 566 F. Supp. at 1521 ("When the primary beneficiary has killed the insured, there is a strong public policy against allowing the killer to profit from the crime. It would also seem to be appropriate that the act of the killer not destroy the interest of the contingent beneficiaries who are the *contemporary second choice* of the insured to receive the insurance proceeds.") (emphasis in original).

The required analysis in the instant case would be relatively simple and straightforward, and certainly would not be complex enough to outweigh the Petitioners' right to restitution. Indeed, this analysis is further simplified by the fact that there are no other claimants to the life insurance proceeds. The district court therefore need only choose whether the proceeds should go to Dr. Rudolph, who is

plainly disqualified from benefitting, the Rudolph Trust (for which Petitioners are the sole beneficiaries), or Petitioners directly as specifically named contingent beneficiaries. Moreover, given that the sentencing hearing in the case is not scheduled until June 21, 2023, Mandamus Appx. at 281, there is ample time for the district court to engage in an analysis of the policies, their choice of law provisions, and the applicable slayer statutes without overly burdening or unduly delaying the sentencing process. The district court thus clearly erred in refusing to acknowledge Petitioners' status as victims and, thus, permitting them to assert their right to seek restitution of the $4.8 million in life insurance proceeds.

**III.    The District Court's Conclusion that Petitioners Have Not Suffered a Loss Because There Is a Possibility that They Will Receive Funds from the Insurance Companies Was Also Clear Error.**

The district court also incorrectly found that "even if [Petitioners] are entitled to the life insurance proceeds as contingent beneficiaries, they have suffered no loss because [Petitioners] may be able to obtain the funds to which they are entitled through alternate means." *Id.* at 280. Although "the availability of other relief is … not necessarily irrelevant to the availability" of a restitution award, a "district court should not place great weight on this factor. The mere fact that a victim has filed a civil suit, or the possibility that the victim could in the future file such a suit, is of little—and, typically, *no*—relevance." *Gallant*, 537 F.3d at 1254 (emphasis in original). Indeed, this Court's sister circuit recently

rejected a district court determination that was overly reliant on the availability of a possible civil remedy in *In re Brown*. There, movant Brown sought restitution for injuries directly and proximately caused by the defendant in a car accident. The defendant argued that "the issue of restitution would all get flushed out in the civil proceedings through discovery where it should be flushed out" and the district court agreed, in part, because the forum was "much less equipped to handle situations like this than a civil proceeding." 932 F.3d at 167, 173. The Fourth Circuit disagreed, finding that while a district court "may consider, among other factors, the availability of alternative civil remedies[,]" that "is merely one factor for the court to balance and should not be the controlling factor in and of itself." *Id.* at 175 (citing *Gallant*, 537 F.3d at 1254).

Petitioners concede that the district court was not wrong to consider the possibility that alternative avenues to obtaining the funds that are rightfully theirs may exist. However, the district court erred by concluding, without considering any other factors, that those alternative avenues automatically preclude Petitioners from seeking or receiving restitution in the case at bar. The district court was permitted to consider the possibility that Petitioners might recover the funds by means other than restitution, but only as a single point weighed against other factors salient to the statutory requirement to provide Petitioners, as victims, with a means to assert their right to restitution. Merely concluding in summary fashion

30

that Petitioners were not harmed, and restitution was not warranted, because Petitioners may still be able to recover through civil litigation was a clear error.

## **CONCLUSION**

The conduct for which Dr. Rudolph was convicted "directly and proximately" harmed Petitioners. As a result, Petitioners are "crime victims" of both offenses within the meaning of the CVRA and the MVRA. This Court should therefore issue a writ of mandamus directing the district court to recognize Petitioners as such and ordering the district court to provide Petitioners with a right to be heard so they may assert and enforce their right to full restitution as provided by law.

Dated: May 12, 2023

PETITIONERS' COUNSEL

/s/ *Christopher P. Hotaling*
Christopher P. Hotaling (IL Bar #6272432)
Andrew A. Kaplan (IL Bar #6329901)
NIXON PEABODY LLP
70 West Madison, Suite 5200
Chicago, IL 60602-4378
Tel:   312.977.4418
Fax:   833.968.0535

/s/ *John R. Sandweg*
John R. Sandweg (DC Bar #1027208)
NIXON PEABODY LLP
799 9th Street NW, Suite 500
Washington, DC 20001-5327
Tel:   202.585.8189
Fax:   877.743.5914

## CERTIFICATE OF SERVICE

I certify that on May 12, 2023, I caused a true and accurate copy of the foregoing document to be electronically filed with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit through the CM/ECF system. I further certify that on the same date I served a true and accurate copy of the foregoing document on the case participants below by email:

UNITED STATES ATTORNEY'S OFFICE FOR THE DISTRICT OF COLORADO
Kurt J. Bohn
Bryan David Fields
Edwin Garreth Winstead , III
Justin Bishop Grewell
1801 California Street Suite 1600
Denver, CO 80202
kurt.bohn@usdoj.gov
bryan.fields3@usdoj.gov
garreth.winstead@usdoj.gov
bishop.grewell@usdoj.gov

*Counsel for the United States*

MARKUS/MOSS PLLC
Anita Margot Moss
David Oscar Markus
Lauren I. Doyle
40 NW Third Street
Miami, FL 33128
mmoss@markuslaw.com
dmarkus@markuslaw.com
ldoyle@markuslaw.com

*Counsel for Defendant Lawrence Rudolph*

JOHN W. DILL P.A.

33

John W. Dill
941 West Morse Boulevard Suite 100 Winter Park, FL 32789-3781
John@JohnWDill.com

*Counsel for Defendant Lori Milliron*

I hereby further certify that on May 12, 2023, a true and accurate copy of the

foregoing document was served on the following by U.S. mail:

The Honorable William J. Martinez
United States District Court Judge for the District of Colorado
Alfred A. Arraj United States Courthouse
901 19th Street
Denver, CO 80294

Dated: May 12, 2023

<u>/s/ *Christopher P. Hotaling*</u>
Christopher P. Hotaling
*Attorney for Petitioners*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.    This document complies with the word limit of Fed. R. App. P. 21(d)(1) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this petition contains 7,286 words based on the word-count function of Microsoft Word.

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: May 12, 2023

/s/ *Christopher P. Hotaling*
Christopher P. Hotaling
*Attorney for Petitioners*

No. _____

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

IN RE JULIAN RUDOLPH; ANABIANCA RUDOLPH; and THE ESTATE OF
BIANCA RUDOLPH,

Petitioners

Petition for a Writ of Mandamus Relating to An Order of the
U.S. District Court for the District of Colorado,
No. 1:22-cr-00012-WJM (The Honorable William J. Martinez)

**MANDAMUS APPENDIX**

**Christopher P. Hotaling**
**Andrew A. Kaplan**
NIXON PEABODY LLP
70 West Madison, Suite 5200
Chicago, IL 60602-4378
Tel: 312.977.4418

**John R. Sandweg**
NIXON PEABODY LLP
799 9th Street NW, Suite 500
Washington, DC 20001-5327
Tel: 202.585.8189

*Attorneys for Petitioners*

## TABLE OF EXHIBITS

| Exhibit Number | Name of Document | Docket Number | Page Number |
|---|---|---|---|
| 1 | Superseding Criminal Complaint | 4 | 1 |
| 2 | Indictment | 26 | 26 |
| 3 | Superseding Indictment | 53 | 31 |
| 4 | Verdict Form | 247 | 43 |
| 5 | Motion for Revocation of Defendant's Order of Release Pursuant to 18 U.S.C. § 3148 and Application for Arrest Warrant as to Lori Milliron | 256 | 48 |
| 6 | Motion for Mandatory Restitution and Forfeiture | 296 | 61 |
| 7 | Order | 317 | 120 |
| 8 | Motion for Leave to File Response to Government's Motion for Mandatory Restitution and Forfeiture | 319 | 125 |
| 9 | United States' Response to Movants' Motion for Leave to File Their Response to Government's Motion for Mandatory Restitution and Forfeiture | 325 | 255 |
| 10 | Movants' Response to The Government's Response to Movants' Motion for Leave to File Their Response to Government's Motion for Mandatory Restitution and Forfeiture | 329 | 263 |
| 11 | Order Denying Movants' Motion for Leave to File Their Response to Government's Motion | 344 | 274 |

| Exhibit Number | Name of Document | Docket Number | Page Number |
|---|---|---|---|
| | for Mandatory Restitution and Forfeiture | | |
| 12 | Ameritas Term Life Policy Number T00017578A | N/A | 283 |

# **MANDAMUS**

# **EXHIBIT 1**

# UNITED STATES DISTRICT COURT

for the

District of Colorado

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | |
| LAWRENCE RUDOLPH | ) | Case No. 1:21-mj-00209-MEH |
| | ) | |
| _Defendants_ | ) | |
| | ) | |

## SUPERSEDING CRIMINAL COMPLAINT

I, Donald Peterson, the complainant in this case, state that the following is true to the best of my knowledge and belief:

**COUNT 1:** On or about January 18, 2017, within the State and District of Colorado and elsewhere, the defendant LAWRENCE RUDOLPH, having devised and intended to devise a scheme and artifice to defraud and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property, for the purpose of executing such scheme and artifice did knowingly deliver and cause to be delivered by means of commercial interstate carrier, namely Federal Express, according to the direction thereon, a matter and thing, namely a package containing documents related to a claim for life insurance.
All in violation of Title 18, United States Code, Sections 1341

**COUNT 2:** On or about October 11, 2016, the defendant LAWRENCE RUDOLPH, being a national of the United States as defined by the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(22), willfully, deliberately, maliciously, and with premeditation and malice aforethought, unlawfully killed Bianca Rudolph, a national of the United States as likewise defined by the Immigration and Nationality Act, while she was outside the United States but within the jurisdiction of another country.
All in violation of Title 18, United States Code, Sections 1119 and 1111

| _Code Sections_ | _Offense Description_ |
|---|---|
| 18 U.S.C. § 1341 | Mail Fraud |
| 18 U.S.C. §§ 1119 and 1111 | Foreign Murder |

This criminal complaint is based on these facts:

See Affidavit attached hereto and herein incorporated by reference.

**X** Continued on attached sheet.

_s/ Donald Peterson_

_Complainant's signature_

Donald Peterson, FBI Special Agent

_Printed name and title_

Sworn to before me and: ☐ signed in my presence.
☒ submitted, attested to, and acknowledged by reliable electronic means.

Date: December 22, 2021

_Judge's signature_

City and state: Denver, CO

Hon. Scott T. Varholak, U.S. Magistrate Judge

_Printed name and title_

2

DEFENDANT:          LAWRENCE RUDOLPH

YOB:                1955

ADDRESS (CITY/STATE):  Paradise Valley, AZ

OFFENSE(S):         **Count 1:** Mail Fraud (18 U.S.C. § 1341)
                    **Count 2:** Foreign Murder 18 U.S.C. § 1119


LOCATION OF OFFENSE (COUNTY/STATE): Arapahoe/Colorado

PENALTY:    **Count 1:** NMT 20 years' imprisonment; NMT $250,000 fine (or 2x the gain or loss, whichever is great), or both a fine and imprisonment; NMT 3 years' supervised release; $100 special assessment.

            **Count 2:** NLT life imprisonment or death; NMT $250,000 fine or both; $100 Special Assessment

AGENTS:             FBI SA Donald Peterson
                    FBI SA Scott Dahlstrom
                    Rocky Mountain Safe Streets Task Force Officer Shawna Gilbert

AUTHORIZED BY:  Bryan David Fields
                Assistant U.S. Attorney

ESTIMATED TIME OF TRIAL:

_____ five days or less    __X__ over five days    _____ other

THE GOVERNMENT

__X__ will seek detention in this case    _____ will **not** seek detention in this case

The statutory presumption of detention **is** or **is not** applicable to this defendant. **(Circle one)**

OCDETF CASE:    _____ Yes    __X__    No

3

**AFFIDAVIT IN SUPPORT OF SUPERSEDING CRIMINAL COMPLAINT**

I, Donald Peterson, Special Agent of the Federal Bureau of Investigation ("FBI"), being duly sworn, depose and state under penalty of perjury that the following is true to the best of my information, knowledge and belief.

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a superseding criminal complaint alleging that United States National LAWRENCE RUDOLPH murdered his wife, United States National Bianca Rudolph (Finizio), outside the United States and in the jurisdiction of Zambia, on October 11, 2016, in violation of 18 U.S.C. §§ 1119 and 1111, and then used an interstate commercial carrier as part of a scheme to defraud life insurance companies and to obtain money and property from them through the false and fraudulent pretense, representation, and promise that the death was an accident, in violation of 18 U.S.C. § 1341.

2.      I am currently employed as a Special Agent of the FBI assigned to the Denver Division's Rocky Mountain Safe Streets Task Force (RMSSTF). I have been an FBI Special Agent for nearly 17 years since graduating from the FBI Academy in Quantico, Virginia in January of 2005. Since graduating from the Academy, I have participated in numerous criminal investigations. These investigations have utilized physical and electronic surveillance, financial analysis, interviews, surreptitious recordings, undercover operations, search warrants, arrests, confidential human sources, seizure and analysis of computer and cellular telephone information, and various other techniques. During my career with the FBI, I have investigated violent criminal enterprises, gangs, drug offenses, weapons violations, civil rights matters, robberies, homicides, and other federal crimes. I am one of the primary Case Agents for this investigation, and as such, I am familiar with the facts of the case.

1

3.      For the reasons set forth in more detail below, I submit that there is probable cause to believe LAWRENCE RUDOLPH murdered his wife Bianca Rudolph, with premeditation, while the two were on a hunting trip in Zambia on October 11, 2016, in such a manner that he could falsely claim the death was the result of an accident.

4.      The facts set forth in this affidavit are based on my personal knowledge as a Case Agent, knowledge obtained from other individuals including law enforcement personnel, and my review of documents, reports and other evidence.  Except as explicitly set forth below, I have not distinguished in this affidavit between facts of which I have personal knowledge and facts of which I have hearsay knowledge.  The information contained within this affidavit does not represent every fact learned by law enforcement during the course of the investigation.  Rather, I have only included information sufficient to establish probable cause for the requested criminal complaint.

**THE RUDOLPHS' MARRIAGE**

5.      LAWRENCE RUDOLPH (LAWRENCE) and Bianca Rudolph (Bianca) were each born in the United States and were at all times material to this affidavit, citizens of the United States as defined by the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(22).

6.      LAWRENCE RUDOLPH first met Bianca Finizio when LAWRENCE was in dental school and Bianca was in an undergraduate program at the University of Pittsburgh.  They were married in approximately 1982.  LAWRENCE started a dental practice at approximately the same time.  Bianca initially worked in the dental office, but later had less involvement in the practice after the couple had two children.  After becoming disabled in approximately 2006, LAWRENCE separated from his partners and started a new group of dental offices known as Three Rivers Dental.  These offices are still in business and an adult child of the RUDOLPHS now works

2

at the offices as a dentist.

7.      LAWRENCE RUDOLPH and Bianca Rudolph often spent time traveling and hunting.  As time went by these trips became more frequent, with hunting trips to Africa and other countries being common for them.  Prior to meeting LAWRENCE, Bianca did not have hunting experience.  As Bianca's relationship with LAWRENCE developed over the years, she began hunting with him and she became a well-respected international hunter.  Friends and relatives interviewed by the FBI said Bianca appeared to enjoy hunting and was an accomplished hunter.  During their marriage, the RUDOLPHS were both active members of a prominent hunting organization.  At times Bianca would travel and hunt without LAWRENCE present.

8.      Approximately four years prior to Bianca Rudolph's death, the RUDOLPHS moved from Pennsylvania to Arizona.  The dental practices of LAWRENCE RUDOLPH remained in Pennsylvania.  LAWRENCE traveled back and forth between Pennsylvania and Arizona regularly for business.

**BIANCA RUDOLPH'S DEATH**
**AND THE INVESTIGATION BY THE ZAMBIAN POLICE SERVICE**

9.      During 2016, the RUDOLPHS traveled to Zambia multiple times.  Their final trip to Zambia was scheduled to take place between September 27, 2016, and October 11, 2016.  Bianca Rudolph's goal during the trip was to kill a leopard.  She was unsuccessful in killing a leopard but did kill numerous other animals during the trip.  LAWRENCE RUDOLPH was present for the hunt, but he was not actively hunting.  The RUDOLPHS took two guns with them for the hunt: a Remington .375 Rifle and a Browning 12-gauge shotgun.

10.      On October 11, 2016, at approximately 5:30 a.m. local time, the RUDOLPHS were packing to leave their hunting camp in Kafue National Park, Zambia, when Bianca Rudolph

3

was shot in the chest with the Browning shotgun.  The Zambian Police Service was notified of

the death and performed an investigation that included interviewing LAWRENCE RUDOLPH,

PROFESSIONAL HUNTING GUIDE, whose identity is known to me, and ZAMBIAN GAME

SCOUT, whose identity is also known to me.

11.     LAWRENCE RUDOLPH told Zambian Police in sum and substance and in

pertinent part that he was in the bathroom of their cabin and Bianca Rudolph was in the bedroom

area when LAWRENCE heard a gunshot.  LAWRENCE came out of the bathroom to find

Bianca lying on the floor bleeding from the chest.  LAWRENCE tried to resuscitate Bianca but

was unsuccessful.  LAWRENCE told the Zambian Police he suspected the shotgun had been left

loaded from the hunt the previous day and that the discharge occurred while she was trying to

pack the shotgun into its case.

12.     PROFESSIONAL HUNTING GUIDE told the Zambian Police in sum and

substance and in pertinent part that on the morning of Bianca Rudolph's death he was

completing paperwork related to the hunt in the camp's dining hall.  When he heard a gunshot

from the cabin shared by the RUDOLPHS he rushed there with others, including ZAMBIAN

GAME SCOUT, and found Bianca Rudolph laying on the floor bleeding from the chest.

LAWRENCE RUDOLPH was shouting for help.  PROFESSIONAL HUNTING GUIDE ran to

get a medical kit and gave it to LAWRENCE, but LAWRENCE was unable to stop the bleeding.

PROFESSIONAL HUNTING GUIDE recalled seeing the shotgun and an expended shotshell on

the ground.  The shotgun was inside a partially zipped gun case.

13.     ZAMBIAN GAME SCOUT — a village game scout who had been escorting

the RUDOLPHS during their hunt — told the Zambian Police in sum and substance and in

pertinent part that he was in the dining hall with PROFESSIONAL HUNTING GUIDE when he

4

heard the gunshot from the cabin shared by the RUDOLPHS. When he heard it, he ran to the cabin with PROFESSIONAL HUNTING GUIDE and saw Bianca Rudolph lying on the floor with blood coming out of the left side of her chest. ZAMBIAN GAME SCOUT said he saw the shotgun laying near the door. ZAMBIAN GAME SCOUT saw LAWRENCE RUDOLPH trying to lift Bianca up. ZAMBIAN GAME SCOUT said Bianca's body was taken outside and covered with a blanket.[1]

14.      According to the investigation conducted by the Zambian Police Service, only one round was in the shotgun when Bianca Rudolph was shot, and the shotgun was in a soft-sided gun case that was partially zipped when the gun was fired. Zambian police confiscated the shotgun to perform a ballistics examination of the weapon. BALLISTICS EXPERT, a Zambian Police Officer and Forensic Ballistics Expert whose identity is known to me, stated he did a drop test with the shotgun from one and one and one-half meters onto cement. BALLISTICS EXPERT stated the gun did not misfire during the tests. PROFESSIONAL HUNTING GUIDE was present when this shotgun was later returned to LAWRENCE RUDOLPH.

15.      ZAMBIAN FORENSIC PATHOLOGIST, whose identity is known to me, conducted an examination of Bianca Rudolph's body. The report he completed after the exam identified the Cause of Death as, "(a) Haemorrhagic shock (b) Macerated left side of heart and perforated lung (c) gunshot injury."

16.      A summary of the investigative findings prepared by the Zambian Police

---

[1] No other witnesses reported the body being moved outside and later photos of the body taken by the Zambian Police Service show Bianca's body inside the cabin. There are also other accounts from bystanders near the hunting cabin with statements that diverge in small respects from one another, including whether Bianca screamed around the same time the gunshot was heard.

Service states, "Findings further suggested that the firearm was loaded from the previous hunting activities and the Normal Safety Precautions at the time of packing the firearm were not taken into consideration causing the firearm to accidently fire."

**LAWRENCE RUDOLPH'S INTERACTIONS WITH U.S. EMBASSY PERSONNEL**

17.      CONSULAR CHIEF, whose identity is known to me, was a Consular Section Chief at the U.S. Embassy in Lusaka, Zambia in October 2016.  He told the FBI the following, in sum and substance and in pertinent part:

a.      LAWRENCE RUDOLPH called the embassy late in the afternoon on October 11, 2016, at around 4:30 Central African Time[2].  The call was eventually passed to CONSULAR CHIEF.  LAWRENCE identified himself and said his wife, Bianca Rudolph, had died that morning of an accidental gunshot wound.  CONSULAR CHIEF reported that LAWRENCE quickly turned the conversation to the issue of cremating Bianca's body and leaving the country.  CONSULAR CHIEF obtained contact information for LAWRENCE and explained the documentation the embassy would need to allow LAWRENCE to leave the country with Bianca's remains.

b.      CONSULAR CHIEF was in contact with LAWRENCE RUDOLPH again on October 12, 2016.  The two discussed options for funeral homes and mortuaries.  At that time, Bianca Rudolph's body was being maintained at Ideal Funeral Home in Lusaka.  CONSULAR CHIEF provided information for Ambassador St. Ann's Funeral Home, which was one of the few in the area capable of performing a cremation.

---

[2] Unless otherwise specifically noted, times described in this affidavit are in Central African Time.

6

c. On October 13, 2016, CONSULAR CHIEF was informed that Ambassador St. Ann's was waiting for the report from the pathologist — the ZAMBIAN FORENSIC PATHOLOGIST referenced above — before accepting the body for cremation. Approximately an hour later, CONSULAR CHIEF received a call from Ideal Funeral Home saying the body was scheduled for cremation the next day. CONSULAR CHIEF told the FBI he had a bad feeling about the situation, which he thought was moving too quickly. As a result, he traveled to Ideal Funeral Home with two others from the embassy to take photographs of the body and preserve any potential evidence.

d. CONSULAR CHIEF arrived at Ideal Funeral Home on the afternoon of October 13, 2016 to observe Bianca Rudolph's body. He took several pictures and used a scale to measure the primary wound in her chest, which CONSULAR CHIEF described as being "straight on the heart." CONSULAR CHIEF observed that the wound was not caused by a "tight group" of pellets and was approximately six centimeters in diameter. CONSULAR CHIEF, familiar with firearms and firearm injuries from approximately 20 years in the United States Marine Corps, did not observe the gas burns or obvious tissue expansion he would expect of a contact wound. He also observed what he believed to be a second injury to Bianca's chest caused by the "wadding" from the shotgun cartridge.[3] Based on his observations, CONSULAR CHIEF believed the distance between the muzzle of the shotgun and Bianca's chest when the shotgun was fired was approximately two to two and a half meters (approximately 6.5 to 8 feet).

---

[3] I know, from my training and experience and from the training and experience of others with whom I have consulted, that "wadding" is a component of a shotgun shell. Modern wadding is typically plastic. Wadding sits inside of a shotgun shell, separating the shot from the powder and providing a seal that helps propel the shot out of the barrel. Wadding leaves the barrel with the shot when a shotgun shell is fired.

7

e.    When CONSULAR CHIEF returned to the office after visiting Ideal Funeral Home, he received a call from LAWRENCE RUDOLPH. CONSULAR CHIEF described LAWRENCE as "livid" over the fact that CONSULAR CHIEF had observed Bianca Rudolph's body and taken photographs. CONSULAR CHIEF offered to meet with LAWRENCE at the embassy, but he declined.

f.    CONSULAR CHIEF met LAWRENCE RUDOLPH in person for the first time on the morning of October 14, 2016, at Ambassador St. Ann's Funeral Home to collect Bianca Rudolph's passport and other documents necessary for the cremation to occur. LAWRENCE was there with PROFESSIONAL HUNTING GUIDE. During the meeting, LAWRENCE declined offers of assistance in contacting family members and told CONSULAR CHIEF he wanted to personally inform family members of the death. LAWRENCE claimed he had been married previously, that his children were from that marriage, and that the children were not Bianca's biological children. LAWRENCE repeatedly asked about the Privacy Act and its applicability to Zambia. More specifically, he asked questions about who would be able to access information about Bianca's death, including the police reports. LAWRENCE did not have the firearm that killed Bianca, but he expected it would be returned to him by Zambian law enforcement. When asked what kind of firearm it was, LAWRENCE claimed not to know and described it as an antique. When asked what had happened to Bianca, LAWRENCE told CONSULAR CHIEF he was in the shower at approximately 5:00 a.m. while Bianca was packing to leave. LAWRENCE heard the discharge and came running out of the shower, where he was almost immediately joined by PROFESSIONAL HUNTING GUIDE and others.

8

g.      CONSULAR CHIEF told the FBI that either before or after Bianca Rudolph's cremation LAWRENCE told him Bianca may have committed suicide by shooting herself with the shotgun.

### LIFE INSURANCE POLICIES AND THE PRIVATE INVESTIGATION

18.     The FBI has reviewed documents associated with life and accidental death policies covering Bianca Rudolph at the time of her death on October 11, 2016.  The earliest identified life insurance policy was purchased in approximately 1987.  The policies were then updated and adjusted into 2016.  The policies and the life insurance companies, whose identities are known to me, are referenced in the table below, along with the approximate date on which LAWRENCE RUDOLPH began the process of claiming the benefits of those policies, the amount paid out on those policies, and the approximate date the policy was paid.  The primary beneficiary of each of these policies was a revocable trust established by the RUDOLPHS on or about April 25, 2016.  The terms of that trust made LAWRENCE the ultimate beneficiary and recipient of each of the payments identified below:

| Company | Policy | Approx Claim Date | Approx. Paid Date | Amount Paid |
|---|---|---|---|---|
| INSURANCE COMPANY 1 | Policy No. 215 150 755 UT | 11/7/16 | 03/6/17 | $772,901.17 |
| INSURANCE COMPANY 2 | Policy No. 0100382288 | 10/31/16 | 02/27/17 | $100,973.41 |
| INSURANCE COMPANY 3 | Policy GT8107 Certificate 4019648262 | 11/7/16 | 02/3/17 | $200,000.00 |
| INSURANCE COMPANY 4 | Policy 42728878 | 11/7/16 | 03/7/17 | $503,438.85 |
| INSURANCE COMPANY 4 | Policy 42186233 | 11/7/16 | 03/7/17 | $500,840.86 |
| INSURANCE COMPANY 5 | Policy 104 TLP | 11/7/16 | 03/16/17 | 1,000,157.54 |

9

|  | Certificate 105665 |  |  |  |
|---|---|---|---|---|
| INSURANCE COMPANY 6 | Policy 1308458 | 11/7/16 | 01/9/17 | $44,533.88 |
| INSURANCE COMPANY 7 | Policy T00017578A | 11/14/16 | 03/09/17 | $1,003,049.90 |
| INSURANCE COMPANY 7 | Policy U00013758A | 11/14/16 | 03/09/17 | $751,849.32 |
| **TOTAL** |  |  |  | $4,877.744.93 |

19.     LIFE INSURANCE COMPANY 5 had addresses in Denver, Colorado, Englewood Colorado, and Greenwood Village, Colorado.  Records provided by LIFE INSURANCE COMPANY 5 show that LAWRENCE RUDOLPH caused attorneys, on or about January 18, 2017 to send LIFE INSURANCE COMPANY 5 a packet of documents in support of his claim for insurance policies on the life of Bianca Rudolph. The packet was directed to an address in Englewood, Colorado.  Those documents were sent from Arizona to Colorado via Federal Express, a commercial interstate carrier.

20.     After LAWRENCE RUDOLPH filed the above claims, several of the listed insurance companies, including INSURANCE COMPANIES 1, 3, 6, and 7, retained Diligence International, a private investigation firm, to conduct due diligence related to the circumstances of Bianca Rudolph's death.  Diligence recovered Bianca's death certificate as well as documents related to her cremation, which LAWRENCE authorized and paid for on October 14, 2016.

21.     Diligence also interviewed LAWRENCE RUDOLPH in the presence of his attorneys on or about December 22, 2016, in connection with the policy provided by INSURANCE COMPANY 1.  Diligence's report includes the following statements made by LAWRENCE in sum and substance and in pertinent part:

10

a.     The RUDOLPHS left for their hunting trip in Zambia on September 27 or

28, 2016, intending to return on October 12, 2016.

b.     Bianca was the only one hunting during the trip because they had only one

permit to hunt a leopard.

c.     During the trip, the RUDOLPHS stayed in a cabin with one bedroom and

one bathroom.

d.     On the morning of Bianca's death, October 11, 2016, LAWRENCE and

Bianca got up early to finish packing for their return.  Bianca told LAWRENCE she intended to

pack the firearms while he was in the bathroom.  Packing the firearms consisted of placing them

in a soft-sided gun case and then into a larger hard-sided gun case.

e.     Bianca had two firearms with her.  LAWRENCE identified one as a

Remington rifle and the other as a 12-gauge Browning shotgun but notes in parentheses "it may

have been a Beretta."

f.     Between 5:15 and 5:30 a.m., while LAWRENCE was in the bathroom, he

heard a gunshot and then heard his wife scream.  He ran into the bedroom, found her lying on the

floor, and performed CPR.  LAWRENCE did not remember whether PROFESSIONAL

HUNTING GUIDE called the police from the camp or if, instead, they were called on the two-

hour trip to the nearest town.

g.     The Zambian law enforcement investigation ruled it an accidental

discharge, not a suicide, and noted that the RUDOLPHS had been looking forward to attending a

wedding the following week.

h.     Once Bianca's body was released from the coroner's office it was

transported to Ambassador St. Ann's for cremation.  LAWRENCE said he and Bianca had

11

always planned to be cremated. He also explained that it was "challenging" to transport a body

from another country to the United States because it required the purchase of a lead-lined coffin.

He said that since he and Bianca had talked about and planned on cremation, he decided to have

her cremated in Zambia.

22.     Diligence also interviewed PROFESSIONAL HUNTING GUIDE on March 2,

2017. Diligence's report provides that PROFESSIONAL HUNTING GUIDE made the

following statements, in sum and substance and in pertinent part:

a.     Bianca Rudolph was an experienced hunter.

b.     The shotgun that killed Bianca was owned by LAWRENCE RUDOLPH

and LAWRENCE carried the shotgun during the hunt.

c.     LAWRENCE unload and cleaned the shotgun the night before Bianca's

death.

d.     PROFESSIONAL HUNTING GUIDE speculated that it was "probably"

difficult for a person of Bianca's size to reach the trigger of a shotgun from the end of a full-

length sporting barrel, but that he didn't know the exact length of the barrel and didn't want to

speculate. He did, however, also speculate that Bianca may have leaned over to push the

shotgun into its soft-sided case, which was a "tight fit."

e.     The zipper of the soft-sided gun case was pulled down close to the trigger

guard and that Bianca may have touched the trigger while zipping the case closed. He said

Bianca had long fingernails and the trigger on a shotgun was "light."

f.     The shotgun may have discharged if Bianca had hit the butt of the shotgun

on the ground to try to push it further into the case.

12

g.      The shotgun was moved sometime after Bianca was shot. PROFESSIONAL HUNTING GUIDE noticed it on a travel trunk outside the cabin. ZAMBIAN GAME SCOUT told PROFESSIONAL HUNTING GUIDE he had moved it outside for safety. After hearing that, PROFESSIONAL HUNTING GUIDE told ZAMBIAN GAME SCOUT to put it back where he had found it.

23.      Each of the insurance companies listed above ultimately concluded that the relevant policy should be paid, including the companies that retained Diligence. However, for the reasons set forth in this affidavit, I submit there is probable cause to believe the claims LAWRENCE RUDOLPH filed in connection with these life insurance policies were part of a scheme to defraud those companies and to obtain money through false and fraudulent pretenses, representations and promises. Specifically, LAWRENCE claimed, either explicitly or implicitly through the submission of his account of the death in the Zambian Police Service reports that Bianca's death was the result of an accident. In each case, the communications from LAWRENCE to the insurance companies were made through fax or some kind of interstate postal carrier, such as the United States Postal Service or Federal Express. For example, on or about December 16, 2016, LAWRENCE, via his attorneys, caused to be mailed from Phoenix, Arizona to Denver, Colorado a packet of documents in furtherance of an accidental death insurance claim that included a statement that he had not withheld any material facts from Great Western.

**THE FBI'S DEATH INVESTIGATION**

24.      On or about October 27, 2016, FRIEND, whose identity is known to me, called the FBI legal attaché in Pretoria, South Africa to report that she wanted the FBI to investigate the death of her friend, Bianca Rudolph. FRIEND reported, in sum and substance

13

and in pertinent part, that she suspected foul play because LAWRENCE RUDOLPH had been involved in prior extramarital affairs and had been having an affair at the time of Bianca's death. FRIEND said LAWRENCE had been verbally abusive in the past and that the two had had fights about money. In a subsequent interview, FRIEND elaborated that the RUDOLPHS' children did not find out about the death of their mother until about one week after it occurred and that some of Bianca's friends and family did not know about the death until the funeral.  FRIEND also said she believed the cremation to have been against Bianca's wishes because Bianca was a strict Catholic who had once expressed disapproval that FRIEND's husband was cremated. Similarly, FRIEND stated, "Larry is never going to divorce her because he doesn't want to lose his money, and she's never going to divorce him because of her Catholicism."

     25.     Additional witnesses interviewed by the FBI corroborated FRIEND's belief that LAWRENCE RUDOLPH was having an affair, providing a possible motive for murder in addition to the substantial insurance proceeds described above.

     26.     While LAWRENCE RUDOLPH said it was "challenging" to send Bianca Rudolph's body to the United States, as opposed to rapidly cremating her, investigators learned that LAWRENCE frequently arranged for the transportation of animals hunted on his trip to be transported back to the United States.  Investigators learned, from speaking to a United States Fish and Wildlife Service Office of Law Enforcement Special Agent who specializes in the investigation of crimes related to wildlife trafficking, that sending such animals back to the United States is often cumbersome, expensive, and time-consuming.

     27.     I and other investigators also interviewed PROFESSIONAL HUNTING GUIDE's EX-WIFE, whose identity is also known to me.  In sum and substance and in pertinent part, she relayed the following:

14

a.    She was first introduced to LAWRENCE RUDOLPH and Bianca Rudolph at a hunting convention in 2010.  She then regularly met with the RUDOLPHS in South Africa before their safaris in Zambia and considered both of the RUDOLPHS to be friends.

b.    She traveled to Zambia in late September 2016 to meet with PROFESSIONAL HUNTING GUIDE and the RUDOLPHS during the hunt in Zambia. She stayed with the group until October 8, 2016.  She relayed that Bianca seemed nervous because of a prior failed leopard hunt but that she had no concerns about Bianca's handling of firearms. She remembered that the RUDOLPHs brought several firearms, including a shotgun. The shotgun may have been customized to alter its ammunition capacity, repeatedly jammed, and was not functioning properly.

c.    She relayed that the RUDOLPHS appeared to be having a good time in Zambia.  She did not notice any problems between them and told us they seemed to be a very strong couple who were happy together.  She said LAWRENCE was very attentive to Bianca's needs.

d.    She learned that Bianca died on October 11, 2016, after a call from PROFESSIONAL HUNTING GUIDE. She returned to Zambia on October 12 and met with LAWRENCE the next day, October 13, 2016.  LAWRENCE appeared to be distraught. LAWRENCE told her that he had been using the bathroom while Bianca was putting guns into the cases when the shotgun discharged and killed her.

e.    She relayed that the process of making arrangements for Bianca's body seemed rushed.  She felt there was a sense of urgency in getting the body cremated that she did not understand.  LAWRENCE said he would tell the children about Bianca's death but did not take their calls. She felt that the children should have been given an opportunity to travel to

15

Zambia to say goodbye. LAWRENCE later told her that he contacted their son to tell him that

Bianca died in an accident.

        f.   She was uncomfortable with the proceeding to cremate Bianca because

Bianca was Catholic, and religion was important to her. She asked LAWRENCE about

traditions like dressing the body in black and placing a cross around the decedent's neck, but

LAWRENCE did not pay attention to these concerns. She, rather than LAWRENCE, provided

clothes to the crematorium and put a necklace on Bianca's body. LAWRENCE suggested that

Bianca desired to be cremated.

        g.   She told us that money was exchanged to expedite Bianca's cremation. She

said she personally witnessed LAWRENCE pay an official to expedite the process, though she

did not know the person's name or precise role. Although familiar with bribes being paid in

other contexts as the normal way business is conducted, she thought that these payments were

odd under the circumstances.

      28.     FORMER EMPLOYEE, whose identity is known to me, was interviewed on

or about October 19, 2019. FORMER EMPLOYEE worked at Three Rivers Dental, the practice

owned by LAWRENCE RUDOLPH, between approximately February 2015 and February 2016.

FORMER EMPLOYEE may not have left employment at Three Rivers Dental under favorable

circumstances, which means that FORMER EMPLOYEE may have a bias towards her former

employer. FORMER EMPLOYEE came to know GIRLFRIEND, whose identity is known to

me. GIRLFRIEND was a manager for Three Rivers Dental. During their time working together,

GIRLFRIEND disclosed to FORMER EMPLOYEE that she had been involved in a long-term

relationship with LAWRENCE for approximately 15 to 20 years. GIRLFRIEND disclosed

several things about her relationship with LAWRENCE, including that GIRLFRIEND had given

16

LAWRENCE an ultimatum of one year to sell his dental offices and leave Bianca.

29.      FBI investigators also spoke with COMMUNITY ASSOCIATION EXECUTIVE DIRECTOR, whose identity is known to me.  COMMUNITY ASSOCIATION EXECUTIVE DIRECTOR reported that on January 3, 2017, LAWRENCE RUDOLPH instructed her to change the records to reflect his email instead of the one that was on the account.  Subsequently, COMMUNITY ASSOCIATION EXECUTIVE DIRECTOR learned that a new woman, GIRLFRIEND, was living with LAWRENCE and had been since at least January of 2017.  COMMUNITY ASSOCIATION EXECUTIVE DIRECTOR also learned that LAWRENCE and GIRLFRIEND offered $3.5 million cash to purchase a different home in the same subdivision.  Within the interview, GIRLFRIEND was at one-point referenced as LAWRENCE's new wife, however, investigators do not have information confirming their marriage.

30.      As part of the investigation, I have reviewed financial records, border crossing records, and business records related to travel by the LAWRENCE RUDOLPH, Bianca Rudolph, and GIRLFRIEND.  Among other things those records show:

        a.   LAWRENCE and GIRLFRIEND travelled to Cabo San Lucas, Mexico, in 2010, 2011 (twice), 2013, 2014, 2015, in July 2016 before Bianca's death, and in 2017 a few months after Bianca's death.  Bianca did not travel on any of those trips.

        b.   Other business and travel records show LAWRENCE and GIRLFRIEND travelling and staying with one another, without Bianca, on several occasions.

        c.   On or about October 23, 2016 — the day after Bianca's funeral — LAWRENCE purchased a ticket for GIRLFRIEND to travel from Pittsburgh to Phoenix on October 24, 2016.  Records show that the ticket for GIRLFRIEND was cancelled the same day;

17

however, LAWRENCE also purchased a ticket on October 23, 2016, for another woman to travel to Las Vegas on October 26, 2016, and that ticket was not canceled. LAWRENCE also purchased a ticket for himself on October 23, 2016, to fly from Phoenix to Las Vegas between October 26, 2016, and October 28, 2016. Financial records show LAWRENCE paid for a hotel room in Las Vegas from October 26, 2016, through October 28, 2016, and a car service in Pittsburgh on or about October 27, 2016. On October 24, 2016, a ticket was purchased for GIRLFRIEND to fly from Pittsburgh to Phoenix on October 31, 2016.

31.     In addition to the evidence of motive — the insurance proceeds and the possible desire to live openly with GIRLFRIEND — additional evidence gathered during the investigation supports my conclusion that there is probable cause to believe that Bianca Rudolph did not die by accident and was, rather, killed by LAWRENCE RUDOLPH.

a.     ZAMBIAN BALLISTICS EXPERT identified the shotgun that killed Bianca Rudolph as a Browning Shotgun with serial number WT15100116. The FBI obtained a Browning shotgun of the same make and model from a private seller, a soft-sided gun case matching the one seen in photographs taken at the death scene in Zambia, and ammunition matching descriptions of the ammunition used in Zambia.

b.     The Browning shotgun obtained by the FBI that is the same make and model of the shotgun that killed Bianca Rudolph is approximately 45.25 inches (approximately 3.7 feet) long, with a barrel that is approximately 26 inches (approximately 2.16 feet) long, with a muzzle to trigger distance of approximately 31.1875 inches. Medical records list Bianca's height as 5'4" tall without shoes and 5'5" tall with shoes.

c.     The soft-sided gun case provided by Allen Company, which matches the one seen in photographs of the death scene, is not a tight fit. Rather, the shotgun slides easily into the

18

case, with the trigger facing toward the zipper and the top of the shotgun flush against the inside. Based on an examination of the shotgun and the case, there would be no need to force the case over the shotgun by using body weight or by hitting the bottom of the shotgun on the floor.

d.    The FBI Digital Evidence Laboratory conducted a forensic examination of a photograph showing FRIEND and Bianca Rudolph.  FRIEND posed for a photograph wearing the same dress she was wearing in the photograph with Bianca.  This photograph was then used to determine the approximate length of the dress to serve as a reference, from which an FBI analyst was able to provide a static measurement of Bianca's right arm, which was determined to be between 26.75 inches and 28.75 inches.

e.    On September 1, 2021, the FBI conducted a reach study to determine whether fifteen female volunteers from the Lakewood Police Department and the FBI could reach the trigger of the Browning shotgun obtained by the FBI.

i.        During the first phase of the test, each of the volunteers submitted themselves to be measured.  The subjects ranged in height from 61 inches to 66.125 inches. Static right arm measurements ranged from 27.125 inches to 31.625 inches with an average of 28.575 inches.  Static left arm measurements ranged from 27.25 inches to 32.0 inches with an average of 28.56 inches.  The participants were then asked to roll their shoulders forward and extend their arms, hands and fingers to determine their maximum reach on a yardstick.  No test subject had a reach measurement greater than their static arm measurement.

ii.       In phase two of the test, subjects were brought into a room and handed the Browning shotgun obtained by the FBI and the Allen soft case.  They were then instructed to "please place the shotgun in the back and zip the bag closed."  None of the subjects placed the butt of the shotgun on the ground with the muzzle pointed at their chest to complete

19

the task.  None of the subjects pointed the muzzle at themselves at all.  And none of the subjects struggled to fit the shotgun in the case or to zip the case closed with the shotgun inside.

          iii.       In phase three of the test, the subjects were given the partially zipped Allen soft case with the shotgun inside. The subjects were asked to keep the shotgun fully inserted in the bag, put the barrel of the shotgun at their heart and, keeping the shotgun at a 90-degree angle, continue to zip the bag closed and determine whether they could reach the trigger. None of the subjects were able to maintain the shotgun in that position while zipping the case. None of the fifteen subjects was able to reach the trigger of the shotgun while zipping the case without significantly changing the angle of the muzzle to their chest.

        f.   An FBI Special Agent conducted testing to determine, by comparison to photographs from the scene of the death, the approximate position of the shotgun muzzle within the soft case at the time of discharge, as well as the resulting shot patterns created by firing the shotgun with the case over the barrel at various distances.  These patterns were then provided to an expert forensic medical examiner, who determined that the patterns most likely matching the wound observed in photographs of the body were created by a shot from a distance of between two and three and one-half feet.  At that distance, there is reason to believe that Bianca Rudolph was not killed by an accidental discharge as stated by LAWRENCE RUDOLPH.

        g.   COLORADO MEDICAL EXAMINER, whose identity is known to me, is a medical doctor board-certified in anatomic and forensic pathology who has performed over 7,000 autopsies while serving as a medical examiner in several jurisdictions.  COLORADO MEDICAL EXAMINER reviewed, among other materials, photographs of Bianca Rudolph at the scene of her death, the photographs taken by CONSULAR CHIEF, the report of the ZAMBIAN FORENSIC PATHOLOGIST, and the analysis referenced in the prior paragraph.

20

COLORADO MEDICAL EXAMINER concluded as follows:

> *In my opinion, it would be physically impossible to accidentally fire this shotgun in its carrying case and produce the entrance defect noted on the body of Ms. Rudolph. The tip of the carrying case was most likely at least two feet from Ms. Randolph when the weapon was discharged regardless if it was on cylinder or full choke settings. Further, it would be extremely difficult, if not impossible, for Ms. Rudolph to reach the trigger of this weapon even if it was placed in the case with the muzzle pressed against her chest*

## STATEMENT OF PROBABLE CAUSE

32.    For the reasons set forth above, I submit there is probable cause to believe that on or about January 18, 2017, LAWRENCE RUDOLPH, having devised and intended to devise a scheme and artifice to defraud and to obtain, by means of material false and fraudulent pretenses, representations and promises, money and property, for the purpose of executing such scheme and artifice, did deliver and cause to be delivered by means of commercial interstate carrier, namely Federal Express, according to the direction thereon, a matter and thing, namely a package containing documents related to a life insurance claim, all in violation of 18 U.S.C. § 1341.

33.    For the reasons set forth above, I further submit there is probable cause to believe that on October 11, 2016, United States National LAWRENCE RUDOLPH murdered his wife,

21

United States National Bianca Rudolph, outside the United States, but in the jurisdiction of Zambia in violation of 18 U.S.C. §§ 1119 and 1111.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Respectfully Submitted,

_s/ Donald Peterson_
Donald Peterson
Special Agent
Federal Bureau of Investigation

Sworn to before me this 22nd day of December 2021.

_____
Hon. Scott T. Varholak
United States Magistrate Judge

**Reviewed and submitted by Bryan David Fields, Assistant United States Attorney.**

22

# MANDAMUS EXHIBIT 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Criminal Case No.**  22-CR-0012-WJM

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

**v.**

**LAWRENCE RUDOLPH,**

    **Defendant.**

---

## INDICTMENT

---

The Grand Jury Charges that:

### COUNT 1

1.    On or about October 11, 2016, the defendant LAWRENCE RUDOLPH, being a national of the United States as defined by the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(22), willfully, deliberatively, maliciously, and with premeditation and malice aforethought, unlawfully killed Bianca Rudolph, a national of the United States as likewise defined by the Immigration and Nationality Act, while she was outside the United States but within the jurisdiction of another country.

    All in violation of Title 18, United States Code, Sections 1119 and 1111.

### COUNT 2

2.    Beginning no later than October 11, 2016 and continuing until in or about March 16, 2017, within the state and district of Colorado and elsewhere, the defendant LAWRENCE RUDOLPH, devised and intended to devise a scheme and artifice to defraud and to obtain, by means of materially false and fraudulent pretenses, representations and

promises, money and property, to wit a total of approximately $4,877,744.93 in U.S.
currency, from LIFE INSURANCE COMPANIES 1-7, the identities of which are known to
the Grand Jury.

3.    LAWRENCE RUDOLPH defrauded LIFE INSURANCE COMPANIES 1-7
by means, of among others, the false and fraudulent pretense, representation and promise that
Bianca Rudolph had died as the result of the accidental discharge of a firearm when, in fact,
she had been murdered as alleged in COUNT 1.

4.    On or about the dates listed below, in the State and District of Colorado and
elsewhere, for the purpose of executing the scheme, defendant LAWRENCE RUDOLPH
knowingly caused and aided and abetted others who knowingly caused to be delivered by the
interstate commercial carrier identified below addressed to the address listed below,
according to the direction thereon, an envelope containing documents related to the life
insurance policy identified below:

| Date | Company | Policy/ Certificate Number | Address Where Sent | Carrier |
|---|---|---|---|---|
| 1/18/17 | LIFE INSURANCE COMPANY 1 | 104TLP 105665 | 116 Inverness Drive East Englewood, CO 80112 | Federal Express |

All in violation of Title 18, United States Code, Sections 1341 and 2.

NOTICE OF FORFEITURE

5.    The allegation contained in Count 2 of this Indictment is hereby re-alleged and
incorporated by reference for the purpose of alleging forfeiture pursuant to the provisions of Title
18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

6.    Upon conviction of the violation alleged in Count 2 of this Indictment involving the
commission of a violation of Title 18, United States Code, Sections 1341 and 2, the defendant
LAWRENCE RUDOLPH shall forfeit to the United States, pursuant to Title 18, United States

Case No. 1:22-cr-00012-WJM Document 358-1 Filed 01/06/23 USDC Colorado Page 8 of 9
Case 1:22-cr-00012-WJM Document 26 Filed 05/16/23 USDC Colorado Page 73 of 342
Appellate Case: 23-1162     Document: 010110860450     Date Filed: 05/16/2023     Page: 73

Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all rights, title, and interest in all property constituting and derived from any proceeds he obtained directly and indirectly as a result of such offense or offenses or shall be liable for a money judgment in the amount of the proceeds that he obtained as a result of the scheme charged in Count 2f this Indictment.

      7.    If any of the property described above, as a result of any act or omission of LAWRENCE RUDOLPH, cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been substantially diminished in value; or has been commingled with other property that cannot be divided without difficulty, it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c), incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of LAWRENCE RUDOLPH up to the value of the forfeitable property described above.

A True Bill:

Ink signature on file in Clerk's Office
Foreperson

COLE FINEGAN
United States Attorney

By:     */s Bryan Fields*               
Bryan Fields
Assistant United States Attorney
U.S. Attorney's Office
1801 California St. Suite 1600
Denver, CO 80202
(303) 454-0100
Bryan.Fields3@usdoj.gov

By:     */sGarreth Winstead*          
Garreth Winstead
Assistant United States Attorney
U.S. Attorney's Office
1801 California St. Suite 1600
Denver, CO 80202
(303) 454-0100
Garreth.Winstead@usdoj.gov

Case No. 1:22-cr-00012-WJM Document 355 filed 01/05/23 USDC Colorado pg 1 of 1
Case 1:22-cr-00012-WJM Document 26-1 filed 01/05/23 16:13 C USDC Colorado Page 1 of 1
74 of 342
Appellate Case: 23-1162    Document: 010110860450    Date Filed: 05/16/2023    Page: 74

INFORMATION SHEET

DEFENDANT:  LAWRENCE RUDOLPH

YEAR OF BIRTH: 1955

ADDRESS: Arizona

COMPLAINT FILED?    X    YES _____ NO

    IF YES, PROVIDE MAGISTRATE CASE NUMBER:  21-MJ-209-MEH

HAS DEFENDANT BEEN ARRESTED ON COMPLAINT?  X  YES ___ NO

| | |
|---|---|
| OFFENSES: | Count 1:  18 U.S.C. §§ 1119 and 1111 (Foreign Murder) |
| | Counts 2: 18 U.S.C. § 1341 (mail fraud) and § 2 (aiding and abetting and willfully causing). |

LOCATION OF OFFENSES: Arapahoe, Colorado, and elsewhere

| | |
|---|---|
| PENALTY: | Count 1:  NLT life imprisonment or death; NMT $250,000 fine or both; $100 Special Assessment |
| | Count 2: Imprisonment of NMT 20 years, a fine of NMT $250,000 or NMT the greater of twice the gross pecuniary gain or twice the gross pecuniary loss resulting from each offense, or both fine and imprisonment; $100 special assessment; a term of supervised release NMT 3 years; and restitution (each count). |

| | |
|---|---|
| AGENTS: | Donald Peterson |
| | Scott Dahlstrom |
| | Federal Bureau of Investigation |

| | |
|---|---|
| AUTHORIZED BY: | Bryan David Fields |
| | Garreth Winstead |
| | Assistant U.S. Attorneys |

ESTIMATED TIME OF TRIAL:

____ five days or less   X   over five days

THE GOVERNMENT will seek detention in this case.

# MANDAMUS EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Criminal Case No. 22-cr-000012**

**UNITED STATES OF AMERICA,**

     **Plaintiff,**

**v.**

1.    **LAWRENCE RUDOLPH and**
2.    **LORI MILLIRON,**

     **Defendants.**

---

## SUPERSEDING INDICTMENT

---

The Grand Jury Charges that:

<u>COUNT 1</u>

1.     On or about October 11, 2016, the defendant LAWRENCE RUDOLPH, being a national of the United States as defined by the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(22), willfully, deliberatively, maliciously, and with premeditation and malice aforethought, unlawfully killed Bianca Rudolph, a national of the United States as likewise defined by the Immigration and Nationality Act, while she was outside the United States but within the jurisdiction of another country.

  All in violation of Title 18, United States Code, Sections 1119 and 1111.

<u>COUNT 2</u>

2.     Beginning no later than October 11, 2016, and continuing until on or about March 16, 2017, within the state and district of Colorado and elsewhere, the defendant LAWRENCE RUDOLPH, devised and intended to devise a scheme and artifice to defraud

1

and to obtain, by means of materially false and fraudulent pretenses, representations and promises, money and property, to wit a total of approximately $4,877,744.93 in U.S. currency, from LIFE INSURANCE COMPANIES 1-7, the identities of which are known to the Grand Jury.

3.    LAWRENCE RUDOLPH defrauded LIFE INSURANCE COMPANIES 1-7 by means, of among others, the false and fraudulent pretense, representation and promise that Bianca Rudolph had died as the result of the accidental discharge of a firearm when, in fact, she had been murdered as alleged in COUNT 1.

4.    On or about the dates listed below, in the State and District of Colorado and elsewhere, for the purpose of executing the scheme, defendant LAWRENCE RUDOLPH knowingly caused and aided and abetted others who knowingly caused to be delivered by the interstate commercial carrier identified below addressed to the address listed below, according to the direction thereon, an envelope containing documents related to the life insurance policy identified below:

| Date | Company | Policy/Certificate Number | Address Where Sent | Carrier |
|------|---------|---------------------------|---------------------|---------|
| 1/18/17 | LIFE INSURANCE COMPANY 1 | 104TLP 105665 | 116 Inverness Drive East Englewood, CO 80112 | Federal Express |

All in violation of Title 18, United States Code, Sections 1341 and 2.

<u>COUNT 3</u>

5.    On or about January 5, 2022, in the State and District of Colorado, the defendant LORI MILLIRON, knowing that an offense against the United States had been committed, that is the foreign murder described in Count 1, did comfort and assist the offender, LAWRENCE RUDOLPH, in order to hinder his trial and punishment.

All in violation of 18 United States Code, Section 3.

2

<u>COUNT 4</u>

6.      On or about January 5, 2022, in the State and District of Colorado, the defendant

LORI MILLIRON corruptly influenced, obstructed and impeded and endeavored to influence,

obstruct and impede the due administration of justice, to wit, MILLIRON provided false and

misleading testimony to a grand jury sitting in the District of Colorado regarding (i) the

circumstances of cash payments made to her by LAWRENCE RUDOLPH in 2015, 2016 and

2017, (ii) the nature, scope, and circumstances of her relationship with LAWRENCE

RUDOLPH, (iii) the nature and circumstances of LAWRENCE RUDOLPH's relationship with

Bianca Rudolph, (iv) whether she gave LAWRENCE RUDOLPH an ultimatum to leave his

wife, (v) what LAWRENCE RUDOLPH told her about the circumstances of the death of Bianca

Rudolph, (vi) her discussion with LAWRENCE RUDOLPH about a pending investigation by the

Federal Bureau of Investigation; and (vi) the circumstances of the accident that caused

LAWRENCE RUDOLPH to lose part of his thumb.

All in violation of Title 18 United States Code § 1503(a)

<u>COUNT 5</u>

7.      On or about January 5, 2022, in the State and District of Colorado, the defendant

LORI MILLIRON, having taken an oath to testify truthfully in a proceeding before a grand jury

of the United States sitting in the District of Colorado, knowingly made false material

declarations, that is, MILLIRON gave the following underlined false testimony:

Q:      At the time you were working at Three Rivers, did you have any other substantial
        source of cash income?

A:      <u>I don't recall</u>

Q:      Do you recall making – well, how frequently do you think you deposited cash into
        your personal account?

A:     I don't know. I couldn't say

       . . . .

Q:     Take a look at Exhibit 2. This is an analysis of cash deposits into your PNC Bank
       account. Do you recall depositing approximately $20,000 in cash into that account
       in 2014?

A:     <u>No, I don't.</u>

Q:     $60,000 in 2015?

A:     <u>No, I don't.</u>

All in violation of Title 18, United States Code, Section 1623(a).

<u>COUNT 6</u>

8.      On or about January 5, 2022, in the State and District of Colorado, the defendant

LORI MILLIRON, having taken an oath to testify truthfully in a proceeding before a grand jury

of the United States sitting in the District of Colorado, knowingly made false material

declarations, that is, MILLIRON gave the following underlined false testimony:

Q:     Why was Larry paying you this additional money if you already had a salary for
       those things?

A:     Because he wanted to help me.

Q:     Did he explain why?

A:     He was very generous.

       . . . .

Q:     So in 2015 you received approximately double your salary — or your salary again
       but all in cash?

A:     Yes

Q:     And in 2016 you received a little bit more than your salary in cash?

A:     Yes.

4

Q:    Why was Larry so generous to you?

A:    <u>I don't know why.</u>   But like I said, he would give other — staff members, he would buy them washers and dryers. He would give them cash if they needed it, a whole variety of things.

Q:    So your testimony before the members of the Grand Jury today is that you don't know exactly why he gave you $60,000 in 2015?

A:    <u>I don't know exactly why.</u>

All in violation of Title 18, United States Code, Section 1623(a).

COUNT 7

9.    On or about January 5, 2022, in the State and District of Colorado, the defendant

LORI MILLIRON, having taken an oath to testify truthfully in a proceeding before a grand jury

of the United States sitting in the District of Colorado, knowingly made false material

declarations, that is, MILLIRON gave the following underlined false testimony:

Q:    Ms. Milliron, if you'll notice there was $75,000 in 2016 with $33,500 in 2017. Do you see that?

A:    Yes.

Q:    Why would he give you less in 2017?

A:    I don't know why.

          . . . .

Q:    He gave you approximately $75,450 in 2016 and in 2017 he gave you $33,350. I believe your testimony earliest was that you weren't sure why he gave you less in 2017. Do you now remember why he might have given you less in 2017?

A:    No.   I don't know why.

Q:    Was it because at that point you were on his American Express card?

A:    <u>No.   The card was basically part of my — it's a Three Rivers Dental card.   It was part of my perks, I guess.</u>

All in violation of Title 18, United States Code, Section 1623(a).

5

<u>COUNT 8</u>

10.     On or about January 5, 2022, in the State and District of Colorado, the defendant

LORI MILLIRON, having taken an oath to testify truthfully in a proceeding before a grand jury

of the United States sitting in the District of Colorado, knowingly made false material

declarations, that is, MILLIRON gave the following underlined false testimony:

Q:     Before that hunt had you ever given him an ultimatum that he needed to leave his
       wife?

A:     <u>I don't believe so.</u>

Q:     You don't believe so or you did not?

A:     <u>I don't think I did.</u>

Q:     Could he have — well, did you ever threaten to break off the affair?

A:     <u>I don't remember.</u>

       . . . .

Q:     So you said you don't think you could have given an ultimatum.   Ms. Milliron,
       yes or no, did you ever give him an ultimatum?

A:     <u>No.</u>

       . . . .

Q:     Did you ever tell anyone at the office you were thinking about leaving Mr.
       Rudolph?

A:     <u>No.</u>

Q:     Did you ever tell anyone at the office that you had given Mr. Rudolph an
       ultimatum that he needed to leave his wife?

A:     <u>No, I did not.</u>

All in violation of Title 18, United States Code, Section 1623(a).

<u>COUNT 9</u>

11.    On or about January 5, 2022, in the State and District of Colorado, the defendant

LORI MILLIRON, having taken an oath to testify truthfully in a proceeding before a grand jury

of the United States sitting in the District of Colorado, knowingly made false material

declarations, that is, MILLIRON gave the following underlined false testimony:

Q:    Did he say anything about the merits of an investigation?

A:    I don't recall.

Q:    Did he say anything about whether it was an accident?

A:    No. He had told me previously it was an accident.

      . . . .

Q:    Did he proclaim his innocence?

A:    <u>He probably did.   I don't really recall that.</u>

Q:    What do you recall?

A:    I really don't recall.

Q:    As you sit here today with the members of the Grand Jury, you don't recall a
      conversation with Mr. Rudolph about an FBI investigation?

A:    There has been a conversation about that, but I think he was aggravated. I can't
      give you specifics.

Q:    Can you give me generalities?

A:    <u>Irritated that there was an FBI investigation because he felt he was innocent.</u>

All in violation of Title 18, United States Code, Section 1623(a).

7

<u>NOTICE OF FORFEITURE</u>

12.     The allegation contained in Count 2 of this Superseding Indictment is hereby re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

13.     Upon conviction of the violation alleged in Count 2 of this Indictment involving the commission of a violation of Title 18, United States Code, Sections 1341 and 2, the defendant LAWRENCE RUDOLPH shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), any and all rights, title, and interest in all property constituting and derived from any proceeds he obtained directly and indirectly as a result of such offense or offenses or shall be liable for a money judgment in the amount of the proceeds that he obtained as a result of the scheme charged in Count 2 of this Superseding Indictment.

14.     If any of the property described above, as a result of any act or omission of LAWRENCE RUDOLPH, cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third party; has been substantially diminished in value; or has been commingled with other property that cannot be divided without difficulty, it is the intent of the United States, pursuant to Title 28, United States Code, Section 2461(c),

. . . .

. . . .

. . . .

. . . .

. . . .

incorporating Title 21, United States Code, Section 853(p), to seek forfeiture of any other property

of LAWRENCE RUDOLPH up to the value of the forfeitable property described above.

A True Bill:

Ink signature on file in Clerk's Office
Foreperson

COLE FINEGAN
United States Attorney

| | | |
|---|---|---|
| By: */s Bryan Fields* | By: *E. Garreth Winstead* | By: *J. Bishop Grewell* |
| Bryan Fields | E. Garreth Winstead | J. Bishop Grewell |
| Assistant United States Attorney | Assistant United States Attorney | Assistant United States Attorney |
| U.S. Attorney's Office | U.S. Attorney's Office | U.S. Attorney's Office |
| 1801 California St. Suite 1600 | 1801 California St. Suite 1600 | 1801 California St. Suite 1600 |
| Denver, CO 80202 | Denver, CO 80202 | Denver, CO 80202 |
| (303) 454-0100 | (303) 454-0100 | (303) 454-0100 |
| Bryan.Fields3@usdoj.gov | Garreth.Winstead@usdoj.gov | Bishop.Grewell@usdoj.gov |
| Attorney for the Government | Attorney for the Government | Attorney for the Government |

9

INFORMATION SHEET

DEFENDANT:  LAWRENCE RUDOLPH

YEAR OF BIRTH: 1955

ADDRESS: Arizona

COMPLAINT FILED?     X     YES _____ NO

        IF YES, PROVIDE MAGISTRATE CASE NUMBER:  21-MJ-209-MEH

HAS DEFENDANT BEEN ARRESTED ON COMPLAINT?  X  YES ___ NO

OFFENSES:          Count 1:  18 U.S.C. §§ 1119 and 1111 (Foreign Murder)

                   Counts 2: 18 U.S.C. § 1341 (mail fraud) and § 2 (aiding and abetting and
                   willfully causing).

LOCATION OF OFFENSES: Arapahoe, Colorado, and elsewhere

PENALTY:           Count 1:  NLT life imprisonment or death; NMT $250,000 fine or both;
                   $100 Special Assessment

                   Count 2: Imprisonment of NMT 20 years, a fine of NMT $250,000 or
                   NMT the greater of twice the gross pecuniary gain or twice the gross
                   pecuniary loss resulting from each offense, or both fine and imprisonment;
                   $100 special assessment; a term of supervised release NMT 3 years; and
                   restitution (each count).

AGENTS:            Donald Peterson
                   Scott Dahlstrom
                   Federal Bureau of Investigation

AUTHORIZED BY:     Bryan David Fields
                   E. Garreth Winstead
                   J. Bishop Grewell
                   Assistant U.S. Attorneys

ESTIMATED TIME OF TRIAL:

____ five days or less   X   over five days

THE GOVERNMENT will seek detention in this case.

INFORMATION SHEET

DEFENDANT:  LORI MILLIRON

YEAR OF BIRTH: 1957

ADDRESS: Arizona

COMPLAINT FILED?  _____ YES  __X__ NO

        IF YES, PROVIDE MAGISTRATE CASE NUMBER:  _____

HAS DEFENDANT BEEN ARRESTED ON COMPLAINT?  __ YES  _X_ NO

OFFENSES:          Count 3:        18 U.S.C. § 3 (Accessory after the Fact)

                  Count 4:        18 U.S.C. § 1503 (obstruction of grand jury proceeding)

                  Counts 5-9:    18  U.S.C. § 1623(a) (perjury before grand jury)

LOCATION OF OFFENSES: Denver, Colorado

PENALTY:           Count 3:  NMT 15 years' imprisonment; NMT $125,000 fine or both;
                   $100 Special Assessment; a term of supervised release NMT 3 years

                   Count 4: NMT 10 years' imprisonment, NMT $250,000 fine or both; $100
                   Special Assessment, a term of supervised release NMT 3 years.

                   Counts 5-9: NMT 5 years' imprisonment, NMT $250,000 fine or both;
                   $100 Special Assessment, a term of supervised release NMT 3 years.

AGENTS:            Donald Peterson
                   Scott Dahlstrom
                   Federal Bureau of Investigation

AUTHORIZED BY:        Bryan David Fields
                      E. Garreth Winstead
                      J. Bishop Grewell
                      Assistant U.S. Attorneys

ESTIMATED TIME OF TRIAL:

____ five days or less  _X_ over five days

THE GOVERNMENT will seek detention in this case.

# MANDAMUS

# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Criminal Case No. 22-cr-012-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1. LAWRENCE RUDOLPH, and
2. LORI MILLIRON,

      Defendants.

---

**VERDICT FORM**

---

      Please do not write anything on this form except to check a response and to sign and date the form.

**COUNT 1**

We, the jury, upon our oaths, do unanimously find the defendant, LAWRENCE RUDOLPH, in Count One of the Superseding Indictment charging foreign murder:

    \_\_\_\_\_     Not Guilty

    ✓     Guilty

**COUNT 2**

We, the jury, upon our oaths, do unanimously find the defendant, LAWRENCE RUDOLPH, in Count Two of the Superseding Indictment charging mail fraud:

    \_\_\_\_\_     Not Guilty

    ✓     Guilty

### COUNT 3

We, the jury, upon our oaths, do unanimously find the defendant, LORI

MILLIRON, in Count Three of the Superseding Indictment charging accessory-after-the-

fact to the foreign murder charged in Count One:

     \_\_\_\_\_          Not Guilty

     _✓_          Guilty

### COUNT 4

We, the jury, upon our oaths, do unanimously find the defendant, LORI

MILLIRON, in Count Four of the Superseding Indictment charging obstruction of a grand

jury proceeding:

     \_\_\_\_\_          Not Guilty

     _✓_          Guilty

### COUNT 5

We, the jury, upon our oaths, do unanimously find the defendant, LORI

MILLIRON, in Count Five of the Superseding Indictment charging perjury before a grand

jury:

     _✓_          Not Guilty

     \_\_\_\_\_          Guilty

2

## COUNT 6

We, the jury, upon our oaths, do unanimously find the defendant, LORI MILLIRON, in Count Six of the Superseding Indictment charging perjury before a grand jury:

_____    Not Guilty

___√___    Guilty

## COUNT 7

We, the jury, upon our oaths, do unanimously find the defendant, LORI MILLIRON, in Count Seven of the Superseding Indictment charging perjury before a grand jury:

___√___    Not Guilty

_____    Guilty

## COUNT 8

We, the jury, upon our oaths, do unanimously find the defendant, LORI MILLIRON, in Count Eight of the Superseding Indictment charging perjury before a grand jury:

___√___    Not Guilty

_____    Guilty

## COUNT 9

We, the jury, upon our oaths, do unanimously find the defendant, LORI MILLIRON, in Count Nine of the Indictment charging perjury before a grand jury:

_____    Not Guilty

___√___    Guilty

3

01/1/2022

**DATE**

**4**

# MANDAMUS EXHIBIT 5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Case No. 22-cr-00012-WJM-2

UNITED STATES OF AMERICA,

       Plaintiff,                 **FILED UNDER RESTRICTION**

v.

    1.  LAWRENCE RUDOLPH and
    2.  **LORI MILLIRON**,

       Defendants.

---

## MOTION FOR REVOCATIONOF DFENDANT'S ORDER OF RELEASE PURSUANT TO 18 U.S.C. § 3148 AND APPLICATION FOR ARREST WARRANT

---

Lori Milliron tried to help Lawrence Rudolph get away with murdering his wife. While on pretrial release, she has been defrauding the children out of money that belongs to their parents' estate. A convicted perjurer with no respect for the law, she waited all of five days before willfully violating this court's order to have lengthy conversations with Lawrence Rudolph in which he identified the assets she could use to finance her flight. Although she responded that she would not flee, pressure to do so will increase as she comes to terms with the substantial likelihood of a prison sentence. She is a flight risk who poses a danger to the victims in this case. The government moves the Court, pursuant to 18 U.S.C. § 3148, to (1) issue a warrant for her arrest and (2) hold a hearing to determine whether her order of release should be revoked.

**I.**    **Milliron's conditions prohibiting contact with Rudolph absent counsel and requiring her to obey the law remain in place after her conviction for perjury, accessory after the fact to murder, and obstruction of justice.**

A grand jury investigating the death of Bianca Rudolph heard testimony from Lori Milliron on January 5, 2022. Later that same day, the grand jury returned an indictment charging

Lawrence Rudolph — Bianca's husband — with foreign murder and mail fraud. After considering additional evidence, that same grand jury found probable cause to believe that Milliron's January 5, 2022 testimony had obstructed its investigation, that Milliron had committed several discrete acts of perjury, and that she had made herself an accessory after the fact by doing these things to help Rudolph escape prosecution.

A petit jury unanimously concluded beyond a reasonable doubt that Milliron did what the grand jury thought she did. At the end of a nearly three-week trial featuring dozens of witnesses and hundreds of exhibits, the jury returned a verdict finding Rudolph guilty of both murdering his wife with a shotgun in Zambia and of lying about it to life insurance companies to claim almost $5 million. Milliron was convicted of being an accessory-after-the-fact, of obstructing the grand jury's investigation, and of twice perjuring herself by lying under oath about the reasons she received tens of thousands of dollars from Rudolph before Bianca's death and about what Rudolph told her regarding the death. She was acquitted of three other perjury counts.

Milliron self-surrendered to authorities in Arizona on February 15, 2022. A magistrate judge in the District of Arizona released her on strict conditions that included house arrest, location monitoring, and a condition that she have no contact with victims, witnesses, or co-defendant Lawrence Rudolph. ECF No. 62. Those conditions were largely adopted by the Honorable Nina Y. Wang at an initial appearance in the District of Colorado on February 23, 2022, with a slight modification allowing communication with victims, witnesses, and Lawrence Rudolph only through counsel. ECF No. 76. These conditions continue to govern Milliron during her release pending sentencing.

2

## II. There is probable cause that Milliron has committed offenses while on release and clear and convincing evidence that she has willfully violated the terms of her release.

After the jury returned its verdict, the government moved for Lori Milliron's detention pursuant to 18 U.S.C. § 3143. After being placed under oath — the same oath she'd just been convicted of violating — she told the court she'd been in compliance with her bond conditions and promised she would remain in compliance. But she lied about her past compliance and quickly broke her promise about future compliance just a few days after walking out of the courtroom. Between the perjury convictions and her continued lying on the stand even afterwards, it is plain that she has no respect for the oath or this court's authority. That and the actions discussed below make her a flight risk and a danger to the community.

### A. Milliron stole and fraudulently converted hundreds of thousands of dollars while on pre-trial release.

AnaBianca has provided the government with several power of attorney forms executed by her father. The first, executed by Lawrence Rudolph on January 31, 2022, made Julian Rudolph and Lori Milliron co-powers-of-attorney. (Exhibit 12). An important limitation on that power required that *both* "agents" (Julian and Lori) consent and sign any checks or transfers of $15,000 or more. (Exhibit 12 at ¶ 12.d). More generally, the power of attorney required that Rudolph's agents act in his best interests and for his welfare. (Exhibit 12 at ¶ 1).

While this power of attorney was in effect—and while under bond conditions requiring that she obey federal, state, and local law (ECF No. 76 at 1)— evidence shows that Lori Milliron stole and converted money for her personal advantage.

#### 1. *Theft of Money from Rudolph Trust Account*

Milliron wrote the following checks for more than $15,000 without Julian's consent or signature:

| Exhibit | Check Number | Date | Amount |
|---|---|---|---|
| 06(b) at 4 | 111 | 2/28/22 | $25,000 |
| 06(b) at 3 | 113 | 3/8/22 | $200,000 |
| 06(b) at 2 | 118 | 3/25/22 | $30,000 |
| 06(b) at 1 | 151 | 6/27/22 | $35,000 |
| | | | **$290,000** |

AnaBianca and Julian have represented that these transactions were not authorized. (Exhibit 22).[1] Rudolph himself confronted Milliron with this concern in a call (one that violated her conditions of release) on August 8, 2022 (Exhibit 17 at 2:30; 845; 9:08). The checks appear to have Lawrence Rudolph's signature, but his detention makes it extremely unlikely that he signed them. Rather, they appear to have been affixed to the checks using a stamp, which Milliron references in that same August 8, 2022 telephone call. (Exhibit 17 at 8:01).

There is probable cause to believe that converting this property to Milliron's own use without authorization violates Arizona's consolidated theft statute, Ariz. Rev. Stat. § 13-1802. That statute provides that a person commits theft if, "without lawful authority they

(1) control "property of another with the intent to deprive the other person of such property," or

(2) covert "for an unauthorized term or use services or property of another entrusted to the defendant or placed in the defendant's possession for a limited, authorized term or use."

*See also State v. Tramble*, 695 P.2d 737, 741 (1985) (describing Arizona's adoption of omnibus theft statute combining concepts of larceny, fraud and embezzlement).[2] Milliron was not

---

[1] Exhibit 22 is a summary of information provided by AnaBianca Rudolph. Items 1-10 referenced in that that document correspond with government exhibits 1-10.

[2] Theft of property with a value of $25,000 or more is a "class 2 felony." Thefts of property worth more than $4,000 but less than $25,000 is a "class 3" felony. A class 2 felony carries a penalty of between 3 to 12.5 years, with a presumptive sentence of 5 years. Ariz. Rev. Stat. § 13-702. A class 3 felony carries a penalty of between 2 and 8.75 years, with a presumptive sentence of 3.5 years. Ariz. Rev. Stat. § 13-702.

4

authorized to spend hundreds of thousands of dollars without consent from Julian Rudolph. This is corroborated in a latter call in which Lawrence Rudolph told Milliron she had not been authorized to spend an additional $250,000 of his money on an attorney. (Exhibit 17 at 3:02).

Milliron took high-value personal items from safes located within Rudolph's properties in Arizona and Pennsylvania. Rudolph claims that those safes — the combinations of which were known only to Rudolph and Milliron — contained  (1) $200,000 in cash, (2) 80 ounces of gold coins, (3) jewelry that had belonged to Bianca Rudolph, (4) a man's TAG Hauer watch, (5) a Leopard pendant with gold, (6) the title to Rudolph's property at 101 Moulton Lane in Victor, Idaho (referenced at trial as a property just outside of Jackson Hole, Wyoming), (7) Title to a Toyota Tacoma, (8) title to a Range Rover, (9) title to a Harley Davidson Motorcycle, (10) and passports belonging to Bianca and Larry Rudolph.  (Exhibits 4(a) and 21).

Before the charges, Milliron and Rudolph lived together in a Scottsdale, Arizona condominium while waiting for construction to finish on a property in Paradise Valley, Arizona. Until the lease on that condominium expired, this is where she resided under house arrest. Rudolph's letter asserts that he asked Milliron to take property from a safe in that condominium and take it to a property at 103 Morningside Drive in Cranberry Township, Pennsylvania. When AnaBianca sought these items, however, she discovered that the safe at 103 Cranberry township was empty. (Exhibits 02(d)(1) - 2(d)(3)). AnaBianca and Julian have reported that the safe at the home being constructed in Paradise Valley is also empty. Closed circuit television cameras show a woman who looks like Lori Milliron removing boxes of items from that location on August 6, August 13, August 20 and August 22, 2022.  (Exhibits 11(a) – 11(g)). Probation has confirmed, from its records, that Milliron was at that location on those days.

In the pretrial services report prepared in Arizona on February 15, 2022, Milliron stated

that she had access to only $10,000 in cash. ECF No. 86. This is either a concession that the money in the safe did not belong to her or an intentional omission designed to conceal from the court that she actually had access to $200,000 cash and access to gold coins and jewelry.

Given Milliron's house arrest, it is unlikely that the contents of the safe were ever transferred to Cranberry Township. It is more likely that Milliron removed the contents of the safe and either retains possession of them or has liquidated and converted them. Milliron has been contacted about the items but has not returned them. (Exhibit 21). If she has converted the cash and gold to her own use or otherwise disposed of that property for her own purposes, there is at least probable cause that she has done so without authorization and so committed the crime of theft under Arizona law.

**B.     Milliron continued to illegally convert funds after trial.**

Lawrence Rudolph revoked the power of attorney he granted to both Lori Milliron and Julian Rudolph on July 6, 2022. (Exhibit 13).  That same day he executed a new power of attorney making Julian Rudolph his sole agent. (Exhibit 14).

Julian has informed the government that he fired Lori Milliron from her employment at Three Rivers Dental Group about 30 minutes before the jury's verdict on August 1, 2022. Despite being fired and thus having no legitimate reason to use Three Rivers Dental Group Credit Cards, Milliron used the card for a $6,041.27 charge on August 2, 2022. (Exhibit 01(c)).

**C.     Milliron broke her oath to this court that she would comply with her conditions within days of making the promise.**

Lori Milliron waited a mere five days before violating the condition of her post-trial bond prohibiting contact with Lawrence Rudolph and therein her oath to this court:

- Despite the clear conditions of her release, Milliron took a call from Lawrence Rudolph on August 6, 2022, at 7:53 a.m. and spoke to him for about 8 minutes. Milliron complained about Rudolph's children firing her from the business,

locking her out of email accounts, and otherwise limiting her access to Rudolph's business and financial accounts. (Exhibit 15 at 1:45; 2:42;4:20; 11:04; 18:42). Milliron referenced a power of attorney for Rudolph held by his son, Julian, and asked Rudolph to revoke it. (Exhibit 15 at 4:10; 10:00). Rudolph encouraged Milliron to flee by referencing others who had escaped to either Canada or Mexico to avoid criminal process and telling Milliron directly "you don't want to go inside." (Exhibit 15 at 16:24) Milliron responded "I can't do that." (Exhibit 15 at 17:53). The call ended abruptly when Rudolph said he needed to get his "meds."

- Rudolph called Milliron on August 6, 2022, at 9:33 a.m. and, once again, Milliron violated the conditions of her release by talking to him for about 15 minutes. Milliron again asked Rudolph to reverse Julian's power of authority and complained that Julian was going to throw her out on the street. (Exhibit 16 at 1:14). She admitted to taking money without authorization by paying for a rental in Paradise Valley with one of Rudolph's credit cards. (Exhibit 16 at 3:20). Despite being on house arrest, she said that she had visited the house under construction in Paradise Valley, Arizona. (Exhibit 16 at 5:10). That house, which is the subject of a seizure action in 21-cv-03423, was financed using life insurance proceeds fraudulently procured by Rudolph. Rudolph again encouraged Milliron to flee by referencing others he believed had successfully fled to foreign countries.  (Exhibit 16 at 16:27; 25:05). During the call, Milliron complained against a trial witness, calling her an "evil bitch." (Exhibit 16 at 21:47).

- Lori Milliron violated the conditions of her bond by taking a third call from Lawrence Rudolph on August 8, 2022, at 7:30 a.m. In this call, Milliron accused Rudolph of taking away the power of attorney behind her back.  (Exhibit 17 at 2:30). Rudolph said it was because he worried that Milliron's attorney was taking too much money from her. (Exhibit 17 at 3:02). Later in the call, Rudolph asked if Milliron was receiving disability payments from an insurance company. When she said she was not receiving the full amount, Rudolph encouraged her to lie to the insurance company by saying she was his Executive Administrator and he was out of the country. (Exhibit 17 at 5:43). At least initially, Milliron said she would do it.  (Exhibit 17 at 7:23). Milliron admitted that a financial administrator for Rudolph had warned her not to make "unilateral" moves. (Exhibit 17 at 8:45). Rudolph reminded Milliron that she had no authority to pay her attorney an extra fee without concurrence from Julian. (Exhibit 17 at 9:08).

- Lori Milliron committed a fourth violation of her release conditions when she took another call from Lawrence Rudolph on August 8, 2022, at 8:44 a.m.

7

Rudolph had previously spoken to his daughter, AnaBianca, about obtaining Bianca's cremains. On the call, Rudolph asked Milliron about the location of the cremains. Milliron told Rudolph that Bianca's cremains were in a storage locker in Scottsdale. (Exhibit 18 at 1:14). Milliron then attempted to extort Rudolph, explaining that she wouldn't be able to get the cremains unless she was able to move into the house in Paradise Valley, (Exhibit 18 at 1:30; 8:30; 9:20), and repeatedly asked Rudolph to give her back his power of attorney and to take action to get her "fucking job back." (Exhibit 18 at 4:49;7:00; 7:57; 12:11).

- A fifth violation of Lori Milliron's release conditions took place later that same day, when Milliron took an approximately 14-minute-long call from Rudolph at 4:49 p.m. Milliron complained about Rudolph's children changing the locks on the property at 103 Morningside Drive in Cranberry Township. (Exhibit 19 at 0:45). That property — also financed with fraudulently-obtained life insurance proceeds — is also subject to the forfeiture action docketed at 21-cv-03423. Milliron continued to ask Rudolph to revoke Julian's power of attorney. (Exhibit 19 at 2:01).

- Lori Milliron violated the conditions of her release a sixth time when she took yet another call from Rudolph on August 10, 2022, at 8:19. (Exhibit 20). On this call, Milliron acknowledged what she had known all along: that she should not be talking to Rudolph because it was a violation of the court's order.

Evidence at trial showed that Lawrence Rudolph quickly took action to cremate his wife after the murder. He returned with Bianca's cremains in 2016. After the trial, Bianca's brother Vince Finizio (who was also a witness at trial) contacted the U.S. Attorney's office to express emotional distress over Milliron's perceived lack of cooperation in the family's efforts to obtain the cremains.

In her August 8 call with Rudolph, Milliron appears to condition any effort to return Bianca's cremains on assistance moving materials from that locker to the home in Paradise Valley. On September 2, 2022, an FBI agent visited Life Storage at 10456 N. 74th Street in Scottsdale, Arizona. A Life Storage employee confirmed that two units were rented to Rudolph. The clerk also said that a unit was rented to Lori Milliron in May 2022. That same day —

September 2, 2022 — Julian Rudolph went to the facility to change the locks on the storage units and to direct Life Storage staff not to allow Milliron access to the units.  But because the third unit is rented in the name of Lori Milliron, he was unable to gain access to that unit.

Counsel for the government reached out to Milliron's counsel on September 6 to inquire about the location of the cremains and to ask for Milliron's consent to a search of the storage locker for them. She provided that consent. Three days later, an FBI Special Agent met Milliron's daughter, Stephanie Moroz, at the storage locker, where movers were able to clear out enough items to provide passage to the box containing Bianca's cremains. The agent saw that Ms. Moroz was accompanied by an older blonde woman who did not identify herself. When the agent later asked Ms. Moroz who else was present, Ms. Moroz told the agent that she had been accompanied by her mother, Lori Milliron.

Lawrence Rudolph's children believe that much of the property in the storage lockers belongs solely to Lawrence Rudolph. The telephone calls with Lawrence Rudolph suggest that she may be authorized to obtain the items in that locker, but the precise scope of that authority and whether it has been revoked is unknown to the government.

## III.     Lori Milliron is a flight risk who endangers the wellbeing of Lawrence Rudolph's children.

Time and again, Lori Milliron has demonstrated nothing but contempt for the legal system.  As detailed in the government's response to a pretrial motion *in limine*, she lied after being placed under oath at a civil deposition in 2016. ECF No. 179. Unrepentant, she now stands convicted of doing the same beyond a reasonable doubt to help a murderer escape accountability. In the calls with Rudolph she expresses no remorse or acceptance of responsibility, blaming the verdict on other factors, insulting the witnesses against her, and calling the victims of the crime — Rudolph's children — "brats," (Exhibit 15 at 15:47), "pieces of shit," (Exhibit 19 at 1:42),

and "assholes" (Exhibit 19 at 12:30). And she still seems to think that she will escape

responsibility for her crimes—discussing with Rudolph how a documentary-maker is interested

in their case and how her counsel has a plan to attack the verdict in the "court of public opinion."

There is at least probable cause to believe that Lori Milliron — fresh off being convicted

of perjury — deceived the court when it placed her under oath to talk about the conditions of her

release. She did not tell the Court she had taken hundreds of thousands of dollars without

authorization. She did not tell the Court that she had just been fired and cut off from her prior

sources of income.

Lori Milliron is a flight risk. True, she demurred on the telephone calls when Rudolph

told her to flee. But even after being cut off from the Rudolph's money she likely has access to at

least $200,000 in cash, gold, and other property to finance an escape. She may not have

considered fleeing in the first weeks of August when the shock of the verdict was still fresh — a

"bad dream" she would wake up from (Exhibit 15 at 15:59) — but the lure of a Mexican beach

or freedom overseas with hundreds of thousands of dollars to establish herself will surely get

more tempting as sentencing approaches in February. It is not uncommon for defendants to exist

in a state of delusion regarding the consequences of their actions until the last minute. *See, e.g.,*

Michael Levonson, *Contractor at Center of Navy Bribery Scandal Flees House Arrest*, N.Y.

TIMES (Sept. 6, 2022), https://www.nytimes.com/2022/09/06/us/fat-leonard-escape.html

(describing defendant's flight from home arrest just three weeks before sentencing). But when

she realizes that the "Free Lori" social media groundswell inspired by her Netflix-narrated biopic

isn't imminent, reality will set in.

As an accessory to murder, Milliron likely faces a recommended guideline sentence of

121-151 months' imprisonment. The near-certainty of a lengthy sentence — combined with

Rudolph's exhortation that she does not want to "go in" and should flee — is a continuing source of pressure that will only grow in the coming weeks. Her refusal to follow the court's order of release by contacting Lawrence Rudolph gives her continued access to Rudolph's detailed knowledge of his own assets — his disability payments and a condo in Mexico — that she can also use to plan any escape.

There is a substantial risk that she will continue to prey on the Rudolphs' children. She has expressed contempt for them. On August 22, 2022, AnaBianca and her uncle, Vince Finizio, notified the government that Lori's daughter, Stephanie Moroz, was sending a photograph of Bianca's dead body (an exhibit from the trial) to other employees at Three Rivers Dental Group. Finding out about this caused AnaBianca extreme emotional hardship. Before she was placed on restrictions, Lori Milliron taunted Julian Rudolph in a series of text messages. (Exhibits 09(a)(1) – 09(a)(5)), threatening to persuade Rudolph to withdraw his support of them and of using her influence with Three Rivers Dental Employees (the reference to "Theresa" is a reference to accountant Theresa Danser) to obstruct their operation of the business. Her hostility towards them and her intimate knowledge of their father's finances and electronic accounts makes her an ongoing threat to their well-being at a vulnerable time in their lives.

**IV.     The presumption of liberty no longer applies.**

It is time for Lori Milliron to take the judicial system seriously. Pursuant to 18 U.S.C. § 3148, the government moves that the court initiate proceedings to revoke her order of release. That statute authorizes the Court to issue a warrant for the defendant's arrest. The government requests that the Court do so here.

Section 3148 requires that the court enter an order of revocation if it finds that there is probable cause to believe a person has committed a state crime while on release. Stealing

hundreds of thousands of dollars from a vulnerable inmate and his children is a crime in Arizona.

Ariz. Rev. Stat. Ann. 13-1802. In addition, the Court must revoke the order of release if it finds

by clear and convincing evidence that the defendant has violated any other condition of release.

Testimony from the Probation Officer will clearly and convincingly establish such violations.

The government will then argue, as set forth above, that evaluation of the factors set forth in 18

U.S.C. § 3142 supports revocation of release. Under these circumstances, there is even greater

incentive for the defendant to flee or otherwise avoid her day of reckoning; a warrant is thus the

most expeditious and effective means of securing her appearance.

## V.      **CONCLUSION**

The Government moves the Court to issue a warrant for the defendant's arrest to appear at a

hearing to determine whether her release should be revoked.

Dated this 14th day of September, 2022

Respectfully submitted,

COLE FINEGAN
United States Attorney

By:      */s Bryan Fields*          By:      *J. Bishop Grewell*
Bryan Fields                      J. Bishop Grewell
Assistant United States Attorney  Assistant United States Attorney
U.S. Attorney's Office            U.S. Attorney's Office
1801 California St. Suite 1600    1801 California St. Suite 1600
Denver, CO 80202                  Denver, CO 80202
(303) 454-0100                    (303) 454-0100
Bryan.Fields3@usdoj.gov           Bishop.Grewell@usdoj.gov
Attorney for the Government       Attorney for the Government

# MANDAMUS EXHIBIT 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 22-cr-00012-WJM-1

UNITED STATES OF AMERICA,

        Plaintiff,

v.

1.     LAWRENCE RUDOLPH, and
2.     LORI MILLIRON,

        Defendants.

_____

**UNITED STATES' MOTION FOR MANDATORY
RESTITUTION AND FORFEITURE**

_____

       COMES NOW the United States of America, by and through United States

Attorney Cole Finegan and Assistant United States Attorney Kurt J. Bohn, and

hereby submits this Motion for Mandatory Restitution and Forfeiture in this

matter.

## <u>INTRODUCTION</u>

       Upon the jurors' conviction of Defendant Rudolph for the murder of Bianca

Rudolph and mail fraud to obtain insurance proceeds, restitution to the victims

and forfeiture of his ill-gotten gain became mandatory.  The Defendant received

$4,877,744.93 in insurance proceeds which must be paid back to the victims as

restitution.  Further, the Defendant must forfeit the proceeds resulting from his

criminal activity.  The United States is seeking forfeiture of the following assets

traceable to the proceeds of his criminal offense to satisfy the forfeiture

obligation:

> a)    Real Property located at 7000 N. 39th Place, Paradise Valley, Arizona;

> b)    Real Property located at 103 Morningside Drive, Cranberry Township, Pennsylvania;

> c)    All funds seized from Bank of New York Mellon account #10532701000, in the name of Lawrence P. Rudolph Trust;

> d)    All funds seized from Vanguard account #0540-88150069515, in the name of Lawrence P. Rudolph and Bianca T. Rudolph TR- Rudolph Trust;

> e)    All funds seized from Vanguard account #0585-88150069515, in the name of Lawrence P. Rudolph and Bianca T. Rudolph TR- Rudolph Trust;

> f)    2018 Aston Martin DB-11, VIN SCFRMFAV5JGL03309; and

> g)    2017 Bentley Bentayga, VIN SJAAC2ZV2HC014709.

As set forth below, both restitution and forfeiture are mandatory.

## <u>LEGAL REQUIREMENT FOR RESTITUTION AND FORFEITURE</u>

## A.    RESTITUTION

Restitution is a court-ordered payment made by the perpetrator of a crime

to the victims of that crime. The purpose of restitution "is not to punish

defendants or to provide a windfall for crime victims but rather to ensure that victims, to the greatest extent possible, are made whole for their losses." *United States v. Hudson*, 483 F.3d 707, 710 (10th Cir. 2007) (*citing United States v. Arutunoff*, 1 F.3d 1112, 1121 (10th Cir.1993)).  Restitution is not an inherent power of the courts, as it may only be imposed as authorized by statute.  *United States v. Serawop*, 505 F.3d 1112, 1117 (10th Cir. 2007).

<u>1.     Restitution is Mandatory to the Counts of Conviction</u>

In 18 U.S.C. § 3663A, the Mandatory Victims Restitution Act ("MVRA"), Congress enacted a statute making restitution to victims of certain federal crimes mandatory.  The statutory language makes this clear, "[n]otwithstanding any other provision of law, when sentencing a defendant convicted of an offense described in subsection (c), the court **shall** order, . . .  that the defendant make restitution to the victim of the offense or, if the victim is deceased, to the victim's estate."  18 U.S.C. § 3663A(a)(1)(emphasis added).  As discussed below, there are different victims for the crimes of conviction in this matter and different restitution available to them.

The MVRA applies in this matter because the counts of conviction are specifically provided for in § 3663A(c)(1).  That section states that the MVRA applies to all sentencing proceedings if the offense of conviction relates to offenses identified in § 3663A(c)(1), which states as relevant here:

"for, any offense –

(A) that is –

(i)  a crime of violence, as defined by section 16;

(ii)  an offense against property under this title, . . ., including any offense committed by fraud or deceit; . . ."

18 U.S.C. § 3663A(c)(1)(A).

Both counts of conviction in this matter require the imposition of mandatory restitution under the MVRA.  Mr. Rudolph was convicted in Count 1 of murder, in violation of 18 U.S.C. §§ 1119 and 1111.  It is well settled law that first degree murder is a crime of violence.  *United States v. Stubbs*, 2021 WL 5507221 *4 (E.D. Okla. Nov. 24, 2021) (citing others).  Therefore, § 3663A(c)(1)(A)(i) would impose the mandatory restitution provision of the MVRA and require restitution to the victim or victims of the murder offense.

Likewise, in Count 2, Mr. Rudolph was convicted of mail fraud in violation of 18 U.S.C. §§ 1341 and 2.  Mail fraud involves a scheme to "defraud or obtain property."  *United States v. Schuler*, 458 F.3d 1148, 1152 (10th Cir. 2006); *see also, United States v. Camick*, 796 F.3d 1206, (10th Cir. 2015) (affirming restitution ordered under the MVRA for convictions of mail fraud as it is an offense against property rights).  The conviction of the mail fraud count, an offense against property under § 3663A(c)(1)(A)(ii), would impose the mandatory

restitution provision of the MVRA and require restitution to the victims of the mail fraud offense.

### 2.    There are Different Victims for Each Count

In determining who is a victim for restitution purposes, § 3663A(a)(2) states that "the term 'victim' means a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." To be a victim under the MVRA, the defendant's conduct must be the "but-for" cause of the individual's harm and it must be the defendant who "proximately" caused that harm. *United States v. Speakman*, 594 F.3d 1165, 1171 (10th Cir. 2010). Here, by statute and case law, the victim of Count 1, murder, is not the same victim of Count 2, mail fraud, and vice versa.

As to Count 1, there is no disputing that Bianca Rudolph was directly harmed as a result of the commission of that offense. The statute, § 3663A(a)(2), provides that when the victim of the offense is deceased, then the "representative of the victim's estate, another family member, or any other person appointed as suitable by the court, may assume the victim's rights under this section. . ." *Id*. However, "in no event shall the defendant be named as such a representative or guardian." *Id*. Restitution to the estate of Bianca Rudolph or a suitable person, assuming her rights as a victim, is mandatory in this matter. Two questions would remain for the Court on this issue: 1) who will the Court

appoint to be the representative now that the Defendant can no longer serve in that capacity[1]; and 2) what, if any, restitution is appropriate for the victim of murder in this case?

As for Count 2, the statute also specifically includes victims of offenses that involve the element of "scheme" in the criminal activity. *Id*. Mail fraud is such an offense. *Schuler*, 458 F.3d at 1152 (10th Cir. 2006). The victims of the Defendant in Count 2, the offense of mail fraud, include "any person directly harmed by the defendant's criminal conduct in the course of the scheme, . . ." § 3663A(a)(2). Here the mail fraud scheme consisted of the Defendant receiving property he was not entitled to from the various insurance companies, as such, restitution to the insurance companies who were directly and proximately harmed is mandatory. *United States v. Chin*, 965 F.3d 41, 59 (1st Cir. 2020).

    3.    The Scope of Restitution for Each Count

As there are two separate counts of conviction, the Court must look to the differing nature of the offenses and the separate victims of each count in determining the appropriate amount of restitution. The statute specifies what is compensatory restitution in both offenses involving bodily injury or death and property offenses. § 3663A(b).

---

[1] The United States takes no position on who that person/representative should be at this time.

6

i.  Count 1 – Murder Victim

The victim of Count 1 – would be Bianca Rudolph – or now the suitable person appointed by the Court.  The appointed person "may assume the victim's rights."  § 3663A(a)(2).  Once that person assumes the victim's rights, they can submit a victim's statement expressing the restitution they believe they are entitled to, and which is controlled by statute.

Section 3663A(b)(2)(C) provides for restitution when the offense results in bodily injury to the victim, including income lost as a result of the offense.[2]  The Tenth Circuit addressed whether future lost income to the victim of a crime of violence was appropriate and found it was.  In *Serawop*, the Court rejected the defendant's position that § 3663A did not allow for an order of restitution awarding lost and future income for the victim of voluntary manslaughter. *Serawop*, 505 F.3d at 1119 - 1120.  (The court held that to hold otherwise would result in a deceased victim receiving less restitution than a victim of bodily injury.)

Section 3663A(b)(3) specifically addresses restitution for offenses that result in death.  The statute provides that restitution in matters of death shall be equal to an amount of the cost of a funeral and related services.  *Id*. at 1119.[3]

---

[2]  Section 3663A(b)(2) also provides for necessary and related medical expenses (§ 3663A(b)(2)(A)) and necessary physical and occupational therapy and rehabilitation (§ 3663A(b)(2)(B)).

[3]  From information known to the United States at this time, Defendant Rudolph paid the funeral and related expenses.

7

Case No. 21-cr-00100-WJM Document 356-1 filed 11/16/23 USDC Colorado page 8 of 25
Case 1:22-cv-01012-WJM Document 356-1 filed 11/16/23 USDC Colorado page 8 of 25
113 of 342

Appellate Case: 23-1162     Document: 010110860450     Date Filed: 05/16/2023     Page: 113

Therefore, the Court is required to order restitution to the victim, or appointed representative, for lost or future income and any funeral related expenses if appropriate.[4]

      ii.  Count 2 – Mail Fraud

Section 3663A(b)(1) provides for restitution when the offense results in the loss of property - Count 2 is an offense against property.  The victims in Count 2 would be those directly and proximately harmed by the commission of the offense of mail fraud.

Here, there were nine insurance policies that paid claims out as a result of the mail fraud committed by Defendant Rudolph.  The restitution analysis focuses on the causal relationship of the criminal activity – the mail fraud - and loss suffered as a result of it – the paying out of property.  *Chin*, 965 F.3d at 59 (1st Cir. 2020) (mail fraud scheme directly harmed the insurance companies when they made payments as a result of the criminal conduct.)  Therefore, the Court is required to order restitution to the victims of Count 2 in the amount of the loss of property sustained by each victim.

---

[4]  The information known to the United States at this time indicate that Bianca Rudolph was not working at the time of her murder and did not have plans to return to the work force, and the funeral and related expenses were paid by Defendant Rudolph.  Therefore, there would be no restitution for lost or future income, or funeral and related expenses.

B.    FORFEITURE[5]

"Criminal forfeiture is an *in personam* action in which the forfeiture of and

the vesting of title in the United States in the defendant's tainted property is

imposed as a punishment against the defendant."  *United States v. McGinty*, 610

F.3d 1242, 1247 (10th Cir. 2010).  In this case, the property sought to be forfeited

to the United States is forfeitable under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. §

2461(c).

The purpose of forfeiture statutes is to take away gains made by a

defendant that were obtained by the unlawful activity.  *McGinty*, 610 F.3d at

1246.  (citing *United States v. Hall*, 434 F.3d 42, 59 (1st Cir. 2006)).  "Thus, with

respect to forfeiture of fraud proceeds under § 981(a)(1), a defendant may be

ordered to forfeit all monies received as a result of the fraud, regardless of his net

profits from the scheme.  In other words, "[p]roceeds are property that a person

would not have but for the criminal offense...."  *Yass*, 636 F.Supp.2d at 1184.

The statute provides that property subject to forfeiture includes the

appreciation of the property, "and any property traceable thereto, and is not

limited to the net gain or profit realized from the offense."  § 981(a)(2)(A).  *United*

---

[5]  The determination of forfeiture can be made either by a jury upon the return of
a verdict of guilty, or by the court, upon a request by either party.  Rule
32.2(b)(5)(A).  The parties in this case provided their Notice of Forfeiture Hearing
on July 20, 2022, informing the Court that they would submit the forfeiture issue
for the Court's resolution.  (Docket # 228).

*States v. Afriyie*, 929 F.3d 63, 73 (2d Cir. 2019).  (Traceable property includes the appreciated value of the initial proceeds, including interest, dividends, or other earnings.); *see generally United States v. Betancourt*, 422 F.3d 240, 250–51 (5th Cir. 2005) (holding that the entire amount of Texas lottery winnings were subject to criminal forfeiture where the winning lottery ticket was purchased with drug proceeds); *United States v. Real Property Identified as: Parcel 03179-005R*, 287 F. Supp. 2d 45, 59–60 (D.D.C. 2003) (real property purchased with proceeds derived from mail fraud and wire fraud, and the property's appreciated value, are subject to forfeiture; to hold otherwise would reward the wrongdoer for his illegal activities).  In this case, the interest and dividends earned on the tainted funds would also be forfeited, as well as any appreciation of the real property.

1.     Forfeiture is Mandatory

Forfeiture is also mandatory in this case, and the analysis of the mandatory forfeiture begins at 18 U.S.C. § 981(a)(1) which states that the following property is subject to forfeiture to the United States:

(C)  Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of . . . or any offense constituting "**specified unlawful activity**" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.  (emphasis added).

10

The term "specified unlawful activity" is defined in 18 U.S.C. § 1956(c)(7) which includes "any act or activity constituting an offense listed in section 1961(1) of this title." And § 1961(1) defines "any act which is indictable under any of the following provisions of title 18, United States Code: . . . section 1341 (relating to mail fraud) . . ."

Although 18 U.S.C. § 981(a)(1) is titled Civil Forfeiture, it is incorporated into criminal proceedings by 28 U.S.C. § 2461(c). Section 2461(c) provides:

> If a person is charged in a criminal case with a violation of an Act of Congress for which the civil or criminal forfeiture of property is authorized, the Government may include notice of the forfeiture in the indictment or information pursuant to the Federal Rules of Criminal Procedure. If the defendant is convicted of the offense giving rise to the forfeiture, the court **shall** order the forfeiture of the property as part of the sentence in the criminal case pursuant to the Federal Rules of Criminal Procedure and section 3554 of title 18, United States Code.

(emphasis added.) *United States v. Channon*, 973 F.3d 1105, 1113 (10th Cir. 2020).

The United States provided Defendant Rudolph notice of forfeiture in this matter. The United States provided notice of its intent to seek forfeiture for a violation of Title 18, United States Code, Sections 1341 and 2, in the Indictment filed on January 5, 2022. (Docket # 26, pp. 2 -3). In the Superceding Indictment the United States gave notice of its intent to seek forfeiture upon a conviction of Count 2 "pursuant to the provisions of Title 18, United States Code, Section

11

981(a)(1)(C), and Title 28, United States Code, Section 2461(c)."  (Docket 53, p.

8).  The United States again gave specific notice in the United States' First Bill of

Particulars for Forfeiture of Property of its intent to seek forfeiture of the

Defendant's interest in the identified property therein or to seek a money

judgment in the amount of the proceeds the Defendant obtained as a result of the

scheme alleged in Count 2.  (Docket # 108).

<u>2.      Forfeiture Applies to the Conviction in Count 2 – Mail Fraud</u>

Mail fraud is a specified unlawful activity and the proceeds from a violation

of that statute are subject to forfeiture.  *United States v. Yass*, 636 F. Supp. 2d

1177, 1184 (D. Kan. 2009) ("The forfeiture in this case is predicated upon

convictions of the "specified unlawful activity" of mail fraud, 18 U.S.C. § 1341.

The Court finds that the mail fraud and conspiracy to commit mail fraud crimes

are "unlawful activities," as defined by 18 U.S.C. §§ 1956(c)(7), 1961(1).").

The property became forfeitable to the United States upon the Defendant's

commission of the mail fraud.  Section 981(f) provides that, "All right, title, and

interest in property described in subsection (a) of this section shall vest in the

United States upon commission of the act giving rise to forfeiture under this

section."  The "relation back" doctrine means that not only could no one else

acquire a legally cognizable interest in the property after the commission of the

crime, the property vested in the United States at that time.  *United States v.*

*Real Property Located at 19 Crane Park, Hattiesburg, Lamar County, Mississippi, et al.*, 2022 WL 2898914 * 2 (S.D. Miss. E. Div. July 21, 2022).  Accordingly, any interest, dividends, or appreciation that occurred after the act that gave rise to the conviction would flow to the United States.

Therefore, upon the Defendant's conviction of Count 2 – mail fraud – forfeiture of the subject property, including all appreciation, growth, and other gains from the date the crimes were committed became mandatory.

3.      What Property is Forfeitable

The subject properties identified in the United States' First Bill of Particulars for Forfeiture of Property (Docket # 108) are subject to forfeiture as they are proceeds traceable to the count of conviction.  "Proceeds" are defined by statute as, "…property of any kind obtained directly or indirectly, as the result of the commission of the offense giving rise to forfeiture, and any property traceable thereto, and is not limited to the net gain or profit realized from the offense."  18 U.S.C. § 981(a)(2)(A).

The question involving forfeiture in this matter, after the Defendant has been convicted of mail fraud, isn't if the United States is entitled to forfeiture, as those proceeds were involved in the offense, it is what assets are subject to forfeiture as property traceable to proceeds.  *United States v. Voigt*, 89 F.3d 1050, 1084-1085 (3d Cir. 1996).  Proceeds received directly from the illegal mail

13

fraud, i.e., the insurance proceeds, that are directly traced to an account are forfeitable property as there is a direct nexus between the offense and the property. *Id*. at 1087.

The property subject to forfeiture includes "[a]ny property, real, or personal, which constitutes or is derived from proceeds traceable to [the] violation." 18 U.S.C. § 981(a)(1)(C). *Channon*, 973 F.3d at 1109 (10th Cir. 2020). Therefore, the insurance proceeds that Mr. Rudolph received as a result of his conviction for mail fraud, property procured with them, and any appreciation in value are forfeitable to the United States.

## C. BOTH RESTITUTION AND FORFEITURE ARE APPROPRIATE AND MANDATORY

Restitution and forfeiture are mandatory in this case for the reasons set forth above. The statutory language used both in the MVRA and the forfeiture statutes, that a court "shall" order restitution and forfeiture indicates Congress' strong intent to impose a mandatory duty upon the court. *United States v. Arnold*, 878 F.3d 940, 945 (10th Cir. 2017).

Not only are they mandatory, but they are appropriate as they serve two distinctly different purposes. "Restitution is remedial in nature, and its goal is to restore the victim's loss. Forfeiture, in contrast, is punitive, it seeks to disgorge any profits that the offender realized from his illegal activity." *McGinty*, 610 F.3d at 1247. Forfeiture vests title in the United States in a defendant's tainted

14

75

property, focusing on not with how much an individual has but how much he received in connection with the commission of the crime.   *Channon*, 973 F.3d at 1112.  Because restitution (calculated based on the victim's loss) and forfeiture (calculated based on the offender's gain) are distinct remedies, "ordering both in the same or similar amounts does not generally amount to a double recovery." *McGinty*, 610 F.3d at 1247.

As separate orders of restitution and forfeiture are mandatory, there is no ability for the Court to reduce or offset them against the other.  *Channon*, 973 F.3d at 1113.  Here, Defendant Rudolph is liable to the estate of Bianca Rudolph and to the insurance companies for restitution; and he must forfeit all of his ill-gotten gains to the United States.  The combination of both these orders is not disproportionate to the nature of Defendant Rudolph's criminal offense. *Channon*, 973 F.3d at 1112 - 1113.

## D.     PROCEDURE TO DETERMINE RESTITUTION AND FORFEITURE

### 1.      Restitution

The procedure to determine restitution is set forth at § 3664.  The process begins with the Court ordering the probation officer to prepare a report addressing restitution.  The report needs to address the loss of each victim and the economic circumstance of the defendant.  § 3664(a).  To the extent there is a dispute as to the amount or type of restitution, it shall be resolved by the Court.

15

§ 3664(e).  The burden of establishing any amount of loss sustained by a victim rests upon the United States to prove by a preponderance of the evidence.  *Id*. *United States v. James*, 564 F.3d 1237, 1248 (10th Cir. 2009).  When imposing restitution, "the court shall order restitution to each victim in the full amount of each victims' losses" and does not look to the economic circumstances of the Defendant.  § 3664(f)(1)(A). *United States v. Ferdman*, 779 F.3d 1129, 1132 (10th Cir. 2015).

### 2.    Forfeiture

"Criminal forfeiture is governed by Federal Rule of Criminal Procedure 32.2, which sets forth four requirements before a final order of forfeiture can be entered."  *United States v. Executive Recycling, Inc.*, 953 F.Supp.2d 1138, 1156-1157 (D. Colo. 2013).  Only the first two requirements are relevant at this time.

The first step requires the United States to provide notice to the Defendant that it will seek forfeiture of property as part of the sentence.  Rule 32.2(a).  As stated above, the United States provided notice of its intent to seek forfeiture on three specific occasions – Indictment, Superceding Indictment, and United States' First Bill of Particulars for Forfeiture of Property.  The Defendant has been on notice since the inception of this matter that the United States intended to seek forfeiture.

The second step is the entry of a preliminary order of forfeiture. Rule 32.2(b). When entering that order, the Court must determine the following:

a.    what property is subject to forfeiture under the applicable statutes; and

b.    has the United States established a requisite nexus between the specific property and the offense,

Rule 32.2(b)(1)(A).

If the Defendant requests a hearing regarding forfeiture, the Court must conduct it, but there is no requirement that the Court conduct the hearing prior to the entry of a preliminary order. *Executive Recycling, Inc.*, 953 F.Supp.2d at 1157. In making its determination, the Court can consider the evidence already in the record and any other relevant and reliable evidence or information submitted to it. Rule 32.2(b)(1)(B). Because forfeiture is part of the criminal sentencing procedure, hearsay is admissible. *United States v. Evanson*, 2008 WL 3107332 * 2, (D. Utah August 4, 2008). The burden of proof is on the United States to establish by a preponderance of the evidence that the property is subject to forfeiture. 18 U.S.C. § 983(c)(1). *Executive Recycling, Inc.*, 953 F.Supp.2d at 1158.

Here, the United States has provided notice of its intent to seek forfeiture and, though not required, indicated which specific property is subject to forfeiture.

17

So, the next step is to determine if the United States has established a nexus between the property and the offense.

"In general, proceeds are property a defendant would not have obtained or retained **but for** the commission of the criminal offense." *Evanson*, 2008 WL 3107332, \*3 (D. Utah Aug. 4, 2008) (emphasis added). Courts have applied the "but for" test and held that it applied not only to the original proceeds but the gains from them as well. *United States v. Cekosky*, 171 F. App'x. 785, 787–88 (11th Cir. 2006) (Holding that interest earned was "but for" the illegal proceeds because defendant would not have been able to open his bank account but for having committed an identity theft offense, the interest he earned on the deposits in that bank account represented the proceeds of the offense, even though the deposits themselves were made with legitimate funds); *United States v. Gardenhire*, 2017 WL 6371362 (W.D. Pa. Dec. 13, 2017) (Holding that appreciation of property value was "but for" the illegal proceeds real property purchased and renovated with proceeds of illegal drug dealing is traceable to illegal drug proceeds and is subject to forfeiture, including the appreciation in value of the property after renovations were completed)**.**

The tracing of the proceeds below, establishes beyond a preponderance of the evidence, a nexus between the criminal activity of mail fraud and the property.

## E.     TRACING OF PROCEEDS[6]

The Defendant received $4,877,744.93 from life insurance proceeds from nine different policies as a result of the mail fraud he committed after the murder of Bianca Rudolph.  Tracing these proceeds to the accounts they flowed through (facilitating accounts) to accounts that were seized (proceed accounts) and/or to the property procured (proceed property) with at least portions of these funds establishes the basis for an Order of both restitution and forfeiture.

The Defendant had the payout from the nine insurance policies deposited into two separate Vanguard Fund accounts:  0030-88150069515 (hereinafter "facilitating account **30-9515"**) and 0030-09875915266 (hereinafter "facilitating account 30-5266").  Both accounts were facilitating accounts, as the proceeds flowed through these accounts.  After the funds were received into facilitating account 30-5266 they were transferred to facilitating account **30-9515** and facilitating account 30-5266 was closed.  All nine of the policies identified were paid out as a result of the Defendant's submission of fraudulent claims which were the basis of his conviction for Count Two, mail fraud.

The tracing of the proceeds is addressed in Attachment A.

---

[6] All of the source documents used in the tracing of the funds and assets in this matter have been previously produced in discovery.

19

## F.    MANDATORY ORDERS

The statutes require that the Court shall order restitution and forfeiture. Therefore, the United States requests the Court enter the following orders:

1.    <u>Restitution</u>

a.    Count 1 - Murder

That, based on his conviction of murder in Count 1, Defendant Rudolph be liable to pay restitution to the estate of Bianca Rudolph, or the Court appointed suitable representatiave, for lost income.  As no claim for future lost income has been submitted by a victim, no restitution for lost future income would be appropriate.

That, based on his conviction of murder in Count 1, Defendant Rudolph be liable to pay restitution to the estate of Bianca Rudolph, or the Court appointed suitable representative, for funeral expenses.  As none have been submitted by a victim, no restitution for funeral expenses would be appropriate.

b.    Count 2 – Mail Fraud

That, based on his conviction of mail fraud in Count 2, Defendant Rudolph is Ordered to pay restitution to the following entities and in the following amounts:

| Insurance Company | Policy number | Amount |
|---|---|---|
| AAA Life Insurance Company | GT8107<br>Cert.4019648262 | 200,000.00 |
| Ameritas | U00013758A | 751,849.32 |

20

| Ameritas | T00017578A | 1,003,049.90 |
| Fidelity Life Association | 0100382288 | 100,973.41 |
| Genworth Life and Annuity Insur. Co. | 1308458 | 844,533.88 |
| Great West Life Insurance Co | 104 TLP Cert. 105665 | 1,000,157.54 |
| Metlife Insurance Company | 215 150 755 UT | 772,901.17 |
| Transamerica Life Insurance Co. | 42728878 | 503,438.85 |
| Transamerica Life Insurance Co. | 42186233 | 500,840.86 |

A final amount of restitution owed cannot be determined at this time as all of the victims' statements and required proof have not been received.

2.     Forfeiture

That Defendant Rudolph forfeits the following property to the United States:

a)     Real Property located at 7000 N. 39th Place, Paradise Valley, Arizona;

Upon the Court's Order of forfeiture, the United States will sell the property, and after fees and expenses, will forfeit 58.74% of the proceeds. (See paragraphs B, C, K, and Exhibit 15).

b)      Real Property located at 103 Morningside Drive, Cranberry Township, Pennsylvania;

Upon the Court's Order of forfeiture, the United States will sell the property, and after fees and expenses, will forfeit 50.55% of the proceeds.  (See paragraph L and Exhibit 16).

c)      All funds seized from Bank of New York Mellon account #10532701000, in the name of Lawrence P. Rudolph Trust;

Upon the Court's Order of forfeiture, the United States will take full title and ownership of all funds seized from Bank of New York Mellon account #10532701000.  (See paragraph B and Exhibit 5).

d)      $751,776.28 in United States currency seized from Vanguard account #0540-88150069515, in the name of Lawrence P. Rudolph and Bianca T. Rudolph TR- Rudolph Trust;

Upon the Court's Order of forfeiture, the United States will take full title and ownership of the $751,776.28 in United States currency seized from Vanguard account #0540-88150069515.  (See paragraphs E, I, and Exhibit 13).

e)      All funds seized from held in Vanguard account #0585-88150069515, in the name of Lawrence P. Rudolph and Bianca T. Rudolph TR- Rudolph Trust;

22

Upon the Court's Order of forfeiture, the United States will take full title and ownership of all funds seized from Vanguard account #5085-88150069515.  (See paragraphs D, J, and Exhibit 14).

f)      2018 Aston Martin DB-11, VIN SCFRMFAV5JGL03309;

Upon the Court's Order of forfeiture, the United States will sell the vehicle, and after fees and expenses, distribute the remaining proceeds based on the percentage of tainted funds used to purchase the vehicle to the United States and the percentage of untainted funds to the appropriate person/representative. (See paragraph F and Exhibit 10).

g)      2017 Bentley Bentayga, VIN SJAAC2ZV2HC014709.

Upon the Court's Order of forfeiture, the United States will sell the vehicle, and after fees and expenses, distribute the remaining proceeds based on the percentage of tainted funds used to purchase the vehicle to the United States and the percentage of untainted funds to the appropriate person/representative. (See paragraph H and Exhibit 12).

DATED this 15th day of November, 2022.

Respectfully submitted,

COLE FINEGAN
United States Attorney

s/**Kurt J. Bohn**
Kurt J. Bohn
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: 303-454-0100
Fax: 303-454-0405
Email: kurt.bohn@usdoj.gov

## CERTIFICATE OF SERVICE

    I hereby certify that on this 15th day of November 2022, I electronically filed the foregoing with the Clerk of Court using the ECF system which will send notification of such filing to all counsel of record.

s/ *Kurt J. Bohn*

Kurt J. Bohn
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: 303-454-0100
Fax: 303-454-0405
Email: kurt.bohn@usdoj.gov

## ATTACHMENT A

### 1.      Restitution From Mail Fraud Proceeds

The initial deposits received from the insurance companies as a result of the mail fraud establish the amount of restitution owed.  As of April 18, 2017, all the life insurance proceeds were deposited into facilitating account number **30-9515**.  As described below, these funds were transferred to other accounts and/or used to obtain assets.

Genworth Life and Annuity Insurance Company paid out $44,533.88 from policy number 1308458 on January 31, 2017, to Defendant's Vanguard Fund facilitating account number **30-9515**.  (Gov. Exhibits 300 and 309).

AAA Life Insurance Company paid out $200,000.00 from policy number GT8107 on March 22, 2017, to Defendant's Vanguard Fund facilitating account **30-9515**.  (Gov. Exhibits 306 and 311).

Fidelity Life Insurance Association paid out $100,973.41 from policy number 0100382288 on March 22, 2017, to Defendant's Vanguard Fund facilitating account **30-9515**.  (Gov. Exhibits 305 and 311).

Ameritas Life Insurance Corp. paid out $1,003,049.90 from policy number T00017578A on April 5, 2017, to Defendant's Vanguard Fund facilitating account **30-9515**.  (Gov. Exhibits 307 and 312).

Ameritas Life Insurance Corp. paid out $751,849.32 from policy number U00013758A on April 5, 2017, to Defendant's Vanguard Fund facilitating account **30-9515**.  (Gov. Exhibits 308 and 312).

Great West Life Annuity Insurance Company paid out $1,000,157.54 from policy number 0104 TLP on March 16, 2017, to Defendant's Vanguard Fund facilitating account 30-5266.  (Gov. Exhibits 304[1] and 310).

Metlife Insurance Company[2] paid out $772,901.17 from policy number 215150755 UT on March 16, 2017, to Defendant's Vanguard Fund facilitating account 30-5266. (Gov. Exhibits 301 and 310).

TransAmerica Life Insurance Company paid out $503,438.85 from policy number 42728878 on March 16, 2017, to Defendant's Vanguard Fund facilitating account 30-5266. (Gov. Exhibits 302 and 310).

TransAmerica Life Insurance Company paid out $500,840.86 from policy number 42186233 on March 16, 2017, to Defendant's Vanguard Fund facilitating account 30-5266. (Gov. Exhibits 303 and 310).

The total amount of proceeds Defendant Rudolph received as a result of his mail fraud was $4,877,744.93.  (Exhibits 1 and 2).   The above-described losses are the direct and proximate result of the Defendant's mail fraud.  Accordingly, Defendant should be ordered to pay restitution to each victim listed

---

[1] Government Exhibit 304 is the copy of the check issued by Great-West Life & Annuity Insurance Company to The Rudolph Trust in the amount of $1,000,157.54.  It was produced in discovery and identified as Bates VANG_00000702.  It was referred to at trial but was not offered into evidence, for clarity of the record, it will be referred to in this Motion as Gov. Exhibit 304.
[2] The check is made out by Brighthouse Life Insurance Company.  Brighthouse was created by Metlife Insurance Company on March 6, 2017.

2

above in the full amount of each victims' loss, for a total Count 2 restitution amount of $4,877,744.93.[3]

### 2.     Forfeiture From Mail Fraud Proceeds

The Defendant transferred the $4,877,749.93 proceeds obtained from the insurance companies to various bank accounts.  He then used some of the proceeds to put towards the purchase of two properties – one in Arizona and one in Pennsylvania – and two vehicles – an Aston Martin and a Bentley Bentayga.  The remaining funds had been deposited in/transferred to three different bank accounts at the time they were seized.

> ### A.     Balance in Facilitating Vanguard Account **30-9515** Upon Receipt of Insurance Proceeds.

Defendant Rudolph was the sole account holder of Vanguard facilitating account **30-9515**.  Prior to the deposits of life insurance proceeds into facilitating account **30-9515**, the balance in the account was $413,035.35.  This amount was the "untainted" balance in the account.  The insurance proceeds are the "tainted" funds.  While both types of funds were in this, and later other accounts, they accrued interests, dividends, and appreciation.  The United States has apportioned the earned interests, dividends, and appreciation based on the percentage of untainted and tainted funds in the account.

---

[3] Victim impact statements are still pending at the time of the filing of this Motion.  To the extent that any of the restitution should be paid to someone other than the life insurance companies, the United States will attempt to resolve the issue prior to sentencing and will notify the Court accordingly.  The amount of restitution will not be affected by the designation of the payee.

3

The United States has used a "proceeds first" approach to trace the proceeds in this matter.  The "proceeds first" approach means that criminal proceeds that are commingled with other funds in one account and then moved to another assumes that the criminal proceeds were the first ones transferred out of the account.  *United States v. Banco Cafetero Panama*, 797 F.2d 1154, 1158-1162 (2d Cir. 1986).

The United States used the "proceeds first approach in its tracing of the tainted funds with the following exceptions:  1) funds that passed through an account in short proximity from the time of deposit and the intent of the funds was clear that it was meant as a pass-through transaction;[4] 2) funds transferred to and from Camelback Consulting Marketing LLC's account, Wells Fargo account 5688139749 (hereinafter WF 9749) as that was primarily a business account; and 3) the portion of funds applied to the purchase of the 2017 Bentley Bentayga, as these funds exhausted the tainted funds and the Defendant closed facilitating account **30-9515** after this transfer.

From the time period of January 31, 2017, with the deposit of the insurance proceeds from Genworth Life, until the final insurance deposit from Great West Life on April 18, 2017, facilitating account **30-9515** had other

_____

[4] There were two primary examples of this:  funds acquired from the sale of the Miami, Florida residence that were passed through and applied to the construction of the Arizona residence, and $500,000.00 transferred into Bank of New York Mellon account 0005173568 from one of Defendant's Morgan Stanley accounts was wired out to Global Escrow Solutions LLC for the purchase of the condo in San Jose del Cabo, Mexico, in a short period of time

4

transactions in and out of the account that included income from the untainted funds of $126,653.99 and tainted funds of $1,426.50 (from interest); and withdrawals from untainted of $78,500.00[5] and from tainted of $37,668.92.  That made the account balances after all the life insurance proceeds had been deposited on April 18, 2017, $5,305,961.24, of which <u>$4,841,271.89 was tainted</u>.

| Untainted | Tainted | Balance | |
|---|---|---|---|
| $464,689.35 | $4,841,271.89 | $5,305,961.24 | (Exhibit 3). |

B.    Proceeds Account Bank of New York Mellon 1000.

Facilitating account **30-9515** had various transactions in and out of it involving untainted and tainted funds.  On June 13, 2017, the Defendant received a deposit of $297,562.98 from the sale of a property in Miami, Florida into facilitating account **30-9515**.  On the same day, a transfer in the amount of $105,000.00 was paid out to VPR Builders, LLC towards the construction of the Arizona residence.  These would be considered untainted funds, as it was considered a pass-through transaction, and the untainted balance in the account was then $634,332.95.

Up to August 9, 2017, facilitating account **30-9515** had additional withdrawals and deposits related to untainted funds.  On August 8, 2017, Defendant Rudolph transferred <u>$3,000,000.00 of tainted</u> funds to an account at Bank of New York Mellon account 10532701000 (herein after "BNYM proceeds

_____

[5] All of these funds were transferred to Camelback Consulting's Wells Fargo account 9749.

5

account 1000")[6], which posted the deposit on August 9, 2017.  Prior to that

transfer, the balance in the account was zero.  These funds were used to secure

a construction loan from Bank of New York Mellon for the Arizona property.  The

balances in facilitating account **30**-9515 on that day were:

| Untainted | Tainted | Balance | |
|---|---|---|---|
| $640, 458.01 | $1,857,283.48 | $2,497,741.50 | (Exhibit 4). |

Activity in BNYM proceeds account 1000 from August 9, 2017, until May

31, 2021, included the following transactions:

| | |
|---|---|
| Bank and advisory fees | $  36,764.88 |
| Transfers to BNYM account 3568[7] | $150,000.00 |
| Mortgage payments[8] | $    9,656.36 |
| Payment on condo in Mexico[9] | $100,000.00 |
| Transfer to Wells Fargo account 2446[10] | $200,000.00 |
| Transfer to Morgan Stanley account 408-235[11] | $  51,000.00 |
| Total withdrawal from account | $547,421.24 |

BNYM proceeds account 1000 appreciated $1,229,537.38 from August 9, 2017,

until May 31, 2021.  On December 21, 2021, the United States seized the

---

[6] Defendant Rudolph was the sole account holder of BNYM proceeds account 1000.

[7] These transfers occurred on two dates – April 24, 2019, for $70,000.00 and on January 21, 2020, for $80,000.00.  The funds were used to make mortgage payments towards the construction of 7000 N. 39th Place, Paradise Valley, Arizona.  As of May 3, 2021, $99,082.90 of the $150,000.00 had been applied as mortgage payments.

[8] Mortgage payment for 7000 N. 39th Place, Paradise Valley, Arizona.

[9] Payment for condo in San Jose del Cabo, Mexico.

[10] Funds applied to the purchase of 103 Morningside Drive, Cranberry Township, Pennsylvania.

[11] Funds applied to the construction of 7000 N. 39th Place, Paradise Valley, Arizona.

6

entirety of the account, which was entirely proceeds from the mail fraud, it had a balance of <u>$3,496,092.04 of tainted funds</u>.  (Exhibit 5).

      C.    Proceeds Used For Construction of Proceeds Property Located at 7000 N. 39th Place, Paradise Valley, Arizona.

On August 30, 2017, the Defendant made a payment from facilitating account **30-**9515 of $1,154,739.79 to Fidelity National Title towards the construction of the Arizona property.  There were $192,562.98 in untainted funds remaining from the sale of the Miami residence that were applied to the payment, and the rest consisted of <u>$962,176.41 in tainted funds</u>.  After some other withdrawals, the balances in facilitating account **30-9515**[12] on August 30, 2017, were:

| Untainted | Tainted | Balance | |
|---|---|---|---|
| $437,895.03 | $895,107.14 | $1,333,002.17 | (Exhibit 6). |

      D.    Defendant Transfers Funds From Vanguard Facilitating Account **30-9515** To Six Different Vanguard Accounts.

From August 30, 2017, to February 2, 2018, there were several transactions involving facilitating account **30-9515**, of significance were:  a January 2, 2018, payment of a credit card bill of $15,000.00 – using the "proceeds first" approach this amount was applied to tainted funds; on February 1, 2018, the Defendant transferred $500,000.00 into facilitating account **30-9515** from WF 9749, which was associated with the Defendant's business, Camelback

---

[12] Interest and dividend payments into the account were attributed based on the percentage of untainted and tainted funds in the account.

Consulting Marketing, LLC; the Defendant transferred a net $80,000.00 from facilitating account **30-9515** to WF 9749; and he received $20,000.00 in franchising fees into facilitating account **30-9515**.  The balances in facilitating account **30-9515** on February 1, 2018, were:

| Untainted | Tainted | Balance | |
| --- | --- | --- | --- |
| $880,918.78 | $886,741.72 | $1,767,660.50 | (Exhibit 7). |

On February 2, 2018, the Defendant engaged in moving money from facilitating account **30-9515** to six different Vanguard accounts.  All six of these accounts were in the name of Lawrence P. Rudolph Trust.  Five of these accounts were merely used to facilitate the movement of the proceeds, one of the accounts, Vanguard account 585-9515, consisted entirely of proceeds and was later seized by the United States.

   i.  Facilitating Vanguard Account 569-9515.

Facilitating account 569-9515 was opened and had a zero balance on February 1, 2018.  On February 2, 2018, the Defendant transferred <u>$195,000.00 of tainted</u> funds from facilitating account **30-9515** to Vanguard account 569-9515.

   ii.  Facilitating Vanguard Account 584-9515.

Facilitating account 584-9515 was opened and had a zero balance on February 1, 2018.  On February 2, 2018, the Defendant transferred <u>$157,500.00 of tainted</u> funds from facilitating account **30-9515** to Vanguard account 584-9515.

iii.     Facilitating Vanguard Account 511-9515.

Facilitating account 511-9515 was opened and had a zero balance on February 1, 2018.  On February 2, 2018, the Defendant transferred <u>$52,500.00 of tainted</u> funds from facilitating account **30-9515** to Vanguard account 511-9515.

iv.     Facilitating Vanguard Account 1945-9515.

Facilitating account 1945-9515 was opened and had a zero balance on February 1, 2018.  On February 2, 2018, the Defendant transferred <u>$26,250.00 of tainted </u>funds from facilitating account **30-9515** to Vanguard account 1945-9515.

v.     Facilitating Vanguard Account 1946-9515.

Facilitating account 1946-9515 was opened and had a zero balance on February 1, 2018.  On February 2, 2018, the Defendant transferred <u>$26,250.00 of tainted</u> funds from facilitating account **30-9515** to Vanguard account 1946-9515.

vi.     Proceeds Vanguard Account 585-9515.

Vanguard proceeds account #0585-88150069515 (hereinafter "proceeds account 585-9515") was opened and had a zero balance on February 1, 2018.  On February 2, 2018, the Defendant transferred <u>$292,500.00 of tainted</u> funds from facilitating account **30-9515** to Vanguard proceeds account 585-9515.  The entirety of this account, $527,736.24, was seized by the United States on December 21, 2021.

The total amount of <u>tainted</u> funds transferred out of facilitating account **30-9515** on February 2, 2018, was $750,000.00.  (Exhibit 8).  After all six of these transfers, the balances in facilitating account **30-9515** on February 2, 2018, were:

| <u>Untainted</u> | <u>Tainted</u> | <u>Balance</u> | |
|---|---|---|---|
| $880,918.78 | $136,741.72 | $1,017,660.50 | (Exhibit 7). |

      E.     Proceeds Vanguard Account 540-9515.

Defendant Rudolph had opened Vanguard proceeds account #0540-88150069515 (hereinafter "proceeds account 540-9515") in the name of Lawrence P. Rudolph and Bianca T. Rudolph Trust.  The balance in that account on April 16, 2019, was $785,091.12.  The Defendant made four transfers into proceeds account 540-9515 from four of the facilitating accounts he had opened on February 2, 2018.

          i.     Facilitating Vanguard Account 569-9515.

From February 2, 2018, until April 16, 2019, there were no additional deposits into facilitating account 569-9515.  On April 16, 2019, the Defendant transferred $179,000.00 of tainted funds from facilitating account 569-9515 to proceeds account 540-9515.

          ii.     Facilitating Vanguard Account 584-9515.

From February 2, 2018, until April 16, 2019, there were no additional deposits into facilitating account 569-9515.  On April 16, 2019, the Defendant transferred $161,000.00 of tainted funds from facilitating account 584-9515 to proceeds account 540-9515.

      iii.    Facilitating Vanguard Account 511-9515.

From February 2, 2018, until April 16, 2019, there were no additional deposits into facilitating account 511-9515.  On April 16, 2019, the Defendant transferred <u>$52,869.00 of tainted</u> funds from facilitating account 511-9515 to proceeds account 540-9515.

      iv.    Facilitating Vanguard Account 1945-9515.

From February 2, 2018, until April 16, 2019, there were no additional deposits into facilitating account 1945-9515.  On April 16, 2019, the Defendant transferred <u>$24,000.00 of tainted</u> funds from facilitating account 1945-9515 to proceeds account 540-9515.

The total amount of <u>tainted</u> funds transferred into proceeds account 540-9515 on April 16, 2019, was <u>$416,869.00</u>.  The balance in proceeds account 540-9515 after these transfers was:

| Untainted | Tainted | Balance | |
|---|---|---|---|
| $786,124.23 | $416,869.00 | $1,203,993.23 | (Exhibit 9). |

      F.    Proceeds 2018 Aston Martin DB-11.

On March 1, 2018, the Defendant purchased a 2018 Aston Martin DB-11, VIN SCFRMFAV5JGL03309.  The purchase price was $239,000.00.  On March 1, 2018, the Defendant paid <u>$125,000.00 of tainted</u> funds from facilitating account **30-9515** to Bentley of Scottsdale for the down payment on the Aston Martin.  The Defendant financed $105,111.32 for the purchase.  The percentage

11

of tainted versus untainted funds is 52% tainted ($125,000.00) to 48% untainted ($1.5,111.32).

After the funds were transferred for the purchase of the Aston Martin, there were only $11,910.21 in tainted funds remaining in facilitating account **30-9515**. (Exhibit 10).  On March 13, 2018, the Defendant made a credit card payment of $16,500.00.  Taking the proceeds first approach, and applying the remainder of the tainted money, the balances in facilitating account **30-9515** after this payment on March 13, 2018, were:

| Untainted | Tainted | Balance | |
|-----------|---------|---------|--|
| $877,414.47 | - 0 - | $877,414.47 | (Exhibit 10). |

      G.    Defendant Transfers Funds From Five Facilitating Vanguard Accounts Back To Facilitating Account **30-9515**.

The Defendant then transferred <u>tainted</u> life insurance proceeds <u>back</u> into facilitating account **30-9515** on January 7, 2021, from four facilitating Vanguard accounts he had previously moved money to.

      i.    Facilitating Vanguard Account 584-9515.

From February 2, 2018, until January 7, 2021, there were no additional deposits into facilitating account 584-9515.  On January 7, 2021, the Defendant transferred <u>$3,444.72 of tainted</u> funds from facilitating account 584-9515 to facilitating account **30-9515**.  After the Defendant made this transfer, he closed this account.

        ii.     Facilitating Vanguard Account 511-9515.

From February 2, 2018, until January 7, 2021, there were no additional deposits into facilitating account 511-9515.  On January 7, 2021, the Defendant transferred a net $3,235.14 of tainted funds from facilitating account 511-9515 to facilitating account **30-9515**.  After the Defendant made this transfer, he closed this account.

        iii.    Facilitating Vanguard Account 1945-9515.

From February 2, 2018, until January 7, 2021, there were no additional deposits into facilitating account 1945-9515.  On January 7, 2021, the Defendant transferred $3,606.30 of tainted funds from facilitating account 1945-9515 to facilitating account **30-9515**.  After the Defendant made this transfer, he closed this account.

        iv.    Facilitating Vanguard Account 1946-9515.

From February 2, 2018, until January 7, 2021, there were no additional deposits into facilitating account 1946-9515.  On January 7, 2021, the Defendant transferred $32,437.46 of tainted funds from facilitating account 1946-9515 to facilitating account **30-9515**.  After the Defendant made this transfer, he closed this account.

The total amount of tainted funds transferred back into facilitating account **30-9515** on January 7, 2021, from the five Vanguard Funds Defendant had previously moved money to was $42,723.62 of tainted life insurance proceeds.

The balances in facilitating account **30-9515** after these transfers on January 7, 2021, were:

| Untainted | Tainted | Balance | |
|---|---|---|---|
| $418,968.94 | $42,723.62 | $461,692.56 | (Exhibit 11). |

H.    Proceeds 2017 Bentley Bentayga.

On April 20, 2021, the Defendant purchased a 2017 Bentley Bentayga, VIN SJAAC2ZV2HC014709.  The Defendant paid $162,390.58 to Bentley of Scottsdale on April 26, 2021.  On April 20, 2021, the Defendant wrote himself a check in the amount of $150,000.00 from facilitating account **30-9515** and deposited into WF 9749 to be applied to the purchase of the Bentley Bentayga. The Defendant applied the remaining $42,724.68 in tainted funds and $107,275.32 of untainted funds to the purchase of the vehicle.  The percentage of tainted versus untainted funds is 26.31% tainted to 73.69% untainted.  (Exhibit 12).

The purchase of the Bentley Bentayga consumed the remainder of the tainted funds in facilitating account **30-9515**, leaving an untainted balance in facilitating account **30-9515** of $286,703.57.  On April 27, 2021, the Defendant transferred the $286,703.57 from facilitating account **30-9515** to Vanguard account 45-9515 and closed out facilitating account **30-9515**.

I.     Proceeds Vanguard Account 540-9515.

On January 7, 2021, the Defendant also transferred $4,657.57 of tainted funds from facilitating account 569-9515 to proceeds account 540-9515.  After the Defendant made this transfer, he closed facilitating account 569-9515.

The total tainted funds transferred into proceeds account 540-9515 from the four facilitating accounts was $421,526.57.  (Exhibit 13).   From January 7, 2021, until August 31, 2021, there were no additional deposits into proceeds account 540-9515.  On August 31, 2021, there was a balance in the account of $2,158,786.68, of which $751,776.28 were tainted funds.  On December 21, 2021, pursuant to a seizure warrant, the United States seized $751,776.28 from proceeds account 540-9515 as proceeds of the conviction in Count 2, mail fraud, leaving the remaining $1,407,010.40 in the account.  (Exhibit 13).

J.     Proceeds Vanguard Account 585-9515.

From January 7, 2021, until August 31, 2021, there were no additional deposits made into proceeds account 585-9515.  On August 31, 2021, there was a balance in the account of $513,203.57, consisting entirely of tainted funds.  On December 21, 2021, pursuant to a seizure warrant, the United States seized all funds in proceeds account 585-9515 - $527,736.24 - as proceeds of the conviction in Count 2, mail fraud.  (Exhibit 14).

K. Proceeds Property Located At 7000 N. 39th Place, Paradise Valley, Arizona.[13]

The approximate total amount paid by the Defendant for the construction of the residence at 7000 N. 39th Place, Paradise Valley, Arizona up to May 31, 2021, is $1,910,109.82.  The Defendant used $1,121,915.61 of tainted funds and $788,194.21 in untainted funds to pay for the construction.  The percentage of tainted versus untainted funds used to that time was 58.74% tainted to 41.16% untainted.  Accordingly, 58.74% of the net proceeds from the sale of the property are subject to forfeiture.  (Exhibit 15).

L. Proceeds Property Located At 103 Morningside Drive, Cranberry Township, Pennsylvania.

The approximate amount paid by the Defendant for the residence at 103 Morningside Drive, Cranberry Township, Pennsylvania up to October 1, 2020, was $1,812,500.00.  On September 28, 2000, the Defendant transferred $200,000.00 of tainted funds from proceeds account BNYM 1000 to another Wells Fargo account, number 3615742446 (hereinafter "facilitating account WF 2446").  He also transferred $50,000.00 in untainted funds from facilitating account WF 9749 and $150,000.00 in untainted funds from facilitating account 30-9515 into facilitating account WF 2446.  The Defendant used $199,970.00 of tainted funds and $195,603.69 of untainted to pay for the down payment and closing costs of the property.  The percentage of tainted versus untainted funds

---

[13] The figures used are based on information known to the United States through May 31, 2021, as those were the last financial statements reviewed.

16

is 50.55% tainted to 49.45% untainted.  Accordingly, 50.55% of the net proceeds from the sale of the property are subject to forfeiture.  (Exhibit 16).

The Defendant immediately entered into a rental agreement wherein he was paid $11,000.00 a month beginning on October 26, 2020, after receiving an initial payment of $22,000.00 – consistent with the first and last month's rent. Therefore, the rental income, which was used to pay the mortgage, would have increased the equity in the property and as such would be divided at the same rate as the tainted to untainted rate used to make the down payment. (Exhibit 16).

**Exhibit 1**

| Life Insurance Payments | | | | | |
|---|---|---|---|---|---|
| Insurance Company | Policy Number | Payment Posted | Amount Paid | Account Deposited | Bates |
| Genworth Life and Annuity Insurance Company | 1308458 | 1/31/2017 | $ 44,533.88 | Vanguard 30-9515 | VANG_00000284 GENW_00000003 |
| Great West Life Annuity Insurance Company | 0104 TLP Certificate 105665 | 3/16/2017 | $ 1,000,157.54 | Vanguard 30-5266 | VANG_00000623 VANG_00000903 GRTW_00000876 |
| Metlife Insurance Company | 215150755 UT | 3/16/2017 | $ 772,901.17 | Vanguard 30-5266 | VANG_00000623 VANG_00000903 METLIFE_00000104 |
| TransAmerica Life Insurance Company | 42728878 | 3/16/2017 | $ 503,438.85 | Vanguard 30-5266 | VANG_00000623 VANG_00000903 VANG_00000700 |
| TransAmerica Life Insurance Company | 42186233 | 3/16/2017 | $ 500,840.86 | Vanguard 30-5266 | VANG_00000623 VANG_00000903 VANG_00000699 |
| AAA Life Insurance Company | GT8107 Certificate 4019648262 | 3/22/2017 | $ 200,000.00 | Vanguard 30-9515 | VANG_00000222 AAA_00000157 |
| Fidelity Life Association | 0100382288 | 3/22/2017 | $ 100,973.41 | Vanguard 30-9515 | VANG_00000222 VANG_00000286 |
| Ameritas Life Insurance Corp. | T00017578A | 4/5/2017 | $ 1,003,049.90 | Vanguard 30-9515 | VANG_00000222 AMERITAS_00000045 |
| Ameritas Life Insurance Corp. | U00013758A | 4/5/2017 | $ 751,849.32 | Vanguard 30-9515 | VANG_00000222 AMERITAS_00000045 |
| | | Total Paid | $ 4,877,744.93 | | |



GOVERNMENT EXHIBIT
1
22-cr-00012-WJM
Forfeiture Motion

Life Insurance Payments
Exhibit 2

- Genworth Life and Annuity Policy 1308458 — $44,533.88 (1/31/2017) → Vanguard 30-9515
- AAA Life Insurance Policy GT8107 — $200,000.00 (3/22/2017) → Vanguard 30-9515
- Fidelity Life Association Policy 0100382288 — $100,973.41 (3/22/2017) → Vanguard 30-9515
- Ameritas Life Insurance Policy T00017578A — $1,003,049.90 (4/5/2017) → Vanguard 30-9515
- Ameritas Life Insurance Policy U00013758A — $751,849.32 (4/5/2017) → Vanguard 30-9515
- Great West Life Annuity Policy 0104 — $1,000,157.54 (3/16/2017) → Vanguard 30-5266
- MetLife Insurance Policy 215150755 UT — $772,901.17 (3/16/2017) → Vanguard 30-5266
- TransAmerica Life Insurance Policy 42728878 — $503,438.85 (3/16/2017) → Vanguard 30-5266
- TransAmerica Life Insurance Policy 42186233 — $500,840.86 (3/16/2017) → Vanguard 30-5266
- Vanguard 30-5266 — $2,778,319.10 (4/18/2017) → Vanguard 30-9515

105

GOVERNMENT EXHIBIT
2
PENGAD 800-631-6989
22-cr-00012-WJM
Forfeiture Motion

Case No. 1:21-cr-00012-WJM Document 296-3 Filed 11/05/23 USDC Colorado Page 1 of 1
Case 1:23-cv-00012-WJM Document 296-3 Filed 11/05/23 USDC Colorado Page 1 of 1
150 of 342

## Exhibit 3

| Vanguard Facilitating Account 30-9515 After Life Insurance Payments | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Insurance Company | Policy Number | Payment Posted | Amount Paid | Untainted Balance with dividends and interest | Tainted Balance with Dividends and Interest | Total Balance | Percentage of Tainted to Total Balance | Bates |
| Genworth Life and Annuity Insurance Company | 1308458 | 1/31/2017 | $ 44,533.88 | $ 413,035.35 | $ 44,533.88 | $ 457,569.23 | 9.73% | VANG_00000284 GENW_00000003 |
| AAA Life Insurance Company | GT8107 | 3/22/2017 | $ 200,000.00 | $ 387,625.34 | $ 210,573.39 | $ 598,198.73 | 35.20% | VANG_00000222 AAA_00000157 |
| Fidelity Life Association | 0100382288 | 3/22/2017 | $ 100,973.41 | $ 387,625.34 | $ 311,546.80 | $ 699,172.14 | 44.56% | VANG_00000222 VANG_00000286 |
| Ameritas Life Insurance Corp. | T00017578A | 4/5/2017 | $ 1,003,049.90 | $ 388,000.15 | $ 1,311,103.47 | $ 1,699,103.62 | 77.16% | VANG_00000222 AMERITAS_00000045 |
| Ameritas Life Insurance Corp. | U00013758A | 4/5/2017 | $ 751,849.32 | $ 388,000.15 | $ 2,062,952.79 | $ 2,450,952.94 | 84.17% | VANG_00000222 AMERITAS_00000045 |
| Great West, Brighthouse, and TransAmerica Transfered from Vanguard 30-5266* | | 4/18/2017 | $ 2,778,319.10 | $ 464,689.35 | $ 4,841,271.89 | $ 5,305,961.24 | 91.24% | VANG_00000222 VANG_00000905 |

| Summary of other transactions between 1/31/2017 and 4/18/2017 | | | | | |
|---|---|---|---|---|---|
| Other Income | | | Expenses | | |
| | Untained | Tainted | | Untainted | Tainted |
| Other Insurance | $ 31,024.71 | | Transfers to Camelback Consulting WF 9749 | $ (78,500.00) | |
| Partnership | $ 2,223.00 | | Other Expenses | | $ (37,668.92) |
| Dividends/Interest/Appreciation** | $ 717.08 | $ 1,426.50 | | | |
| Account Transfers | $ 92,689.20 | | | | |
| Total | $ 126,653.99 | $ 1,426.50 | Total | $ (78,500.00) | $ (37,668.92) |

*A dividend of $980.68 mixed in with the transfer of life insurance from Vanguard 30-5266

**Includes dividend transferred from Vanguard 30-5266 on 4/18/2017

Appellate Case: 23-1162    Document: 010110860450    Date Filed: 05/16/2023    Page: 150



GOVERNMENT EXHIBIT
3
22-cr-00012-WJM
Forfeiture Motion

PENGAD 800-631-6989

Case No. 21-cr-20040-WJM Document 296-5 Filed 11/15/23 USDC Colorado Page 1 of 1
Case 1:21-cv-20100-WJM Document 296-5 Filed 11/15/23 USDC Colorado Page 1 of 1
151 of 342

**Exhibit 4**

| Vanguard Facilitating Account 30-9515 Up to Transfer to Bank of New York Mellon | | | | | | |
|---|---|---|---|---|---|---|
| Transaction | Posted Date | Amount Transferred | Untainted Balance | Tainted Balance | Total Balance | Bates |
| Balance on June 12, 2017 | | | $ 441,769.97 | $ 4,848,750.89 | $ 5,290,520.86 | VANG_00000222 |
| Sale of 7350 SW 89th St, Apt 412S, Miami, FL | 6/13/2017 | $ 297,562.98 | $ 739,332.95 | $ 4,848,750.89 | $ 5,588,083.84 | VANG_00000222 20-0377 Fedwire |
| VPR Builders, LLC | 6/13/2017 | $ (105,000.00) | $ 634,332.95 | $ 4,848,750.89 | $ 5,483,083.84 | VANG_00000222 |
| Transfer to WF 9749 | 6/27/2017 | $ (15,000.00) | $ 619,332.95 | $ 4,848,750.89 | $ 5,468,083.84 | VANG_00000222 |
| Transfer from Unknown Vanguard Account | 6/30/2017 | $ 20,000.00 | $ 639,332.95 | $ 4,848,750.89 | $ 5,488,083.94 | VANG_00000223 |
| Interest/Dividend | 6/30/2017 | $ 4,552.59 | $ 639,863.30 | $ 4,852,773.13 | $ 5,492,636.43 | VANG_00000223 |
| Interest/Dividend | 7/31/2017 | $ 5,105.07 | $ 640,458.01 | $ 4,857,283.49 | $ 5,497,741.50 | VANG_00000223 |
| Transfer to BNYM 1000 | 8/8/2017 | $ (3,000,000.00) | $ 640,458.01 | $ 1,857,283.49 | $ 2,497,741.50 | VANG_00000223 |



GOVERNMENT EXHIBIT

4

22-cr-00012-WJM
Forfeiture Motion

PENGAD 800-631-6989

107

Appellate Case: 23-1162     Document: 010110860450     Date Filed: 05/16/2023     Page: 152

## Exhibit 5

| Bank of New York Mellon Proceeds Account 10532701000 (BNYM 1000) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Posted Date | Source Account | Amount Transferred | Untainted Balance | Tainted Balance | Total Balance | Percentage of Tainted to Total Balance | Bates |
| 8/9/2017 | Vanguard 30-9515 | $ 3,000,000.00 | $ - | $ 3,000,000.00 | $ 3,000,000.00 | 100% | NYMEL_00000015 VANG_00000223 20-0377 Fedwire |
| Summary of other transactions between 8/9/2017 and 5/31/2021 | | | | | | | |
| Withdrawals | | | | | | | |
| | Dates | Untainted | Tainted | Percentage of Tainted Funds Used | Subpoena | Property | |
| Bank and Advisory Fees | 8/9/2017 to 5/31/2021 | $ - | $ (36,764.88) | | | | |
| Transfer to BNYM 3568 | 4/24/2019 and 1/21/2020 | $ - | $ (150,000.00) | 100% | NYMEL_00000153 BNY_00000150 | 7000 N 39th Pl, Paradise Valley, AZ | |
| Mortgage Payments | 4/30/2019 and 8/6/2020 | $ - | $ (9,656.36) | 100% | NYMEL_00000153 BNY_00000157 | 7000 N 39th Pl, Paradise Valley, AZ | |
| El Encanto de la Lagunam Condo (Mexico) | 1/4/2021 | $ - | $ (100,000.00) | 100% | BNY_00000168 | Lagunam Condo 101 (Mexico) | |
| Transfer to Wells Fargo 2446 | 9/28/2020 | $ - | $ (200,000.00) | 100% | BNY_00000158 | 103 Morningside Dr, Cranberry Township, PA | |
| Transfer to Morgan Stanley 408-235 | 2/8/2021 | $ - | $ (51,000.00) | 100% | BNY_00000178 | 7000 N 39th Pl, Paradise Valley, AZ | |
| Total | | $ - | $ (547,421.24) | | | | |
| Other Income | | | | | | | |
| | Dates | Untained | Tainted | Total | Percentage of Tainted Funds | Bates | |
| Settlement | 4/21/2021 | $ - | $ 36.69 | $ 36.69 | 100% | BNY_00000412 | |
| Net Investment Income | 8/9/2017 to 5/31/2021 | $ - | $ 1,229,537.38 | $ 1,229,537.38 | 100% | | |
| | | | | | | | |
| Total Seized | | $ - | $ 3,496,092.04 | $ 3,496,092.04 | 100% | | |



GOVERNMENT EXHIBIT

5

22-cr-00012-WJM Forfeiture Motion

PENGAD 800-631-6989

**Exhibit 6**

| Vanguard Facilitating Account 30-9515 Up to Construction Payment Towards Proceeds Property in Arizona | | | | | | |
|---|---|---|---|---|---|---|
| Transaction | Posted Date | Amount Transferred | Untainted Balance | Tainted Balance | Total Balance | Bates |
| Balance on August 8, 2017 | | | $ 640,458.01 | $ 1,857,283.49 | $ 2,497,741.50 | VANG_00000223 |
| Transfer to WF 9749 | 8/15/2017 | $ (20,000.00) | $ 620,458.01 | $ 1,857,283.49 | $ 2,477,741.50 | VANG_00000223 |
| Transfer to WF 9749 | 8/15/2017 | $ (10,000.00) | $ 610,458.01 | $ 1,857,283.49 | $ 2,467,741.50 | VANG_00000223 |
| Three Rivers Dental Franchising | 8/16/2017 | $ 20,000.00 | $ 630,458.01 | $ 1,857,283.49 | $ 2,487,741.50 | VANG_00000223 |
| Fidelity National Title (7000 N 39th Pl, Paradise Valley, AZ) | 8/30/2017 | $ (1,154,739.33) | $ (192,562.98) | $ (962,176.41) | | VANG_00000223 20-0377 Fedwire |
| Balance on August 30, 2017 | | | $ 437,895.03 | $ 895,107.14 | $ 1,333,002.17 | |

Appellate Case: 23-1162   Document: 010110860450   Date Filed: 05/16/2023   Page: 153



GOVERNMENT EXHIBIT
6
22-cr-00012-WJM
Forfeiture Motion

Appellate Case: 23-1162    Document: 010110860450    Date Filed: 05/16/2023    Page: 154

**Exhibit 7**

| Transfers from Vanguard Facilitating Account 30-9515 to Vanguard Sub-Accounts | | | | | | | |
|---|---|---|---|---|---|---|---|
| Transfers from Vanguard 30-9515 | | | | | | | |
| Transaction | Posted Date | Amount Transferred | Untainted Balance | Tainted Balance | Total Balance | Percentage of Tainted to Total Balance | Bates |
| Balance on February 1, 2018 | | | $ 880,918.78 | $ 886,741.72 | $ 1,767,660.50 | 50.16% | VANG_00002604 |
| Transfer to 585-9515 | 2/2/2018 | $ (292,500.00) | $ 880,918.78 | $ 594,241.72 | $ 1,475,160.50 | 40.28% | VANG_00002604 |
| Transfer to 569-9515 | 2/2/2018 | $ (195,000.00) | $ 880,918.78 | $ 399,241.72 | $ 1,280,160.50 | 31.19% | VANG_00002604 |
| Transfer to 584-9515 | 2/2/2018 | $ (157,500.00) | $ 880,918.78 | $ 241,741.72 | $ 1,122,660.50 | 21.53% | VANG_00002604 |
| Transfer to 511-9515 | 2/2/2018 | $ (52,500.00) | $ 880,918.78 | $ 189,241.72 | $ 1,070,160.50 | 17.68% | VANG_00002604 |
| Transfer to 1945-9515 | 2/2/2018 | $ (26,250.00) | $ 880,918.78 | $ 162,991.72 | $ 1,043,910.50 | 15.61% | VANG_00002604 |
| Transfer to 1946-9515 | 2/2/2018 | $ (26,250.00) | $ 880,918.78 | $ 136,741.72 | $ 1,017,660.50 | 13.44% | VANG_00002604 |
| | Total | $ (750,000.00) | | | | | |



GOVERNMENT EXHIBIT

7

22-cr-00012-WJM
Forfeiture Motion

PENGAD 800-631-6989

Appellate Case: 23-1162   Document: 01011060450   Date Filed: 05/16/2023   Page: 155



Exhibit 8

**GOVERNMENT EXHIBIT**

8

22-cr-00012-WJM
Forfeiture Motion

**Exhibit 9**

| Transfers of Tainted Funds into Vanguard Proceeds Account 540-9515 Up to April 16, 2019 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction | Posted Date | Amount | Untainted Balance | Tainted Balance | Total Balance | Percentage of Tainted to Total Balance | Bates |
| Balance on April 15, 2019 | | | $ 785,091.12 | | $ 785,091.12 | 0% | VANG_00002661 |
| Transfer from 569-9515 | 4/16/2019 | $ 179,000.00 | $ 785,091.12 | $ 179,000.00 | $ 964,091.12 | 18.57% | VANG_00002661 |
| Transfer from 584-9515 | 4/16/2019 | $ 161,000.00 | $ 785,091.12 | $ 340,000.00 | $ 1,125,091.12 | 30.22% | VANG_00002661 |
| Transfer from 511-9515 | 4/16/2019 | $ 52,869.00 | $ 785,091.12 | $ 392,869.00 | $ 1,177,960.12 | 33.35% | VANG_00002661 |
| Transfer from 1945-9515 | 4/16/2019 | $ 24,000.00 | $ 785,091.12 | $ 416,869.00 | $ 1,201,960.12 | 34.68% | VANG_00002661 |
| **Total amount of tainted funds** | | | | $ 416,869.00 | | | |



GOVERNMENT EXHIBIT
9
22-cr-00012-WJM
Forfeiture Motion

PENGAD 800-631-6989

Appellate Case: 23-1162     Document: 01011086 0450     Date Filed: 05/16/2023     Page: 157

**Exhibit 10**

| Vanguard Facilitating Account 30-9515 with Transfers for Proceeds Aston Martin DB-11 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction | Posted Date | Account | Amount | Untainted Balance | Tainted Balance | Total Balance | Bates |
| Balance on February 27, 2018 | | Vanguard 30-9515 | | $ 880,918.78 | $ 136,741.72 | $ 1,017,660.50 | VANG_00002604 |
| Interest/Dividend | 2/28/2018 | Vanguard 30-9515 | $ 1,253.97 | $ 882,004.26 | $ 136,910.21 | $ 1,018,914.47 | VANG_00002604 |
| Bentley of Scottsdale (Downpayment DB-11) | 3/1/2018 | Vanguard 30-9515 | $ (125,000.00) | $ 882,004.26 | $ 11,910.21 | $ 893,914.47 | VANG_00002604 VANG_00002747 |
| Amex 3-03004 (Credit Card Payment) | 3/13/2018 | Vanguard 30-9515 | $ (16,500.00) | $ 877,414.47 | $ - | $ 877,414.47 | VANG_00002604 |

| | Untained | Tainted | Total | Percentage Tainted |
|---|---|---|---|---|
| Aston Martin DB-11 Downpayment | $ - | $ 125,000.00 | $ 125,000.00 | 100.00% |



GOVERNMENT
EXHIBIT
10
22-cr-00012-WJM
Forfeiture Motion

113

Appellate Case: 23-1162    Document: 010110860450    Date Filed: 05/16/2023    Page: 158

**Exhibit 11**

| Transfers from Vanguard Sub-Accounts into Vanguard Facilitating Account 30-9515 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Transfers into Vanguard 30-9515 on January 7, 2021 | | | | | | | |
| Transaction | Posted Date | Amount | Untainted Balance | Tainted Balance | Total Balance | Percentage of Tainted to Total Balance | Bates |
| Balance on December 31, 2020 | | | $ 418,968.94 | $ - | $ 418,968.94 | 0% | VANG_00002697 |
| Transfer from Vanguard 1946-9515 | 1/7/2021 | $ 32,437.46 | $ 418,968.94 | $ 32,437.46 | $ 451,406.40 | 7.19% | VANG_00002709 |
| Transfer from Vanguard 1945-9515 | 1/7/2021 | $ 3,606.30 | $ 418,968.94 | $ 36,043.76 | $ 455,012.70 | 7.92% | VANG_00002709 |
| Transfers from Vanguard 584-9515 | 1/7/2021 | $ 3,444.72 | $ 418,968.94 | $ 39,488.48 | $ 458,457.42 | 8.61% | VANG_00002709 |
| Transfer from Vnguard 511-9515 | 1/7/2021 | $ 3,235.14 | $ 418,968.94 | $ 42,723.62 | $ 461,692.56 | 9.25% | VANG_00002709 |



GOVERNMENT EXHIBIT

11

22-cr-00012-WJM
Forfeiture Motion

PENGAD 800-631-6989

**Exhibit 12**

| Bentley Bentayga | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Vanguard 30-9515** | | | | | | | |
| Transaction | Posted Date | Amount | Untainted Balance | Tainted Balance | Total Balance | Percentage of Tainted to Total Balance | Bates |
| Balance on January 28, 2021 | | | $ 418,968.94 | $ 42,723.62 | $ 461,692.56 | 9.25% | VANG_00002709 |
| Income Dividend | 1/29/2021 | $ 3.84 | $ 418,972.42 | $ 42,723.98 | $ 461,696.40 | 9.25% | VANG_00002709 |
| Wire redemption to Unknown Citibank account | 2/17/2021 | $ (25,000.00) | $ 393,972.42 | $ 42,723.98 | $ 436,696.40 | 9.78% | VANG_00002709 |
| Income Dividend | 2/26/2021 | $ 3.46 | $ 393,975.55 | $ 42,724.31 | $ 436,699.86 | 9.78% | VANG_00002709 |
| Income Dividend | 3/31/2021 | $ 3.71 | $ 393,978.89 | $ 42,724.68 | $ 436,703.57 | 9.78% | VANG_00002709 |
| Check to WF 9749 (Check Memo - Bentley Bentayga Camelback Consulting) | 4/20/2021 | $ (150,000.00) | $ 286,703.57 | $ - | $ 286,703.57 | 0.00% | VANG_00005030 |
| Transfer to Vanguard 45-9515 | 4/27/2021 | $ (286,703.57) | $ - | $ - | $ - | | |

| Wells Fargo 9749 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Transaction | Posted Date | Amount | Untainted Balance | Tainted Balance | Total Balance | Percentage of Tainted to Total Balance | Bates |
| Check from Vanguard 30-9515 (Check Memo - Bentley Bentayga Camelback Consulting) | 4/19/2021 | $ 150,000.00 | $ 218,830.11 | $ 42,724.68 | $ 261,554.79 | 16.33% | WFB_00003495 WFB_00004017 |
| Marketing/Advertising | 4/19/2021 | (7,575.00) | $ 211,255.11 | $ 42,724.68 | $ 253,979.79 | 16.82% | WFB_00003495 WFB_00004017 |
| PA Direct 529 Plan 57706518501 (Mason Moroz) | 4/20/2021 | (600.00) | $ 210,655.11 | $ 42,724.68 | $ 253,379.79 | 16.86% | WFB_00003495 WFB_00004017 |
| Unknown | 4/20/2021 | (475.85) | $ 210,179.26 | $ 42,724.68 | $ 252,903.94 | 16.89% | WFB_00003495 WFB_00004017 |
| Pat Madeara | 4/22/2021 | (2,100.00) | $ 208,079.26 | $ 42,724.68 | $ 250,803.94 | 17.04% | WFB_00003495 WFB_00004017 |
| Check Memo - Bentayga Camelback LLC | 4/26/2021 | (162,390.58) | $ 88,413.36 | $ - | $ 88,413.36 | 0.00% | WFB_00003495 WFB_00004017 |

| | Untained | Tainted | Total | Percentage Tainted |
|---|---|---|---|---|
| Bentley Bentayga | $ 119,665.90 | $ 42,724.68 | $ 162,390.58 | 26.31% |

Appellate Case: 23-1162    Document: 010110860450    Date Filed: 05/16/2023    Page: 159



GOVERNMENT
EXHIBIT
12
22-cr-00012-WJM
Forfeiture Motion

### Exhibit 13

| Vanguard Proceeds Account 540-9515 Account Activity Up to August 31, 2021 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Transaction | Posted Date | Amount | Untainted Balance | Tainted Balance | Total Balance | Percentage of Tainted to Total Balance | Bates | Reference |
| **Transfer from 569-9515** | 4/16/2019 | $ 179,000.00 | $ 785,091.12 | $ 179,000.00 | $ 964,091.12 | 18.57% | VANG_00002661 | Exhibits 8 & 9 |
| **Transfer from 584-9515** | 4/16/2019 | $ 161,000.00 | $ 785,091.12 | $ 340,000.00 | $ 1,125,091.12 | 30.22% | VANG_00002661 | Exhibits 8 & 9 |
| **Transfer from 511-9515** | 4/16/2019 | $ 52,869.00 | $ 785,091.12 | $ 392,869.00 | $ 1,177,960.12 | 33.35% | VANG_00002661 | Exhibits 8 & 9 |
| **Transfer from 1945-9515** | 4/16/2019 | $ 24,000.00 | $ 785,091.12 | $ 416,869.00 | $ 1,201,960.12 | 34.68% | VANG_00002661 | Exhibits 8 & 9 |
| Transfer from 6090 | 4/16/2019 | $ 1,033.11 | $ 786,124.23 | $ 416,869.00 | $ 1,202,993.23 | 34.65% | VANG_00002661 | |
| Income Dividend | 6/26/2019 | $ 6,871.93 | $ 790,615.85 | $ 419,250.31 | $ 1,209,866.16 | 34.65% | VANG_00002661 | |
| Income Dividend | 9/25/2019 | $ 6,477.38 | $ 794,847.65 | $ 421,494.89 | $ 1,216,342.54 | 34.65% | VANG_00002661 | |
| Income Dividend | 12/20/2019 | $ 7,156.43 | $ 799,524.19 | $ 423,974.78 | $ 1,223,498.97 | 34.65% | VANG_00002661 | |
| Change in Value | 12/31/2019 | $ 273,014.46 | $ 977,931.91 | $ 518,581.52 | $ 1,496,513.43 | 34.65% | VANG_00002661 | |
| Income Dividend | 3/9/2020 | $ 5,920.00 | $ 981,800.47 | $ 520,632.96 | $ 1,502,433.43 | 34.65% | VANG_00002661 | |
| Income Dividend | 6/26/2020 | $ 7,236.53 | $ 986,529.35 | $ 523,140.61 | $ 1,509,669.96 | 34.65% | VANG_00002661 | |
| Income Dividend | 9/28/2020 | $ 6,642.35 | $ 990,869.95 | $ 525,442.36 | $ 1,516,312.31 | 34.65% | VANG_00002661 | |
| Income Dividend | 12/21/2020 | $ 7,056.35 | $ 995,481.09 | $ 527,887.57 | $ 1,523,368.66 | 34.65% | VANG_00002661 | |
| Change in Value | 12/31/2020 | $ 247,997.05 | $ 1,157,540.60 | $ 613,825.11 | $ 1,771,365.71 | 34.65% | VANG_00002661 | |
| **Transfer from 569-9515** | 1/7/2021 | $ 4,657.57 | $ 1,157,540.60 | $ 618,482.68 | $ 1,776,023.28 | 34.82% | VANG_00002713 | Exhibit 8 |
| Income Dividend | 3/25/2021 | $ 6,464.43 | $ 1,161,753.86 | $ 620,733.85 | $ 1,782,487.71 | 34.82% | VANG_00002714 | |
| Change in Value | 3/31/2021 | $ 103,148.51 | $ 1,228,981.91 | $ 656,654.31 | $ 1,885,636.22 | 34.82% | VANG_00002713 | |
| Change in Value | 4/30/2021 | $ 100,583.72 | $ 1,294,538.34 | $ 691,681.60 | $ 1,986,219.94 | 34.82% | VANG_00005036 | |
| Change in Value | 6/30/2021 | $ 60,396.52 | $ 1,333,902.36 | $ 712,714.10 | $ 2,046,616.46 | 34.82% | VANG_00005036 | |
| Change in Value | 8/31/2021 | $ 112,170.22 | $ 1,407,010.40 | $ 751,776.28 | $ 2,158,786.68 | 34.82% | VANG_00005039 | |
| **Amount Seized** | $ 751,776.28 | | | | | | | |

Appellate Case: 23-1162    Document: 0101108606450    Date Filed: 05/16/2023    Page: 160



**Exhibit 14**

| Vanguard Proceeds Account 585-9515 Account Activity Up to August 31, 2021 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Transaction | Posted Date | Amount | Untainted Balance | Tainted Balance | Total Balance | Percentage of Tainted to Total Balance | Bates | Reference |
| Transfer in from Vanguard 30-9515 | 2/2/2018 | $ 292,500.00 | $ - | $ 292,500.00 | $ 292,500.00 | 100% | VANG_00002609 | Exhibit 7 |
| Income Dividend | 12/26/2018 | 5,405.50 | $ - | $ 297,905.50 | $ 297,905.50 | 100% | VANG_00002609 | |
| Change in Value | 12/31/2018 | (28,955.77) | $ - | $ 268,949.73 | $ 268,949.73 | 100% | VANG_00002609 | |
| Income Dividend | 3/22/2019 | 1,618.29 | $ - | $ 270,568.02 | $ 270,568.02 | 100% | VANG_00002661 | |
| Income Dividend | 6/14/2019 | 1,152.74 | $ - | $ 271,720.76 | $ 271,720.76 | 100% | VANG_00002661 | |
| Income Dividend | 9/13/2019 | 1,481.33 | $ - | $ 273,202.09 | $ 273,202.09 | 100% | VANG_00002661 | |
| Income Dividend | 12/23/2019 | 1,883.27 | $ - | $ 275,085.36 | $ 275,085.36 | 100% | VANG_00002661 | |
| Change in Value | 12/31/2019 | 76,714.19 | $ - | $ 351,799.55 | $ 351,799.55 | 100% | VANG_00002661 | |
| Income Dividend | 3/30/2020 | 1,308.93 | $ - | $ 353,108.48 | $ 353,108.48 | 100% | VANG_00002704 | |
| Income Dividend | 6/30/2020 | 1,503.48 | $ - | $ 354,611.96 | $ 354,611.96 | 100% | VANG_00002704 | |
| Income Dividend | 9/30/2020 | 1,452.35 | $ - | $ 356,064.31 | $ 356,064.31 | 100% | VANG_00002704 | |
| Change in Value | 12/31/2020 | 67,878.73 | $ - | $ 423,943.04 | $ 423,943.04 | 100% | VANG_00002704 | |
| Income Dividend | 12/31/2020 | 1,691.85 | $ - | $ 425,634.89 | $ 425,634.89 | 100% | VANG_00002704 | |
| Income Dividend | 3/24/2021 | 1,457.42 | $ - | $ 427,092.31 | $ 427,092.31 | 100% | VANG_00002713 | |
| Change in Value | 3/31/2021 | 25,912.04 | $ - | $ 453,004.35 | $ 453,004.35 | 100% | VANG_00002713 | |
| Change in Value | 4/30/2021 | 23,258.73 | $ - | $ 476,263.08 | $ 476,263.08 | 100% | VANG_00005035 | |
| Change in Value | 6/30/2021 | 14,243.97 | $ - | $ 490,507.05 | $ 490,507.05 | 100% | VANG_00005035 | |
| Change in Value | 8/31/2021 | 22,696.52 | $ - | $ 513,203.57 | $ 513,203.57 | 100% | VANG_00005039 | |
| **Amount Seized** | $ 527,736.24 | | | | | | | |



GOVERNMENT EXHIBIT

14

22-cr-00012-WJM
Forfeiture Motion

PENGAD 800-631-6989

Appellate Case: 23-1162    Document: 0101108604050    Date Filed: 05/16/2023    Page: 162

**Exhibit 15**

| | Property Proceeds 7000 N 39th Pl, Paradise Valley, Arizona | | | | | | |
|---|---|---|---|---|---|---|---|
| Transactions | Untainted | Tainted | Total | Percentage Tainted to Total | Last Account Statement Date | Bates | Reference |
| VPR Builders Vanguard 30-9515 | $ 105,000.00 | $ - | $ 105,000.00 | 0.00% | 4/30/2021 | VANG_00000222 | Exhibit 4 |
| VPR Builders MS 408-235 | $ 54,603.59 | $ 51,000.00 | $ 105,603.59 | 48.29% | 5/31/2021 | BNY_00000178 MSB_00008101 | Exhibit 5 |
| VPR Builders Camelback WF 9749 | $ 436,027.64 | $ - | $ 436,027.64 | 0.00% | 5/25/2021 | Various Bates Numbers | |
| Fidelity National Title | $ 192,562.98 | $ 962,176.35 | $ 1,154,739.33 | 83.32% | 4/30/2021 | VANG_00000222 20-0377 Fedwire | Exhibit 6 |
| Mortgage Payments BNYM 1000 (2 Transactions) | $ - | $ 9,656.36 | $ 9,656.36 | 100.00% | 5/30/2021 | NYMEL_00000153 BNY_00000157 | Exhibit 5 |
| Mortgage Payments BNYM 3568 (23 Transactions) | $ - | $ 99,082.90 | $ 99,082.90 | 100.00% | 5/20/2021 | Various Bates Numbers | Footnote 11 |
| Total | $ 788,194.21 | $ 1,121,915.61 | $ 1,910,109.82 | 58.74% | | | |



GOVERNMENT EXHIBIT
15
22-cr-00012-WJM
Forfeiture Motion

PENGAD 800-631-6989

118

## Exhibit 16

| Property Proceeds 103 Morningside Dr, Cranberry Township, Pennsylvania | | | | | | | |
|---|---|---|---|---|---|---|---|
| Wells Fargo 3615742446 (WF 2446) | | | | | | | |
| Transaction | Posted Date | Amount | Untainted Balance | Tainted Balance | Total Balance | Percentage of Tainted to Total Balance | Bates |
| Transfer from WF 9749 | 9/3/2020 | $ 1,000.00 | $ 1,000.00 | $ - | $ 1,000.00 | 0.00% | WFB_00002956 |
| Transfer from BNYM 1000 | 9/28/2020 | $ 200,000.00 | $ 1,000.00 | $ 200,000.00 | $ 201,000.00 | 99.50% | WFB_00002956 |
| Transfer from WF 9749 | 9/28/2020 | $ 50,000.00 | $ 51,000.00 | $ 200,000.00 | $ 251,000.00 | 79.68% | WFB_00002956 |
| Wire Transfer Fee | 9/28/2020 | $ (15.00) | $ 51,000.00 | $ 199,985.00 | $ 250,985.00 | 79.68% | WFB_00002956 |
| Transfer from Vanguard 30-9515 | 9/29/2020 | $ 150,000.00 | $ 201,000.00 | $ 199,985.00 | $ 400,985.00 | 49.87% | WFB_00002956 |
| Wire Transfer Fee | 9/29/2020 | $ (15.00) | $ 201,000.00 | $ 199,970.00 | $ 400,970.00 | 49.87% | WFB_00002956 |
| Monthly Service Fee | 9/30/2020 | $ (10.00) | $ 201,000.00 | $ 199,960.00 | $ 400,960.00 | 49.87% | WFB_00002956 |
| Monthly Service Fee Reversal | 9/30/2020 | $ 10.00 | $ 201,000.00 | $ 199,970.00 | $ 400,970.00 | 49.87% | WFB_00002956 |
| American General Services Corp (103 Morningside Dr) | 10/1/2020 | $ (395,573.69) | $ 5,396.31 | $ - | $ 5,396.31 | 0.00% | WFB_00002961 AGS_00000013 |

| Total Amount of Proceeds Towards the Purchase of 103 Morningside Dr, Cranberry Township, Pennsylvania | | | | | | |
|---|---|---|---|---|---|---|
| Transaction | Posted Date | Amount | Untained | Tainted | Percentage Untainted | Percentage Tainted |
| Purchase of 103 Morningside Dr | 10/1/2020 | $ 395,573.69 | $ 195,603.69 | $ 199,970.00 | 49.45% | 50.55% |

On November 23, 2020, WF 2446 was closed and the remaining balance was transferred to PNC Bank Account 10-8062-1775

119



GOVERNMENT EXHIBIT

16

22-cr-00012-WJM
Forfeiture Motion

PENGAD 800-631-6989

# MANDAMUS

# EXHIBIT 7

**Subject:**  FW: Activity in Case 1:22-cr-00012-WJM USA v. Rudolph et al Order

**From:** COD_ENotice@cod.uscourts.gov
**Date:** January 10, 2023 at 10:23:14 PM CST
**To:** COD_ENotice@cod.uscourts.gov
**Subject: Activity in Case 1:22-cr-00012-WJM USA v. Rudolph et al Order**

[EXTERNAL E-MAIL]
Be Aware of Links and Attachments

This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT
RESPOND to this e-mail because the mail box is unattended.
***NOTE TO PUBLIC ACCESS USERS*** Judicial Conference of the United States policy
permits attorneys of record and parties in a case (including pro se litigants) to receive
one free electronic copy of all documents filed electronically, if receipt is required by
law or directed by the filer. PACER access fees apply to all other users. To avoid later
charges, download a copy of each document during this first viewing. However, if the
referenced document is a transcript, the free copy and 30 page limit do not apply.

U.S. District Court - District of Colorado

District of Colorado

## Notice of Electronic Filing

The following transaction was entered on 01/10/2023 at 5:34:41 PM MST and filed on
01/10/2023

**Case Name:**       USA v. Rudolph et al
**Case Number:**    1:22-cr-00012-WJM
**Filer:**
**Document Number:** 317 (No document attached)

**Docket Text:**
**ORDER as to Lawrence Rudolph, Lori Milliron: On January 9, 2023,
the Court received an e-mail from attorneys representing Julian
Rudolph, AnaBianca Rudolph, and the Estate of Bianca Rudolph
(collectively, "Movants") requesting information concerning filing a
response to [296] the Government's Motion for Mandatory
Restitution and Forfeiture.  The substance of Movants' request is
that the Court permit them to file a response brief arguing that the
Court should recognize their rights as victims and entitlement to
receive restitution in this matter.  However, the Court questions
whether Movants, who are not parties in this criminal case, have
standing to participate in the restitution portion of these proceedings**

**and directs briefing on this matter. *See United States v. Kelley*, 997 F.2d 806 (10th Cir. 1993) (holding that Congress did not provide a private right of action for victims in the Victim and Witness Protection Act, 18 U.S.C. § 3663, and precluding victim from appealing restitution order) (citing *United States v. Johnson*, 983 F.2d 216 (11th Cir. 1993) and *United States v. Grundhoefer*, 916 F.2d 788 (2d Cir. 1990)); *see also United States v. Hunter*, 548 F.3d 1308, 1313 (10th Cir. 2008) (analyzing *Kelley*). By January 18, 2023, Movants are DIRECTED to file a motion requesting leave to file a response to the Government's Motion for Mandatory Restitution and Forfeiture that explains the legal basis for them to do so. By February 1, 2023, the Government and Defendant Lawrence Rudolph are DIRECTED to file responses to the Movants' motion for leave to file a response. Defendant Lori Milliron may, but is not required to, file a response to the Movants' motion. All parties should cite binding Tenth Circuit and Supreme Court case law to the greatest extent possible. Once the Court receives the motion and responses, it will determine whether a reply brief is necessary. Solely for the purposes of filing their motion, Movants will be permitted to appear on the docket as "Interested Parties." The Court DIRECTS the Clerk to facilitate such appearances to the extent necessary and DIRECTS Movants to contact the Clerk's office with any questions concerning CM/ECF. SO ORDERED by Judge William J. Martinez on 1/10/2023. Text Only Entry (wjmlc1, )**

**1:22-cr-00012-WJM- 1** Notice has been electronically mailed to:

**1:22-cr-00012-WJM- 1** Notice has been mailed by the filer to:

Anita Margot Moss
Markus/Moss PLLC
40 NW Third Street
Miami, FL 33128

Bryan David Fields
U.S. Attorney's Office
District of Colorado
1801 California Street
Suite 1600
Denver, CO 80202

David Oscar Markus
Markus & Markus, PLLC
Penthouse 1
40 NW Third Street
Miami, FL 33128

Edwin Garreth Winstead , III
U.S. Attorney's Office
District of Colorado
1801 California Street

Suite 1600
Denver, CO 80202

Justin Bishop Grewell
U.S. Attorney's Office
District of Colorado
1801 California Street
Suite 1600
Denver, CO 80202

Kurt J. Bohn
U.S. Attorney's Office
District of Colorado
1801 California Street
Suite 1600
Denver, CO 80202

Lauren I. Doyle
Markus Moss PLLC
40 NW Third Street
Penthouse 1
Miami, FL 33175

**1:22-cr-00012-WJM- 2 Notice has been electronically mailed to:**

**1:22-cr-00012-WJM- 2 Notice has been mailed by the filer to:**

Bryan David Fields
U.S. Attorney's Office
District of Colorado
1801 California Street
Suite 1600
Denver, CO 80202

Edwin Garreth Winstead , III
U.S. Attorney's Office
District of Colorado
1801 California Street
Suite 1600
Denver, CO 80202

John W. Dill
John W. Dill P.A.
941 West Morse Boulevard
Suite 100
Winter Park, FL 32789-3781

Justin Bishop Grewell
U.S. Attorney's Office
District of Colorado
1801 California Street
Suite 1600

Denver, CO 80202

Kurt J. Bohn
U.S. Attorney's Office
District of Colorado
1801 California Street
Suite 1600
Denver, CO 80202

The following document(s) are associated with this transaction:

*This is a re-generated NEF. Created on 1/10/2023 at 9:22 PM MST*

# MANDAMUS
# EXHIBIT 8

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 22-cr-00012-WJM-1

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. **LAWRENCE RUDOLPH** and
2. **LORI MILLIRON,**

Defendants.

---

## MOVANTS' MOTION FOR LEAVE TO FILE
## THEIR RESPONSE TO GOVERNMENT'S MOTION FOR MANDATORY
## RESTITUTION AND FORFEITURE

---

Pursuant to the Court's order of January 10, 2023 (the "Order") (Dkt. #317), Movants hereby submit the instant motion requesting leave to file their response to the Government's Motion for Mandatory Restitution and Forfeiture, which is attached to this motion as Exhibit A. As described more fully below, Movants have standing to participate in the restitution portion of these proceedings because they are asserting their rights as crime victims, rights that are specifically granted to them by Congress in the Crime Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771. *See* 18 U.S.C. § 3771(a)(4) ("right to be reasonably heard at any public proceeding involving . . . sentencing"); 18 U.S.C. § 3771(a)(6) ("right to full and timely restitution as provided in law").

## I.      MOVANTS HAVE STANDING PURSUANT TO 18 U.S.C. § 3771(d)(3)

Movants wish to clarify at the outset the specific basis upon which they are claiming standing to participate in the restitution phase of the sentencing proceedings in this case. To be clear, Movants are not relying on the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. §

1

3663A, for statutory authority to support their standing to participate in this case. Rather, Movants are relying on the express provisions of the CVRA for that purpose.

In enacting the CVRA, Congress identified specific rights afforded to victims of federal crimes. Included within those enumerated rights are the right for crime victims to "be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole hearing," 18 U.S.C. § 3771(a)(4), and "full and timely restitution as provided in law," 18 U.S.C. § 3771(a)(6). However, Congress did not limit itself to merely designating particular rights to which crime victims are entitled, it also crafted an enforcement regime to ensure those rights can be vindicated in court. Specifically, Section 3771(d)(1) states, "[t]he *crime victim or the crime victim's lawful representative*, and the attorney for the government, *may assert the rights described in subsection (a)*." 18 U.S.C. § 3771(d)(1) (emphasis added). In a subsection of the CVRA entitled "Motion for Relief and Writ of Mandamus," Congress explicitly set out the procedure to be followed when a crime victim wishes to assert any of his or her rights described in Section 3771(a):

> The rights described in subsection (a) shall be asserted in the district court in which a defendant is being prosecuted for the crime or, if no prosecution is underway, in the district court in the district in which the crime occurred. The district court shall take up and decide any motion asserting a victim's right forthwith. If the district court denies the relief sought, the movant may petition the court of appeals for a writ of mandamus.

18 U.S.C. § 3771(d)(3); *see also* Fed.R.Crim.P. 60.

That the Movants are victims in this matter is indisputable. As analyzed in more detail in the Movants response, attached as Exhibit A, and contrary to the government's assertions, it is the Movants who are the actual victims of the insurance fraud conduct charged in Count Two of the Superseding Indictment, not the insurance companies. The Movants are the only persons who have been "directly and proximately harmed as a result of the commission" of this offense. 18 U.S.C. § 3771(e)(2)(a). Because they are the victims of that offense and have suffered considerable financial

harm, they have the "right to full and timely restitution as provided in law" (that law being the substantive provisions of the MVRA). 18 U.S.C. § 3771(a)(6). Moreover, as is made clear by Section 3771(d), Movants have the power to "assert" that right through their lawful representatives. *See* 18 U.S.C. § 3771(d)(1), (3).

## II.     THE TENTH CIRCUIT, LIKE OTHER COURTS OF APPEAL, HAS PREVIOUSLY RECOGNIZED THAT THE CVRA GRANTS VICTIMS THE RIGHT TO BE HEARD BY THE DISTRICT COURT

The plain language of the provisions of the CVRA cited above grants Movants standing to file their response to the Government's Motion for Mandatory Restitution and Forfeiture. Nevertheless, as requested by the Court in its Order,[1] Movants have examined cases from the Tenth Circuit that have discussed a crime victim's participation rights. Though few in number, the available cases demonstrate that the Tenth Circuit has acknowledged that victims who have not been recognized by the Government may properly move district courts to recognize them as such. *See In re Antrobus*, 519 F.3d 1123, 1124 (10th Cir. 2008) ("As permitted by the CVRA, 18 U.S.C. § 3771(d)(3), the Antrobuses filed a petition for a writ of mandamus seeking review of the district court's decision [that their daughter was not a victim]."); *see also United States v. Hunter*, 548 F.3d 1308, 1309-10 (10th Cir. 2008) ("The district court denied the motion [to have the Antrobuses' daughter declared a victim] …"); *In re Olesen*, 447 Fed. App'x 868, 869 (10th Cir. 2011) ("The CVRA requires the district court to 'take up and decide any motion asserting a victim's right forthwith' and to clearly state its reasons for denying relief on the record.") (citing § 3771(d)(3)) (unpublished). Movants further note that the Tenth Circuit's sister courts have widely acknowledged that the CVRA mandates that district courts hear petitions of victims of

---

[1] In its Order, the Court also asked Movants to discuss any applicable Supreme Court precedent. Unfortunately, the Supreme Court has not yet had an opportunity to issue any decisions interpreting the victim participation rights section of the CVRA, which Congress passed in 2004. There are approximately 12 Supreme Court decisions addressing what previously had been 18 U.S.C. § 3771 but those were all issued in 1988 and earlier.

crimes. *See, e.g.*, *In re Doe*, 50 F.4th 1247, 1250 (9th Cir. 2022) ("The CVRA requires a district court to decide a motion asserting a victim's rights, including an application for restitution, 'forthwith.'") (citing § 3771(d)(3)); *In re Wild*, 994 F.3d 1244, 1253 (11th Cir. 2021) ("subsection (d)(3) gives victims a 'motion' remedy in the district court and a mandamus remedy in the court of appeals").

Perhaps the most analogous precedent to the situation presented in the instant case is the Seventh Circuit's recent decision in *United States v. Issa*, 21 F.4th 504 (7th Cir. 2021). In that case, the defendant engaged in a widespread embezzlement scheme in which he stole tens of millions of dollars from his employer and his employer's family. *Id.* at 506. As part of the sentencing process, the district court permitted counsel for the employer and his family to file a sentencing memorandum discussing their rights as victims, as well as a request for restitution, and to make an oral statement at the sentencing hearing in their roles as victims of the defendant's offense. *Id.* at 507. In pronouncing sentence, the district court heavily relied on the victims' oral and written statements. *Id.*

On appeal, the defendant's primary argument was that the victims' participation in the sentencing process improperly transformed "the victims into a de facto party" and permitted victims' counsel to act as a "shadow prosecutor." *Id.* at 508. The Seventh Circuit rejected this argument and instead noted that "[u]nder the CVRA, crime victims have the right to be reasonably heard at any public proceeding involving release, plea, sentencing, or any parole proceeding" and that "[v]ictims may exercise this right through their attorneys." *Id.* (citing 18 U.S.C. § 3771(a)(4) and Fed.R.Crim.P. 60(b)(2)). With respect to the extent of the involvement of the victims and their counsel during the defendant's sentencing proceedings, the court held that the "district court did precisely the right thing in accepting the written and oral submissions of the victims personally

and through their lawyer and acted within its discretion in considering and weighing those submissions. Additionally, no facts in the record support any claim that [defendant] did not have notice or opportunity to respond to the victims' statements. The district court correctly applied the CVRA to the sentencing procedures." *Id.* The Movants in this case are asking for no greater level of participation in these proceedings than the Seventh Circuit authorized in *Issa*.

## III.    SEPARATELY, MOVANTS' CASE IS DISTINGUISHABLE FROM THE CASES CITED BY THE COURT

Although the cases cited by the Court in its Order largely focus on the MVRA, on which Movants are not relying to support their standing argument, those cases arguably still support Movants' right to be heard.

First, in *United States v. Kelley*, 997 F.2d 806 (10th Cir. 1993), the party seeking victim status, Danbury, USA, Inc. ("Danbury"), "was allowed to address the court" to request restitution under the MVRA. 927 F.2d at 807. The court declined to order that restitution be paid to Danbury, which led Danbury to file a Motion to Intervene. That motion was denied, as was Danbury's appeal of the denial. The Tenth Circuit stated that Danbury argued "that it has 'implicit standing' to appeal the district court's order," a position with which it disagreed. *Id.* Critically, we note that *Kelley* was decided prior to the passage of the CVRA, which, as explained above, *explicitly* gives victims standing to assert their right to "full and timely restitution" before a district court. Both *United States v. Johnson* and *United States v. Grundhoefer* were also decided prior to the passage of the CVRA, and at least *Grundhoefer* would likely have been decided differently under the CVRA. *See United States v. Grundhoefer*, 916 F.2d 788 (2d Cir. 1990) ("[U]nless the trustee can establish that Congress gave him *a right to restitution* under the [Victim and Witness Protection Act], the trustee has not shown injury in fact and cannot challenge a restitution order imposed as part of a defendant's sentence.") (emphasis added).

5

Second, although *Hunter* was decided after the passage of the CVRA, the case is *readily* distinguishable from the present matter. *Hunter* was the second of two related cases in which the parents of a deceased child sought to establish that their daughter was the victim of Hunter's unlawful sale of a firearm to an individual who used the gun to commit a mass shooting that resulted in the death of their daughter. 548 F.3d at 1309-10. After the district court determined that the daughter did not meet the CVRA's standard for victim status, the Appellants sought mandamus relief from the Tenth Circuit. *In re Antrobus*, 519 F.3d at 1124; *Hunter*, 548 F.3d at 1309-10. The Tenth Circuit denied relief, affirming the district court's decision that the crime of conviction and the acts leading to the death of the Appellants' daughter "were too factually and temporally attenuated." *In re Antrobus*, 519 F.3d at 1125; *Hunter*, 548 F.3d at 1310. After their mandamus petition was denied and Hunter was sentenced, the Appellants appealed the defendant's "judgment of conviction and sentence." *Hunter*, 548 F.3d at 1310. This appeal was denied on the grounds that the Appellants lacked standing. *Id.* at 1311. In denying the right to a direct appeal, the Tenth Circuit stated that the "CVRA explicitly provides for a single avenue through which individuals may seek appellate review of the district court's application of the statute: mandamus." *Hunter*, 548 F.3d at 1315. Here, however, unlike the Appellants in *Hunter*, Movants are not seeking a direct appeal of Dr. Rudolph's conviction or sentence. They are merely requesting that the district court recognize their status as victims under the CVRA and afford them an opportunity to be heard regarding the proper allocation of restitution.

## IV.    **CONCLUSION**

Accordingly, Movants respectfully request that the Court grant them leave to file a response to the Government's Motion for Mandatory Restitution and Forfeiture and recognize their status as victims pursuant to 18 U.S.C. § 3771.

Dated:  January 18, 2023

VICTIMS' COUNSEL

/s/  *Christopher P. Hotaling*
**Christopher P. Hotaling** (IL. Bar #6272432)
NIXON PEABODY LLP
70 West Madison, Suite 5200
Chicago, IL 60602-4378
Tel:     312.977.4418
Fax:     833.968.0535

/s/  *John R. Sandweg*
**John R. Sandweg** (DC Bar # 1027208)
NIXON PEABODY LLP
799 9th Street NW, Suite 500
Washington, DC 20001-5327
Tel:     202.585.8189
Fax:     877.743.5914

7

# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 22-cr-00012-WJM-1

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. **LAWRENCE RUDOLPH** and
2. **LORI MILLIRON,**

Defendants.

---

### JULIAN RUDOLPH, ANABIANCA RUDOLPH, AND THE ESTATE OF BIANCA RUDOLPH'S RESPONSE TO GOVERNMENT'S MOTION FOR MANDATORY RESTITUTION AND FORFEITURE AND REQUEST FOR RECOGNITION OF THEIR RIGHTS AS VICTIMS AND ENTITLEMENT TO RESTITUTION

---

Julian Rudolph, AnaBianca Rudolph, and the Estate of Bianca Rudolph (collectively, the "Movants"), by and through their counsel John R. Sandweg and Christopher P. Hotaling, hereby submit this Response to the Government's Motion for Mandatory Restitution and Forfeiture (ECF Dkt. # 296) (hereinafter the "Government's Restitution and Forfeiture Motion") together with their request that the Court recognize their rights as victims and entitlement to receive restitution in this matter.[1]

### INTRODUCTION

In the past six years, Julian and AnaBianca Rudolph have suffered unimaginable hardship. They lost their beloved mother, and their father now faces a mandatory term of life imprisonment following his conviction at trial. Their family has been torn asunder. To add insult to the emotional

---

[1] The Movants also take issue with certain of the arguments the Government raised in its Restitution and Forfeiture Motion as it relates to the forfeiture of various assets identified in the First Bill of Particulars. (ECF Dkt. # 108). The Movants intend to raise those legal arguments regarding forfeiture to the Court at the appropriate time.

trauma resulting from the loss of their mother, Defendant Lori Milliron has subjected Julian and AnaBianca to outrageous and undeniably inhumane treatment.[2] While this is more than anyone should ever have to bear, Julian and AnaBianca now also face the looming specter of the government's refusal to identify them as victims in its Restitution and Forfeiture Motion and thus deny them the restitution to which they are entitled.

Although the government has correctly stated that restitution must be paid in this case, it has confusingly failed to recognize that the Movants were "directly and proximately harmed as a result of the commission of [] Federal offense[s]" that a jury has concluded Dr. Rudolph committed. 18 U.S.C. § 3771(e)(2). Instead, the Government has asserted in its Restitution and Forfeiture Motion that, with respect to Count Two (the insurance/wire fraud count) of the Superseding Indictment, "restitution to the insurance companies who were directly and proximately harmed is mandatory."[3]  (ECF Dkt. # 296 at pg. 6). This is incorrect. Rather, for purposes of Count Two, the proper victims entitled to restitution are Movants, and not the insurance companies.

As explained fully below, but for Dr. Rudolph's participation in the insurance fraud scheme alleged in Count Two, the proceeds of Mrs. Rudolph's life insurance policies would have flowed to the proper and lawful beneficiaries — the beneficiaries Mrs. Rudolph intended — her children Julian and AnaBianca Rudolph. The government correctly notes in its Motion for Mandatory Restitution and Forfeiture that Dr. Rudolph's conduct caused a loss, but fundamentally misunderstands and misstates who was harmed by that conduct. (See ECF Dkt. # 296, at 8). The

---

[2] Julian and AnaBianca Rudolph will provide the Court with further detail about Lori Milliron's despicable treatment of them in their respective Victim Impact Statements to be submitted at a later date.

[3] Movants do agree with the Government that the Estate of Bianca Rudolph or its beneficiaries are the proper victims for purposes of restitution for purposes of the conviction on Count One of the Superseding Indictment that the jury returned.

2

"paying out of property" by the insurance companies, *id.*, would have happened even if Dr. Rudolph had been candid about the circumstances of his wife's death. Instead, but for Dr. Rudolph's failure to disclose the circumstances surrounding the death of his wife, Julian and AnaBianca would have received the proceeds of the life insurance policies. Thus, the true loss was suffered by Julian and AnaBianca, and it is to them that the proceeds of the insurance policies should have been paid.

The Movants therefore move the Court to recognize their status as victims and afford them all rights to which victims are legally entitled, including, but not limited to, the "right to full and timely restitution as provided in law." 18 U.S.C. § 3771(a)(6).

## FACTUAL BACKGROUND

Having presided over the trial of this matter, the Court is well versed with the facts of this case. The events underlying Dr. Rudolph's conviction began in October 2016, when Julian and AnaBianca Rudolph learned of the tragic passing of their mother. The news of Mrs. Rudolph's death devastated Julian and AnaBianca, who had always shared an incredibly close bond with their mother and were deprived of the opportunity to be with her when she passed or to say goodbye in the way they would have wanted. The passage of the last six years since Mrs. Rudolph's death has not lessened their heartache. In fact, the last thirteen months have been particularly devastating. Not only have Julian and AnaBianca been forced to deal with their father's indictment and subsequent conviction in this case, but they have also been subjected to mental and emotional torture at the hands of Lori Milliron. At the same time, they have needed to manage the financial consequences of their father's conviction on the family dental practice in Pennsylvania.

Amidst all of this, Julian and AnaBianca have also had to confront the loss of money and property that their mother intended to pass on to them. Prior to her death, Mrs. Rudolph obtained the following nine life insurance policies from seven different insurance carriers:

| Insurance Company | Policy Number | Amount ($) | Approx. Claim Date | Primary Beneficiary | Contingent Beneficiary |
|---|---|---|---|---|---|
| AAA Life Insurance Company | GT8107 Cert.4019648262 | 200,000.00 | 11/7/2016 | The Rudolph Trust | Lawrence Rudolph[4] |
| Ameritas | U00013758A | 751,849.32 | 11/14/2016 | Lawrence Rudolph | AnaBianca and Julian Rudolph |
| Ameritas | T00017578A | 1,003,049.90 | 11/14/2016 | Lawrence Rudolph | AnaBianca and Julian Rudolph |
| Fidelity Life Association | 0100382288 | 100,973.41 | 10/31/2016 | The Rudolph Trust[5] | AnaBianca and Julian Rudolph[6] |
| Genworth Life and Annuity Insurance Company | 1308458 | 844,533.88 | 11/7/2016 | The Rudolph Trust | Lawrence Rudolph |
| Great West Life Insurance Company | 104 TLP Cert. 105665 | 1,000,157.54 | 11/7/2016 | The Rudolph Trust | Lawrence Rudolph |
| Metlife Insurance Company | 215 150 755 UT | 772,901.17 | 11/7/2016 | Lawrence Rudolph | AnaBianca and Julian Rudolph |
| Transamerica Life Insurance Company | 42728878 | 503,438.85 | 11/7/2016 | The Rudolph Trust | Lawrence Rudolph[7] |

---

[4] A document executed on July 27, 2016, changed the contingent beneficiary on this policy to Dr. Rudolph.

[5] A document dated May 31, 2016, was sent to Fidelity requesting that the primary beneficiary be changed to the Rudolph Trust. A document dated August 1, 2016, was sent by Fidelity to the insured indicating the beneficiary change could not be processed without Mrs. Rudolph's signature. A renewed change of beneficiary request was sent to Fidelity on September 1, 2016. Though Movants do not have an approval form from Fidelity documenting the change in beneficiary status, the claim on the policy was eventually paid to the Rudolph Trust in 2017.

[6] A document dated June 18, 2012, changed the contingent beneficiaries on this policy to AnaBianca and Julian.

[7] A document executed on July 29, 2016, changed the contingent beneficiary on this policy from AnaBianca and Julian to Dr. Rudolph.

4

| Insurance Company | Policy Number | Amount ($) | Approx. Claim Date | Primary Beneficiary | Contingent Beneficiary |
|---|---|---|---|---|---|
| Transamerica Life Insurance Company | 42186233 | 500,840.86 | 11/7/2016 | The Rudolph Trust | Lawrence Rudolph[8] |

As the above clearly shows, although Mrs. Rudolph largely designated Dr. Rudolph, or a family trust, as the primary beneficiary, she made sure her children were designated as the contingent beneficiaries on several policies, entitled to receive the proceeds of these policies should Dr. Rudolph predecease her or otherwise be disqualified from obtaining the proceeds. Additionally, as explained below, the Rudolph Trust provides for distribution of the trust property to Julian and AnaBianca in the event that Mrs. Rudolph and Dr. Rudolph are deceased or otherwise unable to act as beneficiaries.

Shortly after Mrs. Rudolph's death on October 11, 2016, Dr. Rudolph began submitting claims to the various insurers for the life insurance proceeds on Mrs. Rudolph's policies and, in so doing, failed to disclose the circumstances of her death (the factual predicate for the insurance fraud allegation in Count Two of the Superseding Indictment in this case). As was made clear during the trial, all the insurance companies paid out on the claims Dr. Rudolph filed on his wife's policies in 2017 – in the aggregate amount of approximately $4.8 million. Based on the foregoing, the government charged Dr. Rudolph and Lori Milliron in a multi-count indictment and a jury found Dr. Rudolph guilty of Counts One and Two on August 1, 2022. Since the conclusion of the trial, the government has moved this Court to order that Dr. Rudolph: (1) forfeit property identified as proceeds of his insurance fraud offense and (2) pay mandatory restitution to the victims of his crimes. Paradoxically, although the U.S. Attorney's Office for the District of Colorado itself has

---

[8] A document executed on July 29, 2016, changed the contingent beneficiary on this policy from AnaBianca and Julian to Dr. Rudolph.

specifically stated in an earlier court filing that Julian and AnaBianca are "the victims of the crime," *see* 22 CR 12, Dkt. #256, at 9, in its most recent Motion for Mandatory Restitution and Forfeiture, the government now seems to be claiming that the only victims entitled to restitution are those insurance companies that paid out on claims previously submitted by Dr. Rudolph in 2017. 22 CR 12, Dkt. # 296, at 8. On this issue, the government is incorrect – the Movants are the real victims of these offenses and, as such, are the ones to whom the insurance proceeds should flow

## ARGUMENT

## I.   The Movants are the True Victims of the Insurance Fraud and Not the Insurance Companies

The government's failure to identify the Movants in its Motion for Mandatory Restitution and Forfeiture as the victims of Dr. Rudolph's mail fraud conviction is contrary to applicable law. Both 18 U.S.C. § 3663A (the Mandatory Victim Restitution Act, or "MVRA") and 18 U.S.C. § 3771 (the Crime Victims' Rights Act, or "CVRA") define the "victim" of a crime to be "a person directly and proximately harmed as a result of the commission of" a crime. *United States v. Maldonado-Passage*, 4 F.4th 1097, 1102-03 (10th Cir. 2021) ("[T]he definition of 'victim' in the MVRA and in the CVRA is virtually identical.") (internal quotations removed). Courts have generally interpreted this definition broadly. *See, e.g.*, *id.* (The Tenth Circuit has not "required physical harm for a person to be a 'victim' under 18 U.S.C. § 3663A. … [W]hen a defendant's commission of a crime results in emotional or pecuniary harm, the harmed person qualifies as a crime victim under the CVRA."); *United States v. Checora*, 175 F.3d 782, 795 (10th Cir. 1999) (§ 3663A "defines 'victim' as *any* 'person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered.'") (emphasis added); *see also United States v. Chin*, 965 F.3d 41, 59-60 (1st Cir. 2020) (victim analysis "focuses on whether the

victim was 'harmed as a result of the <u>commission</u> of an offense' or 'by the defendant's criminal <u>conduct</u> in the course of [a] scheme, conspiracy, or pattern [of criminal activity]") (emphasis in original).

With regards to fraud claims specifically, the universe of victims is larger than simply the parties to whom misrepresentations were made. *Chin*, 965 F.3d at 58-59 (reversing lower court determination that restitution was not available to "patients and insurers" because "'misrepresentations' were made 'to the hospitals and clinics that purchased the drugs,' not to 'end-users and patients'"). Importantly, the "fact that the Government has not sought restitution on behalf of a particular party is not determinative of that party's status as a victim." *United States v. Whipple*, 155 F. Supp. 3d 321, 324 (W.D.N.Y. 2015). Instead, the Court "must consider whether there are potential victims and whether the court should exercise its discretion to order restitution." *Id.* (internal quotations and revisions removed). Unlike the insurance companies in this case, who have a contractual obligation to pay out the proceeds of Mrs. Rudolph's policies to a lawful beneficiary, the Movants fit these legal definitions of "victim" to a tee.

As a preliminary matter, the Movants are not contesting the fact that a jury concluded beyond a reasonable doubt that Dr. Rudolph devised a scheme or artifice to defraud the insurance companies of money and property by means of materially false and fraudulent pretenses, representations, and promises. The Movants do contest, however, the government's mistaken conclusion that those insurance companies, and not the Movants, were "directly or proximately harmed as a result of the commission" of the insurance fraud in this case for purposes of restitution and thus are the proper victims of that fraud. 18 U.S.C. § 3663A. The government's restitution analysis is inverted; the Movants are the victims of the insurance fraud and not the insurance companies. As many of the insurance companies themselves have recognized, the jury's verdict

on Count One of the Superseding Indictment did not alter their financial and contractual obligations to pay out to a lawful beneficiary the proceeds of Mrs. Rudolph's insurance policies. More specifically, undersigned counsel for the Movants have attempted to make contact with all seven of the insurance companies who issued policies on Mrs. Rudolph's life. Of the seven, four companies have engaged in either oral or written discussions with counsel regarding their position as putative "victims" for purposes of receiving restitution in this matter. The companies that have responded to the Movants' queries have confirmed that they were contractually required to make the payments under any circumstances other than suicide and implied that, as a result, they do not view themselves as victims and are thus not entitled to restitution because of their contractual obligation to pay these claims regardless of Defendant Rudolph's conduct. *See, e.g., Letter from Genworth Life and Annuity Insurance Company*, attached as Exhibit A. Further, materiality witnesses called by the government as representatives of the insurance companies each stated that disclosure concerning the circumstances of Mrs. Rudolph's death would have been valuable not for purposes of whether they were contractually required to pay claims (which they were), but instead because the proceeds should have been paid to other lawful beneficiaries. *See, e.g.*, *U.S. v. Rudolph, et al.,* 22 CR 12, Trial Transcript, Day 6, Testimony of Greg Mirabelli, pg. 55-56, attached as Exhibit B.

Because the insurance companies were obligated to pay out the proceeds of the life insurance policies regardless of Dr. Rudolph's conduct, they are not properly "victims" under 18 U.S.C. §§ 3663A and 3771. *See United States v. Sharma,* 703 F.3d 318, 323-24 (5th Cir. 2012) (defrauded health care insurers' actual loss for restitution purposes could only include amounts that would not have been paid but for fraud). Instead, the true "loss" caused by Dr. Rudolph's insurance-related conduct was suffered by the Movants. But for Dr. Rudolph failing to disclose

the circumstances surrounding Mrs. Rudolph's death, the insurance companies would have paid the proceeds of her life insurance policies to the lawful beneficiaries - the Movants. They are, therefore, clearly the victims of the crimes of which Dr. Rudolph was found guilty and are entitled to mandatory restitution.

## II.     As the Proper Victims, The Movants Are Entitled to the Proceeds of All of Their Mother's Insurance Policies.

Now that it has been established that the Movants are the "victims" for purposes of restitution of the insurance fraud offense in Count Two of the Superseding Indictment, the remaining question is whether they are entitled to the proceeds of each of their mother's insurance policies or only a subset. As discussed below, the answer to that question is that they should receive the proceeds of all of them

For ease of discussion, the nine insurance policies can be separated into two groups – the first group consists of the two Ameritas, the Fidelity, and the MetLife policies ("Group One") and the second group consists of the AAA, Genworth, Great-West, and TransAmerica policies ("Group Two"). What differentiates these two groups is that, with respect to Group One, the Movants are specifically designated in the policies as contingent beneficiaries while, for Group Two, the Movants are not identified as contingent beneficiaries but either the Rudolph Trust or Dr. Rudolph himself are so designated.

Group One poses little difficulty in terms of concluding to whom the proceeds of those particular insurance policies previously should have been, and now should be, paid. Many states, including those relevant to this case, maintain statutes prohibiting beneficiaries who are found to have played a part in the death of a decedent from benefitting from such conduct. These statutes are commonly known as "Slayer Statutes." For example, Arizona's Slayer Statute, one such statute applicable to two of the policies in Group One (Fidelity and MetLife), states that a person "who

feloniously and intentionally kills the decedent forfeits all benefits … with respect to the decedent's estate, including an intestate share, an elective share, an omitted spouse's or child's share, a homestead allowance, exempt property and a family allowance." Ariz. Rev. Stat. Ann. § 14-2803(A).[9] Notably, Arizona courts have specifically held that the Arizona Slayer Statute precludes a person found guilty of murder from benefitting from life insurance proceeds. *See Castro v. Ballesteros-Suarez*, 213 P.3d 197, 205 (Ariz. Ct. App. 2009).

Julian and AnaBianca Rudolph were specifically and individually designated by Mrs. Rudolph as the contingent beneficiaries for both Ameritas policies, the Fidelity accidental death policy, and the MetLife policy. With respect to the proceeds from these particular policies, there can be no argument that Dr. Rudolph has or can claim any right to them by virtue of the fact that Dr. Rudolph was convicted of Count One. Consequently, pursuant to the applicable Slayer Statutes, Dr. Rudolph was disqualified from receiving the proceeds of the Group One policies. Because of his legal disqualification under the Slayer Statutes, the proceeds from these Group One policies, by their express terms, revert to the contingent beneficiaries – Julian and AnaBianca Rudolph. *See, e.g.,* Ariz. Rev. Stat. Ann § 14-2803; *see also Prudential Ins. Co. of Am. v. Athmer*, 178 F.3d 473, 475-76 (7th Cir. 1999) ("The usual consequence when a primary beneficiary disclaims or is forced to disclaim an interest under an insurance policy … is that the contingent beneficiary takes in the place of the primary one. And this is the approach that a majority of courts take when the beneficiary is disqualified by reason of having murdered his benefactor.") (collecting cases). The Movants are the victims of the scheme to defraud the Group One insurance

---

[9] By virtue of the applicable choice of law provisions, the policies issued by the following companies are governed by the Arizona Slayer Statute: AAA Life Insurance Company, Fidelity Life, Genworth First Colony, and MetLife Insurance. The policies issued by Ameritas Life Insurance and Transamerica Life Insurance are governed by the Pennsylvania Slayer Statute, 20 Pa. S.C.A. § 8801, et seq. The policies issued by Great-West Life & Annuity Insurance Company are governed by the Illinois Slayer Statute, 755 ILCS 5/2-6.

companies, and, by virtue of the applicable Slayer Statutes, the proceeds of those policies should flow to them.

This same logic also applies to those polices in Group Two. For these policies, either the Rudolph Trust or Dr. Rudolph himself are the primary or contingent beneficiaries. With respect to any possessory interest Dr. Rudolph may personally have in any of these policies, the applicable Slayer Statutes extinguishes that interest by force of law. As it pertains to any interest Dr. Rudolph may have in the Rudolph Trust, that too was terminated by operation of the applicable Slayer Statutes. Thus, pursuant to Article 12, Section 12.01 of the Rudolph Trust instrument, attached hereto as Exhibit C, the property held by the trust must be divided "into separate shares for [the trustees'] descendants," *i.e.*, Julian and AnaBianca Rudolph, *see* Rudolph Trust Article 2. Further, as of December 19, 2022, Dr. Rudolph resigned as Trustee of both the Lawrence P. Rudolph Survivor's Trust and the Rudolph Trust, established by Lawrence P. Rudolph and Bianca T. Rudolph on April 25, 2016. *See* Resignation of Trustee, attached hereto as Exhibit D. As relevant here, Movant Julian Rudolph now acts as Trustee for the Rudolph Trust in place of his father and he has Power of Attorney over that Trust. The beneficiaries of that Trust are now Julian and AnaBianca Rudolph.  *See* Exhibit C, Section 12.01.

Finally, and in addition to the above, the applicable Slayer Statutes extinguish any remaining interest Dr. Rudolph may have in the Trust as it pertains to the proceeds from the Group Two insurance policies. This is all to say that, by virtue of the jury's finding on Count One at trial and subsequent legal actions he has taken, Dr. Rudolph has forfeited and lost any and all rights and benefits that may have been available to him from Mrs. Rudolph's Group Two life insurance policies.[10]  The proceeds from these particular polices should therefore pass to Mrs. Rudolph's

---

[10] In addition to the foregoing, Movants are entitled to the proceeds of the insurance policies under a "constructive trust" theory. Constructive trusts are an equitable remedy that operate to prevent individuals who have acquired legal

estate, Julian, and AnaBianca Rudolph. They are the true and sole victims of Dr. Rudolph's insurance fraud.

## CONCLUSION

Because the Movants are victims of Dr. Rudolph's conduct, they are entitled to victim status under the MVRA and the CVRA, and thus to restitution. 18 U.S.C. §§ 3663A, 3771. In determining the amount of such restitution, courts are required to forgo or limit fines and "other monetary penalt[ies]" to the extent necessary to avoid "impair[ing] the ability of the defendant to make restitution." 18 U.S.C. § 3572(b).

Accordingly, the Movants respectfully request that the Court:

1. Grant their motion;

2. Order the United States to treat the Movants as victims entitled to all the rights provided to the same pursuant to 18 U.S.C. §§ 3663A and 3771;

3. Order Defendant Rudolph to pay restitution to the Movants equal to the insurance proceeds fraudulently obtained by him, as well as any interest earned and property acquired using the same or order the United States to return any such funds in its possession or control to Movants; and

---

title to property through fraud or other wrongful means from retaining such property and therefore being unjustly enriched. *See, e.g.*, *CGC Holding Co. v. Hutchens*, 974 F.3d 1201, 1216 (10th Cir. 2020) ("[A] constructive trust is a flexible remedy that a district court may employ when justice so requires."). A constructive trust, and the rights of the constructive trust beneficiary, are created at the time the constructive trustee acquires legal title. Restatement (Third) of Restitution and Unjust Enrichment § 55 (2011); *see also Willis Management (Vt.) Ltd. v. United States*, 652 F.3d 236, 245 (2d Cir. 2011) ("if a constructive trust properly should be imposed on particular property that was in the possession of the [constructive trustee], it was never truly the [constructive trustee]'s property"); Restatement (Third) of Restitution and Unjust Enrichment § 55 ("Constructive trust plays a more complex role in a three-party restitution contest, where its primary purpose … is to achieve priority for the restitution claimant."). Here, Dr. Rudolph unlawfully received the proceeds of Mrs. Rudolph's life insurance policies. At the moment he obtained those funds, he took legal title only as a constructive trustee on behalf of Julian, AnaBianca, and the Estate of Mrs. Rudolph as constructive trust beneficiaries. As a result, the property should be returned to them.

4. Award the Movants all other and further relief to which they are entitled pursuant

to 18 U.S.C. §§ 3663A and 3771.

Dated: January 9, 2023

VICTIM'S COUNSEL

/s/  Christopher P. Hotaling
**Christopher P. Hotaling** (IL Bar #6272432 )
NIXON PEABODY LLP
70 West Madison, Suite 5200
Chicago, IL 60602-4378
Tel:    312.977.4418
Fax:    833.968.0535

/s/    John R. Sandweg
**John R. Sandweg** (DC Bar #1027208)
NIXON PEABODY LLP
799 9th Street NW, Suite 500
Washington, DC 20001-5327
Tel:    202.585.8189
Fax:    877.743.5914

# EXHIBIT A



**Information regarding claim**
November 09, 2022

PO Box 10719
3100 Albert Lankford Drive
Lynchburg VA 24506

| Decedent Name | |
| --- | --- |
| **Bianca Rudolph** | |
| Policy Number | Phone: |
| **1308458** | 888.325.5433 |
| | Fax: |
| Claim Number | 434.948.5783 |
| **107341** | Website: |
| | Genworth.com |

Nixon Peabody LLP
Attn: Christopher Hotaling
Email: chotaling@nixonpeabody.com

Dear Mr. Hotaling:

We have received your email regarding the claim payment for this policy. Genworth has no intention to seek restitution of these funds and agree that they should be paid to the beneficiaries of the Rudolph Trust Dated 4/25/16, excluding Mr. Rudolph. Should Genworth be made party to a proceeding on the matter, that would be our position. Having paid the proceeds, Genworth has no further liability for payment under the policy.

If you have any questions, please feel free to contact our office at 888.325.5433 x8124959.

Sincerely,

*Amanda Childress*

Claims Department

abc

Affiliated Companies: Genworth Life and Annuity Insurance Company, Genworth Life Insurance Company, Genworth Life Insurance Company of New York

# EXHIBIT B

1

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2
        Criminal Action No. 22-cr-0012-WJM
 3
        UNITED STATES OF AMERICA,
 4
        Plaintiff,
 5
        vs.
 6
        LAWRENCE RUDOLPH,
 7      LORI MILLIRON,

 8      Defendants.

 9      ------------------------------------------------------------

10                   REPORTER'S PARTIAL TRANSCRIPT
        TRANSCRIPTS OF ROLECIA SMITH, CHRIS CALGARO, RHONDA LOOSLE,
11         GREG MIRABELLI, MARGARITE JENKINS and DEBRA WAGNER
                          (Jury Trial, Day 6)
12
        ------------------------------------------------------------
13

14         Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

15      Judge, United States District Court for the District of

16      Colorado, on the 18th day of July, 2022, in Courtroom A801,

17      United States Courthouse, Denver, Colorado.

18                             APPEARANCES
19
           BRYAN D. FIELDS, E. GARRETH WINSTEAD, III, J. BISHOP
20      GREWELL, Assistant U.S. Attorneys, 1801 California Street,
        Suite 1600, Denver, Colorado 80202, appearing for the
21      plaintiff.

22         DAVID O. MARKUS, A. MARGOT MOSS, LAUREN L. DOYLE,
        Markus Moss PLLC, 40 NW Third Street, Penthouse 1, Miami,
23      Florida 33175, appearing for the defendant Rudolph.

24        JOHN W. DILL, John W. Dill P.A., 941 West Morse
        Boulevard, Winter Park, Florida 32789, appearing for the
25      defendant Milliron.
```

55

DIRECT - MIRABELLI

1    let's go to page 2.  All right.  And let's try and blow up
2    the body of the claim -- of this, if we can.  All right.
3            So what is this?
4    A.    This is the first page of the life insurance claim
5    form.
6    Q.    What's the purpose of the claim form?
7    A.    The purpose of the claim form is to have the claimant
8    provide written documentation to present their claim.
9    Q.    All right.  Let's unzoom out.  And if we could go to
10   page 2.  Is there a page 2?  Oh.  Sorry.  No page 2.  Sorry
11   about that.
12           Now do you see -- apologies.  You can take that
13   down.  When MetLife receives a claim for a life insurance,
14   are they concerned about the manner in which a death occurs?
15   A.    Yes.
16   Q.    Why?
17   A.    Because typically a person -- you know, if a -- if the
18   manner of death is homicide, that's really the only manner
19   of death that could be questioned before a claim is paid,
20   with the exception of a suicide early in a -- in a policy.
21   But if it is a homicide, then we need to rule out any
22   involvement by the beneficiary in the homicide.
23   Q.    Why would you have to rule that out?
24   A.    Because in most states, there's slayer statutes that
25   say you can't profit from killing the insured.

151

DIRECT - MIRABELLI

1    Q.    When MetLife receives a claim, is there a -- does it
2    make any difference whether or not the death occurs
3    domestically or overseas?
4    A.    Yes.  Typically whenever a death occurs abroad, further
5    investigation is done to validate that the death occurred.
6    Q.    Why?
7    A.    Because in -- in some countries, there's experience in
8    the insurance industry of having fraudulent death claims
9    presented.
10   Q.    Now, after MetLife received the claim in 2016, did it
11   decide to conduct an investigation?
12   A.    Yes.
13   Q.    Why?
14   A.    Well, in this particular case, there was three reasons
15   for the investigation.  The first was because the death
16   occurred within the first two years of the policy.  There's
17   a provision in the policy called the contestable period
18   provision where the contract allows the company to validate
19   the information that was provided at the time of application
20   before paying a claim.
21           The second reason for the investigation in this
22   case was because the death occurred abroad.
23           And the third reason was because when the first
24   death certificate or death document was received, there was
25   no manner of death on it.

# EXHIBIT C

231Pg0 8
"Trust"

# THE RUDOLPH TRUST

## April 25, 2016

LAW OFFICES

**RICHMAN LAW, PLLC**

6424 E. GREENWAY PKWY.
SCOTTSDALE, ARIZONA 85254
Telephone: (480) 527-6008
Fax:  (480) 550-8015

Copyright © 2016 Richman Law, PLLC

# The Rudolph Trust
## Table of Contents

| | | |
|---|---|---|
| **Article One** | **Establishing Our Trust** ................................................. **1-1** | |
| Section 1.01 | Identifying Our Trust ................................................................ 1-1 | |
| Section 1.02 | Reliance by Third Parties ......................................................... 1-1 | |
| Section 1.03 | Statement of Our Intent ........................................................... 1-2 | |
| Section 1.04 | Transferring Property to Our Trust .......................................... 1-2 | |
| Section 1.05 | Powers Reserved by Us as Trustmakers .................................. 1-3 | |
| Section 1.06 | Grantor Trust Status ................................................................ 1-5 | |
| | | |
| **Article Two** | **Family Information** ......................................................... **2-1** | |
| | | |
| **Article Three** | **Trustee Succession Provisions** .................................. **3-1** | |
| Section 3.01 | Resignation of a Trustee .......................................................... 3-1 | |
| Section 3.02 | Trustee Succession while Both of Us Are Alive ..................... 3-1 | |
| Section 3.03 | Trustee Succession after the Death of Either or Both of Us ........................................................................................... 3-2 | |
| Section 3.04 | Notice of Removal and Appointment ....................................... 3-4 | |
| Section 3.05 | Appointment of a Co-Trustee .................................................. 3-4 | |
| Section 3.06 | Corporate Fiduciaries .............................................................. 3-5 | |
| Section 3.07 | Incapacity of a Trustee ............................................................ 3-5 | |
| Section 3.08 | Appointment of Independent Special Trustee ......................... 3-5 | |
| Section 3.09 | Rights of Successor Trustees ................................................... 3-5 | |
| | | |
| **Article Four** | **Trust Protector Provisions** .......................................... **4-1** | |
| Section 4.01 | Provisions for Trust Protector ................................................. 4-1 | |
| Section 4.02 | Designation of Trust Protector ................................................ 4-1 | |
| Section 4.03 | Removal of a Trust Protector ................................................... 4-1 | |
| Section 4.04 | Resignation of a Trust Protector ............................................. 4-1 | |
| Section 4.05 | Incapacity of a Trust Protector ............................................... 4-1 | |
| Section 4.06 | Authority of Successor Trust Protectors .................................. 4-2 | |
| Section 4.07 | Trust Protector Standard of Conduct ....................................... 4-2 | |
| Section 4.08 | Indemnification of Trust Protector .......................................... 4-2 | |
| Section 4.09 | Trust Protector Powers ............................................................ 4-3 | |
| Section 4.10 | Limitation on Trust Protector Powers ..................................... 4-6 | |
| Section 4.11 | Trust Protector May Release Powers ....................................... 4-7 | |
| Section 4.12 | Trust Protector Considered to Have Consented ...................... 4-7 | |
| Section 4.13 | Trust Protector Compensation ................................................. 4-7 | |
| Section 4.14 | Right to Examine Trust Records .............................................. 4-7 | |
| Section 4.15 | Employment of Professionals .................................................. 4-7 | |

| | | |
|---|---|---|
| **Article Five** | **Administration of Our Trust during a Trustmaker's Incapacity** | **5-1** |
| Section 5.01 | Definition of a Trustmaker's Incapacity | 5-1 |
| Section 5.02 | Determination of a Trustmaker's Incapacity | 5-1 |
| Section 5.03 | Trust Distributions during a Trustmaker's Incapacity | 5-2 |
| **Article Six** | **Administration of Our Trust upon the Death of a Trustmaker** | **6-1** |
| Section 6.01 | Surviving Trustmaker's Trust Property and Deceased Trustmaker's Trust Property | 6-1 |
| Section 6.02 | Administrative Trust | 6-1 |
| Section 6.03 | Payment of Expenses and Taxes | 6-1 |
| Section 6.04 | Restrictions on Certain Payments from Retirement Plans | 6-2 |
| Section 6.05 | Excluding Life Insurance Proceeds from Creditors | 6-2 |
| Section 6.06 | Payment of Death Taxes | 6-3 |
| Section 6.07 | Coordination with the Personal Representative | 6-3 |
| Section 6.08 | Authority to Make Tax Elections | 6-4 |
| Section 6.09 | Payment of Charitable Bequests | 6-5 |
| **Article Seven** | **Disposition of Tangible Personal Property** | **7-1** |
| Section 7.01 | Distribution of Tangible Personal Property by Memorandum | 7-1 |
| Section 7.02 | Distribution of Remaining Tangible Personal Property | 7-1 |
| Section 7.03 | Definition of Tangible Personal Property | 7-1 |
| Section 7.04 | Incidental Expenses and Encumbrances | 7-2 |
| Section 7.05 | Residuary Distribution | 7-2 |
| **Article Eight** | **Creating Trust Shares upon the Death of a Trustmaker** | **8-1** |
| Section 8.01 | Distribution to the Deceased Trustmaker's Will | 8-1 |
| Section 8.02 | Division of the Deceased Trustmaker's Remaining Trust Property | 8-1 |
| Section 8.03 | Disposition of Property upon Disclaimer by the Surviving Trustmaker | 8-3 |
| Section 8.04 | Option to Allocate Deceased Trustmaker Trust Property to the Survivor's Trust | 8-3 |
| **Article Nine** | **The Survivor's Trust** | **9-1** |
| Section 9.01 | Trustee of the Survivor's Trust | 9-1 |
| Section 9.02 | The Surviving Trustmaker's Right to Amend | 9-1 |
| Section 9.03 | Survivor's Trust As Only Trust | 9-1 |
| Section 9.04 | Separate Share for Deceased Trustmaker's Trust Property | 9-1 |

Rudolph Trust

ii

Section 9.05      Distribution of Income..............................................................9-1
Section 9.06      Distributions of Principal.........................................................9-2
Section 9.07      Unproductive Property.............................................................9-2
Section 9.08      Trust Distributions during the Incapacity of the
                  Surviving Trustmaker..............................................................9-2
Section 9.09      General Power of Appointment ................................................9-2
Section 9.10      Administration following the Surviving Trustmaker's
                  Death.......................................................................................9-2

**Article Ten        The Marital Trust................................................................10-1**
Section 10.01     Distributions of Net Income ..................................................10-1
Section 10.02     Distributions of Principal.......................................................10-1
Section 10.03     Effect of Remarriage on Principal Distributions ..................10-1
Section 10.04     Nonproductive Property.........................................................10-2
Section 10.05     Qualified Terminable Interest Property ................................10-2
Section 10.06     Administration of the Marital Trust at the Death of the
                  Surviving Trustmaker ............................................................10-2

**Article Eleven     The Bypass Trust...............................................................11-1**
Section 11.01     Bypass Trust Beneficiary.......................................................11-1
Section 11.02     Distribution of Income...........................................................11-1
Section 11.03     Distribution of Principal........................................................11-1
Section 11.04     Guidelines to Our Trustee......................................................11-1
Section 11.05     Effect of Remarriage on Bypass Trust Distributions...........11-1
Section 11.06     Termination of the Bypass Trust ..........................................11-2

**Article Twelve     Our Descendants' Trusts .........................................12-1**
Section 12.01     Division of Our Trust Property..............................................12-1
Section 12.02     Administration of Descendants' Trusts ................................12-1

**Article Thirteen   Remote Contingent Distribution.............................13-1**

**Article Fourteen   Distributions to Underage and Incapacitated
                     Beneficiaries ....................................................................14-1**
Section 14.01     Supplemental Needs Trust.....................................................14-1
Section 14.02     Underage and Incapacitated Beneficiaries............................14-5
Section 14.03     Methods of Distribution.........................................................14-5
Section 14.04     Retention in Trust..................................................................14-5
Section 14.05     Application of Article ............................................................14-6

**Article Fifteen     Retirement Plans and Life Insurance Policies ......15-1**
Section 15.01     Retirement Plans....................................................................15-1
Section 15.02     Life Insurance Policies ..........................................................15-4

| Section 15.03 | Liability of Payor | 15-5 |
| Section 15.04 | Collection Efforts | 15-5 |
| Section 15.05 | No Obligation to Purchase or Maintain Benefits | 15-5 |

| **Article Sixteen** | **Trust Administration** | **16-1** |
| Section 16.01 | Deceased Spousal Exclusion Amount | 16-1 |
| Section 16.02 | Distributions to Beneficiaries | 16-1 |
| Section 16.03 | Trust Decanting; Power to Appoint in Further Trust | 16-1 |
| Section 16.04 | Beneficiary's Status | 16-2 |
| Section 16.05 | Mandatory Payments of a Pecuniary Amount | 16-2 |
| Section 16.06 | No Court Proceedings | 16-2 |
| Section 16.07 | No Bond | 16-3 |
| Section 16.08 | Exoneration of Our Trustee | 16-3 |
| Section 16.09 | Limitations on Trustee Liability | 16-3 |
| Section 16.10 | Trustee Compensation | 16-4 |
| Section 16.11 | Employment of Professionals | 16-4 |
| Section 16.12 | Exercise of Testamentary Power of Appointment | 16-4 |
| Section 16.13 | Determination of Principal and Income | 16-5 |
| Section 16.14 | Trust Accounting | 16-6 |
| Section 16.15 | Information to Beneficiaries | 16-7 |
| Section 16.16 | Action of Trustees and Delegation of Trustee Authority | 16-8 |
| Section 16.17 | Trustee May Disclaim or Release Any Power | 16-8 |
| Section 16.18 | Trustee May Execute a Power of Attorney | 16-8 |
| Section 16.19 | Additions to Separate Trusts | 16-8 |
| Section 16.20 | Authority to Merge or Sever Trusts | 16-8 |
| Section 16.21 | Authority to Terminate Trusts | 16-9 |
| Section 16.22 | Merger of Corporate Fiduciary | 16-10 |
| Section 16.23 | Funeral and Other Expenses of Beneficiary | 16-10 |
| Section 16.24 | Marital Deduction Qualification | 16-10 |
| Section 16.25 | Generation-Skipping Transfer Tax Provisions | 16-10 |

| **Article Seventeen** | **Our Trustee's Powers** | **17-1** |
| Section 17.01 | Introduction to Trustee's Powers | 17-1 |
| Section 17.02 | Execution of Documents by Our Trustee | 17-1 |
| Section 17.03 | Investment Powers in General | 17-1 |
| Section 17.04 | Banking Powers | 17-2 |
| Section 17.05 | Business Powers | 17-2 |
| Section 17.06 | Contract Powers | 17-4 |
| Section 17.07 | Common Investments | 17-4 |
| Section 17.08 | Environmental Powers | 17-5 |
| Section 17.09 | Farm, Ranch, and Other Agricultural Powers | 17-5 |
| Section 17.10 | Insurance Powers | 17-6 |
| Section 17.11 | Loans and Borrowing Powers | 17-6 |
| Section 17.12 | Nominee Powers | 17-7 |
| Section 17.13 | Oil, Gas and Mineral Interests | 17-7 |

Section 17.14    Payment of Property Taxes and Expenses........................... 17-7
Section 17.15    Purchase of Assets from and Loans to a Deceased
                 Trustmaker's Probate Estate ............................................. 17-7
Section 17.16    Qualified Real Property Valuation ..................................... 17-8
Section 17.17    Qualified Tuition Programs ................................................ 17-8
Section 17.18    Real Estate Powers ............................................................ 17-8
Section 17.19    Residences and Tangible Personal Property ...................... 17-9
Section 17.20    Digital Assets .................................................................... 17-9
Section 17.21    Retention and Abandonment of Trust Property................. 17-10
Section 17.22    Securities, Brokerage and Margin Powers........................ 17-10
Section 17.23    Settlement Powers ............................................................. 17-11
Section 17.24    Subchapter S Corporation Stock Provisions...................... 17-11
Section 17.25    Limitation on Our Trustee's Powers................................... 17-13


**Article Eighteen**    **General Provisions ................................................. 18-1**
Section 18.01    Maximum Term for Trusts .................................................. 18-1
Section 18.02    Spendthrift Provision .......................................................... 18-1
Section 18.03    Contest Provision ............................................................... 18-1
Section 18.04    Survivorship Presumption .................................................. 18-1
Section 18.05    Effect of Legal Separation or Dissolution of Marriage ....... 18-2
Section 18.06    Changing the Governing Law and Situs of
                 Administration ................................................................... 18-2
Section 18.07    Definitions .......................................................................... 18-2
Section 18.08    General Provisions and Rules of Construction.................... 18-8

Rudolph Trust

v

# The Rudolph Trust

## Article One
## Establishing Our Trust

The date of this trust is April 25, 2016. The parties to this trust are Lawrence P. Rudolph and Bianca T. Rudolph (the *Trustmakers*) and Lawrence P. Rudolph and Bianca T. Rudolph (collectively, our *Trustee*).

We intend to create a valid trust under the laws of Arizona and under the laws of any state in which any trust created under this trust document is administered. The terms of this trust prevail over any provision of Arizona law, except those provisions that are mandatory and may not be waived.

### Section 1.01    Identifying Our Trust

For convenience, our trust may be referred to as:

"The Rudolph Trust dated April 25, 2016."

To the extent practicable, for the purpose of transferring property to our trust or identifying our trust in any beneficiary or pay-on-death designation, our trust should be identified as:

"Lawrence P. Rudolph and Bianca T. Rudolph, Trustees of the Rudolph Trust dated April 25, 2016, and any amendments thereto."

For all purposes concerning the identity of our trust or any property titled in or payable to our trust, any description referring to our trust will be effective if it reasonably identifies our trust and indicates that the trust property is held in a fiduciary capacity.

### Section 1.02    Reliance by Third Parties

Third parties may require documentation to verify the existence of this trust, or particular provisions of it, including the name of our Trustee or the powers held by our Trustee. To protect the confidentiality of this instrument, our Trustee may use an affidavit or a certification of trust that identifies our Trustee and sets forth the authority of our Trustee to transact business on behalf of our trust instead of providing a copy of this instrument. The affidavit or certification may include pertinent pages from this instrument, including title or signature pages.

A third party may rely upon an affidavit or certification of trust that is signed by our Trustee with respect to the representations contained in it. A third party relying upon an affidavit or certification of trust will be exonerated from any liability for actions the third party takes or does not take in reliance upon the representations contained in the affidavit or certification of trust.

A third party dealing with our Trustee will not be required to inquire into this trust's terms or the authority of our Trustee, or to see to the application of funds or other property received by our Trustee. Our Trustee's receipt of any money or property paid, transferred,

Rudolph Trust
1-1

or delivered to our Trustee will be a sufficient discharge to the third party from all liability in connection with its application. A written statement by our Trustee is conclusive evidence of our Trustee's authority. Third parties are not liable for any loss resulting from their reliance on a written statement by our Trustee asserting our Trustee's authority or seeking to effect a transfer of property to or from the trust.

### Section 1.03    Statement of Our Intent

We created this trust to facilitate the management of our assets during our lifetime, to provide a structured method of care management if we become incapacitated, and to establish the manner and time in which we want our assets to be distributed to our beneficiaries. We considered the respective maturity, financial acumen, understanding and use of life skills, needs, abilities, and relationships of our beneficiaries. It is our intention that our assets be used to fulfill the hopes, dreams, and aspirations of our family while preserving our assets from their creditors, their own potential or actual spendthrift habits, and estate, gift, and income taxes, to the full extent allowed by law while providing discretion that encourages and permits the worthwhile endeavors and accomplishments of our beneficiaries.

### Section 1.04    Transferring Property to Our Trust

Any person or entity may transfer any property to our trust in any manner authorized by law.

#### (a)    Funding of Our Trust

By executing this instrument, we transfer, convey, and assign the property described in the attached schedules to our Trustee. We also transfer all our right, title, and interest in and to all of our property that may legally be held in trust and that may be transferred to our trust by this assignment. This assignment includes all of our real, personal, tangible, and intangible property located in the United States, whether separate property or community property, and whether acquired before or after the execution of this instrument, except for these assets that are expressly not transferred by this instrument:

> life insurance policies, unless the ownership of a policy is transferred to our trust by a separate instrument that specifically refers to the policy;
>
> corporate and self-employed (*Keogh*) pension, profit-sharing, and stock bonus plans;
>
> qualified retirement plans;
>
> commercial annuities;
>
> Section 1244 (small business) stock; and
>
> any property, the transfer of which would result in the immediate recognition of income subject to income or other

taxes, would result in the loss of a homestead exemption, or would violate a restriction on transfer agreement.

### (b)     Acceptance by Our Trustee

By executing this instrument, our Trustee accepts and agrees to hold the property transferred to the trust as trust property. All property transferred to our trust after the date of this trust must be acceptable to our Trustee. Our Trustee may refuse to accept any property. Our Trustee shall hold, administer, and dispose of all accepted trust property for our benefit and for the benefit of our beneficiaries, in accordance with the terms of this trust.

### (c)     Community Property

Any community property transferred to our trust, including the property's income and the proceeds from the property's sale or exchange, will retain its character as community property during our lives, to the same extent as if it had not been transferred to our trust.

### (d)     Separate Property

Separate property transferred to our trust will retain its character as separate property. Our separate property may be identified as the separate property of either of us on the attached schedules. The separate property of either of us, including the property's income and proceeds from the property's sale or exchange, will remain separate property. Each of us has the unrestricted right to remove all or any part of our separate property at any time.

An amount that is payable to our trust on a life insurance policy that is the separate property of either of us will retain its character as separate property.

### (e)     Joint Property

If joint tenancy property with right of survivorship is transferred to our trust, we will be considered to have severed the joint tenancy immediately before transferring the property, and no right of survivorship will exist with respect to this property.

## Section 1.05     Powers Reserved by Us as Trustmakers

As Trustmakers, we retain the powers set forth in this Section in addition to any powers that we reserve in other provisions of this instrument.

### (a)     Action on Behalf of Our Trust

Whenever both of us are serving as Trustee, either or both of us may act for and conduct business on behalf of our trust without the consent of any other Trustee.

Whenever one of us is alive but not serving as Trustee, and the other is serving as Trustee, the one who is serving as Trustee may act for and conduct business on behalf of our trust without the consent of any other Trustee.

Rudolph Trust

1-3

After one of us dies, the ability of the survivor of us, when serving as Trustee, to conduct business on behalf of us without the consent of any other Trustee is subject to the terms and conditions of our trust.

**(b)      Amendment, Restatement, or Revocation**

Acting jointly, we may amend, restate, or revoke this instrument, in whole or in part, for any purpose. Acting jointly, we retain the absolute right to amend, restate, or revoke any term or provision of this trust in whole or in part. Each of us individually retains the right to revoke any term or provision of this trust in whole or in part as to each of our separate property.

Any amendment, restatement, or revocation must be made in writing and delivered to our then-serving Trustee.

**(c)      Addition or Removal of Trust Property**

Either of us may add property to our trust. Both of us, acting jointly may remove any property from our trust. Each of us, acting alone, may remove our own separate property from our trust. Community property removed from our trust will retain its character as community property.

**(d)      Control of Income and Principal Distributions**

We retain the right to control the distribution of income and principal from our trust. We may direct our Trustee to distribute as much of the net income and principal of the trust property as we consider advisable to us or to other persons or entities. Our Trustee may distribute the net income and principal to us or for our unrestricted use and benefit, even to the exhaustion of all trust property. Any undistributed net income is to be added to the principal of our trust.

Unless otherwise directed, our Trustee shall distribute the net income from the community property to us at least quarterly and shall distribute the net income from a Trustmaker's separate property to that Trustmaker at least quarterly.

Our Trustee may also distribute principal of the community property for the unrestricted use of either or both of us and the principal of a Trustmaker's separate property for the unrestricted use and benefit of that Trustmaker, even to the exhaustion of all trust property. Any undistributed net income is to be added to the principal of our trust.

**(e)      Approval of Investment Decisions**

We reserve the absolute right to review and change our Trustee's investment decisions as to the community property. Each of us reserves the absolute right to review and change our Trustee's investment decisions as to our respective separate property. But our Trustee is not required to seek our approval before making investment decisions.

### Section 1.06    Grantor Trust Status

By reserving the broad rights and powers set forth in Section 1.05 of this Article, we intend to qualify our trust as a *Grantor Trust* under Internal Revenue Code Sections 671 to 677. This means that, for federal income tax purposes, each of us will be treated as the owner of one-half of all the community property held in our trust and as the owner of our respective separate property as if we held the property individually.

During any period that our trust is a Grantor Trust, the Taxpayer Identification Number of our trust will be either of our Social Security numbers, in accordance with Treasury Regulation Section 301.6109-1(a)(2).

# Article Two
# Family Information

We were married on September 4, 1982.  Lawrence P. Rudolph is referred to in this trust as *husband*, and Bianca T. Rudolph is referred to in this trust as *wife*.  We have two children.  They are:

> AnaBianca Rudolph, born on June 9, 1986 and

> Julian L. Rudolph, born on June 5, 1990.

All references in this document to *our children* are references to these children.

References to *our descendants* are to our children and their descendants, including any deceased child's descendants.

We intentionally have not provided for Joseph Rudolph and his descendants as beneficiaries in this trust, therefore, for all purposes of this trust, they will be treated as having predeceased both of us.

# Article Three
# Trustee Succession Provisions

### Section 3.01        Resignation of a Trustee

A Trustee may resign by giving written notice to either of us. If we are both incapacitated or deceased, a resigning Trustee shall give written notice to the trust's Income Beneficiaries and any other then-serving Trustee.

Upon the resignation of Ralph Finizio as Trustee, the resigning Trustee may appoint the resigning Trustee's successor as Trustee in the manner set forth in Section 3.04, concurrent with the written notice described above. If the resigning Trustee fails to make the appointment, the other provisions of this Article regarding Trustee succession upon incapacity or death will govern, and the next named successors to the resigning Trustee will serve in the order listed. Likewise, if no named successors to the resigning Trustees are available to serve and the resigning Trustee fails to designate a successor, the other provisions of this Article regarding the filling of a vacant Trustee office will govern.

### Section 3.02        Trustee Succession while Both of Us Are Alive

While we are both alive, this Section governs the removal and replacement of our Trustees.

#### (a)        Removal and Replacement by Both of Us

By joint agreement, we may remove any Trustee at any time, with or without cause. If a Trustee is removed, resigns, or cannot continue to serve for any reason, either or both of us may serve as Trustee, we may appoint a Trustee to serve with either or both of us, or we may appoint a successor Trustee.

#### (b)        Removal and Replacement by One of Us

If one of us is incapacitated, the non-incapacitated Trustmaker may remove any Trustee at any time, with or without cause. If a Trustee is removed, resigns, or cannot continue to serve for any reason, the non-incapacitated Trustmaker may serve as sole Trustee, appoint a Trustee to serve with the non-incapacitated Trustmaker, or appoint a successor Trustee.

#### (c)        Successor Trustee during Incapacity of a Trustmaker

During the incapacity of a Trustmaker, the other Trustmaker may serve as sole Trustee.

If the other Trustmaker is unable or unwilling to serve for any reason, then we name the following to serve as successor Trustee in this order:

>Julian L. Rudolph;

>AnaBianca Rudolph; then

>Ralph Finizio.

### (d)    Removal of Trustee during Incapacity of Both of Us

During any time both of us are incapacitated, the person appointed conservator may remove any Trustee, with or without cause.

Nothing in this Subsection limits the authority of a Trust Protector to remove a Trustee under the provisions of Section 4.09(e).

### (e)    Designation Default

If the office of Trustee of a trust created under this instrument is vacant and no designated Trustee is able and willing to act during any time that one of us is incapacitated, the other Trustmaker may appoint a successor Trustee.

If the other Trustmaker is unable or unwilling to appoint a successor Trustee, our Trust Protector may appoint an individual or a corporate fiduciary to serve as successor Trustee.

If our Trust Protector is unable or unwilling to appoint a successor Trustee, the person appointed conservator may appoint a successor Trustee.

The Legal Representative of either of us may petition a court of competent jurisdiction to appoint a successor Trustee to fill any vacancy lasting longer than 30 days. The petitioned court acquires jurisdiction over the trust only to the extent necessary to make the appointment. The trust is not subject to the court's continuing jurisdiction.

If a Trustee vacancy arises due to resignation, and the Trustee is one of the Trustees identified in Section 3.01, the previous provisions apply only if the resigning Trustee fails to appoint a successor Trustee under Section 3.01.

All appointments, removals, and revocations must be by signed written instrument.

### Section 3.03    Trustee Succession after the Death of Either or Both of Us

After the death of either or both of us, this Section governs the removal and replacement of our Trustees.

### (a)    Upon the Death of a Trustmaker

Upon the death of a Trustmaker, the other Trustmaker may serve as sole Trustee of all trusts created under this instrument.

If the other Trustmaker is unable or unwilling to serve for any reason, we name the following to serve as successor Trustee in this order:

> Julian L. Rudolph;
>
> AnaBianca Rudolph; then
>
> Ralph Finizio.

### (b)    Trustees of the Separate Trusts

The Primary Beneficiary of a separate trust created under this instrument, upon attaining 25 years of age, may appoint himself or herself as a Co-

Trustee of his or her separate trust and may serve as the sole Trustee of the trust and may name any one or more individual or corporate fiduciaries to serve as current or successor Trustee or Co-Trustee.

If the interest of a beneficiary will be merged into a life estate or an estate for years because the beneficiary is serving as sole Trustee, the beneficiary must appoint a Co-Trustee to avoid this merger. Similarly, if the interest of a beneficiary becomes or is likely to become subject to the claims of any creditor or to legal process as a result of serving as sole Trustee, the beneficiary must appoint an Independent Trustee to serve as Co-Trustee.

Notwithstanding the previous provisions, the Primary Beneficiary of any trust administered as a Supplemental Needs Trust under this instrument may never appoint himself or herself as a Co-Trustee of his or her separate trust, and may not serve as the sole Trustee of his or her separate trust.

### (c)     Appointment of Successor Trustees by the Surviving Trustmaker

After the death of one of us, the surviving Trustmaker may appoint the current or successor Trustees for any trust created under this instrument. The surviving Trustmaker may amend or revoke this appointment. Except for the Trustee of the Survivor's Trust, any Trustee appointed by the surviving Trustmaker to a trust of which the surviving Trustmaker is a beneficiary must be an individual or corporate fiduciary that is not related or subordinate to the surviving Trustmaker within the meaning of Internal Revenue Code Section 672(c).

### (d)     Removal of a Trustee

After the death of one of us, the surviving Trustmaker may remove any Trustee, with or without cause. If the surviving Trustmaker is incapacitated, the person appointed conservator may remove any Trustee, with or without cause.

A Trustee may be removed by the surviving Trustmaker only if the surviving Trustmaker appoints an individual or corporate fiduciary by the effective removal date and this appointee simultaneously commences service as Trustee. The Trustee appointed to serve as successor Trustee may not be related or subordinate to the surviving Trustmaker within the meaning of Internal Revenue Code Section 672(c).

After the death of both of us, any beneficiary may remove a Trustee only for cause, and with approval from a court of competent jurisdiction. The petition may subject the trust to the jurisdiction of the court only to the extent necessary to make the appointment.

The right to remove a Trustee under this Subsection is not to be interpreted to grant the person holding that right any of the powers of that Trustee.

A minor or incapacitated beneficiary's parent or Legal Representative may act on his or her behalf.

Rudolph Trust
3-3

Nothing in this Subsection limits the authority of a Trust Protector to remove a Trustee under the provisions of Section 4.09(e).

### (e)    Default of Designation

If the office of Trustee of a trust created under this instrument is vacant and no designated Trustee is able and willing to act, the surviving Trustmaker may appoint an individual or corporate fiduciary that is not related or subordinate to the person or persons making the appointment within the meaning of Section 672(c) of the Internal Revenue Code as successor Trustee.

If the surviving Trustmaker is unable or unwilling to name a successor Trustee or if both of us are deceased, our Trust Protector may appoint the successor Trustee.

If our Trust Protector is unable or unwilling to name a successor Trustee, the trust's Primary Beneficiary may appoint an individual or corporate fiduciary that is not related or subordinate to the person or persons making the appointment within the meaning of Section 672(c) of the Internal Revenue Code as successor Trustee.

Any beneficiary may petition a court of competent jurisdiction to appoint a successor Trustee to fill any vacancy lasting longer than 30 days. The petition may subject the trust to the jurisdiction of the court only to the extent necessary to make the appointment and may not subject the trust to the continuing jurisdiction of the court.

A minor or incapacitated beneficiary's parent or Legal Representative may act on his or her behalf.

If a Trustee vacancy arises due to resignation, and the Trustee is one of the Trustees identified in Section 3.01, the previous provisions apply only if the resigning Trustee fails to appoint a successor Trustee in the manner more fully set forth in Section 3.01.

## Section 3.04    Notice of Removal and Appointment

Notice of removal must be in writing and delivered to the Trustee being removed, along with any other then-serving Trustees. The removal notice will become effective in accordance with its provisions.

Notice of appointment must be in writing and delivered to the successor Trustee and any other then-serving Trustees. The appointment will become effective at the time of acceptance by the successor Trustee. A copy of the notice may be attached to this instrument.

## Section 3.05    Appointment of a Co-Trustee

Any individual Trustee may appoint an individual or a corporate fiduciary as a Co-Trustee. This Co-Trustee will serve only as long as the appointing Trustee serves, or as long as the last to serve if more than one Trustee appointed the Co-Trustee. This Co-Trustee will not

become a successor Trustee upon the death, resignation, or incapacity of the appointing Trustee, unless appointed under the terms of this instrument. Although this Co-Trustee may exercise all the powers of the appointing Trustee, the combined powers of this Co-Trustee and the appointing Trustee may not exceed the powers of the appointing Trustee alone. The Trustee appointing a Co-Trustee may revoke the appointment at any time, with or without cause.

### Section 3.06    Corporate Fiduciaries

Any corporate fiduciary serving under this instrument as a Trustee must be a bank, trust company, or public charity that is qualified to act as a fiduciary under applicable federal or state law and that is not related or subordinate to any beneficiary within the meaning of Internal Revenue Code Section 672(c).

### Section 3.07    Incapacity of a Trustee

If any individual Trustee becomes incapacitated, the incapacitated Trustee need not resign as Trustee. For Trustees other than one of us, a written declaration of incapacity by the Co-Trustee or, if none, by the party designated to succeed the incapacitated Trustee if made in good faith will terminate the trusteeship. If the Trustee designated in the written declaration objects in writing to termination of the trusteeship within 10 days of receiving the declaration of incapacity, a written opinion of incapacity signed by a physician who has examined the incapacitated Trustee must be obtained before the trusteeship will be terminated. The Trustee objecting to termination of trusteeship must sign the necessary medical releases needed to obtain the physician's written opinion, or the trusteeship will be terminated without it.

### Section 3.08    Appointment of Independent Special Trustee

If for any reason the Trustee of any trust created under this instrument is unwilling or unable to act with respect to any trust property or any provision of this instrument, our Trust Protector shall appoint, in writing, a corporate fiduciary or an individual to serve as an Independent Special Trustee as to this property or with respect to this provision. The Independent Special Trustee appointed may not be related or subordinate to any trust beneficiary within the meaning of Internal Revenue Code Section 672(c). Our Trust Protector may revoke any appointment of this kind at any time.

An Independent Special Trustee will exercise all fiduciary powers granted by this trust unless expressly limited elsewhere in this instrument or by our Trust Protector in the instrument appointing the Independent Special Trustee. An Independent Special Trustee may resign at any time by delivering written notice of resignation to our Trust Protector. Notice of resignation will be effective in accordance with the terms of the notice.

### Section 3.09    Rights of Successor Trustees

Each successor Trustee serving under this instrument, whether individual or corporate, will have all of the title, rights, powers and privileges granted to our initial Trustees named under this instrument. In addition, each successor Trustee will be subject to all of the

Rudolph Trust
3-5

restrictions imposed on and to all discretionary and ministerial obligations and duties given to the original Trustees.

# Article Four
# Trust Protector Provisions

### Section 4.01    Provisions for Trust Protector

The Trust Protector's purpose is to direct our Trustee in matters concerning the trust, and to assist in achieving our objectives as expressed by the other provisions of our estate plan if needed.

### Section 4.02    Designation of Trust Protector

Any Trust Protector authorized or required to act with respect to this instrument must be appointed by a court of competent jurisdiction on petition of a Trustee or beneficiary.

The court acting to appoint a Trust Protector will acquire jurisdiction or authority over the trust only to the extent necessary to make the appointment and may not subject the trust to the continuing jurisdiction of the court.

A minor or incapacitated beneficiary's parent or Legal Representative may act on his or her behalf.

For each power and authority granted to a Trust Protector in this instrument, unless the capacity is otherwise specifically stated, the Trust Protector's authority is conferred in a nonfiduciary capacity.

### Section 4.03    Removal of a Trust Protector

Any Trust Protector may be removed for cause only as determined by a court of competent jurisdiction on the petition of any Trustee or beneficiary not acting under compulsion or any kind of duress.  The court removing a Trust Protector may appoint one or more successor Trust Protectors to immediately replace the removed Trust Protector.  The court acting to remove and replace a Trust Protector will acquire jurisdiction or authority over the trust only to the extent necessary for the removal and replacement of the Trust Protector.

### Section 4.04    Resignation of a Trust Protector

A Trust Protector may resign by giving written notice to either of us.  If both of us are deceased, a Trust Protector may resign by giving written notice to the Income Beneficiaries of the trust and to the then-serving Trustee.

Resignation will take effect on the date set forth in the notice, but not earlier than 30 days after the delivery date of the notice of resignation, unless an earlier effective date is agreed to by us or by the trust's Primary Beneficiary.  A resigning Trust Protector is not liable or responsible for the act of any successor Trust Protector.

### Section 4.05    Incapacity of a Trust Protector

If any individual Trust Protector becomes incapacitated, the incapacitated Trust Protector need not resign as Trust Protector.  Any then-serving Trust Protector or the immediately

eligible successor Trust Protector may provide a written declaration that a Trust Protector is incapacitated.

The written declaration of the Trust Protector's incapacity will terminate the Trust Protector's service. If the Trust Protector designated in the written declaration objects in writing to termination of the Trust Protector's service within 10 days of receiving the declaration of incapacity, a written opinion of incapacity signed by a physician who has examined the incapacitated Trust Protector must be obtained before the Trust Protector's service will be terminated. The Trust Protector objecting to termination of the Trust Protector's service must sign the necessary medical releases needed to obtain the physician's written opinion of incapacity, or the Trust Protector's service will be terminated without the physician's written opinion.

The provisions of Section 18.07(g) of this instrument govern the determination of a Trust Protector's incapacity, except that a single physician may make the determination of incapacity instead of two physicians. Further, Section 18.07(g) governs the Trust Protector's obligations to submit to examination and provide necessary releases.

### Section 4.06    Authority of Successor Trust Protectors

Any successor Trust Protector has all the authority of any predecessor Trust Protector, but is not responsible for the predecessor's acts, omissions, or forbearances.

### Section 4.07    Trust Protector Standard of Conduct

The Trust Protector is not liable for any action, omission, or forbearance in the absence of an affirmative showing by clear and convincing evidence of bad faith by the Trust Protector to any of the beneficiaries.

### Section 4.08    Indemnification of Trust Protector

We recognize that some persons or institutions may be reluctant to serve as Trust Protector without indemnification by the trust for potential liability. Therefore, we direct that our Trustee may expend the trust assets to defend any claim brought against any Trust Protector, unless the Trust Protector is shown by clear and convincing evidence to have acted in bad faith, even if the cost of the Trust Protector's defense would exhaust the trust's value. If any claim brought against a Trust Protector is successful and the Trust Protector is shown to have acted in bad faith, our Trustee may seek reimbursement from that Trust Protector using any legal or equitable means available to the Trustee for the value of any trust assets used to defend the Trust Protector.

Any Trust Protector is entitled to reimbursement from the trust estate for any expenses, including reimbursement for attorney's fees and costs of litigation reasonably incurred to defend any claim brought against the Trust Protector, unless the Trust Protector is shown by clear and convincing evidence to have acted in bad faith. This must be done even if the cost of the Trust Protector's defense would exhaust the trust's value.

This Section applies to any currently serving Trust Protector and for claims brought against any former Trust Protector in connection with his or her acts, omissions, or forbearances in regard to the trust while serving as Trust Protector.

### Section 4.09    Trust Protector Powers

Any Trust Protector named or appointed under the provisions of this instrument has the following powers and authorities.

#### (a)    Power to Amend or Modify the Instrument

The Trust Protector may amend or modify this instrument as it applies to any trust over which the Trust Protector is serving as Trust Protector to:

> alter the administrative and investment powers of any Trustee;

> reflect tax or other legal changes that affect trust administration. We recognize that the gift, estate, generation-skipping transfer tax, and income tax provisions of the Internal Revenue Code and Treasury Regulations are subject to change. We grant our Trust Protector the authority to amend this trust instrument's terms in this manner as will, in our Trust Protector's sole and absolute discretion, eliminate or minimize the state and federal taxes payable by either of our estates and provide the maximum benefit to our beneficiaries as expressed in this instrument. This includes dividing trust property into separate shares or funds;

> correct ambiguities, including scrivener errors, that might otherwise require court construction or reformation;

> grant any trust beneficiary of any trust created under this instrument the unlimited and unrestricted testamentary general power to appoint all or any portion of the principal and undistributed income of the beneficiary's trust or trust share to the creditors of the beneficiary's estate. As a condition for the beneficiary's exercise of this power, our Trust Protector may require that the beneficiary first obtain the consent of our Trust Protector. Any testamentary power of appointment granted by our Trust Protector may only be exercised personally by the beneficiary, must be exercised in writing, and may be revoked by our Trust Protector throughout that beneficiary's lifetime. We suggest that our Trust Protector exercise this authority to subject trust property to estate tax instead of the generation-skipping transfer tax or when it appears that it may reduce overall taxes; and

> add or modify terms of any trust created under this instrument so that the trust will protect the financial resources governed by this instrument and comply with the Trustmakers' intent that the trust assets not be considered income or resources for all entitlement benefits from any

Rudolph Trust
4-3

government agency, such as Social Security Disability payments, Medicare, Supplemental Security Income (SSI), In-Home Support Service (IHSS), and any other special-purpose benefits for which the beneficiary is eligible.

Our Trust Protector may not amend this instrument in any manner that would result in a reduction in the estate tax marital deduction under Internal Revenue Code Section 2056 or the estate tax charitable deduction under Section 2055, to which either of our estates would otherwise be entitled. Further, our Trust Protector may not amend this instrument in any manner that would limit or alter the rights of a beneficiary in any trust assets held by the trust before the amendment unless the purpose of the amendment is to modify an existing trust provision that defeats the Trustmakers' intent of preserving a beneficiary's or beneficiaries' public benefits.

Notwithstanding any other provision of this instrument, the Trust Protector may not amend or modify any power or provision of the trust so as to expand the Trust Protector's amending powers or the Trust Protector's other existing powers, authorities, or discretions. But the previous provision does not prevent the Trust Protector from making amendments to correct scrivener's errors as to the Trust Protector's powers, authorities, and discretions, or to amend the trust in any manner required for the sole purpose of ensuring that the powers, authorities, and discretions of the Trust Protector remain legally binding and valid under state and federal law or to modify an existing trust provision that defeats the Trustmakers' intent of preserving a beneficiary's or beneficiaries' public benefits.

Any amendment made by the Trust Protector will be binding and conclusive on all persons interested in the trust, unless the amendment is shown by clear and convincing evidence to have been made in bad faith by the Trust Protector. The Trust Protector may not be liable for any consequences of amending or not amending the trust. Any amendment must be made in writing and signed by the Trust Protector. The Trust Protector must deliver a copy of the amendment to the Primary Beneficiaries and Trustees of the amended trust.

**(b)** **Power to Change the Governing Law and Situs of Administration**

The Trust Protector may change the governing law of the trust, remove all or any part of the property, or change the situs of administration of the trust from one jurisdiction to another as more specifically set forth in Section 18.06 of this instrument.

**(c)** **Power to Terminate a Trust**

The Trust Protector may terminate this trust or any trust created under this instrument at any time as more specifically set forth in Section 16.21 of this instrument.

Rudolph Trust
4-4

**(d)     Power to Decant a Trust**

The Trust Protector may appoint the property subject to our Trustee's power of distribution in trust for the benefit of one or more beneficiaries of any trust created under this instrument under the terms established by the Trust Protector, and as more specifically set forth in Section 16.03 of this instrument.

**(e)     Power to Remove and Appoint Trustees**

The Trust Protector may remove any Trustee (other than a Trustmaker) of any trust created under this instrument at any time, with or without cause. If the office of Trustee of a trust is vacant and no successor Trustee is effectively named, the Trust Protector may appoint an individual or a corporate fiduciary to serve as Trustee. A Trust Protector may not appoint any then-serving Trust Protector as a Trustee.

If the Trust Protector removes a Trustee, notice of removal must be made in writing and delivered to our Trustee being removed and any other then-serving Trustees. The removal of our Trustee will be effective in accordance with the terms of the notice of removal.

If one or more beneficiaries also hold the power to remove, replace, or remove and replace Trustees, the Trust Protector may veto any removal, appointment, or both made by any beneficiary.

**(f)     Power to Refuse a Contribution in Whole or in Part**

Concurrent with our Trustee's acceptance of any contribution to the trust, our Trustee must notify the Trust Protector in writing that a contribution has been made, and must notify the donor that the Trust Protector may direct our Trustee to refuse the contribution in whole or in part. The Trust Protector may direct our Trustee to refuse or reject any contribution made to the trust in whole or in part in the Trust Protector's sole and absolute discretion. The Trust Protector must make the direction to refuse or reject a contribution in writing. If the Trust Protector fails to act in writing within 10 days of the date on which the Trust Protector received written notice of the contribution, the Trust Protector will be considered to have approved the contribution *in toto*. If the Trust Protector directs our Trustee to refuse the contribution, our Trustee must return any refused property to the donor who contributed the property under the authority of this Subsection.

**(g)     Power to Compel, Approve, or Reject Trustee Accountings**

The Trust Protector may demand from time to time a written accounting from our Trustee, but not more often than quarter-annually. If our Trustee fails to account to the Trust Protector within 30 days of a written demand, the Trust Protector may institute appropriate legal actions on behalf of our beneficiaries to compel a full accounting and for other appropriate relief.

Rudolph Trust
4-5

The Trust Protector must either approve or reject any accountings provided by any Trustee within 60 days after the Trustee provides the accounting. Failure to act by the Trust Protector within the 60-day period will be treated as approval of the accounting by the Trust Protector. If the Trust Protector approves an accounting, the approval will be binding on all other parties to the fullest extent allowable under the law. If the Trust Protector rejects a Trustee's accounting, the Trust Protector must provide the Trustee with an explanation that adequately enables the Trustee to revise its accounting. The Trustee will then present the revised accounting to the Trust Protector for approval or further revision, as necessary.

### (h)      Power to Construe the Terms of This Instrument

The Trust Protector may settle any disputes concerning the interpretation of any provision contained in this instrument that arise as a result of any perceived ambiguity. In doing so, the role of the Trust Protector is to ensure that the instrument is construed in a manner consistent with our estate planning objectives.

### (i)      Executing Documents Denoting Authority

The Trust Protector may execute and deliver, and may direct any Trustee to execute and deliver, any documents necessary to carry out any power granted to the Trust Protector or our Trustee. All parties dealing with the Trust Protector and our Trustee may rely on statements and documents made by the Trust Protector and any Trustee. No party is required to inquire into any statement or document's validity. If any conflict exists between assertions of authority made by the Trust Protector and our Trustee, assertions made by the Trust Protector will control, and any assertion made by our Trustee will be disregarded to the extent of the conflict.

## Section 4.10      Limitation on Trust Protector Powers

A Trust Protector may not exercise any power or discretion in favor of the Trust Protector, for the Trust Protector's benefit, or for the benefit of any person to whom the Trust Protector is related or subordinate within the meaning of Internal Revenue Code Section 672(c). Our intent is that nothing in this instrument be construed in any manner that would cause the Trust Protector to possess a general power of appointment within the meaning of Internal Revenue Code Sections 2041 and 2514. This provision, however, does not prohibit the Trust Protector or any related party from receiving reasonable fees for services rendered to the Trust.

If our Trust Protector exercises any one of the powers granted in Section 4.09(b), Section 4.09(c), or Section 4.09(d), the Trust Protector must direct that an amount of assets will be left with the Trustee, sufficient in the Trustee's discretion to cover an estimate of the reasonable claims, expenses and taxes that the Trustee may incur in defending any anticipated claims or winding up the trust.

In exercising and considering whether to exercise any power granted to a Trust Protector under this agreement, the Trust Protector should make reasonable inquiry into any matter

or seek any information that reasonably bear upon the Trust Protector's decision to exercise the power.

## Section 4.11    Trust Protector May Release Powers

Acting on behalf of itself and all successor Trust Protectors, a Trust Protector may irrevocably release, renounce, suspend, or limit any power or discretion held by the Trust Protector at any time.

## Section 4.12    Trust Protector Considered to Have Consented

If any provision of this Article requires the consent or approval of a Trust Protector before a Trustee can act and the Trust Protector does not affirmatively deny consent to the proposed action in writing within 10 days of being notified in writing that approval or consent is sought for the particular act, the Trust Protector will be considered to have given consent or approval for the Trustee's proposed action.

## Section 4.13    Trust Protector Compensation

Any Trust Protector serving under this instrument is entitled to receive reasonable compensation for services rendered, taking into consideration:

>    the market rate for similar services in the jurisdiction in which the Trust Protector serves;

>    the breadth and nature of the powers, authorities, and discretions granted to the Trust Protector;

>    the amount of time the Trust Protector will likely devote to overseeing the trust and our Trustee; and

>    the trust property's current value and the projected amount of appreciation.

The Trust Protector is entitled to reimbursement for all expenses incurred in the performance of its duties as Trust Protector, including reasonable travel expenses.

Serving in the capacity of Trust Protector does not prevent the Trust Protector from also providing legal, investment, or accounting services on behalf of the trust or the trust beneficiaries. If the Trust Protector is providing professional services, the Trust Protector is entitled to charge its normal and customary fees for services provided or to be provided, in addition to the Trust Protector's ordinary compensation as Trust Protector.

## Section 4.14    Right to Examine Trust Records

The books and records of each trust created under this instrument, including all documentation, inventories, and accountings, must be open and available for inspection by the Trust Protector at all reasonable times.

## Section 4.15    Employment of Professionals

Any Trust Protector may appoint, employ, and remove investment advisors, accountants, auditors, depositories, custodians, brokers, consultants, attorneys, advisors, agents, and employees to advise or assist in the performance of the Trust Protector's duties. The Trust

Protector may act on the recommendations of the persons or entities employed, with or without independent investigation.

The Trust Protector may reasonably compensate an individual or entity employed to assist or advise the Trust Protector, regardless of any other relationship existing between the individual or entity and the Trust Protector.

The Trust Protector may direct and our Trustee will pay the usual compensation for services contracted for under this Section out of trust income or principal as the Trust Protector deems advisable. The Trust Protector may direct payment of compensation to an individual or entity employed to assist or advise the Trust Protector without diminishing the compensation to which the Trust Protector is entitled under this instrument. A Trust Protector who is a partner, stockholder, officer, director, or corporate affiliate in any entity employed to assist or advise the Trust Protector may nonetheless receive the Trust Protector's share of the compensation paid to the entity.

# Article Five
# Administration of Our Trust during a Trustmaker's Incapacity

### Section 5.01    Definition of a Trustmaker's Incapacity

A Trustmaker will be considered incapacitated during any time when the Trustmaker is unable to effectively manage his or her property or financial affairs because of age, illness, mental disorder, dependence on prescription medication or other substances, or any other cause.

### Section 5.02    Determination of a Trustmaker's Incapacity

For purposes of this instrument, a Trustmaker is incapacitated if determined to be so under any one of the following Subsections.

#### (a)    Determination by the Other Trustmaker and Attending Physician

A Trustmaker will be considered incapacitated if the then-existing circumstances fall within the definition of incapacity as provided in Section 5.01 in the opinion of the other Trustmaker and the incapacitated Trustmaker's attending physician.

If the other Trustmaker is unable to make this determination, the incapacitated Trustmaker's attending physician will determine whether the incapacitated Trustmaker's then-existing circumstances fall within the definition of incapacity as provided in Section 5.01.

A Trustmaker will be considered restored to capacity if the Trustmaker's personal or attending physician signs a written opinion that the Trustmaker can manage his or her property and financial affairs.

#### (b)    Court Determination

A Trustmaker will be considered incapacitated if a court of competent jurisdiction determines that the Trustmaker is legally incapacitated, incompetent, or otherwise unable to effectively manage his or her property or financial affairs.

#### (c)    Detention, Disappearance, or Absence

A Trustmaker will be considered incapacitated if the Trustmaker has an unexplained disappearance or absence for more than 30 days, or is detained under duress. A Trustmaker's disappearance, absence, or detention under duress may be established by an affidavit of our Trustee, or, if no Trustee is then serving under this trust, by the affidavit of any beneficiary of any trust created under this instrument. The affidavit must describe the circumstances of the Trustmaker's disappearance, absence, or detention

under duress. A third party dealing with our Trustee in good faith may always rely on the representations contained in the affidavit.

A Trustmaker will be considered restored to capacity upon written notice by the missing or detained Trustmaker to the successor Trustee that he or she can manage his or her property and financial affairs.

### Section 5.03    Trust Distributions during a Trustmaker's Incapacity

For purposes of this Article, *incapacitated Trustmaker's trust property* refers to the net income and principal of the incapacitated Trustmaker's separate property and the net income and principal of the incapacitated Trustmaker's share of the community property, during any period when a Trustmaker is incapacitated.

Our Trustee shall administer the incapacitated Trustmaker's trust property as follows.

### (a)    Distributions for the Incapacitated Trustmaker's Benefit

Our Trustee shall regularly and conscientiously make appropriate distributions of income and principal for the benefit of the incapacitated Trustmaker under the circumstances existing at the time each distribution is made.

Appropriate distributions under this Subsection include the payment of any of the incapacitated Trustmaker's enforceable legal obligations and premiums for insurance policies owned by the incapacitated Trustmaker or by our trust, including life, medical, disability, property and casualty, errors and omissions, and longterm health care policies.

Our Trustee is authorized to honor pledges and continue to make gifts to charitable organizations that the incapacitated Trustmaker has regularly supported in the customarily given amounts.

The examples included in this Subsection are for purposes of illustration only and are not intended to limit the authority of our Trustee to make any distribution for the incapacitated Trustmaker's benefit that our Trustee determines appropriate.

### (b)    Manner of Making Distributions

Our Trustee may make distributions for the incapacitated Trustmaker's benefit in any one or more of the following ways:

> to the incapacitated Trustmaker, but only to the extent he or she is able to manage these distributions;

> to other persons and entities for the incapacitated Trustmaker's use and benefit;

> to an agent or attorney in fact authorized to act for the incapacitated Trustmaker under a legally valid durable power of attorney executed by the incapacitated Trustmaker before his or her incapacity; and

to the incapacitated Trustmaker's guardian or conservator who has assumed responsibility for the incapacitated Trustmaker under any court order, decree, or judgment issued by a court of competent jurisdiction.

**(c)   Distributions to Agents under General Durable Power of Attorney**

Under a valid power of attorney executed by the incapacitated Trustmaker, our Trustee may make distributions to any agent for the purpose of making gifts as authorized in the power of attorney, or to assist our agent in carrying out our estate planning objectives.

# Article Six
# Administration of Our Trust upon the Death of a Trustmaker

### Section 6.01    Surviving Trustmaker's Trust Property and Deceased Trustmaker's Trust Property

After the first of us dies, the surviving Trustmaker's interest in any community property of our trust and the surviving Trustmaker's separate trust property will be referred to as the *surviving Trustmaker's trust property*. The surviving Trustmaker's trust property will be referred to as the Survivor's Trust, and our Trustees shall administer the Survivor's Trust as provided in Article Nine.

The deceased Trustmaker's interest in any community property of our trust and the deceased Trustmaker's separate trust property will be referred to as the *deceased Trustmaker's trust property*.

### Section 6.02    Administrative Trust

Upon a Trustmaker's death, our trust will become irrevocable as it pertains to the administration and distribution of the deceased Trustmaker's trust property. Our Trustee may need to apply for a separate Taxpayer Identification Number for the deceased Trustmaker's trust property.

Before the distribution of the deceased Trustmaker's trust property as provided in this trust, the deceased Trustmaker's trust property will be referred to as the *administrative trust*, but may continue to be known as the Rudolph Trust during the administration period. The administrative trust will exist for the period reasonably necessary to complete the administrative tasks set forth in this Article.

### Section 6.03    Payment of Expenses and Taxes

Our Trustee may pay from the deceased Trustmaker's trust property:

> expenses of the deceased Trustmaker's last illness, funeral, and burial or cremation, including expenses of memorials and memorial services;

> legally enforceable claims against the deceased Trustmaker or the deceased Trustmaker's estate;

> expenses of administering the trust and the deceased Trustmaker's estate; and

> court-ordered allowances for those dependent upon the deceased Trustmaker.

These payments are discretionary with our Trustee. Our Trustee may make decisions on these payments without regard to any limitation on payment of the expenses and may make payments without any court's approval. No third party may enforce any claim or right to payment against the trust by virtue of this discretionary authority.

If payment would decrease the federal estate tax charitable deduction available to the deceased Trustmaker's estate, our Trustee may not pay any administrative expenses from assets passing to an organization that qualifies for the federal estate tax charitable deduction.

If payment would decrease the federal estate tax marital deduction available to the deceased Trustmaker's estate or violate the provisions of Treasury Regulation Section 20.2056(b)-4(d), our Trustee may not pay any administrative expenses from the net income of property qualifying for the federal estate tax marital deduction.

Our Trustee shall pay death taxes out of the trust property's principal, as provided in Section 6.06. But if a probate estate is opened within six months after the date of the deceased Trustmaker's death, the deceased Trustmaker's Personal Representative shall pay any outstanding claims and expenses as authorized by the Personal Representative, as well as any death taxes from the deceased Trustmaker's probate estate to the extent that the cash and readily marketable assets in the deceased Trustmaker's probate estate are sufficient.

### Section 6.04    Restrictions on Certain Payments from Retirement Plans

The term *designation date* means September 30 of the calendar year following the year of the deceased Trustmaker's death, or another date as established by Treasury Regulations or other tax law authority as the final date for determining whether this trust meets the requirements for treatment of the trust's oldest beneficiary as if the beneficiary was named individually as beneficiary of any qualified retirement plan payable to this trust.

Notwithstanding any other provision of this trust or state law to the contrary, and except as provided in Article Thirteen, our Trustee may not distribute any qualified retirement benefit payable to our trust or any trust created under this trust to or for the benefit of the deceased Trustmaker's estate, any charity, or any beneficiary other than an individual, on or after the *designation date*. Our intent is that all qualified retirement benefits held by or payable to this trust on or after the designation date be distributed to or held only for individual beneficiaries, within the meaning of Internal Revenue Code Section 401(a)(9).

Qualified retirement benefits payable to the trust may not be used or applied on or after the designation date for payment of the deceased Trustmaker's debts, taxes, expenses of administration, or other claims against the deceased Trustmaker's estate, or for payment of estate, inheritance, or similar transfer taxes due because of the deceased Trustmaker's death, other than those directly attributable to and the legal obligation of a particular qualified retirement plan. This Section does not apply to any bequest or expense that is specifically directed to be funded with qualified retirement benefits.

### Section 6.05    Excluding Life Insurance Proceeds from Creditors

Despite anything to the contrary in this instrument, any life insurance proceeds payable to the Trustee under this instrument must never be or become part of our probate or testamentary estate. Nothing in this instrument directs that these life insurance proceeds be used to pay our debts or expenses.

## Section 6.06     Payment of Death Taxes

For the purposes of this Article, the term *death taxes* refers to any taxes imposed by reason of the deceased Trustmaker's death by federal, state, or local authorities, including estate, inheritance, gift, and direct-skip generation-skipping transfer taxes.  For purposes of this Section, *death taxes* does not include any additional estate tax imposed by Internal Revenue Code Section 2031(c)(5)(C) or Section 2032A(c), or any other comparable recapture tax imposed by any taxing authority.  Nor does the term include any generation-skipping transfer tax, other than a direct-skip generation-skipping transfer tax.

Except as to qualified retirement benefits and as otherwise specified in this Article or elsewhere in this trust, our Trustee shall apportion death taxes among the beneficiaries as those beneficiaries are determined for the purpose of the tax.  In doing this, our Trustee shall charge the death taxes only against the property generating the tax, taking into consideration the applicable provisions of the Internal Revenue Code, other applicable laws apportioning the death taxes, and the provisions of any instrument governing the property. The values used in determining the tax are to be used for tax apportionment purposes.

To the extent practicable, the Trustee shall deduct the death taxes from the property distributable under this trust, and must recover the allocable share of death taxes from the beneficiaries of property passing other than under this trust, unless the Trustee determines that the cost of recovery is greater than warranted.  If death taxes are not collected from the beneficiaries of property passing other than under this trust, the Trustee shall apportion this unrecovered amount equitably among the beneficiaries who are subject to apportionment.

If our Trustee or the surviving Trustmaker's Personal Representative waives any right of recovery granted by Section 2207A and corresponding provisions of applicable state law, death taxes may not be apportioned to any property included in the deceased Trustmaker's gross estate under Internal Revenue Code Section 2044.

## Section 6.07     Coordination with the Personal Representative

The following provisions are intended to help facilitate the coordination between the deceased Trustmaker's Personal Representative and our Trustee.  These provisions apply even if the Personal Representative and the Trustee are the same person or entity.

### (a)     Reliance on Information from the Personal Representative

Our Trustee may rely upon the written request of the deceased Trustmaker's Personal Representative for payments authorized under this Article and the amounts included in those payments without computing the sums involved. If a payment is made under this Article to the deceased Trustmaker's Personal Representative, our Trustee will have no duty to inquire into the application of the payment.

### (b)     Receipt of Probate Property

Our Trustee may accept or decline any distributions of property tendered to our Trustee by the deceased Trustmaker's Personal Representative.  If our

Trustee accepts the property, our Trustee may do so without audit, and will not be required to review the Personal Representative's records.

**(c)     Discretionary Distributions to the Deceased Trustmaker's Personal Representative**

Our Trustee may distribute cash, accrued income, or other trust property to the deceased Trustmaker's probate estate as a beneficiary of this trust, to the extent our Trustee determines that doing so is in the best interests of the trust beneficiaries.

## Section 6.08     Authority to Make Tax Elections

After a Trustmaker's death, our Trustee may make tax elections as provided in this Section. But if a Personal Representative is appointed for the deceased Trustmaker's probate estate, the discretionary authority granted to our Trustee as to any tax election will be subordinate to the Personal Representative's statutorily delegated authority.

**(a)     Tax Elections**

Our Trustee may make any tax elections necessary for the efficient administration of the deceased Trustmaker's estate, including:

> valuing assets according to an alternate valuation date;

> electing whether to take administration expenses as estate tax deductions or income tax deductions;

> allocating a Trustmaker's unused generation-skipping exemption to any portion of the trust property;

> electing special-use valuation;

> deferring payment of all or any portion of any taxes; and

> treating any portion of the deceased Trustmaker's administrative trust as part of the deceased Trustmaker's estate for federal or state income tax purposes, or both.

In addition, our Trustee, in its sole and absolute discretion, may elect to waive, in whole or in part, the deceased Trustmaker's right to have the deceased Trustmaker's estate reimbursed for any tax paid as a result of the inclusion in the deceased Trustmaker's taxable estate of property held in a qualified terminable interest property (QTIP) trust created for the surviving Trustmaker by the deceased Trustmaker.

Our Trustee may make equitable adjustments between income and principal because of any tax elections made by our Trustee.

**(b)     Qualified Terminable Interest Property**

Our Trustee may elect to have any trust property qualify for the federal estate tax marital deduction as qualified terminable interest property under Internal Revenue Code Section 2056(b)(7) (the *QTIP election*) and for any

state death tax marital deduction under any state's law (the *state QTIP election*). Our Trustee is not required to make the same election for both federal estate tax purposes and for state death tax purposes. If our Trustee makes a partial QTIP election, our Trustee will divide the trust on the basis of the fair market value of the trust assets at the time of the division.

Our Trustee is indemnified and held harmless from any loss, claim, or damage incurred by a beneficiary against our Trustee arising out of our Trustee's decision regarding the QTIP election for any portion of the trust property. Our Trustee is specifically authorized to use trust property to pay directly or to reimburse himself or herself for any expenses incurred to defend any threatened or actual legal action arising under this provision.

Our Trustee may make the special election under Internal Revenue Code Section 2652(a)(3) to treat all of the property of a trust created under this trust for which the QTIP election is made as if that election had not been made, making the deceased Trustmaker the transferor of the property for purposes of the generation-skipping transfer tax. We desire that our Trustee set apart the property to which the election has been made as a separate trust, so that the inclusion ratio of the separate qualified trust, as defined in the Internal Revenue Code, is zero.

### (c)   Allocation of GST Exemption

Our Trustee may elect to allocate or not allocate any portion of the Available GST Exemption under Internal Revenue Code Section 2631, or a counterpart exemption under any applicable state law to any property of which the deceased Trustmaker is considered the transferor for generation-skipping transfer tax purposes. This includes any property transferred by the deceased Trustmaker during the deceased Trustmaker's life for which the deceased Trustmaker did not make an allocation prior to death. The exercise of our Trustee's discretion should be based on the transfers, gift tax returns, and other information known to our Trustee, with no requirement that allocations benefit the various transferees or beneficiaries in any particular manner.

### (d)   Qualified Conservation Easements

Our Trustee may create a qualified conservation easement, as defined in Internal Revenue Code Section 2031(c)(8)(A), in any land held by the trust and may make the necessary election provided by Section 2031(c)(6).

## Section 6.09    Payment of Charitable Bequests

To the extent possible, our Trustee must make all charitable distributions from property that constitutes *income in respect of a decedent* (IRD) as that term is defined under the U.S. income tax laws. The distribution will qualify for the income tax charitable deduction under Internal Revenue Code Section 642(c)(2), as amended.

# Article Seven
## Disposition of Tangible Personal Property

### Section 7.01    Distribution of Tangible Personal Property by Memorandum

Each of us may dispose of items of tangible personal property by a signed written memorandum executed after we sign this instrument. The memorandum must refer to our trust and must reasonably identify the items and the beneficiary designated to receive each item. If either or both of us executes a memorandum, our Trustee shall incorporate the memorandum by reference into this instrument to the extent permitted by law.

Our Trustee shall distribute the items of tangible personal property listed in the memorandum as promptly as practicable after the death of a Trustmaker who completed the memorandum, together with any insurance policies covering the property and any claims under those policies, as provided in the memorandum. If either or both of us leave multiple written memoranda that conflict as to the disposition of any item of tangible personal property, the memorandum with the most recent date will control as to that item.

If the memorandum with the most recent date conflicts with a provision of this instrument as to the specific distribution of any item of tangible personal property, the provisions of the memorandum with the most recent date will control as to those items that are in conflict.

If the law does not permit incorporation of the memorandum by reference, the memorandum will then serve as an amendment to our trust, but only to the extent this amendment solely disposes of tangible personal property. We request that our Trustee follow our wishes and distribute the items of tangible personal property listed in the memorandum according to its terms.

### Section 7.02    Distribution of Remaining Tangible Personal Property

Our Trustee shall distribute any of the deceased Trustmaker's remaining tangible personal property not disposed of by a written memorandum to the Survivor's Trust to be administered as provided in Article Nine. If we are both deceased, our Trustee shall distribute the property as provided in the following Articles.

### Section 7.03    Definition of Tangible Personal Property

For purposes of this Article, the term *tangible personal property* includes household furnishings, appliances and fixtures, works of art, motor vehicles, pictures, collectibles, apparel and jewelry, books, sporting goods, and hobby paraphernalia. The term does not include any property that our Trustee, in its sole and absolute discretion, determines to be part of any business or business interest owned by the deceased Trustmaker or our trust.

After the death of a Trustmaker, if our Trustee receives property to be distributed under this Article from the deceased Trustmaker's probate estate or in any other manner, our Trustee shall distribute the property in accordance with this Article's terms. The fact that an item of tangible personal property was not received by our trust until after the death of a Trustmaker does not diminish the validity of the gift. If property to be distributed under this Article is not part of the trust property upon the death of a Trustmaker and is not

subsequently transferred to our Trustee from the deceased Trustmaker's probate estate or in any other manner, then the specific distribution of property made in this Article is null and void, without any legal or binding effect.

## Section 7.04    Incidental Expenses and Encumbrances

Until property distributed in accordance with this Article is delivered to the appropriate beneficiary or his or her Legal Representative, our Trustee shall pay the reasonable expenses of securing, storing, insuring, packing, transporting, and otherwise caring for the property as an administration expense. Except as otherwise provided in our trust, our Trustee shall distribute property under this Article subject to all liens, security interests, and other encumbrances on the property.

## Section 7.05    Residuary Distribution

The deceased Trustmaker's remaining property will be administered as provided in the following Articles.

# Article Eight
# Creating Trust Shares upon the Death of a Trustmaker

Our Trustee shall administer the deceased Trustmaker's remaining trust property as provided in this Article.

### Section 8.01    Distribution to the Deceased Trustmaker's Will

This Section applies if the surviving Trustmaker is a disabled person (as defined in United States Code Title 42, Section 1382c(a)(3), or under Arizona law related to means-based government programs), or is eligible to receive or is receiving assistance (as defined in United States Code Title 42, Section 1396d(a), or under Arizona law related to means-based government programs) or other benefits under a means-based government program, such as Medicaid or Supplemental Security Income.

If the surviving Trustmaker meets the criteria set forth above, our Trustee shall distribute the deceased Trustmaker's remaining trust property to the Personal Representative of the deceased Trustmaker's estate for administration and distribution under the terms of the deceased Trustmaker's Will.

But if the surviving Trustmaker does not meet the criteria set forth above, our Trustee shall administer the deceased Trustmaker's remaining trust property as otherwise provided in this Article.

### Section 8.02    Division of the Deceased Trustmaker's Remaining Trust Property

Our Trustee shall divide the deceased Trustmaker's remaining trust property as provided in this Section.

### (a)    Creation of the Marital Share

Our Trustee shall allocate to the Marital Share a fractional share of the deceased Trustmaker's remaining trust property calculated as follows.

#### (1)    The Numerator

Assuming the value qualifies for the federal tax marital deduction, the fraction's numerator will equal the minimum value sufficient to reduce the federal estate tax to the lowest possible amount. In computing the numerator, our Trustee shall take into account the deceased Trustmaker's transfers, including transfers treated as made by the deceased Trustmaker, and all deductions, exclusions, credits, and reductions in value allowed in computing this tax.

#### (2)    The Denominator

The denominator will be the value of the deceased Trustmaker's remaining trust property as finally determined for federal estate tax purposes.

Rudolph Trust
8-1

The Marital Share must carry its *pro rata* share of the income, but the Marital Share must not receive less income than that required to be paid to the surviving Trustmaker under applicable state law.

**(b)    Creation of the Non-Marital Share**

Our Trustee shall allocate the balance of the trust property to the Non-Marital Share.

**(c)    Funding the Fractional Share**

Our Trustee has complete authority to satisfy the fractional gift by cash contributions, by in-kind contributions, by a combination of cash and in-kind contributions, or by undivided interests in property. If there are insufficient assets qualifying for the federal estate tax marital deduction to fully fund the Marital Share, our Trustee shall reduce the funding to the Marital Share accordingly. We acknowledge that the funding amount may be affected by actions by our Trustee and by the deceased Trustmaker's Personal Representative in making certain tax elections.

Once calculated in this way, the fraction is fixed, and may not vary with changes in the property value after the valuation date used for federal estate tax purposes. Because the fractional gift is not intended to be a specified dollar amount or pecuniary in nature, our Trustee shall apply the fraction to the trust assets at their actual value on the effective allocation date, so that the actual value resulting from the application of the fraction will reflect fluctuations in the trust property's value. Our Trustee may fund the fractional share on a *non pro rata* basis if the funding is based on the total fair market value of the assets on the allocation date.

Our Trustee's allocations of assets are limited as set forth below.

**(1)    Ineligible Assets**

Our Trustee may only allocate property and the proceeds of any property to the Marital Share that qualify for the federal estate tax marital deduction.

**(2)    Tax Consequences of Certain Allocations**

We request that our Trustee always consider the tax consequences of allocating or distributing to the Marital Share any insurance policy that insures the surviving Trustmaker's life, property subject to the foreign death credit, property on which a tax credit is available, or property that is income in respect of a decedent under the Internal Revenue Code.

Our Trustee shall administer the Marital Share as provided in Article Ten. Our Trustee shall administer the Non-Marital Share as provided in Article Eleven.

**Section 8.03    Disposition of Property upon Disclaimer by the Surviving Trustmaker**

The surviving Trustmaker, his or her fiduciary, or his or her agent serving under a power of attorney may disclaim any portion of any interest in or power over property passing from the deceased Trustmaker to or for the surviving Trustmaker's benefit under this instrument. If the surviving Trustmaker disclaims any property that would otherwise be allocated to the Marital Trust, our Trustee shall allocate the disclaimed property to the Non-Marital Share.

If the surviving Trustmaker disclaims his or her interest in any portion of the Non-Marital Share, our Trustee shall dispose of the disclaimed interest as though the surviving Trustmaker had predeceased the deceased Trustmaker.

**Section 8.04    Option to Allocate Deceased Trustmaker Trust Property to the Survivor's Trust**

Our Trustee may waive any allocation to the the Marital and Non-Marital Shares and administer all of the trust assets under the provisions of the Survivor's Trust if:

> the combined value of the deceased and surviving Trustmakers' assets is less than the exemption equivalent for the deceased Trustmaker allowed by the Internal Revenue Service; and

> all of the then-living current and remainder beneficiaries entitled to the assets of any trusts that would otherwise be created from the Marital Share, Non-Marital Share, or both agree to waive any allocation to those shares or trusts or both in writing.

If any of the beneficiaries is a minor, the minor's parent or guardian may waive the allocation on behalf of the minor in writing.

# Article Nine
# The Survivor's Trust

Our Trustee shall administer the Survivor's Trust as provided in this Article.

### Section 9.01     Trustee of the Survivor's Trust

The surviving Trustmaker may serve as sole Trustee of the Survivor's Trust.  The surviving Trustmaker may remove and replace the Trustee of the Survivor's Trust at any time, with or without cause.  Notwithstanding any other provision in this instrument, the surviving Trustmaker may appoint any individual or corporate fiduciary to serve as Trustee of the Survivor's Trust.

### Section 9.02     The Surviving Trustmaker's Right to Amend

The surviving Trustmaker also has the absolute right to amend the Survivor's Trust's terms by restating them in full.  The restated Survivor's Trust must be in writing and signed by the surviving Trustmaker and the Trustee of the restated Survivor's Trust.

The right to amend by restatement may be exercised only by the surviving Trustmaker.

### Section 9.03     Survivor's Trust As Only Trust

If the Survivor's Trust is the only trust established on the death of the deceased Trustmaker, a transfer to that trust need not be evidenced by a change of title.

### Section 9.04     Separate Share for Deceased Trustmaker's Trust Property

If the Survivor's Trust becomes the beneficiary of death benefits under any qualified retirement plan, our Trustee shall hold this property in a separate share of the Survivor's Trust during the surviving Trustmaker's lifetime.  Our Trustee shall administer the separate share in accordance with all of this Article's provisions.  But the surviving Trustmaker may not amend the terms of the separate share.

The purpose of the separate share is to keep the deceased Trustmaker's trust property and its accumulated income separate from the main share during the lifetime of the surviving Trustmaker, in order to qualify the separate share as a designated beneficiary under qualified retirement plans.

Our Trustee shall distribute as much of the principal and accumulated income of the separate share to the main share of the Survivor's Trust as the surviving Trustmaker directs in writing.  This right to direct distribution from the separate share to the main account may be exercised only by the surviving Trustmaker.

### Section 9.05     Distribution of Income

Our Trustee shall distribute all of the net income of the Survivor's Trust to the surviving Trustmaker at least annually.  Nothing contained in this instrument may limit the right of the surviving Trustmaker to receive the Survivor's Trust's entire net income.

### Section 9.06      Distributions of Principal

Our Trustee shall distribute as much of the principal of the Survivor's Trust to the surviving Trustmaker as he or she requests in writing for any reason.

Our Trustee may also distribute as much of the principal of the Survivor's Trust to the surviving Trustmaker as our Trustee determines necessary or advisable for any purpose.

### Section 9.07      Unproductive Property

Upon the written request of the surviving Trustmaker, our Trustee shall convert any nonproductive property held in the Survivor's Trust to productive property.

### Section 9.08      Trust Distributions during the Incapacity of the Surviving Trustmaker

During any time the surviving Trustmaker is incapacitated, our Trustee shall administer the Survivor's Trust according to the provisions of Section 5.03.

### Section 9.09      General Power of Appointment

The surviving Trustmaker may appoint all or any portion of the principal and undistributed income remaining in the Survivor's Trust at the surviving Trustmaker's death among one or more persons or entities, including the creditors of the surviving Trustmaker's estate. The surviving Trustmaker has the exclusive right to exercise this general power of appointment.

### Section 9.10      Administration following the Surviving Trustmaker's Death

The Survivor's Trust becomes irrevocable upon the death of the surviving Trustmaker, and our Trustee shall administer the Survivor's Trust consistent with the provisions of Article Six for administration following the death of the first of us to die.

Upon completion of the administrative tasks, our Trustee shall administer the unappointed balance or remainder of the Survivor's Trust as provided in Article Twelve.

Case: 23-1162 Document: 010110860450 Date Filed: 05/16/2023 Page: 239
Case 1:20-cr-00152-WJM Document 558 Filed 01/18/23 USDC Colorado Page 63 of 122
239 of 342

Appellate Case: 23-1162   Document: 010110860450   Date Filed: 05/16/2023   Page: 239

# Article Ten
# The Marital Trust

Our Trustee shall administer the Marital Share in trust as provided in this Article. The trust will be referred to as the *Marital Trust*.

## Section 10.01   Distributions of Net Income

Our Trustee shall distribute all of the net income of the Marital Trust to the surviving Trustmaker at least annually during the surviving Trustmaker's lifetime. Nothing contained in this instrument limits the right of the surviving Trustmaker to receive the entire net income of the Marital Trust.

## Section 10.02   Distributions of Principal

Our Trustee shall distribute as much of the principal of the Marital Trust to the surviving Trustmaker as our Trustee determines necessary or advisable for the surviving Trustmaker's health, education, maintenance or support.

Our Trustee, in its sole and absolute discretion, may consider the needs of the surviving Trustmaker and other income and resources available to the surviving Trustmaker.

## Section 10.03   Effect of Remarriage on Principal Distributions

Upon the remarriage of the surviving Trustmaker:

> if the surviving Trustmaker is then serving as Trustee of the Marital Trust, the surviving Trustmaker is to be removed and replaced under the provisions of Article Three and

> all distributions of principal from the Marital Trust will terminate unless the surviving Trustmaker and the surviving Trustmaker's fiancé execute a valid prenuptial agreement that complies with the terms set forth below. For purposes of this trust, *remarriage* means any marriage, including a common law marriage, entered into by the surviving Trustmaker after the death of the first of us to die that is valid in the jurisdiction where it took place.

If the surviving Trustmaker chooses to remarry after the death of the first of us to die and executes a valid prenuptial agreement not less than 30 days prior to the time of the remarriage that complies with the following terms, then in our judgment, there will be sufficient protection for the other beneficiaries named in this trust. The distributions under this Article will not be restricted because of this remarriage, and the surviving Trustmaker need not be replaced as Trustee. The prenuptial agreement must be in writing and signed by the surviving Trustmaker and the surviving Trustmaker's fiancé, with each having been represented by independent legal counsel. Prior to the execution of the agreement, each party must make full disclosure of their then-existing assets. The prenuptial agreement must provide that the surviving Trustmaker's fiancé waives any right to any portion of the surviving Trustmaker's share of the surviving Trustmaker's premarital assets, the surviving Trustmaker's share of the Marital Trust in the event of dissolution of the marriage or the

death of the surviving Trustmaker, with the new spouse surviving the surviving Trustmaker.

## Section 10.04    Nonproductive Property

Upon written request of the surviving Trustmaker, our Trustee shall convert any nonproductive property held in the Marital Trust to productive property. In addition, the surviving Trustmaker has the right to require that any nonproductive property held in any qualified retirement plan, private or commercial annuity, individual retirement annuity, pension, profit-sharing plan, stock-bonus plan, stock ownership plan, or similar arrangement made payable to the Marital Trust be converted to productive property.

## Section 10.05    Qualified Terminable Interest Property

Our intent is that the Marital Trust property constitute Qualified Terminable Interest Property (QTIP) for federal and state death tax purposes if and to the extent our Trustee or Personal Representative makes the necessary elections. This trust should be interpreted to accomplish this intent.

If our Trustee or Personal Representative elects to have some but not all of the property in the Marital Trust qualify as qualified terminable interest property for federal or state purposes, our Trustee shall separate the qualified property and the nonqualified property into separate shares as necessary. Our Trustee shall hold and administer each share upon identical terms and conditions as if no division had occurred. The separate shares may be invested in a common fund with each share owning a proportionate fractional share of the fund.

## Section 10.06    Administration of the Marital Trust at the Death of the Surviving Trustmaker

The Marital Trust will terminate upon the death of the surviving Trustmaker.

Our Trustee shall distribute the balance or remainder of the Marital Trust as provided in Article Twelve.

# Article Eleven
# The Bypass Trust

Our Trustee shall hold and administer the Non-Marital Share in a separate trust as provided in this Article. This document refers to the trust as the *Bypass Trust*.

## Section 11.01    Bypass Trust Beneficiary

The surviving Trustmaker is the only beneficiary of the Bypass Trust during the surviving Trustmaker's lifetime.

## Section 11.02    Distribution of Income

Our Trustee shall distribute all of the net income of the Bypass Trust to the surviving Trustmaker at least annually during the surviving Trustmaker's lifetime.

## Section 11.03    Distribution of Principal

Our Trustee shall distribute as much principal of the Bypass Trust to the surviving Trustmaker as our Trustee determines necessary or advisable for the surviving Trustmaker's health, education, maintenance or support.

## Section 11.04    Guidelines to Our Trustee

The surviving Trustmaker is the only beneficiary of the Bypass Trust. In making discretionary distributions under this Article, our Trustee should bear in mind that our primary concern and objective is to provide for the well-being of the surviving Trustmaker, and the preservation of principal is not as important as this objective.

Without limiting our Trustee's discretion, we recommend that our Trustee not distribute principal from the Bypass Trust to the surviving Trustmaker until the principal of the Marital Trust is substantially exhausted.

## Section 11.05    Effect of Remarriage on Bypass Trust Distributions

Upon the remarriage of the surviving Trustmaker, the Bypass Trust will terminate unless the surviving Trustmaker and the surviving Trustmaker's fiancé execute a valid prenuptial agreement that complies with the terms set forth below. For purposes of this trust, *remarriage* means any marriage, including a common law marriage, entered into by the surviving Trustmaker after the death of the first of us to die that is valid in the jurisdiction where the marriage took place.

If terminated, our Trustee shall administer the balance or remainder of the Bypass Trust as provided in Article Twelve.

If the surviving Trustmaker should choose to remarry after the death of the first of us to die and executes a valid prenuptial agreement not less than 30 days prior to the surviving Trustmaker's remarriage then, in our judgment, there will be sufficient protection for the other beneficiaries named in this trust, and the Bypass Trust will not terminate. The prenuptial agreement must be in writing and signed by the surviving Trustmaker and the

surviving Trustmaker's fiancé with each represented by independent legal counsel. Prior to the execution of the agreement, each party must make full disclosure of their assets as these assets exist at that time. The prenuptial agreement must provide that the surviving Trustmaker's fiancé waives any right to any portion of the surviving Trustmaker's share of the surviving Trustmaker's premarital assets and the surviving Trustmaker's interest in any trust created under this instrument in the event of dissolution of the marriage, or in the event of the death of the surviving Trustmaker with the new spouse surviving the surviving Trustmaker.

### Section 11.06   Termination of the Bypass Trust

The Bypass Trust will terminate upon the death of the surviving Trustmaker and our Trustee shall administer the balance or remainder of the Bypass Trust as provided in Article Twelve.

Case 23-1202 Document 31-2 Filed 01/18/2023 Page 67 of 122
Case 23-1162 Document 010110860450 Date Filed: 05/16/2023 Page: 243 of 342

Appellate Case: 23-1162    Document: 010110860450    Date Filed: 05/16/2023    Page: 243

# Article Twelve
# Our Descendants' Trusts

Upon the death of the survivor of us, our Trustee shall administer and distribute our remaining trust property (not distributed under prior Articles of this instrument), or other property allocated to this Article under the terms of this Article.

## Section 12.01    Division of Our Trust Property

Our Trustee shall divide our remaining trust property into separate shares for our descendants, *per stirpes*.

Our Trustee shall administer the share for each of our descendants in a separate trust for the descendant's benefit as provided in the next Section.

## Section 12.02    Administration of Descendants' Trusts

Our Trustee shall administer the trust for each descendant as follows:

### (a)    Distributions of Income and Principal

Our Independent Trustee may distribute to the beneficiary as much of the income and principal of the beneficiary's trust as the Trustee, in its sole and absolute discretion, advises for any purpose. If no Independent Trustee is then serving, our Trustee shall distribute to the beneficiary as much income and principal of the beneficiary's trust as our Trustee determines is necessary or advisable for the health, education, maintenance or support of the beneficiary.

Our Trustee shall add any undistributed net income to principal.

### (b)    Guidelines for Discretionary Distributions

In making discretionary distributions to the beneficiary, we desire to encourage the beneficiary to develop a strong work ethic, to be a productive and contributing member of society, and to provide for those who are dependent on the beneficiary for care and support. Accordingly, we request that our Trustee always consider the other known resources available to the beneficiary before making discretionary distributions. We desire that preservation of principal be a priority for purposes of this trust and that the beneficiary show genuine need before our Trustee makes any discretionary distribution.

### (c)    Right to Withdraw Principal

At the intervals set forth below, the beneficiary may withdraw from the beneficiary's trust, at any time, amounts not to exceed in the aggregate:

> $100,000 of the accumulated trust income and principal, each calendar year after funding of the beneficiary's trust, increased by $100,000 of the accumulated trust income and

principal not already subject to withdrawal, calculated by taking the total accumulated trust income and principal and deducting any amount already subject to withdrawal but not actually withdrawn, each additional year after funding of the beneficiary's trust; and

any amount of the accumulated trust income and principal, once the beneficiary reaches the age of 40 years old.

These withdrawal rights are cumulative and the amount of each successive withdrawal right will be added to any existing withdrawal right. The amount of each withdrawal right will be determined by applying the applicable fraction to the trust's principal and accumulated income as of the date the beneficiary first has the right to exercise the withdrawal right.

The beneficiary may exercise this right at any time by delivering written notice to our Trustee, setting forth the desired withdrawal amount. Upon receiving a notice, our Trustee shall convey and deliver the requested amount to the beneficiary, free of trust. This right of withdrawal is a privilege that may be exercised only by the beneficiary, and is not subject to the claims of any creditor or to legal process, and may not be voluntarily or involuntarily alienated or encumbered. This provision does not limit the beneficiary's exercise of any power of appointment the beneficiary may have.

**(d)      Distribution upon the Death of the Beneficiary**

If the beneficiary dies after the beneficiary's trust is established, but before the complete distribution of the beneficiary's trust, our Trustee shall distribute the remaining trust property *per stirpes* in trusts to the beneficiary's descendants. If the beneficiary has no then-living descendants, our Trustee shall distribute the balance of the trust property *per stirpes* in trusts to the descendants of the beneficiary's nearest lineal ancestor who was a descendant of ours or, if no descendant of this kind is then living, *per stirpes* in trusts to our descendants. Our Trustee shall administer the trusts under the same terms as the beneficiary's trust.

If we have no then-living descendants, our Trustee shall distribute the balance of the trust property as provided in Article Thirteen.

# Article Thirteen
# Remote Contingent Distribution

If at any time no person or entity is qualified to receive final distribution of any part of our trust estate under the foregoing provisions of this trust, this portion of the trust estate must be distributed to St. Jude Children's Research Hospital, Inc., or its successor in interest, to be used exclusively for its general charitable purposes. If the organization has no certainly identifiable successors in interest, our Trustee must designate one or more charitable organizations with similar charitable purposes as St. Jude Children's Research Hospital, Inc. to receive that property. Our Trustee shall determine the amounts, shares, and interests of the distributions. Each charitable organization must be a charity of a type described in Internal Revenue Code Section 2055(a).

# Article Fourteen
# Distributions to Underage and Incapacitated Beneficiaries

### Section 14.01    Supplemental Needs Trust

If under any provision of this trust our Trustee is directed to distribute to or for the benefit of any beneficiary when that person is receiving or applying for needs-based government benefits, our Trustee shall retain and administer the trust property as follows:

#### (a)    Not a Conduit Trust

The distributions from Retirement Plans (*conduit trust provisions*) set forth in Section 15.01 do not apply to the provisions of Section 14.01.

#### (b)    Distributions for Supplemental Needs

In its sole, absolute, and unreviewable discretion, our Trustee may distribute discretionary amounts of net income and principal for supplemental needs of the beneficiary not otherwise provided by governmental financial assistance and benefits, or by the providers of services.

*Supplemental needs* refers to the basic requirements for maintaining the good health, safety, and welfare when, in the discretion of our Trustee, these basic requirements are not being provided by any public agency, office, or department of any state or of the United States.

*Supplemental needs* will also include medical and dental expenses; annual independent checkups; clothing and equipment; programs of training, education, treatment, and rehabilitation; private residential care; transportation, including vehicle purchases; maintenance; insurance; and essential dietary needs. *Supplemental needs* may include spending money; additional food; clothing; electronic equipment such as radio, recording and playback, television and computer equipment; camping; vacations; athletic contests; movies; trips; and money to purchase appropriate gifts for relatives and friends.

Our Trustee will have no obligation to expend trust assets for these needs. But if our Trustee, in its sole, absolute and unreviewable discretion, decides to expend trust assets, under no circumstances should any amounts be paid to or reimbursed to the federal government, any state, or any governmental agency for any purpose, including for the care, support, and maintenance of the beneficiary.

#### (c)    Objective to Promote Independence of the Beneficiary

While actions are in our Trustee's sole, absolute, and unreviewable discretion, all parties to this trust should be mindful that our wish is that the beneficiary live as independently, productively, and happily as possible.

Rudolph Trust
14-1

202

### (d)    Trust Assets Not to be Considered Available Resource to the Beneficiary

The purpose of the provisions of this Section 14.01 is to supplement any benefits received, or for which the beneficiary may be eligible, from various governmental assistance programs, and not to supplant any benefits of this kind. All actions of our Trustee shall be directed toward carrying out this intent, and our Trustee's discretion granted under this instrument to carry out this intent is sole, absolute, and unreviewable.

For purposes of determining the beneficiary's eligibility for any of these benefits, no part of the trust estate's principal or undistributed income will be considered available to the beneficiary for public benefit purposes. The beneficiary must not be considered to have access to the trust's principal or income, or to have ownership, right, authority, or power to convert any asset into cash for his or her own use.

Our Trustee shall hold, administer, and distribute all property allocated to this trust for the exclusive benefit of the beneficiary during his or her lifetime. All distributions from this trust share are in the sole, absolute, and unreviewable discretion of our Trustee, and the beneficiary is legally restricted from demanding trust assets for his or her support and maintenance.

In the event our Trustee is requested to release principal or income of the trust to or on behalf of the beneficiary to pay for equipment, medication, or services that any government agency is authorized to provide, or to petition a court or any other administrative agency for the release of trust principal or income for this purpose, our Trustee is authorized to deny this request and to take whatever administrative or judicial steps are necessary to continue the beneficiary's eligibility for benefits. This includes obtaining legal advice about the beneficiary's specific entitlement to public benefits and obtaining instructions from a court of competent jurisdiction ruling that neither the trust corpus nor the trust income is available to the beneficiary for eligibility purposes. Any expenses incurred by our Trustee in this regard, including reasonable attorney fees, will be a proper charge to the trust estate.

### (e)    Distribution Guidelines

Our Trustee shall be responsible for determining what discretionary distributions will be made from this trust. Our Trustee may distribute discretionary amounts of income and principal to or for the benefit of the beneficiary for those supplemental needs not otherwise provided by governmental financial assistance and benefits, or by the providers of services. Any undistributed income will be added to principal. In making distributions, our Trustee must:

> consider any other known income or resources of the beneficiary that are reasonably available;

consider all entitlement benefits from any government agency, including Social Security disability payments, Medicare, Medicaid (or any state Medicaid program equivalent), Supplemental Security Income (SSI), In-Home Support Service (IHSS), and any other supplemental purpose benefits for which the beneficiary is eligible;

consider resource and income limitations of any assistance program;

make expenditures so that the beneficiary's standard of living will be comfortable and enjoyable;

not be obligated or compelled to make specific payments;

not pay or reimburse any amounts to any governmental agency or department, unless proper demand is made by this governmental agency or reimbursement is required by the state; and

not be liable for any loss of benefits.

**(f)      No Seeking of Order to Distribute**

For purposes of determining the beneficiary's state Medicaid program equivalent eligibility, no part of the trust estate's principal or undistributed income may be considered available to the beneficiary. Our Trustee shall deny any request by the beneficiary to:

release trust principal or income to or on behalf of the beneficiary to pay for equipment, medication, or services that the state Medicaid program equivalent would provide if the trust did not exist; or

petition a court or any other administrative agency for the release of trust principal or income for this purpose.

In its sole, absolute, and unreviewable discretion, our Trustee may take necessary administrative or legal steps to protect the beneficiary's state Medicaid program equivalent eligibility. This includes obtaining a ruling from a court of competent jurisdiction that the trust principal is not available to the beneficiary for purposes of determining state Medicaid program equivalent eligibility. Expenses for this action, including reasonable attorney fees, will be a proper charge to the trust estate.

**(g)      Indemnification of Trustee When Acting in Good Faith**

Our Trustee will be indemnified from the trust property for any loss or reduction of public benefits sustained by the beneficiary as a result of our Trustee exercising the authority granted to our Trustee under this Section in good faith.

**(h)   Termination and Distribution of the Supplemental Needs Trust**

If our Trustee, in its sole, absolute, and unreviewable discretion, determines that the beneficiary is no longer dependent on others and is able to independently support himself or herself, our Trustee shall distribute or retain the remaining property according to the other provisions of this trust as though the provisions of this Section 14.01 had not been effective.

If the other provisions of this trust do not provide for the remaining property's distribution or retention, then our Trustee shall distribute the remaining property to the beneficiary outright and free of trust.

*Independently support* is satisfied when the beneficiary has been gainfully employed for 33 months of the 36-month period immediately preceding the decision to terminate the trust share.

The terms *gainful employment* and *gainfully employed* mean the full-time employment that produces sufficient net income to enable the beneficiary to contribute not less than 100% of the funds (exclusive of other revenue sources) that are necessary to provide for the beneficiary's independent care, support, maintenance, and education. In its sole, absolute, and unreviewable discretion, our Trustee shall determine whether or not the beneficiary has satisfied the condition of gainful employment.

**(i)   Distribution upon the Death of the Beneficiary**

Upon the beneficiary's death, our Trustee shall distribute or retain the remaining property according to the other provisions of this trust as though the provisions of this Section 14.01 had not been effective. If the other provisions of this trust provide for the beneficiary's share to be held in trust, then those provisions will be interpreted as though the beneficiary died after the establishment of that trust.

If the other provisions of this trust do not provide for the distribution or retention of the remaining property, then the beneficiary will have the testamentary limited power to appoint all or any portion of the principal and undistributed income remaining in the beneficiary's trust at his or her death among one or more persons or entities. But the beneficiary may not exercise this limited power of appointment to appoint to himself or herself, his or her estate, his or her creditors or the creditors of his or her estate.

We intend to create a limited power of appointment and not a general power of appointment as defined in Internal Revenue Code Section 2041.

If any part of the beneficiary's trust is not effectively appointed, our Trustee shall distribute the remaining unappointed balance *per stirpes* to the beneficiary's descendants. If the beneficiary has no then-living descendants, our Trustee shall distribute the unappointed balance *per stirpes* to the then-living descendants of the beneficiary's nearest lineal ancestor

Rudolph Trust
14-4

205

who was a descendant of ours or, if there is no then-living descendant, *per stirpes* to our descendants.

If we have no then-living descendants, our Trustee shall distribute the balance of the trust property as provided in Article Thirteen.

## Section 14.02   Underage and Incapacitated Beneficiaries

If our Trustee is authorized or directed under any provision of this trust to distribute net income or principal to a person who has not yet reached 25 years of age or who is incapacitated as defined in Section 18.07(g), our Trustee may make the distribution by any one or more of the methods described in Section 14.03. Alternatively, our Trustee may retain the trust property in a separate trust to be administered by our Trustee under Section 14.04.

We request that before making a distribution to a beneficiary, our Trustee consider, to the extent reasonable, the ability the beneficiary has demonstrated in managing prior distributions of trust property.

## Section 14.03   Methods of Distribution

Our Trustee may distribute trust property for any beneficiary's benefit, subject to the provisions of Section 14.02 in any one or more of the following methods:

Our Trustee may distribute trust property directly to the beneficiary.

Our Trustee may distribute trust property to the beneficiary's guardian, conservator, parent, other family member, or any person who has assumed the responsibility of caring for the beneficiary.

Our Trustee may distribute trust property to any person or entity, including our Trustee, as custodian for the beneficiary under the Uniform Transfers to Minors Act or similar statute.

Our Trustee may distribute trust property to other persons and entities for the beneficiary's use and benefit.

Our Trustee may distribute trust property to an agent or attorney in fact authorized to act for the beneficiary under a valid durable power of attorney executed by the beneficiary before becoming incapacitated.

## Section 14.04   Retention in Trust

Our Trustee may retain and administer trust property in a separate trust for any beneficiary's benefit, subject to the provisions of Section 14.02 as follows.

### (a)   Distribution of Net Income and Principal

Our Independent Trustee may distribute to the beneficiary as much of the net income and principal of any trust created under this Section as our Independent Trustee may determine advisable for any purpose. If there is no then-serving Independent Trustee, our Trustee shall distribute to the beneficiary as much of the net income and principal of the trust created

Appellate Case: 23-1162   Document: 010110860450   Date Filed: 05/16/2023   Page: 251

under this Section as our Trustee determines is necessary or advisable for the beneficiary's health, education, maintenance or support. Any undistributed net income will be accumulated and added to principal.

### (b)   Right of Withdrawal

When the beneficiary whose trust is created under this Section either reaches 25 years of age or is no longer incapacitated, the beneficiary may withdraw all or any portion of the accumulated net income and principal from the trust.

### (c)   Distribution upon the Death of the Beneficiary

Subject to the terms of the next paragraph, the beneficiary whose trust is created under this Section may appoint all or any portion of the principal and undistributed net income remaining in the beneficiary's trust at the beneficiary's death among one or more persons or entities, and the creditors of the beneficiary's estate. The beneficiary has the exclusive right to exercise this general power of appointment.

The beneficiary may not exercise this power of appointment to appoint to the beneficiary, the beneficiary's estate, the beneficiary's creditors, or creditors of the beneficiary's estate from the *limited share* of the beneficiary's trust. For purposes of this power of appointment, the *limited share* of the beneficiary's trust is that portion of the beneficiary's trust that has an inclusion ratio for generation-skipping transfer tax purposes of zero or that without the exercise of the power of appointment, would not constitute a taxable generation-skipping transfer at the beneficiary's death. If the generation-skipping tax does not then apply, the limited share will be the beneficiary's entire trust.

If any part of the beneficiary's trust is not effectively appointed, our Trustee shall distribute the remaining unappointed balance *per stirpes* to the beneficiary's descendants. If the beneficiary has no then-living descendants, our Trustee shall distribute the unappointed balance *per stirpes* to the then-living descendants of the beneficiary's nearest lineal ancestor who was a descendant of ours or, if there is no then-living descendant, *per stirpes* to our descendants.

If we have no then-living descendants, our Trustee shall distribute the balance of the trust property as provided in Article Thirteen.

## Section 14.05   Application of Article

Any decision made by our Trustee under this Article is final, controlling, and binding upon all beneficiaries subject to the provisions of this Article.

The provisions of this Article do not apply to distributions to either of us from any trust established under this trust.

Except as provided in Section 14.01, the provisions of this Article do not apply to distributions that are required to be made to a beneficiary under the provisions of Section 15.01.

# Article Fifteen
# Retirement Plans and Life Insurance Policies

The provisions of this Article apply to qualified retirement plans and insurance policies owned by or made payable to our trust.

### Section 15.01    Retirement Plans

Notwithstanding any contrary provision in this trust, this Section's provisions apply to qualified retirement plans.

#### (a)    Rights of Our Trustee

Subject to the provisions below pertaining to distributions from qualified retirement plans, our Trustee may exercise the right to determine the manner and timing of payments of qualified retirement plan benefits that are permitted and are consistent with the federal income tax rules regarding required minimum distributions under Internal Revenue Code Section 401(a)(9).

Our Trustee may make a qualified disclaimer of any qualified retirement benefits payable or non-qualified annuity benefits to our trust.

No beneficiary may hold our Trustee liable for any decision regarding the selection of the death benefit election or the disclaimer of any qualified retirement benefits payable to our trust.

Our Trustee may not change or designate beneficiaries under any retirement plan. Any power extended to our Trustee under the terms of a retirement plan that gives or appears to give our Trustee the power to change the identity or rights of any beneficiaries under the plan is void *ab initio*.

#### (b)    Distributions from Retirement Plans to the Survivor's Trust

To the extent that at least part of any tax-favored retirement plan is distributed to the Survivor's Trust, our Trustee may (or must, if so requested by the surviving Trustmaker) cause the plan or part of the plan to be paid directly to the surviving Trustmaker as beneficiary, or must (if so required by the surviving Trustmaker) cause the plan or part of the plan to be transferred directly into another retirement plan in the surviving Trustmaker's name, without the intervening step of transferring it to the Survivor's Trust.

If the Survivor's Trust becomes the beneficiary of death benefits under any qualified retirement plan, each year, beginning with the year of the deceased Trustmaker's death, our Trustee shall withdraw at least the greater of:

> the net income earned on the Survivor's Trust's share of the plan during the year; and

Rudolph Trust
15-1

209

the minimum distribution required to be withdrawn from the Survivor's Trust's share of the plan under Internal Revenue Code Section 401(a)(9).

Our Trustee may withdraw additional amounts from the Survivor's Trust's share of the plan as our Trustee deems advisable. Our Trustee shall immediately distribute all amounts withdrawn to the surviving Trustmaker.

If the surviving Trustmaker is then deceased, our Trustee shall instead distribute the amount that would have been distributed to the surviving Trustmaker to the remainder beneficiary.

This Subsection's purpose is to ensure that the life expectancy of the surviving Trustmaker may be used to calculate the minimum distributions required by the Internal Revenue Code. This Subsection is to be interpreted consistent with this intent, despite any direction to the contrary in this trust.

Notwithstanding any other provision of this trust, our Trustee shall treat annuity and other periodic payments from any qualified retirement plans in any given year as income, to the extent the distribution represents income generated and treated as generated by any qualified retirement plan for that year. If income information is not available, then our Trustee shall apportion the annuity and other periodic payments between principal and income in an equitable and practical manner under Section 16.13.

**(c)    Distributions from Retirement Plans to the Marital Trust**

If the Marital Trust becomes the beneficiary of death benefits under any qualified retirement plan, each year, beginning with the year of the deceased Trustmaker's death, our Trustee shall withdraw at least the greater of:

the net income earned on Marital Trust's share of the plan during the year; and

the minimum distribution required to be withdrawn from Marital Trust's share of the plan under Internal Revenue Code Section 401(a)(9).

Our Trustee may withdraw additional amounts from Marital Trust's share of the plan as our Trustee deems advisable, but only if the dispositive terms of the trust authorize our Trustee to immediately distribute the withdrawn amount as provided in this Subsection to the surviving Trustmaker. Our Trustee shall immediately distribute all amounts withdrawn to the surviving Trustmaker.

If the surviving Trustmaker is then deceased, our Trustee shall instead distribute the amount that would have been distributed to the surviving Trustmaker to the remainder beneficiary.

This Subsection's purpose is to ensure that the life expectancy of the surviving Trustmaker may be used to calculate the minimum distributions

required by the Internal Revenue Code. This Subsection is to be interpreted consistent with this intent despite any direction to the contrary in this trust.

Notwithstanding any other provision of this trust, our Trustee shall treat annuity and other periodic payments from any qualified retirement plans in any given year as income, to the extent the distribution represents income generated and treated as generated by any qualified retirement plan for that year. If income information is not available, then our Trustee shall apportion the annuity and other periodic payments between principal and income in an equitable and practical manner under Section 16.13.

**(d)    Distributions from Retirement Plans to Trusts Other Than Trusts That Qualify for the Federal Estate Tax Marital Deduction**

Unless specifically stated otherwise beginning with the year of a Trustmaker's death, if any trust created under this instrument that does not qualify for the federal estate tax marital deduction becomes the beneficiary of death benefits under any qualified retirement plan, our Trustee shall annually withdraw from the trust's share of the plan the minimum distribution required under Internal Revenue Code Section 401(a)(9). This subsection applies to any administrative trust created under Article Six. Our Trustee may withdraw additional amounts from the trust's share of the plan as our Trustee deems advisable, but only if the dispositive terms of the trust authorize our Trustee to immediately distribute the withdrawn amount as provided in this Subsection.

Our Trustee shall immediately distribute all amounts withdrawn to:

> the surviving Trustmaker, if a trust beneficiary;
>
> if the surviving Trustmaker is not a trust beneficiary, to our descendants, *per stirpes*, who are trust beneficiaries; and
>
> if the surviving Trustmaker is not a trust beneficiary and no descendant of ours is a trust beneficiary, then equally to the trust's Income Beneficiaries.

Amounts required to be withdrawn and distributed under this Subsection will reduce mandatory distribution amounts under other provisions of this trust that otherwise require distribution of all the trust's income.

This Subsection's purpose is to ensure that the trust beneficiaries' life expectancies may be used to calculate the minimum distributions required by the Internal Revenue Code. This Subsection is to be interpreted consistent with our intent, despite any direction to the contrary in this trust.

**(e)    Minimum Required Distribution**

In administering the trust, the minimum required distribution for each qualified retirement plan for any year is the greater of:

Rudolph Trust
15-3

the value of the qualified retirement plan determined as of the preceding year end, divided by the applicable distribution period; and

the amount that our Trustee is required to withdraw under the laws then applicable to the trust to avoid penalty.

If a Trustmaker dies before the required beginning date for a qualified retirement plan, the applicable distribution period means the beneficiary's life expectancy. If a Trustmaker dies on or after the required beginning date for a qualified retirement plan, the applicable distribution period means the beneficiary's life expectancy, or the deceased Trustmaker's remaining life expectancy, if longer.

Notwithstanding the foregoing, if a Trustmaker's death occurs on or after the required beginning date for a qualified retirement plan, the minimum required distribution for the year of death means:

the amount that was required to be distributed to the Trustmaker with respect to the qualified retirement plan during the year; minus

amounts actually distributed to the Trustmaker.

*Life expectancy*, *required beginning date* and other similar terms used in this Subsection, are to be determined in accordance with Internal Revenue Code Section 401(a)(9).

### Section 15.02   Life Insurance Policies

The following provisions apply to life insurance policies owned by or made payable to our trust.

#### (a)   Provisions during Our Lives

During our lives, each of us individually reserves all of the rights, powers, privileges, and options, with respect to any insurance policy, annuity, or any other third-party beneficiary contract owned by or made payable to our trust. This includes the rights to designate and change beneficiaries, to borrow money, to surrender the policy, to receive any payments as owner, and to make any available elections.

Our Trustee does not have a duty to exercise or to not exercise any rights, powers, privileges, or options with respect to any insurance policy, annuity contract, or other third-party beneficiary contract. Our Trustee does not have an obligation to pay premiums or other contractual amounts that may be payable under any policy.

#### (b)   Provisions after Our Death

After the death of a Trustmaker, our Trustee may make all appropriate elections with respect to these policies and may collect all sums made payable to our trust or to our Trustee under all these policies or contracts.

Rudolph Trust
15-4

Our Trustee may exercise any settlement options or other options or rights that may be available under the terms of any policy or contract. No beneficiary may hold our Trustee liable because of any election our Trustee has made with respect to any policy or contract.

### Section 15.03    Liability of Payor

Persons or entities dealing in good faith with our Trustee are not required to see to the proper application of proceeds delivered to our Trustee, or to inquire into any provision of this trust.

A receipt signed by our Trustee for any proceeds or benefits paid will be a sufficient discharge to the person or entity making the payment.

### Section 15.04    Collection Efforts

Our Trustee shall make reasonable efforts to collect all life insurance policy proceeds and qualified retirement benefits payable to our trust.

Our Trustee may commence legal or administrative proceedings to collect any life insurance policy proceeds or qualified retirement benefits to which the trust is entitled. Our Trustee need not begin these proceedings until our Trustee is satisfactorily indemnified for any expenses and liabilities our Trustee may incur in connection with the proceeding.

Our Trustee may settle any claims with respect to the collection of any life insurance proceeds or qualified retirement benefits to which our trust may be entitled. A settlement made by our Trustee is binding on all beneficiaries.

### Section 15.05    No Obligation to Purchase or Maintain Benefits

Nothing in this trust imposes any obligation on either of us or on our Trustee to purchase, invest, or maintain any qualified retirement plan or life insurance policy.

# Article Sixteen
# Trust Administration

### Section 16.01    Deceased Spousal Exclusion Amount

Upon the death of the first of us to die, then to the extent the first to die spouse's *applicable exclusion amount* as defined in Internal Revenue Code Section 2010(c)(2) cannot be fully used, our Trustee shall make an election under Internal Revenue Code Section 2010(c)(5)(A) to allow the second of us to die to take the first-to-die spouse's *deceased spousal unused exclusion amount* as defined in Internal Revenue Code Section 2010(c)(4), if any, into account in calculating the second to die spouse's applicable exclusion amount.

### Section 16.02    Distributions to Beneficiaries

Whenever this trust authorizes or directs our Trustee to make a net income or principal distribution to a beneficiary, our Trustee may apply any property that otherwise could be distributed directly to the beneficiary for his or her benefit.  Our Trustee is not required to inquire into the beneficiary's ultimate disposition of the distributed property unless specifically directed otherwise by this trust.

Our Trustee may make cash distributions, in-kind distributions, or distributions partly in each, in proportions and at values determined by our Trustee.  Our Trustee may allocate undivided interests in specific assets to a beneficiary or trust in any proportion or manner that our Trustee determines, even though the property allocated to one beneficiary may be different from that allocated to another beneficiary.

Our Trustee may make these determinations without regard to the income tax attributes of the property and without the consent of any beneficiary.

### Section 16.03    Trust Decanting; Power to Appoint in Further Trust

Our Trust Protector may appoint the property subject to our Trustee's power of distribution in trust for the benefit of one or more beneficiaries of any trust created under this instrument under the terms established by the Trust Protector.  Any trust established by the Trust Protector and funded by the exercise of the power granted under this Section must meet these requirements:

> the trust must not reduce any fixed income, annuity, or unitrust right provided by this trust instrument to any beneficiary;

> the trust must provide for one or more of the beneficiaries of a trust created under this instrument; and

> the interests of remainder beneficiaries of the trust created under this instrument must not be accelerated under the terms of the new trust.

A Trust Protector may not use the powers granted under this Section to extend the term of the new trust beyond the period of perpetuities provided under the governing law of this instrument.

Any trust created under this provision must not contain any provision that, if applicable, would cause the trust to fail to qualify for the marital deduction or charitable deduction, fail to qualify any gift to the trust for any gift, estate, or generation-skipping transfer annual exclusion, or disqualify the trust as a qualified subchapter S corporation shareholder.

If any beneficiary holds a presently exercisable right to withdraw property from this trust, that right may not be defeated by the exercise of the Trust Protector's powers granted under this Section.

## Section 16.04   Beneficiary's Status

Until our Trustee receives notice of the incapacity, birth, marriage, death, or other event upon which a beneficiary's right to receive payments may depend, our Trustee will not be held liable for acting or not acting with respect to the event, or for disbursements made in good faith to persons whose interest may have been affected by the event. Unless otherwise provided in this trust, a parent or Legal Representative may act on behalf of a minor or incapacitated beneficiary.

Our Trustee may rely on any information provided by a beneficiary with respect to the beneficiary's assets and income. Our Trustee will have no independent duty to investigate the status of any beneficiary and will not incur any liability for not doing so.

## Section 16.05   Mandatory Payments of a Pecuniary Amount

If any person holds the right to receive a pecuniary amount from our trust upon our death, our Trustee must either:

> satisfy the entire pecuniary amount or irrevocably set aside property to satisfy the entire pecuniary amount within 15 months of our death; or

> pay appropriate interest, as defined in Treasury Regulations Section 26.2642-2(b)(4)(ii)(B), to the person.

If our Trustee satisfies the pecuniary amount with an in-kind distribution, our Trustee will allocate assets to satisfy the pecuniary amount in a manner that fairly reflects net appreciation or depreciation in the value of the available assets, as measured from the valuation date to the payment date.

## Section 16.06   No Court Proceedings

Our Trustee shall administer this trust with efficiency, with attention to the provisions of this trust, and with freedom from judicial intervention. If our Trustee or another interested party institutes a legal proceeding, the court will acquire jurisdiction only to the extent necessary for that proceeding. Any proceeding to seek instructions or a court determination may only be initiated in the court with original jurisdiction over matters relating to the construction and administration of trusts. Seeking instructions or a court determination is not to be construed as subjecting this trust to the court's continuing jurisdiction.

### Section 16.07    No Bond

Our Trustee is not required to furnish any bond for the faithful performance of the Trustee's duties unless required by a court of competent jurisdiction, and only if the court finds that a bond is needed to protect the beneficiaries' interests. No surety will be required on any bond required by any law or court rule, unless the court specifies its necessity.

### Section 16.08    Exoneration of Our Trustee

No successor Trustee is obligated to examine the accounts, records, or actions of any previous Trustee or the Personal Representative of a deceased Trustmaker. No successor Trustee may be held responsible for any act, omission, or forbearance by any previous Trustee or of the Personal Representative of a deceased Trustmaker. Absent clear and convincing evidence of willful bad faith on the part of our Trustee, our Trustee is exonerated from any liability for the acts, omissions, or forbearances of any Trust Protector and from any liability for our Trustee's own acts, omissions, or forbearances directed by the Trust Protector.

Any Trustee may obtain written agreements from the beneficiaries or their Legal Representatives releasing and indemnifying the Trustee from any liability that may have arisen from the Trustee's acts, omissions, or forbearances. If acquired from all the trust's living beneficiaries or their Legal Representatives, any agreement is conclusive and binding on all parties, born or unborn, who may have or who may later acquire an interest in the trust.

Our Trustee may require a refunding agreement before making any distribution or allocation of trust income or principal, and may withhold distribution or allocation pending determination or release of a tax or other lien. This refunding agreement provision will not apply to any distribution that qualifies for the federal estate tax unlimited marital deduction or the federal estate tax charitable deduction.

### Section 16.09    Limitations on Trustee Liability

We recognize that some individuals and institutions may be reluctant to serve as Trustee because of a concern about potential liability. Therefore, we direct that any individual or corporate fiduciary that serves as our Trustee will not incur any liability by reason of any error of judgment, mistake of law, or action or inaction of any kind in connection with the administration of any trust created under this trust, unless our Trustee's decision is shown by clear and convincing evidence to have been made in bad faith.

Any individual or corporate fiduciary currently serving as our Trustee may expend any portion of the trust assets to defend any claim brought against the Trustee, even if the Trustee's defense costs would exhaust the trust's value, unless the Trustee is shown to have acted in bad faith by clear and convincing evidence.

Any individual or corporate fiduciary that formerly served as our Trustee is entitled to reimbursement from the trust estate for any expenses, including attorney's fees and litigation costs reasonably incurred to defend any claim brought against the Trustee even if the Trustee's defense costs would exhaust the trust's value, unless the Trustee is shown to have acted in bad faith by clear and convincing evidence.

Except for cases of willful misconduct or gross negligence on the Trustee's part, any action, omission, or forbearance made in good faith reliance on information, consent, or directions received from a Trust Protector will be considered to have been made in good faith for this Section's purposes.

## Section 16.10   Trustee Compensation

During any period we or each of us or any individual Beneficiary or Beneficiaries are serving as Trustee under this agreement, neither we nor the individual Beneficiary or Beneficiaries will receive a fee in connection with service as Trustee.

Any other individual serving as Trustee is entitled to fair and reasonable compensation for the services provided as a fiduciary. A corporate fiduciary serving as Trustee will be compensated by agreement between an individual serving as Trustee and the corporate fiduciary. In the absence of an individual Trustee or an agreement, a corporate fiduciary will be compensated in accordance with the corporate fiduciary's current published fee schedule.

A Trustee entitled to compensation may charge additional fees for services provided that are beyond the ordinary scope of duties, such as fees for legal services, tax return preparation, and corporate finance or investment banking services.

In addition to receiving compensation, a Trustee may be reimbursed for reasonable costs and expenses incurred in carrying out the Trustee's duties under this trust.

## Section 16.11   Employment of Professionals

Our Trustee may appoint, employ, and remove investment advisors, accountants, auditors, depositories, custodians, brokers, consultants, attorneys, advisors, agents, and employees to advise or assist in the performance of our Trustee's duties. Our Trustee may act on the recommendations of the persons or entities employed, with or without independent investigation.

Our Trustee may reasonably compensate an individual or entity employed to assist or advise our Trustee, regardless of any other relationship existing between the individual or entity and our Trustee.

Our Trustee may compensate providers of contracted services at the usual rate out of the trust's income or principal, as our Trustee deems advisable. Our Trustee may compensate an individual or entity employed to assist or advise our Trustee without diminishing the compensation the Trustee is entitled to under this trust. A Trustee who is a partner, stockholder, officer, director, or corporate affiliate in any entity employed to assist or advise our Trustee may still receive the Trustee's share of the compensation paid to the entity.

## Section 16.12   Exercise of Testamentary Power of Appointment

A testamentary power of appointment granted under this trust may be exercised by a will or living trust specifically referring to the power of appointment. The holder of a testamentary power of appointment may exercise the power to appoint property among the permissible appointees in equal or unequal proportions, and may designate the terms and

conditions, whether outright or in trust. The holder of a testamentary power of appointment may grant further powers of appointment to any person to whom principal may be appointed, including a presently exercisable limited or general power of appointment.

Our Trustee may conclusively presume that any power of appointment granted to any beneficiary of a trust created under this trust has not been exercised by the beneficiary if our Trustee has no knowledge of the existence of a will or living trust exercising the power within three months after the beneficiary's death.

### Section 16.13    Determination of Principal and Income

The rights among beneficiaries in matters concerning principal and income are to be determined in accordance with the Arizona Principal and Income Act. If the Arizona Principal and Income Act does not contain a provision concerning a particular item, our Trustee shall determine what will be credited, charged, and apportioned between principal and income in a fair, equitable, and practical manner with respect to that item.

Notwithstanding any provision of the Arizona Principal and Income Act or Arizona law to the contrary, our Trustee shall treat distributions from any qualified retirement account to any trust established under this trust in any given year as income to the extent the distribution represents income generated or treated as generated by any qualified retirement account for that year.

#### (a)    Annuity and Other Periodic Payments

*Annuity and other periodic payments* refers to distributions made to our Trustee over a fixed number of years or during the life of one or more individuals because of services provided or property transferred to the payor in exchange for future payments. This includes payments made in money or property from the payor's general assets or from a separate fund created by the payor, including a private or commercial annuity, individual retirement annuity, pension, profit-sharing plan, stock-bonus plan, stock-ownership plan, or similar arrangement. Our Trustee shall treat annuity and other periodic payments to any trust established under this trust in any given year as income to the extent the distribution represents income generated and treated as generated by the annuity or other periodic payment for that year. If income information is not available, then our Trustee shall apportion the annuity and other periodic payments between principal and income in a fair, equitable and practical manner under the guidelines set forth in this Section.

To the extent an annuity or other periodic payment is characterized as interest, dividend, or other item of income, or an annuity or other periodic payment is made instead of interest, dividend, or other item of income, our Trustee shall allocate the payment to income. Our Trustee shall allocate to principal the balance of the annuity or other periodic payment as well as any other payment received in the same accounting period that is not characterized as interest, dividend, or other item of income.

Rudolph Trust
16-5

218

To the extent annuity and other periodic payments are made and no part of the payments are characterized as interest, dividend, or other item of income, our Trustee shall use the present value of the annuity and other periodic payments as finally determined for federal estate tax purposes, and the Internal Revenue Code Section 7520 rate used to determine the value for federal estate tax purposes to prepare an annuitization table to allocate the payments between income and principal.

If the amounts of annuity and other periodic payments change because of changes in the investment markets or other changes, our Trustee shall allocate the change in the amount of the payments between income and principal in a fair, equitable, and practical manner.

### (b)    Protection of Estate Tax Marital Deduction

If, to obtain an estate tax marital deduction for a trust established under this trust, our Trustee must allocate more of a payment to income than provided for by this Section, then our Trustee shall allocate to income the additional amount necessary to obtain the marital deduction.

## Section 16.14    Trust Accounting

Except to the extent required by law, our Trustee is not required to file accountings in any jurisdiction. During our lifetimes or the lifetime of the survivor of us, and as long as at least one of us is serving as a Trustee, our Trustee is not required to provide an accounting to any person. If neither of us is serving as Trustee, our Trustee must provide an accounting to us at least annually unless waived. If both of us are incapacitated, or if one of us is deceased and the other is incapacitated, then our Trustee must provide the accounting to our Legal Representatives, unless waived by our Legal Representatives. After the death of the first of us to die, our Trustee must provide an annual accounting to the Qualified Beneficiaries of any trust created under this trust unless waived by the Qualified Beneficiaries.

The annual accounting must include the receipts, expenditures, and distributions of income and principal and the assets on hand for the accounting period. A copy of the federal fiduciary tax return filed for a trust during the accounting will satisfy this reporting requirement.

In the absence of fraud or obvious error, assent by all Qualified Beneficiaries to a Trustee's accounting will make the matters disclosed in the accounting binding and conclusive upon all persons, including those living on this date and those born in the future who have or will have a vested or contingent interest in the trust property. In the case of a Qualified Beneficiary who is a minor or incapacitated, the beneficiary's natural guardian or Legal Representative may give the assent required under this Section.

In all events, a beneficiary's Legal Representative may receive any notices and take any action on behalf of the beneficiary as to an accounting. If any beneficiary's Legal Representative fails to object to any accounting in writing within 60 days after our Trustee provides the accounting, the beneficiary's Legal Representative will be considered to assent to the accounting.

### Section 16.15    Information to Beneficiaries

Privacy is an important issue to us. This Section defines our Trustee's duties to inform, account, and report to beneficiaries of various trusts created under this trust, and to other individuals during our lifetime and after our death. Except to the extent required by law, our Trustee is not required to comply with a request to furnish a copy of this trust to a Qualified Beneficiary at any time, and our Trustee is not required to send annual reports or reports upon termination of the trust to any Permissible Distributee or Qualified Beneficiary who requests the report. If our Trustee decides, in our Trustee's sole and absolute discretion, to provide any information to a Permissible Distributee or Qualified Beneficiary, our Trustee may exclude any information that our Trustee determines is not directly applicable to the beneficiary receiving the information. Any decision by our Trustee to make information available to any beneficiary does not constitute an obligation to provide any information to any beneficiary in the future.

#### (a)    Providing Information while Either of Us Is Alive and Not Incapacitated

We waive all our Trustee's duties to give notice, information, and reports to any Qualified Beneficiaries other than us while either of us is alive and able to manage our financial resources effectively. Our Trustee is not required to keep Qualified Beneficiaries of any trust created under this trust other than us informed of the administration of our trust in any manner. Further, our Trustee is not required to respond to any request for information related to the administration of the trust from anyone who is not a Qualified Beneficiary, other than us.

#### (b)    Providing Information while Both of Us Are Incapacitated and after Our Deaths

Our Trustee shall deliver any notice, information, or reports which would otherwise be required to be delivered to either of us or to a Qualified Beneficiary to our Trust Protector during any period that both of us are alive but incapacitated, during any period when one of us is deceased and the other is incapacitated, and after the death of both us. To preserve our privacy and the privacy of Qualified Beneficiaries under our trust, we request that while either of us is alive, our Trustee not provide any copies of our trust or any other information which may otherwise be required to be distributed to any beneficiary under Arizona law to any beneficiary to whom the information is not directly relevant. Our Trust Protector may, in his or her sole and absolute discretion and without waiver, distribute copies of all or any part of our trust or other relevant information about our trust to one or more Qualified Beneficiaries or other interested parties during any period that we are both incapacitated or one of us is deceased and the other is incapacitated.

### Section 16.16    Action of Trustees and Delegation of Trustee Authority

When neither of us is serving as a Trustee, if two Trustees are eligible to act with respect to a given matter, they must agree unanimously for action to be taken unless the express terms of the Trustees' appointment provide otherwise.  If more than two Trustees are eligible to act with respect to a given matter, the Trustees must agree by majority for action to be taken.

A nonconcurring Trustee may dissent or abstain from a decision of the majority.  A Trustee will be absolved from personal liability by registering the dissent or abstention in the trust records.  After doing so, the dissenting Trustee must then act with our other Trustees in any way necessary or appropriate to effect the majority decision.

Subject to the limitations set forth in Section 17.25, any Trustee may, by written instrument, delegate to any other Trustee the right to exercise any power, including a discretionary power, granted to our Trustee in this trust.  During the time a delegation under this Section is in effect, the Trustee to whom the delegation is made may exercise the power to the same extent as if the delegating Trustee has personally joined in the exercise of the power.  The delegating Trustee may revoke the delegation at any time by giving written notice to the Trustee to whom the power was delegated.

### Section 16.17    Trustee May Disclaim or Release Any Power

Notwithstanding any provision of this trust to the contrary, any Trustee may relinquish any Trustee power in whole or in part, irrevocably or for any specified period of time, by a written instrument.  The Trustee may relinquish a power personally or may relinquish the power for all subsequent Trustees.

### Section 16.18    Trustee May Execute a Power of Attorney

Our Trustee may appoint any individual or entity to serve as our Trustee's agent under a power of attorney to transact any business on behalf of our trust or any other trust created under this trust.

### Section 16.19    Additions to Separate Trusts

If upon the death of the survivor of us, or upon the termination of any trust created under this trust, a final distribution is to be made to a person who is the Primary Beneficiary of another trust established under this trust, and there is no specific indication whether the distribution is to be made in trust or outright, our Trustee shall make the distribution to the second trust instead of distributing the property to the beneficiary outright.  For purposes of administration, the distribution will be treated as though it had been an original part of the second trust.

### Section 16.20    Authority to Merge or Sever Trusts

Our Trustee may merge a trust created under this trust with any other trust, if the two trusts contain substantially the same terms for the same beneficiaries and have at least one Trustee in common.  Our Trustee may administer the merged trust under the provisions of the instrument governing the other trust, and this trust will no longer exist if it merges into

another trust. Accordingly, in the event another trust is merged into this trust or a trust created under the provisions of this trust document, our Trustee may shorten the period during which this trust subsists to comply with Section 18.01, if necessary, to effect the merger. But if a merger does not appear feasible, our Trustee may consolidate the trusts' assets for purposes of investment and trust administration while retaining separate records and accounts for each respective trust.

Our Trustee may sever any trust on a fractional basis into two or more separate and identical trusts, or may segregate a specific amount or asset from the trust property by allocating it to a separate account or trust. The separate trusts may be funded on a *non pro rata* basis, but the funding must be based on the assets' total fair market value on the funding date. After the segregation, income earned on a segregated amount or specific asset passes with the amount or asset segregated. Our Trustee shall hold and administer each severed trust upon terms and conditions identical to those of the original trust.

Subject to the trust's terms, our Trustee may consider differences in federal tax attributes and other pertinent factors in administering the trust property of any separate account or trust, in making applicable tax elections and in making distributions. A separate trust created by severance must be treated as a separate trust for all purposes from the effective severance date; however, the effective severance date may be retroactive to a date before our Trustee exercises the power.

### Section 16.21   Authority to Terminate Trusts

Our Trust Protector may terminate any trust created under this trust at any time, if our Trust Protector determines that administering a trust created under this trust is no longer economical. Once distributed, our Trustee will have no further responsibility with respect to that trust property. Our Trustee will distribute the trust property from a terminated trust in this order:

> to us, if we are both then living;

> if one of us is deceased, to the surviving Trustmaker, if the surviving Trustmaker is then a trust beneficiary;

> if we are both deceased or the surviving Trustmaker is not a trust beneficiary, to the beneficiaries then entitled to mandatory distributions of the trust's net income, in the same proportions; and then

> if none of the beneficiaries are entitled to mandatory distributions of net income, to the beneficiaries then eligible to receive discretionary distributions of the trust's net income, in the amounts and shares our Trust Protector determines.

But if a Trust Protector is not then serving, only an Independent Trustee will possess the power to terminate any trust created under this trust, and the Independent Trustee can act only as authorized and with the specific powers and discretions permitted under this Section.

### Section 16.22   Merger of Corporate Fiduciary

If any corporate fiduciary acting as the Trustee under this trust is merged with or transfers substantially all of its trust assets to another corporation, or if a corporate fiduciary changes its name, the successor will automatically succeed to the trusteeship as if that successor had been originally named a Trustee.  No document of acceptance of trusteeship will be required.

### Section 16.23   Funeral and Other Expenses of Beneficiary

Upon the death of an Income Beneficiary, our Trustee may pay the funeral expenses, burial or cremation expenses, enforceable debts, or other expenses incurred due to the death of the beneficiary from trust property.  This Section only applies to the extent the Income Beneficiary has not exercised any testamentary power of appointment granted to the beneficiary under this trust.

Our Trustee may rely upon any request by the deceased beneficiary's Legal Representative or family members for payment without verifying the validity or the amounts and without being required to see to the application of the payment.  Our Trustee may make decisions under this Section without regard to any limitation on payment of expenses imposed by statute or court rule and without obtaining the approval of any court having jurisdiction over the administration of the deceased beneficiary's estate.

### Section 16.24   Marital Deduction Qualification

The marital gift as described in Article Eight of this trust is intended to qualify for the federal estate tax marital deduction, and the provisions of this trust are to be construed to reflect this intent.  To the extent that exercising a provision of this trust would disqualify the marital gift from the federal estate tax unlimited marital deduction, that provision is void except to the extent our Trustee or the deceased Trustmaker's Personal Representative elects that all or a portion of the marital gift not qualify for the unlimited marital deduction.

### Section 16.25   Generation-Skipping Transfer Tax Provisions

If any trust created under this trust would be partially exempt from generation-skipping transfer tax after the intended allocation of Available GST Exemption to the trust, then our Trustee may divide the partially exempt trust so that the allocation of Available GST Exemption can be made to a trust that will be entirely exempt from generation-skipping transfer tax.  If our Trustee chooses to divide a trust that would otherwise be a partially exempt trust, our Trustee must create and administer the separate trusts as provided in this Section.

#### (a)      Division into Exempt and Non-Exempt Trusts

Our Trustee shall divide the property of the otherwise partially-exempt trust into two separate trusts, the *exempt trust* and the *nonexempt trust*.  The exempt trust will consist of the largest fractional share of the otherwise partially exempt trust's total assets that will permit the exempt trust to be entirely exempt from generation-skipping transfer tax. The *nonexempt trust*

will consist of the balance of the otherwise partially exempt trust's total assets.

To compute the fractional share, our Trustee will use asset values as finally determined for federal estate tax purposes. Our Trustee must then apply the fraction to the assets at their actual value on the effective date or dates of distribution so that the actual value of the fractional share resulting from the application of the fraction will include fluctuations in the trust property's value. We request that our Trustee allocate the value of any Roth IRAs payable to our trust to the exempt trust to the extent possible.

**(b)    Administration of the Trusts**

Our Trustee shall administer the exempt and nonexempt trusts created under this Section as separate and independent trusts, but under the same terms as the original trust. To the extent possible, our Trustee should make distributions to a non-skip person as defined by Internal Revenue Code Section 2613 from the nonexempt trust and distributions to a skip person as defined by Section 2613 from an exempt trust. Our Trustee may designate names for the exempt and nonexempt trusts.

If an exempt trust and a nonexempt trust are further divided under the terms of this trust, our Trustee may allocate property from the exempt trust first to the trust from which a generation-skipping transfer is more likely to occur.

**(c)    Expression of Our Intent**

Our intent is to minimize the application of the generation-skipping transfer tax to the trust property, but not to affect the total amount of trust property to which any beneficiary may be entitled under this trust. This trust must be construed and interpreted to give effect to this intent.

**(d)    Additions of Property to Exempt and Non-Exempt Trusts**

If at any time any property that has an inclusion ratio greater than zero for generation-skipping transfer tax purposes would be added to a trust with property that has an inclusion ratio of zero, then our Trustee will instead hold the property in a separate trust on the same terms and conditions as the original trust.

**(e)    Re-Allocation**

If our Trustee's determination of whether a trust in this trust is partially, entirely, or not exempt from GST taxes is later incorrect (for example, if the Congress by law or the Service by regulation or ruling applies the generation-skipping transfer tax retroactively to the trust), our Trustee may re-allocate the assets as of the initial division date, as provided in this Section.

# Article Seventeen
# Our Trustee's Powers

## Section 17.01    Introduction to Trustee's Powers

Except as otherwise specifically provided in this trust, our Trustee may exercise the powers granted by this trust without prior approval from any court, including those powers set forth under the laws of the State of Arizona or any other jurisdiction whose law applies to this trust. The powers set forth in ARS 14-10815 and 14-10816 are specifically incorporated into this trust.

Our Trustee shall exercise the Trustee powers in the manner our Trustee determines to be in the beneficiaries' best interests. Our Trustee must not exercise any power inconsistent with the beneficiaries' right to the enjoyment of the trust property in accordance with the general principles of trust law.

Our Trustee may have duties and responsibilities in addition to those described in this trust. We encourage any individual or corporate fiduciary serving as Trustee to obtain appropriate legal advice if our Trustee has any questions concerning the duties and responsibilities as Trustee.

## Section 17.02    Execution of Documents by Our Trustee

Our Trustee may execute and deliver any written instruments that our Trustee considers necessary to carry out any powers granted in this trust.

## Section 17.03    Investment Powers in General

Our Trustee may invest in any type of investment that our Trustee determines is consistent with the investment goals of the trust, whether inside or outside the geographic borders of the United States of America and its possessions or territories, taking into account the overall investment portfolio of the trust.

Without limiting our Trustee's investment authority in any way, we request that our Trustee exercise reasonable care and skill in selecting and retaining trust investments. We also request that our Trustee take into account the following factors in choosing investments:

> the potential return from the investment, both in income and appreciation;

> the potential income tax consequences of the investment;

> the investment's potential for volatility; and

> the role the investment will play in the trust's portfolio.

We request that our Trustee also consider the possible effects of inflation or deflation, changes in global and US economic conditions, transaction expenses, and the trust's need for liquidity while arranging the trust's investment portfolio.

Our Trustee may delegate his or her discretion to manage trust investments to any registered investment advisor or corporate fiduciary.

Rudolph Trust
17-1

### Section 17.04    Banking Powers

Our Trustee may establish any type of bank account in any banking institutions that our Trustee chooses. If our Trustee makes frequent disbursements from an account, the account does not need to be interest bearing. Our Trustee may authorize withdrawals from an account in any manner.

Our Trustee may open accounts in the name of our Trustee, with or without disclosing fiduciary capacity, and may open accounts in the name of the trust. When an account is in the name of the trust, checks on that account and authorized signatures need not disclose the account's fiduciary nature or refer to any trust or Trustee.

### Section 17.05    Business Powers

If the trust owns or acquires an interest in a business entity, whether as a shareholder, partner, general partner, sole proprietor, member, participant in a joint venture, or otherwise, our Trustee may exercise the powers and authority provided for in this Section. The powers granted in this Section are in addition to all other powers granted to our Trustee in this trust.

#### (a)    No Duty to Diversify

Notwithstanding any duty to diversify imposed by state law or any other provision of this trust, our Trustee may acquire or indefinitely retain any ownership interest in or indebtedness of any closely held or nonpublicly traded entity in which the trust, we, our descendants, and the spouses of our descendants have an ownership interest (the *business interests*), and even though any business interest may constitute all or a substantial portion of the trust property. We specifically authorize our Trustee to invest or indefinitely retain all or any part of the trust property in these business interests, regardless of any resulting risk, lack of income, diversification, or marketability. We waive any applicable prudent investor rule, as well as the Trustee's standard of care and duty to diversify with respect to the acquisition or retention of these business interests.

We recognize that the value of a noncontrolling interest in a business entity may be less than the underlying value of the entity's net assets. Nevertheless, we authorize our Trustee to acquire or retain any noncontrolling business interests.

#### (b)    Specific Management Powers

Our Trustee has all power and authority necessary to manage and operate any business owned by the trust, whether directly or indirectly, including the express powers set forth in this Subsection. Our Trustee may participate directly in the conduct of the business, by serving as a general partner of a limited partnership, a member, manager or managing member of a limited liability company, or a shareholder of a corporation, or may employ others to serve in that capacity.

Our Trustee may participate in the management of the business and delegate management duties and powers to any employee, manager, partner, or associate of the business, without incurring any liability for the delegation. To the extent that the business interest held by the trust is not one that includes management powers (such as a minority stock interest, limited partnership interest, or a membership interest in a limited liability company), our Trustee has no obligation to supervise the management of the underlying assets, and no liability for the actions of those who do manage the business.

Our Trustee may enter into management trusts and nominee trusts in which our Trustee and the trust may serve as the exclusive manager or nominee of property or property interests on behalf of any limited partnership, limited liability company, or corporation.

Our Trustee, individually, or if our Trustee is a corporate fiduciary, then an employee of our Trustee, may act as a director, general or limited partner, associate, or officer of the business.

Our Trustee may participate with any other person or entity in the formation or continuation of a partnership either as a general or limited partner, or in any joint venture. Our Trustee may exercise all the powers of management necessary and incidental to a membership in the partnership, limited partnership, or joint venture, including making charitable contributions.

Our Trustee may reduce, expand, limit, or otherwise adjust the operation or policy of the business. Our Trustee may subject the trust's principal and income to the risks of the business for any term or period, as our Trustee determines.

For any business in which the trust has an interest, our Trustee may advance money or other property, make loans (subordinated or otherwise) of cash or securities, and guarantee the loans of others made to the business. Our Trustee may borrow money for the business, either alone or with other persons interested in the business, and may secure the loan or loans by a pledge or mortgage of any part of any trust property.

Our Trustee may select and vote for directors, partners, associates, and officers of the business. Our Trustee may enter into owners' agreements with a business in which the trust has an interest or with the other owners of the business.

Our Trustee may execute agreements and amendments to agreements as may be necessary to the operation of the business, including stockholder agreements, partnership agreements, buy-sell agreements, and operating agreements for limited liability companies.

Our Trustee may generally exercise any powers necessary for the continuation, management, sale, or dissolution of the business.

Our Trustee may participate in the sale, reorganization, merger, consolidation, recapitalization, or liquidation of the business. Our Trustee may sell or liquidate the business or business interest on terms our Trustee deems advisable and in the best interests of the trust and the beneficiaries. Our Trustee may sell any business interest held by the trust to one or more of the beneficiaries of this trust or to any trust in which a majority of the beneficiaries are beneficiaries of this trust. Our Trustee may make the sale in exchange for cash, a private annuity, an installment note, or any combination of those.

Our Trustee may exercise all of the business powers granted in this trust even though our Trustee may be personally invested in or otherwise involved with the business.

### (c)    Business Liabilities

If any tort or contract liability arises in connection with the business, and if the trust is liable, our Trustee will first satisfy the liability from the assets of the business, and only then from other trust property as determined by our Trustee.

### (d)    Trustee Compensation

In addition to the compensation set forth in Section 16.10, our Trustee may receive additional reasonable compensation for services in connection with the operation of the business. Our Trustee may receive this compensation directly from the business, the trust or both.

### (e)    Conflicts of Interest

Our Trustee may exercise all of the powers granted in this trust even though our Trustee may be involved with or have a personal interest in the business.

## Section 17.06    Contract Powers

Our Trustee may sell at public or private sale, transfer, exchange for other property, and otherwise dispose of trust property for consideration and upon terms and conditions that our Trustee deems advisable. Our Trustee may grant options of any duration for any sales, exchanges, or transfers of trust property.

Our Trustee may enter into contracts, and may deliver deeds or other instruments, that our Trustee considers appropriate.

## Section 17.07    Common Investments

For purposes of convenience with regard to the trust property's administration and investment, our Trustee may invest part or all of the trust property jointly with property of other trusts for which our Trustee is also serving as a Trustee. A corporate fiduciary acting as our Trustee may use common funds for investment. When trust property is managed and invested in this manner, our Trustee will maintain records that sufficiently identify this trust's portion of the jointly invested assets.

## Section 17.08    Environmental Powers

Our Trustee may inspect trust property to determine compliance with or to respond to any environmental law affecting the property. For purposes of this trust, *environmental law* means any federal, state, or local law, rule, regulation, or ordinance protecting the environment or human health.

Our Trustee may refuse to accept property if our Trustee determines that the property is or may be contaminated by any hazardous substance or is or was used for any purpose involving hazardous substances that could create liability to the trust or to any Trustee.

Our Trustee may use trust property to:

> conduct environmental assessments, audits, or site monitoring;
>
> take remedial action to contain, clean up, or remove any hazardous substance including a spill, discharge, or contamination;
>
> institute, contest, or settle legal proceedings brought by a private litigant or any local, state, or federal agency concerned with environmental compliance;
>
> comply with any order issued by any court or by any local, state, or federal agency directing an assessment, abatement, or cleanup of any hazardous substance; and
>
> employ agents, consultants, and legal counsel to assist our Trustee in these actions.

Our Trustee is not liable for any loss or reduction in value sustained by the trust as a result of our Trustee's decision to retain property on which hazardous materials or substances requiring remedial action are discovered, unless our Trustee contributed to that loss through willful misconduct or gross negligence.

Our Trustee is not liable to any beneficiary or to any other party for any decrease in the value of property as a result of our Trustee's actions to comply with any environmental law, including any reporting requirement.

Our Trustee may release, relinquish, or disclaim any power held by our Trustee that our Trustee determines may cause our Trustee to incur individual liability under any environmental law.

## Section 17.09    Farm, Ranch, and Other Agricultural Powers

Our Trustee may retain, acquire, and sell any farm or ranching operation, whether as a sole proprietorship, partnership, or corporation.

Our Trustee may engage in the production, harvesting, and marketing of farm and ranch products, either by operating directly or indirectly with management agencies, hired labor, tenants, or sharecroppers.

Our Trustee may engage and participate in any government farm program, whether state or federally sponsored.

Our Trustee may purchase or rent machinery, equipment, livestock, poultry, feed, and seed.

Our Trustee may improve and repair all farm and ranch properties; construct buildings, fences, and drainage facilities; and acquire, retain, improve, and dispose of wells, water rights, ditch rights, and priorities of any nature.

Our Trustee may do all things customary or desirable to operate a farm or ranch operation for the benefit of the beneficiaries.

### Section 17.10    Insurance Powers

Our Trustee may purchase, accept, hold, and deal with as owner, insurance policies on either or both of our lives, any beneficiary's life, or any person's life in whom any beneficiary has an insurable interest.

Our Trustee may purchase disability, medical, liability, longterm health care and other insurance on behalf of and for the benefit of any beneficiary. Our Trustee may purchase annuities and similar investments for any beneficiary.

Our Trustee may execute or cancel any automatic premium loan agreement with respect to any policy, and may elect or cancel any automatic premium loan provision in a life insurance policy. Our Trustee may borrow money to pay premiums due on any policy, either by borrowing from the company issuing the policy or from another source. Our Trustee may assign the policy as security for the loan.

Our Trustee may exercise any option contained in a policy with regard to any dividend or share of surplus apportioned to the policy to reduce the amount of a policy, to convert or exchange the policy, or to surrender a policy at any time for its cash value.

Our Trustee may elect any paid-up insurance or extended-term insurance nonforfeiture option contained in a policy.

Our Trustee may sell any policy at its fair market value to anyone having an insurable interest in the policy, including the insured.

Our Trustee may exercise any other right, option, or benefit contained in a policy or permitted by the issuing insurance company.

Upon termination of the trust, our Trustee may transfer and assign the policies held by the trust as a distribution of trust property.

### Section 17.11    Loans and Borrowing Powers

Our Trustee may make loans to any person including a beneficiary, as well as an entity, trust, or estate, for any term or payable on demand, and secured or unsecured.

Our Trustee may encumber any trust property by mortgages, pledges, or otherwise, and may negotiate, refinance, or enter into any mortgage or other secured or unsecured financial arrangement, whether as a mortgagee or mortgagor. The term may extend beyond the trust's termination and beyond the period required for an interest created under this trust to vest in order to be valid under the rule against perpetuities.

Our Trustee may enter into, negotiate, or modify the terms of any mortgage or any other secured or unsecured agreement granted in connection with any loan entered into by either or both of us or by any Trustee, and may release or foreclose on any mortgage or security interest payable to either or both of us or to the trust.

Our Trustee may borrow money at interest rates and on other terms that our Trustee deems advisable from any person, institution, or other source including, in the case of a corporate fiduciary, its own banking or commercial lending department.

Our Trustee may purchase, sell at public or private sale, trade, renew, modify, and extend mortgages. Our Trustee may accept deeds instead of foreclosing.

### Section 17.12   Nominee Powers

Our Trustee may hold real estate, securities, and any other property in the name of a nominee or in any other form, without disclosing the existence of any trust or fiduciary capacity.

### Section 17.13   Oil, Gas and Mineral Interests

Our Trustee may acquire, maintain, develop, and exploit, either alone or jointly with others, any oil, gas, coal, mineral, or other natural resource rights or interests.

Our Trustee may drill, test, explore, mine, develop, extract, remove, convert, manage, retain, store, sell, and exchange any of those rights and interests on terms and for a price that our Trustee deems advisable.

Our Trustee may execute leases, pooling, unitization, and other types of agreements in connection with oil, gas, coal, mineral, and other natural resource rights and interests, even though the terms of those arrangements may extend beyond the trust's termination.

Our Trustee may execute division orders, transfer orders, releases, assignments, farm outs, and any other instruments that it considers proper.

Our Trustee may employ the services of consultants and outside specialists in connection with the evaluation, management, acquisition, disposition, and development of any mineral interest, and may pay the cost of the services from the trust's principal and income.

### Section 17.14   Payment of Property Taxes and Expenses

Except as otherwise provided in this trust, our Trustee may pay any property taxes, assessments, fees, charges, and other expenses incurred in the administration or protection of the trust. All payments will be a charge against the trust property and will be paid by our Trustee out of income. If the income is insufficient, then our Trustee may make any payments of property taxes or expenses out of the trust property's principal. Our Trustee's determination with respect to this payment will be conclusive on the beneficiaries.

### Section 17.15   Purchase of Assets from and Loans to a Deceased Trustmaker's Probate Estate

Upon the death of a Trustmaker, our Trustee may purchase at fair market value and retain in the form received any property that is a part of the deceased Trustmaker's probate or

trust estate as an addition to the trust. In addition, our Trustee may make secured and unsecured loans to the deceased Trustmaker's probate or trust estate. Our Trustee may not be held liable for any loss suffered by the trust because of the exercise of the powers granted in this Section.

Our Trustee may not use any trust property for the benefit of the deceased Trustmaker's estate as defined in Code of Federal Regulations Title 26 Section 20.2042-1(b), unless the property is included in the deceased Trustmaker's gross estate for federal estate tax purposes.

### Section 17.16    Qualified Real Property Valuation

Our Independent Trustee has the power to amend the terms of a trust holding *qualified real property* as defined in Internal Revenue Code Section 2032A, in order to permit the qualified real property to qualify for special use valuation permitted under Section 2032A, even if the amendment changes beneficial interests and that directs the segregation of trust property into more than one trust.

### Section 17.17    Qualified Tuition Programs

Our Trustee may purchase tuition credits or certificates or make contributions to an account in one or more qualified tuition programs as defined under Internal Revenue Code Section 529 on a beneficiary's behalf for the purpose of meeting the beneficiary's qualified higher education expenses. With respect to an interest in any qualified tuition program, our Trustee may act as contributor, administering the interest by actions including:

> designating and changing the designated beneficiary of the interest in the qualified tuition program;
>
> requesting both qualified and nonqualified withdrawals;
>
> selecting among investment options and reallocating funds among different investment options;
>
> making rollovers to another qualified tuition program; and
>
> allocating any tax benefits or penalties to the beneficiaries of the trust.

Notwithstanding anything in this provision to the contrary, the designated beneficiary must always be a beneficiary of the trust from which the funds were distributed to establish the interest in the qualified tuition program. Investment in a qualified tuition program will not be considered a delegation of investment responsibility under any applicable statute or other law.

### Section 17.18    Real Estate Powers

Our Trustee may sell at public or private sale, convey, purchase, exchange, lease for any period, mortgage, manage, alter, improve, and in general deal in and with real property in the manner and on the terms and conditions as our Trustee deems appropriate.

Our Trustee may grant or release easements in or over, subdivide, partition, develop, raze improvements to, and abandon any real property.

Our Trustee may manage real estate in any manner considered best, and may exercise all other real estate powers necessary to effect this purpose.

Our Trustee may enter into contracts to sell real estate. Our Trustee may enter into leases and grant options to lease trust property, even though the term of the agreement extends beyond the termination of any trusts established under this trust and beyond the period that is required for an interest created under this trust to vest in order to be valid under the rule against perpetuities. Our Trustee may enter into any contracts, covenants, and warranty agreements that our Trustee deems appropriate.

### Section 17.19    Residences and Tangible Personal Property

Our Trustee may acquire, maintain, and invest in any residence for the beneficiaries' use and benefit, whether or not the residence is income producing and without regard to the proportion that the residence's value may bear to the trust property's total value, even if retaining the residence involves financial risks that Trustees would not ordinarily incur. Our Trustee may pay or make arrangements for others to pay all carrying costs of any residence for the beneficiaries' use and benefit, including taxes, assessments, insurance, maintenance, and other related expenses.

Our Trustee may acquire, maintain, and invest in articles of tangible personal property, whether or not the property produces income. Our Trustee may pay for the repair and maintenance of the property.

Our Trustee is not required to convert the property referred to in this Section to income-producing property, except as required by other provisions of this trust.

Our Trustee may permit any Income Beneficiary of the trust to occupy any real property or use any personal property owned by the trust on terms or arrangements that our Trustee determines, including rent free or in consideration for the payment of taxes, insurance, maintenance, repairs, or other charges.

Our Trustee is not liable for any depreciation or loss resulting from any decision to retain or acquire any property as authorized by this Section.

### Section 17.20    Digital Assets

Our Trustee has the authority to access, modify, control, archive, transfer, and delete our digital assets.

Digital assets include our sent and received emails, email accounts, digital music, digital photographs, digital videos, gaming accounts, software licenses, social-network accounts, file-sharing accounts, financial accounts, domain registrations, Domain Name System (DNS) service accounts, blogs, listservs, web-hosting accounts, tax-preparation service accounts, online stores and auction sites, online accounts, and any similar digital asset that currently exists or may be developed as technology advances.

Our digital assets may be stored in the cloud or on our own digital devices. Our Trustee may access, use, and control our digital devices in order to access, modify, control, archive, transfer, and delete our digital assets—this power is essential for access to our digital assets that are only accessible through our digital devices. Digital devices include desktops,

Rudolph Trust
17-9

233

laptops, tablets, peripherals, storage devices, mobile telephones, smartphones, and any similar hardware that currently exists or may be developed as technology advances.

## Section 17.21    Retention and Abandonment of Trust Property

Our Trustee may retain any property constituting the trust at the time of its creation, at the time of the death of a Trustmaker, or as the result of the exercise of a stock option, without liability for depreciation or loss resulting from retention. Our Trustee may retain property, notwithstanding the fact that the property may not be of the character prescribed by law for the investment of assets held by a fiduciary, and notwithstanding the fact that retention may result in inadequate diversification under any applicable Prudent Investor Act or other applicable law.

Our Trustee may hold property that is not income producing or is otherwise nonproductive if holding the property is in the best interests of the beneficiaries in the sole and absolute discretion of our Trustee. On the other hand, our Trustee will invest contributions of cash and cash equivalents as soon as reasonably practicable after the assets have been acquired by the trust.

Our Trustee may retain a reasonable amount in cash or money market accounts to pay anticipated expenses and other costs, and to provide for anticipated distributions to or for the benefit of a beneficiary.

Our Trustee may abandon any property that our Trustee considers of insignificant value.

## Section 17.22    Securities, Brokerage and Margin Powers

Our Trustee may buy, sell, trade, and otherwise deal in stocks, bonds, investment companies, mutual funds, common trust funds, commodities, and other securities of any kind and in any amount, including short sales. Our Trustee may write and purchase call or put options, and other derivative securities. Our Trustee may maintain margin accounts with brokerage firms, and may pledge securities to secure loans and advances made to our Trustee or to or for a beneficiary's benefit.

Our Trustee may place all or any part of the securities held by the trust in the custody of a bank or trust company. Our Trustee may have all securities registered in the name of the bank or trust company or in the name of the bank's nominee or trust company's nominee. Our Trustee may appoint the bank or trust company as the agent or attorney in fact to collect, receive, receipt for, and disburse any income, and generally to perform the duties and services incident to a custodian of accounts.

Our Trustee may employ a broker-dealer as a custodian for securities held by the trust, and may register the securities in the name of the broker-dealer or in the name of a nominee; words indicating that the securities are held in a fiduciary capacity are optional. Our Trustee may hold securities in bearer or uncertificated form, and may use a central depository, clearing agency, or book-entry system, such as The Depository Trust Company, Euroclear, or the Federal Reserve Bank of New York.

Our Trustee may participate in any reorganization, recapitalization, merger, or similar transaction. Our Trustee may exercise or sell conversion or subscription rights for securities of all kinds and descriptions. Our Trustee may give proxies or powers of attorney

that may be discretionary and with or without powers of substitution, and may vote or refrain from voting on any matter.

### Section 17.23    Settlement Powers

Our Trustee may settle any claims and demands in favor of or against the trust by compromise, adjustment, arbitration, or other means. Our Trustee may release or abandon any claim in favor of the trust.

### Section 17.24    Subchapter S Corporation Stock Provisions

During any period the trust is not treated as a grantor trust for tax purposes under Internal Revenue Code Section 671, this trust or any trust created under this trust may hold any S corporation stock held as a separate *Electing Small Business Trust*, or as a separate *Qualified Subchapter S Trust*, as provided in this Section.

For purposes of this Section, *S corporation stock* means all capital stock issued by a corporation (or other entity taxable as a corporation for federal income tax purposes) that is treated or is intended to be treated under Section 1361(a) as an *S corporation* for federal income tax purposes.

#### (a)    Electing Treatment as an Electing Small Business Trust

If our Trustee elects under Internal Revenue Code Section 1361(e)(3) to qualify any portion of the trust as an *Electing Small Business Trust*, our Trustee shall:

> apportion a reasonable share of the unallocated expenses of all trusts created under this trust to the Electing Small Business Trust under the applicable provisions of the Internal Revenue Code and Treasury Regulations; and

> administer the trust as an Electing Small Business Trust, under Internal Revenue Code Section 1361(e).

#### (b)    Electing Treatment as a Qualified Subchapter S Trust

If the current Income Beneficiary of the trust makes an election under Section 1361(d)(2) to qualify the trust as a Qualified Subchapter S Trust within the meaning of Section 1361(d)(3), our Trustee shall:

> refer to the Qualified Subchapter S Trust using the same name as the trust to which the stock was originally allocated, plus the name of the current Income Beneficiary of the trust, followed by the letters QSST;

> administer the Qualified Subchapter S Trust in accordance with the same provisions contained in the trust to which the Trustee allocated the S corporation stock, as long as the provisions of this Subsection control the trust administration to the extent that they are inconsistent with the provisions of the original trust; and

Rudolph Trust
17-11

maintain the Qualified Subchapter S Trust as a separate trust held for the benefit of only one beneficiary as required in Section 1361(d)(3).

Our Trustee shall recommend that the current Income Beneficiary of the trust make a timely election to cause federal tax treatment of the trust as a Qualified Subchapter S Trust.

### (1)   Current Income Beneficiary

The *current Income Beneficiary* of a Qualified Subchapter S Trust is the person who has a present right to receive income distributions from the trust to which the Trustee has allocated the S corporation stock. A Qualified Subchapter S Trust may have only one current Income Beneficiary.

If, under the terms of the trust, more than one person has a present right to receive income distributions from the trust originally holding the S corporation stock, our Trustee shall segregate the S corporation stock into separate Qualified Subchapter S Trusts for each of these people.

### (2)   Distributions

Until the earlier of the death of the current Income Beneficiary or the date on which the trust no longer holds any S corporation stock (the *QSST termination date*), our Trustee shall distribute at least annually all of the trust's *net income*, as defined in Internal Revenue Code Section 643(b) to the current Income Beneficiary.

The terms of the trust to which the S corporation stock was originally allocated govern distributions of principal from the Qualified Subchapter S Trust. But until the QSST termination date, our Trustee may distribute principal only to the current Income Beneficiary of the Qualified Subchapter S Trust and not to any other person or entity.

If the Qualified Subchapter S Trust terminates during the lifetime of the current Income Beneficiary, our Trustee shall distribute all assets of the Qualified Subchapter S Trust to the current Income Beneficiary outright and free of the trust.

### (3)   Allocation of Income and Expenses

Our Trustee shall characterize receipts and expenses of any Qualified Subchapter S Trust in a manner consistent with Internal Revenue Code Section 643(b).

### (4)   Trust Merger or Consolidation

Notwithstanding any other provision of this trust that may seem to the contrary, our Trustee may not merge any

Rudolph Trust
17-12

Qualified Subchapter S Trust with another trust's assets if doing so would jeopardize the qualification of either trust as a Qualified Subchapter S Trust.

### (c)   Governance of the Trusts

The following additional provisions apply to any separate trust created under this Section.

#### (1)   Protection of S Corporation Status

Our Trustee must not administer a trust holding S corporation stock in a manner that would cause the termination of the S corporation status of the entity whose stock is held as part of the trust. Therefore, during any period that the trust holds S corporation stock, our Trustee must construe the terms and provisions of this trust in a manner that is consistent with the trust qualifying as an Electing Small Business Trust or as a Qualified Subchapter S Trust. Our Trustee must disregard any provision of this trust that cannot be so construed or applied.

#### (2)   Methods of Distribution

Our Trustee may not make distributions in a manner that would jeopardize the trust's qualification as an Electing Small Business Trust or as a Qualified Subchapter S Trust.

#### (3)   Disposition of S Corporation Stock

If our Trustee believes the continuation of any trust would result in the termination of the S corporation status of any entity whose stock is held as a part of the trust property, our Trustee, other than an Interested Trustee, in addition to the power to sell or otherwise dispose of the stock, has the power to distribute the stock to the person who is then entitled to receive the income from the trust.

### Section 17.25   Limitation on Our Trustee's Powers

All powers granted to Trustees under this trust or by applicable law are limited as set forth in this Section, unless explicitly excluded by reference to this Section. The limitations set forth in this Section do not apply to either of us while we are both alive, and do not apply if either of us is serving as Trustee of the Survivor's Trust.

### (a)   An Interested Trustee Limited to Ascertainable Standards

An Interested Trustee may only make discretionary decisions when they pertain to a beneficiary's health, education, maintenance, or support as described under Internal Revenue Code Sections 2041 and 2514.

Rudolph Trust

17-13

**(b)  Interested Trustee Prohibited from Acting**

Whenever this trust specifically prohibits or limits an Interested Trustee from exercising discretion or performing an act, then any Interested Trustee serving as our Trustee is prohibited from participating in the exercise of that discretion or performance of that act. If there is no Trustee serving who is not an Interested Trustee, then an Independent Special Trustee may be appointed under the provisions of Section 3.08 to exercise the discretion or perform the act.

**(c)  Exclusive Powers of My Independent Trustee**

Whenever a power or discretion is granted exclusively to our Independent Trustee, then any Interested Trustee who is then serving as our Trustee is prohibited from participating in the exercise of the power or discretion. If there is no Independent Trustee then serving, then an Independent Special Trustee may be appointed under the provisions of Section 3.08 to exercise the power or discretion that is exercisable only by our Independent Trustee.

**(d)  No Distributions in Discharge of Certain Legal Obligations**

Our Trustee may not exercise or participate in the exercise of discretion with respect to the distribution of income or principal that would in any manner discharge a legal obligation of our Trustee, including the obligation of support.

If a beneficiary or any other person has the power to remove a Trustee, that Trustee may not exercise or participate in the exercise of discretion with respect to the distribution of income or principal that would in any manner discharge a legal obligation of the person having the power to remove the Trustee, including that person's obligation of support.

**(e)  Insurance Policy on the Life of Our Trustee**

If the trust holds a policy that insures the life of a Trustee, that Trustee may not exercise any powers or rights with respect to the policy. Instead, a Co-Trustee or an Independent Special Trustee must exercise the powers and rights with respect to the policy.

If any rule of law or court decision construes the ability of the insured Trustee to name an Independent Special Trustee as an incident of ownership of the policy, then a majority of the then current Income Beneficiaries (excluding the insured Trustee if he or she is a beneficiary) will select the Independent Special Trustee.

**(f)  Insurance Policy on a Beneficiary's Life**

If the trust holds a policy that insures a beneficiary's life, the beneficiary, individually or as Trustee, may not exercise any power over the policy, its cash value, or its proceeds. This denial of power is intended to prevent an

insured beneficiary from holding any power that would constitute an incident of ownership of the policy.

In addition, no distribution of income or principal to the insured beneficiary may be satisfied out of the policy's proceeds, cash value, or other economic benefit of the policy.

The limitations of this Subsection do not apply if, upon the beneficiary's death, the policy's proceeds would otherwise be included in the beneficiary's gross estate for federal estate tax purposes.

# Article Eighteen
# General Provisions

### Section 18.01    Maximum Term for Trusts

Notwithstanding any other provision of this agreement, unless sooner terminated under other provisions hereof, any trust share created under this agreement shall terminate upon the expiration of the longest period that property may be held in trust under this agreement without violation of the applicable Rule Against Perpetuities. As of the date this trust is created, the interest must vest within five-hundred (500) years after its creation. The applicable period can be determined by reference to A.R.S. Section 14-2901, as amended from time to time, but the time period shall not be shortened as a result of any change in a statute effective after the effective date of this declaration of trust.

At that time, the remaining trust property shall vest in and be distributed to those persons then entitled to mandatory distributions of net income of the trust and in the same proportions. If no beneficiary is entitled to mandatory distributions of net income, the remaining trust property shall vest in and be distributed to the beneficiaries then eligible to receive discretionary distributions of net income of the trust, in equal shares *per stirpes*.

### Section 18.02    Spendthrift Provision

No beneficiary may assign, anticipate, encumber, alienate, or otherwise voluntarily transfer the income or principal of any trust created under this trust.  In addition, neither the income nor the principal of any trust created under this trust is subject to attachment, bankruptcy proceedings or any other legal process, the interference or control of creditors or others, or any involuntary transfer.

This Section does not restrict a beneficiary's right to disclaim any interest or exercise of any power of appointment granted in this trust.  In addition, this Section does not limit the ability of an Independent Trustee to appoint property in further trust for any beneficiary as provided in Section 16.03.

### Section 18.03    Contest Provision

If any person attempts to contest or oppose the validity of this trust or any amendment to this trust, or commences, continues, or prosecutes any legal proceedings to set this trust aside, then that person will forfeit his or her share, cease to have any right or interest in the trust property, and will be considered to have predeceased the last of us to die for purposes of this instrument.

### Section 18.04    Survivorship Presumption

If we die under circumstances in which the order of our deaths cannot be established, each of us will be considered to have predeceased the other and each Trustmaker's interest in any community property of our trust, and each Trustmaker's separate trust property will be administered as provided in Section 9.10 for administering the remaining property in the Survivor's Trust upon death of the surviving Trustmaker.

If any other beneficiary is living at the death of a Trustmaker, but dies within 30 days after the Trustmaker's death, then the beneficiary will be considered to have predeceased the Trustmaker for purposes of this trust.

## Section 18.05    Effect of Legal Separation or Dissolution of Marriage

If either of us files a petition for legal separation or dissolution of marriage, each of us, each of our respective parents as to the other of us, all of our descendants who are not the descendants of the other of us, and all spouses of such persons who are not descendants of our respective parents will be deemed to have died intestate on the date of the filing for all purposes of this instrument (except Section 18.01, above). Any exercise or exercises of any power of appointment by any person named identified in this paragraph that has not become effective prior to the filing date will be null and void. If, however, a court issues any order dismissing a petition described above, and we accept the dismissal of the petition by a written acknowledgement, then the persons identified in this paragraph will no longer be deemed to have died intestate for purposes of this instrument

## Section 18.06    Changing the Governing Law and Situs of Administration

At any time, our Trust Protector may change the governing law of the trust; change the situs of the administration of the trust; and remove all or any part of the property from one jurisdiction to another. Our Trust Protector may elect, by filing an instrument with the trust records, that the trust will then be construed, regulated, and governed by the new jurisdiction's laws. Our Trust Protector may take action under this Section for any purpose our Trust Protector considers appropriate, including the minimization of any taxes in respect of the trust or any trust beneficiary.

If considered necessary or advisable by our Trust Protector, our Trust Protector may appoint an Independent Trustee to serve as Trustee in the new situs.

If necessary and if our Trust Protector does not appoint an Independent Trustee within 30 days of our Trust Protector's action to change the governing law or situs of the trust, the beneficiaries entitled to receive distributions of the trust's net income may appoint a corporate fiduciary in the new situs by majority consent. If a beneficiary is a minor or is incapacitated, the beneficiary's parent or Legal Representative may act on the beneficiary's behalf.

## Section 18.07    Definitions

For purposes of this trust, the following terms have these meanings:

### (a)    Adopted and Afterborn Persons

A person in any generation who is legally adopted before reaching 18 years of age and his or her descendants, including adopted descendants, have the same rights and will be treated in the same manner under this trust as natural children of the adopting parent. A person is considered legally adopted if the adoption was legal at the time when and in the jurisdiction in which it occurred.

A fetus *in utero* later born alive will be considered a person in being during the period of gestation.

### (b)    Available GST Exemption

The deceased Trustmaker's *Available GST Exemption* means the GST exemption provided in Internal Revenue Code Section 2631 in effect at the deceased Trustmaker's death; reduced by the aggregate of:

> any amount of GST exemption allocated to the deceased Trustmaker's lifetime transfers, including those allocations made at the time of the deceased Trustmaker's death by the deceased Trustmaker's Personal Representative, by the deceased Trustmaker's Trustee, or by operation of law; and

> any amount allocated to direct-skip persons as defined in Internal Revenue Code Section 2612(c)(1) that does not qualify for an exclusion from the generation-skipping transfer tax occurring at the deceased Trustmaker's death to or for the benefit of the deceased Trustmaker's descendants.

At the time of the deceased Trustmaker's death, if the deceased Trustmaker has made a lifetime transfer to a trust with an inclusion ratio of greater than zero but have not filed a gift tax return and the due date for the gift tax return has not yet passed, the deceased Trustmaker's Available GST Exemption will also be reduced so that the trust inclusion ratio is zero, in order to exempt the transfer from generation-skipping transfer tax.

### (c)    Charitable Organization

The terms *charitable organization*, *qualified charitable organization*, and *charity* mean any charitable organization of a type described in Internal Revenue Code Sections 170(c), 2055(a), and 2522(a).

### (d)    Descendants

The term *descendants* means persons who directly descend from a person, such as children, grandchildren, or great-grandchildren.  The term *descendants* does not include collateral descendants, such as nieces and nephews.

### (e)    Education

The term *education* is intended to be an ascertainable standard under Internal Revenue Code Sections 2041 and 2514 and includes:

> enrollment at private elementary, junior, and senior high school, including boarding school;

> undergraduate and graduate study in any field at a college or university;

specialized, vocational, or professional training or instruction at any institution, as well as private instruction; and

any other curriculum or activity that our Trustee considers useful for developing a beneficiary's abilities and interests including athletic training, musical instruction, theatrical training, the arts, and travel.

The term *education* also includes expenses such as tuition, room and board, fees, books, supplies, computers and other equipment, tutoring, transportation, and a reasonable allowance for living expenses.

### (f)    Good Faith

For the purposes of this trust, a Trustee has acted in good faith if:

an action or inaction is not a result of intentional wrongdoing;

the Trustee did not make the decision to act or not act with reckless indifference to the beneficiaries' interests; and

an action or inaction does not result in an improper personal benefit to the Trustee.

Further, all parties subject to the provisions of this trust will treat any action or inaction made in reliance on information, consent, or directions received from the Personal Representative of each of our estates as made in good faith for the purposes of this Section, except for cases of willful misconduct or malfeasance on the Trustee's part.

### (g)    Incapacity

Except as otherwise provided in this trust, a person is considered incapacitated in any of the following circumstances.

#### (1)    The Opinion of Two Licensed Physicians

An individual is considered to be incapacitated whenever two licensed physicians give the opinion that the individual is unable to effectively manage his or her property or financial affairs, whether as a result of age; illness; use of prescription medications, drugs, or other substances; or any other cause. If an individual whose capacity is in question refuses to provide necessary documentation or otherwise submit to examination by licensed physicians, that individual will be considered incapacitated.

An individual is considered restored to capacity whenever the individual's personal or attending physician provides a written opinion that the individual is able to effectively manage his or her property and financial affairs.

Rudolph Trust
18-4

### (2)    Court Determination

An individual is considered incapacitated if a court of competent jurisdiction has declared the individual to be disabled, incompetent, or legally incapacitated.

### (3)    Detention, Disappearance, or Absence

An individual is considered to be incapacitated whenever he or she cannot effectively manage his or her property or financial affairs due to the individual's unexplained disappearance or absence for more than 30 days, or whenever he or she is detained under duress.

An individual's disappearance, absence, or detention under duress may be established by an affidavit of our Trustee, or by the affidavit of any beneficiary if no Trustee is then serving. The affidavit must describe the circumstances of the individual's disappearance, absence, or detention, and may be relied upon by any third party dealing in good faith with our Trustee.

## (h)    Include, Includes, Including

In this document, the words include, includes, and including mean include without limitation, includes without limitation and including without limitation, respectively. Include, includes, and including are words of illustration and enlargement, not words of limitation or exclusivity.

## (i)    Income Beneficiary

The term *Income Beneficiary* means any beneficiary who is then entitled to receive distributions of the trust's net income, whether mandatory or discretionary.

Unless otherwise provided in this trust, the phrase *majority of the Income Beneficiaries* means any combination of Income Beneficiaries who would receive more than 50% of the accrued net income if that income were distributed on the day of a vote. For purposes of this calculation, beneficiaries who are eligible to receive discretionary distributions of net income receive the imputed income in equal shares.

References to a *majority* refer to a majority of the entire trust collectively until our Trustee allocates property to separate trusts or trust shares. After our Trustee allocates property to separate trusts or trust shares, references to a *majority* refer to a majority of each separate trust or trust share.

## (j)    Income in Respect of a Decedent (IRD)

The term *income in respect of a decedent* (IRD) means income received after a decedent's death that would have been taxable to the decedent if the income had been received by the decedent during the decedent's lifetime. For example, payments under qualified retirement plans and other deferred

compensation arrangements are IRD. For purposes of this trust, IRD means any income that would be classified as IRD under Internal Revenue Code Section 691(a).

**(k)    Independent Trustee**

The term *Independent Trustee* means any Trustee who is not an Interested Trustee as defined in Subsection (m) and includes an Independent Special Trustee appointed under the provisions of Section 3.08.

**(l)    Instrument**

The term *this instrument* means this trust, and includes all trusts created under the terms of this trust.

**(m)    Interested Trustee**

The term *Interested Trustee* means a Trustee who:

> is a transferor or beneficiary;

> is related or subordinate to a transferor or beneficiary;

> can be removed and replaced by a transferor with either the transferor or a party who is related or subordinate to the transferor; or

> can be removed and replaced by a beneficiary with either the beneficiary or a party who is related or subordinate to the beneficiary.

For purposes of this Subsection, *transferor* means a person who transferred property to the trust, including a person whose disclaimer resulted in property passing to the trust. *Beneficiary* means a person who is or may become eligible to receive income or principal from the trust under the terms of the trust, even if this person has only a remote contingent remainder interest in the trust, but not if the person's only interest is as a potential appointee under a power of appointment. *Related or subordinate* is used as defined in Internal Revenue Code Section 672(c).

**(n)    Internal Revenue Code and Treasury Regulations**

References to the *Internal Revenue Code* or to its provisions are to the Internal Revenue Code of 1986, as amended, and any corresponding Treasury Regulations. References to the *Treasury Regulations*, are to the Treasury Regulations under the Internal Revenue Code in effect. If a particular provision of the Internal Revenue Code is renumbered or the Internal Revenue Code is superseded by a subsequent federal tax law, any reference is considered to be made to the renumbered provision or to the corresponding provision of the subsequent law, unless to do so would clearly be contrary to our intent as expressed in this trust. The same rule applies to references to the Treasury Regulations.

**(o)     Legal Representative or Personal Representative**

As used in this trust document, the term *Legal Representative* or *Personal Representative* means a person's guardian, conservator, executor, administrator, Trustee, attorney in fact under a Durable Power of Attorney, or any other person or entity representing a person or the person's estate. In the case of a minor beneficiary, the beneficiary's parent or another adult with custody of the beneficiary, except for any transferor to a trust created under this instrument, will be considered the beneficiary's Legal Representative for purposes of this trust.

**(p)     Per Stirpes**

Whenever a distribution is to be made to a person's descendants *per stirpes*, the distribution will be divided into as many equal shares as there are then-living children and deceased children who left then-living descendants. Each then-living child will receive one share, and the share of each deceased child will be divided among the deceased child's then-living descendants in the same manner.

**(q)     Permissible Distributee**

"Permissible Distributee" means a beneficiary who is currently eligible to receive distributions of trust income or principal, whether the distribution is mandatory or discretionary.

**(r)     Primary Beneficiary**

The *Primary Beneficiary* of a trust created under this trust is that trust's oldest Income Beneficiary, unless some other individual is specifically designated as the Primary Beneficiary of that separate trust.

**(s)     Qualified Beneficiary**

"Qualified Beneficiary" means a beneficiary who, on the date the beneficiary's qualification is determined:

(1)   is a distributee or Permissible Distributee of trust income or principal;

(2)   would be a distributee or Permissible Distributee of trust income or principal if the interests of the distributees described in subparagraph (1) terminated on that date; or

(3)   would be a distributee or Permissible Distributee of trust income or principal if the trust terminated on that date.

**(t)     Qualified Retirement Benefits**

The term *qualified retirement plan* means a plan qualified under Internal Revenue Code Section 401, an individual retirement arrangement under Section 408 or Section 408A, or a tax-sheltered annuity under Section 403.

The term *qualified retirement benefits* means the amounts held in or distributed pursuant to a plan qualified under Section 401, an individual retirement arrangement under Section 408 or Section 408A, a tax-sheltered annuity under Section 403, or any other benefit subject to the distribution rules of Section 401(a)(9).

### (u)   Shall and May

Unless otherwise specifically provided in this trust or by the context in which used, we use the word *shall* in this trust to impose a duty, command, direct, or require, and the word *may* to allow or permit, but not require.  In the context of our Trustee, when we use the word *shall* we intend to impose a fiduciary duty on our Trustee.  When we use the word *may* we intend to empower our Trustee to act with the Trustee's sole and absolute discretion unless otherwise stated in this trust.  When we use the words *may not* in reference to our Trustee, we specifically mean our Trustee *is not permitted to.*

### (v)   Trust

The terms *this trust, this document, instrument,* and *this trust document* refer to this trust and all trusts created under the terms of this trust.

### (w)   Trustee

The terms *our Trustee* and *Trustee* refer to the Initial Trustees named in Article One and to any successor, substitute, replacement, or additional person, corporation, or other entity that ever acts as the Trustee of any trust created under the terms of this trust.  The term *Trustee* refers to singular or plural as the context may require.

### (x)   Trustmaker

*Trustmaker* has the same legal meaning as *Grantor, Settlor, Trustor* or any other term referring to the maker of a trust.

### (y)   Trust Property

The term *trust property* means all property acquired from any source and held by a Trustee under this trust.

## Section 18.08   General Provisions and Rules of Construction

The following general provisions and rules of construction apply to this trust.

### (a)   Multiple Originals; Validity of Paper or Electronic Copies

This trust may be executed in any number of counterparts, each of which will be considered an original.

Any person may rely on a paper or electronic copy of this trust that the Trustee certifies to be a true copy as if it were an original.

**(b)    Singular and Plural; Gender**

Unless the context requires otherwise, singular words may be construed as plural, and plural words may be construed as singular. Words of one gender may be construed as denoting another gender as is appropriate within the context. The word *or,* when used in a list of more than two items, may function as both a conjunction and a disjunction as the context requires.

**(c)    Headings of Articles, Sections, and Subsections**

The headings of Articles, Sections, and Subsections used within this trust are included solely for the convenience of the reader. They have no significance in the interpretation or construction of this trust.

**(d)    Governing State Law**

This trust is governed, construed, and administered according to the laws of Arizona, as amended except as to trust property required by law to be governed by the laws of another jurisdiction and unless the situs of administration is changed under Section 18.06.

**(e)    Notices**

Unless otherwise stated, any notice required under this trust will be in writing. The notice may be personally delivered with proof of delivery to the party requiring notice and will be effective on the date personally delivered. Notice may also be mailed, postage prepaid, by certified mail with return receipt requested to the last known address of the party requiring notice. Mailed notice is effective on the date of the return receipt. If a party giving notice does not receive the return receipt but has proof that he or she mailed the notice, notice will be effective on the date it would normally have been received via certified mail. If the party requiring notice is a minor or incapacitated individual, notice will be given to the parent or Legal Representative.

**(f)    Severability**

The invalidity or unenforceability of any provision of this trust does not affect the validity or enforceability of any other provision of this trust. If a court of competent jurisdiction determines that any provision is invalid, the remaining provisions of this trust are to be interpreted as if the invalid provision had never been included.

We have executed this trust on April 25, 2016. This trust instrument is effective when signed by us, whether or not now signed by a Trustee.

_____
Lawrence P. Rudolph, Trustmaker and Trustee

Rudolph Trust
18-9

Appellate Case: 23-1162    Document: 010110860450    Date Filed: 05/16/2023    Page: 293



Bianca T. Rudolph, Trustmaker and Trustee

STATE OF ARIZONA                          )
                                          ) ss.
COUNTY OF MARICOPA                        )

This instrument was acknowledged before me on April 25, 2016, by Lawrence P. Rudolph, as Trustmaker and as Trustee, and Bianca T. Rudolph, as Trustmaker and as Trustee.

   [Seal]

**WHITNEY W PACI**
Notary Public - Arizona
Maricopa County
My Comm. Expires Feb 3, 2018

Whitney W. Paci, Notary Public

My commission expires: Feb 3, 2018

Rudolph Trust
18-10

249

Appellate Case: 23-1162    Document: 010110860450    Date Filed: 05/16/2023    Page: 294

# Schedule C
# Community Property

Ten Dollars Cash
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Rudolph Trust
C - 1

# Schedule T-1
# Lawrence P. Rudolph's Separate Property

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Appellate Case: 23-1162   Document: 010110860450   Date Filed: 05/16/2023   Page: 296

# Schedule T-2
## Bianca T. Rudolph's Separate Property

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

# EXHIBIT D

## RESIGNATION OF TRUSTEE

LAWRENCE P. RUDOLPH, hereby resigns as Trustee of the (i) LAWRENCE P. RUDOLPH SURVIVOR'S TRUST dated April 25 2016, and as AMENDED AND RESTATED on June 15, 2021 established by Lawrence P. Rudolph, as Trustor  and (ii) Rudolph Trust, dated April 25, 2016 established by Lawrence P. Rudolph and Bianca T. Rudolph, as Trustors.

Dated this _19 TH_ day of December, 2022.

_____
LAWRENCE P. RUDOLPH, Trustee

Witnessed this date by John Castellano

By _____

9403823v1/23140-0008

# MANDAMUS

# EXHIBIT 9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 22-cr-00012-WJM-1

UNITED STATES OF AMERICA,

        Plaintiff,

v.

1.    LAWRENCE RUDOLPH, and
2.    LORI MILLIRON,

        Defendants.

_____

**UNITED STATES' RESPONSE TO MOVANTS' MOTION FOR LEAVE TO FILE
THEIR RESPONSE TO GOVERNMENT'S MOTION FOR MANDATORY
RESTITUTION AND FORFEITURE**

_____

The United States responds to the motion by Rudolph's adult children for

leave to file a response to the Government's Motion for Mandatory Restitution

and Forfeiture. Doc. 319.

## <u>ARGUMENT</u>

The adult children of Bianca and Lawrence Rudolph seek to intervene in

this matter as alleged victims of the mail fraud in Count 2, not as family members

of the deceased from Count 1. They seek an order that allows them to file a

response to the United States Motion for Mandatory Restitution and Forfeiture

(Doc. 296), and a finding that they qualify as victims for purposes of the mail

fraud conviction. Because they are not victims of Count 2, however, they lack standing regarding restitution and the court should deny the filing of their proposed response.[1]

    I.      Because the adult children are not victims of the mail fraud, they are not entitled to intervene on restitution.

Statute defines who is a "crime victim" under the Crime Victims' Rights Act (CVRA): "a person directly and proximately harmed as a result of the commission of a Federal offense . . ." 18 U.S.C. § 3771(e)(2)(A). Because the definition in the CVRA is "virtually identical" to the definition in the Mandatory Victim Restitution Act (MVRA), the Tenth Circuit has followed MVRA precedent in interpreting who is a victim under the CVRA. See *United States v. Maldonado-Passage*, 4 F.4th 1097, 1102 (10th Cir. 2021) (citing *United States v. Speakman*, 594 F.3d 1165, 1171 n.3 (10th Cir. 2010)). Direct harm therefore requires proof "that a particular loss would not have occurred but for the conduct underlying the offense of conviction[.]" *Speakman,* 594 F.3d at 1171. And proximate harm requires proof that "the causal connection between the conduct and the loss is not too attenuated (either factually or temporally)." *Id.*

---

[1] The adult children or an official representative of the estate of Bianca Rudolph would be entitled to all the rights provided by the CVRA as it relates to the murder conviction for Count 1. But the parties seem to agree that there is no restitution appropriate for that count of conviction. Even the adult children's proposed response does not allege any restitution would be appropriate for Count 1. See Doc. 319-1.

The conduct underlying Count 2 is Rudolph defrauding life insurers. The Superseding Indictment identifies seven insurance companies (with nine policies) as being defrauded by Rudolph's mailings. Doc. 53, para. 2 – 4. Nowhere does the charging document allege that the children were victims.

Similarly, the jury instructions identify the insurance companies as those being defrauded:

> "First: Lawrence Rudolph devised or intended to devise a scheme to **defraud the life insurance companies** identified during this trial by making false and fraudulent representations that the death of Bianca Rudolph was an accident **to obtain life insurance proceeds**."

Doc. 240 at 29 (emphasis added).

To establish Rudolph's guilt for mail fraud, the United States was required to prove that he defrauded the seven insurance companies and obtained life insurance proceeds from them. The jury, unanimously, found that Rudolph intended to defraud the seven insurance companies out of the life insurance proceeds when he mailed them false and fraudulent representations that the death of Bianca Rudolph was an accident.

There was no evidence presented at trial that Defendant Rudolph schemed to defraud his adult children. They did not receive fraudulent claims in the mail from their father. Nor did they make any payments to him based on the false claims. The jury did not find that he intended to defraud them.

3

The harmed victims are the insurers who paid the proceeds to Rudolph based upon his lies. Even if the children are entitled to the life insurance proceeds as contingent beneficiaries, they have suffered no loss. They can bring a claim against the insurers for any proceeds to which they are entitled. But they likely won't have to do that. Once Rudolph has returned his ill-gotten gains in restitution, there is nothing to suggest that the insurers will not provide those funds to the proper beneficiaries.[2] Because the children have not suffered a loss caused by Rudolph's mail fraud, they are not the victims of Count 2.

An end run around the insurers determining the proper beneficiaries now that Lawrence Rudolph has been removed from that line of beneficiaries presents all sorts of problems. First, if the children were victims of Count 2, they would receive twice the benefits to which they are entitled: one share in restitution from Rudolph and another share from any legitimate contingent-beneficiary claims that they could otherwise bring against the insurers in state court. Second, determining whether the children are indeed the proper beneficiaries of those policies will require this court to interpret those policies and

---

[2] The speculation that the insurance companies would have paid the life insurance proceeds to the adult children "if" they had filed a claim does not create a right to be heard as crime victims of Rudolph's mail fraud. What it may create is a private civil action for enforcement of that civil contract, and the possible need to interplead Rudolph in the absence of an order of restitution to the life insurance companies.

4

answer various choice-of-law questions, so it can then review, interpret, and apply the proper state "Slayer laws" to ascertain the proper beneficiaries of each policy. Those issues belong in a state civil proceeding, not the criminal one here.[3]

Non-parties lack "a judicially cognizable interest" in a criminal defendant's sentence, including restitution. *United States v. Stoerr*, 695 F.3d 271, 277 (3d Cir. 2012). That is because "regardless of the benefit that a restitution order may bestow on a private entity, restitution is largely 'for the benefit of the State' rather than for the benefit of a private party." *Id.* at 277. "Although a restitution order may resemble a civil judgment in the sense that it compensates a private party, it remains 'criminal rather than civil in nature.'" *Id.* The Tenth Circuit has recognized the same:

> Criminal trials, on the other hand, place an individual citizen against the United States government. While non-parties may have an interest in aspects of the case, they do not have a tangible interest in the outcome.

---

[3] It should be noted that it isn't just restitution of the life insurance proceeds the adult children would be seeking if the Court declared them crime victims for purposes of Count 2. As noted in their proposed response they would also be seeking an Order for a return of all the property sought to be forfeited to the United States that the Defendant acquired with the life insurance proceeds. (Docket # 319-1, p. 13). Significantly, there is a bar on intervention for third parties to interfere or object to the entry of a Preliminary Order of Forfeiture. *See* U.S.C. § 853(k), as incorporated by 28 U.S.C. § 2461(c); *United States v. Cox*, 575 F.3d 352, 358 (4th Cir. 2009) ("Third parties claiming an interest in the property have no right to intervene in the criminal proceeding or to receive notice of the forfeiture proceedings before the entry of a preliminary order of forfeiture.").

This distinction is evidenced by our procedural rules. The Federal Rules of Civil Procedure allow non-parties to intervene to assert their rights. See Fed.R.Civ.P. 24. The Federal Rules of Criminal Procedure contain no comparable provision.

*United States v. Hunter*, 548 F.3d 1308, 1312 (10th Cir. 2008).

No one disputes that the adult children are victims of Count 1: the murder of Bianca Rudolph. Everyone agrees that they should be heard at sentencing as to the impact of that murder. But that isn't the issue before the court.

## **CONCLUSION**

The motion fails to establish a basis for the adult children to intervene. The court should deny the motion, its request to file a response to the United States' Motion for Mandatory Restitution and Forfeiture, and its request to find that the children are victims of Count 2.

DATED this 1st day of February, 2023.

Respectfully submitted,

COLE FINEGAN
United States Attorney


*s/***Kurt J. Bohn**
Kurt J. Bohn
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: 303-454-0100

6

Fax: 303-454-0405
Email: kurt.bohn@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of February 2023, I electronically filed the foregoing with the Clerk of Court using the ECF system which will send notification of such filing to all counsel of record.


s/ *Kurt J. Bohn*
Kurt J. Bohn
Assistant United States Attorney
United States Attorney's Office
1801 California Street, Suite 1600
Denver, Colorado 80202
Telephone: 303-454-0100
Fax: 303-454-0405
Email: kurt.bohn@usdoj.gov

7

# MANDAMUS EXHIBIT 10

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Case No. 22-cr-00012-WJM-1

UNITED STATES OF AMERICA,

Plaintiff,

v.

1. **LAWRENCE RUDOLPH** and
2. **LORI MILLIRON,**

Defendants.

_____

**MOVANTS' RESPONSE TO THE GOVERNMENT'S RESPONSE TO MOVANTS'
MOTION FOR LEAVE TO FILE THEIR RESPONSE TO GOVERNMENT'S MOTION
FOR MANDATORY RESTITUTION AND FORFEITURE**

_____

Pursuant to the Court's order of February 1, 2023 (Dkt. 326) (the "Order"), Movants

hereby submit the instant response to the Government's Response to Movants' Motion for Leave

to File Their Response to Government's Motion for Mandatory Restitution and Forfeiture. In

brief summary, the Government makes several fundamental errors in its response to Movants'

motion. First, the government implies that simply because it failed to identify the Movants as

victims during trial, Movants' rights as victims under the Crime Victims' Rights Act ("CVRA"),

18 U.S.C. § 3771, are erased; this is not so. Second, as Movants noted in their Motion for Leave

to File Their Response to Government's Motion for Mandatory Restitution and Forfeiture, and as

most of the insurance companies to whom the Government seeks so desperately to return the life

insurance proceeds *have said themselves*, those companies were, and are, contractually obligated

to pay the proceeds to the lawful beneficiaries of the policies. Third, the Government confusingly

asserts, citing no support whatsoever, that Movants would somehow seek to obtain "twice the

benefits to which they are entitled," as well as that a determination of Movants' status as victims

1

264

would be too complex for the Court to resolve. In fact, Movants seek only the restitution to which they are statutorily entitled, a determination that can be made quite simply. Finally, the Government incorrectly conflates an attempt by purported victims to appeal the sentence of a defendant with what the Movants seek here, which is simply the recognition of their statutorily guaranteed rights as victims under the CVRA.

## I.     THE GOVERNMENT'S FAILURE TO PROPERLY IDENTIFY THE MOVANTS AS VICTIMS AT TRIAL DOES NOT TERMINATE THEIR STATUTORY RIGHTS.

As the Government correctly states, the CVRA lays out the rights guaranteed to any "person directly and proximately harmed as a result of the commission of a Federal offense." 18 U.S.C. § 3771(e)(2)(A). This definition, which mirrors the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A, is to be interpreted broadly. *See, e.g.*, *United States v. Maldonado-Passage*, 4 F.4th 1097, 1103 (10th Cir. 2021) ("[W]hen a defendant's commission of a crime results in emotional or pecuniary harm, the harmed person qualifies as a crime victim under the CVRA."); *United States v. Checora*, 175 F.3d 782, 795 (10th Cir. 1999) (§ 3663A "defines 'victim' as any 'person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered.'"). The CVRA also provides that both the "crime victim or the crime victim's lawful representative, and the attorney for the government may assert" the rights afforded by the CVRA. 18 U.S.C. § 3771(d)(1). Those rights "shall be asserted in the district court in which a defendant is being prosecuted for the crime, or, if no prosecution is underway, in the district court in the district in which the crime occurred," and the "district court shall take up and decide any motion asserting a victim's right forthwith." *Id.* at § 3771(d)(3). "If the district court denies the relief sought, the movant may petition the court of appeals for a writ of mandamus." *Id.*

This language plainly establishes that individuals, such as the Movants, may assert their rights as victims even where the Government has failed to do so. If, as the Government suggests, it is the final arbiter of who does and does not qualify as a victim, there would surely be no ability for victims to assert their rights "if no prosecution is underway." Similarly, there would be no need to allow a "movant" to "petition the court of appeals for a writ of mandamus" in the case of a denial, *id.* at § 3771(d)(3), *in addition to* the Government's right to "assert as error the district court's denial of any crime victim's right" when making "an appeal in a criminal case," *id.* at § 3771(d)(4). In passing the CVRA, Congress clearly foresaw instances, like the one before the Court here, where the Government has failed to identify the proper victims of a crime.

It is also of no consequence that the Government proceeded to, and through, trial without properly identifying the Movants as victims. *See United States v. Whipple*, 155 F. Supp. 3d 321, 324 (W.D.N.Y. 2015) ("The fact that the Government has not sought restitution on behalf of a particular party is not determinative of that party's status as a victim."). The Tenth Circuit has previously recognized that it is not bound by the Government's determinations of who is a victim, nor, necessarily, what the Government chooses to prove at trial. For example, in *In re Antrobus*, the panel noted, matter-of-factly and with no issue, that the district court heard the movants' motion for recognition of the victim status of their daughter after the defendant entered a plea. 519 F.3d 1123, 1124 (10th Cir. 2008) ("*After the plea hearing*, the Antrobuses sought to have Ms. Quinn declared a victim of Mr. Hunter's crime …") (emphasis added); *see also United States v. Hunter*, No. 2:07CR307DAK, 2008 WL 53125, at *1 n.1 (D. Utah Jan. 3, 2008) (noting movants did not file motion asserting victim's rights for over a month after plea hearing and seven months after the action began). Whether the Movants are victims of the mail fraud charge of which Dr. Rudoph was found guilty is a question that the Court is clearly capable of

answering at the current stage of the proceeding. Moreover, the CVRA expressly states that the Court must answer that question "forthwith," 18 U.S.C. § 3771(d)(3), despite the Government's suggestions to the contrary.

## II. THE MOVANTS, AND NOT THE INSURANCE COMPANIES, SUFFERED A LOSS AS A RESULT OF DR. RUDOLPH'S MAIL FRAUD.

The Government next incorrectly asserts that because the Movants "did not receive fraudulent claims in the mail from their father," they are not victims of Dr. Rudolph's mail fraud and "have suffered no loss." As stated above, any person who is "directly and proximately harmed by the commission of a Federal offense" is a victim of such a crime. In cases of fraud, the universe of individuals "directly and proximately harmed" extends beyond those to whom false statements were made. *See United States v. Chin*, 965 F.3d 41, 59-60 (1st Cir. 2020). In *Chin*, the defendant was found guilty of engaging in a scheme that involved the misrepresentation of "various safety protocols to customers who purchased" medications from New England Compounding Center ("NECC"). On appeal, the government challenged the district court's determination that "patients who were adversely affected by NECC's drugs were not victims" because "NECC's misrepresentations were made to the hospitals and clinics that purchased the drugs, not to end-users and patients." *Id.* at 58 (internal quotations removed). The First Circuit concluded that the district court, like the Government in the instant matter, improperly focused on "the causal relationship … between the nature of the statutory offense and the loss." *Id.* at 59. Instead, the proper focus is "on whether the victim was 'harmed as a result of the <u>commission</u> of an offense' or 'by the defendant's criminal <u>conduct</u> in the course of a scheme, conspiracy, or pattern of criminal activity.'" *Id.* at 59-60 (emphasis in original).[1]

---

[1] Though *Chin* cites to the MVRA, we agree with the Government that "the Tenth Circuit has followed MVRA precedent in interpreting who is a victim under the CVRA."

The nature of the loss suffered by the Movants and caused by Dr. Rudolph is detailed fully in Movants' Response to the Government's Motion for Mandatory Restitution and Forfeiture and Request for Recognition of Their Rights as Victims and Entitlement to Restitution. The proceeds of the life insurance policies obtained by Mrs. Rudolph constitute a significant portion of Julian and AnaBianca's inheritance, and these funds were wrongfully taken away from them. But for the conduct for which Dr. Rudolph was found guilty, namely, misrepresenting the circumstances of Mrs. Rudolph's death, Movants would have received the proceeds of the life insurance policies. It is also reasonably foreseeable that the same conduct would lead to the Movants loss of the insurance proceeds. They have thus clearly been "directly and proximately harmed" as a result of the mail fraud charge of which Dr. Rudolph was found guilty. Moreover, as Movants have repeatedly explained to the Government, the insurance companies with which Movants have discussed victim status have confirmed that they were contractually required to make the payments to the lawful beneficiaries under any circumstances other than suicide. As a result, they have implied that they do not view themselves as victims and thus are not entitled to restitution. That Dr. Rudolph did not submit fraudulent claims for the insurance proceeds to the Movants is wholly irrelevant. It is indisputable that the Movants would have received the proceeds of the life insurance policies but for the criminal conduct for which Dr. Rudolph was found guilty. The Movants are therefore clearly the victims and thus entitled to mandatory restitution.

III.    **THE GOVERNMENT INCORRECTLY CLAIMS THAT MOVANTS WOULD BE UNJUSTLY ENRICHED BY A DETERMINATION THAT THEY ARE VICTIMS AND THAT AN ADJUDICATION OF THEIR STATUS IS TOO COMPLICATED FOR THE COURT.**

Citing no support whatsoever – because there is none – the Government claims that Movants "would receive twice the benefits to which they are entitled" if they are recognized as

victims. The Government arrives at this conclusion, it seems, by assuming that after Movants

obtain the restitution that they deserve and that they are statutorily guaranteed, they would bring

additional actions against the insurance companies in state courts. It is entirely unclear why the

Government makes this assumption, or why they assume that state courts would grant the

Movants these additional remedies. Indeed, the applicable Slayer laws anticipate exactly the

scenario envisioned by the Government and preclude precisely the suit the Government fears.

*See* Ariz. Rev. Stat. Ann. § 14-2803(G) ("A payor or other third party is not liable for having

made a payment or transferred an item of property or any other benefit to a beneficiary

designated in a governing instrument affected by an intentional and felonious killing or for

having taken any other action in good faith reliance on the validity of the governing instrument

on request and satisfactory proof of the decedent's death and before the payor or other third party

received written notice of a claimed forfeiture or revocation under this section."); 20 Pa. Cons.

Stat. § 8812 ("Any insurance company making payment according to the terms of its policy or

any bank or other person performing an obligation for the slayer as one of several joint obligees

shall not be subject to additional liability by the terms of this chapter, if such payment or

performance is made without notice of the killing by a slayer."); 755 Ill. Comp. Stat. 5/2.6 ("The

holder of any property subject to the provisions of this Section shall not be liable for distributing

or releasing said property to the person causing the death if such distribution or release occurs

prior to a determination made under this Section.").

 To the extent that the Government recognizes that the Movants are the contingent

beneficiaries of the life insurance policies, Movants agree; indeed, this is fundamental to the

Movants' right to the life insurance proceeds that Dr. Rudolph fraudulently received in their

place. How the Government made the leap to the belief that Movants would somehow receive a windfall based on their status as contingent beneficiaries, however, is unknown to Movants.

The Government similarly provides no support for its claim that "determining whether [Movants] are indeed the proper beneficiaries of [the life insurance] policies will require this court to interpret those policies and answer various choice-of-law questions, so it can then review, interpret, and apply the proper state 'Slayer laws' to ascertain the proper beneficiaries of each policy." As a preliminary matter, the MVRA expressly provides an exception for cases where "determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process." 18 U.S.C. § 3663A(c)(3)(B); *see also* 18 U.S.C. § 3663(a)(1)(B)(ii) ("To the extent that the court determines that the complication and prolongation of the sentencing process resulting from the fashioning of an order of restitution under this section outweighs the need to provide restitution to any victims, the court may decline to make such an order."). This exception has been construed narrowly, *e.g.*, *United States v. Atlantic States Cast Iron Pipe Co.*, 612 F. Supp. 2d 453, 486-87 (D.N.J. 2009), and is not applicable here.

The Government's description of the facts notwithstanding, the requisite analysis of the life insurance policies and the applicable "Slayer laws" is quite simple. Each of the relevant policies contains a choice of law provision that plainly establishes which state's "Slayer law" applies. The policies issued by AAA Life Insurance Company, Fidelity Life, Genworth First Colony, and MetLife Insurance are governed by Arizona law; the policies issued by Ameritas Life Insurance and Transamerica Life Insurance are governed by Pennsylvania law; and the policies issued by Great-West Life & Annuity Insurance Company are governed by Illinois law.

Further, the language of these states' "Slayer laws" is substantively identical with regards to the disqualifying effect of Dr. Rudolph's conviction. *See* Ariz. Rev. Stat. Ann. § 14-2803(E) ("A wrongful acquisition of property or interest by a killer not covered by this section shall be treated in accordance with the principle that a killer cannot profit from that person's wrong."); 20 Pa. Cons. Stat. § 8811(a) ("Insurance proceeds payable to the slayer as the beneficiary or assignee of any policy or certificate of insurance on the life of the decedent, or as the survivor of a joint life policy, shall be paid to the estate of the decedent, unless the policy or certificate designates some person not claiming through the slayer as alternative beneficiary to him."); 755 Ill. Comp. Stat. 5/2.6 ("A person who intentionally and unjustifiably causes the death of another shall not receive any property, benefit, or other interest by reason of the death, whether as heir, legatee, beneficiary, joint tenant, survivor, appointee or in any other capacity and whether the property, benefit, or other interest passes pursuant to any form of title registration, testamentary or nontestamentary instrument, intestacy, renunciation, or any other circumstance."). Movants trust and believe that this Court is well suited and qualified to analyze seven choice of law provisions and three, largely identical, state "Slayer laws," determine that Dr. Rudolph is, and was, disqualified from receiving the life insurance proceeds that rightfully belong to Movants, and order that restitution properly be paid to them.

## IV.    THE GOVERNMENT'S REFERENCE TO *UNITED STATES V. HUNTER* IS INAPPOSITE.

Finally, as Movants explained in their Motion for Leave to File Their Response to Government's Motion for Mandatory Restitution and Forfeiture, the Government's citation to *United States v. Hunter* is not relevant to the matter at hand.[2] Movants agree that "non-parties …

---

[2] Movants further note that the Government makes no mention of the applicability of the cases that the Court cited, and called on the parties to discuss, in its January 10, 2023 Order (Dkt. 317). Moreover, the Government has neglected to respond to any of the myriad cases raised by Movants in their Motion for Leave to File Their Response

do not have a tangible interest in the outcome" of a criminal trial. 548 F.3d 1308, 1312 (10th Cir. 2008). However, the Tenth Circuit reached that conclusion when the Appellants in the case attempted to appeal the "judgment of conviction and sentence" of the defendant. *Id.* at 1310. Unlike the Appellants in *Hunter*, Movants do not seek to intervene to appeal Dr. Rudolph's conviction, nor are they seeking a direct appeal of his sentence. Instead, they seek the rights guaranteed to them by the CVRA, rights that the Tenth Circuit explicitly recognized in *Hunter*'s sister case, *In re Antrobus*. 519 F.3d at 1124; *see also United States v. Issa*, 21 F.4th 504, 508 (7th Cir. 2021) ("The district court did precisely the right thing accepting the written and oral submissions of the victims personally and through their lawyer and acted within its discretion in considering and weighing those submissions."). Of course, should Movants disagree with the Court's eventual finding on their motion to be recognized as victims, they will exercise their right to seek appellate review through "the single avenue" provided for in the CVRA: mandamus. *Hunter*, 548 F.3d at 1315. At present, however, Movants seek only to be heard by the Court and to have their statutorily guaranteed rights confirmed.

## V.    CONCLUSION

For the foregoing reasons, as well as the reasons set forth in Movants' Motion for Leave to File Their Response to Government's Motion For Mandatory Restitution And Forfeiture and their Response to Government's Motion for Mandatory Restitution and Forfeiture and Request for Recognition of Their Rights as Victims and Entitlement to Restitution, the Government's assertions that the Movants lack standing, that they are not "victims" as defined in the CVRA, and are not entitled to restitution are incorrect.

---

to Government's Motion for Mandatory Restitution and Forfeiture. This failure is particularly noticeable with regards to *In re Antrobus*, a case that is directly on point.

Dated: February 8, 2023                        VICTIMS' COUNSEL

/s/ *Christopher P. Hotaling*
**Christopher P. Hotaling** (IL. Bar #6272432)
NIXON PEABODY LLP
70 West Madison, Suite 5200
Chicago, IL 60602-4378
Tel: 312.977.4418
Fax: 833.968.0535

/s/ *John R. Sandweg*
**John R. Sandweg** (DC Bar # 1027208)
NIXON PEABODY LLP
799 9th Street NW, Suite 500
Washington, DC 20001-5327
Tel: 202.585.8189
Fax: 877.743.5914

10

# **MANDAMUS**

# **EXHIBIT 11**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge William J. Martínez**

Criminal Case No. 22-cr-012-WJM

UNITED STATES OF AMERICA,

     Plaintiff,

v.

1. LAWRENCE RUDOLPH, and
2. LORI MILLIRON,

     Defendants.

---

**ORDER DENYING MOVANTS' MOTION FOR LEAVE TO FILE**
**THEIR RESPONSE TO GOVERNMENT'S MOTION FOR MANDATORY**
**RESTITUTION AND FORFEITURE**

---

On January 9, 2023, the Court received an e-mail from attorneys representing

Julian Rudolph, AnaBianca Rudolph, and the Estate of Bianca Rudolph (collectively,

"Movants") requesting information concerning filing a response to the Government's

Motion for Mandatory Restitution and Forfeiture (ECF No. 296). The substance of

Movants' request was that the Court permit them to file a response brief arguing that the

Court should recognize their rights as victims of Count 2 (mail fraud) under the Crime

Victims' Rights Act ("CVRA"), 18 U.S.C. § 3771, and entitlement to receive restitution in

this matter.[1]  Because the Court questioned whether Movants, who are not parties in

---

[1] The adult children or an official representative of the estate of Bianca Rudolph would
be entitled to all the rights provided by the CVRA as it relates to the murder conviction for Count
1. But the parties seem to agree that there is no restitution appropriate for that count of
conviction. Even the adult children's proposed response does not allege any restitution would
be appropriate for Count 1. (*See* ECF No. 319-1.) Therefore, the Court limits its analysis to
whether Movants are entitled to respond with respect to Count 2.

this criminal case, had standing to participate in the restitution portion of these proceedings, the Court directed separate briefing on this matter.[2]

Before the Court is Movants' Motion for Leave to File Their Response to Government's Motion for Mandatory Restitution and Forfeiture ("Motion").  (ECF No. 319.)  The Government (ECF No. 325) and Defendant Lawrence Rudolph ("Defendant" or "Rudolph") (ECF No. 324) filed responses.[3]  Movants filed a reply.  (ECF No. 329.)

For the following reasons, the Motion is denied.

## I. APPLICABLE LAW[4]

The definition of a "crime victim" under the CVRA is "a person directly and proximately harmed as a result of the commission of a Federal offense . . . ."  18 U.S.C. § 3771(e)(2)(A).  The CVRA provides the right for crime victims to "be reasonably heard at any public proceeding in the district court involving release, plea, sentencing, or any parole proceeding," *id.* § 3771(a)(4), and "full and timely restitution as provided in law," *id.* § 3771(a)(6).

Because the definition of "victim" in the CVRA is "virtually identical" to the definition in the MVRA, the Tenth Circuit has followed MVRA precedent in interpreting who is a victim under the CVRA.  *See United States v. Maldonado-Passage*, 4 F.4th 1097, 1102–03 (10th Cir. 2021) (citing *United States v. Speakman*, 594 F.3d 1165,

---

[2] The Court permitted Movants to appear on the docket as "Interested Parties" solely for the purposes of filing their motion.  (ECF No. 317.)

[3] Rudolph filed a one-paragraph brief which states that it is his position that Movants are not prohibited from appearing and arguing their status and rights as victims.  (ECF No. 324 at 1.)  He has no objection to Movants filing a response.  (*Id.*)

[4] Movants state that they are not relying on the Mandatory Victim Restitution Act ("MVRA"), 18 U.S.C. § 3663A, to support their standing to participate in this case.  (ECF No. 319 at 2.)  Rather, they rely on the CVRA.  (*Id.*)

1171 n.3 (10th Cir. 2010)).  The Tenth Circuit has held that "when a defendant's commission of a crime results in emotional or pecuniary harm, the harmed person qualifies as a crime victim under the CVRA."  *Id.* at 1103.  "[T]o show that one is a victim under the MVRA, [here, Movants] must show both that the defendant's conduct is the 'but-for' cause of [their] harm and that the defendant 'proximately' caused the harm." *Speakman*, 594 F.3d at 1171.  Direct harm therefore requires proof "that a particular loss would not have occurred but for the conduct underlying the offense of conviction[.]" *Id*.  Further, proximate harm requires proof that "the causal connection between the conduct and the loss is not too attenuated (either factually or temporally)."  *Id.* (citations omitted).

## II. ANALYSIS

Here, Movants request that the Court recognize their status as victims under the CVRA and afford them an opportunity to be heard regarding the proper allocation of restitution.  (ECF No. 319 at 6.)  They argue that even though the Government did not recognize them as victims of the mail fraud count, in other cases in the Tenth Circuit, victims have properly moved district courts to recognize them as such.  (*Id.* at 3 (citing *In re Antrobus*, 519 F.3d 1123, 1124 (10th Cir. 2008)).)  Movants' position is that they are victims with respect to Count 2 "because proceeds of the life insurance policies obtained by Mrs. Rudolph constitute a significant portion of Julian and AnaBianca's inheritance, and these funds were wrongfully taken away from them."  (ECF No. 329 at 5.)  They further argue that

> [b]ut for the conduct for which Dr. Rudolph was found guilty, namely, misrepresenting the circumstances of Mrs. Rudolph's death, Movants would have received the proceeds of the life insurance policies.  It is also reasonably

> foreseeable that the same conduct would lead to the
> Movants loss of the insurance proceeds. They have thus
> clearly been "directly and proximately harmed" as a result of
> the mail fraud charge of which Dr. Rudolph was found guilty.

(*Id.*)

For the following reasons, however, the Court finds that Movants are not victims of Count 2 and therefore may not file a response to the Government's Motion for Mandatory Restitution and Forfeiture.

Count 2 concerns Rudolph's actions which defrauded several life insurance companies. The Superseding Indictment identifies seven insurance companies (with nine policies) as being defrauded by Rudolph's conduct, resulting in total of approximately $4,877,744.93 worth of losses. (ECF No. 53 ¶¶ 2–4.) However, the Superseding Indictment does not allege that Movants were victims with respect to Count 2; this, of course, is not dispositive of the instant issue. *See United States v. Whipple*, 155 F. Supp. 3d 321, 324 (W.D.N.Y. 2015) ("The fact that the Government has not sought restitution on behalf of a particular party is not determinative of that party's status as a victim.").

Moreover, as the Government points out, the Court's Final Jury Instructions identify only the insurance companies as the victims of Rudolph's mail fraud—not Rudolph's children. (ECF No. 325 at 3.)

> First: Lawrence Rudolph devised or intended to devise a
> scheme to defraud the life insurance companies identified
> during this trial by making false and fraudulent
> representations that the death of Bianca Rudolph was an
> accident to obtain life insurance proceeds.

(ECF No. 240 at 29.)

To establish Rudolph's guilt for mail fraud, the Government was required to prove

that he defrauded the seven insurance companies and obtained life insurance proceeds from them.  The jury found that Rudolph intended to defraud the seven insurance companies out of the life insurance proceeds when he mailed them false and fraudulent representations that Bianca Rudolph's death was an accident.  However, there was no evidence presented at trial that Rudolph schemed to defraud *Movants*.  To wit, Movants did not receive fraudulent claims in the mail from Rudolph, nor did they make any payments to him based on the false claims.  Consequently, the Court cannot extrapolate that the jury's verdict also contemplates that Rudolph intended to defraud Movants.

Here, the victims are the insurers who paid the life insurance proceeds to Rudolph; they alone suffered harm.  In their reply, Movants state that "the insurance companies with which Movants have discussed victim status have confirmed that they were contractually required to make the payments to the lawful beneficiaries under any circumstances other than suicide."  (ECF No. 329 at 5.)  Further, they argue that it is "indisputable that the Movants would have received the proceeds of the life insurance policies but for the criminal conduct for which Dr. Rudolph was found guilty."  (*Id.*)  While Movants assert that they are the proper beneficiaries of the life insurance policies, making a legal determination concerning whether Movants are indeed the proper beneficiaries of the insurance policies in question would require the Court to review and interpret those policies and answer various choice of law questions, so it can then review, interpret, and apply the proper state "slayer laws" to ascertain the proper beneficiaries of each policy.[5]  Movants simply *assume* they would receive all of the life

---

[5] In their reply, Movants concede that the Court might have to make such determinations without acknowledging that this is not the proper forum in which to do so.  (ECF No. 329 at 8)

insurance proceeds, and they may be right.  Assuming *arguendo* that Movants are proper contingent beneficiaries of all of the life insurance policies at issue, that still does not necessarily make them victims of Rudolph's mail fraud.  That designation belongs to the life insurers, who paid the life insurance proceeds to Rudolph.  But the Court believes that such issues between the life insurers and Movants—to the extent any exist—belong in a civil proceeding, not the criminal proceeding pending in this federal court.[6]  (*See* ECF No. 325 at 5.)

Importantly, even if Movants are entitled to the life insurance proceeds as contingent beneficiaries, they have suffered no loss.  They can bring a claim against the insurers for any proceeds to which they believe they are entitled.  However, the Government surmises that Movants will likely not need to do so, because "once Rudolph has returned his ill-gotten gains in restitution, there is nothing to suggest that the insurers will not provide those funds to the proper beneficiaries."  (ECF No. 325 at 4.)  Nonetheless, the Court will not speculate as to the manner in which Movants may attempt to claim any funds to which they believe they are entitled or whether they are entitled to anything at all.[7]

---

("Movants trust and believe that this Court is well suited and  qualified to analyze seven choice of law provisions and three, largely identical, state "Slayer laws," determine that Dr. Rudolph is, and was, disqualified from receiving the life insurance proceeds that rightfully belong to Movants, and order that restitution properly be paid to them.")

[6] Additionally, the Government points out in another related brief that "Defendant's actions prevented the insurance companies from filing civil interpleader actions at the time that would have sorted out precisely this question."  (ECF No. 323 at 3.)

The Government highlights yet another problem with simply giving the money to Movants, which is that the relinquishment of all of Rudolph's assets to Movants is "potentially fraught with additional legal implications, such as fraudulent conveyance and potential preference of creditors should [Rudolph] declare bankruptcy."  (ECF No. 323 at 4 n.1.)

[7] The Government emphasizes that "it isn't just restitution of the life insurance proceeds

Case No. 21-cr-0129-WJM   Document 344   filed 04/20/23   USDC Colorado   pg 7 of 8
Case 1:22-cv-02209-MJD   Document 348-1   filed 04/20/23   USDC Colorado   Page 7 of 8
325 of 342

Appellate Case: 23-1162     Document: 01011086450     Date Filed: 05/16/2023     Page: 325

Rather, "speculation that the insurance companies would have paid the life insurance proceeds to the adult children 'if' they had filed a claim does not create a right to be heard as crime victims of Rudolph's mail fraud." (*Id.* at 4 n.2.)  Because Movants have not suffered a loss directly or proximately caused by Rudolph's mail fraud, they are not the victims of Count 2.[8]

### III. CONCLUSION

For the reasons explained above, the Court ORDERS that Movants' Motion for Leave to File Their Response to Government's Motion for Mandatory Restitution and Forfeiture (ECF No. 319) is DENIED.  The Court will proceed with Rudolph's sentencing hearing on June 21, 2023 (ECF No. 327), and Movants will not be recognized as victims at that proceeding in connection with Count 2, and their submissions will not be

---

the adult children would be seeking if the Court declared them crime victims for purposes of Count 2.  As noted in their proposed response they would also be seeking an Order for a return of all the property sought to be forfeited to the United States that the Defendant acquired with the life insurance proceeds.  (Docket # 319-1, p. 13).  Significantly, there is a bar on intervention for third parties to interfere or object to the entry of a Preliminary Order of Forfeiture.  *See* U.S.C. § 853(k), as incorporated by 28 U.S.C. § 2461(c); *United States v. Cox*, 575 F.3d 352, 358 (4th Cir. 2009) ("Third parties claiming an interest in the property have no right to intervene in the criminal proceeding or to receive notice of the forfeiture proceedings before the entry of a preliminary order of forfeiture.")."  (ECF No. 325 at 5 n.3.)  The Court sees Movants' position as yet another reason to deny the Motion.

[8] At this juncture, Movants are not trying to appeal Rudolph's sentence, which has not yet been imposed.  (ECF No. 329 at 9.)  Nevertheless, numerous circuit courts have addressed that related issue in connection with the CVRA, which the Court finds noteworthy. *Cf. United States v. Hunter,* 548 F.3d 1309, 1311–12 (10th Cir. 2008) (crime victims, as non-parties to the criminal action, lack standing to appeal the defendant's sentence); *United States v. Stoerr*, 695 F.3d 271, 277 (3d Cir. 2012) (holding that "a non-party lacks standing to appeal a restitution order, because a non-party lacks a judicially cognizable interest in a criminal defendant's sentence. . . .  Although a restitution order may resemble a civil judgment in the sense that it compensates a private party, it remains criminal rather than civil in nature") (citations and quotations omitted); *United States v. Alcatel-Lucent France, SA*, 688 F.3d 1301, 1306 (11th Cir. 2012) ("The CVRA never uses the word "intervene."  *See* 18 U.S.C. § 3771.  From this it follows that the statute does not expressly authorize intervention by crime victims."); *Brandt v. Gooding*, 636 F.3d 124, 136 (4th Cir. 2011) (holding that the CVRA's plain language does not permit intervention).

considered by the Court in connection with sentencing, restitution, or forfeiture in connection with Count 2.

Dated this 20th day of April, 2023.

BY THE COURT:

William J. Martinez
Senior United States District Judge

# MANDAMUS

# EXHIBIT 12



**Ameritas.**    5900 O Street
Lincoln, NE 68510

**Client Service Office**

📞 800-319-6901
Fax: 513-595-2218

✉ PO Box 40888
Cincinnati, OH 45240

**Insured:**  Bianca T Rudolph
**Policy Number:**  T00017578A

*We* will pay the death benefit proceeds to the beneficiary when *we* receive satisfactory proof of death of the *insured* while this policy is in force, subject to the terms of this policy.

**LOOK AT THE APPLICATION FORMS.**  This policy is issued based on payment of the initial premium and the answers in the application (see copy attached).  If all answers are not true and complete, this policy may be affected. If any past medical history has been omitted, please notify *us* within 10 days from the date this policy is delivered to *you.*

**PLEASE READ THIS POLICY CAREFULLY.**  This policy is a legal contract between *you* and Ameritas Life Insurance Corp.

**20-DAY RIGHT TO EXAMINE THIS POLICY.**  It is important to *us* that *you* are satisfied with this policy.  *You* have 20 days to review this policy after *you* receive it.  If this policy is a replacement for an existing policy *you* have 30 days for an external replacement or 45 days for an internal replacement to review this policy after *you* receive it. If *you* are not satisfied, *you* may send it back to *us* or give it to *our* agent.  In such case, this policy will be void from the beginning.  *We* will refund the premiums paid within 10 days after this policy is returned.

AMERITAS LIFE INSURANCE CORP.

*JoAnn M Martin*                    *Robert John H Lawler*

President                                    Secretary

Renewable Term Life Policy with a Change of Premium Provision
Premiums Payable as Stated
Premiums are Subject to Change
Convertible
Nonparticipating

www.ameritas.com
**284**

3011 PA

# TABLE OF CONTENTS

**POLICY SCHEDULE** . . . . . . . . . . . . . . 3

**DEFINITIONS** . . . . . . . . . . . . . . 4

**OWNERSHIP** . . . . . . . . . . . . . . 4

**BENEFICIARY** . . . . . . . . . . . . . . 4

**DEATH BENEFIT** . . . . . . . . . . . . . . 5

**PREMIUMS** . . . . . . . . . . . . . . 5
    Payment of Premium . . . . . . . . . . . . 5
    Premium Changes . . . . . . . . . . . . 5
    Grace Period . . . . . . . . . . . . 6
    Nonpayment of Premium . . . . . . . . . . 6
    Premium Refund at Death . . . . . . . . . . 6

**RENEWAL** . . . . . . . . . . . . . . 6
    Renewal Privilege . . . . . . . . . . . . 6
    Automatic Renewal . . . . . . . . . . . . 6

**CONVERSION** . . . . . . . . . . . . . . 6
    Conversion Privilege. . . . . . . . . . . . 6
    Attained Age Conversion . . . . . . . . . . 7
    Riders . . . . . . . . . . . . . . 7
    Extended Conversion Privilege. . . . . . . . . 7

**GENERAL PROVISIONS** . . . . . . . . . . . 7
    Entire Contract . . . . . . . . . . . . 7
    Nonparticipating Policy. . . . . . . . . . . 7
    Reliance. . . . . . . . . . . . . . 7
    Incontestability . . . . . . . . . . . . 7
    Suicide . . . . . . . . . . . . . . 7
    Misstatement of Age or Gender . . . . . . . . 7
    Assignment . . . . . . . . . . . . . 8
    Reinstatement . . . . . . . . . . . . 8
    Conformity with Laws. . . . . . . . . . . 8

3011 PA

## POLICY SCHEDULE

| | |
|---|---|
| **Policy Number:** | T00017578A |
| **Insured:** | Bianca T Rudolph |
| **Issue Age and Gender:** | 54, Female |
| **Owner:** | Lawrence P Rudolph |
| **Policy Date:** | June 4, 2014 |
| **Issue Date:** | June 4, 2014 |
| **Expiration Date:** | June 4, 2060 |
| **Final Conversion Date:** | June 4, 2036 |
| **Premium Class:** | Standard Nontobacco |
| **Class Upon Conversion:** | Standard Nontobacco |
| **Initial Term Period:** | 20 Years |

| Plan of Insurance | Benefit Amount | First Year Annual Premium |
|---|---|---|
| Renewable Term | $1,000,000.00 | $3,880.00 |

| **First Premium Payment Interval:** | Semiannual | $1,979.00 |
|---|---|---|

| Premium Frequency | Modal Premium | Cumulative Annual Premium |
|---|---|---|
| Annual | $3,880.00 | $3,880.00 |
| SemiAnnual | $1,979.00 | $3,958.00 |
| Quarterly | $1,008.70 | $4,034.80 |
| Monthly | $333.70 | $4,004.40 |

Premiums Years Payable

$ 3,880.00   Years 1 through 20

$72,920.00   * Years 21 and thereafter for life

* Subject to change in accordance with the premium change provision

3011 PA 20          3

This is a renewable term life insurance policy with premiums payable as shown on the policy schedule. *We* will pay the death benefit proceeds to the beneficiary if the *insured* dies while this policy is in force, subject to the terms of this policy.

## DEFINITIONS

(Defined terms appear in italics throughout this policy.)

**ATTAINED AGE.** Means the *issue age* plus the number of completed policy years.

**CONVERSION DATE.** Means the date *we* accept the application for conversion accompanied by the first premium.

**INSURED.** Means the person shown on the policy schedule upon whose life this policy is issued.

**ISSUE AGE.** Means the *insured's* age as of the birthday nearest to the *policy date*.

**ISSUE DATE.** Means the date on which the suicide and incontestability periods begin. If *we* have received the initial premium from *you*, the *issue date* will also be the date when *you* have life insurance coverage with *us*. If *we* have not received the initial premium from *you*, *you* WILL NOT have coverage until the date on which *we* receive the initial premium from *you*.

**POLICY DATE.** Means the date from which policy months, years and anniversaries are measured. The *policy date* will be determined by *us* unless *you* request a different *policy date* that *we* approve. If the *issue date* is after the *policy date* or *we* have not received the initial premium from *you*, *you* WILL NOT have life insurance coverage on the *policy date*.

**WE, US, OUR.** Means Ameritas Life Insurance Corp.

**WRITTEN NOTICE.** Means information *we* have received at the address(es) shown on the first page of this policy which is written, is signed by *you*, and is acceptable to *us*.

**YOU, YOUR.** Means the owner as shown on the policy schedule unless changed. The *insured* may or may not be the *owner*.

## OWNERSHIP

While the *insured* is living, *you* have all rights in this policy. *Your* rights will be subject to any assignment, and to the rights of any irrevocable beneficiary. If *you* die before the *insured*, the successor owner named in the application is the new owner. If there is no successor owner, then *your* estate becomes the new owner.

A change of owner may be made at any time by *written notice*. It will take effect on the date *we* receive *written notice*. Unless there are no surviving primary or contingent beneficiaries, a change of owner does not change the beneficiary.

## BENEFICIARY

The beneficiary will receive the death benefit proceeds when the *insured* dies. The primary and any contingent beneficiaries are named in the application. If no primary beneficiary is living when the *insured* dies, *we* will pay to the contingent beneficiary. If no contingent beneficiary is living when the *insured* dies, *we* will pay *you* or *your* estate.

3011 PA

Unless the beneficiary designation provides otherwise, *we* will follow these rules:

(1) *We* will pay equal shares when more than one beneficiary of the same class is to share the funds.
(2) No revocable beneficiary has rights in this policy until the *insured* dies.
(3) An irrevocable beneficiary cannot be changed without his or her consent.
(4) The interest of any beneficiary is subject to the rights of any assignee shown on *our* records.
(5) When beneficiaries are not shown by name (such as "children"), *we* may find who they are from sworn statements and not wait for court records.

*You* may change the beneficiary at any time while the *insured* is living by *written notice*. *We* must approve any change. If approved, it will take effect on the date the *written notice* was signed by *you*. *We* will not be liable for any payments *we* make or actions *we* take before the change is approved.

Unless otherwise provided, if any beneficiary dies within 30 days after the *insured* dies as the result of a common disaster, *we* will pay the death benefit proceeds as if that beneficiary died first.


# DEATH BENEFIT

Death benefit proceeds will equal:

(1) the amount of insurance in force at death; plus
(2) any additional life insurance proceeds provided by riders; plus
(3) any premium refund due; minus
(4) any unpaid premium, if death occurs during the grace period.

*We* will pay the death benefit proceeds in a lump sum as soon as *we* receive satisfactory proof that the *insured* died while this policy was in force, and other proof that *we* may require in order to investigate the claim. *We* will include interest from the *insured's* date of death to the payment date. The rate will not be less than required by law. Full payment of the death benefit proceeds to the beneficiary discharges *us* from any and all claims.


# PREMIUMS

**PAYMENT OF PREMIUM.** Premiums are payable on or before their due dates. Premiums and premium due dates are stated on the policy schedule. The first premium is due on the *policy date*. Premium payments may be made to the address(es) shown on the first page of this policy or to such other place as *we* may designate. A receipt signed by *our* President or Secretary will be provided upon request.

Premiums may be paid annually, semiannually or quarterly at the rates that are published by *us* and in effect on the *issue date*. Premiums may be paid at other intervals approved by *us*. Premiums may not be less than $10. *You* may request a change in premium payment interval by *written notice*.

**PREMIUM CHANGES.** The guaranteed maximum premiums are shown on the policy schedule. Premiums charged at the time of renewal will not exceed the guaranteed maximum premium.

Premiums are based on *our* expectations regarding such factors as mortality, investment earnings, persistency and expenses. Any change in the premium will be based on a re-evaluation of these factors. Any change in premiums will be on a uniform basis for *insureds* of the same *issue age*, gender, and premium class, whose policies have the same initial term period, amount of insurance and length of time in force. *We* will not change the premiums with respect to any changes in the *insured's* health, occupation or other risk factors after this policy takes affect. Premiums for riders may not be changed, except based on duration.


3011 PA                                  5

Appellate Case: 23-1162    Document: 010110860450    Date Filed: 05/16/2023    Page: 333

Any change in the premium schedule will be determined in accordance with the procedures and standards on file with the Department of Insurance of *your* state. Premium schedules for policies in force shall be reviewed whenever the premiums for new issues are changed, but not more often than annually nor less often than once each five years to determine whether premium changes should be made. Notification of premium changes will be sent to *you* at the last known address at least 15 days prior to the effective date of any changes in premium rates.

**GRACE PERIOD.** After the first premium, a 31-day grace period is allowed for premiums not paid on or before due dates. Insurance will continue during the grace period; however, if the *insured* dies during the grace period, the premium due will be subtracted from the death benefit.

**NONPAYMENT OF PREMIUM.** If a premium is not paid by the end of the grace period, the policy will lapse as of the premium due date.

**PREMIUM REFUND AT DEATH.** Unless otherwise provided, the part of any premium paid for the period after the policy month in which the *insured's* death occurs will be included in the death benefit.

# RENEWAL

**RENEWAL PRIVILEGE.** At the end of any term period, but prior to the expiration date, this policy may be renewed for an additional term period if:

(1)   no premium is in default and this policy is in force on that date; and
(2)   the renewal premium is paid within the grace period.

However, in no event will this policy continue in force beyond the expiration date. The initial term period, expiration date and renewal premiums are shown on the policy schedule. Additional one-year term periods begin at the end of the initial term period. The last one-year term period ends on the expiration date.

**AUTOMATIC RENEWAL.** This policy will be renewed and premiums waived if the *insured* is eligible for benefits under a Waiver of Premium Rider attached to this policy. However, in no event will this policy continue in force beyond the expiration date.

# CONVERSION

**CONVERSION PRIVILEGE.** This policy may be converted, without evidence of insurability, to a new single life policy on the life of the *insured* if:

(1)  no premium is in default and this policy is in force on that date; and
(2)  *we* receive a written application before the final *conversion date* shown on the policy schedule; and
(3)  the *insured* is not disabled and eligible for benefits under a Waiver of Premium Rider which is part of the policy.

The new policy may be any permanent plan of insurance made available by *us* for such purpose at the time of conversion. It will be of the same class of risk as this policy if such class exists. If not, the class of risk of the new policy will be a similar class of risk made available by *us* for this purpose. The class of risk of the new policy to which this policy will convert is shown on the policy schedule. The amount of the new policy may not be greater than the amount of insurance under this policy on the *conversion date*.

3011 PA                                          6

**ATTAINED AGE CONVERSION.** The conversion may be made at any time before the final *conversion date* shown on the policy schedule. The *policy date* of the new policy will be the *conversion date*. The premium rate for the new policy will be *our* then published rate at the *attained age* of the insured.

**RIDERS.** Waiver of Premium and Accidental Death Benefit riders may be issued with the new policy only with evidence of insurability and *our* consent. However, if this policy contains an Accidental Death Benefit Rider, such a rider may be included in the new policy without evidence of insurability for a conversion made before *attained age* 55. Also, if this policy contains a Waiver of Premium Rider, such a rider may be included in the new policy without evidence of insurability for a conversion made before *attained age* 55. However, the *insured* must not be totally disabled on the date the application for conversion is made.

**EXTENDED CONVERSION PRIVILEGE.** If disability benefits are being granted before *attained age* 60 under a Waiver of Premium Rider which is part of this policy and the disability continues until the final *conversion date*, waiver of *premium* benefits will continue to the date disability stops. The conversion period will extend for 180 days after the date disability stops, but in no case past the expiration date of this policy.


# GENERAL PROVISIONS

**ENTIRE CONTRACT.** This policy is a legal contract that *you* have entered into with *us*. The entire contract consists of:

(1) this policy;
(2) any riders;
(3) any endorsements;
(4) the attached copy of the application, and any amendments or supplemental applications; and
(5) the applicable policy schedule(s).

Any change in the contract must be written and signed by *our* President, or a Vice President, or the Secretary, or the Assistant Secretary. No one else is authorized to bind *us*.

Statements made in the application for issuance or reinstatement are representations and not warranties. No such statements will be used in defense of a claim under this policy unless contained in a written application and unless a copy of such statement is part of this policy.

**NONPARTICIPATING POLICY.** This policy is nonparticipating. No dividends will be paid under this policy.

**RELIANCE.** *We* have issued this policy based on the answers in the application and supplemental applications. *We* have assumed all such answers to be true and complete. If any are not, *we* may, subject to the Incontestability provision, have the right to void this policy and send back all premiums paid.

**INCONTESTABILITY.** *We* will not contest this policy after it has been in force while the *insured* is alive for two years from the *issue date;* thereafter, *we* may only contest the policy for nonpayment of premiums. If this policy is reinstated, the contestable period will start over again beginning on the reinstatement date, but only for statements made in the application for reinstatement. Riders to this policy may have separate incontestability provisions.

**SUICIDE.** For the first two full years from the *issue date, we* will not pay the death benefit if the *insured* commits suicide (while sane or insane). *We* will void this policy and give back the premiums paid. Riders to this policy may have separate suicide provisions.

**MISSTATEMENT OF AGE OR GENDER.** If the *insured's* age or gender has been misstated on the application, the amount payable will be that amount which the premiums paid would have purchased at the correct age and gender.

**ASSIGNMENT.**  *You* may assign this policy by giving *written notice.*  *We* will not be responsible for the validity of an assignment.  *We* will not be liable for any payments *we* make or actions *we* take before *we* receive *written notice* of an assignment.

**REINSTATEMENT.**  Within five years after *your* policy terminates, *you* may put this policy back in force by *written notice* to *us* if:

(1)  the *insured* provides *us* with evidence of insurability;
(2)  *you* pay all overdue premiums, with interest at the rate of 3% compounded annually from the due date of each premium;
(3)  the *insured* is alive on the date of reinstatement.

However, in no event will this policy be reinstated after the expiration date shown on the policy schedule.

**CONFORMITY WITH LAWS.**  This policy is subject to the laws of the state where the application is signed.

# UNIFI
Companies™

**Application for Insurance**

1010

**Personal Information**

## CHECK ALL COMPANIES THAT APPLY:

☐ **Acacia Life Insurance Company**
P.O. Box 81889, Lincoln, NE 68501
800-745-1112 Fax 402-467-7335
(Client Service Department)

☒ **Ameritas Life Insurance Corp.**
P.O. Box 81889, Lincoln, NE 68501
800-745-1112 Fax 402-467-7335

☐ **The Union Central Life Insurance Company**
P.O. Box 40888, Cincinnati, OH 45240
800-319-6901, Fax 513-595-2352

**1. Proposed Insured (One):**

a) Name: _DIANCA J RUDOLPH_

b) Date of Birth: _12-04-59_  c) Sex: ☐ Male ☒ Female

d) Place of Birth: _PA_

e) Social Security/Tax ID No.: _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_

f) Driver's License or other Government issued picture ID:
_18 800 713_  State: _PA_

g) Home Address: _336 LAKEWOOD ROAD_
City: _Greensburg_  State: _PA_  Zip: _15601_

h) Years at this Address: _23 yrs_

i) Tel. (Home): _724-832-2408_
(Business): _724-836-1777_
Fax: _____
E-mail: _____
Best time to call: _2PM_  at: ☐ Business ☒ Home
In the event you are not available when our interviewer calls, may we speak with your spouse? ☒ Yes ☐ No

j) Residency Status: ☒ U.S. Resident ☐ Other: _____

k) Are you a U.S. Citizen: ☒ Yes ☐ No  If "No," complete Foreign National form UN 0918 and provide the following:
Citizenship: _____
Visa Type: _____  Visa #: _____

l) Employer Name: _THREE RIVERS DENTAL_
Address: _121 DONOHUE ROAD_
City: _Greensburg_  State: _PA_  Zip: _15601_

m) Occupation: _Manager_  Years: _5_

n) Duties: _Manages office_

**2. Owner Information (One): (Complete only if Owner is other than Proposed Insured.)**

a) ☒ Individual  b) ☐ Trust (provide copy)  c) ☐ Partnership

d) ☐ Corporation: County of Incorporation: _____

e) Full Name: _Lawrence P Rudolph_

f) Relationship to Proposed Insured(s): _Husband_

g) Trustee(s) Name: _____

h) Date of Birth or Date of Trust: _01-07-1955_

i) Social Security/Tax ID No.: _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_

j) Driver's License or other Government issued picture ID:
_15 197 171_  State: _PA_

k) Address: _336 LAKEWOOD ROAD_
City: _Greensburg_  State: _PA_  Zip: _15601_

l) Tel. (Home): _724-832-2408_  (Business): _724-836-1771_
Fax: _____  E-mail: _____

m) Residency Status: ☒ U.S. Resident ☐ Other: _____

n) Are you a U.S. Citizen: ☒ Yes ☐ No  If "No," complete Foreign National form UN 0918 and provide the following:
Citizenship: _____
Visa Type: _____  Visa #: _____

o) Multiple Ownership (indicate type):
☐ Joint with Survivorship
☐ Tenants in Common

p) Successor Owner:
Name: _____
Social Security/Tax ID No.: _____

**3. Beneficiary Information:** (Subject to change by Owner.)

a) Primary Beneficiary: _LAWRENCE P Rudolph_
Address: _336 LAKEWOOD ROAD_
City: _Greensburg_  State: _PA_  Zip: _15601_
Relationship to Proposed Insured: _Husband_
Social Security/Tax ID: _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_
Date of Birth or Date of Trust: _01-07-55_

b) Contingent Beneficiary: _ANA BIANCA RUDOLPH (Daughter)_  50%
_JULIAN L. RUDOLPH (SON)_ 50%
Address: _336 LAKEWOOD ROAD_
City: _Greensburg_  State: _PA_  Zip: _15601_
Relationship to Proposed Insured: _Daughter_  _Son_
Social Security/Tax ID: _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_  _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_
Date of Birth or Date of Trust: _06-09-86_  _06-05-90_

UN 2550 PI-A

Edition: 10/2007

292

**UNIFI**
*Companies*

**Ameritas Life Insurance Corp.**
P.O. Box 40888 Cincinnati, OH 45240
800-319-6901, Fax 513-595-2352
(Client Service Office)

## Universal Life/Traditional Life
### Policy Details

1. **Universal Life:**
   a) Specified Amount *(base only):* $_____
      Plan of Insurance:_____
   b) Death Benefit Option:
      ☐ Option A *(Specified Amount)*
      ☐ Option B *(Specified Amount plus Account Value)*
      ☐ Option C *(Return of Premium)*
   c) Life Insurance Qualification Test:
      ☐ GPT *(Guideline Premium Test)*
      ☐ CVAT *(Cash Value Accumulation Test)*
   d) Planned Periodic Premium *(modal):* $_____
      Additional First-Year Premium *(lump-sum deposits):* $_____
   e) Single Life Supplementary Benefits:
      ☐ Accidental Death Benefit Rider: $_____
      ☐ Accounting Benefit Rider: $_____
      ☐ Children's Insurance Rider: $_____
      ☐ Guaranteed Insurability Rider: $_____
      ☐ Scheduled Increase Rider _____%
      ☐ Supplemental Coverage Rider: $_____
      ☐ Term Insurance Rider: $_____
      ☐ Total Disability Benefit Rider: $_____
      ☐ Waiver of Monthly Deduction Rider
      ☐ Other: _____
   f) Survivorship Supplementary Benefits:
      ☐ Estate Protection Rider
      ☐ Policy Split Rider
      ☐ Term Insurance Rider (Insured One)
         ☐ To Age: _____ ☐ Amount: $_____
      ☐ Term Insurance Rider (Insured Two)
         ☐ To Age: _____ ☐ Amount: $_____
      ☐ Total Disability Benefit Rider (Insured One)
         Amount: $_____
      ☐ Total Disability Benefit Rider (Insured Two)
         Amount: $_____
      ☐ Waiver of Monthly Deduction Rider (Insured One)
      ☐ Waiver of Monthly Deduction Rider (Insured Two)
      ☐ Other: _____
   g) Indexed UL Account Allocations:
      ____% Fixed Account: a current interest rate.
      ____% Capped Participation Account: a 100% participation
         rate on a limited percentage increase in the S & P Index.
      ____% Uncapped Participation Account: a lower participation
         rate on unlimited percentage increases in the S & P Index.
      **100** % Total

2. **Term Life:**
   a) Specified Amount: $ *1,000,000*
   b) Plan of Insurance:
      ☐ Term 1    ☐ Term 10    ☐ Term 15
      ☒ Term 20    ☐ Term 30    ☐ Other: _____

2. **Term Life (continued):**
   c) Supplementary Benefits:
      ☐ Accidental Death Benefit Rider: $_____
      ☐ Children's Insurance Rider $_____
      ☐ Waiver of Premium Rider
      ☐ Other: _____

3. **Whole Life:**
   a) Specified Amount: $_____
      Plan of Insurance:_____
   b) Dividend Option:
      ☐ Paid-Up Additions
      ☐ Cash
      ☐ Accumulate at Interest
      ☐ Reduce Premium *(not on monthly modes)*
      ☐ One-Year Term
      ☐ Other: _____
   c) Nonforfeiture Option:
      ☐ Extended Term Insurance
      ☐ Reduce Paid-Up
      ☐ Automatic Premium Loan
   d) Supplementary Benefits:
      ☐ Accidental Death Benefit Rider: $_____
      ☐ Children's Insurance Rider: $_____
      ☐ Guaranteed Insurability Rider: $_____
      ☐ Level Term Rider: $_____
         ☐ 10 yr   ☐ 15 yr   ☐ 20 yr   ☐ 30 yr
      ☐ One-Year Term Rider: $_____
      ☐ Paid-Up Rider:
         Annual Premium: $_____
         Single Premium: $_____
      ☐ Term Paid-Up Rider (TPL): $_____
      ☐ Total Disability Benefit Rider
      ☐ Waiver of Premium Rider
      ☐ Other: _____

4. **Premium:**
   a) Send Premium Notices to: ☒ Residence  ☐ Business
      ☒ Owner   ☐ Other: *(Specify relationship and address)*
      ☐ Insured
      _____
      _____
   b) Premium Frequency:
      ☐ Annual   ☐ Electronic Fund Transfer *(complete EFT form)*
      ☒ Semi-Annual   ☐ Salary Allotment
      ☐ Quarterly   ☐ Other: _____
   c) Has any premium been given in connection with this
      application? ☐ Yes  ☒ No  *(If "Yes," state amount paid
      for which conditional receipt has been given; the terms of
      which are hereby agreed to.)* Amount: $_____
   d) Association Discount:
      ☐ Yes   ☐ No  *(If "Yes," provide IPN.)*
      Association IPN: _____

---

**UN** 2550 PD 1-11 PA                                    02-01-11

# UNIFI
Companies™

**Universal Life / Traditional Life / VUL**
**Financial Information**

**Acacia Life Insurance Company**
P.O. Box 81889, Lincoln, NE 68501
800-745-1112 Fax 402-467-7335
(Client Service Department)

**Ameritas Life Insurance Corp.**
P.O. Box 81889, Lincoln, NE 68501
800-745-1112 Fax 402-467-7335

**The Union Central Life Insurance Company**
P.O. Box 40888, Cincinnati, OH 45240
800-319-6901, Fax 513-595-2352

## 1. Existing and Pending Insurance - Proposed Insured(s):

Proposed Insured One / Proposed Insured Two

**a)** Total insurance in force on the Proposed Insured(s). $2,500,000 $

**b)** Total insurance currently pending with all companies, including this application. $1,000,000 $

**c)** Of the above pending amount, how much do you intend to accept? $1,000,000 $

**d)** Provide information for each policy in force on the Proposed Insured(s). *(Attach additional page if necessary.)*
Proposed Insured: ☒ One ☐ Two
Company: _TRANSAMERICA_
Group, Personal or Business: _PERSONAL_
Issue Date: _2010_
To Remain in Force? ☒ Yes ☐ No
Face Amount: _500,000_

Proposed Insured: ☒ One ☐ Two
Company: _TRANSAMERICA_
Group, Personal or Business: _Personal_
Issue Date: _2004_
To Remain in Force? ☒ Yes ☐ No
Face Amount: _500,000_

**e)** Have you ever sold, assigned, or pledged as collateral a life insurance policy, or an interest in a life insurance policy? ☐ Yes ☒ No *(If "Yes," give details.)* _____

## 2. Existing Insurance (Replacement):

**a)** Do you have any existing life insurance policies or annuity contracts? ☒ Yes ☐ No *(If "Yes," complete a Replacement Notice if required by State Law.)*

**b)** Will any existing life insurance policy or annuity contract with this or any other company be discontinued, reduced, changed, or replaced if insurance now applied for is issued?
☐ Yes ☒ No *(If "Yes," give details.)*
Company: _____ Policy No.: _____
Amount: $_____ Date: _____
Type of Policy: _____

## 3. Insurance Producer's Replacement Statement:

**a)** To the best of your knowledge, does the applicant have any existing insurance policies or contracts? ☒ Yes ☐ No

**b)** To the best of your knowledge, does the policy applied for involve replacement, in whole or in part, of any existing life insurance, annuity, disability income or overhead expense insurance, or any other accident and sickness insurance?
☐ Yes ☒ No *(If "Yes," give details.)*
Company: _____ Policy No.: _____

**c)** Will a policy loan on one or more policies be utilized to pay any portion of the initial premium or deposit on the policy applied for?
☐ Yes ☒ No *(If "Yes," give policy number(s) involved.)*

## 4. Statement of Intent:

**a)** Is there, or will there be, any agreement or understanding that provides for a party, other than the Owner, to obtain any interest in any policy issued on the life of the proposed insured as a result of this application? ☐ Yes ☒ No

**b)** Will the premiums be financed through a loan? ☐ Yes ☒ No *(If "Yes," list: lender, duration of loan, and collateral required.)*

**c)** Will any entity other than a life insurance company be medically evaluating the proposed insured either to obtain financing or to determine life expectancy? ☐ Yes ☒ No *(If "Yes," give details.)*

**d)** Will the policy, if issued, be placed in a trust? ☐ Yes ☒ No *(If "Yes," give details and provide copy of trust.)* _____

## 5. Financial Questions:

Proposed Insured One / Proposed Insured Two

**a)** Gross annual earned income: $45,000 $ *(salary, commissions, bonuses, etc.)*

**b)** Gross annual unearned income: $ 0 $ *(dividend, interest, net real estate income, etc.)*

**c)** Household net worth: $ 11 MILLION

**d)** In the last 5 years, has either of the Proposed Insured(s) or the business had any major financial problems *(bankruptcy, etc.)*?
☐ Yes ☒ No *(If "Yes," give details.)*

**e)** If Owner, other than the proposed insured, is an individual:
Net Worth: $ 11 MILLION
Net Annual Income: $ 350,000
Total Family Income: $ 295,000

## 6. Source of Premiums: *(Check one or more.)*

☒ Current Income    ☐ Cash Savings    ☐ Employer
☒ Securities    ☐ Relative    ☐ Premium Finance
☐ Sale of personal property or real estate.
☐ Insurance/Annuities (Loans/Withdrawals).
☐ 1035 Exchange
☐ Insurance or annuity maturity value or death benefit.
☐ Rollover/Transfer of 401(k) or Pension Funds.
☐ Other: _____

## 7. Business Insurance: *(Complete for ALL Business Owned Insurance.)*

| | Current Year | Previous Year |
|---|---|---|
| **a)** Assets: | $ | $ |
| **b)** Liabilities: | $ | $ |
| **c)** Gross Sales: | $ | $ |
| **d)** Net Income after taxes: | $ | $ |
| **e)** Fair Market Value of the business: | $ | $ |

**f)** What percentage of the business is owned by Proposed Insured(s)? _____ %

**g)** Are other partners / owners / executives being insured?
☐ Yes ☐ No *(If "Yes," give details.)*

# UNIFI
Companies™

## Application for Insurance
### Lifestyle Questionnaire

**Acacia Life Insurance Company**
P.O. Box 81889, Lincoln, NE 68501
**800-745-1112** Fax 402-467-7335
**(Client Service Department)**

**Ameritas Life Insurance Corp.**
P.O. Box 81889, Lincoln, NE 68501
800-745-1112 Fax 402-467-7335

**The Union Central** Life Insurance Company
P.O. Box 40888, Cincinnati, OH 45240
**800-319-6901,** Fax 513-595-2352

**Lifestyle Questions:** *(Please provide details for "Yes" answers.)*

**Has** any person proposed for coverage:

1. Used tobacco or nicotine products in any form within the last five years? *(In Details, provide dates and type: cigarettes, cigars, cigarillos, a pipe, chewing tobacco, nicotine patches, gum, etc.)*  ☐ Yes  ☒ No

2. Ever applied for insurance or reinstatement which has been: declined, postponed, rated, modified; or had any such insurance canceled or a renewal premium refused? (In Details, provide date, reason, and company name.)  ☐ Yes  ☒ No

3. Ever received or claimed: indemnity, benefits, or a payment for any injury, sickness or impaired condition?  ☐ Yes  ☒ No

4. Ever made any flights as: a pilot, student pilot, or crew member of any aircraft? *(if "Yes," complete Aviation Questionnaire.)*  ☐ Yes  ☒ No

5. Been convicted of a moving traffic violation, had any traffic accidents, or had a driver's license revoked or suspended within the past five years?  ☐ Yes  ☒ No

6. Been charged with, or convicted of, or currently awaiting trial on the violation of any criminal law?  ☐ Yes  ☒ No

7. In the next year, any intention of traveling outside the U.S. or Canada or residing outside of the U.S.? *(If "Yes," complete Foreign Travel Questionnaire.)*  ☒ Yes  ☐ No

8. Belong to or intend joining: any active or reserve military, naval, or aeronautic organization? *(If "Yes," complete Military Service Questionnaire.)*  ☐ Yes  ☒ No

9. Engaged in or plan to engage in any form of the following: *(If "Yes," check all boxes below that apply and complete appropriate form(s).)*  ☐ Yes  ☒ No

   ☐ Motorized Racing     ☐ Scuba diving
   ☐ Parachuting/Skydiving ☐ Hang-gliding
   ☐ Ballooning           ☐ Mountain climbing
   ☐ Rodeo                ☐ Competitive skiing
   ☐ Snowmobiling         ☐ Gliding
   ☐ Boat racing          ☐ Other:_____

**Proposed Insured One** - Details for any "Yes" answers to Lifestyle Questions: *(Indicate question number and timeframe.)*

7. See Attached Travel Questionnaire

**Proposed Insured Two** - Details for any "Yes" answers to Lifestyle Questions: *(Indicate question number and timeframe.)*

**Any** person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

UN 2550 LQ

Edition: 10/2007

# UNIFI
Companies®

## Application for Insurance
### Health Questionnaire

**Acacia Life Insurance Company**
P.O. Box 81889, Lincoln, NE 68501
800-745-1112 Fax 402-467-7335
(Client Service Department)

**Ameritas Life Insurance Corp.**
P.O. Box 81889, Lincoln, NE 68501
800-745-1112 Fax 402-467-7335

**The Union Central Life Insurance Company**
P.O. Box 40888, Cincinnati, OH 45240
800-319-6901, Fax 513-595-2352

Name of Proposed Insured: _Bianca Rudolph_

**Health Questions. Please complete Details for "Yes" answers.**

**1.** a) Height: _5'4_  b) Weight: _170_
   c) Have you lost 10 lbs. or more in the past 12 months? ☐ Yes ☒ No
   d) Have you gained 10 lbs. or more in the past 12 months? ☐ Yes ☒ No

**2.** Have you ever been medically treated for or been diagnosed as having:
   a) Disorder of eyes, ears, nose, or throat? ☐ Yes ☒ No
   b) Dizziness, vertigo, fainting, seizures, recurrent headache; speech defect, paralysis, or stroke? ☐ Yes ☒ No
   c) Shortness of breath, bronchitis, pleurisy, asthma, emphysema, tuberculosis or chronic respiratory disorder? ☐ Yes ☒ No
   d) Chest pain, palpitation, high blood pressure, heart murmur, heart attack or other disorder of the heart or blood vessels? ☐ Yes ☒ No
   e) Jaundice, intestinal bleeding; ulcer, hernia, colitis, hepatitis, diverticulitis, recurrent indigestion or other disorder of the stomach, intestines, liver or gallbladder? ☐ Yes ☒ No
   f) Sugar, albumin, blood or pus in urine; sexually transmitted disease; stone or other disorder of kidney or bladder? ☐ Yes ☒ No
   g) Diabetes, thyroid, or other endocrine disorders? ☐ Yes ☒ No
   h) Disorder of breasts, reproductive organs, or prostate? ☐ Yes ☒ No
   i) Neuritis, arthritis, rheumatism, gout, or disorder of or injury to the bones, muscles, nerves, knees, wrists or other joints? ☐ Yes ☒ No
   j) Disorder of skin, lymph glands, cyst, tumor or cancer? ☐ Yes ☒ No
   k) Allergies, anemia or other disorder of the blood? ☒ Yes ☐ No
   l) Spinal, neck or back disorder or injury, including sprains, strains, or disc disorder? ☐ Yes ☒ No
   m) Anxiety, depression, stress or other mental, nervous, psychiatric or emotional disorder? ☐ Yes ☒ No
   n) Chronic fatigue, fibromyalgia, or Epstein-Barr virus? ☐ Yes ☒ No
   o) C-section, miscarriage, or complication of pregnancy? ☐ Yes ☒ No
   p) Any mental or physical disorder not listed above? ☐ Yes ☒ No

**3.** Have you ever consulted a chiropractor? ☐ Yes ☒ No
**4.** Are you currently pregnant? ☐ Yes ☒ No
**5.** Other than noted above, have you within the past five years:
   a) Had a checkup, consultation, illness, injury, or surgery; been a patient in a hospital, clinic, sanatorium, or other medical facility; had an electrocardiogram, X-ray, or other diagnostic test? ☒ Yes ☐ No
   b) Been advised by a licensed medical professional to have any diagnostic test, hospitalization, or surgery which was not completed? ☐ Yes ☒ No

**6.** Within the past ten years, have you ever:
   a) Used marijuana, cocaine, barbiturates, tranquilizers, heroin, LSD, amphetamines, morphine, narcotics; or any other drug, except as legally prescribed by a physician? ☐ Yes ☒ No
   b) Sought or received medical treatment or professional advice; or been arrested for the use of alcohol, cocaine, marijuana, narcotics or any other drug? ☐ Yes ☒ No
   c) Consumed alcoholic beverages? If yes, specify extent? ☒ Yes ☐ No
   _Socially 2 glasses wine per week_

**7.** Have you been diagnosed by a licensed medical professional as having Acquired Immune Deficiency Syndrome (AIDS) or Human Immunodeficiency Virus (HIV)? ☐ Yes ☒ No

**8.** Have any of your immediate family members (parents, brothers and sisters), died of or been diagnosed as having; coronary artery disease, diabetes, cancer, stroke or kidney disease, prior to age 60? ☒ Yes ☐ No

| | Age if Living | Cause of Death | Age at Death |
|---|---|---|---|
| Father: | | diabetes | 58 |
| Mother: | | cancer | 58 |
| Brothers & Sisters: | | | |

**9.** a) Name and address of personal or attending doctor:
   _Mayo Clinic_
   _Scottsdale AZ_
   b) Telephone: _____
   c) Date last consulted: _Dec 2012_
   Reason and any medication/treatment given: _routine colonoscopy_
   d) List any medications (prescription or nonprescription) you are taking currently: _daily multivitamin_

For each "Yes" answer, give details. (Identify: question number, diagnoses, dates, duration, names and addresses of all attending physicians and medical facilities. Attach additional Health Questionnaire page, UN 2550 HQ, if needed.)

_Diagnosed anemic in April 2011 due to heavy menstrual periods. Ablation surgery performed July 2011 to reduce monthly blood loss. Iron supplement taken until levels returned to normal. no further treatment needed_

**UN** 2550 HQ PA

Edition: 10/2007



**UNIFI**
Companies™

# Application for Insurance
### Agreement

**Acacia Life Insurance Company**
P.O. Box 81889, Lincoln, NE 68501
800-745-1112 Fax 402-467-7335
(Client Service Department)

**Ameritas Life Insurance Corp.**
P.O. Box 81889, Lincoln, NE 68501
800-745-1112 Fax 402-467-7335

**The Union Central Life Insurance Company**
P.O. Box 40888, Cincinnati, OH 45240
800-319-6901, Fax 513-595-2352

### Agreement

The undersigned represent that their statements in this application and Part II, if such Part II is required by the companies listed above ("the Companies"), are true and complete to the best of their knowledge and belief. It is agreed that:

(a) the only statements to be considered as the basis of the policy are those contained in the application or in any amendment to the application;

(b) any prepayment made with this application will be subject to the provisions of the CONDITIONAL RECEIPT;

(c) if there is no prepayment made with this application, the policy will not take effect until:

(1) the first premium is paid during the lifetime of the proposed insured(s) and while his/her health and the facts and other conditions affecting their insurability remain as described in this application and Part II, if required; and

(2) the policy is delivered to the Owner;

(d) no one except the President, a Vice President, the Secretary, or an Assistant Secretary can make, alter or discharge contracts or waive any of the Companies' rights or requirements; and

(e) this application was signed and dated in the state indicated.

If applying for an indeterminate premium plan:

(a) the premium for such plan is guaranteed for the initial guarantee period, and after such period, the current annual premium is not guaranteed and may change; and

(b) the premium will never exceed the specified maximum.

Dated at: _Pittsburgh PA_  _02_  _16_  _2014_
City  State  Month  Day  Year

Print or Type Proposed Insured Name: _Bianca T. Rudolph_
X _Bianca T. Rudolph_
Signature of Proposed Insured.

Print or Type Name of Other Proposed Insured.
X
Signature of Other Proposed Insured (if other than policyholder and age 18 or older).

Print or Type Owner if not Proposed Insured. _Laurence P. Rudolph_
X _Laurence P. Rudolph_
Signature of Owner if not Proposed Insured.

Print or Type Insurance Producer Name. _William M Gorman_   _AG00036573-04_   Producer No./Sit. Code.
X _William M Gorman_   _280913_
Signature of Licensed Soliciting Producer.   Producer State Lic. No.

Print or Type Insurance Producer Name.   Producer No./Sit. Code.
X
Signature of Licensed Soliciting Producer.   Producer State Lic. No.

Agency Name. _Pittsburgh Brokerage_   _1351_
Agency No.

### Fraud Notice

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any material false information or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

### Taxpayer Identification Number (TIN)

| Social Security Number | Employer Identification Number |
|---|---|
| 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 | |

Under penalties of perjury, I certify that:

1) The number shown on this form is my correct TIN (or I am waiting for a number to be issued to me); and

2) I am not subject to backup withholding either because: (a) I am exempt from backup withholding; (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends; or (c) the IRS has notified me that I am no longer subject to backup withholding.

3) I am a U.S. Citizen or other U.S. Person (including a U.S. resident alien).

Cross out item (2) if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return.

X _Laurence P. Rudolph_   _02-16-14_
Signature of Owner, Trustee/Employer   Date

3660 AG PA

Edition: 10/2007

# UNIFI

**Companies**

## Part II – Medical

*Identified by Driver license
Pa 18 900413*

**CHECK THE COMPANY THAT APPLIES (only check ONE company)**

☐ Acacia Life Insurance Company
P.O. Box 81889, Lincoln, NE 68501
800-745-1112, Fax 402-467-7335
(Client Service Department)

☐ Ameritas Life Insurance Corp.
P.O. Box 81889, Lincoln, NE 68501
800-745-1112, Fax 402-467-7335

☒ The Union Central Life Insurance Company
P.O. Box 40888, Cincinnati, OH 45240
800-319-6901, Fax 513-595-2218

Proposed Insured: **BIANCA** **T** **RUDOLPH**    Birth Date: **December 04** **1959**
First Name    Middle Name    Last Name    Month    Day    Year

**Health Questions. Please complete Details for "Yes" answers.**

1. a. Height: **64 inch** b. Weight: **173 lbs**
   c. Have you lost 10 lbs. or more in the past 12 months? ☐ Yes ☒ No
   d. Have you gained 10 lbs. or more in the past 12 months? ☐ Yes ☒ No
2. Have you ever been medically treated for or been diagnosed as having:
   a. Disorder of eyes, ears, nose, or throat? . . . . . . ☐ Yes ☒ No
   b. Dizziness, vertigo, fainting, seizures, recurrent headache; speech defect, paralysis, or stroke? . . . ☐ Yes ☒ No
   c. Shortness of breath, bronchitis, pleurisy, asthma, emphysema, tuberculosis or chronic respiratory disorder? ☐ Yes ☒ No
   d. Chest pain, palpitation, high blood pressure, heart murmur, heart attack or other disorder of the heart or blood vessels? ☐ Yes ☒ No
   e. Jaundice, intestinal bleeding; ulcer, hernia, colitis, hepatitis, diverticulitis, recurrent indigestion or other disorder of the stomach, intestines, liver or gallbladder? ☐ Yes ☒ No
   f. Sugar, albumin, blood or pus in urine; sexually transmitted disease; stone or other disorder of kidney or bladder? . . ☐ Yes ☒ No
   g. Diabetes, thyroid, or other endocrine disorders? . . ☐ Yes ☒ No
   h. Disorder of breasts, reproductive organs, or prostate? . ☒ Yes ☐ No
   i. Neuritis, arthritis, rheumatism, gout, or disorder of or injury to the bones, muscles, nerves, knees, wrists or other joints? ☐ Yes ☒ No
   j. Disorder of skin, lymph glands, cyst, tumor or cancer? ☐ Yes ☒ No
   k. Allergies, anemia or other disorder of the blood? . . ☒ Yes ☐ No
   l. Spinal, neck or back disorder or injury, including sprains, strains, or disc disorder? . . . . . . . . ☐ Yes ☒ No
   m. Anxiety, depression, stress or other mental, nervous, psychiatric or emotional disorder? . . . . . . . ☐ Yes ☒ No
   n. Chronic fatigue, fibromyalgia, or Epstein-Barr virus? ☐ Yes ☒ No
   o. C-section, miscarriage, or complication of pregnancy? ☐ Yes ☐ No
   p. Any mental or physical disorder not listed above? . ☐ Yes ☐ No
3. Have you ever consulted a chiropractor? . . . . . . . ☐ Yes ☒ No
4. Are you currently pregnant? . . . . . . . . . . . . . ☐ Yes ☒ No
5. Other than noted above, have you within the past five years:
   a. Had a checkup, consultation, illness, injury, or surgery; been a patient in a hospital, clinic, sanatorium, or other medical facility; had an electrocardiogram, X-ray, or other diagnostic test? . . . . . . . . . . . . . ☒ Yes ☐ No
   b. Been advised by a licensed medical professional to have any diagnostic test, hospitalization, or surgery which was not completed? . . . . . . . . . . . . . ☐ Yes ☒ No
6. Within the past ten years, have you ever:
   a. Used marijuana, cocaine, barbiturates, tranquilizers, heroin, LSD,

amphetamines, morphine, narcotics; or any other drug, except as legally prescribed by a physician? ☐ Yes ☒ No
   b. Sought or received medical treatment or professional advice; or been arrested for the use of alcohol, cocaine, marijuana, narcotics or any other drug? . . . . . . . ☐ Yes ☒ No
   c. Consumed alcoholic beverages? If yes, specify extent. ☒ Yes ☐ No
7. Have you been diagnosed by a licensed medical professional as having Acquired Immune Deficiency Syndrome (AIDS) or Human Immunodeficiency Virus (HIV)? . . . . . . . ☐ Yes ☒ No
8. Have any of your immediate family members (parents, brothers and sisters), died of or been diagnosed as having; coronary artery disease, diabetes, cancer, stroke or kidney disease, prior to age 60? . . . . . . . . . . . . . ☒ Yes ☐ No

|  | Age if Living | Cause of Death | Age at Death |
|---|---|---|---|
| Father: | | Diabetes Coronary artery Disease | 85 |
| Mother: | | Colon Cancer | 58 |
| Brothers & Sisters | 56458 07 | | |

9. a. Name and address of personal or attending physician: *Arizona mayo clinic 13400 E Shea Blvd, Scottsdale Az 85259 Patient # 7 697308. + consult Brother in law occasion*
   b. Telephone: *Mayo Clinic in Arizona 480-301 8000 pt/Dr 7639-308*
   c. Date last consulted: *December 2012 Dr*
   Reason and any medication/treatment given: *Dec 2012 colonoscopy Dr Brohar Agze Mayo clinic Arizona*
   d. List any medications (prescription or nonprescription) you are taking currently: *womens multi Vitamins*

For each "Yes" answer, give details. (Identify: question number, diagnoses, dates, duration, names and addresses of all attending physicians and medical facilities. Attach additional sheet if needed.)
*2 H 1988 + 1999 removal of 2 benign ovarian cyst at Magee Hospital pittsburgh Pa*
*– uterine bleeding on 6/2012 had Ablasion surgery at Mayo clinic in arizona patient #7639308*
*2K. anaemic due to excessive menstrual bleeding*
*5a physical exam at mayo clinic 6/2012*
*– gyn exam yearly Dr Michael Laffretti Bethel Park Pittsbury Pa. 15102*

I, the undersigned, declare that the answers to the foregoing questions relate to the proposed insured, are complete and true as written to the best of my knowledge and belief, are correctly recorded, are made for the purpose of obtaining the insurance and any supplemental benefit applied for and shall form a part of any contract issued by the Companies on this application and the initial application (UN 2550, et al.)

Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any material false information or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime and subjects such person to criminal and civil penalties.

Dated at: **Greensburg** **PA** **3** **26** **14**
City    State    Month    Day    Year

Signature of Proposed Insured: X *Bianca Rudolph*

Witness: *L Maskari* **03 – 26 – 14**
(Must be Examiner)

Signature of Parent or Guardian: _____ If Proposed Insured is under age 18

UN 2598 PA    5/2008

298