1

1      IN THE UNITED STATES DISTRICT COURT
       FOR THE DISTRICT OF COLORADO
2

3      Criminal Action No. 22-cr-0012-WJM

4      UNITED STATES OF AMERICA,

       Plaintiff,
5
       vs.
6
       LAWRENCE RUDOLPH,
7
       Defendants.
8
       ------------------------------------------------------------
9
                    REPORTER'S TRANSCRIPT
10                      (Sentencing)

11     ------------------------------------------------------------

12          Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

13     Judge, United States District Court for the District of

14     Colorado, commencing at 9:38 a.m., on the 21st day of

15     August, 2023, in Courtroom A801, United States Courthouse,

16     Denver, Colorado.

17
                            APPEARANCES
18
            BRYAN D. FIELDS, E. GARRETH WINSTEAD, III, J. BISHOP
19     GREWELL, and KURT BOHN, Assistant U.S. Attorneys, 1801
       California Street, Suite 1600, Denver, Colorado 80202,
20     appearing for the plaintiff.

21          DAVID O. MARKUS, A. MARGOT MOSS, Markus Moss PLLC, 40
       NW Third Street, Penthouse 1, Miami, Florida 33175,
22     appearing for the defendant Rudolph.

23                  MARY J. GEORGE, FCRR, CRR, RMR
                901 19th Street, Denver, Colorado 80294
24          Proceedings Reported by Mechanical Stenography
                Transcription Produced via Computer
25

1              P R O C E E D I N G S

2          (In open court at 9:38 a.m.)

3          THE COURT:  All right.  We are on the record in

4    criminal case No. 22-cr-012, defendant No. 1, United States

5    of America versus Lawrence Rudolph.  I'll take appearances

6    of counsel.

7          MR. FIELDS:  Good morning, Your Honor.  Bryan

8    Fields for the United States.  And I'm joined by AUSA Kurt

9    Bohn, Garreth Winstead, Bishop Grewell, and Special Agent

10   Donnie Peterson.

11         THE COURT:  Good morning to all of you.  For the

12   defendant.

13         MR. MARKUS:  Good morning, Your Honor.  David

14   Markus and Margot Moss here for Larry Rudolph.  Good

15   morning.

16         THE COURT:  Good morning to the three of you.

17         Probation officer please identify himself for the

18   record.

19         PROBATION OFFICER:  Ryan Kinsella on behalf of

20   probation, Your Honor.  Good morning.

21         THE COURT:  Officer Kinsella, welcome.  Good

22   morning.

23         Mr. Rudolph, I'm going to ask you to turn and stand

24   and face my courtroom deputy who will administer the oath to

25   you.

1      COURTROOM DEPUTY:  Please raise your right hand for

2  me.

3      (Defendant sworn in)

4      THE COURT:  All right.  The record reflects that on

5  August 1st, 2022, a jury of his peers convicted Mr. Rudolph

6  of the following two counts of the superseding indictment

7  returned against him by the grand jury:  Count 1, foreign

8  murder in violation of 18 United States Code Sections 1119

9  and 1111, and Count 2, mail fraud, and the aiding and

10  abetting of same, in violation of 18 United States Code

11  Sections 1341 and 2.

12      We're here for the sentencing of the defendant.

13  Will counsel please briefly summarize your respective

14  sentencing recommendations.  Mr. Fields, let's begin with

15  you.

16      MR. FIELDS:  Yes, Your Honor.  The Government is

17  seeking life imprisonment for Count 1, the foreign murder; a

18  concurrent 20-year sentence for Count 2, the mail fraud;

19  restitution in the amount of $4,877,744.93; a fine of

20  $9,755,489.85; forfeiture as set forth in the preliminary

21  order of forfeiture at ECF No. 354; and a special assessment

22  of $200.

23      THE COURT:  Your motion referenced an upward

24  variance that's being sought by the Government.  What's the

25  upward variance you're seeking?

4

1              MR. FIELDS:  It would be the fine amount, Your

2    Honor.  Instead of using the fine table, we would seek the

3    $9 million fine under the alternative fine provision of the

4    statutes.

5              THE COURT:  All right.  I thought your argument was

6    under one of the guideline sections with respect to that

7    increased amount of a fine so that it would be actually an

8    upward departure.

9              MR. FIELDS:  Sorry, Your Honor.  Yes.

10             THE COURT:  Is that what we're talking about?

11             MR. FIELDS:  Yes.

12             THE COURT:  All right.  Who's going to speak for

13   the defendant?

14             MR. MARKUS:  Good morning, Your Honor.

15             THE COURT:  Good morning, Mr. Markus.

16             MR. MARKUS:  I think on Count 1, there's no

17   discretion; it is a mandatory life sentence, so -- so we

18   understand that to be the case.  And so with that, I think

19   it renders whatever sentence on Count 2 practically

20   doesn't -- doesn't really matter because of the life

21   sentence on Count 1.

22             On the fine, restitution, and forfeiture, I know

23   Ms. Moss is going to be handling that part so I'll let her

24   speak to -- as to each one of those.

25             THE COURT:  All right.  Ms. Moss.

1          MS. MOSS:  Your Honor, our position as to the

2    restitution is that we agree as to the amount; the amount is

3    the insurance proceeds.  What we will be talking about today

4    is who is that going to be payable to.

5          As far as the restitution, it is our position that,

6    at most, the Court -- I'm sorry, as to forfeiture, that, at

7    most, the Court can issue a forfeiture order for, again, the

8    amount of the insurance proceeds, which was the 4.8 million.

9          And as to the fine, Your Honor, our position is

10   that Larry Rudolph is not able to pay a fine and so the fine

11   should be zero.

12         THE COURT:  All right.  Thank you, ma'am.

13         All right, I'm going to turn next to objections to

14   the presentence report.  I note that no objections were

15   filed by the Government.  The defendant filed several

16   objections at ECF 295.  The first objection was to the

17   summary of the facts contained in the presentence report

18   authored by the probation officer.  The defendant --

19         MR. MARKUS:  Sorry, Your Honor.

20         THE COURT:  Go ahead, Mr. Markus.

21         MR. MARKUS:  Oh, I didn't mean to interrupt, Your

22   Honor.  I'm sorry.

23         THE COURT:  I wasn't -- I don't need additional

24   counsel argument on this objection.

25         MR. MARKUS:  Sure, Your Honor.  We didn't want to

1    be heard as waiving our rights to challenge those facts on

2    appeal because we believe the record from the trial speaks

3    for itself.

4         THE COURT:  All right.  The defendant objects to

5    the summary of facts set forth in paragraphs 7 through 109

6    of the final revised report as being based on a skewed

7    interpretation of those facts by the Government.  The

8    analysis and argument in support of this objection is

9    minimal, consisting of only three sentences, barely even

10   raising what I believe would be a skeletal outline of the

11   nature of the argument being made.

12        The Tenth Circuit has stated repeatedly that

13   purporting to raise an argument in such a cursory manner and

14   then failing to develop it constitutes waiver of the

15   argument, citing *Bronson v. Swenson*, 500 F.3d 1099.  For

16   this reason, the defendant's first objection is overruled as

17   waived.  That objection -- that's for purposes of the

18   objection.  Mr. Markus, I understand your position with

19   respect to an appeal issue.

20        With respect to the second objection by the

21   defendant, it's an objection to the sentencing enhancement

22   recommended to me by the probation officer; that being a

23   two-level increase in the offense level for obstruction of

24   justice under guideline Section 3C1.1.  With respect to the

25   second objection, I'm also not in need of any additional

1    attorney argument.  I'm prepared to rule on it.  This

2    guideline provision states that if a defendant, quote,

3    willfully obstructed or impeded, or attempted to obstruct or

4    impede, the administration of justice, end quote, at any

5    point during the case, the base offense level is to be

6    increased by two levels.

7            I find that the Government has established by at

8    least a preponderance of the evidence four separate and

9    independent bases for the imposition of the sentencing

10   enhancement.  First, there was the testimony at trial from

11   Casius Mwiinga, the Zambian funeral director, that the

12   defendant offered him a bribe in exchange for Mr. Mwiinga's

13   assistance in canceling the forensic medical examination of

14   Bianca Rudolph's body.  Such an examination would reveal,

15   among other things, the approximate distance from which the

16   fatal gunshot blast that killed Ms. Rudolph was fired.

17           I agree with the Government that a bribe of this

18   type plainly constitutes obstruction.  In making this

19   determination, I find that the trial testimony of

20   Mr. Mwiinga in regards to this attempted bribe to be highly

21   credible and not inconsistent with any other portion or

22   aspect of his testimony.

23           Second, we have the trial testimony of one of the

24   key witnesses in the case, professional hunter and guide

25   Mark Swanepoel.  On cross-examination, the defendant's

testimony revealed the fact that he had sought to curry

favor with Mr. Swanepoel who was one of the most important

witnesses to what had happened on the morning of Bianca

Rudolph's murder.

Clearly in this role Mr. Swanepoel was someone who

had personal information that could be used against the

defendant in a criminal proceeding.  Specifically

Mr. Rudolph's testimony established that on the 12th of

December of 2016, two days after he was contacted by a

private investigator regarding his wife's death, the

defendant signed documents committing to a $20,000 loan to

Mr. Swanepoel for the purpose of funding a business in

Zambia.

I agree with the Government that whether

Mr. Swanepoel was subjectively influenced by these efforts

is immaterial.  What matters is that the defendant took

action to create goodwill towards this witness at precisely

the time that he was most in need of a favorable reference

from his long-time hunting guide and friend.  I note that

guideline Section 3C1.1, application note 4A, expressly

references an attempt to influence a material witness as an

example of obstruction.

Third, Otto Westhassel, the United States consular

official who testified at trial, testified that the

defendant did not just express anger over the fact that

1    consular officials had gone to the SFG Ideal Funeral Home to

2    inspect and photograph Bianca Rudolph's body, Mr. Westhassel

3    testified that the defendant, in a very harsh and direct

4    manner in the course of a telephone call, forcefully

5    demanded that all evidence related to this visit to the

6    funeral home be located and destroyed.

7         On top of that, according to Mr. Westhassel's

8    testimony, the defendant personalized the interaction by

9    making it clear to Mr. Westhassel that he, the defendant,

10   had done extensive research on his background and career,

11   and he did so in such a way as to intimidate and inspire

12   fear in Mr. Westhassel.

13        Mr. Westhassel also testified that this phone call

14   left him so rattled and so fearful of the defendant that he

15   took diplomatic security with him for his in-person meeting

16   with Mr. Rudolph the following day, something which he had

17   not previously done in his long diplomatic career.

18        I find that this interaction with the consular

19   official clearly constitutes an attempt by the defendant to

20   intimidate and influence a witness, which is all that the

21   guidelines require for imposition of the obstruction

22   enhancement.

23        Finally, as it pertains to Mr. Westhassel and his

24   trial testimony on this topic, I find that it was highly

25   credible and not inconsistent with any other portion or

1        aspect of his testimony.

2                The final grounds for this enhancement is the

3        defendant's own testimony that, even as an avid hunter and

4        with decades of experience owning and handling firearms,

5        that he had a -- and that he had a fully functional shotgun

6        with him -- or in his possession, but he had it picked up by

7        an untraceable trash removal service after being contacted

8        by the FBI about his wife's death.

9                I find by a preponderance of the evidence that

10       Mr. Rudolph was well aware that this shotgun was a critical

11       piece of evidence in this case and that he intentionally

12       sought to prevent this examination by the FBI in disposing

13       of the firearm in this careless and cavalier manner.   I

14       further find that the defendant's protestations to the

15       contrary, and his lame attempts at a purportedly innocent

16       explanation of this bizarre behavior, to be utterly devoid

17       of credibility and I fully reject them.

18               As such, this is yet another separate and ample

19       ground supporting the imposition of the obstruction

20       enhancement as to Mr. Rudolph.

21               For all these reasons, and although it does not

22       make a difference in terms of the ultimate guideline

23       sentence, the defendant's second objection to the

24       obstruction of justice sentencing enhancement is overruled.

25               The third objection of the defendant is to the

11

1    report's recommendations regarding the imposition of a fine,

2    forfeiture, restitution, and ability to pay.  I will reserve

3    rulings on the defendant's third objection to the report's

4    recommendations regarding these issues of restitution,

5    forfeiture, fine, and ability to pay until later in the

6    hearing when I take up each of these matters separately and

7    in a more detailed fashion.

8         Neither the Government nor the defendant challenge

9    any other aspect of the presentence report.  I therefore

10   find that the remaining factual statements and guideline

11   applications in the report are adopted without objection as

12   the Court's findings of fact concerning sentencing.

13        I find, in addition, that the total offense level

14   in this case is 43.  The probation officer has determined

15   the defendant's Criminal History Category to be I, yielding

16   a guideline sentence of life imprisonment on Count 1, and a

17   guideline sentence of 240 months on Count 2.

18        With respect to Count 2, there is also a guideline

19   period of supervised release of one to three years.  The

20   fine range under the guidelines is 50,000 to $250,000, and

21   there's a special assessment of $200.

22        Subject to any objection a party may have to my

23   rulings on the defendant's objections, do counsel agree the

24   Court has correctly calculated the guideline sentences in

25   this case?  For the Government?

1          MR. FIELDS:  We agree with those calculations, Your

2     Honor.

3          THE COURT:  Thank you.  For the defendant.

4          MR. MARKUS:  Yes, Your Honor.

5          THE COURT:  All right.  All right, next I'm going

6     to take up the motions by the parties respecting the

7     sentences to be imposed in this case.  The first one is the

8     Government's sentencing statement and motion for an upward

9     variance, which I have construed as a motion for an upward

10    departure with respect to a fine.  That was filed at ECF

11    270.  And I also take up the defendant's sentencing

12    memorandum filed at ECF 335 attachment 1.

13         I would like counsel to address both sentencing

14    filings in their arguments and remarks at the same time.

15    Mr. Fields, if you'll take the lectern, I'll hear from the

16    Government first.

17         MS. MOSS:  Your Honor, if I may, I think we should

18    handle the fine last.  I think it will make a difference

19    after the Court has ordered restitution and forfeiture so

20    that we see what those amounts are to see whether there is

21    going to be any ability to pay a fine.

22         THE COURT:  Okay.  So what I'm going to do is right

23    now I'm just going to hear arguments with respect to the two

24    sentencing motions -- I'll call them that -- that the

25    parties have filed.  And then I will go into the three

1    separate matters of restitution, forfeiture, and fine, and

2    I'll see if counsel have evidence to put on as to any one or

3    more of them, and we'll approach it in that fashion.  Is

4    that acceptable to you, Ms. Moss?

5              MS. MOSS:  Yes, Your Honor.

6              THE COURT:  All right.  Mr. Fields, if you'll take

7    the lectern.

8              MR. FIELDS:  Thank you, Your Honor.  With regard to

9    the fine, I think it's worth pointing out here just how the

10   defendant's wealth enabled him to commit this crime.  At the

11   end of the day, this was a financial crime.  Rudolph's

12   substantial wealth gave him the means to commit it and an

13   aura of impunity that made him think he could get away with

14   it.

15             Greed pushed him to reap every dollar he thought he

16   could get from Bianca's death and the Court's punishment

17   here should be measured against the financial depravity of

18   the defendant's crimes.  The defendant at one point in time

19   claimed to be worth $27 million.  Since these proceedings,

20   he's refused to cooperate with probation, to provide any

21   clarity regarding his financial resources.  And as a result,

22   the guidelines here -- he has the burden -- the guidelines

23   here require that a fine should be paid and that fine should

24   be measured against, again, his stated wealth.

25             If you go through the various factors in 5.E, first

1    is just the crime itself; the heinous nature of this murder.

2    The Court's already found through many of its obstruction

3    counts how his financial means enabled him to commit this

4    crime.  He was evil to travel to remote Zambia and kill his

5    wife in one of their most precious places; again, due to his

6    wealth.  Then he used that money to try to bribe a mortuary

7    worker; again, thinking that his wealth was going to enable

8    him to get away with this.  That he's this rich American.

9    "No one's going to be able to touch me."  And he starts

10   using that wealth to advance this narrative.

11          Then you have the way he used his wealth to dispose

12   of the shotgun.  You have the way that he's clothed himself

13   in wealth throughout these proceedings.  He said that he was

14   going to build himself a private prison so the Court

15   shouldn't detain him.  He has claimed throughout these

16   proceedings that he has so much money he would never have

17   committed a murder for more money.  All of these things go

18   to the financial nature of this crime.

19          And then add to that the facts in the trial record

20   showing that a lot of the run-up to Bianca's death focused

21   on her increasing concern about her vulnerability to not

22   having access to the finances.  The Court may recall during

23   the trial testimony just a few weeks before they left for

24   Zambia, Bianca finally, after years of marriage, got a

25   signature on one of their main investment accounts.

15

1      The defendant's lust for control over every aspect

2  of his finances and the way he used those finances to

3  exercise control is one reason that the Court should impose

4  a substantial financial penalty in this case.

5      In terms of the other factors the Court must

6  consider under 5.E, evidence of ability to pay.  There's

7  substantial evidence in the record here, including the

8  defendant's own expert report at trial.

9      There's the burden on the defendant and dependents.

10  The defendant has no dependents.  There's restitution.  The

11  defendant has claimed, again, to be worth $27 million.

12  There's more than enough money to pay full restitution in

13  this case, forfeiture, and the fine on top of that.

14      Previous fines for similar offenses, there's

15  nothing like that here.  The expected costs of imprisonment

16  are another factor weighing in favor of a fine, and then

17  there's other equitable considerations.  So in that respect,

18  Your Honor, when we talk about the fine and we talk about

19  whatever the defendant has left in terms of his wealth,

20  another equitable consideration here is making sure, as

21  almost a prophylactic measure, that the defendant has no

22  money to enable him to continue to manipulate those around

23  him.  No money to file sham lawsuits against people who he

24  feels may have wronged him.  No money to seek vengeance

25  against others who may have wronged him.  No money to, you

1    know, potentially hire hit men, or whatever else the case he

2    may want to do, as was alleged at the detention hearing.  No

3    money to exercise any more control over anyone else.

4         There is the concern, as some of the victims have

5    raised about, you know:  What about this money going to an

6    inheritance, or something like that?  Other, you know,

7    nondependents but the children in the family here.  And our

8    response to that, Your Honor, is that while we -- we are

9    deeply concerned about the victims in this case, the problem

10   is at this stage of the proceedings, it's very difficult to

11   figure out ex ante, what money belongs to Rudolph versus

12   Bianca's estate, and what money should actually go to anyone

13   else.

14        The Government's been in contact with the attorneys

15   for the victims.  And our stance on this is that the Court

16   should impose a fine, but that we can work with the

17   children's attorneys after the fact to figure out which

18   assets truly belong to the estate that should be passed

19   along to the children, and which assets belong to Lawrence

20   Rudolph.

21        Assets that belong to Lawrence Rudolph should be

22   collected pursuant to the powers of the Government to

23   collect on the fine.  Anything else should go to the

24   defendant's children.

25        For all of these reasons, the Government believes

1    that a substantial fine in this case is in the interest of

2    justice and consistent with the law and the factors in 3553.

3             THE COURT:    The -- you made reference to the

4    letters from the victims.    I believe you're referring

5    specifically to Julian Randolph's letter, and the one that

6    we received this morning, or from last night.    The point

7    he's making is that while everything hasn't been settled in

8    terms of the money and where all the money is going, that if

9    I impose anything like a $10 million fine in this case, it

10   will certainly adversely affect him and his sister who --

11   and is very pointed in her very poignant letters from --

12   right subsequent to the trial, point out that, apart from

13   Bianca Rudolph, who lost her life in this tragedy, they are

14   the victims that have suffered the most.    They are children

15   of parents, one of whom is dead and the other parent caused

16   the death of that other parent.

17             And I think most of us here can't begin to imagine

18   what they have gone through.    And I think he raises a pretty

19   good argument for -- especially when the guideline limit is

20   250,000, that I can impose something that's in the multiples

21   of that and still not come anywhere near 10 million, and

22   increase the likelihood that they will be in receipt of some

23   of those funds to at least begin to ameliorate what they've

24   gone through.

25             MR. FIELDS:    Your Honor, we -- no one can

1    understand what they're going through right now and I can't

2    imagine how difficult this must be.  Unfortunately, at the

3    end of the day, unless the Court orders a fine, the money

4    does not belong to them; it belongs to Lawrence Rudolph.

5    And the idea that Lawrence Rudolph, who murdered their

6    mother, who had so little consideration for them that that

7    is what he did, and then proceeded to move in with Lori

8    Milliron, spoiled her kids with vacations and other sort of

9    financial rewards, the idea that Lawrence Rudolph out of the

10   goodness of his heart is going to give them any of that

11   money is a fiction and in the Government's view a further

12   manipulation.

13            The Court should order a fine here to make sure

14   that Rudolph is not in control; that he is not able to use

15   any of his money for any of that.  If the Court orders a

16   fine, the Government can work with the children's attorneys

17   *post hoc* to make sure that they are -- they get all of the

18   assets that they're entitled to.  The Government can work

19   with those attorneys, and will work with those attorneys, to

20   make sure that the children get the money and Rudolph does

21   not.  And that's the important consideration.

22            THE COURT:  But isn't another important

23   consideration here -- let's look at those factors you've

24   enumerated and how they should be read.  I think the -- in a

25   typical case -- which this is not -- those factors should be

1    read in the context of a punitive fine to punish the -- to

2    further punish a defendant apart from a custodial sentence

3    for the commission of the crime, to deprive him or her of

4    funds that they may be able to use for their own individual

5    benefit and pleasure, and however else they want to spend

6    it.

7         In this case, we have a statutory mandatory life

8    sentence, as you know.  Parole has been abolished in the

9    federal criminal justice system so we're talking effectively

10   a life sentence without parole.  So there's not much that

11   the defendant individually, personally, will benefit from

12   any of these funds.  I understand that the hypotheticals you

13   listed before that -- he could do and might do, which is not

14   inconsequential and has some merit, but I think the main

15   thrust of the fine cases and the fine guideline discussion

16   and the annotations have to do with depriving a defendant of

17   the pecuniary gain that he would have if that money is not

18   ordered paid as a fine to the crime victim's fund.  And in

19   this case, he's not going to enjoy much in his prison cell.

20        MR. FIELDS:  I agree with that, Your Honor.  But

21   even from within a prison cell, the defendant can use that

22   substantial financial wealth to have his agents exact

23   whatever revenge he wants.  File sham lawsuits.  He could

24   give it all to Lori Milliron; he could give all to Lori

25   Milliron's kids.  He could exact all sorts of instances of

20

1    spite and vengeance, even while he's in a prison cell using,

2    again, that substantial wealth.  That is his power, that is

3    his control, and that's what he spent a lot of the run-up to

4    Bianca's death trying to protect.

5         And I think there's a good argument to say that it

6    was the fact that he might lose some control over that money

7    that caused him to kill Bianca Rudolph.  The money is

8    central to Rudolph's motives here.  It's central to his

9    sense of control and self-worth and a substantial financial

10   penalty here is the sort of thing that is going to, I think,

11   ring loud and clear to the defendant exactly what he did and

12   why he should be punished for it.

13        THE COURT:  All right.  Let's move on beyond the

14   fine.  Is there -- are there any other remarks or arguments

15   you'd like to put on the record in support of your

16   sentencing statement?

17        MR. FIELDS:  May I just consult with my --

18        THE COURT:  Sure.  And just to clarify how I'm

19   organizing this hearing, that's apart from any evidence

20   you're going to put on with respect to forfeiture or

21   restitution.

22        MR. FIELDS:  Yes, Your Honor.

23        Your Honor, I guess just one last point and it's

24   just a point of emphasis.  The defendant can continue to use

25   that money to manipulate his children as well.  So I think

1    it's worth, again, sort of the hope that they're going to

2    get the inheritance; we hope that they get all the money

3    that they're entitled to.  But unless the Court orders a

4    fine, there's no guarantee of that because any money left

5    over would belong to this defendant.

6         So I know that they've pursued a civil judgment.

7    It's worth noting that sort of in their civil judgment they

8    have a default judgment saying that they're entitled to

9    Bianca's estate, and it's premised on this idea that it's

10   Arizona community property laws.  But the Court will recall

11   one of the substantial issues the defendant raised during

12   the trial was that idea that Bianca doesn't have much of an

13   estate at all because she signed this postnup giving him

14   almost everything and her almost nothing.

15        And the Court will also recall as part of the

16   correspondence over the negotiation of that postnup, there

17   was very little regard for the children or for their future.

18   And I think that's an indication of who this defendant is.

19   He is someone who murdered his children's mother out of

20   spite and to maintain the sense of control.  And so, again,

21   the fine and the sentence here should reflect all that.

22        And with that, Your Honor, I have nothing further

23   to add.

24        THE COURT:  Let me ask one other thing of you.  Are

25   you -- do you want to comment on the sentence for Count 2?

1       We have a guideline sentence here of 240 months.  That's not

2       binding on me.  I know in some ways it's an academic point,

3       given the life sentence, but you might want -- if you do

4       want to put something on the record with respect to the

5       Government's position on the sentence on Count 2.

6               MR. FIELDS:  Thank you, Your Honor.  So with regard

7       to Count 2, the 3553 factors -- (a) factors certainly

8       support that guideline sentence of 20 years.  The means of

9       the fraud was a murder.  And while, you know, it might seem

10      like an academic point because he's going to spend the rest

11      of his life in prison, the law has expressive value and one

12      of those factors the Court must consider is sort of respect

13      for the law, general deterrence, what will everyone think

14      about this crime?  And a maximum sentence of 240 months in

15      prison for the fraud should convey to anyone who might be

16      thinking about traveling to some foreign locale, thinking

17      that they're going to get away with a murder because they

18      plotted sort of the perfect crime, they might have second

19      thoughts about it.  They might realize that the long arm of

20      the FBI is long indeed and that it will find them and it

21      will make sure that they are held accountable to the maximum

22      extent of the law.

23              All of those things are important, even if it might

24      seem academic.  And so for those reasons, a 20-month [sic]

25      sentence on the mail fraud is also worth imposing here.

1           THE COURT:  All right.  Thank you.

2           All right, Ms. Moss, if you'll take the lectern.

3    I'll hear from the defendant.

4           MS. MOSS:  Your Honor, I'll speak first on

5    generally to the fine because I think we can speak in detail

6    later on about showing our defense exhibits and showing --

7           THE COURT:  Right.

8           MS. MOSS:  -- the inability to pay the fine.  But

9    what I'd like to start off saying is that the Government

10   knows that the money does not belong to Larry Rudolph, and

11   for them to say that I think is incorrect before this Court.

12          They know that Julian Rudolph, the victim and the

13   son of Bianca Rudolph, has power of attorney over these

14   accounts and is the trustee over the Rudolph Trust.  So he

15   is the one that has power and control over this money; not

16   Larry Rudolph.

17          And we had had a year now since the conviction.

18   The Government has said that they believe that Dr. Rudolph

19   is somehow from a jail cell going to exercise all of this

20   control and vengeance to use this money; however, again,

21   it's not in his control and we had a year of experience to

22   see that he has done absolutely nothing like what the

23   Government has suggested.

24          Today is the day to set the fine.  And we cannot

25   trust that the Government is going to do what is right by

1    the children of Bianca Rudolph, the victims of Count 1,

2    after today.  I know that the Government has said that they

3    have been speaking with the attorneys of Julian and Bianca

4    Rudolph, yet what they failed to inform the Court is that

5    they refuse to give priorities to the children and to give

6    them superiority rights to this money.  We've addressed

7    briefly this default judgment and I'll get to that more in a

8    second.

9            What I did not also hear from the Government's

10   remarks in talking about a fine is, yes, a fine is meant to

11   be punitive, but 18 U.S.C. 3572 and sentencing guideline

12   Section 5E1.2, tells the Court what factors that it must

13   consider in imposing a fine.  And the primary factor is the

14   defendant's ability to pay a fine in light of his future

15   income, his earning capacity, and his financial resources.

16           And as I said to the Court, later we will go into

17   detail to show and to demonstrate that he does not have the

18   ability to pay a fine.

19           THE COURT:  Any fine, or just not $10 million in a

20   fine?

21           MS. MOSS:  Your Honor, I think we will know more

22   after the Court has made a decision on the forfeiture as to

23   what is left in the net worth.  So I -- our position now is

24   he has no ability to pay a fine, and we'll go over the

25   details in a little while.

25

1           You know, what the Government here, though, is

2    asking for is this astronomical fine, and they have not

3    cited a single case that would support the type of fine that

4    they are seeking here, over $9 million.  They've cited one

5    case, which is the *United States v. Ferranti*, which is at

6    928 F.Supp 206, in the Eastern District of New York from

7    1996, to support this massive fine.  Again, the fine in

8    *Ferranti* was something that was something significantly

9    lower, and the Court noted in that --

10           THE COURT:  How much lower?

11           MS. MOSS:  It was 2.9 million, so it was much less.

12           THE COURT:  All right.

13           MS. MOSS:  And the Court noted in that case that

14    after payment of the fine and restitution, that the

15    defendant would still be in retention of significant assets,

16    which is not the case that we have here.

17           And so, again, I -- I come back to the true victims

18    in this case, to the children of Bianca Rudolph,

19    Dr. Rudolph:  AnaBianca and Julian Rudolph.  There is a

20    default judgment in the Arizona court that states that the

21    money that should have passed to Bianca Rudolph's estate

22    upon her death should go to the children now.

23           Now, the Government has raised this issue of a

24    postnup.  And I'll remind the Court that this is a

25    postnuptial agreement that they argued and they pressed even

with their own witnesses was a fraud, and, now they are
saying that that cancels out the default judgment.  The
Government knows that -- because of this slayer statute the
Government knows there was testimony about the postnup and
so the default judgment in Arizona is valid.  So any fine
that the Court imposes here today is going to be competing
with this default judgment against the victims, which means
that any fine that's imposed, any dollars that are imposed
in fines, means dollars less to the victims in this case.

          And I realize we are arguing here for the victims,
and this is something that the Government should be doing,
but it comes down to the fact that, again, fine is meant to
be punitive.  But all that's going to be happening here,
Your Honor, is that Bianca's children, Julian and AnaBianca,
are going to be the ones who are punished, and so the Court
should not impose a fine.

          We also filed a sentencing memorandum, Your Honor,
addressing Larry Rudolph's long, detailed and documented
medical history.  And we included the medical records that
speak to Dr. Rudolph's long-standing heart issues, the heart
surgeries that he has had, and the issues and complications
that arise from that.

          And I believe the Government in their response to
our sentencing memorandum stated that they have no objection
to Dr. Rudolph going to a medical facility, and we would ask

27

1    the Court to recommend the Butner Medical Facility in

2    North Carolina.

3        THE COURT:  All right, what I will do is -- because

4    the Government does not object, and because I think it's

5    appropriate, I will recommend to the director of the Bureau

6    of Prisons that your client be designated to an appropriate

7    medical facility, but one that's appropriate to his security

8    designation.  So I'm not going to recommend to the director

9    any particular facility.  I'll let BOP make that decision

10   but I do agree, and the Government does not agree, that

11   there will be a recommendation to a facility with the

12   necessary medical resources.

