1    IN THE UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF COLORADO
2
3    Criminal Action No. 22-cr-0012-WJM

4    UNITED STATES OF AMERICA,

5    Plaintiff,

6    vs.

7    LAWRENCE RUDOLPH,
      LORI MILLIRON,
8
      Defendants.
9    ----------------------------------------------------------

10    REPORTER'S TRANSCRIPT
         (Jury Trial, Day 4)
11    ----------------------------------------------------------

12

13         Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

14    Judge, United States District Court for the District of

15    Colorado, commencing at 8:47 a.m., on the 14th day of July,

16    2022, in Courtroom A801, United States Courthouse, Denver,

17    Colorado.

18                          APPEARANCES

19         BRYAN D. FIELDS, E. GARRETH WINSTEAD, III, J. BISHOP
20    GREWELL, Assistant U.S. Attorneys, 1801 California Street,
      Suite 1600, Denver, Colorado 80202, appearing for the
21    plaintiff.

22         DAVID O. MARKUS, A. MARGOT MOSS, LAUREN L. DOYLE,
      Markus Moss PLLC, 40 NW Third Street, Penthouse 1, Miami,
23    Florida 33175, appearing for the defendant Rudolph.

24       JOHN W. DILL, John W. Dill P.A., 941 West Morse
      Boulevard, Winter Park, Florida 32789, appearing for the
25    defendant Milliron.

DIRECT - SWANEPOEL

MARY J. GEORGE, FCRR, CRR, RMR
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer

P R O C E E D I N G S

1

2

3

4       (In open court in the presence of the jury at 8:47

5   a.m.)

6           THE COURT:  Good morning, ladies and gentlemen of

7   the jury.  Welcome back to day 4 of our jury trial.

8           Mr. Swanepoel, I remind you you remain under oath.

9           THE WITNESS:  Yes, sir.

10          THE COURT:  Mr. Winstead, you may resume your

11  examination.

12          MR. WINSTEAD:  Thank you, Your Honor.

13              DIRECT EXAMINATION (Continued)

14  BY MR. WINSTEAD:

15  Q.   Good morning, sir.

16  A.   Good morning, sir.

17          MR. WINSTEAD:  And, Your Honor, before we get

18  started, I wanted to note, and see if the Court wanted to

19  give any warnings, or advisals, as we will be going through

20  additional pictures that will be difficult to see in the

21  first part of the examination.

22          THE COURT:  How long -- give me a sense of how many

23  there are and when we will be through them.

24          MR. WINSTEAD:  Yes, sir.  There's two series of

25  pictures taken by the police that are similar to the

DIRECT - SWANEPOEL

1    pictures taken by Mr. Swanepoel.  It is the first subject.

2    It will probably take about 10 minutes.

3         THE COURT:  All right.  And --

4         MR. WINSTEAD:  Oh, I'm sorry.

5         THE COURT:  Go ahead.

6         MR. WINSTEAD:  I was going to say I can also let

7    the Court know when that section is finished, if anyone

8    wants to leave the courtroom, so that they can be notified

9    to reenter or whatever the Court would like.

10        THE COURT:  I think it will be helpful if you did

11   tell us when they were completed so we would know that.  I

12   don't think I need to repeat the advisement, the jury heard

13   you and they're advised of what's coming up.  Go ahead.

14        MR. WINSTEAD:  Okay.  All right, thank you, Your

15   Honor.

16   BY MR. WINSTEAD:

17   Q.   Sir, yesterday we finished up -- actually, I have one

18   quick question about the room.

19   A.   Yes, sir.

20   Q.   After all of this was over, do you recall if you -- if

21   you, personally, or you had the room cleaned?

22   A.   No, sir.  As far as I recall, we didn't clean anything.

23   I do recall us putting a blanket over the body while we were

24   deciding what to do, but after that, we removed the blanket,

25   took some photographs, put the blanket back on, we put a fan

DIRECT - SWANEPOEL

1    on, and we left.

2    Q.    And I'm sorry, I asked that poorly.  So I meant after

3    everything was over, after the defendant had gone back to

4    America, and after -- after all of this was over, at some

5    point later did you have -- did you clean it?

6    A.    I wasn't there, sir.  I don't know when they did, but

7    obviously they -- I believe they would have cleaned it, yes.

8    Q.    Do you happen to remember at any point seeing if there

9    was blood on the foot of the bed?

10   A.    I don't recall seeing any blood on the bed.  I wasn't

11   really looking, to be honest, but I don't recall seeing it.

12   Q.    Okay.  And then do you recall at some point -- or

13   during the actual incident, do you recall seeing any blood

14   on Larry or his clothing or anything like that?

15   A.    To be honest, I don't recall.  I mean, I can recall

16   what Larry was wearing.  I mean, in all honesty I don't even

17   recall what I was wearing.  I couldn't tell you now what

18   clothes I was wearing.  I guess easier to see what you are

19   seeing than yourself, but I couldn't tell you with any

20   honesty if I remember seeing any blood on Larry.

21   Q.    Thank you.  All right.  So then what we were talking

22   about was you were driving to Mumbwa so I'd like to pick

23   back up there.

24   A.    Yes.

25   Q.    When you arrived in Mumbwa, where did you go?

DIRECT - SWANEPOEL

1    A.   We went to the police station.  As far as I recall,

2    outside the police station, when entering we had to write

3    our names and I think a description of why we were at the

4    police station or something, you know, a log book of some

5    kind.  And then in the police station, they separated Larry

6    and I.  They put us in separate rooms.  And then they

7    actually took a statement from us.

8    Q.   Did they verbally take a statement or did you write

9    something down?

10   A.   No, it was written.  They actually wrote -- in my first

11   recollection I thought I actually wrote my own statement,

12   but upon looking at it, it wasn't my handwriting, so I

13   believe it was the police officer that wrote my statement.

14   Q.   What did you do after the statements were finished?

15   A.   I -- it's -- I can't recall exactly when the ambulance

16   came to meet us at the police or if we went past the

17   police -- the hospital to collect the ambulance, but we then

18   left Mumbwa in convoy and went back to the camp together

19   with the police and ambulance.

20   Q.   And when you say "the camp," is that Chinyembe?

21   A.   Back to Chinyembe camp, yes, sir.

22        MR. WINSTEAD:  All right.  If you would please pull

23   up Exhibit 16, page 7.  And these are going to be scene

24   photos, Your Honor.

25        THE COURT:  All right.

271

DIRECT - SWANEPOEL

1          MR. WINSTEAD:  16, page 7.  Not working again

2     today.  All right.  May I please use the Elmo.

3          COURTROOM DEPUTY:  Mr. Winstead, make sure that

4     button is clicked.

5          MR. WINSTEAD:  Oh, yes.

6          COURTROOM DEPUTY:  Thank you.

7     BY MR. WINSTEAD:

8     Q.   All right.  So yesterday we were looking at Exhibit 16,

9     which you said was some photos that you had taken at two

10    times; immediately before you went to the police and then a

11    couple of photos after.  Is this one of the photos that you

12    took once the police were there?

13    A.   It looks like it, yes, sir.

14    Q.   Okay.  And I'd like to show you the same exhibit,

15    Exhibit 16, page 9.  Is this another of the photos that you

16    took of the police?

17    A.   Yes, sir, it looks like it.

18    Q.   Okay.  Were you allowed to go into the room once the

19    police got here or were you supposed to stay outside?

20    A.   That was from the doorway.  I didn't actually go in

21    while they were -- while they were busy inside the room.

22    Q.   Okay.  Were the police also taking pictures and doing

23    investigation?

24    A.   Yes, sir.  I believe I remember seeing a police

25    photographer.

272

DIRECT - SWANEPOEL

1        MR. WINSTEAD:  How are we doing?  Did we get it

2    fixed yet?  No.  All right.

3        THE COURT:  Is this a problem on your end,

4    Mr. Winstead, or on ours?

5        MR. WINSTEAD:  I think it's a problem on our end,

6    Your Honor.

7    BY MR. WINSTEAD:

8    Q.   So I'd like to show you a series of photos taken by the

9    police.  Okay.

10        Oh, it is working?  Okay.  Can we switch back to

11    counsel table.  All right.  Thank you.  Sorry about that.

12        Can you please -- yes, so this is Exhibit 15, page

13    17.  What is this picture?

14    A.   I think it's one of the photographs I took before we

15    left.

16    Q.   Can you see the hand on the right-hand side?

17    A.   Yes, sir.

18    Q.   So this is Exhibit 15, it's a different exhibit from

19    what we were looking at before.  Exhibit 16 were your

20    photos.

21    A.   Okay.

22    Q.   Does that refresh your recollection about what this may

23    be?

24    A.   It looks a lot like the one I took before we left, but

25    yes, sir.

273

DIRECT - SWANEPOEL

1    Q.   All right.  Is that consistent with how you left the

2    room before you went to the police?

3    A.   That's what I say, yeah, it looks very much like the

4    one I took.

5    Q.   Okay.  Did the police document the way things were in

6    the room?

7    A.   As I say, sir, I wasn't -- I wasn't really privy to

8    what they were doing inside.  I just took some photographs

9    when they arrived, just to show, you know, sort of everyone

10   in the room and that was sort of where I exited.

11   Q.   Can I get Exhibit 15, page 1, please.  All right, we're

12   going old school today.

13        All right.  So this is from the series of photos

14   taken by the police.  Did they document where the location

15   of the soft case and the rifle were?

16   A.   It appears so, yes, sir.

17   Q.   And that's consistent with how it was when you left it?

18   A.   It did -- it looks that way, yes, sir.

19   Q.   Okay.  What about the shotgun shell on the floor?

20   A.   Looks to be in the same place, sir.

21   Q.   And the blood on the floor.

22   A.   Looks the same as from the photos I took.

23   Q.   And they examined Bianca's body?

24   A.   Yes, sir.  As I say, I wasn't -- I wasn't present for

25   their examination, but . . .

DIRECT - SWANEPOEL

1    Q.    All right.  So this next one is going to be pretty hard

2    to see with the bad resolution on the Elmo, but we'll try

3    it.  And if not, we'll come back later if we can get the

4    computer working again.

5              In this photo, can you tell me if you can see

6    whether Bianca is wearing any jewelry?

7    A.    Yes, sir.  It appears she's wearing a watch on the one

8    wrist and a bracelet of some kind on the other.

9    Q.    And do you see any --

10   A.    Some earrings.  Earrings, yes, sir.  An earring.

11   Q.    And in this picture, does it look as though the

12   bracelet's --

13   A.    It looks like the jewelry's been removed, yes, sir.

14   Q.    Okay.  Do you recall what happened to the jewelry?

15   A.    To the best of my recollection, I believe the officers,

16   whoever, who were investigating the body, or taking that

17   series of photographs, removed the jewelry and I believe

18   they handed it to either Larry or myself with the jewelry

19   inside.  I believe the explanation was that it would not be

20   a good idea to send the body to the Mumbwa mortuary with the

21   jewelry on as it may go missing.

22   Q.    So what happened to the jewelry?

23   A.    I honestly can't recall, sir.  I think Larry would have

24   kept it.  I guess.  I -- like I say, I can't recall if they

25   handed it to me or to Larry, himself, but I do recall an

DIRECT - SWANEPOEL

1    exchange like that.  But I certainly didn't keep it, sir; I

2    assume Larry kept it.

3    Q.    Do you recall putting the jewelry -- or the jewelry

4    being put into anything?

5    A.    As I recall, I think it was in a little case of some

6    kind.  I can't remember exactly, but yeah, that -- it wasn't

7    just handed sort of, you know, piece by piece, it was in

8    a -- in a little case of something.

9    Q.    After that, did the police take Bianca's body?

10   A.    The police actually asked us if they could wrap her up

11   in that blanket that we'd covered her in and, yeah, then

12   they wrapped her up and they put her body in the ambulance

13   and then they took the body and we traveled together with

14   her and the body to Mumbwa to the mortuary.

15   Q.    Did you travel in the same vehicle or did you

16   follow --

17   A.    No, sir, we followed in our vehicle.  I believe at that

18   stage I had Spencer and Banda and myself and Larry in the

19   vehicle.

20   Q.    Do you know if the police took any other items of

21   evidence?

22   A.    I don't know, sir.

23   Q.    Do you know if they took the shotgun?

24   A.    I believe they did take the gun and probably the ammo

25   because that -- I recall we had to go and collect from the

DIRECT - SWANEPOEL

1    police station in Lusaka, so . . .

2    Q.    And when you say the "ammo," are you meaning the spent

3    shell casing that was on the ground?

4    A.    I -- I do not recall that, sir.  I meant there was a

5    plastic case with the other ammunition from the shotgun that

6    was not used that I recall we collected.

7    Q.    And so did they -- did you follow them back to

8    Mumbwa?

9    A.    Yes, sir, we followed them to the mortuary.  I can't

10   recall if we stopped by the police station or not, but I do

11   recall going to the mortuary, and then Bianca's body was

12   actually left in the mortuary at Mumbwa overnight.  We

13   carried on to Lusaka.

14   Q.    What did -- where did you go to in Lusaka?

15   A.    I recall stopping on the farm first.  I think I dropped

16   Banda off and we dropped that case off and some of the

17   luggage.  And then I left Banda on the farm and myself and

18   Larry went to the hotel in Lusaka.  I believe we stayed at

19   the -- the Protea Hotel.

20   Q.    Can you spell that?

21   A.    P-r-o-t-e-a, Protea.

22   Q.    All right.  After you got to the hotel, what did you

23   all do next?

24   A.    I think, as far as I recall, we just went to our rooms

25   and -- yeah, at that stage I believe I called my -- my wife

277

DIRECT - SWANEPOEL

1   at the time, LeeAnn, and sort of explained to her, you know,

2   more or less what had happened.  And she actually said that

3   she wanted to come up and help.  And she did.

4        But, you know, there was -- I think that was pretty

5   much the end of the day for us, sir.

6   Q.   What did you do the next day?

7   A.   The next day, I believe we made some calls to the

8   hospital to find out how we would go about collecting the

9   body.  And I believe an ambulance was arranged and we

10  then -- Larry and I then followed in the -- in one of our

11  vehicles, followed the ambulance back to Mumbwa, and then

12  collected -- they collected Bianca's body and we followed

13  that back to the hospital in Lusaka.

14  Q.   What was the name of that hospital?

15  A.   It's called the UTH, which is the University Teaching

16  Hospital of Lusaka.

17  Q.   Do you recall calling the Embassy?

18  A.   I believe Larry did call the Embassy.  I think he -- I

19  think -- I think he did it the night before, actually, as

20  far as I recall.

21  Q.   Did you find out anything about that call?

22  A.   Again, I do recall Larry being unhappy with the

23  Embassy.  I don't really recall if he told me that the next

24  morning, but I do recall him saying that he felt they

25  weren't being very helpful.  And I believe that he was

DIRECT - SWANEPOEL

1    actually quite upset with one of the gentlemen from the

2    Embassy that -- when he was first speaking to this gentleman

3    from the Embassy, the gentleman sort of expressed, you know,

4    concern, saying, "Oh, this is terrible.  This is a terrible

5    incident.  You know, we certainly don't need another Cecil

6    the lion incident."

7           And that's -- I do remember Larry sort of saying

8    that to me.

9    Q.   Do you remember the gentleman's name at the Embassy?

10   A.   I believe it was Otto, something.  I didn't really

11   interact with him very much.

12   Q.   What was Cecil the lion?

13   A.   Well, Cecil the lion was an incident that happened

14   quite a few years ago in Africa.  It was actually in

15   Zimbabwe.  And there was this particular lion that was being

16   researched that had a collar, and it was in the national

17   park.  It was an older lion, I think he was around 13 or 14

18   at the time because I think his son, Jerico, was about

19   eight; but older lion.  He was getting pressed out of his

20   pride.  And this lion actually used to go out of the

21   national park and into the hunting area next door.

22          And in one of these, you know, jaunts into the

23   hunting area, a professional hunter and a client, dentist, I

24   believe, from Pittsburgh, or Pennsylvania, or something,

25   this client actually ended up shooting this lion that had a

DIRECT - SWANEPOEL

1    collar on it.

2              Now, there was nothing against the law with that,

3    but the professional hunter, I guess, you know, didn't want

4    a big social media outcry and he removed the collar.  So

5    again, that's, you know, an ethical violation.  There was no

6    laws broken, but it became a massive media sensational

7    story.  I believe the lion, the picture of the -- the

8    incorrect lion was actually put up in Times Square.  One of

9    the professional hunters we know personally, Peter Foster,

10   who hunted with the same client seven years prior to this

11   had his picture posted all over the news networks as being

12   the professional hunter on the safari and the lion that they

13   called being Cecil the lion, which was absolute fabrication.

14   It was not the same professional hunter nor the same lion.

15             But it went viral.  I don't know how many billions

16   of views it got, but it destroyed quite a few people's

17   lives, you know, in the process.

18             I know that the professional hunter in question

19   actually had to move home.  He had death threats, death

20   threats against his daughter.  So it was definitely not

21   something to take lightly.  And -- and I -- it certainly

22   worried me when somebody said that to me, you know.

23   Q.   Why -- what did Larry need from the Embassy?

24   A.   Honestly, I don't recall exactly what he needed at the

25   time.  I think -- I honestly didn't really know what to do

DIRECT - SWANEPOEL

1    further at that point.  We sort of were figuring it out as

2    we went along.  I guess Larry wanted to find out from them

3    what steps he needed to follow in that.

4          And as far as I recall, you know, we weren't

5    getting much help from that side.  And that's when we

6    proceeded -- well, I proceeded to start sort of trying to

7    find out what we needed to do in order to, you know, get him

8    home.

9    Q.    At that point, are you aware of whether Larry had told

10   his family about Bianca's death?

11   A.    At that point, no.  I don't remember asking, honestly.

12   Like I say, I was in a bit of a haze myself.  The first time

13   I recall that being brought up was when my -- my wife at the

14   time, LeeAnn, actually asked Larry -- I think that was the

15   evening of the second day, or -- I believe it was the

16   evening of the second day, if I recall correctly, and I

17   remember her asking Larry -- or them having a conversation

18   about whether he told the kids or not yet.  She's a mother

19   herself.  I guess, you know, that was something she thought

20   about.

21         And as far as I don't really recall how the

22   conversation went, I just recall LeeAnn coming and speaking

23   to me and saying, you know -- you know, "He should be

24   calling the kids and that."

25         And I actually recall disagreeing with her and

DIRECT - SWANEPOEL

1    asking her, you know, "Is that what you would want if it was

2    me, you know, to find out by the phone?"

3            So, yeah, that's the -- the only real recollection

4    I have of that.  I don't -- I guess he hadn't contacted the

5    kids yet by then.

6    Q.   Do you recall finding out when the autopsy happened?

7    A.   I believe we dropped -- when we had came back the

8    second day with the body, then it was taken to the UTH

9    hospital.  And I don't actually recall exactly when, I

10   believe it might have been the next day or two days

11   afterwards; I can't be certain.  I think it was maybe the

12   next day.  And then we got a call through our offices in

13   Lusaka saying that, you know, the autopsy had been done and

14   we can come and have the body transferred to -- to the

15   burial center.

16   Q.   Do you recall going to the location where the autopsy

17   was performed and speaking to the doctor?

18   A.   I don't really recall speaking to the doctor.  I know

19   Larry spoke to the doctor.  I -- I do recall when we went

20   there there was -- where the body was being dropped and the

21   ambulance, we sort of parked outside there.  And I think we

22   walked in and then the doctor started speaking to Larry.

23   And I actually walked outside at that point and I gave my

24   tracker, Banda, some money and said he could go back home to

25   his village.  There was no need for him to stay.

DIRECT - SWANEPOEL

1          So I wasn't in there when Larry was talking to the

2     doctor.

3     Q.   Throughout this period, how was -- how was Larry?  How

4     was he acting?  What was his demeanor?

5     A.   To be honest, he was very morose.  I mean, very down.

6     He was not speaking much.  He -- yeah, sort of seemed to be

7     much like I felt, you know, just sort of stumbling around at

8     that point.

9     Q.   Do you recall any conversation about what would be

10    involved if Larry had wanted to bring Bianca's body home?

11    A.   I do recall in my memory, you know, the -- how

12    difficult it is to transport a body back from Zambia to

13    United States.  That actually came from a story from my

14    father many years ago.

15         THE COURT:  Excuse me, sir.  Excuse me.  Ma'am, in

16    the front row.  What are you doing?

17         UNIDENTIFIED WOMAN:  Oh, binoculars.

18         THE COURT:  Does it have any kind of camera

19    equipment on there?

20         UNIDENTIFIED WOMAN:  No, sir.

21         THE COURT:  Just a straight binocular?

22         UNIDENTIFIED WOMAN:  Yes, sir.

23         THE COURT:  And you can't see the witness stand

24    without a binocular?

25         UNIDENTIFIED WOMAN:  Well, not to draw for.

DIRECT - SWANEPOEL

1          THE COURT:  Go ahead.

2          MR. WINSTEAD:  Thank you, Your Honor.

3          THE WITNESS:  Sorry, I forgot where I was.

4    BY MR. WINSTEAD:

5    Q.    Let's see.  We were talking about -- oh, you were

6    talking about whether you recalled discussing any

7    difficulties with bringing the body home.

8    A.    I do recall, you know, that in my mind -- and I know it

9    came from a story from my father who had a client pass away

10   many, many years ago in the bush, you know, from a heart

11   attack.  And they had to get a special coffin -- a leadlined

12   coffin, or something like that.

13          I don't know if we actually spoke about it then or

14   if it was just my memory putting things together.  It's many

15   years ago.  But I do recall at some stage in there Larry

16   saying that Bianca was -- he was going to have Bianca

17   cremated and, you know, taken back to the United States.

18   Q.    Did he need a death certificate to do that?

19   A.    I believe so, yes, sir.  I think that's actually what

20   we may -- we needed from the U.S. Embassy was a -- some

21   certificate of death, you know, in order to transport the

22   remains back to the United States.

23   Q.    Other than the conversation about Cecil the lion, do

24   you recall there being any other causes of conflict with

25   Otto?

DIRECT - SWANEPOEL

1    A.    I do, sir.  I recall when the body was transported to

2    the burial home -- I can't recall if it was the same evening

3    or the following day -- I believe Larry had made a call back

4    to the same gentleman at the Embassy and explained to him

5    that we'd gone through the procedures necessary in order for

6    Bianca to be cremated.  And I remember Larry saying to me

7    that the gentleman in question that he spoke to at the

8    Embassy seemed very shocked and almost suspicious that these

9    processes had happened so quickly, you know.  He said it

10   seemed very -- seemed too fast to be able to have gotten

11   everything done in time for that.

12            And then I believe that was -- I don't know if that

13   was the same conversation they had -- no, I believe after

14   that, they had quite a big row when Larry found out that

15   this gentleman had gone to the burial home where Bianca's

16   body was being kept and taken some photographs of Bianca's

17   body.

18   Q.    Did Larry tell you why he was angry about that?

19   A.    I recall him saying that he had not been informed;

20   nobody had asked his permission.  He felt it was -- you

21   know, he was being treated suspiciously and he felt it was

22   unjust or unfair that they did that without his -- without

23   his knowledge.

24   Q.    During these days, were you still staying in Lusaka?

25   A.    Yes, sir, we were still staying at the Protea Hotel.

285

DIRECT - SWANEPOEL

1    Q.    Did you receive any news about the police investigation

2    or the autopsy results?

3    A.    We had to go and collect -- I believe we had to collect

4    the autopsy results, the paperwork.  Also we had to go to

5    the police station to collect the ballistics report and

6    the -- for Larry to take possession of the shotgun and the

7    ammunition again so he could travel with it.

8            And they gave us back our temporary import permits

9    and that.  And then we had to go to, I believe, the building

10   for marriages and deaths and we had to get a death

11   certificate with that information.  I don't recall exactly

12   what other documentation, but I think at that stage we

13   pretty much had all the documentation required to get -- I

14   think it was some RD form or something from the Embassy.

15           And I think that's when Larry found out that the

16   gentleman had taken some photographs of Bianca when he said

17   that he would meet Larry at the -- at the cremation center.

18   Q.    As far as the materials from the police department, did

19   Larry receive those?

20   A.    The what, sir?

21   Q.    So you were talking about things that you got.  Did you

22   receive any information about the results of the police

23   investigation?

24   A.    Yes, sir.  They gave us copies of pretty much

25   everything, as far as I recall.  And then I think we had to

286
DIRECT - SWANEPOEL

1    make further copies.  I think we had two or three sets of
2    copies that we had to -- that we had to have.  So, yes, I
3    believe we did have that in possession.
4    Q.    And did you -- or did you or Larry provide those to the
5    Embassy in the whole process?
6    A.    Yes, sir.  I think I recall at the cremation center
7    Larry provided that information to the -- this gentleman,
8    this Otto.  And I think then he had to give Larry a
9    signature or some form in order for Larry to be able to
10   leave the country with Bianca's remains.
11   Q.    Those materials from the police department, did they
12   include the autopsy report?
13   A.    Yes, sir.  I -- autopsy report, ballistics report, I
14   think a certificate of death.  And, like I say, I can't
15   really recall what else, but I think it was everything that
16   was needed by the Embassy.
17   Q.    And did Larry receive the -- all the copies of all of
18   those materials?
19   A.    Yes, sir, he was given copies.  I believe he gave them
20   to the Embassy gentleman.
21   Q.    Okay.  All right.  I'd like to talk about the day of
22   the cremation.  Do you -- again, it's okay if you don't, but
23   do you remember how many days that was after she had died?
24   A.    Honestly, I think it was maybe four days.  It was
25   either -- it was either three or four days, if I -- if I

DIRECT - SWANEPOEL

1    recall correctly.

2    Q.   Can you sort of start out what happened on that day.

3    A.   I believe -- I can't recall if Larry came with us or

4    not.  I do recall him having a conversation with LeeAnn

5    saying that he could not choose clothes for Bianca, you

6    know, for this -- the little ceremony at the burial home.

7    So I took LeeAnn and, like I say, I don't recall if Larry

8    drove with us, stayed in the car, if he stayed at the hotel.

9    But we went into the farm, which was about 15 miles away,

10   and we collected some clothing from Bianca's bag.

11           And I honestly don't recall again if Larry was with

12   us, but I know LeeAnn and I went to the funeral home and

13   LeeAnn actually went in with one of the ladies to help dress

14   Bianca for the ceremony.

15   Q.   And then did the -- can you describe what the ceremony

16   was.

17   A.   At the small burial home, not at cremation center, it

18   was -- you know, they have a small room there where you can

19   sort of have a -- you know, a look, sort of ceremony for

20   somebody's past.  It was myself -- my father and my mother

21   were still in the bush.  It was myself and a couple of the

22   people who work for us at the offices and that knew Larry

23   and Bianca.  It was Larry and us and LeeAnn.  So it was a

24   small little ceremony.  Some words were said.  A lot of

25   crying.  I don't really recall exactly.

DIRECT - SWANEPOEL

1            And then from there, they transported the body in
2     the hearst to the cremation center and then they cremated
3     the body.
4     Q.   Do you recall if at that point Larry had notified any
5     of his family?
6     A.   Again, I don't think I asked any of that stage.  I
7     think the first time I recall actually asking was once we
8     traveled and I got to South Africa, it was -- I actually
9     sent a WhatsApp, I believe, message to Larry saying, "Hey,
10    have you let the kids know," because I believe at that stage
11    I -- I can't recall whether it was Julian and AnaBianca, it
12    seemed like the -- one of the kids tried to contact the
13    office in Lusaka to find out what was going on.
14    Q.   And did you get a response about -- at that point
15    whether he had --
16    A.   Larry said, you know, he'd gotten home and he'd
17    crashed, you know, tired from the long trip and he'd taken
18    some sleeping tablets and stuff.  He just said to me in the
19    message, you know, "Sorry, I -- you know, I meant to tell
20    them but I crashed after the flight.  But don't worry, the
21    kids are coming up to see me."
22    Q.   During those days, did you ever have any conversations
23    about potentially him flying any of his family members out
24    before the cremation?
25    A.   No, sir, not that I recall.

DIRECT - SWANEPOEL

1   Q.   After the cremation, were you still staying in Lusaka?

2   A.   Yes, I believe we -- I believe we spent one more night.

3   And then we managed to get flights back home, I know -- I

4   mean, I do recall Larry wanting to get home as soon as he

5   could, sort of with the remains.

6        I recall having a conversation with my wife at the

7   time.  I can't recall if it was with Larry or just with her.

8   As I say, again, you know, sort of back and forth as to

9   whether, you know, it was best to let the kids know

10  beforehand or to tell them in person.

11  Q.   Then did you all fly out?

12  A.   As far as I recall, I think we were all on the same

13  flight to South Africa.  And then from South Africa Larry

14  continued to the United States.  And obviously we remained

15  in South Africa.

16  Q.   Do you recall if Larry received the -- the shotgun back

17  from the police?

18  A.   Yes, sir, he did.

19  Q.   Did he take it with him?

20  A.   Yes, sir, he had to.

21  Q.   Why did he have to?

22  A.   The police won't let you leave the country unless that

23  temporary import permit is stamped that the firearm has left

24  the country with the person that brought it in.

25  Q.   Towards those -- after -- after the cremation, was

DIRECT - SWANEPOEL

1    Larry still -- was his demeanor still the same or was there

2    any change?

3    A.    He was very sad when we got to the cremation center.  I

4    remember when Bianca's body actually went in, you know, to

5    be -- he actually walked away, you know.  And then -- and

6    then I recall him being very agitated with this gentleman

7    again from the Embassy.  I was not privy to overhearing

8    their conversation at all but, again, it sounded to me like

9    Larry felt this guy was being very insensitive and, you

10   know, treating him with suspicion.  You know, he felt that

11   that was very uncalled for at the time.

12   Q.    Did you feel like the cremation process, there was

13   anything odd about it?

14   A.    Honestly, no, sir.  I didn't feel there was anything

15   odd.  You know, in hindsight -- I guess I know this sounds

16   insensitive, but I just wanted it done as quickly as

17   possible and to get out of there myself, you know.  I just

18   wanted to get home and, you know, deal with it.

19   Q.    Okay.  After Larry went back to the U.S., did you

20   remain in contact with him?

21   A.    Yes, sir, we spoke quite a bit on WhatsApp.  I remember

22   asking him how he was doing, how the kids were doing.  You

23   know, LeeAnn actually spoke to him a few times.  He was --

24   he sounded really, really down and we were actually quite

25   worried about him, you know.

DIRECT - SWANEPOEL

1          It's a -- so yeah, we -- I've got to admit, I mean,

2     I was going through a lot myself, I actually went for quite

3     a bit of counseling; not going to lie, you know.  It was a

4     difficult thing to deal with.  So we tried to stay in touch

5     as much as possible, but, again, if I'm completely honest,

6     you know, you -- there's a part of you that actually just

7     wants to pull away from it completely.

8     Q.   Sure.  Did you -- did Larry continue to come back and

9     hunt in the years immediately following?

10    A.   I believe it was just after your summers, I think it

11    was also sometime June or July of 2017, we actually spoke

12    about going back to the Congo together where Bianca had --

13    there was actually a buy, which is sort of an opening in the

14    jungle that we called Bianca's Buy.  And she failed to shoot

15    a buffalo there so we -- we went back there, we actually

16    shot the buffalo in the same buy.

17    Q.   Did you go to the U.S. to visit Larry?

18    A.   Yes, sir, I went to the shows at the beginning of 2017.

19    And I don't think I actually went to visit him.  I don't

20    think he came to the shows at that time, but I think we

21    spoke quite a bit on the phone and that.

22         I believe the first time I saw him again after the

23    incident was when we went to the Congo.  I could be wrong;

24    it was a lot going on at that stage.

25    Q.   Did you visit him in 2019?  Or see him --

292

DIRECT - SWANEPOEL

1    A.    I think it was '18.  2018.

2    Q.    2018.

3    A.    2018 after -- yes, 2018 after the conventions we went

4    and visited him at his house in Arizona -- my mother, my

5    father, myself, and my girlfriend at the time.

6    Q.    And did you see him again in 2019?

7    A.    2019, he came to Zambia and he did a safari with us in

8    Chinyembe.  That was the first time we went back to

9    Chinyembe after -- after the incident.

10   Q.    Before that, had you seen him at a convention?

11   A.    Early 2019, I -- yes, early 2019 I saw him at the

12   Dallas Safari Club show in Dallas.

13   Q.    Did you talk about coming back to Chinyembe at that --

14   A.    I believe that's when we actually planned the trip to

15   Chinyembe, if I recall correctly.

16   Q.    Was there anyone else with Larry, as far as you recall,

17   when you saw him in Dallas?

18   A.    I don't -- I don't think anybody was at the actual

19   convention with him, but Larry asked myself and our business

20   partner at the time from South Africa, Dave Firstenberg, if

21   we would like to join him for dinner with a friend of his.

22   I believe her name was Lori.

23   Q.    On that visit, did Larry mention anything about being

24   approached by an FBI agent, as far as you recall?

25   A.    No, sir.  As far as I recall, he hadn't said anything.

DIRECT - SWANEPOEL

1    It was, I think, the day after that that was the first time

2    I was approached by the FBI at the hotel in Dallas.

3    Q.   And after that convention, did you go hunting with

4    Larry?

5    A.   Yes, sir, I did.  In Chinyembe, in Zambia.

6    Q.   What did you hunt for?

7    A.   We did a lion safari for Larry.

8    Q.   Did you go back to the Dallas convention in 2020?

9    A.   Yes, I think I did.  20- -- wait, when was lockdown?

10   2020, yes, we did Dallas.  And I believe it was Reno that

11   year.  Or Vegas -- I think it was Vegas that year but, yes,

12   we did.  We missed one year, I think that was 2021.  But I

13   think we went in 2020.  2020?

14        I actually think I've got my years wrong here, sir.

15   I think it was 2020 that we were at the Dallas show and

16   that's, I think, when we saw the FBI.

17   Q.   Okay.

18   A.   It was after the 2019 season.  I've got my years mixed

19   up.  I apologize.  So it was after the hunt that Larry and I

20   had done in Zambia for the lion.  I think it was a 2020

21   convention that the FBI approached me for the first time.  I

22   think that was the year that we met Lori.

23   Q.   Okay.

24   A.   Sorry, it's a couple of years ago now, it's -- and with

25   the COVID and everything, I missed a year coming to the

DIRECT - SWANEPOEL

1   convention, so . . .

2   Q.   Sure.  Tell me about that.  What did the FBI -- how did

3   they approach you?

4   A.   So I was -- I was at the show, I believe it was the

5   second day of the show.  I finished the convention for the

6   day.  I came back to the hotel.  And I went up to my room in

7   the elevator, and when the elevator doors open, the two FBI

8   agents were outside the elevator door.  And they -- I

9   believe they asked me -- you know, they presented --

10          MR. MARKUS:  Objection, Your Honor.  Hearsay about

11  what the FBI said to him.

12          THE COURT:  Sustained.  Let's rephrase it.

13          MR. WINSTEAD:  Sorry, just for effect on the

14  listener to explain what he ended up doing with them.

15  BY MR. WINSTEAD:

16  Q.   So, sir -- so were you --

17          THE COURT:  So you're not -- you're not offering it

18  for what the content -- the truth of the content of what was

19  said to him by the FBI?

20          MR. WINSTEAD:  Right.

21          THE COURT:  So -- well, what does it matter what

22  the effect on him is with respect to this conversation?

23          MR. WINSTEAD:  Just explaining the context of how

24  the conversation happened.

25          THE COURT:  Okay.  I'll allow that.  And then we'll

DIRECT - SWANEPOEL

1   see where you go after that.

2           MR. WINSTEAD:  Okay.  Thank you, Your Honor.

3   BY MR. WINSTEAD:

4   Q.  So -- so, again, you were saying they approached you.

5   Did they ask you -- did they ask you -- to speak with you?

6   A.  Yes, sir.  They just -- they asked me if I would be

7   willing to speak to them and I said, "Yes, sure," you know.

8   And they asked me, "Do you know what this is about?"

9           I said, "I can only imagine that it's about, you

10  know, the incident that had occurred in Zambia."

11  Q.  Why did you --

12  A.  I actually -- just to go back, sir -- I'm sorry, I got

13  my years wrong.  But actually I'd heard while I was in

14  Tanzania on safari that the FBI had gone to Zambia to -- I

15  think it was August of the year before, so it must have been

16  2019 -- they'd actually gone to Zambia and spoken to some

17  people there.  And I believe they wanted to speak to me.  I

18  was unfortunately on another safari in Tanzania.  So I sort

19  of knew they were wanting to, you know, to speak to me.  So

20  that's -- I agreed, yes.  I said, "Yes, I'm happy to speak

21  with you."

22  Q.  And did you speak to them?

23  A.  Yes, sir.  I had about a three-hour conversation with

24  them in the room.

25  Q.  Did you speak to them again not long after?

DIRECT - SWANEPOEL

1    A.    Yes, sir.  So, again, 2020, so the Dallas show, there

2    was a couple of weeks apart from the Safari Club show.  And

3    when I came back to Safari Club show they'd asked if they

4    could speak to me again, and I did.  I spoke to them again

5    for also, I believe, a few hours.

6    Q.    Did you tell Larry that you spoke to the FBI?

7    A.    At -- I only -- I actually spoke to the FBI and I said,

8    you know, "Can I tell Larry that I've spoken to you and

9    that?"

10            I'm not -- I don't know American law, you know.  I

11    don't really know what we're allowed to do or what we're not

12    allowed to do.  And, to be honest, it's quite daunting; it's

13    quite intimidating.  So they did say to me, "Look, you can

14    speak to Larry, you know."

