529

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2
   Criminal Action No. 22-cr-0012-WJM
3
   UNITED STATES OF AMERICA,
4
        Plaintiff,
5
        vs.
6
   LAWRENCE RUDOLPH,
7  LORI MILLIRON,
8  Defendants.

9  ------------------------------------------------------------

10              REPORTER'S TRANSCRIPT
                  (Jury Trial, Day 5)
11
   ------------------------------------------------------------
12         Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

13 Judge, United States District Court for the District of

14 Colorado, commencing at 8:50 a.m., on the 15th day of July,

15 2022, in Courtroom A801, United States Courthouse, Denver,

16 Colorado.

17
                        APPEARANCES
18
       BRYAN D. FIELDS, E. GARRETH WINSTEAD, III, J. BISHOP
19 GREWELL, Assistant U.S. Attorneys, 1801 California Street,
   Suite 1600, Denver, Colorado 80202, appearing for the
20 plaintiff.

21     DAVID O. MARKUS, A. MARGOT MOSS, LAUREN L. DOYLE,
   Markus Moss PLLC, 40 NW Third Street, Penthouse 1, Miami,
22 Florida 33175, appearing for the defendant Rudolph.

23   JOHN W. DILL, John W. Dill P.A., 941 West Morse
   Boulevard, Winter Park, Florida 32789, appearing for the
24 defendant Milliron.

25

MARY J. GEORGE, FCRR, CRR, RMR
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer

P R O C E E D I N G S

(In open court outside the presence of the jury at

8:50 a.m.)

THE COURT:  All right, before we bring in the jury,

I wanted to make an observation.  I want counsel to

understand I'm not upset with anyone, I'm not telling

anybody to do anything or not to do anything.  I just am

going to make an observation.  Yesterday the direct

examination by the Government of this witness was 74

minutes.  The cross-examination, which is not yet complete,

has been 88 minutes.  I think I enabled some of that length

by allowing questions regarding matters that were not

within -- strictly within the scope of direct examination,

but I did so because in a criminal trial I usually have a

slightly more expansive view of that because I want to make

sure the defendant gets to put on the evidence he or she

needs for their defense.

It appears to me that a number of the questions

that were directed at this witness were -- really more

properly should have been directed at Dr. Cina.  But be that

as it may, when I denied the defendants' joint motion to

limit the Government's case, and I expressly kept open the

option of implementing a modified trial clock, I recall

1    specifically referencing the length of cross-examination as

2    to whether I would do that.  I've not yet decided whether I

3    will or will not implement a modified trial clock.  But if

4    we have many more cross-examinations that are not as focused

5    and efficient, then it -- by doing that, it will make it

6    much less likely that I will impose a modified trial clock

7    on the Government.

8            All right.  Let's bring in the jury.

9            MR. MARKUS:  Yes, Your Honor, I'm sorry.  Can I say

10   one thing about that?

11           THE COURT:  Go ahead.

12           MR. MARKUS:  Thank you, Your Honor.  I just wanted

13   to note that the Government -- this is the seventh

14   Government witness, first six Government witnesses, we've

15   used far, far less time on cross-examination in total than

16   the Government has on direct.  And on the estimates that the

17   Government has provided on direct and cross, I think on

18   almost every one, except for Mr. Grewell's witness, they've

19   exceeded the estimate on direct and we've gone far less on

20   the estimate on cross-examination.

21           So this one witness, it is true that we've used

22   more time, but on the other six we've used far less, Your

23   Honor.

24           THE COURT:  All right.  I'll also note that the

25   defendant estimated cross -- defendants estimated

1    cross-examination of Special Agent DeFrance at 45 minutes,

2    and, like I said, we're at 88.

3             All right.  Let's bring in the jury.

4        (In open court in the presence of the jury at 8:53

5    a.m.)

6             THE COURT:  Good morning, ladies and gentlemen of

7    the jury.  Welcome back to day 5 of our jury trial.

8             Special Agent DeFrance, I remind you that you

9    remain under oath.

10            THE WITNESS:  Yes, Your Honor.

11            THE COURT:  Ms. Moss, you may resume your

12    examination.

13            MS. MOSS:  Thank you, Your Honor.

14                CROSS-EXAMINATION (Continued)

15            MS. MOSS:  Good morning, Mr. DeFrance, How are you

16    today.

17    A.    Good morning, ma'am, I'm fine, How are you?

18    Q.    I'm fine.  Thank you.

19            Agent DeFrance you testified on direct that the

20    testing that you performed did not seek to prove any one

21    theory but was designed to consider multiple scenarios; is

22    that correct?

23    A.    That's correct.

24    Q.    And it looks like, from hearing your testimony

25    yesterday, and seeing some of those exhibits of the testing

1  that you did, is that the scenario that you were considering

2  was that someone pulled the trigger; is that right?

3  A.    No.   The scenarios that we were considering were

4  spanned from something that could have been an accidental or

5  intentional discharge by the victim, which would require

6  logically the muzzle to be close to the victim, out to

7  something that was further away.

8  Q.    And did that consideration of an accidental discharge

9  by the victim include her somehow pulling the trigger or

10  something snagging the trigger?

11  A.    We weren't testing for anything in terms of how that

12  might have happened, but simply in terms of distances and

13  the patterns that they would create.

14  Q.    And so, Agent DeFrance, when you were testing all

15  possible theories and multiple scenarios, did you test the

16  possibility of the gun dropping on the ground?

17  A.    We did not.

18  Q.    Did you test the possibility of the gun, say, falling

19  over?

20  A.    We did not.

21  Q.    Did you test the possibility of the gun being jarred

22  into a hard object?

23  A.    We did not.

24  Q.    Now, there is such a thing as a drop test; is there

25  not?

1    A.    There is.

2    Q.    And there's also -- well, before I ask my next

3    question, let me ask you:  Law enforcement does have the

4    ability to drop-test firearms; is that correct?

5    A.    Yes, ma'am.

6    Q.    And have you heard of SAAMI, S-A-A-M-I?

7    A.    Yes.

8    Q.    And that stands for Sporting Arms and Ammunition

9    Manufacturing Institute?

10   A.    Yes.

11   Q.    And this is an organization that has created industry

12   standards for how to perform some of these tests; is that

13   correct?

14   A.    I'm not aware of SAAMI doing industry standards on

15   drop-testing.

16   Q.    Okay.  Fair enough.  But you are aware that there are

17   such a thing called drop tests.

18   A.    Yes.

19   Q.    And the FBI has the ability to perform drop tests.

20   A.    Yes, ma'am.

21   Q.    There's also such a thing as a jar-off test, correct?

22   A.    I'm -- I'm not familiar with that particular term, but

23   it sounds like it would be similar to a drop test.

24   Q.    Are you familiar with a type of test that simulates

25   bumping or hitting the butt of a shotgun against a hard

535

1    surface?

2    A.    Yes.    That's what I would categorize as a drop test.

3    Q.    Okay.    And, again, the FBI has the ability to do those

4    types of tests?

5    A.    Yes, ma'am.

6    Q.    Have you heard of a rotation test?

7    A.    I have not.

8    Q.    Maybe not the term, but have you heard of a test that

9    simulates the fall of a firearm when it's left leaning

10   against a vertical surface?

11   A.    Are you saying it falling down onto the floor?

12   Q.    Yes.    What I have heard is called a "rotation test."

13   A.    Again, I would just call this a drop test, just a

14   different scenario.

15   Q.    Okay.    I'd like to talk to you about some of the

16   testing.    And specifically I'd like to talk about some of

17   the soft cases that were used in this reconstruction.

18          Can we please pull up Defense Exhibit RA-28,

19   page 7.    I think this is RA-28-7, which is already admitted

20   into evidence.    And so I'm moving to another area now.

21          What we're seeing here is a page from your

22   worksheet; is that correct?

23   A.    Yes, ma'am.

24   Q.    And what this page is documenting is the different soft

25   cases that were used; is that right?

536

1    A.    Yes, ma'am.

2    Q.    And so what we're seeing here is that you -- at least

3    on this page, you tested 21 different soft cases.  And it

4    looks like they're all labeled 1-1, 1-2, and 1-3 and so on,

5    correct?

6    A.    Yes, ma'am.

7    Q.    So the soft cases were also measured.  There's a column

8    there that says "Bag Length," do you see that?

9    A.    I do.

10   Q.    And so when these soft cases were measured that were

11   involved in your testing, we see some that are -- that are

12   at 48 and a quarter inches, 48 and a half inches, some that

13   are exactly 48 inches, some at 48 and 3/4, I believe there's

14   some at 48 and 5/8.  Do you see that?

15   A.    Yes, ma'am.

16   Q.    So is it fair to say that all of the cases varied a

17   little bit in size?

18   A.    Yes.

19   Q.    Thank you, Mr. Reyes.

20         Now for the fourth round of testing that you

21   performed, that was in June 15th, 2022, this year, correct?

22   A.    Yes, ma'am.

23   Q.    And that was after the time that you had the

24   opportunity to inspect the actual soft case that had been

25   involved in this incident.

1    A.    Yes, ma'am.

2    Q.    And did you measure what the exact length of that soft

3    case was -- the actual soft case?

4    A.    It's recorded in the photographs with the scales, but

5    it was missing the end of it, so I couldn't make a direct

6    measurement of that.

7    Q.    In your follow-up testing, the testing that we're

8    talking about on June 15th, did you make an attempt to use

9    only soft cases that were the exact length of that actual

10   case?

11   A.    The soft cases were all within a very small difference

12   in length.  And, frankly, the -- the length of what was

13   sticking out the back is not -- didn't seem very relevant to

14   what's happening at the front of the muzzle end.

15   Q.    Okay.  And so that's not something you -- sounds like

16   you took into consideration.

17   A.    No, we documented all of that because we knew that we

18   were damaging these soft cases and we wouldn't be able to

19   take that measurement after we did the testfires.  But it

20   wasn't really a consideration in what kind of damage was

21   happening at the muzzle end.

22   Q.    But to see whether it actually would make a difference,

23   you would have to actually test that; is that correct?

24   A.    I don't think that there's any reason to believe that a

25   quarter-inch extra material at the back end of the soft case

1    is going to affect the results at the muzzle end.

2    Q.    Fair enough.  You also talked about how the actual gun

3    case was an inch narrower.  Did you -- they changed the

4    dimensions of the brand-new soft cases after you realized

5    that the actual soft case was an inch narrower?

6    A.    The soft cases that we had were all manufactured at the

7    same time.

8    Q.    And so when you did the additional testing on June 15th

9    and then again on July 5th, that didn't change?  The cases

10    didn't change.

11    A.    No, it did not.

12    Q.    Let's talk about this fourth round of testing that you

13    did on June 15th.

14            And if we can pull up Government Exhibit 266,

15    page 1.  This is INV 29567.

16            And looking at this photograph -- again, this is

17    from a different round of testing than what we saw before;

18    is that right?

19    A.    This is from the third round of testing.

20    Q.    From June 15th.

21    A.    Yes, ma'am.

22    Q.    And so what we're seeing is that you used the same

23    setup that you used in the prior testings?

24    A.    Yes, we did.

25    Q.    So you have -- again, you have the shotgun mounted on a

539

1    machine rest, correct?

2    A.    Yes.

3    Q.    You have the clamp on the muzzle end of the shotgun,

4    correct?

5    A.    Yes.  And just for clarification, the clamp was removed

6    before firing.  That was just to hold everything in place

7    until we were ready to pull the trigger.

8    Q.    And you wanted to put that clamp there before the

9    firing to ensure it stayed in place, correct?

10   A.    Yes.

11   Q.    Because the bottom of the soft case is, again, flayed

12   out and kind of butterflied over the butt end of the

13   shotgun, correct?

14   A.    I'm not sure what the arrow is trying to point out --

15   Q.    The arrow is pointing at the clamp.  I apologize.

16   A.    Okay.

17   Q.    But --

18   A.    I'm sorry, could you repeat the question.

19   Q.    So the back end of the soft case -- and Mr. Reyes has

20   put some arrows up there.  Again, that's flayed out and

21   somewhat butterflied?

22   A.    Yeah, the back end is flayed out, but the front end is

23   zippered as far back as we could do that inside the mount.

24   Q.    And we also see, again, that there's the strap on the

25   butt of the shotgun to hold the shotgun in place; is that

1    right?

2    A.    Yes, ma'am.

3    Q.    Thank you, Mr. Reyes.

4            Now, Agent DeFrance, when you did this round of

5    testing, you told us, I believe, the position of the shotgun

6    now was 1.8 inches from the end of the soft case.  Do you

7    recall that?

8    A.    Yes, ma'am.

9    Q.    And you demonstrated for us how that -- how you

10   measured that.  Now, so this is -- I guess this is over

11   triple the difference that you used in your first two rounds

12   of testing; is that correct?

13   A.    That's correct.

14   Q.    Now, when you did this testing, again you took

15   photographs of the setup; is that correct?

16   A.    Yes.

17   Q.    You took photographs of the shotgun cases.  And we've

18   seen some of those, correct?

19   A.    Yes.

20   Q.    You took photographs of the cardboard targets that you

21   were firing into, correct?

22   A.    Yes, we did.

23   Q.    And you also set up safety precautions -- the protocol

24   safety precautions similar to the ones that you had done for

25   the first few rounds of testing.

1  A.    They were the same as the first few rounds of testing,

2  yes.

3  Q.    So the same as what you did in 2020 and in 2021,

4  correct?

5  A.    Yes, ma'am.

6  Q.    And would you agree that a basic rule of firearm safety

7  is that you don't want to point the muzzle of a shotgun at

8  yourself or part of your body?

9  A.    Yes.

10  Q.    But during this round of testing -- and Agent Dahlstrom

11  was, I guess, the shooter on this; is that right?

12  A.    Yes, he was.

13  Q.    And before each test-fire, you asked Agent Dahlstrom to

14  put his hand on the target so that you could focus your

15  camera -- your high-speed camera; is that right?

16  A.    Yes.

17  Q.    So Agent Dahlstrom was putting his hand in front of

18  that loaded shotgun, correct?

19  A.    No.  The shotgun was not loaded at that point.

20  Q.    Are you sure about that?

21  A.    We're absolutely sure of that.

22  Q.    Now, I'd like to look at some of the results of that

23  testing.  And I -- we quickly went through these yesterday.

24  I'd like to pause on some of them.  If we could go to

25  Government Exhibit 220, page 7, which is INV 29578.  Can we

542

1    maybe focus in a little bit more.  Thank you.

2              So, Agent DeFrance, this is one of your cardboard

3    targets.  And this is the result of test-firing through test

4    bag 3-2; is that right.

5    A.    That's correct.

6    Q.    Do you remember the distance for this one?

7    A.    I believe this would be a bag-to-target distance of 1

8    foot, without checking my notes.  I'm pretty sure that's

9    correct.

10   Q.    And let me ask you this:  Do you see -- let me try that

11   again.

12             Do you see these points that are sticking out here

13   where I'm drawing the stylus pen in green?

14   A.    I do.

15   Q.    Those are made by pellets; is that right?

16   A.    I'm not comfortable doing any interpretation of these

17   patterns.  I just produced them for interpretation by an

18   appropriate expert since the pattern in question is in a

19   wound in flesh.

20   Q.    Okay.  That's fair.  But did you -- did you see -- you

21   were there for the testing, right?

22   A.    I was.

23   Q.    And -- and so you saw the test-firing, right?

24   A.    Yes, ma'am.

25   Q.    And so you saw the pellets coming out of the shotgun,

1    did you not?

2    A.    Well, we fired them.  We can't really see the pellets.

3    Perhaps, on the high-speed video, but not --

4    Q.    But that's a point.  You took high-speed video.  And

5    even though we call it high speed video, the point of

6    high-speed video is to actually slow it down so you can see

7    what's happening, correct?

8    A.    Correct.

9    Q.    Did you look at your high-speed videos --

10    A.    I did.

11    Q.    -- testing?

12          And so do you see the pellets coming out and going

13    through the target -- cardboard?

14    A.    It depends on the tests.  And it has a lot to do

15    with -- distance because those pellets are in that buffer

16    material, so sometimes that's not visible in the high-speed

17    video because it's obscured by that buffer material.  And

18    then at -- there's a point where it kind of spreads out and

19    you're able to see those more clearly.

20    Q.    And -- and so let me ask you about that.  Okay.  We've

21    talked about there's -- in a cartridge case, there is

22    pellets -- there are pellets, there's buffer material,

23    there's wadding, correct?

24    A.    Correct.

25    Q.    Now, all of these have different ballistic properties,

544

1    correct?

2    A.    Correct.

3    Q.    And the pellets are -- would you agree that those are

4    the heaviest things within that shotgun shell?

5    A.    Yes, ma'am.

6    Q.    And so those are going to come out the fastest and --

7    and go first; is that right?

8    A.    Everything would leave the muzzle at the same velocity.

9    Q.    So it will leave the muzzle at the same velocity --

10   A.    Yes, ma'am.

11   Q.    -- but as it travels through air, doesn't that change

12   for different components of the shotshell case?

13   A.    It would.  Yes, ma'am.

14   Q.    And the way that changes is the heavier objects, like

15   the pellets, will go forward faster.

16   A.    The -- the effect has to do with air resistance and

17   mass is a factor in that, but also shape.

18   Q.    Okay.  So it sounds like -- are you agreeing with me?

19   A.    I am agreeing with you, yes.

20   Q.    Okay.  Thank you.  So I understand you want -- you

21   don't want to testify about interpretation, that's fine.

22   Let me ask you about -- sorry -- do you see a lot of like

23   black specs all over this cardboard?

24   A.    Yes, ma'am.

25   Q.    Can you tell us what that is.

545

1    A.    Those are pieces of the soft case.

2    Q.    So that also seems like it got propelled forward in

3    addition to all the components of the shotshell; is that

4    right?

5    A.    Yes, ma'am.

6    Q.    Thank you.  Can we go to page 12, 29693.  I'm sorry,

7    that's INV, yes.  29693.  And that is still Government

8    Exhibit 220, page 12.

9          Now, this is also another one of the test patterns

10   that you did; is that right?

11   A.    Yes, ma'am.

12   Q.    And do you remember what this distance was?

13   A.    I don't remember off the top of my head.  I'd have to

14   look at my notes.

15   Q.    That's fine.  Can we zoom really far in around the --

16   what looks like a hole.

17         Now, it may be difficult for me to point out, but

18   do you see in the cardboard that instead of holes, that

19   there are sometimes little indentations into the cardboard?

20   Can you see that in -- maybe it's not -- I think over here,

21   maybe over here.  Do you see those things?

22   A.    Yes, ma'am.

23   Q.    Agent DeFrance, do you know what caused those things --

24   those little indentations?

25   A.    I suspected that was probably the buffer material.

546

1    Q.    Okay.

2    A.    But it could have been pieces of the bag as well.

3    Q.    All right.  And -- and when we're talking about buffer

4    material, again, the buffer material is much lighter than

5    the pellets.

6    A.    Yes, ma'am.

7    Q.    And it's possible that the buffer material will hit the

8    target but not necessarily penetrate the target.

9    A.    Yes.  But, again, we're getting into interpretation of

10   the patterns, which is not my place.

11   Q.    Okay.  All right.  And, again, we see a lot of what

12   looks like black cloth.  Do you know what that is?

13   A.    Those are pieces of the soft case.

14   Q.    Can we go to Government Exhibit 220, page 19, which is

15   29652.

16            Now, this is another example of your targets that

17   you were creating on that day; is that right?

18   A.    Yes, ma'am.

19   Q.    And this is from soft case 3-7.  Do you remember the

20   distance on this one?

21   A.    Again, I don't remember off the top of my head.  I

22   would have to look at my notes.

23   Q.    That's fine.  I understand that you're not comfortable

24   with talking about patterns, but would you agree that this

25   looks different than the first one we looked at?

1    A.   Yes, ma'am.

2    Q.   Thank you, Mr. Reyes.

3              Agent DeFrance, you talked about how, when you did

4    this round of testing, you had a limited number of -- not

5    bullets but cartridges; is that right?  Shotgun shells?

6    A.   A limited number of shot shells, yes.

7    Q.   And I believe you said that you had been given 21.

8    A.   Yes, ma'am.

9    Q.   But the ammunition company, Vista Ammunition, they

10   actually made 31; is that right?

11   A.   My understanding is they made 31, but they had to use

12   10 for their own internal testing before releasing the

13   ammunition to us.

14   Q.   And --

15             THE COURT:  Counsel, I thought the manufacturer was

16   Federal not Vista.

17             MS. MOSS:  I'm sorry?

18             THE COURT:  Can you not hear me?

19             MS. MOSS:  I cannot, Judge.  I'm sorry.  I have a

20   hearing problem.

21             THE COURT:  I thought the ammunition manufacturer

22   was Federal and not Vista.

23             MS. MOSS:  I believe Vista is the parent company

24   that owns Federal.

25             THE COURT:  How would the jurors know that?  Let's

548

1    use one name for the manufacturer.

2    BY MS. MOSS:

3    Q.    Agent DeFrance, do you know whether Vista is a parent

4    company for Federal?

5    A.    I believe so.  Yes.

6    Q.    Thank you.  If you had more shotgun shells, would you

7    have tested them?

8    A.    Yes.

9    Q.    Now, you also did some testing on July 5th, just about

10   a week ago.

11   A.    Yes, ma'am.

12   Q.    And I think we saw some photographs of that as well.

13   You said you were testing an alternate theory --

14   A.    Yes, ma'am.

15   Q.    -- at that time.

16         At that time, you had some shotgun shells left

17   over, correct?

18   A.    Yes.  We had six left from that third round of testing.

19   Q.    And when you did that round of testing, did you use --

20   did you fire into a cardboard target?

21   A.    We did not.

22   Q.    So did you photograph the testing that you did --

23   A.    We did.

24   Q.    -- with a high-speed camera?

25   A.    No, we did not.

549

1    Q.    So do you know the pellet patterns that would have been

2    created by that last round of testing?

3    A.    No.  For that last round of testing we were really

4    interested in the damage to the soft case.

5    Q.    I want to ask you about my last subject.  And this has

6    to do with the hole that we saw in the actual soft case and

7    the interior of the soft case.  Okay?

8    A.    Okay.

9    Q.    Just so we can remind everyone, I would like to take

10   one quick look at a picture that's defense Exhibit RA-20,

11   which has been admitted.  I believe it's RA-20-1.  If you

12   don't have that, we can do Government Exhibit 206, page 11,

13   which is INV 27596.

14          Do you recall seeing this picture, Agent DeFrance?

15   A.    Yes, ma'am.

16   Q.    And when I am talking about the hole within the

17   shotgun, I'm talking about this -- the bigger hole at --

18   towards the end of the shotgun case.  Do you recall that?

19   I'll circle it here.

20          COURTROOM DEPUTY:  One second, counsel.

21       (Pause)

22   BY MS. MOSS:

23   Q.    Do you remember seeing that hole in the interior of the

24   actual soft case?

25   A.    I do.

1    Q.    And I believe that you testified on direct that you

2    believe that looked like a snag.

3    A.    That's what it looked like to me, yes.

4    Q.    And I think that you said that you thought it may have

5    been caused by putting the shotgun into the soft case.

6    A.    That's one possible scenario.  I mean, it just looks

7    like a snag to me.  The shotgun does have kind of a sharp

8    front-sight end that would -- could reasonably snag on

9    there.  But it also could have been a different firearm or

10    different object.

11    Q.    Did you test your theory of trying to put that shotgun

12    in the -- a replica soft case to see whether it created a

13    similar snag?

14    A.    I did not.

15    Q.    Did you examine that hole in the actual soft gun case

16    with a stereo zoom microscope?

17    A.    I did not.

18    Q.    Were you able, with your naked eye, to see whether

19    there were any thermal effects on the fiber ends around that

20    hole?

21    A.    I did not see any, no.

22    Q.    And when you say you did not see any, you did not see

23    any just with your naked eye; is that right?

24    A.    Correct.

25    Q.    And with your naked eye, did you see any thermal

551

1    effects on any of the foam past that hole?

2    A.    On the foam, no.

3    Q.    And when I say "thermal effect," I'm talking about

4    heat -- high heat.  Did you understand that?

5    A.    Yes, ma'am.

6    Q.    Okay.  Agent DeFrance, did you do any infrared testing

7    on the interior of this actual soft case?

8    A.    I did not.

9    Q.    Did you perform a sodium rhodizonate test for vaporous

10   lead on the areas surrounding that whole?

11   A.    I did not.

12   Q.    And do you know what a sodium rhodizonate test is?

13   A.    Yes.

14   Q.    Can you explain that to us.

15   A.    Sodium rhodizonate is a chemical test for the presence

16   of lead.

17   Q.    And is lead something that is found in the primer of a

18   shotgun shell?

19   A.    Yes.

20   Q.    And is that a test that can be performed?

21   A.    Yes.

22   Q.    And is that a test that the FBI is capable of

23   performing?

24   A.    Yes.

25   Q.    And if any of those tests had been performed, would --

552

1    is it possible you would be able to tell whether that is

2    where the muzzle of the shotgun fired from?

3    A.    Potentially, yes.

4    Q.    Agent DeFrance, as we sit here today now, do you still

5    believe that the position of the shotgun in the soft case

6    was 1.8 inches from the end of the soft case?

7    A.    I do.

8    Q.    And I don't believe we've seen the photographs of the

9    inside of soft cases that you did that testing with.  Do you

10   have any of those?

11   A.    We do.

12   Q.    Agent DeFrance, if your assumption is wrong about the

13   position of the shotgun being 1.8 inches from the end, would

14   you say that your test patterns are unreliable?

15   A.    It depends on how much of a difference we're talking

16   about.

17   Q.    And if we're talking about a matter of inches, would

18   that cause it to be unreliable?

19   A.    It would put a lot more of the soft case in front, or

20   not in front, of the muzzle and that could potentially

21   affect the patterns.

22   Q.    Thank you, Agent DeFrance.

23           THE COURT:  Any questions, Mr. Dill?

24           MR. DILL:  Just briefly, Your Honor.

25           THE COURT:  All right.

553

CROSS-EXAMINATION

1

BY MR. DILL:

2

3   Q.    Good morning, Agent.

4   A.    Good morning.

5   Q.    I wanted to clarify.  I wrote down something on direct.

6   I think you said you tested the full spectrum of

7   possibilities in this case as to how the shot expelled from

8   the case.

9   A.    I'm -- if you said I said that.  I can't remember.

10  Q.    I wrote it down, so --

11  A.    Okay.

12  Q.    -- is that fair to say -- I talked on top of you.

13  Sorry.

14          Let me ask:  Did you consider the full spectrum of

15  possibilities?

16  A.    In terms of the distance between the case and the

17  target, that's what we were testing was from contact.  And I

18  guess perhaps full spectrum might not have been the best

19  verbiage because we didn't go out to an infinite distance,

20  but we went out to a distance that seemed much further than

21  was reasonable given the case data.

22  Q.    But you also assumed a fixed or stationary gun,

23  correct?

24  A.    We did.  For the --

25  Q.    I --

554

1    A.    I'm sorry.

2    Q.    Go ahead and explain.

3    A.    For the sake of testing to do things consistently from

4    test to test, we did have a fixed firearm.

5    Q.    Okay.  So did not test the scenario where a gun might

6    be moving or falling.  That was not tested, right?

7    A.    We did not.

8    Q.    Okay.  And you mentioned something before, we saw about

9    the safety measures that were taken by the FBI agents.  And

10   that was for their safety while the gun was being shot,

11   correct?

12   A.    Yes, sir.

13   Q.    You mentioned something about a drop test in this case

14   that was not done.  Have you ever observed a drop test?

15   A.    I have.

16   Q.    Okay.  Now it wouldn't be safe, would it, to conduct a

17   drop test with a live, chambered round, correct?  Near

18   somebody.

19   A.    You would not use, no, a live round, no.

20   Q.    So, for instance, that shotgun that we have behind you

21   right there, if we wanted to do like a drop test -- assuming

22   we were allowed to in here -- if we wanted to do a drop

23   test, we would not take one of those Federal shotgun shells

24   and put it in it, drop it, like this, and see if it went

25   off.

REDIRECT - DeFRANCE

1    A.    That would not seem safe to me, but, again, I'm not

2    conducting any drop tests in this case.

3    Q.    That would not seem safe because with a live, chambered

4    round and a gun dropping, the gun could go off and hurt

5    somebody, correct?

6    A.    Well, the purpose of the test is to figure out if the

7    gun would go off.

8    Q.    But in that test itself, one of the dangers of having a

9    live round and the gun dropping onto a hard surface, say

10   concrete, the gun could go off, correct?

11   A.    Again, the purpose of the test is to find out if that

12   might happen.  And if, in fact, it does, you wouldn't want

13   to put yourself in a dangerous situation where you could get

14   hurt or killed.

15   Q.    Thank you, sir.

16           THE COURT:  Redirect.

17           MR. WINSTEAD:  Yes, Your Honor.

18                   REDIRECT EXAMINATION

19   BY MR. WINSTEAD:

20   Q.    Good morning.

21   A.    Good morning.

22   Q.    Just to follow up real quick on those last questions,

23   you said you didn't perform any drop tests; is that right?

24   A.    That's correct.

25   Q.    If you -- I guess that's -- so you said that the gun

556

REDIRECT - DeFRANCE

1   could go off and hurt someone if you were dropping it and

2   standing over it; is that -- is that what I recall?

3   A.    If you're conducting a drop test to test whether or not

4   it might go off and it did, then obviously somebody could be

5   hurt.

6   Q.    As far as drop tests, what would you have needed in

7   order to -- well, if you know -- because you were obviously

8   asked this on cross, although we didn't go into it on

9   direct -- if you know, in order to get a valid drop test,

10  what would you need?

11  A.    You would need the firearm in question.

12  Q.    Would it do much good if you just used a different

13  firearm?

14  A.    No.

15  Q.    Okay.  So moving back to the beginning.  I just want to

16  clear up what may have been a misunderstanding with regard

17  to a lot of the questions that you received last night.  Did

18  you do a crime scene reconstruction in this case?

19  A.    I did not.

20  Q.    And is that -- when I say "crime scene reconstruction,"

21  is that a term of art?  What does that mean?

22  A.    A crime scene reconstruction is an analysis of a scene

23  where the reconstruction identifies different events that

24  happened in that scene to try to reconstruct the events.

25  Q.    And you didn't do that?

REDIRECT - DeFRANCE

1   A.    I did not.

2   Q.    Did you do a distance determination in this case?

3   A.    I did not.

4   Q.    What does that mean, again, as a term of art?

5   A.    A distance determination is an interpretation of

6   gunshot residue patterns or shot patterns to determine a

7   distance between the muzzle and a target.

8   Q.    If what you've got as far as evidence of the pattern is

9   in flesh, does the FBI do distance determinations like you

10  just described?

11  A.    They do not.

12  Q.    Who does?

13  A.    That would be the purview of the medical examiner.

14  Q.    So if you're not doing a crime scene reconstruction,

15  you were asked whether you did a measurement of the amount

16  of kick, whether you did testing for GSR, a number of other

17  things.  Do those -- would those all go to if you had been

18  doing a crime scene reconstruction?

19  A.    Some of them might, yes.

20  Q.    Now you talked about interpretation of the patterns.

21  Why are you not comfortable doing that?

22  A.    I am no longer an examiner in the FBI laboratory.  I

23  was just producing the patterns.  And then, again, as

24  mentioned, the pattern in question is in flesh and that is

25  not something that anybody in the FBI works with.  It's

REDIRECT - DeFRANCE

1   something that falls within the expertise of a medical

2   examiner, somebody versed in wound ballistics.

3   Q.   Now, again, you had said earlier -- I'd like you to

4   clarify what you meant when you said you're not sure if

5   ballistics gel is designed to mimic skin.  What do you mean

6   when you say that?

7   A.   So I don't have a lot of experience with ballistic

8   gelatin, but it's -- my understanding is that it's designed

9   to have the -- the properties and density of flesh, not

10  necessarily skin, which is essentially like covering.  It's

11  a thin material.  It -- ballistic gelatin is more designed

12  for the overall average density of a body.

13  Q.   Ballistic gelatin, you know, blocks of ballistic

14  gelatin, do they have simulated bones in them?

15  A.   Not the ones that I've seen.

16  Q.   What about simulated separate organs?

17  A.   Not the ones that I've seen, no.

18  Q.   When you were at the FBI lab, do you recall using

19  ballistic gelatin to make distance determinations?

20  A.   No, we did not.

21  Q.   Do you recall using it for any of your work at the lab?

22  A.   No, sir.

23  Q.   Have you -- and, again, if you know, have you heard of

24  it being used in any circumstance in the FBI?

25  A.   I know that it's used in the FBI in the context of the

REDIRECT - DeFRANCE

1    unit that does ammunition testing to decide -- basically to

2    choose ammunition that we actually use in the FBI that we

3    would issue to our agents.

4    Q.    And, again, if you know, do you know why they use it in

5    that capacity?

6    A.    They're testing to see what type of penetration that

7    they would get with a particular ammunition.

8    Q.    But is that the same thing as reconstructing a

9    particular circumstance in a particular case?

10              MS. MOSS:  Objection.  Leading.

11              THE COURT:  Overruled.  It's not leading.  You may

12    answer.

13              THE WITNESS:  No, that unit doesn't do any

14    investigative work, to my knowledge.  They're just an

15    evaluation for, basically, procurement.

16    BY MR. WINSTEAD:

17    Q.    You were also asked about examination of toolmarks.

18    Did you used to do that when you were at the FBI lab?

19    A.    I did.

20    Q.    Now, can you very briefly explain how a toolmark

21    examination works.  Just in what you use and what sort of

22    things you're looking at.

23    A.    So for toolmark examination, we would use a comparison

24    microscope, which is essentially two microscopes with an

25    optical bridge so that you can look at two separate items as

REDIRECT - DeFRANCE

1    if they were side-by-side.

2              So we would compare a known toolmark -- and

3    toolmarks also encompasses marks that are left on ammunition

4    components against a unknown toolmark and compare those

5    microscopically to see if there's sufficient agreement to

6    conclude that they were fired or created by the same tool.

7    Q.   How do you get your known?

8    A.   The known would be from a test-fire of the -- of the

9    firearm in question.

10   Q.   So could you just take a different firearm and do a

11   test-fire?

12   A.   No.

13   Q.   Would you need the original firearm?

14   A.   We would need the original firearm, yes.

15   Q.   You were asked about whether -- well, tell me:  What

16   was the purpose of doing this testing ultimately?  Like what

17   were you going to do with those patterns once you got them?

18   A.   Ultimately, we were producing test patterns at known

19   distances so we could provide that, again, to a medical

20   examiner who could use that and interpret them in terms of

21   the wound.

22   Q.   Who was the medical examiner?

23   A.   Dr. Stephen Cina.

24   Q.   Now before you did those patterns, do you recall if he

25   had already formed an opinion?

REDIRECT - DeFRANCE

1    A.    I don't believe so.

2    Q.    Would it make sense to you if he had formed an opinion

3    before he had the things that you were going to give him for

4    his --

5              MS. MOSS:  Objection.  Leading.

6              THE COURT:  Well, I have more of a problem with how

7    he would know what Dr. Cina's thinking.  I think that's a

8    better question for Dr. Cina.  Sustained on different

9    grounds.

10             MR. WINSTEAD:  Okay.

11             THE COURT:  Go ahead.

12   BY MR. WINSTEAD:

13   Q.    All right.  Now, the tests that you presented in court,

14   the patterns that you obtained, in that process of testing

15   can you remind me:  What were your goals in putting that

16   process together?

17   A.    We just wanted to do a test that was very clear and

18   methodical, consistent from shot to shot.  Well-documented

19   and completely transparent in the way that we did it.

20   Q.    And in setting that up, did you use the best evidence

21   at your disposal?

22   A.    Yes, we did.

23   Q.    Were you very clear about any assumptions that you were

24   making?

25   A.    Yes, those are clearly stated in the report.

562

REDIRECT - DeFRANCE

1  Q.   Is it possible that there's some sort of additional

2  variables in this case?

3  A.   Yes, it's possible.

4  Q.   Okay.  Did you -- did you achieve those goals that you

5  just said in how you did the testing?

6  A.   I believe so.

7  Q.   And as far as you know, given the assumptions that

8  you've already been clear about, are the tests that you

9  presented yesterday in court reliable according to the best

10  evidence that you were able to obtain?

11  A.   Yes, sir.

12  Q.   I want to clear up just one little thing.  You did

13  testing on June 15th, 2022, right?

14  A.   Yes.

15  Q.   Okay.  That was referred during cross-examination at

16  one point to your fourth round of testing, and one point to

17  your third round of testing.  So I just want to clarify,

18  those tests -- say 3 dash whatever the specimen was, what's

19  the -- what's the right way to think about those, just so

20  there's no confusion?

21  A.   So the test patterns and the specimens that are marked

22  with a 3 is from the third round of testing, which was in

23  June of this year.  And then the last four cases that we

24  test-fired with the alternate theory are labeled 4-1 through

25  -4.

563

REDIRECT - DeFRANCE

1    Q.    Is that confusion potentially because your first round

2    of testing occurred on two different days?

3    A.    The very first round of testing from 2020, yes.

4    Q.    Okay.

5    A.    That's correct.

6    Q.    Now, on the -- when you -- when you tested the theory

7    of the muzzle being 4 inches back, you were asked previously

8    about whether you saw any evidence in any of your testing of

9    a potential hole or defect created in one of the cases

10   likely by the operation of the long recoil.

11             Do you happen to recall if either of the two tests

12   that you did at an angle did have a defect that may have

13   been related to that?

