799

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Action No. 22-cr-0012-WJM

UNITED STATES OF AMERICA,

Plaintiff,

vs.

LAWRENCE RUDOLPH,
LORI MILLIRON,

Defendants.

-------------------------------------------------------------

**REPORTER'S TRANSCRIPT**
**(Jury Trial, Day 6)**

-------------------------------------------------------------

Proceedings before the HONORABLE WILLIAM J. MARTINEZ, Judge, United States District Court for the District of Colorado, commencing at 8:52 a.m., on the 18th day of July, 2022, in Courtroom A801, United States Courthouse, Denver, Colorado.

**APPEARANCES**

BRYAN D. FIELDS, E. GARRETH WINSTEAD, III, J. BISHOP GREWELL, Assistant U.S. Attorneys, 1801 California Street, Suite 1600, Denver, Colorado 80202, appearing for the plaintiff.

DAVID O. MARKUS, A. MARGOT MOSS, LAUREN L. DOYLE, Markus Moss PLLC, 40 NW Third Street, Penthouse 1, Miami, Florida 33175, appearing for the defendant Rudolph.

JOHN W. DILL, John W. Dill P.A., 941 West Morse Boulevard, Winter Park, Florida 32789, appearing for the defendant Milliron.

MARY J. GEORGE, FCRR, CRR, RMR
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer
P R O C E E D I N G S

1          (In open court outside the presence of the jury at 8:52

a.m.)

          THE COURT:  All right.  First I want to bring up

the matter of the defendants' joint motion for a mistrial.

I wanted to acknowledge on the record it has been received.

The Government's response has been received.  Moments ago I

entered a minute order directing defendants to file a reply

in support of their motion by no later than 8:30 tomorrow

morning.

          All right.  I understand counsel wish to raise

another matter with me.

          MR. MARKUS:  Thank you, Your Honor.  Good morning.

Hope everyone had a nice weekend.

          THE COURT:  Good morning.

          MR. MARKUS:  Just one quick issue.  My

understanding is the Government intends to call a witness

named Rolecia Smith, either this morning or shortly

thereafter.  This is an unnoticed 404(b) witness.  What the

Government is -- what this witness will testify to is -- my

understanding, is -- and I think the Court has heard some

hints about this early in the trial -- is regarding a

claim -- an insurance claim regarding Bianca Rudolph's

1    jewelry.  And there was a claim made to State Farm by

2    Dr. Rudolph for Bianca Rudolph's jewelry.  And I think the

3    Government would like to argue at some point that that was a

4    false claim.  That's, of course, uncharged conduct; there

5    was no 404(b) notice regarding that conduct.  And it's our

6    position that it should not come in.  Even if it was

7    noticed, the 403 value, we would object under that as well.

8    So we would object under 404 and 403 to any evidence or

9    argument coming in to a false insurance claim regarding

10   Bianca's jewelry.

11           THE COURT:  Well, first of all, counsel, before I

12   hear from the Government, you're not contending, are you,

13   that evidence -- all evidence that comes in at trial must be

14   restricted to matters that are intrinsic to the charged

15   conduct, are you?

16           MR. MARKUS:  I -- my position, Your Honor, is that

17   any other alleged bad acts must be noticed, and satisfy 404

18   and 403, and this does not.

19           THE COURT:  Well, the -- you know, that segues to

20   my second question, which is:  It would not by definition be

21   evidence that -- as to which a 404(b) notice was required if

22   it was, in fact, intrinsic evidence to the crimes charged,

23   right?

24           MR. MARKUS:  Sure.  As --

25           THE COURT:  So you're obviously taking a position

1    it's not.

2            MR. MARKUS:  Correct, Your Honor.  If it's

3    intrinsic, then 404 would not apply, only 403 would

4    apply --

5            THE COURT:  Right.

6            MR. MARKUS:  It's our position this is not

7    intrinsic.  You don't need this evidence to prove up any of

8    the charges.  It's not -- it's not intertwined to the degree

9    where you need to -- to call this witness to prove up any of

10   the charges in the case.  In fact, to the contrary, there's

11   nothing about this particular alleged bad act that is

12   intrinsic or required or necessary to prove up Count 1 or

13   Count 2.

14           THE COURT:  All right.  My last question as to 403,

15   How would the prejudice -- to the extent there is some from

16   this evidence -- be undue, or unwarranted, which, of course,

17   is what the rule calls for me to look at, not -- it's not

18   just that there's any evidence -- any prejudice, it's undue

19   prejudice that outweighs the probative value of the

20   evidence.

21           How would this evidence unduly outweigh the

22   probative value of the evidence when compared to the other

23   prejudice that will come in with respect to the charged

24   conduct with respect to the fraud counts?

25           MR. MARKUS:  Your Honor, let me start with that --

1    and I agree that's the analysis under 403.  The probative

2    value is so minimal here.  So I would -- I guess I would

3    start with we have to first determine what is the probative

4    value of this evidence to the charge?  I can't imagine what

5    the Government's argument is going to be as to how this is

6    probative of Count 1 or Count 2.

7         To the extent that they say "making a false

8    insurance claim regarding jewelry is probative of making a

9    false insurance claim on murder," that's excludable argument

10   under 404.  That's propensity argument.

11        So the 403 analysis begins with:  What's the

12   probative value?  My argument is there is none.  And if

13   it's -- if there's any, it's infinitesimal.  And then the

14   prejudice, of course, is that now we're going to get into a

15   separate mini trial as to whether the jewelry was actually

16   missing.  Our position is it is, and so now we're going to

17   have to call evidence -- call witnesses to explain how that

18   jewelry went missing, get into debate about whether this was

19   a legitimate claim or not, and it's going to be a sideshow

20   about whether this was a legitimate claim or it wasn't.

21        THE COURT:  All right.  Thank you.

22        MR. MARKUS:  Thank you, Your Honor.

23        THE COURT:  Before I go to the Government, again,

24   Mr. Dill, do you wish to be heard on this?

25        MR. DILL:  No, Your Honor.

1          THE COURT:  All right.  I'll hear from the

2     Government.

3          MR. FIELDS:  Thank you, Your Honor.  The stipulated

4     instruction here to Count 1 will require that the jury

5     consider the circumstances preceding, surrounding, and

6     following the killing that tends to shed light upon the

7     conditions of the defendant's mind.  Here what we have is

8     the defendant took jewelry off of his wife's corpse.

9     There's testimony that he received it.  And then when he got

10    back, he said that it was missing and he filed a claim for

11    $15,000.

12         So if someone was, say, shot on the streets of

13    Denver and someone else saw them remove $15,000 from the

14    body, that would be direct evidence of malice aforethought.

15    And that is what we have here.  This is direct evidence of

16    murder, of malice aforethought.  It's admissible as direct

17    intrinsic evidence.  And if you look at *United States v.*

18    *Parker* and *United States v. Kupfer*, those are the Tenth

19    Circuit cases describing intrinsic evidence.  So under

20    *Parker*, evidence of acts or events that are part of the

21    crime, itself, or evidence essential to the context of the

22    crime does not fall under the other crimes limitations of

23    Rule 404(b).  That's a direct quote at 553 F.3d 1309 and the

24    pin cite is 1315.

25         *Kupfer*, another Tenth Circuit case at 797 F.3d

1    1233, provides several factors for evaluating whether or not

2    something is intrinsic.  One is whether or not it's

3    inextricably intertwined.  Here the jury can actually see

4    for themselves scenes from Bianca's death where she's

5    wearing jewelry in some but not in others of the --

6            THE COURT:  Right.  They've already seen photos

7    with the jewelry in the earlier photos and then the jewelry

8    not there in the subsequent photos.

9            MR. FIELDS:  Exactly --

10           THE COURT:  And, Mr. Prop- -- I just messed up his

11    name -- Swanepoel testified that he had no knowledge of

12    where that -- the jewelry was.  It was surely not in his

13    possession.

14           MR. FIELDS:  His testimony was also that it was

15    given back to the defendant, Your Honor.  I think that the

16    evidence in this case is that the jewelry was given back to

17    Mr. Rudolph.  He had it in his possession.  He didn't want

18    jewelry when he got back because he couldn't use that; he

19    wanted $15,000.  So he profited directly from the murder,

20    like right when he got back.  It's no different than --

21    again, than taking $15,000 off of a dead body here in

22    Denver.

23           THE COURT:  All right.  So the Government's

24    argument in the main is that this is evidence intrinsic to

25    the murder count and not to the wire fraud counts.

1           MR. FIELDS:  Correct, Your Honor.

2           THE COURT:  All right.  What's your response to the

3    403 argument?

4           MR. FIELDS:  Your Honor, it has to be unfairly

5    prejudicial.  And there's nothing unfairly prejudicial -- I

6    mean this argument is certainly probative of malice

7    aforethought.  That -- so it has extreme probative value, we

8    would say.  It's not unfairly prejudicial.  And there are

9    lots of Tenth Circuit cases talking about what constitutes

10   unfair prejudice.

11          It's one witness that's going to take about 20

12   minutes.  It's not going to be, you know, a waste of time.

13   It's --

14          THE COURT:  What is she going to say?

15          MR. FIELDS:  She's going to testify that when

16   Dr. Rudolph got back he filed a claim for his wife's

17   jewelry.

18          THE COURT:  Well, what's her position?  I mean, how

19   is she --

20          MR. FIELDS:  Oh, sorry.  She is a claims examiner

21   at State Farm.  There was a property policy on the jewelry.

22          THE COURT:  Okay.  All right.

23          MR. FIELDS:  And then, you know, the defense

24   promised that Dr. Rudolph, himself, is going to take the

25   stand, so that's certainly going to come up during his

1    cross-examination anyways.  So we're not talking about sort

2    of something where there's going to be a lot of, you know,

3    additional evidence.  It's going to come out one way or

4    another, Your Honor.

5         THE COURT:  Right.  Okay.  I'm going to allow the

6    testimony.  I find that the proffered evidence is intrinsic

7    to the murder count and that the -- any resulting prejudice

8    is not -- does not unfairly outweigh the probative value of

9    the evidence.

10        All right, let's bring in the jury.

11        (In open court in the presence of the jury at

12    9:02 a.m.)

13        THE COURT:  Good morning, ladies and gentlemen of

14    the jury.  Welcome back.  I trust you had an enjoyable

15    weekend with the fine weather we had.  And thank you again

16    for your patience.  The lawyers and I were discussing some

17    matters that the law requires be dealt with outside your

18    presence.

19        All right, the Government may call its next

20    witness.

21        MR. WINSTEAD:  Your Honor, the United States calls

22    Pieter Swanepoel.

23        THE COURT:  Okay.

24        MR. WINSTEAD:  And, Your Honor, just in case you

25    weren't aware, this is the video teleconferencing --

1                THE COURT:  Right.  He's in the U.S. Embassy in

2        South Africa?

3                MR. WINSTEAD:  Yes, sir.

4                THE COURT:  All right.

5                MR. WINSTEAD:  I'm sorry, Your Honor, he's in the

6        consulate.

7                THE COURT:  Consulate.  All right.

8                COURTROOM DEPUTY:  It's going to take one moment.

9        My system apparently does not like Monday mornings, so bear

10       with me.

11               Unfortunately it seems that IT will need to reboot

12       our system.

13               THE COURT:  IT is what?

14               COURTROOM DEPUTY:  IT will need to come and reboot

15       our system.  We're getting this multi screen of death

16       apparently, so we will be a few minutes.  They're on their

17       way promptly.

18               THE COURT:  Okay.  I guess that's Murphy's Law,

19       right?  It worked perfectly -- how many test runs have you

20       done with this?  Like three or four or five and it all

21       worked perfectly, and then this morning it doesn't.

22               All right, let's take a recess until IT gets it up

23       and going.

24           (Recess taken 9:09 a.m. To 9:42 a.m.)

25               THE COURT:  Ladies and gentlemen of the jury, I

DIRECT - WESTHASSEL

1   apologize for all the technical difficulties we've been

2   having.  I've agreed to allow the Government to proceed with

3   a different witness.  I'm going to hope to get all of our

4   technical difficulties fixed and be able to proceed with the

5   South Africa witness tomorrow morning, first witness.  All

6   right.

7          The Government may call its next witness.

8          MR. FIELDS:  Thank you, Your Honor.  The United

9   States calls Otto Westhassel.

10          COURTROOM DEPUTY:  Please raise your right hand for

11  me.

12          OTTO WESTHASSEL, GOVERNMENT'S WITNESS, SWORN

13          COURTROOM DEPUTY:  Please be seated.  And remove

14  your mask for us.  And then state your name for the record

15  and spell your first and last name for us.

16          THE WITNESS:  Good morning.  Otto Westhassel.

17  First name Otto, spelled O-t-t-o, surname Westhassel,

18  W-e-s-t-h-a-s-s-e-l.

19          THE COURT:  You may proceed, counsel.

20          MR. FIELDS:  Thank you, Your Honor.

21                   DIRECT EXAMINATION

22  BY MR. FIELDS:

23  Q.   Good morning, Mr. Westhassel.

24  A.   Good morning, sir.

25  Q.   Were you the consular chief in Lusaka, Zambia, in

DIRECT - WESTHASSEL

1    October 2016?

2    A.    Yes, sir, I was.

3    Q.    During that time, did you receive Bianca Rudolph?

4    A.    I saw Bianca Rudolph's remains.  I never got to meet

5    Bianca Rudolph.

6    Q.    Did you observe what happened to her body?

7    A.    I observed so much as what happened to her body when I

8    saw her remains at Ideal Funeral Home, or Mortuary.

9    Q.    Who reported her death to you?

10   A.    The death was reported to me by Dr. Lawrence Rudolph on

11   the afternoon of October 11.

12   Q.    Did you have interactions with him while you were in

13   Zambia?

14   A.    I did, sir.

15   Q.    Are you prepared today to tell the members of the jury

16   about those interactions?

17   A.    Yes, sir.

18   Q.    Now, you said you were the consular chief.  What's a

19   consular chief?

20   A.    All right, sir.  Within a U.S. Embassy or within a U.S.

21   Mission, there are various section heads all having

22   different roles.  The consular section chief is responsible

23   for all -- taking care of all U.S. citizen requirements

24   within the country, including internal and external to the

25   U.S. Mission, looking after their well-being.  And also we

DIRECT - WESTHASSEL

1    provide some policy decisions for people traveling to and

2    from the United States to that country.

3    Q.    So you provide U.S. citizens services?

4    A.    That is correct.

5    Q.    What are the services that you provide?

6    A.    So for a U.S. citizen, we provide a litany of services

7    from A to Zed.  From birth to death, really.  So reports of

8    birth, reports of death, issued by the consular office.

9    Passports, notaries, and other services as required.

10   Q.    Before you were posted in Lusaka, where else had you

11   been?

12   A.    Prior to being posted to Lusaka, I worked in Bevnol,

13   Australia, Tashkent Duce, Pakistan.  Also a short stay in

14   Vladivostok, Russia.  And Lahore, Pakistan.

15   Q.    How long have you been with the state department?

16   A.    I'm just short of 14 years at this point, sir.

17   Q.    What did you do before you joined the state department?

18   A.    Before joining Department of State, I worked as a

19   defense contractor for a few years working in training

20   management and development.  And prior to that, I had a

21   career in the U.S. Marine Corps.

22   Q.    During your time in the Marine Corps, did you develop

23   any experience with shotguns?

24   A.    I experienced -- I interacted with a lot of different

25   weapon systems and shotguns in particular, yes, sir.

DIRECT - WESTHASSEL

1    Q.    What was your experience with shotguns?

2    A.    So shotguns are a weapon that is peculiar, mainly, to

3    Marine security guards, which is one of the highlights of my

4    enlisted career.  And then I saw them again and worked with

5    them as a commissioned officer in the second half of my

6    career.

7    Q.    So while you were a Marine did you say guard?

8    A.    Yes, sir.

9    Q.    What's a Marine guard?

10   A.    So Marine guards, it's those who are guarding and

11   protecting our U.S. missions, embassies and some consulates

12   general around the world and provide other services.  First

13   and last line of defense typically.  And are well-trained

14   and well-prepared and well-armed to do so.

15   Q.    And so a shotgun, is that a standard issue of equipment

16   for a Marine guard?

17   A.    That is correct.

18   Q.    So while you were a Marine guard, did you do any

19   training with a shotgun?

20   A.    Extensive training.  I would say prior to ever going to

21   post, working at Quantico, Virginia, training there.

22   Countless rounds fired through all different types of

23   weapons, especially through the shotgun.

24         And then while at post for roughly 2 1/2 to 3

25   years, annual recertifications, qualification,

DIRECT - WESTHASSEL

1    familiarization with the shotguns.  And that carried on into

2    my commissioned career as well.

3    Q.    What kind of ammunition did you use in the shotguns?

4    A.    The weapon we carried was the 870P Remington 12-gauge.

5    We had both slug, which is a solid ball, I presume made of

6    lead, and also the buckshot, which is multiple pellets

7    within the -- within the cartridge.

8    Q.    What happens when you fire buckshot out of a shotgun?

9    A.    Buckshot -- which most people associate with hunting or

10   bird hunting, duck hunting, whatever -- expands when it

11   leaves the barrel; you know, funnels outward.  And that's

12   how you're able to hit a bird out of the air that's moving

13   because a single projectile wouldn't -- you would have to be

14   one incredible shot to do that.  So buckshot expands,

15   simple.

16   Q.    Now I want to turn to one of your responsibilities as a

17   consular chief.  Are you familiar with the process for

18   issuing U.S. passports?

19   A.    I am, sir.

20   Q.    Who's eligible to receive a U.S. passport?

21   A.    So U.S. passports are issued in general to U.S.

22   citizens and those we might refer to as U.S. national.  The

23   only difference is we'll see in that U.S. citizen has all

24   rights that you would expect under the constitution, to

25   include voting; whereas U.S. nationals, mainly Northern

DIRECT - WESTHASSEL

1    Mariana, Swains Island, and the like, are not typically, at

2    least to my knowledge, permitted to vote.  And I haven't

3    issued a passport to a U.S. national specifically, but I've

4    issued hundreds, if not thousands, of passports.

5    Q.    Now, you mentioned that one of your responsibilities is

6    providing services, and you also mentioned sort of birth and

7    death.  What are the services you provide upon the death of

8    an American abroad?

9    A.    That's a great question.  The services provided upon

10   the death of a U.S. citizen are probably the most important

11   that we do besides at the other end of the spectrum, the

12   pleasure of identifying someone as a U.S. citizen.

13   Accounting for someone's death of a U.S. citizen is

14   incredibly important.

15         We want to make sure that the remains are of

16   those -- or the person that is stated is the deceased

17   American.  We want to make sure that we're not providing the

18   service to someone who is not eligible for that service.  We

19   will facilitate the acquisition of all police reports,

20   medical reports, anything that's come up due to the nature

21   of the death, so that we can ultimately receive a death

22   certificate from the host country, which is the formal

23   document that indicates someone is actually deceased.

24         With all that material, and after identifying the

25   citizenship of the person, we can issue that Consular's

DIRECT - WESTHASSEL

1    Report of Death abroad, which is a formal statement from the

2    U.S. Government that this person died in a foreign country.

3        With that, we then assist however we can with

4    repatriation of remains.  Sometimes a body is returned to

5    the U.S.; sometimes cremains are returned.  And we also were

6    looking -- excuse me -- we want to make sure we're notifying

7    next of kin and anybody else that is a party to the deceased

8    family, and notifications and the like.  It's one of the

9    challenging things we do and we do it all too frequently,

10   but it must be done correctly.

11   Q.   How many times would you say you've had to provide that

12   service during your career?

13   A.   I don't keep a tally on it, but it's got to be 25 to

14   30.

15   Q.   How many deaths occurred during your time in Zambia?

16   A.   During my time in Zambia, I would -- I believe there

17   were five to six during that few years that I was there.

18   Q.   In order to effectively provide these services, does

19   the Embassy have relationships with funeral homes?

20   A.   The relationships with funeral homes permit us to

21   execute these services, yes.

22   Q.   What kind of relationships did you have with funeral

23   homes in Zambia?

24   A.   Within Zambia, there were a few branches or chains of

25   funeral homes.  One was Ambassador St. Ann's, and the other

DIRECT - WESTHASSEL

1    was Ideal Funeral Home.  They did business -- they did

2    business as Ideal.  I don't recall off the top of my head

3    the name -- the company.

4         But we would visit with them regularly.  Make sure

5    we understood the prices for their services, the quality of

6    their services; that -- their ability to repatriate remains

7    expeditiously, properly, and with respect for the deceased

8    and the family to whom they were going.

9    Q.   Was cremation common in Zambia?

10   A.   Cremation in Zambia was not common.  Not certainly in

11   the western sense of cremation.  There was one crematorium

12   that to -- still today that I'm aware of in all of Zambia

13   that would meet western standards, and that was the one

14   located at Ambassador St. Ann's.

15   Q.   Now, you mentioned that report of the death of an

16   American abroad.  Is that sometimes just called a CRODA?

17   A.   That's correct.  C-R-O-D-A, CRODA.

18   Q.   What is required before you can issue a CRODA?

19   A.   Before we can issue the Consular's Report of Death or

20   the CRODA, we need to have a fair picture of all the

21   documentation and all the events that led up to the death of

22   that person, because that is a -- it's a legal document,

23   it's binding.  And it says that this person died here in

24   this country.

25        We're looking for the -- definitely identification,

DIRECT - WESTHASSEL

1    meaning we want to have seen a passport if there is, in

2    fact, one available.  We want to identify the remains if we

3    have any doubts as to, you know, whether or not we have the

4    correct passport, correct information.  We want to make sure

5    we're looking at the right person.

6            We want to have any medical reports if the person

7    was under care.  We want to have the final certificate of

8    death from the host country, and then any other

9    documentation that may go to an investigation that would

10   round out the file, if you will.  Just -- we want the full

11   picture before we issue it, because once -- once we -- once

12   we issue that Consular's Report of Death we're pretty much

13   out of the picture and that person is on their way, and

14   we're done at that point.

15   Q.   Was there a difference in the process between, you

16   know, when a death was regular or irregular?

17   A.   Okay.  In the big picture, when we talk about death

18   being regular or irregular, and the issuance of the

19   Consular's Report of Death, there really is no difference

20   once it comes pen to paper and I sign off and seal that

21   document.  We -- getting into that point might be a little

22   differently.

23           A regular death being someone who -- which we

24   did -- we did incur, might have died of a heart attack or

25   under care of a physician in hospital.  We saw that at

DIRECT - WESTHASSEL

1    least -- I can think of two different cases.  Irregular

2    deaths, we saw another case where a gentleman unfortunately

3    stepped in front of a microbus or minivan and was hit early

4    on Thanksgiving morning as it was.

5         And then we want to know at the point -- if someone

6    dies under the care of a physician, I don't really have much

7    need or impetus to pursue a police report or some other

8    pathology, if they're under the care of a physician.

9         The gentleman that stepped in front of the microbus

10   or minivan, we certainly were looking for police reports and

11   knowing that investigations were under way, so that we have

12   a full picture.

13        You asked:  Why is that important to me?  We want

14   Americans to feel safe when they're traveling.  Absolutely

15   we want them to feel safe.  So it goes to our ability to

16   report whether or not they are -- or they will be safe when

17   they get into that country.  Will police be providing

18   services for them like they would anybody else?  And can we

19   uphold that?  And then if we have to address it as a policy

20   issue, we can do so.

21   Q.   You also mentioned the process of identifying remains.

22   A.   Yes, sir.

23   Q.   How would you go about identifying someone's remains?

24   A.   This is the hard part of our job most often.  So the

25   only way to truly identify the remains is you have a copy of

DIRECT - WESTHASSEL

1    the passport or you have the passport in hand, or you're

2    with next of kin or traveling party that can help identify

3    through other means, driver's license, whatnot.  And you go

4    to the mortuary or to the hospital or wherever the event may

5    have occurred, as best you can, and expeditiously, and

6    compare and contrast body, face, and photo identification

7    that you know is accurate.

8    Q.   All right.  So you mentioned earlier interacting with

9    Dr. Lawrence Rudolph.

10   A.   Yes, sir.

11   Q.   Did you provide services to him while he was in Zambia?

12   A.   We did, sir.  Just like I would for you or anyone else

13   in here right now.

14   Q.   While you're providing these services, did you document

15   them in emails in a database?

16   A.   Yes, sir.

17   Q.   Did you review those documents before your testimony

18   today?

19   A.   I did, sir.

20   Q.   Why did you do that?

21   A.   Well, I deal on a business of facts in providing

22   services, and I want to know and refresh my memory as best I

23   could of what I did at the time so that I can give you a

24   fair and honest answer today.

25   Q.   Did you get the -- did you get a call about the death

820

DIRECT - WESTHASSEL

1    of an American on October 11th, 2016?

2    A.    Yes, sir, I did.

3    Q.    Approximately when did you get that call?

4    A.    It was plus or minus 4:30 in the afternoon -- that

5    Tuesday afternoon, the 11th.

6    Q.    How did the person on the call introduce themself?

7    A.    When I received the call, I was introduced on the phone

8    to Dr. Lawrence -- or Lawrence Rudolph I believe the

9    gentleman said his name, and it was about a three-minute

10   call that afternoon, yeah.

11   Q.    What did he say?

12   A.    The caller, after identifying himself, and I introduced

13   myself back to him, and just said straight up that

14   unfortunately his wife was killed in -- I guess

15   unfortunately in a hunting accident early that morning at a

16   safari camp west of Lusaka, I think it's called Mumbwa.  And

17   it's about 150, 180 kilometers west.

18            And he was asking for the services that we would be

19   able to provide.  Stopped me in my tracks about 30 seconds

20   into the call when he asked how quickly that they could get

21   out of the country because they were supposed to be packing

22   and leaving to depart that evening.  He asked how quickly

23   she could be cremated, and they were trying to get out of

24   the country.

25   Q.    Did that surprise you?

DIRECT - WESTHASSEL

1    A.    That would be a good word, yes, sir.  I was absolutely

2    surprised.

3    Q.    Why?

4    A.    Understanding and respecting that anyone and everyone

5    is different in how they handle grief or bereavement at any

6    part of the process, I've taken many calls and been

7    associated with death cases before.  And this was the first

8    time in -- in my experiences that someone flat up asked me,

9    you know, "How quickly can we get cremated because we're

10   trying to get out of the country?"

11   Q.    How would you describe Dr. Rudolph's demeanor on the

12   call?

13   A.    I would describe his demeanor as being rather

14   collected, calm.  And then I can say I don't know the man, I

15   don't have a baseline, but I can compare that to other calls

16   I've taken and to what I expected to hear, and that's all.

17   Q.    What did you tell him about the paperwork you would

18   need?

19   A.    On the initial call, which I mentioned was brief,

20   barely 3, 3 1/2 minutes, I informed him -- actually I

21   first -- I let him know who we were by name, phone numbers,

22   contact numbers, and asked him to provide the same

23   information back to us.  And then for him to please contact

24   us the next day or as soon as possible getting back into

25   Lusaka.

DIRECT - WESTHASSEL

1          I let him know during that phone call about the

2     mortuary, since he mentioned cremation.  I mentioned

3     Ambassador St. Ann's mortuary to him, which is the only

4     crematory in Lusaka.  We found out in the call briefly that

5     Mrs. Rudolph's remains were going to go back to University

6     Teaching Hospital, and I asked him to -- or Dr. Rudolph to

7     provide any police reports, any basic certificates that we

8     would expect to see or get our hands on to paint the picture

9     of the event.

10    Q.   Did you ask him to provide you with Bianca's passport?

11    A.   I did, sir.

12    Q.   What did he say about that?

13    A.   During our conversation there, when he said he would be

14    in Lusaka the next day, I asked him to provide the passport

15    and any other reports that he had the next morning.  If we

16    move on to the next morning, because that afternoon I did

17    not have any more contact with Dr. Rudolph.  I know he

18    called early the next morning, somewhere around the 7:00

19    hour.  I received a message for that.  And we returned a

20    call through Mark Swanepoel's phone number and spoke to

21    Dr. Rudolph, I think it was, a couple times that morning.

22    But he never did come to the mission the next day with the

23    passport.  I was still yet to meet him.

24    Q.   So let's talk about those calls the next day.  That

25    would have been October 12th, 2016?

DIRECT - WESTHASSEL

1    A.    Yes.

2    Q.    Did you actually -- you say the first call you didn't

3    get.  You were able to contact him later through Mark

4    Swanepoel?

5    A.    That's correct.

6    Q.    What did he say on that phone call?

7    A.    There were a couple phone calls -- and I could easily

8    be conflated -- but what I recall of that specifically is a

9    request for a Catholic priest, which we tracked down --

10   trying to remember the gentleman's name, Father Kerney, I

11   think it was -- from one of the local parishes, St.

12   Ignacias.  We provided that.

13          We asked again, you know, for passport information

14   regarding the event out of the safari camp.  We offered and

15   were more than willing -- one of the things I mentioned we

16   do is notify other family members or other next of kin.  We

17   offered that a couple of times over, to no avail.  There was

18   no interest in that.  I recall Dr. Rudolph said he did not

19   want people finding out through other means; he wanted to

20   inform people himself.

21          And I do recall he asked again about cremation

22   expediency and still trying to get out of the country by the

23   end of the week.

24   Q.    You say he didn't want anyone to find out through other

25   means.  Had the death already been reported in the media?

DIRECT - WESTHASSEL

A.    The death -- the news of the death spread fairly

quickly, as I recall.  Both print media, some of the online

or, you know, web-based media as well.  And I said, and I

shared within the mission, and back to Washington, that we

were not -- at least I know I did not share anything of that

outside my office and those people that needed to know what

was going on, because we didn't have any reports yet.  We

had nothing.

Q.    Did you work with Dr. Rudolph to carry out his request

to have Bianca cremated as quickly as possible?

A.    We did, sir.

Q.    Did you call Ambassador St. Ann's funeral home on

October 13th, 2016?

A.    The 13th being Thursday morning, yes, sir, we did.

Q.    Why did you call the funeral home?

A.    Well, knowing that at that point we still had no

reports coming from the police, medical examiner, there was

no pathology, any statement -- formal statement as to what

had happened, and being that St. Ann's was the only

crematorium in Lusaka, I wanted to make sure that the

director of St. Ann's, Kelvin -- I can't remember a

surname -- was aware of our concern.

      We had no desire to prohibit the cremation of

anyone's remains, and we ultimately -- we certainly did

provide the services we were asked to.  But we wanted to

DIRECT - WESTHASSEL

1   make sure that when Kelvin received those remains, that it

2   was done properly and that there was no doubting as to what

3   was going on with the procedure of the police reports,

4   knowing that the police had cleared the case, and provided a

5   report.

6   Q.    Did you expect Bianca's body to be at Ambassador

7   St. Ann's?

8   A.    That is where I expected it to be from pretty much Day

9   1, yes.

10  Q.    Why?

11  A.    When you asked earlier about the relationship with the

12  mortuaries, it is not uncommon for us to add or remove a

13  mortuary from our list of approved services or known

14  services within a country because we have doubts as to their

15  ability to provide a -- you know, a specific rate, charging

16  what they're asked, they're not charging an exorbitant

17  amount of money, trying to backhand or backdoor someone and

18  steal from them.  That when they say they're going to

19  transport remains in a particular way, that they can do it.

20          When we first spoke to Dr. Rudolph that Tuesday

21  night -- that afternoon, and I mentioned St. Ann's was the

22  mortuary with the crematorium, that's where I was expecting

23  he was going to go.  And I don't recall any objection to

24  that.

25          So Thursday I finally did get a call that -- I

DIRECT - WESTHASSEL

1    believe we spoke with Dr. Rudolph that morning again.  And

2    he referenced that Bianca Rudolph's remains were over at

3    Ideal Funeral Home whom we had removed from our list of

4    consistent, you know, and approved vendor, if you will.  And

5    that kind of caught me off guard as to wondering why she was

6    there and not at St. Ann's.  And it seemed like an odd step

7    to take because it was never -- we never mentioned

8    St. Ann's -- or, excuse me, we never mentioned Ideal that I

9    can recall.

10   Q.    So after you talked to Ambassador St. Ann's and you

11   found out the body was actually at Ideal, did you speak to

12   Dr. Rudolph again on October 13th?

13   A.    Yes, sir, I did.  On the afternoon of the 13th, after

14   lunch.

15   Q.    Do you remember speaking to him that morning?

16   A.    Excuse me?

17   Q.    Do you remember speaking to him that morning at all?

18   A.    I do recall speaking to him that morning, because we

19   found out the remains had been released from University

20   Teaching Hospital.  And I think it was at that point, yes,

21   that we found out that they had gone -- Bianca's remains had

22   gone over to Ideal versus St. Ann's.  We asked again to have

23   an opportunity to notify anyone that was needed to be

24   notified.  We asked about documentation, about the passport,

25   and other documents.

DIRECT - WESTHASSEL

1    THE COURT:  Mr. Westhassel, could I ask you to pull

2    the mic closer to you.  Maybe then scoot up your chair just

3    a bit.

4    THE WITNESS:  Thank you.

5    THE COURT:  Thanks.

6    THE WITNESS:  I hope that's better.  Thank you.

7    BY MR. FIELDS:

8    Q.  No problem.  After you spoke to Dr. Rudolph that

9    morning, what did you find out?

10   A.  I'm sorry, could you restate the question?

11   Q.  Sure.  After you spoke to Dr. Rudolph that morning, did

12   you find out that something was going to happen to Bianca's

13   remains?

14   A.  Yes.  Yes.  Thank you.  We found out that the remains

15   would be cremated early on Friday morning, some -- starting

16   somewhere around -- if I say early because it's because of

17   Zambian scheduling, somewhere between 11:00 and 1:00 they

18   should have been done with the cremation is what I heard.

19   Q.  Who notified you of that?

20   A.  I'm not sure I recall specifically who notified me, if

21   it was Kelvin at St. Ann's or Dr. Rudolph, himself.  I don't

22   recall.

23   Q.  At that point, had you actually been able to meet with

24   Dr. Rudolph in person?

25   A.  To that point, no.  By Thursday afternoon, I still

DIRECT - WESTHASSEL

1    don't recall -- no, I had not met Dr. Rudolph.

2    Q.    Is it important to meet with the next of kin in person?

3    A.    When we have next of kin in a country, it does a lot

4    for us to actually meet with them because we can explain and

5    walk through the process at a more leisurely pace; cover

6    more detail.   Identify how the documentation is prepared,

7    what the Consular's Report of Death will look like.   Gather

8    any reports that they may have been privy to or received

9    from law enforcement or medical professionals.   Get a copy

10   of the passport and kind of shepherd them through what the

11   next steps will be to get those remains back to the U.S.

12   Q.    Had you been able to verify at that point that the body

13   that was going to be cremated was actually Bianca Rudolph?

