1046

**1**          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLORADO
**2**

Criminal Action No. 22-cr-0012-WJM
**3**

UNITED STATES OF AMERICA,
**4**

Plaintiff,
**5**

vs.
**6**

LAWRENCE RUDOLPH,
**7**    LORI MILLIRON,

**8**    Defendants.

**9**    -------------------------------------------------------------

**10**               REPORTER'S TRANSCRIPT
                (Jury Trial, Day 7)
**11**
      -------------------------------------------------------------

**12**

**13**        Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

**14**    Judge, United States District Court for the District of

**15**    Colorado, commencing at 8:49 a.m., on the 19th day of July,

**16**    2022, in Courtroom A801, United States Courthouse, Denver,

**17**    Colorado.

**18**
                        APPEARANCES
**19**
        BRYAN D. FIELDS, E. GARRETH WINSTEAD, III, J. BISHOP
**20**    GREWELL, Assistant U.S. Attorneys, 1801 California Street,
       Suite 1600, Denver, Colorado 80202, appearing for the
**21**    plaintiff.

**22**        DAVID O. MARKUS, A. MARGOT MOSS, LAUREN L. DOYLE,
       Markus Moss PLLC, 40 NW Third Street, Penthouse 1, Miami,
**23**    Florida 33175, appearing for the defendant Rudolph.

**24**      JOHN W. DILL, John W. Dill P.A., 941 West Morse
       Boulevard, Winter Park, Florida 32789, appearing for the
**25**    defendant Milliron.

1   **MARY J. GEORGE, FCRR, CRR, RMR**
    **901 19th Street, Denver, Colorado 80294**
2   **Proceedings Reported by Mechanical Stenography**
    **Transcription Produced via Computer**
3               **P R O C E E D I N G S**

4       (In open court outside the presence of the jury at 8:49

5   a.m.)

6           THE COURT:  Before we bring out the jury, we found

7   out yesterday that United States versus Sinnet, which was

8   going to be the trial that was going to start right on the

9   heels of this one, happily has dispo'd.  That means we won't

10  have a final trial preparation conference in that case next

11  Monday, which means we'll have a full day next Monday.

12          Let's bring in the jury.

13      (In open court in the presence of the jury at 8:49

14  a.m.)

15          THE COURT:  Good morning, ladies and gentlemen of

16  the jury.  Welcome back to day 7 of our trial.

17          Before we hear from our first witness, I wanted to

18  inform you of something, a development.  You may recall way

19  back on day 1 of this trial -- it seems like a long time ago

20  now -- I informed you that I was going to have a criminal

21  hearing next Monday at 4:30 and that we would conclude our

22  proceedings at 4:15.  Well, that case has resolved itself

23  and I will not have a hearing at 4:30 on Monday, which means

24  for purposes of your personal planning for that day, we will

25  have a full trial day on Monday.

1048

DIRECT - SWANEPOEL

1      All right, the Government may call its next

2  witness.

3      MR. WINSTEAD:  Thank you, Your Honor.  The United

4  States calls Pieter Swanepoel.

5      THE COURT:  All right.

6      COURTROOM DEPUTY:  Mr. Swanepoel, will you please

7  raise your right hand for me.

8      PIETER SWANEPOEL, GOVERNMENT'S WITNESS, SWORN

9      COURTROOM DEPUTY:  Will you please state your full

10  name for the record and spell your first and last name for

11  us.

12      THE WITNESS:  Pieter, P-i-e-t-e-r, Swanepoel,

13  S-w-a-n-e-p-o-e-l.

14      THE COURT:  You may proceed, counsel.

15      MR. WINSTEAD:  Thank you very much, Your Honor.

16                  DIRECT EXAMINATION

17  BY MR. WINSTEAD:

18  Q.   I suppose I should say good afternoon, sir.  Is it

19  afternoon there?

20  A.   Yes.

21  Q.   Can you tell me where you are right now.

22  A.   At the American Consulate, American Embassy.

23  Q.   In what country?

24  A.   Very difficult to hear.

25  Q.   In what country, sir?

DIRECT - SWANEPOEL

1    A.    In South Africa.

2    Q.    Were you unable to travel to the United States?

3    A.    Due to medical reasons, I couldn't travel.

4    Q.    Okay.  Sir, are you a professional hunter?

5    A.    Yes, sir.

6    Q.    Where mostly do you lead hunts?

7              UNIDENTIFIED WOMAN:  Where?

8              THE WITNESS:  I held professional hunter's licenses

9    in Zambia, Tanzania and in Camaroon.

10   BY MR. WINSTEAD:

11   Q.    Is Mark Swanepoel your son?

12   A.    Yes, sir.

13   Q.    Do you -- do you work with him as a professional

14   hunter?

15             UNIDENTIFIED WOMAN:  Do you work with him?

16             THE WITNESS:  Yes, sir.

17   BY MR. WINSTEAD:

18   Q.    Do the two of you have a company together?

19   A.    You can call it a company, yes, sir.

20   Q.    How did you first meet Larry Rudolph?

21             UNIDENTIFIED WOMAN:  How did you first meet Larry?

22             THE WITNESS:  In around about '91, '92, I attended

23   a Pittsburgh Safari Club International chapter meeting with

24   my then partner, Doug Scandrol.  At that meeting, among

25   other people, I met Larry and Bianca.

1050

DIRECT - SWANEPOEL

1    BY MR. WINSTEAD:

2    Q.    Over the years, did you go on hunts with Larry and

3    Bianca?

4              UNIDENTIFIED WOMAN:  Over the years, did you go

5    hunting with him?

6              THE WITNESS:  Yes, sir.

7    BY MR. WINSTEAD:

8    Q.    And with Bianca as well?

9              UNIDENTIFIED WOMAN:  With Bianca as well?  With

10   Bianca as well?

11             THE WITNESS:  Yes, sir.  Started off first with

12   Larry and then later on Bianca joined.

13   BY MR. WINSTEAD:

14   Q.    How many hunts either lead by you or lead by other

15   people do you think you went on with Larry and Bianca?

16   A.    Probably around about 12.

17   Q.    And does that include hunts lead by Mark?

18             UNIDENTIFIED WOMAN:  Does it include the ones Mark

19   lead?

20             THE WITNESS:  What?

21             UNIDENTIFIED WOMAN:  Does that include the ones

22   Mark hunted with --

23             THE WITNESS:  No.  No.  That -- I just joined as an

24   observer with them just to be in the camp and around the

25   camp.

DIRECT - SWANEPOEL

1    BY MR. WINSTEAD:

2    Q.    When was the first time you hunted with Bianca?

3    A.    Approximately '94 she decided that she wanted to join

4    Larry on African safari and start on a big five, which is

5    the dangerous game.  The safari was booked.  And I was in

6    Tanzania in the Lopasali [phonetic] area waiting for them to

7    arrive when I got a message that Larry would not be joining

8    us for about a week to 10 days.

9            My partner, Doug Scandrol, at that time was going

10   to be the prime professional hunter with them would come

11   with Larry and I would proceed with Bianca.  Which we did.

12   Q.    What were you hunting for?

13   A.    Basically lion, leopard, buffalo and plains game.

14   Q.    At that point, was Bianca a very experienced hunter?

15   A.    No.

16   Q.    Can you describe how she was.

17   A.    Bianca by -- was always a pretty nervous person to

18   start off with.  And so at -- as we got going into the --

19   the hunt, she was a pretty good shot.  Had done quite a lot

20   of target shooting prior to the -- to the hunt.  But I would

21   not put proficiency at that stage with her -- with her rifle

22   at the very high percentage.

23   Q.    Did Larry eventually come on that hunt?

24   A.    What?

25            UNIDENTIFIED WOMAN:  Did Larry come and join?

DIRECT - SWANEPOEL

1    THE WITNESS:  He joined us between 7 and 10 days,

2    together with my partner, Doug Scandrol.

3    BY MR. WINSTEAD:

4    Q.    And was the hunt successful?

5    A.    Yes.  I had already collected a lion, two buffaloes,

6    some plains game and a leopard with Bianca prior to their

7    arrival.

8    Q.    Sir, I'd like to ask you in your role as a professional

9    hunter about firearm safety.

10   A.    Okay.

11   Q.    When you're leading a hunt, do you make sure your

12   clients handle firearms safely?

13   A.    Yes.  I think one could gauge within the first couple

14   of minutes or couple of hours how proficient your client is

15   with a rifle.  If he's a very experienced client, obviously

16   you do not need to interfere or comment on anything.  If you

17   see there's some factors that need to be addressed, that

18   safety of the people around could be at risk, yes, then one

19   would address that.

20   Q.    Does it take you a long time to figure out if clients

21   are safe when they're handling weapons?

22   A.    Yes, sir, very, very quickly.

23   Q.    What are you looking for to make sure that they are

24   safe handling weapons?

25   A.    The minute the client un- -- undetaches his rifle, you

DIRECT - SWANEPOEL

1    can already see if he's confident in handling the weapon.

2    Is he conscious of where the weapon is being pointed at all

3    time?  If he's walking, does he put the gun on his shoulder

4    and pointing it to the person behind, or is he holding the

5    gun up?  There's all factors you see straightaway.

6            Immediately also you would see if the client loads

7    his weapon whether he's familiar with the weapon or not.

8    Q.    Now you said before on that first hunt Bianca was not a

9    particularly experienced hunter, right?

10   A.    No, she wasn't.

11   Q.    Did you get a sense that she was being unsafe with the

12   weapons?

13   A.    The -- from what my memory with -- serves me, I'm sure

14   there was occasions when I had to point out to her that she

15   had to be careful on -- on the -- on those particular things

16   that I noticed.

17   Q.    What would you consider the rules of safe weapons

18   handling?

19   A.    What?

20            UNIDENTIFIED WOMAN:  The rules of safe weapon

21   handling.

22            THE WITNESS:  Rules of safe weapon handling, I

23   think the very first rule is where you are going to be

24   pointing your weapon.  If you're going to load your weapon,

25   you know, always just be careful where you -- where you are

DIRECT - SWANEPOEL

1    holding it.  Hold it up.  That type of thing.

2              Do you immediately, once they've loaded the weapon,

3    switch on the safety?  All those points.

4    BY MR. WINSTEAD:

5    Q.    Do you consider rifles or shotguns more dangerous?

6    A.    Shotguns.

7    Q.    Why is that?

8    A.    Well, a shotgun, to start off with, has a much bigger

9    platform on the front of the barrel where a single

10   projectile rifle would have.  Shotgun also, especially when

11   it's a semi-automatic shotgun, will reload itself, so the

12   client has to be conscious at all time about how many shots

13   he's fired.  Shotgun is -- is a dangerous weapon in that

14   sense.

15   Q.    Over the years that you hunted with Bianca, would you

16   describe her as someone who handles firearms carefully and

17   safely?

18   A.    She was pretty confident.  She was pretty -- she would

19   hold herself always putting on the safety and everything

20   like that.  Because she was a pretty nervous person, you

21   know, she would always check that she had the gun on safety

22   and stuff like that.

23   Q.    Did she like to handle firearms?

24   A.    I -- I -- I don't know.  I wouldn't say for sure she

25   would like to.  She handled them -- that was necessary to

DIRECT - SWANEPOEL

1    be.

2    Q.    Towards the end of your relationship with her, how

3    would you describe her competency with firearms?

4    A.    In the beginning, I would not say much more than 30

5    percent.  The last time I was actually hunting with Bianca

6    and Larry as a second professional hunter, or her

7    professional or Larry's professional -- sometimes we have

8    two professional hunters when we split the clients up -- I

9    would say the last time that I hunted with her was probably

10   around about 2006 or 2007, and at that stage I would still

11   only put Bianca at a 60 percent.

12   Q.    What about Larry?

13   A.    A hundred percent.

14   Q.    What do you mean when you say that?

15   A.    Well, he was already an accomplished hunter when he

16   first came on hunting with us.  He had already been to

17   Tanzania and a couple of other countries.  And you could see

18   that the -- that he was -- he was a hundred percent safe

19   with the rifle.  The way he loaded a rifle and unloaded a

20   rifle was completely confident.  One notices those all the

21   time.

22   Q.    Sir, would clients generally bring their own weapons on

23   hunts?

24   A.    Yes, sir.  Most clients will because they -- they've

25   used their weapons before.  They've target practiced with

1056

DIRECT - SWANEPOEL

1    them before, so they are just confident in handling of their

2    weapon.

3    Q.    Would they often bring shotguns?

4    A.    Yes.  Now, in big-game countries like -- like Tanzania,

5    Zambia, and places like that, the clients will not generally

6    bring a shotgun because we -- we do not hunt birds and stuff

7    like that during that time.  But some -- some do bring their

8    shotgun.  The professional hunter will always have a shotgun

9    if there's leopard involved.  Obviously if something happens

10   that's the desired weapon to follow a wounded leopard with.

11   So I would say 35 to 40 percent of clients would bring their

12   shotgun with.

13   Q.    Why did you say you want a shotgun when you're dealing

14   with a leopard?

15   A.    Leopard, in my -- in my view is one of the most

16   dangerous animals to follow when it's wounded.  First of all

17   because of its character; but secondly, also because of its

18   ability to disguise itself in the bush.  A leopard we always

19   say is not the gentleman.  If you are going to go after him,

20   you better be ready to use the best weapon that is suitable

21   for a charge on a wounded leopard.

22         The reason we use a shotgun is because of -- it can

23   pattern further than a single bullet can.

24   Q.    Do you use shotguns for lions?

25   A.    No, sir.  The lion -- I've never done it.  I'm not

DIRECT - SWANEPOEL

1    saying anybody can't, but I would not use a shotgun on a

2    lion.

3    Q.   If you're -- if you personally are tracking a leopard,

4    would you carry a shotgun?

5    A.   What?

6         UNIDENTIFIED WOMAN:  Would you carry a shotgun if

7    you were personally tracking a leopard, a wound --

8         THE WITNESS:  Yes, absolutely.

9    BY MR. WINSTEAD:

10   Q.   Do you carry a particular type of shotgun?

11   A.   Some people like a pump-action shotgun where you pump

12   the bottom of the loading tube.  I think as -- as one gets a

13   little bit older, one would prefer to use a semi-automatic

14   shotgun that it keeps loading itself.  So, yeah, towards the

15   beginning, I used a pump-action, but I would say for the

16   last 10, 15 years of my career, if I had to follow a wounded

17   leopard, I would use a semi-automatic shotgun.

18   Q.   I'd like to talk to you about the hunt where Bianca

19   died.  On that hunt in October 2016, were you at Chinyembe?

20   A.   Yes, sir.  I was busy preparing the camp and

21   everything, and my wife was also there.  And we were going

22   to spend a couple of days with Larry and Bianca before we

23   went on to another area.

24   Q.   How long, at the beginning of the hunt, were you there

25   with Larry and Bianca?

DIRECT - SWANEPOEL

1    A.    I would say five days.

2    Q.    Do you remember if Larry brought any firearms?

3    A.    Yes.  I believe it was a .375 and a semi-automatic

4    shotgun.

5    Q.    Early in the hunt, did you test-fire the weapons?

6    A.    Well, right in the beginning of any hunt, we -- the

7    professional hunter, together with the client, will go to a

8    designated spot to sight the rifles in, as the sights or the

9    telescopes or whatever could be moved during flights on the

10   way, so that everybody is confident that their rifles are

11   sighted in and everything is working well.

12   Q.    How do you sight in the rifles?

13   A.    If it's a rifle, we have a bench where you would put

14   the rifle in so it's completely steady.  The desired -- the

15   desired distance to sight the rifle in, big gun, is probably

16   at the 100 meters that we would sight.  But there is

17   occasions when you shoot a lion or leopard where we would

18   sight the rifle in at 40 meters, because that is the desired

19   distance that we normally pull the blind to shoot the lion

20   or leopard.

21   Q.    Did you modify the rifle at all?

22            UNIDENTIFIED WOMAN:  Did you modify it?

23            THE WITNESS:  On -- on the shotguns that come from

24   the United States, there's normally a little bamboo rod in

25   the feeding tube of the shells, because they have a local

1059
**DIRECT - SWANEPOEL**

1    rule that you can only put two shells in the feeding tube,

2    especially for duck hunting and stuff like that.

3            In Africa, generally speaking we remove that plug

4    because we would -- would want the gun to fire the five

5    shots or three shots or four shots, whatever -- what it's

6    manufactured for.

7    BY MR. WINSTEAD:

8    Q.    So did you remove that plug on the shotgun Larry

9    brought?

10   A.    Yes.  It is a simple process of just taking a screw

11   out -- a nut out that holds it to the feeding tube.  Once

12   you take that out, you just take the rod out, put the -- the

13   nut back, because it holds a compressed spring inside there,

14   and then that's it.  Then you can -- then it's not got the

15   restricted space to load more bullets in.

16   Q.    Does making that modification make a shotgun unsafe?

17   A.    What?

18            UNIDENTIFIED WOMAN:  Does it make it unsafe?

19            THE WITNESS:  Absolutely not.  It's manufactured

20   for that.

21   BY MR. WINSTEAD:

22   Q.    After you took out the plug from the shotgun, did you

23   do testfires with the shotgun?

24   A.    Yes.  Mark, and I believe Larry -- I'm not too sure if

25   Bianca also fired, she probably would have, but it's not

**DIRECT - SWANEPOEL**

1    necessary actually for her to have fired the shotgun because

2    it's -- it's the professional hunter that's going to do the

3    shooting.   Larry may have also fired the shotgun because --

4    as an experienced hunter, Mark would probably have allowed

5    him to tag along at the end of the group.

6    Q.   Why did you want to pattern the shotgun?

7    A.   What?

8         UNIDENTIFIED WOMAN:   Why did you want to pattern

9    the shotgun?

10        THE WITNESS:   Well, a shotgun has a -- three or

11   four different chokes that -- in the front of the barrel of

12   the shotgun there's a small tube like this that one inserts

13   it -- you screw it in.   We got a full choke, which will

14   pattern tightly; then a modern -- with the modern --

15   moderate, which will pattern a little bit more in the group;

16   and then obviously a spray for bird shooting.

17   BY MR. WINSTEAD:

18   Q.   What sort of choke do you put in your shotgun when you

19   track leopards?

20   A.   Generally speaking a full choke.

21   Q.   And so I'll ask you a little bit about the patterns in

22   a moment, but did you load fully the shotgun and fire it a

23   number of times?

24   A.   Yes.   I think we -- if my memory serves correctly, it

25   was -- I eventually walked away because it was about 10, 12,

DIRECT - SWANEPOEL

1    15 shots fired at a box to make sure that the pattern was

2    good.

3    Q.   All right.  I'd like to -- I'd like you to look at a

4    picture that hasn't yet been admitted.  You should have a

5    copy of it.  This is marked as Government's Exhibit 30.

6         Can you tell me what those pictures are.

7    A.   The first one is me walking 10 yards away to the spot

8    where the box was set up to pattern the shotgun and see what

9    it patterns like at 10 yards, which is, generally speaking,

10   more or less -- that's not a science but more or less where

11   a leopard will -- will see that you're in his space and come

12   for you.

13   Q.   And are the other pictures also pictures of you?

14   A.   What's that?

15        UNIDENTIFIED WOMAN:  Are those also pictures of

16   you, the others?

17        THE WITNESS:  Yes, sir.

18   BY MR. WINSTEAD:

19   Q.   Are those pictures helpful to explain what you were

20   talking about as far as patterns?

21   A.   Yes, sir.  The first one here --

22   Q.   Let me -- sorry --

23   A.   -- is --

24   Q.   Let me pause you for a sec.

25        MR. WINSTEAD:  At this time the United States moves

1062
DIRECT - SWANEPOEL

1    to admit Government's Exhibit 30.

2         THE COURT:  All right.  Give me a moment to look at

3    it.

4         MR. WINSTEAD:  And I don't know if it's possible to

5    display it for the judge so we can --

6         THE COURT:  That's all right.  I've got it here.

7         Is there any objection?

8         MS. MOSS:  There's no objection, Your Honor, but he

9    is testifying live; I think he can do it live.

10        THE COURT:  Do what live?

11        UNIDENTIFIED WOMAN:  I'm sorry?

12        THE COURT:  Do what live?

13        MS. MOSS:  What the prosecutor's attempting to show

14    the photos for.

15        THE COURT:  All right.  Well, the question on the

16    table:  Is there an objection to -- for Government

17    Exhibit 30 to be admitted into evidence?

18        COURTROOM DEPUTY:  It's my understanding, Your

19    Honor, that Government Exhibit 30 has already been admitted.

20        THE COURT:  Oh.  I thought counsel said it hadn't

21    been admitted.

22        MR. FIELDS:  I didn't think it had been.

23        COURTROOM DEPUTY  Government's Exhibit 1 through

24    40 were admitted on Day 1.

25        THE COURT:  That's right.  Okay.  It's in,

                                                                    1063
                         DIRECT - SWANEPOEL

1     Mr. Winstead.  Go ahead.

2               MR. WINSTEAD:  All right.  My mistake, Your Honor.

3               THE COURT:  All right.

4               MR. WINSTEAD:  Is there a possibility to display --

5     yeah.

6               COURTROOM DEPUTY:  Give me one moment.

7     BY MR. WINSTEAD:

8     Q.   All right.  We're looking at page 1 of Government's

9     Exhibit 30.  Actually, could you go to page 2.

10              UNIDENTIFIED WOMAN:  The second picture.

11              THE WITNESS:  Yeah, that's the second -- that's --

12    that's 10 yards from where you guys are standing.

13    BY MR. WINSTEAD:

14    Q.   Is that the -- oh.  Sorry.

15              COURTROOM DEPUTY:  There we go.

16    BY MR. WINSTEAD:

17    Q.   Is that a picture of the place outside of Chinyembe

18    where you do your firearms testing?

19    A.   Yes, sir.

20    Q.   Can you tell me the process you used to go about

21    patterning the shotgun.

22    A.   What's that?

23              UNIDENTIFIED WOMAN:  The process you used to

24    pattern.

25              THE WITNESS:  On a -- generally speaking at 10

**DIRECT - SWANEPOEL**

1    yards you're -- as I show in this picture here, your pattern

2    that we're looking for is roughly this.  So about 4 1/2

3    inches diameter.  Of course you will get a couple of pellets

4    spray there because a shotgun is a smooth ball, it does not

5    have rifling in it.  But what we're looking at is the

6    general pattern to be within that -- that size at roughly 10

7    yards.

8            As I said before, it's not science, it could be 12

9    yards, it could be 8 yards.  But that's more or less what we

10    are looking for.

11    BY MR. WINSTEAD:

12    Q.    And can you display Exhibit 30, page 1.

13    A.    That's the second -- that's about 5 yards.  The

14    pattern, as you can see, is about -- just about half.

15    Q.    Why do you want those size of patterns at 10 yards?

16            UNIDENTIFIED WOMAN:  Why do you want the size and

17    patterns at 10 yards?

18            THE WITNESS:  Just -- just so that -- you know, a

19    leopard's head is about 10 yards and that's where you're

20    going to aim for.  So we more or less want the full pattern

21    to be able to hit right at the head.

22            As I say, it could be 12 yards, could be 8 yards,

23    but generally speaking that will work, anything from about

24    10 yards to even up to 12, 15 yards.  It won't go very much

25    bigger because it's a full choke.

1065

**DIRECT - SWANEPOEL**

1    BY MR. WINSTEAD:

2    Q.    So did you shoot the shotgun Larry brought at 10 yards

3    and 5 yards?

4    A.    Yes, sir.

5    Q.    And did the patterns from that shotgun match what you

6    were looking for?

7    A.    A hundred percent for -- that's when I walked away

8    after that, but it was at roughly that much on the box.  At

9    that 5 yards, it was about that.  And then, of course,

10   point-blank, when you go point-blank it's not much bigger

11   than the shotgun barrel.

12   Q.    During the course of shooting, were there any problems

13   that you observed with the shotgun?

14            UNIDENTIFIED WOMAN:  Any problems?

15            THE WITNESS:  No, sir.  And I wasn't told by

16   anybody else.  Mark, my son, did not mention that there was

17   any problem.

18   BY MR. WINSTEAD:

19   Q.    During the process of shooting, would you be paying

20   attention if there was anything out of the ordinary about

21   the shotgun?

22   A.    Mark would have immediately told -- said, "There's a

23   problem with the shotgun.  We better have a look at it."

24            It's -- it's very important that . . .

25   Q.    When Larry was shooting it, did you see that he had any

1066

DIRECT - SWANEPOEL

1    trouble using the shotgun?

2    A.    Any?

3              UNIDENTIFIED WOMAN:  When Larry shot with it, did

4    he have any trouble with it?

5              THE WITNESS:  Not that I noticed, no, sir.

6    BY MR. WINSTEAD:

7    Q.    Did he appear to handle it comfortably?

8              UNIDENTIFIED WOMAN:  Was he handling it

9    comfortably?

10             THE WITNESS:  Yes.

11   BY MR. WINSTEAD:

12   Q.    Was he unloading it and loading it comfortably?

13   A.    Yes.

14   Q.    Just to clarify a quick thing about the pattern you're

15   looking for at 10 yards, are you wanting every single pellet

16   to be in that circle that you said, or if there's some

17   fliers, is that still acceptable?

18   A.    Yes, generally speaking on the -- on the type of

19   shotgun shell we like to use, it's a double-aught buck.  It

20   would probably have about 15.22 caliber balls in it -- steel

21   balls.  It used to be lead but now it's steel.  And I would

22   say within that 10 yards, probably 10 to 12 of the pellets

23   will hit within that.  We will have two or three fliers

24   around, but as long as you've got the full pattern there,

25   that's -- you're comfortable with that.

1067

DIRECT - SWANEPOEL

1   Q.   Did you specifically note what sort of choke was in

2   Larry's shotgun?

3   A.   I would say that yes, a -- normally if it -- if I was a

4   professional hunter -- and I'm sure Mark would also have

5   said, "Let's just see if this is fitted with a full choke."

6   And if the pattern's like that, it would be a full choke.

7   Q.   You had said before that when you're tracking a leopard

8   you want to use double-aught buck ammo; is that right?

9   A.   Yes, sir.

10  Q.   Do you recall whether you shot the shotgun?

11          UNIDENTIFIED WOMAN:  Did you shoot the shotgun?

12          THE WITNESS:  No, I -- I thought in the beginning

13  that I may have but I did not.  No.

14  BY MR. WINSTEAD:

15  Q.   Sir, can you tell me how firearms are carried when you

16  are flying with them.

17  A.   Generally speaking on the back of the vehicle,

18  there's -- there's --

19          UNIDENTIFIED WOMAN:  Flying.

20          THE WITNESS:  When you're flying, I'm sorry.  I

21  didn't catch that.

22          When you're flying, the airlines require the -- the

23  weapons obviously to be unloaded.  People like to use Teflon

24  bags like those big-sided golf bags these days.  They put

25  the guns in soft bags, zip them up, put them in the Teflon

1068

DIRECT - SWANEPOEL

1    bag, and put the lock on.

2          The airlines also require that the ammunition be

3    separately carried in a safety box for the duration of the

4    flight.

5          MR. WINSTEAD:  Your Honor, I'm going to be

6    displaying a single picture from the scene.  This one does

7    not have Bianca visible, just wanted to --

8          THE COURT:  All right.

9          MR. WINSTEAD:  Okay.

10          THE COURT:  Thank you for the notice.

11   BY MR. WINSTEAD:

12   Q.   All right, sir, could you please bring up what's been

13   admitted as Government's Exhibit 16, page 5.

14          And do you have a copy of that exhibit printed out

15   with you?

16   A.   Yes, I do.

17   Q.   All right.  You see the black case in the upper left of

18   that photo?

19   A.   Yes, sir.

20   Q.   Is that one of the cases that you were describing?

21   A.   Yes, sir.

22   Q.   Do you happen to recall that specific case?

23   A.   I -- you know, I've seen so many of them, I don't think

24   I would have taken notice of it.  But I'm sure when they

25   were carrying it from the vehicle I did see it.

1069

DIRECT - SWANEPOEL

1    Q.    About how high is that case?

2    A.    I would say, from memory, probably about 5-foot high.

3    Q.    How do you put firearms into the case -- into the hard

4    case?

5    A.    Okay, if you look at the top, you'll see there's --

6    there's like a cap on the top of that case.  That -- that

7    cap gets removed and then the box will be open.  Then as the

8    shotgun, in the foreground there, in a bag like that, zipped

9    up, unloaded, one would take it and put it down into the --

10   into the bag.

11   Q.    Do you recall if there's a particular orientation that

12   you usually put firearms into the hard case?

13           UNIDENTIFIED WOMAN:  Which way do you put it?

14           THE WITNESS:  Well, obviously always with the

15   barrel down.  One, because it's smaller to go in that side,

16   so it's easier to go down; but I think it's -- it's just

17   ingrained in a person that you always try to put the barrel

18   down; you know, it's not pointing up.

19   BY MR. WINSTEAD:

20   Q.    Did you ever see Bianca load firearms into or out of

21   the hard case?

22   A.    No, sir.

23   Q.    Who usually did things like that?

24   A.    I think that -- that it would be Larry and Bianca.

25   Larry and Bianca, it would have been Larry, normally.

1070
DIRECT - SWANEPOEL

1    Q.   Okay.  When you fly with a long gun, do you usually

2    carry it with the bolt closed or open?

3            UNIDENTIFIED WOMAN:  When you fly, do you take the

4    bolt open --

5            THE WITNESS:  Yes.  Obviously a shotgun does not

6    have a bolt, it has a sliding latch on the side.  It's got

7    like a hook that you put your finger and open it.  But it

8    does have a facility that you pull that back, it's got a

9    button, and then that -- that chamber will be open for easy

10   access to viewing if there's any bullet or anything in the

11   barrel.

12   BY MR. WINSTEAD:

13   Q.   At the airport -- do officials at the airport inspect

14   weapons when you're flying with them?

15   A.   Well, mainly they -- they inspect the serial number,

16   but -- because they just want to make sure that the guns

17   you're bringing there are leaving the country again.  On the

18   rifles, generally speaking the bolt is removed and put

19   separately from the actual gun.  But I would say that their

20   main inspection is for the serial numbers.

21           MR. WINSTEAD:  May I have a moment, Your Honor?

22           THE COURT:  You may.

23           MR. WINSTEAD:  Thank you.  Nothing further.

24           THE COURT:  All right.  Cross-examination.

25                       CROSS-EXAMINATION

1071

CROSS - SWANEPOEL

1    BY MS. MOSS:

2    Q.    Thank you, Your Honor.

3           Good afternoon, Mr. Swanepoel.  How are you today?

4    A.    Afternoon, ma'am.

5    Q.    Can you hear me okay?  Can you hear me all right?

6    A.    Yes, ma'am.  Yes.

7    Q.    So I -- if at some point you can't hear me, just let me

8    know and I'll repeat my question.  And I'll make sure to

9    speak into the microphone, okay?

10   A.    Okay, ma'am.

11   Q.    Mr. Swanepoel, are you -- you testified that you are a

12   professional hunter.  How many years have you been doing

13   that, or how many decades?

14   A.    I started -- I got my first big game hunting license in

15   1968.  In 1975, I joined a professional hunter's association

16   of Zambia to obtain my dangerous game license to be able to

17   accompany clients.  I did a five-year apprenticeship, which

18   was required during that -- that time with -- much more

19   strict than what they are now.

20          And at the beginning of the 1980s, I went full-time

21   into professional hunting -- hunting both Zambia, Tanzania,

22   and Camaroon, up to 2012 when I retired.

23          THE COURT:  Counsel, one second.

24          What's going on, Ms. Guerra?

25          COURTROOM DEPUTY:  His screen seems to have frozen.

1072
CROSS - SWANEPOEL

1    THE COURT:  Yeah.

2    COURTROOM DEPUTY:  But we can still hear his audio

3    so hopefully it will click back in, because that's going to

4    be on their end, not ours.

5    THE COURT:  So you notice the video has frozen.

6    MS. MOSS:  I did.

7    THE COURT:  So are we okay just doing audio?

8    MS. MOSS:  Can we continue a couple of minutes and

9    see if it clicks back in?

10    THE COURT:  Sure.

11   BY MS. MOSS:

12   Q.    Mr. Swanepoel, can you still hear me?

13    UNIDENTIFIED WOMAN:  Can you still hear?

14    THE WITNESS:  Yes, ma'am.

15   BY MS. MOSS:

16   Q.    Your screen is frozen so we can't see you speaking

17   anymore, but you can still hear me; is that right?

18   A.    I can hear you, yes.

19   Q.    Okay.  Hopefully it will go back into place.

20    So, Mr. Swanepoel, am I correct that you have been

21   hunting for over 50 years, if it was back since 1968?

22   A.    Yes, ma'am.

23   Q.    Now, I want to ask you, Mr. Swanepoel, about Larry and

24   Bianca Rudolph.  Okay?

25   A.    Yes, ma'am.

1073

CROSS - SWANEPOEL

1    Q.    Mr. Swanepoel, you testified, I believe, that you first

2    met Larry and Bianca in 1992; is that right?

3    A.    Yes.  '91, '92.  I can't remember the exact day, but it

4    was early '90s.

5    Q.    Okay.  So am I correct that -- is that about 30 years

6    ago?

7    A.    Yes, it is.

8    Q.    And what was the year that you first went hunting with

9    Larry and Bianca?

10              UNIDENTIFIED WOMAN:  First year you went hunting

11    with them.

12              THE WITNESS:  I hunted with Larry together with

13    Doug Scandrol probably '92, '93.  But the first year, if I

14    remember correctly, that Bianca came was '94.

15    BY MS. MOSS:

16    Q.    Okay.  And after that first time, did you hunt with

17    them many more times through the years?

18    A.    Yes.  I would say Doug Scandrol, my partner, because

19    he -- they both were from Pittsburgh.  He was the primary

20    hunter normally for Larry, but there was many times when

21    Doug couldn't come because of conflicting dates with other

22    clients that I would hunt with Larry and Bianca.

23              But most of the times when I -- in those days from

24    the -- about '95 to about 2006 when they were hunting

25    together, I was generally mostly on the hunt as the second

1074

CROSS - SWANEPOEL

1   hunter.

2   Q.   So -- so am I right to say that even if you weren't the

3   professional hunter, you were with them when they were

4   hunting?

5   A.   Yes, ma'am.

6   Q.   Okay.

7   A.   Yes.

8   Q.   And so how often would Larry and Bianca come to Africa?

9   A.   I would say in the early years when Larry was pursuing

10  the Weatherby award, just about every year.  From the 2000s,

11  just about every year.  They may have skipped a year or

12  two-year in there, but not that I recall.

13  Q.   And -- and what other countries in Africa did you hunt

14  with them?

15  A.   We hunted in Zambia, Tanzania, Camaroon, Uganda, Bongo,

16  South Africa.

17          UNIDENTIFIED WOMAN:  Ethiopia?

18          THE WITNESS:  Ethiopia.

19  BY MS. MOSS:

20  Q.   Does that also include Zimbabwe?

21  A.   Yes, ma'am.  I think we did one or two hunts in

22  Zimbabwe, normally looking for particular species.

23          MS. MOSS:  Your Honor, it doesn't appear that it's

24  clearing up.  Is it possible that we could try and get that

25  fixed?

CROSS - SWANEPOEL

1    THE COURT:  I'm sure Ms. Guerra's been in contact
2    with our IT department.
3        COURTROOM DEPUTY:  We can try to reconnect with
4    them to see if that will help.  It seems to be on their end.
5    But if you'll just -- Mr. Swanepoel, if you'll just hold
6    tight for me, I'm going to disconnect and reconnect to you.
7        (Pause)
8        COURTROOM DEPUTY:  Mr. Fields, would you mind
9    letting them know to reconnect.
10       MR. FIELDS:  I have, Ms. Guerra.  They're trying to
11   reconnect right now.
12       COURTROOM DEPUTY:  Thank you.
13   BY MS. MOSS:
14   Q.   Mr. Swanepoel, can you hear me?
15   A.   Yes, ma'am.
16   Q.   All right.  I think we can continue, then.
17       Mr. Swanepoel, I think I heard you testify on
18   direct that you had hunted maybe 12 times with them.  But in
19   instances when you weren't the professional hunter, did you
20   also just go to camp, and to observe when they were there?
21   A.   Absolutely, yes.  As the years proceeded, obviously we
22   became very good friends, so, yeah, I would probably be on
23   the -- on the -- most of the hunt, anyway.
24   Q.   Okay.  And I just want to ask you about the hunts
25   one -- a couple last questions before I move on.

1076

**CROSS - SWANEPOEL**

1        Are these hunts booked well in advance?

2    A.    Yes, ma'am.

3    Q.    And why is that?

4    A.    Well, generally speaking I guess the clients -- if you

5    can afford a big hunt like that, you obviously -- if you're

6    in business or you got the financeS to be able to do it, so

7    you probably are a busy person, so, you know, it's -- to

8    join the schedule, there is also a hunting period in these

9    countries.  Like Zambia would start the first of June and we

10   finished on the 31st of December.  So one has to plan with

11   the client in advance which month suits him, which months we

12   don't have other clients in the camp, just to make the

13   schedule work properly.

14   Q.    Okay.  And so when you say that they are booked well in

15   advance, does that mean months or maybe even a year in

16   advance?

17   A.    Sometimes even up to three years in advance, but mostly

18   one year in advance.

19   Q.    I want to ask you about another area, Mr. Swanepoel.

20   And this was something that you just mentioned.  That over

21   the years, did you get to know Larry and Bianca very well?

22   A.    Yes.

23   Q.    And let me ask you:  When you were out in the bush

24   hunting with a client, are you spending a lot of time with

25   them?

CROSS - SWANEPOEL

1    A.    Oh, yes, ma'am.  Yes.

2    Q.    So how many average hours a day would you spend with

3    clients?

4    A.    It depended all the time apart from the time where they

5    were showering and going to bed to sleep.

6    Q.    So that could be 16, 17 hours a day?

7    A.    Yes, ma'am.  Up at 5:00, generally to bed 9:00 at

8    night.  Most of the time spent with them.

9    Q.    And I want to make sure it's clear for the jury:  When

10   we're talking about these safari hunts, how many clients are

11   going with you at a time?

12   A.    With -- with -- we always just do a one-on-one unless

13   it is like Larry and Bianca, a family, or maybe two friends,

14   then we would have a two-by-two, which would be one

15   professional hunter with one person, the other professional

16   hunter with the other person.

17          So with Larry and Bianca only at the times when

18   they would split up would Doug or myself hunt one-on-one

19   with them.  But we, generally speaking, don't put more than

20   one client or group in one camp.

21   Q.    Okay.  So it sounds like it's a very small number of

22   people, one or two, or maybe a family.

23   A.    Yes, ma'am.  Unless it's a family, obviously.

24   Q.    Right.

25   A.    Yeah.

1078

**CROSS - SWANEPOEL**

1    Q.    And I think you spoke about -- during direct about

2    sometimes you spend times in a blind.  And I don't think

3    we've discussed yet in this trial what that means.  What is

4    a blind?

5    A.    A blind is something -- when we have a lion or a

6    leopard feeding on a bait, which is -- which is an animal or

7    a part of an animal hanging to a tree, we would then

8    generally gauge with motion cameras if that is a mature

9    animal to shoot, or it's something we want to sit for and

10   have a closer look.  We would then construct a grass blind

11   by putting in poles into the ground and doing thatching

12   around with grass.

13          The modern way in the USA now, you can buy a

14   camouflaged tent but generally speaking in Africa we do

15   the -- the grass hut, because apart from the fact that it

16   blends in well with its -- with its surroundings, it's also

17   safer.