13        MS. MOSS:  One moment, Your Honor.

14        Your Honor, Mr. Markus pointed out to me that part

15   of the reason why we were asking the Court to recommend

16   Butner, not only because it's a medical facility that

17   Dr. Rudolph needs, but also because it is located in the

18   closest position to his children, so that they are able to

19   visit him.

20        THE COURT:  Well, one child is in Pennsylvania and

21   one is in Florida, so --

22        MS. MOSS:  Yes, Your Honor, and the other medical

23   facilities -- or medical institutions are in Minnesota and

24   other western locations, and so that is the one that is the

25   closest.  It's not in the same state, but it is still much

28

1    closer.

2              THE COURT:  All right.  I've heard your argument.

3    Do you wish to address anything other than the fine or

4    anything else that's included in your sentencing statement

5    with respect to Counts 1 or 2 and any legal argument you

6    wish to make on those?

7              MS. MOSS:  No, Your Honor.

8              THE COURT:  Okay.  All right, let's turn to

9    restitution.  Does the Government intend to put on any

10   evidence with respect to the issue of restitution?

11             MR. BOHN:  We do, Your Honor.  We have a witness

12   and then evidence, which is in the notebook you've been

13   provided.

14             THE COURT:  All right.  And that's distinct from

15   evidence with respect to forfeiture?

16             MR. BOHN:  I'm going to put on the evidence for

17   restitution and forfeiture at the same time.  I would like

18   to argue them separately.

19             THE COURT:  Okay.  How many witnesses do you have?

20             MR. BOHN:  One.

21             THE COURT:  One.  Does the defendant have a witness

22   on the issue of restitution or forfeiture?

23             MS. MOSS:  No, Your Honor.  And if I may just say,

24   I believe that the witness that the Government wishes to

25   call for restitution is going to be testifying to the

1      amount, and we are not disputing the amount of restitution

2      that is owed here.  So I don't know if it's necessary for

3      that purpose but we leave it to the discretion of the

4      Court.

5              THE COURT:  Okay.  We can streamline that,

6      Mr. Bohn, since the defendant is not objecting.  I think you

7      should, in terms of making wise use of our time, concentrate

8      on forfeiture.  But the main thing I'm -- I want to get to

9      with respect to whether defendant has witnesses either as to

10     either issue is whether I should be entertaining a motion to

11     exclude witnesses?

12             MS. MOSS:  No, Your Honor.

13             THE COURT:  Okay.  So we won't do that.  All right.

14     With respect to the issue of -- issues of forfeiture and

15     restitution, the Government may call its first witness.

16             MR. BOHN:  Thank you, Your Honor.  At this time the

17     Government calls Tyson Polski to the stand.

18             COURTROOM DEPUTY:  Please raise your right hand.

19             TYSON POLSKI, GOVERNMENT'S WITNESS, SWORN

20             COURTROOM DEPUTY:  Thank you.  Please be seated.

21     Please state your full name for the record and spell your

22     first and last names for us.

23             THE WITNESS:  My name is Tyson Polski.  T-y-s-o-n,

24     P-o-l-s-k-i.

25                     DIRECT EXAMINATION

DIRECT - POLSKI

1    BY MR. BOHN:

2    Q.    Very good.  Good morning.  Sir, how are you employed?

3    A.    I'm employed by the United States Marshal Service.

4    Q.    And, sir, tell the Court, where are you currently

5    assigned?

6    A.    I'm assigned to the United States Attorney's Office in

7    the District of Colorado.

8    Q.    And what are your duties there?

9    A.    I assist the Department of Justice agencies with

10   financial investigations involving forfeiture.  I trace

11   funds, I help locate assets, perform financial analysis, and

12   sometimes draft search and seizure warrants.

13   Q.    All right.  Sir, have you in fact received any training

14   in the tracing of assets?

15   A.    Yes.

16   Q.    And what is the level of education you have, sir?

17   A.    I have a master's degree in business administration.

18   Q.    Sir, let me ask:  What were you asked to do in this

19   case?

20   A.    I was asked to trace the deposit of life insurance

21   through the accounts.

22   Q.    And what records did you have available to you to

23   perform that tracing?

24   A.    I had an investment account statements, bank account

25   statements, checks, deposit slips, I also had spreadsheets.

31

DIRECT - POLSKI

1    I also reviewed the testimony of Ms. Erin Newton and Mitch

2    Hoffman and the Hoffman report.

3    Q.    And of the bank records you reviewed, where did you

4    obtain them from?

5    A.    They were produced in discovery of this case.

6    Q.    Now we're going to look at some of those bank records.

7    Did you have a chance to make any charts as a result of

8    looking at those bank statements?

9    A.    I did.

10   Q.    And what was the source of information that you used in

11   creating these charts?

12   A.    The source were the bank records produced in discovery

13   in this case.

14   Q.    And when we look at those charts, did you identify the

15   Bates number of the actual raw data you looked at?

16   A.    I did.

17   Q.    All right.  Sir, when you trace funds or proceeds, are

18   there different ways to do that?

19   A.    Yes.  There are several accepted tracing methods.

20   Q.    What would some of those tracing methods be?

21   A.    You have first in, first out; last in, first out;

22   pro rata; specific identification; proceeds first, also

23   known as bad in, first out; lowest intermediate balance,

24   also known sometimes as bad in, last out.

25   Q.    Okay.  Of these processes that you just mentioned,

DIRECT - POLSKI

1    which process did you use in this case?

2    A.    I primarily used proceeds first.

3    Q.    All right.  Tell the Court why you used proceeds first

4    as your primary tracing method.

5    A.    The accounts that I looked at, the majority of the

6    deposits consisted of the life insurance proceeds.  At its

7    peak it was more than 90 percent of the account.

8    Q.    Okay.  Were there exceptions to using proceeds first?

9    A.    Yes.  I also used lowest intermediate balance for some

10   preexisting accounts that existed before the deposit of life

11   insurance.

12   Q.    When you talk about it being a preexisting account,

13   what was that preexisting account used for?

14   A.    It was -- so the main one I'm talking about is a

15   preexisting account with Wells Fargo.  It's a business

16   account in the name of Camelback Consulting Marketing, LLC,

17   which existed since 2011.

18   Q.    All right.  And were there times you used specific

19   identification?

20   A.    Yes.  I used that in three different -- three different

21   times here.

22   Q.    Tell the Court what specific identification means.

23   A.    Specific identification is when the intent of the

24   transaction can be determined based on evidence, such as the

25   timings of the transactions, or evidence such as a memo line

DIRECT - POLSKI

1    of a check.

2    Q.    Was there a time that you applied specific

3    identification to a saleable residence in Miami?

4    A.    Yes.    After the sale of the residence in Miami I

5    immediately applied those funds toward the new purchase of

6    the property in Paradise Valley, Arizona.

7    Q.    Why did you do that?

8    A.    It's, for one, the timing of the transactions.    They

9    were very close together and it's also typical when somebody

10    sells a property to then use the proceeds to purchase a new

11    property.

12    Q.    Was there also a time that you applied that to a

13    transfer of $500,000 from a Morgan Stanley account?

14    A.    Yes.    There was another account.    There was a deposit

15    of $500,000, and shortly thereafter there was a wire

16    transfer for $504,000 for the purchase of a condo in Cabo,

17    Mexico.

18    Q.    All right.    And, finally, did you apply that approach

19    to a transfer of funds for the purchase of a vehicle?

20    A.    Yes.    The purchase of the Bentley Bentayga, there were

21    two transactions on the memo line of both checks; it

22    indicated that was for the Bentley Bentayga.

23    Q.    All right.    Did you consider FIFO and LIFO?

24    A.    I considered FIFO and LIFO, yes.

25    Q.    Why did you not use them?

34

DIRECT - POLSKI

1    A.    First I'll explain FIFO.  It just means that funds are

2    spent in the order in which they were received and last in,

3    first out, or LIFO.  The most recently deposited funds are

4    the funds that are spent first.  And my analysis, I wasn't

5    concerned with the timing of the deposits and the

6    transactions, so I didn't use that.

7    Q.    Okay.  Did you consider pro rata?

8    A.    I also considered pro rata.

9    Q.    And why did you not use it?

10   A.    I didn't use pro rata because it was easy to

11   differentiate between the tainted and untainted funds.  They

12   weren't so mixed together that I need to apply a percentage

13   to all the spending.

14   Q.    You indicated that you reviewed both Special Agent

15   Newton's and Mr. Hoffman's testimony, correct?

16   A.    Yes.

17   Q.    Where did their testimony take the Court up to?

18   A.    It took it up to and through the deposit of life

19   insurance.

20   Q.    And where did you pick it up from?

21   A.    After the -- or at the deposit of life insurance.

22   Q.    Now, we're going to talk about things called

23   facilitating accounts and proceed accounts, all right?

24   A.    Yes.

25   Q.    When we talk about a facilitating account, what does

DIRECT - POLSKI

1    that mean to you?

2    A.    It's an account that the funds pass through.  It was

3    just -- it was used during the transaction, but that it

4    wasn't ultimately seized.

5    Q.    And what is a proceed account?

6    A.    Those were the -- that's where the funds ended up.

7    Q.    Sir, how many accounts were the life insurance checks

8    deposited into?

9    A.    Two.

10   Q.    They were deposited into two accounts?

11   A.    Yes.

12   Q.    Was one of them an account that we'll refer to as

13   Vanguard 30-9515?

14   A.    Yes.

15   Q.    And was the other a Vanguard account called 30-5266?

16   A.    Yes.

17   Q.    All right.  As we talk about these accounts, then, let

18   me ask you:  So you have a white notebook in front of you.

19   I'd ask you to look at Exhibits 4 through 12 very briefly.

20   A.    Okay.

21   Q.    And do you recognize them?

22   A.    Yes, these are the checks for the life insurance.

23            MR. BOHN:  Your Honor --

24            MS. MOSS:  No objection.  Sorry.

25            MR. BOHN:  Thank you.  Your Honor, I'm going to

36

DIRECT - POLSKI

1    offer Exhibits 4 through 12.  These are stipulated.  We

2    provided the Court a list of the exhibits that the defense

3    is going to stipulate to.  So I'd offer -- at this time, I

4    would offer 4 through 12.

5              THE COURT:  All right.  Ms. Moss, let him first

6    offer it into evidence before you tell me your position on

7    an offer that had yet to be made.

8              Given the stipulation of the parties, the

9    Government's Exhibits 4 through 12 are admitted into

10   evidence.

11        (Government's Exhibits 4 thru 12 received)

12   BY MR. BOHN:

13   Q.   All right.  Very good.  And then, Your Honor, I -- I

14   mean, Mr. Polski, would you look at Exhibits 13 through 16.

15   A.   Okay.

16   Q.   And do you recognize them?

17   A.   Those are the deposit slips for the checks.

18            MR. BOHN:  Your Honor, I'd offer 13 through 16.

19   And they have been stipulated to.

20            THE COURT:  All right.

21            MS. MOSS:  Your Honor, we have no objection.  If we

22   could -- just for expedience sake, I can let the Court know

23   that we have no objection to Government Exhibits 2 through

24   18, 20, 23 through 26, 28, 30, 31, 36, 41, 46, 51.

25            THE COURT:  Is the Government intending to offer

37

DIRECT - POLSKI

1    all of those exhibits?

2             MR. BOHN:  We are, Your Honor.

3             THE COURT:  All right.

4             MR. BOHN:  I appreciate that's the stipulation by

5    the defense.

6             THE COURT:  That will make things easier.  All

7    right --

8             MR. BOHN:  When I get --

9             THE COURT:  Hold on one second.  Exhibits 13

10   through 18 -- Government Exhibits 13 through 18, 20, 23

11   through 26, 28, 30, 31, 36, 41, 46 and 51 are all admitted

12   into evidence.

13            You may proceed, Mr. Bohn.

14         (Government's Exhibits received)

15            MR. BOHN:  Your Honor, when I get to those

16   exhibits, since those identified exhibits have been

17   admitted, can I publish?

18            THE COURT:  Yes.

19            MR. BOHN:  Thank you.  And the other ones I'll ask.

20   Your Honor, one other housekeeping matter on three of the

21   exhibits:  28, 36 and 41 were seizure warrant returns.  My

22   paralegal reminded me this morning that I did not unseal

23   them in the civil matter where they were obtained.  I'd ask

24   an order of the Court on the record that they may be

25   unsealed at this time.

38

DIRECT - POLSKI

1    THE COURT:  The Court will order that those be

2    unsealed for purposes of this hearing.

3    MR. BOHN:  Thank you, Your Honor.

4    THE COURT:  Thank you.

5    MR. BOHN:  Appreciate that.

6    BY MR. BOHN:

7    Q.    And now when we talked about those checks, 4 through

8    12, what were those checks -- who were the checks from?

9    A.    They were from the -- they were from the life insurance

10   companies.

11   Q.    And when we talked about the deposit slips of 13

12   through 16, which accounts did those go into?

13   A.    They were Vanguard 30-9515 and Vanguard 30-5256.

14   Q.    Was there a chart prepared during the trial of this

15   case that reflected those deposits --

16   A.    Yes.

17   Q.    -- and the account numbers?

18   A.    Yes.

19   MR. BOHN:  Your Honor, may we publish Exhibit 17.

20   BY MR. BOHN:

21   Q.    Okay.  And do you recognize this exhibit?

22   A.    I do.

23   Q.    And, sir, the checks that you referenced, are they

24   reflected on this document?

25   A.    Yes, they are.

DIRECT - POLSKI

1    Q.    All right.  And the amount that was totally paid out,

2    is that reflected on this document?

3    A.    Yes.

4    Q.    And for the record, tell the Court:  How much of life

5    insurance was paid out?

6    A.    $4,877,744.93.

7    Q.    Using these exhibits, 4 through 16, did you have an

8    opportunity to prepare a chart that reflected these

9    transactions?

10   A.    Yes.

11   Q.    Would you look at Exhibit 19 in the book.

12   A.    Okay.

13   Q.    And do you recognize that document?

14   A.    I do.  This is a document I created.

15   Q.    And what was the source of the information you used for

16   that document?

17   A.    It was the bank records that we just talked about.

18            MR. BOHN:  Your Honor, I offer Exhibit 19.

19            MS. MOSS:  No objection.

20            THE COURT:  That's -- hold on.  Hold on.  That's

21   not been stipulated to.  Does the -- what's the defendant's

22   position?

23            MS. MOSS:  No objection, Your Honor.

24            THE COURT:  All right.  Given that there's no

25   objection, Defendant -- or Government Exhibit 19 is admitted

40

DIRECT - POLSKI

1    into evidence.

2              (Government's Exhibit 19 received)

3    BY MR. BOHN:

4    Q.    All right.   Let's look at the right side of the

5    document here.   What do we see under the Great-West Life

6    down through the TransAmerica Life policies?   What are

7    those?

8    A.    Those are the life insurance companies that were

9    deposited into Vanguard 30-9515.

10   Q.    What is on the left side?

11   A.    Oh, on the far left side are the companies and the

12   policy numbers.

13   Q.    And then on the left side from Genworth down to

14   Ameritas Life, what account were those checks deposited

15   into?

16   A.    Into Vanguard 30-9515.

17   Q.    In the middle you indicate that on April 18th there was

18   a transfer of over $2.7 million for Vanguard 30-5266 into

19   Vanguard 30-9515.   At that point on April 18th, where were

20   all the life insurance proceeds located at?

21   A.    In Vanguard 30-9515.

22   Q.    Now did you have an opportunity to look at the bank

23   records for 30-5266 as reflected on the right side of the

24   document?

25   A.    Yes.

41

DIRECT - POLSKI

1    Q.    What was the balance in that account when these life

2    insurance checks were deposited on March 16th?

3    A.    It will be -- there was a zero balance before the

4    deposit of life insurance.

5    Q.    So prior to any life insurance going in, there was zero

6    untainted funds?

7    A.    Correct.

8    Q.    And when you looked at the balance of Vanguard 30-9515,

9    prior to the first deposit of the Genworth check, what was

10   the balance in that account, if you remember?

11   A.    I -- around 430,000.

12   Q.    Let's look at Exhibit 2 for a moment, if you would.

13           MR. BOHN:  And this has been stipulated, Your

14   Honor.

15           THE COURT:  All right.

16           MR. BOHN:  All right.

17   BY MR. BOHN:

18   Q.    And if we can blow up the bottom portion of this from

19   the money down there.  Thank you.

20           And you have a stylus there with you.  Can you see

21   on January 30th, what was the balance in that account prior

22   to any life insurance going in?

23   A.    It's that -- I think it's going backwards.

24           THE COURT:  You can delete -- there you go.

25   Ms. Guerra did it for you.  Go ahead.

DIRECT - POLSKI

1        THE WITNESS:  Okay.

2    BY MR. MARKUS:

3    Q.    If you could just read it to the Court.

4    A.    It was $413,035.35.

5    Q.    And it was -- the deposit on January 31 of the 77,000,

6    did that include the Genworth check for 44,000?

7    A.    It did.

8    Q.    All right.  If we could look at Exhibit 3.  And this

9    is -- the top portion is the account for 30-5266?

10   A.    Correct.

11   Q.    All right.  And, again, the beginning balance was?

12   A.    Zero.

13   Q.    And then the transfer in of the 2.7 million, was that

14   the life insurance we saw and reflected on Exhibit 19?

15   A.    Yes.

16   Q.    Did you have an opportunity to look at the balance in

17   this account 30-5266 after the life insurance was

18   transferred out on April 18th?

19   A.    Yes.

20   Q.    If we could look at Exhibit 18.  And enlarge this.

21   A.    Okay.

22   Q.    Tell the Court what the balance was after the life

23   insurance was transferred out.

24   A.    Zero.

25   Q.    Sir, after the life insurance was transferred out of

43

DIRECT - POLSKI

1    this account, at any time did life insurance proceeds ever

2    go back into this account?

3    A.    No.

4    Q.    Now, you've testified that life insurance funds were

5    all now in 30-9515.  Did you have an opportunity to look at

6    the bank records in that account and trace the life

7    insurance proceeds?

8    A.    I did.

9    Q.    Did you have an opportunity to prepare a chart that

10   reflected this information?

11   A.    Yes.

12   Q.    Would you look at Exhibit 21 in your notebook.

13   A.    Okay.

14   Q.    Do you recognize this exhibit?

15   A.    Yes.  This is the chart that I created.

16   Q.    What was the source of your information for this

17   exhibit?

18   A.    The source were the bank records and investment

19   accounts produced in discovery of this case.

20   Q.    And the Bates-stamp pages that you used as a source of

21   your information, are they reflected in this document?

22   A.    Yes, in the right-hand column.

23            MR. BOHN:  Your Honor, I offer Exhibit 21.

24            THE COURT:  Is there an objection?

25            MS. MOSS:  Yes, Your Honor.  We object to this.

DIRECT - POLSKI

1          THE COURT:  What's the basis for your objection?

2          MS. MOSS:  Your Honor, it's not that we're

3     objecting to the source information.  We agree with the

4     source information.  But there is subjective information

5     that has been inserted within certain columns of this

6     particular chart, including the chart that -- the column

7     labled Untainted Balance with Dividends and Interest,

8     Tainted Balance with Dividends and Interest, and Percentage

9     of Tainted to Total Balance.  And we believe that the

10    numbers and the percentages listed within those columns, as

11    well as the total balance columns, and the table at the

12    bottom, are incorrect.

13         THE COURT:  Mr. Bohn.

14         MR. BOHN:  Your Honor, this is -- pursuant to

15    Rule 32.2, the Court can consider any evidence already in

16    the record; you can consider any additional information.  As

17    this is a sentencing procedure, the rule specifically

18    states:  As long as the evidence is reliable and relevant,

19    it's admissible.  I believe any weight or objection they

20    have as to the, quote-unquote, subjective nature, would go

21    to the weight this Court decides to give it.

22         THE COURT:  I agree with Mr. Bohn.  On top of

23    everything he just said, Rule 1101 makes it clear that the

24    Federal Rules of Evidence do not strictly apply to

25    sentencing hearings.  And I don't believe that the

45

DIRECT - POLSKI

1    referenced figures in the columns that Ms. Moss alluded to

2    are subjective.  They are -- they reflect the testimony of

3    the witness, which can be attacked on cross-examination.

4              For all those reasons, the objection is overruled.

5    Exhibit 21 is admitted into evidence.

6         (Government's Exhibit 21 received)

7              MR. BOHN:  Thank you, Your Honor.

8    BY MR. BOHN:

9    Q.   Will you publish.

10             THE COURT:  Yes.  Go ahead and publish --

11   everything that gets admitted can be published.

12             MR. BOHN:  Thank you, Your Honor.

13   BY MR. BOHN:

14   Q.   All right.  Do you have Exhibit 21 up in front of you?

15   A.   Yes.

16   Q.   All right.  Let's walk through this in short order, if

17   we will.  So on the left side you see the insurance company

18   engagements --

19   A.   Yes.

20   Q.   -- correct?

21             And then let's go to the part that they were just

22   talking about.  Let's talk about the untainted balance.

23   What do you mean by "untainted balance"?

24   A.   That's all the sources of funds into the account that

25   didn't have anything to do with the life insurance payments.

46

DIRECT - POLSKI

1    Q.   Now you looked at the raw data, the bank account

2    record, a minute ago, and told this Court that prior to the

3    Genworth deposit being made, that the untainted balance, or

4    the preexisting balance, was $413, correct?

5    A.   Correct.

6    Q.   Is that the -- as reflected here, is that where that

7    source of information comes from?

8    A.   Yes.

9             MS. MOSS:   I'm sorry, Your Honor.   It's $413,000.

10            THE COURT:   Yeah, I was just going to say, you --

11   obviously they didn't mean $413.

12            MR. BOHN:   Okay.   Thank you.   And I appreciate her

13   help.   If she would pay attention like that --

14            THE COURT:   I knew what you meant.   413,000.

15            MR. BOHN:   Right.   Thank you.

16   BY MR. BOHN:

17   Q.   And now we see -- you see the deposit of 44,000,

18   correct?

19   A.   Correct.

20   Q.   What is that source from?

21   A.   That's the Genworth deposit that we talked about.

22   Q.   All right.   And is that reflected in the Bates page

23   number on the far right?

24   A.   Yes.

25   Q.   Okay.   So when the defense talks about the percentage

DIRECT - POLSKI

1    of tainted and total balance, how did you get the 9.73?

2    A.    That's -- so it's percentage tainted to total, so that

3    would be the 44,000, that we just talked about, divided by

4    the total balance would give you that percentage.

5    Q.    Okay.  Is that a subjective decision you came up with?

6    A.    That's math.

7    Q.    Okay.  Now we see the rest of the insurance policies

8    put involved here -- in play here, on the payment day, the

9    last line of this, we see 4-18-2017.  We see here that the

10   tainted balance is now $4.8 million, roughly, correct?

11   A.    Correct.

12   Q.    What was the percentage of tainted to total balance on

13   April 18th, 2017?

14   A.    91.24 percent.

15   Q.    Let me ask you, sir:  We see the bottom portion, the

16   summary of other transactions.  What did that information --

17   what -- where did it come from?  What does it mean to us?

18   A.    That summarizes the transactions that occurred between

19   that first deposit of life insurance on January 31st of 2017

20   and that last transfer on April 18th, 2017.  There were

21   several transactions; I just summarized them in this chart.

22   Q.    All right.  Now, even though you say there are several

23   transactions, we see in the other income that there's other

24   insurance for $31,000.  Why did you consider that untainted?

25   A.    It wasn't related to the life insurance.

DIRECT - POLSKI

1    Q.    Okay.  Say with the partnership, and then we see

2    dividends and appreciation, tell the Court how you divided

3    that.

4    A.    I divided that using a ratio.  It was the base --

5    whenever there was a deposit of -- or a dividend or there

6    was appreciation, I divided it up based on the relative

7    percentages in the account.

8    Q.    All right.  And then I see an account transfer of

9    $92,000 of income.  Why did you consider that untainted?

10   A.    That came in from another Vanguard account that never

11   received any deposits of life insurance.

12   Q.    All right.  Under the expenses side, we see a transfer

13   to Camelback Consulting of $78,000.  Why did you consider

14   that untainted?

15   A.    As I discussed earlier, I used lowest intermediate

16   balance for the preexisting business account, Wells Fargo

17   9749.  So that came out of the untainted funds.

18   Q.    Now, you did take out expenses -- other expenses worth

19   37,000, correct?

20   A.    Correct.

21   Q.    Why did you do that out of tainted funds?

22   A.    Using proceeds first consistently, it wasn't related to

23   a transfer into the accounts already established, so I took

24   it out of the tainted pile, the life insurance.

25   Q.    All right.  Let me ask you, sir, were there -- now not

49

                    DIRECT - POLSKI

1    all the -- now all life insurance proceeds were in one

2    place.  Were there additional transactions that included --

3    started to occur out of Vanguard 30-9515?

4    A.    Yes.

5    Q.    All right.  And did you prepare a chart to trace those

6    transactions?

7    A.    Yes.

8    Q.    Let's look at Exhibit 22.  Page 2, if you would, sir,

9    first.

10   A.    Okay.

11   Q.    Do you recognize Exhibit -- pages 1 and 2 of

12   Exhibit 22?

13   A.    Yes.

14            MR. BOHN:  All right.  Your Honor, I'd offer

15   Exhibit 22.

16            THE COURT:  Any objection?

17            MS. MOSS:  Your Honor, we are objecting to the

18   chart, which is page 2 of Exhibit 22.

19            THE COURT:  On what basis?

20            MS. MOSS:  On the same basis as before, Your Honor,

21   that the numbers in the columns of untainted balance and

22   tainted balance are incorrect.

23            THE COURT:  As I said before, you can address those

24   with the witness on cross-examination.  And for all the

25   other reasons I stated previously, your objection's

DIRECT - POLSKI

1    overruled.

2              Exhibit 22 is admitted into evidence.

3         (Government's Exhibit 22 received)

4    BY MR. BOHN:

5    Q.    All right, let's look at page 2 of this document.  Now,

6    these are the transfers -- I mean, the activity in the

7    Vanguard fund up to the transfer at the account of Bank of

8    New York Mellon.  So, again, where you see the balance of

9    June 12th, where did you get that figure from?

10   A.    The Vanguard statement for Vanguard 30-9515.

11   Q.    Tell us what these next entries are, the sale of the

12   property in Miami.

13   A.    Yes.  There was the -- so this starts with the sale of

14   the property in Miami, which went into the untainted

15   balance, so you see that number go up.  And then shortly

16   after that was a transfer to VPR Builders, which is related

17   to the property at 7000 North 39th Place, the new property.

18             So I took -- as I mentioned, for specific

19   identification, I exhausted that $297,562.98 first.  So

20   that's where the 105,000 came out.  So then there was a

21   transfer to the Wells Fargo 9749.  Again, I --

22   Q.    Okay, let me ask you a question.  So sorry.  The Wells

23   Fargo 9749, is that the Camelback Consulting account?

24   A.    Yes, that's a preexisting Camelback.

25   Q.    The preexisting account that was used.  Okay.  And

51

DIRECT - POLSKI

1    then, see, we got a transfer out for 20,000.  Why did you

2    take that out of untainted?

3    A.    That was another Vanguard account, but that was not --

4    that account did not receive any life insurance deposits, so

5    therefore it's untainted.

6    Q.    What occurred on August 8th of 2017, at the bottom?

7    A.    There was a transfer of $3 million to a new account

8    with Bank of New York Mellon.

9    Q.    So let me ask you, sir:  At the time of this transfer

10   of $3 million, was there enough untainted funds for that

11   transfer to be made with untainted funds?

12   A.    No.

13   Q.    Were you able to determine in whose name the Bank of

14   New York Mellon 1000 account was opened in?

15   A.    Yes.

16   Q.    Let's look at Exhibit 24.

17         Sir, do you recognize this exhibit?

18   A.    Yes, these are the account opening documents for --

19   Q.    All right.  Let's look at page 2.

20   A.    Okay.

21   Q.    And, sir, can you tell the Court whose name this

22   account was opened in.

23   A.    The account is titled Lawrence P. Rudolph Trust, IMA,

24   and the grantor being Lawrence P. Rudolph.

25   Q.    Did you have an opportunity to look at the activity in

DIRECT - POLSKI

1    Bank of New York Mellon 1000?

2    A.    Yes.

3    Q.    Let's look at Exhibit 23.  If we could blow up the top

4    portion with the beginning balance and the first deposit.

5            Sir, what was the balance in that account at the

6    time it was opened?

7    A.    Zero.  This was a brand-new account.

8    Q.    And what was the first and only deposit into this

9    account?

10   A.    It was the $3 million from Vanguard 30-9515.

11   Q.    Did you take this out of tainted or untainted funds?

12   A.    This was out of tainted.

13   Q.    And why did you do that, sir?

14   A.    There wasn't enough funds in the untainted balance.  It

15   was also a brand-new account.

16   Q.    And, sir, what was the percentage, then, of tainted

17   funds in Bank of New York Mellon 1000 when it was opened?

18   A.    A hundred percent.

19   Q.    Did you have an opportunity to look at the activity

20   Vanguard -- excuse me, Bank of New York Mellon 1000?

21   A.    Yes.

22   Q.    Did you prepare a chart to reflect that activity?

23   A.    Yes.

24   Q.    I'd like you to look at Exhibit 27.

25   A.    Okay.

DIRECT - POLSKI

1    Q.    And do you recognize it?

2    A.    I do.  I created this chart based off the previously

3    produced discovery in this case.

4              MR. BOHN:  Your Honor, I offer 27.

5              THE COURT:  Any objection?

6              MS. MOSS:  Yes, Your Honor, we object.  And for the

7    record, each of our objections to the charts is based on the

8    same reason, that the numbers listed within the columns

9    labeled Tainted and Untainted funds and the percentages

10   associated with them is incorrect.

11             THE COURT:  All right.  For the same reasons I

12   stated before with respect to Exhibits 21 and 22, the

13   objection to 27 is overruled.

14             Government Exhibit 27 is admitted into evidence.

15         (Government's Exhibit 27 received)

16   BY MR. BOHN:

17   Q.    All right.  Let's just go through this.  Let's start at

18   the top.  And what happened on -- or was posted on

19   August 8th of 2017?

20   A.    That was the deposit of the $3 million.

21   Q.    All right.  When we look at the summary of activities,

22   when you noticed the things here called Bank Advisory Fees,

23   why did you take that out of tainted funds?

24   A.    There were only tainted funds in this account.

25   Q.    Okay.  And we see a transfer to Bank of New York Mellon

54

DIRECT - POLSKI

1    account 3568 on the next line for 150,000; do you see that?

2    A.    Correct.

3    Q.    What was this applied to?

4    A.    The majority of that was applied to mortgage payments

5    for 7000 North 39th Place.

6    Q.    Did you have an opportunity to look at the ownership of

7    Bank of New York Mellon 3568?

8    A.    Yes.

9    Q.    Who was the owner of this account?

10   A.    Lawrence P. Rudolph.

11   Q.    Was that account a new account or was it a preexisting

12   account?

13   A.    It was a new account.

14   Q.    What was the balance in that account prior to this

15   deposit?