15            And I said to them, "Okay, well, if Larry asks me

16    if I've spoken to you I'm going to tell him the truth, but

17    I'm not going to immediately run and volunteer information

18    to Larry."

19    Q.    Did he ever ask you if you had spoken to them?

20    A.    I believe it was in 2020, just after the lockdown.  So

21    I went on safari -- oh, yeah, I think it was just before I

22    went to my first safari so must have been late July or

23    somewhere around there, July, August, because I know I  was

24    in Zambia first of August when they opened the country for

25    hunting again.  And Larry gave me a call and he said, you

DIRECT - SWANEPOEL

1    know, "Have you been approached by anybody?"

2        And I said, "Yes, you know, the -- I've been

3    approached by the" -- I think he mentioned something about

4    them speaking to his son, to Julian, or something.  I don't

5    recall exactly, but he basically asked me directly if I'd

6    spoken, you know, if any -- the FBI or any agents had

7    contacted me.  And I said yes and I told him what had

8    happened.  I told him that I had spoken to them.

9    Q.    That was the first time you'd spoken -- you talked to

10   him about --

11   A.    Yes, sir.  That was the first time I let him . . .

12   Q.    Did you go on a hunt with Larry in 2021?

13   A.    Yes, sir.  I believe the first hunt of the season, so

14   that would have been, I think, like May or early June of

15   2021 he came and he did a leopard safari with me then.

16   Q.    Where did you go?

17   A.    Same camp, Chinyembe.

18   Q.    What were you hunting for?

19   A.    For leopard.

20   Q.    Did you discuss Bianca on that trip?

21   A.    We actually discussed her before, you know.  We said --

22   I believe we even spoke about it when he was on the lion,

23   "At some point we've got to close this, you know.  We got to

24   get a leopard and finish it."

25        So, you know, once we got the leopard, it was quite

298
DIRECT - SWANEPOEL

1    an emotional evening.  It was sort of bittersweet, you know,

2    at that moment.  And, yeah.  But obviously she came up and

3    felt -- felt for myself -- I can't speak for Larry, but for

4    me it felt like it was a bit of closure there that was

5    needed.

6    Q.   Did you talk at all at that point about the FBI

7    investigation?

8    A.   Larry did ask me, you know, some things about the FBI.

9    And very much like I said to the FBI, and I've said to

10   Larry, you know, I don't want to get stuck in between two

11   fighting parents, you know.  So I don't really want to

12   discuss what I discussed one side to the other side, you

13   know.

14        Like I said I don't -- in all honesty, I don't want

15   to be here.  It's the right thing to do, but I -- I sort of

16   wanted to put this behind me a long time ago

17        MR. WINSTEAD:  May I have just a moment, Your

18   Honor?

19        THE COURT:  You may.

20   BY MR. WINSTEAD:

21   Q.   All right, sir, you mentioned two interviews with the

22   FBI.  You also mentioned a statement that you made with

23   police.  Were you interviewed by any insurance investigators

24   at any point?

25   A.   Yes, sir.  I believe early 2017.  So that would have

DIRECT - SWANEPOEL

1    been the -- you know, I guess four months or something --

2    three, four months after the incident.  A gentleman in

3    South Africa gave me a call and he identified himself as a

4    securities specialist or investigator.  And he said that he

5    was working on behalf of the insurance company and he would

6    like -- he wanted to interview me about what had happened in

7    Chinyembe.

8    Q.    And you gave a statement?

9    A.    Yes, sir.  I spoke to him again, quite -- you know, a

10   couple of hours.  And I don't recall if I actually gave him

11   the photographs.  I know I discussed them and I showed him

12   some photographs because I think at that time he wasn't even

13   aware that the shotgun had fired through a gun case, so I

14   don't think he had all the information.

15         So I spoke to him, did a full interview with him,

16   you know.  Recalled everything the best I could.

17   Q.    After your two interviews with the FBI in 2020, do you

18   recall speaking with them additional times?

19   A.    Yes, sir.  I spoke to -- I spoke to them quite a bit.

20   I think I actually had a -- I think I had a phone

21   conversation or video conversation.  And then I came to --

22   when I was here I was -- came to the offices around the

23   corner here somewhere and did another -- I believe that was

24   the beginning of this year, I did about another three-hour

25   sort of interview or whatever it's called.  I'm not sure

DIRECT - SWANEPOEL

1    what to call it, but yeah.

2    Q.    If some of the details in those statements change a

3    little bit, what I wanted to ask is:  Your testimony today,

4    is it -- is your testimony today to the best of your

5    recollection what actually occurred in all of the events --

6    A.    Yes, sir.  I mean, I can only apologize if some of the

7    details are slightly different.  As I say, you know, it was

8    more than five years ago and, you know, every time you speak

9    about something, you -- you sometimes tend -- your memory to

10    actually add or subtract but, as far as I know, sir,

11    everything I've answered is the truth the best I can

12    remember it.

13    Q.    And you've thought hard about all these events in

14    preparation for today or -- and yesterday?

15    A.    I tried, yes, sir.  I mean, like I say, the year I

16    think I got a bit drawn.  It's easier -- 2019, 2020, end of,

17    and beginning, but, you know, I tried to remember best I

18    can.

19    Q.    And you took an oath to tell the truth, right?

20    A.    Yes, sir.

21    Q.    So if -- so what you've said today, is that to the best

22    of your recollection even if it conflicts with some prior

23    statements, the actual truth?

24    A.    I've tried to tell the truth the best I can every time

25    I'm answering yes, sir.

CROSS - SWANEPOEL

1          MR. WINSTEAD:  One moment, Your Honor.

2          No further questions, Your Honor.

3          THE COURT:  All right.  Examination by Defendant

4     Rudolph.

5          MR. MARKUS:  Thank you.

6                    CROSS-EXAMINATION

7     BY MR. MARKUS:

8     Q.   Good morning, ladies and gentlemen.  Good morning, Your

9     Honor.  Good morning, Mr. Swanepoel.

10    A.   Good morning, sir.

11    Q.   My name is David Markus.  I represent Dr. Rudolph and

12    I'm going to ask you a few follow-up questions, if that's

13    okay.

14    A.   Yes, sir.

15    Q.   And I think you just ended with you're trying to do the

16    best you can telling the truth, correct?

17    A.   Yes, sir.  It's not always easy to remember a traumatic

18    event at the best of times and then trying to recall it five

19    years afterwards, it makes it more difficult.

20    Q.   Sure.

21    A.   But I'm truly trying my best.

22    Q.   Yes, sir.  And I appreciate that, sir.  One thing you

23    said is you don't want to get between two fighting parents?

24    A.   It's vernacular we use.  But just basically I'm -- how

25    do I explain it?  I'm not on anybody's side here but the

CROSS - SWANEPOEL

1    truth.  That's all I can do is offer that, and that's not my

2    job to do anything further.

3    Q.    And speaking of the truth, sir, I want to ask you very

4    directly at the beginning of this examination, as you being

5    a neutral person, you believe this was an accident, do you

6    not, sir?

7    A.    Yes, sir, I do.

8    Q.    Thank you.

9           THE COURT:  Counsel, you didn't draw an objection

10   to that last question, but let me point out this is a

11   cross-designated witness.  Neither side has established that

12   he is hostile to them and, therefore, I will not permit

13   leading questions from either side of this witness unless

14   and until one of the sides establishes that this witness is

15   hostile to them.

16          MR. MARKUS:  Yes, Your Honor.

17   BY MR. MARKUS:

18   Q.    So, Mr. Swanepoel, let's start with a discussion about

19   accidents, then.  You spoke to the prosecutor about a couple

20   of the accidents that had occurred on safaris and hunts.

21   Are you -- you're a professional hunter, right?

22   A.    Yes, sir.

23   Q.    Okay.

24   A.    I like to believe so.  I mean, yes.

25   Q.    Yeah.  How long have you been doing this?

CROSS - SWANEPOEL

1    A.    Well, as I say, I qualified fully -- actually in 2008,

2    but I've been hunting my whole life, sir.

3    Q.    And you have had accidents, right?

4    A.    Yes, sir.

5              MR. WINSTEAD:  Objection.  Leading.

6              THE COURT:  Sustained.

7    BY MR. MARKUS:

8    Q.    Have you had accidents?

9    A.    Yes, I have.

10   Q.    And can you tell us about the one that you started to

11   discuss with the prosecutor about where a tracker was shot.

12   Can you tell us a little bit more about what happened on

13   that particular one.

14   A.    Well, I tried to explain it best I could the other --

15   yesterday.  As I said, basically we'd had an unfortunate

16   incident where Bianca had wounded the leopard.  At the time

17   I didn't know exactly where she'd shot him, but, you know,

18   from the tracking and that we sort of established that, you

19   know, it was somewhere through the leg by the way he was

20   moving and that.

21              And, you know -- and, unfortunately, nothing really

22   vital had been hit.  I tried to follow it that evening best

23   I could until it got dark and I figured, you know, this

24   was -- it was getting too dangerous to do alone.

25              At that point, we went back to camp.  We slept the

CROSS - SWANEPOEL

1    night, and the next day my father came with us.  And my

2    father, Larry and myself continued to follow up the leopard.

3    We tracked him for quite a few hours.  We actually came to

4    quite a big thicket.  Best I can recall, it was more or

5    less, like I say, about the size of this room, a particular

6    thicket, you know; some gaps in between.

7            And at that stage we couldn't figure out where the

8    leopard had gone.  We stopped for a while, had a little bit

9    of lunch, and then we came back.  And at that stage what we

10   were trying to do is go back to the last point of blood that

11   we'd found and so we could continue tracking him.

12           I -- we had this gentleman that was with us -- as I

13   say, Zambia closed hunting for quite a while and I didn't

14   have my main tracker and a lot of the -- a lot of the more

15   skilled guys had actually moved on and worked for

16   photographic companies and that during the closure.

17           And this gentleman was given to me as a tracker in

18   the area.  I found out later on that he was -- actually used

19   to be a pontoon boy.  He didn't really have much experience

20   tracking.  And at one stage, he sort of separated himself

21   from us.  He was about where you are, maybe, you know, away

22   from us.  He was looking into the brush obviously.  And most

23   of us trained trackers would know that if they do see the

24   leopard, you know, leave him, just carry on walking.  And if

25   he doesn't know that you've seen him, you know you have a

CROSS - SWANEPOEL

1    chance to come back and inform me where it is.

2            Of course this gentleman pointed and shouted,

3    "There it is," made eye contact and the leopard came for

4    him.

5            It's very thick.  I actually still have

6    photographs, you know, from this site.

7    Q.    And so let me just stop you there.  When the leopard

8    attacks, who's with you at that moment?

9    A.    It was myself on point in front, there was a game scout

10   next to me.  I can't recall if he was in front of my father

11   and Larry, but Larry and my dad were on the side.  And then

12   there's a game scout with us as well.

13   Q.    Okay.  And was Bianca with you?

14   A.    No, sir.  No --

15   Q.    Why wasn't Bianca with you?

16   A.    She never came any time that we'd -- we went after

17   wounded leopard, which had happened twice before that

18   incident as well.  She always -- Larry told her to stay in

19   the car.

20   Q.    Okay, I'm sorry, who told her to stay?

21   A.    Larry told her to stay in the car.  And I wouldn't let

22   her come either.  At that point, there's no point having

23   somebody inexperienced in a dangerous situation like that.

24   Q.    And I think you said yesterday, am I right, that Larry

25   was trying to protect her?

CROSS - SWANEPOEL

1    A.    Sir, from all the times I've hunted with him, yes;

2    always.

3    Q.    Okay.  Now, you mentioned yesterday also that when the

4    leopard attacked, you shot, correct?

5    A.    I actually could not shoot immediately.  The

6    gentleman -- once the leopard broke the brush -- he was

7    actually very lucky that the leopard's front leg was broken

8    so it slowed him down a lot.  And he was able to back off

9    and, unfortunately, instead of getting out of the way and

10   allowing me to shoot, he ran straight for me so he was in my

11   line of fire.

12         At that point, the only thing I could do was wait

13   for him to get past me.  I knew he was running to safety,

14   and that's not his fault, you know, in that situation.  As I

15   say, that's why you don't put inexperienced people in those

16   situations because you stop thinking clearly.  And when he

17   ran directly towards me, all I could do was try to move out

18   of his way as best as possible and wait for the impact.

19   Q.    How close was the leopard when you -- when the shot

20   went off?

21   A.    I would say probably less than a couple of feet, maybe

22   2 feet behind the gentleman.

23   Q.    Okay.  And when you saw the leopard later, how spread

24   out were the pellets on the leopard from the shotgun shot?

25   A.    I'll be honest with you, sir, that one I don't really

CROSS - SWANEPOEL

1   recall.  I don't -- I don't -- I could say that I -- I had a

2   recent one on this last safari that I just had a couple of

3   weeks ago.  Unfortunately, you know, I had another incident

4   like that.  It was the first time I'd had a leopard charge

5   since the incident with Bianca.  Frightened the heck out of

6   me, you know.  A lot of thoughts go through your head at

7   that point.  But I shot that leopard at about, I would

8   say -- I've got the photographs, I would say probably around

9   3 feet or so.  And the pattern -- you know the pattern on

10  the head I can see where the pellets hit him.

11          THE COURT:  One second, Mr. Swanepoel.  I'm sure

12  you probably are more anxious than anyone else in this room

13  to be done with your testimony and go home to

14  South Africa -- to --

15          THE WITNESS:  Yes, sir.

16          THE COURT:  -- southern Africa.  Listen to the

17  question and only the question, all right?

18          So the question was:  How far apart were the

19  pellets?  And you said, "I don't recall."  That's the

20  answer.  You don't have to go into this other incident.  If

21  you continue to do that you'll just double the time you're

22  on that stand, so --

23          THE WITNESS:  I understand, sir.

24  BY MR. MARKUS:

25  Q.   On the incident where the tracker fell into you, did

CROSS - SWANEPOEL

1    the tracker get shot himself?

2    A.    Yes, sir.  The bullet actually -- when we looked at the

3    wound, it looked like it had been cut, but it had actually

4    slashed, you know, the side of his leg.  So the barrel was

5    basically on the side of his leg when he ran into it.  As I

6    say, some of the pellets actually landed up in his -- in his

7    butt muscle and then the rest of the pellets went through

8    and hit the leopard fortunately.

9    Q.    Was he injured?

10   A.    Yes, sir, he was injured.  I mean, his leg was open,

11   you know, sort of 6 inches.

12   Q.    Were you and Dr. Rudolph able to treat him?

13   A.    I would say as best we could in the field.

14   Dr. Rudolph -- well, Larry had a medical kit there and we

15   got it from the vehicle.  And if I recall correctly, he -- I

16   don't know if he gave him an antibiotic injection something,

17   cleaned out the wound best we could.  And Larry actually put

18   some basic stitches in to hold it together, and at that

19   stage I got him to the hospital.

20   Q.    Okay.  And later on who paid for his medical care?

21   A.    Dr. -- Larry and Bianca paid for his medical care.

22   Q.    Okay.  I want to talk about one other accident that's

23   happened and then we'll move on.  The British champion that

24   you mentioned with the prosecutor, would you characterize

25   him as an expert with guns?

CROSS - SWANEPOEL

1    A.    I would -- I would say so.

2    Q.    Was he more familiar with guns or less familiar with

3    guns than Bianca Rudolph?

4    A.    He was definitely more familiar with guns.

5    Q.    And is he the one that almost shot you in the ear?

6    A.    Well, he fired next to me, you know.  I wouldn't

7    characterize it as nearly shot me in the ear, but he fired

8    the gun up in the air probably a couple of feet from my ear.

9    Q.    Okay.  And so, you know, the prosecutor asked you a lot

10    of questions about expertise with guns.  If you are an

11    expert with guns, does that mean you're not going to have an

12    accident?

13    A.    I could only answer for myself.  I've had accidents and

14    I believe I'm reasonably expert with it.  I guess you could

15    ask the military if they've ever had training accidents.

16    Q.    Sure.  And I thought I heard you say yesterday when

17    Mr. Winstead was asking you questions -- I'm going to read

18    this to you, tell me if this is what you said because I had

19    never heard this before.  "The devil loads guns."  Is that

20    what you said?

21    A.    Again, just our vernacular.  But when we were raised

22    as, you know, in the hunting industry, and a lot of us

23    raised the same way, our parents always told us, you know,

24    the devil loads the gun.

25    Q.    What does that mean, Mr. Swanepoel?

CROSS - SWANEPOEL

1    A.    It just means, you know, that an accident can happen.

2    It's when you think -- you know, if you -- if you don't

3    think that it's, you know, possible, it's possible, you

4    know, and everybody always sits back and goes, "Oh, how did

5    that happen?"  That's why we say the devil loads the gun.

6    Q.    You also spoke about Dr. Rudolph's expertise with guns.

7    Would you say he was highly proficient with a rifle?

8    A.    Yes, sir.  I would say so.

9    Q.    Okay.  How many times have you seen him shoot a

10   shotgun?

11   A.    Yeah, I -- not very often.  I think I recall one

12   incident a few years before that where we went after a

13   leopard as well and he used a shotgun then.

14   Q.    Okay.  I imagine -- have you ever seen him shoot a

15   shotgun through a soft case?

16   A.    No, sir.

17   Q.    Now, the shotgun in this case -- I want to talk about

18   the shotgun in this particular case.  Why was it brought to

19   Zambia, if you know?

20   A.    As I said yesterday, you know, Larry wanted to have a

21   shotgun in case we had an incident like that occur again.

22   So I believe that's why he brought it with him.

23   Q.    Okay.  And was there discussion about bringing other

24   types of gear?  I think you said body armor --

25   A.    Yes, sir.  Motocross body armor and I think it was

CROSS - SWANEPOEL

1    baseball helmet and some other protective gear.

2    Q.   So he was just to -- I want to make sure I understand.

3    He was talking about body armor, helmets, shotgun, for

4    protection.

5    A.   Yes, sir.

6    Q.   Okay.  And, of course, he always had his medical kit,

7    right?

8    A.   As far as I recall, he always traveled with a medical

9    kit, yes.

10   Q.   Okay.  Now, that particular shotgun, do you know how

11   old that shotgun was?

12   A.   I don't, sir, no.

13   Q.   Yesterday you said that he had mentioned to you that he

14   won it in a raffle.  Did he tell you anything about that

15   shotgun?

16   A.   He just said that, you know -- yeah, he said that he

17   thinks he -- he won it in a raffle or something at one of

18   the Safari Club conventions.  He said, "I hardly ever use

19   it."  That's when he was actually offering to give me the

20   gun to keep in Zambia, which I said we couldn't do.  But

21   that's about the most I recall about that.

22   Q.   Okay.  Did he -- do you know whether the shotgun had

23   ever been shot before?

24   A.   I actually believe he said that he hadn't shot it.  I

25   think when we were shooting it in -- again, I -- the -- I

CROSS - SWANEPOEL

1    can't be a hundred percent certain about this.  I don't

2    really recall him saying so, but I believe we were sort of

3    using it for the first time and that's why we had to remove

4    the plug from the magazine to allow more bullets.

5    Q.   Okay.  I want to explain that to the jury to make sure

6    they understand what you mean by "removing the plug."  So

7    this particular shotgun typically holds how many shells?

8    A.   I'm not sure on that Browning in particular, but I

9    believe it would take four 3-inch shells in the magazine and

10   probably five 2 3/4-inch shells.  Different size shotgun

11   shells.

12   Q.   I'm talking about before it was altered.

13   A.   It was -- it only took two.

14   Q.   Okay.  So before you altered it, the shotgun, you

15   believe, could hold two shells.

16   A.   As far as I recall, yes, sir.

17   Q.   And then who took it apart so it could hold more

18   shells?

19   A.   I actually didn't really know how to do it so I asked

20   my dad to come and assist.  And as I recall, he took the --

21   like I say, there was a screw on the tube underneath the

22   barrel.  He took that out, took out a red plug which sort of

23   stopped the spring mechanism, and he put that back into the

24   magazine.

25   Q.   Okay.  And just to jump ahead for a second -- we'll

CROSS - SWANEPOEL

1    come back to this -- but is it possible that because the

2    shotgun was modified, was altered, that whoever unloaded it

3    may have left a shell in there accidentally?

4    A.    I -- yes, sir, I guess that's very possible.

5    Q.    Okay.  I think you just said, you know, Larry had told

6    you he had never used this gun or was not really familiar

7    with it, right?

8    A.    As I say, I think, yeah, he said that he -- you know,

9    it was a gun that he'd won in a raffle many years before.

10   The way I -- the impression I got is that it was not a gun

11   that he used.

12   Q.    And then was altered, right?

13   A.    Yes, sir.

14   Q.    And when it was unloaded after the hunt that night in

15   the blind on October 10th on the evening, I think you said

16   typically that would be done after dark?

17   A.    Well, generally speaking, yes, sir.  The vehicle comes

18   in pretty much as soon as we're out of shootable light, so

19   it's generally done in semidarkness, more -- well, more

20   darkness than light, let's put it that way.

21   Q.    Okay.  Thank you, sir.  I want to talk just briefly

22   about the hunts in Zambia and what the animals are used for

23   after the hunts.  I think you said they're used for food and

24   conservation.  Can you explain the conservation point to the

25   jury so they understand what that means.

CROSS - SWANEPOEL

1    A.    Well, as I say, these areas are incredibly remote.

2    They're very large tracks of land which traditionally are

3    tribal-owned land.  They're the custodians of the land.

4    Obviously, you know, as the western world creeps in, you

5    know, we tend to want to utilize that land for our own

6    means.  So what we do, and what I like to believe that we

7    do -- and I don't -- I do hunt in South Africa a little bit,

8    which is game ranches, I guess very similar to some parts of

9    the United States.  I'm not particularly fond of it; I like

10   open areas, what we call concession areas.  And part of that

11   is the interaction with the local people.

12           I believe what we're doing is an age-old, you know,

13   from the earliest times of man, you know.  Men ate for food

14   and they still rely on that food very heavily, you know.

15           As I say, some of these -- you saw the remoteness

16   of these areas.  It's not as if there's shops around

17   everywhere for them to get protein from.  So what we're

18   trying to do is retain our hunting heritage and, at the same

19   time, you know, give back to the communities in the area so

20   they feel a desire to protect these areas together with us,

21   you know.

22           We've -- we've seen a lot more loss of habitat and

23   the area from people just not getting any gain out of the

24   areas and they rather just bring in cattle or goats or sheep

25   or whatever else.  I love wildlife and I would like to see

1    it stick around.

2    Q.    Okay.  I think you mentioned also to the prosecutor

3    that there were two hunts in 2016 with the Rudolphs, one in

4    August and one in October, correct?

5    A.    Yes, sir.

6    Q.    The one in August, where was that again?

7    A.    That was in the eastern side of Zambia, an area called

8    Luangwa Valley and the concession was Nyamapala.

9    Q.    And is that an even more remote part of Africa than the

10    hunt in October?

11    A.    Yes, sir, it's pretty far out there.

12    Q.    Okay.  I'd like to talk to you about the October 2016

13    hunt, if I could.  Were Dr. Rudolph and Bianca Rudolph

14    getting along?

15    A.    Yes, sir.  As far as I'm -- can recall, they always got

16    along.  We always had fun on the safaris.  I don't recall

17    any times that they -- that they didn't.

18    Q.    Were they happy?

19    A.    I would say so; in my opinion.

20         MR. MARKUS:  Your Honor, at this point, I'd like to

21    show him what's already admitted in evidence as RA-9, some

22    pictures from the October safari, if I may.

23         THE COURT:  All right.  Once an exhibit's in

24    evidence, you don't need to seek leave to publish to the

25    jury; just go ahead and do it.

CROSS - SWANEPOEL

1          MR. MARKUS:  Thank you, Your Honor.  Thank you,

2    Ms. Guerra.

3    BY MR. MARKUS:

4    Q.    Is this a picture from that October 2016 safari,

5    Mr. Swanepoel?

6    A.    I believe it is.  There was quite a few times we were

7    out in the boat by the river.

8    Q.    Okay.  And is that -- who's that in that picture?

9    A.    That's Larry and Bianca.

10   Q.    Okay.  What about this picture here?  Who's that in

11   that picture?

12   A.    I believe that's Larry and Bianca.  That's my mother

13   and myself and my wife at the time, LeeAnn, my ex-wife now.

14   Q.    You're talking about over here and here?

15   A.    Yes, sir.

16   Q.    Okay.

17   A.    That looks like the Nyamapala camp in Nuangua.  I think

18   that was the 2016 hunt.

19   Q.    And who's that in that picture?

20   A.    That's Larry and Bianca.

21   Q.    Is that how you would typically observe them hanging

22   out, having fun and so on?

23   A.    Yes, sir.

24   Q.    Okay.  Sorry for the glare here, but who is this in

25   this picture?

CROSS - SWANEPOEL

1   A.    That's Larry, Bianca; that's my mother --

2   Q.    Can't really tell, I'm sorry, with the glare there.

3   A.    That looks like Pieter Cheekpee, the old waiter, and

4   Felipo, the younger waiter that's still there.  I can't

5   really see who the other two gentlemen are.

6   Q.    It's okay.  But are these the kinds of pictures and

7   socializing that would occur on these safaris with you and

8   Larry and Bianca and your family and the staff?

9   A.    Yes, sir.  As I said before, I really enjoyed hunting

10  with them and we -- you know, we went on many great

11  adventures together.

12  Q.    They loved coming, right?

13  A.    I believed so.

14  Q.    Now, did they discuss with you shopping and building

15  that cabin?

16  A.    Yes, sir.  They actually -- they actually put some

17  money towards the building of that cabin and, you know, as I

18  said yesterday, I believe -- I'm not very good at

19  decorating.  Bianca was very good at decorating and she

20  wanted to have some sort of, you know, part in how the cabin

21  looked.

22        As far as I recall, there was -- they bought that

23  dining room table that was in the dining room there, some

24  chairs and stuff, you know.  They came to Chinyembe almost

25  twice a year when they could, so they liked being there.

CROSS - SWANEPOEL

1    Q.    And did they want to make that cabin sort of their own?

2    A.    That was the -- that was the discussion that we'd had

3    when they said they'd like to put some things into it.  They

4    said -- actually, if I recall correctly, they said, you

5    know, "We're sort of done with everything.  Now we just want

6    to come and hang out here when we want to, sort of beginning

7    and end of the season."

8    Q.    In other words, they were planning on coming out in the

9    future?

10    A.    That's what they said to me, yes, sir.

11    Q.    You also mentioned to the prosecutor that Bianca was a

12    nervous traveler.  Could you tell us a little about that.

13    A.    I don't want to speak ill of her but, yeah, she could

14    get pretty worked up when we were traveling.  I recall one

15    occasion where she -- whew, she had a good go at me because

16    I'd sent some bags ahead to the camp that had had her hair

17    dryer.  And once -- I was driving around in Uganda for two

18    hours looking for a hair dryer, which is not -- in

19    South Africa is not easy to find.

20             She was a strong Italian woman.  Reminded me a lot

21    of my mother, you know.  They had their ways and, you know,

22    that's what they expected from you.

23    Q.    Did she get up early on the mornings that she had to

24    travel?

25    A.    Yes, we -- again, I don't want to speak ill of her, but

CROSS - SWANEPOEL

1   she was quite the opposite of Larry.  She would really want

2   to get things done quickly and moving.  And we used to

3   joke -- her and I used to joke that it was Lazing Ship

4   Larry, you know, sort of pulling up the rear.  So yeah, they

5   were quite opposite in that.

6   Q.   Right.  And so in addition to being sort of moving

7   quickly and Larry moving slowly, was there anything else

8   about her travel habits -- I understand you don't want to

9   speak ill of her, but I don't think this is speaking ill.

10  Just some people are nervous travelers.  Is there anything

11  else you can tell us to give us some color about that?

12  A.   Yeah, I would -- I mean, as I say, she was one of

13  those -- obviously we have to set up itineraries or

14  traveling and everything, especially when moving in these

15  African countries.  And Bianca would always like to know

16  every single little detail.  And I had to keep reminding

17  her, TIA, this is Africa.  You know, everything moves a

18  little slower.  Not everything works the way it's supposed

19  to.  You know, if we say we're going to leave at a

20  particular time, sometimes it's -- that could be half an

21  hour, an hour difference.  So she did not enjoy that at all,

22  I must admit.

23        I remember a conversation even the evening before

24  we were leaving, she was quite nervous that we were going to

25  make it to the airport on time.  And I kept assuring her,

1    "Look, I've even given half an hour in case we get a flat

2    tire."  So yeah, she was always quite worked up about

3    traveling.

4    Q.    Okay.  Thank you, Mr. Swanepoel.  I want to move now to

5    the morning of October 11th.  And I know this is going to be

6    difficult for you.  I know it's going to be difficult for

7    Dr. Rudolph and his children.

8         MR. MARKUS:  So, Your Honor, I just would like to

9    give a notice at this point to the children if they want to

10   step out, I'm going to talk about the morning of October

11   11th right now.

12        THE COURT:  All right.

13   BY MR. MARKUS:

14   Q.    Okay.  So let me start off by asking -- you know, the

15   prosecutor talked about this fence around the -- I guess I

16   would call the residential area, right?

17   A.    Yes, sir.

18   Q.    Okay.  But that morning, that fence doesn't keep the

19   helpers in and out of the cabin, does it?

20   A.    No, sir.

21   Q.    Okay.  Were people in and out of the Rudolph's cabin

22   that morning?

23   A.    As best I can recall, sir, I believe one of the tent

24   assistants or room attendants, I think it was Kennedy, I

25   think he'd actually gone and -- I don't know if he'd

CROSS - SWANEPOEL

1    actually moved some of that luggage out or was trying to

2    move it to take it to pack it.  And I recall Bianca actually

3    having a bit of a go at him and telling him -- shooing him

4    away saying that they weren't ready yet.

5              I don't recall if there was anybody else that

6    walked past there.  I was busy with the paperwork.

7    Q.   Let's sort of set the scene for the jury, though.  I

8    mean, it is very quiet there, is it not?

9    A.   Yes, sir.

10   Q.   Could you hear from where you are Bianca shooing

11   Kennedy --

12   A.   I did, yes, sir.  I don't recall exactly what she said

13   but I know she sort of chased him off.

14   Q.   Do you remember whether anybody brought coffee to them

15   that morning?

16   A.   Pieter, the older waiter that was in the one photo, he

17   always took coffee to Larry.  I mean, Larry couldn't really

18   get out of bed without his cup of coffee in the morning.

19   But that would have been earlier in the morning, I think

20   when we first woke up when we switched the generator on.

21   Q.   So that morning, is it fair to say we know that at

22   least two different people who were in that cabin?

23   A.   I could say at least I know those two.  I don't know in

24   the cabin, but at the cabin on the deck or whatever else.  I

25   don't know if they actually entered.

CROSS - SWANEPOEL

1    Q.   Okay.  And were you close enough -- I think you said

2    that you could hear from where you were, because it's really

3    quiet.

4    A.   Yes, sir.

5    Q.   Were the French doors to the cabin open that morning?

6    A.   As far as I recall, they were.  You know, as I say, I

7    wasn't paying that close attention, but that's why I

8    couldn't remember if Kennedy had actually tried to take the

9    bags or if he actually had put the bags on the deck before

10   she sort of stopped him.  But I -- as far as I recall, the

11   doors were open.

12   Q.   Let me just show you what's already in evidence as

13   Exhibit 15, page 16.  Is this the cabin we're talking about?

14   A.   Yes, sir.  I believe that is -- that's when we came

15   back with the police.

16   Q.   Oops.  That wasn't what I wanted to do there.  Okay.

17             And are these the doors that you believe may have

18   been open?

19   A.   Yes, sir.  I -- as I said to the prosecutor, I can't

20   remember if we locked the doors, but I know we closed the

21   cabin up when we left, you know -- and I told the staff not

22   to go in there.

23   Q.   Okay.  I think you had mentioned that this door, the

24   side door, was the one that was closed when you came,

25   right?

CROSS - SWANEPOEL

1    A.    Yes, sir.  That one I do recall having to open.

2    Q.    And these blinds here, were they open that morning?

3    A.    I honestly don't know, sir.  I didn't -- I didn't go

4    and look.

5    Q.    Okay.  Now after you hear the shot, Mr. Swanepoel, I

6    think you said you and Mr. Kakoma race over, correct?

7    A.    Yes, sir.

8    Q.    And you were there within seconds?

9    A.    I mean, I can't tell you exactly how quick, sir, but

10   I'm reasonably quick on the run and I would say -- I mean,

11   we got up and ran immediately.  So yeah, like I said, it

12   couldn't have been more than 15 seconds.  If more, maybe a

13   few seconds more than that.

14   Q.    Okay.  And who is Spencer Kakoma?

15   A.    He's the monitoring gaming scout -- he was the

16   monitoring game scout on the safari.

17   Q.    Before you headed over there, before the shot, did you

18   hear any arguing?

19   A.    No, sir.

20   Q.    Did you hear any yelling?

21   A.    No, sir.

22   Q.    Did you hear anybody scream?

23   A.    No, sir.  I heard a slight scream after the shot, but

24   not before.

25   Q.    Okay.  Did you and Mr. Kakoma enter that cabin at the

CROSS - SWANEPOEL

1    same time?

2    A.    I think I was slightly ahead of him, but, I mean, more

3    or less, yes.

4    Q.    Okay.  I'm going to show you some pictures from inside

5    the cabin.  This is the view that you had when you came in,

6    correct, with the sheet over but --

7    A.    Yes, sir.  Not with the blanket on.

8              COURTROOM DEPUTY:  Counsel, what exhibit is this?

9              MR. MARKUS:  This is Exhibit 15, page 17.

10             COURTROOM DEPUTY:  Thank you.

11   BY MR. MARKUS:

12   Q.    Now I want to be clear.  Where was Larry when you came

13   in?  Was he by this doorway here?

14   A.    Yes, sir.  As far as I recall, like I said, I -- I

15   can't honestly tell you whether he was standing or kneeling

16   down, but he was behind her -- behind the body by the

17   bathroom door.

18   Q.    Okay.  Behind, yes?

19   A.    Yes, sir.  Well, on that side of the body, the

20   bathroom-door side.

21   Q.    And it's a little difficult to see, but I'll move the

22   picture up.  This case here, this soft case, this is a

23   picture that was taken after Mr. Kakoma takes the soft case

24   and the gun outside, correct?

25   A.    Yes, sir.  As I said, I don't remember seeing the gun

CROSS - SWANEPOEL

1    outside, but I recall him saying that he put it outside.  I

2    believe it was either outside or in the corner, but yeah, I

3    think it -- I think it was outside.

4    Q.    Okay.  And do you also remember whether he told you

5    whether he cleared --

6    A.    I recall him saying that he checked to see if it was

7    clear and him actually saying that the mechanism was open as

8    it hadn't closed again.

9    Q.    Okay.  Now one of the pictures that was not shown to

10   you is -- that's already in is Exhibit 14, page 12.  This is

11   a picture that -- is this a picture you took or the police

12   took?

13   A.    I don't recall taking this picture, so I'm -- I --

14   probably the police, sir.  It may have been me.  I'm not a

15   hundred percent sure.

16   Q.    And do you see which way the gun is facing in this

17   picture?

18   A.    It's facing the opposite way, I believe.

19   Q.    So in this one that you took, the firearm and the soft

20   case are facing towards the door that you came in, right?

21   A.    Yes, sir.

22   Q.    And away from the carpet, right?

23   A.    Yes, sir.

24   Q.    In this picture, it's facing the opposite way.

25   A.    Yes, sir.

CROSS - SWANEPOEL

1    Q.    Do you know who moved the gun after?

2    A.    During these photographs?

3    Q.    Yes.

4    A.    I couldn't say who moved it, sir.  I mean, maybe they

5    were asking Spencer, to try and figure out where he put it.

6    I don't know, sir.

7    Q.    Okay.

8    A.    I wasn't in the room.

9    Q.    Now I think you also mentioned Larry's demeanor.  Can

10   you talk to the jury a little about what you saw from Larry

11   when you came into the room.

12   A.    I don't want to speak bad about my friend, but, you

13   know, he -- yeah, he was -- he was very upset, you know.

14   Really, really distraught and that.  And almost one way, you

15   know -- I'm sorry, but, you know, I felt like he -- he was

16   almost too distressed to help me.  And I really didn't know

17   exactly what to do there, you know, so, yeah, he was -- he

18   wasn't quite with it.

19   Q.    Did Mr. Kakoma tell you that he needed to take the gun

20   away from Larry because he was concerned for Larry?

21   A.    I recall something about, you know, them saying that

22   Larry -- they were worried he was going to jump in the river

23   and that, you know.  But Larry never said any of that to me.

24   I don't recall -- I recall something along those lines, but

25   I don't recall him saying it directly to me.

CROSS - SWANEPOEL

1    Q.    Let me show you Exhibit 14, page 1, that's in evidence.

2    Is this the river that's right behind the cabin?

3    A.    Yes, sir.

4    Q.    Is that the river that people were talking about that

5    they were scared for for Larry?

6    A.    Yes, sir.

7    Q.    Let me show you what's in as Exhibit 15, page 19.  Now,

8    Mr. Swanepoel, I want to ask you about this hard case right

9    here.  What is a hard case?

10   A.    I think as I said in yesterday -- yesterday's

11   testimony, when you travel with firearms, you know, people

12   don't necessarily handle them with care.  So we always

13   advise -- and most travelers with guns these days would

14   travel with a Tuffpak or a Tuff case.

15            So you have the soft cases for the guns and then

16   you had the soft cases within this Tuff case just to offer

17   them a bit more protection.

18   Q.    Okay.  And is that how Larry and Bianca traveled with

19   firearms?

20   A.    Yes, sir.  Most of the time.

21   Q.    And was the hard case, or Tuff case opened or closed

22   when you took these pictures?