14   A.    One of the tests from round 4, where we were testing

15   the 4-inch-back theory with the gun at an angle, so it was

16   being hand-held by the shooter, there were some cuts on the

17   inside of the bag.

18   Q.    And as far as the long recoil, you briefly described

19   that as the barrel moving backwards some number of inches.

20   Is that right?

21   A.    Yes, sir.

22   Q.    As it's going back, would you expect -- and, again, if

23   it -- you don't know this, that's fine -- but would you

24   expect that there would be any trailing gases or heat that

25   would still be coming out of the barrel when it moves back?

564

REDIRECT - DeFRANCE

1    A.    I'm not sure.

2    Q.    Okay.  So you were asked whether you did a sodium

3    rhodizonate, I believe, test.  What is that test for?

4    A.    Sodium rhodizonate test is a test for the presence of

5    lead.

6    Q.    Have you seen a test -- is that -- is it okay if I ask

7    him?  Okay.

8         Have you seen the results of any testing with

9    sodium rhodizonate?

10   A.    In this case?

11   Q.    Yes.

12   A.    Yes, I have.

13   Q.    After seeing those tests, does your opinion change

14   about where the muzzle was in the bag?

15   A.    No, it did not.

16   Q.    And even seeing those tests, and even evaluating

17   whether that hole could have been caused by the blast, how

18   certain are you that the muzzle was not 4 inches back in the

19   bag?

20   A.    I remain confident that the muzzle could not have been

21   that far back based on the damage to the foam, the lack of

22   damage to that inner liner ahead of that 4-inch hole, and,

23   again, just -- the appearance of that hole, to me, just had

24   the appearance of a tear and not discharge damage.

25   Q.    And after you did the four rounds of testing of the

565

REDIRECT - DeFRANCE

1    muzzle at 4 inches, do you believe that any additional

2    testing would be necessary to confirm your confidence in

3    that analysis?

4    A.    The appearance of the damage in those four bags was

5    dramatically different.

6              MR. WINSTEAD:    Okay.  May I have a moment, Your

7    Honor?

8              THE COURT:    You may.

9              MR. WINSTEAD:    No further questions.  Thank you,

10   Your Honor.

11             THE COURT:    All right.  May this witness be excused

12   for the Government?

13             MR. WINSTEAD:    Yes, sir.

14             THE COURT:    Defendant Rudolph?

15             MS. MOSS:    Yes, Your Honor.

16             THE COURT:    Defendant Milliron?

17             MR. DILL:    Yes, Your Honor.

18             THE COURT:    Special Agent DeFrance, thank you so

19   much for your testimony.  You're excused and you may step

20   down.

21             THE WITNESS:    Thank you, Your Honor.

22             THE COURT:    Government may call its next witness.

23             MR. GREWELL:    Your Honor, the Government calls

24   Dr. Daniel Maswahu.

25             THE COURT:    All right.

**DIRECT - MASWAHU**

1           COURTROOM DEPUTY:  Raise your right hand for me.

2           DANIEL MASWAHU, GOVERNMENT'S WITNESS, SWORN

3           COURTROOM DEPUTY:  Thank you.  Please be seated and

4    remove your mask for us.  Then state your full name for the

5    record and spell your first and last name for us.

6           THE WITNESS:  My name's Dr. Daniel Maswahu.  Daniel

7    Congo Maswahu.  First name Daniel, Spelled M-a-s --

8           THE COURT:  Doctor, could you pull your chair up

9    closer to the mic.  Pull the mic closer to you so that we

10   can all hear you well.

11          THE WITNESS:  All right.  Thank you.  Yes, my full

12   name's Daniel Congo Maswahu.  Daniel spelled M-a-s-w- --

13   sorry, Maswahu, M-a-s-w-a-h-u.  And Daniel is spelled

14   D-a-n-i-e-l.

15          MR. GREWELL:  Your Honor, just for the record, all

16   the exhibits I'm going to go through with this witness have

17   already been admitted.  And then the other thing I'd like to

18   point out is at some point there are going to be autopsy

19   photos.  I'll give an appropriate warning at that time.

20          THE COURT:  If you would, please.  Thank you.

21                    DIRECT EXAMINATION

22   BY MR. GREWELL:

23   Q.   Dr. Maswahu, good morning.

24   A.   Good morning.

25   Q.   What do you do for a living?

**DIRECT - MASWAHU**

1    A.    I am a medical doctor and a pathologist.

2    Q.    And how long have you been doing that?

3    A.    26 years.

4    Q.    What is your educational background?

5    A.    I got my undergraduate medical degree from the

6    University of Zambia.  And I did my residency in pathology

7    in the Eastern Region of England, the Eastern -- what they

8    call the Eastern Deanery.  I rotated through now three

9    hospitals.

10   Q.    What was your job back in 2016?

11   A.    In 2016, I was a pathologist and a histopathologist at

12   University Teaching Hospital Lusaka.

13   Q.    And how long have you been doing that?

14   A.    That was about 18 years.  18, 19 years.

15   Q.    Could I have Exhibit 10, page 31 and if you could blow

16   up the bottom.

17        Is this where you were working?

18   A.    Absolutely.  This is where I was working.

19   Q.    Okay.  What sort of training have you had to do that

20   job?

21   A.    Apart from the medical -- the undergraduate medical

22   training, there was a six- to seven-year training in

23   pathology under the Royal College of Pathology of England

24   and Ireland.

25   Q.    And how many -- how many autopsies have you done in

DIRECT - MASWAHU

1    your career?

2    A.    Close to 5,000.

3    Q.    And how many of those involved gunshot injuries?

4    A.    Between 200 to 300.

5    Q.    All right.  I want to talk a little bit about autopsies

6    generally.

7    A.    Yes.

8    Q.    How would autopsies come to you when you were at the

9    University Teaching Hospital?

10   A.    A police officer who -- who's assigned the case would

11   go to a -- would go to a court and get what we call an order

12   for postmortem, which basically orders me to carry out the

13   postmortem.

14           The order will contain the name of the deceased,

15   the name of the police officer, the name of the court

16   official who authorizes -- or orders the autopsy to be done.

17   Q.    And what is your role in conducting an autopsy?

18   A.    It is basically to formulate a cause of death.

19   Q.    You mentioned cause of death.  What's the difference

20   between a cause of death and a manner of death?

21   A.    A cause of death is what happens immediately prior to

22   death; and a manner of death are the circumstances that

23   surround the death itself.  Can I give an example?

24   Q.    Yes, please.

25   A.    Somebody who -- Michael Jackson died of an overdose of

DIRECT - MASWAHU

1    poisoning; that was cause of death.  An overdose of certain

2    medication.  The circumstances of the -- of the manner of

3    death was what happened leading to that particular moment.

4    He was -- the manner would be -- it would be something like

5    it would have been neglect from the medical officer who gave

6    the drugs.  Was it suicide?  Did he take the medication

7    himself?  So the circumstances surrounding -- leading up to

8    the actual cause of death, itself, are the manner of death.

9    Q.   Do you identify the manner of death in your autopsies

10   or just the cause of death?

11   A.   I -- I do not identify the manner of death in all cases

12   unless -- unless I can substantiate that manner of death

13   before a court of law.

14   Q.   In terms of conducting an autopsy, do you follow any

15   standard procedures or guidelines?

16   A.   Yes.  There's a guideline, a basic protocol, that we

17   follow.

18   Q.   And can you describe that protocol for the jury.

19   A.   Yes.  It's -- the first thing is to identify the body.

20   The member of the family, the police officer, they will

21   positively identify the body.  Then we do a -- an external

22   examination.  There may be some identifying factors,

23   identifying features on the body, itself.

24        Then we do an internal examination.  And the

25   internal examination, we don't just focus on what is

DIRECT - MASWAHU

1    obvious, we look for important negatives.  We also look for

2    accompanying comorbidities, things that may have been

3    present.  And then there's -- there's a -- there's a --

4    there's room for comment for it to be tabulated cause of

5    death.

6    Q.   Did you do an autopsy of Bianca Rudolph in October

7    2016?

8    A.   I did.

9    Q.   Now you said a little bit ago that you've done 5,000

10   autopsies.

11   A.   Yes.

12   Q.   How do you remember one from six years ago?

13   A.   Firstly it was of a Caucasian woman.  Zambia does have

14   a community of Caucasians, so -- but there are not that

15   many.  So that's No. 1.  She's of Caucasian origin.  And the

16   autopsy was conducted in the afternoon.  We do most of our

17   autopsies in the morning.

18        So the -- the other work that -- the other mortuary

19   workers had basically gone away, so I had to call them back

20   and say, "Look, we have an autopsy."  So they came back.

21   Q.   When you conducted that autopsy, did you follow the

22   protocols that you mentioned earlier?

23   A.   Yes, I did.

24   Q.   Okay.  Where did you perform the autopsy?

25   A.   It was carried out in the first -- there's three

DIRECT - MASWAHU

1   autopsy rooms.  I carried it out in the first one.

2   Q.   And was that at University Teaching Hospital?

3   A.   Yes, in the mortuary of the University Teaching

4   Hospital.

5   Q.   I'd like to show you Government Exhibit 26.

6        Are you familiar with this document, Dr. Maswahu?

7   A.   Yes, I am.

8   Q.   What is it?

9   A.   It is the order for postmortem that comes from the

10  court, that the police officer comes with to authorize me to

11  do the postmortem.

12  Q.   So is this how you were assigned the autopsy?

13  A.   Yes.  This is so.

14  Q.   How many other people at the University Teaching

15  Hospital were doing autopsies back in 2016?

16  A.   There were about -- there were three.  They had done

17  most of the morning ones and I -- it wasn't actually my day,

18  but they had gone and I was the one remaining at the

19  hospital.

20  Q.   You mentioned that one of the first things you've got

21  to do in an autopsy under your protocols is to identify the

22  body?

23  A.   Yes.

24  Q.   Who identified the body here?

25  A.   It was identified by the -- by two gentlemen, the --

**DIRECT - MASWAHU**

1    there was a gentleman who identified himself as an officer

2    from the Embassy, and he accompanied the -- the husband of

3    the deceased.

4    Q.    So -- so -- so Mr. Rudolph was present?

5    A.    Yes.    That's for the identification of the body.

6    Q.    What was his demeanor?

7    A.    He was clearly in distress.    The -- the officer from

8    the Embassy told me in no uncertain terms that he would be

9    communicating on his behalf; I was not to talk to him in

10   this -- because he was basically in distress.    I had no

11   problem with that.    I mean, this was a grieving man.

12   Q.    Was a Zambian police officer also present for the

13   autopsy?

14   A.    Yes.    Yes.

15   Q.    Were you told the manner of the death before you

16   conducted your autopsy?

17   A.    Yes.    As a general rule I am told this, the

18   circumstances.

19   Q.    And what were you told about the manner of death?

20   A.    I was told that there was an accidental discharge of a

21   firearm.

22   Q.    Now was -- was Mrs. Rudolph wearing any clothing when

23   she arrived for the autopsy?

24   A.    She was, yes.

25   Q.    What was done with her clothes?

**DIRECT - MASWAHU**

1    A.    The clothes were given to the police officer and the

2    Embassy official.

3    Q.    Why didn't you keep them?

4    A.    As a matter of protocol, we give all belongings of the

5    deceased to the next of kin or whoever does the postmortem.

6    Q.    If you had not been told it was an accident, would you

7    have kept the clothes, preserved them?

8    A.    If we were told that there was not an accident, I

9    suppose so, yes.

10   Q.    Was Mrs. Rudolph wearing any jewelry?

11   A.    I don't quite remember that part.

12   Q.    Did you write up a report of your autopsy?

13   A.    I did, yes.

14   Q.    I'd like to call up Government Exhibit 10 at pages

15   21 -- well, page 21 first.  And now page 22.  Page 21 first.

16   Exhibit 10.  Yes.  Thank you.  And now the next page.

17          Is this a copy of your report?

18   A.    Yes, it is.

19   Q.    Okay.  Could I go back -- could we go back to page 21,

20   the first page.

21          Do you see where your report identifies the date of

22   death?

23   A.    Yes, I do.

24   Q.    And what date did she die?

25   A.    On the 11th of October -- what day did she die?

DIRECT - MASWAHU

1    Q.    Yes.

2    A.    11th of October 2016.

3    Q.    And in Zambia, do you write the day first and then the

4    month?

5    A.    Yes.  We flip them up.

6    Q.    Who gave you that information about when she had died?

7    A.    The officer who attended the postmortem.

8    Q.    Okay.  And do you see where it says when you performed

9    the autopsy?

10    A.    Yes.

11    Q.    And when did you perform the autopsy?

12    A.    On the 12th of October 2016.

13    Q.    And at what time?

14    A.    On -- this was around 1530, or 3:30 p.m.

15    Q.    You can take this one down.  Thanks.

16         After you had identified -- had the body identified

17    for you, did you do an external examination first?

18    A.    Yes, we did an external examination.  And what was

19    immediately obvious was a 5-, 6-centimeter gunshot entry

20    wound in the sixth, seventh and eighth intercostal space in

21    the upper left area.

22    Q.    So you measured the size of the entry wound?

23    A.    I did.

24    Q.    And you said it was 5 or 6 centimeters?

25    A.    Yes.

DIRECT - MASWAHU

1    Q.    Could we have page 1 of his report.  Exhibit 10, page

2    21.  Page 21.  Sorry.  The first page.

3            And do you see where you identified the

4    6-centimeter --

5    A.    Yes, yes.

6    Q.    Okay.  You can take it back down.  Thank you.

7            Did you measure the size of the entry wound before

8    or after you opened up the body for the internal

9    examination?

10   A.    Before opening up.

11   Q.    Did you observe anything around the entry wound during

12   your examination?

13   A.    Yes, there was -- there was an area of bruising or

14   humera [phonetic] around the -- the entry wound.  And there

15   were distinct pellets in some of them.  Some of the pellets

16   were really small and some were larger than others.

17   Q.    Had they punctured the skin?

18   A.    Yes.

19   Q.    Did you look for an exit wound?

20   A.    I did look for an exit wound.

21   Q.    Was there an exit wound?

22   A.    There was no exit wound.

23   Q.    Based on the external examination alone, were you able

24   to identify the angle at which the decedent had been shot?

25           MS. MOSS:  Objection, Your Honor.  He's not been

1    tendered as an expert.

2           MR. GREWELL:  He has, Your Honor, I believe -- I

3    can show the expert report we disclosed to --

4           THE COURT:  Are you -- is your objection based on

5    that we have not done the 702 -- that I have not found him

6    qualified under 702?  Is that --

7           MS. MOSS:  Yes, Your Honor.

8           THE COURT:  Well, yeah, let's establish,

9    Mr. Grewell, the areas that you seek to have him qualified

10   under 702.  Let's see if there's an objection --

11          MR. GREWELL:  Certainly, Your Honor.

12          THE COURT:  -- and then we'll proceed from there

13   and go into opinion testimony if warranted.

14          MR. GREWELL:  So, Your Honor, the areas I'd like to

15   tender him as an expert in are -- certainly in, you know,

16   his ability to testify about angle and distance of wounds

17   based on the numerous autopsies he's done.  Many of them of

18   gunshot wounds, over 200 gunshot wounds.  And based on his

19   training and his numerous time as a forensic pathologist in

20   Zambia.

21          THE COURT:  All right.  So are we talking -- you're

22   asking him to be qualified -- the doctor to be qualified as

23   a forensic pathologist in general or to opine on any

24   particular --

25          MR. GREWELL:  In general.  And then on his

577

VOIR DIRE - MASWAHU

1    examination of -- of the decedent here.

2        THE COURT:  All right.  Is there an objection?

3        MS. MOSS:  Yes, there is, Your Honor.

4        THE COURT:  What's your objection?

5        MS. MOSS:  Your Honor, we're objecting under

6    Rule 702.  And if Your Honor would give me an opportunity to

7    voir dire, I'd like to ask further questions of the witness.

8        THE COURT:  You may voir dire the witness.

9                        VOIR DIRE EXAMINATION

10   BY MS. MOSS:

11   Q.   Good morning, Dr. Maswahu.

12   A.   Good morning.

13   Q.   I just would like to follow up and ask you a few

14   additional questions about your training and your

15   experience.

16        Now you said that you testified -- I'm sorry, you

17   testified that you had trained in England; is that correct?

18   A.   Yes.

19   Q.   And you testified that you had performed 200 to 300

20   postmortem examinations where a deceased had died from

21   shotgun shootings; is that right?

22   A.   Yes, that's an approximation.

23   Q.   That's your estimation?

24   A.   An approximate number.  I don't know exact.

25   Q.   Is it possible it could be less than that?

578

VOIR DIRE - MASWAHU

1    A.    It's possible.

2    Q.    And I believe you testified just on direct that you

3    primarily are performing the postmortem to formulate the

4    cause of death; is that correct?

5    A.    Yes.  But if I am confident that the circumstances are

6    something I can defend before a court of law, I will add

7    that to the report.

8    Q.    So if you're confident, you will also opine on manner

9    of death?

10   A.    Yes.

11   Q.    Now, when you had performed these prior postmortem

12   examinations for decedents that had suffered shotgun wounds,

13   did you determine during any of those autopsies a range of

14   fire?

15   A.    Sorry, can you repeat the question?

16   Q.    During the prior autopsies that you performed --

17   A.    Yes.

18   Q.    -- on shotgun wounds, did you determine range of fire

19   on any of those?

20   A.    Yes, I was -- I was asked to give an approximate -- an

21   estimate of the distance I thought the firearm was

22   discharged from.

23   Q.    And how many did you do that on?

24   A.    About all of them.

25   Q.    About 20, you said?

VOIR DIRE - MASWAHU

1    A.    I said there were 200, and I was asking about all 200

2    of them.

3    Q.    So for all 200, you were asked by some law enforcement

4    or court to estimate the range of fire?

5    A.    Yes.

6    Q.    And what about the -- determining of the angle of fire?

7    Were you determining that when you were performing these

8    prior autopsies?

9    A.    If possible, yes.  During -- during autopsy, we

10   sometimes put a wire probe through the entry wound and see

11   the trajectory of the -- of the bullet.

12   Q.    Now, for a shotgun, that doesn't always involve a

13   bullet; is that right?

14   A.    Sorry?

15   Q.    For a shotgun wound --

16   A.    Yes.

17   Q.    -- that doesn't always involve a bullet, does it?

18   A.    No, it involves multiple pellets.

19   Q.    Okay.  Well, let me ask you:  Are you familiar with

20   different types of shotguns?

21   A.    With what?

22   Q.    Different types of shotguns.

23   A.    In -- my knowledge of firearms is based on the basic

24   training that they give us, high caliber, low caliber, and

25   medium.  And the shotgun would be in the low caliber --

VOIR DIRE - MASWAHU

1    Q.    Low caliber?

2    A.    Low velocity.

3    Q.    Low velocity.  And what is your estimation of low

4    velocity for a shotgun?

5    A.    I don't understand your question.

6            MR. GREWELL:  Your Honor, I haven't tendered him as

7    a shotgun expert.  I have tendered --

8            THE COURT:  I agree, sustained.

9    BY MS. MOSS:

10   Q.    So let me ask you then, Dr. Maswahu, have you written

11   any articles or books on shotgun wounds?

12   A.    No.  Like say, I said the knowledge that I have is

13   basic knowledge about shotguns.  And this is what they teach

14   all pathologists in training.

15   Q.    And have you been qualified as an expert in court

16   before on shotgun wounds?

17   A.    No.

18   Q.    Have you been qualified as an expert before in court on

19   determining range of fire of shotgun wounds?

20   A.    No, but I was asked my opinion.

21   Q.    And have you been qualified as an expert in court

22   before on determining angle of fire from shotgun?

23   A.    Not as an expert, but I -- I do indicate my opinion in

24   that area.

25           MS. MOSS:  Your Honor, we object.  If we could go

DIRECT - MASWAHU

1    sidebar.

2         THE COURT:  I have all the grounds for your

3    objection.

4         Any voir dire questions, Mr. Dill, of this witness?

5         MR. DILL:  No, Your Honor.

6         THE COURT:  All right.  The objection's overruled.

7    Dr. Maswahu is qualified under Federal Rule of Evidence 702

8    to provide expert opinion testimony in the field of forensic

9    pathology in general and in particular the -- his autopsy

10   examination of Bianca Rudolph.

11        You may proceed, counsel.

12        MR. GREWELL:  Thank you, Your Honor.

13            DIRECT EXAMINATION (Continued)

14   BY MR. GREWELL:

15   Q.   To repeat the question I asked you before voir dire --

16   A.   Yes.

17   Q.   -- based on the external examination alone, were you

18   able to identify the angle at which the decedent had been

19   shot?

20   A.   No.

21   Q.   Okay.  Did you take any pictures at the autopsy?

22   A.   No.  At the time our office did not have the equipment.

23   Q.   Did you take any x-rays of the body?

24   A.   No, we did not have x-ray equipment.

25   Q.   Did you later become aware that the -- that photographs

DIRECT - MASWAHU

1    were taken at the mortuary after your autopsy of Bianca

2    Rudolph?

3    A.    Yes, I was told this.

4            MR. GREWELL:  Your Honor, I think this is an

5    appropriate time for me to warn the jury, as well as those

6    in the gallery, that if -- well, those in the gallery if

7    they'd like a moment to step out, but we are going to show

8    some autopsy photos here and they are fairly graphic.

9            THE COURT:  I appreciate that, counsel.

10   BY MR. GREWELL:

11   Q.    I'm going to ask you to bring up Government Exhibit 17,

12   and then I'm going to ask to flip through these photographs

13   with Dr. Maswahu.  Next.  Next.  Next.  Next.  Next.  Next.

14   Next.  Is that all of them?

15           Dr. Maswahu --

16           THE COURT:  Could we -- counsel, can we take this

17   down?

18           MR. GREWELL:  I can take it down --

19           THE COURT:  Unless you're going to ask him a

20   question about that specific photo.

21           MR. GREWELL:  You can take it down.

22   BY MR. GREWELL:

23   Q.    Are those photographs of the body that you autopsied in

24   2016?

25   A.    They are.

583
DIRECT - MASWAHU

1    Q.    Are they representative of what you saw when you

2    examined Bianca Rudolph?

3    A.    They are.

4    Q.    Okay.  Please bring up the photograph on page 5 of

5    Government Exhibit 17.

6            Dr. Maswahu, do you see this mark sort of on the --

7    on the upper edge of the breast from the entry wound?

8    A.    Yes, I do.

9    Q.    What is that?

10   A.    That is a pellet wound away from the primary entry

11   wound.

12   Q.    And it had punctured the skin there?

13   A.    It had, yes.

14   Q.    And you mentioned that there were other pellet wounds

15   around the entry wound.  There's a pen on the side of the

16   screen there on your monitor.  Other side.  Could you show

17   us where some of those other pellet wounds were that you

18   were able to see at the time.

19   A.    Yes.  They're much smaller than this one.  This one is

20   much smaller.  But I can draw on the --

21   Q.    Yup.  Yup.

22   A.    All of these are smaller pellet wounds.  And they

23   caused bruising around -- around them.  But this was a --

24   probably multiple pellets.

25            MS. MOSS:  Your Honor, may I ask --

584

DIRECT - MASWAHU

1          MR. GREWELL:  Would you like me to have him

2     recreate it so that you can get a print screen?

3          MS. MOSS:  Yes, please.

4          MR. GREWELL:  That will be fine.  Can we please

5     bring it back up.

6     BY MR. GREWELL:

7     Q.   Dr. Maswahu, if you could just show us where those

8     other wounds you saw were.

9     A.   Okay.  The one you -- this is the really big one.  But

10    then there's smaller ones that were scattered all around the

11    primary entry wound.

12         MR. GREWELL:  Could we print that and have it

13    marked as Government Exhibit 17-1.

14         THE COURT:  Go ahead, Ms. Guerra.  If we can do it.

15    Can we do it?

16         COURTROOM DEPUTY:  Uhm-hum.

17         THE COURT:  All right.

18         COURTROOM DEPUTY:  It will take a few moments.

19         THE COURT:  Sure.

20         MR. GREWELL:  Your Honor, may I give Ms. Guerra a

21    Government exhibit sticker?

22         THE COURT:  Yes.

23         MR. GREWELL:  Ms. Guerra, are we ready to take this

24    one down?  Has this been printed yet?

25         COURTROOM DEPUTY:  Yes, go ahead.

585
DIRECT - MASWAHU

1      MR. GREWELL:  And I will move to admit that,

2   Government Exhibit 17-1.

3      THE COURT:  Since you asked for this, Ms. Moss, I'm

4   assuming you don't object.

5      MS. MOSS:  No objection, Your Honor.

6      THE COURT:  Any objection, Mr. Dill?

7      MR. DILL:  No, sir.

8      THE COURT:  There being no objection, Government

9   Exhibit 17-1 is admitted into evidence.

10      (Government's Exhibit 17-1 received)

11   BY MR. GREWELL:

12   Q.   I'd like to bring up Government Exhibit 17, page 3.

13      Dr. Maswahu, what is the black discoloring around

14   the wound?

15   A.   So the question again?

16   Q.   What is the black discoloring around the entry wound?

17   This sort of area here?

18   A.   Oh, yes.  This is the bruising in the soft tissue made

19   by the -- by the pellets.  The kinetic energy of the pellets

20   basically bruise the tissue around it.  But the primary

21   entry wound is where the main bullets entered the body.

22   Q.   Do you see a mark on the right breast in this photo,

23   Dr. Maswahu?

24   A.   Yes.

25   Q.   Do you recall that mark being there when you did the

586
DIRECT - MASWAHU

1    external examination?

2    A.    Yes.   That is a -- that is a deflected -- another

3    deflected pellet wound.   Again, you can see the bruising

4    around it.

5    Q.    A deflected pellet wound?

6    A.    That is my opinion, yes.

7    Q.    You can take this exhibit down.   Thank you.

8         Dr. Maswahu, did you later find out that the

9    shotgun here had been fired while in a soft case?

10   A.    Yes, I was told this.

11   Q.    Could that injury on the right breast be from part of

12   that soft case?

13   A.    Yes, that is my opinion.

14   Q.    Let's talk about your internal examination of the body.

15   A.    Yes.

16   Q.    Tell us what you learned about the wound when you moved

17   to the internal examination.

18   A.    On opening the chest cavity, there was a -- an

19   8-centimeter diameter area of macerated tissue mixed with

20   blood.

21   Q.    So did the size of the wound change as -- as the entry

22   went further into the body?

23   A.    Yes, it was bigger on the inside than it was out on the

24   outside.

25   Q.    And what was the cause of that, in your expert opinion?

1   **A.    Well, the nature of a shotgun, the -- the projectiles**

2   **in the shotgun spread with distance.  And you'd expect -- if**

3   **someone was further away, the radius of the pellets would be**

4   **much wider than if it was much closer.  So I would expect**

5   **the injury would be much more significant in the center, but**

6   **it would be radiating and getting bigger.**

7   **Q.    Did you find any foreign material in the body during**

8   **your examination?**

9   **A.    Yes.**

10  **Q.    May I -- may I ask the clerk to provide Dr. Maswahu**

11  **with what has been marked as Government Exhibit 7.  It**

12  **should be in one of those clear bags with some . . .**

13  **        So looking at Government -- the material in**

14  **Government Exhibit 7, Dr. Maswahu, is that the material that**

15  **you found inside Bianca Rudolph during your examination?**

16  **A.    Yes, it is.  It was lying in the -- in the macerated**

17  **tissue in the pool of blood.**

18  **Q.    So -- and so where was that in the body, then?  What**

19  **location in the body did you find that?**

20  **A.    In the area of injury, where there was the macerated**

21  **tissue and the blood.**

22  **Q.    I want to return to your report now, Dr. Maswahu.**

23  **        Could I have Government Exhibit 10, page 21.**

24  **        MS. MOSS:   Excuse me, Your Honor, but may I take a**

25  **look at that exhibit?  I have not seen it.  May I take a**

588

DIRECT - MASWAHU

1    look at that exhibit --

2            MR. GREWELL:  Actually I can put it on the Elmo so

3    everybody can see it, if that will work.

4            THE COURT:  Yes.

5    BY MR. GREWELL:

6    Q.   So is the pink-and-white plastic that you can see here,

7    is that what you found inside --

8    A.   Yes, this is what I found.

9    Q.   Turn it over so . . .

10           MR. GREWELL:  Would you also still like to see it,

11   Ms. Moss?

12           MS. MOSS:  No.

13           MR. GREWELL:  If I could have that back at the

14   podium.

15   BY MR. GREWELL:

16   Q.   Could I have Government Exhibit 10, page 21.  And could

17   you just . . .

18           Your report discusses the right lungs and --

19   pleury.  Is that how it's pronounced?

20   A.   Yes, pleury.

21   Q.   What are the pleury?

22   A.   The pleury are the -- it's the covering -- it covers

23   the lungs of the wall -- of the chest wall, and the pleural

24   space creates a negative area where, when you breathe, the

25   lungs -- the lung can expand into.

DIRECT - MASWAHU

1    Q.    Can you tell us the differences you found between the

2    right and the left lungs during your autopsy.

3    A.    Yes.    The -- the right lung was okay, but the left lung

4    had multiple pellet holes.    And in the area around the

5    heart, it was also partly macerated.    And there was what we

6    call a -- a hemothorax, which is a collection of blood in

7    the pleural space.    It was about 800 milliliters of blood in

8    the pleural space.

9    Q.    And so the right lung, you said there was no damage,

10   then?

11   A.    No.

12   Q.    Let's turn to the heart and pericardium.    Am I

13   pronouncing that correctly?

14   A.    Yes, pericardium.

15   Q.    What is the pericardium, Dr. Maswahu?

16   A.    The pericardium is a translucent cover around the heart

17   which -- and in the pericardial space there is a -- a bit of

18   fluid which allows the heart to -- to pump smoothly.

19   Q.    And I think from my high school biology I can remember

20   what a ventricle and atrium are, but in the event I'm

21   incorrect, could you tell us what a ventricle is first.

22   A.    Yes.    The ventricles are the larger chambers of the

23   heart -- the two larger chambers of the heart; and the

24   atrial are the smaller ones, which are on the top.

25   Q.    What's it mean when you wrote in the report that Bianca

DIRECT - MASWAHU

1    Rudolph's left ventricle and atrium were macerated?

2    A.    The side of the heart facing the direction of the

3    bullet were completely macerated, and there was blood in

4    there.  And this is where the -- the conduction centers of

5    the heart are.  And that -- the atria are part of the left

6    ventricle -- the upper part of the left ventricle.

7    Q.    Had there been damage to the right side of the heart?

8    A.    No.  It was mainly the top part, the -- the atria and

9    the upper part of the left ventricle.

10   Q.    And how severe was the damage to the left heart -- or

11   left part of the heart?  Had it been destroyed or what do

12   you mean when you say "macerated," again?

13   A.    How can I describe?  Like -- like mincemeat.  You've

14   seen mincemeat.  Mixed with blood.  It was totally

15   macerated.

16   Q.    You can take this down.

17            Dr. Maswahu, did you do a toxicology screen for

18   drugs in the decedent's system?

19   A.    No, I did not.

20   Q.    Is that something you would normally do?

21   A.    Yes.  We have guidelines for toxicology.  Our

22   toxicology laboratory is severely underresourced and the

23   guideline is that we only do toxicology for those cases that

24   immediately warrant toxicology.  And at the time I didn't

25   think this case warranted it.

DIRECT - MASWAHU

1    Q.    And why didn't you think that it warranted it?

2    A.    I did -- well, they did say it was the firearm injury

3    and I didn't think there was need to do any toxicology.  The

4    backlog of cases in the toxicology lab go nine months to one

5    year, and the guidelines do indicate that we only take

6    for --

7    Q.    Did the fact that you've been told it was accidental

8    play a part in your decision not to do a toxicology

9    report?

10   A.    It did, yes.  It did influence.

11   Q.    How long did it take for you to conduct your autopsy

12   from start to finish?

13   A.    About 45 minutes.

14   Q.    Can I have Government Exhibit 22, please.

15         Are you familiar with this document, Dr. Maswahu?

16   A.    Yes.  This is the document we write up after the

17   autopsy where I indicate my formulated cause of death.  And

18   it -- it goes to the consul to allow them to -- to provide

19   burial space for the deceased.

20         THE COURT:  Mr. Grewell, let me ask you:  How much

21   longer do you have?  If it's a short amount of time, we can

22   finish up and then take our morning break.  But I'm not

23   trying to cut you off, if it's longer --

24         MR. GREWELL:  I think -- sorry.

25         THE COURT:  Go ahead.

592
DIRECT - MASWAHU

1    MR. GREWELL:  I think it's probably 10 to 15

2    minutes, Your Honor.

3    THE COURT:  That's a little too long before we

4    break, so we're going to take our morning recess.  We will

5    be in recess for 15 minutes.

6    (Jury left the courtroom at 10:20 a.m.)

7    THE COURT:  Dr. Maswahu, during the recess I'm

8    instructing you that -- for you not to speak with any of the

9    lawyers.  You're free to leave the courtroom, go in the

10   lobby or go downstairs, but I need you back in the witness

11   stand in 15 minutes.

12   THE WITNESS:  Yes.

13   THE COURT:  All right.  Thank you.

14   (Recess taken 10:21 a.m. to 10:40 a.m.)

15   THE COURT:  Doctor, I remind you that you remain

16   under oath.

17   THE WITNESS:  Yes, sir.

18   THE COURT:  Mr. Grewell, you may resume your

19   examination.

20   BY MR. GREWELL:

21   Q.   Dr. Maswahu, I'd like to start with a yes-or-no

22   question.  Based on your examination -- the entire

23   examination, were you able to determine the angle from which

24   the decedent was shot?

25   A.   Yes.

593

DIRECT - MASWAHU

1    MR. GREWELL:  Ms. Guerra, could I ask to have the

2    witness provided this dowel.

3    BY MR. GREWELL:

4    Q.   Dr. Maswahu, could you demonstrate for the jury, in

5    your expert opinion, the angle that the shot entered the

6    body.

7    A.   Okay.  If my hand was the body, the shot was direct

8    frontal shot.

9    Q.   Did it go to either side?

10   A.   No.  No.

11   Q.   Up or down, that you could tell?

12   A.   No, it didn't.

13   Q.   What do you base that expert opinion on?

14   A.   Two things.  The area of bruising around the -- the

15   entry wound and, secondly, the position of the -- of the

16   injured tissue behind the -- the entry wound.  Those two

17   things.

18   Q.   There's a place to set the dowel down up there.  You

19   can -- we're done with it.  You can just leave it up there.

20        Do you have an opinion about the distance from the

21   shotgun muzzle to the decedent when she was shot?

22   A.   I would say approximately 1 meter.

23   Q.   And how confident are you of that distance?

24   A.   90 to 95 percent.

25   Q.   What do you base that opinion on?

DIRECT - MASWAHU

1    A.    That opinion is based upon the fact that there is --

2    there are pellets which are already spreading out.  It

3    wasn't a contact injury.  The pellets were already spreading

4    out, and the size of the entry wound, itself.  Those two

5    things.

6    Q.    In Zambia, do they use the metric system?

7    A.    Yes, we use the metric system.  We don't do yards and

8    feet, we use meters and centimeters.

9    Q.    This may be a bit of an unfair question.  Do you know

10   how far a meter is in feet?

11   A.    A meter would be about 5 to 6 or 7 feet.

12   Q.    If -- and if I were to tell you it's probably closer to

13   3 feet, would you object to that?  A meter.  If a meter --

14   if I told you a meter was closer to 3 feet, would you object

15   to that?

16   A.    I --

17   Q.    3 or 4.  Do you think 5 or 6 --

18            THE COURT:  I think -- counsel, his testimony is a

19   meter.  I think the jury knows what a meter is.  We're not

20   that different from the rest of the world.

21   BY MR. GREWELL:

22   Q.    I want to turn back to page 2 of your report,

23   Government Exhibit 10 at 22, please.

24            MR. GREWELL:  I should never try to do math, Your

25   Honor, myself.  I'm not great at it.

DIRECT - MASWAHU

1    BY MR. GREWELL:

2    Q.   All right.  So can you zoom into the bottom of the --

3    the part -- the Comment parts.  What did Bianca Rudolph die

4    from?

5    A.   In simple language she died from massive bleeding

6    and -- well, two things:  massive bleeding and direct injury

7    to the heart due to a gunshot wound.

8    Q.   What is hemorrhagic shock?

9    A.   Hemorrhagic shock is the bleeding -- the massive

10   bleeding.

11   Q.   How long would she live with a wound like this?

12   A.   Probably just moments.

13   Q.   Would there have been any way to save her?

14   A.   No.

15   Q.   What about if she had been at University Teaching

16   Hospital when she was shot, would there --

17   A.   No.  No, there wouldn't have been any way to save her.

18   Q.   Did you find any fabric fibers in the body that you

19   recall?

20   A.   No, I didn't find any.

21   Q.   All right.  Dr. Maswahu, I want to turn to perhaps a

22   difficult subject.  Have you been charged with any crimes in

23   the past?

24   A.   I have, yes.

25   Q.   What were you charged with?

596

DIRECT - MASWAHU

1    A.    There were two.  The first one was drug trafficking

2    and -- and possession of narcotics.

3    Q.    And when was that?

4    A.    In 20- -- I think 2013, 2014, somewhere in there.

5    Q.    Did you go to trial on those drug charges?

6    A.    I did, yes.

7    Q.    What was the result?

8    A.    I was acquitted.

9    Q.    You were -- I'm sorry, you were acquitted?

10   A.    I was acquitted, yes.

11   Q.    Was there another charge that you had brought against

12   you at some point?