14   A.    Up until that afternoon, no, sir, I had not.

15   Q.    So given that, what did you decide to do?

16   A.    So by the time we got to lunch, or midday, call it, on

17   the afternoon of the 13th, that Thursday afternoon, knowing

18   the cremation was imminent, and with all respect for Kelvin

19   and Ambassador St. Ann's, I don't know what documentation he

20   did or did not have at that point and whether he would or

21   would not be able to proceed.   So knowing that the remains

22   were at Ideal Funeral Home, I decided just using a copy of

23   the passport that I could pull from within our records with

24   a -- you know, the most recent photo, we were able to go

25   over to Ideal Funeral Home and do a facial side-by-side

DIRECT - WESTHASSEL

1    comparison.

2    Q.   Did you ask anyone to come with you?

3    A.   I didn't directly ask anyone to go with me.  I informed

4    our diplomatic security agents at post because I was

5    concerned that the -- you know, I wanted to make sure I had

6    a positive identification, for one.  And I know that they

7    also had a concern as we reported upfront, given this was an

8    irregular death, and the reports were not coming through at

9    that point, that if they had any information they wanted

10   to -- anything they wanted to observe or gather, that they

11   had an opportunity to do so.  Because we don't -- we don't

12   want to abuse going to observe remains.  You just get in,

13   get out, do what you're supposed to do, and be on your

14   way.

15   Q.   What is diplomatic security?

16   A.   Diplomatic security is a part of the management bureau

17   of the Department of State and they provide Federal law

18   enforcement within post.  And they are also a liaison from

19   Department of State to the legal attache or Department of

20   Justice, FBI, at post, or at another post, whoever's

21   nearest.

22   Q.   Did some diplomatic security agents go with you to

23   Ideal?

24   A.   Yes, sir, two agents did.

25   Q.   Who?

**DIRECT - WESTHASSEL**

1    A.    The two agents that went with me were our regional

2    security officer -- excuse me, Jonathan Kuzmar, and his

3    assistant regional security officer, Chad Eversgard.

4    Q.    Now let's look at Government's Exhibit 20, which is

5    already in evidence.

6            What is this?

7    A.    So what I'm seeing in this picture here is it reads FSG

8    Zambia.    That's actually the front of Ideal Funeral Home, or

9    mortuary.

10   Q.    Yeah, so even if it says FSG, that's Ideal?

11   A.    That's correct.

12   Q.    What did you do when you arrived at FSG Ideal?

13   A.    So upon arriving at FSG, or Ideal Funeral Home, we made

14   our presence known to the director who, although we had --

15   we said we removed them from our list of specific services,

16   we maintained the best relationship we could.    We identified

17   ourselves to the director and asked for their permission for

18   us to observe the body as I had done previously with

19   different cases there.    And asked to be taken back to their

20   storage area and embalming area to see the remains.

21   Q.    So they took you back to where the bodies are stored?

22   A.    That is correct.

23   Q.    So now let's look at page 2 of this exhibit.

24            What is this?

25   A.    So you're looking from the front of the funeral home or

DIRECT - WESTHASSEL

1    mortuary to the back towards the dark double doors in the

2    background.  And on the right you see the storage freezers

3    for remains.

4    Q.   Do you remember where Bianca's body was stored?

5    A.   Her remains were stored in that first freezer on the

6    right.  I believe the right-hand door.  You'll see a

7    temperature gauge on the top left and then the door panel to

8    the right-hand side of that with the handle on it.

9    Q.   Who took her body out of the cooler?

10   A.   The funeral director did.

11   Q.   Was it covered in anything?

12   A.   Yes, sir.  She was covered in a sheet as far as I

13   recall.

14   Q.   Were you permitted to take off that sheet?

15   A.   The sheet was removed.  I don't make a habit of

16   touching the remains regardless of circumstances.  But the

17   funeral director did pull back the sheet.

18   Q.   Take that exhibit down, please.  Thank you.

19        What did you see when you pulled back the sheet?

20   A.   Excuse me.  So with the sheet being pulled back, I saw

21   the remains of a woman probably mid-50s, late 50s, who was

22   very badly -- badly bruised.  Definitely trauma up in the

23   chest.  A lot of blood pooling and frankly was not a very --

24   you know, there's no way to put it nicely, it was not a

25   pleasant sight.

DIRECT - WESTHASSEL

1    Q.   You said "trauma to the chest."  What did you see?

2    A.   I saw a large hole to the inside of, or on the inner

3    half, I would say, of her left breast, a large hole, a lot

4    of bruising, and torn flesh.

5    Q.   I know this is not a pleasant topic but when you say "a

6    hole," could you describe it to us in as much detail as

7    possible.

8    A.   Okay.  So in the inside of the left breast, somewhere

9    up in this region, you know, vicinity of the heart, a hole

10   in -- looked like a blast area from some type of weapon, you

11   know, projectile or projectiles, I would say, having pierced

12   the flesh with a large section, probably a little -- inch, a

13   little more, in the center where some flesh had been torn.

14         And the funeral director also described that may be

15   as to where, you know, the medical examiner had done some

16   poking around and they were removing pellets from there.

17   The area was very badly bruised; blue if not almost black,

18   with additional -- looked like pellet holes or impact points

19   surrounding that center area.

20         There was considerable blood pooling in the upper

21   half of the chest and up through the neck and into the head

22   as well.

23   Q.   So is it fair to say there was sort of a central wound?

24   A.   One large wound with an expanding cylindrical -- not

25   symmetrical, but cylindrical pellets, or other smaller

DIRECT - WESTHASSEL

1    impact points around it.

2    Q.   When you say "pellets," what made you think those were

3    pellets?

4    A.   At that point, I was aware that this was due to a

5    shotgun accident or a shotgun discharge.  I can't say; I

6    wasn't there, but discharging of a shotgun.  And when I saw

7    those pellets, or the size of the wound, it would appear to

8    me that it made me think back to my days of, you know,

9    firing hundreds of rounds through shotguns and hitting

10   targets from various distances.  That's what it reminded me

11   of straightaway.

12   Q.   Were you able to verify that the body there in the

13   refrigerator was actually Bianca's?

14   A.   Yes, sir.

15   Q.   How?

16   A.   I did a side-by-side comparison with my -- the

17   photograph I had from my passport records that I pulled from

18   the office.  I -- it was challenging, to say the least, due

19   to the discoloration.  And unfortunately no one of us looks

20   at that point in death like we do in life.  I didn't mind.

21   And also do a comparison -- compare and contrast with the

22   funeral director and the two agents that were there with me

23   at the same time.  "Does this really look like the same

24   person to you?"

25            And frankly, it was challenging; it was probably

834

DIRECT - WESTHASSEL

1    the hardest identification I've ever made.

2    Q.   While you were doing that, what did Mr. Eversgard and

3    Mr. Kuzmar do?

4    A.   So the two agents, after I had made my identification,

5    they did take some photographs of the wound -- that main

6    wound up in the center left chest.  I believe they measured

7    it using one of their sticks to gather the size of the

8    wound.  And they asked, I believe to -- they did ask the

9    director to roll the body a little bit to look for an exit

10   wound or anything on the back, which I recall -- I don't

11   recall seeing one there either.

12   Q.   Had you asked them to take photographs?

13   A.   No, sir.

14   Q.   Did they explain why they were taking photographs?

15   A.   Yes, sir, they did.

16          MR. MARKUS:  Objection, Your Honor.  Hearsay.

17          THE COURT:  Counsel.

18          MR. FIELDS:  He just said that they did, Your

19   Honor.  We don't have to get into --

20          THE COURT:  All right.  Sustained.  Let's go into

21   what they did and not what they said.

22          MR. FIELDS:  Your Honor, at this time I'm going to

23   show some pictures, the pictures that were taken.  So if

24   anyone would like to leave the courtroom, now would be a

25   good time.

835
DIRECT - WESTHASSEL

1      THE COURT:  All right.  Thank you for the warning.

2   BY MR. FIELDS:

3   Q.   All right.  Let's look at Government's Exhibit 17,

4   which is already in evidence.

5        Sir, did you review these pictures before your

6   testimony?

7   A.   Yes, sir, I did.

8   Q.   What are they?

9   A.   These are Bianca Rudolph's remains as she was at Ideal

10  Funeral Home.

11  Q.   Now let's look at the next page.

12  A.   That is where they rolled over the body.

13  A.   Yes, sir.

14  Q.   And the page after that.

15       Now, you say that -- you described the wound to us

16  earlier.  You described sort of the main wound.  What would

17  you describe as the main wound here?

18  A.   So if you look there to the left, or -- excuse me,

19  coming down the center of the chest, you see the incision

20  from the medical examiner's work.  And then just looking at

21  my screen here, you'll see the dark oblong-shaped wound,

22  almost looks silver, at least in the way the light has

23  captured it here.  And you'll see --

24       THE COURT:  Sir, there's a stylus on the monitor if

25  that would help --

DIRECT - WESTHASSEL

1    THE WITNESS:  Yeah, thank you.

2    THE COURT:  -- in your testimony.

3    THE WITNESS:  All right.  So --

4  BY MR. FIELDS:

5  Q.   All right.  So since you've circled that, can we please

6  zoom in.

7  A.   Sorry.  Say again.

8  Q.   Just asked Mr. Cowdin to zoom in.

9  A.   Thank you.

10  Q.   Okay.  All right.  So that's the -- that's the primary

11  wound?

12  A.   Yes, sir.  Primary wound there in the center.

13  Q.   Now I recall you saying earlier that you saw some

14  pellet wounds surrounding it.  Can you point those out for

15  us.

16  A.   Well, do that as best I can.  So down in this area

17  here, coming up here; I want to say there were more up in

18  this area around here, and down in that area.

19  Q.   What made you think those were pellets?

20    MR. MARKUS:  Your Honor, I'm sorry to interrupt,

21  but when Mr. Fields is done with this exhibit, we'd ask that

22  it not be cleared and printed out.

23    THE COURT:  Okay.

24  BY MR. FIELDS:

25  Q.   What made you think those were pellets?

DIRECT - WESTHASSEL

1   A.    Again, going back to the point that it was a shotgun

2   that was -- the weapon that was involved in the event, and

3   what I recall seeing were these extra little holes.  There's

4   no other logical thing for me to assume that they were,

5   other than some type of discharge from the weapon.

6   Q.    In your experience firing shotguns, is there also

7   buffer or filler material with the buckshot?

8   A.    Yes.  And if I can just give the most layman's version

9   of that as to what it means to me is behind a projectile in

10  a shotgun, like -- the slug itself is solid within the

11  cartridge.  And you'll still have some type of follower in

12  there that's -- when the explosion happens behind the

13  follower, or the buffer, that's what pushes the slug out of

14  the -- out of the end of the barrel of the weapon.

15          With buckshot, there's air inside the cartridge --

16  or the -- the cylinder for the shotgun shell.  So you need

17  something to follow and push the buckshot out of -- out of

18  the cartridge.  It -- because otherwise it just doesn't

19  work.  It's beyond me in a physics realm, but it just

20  doesn't work.

21          And this did not surprise me that there was a

22  larger hole to the center, as I've seen on targets because

23  that -- that follower's going to be released at a high rate

24  of speed out of the end of the barrel of the weapon as well.

25          MR. FIELDS:  Your Honor, at this time I would ask

DIRECT - WESTHASSEL

1    the courtroom deputy to print out this screen, and I think

2    we can mark it as -- I think it will be 17-2.

3              THE COURT:  All right.

4              MR. FIELDS:  Then I'd move for its admission into

5    evidence.

6              MR. MARKUS:  No objection, Your Honor.

7              MR. DILL:  No objection, Your Honor.

8              THE COURT:  Okay.  There being no objection, the

9    annotated Exhibit 17 annotated by this witness will be

10   admitted into evidence as Exhibit 17-2.

11       (Government's Exhibit 17-2 received)

12             THE COURT:  Mr. Fields, do we need this exhibit up

13   anymore?

14             MR. FIELDS:  I don't think so.  Mr. Markus, do we

15   need this up anymore?

16             MR. MARKUS:  Absolutely not.

17             THE COURT:  All right, let's take it down.

18             MR. FIELDS:  Thank you, Your Honor.

19   BY MR. FIELDS:

20   Q.   Mr. Westhassel, where did you go after you were done at

21   the funeral home?

22   A.   So after finishing at Ideal Funeral Home, I returned to

23   the U.S. Embassy to my office.

24   Q.   What happened when you got back to the Embassy?

25   A.   Shortly after returning and getting back into my

DIRECT - WESTHASSEL

1    office, I did a quick debrief with Special Agent Chad

2    Eversgard regarding what we had seen and making sure that I

3    had my notes in order that -- regarding having positively

4    identified the remains of Bianca Rudolph.

5         And within a few minutes of returning, we did

6    receive a phone call from Ideal Funeral Home from

7    Dr. Rudolph.

8    Q.   Describe that call to us.

9    A.   That was a call that I would probably never, ever want

10   to repeat again.  It was a one-way conversation; Dr. Rudolph

11   expressing his disgust, anger, and unhappiness with our

12   having gone and observed his wife's remains without his

13   direct permission.  I -- for our DS agents having taken the

14   photos of her remains, looking at the wound for -- just not

15   doing pretty much what I presume he expected us to have

16   done.

17   Q.   How would you describe the volume of the conversation?

18   A.   Again, it was one way.  Sitting in my office with the

19   door closed and with Chad in there and having it on

20   speakerphone so we could listen to this conversation,

21   because I wasn't hiding anything, certainly not with my DS

22   comrades there, it was loud; it was direct; it was harsh.

23        I can understand some of that, a little bit of

24   anger.  Angst, if you will.  But it was very directive and

25   some things were said in there that caused me to pause and

DIRECT - WESTHASSEL

1    wonder what was actually happening within our ability to

2    provide services because at no point at this point had I

3    even hinted, and to date I was not going to not provide the

4    services we were supposed to for Dr. Rudolph and mainly for

5    Bianca Rudolph.

6    Q.    What did he say that gave you pause?

7    A.    It was the first time in all the various cases I've

8    handled -- and not just death cases, but in any case --

9    where a -- if you will call Dr. Rudolph a client of ours at

10   that point, someone had made a direct reference to my

11   previous assignments to where I had worked, to where I had

12   lived, and gotten in any way personal with me.

13         And to my knowledge, at that point I had not given

14   him any direct reason to do so.  And of course that's just

15   how I see it.  But to reference back to where I had worked

16   previously, previous assignments, having said -- looked me

17   up on the internet, gone looking for me, that really caught

18   me off guard.

19   Q.    Did he explain why he had done that?

20   A.    There were some words uttered to having said something

21   like had a feeling about me or -- I can't -- I can't quote

22   it.  I can't quote it.  But it really did stop me in my

23   tracks.  And this followed up having woken up that morning

24   to seeing a LinkedIn request, the type of thing you get on

25   social media for someone to become a friend or work

841

DIRECT - WESTHASSEL

1    associate.  And, again, that came from Dr. Rudolph that

2    morning.  At least I recall seeing it when I woke up that

3    morning.

4         That seemed just -- just totally out of character

5    for anyone that I'd ever provided services to for any type

6    of services, which is -- it's just not done.

7    Q.   On this phone call, did he make any requests about the

8    photographs?

9    A.   Dr. Rudolph absolutely did make requests.  I would -- I

10   think "request" is a polite term for it -- that the

11   photographs be destroyed, deleted, anything that was printed

12   be turned over to him, and all record of that event

13   essentially being erased; you know, no photos.

14        And also wanting to -- I would say it straight --

15   wanting -- or demanding an apology from the Ambassador or

16   Deputy Chief of Mission, whomever, to say that those photos

17   were gone and weren't going to be used for anything.

18   Q.   Did you explain to him why the photographs had been

19   taken?

20   A.   At that point on the phone call, and being that I

21   didn't take those photographs, it was not my position to say

22   what they would -- what anybody would or wouldn't do with

23   those as far as diplomatic security, and their gathering or

24   observing evidence so that they had something to compare and

25   contrast with their reports as they were actually published;

DIRECT - WESTHASSEL

1    I couldn't speak to that.

2            And I tried to inform Dr. Rudolph of that, but I --

3    what I could say was that any information, frankly, that we

4    took in the part of identifying the remains or anything that

5    was otherwise collected was not going to be released to the

6    public.  And to my knowledge none of that ever has.

7    Q.   Did you offer to meet with him at the Embassy?

8    A.   I did.  And that was not the first time.  We certainly

9    did offer that.

10   Q.   What did he -- how did he respond to that invitation?

11   A.   From conversation that afternoon, I don't recall

12   specific words, but I know it was not -- there was no

13   attempt to meet at the Embassy.

14   Q.   All right.  So by the time the business day ended on

15   October 13th, 2022, did you have all the information you

16   needed to issue the CRODA?

17   A.   At that point, no, sir; not even close.  There's a

18   series of documents that we were looking for to close the

19   loop.  For example, we -- most any death in Zambia starts

20   with something called a Brought In Dead, or BID,

21   certificate.  So some type of law enforcement person or an

22   official Government person says this person's dead or they

23   think they're dead.  Then there is a notice of death that a

24   medical professional would provide to us.

25           In a case like this, you would have a request for a

DIRECT - WESTHASSEL

1    postmortem.  You'd have a police report showing what

2    happened, where it happened, how did this person die, why

3    did they die.  The very -- you know, the basics of it.

4         And ultimately what we were looking for was that

5    certificate of death from the Government of Zambia, who

6    issues those documents, unlike here where it might come from

7    a state or it comes from their equivalent of a federal

8    government.  We didn't have any of that, to my knowledge, at

9    that point.

10   Q.   Did you set up a time to meet with Rudolph the next

11   day?

12   A.   We did, with the expectation that we were going to get

13   the remainder of the documentation from him that next

14   morning.  We agreed to meet at Ambassador St. Ann's at the

15   time of the cremation because I would need to have from the

16   director a sworn statement from them that the remains were,

17   in fact, cremated, and of the person that we were expecting

18   to have been cremated.  And after collecting all that, I

19   could issue that report of death.

20   Q.   Did you go to that meeting by yourself?

21   A.   No, sir.

22   Q.   Who went with you?

23   A.   I asked for an escort from our regional security office

24   and that came in the form of Special Agent Chad Eversgard.

25   Q.   Why did you ask for an escort?

DIRECT - WESTHASSEL

1    A.    After the comments that were made to me on the phone

2    the afternoon before, knowing that someone lost their life

3    with a weapon on a hunting accident, not knowing -- and

4    today I do not know Dr. Rudolph -- I knew of Mark Swanepoel

5    from the conversation we had during those few days that he

6    was a professional hunter; I didn't know him.  And I wasn't

7    expecting anything -- you know, someone's coming at me with

8    a weapon, by any means; I wouldn't expect that.  But I did

9    not feel safe, frankly, stepping into a meeting without

10   someone looking out for my interest, looking over my -- you

11   know, over my shoulder, protecting me.

12        Because I already realized at that point, at least

13   to me, that Dr. Rudolph was angered, upset.  He was -- he

14   took time to look at me and what I was doing.  And I hadn't

15   given him any reason at that point to think that we weren't

16   providing the services and we tried to provide as we went

17   through.

18        And after that interaction the day before, yes, it

19   would be fair to say I had some fear as to what I was

20   stepping into.

21   Q.    Let's look at Government's Exhibit 21, which is already

22   in evidence.

23        What is this?

24   A.    So what we see here in this photo is the courtyard area

25   in front of Ambassador St. Ann's Mortuary.

DIRECT - WESTHASSEL

1    Q.    And it looks like there's one, two, three doors.

2    A.    That's correct.

3    Q.    Did you meet with Dr. Rudolph at Ambassador

4    St. Ann's?

5    A.    Yes, we did.

6    Q.    Behind which of those doors?

7    A.    So I entered on the far right-hand side.  You'll see it

8    doesn't appear that there's any gate closed on that door.

9    Yes, as you circled there.  That would lead to the office

10   and business area of St. Ann's.

11   Q.    Was anyone else besides Dr. Rudolph present for that

12   meeting?

13   A.    As I recall, he had Kelvin, the director, and his

14   assistant that were there.  Dr. Rudolph, I believe

15   Mr. Swanepoel -- Mark Swanepoel was there as well.  And then

16   Chad Eversgard and I arrived, and Chad stepped in with me

17   and then he stepped outside so I could meet in private.

18   Q.    What did Dr. Rudolph say during this meeting?

19   A.    During that meeting -- which was more calm than the

20   meeting before -- we were going to have something of a

21   conversation.  We exchanged pleasantries.  We sat down in an

22   area -- waiting room that was kind of underneath where the

23   sign is -- where the name is written in, there's another

24   room in the middle there.

25           We spoke for, I don't know, half an hour, 40

DIRECT - WESTHASSEL

1    minutes; discussing the paperwork that we received from him,

2    making sure we had that.  What our next steps would be as

3    far as issuing the report of death once Kelvin signed off on

4    the cremation.

5            And just in all fairness, I asked the questions

6    that I would normally ask someone:  Is there anybody we can

7    still notify?  Is there anything you can tell me that you

8    need to tell me of what happened?

9            Sometimes it helps just to talk it out.  We can get

10   a little more information.  And then there was an extensive

11   discussion about Freedom of Information Act and sharing of

12   information that we had.

13   Q.   Let's talk about each of those.  So you said that you

14   discussed notifying next of kin.  What did he say about

15   that?

16   A.   Notifying next of kin was not something that I recall

17   Dr. Rudolph being interested in, at least not us doing.  And

18   this goes back to our very first conversation and throughout

19   that week, that he wanted to notify anyone and everyone that

20   was going to be a party to this.  I asked about notifying

21   family, children, anyone else, and was just politely told

22   no, that he would do that.

23   Q.   And you say you asked him what happened to Bianca?

24   A.   I did.

25   Q.   What did he say?

DIRECT - WESTHASSEL

1    A.    The conversation frankly was a little bit cryptic

2    because I'd heard the words "accident" the whole week.  And

3    what I took from the conversation, and what I eventually saw

4    in the reports, echoed Dr. Rudolph's words back to me that

5    it very well could have been suicide or other actions.

6    Q.    You say "suicide."  Did that topic come up during your

7    conversation?

8    A.    I don't recall the word actually being used.  I just

9    don't remember that.  But not where it was just a plain old

10   accident because, up until that point I'd asked, you know,

11   "Can you tell me what happened?"  I got the basic story from

12   going back to Day 1.  The weapon was -- I don't know if it

13   was in his possession yet -- returned to him.  I'd asked

14   previously about the weapon and belongings and things that

15   had to go back, and I was just trying to close the loop on

16   all of this.  And I couldn't get much of any detail at that

17   point.

18            And I'm not saying he was obligated to disclose any

19   of this to me, but what we try to make sure of is if someone

20   has belongings or things that need to be returned to their

21   family, that we can account for them, and given the nature

22   of the police investigation -- which I still hadn't seen the

23   final report -- we want to make sure that what they brought

24   into Zambia departed with them.

25   Q.    And you say he didn't use the word "suicide."  Did he

DIRECT - WESTHASSEL

1    leave the impression that suicide might have occurred?

2    A.    Absolutely --

3                MR. MARKUS:  Objection.  Leading, Your Honor.

4                THE COURT:  Sustained.

5    BY MR. FIELDS:

6    Q.    What did he say about Bianca's death?

7    A.    I recall him saying that it may not have been an

8    accident.  There might have been other issues going on.  But

9    again, I can't say the specific words.  I wasn't listening

10   for a specific word.  This was just conversation.

11   Q.    And you say you also mentioned his belongings, his

12   property.  Did you talk about the shotgun?

13   A.    Yes, sir.  That would have been probably the second

14   time I asked about that during the conversations on the

15   Wednesday.  I remember asking about all the belongings,

16   anything they brought in.  Did they get things back from the

17   police?  Were they expecting to get things back from the

18   police?  I asked about the shotgun.

19              At least on Wednesday I recall he -- the response

20   was that he didn't know what type of weapon it was; it was

21   an antique; no specifics.  On Thursday, we -- I don't recall

22   if we spoke about it on Thursday.  And on Friday morning,

23   again I asked if everything had been returned and I don't

24   recall the specific on that.  I know it came up later on in

25   some reporting and emails, but that's it.

DIRECT - WESTHASSEL

1    Q.    So your testimony today is that he said it was an

2    antique?

3    A.    Yes, sir.    That's the word I recall, an antique, and he

4    was nondescript about the make, model, or anything of it.

5    Q.    Now you also said another topic of that conversation

6    was privacy.

7    A.    Yes, sir.

8    Q.    What did he say about privacy?

9    A.    Dr. Rudolph was adamant that no information regarding

10   the death of Mrs. Rudolph be disclosed to anyone.    And he

11   kind of was -- kind of like a quiz and -- quiz-and-answer

12   period of what's going to happen with the Freedom of

13   Information Act?    And who can have access to what

14   information?    When, where, how and why?    And anything beyond

15   the death certificate or the Consular's Report of Death is

16   what I took as his concern.

17   Q.    And what did you tell him?

18   A.    I told him the information that we provide to him is

19   specifically what he's going to get back and what he's going

20   to leave with in hand being that Consular's Report of Death,

21   which will indicate the cause of death as stated on the

22   Zambian's death certificate.    That the records would be

23   maintained by Department of State because they're a party --

24   part of the case for the death of a U.S. citizen.    And we're

25   not going to share them beyond that.

850

DIRECT - WESTHASSEL

1    Q.   Let's go to page 2 of Government's Exhibit 21.

2              THE COURT:  Before we go on, Mr. Fields, would this

3    be a good time for our morning break?

4              MR. FIELDS:  It would, Your Honor.

5              THE COURT:  All right.  Ladies and gentlemen of the

6    jury, we'll be in recess for 15 minutes.

7         (Jury left the courtroom at 10:44 a.m.)

8              THE COURT:  Mr. Westhassel, since you're in the

9    middle of your testimony I direct you not to speak with any

10   of the lawyers during the recess.  And I ask you to be back

11   in the witness stand in 15 minutes.

12             THE WITNESS:  Yes, sir.

13             THE COURT:  You're free to go into the lobby, go

14   outside, whatever you wish.

15             THE WITNESS:  Okay.

16        (Recess taken 10:45 a.m. to 11:04 a.m.)

17             THE COURT:  Mr. Westhassel, I remind you you remain

18   under oath.

19             THE WITNESS:  Yes, sir.

20             THE COURT:  Mr. Fields, you may resume your

21   examination.

22             MR. FIELDS:  Thank you, Your Honor.

23   BY MR. FIELDS:

24   Q.   Mr. Westhassel, I want to go back to that conversation

25   about the Privacy Act.  Do you remember that conversation?

DIRECT - WESTHASSEL

1    A.    Yes, sir.

2    Q.    Do you remember what Dr. Rudolph's profession was?

3    A.    I recall he's a dentist, sir.

4    Q.    A few years before this, had there been a high-profile

5    incident involving a dentist?

6    A.    I'm aware of one somewhere within the African

7    continent, yes, sir.

8    Q.    What was it?

9    A.    I don't know all the true details.  I know there was

10   someone -- I believe a dentist, as well, who had shot a lion

11   on one of our reserves and the neighboring country

12   somewhere.

13   Q.    Do you remember the name of that lion?

14   A.    Leo, I think is what I read.  Yes.

15   Q.    Did that incident come up at all during your

16   conversations?

17   A.    Not from me.  I frankly couldn't have cared.  I was

18   dealing with a loss of a U.S. citizen in my district.  I

19   could say that there was an utterance of it somewhere, but I

20   don't know whom.  Someone asked me somewhere within the

21   mission if it was, you know, something similar.  But, again,

22   I dismissed that because I wasn't worried about that; I

23   wasn't focusing in on that.

24   Q.    Well, in the context of this conversation about the

25   Privacy Act, did Dr. Rudolph say anything to you about media

DIRECT - WESTHASSEL

1  coverage?

2  A.    I recall his concern that the events surrounding the

3  death of Mrs. Rudolph getting out, you know, in other means

4  besides from -- say, from him to his family and friends, his

5  concern that something would get out of the media.  What the

6  true concern was, I don't know.

7  Q.    So let's go back, you know, to what's up on the screen

8  there as Government's Exhibit 21.  This is page 2.  If we go

9  to the next page.

10         What is that?

11  A.    Okay.  That structure there is part of Ambassador

12  St. Ann's Funeral Home and Mortuary.  And what is hard to

13  see in the back of that underneath that concrete awning, or

14  cover, is, I guess, what you'd call a bier, or a place, or

15  beer [phonetic], where the remains would have been placed; a

16  rectangular shape you can just see there in the shadows.

17  And then beyond that was the actual crematorium with the

18  furnace.

19  Q.    Is this the crematorium where Bianca's remains were

20  cremated?

21  A.    That's correct.

22  Q.    You can take that down.

23         Did you obtain a declaration from the funeral

24  director at Ambassador St. Ann's that Bianca had been

25  cremated?

DIRECT - WESTHASSEL

1    A.    Yes, sir, I did.

2    Q.    After that cremation, did you have to meet with Rudolph

3    again --

4    A.    I did.  I did meet with Dr. Rudolph again, and I

5    believe Mark Swanepoel was with him again.  They came over

6    to the mission, to the Embassy, the afternoon after the

7    cremation because, frankly, that takes a few hours to

8    accomplish, and to get all the documentation back that

9    Kelvin had to prepare.

10          So we met with Dr. Rudolph that afternoon.  He was

11   reluctant.  And his escort, Mark Swanepoel, did not come

12   into the chancellery.  We had finished public hours for

13   business that day by noon, 1:00, typically.  So I -- after

14   having completed all the paperwork and the package of

15   documentation, to include all the reports and the Consular's

16   Report of Death, and then the cremation certificate which

17   was needed for him to then carry the cremains with him by

18   air, leaving the country, I met with him outside the

19   fenceline of the chancellery for about 10, 15 minutes.  What

20   was a pleasant exchange as far as I could say.

21          I informed Dr. Rudolph of the papers that we were

22   handing back to him; so many copies of that report of death,

23   where -- the Consular's Report of Death.  What were all the

24   documentation.  Had it packaged for him.  And then he was on

25   his way.  And the last I knew he was to depart Zambia on the

DIRECT - WESTHASSEL

1    morning of the 14th, I guess, that Saturday morning

2    Q.    So let me show you what's already in evidence.  We'll

3    start with Government's Exhibit 22.  Now let's look at

4    Government's Exhibit 31.

5            Is this the CRODA that you were talking about?

6    A.    Yes, sir.

7    Q.    Now let's look at 32.  Is that the death certificate?

8    A.    That is the Zambian-issued natural death certificate,

9    yes.

10   Q.    Government's Exhibit 33.

11           Is that Bianca's passport?

12   A.    That's a certified copy that I made of Bianca's

13   passport, yes, sir.

14   Q.    Next page -- or next Government's Exhibit 34.

15           What was this?

16   A.    This is the police report regarding the death -- or the

17   incident, as it's entitled, of the events at the Mumbwa

18   hunting safari launch.

19   Q.    Government's Exhibit 35.

20           What is this?

21   A.    This would be the forensic report, or the medical

22   examiner's report, surrounding the death.

23   Q.    Government's Exhibit 36.

24           What is this?

25   A.    This is a report from the Inspector General of Police,

DIRECT - WESTHASSEL

1    Zambia Police Services.  And this is the final statement

2    regarding what actually occurred at the -- at the scene.

3    Q.    Government's Exhibit 37.

4         What is this?

5    A.    So this is the first document that we expect to see in

6    anybody's case, or a death case, within Zambia.  This is

7    that BID, or Brought In Dead certificate, that usually a

8    member of law enforcement or somebody that's authorized to

9    sign would sign off on.

10   Q.    Government's Exhibit 38.

11        What is this?

12   A.    This document here is the informal notice of death that

13   is usually -- or should be completed by a physician at the

14   nearest facility, nearest hospital, that they can certify

15   that the person is, in fact, dead.

16   Q.    Government's Exhibit 39.

17        What is this?

18   A.    This is a statement from the director of Ambassador

19   St. Ann's, that's Kelvin Newgel- -- forgive me on the

20   surname -- that Kelvin signed off on regarding the cremation

21   of Bianca Rudolph's remains.

22   Q.    And Government's Exhibit 40.

23        What is this?

24   A.    This is the condolence letter that I prepared and

25   signed for Dr. Rudolph and family.

CROSS - WESTHASSEL

1    Q.    Now all these documents that we've looked at, are those

2    the documents that you needed before you could issue the

3    CRODA?

4    A.    Yes, sir.  With the -- save the condolence letter that

5    we would do independently.

6    Q.    If we go back, let's look at, say, Government's

7    Exhibit 36.

8          Do you see up in the top right-hand corner, what is

9    that?

10   A.    On the top right-hand corner is my stamp signature

11   seal, stating that I've observed or seen and observed the

12   original of this document.

13   Q.    Did you receive all these documents from Dr. Rudolph?

14   A.    To the best of my recollection, yes, I received the

15   originals of these documents from Dr. Rudolph when we met at

16   the mortuary on that Friday morning.

17           MR. FIELDS:  Your Honor, may I have a moment?

18           THE COURT:  You may.

19           MR. FIELDS:  No further questions, Your Honor.

20           THE COURT:  Cross-examination.

21           MR. MARKUS:  Thank you, Your Honor.

22                    CROSS-EXAMINATION

23   BY MR. MARKUS:

24   Q.    Good morning, ladies and gentlemen.  Good morning, Your

25   Honor, counsel.  Mr. Westhassel, good morning.

857

CROSS - WESTHASSEL

1      My name is David Markus.  I'm going to ask you a

2   couple of questions, okay?

3   A.   Yes, sir.  Good morning.

4   Q.   Mr. Westhassel, this is the first time you and I have

5   had a chance to speak, correct?

6   A.   That is correct.

7   Q.   Even though I had emailed you many months ago asking

8   for an opportunity to speak to you, you declined that

9   opportunity.

10  A.   That is correct.

11  Q.   Okay.  Is there a reason you declined to speak with me?

12  A.   No more reason to decline speaking with you, sir, as to

13  the members of the media and the press that were reaching

14  out frequently and even up through this last week.

15  Q.   Okay.  You viewed our table the same as the media?

16  A.   No, sir.

17  Q.   Okay.

18  A.   No, sir.  I don't.

19  Q.   Thank you.  No offense to the media, of course.

20      Mr. Westhassel, let me talk to you about the first

21  thing you discussed, which is the cremation.  I think you

22  said you were surprised when the request came about; is that

23  correct?

24  A.   I was not surprised at the request, sir.  I was

25  surprised at the -- the expediency or how soon I received

CROSS - WESTHASSEL

1    that request and that initial phone call.

2    Q.    Okay.  So I just want to make sure we're clear for the

3    jury.  You didn't have any surprise or suspicion raised

4    because of the request for cremation; it was the request for

5    the speed of the cremation; is that right?