18   Q.    And how big are these blinds, these grass surroundings?

19   A.    Generally I would say -- it depends if there's only you

20   and the client and the game scout in there, we would

21   probably make it 3 meters by 3 meters, which is about 3.3

22   yards by 3.3 yards.  But say, for instance, there's a

23   husband, wife, the two professional hunters, you know, we

24   may make it a little bit bigger.

25   Q.    Okay.  But it still sounds like it's a pretty small

**CROSS - SWANEPOEL**

1    space; is that right?

2    A.   Yes.  Yes.

3    Q.   And so when you're going out on these hunts day after

4    day with your client -- with Larry and Bianca, would you

5    spend a lot of time in the small space in a blind?

6    A.   Well, what we generally do is we -- we wait until

7    roughly 4:00 in the afternoon because that is when the wind

8    stops swirling because of the heat of the day.  Then

9    predominantly your wind will blow from east to west.  Your

10   blind will always obviously be under the wind, not on top of

11   the wind.

12        So you would go into the blind roughly around 4:00

13   in the afternoon.  Everybody goes dead silent and we just

14   sit there and watch through the portholes.  And if the --

15   the cat comes, we find -- do the final gauging and see if,

16   you know, if he's worth to shoot or not.  There is, of

17   course, a cut of time by government law, you have a half an

18   hour before sunrise and half an hour after sunset.  Then you

19   cannot shoot anymore, and you cannot use any artificial

20   light to shoot.

21   Q.   Okay.  And so it sounds like for at least a few hours a

22   day you're in the small blind with your clients.

23   A.   Yes.  I've spent 21 days every afternoon sometimes with

24   a client in a blind.

25   Q.   And do you get to know a client pretty well being in a

1080

CROSS - SWANEPOEL

1    small space like that?

2    A.    Yeah, the -- obviously there's not much talking.  Once

3    you've settled into the blind everybody keeps quiet until

4    the time you move out.

5    Q.    Including the blind, including the time at camp and

6    including the time going out hunting every day, did you get

7    to know Larry and Bianca very well?

8    A.    Yes, ma'am.

9    Q.    Did you consider them close friends?

10    A.    Yes, ma'am.

11    Q.    I'd like to ask you some questions about them as a

12    couple.  Can you describe for us how they were as a couple?

13    A.    Well, for me, you know, they were just a normal couple.

14    They're -- there wasn't any problems or anything that

15    anybody could see.  Spending a lot of time like that,

16    sometimes people do get aggravated with each other at

17    these -- it is just one of those things, sometimes it can be

18    miserable.  But I didn't notice anything strange with them.

19    They seemed a normal couple to me.

20    Q.    Did they seem like a loving couple to you?

21    A.    I would say so, yes.  For the reason that, you know,

22    they talked to each other, they listened to each other.

23    There was some touchy stuff going on, you know.  And one

24    would -- one would say yes.

25    Q.    Okay.  And I think that you said you never saw any

                          CROSS - SWANEPOEL

1   problems, so did you ever see them shout at each other, for

2   example?

3   A.    No, ma'am.

4   Q.    Did you ever see any problems between them?

5   A.    Not that I can recall, no.

6   Q.    And does that include also when you saw them in

7   Arizona?

8   A.    What's this?

9         UNIDENTIFIED WOMAN:  In Arizona did you see them?

10        THE WITNESS:  Yes, ma'am.  I think we visited them

11  in Arizona three times.

12  BY MS. MOSS:

13  Q.    Okay.  And did you ever see any problems when they were

14  at their home setting?

15  A.    No, ma'am.

16  Q.    Did they seem like a happy couple?

17  A.    To me they did.

18  Q.    And let me ask you about the camp in Zambia, in Mumbwa.

19  How did Larry and Bianca feel about that camp, the Chinyembe

20  camp?

21  A.    Bianca used to always say that it is a favorite spot.

22  That's why the last two years that she came there, she

23  actually made us take her to some -- some furniture shops in

24  Lusaka where she actually purchased some furniture for the

25  camp.  She also gave me some money that -- to jack up the

1082

CROSS - SWANEPOEL

1    bathroom because she wanted a little cupboard under there,

2    the washing basin.  And just generally, you know, it was

3    very proud, and she loved it.

4            She also made me make -- move the bed to the middle

5    of the chalet so the morning sun shining over the room that

6    they can lie in bed and see it.

7    Q.   So it sounds like they both enjoyed the camp; is that

8    right?

9    A.   What's that?

10           UNIDENTIFIED WOMAN:  They both enjoyed the camp?

11           THE WITNESS:  Yes, very much so.  Bianca called it

12    her second home.

13    BY MS. MOSS:

14    Q.   And did Larry and Bianca have plans to continue going

15    to the Chinyembe camp in the future?

16           UNIDENTIFIED WOMAN:  Did they have plans to go

17    back --

18           THE WITNESS:  Oh, yes.  Yes.  Absolutely, yes.

19    BY MS. MOSS:

20    Q.   And did they want to come back there every year?

21    A.   I would say so, yes, because, you know, they got the

22    chalet there and they -- they just loved coming there and

23    just spending time.

24    Q.   Okay.  Let me ask you about something else,

25    Mr. Swanepoel.  I want to ask you about when you go out each

**CROSS - SWANEPOEL**

1   day hunting in the bush.  Now, when you would go hunting out

2   in the bush, were you hunting close to camp or could you go

3   just anywhere in the game management area?

4   A.    Oh, ma'am, anywhere.  Sometimes we would cover an area

5   of 200, 250 kilometers during the day, which is probably

6   about a hundred miles.

7   Q.    And how would you get to those different areas in the

8   game management area?

9   A.    With a vehicle -- the hunting vehicle.

10  Q.    And where were the guns kept on the hunting vehicle?

11  A.    The cab is here and the hunting vehicle is -- generally

12  the cab comes off so that it's easy to talk to the driver.

13  And on the back is A hunting seat where generally the

14  clients would sit.  In front of them, there would be a -- a

15  metal structure with like a "U" like this, and that's where

16  the guns will be put in.

17  Q.    And would you put the gun cases in the rack and then

18  put the guns on top of them?

19  A.    Generally speaking we would put the gun bag completely

20  in like that so that the rack doesn't scratch the rifle butt

21  or the barrel.  And then just open the zip on the top so

22  that the gun is easy accessible.

23  Q.    Okay.  So do you want to have the gun easily accessible

24  since you're out in the bush and you might encounter

25  dangerous animal?

1084

CROSS - SWANEPOEL

1    A.    What's that?  Sorry --

2    Q.    That's okay.  Do you want to have the guns easily

3    accessible so that if you encounter an animal in the bush,

4    you will be ready?

5    A.    Absolutely, ma'am.

6    Q.    Now, even though you have the guns easily accessible

7    with the bag open, do you have the guns loaded?

8    A.    No, ma'am.  It would be in the chamber at the bottom,

9    but not in the actual barrel.

10   Q.    So I just want to make sure I'm sure.  They would be in

11   the magazine but not necessarily in the chamber; is that

12   right?

13   A.    That's correct, yes, ma'am.  Because of the bumping of

14   the vehicle, the gun can fall down or whatever, you know.

15   It can be dangerous.

16   Q.    Okay.  And because you don't want to have a dangerous

17   situation, is that why you don't have a cartridge in the

18   chamber?

19   A.    That's correct, ma'am.

20   Q.    And are you driving on paved roads while you're out in

21   the bush?

22   A.    What?

23   Q.    Are you driving --

24   A.    No.  No.  It's very, very rough roads, ma'am.

25   Q.    And I want to ask you about the guns that were used for

**CROSS - SWANEPOEL**

1    hunting.  Can you tell us again what gun is used to shoot

2    big game?

3    A.    Well, the -- generally speaking in Africa the law is if

4    you shoot any big game it has to be a caliber that is .375,

5    which is a point 375 of an inch.  Or if you want to go

6    metric, it's point 9 point -- not point -- 9.5 millimeters.

7    That is the lightest caliber that you are allowed to use on

8    any dangerous game, i.e., elephant or rhino, lion, leopard,

9    buffalo.

10   Q.    Okay.  And --

11   A.    On the plains game -- on the plains game, generally

12   clients can use more or less what they've got in their

13   arsenal, like a point 300 or a 243 or a 30.6, whatever.

14   Q.    And what you're talking about now, that's a rifle; is

15   that right?

16   A.    A rifle, yes, ma'am.

17   Q.    And I believe you testified on direct that a shotgun is

18   the desired weapon for a wounded leopard; is that correct?

19   A.    Correct, ma'am.

20   Q.    Now, I want to ask you about an instance where there

21   was a wounded leopard.  Can I ask you about 2015?

22   A.    Yes, ma'am.

23   Q.    And was there an instance in 2015 where Bianca Rudolph

24   wounded a leopard but wasn't successful in killing it?

25   A.    Yes, ma'am.  What -- the leopard was wounded.  The

CROSS - SWANEPOEL

1    professional hunters followed it up as far as they could

2    during the last light that was available, then came back to

3    camp.

4         And I accompanied Mark, my son, the next day on

5    following the wounded leopard.  We did allow Larry to come

6    with, but behind the group so that there's no danger.

7    Q.   Okay.  So it sounds like it was you, Mark, Larry.  And

8    was there also a tracker with you?

9    A.   There was two trackers and a Government game scout.

10   Q.   Okay.  And did Larry want Bianca to stay in the vehicle

11   so that she could be safe?

12   A.   Yes.  Apart from that, we would not have allowed

13   Bianca -- that she was not that -- no.  She would have had

14   to stay in the vehicle even if Larry didn't want.

15   Q.   And I think you described for us, is that one of the

16   most dangerous animals that you can ever follow is a

17   leopard?

18   A.   I personally think so after the years and years

19   experience.  I'm sure there's other professional hunters

20   that view some other ones, but I would -- I still think the

21   leopard is one of the most dangerous.

22   Q.   And can you describe a little bit for us why that is,

23   why they are so dangerous.

24   A.   First of all, I think the leopards can -- is a vicious

25   animal.  It always has been a vicious animal.  And the other

CROSS - SWANEPOEL

1  thing is people ask -- people always ask you the question,

2  "What do you view as the most dangerous?"  Then you think to

3  yourself, well, could it be the elephant?  It's a massive

4  animal.  If it gets hold of you, you're dead.

5          Could it be the buffalo?  Same thing.  Could it be

6  a lion?  Same thing.  But those animals, at least you can

7  see them at quite a distance.  They -- they're big.  A

8  leopard conceals itself like almost -- liken to a domestic

9  cat.  It lays down in the grass and it's camoflaged.  People

10  always think because it's white-and-black spots that you can

11  see it.  It's a perfect, perfect camouflaged animal.

12  Q.    And I think you said that a leopard is not a gentleman.

13  A.    No, ma'am.  If you're hunting, it's going to try to

14  hurt you.

15  Q.    And so tell us about what happened when all of you were

16  tracking this wounded leopard in 2015.

17  A.    Well, we followed this leopard, I would -- I would

18  occasion to say probably about 2, 2 1/2 hours.

19  Unfortunately the one tracker, he wasn't a very experienced

20  tracker, and he was wandering around a little bit.  But we

21  kept calling him into the group so that we stay together in

22  the group.

23          As we were walking forward, the -- there -- the

24  leopard was lying 5, 6 yards in front of us, just concealed

25  in a small bush.  This -- this tracker saw the leopard and

CROSS - SWANEPOEL

1  he shouted, "Bwana, Bwana, Bwana," meaning "Sir, sir," and

2  pointed to the leopard, which is the biggest mistake you can

3  ever make because once he focuses on who his enemy is, he

4  will come for that particular enemy.

5          So, anyway, as that happened, the leopard made its

6  charge and normally goes [indicating] when it charges

7  immediately.  And Mark immediately stepped forward to shoot

8  the leopard.  I mean, this happens in half a second, one

9  second.  The -- the tracker unfortunately got such a fright

10  that he ran almost into the barrel of Mark's shotgun.  Mark

11  did hit the leopard and a couple of pellets embedded into

12  the leg of the -- the tracker.  Could have been much worse

13  Q.   So when Mark fired the shotgun at the leopard, did he

14  also hit the tracker a little bit?

15  A.   Yes.  Of course the shotgun -- once again, we go back

16  to the point that it's not a single projectile.  So even at

17  3 or 4 yards, it is going to open up a bit.  So I think four

18  or five of those pellets hit the tracker in the buttocks.

19  Q.   And is that the importance of having a shotgun when

20  you're tracking a leopard?

21  A.   What?

22  Q.   Is that the importance of having the shotgun --

23  A.   Yes.  Yes, ma'am.  So that you can -- you've got a

24  little bit more spray, a little bit more coverage.

25  Q.   And did Mark mean for some of the pellets to get into

CROSS - SWANEPOEL

1  the tracker?

2  A.   What?

3       UNIDENTIFIED WOMAN:  Did he intend to hit the

4  tracker?

5       THE WITNESS:  No.  No.  No.  I mean, Mark moved

6  forward like this with the shotgun to shoot the thing, and

7  the tracker came -- he literally jumped on top of Mark.

8  BY MS. MOSS:

9  Q.   So was that an accident, what happened to the tracker?

10  A.   Yes, ma'am.

11  Q.   And I just wanted to say, Mr. Swanepoel, you're frozen

12  again, but we're going to go for a few more minutes to see

13  if hopefully we can see you.

14       Mr. Swanepoel, can you tell us what happened after

15  Mark fired that shot and the tracker got wounded.

16  A.   Well, first of all, we thought that the leopard had

17  actually bit the tracker or scratched him, but on close --

18  looking closer we saw that it was definitely a couple of

19  pellets that hit him.

20       We put him, then, down, you know, to elevate his

21  leg to stop some of the bleeding.  I then ran to the vehicle

22  to go and get my medical kit or Mark's medical kit, and

23  Larry also always had a medical kit with him.  So I came

24  back running with those two.

25  Q.   And you said that Larry always had a medical kit with

CROSS - SWANEPOEL

1    him.  Why does Larry always have a medical kit?

2    A.    I guess it's because his profession, you know, being in

3    the medical profession.  And being -- hunting a lot in the

4    bush, you know, you've got staff of about 20 in the camp,

5    there's always somebody that's got a pain or got a -- or

6    something that you can help with.

7    Q.    Is there always the possibility of a serious accident?

8    A.    Yes, ma'am.  Always.

9    Q.    Okay.  So I want to ask you, once you were able to get

10   the medical kits, what did Larry do?  What did Dr. Rudolph

11   do?

12   A.    Well, Larry -- we immediately cut off the trouser legs,

13   you know, the trousers, make the wound accessible.  Larry

14   then disinfected it.  And he proceeded to suture it closed,

15   as many of the little holes that he could, to stop the blood

16   seeping out.  He would -- the main thing we wanted to make

17   sure was the blood loss was contained.

18   Q.    And so did Larry treat the tracker there -- there in

19   the bush?

20   A.    Yes, ma'am.

21   Q.    And -- and what happened after that, after you took the

22   tracker back?

23   A.    We put the tracker in the Land Cruiser.  It was about

24   three hours to camp.  When we got to camp, we got everything

25   ready and Mark and the government game scout and one other

CROSS - SWANEPOEL

1    camp manager left for the closest hospital.  Now, the -- the

2    closest hospital is about seven hours away.

3             So on the way, there's a smaller town with a police

4    station, so the first stop was obviously the police station

5    to report the accident and hand over a -- an affidavit --

6    what would -- you're not exactly sure what happened with the

7    government game scout putting in his report.

8    Q.    Okay.  And you said you obviously had to report this to

9    the police station.  Is that something you did --

10   A.    A hundred percent, yes, ma'am.

11   Q.    So are you --

12   A.    It was with a gun -- with a gunshot wound, the hospital

13   is not going to admit you unless you have been to the

14   police.

15   Q.    And so any time there's a serious incident in the game

16   management area, are you required to report it to the

17   police?

18   A.    Yes, ma'am.

19   Q.    And are you required to report it to the professional

20   hunter's association?

21   A.    Yes, ma'am.

22   Q.    And Larry knew that, right?

23   A.    Yes, ma'am.

24   Q.    How did Bianca react to this incident?

25   A.    Crying, nervous.  You know, Bianca's a nervous person,

**CROSS - SWANEPOEL**

1    as I mentioned before.  Which she took it to heart, took it

2    to heart.

3    Q.    Was she worried about Larry?

4    A.    Yes, of course.  She was also felt responsible because

5    she had been -- she had wounded the leopard.  It -- it's a

6    bad feeling, you know.

7    Q.    Yes.  But is it an example of how accidents can happen

8    in the bush, Mr. Swanepoel?

9    A.    Yes, ma'am.

10   Q.    I'd like to ask you a little bit more about that, about

11   accidents with firearms in the bush.  And I'd like to ask

12   you about some accidents and incidents that you have seen or

13   heard about with guns.  Can you tell us about an incident

14   with an apprentice named Colin and --

15   A.    Yes.

16   Q.    -- an individual named Adam Buskey.

17   A.    Well, he was not the apprentice, he was my hunter with

18   me.  I had an apprentice by the name of Colin Branda.  And

19   this was his second year as an apprentice, so I allowed him

20   to carry my -- my big double rifle walking behind me because

21   of the area we were in was full of elephants.

22         The client had wounded the leopard the evening

23   before and we were following up the leopard the next day.

24   The leopard charged us and Buskey and -- Adam Buskey and

25   myself killed the leopard.  And when all the hoolala was

CROSS - SWANEPOEL

1   finished, the trackers and everybody said to me that, "The

2   guy behind you pulled off a shot right between your two

3   legs, he got such a fright with the leopard charging."

4   Lucky enough I didn't lose a leg.

5          MS. MOSS:  Your Honor, we've been frozen for a few

6   minutes now.  I'm wondering if we can do something again to

7   try and reconnect.

8          THE COURT:  Hold on.  Why is that necessary?  I

9   know in the perfect world we would have him sitting here and

10  he'd be in great health and -- but, you know, you've been

11  going now 40 minutes on this, I don't want to delay it any

12  further.  Keep going.

13  BY MS. MOSS:

14  Q.   Mr. Swanepoel, you're still frozen, but we're going to

15  go ahead and continue talking.  I'd like to ask you about

16  another incident with an experienced hunter named

17  Dr. Ridgeway.  Can you tell us about that.

18  A.   Yeah.  Dr. Ridgeway was with us many times.  And he was

19  with his wife and we were -- we had come back to camp for

20  lunch.  And we were just sitting down at the lunch table

21  waiting for them when we heard a gunshot go off in the

22  chalet.  Of course we ran there and he was very, very

23  embarrassed, he was cleaning a gun and the gun had gone off.

24  Q.   And is that another example of someone who was actually

25  experienced having an accident and the gun discharging?

1094
CROSS - SWANEPOEL

1    A.   Yes, it can happen, ma'am.

2    Q.   And is there a saying in Africa that the devil loads

3    the gun?

4    A.   Yes, ma'am.  I think that's why my one ear's longer

5    than the other because my dad used to tug on it all the time

6    to make sure I remembered that.

7    Q.   Fair enough.  Mr. Swanepoel, at the end of the day of

8    hunting -- I believe that you said you're allowed to hunt

9    until about half an hour after sunset; is that right?

10   A.   Correct, ma'am.  Correct.

11   Q.   And is it the normal practice that you unload the guns

12   by the blind at the end of the day?

13   A.   Yes, ma'am.  Before they hand it to the trackers on the

14   back of the vehicle.

15   Q.   And is it dark out, or getting dark out at that time of

16   day?

17   A.   Yes.  It would be dark but, you know, we would have

18   obviously flashlights available, you know, so that we can

19   make sure everything is okay.  It's an important part of it

20   because we've got three or four people on the back of the

21   vehicle, so it's important to unload the guns.

22   Q.   And when you're doing this, since you would still be by

23   the blind, are you still in the bush and still in an area

24   where there's a possibility of dangerous animals?

25   A.   Yes.  But once -- once you get into the vehicle, you

CROSS - SWANEPOEL

1    obviously are safe.

2    Q.    Right.  Now when the professional hunter and the

3    clients are unloading the guns, Mr. Swanepoel, do you

4    believe it's possible to make a mistake and not completely

5    unload the gun?

6            MR. WINSTEAD:  Objection.  Speculative.

7            THE COURT:  What's the -- hold on, sir.  Hold on,

8    hold on.  I've sustained an objection.  Next question.

9    BY MS. MOSS:

10   Q.    Let me ask you, Mr. Swanepoel:  Are you aware of that

11   ever happening with a client where he made a mistake and not

12   unloaded the gun fully?

13   A.    No, ma'am, I haven't had that case before.  No.

14   Q.    Have you had an instance where a client flew with a gun

15   that had bullets left in it to United States?

16   A.    I had one client, yes, that when he put his guns away,

17   he obviously did not clear the -- the gun or while he was

18   taking the bullets out of the magazine.  When you have a

19   rifle, you normally crack the bolt four or five times,

20   depending on how many bullets is in the magazine.  Obviously

21   come to the last bullet, he didn't crack it out, and it was

22   left in his gun box.  He flew all the way to the United

23   States with it and they saw that when they were checking the

24   guns on entry.

25   Q.    So is that an example of you knowing about a

CROSS - SWANEPOEL

1    possibility of leaving a cartridge or a bullet in a gun

2    unintentionally?

3    A.    Yes, it can happen, ma'am, but it -- you know, we make

4    very sure when we are -- especially out of a blind or

5    something, it's like, "Okay, Gents, this is it.  Guns

6    unloaded, packed away.  Let's go back to camp."

7    Q.    And I want to talk to you now about 2016.  In 2016, did

8    you and your wife, Luccia, have a chance to spend a few days

9    with Larry and Bianca in the Chinyembe camp?

10   A.    Yes, ma'am.

11   Q.    And I think you said that was about five days; is that

12   right?

13   A.    Yes, ma'am.

14   Q.    Were you the professional hunter on that trip?

15            UNIDENTIFIED WOMAN:  Were you the professional

16   hunter --

17            THE WITNESS:  No, Mark my son was.  I had retired

18   by that time.

19   BY MS. MOSS:

20   Q.    So were you going just to hang out with them?

21   A.    Yes, I -- I always come -- whenever I had the

22   opportunity, I always accompanied Larry and Bianca, even

23   after they started hunting full-time with Mark.

24   Q.    And in this safari in 2016, how were Larry and Bianca

25   getting along?

**CROSS - SWANEPOEL**

1    **A.**    I think very well.  They -- we were even saying that

2    they were in a good space.  I mean, if they weren't hunting

3    the first couple of days when they were there, they were

4    just sitting on the rocks with the woman with their feet in

5    the water, the little fish cleaning their toenails, I guess,

6    and drinking champagne.

7    **Q.**    So did they appear to be having fun?

8    **A.**    Yes, ma'am.

9    **Q.**    Did they seem happy together?

10   **A.**    Yes, ma'am.

11   **Q.**    Now, I want to ask you about -- you spoke about the

12   testing of the shotgun at the camp.  Do you remember that?

13   **A.**    Yes, ma'am.

14   **Q.**    Now, I believe the prosecutor asked you whether you

15   modified the rifle.  I want to be clear, it was the shotgun

16   that you modified; is that right?

17   **A.**    Yes, I would not use the word "modified."  I would use

18   the word going back to what it's manufactured for.

19   **Q.**    Okay, you took the plug out.

20   **A.**    Yes, ma'am.

21   **Q.**    Did you inspect the gun or take it apart?

22   **A.**    I did not take it apart.  It's only a feeding tube at

23   the bottom of the barrel.  We just unscrew a nut and the

24   spring -- the -- there's a little plug comes out and you

25   rescrew it on.

CROSS - SWANEPOEL

1    Q.    And did you know whether this particular gun had been

2    maintained?

3    A.    What did she say?

4    Q.    Had it been maintained?

5    A.    Repeat that, please.

6    Q.    Do you know whether the shotgun had been maintained

7    over the last 20 years?

8    A.    No, ma'am, I -- I did not ask that, no.

9    Q.    Do you know whether it had been regularly oiled and

10   cleaned?

11   A.    Again, that would be the -- the client's -- clients do

12   that.  I've always seen that they've pretty well looked

13   after the firearms, because sometimes your life depended on

14   them.

15   Q.    Now, you spoke about the cartridge in a 12-gauge

16   shotgun, the double-aught buckshot.  How many pellets did

17   you say are in the cartridge?

18   A.    I would say there's 15.

19   Q.    Okay.  And you also spoke about Bianca's proficiency

20   the last time that you hunted with her.  And I believe you

21   said that was 60 percent; is that right?

22   A.    I would say so, yes, ma'am.

23   Q.    And that was 60 percent with a rifle; is that right?

24   A.    Yes.

25   Q.    And you also testified that shotguns are more dangerous

CROSS - SWANEPOEL

1    than rifles.  Do you believe that?

2    A.   Yes, ma'am.

3    Q.   I just have a few more questions, Mr. Swanepoel.

4         I'd like to ask you about Bianca's personality.

5    And you touched on this a little bit in your direct.  And

6    you described Bianca as a nervous person.  Can you tell us a

7    little bit more about that.

8    A.   She got wound up very easily.  When we visited them in

9    Arizona, if she gave a party -- us a barbecue, I mean, she

10   would be stressing like -- until you said to, Bianca, "Calm

11   down, you know.  It's -- it's not the end of the world."

12        She was -- she was always very, very stressed.  And

13   I think she was also very, very stressed that -- with the

14   leopard hunting because she had that accident and felt

15   responsible, you know, that somebody got hurt through it.

16   Q.   So would she also -- did she get jittery and nervous on

17   hunts?

18   A.   Did she?

19   Q.   Jittery and nervous on hunts?

20   A.   Yes.  She was a nervous person, yes.

21   Q.   Let me ask you:  Did you ever observe Bianca on a day

22   that she was traveling, that she had to fly?

23   A.   I'm not too sure what -- can you repeat that, please.

24   Q.   Yes.  When -- on a travel day when Bianca had to fly,

25   would she get very flustered and very panicked on those

CROSS - SWANEPOEL

1    days?

2    A.    If she was leaving the camp?  Yes.  Because she

3    would -- she was almost like a perfectionist.  I think

4    that's the best word to use, you know.  She wanted

5    everything on time and, "Let's go, let's go.  We're going to

6    be late" type thing.

7          Yes.  I would say she was particularly nervous

8    during that time.

9    Q.    Okay.  And so would she move through things very

10    quickly on a travel day?

11    A.    What's that?  Yes.  Yes.

12    Q.    Thank you.  Just a last area I want to ask you about.

13    And this is after Bianca passed away in 2016.  Can you tell

14    us how you observed Larry after his wife had passed away?

15    A.    Oh, he was -- to me, he was very sad, very sad person,

16    yes.  Even in the bush, he came hunting with us every year

17    after she passed away, and wasn't the same Larry.

18    Definitely wasn't joyful and full of jokes or anything like

19    that, you know.  You could see that it was -- something was

20    bothering him, obviously.

21    Q.    And was there a time when Larry asked to have a plaque

22    put up at the cabin in memory of Bianca?

23    A.    Yes.  He asked me to -- if I could please make a plaque

24    for them from the local people that do marble work and just

25    say, "Larry and Bianca," and "2016," and put it on the

CROSS - SWANEPOEL

1  chalet that -- the one that they actually always stayed in.

2  Unfortunately, due to the COVID problem, we couldn't do it

3  because the companies were all closed during that time.

4  Q.   And do you plan to do it in the future?

5  A.   Yes, ma'am.

6  Q.   And, Mr. Swanepoel, based on all your observations of

7  Larry and Bianca over 28 to 30 years, did you think that

8  Larry loved Bianca?

9  A.   Difficult to answer the question.  I would say yes.

10 Q.   And is that based on how you saw them interacting with

11 each other?

12 A.   Yes.  I have no other thing to base anything else on,

13 you know.  To me, they were always good people and that's

14 all I can say.

15 Q.   And so based on all your observations of Larry and

16 Bianca over 28 to 30 years, do you think that Bianca's death

17 was an accident?

18         MR. WINSTEAD:  Objection.  Speculative.

19         THE COURT:  Sustained.  Sustained, sir.  You don't

20 have -- sir.  Sir, this is the judge.  Please don't answer

21 that question.

22         Any more questions, counsel?

23 BY MS. MOSS:

24 Q.   Is there anything that ever led you to believe that

25 there was a problem between them, Mr. Swanepoel?

                            REDIRECT - SWANEPOEL

1    A.    No, ma'am.

2              MS. MOSS:   Thank you very much.

3              THE COURT:   All right.   Thank you.   Any cross,

4    Mr. Dill?

5              MR. DILL:   No, sir.

6              THE COURT:   All right.   Redirect.

7                        REDIRECT EXAMINATION

8    BY MR. WINSTEAD:

9    Q.    All right, sir, just a couple more questions.  Can you

10   hear me okay?

11   A.    Yes, sir.

12   Q.    How many times would you say Larry went to Chinyembe

13   that you knew of?

14   A.    Can you repeat that, sir?

15   Q.    How many times do you think Larry went to Chinyembe?

16   A.    Went to Chinyembe -- I think the very first time he

17   went to Chinyembe was in 1998.  And pretty much from that

18   time on, almost every year that I can remember.

19   Q.    You said that you knew Larry and Bianca well as a

20   couple.  Did --

21   A.    Yes.  I -- you know, as a couple, in the bush, and also

22   spending some time with them.  They came, and everything at

23   their home in Arizona.

24   Q.    Did either of them ever tell you that they had an open

25   marriage?

REDIRECT - SWANEPOEL

1   A.    No, sir.

2   Q.    You said that leopard hunts are required to end a half

3   hour after sunset; is that right?

4   A.    Yeah.  Half an hour before and half an hour after, yes.

5   Q.    If you're still hunting a leopard a half an hour after

6   sunset, is it pitch black?

7   A.    It depends on the time of the year.  If it's winter, it

8   would go darker much quicker.  But you still got visibility,

9   especially with a telescope thing.  But you have to be able

10  to see because you're not allowed to use artificial light.

11  So I would say yes, it's still reasonably visible.

12  Q.    And you won't want to be hunting a leopard if you

13  couldn't see well; is that right?

14  A.    No.  No.  No.  No.  It's against the law.  It's -- the

15  scout will tell you.  Now when the GPS says it's time,

16  you're out of there.

17  Q.    You were asked about a couple accidents where there

18  were accidental discharges.  Do you remember that?

19  A.    What did he say?

20          UNIDENTIFIED WOMAN:  The accidental discharges.

21          THE WITNESS:  Yes, sir.  Yes.

22  BY MR. WINSTEAD:

23  Q.    When Mark shot the leopard and also hit the tracker,

24  did the gun just --

25  A.    Yes.

1104
REDIRECT - SWANEPOEL

1   Q.   -- did the gun just go off by itself or did Mark pull

2   the trigger?

3   A.   No, Mark pulled the trigger.  Obviously tried to shoot

4   the leopard.  The tracker should not have jumped in -- on

5   top of him type of thing.

6   Q.   When the other individual was cleaning a gun and the

7   gun went off, do you know how that fire happened?

8   A.   I --

9            UNIDENTIFIED WOMAN:  When the doctor shot

10   accidentally, do you know how it happened?

11            THE WITNESS:  He was sitting on the bed with his

12   gun pointing up at the roof, cleaning his gun, and then for

13   some reason probably when he closed the bolt, he didn't

14   notice -- he was elderly, and he probably put the bullet in

15   the chamber by accident, but he shot through the roof.

16   There was no damage whatsoever.

17   BY MR. WINSTEAD:

18   Q.   Do you think that he pulled the trigger in order to

19   make it shoot?

20   A.   Yes.  Yes.

21   Q.   And when the shot went between your legs when you were

22   hunting elephant, did the person --

23   A.   What's that?

24   Q.   Did the person pull the trigger in that incident as

25   well?

REDIRECT - SWANEPOEL

1    A.    Yes.  He panicked and he -- he panicked.  He stopped

2    becoming a professional hunter after that incident.

3    Q.    You spoke about a client who flew home with a round in

4    the chamber of a rifle, right?

5    A.    Yes, sir.

6    Q.    Was that Larry?

7    A.    No, sir.  It was a banker from -- what's that place?

8    Seattle.  Yeah.

9    Q.    And was that -- just so my memory -- was it a rifle or

10   a shotgun?

11   A.    That was a rifle, sir.

12   Q.    You were asked if you knew whether Larry's shotgun had

13   been maintained over the years.  Do you remember that?

14   A.    Yes, sir.

15   Q.    Regardless of whether it had been maintained, was it in

16   working order when you saw them shooting it?

17   A.    No, I -- actually quite shocked when they said that the

18   gun was not a new gun because to me it looked -- it looked

19   reasonably good -- in good condition.  I mean, the

20   professional hunter, immediately if the gun is any suspect

21   he would bring up the point immediately.

22   Q.    Did you notice whether Larry took care of his guns?

23   A.    Yes, he did.  I -- I never saw them being like thrown

24   around anywhere or -- or not oiled or something like that in

25   the years that I can remember.  I never had a time to say to

1106

REDIRECT - SWANEPOEL

1    him, "Hey, you better clean your guns," or anything.

2    Q.   Have you ever dropped a firearm?

3    A.   I wouldn't say me.  But I've been around sometimes when

4    a firearm has been dropped.

5    Q.   Do you remember any occasions when a firearm was

6    dropped and it discharged?

7    A.   No, sir.

8    Q.   You said that Bianca was sometimes nervous; is that

9    right?

10   A.   Yes, sir.

11   Q.   When she was nervous, did that make her careless with

12   firearms?

13   A.   I wouldn't say careless, but it -- it -- to me, in

14   retrospect, it was a relatively bit -- it was a little bit

15   more pronounced, the nervousness, with a gun, you know; when

16   she was getting a little bit panicky.

17   Q.   And when you're talking about that, is that when she

18   was about to take a shot?

19   A.   Yes.  Yes.  You -- a lot of times you have to say,

20   "Bianca, just take it easy.  Take a deep breath.  Put the

21   gun on the shooting sticks, inhale once or twice," just to

22   calm her down.

23   Q.   You said that she sometimes would get anxious about

24   traveling; is that right?

25   A.   Yes.  Packing up camp or something, when she arrived

REDIRECT - SWANEPOEL

1    she was always normally very calm, but Bianca got into a

2    panic if -- if it was just 10 minutes late or something.  It

3    was just how her character was.

4    Q.   During that packing, did you ever see her carelessly

5    handling firearms in order to pack quickly?

6    A.   No.  I never saw Bianca pack the rifle so I cannot be

7    witness to that.

8              MR. WINSTEAD:  May I have just a moment, Your

9    Honor?

10              THE COURT:  You may.

11              MR. WINSTEAD:  Nothing further.  Thank you, Your

12    Honor.

13              THE COURT:  May this witness be excused for the

14    Government?

15              MR. WINSTEAD:  Yes, sir.

16              THE COURT:  For the defendants?

17              MS. MOSS:  May I recross, Your Honor?

18              THE COURT:  Sorry?

19              MS. MOSS:  May I recross?

20              THE COURT:  No, this is not a cross-designated

21    witness.  You know the --

22              MS. MOSS:  He is, Your Honor.

23              THE COURT:  He is?

24              MS. MOSS:  Yes, he is.

25              MR. FIELDS:  He is cross-designated, Your Honor.

RECROSS - SWANEPOEL

1    If that's absent from our witness list, that's a mistake.

2              THE COURT:  Oh, you're right.  He is a

3    cross-designated witness.  You may recross, Ms. Moss.

4              MS. MOSS:  Thank you, Your Honor.

5              UNIDENTIFIED WOMAN:  He's going to ask you some

6    more questions.

7                      RECROSS-EXAMINATION

8    BY MS. MOSS:

9    Q.    Mr. Swanepoel, can you still hear me?

10   A.    Yeah.

11   Q.    Mr. Swanepoel, you were asked a question about whether

12   you had heard of Larry and Bianca having an open marriage.

13   Did you hear that question?

14   A.    Yes, ma'am.

15   Q.    Were you aware or did you hear rumors that Bianca had

16   had an affair with your partner, Doug Scandrol?

17   A.    Not with Doug Scandrol, no.  Doug just mentioned it.

18   And I'm talking completely hearsay from him right in the

19   beginning when I met Larry and Bianca, that Doug said that

20   there was a little bit of having problems between them

21   because they both had had affairs.

22              Normally don't listen to things like that, so I --

23   I never, ever heard of anything more of it, so . . .

24   Q.    And so did you hear that later Bianca did have an

25   affair with Doug Scandrol?

RECROSS - SWANEPOEL

1    A.    No.  God, that's a shock to me.

2    Q.    Thank you, Mr. Swanepoel.

3          THE COURT:  All right.  May this witness be excused

4    for the defendants?

5          MR. DILL:  Yes, Your Honor.

6          THE COURT:  Ms. Moss?

7          MS. MOSS:  Yes, Your Honor.

8          THE COURT:  All right.  Mr. Swanepoel, this is the

9    judge.  I thank you so much for your testimony.  You're

10   done.  You're excused.  And your testimony is now ended.

11   Thank you, sir.

12          THE WITNESS:  Thank you, sir.

13          THE COURT:  All right.  Instead of starting the

14   next witness, we're going to take our morning recess.  We're

15   in recess for 15 minutes.

16       (Recess taken 10:20 a.m.)

17       (In open court outside the presence of the jury at

18   10:38 a.m.)

19          THE COURT:  Mr. Markus, I understand you have a

20   matter to raise before we bring in the jury.

21          MR. MARKUS:  Yes, Your Honor, just briefly

22   regarding the last witness.  As the Court knows, we made an

23   accommodation to the Government to allow that witness to

24   testify via videoconferencing with the understanding, of

25   course, that the videoconferencing would allow the jury to

RECROSS - SWANEPOEL

1    see him and see his expressions both for the Government and

2    for the defense.

3            On direct examination, there were no freezes,

4    hiccups, or problems.  As the Court knows, there were a

5    number of problems during the defense cross-examination.

6    Ms. Moss asked for a short break.  It took about 30 seconds

7    the first time, and the Court denied it.  And I believe that

8    affected our Sixth Amendment right to confront this witness.

9    And so I would move for a mistrial based on the Court not

10   allowing us to have that 30 seconds to a minute to fix the

11   video as -- so the jury could see and judge his expressions

12   and judge whether he was a credible witness or not.

13           THE COURT:  All right, I'll hear from the

14   Government.

15           MR. FIELDS:  Your Honor, first of all, the

16   appropriate time to bring up a motion for a mistrial on

17   confrontation clause issues would have been during the

18   witness's testimony.  Obviously there's nothing we can do

19   about it now.  And so from the Government's perspective this

20   argument was forfeited.

21           As far as confrontation clause issues go, I don't

22   take the defense's cross there to be raising any issues

23   about his credibility, about his bias, or anything like

24   that.  That was not the tenor of the cross-examination.  And

25   so if the defense is concerned about the jury being able to

RECROSS - SWANEPOEL

1    see his demeanor because they won't be able to tell whether

2    or not he's telling the truth, that was not the tenor of the

3    cross at all, Your Honor.  And, in fact, on multiple

4    occasions they wanted the jury to credit his testimony.

5        So I don't think that there's -- if there is a

6    confrontation clause issue, it was forfeited.  And also it

7    was done -- finally, Your Honor, they did agree to the VTC,

8    knowing that there are some limitations to that technology.