16   A.    Zero.

17   Q.    So was the entirety of Bank of New York Mellon 3568

18   with tainted or untainted funds?

19            MS. MOSS:  Objection.  Asked and answered.

20            THE COURT:  Overruled.

21            THE WITNESS:  It was all tainted up to that point.

22   BY MR. BOHN:

23   Q.    All right.  When we look at the mortgage payments then,

24   that occurred over a period of time, for 9656.  Why did you

25   take that as tainted?

DIRECT - POLSKI

1    A.    There's only tainted funds in the account.

2    Q.    And what was it applied to?

3    A.    That was applied towards the mortgage on 7000 North

4    39th Place.

5    Q.    When you referenced the condo in Mexico in January 4th

6    of 2021, where does -- that hundred thousand dollars, where

7    does it go?

8    A.    That goes to the purchase of a condo in Cabo, Mexico.

9    Q.    Let me ask you, sir:  The condo in Cabo, Mexico, that

10   was not a piece of property seized by the United States --

11   A.    That's correct.

12   Q.    -- or the forfeiture of?

13   A.    It wasn't seized.

14   Q.    Why is that?

15   A.    It's in another country, which you have to do a whole

16   process with that.  It wasn't my decision on whether it

17   would be seized or not.

18   Q.    Did you have sufficient financial records regarding the

19   payments of that account to that property?

20   A.    I had -- I had most of the records, yes.

21   Q.    Let me ask you, sir:  You see a transfer to Wells Fargo

22   2446 for 200,000 in September 28th of 2020.

23   A.    Yes.

24   Q.    What was that for?

25   A.    That went towards -- so that account was created for

DIRECT - POLSKI

1    the purchase of 103 Morningside Drive in Cranberry Township

2    in Tolini.

3    Q.   You say that account was created.  Had that account

4    existed prior to the life insurance?

5    A.   No.

6    Q.   And did you have an opportunity to look to see who the

7    owner of that account was?

8    A.   Yes.

9    Q.   Who was it?

10   A.   The account was titled to Three Rivers Dental

11   Management Systems, LLC.

12   Q.   And who owned that?

13   A.   Lawrence P. Rudolph.

14   Q.   All right.  So, sir, let me ask you, then:  When you

15   look at these -- these -- this activity up to May 31st of

16   2021, were all the activities involving tainted funds?

17   A.   Yes.

18   Q.   All right.  Let's go and enlarge the portion that says

19   Other Income for -- just that for a moment, please.  So let

20   me ask you, sir:  You see this is income.  Where did this

21   income come from?

22   A.   Other than that settlement that I listed up there, it

23   was all dividends and appreciation based off the -- the life

24   insurance funds that were in the account.

25   Q.   So the next line that says Net Investment Income, is it

DIRECT - POLSKI

1    your testimony that the bank records you reviewed indicate

2    that from August 9th, 2017 until May 31st, 2021, that that

3    account made over $1.2 million in interest and dividends?

4    A.    Yes.

5    Q.    So what was the total amount in that account as of

6    May 31st?

7    A.    That would be $3,496,092.04.

8    Q.    Were there ever any other deposits into that account

9    other than that -- other than the life insurance and the

10   dividends?

11   A.    No, other than that settlement, which is related to a

12   security.  There were no other deposits in that account.

13   Q.    Were the funds in this account seized in relation to

14   this case?

15   A.    Yes.

16   Q.    Let's look at Exhibit 28.

17         And do you recognize this document?

18   A.    Yes.  This is the warrant return for Bank of New York

19   Mellon account 1000.

20   Q.    All right.  And just for the record, what was the

21   amount of money seized out of the account?

22   A.    $3,496,092.04.

23   Q.    Okay.  Now let's go back to Vanguard 30-9515.  Was any

24   of the money in that account used for the construction of a

25   residence in Arizona?

58

DIRECT - POLSKI

1    A.    Yes.

2    Q.    Specifically 7000 North 39th Place, Paradise Valley?

3    A.    Yes.

4    Q.    Did you prepare a chart that reflected that?

5    A.    Yes.

6    Q.    Would you look at Exhibit 29.

7    A.    Okay.

8    Q.    Do you recognize it?

9    A.    Yes.   This is a chart I created off the previously

10   produced discovery in this case.

11            MR. BOHN:   Your Honor, I offer 29.

12            THE COURT:   Any objection?

13            MS. MOSS:   Yes, we object, Your Honor.

14            THE COURT:   On same grounds?

15            MS. MOSS:   Yes, Your Honor.

16            THE COURT:   All right.   The objection is overruled

17   for the same grounds as I've previously stated on the

18   record.

19            Exhibit 29 is admitted into evidence.

20            You may proceed, Mr. Bohn.

21         (Government's Exhibit 29 received)

22   BY MR. BOHN:

23   Q.    All right, so the balance in the Vanguard 30-9515, on

24   August 9th of 2017, what was the untainted balance?

25   A.    $640,458.01.

DIRECT - POLSKI

1    **Q.    And the total amount of tainted balance?**

2    **A.    The tainted balance is $1,857,283.49.**

3    **Q.    All right.  We see two transfers to the Camelback fund,**

4    **the Wells Fargo one, on August 15th.  Why did you take them**

5    **out of untainted?**

6    **A.    As discussed earlier, that was a preexisting business**

7    **account.  All transfers into that account consisted of**

8    **untainted funds.**

9    **Q.    All right.  Now we see a franchise entry for a -- the**

10   **debit on August 18 -- 16th of 20,000.  Why did you put that**

11   **back in as untainted?**

12   **A.    That was payment he received that was not related to**

13   **the life insurance.**

14   **Q.    Okay.  What do we see occurring on August 30th, 2017?**

15   **A.    That was a wire transfer to Fidelity National Title**

16   **related to the 7000 North 39th Place in Paradise Valley,**

17   **Arizona.**

18   **Q.    So over 1.1 million?**

19   **A.    Yes.**

20   **Q.    Where did the 192,000 come from untainted?**

21   **A.    That was the remaining balance from that sale in Miami.**

22   **So I exhausted that first for the specific identification**

23   **that I mentioned earlier, and the remaining portion came out**

24   **of the life insurance.**

25   **Q.    So that takes us up to the property to August 30, 2017.**

60

DIRECT - POLSKI

1    On February 2d, 2018, was there a lot of activity involving

2    the account of 30-9515?

3    A.    Yes.

4    Q.    In fact, let's look at Exhibit 32.

5    A.    Okay.

6    Q.    Did you have a chance to prepare a chart that

7    summarized the activity in that account on February 2d?

8    A.    I did.  I created this chart based off the previously

9    produced discovery in this case.

10          MR. BOHN:  Your Honor, I offer 32.

11          THE COURT:  Any objection?

12          MS. MOSS:  Same objection, same grounds, Your

13    Honor.

14          THE COURT:  All right.  Overruled for the same

15    grounds.  Exhibit 32 is admitted into evidence.

16       (Government's Exhibit 32 received)

17    BY MR. BOHN:

18    Q.    So let me ask you, sir.  You see on the right, the

19    Vanguard numbers there, were those the bank records that you

20    physically looked at?

21    A.    Yes.  All these transactions were on one specific bank

22    page.

23    Q.    And if we were to -- so on this date, there were

24    transfers to six separate subaccounts; is that right?

25    A.    That's correct.

DIRECT - POLSKI

1    Q.    All right.  And you had in front of you Exhibits 30 and

2    31, correct?

3    A.    Correct.

4    Q.    And are these the raw data actual bank records that

5    indicate the source and matches up with the Bates numbers

6    that you used to identify the deposits and transfers?

7    A.    Yes.

8    Q.    Now, did you make a chart that would -- or a PowerPoint

9    that explains the transfers out on this occasion?

10   A.    Yes.

11   Q.    Would you look at Exhibit 33.

12   A.    Okay.

13   Q.    Who prepared this chart?

14   A.    I prepared this chart based off the information that we

15   just looked at from the previously produced discovery in

16   this case.

17           MR. BOHN:  Your Honor, I offer 33.

18           THE COURT:  Wait, hold on.  Let me ask the witness:

19   Is this a summary of the exhibits we've just seen?

20           THE WITNESS:  Yes.  This is just -- it's more of a

21   flow chart.  Just another way of expressing the exhibits

22   we've just seen.

23           THE COURT:  Okay.  Is there an objection to 33?

24           MS. MOSS:  Your Honor, we have no objection to this

25   exhibit.

62

DIRECT - POLSKI

1    THE COURT:  All right, there being no objection,

2    Government Exhibit 33 is admitted into evidence.

3        (Government's Exhibit 33 received)

4    BY MR. BOHN:

5    Q.    All right.  Let's go to page 1.  Okay.  So this is on

6    February 2d of 2018.

7        What does this chart show us?

8    A.    This shows the transfers into the six new subaccounts

9    that were created.  In the middle you have the new

10   subaccounts, and it's all coming from Vanguard 30-9515.

11   Q.    On February 2d, 2018, what was the balance in each of

12   these subaccounts?

13   A.    Zero, they were all new accounts.

14   Q.    They were all new accounts, no balance?

15   A.    No balance.

16   Q.    We see the deposits into the account.  After the

17   deposit in what happens next on April 16th of 2019?

18   A.    There was another series of transfers.

19   Q.    Okay.  Let's go to the next page.  All right.  Now

20   we've been introduced to a proceeds account 500 -- 540-9515.

21   Was this an existing account?  540-9515?

22   A.    No -- that was an existing account.  Yes.

23   Q.    Okay.  So we see there's a transfer out.  Of the four

24   accounts that those transfers came from, were there ever any

25   additional deposits into them?

63

DIRECT - POLSKI

1    A.    I think there were --

2    Q.    Of the four that were inside.

3    A.    No.

4    Q.    Okay.  So they --

5    A.    Wait.  That's correct.

6    Q.    So they were all life insurance proceeds funds?

7    A.    Yes.

8    Q.    Okay.  And then at some point are the transfers out of

9    these accounts?

10   A.    Not out of proceeds in Vanguard 540-9515.

11   Q.    Okay.  How about from the other six in the middle?

12   A.    Yes.  On January 7th, which there was another transfer

13   into 9515 on January 7th, but on the remaining funds from --

14   some of those accounts went back into Vanguard 30-9515.

15   Q.    So let's go to this.  Let's go to the next slide here.

16         And the green arrow shows what?

17   A.    Those are the transfers on January 7th, 2021.

18   Q.    Okay.  So none of the six subaccounts that were present

19   in the middle here had any balance in them before,

20   correct?

21   A.    Correct.

22   Q.    Why did you take them from tainted funds out of 30-9515

23   as the source of funding for them?

24   A.    They were brand-new accounts, and using my consistent

25   proceeds first methodology, I took from the tainted pile of

64

DIRECT - POLSKI

1    funds.

2    Q.    All right.  So of the funds that were in the Vanguard,

3    the very first one, after the transfer out on January 7th to

4    540-9515, what was the balance in 69-9515?

5    A.    Zero.

6    Q.    When you see Vanguard 584-9515 a transfer back

7    into 30-9515 -- Vanguard 584-9515, what was the balance

8    after that money was transferred out on January 7th?

9    A.    Zero.

10   Q.    Okay.  And then in the middle, Vanguard 511-9515.

11   A.    Zero.

12   Q.    And then also on Vanguard 1945-9515, what was the

13   balance after it transferred out?

14   A.    Zero.

15   Q.    And in Vanguard 1946-9515, what was the balance in that

16   account after the transfer out?

17   A.    Also zero.

18   Q.    Now, we see at the bottom there -- the menu's over it,

19   but we see it says Vanguard account -- and that's Vanguard

20   account 585-9515.  That's a proceed account?

21   A.    Correct, that account ended up being seized; the funds

22   that were in there just stayed in there.

23   Q.    What was the source of funds in that last account,

24   585-9515?

25   A.    It was the transfer of the $292,500 on February 2d,

65

DIRECT - POLSKI

1    2018.  And there were no other deposits into that account.

2    Q.   And that account was seized?

3    A.   Yes.

4    Q.   So what was the percentage of life insurance in that

5    account?

6    A.   A hundred percent.

7    Q.   Did that account earn interest and dividends?

8    A.   Yes.

9    Q.   And were the funds in that account seized, you said?

10   A.   Yes.

11   Q.   Let's look at Exhibit 36.

12   A.   I see it.

13   Q.   36 has been stipulated to.  Oh -- sorry.  And let's go

14   to the second page.

15          And do you see the account -- the second account

16   there, the Vanguard 585-9515?

17   A.   Yes.

18   Q.   So can you read into the record how much was seized?

19   A.   $527,736.24.

20   Q.   All right.  Now you mentioned the account on the far

21   right in Exhibit 19, which is account 540-9515.  Correct?

22   A.   Correct.

23   Q.   Would you look at Exhibit 34.  Do you recognize

24   Exhibit 34?

25   A.   I do.  This is a chart I created based off the

DIRECT - POLSKI

1    previously produced discovery in this case.

2              MR. BOHN:  Your Honor, I'd offer Exhibit 34.

3              THE COURT:  Any objection?

4              MS. MOSS:  Objection.  Same grounds.

5              THE COURT:  The objection's overruled for the same

6    reasons as I've stated before.  Exhibit 34 is admitted into

7    evidence.

8         (Government's Exhibit 34 received)

9    BY MR. BOHN:

10   Q.   Prior to the transfers into this account, what was its

11   balance at the beginning?

12   A.   $785,091.12.

13   Q.   And that's all considered untainted at this time?

14   A.   Yes.

15   Q.   Now we see the next four entries to be deposits from

16   April 16th, 2019.  Do you see that?

17   A.   Yes.

18   Q.   You considered them all to be tainted balance?

19   A.   Yes.

20   Q.   Why was that?

21   A.   They were transferred in from those subaccounts that

22   were created and those accounts consisted of 100 percent

23   life insurance proceeds.

24   Q.   What was the total amount of tainted funds transferred

25   in?

DIRECT - POLSKI

1   A.   As of April 16th, 2019, from there it was $416,869.

2   Q.   And what was the percentage of tainted to total balance

3   of these funds?

4   A.   34.68 percent.

5   Q.   Were there ever other deposits made into this account?

6   A.   Yes.

7   Q.   Would you look at Exhibit 35.

8   A.   Okay.

9   Q.   It's a multi-page exhibit.  Do you recognize the first

10  page?

11  A.   Yes, the first page is a chart I created based off the

12  previously produced discovery in this case which includes a

13  lot of the information that's behind it, the other parts of

14  this exhibit.

15        MR. BOHN:  All right.  Your Honor, I offer

16  Exhibit 35.

17        THE COURT:  Is there an objection?

18        MS. MOSS:  Objection based on the same grounds.

19        THE COURT:  All right.  For the same reasons the

20  objection's overruled.

21        Exhibit 35 is admitted into evidence.

22     (Government's Exhibit 35 received)

23  BY MR. BOHN:

24  Q.   All right, let's look at the top portion of this --

25  A.   Okay.

68

DIRECT - POLSKI

1    Q.    -- on page 1.

2              And I see the top, the four bolded, for the

3    deposits on April 16th, 2019.  Those are the tainted funds

4    we just talked about, correct?

5    A.    Correct.

6    Q.    There was a deposit on April 16th -- if we were to go

7    down to the next line -- and you considered that untainted.

8    Why was that?

9    A.    It came in from a -- an account that did not have any

10   tainted funds, or life insurance, in it.  So it was

11   untainted.

12   Q.    And there was one deposit of tainted funds that we saw

13   on the chart of January 7th, 2021, which is bolded down

14   below, for $4,657.  Why was that considered tainted?

15   A.    Because that Vanguard account 569-9515 consisted of 100

16   percent tainted proceeds.

17   Q.    Now, we see the change -- or the -- in value at the end

18   down there of the tainted funds that were deposited in.  Did

19   you determine a percentage of the tainted to the total

20   balance?

21   A.    Yes.

22   Q.    What was that balance, the percentage?

23   A.    At the end it was 34.82 percent.

24   Q.    Were funds in this account seized?

25   A.    Yes.

69

DIRECT - POLSKI

1     Q.    If we could look at Exhibit 36.  Page 2.

2           If you could read into the record the amount that

3     was seized out of account 540-9515.

4     A.    It was the $751,776.28 which represents that

5     percentage.

6     Q.    Now let me ask you, sir:  Was an Aston Martin vehicle

7     seized in this case?

8     A.    Yes.

9     Q.    Did you prepare a chart to reflect the bank activity in

10    its purchase?

11    A.    Yes.

12    Q.    Let's look at Exhibit 37.  It's a multi-page document.

13          Do you recognize the first page?

14    A.    Yes.  This is a chart I created off the previously

15    produced discovery in this case.

16          MR. BOHN:  Your Honor, I offer all of 37.

17          THE COURT:  Any objection?

18          MS. MOSS:  We object to page 1 of Exhibit 37 for

19    the same reasons, Your Honor.

20          THE COURT:  All right.  That objection's overruled.

21    The entirety of 37 is admitted into evidence.

22          (Government's Exhibit 37 received)

23    BY MR. BOHN:

24    Q.    Okay.  We'll enlarge this.

25          All right.  So this shows us the balance on

DIRECT - POLSKI

1    February 27th, 2018.  What was the tainted balance that was

2    left in this account of Vanguard 30-9515?

3    A.    $136,741.72.

4    Q.    What occurs on March 1st of 2018?

5    A.    There is -- that's the down payment for the Aston

6    Martin.

7    Q.    Sir, let me ask you:  How did you apply the last -- I

8    mean the tainted funds for this portion?

9    A.    All -- I -- I was attempting to exhaust the tainted

10   funds, and using that proceeds-first methodology, so 125,000

11   of the remaining funds went towards this -- the down payment

12   for this.

13   Q.    All right.  Let's look at page 4 of this document.

14        And, sir, can you tell us what the purchase price

15   of the vehicle was?  Enlarge the top half.

16   A.    It was $239,000.

17   Q.    So that was the purchase price.  And was there a check

18   or something that documented this transfer?

19        Let's look at page 3.

20   A.    There was a check, yes.  And this is the check right

21   here.

22   Q.    Right.  And, sir, can you tell us, how much was the

23   check for?

24   A.    $125,000.

25   Q.    And what's in the memo line?

71

DIRECT - POLSKI

1    A.    "Down payment DB11."

2    Q.    Sir, what was the percentage of tainted funds used for

3    the purchase of the Aston Martin?

4    A.    The percentage of the down payment was 100 percent.  I

5    have another percentage of the overall --

6    Q.    Right.  Let's go to page 1.  There we go.  Perfect.

7         All right, sir, so you reflected the -- you took

8    the entire amount of the 125,000 from tainted funds,

9    correct?

10   A.    Correct.

11   Q.    And that left a balance, after you did that on

12   March 1st, of 2018.  What was the tainted balance that

13   was -- remained in Vanguard 30-9515?

14   A.    After that transaction there was $11,910.29 which I

15   exhausted with a credit card payment.

16   Q.    Why did you take a credit card payment from the tainted

17   balance?

18   A.    I was using that consistent proceeds-first method.

19   Q.    So, sir, after March 13th, 2018, were there any tainted

20   funds left in Vanguard 30-9515 at that time?

21   A.    Not at that time.

22   Q.    All right.  Sir, was an Aston Martin actually seized in

23   this case?

24   A.    Yes.

25   Q.    Let's look at Exhibit 41.  Page 2.

DIRECT - POLSKI

1          And, sir, do you see an Aston Martin that was

2    seized -- a 2018 Aston Martin that was actually seized in

3    this case?

4    A.    Yes.

5    Q.    All right.  So, sir, we have to be clear now.  There's

6    no tainted funds left in 30-9515 after this purchase,

7    correct?

8    A.    Correct.

9    Q.    You indicated in your chart, which was Exhibit 33, that

10   tainted funds went back into Vanguard 30-9515; is that

11   correct?

12   A.    That's correct.

13   Q.    Let's put up 33 one more time.

14          And that's the transactions that occurred on

15   January 7th of 2021; is that correct?

16   A.    That's correct.

17   Q.    How much funds were transferred back into the Vanguard

18   account at that time?

19   A.    I'd have to go look at the chart.

20   Q.    Let's look at Exhibit 38.

21          Do you recognize this exhibit?

22   A.    I do.  I created this off the previously produced

23   discovery in this case.

24          MR. BOHN:  Your Honor, I offer 38.

25          THE COURT:  Is there an objection?

73

DIRECT - POLSKI

1          MS. MOSS:  Objection, based on the same grounds.

2          THE COURT:  All right.  For the same reasons, that

3     objection's -- same reasons I've stated on the record

4     before, that objection's overruled.

5          Government Exhibit 38 is admitted into evidence.

6        (Government's Exhibit 38 received)

7     BY MR. BOHN:

8     Q.   Sir, do you see the transfers that occurred on

9     January 7th, 2021 reflected in this document?

10    A.   Yes.

11    Q.   What was the total amount of tainted funds that were

12    transferred back in?

13    A.   $42,723.62.

14    Q.   Okay.  Now that there are tainted funds back into

15    Vanguard 30-9515, did you prepare a chart to trace these

16    funds?

17    A.   Yes.

18    Q.   Let's look at Exhibit 39.

19         Do you recognize Exhibit 39

20    A.   Yes.  I created this chart based off the previously

21    produced discovery in this case.

22          MR. BOHN:  All right.  Your Honor, I offer 39.

23          THE COURT:  Is there an objection?

24          MS. MOSS:  Objection to page 1 of 39.

25          THE COURT:  And the grounds for that?

74
DIRECT - POLSKI

1        MS. MOSS:  Same grounds as before, Your Honor.

2        THE COURT:  All right.  That objection's overruled.

3        The entirety of Exhibit 39 is admitted into

4    evidence.

5        (Government's Exhibit 39 received)

6    BY MR. BOHN:

7    Q.   Let's look at just the top portion regarding Vanguard.

8    All right, what was the untainted balance at the time of the

9    transfers in?

10   A.   $418,968.94.

11   Q.   And the tainted balance?

12   A.   $42,723.62.

13   Q.   So what is the percentage of tainted balance at this

14   time?

15   A.   9.25 percent.

16   Q.   All right.  We see a wire check of 25,000 on

17   February 17th.

18   A.   Yes.

19   Q.   Why did that go out of untainted?

20   A.   Actually I traced that to a previously existing Morgan

21   Stanley account.

22   Q.   Okay.  And let me ask you:  Had that Morgan Stanley

23   account ever received any proceeds from life insurance?

24   A.   Out of Bank of New York Mellon 1000, it was reflected

25   in the chart; it did.

75

DIRECT - POLSKI

1   Q.   Okay.

2   A.   Oh, not initially.  It was -- yes, not initially.

3   Q.   Okay.  And then we see the check to Wells Fargo 9749

4   for the purchase of a Bentley Bentayga for 150,000 on April

5   20th.  Do you see that?

6   A.   Yes.

7   Q.   Now you took the remaining 42,000 of tainted funds and

8   applied that for the purchase of that vehicle.  Why was

9   that?

10  A.   It was exhausting -- I was using that proceeds-first

11  methodology.  I exhausted those funds.

12  Q.   Okay.  Let's look -- did you actually see a check that

13  was involved in that process?

14  A.   Yes.

15  Q.   Let's look at page 3.  And if we could enlarge the top

16  portion.

17          And can you read the memo line for that -- that is

18  in that line.

19  A.   "Bentley Bentayga Camelback Consulting."

20  Q.   All right.  And let's look at page 5 of the exhibit.

21          What was in fact the entire purchase of that -- the

22  price of that vehicle?

23  A.   $162,390.58.

24  Q.   If we go back to page 1 of this exhibit.

25          Sir, could you tell us at the very bottom, do you

DIRECT - POLSKI

1    see the Bentley Bentayga?

2    A.    Yes.

3    Q.    What was the percentage of tainted funds used for the

4    purchase of this vehicle?

5    A.    26.31 percent.

6    Q.    All right.  If we go to Exhibit 41, page 2.

7            Sir, was a 2017 Bentley Bentayga in fact seized in

8    this case?

9    A.    Yes.

10   Q.    Sir, after the funds were used to purchase the Bentley,

11   were there any tainted funds left in Vanguard 30-9515?

12   A.    No.

13   Q.    All right.  Let's turn to the property in Arizona.

14   Were you --

15           THE COURT:  Mr. Bohn, hold on.  Let's -- maybe this

16   would be a good time for a brief recess.  Or how much do you

17   have left?

18           MR. BOHN:  Actually, Your Honor, I only have a few

19   pages left.  If I -- I really --

20           THE COURT:  There are pages and there are pages.

21           MR. BOHN:  Well, I only want to talk --

22           THE COURT:  Let's take a break.  We'll be in recess

23   for 10 minutes.

24        (Recess taken 11:12 a.m. to 11:27 a.m.)

25           THE COURT:  Mr. Polski, I remind you that you

DIRECT - POLSKI

1     remain under oath.

2              Mr. Bohn, you may resume your direct examination.

3              MR. BOHN:  Thank you, Your Honor.

4     BY MR. BOHN:

5     Q.   Sir, did you have an opportunity to look at the

6     property that was purchased in Arizona?

7     A.   Yes.

8     Q.   And were you able to determine the amount of tainted

9     funds that were applied to the purchase of the residence in

10    Arizona up to May 30th, 2021?

11    A.   Yes.

12    Q.   Did you prepare a chart that reflected these assets?

13    A.   Yes.

14    Q.   Would you look at Exhibit 42.  It's a multiple page

15    document.  Do you recognize the first page?

16    A.   Yes.

17    Q.   How do you recognize it?

18    A.   I created this charge based off the previously produced

19    discovery in this case.

20             MR. BOHN:  Your Honor, I offer Exhibit 42.

21             THE COURT:  Any objection?

22             MS. MOSS:  Object to page 1 of Government Exhibit

23    42 based on the same reasons.

24             THE COURT:  All right.  Based on the reasons

25    previously stated, the objection's overruled.

78

DIRECT - POLSKI

1      **Exhibit 42 is admitted into evidence.**

2          **(Government's Exhibit 42 received)**

3      BY MR. BOHN:

4      Q.    Let's start here at the beginning.  We noticed that

5      back on April 30th that was -- 2021, there was a transfer of

6      payment of 105,000 to Vanguard Builders -- to VPR Builders.

7      Why did you consider that untainted, that 105-?

8      A.    This was the original 105,000 that came out of the sale

9      of the Miami residence.  That's why it was untainted.

10     Q.    All right.  What do we see next, then, regarding the

11     total transfer or payment of 105,000?  Why is it split like

12     that?

13     A.    For the -- let's see --

14     Q.    The second line.

15     A.    The second line?  Let me make sure I'm -- this is

16     Exhibit 42, the second line, the Morgan -- oh, that one's

17     split because there was a $51,000 transfer from Bank of New

18     York Mellon 1000, which was 100 percent tainted funds, that

19     went to the Morgan Stanley.  And there was a total of

20     105,603; that's why it's split, that $51,000 that came from

21     Bank of America Mellon 1000 -- and the rest was untainted.

22     Because that was the only tainted in the account.

23     Q.    Okay.  Let's look at page 2 of the exhibit, then.

24          And, sir, will you notice the second line, this --

25     that says a withdrawal that occurred on February 8th.

79

DIRECT - POLSKI

1   A.    Yes.

2   Q.    All right.  And what is that withdrawal -- how much is

3   it for?

4   A.    It's the $51,000.

5   Q.    And where did it go to?

6   A.    The -- that went from Bank of New York Mellon 1000 to

7   Morgan Stanley.

8   Q.    All right.  And then, sir, if we go to page 3.  And if

9   we look down under the transfers, then, on February 22d, the

10  second part.

11        Can you just enlarge the whole thing.  Thank you.

12        Do you see the activity for $105,000?

13  A.    Yes.

14  Q.    And what account did that come from?

15  A.    The 105,000 came from the Morgan Stanley.

16  Q.    Okay.  So let's go back to page 1, then.  So then we

17  see a untainted transfer of 436,000 from Wells Fargo 9749.

18  Do you see that?

19  A.    Yes.

20  Q.    Why was that untainted?

21  A.    Because all of Camelback Consulting, the Wells Fargo

22  9749 account, consisted of untainted funds.

23  Q.    Okay.  If we go down below, I noticed you have a

24  mortgage payment of Bank of New York Mellon 1000, correct?

25  A.    Correct.

DIRECT - POLSKI

1    Q.    And, again, for the record, the Bank of New York Mellon

2    1000, was that 100 percent tainted?

3    A.    That's correct.

4    Q.    And then you see the mortgage payments from Bank of New

5    York Mellon, 3568 for 99,000.  Correct?

6    A.    Correct.

7    Q.    Why was that all considered to be tainted funds?

8    A.    Because that account consisted of only tainted funds.

9    Q.    All right.  So let me ask you:  What was the percentage

10   of tainted funds used to purchase this property?

11   A.    58.74 percent.

12   Q.    Was there a property in Pennsylvania that you had a

13   chance to look at?

14   A.    Yes.

15   Q.    Were you able to determine the amount of tainted funds

16   applied to the purchase of that residence?

17   A.    Yes.

18   Q.    Did you prepare a chart to reflect that?

19   A.    Yes.

20   Q.    I'd ask you to look at Exhibit 43.  And it's a

21   multiple-page document.

22         Your Honor, I -- do you recognize the exhibit?

23   A.    Yes.

24   Q.    How do you recognize it?

25   A.    I created this based off the previously produced

                         DIRECT - POLSKI

1    discovery in this case.

2              MR. BOHN:  Your Honor, I offer 43.

3              THE COURT:  Any objection?

4              MS. MOSS:  Objection to page 1 based on prior

5    reasons stated.

6              THE COURT:  All right.  For the prior reasons I've

7    put on the record, that objection's overruled.

8              The entirety of Exhibit 43 is admitted into

9    evidence.

10             (Government's Exhibit 43 received)

11   BY MR. BOHN:

12   Q.    Let's start at the beginning.  Okay.  We see a transfer

13   from Wells Fargo 9749, which is the opening account amount

14   of 1,000.  And am I correct, sir, that this is the Camelback

15   Consulting account?

16   A.    That's correct.

17   Q.    Then we see a transfer from Bank of New York Mellon

18   1000.  You consider that all to be tainted funds?

19   A.    That's correct.

20   Q.    And then there's another transfer from the Camelback

21   Consulting fund of $50,000.  And you consider that to be

22   untainted?

23   A.    Yes.

24   Q.    Why was that?

25   A.    It's from that Camelback Consulting Marketing, LLC

DIRECT - POLSKI

1    account, the preexisting business account.

2    Q.    I'm intrigued by your entry there that says, "Transfer

3    from Vanguard 30-9515 of $150,000."  Why was that considered

4    to be untainted at this time?

5    A.    Because that transaction occurred in that window when

6    all the funds were initially exhausted and then redeposited

7    later on from the subaccounts.  There were no tainted funds

8    in that account at that time.

9    Q.    So at that point, then, all those funds were considered

10   untainted?

11   A.    Correct.

12   Q.    All right.  So then, sir, let me ask you:  We see the

13   bottom, there's a American General Services Corp, there's an

14   entry of 39- -- excuse me, what is that entry of the 39- --

15   395,000?