23   A.    I can't say if anybody, you know, did anything to it

24   while I was busy but, as I say, the photographs I took I

25   tried to take of the room as it was, so it's open.

CROSS - SWANEPOEL

1    Q.    Okay.  And by the way, how did you take these pictures?

2    Was it with a camera or cell phone?

3    A.    Just my phone.

4    Q.    By the way, did Larry ever try to stop you from taking

5    pictures?

6    A.    No, sir.

7    Q.    Did he leave the room when you asked him to leave the

8    room?

9    A.    As I say, I think at that point, I -- I think that was

10   when I sort of asked Banda and Spencer to, you know, help me

11   with him.  He didn't really want to go to -- he didn't

12   really want to leave, so I -- I can't tell you that we had

13   to forcibly remove him, but, you know, I do recall somewhere

14   along the line Banda and Spencer having to assist to get him

15   out the room.

16   Q.    He wanted to be with who?

17   A.    I can't say, sir.  I just know -- as I say, I just

18   recall us at some point, you know, really having to sort of

19   push him to come with us to Mumbwa.

20   Q.    Okay.  Before that point, Mr. Swanepoel, when you first

21   come into the room, did you try to save Bianca's life?

22   A.    I believe yes, sir.  I mean, as I said, you know, I

23   don't really -- I don't really know what to do.  You know,

24   there's some part in my mind that was saying there's nothing

25   we can do here.  And I'm not a doctor, you know.  I -- I --

CROSS - SWANEPOEL

1       even I was -- I don't know if I could be very helpful in a

2       situation with somebody, you know, that you care about on

3       the floor.

4       Q.    And did you ask Larry to help you?

5       A.    I think he was asking for help and I honestly can't say

6       exactly what words we said to each other, but --

7       Q.    Is it --

8       A.    I know I asked for the medical kit at some point and we

9       tried to get that out.  And I think he tried to get some

10      stuff to stop the bleeding.

11      Q.    Okay.  Is it fair to say that you and Larry did the

12      best you could to try to save Bianca?

13      A.    I'd like to believe that.

14      Q.    Okay.  I want to talk just briefly about what you saw

15      on Bianca's chest.  And I know this is difficult.  But did

16      you see the wound itself?

17      A.    I mean, I can -- obviously I looked down and I tried to

18      cover the wound.  I can't tell you exactly what it looked

19      like now, but I do -- I do recall somewhat.

20      Q.    Was it a single-entry wound or were there pellets all

21      over?

22      A.    As far as I recall, sir, it was either -- it was either

23      single or there may have been -- maybe more than one hole,

24      but I don't recall seeing -- if you're asking, I -- I don't

25      know if you're asking if I recall seeing multiple pellet

CROSS - SWANEPOEL

1    wounds or sort of a single-entry wound.  I think it was more

2    of a single-entry wound.

3    Q.    And what does that suggest to you?

4    A.    To me, it would suggest that, you know, she was shot

5    from a very close distance with a shotgun.

6    Q.    Now, you mentioned that Larry did not want to leave --

7    let me show you Exhibit 16, page 1, which the prosecutor

8    also showed you.  Is this a picture that you took?

9    A.    Yes, sir.

10   Q.    Is that Larry there with Bianca?

11   A.    Yes, sir.

12   Q.    Now, I know this picture's a little tough to see but do

13   you see any blood on Larry's shoes there?

14   A.    Not that I can see, sir, no.

15   Q.    What kind of floor was that floor?  Do you know?  Was

16   it marble?

17   A.    No, sir, it's -- actually I built that cabin.  I made

18   the floor.  It's concrete -- well, cement, what we call

19   mixed with river sand, and then in between was old roof

20   beams that we put in, you know, spaces.

21   Q.    On the drive over to the police station, I think you

22   mentioned that you were both theorizing on what may have

23   happened?

24   A.    Yes, sir.

25   Q.    Is one of the ways that came up is that the -- if the

1    bag wasn't zipped all the way it may have fallen out?

2    A.    As I say, I can't recall exactly what it was.  We had

3    quite a bit of back and forth.  But it was a lot to do with,

4    you know, her either trying to jam the gun in the case or

5    the gun not fitting properly or if the case was still open,

6    or if she could have possibly caught it with her hand.

7         And as I say, I mean, I think somewhere in there --

8    I can't be a hundred percent sure, but I think somewhere in

9    there it was, you know, possible that the gun had sort of

10   been bumped, you know, within the case, which as I say,

11   it -- right after that trauma, I can't be accurate about

12   anything there.

13   Q.    I think as you said, the devil loads the firearms,

14   right?

15   A.    My opinion, yes, sir.

16   Q.    Now, at the police station, who gave statements to the

17   police?

18   A.    As far as I recall, it was only myself and Larry.  I

19   don't think they -- I don't think any of the guides that

20   were with us gave statements.  I believe maybe Spencer did.

21   I only recall when we walked in Larry being taken to one

22   room and myself taken to another.  I just remember us being

23   separated.

24   Q.    Do you know whether Larry gave a statement?

25   A.    I believe he did.  I couldn't tell you a hundred

CROSS - SWANEPOEL

1    percent, but I believe he did.

2    Q.    Now in Zambia I believe you mentioned there's how many

3    dialects?

4    A.    There's 54 national languages and 72 if you include the

5    dialects or the offshoots.  But call it 54 national

6    languages.

7    Q.    And now most folks speak some English, right?

8    A.    Yeah, English is one of the national languages, and

9    most of the schooling in the cities is done in English.

10   Some of the more rural areas not so much.  A lot of these

11   guys don't even go to school, unfortunately.

12   Q.    If a local Zambian is proficient in English is it

13   possible they still may mess up a word or two?

14   A.    I think I'm sure you guys have heard even myself -- you

15   know, we use quite a different vernacular in our English in

16   the way we describe stuff.  So yes, I'm sure you're going to

17   have some of the Zambians come and testify.  You'll hear for

18   yourself, yes.

19   Q.    Okay.  Fair enough.  I think you also mentioned to the

20   prosecutor that you're with Larry over the course of the

21   next few days, right?

22   A.    As we -- yeah, as much as can be.  I mean, aside from

23   possibly when we were sleeping or, you know, in our rooms by

24   ourself, but yes, sir.

25   Q.    Did you ever see him bribe anybody?

CROSS - SWANEPOEL

1    A.    No, sir.

2    Q.    Did you ever see him pay anybody off?

3    A.    No, sir.  I do recall, as far as I recall, we had to

4    change some money.  And I think the only person I saw him

5    paying -- and I didn't really see this -- was the funeral

6    home.  Again, I can only assume he would have to pay for

7    that; that's not a free service.

8    Q.    Sure.  Speaking of which, that -- when you went to the

9    funeral home, that's after the autopsy had already been

10   done?

11   A.    Yes, sir.

12   Q.    Okay.  You also discussed conversations you overheard

13   or that Larry told you about with this man from the Embassy.

14   And I think you called him Otto?

15   A.    As far as I can recall.  I don't remember his name

16   exactly, yes, sir.

17            MR. WINSTEAD:  Objection.  That's leading.  And I

18   apologize, I didn't do it before the answer.

19            THE COURT:  One second.  All right, I'll sustain

20   it.

21            MR. MARKUS:  Okay.

22            THE COURT:  Go ahead.

23   BY MR. MARKUS:

24   Q.    What -- let me ask you this:  When is the first time

25   that you remember Larry speaking to Otto?

CROSS - SWANEPOEL

1    A.    I think as I said, sir, I believe he called him

2    probably the first time that evening when we got into the

3    hotel.  But I don't recall being with him.  I think the

4    first time I recall hearing about it was the next morning.

5    Q.    Okay.  And I think you mentioned, you know, this Cecil

6    the lion incident.  Did -- who brought that up to you?

7    A.    Larry was the one who mentioned to me that in his first

8    conversation with this gentleman that that gentleman had

9    actually said that to Larry.  And he was actually quite

10   upset by that.  He sort of said, "What has that got to do

11   with this?"

12   Q.    Who was upset?

13   A.    Larry was upset.

14   Q.    Can you explain to the jury why Larry was upset?  What

15   did he say to you about that?

16   A.    Well, you know, what I recall, you know, is him saying,

17   you know, firstly like that's very insensitive to say.  And

18   I don't recall if it was I, myself, that said it to him or

19   he said it.  I mean, you are a dentist from Pennsylvania and

20   this is a cat hunt, so, you know, all I can -- all I can

21   honestly say is it made me very nervous.  The last thing I

22   thought of being involved in was a trial by social media,

23   that, you know, the truth never really seems to come out in

24   that.

25   Q.    Were there any concerns discussed about this hitting

CROSS - SWANEPOEL

1    the internet?

2    A.   Yes, sir.  I recall the next day -- and I actually

3    still have the photograph -- I think it was my wife at the

4    time, ex-wife now, that sent me a little clip that had

5    already come out and that already got a couple of the facts

6    wrong in that clip.

7         I mean, one of them was pretty important to me

8    because it said we were hunting in the national park, which

9    would obviously have my license revoked and I'd go to jail

10   for it.  So, you know, I was quite concerned about that.

11   Q.   Did Larry tell you why he was concerned with things

12   hitting the internet?

13   A.   I don't recall him specifically saying anything -- I

14   just recall us -- when we were discussing this, you know,

15   that, you know, it would be a trial by social media, you

16   know.  We would be condemned before anything even came out.

17   Q.   And was -- I think you mentioned before that there was

18   a discussion between you and your wife about whether Larry

19   should tell the kids in person or over the phone.

20   A.   Yes, I do recall speaking to her about that.

21   Q.   Okay.  What did Larry tell you about that, if you

22   recall, whether he wanted to tell the kids in person or over

23   the phone.

24   A.   I do recall something like that.  Again, right now,

25   many years ago, I can't recall if she told me that's what he

CROSS - SWANEPOEL

1    said to her or if he told me that.  You know, again, I --

2    I'm sorry if I can't recall exactly, but I'd rather not say

3    something I don't recall.

4    Q.    Fair enough.  No, that's okay.

5          You also mentioned difficulty in bringing a body

6    home from Zambia.  What are the difficulties in bringing a

7    body home from Zambia?

8    A.    Well, again, sir, this was going off what my father

9    said.  And I believe -- now I don't know if it was from many

10   years before and if it -- anything had changed, but from my

11   recollection of what he told me, he said that they had to

12   get a special coffin, had to be a lead-lined coffin or

13   something.  They had to get permissions from airlines to

14   fly, you know, a body.  And from what I can recall, you

15   know, it seemed like a very lengthy process, very difficult

16   to get done.

17   Q.    Okay.  One of the things you mentioned was that Otto

18   said these things were moving too fast.  Do you remember

19   talking about that?

20   A.    That's something Larry said to me after a conversation

21   with this gentleman, yes.

22   Q.    Do you think things were moving too fast?

23   A.    I -- I honestly don't know, sir.  I've never done that

24   before.  Like I say, I was sort of stumbling around trying

25   to figure it out as we went along.  I mean, everybody was

CROSS - SWANEPOEL

1    being very helpful.  Zambia relies a lot on tourism and it's

2    an American gentleman in our country, and I think obviously

3    everybody was trying to assist as much as possible.  I mean,

4    they were all very friendly to us during the process.

5    Q.    Everybody except who?

6    A.    Well, from the sounds of it, this gentleman from the

7    American Embassy.

8    Q.    Okay.

9              THE COURT:  Counsel, why don't we pause there for

10   our morning recess.

11             MR. MARKUS:  Yes, Your Honor.

12             THE COURT:  Ladies and gentlemen of the jury, we're

13   going to be in recess for 15 minutes.

14        (Jury left the courtroom at 10:19 a.m.)

15             THE COURT:  Mr. Swanepoel, same limitation as

16   before.

17             THE WITNESS:  Yes, sir.

18        (Recess taken 10:20 a.m. to 10:39 a.m.)

19             THE COURT:  Mr. Markus, you may resume your

20   examination.

21             MR. MARKUS:  Thank you, Your Honor.  And good

22   morning again, ladies and gentlemen, and counsel and

23   Mr. Swanepoel.

24   BY MR. MARKUS:

25   Q.    Mr. Swanepoel, I just want to back up for one second to

CROSS - SWANEPOEL

1    ask you a question about a picture that you took and that

2    hard case or Tuffpak that we talked about.  Do you recall

3    whether you saw the .375 rifle in the room when you took

4    those pictures?

5    A.    I can't say that I recall seeing it, no, sir.

6    Q.    Okay.  Do you know whether that had already been packed

7    into the Tuff case?

8    A.    As I say, I couldn't tell you.  I -- yeah, I believe it

9    was.  I don't recall actually seeing it in the room, so I

10   assume it might have been.

11   Q.    Okay.  Now after the accident, do you continue to see

12   Larry Rudolph over the years?

13   A.    Yes, sir.

14   Q.    Do you see him in 2017?

15   A.    Yes, sir.  I believe we did that hunt in the Congo in

16   2017.

17   Q.    What was his demeanor like when you saw him?

18   A.    Well, we were both kind of sad, you know.  Yeah, I --

19   we both had been through a lot and, you know, we was maybe

20   talking a lot.  And it's hard to really -- not really

21   anybody else you could talk to about that kind of stuff, so,

22   yeah, he was -- he seemed pretty down, you know.  That's

23   actually why, in many ways, you know, I loved hunting with

24   Larry and Bianca, and Larry on his own, but in many ways we

25   sort of just wanted to keep him going, you know, give him

CROSS - SWANEPOEL

1    something to keep grateful.

2    Q.    You say an interesting thing.  You say, "We wanted to

3    keep him going."

4            Did Larry want to hunt after Bianca had died?

5    A.    If I recall, not really, you know.  Like he sort of --

6    that's why I said we -- you know, I don't know how to

7    explain it.  We kind of like list in Africa, just sort of

8    didn't seem listerate.  Didn't seem as pumped up for it as

9    he used to be.

10   Q.    And did you have a conversation with him about he

11   needed to keep doing it?

12   A.    I did, yeah.  You know, I had a few -- in fact, it was

13   maybe, you know, early but even on that 2017 hunt I was

14   already talking about him coming back and let's finish it,

15   let's get the leopard.  Bianca really wanted to achieve

16   that.  And I thought it was something that, you know, would

17   at least give us -- or give him a bit more purpose.

18   Q.    And did Larry -- how was his initial reaction when you

19   suggested that to him?

20   A.    He said he wasn't ready.  We actually -- if I recall

21   correctly, there was a time we were starting to get a bit

22   more serious about with the bookings, booking the dates and

23   that, and he actually pulled out.  He said he couldn't; he

24   couldn't do it yet.

25   Q.    Were you worried about him?

340

CROSS - SWANEPOEL

1   A.    Yeah, I was.

2   Q.    Now, when you saw him over the years, was he always

3   with Lori Milliron or was he sometimes by himself?

4   A.    I only met Lori once.  That was at the 2020 -- yeah,

5   January 2020 show, the time that we went out for dinner.  I

6   never saw her -- I don't think I ever saw her before or

7   after.

8   Q.    Was there an occasion where you and your wife brought a

9   woman to meet Larry Rudolph?

10  A.    That was 2018.  You know, my mom and dad, myself and

11  Nakita going to his house.  And sort of at the last minute,

12  you know, we'd had some stuff planned to go out and have

13  fun.  And Nakita actually went to gym with a lady, an older

14  lady, in South Africa.  And she said, "Hey, you know, we

15  have friends.  Maybe she wants to come visit with Larry,

16  make it nice for all of us to go out as couples."

17         So, you know, we organized that.  She came over for

18  a few days.  We hung out.  But yeah, never really went

19  anywhere.

20  Q.    Okay.  I think you mentioned also that there were a

21  number of conventions -- are there hunting conventions in

22  the United States?

23  A.    Yes, sir.  There's quite a few of them.

24  Q.    Okay.  And I think you mentioned one in Dallas; is that

25  right?

CROSS - SWANEPOEL

1    A.    Yes, Dallas Safari Club and Safari Club International,

2    that's another -- and there's quite a few other ones.

3    There's over show, there's many of them, yeah.

4    Q.    The Safari Club International one, is that typically

5    held in Vegas or Reno?

6    A.    Yes, sir, it's -- this year it's moving -- well, next

7    year it's moving to Nashville, but typically it was either

8    Las Vegas or Reno; used to alternate.

9    Q.    And you mention that you were approached -- was it

10   February 2020 by the FBI?

11   A.    I think it was January.

12   Q.    January?

13   A.    I think it was January, yes.  I spoke to them twice.  I

14   spoke to them in January at the Dallas show and again at the

15   next show.  I think that was in Reno.

16   Q.    And --

17   A.    I think it was Reno.

18   Q.    And when was the Reno show?

19   A.    It was a few weeks after the Dallas show, so I think

20   that might have been February -- first week of February or

21   so.

22   Q.    And Larry was at both of those shows as well, was he

23   not?

24   A.    I think he was at the Reno -- yeah, he was at the

25   Dallas show and I think he was at the Reno show, yes.

CROSS - SWANEPOEL

1    Q.    And by that time, in early 2020, January, February, I

2    think you had mentioned sort of word was out that the FBI

3    had been to Africa and was investigating.

4    A.    I had heard that they had come to the camp and that

5    they wanted to speak with me, so, yeah.

6    Q.    Okay.

7    A.    I heard that just after the safari which I was in

8    Tanzania.

9    Q.    And of course you and Larry -- are you guys close?

10   A.    I would believe so, yes, sir.

11   Q.    How -- how long have you known him?

12   A.    Whew.    I known him really since I was a kid but really

13   getting to know each other properly from 2008, probably; him

14   and Bianca.

15   Q.    And having known him as a kid, Mr. Swanepoel, and for

16   your whole life, do you think his reaction that morning on

17   October 11th was authentic or do you think he was acting?

18   A.    I really believed it was authentic.    I don't know -- I

19   don't know how you could really act in that situation.    I --

20   just my opinion.

21   Q.    Thank you, Mr. Swanepoel.

22   A.    Yes, sir.

23            THE COURT:  Mr. Dill, any questions?

24            MR. DILL:  No questions, Your Honor.

25            THE COURT:  All right.  Redirect by the Government.

343

REDIRECT - SWANEPOEL

1    MR. WINSTEAD:  Thank you, Your Honor.  Can I get

2   the podium again, and I -- yup.  Okay.

3    COURTROOM DEPUTY:  Counsel, this is Exhibit 2,

4   correct?

5    MR. WINSTEAD:  Yes, this is Exhibit 2.

6                    REDIRECT EXAMINATION

7   BY MR. WINSTEAD:

8   Q.   All right, sir, I'd like to ask a couple follow-on

9   questions about what was going on that morning and the

10  layout of the area.

11  A.   Yes, sir.

12  Q.   So I'm showing you Exhibit 2 that we looked at before.

13  Is this -- actually, let me switch real quick here.

14       All right.  Can you see the overhead of the scene

15  here?

16  A.   Yes, sir.

17  Q.   This point right here, is this at the entrance of the

18  French doors you were discussing?

19  A.   It looks that way, yes, sir.

20  Q.   Okay.  Is this the view inside the room from the French

21  doors?

22  A.   Yes, sir.

23  Q.   Is this the view out of them?

24  A.   Yes, sir.

25  Q.   Is that the fence that's the edge of the -- that

344

REDIRECT - SWANEPOEL

1    area?

2    A.    Yes, sir.  Sort of the perimeter fence.

3    Q.    And are those -- is that the bank of the river?

4    A.    Yes, sir.

5    Q.    From this vantage point, can you see the dining hall?

6    A.    No, sir.

7    Q.    About how far is it to the edge of the bank?

8    A.    If I had to guess, I'd say somewhere around maybe 15 to

9    18 meters.  Maybe 18, 20 yards.

10   Q.    Is there anything on this side of the cabin that would

11   make you walk past it?

12   A.    No, sir.  The only person that would walk that side

13   would be the gentleman that puts the fires in the boiler,

14   but he'll generally walk around the back of the cabin, so

15   not in front of it.

16   Q.    Okay.  Going back to the overhead, is this the back of

17   the cabin?

18   A.    Yes, sir.

19   Q.    Where's the boiler?

20   A.    It would appear to be right behind you.  Now we

21   actually had an unfortunate accident where a tree fell over

22   and knocked them over, but there we go, that's the boiler,

23   yeah.

24   Q.    And you said the person who stokes that walks on the

25   back?

REDIRECT - SWANEPOEL

1   A.   He generally would walk outside the perimeter fence to

2   the left of where you are now.  And he'll -- he would come

3   in -- I think there's actually a gap in the fence -- well,

4   now the fence fell over with the tree, but there's a gap

5   somewhere back here that he would sort of come in and put

6   the firewood in the boiler.

7   Q.   How often would he do that?

8   A.   Generally just morning and evening time.

9   Q.   I'd like to move back to -- is this the dining hall?

10  A.   Yes, sir.

11  Q.   Is this the view towards the cabin that you would have

12  had approximately when you were filling out paperwork that

13  morning?

14  A.   Yes, sir.

15  Q.   Can you see in the French doors?

16  A.   No, sir.

17  Q.   If this door is closed with the curtain, can you see

18  into the cabin at all?

19  A.   No, sir.

20  Q.   Is one of the things the design of this camp is for to

21  make sure that your customers have some privacy?

22          MR. MARKUS:  Objection.  Leading, Your Honor.

23          THE COURT:  Sustained.

24  BY MR. WINSTEAD:

25  Q.   Is it important in your business to make sure -- it's

REDIRECT - SWANEPOEL

1    an open-ended question.

2              THE COURT:  Let's hear the question.  Go ahead.

3    BY MR. WINSTEAD:

4    Q.    Is it or is it not important to you to have your

5    customers feel like they have privacy?

6    A.    Yes, sir.  Obviously, you know, we do try and give them

7    privacy.

8    Q.    Now, after the coffee had been taken and after Kennedy

9    had been sent away, was it likely that any other staff

10   members would interrupt the Rudolphs until they were called?

11   A.    No, sir.

12   Q.    Do you also take some care to not interrupt customers

13   unless it's necessary?

14   A.    Yes, sir.

15   Q.    You mentioned that you recalled the French doors being

16   open.  How sure are you about that?

17   A.    I'm not certain, sir.  Like I said, I -- you know, I

18   wasn't really sort of looking over there, so I can't be

19   certain.  I -- I would say more so because when I heard

20   Kennedy there -- I mean, I heard Bianca talking to them from

21   that side, but I can't be a hundred percent certain.

22   Q.    Would you have noticed if, after that, someone closed

23   the French doors?

24   A.    Well, I do know that they were -- I can say that I know

25   they were open when we were in the room because I recall,

REDIRECT - SWANEPOEL

1    you know -- I think it was Larry and Banda going to get the

2    medical kit, which was, I believe, in the bags on the deck.

3    Q.    And so it's possible that they opened it?

4    A.    It is possible, yes, sir.  I can't say for certain.

5    Q.    All right, I'd like to -- you can take this down.

6    Thank you.

7           I'd like to ask you a couple questions about some

8    of the accidents you've talked about.  You discussed an

9    accidental discharge that you had.

10   A.    Yes, sir.

11   Q.    And a couple others --

12   A.    Yes, sir.

13   Q.    -- is that right?

14          In each of those incidents, had someone pulled the

15   trigger when the firearm went off?

16   A.    I was holding the trigger in my situation.  And, I

17   mean, as far as I can tell, that what -- that's what would

18   have happened with the older gentleman that fired on the

19   back of the vehicle; probably very similar situation to what

20   I had.

21          And then with the -- with John, I -- I think he

22   must have pulled the trigger.  I think he thought the gun

23   was empty and he pulled the trigger.  Again, that was a long

24   time ago, it's tough to recall.  But yes, sir, I don't think

25   it -- as far as I recall, it wasn't a mechanical fault or

REDIRECT - SWANEPOEL

1    some fault of the firearm.

2    Q.    Do you know if you've ever had, yourself, or one of

3    your customers, an accidental discharge without someone

4    pulling the trigger?

5    A.    We have.  And in South Africa actually it was on a

6    safari with Larry and Bianca in an area called Latabah

7    Ranch.  And one of the game scouts was given an old .308

8    rifle in very bad condition.  And we were hunting buffalo.

9    We were actually stalked up against the brush and he was

10   standing behind us and the gun went off and fired into the

11   ground, sort of, you know, 6, 8 feet behind us.

12            You know, when I checked the gun, you could see

13   that it was in pretty bad repair.  I mean, they don't often

14   give those game scouts the best weapon.  So I think that's

15   about the only one I can actually recall off my head where

16   the gun went off -- where he says he didn't pull the

17   trigger; he says it just fired.

18   Q.    Do you think it's possible that he may have pulled the

19   trigger?

20   A.    You know, he swears up and down that he didn't because

21   I was pretty upset with him, you know.  And looking at the

22   gun, I could believe that, you know, it's possible.  I mean,

23   like I said, that gun was in pretty bad condition.  So I

24   don't want to -- I don't want to, you know, speculate either

25   way.

REDIRECT - SWANEPOEL

1    I can just say that the way I spoke to him was

2    maybe pretty harsh and, you know, he responded saying that

3    he did not do it, it was -- you know, an accident -- well,

4    it went off.

5    Q.    Sure.  Thank you.  You had mentioned -- you had

6    mentioned -- and I could have Exhibit 16, page 5, please.

7    The black case standing up there, is that the gun

8    case?

9    A.    That's the hard case, yes, sir.

10    Q.    Okay.  Can you tell me how firearms went into it.

11    A.    Well, in general if you're -- if you're looking at the

12    case over here, you would take that case and you would load

13    it with sort of the butt side down and the barrel up in the

14    gun case, so you'd be taking the -- sliding it into the hard

15    case, you know, sort of like that.

16    Q.    How tall is that?

17    A.    Oh, I can't tell you exactly, but I'm going to -- I'm

18    going to guess probably -- I don't want to speak out of

19    turn, but I would say probably about middle chest height for

20    me.

21    Q.    Okay.

22    A.    It would have to be as long as the guns, obviously, so,

23    you know.

24    Q.    If there was a rifle in it, would you -- if it were

25    shorter than the rifle, would you be able to see the tip

REDIRECT - SWANEPOEL

1    coming out?

2    A.   Well, if it was shorter than the rifle, yes, sir.  I

3    don't know that exact case, but it looks like that's one of

4    those that slots in.  So where you'd see the top is where

5    the top would be.

6    Q.   Is there anything inside the case that sort of holds

7    the firearms so they don't rattle around?

8    A.   They are all different.  But a lot of them have, you

9    know -- like the Pelican case has some of that sponging

10   that's inside the case, so when you put it in, they don't

11   rattle around completely.  But, you know, some clients have

12   it, some people don't.  Some people put other stuff, you

13   know, a lot of valuables in there during the safari.

14   Q.   Do you know about how tall Bianca was?

15   A.   If I had to guess I would say probably -- maybe a bit

16   taller than my mom, 5-7.  5-6.  5-foot-6, 5-7, somewhere

17   around there.

18   Q.   All right.  You mentioned that you hadn't seen Larry

19   with a shotgun before; is that right?

20   A.   I had seen him with a shotgun before, but not -- not

21   regularly.  I mean, again, we don't really hunt with shotgun

22   much.  So I do recall him -- I know he brought a shotgun on

23   some trips, but mostly no.  Not too much with a shotgun.

24   Q.   Did he -- I believe you said this, but I just want to

25   clarify:  Did he shoot the shotgun on this trip?

351

REDIRECT - SWANEPOEL

1  A.    When we were shooting the shotgun in -- to the best of

2  my recollection, I believe he and I were the two that shot

3  the gun.  And I don't recall Bianca shooting it.  You know,

4  I know she shot a .375, but I believe that we both may have

5  shot it that morning.  I could be wrong, sir.  Like I say,

6  it's a long time ago and that's not a detail, you know -- I

7  shoot a lot of guns in the mornings with clients, so . . .

8  Q.    When you went out hunting and Larry took the shotgun,

9  did you see him loading and unloading it each day?

10  A.    As -- like I said, the only time I really recall the

11  shotgun ever coming into play is when we were sitting in the

12  blind and there, yes, every time we went into the blind, he

13  was loading and unloading the shotgun.

14  Q.    And, again, I believe you said this on direct, but did

15  he seem like he knew how to load and unload it or was he

16  struggling with it?

17  A.    No, sir, he seemed like he knew -- knew what he was

18  doing.  I mean, you know, various shotguns are different.

19  But, yeah, he seemed like he knew what he was doing.

20  Q.    Is it complicated to load and unload?

21  A.    That particular Browning I'm not very familiar with.

22  Some shotguns require you to actually push an additional

23  button to drop, you know, a bullet into -- into the breach

24  block so that you can load it up.  Browning, I believe when

25  you're clearing it, it will continuously reload, so the

352

REDIRECT - SWANEPOEL

1    different mechanisms.  I believe like mine is a Seezaid
2    [phonetic], a different model.  And for safety, if you are
3    unloading it, you only have to unload the one bullet, it
4    will not drop the other one into the receiver so it won't
5    jack another bullet every time.

6            Those particular Brownings, I know -- I don't know
7    exactly what model that was, but I know there was a
8    professional with one that does continuously cycle; it will
9    continuously reload.

10   Q.   When you were talking with Larry after Bianca had died,
11   when you're driving to Mumbwa, on direct you talked about
12   two possible scenarios you discussed.  Can you remind me
13   what those were?

14   A.   The two I recall the most was discussing that Larry had
15   said that that particular shotgun didn't fit very well in
16   that -- in that case and, you know, he had to force it to
17   fit the shotgun in.  And he said possibly Bianca was trying
18   to do that, you know, and it may have gone off.  She may
19   have banged it on the ground or something.

20           And then the other one I truly recall us discussing
21   was she may have caught, you know, the trigger while trying
22   to close the zipper on the shotgun.  So I'm not saying
23   that's the only ones we discussed, but those are sort of the
24   two that I recall with more clarity.

25   Q.   Do you recall any others?

REDIRECT - SWANEPOEL

1    A.    As I say, sir, you know, we discussed quite a bit.  The

2    only -- I think we had discussed as to whether the gun case

3    was closed properly or not and possibly, you know, the gun

4    could have possibly slipped out.  I can't say with certainty

5    that we discussed it, but I know we did discuss whether the

6    gun case -- when discussing if she was closing it, whether

7    the gun case was closing properly the night before or not.

8    Q.    Now if you have the gun in the case, and it's not

9    zipped totally to the back, and you lifted the case up, what

10   would happen?

11   A.    The gun would fall out the case and -- you know,

12   wouldn't fall completely out, depends how you're holding the

13   case, but it would drop the butt onto the floor.

14   Q.    Have you ever had a gun fall out of a case like that

15   before?

16   A.    I've had my .458 sort of slide and I've, you know,

17   managed to catch it.  I can't say that I recall ever really

18   dropping -- dropping a gun out of the case like that.  But

19   can't say that it hasn't happened either.

20   Q.    All right.  In this photograph, which is, again, page

21   6 -- or Exhibit 16, page 5, you were shown a -- another

22   photograph where it was pointing the other direction; is

23   that right?

24   A.    Yes, sir.

25   Q.    And that was one of the police photos?

REDIRECT - SWANEPOEL

1   A.    I assume so, sir.  I don't think it was one of mine.

2   Q.    Okay.  When you saw the gun, is this generally what you

3   remember it being like?

4   A.    I think in conversation, when speaking to you before,

5   I'd said that I couldn't recall exactly -- I recall it being

6   somewhere on that carpet.  I do recall that.  You know,

7   that's something that sort of stays in your head.  I said I

8   probably recall -- I do recall not having to struggle to get

9   over it, you know.  In the moment I could be wrong, but I

10  don't remember having to leap over it; I just remember

11  stepping over it.

12        So, if anything, I would say possibly the barrel

13  was pointing more towards the French doors.  But again, I

14  can't -- I was looking at Bianca at that point.  I can't

15  tell you with certainty that that's what I saw.

16  Q.    When you -- you said previously that you and your

17  parents went to visit Larry.  When, about, was that?

18  A.    I think we went the first time with Bianca there.

19  That -- I can't recall exactly that.  Probably would have

20  been maybe in '15.  Maybe early '16s.  Either '15 show, '16

21  show.  I will have to look at photos to recall exactly.  But

22  we had a trip where we went and visited and we actually

23  invited some of our other clients over.  We had a nice

24  cocktail party at their house there.

25        And then after the incident, I believe we went in

REDIRECT - SWANEPOEL

1    2018, I think it was -- I think it was early 2018 after the

2    conventions.

3    Q.    Where did you stay?

4    A.    We stayed at Larry's house in Arizona.

5    Q.    And then in 2019, you saw him at the convention, did

6    you say?

7    A.    I think I recall it was now 2020.  I think it was early

8    2020 because when we went for dinner with Lori, it was the

9    same time that I was first questioned by the FBI.  So I

10   think -- again, sir, I look at the photos to sort of recall,

11   I maybe should have looked a bit more, but I don't know if

12   we saw him in 2019.  I think that's what he -- I think he

13   came -- maybe that's the year he came to the Reno show.  I

14   don't recall which one was which.  But yeah, I think -- I

15   don't know if we visited him in 2019.

16   Q.    Did he introduce you to Lori?

17   A.    Yes, sir.  At that Dallas -- at the Dallas convention

18   that's the first time I met her.

19   Q.    Who did he tell you she was?

20   A.    He said that she was an old friend from work, you know.

21   He didn't really elaborate too much on that.  He just said,

22   "Oh, we've known each for many years.  She's an old friend

23   from work."

24   Q.    Sir, I think you said before, do you feel as though

25   you're close to Larry?

REDIRECT - SWANEPOEL

1    A.    Yeah, I think -- I think so, you know.  It's -- as far

2    out in the field and hunting and everything else, yes.  And

3    things pertaining to the hunting industry -- you know, we

4    spoke a lot about Safari Club and many things like that.  I

5    mean, you know, it's like he's older than I am, but I

6    believe we've got a pretty close relationship.

7    Q.    What's the -- how would you describe that relationship

8    as far as what context you know him well in?

9    A.    Well, you know, he -- I learned a lot from him

10   regarding Safari Club.  You know, he was two-time president

11   of the Safari Club.  Over the years, I learned a lot about

12   the different species for the awards programs, et cetera.

13   We spoke a lot about hunting.

14        You know, we also -- well, I mean, we also spoke --

15   I guess we spoke a lot about a lot of stuff.  Motor bikes.

16   You know, I mean, we thought about -- I remember one stay

17   with Bianca we were talking about importing some, you know,

18   energy drink to South Africa.  So over the years, you know,

19   sort of -- we spoke about many things, you know, not -- not

20   just hunting.

21   Q.    Other than those two visits you were discussing, did

22   you see Larry or Larry and Bianca besides when they were

23   hunting?

24   A.    No, not really, no, sir.

25        MR. WINSTEAD:  Okay.  May I have a moment, Your

RECROSS - SWANEPOEL

1    Honor?

2              THE COURT:  You may.

3              MR. WINSTEAD:  Nothing further.  Thank you, Your

4    Honor.

5              THE COURT:  Do you have any recross, Mr. Markus?

6              MR. MARKUS:  Very briefly, Your Honor, please.

7              THE COURT:  All right.

8                        RECROSS-EXAMINATION

9    BY MR. MARKUS:

10   Q.   Mr. Swanepoel, did Larry and Bianca try to -- did Larry

11   try to help you with your marriage?

12   A.   Yes, sir.  You know, I -- the first time I can really

13   recall speaking to them about it, I think it was in

14   Camaroon.  If I recall correctly, I think it was about 2015.

15   You know, LeeAnn and I were struggling up.  I travel a lot;

16   I'm away from home.  Especially at that stage, I was away

17   from home sometimes eight months a year, you know.  We had

18   small kids and we were struggling.

19              And I spoke to them both as a couple.  And they

20   did, they tried to help me, you know, just to deal with it.

21   Q.   Okay.  And the prosecutor asked you, you know, other

22   than some visits and the safaris.  But I want to ask you

23   about the safaris.  How long were typical safaris -- when

24   Larry and Bianca would come, how long were they?

25   A.   In general, they wouldn't do a shorter safari than, you

RECROSS - SWANEPOEL

1    know, 14 days.  I mean, sometimes on a rare occasion it was

2    a 10-day, but generally we did 14 days and upwards to 30

3    days.

4    Q.   So twice a year you would spend at least 14 days with

5    them?

6    A.   I would say more than 14, yeah.  I would say at least

7    probably -- if I had to say, I would say at least about a

8    month, maybe 30 to 40 days a year with them hunting.

9    Q.   Do you get to know someone pretty well on these

10   safaris?

11   A.   I would say so.  You're in each other's faces morning

12   to night and, you know, extreme situations, and -- you know,

13   yeah it's tough.  And traveling and all the rest, I would

14   say you get to know people pretty well in that environment.

15   Q.   Sure.  The prosecutor asked you about whether guns can

16   go off without someone pulling the trigger.  Do you -- when

17   you go out to the blind, do you load the guns when you put

18   them on the truck?

19   A.   No, sir.  We generally load it when we're in the blind.

20   Q.   Why not load them before you go on the truck?

21   A.   Well, as I said in previous testimony, you know, you

22   will be worried, if it's bouncing around it could go off.

23   Q.   Without someone pulling the trigger.

24   A.   I'm not an expert on it, but yeah.  I mean, that's how

25   we feel, you know.  We're always -- you're always careful

RECROSS - SWANEPOEL

1    with a gun, dropping it or banging it around.  I mean, you

2    wouldn't -- I wouldn't feel safe doing it.

3    Q.    Okay.  The prosecutor asked you about the French doors

4    and the layout of the cabin.  When people would bring in

5    coffee or try to help the Rudolphs pack, would they come in

6    through the French doors?