13   A.    Yes.  Much more recently, in 2017, possession of

14   counterfeit notes.

15   Q.    What kind of notes are we talking about?

16   A.    They were U.S. dollars.

17   Q.    Did you have those notes in your possession?

18   A.    At the time I was searched, yes.

19   Q.    Were you aware that you had those counterfeit notes?

20   A.    No, I was not.

21   Q.    How did they come into your possession?

22   A.    I -- I don't know, but I've been a very vocal opponent

23   of the previous regime.  And the background is that when I

24   was in England for my training, I was the editor of the Main

25   Opposition Party website.  So I spoke very heavily against

CROSS - MASWAHU

1    the government, and they were basically trying to fix me.

2            I -- when I came back from my training, I was -- I

3    was appointed the -- what they call the state forensic

4    pathologist, but this -- this appointment was rescinded

5    within -- within a few days by the politicians because of my

6    strong opposition to -- to the policies of purist regime.

7    Q.    What was the result of that charge?

8    A.    I plead guilty.  I was given a suspended sentence.

9    Q.    Did the Zambian Government still assign you autopsies

10   after your guilty plea?

11   A.    Yes, did.

12   Q.    Have you ever been accused of conducting bad medical

13   work?

14   A.    No, I haven't.

15   Q.    Have you ever been accused of improperly conducting an

16   autopsy?

17   A.    No, I haven't.

18            MR. GREWELL:  No further questions, Your Honor.

19            THE COURT:  Thank you.  Cross-examination.

20            MS. MOSS:  Thank you, Your Honor.

21                    CROSS-EXAMINATION

22   BY MS. MOSS:

23   Q.    Good morning, Dr. Maswahu.

24   A.    Good morning.

25   Q.    Dr. Maswahu, I believe that you said on direct

598
CROSS - MASWAHU

1   examination that you met the husband of the deceased woman;
2   is that correct?
3   A.    I met him at the time that he came with the Embassy
4   official.
5   Q.    And that was the husband of the deceased woman; is that
6   right?
7   A.    Yes.
8   Q.    And he came to your facility -- he came to the
9   University Teaching Hospital?
10  A.    Yes, he did.
11  Q.    And that was the same day that you were conducting the
12  autopsy examination?
13  A.    That was the same day.
14  Q.    And that was October 12th, 2016, correct?
15  A.    Yes.
16  Q.    And I know that you have said that he came with an
17  Embassy official.  Is it possible he came with a friend of
18  his named Mark?
19  A.    I -- I don't remember.  It's been a while.  But the
20  gentleman introduced himself as an official from the
21  Embassy.  He even showed me an ID.
22  Q.    Okay.  And when you met the husband of the deceased,
23  you testified on direct that he was clearly in distress; is
24  that right?
25  A.    Yes.  Yes.

CROSS - MASWAHU

1    Q.    And you said that he was a grieving man.

2    A.    Those were the appearances, yes.  His eyes were red and

3    he was -- he was looking down and -- he was clearly in

4    distress in my opinion, yes.

5    Q.    And this gentleman was not able to speak with you or he

6    did not speak to you; is that correct?

7    A.    We don't exchange any words because the Embassy

8    official I was with told me not to speak to him and that any

9    communication would be done through him.

10   Q.    Okay.  So -- so there were no words exchanged between

11   you and --

12   A.    No.  None at all.

13   Q.    -- the other gentleman?

14         And so the husband of the deceased woman, he never

15   offered you any money, did he?

16   A.    No, he didn't.

17   Q.    The person that was with him obviously never offered

18   you any money, correct?

19   A.    No.

20   Q.    So there was no attempts to get you to stop from

21   performing an autopsy; is that right?

22   A.    Yes.  There was not.

23   Q.    Now, I'd like to talk about your examination, your

24   autopsy.

25   A.    Yes.

600

CROSS - MASWAHU

1   Q.    And, again, I -- it's going to be important for us, but

2   I want to make clear that it was performed on October 12th,

3   2016; is that right?

4   A.    That's right.

5   Q.    And you testified on direct that that was in the

6   afternoon.

7   A.    It was in the afternoon.

8   Q.    And you wrote a report -- and we've seen that report

9   here today -- didn't you?

10  A.    Yes.

11  Q.    Okay.  And part of the reason that you write a

12  report -- are you required to write that report?

13  A.    Yes.  I'm . . .

14  Q.    Yes.  And is it considered an official report?

15  A.    It is, yes.

16  Q.    And is it a report that you know other people are going

17  to see?

18  A.    Yes.

19  Q.    And other people will be able to see what your findings

20  are and what your conclusions are.

21  A.    Yes.

22  Q.    And so is it important to you, Dr. Musazulwa, that you

23  put important information in the report so that when others

24  see it, they can see all of your findings?

25  A.    Yes.

CROSS - MASWAHU

1   Q.   And is it important to you that you make a detailed

2   report so that if you have to go back, say, five or six

3   years later, you know exactly what happened?

4   A.   Yes, it is.

5   Q.   And so for those reasons, do you want to make sure that

6   you're precise and accurate?

7   A.   Yes.

8   Q.   And this is a report that you have to sign; is that

9   right?

10  A.   Yes, I signed it.

11  Q.   And you did sign it.

12  A.   Yes.

13  Q.   And did you perform this autopsy alone?

14  A.   Yes, I performed it alone.

15  Q.   So there was no one else with you there that could

16  confirm any of your findings?

17  A.   No, the Embassy official and the police officer were

18  there.

19  Q.   So the Embassy officials and the police officers watch

20  you perform your autopsy?

21  A.   Yes.  Yes.

22  Q.   Have you seen a report saying that they were -- did you

23  include in your report that they were present?

24  A.   No, I didn't.  I omitted that part.

25  Q.   I'd like to talk about some of the things that you did.

CROSS - MASWAHU

1    And if we can look at Government Exhibit 35,

2    page 1.  And that's INV 590.

3    Do you recognize this as your report, Dr. Maswahu?

4    A.    Yes, I do.

5    Q.    Now, there is a stamp at the top.  I understand that is

6    not your stamp; is that correct?

7    A.    No, that's not my stamp.

8    Q.    But otherwise this is your report?

9    A.    Yes.

10   Q.    Now, I'd like to zoom in on the section that says

11   External Examination.  Can we do that, please.

12   Now, in your report, Dr. Maswahu, you noted that

13   you were doing an external examination of Mrs. Rudolph's

14   body.  And you noted height.  Is that what the 1.70 meters

15   is?

16   A.    Yes, the height of the body.

17   Q.    And you don't say "approximate" there or "close to,"

18   you write 1.70 meters; is that right?

19   A.    Yes, there's a ruler on the mortuary table that gives

20   you an accurate assessment of height.

21   Q.    Okay.  And is 1.70 meters the same as 170 centimeters?

22   A.    Yes, it is.

23   Q.    And you say that you determined that because you had a

24   measurement device there and you measured the length of the

25   body?

603

CROSS - MASWAHU

1    A.    Yes.

2    Q.    Now, if you were to compare 170 centimeters to 162

3    centimeters, would you say that that's a difference of

4    8 centimeters?

5    A.    It is.

6    Q.    And had you seen any medical records of the woman that

7    you were performing the autopsy on?

8    A.    No.

9    Q.    If those medical records reflected that the height of

10   Mrs. Rudolph was 162 centimeters, would you agree that that

11   would be different from your finding here?

12   A.    This is an approximation.  They are different, yes.

13   Q.    And so now you're saying this is an approximation.

14   A.    Yes.

15   Q.    But 8 centimeters, is that a relatively big difference?

16   162 centimeters compared to 170 centimeters?

17   A.    I think it's a minor.

18   Q.    In your mind that's a minor difference?

19   A.    Yes.

20   Q.    Now, if it was true that she was 162 centimeters

21   instead of 170, would you say that your report is inaccurate

22   there?

23   A.    I would not.

24   Q.    So you believe she's 170.

25   A.    That's what we measured.

604

CROSS - MASWAHU

1    Q.   Now, I also want to ask you about -- you note a

2    6-centimeter diameter gunshot entry wound in her left chest,

3    Do you see that?

4    A.   Yes.

5    Q.   And how did you determine that?

6    A.   We measured it.

7    Q.   And did you use the same measuring device that you

8    would use when you were measuring her height?

9    A.   No.   We have rulers you can pick up with your hand.

10   Q.   And so was this a different measuring device that you

11   used to measure the wound as opposed to the height?

12   A.   The one for measuring the height is actually stuck to

13   the -- to the -- to the surface of the examination table.

14   Q.   I see.   And so you use a different measuring device --

15   A.   Yes, we used a different one.

16   Q.   I see.   Now, I believe you testified on direct that you

17   did this measurement -- this 6-centimeter measurement before

18   you did the internal examination, correct?

19   A.   Yes.   Yes.

20   Q.   Now, actually on direct, you said that the wound was 5

21   to 6 centimeters.

22   A.   Yes.

23   Q.   So is it your opinion today that it was 5 to

24   6 centimeters?

25   A.   5 to 6.   6 centimeters.

605

CROSS - MASWAHU

1    Q.    Now, what you were looking at here, what we're talking

2    about here, is an open wound that is on a deceased body; is

3    that correct?

4    A.    Yes.

5    Q.    Now, I would like to ask you about some of the

6    qualities of skin.  Is skin something that's prone to

7    stretching and gaping?

8    A.    Yes, it is.

9    Q.    And does that mean that a wound can stretch and perhaps

10   get larger?

11   A.    It depends.

12   Q.    Okay.  That's fair.  Is one of the reasons why we

13   stitch people up is to close wounds and to make them

14   smaller?

15   A.    I don't think the stitching in the pictures was so --

16   to reduce or increase the size of the wound.

17   Q.    I understand.  We're not -- I'm not talking about the

18   stitching of the gunshot wound, I'm just talking about in

19   general.  If someone has a wound, someone who is alive --

20   A.    Yes.

21   Q.    -- would you stitch a wound closed in order to make it

22   smaller, to close that?

23   A.    Yes.

24   Q.    Otherwise, it's possible that the wound can expand and

25   stretch if you don't do that; is that right?

606

CROSS - MASWAHU

1   A.    Yes.

2   Q.    Now, you examined Mrs. Rudolph's body 34 hours after

3   she had passed away.  Did you know that?

4   A.    Yes.  Yes.

5   Q.    And do you know whether the skin had stretched and

6   increased and expanded in that 34 hours of time?

7   A.    It's possible.

8   Q.    Do you know the size of the wound when she passed away

9   34 hours before on 5:30 a.m. on October 11th?

10  A.    No, I don't.

11  Q.    And is there any way that you can tell that?

12  A.    How can I tell?

13  Q.    Is there any way that you would be able to tell that?

14  The size of the wound 34 hours before.

15  A.    No.  No, of course not.

16  Q.    When you were performing your autopsy, Dr. Maswahu, I

17  heard that you testified on direct that there were no

18  cameras in the hospital; is that right?

19  A.    Yes.

20  Q.    Do you know who took the photographs that we saw here

21  in court today?

22  A.    No, I don't.

23  Q.    Now, you said today that the police were with you.  Did

24  you ask the police who were there observing for a camera?

25  A.    Sorry?

607

CROSS - MASWAHU

1    Q.    Did you ask the police who you say were there observing

2    the autopsy, did you ask them for a camera?

3    A.    No, I didn't.

4    Q.    Did you -- did you have a cell phone at the time?

5    A.    I think I did, yes.

6    Q.    Did you try to take photographs with your cell phone?

7    A.    No, I didn't.

8    Q.    Now, did you try to find a camera anywhere else in the

9    hospital?

10   A.    No.

11   Q.    Did you draw a diagram so that we could see the exact

12   size of the wound at the time that you performed the

13   autopsy?

14   A.    No.

15   Q.    So did you ever draw on a piece of paper what -- what

16   the size of the wound was that you observed?

17   A.    No.

18   Q.    So what we have to go by is your report, then; is that

19   right?

20   A.    And the photographs.

21   Q.    And the photograph that was taken a couple of days

22   later.

23   A.    Yes.

24   Q.    Now, I want to ask you, before we move on, one other

25   thing.  The last thing that's noted here in this section,

CROSS - MASWAHU

1    External Examination, is it -- the last phrase, "Associated

2    8-centimeter diameter blast effect in the 7th, 8th and 9th

3    ribs."  Do you see that?

4    A.   Yes.

5    Q.   Is that something that you were able to observe through

6    an external examination?

7    A.   Yes, you could actually feel with the fingers and see

8    the ribs were broken into.

9    Q.   And so you could see that just looking at the body

10   without opening it up?

11   A.   Yes.  The ribs were clearly broken by the -- the entry

12   wound -- the entry ballistic.

13   Q.   And could you see the ribs through the wound?

14   A.   The -- at the edge of the wound.

15   Q.   Through the edge of the wound.  So you were able to see

16   the ribs through the edge of the wound?

17   A.   Yeah.

18   Q.   Okay.  Now, let's -- thank you, Mr. Reyes.  Let's move

19   on.

20           And I'd like to talk to you now about your internal

21   examination of Mrs. Rudolph's body.  You spoke about, on

22   direct, that you saw some foreign items in her body,

23   correct?

24   A.   Yes.

25   Q.   And we were shown two plastic pieces, material, that

CROSS - MASWAHU

1    were found in her body.  Do you recall that?

2    A.    Yes.

3    Q.    And do you know what those two plastic pieces were?

4    Where they came from?

5    A.    The -- the other wadding, they're part of the bullet,

6    isn't it?  But as to how they got there, I don't know.

7    Q.    And is it your understanding that a bullet entered

8    Mrs. Rudolph's body?

9    A.    Yes.

10   Q.    Now, can you explain to us where you found that plastic

11   material in her body.

12   A.    Yes.  When we -- when I was looking for -- for possible

13   pellets in the injured area, I did pull out the plastic

14   pieces.

15   Q.    Okay.  And we're going to get to that in just a second.

16         I would like to go back to Government Exhibit 35,

17   which is INV 590 and 591.

18         Dr. Maswahu, do you see your report there?

19   A.    Yes, I do.

20   Q.    And is this your entire report that you wrote for this

21   autopsy?

22   A.    Yes.  Yes, it is.

23   Q.    Can you tell us where in your report it says that you

24   recovered wadding from Mrs. Rudolph's body?

25   A.    I did not indicate that in the report.

610

CROSS - MASWAHU

1    Q.    So you did not include that within the report.

2    A.    No, I didn't.  Just as I didn't indicate that the

3    clothes were given, but we did give them.

4    Q.    So there are things that happened that day six years

5    ago that are not included within your report.

6    A.    Yes.

7    Q.    And so we are just going to have to rely on your

8    testimony here today, six years later, for that

9    understanding; is that right?

10   A.    Yes.

11   Q.    Can you tell us the orientation of that wadding within

12   the body.  And I suppose what I mean by that is there's a --

13   a plastic thing that has -- it's shaped like a cup.  Do you

14   know which way that was facing within the body?

15   A.    No.  I don't.  I -- I was just looking around within

16   the injured tissue and pulled it out.  I -- I didn't pay

17   particular attention to its orientation.

18   Q.    Did you take an x-ray of Mrs. Rudolph's body?

19   A.    No, I didn't -- we did indicate that.  We didn't

20   indicate any -- there were no x-ray facilities and no

21   photographic equipment.

22   Q.    Now, the autopsy was performed at the University

23   Teaching Hospital; is that right?

24   A.    Yes.

25   Q.    And is that the capitol of -- in the capitol of

CROSS - MASWAHU

1    Zambia?

2    A.    It is.

3    Q.    And is that Lusaka?

4    A.    That's Lusaka.

5    Q.    That is a hospital that's been around for many decades;

6    is it not?

7    A.    Yes.  Since --

8    Q.    1964?

9    A.    Yes, somewhere in there.

10   Q.    And so are you saying that there were no x-ray

11   facilities anywhere within that hospital?

12   A.    None that were provided specifically for the mortuary.

13   Q.    Would you be able to go outside of the mortuary to

14   other sections of the hospital to use their x-rays?

15   A.    I don't understand the question.  You mean like take

16   the body to --

17   Q.    Another section of the hospital to do an x-ray.

18   A.    We were not allowed to take any bodies for fear of

19   contaminating the other parts of the hospitals.  What --

20   what went into the mortuary stayed in the mortuary.  If

21   x-rays were required, they were taken there, but there were

22   no specific radiographic equipment assigned to the mortuary.

23   Q.    Is that still the case today?

24   A.    I'm not sure.  I haven't been there in a while.

25   Q.    Is that because you're not -- no longer there?

612

CROSS - MASWAHU

1    A.    Yes.

2    Q.    Now -- you can take that down.  Thank you.

3          You have said before that there were no pellets

4    found in the body; is that right?

5    A.    I did look, but I didn't actually find any.

6    Q.    Okay.  So you did an external examination of the body,

7    didn't you?

8    A.    Uhm-hum.

9    Q.    Yes?

10   A.    Yes, I did.

11   Q.    And in order to do an external examination of the body,

12   you -- well, why don't you tell us how you do that.  How --

13   where do you do an incision?

14   A.    When you come to the part of the incision, then you are

15   beginning your internal examination.  Internal examination

16   is mainly what you see with your naked eye.

17   Q.    So -- no, I understand, but do you open the body up

18   to -- I'm sorry, an internal examination.  Do you open the

19   body up to do an internal examination?

20   A.    Yes.

21   Q.    And during that internal examination, you were not able

22   to find any pellets?

23   A.    We did look.  I did not -- but I could see evidence of

24   where they passed in the lungs and in the skin.

25   Q.    In the lungs and in the skin.

613

CROSS - MASWAHU

1    A.    Yes.

2    Q.    Okay.  Would an x-ray have detected where the pellets

3    were?

4    A.    The -- it would have been an excellent machine to have

5    down there.

6    Q.    And would an x-ray have the ability to perhaps confirm

7    the angle of entry?

8    A.    It would have, yes, better.

9    Q.    Now I want to talk further about that.  And I'm

10   referencing your internal examination of the body.

11          Now, we spoke before about how you saw an

12   8-centimeter blast effect in the seventh, eighth, and ninth

13   ribs.  Do you recall that?

14   A.    I do.

15   Q.    So I want to talk about where the seventh, eighth, and

16   ninth ribs are.  Now, all of us, we have a rib cage; is that

17   right?

18   A.    Yes.

19   Q.    And our rib cages extend well below where our heart is;

20   is that right?

21   A.    Yes.

22   Q.    And I think we can all feel where our rib cages end; is

23   that right?

24   A.    Yes.

25   Q.    And where our rib cages end below our heart is where

614

CROSS - MASWAHU

1    the tenth rib is; is that right?  That's where the tenth rib

2    is.

3    A.    Where -- I'm not getting your question.

4    Q.    The ribs are numbered --

5    A.    Yes.

6    Q.    -- in medicine; is that right?

7    A.    So which part of the heart are you talking about?

8    Q.    I am just talking about the ribs right now; the rib

9    cage.

10   A.    Okay.

11   Q.    So the tenth rib is the bottom rib, is it not?

12   A.    Yes.

13   Q.    And so the next rib up would be the ninth rib; is that

14   right?

15   A.    Yes.  Go on.

16   Q.    And so forth.  Okay.

17   A.    Yeah.

18   Q.    So the ninth, eighth, and seventh ribs, that is where

19   you're saying that you saw this 8-centimeter blast defect;

20   is that right?

21   A.    Yes.

22   Q.    And is the heart primarily behind the third and the

23   fourth rib?

24   A.    No.

25   Q.    Which ribs are the heart behind?

615
CROSS - MASWAHU

1    A.    About the -- from the fourth to about the eighth or

2    ninth.

3    Q.    The fourth to about the eighth.

4    A.    Yes.

5        THE COURT:    You said fourth to the eighth and

6    ninth.

7        MS. MOSS:    Fourth to the eighth and the ninth.

8        THE COURT:    You misquoted the witness.

9        MS. MOSS:    Thank you.

10   BY MS. MOSS:

11   Q.    Let's talk about Mrs. Rudolph's clothing, because you

12   had said that when you first saw the body, that she had

13   clothing on her; is that right?

14   A.    Yes.

15   Q.    And you -- I believe you testified that the clothing

16   was given back to the police?

17   A.    Yes.

18   Q.    So the police took possession of the clothing from

19   you?

20   A.    Yes.

21   Q.    And did you remove the clothing from the body?

22   A.    Yes, together with the mortuary assistant.

23   Q.    With your assistant?

24   A.    Yes.

25   Q.    And when you did this, when you removed the clothing

CROSS - MASWAHU

1   from the body, did you lay it out so that you could look at

2   the clothing?

3   A.   Yes, momentarily.  And then handed it over to . . .

4   Q.   And can you tell us -- describe for us what you saw in

5   the clothing.

6   A.   I don't quite remember.  It's a long time ago.

7   Q.   Did you ever try to take pictures of the clothing?

8   A.   No.

9   Q.   Did you ever draw a diagram of what you may have seen

10  on the clothing?

11  A.   No.

12  Q.   Do you ever collect trace evidence from the clothing?

13  A.   Depends on the case.  But in this case, I didn't.

14  Q.   Now, you've testified today as to a wound direction, or

15  path, a wound path.

16       Can we go back to Government Exhibit 350, please.

17  I'm sorry, 35.

18       And, again, we're looking at your report, correct,

19  Dr. Maswahu?  This is your report?

20  A.   Yes.

21  Q.   And can you tell us where it indicates in your report

22  the path of the wound.

23  A.   Even that I did not indicate in the report.

24  Q.   Did you indicate in any notes?

25  A.   No, I did not.

617
CROSS - MASWAHU

1    Q.    Did you do a diagram of it?

2    A.    No, I did not.

3    Q.    And what you've shown us today is that you believe it

4    was -- looked to me like a 90-degree angle; is that right?

5    A.    Yes.

6    Q.    And how did you measure that?  How were you able to

7    determine that it was a 90-degree angle?

8    A.    The position of the external injury and the position of

9    the internal injury.

10   Q.    So it -- was it anything that you measured or just

11   based on your observation of the -- I believe you said the

12   bruising --

13   A.    Yes.

14   Q.    -- around the wound?

15   A.    Based on my observation.

16   Q.    Okay.  Now, you also testified -- thank you very

17   much -- you testified that the police had told you that this

18   was an accident.  Do you remember that?

19   A.    Yes.

20   Q.    When you perform an autopsy, Dr. Maswahu, do you not

21   form your own independent opinion about how something

22   happened?

23   A.    Yes, but sometimes it's not clear.  I -- if I may, I --

24   I think -- I don't know if I mentioned it, but there are

25   times when what the police officer and what actually

1    happened don't agree.  And unless I'm really confident about

2    what actually lead to the events, I do not comment.

3    Q.    Okay.  And -- and just to confirm that, so unless

4    you're really confident --

5    A.    Yes.

6    Q.    -- that your opinion disagrees with the findings of the

7    police, you're not going to note that or say otherwise.

8    A.    Yes.

9    Q.    And in fact, you spoke to some Embassy officials

10   directly after -- or the day after you performed this

11   autopsy, didn't you?  Did someone call you from the U.S.

12   Embassy?

13   A.    I don't remember.

14   Q.    You don't remember that?

15   A.    No.

16   Q.    Do you recall a Dr. Sundeep Gupta calling you and

17   speaking to you about your findings?

18   A.    No.

19   Q.    Do you recall telling anyone on the following day after

20   the autopsy that -- in your mind that this was -- there was

21   no evidence of foul play here?

22   A.    I don't remember that.

23   Q.    Let's take a look at Government Exhibit 38, which has

24   been admitted.  And, I'm sorry, I don't know the number.

25          Now, this is a notice of death.  Do you see that?

619

CROSS - MASWAHU

1    A.    Yes.

2    Q.    And this is a document that is issued by the Republic

3    of Zambia?

4    A.    Yes, it is.

5    Q.    And do you see that on this document, it's noted

6    "accidental discharge of firearm" in the middle area there?

7    Do you see where it says that?

8    A.    Yes, I see that.

9    Q.    Now --

10   A.    And who was this written by?

11   Q.    Actually I do not know.

12   A.    Well, there's no signature at the end.

13   Q.    No, this is just a stamp.  Do you see the stamp at the

14   bottom?

15   A.    There is a signature.  There is a name, anyway.

16   Q.    Which one are you referring to?  The office -- the --

17   A.    The C. Mumba.  Mr. C. Mumba something.

18   Q.    And that -- you're referring to something that's close

19   to the bottom there; is that right?

20   A.    Yes.  Yes.

21   Q.    Do you know who that individual is, Mr. C. Mumba?

22   A.    No, I don't.

23   Q.    Is that a Zambian name?

24   A.    It is.

25   Q.    Okay.  Thank you.  Let's take a look at Government

620

CROSS - MASWAHU

1    Exhibit 22.  And that is INV 29127.

2              MR. REYES:  INV 29-?

3              MS. MOSS:  -127.  Government Exhibit 22.

4    BY MS. MOSS:

5    Q.   Do you see this exhibit here on your screen,

6    Dr. Maswahu?

7    A.   I do.

8    Q.   And tell us what this is, please.

9    A.   This is the form we give out to allow the burial of the

10   body.  It's a --

11   Q.   And -- I'm sorry.

12   A.   Authority for burial.

13   Q.   Authority for burial.  And that's the title of it.

14   Coroner's Authority for Burial; is that right?

15   A.   Yes.

16   Q.   And is this a form that you signed?

17   A.   Yes.

18   Q.   You see your signature there in the middle?

19   A.   Yes, I signed this.

20   Q.   And it looks like you signed it on the day of the

21   autopsy, October 12th, 2016; is that correct?

22   A.   Yes.

23   Q.   And so is this a form where you are releasing the body

24   and saying it can be buried at this point?

25   A.   Yes.

621

CROSS - MASWAHU

1    Q.    Thank you, Mr. Reyes.

2         Now I'd like to talk about some of the opinions

3    that you've expressed here today.  And one of those is that

4    you said that the distance of the muzzle of the shotgun --

5    of the shotgun from the body is approximately 1 meter; is

6    that right?

7    A.    Yes.

8    Q.    Now, you've said a number of different things before in

9    the past, have you not?  Have you --

10   A.    I don't know.  You would have to remind me.

11   Q.    Well, let me ask you about some of those.  So I want to

12   pull up Exhibit RA-16, page 5, which is DLG 391, please.

13            THE COURT:  Has this been admitted?

14            MS. MOSS:  It has been admitted, Your Honor.

15            THE COURT:  Okay.

16   BY MS. MOSS:

17   Q.    And if we can focus on the top half that says, Medical

18   Examiner.  And maybe even one more paragraph down.  And it

19   looks like we need some help here.  Can everyone see RA-16?

20         Now, Dr. Maswahu, in January of 2017, you were

21   interviewed by someone for the -- from the insurance

22   company, weren't you?

23   A.    Yes.

24   Q.    And you recall doing that?

25   A.    Yeah, there was a gentleman who came and introduced

622

CROSS - MASWAHU

1   himself as a representative of an insurance company.

2   Q.   And this was just three months after your examination.

3   A.   Yes.

4   Q.   And would you agree that your memory was fresher in

5   2017 -- January of 2017, than perhaps it is in 2022?

6   A.   Considering the time, I suppose so, yes.

7   Q.   Now this person that you spoke to for the insurance

8   company, you met them at the University Teaching Hospital;

9   didn't you?

10  A.   He came looking for me.

11  Q.   He came looking for you.  And where he found you was at

12  the University Teaching Hospital; is that right?

13  A.   Yes.

14  Q.   And that's where you were working at the time?

15  A.   Yes.

16  Q.   And so they asked you questions about your autopsy,

17  didn't they?

18  A.   Yes.

19  Q.   And you answered their questions, didn't you?

20  A.   I did.

21  Q.   Now, we can see in this report at Exhibit RA-16  -- and

22  if we look at the second paragraph -- and if we can

23  highlight the second sentence.

24       Do you see where it says that, "He" -- referring to

25  Dr. Maswahu, you -- "stated the insured was shot with a

623

CROSS - MASWAHU

1    shotgun and the entry wound where shell went through was

2    very large, meaning it was fired at very close range."  Do

3    you see that?

4    A.    Yes.

5    Q.    And do you agree with that statement?

6    A.    It doesn't give a measurement.

7    Q.    It doesn't give a measurement, but is that what you

8    told the insurance examiner?

9    A.    I don't think so.

10   Q.    So is it your understanding and your belief that they

11   wrote this down wrong?

12   A.    Yes.  And that's not the only part that's wrong.  I can

13   see other places where it's wrong.

14   Q.    So you believe there's other places that it's wrong.

15   A.    Yes.

16   Q.    So are you telling us that you did not say "very close

17   range"?

18   A.    I may have, but he didn't ask me for a measurement.

19   Q.    Okay.  So it sounds like you are saying you may have

20   said "very close range," but they didn't follow up and ask

21   you what that means.

22   A.    Exactly.

23   Q.    Now, I'd also like to just note here at the fourth

24   paragraph, where it says that you said "the husband seemed

25   genuinely shocked and was sometimes assisted by the two men

624

CROSS - MASWAHU

1    who accompanied him."  And you said, "the husband later

2    called to thank you for his services."  Do you see that?

3    A.   Yes.

4    Q.   And that is a reflection of what you saw on that day of

5    the autopsy; isn't it?

6    A.   Yes.

7    Q.   Thank you.  Now, you've also spoken to the FBI before

8    about this, haven't you?

9    A.   I have.

10   Q.   And you were interviewed by the FBI a couple of years

11   later on June 18th, 2019; do you recall that?

12   A.   What are the dates again?

13   Q.   June 18th, 2019.

14   A.   Yes.

15   Q.   And you were interviewed by individuals from the FBI;

16   is that right?  A man and a woman?

17   A.   Yes.

18   Q.   And there were also officials there from the Zambian

19   Police Service?

20   A.   Yes.

21   Q.   And they asked you questions again about your autopsy;

22   is that right?

23   A.   Yes.

24   Q.   And you answered those questions, didn't you?

25   A.   I did.

625

CROSS - MASWAHU

1    Q.    And they were taking notes at the time.

2    A.    Yes.

3    Q.    And what you told them at that time was that the

4    shotgun was less than a foot away from the body at the point

5    of impact; is that right?

6    A.    I think in meters; I don't think in feet.

7    Q.    So if it was written in the report 1 foot, are you

8    saying the FBI wrote that down wrong?

9    A.    Yes.

10   Q.    You also said at the time that the force of the blast

11   would have caused her to be thrown backwards; do you recall

12   that?

13   A.    No, I don't recall.

14   Q.    Do you believe that the cause -- the force of the blast

15   would have caused her to be thrown backwards?

16   A.    I'm not sure.

17   Q.    You're not sure.  We spoke a little bit before about

18   your examination of her lungs.

19   A.    Yes.

20   Q.    Do you recall that?

21   A.    Yes.

22   Q.    Would she have been able to make a sound after being

23   shot?

24   A.    I'm not sure.

25   Q.    You're not sure.

CROSS - MASWAHU

1    A.    No.

2    Q.    Is it possible that she would have been able to make a

3    sound, a scream, or say words?

4    A.    It's possible, but I'm not sure.

5    Q.    Now, may I use the Elmo, please.  Do I need to press a

6    button here, Ms. Guerra?

7              MS. MOSS:  Before I do this, Dr. Maswahu, and Your

8    Honor, I just want to let the people in the gallery know

9    that I am going to be showing a photo -- a post-autopsy

10   photo.

11             THE COURT:  Thank you for the warning.

12   BY MS. MOSS:

13   Q.    And I'm just going to put this up here for a very brief

14   time.

15             Dr. Maswahu, do you recall -- do you recall that

16   you put these dots on this photograph during your direct

17   examination?

18   A.    Yes, I do.

19   Q.    And can you count up those dots for me.  Tell me how

20   many there are.

21   A.    There's eight.

22   Q.    Eight.  The shell cartridge that was discharged into

23   Mrs. Rudolph's body, do you know how many pellets were in

24   that shell cartridge?

25   A.    No.

CROSS - MASWAHU

1    Q.   Dr. Maswahu, I -- I'm sorry to bring this up, but I do

2    want to talk about the last thing that the prosecutor raised

3    with you on your direct examination, and that was your

4    arrest that you told us about.  Is that all right?

5    A.   Yes.  Yes.

6    Q.   Now, you told us the first time that you had been

7    arrested was for drug trafficking; is that right?

8    A.   Yes.

9    Q.   And you said that you went to trial and you were found

10   innocent.

11   A.   Yes.

12   Q.   So was that a time when you were wrongly accused and

13   then you went to trial and you were found -- you were

14   acquitted?

15   A.   Yes.

16   Q.   Now, the second time was in 2018.

17   A.   Yes.

18   Q.   And this is when you were convicted and pled guilty to

19   possession of counterfeit currency; is that right?

20   A.   Yes.

21   Q.   And I believe you said on direct that you didn't know

22   how you came into possession of this money; is that right?

23   A.   No.  Well, yes.

24   Q.   That's correct?

25   A.   Yes.  Yes.

628
CROSS - MASWAHU

1   Q.   And the money that you were in possession of was 18,100

2   counterfeit U.S. dollars, was it not?

3   A.   I don't remember.

4   Q.   Do you remember that you had 800 $100 bills that you

5   were carrying with you?

6   A.   I don't remember.

7   Q.   Is that possible that is correct?

8   A.   It's possible.  Like I said, some time ago.

9   Q.   But are you saying you don't know how you came into

10  possession of that money?

11  A.   Yes.

12          MS. MOSS:  I have nothing further.  Thank you.

13          THE COURT:  Any questions, Mr. Dill?

14          MR. DILL:  Yes, Your Honor.  Thank you.

15                  CROSS-EXAMINATION

16  BY MR. DILL:

17  Q.   Good morning, Doctor.

18  A.   Good morning.

19  Q.   Doctor, is there a international standard that you were

20  aware of for the performance of autopsies like this?

21  A.   Yes.  It's between the British and the American one.

22  Q.   So there is a standard as far as --

23  A.   Yes.

24  Q.   -- in the British, and the American one has a standard

25  as well; is that correct?

1   A.   Yes, yes.

2   Q.   And certainly understanding the American standard, that

3   any material that may be taken out of an autopsy has to be

4   cataloged and photographed, are you aware of that?

5   A.   Yes.

6   Q.   Okay.  That wasn't done here, was it?

7   A.   No, it wasn't.

8   Q.   Okay.  As far as you talked about the trajectory of the

9   wound, we heard about that today, correct?

10  A.   Yes.

11  Q.   That, again, was never mentioned in the report,

12  correct?

13  A.   Yes.

14  Q.   Now, you've seen pictures of autopsies where, in fact,

15  there may, in fact, be a drawing of a path of a bullet, for

16  instance, to say what the trajectory of it is.  You've seen

17  that before, haven't you?

18  A.   Yes.

19  Q.   We don't have that here, do we?

20  A.   No, we don't.

21  Q.   And as far as the measurement of that wound, I think

22  you said before that if you were going to measure the

23  trajectory of a bullet or a pellet through tissue, there's a

24  tool by which you can do that, right?

25  A.   Yes.

630

CROSS - MASWAHU

1    Q.   And he was giving you a tool there, but actually a

2    pathologist practicing within the standard of care would

3    actually take the instrument and find out what the actual

4    angle was, correct?

5    A.   Yes.

6    Q.   That wasn't done either, was it?

7    A.   It was done, but I did not document it.

8    Q.   Okay.  You -- so you took -- what instrument did you

9    use, sir?

10   A.   I -- I think it was a metal ruler.

11   Q.   A -- okay.  Where was this metal ruler?  You had it

12   there --

13   A.   Yes.

14   Q.   -- at the autopsy?

15   A.   Yes.

16   Q.   Okay.  So which wound did you probe with the metal

17   ruler?

18   A.   The primary entry wound.

19   Q.   Okay.

20   A.   Going into the -- into the damaged tissue.

21   Q.   All right.  And did you measure how far down the

22   trajectory with the metal ruler -- did you measure that and

23   document it here?

24   A.   I may have measured it, but I didn't document it.

25   Q.   Okay.  Well, did you follow just that trajectory or

631

CROSS - MASWAHU

1    multiple trajectories?  Weren't there multiple pellets?

2    A.    There was the primary entry wound, but the -- the

3    smaller ones I didn't follow.

4    Q.    Okay.  You had to understand how the -- the way the

5    shotgun works.  There's an entry, correct?

6    A.    Yes.

7    Q.    And then the pellets, correct?

8    A.    Yes.

9    Q.    All right.  In fact, you saw yourself, from the

10   autopsy, that at the top where the wound was, you're

11   measuring about 6 centimeters, correct?  Was it

12   6 centimeters, sir?

13   A.    I don't understand your question.

14   Q.    Sure.  You said to us that the entry wound was about 5

15   to 6 centimeters --

16   A.    Yes.

17   Q.    -- correct?

18   A.    Okay, yes.

19   Q.    And you said also underneath that wound it had spread

20   out and it was larger --

21   A.    Internally, yes.

22   Q.    Internally.  So between this skin and underneath into

23   the lungs, it had spread out from 6 centimeters to at least

24   8 centimeters, hadn't it?

25   A.    Yes.

CROSS - MASWAHU

1    Q.    And that's where the pellets went, right?

2    A.    Yes.  And there were others that I had already said it

3    was spreading out even before that entry wound.

4    Q.    Okay.  Well, you said that.  You said you didn't find

5    any pellets, though.

6    A.    I did look, but I didn't find any.

7    Q.    Okay.  Well, the -- you showed us a picture of one --

8    what you thought was a pellet at the top.  Did you extract a

9    pellet out of that?