6    A.    Not entirely, sir.

7    Q.    All right.  Well, can -- so you did have suspicion

8    about the cremation?

9    A.    I had suspicion in the first 30 to 40 seconds of a

10   phone call with next of kin reporting a death from a --

11   about 12 hours earlier that day that the first question was

12   how quickly we could get this person cremated so that they

13   could depart the country.

14   Q.    Let me ask you this:  Would -- can you understand why

15   someone would want to leave Zambia after a tragic accident

16   and get back home and be able to be with family and friends

17   and be able to talk with them about what happened?

18   A.    I can presume so.

19   Q.    And if it was the wishes of Bianca Rudolph to be

20   cremated, you can understand why someone would want to do

21   that quickly so that they could get home and be with their

22   family, correct?

23   A.    That is possible, yes, sir.

24   Q.    Okay.  And if we could put up, Mr. Reyes, RA-36.

25         This is already in evidence, Your Honor.

CROSS - WESTHASSEL

1          I'm going to show you Bianca Rudolph's will that's

2     already in evidence, sir.  Nope.  All right, that's -- I'm

3     sorry, RA-3.  My fault.  RA-3-6.  Sorry, Mr. Reyes.  And if

4     we could zoom in on the middle section, Section 7.03,

5     Cremation Instructions.

6          Do you see those, Mr. Westhassel?

7     A.   Yes, sir.

8     Q.   And do you see the last sentence there, "I wish that my

9     remains be cremated and my ashes dispersed as my personal

10    representative sees fit"?

11    A.   Yes, sir.

12    Q.   Of course you didn't have the benefit of seeing this

13    will at the time, correct?

14    A.   That's correct.

15    Q.   Okay.  You also -- thank you, Mr. Reyes.

16         You also didn't have the benefit of Ms. Rudolph's

17    healthcare and medical power of attorney, which is also in

18    evidence at RA-37, page 6.

19         If we could put that on the screen.  And if we

20    could zoom in on the top, section 2.11, Funeral and

21    Disposition Arrangements.

22         And do you see this last sentence that as well

23    says, "I wish that my remains be cremated and my ashes

24    dispersed as my healthcare agent sees fit"?  Do you see that

25    sir?

CROSS - WESTHASSEL

1    A.    Yes, sir, I do.

2    Q.    And you didn't have the benefit of her healthcare power

3    of attorney, did you, sir?

4    A.    No, sir.

5    Q.    Thank you, Mr. Reyes.

6              And so I think we can agree that if Ms. Rudolph

7    wanted to be cremated, that we can both understand why

8    someone in Dr. Rudolph's shoes would want to get that done

9    as soon as possible, return home from a remote and foreign

10   country of Africa, and get home to his family?  Can we agree

11   on that?

12   A.    I cannot presume to understand what was in the

13   gentleman's head at the time that he made the phone call.  I

14   know what he said to me and I know what he asked.  I know

15   what he asked repeatedly.  And not having seen these

16   documents -- and I would not have asked to have seen these

17   documents.

18   Q.    Sure.  Let's talk about if he had not decided to

19   cremate Bianca Rudolph's body what would be involved.

20   Bringing a body back from Africa is not easy, is it, sir?

21   A.    Repatriating remains from anywhere in the world is not

22   easy, especially Africa.

23   Q.    Especially Africa.  There are a number of steps that

24   would be involved in bringing a body back from Africa that

25   is not the same as bringing cremation remains back from

CROSS - WESTHASSEL

1    Africa; is that correct?

2    A.    Similar process; easier in some ways, more challenging

3    in others.

4    Q.    Well, let me ask you this:  To bring a body back that's

5    not cremated, you would have to get a special container for

6    the body, correct?

7    A.    Body must -- or should be -- should be, I will say, in

8    a zinc-lined or zinc-layered container to prevent seepage,

9    spillage, any bodily fluids.  Certain wrapping cargo

10   containers and the like.  And it's not a cheap expense, by

11   any means; it is expensive.

12   Q.    It's not only expensive, you have to find that

13   container in Zambia, correct?

14   A.    That's the intent.

15   Q.    And you say it should be in such a container.  But it's

16   not just "should," it's required by 42 CFR Section 71.55,

17   correct?

18   A.    I don't recall the element of law, no, sir.

19   Q.    Well, you know it's required, right?

20   A.    Yes, sir.

21   Q.    Okay.  So it's more than a "should."  If he was not

22   going to cremate Bianca Rudolph's body, he would have to

23   find a special casket that I think you said is lined with

24   what?

25   A.    If I recall correctly, it's zinc.

CROSS - WESTHASSEL

1    Q.    Okay.  And if he had done that, and it was

2    Ms. Rudolph's wishes that she be cremated, he would be

3    getting the special container, bringing the body back, and

4    then just having it cremated when he got back to the United

5    States, correct?

6    A.    That would have been next of kin's choice, sir.

7    Q.    Okay.  That would have --

8    A.    We provide an offer in -- you know, whatever path the

9    next of kin chooses to take.

10   Q.    And so is it your position that that's what he should

11   have done?

12   A.    No, sir.

13   Q.    Okay.  So can we agree that there was nothing wrong

14   with following the documents that Mrs. Rudolph said she

15   wanted to be cremated, having the body cremated in Zambia,

16   and returning back to the United States instead of going

17   through this procedure of getting a casket specially lined

18   and spending that money and being delayed in Zambia?  Can we

19   agree that that's -- there's nothing wrong with doing it

20   that way?

21   A.    There is nothing wrong with an individual wanting their

22   next of kin's remains cremated.

23   Q.    Okay.  I want to talk to you for a moment about forms

24   you filled out in Zambia while you were there and this

25   incident was occurring.  Do you recall filling out what

CROSS - WESTHASSEL

1    you -- what is called a Department of State Activity Log?

2    A.    Yes, sir.  If it's the document I believe you're

3    referring to in our citizen services records.

4    Q.    Those are records that are kept by people in your

5    position, correct?

6    A.    That's correct.

7    Q.    They're records that are made at the time that the

8    event is occurring, correct?

9    A.    During the course of events, yes, sir.

10   Q.    In other words, you entered data and impressions into a

11   computer system during that week in October of 2016,

12   correct?

13   A.    Many notes were entered, yes, sir.

14   Q.    Okay.  And those are regularly kept in the ordinary

15   course of business, correct?

16   A.    Notes are kept -- excuse me -- notes are kept, whether

17   it be on note paper, emails, and then translated,

18   transferred, into the citizen services records.

19   Q.    And specifically with this activity log that you filled

20   out in this case, you entered notes on October 11th, 12th,

21   13th, and 14th, correct?

22   A.    That sounds correct, yes, sir.

23   Q.    And it is -- is it your usual practice to enter those

24   notes as events are occurring?  Or shortly thereafter.

25   A.    Shortly thereafter.  And it depends on everything else

CROSS - WESTHASSEL

1    that is going on at the time, sir.  You --

2    Q.   You --

3    A.   You know, each situation is different.

4    Q.   Sure.

5           MR. MARKUS:  Your Honor, at this time, we would

6    move in Exhibit RA-10, which is Mr. Westhassel's Department

7    of State activity log under 803(6), regularly conducted

8    business activity.

9           THE COURT:  All right.  First of all, I haven't

10   seen a copy of it, so I need to get the -- what is the

11   exhibit number?

12          MR. MARKUS:  It's RA-10, Your Honor.  And if you'd

13   like I could put it up just on your screen if that's

14   possible.

15          THE COURT:  Yeah, I think counsel should know by

16   now Ms. Guerra has the ability to, before an exhibit is

17   admitted into evidence, put it up only on counsel's screen

18   and my screen.

19          MR. MARKUS:  Yes.  If we could do that for RA-10,

20   Mr. Reyes.  Page 1.  Let's go to -- yeah, sure, page 1.

21   Actually, let's do page 2, if we could.  Page 2.

22          THE COURT:  All right.  Are you moving the entire

23   RA-10 exhibit?

24          MR. MARKUS:  Yes, Your Honor.

25          THE COURT:  All right.  Is there any objection?

CROSS - WESTHASSEL

1    MR. FIELDS:  Yes, Your Honor.  Witness reports are

2    not business records.  This is hearsay and the witness is

3    here to answer any questions.

4        THE COURT:  What about that, Mr. Markus?

5        MR. MARKUS:  I've never heard that witness reports

6    are not admissible.  A witness report like this is -- that's

7    a business record, is absolutely admissible under 803(6) and

8    under 803(8) as a public record, Your Honor.

9        THE COURT:  Mr. Westhassel, is it your practice to

10   maintain this activity log to record services you provide to

11   American citizens?

12       THE WITNESS:  The activity log is the -- is kept to

13   account for and maintain the records of information on the

14   particular case for citizen services, yes, sir.

15       THE COURT:  All right.  So is there any reason why

16   it would or would not be done in a particular case?

17       THE WITNESS:  A citizen services record is open for

18   pretty much every service that we provide.  The records of

19   entry are usually made from a journal or log that we're

20   keeping so that we only have to go in here and make, you

21   know, a specific number of entries or -- or a reasonable

22   number of entries, and not every time we take a phone call

23   or --

24       THE COURT:  Right.

25       THE WITNESS:  -- get a piece of information.

CROSS - WESTHASSEL

1          THE COURT:  Now I don't know if you have it in

2     front of you.  Do you have the exhibit in front of you --

3          THE WITNESS:  Yes, sir.

4          THE COURT:  -- or seen it?

5          Is this your activity log logging information known

6     to you?

7          THE WITNESS:  Yes, sir, these are notes that either

8     I entered or in some of these cases maybe from my citizen

9     services clerk, but were entering into the same official

10    file for each particular case.

11         THE COURT:  All right.  The objection's overruled.

12    RA-10 is admitted into evidence and may be published to the

13    jury.

14         (Defendant's Exhibit RA-10 received)

15    BY MR. MARKUS:

16    Q.   Thank you.  Can you all see that?  Okay.  If we could

17    zoom in, Mr. Reyes, on where it says, Initial Contact, that

18    paragraph towards the bottom.  Perfect.

19         So, Mr. Westhassel, do you see the portion that

20    says, Initial Contact --

21    A.   Yes, sir.

22    Q.   -- right there?

23    A.   Yes, sir.

24    Q.   Okay.  And is this the initial contact that you were

25    discussing with the prosecutor with Dr. Rudolph?

CROSS - WESTHASSEL

1    A.    Yes, sir.

2    Q.    Okay.  And you see there on the second line where it

3    says "post" -- is "post" you?

4    A.    Post is referring to U.S. Embassy at Lusaka, Zambia, in

5    this case.

6    Q.    Okay.  So the Embassy received the call at 1630.  Is

7    that 4:30?

8    A.    Correct.  Yes, sir.

9    Q.    From Dr. Larry Rudolph.  Do you see that?

10   A.    Yes, sir.

11   Q.    And he explained to you that there was an accidental

12   discharge of a firearm.  Do you see that in the next line?

13   A.    Yes, sir.

14   Q.    Now do you see towards the bottom of that paragraph, it

15   says, "Dr. Rudolph said the preliminary police investigation

16   was started and that the event was an accident."

17   A.    Yes, sir.  And that was conveyed by Dr. Rudolph.

18   Q.    That's what he told you, correct?

19   A.    That's correct.

20   Q.    Okay.  Let's go to the next paragraph now, which is the

21   second contact on October 12th.

22            Do you see the second paragraph there, second

23   contact, 12 October?

24   A.    Yes, sir.

25   Q.    Now you mentioned with the prosecutor about a Catholic

CROSS - WESTHASSEL

1    priest.  Do you see there on the second and third lines that

2    it says, "Rudolph asked for information regarding a Catholic

3    priest and for instructions on how to proceed"?  Do you see

4    that?

5    A.    Yes, sir.

6    Q.    Can you tell us what Dr. Rudolph was asking you there.

7    A.    Well, the first part of the sentence is clear as can

8    be, that he was looking for some religious counsel.  For

9    what reason he wanted that, I don't know.

10         When we move into the part about instructions on

11   how to proceed, if I recall he was asking for information

12   there for -- on how to go from what would happen after the

13   postmortem and the exams were done at University Teaching

14   Hospital, and proceed, I presume, to cremation.

15   Q.    Okay.  And actually the timing is important on this.

16   Are you aware that the postmortem and autopsy were performed

17   on that day, October 12th?

18   A.    That's what I recall, yes, sir.  I don't know the times

19   off the top of my head, but that's what I recall.

20   Q.    We don't need to go through the times right now.  I

21   just want to talk about the day.  Was it October 12th that

22   the postmortem and autopsy were performed?

23   A.    That's what I recall, yes, sir.

24   Q.    And also I'd like to ask you, Mr. Westhassel, were you

25   personally at the postmortem or the autopsy?

CROSS - WESTHASSEL

1    A.    No, sir.

2    Q.    Was anybody at the Embassy at the postmortem or

3    autopsy?

4    A.    Not that I'm aware of.

5    Q.    Okay.  At the bottom of that paragraph, do you see

6    where you wrote, "Rudolph was asked many times over if he

7    had contacted any of his family and he stated repeatedly

8    that he did not want to do that by phone"?

9    A.    Yes, sir.

10   Q.    What Dr. Rudolph told you was that he wanted to tell

11   his family in person, correct?

12   A.    I don't recall him saying he wanted to tell them in

13   person.  But I could agree that he did want to notify them

14   however he did so.

15   Q.    Okay.  If we could go to the next page, Mr. Reyes, of

16   this exhibit.

17        And if we could zoom in on the top half there.  Now

18   do you see this is the third day, October 13th, correct,

19   sir?

20   A.    Yes, sir.

21   Q.    Now you mentioned that you had tried to contact

22   Dr. Rudolph, but the truth is Dr. Rudolph had been

23   contacting you that day, correct?  You see the first

24   sentence there.

25   A.    I read that he contacted us, post, by phone and email,

CROSS - WESTHASSEL

1    yes.

2    Q.    Multiple times throughout the day; do you see that?

3    A.    Yes, sir.

4    Q.    If we go about middle of the way down, you see where

5    he's talking about the actual firearm there.  "The weapon

6    was brought with them from the U.S. and would need to be

7    returned"?  Do you see that?

8    A.    Yes, sir.

9    Q.    Why would the weapon need to be returned?

10   A.    Well, when U.S. citizens travel into any country, we

11   expect that they're taking back with them anything that they

12   brought into that particular country.  This weapon, being a

13   firearm -- well, obviously -- I couldn't expect, if the

14   police weren't going to keep it for any good reason in

15   whatever investigation -- which was still ongoing at that

16   time to my knowledge -- that the weapon would be returned.

17           I wanted to make sure that our customer,

18   Dr. Rudolph, when he left the country, didn't get held up

19   and wasn't looking for anything more, especially since he

20   eventually would have been taking cremains with him through

21   the airport.  And if there's anything we could do to help

22   facilitate his departure, we wanted to be able to do that.

23   Q.    Let me pause here for a second, sir, and ask you:  Is

24   it your testimony that you don't remember on the very first

25   call with Dr. Rudolph on the 11th that you had raised the

CROSS - WESTHASSEL

1    issue of Zambian tourism and a dentist and a lion in a

2    previous incident?

3    A.    I'm sorry, can you restate the question, please?

4    Q.    Sure.  Let me ask it this way:  Do you recall ever

5    bringing up the idea that a lion had previously been shot by

6    a dentist in Africa?

7    A.    No, sir, I don't recall bringing that up with

8    Dr. Rudolph or anyone else.

9    Q.    Do you recall that being discussed at any time with you

10    internally with other American officials?

11    A.    As I mentioned for the -- in the prosecution's

12    examination, sir, I recall it being mentioned at some point.

13    But, frankly, that was the farthest from any concern of

14    mine.  I was concerned with dealing with the remains of our

15    deceased U.S. citizen, providing the services for

16    Dr. Rudolph, and the departure from the country.

17    Q.    Who brought it up?

18    A.    I don't recall, sir.

19    Q.    Who discussed it?

20    A.    I don't recall anyone discussing it with me.

21    Q.    I thought -- I thought maybe I missed it.  I thought

22    maybe you said it was discussed internally.

23    A.    There was -- thank you.  There was mention of it.  I

24    dismissed it and I moved on.

25    Q.    And you don't recall who mentioned it?

CROSS - WESTHASSEL

1    A.    I do not, sir.

2    Q.    Was it one of the officials that accompanied you to the

3    funeral home?

4    A.    I don't recall, sir.

5    Q.    Were there emails about it?

6    A.    Not that I'm aware of.  There may have been, but I

7    don't know.

8    Q.    And you're saying that you never discussed it after

9    that?  Is it your testimony that you did not discuss it with

10   either Dr. Rudolph or Mr. Swanepoel?

11   A.    I don't recall discussing it with anyone, sir.

12   Q.    Okay.  Let's go to the next paragraph, October 14th.

13   You see in this paragraph, sir, where you're talking about

14   the FOIA requests?

15   A.    Yes, sir.

16   Q.    I'd like to talk to you for a moment about those

17   concerns that Dr. Rudolph had.  It says, "Rudolph is

18   concerned about FOIA requests for any information relating

19   to his wife's death."

20          Now this is on the 14th when the cremation occurs,

21   correct?

22   A.    14th, yes, sir, Friday.

23   Q.    The day before is the day that you and Dr. Rudolph had

24   that dust-up, correct?

25   A.    One-way conversation, yes, sir.

873

CROSS - WESTHASSEL

1    Q.    He was very upset, wasn't he?

2    A.    Yes, sir.

3    Q.    Now I want to just talk to you about that for a second,

4    Mr. Westhassel.  Did you call Dr. Rudolph before you went to

5    the funeral home to say, "Listen, I'm going to be performing

6    services for you.  I'd like to go match up the body and take

7    some pictures"?  Did you make that phone call to

8    Dr. Rudolph?

9    A.    No, sir, not that I recall.

10   Q.    Now, he had called you up, if you look at the top,

11   numerous times on October 13th.  Did you mention to him that

12   you would be doing -- taking those pictures?

13   A.    I didn't take any pictures, sir.

14   Q.    Did you mention to him that you would be going to the

15   home with your colleagues to have pictures taken?

16   A.    No, sir.

17   Q.    Have you --

18             THE COURT:  Counsel, I'm going to interject a

19   question because I'm sure the jury must be asking

20   themselves, too.  And I don't know the answer.  The

21   capitalized acronym CONS, C-O-N-S, what is that in reference

22   to?

23             THE WITNESS:  Yes, sir, Cons is just an

24   abbreviation for consular.

25             THE COURT:  Consular?

CROSS - WESTHASSEL

1          THE WITNESS:  Consular, consular.

2          THE COURT:  That's you?

3          THE WITNESS:  Yes, sir.

4          THE COURT:  What's the difference between Cons and

5     Post?

6          THE WITNESS:  Post, Your Honor, is referring to the

7     mission in general.

8          THE COURT:  The entire Embassy?

9          THE WITNESS:  The entire Embassy.  Yes, and Cons

10    specifically to the consular section, or consular services,

11    consular officer.

12         THE COURT:  Got it.  Thank you.

13         Go ahead, counsel.

14         MR. MARKUS:  Thank you, Your Honor.

15    BY MR. MARKUS:

16    Q.   Now when Dr. Rudolph was having that one-way

17    conversation with you and he was upset, this was after he

18    had learned, not from you but from someone else, that these

19    pictures were taken, correct?

20    A.   That is correct.

21    Q.   So you and your colleagues didn't tell him beforehand,

22    and you didn't tell him during, and you didn't tell him

23    afterwards, correct?

24    A.   If I understand your question, sir, you're presuming

25    that there was an obligation to notify Dr. Rudolph of any --

CROSS - WESTHASSEL

1    any part of the procedure --

2    Q.    Not -- not presuming that at all, sir.

3    A.    -- or any steps.

4    Q.    I'm asking you whether you informed him or not.

5    A.    No, sir, I did not.

6    Q.    You're the one who said he's your customer, correct?

7    A.    Yes, sir.

8    Q.    And you were providing him services, correct?

9    A.    He was a party to that, sir.  The customer was a

10   deceased U.S. citizen, and I was doing what I had to do as

11   our regulations require us to do to make sure that we have,

12   in fact, the correct, you know, deceased person, deceased

13   remains.  And at that point I did not yet have the passport.

14   Q.    Sure.  I understand.  And you had a copy of the

15   passport from your computer system, right?

16   A.    We had a copy of the records, yes, sir.

17   Q.    Okay.  And so instead of informing your customer, who

18   you were providing services to, that these pictures were

19   going to be taken, he had to learn it from someone else,

20   correct?

21   A.    I had no control over those pictures being taken, sir.

22   Q.    You knew of the pictures being taken, right?

23   A.    Once -- once the act was in progress when they were --

24   DS was taking those photos, yes, sir, at that point.

25   Q.    Sure.  And I want to ask you, sir, over the years -- I

CROSS - WESTHASSEL

1    understand you've been in Africa and other places -- but

2    you've heard of outlets called TMZ and other places, have

3    you not?  Media outlets.

4    A.    Frankly, I don't know much.  You mentioned TMZ, I don't

5    know much of it.  I don't watch it, listen, whatever it is

6    you do with it, no.

7    Q.    Have you -- are you aware that there's been a lot of

8    debate and controversy about being able to post autopsy

9    pictures online?  For example, have you heard about the Dale

10   Earnhardt controversy where his autopsy pictures were posted

11   online?

12   A.    I don't know anything of it.  It's possible, but I

13   don't know.

14   Q.    Did you hear about Bob Sagget's autopsy pictures -- the

15   family fighting hard to keep those autopsy pictures from

16   being posted online?

17   A.    No, sir.  I know he passed away recently, but I don't

18   know anything of it.

19   Q.    Can you understand why someone would not want autopsy

20   pictures of their spouse being in public and posted online?

21   A.    Yes, sir.  I think I can understand that, yes.

22   Q.    And Dr. Rudolph, when he was having this one-way

23   conversation with you, was very concerned about these

24   pictures becoming public on social media and other outlets

25   like TMZ, correct?

CROSS - WESTHASSEL

1      A.    That would make sense, yes, sir.

2      Q.    And you can understand that, right?  You're -- you work

3      for the Government, do you not?

4      A.    Yes, sir.

5      Q.    You're subject to Freedom of Information Act requests,

6      are you not?

7      A.    We are, yes, sir.

8      Q.    If these media outlets had requested them, you would

9      have had to consult with legal departments and other things

10     about whether to release them or not, would you not?

11     A.    The decision and the maintaining -- excuse me, the

12     maintaining or maintenance of those photos was not a

13     consular function, sir.  Those photos were taken by

14     diplomatic security to support the legal attache and

15     Department of Justice, I presume, based upon an ongoing

16     investigation that was occurring regarding the death of

17     Mrs. Rudolph.

18     Q.    Oh, wait.  I'm sorry.  We have to pause here for a

19     second.  Are you saying now that the pictures were not taken

20     as part of services to compare the body to the passport, but

21     were done as an ongoing investigation?  Is that your

22     testimony?

23     A.    No, sir.

24     Q.    The pictures were taken, were they not, as part of the

25     services that you all were providing to compare the photo

878

CROSS - WESTHASSEL

1    that you had on the passport to the body that you were

2    seeing --

3    A.    That is not --

4    Q.    -- correct?

5    A.    That is not correct, sir.

6    Q.    Did you go to the funeral home that day to conduct your

7    services?

8    A.    I went to the Ideal Funeral Home that morning -- or

9    excuse me, midday, to compare and contrast the

10   identification of the deceased.  And for that reason

11   specifically, sir.

12   Q.    Okay.  By the way, let's talk -- let's finish with this

13   exhibit, if we could.

14         There's -- you've mentioned the idea that suicide

15   came up.  I think we agree that Larry Rudolph never used the

16   word "suicide," correct?

17   A.    I don't recall him using that, no, sir.

18   Q.    And in your report here, you see where that little

19   green dot is, it says, "The subject was killed due to a

20   gunshot wound to the chest, which is reported as either an

21   accidental discharge or possible suicide to indicate that

22   the death did not appear to be at the hands of another"?  Do

23   you see that?

24   A.    Yes, sir.

25   Q.    Now what that's saying there, sir, is that when suicide

CROSS - WESTHASSEL

1    was used in one of the reports, it didn't mean that she

2    committed suicide by intentionally shooting herself, it

3    meant that the death did not appear to be at the hands of

4    another.  Do you see that?

5    A.    Yes, sir.

6    Q.    Thank you.  Okay.  We can take down this exhibit.

7             I want to talk briefly about those pictures that

8    were taken.  First thing I'd like to ask you, sir, is you

9    saw the wound -- I'm not going to put it back on the

10   screen -- but could you see through the wound and see broken

11   ribs through the wound?

12   A.    I don't recall looking that closely, like trying to

13   move flesh or to look inside the wound, no, sir.

14   Q.    Okay.  You -- you have testified before that it's

15   your -- by looking at the wound, you could see that flesh

16   was removed, correct?

17   A.    It appeared to me that flesh was moved in and around

18   the wound, like there might have been a flap or some things

19   that had been cut because it wasn't just jagged flesh or

20   truly like ripped flesh.  So it looked like it might have

21   been cut.  And the funeral director intimated as much --

22   forgive me for not knowing the words -- that the medical

23   examiner may have cut at or around the wound.

24   Q.    And that cutting would be important if we were trying

25   to determine the actual size of the wound, correct?

CROSS - WESTHASSEL

1    A.    I can't tell you what's important for what a

2    pathologist is going to be looking at.  What the size of the

3    wound, I can't speak to that.

4    Q.    Fair enough.  Let me ask it this way:  If the wound had

5    been cut and manipulated, can we agree that it would have

6    been different before that had been done?

7    A.    It may have.

8    Q.    Sure.  The other thing I noticed when you put the

9    little dots around the wound, you did 13 little red dots.

10   With all your experience with shotguns and pellets, are you

11   aware that the ammunition -- a shotgun shell has 15 pellets

12   in it?

13   A.    No, sir, I don't know the number of pellets.  And I

14   presume it could vary from different size cartridges or

15   shells.

16   Q.    Okay.

17   A.    And I was not counting -- specifically trying to put

18   dots on there.  I was referring to the general locations as

19   I -- as best I can remember and that photo.

20   Q.    From your experience with shotguns, would you agree

21   with me that there would have needed to be more than two

22   pellets to cause that central wound there?

23   A.    The pellets causing the central wound?

24   Q.    Yes, sir.

25   A.    I would expect, and I also believe, as I stated for the

CROSS - WESTHASSEL

1    prosecution, that there is a buffer or follower that comes

2    out of the -- behind the pellets as well.

3    Q.   And are you aware, sir, that in this case the shot went

4    through a soft case?

5    A.   No, sir.

6    Q.   If you had that knowledge, is it possible that what

7    you're pointing to on the body may have been pieces of soft

8    case and not pieces from the ammunition?

9    A.   It is possible.  I'm not aware of it, sir.

10   Q.   Okay.  If we could put up -- I'm sorry, Mr. Reyes, I

11   didn't give you this before, but Government Exhibit 39.

12           MR. DILL:  What's the Bates number on the bottom?

13           MR. MARKUS:  Let me grab it.

14           MR. REYES:  I have it.

15   BY MR. MARKUS:

16   Q.   This is a document that's in evidence, Government

17   Exhibit 39, that you signed at the bottom, correct?

18   A.   Yes, sir.

19   Q.   Okay.  And the prosecutor asked you some questions

20   about this document.  This is a document that's signed by

21   the people who conducted the cremation, correct?

22   A.   That's correct.

23   Q.   I can't pronounce the name, but the first name you see

24   there is Kelvin?

25   A.   Nfolofwana, yes.

CROSS - WESTHASSEL

1    Q.    Okay.  And this is not signed by anybody named Mwiinga,

2    correct?  Casiuss Mwiinga?

3    A.    Not that I can see, sir.

4    Q.    Okay.  And do you see here that this person, Kelvin,

5    who signs it, says, "I am the funeral director at Ambassador

6    funeral home"?  Do you see that?

7    A.    Yes, sir.

8    Q.    Okay, thanks.  We can take this down, Mr. Reyes.  Thank

9    you.  Let's turn to INV 588, which is Government Exhibit 34,

10   already in evidence.

11         That's your stamp at the top, correct, sir?

12   A.    That is, sir.

13   Q.    And this is a document by the police force of Zambia,

14   correct?

15   A.    Yes, sir.

16   Q.    And this is a document that you had to sign off on

17   before Dr. Rudolph could leave the country, correct?

18   A.    It is a document which I certified the copy of as

19   having received.  I cannot attest to the contents of said

20   document.

21   Q.    Did you read it?

22   A.    I recall reading it, but it -- at that point it's not

23   my investigation.  I'm just certifying that the document is

24   true and that we've made a copy of it.

25   Q.    And you sign off on this document before Dr. Rudolph

CROSS - WESTHASSEL

1    can leave, correct?

2    A.    I would presume Dr. Rudolph, or anybody, could have

3    left Zambia before, but this is what we were looking for to

4    have with the entire package of documents for the Consular's

5    Report of Death, yes, sir.

6    Q.    And Mr. -- and Dr. Rudolph can't leave until you issue

7    that Consular Report of Death, correct?

8    A.    He could have in fact departed, had he chosen to, prior

9    to receiving the report of death.  And in fact many times we

10    mail those reports of death off to people -- next of kin.

11    Q.    In other words, some people don't even wait around to

12    get those documents.  They get out of there, right?  And you

13    mail them.

14    A.    You can say it that way, sir.

15    Q.    Okay.

16    A.    I -- it's possible.

17    Q.    Dr. Rudolph waited for you to have these documents,

18    sign off on them, issue the CRODA, and give it to him,

19    correct?

20    A.    And there is a reason he would have been hanging around

21    for this document, sir.

22    Q.    And the reason is because he couldn't leave with -- he

23    couldn't leave with the remains unless he had these

24    documents, correct?

25    A.    That is correct, sir.

CROSS - WESTHASSEL

1    Q.    Okay.  So he didn't just leave Bianca Rudolph in

2    Zambia; he waited and followed the process and the services

3    that you gave to him, correct?

4    A.    Yes, sir.

5    Q.    And if you look at the bottom paragraph on that

6    document, could you read it out loud for us.

7          If you could zoom in on it --

8    A.    If you could zoom that in, please.

9    Q.    Sure.

10   A.    Thank you.  And you're looking at the last paragraph

11   and that statement there?

12   Q.    Yes, sir.

13   A.    Okay.  "Findings further suggested that the firearm was

14   loaded from the previous hunting activities and the normal

15   safety precautions at the time of packing the firearm were

16   not taken into consideration causing the firearm to

17   accidentally fire."

18   Q.    Thank you.  You can take that down, Mr. Reyes.

19         I want to talk about one other area that you focus

20   on -- actually, before I get to that, I want to ask about an

21   email.

22         If we could put on the screen, but not to the jury

23   because this is not in yet -- give me one moment to fish

24   this out.  This is RA-11.  This would -- this is not in

25   evidence yet.  I'd like to just show the witness and the

CROSS - WESTHASSEL

1   Court if I could, Mr. Reyes.

2          Can you see that, Mr. Westhassel?

3   A.   Yes, sir.

4   Q.   At the time that you were dealing with Dr. Rudolph and

5   this situation, there were numerous internal emails between

6   you and your colleagues, correct?

7   A.   Yes, sir.

8   Q.   And you would act based on certain information that you

9   would receive from your colleagues, correct?

10  A.   Yes, sir.  Depending upon if it was a consular

11  responsibility or not, yes, sir.

12  Q.   Okay.  And you received the copy of an email from

13  Christopher Craft.  Who's Christopher Craft?

14  A.   Christopher Craft was my boss and our deputy chief of

15  mission at that time.

16  Q.   You received an email from Christopher Craft -- I'm

17  sorry, from Sundeep Gupta to Christopher Craft, correct?

18  A.   Yes.

19  Q.   Sundeep.  Who's Sundeep Gupta?

20  A.   If I recall, Sundeep was our director for Centers for

21  Disease Control and Prevention within Zambia.

22  Q.   And before you issued the CRODA in this case, you

23  reviewed this email, correct?

24  A.   Looking at the times on it, I would expect that I

25  had -- at least it was in my email in-box at that point,

CROSS - WESTHASSEL

1    because I know on the Friday morning at about 11:00 I was

2    definitely engaged at Ambassador St. Ann's.  And that email

3    was received -- I can't tell you if that is 4:55 a.m. on

4    Friday -- I doubt that to be Zambia time, but probably U.S.

5    time.

6             So whether this email was from late Thursday or

7    early Friday, I can't tell you.

8             MR. MARKUS:  Okay.  Your Honor, I move for

9    admission of RA-11.

10            THE COURT:  Any objection?

11            MR. FIELDS:  No objection.

12            THE COURT:  There being no objection, RA-11 is

13   admitted into evidence.

14       (Defendants' Exhibit RA-11 received)

15   BY MR. MARKUS:

16   Q.   Thank you.  I'd like to focus your attention, sir, on

17   the middle part of that email from Mr. Gupta to Mr. Craft.

18   A.   Yes.

19   Q.   Do you see where it says, "Hi Chris," there?

20   A.   Yes, I do.

21   Q.   That's Gupta sending an email to your boss, correct?

22   A.   That's correct.

23   Q.   And he says he just talked to Dr. Musese.  Do you see

24   that?

25   A.   Yes, sir.

CROSS - WESTHASSEL

1    Q.   Dr. Musese was the doctor who conducted the postmortem

2    and autopsy, correct?

3    A.   I'll take that if he's the gentleman that signed off on

4    the other documentation, the pathology, I won't dispute

5    that.

6    Q.   Do you see the next sentence saying he -- referring to

7    Dr. Wausau -- said, "He would email me a revised postmortem

8    which says there was no evidence of foul play"?  Do you see

9    that?

10   A.   Yes, sir.

11   Q.   And then Mr. Gupta follows up, and he tried a number of

12   times to ask for more specifics; evidence of defensive

13   injuries, et cetera.  But all he would say is that there was

14   no evidence it was not accidental.  Do you see that?

15   A.   Yes, sir.

16   Q.   And when it's saying "all he would say," he's referring

17   to Dr. Maswahu there, correct?

18   A.   I presume so.

19   Q.   Thank you.  You can take that down, sir.

20        The last area I'd like to speak to you about is one

21   of your roles and services that you provide is if an

22   American were to be arrested in Zambia, helping that

23   American and his family, correct?

24   A.   I wouldn't use the word "helping" directly, sir.

25   Q.   Okay.

CROSS - WESTHASSEL

1    A.    But, yes, we would make ourselves available to assist

2    the U.S. citizen and -- who's in any type of distress or

3    duress.

4    Q.    The Zambian police force certainly had the authority to

5    arrest Dr. Rudolph if they wanted, correct?