9    It's not perfect.  This was raised in the motion.  But they

10   agreed to it.  This was a joint witness from South Africa.

11       So for all those reasons we think the motion must

12   be denied.

13       THE COURT:  Mr. Dill, do you wish to be heard on

14   the motion?

15       MR. DILL:  No, Your Honor.

16       THE COURT:  The motion for mistrial is denied.

17   First of all, I want to put on the record that I -- we

18   interrupted the testimony of the -- of this witness once for

19   rebooting, and it was quicker -- it was not as quick as 30

20   seconds.  Secondly, I agree with Mr. Fields that this is not

21   a witness in which there was an issue of the -- the -- of

22   the witness's bias towards the defendant.

23       There was no -- I saw no evidence -- or heard no

24   evidence that this witness was hostile in any way to the

25   defendants.  In fact, most of the witness's testimony I

RECROSS - SWANEPOEL

1   believe was favorable to the defendants.  And so the

2   issue -- the confrontation issues raised by the motion in my

3   view simply are not present.

4           Thirdly, I agree with the Government also that the

5   matter was waived because it was not raised while the

6   witness was still connected to us.

7           And, lastly, one of the reasons I denied it was to

8   keep the matter proceeding in a way that can accommodate

9   both sides with a cross-designated witness, given the

10  limited trial time that we have.  And I thought

11  cross-examination was rather lengthy for this witness;

12  covered -- there wasn't -- maybe because of past rulings so

13  far in the trial there wasn't scope issues, I guess the

14  cross-designation would have limited that, but there were a

15  number of matters that went way beyond direct that I was of

16  the view was of very limited relevance to this matter.  So

17  for all those reasons the motion is denied.

18          Let's bring in the jury.

19          THE COURT:  Government may call its next witness.

20          MR. FIELDS:  Thank you, Your Honor.  The United

21  States calls Peter Milnes.

22          COURTROOM DEPUTY:  Please raise your right hand for

23  me.

24          PETER MILNES, GOVERNMENT WITNESS, SWORN

25          COURTROOM DEPUTY:  Thank you.  Please be seated and

DIRECT - MILNES

1    remove your mask for us.  And then state your name for the

2    record and spell your first and last name for us.

3              THE WITNESS:  Peter Robert Milnes.  Peter,

4    M-i-l-n-e-s.

5              MR. FIELDS:  Thank you, sir.  Yeah, if you could

6    just make sure you speak directly into the microphone.

7              Your Honor, may I begin?

8              THE COURT:  You may, counsel.

9                      DIRECT EXAMINATION

10   BY MR. FIELDS:

11   Q.   Do you work in the insurance industry?

12   A.   I do.

13   Q.   Were you hired by the Government to evaluate life

14   insurance policies purchased by Lawrence and Bianca Rudolph?

15   A.   Yes, I was.

16   Q.   Were you asked to determine whether those policies were

17   consistent with the typical market behavior of life

18   insurance consumers?

19   A.   Yes.

20   Q.   Were you able to answer that question?

21   A.   I believe I was.

22   Q.   Are you prepared to give that answer to the members of

23   the jury today?

24   A.   Yes, I am.

25   Q.   Before we do that, though, let's talk about your

1114

DIRECT - MILNES

1   background.  How long have you worked in the insurance
2   industry?
3   A.   I've been in the insurance business for over 40 years.
4   Q.   That's a long time ago, but let's start with your
5   undergraduate studies.  Where did you go to school?
6   A.   I went to Bucknell University in Lewisburg,
7   Pennsylvania.
8   Q.   What did you study?
9   A.   So my major was economics, but I combined that with a
10  number of insurance courses that I took under independent
11  study programs in order to be able to graduate early.
12  Q.   Do you have any post-graduate education?
13  A.   So in the insurance side of things, I attended the
14  Oberlin School of Insurance.  I attended the Aetna
15  Commercial Insurance School for Agents and graduated No. 1
16  in my class there.  I have taken a variety of courses for
17  professional designations also.
18           I'm a charter property and casualty underwriter,
19  I'm a certified insurance counselor, and I'm also a licensed
20  insurance advisor.
21  Q.   Those last three credentials you talked about, how do
22  you get those?
23  A.   Those all involve a series of either self-study or
24  in-person classes.  The CPCU program, the charter property
25  and casualty underwriter, I started that while I was still

DIRECT - MILNES

1    in college under a system where you had to take five -- five

2    six-hour exams, I believe.  The system converted to a

3    10-exam system and I finished it up under that system.

4            The insurance counselor designation, that you take

5    a series of five three-day courses followed by an exam

6    covering a variety of property and casualty and life

7    insurance topics.  And upon passing the exam, you are then

8    eligible for the designation.

9    Q.    What was your first job in the insurance industry?

10   A.    Initially I was employed by a group called, ultimately,

11   The Insurance Exchange, where I and my father were involved

12   in rolling up agencies in the state of New Hampshire and

13   through the mid-'80s built what was then the largest

14   independent agency in New Hampshire.

15   Q.    What did you learn from that experience?

16   A.    A lot.  That involved everything from changing light

17   bulbs to typing invoices to collecting receivables to

18   installing agency management programs, computer programs,

19   and selling insurance of a variety of types to consumers and

20   businesses.

21   Q.    Did you help found a company called USI?

22   A.    Yes.  The initial company that I had was The Insurance

23   Exchange.  And in the mid-'90s I took most of my insurance

24   holdings and put them together with five other entities to

25   form the basis for USI.  That company was one where I was

1116

DIRECT - MILNES

1    chairman of USI New England, and also on the executive board

2    and leader team.  And I was involved with the USI from the

3    mid-'90s through approximately 2000 where we built that

4    company into one of the top 10 brokers in the U.S.

5    Q.   What did you learn from that experience?

6    A.   Even more.  A lot of personnel management, created

7    program building.  I continued to sell insurance directly

8    but I also had a variety of management and executive

9    functions.  On the -- my day job was working in the

10   northeast, but we were an upstart -- a brand-new company and

11   so I also did technology, Arizona Admissions Quality

12   Control, contingent commission management, and acquisitions.

13   Q.   What is your current position?

14   A.   I -- so as of about a month ago, I'm now chairman of

15   King and Obtisure Risk Partners.  That's a company that I

16   started in -- at least the Obtisure part of it I started in

17   2016 with the intent of building another top 100 U.S.

18   broker.  And four weeks or so ago put that company together

19   with King Insurance to accomplish that.  And we're now

20   approximately the 95th largest broker in the U.S.

21   Q.   You mentioned some of your professional certifications.

22   Do you also have any professional licenses with any states?

23   A.   So I'm a licensed insurance producer for all lines in

24   most states in the U.S.  I also mentioned that I'm a

25   licensed insurance advisor; that's a Massachusetts

DIRECT - MILNES

1  designation.

2  Q.   Have you served as director or a board member for any

3  insurance agencies?

4  A.   I do for a variety of insurance entities.   Probably

5  approximately a half a dozen retail agencies.   I'm also a

6  board member of a publicly traded life insurance aggregator

7  independent marketing organization called The Marketing

8  Alliance.   I'm a board member of Quincy Perpetuation

9  Partners which helps preserve independent agencies within --

10  as independent in conjunction with an insurance company that

11  I'm involved with.

12  Q.   In your many years in the life insurance industry, have

13  you ever had experience as a claims adjuster?

14  A.   Not as a claims adjuster in the life insurance

15  industry.   I previously held a claims adjuster license for

16  property and casualty claims, because I also owned an

17  insurance adjusting company that specialized primarily in

18  property claims.

19  Q.   As a result of all of your experience, are you familiar

20  with the customs and practices of the life insurance

21  industry?

22  A.   I am.

23  Q.   Do you know how to assess the life insurance needs of

24  individual consumers?

25  A.   I do that for individual consumers and businesses.

1118

DIRECT - MILNES

1    Q.    Do you have any specific experience related to the use

2    of life insurance in estate planning?

3    A.    Yes.

4    Q.    What is it?

5    A.    So I tend to work with business owners who are

6    entrepreneurs and wealthier individuals.  And that work is

7    focused on counseling them for a variety of their needs,

8    including their estate planning and life insurance

9    activities.  And so I'm involved with them in connecting

10   them with estate planning attorneys, with occasionally

11   providing template documents for irrevocable life insurance

12   trusts, for assessing what types of policies they would need

13   for estate tax, liquidity, and other purposes.

14   Q.    You mentioned something called an irrevocable life

15   insurance trust.  Is that sometimes called an ILIT?

16   A.    Yes, it is.

17   Q.    During the -- so during the course of your career

18   you've had interactions with those entities?

19   A.    Frequently.

20   Q.    As a result, are you able to identify those kinds of

21   trusts?

22   A.    I believe I am.

23   Q.    And, generally speaking, do you know how life insurance

24   companies make decisions related to insurance claims?

25   A.    Yes.

DIRECT - MILNES

1    Q.    Have you ever served as an expert witness before?

2    A.    I have.

3    Q.    Where?

4    A.    So I've been deposed in Colorado, New Hampshire,

5    Massachusetts, Washington, D.C., and Pennsylvania and

6    New Jersey.

7    Q.    How much of your business relates to being an expert

8    witness in courts?

9    A.    Very little, frankly.  Probably 1 to 2 percent at most.

10   I typically only take on one or two cases every two or three

11   years.

12           MR. FIELDS:  Your Honor, at this time I'd move for

13   this witness to be certified as an expert under Rule 702 in

14   the insurance custom and practice and the structure, use,

15   and maintenance of life insurance policies.

16           THE COURT:  Okay.  One second.  Is there any

17   objection?

18           MR. MARKUS:  No objection.

19           THE COURT:  All right.

20           MR. DILL:  No, Your Honor.

21           THE COURT:  All right.  There being no objection,

22   Mr. Milnes is qualified under Federal Rule of Evidence 702

23   to provide expert opinion testimony in the fields of

24   insurance custom and practice -- customs and practices and

25   the structure, use, and maintenance of life insurance

1120

DIRECT - MILNES

1   policies.

2   BY MR. FIELDS:

3   Q.   Now you said earlier you were hired by the Government

4   to provide an expert opinion in this case?

5   A.   Yes, sir.

6   Q.   So are you being paid?

7   A.   Yes.

8   Q.   How is your pay structured?

9   A.   Based on the time that I spend.

10  Q.   Were you paid to reach a particular result?

11  A.   No.

12  Q.   Did you discount your fee for the Government?

13  A.   I did.

14  Q.   Why?

15  A.   I tend to take, as I said earlier, very few cases, but

16  I look for interesting ones that are a puzzle where I can

17  either help solve that puzzle or learn something.  And this

18  case as it was presented seemed like an opportunity to do

19  that.

20  Q.   What instructions were you given for this case?

21  A.   I was asked to look at the purpose of life insurance

22  and identify that as part of a report.  I was asked to

23  consider whether the policies that the Rudolphs purchased

24  were consistent with the general purposes of life insurance

25  and how they might have fulfilled the objectives that were

DIRECT - MILNES

1    had.  And I was also asked to consider whether the pattern

2    of purchase of those policies was consistent with business

3    and consumers in general as they go about their life

4    insurance.

5    Q.    Before we get into the specific policies you reviewed,

6    let's talk about life insurance a little bit more generally.

7         So what is life insurance.

8    A.    So life insurance is a product -- if I back up a little

9    bit.  Consistent with many insurance products, it's where

10   you're trading a small certain dollar loss, the premium, in

11   exchange for a potentially large uncertain dollar loss:  the

12   life insurance benefit, the death benefit.

13        Insurance, in general, is designed to put you in

14   the position you were before a loss.  Life insurance can't

15   really do that because it can't replace a person or a loved

16   one at their passing; however, it can address some of the

17   economic issues that might surround the person who passes.

18   Q.    Are there different types of life insurance?

19   A.    There are.  There are a wide range of life insurance

20   products.  At the simplest end might be something called

21   term insurance where that's typically the lowest price

22   because it's bought for a finite period of time, and may

23   have a level premium for a certain period of time.  But once

24   the passage of time elapses, the premium tends to go up

25   reasonably significantly, particularly as you get to later

DIRECT - MILNES

1    years.

2              At the opposite end of the spectrum, would be

3    products called permanent or whole life, or universal life,

4    which is a combination of term and permanent, or whole life

5    attributes.  And so you can use various combinations of

6    these products to reach whatever objective you're trying to

7    look for.

8    Q.    Who qualifies for life insurance?

9    A.    So typically there is a health or physical component

10   coupled with a process called underwriting where the

11   insurance carrier looks at whether you fit their -- at

12   whether the insured person would fit the criteria that they

13   have set and they would consider how to price it.

14   Q.    How is life insurance sold?

15   A.    It can be sold direct in this day and age but more

16   typically it is sold by insurance agents.

17   Q.    Those are also called insurance brokers?

18   A.    They can be, certainly.

19   Q.    What is the role of an agent or a broker?

20   A.    So the agent or broker is -- really has a dual role.

21   They are selling on behalf of an insurance company or an

22   insurance entity, but they also are trying to match products

23   up with the insured or the business to meet whatever

24   objectives that have been laid out by the potential insured.

25   Q.    In your experience, do individuals use one broker or

DIRECT - MILNES

1    multiple brokers?

2    A.    So more often than not people tend to stick with the

3    same broker for a number of reasons.  Those reasons include

4    developing a rapport and relationship of some trust; the --

5    the -- going to one broker who already knows you.  They tend

6    to know your portfolio of products that you may have

7    purchased and how those products would integrate with

8    whatever estate planning or needs planning, slash,

9    counseling that needs to be done with you.

10   Q.    Now this might seem obvious, but I'll ask you anyways:

11   What triggers the payout on life insurance?

12   A.    A death claim.

13   Q.    What kinds of things do insurance companies consider

14   when they decide whether to investigate the circumstances of

15   a death claim?

16   A.    So they would look at the nature of cause of death,

17   where it occurred, how it occurred.  They would potentially

18   look at the application that had been filled out to see if

19   there were any misrepresentations, if the information was

20   presented accurately.  They would also consider the time

21   period, because once a certain period of time has passed

22   then the other information becomes incontestable, where they

23   can't raise a late objection, if you will.

24   Q.    Can insurance companies decide to investigate the

25   circumstances of a death?

1124

DIRECT - MILNES

1    A.    Certainly.

2    Q.    Under what circumstances might they do so?

3    A.    They might do so under a suicide, a homicide.  If there

4    was a pattern of purchases that gave rise to a suspicion on

5    their part that perhaps the death was intentional in some

6    shape, form or fashion.

7    Q.    Is that decision to investigate subject to cost/benefit

8    considerations?

9    A.    That certainly would be part of it, yes.

10   Q.    Why?

11   A.    Well, investigation is expensive at some level,

12   depending upon how far you have to go or decide to go into

13   the circumstances.  In addition, if you delay the claim

14   payment unduly -- and this varies some by the state or

15   policy insurer -- that there may be a requirement that

16   interest be paid on the death benefit because of the delay.

17   Q.    All right.  So now let's talk about the purposes of

18   life insurance.  Can you give us at least 10 purposes for

19   life insurance?

20   A.    Sure.  There are a whole variety, but some of the more

21   common ones would be liquidity needs that would be immediate

22   upon death.  Could be income replacement for a breadwinner

23   in the family.  Could be for estate planning needs.  Could

24   be for final expenses, like burial, funeral expenses.  Could

25   be for charitable purposes.  It could be for a key person,

DIRECT - MILNES

1   buy-sell investment purposes.  Paying off or covering debt

2   either on behalf of the surviving spouse or people in the

3   family or beneficiaries of the estate, or because the

4   creditor or lending institution requires it in connection

5   with a loan that they've given.

6   Q.   What about something called split-dollar funding?

7   A.   Split-dollar funding is also a business-oriented

8   approach to using life insurance for the equivalent of a

9   retirement plan or pension plan.

10  Q.   And can life insurance also be a tax advantaged form of

11  investment?

12  A.   Yes.  Life insurance proceeds, when they're paid as a

13  result of death, come in tax free, but they do count

14  relative to looking at the overall level of someone's

15  estate.  But one of the other unique things about life

16  insurance is that, to the extent that someone is paying for

17  more than the cost of insurance, then the investment return,

18  the proceeds, interest buildup, if you will, on that with

19  inside the policy, those are not taxed to the individual,

20  and so it is sometimes employed as an investment mechanism

21  where you can fund the policy on a tax advantage basis and

22  then the proceeds come into an estate tax free.

23  Q.   Let's talk about that first use of life insurance you

24  mentioned, liquidity.  So what is liquidity?

25  A.   So if you have an immediate need, upon the passing of

DIRECT - MILNES

1    someone, for funds, if the family, for example, does not

2    have sufficient liquid funds to be able to pay ongoing

3    expenses.

4    Q.    So how does life insurance help meet that need?

5    A.    So life insurance provides a lump sum with no tax

6    friction upon death.  And those proceeds then can be used to

7    take care of needs that are immediate, particularly where

8    there isn't an ongoing income stream, or, as I mentioned

9    relative to the payment of debt, it can be used for that

10   also.

11   Q.    How much life insurance would someone need to

12   accomplish that goal?

13   A.    So it all depends upon the individual or the business.

14   There isn't any pat answer.  It's a balance between how much

15   life insurance is enough versus the premium payment that

16   goes along with maintaining that level of life insurance

17   such that someone doesn't become insurance poor, if you

18   will.

19   Q.    Now that second -- one of the second purposes you gave

20   was income replacement.  So what do you mean by "income

21   replacement"?

22   A.    So frequently in a family situation, you have one

23   individual who is a breadwinner and one who is not.  So in

24   the event that the breadwinner passes, now there is no

25   income flow and life insurance can help to offset that by

1127

DIRECT - MILNES

1  the investment of the death benefit either as a direct

2  investment that then gets a return either in trust or

3  capital gains, or the purchase of an annuity, which would

4  then provide an income stream for either a set period or

5  potentially for life.

6  Q.   And how much life insurance would someone need to

7  accomplish that goal?

8  A.   Again, you would do a problem-solving exercise where

9  you would essentially work backwards and say, I need to

10  replace this much income upon the death of this particular

11  insured, and so what sort of a lump sum do I think would be

12  needed to create that level of income stream?

13  Q.   Let's talk about the third purpose you mentioned, the

14  estate planning.  Is life insurance used in estate planning?

15  A.   Yes.  Very frequently.

16  Q.   What is estate planning?

17  A.   So estate planning has, I'd say, at its simplest two

18  primary components.  One is relative to who gets what in

19  terms of the deceased wishes, either through a revocable

20  trust or will, i.e., passing on what someone wants done with

21  their assets.

22       The second piece of it is relative to minimizing

23  any estate tax, which might be due on that estate.

24  Q.   So would you say taxes are an important part of estate

25  planning?

DIRECT - MILNES

1    A.    Typically a very important part, and perhaps one of the

2    most frequent uses of life insurance, particularly when

3    you're dealing with business owners or wealthy individuals.

4    Q.    Why are taxes so important to that?

5    A.    So when we think about estate taxation, the Government

6    says that estates above a certain size are subject to an

7    estate tax.    That tax -- that exemption amount, as it's

8    called, has varied over time and the rate at which the

9    excess estate is taxed at has varied over time.    So, for

10    example, through the late '80s, into the late '90s, estates

11    in excess of $600,000 were subject to an estate tax of, I

12    think, 55 percent.

13            Over time, the exemption amount grew.    Up through

14    2010-ish it became $5 million and was then indexed for

15    inflation.    And the tax rate over time in recent decades has

16    varied from a high of 55 percent to, I think, a low of

17    around 35 percent.    And currently I believe is in the

18    40 percent range.

19    Q.    In 2012, did the estate tax exemption change again?

20    A.    Yes.    It has been increasing over time.    And so that

21    $5 million level, I believe hit in 2012.

22    Q.    Now you mentioned something earlier called an

23    irrevocable trust, or ILIT.    What is that?

24    A.    So an ILIT is an acronym for irrevocable life insurance

25    trust.    And so the operative words there are irrevocable.

DIRECT - MILNES

1    It has to be set up in a fashion where it can't be changed

2    on a whim and that it is not controlled by the person

3    setting it up, so you need an independent trustee.  And it

4    is designed specifically to be the holder of and receive

5    life insurance proceeds.

6           So in order to make that effective, the trust needs

7    to be the owner, and typically you want the trust to be the

8    beneficiary.  So let me use an example.  So if you had an

9    estate that was worth $5 million -- or let me use a better

10   example.  Let's say you had an estate valued at $10 million

11   and you're looking at a $5 million exemption.  You have

12   $5 million now in excess of the exemption amount that is

13   going to be subject to the current estate tax rate I'm in.

14   So if that rate was 40 percent, then the estate is going to

15   have to pay another $4 million of taxes.  Some people would

16   say, "Okay, well I'm going to solve that problem by buying

17   $4 million of life insurance because that's going to be much

18   less in terms of premium than the ultimate tax hit that I

19   would face here."

20          So the problem with that is if they buy the policy

21   as the owner on themselves and it then flows into the

22   estate, it just compounds the estate tax problem because now

23   instead of a $10 million estate, you have a $14 million

24   estate.  So an ILIT solves that problem by keeping the

25   proceeds paid as a result of death outside of the person's

DIRECT - MILNES

1    estate.

2    Q.    Another purpose you mentioned for life insurance are

3    final expenses.  What do you mean by final expenses?

4    A.    Final expenses are the expenses associated with burial,

5    funeral, perhaps paying the legal bills in terms of settling

6    an estate type of thing.  Final expense policies tend to be

7    relatively small in nature and are bought, again, primarily

8    by consumers of, I'd say, limited means that are able to

9    afford a relatively inexpensive policy and are primarily

10   trying to not burden someone who's been left behind with

11   funeral and burial expenses.

12   Q.    And you also mentioned that another purpose of life

13   insurance can be charitable donations.

14   A.    Yes.  In working with wealthy individuals, we see a

15   variety of occasions where instead of making a direct gift

16   to a charity, they'll agree to pay premiums on a life

17   insurance product for a set period of time with the charity

18   being the beneficiary of the life insurance policy.

19   Q.    And another purpose you mentioned was something called

20   buy-sell life insurance.  What is that?

21   A.    So buy-sell insurance is primarily used in a business

22   setting where there are multiple business owners, and upon

23   the death of one business owner, the other one or remaining

24   business owners are required or want to have the option of

25   buying out the deceased business owner.  And there are two

DIRECT - MILNES

1    ways to handle that.  One is by a redemption by the legal

2    entity of the business owner's interests, or all of the

3    remaining business owners can buy a policy on the other

4    business owners that will then enable them, upon the

5    deceased business owner, to take those proceeds and use it

6    to buy the equity interests of the deceased business owner.

7    Q.    You also mentioned something called split-dollar

8    funding.  What is that?

9    A.    So split-dollar funding is used in an executive setting

10   where part of the premium is attributable to the business,

11   part to the individual, and the death benefit gets paid

12   split, if you will, between the business and the individual.

13   Q.    Another purpose you mentioned was keyman insurance.

14   What is that?

15   A.    So businesses, particularly smaller businesses, are

16   frequently dependent upon a key person to generate the

17   revenue of the business.  Sometimes the business owner --

18   frequently the business owner himself or herself, or a key

19   executive, has relationships that if either the business

20   owner or the key executive dies, the business may not

21   continue, and so keyman insurance is set up in a fashion

22   where typically the business pays the premium, the key

23   person is the insured under the policy, and the business

24   owns the policy such that upon the death of that key person,

25   the proceeds flow into the business and then that gives the

**DIRECT - MILNES**

1    business the ability to use those proceeds to recruit,

2    attract talent, do whatever they need to do to find ways to

3    replace the flow that that deceased person created on behalf

4    of the business.

5    Q.   All right.  Two more purposes.  Let's talk about debt

6    coverage.  How is life insurance used to accomplish that

7    purpose?

8    A.   So frequently a lender, when loaning funds to a

9    business, will require a guarantor of the loan, and they may

10   also require that an insurance policy be taken out such that

11   there is immediate liquidity and the ability to fund and pay

12   down that debt because more often than not death of a

13   guarantor is a cause to have the loan called.

14   Q.   All right.  And, finally, we mentioned life insurance

15   is a form of tax advantage investing.  How does life

16   insurance accomplish that goal?

17   A.   So I mentioned parts of that earlier where you can

18   contribute, depending upon the type of product, premiums in

19   excess of the minimum amount required to fund the policy for

20   the time period that you're thinking about maintaining the

21   policy in force.  And so the investment return on those

22   excess funds builds up; it builds additional cash value

23   within the policy.  That gives you the ability to

24   potentially borrow against it at favorable rates and you're

25   not paying any tax burden on that.

DIRECT - MILNES

1              Then upon death of the insured, again those funds

2     flow tax free into the -- whatever beneficiary the

3     individual has designated on the policy.

4     Q.   Let's move on to the specific policies you reviewed

5     here.  Approximately how many pages of insurance documents

6     would you say you looked at?

7     A.   Literally thousands.

8     Q.   Would it be easy to go page by page here in court to

9     look at this?

10    A.   No, sir.

11    Q.   So did you prepare a summary chart?

12    A.   I did.

13    Q.   Let's look at -- this is not yet in evidence but it's

14    Government's Exhibit 473.

15              What is this?

16    A.   So -- so this is a graphic summary of the policies on

17    Bianca Rudolph.

18    Q.   If we go to page 2.

19              What is that?

20    A.   And this is a similar summary of the policies on

21    Lawrence Rudolph.

22    Q.   Does it fairly and accurately summarize the thousands

23    of pages you reviewed?

24    A.   To the best of my knowledge and belief, it does.

25              MR. FIELDS:  Your Honor, at this time I move for

VOIR DIRE - MILNES

1    the admission of Government's Exhibit 473.

2              THE COURT:  Any objection?

3              MR. MARKUS:  We object to page 2, Your Honor, as we

4    believe it's not accurate.

5              THE COURT:  First let me find out, Mr. Dill, is

6    there an objection for your client?

7              MR. DILL:  I'll join in my colleague's objection on

8    page 2.

9              THE COURT:  All right.  Mr. Fields, do we need a

10   sidebar?

11             MR. FIELDS:  I believe he said that in his opinion

12   it fairly and accurately summarizes, Your Honor, so that

13   would be a subject for cross-examination.

14             MR. MARKUS:  May I just voir dire briefly on it,

15   Your Honor?

16             THE COURT:  Go ahead, we'll -- I'm allow voir dire

17   of the witness.

18                      VOIR DIRE EXAMINATION

19   BY MR. MARKUS:

20   Q.   Hi, Mr. Milnes.  My name is David Markus.  Just a

21   couple quick questions on page 2 there.  Page 2 is a summary

22   of Dr. Rudolph's life insurance on his life, correct?

23   A.   Yes.

24   Q.   Okay.  And this is based on the materials you reviewed.

25   If there were policies that you did not review, it would not

VOIR DIRE - MILNES

1   be included in this chart, correct?

2   A.    That's correct.

3   Q.    Are you -- and the materials you reviewed were provided

4   to you by the Government?

5   A.    Yes, sir.

6   Q.    And this chart here reflects $3 million of insurance on

7   Dr. Rudolph's life, correct?

8   A.    Yes.

9   Q.    Are you aware that there were over $4 million in

10  insurance on Dr. Rudolph's life?

11  A.    No, I'm not.

12  Q.    Okay.  Would that knowledge change this chart?

13  A.    It would add -- I'm sorry, if I could clarify.  Are you

14  saying there's 4 million of additional insurance or total?

15  Q.    No, total.

16  A.    Yes.  It would then change the chart to superimpose

17  whatever the additional policies were such that the total

18  would be increased from 3 million to 4 million.

19  Q.    So if we use this chart, is it fair to say that --

20  that -- well, this chart only reflects, I think we said,

21  what the Government gave you to review, correct?

22  A.    Yes.

23          MR. MARKUS:  Thank you.  Nothing further, Your

24  Honor.

25          THE COURT:  All right, I'm going to overrule the

1136
DIRECT - MILNES

1  objection.  I agree with Mr. Fields that any policies that

2  were not included in page 2 are properly the subject of

3  cross-examination.

4          Having overruled the objection, Exhibit --

5  Government Exhibit 473 is admitted into evidence and may be

6  published to the jury.

7          (Government's Exhibit 473 received)

8                  DIRECT EXAMINATION (Continued)

9  BY MR. FIELDS:

10  Q.   Mr. Milnes, before we start getting into this chart in

11  detail, what other materials did you review in preparation

12  for your testimony?

13  A.   I'd have to refer to my exhibit list to give that to

14  you fully.  There are a variety of applications, policies,

15  items relative to the payment of claims, the tape of the

16  interview with the other life insurance agent.  I looked at

17  summaries of net worth, assets and liabilities of the

18  Rudolphs.  I looked at another opinion relative to the

19  Rudolph Trust of 2016, I believe it was relative to whether

20  that qualified as an ILIT.  I think those are the primary

21  documents that I --

22  Q.   You said you looked at a financial summary.  Did you

23  look at a report from a forensic accountant that was

24  prepared by the defendant?

25  A.   Yes.

DIRECT - MILNES

1   Q.   Why were you -- why did you need to look at accounting

2   reports about net wealth?

3   A.   So in trying to understand what the life insurance was

4   set up to be used for -- I made reference earlier to the

5   idea that -- the concept that there's a level of counseling

6   and interpretation that's typically involved in the sale of

7   life insurance, as you seek to understand the objectives of

8   the person purchasing it.

9        And so I spoke earlier relative to concepts like

10  liquidity and income replacement, and so you need to have a

11  sense of the overall financial wherewithal and income stream

12  created to be able to make sense of how to structure

13  policies for someone.

14  Q.   All right.  Now let's go to page 2 of Government's

15  Exhibit 473 and let's blow that up so maybe we can see it a

16  little bit better.

17       So this represents the life insurance policies you

18  reviewed insuring the life of Lawrence Rudolph?

19  A.   Correct.

20  Q.   All right.  So let's orient us a bit.  There's two

21  axes.  There's one that goes up and down, the Y axis, and

22  the one that goes left to right, the X axis.  So what is

23  measured on the Y axis, the up-down?

24  A.   So the up-down shows the individual policy amount and

25  aggregate amount in force.

1138

DIRECT - MILNES

1  Q.    And then what's along the X axis there at the bottom?

2  A.    So those show the years in which there were changes,

3  and then the aggregate amount for that particular year

4  relative to the dollar value of insurance that was in force.

5  Q.    And what do each of the bars mean?  Each of these sort

6  of boxes that we see where the --

7  A.    So each box represents an individual policy.

8  Q.    And the information inside the bars, what information

9  did you put inside?

10 A.    So inside, if you refer to the yellow format key, the

11 top line is the amount and the type of policy; next line is

12 the company and the policy number; and then the bottom line

13 is the owner of the policy, on the left of the slash.  And

14 the beneficiary of the policy on the right of the slash.

15 Q.    Did you learn in your review of the policies that

16 Dr. Lawrence Rudolph had at least one of his applications

17 denied?

18 A.    Yes.  That's shown in the dotted box in 2004.

19 Q.    Is that unusual for a life insurance policy to be

20 denied?

21 A.    No, it happens.

22 Q.    Why?

23 A.    Typically for medical reasons.

24 Q.    Now each of these policies here, insuring the life of

25 Dr. Lawrence Rudolph, who was the beneficiary on those

Case No. 1:22-cr-00012-WJM    Document 453    filed 10/31/23    USDC Colorado    pg
94 of 278

DIRECT - MILNES

1  policies?

2  A.   So the beneficiary on all of the policies through 2005

3  was Bianca Rudolph.  And then in April of '16 I believe that

4  the beneficiary was changed to the Rudolph Trust.

5  Q.   Were these term policies or universal policies?

6  A.   All of these policies were universal policies.  The one

7  that was declined had been attempted to be placed as a term

8  policy.

9       So the universal policies I refer to as universal

10  life policies.  Those are the ones that have much more

11  flexibility than term policies and are typically designed to

12  stay in force for longer periods of time, or on a permanent

13  basis.

14  Q.   Based on your review of the financial records that were

15  provided to you, who was the primary income earner in the

16  Rudolph family?

17  A.   I believe that was Lawrence Rudolph.

18  Q.   Based on that, who would you expect to have more life

19  insurance, Lawrence Rudolph or Bianca Rudolph?

20  A.   Lawrence Rudolph.

21  Q.   Why?

22  A.   That's the income that you would be trying to replace.

23  It's my understanding that Bianca was not a primary

24  breadwinner in the family and so, again, I spoke earlier

25  about insurance being designed to put you in the position

DIRECT - MILNES

1    you were before the loss.  So you would presumably be

2    oriented to replacing the breadwinner income and going

3    through the calculus of that as I indicated earlier.

4    Q.    Did Lawrence Rudolph have any accidental death

5    insurance?

6    A.    I believe all of the -- that none of this was

7    accidental death coverage.

8    Q.    Let's go to page 1.  Let's blow that one up a little

9    bit.

10         What's depicted in this exhibit?

11   A.    So in a similar fashion, this shows the life insurance

12   policies that were carried on Bianca Rudolph.

13   Q.    Was Bianca's life insured for more or less than

14   Lawrence Rudolph's life?

15   A.    So ultimately it was insured for more based on the

16   policies that I reviewed.

17   Q.    Was this portfolio of insurance mostly term or

18   universal?

19   A.    It was really all term, other than I think there are

20   two universal policies that are featured in here.

21   Q.    What are the reasons that Lawrence Rudolph's portfolio

22   might be mostly whole or universal but Bianca's mostly be

23   term?

24   A.    I can understand Lawrence Rudolph's policies being

25   universal because, again, that's where the income

DIRECT - MILNES

1    replacement approach would come in.  I don't really have an

2    answer for you as to why they would be term insurance on

3    Bianca in contrast.  Again, the term is typically used to

4    stay in force for a defined period of time to meet a

5    specific need for that time period.

6    Q.   For each of these policies insuring the life of Bianca

7    Rudolph, who was the beneficiary?

8    A.   In all of these, Lawrence Rudolph was the beneficiary,

9    again, up until April of '16 when the policies were -- the

10   beneficiaries were changed over to the Rudolph Trust.

11   Q.   And who were the ultimate beneficiaries of that trust?

12   A.   I believe that was Lawrence and Bianca Rudolph.

13   Q.   Now, a couple of squares in your chart here are yellow.

14   Why is that?

15   A.   So there were two things that didn't make a lot of

16   sense to me.  One was in 2014 at the top of the -- that

17   stack, you see a whole life policy.  And that whole life

18   policy was surrendered such that the cash value was

19   adversely impacted by the surrender charge.  The agent on

20   the policy did point that out that cancellation would cause

21   a surrender charge penalty, but it was surrendered.  And

22   that again, as I said, didn't make a lot of sense to me as

23   to why you would accept that penalty in contrast to leaving

24   that policy in force because the surrender charges typically

25   decline over time as the policy is held.

1142

DIRECT - MILNES

1        THE COURT:  Mr. Fields, can we -- I know you have

2   already blown it up, can we blow it up let's say by column

3   or even more if you're going to be examining on certain

4   particular policies?  Because I can barely read it as it is

5   here, even with my glasses, so I'm wondering if some of the

6   jurors are having trouble, too.

7        MR. FIELDS:  Thank you, Your Honor.  Yes, that

8   would be helpful.  So let's just highlight, yeah, those two

9   columns there and see if that helps.  There you go.

10        Is that a little bit better?

11        THE COURT:  Yup, that is.

12   BY MR. FIELDS:

13   Q.   Okay.

14   A.   So the other thing that I noted on the 2014 term --

15   and, again, this is the hallmark of a term policy, this

16   particular policy was a 10-year level premium term.  If you

17   don't level the premium, what happens is that the premium in

18   part is based on the mortality charge or the likelihood that

19   someone is going to pass in any given year.  And so as

20   someone gets older, likelihood that you'll pass typically

21   increases.  So people don't like the idea of the premium

22   going up at a consumer level, or even a business level, and

23   so the insurance companies have come up with a mechanism

24   where they say, "Okay, how long do you want the policy to be

25   in force for?  How long do you want the premium to be

DIRECT - MILNES

1    level?"

2            And so they figure out what the combination of

3    mortality, actuarial, administrative charge, and income that

4    they will receive on the premium and they use that to level

5    the premium out for a period of time.  Once that period of

6    time has passed, though, then the premiums starts to

7    increase as it goes out of term.  And so frequently people

8    then surrender those policies or they look for a better way

9    to deal with the premium increases.

10           And so in '14, that policy went out of term and the

11   premium started to increase and would then increase on a

12   sequential basis over the years after that.

13   Q.   Which of those policies went out of term?

14   A.   That was the $500,000 10-year term.

15   Q.   So even though it went out of term, the premiums kept

16   being paid?

17   A.   Yes.  The policy stayed in force.

18   Q.   Now if we -- let's zoom out a little bit just to sort

19   of get a visualization here.

20           But between what years did the life insurance stack

21   here increase the most here?

22   A.   So you can see -- yes.  You had the '04 to '10 and then

23   '10 to '12, and then again in '10 -- yes, '10 to '12.  Thank

24   you, you got that.

25   Q.   So between '10 and '12, approximately how much was the

DIRECT - MILNES

1    life insurance increased?

2    A.    So about a million eight.

3    Q.    And zoom back out and take that down for a second.

4    We'll come back to it.

5         Are you aware of something called a second-to-die

6    policy?

7    A.    Yes.  So the most effective way to estate plan -- to

8    deal with the tax impact relative to estate planning is a

9    combination of using an irrevocable life insurance trust to

10   keep insurance proceeds out of the estate so you're not

11   compounding the problem that I highlighted earlier.  In

12   addition to that, a second-to-die policy is a policy that

13   actually insures two lives, not one.  And it's a policy that

14   typically is used, again, for estate planning purposes by

15   wealthy individuals.

16        And the concept is that under the estate

17   planning -- estate tax rules, if you will, as they've been

18   in effect for most of the time period that -- or significant

19   period of the time period that we're looking at here,

20   there's what is called portability.  So for a husband and

21   wife, when one spouse dies, the entire estate tax does not

22   become due, they basically get to combine.  So the

23   $5 million-ish limit from an estate standpoint that we're

24   talking about right now, you combine husband and wife, and

25   you now have a $10 million and change exemption level.

### DIRECT - MILNES

1    So what's more important, then, from a life

2 insurance perspective is having the proceeds of the policy

3 available when the second person dies because that's when

4 the estate tax will come due.  So even though you're

5 insuring two people, it has an advantageous aspect because

6 the insurance company is less concerned about pricing for

7 the older person or the person that might have greater

8 difficulty getting insurance because of a medical reason,

9 because they don't care so much when the first person dies

10 because there's not going to be any payout.  The payout is

11 going to come when the second person dies.

12    So this is used very frequently when you have an

13 insurability issue or when you have a very large disparity

14 in ages between the spouses.

15 Q.    So let's go back to Government's Exhibit 473.

16    Were any of these policies -- let's zoom in so we

17 can see a little bit better -- were any of these policies

18 insuring the life of Bianca Rudolph second-to-die policies?

19 A.    I do not believe so.

20 Q.    So since they were not second-to-die policies, what

21 does that mean upon Bianca's passing?

22 A.    Right.  So upon her passing, the death benefit would be

23 paid and it would flow into the estate and be counted in

24 terms of figuring out whether or not the overall estate --

25 again, subject to portability of combining those two

DIRECT - MILNES

1    exemption amounts -- would be subject to the estate tax.

2    Q.    If they had been second-to-die policies, what would

3    have happened?