16   A.    That's the down payment for 103 Morningside Drive.

17   Q.    Sir, were you able to determine what the percentage --

18   let's go to the bottom.

19        What was the percentage of tainted funds used to

20   purchase the 103 Morningside Drive residence?

21   A.    50.55 percent.

22   Q.    Sir, when was this property purchased?

23   A.    On October 1st, 2020.

24   Q.    Was this property used as a residence after being

25   purchased?

83

DIRECT - POLSKI

1    A.    No.

2    Q.    Was there a lease executed regarding this property?

3    A.    Yes.   There was a lease executed between Infinity

4    Custom Homes, which was the builder of the property.

5    Q.    And, sir, would you look at Exhibit 44.   Do you

6    recognize this document?

7    A.    Yes.   This is the lease agreement.

8              MR. BOHN:   Your Honor, I offer 44.

9              THE COURT:   Any objection?

10             MS. MOSS:   No -- no objection, Your Honor.

11             THE COURT:   There being no objection, Exhibit 44 is

12   admitted into evidence.

13        (Government's Exhibit 44 received)

14   BY MR. BOHN:

15   Q.    Let's start at the first part here.   Who are the

16   parties involved in the lease of this property?

17   A.    The tenant is Infinity Custom Homes and the landlord is

18   Lawrence P. Rudolph and Lori A. Milliron.

19   Q.    So Mr. Rudolph purchased this property and then turns

20   around and leases it back to the custom homebuilder?

21   A.    That's correct.

22   Q.    Let's look at the second page of this document.   Under

23   the rent, were you able to determine how much rent he was

24   going to get paid for this property?

25   A.    Yes.   It's in the bottom there.   It's $11,000 a month

DIRECT - POLSKI

1    for 15 months.

2    Q.    How does the fact that there was rental income affect

3    your percentage of tainted or untainted funds?

4    A.    It didn't.

5    Q.    Why is that?

6    A.    Because the property was purchased with 50 -- a little

7    over 50 percent, any rent I would kind of look at that split

8    as well.  So it didn't change the balances.

9    Q.    Now you mentioned you had an opportunity to review

10   Mr. Hoffman's expert report, correct?

11   A.    Correct.

12   Q.    And that was a report produced in -- and admitted into

13   evidence in the trial, correct?

14   A.    Correct.

15   Q.    Let's look at Exhibit 1.  Will you look at Exhibit 1

16   for me, please, sir.  Do you recognize this exhibit?

17   A.    I do.  This is the report I reviewed from Hoffman's

18   larger report.

19           MR. BOHN:  Your Honor, I offer Exhibit 1.

20           THE COURT:  Is this the report that -- was this

21   offered at trial?

22           MR. BOHN:  Yes.

23           THE COURT:  Okay.  Is there an objection?

24           MS. MOSS:  Your Honor, we object to relevance since

25   this takes account of the counts that Dr. Rudolph possessed

DIRECT - POLSKI

1    prior to the deposit of the insurance proceeds.

2            THE COURT:  Right.  But I let it in before, so why

3    would I keep it out now?

4            MS. MOSS:  Because it's irrelevant to what they're

5    trying to assert for forfeiture.

6            THE COURT:  Objection's overruled.

7            Exhibit 1 is admitted into evidence.

8        (Government's Exhibit 1 received)

9    BY MR. BOHN:

10   Q.   All right.  Let's look at just the first two columns,

11   the first three sections there.  Correct.  Perfect.

12           And what I'm going to ask you about, sir, is:  Do

13   you see all the account numbers that are reflected here?

14   A.   Yes.

15   Q.   All right.  And when you look at these account numbers,

16   did you also look at the bottom portion of this page?

17   A.   Yes.

18   Q.   Let's go to the bottom half of the page.

19           Were -- and here you see the surrender value of

20   life insurance, the dental practice, and the real property.

21   I noticed there's a property in Victor, Idaho.  Is that

22   correct?

23   A.   Correct.

24   Q.   And is that still in the ownership of Mr. Rudolph?

25   A.   The last time I checked, it was.

DIRECT - POLSKI

1    Q.    And when did you check last, roughly?

2    A.    A couple of weeks ago.

3    Q.    Okay.  So the reason I asked you about these accounts

4    is:  Were these accounts that existed prior to or during --

5    that were available to Dr. Rudolph in -- during the course

6    that he had access to or in the time of the life insurance?

7    A.    Yes.

8    Q.    Did you then compare those -- those accounts to see

9    which of the accounts had any involvement at all with the

10   life insurance?

11   A.    Yes.

12   Q.    Did you prepare a chart to reflect that?

13   A.    Yes.

14   Q.    Would you look at Exhibit 48.  Do you recognize

15   Exhibit 48?

16   A.    Yes.  I created this exhibit.

17   Q.    And does it reflect the Bates number of these pages?

18   A.    Yes.  It reflects that.  I merged some of the

19   information from the chart we just looked at, the Hoffman

20   report, and also updated some of the information that has

21   the Bates numbers right there.

22              MR. BOHN:  Your Honor, I offer Exhibit 48.

23              THE COURT:  Any objection?

24              MS. MOSS:  Yes, Your Honor.  We are objecting to

25   this.

87

DIRECT - POLSKI

1        THE COURT:  On what basis?

2        MS. MOSS:  Based on the fact that these accounts

3    are only reflecting balances up to 2021.  And so on

4    relevance, Your Honor.

5        THE COURT:  You want to address that, Mr. Bohn?

6        MR. BOHN:  Yeah, we're not offering -- we're not

7    offering it for the balances.  I'm only going to direct the

8    Court to the account numbers to show the significance of the

9    number of accounts that were out there that were never

10   involved in life insurance.  To the -- to the extent that

11   the defense is going to argue that tracing was hard or

12   difficult, we're going to show the Court that there are only

13   very few accounts that had actually any involvement with

14   life insurance.

15       THE COURT:  So these are all accounts that never

16   received any funds from the insurance --

17       MR. BOHN:  That's exactly right.

18       THE COURT:  -- proceeds.  All right.  The

19   objection's overruled.

20       Exhibit 48 is admitted into evidence.

21       (Government's Exhibit 48 received)

22   BY MR. BOHN:

23   Q.   Let's look at the first three columns on page 1 if we

24   can.

25       Mr. Polski, what does this -- do these accounts

88

DIRECT - POLSKI

1   show us?

2   A.   These are accounts that Dr. Rudolph had that were

3   not -- they didn't involve any of the life insurance

4   deposits and they were not seized.

5   Q.   So no life insurance policies proceeds ever went out of

6   30-9515 into these accounts?

7   A.   That's correct.  Or 5266.

8   Q.   Or 5266, correct.

9        Let's look at page 2.  And if we could start just

10  the top, those first three columns.

11       And, again, are these three other accounts that had

12  the same thing, no life insurance went in?

13  A.   That's correct.

14  Q.   All right.  Now let's look at the bottom half of the

15  page, from the real property down, please.  No, real

16  property.  I'm sorry, the real property starting with the

17  Victor, Idaho -- up one.  Right there.  Perfect.  All the

18  way down.

19       And, again, we see here that the -- there's a

20  property in Victor, Idaho.  Was that ever involved in life

21  insurance proceeds?

22  A.   No.

23  Q.   That's a different home in Paradise Valley than the

24  7000, correct?

25  A.   That's correct.

DIRECT - POLSKI

1   Q.   And did that have any involvement with life insurance?

2   A.   No.

3   Q.   And then the residence in Miami, Florida, did that have

4   any involvement in life insurance?

5   A.   No, that was a home that was quickly sold at the time.

6   It did not have any involvement.

7   Q.   The vehicle that is reflected as a Mercedes Benz

8   convertible, did that have any life insurance --

9   A.   No.

10  Q.   -- connection?

11  A.   No.

12  Q.   And I'll ask you, sir, about the remainder of the items

13  on there:  Did they have any involvement at all with life

14  insurance proceeds?

15  A.   No.

16  Q.   Did you get a chance --

17       THE COURT:  Mr. Bohn, let me interject a question

18  here before you move on.

19       Mr. Polski, which, if any, of these real properties

20  or personal properties remain in the ownership of the

21  defendant and have not been seized and have not been sold?

22       THE WITNESS:  Only Victor, Idaho.  The other two

23  properties were sold.

24       THE COURT:  All right.  So as of two weeks ago -- I

25  think you testified you last checked into that -- that

90

DIRECT - POLSKI

1    property was still counted as an asset of his?

2            THE WITNESS:  Correct.

3            THE COURT:  All right.  You may resume your

4    questions.

5    BY MR. BOHN:

6    Q.    Thank you.  Did you also prepare a chart of the

7    facility in the accounts that did receive life insurance

8    funds transferred in or out of them?

9    A.    Yes.

10   Q.    Let's look at Exhibit 49.

11           Do you recognize this exhibit?

12   A.    Yes, I created this chart based off the previously

13   produced discovery.

14           MR. BOHN:  Your Honor, I offer Exhibit 49.

15           THE COURT:  Any objection?

16           MS. MOSS:  Yes, Your Honor.  We object to this as

17   well based on relevance.  If it's not being used for the

18   columns stating the amounts, then all of that is completely

19   irrelevant.  And it's also irrelevant because we've already

20   addressed all of these accounts.

21           THE COURT:  I'm going to overrule that objection.

22           Exhibit 49 is admitted into evidence.

23       (Government's Exhibit 49 received)

24   BY MR. BOHN:

25   Q.    If we could please look at the left -- the first three

DIRECT - POLSKI

1    columns.

2            And let me ask you, sir, what do these accounts

3    show us again?

4    A.    These accounts were involved -- either received life

5    insurance deposits -- it was pass-through.  These are

6    basically facilitating accounts almost.  There are a couple

7    that aren't facilitating.  But they were involved in some

8    way with life insurance.

9    Q.    Were some of these accounts new accounts or opened

10   after the arrival of the life insurance?

11   A.    Most of them were opened after.

12   Q.    And did you prepare a chart of the accounts and

13   proceeds that did in fact contain life insurance proceeds

14   and were seized in this case?

15   A.    Yes.

16   Q.    Let's look at Exhibit 50.

17           Do you recognize this chart?

18   A.    Yes.  I created this chart based off the previously

19   produced discovery.

20           MR. BOHN:  Your Honor, I'd offer 50.

21           THE COURT:  Any objection?

22           MS. MOSS:  Yes, Your Honor, we're objecting to

23   relevance of this chart.

24           THE COURT:  All right.  I find that it is relevant,

25   and the objection's overruled.

92

DIRECT - POLSKI

1        **Exhibit 50 is admitted.**

2          **(Government's Exhibit 50 received)**

3    BY MR. BOHN:

4    Q.    So let's talk about the first top three accounts.   Are

5    those the three bank accounts we've talked about in this

6    case?

7    A.    Yes.   Those are the accounts that were seized, or a

8    portion thereof were seized.

9    Q.    All right.   And then under the real property, the two

10   properties of 7000 North 39th Place, Paradise Valley,

11   Arizona, does it reflect the amount of tainted funds used?

12   A.    Yes.   That -- in that far right column, that's the

13   amount that I have in that other spreadsheet.

14   Q.    And the same with the 103 Morningside Drive, Cranberry

15   Township, Pennsylvania, does it reflect the percentage of

16   tainted funds used for the purchase of that?

17   A.    Yes.

18   Q.    And then again, sir, the same questions regarding the

19   vehicles, the Bentley and the Aston Martin:   Does this chart

20   reflect the percentage of tainted funds used for the

21   purchase in that -- in those vehicles?

22   A.    Yes.

23          MR. BOHN:   Your Honor, I just need a moment to make

24   sure that I have admitted everything I wish to admit.

25          THE COURT:   51 is in, but do you want to examine

DIRECT - POLSKI

1   the witness on it?  You don't have to, right?  You just have
2   it in evidence.
3           MR. BOHN:  Your Honor, I don't need to examine on
4   it.  It's there as a reference point if needed for argument,
5   but it has been admitted.  I'm just going to check.
6           Your Honor, I believe Exhibit 40 is in.  Is that
7   correct with your records?
8           THE COURT:  I'll ask Ms. Guerra.
9           COURTROOM DEPUTY:  No, Your Honor, it is not.
10          THE COURT:  Okay.  40 is not in.
11  BY MR. BOHN:
12  Q.   Sir, take a look at Exhibit 40.  Do you recognize it?
13  A.   Yes, this is a chart I created off of previously
14  produced discovery.
15  Q.   That's a multi-page document.
16          MR. BOHN:  Your Honor, I offer 40.
17          THE COURT:  So what is this?
18          MR. BOHN:  This is the -- Your Honor, this is the
19  chart that reflects the last of the six subaccounts that
20  were created.  At the very bottom, account No. 585-9515 was
21  the account that was seized.  This shows the total that
22  matches up with the seizure warrant that you saw at 41.
23          MS. MOSS:  Just object to the prosecutor
24  testifying.
25          THE COURT:  All right.  He was responding to a

94

DIRECT - POLSKI

1    question.

2                The -- is there an objection to 40?

3                MS. MOSS:  Yes, Your Honor.

4                THE COURT:  What basis?

5                MS. MOSS:  The same objection that we had to the

6    other charts, Your Honor, that the -- the account -- the

7    columns for the tainted balance and the total balance and

8    the percentages are incorrect.

9                THE COURT:  All right.  The objection -- well, for

10   those grounds, they can be explored on cross-examination.

11   40 is -- that objection is overruled and 40 is admitted into

12   evidence.

13       (Government's Exhibit 40 received)

14   BY MR. BOHN:

15   Q.   Let's go to 33 again real quick so we orientate where

16   we are.

17                Do you see at the bottom there that -- in the

18   middle sixth, the Proceed Vanguard Account, 585-9515?

19   A.   Yes.

20   Q.   All right.  And then if we were to look at Exhibit 40

21   again -- can we enlarge this.

22                What was the amount of tainted funds used that was

23   transferred in on February 2d, 2018?

24   A.   $292,500.

25   Q.   And, sir, what was the amount seized at the bottom,

CROSS - POLSKI

1    then, on August 31st, 2021?

2    A.    $527,736.24.

3            MR. BOHN:   Okay.   Your Honor, I have no further

4    questions at this time.   Thank you.

5            THE COURT:   All right.   Cross-examination.

6            MS. MOSS:   Ms. Guerra, I may be using the Elmo,

7    please.

8                        CROSS-EXAMINATION

9    BY MS. MOSS:

10   Q.    Good morning.   Is it Deputy Polski?

11   A.    Deputy or senior inspector.

12   Q.    Good morning.

13   A.    Good morning.

14           MS. MOSS:   Your Honor, before I begin my questions,

15   I'd like to move to admit Defense Exhibits H through S.   I

16   believe that the Government has stipulated to these and has

17   no objection.

18           THE COURT:   Does that remain the case, Mr. Bohn?

19           MR. BOHN:   It does, Your Honor, to those exhibits.

20           THE COURT:   All right.   There being a stipulation,

21   Defense Exhibits H through S are admitted into evidence.

22       (Defendant's Exhibits H thru S received)

23   BY MS. MOSS:

24   Q.    Deputy Polski, we just saw Government Exhibit 49 that

25   listed the accounts that you examined and traced insurance

96

CROSS - POLSKI

1   proceeds through, correct?

2   A.    Correct.

3   Q.    And what we looked at there is 14 different accounts

4   that you had to trace money through, correct?

5   A.    Correct.

6   Q.    So what we have is, I think -- there were eight

7   Vanguard accounts?

8   A.    Yes, the majority of these are the subaccounts that

9   were created that we talked about.

10  Q.    Correct.  There were six of those, and then there were

11  two other Vanguard accounts, correct, so eight in total?

12  A.    Correct.

13  Q.    And there were also two Bank of New York Mellon

14  accounts?

15  A.    There were two Bank of New York Mellons, but one is

16  going to be on the seized side of it, that would be the

17  1000, and this is the other one that was created that you

18  see, the mortgage payments.

19  Q.    But you looked at both, correct?

20  A.    Correct.

21  Q.    And then there's two -- at least two Wells Fargo

22  accounts that you looked at?

23  A.    Correct.

24  Q.    And then the Morgan Stanley that is listed there, too?

25  A.    Yes.

CROSS - POLSKI

1    Q.    So, again, a total of 14 accounts that you looked at

2    money and saw money going back and forth and transfers and

3    deposits?

4    A.    One of these Vanguard accounts I kind of conservatively

5    added to this.    That was where the remaining funds of

6    Vanguard 30-9515 ended up after it exhausted its -- the

7    tainted funds.    I just conservatively added this chart

8    because there were transfers from Vanguard 30-9515, but

9    there were no tainted funds left in that account at the

10    time.

11    Q.    Okay.    But, again, it's an account that you looked at

12    in order to follow money from account to account, correct?

13    A.    I saw this account, yes.

14    Q.    90 --

15    A.    No -- oh, I'm talking about Vanguard 45-9515.    It's on

16    this chart.

17    Q.    Okay.    But, again --

18    A.    Yeah.

19    Q.    -- an account that you looked at to follow money in and

20    out, correct?

21    A.    Correct.

22    Q.    Okay.    And a number of different accounts -- how long

23    did it take you to follow this money in and out of all these

24    accounts?

25    A.    I first started working on this case in the middle of

CROSS - POLSKI

1    August --

2    Q.    August of what year?

3    A.    Of 2021.  And I kind of worked on it off and on through

4    about the beginning of November of 2021.

5    Q.    And is that the last time that you worked on this?

6    A.    I mean, I've been following this -- I just kind of

7    maintained this, but the tracing was completed at that

8    point.

9    Q.    Okay.  So it sounds like August -- so several months

10   that you spent working on the -- following the money through

11   account to account to account?

12   A.    I had other cases I was working on during that time.  I

13   didn't spend three months on this specific case.

14   Q.    Understood.

15   A.    Okay.

16   Q.    But were there several months that you spent working on

17   this case?

18   A.    Correct.

19   Q.    And you were looking at account statements that went

20   over a period of five years, correct?

21   A.    Correct.

22   Q.    And you created an attachment to one of the Government

23   pleadings; is that correct?

24   A.    There was a motion -- I think the exhibits I created

25   were included in a motion.  Is that what you're referring

99

CROSS - POLSKI

1    to?

2    Q.    Well, did you create something that the Government

3    listed as Attachment A that's a 17-page document?

4    A.    I'd have to see it.  I don't . . .

5              MS. MOSS:  Your Honor, may I hand to

6    Ms. Guerra . . .

7              THE COURT:  Are you just trying to remind him what

8    it is or refresh his recollection on that?

9              MS. MOSS:  Sure.

10             THE COURT:  What is that we're talking about?

11   Maybe we can --

12             MS. MOSS:  Your Honor, I'm referencing a -- an

13   attachment to Government Exhibit -- docket entry 296, which

14   is the Government's motion for mandatory restitution and

15   forfeiture.  And there is a 17-page document attached to it

16   labeled Attachment A.

17             THE COURT:  Does the Government have access to this

18   document, Mr. Bohn?  So we all --

19             THE WITNESS:  It's blurry.

20             MR. BOHN:  I do, Your Honor.

21   BY MS. MOSS:

22   Q.    Do you see that, Deputy Polski?

23   A.    I do.

24             THE COURT:  One second, Ms. Moss.

25             MR. BOHN:  Do you need it?

CROSS - POLSKI

1          MS. MOSS:  No, I've got it.

2          MR. BOHN:  Okay.

3          THE COURT:  I'm just asking -- Mr. Bohn, do you

4    have it so that you have a copy of it --

5          MR. BOHN:  Oh, yeah, I'm good, Your Honor.

6          THE COURT:  Okay.  All right.  Go ahead, Ms. Moss.

7    BY MS. MOSS:

8    Q.    Do you see this, Deputy Polski?

9    A.    I do.

10   Q.    Did you create this document?

11   A.    I believe this information was created off the charts

12   that I created.

13   Q.    So, again, my question is:  Did you create this

14   document?

15   A.    No.

16   Q.    So the Attachment A is something that was written by

17   somebody else?

18   A.    Can I see the full document, please, instead of just

19   the first page?

20   Q.    Yes.

21   A.    I did not create this document.  I helped -- I

22   contributed work to this.

23   Q.    And since you did not write this document, Detective --

24   Deputy Polski, did you review it after it was written by

25   someone else?

101

CROSS - POLSKI

1    A.    Yes.

2    Q.    And do you believe that what's contained in it is

3    correct?

4    A.    Yes.

5    Q.    And who is it that did write this document?

6    A.    I believe I worked with AUSA Kurt Bohn.

7    Q.    And so is that the individual who wrote this document?

8    A.    We worked on this together, yes.

9    Q.    Okay.  Might I get that back, please.

10          And is this a 17-page document that attempts to

11   trace money from account to account to show where the

12   insurance proceeds went?

13   A.    Correct.

14   Q.    And we've also looked at a number of charts on your

15   direct, and there's a number of charts that are attached to

16   that docket entry.  And there were 16 charts, correct?

17   A.    Correct.  Those were also the charts that were just

18   used in front of me that I already did my testimony for,

19   yes.

20   Q.    And are those charts that you created?

21   A.    Yes.

22   Q.    Okay.  And what you've looked at here, I think you've

23   testified that there were business accounts, there were

24   brokerage accounts that you looked at, personal accounts

25   that you looked at, a number of types of accounts, correct?

CROSS - POLSKI

1    A.    Correct.

2    Q.    Okay.  I want to talk about one of the accounts that

3    you've spoken about, and that is Vanguard account 30-9515.

4    A.    Correct.

5    Q.    Okay.  Now, you testified on direct that insurance

6    proceeds were deposited into this account, correct?

7    A.    Correct.

8    Q.    And that is between the dates of January 31st, 2017 to

9    April 18th, 2017, correct?

10    A.    Correct.

11    Q.    And so the insurance proceeds were not all deposited

12    into that account on one day, correct?

13    A.    Correct.

14    Q.    They were deposited over time, over several days.

15    A.    Correct.

16    Q.    Between that time period --

17    A.    Yes.

18    Q.    -- correct?

19         And also between that time period -- well, before

20    we get to that:  Before insurance proceeds began to be

21    deposited in that account, there was what we'll call

22    untainted money in that account, correct?

23    A.    Correct.

24    Q.    And just so it's clear for the Court, when I'm

25    referencing "tainted," I'm just adopting the Government's

CROSS - POLSKI

1    language, not that we are acknowledging that's tainted.

2            But there was untainted money in that account prior

3    to January 31st, 2017, correct?

4    A.    Correct.

5    Q.    Okay.  And then between January 31st, 2017 and

6    April 18th, 2017, there were other deposits into that

7    account, correct?

8    A.    Correct.

9    Q.    Other than the insurance proceeds, correct?

10   A.    Correct.

11   Q.    There were also other withdrawals from that account,

12   correct?

13   A.    Correct.

14   Q.    Okay.  Now, let's talk about after April 18th, 2017.

15   And we're still focused on Vanguard account 30-9515.  After

16   April 18th, 2017, there were also deposits into that

17   account, correct?

18   A.    Yes.

19   Q.    And there were also withdrawals from that account,

20   correct?

21   A.    Correct.

22   Q.    There were also income dividends that were credited to

23   that account, correct?

24   A.    Correct.

25   Q.    Okay.  And I believe that we've seen all of that

CROSS - POLSKI

1    documented within the records that are located at Government

2    Exhibit 2, 20, and 22.  Do you want to take a quick look at

3    those?

4    A.    Yeah, there might have been -- I had summaries of

5    transactions.  Sometimes I picked up specific points, so

6    this isn't like an all-encompassing work of all the -- all

7    the spreadsheet.

8    Q.    And I'm not referring to the spreadsheet.  What I'm

9    referring is actually to the Vanguard statements --

10   A.    Yes.

11   Q.    -- at Government Exhibit 2, 20, and 22.

12   A.    Okay.

13   Q.    Do you see those?

14   A.    Yes.

15   Q.    Do you agree those are the statements?

16   A.    Let's see.  Yes.

17   Q.    And those statements reflect different deposits going

18   in and different withdrawals going out of 30-9515.

19   A.    Correct.

20   Q.    Other than the insurance proceeds, correct?

21   A.    Correct.

22   Q.    Okay.  Now I'd like to ask you about some of the charts

23   that you spoke about on direct, okay?

24   A.    Okay.

25   Q.    The first chart I want to ask you about is Government

105

CROSS - POLSKI

1    Exhibit 21.

2    A.    Okay.  I have it in front of me.

3    Q.    And I'm going to try to put this on the Elmo.

4          COURTROOM DEPUTY:  Ms. Christ, would you please

5    pull up Exhibit 21?  Thank you.

6          MS. MOSS:  Can I do it that way?

7    BY MS. MOSS:

8    Q.    Okay.  Let's take a look first -- now this is a -- a

9    chart that you testified about on direct.  And it deals with

10   that Vanguard account 30-9515; is that right?

11   A.    Correct.

12   Q.    Now let's take a look at just the first row, if we

13   could.  The first row reflects that deposit from Genworth --

14   you don't have to pull it down.  That's okay.

15         That first deposit reflects the Genworth check that

16   has been deposited into this account on January 31st, 2017.

17   Do you see that?

18   A.    Yes.

19   Q.    And that was a check from Genworth for 45,533.88.

20   A.    That's 44,533.

21   Q.    I'm sorry, did I say something different?

22   A.    I thought you said 45.

23   Q.    Okay.  44,000 --

24   A.    Correct.

25   Q.    -- do you agree with that?

CROSS - POLSKI

1    A.    Yes, I agree.

2    Q.    And in addition to this deposit that was done on

3    January 31st, there was also a deposit on that same day of

4    $33,076.67 of untainted money, correct?

5    A.    Are you looking at the -- now are you looking at --

6    well, are you looking at the Exhibit 2?  Or --

7    Q.    Yes.  Government Exhibit 2.

8    A.    Yes.  There was a reference -- a deposit slip that will

9    have multiple deposits into it, and that was one check --

10   the check was one of the deposits on that date.

11   Q.    Okay.  So what I'm talking about -- just so it's clear

12   for the Court -- is if we look at January 31st on Government

13   Exhibit 2, you see this deposit of $77,610.55.  Do you see

14   that?

15   A.    Yes.

16   Q.    Okay.  And then if we could go just very quickly to

17   Government Exhibit 13.  How do I clear this?

18        COURTROOM DEPUTY:  I've already cleared it for you,

19   Ms. Moss.

20        MS. MOSS:  All right.  Thank you.

21   BY MS. MOSS:

22   Q.    We see that there were other deposits made on that same

23   day.  First you see at the top $32,969.16.  Do you see

24   that?

25   A.    Yes.

CROSS - POLSKI

1   Q.   And also at the bottom, 109.57, correct?

2   A.   I think it might be 51 cents, but correct.

3   Q.   Sorry.  In the middle is that deposit which is the

4   Genworth check, correct?

5   A.   Correct.

6   Q.   So there's actually a deposit, not just of 44,000 that

7   day, but a deposit -- a total deposit of -- what would that

8   be -- the 77,000 that we saw in Government Exhibit 2,

9   correct?

10  A.   Yes.

11  Q.   So let's go back to Government Exhibit 21.

12       Now, you don't have that reflected in your first

13  row on January 31st, 2017, do you?

14  A.   You -- that's because the top portion only references

15  the deposits of life insurance.  The bottom is --

16  Q.   Understand.

17  A.   -- a summary of other deposits during that time.

18  Q.   Understood.  But if we're talking about the amount that

19  was in the account on that day that's untainted, you say

20  it's $413,035, correct?

21  A.   Yes.

22  Q.   But if you count the other $33,000 that's been

23  deposited on that day, the balance of untainted funds is

24  higher; isn't that correct?

25  A.   It would have been added at some point.  It's kind

CROSS - POLSKI

1    of -- despite it looks a little bit deceiving, but this --

2    there's a lot that happened in between these transactions.

3    It would have been in there.  There was money going in,

4    money going out, just like you said --

5    Q.   No, no, no.  I'm talking about one day, January 31st,

6    2017.  That's when the deposit of $77,000 went in, correct?

7    A.   Correct.

8    Q.   And $33,000 of that was untainted funds.

9    A.   Correct.

10   Q.   So if we were accurately saying what the balance in

11   that account was of untainted funds on January 31st, 2017,

12   that would be an amount higher than $413,000, correct?

13   A.   It could be.  I -- it might also depend on the order of

14   the transactions in the spreadsheet where it's referenced,

15   but --

16   Q.   And that's a choice that you made as far as the order

17   of the transactions, correct?

18   A.   Yes.

19   Q.   So if the account balance of untainted funds is higher

20   on January 31st, 2017, then the column for percentage of

21   tainted to total balance would be different, correct?

22   A.   Correct.  But also if you look at the next column down,

23   there's also $78,500 of untainted funds that were spent.

24   That's also a summary of multiple transactions where those

25   funds came -- could have come out of.  So it -- it's hard to

CROSS - POLSKI

1    tell just looking at this because this is a summary of

2    activity.

3         So I can't really say for certain that this is an

4    accounting for it.  I would have to look at my original

5    spreadsheet.

6    Q.   Do you have that original spreadsheet?

7    A.   I mean, I could pull it up, but . . .

8    Q.   Well, I don't want to get too confused.  But when

9    you're referencing that 76- -- I'm sorry, 78,500 of

10   untainted funds, that's money that came out later, right?

11   A.   That could have also been starting that day.  That's

12   between the January 31st deposit and the April 18th deposit.

13   Q.   Let's go back to the Government Exhibit 2.

14   A.   Okay.

15   Q.   We see on January 31st, the $77,000, that we keep

16   talking about, of deposit, right?

17   A.   Yes.

18   Q.   And then we see February 22d, there's two transfers or

19   two checks that are withdrawing money from the account,

20   correct?

21   A.   Correct.

22   Q.   Those are the Camelback Consulting Wells Fargo account

23   checks, correct?

24   A.   Yes.

25   Q.   That's what you're attributing to that $78,000 money

CROSS - POLSKI

1   number, correct?

2   A.    Yes, yes.

3   Q.    So that happens later.

4   A.    Yes.

5   Q.    Okay.  Going back again to Government Exhibit 21 --

6   A.    Okay.

7   Q.    -- I'm only talking about January 31st.

8           So, again, if the balance of untainted funds on

9   January 31st is higher than what you have in this chart,

10  that also means that the percentage of tainted to total

11  balance is different, correct?

12          COURTROOM DEPUTY:  Counsel, does somebody have a

13  hot spot near a microphone, or a phone near a microphone at

14  all?  Thank you.

15          THE WITNESS:  Okay, I'll continue.  I would need

16  the complete spreadsheet to show the order of transactions.

17  But when I put this up there, I would have imagined that I

18  put the deposit of life insurance as the first deposit in

19  that series of 77,000.

20          And then the next thing you're seeing is the next

21  AAA on 3-22.  We're looking at transactions on

22  February 22d --

23  BY MS. MOSS:

24  Q.    Correct.

25  A.    -- which would have come out of untainted.  So you do

CROSS - POLSKI

1    see a major drop in the untainted.  So I'm not saying I'm

2    not accounting for that.  There's 78,500 spent, you're

3    not -- so if we look at --

4    Q.    I am only focusing on the first row.

5    A.    I know.  I'm just saying it's a little bit deceptive to

6    just focus on the first row.