7    A.    Generally speaking, yes, sir.

8    Q.    Okay.  And I imagine on mornings of any safari, let

9    alone the morning, people are getting ready to leave, the

10   mornings are a busy time at camp?

11   A.    Yes, sir.

12   Q.    People are out and about.

13   A.    Yes, sir.

14   Q.    And after Bianca shoos away -- who was it?  Kennedy?

15   A.    Kennedy, I believe, yes, sir.

16   Q.    They hadn't finished packing at that point, right?

17   A.    As far as I recall, that's why she sort of shooed him

18   away.

19   Q.    And so at some point they would expect people to come

20   back and help them pack.

21   A.    Yes, sir.

22   Q.    Thank you, Mr. Swanepoel.

23   A.    Yes, sir.

24        THE COURT:  Any recross, Mr. Dill?

25        MR. DILL:  No, sir.  No questions.

RECROSS - SWANEPOEL

1      THE COURT:  All right.  May this witness be excused

2   for the Government?

3      MR. WINSTEAD:  Yes, Your Honor.

4      THE COURT:  For Defendant Rudolph?

5      MR. MARKUS:  Yes, Your Honor.

6      THE COURT:  Defendant Milliron?

7      MR. DILL:  Yes, Your Honor.

8      THE COURT:  All right, Mr. Swanepoel, you're done.

9   Thank you for your testimony.  You're excused.  You may step

10  down.

11     THE WITNESS:  Thank you, sir.

12     THE COURT:  Government may call its next witness.

13     MR. FIELDS:  Your Honor, the United States calls

14  Mwene Casiuss Banda.  Your Honor, this witness has an

15  interpreter.  She will need just a couple of seconds to get

16  that set up.

17     THE COURT:  Sure.

18     COURTROOM DEPUTY:  Interpreter, will you please

19  state your name for the record.

20     THE INTERPRETER:  My name is Towena Abray

21  [phonetic].  I'm with All Alliance Languages.

22     COURTROOM DEPUTY:  Will you raise your right hand

23  for me, please.

24     (Interpreter sworn in)

25     COURTROOM DEPUTY:  Thank you.  Sir, would you stand

361

DIRECT BANDA

1    for me and please raise your right hand.

2        (All responses of the witness are given through

3    interpreter)

4        MWENE CASIUSS BANDA, GOVERNMENT'S WITNESS, SWORN

5            THE INTERPRETER:  Yes, I agree, and everything I

6    say is true.

7            COURTROOM DEPUTY:  Please be seated and then remove

8    your mask.  And state your full name for the record and

9    spell your first and last name for us.

10            THE WITNESS:  My name is Casiuss Mwene.

11            THE COURT:  Sir, you can -- sir, you can take your

12    mask off.  And why don't you lean closer to the microphone.

13            You may proceed, Mr. Fields.

14            MR. FIELDS:  Thank you.

15                    DIRECT EXAMINATION

16    BY MR. FIELDS:

17    Q.   Good morning.

18    A.   Good morning.

19    Q.   Are you training to be a professional hunter?

20    A.   Yes, I'm being trained starting next year.

21    Q.   Who is your teacher?

22    A.   Bwana Mark is someone who's going to help me.

23    Q.   Were you with Mark in October 2016?

24    A.   Yes, I was with him.

25            THE COURT:  One second, counsel.  Madam

DIRECT BANDA

1    Interpreter, you need to speak louder.  I can hardly hear

2    you.  I don't know if my court reporter can hear you; the

3    jury probably cannot hear you.

4              THE INTERPRETER:  Okay.

5              THE COURT:  So please -- is the mic on?

6              THE INTERPRETER:  It says it's on.

7              THE COURT:  Okay.  Hold it close to your mouth and

8    just raise your voice.  You have a very soft voice.

9              THE INTERPRETER:  Okay.  Thank you.

10             MR. FIELDS:  Thank you, Your Honor.

11   BY MR. FIELDS:

12   Q.   Sir, where were you born?

13   A.   I was born in Mumbwa.

14   Q.   Is that in Zambia?

15   A.   Yes, it's in Zambia.

16   Q.   How old are you?

17   A.   I'm 36 years.

18   Q.   Do you speak English?

19   A.   I know how to speak it, just a little bit.  Not too

20   much.

21   Q.   What language are you most comfortable with?

22   A.   Nyanja.

23   Q.   How long have you worked with Mark?

24   A.   I started with him in 2013 -- 2003.  I started in 2003

25   and then they closed and then started again in 2011 and then

363

DIRECT BANDA

1    started again in 2016 with him.

2    Q.    What kind of training has he given you?

3    A.    I work as a tracker.

4    Q.    How many hunts have you helped him with?

5    A.    I've done hunting with him quite a few times.

6    Q.    When is hunting season in Zambia?

7    A.    They start in May for six months.

8    Q.    During those six months, where do you live?

9    A.    Six months when?  When we're closed?

10   Q.    When you're -- during hunting season, where do you

11   live?

12   A.    I stay at the camp and -- but when it's done, then I go

13   home.

14   Q.    Let's pull up Government's Exhibit 12, which has

15   already been admitted into evidence.  And if we could zoom

16   in on the camp generally, this area.  We'll zoom back out a

17   little bit.  We didn't capture it all.

18            Okay.  Do you recognize this?

19   A.    Yes, I do.

20   Q.    What is it?

21   A.    It is the camp.

22   Q.    This is the camp where you live during hunting season?

23   A.    Yes, this where I lived.

24   Q.    What's this part down here on the bottom left?

25   A.    That's the skin shed.

364

DIRECT BANDA

1   Q.    What part of the camp do you live in?

2   A.    Where there are houses, close to the skin shed.

3   Q.    When you have clients in camp, where do they live?

4   A.    The clients when -- they live close to the dining

5   area.

6   Q.    Sir, you'll see there's a little pen on that monitor

7   there.  Do you see that?

8   A.    Yes.

9   Q.    Can you grab that pen, and you can actually draw on the

10  map.  Can you draw for us where the clients live.

11  A.    Bianca, they live in this area.

12  Q.    I would like the record to reflect he's circled the

13  area sort of in that top right part of this photograph.

14          THE COURT:  The record will so reflect.

15  BY MR. FIELDS:

16  Q.    How many other workers live at the campsite?

17  A.    There are about nine.

18  Q.    Is it easy to contact others outside of camp when

19  you're inside camp?

20  A.    The ones who live together with -- on the camp?

21  Q.    No, people in -- outside villages.

22  A.    No, it's not easy to contact any outside people, only

23  when they put the battery in the network.

24  Q.    Where's the nearest town?

25  A.    Mumbwa.

DIRECT BANDA

1    Q.    Now you mentioned that area where the clients live.

2    Who is allowed to be in that area when clients are in camp?

3    A.    Only the room attendant and the waiter are allowed to

4    be close to the clients.

5    Q.    Now you mentioned that you've been working for Mark,

6    and you also mentioned that you were with him in October

7    2016.  Who were the clients for that hunt?

8              THE INTERPRETER:  He says for me to repeat the

9    question.

10   BY MR. FIELDS:

11   Q.    Who were the clients in October 2016?

12   A.    Bwana Rudolph and Madam Bianca.

13   Q.    Had Madam Bianca and -- is it Bwana?  Is that the word

14   you're using?

15   A.    Bwana is boss.

16   Q.    Bwana Rudolph and Madam Bianca, have they been on hunts

17   with you before?

18   A.    Yes, I've hunted with them before.

19   Q.    How many times?

20   A.    So this time that they came around would be the third

21   time.

22   Q.    On the previous two times, did you see Madam Bianca

23   using firearms?

24             THE INTERPRETER:  He doesn't understand the

25   question.  Can you repeat.

DIRECT BANDA

1    BY MR. FIELDS:

2    Q.   Did you see Madam Bianca using firearms on the prior

3    hunts?

4    A.   Yes, she was using it.

5    Q.   How would you describe her firearms handling?

6    A.   Yes, she knew how to use this with no mistakes.

7             THE COURT:  Excuse me, counsel.  Madam Interpreter,

8    please keep your voice up.  You're trailing off and I -- if

9    I can't -- if I'm having difficulty hearing, I know the

10   folks at the end -- folks at the end of the jury box, can

11   you hear her?  Yes, a little?  So-so?

12            So if you could just do that, please.

13            THE INTERPRETER:  Okay.

14            THE COURT:  All right.

15   BY MR. FIELDS:

16   Q.   Do you remember this hunt in October 2016?

17   A.   Yes, I remember.

18   Q.   What firearms did Bwana Rudolph and Madam Bianca bring?

19   A.   I saw a shotgun -- a shotgun, .375.  That's what I

20   saw.

21   Q.   What kind of hunt was that?

22   A.   We were trying to hunt for leopard.

23   Q.   What was the schedule like for each day of the leopard

24   hunt?

25   A.   Going in the morning, then sometimes we come back in

DIRECT BANDA

1    the afternoon for lunch.  Or sometimes we eat in the bush.

2    Q.    In the morning, when the clients got ready, what would

3    they do with their firearms?

4    A.    So the room attendant will pick up the -- the rifles

5    and then bring them to the vehicle.

6    Q.    Who were the room attendants at the time?

7    A.    Kennedy.

8    Q.    Was -- were there any other room attendants?

9    A.    No, just Kennedy.

10   Q.    All right.  Now let's look at Government's Exhibit 13,

11   which is also already in evidence.

12        Do you see that picture in front of you, sir?

13   A.    Yes, I see it.

14   Q.    What is that?

15   A.    It's a hunting vehicle.

16   Q.    Now let's go to page 2, please.  What do you see there?

17   A.    Where we put the guns.

18   Q.    Were the guns put in the racks with cases or without

19   cases?

20   A.    They -- they put them in the gun cases.

21   Q.    Why?

22   A.    To prevent the vehicles from getting dust -- dust.

23   Q.    Now, on this hunt, you said there was a rifle and a

24   shotgun.  Who was using the rifle?

25   A.    The madam was using the rifle.

368

DIRECT BANDA

1    Q.    What was the rifle used for?

2    A.    So she used it to kill bait -- animal bait and a hippo.

3    Q.    Did you see her handling the rifle during this hunt?

4    A.    Yes, she's the one who killed the hippo.

5    Q.    How did you -- how did she handle the rifle?

6    A.    She just used it fine.  There was no problem.

7    Q.    Who used the shotgun on the hunt?

8    A.    The person who used the shotgun was Boss Rudolph.

9    Q.    What was the shotgun used for?

10   A.    So he just tried it because it was new.  He was just

11   trying to -- to test it to see if it works.

12   Q.    Do you remember the last night of the hunt?

13   A.    Yes, I remember the last night.

14   Q.    Did you go out with the group on the last night of the

15   hunt?

16   A.    Yes -- yes, we go together.  Scout and the group of our

17   friends, we all go together.

18   Q.    Did part of the group go to a hunting blind?

19   A.    Yes, we were all together.  There's a tracker, PH, and

20   a game scout, and we all go together and we were all

21   together.

22   Q.    Did the group split up at any point in time?

23   A.    The only separation is when the clients stay in the

24   blinds and then -- with the PH.  The rest of us go in the

25   vehicle and drive away.

**DIRECT BANDA**

1    Q.    How far away did you drive?

2    A.    It's about 1.1 kilometer to 1.5 kilometers.

3    Q.    When you go away in the truck like that during a hunt,

4    what are you doing?

5    A.    So they -- they drive away and then they wait either --

6    till they hear a gunshot to return.

7    Q.    That night, the last night of the hunt, did you hear a

8    gunshot?

9    A.    No, they did not hear any gunshot.  They just returned

10   the time that was agreed upon.

11   Q.    When you returned to the blind at the time it was

12   agreed upon, what was the group doing with the firearms?

13   A.    So when we got there, they gave us the guns.  But right

14   before they gave it to us, they, you know, cleaned them or

15   took them apart to put them in the cases and then handed the

16   guns to us.

17   Q.    When you say "cleaned them or took them apart," what

18   were they doing?

19   A.    So when they arrived at -- at the -- in the blind, what

20   they normally do is that the firearm is loaded to wait for

21   the hunt.  But once the time is arranged that they meet, in

22   this case, you know, they went back, and at that time

23   they -- whoever was in the blind was making sure that there

24   are no gun, you know, there are no cases or gun shells or

25   bullets in the gun.  So they take those apart and then they

DIRECT BANDA

1    give them to the attendants.  Once they're there, they know

2    there are no bullets in the gun.

3    Q.    What happened with the shotgun when you arrived

4    there?

5    A.    He was -- he was just handed the shotgun and then he

6    put it in the gun case.

7    Q.    Into the soft case?

8    A.    Yes, in the soft case, and placed it on the gun rack.

9    Q.    Did you have any difficulty putting it into the soft

10   case?

11   A.    No, there was no issue putting it in the soft case.

12   Q.    When you put it in the soft case, did you close the

13   soft case?

14   A.    Yes, I zipped it up, I put it on the gun rack.

15   Q.    What happened with the shotgun when you got back to

16   camp?

17   A.    I gave it to the room attendant who returned it to the

18   client.

19   Q.    Where were you working early the next morning?

20   A.    So in the morning we took the bags just -- we were

21   waiting for the bags so -- because they said they were

22   leaving that morning.

23   Q.    Did you hear a gunshot?

24   A.    After I parked the vehicle, that's when I heard the

25   gunshot.

371

DIRECT BANDA

1    Q.    What did you do when you heard the gunshot?

2    A.    I ran towards the room.

3    Q.    Let's pull up Government's Exhibit 15, page 16.    This

4    is already in evidence.

5          Is this the cabin?

6    A.    Yes, it is.

7    Q.    Did you go into the cabin after you heard the shot?

8    A.    Yes.    When I heard the gunshot, we drove up to the

9    cabin.

10   Q.    Did you go inside?

11   A.    No, I just stood to the side, close to the door.

12   Q.    Could you see inside?

13   A.    Yes.    The door was open.    I was very close.    I could

14   see inside.

15   Q.    What did you see?

16   A.    I saw the madam on the floor and the gun on the side of

17   the bed.    And Mr. Rudolph was inside.

18   Q.    Where did you see him standing?

19   A.    He was standing next to the body close to where the

20   toilet door was.

21   Q.    And you said you saw the shotgun.    Where did you see

22   it?

23   A.    So the madam was in front and the gun was on the floor

24   by the bed.

25   Q.    Where was it pointed?

DIRECT BANDA

1   A.   The gun was pointing the opposite direction.

2   Q.   Opposite --

3   A.   Opposite of the body.

4   Q.   Was the shotgun covered in anything?

5   A.   No, it was in the gun case halfway.

6   Q.   Could you see the gun case?

7   A.   Yes, I saw it.

8   Q.   Was it closed like it had been the night before or was

9   it -- had it been modified?

10  A.   I found it.  It looked -- it was unzipped; it was

11  unzipped and open.

12  Q.   Now let's take this down.  And for the first time,

13  Ms. Guerra, I want to use Government's Exhibit 2 from our

14  table over here.  I believe Mr. Winstead has it lined up.

15  All right.  And if we could, let's go inside the cabin.

16  Yup.

17         MR. WINSTEAD:  Would you like 12 or 13 --

18         MR. FIELDS:  That one.  13.  All right, if we could

19  look at the foot of the bed there.  Thank you.

20  BY MR. FIELDS:

21  Q.   Now, sir, is this how you remember the cabin back in

22  2016?  Do you want us to orient you around a little bit?

23  A.   That's how the bed was.  I just don't recognize the

24  mat.

25  Q.   Let's look to the left a little bit.  That door there,

373

DIRECT BANDA

1    where does that door go?

2    A.    It goes to the bathroom.

3    Q.    All right.  Now, on this photograph, do you remember

4    approximately where you saw Madam Bianca?

5    A.    Yes, I remember.

6    Q.    Now, again, if you have that pen there -- do you have

7    that pen?  Could you draw on the screen for us where you

8    remember Madam Bianca.

9    A.    Turn the picture a little bit towards the left.

10   Towards the left.

11         THE INTERPRETER:  Did you want him to -- to draw

12   where the body was?

13   BY MR. FIELDS:

14   Q.    Yup, there you go.

15   A.    That's where the body was.

16   Q.    And if you could also now draw maybe an X just to

17   differentiate where you saw Bwana Rudolph.

18   A.    First when I found him, he was standing right there

19   when he saw -- when he got there, he saw him standing right

20   there.

21   Q.    And now let's circle around over to the right, back to

22   where the rug is.  Okay.

23         Now can you tell us where you saw the shotgun.

24   A.    The gun was right there.

25   Q.    And could you draw an arrow, what direction was it

374

DIRECT BANDA

1    pointing?

2    A.    That's what he saw.

3            MR. FIELDS:  Let the record reflect that the

4    witness has drawn an arrow pointing to the right.

5            THE COURT:  Pointing to the -- when you say "to the

6    right," to the right in the photograph?

7            MR. FIELDS:  Yup.

8            THE COURT:  All right.  The record will so reflect.

9    BY MR. FIELDS:

10   Q.    You can take that down.  Thank you.

11           How quickly did you get to the cabin?

12   A.    We didn't take long.  We just discussed quickly, "What

13   was that we heard," and then ran towards where the shot came

14   from.

15   Q.    Who got there before you?

16   A.    I found Bwana Mark and Scout Spencer and the waiter,

17   Mr. Peri.

18   Q.    The way you described the scene for us with Madam

19   Bianca, Bwana Rudolph, and the shotgun, did you see anyone

20   move anything around when you first saw the scene?

21   A.    No, when I got there it didn't seem like anybody had

22   moved anything.

23   Q.    When you saw Bwana Rudolph, how would you describe his

24   demeanor?

25   A.    He was crying and asking for help.

DIRECT BANDA

1    Q.   Did Madam Bianca die?

2    A.   Yes, she was dead.

3    Q.   What happened after she died?

4    A.   So after that, we decided to go to the police

5    station.

6    Q.   Did you go with?

7    A.   Yes, we went with Bwana Rudolph and Mr. Mark and Scout

8    and another friend of mine.

9    Q.   Could you hear what Mark and Bwana Rudolph were talking

10   about on the way to the station?

11   A.   No, I was sitting in the back, Rudolph -- Bwana Rudolph

12   was sitting in the front, and it didn't seem like they were

13   saying much, so no.

14   Q.   What happened when you got to Mumbwa?

15   A.   When we got to the station, we parked the vehicle on

16   the side.  Bwana Mark and Rudolph went inside the building.

17   I stayed in the vehicle.

18   Q.   Did the police interview you?

19   A.   No, they didn't question me then, but they did -- when

20   they came to the camp, they asked me a few questions.

21   Q.   So you went back to the camp with them?

22   A.   Yes.  So we drove back to the camp with them.  We took

23   few -- three vehicles.  Two vehicles and some type of

24   ambulance and drove back to the camp.

25   Q.   And what happened at the camp the second time?

376

DIRECT BANDA

1    A.    When we got to the camp, they went into the cottage and

2    took some pictures.

3    Q.    Then what happened after that?

4    A.    After that, they picked up the body, put it in a white

5    ambulance, and drove it to Mumbwa hospital.

6    Q.    Where did you stay that night?

7    A.    I stayed on a farm between Lusaka and Mumbwa.

8    Q.    Where did you go the next day?

9    A.    In the morning we returned to Mumbwa and picked up the

10   body to take it to Lusaka.

11   Q.    Where did the body go in Lusaka?

12   A.    They took the body to UTH.

13   Q.    UTH, is that University Teaching Hospital?

14   A.    Yes, that's the main hospital.

15   Q.    Let's look at Government's Exhibit 10, which is already

16   in evidence.  If we go to page 31.  There was a pause there.

17   And if we could blow up that picture down there in the

18   bottom half.

19           Do you recognize that picture?

20   A.    Yes, I do.

21   Q.    What is that?

22   A.    That's the hospital.

23   Q.    We could take that down.

24           After you were at the hospital, what happened next?

25   What you did do?

CROSS - MWENE

1    A.    When we arrived at the hospital, they took the body

2    inside, and I just stayed behind as usual in the vehicle.

3    After that, we left and I went home.

4              MR. FIELDS:   Your Honor, may I have a moment?

5              THE COURT:   You may.

6              MR. FIELDS:   Your Honor, I have no further

7    questions for this witness.

8              THE COURT:   All right.  Cross-examination.

9                        CROSS-EXAMINATION

10   BY MS. MOSS:

11   Q.    Good morning, Mr. Mwene.

12   A.    Good morning.

13   Q.    Have you ever been in a setting like we are here today?

14   A.    No, this is my first time.

15   Q.    Are you more comfortable out in the bush than being in

16   this courtroom where it's very nerve-wracking?

17   A.    Of course, I prefer the bush.

18   Q.    I understand.  Mr. Mwene, I understand that people call

19   you Banda; is that right?

20   A.    Yes, they call me Banda everywhere.

21   Q.    And is that because you were named after your

22   grandfather, who was also called Banda?

23   A.    Yes, my grandfather's father was named Banda, so they

24   named him after me.

25   Q.    I see.  And is it okay, then, if I refer to you as

CROSS - MWENE

1    Mr. Banda as we're speaking?

2    A.    Yeah, any name is fine in -- on the -- all the

3    documents is Casiuss, so any -- it's fine with any name.

4    Q.    Thank you.  Now, Mr. Banda, we've been talking about

5    events that happened six years ago now.

6    A.    Yes.

7    Q.    And are you here today telling us what happened to the

8    best that you can remember, since it was six years ago?

9    A.    Yes, it's what I saw.  I can only recall what I saw and

10   what I remember.

11   Q.    Okay.  So let's talk about some of those things.  When

12   the prosecutor was speaking to you, he was referring to

13   people named Larry and Bianca; is that right?

14   A.    Yes.

15   Q.    And did you call Larry Rudolph, Bwana Larry?

16   A.    Yes, I do call him Bwana because that's the sign of

17   respect in our culture.

18   Q.    And with Bianca, would you call him Madam -- call her

19   Madam or Madam B, sometimes?

20   A.    We called them Madam Bianca.

21   Q.    Madam Bianca.  So did you know Bwana Larry and Madam

22   Bianca for a few years?  You had seen them a few times

23   before this last hunting trip?

24   A.    Yes.

25   Q.    And had Bwana Larry and Madam Bianca been long-time

CROSS - MWENE

1    clients of Bwana Mark and his father?

2    A.    Yes.  So before I was a permanent worker for Mark, I

3    would see that they would come, and I've heard that they

4    used to come before and -- before I became a permanent

5    worker.

6    Q.    And after you became a permanent worker, did you get to

7    know them a little bit?

8    A.    Yes.  So when I was given the permanent position as a

9    tracker, then I was -- you know, would meet Rudolph and

10   Bianca when they came to the vehicle.

11   Q.    And you also met their children at times, didn't you?

12   A.    Yeah, I saw the male.

13   Q.    And you believe that Bwana Larry and Madam Bianca, that

14   they were a good family, a good couple.

15   A.    Yeah, in my opinion I never saw them argue or have any

16   quarrels.

17   Q.    So they -- they didn't argue.  In fact, they seemed to

18   love each other, didn't they?

19   A.    Yes, they loved each other very much.  I didn't see

20   them quarrel.

21   Q.    And they seemed happy when they were together, didn't

22   they?

23   A.    Yes, we would see them hang out and, you know, just

24   have fun.  But we can't get really too close to them because

25   it's not that area that he worked in.

CROSS - MWENE

1    Q.    But the time that you did see them, you never saw any

2    problems with them, did you?

3    A.    No, I didn't see any issues.

4    Q.    Now, the prosecutor showed you photographs -- overhead

5    photographs of the camp where you were.  Do you remember

6    that?

7    A.    Yes, I remember.

8    Q.    It's not a very big camp, is it?

9    A.    No, it's not very big.

10   Q.    And there's not a lot of other people around the area,

11   just the people that work at the camp.

12   A.    Yeah, the only people at the camp are the people that

13   work there.  The only time there will be instances when the

14   officers or the scouts would be maybe patrolling the area,

15   that's the only time you would see maybe people from

16   outside.

17   Q.    Okay.  Otherwise it's just the few amount of people

18   that are working at the camp that are there.

19   A.    Yes, most of the time it's just us workers.

20   Q.    And it's a very quiet environment, isn't it?

21   A.    Yes, it's very quiet.

22   Q.    You can hear any noise that happens while you're out in

23   the camp.

24   A.    Yeah.  Only when it's in the evening, that's when you

25   can kind of, you know, hear a few noises here and there.

CROSS - MWENE

1   Otherwise it's usually quiet.

2   Q.    And I want to ask you about what goes on during a hunt

3   with clients.  Okay?

4   A.    Okay.

5   Q.    Now, you told us before that the hunting -- or people

6   would get started to go out hunting early in the morning,

7   maybe around 7:00 a.m. in the morning.

8   A.    Yes, it's based on the program, what program that

9   they're told to -- given.  Usually though it's after they

10  eat breakfast is when they go.

11  Q.    And when they would go out on -- to go hunting for the

12  day, the room attendants would be the ones who would take

13  the guns out of the client's cabin and put them in the

14  truck; is that right?

15  A.    The room attendant picks up the guns from the client

16  and then brings it to the truck.

17  Q.    And you talked about how you would put those guns on

18  that gun rack on the truck.  Do you remember that?

19  A.    Yes, they did.

20  Q.    And the guns would be in the soft cases because you

21  said you wanted to protect them from dust and dirt.

22  A.    Yes -- yes, they stayed in the gun cases to prevent the

23  dust and from them scratching.

24  Q.    And the gun case is not always completely zipped, it's

25  just zipped so that the gun is fitted all the way to the

CROSS - MWENE

1    end; is that right?

2    A.   Can you repeat the question.

3    Q.   So when you put the gun case on the gun rack in the

4    back of the truck, the gun case does not need to be zipped

5    all the way in order to protect the guns from dirt and from

6    dust.

7    A.   So when the guns are brought in the morning, they're

8    zipped all the way.  They bring them to us zipped all the

9    way.  We just put them on the gun rack.  The only time that

10   they're unzipped is when we go -- they are about to hunt or

11   see the hunt is when they're unzipped.

12   Q.   Okay.  And so because when you're driving out to do the

13   hunt, if you see animals, because you're driving in the

14   bush, you want to be able to get the gun quickly; is that

15   right?

16   A.   So when we drive away towards the -- you know, the

17   hunting range, we see a lot of animals.  So if there are

18   tiny animals or the animals that they are not desirable to

19   shoot, you know, we -- they don't do anything.  But if

20   there's a big animal that they would like to shoot, at that

21   point is when they pick up the gun and unzip it and then use

22   the rifle at the time.

23   Q.   And let me ask you:  When the guns are on the gun rack,

24   are they unloaded?

25   A.   Usually they are on the gun rack, they don't have

383

CROSS - MWENE

1   bullets.  The bullets are at the bottom.  They put the

2   bullets at the bottom.  They need to put bullets, they can,

3   but usually they have the bullets at the bottom.

4   Q.   And is the reason that the bullets are at the bottom is

5   because when you're driving out into the bush, the truck is

6   very bumpy, the -- the ground is very bumpy and you don't

7   want the gun to go off?

8   A.   In my opinion, they put the bullets at the bottom for

9   safety reasons.  And the only time that they, you know, use

10  them is when they see an animal, then they call -- cock the

11  gun themselves.

12  Q.   Okay.  And at the end of the day, when the clients and

13  the professional hunters are done hunting at the end of the

14  day, is it the professional hunter that unloads the guns?

15  A.   And so it's up to the client.  When they're done at the

16  end of the day, the client -- normally they would cock or

17  remove the bullets themselves.  But if they need help, they

18  can ask a professional hunter to help them.

19  Q.   And at the end of this hunt, on the last night of the

20  hunt, was it Mark that you saw unloading the guns?

21  A.   So when we got to the blinds to pick up the guns,

22  they -- we were just handed the guns and then we handed them

23  to the attendant and, you know, I don't know if, you know,

24  in -- if anybody, you know, uncocked them or put them up.

25  We were just handed the guns and it was handed to the

CROSS - MWENE

1    attendant.

2    Q.   Understood.  And then you drive back to the camp after

3    that; is that right?

4    A.   So when -- on the last day -- sometimes, you know, the

5    guns are taken to the dining room and then that's where the

6    client would then take them apart themselves.  And then

7    after that, we leave.  And sometimes -- and knowing that it

8    was the last day, we just gave them to the attendant and we

9    left.

10   Q.   So you gave the guns to the room attendant; you gave

11   them to Kennedy?

12   A.   Yes, I did.

13   Q.   And then it's Kennedy who is -- it's his job to take

14   the guns to the client's cabin?

15   A.   Yes, that's his job, and to clean the room.

16   Q.   And I understand that you don't normally go in the

17   client's cabins; is that right?

18   A.   No, we -- I don't go there at all.  We don't go there

19   at all.  Only the room attendant.

20   Q.   So when Kennedy takes the guns to the room, you

21   don't -- do you -- you don't know how he puts them in the

22   room or what he does with them in the room?

23   A.   No.  So he just hands -- we hand the gun to him and he

24   takes it from there, and vice versa in the morning he's the

25   one who would give the guns to us.

CROSS - MWENE

1    Q.    So you don't know what Kennedy does with it after

2    you've given it to him.

3    A.    No, I don't see where he goes after that.

4    Q.    Okay.  I want to talk about the morning, the last day

5    of the hunt in 2016.  That very early morning.  Do you

6    remember that day?

7    A.    Yes, I remember.

8    Q.    Everyone was up very early that day, weren't they?

9    A.    Yes, we woke up in the morning.

10   Q.    And that morning you didn't hear any yelling or any

11   screaming coming from Bwana Larry's and Madam Bianca's

12   cabin, did you?

13   A.    No.  So when I arrived, I parked the vehicle next to

14   the cabin, and I was in the back eating -- having breakfast.

15   I didn't hear any -- any noise, any commotion at all.

16   Q.    But what you did hear at some point was a gunshot.

17   A.    Yes.  After I parked the vehicle close to dining,

18   that's when -- you know, we're eating breakfast and then I

19   heard the gunshot.

20   Q.    And who were you with when you heard the gunshot?

21   A.    So there were a few of us sitting there.  Somebody from

22   the socka [phonetic] that I forgot the name, a manager.  And

23   other workers that were there sitting with me.  We were

24   having breakfast.

25   Q.    And Mark -- Bwana Mark and the game scout ran to the

CROSS - MWENE

1    cabin after they heard the gunshot.

2              THE COURT:  Counsel, hold on one second.  Let's ask

3    questions as opposed to just making statements, counsel.

4    BY MS. MOSS:

5    Q.    Did Bwana Mark and the game scout run to the cabin?

6    A.    So he was sitting in the kitchen and then they heard

7    the gunshot and ran towards where they heard the gunshot.

8    And Mark and some -- a few others were already there.

9    Q.    And was the game scout already there?

10   A.    Yes, they were together.

11   Q.    So when you got there, Bwana Mark and the game scout,

12   Spencer Kakoma, had already entered the cabin; is that

13   right?

14   A.    Yes, they were already there inside -- inside the

15   cabin.

16   Q.    Now, we've heard that the game scout, Spencer Kakoma,

17   took the shotgun outside of the cabin.  Did you see when the

18   game scout did that or did that happen before you got there?

19   A.    No, I saw the gun inside.  I don't know.

20   Q.    And do you know if, when you saw the gun inside,

21   it's -- it's after Mr. Kakoma put the gun back in the room.

22             THE COURT:  Hold on.  Ask a question as opposed to

23   just making a statement.

24             MS. MOSS:  I'm sorry, I thought that was a

25   question.

CROSS - MWENE

1    THE COURT:  No, it wasn't.

2    BY MS. MOSS:

3    Q.   Do you know if -- when you saw the gun in the cabin, is

4    that after the game scout, Mr. Kakoma, had placed it back

5    into the room?

6    A.   No -- no, when I got there, the gun was there.  I don't

7    know if anybody -- if Spencer had moved it or anybody moved

8    it.  I -- when he arrived there, they were already inside

9    and the gun was there.

10   Q.   And let me ask you about what you saw when you looked

11   in that room.  Was Larry Rudolph crying when you saw him in

12   that room?

13   A.   Yes.  When I got there, to be honest, he was crying.

14   Q.   And Bwana Larry was crying, "Help me, help me," wasn't

15   he?

16   A.   Yes.  When I got there, he was crying, "Help me, help

17   me."  And that's when they came up with the program that

18   they should, you know, take the body to Mumbwa.

19   Q.   And I just want to confirm again, when you looked into

20   the room, did you see Bwana Larry standing near the bathroom

21   door?

22   A.   When I entered -- when I entered the room, Bwana Larry

23   was close to the body but close to the -- also the bathroom

24   door.  So there's a bathroom door behind, Bwana Larry in the

25   front, and then the body in front of him.

388

REDIRECT - BANDA

1    Q.   And is that where he was when you saw him crying, "My

2    wife," and "Help me"?

3    A.   Yes, that's where I found him crying there.

4              MS. MOSS:   Thank you, Mr. Banda.

5              THE COURT:   Any questions, Mr. Dill?

6              MR. DILL:   No, Your Honor.

7              THE COURT:   All right.   Redirect?

8                        REDIRECT EXAMINATION

9    BY MR. FIELDS:

10   Q.   Thank you.   Hello again.   First of all, we've been

11   talking about Bwana Larry.   Do you see Bwana Larry in this

12   courtroom today?

13   A.   No -- yes, I see him.

14   Q.   Is he wearing a mask?

15   A.   Yes, he's wearing a mask.

16   Q.   What color is it?

17   A.   It's blue.

18             MR. FIELDS:   Your Honor, I'd like the record to

19   reflect the identification of the defendant.

20             THE COURT:   The record will so reflect.

21   BY MR. FIELDS:

22   Q.   Now, sir, you were asked about that last night of the

23   hunt.   Do you remember Ms. Moss asking you about that?

24   A.   Yes, I remember.

25   Q.   I think you said that when you got to the blind that

389

REDIRECT - BANDA

1    you were just handed the shotgun.  Do you remember that?

2    A.    Yes, that's usually how the clients give me the . . .

3    Q.    Before the gun was handed to you, do you know what was

4    done with it?

5    A.    I just heard that they were clearing the guns.  That's

6    all I heard.  I heard them clearing the guns, and then the

7    next thing I know they handed it to us.

8    Q.    You were also asked about Kennedy.  Do you remember

9    those questions?

10   A.    Yes, I remember.

11   Q.    Do you know whether Kennedy was invited to come here to

12   the United States?

13            MS. MOSS:  Objection.  Objection.  Based on hearsay

14   and outside of the scope.

15            THE COURT:  Overruled.  It's -- if he knows.

16   BY MR. FIELDS:

17   Q.    Sir, you may answer the question.  Do you know whether

18   Kennedy was invited here to the United States?

19   A.    Yes, I know.

20   Q.    Was he able to make it?

21   A.    No, he didn't come.

22   Q.    Why not?

23   A.    He stayed at the camp.  I was at home.

24   Q.    Now, you were also asked about when you got back to the

25   camp.  Do you remember those questions?

**REDIRECT - BANDA**

1    A.    Coming from Mumbwa?

2    Q.    Coming back on the last night of the hunt.

3    A.    Yes, I remember.

4    Q.    And you said that Kennedy was handed the shotgun off of

5    the truck?

6              MS. MOSS:  Objection.  Leading.

7              THE COURT:  Sustained.

8    BY MR. FIELDS:

9    Q.    Do you remember being asked questions about whether or

10   not Kennedy received the shotgun?

11   A.    He's the one who got them.  He usually is the one who

12   gets them.

13   Q.    When he received that shotgun, was the case fully

14   zipped, partially zipped, or unzipped?

15   A.    It was zipped all the way.

16   Q.    After Kennedy got the shotgun, would there have been

17   any reason for him to unzip it?

18             MS. MOSS:  Objection.  Speculation.

19             THE COURT:  Overruled.  If he knows.

20             THE WITNESS:  Usually -- usually when Kennedy's

21   given the guns, it's zipped up and he doesn't alter it or

22   anything.  So I don't recall any of that.

23             MR. FIELDS:  May I have a moment, Your Honor?

24             THE COURT:  You may.

25             MR. FIELDS:  Thank you, Your Honor.  I have no

REDIRECT - BANDA

1    further questions.  And for the Government's side, this

2    witness can be excused.

3            THE COURT:  All right.  Tell me about the madam

4    interpreter.  Are you going to be using her for any

5    witnesses coming up?

6            MR. FIELDS:  No, Your Honor.

7            THE COURT:  Okay.  Great.  May this witness be

8    excused for the Defendant Rudolph?

9            MS. MOSS:  Yes, Your Honor.

10           THE COURT:  For Defendant Milliron?

11           MR. DILL:  Yes, Your Honor.

12           THE COURT:  Okay.  Thank you for your services,

13   Madam Interpreter.  Mr. Banda.  Mr. Banda.  Thank you for

14   your testimony.  You're excused.  You may step down.  And

15   safe travels back to your country.

16           THE WITNESS:  Thank you.

17           THE COURT:  All right.  I think instead of starting

18   a new witness, we'll take our lunch break now.  Members of

19   the jury, we'll be in recess for one hour.

20       (Recess taken 12:22 p.m.)

21                   AFTERNOON SESSION

22       (In open court in the presence of the jury at 1:31

23   p.m.)

24           THE COURT:  The Government may call its next

25   witness.