10   A.    No.

11   Q.    Okay.  Well, there was no exit wound, was there?

12   A.    There was no exit wound.

13   Q.    So the pellets were in there?

14   A.    They were, yes.

15   Q.    But you didn't -- did you not find them or did you not

16   look for them?

17   A.    I looked, but I didn't find them.

18   Q.    Okay.  Well --

19   A.    But there was -- there was evidence that they had

20   passed there.

21   Q.    Evidence because you said it looked like minced meat,

22   but no evidence --

23   A.    No, no, evidence that -- the little holes in the skin.

24   Q.    Let's talk about that.  The little holes in the skin,

25   do you know what the material was that caused the little

633
CROSS - MASWAHU

1    holes in the skin?

2    A.    Pellets.

3    Q.    Okay.  When you're saying "pellets," what is the pellet

4    made out of?

5    A.    Metal.

6    Q.    So that  -- these little -- those that we're seeing in

7    the skin, those were pieces of metal?

8    A.    Yes.

9    Q.    Do you know how big the actual pellets are in this

10   particular shotgun shell?

11   A.    I don't.  2 -- 2 millimeters diameter.

12   Q.    I'm sorry, I didn't hear you, sir.

13   A.    2 millimeters diameter.

14   Q.    So 2 millimeters diameter.  So you're saying all the

15   speckles that we see around there, those are all metal

16   pellets of 2 millimeter diameter?

17   A.    Yes.  Some are grouped, some were individual.

18   Q.    All of which you didn't find, though?

19   A.    I did look, but I didn't find them.

20   Q.    So --

21   A.    Doesn't mean that they were not there.

22   Q.    Okay.  Well, sir, if you're going to be doing an

23   autopsy and now coming in however many years later and

24   saying something was there or not there, wouldn't it be more

25   prudent to actually document what you're seeing at the time?

634

CROSS - MASWAHU

1    A.    It would, yes.

2    Q.    Okay.  And that obviously didn't happen, did it, sir?

3    A.    No, it didn't.

4    Q.    Okay.  So as far as what wound you were tracking, for

5    the first time in any of the reports you're saying that you

6    actually took a rod and went through.  Did you write down

7    the measurement of the angle of that metal ruler that you

8    used?

9    A.    No, I didn't.

10   Q.    Okay.  So -- but now you remember it's 90 degrees,

11   right?

12   A.    Well, yes.

13   Q.    Okay.  And so you told Mr. Grewell 5,000 autopsies?

14   A.    Approximately.

15   Q.    About 2- to 300 involving gunshots?

16   A.    Approximately.

17   Q.    Are you able to just -- can I just pick one?  Let's say

18   150.  No. 150 on the gunshot.  What was the angle there?  Do

19   you know?

20   A.    If you give me the name, yes.

21   Q.    Okay.  You can remember the names of all the autopsies

22   you've done and all the angles of shots, even though you

23   haven't written it down?

24   A.    No, of course not.

25   Q.    Okay.  And, sir, it's fair to say you don't remember

635

CROSS - MASWAHU

1    what the angle was in this case, right?  I mean, truly.

2    A.    It's obvious from the injuries.

3    Q.    Okay.  My question is:  What is the angle of the

4    trajectory of the bullet?  Are you telling us within a

5    reasonable -- reasonable medical certainty here that you

6    could say for sure you know what that is or not?

7    A.    I told you my certainty as 90 to 95 percent.

8    Q.    Okay.  So with 95 percent certainty, that's the angle

9    of the gun or the distance away?

10   A.    Which one are you asking me about?

11   Q.    I'm asking you first and foremost about the trajectory

12   and I'll get to the distance in a moment.  But the

13   trajectory of the bullet -- which you didn't write down, and

14   you don't recall measuring, and you didn't find the

15   bullets -- are you telling us now within certainty you know

16   it was 90 degrees?

17   A.    This is based on the location -- the size and location

18   of the entry wound and the position of the internal

19   injuries.  Those two things.

20   Q.    I understand, sir.  Again, but all we have, as far as

21   documentation, is no measurements and no angles, and nothing

22   written down as to what the angle was, whether it was

23   straight out, upwards, from the side.  There's no way to

24   tell?

25   A.    But I -- like I said, I didn't document that, but the

636

CROSS - MASWAHU

1    position of the entry wound is there; the position of the

2    internal injury is there.  Those two are good enough.

3    Q.   And that's -- again, we didn't do any microscopic exams

4    in this case --

5    A.   No, we didn't.

6    Q.   So you understand what that means.  You can take, for

7    instance, the lungs, and look under a microscope and

8    determine what has gone through the lungs, correct?  That

9    could be --

10   A.   You wouldn't be able to determine unless you found

11   it.

12   Q.   You wouldn't be able to determine the path of the

13   injury --

14   A.   Not the path.  I thought you said the material.  You're

15   confusing me.  What --

16   Q.   I'm sorry, I apologize.  I don't mean to confuse you.

17   And I do understand as far as the barrier of the language

18   here.

19        There was no microscopic exam performed, correct?

20   A.   No, there wasn't.

21   Q.   You understand with pathologists practicing within the

22   standard of care, that one of the ways to determine what has

23   been injured as far as the organs is to look microscopically

24   and determine what has caused the injury.  Are you aware of

25   that?

CROSS - MASWAHU

1  A.   Yes.  But if it's obvious with the naked eye, there's

2  no need for the microscope.

3  Q.   Was it obvious with the naked eye as to what the

4  distance was away that the gun was as well, to you?  You

5  could tell by looking at it?

6  A.   It was an approximation.  You could take the same gun

7  and fire it and determine the radius of the pellets.

8  Q.   What is the radius of the pellets, sir?

9  A.   I don't know.

10  Q.   Did anybody tell you, "Hey, this is the radius of the

11  shotgun, so determine for us how far away it was"?

12  A.   No.

13  Q.   Okay.  But certainly we've already established with

14  it -- between the entry wound and what goes on before the

15  exit wound, as far as the path, if it spreads out, correct?

16  A.   Yes.

17  Q.   Okay.  Now, you were asked some questions about

18  toxicology.  Why -- why toxicology is being done or not.

19  You didn't see on internal examination any sign of any

20  hypodermic needle marks or anybody had run an IV on this

21  person.  You didn't see any of that, did you, sir?

22  A.   No.

23  Q.   Okay.  Thank you, sir.  That's all I have.

24        THE COURT:  Thank you.  Redirect.

25                REDIRECT EXAMINATION

638

REDIRECT - MASWAHU

1    BY MR. GREWELL:

2    Q.    Dr. Maswahu, what is your primary language?

3    A.    English.

4    Q.    And you studied in England, correct?

5    A.    Yes.

6    Q.    Why are you no longer at the University Teaching

7    Hospital?

8    A.    I took early retirement.  I'm not as fit as I used to

9    be.  The workload was quite high.

10   Q.    Could I have Government Exhibit 10, page 21.  Can you

11   zoom in at the top half above External Examination.

12         Dr. Maswahu, you were asked questions about being

13   offered money regarding this autopsy.  Was there a Zambian

14   police officer there to deliver the body to you?

15   A.    Sir, what's the question again?

16   Q.    Was there a Zambian police officer there present at the

17   autopsy?

18   A.    I don't quite remember.  But --

19   Q.    You see the exhibit here.  Did you write down the name

20   of an attending police officer?

21   A.    Oh, yes.  Yes.

22   Q.    So was there a police officer present at the autopsy?

23   A.    Yes.  Yes.

24   Q.    And, again, before you conducted the autopsy, you had

25   been told this was an accident, correct?

REDIRECT - MASWAHU

1    A.    Yes.

2    Q.    And when the police tell you that something's an

3    accident, do you rely on that information when you're

4    conducting your autopsy?

5    A.    I don't.

6    Q.    Okay.  Does it affect how you conduct the autopsy?

7    A.    It does.

8    Q.    Yeah.  If you had not been told this was an accident,

9    would you have recorded the angle of the entry wound?

10   A.    I would have been much more careful, yes.

11   Q.    Is it fair to say that University Teaching Hospital has

12   limited resources?

13   A.    Yes.

14   Q.    Is it fair to say -- sorry?

15   A.    Very limited.

16   Q.    Is it fair to say that you have even more limited

17   resources?

18   A.    Yes.

19   Q.    Did you have the equipment to meet international

20   standards?

21   A.    No.

22   Q.    But did you try to do your best?

23   A.    We did our best under the circumstances.

24   Q.    Did you need an x-ray to determine the angle or was it

25   obvious to your eyes?

REDIRECT - MASWAHU

1    A.    It was obvious to my eyes.

2    Q.    You were asked about the stretching of skin.

3    A.    Yes.

4    Q.    Was the 8-centimeter diameter underneath the skin

5    consistent with a 6-centimeter entry wound on the skin?

6    A.    No, the sizes were different.  And --

7    Q.    As the bullet, as you say, goes inward, it would get

8    larger?

9    A.    Yes.  Yes.

10   Q.    And so was that 8 centimeters consistent with it

11   starting at 6 centimeters --

12   A.    Yes, it's consistent.

13   Q.    Have you seen the inside of the particular shell -- the

14   particular brand of shell here before your autopsy?

15   A.    No, I haven't.

16   Q.    Could I have Government Exhibit 273, page 7.

17            Do you see this inside, Dr. Maswahu?

18   A.    Yes, I do.

19   Q.    Could I have page 11.

20            Are you able to see that, Dr. Maswahu?

21   A.    Yes, I can see these.

22   Q.    Can I have page 14.

23            Are you able to see that, Dr. Maswahu?

24   A.    Yes, I can see this.

25   Q.    Can I have page 15.

641
REDIRECT - MASWAHU

1        Are you able to see that, Dr. Maswahu?

2    A.   Yes, I can see that plastic.

3    Q.   Is that what you extracted from the body that we --

4    A.   Yes.

5    Q.   -- saw as part of Exhibit --

6    A.   Yes.

7    Q.   Can I have page 16, please.

8         Is that the pink part of Exhibit 7 that you --

9    A.   That is the pink part.

10   Q.   Could I go back to page 14, please.

11        Do you remember earlier when you identified the

12   smaller dots around the entry wounds?

13   A.   Yes.

14   Q.   Now having seen the inside of the shell, would this be

15   consistent with those smaller marks being made by this white

16   material here?

17   A.   Also those metal balls --

18   Q.   So the metal ball -- so can we show the metal balls.

19   No. 11.

20        Would one of those have made the big wound that you

21   saw?

22   A.   Yes.

23   Q.   And then the smaller wounds around, could they have

24   been made by the white --

25   A.   Yes, that's possible.

REDIRECT - MASWAHU

1   Q.    And earlier when you're saying "bullet," you just mean
2   all those materials together.
3   A.    Yes, all the projectiles.
4   Q.    Is a meter very close range for a shotgun injury, in
5   your opinion?
6   A.    It is.
7   Q.    Is 6 centimeters fairly large for an entry wound?
8   A.    It is large.
9   Q.    Okay.  When you measured -- you talked about they --
10  you were asked about the 1.7 meter length of Mrs. Rudolph's
11  entire body.  Do you remember that?
12  A.    Yes.  Yes.
13  Q.    Was she standing up on the table --
14  A.    No --
15  Q.    -- when you did that examination?
16  A.    No, the body was like --
17  Q.    Were her feet and her toes angled downward then?
18  A.    They were angled downward.
19  Q.    Would that affect the measurement a bit and perhaps
20  make her longer than her medical record height?
21  A.    Absolutely.
22  Q.    Could I have Government Exhibit 38.  Could you zoom in
23  on this middle part here.  Yeah.  Thank you.
24         You were asked about where it says "Cause of Death:
25  Accidental discharge of a firearm."  Correct?

643

1    A.    Yes.

2    Q.    Do you see who's identified as the informant for that

3    information?

4    A.    Yes.  I see.

5    Q.    And what is that name?

6    A.    Lawrence P. Rudolph.

7    Q.    And do you see a signature next to that?

8    A.    I do, yes.

9            MR. GREWELL:  No further questions, Your Honor.

10           THE COURT:  All right.  May this witness be excused

11   for the Government?

12           MR. GREWELL:  He may.

13           THE COURT:  For Defendant Rudolph?

14           MS. MOSS:  Yes, Your Honor.

15           THE COURT:  For Defendant Milliron.

16           MR. DILL:  Yes, Your Honor.

17           THE COURT:  All right.  Doctor, thank you so much

18   for your testimony.  You're excused.  You may step down.

19   And safe travels back to your country.

20           THE WITNESS:  Thank you very much, sir.

21           MR. GREWELL:  Your Honor, for our next witness,

22   who's going to be Dr. Stephen Cina we're going to want to

23   set up some cardboard targets about the courtroom.  Would

24   you like to take a break to handle that --

25           THE COURT:  Yeah, let's do that.  Let's take a

644

DIRECT - CINA

1    brief recess.  When you're done, we'll all come back.

2         (Recess taken 11:46 a.m. to 11:56 a.m.)

3              THE COURT:  The Government may call its next

4    witness.

5              MR. GREWELL:  Your Honor, Government calls

6    Dr. Stephen Cina.

7              THE COURT:  All right.

8         STEPHEN CINA, GOVERNMENT'S WITNESS, SWORN.

9              COURTROOM DEPUTY:  Please be seated and remove your

10   mask for us.  And please state your name for the record and

11   spell your first and last name for us.

12             THE WITNESS:  Good morning, My name is Dr. Stephen,

13   S-t-e-p-h-e-n, Cina, C-i-n-a.

14                        DIRECT EXAMINATION

15   BY MR. GREWELL:

16   Q.   So, Dr. Cina, I'd like to start so that we don't have

17   these barriers in front of you the whole time -- do you

18   recognize these various cardboard figures around the

19   courtroom?

20   A.   Yes, they were generated from a test firing.

21   Q.   Okay.  And you've reviewed these before, then?

22   A.   Yes, they were brought to my house where I looked at

23   them.

24   Q.   If -- in a second I'm going to ask His Honor for

25   permission for you to get up, walk around the room amongst

DIRECT - CINA

1    the cardboard targets.  But would you be able to identify

2    the ones that, in your expert opinion, most closely reflect

3    the wounds suffered by Bianca Rudolph?

4    A.   I believe so.

5         MR. GREWELL:  Your Honor, may I have leave for the

6    witness to step down from the stand, look at the various

7    targets, and pick out the ones that he believes most closely

8    resemble those wounds, and then I will take those and we'll

9    clear the rest out of the way.

10        THE COURT:  Any objection from the defendants?

11        MS. MOSS:  No objection.

12        MR. DILL:  No, Your Honor.

13        THE COURT:  All right.  Leave granted.

14        You may step down and do so, Doctor.

15        THE WITNESS:  This has a nice central defect, so

16   that's one of them.  This has a central defect of smaller

17   defects around the edges, so this is also a candidate.  So

18   that's 3-2 and 3-4.  And I also like 3-9, which has a

19   central defect and a satellite injury several inches away.

20        MR. GREWELL:  Thank you, Ms. Guerra.  May I

21   proceed, Your Honor?

22        THE COURT:  You may.

23   BY MR. GREWELL:

24   Q.   We'll come back to the targets in a little bit, but I

25   want to get some of your background.  What do you do for a

DIRECT - CINA

1    living?

2    A.    I'm a forensic pathologist.  I'm contracted

3    predominantly with the Adams County Coroner's Office to do

4    their autopsies, but I also cover northern Colorado, and

5    Wyoming on occasion.

6    Q.    And how long have you been doing that?

7    A.    I was board certified in 1997.  I moved back from

8    Chicago to Colorado in 2016 and have been with Adams County

9    since.

10    Q.    And what are your responsibilities in that current

11    position at Adams County?

12    A.    I perform autopsies, take samples for toxicologic

13    analysis, write my autopsy reports, add the toxicology into

14    it, review microscopic slides that I generate from the

15    autopsies, and determine cause and manner of death.

16    Q.    Are you a medical doctor?

17    A.    I am.

18    Q.    In what states are you licensed to practice medicine?

19    A.    Currently in Colorado, but I'm also getting a license

20    in South Carolina.

21    Q.    Dr. Cina, what sort of training have you had to do your

22    current job?

23    A.    Well, it started in college.  I received my BA in

24    natural sciences from the Johns Hopkins University in 1988,

25    followed by my MD degree from Vanderbilt University School

DIRECT - CINA

1    of Medicine in 1992.

2          I then did three years of anatomic pathology

3    residency training in Charleston, South Carolina, followed

4    by a year-long surgical pathology fellowship at Johns

5    Hopkins Hospital, followed by a year-long forensic pathology

6    fellowship at the office of the chief medical examiner for

7    the State of Maryland.

8    Q.    Have you taught the proper way to conduct autopsies?

9    A.    I have.    I've ran a fellowship program and I've taught

10   residents how to do autopsies.

11   Q.    Have you won any awards for teaching medical

12   students?

13   A.    I received awards from Medical University of

14   South Carolina three years in a row for teaching medical

15   students.

16   Q.    Do you belong to any relevant professional societies?

17   A.    Yes.    I belong to the College of American Pathologists

18   where I served as chair of their forensic pathology

19   committee.    The American Academy of Forensic Sciences, the

20   International Association of CoronerS and Medical Examiners

21   where I served on their board of directors.    And the

22   National Association of Medical Examiners, I served four or

23   five terms on their board, as well as serving as their vice

24   president.

25   Q.    Did you previously work as the chief medical examiner

DIRECT - CINA

1    in Cook County, Illinois?

2    A.    Yes, from 2012 to 2016 I was the chief medical examiner

3    in Chicago.

4    Q.    What were your responsibilities there?

5    A.    In addition to performing autopsies, I was in charge of

6    the budget, hiring, firing, union issues, dealing with

7    politicians, dealing with the media, renovating the morgue,

8    instituting a computerized system.  So a lot of

9    administrative duties, as well as doing autopsies.

10   Q.    And in your current job, how many autopsies would you

11   say you do in any given year?

12   A.    I think last year I did 550.

13   Q.    When did you first start doing autopsies?

14   A.    I did my first forensic autopsies at our rotation in

15   Nashville, Tennessee, in 1991 when I was a fourth-year

16   medical student.

17   Q.    And how many autopsies have you done in your career?

18   A.    Right around 8,000.

19   Q.    And how many of those involved gunshot wounds?

20   A.    Hundreds.

21   Q.    What about autopsies specifically involving shotguns?

22   A.    I would say somewhere between 100 and 150.

23   Q.    When was the last time you did an autopsy involving a

24   shotgun wound?

25   A.    Last month I had a murder/suicide that involved a

649

DIRECT - CINA

1    shotgun.

2    Q.   Have you lectured on shotgun wounds?

3    A.   Yes, I have.

4    Q.   When and where?

5    A.   Oh, multiple national meetings.  International

6    Association of Coroners and Medical Examiners, National

7    Association of Medical Examiners meetings.  So I've probably

8    done broad lectures on forensic topics, which include

9    gunshot and firearm injuries probably 30 or 40 times.

10   Q.   Have you testified as an expert in court before?

11   A.   Yes.  I've been qualified as an expert in anatomic and

12   forensic pathology around 350 times.

13   Q.   State or federal?

14   A.   Both.

15   Q.   Have you ever been excluded as an expert?

16   A.   I have not.

17   Q.   I want to turn to the autopsy in this case now.  Were

18   you asked to review the death of Bianca Rudolph and express

19   an opinion on the nature and cause of her death?

20   A.   Yes, I was.

21   Q.   I want to first ask if you reviewed the autopsy done by

22   Dr. Maswahu in this case.

23   A.   I did.

24   Q.   Was it done in accord with professional standards?

25   A.   It provides basic information regarding the cause of

DIRECT - CINA

1    death in this case.  However, in -- by National Association

2    of Medical Examiners standards for this country, it's

3    lacking in certain measurements and detail.

4    Q.    What should have been done that wasn't?

5    A.    Well, for example, we measured firearm injuries from

6    the head down and to the left and right of the midline.

7    There would be more detail about the entrance site.  Is it a

8    nice smooth hole, is there scalloping at the edges?  Are

9    there individual buckshot entry sites?

10          There's a wound in the photos on the right side of

11   the chest, which isn't described in the autopsy report.

12   Things of that nature.  Just more detail.

13   Q.    Did you review the results of test-firing done by the

14   FBI using a Browning 12-gauge Auto 5 shotgun that was fired

15   through a soft case?

16   A.    Yes, I did.

17   Q.    Did you also review the photographs of Bianca Rudolph

18   that were taken within a day of her autopsy?

19   A.    Yes, I did.

20   Q.    From you -- from your review of the materials in this

21   case, were you able to reach any conclusions about the

22   distance of the shotgun muzzle from Bianca Rudolph when it

23   was fired?

24   A.    Yes, I did.

25   Q.    What did you conclude?

DIRECT - CINA

1          THE COURT:  Hold on.  Counsel, don't you want to

2     ask me to have this witness qualified under 702?

3          MR. GREWELL:  Yes, Your Honor.  I move for his

4     qualification under 702.

5          THE COURT:  In the fields of?

6          MR. GREWELL:  General forensic pathology and then

7     in examining the wounds in this particular case.

8          THE COURT:  One second.  Any objection from

9     Defendant Rudolph?

10          MS. MOSS:  No objection.

11          THE COURT:  Defendant Milliron?

12          MR. DILL:  No, Your Honor.

13    BY MR. GREWELL:

14    Q.   What did you --

15          THE COURT:  Hold on.  Dr. Cina is qualified under

16    Federal Rule of Evidence 702 to provide expert opinion

17    testimony in the field of general forensic pathology and

18    specifically with respect to an examination of the wounds in

19    this case.

20          You may proceed, counsel.

21          MR. GREWELL:  My apologies, Your Honor.

22    BY MR. GREWELL:

23    Q.   Dr. Cina, what did you conclude about the distance of

24    the shotgun muzzle from Bianca Rudolph when it was fired?

25    A.   Well, although the photos are suboptimal, based on the

DIRECT - CINA

1   test-firing and what I can definitively see from the wounds

2   on the body, my best estimate is 1 to 3 feet for the range

3   of fire.

4   Q.    And how certain are you of that conclusion?

5   A.    To within a reasonable degree of medical certainty.

6   Q.    And how did you reach that conclusion?

7   A.    Once again, the photos show a wound to the left side of

8   the front of the chest.  I believe Dr. Maswahu said it was

9   about 6 centimeters across, which is a little less than

10  2 1/2 inches.  Looking at the test-firing, I tried to see

11  which hole was about that size.  Granted, skin behaves

12  differently than cardboard, so you have to take that into

13  account.  And also which of the test-firing caused the

14  satellite injury which I see on the right side of the chest

15  from the post autopsy photos.  So I believe that might have

16  been No. 3.9, that probably is my best estimate.

17  Q.    Is that this target?

18  A.    That's correct.  It has a central defect and then a

19  satellite injury several inches away from it.

20  Q.    Okay.  We'll come back to that in a second.  As you are

21  aware, Dr. Maswahu's report identified the entry wound as

22  6 centimeters expanding to 8 centimeters as you go further

23  into the body.  Is that surprising to you?

24  A.    No.  Once the pellets hit the body, they're going to

25  start to fan out.  So it's not uncommon to have a bigger

DIRECT - CINA

1    defect inside than outside.

2    Q.   And how did the 6-centimeter and 8-centimeter

3    measurements figure into your analysis?

4    A.   Well, first of all, 6 centimeters is big for, let's

5    say, a contact-range shotgun wound.  Usually the defect on

6    the skin is about the same size as the barrel.  And I have

7    never seen a shotgun with a 2 1/2-inch size barrel.  So that

8    suggests it's backed off a little further than the contact

9    range.

10        Once again, the 6 centimeters also indicates the

11   shot may have been starting to spread out before it hit the

12   body rather than going as one tight compact ball.  That

13   backs the range of fire off more into the 1-to-3 feet range,

14   which is closer to what I saw on the test-firing.

15        MR. GREWELL:  May I ask Ms. Guerra to provide

16   physical Exhibit 7, the wadding you saw earlier, to

17   Dr. Cina.

18   BY MR. GREWELL:

19   Q.   Dr. Cina, were you aware that this material was found

20   during the autopsy of Bianca Rudolph inside her body?

21   A.   Yes.

22   Q.   And how did that affect your analysis, if at all, in

23   terms of the distance?

24   A.   Seeing wadding and the shot cup in the body, most

25   commonly seen within 1 to 2 feet of range of fire.  Of

DIRECT - CINA

1    course, it could be seen in contact range as well, but with

2    a contact range you also see a muzzle imprint around the

3    wound, which you don't see in this case.

4    Q.    Now I want to turn to those targets.  And there should

5    be a laser pointer at the witness stand.  So let's start

6    with -- I know you said 3-9 was the one that was best, but

7    let's start with 3-2 and 3-4 first.

8    A.    Okay.

9    Q.    So if you could tell the jury, what was it about this

10   target pattern that caused you to select it among the 14?

11   A.    Well, a lot of the other ones that you saw had many

12   individual buckshot entries, very spread out.  That's

13   usually seen, you know, 4, 5 feet away for a range of fire.

14   And I did not see that pattern on Ms. Rudolph's body.

15           It is possible from the photos that there is a

16   buckshot satellite wound adjacent to the big wound, but I

17   can't tell for sure.  My range of fire --

18   Q.    I can see it pointing in my eyes, so it's -- does that

19   work?

20   A.    Since this isn't working, can I approach?

21           THE COURT:  Let's let Ms. Guerra see if she can get

22   it to work.

23           MR. GREWELL:  Is it too far of a distance?

24           COURTROOM DEPUTY:  Yeah, it's too far away.

25           MR. GREWELL:  May we provide him with these three

DIRECT - CINA

1    targets, then?  Unfortunately, I think they're in reverse

2    order, so 3-2 is in the back, 3-4, and 3-9 in the front.

3            THE WITNESS:  And can you maybe tilt it just a

4    bit.

5            MR. GREWELL:  And can we have 3-2, which is the

6    back one.  Sorry.

7            THE COURT:  Doctor, if it will be easier for you,

8    you can stand.

9            THE WITNESS:  So here you have a tight grouping,

10   which will correspond to the wound on the left side of the

11   front of the chest of Ms. Rudolph.  We do have -- looks like

12   one individual pellet entry over here.  And on one of the

13   photographs there is something that may have represented a

14   single-pellet entry, which will be separate from the main

15   bolus if you're there.  So this is a candidate.

16   BY MR. GREWELL:

17   Q.   If we could have 3-4, which I think is the next one.

18   A.   This has a central defect possibly with a couple of

19   pellets just starting to separate, which may correspond to

20   that wound on the left side of the front of the chest.  And

21   also has a satellite injury way over here that could be

22   caused by a pellet, but also could be an impact from a piece

23   of the carrying case as the projectiles went through it and

24   tore a piece off and impacted the body.

25            You'll see from the photographs looking at the

DIRECT - CINA

1    major injury on the left side of the front of the chest,

2    there's an injury on the right side of the chest, which I

3    believe was caused by part of the carrying case that was

4    blown off.

5    Q.    And if we could have 3-9 for Dr. Cina.  Thank you.

6    A.    Once again, you have the good-sized central defect

7    here.  We have a little satellite injury over there.

8              Once again, this may correspond to the left side of

9    the front of the chest, and the piece of the carrying case

10   caused that injury on the right side of the front of the

11   chest.

12   Q.    Thank you.  Thank you, Ms. Guerra.

13             You mentioned earlier, Dr. Cina, the targets here

14   are obviously made from cardboard, not flesh, right?

15   A.    That's correct.

16   Q.    And so how do you account for that difference in your

17   analysis of which test fires most closely reflected the

18   injuries here?

19   A.    Well, cardboard, just like shooting through wood, is a

20   brittle structure.  So even though you're shooting at close

21   range, the injury appears somewhat ragged.  Being that

22   skin's elastic, at 1, 2, 3 feet, you're going to have a

23   nice, rounder defect rather than a ragged defect.

24             So I'm trying to basically try to see which of

25   these ragged, tight defects is closest to a 6-centimeter

DIRECT - CINA

1    hole in the front of the chest.

2           MR. GREWELL:  And, Your Honor, I'm about to go back

3    to the autopsy photos, so I'd like to give anyone in the

4    gallery an opportunity to leave if they'd like to.

5           THE COURT:  Thank you.

6    BY MR. GREWELL:

7    Q.   Dr. Cina, did you review -- you mentioned you reviewed

8    the photographs that were taken the day after Bianca

9    Rudolph's autopsy, correct?

10   A.   Yes, I did.

11   Q.   May I have Government Exhibit 17, page 1.

12          And, Dr. Cina, you'll see there's a little stylus

13   on the side of your monitor that you can use to draw on the

14   screen once it's up.

15          All right.  Could you -- could you show the jury

16   that mark on the right breast that you were talking about,

17   the satellite, when you were talking about.  And what is it,

18   in your opinion, that that mark is, Dr. Cina?

19   A.   Being that the cup and wadding were found inside the

20   body, that makes the most sense that would be a fragment of

21   the carrying case that was blown off with the shotgun blast.

22   Q.   Could I have page 3 of this exhibit.

23          And do you see that same mark in this picture?

24   A.   Right.  What I see in this -- there is the satellite

25   injury there.  This is the main defect.  What I'm not sure

658

DIRECT - CINA

1    of, which could be significant, is:  What is that?  That is

2    suspicious to me for an individual pellet entry, in which

3    case that means the range of fire's probably closer to 3 to

4    4 feet.  I can't say for certain, so I'm just going with the

5    major wound, which has the arrow on it.

6    Q.    May I have page 5, please.

7          And, Dr. Cina, do you see what you were talking

8    about earlier, that smaller puncture wound around the entry

9    wound?

10   A.    Right.  So here's the main entrance defect.  I can't

11   see exactly what's going on in the skin here.  If it's nice

12   and smooth, that probably makes the range closer to 1 to 2

13   feet.  If it's scalloped, meaning you got individual pellets

14   starting to come apart, it would have more of a

15   configuration like this.  But since all that tissue's

16   pooching out a bit, I can't really tell the details of that

17   entrance site.

18         Like I said, this is very suspicious for a

19   satellite wound.  The buckshot starting to spread apart.

20   Most of it going right through here, but then this flier

21   coming off, that would put you more in the 3- to 4-foot

22   range.  And one of the exhibits I picked out did have a

23   little flier like that.

24   Q.    What is stippling, Dr. Cina?

25   A.    Stippling is when fragments of burnt and unburnt

DIRECT - CINA

1    gunpowder impact the skin following discharge of a weapon.

2    Q.    From these photos, were you able to identify any

3    stippling?

4    A.    No, I don't see any stippling around the entrance site.

5    However, stippling could have been weeded out by the soft

6    carrying case, the gunpowder may not make it through it.  It

7    also can be weeded out by the clothing overlying the

8    wound.

9              THE COURT:  Are we done with this photo?

10             MR. GREWELL:  Yes.  Sorry.

11             THE COURT:  Can we take it down, please.

12   BY MR. GREWELL:

13   Q.    Although you can't see it in the photos, from the

14   materials you've reviewed, do you have a reason to believe

15   that there might have been stippling?

16   A.    There might have been.  If you're in the 1- to 2-foot

17   range, I would expect at least some of the gunpowder or

18   possibly the polystyrene filler within the shotgun shell to

19   have reached the clothing at least.  I think a lot of it

20   would have been weeded out by the carrying case.  I don't

21   believe the clothing was thoroughly examined, so I don't

22   know what was on the surface of the clothing.

23   Q.    And you said these autopsy pictures are not

24   particularly good, correct?

25   A.    Correct.  I really can't see the edges of that entrance

DIRECT - CINA

1    defect to see if there's a scalloping or not.

2    Q.    If the -- if the doctor who performed the autopsy said

3    that he saw smaller entry wounds around the major entry

4    wound, would that be evidence of stippling?

5    A.    No.    What that would be is evidence that the shot is

6    starting to spread apart, so if you have a central defect

7    with individual holes around it, that means the shot is

8    starting to spread out, and that usually occurs at the 3- to

9    4-foot range.

10   Q.    Do you have an opinion, Dr. Cina, on the angle at which

11   the projectiles from the shotgun entered the body here?

12   A.    Front to back and maybe a little bit downward, being

13   that I think it injured rib 6 through 8.    I don't think it

14   was sharply downward, otherwise you'd have injuries to the

15   diaphragm on that side and maybe the abdominal organs as

16   well.    That was not described in the autopsy.

17   Q.    You see a dowel -- a little wooden dowel at the witness

18   stand.    Could you demonstrate for the jury what angle you

19   believe the projectile entered?

20   A.    Probably more or less like this.

21   Q.    So is that straight on and a little bit up-down?

22   A.    Right, a little bit up to down, and the vast majority

23   is just front to back.    From the autopsy report, I can't

24   tell if it went a little left to right.    It might have, but

25   there was no injury to the right lung.

DIRECT - CINA

1    Q.    And -- and so what do you base the angle on again,

2    then?

3    A.    Basically the structures that were hit and the fact

4    that the entrance side is probably closer to ribs 4 and 5,

5    but there was also injury to rib 6 through 8, which are a

6    little lower.

7    Q.    How confident are you of that angle?

8    A.    I'm extremely confident of the front to back.  As far

9    as the slightly downward, I'm reasonably comfortable with

10   that.

11   Q.    When talking about gun injuries, what is a contact

12   wound?

13   A.    A contact wound is when the muzzle of a firearm is

14   pressed up against the skin when the weapon is discharged.

15   Q.    And what would be the size of the muzzle compared to

16   the size of the entry wound in a contact wound?

17   A.    With shotguns, generally right around the same size as

18   the muzzle, depending on the elastic planes of the skin.

19   Might be a little bit wider than the muzzle or might be a

20   little bit smaller, but basically around the size of the

21   muzzle.

22   Q.    Is it possible that the wound here could have been a

23   contact wound?

24   A.    It doesn't look like that to me, otherwise you wouldn't

25   have the fliers, the little individual pellets, that enter

DIRECT - CINA

1    around the skin as Dr. Maswahu described.  That doesn't

2    happen with a contact wound.  You need to be 3 or 4 feet out

3    for the buckshot to spread.

4    Q.    Have you ever held an opinion in this case that the

5    wound here was a contact wound?

6    A.    I have not.

7    Q.    What sort of -- strike that.

8         Would you expect blood on the shotgun case if it

9    was pressed against the decedent's chest when she was shot?

10   A.    Usually you would get at least some blowback of blood

11   or tissue onto the case.

12   Q.    What about internal damage?  Would there be

13   particularly any internal damage you would see from a

14   contact wound?

15   A.    In a contact wound, although the pellets cause a lot of

16   damage, sometimes more of the damage is actually caused by

17   the gases that are discharged along with the pellets.  For

18   example, with an intraoral shotgun wound, the gases

19   sometimes will blow the brain right out of the top of the

20   head before the pellets even reach it.  So the gases are

21   devastating.

22        If this was a contact wound, I'd expect those gases

23   to go into the left chest cavity, probably cause bruising to

24   the right lung as well -- which wasn't described as being

25   bruised -- and possibly blowing out the diaphragm because

DIRECT - CINA

1    all those gases have to fill up your left pleural space.

2    Q.   And you mentioned there was no sign of -- in

3    Dr. Maswahu's report, no sign of damage to the right lung;

4    is that correct?

5    A.   Correct.  Or the diaphragm.

6    Q.   Does the fact that the shotgun here was fired while in

7    a soft case change your conclusion about the distance of the

8    muzzle to Bianca Rudolph?

9    A.   What it does is it could potentially weed out sort of

10   stippling or pseudostippling, or it could weed out some of

11   those little polystyrene filler pellets that are around the

12   main box shot pellets.

13       If I saw those on the shirt or the skin, it would

14   be easier to say a more exact range of fire.  Being that the

15   clothing wasn't well examined, all I can say is it was shot

16   through the -- the projectiles at least made it through the

17   defect in the case; the wadding made it through the defect

18   in the case.

19       I don't know if the polystyrene filler or how much

20   of the soot or how much of the gunpowder made it through the

21   case.

22   Q.   Given your familiarity with shotgun wounds, can you

23   start with the contact wound and move out to a distance of

24   about 4 feet from the body and take us through the evidence

25   you would expect to see at different distances.

DIRECT - CINA

1    A.    Sure.  Well, we already talked about contact range.  If

2    you back off, let's say, 2, 3, 4 inches, you'll still have a

3    nice round, central defect with the wadding and the shot cup

4    going up into the wound, but you may see a cloud of soot

5    around the end of the entrance site.

6         As you back off further, let's say 6 to 8 inches,

7    to maybe 2 feet, those fragments of burnt and unburnt powder

8    will cause little pinpoint abrasions around the entrance

9    site.  The farther away you get, the bigger these little

10   pinpoint abrasions will be.  We call that stippling.

11        Once you get out to about 3 feet with an average

12   weapon, an average shotgun ammunition, you'll no longer see

13   any soot or any stippling.  What you'll see is some

14   scalloping at the edges of that nice, round defect, where

15   the pellets are just starting to come apart, almost making

16   like a little floral pattern, little divots around the edge.

17        When you get out to 3 1/2, 4 feet, that's when you

18   usually start seeing individual pellet entries around a main

19   defect.

20        And as you back off to 5, 6 feet, you're going to

21   start losing that central defect and just have multiple

22   individual impacts from the buckshot.

23   Q.    Thank you.  Were you able to handle the Browning

24   12-gauge shotgun used for the test-firing in this case?

25   A.    Yes, I was.

DIRECT - CINA

1    Q.    Did you reach any conclusions on whether Bianca Rudolph

2    could shoot herself in the chest with that model of shotgun

3    and create the injuries here?