6    A.    I would believe so, yes.

7    Q.    And if the Zambians had arrested or charged

8    Dr. Rudolph, he would have gone to a Zambian prison,

9    correct?

10   A.    I believe he would have received due process there, as

11   he should here, yes.

12   Q.    Okay.  My question is:  He would have gone to a Zambian

13   prison, correct?

14   A.    I expect so.

15   Q.    And you're very familiar with Zambian prisons in your

16   role in the consulate, correct?

17   A.    Familiar with prisons in Zambia?

18   Q.    Yes, sir.

19   A.    I would say more local jails than prison.

20   Q.    And you're aware, sir, of the criticism and the

21   complaints about the human rights violations in Zambia jails

22   and prisons, correct?

23   A.    I don't recall specific human rights violations, any

24   specifics or something stated of that.  It's not a place I

25   would want to be --

889

CROSS - WESTHASSEL

1    Q.    If you --

2    A.    -- by any means.

3    Q.    If you were a white American arrested in a Zambian

4    prison, you say you wouldn't want to be there -- it's the --

5    pretty much the last place on earth you'd want to be,

6    correct?

7    A.    I don't think anybody wants to be in prison, sir, but I

8    don't recall ever seeing in my interactions with Zambian

9    police and correctional officers anybody being treated any

10   differently because of the color of their skin or their

11   race.  Not once.

12   Q.    Thank you, sir, I have nothing further.  Thank you.

13              THE COURT:  Any cross, Mr. Dill?

14              MR. DILL:  No, sir.

15              THE COURT:  All right.  Redirect.

16              MR. FIELDS:  Thank you, Your Honor.

17              MR. FIELDS:  May I begin, Your Honor?

18              THE COURT:  Oh, I'm sorry.  Go ahead, counsel.

19                      REDIRECT EXAMINATION

20   BY MR. FIELDS:

21   Q.    Thank you.  Mr. Westhassel, do you remember being asked

22   about cremation in Zambia?

23   A.    Yes, sir.

24   Q.    And do you remember saying that, you know, there's

25   nothing necessarily wrong with being cremated, right?

CROSS - WESTHASSEL

1    A.    Not at all, sir.

2    Q.    Did something seem wrong with Dr. Rudolph's request?

3            MR. MARKUS:  Objection, Your Honor.

4            THE COURT:  What's the objection?

5            MR. MARKUS:  The objection is, A, leading; and, B,

6    relevance.

7            THE COURT:  Denied on both counts -- or overruled

8    on both counts.

9            You may answer, Mr. Westhassel.

10           THE WITNESS:  Thank you, sir.  Would you say,

11   again, the question, please.

12   BY MR. FIELDS:

13   Q.    Did something seem wrong with Dr. Rudolph's request?

14   A.    With the request, itself, for cremation, no.

15   Q.    What -- what seemed odd about his discussions regarding

16   cremation?

17   A.    What seemed odd to me was the -- see if I can capture

18   my words from earlier this morning -- it came very quickly

19   in our conversation.  It was frequent; it was repeated.  And

20   it just seemed, frankly, out of sorts for anyone asking for

21   our services to be so intent.  But I -- to me, there's

22   nothing wrong with it, people can ask for cremation, but

23   sometimes when you look at a situation in totality, and

24   realizing there's an irregular death, and a persistency to

25   essentially -- forgive me, I don't like speaking about it

CROSS - WESTHASSEL

1    like this -- but you're trying to remove the remains

2    quickly, the police reports had not yet been received, and

3    the requests for cremation were again repeated.

4          And early on when the first information of this

5    became public and we -- I did not release any of this

6    information out in the public realm, gosh, no -- he was --

7    already said it was an accident, but we hadn't seen anything

8    of a police report.

9          And the repeated insistency, for whatever reason,

10   to have those remains cremated did cause me to pause.

11   Q.    Now let's talk about the photographs.

12   A.    Yes.

13   Q.    Why didn't you call him before you were going out to

14   Ideal Funeral Home?

15   A.    Well, for one, I wasn't going out there for any

16   evidentiary, or whatever word you would use for that, to

17   look at the wounds and to capture that.  To make sure that

18   there was some record of it is what I understand DS was

19   doing just from subsequent looking at the case.

20         My customer, the true customer, was the deceased.

21   Next of kin is whom we'll refer to as a customer as we're

22   trying to provide a service to them.  And often they are not

23   in country.  We go and look at the remains, it's not a

24   voyeuristic adventure.  It's -- and it's not fun.  Again,

25   it's not fun.

**CROSS - WESTHASSEL**

1          But we're going there to make sure we have the

2     right person because sometimes bodies are -- as you saw in

3     these photos here today, they are badly bruised, damaged,

4     hard to identify.  And the last thing I want is for someone

5     to think they're getting the remains of someone and they're

6     not.  And with that, the dead respectfully don't really have

7     a right to privacy in that regard.  I'm not looking to

8     exploit -- exploit them.  I had to make sure that we had the

9     remains identified because, for whatever reason, had they

10    gone to cremation after that, I could not attest to that

11    legally.

12    Q.    When you went to the funeral home, you said you had DS

13    agents with you?

14    A.    That is correct.

15    Q.    What are DS agents?

16    A.    Diplomatic security, sir.

17    Q.    They're law enforcement?

18    A.    Yes, sir.

19    Q.    Why didn't you call Dr. Rudolph to tell him that law

20    enforcement was going to Ideal Funeral Home?

21    A.    It was not my choice, not my decision, that they should

22    or shouldn't go, sir.

23    Q.    You were also asked a lot of questions about posting of

24    autopsy photos online.  Do you remember those questions?

25    A.    Yes, sir.

CROSS - WESTHASSEL

1    Q.    Have you ever heard of someone in the Department of

2    State consular services posting autopsy photos online?

3    A.    I have not heard of that, sir, not -- no.  No.  I have

4    no knowledge of that.

5    Q.    Would you be permitted to do that?

6    A.    Not unless I want to be fired, I won't be doing that.

7    Q.    And then diplomatic security, they're law enforcement?

8    A.    Yes, sir.

9    Q.    In your experience with the state department, have you

10   ever seen diplomatic security post photos that they take

11   regarding investigations on the internet?

12   A.    Not that I know of, sir.

13   Q.    Let's talk about the wound that you saw.  Do you

14   remember those questions?  You were asked about the shotgun

15   being fired through a case.  Do you remember that?

16   A.    Yes, sir.

17   Q.    When you looked at the wound, did you see any pieces of

18   fabric?

19   A.    I didn't see anything there, sir, but flesh, and blood

20   staining and some blood residue.

21   Q.    Now let's look at Government's Exhibit 39.  Can we pull

22   that up again, please.

23          Do you remember being asked about Kelvin?

24   A.    Yes, sir.

25   Q.    Do you remember being asked whether or not that's the

CROSS - WESTHASSEL

1    same as Casiuss Mwiinga?

2    A.    I remember the name Casiuss.  And I don't recall why I

3    remember his name; it could have been associated with Ideal

4    Funeral Home, if -- if memory serves.

5    Q.    Did Kelvin -- well, did Kelvin -- how do you pronounce

6    the last name, again, I'm sorry?

7    A.    Ngolofwana.

8    Q.    Ngolofwana.  Kelvin Ngolofwana.  Did he work at Ideal

9    or Ambassador St. Ann's?

10   A.    No, he worked at Ambassador St. Ann's.

11   Q.    Now let's look at Government's Exhibit -- well,

12   actually Defense Exhibit RA-11, which was admitted on the

13   cross-examination.  Now, page 1 here, can we blow up this

14   email.

15           Do you remember you were asked these questions

16   about the ME saying there was no evidence that it was not

17   accidental?

18   A.    Yes, sir.

19   Q.    Do you know, in Zambia, are medical examiners trained

20   in the British system or the American system?

21   A.    I don't know specifically, sir.

22   Q.    Now if we could go to page 2.  If we could look down

23   here at the bottom, if we could blow that one up.

24           Do you see that sentence that says, "ZPS,

25   apparently"?

CROSS - WESTHASSEL

1    A.    Yes, sir.

2    Q.    What does that sentence say?

3    A.    It says "ZPS," or Zambia Police Service, "apparently

4    decided it was accidental, or an accident, before the

5    medical examiner's report was done."

6    Q.    You also testified on cross-examination that you are

7    assisting Americans if they have involvement with Zambian

8    law enforcement?

9    A.    That is correct.

10   Q.    So you -- generally did you develop some impressions of

11   capability of Zambian law enforcement?

12   A.    Yes, sir.

13   Q.    How would you describe their capabilities?

14        MR. MARKUS:  Objection, Your Honor.  401, 403, and

15   speculative about his impressions of the Zambian law

16   enforcement.

17        THE COURT:  I think we need more foundation as to

18   how he would have the basis to answer such a question.

19   BY MR. FIELDS:

20   Q.    How many times did you interact with Zambian law

21   enforcement while you were in Lusaka?

22   A.    Excuse me, while I was in Zambia or --

23   Q.    I'm sorry, in Zambia, yes.

24   A.    In Zambia.  Oh, gosh, at least -- I don't know, a dozen

25   times, if not more.  Personally and on the job.

CROSS - WESTHASSEL

1    Q.    So did you get to see how they conducted

2    investigations?

3    A.    An investigation of this type?  No, sir.  How they

4    conducted investigations in general left me wanting.

5    Q.    How so?

6            MR. MARKUS:  Objection, Your Honor --

7            THE COURT:  Yes --

8            MR. MARKUS:  -- relevance.

9            THE COURT:  I don't think this is the right witness

10    to accomplish what you're trying to do here.  Sustained.

11    BY MR. FIELDS:

12    Q.    All right.  So let's move on to -- let's go back to

13    Government's -- or, sorry, Defense Exhibit RA-10.  If we

14    could go to page 4.  And let's look at this log here,

15    please.  Can we zoom in?

16            Can you start reading that sentence that starts,

17    "Although."

18    A.    Sure.  "Although there are inconsistencies in the

19    reports, the subject was killed due to a gunshot wound to

20    the chest, which is reported as either an accidental

21    discharge or possible suicide, to indicate that the death

22    did not appear to be at the hands of another."

23    Q.    Now you were asked on cross-examination about whether

24    "suicide" means the same as "not by another."  Do you

25    remember those questions?

1    A.    Yes, sir.

2    Q.    What did you mean when you wrote that sentence?

3    A.    Well, just my own choice of words.  As I understand,

4    homicide is death at the hands of another; suicide being by

5    your own hand.  And in the reports which we had seen at this

6    point, we saw "accidental" and "suicide" in the same bodies

7    of text, which was confusing to me when looking at it as to

8    what was the actual intent.

9         But I'm not there to dispute the language used by

10   the ME.  But trying to clarify and understand truly what

11   happened here was challenging because we saw both words

12   used.

13   Q.    Now if we look at Government's Exhibit 36.

14        What does it say right there at the top in bold?

15   A.    "Suicide."

16        MR. FIELDS:  May I have a moment, Your Honor?

17        THE COURT:  You may.

18        MR. FIELDS:  No further questions, Your Honor.

19        THE COURT:  All right.  May this witness be excused

20   for the Government?

21        MR. FIELDS:  Yes, Your Honor.

22        THE COURT:  For the defendants?

23        MR. MARKUS:  Yes, Your Honor.

24        MR. DILL:  Yes, Your Honor.

25        THE COURT:  All right.  Mr. Westhassel, thank you

DIRECT - MEYER

1    so much for your testimony.  You're excused.  You may step

2    down.

3              THE WITNESS:  Yes, sir.

4              THE COURT:  Government may call its next witness.

5              MR. GREWELL:  Your Honor, the United States calls

6    Helen Meyer.

7              THE COURT:  All right.

8              COURTROOM DEPUTY:  If you'll remain standing for me

9    and raise your right hand.

10              HELEN MEYER, GOVERNMENT'S WITNESS, SWORN

11              COURTROOM DEPUTY:  Please be seated.  And state

12    your full name for the record and spell your first and last

13    name for us.

14              THE WITNESS:  Okay.  Helen Meyer.  H-e-l-e-n,

15    M-e-y-e-r.

16              THE COURT:  You may proceed, counsel.

17              MR. GREWELL:  Thank you, Your Honor.

18                        DIRECT EXAMINATION

19    BY MR. GREWELL:

20    Q.    Good morning.

21    A.    Good morning.

22    Q.    Did you know Bianca Rudolph?

23    A.    I did.

24    Q.    Approximately when did you first meet?

25    A.    We met, I think it was, 1992.

DIRECT - MEYER

1    Q.    Where were you living at the time?

2    A.    We were in Greensburg, Pennsylvania.

3    Q.    And where was she living?

4    A.    Greensburg.

5    Q.    How did you first meet?

6    A.    I think we met on a field trip, our daughters.  My

7    daughter, Jessica, and her daughter, AnaBianca, were in the

8    same grade at the elementary school, and we met through

9    them, actually.

10   Q.    Did you eventually become friends?

11   A.    We did.

12   Q.    Could you please describe the nature of your

13   relationship with Bianca Rudolph.

14   A.    Well, as I said, we became friends because of our

15   children.  So there are a lot of childhood activities that

16   we were involved in together.  They went to the same small

17   elementary school, so we were very involved in that.  And

18   then it just developed as a closer friendship that we did

19   things aside from the kids, and went to the same gym and

20   went skiing together, went to dinner together, went shopping

21   together.  Shared a lot of the same interests in that way.

22   Q.    Were you still friends at the time of her passing?

23   A.    I was.

24   Q.    Were you aware of Bianca's interest in hunting?

25   A.    I was.

**DIRECT - MEYER**

1    Q.    How often would she go on hunting trips?

2    A.    Several times a year.  I -- let me say that I'm not

3    sure when the kids were younger how often she went, but as

4    they got older she went several times a year.

5    Q.    Did you see Bianca the year that she died?

6    A.    I did.

7    Q.    When did you see her that year?

8    A.    I saw her -- I think it was in May and maybe in June

9    for two dinners when she was back in Greensburg -- I was --

10   I'm living in Pittsburgh now and we got together for dinner.

11   Q.    Did she talk about her plans for later that year?

12   A.    She did.  She -- we always ended our dinners with

13   trying to decide when we'd see each other again since she

14   didn't live in Greensburg all the time; she was mostly in

15   Arizona.  And she told me she had this family wedding in

16   New York, that her nephew was getting married, I think at

17   St. Patrick's Cathedral.  She was pretty excited about the

18   whole thing.

19         And she was going hunting in September, I thought,

20   to Zambia.  Her and Larry were going and they'd be back in

21   time to go to the wedding in New York City.  She had family

22   from Europe coming in for that wedding, I know that.  And

23   they were to travel out west after the wedding to visit the

24   Grand Canyon and some national parks, I think.  They were

25   going to meet at Valerie Woods' house in Sedona, and then

DIRECT - MEYER

1   her family was going to come and visit with her and Larry in

2   Phoenix.

3   Q.    I'd like to bring up Government Exhibit 46, which has

4   already been admitted.

5         Is this an email that Bianca sent to you and

6   another friend just a few weeks before she died?

7   A.    Yes, it is.

8   Q.    And does she indicate that she's looking forward to

9   hosting her family after the upcoming wedding?

10  A.    Yes, she does.

11  Q.    You can take this down.  Thank you.

12        How did you learn about Bianca's death?

13  A.    On a Tuesday -- it was a Tuesday, and I think it was

14  the 18th of October.  I was -- had worked the next day so I

15  was in Pittsburgh.  And I got a phone call from a

16  Greensburg, Pennsylvania number that I didn't recognize, but

17  I decided to pick it up since I knew a lot of people there.

18        And it was Julian Rudolph calling me, which was

19  very surprised.  He never called me before.  And for a split

20  second I thought, oh, they must be planning a party or

21  something.  And then he choked up a bit and told me that his

22  mother had passed away.

23        This -- I was pretty rattled at that point.  And

24  then I -- I said, "How -- how did she die?"

25        And he said, "It was an accident."

DIRECT - MEYER

1          And since I knew about this -- all these wedding

2     plans and her hunting plans, I assumed it was a car

3     accident.  And I asked him if it had been a car accident and

4     where?  And he said, "No, it had been a hunting accident."

5     And I asked him, "Were they still in Africa?"

6          And he said, "Yes."

7          I could hear AnaBianca crying in the background.

8     And I asked him where his -- you know, where his dad was.

9     And he said, "Oh, he's in Arizona."

10          And I said, "Well, what happened?"  Because at that

11     point I -- a hunting accident could have meant anything to

12     me.  You know, she could have been mauled by a lion for all

13     I knew.  And he said he didn't know anything; that the

14     details of the accident he did not know.

15     Q.    Did you attend Bianca's memorial service?

16     A.    I did.

17     Q.    Who invited you?

18     A.    Ana called me I think the next day after Julian had,

19     and told me they were doing a memorial.  And I said I would

20     definitely be there.  And she said that wasn't necessary

21     because it was going to be in Arizona.  And I said, "No,

22     we'll be there."

23          And then she called me I think the day after that

24     to give me the details of where to go.

25     Q.    Did it surprise you that it was being held in Arizona?

DIRECT - MEYER

1    A.    I was shocked.

2    Q.    Why?

3    A.    Her friends and family, Larry's work, Bianca, were all

4    located in Pittsburgh and Greensburg area.  Bianca really

5    made a point of saying that once they went to Arizona, they

6    were very private.  And I -- I knew this from them -- from

7    my years of knowing her, that she was a very private person.

8    And they really didn't have friends there, and had no

9    intention of having friends there, really, is what she

10   said.

11   Q.    Were many of her friends in attendance at the memorial

12   service?

13   A.    There -- no.  I think there were three of us.  My

14   husband; and the -- and Karen's husband; friends of Ana and

15   Julian's.

16   Q.    Did anything surprise you about the memorial service?

17   A.    When I went, I really didn't have a strong opinion one

18   way or another what had happened or anything.  I was still

19   pretty upset.  But when I walked into this small room and

20   realized that there was not a casket or a priest or a

21   service or anything, I -- I was surprised.  I didn't think

22   that's what she would necessarily have wanted, and how small

23   it was.  And I know that Ana and Julian and Larry all spoke,

24   but I think that was it.

25   Q.    So was there a Catholic mass, then?

DIRECT - MEYER

1    A.    No, there was no mass.  I don't recall there even being

2    any kind of service or readings, but . . .

3    Q.    And did the absence of a mass surprise you?

4    A.    Very much.

5    Q.    Why was that?

6    A.    She was a fairly devout Catholic.  She -- I don't think

7    she went to mass all the time, but she -- she prayed the

8    rosary for her kids all the time, I know that.  And she --

9    she was very -- she was very devout.  She was very happy to

10   be a Catholic and was very much into it.

11   Q.    Did Larry give a eulogy?

12   A.    He did.

13   Q.    What was his demeanor at the memorial service?

14   A.    Cold.

15   Q.    Did you attend a reception after the memorial

16   service?

17   A.    I did.

18   Q.    Where was that held?

19   A.    At Larry and Bianca's house in Phoenix.

20   Q.    Did you talk to Larry at that reception?

21   A.    Yes.  He came up to me, gave me a hug, and kind of

22   looked around their house and said, "All of this, what am I

23   going to do with this now?"

24        And I just said, "Larry, what happened in Africa?"

25   And he said, "Oh, I thought you heard.  It was an accidental

DIRECT - MEYER

1   discharge of a firearm."

2           I said, "I know, but what -- where were you?"

3           And I -- and he said, "I was in the other room."

4           I said, "Were you in a hotel?"  I didn't really

5   know where they were at that time.  And he said, "No, it was

6   a camp," and then he left.

7   Q.   You described his demeanor earlier at the funeral as

8   cold.  Had his demeanor changed at the reception?

9   A.   No, I -- he seemed pretty unemotional, detached.  To be

10  honest, I felt that at the memorial and at the dinner

11  afterward, the gathering afterwards at the house, I -- I had

12  the feeling, you know, just a feeling, that he really wanted

13  everybody to be gone.  He wasn't very comfortable with us --

14  with all of us being there, I didn't think.

15  Q.   When did you return home to Pennsylvania?

16  A.   The next day.

17  Q.   Was --

18  A.   Which was Sunday.

19  Q.   The day after?

20  A.   Uhm-hum.

21  Q.   Was anyone else from the memorial on the plane with

22  you?

23  A.   AnaBianca and Julian were on the same plane.

24  Q.   Were you surprised by that?

25  A.   Yes, I was very surprised.

CROSS - MEYER

1    Q.    Why?

2    A.    Just assumed they would stay with their father for a

3    little while longer.  And they had just learned of this

4    tragedy, it just seemed surprising to me that they were

5    headed back already.

6            MR. GREWELL:  No further questions, Your Honor,

7    from the Government.

8            THE COURT:  Cross-examination.

9            MS. DOYLE:  Yes, Your Honor.

10                      CROSS-EXAMINATION

11   BY MS. DOYLE:

12   Q.    Good afternoon, Ms. Meyer.  My name is Lauren Doyle.

13   I'm one of the attorneys representing Dr. Rudolph, and I'd

14   like to ask you a few questions, if that's okay.

15   A.    Sure.

16   Q.    Ms. Meyer, I want to talk about the funeral that

17   Bianca's children and Dr. Rudolph organized in her memory.

18   You said it was not what she would have wanted; is that

19   correct?

20   A.    Yes.

21   Q.    Mr. Reyes, could you please pull up Exhibit RA-8 that

22   has previously been admitted into evidence, please.

23            Now, Ms. Meyer, you mentioned that Dr. Rudolph

24   hosted a reception at his home after the service; is that

25   right?

CROSS - MEYER

1    A.    Yes.

2    Q.    We see in the photo that Dr. Rudolph and his children

3    displayed photos in memory of Bianca.  Do you see that?  Do

4    you remember that?

5    A.    I do.

6    Q.    And we can see in the photos it looks like Dr. Rudolph

7    ordered food to host the friends and family; do you remember

8    that?

9    A.    No, actually somebody told me that AnaBianca's friends

10   in Arizona arranged for the food.

11   Q.    Oh, Ms. Meyers, who told you that?

12   A.    I don't recall.

13   Q.    So you can't confirm whether or not it was Dr. Rudolph

14   or somebody else who ordered the food.

15   A.    No.

16   Q.    Okay.  Thank you.  We can go to the next picture,

17   Mr. Reyes.  We can move on to the next one.  And to the next

18   one.

19         And it looks here like -- here, Ms. Meyer, that the

20   family also arranged to have flowers to decorate the

21   reception.  Do you remember that?

22   A.    I don't remember those -- that particular scene, no.

23   Q.    Okay.

24   A.    I think that was outside.  I wasn't really outside.

25   Q.    Right.  Outside where everybody was gathering?

CROSS - MEYER

1    A.    Yeah.

2    Q.    Okay.  Can you move to the next picture, Mr. Reyes.

3         And we see here in this picture different types of

4    memorabilia.  See that there's some prayer cards; we see

5    that there are some saint candles; some angels; some flowers

6    arranged.  Do you remember this --

7    A.    Not that particular one, no, I don't.

8    Q.    Okay.  We can take the pictures down.  Thank you,

9    Mr. Reyes.

10         Ms. Meyer, you said that you were shocked that this

11   funeral took place in Arizona; is that right?

12   A.    Yes.

13   Q.    Isn't that where Larry and Bianca lived at the time of

14   her death?

15   A.    It is.

16   Q.    And they hadn't just moved to Arizona, right?

17   A.    No.

18   Q.    No, they had been living there for about four years; is

19   that right?

20   A.    Could be.  Yes.  Several years.

21   Q.    And I think you also mentioned on your direct

22   examination that you were aware that Bianca's family was

23   going to be in town during that October 2016 period?

24   A.    I did.

25   Q.    That her siblings and I believe some cousins from

CROSS - MEYER

1    Europe were going to actually be in Arizona.

2    A.    Yes.

3    Q.    Okay.  So you don't think it's unreasonable that Larry

4    and Bianca's children would host a funeral in the city where

5    she lived and the city where her closest siblings and

6    cousins were going to be at the time, do you?

7    A.    Her -- well, I guess not.  I don't know.

8    Q.    Okay.  Mr. Reyes, can we please pull up Exhibit RA-6,

9    that's already been admitted into evidence.

10           And while he does that, Ms. Meyer, I want to talk

11   about where the service was held.  You mentioned that it was

12   in like a small room.  Are you aware that that room was

13   located on the property of the Catholic church?

14   A.    I am.

15   Q.    And are you aware that Bianca's children and

16   Dr. Rudolph arranged for the funeral to be there because

17   that's where Bianca attended mass from time to time?

18   A.    I was not aware of that.

19   Q.    And were you aware that the service was held in the

20   smaller chapel because the church was under construction?

21   A.    I did have some memory of that, yeah.

22   Q.    Okay.  Do you recognize the prayer card that's on your

23   screen, Ms. Meyer?

24   A.    Yes.  I have it at home.

25   Q.    And this is a card that has a prayer from Bianca's

910

CROSS - MEYER

1    favorite saint.  Do you see how Dr. Rudolph and his children

2    had the card personalized with her name at the top?

3    A.    I have many prayer cards at home.  That's how they're

4    set up, yes.

5    Q.    Right.  My question was if you see Bianca's name at the

6    top of the days of her life.

7    A.    Yes.

8    Q.    And do you remember this being made available at the

9    service for friends and family to take home --

10   A.    Yes.

11   Q.    -- in memory of her?

12         You spoke a little -- thank you, Mr. Reyes.  We can

13   take that down.

14         You spoke a little bit at the reception about what

15   you call Dr. Rudolph's cold demeanor.

16   A.    Uhm-hum.

17   Q.    I think you said today, and also many times to the FBI,

18   how many times Dr. Rudolph hugged you during that reception.

19   Is that right?

20   A.    I remember him hugging me once.

21   Q.    Do you remember speaking to the FBI in November of

22   2019?

23   A.    I do.

24   Q.    Do you remember telling the FBI that Dr. Rudolph hugged

25   you at least four times at that reception?

CROSS - MEYER

1    A.    I don't remember that at all.

2    Q.    Dr. Rudolph didn't have the service and then go on his

3    way, right?  He opened his home and had this setup with the

4    display of pictures and food and flowers, and welcomed all

5    of you into his home; is that right?

6    A.    He and his children, yes.

7    Q.    Right.  And he didn't avoid speaking to anybody, did

8    he?

9    A.    I didn't really talk to Larry or see him other than

10   that exchange with one exchange we had.

11   Q.    Right.  You said that not all of Bianca's friends were

12   there, but isn't it true her closest friends were there?

13   A.    Yes.

14   Q.    And her siblings were there?

15   A.    Yes.

16   Q.    And their spouses?

17   A.    Yes.

18   Q.    And her cousins.

19   A.    Yes.

20   Q.    And her children.

21   A.    Yes.

22   Q.    And their closest friends.

23   A.    Yes.

24        MS. DOYLE:  May I have a moment, Your Honor?

25        THE COURT:  You may.

                        REDIRECT - MEYER

1              MS. DOYLE:  No further questions.  Thank you.

2              THE COURT:  Any cross, Mr. Dill?

3              MR. DILL:  No questions, Your Honor.

4              THE COURT:  All right.  Redirect.

5                        REDIRECT EXAMINATION

6    BY MR. GREWELL:

7    Q.   Just one question, Ms. Meyer.  I just want to make sure

8    I heard you correctly.  You say you still have the prayer

9    card from the memorial service for Bianca at your home?

10   A.   I do.

11             MR. GREWELL:  No further questions.

12             THE COURT:  May this witness be excused for the

13   Government?

14             MR. GREWELL:  Yes, Your Honor.

15             THE COURT:  For defendants.

16             MS. DOYLE:  Yes, Your Honor.

17             MR. DILL:  Yes, Your Honor.

18             THE COURT:  Thank you, Ms. Meyer.  Thank you for

19   your testimony.  You're excused.  You may step down.  That's

20   all right.  Thank you, ma'am.

21             I think instead of starting a new witness we'll

22   take our lunch recess at this time.  We'll be in recess for

23   one hour.

24        (Recess taken 12:29 p.m.)

25                        AFTERNOON SESSION

913

DIRECT - SMITH

1      (In open court in the presence of the jury at 1:33

2  p.m.)

3            THE COURT:  Government may call its next witness.

4            MR. GREWELL:  Your Honor, the United States calls

5  Rolecia Smith.

6            THE COURT:  All right.

7            COURTROOM DEPUTY:  Ma'am, if you'll remain standing

8  and raise your right hand for me.

9            ROLECIA SMITH, GOVERNMENT'S WITNESS, SWORN

10            COURTROOM DEPUTY:  Please be seated and remove your

11  mask for us.

12            THE WITNESS:  Okay.

13            COURTROOM DEPUTY:  Then state your full name for

14  the record and spell your first and last names for us.

15            THE WITNESS:  Okay.  My name is Rolecia Smith,

16  R-o-l-e-c-i-a, last name Smith, S-m-i-t-h.

17            THE COURT:  You may proceed, counsel.

18                      DIRECT EXAMINATION

19  BY MR. GREWELL:

20  Q.   Good afternoon.

21  A.   Hi.

22  Q.   Where do you work?

23  A.   State Farm Insurance.

24  Q.   And what services does State Farm provide?

25  A.   Insurance for different products:  home, boats,

DIRECT - SMITH

1    jewelry, different insurance products.

2    Q.   Do they provide life insurance?

3    A.   I'm not sure.

4    Q.   What do you do for State Farm?

5    A.   I am a claims specialist.  I handle property claims.

6    Q.   And what does that job entail?

7    A.   I -- call -- well, I take in claims where people have

8    something bad had happened to them, something happened to

9    their house, something happened to their trailer, to their

10   jewelry, things like that.  I settle claims.

11   Q.   Did you handle a personal property claim filed by

12   Lawrence Rudolph in 2016?

13   A.   I did.

14   Q.   What was he filing an insurance claim about?

15   A.   Missing jewelry; stolen jewelry.

16   Q.   Did he say where that jewelry went missing?

17   A.   I didn't talk to him.

18   Q.   Did he report the -- did he report to State Farm where

19   he was when it went missing?

20   A.   I don't know.

21   Q.   Would looking at the claim history help refresh your

22   memory?

23   A.   Sure.

24        MR. GREWELL:  This is not admitted, Your Honor,

25   just for refreshing.

DIRECT - SMITH

1          Could I have Government Exhibit 181, at page 2.

2     Zoom in for the witness that top -- that section right

3     there.  Thank you.

4     BY MR. GREWELL:

5     Q.    Do you see where he said he -- where he reported to

6     State Farm that he was when the jewelry went missing?

7     A.    That he was -- I'm sorry, say that again?

8     Q.    Do you see where he stated he was when the jewelry went

9     missing?

10    A.    Oh, the named insurer said he was in Zambia.

11    Q.    You can take that down.

12          When did he report the claim to State Farm?

13    A.    I don't know offhand.  I would have to look at the

14    document.

15    Q.    Would that document help refresh your recollection?

16    A.    Uhm-hum.  It would show me when he filed a claim.

17    Q.    Could I have that 181 at 2 -- page 2 again, just for

18    refreshing.  The top section there.

19          Do you see where -- the date it was reported.

20    A.    It was reported on November 22d, 2016.

21    Q.    And do you see the date of the loss?

22    A.    October 11th, 2016.

23    Q.    Thank you.  I'd like to direct your attention to an

24    exhibit that has not yet been admitted.  I'd like Government

25    Exhibit 180.  Again, this hasn't been admitted.

DIRECT - SMITH

1          And could you zoom in on the top part.  Or,

2    sorry -- yeah.  Thank you.  And then could we have page 2 as

3    well.

4          Are you familiar with this document?

5    A.   Yes.

6    Q.   And if we could go back to page 1, please.

7          And what is this document?

8    A.   This is the payment worksheet.  It summarized the

9    payment that's issued on the claim.

10   Q.   Is this a record that State Farm would have made at or

11   near the time the payment was made for the lost earrings?

12   A.   Yes.

13   Q.   Is there a record that's kept in the course of State

14   Farm's regularly conducted business activity?

15   A.   It is.

16   Q.   Is making the record a regular practice of State Farm's

17   business activities?

18   A.   Yes.

19        MR. GREWELL:  I'd move to admit Government Exhibit

20   180, Your Honor.

21        THE COURT:  Any objection?

22        MR. MARKUS:  No objection.

23        MR. DILL:  No objection, Your Honor.

24        THE COURT:  All right, there being no objection,

25   Government's Exhibit 180 is admitted into evidence and may

DIRECT - SMITH

1    be published to the jury.

2          (Government's Exhibit 180 received)

3    BY MR. GREWELL:

4    Q.    How much did State Farm pay on the claim for the lost

5    hearings?

6    A.    $15,044.

7    Q.    And when did it make that payment?

8    A.    I don't know.  I would need to look at the -- another

9    document.

10   Q.    Do you see under the next to the --

11   A.    Right there.

12   Q.    -- Lost Payment Summary, next to the amount, does it

13   say a date paid?

14   A.    Uhm-hum.  It's November 23d of 2016, when the payment

15   was issued.

16   Q.    Thank you.  You can take this one down.

17          Do you recall whether there was a single payee or

18   two joint payees on the check that paid this claim?

19   A.    I don't recall.

20   Q.    Would looking at the payment settlement help refresh

21   your memory?

22   A.    Yes.

23          MR. GREWELL:  This has not been admitted, Your

24   Honor, just to refresh her memory.  Government 182, page 1,

25   please.

DIRECT - SMITH

1    BY MR. GREWELL:

2    Q.    Does this refresh your recollection of whether there

3    was more than one payee?

4    A.    There's more than one.

5    Q.    And who were those payees?

6    A.    Bianca and Lawrence Rudolph.

7    Q.    Okay.  I can take this one down.

8           Did you have a conversation with Mr. Rudolph to

9    insure that he could get the funds with his deceased wife as

10   one of those payees?

11   A.    I don't remember.

12   Q.    Would looking at the file history again help refresh

13   your recollection?

14   A.    Yes.

15   Q.    If I could have Government Exhibit 183, at 3, to

16   refresh.

17          Do you see at the top of this document -- does

18   what's described there refresh your recollection about

19   whether you had a conversation with Mr. Rudolph to ensure

20   that he could get the funds with his deceased wife as one of

21   the payees?

22   A.    Can I read this?

23   Q.    Yes.  If it helps refresh your recollection.

24          THE COURT:  Can we blow it up, please.

25          THE WITNESS:  Thank you.  Okay.  Can you repeat the

DIRECT - SMITH

1    question.

2    BY MR. GREWELL:

3    Q.    Did you speak with him about how he could get the funds

4    with his deceased wife being one of the payees?

5    A.    No, I had a conversation with Maryann who worked in the

6    agent's office.

7    Q.    Do you see the very last paragraph in there that's

8    blown up?

9    A.    Okay.  Yes, I did.

10   Q.    And what did -- what did you -- what did you ask him?

11   A.    I asked if there was an account that had both their

12   names on it or if he had power of attorney documents.