4    A.    They would have no payout until Lawrence Rudolph

5    passed.

6    Q.    Second-to-die policies like that, can they be

7    particularly helpful when you have children?

8    A.    They can be helpful under almost any circumstances

9    where you are trying to save on premiums as well as, if you

10   structure it properly, on the overall level of estate taxes.

11   Q.    Let's go back to page 2.

12         After Lawrence Rudolph was denied a life insurance

13   policy, could a second-to-die policy have helped him get

14   more insurance to benefit Bianca?

15         MR. MARKUS:    Objection.    Leading, Your Honor.

16         THE COURT:    Sustained.    Let's rephrase.

17   BY MR. FIELDS:

18   Q.    So was Lawrence Rudolph denied a life insurance policy

19   in 2004?

20   A.    Yes.

21   Q.    How would a second-to-die policy have helped him if he

22   wanted to get more insurance benefiting Bianca?

23   A.    It would have minimized the impact of that denial or

24   whatever the underlying health problem that may have led to

25   the denial was.

1147

DIRECT - MILNES

1    Q.    How so?

2    A.    Again, it -- the insurance company would have viewed

3    the likelihood that Bianca would survive because of perhaps

4    this reason, or an age difference, and it would have been --

5    the second-to-die policy would have been primarily

6    underwritten based on her rather than on Lawrence Rudolph.

7    Q.    So now let's go back to page 1.  And let's blow up that

8    last column there.

9          Now you mentioned that in 2016, the beneficiary was

10   converted into a trust?

11   A.    Yes.

12   Q.    Did you review those trust documents?

13   A.    I did.

14   Q.    Who were the grantors of that trust?

15   A.    Lawrence and Bianca Rudolph.

16   Q.    What does it mean to be the grantor of the trust?

17   A.    It means you are the ones that set it up, you set the

18   terms, and the trust is a separate legal entity, and the

19   trustees are responsible for carrying out the provisions of

20   the trust, which are typically the wishes of the grantors.

21   Q.    So who were the trustees of the trust?

22   A.    I believe both Bianca and Lawrence Rudolph were

23   trustees.

24   Q.    Who were the beneficiaries of the trust?

25   A.    They were the beneficiaries.

1148

DIRECT - MILNES

1    Q.    "They" being Lawrence and Bianca Rudolph?

2    A.    Correct.

3    Q.    Was there an independent trustee?

4    A.    I don't recall off the top of my head.  I do not -- oh,

5    an independent trustee?  I don't believe there was.

6    Q.    Did the trust document reserve broad discretion to the

7    grantors?

8    A.    Yes, it did.

9    Q.    And were any of these life insurance policies purchased

10   directly by that trust?

11   A.    No.

12   Q.    So what did all of those circumstances mean to you?

13   A.    It meant that trust was a more traditional estate

14   planning vehicle wherein the wishes of the grantors were

15   memorialized, but flexibility was completely retained to

16   change the provisions of the trust over time.  It had the

17   primary benefit of removing the assets, passing via a will

18   through probate, and hence becoming public knowledge,

19   presumably.  But it conferred no benefit relative to estate

20   tax planning.

21   Q.    Why not?

22   A.    Because I don't believe it was an irrevocable life

23   insurance trust.  And the -- even if it were contributing

24   these policies into it, it had potentially other problems

25   relative to the timing if a death occurred right afterwards,

1149

DIRECT - MILNES

1   and it is -- it was not an arm's length, you know,

2   independent transaction here.

3   Q.   Now earlier you testified about these 10 possible uses

4   of life insurance.  After reviewing the Rudolph finances and

5   policies, were you able to immediately rule out some of

6   those purposes?

7   A.   I ruled out most of them.  I focused mostly on:  Was it

8   a liquidity need potentially?  Was there an investment need

9   or goal?  Was there an estate tax planning goal?

10  Q.   So you narrowed it down to those three.  Does that mean

11  you ruled out split-dollar funding?

12  A.   Yes.

13  Q.   What about keyman?

14  A.   Yes.

15  Q.   Charitable gifts?

16  A.   Yes.

17  Q.   Buy-sell?

18  A.   Yes.

19  Q.   Debt coverage?

20  A.   Yes.

21  Q.   What about financial expenses?

22  A.   More than sufficient liquidity based on the financial

23  statements that I saw to cover that.

24  Q.   Let's talk about one of those three purposes you

25  thought might apply here.  Liquidity.  Could these policies

DIRECT - MILNES

1   have been intended to cover liquidity needs for the Rudolphs

2   after a death?

3   A.    So they could have been intended for that, but there

4   was significant liquidity based on the statements I saw

5   during these time periods, and so you would raise the

6   question what liquidity need would there be that would have

7   to be handled by the insurance?

8   Q.    Did you see any liquidity need?

9   A.    I did not.

10  Q.    Would these policies have been a useful way to replace

11  lost income?

12  A.    They would not because, as I understand it, Bianca did

13  not have a significant financial contribution to the

14  combined income.

15  Q.    So that left estate planning.

16  A.    Yes.

17  Q.    Did you see any evidence that these policies were part

18  of an estate plan?

19  A.    No.  Again, I saw no relationship -- I saw no

20  irrevocable life insurance trust.  They clearly would have

21  fallen within the bounds of what would be counted within the

22  overall estate once the final estate tax bill became due

23  unless this was all spent down to get below the exemption

24  amount.

25  Q.    Were the policies for Bianca's life issued by several

1151

DIRECT - MILNES

1    different insurance companies?

2    A.    Yes.    You have TransAmerica, Great-West, you know,

3    Keystone, MetLife, a variety of companies there.

4    Q.    What's the significance of that to you?

5    A.    That could occur for a variety of reasons.    Pricing is

6    different from time to time between different insurance

7    companies.    Some of them have more attractive yields

8    potentially, although that wouldn't really be a factor in

9    this case on other than the universal life.

10              And so I'd say in general there's -- one carrier is

11   not always the best carrier over time.

12   Q.    Were any of these policies the sort of investment

13   vehicles you talked about earlier?

14   A.    The only one that would potentially qualify there would

15   be the universal life where you have the flexibility on

16   premium payments and some form of internal return.

17   Q.    In the thousands of pages of life insurance documents

18   you reviewed, did you see any sign in the files of a desire

19   not to indicate the total amount of coverage?

20   A.    Yes.    In -- on one of the Ameritas applications, only a

21   portion of the insurance that was then in force was

22   disclosed.

23   Q.    What was the significance of that to you?

24   A.    So I don't know why that was.    I believe that policy

25   was placed by the agent that placed many of the policies.

1152

DIRECT - MILNES

1    Insurance -- insurance carriers have limits on the amount of

2    insurance that they may want to have on an individual.  For

3    example, an individual with a low net worth -- might not be

4    able to put a number.  If someone has a net worth of 500,000

5    and they go out and try and buy $5 million worth of

6    insurance, the insurance carrier is going to be concerned

7    about that because they're going to question what is the

8    need.  And that question is going to lead to a concern over

9    a moral hazard in terms of, okay, does this person intend to

10   commit suicide?  Is someone else buying the insurance in

11   this amount and paying for it on this person?  That type of

12   thing.

13        And so invariably the insurance carrier wants to

14   know what is the overall insurance amount carried on the

15   individual that's being applied for here.  And is that

16   consistent with the circumstances of the individual.

17   Q.    Do insurance agents sometimes get paid on commission?

18   A.    More often than not they get paid on commission.

19   Q.    So can that give them incentives to sell more

20   insurance?

21   A.    Certainly.

22   Q.    Did you take that into account when you were reviewing

23   these policies?

24   A.    I considered it.  And, again, I'm not privy to the

25   underwriting files and the discussion that the agent may

DIRECT - MILNES

1    have had at the time, but insurance salespeople get paid on

2    commission, and so it's certainly possible that if interest

3    is expressed in acquiring more insurance, that they're going

4    to be inclined to sell more insurance.

5    Q.    Could the reason for this total number of policies be a

6    lack of financial sophistication?

7    A.    It could be.

8    Q.    Did you see anything in the materials you reviewed

9    indicating a lack of sophistication on the part of the

10   Rudolphs?

11   A.    So the detail level that I had indicated that you have

12   a husband and wife that built an estate of consequence, and

13   so there would be a presumption that there would be some

14   level of financial sophistication that's gone along with

15   that.

16   Q.    So throughout your testimony you've been talking about

17   these 10 possible uses for life insurance.  Do any of them

18   explain these policies?

19   A.    Not really.

20   Q.    So if you ruled out all of those 10 purposes, what's

21   left?

22   A.    So it could be things like --

23            MR. MARKUS:  Objection, Your Honor.  Speculation.

24            THE COURT:  Overruled.  You may answer, sir.

25            THE WITNESS:  Thank you.  So it could be the idea

CROSS - MILNES

1  of passing on a legacy beyond what one has created.  It

2  could be that insurance is being placed on an individual

3  because there's the thought process that the -- that

4  individual may not be around for a long period of time and,

5  therefore, a windfall would be created.  It could be showing

6  a comfort level that, "I have insurance on you, you have

7  insurance on me type of thing."

8  Q.    You mentioned the word "windfall."  What is that?

9  A.    A significant amount of funds flowing in unexpectedly

10 for someone.

11          MR. FIELDS:  May I have a moment, Your Honor?

12          THE COURT:  You may.

13          MR. FIELDS:  Your Honor, I have no further

14 questions.

15          THE COURT:  All right.  Cross-examination.

16          MR. MARKUS:  Good morning, ladies and gentlemen.

17 Good morning, counsel, Your Honor.

18                  CROSS-EXAMINATION

19 BY MR. MARKUS:

20 Q.    Sir, nice to meet you again.  My name is David Markus.

21 I represent Dr. Rudolph.  And I'd like to ask you a few

22 questions, please.  Is that okay?

23 A.    Certainly.

24 Q.    So I think you started by saying you were interested in

25 this case because you like solving puzzles, right?

CROSS - MILNES

1    A.    Yes.

2    Q.    And you certainly reviewed a lot of documents in this

3    case.  That goes into solving a puzzle, right?

4    A.    Yes.

5    Q.    And speaking to both sides would help you solve that

6    puzzle, correct?

7    A.    Yes.

8    Q.    Because you don't want to just hear one side of the

9    story, right?  You want to hear both sides before you can

10   solve a puzzle, right?

11   A.    So within a puzzle, I typically look at the facts that

12   are presented to me.

13   Q.    Sure.  And you spoke many times with the prosecution

14   and the agents about their understanding of the facts,

15   correct?

16   A.    Yes.

17   Q.    And you spoke to them on the phone numerous times,

18   right?

19   A.    Yes.

20   Q.    You spoke to them in person numerous times, right?

21   A.    By video.

22   Q.    By video conference where you could see each other,

23   right?

24   A.    Yes.

25   Q.    Going all the way back to 2020, correct?

1156
CROSS - MILNES

1    A.    Yes.

2    Q.    And you've never spoken to us, correct?

3    A.    Correct.

4    Q.    We sent you emails to speak and you have declined to

5    speak to us, right?

6    A.    I'm not aware of any email coming to me.

7    Q.    Okay.  You've certainly never spoken to Larry Rudolph,

8    right?

9    A.    Correct.

10   Q.    You didn't speak to the broker in this case who sold

11   the life insurance, Mr. Gorman, correct?

12   A.    Correct.

13   Q.    And you have no idea what advice Gorman gave to

14   Dr. Rudolph, correct?

15   A.    Correct.

16   Q.    So you haven't gotten the full story; would you agree

17   with me?

18   A.    That would be correct.

19   Q.    Okay.  And would you also agree, sir, that insurance,

20   whether it's life insurance or any other insurance, is a

21   very personal decision?

22   A.    Yes, it is a personal decision.  The individual

23   purchasing it gets to make that decision.

24   Q.    Right.  And everyone has different theories, risk

25   tolerances, ideas about what insurance to have and how much

CROSS - MILNES

1    insurance to have, right?

2    A.    I would say again that's a personal decision by the

3    individual making a purchase.

4    Q.    And you gave a number of economic reasons with

5    Mr. Fields for why you might have insurance to cover funeral

6    expenses, keyman.  Those are economic reasons, right?

7    A.    Yes.

8    Q.    But not every insurance decision is based on economics;

9    would you agree with me?

10    A.    Not every one; most of them are.

11    Q.    Well, you mentioned personal legacy at the end; passing

12    on a legacy.  That's not an economic reason, correct?

13    A.    I'd say it's partly economic.

14    Q.    Partly.  And partially making a legacy for your

15    children, right?

16    A.    That can be part of it also, yes.

17    Q.    Okay.  And I want to ask you, in taking into account

18    your trying to solve the puzzle and coming to conclusions,

19    are you aware that Bianca Rudolph was equally involved in

20    the decision-making with Dr. Rudolph about the insurance

21    decisions?

22    A.    My only knowledge of that comes from the interview that

23    I saw or heard with the insurance agent.

24    Q.    Okay.  That's what we call in court as hearsay, right?

25    Listening to what somebody else said.

1158
CROSS - MILNES

1  A.    So I'm listening to what the agent said, yes.

2  Q.    Right.  You didn't have a chance to interview people

3  yourself to find out whether Bianca Rudolph was involved in

4  the decision-making process, did you?

5  A.    That's correct.

6  Q.    And you mentioned that when you get life insurance, you

7  have to take certain exams, right?

8  A.    Physical exams, yes.

9  Q.    So would you presume that Bianca Rudolph took those

10  exams in this case?

11  A.    I would indeed presume so.

12  Q.    You also have to sign life insurance policies, correct?

13  A.    Yes.

14  Q.    And you reviewed those policies and saw that she signed

15  them, right?

16  A.    Yes.

17  Q.    So she was actually involved in the process, right?

18  A.    Yes.

19  Q.    I want you to tell the jury:  Do you have any evidence

20  whatsoever, any evidence, that Larry Rudolph bought one

21  dollar of life insurance without Bianca Rudolph on Bianca

22  Rudolph's life?

23  A.    No.

24  Q.    You have no evidence of that, right?

25  A.    That's correct.

CROSS - MILNES

1  Q.    And there's a number of things you'd like to take into
2  account when determining how much life insurance to have on
3  somebody's life; isn't that right?
4  A.    Yes.
5  Q.    So one thing you'd want to know is how much income the
6  person was making, right?
7  A.    Yes.
8  Q.    How much net worth the person or couple had, right?
9  A.    Yes.
10  Q.    You'd also want to know, would you not, sir, the
11  lifestyle of the couple, correct?
12  A.    In terms of their level of expenses.
13  Q.    Level of expenses, but also not just economics, whether
14  the people lived a dangerous lifestyle.  Is that something
15  that might be taken into account in determining how much
16  life insurance to have?
17  A.    It could be.
18  Q.    So, for example, if -- and by the way, life insurance
19  companies ask some of those questions, right?  They ask, "Do
20  you jump out of planes sometimes?"  They want to know before
21  they insure people if those people live dangerous
22  lifestyles, correct?
23  A.    Absolutely.
24  Q.    Because if they do, they might not insure them, right?
25  A.    That's correct.

CROSS - MILNES

1  Q.    One question that's not asked is whether they --

2  whether individuals travel across to different continents to

3  engage in hunting safaris.  That's not asked on a life

4  insurance application, is it?

5  A.    Some applications may ask about travel outside the U.S.

6  Q.    Because that's a risk factor, right?

7  A.    Yes.

8  Q.    Okay.  Are you aware that the Rudolphs traveled at

9  least twice a year overseas to Africa?

10  A.    I know they traveled overseas.  I am not sure of the

11  frequency.

12  Q.    Okay.  That would be a risk factor for an insurance

13  company to consider, correct?

14  A.    Yes.

15  Q.    And that might be a reason why a couple might want more

16  insurance if they lived a dangerous lifestyle in case

17  something were to happen to make sure that their kids had

18  enough money to pay the estate, correct?

19  A.    Yes.

20  Q.    Okay.  And just traveling overseas would be one risk

21  factor, but traveling overseas with guns would certainly be

22  another risk factor, right?

23  A.    Yes.

24  Q.    Health would be another factor, correct?

25  A.    Certainly.

1161

CROSS - MILNES

1   Q.   And I think you mentioned, sir, that in this case

2   Dr. Rudolph was denied insurance.  And you presume that was

3   because of his health, correct?

4   A.   I -- I believe it was a medical denial.

5   Q.   What is a medical denial?

6   A.   Because of his health, yes.

7   Q.   Okay.  And that occurred back in 2004, correct?

8   A.   I don't have the chart, but I believe that is the date.

9   Q.   Okay.  And at that time, in 2004, would you agree with

10  me that Dr. Rudolph only had $2 million in life insurance on

11  his life and Bianca Rudolph only had $1.5 million in

12  insurance on her life?

13  A.   I believe that's correct, but I'm saying that without

14  my chart in front of me.

15  Q.   Okay.  Trust me on the numbers for a second.  In 2004,

16  if the combined total was about 3.5 million, anything -- any

17  issues with the number in 2004 about the amount of life

18  insurance they had on each other's life?

19  A.   I'm sorry, what do you mean "any issues"?

20  Q.   Well, the prosecutor asked you all these 10 reasons.

21  Could you understand why the Rudolphs would have

22  $3.5 million in life insurance back in 2004?

23  A.   So relative to the income replacement amount, that

24  certainly would be a contributor to being able to replace

25  that.

CROSS - MILNES

1  Q.    And you're aware, from reviewing the documents, that

2  from 2004 to today, the Rudolphs' net worth continued to

3  rise, right?

4  A.    Yes.

5  Q.    And it didn't just rise a little bit, it rose

6  significantly from 2004 to 2016, right?

7  A.    I believe so.

8  Q.    We see a line going up in their net worth, right?

9  A.    I believe so.

10 Q.    So it would make sense that from 2004 to 2016, you

11 would expect the life insurance to go up as well, correct?

12 A.    Certainly.

13 Q.    Okay.  But we've just agreed that in 2004, Larry

14 Rudolph was denied getting more insurance, correct?

15 A.    Yes.

16 Q.    So he couldn't get any more on his life, correct?

17 A.    So I'm not certain that I can make that definitive

18 statement because, again, under a second-to-die policy he

19 probably would have been able to.  In addition, I didn't

20 dive into the nature of the denial so it might have been

21 possible to get a substandard policy.  And when I say

22 substandard, not a preferred rating but a standard or

23 less-than-standard rating, which means it would be more

24 expensive.

25 Q.    I'm going to get into those special policies with you

CROSS - MILNES

1    in a moment, the second-to-die and the other one you just

2    mentioned.  But let's assume for a minute that because of

3    Dr. Rudolph's health condition, his heart -- were you made

4    aware that he had a pacemaker?

5    A.    Yes.

6    Q.    And that he had a heart condition.

7    A.    Yes.

8    Q.    And that would be a reason a life insurance company

9    might deny coverage, correct?

10   A.    Yes.

11   Q.    Because life insurance companies don't want to give

12   life insurance to people who have pacemakers and heart

13   problems, right?

14   A.    Tends not to be a preferred class.

15   Q.    Right.  And so if in 2004 we see a medical denial for

16   Larry Rudolph, but their net worth continues to rise, would

17   you agree with me that it makes sense that the couple, as a

18   couple, would want to get more insurance?

19   A.    So I'm not sure that I would agree with you, sir,

20   relative to "as a couple."  Because, again, you're then

21   buying insurance on not -- not on the person that has the

22   problem, but on the person that doesn't have the problem,

23   right?

24   Q.    Sure.  Exactly right.  The person who has the problem

25   can't get any more insurance, right?  Let's assume that in

CROSS - MILNES

1    the hypothetical for a minute.  We'll get to the

2    second-to-die in a second, but let's assume in my

3    hypothetical that you can't get any more standard insurance,

4    okay?  Are we on the same page?

5    A.    I understand.

6    Q.    And can you understand why a broker, or even a couple

7    just talking about estate planning, would think to

8    themselves, "You know, we need more life insurance.  I,

9    husband, can't get any, so let's get more on the wife."

10            Can you understand how a couple might come to that

11   conclusion?

12   A.    You could come to that conclusion if you wanted to

13   increase the overall size of the estate, yes.

14   Q.    If you wanted to increase the size of the estate,

15   correct?

16   A.    Yes.

17   Q.    And there's a number of reasons for doing that, right,

18   sir?

19   A.    You could have many reasons for it, certainly.

20   Q.    Many legitimate reasons, right?

21   A.    Yes.

22   Q.    Okay.  I want to talk to you for a moment about

23   something you said at the beginning.  You said life

24   insurance can't replace a person, they can only replace the

25   money the person is making.  Do you remember talking about

1165
CROSS - MILNES

1    that?

2    A.    Yes.

3    Q.    And I asked you before, some people don't actually look

4    at life insurance in that way as just replacing the income

5    or the money, correct?

6    A.    Yes.

7    Q.    There's no set formula for how much life insurance you

8    should have, correct?

9    A.    Well, there are -- at least relative to income

10   replacement, there are a variety of guidelines.

11   Q.    For income replacement.  If you're looking at that

12   factor alone, there are guidelines, right?

13   A.    Yes.

14   Q.    Okay.  In fact, while you were testifying, I was trying

15   to find those guidelines.  People give lots of different

16   advice on that, right?

17   A.    It will vary a lot, yes.

18   Q.    Some people say you only need five times your income,

19   right?

20   A.    Yup.

21   Q.    Some people say you need 10 times your income, right?

22   A.    Yes.

23   Q.    And there are some brokers who even say you need 17

24   times your income in life insurance, right?

25   A.    Brokers will give a variety of answers to that

1166

CROSS - MILNES

1    question.

2    Q.    And that's just on the income replacement part,

3    right?

4    A.    Yes.

5    Q.    So if somebody's making a million dollars a year and a

6    broker says under the guidelines you need 10 or 17 times,

7    that person would be getting advice to get $10 million in

8    life insurance, right?

9    A.    Yes.

10   Q.    Or 17 million in life insurance, right?

11   A.    Whatever the formula is.

12   Q.    So if Dr. Rudolph was making from the practice about a

13   million dollars a year, a broker might tell him, "Hey, you

14   need to have 10 million or more in insurance," right?

15   A.    A broker could say that, yup.

16   Q.    And he could -- he, at the time, in 2004, under your

17   chart, only had 2 million, right?

18   A.    Yes.

19   Q.    So if a broker was talking to Dr. Rudolph and his wife,

20   he might say, "Listen, Larry, you can't get any more, you've

21   been denied.  Let's get -- let's increase Bianca's

22   insurance."

23            You could see that conversation happening, couldn't

24   you?

25   A.    He -- if the intent was passing on money after Bianca's

1167

CROSS - MILNES

1    death.

2    Q.    Okay.  Now the second-to-die policy, you mentioned that

3    and that's -- I could tell you want to talk about that

4    second-to-die policy in this, so let's talk about it for a

5    moment.

6            You have -- I think the prosecutor went through all

7    of these credentials, amazing credentials:  first in your

8    class.

9    A.    Yes.

10   Q.    And -- and all the schooling about insurance, right?

11   A.    Yes.

12   Q.    I mean, you are heavily credentialed in life insurance,

13   yes?

14   A.    So I've worked hard to learn in a variety of lines,

15   yes.

16   Q.    Okay.  Now a broker trying to sell insurance to a

17   couple may not have all your credentials, right?

18   A.    Perhaps.

19   Q.    And, in fact, in listening to the interview of

20   Mr. Gorman in this case, you heard that he was not familiar

21   with second-to-die policies, right?

22   A.    I believe that was mentioned.

23   Q.    So even though your advice would have been to

24   Dr. Rudolph and Bianca Rudolph to get this second-to-die

25   policy, their broker doesn't have all of your credentials

1168

CROSS - MILNES

1    and didn't really know about this kind of policy, right?

2    A.    I -- I don't know the depth of his knowledge relative

3    to that type of a policy.

4    Q.    You heard in his interview that he didn't recommend

5    that policy to the Rudolphs, right?

6    A.    He didn't recommend it.  I'm sure he's -- you can't be

7    in the life insurance business for that long and not have

8    heard of such a thing because the carriers tend to feature

9    and discuss it.

10   Q.    You must have been surprised when you listened to that

11   interview and heard him say, "I don't really use that

12   product and I didn't recommend it to the Rudolphs."

13          Was that surprising to you?

14   A.    I don't know that I'd say surprised.  But I would say I

15   wondered why not.

16   Q.    Sometimes people just don't know as much as you, right?

17   A.    Perhaps.

18   Q.    Okay.  There's nothing nefarious about that.  He just

19   got some bad advice about the second-to-die policy, right?

20   A.    That can happen.

21   Q.    Okay.  You said that you typically deal with high net

22   worth individuals in your life insurance business, correct?

23   A.    Yes.

24   Q.    You've certainly seen people with more insurance than

25   the Rudolphs, haven't you?

CROSS - MILNES

1    A.    Yes.

2    Q.    A lot more.

3    A.    Yes.

4    Q.    Okay.  And in this case, you issued a report with your

5    conclusions and sent that report in writing to the

6    prosecution, correct?

7    A.    Correct.

8    Q.    That report was dated May 27th, 2002, yes?

9    A.    Yes.

10   Q.    And that report --

11              THE COURT:  2002 or '20?

12              MR. MARKUS:  2022.

13              THE COURT:  You said 2002.

14              MR. MARKUS:  My fault, Your Honor.

15              THE COURT:  I was just bringing that to your

16   attention.

17              MR. MARKUS:  Thank you, sir.

18   BY MR. MARKUS:

19   Q.    2002 would have been -- we would have been in different

20   places.  2022, just a couple of months ago, right?

21   A.    Yes.

22   Q.    All right.  And when you issued that report, sir, you

23   did not have the benefit of knowing Dr. Rudolph's and Bianca

24   Rudolph's net worth, correct?

25   A.    I believe that I had seen the Newton report at that

1170

CROSS - MILNES

1    point in time.

2    Q.    Okay.  But you had not been provided Mitch Hoffman's

3    report on the Rudolphs' net worth, correct?

4    A.    That report I had not seen, correct.

5    Q.    Okay.  And you based your conclusion on a net worth

6    that didn't take into account Dr. Rudolph's business, right?

7    A.    Yes.

8    Q.    Dr. Rudolph's real estate holdings, correct?

9    A.    So I did not know the numbers.  I knew of their

10   existence and I believe I commented on that being a

11   potential deficiency of the earlier report.

12   Q.    And deficiency of your opinion.

13   A.    To the extent that I didn't know how extensive the

14   holdings were.

15   Q.    Because to make an opinion about how much life

16   insurance someone should have, you need to know what the

17   couple's net worth is, right?

18   A.    You need to have a sense overall of what their net

19   worth would be, yes.

20   Q.    Of course.  And you were basing it on a report that you

21   had that only had a very limited picture of the net worth;

22   is that fair?

23   A.    So it was a more limited picture than what ultimately

24   came out, yes.

25   Q.    And when you issued your report, the net worth that you

CROSS - MILNES

1    were basing it on was around how much, 7 million?

2    A.    I believe -- I believe that's in the ballpark.  But,

3    again, I knew that, as I commented, it did not encompass

4    those other components.

5    Q.    And when you issued your report, you stated, "Based on

6    the $7 million figure, that the likely result of including

7    the full market value of all assets would be to put the

8    Rudolphs' estate value well over the estate tax exemption."

9         You said that, right?

10   A.    Yes.

11   Q.    And you said that means they would have needed, quote,

12   even more insurance, correct?

13   A.    I said that because of the opinion that I have that the

14   proceeds of the insurance would have flowed into the estate

15   such that it would then increase the tax burden.

16   Q.    In other words, because of the structure that they had

17   with their trust, if their net worth was, let's say,

18   15 million, your opinion is they would need even more

19   insurance, correct?

20   A.    Yes.

21   Q.    Let's talk about that trust for a moment.  You don't

22   know who set that trust up, correct?

23   A.    I don't know off the top of my head.  I can't recall if

24   the name of the law firm appeared somewhere in the

25   documents.

1172

CROSS - MILNES

1  Q.    Fair to say that in your review, you saw that a law

2  firm prepared that trust, correct?

3  A.    Yes.

4  Q.    Okay.  So you don't know what advice the law firm gave

5  to the Rudolphs about how to structure their trust, correct?

6  A.    That's correct.

7  Q.    And your advice may have been different, right?

8  A.    Possibly, certainly.

9  Q.    We've heard about this ILIT that you may have advised

10 them on.

11 A.    Yes.

12 Q.    You don't know whether they got that advice or not,

13 correct?

14 A.    Correct.

15 Q.    What we know is that the trust they used, I think to

16 use your words, would be to use a more traditional estate

17 planning vehicle, correct?

18 A.    Yes.

19 Q.    Nothing wrong with using a trust like that, right?

20 A.    Nothing at all, because that should be one component of

21 a viable estate plan.

22 Q.    There's plusses and minuses to using revocable and

23 irrevocable trusts, correct?

24 A.    They serve different purposes typically.

25 Q.    And in this purpose, with the revocable trust that the

CROSS - MILNES

1    Rudolphs had, based on their net worth, they would need more

2    insurance to cover their tax bills upon their death,

3    correct?

4    A.    Yes, because it becomes a circular calculation.  The

5    more money that you put in, the more insurance you have to

6    buy.

7    Q.    So do you know whether they were receiving advice that,

8    based on this traditional estate planning vehicle they had,

9    they should increase the amount of insurance they had?  Do

10   you know whether they received that advice?

11   A.    I have no knowledge of that whatsoever.

12   Q.    But that would be advice that they may have received

13   because of the structure of their trust, correct?

14   A.    So in my experience, typically you -- when you engage

15   in that level of estate planning, you end up with a

16   revocable trust such that the property in that trust does

17   not pass through a will and then you have a separate

18   irrevocable trust that is used to handle the life insurance

19   proceeds so that it keeps out and does not -- and

20   essentially prevents the circular calculation that we've

21   been talking about.

22   Q.    That's how you would have done it, right?

23   A.    That's how I've done it and how I've done it

24   personally, sir.

25   Q.    Sure.  And, I mean, if the Rudolphs had gotten better

1174

CROSS - MILNES

1   advice, maybe they would have done it that way, right?

2   A.   Perhaps.

3   Q.   But if they didn't get that advice, they might be

4   thinking since the money in this trust is going to be taxed,

5   we need more insurance, right?

6   A.   If they knew the money was going to be taxed, yes.

7   Q.   And I think you said before, you haven't seen any

8   evidence that Bianca Rudolph wasn't involved in this

9   process, correct?

10  A.   Yes.

11  Q.   All right.  By the way, in the review of the trust, did

12  you see Bianca also signed that trust agreement?

13  A.   Yes, she would have had to.

14  Q.   One last area sir, if I might.  You mentioned that in

15  2014, there was a cancellation or a surrender of a policy.

16  Do you remember talking about that?

17  A.   Yes.

18  Q.   That was on Bianca Rudolph's life, right?

19  A.   Yes.

20  Q.   And are you aware that if they hadn't canceled it there

21  would be even more insurance on Bianca's life?

22  A.   That's right.

23  Q.   So the --

24  A.   If I could just rephrase that answer, please.

25  Q.   Sure.

1175

CROSS - MILNES

1    A.    Assuming they did not replace it with another policy.

2    Q.    Assuming they didn't replace it, there would be -- if

3    we were in court today, an extra, what is it, a million

4    dollars extra?

5    A.    I think it was either 750- or a million there.

6    Q.    Okay.  It would be quite a bit more of insurance if

7    they hadn't let that lapse in 2014, right?

8    A.    Yes.

9    Q.    And by the way, they had the same amount of insurance

10   in 2014 as they did in 2016, correct?

11   A.    Right.

12   Q.    There was no increase from '14 to '16, right?

13   A.    That I believe is correct.

14   Q.    What we see is with the Rudolphs, as their net worth

15   grows, the amount of insurance grows, correct?

16   A.    Yes.

17   Q.    Nothing abnormal about that, correct?

18   A.    Correct.

19   Q.    Finally, sir, the -- I know I said "finally" before but

20   I have to say one more note here:  So the 3 million you say

21   that Dr. Rudolph has on his life -- I just want to be clear

22   with the jury -- are you aware that the Great-West policy

23   for a million dollars was actually double if it was an

24   accident?

25   A.    No, I'm not aware of that.

1176
CROSS - MILNES

1    Q.    If that was -- if you saw a document that showed you

2    that, the chart here would have -- instead of 3 million, it

3    would be 4 million for him, correct?

4    A.    Correct.

5    Q.    Okay.  We'll look at those documents later.  But I want

6    to thank you for answering my questions.  Thank you.

7              THE COURT:  Any cross, Mr. Dill?

8              MR. DILL:  I just have one brief area, Your Honor.

9              THE COURT:  All right.

10                     CROSS-EXAMINATION

11   BY MR. DILL:

12   Q.    Good afternoon, sir.  I -- you did review the trust

13   documents; is that correct?

14   A.    Yes.

15   Q.    Okay.  Do you recall seeing in the trust documents --

16   and, again, the trust that was signed by Dr. Rudolph and

17   Mrs. Rudolph, do you recall seeing in those trust documents

18   that were put together in 2016, something called the marital

19   trust, that portion?

20   A.    Yes.

21   Q.    Okay.  And do you recall that in that portion upon the

22   death of one of the trustmakers, if the surviving trustmaker

23   chose to remarry, there would be a requirement of a

24   prenuptial agreement, correct?

25   A.    That's possible.  I don't recall that specifically.

1177
CROSS - MILNES

1    Q.    Okay.  Well, would it refresh your recollection to look

2    at that, the actual -- that portion of the trust?

3    A.    Certainly.

4    Q.    Okay.  Just for his purposes only, 28382.  I'll put it

5    on the screen there, sir.  When that comes up, take a look

6    at it and just read it and then after you're done reading

7    it, when we get it for you, let me know if that's refreshed

8    your recollection.  INV 28382.  Down in the bottom right

9    corner.

10            MR. REYES:  Bottom right?

11            MR. DILL:  Yes, sir.  No, I'm sorry, the other

12   right.  Bottom left.

13   BY MR. DILL:

14   Q.    All right, sir, now take a look at that under Effective

15   Remarriage, that portion.  Read that for me and let me know

16   if that refreshes your recollection as to what I just asked

17   you about.

18            THE COURT:  Mr. Dill, what exhibit are we looking

19   at here?

20            MR. DILL:  I'm -- I can have it marked.  It's one

21   of the --

22            THE COURT:  Oh, it's not marked?  It's -- you're

23   just using it to refresh --

24            MR. DILL:  Yes, sir I'm, refreshing.  For the

25   record it's INV 23832, Bates number.

1178

REDIRECT - MILNES

1    THE WITNESS:  Yes, that provision is there.

2    BY MR. DILL:

3    Q.    Okay.  So upon reviewing that, you understand that in

4    April of 2016, it was the intent of the trustmakers that

5    upon the death of one of them, if there were to be a

6    remarriage, there would have to be a prenuptial agreement,

7    so that person you married couldn't get the proceeds of the

8    trust, correct?

9    A.    That's what that says, yes.

10   Q.    Okay.  That's all I have.  Thank you, sir.

11   THE COURT:  All right.  Redirect.

12   MR. FIELDS:  Thank you, Your Honor.

13                   REDIRECT EXAMINATION

14   BY MR. FIELDS:

15   Q.    If Dr. Rudolph had been advised of the advantages of an

16   ILIT in 2000, would you expect him to use it for estate

17   planning?

18   MR. MARKUS:  Objection, Your Honor.  Speculation

19   about whether -- about what Dr. Rudolph would be expected to

20   do.

21   MR. FIELDS:  Your Honor, he's an expert.  He can

22   answer hypotheticals.

23   MR. MARKUS:  Not about Dr. Rudolph's state of mind,

24   Your Honor.

25   THE COURT:  I disagree.  I think this is directly

1179

REDIRECT - MILNES

1   in his line of expertise.  Overruled.

2   BY MR. FIELDS:

3   Q.   So the question is:  If Dr. Rudolph had been advised of

4   the advantages of an ILIT in, say, the year 2000, would you

5   expect him to use it in estate planning?

6   A.   Absolutely.

7   Q.   But if an ILIT is used, does the beneficiary have as

8   much control over the proceeds?

9   A.   No.

10  Q.   Why not?

11  A.   So the irrevocable life insurance trust is controlled

12  by a trustee -- independent trustee and so you don't have

13  the ability to do a revisionist history, if you will, where

14  you have the same level of flexibility in terms of changing

15  the terms.

16       So however the beneficiary setup appears at the

17  outset basically is -- without jumping through a lot of

18  hoops is what you're stuck with.

19  Q.   And you mentioned using life insurance as a way to pass

20  down a legacy.

21  A.   Yes.

22  Q.   Would these policies on Bianca Rudolph's life have been

23  a good way to do that?

24  A.   Yes.

25  Q.   How so?

REDIRECT - MILNES

1    A.    Well, upon her death, it would have added to the

2    overall financial wherewithal.  And so the key would be that

3    that principal, and potentially the income additions to it,

4    would have been preserved.

5    Q.    The way these policies were structured, who got to

6    benefit from the legacy of Bianca's death?

7    A.    Lawrence Rudolph Trust.

8    Q.    Now, you were also asked on cross-examination about

9    other high net worth individuals having perhaps more life

10   insurance.

11   A.    Yes.

12   Q.    When you saw those policies, did you -- did those life

13   insurance policies have economic rationales?

14   A.    So, again, I think that relative to Lawrence Rudolph,

15   yes.  The economics, while I don't know specifically

16   relative to Bianca's earnings, my understanding is that they

17   were not significant, so I don't know where the economic

18   tie-in that would be.

19   Q.    Yeah, so for these particular policies, you didn't see

20   an economic rationale?

21   A.    That's correct.

22   Q.    But when we're talking about sort of the other high net

23   worth individuals you were talking about who had maybe even

24   more life insurance, when you saw those policies, did they

25   make economic sense?

1    A.    Yes.  Yes, for sure.

2    Q.    In your experience, do high net worth individuals make

3    economically rational decisions?

4    A.    So I would have to qualify that by saying in certain

5    areas when you have a high net worth people tend to spend

6    money on whatever they want to spend money on.

7    Q.    When they're using life insurance, do they tend to make

8    economically rational decisions?

9    A.    Yes.  A little joy is brought at purchase of the

10    policy, itself.

11          MR. FIELDS:  All right.  I have no further

12    questions.

13          THE COURT:  All right.  May this witness be excused

14    for the Government?

15          MR. FIELDS:  Yes, Your Honor.

16          THE COURT:  All right, for the defendants.

17          MR. MARKUS:  Yes, Your Honor.  Thank you.

18          MR. DILL:  Yes, Your Honor.

19          THE COURT:  All right.  Mr. Milnes, thank you for

20    your testimony.  You're excused.  And you may step down.

21          All right, members of the jury, we're not -- we're

22    going to take our lunch recess before we start a new

23    witness.  You may have noticed -- I did -- that this is the

24    middle of the seventh day, so we are now over the hump,

25    midway through a 13-day trial, so we should feel good about

1182

1    that.  All right.  We will be in recess for 60 minutes.  One

2    hour.

3            (Recess taken 12:24 p.m.)

4                      AFTERNOON SESSION

5        (In open court in the presence of the jury at 1:25

6    p.m.)

7            THE COURT:  Government may call its next witness.

8            MR. FIELDS:  Thank you, Your Honor.  The United

9    States --

10           THE COURT:  Sorry.  No, go ahead.  I was just

11   coughing.

12           MR. FIELDS:  The United States calls William Gorman

13   to the stand.