7    Q.    Well, we're just focusing on the first row now.

8    A.    Okay.

9    Q.    So on that first row now, that's just focused on

10   January 31st, 2017, correct?

11   A.    That's focused on the first -- the deposit of the life

12   insurance.  If I had that as my first deposit in the order

13   of the spreadsheet, then it would -- that would be correct,

14   how it is right here.

15   Q.    Okay.  Well, but we just talked about how there was

16   33,000 other dollars deposited on that day, correct?

17   A.    Correct.

18   Q.    And so if you're -- and that's untainted, correct?

19   A.    Correct.

20   Q.    And so if you're looking at your column of untainted

21   balance with dividends and interest, that number should be

22   higher, correct?

23   A.    I'm not referencing the day, I'm referencing that

24   specific transaction.

25   Q.    Well, you are referencing a balance, right?

112

CROSS - POLSKI

1    A.    Yes.  At that -- the time of that specific check

2    deposited -- it's broken down in the spreadsheet per each

3    deposit, so --

4    Q.    So what you're doing is you're crediting the other

5    $3,000 deposit after this 44,000, right?

6    A.    He's getting credit for that; I guarantee it.

7    Q.    I understand that.

8    A.    Yes.

9    Q.    But that would change your numbers on this chart,

10   wouldn't it?

11   A.    It might change the first number; so it would be 9.73

12   percent.

13   Q.    Correct.

14   A.    Correct, yes.

15   Q.    So it would change --

16   A.    Yes.

17   Q.    -- that balance.

18   A.    Yes.

19   Q.    Okay.  Now, I want to take a look at -- let's just jump

20   to the final row of the top table.

21   A.    Okay.

22   Q.    Do you see there that you write that the total balance

23   is $5,305,961?

24   A.    Yes.

25   Q.    And where does that come from?

CROSS - POLSKI

1    A.    The 5,305,000, that would be -- the total between

2    tainted and untainted should always equal your total

3    balance.

4    Q.    Okay.  Let's take a look at Government Exhibit 2.

5    A.    Exhibit 2?  Okay.

6    Q.    Actually, let's take a look at Government Exhibit 20.

7          If you look at the balance in this account on

8    April 18th, do you see that?

9    A.    Yes.

10   Q.    What is this balance reflected in the bank statement?

11   A.    $5,303,672.53.

12   Q.    Is that different than the number you notated in your

13   chart?

14   A.    It is.  And I noticed it.  It's an ordering of the

15   transactions in my spreadsheet is different than the order

16   of transactions here.  And that would account for that

17   difference.

18   Q.    So because of how you ordered it, that means there's a

19   different number?

20   A.    Yes, for the total.  It doesn't really affect the

21   amount of untainted fund, but yes, it's different.

22   Q.    Okay.  And that's a choice that you made as to how you

23   would order those transactions?

24   A.    Yes.  And there's reasons for that, but yes.

25   Q.    Okay.  Now I want to talk to you about the tracing

CROSS - POLSKI

1    method that you used.  And I believe you testified on direct

2    that the method that you followed in this case was the

3    proceeds-first approach?

4    A.    That was my primary approach, correct.

5    Q.    Your primary approach.

6    A.    Yes.

7    Q.    Okay.  And the document that we referred to before,

8    that Attachment A, cited a particular case.  Did you see

9    that?

10   A.    I could -- I'm familiar with some of the cases, but I

11   would have to look at the document to see which case you're

12   talking about, correct.

13   Q.    It's a case called *Banco Cafatero Panama*.

14   A.    I'm familiar with it.

15   Q.    Okay.  Is that a case that you included in there?

16   A.    I'm aware and I've reviewed that case.

17   Q.    Okay.  Now, you also spoke about there were certain

18   exceptions, I think --

19   A.    Yes.

20   Q.    -- that you followed, there were exceptions to the

21   proceeds first --

22   A.    Correct.

23   Q.    -- correct?

24        Okay.  One is something that I think you referred

25   to as a pass-through transaction; is that right?

CROSS - POLSKI

1    A.    Can you say that again.

2    Q.    Something that I think you referred to as a

3    pass-through transaction?

4    A.    I don't know if I referenced it in that way.  Are you

5    talking about the other methods I've used, or --

6    Q.    Right.  Well, I'm following what has been written --

7    A.    Okay.

8    Q.    -- in that particular document, that 17-page

9    attachment.  But let's -- let me -- instead of labeling, let

10   me just go through them.

11         So one is, where you see, for example, the Miami

12   funds from the sale of the Miami condo coming in and then

13   money going out immediately the next day, correct?

14   A.    Correct.

15   Q.    Okay.  And so you considered that as an exception to

16   the proceeds-first.

17   A.    That is specific identification, correct.

18   Q.    Okay.  And then there's another exception that you

19   utilized with regard to that Camelback Consulting Wells

20   Fargo Bank account, correct?

21   A.    Correct.

22   Q.    And the way that's notated in the attachment is that

23   that is an exception to the proceeds-first approach because

24   that is a -- primarily a business account --

25   A.    That's correct.

CROSS - POLSKI

1    Q.    -- is that right?

2              Okay.  So are you saying that that's an exception

3    to the proceeds-first approach because -- is there some

4    business account exception?

5    A.    That's not accurate.  It's a preexisting business

6    account.  The account was opened in 2011.

7    Q.    So it's because it was preexisting.

8    A.    Correct.

9    Q.    Okay.  Now if we look back at the attachment, the

10   attachment that documents the tracing has nothing in there

11   about preexisting, does it?

12   A.    It -- I'll take you word for it, but I'm not sure

13   exactly what's in the document.

14   Q.    Well, it's a document that you said that you reviewed

15   and that you went over with Mr. Bohn and that you approved

16   and you agreed with, correct?

17   A.    Yes, I haven't seen that document in a long time but,

18   yes, I reviewed it and I accepted that, yes.

19   Q.    And there's nothing in there about preexisting.

20   A.    I am -- without seeing it again, but that could be

21   true.  I'll take your word for that.

22   Q.    Okay.  What it says is that because it's primarily a

23   business account, that's an exception to the proceeds-first

24   tracing method.

25   A.    It should have said a preexisting business account.

CROSS - POLSKI

1   Q.    And is there a case that supports that, Deputy?

2   A.    That I have to do that for a preexisting business

3   account?  Or what is your -- is there a case that supports?

4   Q.    That supports that that's an exception to the

5   proceeds-first approach.

6           MR. BOHN:  Objection, Your Honor.  That calls for a

7   legal conclusion.

8           THE COURT:  Well, the rules of evidence don't

9   strictly apply.  I'm going to let the witness answer.

10          THE WITNESS:  I thought it would be consistent to

11  fund that account with untainted funds because it was open

12  since 2011.  And prior to the deposit of life insurance,

13  there were other sources of income going into that, such as

14  his franchising fees, his other insurance payments.  And I

15  thought it would be consistent to continue to fund that

16  account in the same manner.

17  BY MS. MOSS:

18  Q.    So, again, are you aware of any accounting principles

19  or any legal case that says that that is an exception to the

20  proceeds-first approach?

21  A.    Nothing that specific.

22  Q.    So that is something that you created on your own to --

23  in order to trace this money?

24  A.    It's my understanding that I have wide discretion to

25  use different tracing methods.

CROSS - POLSKI

1    Q.    Okay.  So that, again, is a choice that you made?

2    A.    Correct.

3    Q.    And let's say for a second that that choice is wrong,

4    and let's just assume that that choice is wrong.

5          If we go back to chart 21.  Government Exhibit 21.

6          Would that change the numbers on this chart?

7    A.    Yes.  Any changes of the tracing methodology would

8    change the numbers.

9    Q.    So I want to just track, for example, on some of these

10   Vanguard statements.  I want to go back to Government

11   Exhibit 2.

12   A.    Okay.

13   Q.    Now, we've talked a lot about how, on January 31st,

14   there was $44,000 that went into this account, correct?

15   A.    Correct.

16   Q.    Now, there's a withdrawal of a check being written on

17   February 22d of $20,000.  Do you see that?

18   A.    Correct.

19   Q.    Now because you applied this preexisting business

20   account exception, normally that $20,000 under the

21   proceeds-first approach, that would reduce the amount of

22   tainted funds in the account, correct?

23   A.    Correct.

24   Q.    Okay.  But because you selected to use this business

25   account exception, you're saying that it's untainted.

CROSS - POLSKI

1    A.    Correct.

2    Q.    Okay.  So let's assume for a second that it is tainted;

3    that that business account exception is incorrect.

4    A.    Okay.

5    Q.    Okay?  That would reduce the $44,000 by $20,000,

6    correct?

7    A.    Correct.

8    Q.    So we would be down to 24,000, correct?

9    A.    Correct.

10   Q.    Now, there's another check that comes out that day on

11   February 22d of $14,000.  Do you see that?

12   A.    Yes.

13   Q.    And so, again, if we assume that your business account

14   exception is not an acceptable tracing method, that further

15   reduces the $44,000 under the proceeds-first approach to

16   $10,000, doesn't it?

17   A.    Yes.

18   Q.    And if we could go to Government Exhibit 20.  Now, on

19   March 15th, do you see that there's another check for

20   $25,000?

21   A.    Yes.

22   Q.    And that, again, is going to the Camelback account, the

23   Wells Fargo account, correct?

24   A.    Correct.

25   Q.    So, again, if we're following strictly the

CROSS - POLSKI

1   proceeds-first approach, by the time that $25,000 check

2   comes out, that means there's no insurance proceeds left in

3   the account, correct?

4   A.   Correct.  And that would exhaust the other sources of

5   funds, yeah.

6   Q.   So that would leave the balance of tainted funds in

7   30-9515 as zero, correct?

8   A.   Yes.  Until the deposit of future ones, but yes.

9   Q.   Okay.  And now, again, would mean that the numbers and

10  the percentages in chart 21 -- Exhibit 21 would be

11  different.

12  A.   That's correct.

13  Q.   Now, that's -- those three that we looked at, the

14  $20,000 check, the $14,000 check, and the $25,000 check,

15  those were not the only checks that were being written to

16  Camelback Consulting, correct?

17  A.   That's correct.

18  Q.   There were a number of other checks that take place

19  after that time period, correct?

20  A.   During this time period it was 78,500 -- are you

21  talking about the entire period of it or --

22  Q.   No --

23  A.   There was a little over 200,000 --

24  Q.   Over $200,000, okay.  All right.  We can take down

25  chart 21.  Let's take a look at Government Exhibit 27,

121

CROSS - POLSKI

1    please.

2             Do you remember seeing this chart --

3    A.    Yes.

4    Q.    -- Deputy?

5    A.    I created this.

6    Q.    Now, again, you talked about this preexisting business

7    account exception to your tracing method.  This particular

8    chart traces money from a Wells Fargo account to 446.  Do

9    you see that?

10   A.    Yes.

11   Q.    And that's a transaction on September 28th, 2020 of

12   $200,000 --

13   A.    That's correct.

14   Q.    -- is that correct?

15            Now, this is also a business account, is it not?

16   A.    That's correct.

17   Q.    And this is a business account that the owner is Three

18   Rivers Dental Management?

19   A.    That's correct.

20   Q.    And why don't you apply the -- the business account

21   exception to this account?

22   A.    Two reasons.  One, this account was 100 percent

23   proceeds.  There were no untainted funds to dip into.  And

24   then, two, that account was created later.  I was -- there

25   was a preexisting business account exception.  That account

CROSS - POLSKI

1    was created later.

2    Q.    Okay.  So because it's not preexisting, then you're

3    saying it doesn't apply here?

4    A.    That and the fact that there were no untainted funds in

5    this account to move towards it.

6    Q.    Let me ask you about one other transaction on this

7    account.  You have at the bottom something called

8    "settlement."

9    A.    Yes.

10   Q.    Is that money that comes into the account?

11   A.    Yes.

12   Q.    Is that money linked to the insurance proceeds?

13   A.    It is -- so since this account was 100 percent

14   proceeds, that settlement -- there's not more information

15   here, but I researched that settlement, and it's for one of

16   the securities, one of the stocks that were owned in that

17   account, there was a settlement payment into it.

18             So how I based that is because he owned that stock

19   with the tainted funds, it still goes to the tainted.

20   Q.    Okay.  So you made a judgment that even though there's

21   money coming in from a different source, right, not coming

22   in from the Vanguard 30-9515, you made a judgment that that

23   should be tainted?

24   A.    Any dividends, appreciation, or other ways of making

25   money off the tainted funds will go back into the tainted

CROSS - POLSKI

1    pile.

2    Q.    Okay.  So even though, again, this is money coming in

3    from a completely different source, coming into this

4    account, you considered that tainted?

5    A.    Yes.

6    Q.    Okay.  Let's take a look at another chart.  Let's pull

7    up, if we could, Government Exhibit 29.

8    A.    Okay.

9    Q.    Now, Deputy, this is a chart that shows account 30-9515

10   leading up to the payment to Fidelity National Title for the

11   Arizona home, correct?

12   A.    Correct.  This picks you up after that transfer of

13   $3 million --

14   Q.    I'm sorry.  I'm sorry, I ask you to slow down for me.

15   A.    I'm sorry.  This chart starts off after that

16   transaction for the $3 million, and it goes to the payment

17   of Fidelity National Title.  That's correct.

18   Q.    Okay.  And in this chart, you're keeping track of what

19   you say are tainted funds versus untainted funds, correct?

20   A.    Correct.

21   Q.    Now, you told us before about this exception that you

22   applied to the Miami funds because the Miami funds went in

23   on a date and came out on another date, correct?  Came in on

24   the same date, actually.

25   A.    Yes.

CROSS - POLSKI

1    Q.    And if we could just quickly look at that.  And this is

2    Government Exhibit 20.

3            So just -- so everyone knows what we're talking

4    about, you see on June 13th, towards the bottom, that money

5    comes into 30-9515 of $297,000 and 562 [sic] cents.  Do you

6    see that?

7    A.    Yes.

8    Q.    And then that same day, there's a wire out or check out

9    of $105,000, correct?

10   A.    Correct.

11   Q.    Okay.  And because that money is coming in and going

12   out on the same day, you assume those are linked, correct?

13   A.    It's not just the timing; it was also the fact that

14   people typically, when they sell one property and buy

15   another, they intend to use that funds for that purchase.

16   So it wasn't specifically the timing, it was because it was

17   a real estate transaction; I wanted to give him credit for

18   that.

19   Q.    Okay.  So that's a judgment that you made, then,

20   correct?

21   A.    Yes.

22   Q.    And so for these related real estate transactions,

23   you're counting differently from the proceeds-first

24   approach, correct?

25   A.    I believe that is specific identification, yes.  I

125

CROSS - POLSKI

1    wanted to use real estate money for real estate money.

2    Q.    Okay.  And so going back, again, to Government

3    Exhibit 29, when we see the money that's finally going out

4    to Fidelity National Title on August 30th, you are applying

5    that same exception there because it's real estate money for

6    real estate money?

7    A.    Yes.

8    Q.    Okay.  And we see there, though -- this is August 30th,

9    2017, right?

10   A.    Yes.

11   Q.    So this is 2 1/2 months after that money has come in?

12   A.    Yes.  That was the next real estate related transaction

13   for Vanguard 30-9515.

14   Q.    Okay.  And so if that's incorrect, then that would

15   change the numbers in the tainted balance and the untainted

16   balance?

17   A.    If I change may tracing methods, it's going to change

18   the numbers.

19   Q.    Okay.  And I just want to point out also on this

20   Government Exhibit 29, that we see transfers to Wells Fargo

21   9749 on August 15th, 2017.  Do you see that?

22   A.    Yes.

23   Q.    For $20,000.

24   A.    Yes.

25   Q.    And also on August 15th, for $10,000.

**A. Yes.**

**Q. And that's where you're doing this preexisting business account exception to the proceeds-first --**

**A. Correct.**

**Q. Okay. And, again, if that is an incorrect tracing method or exception to the tracing method, that's going to change the numbers on the untainted balance and the tainted balance columns, correct?**

**A. Yes. Any time I change my methods, it's going to change the numbers.**

**Q. Okay. Let's take a look at Government Exhibit 32.**

**A. Okay.**

**Q. Do you see that?**

**A. I do.**

**Q. I want to take a look at the first row here, which is the balance on February 1st, 2018. And we see the total balance. And then we see numbers that you've attributed to untainted balance and tainted balance. Do you see that?**

**A. Yes.**

**Q. And these numbers are partially based on a transfer that occurred on the same day of $500,000 to -- from -- I'm sorry, from 30-9515 -- actually, it's to 30-9515 from Wells Fargo 9749. Do you recall that?**

**A. Yes. There's a $500,000 transfer.**

**Q. Okay.**

127

CROSS - POLSKI

1    A.    Or check deposit.

2    Q.    And, again, if your business account exception is

3    incorrect, that changes those columns of untainted balance

4    and tainted balance, correct?

5    A.    I added that $500,000 to the untainted pile.

6    Q.    Untainted balance.

7    A.    Correct.

8    Q.    And if we add it to a different column, it changes the

9    numbers.

10   A.    Well, I -- there's no reason for me to add it to a

11   different column because it wasn't related to life

12   insurance.  I don't understand.

13   Q.    Well, we -- you're doing the proceeds-first approach,

14   right?

15   A.    It's a deposit from an account that did not receive any

16   life insurance deposits; therefore it goes to the untainted

17   balance.

18   Q.    Got it.  Okay.  So let's pull up a different account

19   now -- a different chart.  Let's take a look at Government

20   Exhibit 39.

21        This is a chart that you made to follow the money

22   for the payment of the Bentley; is that right?

23   A.    That's correct.

24   Q.    And the top table is money going in and coming out of

25   the Vanguard account of 30-9515.

CROSS - POLSKI

1    A.    That's true.

2    Q.    If you look at the third row there on February 17th,

3    2021, do you see a wire redemption to this unknown Citibank

4    account?

5    A.    Yes.

6    Q.    So that's money going out of the account, correct --

7    out of the account, correct?

8    A.    That's true.

9    Q.    Now, under the proceeds-first approach, is that tainted

10   money?

11   A.    I traced the -- that deposit to a preexisting Morgan

12   Stanley account; it's not Citibank.  It did go to Morgan

13   Stanley based off the memo lines of that wire.

14   Q.    So instead of going to Citibank, it went to another

15   Wells Fargo preexisting account?

16   A.    No, it went to a Morgan Stanley account.

17   Q.    Morgan Stanley?

18   A.    Sometimes wires go through other accounts.  So, for

19   example, if you looked at that $3 million, it would say

20   HSBV, but we know that was Vanguard.  I believe that's what

21   happened here.  I saw that deposit in the Morgan Stanley.

22   Q.    Okay.  Is that reflected in this chart?

23   A.    No.  This is pulled directly from my excel spreadsheet,

24   but I did trace that transaction there.

25   Q.    Okay.  So, again, you are applying this preexisting

CROSS - POLSKI

1   business account exception to that?

2   A.    It's a preexisting account, correct, that existed

3   before any deposit of the life insurance.

4   Q.    And because it's a preexisting account, you're saying

5   that's untainted now?

6   A.    Yes.

7   Q.    Okay.  Now, going to a lower row, which is the check --

8           THE COURT:  Counsel, let me jump in.  I'm confused

9   by a line of your cross-examination about these prior

10  business exception -- business account exceptions.  The

11  witness has said he's attributed that to untainted.  Is it

12  your position he should have attributed it to tainted funds?

13  Because if not, then I don't see the -- I don't see the

14  logic of your examination as to that particular thread of

15  questions.

16          MS. MOSS:  We haven't traced it, Your Honor, to see

17  how it would affect the specific assets.  It could be that

18  other assets -- the balances are completely different.

19          It also goes to show that the way he's documenting

20  these charts, the numbers in these charts, and he's

21  attributing percentages, is incorrect.

22          THE COURT:  You're conflating a lot of things

23  there.  One is I think it's been established that if he just

24  cherrypicked a particular date, that number may change based

25  on the sequence of the transactions that gave rise to that

CROSS - POLSKI

1    number on that particular date, which is a point, I guess,

2    but I don't know what -- how much of a difference it makes

3    in the larger scheme.  But I'm asking a more specific

4    question.

5            I don't understand why you're asking this witness,

6    "Oh, so you're assuming that because it's a preexisting

7    business account, you're putting it into the untainted

8    basket," as if that was the wrong thing to do.

9            If it was the right thing to do, I don't see why

10   we're wasting time on the line of questions having to do

11   with the preexisting business account going into an

12   untainted column.  That's the column you want it to go into

13   as a -- as the defense, right?

14           MS. MOSS:  Your Honor, the point that we're making

15   is that the tracing method is unreliable.

16           THE COURT:  I know that's what you're trying to get

17   to.  I'm just teasing out one sliver of your

18   cross-examination, which I don't think is really getting us

19   anywhere, but it's just taking up a lot of time.  Which is

20   asking him:  Why is it that he put funds from a preexisting

21   business account and characterized those as untainted funds?

22           I don't think you want him to have done anything

23   different than that.  And assuming I'm right, why are we

24   spending time on that?  You should focus on the other parts

25   of your cross-examination.

CROSS - POLSKI

1      MS. MOSS:  Well, again, I can't say whether I want

2  him to do that or not without having followed that through

3  and seeing how that affects all the assets that the

4  Government is attempting to forfeit.

5      THE COURT:  Okay.  I don't want to get into an

6  argument with you here.  You've heard what I've said.

7  You've heard how I'm viewing what you're getting out of this

8  cross -- at least that portion of that cross.  And if you

9  want to continue down this road, I'm not going to stop you.

10  Go ahead.

11      MS. MOSS:  Thank you.

12  BY MS. MOSS:

13  Q.   Let's take a look at that transaction on April 20th,

14  2021.  The check to Wells Fargo 9749.  Do you see that,

15  Deputy?

16  A.   That's the check for 150,000, correct.

17  Q.   Correct.  Okay.  Now, again, according to what the

18  judge just said, and what you have said, that that -- you're

19  attributing it to untainted funds because it's a preexisting

20  business account, correct?

21  A.   I was more focused on the memo line seeing it was for

22  the Bentley Bentayga.

23  Q.   I'm sorry?

24  A.   I -- that was because it was for the Bentley Bentayga;

25  it was pretty clear what the intent of that transaction was.

CROSS - POLSKI

1    Q.    So you're counting some of that money to tainted and

2    some untainted because you could see what it was for?

3    A.    Yes.  I saw -- I labeled this more specific

4    identification because there's two checks that both say

5    "Bentley Bentayga."  So, yes, even though it went to Wells

6    Fargo 9749, the intent was to buy that Bentley with it.

7    Q.    So you're applying an exception to the exception?

8    A.    No, that's my -- that's specific identification, in my

9    opinion.  I knew exactly what that transaction was for.

10   Q.    Well, let me ask you, then -- and I don't want to bring

11   up all of these different withdrawals -- but there are a lot

12   of checks from this particular account that go to Wells

13   Fargo, that business account for Camelback Consulting,

14   correct?

15   A.    That's correct.

16   Q.    And some of them have on the memo lines something

17   personal.  In other words, it's not a business transaction,

18   but it's a personal transaction.

19   A.    I'm aware of what's on a lot of the memo lines, yes.

20   Q.    Okay.  But you still attributed all of those a

21   different way, right?

22   A.    Yes.

23   Q.    Let's go to Government Exhibit -- let's go to

24   Government Exhibit 40.

25   A.    Okay.

133

CROSS - POLSKI

1    Q.    Now, this, again, is tracing money through this

2    particular Vanguard account, correct?

3    A.    Yes.  This is the -- that transaction happened on

4    February 22d, 2018, to the six subaccounts, yes.

5    Q.    And I just want to make a point on this particular

6    chart -- and actually on all the charts -- that the tracing

7    that you do is based on bank statements up until

8    August 31st, 2017 -- or 2021?

9    A.    Everything is based on what I had in front of me, which

10   were returns up until that period, correct.

11   Q.    Okay.  So, again --

12   A.    Yes.

13   Q.    -- you were only able to look at bank statements and

14   account statements up until August 31st, 2021, correct?

15   A.    That's correct, yes.

16   Q.    Okay.  So when we see that there were an amount seized

17   of $527,736 at the bottom there, right?

18   A.    Correct.

19   Q.    That money was seized in December of 2021, right?

20   A.    Correct.

21   Q.    Okay.  And, so, what we don't see in any of these

22   charts is what happened between August and December of 2021.

23   A.    That's correct.

24   Q.    Okay.  You can take that down.  Let's take a look at

25   Government Exhibit 42.

134

CROSS - POLSKI

1          This is a chart where you were documenting proceeds

2     that you traced to the Paradise Valley, Arizona, home,

3     correct?

4     A.    Correct.

5     Q.    And, again, what we're looking at here is money that

6     you followed up until May 31st, 2021.

7     A.    That's correct.

8     Q.    And based on the money that you followed up to that

9     date, you determined that 58.74 percent was tainted.

10    A.    Yes.

11    Q.    Now, if money came in that was used to pay for the

12    construction or the mortgage or -- let's say the tax

13    liability for this property in 2021, 2022, 2023, would you

14    need to add those to this chart to make it more accurate?

15    A.    Yes.

16    Q.    And if more money -- and I should say untainted

17    money -- came in during 2022, 2023, and the end of 2021,

18    would that change the percentage that you have listed here

19    in this chart?

20    A.    If it was untainted, then yes.

21    Q.    Yes.  So then this does not necessarily give us a full

22    picture of the percentage of tainted versus untainted for

23    that property, does it?

24    A.    This is an accurate representation up until May 30th of

25    2021, correct.

135

CROSS - POLSKI

1    Q.    And the same with Government Exhibit 43.  This is a

2    chart where you tracked money going to the Cranberry

3    Township property, correct?

4    A.    Correct.

5    Q.    And you're following money going up to -- is it the

6    same date, May 31st, 2021?

7    A.    This -- well, out of this account, no; this was just

8    going through the October 1st, 2020 payment.

9    Q.    So you're just going to 2020 on this.

10   A.    That is all the direct tainted proceeds, yes.

11   Q.    So, again, the same question for this property:  If

12   there is untainted money that is being used to help fund

13   this property, pay mortgage payments, pay tax liability, pay

14   HOA fees beyond the lease, would that change the numbers in

15   this account -- in this chart?

16   A.    If there are other untainted sources of income, it

17   could change -- yes, it would change the numbers.

18   Q.    Okay.  So, again, the percentage that you have listed

19   tainted is 50.555 --

20   A.    That is --

21   Q.    -- that does not take into account tainted monies from

22   2022 and 2023 that went into this property.  Untainted,

23   sorry.

24   A.    That's correct.

25   Q.    So that would -- that percentage would need to change.

CROSS - POLSKI

1    A.    Yes, under -- the mortgage payments were largely

2    being -- I have another chart that follows the funds from

3    the $11,000-a-month monthly mortgage payments that go

4    towards the mortgage payments here.  So he's getting rent

5    money and it ends up going towards the mortgage payments.

6    Q.    Okay.  So that's what you spoke about for those lease

7    agreements, but that was a lease agreement that ended in

8    2021, correct?

9    A.    The end of 2021, I believe.  It was in -- it was a

10   15-month lease and it started in October of 2020, so, yes,

11   it would have ended in end of 2021.

12   Q.    So, again, make sure it's all clear --

13   A.    Yes.

14   Q.    -- so money after that -- untainted money coming after

15   that, end of 2021, 2022, 2023, going into this property,

16   that would change the percentage that you have on this

17   chart, correct?

18   A.    Correct.

19   Q.    Now --

20         THE COURT:  Ms. Moss, before you move on to

21   something else, let me inject a question.

22         Mr. Polski, what is your understanding of the

23   current status of the Cranberry Township property?

24         THE WITNESS:  It's been restrained; it's the last I

25   know.  There's a lis pendens probably filed on it.

CROSS - POLSKI

1          THE COURT:  It's been, sorry?

2          THE WITNESS:  There's probably a lis pendens filed

3    on it.  It's been restrained.

4          THE COURT:  By the magistrate judge in this case?

5    Restrained -- what do you mean by "restrained"?

6          THE WITNESS:  There was a civil warrant, probably

7    included in the case.  It's --

8          THE COURT:  From this case?

9          THE WITNESS:  Yes.  Or it's a civil case, I

10   believe.

11         THE COURT:  All right.

12         THE WITNESS:  I can't remember if it's civil or

13   criminal, but yes.

14         THE COURT:  Let me ask the question a different

15   way.  Is this an asset that's currently available to the

16   defendant to discharge any debts that might arise out of the

17   judgment of conviction in this case?

18         MS. MOSS:  Which account did you say, Your Honor?

19         THE COURT:  Not an account; the Cranberry Township

20   property.  I'm asking:  Is it -- is it an asset that's

21   available to the defendant from which he can meet

22   obligations of the -- his financial obligations from any

23   judgment of conviction entered in this case is the question?

24         THE WITNESS:  There is equity in the property that

25   could be used to pay --

CROSS - POLSKI

1      THE COURT:  Does he have access to it?

2      THE WITNESS:  I believe -- he can't sell it without

3   permission, I don't believe, with that lis pendens filed on

4   it.

5      THE COURT:  Okay.  Let's do this.  We're going to

6   take a break for lunch.  Why don't you, sir, in the

7   meantime -- since you're in the middle of your testimony,

8   I'm directing you not to speak with any of the lawyers

9   during the lunch recess -- and I'd ask you to review your

10  files or whatever other sources of information they have

11  available to you in order to definitively answer my question

12  when we come back.

13      All right, we will be in recess until 1:30.

14      (recess taken 12:42 p.m.)

15                      AFTERNOON SESSION

16      (In open court at 1:31 p.m.)

17      THE COURT:  All right, Mr. Polski, I remind you you

18  remain under oath.

19      Have you gotten an answer to my question?

20      THE WITNESS:  103 Morningside Drive is a property

21  that can be used to satisfy any judgments against Lawrence

22  Rudolph.

23      THE COURT:  Okay.  Thank you.

24      THE WITNESS:  You're welcome.

25      THE COURT:  All right.  Ms. Moss, you may continue

CROSS - POLSKI

1    your examination.

2    BY MS. MOSS:

3    Q.    Can I ask you what you mean by that, that it can be

4    used to satisfy any forfeiture judgment?

5    A.    He -- so the property is owned by Three Rivers Dental

6    Management Systems, an entity that is controlled by Lawrence

7    Rudolph.    There is a cosigner, Lori Milliron, but . . .

8    Q.    What -- how do you know that he is the one that

9    controls Three Rivers Dental Management?

10   A.    I pulled documents from the Pennsylvania Secretary of

11   State for Three Rivers Dental Management Systems.

12   Q.    And do you know who currently is the power of attorney

13   and who is controlling that property?

14   A.    I know that -- I can't be a hundred percent certain.    I

15   believe it's Julian.

16   Q.    And so is -- as far as you know, Julian is the one

17   who's actually controlling that property and has possession

18   of it?  Or not possession, but is controlling.