392
DIRECT - WOOD

1          MR. GREWELL:  Your Honor, the United States calls
2     Valerie Wood.
3          THE COURT:  All right.
4          COURTROOM DEPUTY:  Raise your right hand for me.
5          VALERIE WOOD, GOVERNMENT'S WITNESS, SWORN
6          COURTROOM DEPUTY:  You can be seated.  Please
7     remove your mask for us and state your full name for the
8     record and spell your first and last name for us.
9          THE WITNESS:  Valerie Daily Wood.  V-a-l-e-r-i-e,
10    W-o-o-d.
11         THE COURT:  You may proceed, counsel.
12                        DIRECT EXAMINATION
13    BY MR. GREWELL:
14    Q.   Good afternoon, Ms. Wood.  Did you know Bianca
15    Rudolph?
16    A.   Yes, I did.
17    Q.   How did you first meet?
18    A.   We met in the mid-'90s.  Our children were in carpool
19    together.
20    Q.   Where were you living at the time?
21    A.   In Greensburg, Pennsylvania.
22    Q.   And was she living nearby?
23    A.   Yes, she lived in the same neighborhood.
24    Q.   Did you become friends with Bianca?
25    A.   Yes, I did.

DIRECT - WOOD

1    Q.    Please describe the nature of that friendship for the

2    jury.

3    A.    Well, we just hit it off really well after -- you know,

4    with our kids, you know, going to school -- you know, in the

5    same school for, you know, the next five years, and so we

6    just saw each other repeatedly and we became friends.  We

7    started traveling together.  Our husbands eventually met and

8    we became friends as couples also.

9    Q.    Did you remain close until her death?

10   A.    Yes.

11   Q.    Were you aware of Bianca's interest in hunting?

12   A.    Yes.

13   Q.    How often would she go on hunting trips?

14   A.    You know, as often as, you know, as she could.  I mean,

15   during the year, you know, she -- she had to take care of

16   the children, so -- but when they were able, and the kids

17   would sometimes go on hunt trips also, but she really

18   enjoyed hunting with . . .

19   Q.    I want to turn to 2016, the year that Bianca passed.

20   Did you talk to Bianca earlier in that year?

21   A.    Yes.  I talked to her before she left to go to Africa

22   because she was supposed to come to my house to visit with

23   her relatives after her nephew's wedding.  They were all

24   supposed to be coming to my house.

25   Q.    So did she talk about her plans for her nephew's

394

DIRECT - WOOD

1    wedding that fall?

2    A.   Oh, yes --

3              MS. DOYLE:  Objection.  Your Honor --

4              THE WITNESS:  Yes she was very excited about it.

5              MS. DOYLE:  Objection, Your Honor.  Hearsay.

6              MR. GREWELL:  803(3), her statement in her mind at

7    the time about a future event.

8              THE COURT:  I'll agree.  Overruled.  You may

9    answer, ma'am.

10             MR. GREWELL:  You can answer.

11             THE COURT:  You may answer.

12             THE WITNESS:  Yes, she was very excited about her

13   nephew's wedding.

14   BY MR. GREWELL:

15   Q.   So was she looking forward to it?

16   A.   Very much.

17   Q.   How did you learn about Bianca's death?

18   A.   Her daughter, Ana, called me.

19   Q.   Did you attend her memorial service?

20   A.   Yes, I did.

21   Q.   Who invited you?

22   A.   I -- I believe it was Ana, because I asked her to let

23   me know, you know, what was going on going forward.

24   Q.   Where was the memorial service held?

25   A.   It was held in Phoenix at a small kind of little

**DIRECT - WOOD**

1    basilica type thing.

2    Q.    Did that surprise you at all?

3    A.    Yes, it did.  Bianca was known for buying mass cards

4    for everybody, you know.  Her religion was very important to

5    her.  So I was kind of surprised that there wasn't a

6    Catholic mass said for her.

7    Q.    Were you surprised at the location at all?

8    A.    I was also very surprised it was in Phoenix because

9    they had only lived in Phoenix maybe a year, and she was

10   born and raised in Greensburg, most of her family was there,

11   her siblings were there.  And so she really had no real

12   connections to Phoenix, so I was surprised that it was held

13   in Phoenix, yes.

14   Q.    Were many of her friends in attendance?

15   A.    Just a few of us.  Just about three of us that we had

16   called and kept in touch.  Her three good girlfriends were

17   the ones that attended.

18   Q.    Did anything else surprise you about the memorial

19   service?

20   A.    Well, I was kind of surprised she was cremated because

21   she had expressed to me when my husband was cremated that --

22            MS. DOYLE:  I apologize for interrupting, Your

23   Honor.  Objection.  Hearsay.

24            THE COURT:  Counsel.

25            MR. GREWELL:  803(3), when the expression was made

**DIRECT - WOOD**

1    it would have been under the statement of future intent.

2                THE COURT:  Overruled.  Go ahead.

3                MR. GREWELL:  You may finish your answer.

4                THE COURT:  Go ahead.

5                THE WITNESS:  She had -- she was very upset with me

6    that my husband was Catholic and he was cremated.

7    BY MR. GREWELL:

8    Q.   Was there a Catholic mass at the funeral?

9    A.   No, there was not.

10   Q.   Did that surprise you?

11   A.   Yes, it did.

12   Q.   Why?

13   A.   Because, as I stated previously, she, you know, had

14   mass cards said for other friends that were Catholic, or

15   even anybody that wasn't Catholic, that her religion was

16   very important to her.  And I assumed that she would have

17   had mass said for her at the very least.

18   Q.   So based on your conversations with Bianca over the

19   years, was the service what Bianca would have wanted?

20   A.   Yes.

21   Q.   It was what she would have wanted, okay?

22   A.   So, this service?

23   Q.   Yes.

24   A.   No.

25   Q.   I would like to ask you about some photographs now.

397

DIRECT - WOOD

1    Can we please have Government Exhibit 430 at

2    page 9.

3    What is this photograph, Ms. Wood?

4    A.    This was a photograph of an event that Bianca and I

5    attended in Greensburg, Pennsylvania.

6    Q.    So who is depicted in it?

7    A.    That's me on the right and that's Bianca on the left.

8    Q.    When, approximately, was this photograph taken?

9    A.    Probably about 2006 somewhere.

10   Q.    And you said you're on the left.  So are you the one in

11   the plain white dress then, the -- with no pattern?

12   A.    Yes.

13   Q.    Okay.  Could I have page 7.

14   What is this a photograph of?

15   A.    That's a photograph of the dress that I was wearing in

16   the picture.

17   Q.    Do you remember when and where this photograph was

18   taken?

19   A.    This was taken at my home in Sedona, Arizona, in

20   probably, around, you know, 2018, '19.

21   Q.    Can I have page 1, please.

22   What is this a photograph of?

23   A.    This is of the agents that came to measure myself, you

24   know, in my home in Sedona.

25   Q.    So is that you being measured --

CROSS - WOOD

1    A.    Yes, that is me being measured there, yes.

2    Q.    And this is in -- is this -- when did this occur?

3    A.    Pardon?

4    Q.    What year was this?

5    A.    I -- you know, like I said, I think it was 2018, 2019.

6    Q.    And were they taken at your house?

7    A.    Yes.

8    Q.    What are you wearing in the photograph?

9    A.    I'm wearing the exact same outfit that I was taken in

10   the picture of me standing with -- next to Bianca.

11   Q.    Okay.  Did you have the length of that dress altered

12   between that picture with you and Bianca and the pictures

13   taken here?

14   A.    No.

15              MR. GREWELL:  No further questions, Your Honor.

16              THE COURT:  Cross-examination.

17                        CROSS-EXAMINATION

18   BY MS. DOYLE:

19   Q.    Good afternoon, ladies and gentlemen.

20              Good afternoon, Ms. Wood.  My name is Lauren, one

21   of the attorneys who's representing Dr. Rudolph.  I'd like

22   to ask you a few questions if that's okay.

23   A.    Yes.  Sure.

24   Q.    So you talked a little bit on direct about Bianca's

25   religion and cremation; is that right?

399

CROSS - WOOD

1   A.   Yes.

2   Q.   This conversation that you referenced, that took place,

3   I believe you said, after your husband's death?

4   A.   Correct.

5   Q.   And that was in 2008?

6   A.   Correct.

7   Q.   Which would have been about eight years before Bianca

8   passed, correct?

9   A.   Correct.

10  Q.   When you first spoke with the FBI and said that Bianca

11  would not have wanted to be cremated, were you aware that

12  she had a will?

13  A.   No.

14  Q.   So you were not aware that in Bianca's will she

15  expressly stated that she wanted to be cremated?

16  A.   No.

17  Q.   When you spoke with the FBI, again, and told them that

18  Bianca would not have wanted to be cremated, were you aware

19  that she also had a healthcare power of attorney that also

20  expressly stated that she wanted to be cremated?

21  A.   No, I did not.

22  Q.   Okay.  You've said a couple of things about the funeral

23  that Dr. Rudolph and his children arranged for Bianca.  So I

24  want to talk a little bit about that, if that's okay.

25  A.   Okay.

CROSS - WOOD

1    Q.    You mentioned that it took place in Phoenix, Arizona.

2    That is where Bianca and Larry lived, correct?

3    A.    At the time.

4    Q.    Right.  And they hadn't just moved to Arizona, they had

5    been living there for four years since 2012; is that right?

6    A.    I don't know if that was during the time that their

7    daughter was in -- still in college, maybe.  They had a

8    place.

9    Q.    You were also aware, I believe you mentioned, that

10   Bianca's close family from out of town was already scheduled

11   to be in Arizona in October of 2016 for that trip that she

12   was very excited about?

13   A.    Yes.  I don't -- I don't know if they were still

14   planning on coming, you know, except for the fact that she

15   had been deceased now.

16   Q.    Right.  Well, my question is:  You were aware that

17   Bianca's close family was scheduled to be in Phoenix in

18   October of 2016.

19   A.    Yes, I guess.  I don't know that the -- that was where

20   the wedding was.

21   Q.    Did Bianca tell you that her siblings and her family,

22   during that October 2016 trip, were going to stay at her and

23   Dr. Rudolph's home?

24   A.    I don't know where they were going after that.  I know

25   they were going -- coming back and going to the wedding and

CROSS - WOOD

1    then they were coming to Arizona.

2    Q.    Thank you.  Now, I'd like to talk a little bit about

3    why this took place in Arizona.  We spoke about how they had

4    lived there for a number of years and how Bianca's siblings,

5    like you mentioned who she was very close with, were also

6    scheduled to be in Arizona in October of 2016, so I just

7    would like to ask if you think it's reasonable that Bianca's

8    children and Dr. Rudolph would host the funeral there.

9    A.    It depends on where the wedding was supposed to be

10   held.

11   Q.    Ms. Wood, we just discussed how Bianca's family was

12   scheduled to be in Arizona in October of 2016.  So if they

13   were scheduled to be in Arizona at that time and that is

14   where Bianca and Larry lived, would it be reasonable to have

15   the funeral there?

16   A.    I still think, but the -- the multitude of years she

17   lived in Greensburg, it just seemed more reasonable that she

18   would have had it where all of her -- you know, most of her

19   family and friends were.

20   Q.    But she wasn't living in Greensburg at the time,

21   correct?

22   A.    No, but it wasn't that long ago.

23   Q.    Right.  I think we discussed four years.

24         You've said that it was surprising to you that her

25   funeral service didn't take place in a Catholic church; is

402

CROSS - WOOD

1    that right?

2    A.    Correct.

3    Q.    Were you aware that the chapel where the service was

4    held was, in fact, on the property of a Catholic church?

5    A.    I knew it was -- you know, was attached to, you know,

6    some religious order.

7    Q.    Right.  Were you aware that it was a Catholic retreat

8    property that consisted of various different chapels,

9    various churches, a prayer center?  It was kind of a big

10   compound.

11   A.    It looked like a big compound.  I didn't spend any time

12   there other than to attend the funeral.

13   Q.    Okay.  Were you aware that that compound worked

14   directly with the Roman Catholic Diocese of Phoenix?

15   A.    No, I was not.

16   Q.    Were you aware that Bianca's children and Larry chose

17   that venue because that's where Bianca actually attended

18   mass from time to time?

19   A.    No, I was not aware.

20   Q.    Were you aware that the services were going to be held

21   in a smaller chapel because there was a lot of construction

22   going on in that compound?

23   A.    No, I . . .

24   Q.    Do you remember Bianca's daughter, AnaBianca, who's

25   here in court today, sending you a text message on

CROSS - WOOD

1    October 21st, 2016 at 3:07 p.m. with the information on the

2    service?

3    A.    I don't exactly remember exactly how it was.  I do know

4    that I'd asked Ana to let me know so that I can attend her

5    services, yes.

6    Q.    Do you remember her sending you a map with instructions

7    on how to get to the chapel and telling you that there was

8    construction on the main part of the compound?

9    A.    Nothing about construction.  I just, you know, got the

10   address, and I didn't want to bother her with any details

11   and I assumed I could get there myself.

12   Q.    Okay.

13             MS. DOYLE:  Your Honor, I'd like to show the

14   witness a screenshot of the conversation that I'm

15   referencing.  May I give a copy to the Government, to

16   co-counsel, and one for the Court?

17             THE COURT:  Has this been labeled with an exhibit

18   label?

19             MS. DOYLE:  No, Your Honor.

20             THE COURT:  Okay.  You are giving this to refresh

21   recollection?

22             MS. DOYLE:  Yes, Your Honor.

23             THE COURT:  Please give a copy to Government

24   counsel and to Ms. Guerra.

25   BY MS. DOYLE:

404

CROSS - WOOD

1    Q.    Ms. Wood, I'd like you to just take a moment to look

2    over that -- that conversation.  Please let me know once

3    you've been able to review it.

4    A.    Yeah.  Yes.

5    Q.    Okay.  And after reading this, do you remember how

6    AnaBianca let you know that there was construction going on

7    and she drew, you know, on the map that there was

8    construction going into the main part of the property?

9    A.    You know, I -- I mean, I see this now, but I don't

10   remember this, you know, *per se*.

11   Q.    Okay.  But you would agree that that's what was in the

12   message?

13   A.    You know, I'm sure that that's probably what she sent

14   me, yes.

15   Q.    Okay.  Thank you so much.  So moving on, Mr. Reyes,

16   could you please put on the screen what has been previously

17   admitted into evidence as RA-6.

18          And while he's doing that, Ms. Wood, I know you've

19   said before how important St. Theresa was to Bianca.  I

20   think you mentioned she -- that was Bianca's patron saint,

21   correct?

22   A.    Yes, it was.

23   Q.    And the family knew how important this was to Bianca as

24   well, because -- I want you to take a look at the screen in

25   front of you.  Do you recognize this prayer card?

405

CROSS - WOOD

1    A.    I don't really recognize that as being part of the

2    thing that we were given.

3    Q.    Okay.  Is it possible --

4    A.    Oh, yeah, actually now I see the top of it.  Yes.

5    Q.    So these were the prayer cards that were made available

6    to friends and family at Bianca's funeral service.  You

7    remember that?

8    A.    I -- you know, I was not raised Catholic so I'm not

9    really sure what it -- that that was -- you know, if it was

10   a prayer card.  I was not aware that that was what that was.

11   Q.    Okay.  And if you see at the top, do you see that

12   Dr. Rudolph and his children personalized this prayer card

13   with Bianca's name?

14   A.    Yes, I see that.

15   Q.    And do you see the prayer underneath?

16   A.    Yes, it's a prayer, but I don't know.  It doesn't say

17   anything about a mass being said for her.

18   Q.    Right.  Well, this is -- this is, again, her patron

19   saint who you've told us you're aware of.  This is a prayer

20   from that patron saint.  So do you recall seeing this at the

21   funeral at any point?

22   A.    If that was on the little -- that then, yes.

23   Q.    Okay.  Thank you, Mr. Reyes.  You can take that down.

24         At the funeral service, did Dr. Rudolph give a

25   eulogy?

CROSS - WOOD

1    A.    Yes, he spoke.

2    Q.    Did Bianca's children speak?

3    A.    Yes, they did.

4    Q.    And after the service, Dr. Rudolph hosted a gathering

5    at his home; is that right?

6    A.    Correct.

7    Q.    Did you attend that gathering?

8    A.    Yes, I did.

9    Q.    Mr. Reyes, can you please put on the screen what's been

10   previously admitted into evidence as RA-8.

11         Now, Mrs. Wood, do you recognize kind of the

12   setting here?

13   A.    Yes, I do.  This was at their home in -- in Arizona.

14   Q.    And we can kind of see that there was photos displayed

15   of Bianca and the family; is that correct?

16   A.    Correct.

17   Q.    And there was food that Dr. Rudolph had ordered for --

18   you know, for the family, for friends.

19   A.    Yes.

20   Q.    Okay.  Mr. Reyes, can we just go to the next picture,

21   please.  To the next one, please.  Next.  To the next one.

22   Again, more of, you know -- there we go.  We can stop there.

23         Do you see the flowers on the screen?  Do you

24   recognize that from the gathering?

25   A.    Yes, I do.  That was also there at her service.

CROSS - WOOD

1    Q.    And Larry hosting, you know, Bianca's friends and

2    family, you would agree that he wasn't trying to avoid

3    getting together with everybody.  I mean, he was hosting

4    everybody, right?

5    A.    Yes.

6    Q.    And he, you know, welcomed Bianca's family, his family,

7    her closest friends into the home.

8    A.    Correct.

9    Q.    You said Bianca's closest friends were there, right?

10    A.    As far as I knew.  I know that, you know, Bianca had

11    said that she didn't have a lot of friends, you know, when

12    her children were younger, and these were the ones that I

13    knew that were her friends that she had met through the

14    school that our children went to.

15    Q.    Okay.  And her siblings were also there.

16    A.    Yes, but I did not talk to his brother.

17    Q.    Okay.  By the way, Ms. Wood, do you know if a woman

18    named Cassandra Olmstead was at the funeral?

19    A.    I don't recall her being there.

20    Q.    Ms. Wood, you said on direct -- you know, as we sit

21    here, six years later -- that the service and the day that

22    Bianca's children and Larry arranged was not what she would

23    have wanted; is that right?

24    A.    I was just surprised at -- you know, that, you know,

25    the lack of, you know, any type of postmortem and

CROSS - WOOD

1    circumstance, and I was also surprised at the dates.

2    Q.   But at the time of this funeral, in fact that same day,

3    you said that this was a beautiful tribute to Bianca.  Do

4    you remember that?

5    A.   No, I do not specifically recall saying that.  I was

6    glad to see that there was something done for her, yes.

7    Q.   Do you remember saying in a text message to Bianca's

8    daughter, AnaBianca, on October 22d, 2016, the same day as

9    the funeral, around 8:25 p.m., it was that night, that this

10   was a beautiful tribute to her mother?

11   A.   I was trying to comfort Ana.

12   Q.   So do you remember saying that?

13   A.   I'm sure I said something of that nature.

14   Q.   Okay.  Do you also remember expressing to AnaBianca

15   that you enjoyed all of the beautiful pictures of the family

16   and that it was so lovely to see all of the great times that

17   this family had together?

18   A.   Yes, I was very happy to see all the -- all of the

19   lovely pictures of them as a family.

20   Q.   After the funeral, Mrs. Wood, do you remember seeing --

21   sending Dr. Rudolph text messages just checking up on him,

22   sometimes on Bianca's birthday, sometimes around the

23   holidays?

24   A.   Yes.

25   Q.   Bianca traveled quite a bit overseas without

CROSS - WOOD

1    Dr. Rudolph; is that right?

2    A.    She traveled a couple of times with me.

3    Q.    Did she ever go on hunting trips without Dr. Rudolph?

4    A.    On a few occasions.

5    Q.    Ms. Wood, did Bianca ever confide in you that she had

6    an affair?

7    A.    Yes, at one point.

8    Q.    Okay.  Now, Mrs. Wood, you were very good friends with

9    Bianca.  But isn't it fair to say that there was a --

10   there's a good amount that you didn't know about her, right?

11   A.    Well, I don't know.  I mean, I know -- I know what she

12   told me, and, like I said, she revealed a lot to me.

13   Q.    Right.  And this is perfectly normal.  We can be

14   friends with people and still not know all of the intimacies

15   of their lives, would you agree?

16   A.    Of course.

17   Q.    Especially with someone like Bianca who you've said was

18   a private person.

19   A.    Well, I didn't specifically say that but, you know,

20   I -- like I said, she did, you know, tell me a lot of

21   private things about her life.

22   Q.    Ms. Wood, you didn't know that Bianca was unfaithful to

23   Larry, not just once, like you told the FBI, but multiple

24   times?

25   A.    I was not aware of that, no.

CROSS - WOOD

1    Q.    And you were not aware that after Dr. Rudolph found out

2    that Bianca had been unfaithful for a second time, that the

3    couple signed a postnuptial agreement?

4    A.    I -- I just knew that she -- you know, I -- that

5    wouldn't surprise me.

6    Q.    But it's not something that she told you about.

7    A.    I don't know.  I can't recall.

8    Q.    Okay.  And, again, Ms. Wood, you didn't know that she

9    had a will which expressly stated that she wanted to be

10    cremated, right?

11    A.    I just -- that just really surprises me that she would

12    have said that because I -- at the time, you know, she may

13    have changed her mind, but that just -- that surprised me

14    that she would have changed her mind on something that

15    was -- seemed so important to her.

16    Q.    Right.  Ms. Wood, but my question was that --

17            MR. GREWELL:  Objection, Your Honor.  I think this

18    was asked and answered earlier.

19            THE COURT:  Sustained.

20            MS. DOYLE:  I have no further questions, Your

21    Honor.

22            THE COURT:  Any questions, Mr. Dill?

23            MR. DILL:  Just briefly, Your Honor.

24            THE COURT:  All right.

25                        CROSS-EXAMINATION

411
REDIRECT - WOOD

1    BY MR. DILL:

2    Q.   Good afternoon, Ms. Wood.  I think you said you were

3    not raised Catholic; is that right?

4    A.   Correct.

5    Q.   Were you aware that since 1963, it's appropriate for a

6    Catholic to be cremated?

7    A.   Well, that was one reason why I had my husband

8    cremated, but he wasn't super religious.

9    Q.   Okay.  But it's your understanding it's perfectly

10   appropriate for Catholics to be cremated since 1963?

11   A.   That's my understanding, yes.

12          MR. DILL:  Thank you.

13          THE COURT:  Redirect.

14                    REDIRECT EXAMINATION

15   BY MR. GREWELL:

16   Q.   Would Bianca have wanted a mass?

17   A.   I believe so, yes.

18   Q.   We heard about how Dr. Rudolph and the children spoke.

19   All told, how long was the memorial service?

20   A.   Probably a half an hour to 40 minutes.

21   Q.   Did the priest perform any Catholic funeral rite?

22   A.   No.

23          MR. GREWELL:  No further questions, Your Honor.

24          THE COURT:  All right.  May this witness be excused

25   for the Government?

412
DIRECT - DeFRANCE

1      MR. GREWELL:  Yes, Your Honor.

2      THE COURT:  For Defendant Rudolph?

3      MS. DOYLE:  Yes, Your Honor.

4      THE COURT:  All right.  For Defendant Milliron?

5      MR. DILL:  Yes, Your Honor.

6      THE COURT:  All right.  Ms. Wood, thank you so much

7  for your testimony.  You're excused.  You may step down.

8      THE WITNESS:  Thank you.

9      THE COURT:  Government may call its next witness.

10      MR. WINSTEAD:  Thank you, Your Honor.  The United

11  States calls Special Agent DeFrance.

12      COURTROOM DEPUTY:  Please raise your right hand.

13      CHARLES DeFRANCE, GOVERNMENT WITNESS, SWORN

14      COURTROOM DEPUTY:  Please be seated and remove your

15  mask.  Then state your full name for the record and spell

16  your first and last name for us.

17      THE WITNESS:  My name is Charles S. DeFrance.

18  First name C-h-a-r-l-e-s, last name, D-e, capital

19  F-r-a-n-c-e.

20      THE COURT:  You may proceed, counsel.

21      MR. WINSTEAD:  Thank you, Your Honor.

22                   DIRECT EXAMINATION

23  BY MR. WINSTEAD:

24  Q.   Good afternoon, Special Agent.

25  A.   Good afternoon.

413

DIRECT - DeFRANCE

1    Q.    Where do you work?

2    A.    I work for the Federal Bureau of Investigation here in

3    Denver, Colorado.

4    Q.    What's your role there?

5    A.    I'm a special agent.

6    Q.    What specific assignment do you have?

7    A.    My current assignment is as the senior team leader of

8    the Evidence Response Team, or ERT.

9    Q.    What does that mean?

10   A.    The Evidence Response Team is the FBI's field evidence

11   collection unit.  So we're responsible for responding to

12   crime scenes and processing the crime scenes, documenting

13   them, and processing evidence from them.

14   Q.    Is that what might, in other agencies, be called CSI?

15   A.    Yes.

16   Q.    Okay.  Is that a collateral duty or is that your

17   full-time duties with the FBI?

18   A.    It is my full-time duty.

19   Q.    How were you first approached to be involved in this

20   case?

21   A.    I was contacted by the case agents for this case, so on

22   various occasion, and we discussed some of the evidence

23   potential of the case, reviewed the scene photos, and

24   discussed different types of evidence that might be of use

25   in the investigation.

414

DIRECT - DeFRANCE

1    Q.    Eventually what did they ask you to help them do?

2    A.    Eventually we worked on creating test patterns using a

3    shotgun, equivalent to the shotgun from the shooting, to

4    make test patterns to provide to a medical examiner or

5    someone else versed in wound ballistics.

6    Q.    When you say "pattern," what do you mean?

7    A.    When a shotgun is fired, it has multiple projectiles

8    and those projectiles spread out over distance, and they

9    create a pattern of defects in a target.

10   Q.    So when you set about to do these test shots and create

11   test patterns, what were your goals in the process?

12   A.    Our goals were simply to do a very methodical,

13   well-documented, and transparent set of tests that would

14   produce patterns at known distances under very controlled

15   conditions.  And then be able to provide that to, again,

16   somebody versed in wound ballistics that could evaluate

17   them.

18   Q.    So did you end up doing test shots?

19   A.    Yes, we did.

20   Q.    We'll talk in more detail later about the specific

21   shots, but is setting up firearms for test shots at targets

22   like this something that you had done before?

23   A.    Yes, I had.

24   Q.    And had you received training on how to do these sorts

25   of shots?

415

DIRECT - DeFRANCE

1    A.    Yes, sir.

2    Q.    And specifically for the process of doing what you

3    said, a methodical, well-documented process?

4    A.    Yes, sir.

5    Q.    Okay.  When you eventually did the test shots, did your

6    process conform with what your training had been as far as

7    how to set up the process, document it, et cetera?

8    A.    Yes.

9    Q.    Now, did you do several rounds of testing in this case?

10    A.    We did do several rounds.

11    Q.    What were the conditions that you were trying to

12    replicate for your testing?

13    A.    We were trying to use the same type of weapon, so the

14    same make and model of shotgun, the same barrel length, and

15    the same choke in the barrel.  The same type of ammunition

16    that was used in the shooting.  And the same type of soft

17    case that the shotgun was fired in.

18    Q.    Did you -- well, was one of the aspects of your testing

19    determining where in the soft case the shotgun may have

20    been?

21    A.    Yes.  We could tell from the crime scene photos that

22    the gun went off inside of the soft case, so we -- part of

23    what we were trying to do was determine what was the likely

24    approximate position of the muzzle inside of the soft case.

25    Q.    Once you tried to control for those conditions, what

DIRECT - DeFRANCE

1    was the main variable that you were interested in -- in

2    varying throughout the different tests?

3    A.    Once we fixed those variables, the only thing that we

4    changed from shot to shot was the distance between the soft

5    case and the target.

6    Q.    Okay.  Now, you said you wanted to have a similar

7    shotgun, ammo, and case.  Did you have access to the actual

8    shotgun?

9    A.    We did not.

10   Q.    What did you use?

11   A.    Investigators in the case were able to obtain a

12   Browning Auto 5 of the same make and model and all the same

13   characteristics.

14   Q.    Do you personally have any independent knowledge about

15   whether the shotgun is -- that shotgun is actually the same

16   of -- as the original?

17   A.    I do not.

18   Q.    What about the ammo you used in your first rounds of

19   testing?

20   A.    It was ammunition that was identified by Federal and

21   provided to us for the testing as the same -- as being the

22   same as the ammunition that was used during the shooting.

23   Q.    Same question:  Do you have any independent knowledge

24   about -- well, at the time when you did that testing, did

25   you have any specific knowledge about whether that

DIRECT - DeFRANCE

1    ammunition was the same?

2    A.    No, I was going off the word of Federal.

3    Q.    And what about the case?

4    A.    Likewise, the -- we were able to obtain --

5    investigators were able to obtain equivalent cases for the

6    manufacturer that made the same case that was used in the

7    shooting, and those were provided to us.

8    Q.    So you mentioned before one of the questions you had to

9    answer was where inside the case the shotgun may have been.

10   In your original rounds of testing, what did you do to try

11   to figure that out?

12   A.    Initially we fired the shotgun in different positions

13   inside of the soft cases and compared the damage to the

14   damage that we could see from the scene photos, which

15   unfortunately only showed one side of the case and not

16   particularly close-up, and only from the outside.

17   Q.    What, based on that, did you -- well, so when you did

18   that process, did you arrive at a distance -- or placement

19   inside the case that you thought was consistent with those

20   photos?

21   A.    Yes, we did.  We fell upon a distance back from the

22   front edge of the soft case of half an inch.

23   Q.    Why did you arrive at that?

24   A.    Again, just looking at the damage that we were seeing

25   at that distance compared to other distances, we did it all

DIRECT - DeFRANCE

1    the way into the case, as far as it would go; and we did an

2    inch back and 2 inches and 3 inches; I think perhaps as far

3    as 4 inches.  And the damage was different -- just

4    qualitatively very different from what we were seeing in the

5    scene photos.  So we thought the most consistent was the

6    half-inch back.

7    Q.    Once you decided on half an inch, did you use that

8    placement for all of your initial series -- series of

9    testing?

10   A.    Yes, we did.

11   Q.    Do you know how many shots you did total in those

12   rounds?

13   A.    I believe it was 42.

14   Q.    Eventually did you gain access to the original -- the

15   original soft case from the incident?

16   A.    Yes, we did.

17   Q.    How did that happen?

18   A.    We were notified that the defense had the case and were

19   going to provide it to us to examine, and we traveled to

20   Phoenix, Arizona to examine the case.

21   Q.    When was that?

22   A.    That was at the end of April of this year.

23   Q.    I'd like to show you what's already been admitted as

24   Government's Exhibit 16, page 4, please.

25          Is this what you were describing in the scene

DIRECT - DeFRANCE

1    photos?

2    A.    Yes.

3    Q.    Now, we'll look at the photos of the case you examined

4    in a moment.  But based on the photos that you have from the

5    scene, do you believe that it is, in fact, the same case

6    from the scene?

7    A.    Yes, I do.

8    Q.    Okay.  When you do exams of evidence like this, are

9    there procedures that you follow?  Like the original case

10   when you examined it.

11   A.    Yes.  When we -- whenever we're examining evidence, we

12   want to think about preserving that evidence.  Making sure

13   that we're not contaminating it and making sure that we're

14   being careful to preserve any evidence that might be coming

15   off of it.  Depending on the exam, that could be things like

16   trace evidence, which is very small, and you want to be

17   careful about potentially losing that during an exam.

18   Q.    Do you take precautions with how you handle it?

19   A.    Yes, we do.

20   Q.    When you're doing a visual examination, is there

21   anything you need to make sure you have available?  Do you

22   need adequate lighting?

23   A.    Yes.  So in -- we want to make sure that we have good

24   lighting.  We want to make sure that we have a clean working

25   surface to work on, and something that would catch anything

DIRECT - DeFRANCE

1    that would potentially come off of the evidence.

2    Q.    What do you use to do that?

3    A.    So we typically use brown paper.  So a very large roll

4    of brown paper.  And we rip off a sheet and put that down

5    and use that as a clean catch for anything that might come

6    off of the evidence.

7    Q.    Do you use gloves?

8    A.    Yes.

9    Q.    When you first arrived at the place where you were

10    doing the examination, did you -- how was the evidence case

11    provided to you?

12    A.    It was delivered to us in a cardboard box; it was an

13    unsealed box.  And then the soft case, itself, was inside,

14    kind of folded in half, and inside of a black garbage bag.

15    Q.    I'd like to display what's already been admitted as

16    Government's Exhibit 205.

17            Can you tell me what this is.

18    A.    This is a photograph that I took of the packaging as it

19    was provided to us, with the soft case inside still.

20    Q.    Next photo, please.

21            MR. MARKUS:  Garreth, they can't see, the jury.

22            MR. WINSTEAD:  Can you go back to the first one,

23    please.  Next picture, please.

24    BY MR. WINSTEAD:

25    Q.    What is this?

DIRECT - DeFRANCE

1    A.    This is the original evidence soft case after it had

2    been removed from the packaging it was provided in.    I

3    placed it on the brown paper and had begun the

4    examination -- just the documentation, really, at this

5    point, of that soft case.    Taking photos of it.

6    Q.    Next photo, please.    No, not next exhibit; still on

7    page 205.    Next page of 205.    Now next page of 205.    This is

8    page 2.    Next.    Next.    Next.

9         What's visible in these photos?

10   A.    So this is the original evidence soft case.    As

11   mentioned before, it was folded and inside of a garbage bag,

12   and here you can see the garbage bag and that cardboard box.

13   Q.    Do you know if there is a way to change it so you can

14   see only one page at a time, even on the side?    Okay, for

15   right now it's okay, you can zoom out of that and we'll go

16   through some of these photos.

17        All right.    So back on Exhibit 205.    All right.

18   And please take to -- go back to where you were.    Keep going

19   down.    Keep going down.    All right.

20        What are these pictures we're looking at?

21   A.    So this is the original soft case inside of the inner

22   packaging, which was that black garbage bag that's been

23   removed from the box.    The box was set aside and now I

24   placed it on that clean brown paper to begin documenting

25   it.

DIRECT - DeFRANCE

1    Q.    All right.  Go down to the next couple of pages.  All

2    right.  What do we see -- that's page 8 -- of Exhibit 205?

3    A.    That is the inner packaging, the garbage bag, alongside

4    the original soft case laid out on the brown paper.

5    Q.    So we got a little preview of it.  Luckily that had

6    already been admitted as well.  Government's Exhibit 206,

7    page 1, please.  All right.

8         Now once you had the original soft case out, what

9    did you do?

10   A.    At this point, the first step was just to

11   photographically document it before we did any additional

12   examination of it.  I -- another person was with me, Thomas

13   Griffin, who is a blood-stain-pattern analyst, and he was

14   going to do an exam of it.  So I did the initial

15   documentation of it first before it went to him for his

16   examination.

17   Q.    What -- why the yellow rulers?

18   A.    Just to provide a scale in the photographs so if you

19   need to measure anything off of this, you can see what the

20   scale was.

21   Q.    All right.  Can we go to page 2 of this, please.

22   Page 3.  What does this show?

23   A.    This shows the front end of the original evidence soft

24   case with the damage from the discharge of the shotgun.

25   Q.    Do you see on the left of where it says "Gander

DIRECT - DeFRANCE

1    Mountain," any black writing?

2    A.    Yes.    There's some black markings there of some sort.

3    Q.    And does -- did that appear to match black writing --

4    similar black writing in the scene photos?

5    A.    It does.    Those markings were visible in the scene

6    photos.

7    Q.    Go to page 4, please.    5.    Next.    Next.    All right.    Go

8    ahead and just page through to the end, pausing a little bit

9    on each picture.    All right, stop.

10            Now, is this a -- is this a view you had seen

11    before examining this -- examining the case in person?

12    A.    I'm sorry, could you reword the question?

13    Q.    Yeah.    Had you seen the inside of the original case

14    before you were examining it here?

15    A.    No, this was the first time that we got to see the

16    inside of the case.    As mentioned before, the only images we

17    had were from the scene photos that only showed one side of

18    the case as it lay on the ground in the scene.

19    Q.    All right.    Can you please do the same thing, click

20    through the photos, and I'll tell you if I want you to stop.

21    All right.    Now, go ahead and take that down.

22            During your -- this initial examination that you

23    did and the photographing, did you find any debris?

24    A.    Yes.    During that initial photographing phase when we

25    first pulled out the soft case and had it on that first

DIRECT - DeFRANCE

1    piece of brown paper, once I had documented it well, I was

2    passing it over to another sheet of brown paper on a table

3    so that Thomas Griffin could have an opportunity to conduct

4    his examination.  And when I was doing that, I noticed that

5    there was some debris that had fallen off of the case onto

6    that brown paper.

7    Q.    Could you please bring up what's already been admitted

8    as Government's Exhibit 209.

9          Is this it?

10   A.    Yes, it is.

11   Q.    What did you do with that?

12   A.    I gathered it up on that brown paper and packaged it in

13   that brown paper, folded it up, and preserved it.

14        MR. WINSTEAD:  Ms. Guerra, may I ask you to get

15   three physical exhibits and provide them to the witness.

16   It's 202, 203, and -- 202, 203, and 204, please.

17        THE COURT:  Do you want them all at the same time

18   or one at a time?

19        MR. WINSTEAD:  All at the same time and I'll

20   discuss them --

21        THE COURT:  Okay.

22        MR. WINSTEAD:  Thank you.

23   BY MR. WINSTEAD:

24   Q.    All right, sir, can you look at 202, please.  And you

25   may have to open it out of that envelope.

425

DIRECT - DeFRANCE

1   A.   Yes, sir.

2   Q.   Is that the debris that you collected on that day?

3   A.   Yes.   I labeled it item 1; it has the file number, the

4   date of 28th of April, 2022, and my initials.

5   Q.   Thank you.   After collecting that, did Mr. Griffin

6   conduct an exam?

7   A.   He did.

8   Q.   What was he looking for?

9   A.   He was looking for any blood-stain patterns or traces

10  of blood on the soft case.