4    A.    In my opinion, no.  The -- like I said, I'm looking at

5    a 1- to 3-feet range of fire.  Even when I leaned over and

6    pressed the barrel of that against my chest, I could barely

7    reach the trigger guard.  So even if you're a few more

8    centimeters, there's no way she could have reached down and

9    pressed the trigger with it against her chest.  It's a very

10   long barrel.

11   Q.    How, if at all, does the fact that the gun was in the

12   case when it was fired affect that conclusion?

13   A.    Well, I mean, when you go see a doctor and you're sick,

14   one of their jobs is to figure out how you got sick and why

15   you're sick.  As a forensic pathologist, we can't talk to

16   the patient about how and why; we can just see -- try to

17   think about how and why as it relates to the circumstances

18   of the fatality.  So being that it was in a case, it made me

19   wonder why would somebody be -- have a shotgun in a case

20   against their chest, reaching toward the trigger.  It just

21   didn't make sense.

22   Q.    Given her injuries, how long could Bianca Rudolph have

23   lived with these injuries?

24   A.    I'd say less than a minute.  It sounds like her heart

25   was destroyed.  It did beat enough to fill her left chest

666

DIRECT - CINA

1    cavity with blood.

2              Of note, in the blood pool in her chest, there

3    wasn't any of these white polystyrene fillers.  When I see

4    contact wounds to the chest, often I'll see these white

5    little dots floating in the blood.  Did not see it in that

6    case which, once again, means you're not at contact range.

7    But I'd say less than a minute.  Her heart was probably

8    beating while she was unconscious and dying.

9    Q.   Would she have been able to shout or scream after being

10   shot in the manner here?

11   A.   Probably briefly.  You know, probably a scream or a

12   couple of words, but she probably would have collapsed

13   extremely quickly.

14   Q.   So would she have been able to speak coherently?

15   A.   Other than a -- maybe a short sentence, no.

16   Q.   As a medical doctor, are you familiar with a drug

17   called propofol?

18   A.   I am.

19   Q.   What is that?

20   A.   It's commonly used as part of the anesthesia process.

21   It's a sedative.  But it is also subject to abuse by some

22   people.

23   Q.   And what does it do to someone who receives it?

24   A.   It basically puts them to sleep.  At higher doses it

25   induces respiratory depression.  And without respiratory

DIRECT - CINA

1    support, it can lead to death, like in Michael Jackson's

2    case.

3    Q.    How is it administered?

4    A.    Usually IV.

5    Q.    Can it be administered in other ways?

6    A.    You probably could introduce it IM.  I don't believe

7    it's usually taken orally.  In the medical setting it's IV.

8    Q.    And if it were taken in another method other than an

9    IV, would it still have an effect?

10   A.    Probably not as quickly, but it would have an effect.

11   Q.    How would it present itself in a forensic medical

12   examination?

13   A.    It wouldn't unless you ran toxicology and looked for

14   it.

15   Q.    And how long would it be observable in the body if you

16   run a toxicology report to look for it?

17   A.    Well, if it was present in the blood at the time of

18   death, being that this autopsy was conducted rather quickly,

19   it should have -- the level in the blood postmortem should

20   reflect the level of -- in the blood at the time of death.

21          MR. GREWELL:  I have no further questions, Your

22   Honor.

23          THE COURT:  All right.  Cross-examination.

24                    CROSS-EXAMINATION

25   BY MS. MOSS:

668

CROSS - CINA

1    Q.    Good afternoon, Dr. Cina.  How are you today?

2    A.    Doing well.  And you?

3    Q.    Doing well.  Thank you.

4         Dr. Cina, you told us about your qualifications on

5    direct examination.  And it sounds like you have done

6    thousands of autopsies; is that right?

7    A.    Yes, ma'am.

8    Q.    And you also said that you had probably done, I think,

9    hundreds that involved shotgun wounds; is that right?

10   A.    I probably would say in the hundred, 150 range.

11   Q.    And of any of those autopsies that you performed with

12   shotgun wounds, were any of them discharges through a soft

13   case?

14   A.    Not to my knowledge, no.

15   Q.    So would you say that this is a little bit of an

16   unusual circumstance or something that you hadn't

17   encountered before?

18   A.    I would say it's a little unusual in that most -- most

19   of the time the weapon's discharged without a case around

20   it.

21   Q.    And, Dr. Cina, you said that your opinion today is that

22   the shotgun was fired at a distance of 1 to 3 feet; is that

23   right?

24   A.    That's my best estimate, unless that is an individual

25   pellet wound next to the main defect, in which case I would

CROSS - CINA

1    probably put it closer to 4 feet.

2    Q.    And you have formed that opinion based on test patterns

3    that were created for you, correct?

4    A.    That's correct.  And correlating them with the wounds

5    on the body.

6    Q.    And correlating them with the photographs of the wounds

7    that you've seen before, correct?

8    A.    Yes, ma'am.

9    Q.    Now, Dr. Cina, did you become involved in this -- in

10   this case in 2020?

11   A.    I believe February of 2020 was the initial contact.

12   Q.    And at that time, were you provided materials by the

13   FBI, perhaps by the prosecutors?

14   A.    Around February, or shortly thereafter, I received my

15   initial batch of materials and then more trickled in over

16   the last two years.

17   Q.    And was that before any of the shotgun testing had been

18   done?

19   A.    I believe the initial materials was before the initial

20   round of test-firing.

21   Q.    And did you have a phone call with some of the members

22   of the FBI and the prosecution team about your initial

23   conclusions about this case?

24   A.    I believe when I was told about the case initially, we

25   did have a phone call.

CROSS - CINA

1    Q.    And was that after you had reviewed some of the

2    materials that were provided to you?

3    A.    I don't recall if it was prior to it and I was

4    responding to their description of the case or if I had

5    looked at materials.  That was a while ago.

6    Q.    Do you recall saying, when you were speaking with them

7    on the phone, that you thought that this was a round wound?

8    A.    Yes, I believe that's how it was described to me

9    initially.

10   Q.    And do you recall that your initial conclusion that it

11   was fired at very close range?

12   A.    I believe I said that if it's a round wound, most round

13   wounds are contact range, and most of those are suicides.

14   Q.    And did you say at that time also that -- based on your

15   review of the photographs, that you didn't see any

16   scalloping to the edges?

17   A.    That's correct.  I can't see the edges of the wound so

18   I can't say if there's scalloping there or not.

19   Q.    Now, Dr. Cina, you did not perform the autopsy in this

20   case, correct?

21   A.    That's the truth.

22   Q.    And so you weren't able to actually see the wound,

23   itself, correct?

24   A.    Correct.  Dr. Maswahu is the only person who saw it, so

25   I would defer to him on exactly what he saw.

CROSS - CINA

1    Q.    And so you have to rely on what Dr. Maswahu included in

2    his reports in order to form your opinion on this case,

3    correct?

4    A.    That's correct.

5    Q.    And if Dr. Maswahu had put any sort of inaccurate

6    information in his report, would that affect possibly your

7    conclusion in this case?

8    A.    Yes.  For example, I believe he describes a

9    6-centimeter defect, but I don't know if he's talking about

10   a single defect or is there a defect with the buckshot entry

11   about 6 centimeters away.  So it's unclear exactly what he's

12   describing.

13   Q.    And did you ever see any photographs actually taken

14   from the time of the autopsy?

15   A.    No, I believe the photos that I saw were a day after

16   the autopsy when decomposition was starting to set in.

17   Q.    Did you ever speak to Dr. Maswahu?

18   A.    I have not.

19   Q.    Now, on direct examination, Dr. Cina, you mentioned the

20   National Association of Medical Examiners a few times.  Do

21   you recall that?

22   A.    Yes.

23   Q.    And tell us what the National Association of Medical

24   Examiners is.

25   A.    It's the largest association of forensic pathologists

CROSS - CINA

1    and medicolegal death investigators in the country.  It's

2    responsible for setting standards in forensic pathology and

3    holding annual educational meetings; developing policy for

4    forensic pathology and working with Washington on that; and

5    accrediting offices around the -- accredit -- providing

6    accreditation for offices around the country.

7    Q.    Now, you brought up standards.  I'd like to talk about

8    those standards that have been set by -- do you call it NAME

9    for short?

10   A.    We do.

11   Q.    Now --

12        THE COURT:  Ms. Moss, before you go into it, it

13   sounds like you're going into a new area.  Would this be a

14   good time for our lunch?

15        MS. MOSS:  Yes, Your Honor.

16        THE COURT:  Okay.  All right, ladies and gentlemen

17   of the jury, we're going to take our lunch recess.  We will

18   be in recess for one hour.

19        (Jury left the courtroom at 12:34 p.m.)

20        THE COURT:  Doctor, since you're in the middle of

21   your testimony, I direct you not to speak with any of the

22   lawyers during the lunch recess.  You're free to go wherever

23   you want for lunch, I just ask you to be back in the witness

24   stand by 1:30.

25        THE WITNESS:  Yes, sir.

CROSS - CINA

1        (Recess taken 12:35 p.m.)

2                        AFTERNOON SESSION

3        (In open court in the presence of the jury at 1:36

4    p.m.)

5             THE COURT:  Dr. Cina, I remind you that you remain

6    under oath.

7             THE WITNESS:  Yes, sir.

8             THE COURT:  Ms. Moss, you may resume your

9    examination.

10            MS. MOSS:  Thank you.

11   BY MS. MOSS:

12   Q.   Dr. Cina, before we took our lunch break I believe we

13   were talking about the NAME standards.  Do you remember

14   that?

15   A.   Yes ma'am.

16   Q.   And the NAME standards are, again, created by the

17   National Association of Medical Examiners, correct?

18   A.   Correct.

19   Q.   And you are a member of the National Association of

20   Medical Examiners?

21   A.   That is correct.

22   Q.   And you have been for a number of years.

23   A.   Correct.  Since, I believe, 1992.

24   Q.   And so I'd like to go through some of those standards

25   with you.  And those standards are defining the fundamental

1    basic services that a forensic pathologist should perform

2    during an autopsy; is that correct?

3    A.    Yes.    That's why the standards were developed.

4    Q.    And they include photographing the decedent as they are

5    presented.

6    A.    Correct.

7    Q.    Documenting and correlating clothing findings with

8    injuries in the body.

9    A.    Correct.

10   Q.    Collecting trace evidence on the clothing.

11   A.    If that's requested by the police agency.

12   Q.    And if that is requested, you would do that?

13   A.    Yes, I do that routinely.

14   Q.    Removing the clothing from the decedent's body?

15   A.    Yes, you have to do that for the autopsy.

16   Q.    Listing the clothing and personal effects?

17   A.    Yes, there's an inventory log.

18   Q.    Documenting a basic description of the body?

19   A.    Correct.

20   Q.    Documenting any decompositional changes to the body?

21   A.    Correct.

22   Q.    And let me pause there for a second.    When you saw the

23   photographs that were post-autopsy photographs of

24   Mrs. Rudolph's body, did you notice any decompositional

25   changes in the body?

675

CROSS - CINA

1    A.    Yes, there were changes consistent with early

2    decomposition on the photographs after the autopsy.

3    Q.    Now going back to the standards, does it include

4    photographing the wounds on the body?

5    A.    Yes, it does.

6    Q.    Is that a very basic standard?

7    A.    In America, yes.

8    Q.    And those photographs create a permanent record of the

9    details of what the wound looks like at the time of the

10   autopsy; is that right?

11   A.    That's correct.  We take photographs with a scale in

12   place so you can get an idea of what the size is you're

13   looking at.

14   Q.    And just to be clear, when you say a "scale," you mean

15   a measurement scale?

16   A.    That is correct.

17   Q.    And with firearm injuries, do the standards include

18   describing the presence or the absence of soot and

19   stippling?

20   A.    Yes.

21   Q.    And for firearm injuries, does it also include

22   describing the presence or absence of searing or abrasions

23   or lacerations?

24   A.    Yes, it's a detailed description of the wounds.

25   Q.    And documenting any sort of penetrating injuries in the

CROSS - CINA

1    body and including details of it?

2    A.    Basically the details would be what the projectiles hit

3    inside the body.

4    Q.    Does it also include an analysis or examination for

5    gunshot residue?

6    A.    Not necessarily.  That's usually performed by law

7    enforcement.

8    Q.    So that's something the police normally do is they do

9    an analysis of gunshot residue or swipe for gunshot residue?

10   A.    In my practice, it's always been law enforcement that

11   takes gunshot residue.  I take other trace evidence.

12   Q.    Is -- let me ask you, Dr. Cina, though:  Is gunshot

13   residue something that you as a medical examiner take into

14   consideration in determining distance?

15   A.    It could be.  In an instance of close-range firing,

16   let's say people are within 4, 5 feet of each other, chances

17   are both the shooter and the victim are going to have

18   gunshot wound -- gunshot residue on them.

19         If you back up beyond 6, 7 feet, the shooter should

20   have gunshot residue on their hands, the victim should not.

21   So I don't particularly rely on it in close-range incidents.

22   Q.    Okay.  So -- but -- so in some instances you rely on it

23   and on others you do not?

24   A.    I can't recall it coming up in court in any of the

25   cases I've done with gunshot wounds.

677

CROSS - CINA

1    Q.    Okay.  And that's normally left up to the police,

2    then?

3    A.    Yes.

4    Q.    Now, I haven't mentioned all of the standards, but the

5    standards that exist from NAME, do they help you to know

6    what to put into your autopsy report?

7    A.    Yes.  The autopsy report, where I work, needs to be in

8    compliance with the NAME standards.

9    Q.    And is one of the reasons why you document all of those

10   things in an autopsy report is so that you can remember them

11   if you have to look back months or years later?

12   A.    Yes, it's for my recollection, but it's also to aid the

13   judicial process if another expert wants to get a detailed

14   account of what was found in the autopsy.

15   Q.    So, for example, if the original medical examiner was

16   not available, another medical examiner could look at an

17   autopsy report and see exactly what was done and what the

18   findings were?

19   A.    Yes.  That occurs frequently, especially in cases of

20   retirement or when a medical examiner has moved.

21   Q.    Now, did the standards also include describing and

22   documenting the track or the path of the wound?

23   A.    It does.

24   Q.    And does it also include recovering and documenting any

25   foreign bodies or foreign objects found in the body?

CROSS - CINA

1    A.    Yes, it does.

2    Q.    Does that include shotgun pellets?

3    A.    That includes shotgun pellets, shotgun cup, wadding, in

4    these types of cases.

5    Q.    And in the autopsies of -- that decedents -- autopsies

6    you performed of decedents who suffered shotgun wounds, have

7    you been able to recover foreign objects from the body?

8    A.    Unless all the projectiles have exited the body, I do

9    recover the projectiles.  In cases of birdshot wounds, I'll

10   recover the wadding, the shot cup if it's present, and

11   representative samples of the birdshot, not every little

12   pellet.

13   Q.    Okay.  And what about buckshot?  Is that something that

14   you have been able to recover from the body?

15   A.    Yes, I have been able to recover buckshot from the

16   body.  It's quite a bit bigger than birdshot, so it's easier

17   to recover all of them.

18   Q.    And when you recover that, do you collect and maybe

19   preserve some or all of that for evidentiary purposes?

20   A.    Usually I turn it over to the police.

21   Q.    Do the standards include, for firearms cases, taking

22   x-rays of decedents?

23   A.    I believe it does.  In my practice, I've always taken

24   x-rays on my firearm-wound victims.

25   Q.    I'm sorry, you always do?

1    **A.    I personally do.  I believe it's one of the standards,**

2    **but I haven't read the standards in a while.**

3    **Q.    And, again, we're talking about the minimum standards;**

4    **is that right?**

5    **A.    Yes, developed for the United States.**

6    **Q.    Let me ask you, Dr. Cina:  When you perform autopsies,**

7    **how long are your autopsies generally?**

8    **A.    It depends on the nature of the case.  If it's a young,**

9    **healthy person who died of a fentanyl overdose, I can do it**

10   **in about 35 minutes.  I had a case last week that was 18**

11   **gunshot wounds; it took about three hours.**

12   **Q.    So it sounds like a pretty long amount of time.**

13   **A.    Average case I wouldn't say is that long, but a**

14   **complex -- for example, this case, a single shotgun wound**

15   **homicide probably would take me about 50 minutes.**

16   **Q.    50?  You said five zero?**

17   **A.    Five zero.**

18   **Q.    And we talked a lot about the standards and gone**

19   **through the things that you would do.  Were those things**

20   **done in the autopsy in Mrs. Rudolph's -- for Mrs. Rudolph's**

21   **body?**

22   **A.    No.  The autopsy report is deficient by NAME standards.**

23   **I also believe the photography is insufficient -- doesn't**

24   **meet the standards.**

25   **Q.    And do we have the standards in order to assist you in**

CROSS - CINA

1    forming credible opinions?

2    A.    I guess that's one way to put it.  I mean, the

3    standards ensure that you do at least the minimum requisite

4    requirements to document all of your findings and make a

5    cohesive report, and the report informs your opinions.

6    Q.    And others looking at your report can also rely upon

7    your findings; is that right?

8    A.    That's correct.

9    Q.    And so, for example, if another medical examiner

10   performed an autopsy and took a photograph with the

11   measurement scale next to a wound, you'd be able to rely on

12   that, wouldn't you?

13   A.    Yes.  Good photographs are very important.

14   Q.    And you could tell whether that was accurate or not by

15   seeing a measurement scale.

16   A.    Yes.  Aside from seeing wounds with your own eyes,

17   seeing good photographs with a scale in place can be

18   invaluable.

19   Q.    Now, we've talked a little bit about a 6-centimeter

20   wound in this case.  Now, again, our only source for

21   believing that that is a 6-centimeter wound is from

22   Dr. Maswahu's report, right?

23   A.    That's correct.

24   Q.    So we have not seen -- you have not seen any

25   photographs with a measurement scale that shows the wound

681

CROSS - CINA

1    was 6 centimeters; is that correct?

2    A.    That's correct.

3    Q.    So we're not sure if that's accurate at all.

4    A.    All I can say is his report says 6 centimeters.  That's

5    all I know.

6    Q.    Now, Dr. Cina, do you know the initial -- the initial

7    velocity of the components of the 12-gauge shotgun shell

8    that is -- was associated with Mrs. Rudolph's wound?

9    A.    Not off the top of my head.

10   Q.    Let me ask you:  Do you know the velocity of 1100 feet

11   per second?  Do you know how -- basically how fast that is?

12   A.    It's about the speed of most handguns.  It's less than

13   a high-powered rifle.

14   Q.    And is that approximately 750 miles per hour?

15   A.    I'd have to do the math, but if you've done the math, I

16   have no reason to distrust you.

17   Q.    And if a projectile were to hit a body at that high

18   velocity -- or at that velocity, is it likely that it would

19   penetrate the body?

20   A.    Yes.

21   Q.    And if a shell was fired at that velocity through a gun

22   case, is it possible that parts of the case could also hit

23   the body at a high velocity?

24   A.    Yes.  Actually, if you were at contact or close contact

25   range, there's a good chance that a fragment of the case

682

CROSS - CINA

1    will be taken into the body.  As you back away further, that

2    fragment of case should strike somewhere on the front of the

3    body near the entrance site.

4    Q.    Now, Dr. Cina, you spoke during your direct examination

5    about satellite wounds on Mrs. Rudolph's body.  Do you

6    recall that?

7    A.    Yes, ma'am.

8    Q.    And now that we're talking about the velocity of the

9    shotgun shell and possibly the case, is it possible that a

10   piece of that case could have caused that satellite injury

11   on Mrs. Rudolph's right breast?

12   A.    In my opinion, that's the most likely source for that

13   impact site that you saw on the right side of the chest, the

14   fragment of the case that was carried away but didn't go

15   with the shot into the body.

16   Q.    And -- okay.  And that was the one on the right breast,

17   correct?

18   A.    Correct.  That's the satellite wound.

19   Q.    Now, you also noted that there was another satellite

20   wound, it looked slightly above the main defect in the body.

21   A.    Right.  I believe I said that was suspicious for an

22   individual pellet entry, but I could not be conclusive about

23   that.

24   Q.    And it -- so, again, is it possible that a piece of the

25   case could have caused that as well?

CROSS - CINA

1    A.    It's possible if the case fragmented in several pieces.

2    Q.    And the reason we're talking about possibilities

3    here -- or at least part of the reason, is I believe you

4    testified on direct that the injuries in this case are

5    suboptimally depicted in photographs; is that right?

6    A.    That's correct.    Ideally you would want to photograph

7    them at the time of autopsy with the scale.

8    Q.    And "suboptimally depicted" meaning not very good

9    photographs?

10   A.    Yeah, I think that's a good way to put the -- to

11   describe the photographs in this case.    They're not really

12   that good.

13   Q.    Would you have done it this way or would you have done

14   it differently?

15   A.    I would have done it in accordance with NAME standards.

16   Q.    I want to take a brief detour for a second.    You were

17   asked during direct about someone experiencing a gunshot

18   wound to the heart.    And I believe that you said that that

19   person could survive maybe up to a minute; is that right?

20   A.    Maybe up to a minute.    I don't believe they would be

21   conscious the entire time; I believe they'd be rapidly

22   unconscious.    The heart's not pumping effectively so if your

23   brain doesn't get blood in 12 to 15 seconds, you're going to

24   pass out.

25   Q.    And during that 12 to 15 seconds that that person may

684

1    be conscious, I believe you also said that it's possible

2    they could scream or maybe say some words or even a

3    sentence.

4    A.    Sure.  You haven't destroyed your brain stem, you

5    haven't ruptured your larynx, so it would be possible to say

6    a few words, make a sound before you pass out.

7    Q.    Dr. Cina, did you also review photographs of

8    Mrs. Rudolph at the scene?

9    A.    Yes, I believe I did.

10    Q.    And Could you see that Mrs. Rudolph was wearing a black

11    bra and a black shirt?

12    A.    I believe that's the case.

13    Q.    And that's what she was wearing when she sustained the

14    gunshot wound?

15    A.    That's what I've been informed.

16    Q.    And if she was wearing a shirt and a bra, would those

17    things be the first things that the components of the

18    shotgun shell would hit before entering her body?

19    A.    Yes.  First the outer clothing, then the bra, then the

20    skin.

21    Q.    And would a careful examination of the clothing reveal

22    how that entry hole looked?

23    A.    Sometimes the defect in the clothing is more ragged

24    than the round hole or the scalloped hole in the skin, so

25    often the holes in clothing are somewhat irregular.  It's

CROSS - CINA

1      just a different texture than skin.

2      Q.    And it sounds like what you're saying, also, is similar

3      to the cardboard, where it might be a little bit more

4      ragged, it's different from skin.

5      A.    Correct.  They have a different elastic property, so

6      skin defects tend to be more regular than defects in

7      clothing or cardboard or wood.

8      Q.    But is it possible that if you were to examine the

9      clothing -- the clothing does have important evidentiary

10     purpose?

11     A.    Correct.  That's why it's part of the standards in a

12     firearm case.  You'd be looking for, in a shotgun case, soot

13     or stippling or polystyrene filler.

14     Q.    Okay.  And what we're talking about is the blast

15     effects from the gun.

16     A.    We're talking about everything that comes out of the

17     muzzle of the gun, along with the pellets.

18     Q.    Okay.  And so if you were to look at the clothing that

19     Mrs. Rudolph had been wearing, could -- is it possible to

20     see a pellet pattern?

21     A.    If there are multiple pellet entries, yes, you'd see

22     multiple defects in the clothing.

23     Q.    And would it be a better way to determine the size of

24     the wound at the actual time of the shot?

25     A.    I don't understand your question.

CROSS - CINA

1   Q.   Could the clothing demonstrate the size of the wound?

2   A.   Well, I mean --

3   Q.   Could it correlate to the size of the wound?

4   A.   Roughly.  Sometimes the defects in the clothing don't

5   exactly match what's on the skin, which is why we measure

6   the pattern on the skin.  That's the gold standard.

7   Q.   Okay.  But you said that you would look at the clothing

8   for gunshot residue and any -- any other types of trace

9   evidence.

10  A.   I wouldn't look for gunshot residue, I would look for

11  polystyrene filler, I would look for burnt or unburnt gun

12  powder and look for soot.

13  Q.   And when you're talking about polystyrene filler, is

14  that the white buffer material that was in the shotgun

15  shell?

16  A.   Yes, it's the little tiny white beads that surrounds

17  the buckshot.

18  Q.   Now, from the photographs that we have, Dr. Cina, is it

19  fair to say it was difficult for you to assess the nature of

20  the large entrance wound?

21  A.   Yes.  Because decomposition has set in, tissue is

22  starting to protrude from the site, so I can't see the edges

23  to see if there's any scalloping or if it's completely

24  round.

25  Q.   And it appeared -- but it appeared to you to be one

CROSS - CINA

1    large defect with a couple of other satellite wounds?

2    A.    There appears to be at least one large defect, there's

3    that possible individual buckshot strike slightly above it,

4    and then there's the wound on the right breast.

5    Q.    And in the photographs that you observed, did you see

6    any scalloping in the photographs?

7    A.    I can't see the edges of the large defect itself, so I

8    can't tell if it's scalloping there or not.

9    Q.    Now, you're aware that there was shotgun testing that

10    took place in this case, correct?

11    A.    There was a lot of test-firing.

12    Q.    And were you present at any of that test-firing?

13    A.    I was not.  I was invited to be, but I had to do

14    autopsies that day.

15    Q.    And do you know whether the actual shotgun was used to

16    perform these test firings?

17    A.    I don't believe it was the actual shotgun; I believe it

18    was the same make and model.

19    Q.    Okay.  So not the actual, but the same make and model.

20    A.    That's my understanding.

21    Q.    Okay.  Did you inform or advise the agent performing

22    the shotgun testing as to how you thought this should be set

23    up?

24    A.    No.  I mean, standard test-firing procedures is you

25    take a weapon using ideally the exact same weapon, or the

1    same make and model, using the same ammunition, and then

2    test-fire at various distances.  I think we both are on the

3    same page, that's how it's done.  So I don't know if I

4    advised them other than agreeing with the protocol.

5    Q.    Well, let me ask you this:  Did you -- do you know

6    whether they took your opinion on the angle of discharge

7    into account in carrying out their shotgun testing?

8    A.    Well, being that my main opinion is predominantly a

9    front-to-back wound, that's how you do test-firing anyway,

10   so I don't understand what you're getting at.

11   Q.    Well, is it possible -- do you know if it's possible

12   for them to angle the shotgun one way or the other, up or

13   down, or to the side right or left?

14   A.    You could do that.  I don't know if that was done.  I

15   don't believe it was.

16   Q.    Would you agree that, you know, in any type of

17   reconstruction or scientific experiment that's being

18   conducted, that you do want to replicate as near as possible

19   the actual facts and the conditions of the incident that

20   you're investigating?

21   A.    That would be ideal, but I don't know if that's

22   possible in this case.

23   Q.    And when you talk about "ideal," I believe you also

24   said before that ideally you would want to do any shotgun

25   testing with the actual firearm.

689

CROSS - CINA

1  A.    That's the ideal.

2  Q.    And when we say "ideal," is that what you think will

3  give you the most accurate results?

4  A.    I mean, technically to get the most accurate results,

5  you would have the same ammo and the exact weapon that

6  shot -- that was used to shoot the person, and you'd be

7  shooting human skin to try to replicate what you saw.  But

8  that's really not feasible.

9  Q.    Okay.  And so --

10          THE COURT:  Counsel.  Counsel, excuse me.

11  Ms. Guerra.

12       (Pause)

13          THE COURT:  Back in business.  Go ahead, counsel.

14  BY MS. MOSS:

15  Q.    And we're talking about the feasibility.  You're

16  talking about we can't -- it's not feasible to use human

17  skin?

18  A.    Right.  I mean, it's -- I don't believe it would pass

19  ethical standards to shoot cadavers to try to replicate

20  shotgun wounds.

21  Q.    But it's -- it is feasible to use the exact same

22  shotgun and the exact same ammunition.

23  A.    If you have access to it, that would be perfect.

24  Q.    Would you say that's kind of the gold standard?

25  A.    That's what I was taught is ideally you would like the

CROSS - CINA

1    exact weapon that was used in a crime and using the exact

2    same ammunition.

3    Q.    Now I'd like to switch a little bit and talk about the

4    angle that you mentioned on direct.

5             And, Dr. Cina, I believe when you were speaking on

6    direct, you were referencing Dr. Maswahu's report and the

7    defect that he noted to the 6th, 7th, and 8th ribs; is that

8    right?

9    A.    That's correct.  That was the underlying 8-centimeter

10   defect below the 6-centimeter skin defect.

11   Q.    May I pull up Exhibit 35, page 1, which is INV 590.

12            Do you see this report on the screen?  This has

13   been admitted into evidence.  Do you --

14   A.    I do.

15   Q.    -- see that report on the screen?

16   A.    Yes, ma'am.

17   Q.    Is that Dr. Maswahu's report that you looked at?

18   A.    It is.

19   Q.    Now, if you take a look in the section called External

20   Examination, do you see where he has written 7th, 8th, and

21   9th ribs?

22   A.    Yeah, 7th and 8th and 9th.

23   Q.    7th, 8th, and 9th.  Thank you.  Now the 7th, 8th, and

24   9th ribs, are these below the heart?

25   A.    Depending on how big your heart is, they could be right

CROSS - CINA

1    where the tip of the heart is.

2    Q.    What ribs are the heart behind?

3    A.    Generally when you're doing CPR, you're trying to go

4    between 3 and 5.  Which is up here.

5    Q.    Okay.  And so if we're talking about between 3 and 5,

6    the seventh, eighth, and ninth are below that.

7    A.    Yes.

8    Q.    And I believe that your opinion in your report is that

9    it appears to be front to back and slightly downward; is

10   that right?

11   A.    It's definitely front to back.  And based on the fact

12   that where the skin defect is and that the ribs are lower,

13   it appears to be going somewhat downward.

14   Q.    And, again, what we're relying on -- or what you are

15   relying on to form that opinion is what is in Dr. Maswahu's

16   report; is that right?

17   A.    Correct.  He said ribs seven, eight, and nine, which

18   are below where the skin defect would be.

19   Q.    And is there any way for you to know for sure what the

20   trajectory of the path of the wound was?

21   A.    I can tell you definitively it was front to back.

22   Beyond that, from the report it appears to be downward, but

23   I wasn't there at the autopsy.

24   Q.    And so you would need to see the body yourself or maybe

25   see x-rays or some -- something else other than what

CROSS - CINA

1    Dr. Maswahu's report is in order to give a definitive

2    opinion?

3    A.    Not sure how helpful x-rays would be, but seeing some

4    internal photos of the ribs would be useful.

5    Q.    Internal photos.  Okay.  And so are internal photos

6    something that you use in order to form an opinion on angle

7    of entry?

8    A.    Usually when I'm determining a wound path through a

9    body, it's basically connecting a dot between where the

10   entrance site is and the exit, or between the entrance site

11   and where the bullet ended up.

12   Q.    What about in the case of a shotgun shell, where there

13   are multiple pellets?

14   A.    Then I would probably be looking at where is the rib

15   defect in relation to the skin?  Or, let's say, there's an

16   entrance on the chest and pellets are down in the right side

17   of the abdomen, that would help that it's a downward and

18   left to right.

19   Q.    Understood.  Would you ever stick a ruler in a body in

20   order to determine the wound path?

21   A.    No, I tend to use trajectory rods, that are longer than

22   this one.

23   Q.    Is it possible, if someone were to stick a ruler in a

24   body, that that could affect the wound, the size, or the

25   shape of the wound?

CROSS - CINA

693

1    A.    What type of ruler are you referring to?

2    Q.    I think what I'm -- well, I'm not sure what we're

3    referring.  But let me ask you about a standard 1-foot ruler

4    that's maybe 2 inches thick.

5    A.    I mean, in a case like this, there seems to be a big

6    enough hole through the ribs that that shouldn't change

7    anything.

8    Q.    Okay.  Would you do that through the wound or would you

9    do that another way?

10   A.    I wouldn't stick a ruler in a wound.

11   Q.    Let me ask you about something else, Dr. Cina.  You

12   mentioned on direct that skin is different from cardboard;

13   is that right?

14   A.    Yes.

15   Q.    And as part of that, cardboard doesn't necessarily

16   move, doesn't stretch, doesn't -- doesn't have elastic

17   qualities to it.

18   A.    Yes.

19   Q.    And -- but the skin does; is that right?

20   A.    Correct.

21   Q.    So skin can stretch and can gape at times; is that

22   right?

23   A.    It can, depending on where the skin defect is in

24   relation to the elastic lines of tissue that run through

25   your body.

CROSS - CINA

1    Q.    And let's talk about the wound in this case.  The wound

2    appearing on the left breast of the decedent, is it possible

3    that that wound could stretch and gape?

4    A.    It could gape a little bit, so the actual skin defect

5    would be larger than the muzzle size.  It's also possible

6    that the wound could contract depending on where the skin

7    is, or what part of the skin it is.

8    Q.    Does time have an effect on whether a wound can stretch

9    out and increase in size?

10   A.    Yes, especially when decomposition sets in.

11   Q.    And does heat contribute to decomposition?

12   A.    Heat's one of the main factors causing decomposition.

13   Q.    And, Dr. Cina, are you aware of what Mrs. Rudolph's

14   body went through before it actually made its way to the

15   funeral home where these post-autopsy photographs were

16   taken?

17   A.    I don't recall all the steps that the body took.

18   Q.    Let me ask you:  Are you aware that Mrs. Rudolph passed

19   away at 5 a.m. -- approximately 5 a.m. on October 11th?

20   A.    I would have to check my notes, but if you say that's

21   the time, I believe you.

22   Q.    Were you aware that her body remained in a cabin that

23   was not air conditioned for about six to eight hours after

24   that?

25   A.    I believe there was a period of time around that.

CROSS - CINA

1    Q.    And that it was carried in an ambulance for another two

2    to three hours after that?

3    A.    That seems about right.

4    Q.    And then it was kept overnight in a facility?

5    A.    I believe so.  I'm not sure if there was refrigeration

6    or not.

7    Q.    And then are you aware that the body was then driven

8    three hours or more to Lusaka?

9    A.    Like I said, I don't recall all the steps that the body

10   took, but if that's what the facts are, then I trust you.

11   Q.    Okay.  And so knowing that there's been a long period

12   of time, and the body has been exposed to maybe outside air

13   and to heat, are those things that could contribute to

14   changing the look of the wound?

15   A.    Well, if decomposition has set in, one of the main

16   factors you see in decomposition, which is bloating, which

17   can cause wounds to gape more.  Just judging by the autopsy

18   report, he didn't describe decomposition, though.

19   Q.    But do you see it in the photographs that you've seen?

20   A.    I see it in the photo taken a day later, yes.

21   Q.    Now I wanted to shift again and I want to talk you --

22   talk to you about the shotgun testing that took place.

23          So you know that there was a lot of shotgun testing

24   in this case; is that right?

25   A.    Yes, a lot.

CROSS - CINA

1    Q.    And you formed different opinions following different

2    rounds of shotgun testing, did you not?

3    A.    That is correct.  I saw an initial round of test-firing

4    where I made some opinions.  Then I believe they corrected

5    the ammo for accuracy and I reviewed those test-firing,

6    which is what we saw today.

7    Q.    And you also looked at -- we've seen cardboard targets

8    with pellet patterns, correct?

9    A.    Correct.

10   Q.    And you received the latest report and photos from the

11   additional test-firing I believe on June 24th, 2022; is that

12   right?

13   A.    Likely right around then.

14   Q.    Okay.  And that's less than a month ago.

15   A.    Correct.

16   Q.    And that was for new testing that had been performed on

17   June 15th?

18   A.    I don't recall the date, but the testing was shortly

19   before I saw the photos.

20   Q.    Now you mentioned that you were aware that there was

21   some change in the variables that were used by the FBI when

22   they did this new round of shotgun testing.

23   A.    Right.  I believe there was an ammunition correction to

24   address a gunpowder issue is my recollection.

25   Q.    Were you also aware that there was a change of the

CROSS - CINA

1      position of the shotgun within the soft case?

2      A.    I believe it was positioned maybe a centimeter and a

3      half back within the case, but I don't recall exactly.

4      Q.    Now your report notes that it was 1.8 inches back; does

5      that sound fair?

6      A.    If that's what my report says, then that's what it was.

7      Q.    And is that something different from the testing that

8      had taken place prior to that?

9      A.    I don't recall exactly.  It was a while ago.

10     Q.    If I were to tell you that the placement of the shotgun

11     in the case was half an inch from the end of the case in the

12     prior shotgun test, does that sound fair?

13     A.    If that's what it was, then I believe that.

14     Q.    So changing variables on the shotgun testing that's

15     performed, could that change your opinions?

16     A.    Sure, if you change variables, you could get different

17     patterns.

18     Q.    Now, based on the latest round of test fires, I think

19     you've told us that it was 3-2, 3-4, and 3-9 that most

20     closely approximated the wounds seen on the chest of the

21     decedent; is that right?

22     A.    Yes, ma'am.

23     Q.    And I do believe you used the words "most closely

24     approximated."  Is that right?

25     A.    That's correct.  Because, once again, we're dealing

CROSS - CINA

1    with cardboard patterns instead of skin patterns.

2    Q.    And so you can't say that these cardboard patterns look

3    exactly like the wound that you had seen on the decedent.

4    A.    That's correct, because they're cardboard and not skin.

5    Q.    Now I'd like to take a look at some of those patterns

6    and I'd like to use the photos, if that's okay, because they

7    have a scale in them.