13   Q.    And what did he tell you?

14   A.    He advised that he had an account that had both names

15   on it.

16   Q.    Did he report to State Farm at all how the jewelry went

17   missing?

18   A.    He spoke to someone else.

19   Q.    So did he report it to State Farm --

20   A.    Yes.

21   Q.    -- someone at State Farm?

22   A.    In the agent's office.

23   Q.    Okay.  And -- and what did he say had happened?

24        MR. MARKUS:  Objection, Your Honor.  I think that

25   calls for hearsay, what he told someone else at State Farm.

                          DIRECT - SMITH

1              THE COURT:  Counsel.

2              MR. GREWELL:  And we're not offering it for the

3     truth of the matter asserted, Your Honor.

4              THE COURT:  What are you offering it for?

5              MR. GREWELL:  Simply the statement that he made;

6     not that the statement was true.

7              THE COURT:  Well, then if it's -- what is the other

8     purpose other than that it was -- just the fact that he made

9     the statement?

10             MR. GREWELL:  Yes, Your Honor.

11             THE COURT:  All right.  I'll allow it.  Overruled.

12             You may answer.

13             THE WITNESS:  I would need to go back to the first

14    document.

15    BY MR. GREWELL:

16    Q.  Do you see in this second paragraph of this document --

17    does it say how the jewelry went missing?

18    A.    Yes.

19    Q.    To -- if it refreshes your recollection.

20    A.    It says that the -- they go on safaris --

21             MR. MARKUS:  Well, Judge, I'm sorry, I would

22    object.  He's asked if it refreshes her recollection and

23    she's just reading the document.

24             THE COURT:  Right.  I mean, ma'am, what you've got

25    to do is review the document, have your memory refreshed,

921

DIRECT - SMITH

1    and then we'll take down the document and you have to

2    testify from your refreshed recollection.  You don't get to

3    read it.

4                THE WITNESS:  Okay.

5                THE COURT:  Okay.

6                THE WITNESS:  From my memory, I was told that

7    the -- both policyholders go on safaris and, while at a

8    safari, Missus was killed.  While her body was being

9    transferred from one place to another, jewelry that she had

10   on was missing.  And a claim was filed for the jewelry that

11   was missing.

12               MR. GREWELL:  Thank you.  No further questions,

13   Your Honor.

14               THE COURT:  All right.  Cross-examination.

15               MR. MARKUS:  No questions, Your Honor.  Thank

16   you.

17               THE COURT:  Any questions, Mr. Dill?

18               MR. DILL:  No, Your Honor.

19               THE COURT:  All right, may this witness be excused

20   for the Government?

21               MR. GREWELL:  She may.

22               THE COURT:  For defendants?

23               MR. MARKUS:  Yes, Your Honor.

24               THE COURT:  Mr. Dill?

25               MR. DILL:  Yes, Your Honor.

1          THE COURT:  Ms. Smith, thank you so much for your

2     testimony.  You're excused.  You may step down.

3          THE WITNESS:  Thank you.

4          THE COURT:  Government may call its next witness.

5          MR. WINSTEAD:  Thank you, Your Honor.  United

6     States calls Chris Calgaro.

7          THE COURT:  All right.

8          COURTROOM DEPUTY:  If you'll raise your right hand

9     for me.

10        CHRISTOPHER CALGARO, GOVERNMENT'S WITNESS, SWORN

11         COURTROOM DEPUTY:  Please be seated and remove your

12    mask for us and then state your full name for the record and

13    spell your first and last name for us.

14         THE WITNESS:  Christopher Calgaro.  Oh, here?

15         COURTROOM DEPUTY:  Please.

16         THE WITNESS:  Christopher Calgaro.

17    C-h-r-i-s-t-o-p-h-e-r, C-a-l-g-a-r-o.

18         THE COURT:  Sir, you can take your mask entirely

19    off.  There you go.  I think you will be more comfortable

20    that way.

21         THE WITNESS:  Thank you.

22         THE COURT:  You may proceed, counsel.

23         MR. WINSTEAD:  Thank you, Your Honor.  With this

24    witness I'm going to be referencing Government Exhibits 140,

25    141, and 142.  They weren't previously stipulated to, but I

923
DIRECT - CALGARO

1    believe that there's no objection and so I would move to

2    admit them at this time.

3         THE COURT:  All right, given the stipulation of the

4    parties, Government Exhibits 140, 141, and 142 are admitted

5    into evidence and may be published to the jury.

6         (Government's Exhibit 140, 141, and 142 received)

7         MR. WINSTEAD:  Thank you, Your Honor.

8                          DIRECT EXAMINATION

9    BY MR. WINSTEAD:

10   Q.   Good afternoon, sir.

11   A.   Good afternoon.

12   Q.   Can you tell me where you work.

13   A.   Fidelity Life Association.

14   Q.   What sort of a company is that?

15   A.   It's a life insurance company.

16   Q.   What sort of life insurance do you administrate?

17   A.   Mostly term life and some accidental death benefit

18   policies.

19   Q.   What's your current position?

20   A.   Business services executive.  My main role is claim

21   manager.

22   Q.   Did you have the same job in 2016?

23   A.   Yes.

24   Q.   Can you tell me briefly what your duties are in that

25   role.

DIRECT - CALGARO

1    A.    Basically to make decisions on the life insurance

2    claims that come in.

3    Q.    Do you make -- or do you do upfront administration on

4    the claims?

5    A.    No.  We -- we send it out to an investigator when one

6    is needed and they gather the information, a third party,

7    for us.  Then once they think they've got all the

8    information, they send it to me and then I review it all and

9    make one of three choices:  Pay, deny, or get more

10   information.

11   Q.    Do you review every single claim that comes through

12   fidelity?

13   A.    No.

14   Q.    Which ones do you review?

15   A.    I review all the accident policy claims, and all of the

16   contestable life claims.

17   Q.    How long have you been doing this work?

18   A.    Since 1986.  I believe that's 30 -- 36 years.

19   Q.    How many claims do you think you have reviewed in all

20   that time?

21   A.    Thousands.  More than 10,000, I would -- I would think.

22   Q.    Are you aware of a policy on Bianca Rudolph?

23   A.    Yes.

24   Q.    Do you recall what sort of policy it was?

25   A.    Yes, it was an accidental death benefit policy.

DIRECT - CALGARO

1    Q.    When you say "accidental death benefit," what does that

2    mean?

3    A.    Well, the policy is meant to cover only if there's a

4    covered accident based on the policy language.

5    Q.    Do you recall when that policy was purchased?

6    A.    I'm thinking it was 2012.

7    Q.    At some point was Fidelity notified of Bianca's death?

8    A.    Yes, I believe 2016, maybe.

9    Q.    Okay.  Could I please get Government's Exhibit 140,

10   page 1, which has been admitted.

11         What is this, sir?

12   A.    That is a letter advising us that there -- there's

13   going to be a claim.

14   Q.    So did you receive this letter?

15   A.    Yes.

16   Q.    Okay.  After you received that, what happens in the

17   process?

18   A.    What happens next is my third-party administrator, the

19   people that gather the information for me, they send out the

20   necessary claim forms and a letter -- a short letter

21   explaining what the beneficiary needs to send.

22   Q.    Can you please bring up Exhibit 141, page 1.

23         Did you receive this back in response to that

24   process?

25   A.    Yes.

926

DIRECT - CALGARO

1    Q.    What is this?

2    A.    This is a letter from a Gallagher & Kennedy saying that

3    they're sending the attachments that are listed there:

4    claimant statement, the policy, certified death certificate.

5    The things that we asked for.

6    Q.    Could you please go to the same exhibit, 141, page 3.

7    What is this?

8    A.    That's the cover page to the policy.

9    Q.    All right.  And would you go to 141, page 6.

10   Does it say what the name of the insured is?

11   A.    Yes.

12   Q.    What is it?

13   A.    Bianca Rudolph.

14   Q.    What's the benefit amount?

15   A.    Yes.  100,000.

16   Q.    And does it say there what the issue date was?

17   A.    Yeah, effective May 4th, 2012.  Oh, and the issue of

18   date as well, April -- is that 26, 2012?

19   Q.    Okay.  Would you please go to 141, page 8.

20   What is this?

21   A.    Page 1 of the claim form.

22   Q.    Is that -- what is this form used for?

23   A.    This is what the beneficiary fills out to say why we're

24   making a claim on this policy.

25   Q.    Can you read the name under "beneficiary."

DIRECT - CALGARO

1    A.    Lawrence Patrick Rudolph.

2    Q.    And can you look at the -- just above that, there's a

3    space that says "cause of death."  What's written in there?

4    A.    "Accident."

5    Q.    All right.  Thank you.  You can take that down.

6          After that -- at this point, is the third-party

7    administrator you described still handling this part of the

8    process?

9    A.    Yes.

10   Q.    What -- in a situation like this, did the administrator

11   ask for any initial information?

12   A.    Yes.  They hired an investigative firm; in this case it

13   was Diligence.  And they asked them to do things that we

14   have prearranged that they do on accidents, which is if

15   there's an autopsy, get one.  If there's a police report,

16   get one.  If there's toxicology, get it.

17   Q.    And I'd like to bring up Government's Exhibit 142.

18         Did the third-party administrator also ask the

19   beneficiary for additional information?

20   A.    Yes.  Because it was a foreign death, we asked for a

21   foreign death questionnaire to be filled out.  And that was,

22   and they sent it back.

23   Q.    So what is this exhibit?

24   A.    This is the return from Gallagher & Kennedy telling us

25   they've got -- they're sending the foreign death

DIRECT - CALGARO

1   questionnaire completed.

2   Q.   And so what materials are attached to this letter?

3   A.   Well, the travel -- you know, when they went, what they

4   were going for, what was their return home, you know,

5   planned.

6   Q.   And are all the materials listed there on the cover

7   letter attached here?

8   A.   I believe they were.

9   Q.   Would you go to page 4 of this Exhibit 142.

10          Can you see, is there a word on that second line

11  that is circled?

12  A.   Yes.

13  Q.   What is it?

14  A.   "Accident."

15  Q.   And then can you read that whole line and then what is

16  handwritten in it.

17  A.   "If death was due to accident, indicate nature of

18  accident and date of accident."

19          And then what's written in is "Gunshot injury,

20  accidental discharge, 10-11-2016."

21  Q.   Thank you.  Were these letters sent through the mail?

22  A.   Yes.

23  Q.   How do you know that?

24  A.   They were sent via, I believe it was, FedEx or UPS.

25  Q.   Could you go to 141, page 12.  What's this?

DIRECT - CALGARO

1    A.    That's the FedEx envelope.

2    Q.    Is it normally your practice to scan those envelopes

3    once you receive things through the mail?

4    A.    Yes.

5    Q.    And could you go to page 142, page 27.  Exhibit 142,

6    page 27.

7          Likewise, was this received in the mail as well?

8    A.    Yes.

9    Q.    All right.  Sir, you had also mentioned that additional

10   investigation with a company called Diligence International

11   was conducted.  Can you explain, is that something you do in

12   every case or is that something that's particular to this

13   case?

14   A.    No, every accident case we -- we use Diligence.  We

15   could use another firm, but we -- lately we've been using

16   Diligence to gather the -- the basic information that we

17   know we always ask for.

18   Q.    Do you automatically do that for foreign deaths?

19   A.    Yes.

20   Q.    So once all these materials had been received and you

21   received materials from Diligence, at that point did you

22   review the claim?

23   A.    Yes.

24   Q.    Was that the first time you had reviewed it?

25   A.    That would be the first time I would have reviewed the

DIRECT - CALGARO

1    whole thing, yes.

2    Q.    So I think you said the options that you have at this

3    stage, but could you tell us again, what decisions are you

4    looking to make once you review a package at this stage of

5    the process?

6    A.    First of all, I'm looking to pay it if it's payable;

7    deny it if there's reason to deny it.  Or if I don't have

8    enough information, send it back and tell them specifically

9    what more information I would want.

10   Q.    What did you do in this case?

11   A.    I asked for more information from the police.

12   Q.    Why did you ask for more information?

13   A.    Well, the police report was not very complete; not what

14   I'm used to seeing.  And I found it odd that a experienced

15   hunter would pack --

16           MR. MARKUS:  Objection, Your Honor, under 401 and

17   403 --

18           THE COURT:  Right.  Sustained.

19           MR. WINSTEAD:  Your Honor, I'm just asking why he

20   took the steps he did in his investigation of the claim.

21           THE COURT:  Why don't you rephrase it that way.

22   BY MR. WINSTEAD:

23   Q.    Well, so, sir, can you explain to us why you decided to

24   request further information rather than either paying it or

25   denying it at that stage.

DIRECT - CALGARO

1    A.    Because of the circumstances with the gun being packed

2    for travel and having ammunition in it.

3    Q.    Why -- why were those circumstances things that made

4    you want more information?

5              MR. MARKUS:  Objection, Your Honor.

6              THE COURT:  Well, I -- have you -- why don't you

7    ask him some more foundation questions in terms of his

8    experience with firearm discharge accidents and we can get a

9    basis for his background to know what you're asking him

10    about.

11              MR. WINSTEAD:  Yes, sir.

12    BY MR. WINSTEAD:

13    Q.    So you said you reviewed upwards of 10,000 claims; is

14    that right?

15    A.    At least.

16    Q.    Did some of those involve firearm deaths?

17    A.    Yes.

18    Q.    In all of that time, looking at firearms deaths, had

19    you ever seen a set of circumstances like this?

20    A.    No.

21    Q.    What about these circumstances were different from what

22    you had seen before?

23    A.    The gun being packed away for travel.

24    Q.    Did you know anything about whether the decedent was

25    familiar with firearms when you were at that stage?

DIRECT - CALGARO

1    A.    Yes.

2    Q.    How did you know that?

3    A.    Through the claim investigation.

4    Q.    And what did you know about her experience with

5    firearms?

6    A.    That she had been hunting multiple occasions prior to

7    this one.

8    Q.    Did the type of firearm involved and the type of injury

9    involved make you pause in your review of the investigation?

10            MR. MARKUS:  Objection, Your Honor.  Relevance.

11            THE COURT:  Overruled.

12   BY MR. WINSTEAD:

13   Q.    Anything about the type of firearm --

14            THE COURT:  You may answer --

15            MR. WINSTEAD:  Oh, sorry.

16            THE COURT:  Did he answer?

17            MR. WINSTEAD:  Not yet.

18            THE COURT:  Okay.  Well, I overruled the objection

19   so he can answer.

20            MR. WINSTEAD:  Sorry, Your Honor.  He was looking

21   back to me.  I was just restating the question.

22            THE COURT:  Oh, all right.

23            THE WITNESS:  I'm sorry, please ask again.

24   BY MR. WINSTEAD:

25   Q.    Sure.  Was there anything about the type of weapon and

DIRECT - CALGARO

1    the type of injury that seemed out of the ordinary to you?

2    A.    Yes.    The -- the length of the weapon.

3    Q.    What additional information did you request?

4    A.    I requested to see if the police were still

5    investigating and if they had any more information.

6    Q.    Did you receive any additional information?

7    A.    Yes and no.    Yes, I got information, but it wasn't --

8    not information that -- what they said was they had closed

9    the case.

10   Q.    Did you eventually decide whether the claim should be

11   paid or denied?

12   A.    Yes, I did.

13   Q.    What did you decide?

14   A.    I paid it.

15   Q.    Why did you decide that?

16   A.    Well, when the police closed the case, there would have

17   been a lot more investigating work to be done and I'm under

18   a time restraint with these things because I can't just keep

19   investigating without, you know, time going by.   I -- I have

20   to make a decision at some point.   And the decision always

21   when -- for me, when I'm unsure and I -- it's always in

22   favor of the beneficiary.

23   Q.    Do you -- when you talk about the time constraints,

24   what concerns do you have about delaying payment on the

25   claim?

DIRECT - CALGARO

1    **A.    There's a couple of things.  In some -- in some**

2    **instances it's statutes that say you've got to make a**

3    **decision in a certain amount of time.  In other cases, it's**

4    **the threat of a lawsuit against the insurance company.  So I**

5    **have to make a business decision based on, okay, if I hold**

6    **this up for more information, is it going to cost us more to**

7    **defend a lawsuit?**

8    **Q.    Do you always try to avoid paying claims if you can?**

9    **A.    I always try to pay claims if I can.**

10   **Q.    Okay.  So when you paid -- actually he already answered**

11   **that.**

12           **So if you had been told during this investigatory**

13   **process by the beneficiary that the death was a homicide**

14   **rather than an accident, would that have changed the way you**

15   **handled it?**

16   **A.    No, I would have gotten all the same information.**

17   **Q.    Would there have been anything different?  So --**

18   **A.    Probably.**

19   **Q.    So -- so if the beneficiary -- if you found out that**

20   **the beneficiary was a suspect or was the murderer, would**

21   **that have changed how you paid the claim at all?**

22   **A.    Yes.  As a suspect, I would have held the claim up.**

23   **Even though I just said I don't hold it up, that's one**

24   **instance where if the beneficiary is a suspect, I have to**

25   **know before I can pay whether or not they are found guilty**

935

CROSS - CALGARO

1    or not.

2              And if they, after trial, are found not guilty, I

3    would pay them.  If they're found guilty, then I wouldn't

4    pay them; it would go to insured's estate or a contingent

5    that wasn't related to the beneficiary.

6    Q.    And this claim was actually -- was this claim actually

7    paid?

8    A.    Yes, this was paid.  To the beneficiary.

9              MR. WINSTEAD:  Thank you.  May I have a moment,

10   Your Honor?

11             THE COURT:  You may.

12             MR. WINSTEAD:  No further questions, Your Honor.

13             THE COURT:  All right.  Cross-examination.

14                        CROSS-EXAMINATION

15   BY MR. MARKUS:

16   Q.    Good afternoon, ladies and gentlemen.  Good afternoon

17   counsel.  Your Honor.

18             Sir, my name -- let me take my mask off.  My name

19   is David Markus.  I represent Dr. Rudolph.  I'm going to ask

20   you a couple of questions, okay, sir?

21   A.    Yes.

22   Q.    The prosecutor just asked you if Dr. Rudolph was a

23   suspect you would have held off paying, right?

24   A.    Correct.  If the police had said that's -- the police

25   have to tell me.  I get that information directly from the

CROSS - CALGARO

1    police.

2    Q.    But he wasn't a suspect, so you paid, right?

3    A.    Correct.

4    Q.    And the FBI wasn't investigating at the time, was it?

5    A.    Not that I'm aware of.

6    Q.    Sure.  In fact, you weren't aware of any open

7    investigations, correct?

8    A.    Correct.

9    Q.    Okay.  I'd like to show you what's -- something that's

10   not in evidence, so I'm going to ask Ms. Guerra to only put

11   it on your screen, which is RA-14-1.

12         You mentioned, sir, that you hired a company called

13   Diligence to do the investigation in this case, correct?

14   A.    Yes.

15   Q.    Is this the website for Diligence, the investigation

16   company that you hired?  The front page of it?

17   A.    I believe it is, but I've never seen it.  I have a

18   third-party administrator that does the hiring for me.  I

19   just tell them who to use so I -- that looks like it for

20   sure.

21         MR. MARKUS:  All right.  We move in RA-14, Your

22   Honor.

23         THE COURT:  Any objection?

24         MR. WINSTEAD:  Just don't understand the relevance.

25         THE COURT:  What is the relevance?

CROSS - CALGARO

1          MR. MARKUS:  The relevance goes to the background

2    of this company that this insurance company hired to do the

3    investigation and what they're specializing in.

4          THE COURT:  I'll allow it.  RA-14 Defendants'

5    Exhibit RA14 is admitted into evidence and may be published

6    to the jury.

7          (Defendants' Exhibit RA-14 received)

8          MR. MARKUS:  Thank you, Your Honor.

9    BY MR. MARKUS:

10   Q.   Can you all see that?  I know it's light.  Yes.

11   Mr. Reyes, can you zoom in on the top part -- portion of the

12   website.

13          Do you see there where it says this is "More than a

14   Global Leader in Due Diligence"?

15   A.   Yes.

16   Q.   And that they offer investigative solutions, foreign

17   and domestic.  Do you see that?

18   A.   Yes.

19   Q.   Is that one of the reasons why you use Diligence,

20   because they can do investigations all over the globe?

21   A.   Absolutely, yes.

22   Q.   Okay.  Thank you.  You can take that down, Mr. Reyes.

23   And the bottom section there where it says, "foreign

24   investigations," can we blow that part up.

25          And do you see here, sir, where it says "Our

CROSS - CALGARO

1    foreign investigations team has proven to be the best

2    anywhere with a deep understanding of nuanced global

3    requirements, we have unrivaled global reach"?  Do you see

4    that?

5    A.    Yes.

6    Q.    Is that another reason why Diligence is used for these

7    foreign investigations, because they're pretty much the best

8    in the business?

9    A.    Yes, I -- I've never seen that before right now, but I

10   wouldn't disagree with it.

11   Q.    Okay.  Thank you.  Thank you, Mr. Reyes, we can take

12   that down.

13            I also think you mentioned that you've done over

14   10,000 claims, correct?

15   A.    Yes, approximately.

16   Q.    Now, I imagine you've seen some -- many different

17   situations over the years, right?

18   A.    Yes.

19   Q.    Lots of gun accidents, I would imagine.

20   A.    Yes.

21   Q.    And each one is a little different, right?

22   A.    Correct.

23   Q.    Sometimes I think you pay it, sometimes you don't pay

24   it, and sometimes you request more information.

25   A.    Correct.

CROSS - CALGARO

1    Q.    Okay.  Now you also mentioned one of the reasons why

2    you might pay something is because of a threat of a lawsuit;

3    do you remember that?

4    A.    Yes, I do.

5    Q.    There was no threat of a lawsuit in this case, was

6    there?

7    A.    I would say sort of.

8    Q.    Well --

9    A.    I was -- I received a letter right -- not long after I

10   received the police report that I had asked for saying, "Did

11   you do anything else," to the police, and they said, "No, we

12   closed the case."

13        And I was contemplating what -- what to do next,

14   and received a letter saying basically "Pay this" from an --

15   an attorney's office.

16   Q.    Okay.  The letters that you saw during direct were

17   letters with the information you had requested, correct?

18   A.    Correct.

19   Q.    That's what you received from the attorney's office,

20   correct?

21   A.    No, then after this, I'm talking about a letter that

22   basically said you need to pay.

23   Q.    Okay.  Did you receive a threat of a lawsuit?

24   A.    I took it that way.

25   Q.    Okay.  Fair enough.  Do you remember whether this

CROSS - CALGARO

1    policy covers suicide?

2    A.   Yes, I do remember.  It doesn't.

3    Q.   It does not.

4    A.   Correct.

5    Q.   So if Mr. Rudolph was trying to commit some scam on an

6    insurance company, the last thing that he would do is say

7    Ms. Rudolph committed suicide, right?

8    A.   Right.

9    Q.   Because if he said that, you wouldn't pay, right?

10    A.   Well, it's -- I have to go based on what the death

11    certificate says and what the experts say, not what the

12    beneficiary says.

13    Q.   Okay.  But certainly if the beneficiary had raised

14    suicide with you, that would have put your antenna up --

15    A.   Yes.

16    Q.   Very good.  Now you received Diligence's initial

17    report, correct?

18    A.   Yes.

19    Q.   And Diligence provided you a pretty detailed report.

20    How -- it was, what, 50 pages or something like this?

21    A.   I don't remember how many pages, but yes, they

22    always -- in my recollection, on all cases they send me a

23    detailed report.

24    Q.   And, Mr. Calgaro, in that report they explained to you

25    how they did site visits, right?

941

CROSS - CALGARO

1    A.    Correct.

2    Q.    They went out in Africa and interviewed people,

3    correct?

4    A.    Yes.

5    Q.    They interviewed people at the funeral home, right?

6    A.    Correct.

7    Q.    People at the camp, right?

8    A.    Yes.

9    Q.    And they reported back to you on all of the

10   investigation that they did, right?

11   A.    Yes.

12   Q.    And they told you that there was nothing to suggest

13   this wasn't an accident, right?

14   A.    They don't tell me that, they just -- they just send me

15   the information.

16   Q.    And there was nothing in there to suggest this wasn't

17   an accident, right?

18   A.    No.

19   Q.    And, in fact, you asked Diligence, "Listen, I'd like

20   some more investigation here," right?

21   A.    Right.

22   Q.    You asked them to interview the professional hunter,

23   Mark Swanepoel, right?

24   A.    Yes, I -- actually when I wanted more I asked for more

25   police work done.

CROSS - CALGARO

1    Q.    You wanted more police work done and you also requested

2    an additional interview, right?

3    A.    Yes.

4    Q.    And Diligence did those things for you, did they not?

5    A.    They did.

6    Q.    And I think you wrote at the time after receiving these

7    additional reports, you could no longer, quote, in good

8    faith hold up payment any longer.  Correct?

9    A.    Correct.

10   Q.    I'd like to show you what's in evidence as Government

11   Exhibit 142, page 6, which is Bates Fidelity 39.

12          This is a portion of the file that Dr. Rudolph

13   provided to you upon your request, correct?

14   A.    Yes.

15   Q.    You asked Dr. Rudolph for a list of the other insurance

16   policies that Mrs. Rudolph had on her life, correct?

17   A.    I think that's part of it, yes.

18   Q.    And Dr. Rudolph provided that to you, did he not?

19   A.    That's true.

20   Q.    And when you saw this, you didn't say, "There's

21   something wrong here, there's other policies.  I can't pay

22   this," did you?

23   A.    No, I did not say that.

24          MR. MARKUS:  Your Honor, I have nothing further.

25   Thank you very much.

REDIRECT - CALGARO

1        THE COURT:  Any cross, Mr. Dill?

2        MR. DILL:  No, Your Honor.

3        THE COURT:  All right.  Redirect.

4        MR. WINSTEAD:  Thank you, Your Honor.

5                REDIRECT EXAMINATION

6   BY MR. WINSTEAD:

7   Q.   Sir, you were just asked about that number of life

8   insurance policies that was disclosed to you.  Did you find

9   anything odd about the number of policies?

10  A.   There was more than what I would usually see.

11  Q.   Okay.  Did -- in the investigation that Diligence did,

12  do you know if they hired a medical examiner?

13  A.   If Diligence hired a medical examiner?  I don't

14  recall.

15  Q.   Do you know if Diligence did any forensics analysis on

16  the scene?

17  A.   No.

18  Q.   If you received a full 50-page report from

19  Diligence --

20        THE COURT:  You can take your mask off, counsel.

21        MR. WINSTEAD:  Oh, sorry.  Thank you, Your Honor.

22  BY MR. WINSTEAD:

23  Q.   If you received the 50-page report from Diligence and

24  it was thorough and had a lot of information in it, I'd ask

25  you again just to explain:  Why didn't you just pay the

REDIRECT - CALGARO

1    policy then?  What questions did you want answered?

2    A.    I -- I was wondering if the police completed their work

3    based on the idea of an experienced hunt- -- only that, only

4    that.  That was my only contemplation of why shouldn't I

5    just pay it now?  And it was to verify how, or if someone,

6    looked at that commonsense part of an experienced hunter --

7    which I'm not -- but common sense tells me if I'm going to

8    pack up a gun --

9              MR. MARKUS:  Objection, Your Honor.

10             THE COURT:  Overruled.  You may finish.

11             THE WITNESS:  If I'm going to pack up a gun for a

12   flight home from Africa back here, before I pack it, all the

13   ammunition's going to be out of it.

14   BY MR. WINSTEAD:

15   Q.    In all of the claims that you reviewed over your

16   career, do you ever remember reviewing a claim where an

17   experienced hunter shot themselves in the chest with their

18   shotgun?

19   A.    Never.

20             MR. WINSTEAD:  No further questions, Your Honor.

21             THE COURT:  All right.  May this witness be excused

22   for the Government?

23             MR. WINSTEAD:  Yes, sir.

24             THE COURT:  For the defendants?

25             MR. DILL:  Yes, Your Honor.

1              MR. MARKUS:  Yes, Your Honor.

2              THE COURT:  Thank you, counsel.

3              Mr. Calgaro, thank you for your testimony.  You're

4    excused.  You may step down.

5              THE WITNESS:  Thank you.

6              THE COURT:  All right, the Government may call its

7    next witness.

8              MR. GREWELL:  Your Honor, the Government calls

9    Rhonda Loosle.

10             MR. MARKUS:  Your Honor, before this witness takes

11   the stand, can we have a very brief sidebar?

12             THE COURT:  About?  Can you just give me a

13   general --

14             MR. MARKUS:  Yes, Your Honor.  The continued

15   questions about whether something was suspicious to the

16   insurance witness, we believe is excludable under 401 and

17   403.  It doesn't tend to make any fact at issue in this case

18   more or less admissible.

19             THE COURT:  All right.  Counsel, approach.

20        (Discussion at sidebar)

21             MR. MARKUS:  Your Honor, our objection is that

22   whether the insurance company witnesses believe something's

23   suspicious is irrelevant and invades the province of the

24   jury.  They were provided information, they either paid or

25   they didn't pay.  Whether they were suspicious or not should

1   be excluded under 401 and under 403.

2           THE COURT:  Who's going to speak?

3           MR. FIELDS:  Your Honor, it goes directly to

4   materiality.  It goes to the decision-making process of the

5   insurance companies and what information they need to

6   influence their decision-making process.  Why they're making

7   those decisions and how, if they had been provided with

8   other information, they would have  -- it would have

9   influenced their decision.  That's a direct element of the

10  cross claim.

11          THE COURT:  I'll let you respond.

12          MR. MARKUS:  Yes, Your Honor.  Whether they were

13  provided with other information or not, we have no objection

14  to that.  What our objection is is when they keep asking

15  questions like:  Did you find it suspicious?  Did this raise

16  your suspicions?  Those are irrelevant and not admissible

17  questions.

18          THE COURT:  Do you have anything else to say?

19          MR. FIELDS:  Same thing, Your Honor.  Those go

20  directly to why they are making the decisions they're

21  making, which is a materiality analysis.

22          THE COURT:  I agree with the Government.  I think

23  this evidence goes directly to the decision-making process

24  and -- of the insurance companies, and for that your

25  objection's overruled.  Yes, it's overruled.  Sorry.

1            (End of discussion at sidebar)

2                  THE COURT:  All right, who's your next witness?

3                  MR. GREWELL:  Rhonda Loosle, Your Honor.

4                  THE COURT:  Okay.

5                  COURTROOM DEPUTY:  If you'll raise your right hand.

6                  RHONDA LOOSLE, GOVERNMENT'S WITNESS, SWORN

7                  COURTROOM DEPUTY:  Thank you.  Please be seated,

8       and you may remove your mask for us.  And then state your

9       full name for the record and spell your first and last name

10      for us.

11                 THE WITNESS:  Rhonda Loosle, it's R-h-o-n-d-a,

12      L-o-o-s-l-e.

13                 MR. GREWELL:  Your Honor, there are five exhibits

14      that have not been stipulated to.  Three of them are

15      submissions to the insurance company, two are checks, but my

16      understanding is that there is no objection from defense

17      counsel to the admission of these exhibits.  They're

18      Government Exhibit 150, 151, 152, 307, and 308.

19                 THE COURT:  All right.  So there's no stipulation?

20      Let me ask:  Is there any objection from either of the

21      defendants to these five exhibits?

22                 MR. MARKUS:  No, Your Honor.

23                 MR. DILL:  No, Your Honor.

24                 THE COURT:  All right.  There being no objection,

25      Government Exhibits 150, 151, 152, 307, 308, are all

948

DIRECT - LOOSLE

1    admitted into evidence and may be published to the jury.

2        (Government's Exhibits received)

3            MR. GREWELL:  Thank you, Your Honor.

4                    DIRECT EXAMINATION

5    BY MR. GREWELL:

6    Q.    Good afternoon, Ms. Loosle.

7    A.    Good afternoon.

8    Q.    Where do you work?

9    A.    Ameritas Life Insurance.

10   Q.    And what services does Ameritas provide?

11   A.    Life and annuities -- life insurance annuities and

12   disability insurance.

13   Q.    What do you do for Ameritas?

14   A.    I am -- currently I'm a supervisor of the life and

15   annuity claims department.

16   Q.    Were you working for Ameritas in 2016?

17   A.    Yes, I was.

18   Q.    What was your role at that time?

19   A.    Claims examiner.

20   Q.    And what does a claims examiner do?

21   A.    We review the claims that come in and make a

22   determination that we have a valid claim and then pay the

23   claims.

24   Q.    Did you process life insurance claims for Ameritas on

25   Bianca Rudolph?

949

DIRECT - LOOSLE

1    A.    Yes, I did.

2    Q.    All right.  I'd like to direct your attention to

3    Government Exhibit 150.  Can we zoom in on the top.

4          Are you familiar with this document?

5    A.    Yes, I am.

6    Q.    What is this document?

7    A.    This was the correspondence that we received notifying

8    us of the death of Bianca Rudolph.

9    Q.    And who sent it to Ameritas?

10   A.    Mr. Rudolph.

11   Q.    And how was it sent?

12   A.    We received it via fax, and then a day later we

13   received it by FedEx.

14   Q.    And when did you receive it?

15   A.    The first notice was on November 14th, 2016 and the

16   FedEx document came November 15th, 2016.

17   Q.    What was Mr. Rudolph requesting?

18   A.    The forms and any other information needed to process

19   the claim.

20   Q.    Do you see anywhere on this document where it says --

21   strike that.

22          Does it say where his wife died?

23   A.    No, it doesn't.

24   Q.    Does he identify where he is living?

25   A.    It does.

950

DIRECT - LOOSLE

1    Q.    And where is that?

2    A.    4141 East Lakeside Lane, Paradise Valley, Arizona

3    85253.

4    Q.    What would Ameritas do when it receives a document like

5    this?

6    A.    We would assign it to a claim examiner who would review

7    the file, put together a packet, along with a letter

8    indicating who the beneficiary is, what documents we need,

9    and include any necessary forms to proceed with the claim.

10    Q.    So did you do that here?

11    A.    Yes.

12    Q.    I'd like to turn to Government Exhibit 151, please.

13          Are you familiar with this document?

14    A.    Yes, I am.

15    Q.    If I could have the second page as well -- or page 2,

16    please.  If I could go back to page 1.

17          When did Ameritas receive this document?

18    A.    I'm not sure of the -- oh, December 27, 2016.

19    Q.    Who submitted this document to Ameritas?

20    A.    A Jennifer Cranston, attorney from Gallagher &

21    Kennedy.

22    Q.    And could I have this part blown up.

23          On whose behalf was it submitted?

24    A.    Mr. Rudolph.

25    Q.    Back out.

DIRECT - LOOSLE

1      Does it mention five attachments to it?

2  A.    Yes, it does.

3  Q.    And do you know how it was submitted to Ameritas?

4  A.    We received it through the mail.  I'm not sure of

5  exactly if it was -- what type of mail, FedEx or UPS or

6  USPS.

7  Q.    If I could have this part zoomed in, please.

8      What is identified as the third attachment to the

9  document?