14           THE COURT:  Okay.

15           COURTROOM DEPUTY:  If you'll raise your right hand

16   for me.

17         WILLIAM GORMAN, GOVERNMENT'S WITNESS, SWORN

18           COURTROOM DEPUTY:  Thank you.  Please be seated and

19   remove your mask for us.

20           THE WITNESS:  Okay.  Getting old.

21           COURTROOM DEPUTY:  And if you wouldn't mind, sir,

22   when you get seated state your full name for the record and

23   spell your first and last name for us.

24           THE WITNESS:  My name is William Gorman.

25   G-o-r-m-a-n.  Was there something else you asked me to do?

1183

DIRECT - GORMAN

1    COURTROOM DEPUTY:  First name as well.

2    THE WITNESS:  W-i-l-l-i-a-m.

3    THE COURT:  You may proceed, counsel.

4    DIRECT EXAMINATION

5    BY MR. FIELDS

6    Q.    Do you need a moment to catch your breath, sir?

7    A.    No, I'm fine.

8    Q.    Okay.  Good afternoon.  Did you sell Lawrence Rudolph

9    policies insuring the life of Bianca Rudolph?

10   A.    I did.

11   Q.    Who was the beneficiary on those policies?

12   A.    The beneficiary initially was Larry, but then it was

13   changed to the trust.

14   Q.    How much insurance did you sell him?

15   A.    Three policies for 2.5 million.

16   Q.    Have you since learned that he bought policies from

17   other brokers?

18   A.    I have since learned that.

19   Q.    What was your reaction when you found that out?

20   A.    Mildly surprised but, you know, in my business people

21   go to different agents all the time.

22   Q.    So let's back up a bit.  Where do you work?

23   A.    I work for Luttner Financial Group in Pittsburgh,

24   Pennsylvania.

25   Q.    What's your title?

1184
DIRECT - GORMAN

1    A.    Financial analyst.  Financial advisor, really.

2    Financial advisor.

3    Q.    And as a financial advisor, what do you do?

4    A.    So I'm licensed in the areas of life insurance,

5    investments, 401(k)s, annuities, estate planning.  All the

6    realms of financial business.

7    Q.    How long have you been in that business?

8    A.    Unfortunately -- no.  50 years this year.  50 years.

9    Q.    So as a result of your 50 years of experience, are you

10   pretty familiar with life insurance?

11   A.    I'm pretty familiar, yes.

12   Q.    What are the different types of life insurance?

13   A.    Several.  But there's whole life, which is a

14   cash-value-building policy.  There is term insurance, which

15   is just pure death benefit.  There are endowment policies,

16   which build cash even quicker than whole life does.  There's

17   second-to-die policies.  There's pretty much term, whole

18   life and hybrid universal life policies.

19   Q.    What are some of the reasons people buy life insurance?

20   A.    Life insurance is to protect the family.  And in many

21   cases the way we sell it is to build up a cash value that

22   can help people in retirement.

23   Q.    In your role as an investment advisor, were you also an

24   insurance broker?

25   A.    Yes.

1185

DIRECT - GORMAN

1   Q.   So when a client comes to you with a desire to purchase

2   a life insurance policy, what's the process of advising him

3   or her?

4   A.   I take them through a questionnaire and try to assist

5   them with evaluating their needs; to advise them on amounts

6   of protection that they need.  And then I have to ask them

7   to -- if they agree with that, they have to fill out an

8   application, they have to take a medical exam.  The policy's

9   issued.  And then they subsequently pay for it and the

10  policy's in force.

11  Q.   Is it common for people to buy more than one policy?

12  A.   Oh, absolutely.

13  Q.   And what circumstances?

14  A.   Geez, I -- in my 50 years I've been in business, I

15  probably have -- well, I do know that I have over 700

16  clients.  And I would venture to guess that 80 percent of

17  them have multiple policies.

18  Q.   What are the advantages of having multiple policies?

19  A.   The advantage is that in an -- in the initial phase

20  it's about how much they need, how much they can afford.

21  And then subsequent review meetings is:  Can we provide more

22  protection for you for the reasons that I mentioned.  Some

23  of them have multiple children and now they feel like they

24  need more insurance so they get more insurance.

25  Q.   As an insurance broker, do you get paid a flat rate or

1186

DIRECT - GORMAN

1 a commission?

2 A.    Commission.

3 Q.    Does that give you incentives to sell as much insurance

4 as you can?

5 A.    No.  That's never been my MO.  I sell insurance for

6 purpose of helping a family do what's right for them.  It

7 was never about me.  It -- I could embellish that, but I

8 won't.

9 Q.    Well, embellish it a bit.  I mean, was life insurance a

10 big part of your business?

11 A.    Yeah, very much so.  I just know that if you're honest

12 with a person and a family, I'm going to earn money.  It's

13 not about me earning the money, it's me about -- it's about

14 me helping people.  I know that sounds altruistic, but it's

15 very true.

16 Q.    Would you sell someone insurance they didn't need?

17 A.    No.

18 Q.    Why not?

19 A.    Repeat the question.

20 Q.    You said you wouldn't sell someone insurance they

21 didn't need.  Why wouldn't you do that?

22 A.    It's not ethical for me.

23 Q.    How do you determine how much insurance someone needs?

24 A.    Well, there's many different models, you know, in our

25 business.  It's based on earnings in many cases.  There's

DIRECT - GORMAN

1    some insurance companies that say that you can sell as much

2    as 15 times earnings to a person.  If they have a business,

3    then you have to evaluate the -- the worth of the business

4    and then tie that into partners, perhaps, as a buy-sell

5    agreement, and -- and make sure you cover proper amounts.

6    Q.    Do you also help clients when they need to file claims

7    on the insurance policies they purchased?

8    A.    Absolutely.  Yes.

9    Q.    How does that process work?

10   A.    I've had a -- in recent years I've had a lot of death

11   claims, being in the business 50 years.  My clients get

12   older and they die.  The spouse typically would call me,

13   either the wife or the husband, and they will say, "Bill, my

14   husband died.  I need your help to guide me through the

15   process."

16          We then get the information from them, a claim

17   form.  We get a claim form to them.  We get a death

18   certificate.  And we have forms through the companies that

19   have to be completed, sent in, and then verified by the

20   insurance companies.  And then payments are made.

21   Q.    Do you hire attorneys to help with that process?

22   A.    I do not.

23   Q.    Why not?

24   A.    I don't need to.

25   Q.    Why don't you need an attorney?

DIRECT - GORMAN

1    A.   Because I've been in the business 50 years, and -- and
2    I certainly know the process.  And I have about seven people
3    that surround me on my team.  I've got an accountant, I do
4    have an attorney that's on my team.  I've got a financial
5    analyst, I've got CLUs, CFPs.  So together we know the
6    process to go through for a claim admission --
7    Q.   I --
8    A.   -- submission.
9    Q.   Submission.  Sorry I interrupted you.
10   A.   Yeah.
11   Q.   Let's talk a little bit now about your relationship
12   with Dr. Rudolph.
13   A.   Okay.
14   Q.   When did you first meet him?
15   A.   2002.
16   Q.   How were you introduced?
17   A.   I was -- a partner of his, John Tiano, became a client
18   of mine and he -- in many, many cases, I work on referrals
19   from my clients.  So he referred me to Larry.  And he
20   referred me to Tim Runko, the other partner.
21   Q.   Did you have to actively pursue him as a client?
22   A.   I -- I pursued him, but not -- you know, it wasn't
23   tough.  He was willing to meet with me.
24   Q.   Did you eventually meet his wife?
25   A.   I did.

DIRECT - GORMAN

1    Q.    Who was she?

2    A.    Bianca.  Yeah.

3    Q.    How long after you first met Larry did you meet Bianca?

4    A.    Oh.  I don't know.  10 -- 10 years.  Maybe 10, 12

5    years.

6    Q.    Do you remember where you first met her, what the

7    setting was?

8    A.    Not really.  I mean, I -- I certainly know that I met

9    her with Larry on several occasions.  He wanted me to meet

10   Bianca.  He wanted Bianca to know who to go to in the event

11   that something happened to him; that she could reach out to

12   me.  So when exactly, I'm not sure.

13   Q.    So let's unpack a little bit exactly why he introduced

14   you to her.  Was she going to purchase any policies from

15   you?

16   A.    At first there was no talk of buying a policy.  Excuse

17   me.  He just wanted me to meet her, once again, so that she

18   would know who to contact in the event that something

19   happened to him.  Ultimately, we met and Larry suggested

20   that I get insurance on Bianca.  Bianca was fine with that.

21   We completed an application.  She signed everything.  She

22   took a medical exam and we got life insurance on her.

23   Q.    Did Larry explain why he wanted life insurance for

24   Bianca?

25   A.    Yeah.  He -- I mean, he was -- the kids were relatively

DIRECT - GORMAN

1   still young and I think he was concerned that if something

2   happened to him -- or her, he was going to be in a little

3   bit of high -- high -- you know, in trouble.

4   Q.   Did you sell policies insuring the lives of both Larry

5   Rudolph and Bianca Rudolph?

6   A.   Separately to Larry and separately to Bianca.

7   Q.   So let's start with the ones insuring Larry's life.

8   What policies did you sell him?

9   A.   The first policy was a million dollar whole life

10  policy, which grows over time.  It recently got as high as a

11  million three.  Then I sold him a million dollar policy

12  because he felt like he wanted to have more.  He had a heart

13  valve problem, so we -- we actually had a little bit of a

14  problem getting him the additional insurance.  Subsequently

15  we did.  He was at table 6 and he still took the policy.

16           Now, you have to understand in the -- in the

17  insurance industry, there's a preferred rate, there's

18  standard, and then there's tables 1 through 25, based on a

19  serious problem.  He was a table 6.  He saw the virtue of

20  taking that policy.

21  Q.   What did he say he wanted to accomplish with those

22  policies?

23  A.   It was two-fold.  He wanted to protect his family and

24  he wanted the whole life insurance to grow and be part of

25  his retirement plan.

DIRECT - GORMAN

1   Q.   Now these policies insuring Larry Rudolph's life, who

2   were the beneficiaries of those policies?

3   A.   Bianca.  And then ultimately they were put into a trust

4   also.

5   Q.   Now you mentioned earlier in your testimony something

6   called a second-to-die policy.  What is that?

7   A.   So a second-to-die policy is a policy that is issued on

8   both the husband and the wife.  But the -- and the payment

9   is usually lower because it's on two lives.  But the death

10  benefit doesn't come into play until the second person's

11  death.

12  Q.   When are they used?

13  A.   It's often -- often used in estate planning to pay

14  estate taxes.

15  Q.   Did you discuss the possibility of these types of

16  policies with Dr. Rudolph during your relationship with him?

17  A.   We touched on them, but that was not what he was

18  interested in and -- and, frankly, I'm not a big believer in

19  second-to-die policies anyway.

20  Q.   Why not?

21  A.   Because I think first-to-die policies are much more

22  adequate for the family.  When the first person dies, the

23  spouse needs money.  So unless it's a very wealthy family, a

24  second-to-die is not usually suitable for most of my

25  clients.

1192
DIRECT - GORMAN

1    Q.    In this particular case, who was the primary

2    breadwinner in the Rudolph family?

3    A.    Larry was.

4    Q.    Now let's talk about policies for Bianca Rudolph's

5    life.

6    A.    Okay.

7    Q.    Do you remember approximately when you first sold a

8    policy for Bianca's life?

9    A.    I think I sold Bianca a policy in -- oh, 2010 was the

10   first policy, and that was for a million dollars.  It was a

11   universal life policy.

12   Q.    Did --

13   A.    Actually, no, it was a term -- it was a term policy

14   that initially was converted into a universal life policy.

15   Q.    Did Dr. Rudolph explain why he wanted to insure

16   Bianca's life?

17   A.    Once again, he felt like she was an integral part to

18   the family and he was going to struggle at her death.

19   Q.    When they first approached you, did they already have

20   some life insurance on Bianca's life?

21   A.    Not that I knew of, no.

22   Q.    Did you sell more policies for Bianca's life over

23   the --

24   A.    I did.

25   Q.    -- the course of the time you knew them?

1193

DIRECT - GORMAN

1   A.   I did.

2   Q.   How much were those policies worth?

3   A.   There were two different policies for $750,000.  So in

4   total, I sold 2 1/2 million dollars of insurance on Bianca.

5   Q.   How did you determine how much insurance they should

6   have?

7   A.   Well, it's interesting.  I mean, in many cases I do an

8   analysis to determine needs.  In this case, it was pretty

9   much that Larry said, "Bill, we need more insurance on

10  Bianca."

11       We talked about the $750,000, on top of the million

12  she had.  And then there was another conversation to get

13  another $750,000.  She had a little bit of a health problem

14  also, so, you know, we had to search to get her appropriate

15  companies to insure her.

16  Q.   That $2 1/2 million, do you think that was sufficient?

17  A.   Every situation is different.  And I think that if

18  something had happened to Bianca, I think 2 1/2 million

19  would have been sufficient.

20  Q.   Are there tax implications to life insurance policies?

21  A.   Life insurance is payable income tax free.  It's part

22  of the estate for estate tax purposes but not for income.

23  Q.   Did you discuss these tax implications with

24  Dr. Rudolph?

25  A.   He was fully aware of those.

1194

DIRECT - GORMAN

1    Q.    Would you say Dr. Rudolph -- was he a sophisticated

2    client, unsophisticated client, or somewhere in the

3    middle?

4    A.    He was very sophisticated.

5    Q.    Are life insurance policies an asset to your clients?

6    A.    Once again, permanent life insurance is an asset.    Term

7    insurance is a death benefit.

8    Q.    So, in your experience, can they sometimes be part of

9    divorce proceedings?

10    A.    Repeat the question.

11    Q.    Life insurance assets, can they sometimes be implicated

12    in divorce proceedings?

13    A.    Yes.

14    Q.    So do you talk to your clients about the implications

15    of divorce on their insurance portfolio?

16    A.    If the question is asked of me, I will certainly tell

17    them the implications of life insurance in a divorce.

18    Q.    And if a client had a pre- or a postnuptial agreement,

19    would that have an effect on their life insurance needs?

20    A.    Would it have an effect on their life insurance needs?

21    Q.    Yeah.

22    A.    Yeah, I -- in many cases it would have an effect on the

23    needs, yes.

24    Q.    Did Dr. Rudolph ever bring that up with you, the --

25    A.    No.    I did not know if Dr. Rudolph had a pre- or

1195

DIRECT - GORMAN

1   postnup.  I had no idea.

2   Q.   And you say you discussed estate planning with

3   Dr. Rudolph?

4   A.   Once again, he was a very sophisticated client.  I knew

5   he was surrounded by people, attorneys.  He was not going to

6   use me, in my opinion, for estate planning; he was going to

7   use me for insurance planning.

8   Q.   Did he ever talk about the concept of an irrevocable

9   life insurance trust?

10  A.   Yeah, we discussed irrevocable life insurance trust,

11  yes.  And that is -- if you're posing the next question.

12  Q.   Yeah, what is an irrevocable life insurance trust?

13  A.   An irrevocable life insurance trust is a trust that's

14  set up to transfer life insurance policies into, once again,

15  an irrevocable life insurance trust that is out of their

16  estate for estate planning purposes.

17  Q.   How did that topic come up when you were with

18  Dr. Rudolph?

19  A.   It didn't come up.

20  Q.   Did you ever discuss that with him?

21  A.   No.

22  Q.   During the time you counted Dr. Rudolph as a client,

23  did he ever express dissatisfaction with your services?

24  A.   No.

25  Q.   Did he ever seem confused about life insurance?

1196

CROSS - GORMAN

1    A.    No.

2         MR. FIELDS:  Your Honor, may I have a moment?

3         THE COURT:  You may.

4         MR. FIELDS:  No further questions, Your Honor.

5         THE COURT:  Cross-examination.

6         MR. MARKUS:  Good afternoon, ladies and gentlemen.

7    Good afternoon, Your Honor, counsel.

8                      CROSS-EXAMINATION

9    BY MR. MARKUS:

10   Q.    Mr. Gorman, Hi.  My name is David Markus.  We've spoken

11   on the phone before, but we've never actually met in person.

12   A.    That's correct.  That's correct.

13   Q.    Nice to meet you in person.

14   A.    Nice to meet you as well.

15   Q.    I have a few follow-up questions, if I might.

16   A.    Certainly.

17   Q.    So one of the things you started out by saying is that

18   people go to different agents all the time.  Do you remember

19   saying that?

20   A.    Yes.

21   Q.    There's nothing wrong with that, right?

22   A.    It's a natural phenomenon in my business.

23   Q.    Nothing suspicious about that, right?

24   A.    Nope.

25   Q.    Okay.  There's also nothing suspicious about hiring a

CROSS - GORMAN

1    lawyer, right?

2    A.    Nope.

3    Q.    Okay.

4    A.    Nothing.

5    Q.    Because the prosecutor asked about whether Dr. Rudolph

6    used you or a lawyer.  There's nothing wrong with

7    Dr. Rudolph using a lawyer, right?

8    A.    Certainly not.

9    Q.    Okay.  I want to talk for a moment about the heart

10   issue that you mentioned that Dr. Rudolph had.  Do you

11   remember that Dr. Rudolph, in 2004, applied for a policy and

12   got denied?

13   A.    Yes.

14   Q.    Okay.  And as part of getting life insurance, I think

15   you mentioned you have to take a medical exam, right?

16   A.    Correct.

17   Q.    You have to disclose to the life insurance company

18   about your health and well-being, correct?

19   A.    Yes.

20   Q.    And you and Dr. Rudolph disclosed to the life insurance

21   company that he had major heart surgery and had a pacemaker,

22   correct?

23   A.    Correct.

24   Q.    And that was a problem, of course, in getting life

25   insurance, right?

CROSS - GORMAN

1    A.    It's -- it's a problem; not -- it's very achievable,

2    but, yes, it's a problem.

3    Q.    And so at the time in 2004, Mr. Gorman, are you aware

4    that Dr. Rudolph and his wife, Bianca, had about

5    $3.5 million in life insurance combined at the time?

6    A.    I was not aware of that.

7    Q.    Okay.  Fair to say that one of the things that

8    Dr. Rudolph told you was that because he was having this

9    issue with the heart and life insurance, that he wanted to

10   raise the level that Bianca had on -- of life insurance.

11   A.    I -- I don't know that it was posed to me in that -- in

12   that regard.

13   Q.    Okay.  Do you remember, after Dr. Rudolph's insurance

14   request was denied, that Bianca then got an additional

15   policy?

16   A.    It wasn't -- certainly it wasn't back in 2004 area.

17   Q.    No, over time they got additional policies.

18   A.    That's correct.

19   Q.    But those policies were on Bianca's life after 2004,

20   not on Dr. Rudolph's life.

21   A.    You know, I would have to go back to my notes, but I

22   know that his first policy with the Guardian was a very good

23   policy.  I think it was a standard rate.  The subsequent

24   policies that I got for him, two $1 million policies were

25   rated, and then he subsequently said, "Bill, I want to get

CROSS - GORMAN

1    insurance on Bianca."

2    Q.    Fair enough.  The three insurance policies that you had

3    with Dr. Rudolph's life, I think you said it was a 1.3 whole

4    life and then two $1 million life insurance policies?

5    A.    That's correct.

6    Q.    Was one of those $1 million life insurance policies

7    through Great-West?  Do you recall?

8    A.    I'm not sure it was through Great-West.  I think it was

9    one with Ameritas, and one with -- I wish I had my notes.

10   But Great-West doesn't ring a bell.

11   Q.    Do you recall whether one of the policies had a -- I'm

12   calling it a kicker, I don't know what you want to call it.

13   If there was an accidental death you get an additional

14   million dollars?

15   A.    We never dealt with accidental death on Larry's

16   policies.

17   Q.    Okay.  I'm going to pull out the document and show you

18   in a second so you can look at it.

19   A.    Okay.

20   Q.    Would it help to -- would it help to look at the

21   document?

22   A.    Sure.

23   Q.    Okay, we'll grab that in a minute.

24   A.    I brought my glasses so I could.

25   Q.    I need them, too.  Okay.  Let's turn to Bianca's

CROSS - GORMAN

1   policies for a second.

2           Did Bianca know about every policy that you wrote

3   on her life?

4   A.    She did.

5   Q.    Okay.  Was she in touch with your office?

6   A.    She was very responsive with my office.

7   Q.    Okay.  She signed every document that was requested of

8   her?

9   A.    She did.

10  Q.    She always got the exam she needed?

11  A.    She did.

12  Q.    These weren't policies that Larry Rudolph took out in

13  secret on Bianca's life, were they?

14  A.    No.

15  Q.    Okay.  And when you would meet with the Rudolphs about

16  life insurance, many times Bianca would come, right?

17  A.    Yes.

18  Q.    Okay.  And in discussing the purposes of getting life

19  insurance, I think you mentioned to Mr. Fields that

20  sometimes it was to protect the family, correct?

21  A.    That's correct.

22  Q.    Sometimes it was for the children, right?

23  A.    Correct.

24  Q.    And Larry and Bianca also mentioned to you that they

25  took dangerous trips, right?

CROSS - GORMAN

1    A.    Yeah, I knew that.  Yeah.

2    Q.    And I think the first time you met with Larry regarding

3    life insurance for Bianca, Larry told you he would be in

4    trouble if Bianca wasn't in his life, correct?

5    A.    He did.

6    Q.    He loved Bianca.

7    A.    I'm sorry?

8    Q.    You saw that he loved Bianca.

9    A.    Yeah.  I mean I --

10   Q.    Now -- go ahead.

11   A.    I assumed he did.  I mean, they seemed like a loving

12   couple, yeah.

13   Q.    Sure.  When Dr. Rudolph was working with you on life

14   insurance for his life, he lived in Pennsylvania, correct?

15   A.    Correct.

16   Q.    That's where you live.

17   A.    That's correct.

18   Q.    That's where your office is.

19   A.    That's correct.

20   Q.    Are you aware that he moved to Phoenix, Arizona?

21   A.    Yes.

22   Q.    Okay.  And would it surprise you that he might get an

23   agent somewhere else not in Pennsylvania after he moved?

24   A.    Would not surprise me.

25   Q.    Okay.  I think in addition to protecting the family,

CROSS - GORMAN

1  kids, dangerous trips, Dr. Rudolph also told you that there

2  was estate planning purposes for the life insurance,

3  correct?

4  A.    We never discussed estate planning for Larry.

5  Q.    Now you have had clients with more insurance than Larry

6  and Bianca Rudolph, right?

7  A.    Yes.

8  Q.    Life insurance is a very personal thing, right?

9  A.    Yes.

10  Q.    I think you said there's a formula, some people

11  recommend 15 times earnings?

12  A.    Yes.

13  Q.    So if Larry Rudolph was making a million dollars a

14  year, those brokers might recommend for Larry and Bianca

15  Rudolph life insurance of over 15 million.

16  A.    For Larry.

17  Q.    For Larry.  Over 15 million, right?

18  A.    Yeah.

19  Q.    Now, if Larry couldn't get it on his life because of

20  the medical issue, a family might say, "Since a husband

21  can't get it, let's get some more on the wife," right?

22  A.    Yes, I've had that situation.

23  Q.    That's not suspicious or abnormal, is it?

24  A.    No.

25  Q.    Okay.  And I think you said $2.5 million is

CROSS - GORMAN

1  sufficient -- was sufficient for Bianca's life, but every

2  situation is different, right, sir?

3  A.    Absolutely.

4  Q.    And some people are insurance people, would you agree

5  with me on that?

6  A.    Yes.

7  Q.    In other words, some people like to have a lot of

8  insurance.

9  A.    For me, fortunately, yes.

10  Q.    Yeah, I bet.  And people who like to have lots of

11  insurance use brokers like you and that's what makes the

12  world go round, right?  Some people don't get insurance;

13  some people do.

14  A.    That's correct.

15  Q.    People who do, some people get a lot, some people get a

16  little?

17  A.    That's correct.

18  Q.    And Larry certainly wasn't the highest person of

19  insurance for him and Bianca of your customers, was he?

20  A.    No.  Bianca probably had more insurance than most of my

21  female clients.

22  Q.    And that's a good point.  I want to raise this.  Most

23  of the time it's the breadwinner who gets the insurance,

24  right?

25  A.    Yes.

1204

CROSS - GORMAN

1    Q.    We've heard this term in -- from the prosecutor and

2    from another witness:  The breadwinner is typically the

3    person who has the insurance on their life, right?

4    A.    Correct.

5    Q.    Now there are situations, I think we've talked about,

6    where that might not be available, right?

7    A.    That's correct.

8    Q.    Or the rates might be higher if somebody has a heart

9    condition, you might get a much worse rate on the

10   insurance?

11   A.    That's correct.

12   Q.    So a family might decide, "Let me get more insurance on

13   the nonbreadwinner if the rate on the breadwinner is going

14   to be too high."

15   A.    That's reasonable.

16   Q.    And that might have happened in this case.

17   A.    I don't know that.

18   Q.    Fair enough.  But if that were the case, it wouldn't be

19   something suspicious or abnormal, would it?

20   A.    No.

21   Q.    Okay.  You mentioned that Larry Rudolph used an

22   attorney to make the claims.  He did inform you of Bianca

23   Rudolph's passing, did he not?

24   A.    He did not.

25   Q.    He did not?

1205

CROSS - GORMAN

1    A.    He did not.

2    Q.    All right.  I'm going to show you what's been marked in

3    evidence -- it's already admitted as RA1.  Mr. Reyes, this

4    is LR 227.

5         Can all the jurors see that letter?  Thank you.

6         And, Mr. Gorman, can you see this letter?

7    A.    Where am I looking?  Oh.

8    Q.    There you go.  Do you see that, sir?

9    A.    So this is written November of 2016.

10   Q.    Yes, sir.

11   A.    "As I indicated in my email yesterday, Bianca passed

12   away earlier this month.  I'm trying to organize all my life

13   insurance information in order to submit the necessary

14   claims.  I show the following four Ameritas policies that

15   you helped procure:  universal, term, whole life

16   surrendered, term insurance" --

17        THE COURT:  Mr. Gorman.  I don't think -- Mr. --

18   over here.  I don't think the lawyer asked you to read the

19   letter.

20        THE WITNESS:  Yeah, I'm reading it to myself.

21        THE COURT:  Okay, well, then do that.

22        THE WITNESS:  I frankly don't remember this letter.

23   BY MR. MARKUS:

24   Q.    Okay.  You don't remember that Dr. Rudolph sent you

25   this letter via Federal Express and fax?  You see that at

1206

CROSS - GORMAN

1    the top?

2    A.    I do not remember that.

3    Q.    Or that he emailed you the day before?

4    A.    So let me explain to you, if I might --

5    Q.    Sure.

6    A.    -- how I found out about Bianca's death.

7    Q.    Well, let me just ask you one other question about this

8    and then we'll turn to that.

9    A.    Okay.

10    Q.    Okay.  Do you -- well, do you recall learning about

11    Bianca's death before or after November 1st?

12    A.    What was the date of her death?

13    Q.    October 11th.

14    A.    Your question was:  Do I know about her death prior to

15    November the 1st?

16    Q.    Yes, sir.

17    A.    I'm not certain of that.

18    Q.    Okay.  Fair enough.  We can take that down.  Let's turn

19    to RA2, which is in evidence LR 228.

20          Here's a letter, sir, that your office -- who's Liz

21    Devich?  Did you see --

22    A.    She is my assistant.

23    Q.    Here's a letter that Ms. Devich sent back to

24    Dr. Rudolph.  Do you see that your office received the

25    letter that he sent on November 1st and --

CROSS - GORMAN

1    A.    Yes, I see that.  Yes.

2    Q.    Okay.  So is it fair to say that Dr. Rudolph did inform

3    you and your office of Bianca Rudolph's death?

4    A.    No.

5    Q.    It's not fair to say?

6    A.    No.  And I'm going to tell you the way that we found

7    out.

8    Q.    Okay.  Let's hear it.  And then I'll come back to why

9    it's not fair that he informed you on November 1 and your

10   office responded on November 3.

11   A.    We needed Bianca's signature on a policy for their son,

12   and we reached out to Bianca on several occasions.  Bianca

13   was always very receptive to our contacting her and got back

14   to us in a very quick manner.  When Liz said to me, "Bill, I

15   cannot get Bianca to respond to this," I said, "Then you

16   need to email Dr. Rudolph and have him get this to Bianca."

17         Liz did in fact send that to Dr. Rudolph.

18   Subsequently, Dr. Rudolph said, "I'm so sorry to tell you,

19   but my wife passed away."

20         So I did not know she passed away until we

21   attempted to reach out to Bianca, at which point Larry then

22   said she passed away.  "Send forms to me to become the owner

23   of his policy and I'll sign the document."

24   Q.    Thank you for telling us about that.  But is it fair to

25   say that Dr. Rudolph also sent this letter on November 1

CROSS - GORMAN

1    that makes no reference to that conversation informing you

2    about Bianca Rudolph's death, and that your assistant looks

3    like she's hearing it for the first time, writes, "My

4    deepest sympathy on the loss of Mrs. Rudolph," correct?

5    A.    That's correct.

6    Q.    Okay.  By the way, the insurance policy that you were

7    talking about regarding the son, that's another example of

8    the Rudolphs employing life insurance for a family member,

9    correct?

10   A.    Yes.

11   Q.    And that was -- well, I don't want to get into the

12   amount since Julian's here.

13   A.    I talked to Larry about having both his daughter and

14   his son acquire insurance because I felt like that was a

15   very appropriate asset for them to own.

16   Q.    Fair enough.  Okay.  We can take that down.

17            You talked about prenups and postnups and whether

18   Dr. Rudolph discussed that with you.  I think you said he

19   didn't talk about estate planning with you, correct?

20   A.    Correct.

21   Q.    He didn't talk about divorce pleadings with you,

22   correct?

23   A.    Correct.

24   Q.    There are a lot of things that Dr. Rudolph didn't

25   discuss with you, right?

1209

CROSS - GORMAN

1   A.    That's correct.

2   Q.    Okay.  I want to pull up, just for you, a document

3   that's not in evidence.  This is regarding that Great-West

4   we were discussing a little while ago.  It's GRTW 569.  This

5   is a document not in evidence, just for Mr. Gorman to look

6   at.

7         Do you see that letter, sir?

8   A.    I can.  I see it better now.  Okay.

9   Q.    And that's a letter that you wrote to Great-West,

10  correct?

11  A.    That's correct.

12  Q.    Okay.  And if we could just call up, just for you as

13  well, a document that's not in evidence, GRTW-645.

14        Is -- does this look like the Great-West policy

15  that you and I were discussing a few minutes ago?

16  A.    Yes.  That's why I didn't remember it.  It was part of

17  a group policy that he took over.  Yes.

18  Q.    Okay.  And do you see, when you mentioned that there

19  was no accidental death benefits that you handled, in fact

20  this policy -- this group policy did have an additional

21  $1 million accidental benefit of a million dollars?

22  A.    I can see that, yes.

23  Q.    Is it fair to say that there was, in fact, a Great-West

24  policy and, in fact, it did have an additional million

25  dollars kicker for an accidental death?

1210

CROSS - GORMAN

1    A.    That's correct.

2    Q.    Okay.  Thank you.  You can take that down.

3          MR. MARKUS:  If I could just have a moment to make

4    sure I didn't miss anything here, Your Honor.

5          THE COURT:  All right.

6    BY MR. MARKUS:

7    Q.    Oh, one last area.  I think the FBI questioned you

8    about whether you were surprised that the insurance

9    companies actually paid the claims here.  Do you remember

10   those questions that the FBI asked you during the interview

11   process over the course of the last couple of months?

12   A.    Yeah.  Yes.

13   Q.    And you were surprised that the insurance companies

14   paid, right?

15   A.    I was.

16   Q.    Because they're not in the business of paying claims,

17   are they?

18   A.    They're in the business of paying legitimate claims.

19   Q.    Right.  And they paid here, right?

20   A.    They did pay it.  Yes.

21   Q.    They must have thought they were legitimate.

22   A.    Yes.

23   Q.    Thank you.  I have nothing further.

24         THE COURT:  Any cross, Mr. Dill?

25         MR. DILL:  No questions, Your Honor.

1211

REDIRECT - GORMAN

1    THE COURT:  All right.  Redirect.

2    MR. FIELDS:  Thank you, Your Honor.

3                    REDIRECT EXAMINATION

4    BY MR. FIELDS:

5    Mr. Gorman, you told us earlier that you often help

6    your clients file claims.

7    A.    Correct.

8    Q.    Did Mr. Rudolph ask you to help file claims in this

9    particular case?

10   A.    He did not come to me to file claims, no.

11   Q.    Do you remember you were asked questions about clients

12   sometimes being advised to get 15 times their income in life

13   insurance?

14   A.    That's an amount that an insurance company will abide

15   by for how much a person can get.

16   Q.    Have you ever recommended that a client purchase that

17   much life insurance?

18   A.    I mean, I've got clients that have 30- and $40 million

19   worth of insurance, but it's because their business is so

20   big.

21   Q.    Yeah.  It -- have you ever advised them to get 15 times

22   their wealth in life insurance?

23   A.    That was not the premise about getting their insurance.

24   So -- no, I would just make the statement that people have

25   the right to get up to 15 times their income.

RECROSS - GORMAN

1  Q.    And I think you testified, and you were asked some

2  questions, about $2.5 million being enough for Bianca.  Do

3  you remember that?

4  A.    Yes.

5  Q.    And then you were asked whether or not the life

6  insurance policies were here -- or getting more life

7  insurance for Bianca was abnormal or suspicious.  Do you

8  remember those questions?

9  A.    I'm not sure -- repeat that.

10  Q.    Do you remember being asked whether or not getting more

11  life insurance for Bianca was abnormal or suspicious?

12  A.    I remember that, yes.

13  Q.    Given that you thought $2 1/2 million was enough, do

14  you think the $4.8 million of life insurance for Bianca

15  Rudolph's life is abnormal or suspicious?

16  A.    I think that is somewhat abnormal.

17          MR. FIELDS:  No further questions, Your Honor.

18          THE COURT:  All right.  Recross.

19                    RECROSS-EXAMINATION

20  BY MR. MARKUS:

21  Q.    But not suspicious.

22          THE COURT:  Can you take the lectern.

23          MR. MARKUS:  Sure.  You know, Your Honor, I have no

24  further questions.

25          THE COURT:  All right.  May this witness be excused

RECROSS - GORMAN

1    for the Government?

2              MR. FIELDS:  Yes, Your Honor.

3              THE COURT:  For the defendants?

4              MR. MARKUS:  Yes, Your Honor.

5              MR. DILL:  Yes, Your Honor.

6              THE COURT:  Mr. Gorman, thank you for your

7    testimony.  You're excused and you may step down.

8              Government may call its next witness.

9              MR. WINSTEAD:  Your Honor, the United States calls

10   Charlene Arnold.

11             THE COURT:  All right.

12             COURTROOM DEPUTY:  If you'll stand and face me,

13   ma'am, and raise your right hand.

14             THE WITNESS:  Yes.

15             COURTROOM DEPUTY:  Sorry.

16       CHARLENE ARNOLD, GOVERNMENT'S WITNESS, SWORN

17             COURTROOM DEPUTY:  Please take a seat for me and

18   remove your mask.  And state you full name for the record

19   and spell your first and last name for us.

20             THE WITNESS:  My name is Charlene Smith Arnold,

21   it's C-h-a-r-l-e-n-e, last name A-r-n-o-l-d.

22             THE COURT:  Ma'am, can you pull the mic closer to

23   you -- the mic right in front of you, and scoot your chair a

24   little closer.  Great.  Thank you.

25             You may proceed, counsel.

1214

DIRECT - ARNOLD

1    MR. WINSTEAD:  Thank you, Your Honor.

2    DIRECT EXAMINATION

3    BY MR. WINSTEAD:

4    Q.    Good afternoon, ma'am.

5    A.    Good afternoon.

6    Q.    Can you tell me, where do you currently work?

7    A.    I currently work at DXE Technology.  It's a company

8    that has been contracted by Genworth Financial to handle its

9    life and annuity policies.  But prior to that I worked at

10   Genworth Financial for 24 years.

11   Q.    Were you working for Genworth directly in 2016?

12   A.    Yes, sir.

13   Q.    What were your duties back then?

14   A.    In 2016, I was a customer service manager.  And in that

15   role I had a team of phone reps, they were customer service

16   reps, so they handled the enforce side of the life insurance

17   business.

18   Q.    The folks that you were leading, what were they doing

19   that you were supervising?

20   A.    So they were customer service representatives.  So I

21   handled the life side, the enforce side.  So if a customer

22   called in and they had a question or an inquiry about their

23   policy, my team was responsible for helping them answer

24   their questions, look at their contract, making any policy

25   changes.

1215

DIRECT - ARNOLD

1  Q.   Did your duties change around 2018?

2  A.   Yes, they did.

3  Q.   What did you do after that?

4  A.   In October of 2018, I transitioned as a manager of the

5  life claims department.

6  Q.   At that point, what were you doing?

7  A.   I was a manager for the life claims department.  So I

8  was responsible for the transaction team and that is the

9  team that is actually responsible for paying out the claims.

10 Q.   So would you receive notices of death and then follow

11 the further process?

12 A.   Yes.

13 Q.   And so you're familiar with how that process works at

14 Genworth?

15 A.   Yes, I am.

16 Q.   Okay.  Are you aware of a life insurance policy on

17 Bianca Rudolph?

18 A.   I am aware.

19 Q.   Do you know how many there were at Genworth?

20 A.   There was only one policy with Genworth.

21 Q.   What sort of a policy was it?

22 A.   It was a single premium whole life policy.  The product

23 is actually Lifenet.  And what that is is a single premium

24 policy, whereas you pay one premium and it buys you a level

25 death benefit that's guaranteed for life.

1216

DIRECT - ARNOLD

1    Q.    Do you know when that was purchased?

2    A.    It was in March of 1987.

3    Q.    At some point was Genworth notified of Bianca's death?

4    A.    Yes, we were.

5         MR. WINSTEAD:  And, Your Honor, at this time I

6    would move to admit Government's Exhibit 100 and 101.  I

7    believe they weren't previously stipulated to but I don't

8    believe there's any objections, but I'll leave that to --

9         THE COURT:  All right, any objection?

10        MR. MARKUS:  No objection.

11        MR. DILL:  No objection.

12        THE COURT:  All right.  There being no objection,

13   Government Exhibits 100 and 101 are admitted into evidence

14   and may be published to the jury.

15        (Government's Exhibits 100 and 101 received)

16        MR. WINSTEAD:  Thank you, Your Honor.

17   BY MR. WINSTEAD:

18   Q.    Would you please bring up Exhibit 100.

19        Can you tell me what this is.

20   A.    Yes, I can.  This is actually what we would -- at

21   Genworth, this is what we would classify as our initial

22   notification of death.  So we received this correspondence

23   by fax and Federal Express, and it was notifying us of the

24   death of Bianca Rudolph.