19   A.    Julian Rudolph has the power of attorney over Lawrence

20   Rudolph.

21   Q.    And, Deputy, do you know who it is that has been paying

22   the mortgage and the taxes and the HOAs for the Cranberry

23   property and for the Paradise Valley property in 2022 and

24   2023?

25   A.    I do not.

140

CROSS - POLSKI

1    Q.    I want to ask you just quickly about the Victor, Idaho,

2    property.  And I believe that your testimony on direct was

3    that was in the name of Lawrence Rudolph?

4    A.    It was Lawrence and Bianca Rudolph originally.  I said

5    that it's still a property that's available.  It was listed

6    for sale recently.

7    Q.    Are you aware that it's no longer for sale?

8    A.    This would be news to me.

9    Q.    Are you aware that it's recently been transferred into

10   what's called the Credit Bypass Trust?

11   A.    I was not.

12   Q.    And are you aware that that Credit Bypass Trust is part

13   of an Arizona default judgment that has been ordered by a

14   judge so that property no longer is belonging to Lawrence

15   Rudolph?

16   A.    That is news to me.

17   Q.    Just one last area of questions on the Paradise Valley.

18   You testified that -- again about you don't know about the

19   untainted money that's been going towards payments for

20   Paradise Valley in 2022 and 2023, correct?

21   A.    Correct.

22   Q.    And if there are payments that have been going to, that

23   would change your percentages, correct?

24   A.    Correct.

25   Q.    And in addition to the payments that have been going to

CROSS - POLSKI

1    Paradise Valley in 2022 and 2023, we haven't looked at, but

2    there is Government Exhibit 51 that was admitted into

3    evidence.

4    A.    Okay.

5    Q.    Have you seen Government 51 before?

6    A.    I have.

7    Q.    And Government 51 is a note that is on the property,

8    correct?

9    A.    Correct.

10   Q.    So there is a -- currently a mortgage of $2.5 million

11   to the bank of New York Mellon; is that right?

12   A.    Correct.  I think he owes about 2,493,000 right now,

13   but yes.

14   Q.    And that -- the 2.4 million that you talked about, that

15   does not include late fees and that does not include

16   interest.

17   A.    I believe this is an interest-only loan for a set

18   period of time.

19   Q.    And that does not include the late fees.

20   A.    Correct.

21   Q.    So are you aware that the amount owed on the property

22   is actually over 2.5 million at this point?

23   A.    I wasn't aware of that.

24          MS. MOSS:  I have nothing further, Your Honor.

25          THE COURT:  All right.  Brief redirect.

142

REDIRECT - POLSKI

1    MR. BOHN:   Thank you, Your Honor.

2    REDIRECT EXAMINATION

3    BY MR. BOHN:

4    Q.   Sir, when you did your analysis of this case using

5    proceeds-first, did you ever take the time or have the

6    opportunity to evaluate this case under any other theory of

7    accounting principles?

8    A.   Yes.

9    Q.   What theory did you use or look at?

10   A.   I started with -- I looked at pro rata, for example.  I

11   also did an initial analysis of perhaps using lowest

12   intermediate balance for a primary.  But they did not make

13   sense to me.

14   Q.   When you looked at those other methods, did any of them

15   have a different outcome or effect in the favor of

16   Dr. Rudolph?

17   A.   No, but I would have to run it to its conclusion to get

18   a conclusive analysis on that.

19   Q.   Okay.  And in evaluating the accounts with the

20   proceeds-first, were you -- did you take an aggressive or

21   conservative approach?

22   A.   I took a conservative approach.

23   Q.   So one of the things you mentioned earlier on direct

24   was that $100,000 went out from Bank of New York Mellon to

25   the purchase of a condo in Cabo, correct?

143

REDIRECT - POLSKI

1   A.    That's correct.

2   Q.    And was that in any way made a part of the recovery

3   sought in this case?

4   A.    It wasn't.  We had not -- the condo has not -- it's

5   still out there.

6   Q.    They have -- you were asked on cross-examination

7   numerous times about the Wells Fargo Camelback account,

8   9749, and they kept referring to it as a preexisting

9   business approach.  Was that -- is that an accounting

10  principle term you're familiar with?

11  A.    That was the first time I'd ever heard that.

12  Q.    Is there a -- an accounting principle that you did look

13  at when you were looking at the Wells Fargo account?

14  A.    Yes.  That was the lowest intermediate balance, also

15  known as bad-in, last-out.

16  Q.    And did you change your accounting principles that you

17  applied to that account at any time through the process?

18  A.    No.

19  Q.    And how about to each of the other assets that we

20  talked about.  Did you maintain the consistent same

21  accounting principle applied to each asset that you did?

22  A.    Yes.

23          MR. BOHN:  Your Honor, I have nothing else.  Thank

24  you.

25          THE COURT:  All right.  May this witness be excused

144

1    for the Government?

2         MR. BOHN:  He may on behalf of the Government, Your

3    Honor.

4         THE COURT:  All right.  For the defendant?

5         MS. MOSS:  Yes, Your Honor.

6         THE COURT:  All right.  Mr. Polski, thanks so much

7    for your testimony.  You're excused.  You may step down.

8         THE WITNESS:  Thank you, Your Honor.

9         THE COURT:  Mr. Bohn, I just want to confirm, the

10   Government has no other witness on the issues of restitution

11   or forfeiture.

12        MR. BOHN:  That's correct, Your Honor.

13        THE COURT:  All right.  And, Ms. Moss, to confirm,

14   the defendant has no witness on restitution or forfeiture?

15        MS. MOSS:  That is correct.

16        THE COURT:  All right.  Mr. Bohn, does the -- or,

17   Mr. Fields, does the Government have a witness it wishes to

18   put on with respect to the issue of a fine or ability to

19   pay?

20        MR. FIELDS:  No, Your Honor.

21        THE COURT:  All right.  Same question for the

22   defendant.

23        MR. MARKUS:  No witnesses, Your Honor.  Just the

24   exhibits.

25        THE COURT:  All right.  So I will make my ruling on

1    all three issues -- restitution, forfeiture and fine, and

2    ability to pay -- a little bit later in the hearing.

3             Mr. Fields, let me confirm, Mr. Finizio wishes to

4    address the Court; is that correct?

5             MR. FIELDS:  Yes, Your Honor.

6             THE COURT:  Is there anyone else for the Government

7    that wishes to make a statement?

8             MR. FIELDS:  Not that the Government is aware of,

9    no.

10            THE COURT:  All right.  And, Mr. Markus, is there

11   an individual who wishes to make a statement for the

12   defendant?

13            MR. MARKUS:  I believe Mr. Rudolph would like to at

14   the conclusion of the hearing, Your Honor.

15            THE COURT:  Well, yeah, definitely he'll have his

16   opportunity for an allocution.

17            MR. MARKUS:  Great.  And other than that, Your

18   Honor, no, other than the letter from Julian Rudolph which

19   we submitted.  And we would ask for some brief argument on

20   the fine, restitution and forfeiture provisions.

21            THE COURT:  Okay.  Then let's do that now.  Since

22   you raised it, we'll go with the defendant first.

23            MS. MOSS:  Which would you like to address first?

24            THE COURT:  Right now we're just addressing the

25   fine and ability to pay.

1          MS. MOSS:  I -- Your Honor, I still believe that

2    fine should be addressed last, if that's going to be

3    affected by how the Court orders on restitution and

4    forfeiture, so if we could address the restitution and

5    forfeiture before that.

6          THE COURT:  One second.  So you know what I'll do,

7    since I'm going to be coming back to all three later in the

8    hearing when I'm prepared to rule, I'll pause before that

9    and let whichever side wishes to put on any legal argument

10   with respect to one or more of those issues, we can do that

11   at that time.

12         All right.  So before I hear a statement from

13   Mr. Finizio, there are some matters I want to put on the

14   record with respect to the history and characteristics of

15   the defendant.

16         The record shows that Mr. Rudolph is 68 years old.

17   He's a citizen of the United States.  He was born and raised

18   in the Pittsburgh, Pennsylvania, metro area and has lived

19   there most of his life.  He had a comfortable middle-class

20   upbringing.  His father was a research chemist and his

21   mother was a school teacher.  He was not subjected to any

22   physical or mental trauma or abuse as a child or adolescent.

23         As for his education, the defendant graduated from

24   Norwin High School in Pennsylvania in 1972.  He received a

25   bachelor of science degree in chemistry from the University

1    of Pittsburgh in 1976 and a doctor of dental medicine degree

2    from that university in 1979.

3        With regard to his criminal history, he has no

4    juvenile criminal adjudication, according to the presentence

5    report.  He's been assessed zero criminal history points by

6    the probation officer placing him in Criminal History

7    Category I and he's before me on his first and second felony

8    convictions.  His only prior criminal conviction was for a

9    misdemeanor breaking and entering when he was 23 years old.

10        Turning to the nature and circumstances of the

11    offense, given that this matter went to trial and the

12    defendant's guilt was determined by the jury, and all

13    counsel and all parties and I were present throughout the

14    entire trial and heard all that evidence, I believe little

15    purpose would be served by a detailed recitation of the

16    nature and circumstances of the offenses.  I will instead

17    incorporate by reference the statements of fact contained in

18    the Government's sentencing statement filed at ECF 270-1,

19    which was filed pursuant to the Court's General Order

20    2002-3, as well as local criminal Rule 32.1.  All of which

21    were set forth in the -- by the probation officer in

22    paragraphs 7 through 109 of the final revised presentence

23    report, which was filed at ECF 389.

24        I note that although he was given the same

25    opportunity by the Court's General Order and the local

criminal rule to file his own statement of facts with the

Court, no such document was received by the defendant.

I incorporate the Government's statements of fact

with the caveat that I do so only to the extent that these

factual contentions are not inconsistent with any of my

findings in this hearing as they relate to the parties'

respective objections and sentencing related filings.  In

addition, later in this hearing I will discuss in an

abbreviated fashion some of the facts of this case which I

have specifically considered in making my sentencing

determination.

Officer Kinsella, do you wish to make a statement

at this time on behalf of the probation office?

PROBATION OFFICER:  No, Your Honor.

THE COURT:  All right.  Thank you, sir.

All right, Mr. Finizio, you may come forward.  So

let's begin by you stating for the record your name and how

you're related to any of the parties here.

MR. Vincent FINIZIO:  Yeah, I'm Vincent Finizio.

I'm the older brother of Bianca Rudolph.

THE COURT:  All right.  Go ahead, sir.

MR. VINCENT FINIZIO:  Okay.  Thank you.  Okay.

Apologies in advance; I'm kind of in a state here.  I would

like to begin -- I'd like to thank, on the record, the

investigators, the prosecution team, everyone involved in

1    this for your hard work and dedication in bringing about

2    justice for my sister.  The Court's time is valuable, so I

3    won't name you all, but you know who you are.  You have my

4    eternal thanks and that of my family.  I would also like to

5    thank you, Judge Martinez.  The way you applied the law with

6    rigor and even-handedness, even at times to my frustration,

7    leaves no doubt that the trial was fair and the verdict

8    just.

9            A prison sentence is mandatory.  I would urge as a

10   matter of principle that the sentence for the fraud be

11   applied connectively, although it's moot legally, probably.

12   But I would also urge that the sentence be served in an

13   institution appropriate to the severity and brutality of the

14   crime in question.

15           I also -- I would also urge -- which I will come to

16   again later -- that the Government exert whatever power it

17   has to direct as much of the defendant's assets to the

18   relief of the children who are suffering greatly in the

19   financial sense as well as an emotional sense.

20           All right.  I'm here -- I'm here on behalf of my

21   entire family to address the Court and the convicted, whose

22   name I will not speak.  Needless to say, none of us wants to

23   see you ever again or breathe the same air as you or even

24   think of you.  But the distasteful task of facing you one

25   last time has fallen to me.

1           This circumstance is just so heinous, so

2    outrageous, some things just need to be said.  Let's

3    remember why we're all here.  You shot my sister through the

4    heart at point-blank range.  That's why we're here.  That's

5    what this all comes down to in the end.

6           During the entire three weeks of the trial, I was

7    stunned again and again by the mountains of evidence against

8    you.  I was horrified.  Horrified by the lies you told to

9    justify yourself.  I was also surprised by some of the

10   evidence that the judge did not even allow the jury to hear.

11   Even without that, by the end of the trial your guilt was

12   obvious.  The fact that the jury returned nine unanimous

13   verdicts in 11 hours speaks for itself, I believe.

14          Excuse me here.  I'm -- you may or may not recall,

15   I sent you a letter in jail through your attorney which

16   neither of you ever acknowledged.  At that time, I made no

17   mention of your guilt or innocence, I simply asked you to do

18   the one decent thing you could still do:  Help your

19   children.  Use your wealth to help your children.

20          You took their mother.  You also destroyed their

21   livelihoods and their peace of mind for the foreseeable

22   future.  You can't bring back their mother, but you can help

23   with the others.

24          I will note, repeating what Mr. Fields said, that

25   your self-reported net worth is far greater than the amount

1    the Government is seeking for fines and restitution.

2    Despite this, and despite decades of indulging your own

3    lavish lifestyle, you have not lifted a finger to help them.

4    Not one finger.

5         If you -- over here.  We all know what you did to

6    my sister.  But look at what you've done to her children.

7    The instant you knew you were under investigation, you hired

8    attorneys for them, to represent them, with the intent --

9    the clear intent of poisoning them against me and my

10   brother, by telling them not to speak to us.  You also put

11   them on an adversarial footing with the Justice Department

12   who, as it turns out, was the only entity which was capable

13   of bringing around -- about justice for my sister.

14        This manipulation of yours, which lasted the entire

15   length of your marriage to my sister, and the entire

16   lifetime of my niece and nephew, continues to this very day.

17   We've seen it here in this very courtroom.

18        You've spun a false narrative in which you have

19   somehow partly at least convinced the children that now the

20   Government is the cause of all their problems.  In fact, it

21   is you, it is you, by your actions, which are outside any

22   bounds of the law, human decency, ethics, or morality that

23   caused every single problem that your children are now

24   facing.  It's all on you.  It's all on you.

25        I wasn't going to go too much into the whole

152

1    financial issue -- I have no stake in it whatsoever -- but

2    I'm deeply disturbed by some of the stuff I hear today

3    because I see it as just a continuation of manipulation

4    that's been going on, okay?  We have two wildly divergent

5    narratives of your financial status.

6            Based on the pattern of -- based on the pattern

7    of -- that I saw in the trial of misdirection,

8    prevarications, half-lies, and outright lies that you and

9    through your attorneys spewed during the whole -- during the

10   whole length of the trial -- I urge you, Your Honor, to give

11   no credence whatsoever to the defense's assertion that there

12   is no ability to pay a fine.  None of that makes any sense

13   at all.  $27 million just doesn't disappear like that.  Even

14   allowing for the amounts seized by the Government, even

15   allowing for the most exorbitant attorney's fees imaginable,

16   there's still plenty left over to help the children.

17           And in any case, why are these attorneys, you know,

18   continuing to rack up thousands of dollars per hour in fees

19   trying to prevent the seizure of assets which don't exist?

20   Someone explain that to me.  I understand, please, we're in

21   court here, and I do understand the role defense attorneys

22   play in the justice system and I respect it.  It's an

23   important one.  It's an important one.  But I do understand

24   this much:  An attorney has a client, one client.  He has --

25   they have one client.  He is their client.  And he is the

only person in whose interest they are acting.  The very
notion that the attorneys representing the murderer of their
mother is now purporting to act in their best interests is
preposterous and appalling.

I don't know if this accords with any principle of
legal probity, but on the level of common sense, human
decency, and morality, it is disgusting.  Again, Your Honor,
I urge you to give no credence to anything they say in this
regard.

I must sadly concur with what Attorney Fields said,
that I do not believe that the children will ever see a
penny of any money that he controls, okay?  Without
understanding the legal details, the legal -- surrounding
this request of my nephew, Julian, I do urge you to give
that serious consideration.  If there's any way the laws
allows that, I would -- obvious to me, on the face of it,
that the children deserve to get their mother's money, okay?
And certainly if there's any way to get it to them without
having it go through him, I urge you to take that path,
okay?

And I also have to agree with Mr. Fields that the
interest of justice and society at large would be best
served if the defendant were left penniless.

As to the matter of who is or is not acting in the
children's interests, I have total -- total faith in the

1    Department of Justice to do this fairly.

2              Let's see, where was I?  Sorry, I have another --

3    sorry.  I'm really not used to this here.  What's the last

4    thing I said?

5              Yes.  All right.  I spoke about the letter I sent

6    here that you ignored.

7              Let's move on from the children and the money to my

8    sister.  You thought you were better than my sister.  You

9    thought you could abuse, manipulate, terrorize, and finally

10   kill her with impunity.  In fact, you were never worthy of

11   her.  I bitterly wish I'd seen it sooner, but the truth of

12   it has now been laid bare for the whole world to see.

13             By this verdict, society brands you a murderer and

14   a thief.  You are also a traitor and a liar.  You betrayed

15   that which should have been most sacred to you:  the woman

16   you were pledged to and the children she bore you.

17             You spewed vile, disgusting lies before the whole

18   world that no man should ever have to hear about his baby

19   sister and which no children should ever hear about their

20   mother.  Your words, like your actions, are poison.

21   Everyone is worse for having known you.  Everyone who's ever

22   run into you.

23             Your attorney claimed in court, and I quote, The

24   devil loads the shotgun.  Some sort of attempt to deflect

25   blame, I guess.  Well, he thought he was being clever.  But

in fact, he was correct.  What he failed to mention is that
you were the devil.  Yes, you loaded it, then you pointed it
at my sister's heart and then you pulled the trigger.  Do
not forget that.  Never forget that.

God forgive me for saying this, but I hope the
horror of her last moments will haunt you forever.  May you
never have a peaceful night's rest.  God knows you do not
deserve it.  I will refer to Dante's Inferno where the
lowest circle of hell was reserved for Judas and those who
betrayed a friend.  You betrayed not a friend, but much,
much worse:  your own wife and children.  If Dante knew you,
he would have to add another circle to his hell.  Even Judas
would be ashamed to be in your company.

You are not fit to be mentioned in the same breath
as my sister.  After today, you never will be.  We stand for
Bianca.  I stand as a family for all of us, but no one
stands for you unless they're being paid.  Your family has
abandoned you.  Your parents to whom Bianca, I must point
out, was a dutiful, loving daughter-in-law to their dying
days, are turning over in their graves.

You will go to your prison cell reviled, unloved,
and forgotten.  You will die alone and unmourned.  This
knowledge unfortunately brings us some satisfaction that
justice has been done but, alas, no comfort.  What little
comfort we have comes from knowing that my sister's finally

1      free of you, and the rest of us can live on in a better

2      world without you in it.

3              My sister was a sweet, beautiful girl who blossomed

4      into a radiant young woman.  She would still be with us as a

5      happy, well-adjusted wife and mother if she had not fallen

6      into your clutches and been sucked into your twisted world.

7              She was also a faithful Catholic who turned to her

8      faith in times of trouble.  And our religion does tell us

9      that she's in a better place.  I believe that.  She could

10     hardly be in a worse place than here on earth married to

11     you.

12             It also teaches us to believe in forgiveness and

13     redemption.  But I speak for the whole family when I say we

14     cannot forgive you for ourselves and certainly we cannot

15     forgive you on her behalf.  Forgiveness must be earned.

16     I've seen no hint of remorse or shame, apart from a few

17     crocodile tears.  And you took from my sister the one thing

18     that can never be restored.

19             If you seek forgiveness -- a doubtful

20     proposition -- but if you do, it must come from a higher

21     power.  Even though, in honor of Bianca's better nature, I

22     won't dismiss the possibility of redemption, but that's

23     between you and your God, if you ever, ever choose to

24     acknowledge a higher power than your own greed and lust.

25             Finally, hearing your sentence pronounced today

1    will bring us near to closure.  Our family's moving on;

2    cherishing memories of Bianca, and purging those of you.  We

3    will provide a dignified final resting place for Bianca,

4    which you denied her.  In a place you will never know or

5    sully with your presence.

6         We will cherish the love Bianca gave us in life and

7    take comfort from honoring her memory.  She will live

8    forever in all our hearts, especially in the hearts of her

9    children, who will pass on precious, untainted memories of

10   their mother to their children to come.  The greatest

11   blessing that can come to those children will be to have

12   never even known that you existed; something I would wish

13   for all of us.  And with that, I dismiss you.

14        I thank the Court once again for your attention and

15   to all of you who helped bring this verdict -- verdict -- or

16   this result about.  I again offer my eternal thanks.  By

17   your actions here you have truly in every sense earned your

18   collective title as the Department of Justice.  Thank you.

19        THE COURT:  Mr. Finizio, thank you for your

20   comments.  I know it's not easy for you to come here in a

21   courtroom and express yourself as you did and speak on

22   behalf of your family and I do genuinely appreciate the

23   effort you made to be here, and appreciate your comments.

24        MR. VINCENT FINIZIO:  Thank you.

25        THE COURT:  All right, Mr. Rudolph, if you'll take

1    the lectern, please.  Do you wish to make any statement to
2    the Court on your own behalf before I announce your
3    sentence?
4            THE DEFENDANT:  Yes, sir.  Yes, Your Honor.  Thank
5    you for allowing me the time to make a statement.
6            THE COURT:  Go ahead.
7            THE DEFENDANT:  My name is Dr. Larry Rudolph.  On
8    October 11th, 2016, my life and my children's lives were
9    forever shattered.  I lost my wife of 34 years; my best
10   friend, my hunting buddy, and the mother of my children.  My
11   children, AnaBianca and Julian, lost their mother whom they
12   loved and adored.  It was a thrill and a joy to watch them
13   together, laughing and playing games as they were growing
14   up.  We were a very close family.  We had special movie
15   nights, family dinners where we would all prepare the meal
16   together.  School activities, sports and travel.
17           Bianca and I introduced them to their -- to travel
18   and adventures of seeing different countries and people.
19   Bianca was always there for -- for them when it came time
20   for school plays and sports.  Usually I was working, which
21   she never complained doing these things without me.
22           I fell in love with Bianca when we first met at the
23   University of Pittsburgh in 1977.  She was so beautiful.  We
24   married in 1982 in a Catholic mass and honeymooned in Italy.
25   Through the years, our marriage had its share of problems,

but we worked through them.  And our love and our friendship
endured.

We were both in our 60s, living in Phoenix, having
moved from Pittsburgh, and were semi-retired.  We were
looking forward to watching our children graduate from law
school and dental school, starting their businesses,
weddings and, hopefully, grandchildren.  We were both happy
and content.  Life was good.  We were both so very proud of
our children.

What happened in Zambia was a terrible, tragic
accident.  Nothing more.  This was not a murder, but a
horrible moment in time, with unimaginable grief that took
her from me and her children, shattering our family.  Now my
children are orphans, losing both parents.

And AnaBianca and Julian, like Grandpa, I always
put our family first and did all I could to keep us together
as a family.  Please stay well, healthy, and strong.  Be
happy in your lives.  Don't let all that has happened
destroy you and your chance of happiness.  Know that Mom and
I pray for you every day.  We love you more than you know.
God bless you both.

THE COURT:  All right.  Hold on.  Hold on,
Mr. Rudolph.  I have some questions for you.

Now, sir, you understand that you continued to
maintain your innocence, but you appreciate, I hope, that I

1    have to sentence you based on the jury's guilty verdict.

2    You understand --

3              THE DEFENDANT:  I do, sir.

4              THE COURT:  All right.  What do you think is the

5    greatest tragedy that occurred in this case?

6              THE DEFENDANT:  The loss of their mother and my

7    wife; just combined tragedy.

8              THE COURT:  What do you most regret about your role

9    in this case?

10             THE DEFENDANT:  I've thought about that ever since

11   the accident, Your Honor.  My role, I should have taken

12   better care of her.  Maybe I should never have started her

13   hunting in the first place, and been more attentive.  I let

14   her down.

15             THE COURT:  You understand the jury saw that

16   differently, don't you?

17             THE DEFENDANT:  I know that, sir.

18             THE COURT:  All right.  And I saw the evidence

19   differently, too.  I don't know if you appreciate that, but

20   I do.

21             THE DEFENDANT:  I do, sir.

22             THE COURT:  You know what I think is the greatest

23   tragedy here?  That but for you and Ms. Milliron's

24   phenomenal avarice, that none of this need to have happened.

25   If your marriage to Bianca was over and you were in love

1    with Ms. Milliron, you could have gotten a divorce.  You

2    would have been -- you wouldn't have received the insurance

3    proceeds because she would still be alive.  You would have

4    had to split your estate, your phenomenal 20-plus million

5    estate with her so you'd have half of that, but she'd be

6    alive today.  Your children would have their mother.  You'd

7    be with Ms. Milliron in Cabo, or wherever you wanted to be,

8    and neither of you would be in jail today.  That's what I

9    think is the greatest tragedy here.  What do you say to

10   that?

11            THE DEFENDANT:  Your Honor, it's been a living hell

12   since October 11th, 2016.  I do reassert my innocence.  I

13   understand what you're saying.  My wife and I were happy.

14   Believe it or not, we were content in those years.  And I

15   did not murder her.

16            THE COURT:  Do you view yourself as a victim in

17   this case?

18            THE DEFENDANT:  No, sir.

19            THE COURT:  I'm sure you view your deceased wife as

20   a victim.

21            THE DEFENDANT:  My wife?

22            THE COURT:  Yes.

23            THE DEFENDANT:  Yes, sir.  She's no longer with us.

24            THE COURT:  And what about your children?  Are they

25   victims?

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  What are you going to do for them after

3    today?

4          THE DEFENDANT:  I want to try to provide them with

5    everything we can through the system to help them have a

6    good life, as Bianca and I spent 38 years preparing them

7    for, sir.  We worked very hard to provide them with good

8    educations, with good training, a religious upbringing.  And

9    provide them with an inheritance at some point.  That was

10   our goal when we set up our trust together.

11         THE COURT:  Well, why do you think they're not here

12   today?

13         THE DEFENDANT:  Well, my daughter was ill.  My son

14   was planning on attending.  I just found out this morning he

15   wasn't coming.  Apparently it was too emotional for him.

16         THE COURT:  Do you think it might have something to

17   do with what they think you did to their mother?

18         THE DEFENDANT:  I don't think so, sir.  They've

19   been very supportive of me throughout the whole process.

20   They really have.  We love each other.  There's no

21   animosity.  We care for one another.  And I miss them

22   terribly.  I only wish I was there to help guide them

23   through this time in their life, but it's not available to

24   me.

25         THE COURT:  All right.  Anything else you want to

1    tell me?

2              THE DEFENDANT:  No, sir.

3              THE COURT:  All right.  The two of you can return

4    to counsel table.

5              MR. MARKUS:  Your Honor, may I just briefly address

6    the children for one second?

7              THE COURT:  Yes.

8              MR. MARKUS:  As the Court knows, they were in trial

9    every day here supporting their father.  We've been in touch

10   with them throughout the past year, including about whether

11   they were going to come to the sentencing.  Both children,

12   AnaBianca, and Julian, told us last week they would be here.

13   I received a text -- actually an email from AnaBianca on

14   Saturday, saying she was ill and could not make it.  And

15   just this morning from Julian, that he was unable to come

16   because it was just too emotional for him to be here.  But

17   we are in touch with them, as is Larry Rudolph.

18             THE COURT:  All right.  Thank you.

19             I'm prepared to rule on the Government's sentencing

20   statement and what I have construed as a motion for an

21   upward departure on the issue of the fine to impose.  And

22   I'm also prepared to rule on the defendant's sentencing

23   memorandum.  And we will get to forfeiture and restitution

24   and fines after this.

25             At this time, I want to make a record regarding

some of the key facts of this case which have been proven

beyond a reasonable doubt at trial and which I have

specifically relied upon in arriving at my sentencing

decision in regards to Defendant Rudolph.

I begin with the central fact that the defendant

was found guilty by the jury of the two counts returned

against him by the grand jury in the superseding indictment.

That being, of course, foreign murder and mail fraud and the

aiding and abetting of same.

Apart from the breaking-and-entering misdemeanor

conviction which he incurred 45 years ago, the defendant's

two felony convictions in this case are his only criminal

convictions of any kind.  He's been assessed zero criminal

history points by the probation officer, placing him in

Criminal History Category I.

Any foreign murder, and indeed any murder of any

kind, is, of course, a very serious crime.  Defendant's

crime truly stands out, however, in my view, not only for

its heinous character, but also for the meticulous and

indifferent planning undertaken in order to carry it out.

Mr. Rudolph lured his wife into a remote part of

Zambia under the pretense that he was working to save their

marriage.  Instead, he entered -- he ended their marriage by

shooting her in her heart.  He killed her at one of their

special, shared places, rich in memory to the couple,

1    because he knew she let her guard down there.

2         I agree with the prosecution that the facts of this

3    case point to a remorseless defendant who killed his wife

4    out of greed, to avoid the significant financial loss that

5    would have been occasioned by a divorce, and to advance a

6    petty, spiteful, sham lawsuit against his social enemies.

7         Contemptuous of his Zambian host, he deliberately

8    chose to make their beautiful country the scene of his

9    crime.  He planned the murder in Zambia because he had

10   little regard for its people, government, law enforcement

11   personnel and, most importantly, he thought he'd be able to

12   get away with it there.

13        The jury found that the defendant murdered his

14   wife, Bianca, at approximately 5:30 a.m. on the 11th of

15   October of 2016.  While the Rudolphs were packing inside

16   their cabin to leave for their return trip to the United

17   States for a nephew's wedding, the defendant partially

18   unzipped the shotgun case, put one round in the chamber,

19   pointed the shotgun at Bianca's chest, and pulled the

20   trigger.

21        The shotgun blast from approximately 1 to 3 feet

22   away entered Bianca's chest at a slightly downward angle,

23   macerating her heart, and killing her within minutes.

24        When the professional hunter and local game scout

25   arrived in the cabin a few seconds later, they found Rudolph

distraught next to his wife.  The defendant was told that he
had to report the death to the police.  They covered Bianca
with a blanket and they drove to the police station in
Mumbwa.

The defendant repeatedly and steadfastly lied to
the professional hunter, the game scout, the Zambian police,
and to United States consular officials, and swore to them
that Bianca's death was an accident.  He made and signed a
written statement to that effect.  He repeatedly lied and
claimed that he was in the bathroom while Bianca was packing
the shotgun and that he heard a shot, and that when he ran
out of the bathroom he found Bianca on the floor with a
wound to her chest.

Because the shotgun case was a tight fit for the
shotgun, the defendant speculated to all these law
enforcement and consular officials that his wife may have
tried to jam it into the soft shotgun case, and in the
process, unfortunately, causing the firearm to discharge.

The defendant knew his crime would be difficult,
extremely difficult, to investigate in Zambia where he would
be surrounded by people relying on him for their financial
livelihood.  He knew that underfunded investigators would
not have access to evidence from the United States and would
lack the investigative means or motivation to unravel his
meticulously planned crime.

1          And he also knew that the sheer remoteness of the

2    location of the murder would make it a formidable task for

3    any law enforcement organization, Zambian or American or

4    otherwise, to successfully solve the murder mystery he had

5    created.