11  Q.   Can you please bring up what's already been admitted as

12  Government's Exhibit 208.

13       Are these the photos documenting his examination?

14  A.   Yes.   During his exam, I basically served as his

15  photographer, so I followed his lead on anything that he

16  wanted documented photographically.

17  Q.   Did he use a particular tool to take these photographs?

18  Was the camera in anything?

19  A.   For this, we had mounted the camera in what's called a

20  copy stand.   So it's a vertical column that you can mount

21  the camera on that holds the camera directly over the item

22  of evidence so that we're getting perpendicular shots to

23  that evidence.

24  Q.   Would you, again, just click through, giving a little

25  pause on each photo.   Thank you.

DIRECT - DeFRANCE

1    So, sir, during that exam, I see a lot of things

2    that appear to have been marked.  Did -- were there any --

3    anything confirmed to be blood or tissue found on the case?

4    A.   No.  Mr. Griffin did not find any positive reactions

5    for blood or anything that appeared to be blood.

6    Q.   Okay.  When you went to move the case off of the table

7    where it had been examined, did you find anything there?

8    A.   Yes.  The piece of brown paper that was underneath the

9    case during Mr. Griffin's examination, I saw another

10   particle that had fallen off onto that.

11   Q.   I'd like to show you what's already been admitted as

12   Government's Exhibit 211.  Is that it?

13   A.   Yes, it is.

14   Q.   What did you label it?

15   A.   I labeled it as item 2.

16   Q.   And can you go to the next page, please.  This same

17   exhibit.  Oh, there's only one page on this.  Okay.  That's

18   right.

19   Can you look at Exhibit 203 up on the -- it's one

20   of the physical exhibits you've got.  And tell me if that's

21   this same particle.

22   A.   Yes, it is.  It's item 2.  Again labeled with the same

23   date and my initials.

24   Q.   Okay.  All right, now did -- what did you -- what sort

25   of photos did you take next?

427

**DIRECT - DeFRANCE**

1          You can take that off.

2     A.   Oh, the -- the next --

3     Q.   I can put it up if that would help.

4     A.   I -- I just had to get my thought together.

5     Q.   Sure.

6     A.   So the next series of photos that we did were close-up

7     photos of the damage to the soft case, and then we also did

8     comparison -- side-by-side comparison photos of the original

9     evidence shot case side-by-side with one of the undamaged

10    shot cases that we had been using for the test-firing that

11    was described earlier.

12    Q.   Can I bring up what's already been admitted as

13    Government's Exhibit 207.

14          Are these those photos?

15    A.   Yes, sir.

16    Q.   All right.  When you examined these, did they appear to

17    be generally the same -- did the two cases appear the same?

18    A.   They did.

19    Q.   Were there any differences in measurements or shape

20    that you noticed?

21    A.   When opened up at the widest part of the curve, they --

22    the -- the evidence shot case was an inch narrower, but

23    other than that, the length and everything else seemed to be

24    consistent.

25    Q.   All right.  Can you please start clicking through these

428

DIRECT - DeFRANCE

1    and I'll pause you when . . .

2              All right.  Pause.

3              Is this what you were describing?

4    A.   Yes.

5    Q.   Can you show me what you mean where at the widest point

6    the evidence case was about an inch narrower.  Are we

7    getting another "Forced Adobe update"?  Okay.  Good.

8              Can you just -- there's a little pen on the side of

9    your screen.  Can you just sort of mark what you're -- what

10   part of the case you're talking about.

11   A.   So what -- when I'm referring to the widest part of the

12   case, it is from here to here, approximately.  And on the

13   undamaged case that was just about an inch wider.

14   Q.   Total between the -- with it opened up?

15   A.   With it opened up.  So folded, it would be half that.

16   Q.   Did they appear to be the same length?

17   A.   They appeared to be the same length, yes.

18   Q.   Okay.  Next photo -- or next -- yes.  Good.  Pause.

19             Why did you take this picture?

20   A.   So this is a photograph of the undamaged -- an

21   undamaged example of the soft cases we were using for the

22   testfires that I had sectioned.  So that's on the right.  So

23   I cut through that to show the construction of the soft

24   cases and do a direct comparison of the construction of the

25   soft cases the Allen Company made for us, compared to the

DIRECT - DeFRANCE

1    original evidence soft case.

2    Q.   And, again, I -- this is page 19 of Government's 207.

3    I need to remember to make a record.

4         Sir -- oh, ma'am, would it be possible to get

5    Special Agent DeFrance what's been marked as Government's

6    Exhibit 217.  It should be in the white case -- in the white

7    box.  Not the one in the front, but the one in the box.

8    Yup.

9         What's that, sir?

10   A.   This is the soft case that we took to Phoenix that I

11   sectioned for this photograph that's on the screen right

12   now.

13   Q.   Is the tip in there?  Is that what you were checking

14   for?

15   A.   Yes, it is.

16        MR. WINSTEAD:  I would move to admit Government's

17   Exhibit 217.

18        THE COURT:  Any objection?

19        MS. MOSS:  No objection.

20        MR. DILL:  No objection, Your Honor.

21        THE COURT:  All right, there being no objection,

22   Government's Exhibit 217 is admitted into evidence and may

23   be published to the jury.

24        (Government's Exhibit 217 received)

25   BY MR. WINSTEAD:

DIRECT - DeFRANCE

1    Q.    And can you go back to 207, page 13.  All right.  Just

2    for purposes of the record, this is Government's exhibit

3    page 13.

4         Is this the photograph you were talking about when

5    you were describing the width -- the comparative widths?

6    A.    Yes, it is.

7    Q.    Okay.  Thank you.  Now, go back to 207, page 19.

8         It looks like -- once we get there -- the foam

9    appears to be a different color.  What do you think about

10   that?

11   A.    The foam is a different color.  I -- I assumed that

12   that was attributable to the difference in the age of the

13   cases.

14   Q.    All right.  After you finished those photos, did you do

15   any further inspection of the packaging?

16   A.    Once we were done with the soft case, I wanted to

17   thoroughly examine the packaging as well.  So I took that

18   garbage bag, shook it out, turned it inside out and shook it

19   out, and also shook out the cardboard box.  Again, all of

20   this over a piece of clean brown paper.

21   Q.    Can you bring up what's already been admitted as

22   Government's Exhibit 213, please.

23        Did you find anything when you did that?

24   A.    Yes, another particle was visible, and when I moved it,

25   it actually separated and it was two particles that were

431

DIRECT - DeFRANCE

1    stuck together.

2    Q.    Can you look at -- you should have in front of you 204.

3    A.    Yes, this is Government's Exhibit 204, my item 3.    Two

4    particles, same date, and my initials on the packaging.

5    Q.    Thank you.    All right, you can take that down.

6            Now, you'd previously made a determination of

7    the -- what you thought was the position of the muzzle in

8    the soft case.    Once you did this examination, did you

9    change your mind about that?

10   A.    At the time of exam, I had some doubts about it

11   because, again, this was the first time that we had gotten

12   to see the inside of the case and it looked, from my memory,

13   different than the test shots that we had already done.    But

14   I needed to go back to the office and look at those original

15   cases from, at that point, a couple of years earlier to

16   confirm that.

17   Q.    When you looked at those earlier cases from the earlier

18   testfires, did you find that there was anything consistent

19   relative to the position of the muzzle inside those cases?

20   A.    So because we knew the position that the muzzle was in

21   in all of those testfires, I was able to look at the damage

22   on the inside of the case and see if there was anything that

23   aligned with that muzzle position.

24           And what I was able to find is that the best record

25   of the muzzle position was the foam itself.    The foam would

432
DIRECT - DeFRANCE

1    either be split or sometimes completely separated from the

2    case right at the location where the muzzle was.

3    Q.    Was there anything else that was consistently true

4    with -- with relationship to the muzzle as far as the parts

5    of the interior of the case?

6    A.    So on the interior of the case, there's this black

7    liner; it's a very thin material.  That was consistently not

8    present in front of where the muzzle had been, and it had

9    also kind of burned -- or melted back behind where the

10   muzzle was.

11   Q.    So did you then go back to the photos of the original

12   case and try to figure out, based on knowing those two

13   things, where the muzzle may have been?

14   A.    Yes, I did.

15   Q.    Would you bring up what's already been admitted as

16   Government's Exhibit 207, page 13, again.

17         Did you do anything with this photo?

18   A.    So using this photo, I took a digital copy of the

19   undamaged case and clipped that out and overlaid it on the

20   damaged case, and aligned those two cases so that I could

21   see the profile of the undamaged case on top of the profile

22   of the damaged case.

23   Q.    Can you please bring up what's already been admitted as

24   Government's Exhibit 221.  And, actually, can you go to page

25   2 of this exhibit.

433
DIRECT - DeFRANCE

1        All right, is this what you were talking about?

2    A.    Yes, sir.

3    Q.    If you wouldn't -- if you wouldn't mind, can you zoom

4    in on just the bottom there.  Perfect.

5        All right, now can you tell me again what you did

6    here.

7    A.    So what you're seeing on the right is a square --

8    roughly square cut-out or copy of the image on the left

9    that's laid down on top of the image -- of the damaged case,

10   the original case, on the right.  And then I've taken that

11   overlay image and made it partially transparent so we can

12   see through it to the damaged original soft case.

13   Q.    Can we go back to page 1 of 221.

14       Is this a close-up of that same image?

15   A.    Yes, sir.

16   Q.    Now, it looks like on the bottom here, it may not line

17   up right; is that -- is that accurate?

18   A.    The -- what initially might look as -- like a mismatch

19   on the bottom edge of that is actually just the shadow of

20   the undamaged soft case that's been overlaid.

21   Q.    And so did you align the edges around stitching and

22   things like that?

23   A.    Yeah.  I was able to zoom in just on the -- on the

24   actual soft case, itself, and line up the edges and the

25   stitching and -- on that -- on that border around the case.

434

DIRECT - DeFRANCE

1       THE COURT:  Special Agent, you -- you can use a

2   stylus if --

3       THE WITNESS:  Oh.

4       THE COURT:  -- it will assist your testimony.

5       THE WITNESS:  Thank you, Your Honor.

6       So I went into this area and this area and made

7   sure they lined up with the stitching and the border that's

8   around that case.

9   BY MR. WINSTEAD:

10  Q.   Now, I see some white lines on here.  What are they?

11  A.   Those are markings that I made to note the -- the long

12  white line on the right is marking the end of the undamaged

13  soft case; and then the two shorter lines are marking the

14  location of the damage on the original shot -- evidence soft

15  case.

16  Q.   That damage to the foam, is that what you were talking

17  about, that aligned with the barrel in the previous testing

18  you'd done?

19  A.   Yes.

20  Q.   Now, how did you measure how far apart those lines

21  were?

22  A.   So in the software, I was able to measure the number of

23  pixels between those two sets of lines.  There was a little

24  bit of a difference on the damage on the top part versus the

25  bottom part; not very much, but I averaged those together.

**DIRECT - DeFRANCE**

1              And then by taking a measurement of the scale

2       that's in that photo, I was able to convert those number of

3       pixels to a number of inches.

4       Q.    What was the result you got?

5       A.    1.8 inches.

6       Q.    And so was that different from your initial estimate of

7       where the firearm may have been?

8       A.    Initially we were firing at half an inch back.

9       Q.    All right.  Would you please bring up what's already

10      been admitted as Government's Exhibit 206, page 14.

11             Did you take a look at the hole right here?

12      A.    Yes, sir.

13      Q.    What did you think that hole was?

14      A.    To me, that looked like just a snag in a tear of that

15      inner lining.

16      Q.    Did you think it was potentially caused by the blast of

17      the shotgun?

18      A.    I did not.  I didn't think it was consistent with the

19      damage that we were seeing from any of the testfires that we

20      had done.

21      Q.    What about it wasn't -- so just to clarify what I'm

22      talking about, did you think it was possible that the muzzle

23      was back in the location of that hole and that that hole was

24      caused when the shotgun was fired?

25      A.    I did not.

**DIRECT - DeFRANCE**

1    Q.    What -- and what was inconsistent with that particular

2    scenario?

3    A.    So, again, looking at all the testfires that we had

4    done, I would -- expected to see significant damage to the

5    foam at that location because, again, the foam seemed to

6    record that muzzle location the best.  There was -- that

7    black inner lining did not survive in front of the muzzle.

8    And it also burned back behind the muzzle some distance.

9    Q.    All right, may I please -- I'm going to be discussing a

10   not-admitted photograph.  Can I have just our monitors.

11   Good?  Okay.  Would you please bring up what's been marked

12   as Government's Exhibit 268.

13            So did you -- despite the fact that you thought

14   that wasn't likely, did you test that scenario out?

15   A.    We did.

16   Q.    What are these photos?

17   A.    This is a photograph for our final round of testing

18   that we did in which we were considering the potential of

19   the muzzle being in the location where that -- what I

20   described as a snag was, which was 4 inches back from the

21   end of the case.  And in this case, the shotgun is angled as

22   described by another theory.

23   Q.    All right.  Can you go to the next picture, please.

24   And just page through them real quick and then I'll ask him

25   about them.

DIRECT - DeFRANCE

1      So as we're looking at them, what are all -- what's

2   this whole series of photos?

3   A.    This is a series of photos documenting the results of

4   those testfires with the muzzle at the 4-inch position.

5   Q.    Do these photos fairly and accurately represent the

6   results of that testing?

7   A.    Yes, they do.

8      MR. WINSTEAD:    At this time, the United States

9   moves to admit Government's Exhibit 268.

10      THE COURT:    Any objection?

11      MS. MOSS:    No objection, Your Honor.

12      MR. DILL:    No objection, Your Honor.

13      THE COURT:    Okay.    There being no objection,

14   Government's Exhibit 268 is admitted into evidence and may

15   be published to the jury.

16      (Government's Exhibit 268 received)

17      MR. WINSTEAD:    All right.    And, Ms. Guerra, may the

18   witness be provided four soft cases.    One of them is 4-1 and

19   it should be laid on there and the other three are in that

20   tall cardboard box.    I forgot he would have to look at those

21   as well to admit them.

22      THE COURT:    You just want one at a time, right?    I

23   mean, it's going to --

24      MR. WINSTEAD:    I was just going to have him look at

25   them all real quick and then get them admitted.

DIRECT - DeFRANCE

1      THE COURT:  You want her to put all these soft

2  cases on top of the witness stand here at the same time?

3      MR. WINSTEAD:  Just so he can look at them.  I'll

4  get them admitted and was going to put the other three back.

5      THE COURT:  Okay.

6      MR. WINSTEAD:  Sorry, Your Honor.

7      THE COURT:  All right.

8  BY MR. WINSTEAD:

9  Q.   Are those the four cases from this round of testing?

10 A.   Yes, they are.

11      MR. WINSTEAD:  At this time, the United States

12 moves for admission of Government's Exhibit 269 through 272.

13      THE COURT:  Okay.  Let's make the record clear as

14 to what 269 through 272 are.

15      MR. WINSTEAD:  Oh, sorry.  I mean, how are we going

16 to distinguish them?

17 BY MR. WINSTEAD:

18 Q.   So, first, if you can look at what's marked as 269.

19 A.   Yes.

20 Q.   Is that one of the cases?

21 A.   Yes.  This is test-fire 4-1.

22 Q.   And 270.

23 A.   270 is the soft case for test-fire -- excuse me, 4-2.

24 Q.   271.

25 A.   This is the soft case from test-fire 4-3.

439
DIRECT - DeFRANCE

1     Q.   272.

2     A.   Is the soft case from test-fire 4-4.

3     Q.   All right, thank you.

4          MR. WINSTEAD:   I'm sorry, ma'am.  We're finished

5     with all except --

6          THE COURT:   Hold on, hold on.  Is there an

7     objection to -- you've moved for them, right, counsel?

8          MR. WINSTEAD:   Sorry.

9          THE COURT:   Is there an objection to Exhibits 269

10    through 272?

11         MS. MOSS:   No objection, Your Honor.

12         MR. DILL:   No objection, Your Honor.

13         THE COURT:   All right.  There being no objection,

14    Government's Exhibits 269, 270, 271, and 272 are all

15    admitted into evidence and may be published to the jury.

16        (Government's Exhibits 269 thru 272 received)

17         MR. WINSTEAD:   Thank you, Your Honor.

18         And, yes, ma'am, we'll just need, for the next

19    part, just 269.  And the other three we won't be referencing

20    again right now.

21    BY MR. WINSTEAD:

22    Q.   All right.  Can you go back to page 2 of the

23    Government's Exhibit 268.

24         Is this a picture of the case that you got up

25    there?

440

DIRECT - DeFRANCE

1    A.    Yes, sir.

2    Q.    Next page.

3          Is this the inside?

4    A.    Yes, it is.

5    Q.    Can you hold up that case just so the jury can see it.

6          So first I'd like to ask you a couple of questions

7    about how you set up this testing, and then we can get back

8    to the physical exhibit.  How did you set it up?

9    A.    So we set it up -- the first two shots in the same way

10   that we had done all of the other shots.  The only

11   difference was we were working off of an alternate theory

12   that the muzzle was 4 inches back at the location of what I

13   described as looking like a snag to me.  So we put it at

14   that position with the shotgun aligned with the -- with the

15   fold of the case.

16   Q.    Did you do two shots with that setup?

17   A.    We did.  4-1 and 4-2 were done in the same way.

18   Q.    And then did you do two other shots with a different

19   setup?

20   A.    We did.

21   Q.    Can you go back to page 1 of Exhibit 268.

22          What's that?

23   A.    So this is the positioning of the shotgun, again with

24   an alternate theory where the muzzle was at 4 inches back

25   from the front of the case, and the shotgun was angled

DIRECT - DeFRANCE

1    approximately to align the charging handle with a small tear

2    on what in the photo would be kind of the lower part of that

3    case near that handle.

4    Q.    And how did you actually shoot this one?

5    A.    This one we weren't able to put in a mount which we had

6    used for all of our testfires.  So in this case, Special

7    Agent Dahlstrom actually held it in this position.  We

8    closed it up, measured the location of the muzzle, and then

9    he carefully loaded and fired the shotgun without the case

10   moving out of position.

11   Q.    Of those four cases, which ones were fired like this?

12   A.    That was 4-3 and 4-4.

13   Q.    Okay.  All right, go back to Government's Exhibit 268

14   at page 3, please.  Actually, next page.  Page 4.

15              What are you measuring here?

16   A.    Here I'm placing a tape measure into that furthest back

17   point of damage in the foam.

18   Q.    You were telling us before about black lining.  Can you

19   point out with the little stylus what you're talking about.

20   A.    So this -- this inner lining on the case, what I was

21   referring to is here you can see that it essentially burnt

22   back behind the location of where the muzzle would have

23   been.

24   Q.    Why did you only do four shots with -- at this -- with

25   this sort of test?

442

DIRECT - DeFRANCE

1   A.   So when we were working with our last set of ammunition

2   that was provided by Federal Cartridge Company, we had only

3   21 shotshells to work with.  We had already used a number of

4   them during the round 3 of testing, so for this we had a

5   very limited number of shotshells left, so we decided to

6   just do two of each.

7   Q.   All right.  And we'll talk about that round 3 of

8   testing.  But when you compared all four of those tests,

9   were any of them consistent with the damage in the original

10  soft case?

11  A.   No.

12  Q.   And when I say "original," it -- is there a better

13  term?  Do you say "evidence shot case"?

14  A.   Sure, the original evidence shot case that was from the

15  shooting in Zambia.

16  Q.   Okay.  Did it make much of a difference what the angle

17  was between the first two and the second two?

18  A.   Not much.  They looked very similar.

19  Q.   All right.  So can you please go back to Government's

20  Exhibit 208 at 20, what's already been admitted.

21          THE COURT:   Okay.

22  BY MR. WINSTEAD:

23  Q.   So why did you think that it looked like a snag or a

24  tear?

25  A.   To me, what I noticed was that there's kind of a

DIRECT - DeFRANCE

1    bunching up of material on this side and it's very thin on

2    the other; almost like it's very worn material.

3    Q.   Where does it look thin and worn?

4    A.   On the -- on the opposite side here.

5    Q.   Does it look like there's another small hole in that

6    area?

7    A.   It does, yes.

8    Q.   Now this material that you were just talking about when

9    you said it's bunched up, was the material actually gone?

10   A.   No, it was present as you see it in the photo.

11   Q.   Can you please bring up 208 at 24.

12        What's this picture of?

13   A.   So this is a photograph of that same lining from the

14   original evidence shot case.  During Mr. Griffin's

15   examination, we obtained permission from defense counsel to

16   actually dissect that part of the case and fold it over, so

17   you're looking at the underside of that same defect in the

18   case.

19   Q.   So the material that went in that hole, was it gone or

20   was it still present here?

21        And can you go to 208 at page 25.

22        What is this?

23   A.   I -- so what you're seeing here is this kind of flap of

24   material that's been laid back out, so it was kind of pushed

25   forward.  And in this photo it's been laid back flat.

444

DIRECT - DeFRANCE

1    Q.    So going back to 208 at 20.

2              Can you sort of -- well, I guess you already

3    said -- what do you think may have caused this?

4    A.    My best guess would just be a snag on probably a

5    firearm as it's being put into the bag.

6    Q.    What about -- do you know what "long recoil" means?

7    A.    I do.

8    Q.    What does that mean, very briefly?

9    A.    Long recoil is a type of a -- sorry.

10   Q.    She just didn't hear me.

11   A.    Okay.  A long recoil is a type of a semi-automatic

12   action in which the barrel and the bolt of a firearm

13   actually move back together a distance.  And in the case of

14   a long recoil, it moves back the length of the cartridge or,

15   in this case, a shotshell, that entire distance before

16   the -- the bolt unlocks from the barrel and then the barrel

17   slides forward separate from the bolt.

18   Q.    So do you know whether or not the long recoil could

19   have been responsible for a snag like this?

20   A.    The long recoil would move the tip of the muzzle

21   backward and then forward again, so that's reasonable.

22   Q.    Did you do -- after you finished your exam --

23             You can take this down.  Thank you.

24             After you finished this exam, did you take back

25   those three items you were describing and do any further

DIRECT - DeFRANCE

1    examination of them?

2    A.    So I took those three debris items that I found during

3    the examination of the soft case -- the original evidence

4    soft case -- and did better photographs of them back in my

5    office under controlled conditions with a scale.

6    Q.    All right.  I'd like to put up Exhibit -- what's

7    already been admitted as Exhibit 209.

8         So I think you said this was item 1 before.

9         Now can you put up what's already been admitted as

10   Government's Exhibit 210.  Next page.

11        What's this?

12   A.    That's a photograph of item 1 as collected from the

13   original evidence soft case.

14   Q.    Did you identify any of these as something important to

15   your inquiry?

16   A.    I couldn't tell what specifically this was.  It looks

17   like an assortment of different debris that came off of the

18   case.

19   Q.    Okay.  All right.  Now what's been already admitted as

20   Government's Exhibit 211.

21        Is this item 2?

22   A.    Yes, it is.

23   Q.    Now, what's already been admitted as Government's

24   Exhibit 212.  Next page.

25        What's that?

446

DIRECT - DeFRANCE

1    A.    That is a photograph of item 2 with a scale.

2    Q.    Next page.   Next.

3          What's that?

4    A.    That's showing that it has approximately 2 millimeter

5    diameter.

6    Q.    All right.   And now what's been admitted as

7    Government's Exhibit 213.

8          Is this item 3?

9    A.    Yes, it is.

10   Q.    Now, what's been admitted as Government's Exhibit 214.

11   Next page.

12         What's that?

13   A.    This is item 3, again photographed back here in Denver

14   with a scale.

15   Q.    Next page.   How big is that?

16   A.    Approximately 2 millimeters in diameter.

17   Q.    What does this look like to you?

18   A.    To me, they have the physical appearance of gunpowder.

19   Q.    Now if there were gunpowder grains in the original soft

20   case, did you believe that -- what did you believe about

21   where they may have come from?

22   A.    The reasonable conclusion was that they came from the

23   discharge of the firearm inside that soft case.

24   Q.    Wouldn't all of the powder have been consumed when the

25   cartridge was fired inside the soft case?

DIRECT - DeFRANCE

1    A.    It's actually typical for some of the gunpowder to not

2    be consumed, and that's something that's used forensically

3    in various situations.

4    Q.    So did you go back and cut apart one of the ammo shells

5    that had previously been given to you by Federal?

6    A.    So after I did these photographs, I pulled out one of

7    the shotshells that we had been provided for that -- those

8    original rounds of test-firing and I just wanted -- because

9    we actually had something to compare it to, just to compare

10   the powder and make sure that it was consistent.

11   Q.    Can you please bring up what's been admitted as

12   Government's Exhibit 215.  All right.  And go ahead and

13   cycle through these until I tell you to stop.

14           Did you take these photos?

15   A.    I did.

16   Q.    Is this the ammo that Federal had previously provided?

17   A.    It is.

18   Q.    Go ahead and stop.

19           What's this?

20   A.    This is the gunpowder from the previously provided

21   Federal shotshells.

22   Q.    And this is page 18 of Government's Exhibit 215.

23   Please keep going.

24           What's this?

25   A.    This is one of those powder grains placed on the same

448

DIRECT - DeFRANCE

1    scale that I was using for the items 2 and 3.

2    Q.    Next picture.

3          How big is it?

4    A.    Approximately 1 millimeter in diameter.

5    Q.    How does that compare to the items you recovered from

6    the original soft case?

7    A.    About half the diameter.

8    Q.    Okay.  Did you provide -- or did Federal identify the

9    type of powder that you had found in the original soft case?

10   A.    I provided these images so that they could be shared

11   with Federal so that they could determine why it was

12   inconsistent.

13   Q.    And did they send you new ammunition?

14   A.    They did.

15   Q.    How did they -- did you learn whether they matched the

16   components from the original crime scene to the ammunition

17   they provided you?

18   A.    I was told that the new set of ammunition was matching

19   the powder that was recovered from the evidence soft case,

20   as well as the components that were recovered at autopsy.

21   Q.    I've got another one to discuss with him that hasn't

22   been admitted yet.  Good.

23          I'd like to show you what's been marked as

24   Government's Exhibit 273.  What are these photos?

25          And go ahead and click through.

449

DIRECT - DeFRANCE

1    A.    These are photographs of the new set of ammunition that

2    was provided by Federal.  Again, matching all of the known

3    components of the shotshell that was used in the -- in the

4    fatal shooting.

5    Q.    Did you take these photos?

6    A.    I did.

7    Q.    Do they fairly and accurately represent the shotshell

8    you were disassembling here?

9    A.    They do.

10            MR. WINSTEAD:  The Government moves for admission

11   of Exhibit 273.

12            THE COURT:  Any objection?

13            MS. MOSS:  No objection.

14            MR. DILL:  No objection, Your Honor.

15            THE COURT:  All right.  There being no objection,

16   Government Exhibit 273 is admitted into evidence and may be

17   published to the jury.

18        (Government's Exhibit 273 received)

19            MR. WINSTEAD:  Thank you, Your Honor.

20   BY MR. WINSTEAD:

21   Q.    So can you go back to page 1 of 273.  And we'll go

22   through.  All right.  Next page.  Next page.  Next.  Next.

23   Next.  All right.

24            What is this?

25   A.    This is one of the shotshells that has been sectioned

DIRECT - DeFRANCE

1    to remove essentially a window of the case so that you can

2    see some of the components that are inside.

3    Q.    What's that white plastic thing sticking out?

4    A.    It's a -- there -- the solid white plastic item is a

5    shot cup, and then the granular items are a buffer material

6    that's mixed in with the shot.

7    Q.    All right.  Next page.

8              MS. MOSS:  Excuse me, what page is that?

9              MR. WINSTEAD:  Sorry, go back one page.  That was

10   Government's Exhibit 6.  Thank you for reminding me.

11   BY MR. WINSTEAD:

12   Q.    Next.  Next.  Next.

13             Now, what -- this is Government's Exhibit 273,

14   page 9.  What is this a photo of?

15   A.    This is that same shotshell, but at this point in

16   disassembly I have already removed the buffer material, the

17   shot that's inside, and the shot cup.  And what's left here

18   is a wad, which is that pinkish, orangish circular item in

19   the base there, and then underneath that is the gunpowder.

20   Q.    Next page.

21             What happened in this?  This is page 10.  What did

22   you do to obtain this photo?

23   A.    So this is with that plastic wad removed and now you

24   can see the gunpowder underneath.

25   Q.    Next page.  Next page.  Next.  Next.  Next.  This is

451

DIRECT - DeFRANCE

1    Government's -- this is page 15.

2            Is this what you were describing as the shot cup?

3    A.    Yes.

4    Q.    Next page.  What -- this is page 16.

5            What would you call this?

6    A.    It would be called an over-powder wad.

7    Q.    Next.  Next.

8            Did this powder appear to be consistent with items

9    2 and 3 that you recovered from the original soft case?

10   A.    It did.

11   Q.    Thanks.  Take it down.

12           Now how many rounds did you say you got from

13   Federal?

14   A.    I believe it was 21.

15   Q.    Why so few?

16   A.    What I was told is that they had a very limited number

17   of that pinkish over-powder wad and they basically used

18   every one that they had in their inventory to make that last

19   round of shotshells for testing.

20   Q.    So now that you had a new muzzle position in the bag

21   and new ammo, did you do new tests?

22   A.    We did.

23   Q.    Why didn't you just use the old tests?

24   A.    Because there's a discrepancy in the components, I

25   didn't feel it would be as reliable.

452

DIRECT - DeFRANCE

1    Q.    So first of all, when you did the additional shots with

2    the muzzle at 1.8 inches from the tip of the bag, was the

3    damage inside generally similar to the original evidence

4    case?

5    A.    It was generally similar.  There are variations from

6    shot to shot, but what is consistent is the location of that

7    damage in the foam.

8    Q.    And in any of those shots, does the thin liner material

9    survive in front of the muzzle?

10   A.    No, it's always absent from in front of the muzzle and

11   kind of melted back behind it.

12              MR. WINSTEAD:  May I have just a moment, Your

13   Honor?

14              THE COURT:  You may.

15   BY MR. WINSTEAD:

16   Q.    All right, I would like you to show me one thing real

17   quick.  Well, first of all, let's look at a couple of

18   photos.

19              I'd like to pull up what's already been admitted as

20   Government's Exhibit 222, page 20.

21              What is -- what's on the screen?

22   A.    This is a title page showing the next photos are test

23   specimens 3-3.

24   Q.    All right.  Next page, please.  This is page 21 there

25   at the top.  All right.  Can you scroll down a little bit.

453
DIRECT - DeFRANCE

1    Scroll down a little bit more.  All right.

2          On page 23, is that an after-photo of 3-3?

3    A.   Yes, it is.

4    Q.   Okay.  Go down a little bit.  More.  More.  All right,

5    down one more.  All right.  That -- at the top there is page

6    27 of Exhibit 222.

7          Can you tell me what we're looking at there.

8    A.   That is a photograph of specimen 3-3 after the

9    test-firing.  This is the soft case, and it's been opened up

10   to show the interior.

11   Q.   Can you zoom in on the tip there.

12         All right.  Can you show me if you see damage to

13   the foam in the location the muzzle was.

14   A.   Yes.  So right in this area -- not trying to mark over

15   it -- there are splits in the foam here that are in the same

16   location as where the muzzle was because this was a known

17   test-fire, so we knew exactly where that muzzle was located.

18         MS. MOSS:  I'm sorry, what page?

19         MR. WINSTEAD:  This is page 27.

20         MS. MOSS:  Thank you.

21   BY MR. WINSTEAD:

22   Q.   All right.  Thank you.  Now I want to ask you to do one

23   more thing.  Would it be possible to have the witness given

24   what's already been admitted as Government's Exhibit 3 and

25   4.  One of them is the -- actually they're both in that

DIRECT - DeFRANCE

1    other white cardboard box.  One of them is the duplicate

2    shotgun and the other one is an intact case.

3            All right, sir, can you please just show me when

4    you put the duplicate shotgun into that intact case and

5    measure it 1.8 inches back the way you did during your

6    testing.

7    A.   Can I get a tape measure?

8    Q.   I've got a couple of tape measures for when you have a

9    moment.

10   A.   So during the testing, the shotgun was actually mounted

11   in a mount that was also on a table, so it was strapped down

12   so we were doing that consistently and we weren't just

13   hand-holding it.  And then the bag -- the soft case was

14   placed over it.  And then the measurement was taken from the

15   outside -- do you have the tape measure instead?

16   Q.   Yes.

17   A.   That's actually how I did it, so . . .

18   Q.   It's right over there.

19   A.   Perfect.  So with it placed in here, we measure on the

20   outside of the case until we could feel the muzzle in here.

21   So it's pressed up against the muzzle there and almost got

22   it . . .

23           That's right at about 1.8.

24   Q.   Now without moving it, can you tell me where the end of

25   the buttstock is in comparison to the end of the soft case.

DIRECT - DeFRANCE

1    A.    The buttstock is about flush with the back of the

2    case.

3    Q.    Thank you.  All right.  Thank you, we're finished with

4    those exhibits.

5          Now going back to the testing, were you trying to

6    evaluate a specific theory about what happened in recreating

7    these shot conditions?

8    A.    No, we were not.

9    Q.    What were you trying to do?

10   A.    We were trying to account for a range of possibilities

11   from the target being in contact with the soft case all the

12   way out to a distance that seemed to reasonably encompass

13   most theories.  So we went out to 5 feet on the last

14   round -- or on the third round of testing.

15   Q.    Can you show me what's been admitted as Government's

16   Exhibit 266.  And go to page 3.

17          What is this picture of?

18   A.    So this is a photograph of the setup that we used.

19   This was specifically the setup for test shot 3-1, which was

20   contact with the soft case.

21          So what you're seeing here is the shotgun that's

22   mounted in that mount that's then clamped down to a table.

23   It's strapped into that mount and then the soft case is

24   placed over it.  We would measure the location to get that

25   1.8 inches back.  And then put a clamp over the barrel to

DIRECT - DeFRANCE

1    hold everything in place during the next -- during the rest

2    of the setup.  So the next step would be to position the

3    target at whatever distance we were doing, in this case it

4    was a contact shot, but we would move that at 1 foot

5    increments to get all of our different test patterns.

6         Once the target was set up, then the person that

7    was doing the shooting, in this case Special Agent

8    Dahlstrom, would go into the case, load the shotgun, chamber

9    that shotshell, and then an assistant would remove the

10   clamp.  That way we kept everything in position until the

11   moment that he fired.  So the clamp was removed, everybody

12   moved downrange, and then the shot was fired.

13   Q.   Now you said everyone moved downrange.  Did anyone move

14   uprange?

15   A.   I'm sorry.  You're correct.  Everybody moved behind the

16   muzzle into a safe area.

17   Q.   All right.  Please go to what's been admitted as

18   Government's Exhibit 220, page 3.

19        Was this the first pattern that you created?

20   A.   Yes.  3-0 was a pattern at 30 feet.  And we did not use

21   a soft case, it was just to determine what the pattern was

22   at that distance.

23   Q.   All right.  Would you please cycle through a couple of

24   these photos.  Now go back one, please.  Okay, this is at

25   page 4.

**DIRECT - DeFRANCE**

1              What's on this page?

2    A.    So this is just describing the next series of photos.

3    This is test specimen 3-1.  So this was that contact of the

4    target to the soft case.  But also keeping in mind that the

5    muzzle is still 1.8 inches back from that, so we were taking

6    all the measurements from the end of the soft case, so

7    you'll see 1 foot, 1.8 inches, and so on.

8    Q.    In these whole series of photos, did you review to make

9    sure that the distances recorded matched the test specimens?

10   A.    I did.

11   Q.    Next.  All right.

12              What's this a picture of?

13   A.    This is a photograph of the -- of the test panel for

14   3-1.  So this was contact plus 1.8 inches back in the

15   muzzle -- of the muzzle in the bag, I'm sorry.

16   Q.    If you could just click through a couple more.  Keep

17   going.

18              Why are there different lighting set up for some of

19   these photos?

20   A.    I asked the photographer to get some side lighting to

21   bring out some of the detail and texture of the test

22   shots --

23   Q.    Okay.

24   A.    -- the test panels.

25   Q.    Keep going.  Okay, go ahead and stop.

DIRECT - DeFRANCE

1      Does this series of photos cycle through all of the

2   test shots you did in this round?

3   A.   It does.

4   Q.   How many total shots did you do?

5      Go ahead and go to page 51.  Oh, that's not going

6   to tell you because they're not in order.  That's okay.

7      If they're on here, is this all the shots that you

8   did?

9   A.   These are all the shots that were fired.  I want to say

10  it was like 13 or 14, but I'd have to check my notes.

11  Q.   All right.  So I asked you before -- well, you already

12  said there's 21 rounds, so . . .

13     If you had had access to more ammunition, would you

14  have done additional shots?

15  A.   Yes.

16  Q.   All right.  I'd like to --

17     THE COURT:  Mr. Winstead, you tell me what would be

18  a good -- I don't want to interrupt the logic of -- or flow

19  of your examination.  You tell me when will be a good time

20  to stop.

21     MR. WINSTEAD:  We're very close to being finished,

22  Your Honor.

23     THE COURT:  Okay, let's go.

24  BY MR. WINSTEAD:

25  Q.   All right, could you please play a video exhibit,

DIRECT - DeFRANCE

1    Government's Exhibit -- what's already been admitted as

2    Government's Exhibit 226.  Oh, you want to turn it off.  We

3    don't need sound.

4         (Video played)

5    BY MR. WINSTEAD:

6    Q.    What's this a video of?

7    A.    So this is a video of test shot 3-1.  So in addition to

8    notes and photography of all the test shots, we also ran a

9    high-speed video during the actual test shot.