8    A.    Okay.

9    Q.    Can we take a look at Exhibit 220, page 7, which is INV

10   29578.

11        Do you recall seeing this, Dr. Cina?

12   A.    Yes.

13   Q.    And we do see -- well, let me ask you:  Does it look

14   like you're starting to see a little bit the spreading of

15   the pellets there?

16   A.    Possibly.  May I use --

17   Q.    Yes.  Feel free.

18   A.    When I talked about scalloping on the skin, remember I

19   was talking about little round things at the edges of a

20   defect?  You know, it's possible that's a little scallop,

21   that could be a little scallop, that could be a scallop.

22   Scallop.  Possibly a scallop.  And then the satellite one on

23   the right breast would correspond to that, probably a

24   fragment from the carrying case itself.

25   Q.    Okay.  And when we were talking about scalloping, does

CROSS - CINA

1    that word come from a scalloped shell that has those round

2    bumps on them?

3    A.    I don't know.  We -- all the firearms folks just call

4    it scalloping, so I'm not sure if it's related to a shell or

5    not.

6    Q.    I want to talk about that satellite wound.  And, again,

7    what we're talking about is this kind of extraneous defect,

8    apart from the main defect.

9    A.    Correct.  The main defect is definitely a penetrating

10   type of wound.  The other wound is -- would correlate more

11   with an abrasion or a contusion, a bruise, from a less

12   velocity.

13   Q.    And what we're seeing here in this photograph, which is

14   3-2 -- and I believe this is at a distance of 1 foot away --

15   is that the satellite wound is to the left and a little down

16   of the main defect.  Would you agree with that?

17   A.    That's correct.

18   Q.    And does it appear to you that it is -- and I'm

19   estimating here -- about 3 to 4 centimeters away, based on

20   the scale at the bottom of the photograph?

21   A.    Let me see.  That's about 85 -- that's about 110.  25.

22   Probably about 25 -- looks like 25 millimeters, 2.5

23   centimeters.

24   Q.    2.5 centimeters.  Okay.

25   A.    That's what it looks like.

CROSS - CINA

1    Q.   Do you know if that's the distance of the satellite

2    wound from the main defect wound on Mrs. Rudolph's chest?

3    A.   To me, the wound on the right side of Ms. Rudolph's

4    chest would be a little farther than that.

5    Q.   Now, if we can take a look at Exhibit 220, page 8,

6    which is INV 29678.

7         Do you recognize this one also, Dr. Cina?

8    A.   Yes.

9    Q.   And this is target 3-9, which I understand was fired

10   with the gun case 1 foot away.  Do you similarly see some

11   scalloping on this target?

12   A.   Let's see.  On the cardboard, that could be a scallop,

13   that could be a scallop.  But, once again, this is

14   cardboard, not skin --

15   Q.   I understand.

16   A.   -- so it could make a round defect on the skin even

17   though it's looking scallopy on the cardboard.

18   Q.   Understood.

19   A.   But it is possible that there's some scalloping there.

20   And then there's your satellite wound, which is farther away

21   on this one.

22   Q.   Okay.  And when we're looking at the satellite in this

23   one, it is to the left and up?

24   A.   Correct.

25   Q.   And, again, to me it looked like 6 or 7 centimeters,

1    but what does it look like to you?

2    A.   Is there a way to blow up that scale?  I didn't bring

3    my glasses.

4    Q.   That's okay.  That's all right.  We can look at them

5    later.

6    A.   It looks like it's several inches away.

7    Q.   Several inches away.  Do you also see that there is

8    another satellite defect that is on the right side?

9    A.   You mean --

10   Q.   Up and to the right.

11   A.   There is a little -- an impact up there as well.

12   Q.   And did you see any sort of satellite wound like that

13   on Mrs. Rudolph's body?

14   A.   I only saw the one satellite wound on the right breast.

15   Q.   Can we look at Exhibit 220, page 26, which is INV

16   29613.

17        And now what we're looking at here, Dr. Cina, is

18   target 3-4.  And I believe this was fired from 3 feet away.

19   Now in this one, again, do you see two satellite wounds --

20   or two satellite defects?

21   A.   I do.  Here and here and a possible individual pellet

22   entry there.

23   Q.   Just so it's clear for the record, the original -- the

24   first two satellite defects that you pointed out are, would

25   you agree, several inches away and to the right, according

1    to this photograph?

2    A.    I would agree.

3    Q.    And that's -- one of them is maybe slightly down but

4    away to the right; would you agree?

5    A.    Correct.

6    Q.    And one is a little more up and away to the right;

7    would you agree with that?

8    A.    Correct.

9    Q.    And, again, did you see any defects like that in the

10   photographs that you saw on Mrs. Rudolph's body?

11   A.    No, I saw the one injury on the right side of the front

12   of the chest.

13   Q.    So when we're talking about a close approximation,

14   these pellet patterns are not perfect; is that right?

15   A.    That's correct.  They're not perfect and it would seem

16   that the soft shell case, when it's fired through, can be a

17   bit unpredictable in how it fragments.

18   Q.    Thank you, Mr. Reyes.

19         So based on the limited information that you had,

20   Dr. Cina, you did form an opinion, and you said that you

21   believed the shotgun discharged at 1 to 3 feet from the

22   decedent; is that correct?

23   A.    That's my best estimate.

24   Q.    And your best guesstimate is based on the limited

25   information that you have; is that right?

CROSS - CINA

1    A.    Correct.   The presence of that central defect where I

2    can't see the edges, the possible individual pellet strikes

3    adjacent to it, and the wound on the right breast, I'm

4    trying to compare that to the test-firing.

5    Q.    And because you don't have very good autopsy

6    photographs -- or any autopsy photographs.

7    A.    Correct.  I have no autopsy photographs.  They would

8    have been helpful.

9    Q.    Now, when you're telling us that it was 1 to 3 feet

10   away, does that suggest that it could also be 2 feet away?

11   A.    Yes, being that the shot cup and the wadding went into

12   the body with the shot, within that 1-to-3-feet range, if I

13   had to refine it further it would be more in the 1 to 2.

14   Q.    More like 1 to 2?

15   A.    Correct.  But 3 feet was one of the good test-firing

16   patterns, so that's why I said 1 to 3.

17   Q.    I'd like to show you Exhibit 220, page 16.  And this is

18   INV 29590.

19         Have you seen this target before, Dr. Cina?

20   A.    Yes.

21   Q.    And this is target 3-3, which I believe was fired at

22   2 feet away.  In your opinion, does this resemble at all the

23   wound that you saw in the post-autopsy photographs?

24   A.    To me, it looks like there's more buckshot spread than

25   what I saw on the autopsy photographs.

CROSS - CINA

1    Q.    Did you say upchucks?

2    A.    Buckshot.

3    Q.    Buckshot.  Sorry.

4    A.    No, the main mass of the pellet seems to go in here,

5    but clearly other pellets have started separating and

6    entering there, there, there, there.  So there's more spread

7    than what I can see from the photos taken after the autopsy.

8    As far as Dr. -- if Dr. Maswahu saw individual pellets, then

9    this would be compatible with that.

10   Q.    Now let me ask you -- by the way, we see a lot of --

11   like black stuff on the target as well.  Do you know what

12   that is?

13   A.    I'm not sure what the black stuff is.

14   Q.    Okay.  Thank you.

15         Dr. Cina, in forming your opinion about distance in

16   this case, you already told me that you are basing it on the

17   limited information you have from Dr. Maswahu; is that

18   right?

19   A.    That's correct.

20   Q.    And you're also forming it based on the shotgun testing

21   that occurred in this case.

22   A.    That's correct.

23   Q.    And if that shotgun testing that occurred used wrong

24   variables or wrong conditions that actually occurred at the

25   time of the discharge, would that change your opinion?

705

CROSS - CINA

1    A.    If there was severe flaws in the testing, it could

2    change my opinion.

3    Q.    Now you've testified that the shotgun may have been, it

4    sounds like, at 1 foot, at 2 feet, at 3 feet.  Can we agree

5    that we don't know exactly how far that shotgun was from the

6    decedent?

7    A.    I can't narrow it down more than that 1- to 3-foot

8    range.  And if there are individual pellet entries, it could

9    be even farther.

10   Q.    And that's your closest approximation that you can give

11   us today based on the limited information we have.

12   A.    Yes, ma'am.

13   Q.    Thank you very much, Dr. Cina.

14   A.    You're welcome.

15          THE COURT:  One second, Mr. Dill.  Ms. Guerra.

16      (Pause)

17          THE COURT:  All right, Mr. Dill, cross-examination.

18          MR. DILL:  Thank you, Your Honor.

19                    CROSS-EXAMINATION

20   BY MR. DILL:

21   Q.    Good afternoon, Doctor.  I just have a few questions.

22          You mentioned on direct examination about propofol.

23   Do you remember those questions?

24   A.    Yes, sir.

25   Q.    You didn't see any -- certainly no evidence at autopsy

CROSS - CINA

1    or any physical evidence that propofol was used at all in

2    this -- in this case, correct?

3    A.    With propofol, there's really nothing to see.  It's a

4    result of toxicological analysis, and I haven't seen any tox

5    reports.

6    Q.    Let's talk about the mechanism by which propofol is

7    used.  What is the mechanism by which propofol puts somebody

8    to sleep?

9    A.    I believe it acts on the central nervous system and it

10   can basically sedate you and cause respiratory depression.

11   That's why it's used to induce anesthesia.

12   Q.    And you understand that when propofol is used to induce

13   anesthesia, it's done intravenously; is that correct?

14   A.    That's my understanding.

15   Q.    Okay.  Because propofol is something called a

16   hydrophobic substance; are you aware of that?

17   A.    I haven't studied all the properties of propofol since

18   med school.

19   Q.    All right.  Well, intravenous means it goes in the

20   vein, correct?

21   A.    Yes, I do understand that.

22   Q.    And intramuscular means somebody would have to put it

23   intramuscularly, correct?

24   A.    Correct, IM.

25   Q.    And as far as IM, that would be a needle, right?

1    A.    That's correct.

2    Q.    Generally somebody would notice if they were stuck with

3    a needle for intramuscular, correct?

4    A.    Yeah, usually you react if you're jabbed with a needle.

5    Q.    Any evidence in this case of anybody being jabbed with

6    a needle or saying, "Hey, what are you doing trying to

7    inject me?"

8          Did you see any evidence of that in this case?

9    A.    I mean, we can miss needle punctures at autopsy,

10   they're really small, but I've not been provided any

11   evidence that Ms. Rudolph said, "Hey, why are you attacking

12   me with a needle?"

13   Q.    Okay.  And on that point, how long would it take -- if,

14   in fact it was done intramuscularly, how long would it take

15   for that to -- do you know if it would even work if it was

16   given intramuscularly and how long it would take?

17   A.    I would think IM would have some effect, but it

18   wouldn't be as quick or as effective as giving it

19   intravenously.

20   Q.    And there's no evidence of anybody drawing an IV for

21   Ms. Rudolph, correct?

22   A.    I didn't see anything in the autopsy report that she

23   had an IV in place.

24   Q.    Now, you said in your direct exam -- I just wanted to

25   kind of clarify -- that you handled and manipulated the gun,

1    I believe -- did you do it with the case and try to see if

2    you could reach down?

3    A.   Yes, at my house.

4    Q.   Okay.  And so did -- in that case, you would be

5    assuming an actual pull of a trigger by somebody, correct?

6    A.   Correct.  Guns don't go off by themselves; their

7    trigger has to be pulled.

8    Q.   Okay, well, don't, in fact  -- are you aware, sir, that

9    guns do -- in fact, can go off without the trigger being

10   pulled?

11   A.    If they're defective or if they're dropped, I've

12   seen -- I've seen a defective shotgun dropped once that

13   discharged.  That's the only time I've seen a weapon

14   discharged that didn't have a trigger pulled.

15   Q.   Right.  So if it's dropped, you -- and in your own

16   personal experiences have seen that, that it can be dropped

17   and discharge, correct, without a trigger-pull?

18   A.    I mean, I didn't see the gun being dropped.  The story

19   from the police was the gun was dropped and the weapon

20   discharged.

21   Q.   Yeah.  As a matter of fact, in the -- you mentioned the

22   NAME several times, and the guideline and classifications

23   for manner of death.  There's actually separate ones for

24   firearm deaths in which a gun is dropped; is that correct?

25   Do you recall that?

CROSS - CINA

1    A.    NAME also has the manner of death classification

2    system.   I'm not sure of the carve-out for when a gun is

3    dropped, but if a gun was dropped and went off and struck

4    someone, I probably would rule that accident.

5    Q.    Okay.  So in that scenario, if, in fact, the gun was

6    dropped and went off and struck someone, that would be

7    ruled, as far as manner of death, as an accident.  I think

8    I'm understanding what you just said, correct?

9    A.    Right.  If I had a case like that and the gun was

10   dropped and it went off, I would call that an accident.

11   Q.    And as far as what the physical evidence is in this

12   case, as to a trigger being pulled, you have an

13   understanding, don't you, that there was no physical

14   evidence of gunshot residue that was obtained at the scene,

15   correct?

16   A.    I haven't seen any reports on a gunshot residue

17   analysis.

18   Q.    And there's no evidence of fingerprints on the trigger

19   matching any person, correct?

20   A.    I haven't seen any reports to that effect.

21   Q.    Okay.  So as far as when you say in the scenario if the

22   gun dropped and went off it would be an accident, there's no

23   physical evidence that you've seen as far as this being a

24   volitional act, correct?

25   A.    You mean have I seen evidence that somebody pulled a

REDIRECT - CINA

1   trigger?

2   Q.   Right.

3   A.   All I can say is out of the hundred, 150 cases, I've

4   seen one accident when it was dropped; the rest someone

5   pulled a trigger.  So I haven't seen fingerprint analysis, I

6   haven't seen gunshot residue analysis, but in my experience,

7   the vast, vast majority involved a trigger being pulled.

8   Q.   Well, let's talk about what the actual physical

9   evidence is in this case.  You cannot point to physical

10  evidence saying, "I could see a trigger was pulled,"

11  correct?

12  A.   Correct.  Like I said, I've seen no reports that GSR

13  was done or that fingerprints were done.

14  Q.   Thank you, sir.

15           THE COURT:  Redirect.

16                    REDIRECT EXAMINATION

17  BY MR. GREWELL:

18  Q.   If a shotgun fired by being dropped, what would you

19  expect the angle to be through the body?

20  A.   Most likely upward in that if it was dropped and went

21  sort of muzzle downward, I would assume it would shoot into

22  the ground.  It would have to strike a person, it would have

23  to hit on the butt end of the gun with the muzzle pointing

24  upward.

25  Q.   Is it likely, in your professional medical opinion,

REDIRECT - CINA

1    that the wound here was caused by a dropped shotgun?

2    A.    I would find that very unlikely.

3    Q.    Given that the wound photos here are suboptimal, what

4    is the best source for you of what was observable on the

5    body?

6    A.    I mean, the best source for me -- all I can do is what

7    I have to work with, which are the postmortem photos, which

8    is why I defer to Dr. Maswahu to what he saw with his own

9    eyes.

10   Q.    Did the targets of contact shots by the FBI have any

11   satellite wounds?

12   A.    They did not.  And some of them had soot deposition,

13   which I do not see described on the skin in this case.

14   Q.    I believe you stated earlier that you picked 3-9 as

15   probably the best representation because of the satellite

16   wound; is that right?

17   A.    I believe I did.

18   Q.    In your expert opinion, is the fact that the gun was in

19   the soft case important to explaining that satellite wound,

20   then?

21   A.    I believe that the satellite wound, or in some of the

22   test-firing two different satellite wounds, were caused by

23   fragments of the case.  So I don't believe they would have

24   been there if it was not fired through the case.

25   Q.    Would you expect the direction of a blown-off piece of

REDIRECT - CINA

1   that soft case to necessarily go in the same direction of

2   the body every time from the entry wound?

3   A.    I would say the soft case would be somewhat

4   unpredictable based on what we saw on the test-firing.

5   Sometimes it's to the left; sometimes to the right.

6   Sometimes up; sometimes down.  Sometimes it fragments into

7   two pieces; sometimes it fragments into one.  So I'd say

8   it's unpredictable.

9   Q.    Now separate from the orientation, would you expect the

10  distance from the wound to be a bit more consistent?

11  A.    Can you repeat that, please?

12  Q.    The distance from the wound of the satellite -- the

13  distance -- let me rephrase.

14        Would you expect the distance of the satellite

15  wound from the entry wound to be a bit more consistent than

16  the direction around the wound?

17  A.    Most likely because it would have a similar kinetic

18  energy.  However, if it fragmented into two pieces, each one

19  would have less energy, so it may not go as far.

20  Q.    Can you determine an angle without an x-ray machine?

21  A.    Yes.

22  Q.    In fact, we didn't have -- did you -- you determined an

23  angle here without an x-ray machine, correct?

24  A.    Just based on his description of which ribs were

25  hurt -- hit in relation to where the entrance is, it appears

REDIRECT - CINA

1    to be slightly downward, but predominantly front to back.

2    Q.    Do you have any reason to doubt Dr. Maswahu's

3    measurements?

4    A.    No, I have no reason to doubt him, but I've never met

5    him.    I would have liked him to write a more detailed

6    report, though.

7    Q.    Does the decomposition in the photos affect your

8    analysis of the distance of the muzzle to the wound?

9    A.    In that, due to decomposition you have tissue spewing

10   out of the big defect.    Because of that I can't see if

11   there's any scalloping.    I can't see if there's any

12   individual buckshot entrances around there because it's

13   obscured by the tissue that's coming out.    So I would say

14   decomposition affects my interpretation of the photographs.

15   Q.    Does it infect -- does it affect your interpretation

16   that it was at least a foot away?

17   A.    No, it does not.    I believe it was loose -- close

18   contact, that that fragment of case would have been carried

19   into the body rather than striking adjacent to the entrance

20   site.

21   Q.    And does it affect your opinion about -- does the

22   decomposition in the photos affect your opinion about the

23   angle of the wound at all?

24   A.    No, that's more determined on what structures were

25   hitting the body.

714

REDIRECT - CINA

1   Q.   Can you still form an opinion in this case, even though

2   the original autopsy was not done according to NAME

3   standards?

4   A.   Yes.   I've stated my opinion that it appears to me 1 to

5   3 feet, more likely within that 1 to 2 feet.   Had better

6   photographs been taken at autopsy, with measurements, I'd

7   believe I could have refined that closer.

8   Q.   And how are you able to still form that opinion despite

9   the lack of NAME standards?

10  A.   If it was much farther away, I would expect lots of

11  individual pellet entries on the chest spread out over a

12  wider distance.   I don't see that.   I may see one.   I don't

13  see any soot on the skin, which you would expect with a very

14  close-range wound.   That was not described.   And I don't see

15  any fragment of the case being carried into the body, which

16  you would expect if -- if the muzzle in the case were right

17  against the skin.

18  Q.   Based on what you've reviewed in this case, can you

19  make a manner-of-death determination?

20  A.   Yes, I can.

21  Q.   What is that manner-of-death determination?

22          MS. MOSS:   Objection.   Beyond the scope

23          THE COURT:   Overruled.

24          THE WITNESS:   In my opinion, I would have ruled

25  this a homicide.   I don't believe she could have fired the

REDIRECT - CINA

1    weapon herself.

2              MR. GREWELL:  Thank you, Dr. Cina.

3              THE COURT:  May the -- excuse me, may this witness

4    be excused for the Government?

5              MR. GREWELL:  He may, Your Honor.

6              THE COURT:  For Defendant Milliron?

7              MR. DILL:  He may, Your Honor.

8              THE COURT:  Defendant Rudolph?

9              MS. MOSS:  Nothing further, Your Honor.

10             THE COURT:  Okay.  Doctor, thank you so much for

11   your testimony.  You're excused and you may step down.

12             THE WITNESS:  It was my pleasure.  Thank you.

13             THE COURT:  Thank you.  Government may call its

14   next witness.

15             MR. GREWELL:  Your Honor, the Government calls Boyd

16   Malama.

17             COURTROOM DEPUTY:  If you'll raise your right hand

18   for me, sir.

19             BOYD MALAMA, GOVERNMENT'S WITNESS, SWORN

20             COURTROOM DEPUTY:  Thank you.  Please take a seat

21   for me and then state your full name for the record and

22   spell your first and last name for us.

23             THE WITNESS:  Thank you.  My name's Malama, Boyd.

24   Boyd is B-o-y-d.

25                       DIRECT EXAMINATION

716

DIRECT - MALAMA

1    BY MR. GREWELL:

2    Q.    And is Malama your last name?

3    A.    Yes, sir.

4    Q.    Could you spell that as well.

5    A.    That is M-a-l-a-m-a.

6    Q.    Mr. Malama, where do you currently work?

7    A.    Lusaka police officer.

8    Q.    And what is your job there?  You're a police officer, I

9    guess.  You work for the Zambia police?

10   A.    My job is to maintain law and order, protect property,

11   and save life.

12   Q.    Where were you working in October of 2016?

13   A.    I was at Mumbwa Police Station.

14   Q.    What were your responsibilities there?

15   A.    My responsibilities there was to maintain law and

16   order.

17   Q.    Could I have Government Exhibit 19, please.

18            Are you familiar with this building?

19   A.    No.

20   Q.    The one on the screen.

21   A.    Yes, sir.

22   Q.    What is it?

23   A.    This is the police station in Mumbwa District.

24   Q.    Is that where you worked in 2016?

25   A.    Yes.

717

DIRECT - MALAMA

1   Q.    Did you help investigate the shooting death of Bianca

2   Rudolph?

3   A.    Yes.

4   Q.    How did you first learn of the incident?

5   A.    We first received a report from the two gentlemen,

6   Mr. Lawrence Rudolph and the Mark.  They come to the station

7   to report the shooting is this.

8   Q.    Did Mr. Rudolph say where he was when his wife was

9   shot?

10  A.    Yes, he did.

11  Q.    Where did he say that he was?

12  A.    He said he was in the bathroom.

13  Q.    Did you eventually visit the Chinyembe hunt camp where

14  Rudolph had been shot?

15  A.    Yes.

16  Q.    How long did it take to get from Mumbwa Police Station

17  to the hunting camp?

18  A.    It was two hours plus.

19  Q.    Can you describe the area where the hunting camp is

20  located.

21  A.    It's located in the Kafue National Park.

22  Q.    And how did you get there?

23  A.    We got there using a motor vehicle.

24  Q.    How big is the area that the Mumbwa Police District is

25  responsible for?

DIRECT - MALAMA

1    A.    It covers a vast area and the national park where we --

2    where the Mumbwa Police Station covers.

3    Q.    Would it be fair to say several hundred kilometers?

4    A.    Let's put it a hundred kilometers, plus, yes.

5    Q.    What did do you when you arrived at the Chinyembe

6    hunting camp?

7    A.    Once we reached the Chinyembe camp, I didn't do that

8    much because we had the other officers were handling other

9    matters there.

10   Q.    Were you the officer in charge?

11   A.    No.

12   Q.    Did anyone take pictures of the scene?

13   A.    Yes.

14   Q.    Who was that?

15   A.    That was -- the one on the case was Mr. Silling

16   [phonetic] Chirwa.

17   Q.    Could you spell his last name?  Do you know how  --

18   A.    Chirwa is C-h-i-r-w-a.  Chirwa.

19   Q.    Is Mr. Chirwa still alive?

20   A.    No.  He died.

21   Q.    Where was Mrs. Rudolph's body taken from the camp?

22   Where was it taken to?

23   A.    It was taken to Mumbwa mortuary.

24   Q.    And did it remain overnight there?

25   A.    Yes.

DIRECT - MALAMA

1    Q.    And then what happened to it the next day?

2    A.    The next day it was collected.

3    Q.    Did you -- and where was it taken to?

4    A.    To UTH, that's the University Teaching Hospital, in

5    Lusaka.

6    Q.    Did you accompany the body to Lusaka?

7    A.    Yes.

8    Q.    Could I have Government Exhibit 26, please.

9          What is this?

10   A.    That is the document which you would call the Order of

11   Postmortem.

12   Q.    And who was ordered to conduct the autopsy?

13   A.    The order was a local magistrate.

14   Q.    Sorry, he -- the local magistrate was ordered to

15   conduct the autopsy or he ordered the autopsy?

16   A.    He ordered.  He's supposed to sign then so that the

17   autopsy could -- so the autopsy can be conducted.

18   Q.    At the mortuary -- I want to take one step back.

19         At the mortuary in Mumbwa, was the body kept

20   refrigerated?

21   A.    Can you come again?

22   Q.    Was the body at the mortuary in Mumbwa kept

23   refrigerated, cool?

24   A.    Yes.  Yes, it was.

25   Q.    How did you -- so did you deliver Mrs. Rudolph's body

720

DIRECT - MALAMA

1    to the University Teaching Hospital that --

2    A.    Yes.

3    Q.    And how did you deliver her body to the hospital?

4    A.    With the -- as I say, there's a funeral parlor called

5    the F -- F for -- that's -- I don't remember the last name,

6    but it was an organized vehicle which came to pick the body

7    in Mumbwa; the one which offers the funeral services.

8    Q.    Were you present for the autopsy?

9    A.    Yes, I was.

10   Q.    Did you have anything more to do with Mrs. Rudolph's

11   body after the autopsy?

12   A.    No.

13   Q.    Can I have Government Exhibit 22.

14         Are you familiar with this document?

15   A.    Yes.

16   Q.    What is it?

17   A.    This is a Coroner's Authority for Burial.

18   Q.    Could we zoom on the middle section.

19         Did you sign this document?

20   A.    Yes, I did.

21   Q.    What day did you sign it?

22   A.    I signed as an officer that was attending the

23   postmortem.

24   Q.    And what -- what day was that that you signed it?

25   A.    That was on 12th October 2016.

DIRECT - MALAMA

1   Q.   Can you read for me the part of the -- the part below

2   where you signed?

3   A.   The part reads, "I am the investigating officer in this

4   case.  The police has no objection to the burial."

5   Q.   And why did the police have no objection to the burial

6   here?

7   A.   The -- this document says after postmortem is

8   conducted, the police have got nothing to do with the

9   burial -- I mean with the body because the postmortem has

10   already been conducted.

11   Q.   Let's -- I'd like to return to the hunting camp.

12          Were any shotgun shells found at the scene?

13   A.   What?

14   Q.   Were any shotgun shells found at the scene of the

15   hunting camp?

16   A.   There was -- there was -- there was a particle which

17   was found inside the body --

18   Q.   Are you talking at the autopsy?

19   A.   When the body was -- when the postmortem was conducted

20   by the doctor.

21   Q.   So, sorry.  Going back in time, the day you visited

22   Chinyembe hunting camp?

23   A.   Okay.

24   Q.   Was there a -- was there a shell found at the scene?

25   A.   Yes.  There was a shell at the scene.

DIRECT - MALAMA

1    Q.    May I ask Ms. Guerra to provide physical Exhibit No. 5

2    to the witness.   Government Exhibit 5.

3              Is this the shell that was found at the scene?

4    A.    Yes.

5    Q.    Ms. Guerra, may I put it on the Elmo for the jury.

6    Thank you.

7              If I could have it back at the podium, please.

8              Was the shotgun that killed Mrs. Rudolph taken from

9    the scene?

10   A.    Yes.

11   Q.    Where was it taken?

12   A.    It was taken -- first at the scene, it was right there

13   by the one was in the case -- taken to the Mumbwa Police

14   Station.   Then later on it was taken for ballistics

15   examination at police force headquarters.

16   Q.    And who was responsible for taking it to the

17   headquarters?

18   A.    I was the one who took it.

19   Q.    What happened with the shotgun when the ballistics

20   examiner was done with it?

21   A.    After they had done the examination, there was a

22   direction from the arresting officer, was in Chinyembe, that

23   was the ballistic report.   I should also give the shotgun to

24   Mr. Rudolph Lawrence.

25   Q.    So you were supposed to give both the ballistics report

DIRECT - MALAMA

1    and the shotgun to Mr. Rudolph; is that what you said?

2    A.    A copy of the ballistic report and the shotgun.

3    Q.    Can I have Government Exhibit 28, please.  Are you

4    familiar with this document?

5    A.    Yes.  Yes.

6    Q.    What is it?

7    A.    This is a handing over the shotgun to Mr. Rudolph.

8    Q.    What is the date of this document?

9    A.    That was on 14th of October, 2016.

10   Q.    Did you sign this document?

11   A.    Yes, I did.

12   Q.    And did Mr. Rudolph sign this document?

13   A.    Yes.

14   Q.    Mr. Malama, could you read this document to the jury

15   for me?

16   A.    The document reads, "I, No. 39524, Detective" -- I

17   start again.  Thank you.

18           "I, No. 39524, Constable Malama have today 14th

19   October 2016 handed over the shotgun, serial number WT

20   15100116 to" Mr. -- Dr. Rudolph -- I mean "to Dr. Rudolph,

21   Patrick, Lawrence, 861, an American, after the ballistic

22   examination" concluded -- "concluded.  The same was involved

23   in a shooting" -- "in a shooting on 11th of October 2016 in

24   Chinyembe Safari near management area Mumbwa District."

25           The third is the right of the aforementioned.

724

CROSS - MALAMA

1    Q.    And that, that you just read for us, is that your

2    handwriting?

3    A.    Yes, it's mine.  Yes.

4    Q.    One last question, Mr. Malama.  During the

5    investigation, did Mr. Rudolph ever report any jewelry

6    missing from his wife's body?

7    A.    No.

8          MR. GREWELL:  No further questions, Your Honor.

9          THE COURT:  All right.  Cross-examination.

10                   CROSS-EXAMINATION

11   BY MS. DOYLE:

12   Q.    Good afternoon, ladies and gentlemen.  Good afternoon,

13   Officer Malama.

14   A.    Good afternoon.

15   Q.    My name is Lauren Doyle.  I'm one of the attorneys

16   who's representing Dr. Rudolph.  How are you today?

17   A.    Fine.  How are you?

18   Q.    Good.  Thank you.  Dr. Malama, based on the Zambia

19   police investigation, were you made aware that the Zambia

20   authorities concluded that Bianca Rudolph's death was an

21   accident?

22   A.    No, not aware.

23   Q.    You were not aware --

24   A.    No.

25   Q.    -- that the Zambian authorities --

CROSS - MALAMA

1    A.    No.

2    Q.    Okay.  You said you heard Dr. Rudolph say he was in the

3    bathroom when he heard the gunshot.

4    A.    Yes.

5    Q.    And you also said that other officers were around when

6    Dr. Rudolph made the statement.

7    A.    Yes.

8    Q.    Dr. Rudolph didn't try to stop the Zambian police from

9    doing a full investigation, did he?

10   A.    Come again.

11   Q.    Did Dr. Rudolph ever try to interfere with the Zambian

12   police's investigation?

13   A.    No.

14   Q.    To your knowledge, Dr. Rudolph cooperated with the

15   police, right?

16   A.    Yes.

17   Q.    In fact, Dr. Rudolph, and I think you mentioned his

18   guide, were the ones who came to the police to bring you

19   back to the cabin, right, and to report the death?

20   A.    Can -- say that again.

21   Q.    Dr. Rudolph and another man, who I think you mentioned

22   was his guide, came to the police station to report the

23   death.

24   A.    Yes.

25   Q.    And they came to the police station to bring you back

CROSS - MALAMA

1    to the cabin where Bianca Rudolph had died.

2    A.    Yes.

3    Q.    And Dr. Rudolph gave a statement to the police.

4    A.    Yes, he did.

5    Q.    He wasn't forced to speak with the police officers, was

6    he?

7    A.    No, he wasn't forced.

8    Q.    And he wasn't under arrest when he gave that statement?

9    A.    No.

10   Q.    And to your knowledge, Dr. Rudolph didn't demand for a

11   lawyer to be present there during the statement --

12   A.    No, he didn't demand anything.

13   Q.    And he didn't try to keep officers away from the

14   cabin --

15   A.    No.

16   Q.    -- where --

17   A.    No.

18   Q.    Okay.  When you and the other officers arrived at the

19   cabin, Dr. Rudolph didn't try to prevent any of the officers

20   from collecting evidence?

21   A.    Can you repeat that again.

22   Q.    Yes.  When you and the other officers arrived at the

23   cabin, Dr. Rudolph didn't try to prevent any of you from

24   collecting evidence.

25   A.    No.

CROSS - MALAMA

1          THE COURT:  Can we ask questions instead of making

2     statements.

3               MS. DOYLE:  Yes, Your Honor.

4     BY MS. DOYLE:

5     Q.   Did Dr. Rudolph try to prevent any police officers from

6     interviewing other witnesses?

7     A.   No.

8     Q.   Did Dr. Rudolph ever offer to pay you for any reason?

9     A.   No.

10    Q.   Do you know if he ever offered to pay any of the police

11    officers?

12    A.   Can you rephrase that.

13    Q.   Sure.  Do you know if Dr. Rudolph offered to pay any of

14    the other police officers?

15    A.   I don't know.

16    Q.   Officer Malama, you accompanied the body each time it

17    was transported, you know, from the camp to Mumbwa, right?

18    You --

19    A.   Yes, yes.

20    Q.   -- went with the body from -- to Mumbwa.

21    A.   I was the main officers, yes.

22    Q.   Right.  And then you also went when the body was taken

23    from Mumbwa to Lusaka.

24    A.   Yes.

25    Q.   Was Dr. Rudolph there as well when the body was

CROSS - MALAMA

1    transported each time?

2    A.    Yes.  Was there.

3    Q.    Did he ever try to stop the body from being

4    transported?

5    A.    No.

6    Q.    Did he ever try to interfere with that process of

7    taking the body to the hospital?

8    A.    Not to my knowledge.

9    Q.    You were with Dr. Rudolph when the body was left at the

10   hospital for the autopsy; is that right?

11   A.    Yeah.  He was present but he didn't attend.

12   Q.    Right.  He was present just when the body was --

13   A.    He wasn't -- he was there but he didn't attend.

14   Q.    Right.  Right.  And I think you mentioned he was -- he

15   was crying at the hospital when the body was dropped off.

16   A.    No.  I didn't mention that.

17   Q.    Do you remember being interviewed by FBI agents, Dr.

18   [sic] Malama?

19   A.    I do.

20   Q.    Do you remember an interview in July of 2019?

21   A.    Yes.

22   Q.    Do you remember telling the officers that you spoke

23   with Larry at the University Teaching Hospital where the

24   postmortem examination occurred and Larry was crying?

25   A.    Who was that?  Sorry?

729

CROSS - MALAMA

1    Q.   I'm sorry.  Larry is Dr. Rudolph.

2    A.   Oh.  I talked, yes, he had --

3    Q.   Yes --

4    A.   -- UTH was there.

5    Q.   And do you remember telling the FBI agents in July of

6    2019 that Mr. -- or Dr. Rudolph was crying there at UTH?

7    A.   I don't remember.  The only thing I remember is that I

8    asked him to attend but he never attended.  He didn't attend

9    the postmortem.

10   Q.   He wasn't there during the postmortem examination --

11   A.   He was asked -- he didn't attend but he was just within

12   the premises.

13   Q.   Okay.  And you didn't see Dr. Rudolph trying to pay the

14   doctor who performed the postmortem examination, did you?

15   A.   No.

16   Q.   He wasn't trying to stop the postmortem examination

17   from happening?

18   A.   Not to my knowledge, no.

19   Q.   And I think you mentioned you attended the postmortem

20   examination; is that right?

21   A.   Yes.

22   Q.   Were you in the room for the entire --

23   A.   Yes.

24   Q.   -- postmortem examination?

25   A.   Yes.  Yes.

CROSS - MALAMA

1    Q.    Who else was in the room during the postmortem

2    examination?

3    A.    It was myself, a doctor, and the assistant to the

4    doctor -- those who assist the doctors.  And I think -- I

5    can't recall if there was somebody from the American

6    Embassy.

7    Q.    How long did the postmortem examination last, if you

8    remember?

9    A.    I didn't put it in the record.  Approximately maybe, I

10   think, 40 minutes.

11   Q.    Okay.  And you saw the doctor who was conducting

12   examining the outside of Bianca Rudolph's body?

13   A.    Yes.

14   Q.    And did you see him cutting into the body?

15   A.    Yes.

16   Q.    And did you see him sewing the body back up when he was

17   done?

18   A.    Yes.

19   Q.    Did you see him going inside of the shotgun wound?

20   A.    Yes.

21   Q.    And did you see him looking for maybe pellets that had

22   been released when she was injured?

23   A.    Yes.  Yes.

24   Q.    Do you know if he found any of those shotgun pellets?

25   A.    There was something that was found, but I can't recall.

CROSS - MALAMA

1    But it was something which was found inside.

2    Q.    And I believe that was like a plastic piece, right?

3    A.    I couldn't say that, but it was something.

4    Q.    So there was just that one piece that was found inside

5    the wound that you know of?

6    A.    I think so.

7    Q.    Okay.  Did you at any point see him sticking something

8    inside of the wound, maybe a long metal object?

9    A.    See who?

10   Q.    Did you ever see the doctor --

11   A.    No.

12   Q.    -- stick inside of the wound a metal object?

13   A.    No.

14   Q.    Maybe to see what angle the shot was at?  Did you ever

15   see him put something metal inside?

16   A.    As he was conducting postmortem I couldn't see him.  He

17   was checking for something inside the body.

18   Q.    Okay.  But you never saw a big metal tool like you just

19   told us?

20   A.    He was checking.  Obviously he was using the metals,

21   which was as doctors to check for something.