10 A.    The claimant's state form UN 3963 completed and

11 notarized.

12 Q.    And what is that form?

13 A.    That is our document that we provide to our

14 beneficiaries for them to complete with the beneficiary's

15 information, some basic information about the insured, along

16 with the policy numbers.  And then we ask them to have it

17 notarized and signed.

18 Q.    Could I have page 7 of this document, please.

19     Is this that UN 3963 form?

20 A.    That is correct, yes.

21 Q.    Okay.  Did Ameritas provide this form in response to

22 Mr. Rudolph's letter requesting the forms necessary to

23 process his life insurance claims?

24 A.    Yes.

25 Q.    And how many life insurance policies does he identify

952

DIRECT - LOOSLE

1    with Ameritas here?

2    A.    Two policies.

3    Q.    Could you circle where those are identified.  There's a

4    pen on the side of your screen, if -- to the right side of

5    your screen.  On the monitor.  Sorry.

6    A.    Oh.

7    Q.    Do you see it?  That works, too.  Thank you.

8          Let's go to the next page, page 8.

9          Who -- who signed the 3963 form?

10   A.    Lawrence P. Rudolph.

11   Q.    And was his signature notarized?

12   A.    Yes, it -- yes, it was.

13   Q.    Do you see above where he signed where it says, "fraud

14   warning notice"?

15   A.    Yes.

16   Q.    Zoom in on this part right here.  Sorry -- oh, zoom

17   back out.  Above it.  Thank you.

18          And could you read the line above the fraud warning

19   notice.

20   A.    "The statements above are true and complete to the best

21   of my knowledge."

22   Q.    Okay.  Could we go back to page 7, please.

23          Do you see where it says "cause of death"?

24   A.    Yes.

25   Q.    And what has been checked?

DIRECT - LOOSLE

1    A.    "Accident."

2    Q.    If Mr. Rudolph had selected "homicide," would that have

3    changed how you processed his claim?

4    A.    Yes, it would.

5    Q.    How so?

6    A.    We would have obtained additional documentation or

7    spoke with the detective in the case to determine if there

8    was beneficiary involvement.

9    Q.    If you -- if you discovered that he had intentionally

10   shot her, would that -- would he have been entitled to the

11   proceeds of the policies here?

12   A.    Intentionally?

13   Q.    Yes.

14   A.    I can't think.  Sorry.  No, he would not have.

15   Q.    Could I have page 3 of this exhibit, please.

16         And is this the first attachment to the submission

17   by Mr. Rudolph?

18   A.    Yes.

19   Q.    And what does it appear to be?

20   A.    A death certificate.

21   Q.    And where is that death certificate from?

22   A.    Republic of Zambia.

23   Q.    Did you request more information from Mr. Rudolph when

24   you learned that his wife had died overseas?

25   A.    Yes, I did.

DIRECT - LOOSLE

1    Q.    Why is that?

2    A.    Whenever we have a insured die in a foreign country, we

3    need to verify that it was our insured that died and that

4    the documents we obtained were valid.

5    Q.    Could I have Government Exhibit 152.

6          Are you familiar with this document?

7    A.    Yes.

8    Q.    What is it?

9    A.    Correspondence we received from Jennifer Cranston,

10   attorney, with the additional documentation that we had

11   requested.

12   Q.    And on whose behalf was it sent?

13   A.    Mr. Rudolph.

14   Q.    When did you receive it?

15   A.    January 23d, 2017.

16   Q.    And does it identify 16 attachments included with it?

17   A.    Yes.

18   Q.    Are -- is this some of the information, then, that you

19   requested once you found out that Mrs. Rudolph had died

20   overseas?

21   A.    Can you repeat that?

22   Q.    Is this some of the information that you requested when

23   you found out Mrs. Rudolph had died overseas?

24   A.    Yes.

25   Q.    Could I have page 17.

955

DIRECT - LOOSLE

1       So is this one of the documents that Mr. Rudolph

2    was submitting in support of his life insurance claim?

3    A.   Yes.

4    Q.   What does it say next to the "cause of death" on this

5    document?

6    A.   "Accidental discharge of firearm."

7    Q.   And below that, who's identified for providing that

8    information?

9    A.   Lawrence P. Rudolph.

10   Q.   May I have page 15, please.

11       Did you review all of the materials that he

12   provided in considering his claims?

13   A.   Yes.

14   Q.   So you reviewed this letter in considering his claim?

15   A.   Yes.

16   Q.   Can you read that first paragraph for me.

17   A.   "The couple wound up their program on October 10th,

18   2016 in the late afternoon and were both destined back home

19   to America on October 11th, 2016 but prior to their

20   departure on October 11th, 2016 around 5:30 hours as they

21   were packing their luggage in the room they were staying,

22   the husband went to the bathroom leaving the wife in the

23   bedroom, later the husband Dr. Lawrence Rudolph heard a

24   gunshot and a scream."

25   Q.   And if you could read the next two sentences of the

DIRECT - LOOSLE

1    following paragraph.

2    A.    "Dr. Lawrence Rudolph rushed to the bedroom only to

3    find his wife lying on the floor bleeding from the chest.

4    He tried to resuscitate her with the help of other people at

5    the camp but it was in vain."

6    Q.    Does this document that he submitted claim that he was

7    not in the room when his wife was shot?

8    A.    Correct.

9    Q.    You can take this down.  Thank you.

10           You've already stated that it would have changed

11   how you processed the life insurance claim if you knew he

12   had intentionally shot his wife.  Would it have affected the

13   process of his claims if he had shot his wife on accident?

14   Would you have had to get more information?

15   A.    We would have had to get more information, yes.

16   Q.    Okay.  Do you know if Ameritas eventually paid

17   Mr. Rudolph's life insurance claims for the death of Bianca

18   Rudolph?

19   A.    Yes, we did.

20   Q.    Could I have Government Exhibit 307, please.

21           What is this?

22   A.    Copy of a cashed check.

23   Q.    Is this a check from Ameritas to Mr. Rudolph?

24   A.    Yes.

25   Q.    And how much is he being paid?

957
                          CROSS - LOOSLE

1   A.    $1,003,049.90.

2   Q.    Could I have Government Exhibit 308, please.

3         What is this?

4   A.    A cashed check.

5   Q.    Is this also a check from Ameritas to Mr. Rudolph?

6   A.    Yes.

7   Q.    And were both of these checks to pay the life insurance

8   claims?

9   A.    Yes.

10  Q.    So in total, about how much did Ameritas then end up

11  paying for these claims?

12  A.    1.7 million approximately.

13         MR. GREWELL:  No further questions, Your Honor.

14         THE COURT:  All right.  Cross-examination.

15         MR. MARKUS:  Thank you.

16                    CROSS-EXAMINATION

17  BY MR. MARKUS:

18  Q.    Good afternoon, Your Honor.

19         Hi, ma'am.  My name is David Markus.  Just a couple

20  of questions, okay?

21  A.    Okay.

22  Q.    If this was an accident, Dr. Rudolph should have marked

23  off "accident," right?

24  A.    Yes.

25  Q.    Okay.  Now I think the prosecutor mentioned that you

CROSS - LOOSLE

1    hired a company named Diligence, correct?

2    A.    Yes.

3    Q.    And when you hire a company to do an investigation like

4    Diligence, you have an engagement letter with that company,

5    correct?

6    A.    I'm not sure what you mean by "engagement."

7    Q.    In other words, there's a contract to hire them.

8    A.    Yes.   Correct.

9    Q.    Okay.   And are you aware that in this case, the

10   contract between Ameritas, your company, and Diligence said

11   that you would like Diligence to, quote, conduct a complete

12   investigation in the Republic of Zambia and related

13   locations?

14   A.    I did not know that that said that.   No.

15   Q.    Does that sound about right to you, that that's what

16   Ameritas wanted Diligence to do?

17   A.    Yes.

18   Q.    Conduct a complete investigation in Zambia, correct?

19   A.    Yes.

20   Q.    Okay.   Now before paying the claims, did you have

21   contact with a woman named Jill O'Connor?

22   A.    Yes.

23   Q.    Who's Jill O'Connor?

24   A.    She was my manag- -- well, she is my manager.

25   Q.    Okay.   And before paying the claims, you make a

CROSS - LOOSLE

1    recommendation to Ms. O'Connor as to what should happen,

2    correct?

3    A.    Correct.  At that time, being an examiner, we would

4    take things up to management with foreign deaths,

5    contestables, things like that, to verify that we should

6    move forward.

7    Q.    Sure.  And in this case, when you spoke with

8    Ms. O'Connor, you gave her your recommendations, right?

9    A.    Yes.

10   Q.    And you said that you were basing your recommendations

11   on receiving that full investigation from Diligence,

12   correct?

13   A.    Yes.

14   Q.    And you informed Ms. O'Connor that the death, quote,

15   had been ruled accidental, right?

16   A.    Yes.

17   Q.    There was no information indicating anything

18   additional, correct?

19   A.    Yes.

20   Q.    And your recommendation was, quote, to proceed with

21   payment, correct?

22   A.    Correct.

23   Q.    Thank you, ma'am.  Nothing further.  Thank you.

24        THE COURT:  Any cross, Mr. Dill?

25        MR. DILL:  No, Your Honor.

1           THE COURT:  All right.  Redirect.

2                     REDIRECT EXAMINATION

3    BY MR. GREWELL:

4    Q.   Does Diligence hire a medical examiner?

5    A.   Not to my knowledge.

6    Q.   Do they do forensics at the scene?

7    A.   Not to my knowledge, no.

8    Q.   Do they rely on investigations by foreign law

9    enforcement?

10   A.   Yes.

11           MR. GREWELL:  No further questions, Your Honor.

12           THE COURT:  All right.  May this witness be excused

13   for the Government?

14           MR. GREWELL:  She may.

15           THE COURT:  All right.  For defendants.

16           MR. DILL:  Yes, Your Honor.

17           MR. MARKUS:  Yes, Your Honor.

18           THE COURT:  All right, thank you, counsel.

19           Ms. Loosle, thank you so much for your testimony.

20   You are excused.  You may step down.

21           THE WITNESS:  Thank you.

22           THE COURT:  All right, the Government may call its

23   next witness.

24           MR. FIELDS:  Thank you, Your Honor.  The United

25   States calls Greg Mirabelli.

1              COURTROOM DEPUTY:  Please raise your right hand for

2      me.

3            GREGORY MIRABELLI, GOVERNMENT'S WITNESS, SWORN

4              COURTROOM DEPUTY:  Thank you.  Please be seated and

5      state your full name for the record and spell your first and

6      last name for us.

7              THE WITNESS:  Should I put my mask on?

8              COURTROOM DEPUTY:  You can take it off for now.

9              THE WITNESS:  Gregory Joseph Mirabelli,

10     G-r-e-g-o-r-y.  Mirabelli is M-i-r-a-b-e-l-l-i.

11             THE COURT:  You may proceed, counsel.

12             MR. FIELDS:  Thank you, Your Honor.  Your Honor, at

13     this time before I begin I move for the admission of

14     Government's Exhibits 301, 110, 111, 112, 113, and 120.

15             THE COURT:  Are these stipulated to?

16             MR. FIELDS:  I believe so, Your Honor.

17             MR. MARKUS:  No objection, Your Honor.

18             MR. DILL:  No objection.  No objection, Your

19     Honor.

20             THE COURT:  All right.  Okay, either they're

21     stipulated to or there's no objection for the record.  Given

22     that, Government's Exhibit 301, 110, 111, 112, 113, and 120

23     are all admitted into evidence and may be published to the

24     jury.

25          (Government's Exhibits received)

962

DIRECT - MIRABELLI

1          MR. FIELDS:  Your Honor, just to clarify, did you
2     also get 301?
3          THE COURT:  I think I started off with 301.
4          MR. FIELDS:  Okay, thank you, Your Honor.
5                    DIRECT EXAMINATION
6     BY MR. FIELDS:
7     Q.   Mr. Mirabelli, are you familiar with insurance policies
8     covering the life of Bianca Rudolph?
9     A.   Yes.
10    Q.   How are you familiar with those policies?
11    A.   I was made aware of the policy during -- or shortly
12    after the claim was administered.
13    Q.   Let's look at Government's Exhibit 301.  If we could
14    zoom in on the top.
15          What is this?
16    A.   This is a death benefit check that was payable on the
17    life insurance policy.
18    Q.   For how much money?
19    A.   $772,901.17.
20    Q.   Who was that money paid to?
21    A.   It's paid to Lawrence Rudolph.
22    Q.   All right, let's back up a little bit.  Where did you
23    work in 2016?
24    A.   In 2016, I was employed by MetLife.
25    Q.   Now this check that we're looking at here, 301, it says

DIRECT - MIRABELLI

1    Brighthouse Life Insurance Company.  What's the relationship

2    between Brighthouse and MetLife?

3    A.    So in -- sometime before 2016, MetLife chose to exit

4    the retail or individual life insurance business and

5    established a spin-off company called Brighthouse Financial.

6    Q.    So if a claim was made to MetLife, but this check was

7    paid by Brighthouse, why is that?

8    A.    I'm sorry?  Can you repeat that?

9    Q.    If the claim was made to MetLife but this check was

10   issued by Brighthouse, why?  Why is that the case?

11   A.    Well, it was a -- it was originally a MetLife policy,

12   but through the transition to Brighthouse, it became a

13   Brighthouse policy.

14   Q.    I see.  Okay.  You can take that down, please.  Thank

15   you.

16         At that point in 2016, how long had you worked at

17   MetLife?

18   A.    I began at MetLife in 2005 as a result of the

19   acquisition of Travelers Life & Annuity.

20   Q.    Before that, where did you work?

21   A.    Prior to Travelers Life & Annuity, I worked for the

22   post office for about 18 months, and prior to that I was in

23   the Air Force.

24   Q.    How long have you been in the life insurance industry?

25   A.    Since January of 1989.

DIRECT - MIRABELLI

1    Q.   And, you know, from the time you started in 1989 until

2    2016, approximately how many claims would you say you

3    handled?

4    A.   I would say hundreds.

5    Q.   What was your position at MetLife in 2016?

6    A.   Before August '16 -- before August of 2016, I was in

7    the life investigations unit handling life insurance claims.

8    Q.   Where were you after August 2016?

9    A.   After August of 2016, when MetLife decided to exit that

10   business, I was moved to the disability claims area.

11   Q.   Where was your physical office located at this time?

12   A.   I have been working remotely in my home in Broad Brook,

13   Connecticut, since 2006.

14   Q.   Where is -- where was MetLife's office?

15   A.   The MetLife office that was handling this claim was in

16   Warren Oak, Rhode Island.

17   Q.   Let's look at Government's Exhibit 110, please, which

18   is now in evidence.  Actually let's go to 111.

19        What is this?

20   A.   This is a letter that was received from Dr. Rudolph to

21   notify the company of Mrs. Rudolph's death.

22   Q.   And do you see at the top there, how did MetLife

23   receive this letter?

24   A.   It was received by three means; it was received by fax,

25   by U.S. mail, and by FedEx.

DIRECT - MIRABELLI

1    Q.    Was anything odd about this letter?

2    A.    Well, it's unusual -- it's unusual for a death

3    notification to come in in multiple ways.  Typically a

4    person will either call the customer service area to report

5    the death or send something in writing by one means to

6    report the death.  It does seem unusual, from my experience,

7    that it was sent in by three different ways.

8    Q.    Now if you look at the face of this letter, does it --

9    does it say how Ms. Rudolph died?

10          THE COURT:  Can we blow up --

11          MR. FIELDS:  Yes, sorry.  Thank you.  That's a

12   little bit easier.

13          THE WITNESS:  It does not show -- or it does not

14   say how she died.

15   BY MR. FIELDS:

16   Q.    Does it say where she died?

17   A.    It does not say where she died.

18   Q.    After receiving a letter like this, does MetLife ask

19   policyholders to fill out a claim form?

20   A.    Yes.

21   Q.    So let's look at Government's Exhibit 112.  And now

22   let's go to page 2.  All right.  And let's try and blow up

23   the body of the claim -- of this, if we can.  All right.

24          So what is this?

25   A.    This is the first page of the life insurance claim

DIRECT - MIRABELLI

1    form.

2    Q.    What's the purpose of the claim form?

3    A.    The purpose of the claim form is to have the claimant

4    provide written documentation to present their claim.

5    Q.    All right.  Let's unzoom out.  And if we could go to

6    page 2.  Is there a page 2?  Oh.  Sorry.  No page 2.  Sorry

7    about that.

8         Now do you see -- apologies.  You can take that

9    down.  When MetLife receives a claim for a life insurance,

10   are they concerned about the manner in which a death occurs?

11   A.    Yes.

12   Q.    Why?

13   A.    Because typically a person -- you know, if a -- if the

14   manner of death is homicide, that's really the only manner

15   of death that could be questioned before a claim is paid,

16   with the exception of a suicide early in a -- in a policy.

17   But if it is a homicide, then we need to rule out any

18   involvement by the beneficiary in the homicide.

19   Q.    Why would you have to rule that out?

20   A.    Because in most states, there's slayer statutes that

21   say you can't profit from killing the insured.

22   Q.    When MetLife receives a claim, is there a -- does it

23   make any difference whether or not the death occurs

24   domestically or overseas?

25   A.    Yes.  Typically whenever a death occurs abroad, further

DIRECT - MIRABELLI

1  investigation is done to validate that the death occurred.

2  Q.   Why?

3  A.   Because in -- in some countries, there's experience in

4  the insurance industry of having fraudulent death claims

5  presented.

6  Q.   Now, after MetLife received the claim in 2016, did it

7  decide to conduct an investigation?

8  A.   Yes.

9  Q.   Why?

10  A.   Well, in this particular case, there was three reasons

11  for the investigation.  The first was because the death

12  occurred within the first two years of the policy.  There's

13  a provision in the policy called the contestable period

14  provision where the contract allows the company to validate

15  the information that was provided at the time of application

16  before paying a claim.

17       The second reason for the investigation in this

18  case was because the death occurred abroad.

19       And the third reason was because when the first

20  death certificate or death document was received, there was

21  no manner of death on it.

22  Q.   Are you familiar with the process by which

23  investigations like these are conducted?

24  A.   Yes.

25  Q.   How are you familiar with that process?

DIRECT - MIRABELLI

1    A.    Well, from May of 2006 to August of 2016, my role was

2    as an investigator with MetLife investigations unit that I

3    mentioned earlier.

4    Q.    In this particular case, did MetLife send you out as an

5    investigator?

6    A.    No.

7    Q.    Why not?

8    A.    I was -- I had moved on to another area when this claim

9    came in.

10   Q.    Who did they hire to conduct the investigation?

11   A.    The first -- the first investigative service that was

12   hired was Research Service Bureau, or RSB for short.  They

13   were assigned to do the domestic inquiries, which would

14   entail interviewing the claimant and then gathering

15   information.  When RSB was assigned the case, they advised

16   MetLife that they did not have an investigator in Arizona so

17   it was then reassigned to another vendor.

18   Q.    Who was that vendor?

19   A.    Diligence International Group.

20   Q.    As part of their investigation, did Diligence conduct

21   an interview with Dr. Rudolph?

22   A.    Yes.

23   Q.    What happened when they first tried to contact him?

24             MR. MARKUS:  Objection, Your Honor.  Calls for

25   hearsay.

DIRECT - MIRABELLI

1    THE COURT:  Well, let's establish first a

2    foundation of how he would know this.

3    BY MR. FIELDS:

4    Q.   Do you know how -- well, do you know whether or not

5    they tried to contact Dr. Rudolph?

6    A.   Yes.  There's a report from the --

7    MR. MARKUS:  Objection.  Objection, Your Honor.

8    Calls for hearsay.

9    THE COURT:  Well, this question doesn't.  Let's try

10   to answer the question, sir, without getting into something

11   that someone said.  All right?  If you can just describe

12   what happened, we'll be -- we'll stay out of trouble.  How's

13   that sound?

14   THE WITNESS:  Yes, sir.

15   THE COURT:  All right.

16   MR. FIELDS:  Your Honor, actually my question was

17   about what happened when they contacted Rudolph --

18   THE COURT:  I know that was your question.  You

19   didn't ask him that, but I had a sense that the witness

20   might be shading into discussion statements, so just stay

21   away from the statements.

22   BY MR. FIELDS:

23   Q.   Do you know what happened when they first tried to

24   contact Dr. Rudolph?  Yes or no?

25   A.   Yes.

DIRECT - MIRABELLI

1    Q.    What -- without getting into what -- anything that was

2    said, what happened when they tried to contact Dr. Rudolph?

3            MR. MARKUS:   Objection, Your Honor.   He knows that

4    from hearsay.

5            THE COURT:   Overruled.   You may answer, sir.

6            THE WITNESS:   The report that was supplied by the

7    vendor, the investigation company, stated that they tried to

8    contact Dr. Rudolph and he hung up.   They called back and

9    there was no answer.

10   BY MR. FIELDS:

11   Q.    Did he eventually submit himself for an interview?

12   A.    Yes.

13   Q.    Let's look at Government's Exhibit 113.   Is this an

14   affidavit he provided of that interview?

15   A.    Yes.

16   Q.    What's the purpose of this affidavit?

17   A.    So the purpose of this affidavit is because in order to

18   collect certain information relative to the insured person

19   to conduct the contestable period investigation, some

20   providers require that an authorization be signed by a

21   court-appointed executor or administrator of a person's

22   estate.   And sometimes, in lieu of that, the providers would

23   accept an affidavit of next of kin, so that is the purpose

24   for getting this affidavit.

25   Q.    Let's look at Government's Exhibit 120.

DIRECT - MIRABELLI

1          Is this a list of documents that he provided during
2     the interview?
3     A.    Yes, it is.
4     Q.    Now let's look at Government's Exhibit 10, which is in
5     evidence.  10, please.  One zero, not 110.  Thank you.
6          Is this a report from Diligence?
7     A.    Yes, it is.
8     Q.    Let's look at page 44.
9          Is this a report of Diligence's interview with
10    Lawrence Rudolph?
11    A.    Yes, it is.
12    Q.    Approximately when did this interview take place?
13    A.    I believe this interview took place on December 22d,
14    2016.
15    Q.    All right.  Now let's look at the next page, page 45.
16    Let's see if we can blow up that second paragraph, please.
17          What did he say about the shotgun involved in the
18    incident?
19    A.    It said the insured told the beneficiary she intended
20    to pack the firearms while he was in the bathroom.  Packing
21    the firearms consists of placing them in a soft gun case and
22    then into a larger gun case.  She had two firearms with her,
23    a Remington rifle and a 12-gauge Browning shotgun.  It may
24    have been a Beretta.  They are long guns, though the
25    Remington is a bit shorter than the shotgun.

DIRECT - MIRABELLI

1    Q.    During your career as a claims investigator, did you

2    investigate any firearms accidents?

3    A.    I have been involved in claims that have been impacted

4    by firearms.  It's important to -- it's important to

5    understand that the role of the investigator at this time

6    isn't to solve the crime, if there is a crime; it's simply

7    to gather information from authorities to allow the

8    insurance company to properly evaluate the claim.

9    Q.    Now let's look at the next paragraph, paragraph 3.

10   Actually, the paragraph after that, please.  This paragraph

11   right here, starting with "The beneficiary."

12            Did Dr. Rudolph say anything about the Zambia

13   investigation?  If you could start reading with, "The

14   police."

15   A.    Yes, it says, "The police came to the camp with their

16   investigation unit and conducted a thorough investigation.

17   He stated they ruled it an accidental discharge, not a

18   suicide.  He said that they were looking forward to

19   attending a wedding the next week."

20   Q.    Take that down.  Now let's go to Government's

21   Exhibit 10, page 56.

22            Did Diligence also interview the hunting guide who

23   led the trip?

24   A.    Yes.

25   Q.    What was his name?

DIRECT - MIRABELLI

1    A.    His name is Mark Andrew Swanepoel.

2    Q.    All right.  And let's go to the next page, page 57.  If

3    we look at that -- this third paragraph here.  Yes.

4          What did Mr. Swanepoel say there?

5    A.    It says, "As far as the shooting, Swanepoel deduced

6    that it was probably difficult for a 1.70 M person to reach

7    the trigger of a shotgun if it was a full-length sporting

8    barrel.  However, Swanepoel did not know the barrel length

9    of this particular shotgun and did not wish to speculate.

10   He told us that the pellets did not exit the insured's back.

11   The police photos contain a white blister pack on the floor.

12   Swanepoel told us that this was a wound dressing left by

13   Mr. Rudolph while trying to assist the insured."

14   Q.    Now let's go to the next paragraph.  Actually, sorry, I

15   keep on doing that.  The paragraph after that, please.  The

16   one that starts, "He told us."

17          If you could read that -- the first two sentences,

18   please.

19   A.    "He told us that he had seen Mr. Rudolph unload and

20   clean the shotgun the night before.  The gun was in a soft

21   zippered case which would then be packed into a hard case.

22   Swanepoel thinks that the soft case was a tight fit and he

23   speculates that the insured might have leaned over to push

24   it fully down or to push down the zipper."

25   Q.    Okay.  You can stop there.

DIRECT - MIRABELLI

1    Now I've already showed this to you, Government's

2    Exhibit 120.  Let's go back to it.  These are a list of

3    documents he provided during the interview?

4    A.    Yes.

5    Q.    What does MetLife do with those documents after it

6    receives them from Diligence?

7    A.    So the -- the documents are compared to the information

8    that is -- was provided on the original policy application

9    to validate that the information provided was accurate and

10    the policy was issued properly.

11    Q.    Is it important during an interview like this for the

12    beneficiary to provide you with all of the documents related

13    to an incident?

14    A.    It's absolutely very helpful, yes.  It expedites the

15    investigation process.

16    Q.    Let's go to page 4 of this.

17    What is represented here as the cause of death?

18    A.    "Accidental discharge of firearm."

19    Q.    Let's go back to Government's Exhibit 120, page 1.  And

20    actually put that on the left-hand side of the screen.  Now

21    let's scroll through and let's -- on the right-hand side of

22    the screen there, let's go to page 2.  And let's just keep

23    scrolling.  Let's look at all the documents that he

24    submitted.  Okay.  And now on the left side of the screen,

25    let's pull up Government's Exhibit 36.

DIRECT - MIRABELLI

1      This document on the left, Government's Exhibit 36,

2    did he submit this document to MetLife?

3    A.    I do not believe he did, no.   That was not in the file.

4    Q.    And do you see what it says there in bold right at the

5    top?

6    A.    Yes.

7    Q.    What does it say?

8    A.    Says "suicide."

9    Q.    If MetLife had received this document, would it have

10   made different decisions?

11   A.    Yes.

12   Q.    Why?

13   A.    When a death occurs by suicide on the first two years

14   of a policy, the death benefit is limited to the amount of

15   premiums paid for the policy.

16        MR. MARKUS:   Judge, objection.   I'd like to reserve

17   a motion that I could raise later with the Court.

18        THE COURT:   All right.   Okay, we'll do that when we

19   get to the appropriate time.   Go ahead.

20   BY MR. FIELDS:

21   Q.    And do you see here -- let's blow up this sort of

22   middle paragraph there.

23   A.    Yes.

24   Q.    Okay.   What does it say about the working mechanism of

25   the exhibit shotgun?

DIRECT - MIRABELLI

1    A.    It says, "The working mechanism of the exhibit shotgun

2    is perfect as both its cocking and firing mechanism are in

3    good condition.  This was arrived at when I test-fired the

4    exhibit by loading and discharging two cartridges and

5    obtained" --

6            MR. MARKUS:  Excuse me, sir.  Objection.  He's

7    reading from a document he's never seen before.  I would

8    object.

9            MR. FIELDS:  It's in evidence, Your Honor.

10            THE COURT:  It's in evidence.  Overruled.

11    BY MR. FIELDS:

12    Q.    You can keep going, sir.

13    A.    "This was arrived at when I test-fired the exhibit by

14    loading and discharging two cartridges and obtained

15    cartridges cases from the" -- "from the purpose a comparison

16    analysis.  Therefore, it is capable of loading, discharging

17    and ejecting cartridges of the same caliber."

18    Q.    You can take that down now.

19            If MetLife had been informed that the shotgun that

20    was part of an accidental discharge was in perfect

21    condition, would that have changed its decision?

22    A.    Yes.

23    Q.    How so?

24    A.    Well, with this document, it's likely that the suicide

25    benefit would be paid.

1      Q.    Take those down.

2            If MetLife, during the course of its investigation,

3      had obtained information that this was something other than

4      an accident, would that have changed its decision-making

5      process?

6      A.    Yes.

7      Q.    How so?

8      A.    Well, if it -- if it was determined to be a suicide,

9      then the suicide benefit would be paid.  If it was

10     determined to be a homicide, then an investigation would

11     have included ruling out any involvement from the

12     beneficiary.

13            MR. FIELDS:  Your Honor, may I have a moment?

14            THE COURT:  You may.

15            MR. FIELDS:  No further questions, Your Honor.

16            THE COURT:  All right.  Before we go to cross,

17     counsel approach for the defendants' motion.

18          (Discussion at sidebar)

19            THE COURT:  Thank you.

20            MR. MARKUS:  Thank you, Your Honor.  My motion is

21     for mistrial because as the prosecution knows, that document

22     with the word "suicide" there does not mean suicide in the

23     sense that we know suicide.  It's what the previous witness,

24     Otto Westhassel, said, It means from -- it means not from

25     the hands of another.  And so it could be an accidental

1    discharge as suicide is understood in Zambia and by the
2    Zambian people who wrote that report.

3           The prosecutor knows this and is trying to suggest
4    to the jury that that word "suicide" means that Ms. Bianca
5    Rudolph intentionally took her life which is absolutely not
6    what that document means.

7           THE COURT:  Mr. Fields.

8           MR. FIELDS:  Your Honor, the document itself
9    says -- sorry, says "suicide."  They speak English in Zambia
10   so they know what suicide means.  Otto Westhassel testified
11   that the defendant left the impression that suicide may have
12   been committed here.  And certainly some of the Zambian
13   investigators were under that impression, which is why the
14   document says "suicide."

15          Mr. Rudolph intentionally withheld this document
16   from the insurance companies because it would have resulted
17   in additional investigation.  It's relevant.  It's material
18   and it goes to both the fraud and his intent regarding the
19   murder.

20          MR. MARKUS:  That document is in the Diligence
21   reports, which this witness had.

22          MR. FIELDS:  He did not have these documents, Your
23   Honor.  In fact, Government's Exhibit 120 is the list of
24   documents submitted, and his testimony just now is that this
25   document was not provided to him.  It was provided to

1    Diligence and some other insurance companies, but this

2    particular witness at MetLife did not see it, which is his

3    testimony today.

4        THE COURT:  Okay.  How in the context of all the

5    other evidence that has come in on the stand for showing the

6    requirement of a mistrial, how does this particular piece of

7    evidence preclude the defendant from having the fair and

8    impartial trial that he's entitled to?

9        MR. MARKUS:  Because the Government is making a

10   misleading argument about suicide here, Your Honor.  It

11   knows that that's not what that document means.  It knows

12   that suicide in that context, in that document, does not

13   mean that she intentionally --

14       THE COURT:  But how do we know that?  You're basing

15   this on Mr. Westhassel --

16       MR. MARKUS:  Westhassel.

17       THE COURT:  -- Westhassel's testimony?

18       MR. MARKUS:  It's based on his testimony and based

19   on the entire investigation that Mr. Fields and I know very

20   well that that word "suicide" does not mean that she

21   intentionally took her life.

22       THE COURT:  You're trying to attribute a meaning to

23   this word and the context of this document based on one

24   witness where -- it would be one thing if we were talking

25   about two countries where different languages are spoken,

CROSS - MIRABELLI

1    but this is a country that also, at least seems the official

2    language is English.  And they use particular words that I

3    can't ascribe just one meaning to it because of the

4    testimony of a witness.

5           I don't think you've met the burden to show that

6    this is -- in the context of all the other evidence that is

7    produced during the trial has taken away the accused's right

8    to a fair and impartial trial, so your motion for mistrial

9    is denied.

10          (End of discussion at sidebar)

11          THE COURT:  All right, before we go to cross,

12   folks, we're going to take our afternoon recess.  We will be

13   in recess for 15 minutes.

14          (Recess taken 3:10 p.m. to 3:27 p.m.)

15          THE COURT:  Mr. Mirabelli, I remind you you remain

16   under oath.

17          THE WITNESS:  Yes, sir.

18          THE COURT:  Cross-examination.

19          MR. MARKUS:  Thank you, Your Honor.  Good

20   afternoon, ladies and gentlemen, counsel, Your Honor.

21                    CROSS-EXAMINATION

22   BY MR. MARKUS:

23   Q.   Mr. Mirabelli, my name is David Markus.  I'm going to

24   ask you a few questions, okay, sir?

25   A.   Yes, sir.

CROSS - MIRABELLI

1    Q.    Let's start with Government Exhibit 110, page 13, which

2    is MetLife 88.

3              This, sir, is the signature page for the MetLife

4    policy, correct, sir?

5    A.    Yes.

6    Q.    And if we could zoom in on the signatures for that

7    page, Mr. Reyes.

8              Do you see the two signatures there?

9    A.    Yes.

10   Q.    Do you see one is by the proposed insured, Bianca

11   Rudolph?

12   A.    Yes.

13   Q.    And do you see that it's signed in Paradise Valley,

14   Arizona, where they lived?

15   A.    Yes.

16   Q.    Do you see that the next line is for additional -- I'm

17   sorry, signatures of all owners; do you see that?

18   A.    Yes.

19   Q.    And does that appear to be Lawrence Rudolph's

20   signature?

21   A.    Yes.

22   Q.    Okay.  And can you tell there, sir, that a different

23   pen is used for Lawrence Rudolph's signature and Bianca

24   Rudolph's signature?

25   A.    It does appear that way, yes.

CROSS - MIRABELLI

1    Q.    And do you see where it says Paradise Valley for both

2    her and him, it appears to be a different pen?

3    A.    Yes.

4    Q.    Okay.  Looks like Bianca Rudolph and Larry Rudolph

5    signed this document, sir, correct?

6    A.    Yes.

7    Q.    Okay.  And at the bottom of that page, do you see the

8    signature for a witness named William Gorman?

9    A.    Yes.

10   Q.    Do you know who that is?

11   A.    It was a life insurance producer.

12   Q.    Okay.  Thank you, Mr. Reyes.  We can take that down.

13         Let's now turn to a Government exhibit that the

14   prosecutor asked you a lot of questions about.  Government

15   Exhibit 10, which is the Diligence report.

16         You've reviewed this Diligence report, correct,

17   sir?