25   Q.    All right.  You can take that down.  Thank you.

1217
DIRECT - ARNOLD

1       After you received that, what is the next step in
2   the process?
3   A.   So the next step in the process is I have a team of
4   claim examiners, as I stated.  And what they do once we
5   receive the initial notification of death, they look at the
6   file and make sure that there's active coverage, meaning
7   that, you know, there's -- the claim is -- the policy is in
8   force and we can pay a claim.
9       And then once they do that, they determine the
10  beneficiary of record, the death benefit.  And at that point
11  in time they'll send out the claim packet with instructions
12  on how to proceed with the claim.
13  Q.   Would you please bring up 101.  This is Government's
14  Exhibit 101.
15      What is this?
16  A.   Okay, this is the letter that we received -- after my
17  team has sent out the claim packet, as I stated, this is how
18  we received the information back in to us.  And, again, we
19  received this fax and via Federal Express.
20      And this was -- I believe it came from -- yeah, it
21  was an attorney's office on behalf of Mr. Rudolph.  And it's
22  just telling them the documents that we had requested and
23  the documents that we were in receipt of.
24  Q.   Would you please go to page 3 of Government's
25  Exhibit 101.

1218

DIRECT - ARNOLD

1    What is this?

2    A.    This is what we call the proof of loss claimant

3    statement, or what we refer as the claim packet.  So as I

4    stated earlier, what my team is responsible for is sending

5    out the claim packet, and this is one page of that packet.

6    Q.    Can you highlight this part right there.  This section.

7    Nope, sorry, the whole section, all the way across the page.

8    And I mean to make it bigger.  Words mean things, right?

9    I'll say "make it bigger next time."  Yup.  Right there.

10   Yup.

11   All right, sorry about that.  Can you tell me who's

12   the beneficiary noted here?

13   A.    Yes.  The beneficiary noted here is the Rudolph Trust,

14   and the trust is dated April 25th, 2016.

15   Q.    Can you zoom back out, please.  And can you zoom in on

16   this section right here.

17   What does it say in the checkmarked -- the checked

18   boxes for "manner of death"?

19   A.    Accidental.

20   Q.    Okay.  Thank you.  You can take all that down.

21   What happens next in the process after you received

22   that information?

23   A.    So once my team receives the information, they scrub --

24   it's called what we call "scrubbing the file."  So they make

25   sure that all of the outstanding requirements that we

Case No. 1:22-cr-00012-WJM    Document 453    filed 10/31/23    USDC Colorado    pg
174 of 278

1219

DIRECT - ARNOLD

1    requested, that we have received.  And then if we have

2    received all of those outstanding requirements, if the claim

3    form is signed and dated in the right capacities, at that

4    point we proceed with paying the claim.

5    Q.    In this case, did you end up paying the claim?

6    A.    Yes, sir, we did.

7    Q.    Do you recall if there was any indications in what you

8    received that this may have been a homicide?

9    A.    No, not in anything we had received.

10    Q.    If you had found out that it may have been a homicide,

11    would that have been a different process?

12    A.    Yes, it would have been a different process.

13    Q.    What process happens then?

14    A.    So if it's deemed to be a homicide, what we have to do,

15    we have to rule out the beneficiary as a suspect.  So often

16    we will have to call the medical examiner's office.  There's

17    a whole different process if it's a case of a homicide.

18    Q.    And is there such a thing as an interpleader?

19    A.    Yes.

20    Q.    What is that?

21    A.    So an interpleader is often where we may have someone

22    else come in, and instead of us making the decision, they'll

23    help us decide whether the company is going to take the risk

24    and pay the claim or not.

25              MR. WINSTEAD:  May I have a moment, Your Honor?

1220
CROSS - ARNOLD

1          THE COURT:  You may.

2          MR. WINSTEAD:  Nothing further.  Thank you, Your

3    Honor.

4          THE COURT:  All right.  Cross-examination.

5                     CROSS-EXAMINATION

6    BY MR. MARKUS:

7    Q.    Good afternoon, ma'am.

8    A.    Good afternoon.

9    Q.    Just a few questions if I might.

10   A.    Sure.

11   Q.    You told the prosecutor that if this was a homicide,

12   there would be a different process, right?

13   A.    Yes.

14   Q.    But the truth is, when you reviewed everything,

15   everybody said this was an accident, right?

16   A.    At the time it was on the claim form that it had

17   "accident," and then I think the claims examiner at that

18   time had located a news article and the news article had

19   indicated that it was an accident.

20   Q.    There were no red flags to you or the claims examiner,

21   correct?

22   A.    There -- I will have to say there were red flags to the

23   claims examiner.  At that time, I know that they had

24   consulted with our legal department because on, I believe it

25   was -- I believe it was the death certificate, we had a

CROSS - ARNOLD

1    cause of death but no manner of death.  And so when that

2    happens, you know, my team, before they pay a claim, they

3    will reach out to the legal department and consult with

4    them.

5    Q.   Okay.  I guess what I meant by "red flag" is something

6    saying this was a homicide or something like that.  There

7    was nothing like that?

8    A.   No, there was nothing like that.

9    Q.   Okay.  And in terms, ma'am, of when a claim should be

10   made, based on your experience, was there anything abnormal

11   about the amount of time it took Dr. Rudolph to make this

12   claim?

13   A.   No.

14   Q.   How often -- how long should a person take to make a

15   claim?

16   A.   There's really no time frame.  I mean, if someone comes

17   back several years later, of course if it's deemed a payable

18   claim, it will be paid.

19   Q.   Uhm-hum.

20   A.   So there's no time frame.

21   Q.   Okay.  But this was within the normal time?

22   A.   Yes, this was the normal time.

23   Q.   Okay.  And the policy that this -- this policy was

24   taken out in what year?  I apologize.

25   A.   1987.

1222
CROSS - ARNOLD

1  Q.   199- --

2  A.   1987.

3  Q.   1987.

4  A.   Yes, sir.

5           MR. MARKUS:  Thank you, ma'am.  Appreciate it.

6           MR. DILL:  No questions.

7           THE COURT:  Any questions, Mr. Dill?

8           MR. DILL:  No questions, Your Honor.

9           THE COURT:  All right.  Redirect.

10          MR. WINSTEAD:  Nothing further.  Thank you, Your

11  Honor.

12          THE COURT:  All right.  May this witness be excused

13  for the Government?

14          MR. WINSTEAD:  Yes, Your Honor.

15          MR. MARKUS:  Yes, Your Honor.

16          THE COURT:  For defendants.

17          MR. DILL:  Yes, Your Honor.

18          THE COURT:  All right.  Ms. Arnold, thank you so

19  much for your testimony.  You're excused.  You may step

20  down.

21          THE WITNESS:  Thank you.

22          THE COURT:  All right, Government may call its next

23  witness.

24          MR. GREWELL:  Your Honor, the United States calls

25  Kelly Siebels.

1    THE COURT:  All right.

2    COURTROOM DEPUTY:  If you'll raise your right hand

3    for me.

4    KELLY SIEBELS, GOVERNMENT'S WITNESS, SWORN

5    COURTROOM DEPUTY:  Thank you.  Please be seated and

6    remove your mask for us.  Then state your full name for the

7    record and spell your first and last name for us.

8    THE WITNESS:  Kelly Siebels.  K-e-l-l-y,

9    S-i-e-b-e-l-s.

10    MR. GREWELL:  Your Honor, at this time I'd like to

11    move into the record Government Exhibits 160, 161, 162, 302,

12    and 303.  These weren't stipulated but my understanding is

13    there is no objection.  We'll find out.

14    MR. MARKUS:  On behalf of Mr. Grewell, no, no

15    objection.

16    THE COURT:  Okay.

17    MR. DILL:  No objection.

18    THE COURT:  No objection.  Okay.  There being no

19    objection, Government Exhibits 160, 161, 162, 302 and 303

20    are admitted into evidence and may be published to the jury.

21    (Government's Exhibits received).

22    THE COURT:  Ma'am, you can take your mask off

23    entirely.  Probably be more comfortable for you.

24    THE WITNESS:  Yeah.  Thank you.

25    THE COURT:  Thank you.

1224

DIRECT - SIEBELS

1    DIRECT EXAMINATION

2    BY MR. GREWELL:

3    Q.   Good afternoon.  Are you familiar with insurance

4    policies covering the life of Bianca Rudolph?

5    A.   Yes.

6    Q.   How are you familiar with those policies?

7    A.   At -- in preparation for this.

8    Q.   Could I have Government Exhibit 302, please.

9         What is this?

10   A.   It is our check payment.

11   Q.   Do you work for TransAmerica?

12   A.   Yes.

13   Q.   And who was this check paid to?

14   A.   To the Rudolph Trust dated 4-25 of '16.

15   Q.   And how much was it for?

16   A.   $503,438.85.

17   Q.   And could I now have Government Exhibit 303.

18        What is this?

19   A.   Our check for the payment of the claim.

20   Q.   Is this the same check?

21   A.   No.

22   Q.   So -- and what is this check in the amount of?

23   A.   $500,840.86.

24   Q.   So did Mr. Rudolph have more than one policy on the

25   life of Bianca Rudolph?

**DIRECT - SIEBELS**

1    A.    Yes.

2    Q.    You can take this down.  Thank you.

3          What did Mr. Rudolph say in order for TransAmerica

4    to send out those checks to him?

5    A.    Well, we received notice of death from him to obtain

6    the paperwork for it.  And then in the course of the claim

7    then submitted paperwork.

8    Q.    Did he say how his wife had died?

9    A.    Not with the first notice, no.

10   Q.    Are you prepared to talk to the jury more about these

11   life insurance policies?

12   A.    Yes.

13   Q.    Where did you work in 2016?

14   A.    TransAmerica in the claims department.

15   Q.    And how long had -- at that point had you been working

16   for TransAmerica?

17   A.    Since 1993.

18   Q.    I want to start in 2016.  What was your position at

19   TransAmerica in 2016?

20   A.    I was a lead claims examiner.

21   Q.    And what were your responsibilities in that position?

22   A.    Processing investigative claims as well as mentoring

23   teammates and assisting the manager of the department.

24   Q.    And at what point did you go back to handling life

25   insurance claims?  Were you still handling life insurance

1226

DIRECT - SIEBELS

1    claims in 2016 as well?

2    A.    Yes.

3    Q.    Okay.

4    A.    Yes.  Yeah, I had a regular caseload, too.

5    Q.    Where was your physical office located?

6    A.    In Cedar Rapids.

7    Q.    If I could have Government Exhibit 160, please.

8          What is this?

9    A.    Thank you.  It is the first notice of death that we

10   received.

11   Q.    And how was it sent to TransAmerica?

12   A.    By mail.

13   Q.    Does it identify where the death occurred?

14   A.    No.

15   Q.    Does TransAmerica treat foreign deaths different from

16   domestic deaths?

17   A.    Yes.

18   Q.    Why?

19   A.    Because additional paperwork is needed in order to

20   assist us in the process.

21   Q.    So do you -- so do you request additional information,

22   then, if it's a foreign death?

23   A.    Yes.

24   Q.    After TransAmerica got this, did you ask for a claimant

25   statement?

1227

DIRECT - SIEBELS

1    A.    Yes.

2    Q.    And what is that?

3    A.    It's the form that the beneficiary completes giving

4    some general details about the death, but then also their

5    information as far as -- since it's a trust, the tax ID

6    number, their mailing address.

7    Q.    Do you also usually ask for obituaries?

8    A.    Yes.

9    Q.    Why is that?

10   A.    Just another item that may have some information for

11   us.

12   Q.    In your review process, did you confirm that there were

13   policies on the life of Bianca Rudolph?

14   A.    Yes.

15   Q.    And what were those policies?

16   A.    The two policies that we ended up paying.

17   Q.    Have Government Exhibit 161, please.

18         What is this document?

19   A.    This -- thank you -- this is the letter that came in

20   with the paperwork submitted that's outlined in the letter.

21   Q.    And how was it sent to TransAmerica?

22   A.    I believe it was by mail.

23   Q.    Zoom out a moment.  If you could zoom in that part

24   here.

25         What does it say about an obituary?

1228

DIRECT - SIEBELS

1    A.    That it was not enclosed because there was not one.

2    Q.    Thank you.  If I could have page 2, please.  Sorry,

3    page 3, please.

4          So this document is the claimant statement you

5    mentioned earlier?

6    A.    Yes.

7    Q.    What does it say about cause of death?

8    A.    Accident.

9    Q.    Would you zoom back out, please.  And could I have this

10   third paragraph here under Remarks.

11         Could you please read that paragraph.

12   A.    "All of the above answers and statements are true and

13   complete and correctly recorded.  I understand that the

14   furnishing of forms by the company does not constitute an

15   admission that there is any insurance coverage in force or

16   payable."

17   Q.    And if you could zoom back out.  And if you could zoom

18   on the paragraph that begins, "Warning."

19         Is this a fraud warning?

20   A.    Yes.

21   Q.    And what does it say?

22   A.    That "Any person who knowingly and with intent to

23   defraud any insurance company or other person files an

24   application for insurance or statement of claim contain any

25   materially false information or conceals for the purpose of

1229

DIRECT - SIEBELS

1   misleading information concerning any fact materials

2   thereto, commits a fraudulent insurance act, which is a

3   crime, and shall also be subject to a civil penalty not to

4   exceed $5,000, and the stated value of the claim for"

5   such -- or "each such violation."

6   Q.    Thank you.  Could I have the next page.  One more,

7   please.  Could you zoom in on that, please.

8           And what did this document say regarding the cause

9   of death?

10  A.    "Hemorrhagic" -- can't say the word, "hemorrhagic shock

11  due to gunshot injury."

12  Q.    Under what circumstances would TransAmerica be

13  concerned not just with the fact of death but also the

14  manner of death?

15  A.    In order to determine if it's homicide.

16  Q.    What, if anything, would have changed about

17  TransAmerica's decision-making process if it had been

18  determined to be a homicide?

19  A.    We want to be in compliance with slayer statutes and

20  thus determine if the beneficiary was involved.

21  Q.    And what are slayer statutes?

22  A.    Basically to the extent of -- that somebody can't

23  benefit from killing the insured.

24  Q.    Likewise, would you have needed to get further

25  information if you discovered that the beneficiary caused

1230

DIRECT - SIEBELS

1   the insured's death even accidentally?

2   A.    Yes.

3   Q.    You can take this down.

4         After getting this December letter, did

5   TransAmerica ask for more information?

6   A.    Yes.

7   Q.    And why was that?

8   A.    To assist us in the investigation of the claim.

9   Q.    If I could have Government Exhibit 162, please.   Zoom

10  in on this.

11        Now what does this paragraph say about the nature

12  of Mrs. Rudolph's death?

13  A.    That it was accidental.

14  Q.    Zoom out, please.  And if I could have page 3, please.

15        Why does TransAmerica ask for a foreign claim

16  questionnaire?

17  A.    Just to provide us some additional details so we can

18  get an idea of, you know, why they were in the foreign

19  country, when they went, where they passed away.  You know,

20  if they had medical treatment, et cetera.

21  Q.    Could I have page 5, please.

22        And what does it say about the nature of the

23  accident?

24  A.    "Gunshot injury, accidental discharge."

25  Q.    Could you zoom back out, please.  If I could have

1231

DIRECT - SIEBELS

1    page 6, please.

2              Is there a signature here?

3    A.    Yes.

4    Q.    And who is the person signing?

5    A.    Just in looking at it, I'm not sure.

6    Q.    If we could zoom back out.

7              And have the -- do you see where it says

8    "relationship to the deceased"?

9    A.    Yes.

10   Q.    And so who was signing here?

11   A.    The spouse.

12   Q.    Was that Mr. Rudolph?

13   A.    That's my understanding, yes.

14   Q.    You can take this down.   Thank you.

15             This claim of an accident, did TransAmerica have

16   any evidence to the contrary?   At the time you received

17   these forms, did you have any evidence to the contrary?

18   A.    No.

19   Q.    Can TransAmerica conduct investigations?

20   A.    Yes.

21   Q.    Did it hire a company called Diligence to do that?

22   A.    Yes.

23   Q.    Why?

24   A.    We use them for any deaths that are outside the United

25   States.

**DIRECT - SIEBELS**

1    Q.    And what exactly does Diligence do?

2    A.    They work to verify the documentation, you know, verify

3    the death certificate, any other documents like funeral home

4    bills, is all I can think of.  Just -- and any other

5    documents that we ask them to, or conduct interviews if we

6    need that, so that we can verify the documentation

7    submitted.

8    Q.    And what is the scope of its investigation?

9    A.    Basically to determine that the insured indeed did pass

10    away.

11    Q.    How much do investigations like this cost?

12    A.    It varies depending on where they go and what's

13    involved.

14    Q.    Can they be expensive?

15    A.    Sure.

16    Q.    What happens if you delay payment of a claim to conduct

17    an investigation and the investigation doesn't turn up

18    anything?

19    A.    Then we use the information we have and work to make a

20    determination with what we have.

21    Q.    Does TransAmerica consider the trade-off between paying

22    for an investigation and just paying the claim?

23          MR. MARKUS:  Objection.  Leading, Your Honor.

24          THE COURT:  One second, let me read it.

25          MR. GREWELL:  I'm sorry, I couldn't hear you, Your

1233
DIRECT - SIEBELS

1    Honor.

2            THE COURT:  I said I'm reading the question again.

3            Let's rephrase that.

4    BY MR. GREWELL:

5    Q.   Are there any trade-offs that TransAmerica considers in

6    deciding to do investigations?

7    A.   No.

8    Q.   Are there any trade-offs that -- strike that.

9            What, if anything, would have changed about

10   TransAmerica's decision-making process if it had found

11   evidence that the death was a homicide?

12   A.   Then we would have worked to determine who is the

13   payable party.

14   Q.   Did TransAmerica pay the claim here?

15   A.   Yes.

16   Q.   Does that mean that TransAmerica actually thought it

17   was an accident?

18   A.   With the information we had, yes.

19   Q.   Okay.

20           MR. GREWELL:  May I have a moment, Your Honor?

21           THE COURT:  You may.

22           MR. GREWELL:  No further questions, Your Honor.

23           THE COURT:  All right.  Cross-examination.

24                    CROSS-EXAMINATION

25   BY MR. MARKUS:

1234

CROSS - SIEBELS

1    Q.    Good afternoon, ma'am.

2    A.    Hi.

3    Q.    I'm just going to ask you a couple of questions, if

4    that's okay.

5    A.    Okay.

6    Q.    The prosecutor asked you about an obituary.  Do you

7    remember that?

8    A.    Yes.

9    Q.    Okay.  You've looked at lots of claims over the years,

10   right?

11   A.    Uhm-hum.  Yes.

12   Q.    You have to say yes or no for Mary.

13   A.    Yes, sorry.

14   Q.    Okay.  Sure.  And the reason you asked for an obituary

15   is because it has certain information that could be helpful

16   in processing the claim, right?

17   A.    Yes.

18   Q.    For example, it has the date of birth, right?

19   A.    Yes.

20   Q.    It has the name of the person, yes?

21   A.    Yes.

22   Q.    And it's almost like a confirmation that the person had

23   actually died, right?

24   A.    Yes.

25   Q.    In this case, there wasn't an obituary, but you got all

1235

CROSS - SIEBELS

1    that information, right?

2    A.    Yes.

3    Q.    In other words, even though there wasn't an obituary

4    for Mrs. Rudolph, the information that would have been in

5    there was provided to you, correct?

6    A.    Correct.

7    Q.    And so there was nothing wrong or suspicious or

8    abnormal about not having an obituary, correct?

9    A.    Correct.

10   Q.    In fact, in many of the claims that you processed,

11   there's not an obituary, right?

12   A.    Correct.

13   Q.    And you get the information a different way, right?

14   A.    Correct.

15   Q.    Okay.  As long as you get the information, that's all

16   that's needed to process the claim, correct?

17   A.    Yes.

18   Q.    Okay.  Thank you, ma'am.

19           MR. DILL:  No questions, Your Honor.

20           THE COURT:  No questions?  All right.  Redirect.

21           MR. GREWELL:  None, Your Honor.

22           THE COURT:  All right.  May this witness be excused

23   for the Government?

24           MR. GREWELL:  She may.

25           THE COURT:  All right.  For the defendants?

DIRECT - VORDER BRUEGGE

1     MR. MARKUS:  Yes, Your Honor.

2     MR. DILL:  Yes, Your Honor.

3     THE COURT:  Ms. Siebels, thank you so much for your

4     testimony.  You're excused.  You may step down.

5     THE WITNESS:  Thank you.

6     THE COURT:  Government may call its next witness.

7     MR. GREWELL:  Your Honor, the United States calls

8     Richard Vorder Bruegge.

9        RICHARD VORDER BRUEGGE, GOVERNMENT'S WITNESS, SWORN

10     COURTROOM DEPUTY:  Thank you.  Please be seated and

11     remove your mask for us.  And then state your name for the

12     record and spell your first and last name for us.

13     THE WITNESS:  Okay.  My name is Richard, middle

14     initial W, last name Vorder Bruegge.  The first name Richard

15     is R-i-c-h-a-r-d.  The last name Vorder Bruegge is two

16     words.  The first word Vorder, V as in Victor, o-r-d as in

17     David, e-r.  Then second word Bruegge, capital B as in

18     Baker, r-u-e-g-g-e.

19     THE COURT:  You may proceed, counsel.

20                    DIRECT EXAMINATION

21     BY MR. GREWELL:

22     Q.   Good afternoon, Mr. Vorder Bruegge.  Where do you work?

23     A.   I work at the Federal Bureau of Investigation in

24     Quantico, Virginia.

25     Q.   What are your responsibilities there?

DIRECT - VORDER BRUEGGE

1   A.   I am a senior physical scientist.  I was hired as a

2   photographic technologist forensic examiner.  My primary

3   responsibilities being to conduct forensic examinations of

4   image and video evidence.  That also includes conducting

5   research in those areas.  That is primarily what I do now is

6   conduct research in forensic analysis of image and video

7   evidence, computer vision-related technologies such as that.

8   Q.   You mentioned also serving as a forensic examiner for

9   the Bureau.  How long have you done that?

10  A.   So I was hired in 1995.  I was qualified to conduct

11  examinations as a recognized forensic expert for the FBI in

12  1996.  So it's 26 years.

13  Q.   Have you testified as an expert in court before then?

14  A.   I have.

15  Q.   Approximately how many times?

16  A.   I've testified over 60 times in federal, state, and

17  international courts.

18  Q.   Do you have any advanced degrees?

19  A.   I have a master's degree in geological sciences and a

20  PhD in geological sciences that goes along with my bachelor

21  of science degree in engineering.

22  Q.   Have you previously testified as an -- in court as an

23  expert in the field of photogrammetry?

24  A.   Yes, I have.

25  Q.   How many times have you testified as an expert in

DIRECT - VORDER BRUEGGE

1   photogrammetry?

2   A.   More than 20 times.

3   Q.   About when was the first time that you testified

4   regarding photogrammetry?

5   A.   1996.

6   Q.   How do you keep your photogrammetry skills up to date?

7   A.   Well, I follow the literature in the forensic sciences

8   and in the broader photogrammetry field.  So I read articles

9   that are in journals.  I attend scientific conferences where

10  photogrammetry in a forensic context is applied.  I speak

11  with my colleagues in the field.  And at the lab, I consult

12  with them on cases that they are working on, and I handle

13  cases when they come in.

14  Q.   Do you teach in the field?

15  A.   I teach forensic image analysis courses at various

16  conferences.  Primarily the teaching that I do these days is

17  related to the computer vision topics, though.

18  Q.   Do you belong to any relevant professional societies?

19  A.   Yes.  I am a fellow of the American Academy of Forensic

20  Sciences.  I am a member of the International Association

21  for Identification, another forensic science group.  I'm a

22  member of IEEE, the Institute of Electrical and Electronics

23  Engineers.  This is where a lot of computer vision work

24  is -- research is published and developed.

25  Q.   Were you asked to apply photogrammetry to an image in

DIRECT - VORDER BRUEGGE

1   this case?

2   A.    Yes, I was.

3          MR. GREWELL:    Your Honor, I move to have

4   Mr. Vorder Bruegge qualified as an expert under 702 under

5   photogrammetry generally and for purposes of the analysis he

6   did in this case.

7          THE COURT:    Any objection?

8          MS. MOSS:    No objection.

9          THE COURT:    All right.

10         MR. DILL:    No, Your Honor.

11         THE COURT:    All right.    Excuse me.    There being no

12  objection, Mr. Vorder Bruegge is qualified under Federal

13  Rule of Evidence 702 to provide expert opinion testimony

14  generally in the field of photogrammetry and specifically

15  with respect to analysis done in this case.

16  BY MR. GREWELL:

17  Q.    What is photogrammetry?

18  A.    Well, if you break down the word photogrammetry to its

19  roots, photogrammetry, photo, light, from the Greek;

20  metrics, measurements; measuring with light is basically the

21  art and science of obtaining measurements from photographs,

22  image, videos, et cetera.

23  Q.    Could you give us an example of how photogrammetry

24  might be used.

25  A.    Well, photogrammetry is a relatively old field.    The --

DIRECT - VORDER BRUEGGE

1   in World War II, for example, photogrammetry was used from

2   aerial photographs to help determine when bombs should be

3   dropped, when planes were flying over target areas.

4   Photogrammetry is also used in the medical profession and in

5   fields such as forensic anthropology where skull

6   measurements may be made and compared to living images of

7   people's faces, photographs of those faces.

8   Q.   Could you tell us a little bit about how unknowns

9   are -- and knowns factor into photogrammetry?

10  A.   So the key thing when conducting a photogrammetric

11  analysis is you need a scale, you need a known measurement,

12  something that you can use as the basis for making a

13  determination in the scene.  So if you have a photograph

14  depicting any sort of a scene, you want to have at least one

15  object in the scene that you know the dimension.

16          And then given certain rules of perspective and

17  geometry in the photographic process, you can determine

18  other measurements in the scene from that single

19  measurement.

20  Q.   Can you tell us a little bit about how pixels in a

21  photograph play a role in photogrammetry, if they do.

22  A.   So pixels, of course, refer to how a digital image is

23  composed.  In a digital camera that you might have in your

24  cell phone, the photograph is actually represented by a

25  series of rows and columns.  Those rows and columns are made

DIRECT - VORDER BRUEGGE

1    up of individual pixels.  So a typical phone camera might

2    have as many as 12 million pixels.  So that might be

3    something on the order of 3,000 pixels across by 4,000

4    pixels tall if you're holding your phone in portrait mode.

5    That would give you 12 million pixels.

6              If you have a particular feature in the scene that

7    you know the size of it, and you're looking at it straight

8    on, then the number of pixels that cover that particular

9    distance can be used to estimate how many inches per pixel,

10   or how many pixels per inch, there are within that

11   particular object that you're looking at.

12   Q.   Did you use photogrammetry to analyze a photograph in

13   this case?

14   A.   I did.

15              MR. GREWELL:  If I could have Government Exhibit

16   430, which has already been admitted, Your Honor.  Page 9.

17   BY MR. GREWELL:

18   Q.   Is this the photograph that you were asked to analyze

19   for this case?

20   A.   Yes, it is.

21   Q.   What were you trying to measure in this photograph?

22   A.   So in this particular photograph, which is marked in

23   the exhibit as INV underscore 00006496, two individuals are

24   depicted standing next to one another on a -- what appears

25   to be a tile floor.  I was asked to determine the length of

DIRECT - VORDER BRUEGGE

1    the arm shown on the far left of the image that would be the

2    right arm of the individual standing on the left side of

3    this image.

4    Q.    Mr. Vorder Bruegge, there is a stylus on the side of

5    your monitor, if you would like to use that to show us which

6    arm it was that you were measuring.

7    A.    Oh, so I'm indicating the right arm of the individual

8    on the left of this photograph.

9    Q.    And is that red line basically the entire length you

10   were trying to measure then?

11   A.    Yes, it is.

12   Q.    Okay.  So what was the known object that you used,

13   then, in this photograph to end up measuring that arm?

14   A.    So in this particular image, I used the length of the

15   dress of the individual standing on the right-hand side of

16   this picture.  And I'll indicate that for -- from the

17   shoulder down to the bottom of the dress.

18   Q.    So the plain white dress without a pattern on it?

19   A.    The plain white dress without a pattern, yes.

20   Q.    Given your choice to use that dress, did the

21   measurements of anything else in the photograph matter,

22   other than that dress, for purposes of your analysis?

23   A.    Yes.  I also used measurements of the length of the arm

24   of the subject -- of the individual depicted on the

25   right-hand side.  So, again, from the shoulder to the bottom

DIRECT - VORDER BRUEGGE

1  of the hand.  I also attempted to measure the length from
2  the shoulder to the ground beneath the individual on the
3  right.
4  Q.   And did one of those three measurements prove to be the
5  most accurate measurement in your testing?
6  A.   Based on a validation test that I did using other
7  individuals in another dress hanging down, I determined that
8  the length of the dress rather than the length of the arm,
9  or the distance from the shoulder to the ground, would
10 provide the most accurate measurement of the subject's right
11 arm on the left of this photo.
12 Q.   And if I could have page 1 of this exhibit.
13      And are you familiar with this photograph?
14 A.   Yes, I am.
15 Q.   And what was this photograph used for?
16 A.   So this photograph marked Government Trial Exhibit 043,
17 represents one of the photographs depicting the individual
18 who was standing on the right-hand side in that photograph
19 wearing the -- what was reported to me as the same dress as
20 was in the previous image.
21 Q.   After conducting your photogrammetric analysis, do you
22 have an opinion as to the length of the arm that you were
23 attempting to measure?
24 A.   Yes, I do.
25 Q.   What is that opinion?

DIRECT - VORDER BRUEGGE

1    A.    I estimate the length of the right arm of the

2    individual depicted in that photograph to be approximately

3    27 and 3/4 inches long with uncertainty of approximately

4    1 inch.   That distance, I should point out, is the distance

5    from the top of the shoulder to the tip of the fingers, in

6    that image depicted, a straight-line distance.

7    Q.    And can you tell us what you did to gauge the accuracy

8    of that measurement.

9    A.    Yes.  So in addition to the validation study that I had

10   performed using other individuals, I determined -- I had

11   known measurements of this subject, the subject depicted in

12   Government Exhibit 430.  I had measurements of the length of

13   their arm and the distance from the shoulder to the ground.

14   And so I calculated, using the length of the dress as my

15   scale, what the length of that left arm and the distance

16   from the ground to the shoulder were and determined that

17   there was approximately a 3 1/2 percent uncertainty or error

18   associated with those measurements.

19        And so that 3 1/2 percent is what I applied to the

20   uncertainty of the subject on the left's right arm.  So the

21   1 inch that I gave the range from 26 and 3/4 inches to

22   28 and 3/4 inches is due to the fact that when I tested the

23   measurements of the shoulder to ground and arm length of

24   this individual depicted in 430, that I got no more than a

25   3 1/2 percent error.

1245

DIRECT - VORDER BRUEGGE

1   Q.   Was your analysis in this case reviewed by anyone

2   else?

3   A.   Yes, it was.

4   Q.   Who reviewed it?

5   A.   So another qualified forensic examiner in my laboratory

6   conducted the technical review.  That's standard procedure

7   for any report that goes out of our lab.

8   Q.   And what did their review conclude?

9   A.   They found no -- nothing to disagree with my analysis.

10  Q.   Mr. Vorder Bruegge, are you familiar with the length of

11  the shotgun in this case?

12  A.   No, I am not.

13  Q.   Are you familiar with the dimensions of the crime scene

14  at all?

15  A.   No, I am not.

16  Q.   So you reviewed neither of those in trying to determine

17  the length of the woman's arm in these photos?

18  A.   No.

19  Q.   Mr. Vorder Bruegge, are you familiar with an article

20  that appeared in the publication, ProPublica, about your

21  work?

22  A.   Yes, I am.

23  Q.   Was it about your work in this case?

24  A.   No.

25  Q.   Just your work generally?

1246

DIRECT - VORDER BRUEGGE

1    A.    Yes.

2    Q.    What did ProPublica say about your work?  What were

3    their allegations?

4    A.    So ProPublica had some unkind words to say about

5    analyses that I had done in a number of cases.  In

6    particular, there were allegations that I would testify to

7    something that disagreed with the report that I had written

8    or that I was going to testify outside of the scope of my

9    expertise.

10   Q.    Are those allegations correct?

11   A.    No.

12   Q.    Why not?

13   A.    There are a number of problems with the ProPublica

14   article, and I will highlight two for your attention.  One

15   of the allegations made was that the prosecutor in a case in

16   which I was a witness characterized the testimony that I

17   would give as basically identifying a particular individual

18   in a case.  My report did not identify that person nor did I

19   identify that person in that case.  The ProPublica reporter

20   was relying upon a court filing that was mistaken in its

21   characterization of what I would say.

22         Second, the ProPublica reporter reported that I had

23   written a report which said that I could not compare a shirt

24   in a given case and that I could not identify the shirt

25   because of that.  That report was accurately reported.  What

DIRECT - VORDER BRUEGGE

1    the ProPublica -- subsequently in testimony, I did identify

2    the shirt in that case.  What the ProPublica reporter had

3    missed was the fact that there was a second laboratory

4    report in which I had identified the shirt in that

5    particular case.

6             So it was a matter of -- in the first report I had

7    only examined traditional bank film, so the kinds of film --

8    old school film that you process in a wet photographic

9    process, because at the time of the analysis film was higher

10   quality than video.  When I was unable to conduct a

11   meaningful comparison from the film image in that case, the

12   case agent said, "Well, we have video as well."

13            And I said, "Well, send the video in."

14            And the video was good enough to allow me to

15   identify that shirt.  The ProPublica reporter had failed to

16   discover that there was a second report.  And so he

17   characterized me as perjuring myself in court.

18   Q.    Has any court ever excluded your testimony as

19   unreliable?

20   A.    No, sir.

21   Q.    Did the article attack the reliability of

22   photogrammetry?

23   A.    Not that I recall.

24            MR. GREWELL:  No further questions, Your Honor.

25            THE COURT:  All right.  Thank you.

1248

CROSS - VORDER BRUEGGE

1    Cross-examination.

2            MS. MOSS:  Thank you, Your Honor.

3                    CROSS-EXAMINATION

4    BY MS. MOSS:

5    Q.    Good afternoon, Mr. Vorder Bruegge.

6    A.    Good afternoon.  Very good.

7    Q.    The prosecutor just brought up this ProPublica article

8    that you were just discussing.

9    A.    Yes.

10   Q.    Is it your position that the article -- what was

11   represented in that article is incorrect, was wrong?

12   A.    Yes.

13   Q.    And so some -- do you believe that sometimes reporters

14   and media get things wrong?

15   A.    Yes.

16   Q.    So you can't always believe everything that you read in

17   the media; is that right?

18   A.    Yes.

19   Q.    Thank you very much.

20            THE COURT:  Mr. Dill, any questions?

21            MR. DILL:  No, sir.  No questions.

22            THE COURT:  Redirect.

23            MR. GREWELL:  No redirect, Your Honor.

24            THE COURT:  All right.  May this witness be excused

25   for the Government?

1249

CROSS - VORDER BRUEGGE

1     MR. GREWELL:  He may, Your Honor.

2     THE COURT:  For the defendants?

3     MS. MOSS:  Yes, Your Honor.

4     MR. DILL:  Yes, Your Honor.

5     THE COURT:  Thank you.  Mr. Vorder Bruegge, thank

6  you so much for your testimony.  You're excused and you may

7  step down.

8     THE WITNESS:  Thank you, Your Honor.

9     THE COURT:  All right, at this time we're going to

10  take our afternoon recess.  We will be in recess for 15

11  minutes.

12     (Recess taken 3:03 p.m. to 3:21 p.m.)

13     THE COURT:  Government may call its next witness.

14     MR. FIELDS:  Thank you, Your Honor, the United

15  States calls Dr. Bruce Bradtmiller.

16     COURTROOM DEPUTY:  If you'll stay standing for me

17  and raise your right hand.

18     BRUCE BRADTMILLER, GOVERNMENT'S WITNESS, SWORN

19     COURTROOM DEPUTY:  Thank you.  Please be seated and

20  remove your mask for us.  And please state your full name

21  for the record and spell your first and last name for us.

22     THE WITNESS:  Bruce Paul Bradtmiller.  B-r-u-c-e,

23  B-r-a-d-t-m-i-l-l-e-r.

24     THE COURT:  You may examine.

25     MR. FIELDS:  Thank you, Your Honor.

1250

DIRECT - BRADTMILLER

1       DIRECT EXAMINATION

2    BY MR. FIELDS:

3    Q.    Dr. Bradtmiller, were you asked by the Government to

4    conduct a study?

5    A.    Yes.

6    Q.    What was the purpose of that study?

7    A.    The purpose of the study was to assess arm length and

8    reach capability, and to essentially bolster the sample size

9    of a study previously done by the FBI.

10   Q.    Are you prepared today to tell the members of the jury

11   your conclusions regarding that study?

12   A.    Yes.

13   Q.    Before we get to that, let's talk about your

14   background.  Where did you go to college?

15   A.    Indiana University for undergraduate, and Northwestern

16   University for graduate school.

17   Q.    What did you study as an undergraduate?

18   A.    Anthropology and French.

19   Q.    And as a graduate?

20   A.    Physical anthropology.

21   Q.    Physical anthropology, where did you get your degree

22   from?

23   A.    Northwestern University.

24   Q.    Do you have a PhD?

25   A.    I do.  A master's and a PhD.

1251

DIRECT - BRADTMILLER

1  Q.    What is a PhD?

2  A.    Stands for doctor of philosophy.

3  Q.    What did you have to do to get that?

4  A.    Several years of coursework, some teaching, and then a

5  dissertation.

6  Q.    Did you do any work as a professor?

7  A.    Briefly I was a visiting professor at University of

8  Tennessee, Knoxville.

9  Q.    As a PhD, what would you describe as your field of

10  study?

11  A.    My field of study as I did in graduate school is called

12  paleopathology, which is the study of diseases on ancient

13  bones that might be dug up.  Since then, though, I've been

14  focused on anthropometry, which is the study of measuring

15  people.

16  Q.    The study of measuring people?

17  A.    Yes.

18  Q.    That's an entire field of study?

19  A.    It is.

20  Q.    Is there a subfield involving applied anthropometry?

21  A.    There is.  Anthropometry generally just means measuring

22  people.  Applied anthropometry is when we use those

23  dimensions for product design, typically, or safety of that

24  sort of thing.  So we're using the dimensions that we've

25  measured in some other purpose.

DIRECT - BRADTMILLER

1   Q.   Can you give us some examples of applied anthropometry.

2   A.   Sure.  We're doing some -- actually we're doing some

3   work now for the IT industry where many companies are making

4   applied -- or making virtual reality headsets, and so they

5   need to know where are the eyes with respect to the ears

6   with respect to the circumference of the head.

7          But we've done a lot of work previously with the

8   military where arm reach comes into it.  When you're

9   designing an airplane cockpit, you want to make sure that

10  the pilot can reach the necessary controls and so on.  So

11  those are just two examples.  There are many more.

12          THE COURT:  Mr. Fields, help me.  I'm not getting

13  the word, anthro what?

14          MR. FIELDS:  -pometry.

15          THE COURT:  -pometry?  Can you spell it.

16  BY MR. FIELDS:

17  Q.   Dr. Bradtmiller, could you spell that for us?

18  A.   Sure.  A-n-t-h-r-o-p-o-m-e-t-r-y.

19          THE COURT:  Learn something every day.

20  BY MR. FIELDS:

21  Q.   Do you work now for a company called Anthrotech?

22  A.   I'm a consultant for them, yes.  I used to own the

23  company until last year.

24  Q.   What does Anthrotech do?

25  A.   Anthrotech does applied anthropometry.  We've been

DIRECT - BRADTMILLER

1   doing it since 1950.

2   Q.   Are you familiar with something called an anthrometric

3   survey?

4   A.   Yes.   Anthrotech has conducted several of those over

5   the years.   And I, myself, have led teams that do those.