6          To get to the hunting safari camp, where Bianca

7    Rudolph was killed, from Phoenix, the Rudolphs were -- where

8    the Rudolphs were then living, they had to fly first to

9    Atlanta, then on to Johannesburg, South Africa, and then to

10   Lusaka, the capitol of Zambia.  From there they had to drive

11   to the camp site in Chinyembe.  The camp is approximately 80

12   miles from the nearest police station or medical clinic in

13   the town of Mumbwa, which is itself a relatively small town

14   about 80 miles from Lusaka.

15         The 80-mile trip between Mumbwa and Chinyembe is

16   only partially paved.  20 of those miles required driving

17   along a tumbling four-wheel drive Jeep track that winds

18   through lion country, over several muddy streams, and past

19   swarms of tsi-tsi flies.

20         After the murder, the defendant repeatedly

21   expressed deep concerns for his privacy and was adamant that

22   no information about the death be disclosed to anyone.  He

23   asked about the Freedom of Information Act and the Privacy

24   Act.  And he made it clear to Zambian and U.S. consular

25   officials that he did not want anyone to be able to get

information about his wife's death.  More aware of the

emotional consequences of his actions than anyone else could

possibly be, the defendant still chose to intentionally take

away his children's mother so that he could replace her with

his paramour of many years.

One only has to read the victim impact statements

of the Rudolph children to get just a glimpse of the tragedy

and the pain the horrific murder of their mother has

inflicted upon these innocent and heartbroken young adults.

After Bianca Rudolph's funeral in Arizona, the

defendant spoke to Bianca's brother and a cousin.  They

asked the defendant for more information about the

circumstances of Bianca's death.  Mr. Rudolph promised he

would tell them anything they wanted to know.  He then lied

to distance himself from the death, telling them that he was

outside of the cabin when he heard the shot.

For months and years after the murder of their

sister and cousin, Vincent and Ralph Finizio, and Anthony

Giustini's, perfectly understandable and legitimate efforts

to learn about what had really happened to Bianca were met

by the defendant's actions in deflecting and avoiding those

efforts and by his persistent efforts to excuse, justify,

minimize, or otherwise legitimize his criminal conduct.

By way of just one example, when Ralph Finizio,

Bianca's brother, followed up on the defendant's promise to

tell him anything he wanted to know about Bianca's death, he
followed up by sending defendant an email asking for
documents relating to her demise; the defendant refused to
provide them.  Instead, he delayed responding directly to
the request for several months, and then he only offered to
show them via Facetime out of a purported concern that the
brother might make them public.

The defendant took immediate steps to profit from
his crime as quickly as possible.  And I find this an
extraordinarily aggravating fact.  He began to inquire on
how to cash in the life insurance policies on only his third
day back in the United States.  By the 14th of November of
2016, the defendant had submitted claims to all of the
victim life insurance companies in order to collect on the
policies that had been taken out on the life of Bianca
Rudolph.

He received payments on those policies between
January and March of 2017 that added up to $4,877,744.93.
The payments were made into an account held in the name of
the trust Rudolph and Bianca had created in April of 2016.
Upon Bianca's death, Mr. Rudolph assumed total control over
this trust.

In each claim the defendant falsely represented
that Bianca's death was the result of an accident and that
he fraudulently withheld reports that may have raised

questions about the cause of the death like the forensic
ballistics report with the heading, "Suicide."  And the
description of the shotgun's working mechanism as, quote,
perfect.

A representative from the insurance companies
testified that their decision-making would have been
different had they received information that Bianca's death
was the result of a murder.

Not content with the nearly $5 million he defrauded
from the insurance companies as a result of the murder of
his wife, his spectacular avarice caused him to wring out
every possible dollar he could from Bianca's death by filing
yet another fraudulent insurance claim.  This time,
incredibly, and disgustingly, in my view, to profit from the
jewelry she was wearing at the time he put a shotgun shell
into her chest.

And while the murder was over in minutes, the
defendant's obstruction of justice lasted for years.
Heedless of his crime's extraordinarily emotional toll, he
lied to his closest family, obstructed their efforts to
obtain closure, and otherwise sought to diminish Bianca
Rudolph by claiming she wasn't a very good hunter at all and
had carelessly shot herself with a nearly 4-foot long
shotgun.

He called the United States Embassy in Zambia later

171

in the day that she was murdered to report his wife's death.
Almost immediately he told the consular chief that he wanted
his wife to be cremated, beginning the process by which the
defendant was calculating how to destroy all the evidence of
the true cause of his wife's death.

The next day, the defendant had additional
conversations with the consular official and again asked
about the most expedient way to have Bianca cremated.  The
consular official asked Mr. Rudolph if he wanted any help in
notifying kin in the United States -- next of kin in the
United States and the defendant declined, saying that he
wanted to notify his children himself.

The defendant offered to bribe a Zambian mortuary
manager for his help in canceling his wife's autopsy.  He
used veiled threats and intimidation to try to get
incriminating evidence, photos of his wife's injuries,
destroyed.  He agreed to loan money to a key prosecution
witness in order to curry favor and maintain his favor.

Fully aware that the murder weapon would be of
inestimable value to investigators, he took steps to dispose
of it using untraceable means that would ensure that it
could never be forensically analyzed by the FBI.  He then
cynically represented to the jury that he was actually
cooperating with law enforcement and, as a key part of his
defense, he attacked the FBI's failure to analyze the murder

1    weapon that he, and he alone, had made disappear.

2            I'll next consider in aggravation the falsehoods

3    that the defendant told the jury from this very witness

4    stand while he was under oath and subject to the penalty of

5    perjury.

6            A sampling of those false statements are the

7    following:

8            He told the jury that Bianca's death was an

9    accident.  A statement the jury found beyond a reasonable

10   doubt to be a lie.

11           He claimed that he didn't tell his children about

12   his wife's death from 8,000 miles away because he wanted to

13   do it in person so that he could hug them and hold them and

14   grieve with them together.  The truth, however, is that

15   instead of flying from Zambia to Pennsylvania or Florida,

16   where his children were living, he booked his return ticket

17   from Africa to Arizona.  From the trial evidence, it was

18   clear to me that he never had any intention of breaking the

19   news to his grieving and hurting children in person.

20           He told his son, Julian, about his mother's death

21   over the phone and then he told -- and then he made his son

22   be the one to break this horrific news to his sister,

23   AnaBianca.

24           In the version he told the jury of the trip he made

25   to Las Vegas a few days -- just a few days after his wife's

173 of 222

funeral, the defendant tried to portray himself as a
grieving husband who went to Las Vegas to take long walks
and drink alone at bars, empty and forlorn.  The truth,
however -- and a little detail that he failed to disclose to
the jury -- is that he was also -- that he had also booked a
ticket to Las Vegas at that same time for a female companion
to be there with him.  Amazingly the female companion was
yet another woman, and not even his paramour and
codefendant, Lori Milliron.

He told the jury that it was Mr. Swanepoel, the
professional hunter and guide, who had told him he was under
investigation in January of 2020.  This would have been
before his now infamous outburst at the Steak 44 restaurant
in Phoenix in February or March of 2020, in which the
restaurant's bartender testified he heard the defendant tell
Lori Milliron that he, quote, killed my fucking wife for
you, end quote.

But Mr. Swanepoel testified that he had made no
such statement to the defendant and that all of the evidence
at trial points to the defendant not being informed of an
FBI investigation until August of 2020, after he had made
that statement and after his son, Julian, had told him about
the FBI's attempt to interview him.

The last thing I will take up at this time is the
defendant's sentencing memorandum.  I take note of the fact

that the defendant has requested that I recommend to the

director of the Bureau of Prisons that he be designated to a

medical facility with the necessary resources to accommodate

his medical needs.  The Government does not object to this

request and it will be granted.

In sum, for all the reasons that I've articulated

on the record, and given the totality of the evidence before

me, I find that the guideline sentence of life imprisonment

on Count 1 and the guideline sentence of 240 months on Count

2 are the just and appropriate custodial sentences to impose

on the defendant.

Before I turn to a ruling on restitution, let me

ask counsel, do they wish to make any final arguments on the

issue of restitution separated from the issue of forfeiture?

MR. BOHN:  We would like to be heard separately on

restitution first.

THE COURT:  Okay.  Go ahead.

MR. BOHN:  Thank you.  I'm going to be very brief

on this, because the defense has now indicated that they

intend not --

THE COURT:  Can you pull the mic towards you,

Mr. Bohn.  Thank you.

MR. BOHN:  I'm going to be brief on restitution

because the defense has now indicated that they are not

going to oppose an order of restitution, but as I indicated

it should be about who it should be paid to.  I want to be
clear that there really is only one answer.  And the fact is
that this court has already said what that answer is.

You know, the defense first came out in their
response to the motion for restitution and said, "There is
no restitution because the insurance companies have suffered
no loss."  Now they're saying, "Okay, they have suffered a
loss, but we want that" -- and I'm anticipating, from
conversations, that they want the restitution paid directly
to the children.  But they make such a request without any
authority.

And it's interesting to note because they're well
aware of the pleadings in this case that the kids had filed
the petition -- or, I mean, a motion to intervene as
victims; this Court denied it.  They then mandamused that
opinion to the Tenth Circuit.  The Tenth Circuit said
they're not the victims for restitution when it comes to
that; that it's the life insurance companies.

Based on that, Your Honor, I think it's a very
simple task.  We would ask the Court to impose restitution
the way it has been identified in the Government's Trial
Exhibit 504, or our exhibit today, 17, and impose
restitution on all nine policies to all seven of the
insurance companies.

Absent specific questions on restitution, Your

176

1    Honor.

2              THE COURT:  I don't have any.

3              MR. BOHN:   Thank you, Your Honor.

4              THE COURT:  Thank you, Mr. Bohn.

5              I'll hear argument from the defendant on the issue

6    of restitution only.

7              MS. MOSS:  Your Honor, the Government submitted

8    several pleadings on the issue of restitution and I'd like

9    to note that in one of those pleadings, which is at docket

10   entry 323, the Government stated that:  If any insurance

11   company requested that restitution go to the contingent

12   beneficiaries, who are Julian and AnaBianca Rudolph, that

13   they would not contest that request.  Five insurance

14   companies with seven policies have made that request here.

15             And we have submitted Defense Exhibits A through E,

16   which I know that the Government objects to because of

17   certain language in them, but I don't think there's any

18   contention as to authenticity of those documents.

19             THE COURT:  I don't believe those have been entered

20   into evidence.

21             MS. MOSS:  And I'm moving to admit them now, Your

22   Honor.

23             THE COURT:  That's A through E?

24             MS. MOSS:  A through E, Your Honor.

25             THE COURT:  Is there an objection, Mr. Bohn?

1           MR. BOHN:  There is, Your Honor.

2           THE COURT:  Okay.

3           MR. BOHN:  Specifically -- let me get the exhibit

4    here.

5           THE COURT:  First, Ms. Moss, tell me why you

6    believe it's admissible -- or they are admissible.

7           MS. MOSS:  Number 1, based on what the Government

8    stated in this pleading that I just represented to the Court

9    and docket entry 323.  And also based on 18 U.S.C. 3664,

10   which gives the Court discretion how to fashion a

11   restitution order.

12          So we're fully aware of the pleadings that have

13   been filed and the Court's finding that legally AnaBianca

14   and Julian Rudolph are not victims under Count 2; however,

15   again, because the insurance companies themselves are making

16   a request, and because the Government has said that they

17   would honor that request, and because the Court has

18   discretion to fashion a restitution order, we are asking

19   that the Court look at Exhibits A through E, which consist

20   of a letter from Ameritas saying that they want the money --

21   the restitution money -- or the insurance proceeds to go to

22   the children; a letter from Genworth, which states similarly

23   that they're requesting that the money that they paid on the

24   insurance policy go to the children; and that three

25   assignment and release agreements signed by Ameritas, Great

178

1    West, Fidelity, and TransAmerica which is going to sign one

2    this week, that they acknowledged that they want the

3    insurance proceeds to go to Bianca Rudolph's children,

4    AnaBianca and Julian Rudolph.

5        THE COURT:  And that's the contents of those five

6    exhibits?

7        MS. MOSS:  That is the contents --

8        THE COURT:  You're summarizing --

9        MS. MOSS:  That is the summary of those exhibits,

10    Your Honor.

11        THE COURT:  Okay.  Mr. Bohn, I'll save us some

12    time -- hold on.  1101 says clearly federal rules of

13    evidence don't strictly apply in these sentencing hearings.

14    I find that the indicia of reliability of these documents,

15    plus their somewhat limited relevance, but relevance

16    nonetheless, I'm going to overrule the objection.  I'm going

17    to admit Defendant's Exhibit A through E.  So I know I

18    didn't give you a chance to --

19        MR. BOHN:  I would like to make a record.

20        THE COURT:  Go ahead --

21        MR. BOHN:  I just want to make a record, Your

22    Honor, because I don't believe --

23        THE COURT:  Go ahead.

24        MR. BOHN:  I don't believe these are reliable.  We

25    got these -- last Monday, A through E, were provided to the

United States Attorney's Office by the kids' attorneys.  We

get these, then, Friday.

THE COURT:  Which is a first-rate law firm in

Chicago, right?

MR. BOHN:  Sure.

THE COURT:  I mean, are you -- are you --

MR. BOHN:  Sure.

THE COURT:  -- implying something about their

motivations and intentions?

MR. BOHN:  No, I'm saying we got them last Monday.

We were notified they were coming.  We then find out on

Friday that the defense is going to use these as exhibits,

or want to.  Here's the problem, okay?  If you -- Exhibit B

says -- this is the agreement -- or the release agreement.

And it says that -- this is from Ameritas -- that it would

release -- and they would want the restitution to go to

possibly the -- AnaBianca, Julian, the trustee, or the --

and the estate of Bianca Rudolph.  The policy only lists the

contingent beneficiaries as Julian and AnaBianca.

So this document is -- it's inconsistent with what

the insurance policy says.  The policy says it goes to these

two.  The release agreement identifies four different

parties.  If you were to accept these into evidence in the

vague state that they're in and the inconsistent state,

they're unreliable because who, then, would the clerk of

1    courts pay?  The policy says two; the alleged release says

2    four.

3            We have indicated that we would be happy to talk --

4    go back and follow up with these insurance companies.  We

5    just got these.

6            THE COURT:  No, I understand.

7            MR. BOHN:  So they're not relevant or --

8            THE COURT:  You've made your record.  There's a

9    huge difference, Mr. Bohn, between me allowing these

10   documents into evidence because I'm permitted -- I have wide

11   discretion at sentencing hearing to do so, and whether I'm

12   going to give them much weight or do anything that they're

13   suggesting.

14           All I'm really going to do with them -- so the

15   objection is overruled and A through E are admitted into

16   evidence.

17       (Defendant's Exhibits A thru E received)

18           THE COURT:  But beyond that, Ms. Moss, what --

19   here's my response to this general argument.  I'm heartened

20   to hear -- this is a rare event -- I'm heartened to hear

21   that insurance companies are so willing to give up millions

22   of dollars.  You don't see that too often.  But that's all

23   stuff that can be arranged -- if truly this is their

24   intention, they can make good on their intention outside of

25   this proceeding.

1          I've made a ruling, and Mr. Bohn referenced on

2    restitution, a preliminary ruling, which the children's

3    lawyer saw fit to do a mandamus on me -- and that's their

4    right -- and the circuit agreed.  So I would be somewhat

5    foolish then to upset all of that, and on the basis of some

6    handful of letters, enter into something to the contrary.

7          I just want to go on the record -- and folks six

8    months from now or a year from now in negotiations with the

9    insurance company can quote me on this -- that I hope that

10   they make good on their representations that they believe

11   that this really does -- apart from what the law requires me

12   to do, which I had to follow, and the Tenth Circuit said I

13   was right in following it, but -- but that apart from all

14   that in a sort of an over-arching sense of justice, that

15   ultimately this money goes to the children.

16         But I can't make that happen in this proceeding,

17   it's my view.  Legally, I cannot.  That's a matter for a

18   subsequent proceeding in a civil courtroom or just plain

19   negotiation between the parties.  And I hope the insurance

20   companies make good on their representation that they don't

21   want the millions of dollars; they want to give it to the

22   children.

23         So beyond that, do you have anything else you want

24   to put on the record in terms of an argument on the issue of

25   restitution?

1          MS. MOSS:  The only thing I would say, Your Honor,

2    is we're not asking Your Honor to overrule what has happened

3    before in terms of labeling the insurance company as the

4    victims, but we're saying Your Honor under the law does have

5    discretion to honor the victim's -- the insurance

6    companies' -- intention and request here that the money go

7    to Bianca Rudolph's children:  Julian and AnaBianca.

8          And I would just note that even the PSI in

9    paragraph 229 has recommended that restitution, at least to

10   three of the policies, go to Julian and AnaBianca Rudolph.

11   And it seems to appear that that is what the family is

12   requesting as well.

13         And so for those reasons, Your Honor, we're asking

14   that the restitution be paid to the children.

15         THE COURT:  All right.  Thank you.  I'm prepared to

16   rule on restitution.  The parties agree that no order of

17   restitution should be entered on Count 1 because there's no

18   claim for loss of future income -- lost or future income.

19   Lost or future income.  And the defendant has paid for all

20   of the defendant's funeral expenses.  Therefore, the Court

21   will not order the defendant to make restitution with

22   respect to Count 1.

23         With respect to Count 2, there are nine insurance

24   policies that paid some -- that paid claims as a result of

25   the mail fraud committed by the defendant.  He argues that

the insurance companies are not victims in this case because
they did not suffer a financial loss and are not seeking
restitution.  He argues that the insurance companies would
still have made disbursements according to Bianca Rudolph's
insurance policies, and would have paid the death benefit to
the contingent beneficiaries, those being the children,
pursuant to each state's slayer statutes.

        The Court has addressed the arguments raised in the
defendant's objection in its order denying movant's motion
for leave to file their response to the Government's motion
for mandatory restitution and forfeiture.  That was filed at
ECF 344.  In that order, the Court found that the movants
are not victims -- the movant being the children -- are not
victims of the defendant's mail fraud, and, instead, the
insurance companies that paid the proceeds of Bianca
Rudolph's life insurance policies to the defendant are the
actual victims of this mail fraud.

        This order was appealed to the Tenth Circuit by way
of a writ of mandamus and my order was affirmed.  Therefore,
the Court will order that -- the defendant to make
restitution to the victims of Count 2 in the individual
amounts of loss for each victim insurance company as set
forth in the life insurance payments table appended as
Exhibit 1 to the Government's motion for order of
restitution and forfeiture, which was filed at ECF 296-2.

184

1          The Court further finds that requiring the

2    defendant to pay interest on his restitution obligation

3    would impair his ability to pay all of his financial

4    obligations under the Court's judgment and, as a

5    consequence, interest on the restitution amount will be

6    waived.  For all these reasons, that portion of the

7    Government's motion for order of restitution and forfeiture

8    filed at ECF 296 which seeks an order of restitution is

9    granted.  And the defendant's third objection as it relates

10   to restitution is overruled.

11          I'm prepared to take up next a ruling on

12   forfeiture.  Does the Government have any additional

13   argument it wishes to make on forfeiture?

14          MR. BOHN:  We do, Your Honor.

15          THE COURT:  All right.  Brief, please.

16          MR. BOHN:  Yes, Your Honor.  Your Honor, I'm going

17   to ask the Court to consider and incorporate my argument

18   from docket 296, which was the original motion which laid

19   out the extensive forfeiture and the basic law for that.

20          Obviously in that document, we indicated that

21   forfeiture was mandatory in this case, and we start with the

22   basic premise that forfeiture is appropriate when, but for

23   the criminal conduct, the accused would not have had those

24   assets.

25          And with that said, Your Honor, I think I'll

anticipate and save the Court some time.  I want to go to

what the issues are that I think are relevant here.  What

you've had today in the testimony and the exhibits that were

provided is a basis that establishes well beyond a

preponderance of the evidence, in fact, in many cases beyond

a reasonable doubt, that the funds were traced and traceable

to these accounts.

          And specifically I want to direct the Court -- and

I'll just deal with a couple of issues so -- at this time to

save some time.  It is clear in the forfeiture world that

the question really comes down to:  What is directly

traceable without difficulty?  And that seems to be the

phrases that the Courts have used.  And I'm sure the

defendants will talk about the *Voigt* decision --

          THE COURT:  Which is not easily applied in --

          MR. BOHN:  Sorry.

          THE COURT:  A concept that was not easily applied

in this case.

          MR. BOHN:  Right.

          THE COURT:  I mean, it's -- the forfeiture issues

of this case probably -- if I added up the complexity of all

the forfeiture issues of all the other cases I've heard in

12 1/2 years -- would not equal the one for this case.

          MR. BOHN:  Right.  And so I want to assure the

Court of a couple of things.  One, the defense seems now to

be in a position of saying to you that you shouldn't impose
forfeitures; but if you do, the Government only gets the
amount of the actual insurance loss, the roughly 4.8 as a
money judgment.  But that's not true.  That would be the
easy way out, because when you looked at the *Voigt* decision,
*Voigt* was a complex security fraud case that went on for
five years.  And the misnomer of *Voigt* is that people say,
"Oh, *Voigt* doesn't allow you to trace.  You have to give a
money judgment."  That's not what *Voigt* stands for.

        *Voigt* says if it's complex like that, then the
answer is to go down the road and give a money judgment for
that, and then they cite and they talk about -- well, the
attempt to recently introduce the *Rothstein* opinion -- which
was from 2013, and we are familiar with long before this --
but it was -- the *Rothstein* opinion correctly cites *Voigt*
again.  And the *Rothstein* decision that was cited by the
defense, again comes back to the question:  Can you divide
or trace the assets without difficulty?

        And in this case, in the *Rothstein* decision, the
Court was dealing with 70 attorneys, over four years, with
$12 million in 10 months.  And I brought the *Voigt* -- the
*Rothstein* decision because I don't know if the Court had a
chance to look at it, but if you were to look at it -- and I
don't know if you will punish yourself to do it, but from
page 7 through -- 7 through 14, those are assets that court

1    was forced to try to deal with.  That's complex.  At that

2    point, you get it.  It's too hard.  The number of assets was

3    incredible.

4            So the *Rothstein* decision says nothing that *Voigt*

5    doesn't say.  If it's difficult, then give a money judgment.

6    That's not the case here.  On the other end, the defense

7    will talk about the *Stuart* decision.  The *Stuart* decision

8    was a simple case with one asset:  The money went in, it was

9    frozen, and it was traced back.

10           That's not what the answer is either.  It doesn't

11   have to be that way.  More consistent with that is -- was

12   the Tenth Circuit opinion cited by the Government in *Hinshaw*

13   from 2004.  In *Hinshaw* -- it was a bankruptcy case -- but it

14   talks about how district courts can use many different

15   accounting principles.

16           In that case, the Court used the -- the life

17   approach, which was accepted by the Tenth Circuit, and it

18   had no problem with the Court's discretion.  But I think

19   probably the best example for this Court was a case out of

20   the Northern District -- excuse me, the District of Utah,

21   the *Kingston* matter, and that was out of November 15th,

22   2022, and it's 2022 WestLaw 16948816.

23           Specifically that court adopted and approved of the

24   bad-in first-out approach of accounting principle which our

25   auditor used in this case.  So there's another case from

1    this circuit applying the exact same accounting principles

2    that we had here.

3          And it's interesting to note that in that case, the

4    Court went on to talk about:  When you are able to use

5    different accounting principles, it really comes down to the

6    District Court's reasonableness in finding the appropriate

7    approach that was appropriate for that case.  Here, the

8    bad-in first-out approach was clearly the right approach.

9          Now, there's some discussion of, well, you used --

10   I've never heard of this and neither had the auditor, the

11   preexisting business exception.  As you heard on redirect,

12   it's called lowest intermediate balance approach accounting

13   principle, which, as the auditor mentioned, was one of the

14   principles that he looked at.

15         And what was significant about that was that he

16   applied each accounting principle consistently with each

17   account.  He always used the lowest intermediate balance

18   principle with the Wells Fargo Camelback account because it

19   was a business account.  He also was very consistent in the

20   bad-in first-out when it came to tracing the assets that

21   were there in the fund that came in directly from the

22   insurance.

23         You know, you've got a chance to look at -- and the

24   defense brought it up, because it was Government

25   Exhibit 48 -- and that was the chart that showed this Court

1    all the accounts that were never touched by any -- any of

2    the asset forfeitures -- I mean, excuse me, any of the life

3    insurance proceeds.  So when people try to say, "This was a

4    difficult task," well, it wasn't that difficult because the

5    vast majority of accounts were never touched.

6            And if you look at Exhibit 49, Your Honor, which

7    was the one that was specifically referenced on

8    cross-examination, there's actually only 13 accounts.  And

9    as the auditor tried to explain, of those 13, 6 were the

10   subaccounts, then you had the ones with -- and you look at

11   the others.  We're not talking about five years, $12 million

12   in 10 months, 70 attorneys billing.  We're talking about 13

13   accounts that -- where money was in and out of, and 3 that

14   were seized.  We're talking 16 accounts.

15           And let's remember the testimony you heard at the

16   trial from Special Agent Newton.  She had no problem

17   tracking this money.  What you heard today was the tracing

18   of those proceeds further on down the road.  This was not a

19   difficult tracing process; that these auditors had a chance

20   to look at these raw records and get there.

21           I think because when you look at the analysis of

22   these cases, Your Honor, you come to the conclusion that the

23   tracing was done without difficulty.  It was done well

24   within the preponderance of the evidence.

25           I would ask the Court at this point to adopt the

1    preliminary order of forfeiture that you've already entered

2    at 354.    Absent your specific questions.

3            THE COURT:    I have none.    Thank you.

4            MR. BOHN:    Thank you, Your Honor.

5            THE COURT:    Thank you, Mr. Bohn.

6            Argument from the defendant on the issue of

7    forfeiture.

8            MS. MOSS:    Your Honor, we understand that

9    forfeiture's required, but what the Government is asking the

10   Court to do, and what they've done, they've seized and they

11   want to take money and specific property that equals nearly

12   twice the amount of the insurance property -- the insurance

13   proceeds.

14           And our position is the Government hasn't

15   established, and they cannot establish, the required nexus

16   between the specific assets that have been listed in the

17   preliminary order of forfeiture and the insurance proceeds,

18   and that's what's required by Rule 32.2 in order to do this.

19           And I think it's important to say that what we're

20   trying to do here by limiting the forfeiture to a money

21   judgment that is equal only to the amount of the insurance

22   proceeds is not because we're trying to make sure that

23   Dr. Rudolph has more money for himself, but we are trying to

24   preserve this money for the children, who have a right to it

25   from the default judgment as inheritance from their mother.

1             The issue in this case, Your Honor, as far as

2    forfeiture, is not whether the proceeds-first approach is

3    not an accepted or recognized accounting practice, or not

4    whether the deputy took a liberal or a conservative approach

5    in trying to do this tracing, or not whether the percentages

6    should have been more or less in those charts.  The point of

7    all this is that this is an extremely, extremely complicated

8    method and attempt to trace this money.

9             And I think what the Court started out saying that

10   the complexity of this case -- the complexity of cases that

11   the Court has handled in the last 12 years does not equal

12   the complexity in this case.  And I don't know the Court's

13   experience over the last 12 years, but I would say that this

14   case is extremely complex.

15            Deputy Polski looked at a massive amount of

16   financial information, at least 14 different accounts over

17   five years.  There were five years between the time that the

18   insurance proceeds were deposited into the account to the

19   time that they were seized.  They've created 16 different

20   charts, a very lengthy affidavit to try and trace this.  But

21   it's impossible.  And it's especially impossible where the

22   insurance proceeds went into an account and they were

23   commingled with untainted funds.  And that after and before

24   the insurance proceeds went into this particular account,

25   that there were numerous intervening deposits and

1    withdrawals.

2           And Agent -- Deputy Polski testified to that with

3    regard to this Vanguard account 30-9515, that there was

4    untainted funds in the account prior to the insurance

5    proceeds going in, that in between the insurance proceeds

6    deposits, that there were intervening deposits and

7    withdrawals.  That after the insurance proceeds were

8    deposited, there were further intervening deposits and

9    withdrawals.

10           And what the law states -- and I know that the

11    Government's referred to the case of *United States v.*

12    *Voigt* -- which is at 89 F.3d 1050, Third Circuit, 1996 -- is

13    that when tainted funds are commingled in account with

14    untainted funds, and there are intervening deposits and

15    withdrawals, as there were here, the funds cannot be traced

16    as a matter of law.

17           And so that the Government must satisfy its

18    forfeiture judgment through the substitute asset provision

19    of 853(p).  And so what does 853(p) tell us?  And this,

20    again, is what the Government was referring to.  That in any

21    case where tainted funds have been commingled with other

22    property, and cannot be divided without difficulty, the

23    Court shall resort to substitute property up to the value of

24    the proceeds the person obtained as a result of the

25    conviction.

1          So the Court must resort to a money judgment which

2     the Government can then try to seek substitute property, but

3     they cannot get appreciation, they cannot get interest, they

4     cannot get dividends.  They are limited to the amount of

5     that insurance proceeds.

6          And I think we saw other examples, showing other

7     than this commingling, of why this was so difficult to

8     divide in this case, including the commingling.  But I also

9     point out, Your Honor, that we saw these charts, Government

10    Exhibits 42 through 43.  And these are the charts where

11    Deputy Polski attempted to track the money to the Paradise

12    Valley property and to the Cranberry Township property in

13    Pennsylvania.

14         And it was clear from these charts that these are

15    incomplete pictures.  That the percentages that could be

16    forfeited are incorrect; that there have been a significant

17    number of monies that have not been counted towards these

18    properties.  And it just goes to explain the complexity of

19    this case.

20         I would also say that these properties are similar

21    to the Vanguard account 30-9515 and the *Voigt* case.  That

22    this is an example of tainted and untainted funds going to

23    another asset and they can't be divided without difficulty.

24         So this is all, again, going back to say that this

25    is a complex case, and that the tracing is impossible as a

194

1    matter of law under *Voigt*.  And because these things can't

2    be divided without difficulty, the Court cannot forfeit the

3    specific property that's listed in the preliminary order of

4    forfeiture and you have to enter a money judgment from which

5    the Government can seek substitute property; but they cannot

6    get appreciation and interest and dividends.

7            THE COURT:  All right.  Thank you.  First, let me

8    clarify a statement I made previously about the relative

9    complexity of the forfeiture issue in this case and prior

10   cases.  I think it's more of a statement that I was so

11   fortunate in prior cases to get such simple forfeiture

12   issues.

13           I disagree with defense counsel in terms of the

14   relative complexity of the tracing aspect of forfeiture in

15   this case.  I thought that the Deputy Polski's testimony was

16   not only credible, it was very logical.  I followed it.  I

17   think the complexity at first blush is actually made much

18   less complex when we realize that there were brand-new

19   accounts that had never been opened, that had not received

20   any funds, that were opened specifically to receive life

21   insurance proceeds, and that facilitated the tracing

22   procedure that he employed.

23           The -- he called it the proceeds-first approach

24   that he used.  I find that that approach was logical,

25   consistent with the law, and the defendant has not convinced

me that it's anything to the contrary.