10   Q.    All right.  And can you play one more video,

11   Government's Exhibit 238.

12        (Video played)

13   BY MR. WINSTEAD:

14   Q.    Is this also a video of one of the tests?

15   A.    Yes, it is.

16   Q.    Now on the Government's exhibit list, this is

17   Government's Exhibit 238, which is described on Government's

18   exhibit list as high-speed video of test 3-5.  Did you

19   review all the videos and compare them to the descriptions

20   on the Government's exhibit list?

21   A.    Yes, I did.

22   Q.    And are all those accurate?

23   A.    They are.

24   Q.    Okay.  And so if a person were to reference the test

25   number and go to the series of photographs of the -- the

460

DIRECT - DeFRANCE

1    pictures of the actual test, would those match up?

2    A.    Yes, they would.

3    Q.    Okay.   Now, from these patterns, did you make any

4    determination about how far the muzzle may have been from

5    the wound?

6    A.    No, I did not.

7    Q.    Why not?

8    A.    That's not a determination that I can make.   The wound

9    that involves wound ballistics, and that requires an expert

10   in wound ballistics, or forensic pathology.

11   Q.    Did -- were these test patterns that you created

12   provided to an expert?

13   A.    Yes, they were.

14   Q.    Who was that?

15   A.    Dr. Stephen Cina.

16        MR. WINSTEAD:   One moment, Your Honor.

17        THE COURT:   Sure.

18        MR. WINSTEAD:   Thank you, Your Honor.   No further

19   questions.

20        THE COURT:   All right.   Folks, we're going to take

21   our afternoon recess.   We'll be in recess for 15 minutes.

22        (Jury left the courtroom at 3:17 p.m.)

23        THE COURT:   All right, Special Agent, since you're

24   in the middle of your testimony, I direct you not to speak

25   with any of the lawyers during the recess.

CROSS - DeFRANCE

1          THE WITNESS:  Yes, sir.

2          (Recess taken 3:18 p.m. to 3:36 p.m.)

3          THE COURT:  Special Agent, I remind you that you

4     remain under oath.

5          THE WITNESS:  Yes, Your Honor.

6          THE COURT:  Cross-examination.

7          MS. MOSS:  Yes, CROSS-EXAMINATION.

8                    CROSS-EXAMINATION

9     BY MS. MOSS:

10    Q.   Good afternoon, Special Agent DeFrance.  How are you

11    doing today?

12    A.   I'm good.  How are you?

13    Q.   I'm well.  Thank you.

14          Agent DeFrance, I'm going to be asking you some

15    questions about this case.  Is that okay?

16    A.   Absolutely.

17    Q.   Now, we heard a lot during your direct examination

18    about your examination of the evidence soft case -- you'll

19    call it the actual soft case -- about debris that was found

20    in that soft case or in that box.  And we saw a lot of

21    photographs of ammunition dissection.  But wasn't it also a

22    big part of your involvement in this case to do a shooting

23    reconstruction?

24    A.   No, ma'am.

25    Q.   So you did testify that you were doing tests in order

462

CROSS - DeFRANCE

1    to create test patterns; is that right?

2    A.    Yes, ma'am.

3    Q.    Okay.  And you were doing testing to try to reproduce

4    the conditions of the shooting death of Bianca Rudolph,

5    correct?

6    A.    We were -- we were creating test patterns using those

7    conditions, yes.

8    Q.    Correct.  And after -- you've written many reports in

9    this case, have you not?

10    A.    Yes.

11    Q.    Because you've done many rounds of testing.

12    A.    Yes, ma'am.

13    Q.    And the first line of every report that you have, you

14    say that "This testing sought to reproduce the conditions of

15    the shooting death of Bianca Rudolph, the victim on

16    October 11th, 2016, in Zambia;" is that correct?

17    A.    Yes.

18    Q.    Now, would you agree that a basic requirement of any

19    sort of experiment or reproduction that you're carrying out

20    is that you want to replicate as near as possible, as

21    closely as possible, the actual facts and conditions from

22    the incident?

23    A.    Yes, ma'am.

24    Q.    And if your reproduction utilizes facts or conditions

25    that are different from the evidence or the facts at the

463

1    scene, then those results could be unreliable or inaccurate;

2    is that correct?

3    A.    I think that's true.

4    Q.    Now, again, you did a lot of testing in this case,

5    didn't you?

6    A.    I did.

7    Q.    And you did testing in 2020; is that correct?

8    A.    Yes, ma'am.

9    Q.    And also in 2021, correct?

10   A.    Yes, ma'am.

11   Q.    And in 2022 --

12   A.    Yes, ma'am.

13   Q.    -- correct?  And you were doing this testing in order

14   to determine distance, weren't you?

15   A.    No, ma'am.

16   Q.    So again, I'm going to ask you, Agent DeFrance:  That

17   you wrote reports in this case, didn't you?

18   A.    Yes.

19   Q.    And you also wrote what's called a 302, which is an FBI

20   report to these cases, for your testing, correct?

21   A.    Yes, ma'am.

22   Q.    And for each time you did testing, you did one of these

23   302 FBI reports, correct?

24   A.    Yes, ma'am.

25   Q.    And for each time that you did this testing, you wrote

CROSS - DeFRANCE

1    that you were conducting testing to produce distance tests.

2    A.    I was -- we were producing test patterns to provide to

3    an appropriate expert for interpretation.

4    Q.    Okay.  Understood.  And what you wrote on your -- your

5    report is you were doing testing to produce distance tests;

6    that's what you're doing.

7    A.    Yes.

8    Q.    Now, you did not perform tests with the actual shotgun,

9    did you?

10    A.    No, ma'am.

11    Q.    Have you heard experts say that no muzzle-to-target

12    distance test can be done without the weapon that was

13    involved in the shooting?  Have you ever heard that?

14    A.    I have.

15    Q.    But in this case, you did not have the actual shotgun

16    to do the testing; is that right?

17    A.    That's correct.

18    Q.    Now, you also did not have the ability to perform tests

19    with used soft gun cases that were manufactured at the same

20    time as the actual soft gun case; isn't that correct?

21    A.    That's correct.

22    Q.    And you also did not do testing onto a target that was

23    covered with any sort of fabric or clothing; is that right?

24    A.    No, we did our test patterns on cardboard.

25    Q.    And so because you did it on cardboard, would you agree

CROSS - DeFRANCE

1    that cardboard does not replicate human skin?  It does not

2    act like human skin?

3    A.    That's true, but we were just recording the pattern for

4    an appropriate expert to interpret when it comes to wound

5    ballistics.

6    Q.    Understood.  Now on direct, you started off by talking

7    a lot about responding to scenes and how you are now a

8    member of the Denver division of the Evidence Response Team;

9    is that correct?

10   A.    Yes, ma'am.

11   Q.    So I'm guessing that you've been to a lot of different

12   scenes and incident scenes?

13   A.    Yes.

14   Q.    And that includes shooting scenes, correct?

15   A.    It does.

16   Q.    Now, so because you are a member of the FBI division of

17   the Evidence Response Team, you know about the importance of

18   collecting evidence, of properly documenting evidence at a

19   shooting scene, don't you?

20   A.    Yes, ma'am.

21   Q.    And so you also know the importance of maintaining the

22   scene, correct?

23   A.    Yes, ma'am.

24   Q.    And the importance of preventing evidence from being

25   tampered with, correct?

CROSS - DeFRANCE

1    A.    Correct.

2              MR. WINSTEAD:  Objection, Your Honor.  Beyond the

3    scope.

4              THE COURT:  Counsel.

5              MS. MOSS:  The prosecutor asked him what his

6    primary job is at the moment and Agent DeFrance testified

7    that he is a member of the Evidence Response Team.  And he

8    discussed collection of evidence --

9              THE COURT:  So you're just talking about his

10   general work duties and responsibilities.

11             MS. MOSS:  Yes.  And what --

12             THE COURT:  As opposed to what he was trying to do

13   in this case.

14             MS. MOSS:  I'm sorry?

15             THE COURT:  As opposed to what he was trying

16   specifically to do in this case.

17             MS. MOSS:  Well, I think that's -- will become a

18   part of what happened in this case.

19             THE COURT:  Well -- oh, okay.  So I'm going to

20   overrule it for now.  But you may get an objection again

21   later.  Go ahead.

22   BY MS. MOSS:

23   Q.    For law enforcement who are trying to do a

24   reconstruction, it's important to them that the initial

25   investigators on the scene are well versed in preserving

CROSS - DeFRANCE

1    evidence; is that correct?

2    A.    That's correct.

3    Q.    And proper documentation of the scene through

4    photographs, through sketches, through diagrams, that can be

5    very important to a reconstruction person, correct?

6    A.    Yes.

7    Q.    And you're very familiar with these things aren't you,

8    Agent DeFrance?

9    A.    Yes, ma'am.

10    Q.    And you've written an article about this, haven't

11    you?

12    A.    I have.

13    Q.    And in that article, you cite to a book written by

14    Lucien "Luke" Haag, don't you?

15    A.    I don't recall at the top of my head, but I'll assume

16    so.

17    Q.    Would you be surprised if you had cited Mr. Haag's

18    book, Shooting Reconstruction?

19    A.    I have -- I would not be surprised.

20        MR. WINSTEAD:  Objection, again, Your Honor.

21    Shooting reconstruction is beyond the scope.  Oh, yes,

22    sorry, I said say shooting reconstruction is beyond the

23    scope.  The witness already said --

24        THE COURT:  The question was not asking an opinion

25    or view of that -- of shooting reconstructions.  The

CROSS - DeFRANCE

1    question has to do is whether he cited a book in an article

2    he's written.  Overruled.

3    BY MS. MOSS:

4    Q.    So I think we have stated pretty clearly that scene

5    preservation is really important for a reconstruction

6    person, correct?

7    A.    Yes.

8    Q.    And one really critical piece of evidence, would you

9    agree, for someone doing a reconstruction is a victim's

10   clothing; is it not?

11   A.    Yes, it would be.

12   Q.    And you know the importance of having the victim's

13   clothing, don't you?

14   A.    Yes, ma'am.

15   Q.    And at any shooting scene, the victim's clothing should

16   be collected and properly preserved for gunshot residue

17   analysis, shouldn't it?

18   A.    Yes, it should.

19   Q.    And can you explain to the jury, what is gunshot

20   residue?

21   A.    Gunshot residue, or the combustion products during

22   discharge, that if a target is close enough to the barrel

23   they can be deposited on that target.

24   Q.    And so gunshot residue can be critical to a shooting

25   reconstruction; isn't that correct?

469

CROSS - DeFRANCE

1  A.    It can be.

2  Q.    And the -- not just gunshot residue, but the actual

3  amount, the pattern, the distribution of the gunshot residue

4  on the victim's clothing and maybe even on the victim's

5  skin, that could be crucial to also determining distance

6  between the muzzle of the firearm and the body; isn't that

7  correct?

8         MR. WINSTEAD:  Objection.  Compound.

9         THE COURT:  Sustained.

10  BY MS. MOSS:

11  Q.    Well, okay, let me ask it this way.  Can gunshot

12  residue be important to determining distance between the

13  muzzle of a shotgun and a body?

14  A.    Yes.

15  Q.    And a trajectory analysis combined with gunshot residue

16  analysis could also be very important in determining

17  distance between the muzzle of a shotgun and a person's

18  body; isn't that correct?

19         MR. WINSTEAD:  Objection, Your Honor.  The witness

20  has already stated he wasn't trying to make that

21  determination.

22         THE COURT:  That's true.  I'll let you go one more

23  time.  Overruled.  You may answer.

24         THE WITNESS:  I'm sorry, could you repeat the

25  question.

CROSS - DeFRANCE

1    BY MS. MOSS:

2    Q.   What I'm actually citing from your article here that

3    the combination of trajectory analysis and gunshot residue

4    analysis is critical and important in determining the

5    distance between the muzzle of the shotgun and a body; isn't

6    that correct?

7    A.   Yes.   That can be correct, yeah.

8    Q.   And I wanted to ask you about the importance of

9    collecting some other types of evidence.   Now, it also can

10   be very important to collect other people's clothing who may

11   have been in the area of a firearm discharge; isn't that

12   correct?

13           MR. WINSTEAD:   Objection, Your Honor.   All of this

14   is getting really beyond the scope.

15           THE COURT:   I think the problem here, Ms. Moss, is

16   that it's not clear from your questions if you're -- is this

17   just background information where you're exploring his

18   background and his views on things generally, or are we

19   talking about his test rounds and his tests that he

20   performed in this case?

21           MS. MOSS:   We are going to talk about his tests and

22   we are going to also contrast his knowledge of what's

23   important for a shooting reconstruction with what actually

24   occurred in this case.

25           THE COURT:   Well, I think you can draw fewer

471
CROSS - DeFRANCE

1    objections if we -- if you restrict your questions to the

2    scope of his direct, which were a description of the tests

3    that he performed in this case.

4    BY MS. MOSS:

5    Q.   Well, let me ask you, Agent DeFrance, about when you're

6    doing reconstruction -- what I'm trying to do is ask you

7    about things that are important to somebody who's doing a

8    shooting reconstruction.  Now, in this case, you didn't

9    become involved in this case until 2020; is that correct?

10   A.   Approximately.

11   Q.   Actually, December of 2020, or maybe November of

12   2020?

13   A.   That's when we did the first round of testfires, but

14   I'm not entirely sure when we first started discussing

15   things.

16   Q.   Okay.  But that is when you did your first round of

17   testfires in December of --

18   A.   Yes, ma'am.

19   Q.   -- December of 2020.

20          So am I correct that you didn't go to the scene in

21   this case?

22   A.   No, ma'am.

23   Q.   So you didn't go to Zambia in 2016 and you didn't go in

24   2020; is that correct?

25   A.   No, ma'am.

472

CROSS - DeFRANCE

1        MR. WINSTEAD:  Compound.

2        THE COURT:  Sustained.

3   BY MS. MOSS:

4   Q.   Did you go to Zambia in 2016?

5   A.   No, ma'am.

6   Q.   Did you go to Zambia in 2020?

7   A.   No, ma'am.

8   Q.   Have you been to Zambia at all for information about

9   this case?

10  A.   Not for this case or anything else.

11  Q.   You mentioned on direct that you have looked at scene

12  photographs; is that right?

13  A.   Yes.  I have seen the scene photographs, yes.

14  Q.   Okay.  And those were scene photographs taken from the

15  camp in Zambia.

16  A.   Yes, ma'am.

17  Q.   So you have a little bit of knowledge of the scene

18  setting.

19  A.   Yes, ma'am.

20  Q.   Now, would you agree that the scene in this case was

21  not properly preserved?

22        MR. WINSTEAD:  Objection.  This is beyond the

23  scope.

24        THE COURT:  Overruled.

25        THE WITNESS:  From the information that I have, no,

CROSS - DeFRANCE

1    it doesn't seem like it was properly preserved.

2    BY MS. MOSS:

3    Q.    And were you aware that the shotgun and the soft case

4    had been moved?

5    A.    I know that there's information about that, but I'm

6    not -- I don't know all the details on that.

7    Q.    Do you -- were you ever given any information to --

8    that documented whether the actual firearm had a safety on

9    or not?

10   A.    I do not know.

11   Q.    Were you ever given information of the location of the

12   shell that was extracted from the actual shotgun?

13   A.    I know that it was in the scene.  I recall seeing it in

14   the scene photos, but I don't recall the exact location.

15   Q.    Did you ever see photographs with measurement

16   dimensions?

17   A.    No.

18   Q.    Now, I noted in your direct we saw a lot of photographs

19   where there were rulers and sometimes there were circles

20   that showed millimeters.  Is that something that's important

21   to you that -- to know the measurements and to know the size

22   of different things?

23   A.    Certainly.

24   Q.    And did you have access to any of that for any of the

25   evidence found at the scene in Zambia?

474

CROSS - DeFRANCE

1    A.    No.

2    Q.    What about Mrs. Rudolph's clothing?  You said that you

3    have seen photographs of the incident scene.  And, so are

4    you aware that Mrs. Rudolph was wearing clothing at the time

5    that the -- the firearm discharged?

6    A.    Yes, ma'am.

7    Q.    And so when the shotgun discharged into Mrs. Rudolph,

8    it went through her clothing; is that right?

9    A.    I believe so.  Or it would have at least gone very

10   close to her clothing.

11   Q.    Well, have you seen any photographs of that clothing?

12   A.    Only the clothing that can be seen in the scene

13   photographs that's on her.

14   Q.    So have you seen any photographs where the clothing was

15   laid out with any sort of measurement devices?

16   A.    No, ma'am.

17   Q.    So have you seen any photographs where the clothing was

18   laid out where you could see a pattern in the clothing?

19   A.    No, ma'am.

20   Q.    Would that have been important to you?

21   A.    That would have been a useful piece of evidence, but I

22   inquired about it, but was told that the clothing was not

23   available.

24   Q.    And where is the clothing?

25   A.    I don't know.

CROSS - DeFRANCE

1    Q.    Since we talked about the importance of victim's

2    clothing and its importance in shooting reconstruction, have

3    you seen any reports of analysis of Mrs. Bianca's -- Bianca

4    Rudolph's clothing and gunshot residue that was found there?

5    A.    No, ma'am.

6    Q.    Do you know if anything like that even exists?

7    A.    Not to my knowledge.

8    Q.    And let me ask you, Agent DeFrance, would you agree

9    that clothing often is different from skin, correct?

10   A.    I think that's fair to say.

11   Q.    And so skin can stretch and skin can gape, correct?

12   A.    Yes.

13   Q.    But oftentimes when there's a shooting through

14   clothing, the pattern in the clothing will stay the same,

15   correct?

16   A.    Your question is getting into the interpretation of

17   shot patterns that I'm not comfortable getting into.

18   Q.    Okay.  That's fine.  So you're not an expert in shotgun

19   patterns or analysis?

20   A.    Not in interpreting them.

21   Q.    Okay.  Fair enough.  Would you agree that if we had the

22   victim's clothing where there were projectiles that had gone

23   through, you could see from the size of a hole?  Do you

24   think that's fair?

25   A.    The clothing should record the pattern, yes.

476

CROSS - DeFRANCE

1  Q.   Okay.

2  A.   If that's what you're asking.

3  Q.   And, again, we talked about how that could be crucial

4  to determining distance, correct?

5  A.   Yes, ma'am.

6  Q.   Now, sometimes the results of an autopsy can be

7  important to a shooting reconstruction, would you agree with

8  that?

9  A.   Yes.

10        MR. WINSTEAD:  Objection.  Again, beyond the scope.

11        THE COURT:  Overruled.  You may answer.

12        THE WITNESS:  Yes.

13  BY MS. MOSS:

14  Q.   Now, oftentimes in an autopsy, you will see photographs

15  taken of a wound, will you not?

16  A.   Generally those would be photographed, yes.

17  Q.   And when you say "generally," I mean, almost always --

18  I mean, that's a standard U.S. requirement that --

19  A.   They certainly should be photographed, and I would

20  photograph them at any autopsy that I attended.

21  Q.   And not only a photograph of the wound, but you would

22  see pattern on the body, wouldn't you?

23  A.   It would depend on if the pattern was present.

24  Q.   Was what?

25  A.   If a pattern was present.

CROSS - DeFRANCE

1    Q.    A pattern -- so if there was a pattern present, you

2    might see that on the body?

3    A.    Yes.

4    Q.    And so photographs, again, can be crucial during an

5    autopsy so you can see what the body looked like very soon

6    after a shooting has taken place; isn't that correct?

7    A.    Yes.

8    Q.    And in many autopsies, especially involving shooting

9    scenes, a medical examiner will take x-rays of the body,

10   will they not?

11   A.    Yes, x-rays are not uncommon in the autopsies that I

12   have attended.

13   Q.    And will x-rays help a shooting reconstruction person

14   and the medical examiner to determine path and trajectory?

15   A.    I think that that would generally be in the -- in the

16   purview of the medical examiner to make interpretations

17   about wounds.

18   Q.    Have you ever seen photographs and used x-rays for any

19   testing you've ever done?

20   A.    I'm sorry, could you re- --

21   Q.    I'm sorry, that was a bad question.

22         Have you ever used x-rays from an autopsy to assist

23   you in doing a shooting reconstruction?

24   A.    No, I would not do that.

25   Q.    Let me ask you:  Have you seen any photographs --

478

CROSS - DeFRANCE

1    autopsy photographs of Mrs. Rudolph in this case?

2    A.    I have not.

3    Q.    Have you seen any x-rays of Mrs. Rudolph's body showing

4    where pellets may have been and what direction?

5    A.    I have not.

6    Q.    Do they exist?

7    A.    Not to my knowledge.

8    Q.    What about Dr. Rudolph's clothing?  Have you examined

9    Dr. Rudolph's clothing to see if there's any gunshot residue

10   on his clothing?

11   A.    I have not, but that is also not an examination that I

12   would conduct.

13   Q.    Is that something that another type of expert might

14   look at?

15   A.    Potentially, yes.

16   Q.    Okay.  Now, Agent DeFrance, you said that you were

17   doing this testing so that you could produce results and

18   give them to another expert, a medical examiner, correct?

19   A.    Yes, ma'am.

20   Q.    So because we didn't have all these other things,

21   because we didn't have the victim's clothing, you couldn't

22   give Dr. Cina, the medical examiner, any information about

23   gunshot residue, could you?

24   A.    No, ma'am.  All we provided were the test patterns and

25   information about how they were produced and what distances.

479

CROSS - DeFRANCE

1   Q.   And what about photographs of the wound?  Have you seen

2   photographs of the wound in this case?

3   A.   I have.

4   Q.   And when were those photographs taken?

5   A.   My understanding is post-autopsy, but that's just what

6   I've heard in discussion.

7   Q.   Okay.  So do you believe that the photographs that you

8   saw may have been taken several days after Mrs. Rudolph's

9   death?

10  A.   I do not know.

11  Q.   So you don't have any idea?

12  A.   I don't know.

13  Q.   Okay.  So let's get into your testing.  Now even

14  despite the lack of proper scene preservation, evidence

15  collection, missing evidence, no gunshot residue analysis,

16  no clothing, no proper autopsy, there are some things that

17  you know as fact about the death of Bianca Rudolph; is that

18  correct?

19  A.   Yes, ma'am.

20  Q.   Now, I want to go through them and you can tell me if

21  I'm wrong or you can add to them.

22          Did you determine that it was a fact that

23  Mrs. Rudolph was killed because a Browning A5 semi-automatic

24  discharged?

25  A.   Yes.

CROSS - DeFRANCE

1    Q.    I'm sorry?

2    A.    Yes, ma'am.

3    Q.    Okay.  And you had the serial number of that

4    Browning A5 semi-automatic, did you not?

5    A.    Yes, we were provided that.

6    Q.    And you spoke a lot about -- on direct about this soft

7    case, and I believe that you said that you had some

8    confidence that that was the actual shot -- soft case that

9    was fired through when Mrs. Rudolph passed away.

10   A.    Yes, because it was consistent with the one that was in

11   the scene photos.

12   Q.    And so you were able to look at the actual soft case

13   and compare it with what was in the scene photos, and to you

14   they looked exact, correct?

15   A.    Yes, ma'am.

16   Q.    And that was a used, older, soft gun case, correct?

17   A.    I don't know how old it was at the time.

18   Q.    Did it appear to be used?

19   A.    It appeared to be used, but -- because it had markings

20   on it, but I don't know how old.

21   Q.    That's fair.  Now, we know that the soft gun case was

22   folded over, meaning you can butterfly the soft case,

23   correct?  Or you can fold it so it's together.

24   A.    Yes.

25   Q.    Would you agree that we know that the actual soft case

481

CROSS - DeFRANCE

1     in this case was folded over?

2     A.   Are you asking at the time of the discharge?

3     Q.   Yes.

4     A.   Yes, I believe so.

5     Q.   And you have seen photographs of that.  You've seen

6     photographs of the firearm on the ground, and it's folded

7     over, correct?

8     A.   Yes, ma'am.

9     Q.   And you also believe that may have been partially

10    unzipped at the bottom?

11    A.   In the scene photographs, it's a -- it's maybe halfway

12    back.

13    Q.   I'm sorry, halfway --

14    A.   About halfway back.

15    Q.   Halfway back.  Okay.  We also know as a fact in this

16    case that after the shotgun discharged, that pellets ejected

17    from the barrel of that shotgun and penetrated through

18    Mrs. Rudolph's shirt and also into her body, correct?

19    A.   I -- I don't know exactly what happened to her shirt

20    but, yes, she was wounded in the chest.

21    Q.   So what caused that wound is that those pellets from

22    the shell fired from that shotgun entered her body, correct?

23    A.   Yes.  The pellets and also some of the wadding.

24    Q.   Okay.  So -- and we've talked a little bit about the

25    wadding in the direct, and you talked about the shot cup and

482
CROSS - DeFRANCE

1   what you called the over-powder wad.  Is that what you are

2   classifying as wadding?

3   A.   Yes, ma'am.

4   Q.   And so we know that was found in her body.

5   A.   From what I was told from the autopsy report, yes.

6   Q.   Okay.  So can we agree that we -- those are some things

7   that we do know existed in this case.

8   A.   Yes, ma'am.

9   Q.   Now, there were some things that are variables, so some

10  things that we are not absolutely sure of in this case; is

11  that correct?

12  A.   Yes, ma'am.

13  Q.   So one of the variables that you noted in your report

14  is the make and model of the shotgun, correct?

15  A.   The -- I don't think that the make and model -- the

16  make and model from the information I was provided is known.

17  Q.   Was known?

18  A.   Yes.

19  Q.   Okay.  What about the type of ammunition?  We talked in

20  your direct about even though we know that there was a

21  Federal shell that was used, correct, a Federal 3-inch

22  double-aught buckshot shell that was used, sometimes that

23  ammunition, the components of it, varies; is that correct?

24  A.   So the determination of the ammunition was done by

25  Federal independent of me.

483

CROSS - DeFRANCE

1    Q.   But it sounds like you learned through all the

2    different testing in this case that the components of

3    Federal 3-inch double-aught buckshot shells can vary.

4    A.   Yes, we did learn that.

5    Q.   So having the right ammunition could, or could not,

6    make a difference, right?

7    A.   That's correct, yes.

8    Q.   Now, you also talked about the position of the shotgun

9    within the soft case, that that's a variable that you

10   started off with.  You did not know that to begin with.

11   A.   That's correct.

12   Q.   And the position of that shotgun in the shot case, that

13   could matter to your testing, couldn't it?

14   A.   Yes, I think it could.

15   Q.   And also the angle of the shotgun when you're firing

16   it, is that something that could make a difference in the

17   patterning?

18   A.   Potentially, yes.

19   Q.   Now, so we've got facts, we've got variables.  Let's

20   talk about things that you did not have to do this testing.

21   Now, we've already talked about you did not have the actual

22   shotgun, correct?

23   A.   Correct.

24   Q.   So you used what I think you've called a stand-in

25   shotgun in order to do your testing; is that correct?

484

CROSS - DeFRANCE

1    A.    That's correct.

2    Q.    But if you had the actual shotgun, you would have used

3    that, wouldn't you?

4    A.    Absolutely.

5    Q.    That would have given you the most accurate results

6    possible, correct?

7    A.    Correct.

8    Q.    And why?

9    A.    Because you don't have to worry about any differences

10   between the shotguns.

11   Q.    And that's important.  You need to know if there are

12   any differences between the shotguns, don't you?

13   A.    Yes, ma'am.

14   Q.    And here you do not know that, do you?

15   A.    That is something that's being discussed by a different

16   witness about the consistency of the two shotguns.

17   Q.    Okay.  Well, tell me about its importance to you in

18   doing your testing.  Is it important to you?

19   A.    Yes, it's absolutely an important variable.

20   Q.    Now we talked again about the soft gun cases.  Now,

21   there were soft gun cases that were specifically

22   manufactured for the FBI in order for you to do your

23   testing; is that correct?

24   A.    Yes, ma'am.

25   Q.    And so these were brand-new shotgun cases.

CROSS - DeFRANCE

1    A.    Correct.

2    Q.    And are you aware that these were newly created soft

3    gun cases cut from a different pattern than the shotgun case

4    of the actual case?

5    A.    I don't know the details of the manufacturer.

6    Q.    So you were not aware of that, then?

7    A.    I was not.

8    Q.    Did you use a shotgun that had been modified to perform

9    your testing?

10   A.    No, ma'am.

11   Q.    Did you have anything that resembled the clothing that

12   Mrs. Rudolph was wearing in order to fire and test with?

13   A.    No.

14   Q.    Did you have any type of target that replicated skin?

15   A.    No, ma'am.

16   Q.    Did you ever consider using pig carcasses in this case?

17   A.    There was discussion of some testing with pig

18   carcasses, but that was more related to blood-stain

19   patterns.

20   Q.    And so it was never a thought that you were going to

21   try and do testing on an animal skin that was something more

22   akin to human skin; is that right?

23   A.    No.

24   Q.    Now, there are things out there, like ballistics

25   gelatin, that represents -- replicates something like

486

CROSS - DeFRANCE

1    skin -- actual skin, correct?

2    A.    I don't believe that ballistics gelatin replicates

3    skin.  It's meant to -- I believe to replicate tissue, but

4    I'm -- that's not my area.

5    Q.    Okay.  Well, fair enough.  But would you agree that the

6    FBI does use testing in ballistics -- with ballistic

7    gelatin?

8    A.    Not for investigative purposes that I'm aware of.

9    Q.    So you're not aware of that.

10   A.    No.

11   Q.    You've heard of ballistic gelatin, though?

12   A.    Yes, ma'am.

13   Q.    And you've heard of ballistic gelatin being more

14   consistent with skin and tissue than cardboard paper?

15   A.    I want to modify that I don't believe that it would

16   have any consistency with skin.  It's meant to have the same

17   density and behavior as tissue generally.

18   Q.    You're talking about the ballistics gelatin?

19   A.    Yes, ma'am.

20   Q.    Okay.  Would you agree that with cardboard -- and we

21   spoke about this briefly before -- that cardboard does not

22   stretch.

23   A.    Uhm-hum.

24   Q.    Correct?

25   A.    Yes, ma'am.

487
CROSS - DeFRANCE

1  Q.   Cardboard does not gape, correct?

2  A.   I'm not sure what you mean by "gaping," but --

3  Q.   Well --

4  A.   -- it's not elastic.

5  Q.   It's not -- it's not elastic.  Better word.  Okay.

6        Now, some things that you also do not know in this

7  case is the actual shotgun.  Do you know how it had been

8  maintained and how old it was?

9  A.   I do not.

10  Q.   Do you know over the years whether that actual shotgun

11  had undergone any other modifications?

12  A.   I do not.

13  Q.   Do you know the condition of the actual shotgun?

14  A.   I do not.

15  Q.   Do you know the choke that was on the actual shotgun?

16  A.   My understanding is it was sold with a full choke, but

17  that's all I know.

18  Q.   It was sold with a full choke.  So --

19  A.   Yes.

20  Q.   -- in other words, you don't know if it had a full

21  choke on it on October 11, 2016.

22  A.   I do not.

23  Q.   Now, all these things that we're talking about here

24  could matter.

25  A.   Uhm-hum.

488

CROSS - DeFRANCE

1    Q.    Is that correct?

2    A.    That's correct.

3    Q.    Now, just to be clear, I spoke about choke.  Can you

4    just explain what "choke" means.

5    A.    Choke is a reference to a constriction at the muzzle of

6    a shotgun that controls the pattern size.  So something that

7    has a full choke has a constriction that will produce a

8    tighter pattern at a given distance, and something that has

9    a different type of choke, like a cylinder choke, would have

10   a larger pattern at that same distance.

11   Q.    Thank you.  Now, we've talked about facts, we've talked

12   about variables, we talked about things you did not know.  I

13   want to talk about some assumptions that you had to make in

14   order to conduct your testing.

15          Now, maybe this is not an assumption, but did you

16   believe that the shotgun was oriented in the soft gun case

17   with the trigger side -- with the trigger towards the

18   zipper?

19   A.    Yes, ma'am.

20   Q.    And why did you believe that?

21   A.    That's the way it was present in the scene photographs.

22   Q.    And you were able to tell that just from the little bit

23   of the shotgun that was sticking out of the end of the soft

24   case in the scene photographs, correct?

25   A.    Yes, ma'am.

489

CROSS - DeFRANCE

1    Q.    Now, another assumption that you had to make is that

2    there was nothing else in that shotgun case, correct?

3    A.    That's true.

4    Q.    That there's no cleaning rod or no plug in that shotgun

5    case.

6    A.    That's true.  We --

7    Q.    And, again, the biggest assumption that you're making

8    is that the stand-in shotgun that you're using to test is

9    functionally equivalent to the actual shotgun in the

10   shooting, correct?

11   A.    Correct.  And that's exactly how I stated it in the

12   report.

13   Q.    Very good.  Are you also making an assumption about the

14   angle of the discharge and the angle of the entry into the

15   body?

16   A.    Yes.  Based on -- on a medical examiner looking at the

17   wound, we were going with a perpendicular angle of impact.

18   Q.    And who is that medical examiner you're referring to?

19   A.    That would be Dr. Cina.

20   Q.    Okay.  So this is something you heard from someone

21   else.

22   A.    Yes.

23   Q.    And based on that, that's the only testing that you

24   did, correct?

25   A.    Yes, we only did perpendicular -- the shot

CROSS - DeFRANCE

1    perpendicular to the target.

2    Q.    Okay.  And we're going to get to that.

3          Now, another assumption is about the zipper on the

4    shotgun case.  Now, there is a zipper on the shotgun case

5    that allows you to zip it all the way up so that it's fully

6    enclosed.  You can also zip it all the way back, or

7    somewhere in between, correct?

8    A.    Yes, ma'am.

9    Q.    And you did not know where that zipper was at the time

10   that the shotgun discharged on October 11, 2011, did you?

11   2016.  Sorry.

12   A.    We could see that it was partially back from the scene

13   photos, but we couldn't know exactly where it was at the

14   time of discharge, no.

15   Q.    Okay.  And, again, were you aware that someone had

16   taken that shotgun, unzipped it, looked inside of it, and

17   then put it back on the scene before photographs were

18   taken?

19   A.    I don't have knowledge of that.

20   Q.    Would you agree that if the shotgun was fully zipped,

21   that you couldn't have pulled the trigger?  Or it would be

22   very difficult, I would think.

23          THE COURT:  Which question do you want him to

24   answer?

25   BY MS. MOSS:

491
CROSS - DeFRANCE

1    Q.    Could you pull the trigger if the shotgun case was

2    fully zipped?

3    A.    I'm not sure.  It's not something I've tried to do.

4    Q.    So you didn't try to replicate that in this case.

5    A.    Trying to pull the trigger through the case, no, I did

6    not.

7    Q.    Can you give me your -- just your opinion on that.

8    A.    My opinion on what?

9    Q.    Could you pull the trigger if the shotgun case was

10   fully zipped?

11   A.    I -- I don't know.  I would have to have to try to do

12   that.

13   Q.    Okay.  So in order to figure out if you can do

14   something, you actually have to test it, right?

15   A.    Yes.

16   Q.    Now, we talked about things you didn't have, things you

17   didn't know.  I want to talk about some of the things you

18   did have, okay?

19            Now, you had the pink over-powder wad, correct?

20   A.    Yes, ma'am.

21   Q.    And you had the shotgun --

22   A.    Let me modify my answer.  I'm sorry.

23   Q.    That's fine.

24   A.    I know that it was in evidence.  I didn't personally

25   have it.

CROSS - DeFRANCE

1    Q.    Okay.  Well, let me ask:  Did you see a photograph of

2    it?

3    A.    Yes, I have.

4    Q.    And did you see a photograph of the shot cup from the

5    actual shotgun shell that had been fired?

6    A.    I have, yes.

7    Q.    Okay.  Now, I know you talked about this on direct, but

8    I find this very confusing, so can you explain again,

9    please, what an OP wad, over-powder wad, is and a shot cup

10   is.

11   A.    It is a -- it is a circular piece of plastic that sits

12   over the powder, and creates a seal during discharge as the

13   over-powder wad and everything in front of it is pushed down

14   the barrel.

15   Q.    Okay.  And we're going to talk a little bit more about

16   that in a minute.  I want to ask you about another thing

17   that maybe you didn't have but you knew existed in this

18   case, and you -- well, let me ask you:  Have you seen a

19   photograph -- or have you seen the actual spent cartridge

20   case that was ejected from the actual shotgun?

21   A.    I have seen a photograph of it in -- from the scene

22   photos.

23   Q.    Okay.  So you've seen a photograph from the scene

24   photos.  Do you know if that is something that is in

25   possession of the FBI?

CROSS - DeFRANCE

1   A.   I believe so, yes.

2   Q.   Now, Agent DeFrance, prior to becoming a member of the

3   Evidence Response Team, you worked for a period of time at

4   the FBI Firearms and Toolmark Unit at Quantico?

5   A.   I did.

6   Q.   So are you aware from working there to -- how many

7   years did you work there?

8   A.   Four years.

9   Q.   Four years.  So are you aware from working there for

10  four years that a firearm, or shotgun in particular, can

11  leave certain marks on spent cartridges and shotgun shells?

12  A.   Yes, ma'am.

13  Q.   And the kind of marks that I'm referring to are things

14  like breach face marks, correct?