22   Q.    I'm sorry, can you say that again.

23   A.    I'm saying the doctor, he was checking the body.

24   Q.    Right.

25   A.    Obviously he was checking for something to -- if

732

CROSS - MALAMA

1    something can be found inside.

2    Q.    Okay.    Thank you.    Dr. Malama, your police department

3    was the first agency to investigate this case, right?

4    A.    Yes.

5    Q.    Your investigation started the day Bianca Rudolph died.

6    A.    Yes.

7    Q.    If you found out about a death, would you wait years to

8    start a homicide investigation?

9    A.    Can you --

10   Q.    Sure.    If your police department found out that

11   somebody had died, would you wait years before starting a

12   homicide investigation?

13   A.    No.

14   Q.    The Zambian officers saw the scene in that cabin the

15   very same day that Bianca Rudolph died, right?

16   A.    That is the very day, but after -- it was the very day

17   of the death that it happened, some of it was after.

18   Q.    And they spoke to the witnesses the very same day that

19   Bianca Rudolph died; is that right?

20   A.    Yes.

21         MR. GREWELL:    Objection, Your Honor.    If there

22   could be more questions and less testifying.

23         THE COURT:    Well, it is cross-examination so I'm

24   going to have to allow leading questions, overruled.

25   BY MS. DOYLE:

CROSS - MALAMA

1    Q.    Officer Malama, were the witnesses on the scene

2    interviewed the very same day that Bianca Rudolph died?

3    A.    Yes.

4    Q.    And they spoke to Dr. Rudolph the very same day that

5    Bianca Rudolph died.

6    A.    Yes.

7    Q.    And they saw his emotional state the very same day

8    Bianca Rudolph died, right?

9    A.    Yes.

10   Q.    And the pathologist examined her body the day after she

11   was shot; is that right?

12   A.    Yes.

13            MS. DOYLE:  Your Honor, may I have one moment,

14   please?

15            THE COURT:  You may.

16            MS. DOYLE:  No further questions, Your Honor.

17            THE COURT:  All right.  Thank you.  Any cross --

18            MR. DILL:  No, sir, no questions.

19            THE COURT:  Okay.  Thank you.  Redirect.

20                    REDIRECT EXAMINATION

21   BY MR. GREWELL:

22   Q.    Just two questions for you, Mr. Malama.

23   A.    Thank you.

24   Q.    What would you have done if Mr. Rudolph had offered to

25   pay you money to stop the autopsy?

734

1   A.   That's not possible.  Can't accept that.

2   Q.   What would you have done if he tried to stop the

3   investigation in any way?

4   A.   That would create suspicion.  Why would you pay an

5   officer to stop a known procedure that's supposed to be

6   done.

7   Q.   Thank you.

8          THE COURT:  May this witness be excused for the

9   Government?

10         MR. GREWELL:  He may, Your Honor.

11         THE COURT:  For Defendant Rudolph?

12         MS. DOYLE:  Yes, Your Honor.

13         THE COURT:  Thank you.  For Defendant Milliron.

14         MR. DILL:  Yes, Your Honor.

15         THE COURT:  Okay.  Officer Malama, thank you so

16   much for your testimony.  You're excused.  You may step

17   down.  And safe travels back to your country.

18         THE WITNESS:  Thank you so much.

19         THE COURT:  All right, the Government may call its

20   next witness.

21         MR. FIELDS:  Your Honor, the United States calls

22   Casiuss Mwiinga.

23         COURTROOM DEPUTY:  Please raise your right hand for

24   me.

25       CASIUSS MWIINGA, GOVERNMENT'S WITNESS, SWORN

735

DIRECT - MWIINGA

1     COURTROOM DEPUTY:  Please be seated and remove your

2     mask for us.  And state your full name for the record and

3     spell your first and last name for us.

4     THE WITNESS:  My name's Casius Mwiinga, spelled as

5     C-a-s-i-u-s.

6     MR. FIELDS:  And your last name, how do you spell

7     that?

8     THE WITNESS:  My last name M-w double I-n-g-a.

9     MR. FIELDS:  May I begin, Your Honor?

10     THE COURT:  You may.

11                         DIRECT EXAMINATION

12     BY MR. FIELDS:

13     Q.   Mr. Mwiinga, did you work at FSG Ideal Funeral Home in

14     Zambia in 2016?

15     A.   Yes, Your Honor.

16     Q.   What was your position?

17     A.   Your Honor, my position was I was a branch coordinator,

18     a position compared to a branch manager, or -- or an

19     operations manager.

20     Q.   Did you provide funeral services for an American named

21     Bianca Rudolph?

22     A.   Your Honor, yes, I did.

23     Q.   How did she die?

24     A.   According to the cause of certificate done by the

25     medical doctor, it stated that she died of -- she died of

736

DIRECT - MWIINGA

1    wounds as a result of gunshots.

2    Q.    Did you speak with her husband, Dr. Lawrence Rudolph,

3    at the funeral home?

4    A.    Your Honor, yes, I did.

5            THE COURT:  Sir.  Mr. Mwiinga.  As much as

6    Mr. Fields, I'm sure, is enjoying being called "Your Honor,"

7    you don't have to do that.  So just answer the question.

8    Okay, sir?  We just don't do it here in this country.

9            THE WITNESS:  Obliged.

10            THE COURT:  I'm not trying to be disrespectful of

11    you.  Just ask -- you know, just telling you just answer the

12    question.  Okay?

13            THE WITNESS:  Obliged.

14            THE COURT:  Okay.

15            MR. FIELDS:  Thank you, Your Honor.

16    BY MR. FIELDS:

17    Q.    Mr. Mwiinga, how long have you worked in the funeral

18    industry?

19    A.    For 15 years.

20    Q.    What's the common funeral practice in Zambia?

21    A.    We bury.

22    Q.    Approximately what percentage of funerals in Zambia are

23    conducted by burial?

24    A.    I would say 99.9 percent.

25    Q.    So are cremations very common?

737

DIRECT - MWIINGA

1    A.    Not very common.

2    Q.    Did FSG Ideal Funeral Home have an agreement with the

3    U.S. Embassy in Lusaka?

4    A.    We do.

5    Q.    What was the agreement?

6    A.    The agreement was we furnish them with the requirements

7    needed for a body to be taken out of Zambia for United

8    States of America for disposal.  In this case, we call it

9    body export.

10   Q.    In Zambia, when are postmortem autopsies done?

11   A.    Sorry?

12   Q.    Let me rephrase.  In Zambia, when is a postmortem

13   autopsy conducted?

14   A.    Postmortems are conducted when someone has died of an

15   accidental death or a sudden death -- death as well as an --

16   a -- in the -- in unclear circumstances.

17   Q.    Under what circumstances?

18   A.    Someone has been -- the whole day, the whole week was

19   all right.  He was enjoying his good health.  And at the end

20   of the day, he says his good night to the member of -- his

21   family member, only to wake up to a rude shock that he's no

22   more.  Usually someone dies in his sleep.  That attracts

23   postmortem.

24   Q.    Okay.

25   A.    Yes.

DIRECT - MWIINGA

1    Q.   So let's look at Government's Exhibit 20, which is

2    already in evidence.

3          Is this the funeral home where you worked?

4    A.   Yes, Your Honor.

5    Q.   I'm sorry, again, you don't need to call me "Your

6    Honor."

7          Could we go to page 4.  And let's zoom out.  I

8    think that's a little zoomed in.  Or we'll scroll down.

9          Do you recognize this?

10   A.   Yes.

11   Q.   What is that?

12   A.   That's my formal office.

13   Q.   And let's go back to page 3.

14          Is this another part of that office?  Sir, is this

15   another part of your office?

16   A.   Yes.

17   Q.   And page 5.

18          What is this?

19   A.   This is the front -- the front office, the reception.

20   Q.   And then what's behind this door that I've circled

21   there on sort of the top left of the photograph?

22   A.   That's the door leading into -- as you go, you pass

23   through the showroom where we -- coffins and caskets are

24   displayed.  Going beyond that is the mortuary.

25   Q.   We can take that down, please.

**DIRECT - MWIINGA**

1          Where was Bianca's body before it came to FSG?

2    A.    It was at University Teaching Hospital.

3    Q.    How were you notified that the body would be brought to

4    FSG?

5    A.    I was called by the medical personnel at Mumbwa General

6    Hospital.

7    Q.    Now you said you had a conversation with Dr. Lawrence

8    Rudolph about his wife, Bianca, correct?

9    A.    Yes.

10   Q.    When was that conversation?

11   A.    The conversation was when the body was brought to

12   University Teaching Hospital, pre- -- before postmortem.

13   Q.    Where did the conversation take place?

14   A.    It was at FSG in my office then.

15   Q.    Was anyone with you?

16   A.    Sorry?

17   Q.    Was anyone else with you?

18   A.    No.

19   Q.    What did Dr. Rudolph ask you?

20   A.    He came into -- in my office.  He introduced himself as

21   Dr. Rudolph, the husband to the late Bianca, who -- who died

22   accidentally while she was trying to -- to pack and clean

23   the gun.

24   Q.    Did he ask you to do something?

25   A.    He asked me if it was possible for me to help him

DIRECT - MWIINGA

1    cancel postmortem.  He didn't want his wife to be subjected

2    to that.

3    Q.    And then what did -- what did he say after that?

4    A.    I told him unfortunately is not possible because in

5    Zambia, accidental death attracts a postmortem.  He went on,

6    "My brother, help me in any way possible.  I will -- I will

7    give you something.  I" --

8    Q.    Did he -- sorry.  Did he say what he would give you?

9    A.    He said, "I" -- "I will give you some money.  I will --

10   in -- in the -- in the appreciating for the cancellation of

11   the postmortem."

12         And I said, "Is not possible."

13   Q.    Was he upset?

14   A.    He was disappointed and upset.

15   Q.    Did he make any requests about cremation?

16   A.    At that point, we left it there because it was now

17   clear that body was to be faced to be -- to undergo

18   postmortem.  Thereafter he say he wanted cremation.

19         THE COURT:  Sir, could you scoot your chair a

20   little bit closer to the microphone because your voice is

21   trailing off a little bit, sir.  There you go.  Thank you.

22   BY MR. FIELDS:

23   Q.    Did I hear you correctly that he did request a

24   cremation?

25   A.    Sorry?

741

DIRECT - MWIINGA

1    Q.    Did I hear you correctly, did he request a cremation?

2    A.    Yes, he did.

3    Q.    Did he make any specific requests about that cremation?

4    A.    Unfortunately cremation is only one way.  There's

5    nothing like special or anything.  Yes.  So he didn't

6    request further.

7    Q.    When was Bianca's cremation scheduled?

8    A.    Immediate after postmortem.

9            MR. FIELDS:  May I have a moment, Your Honor?

10           THE COURT:  You may.

11   BY MR. FIELDS:

12   Q.    Sorry, one more point.

13           Was Bianca's body brought to FSG Funeral Home?

14   A.    It was.

15   Q.    Does that funeral home have refrigerators?

16   A.    Yes, we do.

17   Q.    Was her body kept under refrigeration?

18   A.    Yes.

19           MR. FIELDS:  No further questions, Your Honor.

20           THE COURT:  All right.  We're going to take our

21   afternoon break before we go to cross-examination.

22           Ladies and gentlemen of the jury, we'll be in

23   recess for 15 minutes.

24       (Jury left the courtroom at 3:09 p.m.)

25           THE COURT:  All right, Mr. Mwiinga, during these 15

CROSS - MWIINGA

1   minutes in the recess, I'm directing you not to speak with

2   any of the lawyers.  Okay?  You're free to go into the lobby

3   or go downstairs, outside for a bit, but I need you back at

4   the witness stand in 15 minutes.

5            THE WITNESS:  All right.

6            THE COURT:  Thank you, sir.

7         (Recess taken 3:10 p.m. to 3:28 p.m.)

8            THE COURT:  Cross-examination.

9            MR. MARKUS:  Thank you, Your Honor.

10                    CROSS-EXAMINATION

11   BY MR. MARKUS:

12   Q.   Good afternoon, ladies and gentlemen.  Good afternoon,

13   counsel, Your Honor.  Mr. Mwiinga.  Hi, I'm David Markus.

14   Nice to meet you.

15   A.   Thank you.

16   Q.   I'm going to ask you a couple of questions about what

17   you just said.

18            If I could call up, Mr. Reyes, INV 590.

19            COURTROOM DEPUTY:  Which is what exhibit, counsel?

20            MR. MARKUS:  I apologize.  Government Exhibit 35,

21   which is in evidence.

22            COURTROOM DEPUTY:  Thank you.

23            MR. MARKUS:  Sure.

24   BY MR. MARKUS:

25   Q.   And if we could call out that top half of that page

743

CROSS - MWIINGA

1      there.

2              Mr. Mwiinga, would you agree with me that the date

3      of Mrs. Rudolph's death was November 11th, 2016?  I'm sorry,

4      October -- I get confused with the backwards --

5      October 11th, 2016?

6      A.    Come again.

7      Q.    When did Ms. -- when did Mrs. Rudolph die?  What date?

8      Do you see it on there?

9      A.    Yeah, I can read.  11th of October 2016.

10     Q.    Okay.  And when was the date of the postmortem

11     examination?  Do you see it right there next to the green

12     dot on the 12th of October?

13     A.    Yes.

14     Q.    That's the very next day, correct?

15     A.    Yes.

16     Q.    Okay.  And is it your testimony, sir, that between the

17     date of the death on the 11th and the date of the

18     postmortem, the very next day, that Dr. Rudolph came to see

19     you?

20     A.    Yes.

21     Q.    And you're saying he -- did he see you on the 11th or

22     did he see you on the 12th?

23     A.    The -- he saw me on the 12th.

24     Q.    Okay.  So it's your testimony that he came to see you

25     at the funeral home on October 12th?  You're sure about

744

CROSS - MWIINGA

1    that, sir?

2    A.    Yes.

3    Q.    Okay.  And when was the cremation?  Are you saying it

4    was the very next day on the 13th?

5    A.    The -- the day after postmortem.

6    Q.    So your testimony is the day after Dr. Rudolph saw you

7    was the date of the cremation, correct?

8    A.    No.

9    Q.    Okay.

10   A.    Before.

11   Q.    I'm confused.  I'm sorry.  Explain it to me.  When

12   was -- was the cremation the day after the postmortem?

13   A.    Postmortem -- cremation took place after postmortem.

14   Q.    Was it one day later, sir?

15   A.    Yes.

16   Q.    Okay.  So if the date of the death is the 11th, and the

17   date of the postmortem is the 12th, can we agree that you

18   believe the cremation was the next day, the 13th?

19   A.    My understanding on that one, I wouldn't be too sure

20   because of the time that elapsed.  What I'm too sure is

21   Doctor came to my office on the 11th before postmortem.

22   Q.    Okay.  So now you're saying he came to your office the

23   same day as Mrs. Rudolph died?

24   A.    No.

25   Q.    Okay.  I'm sorry.  I'm getting confused.  Can you tell

CROSS - MWIINGA

1    me when you think Dr. Rudolph came to see you.

2    A.    The body came to UTH the day after she had died.

3    Q.    Okay.  That's the 12th, correct?

4    A.    Yes.

5    Q.    Okay.  And are you saying that he came to see you the

6    very same day?

7    A.    The same day of what?

8    Q.    The postmortem.

9    A.    Yes.

10   Q.    Okay.  And you agree with me, right, that the cremation

11   happened the day after he saw you, correct?

12   A.    Yes.

13   Q.    And we're sure of that, correct?

14   A.    Yes.

15   Q.    We're sure that the cremation happened the day after he

16   saw you, correct?

17   A.    Which was the 13th.

18   Q.    Okay.  Because you're sure that it was the day after he

19   saw you, right?

20   A.    Yes.

21   Q.    Okay.  We can take that down, Mr. Reyes.  If we could

22   put up what's in evidence as Government Exhibit 10, DLG 399,

23   please.  If we could zoom in on that cremation certificate.

24        Do you see here, sir, where the cremation actually

25   happened on the 14th?

746

CROSS - MWIINGA

1   A.   This 14th is the day when the cremation certificate was

2   prepared.

3   Q.   Okay.  It's prepared the very same day that the

4   cremation happens; isn't that right?

5   A.   No.

6   Q.   Because the cremation certificate was given to

7   Dr. Rudolph, correct?

8   A.   The cremation is given -- the cremation certificate is

9   given after cremation has been done.

10  Q.   Yes.

11  A.   Which is the following day.

12  Q.   Did you give Dr. Rudolph the cremation certificate --

13  did he come back a day after the cremation?

14  A.   For the -- to collect the remains in the form of ashes,

15  as well as the cremation, which was the following day after

16  cremation.

17  Q.   Is it your testimony, sir, that Dr. Rudolph didn't take

18  the ashes on the very day that his wife was cremated?  Is

19  that your testimony?

20  A.   Yes.

21  Q.   Okay.  And did you give Dr. Rudolph -- did you also

22  give him a bill on the day that the cremation occurred?

23  A.   Yes.

24  Q.   So you would have given him a bill when the cremation

25  occurred, correct?

747

CROSS - MWIINGA

1    A.    Yes.

2    Q.    Okay.  Can we call up Government Exhibit 10, which is

3    already in evidence, DLG 398.

4          Here's a bill -- can we zoom in on the top part of

5    the date where it says October 14th, please.

6          Do you see the date at the top right where this

7    bill was done on October 14th, sir?

8    A.    Yes.

9    Q.    That's the day that the cremation occurred, correct?

10   A.    No.

11   Q.    Okay.  So we have two documents dated October 14th, but

12   it's your testimony that that's not the date it occurred?

13   A.    The -- what happens back home is cremation is arranged.

14   We only have one crematorium in Lusaka.  So cremation was

15   arranged on the -- on the -- on the 12th for the following

16   day.

17   Q.    Yes.  Cremation was arranged on the 12th for the 13th,

18   correct?

19   A.    Yes.

20   Q.    Okay.

21   A.    Yes.

22   Q.    And -- you can take that down, Mr. Reyes.  Thank you.

23         Now, you testified that when Dr. Rudolph saw you,

24   your testimony is that it's on the 12th, correct, before the

25   postmortem?

CROSS - MWIINGA

1   A.    Yes.

2   Q.    Are you aware that Dr. Rudolph was with a man named

3   Mark Swanepoel at the hospital that day?

4   A.    I'm not.

5   Q.    Okay.  Are you aware that Mr. Swanepoel was with

6   Dr. Rudolph on the 11th, 12th, and 13th?

7   A.    I'm not aware.  I never saw him.

8   Q.    You didn't see Mr. Swanepoel, right?

9   A.    No.

10  Q.    It's your testimony Dr. Rudolph was alone when he saw

11  you, right?

12  A.    In my office.

13  Q.    In your office alone.

14  A.    Yes.

15  Q.    That Mark Swanepoel was not there with him, right?

16  A.    In my office, he was not there; he was alone.

17  Q.    He was alone.  That's your testimony.

18  A.    Yes.

19  Q.    Okay.  And you must have been shocked, sir, when

20  Dr. Rudolph started offering you money, right?

21  A.    I was not okay.

22  Q.    Did you tell anybody about it?

23  A.    Anybody about -- everybody about -- like everybody --

24  what do you mean?  Who?

25  Q.    Let's talk about it.  Do you have a coworker named

749

CROSS - MWIINGA

1    Grace?

2    A.    Yes.

3    Q.    Did you tell Grace that somebody had just tried to

4    bribe you?

5    A.    No.

6    Q.    You didn't tell your coworker?

7    A.    No.

8    Q.    Did you tell the police?

9    A.    No.

10   Q.    The FBI came and interviewed you just in May of this

11   year, correct?

12   A.    Yes, they did.

13   Q.    That's the first time in all of these years that you

14   ever said anything about this, correct?

15   A.    Yes.

16   Q.    Okay.  But you were posting on Facebook about this

17   case, weren't you?

18   A.    I never posted.

19   Q.    You never posted on Facebook?

20   A.    No.

21   Q.    You never posted on social media about this case?

22   A.    I never posted.

23   Q.    Did you write a comment about this case on the

24   internet?

25   A.    I did comment.

CROSS - MWIINGA

1    Q.    Okay.  Did you say anything about your comment about

2    Dr. Rudolph trying to bribe you?

3    A.    No.

4    Q.    Okay.  The truth is, sir, that Dr. Rudolph offered

5    you -- offered you money to try to get the cremation done

6    faster, not to try to stop the postmortem, correct?

7    A.    No.

8    Q.    Because you have no control over the postmortem, do

9    you?  Are you a police officer, sir?

10   A.    No.

11   Q.    Are you -- do you conduct autopsies?

12   A.    I don't.

13   Q.    You do not.

14   A.    No.

15   Q.    Okay.  What you control is burials and cremations,

16   right?

17   A.    Yes.

18   Q.    And so when Dr. Rudolph was seeing you, he was asking

19   you for an expedited cremation, correct?

20   A.    No.

21   Q.    And just to be clear, your testimony is, to summarize

22   for the jury, that he saw you on the 12th and that

23   Mr. Swanepoel was not with him, correct?

24   A.    In my office, he was not with him.

25        MR. MARKUS:  Thank you.  I have nothing further.

751
REDIRECT - MWIINGA

1      THE COURT:  Mr. Dill, cross-examination?

2      MR. DILL:  No questions, Your Honor.

3      THE COURT:  All right.  Redirect.

4                    REDIRECT EXAMINATION

5  BY MR. FIELDS:

6  Q.    Mr. Mwiinga, you were asked a lot of questions about

7  the dates.  Do you remember those questions?

8  A.    I do.

9  Q.    Even if you don't remember the exact date, do you

10  remember this particular conversation?

11  A.    I do.  It was on the 12th of October 2016.

12  Q.    So this happened almost six years ago, right?

13  A.    Yes.

14  Q.    How does it stand out to you?  Why do you remember

15  something that happened six years ago?

16  A.    Sorry, come again.

17  Q.    How can you remember something that happened so long

18  ago?

19  A.    Something like what?

20  Q.    The conversation that you had with Dr. Rudolph, that

21  happened six years ago, right?

22  A.    Yes.

23  Q.    How do you remember it so well?

24  A.    How I remember it, like many of this that I do

25  remember, when I was first called in 2019 by Zambia police

**REDIRECT - MWIINGA**

1    to say, "You are required for an interview at our office, at

2    about that time," they stated the time.  So I -- I went

3    there.  I was asked -- I went there with my colleague,

4    Grace.  We were asked questions concerning the death of

5    Bianca.  And it's out of that that something that I was not

6    going to forget from -- I -- my -- my brain's pitted from

7    there, that what -- one thing my brain pits, this case has

8    not -- it was -- hasn't forgotten, so it's something that is

9    now boiling, it's cooking.  So it's really something that I

10   was not going to forget.

11   Q.   What makes it so unforgettable?

12   A.   The attention is getting by media such as Facebook, and

13   from the time that people back home, this -- they have been

14   talking about it.  Yeah.  It's in the public domain.

15   Q.   Before you had this conversation with Dr. Rudolph, had

16   you ever been offered a bribe before?

17   A.   Not a bribe, *per se*.  I would have one or two cases

18   where someone would -- a family member would come to my

19   office to say, "We want you to help us facilitate it,"

20   because that's -- no wonder when doctor came to me it's --

21   it didn't come as a shock.  It was not the first incident

22   of -- I've had cases where family members would come and ask

23   to say, "Is there -- is there a way you can help us to

24   cancel postmortem?"

25            Because one thing I'm -- I've been very honest to

**REDIRECT - MWIINGA**

1    my clients, but the vigil of my jobs, at times it tells me

2    to witness postmortem.  Trust me, is not a good thing.  I,

3    for one, would not want any of my family members to go

4    through that.  So through that, it -- customers would come

5    to me and I would gladly lead them through like some of

6    these -- like when I say -- I said accidental death.  I

7    remember in 2014 we had a very bad accident in Zambia where

8    we lost 19 lives.

9            MR. MARKUS:  Objection, Your Honor.

10            THE COURT:  Overruled.  You may continue, sir.

11            THE WITNESS:  We had -- we lost -- the country lost

12    19 lives at a go.  So because of the nature of the death, it

13    was imperative that postmortem be done.  So family members

14    came to me, those that -- they -- they -- they -- they

15    sought our services.  They came to me to say, "Mr. Mwiinga,

16    I want -- our relative has already died and we know they

17    have died in an accident, a road accident.  So we want you

18    to help us cancel postmortem."

19            So in that instance, I would take them, go to

20    the -- to the Majesty's Court, and we have a form what we

21    call an affidavit where they will state the reasons why they

22    don't want it done.  And they may grant that and cancel

23    postmortem.

24    Q.   Okay.  So I want to make sure I understand this.  So

25    there can be ways to cancel a postmortem in Zambia?

REDIRECT - MWIINGA

1    A.    Yes.

2    Q.    When Dr. Rudolph asked you in this particular case

3    whether you could cancel the postmortem, did you explain

4    that to him?

5    A.    I didn't explain that to him.

6    Q.    Why not?

7    A.    I must -- I must tell the Court, the reason why I

8    didn't tell that because prior to that I was already

9    informed by police to say, "That body you are handling, that

10   has come to IDU as a way of -- you've been engaged to pick

11   it up."

12        By the way I picked it up from Mumbwa, I -- by

13   sending my driver to pick it up.  So police had already

14   called me to say they are suspecting foul play on the body.

15   And because of that, I didn't want to open the can of worms.

16        MR. FIELDS:  Your Honor, may I have a moment?

17        THE COURT:  You may.

18        MR. FIELDS:  No further questions, Your Honor.

19        THE COURT:  May this witness be excused for the

20   Government?

21        MR. FIELDS:  Yes, Your Honor.

22        THE COURT:  For Defendant Rudolph?

23        MR. MARKUS:  Your Honor, may I ask a few follow-up

24   questions?

25        THE COURT:  No.  May this witness be excused?

DIRECT - MUSESE

1          MR. MARKUS:  Yes, Your Honor.

2          THE COURT:  For Defendant Milliron?

3          MR. DILL:  Yes, Your Honor.

4          THE COURT:  All right.  Mr. Mwiinga, thank you so

5  much for your testimony.  You're excused.  You may step

6  down.  And safe travels back to your country.

7          THE WITNESS:  Thank you.

8          THE COURT:  Government may call its next witness.

9          MR. FIELDS:  Thank you, Your Honor.  The United

10 States calls Musuwa Musese.

11         COURTROOM DEPUTY:  Raise your right hand for me.

12         MUSUWA MUSESE, GOVERNMENT'S WITNESS, SWORN

13         COURTROOM DEPUTY:  Please be seated and remove your

14 mask for us.  State your full name for the record and spell

15 your first and last name for us.

16         THE WITNESS:  My first name Musuwa, M-u-s-u-w-a.

17 The last name Musese, M-u-s-e-s-e.

18         MR. FIELDS:  May I begin, Your Honor?

19         THE COURT:  You may proceed, counsel.

20         MR. FIELDS:  Thank you.

21                   DIRECT EXAMINATION

22 BY MR. FIELDS:

23 Q.   Mr. Musese, where did you work in 2016?

24 A.   In 2016, I was working as senior investigations officer

25 under the Department of National Parks and Wildlife --

756

DIRECT - MUSESE

1   Department of National Parks and Wildlife.

2   Q.   Were you at Kafue National Park?

3   A.   Yes, I was in Kafue National Park.

4   Q.   What were your responsibilities?

5   A.   My responsibility was -- as a senior investigations

6   officer was to investigate wildlife crime and short

7   environmental crime.  And for environmental crime, poaching,

8   people who are cutting trees, and also people who are found

9   with illegal firearms in the national park and the

10   surrounding areas.

11   Q.   Those surrounding areas, what are they called?

12   A.   The surrounding areas we call them game management

13   area.  We have the national park and then we have the game

14   management area.  In the national park we only have tourism,

15   that is for the photographing; and then in the game

16   management area, that's where we allow hunting.

17   Q.   How long have you worked at Kafue National Park?

18   A.   I have worked there for almost 10, 15 years.

19   Q.   What kind of training did you get as a wildlife crime

20   investigator?

21   A.   The type of training which I got is that I've been

22   trained to investigate crime in terms of, like, people

23   involved in poaching.  And also like the way I have heard

24   mentioned, people who do things within the national park and

25   outside -- outside the national park.

757
**DIRECT - MUSESE**

1    Q.   Had you received any training in the United States?

2    A.   Yes.  I was trained here some few years ago in 2019.  I

3    was trained here by Fish & Wildlife.  I remember I even flew

4    up to -- here to Denver.  We came here for the same

5    training.

6    Q.   Approximately how large is Kafue National Park?

7    A.   Kafue National Park is one of the big national parks in

8    the -- on the southern region of Africa.  It's the second

9    largest national park in Zambia.  It has many species.  We

10   have species like elephant, lion, and all sorts of lions,

11   big game.

12   Q.   Big what?

13   A.   Big game.

14   Q.   Big game.

15   A.   Yes.

16   Q.   Can it be hard to get around in the interior of the

17   park?

18   A.   Come again.

19   Q.   Is it hard to navigate inside of the park?

20   A.   Yeah, you can't -- you have to go around because you

21   have some dangerous animals, like lion and.

22   Q.   As a senior wildlife investigator, are you familiar

23   with the role of professional hunters?

24   A.   Yes, I am.

25   Q.   What's the role of a professional hunter inside the

DIRECT - MUSESE

1    game management areas?

2    A.    The professional -- the role of the professional

3    hunter, they are three parties involved.  The first party,

4    we call it the client who is the professional hunter.  Then

5    the second -- yeah, the first party is the client who comes

6    to hunt as a professional hunter.  And then the second party

7    is the professional hunter.  And then the third party is the

8    officer from the Government who will represent the

9    Government.  We call him monitoring officer.

10   Q.    What did you call that third party?  Was it a

11   monitoring officer?

12   A.    Yes, monitoring officer.  The one who monitors to see

13   how they are doing the hunting.

14   Q.    Are you also in charge of enforcing rules inside the

15   park?

16   A.    Yes, I am.  I am the one who's supervising, enforcing

17   the law in the national park and also the surrounding areas

18   of the national park.

19   Q.    Are there rules about when firearms can be loaded and

20   used inside the park?

21   A.    Yes, there are rules.

22   Q.    What are the rules?

23   A.    Yeah.  For -- for example, if someone comes to hunt in

24   the game management area, we have the professional hunter.

25   The professional hunter, his role is to guide the client.

DIRECT - MUSESE

1    And when he guides the client when they are doing the

2    hunting, he's able to tell him that, you know, "Now you're

3    supposed to load your firearm.  Now you're supposed to

4    unload your firearm."

5            And also the officer -- the monitoring officer

6    also, he's there to help and monitor, to see that the

7    professional hunter and the client, they -- they shoot or

8    kill the animal in the designated area.  For example, in

9    the -- not in the national park but in the game management

10   area.  So when they do the hunting, the professional hunter

11   guides the client; that the right species, female or male.

12   That male has a good trophy.  That species you're not

13   supposed to shoot it.  So that's the role of the -- the role

14   of the professional hunter.

15           And immediately they come out from the hunting.

16   The professional hunter has to guide his client to unload.

17   We call it NSP, normal safety precaution.

18   Q.   Did you say NSP?

19   A.   Normal safety precaution.

20   Q.   And what is the normal safety precaution?  Or --

21   A.   Normal safety precaution, this is how to handle the

22   firearm.   Immediately whether you've hunted or not hunted,

23   when you come out from the hunting, the client is supposed

24   to be told that, you know, "Now can you remove the bullet

25   from the chamber for the safety of everyone who is in the

DIRECT - MUSESE

1    vehicle or who are together in that group."

2    Q.    Now in your role as an investigator with the Zambian

3    National Parks, did you sometimes interact with American

4    hunters?

5    A.    Yes.  Sometimes we do interact because when they come

6    to hunt, I was -- I was with the regional office, so

7    sometime they would pass by the office for them to clear

8    them in terms of, like, hunting permit and so on.  So they

9    used to come to our office, they pass there, then they go in

10   the -- in the hunting areas.

11   Q.    Now I mentioned 2016 early on.  But even before that in

12   your role working at Zambia National Parks, had you met

13   Dr. Lawrence Rudolph before?

14   A.    Yes.  I remember one time he passed by the professional

15   hunter.  The professional hunter passed by our office.  He

16   brought some permits, so we were trying to finalize the

17   permits.  Then they pass through the office and then that's

18   how they went to the hunting area.

19   Q.    On October 11th, 2016, did you get a report that an

20   American had been killed in a game management area?

21   A.    Yes.  On the 11th of October 2016 I received a message

22   between 7:00 and 8:00 that there was an -- there was an

23   accident which had happened at Chinyembe safari camp, that a

24   female client had shot herself accidentally.

25            So after I got that report, I rushed the police to

**DIRECT - MUSESE**

1    go and report -- from the -- let them know, "This is the

2    report which I received from the hunting area."

3            So when I arrived at police, I -- I learned that

4    the professional hunter and the client and one of her

5    officer, they were already at the police office; they

6    already were at the police.

7    Q.   Who was that officer?

8    A.   That was Spencer Kakoma.

9    Q.   Were you his supervisor?

10   A.   Yes.

11   Q.   And you said he was with the professional hunter.  Who

12   was the professional hunter?

13   A.   The professional hunter was Mark Swanepoel.

14   Q.   And did you see the client?

15   A.   The client, yes; I saw the client.

16   Q.   Where were they?  Where were they standing when you got

17   to the police station?

18   A.   The client was standing to the vehicle and Swanepoel

19   and Spencer Kakoma, they were putting the issue to the

20   police about the accident.

21   Q.   Okay.  Now, without getting in any details, did you

22   talk to Spencer and to Mark Swanepoel?

23   A.   Yes.  I talked to Spencer, the monitoring officer, who

24   explained to me what had --

25   Q.   Yeah, I'll stop you there.  Did you also talk to

DIRECT - MUSESE

1  Dr. Rudolph?

2  A.   Yes, I also talked to him.

3  Q.   I'm sorry I interrupted you earlier, but I really want

4  to focus in on the conversation with Dr. Rudolph.  When you

5  saw Dr. Rudolph, how would you describe his demeanor?

6  A.   When I talked to Dr. Rudolph, the demeanor which I can

7  say was that he -- he -- he looked to be sad.  And he told

8  me that you know, "I have lost my wife.  I don't know what

9  my children will say when I go back."

10       But to me, he -- what I saw in his eyes were that

11  he was not all that -- you know, because someone who flew

12  from American going to Africa, Zambia, to do the hunting and

13  then accidentally -- I mean he loses the wife, someone is

14  supposed to be so, so sad, or emotional.  But to me what I

15  could see that -- I didn't see that remorseness for him very

16  much, but the way he was trying to show that, but when I

17  looked into his eyes, as an investigator I could see

18  something from him that there's something fishy which is

19  happening in his eyes.

20  Q.   Did you ask him what had happened?

21  A.   Yes, I asked him.

22  Q.   What did he say?

23  A.   He told me that on that day on the 11th in the morning,

24  he was taking a shower in the bathroom and then he just

25  heard a gunshot.  So when he walked in, he found that there

DIRECT - MUSESE

1    were -- his wife has -- had shot herself accidentally and

2    the wife was lying in a pool of blood.

3    Q.   Now --

4    A.   And from there that's how he walked out to shout for

5    help.

6    Q.   When he said he was in the shower, was he describing an

7    activity or a room?

8    A.   He was describing an activity.  He was taking a bath in

9    the -- I mean in the -- in the -- I mean in the bathroom or

10   in the shower.

11   Q.   Are you sure he said he was in the shower?

12   A.   Yes.   That's what he told me, because I also confirmed

13   that information from Spencer and also from Mike Swanepoel.

14   Q.   Did he say what his wife had been doing before he heard

15   the shot?

16   A.   Couldn't -- he told me that the wife was trying to pack

17   the luggages and then maybe that's how the accident

18   happened.

19   Q.   Did you ask him any more questions about that?

20   A.   No, I didn't ask him any more questions.

21   Q.   Did anything about his explanation stand out to you?

22   A.   Come again?

23   Q.   Did anything about his explanation stand out to you?

24   A.   Yeah, because when -- when -- when -- when he explained

25   to me that, you know, he was taking a shower in the -- in

764

DIRECT - MUSESE

1    the shower room or the bathroom, I had to ask him -- because

2    the officer, Spencer Kakoma, told me that he came out from

3    the room shouting, full dressed.

4              So now what came to my mind, if he was taking a

5    shower, at what stage did he again dress up because,

6    according to Spencer Kakoma, he said that when he came out

7    from the room, Mr. Rudolph was fully dressed.  Now if the

8    accident happened in the blink of an eye, how can someone

9    dress up, put on shoes.  And, because if it was an accident,

10   it maybe supposed to be wearing a towel, but he was fully

11   dressed.

12   Q.   Did you ask him any more questions while you were there

13   at the police station?

14   A.   No, I didn't ask him any more questions.

15   Q.   After you had finished asking him questions there at

16   the police station, did you go back with the group to

17   Chinyembe?

18   A.   Yes.  We went to Chinyembe.  Me from Wildlife and our

19   colleague from the police.

20   Q.   What did you do when you got to the Chinyembe?

21   A.   When we arrived at Chinyembe, we were shown the room

22   where the deceased body was.  So when we arrived there we

23   found the body in the room lying; next to it there was a

24   shotgun and also an empty shell.  So from there, the police

25   took it up now that -- to construct the scene of the crime,

DIRECT - MUSESE

1    and then they got photographs and so on.

2    Q.    While you were at Chinyembe, did you try to talk to

3    Dr. Rudolph again?

4    A.    Yeah, I -- I -- I tried to talk to him, but it's like

5    he was trying to avoid me because of the questions which I

6    was trying to ask him.