18   A.    Yes.

19   Q.    And you reviewed it not just before your testimony

20   today, but before you agreed to pay the claim, correct?

21   A.    I personally did not.

22   Q.    You never reviewed the Diligence report?

23   A.    Not before I was -- the claim was approved to pay.  I

24   reviewed the report in preparation for this trial.

25   Q.    Okay.  The prosecutor asked you a lot of questions

CROSS - MIRABELLI

1    about this report, remember that?

2    A.    Yes.

3    Q.    Okay.  Let's turn to page DLG 390 of that report.

4         Do you see, sir, that Diligence did a site visit to

5    FSG Limited Funeral Home?

6    A.    Yes.

7    Q.    That means that they actually went to the funeral home

8    and did a visit where they interviewed somebody, correct?

9    A.    Yes.

10   Q.    Okay.  Do you see here, sir, where the person that was

11   interviewed at FSG Funeral Home said that Dr. Rudolph was

12   accompanied by some people and a police officer?  Do you see

13   that?

14   A.    Yes.

15   Q.    Okay.  Nothing about a bribe mentioned there; do you

16   see that, sir?

17   A.    Nothing about a bribe?

18   Q.    Do you see anything about a bribe mentioned in that

19   paragraph?

20   A.    No, I do not.

21   Q.    Just the opposite.  He was with a police officer at the

22   funeral home, correct?

23   A.    That's correct.

24   Q.    Thank you.  Okay.  We can move down on the page now to

25   site visit of Ambassador St. Ann's Funeral Home.

CROSS - MIRABELLI

1          This is a different funeral home, correct?

2     A.    Yes.

3     Q.    And do you see here that they also did a site visit

4     here?

5     A.    Yes.

6     Q.    Okay.  Thank you.  We can take that down.  Let's go to

7     the next page, which is DLG 391.

8          Sir, do you see at the top that they did a site

9     visit with the medical examiner?

10    A.    Yes.

11    Q.    Now, this is the Diligence investigative company that

12    was doing the investigation for the insurance companies,

13    correct?

14    A.    Yes.

15    Q.    They did site visits to meet with all these people in

16    Lusaka, Zambia, correct?

17    A.    Yes.

18    Q.    And do you see here where they met with a man named Dr.

19    D. Maswahu?

20    A.    Yes.

21    Q.    Okay.  And if we could go to the second paragraph of

22    that portion where it said, "The insured's heart and left

23    lungs were in pieces."

24         Do you see the next sentence there where he stated

25    "The insured was shot with a shotgun and the entry wound

985
CROSS - MIRABELLI

1    where a shell went through was very large, meaning it was

2    fired at very close range;" do you see that?

3    A.    I see it.

4    Q.    That's the medical examiner saying that the shot was at

5    very close range, correct?

6    A.    Yes.

7    Q.    Okay.  Let's go to the very bottom paragraph of that

8    section where it says, "He said the husband."

9         Do you see that sentence where it said, "He said

10   the husband seemed genuinely shocked"?

11   A.    Yes.

12   Q.    "And was sometimes assisted by two men who accompanied

13   him;" do you see that?

14   A.    Yes.

15   Q.    He's referring there to the husband, Dr. Rudolph,

16   correct?

17   A.    Yes.

18   Q.    And the words used were "genuinely shocked."  Like

19   actually shocked at what had occurred, right?

20   A.    Yes.

21   Q.    Okay.  We can take that down.

22        Let's go to the next portion of that page.  Sorry,

23   DLG 391.  I apologize, Mr. Reyes.

24        Do you see that they also interviewed the police

25   commanding officer, a man named Roston Yeyenga?  Do you see

CROSS - MIRABELLI

1    that?

2    A.    Yes.

3    Q.    That was the commanding police officer at the time,

4    correct?

5    A.    That's what the report says, yes.

6    Q.    Okay.  And if we could turn to the next page, which is

7    DLG 392.  If we zoom in on this paragraph here.

8          I want to focus your attention starting with this

9    sentence, "They did not know."  Do you see that?

10   A.    Yes.

11   Q.    "They did not know exactly how close the shotgun was to

12   the wound but said it appeared to be very close."  Do you

13   see that?

14   A.    Yes.

15   Q.    Now I want to pay specific attention to the next

16   sentence.  "They did not notice any gunpowder residue that

17   could help estimate the distance."  Do you see that, sir?

18   A.    Yes.

19   Q.    So here the police are telling the commanding police

20   officer he said that his investigation was looking for

21   gunpowder residue.  Do you see that?

22   A.    Yes.

23   Q.    Thank you, sir.  We can take that down.  I'd like now

24   to turn to DLG 400, which is also part of the Diligence

25   report.

CROSS - MIRABELLI

1          Now the prosecutor asked you questions about

2    whether this was -- this document was provided by

3    Dr. Rudolph.  Do you remember those questions?

4    A.    I do.

5    Q.    The truth is, sir, that this document was provided by

6    Diligence to you, correct?

7    A.    It does appear that way.

8    Q.    So you had the document that the prosecutor said was

9    not provided to you, correct?

10   A.    I -- I -- from my -- from my review of the file prior

11   to today, I don't recall seeing this before today.

12   Q.    Okay.  So the prosecutor asked you about this word at

13   the top, "suicide."  I want to talk to you about that word.

14   If we could call up for a second, Mr. Reyes, RA-10-3.    I

15   want to -- I'm sorry, it's INV 605.  Sorry about that.    I

16   want to zoom in on this section here.

17          Now are you aware, sir, that the word "suicide" in

18   Zambia has a slightly different meaning than here in the

19   United States?

20   A.    I'm not aware of that.

21   Q.    Are you aware that suicide in Zambia indicates that the

22   death did not appear to be at the hands of another?  Do you

23   see that?

24   A.    Yes.

25   Q.    So when the prosecutor was suggesting to you that that

CROSS - MIRABELLI

1    document, "suicide" meant that Ms. Rudolph intentionally

2    took her own life, are you aware that that's not at all what

3    that document meant?

4    A.    I -- I did not read the entire document so I don't

5    know.

6    Q.    Thank you, sir.  We can take that down.  Let's go to

7    DLG 645.

8         I think you discussed how the beneficiary was

9    interviewed -- the beneficiary's Dr. Rudolph, correct?

10   A.    Yes.

11   Q.    And there's a discussion -- if we go to the next page,

12   DLG 646 -- if we can zoom in on the third paragraph there.

13        This is -- I want you to read the paragraph that

14   the prosecutor skipped over with you where it starts,

15   "Somewhere between 5:15 a.m. and 5:30 a.m."  Could you read

16   that to the jury, please.

17   A.    "Somewhere between 5:15 a.m. and 5:30 a.m., while in

18   the bathroom the beneficiary heard a gunshot and then heard

19   his wife scream.  He ran into the bedroom where he found her

20   lying on the floor.  She had a gunshot wound to her left

21   chest.  He administered CPR.  The beneficiary stated he

22   always carries an extensive medical kit.  Mark, their

23   professional hunter, heard the gunshot and came into the"

24   cabinet -- excuse me, "the cabin.  He assisted the

25   beneficiary by getting the medical kit for the doctor and

CROSS - MIRABELLI

1    getting whatever he needed from it. 'In less than a minute,'

2    the beneficiary pulled him away from doing any further CPR

3    because she had passed away."

4    Q.   Thank you, sir.  We can take that down.  If we could go

5    to DLG 687, please.

6         I want to talk to you briefly about the interview

7    with the hunting guide.  This is Mark Swanepoel.  The

8    prosecutor asked you some questions about this.  Do you

9    remember that?

10   A.   Yes.

11   Q.   Okay.  In the second paragraph there, towards the end,

12   you see where it starts with the word "During the

13   interview"?

14   A.   Yeah.

15   Q.   Right here.

16   A.   Yes.

17   Q.   Do you see that Mr. Swanepoel had two Light beers

18   during the interview?

19   A.   Yes, I see that.

20   Q.   Okay.  And ordered another beer when the interviewer

21   left.  Do you see that?

22   A.   I see that.

23   Q.   Okay.  If we could go to the next page, DLG 688.

24        I want to read some portions that the prosecutor

25   skipped over here.  If we could go to the fourth paragraph

CROSS - MIRABELLI

1    and blow that up, please.

2              So do you see here where it says that, "Swanepoel

3    states he was about 20 meters away completing paperwork when

4    he heard the shot and ran"?

5    A.    I see that.

6    Q.    "He heard the insured gasp and fall after the shot."

7              In other words, from 20 meters away he could hear

8    not only the shot but the gasp and the fall; do you see

9    that?

10   A.    I see that.

11   Q.    "Took him about 5 to 6 seconds to arrive at the scene."

12   Do you see where he said that?

13   A.    Yes.

14   Q.    And could you read the next sentence for me, please.

15   A.    "The insured's husband was in shock and appeared very

16   distraught.  He asked Swanepoel to call Global Rescue, even

17   though it was very obvious the insured was deceased."

18   Q.    Thank you.  If you could take that down, Mr. Reyes.  If

19   we could go to the next paragraph that starts with, "He told

20   us."

21              I want you to look at starting with this word here,

22   "Swanepoel thinks that the soft case was a tight fit."  Do

23   you see that, sir?

24   A.    Yes.

25   Q.    "And he speculates that the insured might have leaned

CROSS - MIRABELLI

1    over it to push it fully down or to push down on the

2    zipper."  Do you see that, sir?

3    A.    Yes.

4    Q.    This is Mr. Swanepoel giving his speculation as to what

5    may have occurred, correct?

6    A.    Yes.

7    Q.    "He said the zipper was pulled down close to the

8    trigger guard and the insured may have touched the trigger."

9    That's one possibility he gives, right?

10    A.    That's -- yes.

11    Q.    He says -- he mentioned that she had long fingernails.

12    That's another possibility, correct?

13    A.    Yes.

14    Q.    And he said that the trigger on the shotgun is light.

15    Do you see that?

16    A.    Yes.

17    Q.    He gives another theory where he says, "He also said

18    that if the insured had hit the butt of the gun on the

19    ground to try to push it in further, it might have

20    discharged."  Do you see that, sir?

21    A.    I see that.

22    Q.    Thank you, Mr. Reyes.  We can take that down.

23            MR. MARKUS:  Your Honor, may I have a moment,

24    please?

25            THE COURT:  You may.

REDIRECT - MIRABELLI

1          MR. MARKUS:  Thank you, sir.  Appreciate.  Thank

2     you.

3               THE COURT:  Cross, Mr. Dill?

4               MR. DILL:  No questions, Your Honor.

5               THE COURT:  All right.  Redirect.

6               MR. FIELDS:  Thank you, Your Honor.  May I begin?

7               THE COURT:  You may.

8                      REDIRECT EXAMINATION

9     BY MR. FIELDS:

10    Q.    Thank you.  If we could, let's pull up Government's

11    Exhibit 110.  If we could go to page 13.  I apologize, I did

12    this again.  Government's Exhibit 10, page 13.  Actually the

13    page before this.  And before this.  It should be DLG 390.

14    So I guess it would be two more before this.  There we go.

15          Do you see the section in the middle?  Do you

16    remember being asked questions about this funeral home,

17    Mr. Mirabelli?

18    A.    Yes.

19    Q.    And you see that name where it says Grace Musazulwa?

20    A.    Yes.

21    Q.    Did Diligence interview anyone named Casius Mwiinga?

22    A.    It doesn't appear so in that paragraph, no.

23    Q.    Take that down.

24          Do you remember you were asked questions about

25    Diligence's interview with the medical examiner?

REDIRECT - MIRABELLI

1   A.   Yes.

2   Q.   And the medical examiner said that it -- the blast

3   occurred at very close range?

4   A.   Yes.

5   Q.   Would you call 2 feet away close, medium, or far away

6   with a shotgun if someone was shot?

7   A.   I would call it close.

8   Q.   Let's look at Government's Exhibit 10.  And I think it

9   will be page 6.  All right, if we could go to the next page.

10           Do you see which insurance company this one's

11   addressed to?

12   A.   Yes.

13   Q.   Who is it addressed to?

14   A.   Ameritas.

15   Q.   Is that the same as MetLife?

16   A.   No.

17   Q.   Can any insurance company hire Diligence?

18   A.   Yes.

19   Q.   Okay.  So if we -- if we scroll down here.  Keep going.

20   Let's go all the way down to DLG -- keep going.  More.

21   Okay.  Next.  Next.  Next.  Next.  Oh, there we go.  Let's

22   go back up to this one.

23           So remember you were asked about whether or not

24   MetLife received this document.

25   A.   Yes.

REDIRECT - MIRABELLI

1    Q.    Having had a chance to actually look at this entire

2    report, does it actually look like this report was provided

3    to Ameritas?

4    A.    Yes.

5    Q.    Let's go back to Government's Exhibit 120.  Again, are

6    these the documents that MetLife received?

7    A.    Yes.

8    Q.    Did MetLife receive that document that we looked at

9    earlier that said "suicide"?

10   A.    I don't recall seeing it in the file.

11         MR. MARKUS:  Your Honor, could the prosecutor

12   clarify which letter this is coming from.  Not -- it's not

13   coming from Diligence.

14   BY MR. FIELDS:

15   Q.    Let's look at Government's Exhibit 113.  Let's go -- is

16   there another page?  Let's look at Government's

17   Exhibit 110 -- sorry, let's go back to Government's

18   Exhibit 120.

19         This interview with Patrick Rudolph -- or Lawrence

20   Patrick Rudolph on December 22d, 2016, who did MetLife hire

21   to do that interview?

22   A.    Diligence.

23   Q.    So were these documents provided to Diligence by

24   Lawrence Rudolph?

25   A.    Yes.

REDIRECT - MIRABELLI

1    Q.    Okay.   Among the documents that Lawrence Rudolph gave

2    to Diligence, did it include that document that said

3    "suicide" on it?

4    A.    No.

5    Q.    So did MetLife receive that document?

6    A.    To my knowledge, no.   It was not in the file.

7    Q.    Now let's look at Defense Exhibit RA-10.   If we go to

8    the next page.   And the next page.   Let's blow up this part

9    here.

10          Now, sir, you were shown this document.   Have you

11   ever seen this document before?

12   A.    No.

13   Q.    Do you know who Otto Westhassel is?

14   A.    I believe I do know who he is from reading the MetLife

15   file, yes.

16   Q.    These notes about a suicide, have you seen those notes

17   before?

18   A.    No.

19   Q.    Do you know whether Otto Westhassel's description of

20   suicide is the same way the word "suicide" is used in

21   Zambia?

22   A.    I do not know.

23   Q.    When you hear the word "suicide," what do you think?

24          MR. MARKUS:   Objection, Your Honor.   Relevance.

25          THE COURT:   Overruled.   You may answer.

REDIRECT - MIRABELLI

1           THE WITNESS:  The definition of "suicide" is taking

2    your own life.

3    BY MR. FIELDS:

4    Q.    Do you have any reason to think that the definition of

5    "suicide" in Zambia is any different than the definition of

6    "suicide" here in the United States?

7    A.    I wouldn't think so.

8           MR. FIELDS:  No further questions, Your Honor.

9           THE COURT:  May this witness be excused for the

10   Government?

11          MR. FIELDS:  Yes, Your Honor.

12          THE COURT:  For the defendants?

13          MR. DILL:  Yes, Your Honor.

14          MR. MARKUS:  Yes, Your Honor.

15          THE COURT:  All right, Mr. Mirabelli, thank you for

16   your testimony.  You're excused and you may step down.

17          THE WITNESS:  Yes, sir.  Thank you.

18          THE COURT:  Government may call its next witness.

19          MR. GREWELL:  The United States calls Marguerite

20   Jenkins.

21          THE COURT:  All right.

22          COURTROOM DEPUTY:  Please raise your right hand for

23   me.

24      MARGUERITE JENKINS, GOVERNMENT'S WITNESS, SWORN

25          COURTROOM DEPUTY:  Thank you.  Please be seated and

DIRECT - JENKINS

1    remove your mask for us.  State your name for the record and

2    spell your first and last names for us.

3        THE WITNESS:  Marguerite Jenkins.

4    M-a-r-g-u-e-r-i-t-e, J-e-n-k-i-n-s.

5        MR. GREWELL:  And, Your Honor, I'd move Government

6    Exhibits 130, 131, and 306 into the record.  These are not

7    stipulated but my understanding is there's no objection.

8        THE COURT:  All right.  One second.

9        MR. GREWELL:  130, 131, and 306.

10        THE COURT:  Do defendants have any objection?

11        MR. MARKUS:  No objection.

12        MR. DILL:  No, Your Honor.

13        THE COURT:  All right.  There being no objection,

14    Government's Exhibits 130, 131, and 306 are admitted into

15    evidence.

16        (Government's Exhibits received)

17        MR. GREWELL:  May I proceed, Your Honor?

18        THE COURT:  You may.

19                    DIRECT EXAMINATION

20    BY MR. GREWELL:

21    Q.   Good afternoon, Ms. Jenkins.  Where do you work?

22    A.   AAA Life Insurance Company.

23    Q.   And what services does AAA provide?

24    A.   We provide life insurance policies for members.

25    Q.   And what do you do for AAA?

998

DIRECT - JENKINS

1    A.    I'm the chief claims examiner.

2    Q.    And what did you do before you became the chief claims

3    examiner?

4    A.    I was a claims specialist with Swiss Re Life Insurance

5    Company.

6    Q.    What does a claims examiner do?

7    A.    They make sure that they get the claim in good order so

8    that we can make a determination on benefits to be released.

9    Q.    May I have Government Exhibit one three zero, 130.  And

10   could I -- could we flip to the second page of this

11   document.

12        Are you familiar with this document?

13   A.    Yes.

14   Q.    What is this document?

15   A.    This is a notification of death submitted via fax on

16   November 7th, 2016, notifying us that our policy owner,

17   Bianca Rudolph, had passed away.

18   Q.    And who sent it to AAA?

19   A.    Dr. Lawrence Rudolph.

20   Q.    If you could zoom back out.

21        And do you know when AAA received it?

22   A.    We actually received two notifications; the same

23   notification.  One was on November 7th via fax, the other

24   was November 8th via FedEx.

25   Q.    What would AAA do when they receive a document like

DIRECT - JENKINS

1    this?

2    A.    We initiate a claim so that we set up a claim in our

3    system.  We will mail out claim forms and request certain

4    documentation, such as death certificates.

5    Q.    So did you end up requesting more information from

6    Mr. Rudolph?

7    A.    Yes, we did.

8    Q.    If you could bring up Government Exhibit 131.

9          Are you familiar with this document?

10   A.    Yes.

11   Q.    And what is it?

12   A.    It is a letter of -- that was attached to documentation

13   that we received regarding the claim:  The life insurance

14   form, the death certificate, the American citizen abroad

15   death verification, and a copy of the trust.

16   Q.    And who submitted this document to AAA?

17   A.    It appears Dr. Rudolph's attorney.

18   Q.    So it was submitted on Dr. Rudolph's behalf?

19   A.    Yes.

20   Q.    I want to look at the first attachment included here.

21         Could I have page 3, please.

22         What is this attachment?

23   A.    This is the claim form that we request our

24   beneficiaries to complete.

25   Q.    If I could have -- there.

DIRECT - JENKINS

1         Do you see where it says Payment of Claims

2   Authorization?

3   A.    Yes.

4   Q.    Could you read for the jury the sentence below that.

5   A.    "I declare that all my statements are true and complete

6   and that to the best of my knowledge and belief I have

7   withheld no relevant facts from the company."

8   Q.    And do you see below who's identified as the claimant

9   making that declaration?

10  A.    Yes.

11  Q.    And who is it?

12  A.    It is Dr. Lawrence Rudolph.

13  Q.    And do you see his signature next to his name?

14  A.    Yes.

15  Q.    What would AAA consider to be relevant facts to a life

16  insurance claim?

17  A.    We look to see location of death, we look to see cause

18  of death, we look to confirm that there are no other

19  information that might be relevant to our being able to

20  determine whether the payments are -- the benefits are

21  payable.

22  Q.    Would the manner of death be a relevant fact?

23  A.    We do look for manner when we request the death

24  certificate.

25  Q.    So would it be relevant to AAA if the claimant had been

1001

DIRECT - JENKINS

1    the one to kill the deceased?

2    A.    Yes.

3    Q.    Why would that be relevant?

4    A.    The majority of states have slayer statutes.  So if the

5    beneficiary is the person that caused the insured to pass

6    away, those benefits would not be payable.

7    Q.    What if he had accidentally shot his wife?  Would that

8    still affect how you would process the claim?

9    A.    Yes.

10   Q.    Can I have page 7 of this exhibit.  If you could zoom

11   out.

12        What is this part of the claim form?

13   A.    This is a part of our claim form that's required.

14   It's -- it indicates fraud warnings specific to certain

15   states.

16   Q.    And which state did Mr. Rudolph initial?

17   A.    Arizona.

18   Q.    Could we zoom in on that.

19        Can you please read that fraud warning for the

20   jury.

21   A.    "For your protection, Arizona law requires the

22   following statement to appear on this form.  Any person who

23   knowingly presents a false or fraudulent claim for a payment

24   of a loss is subject to criminal or civil penalties."

25   Q.    Thank you.  Do you know if AAA ended up paying this

1002
DIRECT - JENKINS

1    life insurance claim?

2    A.    Yes, we did.

3    Q.    Could I have Government Exhibit 306.   What is this

4    document?

5    A.    That is a copy of the check.

6    Q.    And to whom did AAA end up paying the proceeds?

7    A.    To the named beneficiary, the Rudolph Trust.

8    Q.    Let me go back to Government Exhibit 131.  If I could

9    have page 12, please.

10           And so did he submit these trust documents to AAA

11   for that same trust?

12   A.    Yes.

13   Q.    Who are identified as the parties to the trust?

14   A.    Lawrence P. Rudolph and Bianca T. Rudolph.

15   Q.    And can we go up one page to page 11.

16           And you see paragraphs 3 and 4.

17           If I could have those zoomed in on.

18   A.    Yes.

19   Q.    Could you read those.

20   A.    3:   "Trustor, Bianca T. Rudolph, died on October 11th,

21   2016."

22           4:   "Lawrence P. Rudolph is the current acting sole

23   Trustee of the Rudolph Trust dated April 25th, 2016."

24   Q.    Could I have page 14 of this exhibit.  And could you

25   blow up the first paragraph on this page.

DIRECT - JENKINS

1    Would you please read that for the jury.

2    A.    "After one of us dies, the ability of the survivor of

3    us, when serving as Trustee, to conduct business on behalf

4    of us without the consent of any other Trustee is subject to

5    the terms and conditions of our trust."

6    Q.    And could you zoom back out and then zoom in on

7    paragraph -- the first paragraph of section D.

8    Could you read this paragraph for the jury.

9    A.    "We retain the right to control the distribution of

10   income and principal from our trust.  We may direct our

11   trustee to distribute as much of the net income and

12   principal of the trust property as we consider advisable to

13   us or to other persons or entities.  Our trustee may

14   distribute the net income and principal to us for our

15   unrestricted use and benefit, even to the exhaustion of all

16   trust property.  Any undistributed net income is to be added

17   to the principal of our trust."

18   Q.    And do you remember when we read earlier paragraphs 3

19   and 4, after Bianca Rudolph died who was identified as the

20   sole trustee?

21   A.    Yes.

22   Q.    And who was that?

23   A.    Dr. Rudolph.

24        MR. GREWELL:  No further questions, Your Honor.

25        THE COURT:  Cross-examination.

CROSS - JENKINS

1                           **CROSS-EXAMINATION**

2    BY MR. MARKUS:

3    Q.    Good afternoon, ma'am.  Good afternoon ladies and

4    gentlemen, and Your Honor, counsel.

5          Just a couple quick questions, okay?  I represent

6    Dr. Rudolph.  My name is David Markus.  The trust that the

7    prosecutor was just asking you about, that's a trust between

8    a husband and a wife, correct?

9    A.    Yes.

10   Q.    And if one of the two spouses were to pass away,

11   there's nothing abnormal about the other spouse having

12   control of that trust, correct?

13   A.    Correct.

14   Q.    Okay.  And, ma'am, are you aware that Dr. Rudolph never

15   touched one dollar of that insurance money that came into

16   that trust?

17   A.    I would have no idea.

18         MR. MARKUS:  Okay.  Thank you.  Nothing further.

19         MR. DILL:  No questions, Your Honor.

20         THE COURT:  All right.  Redirect.

21         MR. GREWELL:  None, Your Honor.

22         THE COURT:  I have a question.  And I don't know if

23   the witness can answer it or whether you have the documents

24   to refresh your recollection for it to be answered.

25         What -- on what date was this policy purchased?

CROSS - JENKINS

1    THE WITNESS:  It was purchased -- it was purchased
2    in 2012.  I do not recall the exact date.
3    THE COURT:  All right.  Thank you.
4    I'll allow additional questions from counsel based
5    on the Court's question.
6    MR. GREWELL:  I don't have any, Your Honor.
7    THE COURT:  All right.  Defense counsel?
8    MR. MARKUS:  No, Your Honor.  Thank you.
9    MR. DILL:  No, Your Honor.
10    THE COURT:  May this witness be excused for the
11    Government?
12    MR. GREWELL:  She may, Your Honor.
13    THE COURT:  All right.  For defendants.
14    MR. MARKUS:  Yes, Your Honor.
15    MR. DILL:  Yes, Your Honor.
16    THE COURT:  All right, Ms. Jenkins, thank you for
17    your testimony.  You're excused.  You may step down.
18    Government may call its next witness.
19    MR. FIELDS:  Thank you, Your Honor.  The United
20    States calls Debra Wagner.
21    COURTROOM DEPUTY:  Raise your right hand for me.
22    DEBRA WAGNER, GOVERNMENT'S WITNESS, SWORN
23    COURTROOM DEPUTY:  Please be seated and remove your
24    mask for us.  Then state your name for the record and spell
25    your first and last name for us.

CROSS - JENKINS

1    THE WITNESS:  Debbie Wagner.  D-e-b-b-i-e,

2    W-a-g-n-e-r.

3    THE COURT:  You may proceed, counsel.

4    MR. FIELDS:  Thank you, Your Honor.  Before we

5    begin, I'd like to move for the admission of Government's

6    Exhibit 170, 171, 172, 173, 174, 175, and 304.  I understand

7    there's no objection.

8    MR. MARKUS:  Judge, I'm going to wait and see how

9    Mr. Fields goes through these exhibits and we can take them

10   one at a time.

11   MR. FIELDS:  Okay.

12   THE COURT:  So there are -- you're provisionally

13   objecting to all of them?

14   MR. MARKUS:  I think we're going to end up agreeing

15   to them.  I would just like to see as we go, Your Honor.  I

16   wasn't expecting to get to this witness today, so I'm just

17   not prepared.

18   THE COURT:  All right.  Mr. Dill, what's your

19   position on these exhibits?

20   MR. DILL:  I have no position, Your Honor.

21   THE COURT:  All right.  And they're not stipulated?

22   MR. FIELDS:  They're not stipulated, Your Honor.

23   THE COURT:  All right.  Since they're not

24   stipulated and defense counsel are not stating they have no

25   objection, let's go through them one at a time and we'll

1007

DIRECT - WAGNER

1    have them come in evidence or not as the rulings go.

2              MR. FIELDS:  Okay.  No problem, Your Honor.

3                    DIRECT EXAMINATION

4    BY MR. FIELDS:

5    Q.    Ms. Wagner, are you familiar with insurance policies

6    covering the life of Bianca Rudolph?

7    A.    I am.

8    Q.    How are you familiar with those policies?

9    A.    I am -- I work as a claims team leader and I reviewed a

10   claim that was submitted by Dr. Rudolph on the life of

11   Bianca Rudolph.

12   Q.    Claims team manager at what company?

13   A.    At the time of the claim, Great-West Financial.

14             THE COURT:  Ms. Wagner, can I ask you to pull the

15   mic towards you a little further?

16             THE WITNESS:  Thank you.

17             THE COURT:  And maybe you can scoot your chair up a

18   little bit.

19             THE WITNESS:  Okay.  Thank you.

20             THE COURT:  Thank you, ma'am.

21   BY MR. FIELDS:

22   Q.    Let's look at Government's Exhibit 304, which is not in

23   evidence.  What is that?

24   A.    This is the term life benefit check that was paid to

25   the Rudolph Trust dated April 25, 2016.

1008

DIRECT - WAGNER

1    Q.    Who issued that check?

2    A.    I was the reviewer and the approver for that check.

3    Q.    Was it issued by Great-West Life Insurance Company?

4    A.    It was.

5              MR. FIELDS:  Your Honor, at this time I move for

6    the admission of Government's Exhibit 304.

7              THE COURT:  Any objection?

8              MR. MARKUS:  No objection, Your Honor.

9              MR. DILL:  No objection.

10             THE COURT:  There being no objection, Government

11   Exhibit 304 is admitted into evidence and may be published

12   to the jury.

13         (Government's Exhibit 304 received)

14   BY MR. FIELDS:

15   Q.    If we could zoom in on the top.

16             Is this the money that Great-West Life paid out on

17   the policy ensuring Bianca Rudolph's life.

18   A.    Yes.

19   Q.    How much money did Great-West Life & Annuity Company

20   pay?

21   A.    $1,000,157.54.

22   Q.    Who is the money paid to?

23   A.    The Rudolph Trust dated April 25th, 2016; Lawrence

24   Rudolph as the trustee.

25   Q.    We can take that down.

DIRECT - WAGNER

1         Now you said in 2016 you were employed at

2    Great-West Life & Annuity.  Was Great-West purchased by

3    another company in 2019?

4    A.    We were.

5    Q.    Which company?

6    A.    Protective Life Insurance.

7    Q.    So as a result, do you now work at Protective Life

8    Insurance?

9    A.    I do.

10   Q.    How long have you worked at this insurance company that

11   was once Great-West and is now Protective?

12   A.    I'll be celebrating 35 years in 2023.

13   Q.    What was your position in the company in 2016?

14   A.    Claims team leader.

15   Q.    What is a claims team leader?

16   A.    Claims team leader as -- in that role I review all the

17   life insurance claims and disability office overhead claims.

18   The consultants work up the claim.  They're then put into a

19   manager's queue, which is my work queue.  I then review the

20   entire claim:  the certificate, the claim details.  And I

21   issue a determination on the claim.

22   Q.    Where was your physical office located in 2016?

23   A.    Greenwood Village, Colorado.

24   Q.    As a team leader, do you have -- or did you have

25   firsthand knowledge of how Great-West maintains its claim

1010

DIRECT - WAGNER

1    records?

2    A.    Yes, I do.

3    Q.    Did Great-West have a system called On Base?

4    A.    Yes, we do.   It's an electronic claims filing system.

5    Q.    What kind of records were kept in that system?

6    A.    We are paperless, so everything that is in all the

7    papers, all the documents, the claim files, underwriting

8    reports, premium payment information, entire -- really the

9    entire claim file is maintained in On Base.

10   Q.    Who creates those records?

11   A.    The information -- the claims are submitted to Great

12   Life or Protective via the mailroom.   And/or if it's a

13   Federal Express package then it comes into the mailroom.

14   Those documents are uploaded or scanned into a claims queue.

15   An administrative assistant then moves the documents into a

16   consultant's queue, depending on who's assigned to the

17   claim.

18   Q.    Are those records created at or near the time of what

19   is being recorded?

20   A.    I'm sorry?

21   Q.    Those records, are they made at or near the time

22   they're received?

23   A.    Yes.   They -- the same day.   Scanned into the claims

24   queue and then moved into the consultant's queue.

25   Q.    And were they kept in the regularly conducted activity

DIRECT - WAGNER

1    of Great-West Insurance business?

2    A.    Yes.

3    Q.    And was it the regular practice of Great-West to make

4    those records?

5    A.    Yes.

6    Q.    Now I want to show you on the screen -- we'll have to

7    go document by document, so let's start off with

8    Government's Exhibit 170.  And now let's go to Government's

9    Exhibit 11.  Government's Exhibit 172.  Government's

10   Exhibit 173.  174.  And 175.

11        Did you review these records before your testimony

12   today?

13   A.    I did.

14   Q.    Are these the -- are these records the type created

15   using that process you just described?

16   A.    In On Base, yes.

17        MR. FIELDS:  Your Honor, at this time I'd move for

18   the admission of Government's Exhibits 170 through 175.

19        THE COURT:  Any objection?

20        MR. MARKUS:  No objection.

21        MR. DILL:  No objection, Your Honor.

22        THE COURT:  All right.  There being no objection

23   from the defendants, Government Exhibits 170, 171, 172, 173,

24   174, and 175 are admitted into evidence and may be published

25   to the jury.

DIRECT - WAGNER

1    (Government's Exhibits received)

2  BY MR. FIELDS:

3  Q.   Let's look at Government's Exhibit 174, please.  We'll

4  look at this exhibit more closely later.

5       But first of all, is this a scanned copy of a

6  letter?

7  A.   Yes.

8  Q.   How was this letter sent to Great-West?

9  A.   It's noted to have been sent via Federal Express

10  overnight.

11  Q.   Was it sent from outside the state of Colorado?

12  A.   Yes.

13  Q.   Where was it received?

14  A.   At our offices at the time at 116 Inverness Drive East,

15  Englewood, Colorado.

16  Q.   All right.  We can take that down.  Now you mentioned,

17  you know, your role as a senior team leader.  How many

18  people did you have working under you?

19  A.   I have two life consultants and four disability

20  consultants.

21  Q.   As the manager of those life consultants, did you have

22  a role in evaluating claims?

23  A.   I do -- did.

24  Q.   What was your role?

25  A.   My role was to review the claim file in its entirety,

DIRECT - WAGNER

1  review the certificate language, the policy language.  Make

2  sure premiums are paid to date and that we have accurate

3  beneficiary information.

4  Q.   During the course of your career, can you give us an

5  estimate as to how many life insurance claims you say you've

6  processed?

7  A.   Between 9- and 10,000.

8  Q.   Based on your experience, how are claims typically

9  reported?

10  A.   Typically we receive a call from the beneficiary.

11  Q.   What number do they call?

12  A.   They call a 1-800 claims number that is on the premium

13  billing statements, and is available to them in their

14  certificates.

15  Q.   What, if any, role do attorneys have in the process of

16  filing life insurance claims?

17  A.   In my experience with the -- our block of business,

18  it's very rare to have a claim come in via an attorney.

19  Q.   When a claim is made by phone, what would be the first

20  process -- or what would be the first step in the process in

21  your claim?

22  A.   Usually a family member of the beneficiary or the

23  beneficiary directly calls to advise of the death of the

24  insured, and then they ask for the process or instructions

25  on filing a claim.

1014

DIRECT - WAGNER

1    Q.    And if the claim is made by mail, what is the first

2    step?