6   Basically it's when you measure a bunch of people for a

7   series of dimensions to try to capture for a population of

8   people, for example, the Army, the Air Force, their

9   dimensional characteristics.   So that if you wanted to

10  design a product for them, you would know what are the

11  largest people, what are the smallest people and what are

12  the people in between?

13  Q.   Have you designed these surveys?

14  A.   Yes.

15  Q.   Can you give us some examples.

16  A.   Sure.   The first large one I did was 1987 and '88.   We

17  measured, I think, maybe 8- or 9,000 U.S. Army soldiers.

18  And then the next super large one we did was in 2010 to

19  2012, we measured the Marines, and about 12,000 Army

20  soldiers.   But I've done surveys for the National Institute

21  of Occupational Safety and Health, the Navy, private

22  companies, and so on.

23  Q.   What's the purpose of doing these really large surveys?

24  A.   Well, as we spoke about in applied anthropometry,

25  typically the focus is design.   And so, you know, we did a

DIRECT - BRADTMILLER

1  survey of truck drivers, for example.  And our client in

2  this case was a manufacturer of heavy trucks.  And they

3  wanted to make sure that their truck cabs were sufficient to

4  accommodate the truck-driver population.

5         So we measured arm length and we measured sitting

6  height, and all kinds of things.

7  Q.   While working at Anthrotech, do you still have time to

8  produce papers?

9  A.   Yeah.

10 Q.   How many papers have you written over the course of

11 your career?

12 A.   You know, I looked at my resume yesterday in

13 preparation for this and I didn't count them, but I think

14 there are like 14 pages of papers in my resume.  But I

15 didn't count them.  Sorry.

16 Q.   And what topic areas have you written?

17 A.   Well, all areas of applied anthropometry.  Several

18 papers about the anthropometric surveys, but several papers

19 about pit tests of various products.  I've written some

20 papers about sample size for anthropometric surveys.  Yeah.

21 Lots of stuff.

22 Q.   Have you been published in peer-reviewed journals?

23 A.   I did count those.  In 13 different journals I've been

24 published.

25 Q.   Do you still have time to participate in any

DIRECT - BRADTMILLER

1    professional societies?

2    A.    I do.  I'm a member of the American Association of

3    Biological Anthropology, Human Factors in Ergonomic Society.

4    Seems like there are at least one more that I can't recall

5    at the moment.

6    Q.    Are you on the ISO technical committee?

7    A.    I am.  The International Standards Organization has

8    technical committees in a variety of areas, and I'm the

9    U.S.-appointed expert for the area of anthropometry.

10   Q.    Who appointed you?

11   A.    An organization called American National Standards

12   Institute upon the recommendation of the Human Factors and

13   Ergonomic Society.

14   Q.    Have you served on the editorial board of any journals?

15   A.    Applied Ergonomics.

16   Q.    And we talked about designing anthropometric surveys.

17   Do you have experience designing reach studies in applied

18   anthropometry?

19   A.    Yes.  All of the projects that we have done that

20   weren't surveys, I designed those.

21   Q.    How many such studies would you say you've conducted

22   over the course of your career?

23   A.    I've been doing this for almost 40 years, so -- gosh, I

24   don't know.  30, 40, 50.  I don't know.

25   Q.    Do you have any particular experience designing studies

1256

DIRECT - BRADTMILLER

1    to determine reach potential?

2    A.    Not specifically reach, but reach is a dimension that

3    we routinely measure.

4    Q.    Well, is Anthrotech retained by the Government?  Are

5    you being paid?

6    A.    Yes, Anthrotech is being paid, and then subsequently

7    Anthrotech pays me.

8    Q.    Was some of the money you were paid used to pay

9    research participants?

10   A.    Not the money that I was paid, but Anthrotech was paid

11   to pay for research participants, correct.

12   Q.    How much was each participant paid?

13   A.    $50.

14   Q.    Is it common for participants in a scientific study to

15   be compensated?

16   A.    It is.

17   Q.    Can the payment to the participants affect the results

18   of the study?

19   A.    No.

20   Q.    Why not?

21   A.    Well, we're -- in this particular case, but -- which is

22   typical, you know, we're doing some measurements, and people

23   can't change their dimensions and -- for money.  And they

24   wouldn't know which direction to change them anyway.

25            MR. FIELDS:  Your Honor, before we get any further,

1257
DIRECT - BRADTMILLER

1    I'd like to move at this time to certify Dr. Bruce

2    Bradtmiller as an expert in the fields of general

3    anthropometry, applied anthropometry, and in particular on

4    the research study that he conducted in this case.

5            THE COURT:  Any objection?

6            MS. MOSS:  No objection.

7            MR. DILL:  No objection.

8            THE COURT:  All right.  There being no objection,

9    Dr. Bruce Bradtmiller is qualified under Federal Rule of

10   Evidence 702 to provide expert opinion testimony in the

11   Fields of general applied anthropometry, applied

12   anthropometry, general field of anthropometry, and the

13   specific research study conducted in this case.

14   BY MR. FIELDS:

15   Q.   We talked about anthropometry surveys.  Are there

16   particular surveys on arm reach?

17   A.   Well, arm reach is a part of many surveys.

18   Q.   How are those surveys done?

19   A.   I'm not sure what the question is.

20   Q.   How are those surveys conducted?  Are they conducted by

21   you?  Are they conducted by you or are they conducted by

22   other anthropometrists?

23   A.   I see.  Large surveys, typically we would -- we ramp up

24   our staff for those.  And for the large ones we would hire

25   maybe 15 or 20 people and then spend a month training them.

1258

DIRECT - BRADTMILLER

1    And then in the case of the military surveys that

2    take, you know, a year or two years to conduct, we would go

3    from military base to military base.  And on any given day,

4    you know, 30 or 40 soldiers would be -- would show up and

5    we -- they would process them kind of like an assembly line.

6    And so, you know, some -- some measurers would

7    measure chest circumference and weight circumference and

8    other measurers would measure arm reach and that sort of

9    thing.

10   Q.   Do you have access to the data from all of these

11   surveys?

12   A.   I do, yeah.

13   Q.   What conclusions can be drawn about the relationship

14   between height and reach?

15   A.   They are correlated.  And for, in this particular case,

16   white women, the correlation is, I think, point 864,

17   something like that, which is a high correlation.  It means

18   basically the -- that height and arm reach are related.

19   Q.   And let's talk about arm reach in particular.  Is there

20   a relationship between arm length and arm reach?

21   A.   That is also correlation of point 8 something.  It --

22   they are also highly related.

23   Q.   When you say "correlation of point 8 something," what

24   does that mean?

25   A.   That means that if you know arm length of a person, you

DIRECT - BRADTMILLER

 1    have a good idea what the arm reach is.  Correlation varies

 2    from zero, which means no relationship, to 1, which means a

 3    perfect relationship.  And so when you're in the

 4    point-8-something range, that means your -- it's a pretty

 5    good relationship.  It's not a hundred percent predictive,

 6    but you have a pretty good idea.

 7    Q.   The anthropometric surveys, do they show any

 8    relationship between reach and race, or ethnicity?

 9    A.   Yes.  There -- because race or ethnicity affects the

10    way limbs are proportioned, typically Asian Americans

11    have -- and I'm speaking in the U.S. -- speaking in the

12    U.S., Asian Americans have shorter limbs relative to other

13    ethnic groups, and Black Americans typically have longer

14    limbs relative to other groups.  So there is a relationship

15    there.

16         So if you're trying to -- trying to establish some

17    arm reach from arm length, you would want to restrict your

18    analysis to people of the same ethnic group.

19    Q.   And did you do that in your study here?

20    A.   We did.

21    Q.   Now, arm length, it seems pretty easy to measure, but

22    is there a particular way that anthropometrists conduct

23    measurements?

24    A.   Well, it always seems easy to measure until you do it.

25    There are a number of definitions of arm length, actually.

1260

DIRECT - BRADTMILLER

1        And this particular case, since the FBI had conducted -- or

2        commissioned a photogrammetric study where arm length was

3        calculated essentially by subtracting shoulder height,

4        subtracting a fingertip height from shoulder height, we used

5        that definition for our study.

6        Q.    And is that an appropriate definition to use?

7        A.    Yeah.  Yeah.  I mean, as I say, there are a number,

8        and -- and in applied anthropometry specifically, if there

9        are multiple definitions, you choose the one that is most

10       relevant to the problem at hand.

11       Q.    Now can reach vary, depending on how flexible someone

12       is?

13       A.    Sure.

14       Q.    And do the motives of the person doing the reaching

15       have any effect on reach?

16       A.    I -- I would think so.  You know, if you're just asking

17       someone, "Just go ahead and reach for a thing," they'll

18       reach for a thing.  But if you say, "Reach like your life

19       depends on it," you're going to get a little further.

20       Q.    Did you review medical records showing Bianca Rudolph's

21       reported height?

22       A.    I did.

23       Q.    How tall was she?

24       A.    I -- they varied.  I had records over a five- or

25       six-year period, as I recall.  And I think the -- I think

DIRECT - BRADTMILLER

1   the range was maybe 162 to 164 centimeters, as I recall.

2   Q.   Is it uncommon for measurements to vary a little bit?

3   A.   That is not uncommon at all.  Often -- well, first of

4   all, medical personnel don't know how to make measurements;

5   but, No. 2, a lot of times they just ask you anyway.  Yeah.

6   Q.   Now, based just on the height, given all these

7   anthropometric surveys, can you get an estimate as to how

8   long someone's arm might be?

9   A.   Yeah.  Because of that correlation, you can certainly

10  get an estimate.

11  Q.   Were you provided with the results of a photogrammetry

12  analysis of photographs of Bianca Rudolph?

13  A.   I was.

14  Q.   What did you conclude regarding that analysis?

15  A.   I looked at that analysis, and I thought the methods

16  were sound based on -- I had done some photogrammetry

17  earlier in my career.  It's not the used too often anymore

18  because we have other ways to do it, but the methods were

19  sound.  But I did a double-check, and I pulled a bunch of

20  white women from our large anthropometric surveys and --

21  give or take a centimeter of Bianca Rudolph's height, and I

22  looked at their arm lengths and it was consistent with the

23  arm length that was -- that came out of the photogrammetry

24  study.

25  Q.   So now looking at sort of arm length generally, if

DIRECT - BRADTMILLER

1    Bianca's arm was approximately 27 3/4 inches long, does that
2    mean she can't reach anything that's more than, you know, 27
3    point -- and 3/4 inches away?
4    A.   No, because the reach -- arm reach and arm length are
5    not the same.  And it has to do with the mobility of the
6    shoulder as well as motivation as we discussed earlier.
7    Q.   So in a case like this where Bianca Rudolph is
8    unavailable for a study, is there a way to determine what
9    her reach potential might have been?
10   A.   I don't think so.  So I think in the case of Bianca
11   Rudolph, the best we have is her estimated arm length.
12   Q.   Can you use a study to determine how long arm reach
13   might be for someone with that length of arm?
14   A.   Yes.  And that's what the FBI study did.  And when I
15   reviewed it, the methods seemed reasonable, but I advised
16   them that I thought their sample size of 15 was too small
17   for -- to give, you know, confidence in the results.
18   Q.   So what is a sample size?
19   A.   How many people participate in a study.
20   Q.   How many -- what did the sample size need to be to
21   reach your conclusion in this case?
22   A.   In my experience and in my opinion, it should have been
23   about 50.  And so we did a -- we recruited another 37 people
24   to add to the FBI's sample, so that the total that we had
25   was actually 52.  And we dropped one person because she had

1263

DIRECT - BRADTMILLER

1    shortened fingers, but . . .

2    Q.    All right.  So this FBI study -- just to be clear, how

3    many people participated in that study?

4    A.    15.

5    Q.    Was that study broken up into different phases?

6    A.    It was.  They called it a three-phase study.  And the

7    first phase was the anthropometry.  They measured the

8    person's height and arm length and arm reach.

9          And then the second phase of the study, they asked

10   the participants -- they gave the participants a shotgun and

11   a shotgun bag and asked them to put the shotgun in the bag.

12         And then in the third phase of the study, the

13   shotgun was partially in the bag, they asked them to hold

14   the shotgun at 90 degrees to the chest, and asked them if

15   they could simultaneously zip the bag and reach the trigger.

16   Q.    In this FBI study, what was the height range of the

17   participants?

18   A.    As I recall, it was about 61 to 66 inches.  The

19   number's in my report exactly, but it's close to that.

20   Q.    So were some of the women in that study even taller

21   than Bianca Rudolph?

22   A.    Yes, correct.

23   Q.    Do you remember what the range of the static arm

24   measurements was in that study?

25   A.    I don't.  I remember that the average was 27 and

1264

DIRECT - BRADTMILLER

1   something, but I don't remember the range.

2   Q.   So the average was approximately the same as Bianca's

3   arm?

4   A.   Yes, correct.

5   Q.   Now, in the second phase, you mentioned that

6   individuals were asked to put a shotgun into a bag?

7   A.   Correct.

8         MR. FIELDS:   So, Madam Deputy, I believe there

9   should be Government's Exhibits 3 and 4, which are already

10  in evidence.  That's the FBI shotgun and the soft case.

11  BY MR. FIELDS:

12  Q.   So, sir, are those the shotgun and the soft case that

13  were used in your study?

14  A.   I'm not an expert on shotguns, but it looks very

15  similar, certainly.

16  Q.   And these -- these phases of the FBI study, were they

17  video-recorded?

18  A.   They were.

19  Q.   Did you review those video recordings when you were

20  conducting your analysis?

21  A.   I did.

22        MR. FIELDS:   Your Honor, at this time I'd move for

23  the admissions of Government's Exhibits 415 through 429.

24  They are not stipulated to, but I understand there's no

25  objection.

DIRECT - BRADTMILLER

1      MS. MOSS:  That's correct, Your Honor.  No

2  objection.

3      THE COURT:  Any objection?

4      MR. DILL:  No objection, Your Honor.

5      THE COURT:  All right.  There being no objection,

6  Government Exhibits 415 through 429 are admitted into

7  evidence and may be published to the jury.

8      (Government's Exhibits 415 thru 429 received)

9  BY MR. FIELDS:

10  Q.    All right, we'll play one of those videos in a second,

11  but before we do that, can you remind us what happened in

12  phase -- what the FBI called phase 2?

13  A.    FBI's phase 2 study -- phase 2 of the FBI study was

14  when -- the participants were handed a shotgun and the bag

15  and they were asked to place the shotgun in the bag.

16  Q.    What happened during that phase of the study?

17  A.    Well, they -- among the 15 people that the FBI -- that

18  participated in the FBI study, some laid it on a table, some

19  laid it on the floor, some held it out in the air and did

20  it.

21  Q.    While they were conducting that phase of the study,

22  where did they point the muzzle of the shotgun?

23  A.    Well, if they were -- did it in the front, it would be

24  to the side.  If they did it on the table, it would be kind

25  of on the side.  It was never at themselves.

DIRECT - BRADTMILLER

1    Q.    Did anyone have difficulty putting the gun inside the

2    case?

3    A.    No.

4    Q.    In phase 3 -- remind us, what was phase 3?

5    A.    Phase 3, they -- the participants were handed a shotgun

6    already in the bag and partially zipped, and then they asked

7    the participants to hold the shotgun in the bag so the

8    muzzle was at 90 degrees to their torso, and then asked if

9    they could zip the bag and reach the trigger.

10   Q.    And what were the results of that phase?

11   A.    Most people couldn't hold it that way because it's

12   heavy -- the -- the far end was heavy.  So people did a

13   variety of ways to put it in the bag.  But most of them

14   ended up putting -- putting it on the floor and trying to

15   zip it.  But nobody pointed it at themselves.  And no one

16   could reach the trigger in the FBI study.

17   Q.    So let's look at another example of one of those

18   videos.  If we could, let's see if we could pull up

19   Government's Exhibit 415.

20        (Video played)

21   BY MR. FIELDS:

22   Q.    Pause it for a second.  All right.

23        Were these videos -- does this video have both what

24   the FBI called phase 2 and phase 3 spliced into one video?

25   A.    When I looked at them I think they were separate.

1267

DIRECT - BRADTMILLER

1    Q.   Okay.  Let's play until we get to 38 seconds in.

2         (Video played)

3    BY MR. FIELDS:

4    Q.   Let's pause for a second.

5              It looks like we have no audio.  Are we plugged

6    into the phone -- or --

7              COURTROOM DEPUTY:  Try again.

8         (Video played)

9    BY MR. FIELDS:

10   Q.   Pause there.  So was that the -- was that what the FBI

11   called phase 2?

12   A.   That's correct.

13   Q.   And so let's keep playing until we get to 1 minute and

14   23 seconds in.

15        (Video played)

16   BY MR. FIELDS:

17   Q.   Stop there.

18             Did you see the shotgun fall out of the bag there?

19   A.   Yes.

20   Q.   Can you see where the barrel of the shotgun is pointed?

21   A.   Yes.

22   Q.   Where is it pointed?

23   A.   Ceiling.

24   Q.   Is it pointed straight at the participant's heart?

25   A.   No.

DIRECT - BRADTMILLER

1    Q.    Okay.  Let's go ahead and keep playing.

2          (Video played)

3    BY MR. FIELDS:

4    Q.    Now, the other videos from the FBI, do they generally

5    show that same process?

6    A.    Yes, absolutely.

7    Q.    Did you see any methodological flaws with the FBI's

8    study?

9    A.    The only flaw I saw was the sample size.

10   Q.    So after reviewing the FBI study, did you recruit more

11   participants to increase the sample size?

12   A.    We did.

13   Q.    Did you do anything different with your study when you

14   increased the sample size?

15   A.    We followed their procedures as closely as we could.

16   We added one -- one measure -- two measurements, one on each

17   side.  We wanted to measure by how -- because people

18   generally could not reach the trigger, we wanted to answer

19   the question:  Well, how far off were they?  So we did

20   measure the distance from the longest finger to the trigger.

21   Q.    Now, the FBI had what they called three phases in their

22   study.  Did you sort of redefine and call them tasks

23   instead?

24   A.    I did, yeah.

25   Q.    What were the tasks?  How would you describe your

1269

DIRECT - BRADTMILLER

1    task?

2    A.    Our task 1 was the same as FBI phase 2 where they were

3    asked -- participants were asked to simply put the shotgun

4    in the bag.  And our task 2 was the same as FBI phase 3,

5    which is the one that we just saw on the video.

6    Q.    And I think you said that you recruited 37

7    participants?

8    A.    Correct.

9    Q.    But you also mentioned one was disqualified.  Why was

10   that one disqualified?

11   A.    She -- she was missing several of the terminal

12   phalanges -- phalanges, several digits.  So, in other words,

13   her fingers were short.

14   Q.    So that left you with 36?

15   A.    Yes, sir.

16   Q.    When you were identifying participants, did you do any

17   filtering for familiarity with firearms?

18   A.    We did not.

19   Q.    Why not?

20   A.    It wasn't clear that the FBI had done that and -- but

21   it really was not a firearm study *per se*; it was an

22   anthropometry reach study.

23   Q.    What did you tell the participants about the study

24   before they participated?

25   A.    We told them that we were doing this for a legal case

1270

DIRECT - BRADTMILLER

1   and we needed to ask them to -- we asked them to come in,

2   and told them we would measure their arms and ask them to

3   handle a shotgun.  And that's pretty much what we told them,

4   as I recall, as well as told them they would get $50 if they

5   would do that.

6   Q.   Did you video-record each of these participants?

7   A.   We did.

8        MR. FIELDS:  Your Honor, at this time I would move

9   for admission of Government's Exhibit 434 through 469.  They

10  are not stipulated to but I understand there's no objection.

11       MR. DILL:  No objection.

12       THE COURT:  Any objection?

13       MS. MOSS:  No objection, Your Honor.

14       THE COURT:  All right, there being no objection,

15  Government Exhibits 434 through 469 are admitted into

16  evidence and may be published to the jury.

17       (Government's Exhibits 434 thru 469 received)

18  BY MR. FIELDS:

19  Q.   Once you had increased the sample size to 51, what was

20  the -- what was the average height of the participants?

21  A.   I don't remember exactly, but it was very close to

22  Bianca Rudolph's height.

23  Q.   So a good representation?

24  A.   Yes, correct.

25  Q.   And what about the arm measurements?

1271

DIRECT - BRADTMILLER

1   A.    Of the 51 participants, they were within -- I want to

2   say within half an inch of the estimated Bianca Rudolph arm

3   length.

4   Q.    So now focusing in on your task 1 with the FBI -- I

5   call it phase 2 -- that's the one where participants were

6   asked to put it in a bag?

7   A.    Correct.

8   Q.    What happened when your participants tried to put the

9   shotgun inside the bag?

10  A.    It was the same thing as with the FBI study.  They

11  tried to -- a number of different ways.  Some on the table,

12  some on the floor, some holding out this way, but no one

13  pointed it at themselves.

14  Q.    Did anyone have difficulty putting it in the soft case?

15  A.    A handful of people had a little bit of difficulty, but

16  they all got it done.

17  Q.    And in the task 2, what happened when your 36

18  participants tried to zip the bag with the shotgun pointed

19  at their hearts?

20  A.    It was again very similar to the FBI study results.

21  They would try to initially, following the instructions,

22  hold it out at 90 degrees, but it was, you know -- the heavy

23  end is out there so they couldn't do that.  So then most of

24  them ended up putting the butt end on the floor, bending

25  over trying to maintain 90 degrees.  And of the 51

                                                                    1272
                          DIRECT - BRADTMILLER

1    participants combined, one person was actually able to just

2    barely touch it.

3    Q.    Let's look at Government's Exhibit 454.

4          (Video played)

5    BY MR. FIELDS:

6    Q.    Pause for a second, please.

7              Is this the participant who could reach the

8    trigger?

9    A.    That's correct.

10   Q.    So let's go ahead and keep watching.

11         (Video played)

12   BY MR. FIELDS:

13   Q.    And pause for a second.

14             Are we watching phase 2, or task 1?

15   A.    This is our task 1, FBI phase 2, correct.

16   Q.    Keep going.

17         (Video played)

18   BY MR. FIELDS:

19   Q.    And stop.

20             So you were able to observe her actually touching

21   the trigger?

22   A.    Yes.

23   Q.    Would she have been able to push the trigger?

24   A.    I don't think so.

25   Q.    Now this was the only participant who could even reach

DIRECT - BRADTMILLER

1    the trigger?

2    A.    That's correct.  As I mentioned, we measured the

3    distance by which people could -- the participant missed the

4    trigger, and the average was 4 inches.

5    Q.    So if everyone else was 4 inches away but one person

6    was able to reach that, how is that possible?

7    A.    She -- we were surprised because she wasn't our first

8    participant; she was kind of well into the list.  And so we

9    kind of expressed surprise about that.  And she said, "Well,

10   you know, I've always been told that I really have flexible

11   shoulders, and my brother, does, too."

12   Q.    So after reviewing the FBI study and conducting your

13   own to increase the sample size, were you able to come to an

14   expert conclusion on the likelihood that Ms. Bianca Rudolph

15   would have been able to reach the trigger of a Browning A5

16   semi-automatic shotgun?

17   A.    My conclusion was it would be extremely unlikely that

18   she could have reached it.

19   Q.    How can you be so sure extremely unlikely, even though

20   one person was able to reach it?

21   A.    The one person who reached it, as you could see,

22   struggled mightily to reach it, and she had extra mobility

23   in her shoulders for whatever reason.  But the other issue

24   is, you know, going back to FBI phase 2 and our task 1, I

25   mean, nobody pointed it at themselves when they were putting

1274
CROSS - BRADTMILLER

1     it in the bag.  So that, combined with the fact that she had

2     to struggle to even barely touch it, suggests to me that

3     it's -- it would be extremely unlikely that occurred.

4              MR. FIELDS:  Your Honor, may I have a moment?

5              THE COURT:  You may.

6              MR. FIELDS:  No further questions for this witness,

7     Your Honor.

8              THE COURT:  All right.  Cross-examination.

9                      CROSS-EXAMINATION

10    BY MS. MOSS:

11    Q.   Good afternoon, Dr. Bradtmiller.  How are you today?

12    A.   Very well.  Thank you.

13    Q.   Dr. Bradtmiller, I'm going to follow up and ask you

14    about a few different areas, if that's okay.

15    A.   Okay.

16    Q.   The first thing I want to ask you about is:  I believe

17    you mentioned on direct Anthrotech.

18    A.   Yes.

19    Q.   Is that right?  Is Anthrotech your company?

20    A.   It was my company for 20-some years and at the end of

21    2020 we sold it.

22    Q.   In 2020 you sold it?

23    A.   The last day of 2020.

24    Q.   Okay.  And were these studies conducted in 2020 or

25    2021?

1275
CROSS - BRADTMILLER

1    A.    2022.

2    Q.    2022.  Oh, so this year.

3    A.    Yeah, correct.

4    Q.    Okay.  Now since the prosecutor brought it up, they

5    mentioned that you have been paid in this case; is that

6    right?

7    A.    That's correct.

8    Q.    And you're being paid because Anthrotech is paying you;

9    is that right?

10   A.    That's correct, yes.

11   Q.    And, again, since the prosecutor brought it up, I

12   believe as of May 24th, 2022, this year, that Anthrotech has

13   billed the Government $75,000; is that right?

14   A.    I no longer do the billing, thank goodness, but that's

15   probably right.

16   Q.    And that's just, again, since May 24th.  So is

17   Anthrotech going to be billing for additional time for you

18   being here and traveling here --

19   A.    Sure.

20   Q.    -- and additional work?

21   A.    Correct, yes.

22   Q.    Now, the prosecutor asked you on direct about this FBI

23   study that was carried out.  Do you remember that?

24   A.    Yes.

25   Q.    And this is a study that was created by the FBI?

1276
CROSS - BRADTMILLER

1    A.    That's correct.

2    Q.    And this was a study that was created by the FBI before

3    you got involved in this case; is that right?

4    A.    That's correct, yes.

5    Q.    And I believe you testified on direct that you believe

6    that the FBI methods were reasonable.

7    A.    I do.

8    Q.    And I believe you also said that the only flaw that you

9    found is that you thought the sample size was much too

10   small; is that right?

11   A.    That's correct.

12   Q.    And I think you said that in order to create more

13   confidence in the outcome of the testing results, you wanted

14   a larger sample size; is that right?

15   A.    That's correct.

16   Q.    So 15 was not enough for you.

17   A.    You know, if -- it was enough, but it doesn't provide a

18   lot of confidence in the results.

19   Q.    It doesn't provide a lot of confidence in the results.

20   So you wanted more than that, right?

21   A.    That's right.

22   Q.    And I believe you settled at a number of 50; is that

23   right?

24   A.    It is.  Yes.  Yes.

25   Q.    And did that provide you more confidence in the results

CROSS - BRADTMILLER

1   to have at least 50 sample participants in this study?

2   A.   Yes, it did.

3   Q.   And would you agree that good research requires good

4   data?

5   A.   Sure.

6   Q.   And that's actually something you put on the informed

7   consent form that the participants --

8   A.   Right, yes.

9   Q.   -- filled out, right?

10          And so that's a true statement, right?

11  A.   Yes.

12  Q.   And if you don't have good data, then you can't rely on

13  the testing results, can you?

14  A.   That would follow, yes.

15  Q.   So you wanted to increase the number of test subjects

16  to enhance the validity of the results, okay.

17          So in your opinion, Dr. Bradtmiller, would three

18  test subjects ever be enough to have confidence in validity

19  of the results?

20  A.   Typically, no.  I -- there might be some studies where

21  three would be enough, but I would say typically not.

22  Q.   And you didn't feel comfortable with that here; is that

23  right?

24  A.   That's correct.

25  Q.   Now, was the defense given the opportunity to attend

CROSS - BRADTMILLER

1    any of your testing?

2    A.    No.  Well, I don't know.  They did not attend it.

3    Q.    Did you invite the defense?

4    A.    We did not invite the defense.

5    Q.    And was the defense offered the opportunity to give you

6    any sort of input?

7    A.    Not that I -- we did not make that offer.

8    Q.    And was the defense provided the opportunity to make

9    any suggestions to you?

10   A.    We did not make that offer to the defense.

11   Q.    Let me ask you about another thing that you discussed

12   with the prosecutor.  And this is in regards to the

13   correlation between height and reach.  Do you remember

14   speaking about that?

15   A.    Yes.

16   Q.    And so you believe that it was somewhat important to

17   have people participate in the study who were a similar

18   height of Bianca Rudolph?

19   A.    That's correct.

20   Q.    And I believe that you testified on direct that you

21   looked at Bianca Rudolph's medical records -- or some of

22   them at least?

23   A.    Correct.

24   Q.    And did you discover in reviewing her medical records

25   close to the time of her death, that her height was recorded

1279

CROSS - BRADTMILLER

1    at 162 centimeters?

2    A.    That's my recollection, yes.

3    Q.    Okay.  And would you agree that 162 centimeters is

4    different than 170 centimeters?

5    A.    It is different, correct.

6    Q.    And I believe that you testified that the average

7    height of the participants that participated in this study

8    was somewhere around 161 or 162; is that right?

9    A.    That's what my recollection is, yes.

10   Q.    Okay.  Now we've talked about -- I think what you call

11   task 1 and task 2, and what the Government had called -- or

12   the FBI called phase 2 and phase 3.

13   A.    Correct, yeah.

14   Q.    Okay.  When you were performing this study, you were

15   provided the shotgun by the FBI?

16   A.    That's correct.

17   Q.    And you were provided a case by the FBI?

18   A.    Correct.

19   Q.    And you were only provided one gun case by the FBI?

20   A.    Yes, that's right.

21   Q.    And did you measure the length of the gun case?

22   A.    No.

23   Q.    Do you know whether the length of the gun case that you

24   were using during your study was the same length as the

25   actual gun case that was -- occurred in the incident --

1280
CROSS - BRADTMILLER

1   A.   I don't know.

2   Q.   You don't know.  Now for phase 2 of the study, task --

3   no, I'm sorry, task 2, phase 3.

4   A.   Sorry to be confusing.  Yeah.

5   Q.   You said that -- there's a script that you're reading

6   to the participants; is that right?

7   A.   Yes, correct.

8   Q.   And is this a script that the FBI prepared?

9   A.   Yes, we used the same script.

10  Q.   I can't quote exactly what the script is, but you're

11  asking them to point the gun directly at their heart at a

12  90-degree angle, something like that?

13  A.   Something like that, yes.

14  Q.   And did that information about 90-degree angle come

15  from the FBI?

16  A.   It did.

17  Q.   Okay.  And are you aware that other doctors have said

18  that the wound did not occur at a 90-degree angle?

19  A.   I am not aware of that.

20  Q.   If you had been aware of that, would you have changed

21  the way you conducted your study?

22  A.   I imagine so.

23  Q.   And when we talk again about good data -- you need good

24  data for a good study -- is that something that may have

25  been important to you?

1281

CROSS - BRADTMILLER

1   A.    It might have been.

2   Q.    And there's no way to know because we -- you didn't

3   test it, right?

4   A.    That's correct.

5   Q.    Okay.  I'd like to look at some of these videos.  We

6   looked at two of them and I'd like to look at a few more, if

7   that's okay.

8         First of all, again, the FBI did 15 studies first

9   before you got involved.  And then you did 37 more, I think

10  you said; is that right?

11  A.    That's correct.

12  Q.    But have you reviewed the FBI clips to --

13  A.    Yes.

14  Q.    -- see the participants?

15  A.    Yes.

16  Q.    Okay.  And you used those clips also to help form your

17  opinion in this case?

18  A.    Yes.

19  Q.    Okay.  So I'd like to take a look at some of those.  So

20  this is Exhibit 415 and it's clip 1.  And I'm just going to

21  be showing you a very small portion of an extended clip.

22  A.    Okay.

23  Q.    But I'd like you to take a look at this first clip.

24        (Video played)

25  BY MS. MOSS:

CROSS - BRADTMILLER

1    Q.    Now, Dr. Bradtmiller, did you see that the shotgun

2    slipped, dropped out of the case there, and hit the floor

3    with some force?

4    A.    I did see that.

5    Q.    Now I know that the prosecutor asked you which

6    direction the shotgun was facing.  I believe you said up.

7    If the person had leaned over to try and grab the shotgun,

8    would it have been possibly facing the person's chest?

9    A.    Possibly.

10   Q.    And I -- I heard when you were testifying about your

11   qualifications that you have some background with

12   anthropology and human factors; is that right?

13   A.    That's right.

14   Q.    And is it a -- I don't know if you call it a reflex, or

15   is it something that humans normally do, when they drop

16   something, they reach for it to grab it?

17   A.    That's not my particular area of expertise.

18   Q.    Okay.  So that's not something you can testify to.

19   A.    No.

20   Q.    Let's take a look at another clip.  And this is going

21   to be Exhibit 419.  And this is clip 2.

22        (Video played)

23   BY MS. MOSS:

24   Q.    Do you see that the gun also drops there slightly

25   towards the floor?

1283
CROSS - BRADTMILLER

1    A.    Yes.

2    Q.    Thank you.  Let's take a look at another exhibit.  This

3    is 424, and this is clip 3.

4          (Video played)

5    BY MS. MOSS:

6    Q.    Okay.  We can stop there.

7          And do you see that the gun drops there as well?

8    A.    Yes.

9    Q.    And so with the soft case partially unzipped, do you

10   see some of the participants have difficulty actually

11   holding it in there and it falls to the floor?

12   A.    Yes, that's right.

13   Q.    And this is not a light gun, right?  This is a pretty

14   heavy gun, would you say?

15   A.    I would say, yes.

16   Q.    Okay.  Heavy enough that some people even had a hard

17   time just lifting it up in front of themselves; is that

18   right?

19   A.    That was our observation, yes.

20   Q.    Let's take a look at now Exhibit 426.  And this is clip

21   4.

22         (Video played)

23   BY MS. MOSS:

24   Q.    And, again, is this an example of a woman who was --

25   just seemed to be having a hard time just holding it up

1284

CROSS - BRADTMILLER

1  because of the weight of the gun?

2  A.    Yes.  I would agree.

3  Q.    And do you see in this clip also that the gun drops to

4  the floor?

5  A.    Yes.

6  Q.    Let's take a look at Exhibit 428, which is clip 5.

7      (Video played)

8  BY MS. MOSS:

9  Q.    Okay.  So let's stop that there.

10      Now I believe that this participant in Exhibit 428,

11  she is performing -- let me try and get this right -- task

12  1, phase 2, of the FBI study; is that right?

13  A.    That's correct, yeah.

14  Q.    So she is just performing the part of the study where

15  she's asked to zip the gun case closed; is that right?

16  A.    That's correct.

17  Q.    Can we play that one more time, please, Mr. Reyes.

18      (Video played)

19  BY MS. MOSS:

20  Q.    And let's pause for one second.

21      Were you aware that this participant was actually a

22  police detective?

23  A.    The FBI report indicated that the participants were

24  some police personnel and some other personnel, so I don't

25  know this particular one.  I don't know.

1285

CROSS - BRADTMILLER

1    Q.    Okay.   I believe she may say that at the beginning.   Do

2    you recall hearing that?

3    A.    I don't recall.

4    Q.    So were some of the participants in your study and in

5    the FBI study familiar with firearms?

6    A.    In our -- well, I would assume the FBI study, since

7    some were sworn officers; and in our study some were, we

8    gathered from commentary that they made.

9    Q.    Okay.   Mr. Reyes, can we play this one again, please.

10        (Video played)

11   BY MS. MOSS:

12   Q.    Now, again, this is going back to task 1, phase 2.   And

13   this participant had just been given the directions about

14   needing to zip the gun case all the way closed just like two

15   seconds before this; is that right?

16   A.    Yes, that's right.

17   Q.    And did you see that she failed to zip the gun case all

18   the way closed?

19   A.    Yes.

20   Q.    And did you see again that the gun case -- the gun --

21   the shotgun dropped with some force out of that gun case?

22   A.    Yes.

23   Q.    Did she seem surprised by that dropping out of there?

24   A.    I -- I suppose -- yeah, I think she did.   Yeah.

25   Q.    Okay.   Let's go to Exhibit 436.   And this is clip 6 --

1286
CROSS - BRADTMILLER

1   no; is that right?  Yeah, 6, I believe.  Is that the one we

2   just played?  I think we're on 6.

3            MR. REYES:  State the exhibit number again, please.

4            MS. MOSS:  436.  And if it's easier for you, it's

5   Exhibit 436 at 1 minute, 17 seconds, if that's any easier.

6        (Video played)

7   BY MS. MOSS:

8   Q.   So actually before we start this, Dr. Bradtmiller, have

9   we now moved on to your testing participants?

10  A.   That's correct, yes.

11  Q.   Okay.  So we're going to start this clip at 1 minute,

12  17 seconds.  And go ahead and play that.

13       (Video played)

14  BY MS. MOSS:

15  Q.   And you can stop it there.

16            Again, Dr. Bradtmiller, do you see that the gun has

17  dropped out of the shotgun case?

18  A.   Yes.

19  Q.   And do you see in that example, that is an example of

20  the shotgun dropping where it is pointing at the individual

21  who was holding the case?

22  A.   Well, in this -- well, it's pointing over her shoulder,

23  but in the general direction of her, yes.

24  Q.   Okay.  Let's take a look at -- can we go back to the

25  clips.  And this is Exhibit 442, clip 7.

1287
CROSS - BRADTMILLER

1      (Video played)

2    BY MS. MOSS:

3    Q.   And, Dr. Bradtmiller, do you again see --

4    A.   Yes.

5    Q.   -- the shotgun dropping to the floor there?

6    A.   Correct.

7    Q.   Can we play that one more time.

8          (Video played)

9    BY MS. MOSS:

10   Q.   And do you see in this example where when the

11   participant drops the gun on the floor, she actually reaches

12   forward for it?

13   A.   She did, yes.

14   Q.   Let's take a look now at Exhibit 449, which is clip 8.

15          (Video played)

16   BY MS. MOSS:

17   Q.   Do you see again they --

18   A.   Yes.

19   Q.   -- the shotgun drops out of the shot case -- the gun

20   case there as well?

21   A.   That's correct.

22   Q.   Let's go to Exhibit 451.  And let's take a look at clip

23   9.

24          (Video played)

25   BY MS. MOSS:

CROSS - BRADTMILLER

1    Q.    Now is this participant again trying to carry out task

2    1, phase 2, where she's just trying to zip the --

3    A.    That's correct, yes.

4    Q.    And as she's trying to zip that gun case, do you see

5    that that gun -- shotgun drops again to the floor out of the

6    gun case?

7    A.    Yes.

8    Q.    Let's go a little bit further in this same exhibit,

9    which I believe, Mr. Reyes, is clip 10.

10         (Video played)

11   BY MS. MOSS:

12   Q.    Okay.  And I don't mean for it to repeat and repeat

13   like that.  But, again, do you see this example where this

14   participant -- again, the shotgun drops out of that soft

15   case with some force; do you see that?

16   A.    Yes.

17   Q.    And -- and this is the same one that we saw drop it

18   during task 1 and now she is doing it for task 2; is that

19   right?

20   A.    That's correct.

21   Q.    Now, Dr. Bradtmiller, did this start happening so often

22   that you started helping the women place the shotgun on the

23   ground?

24   A.    Yes, it did.  Well, I started helping after mostly they

25   couldn't hold it up.

CROSS - BRADTMILLER

1    Q.   Well, let's take a look at the same exhibit, clip 11,

2    please.