Let me say on top of that, that last May I entered my preliminary order of forfeiture at ECF 354 in which I determined which specific assets were preliminarily forfeited by the defendant. In that order, I construed the six arguments the defendant raised in its consolidated response to motion for mandatory restitution and forfeiture and motion for preliminary order of forfeiture, which the defendant filed at ECF 316. I construed them as objections to the preliminary order of forfeiture and I considered such objections preserved for this hearing.

The defendant went on to request a hearing pursuant to Rule 32.2(b)(1) to contest the Court's preliminary order of forfeiture. Earlier in this hearing, the defendant was given full opportunity to address any and all of those six objections that he raised in his written filings and that he wished to continue to pursue at this hearing.

I have heard the oral argument at this hearing and the evidence on the issue of forfeiture. I've heard argument in support of the defendant's objections, and I've also considered the very extensive, written briefing on forfeiture submitted by the parties filed at ECF numbers 296, 309, 316, 323, 349, and 352.

Being thoroughly apprised of the matter of forfeiture in this case, the Court overrules all of the

1    defendant's objections to the preliminary order of

2    forfeiture.  Pursuant to Rule 3.2(b)(4), the Court orders

3    that the preliminary order of forfeiture, ECF 354, is made

4    final as to Defendant Lawrence Rudolph.

5         As the parties are aware, at least two verified

6    petitions to determine third-party interests in the property

7    subject to forfeiture have been filed in this case at ECF

8    367 and 386.  And as the Court stated in its preliminary

9    order of forfeiture, it anticipates entering a separate

10   final order of forfeiture as it concerns the interest of

11   those third parties.  The order will be entered at the

12   conclusion of the ancillary proceeding required by

13   Rule 32.2(c), and this proceeding remains ongoing and

14   pending to that extent.

15        The Court further finds that requiring the

16   defendant to pay interest on its forfeiture obligation would

17   impair his ability to pay all of his financial obligations

18   under the Court's judgment and as a consequence, interest on

19   this forfeiture amount will be waived.

20        For all these reasons, that portion of the

21   Government's motion for order of restitution and forfeiture

22   filed at ECF 296, which seeks a final order of forfeiture,

23   is granted as it pertains to the defendant individually

24   only.  And the defendant's third objection as it relates to

25   the Government's proposed final order of forfeiture is

1    overruled.

2            I will next turn to the final issue of fine and

3    ability to pay.  Does the Government have any additional

4    legal argument it wishes to raise in support or related to

5    that issue?

6            MR. FIELDS:  Very briefly, Your Honor.

7            THE COURT:  If you'll take the lectern, Mr. Fields.

8            MR. FIELDS:  Your Honor, when I say very briefly,

9    this is only by way of response to some of the things that

10    were said by Ms. Moss when we were last addressing the fine.

11            THE COURT:  Right.

12            MR. FIELDS:  So first with regard to the fact that,

13    you know, there might be this competing default judgment, as

14    far as the postnup goes the Government obviously has its

15    views on the validity of the postnup.  At the end of the

16    case, the Government is not the decider and the jury here

17    didn't decide that question either.  That is the question

18    for future civil proceedings where a court in Arizona, being

19    fully informed -- so right now the Court in Arizona wasn't

20    told anything about a postnuptial agreement or the size of

21    the estate.  That is something that can be sorted out.  And

22    if there are two judgments -- competing judgments happen all

23    the time in the law, Your Honor -- and there are mechanics

24    for evaluating those and reconciling them.

25            And when it comes -- I think this goes to the point

that the Government really does want to work with AnaBianca and Julian's attorneys to make sure that they get everything they're entitled to.  If there were disputes over the collection of the fine, those would come before this Court and this Court would be in a position to evaluate how the fine should be collected and, if so, for what reasons.

So for all these reasons, and for the reasons I've previously stated, we think a fine is in the interest of justice in this case.  It will prevent any further manipulation by Rudolph, and we ask the Court to impose one.

THE COURT:  Thank you, sir.

I'll hear from the defendant on the issue of fine and the ability to pay a fine.

MS. MOSS:  Your Honor, I think this issue has become simpler based on the Court's rulings on the restitution and the forfeiture.  So restitution has now been ordered against Mr. Rudolph for 4.8 million, and there is now forfeiture that is going to be entered of well over $9 million in this case.  So, again, I think it's quite clear that there is no money left to pay a fine.

Your Honor, I --

THE COURT:  Well, again, let me repeat the question I asked you before when you just said that pretty much the same thing:  No ability to pay a fine at all?  Or no ability to pay a fine in the amount of nearly $10 million?

1          MS. MOSS:  No ability to pay a fine at all.

2          THE COURT:  All right.  Go ahead.

3          MS. MOSS:  And, Your Honor, this is where I would

4    reference the exhibits that we had previously admitted.  So

5    a lot has happened since 2021, Your Honor.  And I know that

6    the Government -- and the defense painted a picture of

7    Mr. Rudolph's assets in 2021, but much has changed since

8    that time, including his murder conviction, and the fact

9    that his --

10          THE COURT:  Well, it wasn't 2021.  I mean, it

11   was -- wasn't it --

12          MS. MOSS:  I'm sorry, 2022.

13          THE COURT:  -- initial appearance.

14          MS. MOSS:  It was in 2021.

15          THE COURT:  In January of 2022 that he made that

16   statement --

17          MS. MOSS:  Well, 2021 --

18          THE COURT:  -- or deposition.

19          MS. MOSS:  -- is when we have these documents in

20   Government's Exhibit 48 and 49 as to Mr. Rudolph's net worth

21   and the conviction was in 2022.  I understand that, and a

22   lot has happened --

23          THE COURT:  No, but you're referring to his

24   statement that he was worth $27 million.  I thought -- I

25   could be wrong, I could be corrected -- that that statement

was given in the context of his initial appearance or

arraignment for the magistrate judge and the forms that were

filled out for the presentence supervision phase.

MS. MOSS:  In 2021.

THE COURT:  In January of -- either December of

2021 when he was arrested in Cabo, the last week of

December, or the first week of January of '22.

MS. MOSS:  Correct.

THE COURT:  All right.  So you're saying a lot has

happened in the 18 months since then.

MS. MOSS:  Yes, a lot has happened since that time,

including the most significant asset that Mr. Rudolph owned,

which was the Three Rivers Dental practice, has now been

decimated and is essentially worthless.

THE COURT:  How can a practice be worthless?  I

mean, isn't a medical practice a business practice?  Just

the goodwill generated by a practice is usually worth a

significant amount of money.  There's equipment, dental

equipment -- I mean, how could it go from X million to zero?

MS. MOSS:  Well, if you're talking about goodwill,

I could cite what Dr. AnaBianca Rudolph has written in her

letters to the Court -- and those are at docket entry

343-2 -- and also a letter from Julian Rudolph at docket

entry 343-1, that the dental practice had become the black

sheep of the community and that no one wants to be

201

1    associated with it.  So they have no ability to sell this

2    practice; so it has no saleable value.  It has no value to

3    them as a practice.  They are operating, but they are paying

4    bills month-to-month.  They have significant liabilities.

5    They completely closed one practice.  They have

6    completely -- they had closed another practice; they

7    reopened it.  They're operating on a very limited basis.

8         The website shows that there's only one dentist

9    that is working at the practice, which is Dr. AnaBianca

10   Rudolph.

11        And I submitted also as Defense Exhibit S to show

12   there are a number of lawsuits that are pending against

13   Three Rivers Dental, one which is actually currently set for

14   trial in September, where people are seeking hundreds and

15   hundreds of thousands of dollars in damages against.  So --

16        THE COURT:  For what?  What are the allegations?

17        MS. MOSS:  Primarily, Your Honor, that there was a

18   prior dentist at Three Rivers Dental by the name of

19   Dr. Farentino who collected deposits from a number of

20   patients for dental work that was supposed to be done.

21   Dr. Farentino died.  That dental work was never completed,

22   so now those patients are suing the practice and blaming

23   AnaBianca Rudolph.

24        THE COURT:  All right.

25        MS. MOSS:  And the PSI, itself, takes note of the

202

1    fact that the practice has significantly reduced in value.

2    And so that's why I'm saying that there is no sale value and

3    that it is no longer an asset.

4          Your Honor, I would refer also to Defense Exhibits

5    L, M, N, O, Q, R, and S, because these exhibits show what

6    the current state of Dr. Rudolph's finances are.

7          Defense Exhibit L shows the most recent statements

8    for the Morgan Stanley accounts.  And if Your Honor looks at

9    Defense Exhibits N and O, what these have done is they have

10   taken Government Exhibits 48 and 49 and they have input the

11   current value in the accounts.  And what these exhibits show

12   is that a number of the accounts have had to have been

13   closed, they have no money in them.  And so what's remaining

14   is significantly less than what Dr. Rudolph may have stated

15   in 2021 or 2022, or even may be inconsistent with what the

16   net worth was prior to the trial.  Things are completely

17   different now.

18         Defense Exhibit M is just an exhibit that shows the

19   value of the taxidermy animals -- something that the

20   Government valued at $232,000 -- was actually $67,000.

21   Defense Exhibit R shows the current value of the Three

22   Rivers Dental PNC bank accounts.  And I'll just state for

23   the record that this is all information that was provided by

24   the children, by Julian and AnaBianca Rudolph.

25         And so what we're left with in Exhibits N and O are

the actual current net worth of Dr. Rudolph.  And what it
shows is that he has an approximate net worth now of
$3 million.  I believe it's just a little bit over
$3 million.  And I would mention for the Court also that all
of this does not take into consideration that there are
significant liabilities out there for Dr. Rudolph.

There is also a declaration that has been submitted
as a defense exhibit, I believe that's Defense Exhibit R --
or Q, from Julian Rudolph that states there are significant
tax liabilities for money that was taken from the IRA
accounts, including by the Government, and from the Vanguard
brokerage accounts, that showed that he owes perhaps even
millions of dollars to the IRS on these taxes.

And, Your Honor, we've also spoken about the
default judgment.  And this is the default judgment to
AnaBianca and Julian Rudolph for $6.9 million.  And so when
you break this all down, Your Honor, if he has a current net
worth of $3 million, Your Honor has ordered 4.8 billion --
million to be paid in restitution, after the restitution is
taken care of, he's left with no money.  Everything else is
being controlled or has been passed to a credit bypass trust
in favor of the children.  But Lawrence Rudolph, himself,
has no money left to pay a fine.

And so that's why, Your Honor, we're saying that he
has no ability to pay a fine.

1        THE COURT:  All right.  Thank you, Ms. Moss.

2        I'm prepared to rule on the issue of fine and

3   ability to pay a fine.  The fine range under the guidelines

4   for the crimes of conviction is 50,000 to $250,000.  The

5   Government seeks an upward departure of this amount pursuant

6   to guideline Section 5E1.2(d)(1), which authorizes a fine of

7   up to two times the amount of the gain to the defendant as a

8   result of his crimes.

9        In this case, the Government contends that that

10  would be $9,785,577.86, representing twice the life

11  insurance proceeds, plus twice the proceeds the defendant

12  obtained after he took the jewelry Bianca Rudolph was

13  wearing when he murdered her, which is $30,088.

14       The Court finds that based on the totality of the

15  evidence in the record, that in light of the very

16  substantial restitution and forfeiture obligations that will

17  be imposed upon him by the Court's judgment, that the

18  defendant does not have the financial ability to pay an

19  upwardly adjusted fine of nearly $10 million.

20       Apart from the limits of the defendant's financial

21  resources, the other grounds for my decision to limit the

22  fine I will require the defendant to pay involve his

23  children, Julian and AnaBianca Rudolph.  And I have

24  carefully considered their thoughtful and moving victim

25  impact statements filed in this case.

205

1          Apart from their deceased mother, I believe they

2    are the victims who have endured and suffered the most as a

3    result of the heinous crimes committed in this case by both

4    defendants.

5          I regret, given my reading of the governing law,

6    that I am unable to order the restitution be made directly

7    to the Rudolph children.  By way of his compelling victim

8    impact letter, Julian Rudolph has convinced me that imposing

9    anything like a $10 million fine on the defendant will,

10   among other things, go a very long way towards further

11   punishing him and his sister, even beyond what the death of

12   their mother, and the fraud and insults perpetrated by

13   Mr. Rudolph, their father, has already inflicted on them.

14   Equity and fairness, in my view, require that I not allow

15   that to happen.

16         I find, therefore, that given the present assets

17   and access to financial resources, the defendant has the

18   ability to pay a lesser fine of $2 million, which is eight

19   times the top of the guideline fine range.  The Court

20   further finds that requiring the defendant to pay interest

21   on his fine obligation would impair his ability to pay all

22   of his financial obligations under the Court's judgment, and

23   as a consequence, interest on the fine amount is also

24   ordered waived.

25         For these reasons, the Government's construed

1    motion for an upward departure on the fine imposed is

2    granted in part.

3              In addition, the defendant's third objection as it

4    relates to the issue of fine and ability to pay is sustained

5    in part and overruled in part.

6              I intend to sentence the defendant to a custodial

7    sentence of life imprisonment on Count 1, and 240 months on

8    Count 2, with both such sentences to be served concurrently.

9    I also intend to order the custodial sentence on Count 2 be

10    followed by a term of supervised release of three years.

11              With respect to restitution, forfeiture, and fine,

12    I intend to order same, as just set forth in the record.

13    Finally, I intend to order the defendant pay the mandatory

14    special assessment of $200.

15              Before I actually impose sentence, I'll give

16    counsel a final opportunity to make any record they believe

17    appropriate.  Mr. Fields.

18              MR. FIELDS:  Thank you, Your Honor.  Just with

19    regard to the restitution and the fine, we just ask that

20    that be imposed immediately and not on a payment plan.  That

21    way the Government can proceed on collection as soon as

22    possible.

23              THE COURT:  I think that's how Officer Kinsella has

24    recommended that.  Let me just see how we're going to have

25    that here.

1                    All right, the complicating fact is that, as I
2          already mentioned, final -- a final judgment cannot be
3          entered until I rule definitively on the ancillary
4          proceeding with respect to the third parties.  So, I mean,
5          what I would have to then consider is entering a judgment
6          now and then amending the judgment later to incorporate that
7          if I can do so.  Let me -- Susan, we can do that?
8                    LAW CLERK:  I believe so, Your Honor.
9                    THE COURT:  Yeah, the amended -- yeah.  Is that
10         what the Government is requesting?
11                   MR. FIELDS:  Your Honor, with regard to
12         restitution, I think that is an in personam judgment that
13         can be imposed now with one lump sum, the same as the fine,
14         and then I agree the forfeiture can be subject to amendment
15         later on.
16                   THE COURT:  Let me hear from the defendant.
17                   MR. MARKUS:  Your Honor can do it either way.  You
18         have the discretion to enter a judgment now and then amend
19         it or wait and enter a judgment later.  We would request
20         that you enter the judgment later and the reason is because
21         once you enter the judgment now, we have 14 days to file a
22         notice of appeal and then if you amend it, we'll have to
23         file another notice of appeal and it does create some issues
24         regarding payment of the fees for the appeal and so on.  So
25         I would just ask the Court to issue one judgment and wait

1    until all those issues are handled.

2             THE COURT:  All right.  Officer Kinsella, you were

3    going to say something.

4             PROBATION OFFICER:  I was going to ask the same

5    question, Your Honor, as far as how that was all going to

6    break down.  I think that the Court could impose the

7    restitution and the fine and waive -- or waive interest as

8    to both of those and order them immediately paid, and then

9    leave the forfeiture to potentially an amended judgment for

10   just that specific issue down the road.

11            THE COURT:  Mr. Fields, what's the rush?

12            MR. FIELDS:  Your Honor, it -- you know, I don't

13   know exactly how long the ancillary proceedings are going to

14   take, but it would allow our asset forfeiture unit to begin

15   immediately collecting on the fine and on the restitution.

16   So to the extent there are any assets out there, we can

17   start using tools to identify them and seize them so that

18   Lawrence Rudolph is not in the position to using any of that

19   wealth to advance any of the sort of things that he

20   shouldn't that we've been talking about throughout these

21   proceedings.

22            THE COURT:  And what would a delay of -- well, in

23   part it's when we get the briefing completed on that, so

24   which I think your colleague, Mr. Bohn, has asked for an

25   extension or two on that.  But we're -- but, I mean, we're

209

1    not looking at months and months, right?  We're looking at a

2    few weeks.  Is that going to make a difference -- are you

3    representing to me that will make a material difference in

4    the collection of these fines?

5         Because I think there's -- I mean, there -- in

6    terms of simplicity, what I would prefer is one final

7    judgment that takes care of everything, including fine,

8    forfeiture, and restitution.  It rules on the third-party

9    proceedings under Rule 32, wraps it all together, and then

10   all the dates flow from that in terms of an appellate

11   period.  So I really need a compelling reason why to break

12   that up and make this case even more complicated than it's

13   been so far.

14         MR. FIELDS:  May I have just a moment to consult

15   with the head of our asset forfeiture unit?

16         THE COURT:  Sure.

17      (Pause)

18         THE COURT:  One second, Mr. Fields.  All right,

19   Mr. Fields.

20         MR. FIELDS:  So, Your Honor, in terms of the

21   judgment and what it's going to look like here, I think

22   conceptually it's important to realize that Your Honor's

23   judgment with regards to forfeiture, restitution, and fine

24   will be finalized today.  We're talking about with respect

25   to --

1          THE COURT:  Forfeiture individually, right?  The

2    Rule 32.2 and the cases talk about forfeiture -- a

3    forfeiture order as it pertains to the defendant, and then

4    there's a component of forfeiture that relates to

5    third-parties' petitions.

6          MR. FIELDS:  Correct, Your Honor.  That's why --

7    and so this third party -- however that gets sorted out with

8    the third party, that's going to be subject to a separate

9    appeal.  So we don't actually think there's a realistic

10   concern of sort of multiple sort of moving deadlines to an

11   appeal.

12         With regard to restitution and forfeiture, those

13   are going to be separate sort of conceptual judgments from

14   the Court on separate assets.  We've already found out for

15   the first time today that apparently this property was moved

16   into some sort of new trust.  That was --

17         THE COURT:  Which property are you talking about?

18         MR. FIELDS:  That was the cranberry property.  I'm

19   sorry, the Idaho property.  The Idaho property, Your

20   Honor.

21         THE COURT:  Okay.

22         MR. FIELDS:  So assets -- things are happening with

23   them.  They can be sold.  The property in Cabo San Lucas,

24   there were jail calls in which the defendant was talking to

25   Milliron about selling that property --

211

1          THE COURT:  Well, she's not in a position to sell

2     anything right now.

3          MR. FIELDS:  She's not, but the defendant is

4     potentially, Your Honor.  And so all of these give the

5     Government concerns moving as quickly as possible to use the

6     means at its disposal to get -- to satisfy the Court's order

7     and to make sure that Lawrence Rudolph is deprived of any

8     assets derived from the crime, that he's -- that restitution

9     is fully paid and that he pays the fine.

10          THE COURT:  Let me ask Officer Kinsella, since

11     you're the one that's going to be preparing the judgment.

12     Is this all something that we can make happen and -- No. 1?

13          And, No. 2, if the answer to that is yes, don't we

14     usually give the defendant X days to satisfy the financial

15     obligations?  And if they're not paid within X days of the

16     judgment, then sanctions would enter?

17          PROBATION OFFICER:  Typically, Your Honor, that

18     only comes into play when there's interest imposed and then

19     interest would start accruing on that.

20          THE COURT:  Okay.

21          PROBATION OFFICER:  But if you're waiving that,

22     then it's more just -- it's due immediately, the

23     Government's financial litigation unit can go about their

24     business of making collection on whatever's ordered by the

25     Court.

1          THE COURT:  All right.  So how about my first

2   question?  Is this -- since you're going to be preparing it,

3   is this -- is this a matter that we can do?

4          PROBATION OFFICER:  I mean, the way I have it

5   currently, like, at least drafted, Your Honor, is just

6   citing the orders that you've -- the ECF numbers that you've

7   previously cited for both the forfeiture and restitution and

8   then, obviously, the fine amount that you just put on the

9   record for $2 million.  So, I mean, as far as making changes

10  or amending things or addressing that, it's mostly just me

11  checking boxes and --

12         THE COURT:  Then we'll have to -- if we go this

13  way, then we'll have to do an amended judgment later after

14  the third-party proceedings have concluded.  Amending a

15  judgment --

16         PROBATION OFFICER:  Yeah, this is the first time

17  I've ever encountered that, Your Honor, so I don't have a

18  direct answer.  But an amended judgment is simply me

19  checking a box and putting a star to what we just changed.

20  So that's not a big deal for the probation office.

21         THE COURT:  All right.  The Government has

22  convinced me that there are important reasons to expedite

23  the entry of the judgment in this case and that is what

24  we're going to do.

25         Apart from that, Mr. Fields, is there anything else

1    the Government wants to put on the record before I enter the

2    sentence?

3          MR. FIELDS:  Your Honor, just one very minor

4    housekeeping matter.  The Government's Exhibit 8 at the

5    trial was the trigger mechanism from the Auto 5 shotgun.

6    You may remember it was used as a demonstrative exhibit.

7    Browning has asked for that --

8          THE COURT:  Actually, I don't, but go ahead.  I

9    don't have reason to doubt what you're telling me.

10          MR. FIELDS:  Browning has asked for that piece

11    back.  We've talked to defense counsel and they have no

12    objection to us giving it back to Browning.

13          THE COURT:  Are you going to take a photograph of

14    it or something so we have a complete record?

15          MR. FIELDS:  Yeah, we can do that, Your Honor.

16          THE COURT:  All right.  I mean, the Circuit may

17    want to see it for some reason.

18          Does the defendant object?

19          MR. MARKUS:  No, Your Honor.

20          THE COURT:  All right.  You have leave to do that.

21          MR. FIELDS:  Okay.

22          THE COURT:  All right.  Anything further from the

23    defendant before I sentence the -- enter the final sentence?

24          MR. MARKUS:  Your Honor, just -- just on that issue

25    of amending the judgment.  I mean, I think the Government

214

said, you know, something could happen to the property.

If Mr. -- if Mr. Rudolph wanted to do something with the

property, he could have done it over the past year.  We're

talking about a couple of weeks so that we don't have to

have two judgments, two notices of appeal --

THE COURT:  Well, I don't know that it's a couple

of weeks.  I mean, we -- I mean, this is not a simple issue.

The Chicago firm with respect to the children's petition

have not been shy about seeking continuances --

MR. MARKUS:  Neither has the Government, Your

Honor.

THE COURT:  Right.  And so I think on balance -- I

mean, it's not perfect, but I think on balance there's more

reasons for me to do that.  Anything else?

MR. MARKUS:  One last request, Your Honor.  And

despite what has been said in court, the defense handled

this sentencing and the issues of fine, restitution, and

forfeiture on a pro bono basis.  We did that because we

believe in Mr. Rudolph's innocence.

Based on the Court's findings today and order, we

would ask that the Court find him indigent for costs for the

appeal.  We need that finding so that when we file the

notice of appeal, there's costs associated with that in

excess of $500, and then the cost of the transcripts, so we

would ask the Court to make a finding that he's indigent for

1    costs for the appeal so that those costs can be paid by --

2              THE COURT:  Apart from your statement to that

3    effect, I have no evidence before me as to the indigent

4    status or not to your client, so I would recommend the

5    better approach is to file a motion seeking such a leave --

6    or such a status.

7              MR. MARKUS:  Yes, Your Honor.  Sure.

8              THE COURT:  Okay.  All right.  I'm going to ask the

9    defendant and defense counsel to stand for sentencing.

10             Pursuant to the Sentencing Reform Act of 1984, it

11   is the judgment of this Court that the defendant, Lawrence

12   Rudolph, be committed to the custody of the Bureau of

13   Prisons to be imprisoned for a term of life imprisonment on

14   Count 1 and 240 months on Count 2, with both sentences to be

15   served concurrently.

16             The Court recommends to the director of the Bureau

17   of Prisons that the defendant be incarcerated at a medical

18   facility appropriate to his security designation and which

19   has the necessary medical resources with which to address

20   the defendant's medical and health issues.

21             In the event the defendant is ever released from

22   custody, upon such release, the defendant shall be placed on

23   supervised release for a term of three years on Count 2.

24   While on supervised release, the defendant shall not commit

25   another federal, state or local crime.  He shall not possess

216

a firearm as defined in 18 United States Code Section 921,
and he shall comply with the standard conditions that have
been adopted by this Court in District of Colorado General
Order 2020-20.

The defendant shall not unlawfully possess and he
shall refrain from unlawfully using a controlled substance.
The Court waives the mandatory drug testing provisions of
Section 3563(a)(5) because the presentence report indicates
a low risk of future substance abuse by the defendant.  The
defendant shall cooperate in the collection of DNA as
directed by the probation officer.

The Court finds that the following special
conditions of supervision recommended to me by the probation
officer in his report are reasonably related to the factors
enumerated in Section 3553(a) and 3583(d), they do not
constitute a greater deprivation of liberty than reasonably
necessary to accomplish the goals of sentencing, and they
will be included in the Court's judgment and those are
special conditions 1 through 6.

With respect to restitution, the defendant is
ordered to make restitution to the insurance company victims
of Count 2 as set forth in the life insurance payments table
appended as Exhibit 1 to the Government's motion for order
of restitution and forfeiture filed at ECF 296-2.

With respect to forfeiture, pursuant to Rule

1    32.2(b)(4), the Court orders that its preliminary order of

2    forfeiture entered at ECF 354 is made final as to Defendant

3    Lawrence Rudolph individually.

4         With respect to a fine, the Court -- the defendant

5    is ordered to pay a fine in the amount of $2 million into

6    the crime victim's fund.  In addition, the defendant will

7    pay a special assessment of $200.

8         Further, it is ordered that the restitution,

9    forfeiture, fine, and special assessment amounts are due and

10   payable immediately.

11        Finally, Mr. Rudolph, I'm advising you that you

12   have the right to appeal both your conviction and the

13   sentence that I've just imposed.  If you wish to file such

14   an appeal, a notice of appeal must be filed with the Clerk

15   of the Court within 14 days after the entry of judgment or

16   the right to appeal will be lost.

17        I'm further advising -- one second here, I'm

18   changing this.  If you are unable to afford an attorney for

19   an appeal, the Court will appoint one to represent you.  If

20   you are unable to afford the fees for filing an appeal, you

21   may file a request with the Court that such fees be waived.

22        All right, is there anything further from the

23   Government at this time?

24        MR. FIELDS:  No, Your Honor.  Thank you.

25        THE COURT:  Thank you.  Anything further from the

1    defendant?

2         MR. MARKUS:  Yes, Your Honor.  We just want to

3    preserve our objections that we've made throughout the

4    sentencing hearing and at the trial.  I know the Court had

5    made a lengthy statement of facts in support of sentencing;

6    we obviously vehemently disagree with that, reassert

7    Dr. Rudolph's innocence.  We believe in his innocence and we

8    look forward to the appeal in this case.

9         THE COURT:  All right.  Anything further from the

10   probation officer?

11        PROBATION OFFICER:  I know you stated earlier, Your

12   Honor, but waiving the interest on the fine and restitution?

13        THE COURT:  Oh, I should have repeated that again.

14   Yes.  Thank you, Officer Kinsella.

15        The Court orders that the interest on the

16   restitution, individual forfeiture, and fine amounts are

17   waived.  Apart from that, Officer, anything else?

18        PROBATION OFFICER:  That's it, Your Honor.  Thank

19   you.

20        THE COURT:  All right, the defendant is remanded to

21   the custody of the United States Marshal.  Thank you.  That

22   will be all.

23        (Proceedings concluded at 3:29 p.m.)

24

25

```
 1                            INDEX

 2     Item                                          PAGE

 3                     GOVERNMENT'S WITNESSES

 4       TYSON POLSKI
         Direct Examination by Mr. Bohn              30
 5       Cross-examination by Ms. Moss               95
         Redirect Examination by Mr. Bohn            142
 6

 7                     GOVERNMENT'S EXHIBITS

 8     EXHIBITS:      Offered   Received  Refused   Stipulated

 9     1              84        85

10     2              36        36

11     3              36        36

12     4              36        36

13     5              36        36

14     6              36        36

15     7              36        36

16     8              36        36

17     9              36        36

18     10             36        36

19     11             36        36

20     12             36        36

21     13             36        36

22     14             36        36

23     15             36        36

24     16             36        36

25     17             36        36
```

**GOVERNMENT'S EXHIBITS**

| **EXHIBITS:** | **Offered** | **Received** | **Refused** | **Stipulated** |
|---|---|---|---|---|
| 18 | 36 | 36 | | |
| 19 | 39 | 39 | | |
| 20 | 36 | 36 | | |
| 21 | 43 | 45 | | |
| 22 | 49 | 49 | | |
| 23 | 36 | 36 | | |
| 24 | 36 | 36 | | |
| 25 | 36 | 36 | | |
| 26 | 36 | 36 | | |
| 27 | 53 | 53 | | |
| 28 | 36 | 36 | | |
| 29 | 58 | 58 | | |
| 30 | 36 | 36 | | |
| 31 | 36 | 36 | | |
| 32 | 60 | 60 | | |
| 33 | 61 | 62 | | |
| 34 | 66 | 66 | | |
| 35 | 67 | 67 | | |
| 36 | 36 | 36 | | |
| 37 | 69 | 69 | | |
| 38 | 72 | 73 | | |
| 39 | 73 | 74 | | |
| 40 | 91 | 91 | | |

1                           **GOVERNMENT'S EXHIBITS**

2      **EXHIBITS:**       **Offered**    **Received**  **Refused**    **Stipulated**

3      **41**              **36**         **36**

4      **42**              **77**         **77**

5      **43**              **81**         **81**

6      **44**              **83**         **83**

7      **46**              **36**         **36**

8      **48**              **86**         **87**

9      **49**              **90**         **90**

10     **50**              **91**         **91**

11     **51**              **36**         **36**

12                          **DEFENDANT'S EXHIBITS**

13     **EXHIBITS:**       **Offered**    **Received**  **Refused**    **Stipulated**

14     **A**               **176**        **180**

15     **B**               **176**        **180**

16     **C**               **176**        **180**

17     **D**               **176**        **180**

18     **E**               **176**        **180**

19     **F**               **176**        **180**

20     **G**               **176**        **180**

21     **H**               **95**         **95**

22     **I**               **95**         **95**

23     **J**               **95**         **95**

24     **K**               **95**         **95**

25     **L**               **95**         **95**

1                        **DEFENDANT'S EXHIBITS**

2        **EXHIBITS**:        **Offered**    **Received**    **Refused**    **Stipulated**

3        M                95            95

4        N                95            95

5        O                95            95

6        P                95            95

7        Q                95            95

8        R                95            95

9        S                95            95

10                    *        *        *        *        *

11                    **REPORTER'S CERTIFICATE**

12            I certify that the foregoing is a correct transcript

13    from the record of proceedings in the above-entitled matter.

14            Dated at Denver, Colorado, this 23d day of October,

15    2023.

16

17

18

19

20                MARY J. GEORGE, FCRR, CRR, RMR

21

22

23

24

25