15  A.   Yes.

16  Q.   Extractor marks.

17  A.   Yes.

18  Q.   Ejector marks.

19  A.   Yes.

20  Q.   Magazine marks.

21  A.   Potentially.

22  Q.   Magazine lash marks?

23  A.   I'm not familiar with those, but . . .

24  Q.   Have you ever heard of the term?

25  A.   I have not heard of marks from a magazine latch.

494

CROSS - DeFRANCE

1   Q.   Okay.  But you've heard of the other ones?

2   A.   Yes.

3   Q.   Breach face, extractor, ejector, magazine; correct?

4   A.   Yes, ma'am.

5   Q.   Now, can some of these marks on a spent shotgun shell

6   reveal how a spent shotgun shell -- or how a shotgun shell

7   was loaded in the firing chamber of a shotgun such as the

8   Browning Auto 5?

9   A.   I don't really understand the question.

10  Q.   Let me ask you this:  If an expert from the FBI

11  Quantico lab had a shotgun shell and there was a magazine

12  latch mark on its head, or a magazine mark on its head,

13  would that -- would that show that the shell had come from

14  the magazine to -- prior to going into the chamber of the

15  shotgun?  Do you know that?

16  A.   I do not.

17  Q.   Well, let me ask you this, then:  Are there people that

18  do know those things?

19  A.   Yes, I would imagine so.

20  Q.   And, in fact, there are people that know those things

21  at the FBI, aren't there?

22  A.   I would imagine so, yes.

23  Q.   And -- and I mentioned a little bit about the FBI lab.

24  There is an -- a very large and world-renowned lab at

25  Quantico for the FBI; isn't there?

495

CROSS - DeFRANCE

1   A.   Yes, there is.

2   Q.   And that FBI laboratory has a division that is

3   specifically dedicated and focused on firearms and toolmarks

4   like the things I'm talking about, isn't there?

5   A.   There's a unit called the Firearms Toolmarks Unit, yes.

6   Q.   Would you agree this is one of the most comprehensive

7   labs in the world?

8   A.   I think that's true.

9   Q.   And it's an FBI lab, right?

10  A.   Yes, ma'am.

11  Q.   And you work for the FBI.

12  A.   Yes, ma'am.

13  Q.   Now, this FBI lab has scientists and forensic examiners

14  and technicians, correct?

15  A.   Yes, ma'am.

16  Q.   And these are highly trained and highly educated and

17  qualified people; is that correct?

18  A.   Yes, ma'am.

19  Q.   Do you know whether the spent shotgun shell in this

20  case was ever sent to the FBI lab to look for breach marks,

21  extractor marks, ejector marks, latch marks?

22  A.   Not to my knowledge.

23  Q.   Now, on your direct, you talked about certain protocols

24  that were set up.  And you've already said that you did

25  testing several times in this case.  Now, when you did the

496

CROSS - DeFRANCE

1    testing, you didn't do the testing alone; is that correct?

2    A.    No.

3    Q.    You did -- when you did the testing, you had someone

4    that you called a range safety officer, didn't you?

5    A.    Yes, ma'am.

6    Q.    You had a case agent normally there.

7    A.    Yes, ma'am.

8    Q.    You had a photographer -- maybe one or two

9    photographers.

10   A.    Correct.

11   Q.    You had a firearms instructor there as well?

12   A.    On one instance we had a firearms instructor who was

13   present, yes.

14   Q.    Okay.  And --

15           THE COURT:  One second, counsel.

16        (Pause)

17           THE COURT:  All right, we're back in business.  Go

18   ahead, counsel.

19   BY MS. MOSS:

20   Q.    Agent DeFrance, you were trained in and experienced in

21   the use of firearms; is that correct?

22   A.    Yes, ma'am.

23   Q.    And the other individuals that were with you that day

24   at the testing -- or those days -- are also experienced and

25   trained in the use of firearms?

CROSS - DeFRANCE

1   A.    Some of them, yes; some of them, no.

2   Q.    Would you say that the range safety officer was

3   probably trained and experienced with firearms?

4   A.    Yes.

5   Q.    Case agent was probably trained and experienced with

6   firearms?

7   A.    Yes ma'am.

8   Q.    The firearms instructor was probably trained and

9   experienced with firearms?

10  A.    Yes, ma'am.

11  Q.    Okay.  And so even though all of you were trained and

12  experienced with firearms, you still put in place certain

13  safety precautions for your testing, correct?

14  A.    Of course.

15  Q.    And you were testing -- I believe you tested at

16  different ranges each time, but you had safety precautions

17  such as all personnel had to be behind the muzzle of the

18  shotgun, correct?

19  A.    Correct.

20  Q.    All personnel had to put on eye and ear protection,

21  correct?

22  A.    Correct.

23  Q.    No one was permitted to move forward until after the

24  range safety officer said, "It's okay, everything's safe and

25  empty"?

498

CROSS - DeFRANCE

1    A.    Correct.

2    Q.    And after the shotgun had been fired, the range safety

3    officer had to verify, "Okay, it's safe to move forward

4    now," right?

5    A.    Yes, ma'am.

6    Q.    Now, these safety precautions are put in place and

7    taken even with people who are experienced and trained in

8    firearms because firearms are dangerous, aren't they?

9    A.    Yes, ma'am.

10    Q.    Shotguns are dangerous.

11    A.    Yes, ma'am.

12    Q.    Firearms are unpredictable.

13    A.    I don't think they're unpredictable.

14    Q.    But they can be dangerous.

15    A.    They can be dangerous, yes.

16    Q.    And you also had -- as part of your safety protocol --

17    that in the event of a malfunction, the range safety officer

18    would troubleshoot the situation to make sure it was safe

19    before anyone else approached the setup or moved downrange;

20    isn't that correct?

21    A.    That's correct.

22    Q.    And isn't it true that at least a couple of times when

23    Agent Dahlstrom was firing the shotgun, that the shell

24    fell -- failed to eject and he had to pull it out -- pry

25    it out?

499

CROSS - DeFRANCE

1    A.    I -- yes on a few occasions that happened.

2    Q.    So sometimes there are malfunctions, even with people

3    who are trained and experienced.

4    A.    So in that case, it would have been an ejection

5    malfunction, but yes.

6    Q.    Okay.  And because there is always the possibility of a

7    malfunction, you have a protocol to address what to do if

8    there's a malfunction, correct?

9    A.    Absolutely.

10   Q.    Now, I'm finally going to get to your testing.  And I

11   want to start off with the testing that you did in December

12   of 2020.  Do you remember that?

13   A.    Yes, ma'am.

14   Q.    Now, one of the main things that you were doing at this

15   time -- and you spoke about this a lot during your direct --

16   is you needed to find out what was the position of the

17   shotgun within the shotgun case, correct?

18   A.    Yes.

19   Q.    And so you did that by just trying different things

20   out, right?

21   A.    Yes.  We fired it with the muzzle in different

22   positions and then compared the resulting damage to the soft

23   case to the photograph that we had of the original soft case

24   in the scene.

25   Q.    And at that time, that was the best you could do,

CROSS - DeFRANCE

1    right?  You could just compare it to a photograph, maybe not

2    the best photograph, but that was the best that you could do

3    at that time, correct?

4    A.    Yes, ma'am.

5    Q.    Now, prior to doing this testing, were you given

6    Dr. Cina's initial conclusions that he made in March of 2020

7    that the shotgun was fired at very close range to the

8    victim?

9    A.    All I recall being told was that it was an

10   approximately perpendicular impact to her chest.

11   Q.    So you were not talk- -- you were not told about his

12   initial conclusions about the distance being very close.

13   A.    I don't recall that, no.

14   Q.    Were you told --

15   A.    I don't think he had -- well, I'm sorry.  Continue.

16   Q.    Were you told about Dr. Cina's conclusions -- initial

17   conclusions in March of 2020 that it could have even been

18   just a couple of inches away?

19           MR. WINSTEAD:  Objection, Your Honor.  Fair to say

20   that he doesn't know.

21           THE COURT:  Sustained.

22           MS. MOSS:  I'm sorry, what was the objection?

23           MR. WINSTEAD:  Oh, that he already said he didn't

24   know.

25           MS. MOSS:  Oh, okay.

CROSS - DeFRANCE

1    BY MS. MOSS:

2    Q.   Agent DeFrance, were you aware of Dr. Cina's initial

3    conclusions that the wound -- the wound on Mrs. Rudolph was

4    round and there was no scalloping around the edges?

5         MR. WINSTEAD:  Objection.  Assumes facts not in

6    evidence.

7         THE COURT:  Counsel.

8         MS. MOSS:  Your Honor, I believe it's not for the

9    truth of the matter asserted, but to show his thought

10   process for how he was going to conduct his testing.

11        THE COURT:  I don't know that you've established

12   that this information from Dr. Cina was something that he

13   relied upon in conducting his test.  I'm not seeing any

14   connection here.

15   BY MS. MOSS:

16   Q.   Well, is that something that would have been important

17   to you to know Dr. Cina's initial conclusions before you

18   started doing any testing?

19   A.   The testing was designed to test the full spectrum of

20   possibilities from contact out to a distant shot.

21   Q.   And let me ask you this:  In terms of determining

22   patterns, did you go into this trying to achieve a certain

23   kind of pattern?

24   A.   Absolutely not.

25   Q.   Now, I just mentioned a moment ago about scalloping.

CROSS - DeFRANCE

1    Can you tell us what scalloping is.  Do you know what that

2    is?

3    A.    As the shot -- when it comes -- when the shot comes out

4    of a barrel, it's in a very tight clump, and as it starts to

5    spread out it will cause little semi-circles around the edge

6    of a -- of the shot pattern.  And that's referred to as

7    scalloping.

8    Q.    Does that come from a scalloped shell where you see all

9    the bumps from the scalloped shell?

10   A.    I assume so.

11   Q.    Now, I'd like to show you Defense Exhibit RA-28, which

12   has already been admitted into evidence.  And this is INV

13   underscore 921.  Now, if we can focus and draw out the top

14   part, which is the sketch.  Thank you.

15           Now, I don't believe we saw this on your direct,

16   but this is a sketch that you made, Agent DeFrance; is that

17   right?

18   A.    Yes, ma'am.

19   Q.    And this shows a sketch of how you did your testing,

20   correct?

21   A.    Yes, ma'am.

22   Q.    And so what we're seeing here is a shotgun that is

23   secured in a machine rest; is that correct?

24   A.    Yes, ma'am.

25   Q.    And so to do that, you had to mount the machine rest on

CROSS - DeFRANCE

1    that table and then put the shotgun in the machine rest; is

2    that correct?

3    A.    That's correct.

4    Q.    So it appears that the table and the machine rest are

5    horizontal to the floor, correct?

6    A.    Yes, ma'am.

7    Q.    And tell us -- a machine rest, is that something that

8    holds the shotgun in place?

9    A.    Yes, ma'am.

10    Q.    Now, I want to take a look at RA-20.  And this is INV

11    7796.  Can we blow that up a little bit bigger, please.

12          Now this is also a photograph showing a similar

13    kind of thing from what your sketch was, right?

14    A.    Yes, ma'am.

15    Q.    So what this is showing is what this actually looked

16    like.  So we see the table, we see the machine rest, and we

17    see -- we don't actually see the shotgun but we see a soft

18    case that's on top of that machine rest, correct?

19    A.    Yes.

20    Q.    And these are the brand-new soft cases that were

21    manufactured for the FBI by the Allen Company; is that

22    right?

23    A.    Yes, ma'am.

24    Q.    I'm sorry?

25    A.    Yes, ma'am.

504
CROSS - DeFRANCE

1    Q.    Okay.  Now, I want to go to page 2, which is INV 7797.

2              And this is just another angle of that same thing;

3    is that right?

4    A.    Yes, ma'am.

5    Q.    And so we see the clip that you talked about that was

6    holding that soft case down, correct?

7    A.    Yes.

8    Q.    And, again, we see the machine rest and we see the soft

9    case, correct?

10   A.    Yes, ma'am.

11   Q.    So I'd like to go to page 3 now of that exhibit, which

12   is 7798.

13             And so this is showing the same thing, but this is

14   a different angle, correct?

15   A.    Yes.

16   Q.    So we're looking at this from the back now, correct?

17   A.    Yes.

18   Q.    And so we can see the shotgun at this point; is that

19   right?

20   A.    Yes.  You can see the butt of the shotgun there.

21   Q.    Did you do that arrow?  Oh, you did that?

22   A.    I did not.

23   Q.    No, but thank you.

24             And -- okay.  So we see the butt of the shotgun and

25   we see the soft case on top of it, correct?

CROSS - DeFRANCE

1    A.    Yes, ma'am.

2    Q.    Now we see that the gun case is kind of split open into

3    a V; is that right?

4    A.    Yes.

5    Q.    So it looks like the gun case must be unzipped for

6    quite a ways in order for it to be kind of butterflied open

7    like that.

8    A.    So we zipped the front as far as we could until it ran

9    into the rest.  And the pieces of the rest, I guess, are

10   kind of flaying that out a little bit more behind that.

11   Q.    The pieces of the -- the machine rest.

12   A.    Yes, ma'am.

13   Q.    Okay.  And is it your understanding that the gun case

14   was flayed out like that when the shotgun was discharged on

15   October 11, 2016?

16   A.    I -- I wouldn't imagine so, but I have no information

17   on that.

18   Q.    So that's -- that's something that's a little bit

19   different than probably what was at the actual scene,

20   correct?

21   A.    Yes, on the back of the case.

22   Q.    On the back end of the case --

23   A.    Yes.

24   Q.    -- correct?

25              Now, Mr. Reyes, can you do an arrow at this black

506

CROSS - DeFRANCE

1    strap behind the butt of the shotgun.

2           Do you see that -- what looks like, to me, like a

3    strap there, Agent DeFrance?

4    A.    Yes, ma'am.

5    Q.    And is that what it is, it's just a strap?

6    A.    It's just a strap that holds the shotgun in place.

7    Q.    Okay.  And so the purpose of that is to hold the

8    shotgun there, right?

9    A.    To hold it from coming rearward.

10   Q.    Okay.  And when you say "rearward," you mean coming

11   back this way --

12   A.    Yes.

13   Q.    -- that would be uprange?

14   A.    Yes.

15   Q.    Now, was that important that you needed to do that?

16   A.    That's just the way that the rest works to hold the

17   shotgun in place.

18   Q.    And if you didn't have that strap there, am I correct

19   that the shotgun has a recoil on it?

20   A.    Yes, absolutely.

21   Q.    Can you explain to us what recoil is.

22   A.    Recoil is the felt rearward motion of the firearm

23   during discharge.

24   Q.    And it's -- sometimes people describe it as a kick,

25   right, after --

CROSS - DeFRANCE

1    A.    Yes.

2    Q.    After the firearm is discharged it kind of throws you

3    backward.    It's like the law of physics, something goes

4    forward, something else has got to come backward, correct?

5    A.    Yes, ma'am.

6    Q.    Now, that strap is there so when the recoil happens,

7    the gun doesn't go flying backwards, correct?

8    A.    Correct.

9    Q.    Do you know how far that gun would go flying backwards

10    if you didn't have that strap there?

11    A.    I do not.

12    Q.    Do you know what direction it would have gone flying

13    into if you had not had that strap there?

14    A.    I do not.

15    Q.    If a gun is free-fired, meaning it's not being held in

16    place by a person or a machine rest, it would go flying,

17    wouldn't it?

18    A.    A -- it would -- it would have, like you were saying,

19    the opposite reaction to the discharge, so yes.

20    Q.    Now, things like recoil or kick, those things can be

21    measured, can't they?

22    A.    I suppose so.

23    Q.    Well, we've talked again about this FBI lab.    Is that

24    something that they do there?

25    A.    Not to my knowledge.

CROSS - DeFRANCE

1    Q.    But are you aware that -- that that's something that

2    can take place; that you can specifically measure recoil?

3    A.    It's a force, so yes, it should be measurable.

4    Q.    Okay.  Is that something that you did here?

5    A.    No.

6    Q.    And why not?

7    A.    I didn't have the equipment to do that, nor did I think

8    of a reason why it would be important.

9    Q.    So you didn't think that was important and you didn't

10   have the equipment; is that why you didn't do it?

11   A.    Correct.

12   Q.    Now, I'd like to go back to RA-28, page 1.  And I think

13   that's INV 921.  And if we could again focus on the top part

14   of this sketch.  Correct.

15         Now one thing I failed to point out before is that

16   you're firing at a cardboard target.  And can you circle on

17   this -- actually, let me just ask Mr. Reyes, can you point

18   at where the cardboard target is.

19         And is that correct, that's where the cardboard

20   target is?

21   A.    Yes, it's where I've labeled it on the sketch as

22   "witness panel."

23   Q.    Witness panel.  And that's the cardboard paper,

24   correct?

25   A.    Yes, ma'am.

509

CROSS - DeFRANCE

1    Q.    And so that's being held perpendicular to the floor --

2    A.    Yes.

3    Q.    -- yes?

4    A.    Yes.

5    Q.    Okay.  And so what we're looking at now -- and we saw

6    this somewhat in the photographs -- is this -- the

7    conditions of all the testing that you did in 2020, 2021,

8    and 2022?

9    A.    That's correct.

10   Q.    So you only did reconstruction testing in one way where

11   the gun was held horizontal to the floor and the target was

12   exactly perpendicular, correct?

13   A.    That's correct.

14   Q.    Thank you.  Let me ask you, when Agent Dahlstrom was

15   firing this shotgun, what he would have to do, because it

16   was mounted on this machine rest, is he would have to reach

17   over the machine rest and the soft gun case and put his hand

18   underneath the soft case; is that right?

19   A.    I think it would be more accurate to say that he had to

20   reach in under the case --

21   Q.    Okay.

22   A.    -- to get to the trigger, yes.

23   Q.    Okay.  So reach under the case in order to be able to

24   pull the trigger.

25   A.    Yes.

CROSS - DeFRANCE

1    Q.    Okay.  So did you ever test Agent Dahlstrom's hands for

2    gunshot residue to see how much gunshot residue would be on

3    his hands from reaching under that case and pulling that

4    trigger?

5    A.    No, ma'am.

6    Q.    Would there be gunshot residue on his hands under that

7    case, firing that shotgun?

8    A.    That seems likely.

9    Q.    Is it likely that it was -- would be fairly

10   concentrated because it's within this shotgun case?

11   A.    I'm not qualified to talk about concentrations of

12   gunshot residue.

13   Q.    Fair enough.  Now, you started doing testing and you --

14   you've done shotgun testing before, so you've seen how

15   patterns normally occur when you fire a shotgun at different

16   distances; is that correct?

17   A.    Yes, ma'am.

18   Q.    And sometimes the patterns will change, but I assume

19   they roughly stay the same at different distances?  Or does

20   it depend on the type of gun that's being used and the

21   length of the barrel and those sorts of things?

22   A.    It depends on all those variables and that distance.

23   It would be different at different distances, more than

24   likely.

25   Q.    So it sounds like you can't always predict what the

511

CROSS - DeFRANCE

1    pattern is going to be.

2    A.    No, a shotgun will behave in a relatively predictable

3    manner.  There's some variation in each of those patterns,

4    but . . .

5    Q.    Now let me ask you:  Does a shotgun with a soft case

6    over the top of it that it's being fired through, does that

7    behave in a fairly predictable manner?

8    A.    So that's exactly why we did this testing is we didn't

9    know.

10    Q.    And what did you learn?  Did you learn that it was

11    unpredictable?

12    A.    So I'm not interpreting these patterns.  We just

13    generated the patterns for the interpretation of somebody

14    versed in wound ballistics.

15    Q.    Well, tell us what you saw.  Did you see a lot of

16    unpredictability and differences in patterns because of that

17    intervening object of the soft gun case?

18    A.    We did see variation in the patterns, yes, absolutely.

19    Q.    And, Agent DeFrance, have you been involved in a lot of

20    shooting cases?

21    A.    A fair number.

22    Q.    And how many of the shooting cases involved a shotgun

23    that was discharged through a soft bag?

24    A.    None of them.

25    Q.    So that's something you have never seen before?

CROSS - DeFRANCE

1    A.    No, ma'am.

2    Q.    Never heard of?

3    A.    No, ma'am.

4    Q.    Now, I want to talk about what you did in order to try

5    to determine the position of the shotgun within the soft

6    case.

7         And if we can go to RA-28, which is already

8    admitted, page 2, which is INV 922.  And if we can, again,

9    focus on the sketch there.

10        So what I'm looking at is the sketch that's kind of

11   in the middle there.  And what it looks like to me is that

12   is the -- part of the barrel of a shotgun within a soft

13   case; is that right?

14   A.    Yes, ma'am.

15   Q.    And so what you're sketching out is what you ended up

16   testing in December of 2020, which is having the muzzle half

17   an inch from the end of the bag, correct?

18   A.    Yes, ma'am.

19   Q.    And having the barrel one-and-a-quarter inches below

20   the top of the soft case, correct?

21   A.    Yes, ma'am.

22   Q.    Now, in order to do that, you tested a wide variety of

23   distances to try and figure that out.

24   A.    Yes.

25   Q.    So I believe you tested 3/4 of an inch, 1 inch, 1 1/2

CROSS - DeFRANCE

1    inches; is that right?

2    A.    I don't remember all the distances off the top of my

3    head, but we tried a number of different positions.

4    Q.    And those are documented in your report so if you

5    wanted to, you could look at to see what you did.

6    A.    Yes, ma'am.

7    Q.    Now at that point, you did not test 4 inches or 4 1/2

8    inches or anything past that; is that right?

9    A.    Again, I don't remember how far back we went at that

10   point.  I'd have to look at my notes.

11   Q.    I believe 3 inches is as far back that you went.  Do

12   you want to trust me on that?

13   A.    I -- that seems reasonable because I think the damage

14   to the case, as we moved further back, didn't look

15   consistent with the photo from the scene.

16   Q.    Okay.  And, again, at that time all you have to figure

17   this out and to compare it to is a photograph at the scene

18   of a shotgun on the floor; is that right?

19   A.    Yes, ma'am.

20   Q.    That's the best that you could do.

21         Now, the down distance that you marked here, the

22   one-and-a-quarter inches, that's the only distance that you

23   test for that down distance; isn't that right?

24   A.    Again, I don't remember without looking at my notes.

25   Q.    And if I represented that that's all you tested, would

514
CROSS - DeFRANCE

1    that be fair?

2    A.    That's probably fair.

3    Q.    Okay.  And did you ever angle the gun upward or angle

4    the gun downward?

5    A.    No.

6    Q.    So that was never tested.

7    A.    No, ma'am.

8    Q.    Okay.  Thank you, Mr. Reyes.

9              Now, for each test that you performed, someone took

10   photographs of the case, correct?

11   A.    Yes.

12   Q.    Someone took photographs of the target that was being

13   fired at, correct?

14   A.    Yes.

15   Q.    Correct?

16   A.    Yes.

17   Q.    And we -- it looks like we have some of the cases, but

18   you probably have somewhere all of the cases and all of the

19   targets --

20   A.    Yes.

21   Q.    -- correct?

22             And we haven't seen any targets here yet, but you

23   used those targets and you have those targets, don't you?

24   A.    Yes.

25   Q.    Now, this testing that you did in December of 2020, you

CROSS - DeFRANCE

1    did it on two days:  December 3d and December 20th, correct?

2    I mean, sorry, December 3d and December 10th.

3    A.    I remember it was two days in December so . . .

4              I'll assume that is correct.

5    Q.    Okay.  And I just asked you about taking photographs of

6    the cases.  At that time, did you take photographs of the

7    insides of the cases?

8    A.    We did not.

9    Q.    So is there any documentation, I guess other than the

10   cases themselves, of what the inside of the case looked

11   like?

12   A.    No.  Besides the cases themselves, no.

13   Q.    Okay.  And certainly nothing that we've seen here today

14   of what the inside of those cases looked like from your

15   December 2020 testing, correct?

16   A.    No.

17   Q.    Now, once you determined that it was half an inch from

18   the end, one-and-a-quarter inches from the top, you did all

19   your testing based on that positioning of the shotgun in the

20   case; is that correct?

21   A.    That's correct.

22   Q.    And so that was the first phase of your testing is to

23   determine the position of the shotgun, correct?

24   A.    Yes.

25   Q.    And once you thought you had that, then you fired a

516

CROSS - DeFRANCE

1    bunch of test patterns, correct?

2    A.    Correct.

3    Q.    Now, we have -- again, we haven't seen those today, but

4    there are photographs of them, correct?

5    A.    Yes.

6    Q.    There's a lot of photographs of them, aren't there?

7    A.    There are.

8    Q.    Now, if your hypothesis about the position of the

9    shotgun in the case is incorrect, then all those target

10   pellet patterns are unreliable; is that right?

11   A.    And that's why we didn't use them today.

12   Q.    So December 3d and the December 10th testing, all of

13   those targets and the results of that distance testing is

14   flawed.

15   A.    I do not personally consider them reliable.

16   Q.    So you proceeded to do more tests, right?

17   A.    Yes, but that was because we learned new information

18   about the ammunition.

19   Q.    Okay.  Well, let me -- before we get to that, you did

20   additional testing in July 14th of 2021, correct?

21   A.    Uhm-hum, yes.

22   Q.    Now, that's before you changed some of your variables,

23   correct?

24   A.    Correct.

25   Q.    So at that time, you did even more testing, and your

CROSS - DeFRANCE

1    testing with the same conditions, half an inch from the end,

2    one-and-a-quarter inches from the top, correct?

3    A.    Correct.

4    Q.    And so you do even more testing and shoot at more

5    cardboard targets and create dozens of pellet patterns, and

6    all of that is unreliable, too, correct?

7    A.    Correct.

8    Q.    Before we get to the next round of testing, can we pull

9    up defense Exhibit RA-28, page 5, which is INV 925, please.

10   And can we focus on just the very top part of that, please.

11   That's great.

12           Now, I want to talk to you a little bit about the

13   ballistics of shotgun shells, if I may.  What this shows --

14   and this comes from a worksheet that you put together; is

15   that right, Agent DeFrance?

16   A.    Yes.

17   Q.    Is that your handwriting?

18   A.    That is.

19   Q.    And what this shows, again, the type of shell that you

20   used, the type of ammunition used was Federal Premium

21   12-gauge 3 inches, we say double-aught, but I guess it's

22   double zero buck, which is 15 pellets, and copper plated,

23   correct?

24   A.    Correct.

25   Q.    Now, you also write at the bottom there, 1100 FPS muz

518

CROSS - DeFRANCE

1   vel.  What does that mean?

2   A.    Muzzle velocity.

3   Q.    And what is FPS?

4   A.    Feet per second.

5   Q.    And 1100 feet per second, did you ever do that

6   conversion into miles per hour?

7   A.    I did not.

8   Q.    Would you trust me if I told you that was 750 miles per

9   hour?

10  A.    That sounds about right.

11  Q.    And so what does that mean?  Is that the force of

12  that -- those pellets coming out of that shotgun when it's

13  fired?

14  A.    That's the velocity that was printed on the packaging

15  that I just noted.

16  Q.    Does that velocity represent, or should it represent,

17  the force that the pellets are fired out of the barrel of a

18  shotgun?

19  A.    It's the velocity that the pellets leave the muzzle at.

20  Q.    And that is 1100 feet per second, or 750 miles per

21  hour; is that right?

22  A.    Yes.

23  Q.    And so what's coming out of the muzzle of that shotgun

24  at 750 miles per hour are 15 pellets, correct?

25  A.    Yes.

CROSS - DeFRANCE

1    Q.    A shot cup.

2    A.    Yes.

3    Q.    An over-powder, correct?

4    A.    Yes.

5    Q.    And I think it's called buffer material, all that white

6    material that we saw in the shotgun shell, correct?

7    A.    Correct.

8    Q.    And also parts of the gun case, correct?  They're not

9    coming out of the barrel, but they are fired through and

10   they shoot forward; is that correct?

11   A.    Yes, pieces of the gun case that were ahead of the

12   muzzle do get accelerated.

13   Q.    So would you agree, Agent DeFrance, that 750 miles per

14   hour is a very high velocity?

15   A.    I guess it depends on what we're comparing it to.

16   Q.    If we're comparing it to driving our car 70 miles per

17   hour.

18   A.    That would be pretty fast, then.

19   Q.    And would you agree that at a close distance -- and

20   I'll say a close distance of 1 to 3 feet -- pellets coming

21   out at 750 miles per hour, that they are going to penetrate

22   skin?

23   A.    I don't feel comfortable discussing wound ballistics

24   because it is not my area.

25   Q.    Fair enough.  So let's talk about your cardboard

520

CROSS - DeFRANCE

1    targets.  Did the 15 pellets coming out from all the tests

2    that you did at different distances, did they penetrate the

3    cardboard target?

4    A.    Yes.

5    Q.    And I think we even saw -- and I'm sorry, I don't

6    remember the exhibit number -- but I think we even saw that

7    at 30 feet away they penetrate the target, correct?

8    A.    Correct.

9    Q.    So pellets did not hit the target and slide down.

10   A.    No.

11   Q.    Pellets did not bounce off the target --

12   A.    No.

13   Q.    -- correct?

14            Pellets went through that cardboard target.

15   A.    Yes.

16   Q.    And is that what you would expect them to do?

17   A.    Yes.

18   Q.    Thank you, Mr. Reyes.

19            What about the shotgun shell?  Now, if a shotgun

20   fires, the shell doesn't go through the end of the barrel;

21   is that right?

22   A.    The shotshell stays in the chamber.

23   Q.    And does it get ejected from the chamber?

24   A.    It gets extracted and ejected from the chamber.

25   Q.    And that should happen automatically; is that right?

CROSS - DeFRANCE

1    A.    It should.  In this particular shotgun, yes.

2    Q.    So what's going through the barrel are the pellets, the

3    shot cup, the wadding, but the shell gets ejected from the

4    side of the shotgun; is that right?

5    A.    That's correct.

6    Q.    And on this particular shotgun, a Browning Auto 5, it

7    comes out the right side.

8    A.    That's correct.

9    Q.    Did you do any test to determine how far that ejected

10   shell -- where that would go?  Did you ever trace that,

11   follow that?

12   A.    We did not.

13   Q.    Let me ask you about something else.  Now, for all your

14   testing again, we talked about how you did -- used these

15   newly created soft cases made by the Allen Company.

16         I'd like to look at Government Exhibit 222, page 3,

17   which has been admitted.  And it's INV 29562.

18         Now I don't know if we saw this on your direct, but

19   do you recognize this photograph?

20   A.    I do.

21   Q.    Now, I'm going to try something with my stylus.  I want

22   to circle something.  That didn't work.

23         Do you see this thing here at the left-hand end of

24   the shotgun case?

25   A.    I do.

CROSS - DeFRANCE

1  Q.    What is that?

2  A.    It's a -- like a loop or tab that's affixed to the end

3  of the soft case with a rivet.

4  Q.    And that's a steel rivet that is clamped into that soft

5  case; is that right?

6  A.    It's metal.  I don't know if it's steel, but . . .

7  Q.    Did you --

8  A.    A metallic rivet, let's say.

9  Q.    A metallic rivet.  I don't want to look at every

10  photograph, but would you say that that hanging loop with

11  the metal rivet was on every shotgun case that you tested?

12  A.    Yes, it was.

13  Q.    Thank you, Mr. Reyes.

14        Now, after you fired your stand-in shotgun through

15  these brand-new cases, tell me what happens to that hanging

16  loop and steel rivet.

17  A.    I believe it was missing after all of the test shots.

18  Q.    So it gets completely blown away; isn't that true?

19  A.    I wouldn't say completely blown away.  It gets

20  accelerated along with the projectiles and, in some cases,

21  we would actually find that protruding through the

22  cardboard.

23  Q.    So I guess what I meant when I said that is it's no

24  longer attached to the case.

25  A.    No.  No, it was not.

CROSS - DeFRANCE

1    Q.   Okay.  And let's just look at one example of that,

2    Government's Exhibit 222 page 9, which is 29574.

3         And so, again, this is a soft case after it has

4    been fired through.  And do you see that that hanging loop

5    and steel rivet are missing from there?

6    A.   Yes, ma'am.

7    Q.   And just to repeat, that happens every single time,

8    correct?

9    A.   I believe so.

10   Q.   Thank you, Mr. Reyes.

11        Now, I want to go to the actual -- well, before I

12   do that, let me ask you:  Did you -- did you note that the

13   hanging loop and the steel rivet got disconnected from the

14   case every single time?

15   A.   I noticed it.  If that's what you're asking, yes.

16   Q.   Did you track where it went?

17   A.   We didn't specifically track it, but in -- as I

18   mentioned, in some cases we could actually find it partially

19   penetrating through the cardboard.

20   Q.   Okay.  And when you say partially penetrating, so it

21   didn't go all the way through the cardboard, but could hit

22   it or partially penetrate it?

23   A.   In some cases it might have gone all the way through

24   the cardboard, but the cases where we could see it, it was

25   actually impaled into the cardboard.

524
CROSS - DeFRANCE

1    Q.    Okay.  But you didn't track it, you didn't see where it

2    went, you didn't follow that?

3    A.    No.

4    Q.    And let's take a look at the actual shotgun case.  And

5    this is Government Exhibit 206.  Let's take a look at 27588,

6    which is page 3.  And again what we're looking at here is

7    the actual shotgun case; is that right?

8    A.    That is correct.

9    Q.    And would you agree that that hanging loop and that

10   metal rivet are not on there.

11   A.    I would agree.

12   Q.    Let's take a look at one other photo, which is page 9,

13   27594.  And that's just a more close-up view of that.

14          And can you see again that that hanging loop and

15   metal rivet -- or metal -- yeah, metal rivet is not there?

16   A.    Yes, and it's not there.

17   Q.    And I understand that you can't talk about wound

18   velocity, but -- or wound impacts, but based on your testing

19   in this case, you saw that it was disconnected from the case

20   and sometimes hit into the target.

21   A.    Yes, it did.

22   Q.    Thank you, Mr. Reyes.

23          Now, we talked about the testing that you did on

24   July 14th.  Why did you do additional testing July 14th?

25   A.    The July 14th testing is because we were presented with

CROSS - DeFRANCE

1    an alternate theory of the muzzle at 4-inch back from the

2    front --

3    Q.   I'm talking about July 14th, 2021.

4    A.   Oh, I'm sorry.  We were just producing additional test

5    patterns at those distances.

6    Q.   Okay.  And those additional test patterns, again, were

7    relying on the condition of the half-inch from the end of

8    the case and the one-and-a-quarter from the top; is that

9    right?

10   A.   Yes, ma'am.

11   Q.   So you would agree that none of those patterns produced

12   in December 3d, December 10th and July 14th, are something

13   that we can rely on here today?

14   A.   I don't consider them reliable because of the muzzle

15   position, as well as the differences in the shotshells -- in

16   the ammunition.

17   Q.   And because it's important to know the exact facts and

18   conditions from the scene; isn't that right?  Because all

19   those things can make a difference; isn't that correct?

20   A.   So the things that I thought would make a difference I

21   specifically noted in the report as assumptions that we were

22   making regarding the functional equivalency of the firearm,

23   the ammunition, and the construction of the backs.

24   Q.   I'm sorry, can you repeat that.  I'm not sure I

25   understood that answer.

526

CROSS - DeFRANCE

1    A.    So there are assumptions listed in the report that are

2    conditions for the -- that testing to be reliable that

3    the --

4    Q.    Right.  Okay.  I understand.  So --

5          THE COURT:  You just asked him to repeat his

6    answer.  Let him answer.

7          Go ahead, sir.

8          THE WITNESS:  That the -- that the firearm, the

9    ammunition, and the soft cases were all functionally the

10   same as the ones used in the shooting.

11   BY MS. MOSS:

12   Q.    And that's an assumption.  And if you learn that

13   assumption was incorrect, you would not want to use that

14   assumption anymore.

15   A.    Correct.

16   Q.    Now, you talked --

17         THE COURT:  Ms. Moss, would this be a good time to

18   call it a day?

19         MS. MOSS:  Yes, Your Honor.

20         THE COURT:  All right.  All right, folks, we're

21   going to call it a day.  Please be back in the jury

22   deliberation room, like we've been doing every morning, by

23   8:35.  Again, I will instruct you do not do any independent

24   research in or discuss with anyone the facts, the law, or

25   the persons involved in this case.

CROSS - DeFRANCE

1        We'll be in recess until 8:45 tomorrow morning.

2        (Jury left the courtroom at 5:04 p.m.)

3        THE COURT:  Special Agent, same restriction as I

4   told you before.  Please be back in the witness stand by

5   8:40 tomorrow morning.

6        THE WITNESS:  Yes, sir.

7        (Proceedings concluded at 5:05 p.m.)

8                           INDEX

9   Item                                           PAGE

10                GOVERNMENT'S WITNESSES

11      MARK SWANEPOEL (Continued)
        Direct Examination by Mr. Winstead        267
12      Cross-examination by Mr. Markus           301
        Redirect Examination by Mr. Winstead      343
13      Recross-examination by Mr. Markus         357

14      MWENE CASIUSS BANDA
        Direct Examination by Mr. Fields          361
15      Cross-examination by Ms. Moss             377
        Redirect Examination by Mr. Fields        388
16
        VALERIE WOOD
17      Direct Examination by Mr. Grewell         392
        Cross-examination by Ms. Doyle            398
18      Cross-examination by Mr. Dill             410
        Redirect Examination by Mr. Grewell       410
19
        CHARLES DeFRANCE
20      Direct Examination by Mr. Winstead        412
        Cross-examination by Ms. Moss             461
21

22                GOVERNMENT'S EXHIBITS

23   EXHIBITS:      Offered   Received  Refused   Stipulated

24   217            429       429

25   268            437       437

CROSS - DeFRANCE

1    269              438         439

2    270              438         439

3    271              438         439

4    272              438         439

5    273              449         449

6                     *      *      *      *      *

7                    REPORTER'S CERTIFICATE

8         I certify that the foregoing is a correct transcript

9    from the record of proceedings in the above-entitled matter.

10        Dated at Denver, Colorado, this 11th day of September,

11   2023.

12

13

14

15

     MARY J. GEORGE, FCRR, CRR, RMR

16

17

18

19

20

21

22

23

24

25