7    Q.    What kind of questions were you trying to ask him?

8    A.    The questions like:  How is it happened?  And --

9    because the procedure is like this:  When you finish your

10    hunting, it was -- they had finished the hunting on the

11    10th, and on the 10th when they finished, according to the

12    procedure, if you are successful -- for example, in this

13    situation they were hunting a leopard, but unfortunately

14    they didn't kill the leopard.

15         So if they had a successful hunt, on the 10th is

16    what you call dining and wining to celebrate that, you know,

17    they had a successful hunt.

18         So on this day now, they pack all their luggages

19    including the firearm and everything in preparation for them

20    to leave.  So in this particular case, they had finished the

21    hunting on the 10th, and on the 10th they packed all the

22    luggages so that on the morning of the 11th you should start

23    off coming to Lusaka en route to USA.

24         So now my question which comes to my mind was:  At

25    what stage again, did the wife now started packing the

DIRECT - MUSESE

1    firearm?  So those questions -- I think the questions which

2    I was trying to find out from him -- for him to clarify.

3    Q.    When you say that he was avoiding you, what do you mean

4    by that?

5    A.    Avoiding me because of the questions which I was trying

6    to find out from him.  Being the investigations officer, I

7    was trying to find out so I could have a clear picture of --

8    of -- of what really happened.

9    Q.    How would he avoid you?  What sort of things would he

10   do?

11   A.    Come again.

12   Q.    When you say that he would avoid -- he tried to avoid

13   you, how would he avoid you?  What sort of things did he do

14   to avoid you?

15   A.    For example -- for example, if I want to talk to him,

16   he would now make himself like busy, or wouldn't, like, want

17   to talk to me, or maybe not get closer to me.

18   Q.    How long were you out there at the camp?

19   A.    At Chinyembe, I can't remember very well for how long I

20   would be.

21   Q.    Do you remember how Bianca's body was transported back

22   to Mumbwa?

23   A.    Yes.  The body was transported in an ambulance.  We had

24   the hospital vehicle, and also we had my vehicle, and the

25   other vehicles for the professional hunt.

767

CROSS - MUSESE

1           MR. FIELDS:  May I have a moment, Your Honor?

2           THE COURT:  You may.

3           MR. FIELDS:  Your Honor, I have no further

4    questions.

5           THE COURT:  Cross-examination.

6                    CROSS-EXAMINATION

7    BY MR. MARKUS:

8    Q.   Good afternoon, everybody.  Good afternoon, Your Honor.

9    Counsel.

10          Sir, my name's David Markus.  I'm going to ask you

11   a couple of questions, okay?  Okay?

12   A.   Yes.

13   Q.   All right.  So if Dr. Rudolph was avoiding you, he must

14   have been avoiding the other police officers, too, correct?

15   A.   I'm not sure, but to me that's what happened.

16   Q.   It looked to you like he was just trying not to answer

17   questions from the police officers than from you, right?

18   A.   Come again.

19   Q.   Did it look to you like he was trying to avoid not just

20   you, but all the police officers?

21   A.   No, he was trying to avoid me being the investigations

22   officer of that area because police were in charge of that

23   area.

24   Q.   Were the Zambian police officers there?

25   A.   They were, yes.

768
CROSS - MUSESE

1    Q.   The first time you encountered Dr. Rudolph was at the

2    Zambian Police Department, correct?

3    A.   Yes.

4    Q.   In the parking lot, correct?

5    A.   Come again.

6    Q.   Were you in the parking lot?

7    A.   Yes.  Yes.  Yes, at the police.

8    Q.   And -- and that's where they're in charge, correct?

9    A.   Yes.

10   Q.   And it's your testimony, sir, that he told you in the

11   parking lot that he was in the shower?

12   A.   That's what he told me.

13   Q.   As the senior investigator of the park, did you write

14   any reports in this case?

15   A.   I didn't write a report because this matter was a

16   matter and -- where the police were handling this issue.

17   Q.   So even though you were the senior police officer of

18   the park, this was being handled by the Zambia police,

19   correct?

20   A.   Yes, that is correct.

21   Q.   And so you didn't write one report, did you?

22   A.   No, the report which I wrote was to my supervisor to

23   show what really happened.

24   Q.   You wrote a report in this case?

25   A.   Yes.  A report was written by myself to explain to them

CROSS - MUSESE

1    what really happened in the park.

2    Q.    And did you sign that report?

3    A.    Yes, definitely.  Yes.

4    Q.    Did you give it to the FBI?

5    A.    No.

6    Q.    You haven't provided your report to the FBI?

7    A.    No, I haven't -- I haven't provided the report.

8    Q.    When did you write that report?

9    A.    I'm not sure.  It was -- some years have passed.

10    Q.    Did you write it at the time in 2016?

11    A.    Come again.

12    Q.    Did you write your report in 2016?

13    A.    Yes.  That is correct.

14    Q.    At the time of the incident?

15    A.    That was after the incident.

16    Q.    Okay.  In October, did you write your report?

17    A.    That was in October.

18    Q.    Okay.  And who did you give your report to?

19    A.    I report to my supervisor who is the senior --

20    Q.    What's his name?

21    A.    At that time was Mr. Momoonga, Phinwell Momoonga.

22    Q.    Spell it please.

23    A.    P-h-i-n-w-e-l-l.  Momoonga, M-o-m-o-o-n-g-a.

24    Q.    Okay.  And this is a report that you wrote in October

25    of 2016 and provided to this man?

770

CROSS - MUSESE

1    A.    Yes, the report was written to my supervisor who is the

2    senior at that time who's Senior Momoonga.

3    Q.    And I'm sure in that report you mentioned that

4    Dr. Rudolph said in the Zambian police parking lot that he

5    was in the shower, correct?

6    A.    Yes.

7    Q.    You wrote that in your report?

8    A.    In my reports to my supervisor.

9    Q.    Did you write that?

10    A.    In my report?

11    Q.    Yes.

12    A.    Yes, I -- I explained what really happened.

13    Q.    And did you say in your report that Dr. Rudolph said he

14    was in the shower?

15    A.    Yes.

16    Q.    Okay.  And who else was around you in the parking lot?

17    Was a man named Mr. Malama, Boyd Malama, next to you?

18    A.    Come again.

19    Q.    Was there a police officer named Boyd Malama in the

20    parking lot next to you when Dr. Rudolph --

21    A.    No.  When I was talking to him it was me, him,

22    Mr. Rudolph, Mike Swanepoel, and Spencer Kakoma.

23    Q.    And so Mark Swanepoel would have overheard, correct?

24    A.    Come again.

25    Q.    Mark Swanepoel would have overheard the conversation,

CROSS - MUSESE

1    correct?

2    A.    No.  He -- no, he didn't.  He didn't hear the

3    conversation because Mark was talking to the police.

4    Q.    Oh, so there were other police officers around.

5    A.    I didn't say that there are police officers nearby.

6    Q.    Who was Mark Swanepoel speaking to?

7    A.    Mark Swanepoel was talking to the senior police

8    officer --

9    Q.    Named --

10    A.    Mr. --

11    Q.    Sorry.

12    A.    He was talking to the commanding officer, Mr. Yeyenga.

13    Q.    Mr. Yeyenga?

14    A.    Yes.

15    Q.    And I think you said that you confirmed with

16    Mr. Swanepoel that Dr. Rudolph said he was in the shower?

17    A.    That's what Mark Swanepoel told me.

18    Q.    So I just want to be very clear about this.  Mark

19    Swanepoel told you that Dr. Rudolph said he was in the

20    shower.  That's your testimony?

21    A.    Yes.

22    Q.    And So that was surprising to you because Dr. Rudolph

23    was dressed, right?

24    A.    Yes, he was dressed, according to the story which he

25    told me.

CROSS - MUSESE

1    Q.    Right.  It would make much more sense if Dr. Rudolph

2    said he was in the bathroom, right?

3    A.    Bathroom, yes.  He was -- he was in the bathroom taking

4    a shower.

5    Q.    Okay.  Let's -- let's call up what's in evidence as

6    Government Exhibit 34, INV 588.  If we could zoom in on the

7    third paragraph there, please.

8         Actually, I'm sorry.  Before we do that, sir, do

9    you see that this is a report by the Zambian Police Service?

10   Do you see that at the top there?  Oh.

11        (Pause)

12   BY MR. MARKUS:

13   Q.    Do you see that this is a report by the Zambian Police

14   Service?

15   A.    Yes, I've seen it.

16   Q.    Okay.  And if we could zoom in now on the third

17   paragraph.  Do you see here where Dr. Rudolph tells the

18   Zambian Police Service, "The husband went to the bathroom

19   leaving the wife in the bedroom"?  Do you see that?

20   A.    Which paragraph?

21   Q.    The part that's highlighted.

22   A.    Yes.  "The husband went to the bathroom leaving the

23   wife in the bedroom."  Yes, I have seen that statement.

24   Q.    Okay.  There's nothing there about a shower, correct?

25   A.    Yeah, that's the statement he gave to the police, not

CROSS - MUSESE

1    to me.

2    Q.    And so your position is Dr. Rudolph gave a different

3    story to you in the parking lot than he gave to numerous

4    police officers, correct?

5    A.    To me that's what he told me.

6    Q.    Okay.  And that would be reflected in your report.

7    A.    In my report?

8    Q.    Yes.  You would have reflected that in your report,

9    right?

10   A.    Yes, in my report that's what I indicated because this

11   is what I heard from him.

12   Q.    Okay.  Are you having any trouble understanding me,

13   sir?

14   A.    Maybe you can clarify your question.

15   Q.    Sure.  Are you -- my question is:  Are you having any

16   trouble understanding my questions?

17   A.    No, I'm not getting any trouble.

18   Q.    Okay.

19   A.    Yeah.

20   Q.    Are you aware that Dr. Rudolph, Mark Swanepoel, and

21   Spencer Kakoma gave statements to the police at the police

22   station?

23   A.    Yes, I am aware.

24   Q.    Okay.  So he wasn't avoiding the police officers, was

25   he?

774

CROSS - MUSESE

1    A.    No, he was not avoiding.

2    Q.    Okay.  Was he just avoiding you because you had this

3    ability to see into his eyes?

4    A.    Come again.

5    Q.    You said you had the ability to see through his eyes

6    and understand what he was thinking.

7    A.    Yeah, I went -- when I was looking to him, when I was

8    talking to him, when I was trying to ask him some of the

9    questions, that's when he was trying to avoid me.

10   Q.    Because you could see into his eyes, right?

11   A.    I'm an investigator.  I'm able to understand and see

12   the truth of someone when looking through his eyes.

13   Q.    You have that ability.

14   A.    I'm a trained officer.

15   Q.    You're trained in being able to see into somebody's

16   eyes?  Yes?

17        Let me ask you this, sir:  In your training, are

18   you trained that you should speak to the media about cases?

19   A.    Come again.

20   Q.    Are you trained that you should speak to the media

21   about cases?

22   A.    No, I'm not trained.

23   Q.    Are you trained that you should take payments from the

24   media to speak about cases?

25   A.    No, I'm not trained to do that.

775

CROSS - MUSESE

1    Q.    But you did it in this case, did you not?  You spoke to

2    48 Hours in this case, did you not?

3    A.    Yes, some people came to view us in -- in Zambia.

4    Q.    And most people said no, but you said yes.  You went on

5    camera -- they put up a camera, and you agreed to speak with

6    them on camera; did you not?

7    A.    Yes.  Some people came to interview us in Zambia, so

8    we -- we -- I mean, they came to us for permission from

9    the -- from the Government, so after they got the permission

10   from the Government, we were allowed to talk to the people.

11   Q.    And you chose to speak to them, did you not?

12   A.    Yeah, through -- I mean, through the permission which I

13   had been given through the Government.

14   Q.    And you agreed to speak with them, correct?

15   A.    I'm saying through the permission which I was -- which

16   we were given.

17   Q.    And did the Government give you permission to take

18   money from them?

19   A.    There was no money which was given to us.

20   Q.    You didn't take any money in this case?

21   A.    There was no money which was given.

22   Q.    Were you paid 6,000 qwacha for the interview?

23   A.    Come again.

24   Q.    What's "qwacha"?

25   A.    Qwacha for what?

776

CROSS - MUSESE

1    Q.    What is qwacha?  I don't know what it is.  What is it?

2    A.    That's Zambian money.

3    Q.    Were you paid Zambian money to speak with 48 Hours?

4    A.    I was not paid money for --

5    Q.    Did you --

6    A.    -- for speaking.

7              The -- the -- what happened, that when -- when

8    someone moves from one place, for example, goes in the

9    field, he's given an allowance for that office.

10   Q.    You were given an allowance?

11   A.    An allowance to go to the scene of crime to take the

12   people where it happened.

13   Q.    You were given an allowance by 48 Hours?  The TV show

14   that gave you --

15   A.    No.

16   Q.    -- an allowance?

17   A.    No, they never gave me money.

18   Q.    Who gave you the allowance?

19   A.    The Government.

20   Q.    How did they give it to you?  In cash?

21   A.    Yeah, they can give us in cash.

22   Q.    After you had all of these suspicions seeing into

23   Dr. Rudolph's eyes, hearing the shower remark, did you tell

24   the police, "Hey, guys, we have a problem here"?

25   A.    The police were aware.

CROSS - MUSESE

1    Q.    Did you tell the police that you had a real problem

2    with what Dr. Rudolph was telling you?

3    A.    The police are the people who investigating, so when --

4    I mean, when we are going, I said, "I have also talked to

5    Mr. Rudolph and these are the questions which he's given

6    me."

7    Q.    And so what did the police do when you told them

8    that?

9    A.    They -- I'm -- the police said, "Leave it to us.  We

10   shall investigate and find the truth."

11   Q.    So do you think the police dropped the ball?  Do you

12   think they did their job or didn't do their job?

13   A.    I cannot speak on behalf of the police.  That's why the

14   police are here.

15   Q.    I'm sorry?

16   A.    I cannot speak on behalf of the police.

17   Q.    Well, you had these suspicions.  You told the police

18   about them.  Do you think the police did their job or didn't

19   do their job?

20   A.    The police did their job.

21   Q.    Okay.  Do you have the authority to arrest someone on

22   the park?

23   A.    To do what?

24   Q.    Arrest people who commit crimes on Kafue National

25   Park?

CROSS - MUSESE

1    A.    Yes.

2    Q.    You have the authority to do that?

3    A.    Yes, I have -- I have that power.

4    Q.    Okay.  Did you exercise your power in this case?

5    A.    I didn't exercise my powers because this was the case

6    in the hands of the police.

7    Q.    Okay.  You didn't exercise your powers to arrest

8    Dr. Rudolph, but you did exercise your powers to speak to 48

9    Hours, correct?

10    A.    Maybe you can clarify your question.

11    Q.    That's okay.  I have nothing further.

12            THE COURT:  Cross-examination from Defendant

13    Milliron?

14            MR. DILL:  Just briefly, Your Honor.

15                    CROSS-EXAMINATION

16    BY MR. DILL:

17    Q.    Dr. -- sorry, I keep saying doctor.  Officer, just

18    wanted to -- you said the police did their job in this case.

19    Check the bottom -- the bottom paragraph for me, please.

20    Okay.  Exhibit 34.

21            And you were shown the police report a moment ago.

22    "Findings further suggested that the firearm was loaded from

23    the previous hunting activities and the normal safety

24    precautions at the time of packing a firearm were not taken

25    into consideration.  Firearm accidentally fired."

779

CROSS - MUSESE

1        That was the conclusion, correct?  Does it say

2   that?

3   A.    Come again.

4   Q.    Does -- do you see what's highlighted here?

5   A.    Yes.

6   Q.    Okay.  And this was prepared by the police, correct?

7   A.    Yes.

8   Q.    Okay.  Thank you.

9            THE COURT:  Redirect.

10           MR. FIELDS:  I have no further questions, Your

11  Honor.

12           THE COURT:  May this witness be excused for the

13  Government?

14           MR. FIELDS:  Yes, Your Honor.

15           THE COURT:  For Defendant Rudolph?

16           MR. MARKUS:  Yes, Your Honor.

17           THE COURT:  For Defendant Milliron?

18           MR. DILL:  Yes, Your Honor.

19           THE COURT:  All right, Officer Musese, thank you so

20  much for your testimony.  You're excused.  You may step

21  down.  And safe travels back to your country.

22           THE WITNESS:  Thank you, Your Honor.

23           THE COURT:  Government may call its next witness.

24           MR. FIELDS:  Thank you, Your Honor.  The United

25  States calls Francis Jani.

780

DIRECT - JANI

1      COURTROOM DEPUTY:  Head up to that seat for me,
2  please, and then I'll swear you in.
3      Before you sit -- oop.  Would you stand back up for
4  me.  Will you stand up.
5      THE WITNESS:  Oh, sorry.
6      COURTROOM DEPUTY:  Thank you.  Raise your right
7  hand.
8      FRANCIS JANI, GOVERNMENT'S WITNESS, SWORN
9      COURTROOM DEPUTY:  Thank you.  Now you can take a
10  seat and remove your mask for us.  Please state your full
11  name for the record and spell your first and last name for
12  us.
13      THE WITNESS:  My first name is Francis,
14  F-r-a-n-c-I-S.  Last name Jani, J-a-n-I.
15      THE COURT:  Mr. Jani, can you move your seat
16  forward a little bit so you can get a little closer to the
17  mic so we can hear you better.  Thank you, sir.
18      You may proceed, Mr. Fields.
19      MR. FIELDS:  Thank you, Your Honor.
20               DIRECT EXAMINATION
21  BY MR. FIELDS:
22  Q.  Mr. Jani, you can also move that microphone a little
23  bit closer to you.  And if you will, please speak slowly,
24  okay?  It will help our court reporter.
25  A.  Noted.

DIRECT - JANI

1    Q.    Where do you work?

2    A.    The Zambia Police.

3    Q.    Were you working for the Zambian police in 2016?

4    A.    Yes, My Lord.

5    Q.    You don't have to call me My Lord.

6            MR. MARKUS:  I object.

7            THE COURT:  Mr. Fields is getting a big head today.

8    He's been called Your Honor and now My Lord.

9            I don't mean to be disrespectful, I'm -- it may be

10   in your culture to use those titles or those words, but here

11   just answer the question.  You don't have to make a

12   reference to his title.  Okay, sir?

13           THE WITNESS:  Okay.

14           THE COURT:  All right.

15           MR. FIELDS:  Thank you, sir.

16   BY MR. FIELDS:

17   Q.    So in 2016, where did you work?

18   A.    Chinyembe District Police.

19   Q.    What was your position?

20   A.    I was in charge of the CIDs; in charge of

21   investigations in the Mumbwa Police Station.

22   Q.    Did you say CIDs?

23   A.    Which is the Criminal investigations officer.

24   Q.    In a Zambian police station, are there multiple

25   different divisions?

DIRECT - JANI

1    A.    Yes.

2    Q.    So there's CID.  What are the other divisions?

3    A.    Traffic section, victim support unit.  And the

4    general -- general -- general department, which are part of

5    the inquiry's office.

6    Q.    As the chief of the criminal investigative division,

7    what kind of crimes did you investigate?

8    A.    Some where there were murders, burglary and thefts.

9    Housebreaking and thefts, stolen thefts.

10   Q.    How many officers did you have under your command?

11   A.    There were eight.

12   Q.    Did you say eight?

13   A.    Yes.

14   Q.    For the entire district?

15   A.    For the entire district.  But in some areas there were

16   some police support which were away from Mumbwa Tower, yes.

17   Q.    The Mumbwa District, how large was that district?

18   A.    It was very vast.

19   Q.    How long would it take you to drive from one end of the

20   district to the other end of the district?

21   A.    Oh, 252 kilometers.

22   Q.    Did the police station have any police cars?

23   A.    It did.

24   Q.    How many?

25   A.    Three.  At that time, we had three.

DIRECT - JANI

1    Q.    How many were assigned to CID?

2    A.    Nothing.

3    Q.    Nothing?

4    A.    We just had like the Land Cruisers for the officer in

5    charge.

6    Q.    What kind of police equipment did your station have?

7    A.    We had some firearms, handcuffs, geronet [phonetic],

8    long buttons.  We didn't have a fingerprint machine there;

9    we just using a glass-improvised one when you lift the

10   fingerprints.

11   Q.    So let me make sure I understand that.  Could you lift

12   fingerprints?

13   A.    Yeah, yes.

14   Q.    But could you process fingerprints?

15   A.    In -- after we pick fingerprints from a suspect, we do

16   send them to the headquarters.

17   Q.    What about gunshot residue?  Did you have the

18   capabilities to test for gunshot residue?

19   A.    No.

20   Q.    Do you know what gunshot residue is?

21   A.    No.

22   Q.    Were you at the station on October 11th, 2016?

23   A.    Yes.

24   Q.    What report did you get that day?

25   A.    I received a report from my officer by the name of

**DIRECT - JANI**

1    Chirwa, to say there was a shooting incident at the

2    Chinyembe safari camp west of Mumbwa police station.

3    Q.    Who reported that incident to the police?

4    A.    That is the Andrew Mark -- his name is gone -- together

5    with the -- Dr. Rudolph, Lawrence Patrick.

6    Q.    Were you able to speak to Dr. Rudolph?

7    A.    After the -- after Chirwa informed me, I spoke to

8    Dr. Rudolph to find out exactly what happened.

9    Q.    What did he say to you?

10   A.    Yeah, he said it was 5:30.  He was there together with

11   his wife, who is the deceased now, in the bedroom, so he

12   went to the bathroom.  The reason why he went to the

13   bathroom he didn't mention it to us because I was in the

14   office.  When he said -- he said she was forcing the gun to

15   be put into the gun case.  That's when maybe the firearm

16   went off inside.

17        So I decided to accompany the officers so that I

18   could see if I thought it was possible when you are in the

19   bathroom, are you -- are you able to see the pistol in the

20   bedroom?  That's why I accompanied my officers.

21   Q.    When you say you accompanied "your officers," did a

22   group of you go out to Chinyembe?

23   A.    Yes.

24   Q.    Before that happened, did a police officer at the

25   station take a formal statement from Dr. Rudolph?

DIRECT - JANI

1    A.    They did.

2    Q.    Let's pull up Government's Exhibit 18, which is already

3    in evidence.

         Is this a Zambian Police Service form?

4

5    A.    Yes.

6    Q.    Okay.  And if we could zoom in there just on the top.

7         Is this the statement of Dr. Rudolph that was taken

8    at the station that day?

9    A.    Yes, please.

10   Q.    And if we go to the next page.

11        Do you see a signature on the document?

12   A.    The signature for the officer.  I think that's been

13   quite a long time, I can't remember that one.

14   Q.    Is it the usual practice at the police station to have

15   the person making the statement sign it after he gives it?

16   A.    Yes.

17   Q.    So would Dr. Rudolph have signed the statement that he

18   gave?

19   A.    Yes, please.

20   Q.    You can take that down.

21        When you went out to Chinyembe, how long did it

22   take you to get out there?

23   A.    Around 150 Ks.

24   Q.    How long?

25   A.    After -- I think about two hours or so.  The road is

DIRECT - JANI

1    bad.

2    Q.    What equipment did you bring with you?

3    A.    When we went to Chinyembe?

4    Q.    Yeah.

5    A.    We carried out the criminal, so that is the CDC

6    photographed over there.

7    Q.    Did you take anything other than a camera?

8    A.    Photographs, some photos.  The one that was doing that

9    job was the lead inspector Chirwa.  He was senior crime

10   officer.

11   Q.    And then when the officers got out to Chinyembe, how

12   did they conduct the investigation?  What happened?

13   A.    When arrival -- on arrival there we found the -- some

14   people there waiting outside.  Then we had to inquire from

15   people first before the door is opened where the body was.

16         So we followed this man, Spencer Kakoma.  Would say

17   to them that he was with the Mark Andrew outside when they

18   heard the gunshot.  So thereafter, the same Andrew Mark

19   opened the door, we went in.

20         First at the scene of the crime officers was

21   Chirwa, because it was his show now to start to review the

22   scene of crime.

23   Q.    So Detective Inspector Chirwa was the investigator in

24   charge?

25   A.    Yes, he was.

DIRECT - JANI

1    Q.    After he conducted his investigation, did he come to

2    any conclusions?

3    A.    Yeah.  After getting all the photos, he said -- he

4    thought that was -- immediately there was one picture, part

5    by part.  You set it by the door outside, photographed it,

6    the door, as it was closed.  When it opened, he went in and

7    out, as we were behind.

8         So when you record it, you -- we found the gun

9    lying by the floor next to -- near the deceased body, and

10   then the cartridge also spent for the shotgun.

11   Q.    And he took pictures of the scene?

12   A.    Yes.

13   Q.    After he had taken pictures of the scene and looked at

14   the scene, did he come to a conclusion as to what had killed

15   Bianca Rudolph?

16   A.    Yeah, he -- we went back -- after getting the --

17   getting the body, we went back.  And on the way I received a

18   phone call from my OC informing me to say, "You guys are

19   needed the body from there" -- I'm sorry -- "This matter,

20   the matter in Lusaka, they want to take it off, so they are

21   coming.  The minute you are here, it will be handed back to

22   the headquarters of the Lusaka officer."

23   Q.    Did you say headquarters in Lusaka?

24   A.    Headquarters in Lusaka.

25   Q.    After you got that call that headquarters in Lusaka

DIRECT - JANI

1  would be taking over the case, did you do anything further?

2  A.    No.    When we got over there, I told my -- my charging,

3  say the OC to say, "We are now in.    The Lusaka are already

4  here."

5          He said so that's how we had to take the body to

6  the mortuary.    And they informed the Dr. Rudolph and

7  Mr. Andrew Mark to come in there when one of the Lusaka

8  officers would be available.

9  Q.    You mentioned an OC.    Is that the officer

10  commanding --

11  A.    Officer commanding.

12  Q.    Who was the officer commanding?

13  A.    Mr. Yeyenga.

14  Q.    Now as an investigator in Zambia, did you have any

15  access to evidence that might be here in the United States?

16  A.    No.

17  Q.    Were you able to use any laboratories in the United

18  States?

19  A.    No.

20          Did you ask any particular officer to accompany the

21  body to Lusaka?

22  A.    After the -- we took the body to mortuary.    I -- I told

23  Molomba to accompany the body so that he can be witness --

24  he can present Mumbwa police station where the postmortem

25  was taking place.

DIRECT - JANI

1          MR. FIELDS:  Your Honor, may I have a moment?

2          THE COURT:  You may.

3   BY MR. FIELDS:

4   Q.    Sir, a couple of additional questions.  In Lusaka, are

5   there ballistics experts?  Zambian ballistics experts?

6   A.    Yes, we have that section.

7   Q.    Do you know whether or not Zambian ballistics experts

8   did any tests?

9   A.    No, I don't know whether they did over there.

10  Q.    Do you know whether or not the shotgun was given over

11  to the Zambian ballistics experts for tests?

12  A.    No, simply because after that incident, the --

13  some -- I left Mumbwa after the incident, the man was

14  transferred to another district, leaving Mumbwa police

15  station.

16  Q.    You were transferred to another district?

17  A.    Yes, that was Mumbwa District in Western Province.

18  Q.    So after you were transferred, did you find out what

19  happened with this investigation?

20  A.    I was trying to ring -- it was a procedure in Zambia,

21  is when you are transferred to another district

22  automatically you become the charge for any crime in that

23  district and someone took over for me now, takes over

24  everything whether you are ready or not.

25  Q.    So someone else took over this case?

CROSS - JANI

1    A.    He took -- he took over my office.  So I suppose it was

2    him was supposed to be finding out now from Lusaka office.

3              MR. FIELDS:  No further questions, Your Honor.

4              THE COURT:  All right.  Cross-examination.

5              MR. MARKUS:  Thank you, Your Honor.

6                         CROSS-EXAMINATION

7    BY MR. MARKUS:

8    Q.    Good afternoon, sir.

9    A.    Good afternoon.

10   Q.    I know it's Friday afternoon.  I'm going to try to keep

11   it very brief with you, okay?

12   A.    Yes, please.

13   Q.    Okay.  I bet.  Let's -- let's call up Exhibit 15, page

14   19.  That's already in evidence.  Government Exhibit 15.

15            Is this the room that you were at at the park?

16   A.    This is the room, yes.

17   Q.    Okay.  Do you see, sir, the hard case there on the left

18   of the picture?

19   A.    Yes, I'm seeing it.

20   Q.    And do you see that it's open there, sir?

21   A.    Yes.

22   Q.    And is that how it was when you were in the room?

23   A.    I beg your pardon?

24   Q.    Is that how the hard case was when you were in the

25   room?

CROSS - JANI

1    A.    Yeah, when you entered we found this both standing

2    there the way it is.

3    Q.    Okay.  And I think you mentioned that you had looked in

4    that hard case and saw a rifle, correct?

5    A.    Yes.

6    Q.    Okay.  So we know that the rifle had already been

7    packed that morning into the hard case, correct?

8    A.    That -- I -- that I'm not sure.  I wasn't there.

9    Q.    I'm sorry, I didn't understand you.  Can you repeat

10   that answer for me.

11   A.    In short I'm saying no.  If I told you guns were

12   already packed or not, I can't tell.

13   Q.    I see.  I'm not talking about the shotgun right now;

14   just the rifle you saw in the hard case, correct?

15   A.    Yes.

16   Q.    Okay.  You can take that down.  Thank you, Mr. Reyes.

17         Let's turn to Government Exhibit 34, in evidence,

18   at INV 588.

19         You mentioned -- if we could -- well, just to

20   orient you, do you see that this is the Zambia Police

21   Service report?  Do you see that at the top there?

22   A.    Yes.

23   Q.    Okay.  If we could zoom in on the third paragraph.

24         I think you already mentioned, sir, that

25   Dr. Rudolph told you that he was in the bathroom, correct?

792

CROSS - JANI

1    And do you see that that's reflected in this report here,

2    "the husband went to the bathroom"?

3    A.    Yes.

4    Q.    Okay.  Thank you.  We can take that one down.  Let's go

5    to what's been admitted as Government Exhibit 10, at DLG

6    404.

7             I want to show you now, sir, the written statement

8    that Dr. Rudolph gave and that the prosecutor asked you

9    about.  This is a statement that was written down by police

10   officers but signed by Dr. Rudolph, correct?

11   A.    Yes.

12   Q.    Okay.  And I want to take you through it just for a

13   second.  You see where the little green dot is there?

14            Maybe we could zoom in on that line and the next

15   three, four lines.

16            Do you see it says, "The morning around 4:30 we

17   started packing our belongings and went to bath."  Do you

18   see that?

19   A.    Yeah.  Yes, I'm seeing it.

20   Q.    Okay.  Could that be shorthand for "went to the

21   bathroom," as we saw in the other report?

22   A.    Repeat.

23   Q.    Sure.  This is a police officer writing this down,

24   correct?

25   A.    Yes.

CROSS - JANI

1    Q.    Could the police officer have written this down as

2    shorthand as "went to the bathroom" as we saw in the other

3    report that I have just shown you from the Zambian police

4    officer -- service that said "the husband went to the

5    bathroom"?

6    A.    Yes, that's how it is -- it was written.

7    Q.    Okay.  Thank you.  If we can take that down and go --

8    scroll down a little bit.

9         You mentioned that Dr. Rudolph told you that --

10   what he thought was happening with his wife in the bedroom,

11   correct?  If we --

12   A.    Yes.

13   Q.    If we go -- can you just highlight where it says, "I

14   suspect," and the next couple of lines there.

15        Let's read this together, sir.  Does it say, "I

16   suspect the firearm must have been left loaded from the

17   previous day's activities?"  Do you see that?

18   A.    Yes, please.

19   Q.    And then it says, "And this happened while she was

20   trying to pack the firearms in their appropriate pouches."

21   Do you see that?

22   A.    Yes, please.

23   Q.    And that's what it says.  The very first two words is,

24   "I suspect."  Do you see that?

25   A.    Yes.

794

CROSS - JANI

1    Q.    In other words, Dr. Rudolph was giving the police what

2    he suspected happened, right?

3    A.    Yes.

4    Q.    He didn't say "I could see from the bathroom," right?

5    A.    No.

6    Q.    Okay.  Thank you.  You can take that down.  I want to

7    now turn in the same exhibit, Exhibit 10 of the Government

8    that's already in evidence, at DLG 408.  And 409.  Well,

9    let's start on 408, actually.

10          At the top, you see that this is a statement --

11   written statement that was given by Spencer Kakoma, correct?

12   A.    Yes.

13   Q.    And this is a statement by Spencer Kakoma to the

14   police -- the Zambia Police Service, correct?

15   A.    Yes.

16   Q.    That's where you were working at the time?

17   A.    Yes.

18   Q.    Okay.  And if we go towards the bottom here, that last

19   part where it says -- does it say -- one second here so I

20   can read it -- it says, "As I was doing this paperwork with

21   Mr. Swanepoel, we just heard a gunshot from the room where

22   Mr. Larry P. Rudolph and his wife were sleeping."  Do you

23   see that there?

24   A.    Yes.

25   Q.    It says, "We rushed there.  I and Swanepoel and -- and

795

CROSS - JANI

1    if we could go to the next page, which is DLG 409, if we

2    could highlight the written section -- it says, "We entered

3    the room.  We found Mrs. Rudolph lying down and blood coming

4    out of the side of the front chest and the gun was on the

5    other side near the door."

6           Do you see there where it says that --

7    A.   Yes.

8    Q.   -- the gun is near the door?

9    A.   Yes, I see.

10   Q.   Okay.  It doesn't say it was on the carpet, correct?

11   A.   No.

12   Q.   Okay.  The next sentence says, "The time we arrived we

13   found the husband who was trying to lift wife up."  Do you

14   see that?

15   A.   Yes.

16   Q.   Okay.  And then Mr. Kakoma says, "We then took the body

17   outside."  Do you see that?

18   A.   Yes.

19   Q.   Thank you.

20          MR. MARKUS:  I have nothing further for this

21   witness, Your Honor.

22          THE COURT:  Thank you.

23          MR. DILL:  No questions, Your Honor.

24          THE COURT:  All right.  Redirect.

25          MR. FIELDS:  No further questions, Your Honor.

1    THE COURT:  All right, may this witness be excused

2    for the Government?

3    MR. FIELDS:  Yes, Your Honor.

4    THE COURT:  For the defendants?

5    MR. MARKUS:  Yes, Your Honor.

6    MR. DILL:  Yes, Your Honor.

7    THE COURT:  All right.  Chief Jani.  Chief Jani,

8    thank you for your testimony.  You're excused.  You may step

9    down.  And safe travels back to your country.

10    THE WITNESS:  Thank you.  Thank you very much.

11    THE COURT:  You're welcome.  Thank you.

12    Mr. Fields, by any chance would your next witness

13    be someone we could squeeze in in the next 15, 20 minutes?

14    MR. FIELDS:  Unfortunately, Your Honor, it's a much

15    longer witness.

16    THE COURT:  Okay.  And you don't have someone else

17    on the on-deck circle?

18    MR. FIELDS:  We don't.

19    THE COURT:  Okay.  All right.  All right, folks,

20    we've made it through week No. 1.  You seem to be holding up

21    well.  That's great.  So we're going to start again Monday

22    morning, same time, same station.  Please be here at 8:35.

23    Again, I must remind you please do not do any

24    independent research into or discuss with anyone the facts,

25    the law, or the persons involved in this case.  We'll be in

797

1        recess until Monday morning at 8:45.

2            (Proceedings concluded at 4:49 p.m.)

3                            INDEX

4    Item                                         PAGE

5                    GOVERNMENT'S WITNESSES

6        CHARLES DeFRANCE (Continued)
         Cross-examination by Ms. Moss (Cont'd)        532
7        Cross-examination by Mr. Dill                 553
         Redirect Examination by Mr. Winstead          555
8
         DANIEL MASWAHU
9        Direct Examination by Mr. Grewell             566
         Voir Dire Examination by Ms. MOss             577
10       Direct Examination by Mr. Grewell (Cont'd)    581
         Cross-examination by Ms. Moss                 597
11       Cross-examination by Mr. Dill                 628
         Redirect Examination by Mr. Grewell           638
12
         STEPHEN CINA
13       Direct Examination by Mr. Grewell             644
         Cross-examination by Ms. Moss                 668
14       Cross-examination by Mr. Dill                 705
         Redirect Examination by Mr. Grewell           710
15
         BOYD MALAMA
16       Direct Examination by Mr. Grewell             716
         Cross-examination by Ms. Doyle                724
17       Redirect Examination by Mr. Grewell           733

18       CASIUSS MWIINGA
         Direct Examination by Mr. Fields              735
19       Cross-examination by Mr. Markus               742
         Redirect Examination by Mr. Fields            751
20
         MUSUWA MUSESE
21       Direct Examination by Mr. Fields              755
         Cross-examination by Mr. Markus               767
22       Cross-examination by Mr. Dill                 778

23       FRANCIS JANI
         Direct Examination by Mr. Fields              780
24       Cross-examination by Mr. Markus               790

25

798

1          **GOVERNMENT'S EXHIBITS**

2     **EXHIBITS**:        **Offered**      **Received**    **Refused**      **Stipulated**

3     17              585          585

4                      *       *       *       *       *

5                    **REPORTER'S CERTIFICATE**

6

7          I certify that the foregoing is a correct transcript

8     from the record of proceedings in the above-entitled matter.

9          Dated at Denver, Colorado, this 12th day of September,

10    2023.

11

12

13

14

15    MARY J. GEORGE, FCRR, CRR, RMR

16

17

18

19

20

21

22

23

24

25