3    A.    If it's received by mail then we usually send out our

4    standard claim letter with a claim packet to the beneficiary

5    after we verify the beneficiary in our system.

6    Q.    What does it mean for a policy to be contestable?

7    A.    Contestable is a standard two-year period after the

8    initial application or any increase in coverage.  If a claim

9    were to be submitted during that two-year period, it would

10   be identified as contestable.

11   Q.    After Great-West gets a claim on a life insurance

12   policy, what documents does it need from the claimant before

13   it can process that claim?

14   A.    Typically on a standard claim we require a claimant

15   statement and a certified original death certificate, along

16   with information pertaining to how they want the benefit

17   paid via mail or direct deposit.

18   Q.    Would it be typical for Great-West to look for

19   additional information through publicly available sources?

20   A.    Yes.

21   Q.    What kind of information would Great-West look for?

22   A.    Typically we look for an obituary online to kind of

23   help establish or identify that family members, the

24   deceased, were they married, date of death, et cetera.  We

25   often also just review the internet just to see what

DIRECT - WAGNER

1    information might be available if the claim were to be

2    accidental or if there were any accident reports or --

3    online.

4    Q.    Is the process any different if the death occurs

5    overseas?

6    A.    No, but overseas claims can be more challenging as far

7    as verifying information and verifying specifics of the

8    death.

9    Q.    What makes them more challenging?

10   A.    No. 1, it's their -- the forms of death or the note --

11   the official forms of death can be different.  There's not

12   usually a certified death certificate available.  There are

13   other forms such as a death of a U.S. citizen abroad.  An

14   investigation into the specifics of the death can be

15   expensive, challenging, as far as hiring an investigator to

16   maybe travel overseas.

17   Q.    In your 30 years of experience, were foreign deaths

18   common?

19   A.    They're not common with our block of business.

20   Q.    I'm going to ask you about life insurance policies.

21   Did Great-West also issue accidental death policies?

22   A.    Yes.  It is an option that is available for purchase

23   with the standard term life policies.

24   Q.    What's the difference between regular life insurance

25   policy and an accidental life insurance policy?

DIRECT - WAGNER

1    A.    A basic life insurance policy is obtained in the amount

2    that the insured elects.  They can also elect to pay premium

3    for an additional benefit, which would be the accidental

4    death benefit.

5    Q.    What qualifies as an accident?

6    A.    According to our certificate, accident is an unforeseen

7    event.  Accident means something that is kind of -- injury

8    to the structure of the body independent of disease cause of

9    death.  Something that happens involuntarily to the body.

10   Q.    Could a homicide be considered an accident?

11   A.    A homicide would also -- would -- would allow the

12   accidental death portion of the benefit to be paid.  It is

13   considered accidental to the insured.

14   Q.    Would it depend on the circumstances of the homicide?

15   A.    It may.

16   Q.    Are there some circumstances that would not be

17   considered accidental?

18   A.    Suicide, of course, is not an accident; would not allow

19   the additional accidental death benefit.

20   Q.    Any other circumstances?

21   A.    A homicide would allow the accidental death portion,

22   but the issue would be who we could pay.  There are limits

23   to the beneficiary and the payee based on if it was a

24   homicide.

25   Q.    What kind of limitations?

DIRECT - WAGNER

1    A.    Slayer statute.

2    Q.    What's that?

3    A.    That's a statute that basically says that a beneficiary

4    or a payee cannot receive the proceeds of a life insurance

5    policy if they had any involvement in the death of the

6    insured.

7    Q.    When someone makes a claim on an accidental death

8    policy claim -- policy, do you need additional documents

9    that you wouldn't need in just a regular life insurance

10   policy?

11   A.    Yes.   Typically we ask for toxicology, medical

12   examiner's report, autopsy report, police report.   And

13   usually we talk to the pay -- the beneficiary relating to

14   the kind of the details of the accident.

15   Q.    When you -- when you're evaluating a claim, do you try

16   to make sure that you evaluate it correctly?

17   A.    Absolutely.   I'm -- I try to make sure that we pay the

18   claim correctly, accurately, and promptly.

19   Q.    What are the consequences if you make a mistake

20   regarding a claim?

21   A.    Well, I'm audited.   I mean, we are -- we are -- our

22   department is -- has an internal audit program.   And, of

23   course, I don't want to pay a claim that would cost the

24   company money or to pay it incorrectly.

25   Q.    Let's look at Government's Exhibit 170.   If we go to

DIRECT - WAGNER

1    page 2.  Let's blow that up a little bit so we can see it a

2    little better.

3         What is this?

4    A.    This is the original notice of death that we received

5    from Dr. Lawrence Rudolph.

6    Q.    How was it received by Great-West?

7    A.    Via Federal Express and fax.

8    Q.    Who among the members of your team was this assigned

9    to?

10   A.    This was -- this claim was assigned to Melinda

11   Cisneros.

12   Q.    Were you responsible for supervising and approving her

13   actions?

14   A.    Yes.

15   Q.    Employees like Ms. Cisneros, do they have a standard

16   checklist to follow when they receive one of those letters?

17   A.    Yes.  The checklist is kind of a form that is

18   identify -- identifies all of the documents and the process

19   for the review from the start of the review through the

20   finalization of the review.

21   Q.    Did Ms. Cisneros check to see if there was an obituary?

22   A.    She did.

23   Q.    Did she find one?

24   A.    She did not.

25   Q.    What happens when an obituary can't be found?

DIRECT - WAGNER

1    A.    I'm sorry?

2    Q.    What happens when you can't find an obituary?

3    A.    There's no -- there's not a real problem except that it

4    is something that is part of our process to look for.  There

5    are some folks that do not put an obituary online.

6    Q.    Was Ms. Cisneros able to determine whether there was a

7    policy in place?

8    A.    She was.

9    Q.    What was the policy?

10   A.    Bianca Rudolph was insured for a basic policy of

11   500,000 with an additional 500,000 for the accidental death

12   portion.

13   Q.    Approximately when was that policy issued?

14   A.    The policy was issued back in 1994, I believe.  Many

15   years ago.

16   Q.    Who was the beneficiary of the policy?

17   A.    For a period of time, I believe Dr. Rudolph was the

18   beneficiary.  In July of 2016, we did receive a change of

19   beneficiary.

20   Q.    What was the change?

21   A.    The change of beneficiary named a trust with

22   Dr. Rudolph as a trustee.

23   Q.    Let's look at -- well, first of all, from the face of

24   this letter, can you tell how Bianca Rudolph died?

25   A.    No, this is just a written notice that she is deceased.

DIRECT - WAGNER

1    Q.    Does it say where she died?

2    A.    No.

3    Q.    Let's look at Government's Exhibit 171.  What is this?

4    A.    This is our standard death claim letter.  Once we

5    receive notice of death, this is the letter that's sent out.

6    This letter is sent out after we verify who the beneficiary

7    is.  It's sent to the beneficiary.  And it asks for standard

8    documents, which typically are a certified original death

9    certificate and a claimant's statement.

10   Q.    If we could blow up this first top paragraph there.

11         Didn't you say earlier there were two parts to the

12   policy?

13   A.    There were.  I'm sorry, there were.  Both the basic and

14   the accidental.  At this point, we did not know it was an

15   accidental death and we usually do not address that unless

16   we know at the time.

17   Q.    So is that why this letter says just $500,000?

18   A.    That is correct.

19   Q.    If we could zoom back out.  And if we could zoom in on

20   the item No. 1 there.

21         It says a finalized certified death certificate

22   showing the cause and manner of death.  Why did Great-West

23   need to know the manner of death?

24   A.    The manner of death is required because there are --

25   the benefit payout is different based on the manner of

DIRECT - WAGNER

1    death.

2    Q.    How can that change?  Based on --

3    A.    If it's an actual death, the basic benefit only is

4    payable.  If it's a suicide after a two-year period of

5    insurance, only the basic benefit is payable as well.  If

6    it's an accidental death or a homicide, we could pay both

7    the basic and the accidental.

8    Q.    Let's look at Government's Exhibit 172.

9         What is this document?

10   A.    This is a letter from Dr. Rudolph's attorney providing

11   us with the claimant statement, a certified death

12   certificate, and a certified report of death of an American

13   citizen abroad.

14   Q.    How did Great-West receive this document?

15   A.    It is indicated as received via certified mail, return

16   receipt requested.

17   Q.    If we could blow up this middle paragraph there.

18        What does it say there?

19   A.    "Please note that Ms. Cisneros's letter referenced

20   $500,000 policy limit; however, in addition to the 500,000

21   life benefit, the policy also includes a 500,000 accidental

22   death benefit."

23   Q.    Was this letter sent on behalf of Dr. Lawrence Rudolph?

24   A.    Yes.

25   Q.    So was he making a claim on both parts of that policy?

1022

DIRECT - WAGNER

1    A.    Yes.

2    Q.    Now let's look at page 3 of this exhibit.  What is

3    this?

4    A.    This is the claimant's statement that Dr. Rudolph

5    completed.

6    Q.    What is the claimant statement?

7    A.    The claimant's statement is the permanent form that

8    lists the insured's name, the date of death, the

9    beneficiary's name, the relationship to the insured,

10   address, phone number, Social Security number.

11   Q.    Then if we could blow up this paragraph below item

12   No. 6, please.

13         What does this first line say?

14   A.    "I hereby declare that the foregoing answers are true

15   and full.  That to the best of my knowledge and belief, I

16   have withheld no material facts from the company and that

17   the foregoing answers and statements are made with the

18   object of securing payment to me of the proceeds of the

19   above policy."

20   Q.    And what does that notice say down there at the bottom

21   in bold?

22   A.    I'm sorry?

23   Q.    This notice, do you see where it says that in bold?

24   A.    Oh.

25   Q.    What does that say?

DIRECT - WAGNER

1    A.    "Filing a statement of claim containing any false,

2    incomplete or misleading information with intent to defraud

3    or deceive any insurance company is considered to be a

4    felony in some states."

5    Q.    Let's take that -- zoom out.

6          Who is the -- what is the printed name of the

7    claimant on this form?

8    A.    Bianca Theresa Rudolph.

9    Q.    Before Great-West received this letter, was it aware

10   that a death had occurred overseas?

11   A.    No.

12   Q.    Let's go to the next page.

13         What is this?

14   A.    This is a death certificate from the Republic of

15   Zambia.

16   Q.    What did the death certificate list as the cause of

17   death?

18   A.    Cause of death is hemorrhagic shock due to gunshot

19   injury.

20   Q.    Does it say anything about the manner of death?

21   A.    It does not.

22   Q.    So after Great-West received this, what did it decide

23   to do?

24   A.    It was discussed with management that we did not have

25   confirmation of manner of death, which is required.  We were

1024

DIRECT - WAGNER

1    not sure how we could act -- accurately confirm that

2    information.

3    Q.    Let's look at Government's Exhibit 173.

4          What is this?

5    A.    This is a letter to Dr. Lawrence Rudolph, trustee,

6    explaining that there was additional information that would

7    be required.  We asked for a copy of the trust document, we

8    asked for a signed HIPAA authorization form to obtain the

9    necessary documents for the accidental death investigation.

10   We outlined the provision in the certificate for accident,

11   and the limitations on when an accidental benefit may not be

12   payable.

13   Q.    If we could go to the next page.

14         You see this paragraph here?

15   A.    Yes.

16   Q.    What does that paragraph say?

17   A.    "The death certificate lists the cause of death as

18   hemorrhagic shock due to gunshot injury.  However, it does

19   not indicate the manner of death:  accidental, natural,

20   et cetera.  In order to make a determination on the basic

21   life and accidental death benefits, we are investigating the

22   circumstances surrounding Mrs. Rudolph's death.  We have

23   attained the resources of our outside vendor to assist in

24   obtaining the police and accident report, autopsy,

25   toxicology and medical examiner's reports.  Once the

DIRECT - WAGNER

1    information is received and reviewed, we will provide you

2    with our written determination."

3    Q.    Now this references an accidental death investigation.

4    What would such an investigation entail?

5    A.    Typically in the United States we would hire an outside

6    vendor to obtain police reports, medical examiner's reports,

7    autopsy, toxicology, and confirmation regarding the details.

8    Q.    What about if an -- a death occurs overseas?

9    A.    That creates some challenges.  We did contact a vendor

10   to inquire about the cost of an investigation.  It was

11   determined by my management to be cost prohibitive.

12   Q.    How much would that investigation have cost?

13   A.    At the time, I recall that it would have been anywhere

14   between 20- to 30,000.

15   Q.    Let's look at Government's Exhibit 174.

16          What is this?

17   A.    This is a letter from Dr. Rudolph's attorney providing

18   us with additional information.

19   Q.    If you see this paragraph -- let's see if we can zoom

20   in on that.  It's below the number 9.

21          What does it say about the manner of death?

22   A.    "As you will note, several of the enclosed documents

23   identify" -- "identify the cause of death as an accident,

24   specifically the accidental discharge of a firearm."

25   Q.    Let's zoom back out.

DIRECT - WAGNER

1          Was there anything about this letter that concerned

2     you?

3     A.    It did.

4          MR. MARKUS:  I'm sorry, Judge, objection.

5     Relevance.

6          THE COURT:  Overruled.  You may answer.

7          THE WITNESS:  What?

8          THE COURT:  You may answer, ma'am.

9          THE WITNESS:  I can answer?

10         THE COURT:  You may answer.

11         THE WITNESS:  Thank you.  Thank you.

12         The concern was that even though there was

13    indication that this was an accidental discharge, none of

14    the official death documents specifically noted manner of

15    death as accidental.

16    BY MR. FIELDS:

17    Q.    So after you received this letter, what did you do?

18    A.    The claim was discussed with my director of claims, my

19    manager, and the vice president of the department.  It was

20    discussed --

21         MR. MARKUS:  Objection, Your Honor.  Hearsay.

22         THE COURT:  Sustained.  Ma'am, so when you're

23    giving your answer to these questions, try to steer clear of

24    stating what other people said to you.

25         THE WITNESS:  Okay.

DIRECT - WAGNER

1    THE COURT:  All right.  Just discuss what happened.

2    What you have personal knowledge of what happened.

3    THE WITNESS:  Thank you.  Sorry.

4    This letter and documents were discussed with other

5    managers and -- of the department.

6    BY MR. FIELDS:

7    Q.    Did you want more information?

8    A.    I personally thought additional documentation was

9    required.

10    Q.    Why?

11    A.    The manner of death as accidental was not officially

12    verified on any of the documents.  Also I did have some

13    concern about the explanation of how the accident --

14    accident occurred.

15    Q.    What was your concern?

16    A.    My concern was related to the fact that Mrs. Rudolph

17    was a experienced gun handler, and I had concerns as to how

18    she might have accidentally shot herself with a shotgun.

19    Q.    Did Great-West do more research?

20    A.    We did some online research of the physician noted to

21    have viewed Mrs. Rudolph's body.  We researched the internet

22    to identify that the hospital and the police departments

23    existed and -- in Africa.  We did do some online research

24    related to Dr. Lawrence Rudolph.

25    Q.    After doing all that research, was a determination made

DIRECT - WAGNER

1    to pay the claim?

2    A.    After review of all the documents and based on the

3    information that we had at the time, it was suggested, and I

4    was advised, to pursue -- or to move forward with claim

5    approval.

6    Q.    Did you want to pay the claim?

7              MR. MARKUS:  Objection, Your Honor.  Relevance.

8              THE COURT:  Did she personally or the company?

9              MR. FIELDS:  Yeah -- both.  She's the supervisor --

10             THE COURT:  What's the relevance of her personal

11   desire?

12             MR. FIELDS:  She's the manager, Your Honor.  She

13   certainly has a role in the company's decision to pay.

14             THE COURT:  That's true.  All right.  Overruled.

15             You may answer, ma'am.

16             THE WITNESS:  The concerns that I had were related

17   to the manner of death and understanding how the accidental

18   discharge of the gun occurred and why an experienced gun

19   handler might point the gun at their own chest.

20   BY MR. FIELDS:

21   Q.    Why, even though you had these concerns, did you

22   ultimately approve the claim?

23   A.    We are in the business of paying claims, and without a

24   criminal investigation at the time, it was identified that

25   we did not have enough information to dispute the claim as

DIRECT - WAGNER

1    submitted.

2    Q.    This document, No. 174 -- let's put it on the

3    right-hand side of the screen.  And Government's Exhibit 36,

4    let's put that on the left-hand side of the screen.  Now

5    Government's Exhibit 174 on the right there -- let's scroll

6    through and just look at each of the documents that's

7    provided.  Now on the left, let's go back up to page 1.

8            This document on the left, Government's Exhibit 36,

9    did Great-West receive that document?

10   A.    We did not.

11   Q.    What's it say there in bold at the top?

12   A.    "Office of the Inspector General."

13   Q.    And do you see here on this first paragraph here, what

14   is that first heading?

15   A.    "Suicide."

16   Q.    If Great-West had received this document, would its

17   decision-making process have been different?

18   A.    Yes.

19   Q.    And then here, if we blow up this middle paragraph, do

20   you see -- can you read this sentence that starts, "The

21   working mechanism."

22   A.    Yes.

23   Q.    Please read that for us.

24   A.    "The working mechanism of the exhibit shotgun is

25   perfect as both its cocking and firing mechanism are in good

DIRECT - WAGNER

1    condition.  This was arrived at when I test-fired the

2    exhibit by loading and discharging two cartridges and

3    obtained cartridge cases from the purpose of a

4    comparison analysis.  Therefore, it is capable of loading,

5    discharging, and ejecting cartridges of the same caliber."

6    Q.    If Great-West had been told that the working mechanism

7    of the shotgun that killed Bianca Rudolph was in -- was

8    perfect and that its cocking and firing mechanism were in

9    good condition, would that have changed the decision-making

10   process?

11   A.    I have to -- I have to say that this would have been

12   important information for our claim.

13   Q.    How so?

14   A.    This was not information that we had.  Based on the

15   police report that was attached from the attorney of -- for

16   Dr. Rudolph, it was indicated that she -- Mrs. Rudolph was

17   loading the shotgun for travel and may have been placing the

18   shotgun in a case or a travel bag when the firearm

19   accidentally discharged.

20   Q.    So how would the working mechanism being in good

21   condition have affected that analysis?

22   A.    This would have had, I feel, significant weight to the

23   claim review.

24   Q.    When you say "significant weight," what do you think

25   would have happened?

CROSS - WAGNER

1    A.    I feel this would have been enough information for us

2    to consider pending the claim, getting more information, and

3    possibly considering interpleader of the benefit.

4    Q.    What's an interpleader?

5    A.    Interpleader is an avenue insurance companies often use

6    if there are competing claims for the benefit amount or if

7    we are unable to identify the payee or if there are

8    questions about the claim that we can't -- we can't resolve.

9             MR. FIELDS:  Your Honor, may I have a moment?

10             THE COURT:  You may.

11             MR. FIELDS:  Your Honor, I have no further

12    questions for this witness.

13             THE COURT:  All right.  Cross-examination.

14             MR. MARKUS:  Thank you, Your Honor.  Good

15    afternoon, ladies and gentlemen.  We're almost there.  Good

16    afternoon, Your Honor, counsel.

17                         CROSS-EXAMINATION

18    BY MR. MARKUS:

19    Q.    Ma'am, I'm going to ask you -- my name is David Markus.

20    Nice to meet you.

21    A.    Thank you.  Nice to meet you.

22    Q.    I'm just going to ask you a couple of questions, if I

23    may.

24    A.    Okay.

25    Q.    Perhaps we could start where we left off with that

CROSS - WAGNER

1    document.  Are you aware that the Zambian police had that

2    same document that the prosecutor was showing you and

3    determined that the firearm accidentally discharged?

4    A.    We did receive a report -- a police report that

5    indicated it was an accidental discharge.

6    Q.    That document that the prosecutor was showing you was

7    dated October 13th, 2016.  Are you aware that the reports

8    that are in your file come after that, October 14th, and so

9    on, from the Zambian Police Department, and took this report

10   into consideration when determining that it was an

11   accidental discharge?

12   A.    As I have not seen that other document, I'm not sure I

13   can answer that.

14   Q.    Sure.  Perhaps we can just put that document back on

15   the screen.  It's Government Exhibit 10 in evidence at

16   DLG 400.

17         Do you see there at the top where it's dated

18   October 13th, 2016?

19   A.    Yes.

20   Q.    Okay.  Now the -- thank you, Mr. Reyes.

21         Do you see where the prosecutor mentioned the word

22   "suicide" at the top?

23   A.    Yes.

24   Q.    Now I'd like for you to take a moment -- if we could

25   just keep it zoomed out, Mr. Reyes.

CROSS - WAGNER

1    If you could just take a second and look at the

2    report yourself and tell us when you're done with page 1 and

3    then we can turn to page 2.  Is there any discussion of

4    suicide, as we understand that word?

5    A.    Can you go on?

6    Q.    Sure.  We can go to the next page, then.

7    A.    Yes.

8    Q.    Sure.  It's DLG 401, Mr. Reyes.  And if you could zoom

9    in for her so she can see that a little bit better.  There

10    you go.

11    A.    Okay.

12    Q.    Is it fair to say, ma'am, that other than the word

13    "suicide" on page 1, this report has absolutely nothing to

14    do with suicide?  Correct?

15    A.    Based on my quick review of the document, I would

16    agree.

17    Q.    Okay.  This is a report about -- if we look at the

18    conclusion, "That the exhibit cartridge case allegedly

19    picked from the crime scene was loaded, discharged and

20    ejected from" -- "from one and the same semi-automatic

21    Browning shotgun."  Do you see that conclusion No. 1, right?

22    A.    Yes.

23    Q.    Conclusion No. 2:  "The two exhibit plastic wads were

24    discharged at a terrific speed; however, for them to be

25    extracted from a deceased body they were discharged at a

CROSS - WAGNER

1  shot range of zero to 10 meters."  Do you see that?

2  A.  Yes.

3  Q.  Okay.  So the conclusions in this report have

4  absolutely nothing to do with suicide, correct?

5  A.  I am not an expert on -- on guns, but based on my,

6  again, quick review of this document, I see the word

7  "suicide" only on the first page.

8  Q.  Okay.  And you don't know why this person at the

9  bottom, VR Chibesa, wrote the word "suicide" at the very

10  top, do you, ma'am?

11  A.  I don't, but it would lead to possibly further

12  questioning that reason.

13  Q.  Sure, I understand you may have further questioning.

14  My question -- you know, because the prosecutor focused so

15  much on this document to suggest that this document had

16  something to do with suicide, is it fair to say that in

17  actually now looking at what the words of the document are,

18  that the conclusion in the body of the document don't

19  discuss suicide at all.  Fair to say?

20  A.  Fair.

21  Q.  Okay.  Thank you.  We can take that down.

22      Now, the policy that is at issue here, I think we

23  agree was from 1994, correct?

24  A.  I believe so.

25  Q.  Okay.  That's a pretty old policy, right?

CROSS - WAGNER

1    A.    It is.

2    Q.    Okay.  And over the years, Ms. Wagner, you were in

3    touch -- or I should say MetLife was in touch -- I'm sorry,

4    MetLife.  I'm getting all the companies confused.  It's at

5    the end of the day.

6          Great-West was in touch with Bianca Rudolph over

7    the years, correct?

8    A.    Usually we don't reach out to the insured other than

9    maybe to send marketing material.  But I don't believe there

10   was a whole lot of communication between the Rudolphs and

11   Great-West.

12   Q.    Well, let me show you a document; it hasn't been

13   admitted yet.  So just to show you defense Exhibit RY.  I'm

14   sorry, Mr. Reyes.  RY.  Thank you.  Sorry to surprise you

15   like that.  Oh, it's actually in evidence so we can display

16   it across the screens here.  The -- there you go.

17         This is a letter from Great-West to Dr. Rudolph,

18   correct?

19   A.    It appears to be, yes.

20   Q.    And what is the very first line of that letter?

21   A.    "This is in response to a phone call from your wife,

22   Bianca, on September 13th, 2004."

23   Q.    So Mrs. Rudolph was in touch with Great-West over the

24   years regarding this policy, correct?

25   A.    It appears at least once.

CROSS - WAGNER

1    Q.    Thank you.  We can take that exhibit down.  Thank you,

2    Mr. Reyes.

3              Now I understand that you mention that, you know,

4    you had a concern because Mrs. Rudolph was an experienced

5    gun handler, correct?

6    A.    Yes.

7    Q.    Now, is it fair to say that you don't know all the

8    background about Mrs. Rudolph, her experience with guns, how

9    she was when she was packing and traveling and all those

10   things?  Is that fair to say?

11   A.    It's fair to say.

12   Q.    I mean, you didn't know she was a rushed and frantic

13   traveler on the mornings that she had to get to an airport,

14   did you, ma'am?

15   A.    No.

16   Q.    Okay.  And even if she was a very experienced gun

17   handler, accidents happen, right?

18   A.    Yes.

19   Q.    I mean, some of the most experienced -- I'll use an

20   example -- truck drivers sometimes get into a truck

21   accident, right?

22   A.    I suppose.

23   Q.    Sometimes things happen, right?

24   A.    Yes.

25   Q.    That's why we have insurance, right?

CROSS - WAGNER

1   A.    Correct.

2   Q.    That's the whole reason people get insurance is because

3   sometimes the unexpected happens, right?

4   A.    Correct.

5   Q.    Okay.  I want to bring up something that may be a

6   little uncomfortable, if I may.  I think you told the FBI

7   that when you were first investigating this claim, you read

8   online about Dr. Rudolph may have engaged in some

9   extramarital affairs.  Do you remember telling the FBI about

10  that?

11  A.    I do.

12  Q.    Okay.  I don't want to get into the specific of those,

13  but what you said to the FBI was you personally had a

14  problem with Dr. Rudolph when you read about that.  Do you

15  remember saying that?

16  A.    I don't know if I said those exact words.

17  Q.    Okay.  Do you remember having a problem with

18  Dr. Rudolph when you read about his extramarital affairs?

19  A.    I wouldn't say it was a problem; it was just the

20  article indicated that that was the case.

21  Q.    Okay.  And without getting into the specifics of the

22  article or anything like that, that was a problem for you.

23  A.    I wouldn't say it was a problem personally.  It was a

24  concern -- it was a concern related to the claim.

25  Q.    Okay.  Now you said it was cost prohibitive to hire an

CROSS - WAGNER

1   investigative company in this case.  Do you remember saying

2   that?

3   A.    I do.

4   Q.    Are you aware that the other insurance companies in

5   this case all got together and split the cost of hiring

6   Diligence?

7   A.    I did not know that until you are telling me now.

8   Q.    Okay.  Would that surprise you that all the other

9   insurance companies split the cost of hiring an

10  investigative company that actually went out to Africa and

11  conducted numerous interviews and so on?

12  A.    I didn't know there were other insurance companies at

13  the time of our claim.  I did not know there were other

14  claims.

15  Q.    Okay.  By the way, in addition to reading articles at

16  the time that this occurred, since meeting with the FBI,

17  you've read articles and watched TV about this case, have

18  you not?

19  A.    I have.

20  Q.    You watched the 48 Hours episode about this case?

21  A.    I did.

22  Q.    Okay.  And just to be clear, you were the final

23  approver of this claim, correct?

24  A.    I do approve the claim, but I don't do it without -- I

25  mean, I don't just do it on my own.  I mean, there are

CROSS - WAGNER

1  oftentimes due to dollar amounts, et cetera, that the claims

2  are discussed.

3  Q.    Okay.  And you chose to approve this claim, right?

4  A.    I chose at the suggestion of my manager.

5  Q.    Okay.  So your manager approved it and ultimately you

6  approved it, correct?

7  A.    Yes.  Yes, at the time of the review, we did not have

8  enough information to support nonapproval.

9  Q.    Okay.  And you took notes in this case, case notes,

10  that are -- I think we -- they're in evidence, I don't need

11  to show them, at Exhibit 177.  You -- there were case notes

12  by you and a woman named Melinda Cisneros, correct?

13  A.    What case notes?

14  Q.    I'm sorry.  Let me pull them out for you.

15          MR. FIELDS:  Your Honor, just for the record, those

16  are not admitted, but I don't have an objection.

17          MR. MARKUS:  My fault.  My fault.  My fault.

18  BY MR. MARKUS:

19  Q.    Why don't we show you what case notes I'm referring to

20  without showing them to the jury.  They're at Exhibit --

21  Government Exhibit 177.

22          THE COURT:  Are you showing her this to refresh

23  recollection?

24          MR. MARKUS:  Yes, Your Honor.  She --

25          THE COURT:  All right.

                          REDIRECT - WAGNER

1           MR. MARKUS:  Government Exhibit 177, which is

2    GRTW-3.

3    BY MR. MARKUS:

4    Q.   Do you recognize those case notes, ma'am?

5    A.   Yes.  These are part of the On Base notes.

6    Q.   Okay.  At any time did you raise suspicions, concerns,

7    questions, in these case notes?

8    A.   No.

9    Q.   Instead, the last reflection is you approved the claim,

10   right?  Approved DSW.  That's you.

11   A.   Correct.

12           MR. MARKUS:  Thank you.  I have nothing further,

13   Your Honor.

14           THE COURT:  Cross-examination, Mr. Dill?

15           MR. DILL:  No, sir.

16           THE COURT:  Redirect.

17                      REDIRECT EXAMINATION

18   BY MR. FIELDS:

19   Q.   Thank you.  Those case notes that you were shown at the

20   end, do you remember those?

21   A.   Yes.

22   Q.   Who is the life consultant assigned to the case?

23   A.   Melinda Cisneros.

24   Q.   So who would have put notes inside that log?

25   A.   I'm sorry?

REDIRECT - WAGNER

1   Q.   So who would have been the one to put notes inside that

2   log?

3   A.   Melinda puts notes after every time the claim is

4   handled.

5   Q.   So is it surprising that there are no notes from you in

6   there --

7   A.   It's not surprising.

8   Q.   I think I heard you testify on cross-examination that

9   you didn't know there were other life insurers?

10  A.   I did not.  We do not have a database or any -- any

11  means of verifying what other policies might exist.

12  Q.   If you had known that, in addition to the almost

13  $1 million at Great-West, Bianca Rudolph's life was insured

14  for another approximately 3.7 million, would that have

15  affected your evaluation of the claim?

16  A.   It would have been another piece of information that we

17  would use to look at in totality.

18          MR. FIELDS:  No further questions, Your Honor.

19          THE COURT:  May this witness be excused for the

20  Government?

21          MR. FIELDS:  Yes, Your Honor.

22          THE COURT:  For the defendants?

23          MR. MARKUS:  Yes, Your Honor.

24          MR. DILL:  Yes, Your Honor.

25          THE COURT:  All right, Ms. Wagner, thank you so

1042

REDIRECT - WAGNER

1  much for your testimony.  You're excused.  You may step

2  down.

3      All right, since it's four minutes to 5:00, I think

4  instead of starting a new witness, we're going to call it a

5  day.  Ladies and gentlemen of the jury, please be back in

6  the jury deliberation room by 8:35 tomorrow morning.

7      Again, I must remind you:  Please do not do any

8  independent research into or discuss with anyone the facts,

9  the law, the persons involved in this courtroom.  And I want

10  to emphasize that doing independent research into -- because

11  you've now heard several references during the trial, two or

12  three or four times today, about media coverage of this

13  case, so it's imperative that you wall yourself off from all

14  that information.

15      All right, we'll be in recess until 8:45 tomorrow

16  morning.

17      (Proceedings concluded at 4:57 p.m.)

18                  INDEX

19  **Item**                                                 **PAGE**

20              **GOVERNMENT'S WITNESSES**

21  OTTO WESTHASSEL
    **Direct Examination by Mr. Fields**          809
22  **Cross-examination by Mr. Markus**            856
    **Redirect Examination by Mr. Fields**        889

23

24


25  **Item**                                                 **PAGE**

REDIRECT - WAGNER

1              **GOVERNMENT'S WITNESSES**

2         **HELEN MEYER**
          Direct Examination by Mr. Grewell          898
3         Cross-examination by Ms. Doyle            906
          Redirect Examination by Mr. Grewell       912
4
          **ROLECIA SMITH**
5         Direct Examination by Mr. Grewell          913
          Cross-examination by Mr. Markus           935
6
          **CHRISTOPHER CALGARO**
7         Direct Examination by Mr. Winstead         923
          Cross-examination by Mr. Markus           935
8         Redirect Examination by Mr. Winstead      943

9         **RHONDA LOOSLE**
          Direct Examination by Mr. Grewell          948
10        Cross-examination by Mr. Markus           957
          Redirect Examination by Mr. Grewell       960
11
          **GREGORY MIRABELLI**
12        Direct Examination by Mr. Fields           962
          Cross-examination by Mr. Markus           980
13        Redirect Examination by Mr. Fields        992

14        **MARGUERITE JENKINS**
          Direct Examination by Mr. Grewell          997
15        Cross-examination by Mr. Markus          1004

16        **DEBRA WAGNER**
          Direct Examination by Mr. Fields          1007
17        Cross-examination by Mr. Markus          1031
          Redirect Examination by Mr. Fields       1040
18

19             **GOVERNMENT'S EXHIBITS**

20   **EXHIBITS**:      **Offered**    **Received**  **Refused**    **Stipulated**

21   110            962          962

22   111            962          962

23   112            962          962

24   113            962          962

25             **GOVERNMENT'S EXHIBITS**

REDIRECT - WAGNER

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| 120 | 962 | 962 | | |
| 130 | 997 | 997 | | |
| 131 | 997 | 997 | | |
| 136 | 997 | 997 | | |
| 140 | 923 | 923 | | |
| 141 | 923 | 923 | | |
| 142 | 923 | 923 | | |
| 150 | 947 | 947 | | |
| 151 | 947 | 947 | | |
| 152 | 947 | 947 | | |
| 170 | 1006 | 1006 | | |
| 171 | 1006 | 1006 | | |
| 172 | 1006 | 1006 | | |
| 173 | 1006 | 1006 | | |
| 174 | 1006 | 1006 | | |
| 175 | 1006 | 1006 | | |
| 180 | 916 | 916 | | |
| 301 | 962 | 962 | | |
| 304 | 1006 | 1006 | | |
| 306 | 997 | 997 | | |
| 307 | 947 | 947 | | |
| 308 | 947 | 947 | | |

REDIRECT - WAGNER

1          **DEFENDANT'S EXHIBITS**

2     **EXHIBITS:**        **Offered**     **Received**   **Refused**      **Stipulated**

3     **RA-14**           936           937

4                              *        *        *        *        *

5                    **REPORTER'S CERTIFICATE**

6          I certify that the foregoing is a correct transcript

7     from the record of proceedings in the above-entitled matter.

8          Dated at Denver, Colorado, this 12th day of September,

9     2023.

10

11

12     ─                                              ─

13                **MARY J. GEORGE, FCRR, CRR, RMR**

14

15

16

17

18

19

20

21

22

23

24

25