3        (Video played)

4    BY MS. MOSS:

5    Q.   And -- thank you.

6        Do you see there you're assisting her placing

7    the --

8    A.   Yes.

9    Q.   -- shotgun on the ground?

10        Okay.  Let's take a look at Exhibit 459, clip 12,

11   please.

12        (Video played)

13   BY MS. MOSS:

14   Q.   And, Dr. Bradtmiller, is this another example of the

15   shotgun slipping and dropping out of that gun case?

16   A.   Yes.

17   Q.   And it seems that that woman also seemed quite

18   surprised at that; would you agree with that?

19   A.   I would.

20   Q.   Let's take a look at just a couple more.  Let's -- this

21   is Exhibit 462, clip 13.

22        (Video played)

23   BY MS. MOSS:

24   Q.   I'm sorry, can we do that one more time.

25        (Video played)

1290

CROSS - BRADTMILLER

1   BY MS. MOSS:

2   Q.   Did you see the shotgun again drop in that one?

3   A.   I did.

4   Q.   And I failed to mention this on the clip before, which

5   was 459, did you see that when the woman dropped the

6   shotgun -- and that's okay, you don't -- that it was facing

7   towards her chest at that point?

8   A.   I wasn't looking at that, but I will believe you if you

9   say so.

10   Q.   Okay.  Why don't we try that again, then.  Clip 12,

11   which is Exhibit 459.

12        (Video played)

13          THE WITNESS:  It's pointed over her shoulder.

14   BY MS. MOSS:

15   Q.   Pointed over her shoulder.  Okay.  So we're seeing

16   examples of where the shotgun is dropping in different ways,

17   pointing different directions, correct?

18   A.   Yes.

19   Q.   Let's take a look at one more clip.  And this is

20   Exhibit 465, clip 14.

21        (Video played)

22   BY MS. MOSS:

23   Q.   Let's try that one more time, please.

24        (Video played)

25   BY MS. MOSS:

1291

CROSS - BRADTMILLER

1    Q.    And, again, you see the participant drops the shotgun

2    out of the gun case.

3    A.    Yes.

4    Q.    And do you see in that particular case that the shotgun

5    is pointing at the body of the participant when it's

6    dropped?

7    A.    Well, in -- for a moment, but by the time it hits the

8    floor, though, it's pointed over her shoulder.

9    Q.    It looks like the gun case may be pointed over her

10   shoulder, but could you even tell where the shotgun is

11   facing, which direction?

12   A.    Well, the shotgun's more or less straight.  So we see

13   where the butt is, we see the angle on the floor.

14   Q.    Right.  But the -- the case has some room in it, right?

15   A.    It has some room in it, yes.

16   Q.    Right.  So it looks to me like it could be pointing

17   directly at her body.  Do you see that?

18   A.    It's a possibility, certainly.

19   Q.    Thank you, Mr. Reyes.

20         So, Dr. Bradtmiller, did you keep track of -- I

21   don't think I played them all here, but did you keep track

22   the number of times the shotgun dropped down out of that

23   partially unzipped gun case?

24   A.    No.

25   Q.    So was that not something that you were looking for in

CROSS - BRADTMILLER

1    your study?

2    A.    No.

3    Q.    Now when you were performing this test, I believe it

4    states on your consent form that you were telling

5    participants that they were assisting the FBI in determining

6    whether the defendants' claim about an accidental death is

7    possible or not.  Do you remember that being in the

8    script?

9    A.    I don't, but I -- it sounds reasonable.

10   Q.    So what you were just testing, though, is someone's

11   ability to push the trigger; is that right, and cause an

12   accidental discharge?

13   A.    We were testing the ability to reach the trigger, yes.

14   Q.    And so you were not looking for how many times the gun

15   might drop.

16   A.    We were not.

17   Q.    If the gun dropped and discharged by dropping, would

18   you consider that an accident as well?

19   A.    I would.

20   Q.    Did you ever test whether the shotgun could have

21   been -- what would happen if you had to pick up this heavy

22   shotgun and put it in a 5-foot-tall hard gun case?

23   A.    We did not.

24   Q.    And so do you know whether -- if someone were to

25   attempt to do that and the gun again dropped with force to

CROSS - BRADTMILLER

1    the floor, whether that might have hit that person's heart

2    if it discharged?

3    A.    I don't have any data on that at all.

4    Q.    So you did not test that or look at that at all?

5    A.    We did not.

6    Q.    Dr. Bradtmiller, my final questions to you are about --

7    I guess this would be task 2.

8           Now we've talked about how there were 51 -- or

9    maybe you said 52 women participated in this study?

10   A.    Well, 52 participated.  We dropped one, yeah.

11   Q.    Okay.  And did the participants in your study and in

12   the FBI study believe that the shotgun was unloaded?

13   A.    They did.  And we showed them in each case that it was

14   unloaded.

15   Q.    And so none of the participants had any hesitation

16   pointing that gun at themselves and at their heart because

17   they believed it was unloaded, right?

18   A.    They did not have any hesitation.

19   Q.    Thank you very much, Dr. Bradtmiller.

20             THE COURT:  Mr. Dill, any cross-examination?

21             MR. DILL:  Just one question on that point.

22             THE COURT:  All right.

23                        CROSS-EXAMINATION

24   BY MR. DILL:

25   Q.    Sir, you obviously would never test -- do those tests

1294

REDIRECT - BRADTMILLER

1   with a gun loaded, would you?

2   A.    Of course not.

3            MR. DILL:   Thank you.

4            THE COURT:   Redirect.

5                    REDIRECT EXAMINATION

6   BY MR. FIELDS:

7   Q.    Thank you, Your Honor.

8            Dr. Bradtmiller, you were shown a bunch of clips of

9   the gun falling out of the bag.  Do you remember that?

10  A.    Yes.

11  Q.    Did any of the participants voluntarily choose to put

12  the shotgun in the bag that way?

13  A.    All of the dropping, as I recall -- well, there was the

14  one.  But we gave them -- putting in the bag, they could do

15  it however they did it.  And I don't recall that anyone --

16  any one of our participants did it that way.

17  Q.    When you saw the gun falling out of the bag in each of

18  those studies, approximately how far away was the muzzle of

19  the gun from the person's body?

20  A.    Well, depending on the person's height as it was

21  falling -- I mean, the taller person would be further away

22  when it was -- after it had fallen.  While it's falling, the

23  distance changes.

24  Q.    Did you see the gun pointed directly at anyone's heart

25  in any of those clips where it was falling out of the bag?

1295

REDIRECT - BRADTMILLER

1    A.    Not that I recall.

2    Q.    You were also asked about how much money you were paid

3    for this study.  Do you remember that?

4    A.    I do.

5    Q.    Of that $75,000, how much went into your pocket?

6    A.    I looked that up this morning.  It was 1900.

7    Q.    Were you paid per hour or on a salary?

8    A.    I'm paid $52 an hour.

9    Q.    Did the amount that you were paid affect your results

10   in this case?

11   A.    No.

12        MR. FIELDS:  No further questions, Your Honor.

13        THE COURT:  All right.  May this witness be excused

14   for the Government?

15        MR. FIELDS:  Yes, Your Honor.

16        THE COURT:  For the defendants?

17        MS. MOSS:  Yes, Your Honor.

18        MR. DILL:  Yes, Your Honor.

19        THE COURT:  All right.  Dr. Bradtmiller, thank you

20   so much for your testimony.  You're excused.  You may step

21   down.

22        All right, Government may call its next witness.

23        MR. FIELDS:  Thank you, Your Honor.  The United

24   States calls Rochelle Sanchez.

25        THE COURT:  All right.

1296
DIRECT - SANCHEZ

1    COURTROOM DEPUTY:  Please raise your right hand for
2    me.
3         ROCHELLE SANCHEZ, GOVERNMENT'S WITNESS, SWORN
4         COURTROOM DEPUTY:  Please be seated and remove your
5    mask for us.  And then if you'll tell us your full name and
6    spell your first and last name for us.
7         THE WITNESS:  My name is Rochelle Sanchez.
8    R-o-c-h-e-l-l-e, S-a-n-c-h-e-z.
9         THE COURT:  You may proceed, counsel.
10        MR. FIELDS:  Thank you, Your Honor.
11                   DIRECT EXAMINATION
12   BY MR. FIELDS:
13   Q.   Ms. Sanchez, are you the -- well, have you served in
14   the past as the plant manager and demand planner of the
15   Allen Company?
16   A.   Yes.
17   Q.   What does the Allen Company do?
18   A.   They manufacture sporting goods, soft-sided gun cases.
19   Q.   Was the Allen Company asked to provide certain cases to
20   the Federal Bureau of Investigation?
21   A.   Yes.
22   Q.   Now, you said you served as the plant manager of the
23   Allen Company.  How long have you worked for the Allen
24   Company?
25   A.   34 years.

1297

DIRECT - SANCHEZ

1    Q.    How long were you the plant manager?

2    A.    About 21 years.

3    Q.    What do you do now?

4    A.    I'm the forecast demand planning manager.

5    Q.    Where is the Allen Company?  Where are you located?

6    A.    We're located in Louisville, Colorado.

7    Q.    Are you familiar with the process by which the Allen

8    Company makes those soft-sided firearms cases?

9    A.    Yes.

10   Q.    How are you -- how are you familiar with that

11   process?

12   A.    I worked as a production floor employee for several

13   years and then moved my way up to the plant manager.

14   Q.    What is the process of making those soft cases?

15   A.    So like the step-by-step process?

16   Q.    Yes, please.

17   A.    So we get patterns for the gun cases.  We draw them

18   out, lay it on the table.  And then we spread the plies of

19   material, depending on how many cases we're going to do.

20   Cut them out with a large cutting knife.  Send them to a

21   handle department to get the handles sewn on.

22         We used to send them out -- outsource them to get

23   the silk screen applied.  And then when they came back, we

24   would cut the lining and the foam through a lamination

25   process that glues them together.  Send them to the

DIRECT - SANCHEZ

1  department where they join those two pieces, just by setting

2  them up one on top of the other.

3       And then they go on to the sewing -- next sewing

4  departments, tacking, which sews around the gun case, cuts

5  off the excess foam, while sewing the gun case -- the

6  case -- the shell to the foam and lining.

7       And then the next department is the zipper

8  department where they sew the zipper around the outer edge

9  of the gun case.  The next department would be the finishing

10 department where they inspect the gun case, trim off all the

11 excess threads, apply the slider to the zipper, close up the

12 gun case.

13      And then the next department is the riveting

14 department where they put a rivet at the edge of the gun

15 case to hold it closed.  And then the final department is

16 the boxing department where they apply the hang tag with the

17 bar code and box them up into the gun case to send them to

18 the warehouse.

19      MR. FIELDS:  Your Honor, at this time I'm going to

20 show Government's Exhibit 16.  It's one of the crime scene

21 photos.  So if anyone would like to leave the courtroom now

22 would be a good time.

23      THE COURT:  All right.  Thank you for the advance

24 notice.

25 BY MR. FIELDS:

DIRECT - SANCHEZ

1    Q.    Let's look at Government's Exhibit 16, which is already

2    in evidence.  And let's look at page 4, please.  Now let's

3    look at page 6.

4            Do you see a firearm case in the photograph?

5    A.    Yes.

6    Q.    Does anything about that case stand out to you?

7    A.    It's one of the cases that we used to make.

8    Q.    What kind of case is it?

9    A.    It's a -- from this angle, it looks like it is a

10   shotgun case.

11   Q.    Did this model have a particular name?

12   A.    It had a part number.

13   Q.    What was the part number?

14   A.    340-52 GM.

15   Q.    And was there also one 340-46 GM?

16   A.    341-46 GM would have been a rifle case.

17   Q.    So what's the difference between the 46 GM and the 52

18   GM?

19   A.    The 46 GM is typically a rifle case for rifles that

20   measure 46 inches.  And then the shotgun case is the 52-inch

21   case that we typically make for shotgun cases.

22   Q.    And that measurement, the 46 or the 52, is that on the

23   outside of the case or the inside of the case?

24   A.    Typically the outside of the case.  That's the length.

25   Q.    Over what period of time did Allen Company make these

DIRECT - SANCHEZ

1    cases?

2    A.    Approximately -- and it's just an approximation --

3    2010, 2011, maybe through 2017.

4    Q.    Were you the plant manager during those years?

5    A.    Yes.

6    Q.    So were these cases made during the process you

7    described to us earlier?

8    A.    Yes.

9    Q.    And there's a logo on that case.  Who applied the logos

10   on those cases?

11   A.    We outsourced it to a silk screener -- a local silk

12   screener.

13   Q.    So if, you know -- the logo appears, you know, in one

14   part of the case here, but could it appear on different

15   parts of the cases in different cases in the manufacturing

16   process?

17   A.    Yes.  It's a manual process.

18   Q.    And you mentioned the 46 and the 52.  Is there an

19   internal measurement for the case, too, where they designed

20   to fit a particular internal dimension?

21   A.    The sizes vary usually by a 16th or an 18th of an inch

22   just throughout the manufacturing process.  But typically we

23   measure it based on the outside of the case.

24   Q.    And let's look at Government's Exhibit 200.  It's

25   already in evidence.  That's page 1.  Now let's look at

1301

                        DIRECT - SANCHEZ

1    page 2.

2              What's the difference between these two cases?

3    A.    The first picture was a shotgun case which measures the

4    52 inches.   And then this picture right now is the 46-inch

5    case which measures 46 inches.

6    Q.    And let's go back to Government's Exhibit 16, page 6.

7              I think you told us, but I just want to make sure:

8    Which one of the cases that Allen Company made -- what do

9    you identify this case as being?

10   A.    This -- from this angle, it looks like the shotgun

11   case.

12   Q.    All right.   You can take that down.

13             Now when the FBI asked you to make cases, did they

14   ask you to make the bigger shotgun case or the smaller rifle

15   case?

16   A.    I -- I believe we made the 46-inch rifle case.

17   Q.    That's the smaller of them?

18   A.    Yeah.

19   Q.    The cases that were made for the FBI, were they made on

20   the same factory floor that you described earlier?

21   A.    Yes.

22   Q.    Was anything different about the process used to make

23   the FBI case as opposed to cases manufactured earlier?

24   A.    We had changed the lamination process of the foam and

25   the lining.   So yes, it changed.

CROSS - SANCHEZ

1   Q.   The lamination process, what's the lamination process?

2   A.   Prior -- before we used to shoot out glue through --

3   kind of like paint guns in a booth, and it would shoot the

4   glue onto the lining and the foam, and then it would go

5   through some rollers and press those two pieces together,

6   and adhere them together, making them stick together.  And

7   now our process is we buy a lining with the glue already

8   attached and it goes through rollers, but it goes through

9   with heat.  And that's how the lining and the foam get glued

10  together.

11  Q.   Does that difference in the lamination in the process

12  have any effects on the physical property of the shotgun

13  case?

14  A.   No.

15          MR. FIELDS:  Your Honor, may I have a moment?

16          THE COURT:  You may.

17          MR. FIELDS:  No further questions, Your Honor.

18          THE COURT:  Cross-examination.

19                    CROSS-EXAMINATION

20  BY MR. MARKUS:

21  Q.   Thank you, Your Honor.

22          Good afternoon, ladies and gentlemen.  Counsel.

23  Your Honor.

24          Ms. Sanchez, hi, I'm David Markus.  We spoke on the

25  phone a week or two ago.  It's nice to meet you in person.

1303

CROSS - SANCHEZ

1    A.    Nice to meet you, too.

2    Q.    Just a couple of questions.  The case that you saw from

3    those pictures in the scene, would it surprise you to learn

4    that that was a 46-inch case?

5    A.    It doesn't surprise me.

6    Q.    Okay.  And the 46-inch case, that's for rifles, not for

7    shotguns, right?

8    A.    Yes.

9    Q.    The bigger case, the 52-inch case, that's for shotguns.

10   A.    Yes.

11   Q.    Okay.  And there are reasons you use different cases

12   for different guns, of course, right?

13   A.    I believe so.

14   Q.    Yeah.  The case from the scene, you don't make that

15   case anymore, right?

16   A.    Not that particular part number, no.

17   Q.    And machines don't make your bags, I think you said,

18   right?

19   A.    No.  Not automatic machines.

20   Q.    Not automatic machines.  You have people still cutting

21   the fabric, right?

22   A.    Yes.

23   Q.    And still sewing the fabric, correct?

24   A.    Yes.

25   Q.    And that's from a pattern that the company keeps,

CROSS - SANCHEZ

1    right?

2    A.    Correct.

3    Q.    And so for the case in the picture that we saw from the

4    scene, there was a pattern for that case, and a pattern

5    would be given to first the cutter and then the sewer to try

6    to make the case as close as possible to the pattern.

7    A.    The patterns are not given to the sewers.

8    Q.    But the sewer tries to do it in accordance with the

9    standards, right?

10   A.    Yes.

11   Q.    And I think you said because they're made by hand, they

12   could be a 16th or an 18th of an inch difference.

13   A.    Yes.

14   Q.    Now when the FBI asked you to replicate the bag in the

15   scene, there was a problem, right?

16   A.    Not -- I don't understand the problem.

17   Q.    Sure.  You didn't have the pattern anymore.

18   A.    Not the same pattern, no.

19   Q.    You didn't have the same pattern that was used for that

20   original -- for the case that we saw in the picture, right?

21   A.    Correct.

22   Q.    So you had to try to -- what did you do, recreate a

23   pattern or find a similar pattern?

24   A.    We used the pattern that we had currently.

25   Q.    You just took the pattern that you had currently for

1305

CROSS - SANCHEZ

1    the 46-inch bag, right?

2    A.    Correct.

3    Q.    And that pattern is different than the pattern you had

4    for the previous model, right?

5    A.    Correct.

6    Q.    These are two different patterns.

7    A.    Yes.

8    Q.    Okay.  So the FBI accepted this newer pattern when it

9    made its exemplar case, correct?

10   A.    I believe so.

11   Q.    And even with this new pattern, you had to have a

12   person cut and then sew the bags, right?

13   A.    Correct.

14   Q.    And so just so we're clear, there's a different

15   pattern, a different sewer and a different cutter for the

16   bags that you made for the FBI than the bag we saw in the

17   picture, correct?

18   A.    Yes.

19   Q.    Okay.  Those are three different variables:  patterns,

20   sewer, and cutter, right?

21   A.    Yes.

22   Q.    And would you agree with me, then, that the case that

23   the FBI had your company make is different than the case

24   that was in that picture?

25   A.    Yes.

1306

REDIRECT - SANCHEZ

1   Q.   Thank you.  I have nothing further.

2        THE COURT:  Any cross, Mr. Dill?

3        MR. DILL:  No, sir.

4        THE COURT:  Redirect.

5                    REDIRECT EXAMINATION

6   BY MR. FIELDS:

7   Q.   The cases made from the FBI, how different are they

8   from the one that was in the picture?

9   A.   They vary by, again, probably maybe a 16th.  I'm -- I

10  mean, I can't say exactly, but less than -- less than half

11  an inch.

12  Q.   So they are very similar?

13  A.   Very similar.

14  Q.   Are there any -- what you would call substantial

15  differences?

16  A.   No.

17  Q.   Any differences that would affect the operation of the

18  case?

19  A.   No.

20  Q.   Any differences to the physical properties of the

21  cases?

22  A.   No.

23  Q.   And defense counsel asked you about these three

24  different variables:  the pattern, the sewer, and the

25  cutter.  Did that make any substantial difference between

1307

REDIRECT - SANCHEZ

1    the cases you gave to the FBI and the case you see in that

2    photograph?

3    A.    Not substantial, no.

4              MR. FIELDS:  No further questions, Your Honor.

5              THE COURT:  May the witness be excused for the

6    Government?

7              MR. FIELDS:  Yes, Your Honor.

8              THE COURT:  For defendants.

9              MR. MARKUS:  Yes, Your Honor.

10             MR. DILL:  Yes, Your Honor.

11             THE COURT:  Ms. Sanchez, thank you so much for your

12    testimony.  You're excused.  You may step down.

13             All right, the Government may call its next

14    witness.

15             MR. WINSTEAD:  Thank you, Your Honor.  May I have

16    just a moment to confer with --

17             THE COURT:  Sure.

18             MR. WINSTEAD:  Your Honor, the United States calls

19    Ryan Cook.

20             COURTROOM DEPUTY:  Stay standing and raise your

21    right hand for me.  If you'll stand up, sir.  Sorry.

22             RYAN COOK, GOVERNMENT'S WITNESS, SWORN

23             COURTROOM DEPUTY:  Thank you.  Please be seated and

24    remove your mask for us.  And state your full name for the

25    record and spell your first and last name for us.

1308
DIRECT - COOK

1    THE WITNESS:  Ryan Darrel Cook.  R-y-a-n, C-o-o-k.

2    THE COURT:  You may proceed, counsel.

3    MR. WINSTEAD:  Thank you, Your Honor.

4    DIRECT EXAMINATION

5    BY MR. WINSTEAD:

6    Q.    Good afternoon, sir.

7    A.    Hello.

8    Q.    Can you tell me where you work.

9    A.    I work at Browning.  Browning Arms Company.

10   Q.    And are you an engineer?

11   A.    Yes.

12   MR. WINSTEAD:  Ma'am, would it be possible to

13   provide the witness with Government's Exhibit 3, the

14   shotgun.

15   BY MR. WINSTEAD:

16   Q.    What is that?

17   A.    This is a Browning Auto-5.

18   Q.    Do you know a lot about that?

19   A.    Yes, I've studied it.  I do.

20   Q.    Are you ready to tell the jury about it?

21   A.    Yes.

22   Q.    All right.  Thank you.  So let's loop back.  You can

23   put that on the counter in front of you.

24   Can you tell me what your educational background

25   is.

**DIRECT - COOK**

1    **A.    I graduated with a bachelor's degree and a master's**

2    **degree from Brigham Young University.  I studied mechanical**

3    **engineering.**

4    **Q.    And what about work?  How long have you worked at**

5    **Browning?**

6    **A.    I worked at Browning since September of 1999, so 22**

7    **years so far.**

8    **Q.    What -- when you first worked there, what were your**

9    **duties?**

10    **A.    I was hired as a mechanical design engineer.  So my**

11    **main responsibilities were to design new firearm products,**

12    **or modifications to existing firearms.**

13    **Q.    And is that still what you do?**

14    **A.    I still do that work, but since 2019 I've had some**

15    **additional responsibilities on analysis.**

16    **Q.    Analysis of what?**

17    **A.    Analysis of failure analysis, or any issues that are on**

18    **the complex side of the design work.  So I do things like**

19    **fractography, which is studying cracks.  Metalography,**

20    **fine-element analysis, which is stress analysis.**

21    **Q.    Have you ever designed a firearm yourself?**

22    **A.    Yes, many.**

23    **Q.    Have you ever designed a shotgun?**

24    **A.    Yes.**

25    **Q.    Did you, early in your career, design a shotgun?**

DIRECT - COOK

1    A.    The first project I worked on there with Browning was

2    released as the Winchester 9410, which is a lever-action

3    shotgun.

4    Q.    Why Winchester?

5    A.    So Browning licensed the opportunity to produce

6    firearms under both the Winchester brand name and we also

7    produced Browning firearms, so we do design work for both

8    brands.

9    Q.    What year was that?

10   A.    So I started in 1999 and finished in 2000.  The product

11   was released in 2001.

12   Q.    Anything notable about that product?

13   A.    It was awarded the Shooting Industry Shotgun of the

14   Year Award in that particular year.

15   Q.    And since then, have you designed other firearms?

16   A.    Yes.  I've worked on pistol projects, rifle projects,

17   and shotgun projects.  Do you want to know specific models

18   or is that sufficient?

19   Q.    That's sufficient.

20   A.    Okay.

21   Q.    Are you familiar with SAAMI?

22   A.    Yes, Browning is a member of SAAMI.  And I also serve

23   on their leadership committee.

24   Q.    What is SAAMI?

25   A.    So SAAMI -- it's spelled S-A-A-M-I.  It stands for the

DIRECT - COOK

1   Sporting Arms and Ammunition Manufacturer's Institute.  It's

2   essentially a standards working group that's made up of the

3   large ammunition and firearm companies in the United States.

4   Q.   What -- when you say "standards," what are they -- what

5   do they do?  What's their purpose?

6   A.   So, really, the main purpose of SAAMI is to make sure

7   that there is consistency in the ammunition and the firearms

8   that are produced so that ammunition from company A works in

9   firearms from company B.

10          So we have standards that are related to the

11  dimensions and the pressure and the velocity.  All of the

12  inner workings between the ammunition and firearm side.

13  Q.   Anything else that SAAMI regulates?

14  A.   So in addition to standards that are related to the

15  interaction between the firearm and the ammunition, there

16  are standards related to recommended procedures for

17  qualifying new products -- new firearm products.

18          That particular standard just called -- is --

19  refers to as the abusive mishandling; so it talks about how

20  to qualify firearms to make sure they're safe.

21  Q.   And I think you mentioned this briefly, but do you

22  personally have a role with SAAMI?

23  A.   Yes.  So there's a couple of different committees on

24  SAAMI.  One of the committees is the joint technical

25  committee.  So that includes all of the technical people on

1312

DIRECT - COOK

1    the firearms and on the ammunition side.  And I currently

2    chair the firearms committee of that -- of that joint group.

3    Q.    What does the firearms committee do?

4    A.    So as we were looking at these safety standards and

5    interchangeability standards, the firearms committee really

6    is focused on making sure that, as we look at the standards,

7    that we're addressing issues that are relevant to the

8    firearm design and manufacturing.

9         The ammunition committee's mostly focused on issues

10   related to the design and production of the ammunition.

11   Q.    Are you familiar with the Browning Auto-5?

12   A.    Yes, I've -- I own one, I've hunted with one, I've shot

13   targets with one.  I've also studied the history of its

14   development, and taking them apart and putting them

15   together.  Yes.

16   Q.    Have you ever specifically worked on a design project

17   for the old Auto-5?

18   A.    I have not worked on any projects specific to the

19   Auto-5, no.

20   Q.    Have you ever assembled and disassembled them?

21   A.    Yes.

22   Q.    And you said you had -- you knew the history of it.

23   How do you know that?

24   A.    Mostly from research and reading that I've done.  I'm

25   a -- I have followed how it was developed because, sometimes

DIRECT - COOK

1    as you look at the history of how things were developed,

2    it's helpful as we develop new products also.

3    Q.    And you said you own one?

4    A.    Yes, I do.

5    Q.    What is the -- what are the specifications for the one

6    you own?

7    A.    The one I own is a 26 -- it's a .20-gauge Auto-5 and it

8    has a 28-inch barrel.  So it shoots smaller ammunition than

9    this particular one.  It's .20-gauge instead of .12-gauge,

10    and the barrel is 28 inches instead of 26.  Other than that,

11    they're functionally very similar.

12         MR. WINSTEAD:  At this time, Your Honor, I would

13    move for the admission of expert testimony from the witness

14    in the areas of the design, testing, history, and functions

15    of firearms, including the Auto-5.

16         THE COURT:  Any objection from the defendants?

17         MS. MOSS:  No objection, Your Honor.

18         THE COURT:  Mr. Dill?

19         MR. DILL:  No, Your Honor.

20         THE COURT:  There being no objection, Mr. Cook is

21    qualified under Federal Rule of Evidence 702 to provide

22    expert opinion testimony in the fields of design, testing,

23    history and functions of firearms, to include the Browning

24    Auto-5.

25    BY MR. WINSTEAD:

1314

DIRECT - COOK

1    Q.    All right, sir, I think you said before, the shotgun in

2    front of you, that's a Browning Auto-5.

3    A.    Yes, it is.

4    Q.    Who designed that shotgun -- or who designed that

5    model?

6    A.    So the Auto-5 was originally designed by John Browning

7    in the late 1890s.

8    Q.    And when did it go into production?

9    A.    It first went into production in 1902 at a facility in

10   Belgium.  It was subsequently produced by a lot of different

11   factories all over the world.  And it continued in

12   production until -- for about a hundred years, actually.

13   Q.    Was Browning the only company that produced it?

14   A.    No.  As I said, it was first produced in Belgium

15   because John Browning had formed a relationship with a

16   company in Belgium to do the production there.  It was also

17   produced by Remington here in the United States.  And there

18   was one other that produced it, I don't recall offhand.

19   Those were the two major ones, were FN and Remington.

20   Q.    Was there anything remarkable about the design of the

21   Auto-5 when it was first designed in the late 1800s?

22   A.    So it really is the first commercially successful

23   semiautomatic shotgun ever.  It was -- it was very novel in

24   the way that it was designed, and extremely successful.

25   Like I said, being in production for essentially a hundred

1315

DIRECT - COOK

1   years.

2   Q.   Do you know if there were any design changes over the

3   hundred years that it was being produced?

4   A.   So there were various models that were produced, but as

5   far as major function changes, in 1951 the safety system was

6   changed from being located at the front of the trigger guard

7   to the rear of the trigger guard.   The --

8   Q.   So I guess we'll walk through one by one.  As far as

9   that change, do you know why that change was made?

10  A.   I don't know the specific reasons that motivated.  I've

11  studied the mechanics of how it changed and why -- and the

12  user side of it, but I don't know specifically what

13  motivated that.

14  Q.   So on the user side of it, is there anything better

15  about having the safety behind the trigger?

16  A.   So having it located closer to the grip makes it easier

17  to activate the safety.  And the way that it blocked the

18  trigger was very similar between the two systems.

19  Q.   All right.  Any other changes in the '50s?

20  A.   In the late '50s -- in 1958 is when the .12-gauge

21  Magnum version, which is what this particular gun is, was

22  introduced.   Prior to 1958, the gun was designed to handle

23  the 2 3/4-quarter inch, which is the length of the

24  ammunition.  Starting in 1958 with this, it could also

25  handle the 3-inch, which is the more powerful ammunition.

1316

DIRECT - COOK

1    Q.    In the early 1900s, was anything added to the design?

2    A.    In 1909 when they also introduced the .16-gauge

3    version, along with that there was a system called the

4    magazine cutoff, which is included -- has been included

5    since that time.

6    Q.    Okay.  And we can talk about what those parts are in a

7    minute.

8    A.    Okay.

9    Q.    But was the safety ever changed to allow both left- and

10   right-handed activation?

11   A.    Yes.  So when this -- in 1951 they changed the location

12   of the safety to the cross bolt behind the trigger guard.

13   And then in 1960, they made it so that it was also available

14   for left-hand and right-hand shooters.

15   Q.    Okay.  Were there any other significant changes that

16   you're aware of?

17   A.    The -- the speed-loading feature, which means that a

18   switch from a one-piece carrier to a two-piece carrier, that

19   took place in about 1953, '54 is when that change took

20   place.

21   Q.    For all of the -- and any others?

22   A.    Not -- those are the major functional ones, yeah.

23   Q.    Do any of those changes significantly change the inner

24   workings or mechanism of the Auto-5?

25   A.    As far as inner workings like the trigger group goes or

DIRECT - COOK

1    how it cycles, no.  The two-piece trigger -- or the

2    two-piece carrier allows you to load it with the action

3    locked open instead of closing the action first.

4         I should clarify that:  To load the magazine with

5    the action locked open instead of through the ejection port.

6    Q.   Sure.  And this particular model that you have in front

7    of you, do you happen to know when it was manufactured?

8    A.   So I've looked at this gun before.  I know what the

9    serial number is.  I've seen the invoice for it.  That was

10   in 1961 that it was shipped.

11   Q.   1961?

12   A.   '61, when it shipped from our warehouse to the

13   purchaser.  I believe it was manufactured in the summer of

14   1960.

15   Q.   And you're basing that on the invoice for this

16   particular gun?

17   A.   So the invoice shows when it was shipped from our

18   warehouse to the customer.  When it was actually

19   manufactured comes from a record of -- from the

20   manufacturing plant in Japan.

21        MR. WINSTEAD:  Your Honor, at this time, I would

22   move to admit Government's Exhibit 402.  I've previously

23   spoken to counsel and they have agreed to its admission.

24        THE COURT:  Any objection to 402?

25        MS. MOSS:  I have no objection, Your Honor.

1318

DIRECT - COOK

1    THE COURT:  All right, Mr. Dill?

2    MR. DILL:  No objection, sure.

3    THE COURT:  All right, there being no objection,

4    Government Exhibit 402 is admitted into evidence and may be

5    published to the jury.

6    (Government's Exhibit 402 received)

7    BY MR. WINSTEAD:

8    Q.  Could you pull that up, please, Government's

9    Exhibit 402.

10    Do you see what that is, sir?

11    A.  That's the invoice that specifies where the gun shipped

12    to from our warehouse.

13    Q.  And do you see -- do you see right up here the date?

14    A.  Yes.  That says November 27th, 1990.

15    Q.  Does that clarify anything about the date that you were

16    telling us before about when this shotgun was manufactured?

17    A.  Yeah.  It seems to say that it shipped in November

18    27th, 1990.

19    Q.  All right.  Thank you.  So if it was built in the '90s,

20    other than some of those changes that you talked about, is

21    it functionally identical to what John Browning designed in

22    19- -- or 1898?

23    A.  Other than the changes that I've talked about, yes.

24    Q.  Okay.

25    THE COURT:  Mr. Winstead, it's straight up 5:00.

1319

DIRECT - COOK

1  Would this be a good time to finish for the day?

2            MR. WINSTEAD:  Absolutely, Your Honor.

3            THE COURT:  All right.  Great.  Okay, ladies and

4  gentlemen of the jury.  Like I said at lunchtime, we're past

5  halfway through the trial, so we should feel good about

6  that.  Please be back in the deliberation room by 8:35

7  tomorrow morning.  I know you're getting tired of me saying

8  this, but I have to, especially in a case like this which

9  has generated significant media attention.  Please do not do

10  any independent research into or discuss with anyone the

11  facts, the law, or the persons involved in this case.

12            We'll be in recess until 8:45 tomorrow morning.

13         (Jury left the courtroom at 4:59 p.m.)

14            THE COURT:  All right, Mr. Cook, since you're in

15  the middle of your testimony, I direct you not to speak with

16  any of the lawyers while we're in recess.  And I ask you to

17  be back in the witness stand by 8:40 tomorrow morning.

18            THE WITNESS:  Okay.

19         (Proceedings concluded at 5:00 p.m.)

20                        INDEX

21  Item                                          PAGE

22              GOVERNMENT'S WITNESSES

23  PIETER SWANEPOEL (BY VTC)
    Direct Examination by Mr. Winstead        1048
24  Cross-examination by Ms. Moss              1071
    Redirect Examination by Mr. Winstead       1102
25  Recross-examination by Ms. Moss            1108

DIRECT - COOK

1    Item                                                       PAGE

2                        GOVERNMENT'S WITNESSES

3        PETER MILNES
         Direct Examination by Mr. Fields              1113
4        Voir Dire Examination by Mr. Markus           1134
         Direct Examination by Mr. Fields (Cont'd)     1136
5        Cross-examination by Mr. Markus               1154
         Cross-examination by Mr. Dill                 1176
6        Redirect Examination by Mr. Fields            1178

7        WILLIAM GORMAN
         Direct Examination by Mr. Fields              1183
8        Cross-examination by Mr. Markus               1198
         Redirect Examination by Mr. Fields            1211
9        Recross-examination by Mr. Markus             1212

10       CHARLENE ARNOLD
         Direct Examination by Mr. Winstead            1214
11       Cross-examination by Mr. Markus               1220

12       KELLY SIEBELS
         Direct Examination by Mr. Grewell             1224
13       Cross-examination by Mr. Markus               1233

14       RICHARD VORDER BRUEGGE
         Direct Examination by Mr. Grewell             1236
15       Cross-examination by Ms. Moss                 1248

16       ROCHELLE SANCHEZ
         Direct Examination by Mr. Fields              1296
17       Cross-examination by Mr. Markus               1302
         Redirect Examination by Mr. Fields            1306
18
         RYAN COOK
19       Direct Examination by Mr. Winstead            1308

20                        GOVERNMENT'S EXHIBITS

| 21 | EXHIBITS: | Offered | Received | Refused | Stipulated |
|----|-----------|---------|----------|---------|------------|
| 22 | 100 | 1216 | 1216 | | |
| 23 | 101 | 1216 | 1216 | | |
| 24 | 160 | 1223 | 1223 | | |
| 25 | 161 | 1223 | 1223 | | |

1321

DIRECT - COOK

1        GOVERNMENT'S EXHIBITS

| | EXHIBITS: | Offered | Received | Refused | Stipulated |
|---|---|---|---|---|---|
| 3 | 162 | 1223 | 1223 | | |
| 4 | 302 | 1223 | 1223 | | |
| 5 | 303 | 1223 | 1223 | | |
| 6 | 402 | 1317 | 1318 | | |
| 7 | 415 | 1264 | 1265 | | |
| 8 | 416 | 1264 | 1265 | | |
| 9 | 417 | 1264 | 1265 | | |
| 10 | 418 | 1264 | 1265 | | |
| 11 | 419 | 1264 | 1265 | | |
| 12 | 420 | 1264 | 1265 | | |
| 13 | 421 | 1264 | 1265 | | |
| 14 | 422 | 1264 | 1265 | | |
| 15 | 423 | 1264 | 1265 | | |
| 16 | 424 | 1264 | 1265 | | |
| 17 | 425 | 1264 | 1265 | | |
| 18 | 426 | 1264 | 1265 | | |
| 19 | 427 | 1264 | 1265 | | |
| 20 | 428 | 1264 | 1265 | | |
| 21 | 429 | 1264 | 1265 | | |
| 22 | 473 | 1133 | 1136 | | |
| 23 | 434 | 1270 | 1270 | | |
| 24 | 435 | 1270 | 1270 | | |
| 25 | 436 | 1270 | 1270 | | |

1322

DIRECT - COOK

GOVERNMENT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|---|---|---|---|---|
| 437 | 1270 | 1270 | | |
| 438 | 1270 | 1270 | | |
| 439 | 1270 | 1270 | | |
| 440 | 1270 | 1270 | | |
| 441 | 1270 | 1270 | | |
| 442 | 1270 | 1270 | | |
| 443 | 1270 | 1270 | | |
| 444 | 1270 | 1270 | | |
| 445 | 1270 | 1270 | | |
| 446 | 1270 | 1270 | | |
| 447 | 1270 | 1270 | | |
| 448 | 1270 | 1270 | | |
| 449 | 1270 | 1270 | | |
| 450 | 1270 | 1270 | | |
| 451 | 1270 | 1270 | | |
| 452 | 1270 | 1270 | | |
| 453 | 1270 | 1270 | | |
| 454 | 1270 | 1270 | | |
| 455 | 1270 | 1270 | | |
| 456 | 1270 | 1270 | | |
| 457 | 1270 | 1270 | | |
| 458 | 1270 | 1270 | | |
| 459 | 1270 | 1270 | | |

1323

DIRECT - COOK

1    GOVERNMENT'S EXHIBITS

2    **EXHIBITS:**        **Offered**    **Received**  **Refused**    **Stipulated**

3    460            1270        1270

4    461            1270        1270

5    462            1270        1270

6    463            1270        1270

7    464            1270        1270

8    465            1270        1270

9    466            1270        1270

10   467            1270        1270

11   468            1270        1270

12   469            1270        1270

13                *      *      *      *      *

14   REPORTER'S CERTIFICATE

15

16       I certify that the foregoing is a correct transcript

17   from the record of proceedings in the above-entitled matter.

18       Dated at Denver, Colorado, this 12th day of September,

19   2023.

20

21

22

23

MARY J. GEORGE, FCRR, CRR, RMR

24

25