1324

                    IN THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLORADO

     Criminal Action No. 22-cr-0012-WJM

     UNITED STATES OF AMERICA,

         Plaintiff,

         vs.

     LAWRENCE RUDOLPH,
     LORI MILLIRON,

         Defendants.

     --------------------------------------------------------------

                         REPORTER'S TRANSCRIPT
                         (Jury Trial, Day 8)

     --------------------------------------------------------------


          Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

     Judge, United States District Court for the District of

     Colorado, commencing at 8:46 a.m., on the 20th day of July,

     2022, in Courtroom A801, United States Courthouse, Denver,

     Colorado.


                              APPEARANCES

          BRYAN D. FIELDS, E. GARRETH WINSTEAD, III, J. BISHOP
     GREWELL, Assistant U.S. Attorneys, 1801 California Street,
     Suite 1600, Denver, Colorado 80202, appearing for the
     plaintiff.

          DAVID O. MARKUS, A. MARGOT MOSS, LAUREN L. DOYLE,
     Markus Moss PLLC, 40 NW Third Street, Penthouse 1, Miami,
     Florida 33175, appearing for the defendant Rudolph.

          JOHN W. DILL, John W. Dill P.A., 941 West Morse
     Boulevard, Winter Park, Florida 32789, appearing for the
     defendant Milliron.

MARY J. GEORGE, FCRR, CRR, RMR
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer

P R O C E E D I N G S

1     (In open court outside the presence of the jury at 8:46

a.m.)

THE COURT:  All right, I have two matters to raise

before we bring in the jury.  I understand counsel has a

matter as well.

First one is I have still pending in front of me

the defendants' joint motion for a mistrial, the written

joint motion that was filed on Sunday at ECF 222.  I'm just

going to briefly state at this time that I find that no

discovery violation under Rule 16 has taken place and, as a

consequence, I conclude that the defendants' right to a fair

and impartial trial has not been compromised or impaired, so

the motion is denied.  I'm going to, later this morning,

enter a written order on this motion.

Second matter I wanted to raise is that last night,

Juror Grace Butler informed Ms. Guerra that her husband had

tested positive for COVID, but that she took a test and

she's feeling well and tested negative.  After consulting

with my resident medical advisor, I had Ms. Guerra tell her

the following:  That she can still stay on our jury, that

she should keep a far distance from her husband; sleep in

different rooms, wash her hands frequently.  Have a mask on

1  at all times while she's in this building.  And as long as

2  she does not become symptomatic I think that it's safe for

3  her to stay on the jury for now, but we'll monitor the

4  situation.  She's, of course, been told not to disclose this

5  situation with her fellow jurors.

6          All right.  Counsel wants to raise something.

7          MR. MARKUS:  Thank you.  Good morning.

8          THE COURT:  Good morning.

9          MR. MARKUS:  The issue I'd like to raise is later

10 this morning I expect the Government's going to call a man

11 named Paul Babaz.  We would object to his testimony, Your

12 Honor.  I believe his testimony will --

13         THE COURT:  Paul Alabaz?

14         MR. MARKUS:  Paul Babaz.

15         THE COURT:  Oh, I see.  I was -- I thought you

16 said Al and then -- all right.  And I couldn't find --

17         MR. MARKUS:  I apologize.

18         THE COURT:  I see him on the witness list.  Sorry,

19 counsel, go ahead.

20         MR. MARKUS:  Sure.  My understanding is that the

21 Government would like to call him to testify about an

22 unrelated 2012 defamation case that Dr. Rudolph brought

23 against Safari Club International.  This witness Babaz was

24 not a party to the lawsuit and the Government would like to

25 have him testify about the complaint, about depositions, And

1    we've -- I think we're going into collateral matters at this

2    point if we're going to be testifying about a 2012

3    defamation case, and we would object.

4         I know the Government's going to say that that

5    case -- there's discussion in the depo of Dr. Rudolph of

6    whether he was having an affair with Ms. Milliron.  I have

7    no objection when Dr. Rudolph testifies if the Government

8    wants to cross-examine him about that depo, but to call Paul

9    Babaz who has nothing to do with this case, this trial, or

10   anything like it, is going to raise collateral matters.

11        Babaz and Dr. Rudolph got into a altercation.

12   There's going to be a lot of cross-examination --

13        THE COURT:  Physical altercation?

14        MR. MARKUS:  Yes, Your Honor.  They didn't actually

15   touch each other but they were screaming at each other.

16   That comes up in Babaz's deposition in the case.  It comes

17   up in Dr. Rudolph's deposition.  And we're going to have to

18   cross-examine him about this altercation, about how

19   Mrs. Rudolph -- Bianca Rudolph -- witnessed it and what she

20   said to him.  It's just going to lead to all kinds of

21   collateral matters.  So we would object to Mr. Babaz, Your

22   Honor.

23        THE COURT:  Why didn't you include this in your

24   motion *in limine*?

25        MR. MARKUS:  For a number of reasons.  One, we only

1328

1    had a certain amount of space, so we raised what we thought

2    were the most important issues.  No. 2 --

3          THE COURT:  Right, but you've never been shy about

4    seeking leave to have additional time or space to make

5    arguments.

6          MR. MARKUS:  Fair enough, Your Honor.  I did try to

7    work this out a number of times with the Government.  We

8    just have not been able to it work it out.  Perhaps I should

9    have asked for more pages to file on this.  I really -- I

10   have to say, I didn't think they would actually go through

11   with calling this man, but here we are.  So I'm going to

12   object to it and I hope Your Honor hears this verbal

13   objection.

14         THE COURT:  All right.

15         MR. MARKUS:  Thank you.

16         THE COURT:  First, let me find out, Mr. Dill, do

17   you wish to be heard on your own motion?

18         MR. DILL:  I join in the motion, Your Honor.

19         THE COURT:  All right.  Let me hear from the

20   Government.

21         MR. FIELDS:  Thank you, Your Honor.  One of the

22   issues that was raised in the opening statement was this

23   idea that the Rudolphs had an open marriage.  Paul Babaz is

24   going to testify that --

25         THE COURT:  First of all, who is he?  What's --

1329

1      MR. FIELDS:  Oh --

2      THE COURT:    -- what role does he play in this cast

3  of characters that have been --

4      MR. FIELDS:  Sure, Your Honor.  He was on the board

5  of Safari Club International, which the defendant was

6  previously a president.

7      THE COURT:  And this is the organization that

8  withdrew its award or the office that the defendant held

9  because of these allegations?

10     MR. FIELDS:  It was for a variety of allegations,

11  but of particular relevance here, and the testimony we're

12  going to bring out, is Dr. Rudolph brought a suit alleging

13  defamation.  And one of the --

14     THE COURT:  I was aware of that, yeah.

15     MR. FIELDS:  One of the allegations of defamation

16  was, "You've defamed me because you've said I had an

17  affair."  Dr. Rudolph didn't defend himself by saying, "I've

18  had an open marriage," or anything like that.  Instead he

19  took great umbrage to that, including in this altercation.

20          So the idea that there was an open marriage, all of

21  this evidence goes directly to that fact.  The defendant did

22  not say, "My wife is super cool with all of my affairs

23  because I've had an open marriage."  Instead, he sort of

24  very theatrically felt like he had to defend her honor.  He

25  had to file a suit alleging that even the allegation of an

1330

1    affair is defamatory, and testified under oath at a

2    deposition that this accusation inflicted great harm on his

3    marriage.   There's also interrogatories and a complaint

4    discussing all of this.  It's all relevant to this idea of

5    an open marriage and it all contradicts and is evidence that

6    there was no open marriage.

7            We didn't necessarily want to get into it, Your

8    Honor.  All the discussions we previously had, we told

9    defense counsel that if he planned on pursuing this line of

10   defense that the very Catholic Bianca Rudolph was okay with

11   an open marriage, that we were going to present evidence

12   showing that that's just not true.

13           THE COURT:  So give me a roadmap of how you

14   anticipate that -- this testimony going.  What are you going

15   to ask him about and what context?

16           MR. FIELDS:  So -- well, we'll first ask him about

17   his relationship with Lawrence Rudolph; how they know each

18   other.  Then we'll ask about a fundraiser that took place in

19   Atlanta where Paul Babaz introduced Dr. Rudolph to some

20   family friends including a woman named Ann McCoy.

21   Dr. Rudolph immediately started pursuing Ann McCoy to have

22   an affair with her.  Ann McCoy called Paul Babaz's wife and

23   said, "What's going on?  Dr. Rudolph is married."

24           Paul Babaz had a direct conversation with the

25   defendant, which she will relate to the jury, in which the

1331

1   defendant did not defend himself by saying, "It's okay, I've

2   got an open marriage.  Everything is fine."  Instead he sort

3   of denied that anything untoward was happening.

4              Also in 2012 these sort of allegations about an

5   affair, it's sort of been percolating within SCI.  And,

6   again, the defendant took great umbrage at even the idea

7   that someone would accuse him of adultery.  Very

8   theatrically tried to defend Bianca's honor with Bianca

9   right there, right?  So the idea that -- like he needs to

10  defend himself from any allegations of adultery while

11  Bianca's there also goes to this idea that there really

12  wasn't an open marriage here.

13             And then Paul Babaz will describe the subsequent

14  lawsuit.  He was on the board of SCI, which was a defendant

15  at the time.  They reviewed all these materials as they were

16  filed.  And we're going to introduce the deposition, the

17  complaint, Rudolph's response to interrogatories, through

18  Paul Babaz, and play portions of the deposition where the

19  defendant denies having an affair.

20             THE COURT:  And you, I assume, believe that the --

21  counsel's suggestion about -- in lieu of all that, because

22  he's made a commitment to the jury he's going to call his

23  client -- which I think he would be hardpressed not to

24  follow through on that commitment, the jury would not like

25  that -- so I think it's safe to assume that Dr. Rudolph will

1  take the stand.  You don't believe cross-examination of him

2  through these deposition transcripts and other materials

3  will be sufficient?

4          MR. FIELDS:  I think it might, Your Honor.  But I

5  also think it's important for the jury to observe Paul Babaz

6  and his credibility when it comes to sort of these

7  allegations of -- what happened when Rudolph was even

8  accused of having an affair.

9          THE COURT:  All right.  Okay.  I'm going to --

10          MR. MARKUS:  Can I just say one thing, Your Honor?

11          THE COURT:  Go ahead.  Take the lectern.

12          MR. MARKUS:  Your Honor, the affair that the

13  Government is talking about is regarding a woman named Ann

14  McCoy, as you heard.  And the truth is that Dr. Rudolph

15  never had an affair with that woman.  That was the basis of

16  the lawsuit.  We're going to get down a rabbit hole about

17  whether Dr. Rudolph had an affair or not with Ann McCoy.

18  We're also going to get into -- you know, the prosecutor

19  says the "very Catholic Bianca Rudolph" and whether she

20  would have been okay with it.  Remember, Bianca Rudolph had

21  a number of affairs herself, and then we're going to be

22  forced to get into her answers in the deposition in that

23  lawsuit about how she was okay with the affairs.  We never

24  used the word "open marriage," not once in opening

25  statement.  That is not true.

1           What we said was they came to an understanding

2    after Bianca Rudolph had affairs, and that's the way we

3    described it.  Not that there was an open marriage; not that

4    they could discuss this with the world.  That's not what we

5    said.  And that's what the Government's strawman is.

6    They're trying to set up this strawman that Lawrence Rudolph

7    could just go out and do whatever he wanted.  That's not

8    what we said, Your Honor.

9           THE COURT:  Which side on opening put up the slide

10   of "don't-ask-don't-tell"?

11          MR. MARKUS:  That was us.  That is --

12          THE COURT:  Isn't that the functional equivalent of

13   an open --

14          MR. MARKUS:  No, Your Honor.  Because what the

15   Government's trying to say is that Larry Rudolph could just

16   go out there and do whatever he wanted openly.  That's not

17   what the defense was at all.  It was that they couldn't

18   embarrass each other.  They couldn't talk about this.  So

19   when this man Babaz made the false allegation, the false

20   allegation, that Dr. Rudolph was having an affair with Ann

21   McCoy, that's what led to this lawsuit.

22          So now we're going to have Babaz getting up there

23   to say Rudolph had an affair and was upset about it when it

24   came out.  And we're going to have to disprove -- by the

25   way, the SCI lawsuit resulted in a favorable settlement to

1   Dr. Rudolph.  So we're going to have to go down all these

2   different rabbit holes about Ann McCoy, which has nothing to

3   do with this trial.

4           THE COURT:  Mr. Fields, if you'll take the lectern

5   again.  Actually counsel's raised a point I want to explore

6   with you.

7           Sounded to me that what you are explaining is that

8   the purpose of this testimony is to rebut the assertion of

9   a -- as you've characterized it -- and I think it's a fair

10  one -- an open-marriage defense on the part of the

11  defendants, because in response to accusations of adultery

12  and other matters, that the defendant never used that

13  defense to defend himself with, right?  Is that essentially

14  your -- what you're trying to get here?

15          MR. FIELDS:  Yeah, it's not just that he, you know,

16  didn't defend himself that way.  He affirmatively said he

17  wanted damages because this would harm his marriage --

18          THE COURT:  All right.  Now why would, then --

19  if -- assuming I agree with you up to that point, why is it

20  necessary -- I see counsel's point about -- and especially

21  since we have an over-arching concern about whether we're

22  going to get this trial done in time -- is it necessary to

23  have the trial within the trial of whether, in fact, the

24  defendant had actually had an affair with Ms. McCoy or not?

25          MR. FIELDS:  Your Honor, I don't think that whether

1    there was actually an affair is actually something that we

2    need to get into.  We don't --

3         THE COURT:  If you elicit a response from Mr. Babaz

4    that with respect to these accusations of the defendant

5    pursuing his wife, I think Mr. Markus is right, he's going

6    to have to attempt to rebut that.  And my question is:  Do

7    we need to go down that path?

8         MR. FIELDS:  Your Honor, if one of the main

9    defenses here is that there was no motive for murder because

10   Bianca was really okay with the idea that the defendant

11   could pursue any woman he wanted, then yes, we do.  It's --

12   if it's an important part of their defense, we have the

13   burden of proving beyond a reasonable doubt the defendant

14   did in fact have a motive for killing Bianca Rudolph.  One

15   of those motives --

16        THE COURT:  A motive for killing -- how is that

17   related to whether he pursued this woman or not?

18        MR. FIELDS:  One of the motives, Your Honor, is

19   that he wanted to be free of having a wife.  He wanted to

20   actually live openly with Lori Milliron and to be able to

21   pursue women freely.

22        THE COURT:  Well, you have Ms. Milliron, you have

23   the person he went to Las Vegas with after the funeral.  I

24   mean, do you really need also to add to that roster

25   Ms. McCoy?

1336

1    MR. FIELDS:  The fact that the defendant, himself,

2    did not -- took offense to the idea that there was an

3    adultery, I think shows that this sort of defense of an --

4    you know, open marriage or that Bianca was okay with it, is

5    a *post hoc* rationalization, Your Honor.  It's not the truth.

6    And we're -- I think we -- it's important for us to

7    be able to present evidence to the jury of what the truth of

8    the matter is regarding their relationship, and that is that

9    there -- it wasn't an open one.

10    THE COURT:  I'm going to grant the motion in part

11    and deny it in part.  I have a lot of discretion under 611

12    of how I manage -- you can sit down, Mr. Fields -- how I

13    manage the evidence coming in.  I do believe that the

14    Government is entitled to question Mr. Babaz with respect to

15    evidence that shows that the -- from the Government's view

16    of the evidence, that the defendant, Dr. Rudolph, did not

17    defend himself with the -- with the assertion of -- that the

18    couple had an open marriage; that none of that was -- was

19    used by the defendant, and that he pursued damages because

20    he took great umbrage at this accusation against him and his

21    wife.  So I think that's appropriate.

22    I don't believe that it's necessary to -- in

23    addition to that, get into a mini trial as to whether, in

24    fact, this defendant had an affair or whether he attempted

25    to have an affair or pursued Mr. Babaz's wife.  It's -- I

1337

don't think it's -- it would be -- in my view, given all the
other evidence we've heard, cumulative.  But more than
cumulative, I think it would be an exceptional waste of
time.  We would take a long time with both sides exchanging
fire on this point that I think is not compelled or
necessary given the overall scheme of how the evidence is
going in.  So to that extent, the motion is granted.

Anything else before we bring in the jury?

MR. DILL:  Your Honor, I have --

THE COURT:  Mr. Dill, if you'll take the lectern.

MR. DILL:  Thank you, sir.  Your Honor, just --
it's a small but subtle point.  Several times during the
presentation the Government has referred to the photos of
the scene as "crime scene photos."  We would object to that.
We could also term them "accident scene photos."  If we
could just refer to the photos as the "scene photos" I think
that could cure any potential prejudice.

THE COURT:  Well, that reference has already
happened several times, of course.  Why didn't you raise
this before?

MR. DILL:  Because, again, I think it's a subtle
point.  I think if it's -- continues to be raised, then it
could be obviously objectionable.  I would just request that
it just be referred to as "scene photos."

THE COURT:  Well, you know, I think the phrase

1338

```
1    "crime scene" is one that is frequently used in criminal
2    matters, criminal trials.  I don't think it necessarily puts
3    a imprimatur of the Court on the theory that there was in
4    fact a crime that took place here.  The jury well
5    understands it's for them to decide whether a crime occurred
6    here or whether there was an accident.  So --
7              MR. DILL:  Understood.
8              THE COURT:  Go ahead.
9              MR. DILL:  No, I understand, Your Honor.
10             THE COURT:  Okay.  So the request is denied.
11             MR. DILL:  Thank you.
12             THE COURT:  All right, let's bring in the jury.
13         (In open court in the presence of the jury at 9:05
14    a.m.)
15             THE COURT:  Good morning, ladies and gentlemen of
16    the jury.  Welcome back to day 8 of our jury trial.
17             Government may call its next witness.
18             MR. WINSTEAD:  Your Honor, I believe we're still --
19             THE COURT:  Oh --
20             MR. WINSTEAD:  We still have Ryan Cook --
21             THE COURT:  You're absolutely right.  Mr. Cook may
22    take the witness stand again.
23             Go ahead and take the stand, Mr. Cook.  And -- yes,
24    go ahead and sit down and I -- you can remove your mask.
25    And I remind you you remain under oath.
```

DIRECT - COOK

1    THE WITNESS:  Okay.  Thank you.

2    THE COURT:  All right.  You may proceed, counsel.

3    MR. WINSTEAD:  Ma'am, could I have Exhibit 3 given

4    back to him.

5    THE COURT:  Go ahead.

6    MR. WINSTEAD:  Thank you, Your Honor.

7    DIRECT EXAMINATION (Continued)

8    BY MR. WINSTEAD:

9    Q.   Sir, I'd like to start asking you some more questions

10   about the shotgun there.

11   A.   Okay.

12   Q.   So could you show us:  Where is the ammunition kept in

13   it?

14   A.   So the round of ammunition that's ready to be fired

15   would be in the chamber.  The ammunition that's stored being

16   for subsequent shots is in the magazine, which is a tube

17   underneath the forearm here.

18   Q.   Is there -- how many shells fit in the magazine?

19   A.   So if -- if it has a magazine plug in it, which is a

20   magazine reducer, then it will hold two shells in the

21   magazine.  If there's no reducer or plug in it, then it

22   could hold four shells.

23   Q.   All right.  Sir, do you know if there's a magazine plug

24   in that shotgun?

25   A.   I don't know yet.

1340

DIRECT - COOK

1   Q.    Can you -- can you check?  And if so, can you remove

2   it.

3   A.    Sure.  Is it okay if I stand?

4           THE COURT:  Sure.  Go ahead, sir.

5   BY MR. WINSTEAD:

6   Q.    Can you hold up the -- what you removed.

7   A.    Yeah.

8   Q.    Now, is what you just did, would you consider that a

9   major modification to the shotgun?

10  A.    No.  It's an operation that's explained in the owner's

11  manual so that people can select how many rounds they have

12  in the gun.

13  Q.    Does removing it make the shotgun unsafe?

14  A.    No, I would say it's no more safe or less safe with or

15  without it.

16  Q.    Okay.  All right.  So -- and, again, if it helps to

17  sort of stand up while talking about it, could you sort of

18  point to the visible parts of the shotgun and explain what

19  they are and what they're called.

20  A.    Yes.  Can you still hear me or should I use the

21  microphone?

22          COURTROOM DEPUTY:  We're going to have to tilt this

23  for you.

24          THE WITNESS:  Okay.  Is that okay?

25          THE COURT:  Yeah, go ahead, sir.

1341

DIRECT - COOK

1   THE WITNESS:  So starting from the back, this

2   section -- the wood section is called the buttstock

3   assembly.  Of course it's made up of multiple parts but in

4   general it's the buttstock assembly.  The center section is

5   the receiver assembly.  Sorry, Your Honor.

6   THE COURT:  That's okay.

7   THE WITNESS:  Apologies.

8   THE COURT:  Just watch where you're pointing it.

9   THE WITNESS:  Yeah.  Sorry.  Inside the receiver

10  assembly is the slide assembly, that's the silver section

11  that cycles back and forth in the receiver.  It also has the

12  trigger assembly.  This is the forearm assembly, the wood

13  section that you hold onto in the front.

14  Underneath that is the magazine tube, that's where

15  the extra ammunition is stored.  And then this is the

16  barrel.  The front end of it, it's called the muzzle.  The

17  back end of it is the chamber.  That's where the ammunition

18  that's fired is -- is in the chamber.

19  BY MR. WINSTEAD:

20  Q.   Where does the choke go?

21  A.   The choke refers to the last couple of inches of the

22  barrel.  In this particular model, it's a removable piece,

23  so you can switch how much constriction it has, whether it's

24  a full choke, which is a tighter constriction, or an -- or

25  an open choke, which allows the shot to spread out more

1342

DIRECT - COOK

1  quickly.

2  Q.   Now I -- when you were removing the magazine plug, I

3  saw you pushing down on the barrel.  Does the barrel move?

4  A.   Yes.  Each time the gun is fired, the barrel assembly

5  and the slide assembly move together into the receiver,

6  about 3 1/2 inches each time it's cycled -- each time it's

7  fired they move together into the receiver.

8  Q.   Is there something that resists the barrel moving

9  backwards?

10  A.   So there's a very stiff spring on the outside of the

11  magazine tube, which pushes the barrel forward.  There's

12  also a spring in the wrist area of the buttstock, which

13  pushes the slide assembly forwards.

14  Q.   Is it pretty hard to push the barrel down?

15  A.   In addition to the spring, there's a friction system in

16  here.  And you can have different settings for different

17  ammunition that you're shooting.  It's doable, but it's

18  pretty stiff.

19  Q.   Does the fact that the barrel moves have any impact on

20  felt recoil?

21  A.   Yes, it does.  Because the friction ring system that's

22  in here is designed so that you can shoot lighter ammunition

23  or heavier ammunition, the friction ring system affects how

24  fast all of this slide assembly and barrel assembly move in

25  the receiver, how much it punches the back of the receiver.

1343

DIRECT - COOK

1    And you feel some of that in the shoulder when you shoot.

2    Q.   What's the -- what's the name for that system where the

3    barrel moves to the rear?

4    A.   It's called long recoil because it recoils a long

5    distance inside the gun.

6         MR. WINSTEAD:  Your Honor, I'd like to bring up a

7    video -- first I'd like to move to admit Government's

8    Exhibit 492.  And I believe that there's no objection to it.

9    It's a video.

10         MS. MOSS:  No objection.

11         THE COURT:  All right.  Mr. Dill.

12         MR. DILL:  No objection, Your Honor.

13         THE COURT:  There being no objection, Government

14   Exhibit 492 is admitted into evidence and may be published

15   to the jury.

16        (Government's Exhibit 492 received)

17   BY MR. WINSTEAD:

18   Q.   All right.  Thank you.  So, sir, what I'd like to do is

19   I'm going to hit "play" on this, and as it's playing along,

20   can you just tell us when to pause it and sort of narrate

21   what we're seeing.

22   A.   Okay.

23   Q.   There we go.

24        (Video played)

25         THE WITNESS:  If you could pause right there.  What

1344

DIRECT - COOK

1    we've seen so far is shots where the barrel and the slide

2    assembly have recoiled to the rear.  When it does that, and

3    the slide assembly is all the way in the back of the

4    receiver, it gets temporarily locked in the back, and the

5    barrel comes forward again based on that stiff spring

6    underneath the forearm.  As the barrel comes forward, you'll

7    see the empty shotgun shell get ejected out of the receiver,

8    and when the barrel is fully forward -- or as it's going

9    forward it releases a shell out of the magazine, so that

10    then the shell can release the slide assembly, and it pushes

11    it back up into the barrel again.

12            So I know it happens quickly, but let's watch

13    another couple of sections here.  You'll see it recoil to

14    the rear, kick out empty, chamber a new round.

15        (Video played)

16            THE WITNESS:  In that case, it shows that after the

17    last shot it locked open; it didn't close again.

18        (Video played)

19            THE WITNESS:  And there on -- the last shot is

20    locked open because there wasn't a shell in order to release

21    it and close the gun again.

22            This is demonstrating the safety system that, when

23    the safety's on fire, it allows the trigger --

24    BY MR. WINSTEAD:

25    Q.   Can we actually just mute the video --

1345

DIRECT - COOK

1    A.    Yeah, mute the video there.

2              Yes, when the safety's on, it blocks the trigger so

3    that it can't be pulled.  When the safety is off, there's a

4    release so the trigger can move enough to fire the gun.  And

5    so this will show the safety moving back and forth either

6    blocking or allowing the trigger to move.

7    Q.    Okay, go ahead and play.

8          (Video played)

9    BY MR. WINSTEAD:

10   Q.    The next time it's visible, can you talk about the

11   hammer.

12   A.    Yes.  So let's stop right here, if we can.

13   Q.    And you can draw on the screen, if you want to.

14   A.    Oh, great.

15   Q.    There's a little stylus next to the -- next to the

16   screen.  You can draw and it will make marks.

17   A.    Okay.  So first I'm going to outline what the trigger

18   is, and then the next I'll outline what the hammer is.  And

19   I'll try to illustrate how the two of them work together.

20             So outlined it in red.  Hopefully we can erase that

21   in a minute.  You'll be able to see that's the trigger.  And

22   it's got this forked section at the top with a couple of

23   hooked surfaces on it.  The hammer is this piece.  And those

24   two dots are the pins that they rotate about.

25             So when you pull the trigger, it releases the

1346

DIRECT - COOK

1    hooked part of the hammer, which had previously been

2    captured in the barbed section of the trigger.  That allows

3    the hammer to move forward in order to hit the firing pin,

4    which hits the cartridge case and ignites the cartridge to

5    fire.

6           So if we could erase my doodles and watch it in

7    slow motion a moment.

8        (Video played)

9           THE WITNESS:  Pause right there when you can.  As

10   soon as the action closes again.  Okay.

11          Now one other thing to point out -- and I don't

12   know how much detail you're interested in -- but right now

13   this -- the way that the hammer is hooked by the trigger,

14   that's called the sear engagement, which are a very

15   important interaction in order to make sure that the trigger

16   pull is safe and working properly.

17          The backside of the trigger is what temporarily

18   catches the hammer when the action is open.

19   BY MR. WINSTEAD:

20   Q.   We'll talk a little bit more about that part in a

21   second.

22   A.   Okay.

23   Q.   I wanted to ask you:  What is this part right there?

24   A.   That's called the safety sear.

25   Q.   And what does it do?

DIRECT - COOK

1    A.    So it's -- its function is to make sure that the

2    trigger cannot be pulled unless the slide assembly and

3    barrel assembly are all the way forward in their

4    ready-to-fire position.  If they're retracted at all, then

5    the safety sear blocks movement of the trigger.

6    Q.    And what pulls it out of the way?

7    A.    So there's actually -- there's a spring that pushes it

8    into engagement.  It interacts with this link, which is part

9    of the slide assembly, so if the slide assembly moves to the

10   rear then it allows the safety sear to rotate in a clockwise

11   direction in order to block the trigger.

12   Q.    And so this rod, is this going back forward when the

13   slide assembly goes forward?

14   A.    Yes.  They're pinned together at the -- within the

15   slide assembly.

16   Q.    And when it's all the way forward, is there something

17   right here that pulls the safety sear so that it's no longer

18   touching?

19   A.    So there's a ramp surface on the inside of the link, so

20   that when the link is all the way forward, it pushes the

21   safety sear in a counterclockwise direction like this, so

22   that the safety sear is no longer blocking the trigger.

23   Q.    Okay.  All right.  So we'll take a look in a second at

24   the trigger assembly in a little more detail, but let's keep

25   playing the video and keep describing sort of anything of

DIRECT - COOK

1    note with the mechanism or the action.

2         (Video played)

3    BY MR. WINSTEAD:

4    Q.   Pause right there.   Oh, play it and then I'll tell you

5    when to pause it.

6         (Video played)

7    BY MR. WINSTEAD:

8    Q.   Okay, pause.

9         What's this right there?

10   A.   So that's the back surface of the firing pin.   That's

11   what the hammer would contact in order to cause the gun to

12   fire.

13   Q.   What does the -- again, just for people who may not be

14   familiar, what does the firing pin do when it's contacted by

15   the hammer?

16   A.   So the hammer rotates forward, hits the back of the

17   firing pin.   The firing pin hits the back of the cartridge

18   where -- which has the primer.   The primer is the part of

19   the ammunition which causes the -- it to start its ignition

20   and fire the -- fire the shell.

21   Q.   So is the firing pin essentially sort of a long metal

22   post that starts here and has a tip up here that hits the

23   back of the shell?

24   A.   Yes.   The tip is kind of a domed, round shape.

25   Q.   All right.   Keep playing.

1349

DIRECT - COOK

1    (Video played)

2    BY MR. WINSTEAD:

3    Q.   Can you see it a little bit better right here?

4    A.   Yeah, so right here -- yeah, if you could pause right

5    there.

6         You can see that there's this cross-pin in the

7    slide assembly, and when the action is unlocked or when it's

8    preparing to move to the rear, one of the first things it

9    does is it mechanically retracts or pulls back the firing

10   pin in this direction so that it's removed it away from the

11   front end so it can't be sticking out too far.

12        It's physically pulled it back and prevents it from

13   moving forward until the gun is fully closed and locked up

14   ready to fire.

15   Q.   Okay.  Keep playing.

16        (Video played)

17   BY MR. WINSTEAD:

18   Q.   Okay, what's happening here?

19   A.   So this is slowly showing the cycling of the action.

20   You can see the cocking handle, which is this piece.  That's

21   the piece that you would manually hold onto in order to open

22   the gun.

23   Q.   Okay.

24   A.   And it moves first in this -- in this sequence.

25   Q.   Okay.

1350
DIRECT - COOK

1    (Video played)

2        THE WITNESS:  This is demonstrating loading of

3    cartridges and cycling in kind of a see-through mode.  If we

4    can pause right here.  Just -- so inside the magazine tube

5    there's a spring and that's what pushes the cartridges

6    rearward so that they can be loaded.  It can also -- see

7    between the barrel and the -- you see there's actually a

8    second spring, which is on the outside of the magazine.

9    That's the stiff spring that I was pushing when I was trying

10   to retract the barrel assembly.

11   BY MR. WINSTEAD:

12   Q.   And what about this?  Is there a spring back here?

13   A.   Yes, that's where the spring is located which pushes

14   the slide assembly back forward in its ready-to-fire

15   position.

16       (Video played)

17       THE WITNESS:  If you can pause right here.

18       I'll just point out also that this longer piece

19   here is called the carrier.  It's the part that lifts the

20   cartridges up so that instead of being on the level of the

21   magazine tube, they're pushed up so that as the slide closes

22   it, they're aimed in order to enter into the chamber.

23   Q.   What -- what pushes them into the chamber once they're

24   lifted up?

25   A.   So as the cartridge comes out of the magazine tube, it

1351

DIRECT - COOK

1    rotates this -- called the carrier latch.  And basically

2    the -- when the carrier latch has been rotated out of

3    position, it allows the carrier to come up, and as the

4    carrier comes up it allows the slide assembly to come

5    forward and push it into the chamber.  So there's an

6    interaction between all of those pieces in the timing of

7    pushing the ammunition into the chamber.

8    Q.    Okay.  Go ahead.

9          (Video played)

10            THE WITNESS:  Now that's actually a pretty good

11   view to see that outside spring on the magazine tube.

12   BY MR. WINSTEAD:

13   Q.    Great.  All right.  Thank you.

14            All right, so you described -- and we saw a little

15   bit -- loading.  So can you show me on that shotgun where --

16   where you put in the cartridges.

17   A.    So if you want -- am I --

18   Q.    Careful where you're pointing it.  You can stand up

19   again.

20   A.    Okay.  So when this condition, when the action is

21   locked open, there's two options to load the first round.

22   You can either put a round in the ejection port and then

23   push this carrier-latch button to close the action like

24   this, or on this particular model, you could load it -- the

25   first round into the magazine and it will automatically

DIRECT - COOK

1    cycle into the chamber, and then you put additional rounds

2    into the magazine, pushing on the carrier and pushing them

3    into that tube.

4    Q.    Okay.  Now you said before it's designed -- so if

5    there's a round -- if there's a shell in the magazine, does

6    that shell get pushed out and then automatically -- assuming

7    the slide is locked back, it automatically gets loaded in

8    the chamber?

9    A.    If the action is locked open and you insert the first

10   one in the magazine, it will automatically come out of the

11   magazine and release the slide in order to chamber it.  It's

12   called speed loading.

13   Q.    All right.  And as you're shooting it, do you have to

14   push that slide release button or does it automatically

15   cycle the next shell into the chamber?

16   A.    When you shoot the gun, all you need to do is pull the

17   trigger; it does the rest of the work to eject the empty and

18   load the new one.  Then when you release the trigger, it's

19   ready to shoot the next round; you don't have to push any

20   other controls.

21   Q.    So is it supposed to lock open in -- when there's still

22   rounds in the chamber?  Is that how it's designed?

23   A.    In the chamber or in the magazine?

24   Q.    Oh, I'm sorry, in the magazine.

25   A.    If there are rounds in the magazine, it should not lock

DIRECT - COOK

1   open unless you've used what's called the magazine cutoff,

2   which is a different feature.

3   Q.    Okay.  So let's talk about the magazine cutoff real

4   quick.  And can you explain what that is.

5   A.    Okay.  So the magazine cutoff is this lever that's on

6   the opposite side of the gun.  Its purpose is that if you

7   have the gun loaded -- for example, you could have a round

8   in the chamber and rounds in the magazine.  If you want to

9   be able to take the round out of -- sorry -- out of the

10  chamber but not feed more ammunition from the magazine, then

11  you could flip the lever and that basically locks everything

12  that's in the magazine to stay in the magazine.

13        So then you could open the gun, it will lock open,

14  it won't chamber any ammunition because the magazine has

15  been cut off from use.

16  Q.    Okay.  So besides -- besides the magazine cutoff -- and

17  if you could flip it off so we don't forget later.  Thank

18  you.

19        Besides use of the magazine cutoff, is there any --

20  well, let me back up here for a second.

21        So it's the shell itself, as it's being pushed out

22  of the magazine, which activates the lever that releases the

23  slide and chambers the shell; is that right?  The -- as the

24  shell comes backwards?

25  A.    That's right.  The latch system, which is connected to

1354

DIRECT - COOK

1    this button, if you want to manually close it, you push the

2    button.  If you've got ammunition in the magazine, as it

3    proceeds out of the magazine it -- it slides against that

4    lever, slides it out of the way in order to close the

5    action.  So there's a spring that's pushing the lever into

6    engagement.  There's a spring that's in the magazine trying

7    to push the magazine -- trying to push the ammunition out.

8    Q.    Okay.  So what would happen if the ammunition doesn't

9    come far enough out of the magazine in order to fully

10   disengage that -- that lever?  Would the slide remain locked

11   back?

12   A.    The slide would remain locked back.  If the lever's

13   engaged with the carrier, it's going to stay locked back.

14   Q.    Is there any -- like if -- is there any situation

15   you're aware of where that can happen, where the ammunition

16   only comes partially out of the magazine and therefore

17   doesn't release the slide to go back?

18   A.    So if the slide starts in its closed position and you

19   have ammunition in the magazine and you open it slowly

20   enough, it's possible that that shell will come out

21   partially but not far enough to trip the latch.  And so the

22   slide could lock open in that situation.

23   Q.    Okay.  Is there a name for that?

24   A.    If there's ammunition that's laying on the carrier and

25   the slide should be closing but it isn't, we call that a

DIRECT - COOK

1    lay-on carrier.

2    Q.    Okay.  All right.  I'd like to go back to -- you were

3    describing the trigger assembly.  And I think this should

4    work.  Can I get the podium.  It should already be on.

5          Okay.  So I'm holding Government's Exhibit 8.  And

6    I'm going to put it on here to see if it can be visible to

7    everybody.  What is this?

8    A.    That it is a trigger group from --

9          MR. WINSTEAD:  And I'm sorry, Your Honor, I should

10   have noted it's already been admitted.

11         THE COURT:  Okay.

12         THE WITNESS:  It's a trigger group or trigger

13   assembly from a Auto-5 shotgun.

14   BY MR. WINSTEAD:

15   Q.    So does this assembly just go the way it is right onto

16   an Auto-5?

17   A.    Yes.  If you look on the screen, the left side, the

18   long piece that's extending off the screen, that's the tang,

19   which is visible here on the bottom of the stock.  You can

20   also see the trigger guard and the trigger.  The rest of it

21   is internal that we can't see on the gun, but they are the

22   hammer and the safety sear that I described earlier.

23   Q.    All right.  What's that?

24   A.    That's the safety sear.

25   Q.    And this, just to be --

DIRECT - COOK

1    A.    That's the hammer.

2    Q.    What about that?

3    A.    That's the trigger.

4    Q.    Okay.  What is this?

5    A.    So that's the spring that activates the hammer to

6    rotate forward.  There's also a portion of it that acts as

7    the -- as the spring for the safety so that it clicks back

8    and forth between a safe and fire position.

9    Q.    All right.  Now I'm going to try to do this --

10    hopefully not get out of focus -- and hopefully not let the

11    spring come off.  But I'm going to pull the trigger, and can

12    you tell me what's happening as I'm doing it?

13    A.    So as you're pulling the trigger, you can see the top

14    portion that's touching the hammer is slightly rotating from

15    right to left.  And as it does so, the angles that are in

16    between those -- between the hammer and between the trigger

17    causes the hammer to -- to counter-rotate just a small

18    amount.  And basically, as you pull it, you're starting to

19    reduce your sear engagement, or those are sliding apart to

20    get ready to release.  And then as you release your -- the

21    pressure on the trigger, they're sliding back together.  And

22    that sliding back together function is called "regain."

23    It's designed so that if you start to pull the trigger and

24    change your mind and let go, that everything hooks back up

25    in its safe default position.

1357

DIRECT - COOK

1    Q.    What causes that regain?

2    A.    It's -- it's primarily established by the angle between

3    those two pieces.  That's where most of the regain force

4    comes from is the sliding and the angle of those.  In

5    addition, there's a trigger return spring which is trying to

6    push the trigger back into its fully engaged position.  So a

7    portion of that return is also due to the trigger spring.

8    Q.    Okay.  So just to make sure I'm clear, the trigger

9    spring, this part right here, which direction is it pulling

10   the trigger?  Which direction is it pulling this part right

11   here?

12   A.    Do you mean which direction does it rotate when you

13   pull the trigger?

14   Q.    No, I'm saying the -- you told us that there's a

15   trigger spring which pulled it back into engagement.  Can

16   you put an arrow which direction is it pulling that piece.

17   A.    So the trigger spring is trying to encourage it to go

18   this way.

19   Q.    Okay.

20   A.    Counterclockwise.

21   Q.    And so on the other side of the pin, is it pulling the

22   bottom of the trigger back forward?

23   A.    That's correct.

24   Q.    Okay.  Then I think you were talking about the angle of

25   engagement of these two pieces right here; is that right?

1358

DIRECT - COOK

1    A.    That's right.

2    Q.    Can you show, just like with your hands, what you're

3    talking about with the angle of engagement because it's

4    really hard to see, you know, with these tiny pieces.

5    A.    Sure.  So if I make my left arm the hammer and it wants

6    to rotate up and hit the firing pin, the angle between those

7    two pieces -- if the trigger is my right hand because I

8    slide those together, it forces the trigger backwards just a

9    little bit, which means it's fighting against this main

10   spring right here.  It's forcing that to compress a little

11   bit more.  That's where a lot of the force comes from is --

12   pulling the trigger is trying to push the hammer backwards a

13   little bit.

14          And that's why, when you let go of the trigger, it

15   wants to slide back to its -- its more relaxed position; its

16   stable position.

17   Q.    All right.  Now I'm going to pull it and -- let's see.

18   A.    So the reason why you can't pull it right now is

19   because of the safety sear is blocking it.

20   Q.    So right here -- where's the -- where's the part that's

21   being blocked?  Can you circle it.

22   A.    Right here.  In order for you to pull the trigger far

23   enough for it to release, you have to rotate the safety sear

24   in this direction.

25   Q.    And so does that basically mean unless the slide is all

1359

DIRECT - COOK

1    the way forward, it's mechanically impossible to pull the
2    trigger?
3    A.    Correct.  Because it's being blocked right there.
4    Q.    So now is it rotated out of the way?
5    A.    Yes.
6    Q.    All right.  I'll pull the trigger.  Now what happened
7    there?
8    A.    So --
9    Q.    And I'm not talking about the spring, but in general,
10   what happened?
11   A.    So in general, because the safety sear was out of its
12   lock -- locking position, you were able to pull the trigger
13   far enough so that the hook of the trigger and the hook of
14   the hammer became disengaged and then the hammer was free to
15   rotate forward, hit the firing pin.
16   Q.    Okay.  Now -- now you can explain:  Why did that sear
17   pop all the way up?
18   A.    So -- because it's -- this trigger assembly is outside
19   the gun, the hammer was able to rotate farther than it
20   normally does, and so this engagement right down here
21   between the spring and the hammer, the -- the hammer rotated
22   too far so the spring came up.  That only happens if you
23   have it outside the gun.
24   Q.    Great.  All right.  Now I'm going to simulate the slide
25   moving backwards.  When the slide moves backwards, it

1360

DIRECT - COOK

1  recocks the hammer?

2  A.    So, yes, the slide would -- the bottom of the slide

3  assembly touches the hammer and it pushes it back down into

4  its cocked position.

5  Q.    Okay.  Now I haven't released the trigger yet so tell

6  me what's happening here.

7  A.    Right.  So -- and that's normal because this all

8  happens so fast that the shooter still has pressure on the

9  trigger.  So what happens is instead of having engagement

10  between the front hook of the hammer and the front hook of

11  the trigger, we now have engagement between the rear hooking

12  surfaces.  What that allows it to do is the hammer stays

13  cocked while the trigger is pulled, and then as soon as you

14  release the trigger, it catches on your standard sear

15  engagement surfaces in the front.  Like that.

16  Q.    Is that what just happened?

17  A.    Yup.

18  Q.    Okay.  And now it's ready to fire again?

19  A.    And now it would be ready to fire again, yes.

20  Q.    Just to clarify, you're calling this the safety sear.

21  Is that different from the safety -- the manual safety?

22  A.    Yes.  The manual safety is the -- is the crossbolt

23  button right down here.

24  Q.    So I'm going to -- pull this up.  So is this safety

25  off?

1361

DIRECT - COOK

1    A.    Safety's in the off position, or the fire positions,

2    because we can see the red.  And now it's in the safe

3    position.

4    Q.    All right.  So we'll move that forward.  What's

5    preventing me from pulling back the trigger?

6    A.    So there's a contact between the safety, itself, and

7    between the surface that's on the backside of the trigger

8    which, when the safety is in the on safe, it blocks the

9    trigger so you can't rotate it far enough to fire.

10   Q.    So at this point is it mechanically impossible to

11   release the hammer?

12   A.    At this point -- one of the nice things about this

13   design is because the sear surface is all part of the same

14   piece as the trigger, if the trigger is blocked it means the

15   sear is blocked.  It couldn't be bumped out of the way

16   because they are the same piece that is physically blocked

17   by the safety.

18   Q.    Okay.  Now you told us that the trigger is shaped like

19   this.  Is that one piece of metal?

20   A.    Yes.

21   Q.    And where's the pin?

22   A.    The pivot pin is this one right here.

23   Q.    So I guess let -- tell me how the shape of that trigger

24   affects any rotational inertia of the trigger.

25   A.    Okay.  So when -- because the pivot point, or this pin

DIRECT - COOK

1    that rotates about, is very close to the center of its

2    shape, it's close to the center of its mass, which means

3    it's pretty close to balanced around that pin.

4           When we have something that's rotating around its

5    center of mass, that means that bumps and jars and shaking

6    and things like that has less tendency to cause it to

7    rotate.

8           If I look at this stylus, if I hold it in the

9    middle and move it, it's pretty easy to hold it still.  But

10   if I hold -- held it very far away from its balance and I

11   move it, it has more of a tendency to wobble.  In this

12   design, the center of the trigger and its rotation point are

13   very close together.

14   Q.   Now earlier when we were talking about the safety and

15   that it sort of is unique in that the sear is the same piece

16   of metal as the trigger, in general firearm designs, is this

17   pretty much what all triggers are like or is this -- or not?

18   A.   There's a mix.  Some have them as one piece, some of

19   them have them as separate pieces.

20   Q.   Now let's say you had a trigger design where the

21   trigger was just this piece.  Would that have a different

22   type of rotational inertia potential?

23   A.   Well, in that case, the center of its mass would be

24   somewhere down lower, and so it would be further from its

25   pivot and more likely to rotate in a -- some sort of a bump.

1363

DIRECT - COOK

1    Q.    And so when we're talking about that, let's say -- I'll

2    just hold it up for a second.

3    A.    Okay.

4    Q.    All right.  So I'm pointing it up, right?  If the

5    trigger had a center of mass that was out to the side and

6    you have a really strong bump like that, would the

7    rotational inertia of the trigger potentially exert some

8    force pulling the trigger to the rear?

9    A.    In that orientation it would have a tendency to rotate

10   it to the rear.

11   Q.    Now because there's metal on both sides of that pivot

12   and the center of gravity is pretty close to the pivot, if I

13   do a really hard bump like that, is that likely to exert a

14   lot of inertial force pulling the trigger part to the rear?

15   A.    There will still be some inertia but it depends on how

16   hard you bump it.

17   Q.    All right.  All right, now when I'm pulling this -- and

18   I'll do it again and see if I can avoid the spring popping

19   up -- when I'm pulling this, it's a little bit -- oh -- it's

20   a little bit difficult right there at the end --

21   A.    Well, right now you've got the safety on.

22   Q.    It's really difficult right now.  I think we said

23   mechanically impossible.

24   A.    Yes.

25   Q.    Okay.  Now the safety's off.

DIRECT - COOK

1    A.    Okay.

2    Q.    So we'll see if it's still hard.  All right.  So I

3    notice it sort of gets kind of hard at the end and then it

4    goes all of a sudden.  What's the weight on the Browning

5    Auto-5 trigger?

6    A.    So it's spec'd to be between 4 and 5 pounds of trigger

7    pull.

8    Q.    What does that mean?

9    A.    That means that the peak force, the most force that you

10   have to put on it right there at the end should be somewhere

11   between 4 and 5 pounds.

12   Q.    And so you're talking about if my finger's right here

13   and I'm pulling backwards, that force has to be about 4 or 5

14   pounds?

15   A.    Yes.

16   Q.    Okay.  Is that standard for the Auto-5?

17   A.    For the Auto-5, yes.

18   Q.    Does it change depending on different sorts of

19   firearms?

20   A.    Different firearms will have different trigger pull

21   specifications.

22   Q.    Did you actually measure on the shotgun that you've got

23   up there what the trigger pull was?

24   A.    Yes.  I did measurements on the exemplar gun here.  I

25   did five measurements and the average was 4 pounds, 12

1365

DIRECT - COOK

1   ounces.

2   Q.   Now I've heard about putting hair triggers in firearms.

3   What's a hair trigger?

4   A.   So a hair trigger is a -- kind of a popular term for a

5   trigger which has a very light trigger pull, where you don't

6   have to put very much force on it, and usually don't have to

7   pull it very far, but it's a light trigger.

8   Q.   Do you put really light triggers on semi-auto shotguns?

9   A.   We do not.

10  Q.   Why not?

11  A.   The main reason is it would be pretty difficult -- with

12  all of the action that's going on, with cycling shells and

13  recoil, it would be hard to have a trigger system with a

14  very light trigger pull that is still stable to be set up

15  properly because the parts move so fast and so -- it's

16  almost a little chaotic, if you could use that word.

17  It's -- it's organized but there's a lot going on very fast.

18  Q.   So in nonengineer speak, would it be accurate to say

19  there's just a lot bunking around in there when it cycles?

20  A.   There's a lot moving, there's a lot of forces that are

21  going on.   It would be hard to set up a trigger at a hair --

22  what we would call a hair trigger and have it be stable in a

23  semiautomatic 12-gauge shotgun.

24  Q.   So would you say that this system is specifically

25  designed to deal with a lot of the chaos that happens when

1366

DIRECT - COOK

1    the shells explode and the action cycles?

2    A.    Yes.    It has to be.

3    Q.    Okay.    Now you talked about the system would be

4    unstable or it would fail.  Let's say -- so you said before

5    most of what I'm feeling when I'm -- what I'm feeling

6    resisting me when I'm trying to pull the trigger has to do

7    with those two little hooks being together, right?

8    A.    That's correct.

9    Q.    Okay.    So if you made this into a hair trigger, would

10   that mean you changed those hooks so that you -- they don't

11   make you pull so hard?

12   A.    That would be the most common way to do it would be to

13   change that sear engagement angle.

14   Q.    Okay.    If you did that and you tried to make it a

15   really easy trigger pull, what do you think would possibly

16   happen when the weapon tries to cycle as far as whether the

17   hammer would get retained?

18   A.    Well, I believe that when the slide retracted to the

19   rear, it would cock the trigger -- cock the hammer, but as

20   it came back forward, it's likely that it wouldn't stay

21   cocked on that surface, and it would likely -- the hammer

22   would likely follow the slide as it closes.  It wouldn't

23   necessarily be retained.

24   Q.    Okay.    Now if it wasn't retained -- so let's say it

25   kind of bonks in there -- oh, didn't do it right -- let's

1367

DIRECT - COOK

1    say it kind of bonks in there and then it slips off because

2    that hook is so light and easy.  Then what happens as the

3    slide moves forward?

4    A.    So that's what we call a follow-down because the hammer

5    is following the slide as it's closing.  And it basically

6    doesn't -- isn't able to give enough energy or impact to the

7    firing pin to cause an ignition because it's following the

8    slide down.  It's going as fast as the slide, it's not going

9    its normal speed.

10   Q.    Okay.  So as the slide goes back, it would basically be

11   mooshing along the back of it --

12   A.    Yes --

13   Q.    And sort of already in contact with the firing pin?

14   A.    It -- first in contact with the bottom of the slide,

15   and the further it got forward eventually it could come in

16   contact with the firing pin, yes.

17   Q.    Now -- and you -- I think you said:  Would that give it

18   enough energy to push the firing pin forward and ignite the

19   primer?

20   A.    Not likely.  One of the reasons for that is if you

21   remember that I said the firing pin is mechanically

22   retracted when the gun's not locked, and so even if it were

23   touching the firing pin at that point, the firing pin can't

24   go forward to touch the primer until the gun's all the way

25   closed.  So it really can't smack the firing pin, it can

1368

DIRECT - COOK

1    just kind of push against it.

2    Q.    So when you say the firing pin is mechanically

3    retracted -- I know you circled that little pin.  So if this

4    is the face of the slide, right?  And here's the back of the

5    shell.  When the firing pin fires, it comes out through that

6    little hole, right?

7    A.    That's correct.

8    Q.    And then when you said it mechanically gets retracted,

9    are you saying that that pin you circled pulls it back in?

10   A.    So what it's -- so that it's inside the slide assembly,

11   not sticking out where it can reach the ammunition.

12   Q.    And that pin only releases it when the slide is fully

13   closed?

14   A.    When the slide is fully closed, then the firing pin is

15   unlocked so that it can move back and forth.

16   Q.    Now -- let's see.  Okay.

17          Okay, second, let's say there was something wrong,

18   and let's say it was poorly manufactured, or somebody took a

19   file to these little surfaces in here, right?  I think you

20   already answered this, but I just want to make sure:  If the

21   sear engagement was changed so that there was less -- shoot,

22   I forgot the R word.

23   A.    Regain.

24   Q.    Regain.  So there was less regain.

25   A.    Uh-huh.

1369

DIRECT - COOK

1  Q.   And it was -- there was sort of less forces holding

2  these two pieces together, would it make the trigger feel

3  lighter to me as I'm pulling it?

4  A.   Yeah.  If those angles are different, it's going to

5  directly relate to the trigger feel that you have as far as

6  the amount of force that it causes it to release.

7  Q.   Okay.  Okay.  We were just talking about the firing pin

8  retraction feature.  Can you tell me what a slam fire is.

9  A.   A slam fire is the type of malfunction that occurs if

10  the firing pin were ever to -- and this is not specific to

11  the Auto-5 but just in general -- a slam fire is if the

12  firing pin is protruding or sticking out the front of the

13  slide, so that when it goes to chamber the next round, it's

14  already sticking out, and it hits the primer while the gun

15  is closing, and so the gun fires while the slide is closing

16  instead of when you pull the trigger.

17  Q.   So, in other words, like we talked about, the firing

18  pin comes out of the face of the slide when it fires the

19  shell, and as the slide goes back if it gets stuck, loads

20  another shell and bangs right into it, that would be a slam

21  fire?

22  A.   That would be a slam fire.

23  Q.   Okay.  Do all firearms have a firing pin retraction

24  device?

25  A.   I don't believe so.

1370

DIRECT - COOK

1    Q.   Okay.  So is the Auto-5's firing pin retraction device
2    specifically, at least partly, designed to prevent slam
3    fires?
4    A.   That would be one of the benefits of having it.
5    Q.   Okay.  And it seems like it also has a characteristic
6    of preventing firing if the hammer follows the slide?
7    A.   If the hammer follows the slide, it would also assist
8    with that, yes.
9    Q.   Okay.  All right, we can take that down for a minute.
10   Thank you.
11          I'd like to talk to you about SAAMI standards.
12   A.   Okay.
13   Q.   Remind us what SAAMI stands for.
14   A.   SAAMI is the Sporting Arms and Ammunition
15   Manufacturer's Institute.  S-A-A-M-I.
16   Q.   All right.  And you told us in addition to assuring
17   interchangeability of ammunition and things like that, it
18   also has firearm safety standards?
19   A.   Yeah, it's called the abuse of mishandling standard.
20   Q.   Okay.
21   A.   Just a short name for it.
22   Q.   So before we get to those, does it have any standards
23   about trigger weight?
24   A.   Yes.
25   Q.   What are they as they would apply to a shotgun?

DIRECT - COOK

1   A.    So SAAMI recommends not having a trigger weight below 3

2   pounds.

3   Q.    Why is that?

4   A.    Because 3 pounds is a -- has been considered in the

5   industry a safe minimum level for sporting use for, you

6   know, hunting and applications like that.

7   Q.    And so when you say a "safe use," why wouldn't you want

8   like a 12-pound trigger?

9   A.    Well, if the trigger gets excessively heavy, then it's

10  difficult to pull the trigger when you have a firearm

11  pointed at your target.  It's nice to have it at a range

12  that's light enough that you can pull it and have the gun

13  fire when expected, but heavy enough that it doesn't go off

14  unexpectedly.  3 pound is a good minimum for that.

15  Q.    Thank you.  And you said Auto-5s are between 4 and 5

16  pounds?

17  A.    That's correct.

18  Q.    Okay.  Now let's talk about abuse of mishandling tests.

19  But first, just in general, do you do anything with trigger

20  weight during the abuse of mishandling tests we're going to

21  talk about?

22  A.    So the test specifications include a line which states

23  that the trigger should be set at its minimum specified

24  value when you do the drop tests --

25  Q.    So --

1372

DIRECT - COOK

1    A.    -- or do these tests.

2    Q.    So what would be that for the Auto-5?

3    A.    So for an Auto-5 the trigger would be set at the

4    4-pound level.

5    Q.    All right.  So let's talk about abuse of mishandling

6    standards.  Just to clear up, in the '90s, not the '60s,

7    when we know that this -- that both the -- this one and, I

8    guess you can assume we'll be talking about that with

9    another witness, but the original shotgun.

10            So in the '90s when they were manufactured, were

11    the tests we're going to talk about significantly different

12    than they are today?

13   A.    No.

14   Q.    Okay.  And so the tests that were used in the '90s, are

15   they still within current standards for both SAAMI and

16   Browning?

17   A.    Yes.

18   Q.    Okay.  All right.  So let's first talk about drop

19   tests.  I guess why do abuse of mishandling tests anyway?

20   A.    So the abuse of mishandling tests are intended to give

21   firearm manufacturers a standardized way to evaluate their

22   new designs to see whether they are susceptible to firing

23   when it's not intended.  It's a way to test the designs to

24   see how sensitive they may or may not be to bumps and drops

25   and behavior like that.

1373

DIRECT - COOK

1    Q.    But people aren't supposed to drop firearms, right?

2    A.    That's correct.

3    Q.    Well, then why do you need to test it?

4    A.    Because some people -- sometimes guns get dropped

5    anyway, even though they're not supposed to.

6    Q.    Okay.  All right.  So let's go into drop tests.  And I

7    guess are there two different types of drop tests?

8    A.    So there's multiple kind of drop tests.  There's some

9    that we call drop tests, others that are technically

10   referred to as jar-off tests, but they're similar.

11   Q.    Okay.  Describe to me what the drop tests are in

12   general.  And then we'll get specific with all the different

13   angles and all that kind of stuff.

14   A.    I don't know if I understand your question.

15   Q.    Sure.  Sure.  So if you're going to do a drop test,

16   what position is the safety in?

17   A.    So for a drop test, safety's on the safe position.

18   Q.    All right.  And what's the distance that you drop?  And

19   this would be a good time to talk about if there's any

20   difference between SAAMI standards and Browning standards.

21   A.    Okay.  So in the SAAMI standards, the drop test is

22   conducted with the safety in the safe position.  It's

23   dropped a height of 4 feet from the center of mass of the

24   firearm.  So, again, if I reference this gun, the center of

25   mass is going to be roughly here.  Okay?

DIRECT - COOK

1    So in a SAAMI drop test, we would -- we would
2    point -- put this part of the gun 4 feet above a hard rubber
3    mat and then we would drop it, with the action closed, on a
4    primed case, which means a piece of ammunition where all the
5    gunpowder and the shot has been removed but it still has a
6    primer.  And then we would drop it in six different
7    orientations.  One with the muzzle up, one with the muzzle
8    down, one with the muzzle -- one in a -- what we would call
9    rib up, which is this position.  And we also drop it in its
10   trigger up position.  And we drop it on its left side and we
11   drop it on its right side.  Those six different
12   orientations.
13   Q.   So what about Browning standards?
14   A.   The Browning standard is just a little bit different.
15   We still consider the SAAMI drop test as the minimum
16   acceptable, but we test to a little bit higher standard just
17   to see if we're even close to the SAAMI.  And so, again, in
18   the case of the Browning standard, we do the same six drops,
19   but instead of measuring the height of 4 feet up to the
20   center of the mass of the gun, we measure it to the lowest
21   point of the gun.  So we raise it a little bit higher than
22   the SAAMI test.
23   Q.   All right.  So that's the drop tests.  What's the
24   difference with a jar-off test?
25   A.   So in a jar-off test, it's similar in that we do the

1375

DIRECT - COOK

1    six drops in those six orientations.  But in a jar-off test,

2    safety is put in the fire position instead.  And so we don't

3    drop it from as high, we drop it from 12 inches to the

4    impact surface.

5    Q.    What sort of surface?

6    A.    So all of the SAAMI tests are conducted on a 1-inch

7    hard rubber mat.  It's hard kind of like a truck tire.  I

8    mean, it's that kind of hard rubber; it's not cushiony, it's

9    hard.  But it's designed to protect the surface of the gun

10   in -- as we do these multiple drops.

11   Q.    What about do you do drops onto any other sort of

12   surface?

13   A.    So the jar-off test that we conduct under the Browning

14   standard is similar in that the safety is in the fire

15   position.  We drop it in the six different orientations, but

16   instead of dropping it onto the hard rubber mat, we drop it

17   directly onto tiled concrete instead.

18   Q.    When you're doing those drop tests, what is a

19   successful test?

20   A.    A -- so on the SAAMI standard, because we're using a

21   primed case, you know, piece of ammunition with all of the

22   gunpowder and shot removed, it just has a primer, it is

23   successful if the primer is not ignited.  Even if you break

24   parts on the gun, it's still successful as long as the

25   primer doesn't go off and the gun can be safely unloaded at

DIRECT - COOK

1    the completion of the test.

2    Q.    Why do you mention "even if parts break"?  Do parts

3    break when you're doing these?

4    A.    It's common for the gun to sustain damage or broken

5    parts, yes.

6    Q.    What about damage to woodstocks?  Is that something

7    that happens?

8    A.    That's pretty common.

9    Q.    Even -- even from those heights?

10   A.    Yes.  Yeah.  The most common is the 4-foot drop with

11   the -- with the rib up.  That's a pretty tough drop on a gun

12   for wood damage.

13   Q.    Okay.  All right.  Is there another SAAMI test for long

14   guns?

15   A.    Yes.  There's -- it's called the rotation test.  And

16   it's basically designed to simulate if the gun were leaning

17   up against a wall or some sort of a vertical surface and

18   then falls over to either the right side or the left side.

19   Q.    Okay.

20   A.    Yeah.

21   Q.    And what about -- do you have a rotational impact test

22   under the Browning standards that's in addition to that?

23   A.    Yes.  So we do that same rotation test.  We also do one

24   called the rotation drop test, which is some -- which is

25   separate -- SAAMI doesn't have an equivalent test; it's just

1377

DIRECT - COOK

1    a Browning test.

2    Q.    What is that?

3    A.    In that situation, the muzzle of the firearm is

4    supported near the ground level and the buttstock section of

5    the gun is raised progressively higher and then dropped onto

6    the tile concrete in order to let the receiver smack on the

7    concrete at different heights in order to determine whether

8    that type of a rotation drop would cause the fire control

9    system to release.

10   Q.    Okay.  Is there -- is there a test that involves a

11   mallet?

12   A.    Yeah.  The last Browning test that would apply to a

13   shotgun is called the mallet-impact test.  We take a

14   1-inch -- or a 1-pound mallet with either a rubber or a

15   leather face on it and, holding the gun by hand with it

16   closed, we use a copper crusher which measures how much

17   firing pin indent we get.  You basically smack the gun all

18   over the place, any orientation, anywhere you want, in order

19   to see whether you can get it to go off, hard enough to --

20   as hard as you can without causing permanent damage

21   basically.

22   Q.    All right.  So I'd like to ask you:  All these tests,

23   are they used when you're developing a new firearm?

24   A.    Yes.  We do all of that as we're qualifying the

25   firearms to get through the design stages.

1378

DIRECT - COOK

1  Q.   What happens if a firearm fails a test when you're

2  developing it?

3  A.   Then we begin the diagnosis process to figure out:  Why

4  did it fail?  Did it fail because the -- of inertia of the

5  firing pin?  Did it fail because the hammer released?  Is

6  there something broken?  We have to figure out why it

7  failed.

8  Q.   And then what do you do?

9  A.   Then take corrective action to change the design so

10  that it -- so that we can successfully pass all of those

11  tests.

12  Q.   Okay.  All right.  I'd like to show you a couple

13  videos, if I might.  And I would like audio for these, if

14  possible.  You got them?  Thanks.  All right.  Could you

15  show me 424, starting at 1 minute 10 seconds.  Okay, go

16  ahead and play.

17      (Video played)

18  BY MR. WINSTEAD:

19  Q.   Okay, pause.

20          Was that similar to one of the drop tests you might

21  do?

22  A.   I would say that the impact was less severe than most

23  of our drop tests.  But as far as it was similar to a

24  muzzle-up drop test, not quite perfectly vertical but

25  similar.

DIRECT - COOK

1    Q.    All right.  Can you go to 426, at 1:30.

2          (Video played)

3             THE WITNESS:  I should also point out it's on the

4    carpeted floor and we don't do that.

5    MR. WINSTEAD:

6    Q.    Okay.

7          (Video played)

8    BY MR. WINSTEAD:

9    Q.    Stop.

10   A.    Same comments.  Not perfectly vertical, but an impact

11   less severe than what we normally do on a drop test.

12   Q.    Okay.  Can you show me 415 at 1 minute.

13         (Video played)

14   BY MR. WINSTEAD:

15   Q.    What about that?

16   A.    That was the most severe of the three.  Still less

17   severe sounding and appearing than our normal tests.

18   Q.    All right.  428 at 30 seconds, please.

19         (Video played)

20   BY MR. WINSTEAD:

21   Q.    How about that one?

22   A.    Yeah, that was a pretty good -- I've seen worse but,

23   yeah, that was a fair drop.

24   Q.    All right.  One more and I want to talk a little bit

25   about this next one.  436 at 1, please.

1380

DIRECT - COOK

1    (Video played)

2   BY MR. WINSTEAD:

3   Q.   Okay, pause.

4        Now that one, did that seem like it was a little

5   bit less of an impact?

6   A.   Yes, it did.

7   Q.   Why did it have less force coming out, do you think?

8   A.   Well, one, I don't know for sure what the floor surface

9   is there.  Two, it was pretty clear that it hit directly on

10  the recoil pad.  And it may have been slowed down slightly

11  as she's pinching the case.

12  Q.   Okay.  So did it kind of come at an angle out of the

13  case?

14  A.   Yeah, it did.

15  Q.   And so do you think that may have slowed it down a

16  little bit?

17  A.   The more vertical the gun is, the more direct the

18  impact's going to be, so any of these angles are going to

19  reduce that a little bit.

20  Q.   You mentioned that there's a rubber butt pad.  Can you

21  point to where that is on the . . .

22  A.   It's this brown section right at the end of the

23  buttstock.

24  Q.   If that's where the shotgun contacts the ground on a

25  drop test, does that rubber pad cushion the impact a little

DIRECT - COOK

1    bit?

2    A.    Yeah.   Its main purpose is to be able to compress and

3    protect the shooter while they're shooting from the recoil.

4    That's its job is to cushion things.

5    Q.    Okay.  All right.  Let's see.  All right, so I think

6    you mentioned this, but just so I'm clear:  The sort of

7    surface that a weapon is dropped onto, does that affect

8    whether or not it's going to pass a drop test?

9    A.    That's the reason why we standardize the surfaces that

10   we drop onto for the tests is so that they're consistent.

11   And there is a difference between impacting on concrete

12   versus impacting on the hard rubber mats, yes.

13   Q.    Okay.  Would wood be different from concrete?

14   A.    Wood would be different than concrete.

15   Q.    And what about if it fell onto a rug?  Would that

16   impact its likelihood of passing a drop test?

17   A.    That would also be different than either concrete or

18   rubber.

19   Q.    Okay.  All right, you said before you do it in -- you

20   do these tests when you're designing a firearm.  Do you ever

21   do these tests once a firearm is in production?

22   A.    Yes.  We do periodic audits where we'll take a sampling

23   of production guns and verify that everything is still

24   consistently passing.

25   Q.    Okay.  What -- I guess we'll come back to that.

1382

DIRECT - COOK

1       All right.  So let's say you do a drop test and
2  the -- it is such a severe drop test, higher than what you
3  do, that the mechanism breaks.  Is that possible?
4  A.   If we did a drop test higher than what we normally do?
5  Q.   Yeah.  And the whole firing mechanism just broke in
6  some way.  Is that possible?
7  A.   Depending on how high you drop it, yes, it's possible
8  something could break inside the mechanism.
9  Q.   And -- we'll come back to that.
10       Okay.  So let's talk about the manufacturing
11  process really -- really briefly.  Do you have a
12  manufacturer in Japan?
13  A.   Yes, we do.
14  Q.   What's the name of it?
15  A.   Miroku.
16  Q.   Has it been a Browning manufacturer for a while?
17  A.   Yes.  Since at least 1976, perhaps longer.  I don't
18  know the original date.
19  Q.   Do you happen to know whether both that shotgun and the
20  original shotgun in this case were manufactured at that
21  plant?
22  A.   Yes, they were.
23  Q.   Is that shotgun and the original shotgun, are they
24  special edition?
25  A.   Yes, they are.

1383

DIRECT - COOK

1    Q.    What is it?

2    A.    So it was a limited edition run that was made

3    specifically for the National Wild Turkey Federation, which

4    is a conservation group.  And we did this specific

5    configuration of the gun with the engraving and the finishes

6    in order to make their specific 1991 National Wild Turkey

7    Federation gun -- shotgun of the year.

8    Q.    And do you know how many guns were produced in that

9    special edition run?

10   A.    It was a run of 500 guns.

11   Q.    Do you know if that shotgun and the original shotgun

12   were manufactured close in time to one another?

13   A.    Yes, they were.

14   Q.    How -- do you know how -- what that time period was?

15   A.    I believe the time period was about three to four weeks

16   difference between the two of them.

17   Q.    So in that manufacturing process, how do you make sure

18   that they're not turning out lemons left and right?

19   A.    Well, there's a number of different steps that go into

20   the manufacturing.  If you start at the component level, you

21   know, each part has drawings and specifications for its

22   dimensions, its material, and for the heat treatment.  And

23   so the parts -- there's a quality control procedure to make

24   sure the parts meet the drawings.

25            Once parts are assembled into subassemblies, then

1384

DIRECT - COOK

1    often -- well, the function of the subassemblies is checked

2    to make sure that the parts are working together properly.

3    And then once all of the subassemblies are put together into

4    a complete firearm, there's a number of quality checks to

5    make sure things meet the quality specifications

6    Q.    And you said earlier you do audits on that process?

7    A.    Yes.

8    Q.    And did that involve drop tests?

9    A.    Yes.

10   Q.    Just to go back, you had said they're part of a special

11   edition.   Is there anything about that special edition that

12   makes them significantly different mechanically from the

13   standard Auto-5 --

14   A.    Mechanically -- I'm sorry.

15   Q.    Yeah, go ahead.

16   A.    Mechanically, no.  The things that are specific are,

17   like I mentioned, the engraving and the finish and the

18   particular barrel length, you know, specific to that

19   particular Special Make-up.  But mechanically it would be

20   the same that our other production does during that era.

21   Q.    So let's go back to this.  As part of that auto

22   process, do you do these same drop tests we've been

23   discussing?

24   A.    Yes.

25   Q.    Now let's say there's a post-production drop test fail.

DIRECT - COOK

1    What happens?

2    A.    So the process would be similar in that we would go

3    into a diagnosis mode to try to figure out:  Why did it

4    fail?  Is there a component that's out of specification?

5              So we would check things like the dimensions and

6    the heat treat, and really dig into the -- into the inside

7    of the gun to figure out what's different than the guns that

8    have previously passed.

9    Q.    Okay.  And what happens if you find that there is some

10   significant problem that caused the drop test --

11   A.    Then we would try to isolate and figure out:  Is this

12   specific to this individual gun or is it more widespread

13   than that?  Is it a batch of parts that are problematic?

14   And if so, then we would try to isolate which guns have

15   those parts in them.

16   Q.    If you found out that the failure of the drop test had

17   things in common with guns that were in public, what would

18   you do?

19   A.    Then we would need to recall.

20   Q.    Okay.  Are you aware of any recall of the Auto-5?

21   A.    No.

22   Q.    Ever?

23   A.    I've not heard of any for the Auto-5.

24   Q.    So now in the manual, it sounds like after all these

25   testings, people should feel free to just drop these things

DIRECT - COOK

1   any time they want.  In the manual it says you shouldn't

2   drop it.  Why does it say that?

3   A.    Because you shouldn't drop it.

4   Q.    Well, you've told us all of these reasons why you make

5   it safe.  Is it still possible if you drop the gun, it might

6   go off?

7   A.    It's possible if you were to drop a gun that it could

8   still go off.

9   Q.    So are there limits to the testing standards that you

10  do?

11  A.    The -- yes.  The limits are the specifications that I

12  described:  the materials, the heights, the orientations, in

13  order to make sure that our testing is consistent and

14  repeatable and realistic for real-world use.  But there are

15  other possible ways to make something fail.

16  Q.    So a firearm is a mechanical system?

17  A.    It is.

18  Q.    And so can any mechanical system potentially fail?

19  A.    I believe so.  It -- with the right conditions, you

20  could probably make most, if not all, mechanical systems

21  fail somehow.

22  Q.    Okay.  Now let's say you -- in your engineering of a

23  firearm, you make it right close to that line, right?  It's

24  going to pass at 4 feet, but it's going to fail at 4 feet

25  1 inch.  Is that something you would do?

DIRECT - COOK

1    A.    No.   In fact, that's why we do the extra tests to kind

2    of evaluate:   How close are we to the edge?

3    Q.    Now, if you -- if the design was really close to that

4    line and if it was, you know, subjected to a -- a small

5    amount of additional stress, it would fail, what would that

6    tell you about the likelihood that, over the course of the

7    production of that -- of that particular product, at some

8    point with individual variation, one of them might fail the

9    actual standard?

10         That was a really complicated question.  Do you

11   understand what I'm asking?

12   A.    I think you're asking -- let me repeat if I --

13   Q.    Yea.

14   A.    -- clarify.

15         If we design the gun so that it's very close -- so

16   it's just barely passing the drop test, chances are that

17   because of production variation from gun to gun, we could

18   have guns that don't pass if we design it to be extremely

19   close to the limit.  Yes.

20   Q.    And is it extraordinarily important to you to not have

21   that happen?

22   A.    Yes.  I want all of the guns to pass and be safe.

23   Q.    Does a firearm become unsafe if it sits for many years

24   without being fired?

25   A.    No.

1388

DIRECT - COOK

1    Q.    Now I want to ask you -- so you obviously work at

2    Browning, right?

3    A.    I do.

4    Q.    Isn't it in your interest to convince us that all of

5    your firearms are perfectly safe?

6    A.    My main job here is to be as accurate as possible in

7    the evaluation of this gun.  I believe that the guns we

8    produce are safe because of the testing that we go through.

9    Q.    So let's say you made guns that weren't safe, but you

10   were trying to convince us that they were safe.  Would that

11   be in your interest?

12   A.    No.

13   Q.    Why not?

14   A.    I'm interested in safe guns.

15   Q.    Okay.  All right.  So I just want to finish up by

16   making sure we're clear on what could cause an accidental

17   discharge.  So right now you've described a lot of the parts

18   and things like that, but I want to make sure that we go

19   through the process backwards from a discharge and be clear

20   about what could cause it.

21            So you've get a shotgun shell.  What starts the

22   ignition of that shotgun shell?

23   A.    If the primer is indented enough for it to cause

24   ignition of the gunpowder.

25   Q.    In a gun, what's the thing that indents that primer?

DIRECT - COOK

1   A.    The part that's supposed to do that is the firing pin.

2   Q.    All right.  So if there's an accidental discharge,

3   something has caused the firing pin to indent the primer; is

4   that what you're saying?

5   A.    That would be the -- yes, correct.

6   Q.    Okay.  So you talked a little bit about this -- let's

7   go through the options.  So we -- you talked about how the

8   firing pin, itself, can have some inertia.  So let's --

9   thinking of it like a muzzle downfall.  That firing pin has

10  a little bit of weight to it?

11  A.    It does.

12  Q.    Okay.  So is that what you're meaning if it falls down,

13  if that firing pin has enough inertia it can impact the

14  primer?

15  A.    Yes, it can.

16  Q.    Okay.  And you -- I believe you talked about the

17  mechanisms that prevent that from happening.  Would that be

18  the firing pin retraction device?

19  A.    So the retraction device would actively hold the firing

20  pin away from the primer if the gun is unlocked or un- -- or

21  is open a small amount.  If the gun is closed all of the

22  way, then the retraction system doesn't -- doesn't pull the

23  firing pin back.  It would allow it actually to set against

24  the primer in that situation.

25  Q.    And if that sort of a discharge happened, would it

DIRECT - COOK

1    discharge into the ground?

2    A.    If that's the direction the gun was pointed at the

3    time, yes.

4    Q.    Okay.  And we talked about the slam fire, which is

5    where the firing pin gets stuck, right?

6    A.    Yes.

7    Q.    And that's what the retraction system prevents.

8    A.    Yes.  It would retract -- it pulls it back every time

9    to help make sure it never gets stuck.

10   Q.    Okay.  So the third option is the firearm functioning

11   as it's designed, which is the hammer hits the firing pin;

12   is that right?

13   A.    Yes.

14   Q.    Okay.  Now you talked about how if it follows the slide

15   home, it's unlikely to have enough energy to impact it; is

16   that right?

17   A.    That's right.

18            MS. MOSS:    Your Honor, I'm just objecting to the

19   leading.

20            THE COURT:    Sustained.

21   BY MR. WINSTEAD:

22   Q.    All right.  And in order to -- for it to follow -- to

23   follow the slide home, does the sear system, where -- that

24   retains it have to be damaged or malfunctioning in some way?

25   A.    I'm trying to think if there's any other way that the

1391

DIRECT - COOK

1    hammer could follow it.  In any case, if the hammer does

2    follow the slide down, if it's this follow-down malfunction,

3    it would not cause an ignition.

4    Q.    And the other option would be the hammer's engaged and

5    it becomes unengaged without the trigger pulling --

6            MS. MOSS:  Objection.  Leading.

7            MR. WINSTEAD:  Just trying to --

8            THE COURT:  Overruled.

9    BY MR. WINSTEAD:

10   Q.    Is that right?

11   A.    So if the hammer is released from the trigger in any

12   way, whether someone pulls it or whether it's from a drop or

13   something else, if the hammer release -- if the trigger

14   releases the hammer and it hits the firing pin, it's going

15   to fire.

16   Q.    Now mechanically speaking -- can I get the Elmo again,

17   please.

18           Does that mean this lever -- or is this part and

19   this part would have to come apart to release the hammer?

20   A.    They would have to either separate, or potentially one

21   of the parts be broken so that they weren't engaged, but

22   then you would have the slide follow-down malfunction.

23   Q.    And if the trigger feels like a normal weight, does

24   that tell you anything about whether that sear engagement is

25   functioning properly?

1392

DIRECT - COOK

1    A.   Yes, if the -- if -- when you normally shoot the gun,

2    if the trigger is feeling at a normal trigger weight, that

3    means that those sear surfaces are engaged normally.

4    Q.   I think we talked about also theoretically the whole

5    system could just break, right?

6    A.   Theoretically -- I've never seen that, but

7    theoretically.

8    Q.   And if the whole thing breaks in some way, would it

9    function normally after that had happened?

10   A.   Well, I'm trying to imagine that theoretical break, so

11   it would -- maybe depends on what's broken.

12              MR. WINSTEAD:  Okay.  May I have a moment, Your

13   Honor?

14              THE COURT:  You may.

15              MR. WINSTEAD:  Nothing further.  Thank you, Your

16   Honor.

17              THE COURT:  All right.  We're going to take our

18   morning recess before we go to cross-examination.  Folks,

19   we'll be in recess for 15 minutes.

20        (Jury left the courtroom at 10:25 a.m.)

21              THE COURT:  Mr. Cook, same restriction as before.

22              THE WITNESS:  Okay.

23              THE COURT:  And please be back in the witness stand

24   in 15 minutes.  You're free to go to the lobby, go outside

25   the building as you please.

CROSS - COOK

1    THE WITNESS:  Come back here?

2    THE COURT:  You will be back in the witness stand

3    in 15 minutes.

4    THE WITNESS:  Okay.

5    (Recess taken 10:26 a.m. to 10:48 a.m.)

6    THE COURT:  All right, Mr. Cook, I remind you you

7    remain under oath.

8    THE WITNESS:  Okay.

9    THE COURT:  Cross-examination.

10    MS. MOSS:  Thank you, Your Honor.

11    CROSS-EXAMINATION

12    BY MS. MOSS:

13    Q.  Good morning, Mr. Cook.  How are you today?

14    A.  So far so good.

15    Q.  Now, Mr. Cook, I just want to first start off by saying

16    that the video that we saw on direct and the trigger

17    mechanism are fascinating, and it sounds like you know a ton

18    about the engineering and the parts of this Browning Auto-5;

19    is that fair to say?

20    A.  I've studied it, yes.

21    Q.  And I think you'll agree with me that the engineering

22    design of this shotgun is designed to be very sound and

23    designed to be safe, correct?

24    A.  It's designed to be sound and safe, yes.

25    Q.  And no doubt, all Browning firearms are engineered to

1394

CROSS - COOK

1    be good and functioning and to be safe, correct?

2    A.    Correct.

3    Q.    Now, we had a little bit of a laugh when you were

4    holding the shotgun and pointing it in the direction of the

5    judge, but if that shotgun had been loaded, you would never

6    do that, would you?

7    A.    I should have never done that now.

8    Q.    And --

9              THE COURT:    That's right.

10   BY MS. MOSS:

11   Q.    No matter how well manufactured a shotgun is, you

12   should never do that?

13   A.    That is correct.

14   Q.    Now we looked at this video that showed the shotgun

15   being loaded and showed, you know, the functionality of the

16   shotgun.  Do you remember that?

17   A.    Yes.

18   Q.    Now in that video, I see a couple of things missing, so

19   I wanted to ask you about them.

20             No. 1, you talked about long recoil on direct, and

21   I think that was when the barrel comes back and then goes

22   forward again.  Is that basically right?

23   A.    Yes.  When the slide assembly and the barrel assembly

24   move together into the receiver.

25   Q.    And you also mentioned another kind of recoil, which

1395

CROSS - COOK

1  I -- I guess I know as a kickback on the shoulder of the

2  person firing the shotgun; is that right?

3  A.   That's correct.

4  Q.   So in that video the shotgun remains stationary after

5  it fires, but actually there is a recoil on the shotgun; is

6  that right?

7  A.   Yes, the gun as a whole would move.

8  Q.   Now, also on that video we see how the internal

9  mechanism of the shotgun works and we see the shells popping

10  out the right-hand side after they have fired.  And it's not

11  the shell that fires, though, right?  It's not the cartridge

12  case that fires, right?

13  A.   So what -- the part that we see being ejected is the

14  empty shotgun shell.  So that's the -- that's the container

15  that holds the BBs and the gunpowder inside of it.

16  Q.   Okay.  So, again, that's the empty shotgun shell that's

17  being ejected out of the right-hand side of the shotgun.

18  A.   That is correct.

19  Q.   Okay.  But what we didn't see in that video is there is

20  something coming out of the barrel of the shotgun, correct?

21  A.   That's correct.

22  Q.   Okay.  Now, also we turned the sound off, but there is

23  a loud sound associated with the shooting of a shotgun,

24  correct?

25  A.   Very loud.

1396

CROSS - COOK

1    Q.    And I think when you were showing us the shotgun

2    before -- and I forget what you called it -- I call it the

3    operating handle, or the cocking handle, do you remember

4    that?

5    A.    Yes.   Those are correct.

6    Q.    When you pull that back, can you -- can you do that for

7    us, please.

8    A.    So it's currently locked open.   I can close it and then

9    reopen it if you'd like.

10   Q.    Well, is there a release button there that allows you

11   to close that?

12   A.    Yes.   It's the carrier latch button here located

13   underneath the ejection port.

14   Q.    Can you press that for us.

15   A.    Do you want me to close it quickly?

16   Q.    Yes.

17   A.    It's going to slam closed against the cable lock here

18   which isn't normally what we're going to do --

19   Q.    Is it possible to take that lock out?

20   A.    I don't have a key.

21         THE COURT:   No, hhm-uhm.

22   BY MS. MOSS:

23   Q.    Okay.   That's fine.   That's fine.   Let's try it with

24   the cable lock.

25   A.    That's fine.

CROSS - COOK

1    Q.    Okay.  And we see -- we hear that there is a sound

2    associated with that as well.  Did you hear that?

3    A.    I did hear it.

4    Q.    And I think with the cable lock not there, it might

5    even slam a little harder.

6    A.    It would sound different and -- yes.

7    Q.    Now -- you can put that down.  Thank you.

8    A.    Okay.

9    Q.    Mr. Cook, I believe you said yesterday that this is a

10   shotgun that was started being manufactured, I think you

11   said, in the 1890s?

12   A.    So the design was begun in the late 1890s; the

13   manufacturing began in 1902.

14   Q.    And it continued for over a hundred years that they

15   were producing this gun.

16   A.    Nearly a hundred years.

17   Q.    Okay.  They stopped just one year before you started,

18   right, at Browning?

19   A.    So the final tribute model, which was kind of a

20   celebration model, was actually marketed in the year 2000.

21   I started in September of 1999.

22   Q.    Okay.  And let me just ask you really quickly:

23   Starting after 2000, Browning started to make a new Auto-5

24   that it advertised -- it advertises as, "It ain't your

25   Grandpa's Auto."  Is that gun related to the Auto-5 we've

CROSS - COOK

1  been talking about?

2  A.   So that's the Browning A5.  It's a entirely different

3  shotgun.  The styling of it was intended to help people

4  think back on the greatness of the Auto-5 and so that's why

5  some of the exterior styling is similar.  But mechanically

6  on the inside, it's its own separate independent design.

7  Q.   So different gun.

8  A.   Different gun.

9  Q.   Going back to the Auto-5 that we've been talking about,

10  would you agree that even though this is an excellently

11  designed and manufactured gun, that in the end a shotgun is

12  a mechanical device?

13  A.   It is a mechanical device.

14  Q.   And is it possible that mechanical devices such as the

15  Browning Auto-5 can suffer misuse, abuse, modifications,

16  poor maintenance, things like that, over the years?

17  A.   Yes, that's all correct.

18  Q.   And once a shotgun leaves the factory, leaves Browning,

19  are you aware of how that shotgun reacts and how it performs

20  in the future?

21  A.   Do you mean each individual shotgun?

22  Q.   Yes.

23  A.   No, I -- I'm not aware.

24  Q.   I mean, that would be almost impossible for you to

25  know; would you agree?

CROSS - COOK

1   A.   I agree.

2   Q.   Okay.  Now, the prosecutor ended -- close to the end of

3   your direct, he talked about how your objective is not to

4   come in here and promote the Auto-5, is it?

5   A.   I'm not a promoter.

6   Q.   And you said that the Browning Auto-5 was designed to

7   be a safe --

8   A.   Yes, it was.

9   Q.   -- gun.  Can you tell us about -- is there any firearm

10  that you know of that is designed and sold to be unsafe?

11  A.   I can't think of any.

12  Q.   Would it make sense that anyone would manufacture a gun

13  that's designed to be unsafe?

14  A.   I don't think that would make sense.

15  Q.   And so no firearm is designed and engineered to

16  accidentally discharge; is it?

17  A.   I don't believe anyone would intentionally design one

18  to accidentally discharge.

19  Q.   Now we've talked about the Browning Auto-5 that you

20  have here.

21  A.   Okay.

22  Q.   Have you seen or examined the actual Browning Auto-5

23  that was involved in this incident?

24  A.   No, I have not.

25  Q.   And so would you agree that any sort of issues

1400

CROSS - COOK

1    regarding wear or defects or abuse or failed safety system,

2    that you would have to look at that actual gun to see

3    whether there are any issues with it?

4    A.    And if -- the issues you mentioned, I would have to see

5    the specific gun, yes.

6    Q.    Okay.  Now the prosecutor asked -- also asked you

7    about -- I think it's referred to as trigger weight.

8    A.    Yes.

9    Q.    And, again, since you have not seen the actual gun, do

10   you know what the trigger weight is on the actual gun?

11   A.    I do not.

12   Q.    Now the prosecutor briefly mentioned the manual.  And

13   there is a manual associated with this Auto-5 shotgun; is

14   there not?

15   A.    Are you referring to the owner's manual?

16   Q.    Yes, the owner's manual?

17   A.    Okay, yes.

18   Q.    And this -- I don't think the prosecutor did this on

19   direct, but I'm -- I'd like to refer to Exhibit 403.

20           And I don't think there's any objection to this; is

21   that right?

22           MR. WINSTEAD:  Not -- no, not from me.

23           MS. MOSS:  Your Honor, we'd move to admit

24   Exhibit 403, if it hasn't been done already.

25           THE COURT:  Any objection, Mr. Dill?

CROSS - COOK

1    MR. DILL:  No, Your Honor.

2    THE COURT:  All right.  Given --

3    MS. MOSS:  And --

4    THE COURT:  Hold on.  Given that there's no

5  objection, Government Exhibit 403 is admitted into evidence

6  and may be published to the jury.

7    (Government's Exhibit 403 received)

8  BY MS. MOSS:

9  Q.   Before I show it -- we have it electronically -- but

10  it's actually a little booklet, is that right, that goes

11  with the Auto-5 when you -- when someone purchases it?

12  A.   Yes.  They are generally shipped with an owner's

13  manual.

14  Q.   Okay.  And so there's a booklet that contains

15  information about the Auto-5 that an owner would get.

16  A.   Yes.

17  Q.   And this is -- this Auto-5 manual, this is accurate,

18  right?

19  A.   Well, I haven't examined that one, but I believe it

20  would be.

21  Q.   Okay.  So I'd like to take a look at some of the things

22  in the manual.  If we could go to Exhibit 403, page 2, which

23  is INV-143.

24    And what I'd like to talk about now is point No. 5,

25  which is on the lower right-hand corner.  If we could bring

1402

CROSS - COOK

1    that out, please.

2              So do you see there where it says, "Hunting from

3    elevated surfaces such as tree stands is dangerous"?

4    A.    Yes, I see that.

5    Q.    And then going further down the last sentence, do you

6    see where it says, "Always make certain that your firearm is

7    not dropped from the stand or dropped while it is being

8    taken up or down from the stand"?  Do you see that?

9    A.    Yes, I do.

10   Q.    And I think we're going to have to go to the next page

11   to finish this.  Could you do that?  Which is, I think,

12   INV-144.

13             And so continuing on at the top, I think that

14   finishes No. 5, the first page, it says, "Remember, a loaded

15   firearm may discharge when dropped even with the safety in

16   the 'on safe' position."  Do you see where it says that?

17   A.    I do.

18   Q.    And so what the manual is referring to here is a

19   subject of a drop-fire scenario?

20   A.    Yes.

21   Q.    Now let's take a look at Exhibit 403.  And this is

22   page 4.  And it's INV-145.

23             Now I'd like to focus in on point No. 16 here.  If

24   we could bring that out, please, and highlight it.

25             Now this is another really important one.  And what

CROSS - COOK

1    this says in the manual -- in the Browning manual for the

2    Auto-5, is that, "Dropping a loaded gun can cause an

3    accidental discharge even with the safety in the 'on safe'

4    position.  Be extremely careful while hunting or during any

5    shooting activity to avoid dropping any firearm."

6        Do you see where it says that, Mr. Cook?

7    A.   Yes, I do.

8    Q.   Thank you, Mr. Reyes.

9        And so, again, we're talking about the possibility

10   of dropping a shotgun and it discharging.  Agree?

11   A.   Correct.

12   Q.   And are you aware that just a few years ago there was

13   an epidemic occurring with a different type of gun, a Sig

14   Sauer, where the company released and sold guns that would

15   go off when it was dropped?

16   A.   I'm not aware of that specific instance.

17   Q.   You're not aware of the military making this discovery

18   through its drop tests that these guns would go off when

19   dropped at a certain angle?

20   A.   I'm not.

21   Q.   Or that this particular gun was sold to police officers

22   and the public, and several police officers were shot when

23   the gun was dropped and hit themselves?

24   A.   Honestly I'm not.

25   Q.   That's fair.

1404

CROSS - COOK

1   A.   Okay.

2   Q.   Are you aware that in 2015, which is the year before

3   the incident that we're talking about, the Center for

4   Disease Control and Prevention analyzed data submitted from

5   27 states -- just 27 states -- and found that 193 people

6   were killed due to unintentional firearm-related injuries,

7   and a dropped gun was to blame for 12 of those deaths?  Were

8   you aware of that?

9   A.   I was not.

10  Q.   I want to move to another subject.  And this is when

11  you were talking about SAAMI.

12  A.   Okay.

13  Q.   Now, SAAMI stands for Sporting Arms and Ammunition

14  Manufacturing Institute?

15  A.   Correct.

16  Q.   Okay.  And I believe what you told us is that SAAMI is

17  an organization -- first of all, this is an organization

18  that was founded at the request of the government -- at the

19  federal government?

20  A.   That's correct.

21  Q.   And it's an organization that developed these standards

22  to make sure that firearms and ammunition are safe; is that

23  right?

24  A.   To encourage the safe interchangeability and pressure

25  levels and things like that, yes.

1405

CROSS - COOK

1   Q.   Okay.  And I believe that the FBI and ATF were

2   consulted in developing these standards.  Are you aware of

3   that?

4   A.   So when the SAAMI standards are pro- -- produced in

5   order to become an American National Standard with ANSI,

6   they're  -- there is a review process where lots of

7   interested parties can contribute to that review.

8   Q.   And just so we're clear for Ms. George, what is ANSI?

9   A.   ANSI is the American National Standards Institute.

10  Q.   Okay.  So a lot -- sounds like a lot of organizations

11  were consulted and advised on these SAAMI standards.

12  A.   And had the opportunity to provide feedback.

13  Q.   And so -- and, again, I'm sorry for repeating myself:

14  These are minimum standards that should be utilized when

15  testing the safety of firearms; is that right?

16  A.   So the -- could you repeat the question?

17  Q.   I think what you testified to on direct is that

18  these -- SAAMI sets the minimum standards that should apply,

19  and Browning kind of goes above and beyond that.

20  A.   That is correct.

21  Q.   Okay.  And SAAMI has published these standards so

22  they're available for people to see.

23  A.   That's correct.

24  Q.   Now we talked about gun dropping and a drop fire.  Just

25  so we're clear, a drop fire is when the gun drops and maybe

CROSS - COOK

1    hits something and the gun discharges without the trigger

2    being pulled; is that right?

3    A.    So if the -- if you drop the gun and it fires without

4    the -- someone pulling the trigger, yes, that's a drop fire.

5    Q.    Okay.  And I believe that you said that these tests are

6    performed when these guns are going into production at

7    Browning?

8    A.    Yes, we do it prior to starting production.

9    Q.    And that is to make sure that your design is good.

10   A.    Yes, it's to qualify the design at that point.

11   Q.    And am I correct that a drop-fire test is not performed

12   in every single gun -- every single Auto-5 shotgun that --

13   that comes out of Browning and gets sold; is that right?

14   A.    That is correct.

15   Q.    And you spoke about the standards that SAAMI sets for a

16   drop test.  I think you said there is -- is it something

17   called a drop test that SAAMI does, right?

18   A.    There are drop tests, yes.

19   Q.    And you talked about the SAAMI requirement is to drop

20   it from 4 feet from the center of gravity of the gun,

21   correct?

22   A.    For the drop tests.

23   Q.    Yes.  For the drop test.  And Browning goes above that

24   and does it 4 feet from the butt of the gun.

25   A.    From the lowest point of the gun.

1   Q.    The lowest point?

2   A.    Depending on which orientation, but 4 feet from the

3   lowest point.

4   Q.    So that's important when talking about orientation.   So

5   when you drop the gun, you drop it at different orientations

6   to see whether one orientation could cause a gun to

7   discharge and maybe another one doesn't.

8   A.    That's correct.

9   Q.    And -- and, again, you said that the manufacturer --

10  Browning manufacturer tests the designs to make sure that

11  they satisfy any sort of abuse of mishandling that could

12  occur.

13  A.    Those drop tests will be performed at the manufacturing

14  sight periodically also.

15  Q.    Now other than manufacturers, are you aware that the

16  FBI has the ability to perform drop tests on firearms?

17  A.    I'm sure they could.

18  Q.    And police have the ability to perform drop tests on

19  firearms?

20  A.    Sure.

21  Q.    And the military has the ability to perform drop tests

22  in firearms, correct?

23  A.    I'm sure they could.

24  Q.    And there's actually an FBI laboratory in Quantico that

25  has a section devoted to doing these types of tests; are you

1408

CROSS - COOK

1  aware of that?

2  A.    I did not know that.

3  Q.    Now when Browning, as a manufacturer, performs these

4  drop tests, I believe that you said that it's performed --

5  is it without the powder in the cartridge?

6  A.    So on the SAAMI -- on the SAAMI tests, we use what's

7  called a primed case, which is the cartridge with the powder

8  and the shot removed, it's just the primer left.  When

9  Browning do our own Browning in-house drop tests, we use a

10  copper crusher instead of the primed case.

11  Q.    In other words, are you not using a live shell?

12  A.    We do not use any live ammunition.

13  Q.    So you would not want to use a live shell when

14  performing a drop test; is that --

15  A.    I would never want to use live ammunition on a drop

16  test.

17  Q.    And would you ever feel comfortable, say, in a room

18  like this, dropping even this shotgun loaded with all of us

19  in here?

20  A.    No.

21  Q.    Now when we -- when you were testifying on direct, the

22  prosecutor played some videos for you; do you recall that?

23  A.    Yes.

24  Q.    Now were you consulted for the testing that took place

25  from the videos that they were showing you?

1409

CROSS - COOK

1    A.    So are you referring to the videos of the people trying

2    to handle the gun in a case?

3    Q.    Correct.

4    A.    I was not consulted on those.

5    Q.    Now, you made several comments when we were looking at

6    those videos.  One is that the dropping of the shotgun

7    occurred on a carpeted floor.  Did you see --

8    A.    It appeared to be carpet, yes.

9    Q.    And that could have affected impact; is that what you

10   said?

11   A.    It could.

12   Q.    And you said, I think, in some cases that the drop was

13   less severe than maybe a SAAMI drop test.

14   A.    Yeah, the impact appeared less severe than when we do

15   our standard tests.

16   Q.    And I'm not sure if it's clear or not from the video,

17   but were you aware that obviously the gun was unloaded when

18   it was dropped in those many instances?

19   A.    I assumed so.  I didn't see indication one way or the

20   other, but I assume so.

21   Q.    Okay.  And to know whether it would actually have gone

22   off while it was being dropped forcefully on the ground, we

23   would only know that if there was some sort of shell in the

24   chamber of the shotgun.

25   A.    So if there had been a primed case and it had gone off,

CROSS - COOK

1    we would have known it because we would have heard it.  If

2    you had a copper crusher and it likely had to do with a

3    Browning, you would actually have to remove it and measure

4    it to see if that was the case.

5    Q.    Correct.  Okay.  And can you tell from the videos that

6    we saw there -- we saw, I think, two or three videos of

7    people dropping the gun.  Did it appear that they were

8    actually trying to perform a drop test of the gun?

9    A.    It didn't -- it appeared they were not trying to drop

10   the gun.

11   Q.    All right.  Now you also talked about something called

12   a jar-off test.  Do you recall that?

13   A.    Yes, I do.

14   Q.    Now a jar-off is a situation where a firearm -- again,

15   it discharges without a trigger pull, correct?

16   A.    That's what it's testing for.

17   Q.    And is a jar-off test simulating the impact or bumping

18   of a shotgun against a hard surface?

19   A.    That is correct.

20   Q.    And, again, law enforcement has the ability to perform

21   these jar-off tests?

22   A.    I'm sure they could.

23   Q.    FBI has the ability to perform these jar-off tests?

24   A.    Sure.

25   Q.    Same as we did before.  Okay.  And, again, there's very

1411

CROSS - COOK

1   specific -- a process that you have to follow in order to

2   perform a SAAMI jar-off test.

3   A.   That's the purpose of the standard is to make it

4   consistent, yes.

5   Q.   And, again, with the shotgun, you're going to do it

6   from different orientations:  up, down, tilt it to the

7   right, tilt it to the left, things like that?

8   A.   That is correct.

9   Q.   And I believe you talked about this mat.  And just to

10  be clear, again, the mat that we're talking about is not one

11  of these cushiony mats that you stand on when you're washing

12  the dishes, right?

13  A.   That's right.  It's a 1-inch hard rubber mat.

14  Q.   And there's actually a type of measurement called a

15  gyrometer that measures the --

16  A.   Yes, the durometer is a measure of the hardness of the

17  rubber.

18  Q.   And it's a -- pretty high on the scale of a

19  gyrometer?

20  A.   That's correct.

21  Q.   You also referred to something called a rotation test.

22  And I believe you said a rotation test is something you do

23  with long guns; is that right?

24  A.   Yes.

25  Q.   And this is a test that simulates the fall of a firearm

1412

CROSS - COOK

1    when it's leaning, say, on -- against a vertical surface.

2    A.    Yes.  If you were to lean it against a wall and it fell

3    over.

4    Q.    And it fell over.

5    A.    Yup.

6    Q.    Okay.  So because there's a possibility of even that

7    occurring, you perform a rotation test on the long guns.

8    A.    Correct.

9    Q.    And let me ask you:  For the shotgun that we have

10   here -- what we call the stand-in shotgun -- did you perform

11   a drop test, a jar-off test, or a rotation test on the

12   stand-in shotgun?

13   A.    I did not.

14   Q.    Do you know if anyone did?

15   A.    I haven't been aware -- no one has told me they did.

16   Q.    You talked about this thing called a mallet-impact

17   test.  You -- do you remember -- did you do that?

18   A.    I did not.

19   Q.    And just so, again, we're clear, a mallet-impact test,

20   is, again, bumping or hitting the shotgun against a hard

21   surface?

22   A.    No.  It's holding the shotgun and hitting it with the

23   mallet.

24   Q.    Okay.  Do people do that?

25   A.    We do it with our testing, but I hope people in general

1413

CROSS - COOK

1   do not.

2   Q.    Okay.  I'd like to, again, go back to the manual.  So

3   this is Exhibit 403, page 2.

4   A.    Okay.

5   Q.    And this is INV-143.  And if we can focus on No. 2,

6   please.  And call that out.

7          Now do you see here in the shotgun manual for the

8   Auto-5, that it says, "Never rely totally on your shotgun's

9   mechanical safety device"?  Do you see that?

10  A.    Yes, I do.

11  Q.    And it goes on to say that, "The word 'safety'

12  described a gun's trigger block mechanism, sear block

13  mechanism, hammer block mechanism or firing pin block

14  mechanism."

15         It continues, "These mechanical devices are

16  designed to place your gun in a safer status."  Do you see

17  that?

18  A.    Yes, I see that.

19  Q.    And then the next sentence says, "No guarantee can be

20  made that the gun will not fire even if the safety is in the

21  'on safe' position."  Do you see that?

22  A.    Yes, I do.

23  Q.    And so what the manual is telling you here is even

24  though the gun is designed with this safety -- and we've

25  talked about the sear block, the trigger block, the hammer

1414

CROSS - COOK

1   block -- that you can't rely always on safety, right?

2   A.    That you shouldn't only rely on safety, yes.

3   Q.    Correct?

4   A.    Uhm-hum.

5   Q.    Do you know whether the safety was engaged on the

6   actual firearm in this incident at the time that it

7   discharged?

8   A.    I don't know.

9   Q.    If we could go to Exhibit 403, page 2, please.  And

10  this is INV-143.  Actually, before we -- this is the same

11  page.  Sorry.  Let's go up to the top right-hand side of

12  that.  I just want to finish off this point where it says --

13  and if we can highlight, "Like any mechanical device, a

14  safety can sometimes fail; it can be jarred or inadvertently

15  manipulated into an unsafe condition."  Do you see where it

16  says that?

17  A.    Yes, I do.

18  Q.    If we could go to Exhibit 403, page 4.  And that's

19  INV-145.  And if we could call out No. 14, please.

20        And No. 14 says, "Always unload your shotguns

21  chamber before crossing a fence, climbing a tree, jumping a

22  ditch, or negotiating other obstacles."  Do you see that?

23  A.    Yes, I do.

24  Q.    And going to the very last sentence of that section, it

25  says, "Never place your shotgun on or against a fence, tree,

CROSS - COOK

1    car, or other similar object."  Do you see that?

2    A.    Yes, I do.

3    Q.    If we could go to Exhibit 403, page 5.  And this is

4    INV-146.  And if we could focus in on No. 23, please.

5              And in this point in the Auto-5 owner's manual, it

6    says, "Your shotgun is a mechanical device which will not

7    last forever and as such is subject to wear and requires

8    periodic inspection, adjustment, and service."  Do you see

9    that?

10   A.    Yes, I do.

11   Q.    And then at the bottom in capital, bold letters it,

12   says, "It can be very dangerous to alter the trigger,

13   safety, or other firing mechanism parts of this or any other

14   firearm."  And then in very big letters, "Be careful."

15   That's the end of the manual.  Do you see that?

16   A.    Yes, I do.

17   Q.    Thank you, Mr. Reyes.

18             Now we've talked about how a shotgun is a

19   mechanical device.  And you stated that all Browning

20   firearms are created to be good functioning weapons,

21   correct?

22   A.    Yes.

23   Q.    But there have been recalls on Browning weapons, have

24   there not?

25   A.    There have.

1416

CROSS - COOK

1  Q.    Over the years?

2  A.    Yes.

3  Q.    And it -- for example, in 2001, the 300 Remington Ultra

4  Magnum Caliber rifles were recalled because shooting tests

5  revealed a potential safety problem, and so owners were

6  advised to discontinue any further shooting of these

7  weapons.  Do you recall that?

8  A.    I actually don't.  I mean, I don't doubt you but I

9  don't remember that.

10  Q.    Okay.  And when you do a recall -- let me ask you this,

11  when you're -- Browning issues a recall, you're recalling

12  all the guns, right?

13  A.    All of -- so in that case, it sounded like it was

14  specific to a caliber of some model, yes.

15  Q.    Now, there's also been a recall on the Browning Model A

16  500 shotgun.  Do you recall that?

17  A.    That was prior to my employment.

18  Q.    But you're aware of that?

19  A.    I had heard that.

20  Q.    And that was because testing after the gun had been

21  sold encountered parts breakage in the trigger assembly.

22  Are you aware of that?

23  A.    I didn't know the specifics.

24  Q.    Let me ask you just about one other one.  Are you aware

25  of a recall for a over-and-under shotgun, I think it's

CROSS - COOK

1    called model Belgium Over and Under Shotgun that Browning

2    said a certain quantity of these over-under shotguns were

3    being recalled because it was sometimes possible for the

4    guns to accidentally discharge.  Do you recall that?

5    A.    I think I would need more specifics.  I don't -- I

6    don't know specifically what you're talking about.

7    Q.    Okay.  And this doesn't seem to have any further

8    information, but that doesn't sound familiar to you?

9    A.    Could you repeat the description again.

10   Q.    It's called a Model Belgium Over and Under Shotgun.

11   A.    So that's not specific enough for me to know.  I'm

12   sorry.

13   Q.    I'm sorry, that's all that I have here.  Okay.

14         Well, let me ask you this:  On recalls that

15   Browning issues, these are recalls of guns that have gone

16   through that whole manufacture process that you talked about

17   on direct; is that right?

18   A.    Yes.

19   Q.    And so guns that have gone through testing, correct?

20   A.    Yeah, because they've qualified and gone into

21   production, it sounds like.

22   Q.    And guns that may have gone through audits; is that

23   right?

24   A.    Yes.

25   Q.    And yet they still can have a problem, so Browning

CROSS - COOK

1    would recall them if they become aware of the problem.

2    A.    Yes.

3    Q.    I'd like to ask you some just -- since you haven't had

4    the chance to look at the actual shotgun in this case, I'd

5    like to ask you just some general questions about the Auto-5

6    shotgun, if I may.

7    A.    Okay.

8    Q.    Now if -- when you're unloading the Auto-5 shotgun, if

9    there are five cartridges in the gun -- and just as a little

10   aside, you demonstrated for us taking the plug out of the

11   bottom part --

12   A.    Right.

13   Q.    -- correct, of the shotgun.  And that allows you to put

14   more cartridges in the shotgun than it otherwise would hold.

15   A.    Yes.  If the plug is removed you can put more shells in

16   the magazine.  If the plug is installed, it limits how many

17   you can put in the magazine.

18   Q.    Okay.  So if the plug is out and the gun is now able to

19   hold five cartridges but you only unload four, would there

20   be one left in the shotgun?

21   A.    Yes.

22   Q.    That makes sense.

23   A.    Yeah.

24   Q.    And if you have an Auto-5 shotgun and the bolt -- or

25   the operating handle is moved forward, and the chamber's

CROSS - COOK

1    empty -- following me?

2    A.    I think so, so far.

3    Q.    -- but there's a live cartridge that's in the magazine,

4    if the operating handle, say, snags on something, would that

5    release that live cartridge from the magazine into the

6    chamber?

7    A.    So let me repeat and make sure I understand.   Is -- you

8    said that the operating handle is already forward?

9    Q.    Yes.   It's closed.

10   A.    Okay.

11   Q.    Correct?

12   A.    And there's one shell in the magazine but nothing in

13   the chamber.

14   Q.    Correct.

15   A.    And you're saying if the operating handle snags on

16   something --

17   Q.    So that it pulls it back.

18   A.    If it snagged on something and it came all the way back

19   and then let go, yes, it would chamber that round from the

20   magazine.

21   Q.    Okay.   And I think you -- you can put that down.

22          I think you also said, when speaking to

23   Mr. Winstead, that if you pull that operating handle back

24   slowly -- do you call it -- what do you call it?

25   A.    It's commonly referred to as an operating handle or a

CROSS - COOK

1    cocking handle.  They're both interchangeable.

2    Q.   So if you pull that operating handle back slowly, I

3    believe you said that it's possible that the bolt can remain

4    open, but a shell is still in the magazine or maybe

5    somewhere kind of in between the magazine and the chamber.

6    A.   Yes.  If you open it slowly, it's possible the shell

7    leaving the magazine will become wedged or -- essentially

8    pinched by the spring of the carrier latch and not come all

9    the way out.  That's possible.

10   Q.   And then if the gun maybe is jarred or somebody pushes

11   that release bolt, that would chamber that round; is that

12   right?

13   A.   That would allow it to continue its travel and finish

14   being chambered, yes.

15   Q.   Now, Mr. Cook, you wrote a report in this case; is that

16   right?

17   A.   I'm sorry, what was --

18   Q.   You wrote a report in this case; is that right?

19   A.   I did.

20   Q.   And in that report, I saw that you cited several

21   references to your information.

22   A.   I did.

23   Q.   And is one of those citations to a book called Shooting

24   Incident Reconstruction by Lucien Haag?

25   A.   Yes.

1421

CROSS - COOK

1    Q.    And are -- you're familiar with Mr. Haag?

2    A.    I've never met him, but I've read his book.

3    Q.    And your -- so you know him to be a known expert in

4    shooting-incident reconstruction and firearms?

5              MR. WINSTEAD:  Objection, Your Honor.  Relevance.

6              THE COURT:  What is the relevance of this?

7              MS. MOSS:  He was referencing he performed this --

8    he wrote this report about this case.  He referenced certain

9    articles to provide information --

10             THE COURT:  This is just a article that he -- or a

11   book that he referenced or looked at in writing his report.

12   I mean, is there something specific about his report that

13   you want to ask him about?

14             MS. MOSS:  No, we talked about a lot of the

15   specifics of the report.  I'm just asking about some of the

16   references that he cites.

17             THE COURT:  But why is that relevant?

18             MS. MOSS:  I can move on, Your Honor.

19             THE COURT:  Yeah, please.

20   BY MS. MOSS:

21   Q.    Now, Mr. Cook, you know a lot about Browning shotguns;

22   fair to say?

23   A.    I do.

24   Q.    Are you familiar with things called "toolmarks"?

25   A.    Yes, I know the expression "toolmarks," yes.

1422

CROSS - COOK

1  Q.   Are you an expert at looking at toolmarks on an

2  expended shotgun shell?

3  A.   I am not.

4  Q.   Just very briefly, Mr. Cook, I -- as a designer and

5  engineer at Browning, you also invent things, right?

6  A.   That's part of my job, yes.

7  Q.   And you patent some of those things that you invent,

8  don't you?

9  A.   I do have patents.

10 Q.   And so the prosecutor asked you on direct, and had you

11 demonstrate taking the safety plug out of the firearm.

12 A.   The magazine plug.

13 Q.   Yes.

14 A.   Yes.

15 Q.   Sorry.  And I believe that you were part of inventing a

16 way to improve that method of taking the plug out of the

17 magazine; is that right?

18 A.   I'm an inventor on a patent which includes a method

19 for -- a different method for removing the plug, yes.

20 Q.   And that's called the turnkey magazine plug system?

21 A.   Yes.

22 Q.   And that's to aid a user to remove the magazine -- I'm

23 sorry, to remove the plug from the magazine without some of

24 the difficulties that you might have otherwise.

25 A.   Yes.  The -- yes.

1423

CROSS - COOK

1    Q.    And is that now something that Browning implements in

2    its updated Auto-5 shotguns?

3    A.    That system is included in the new A-5 shotgun as well

4    as the Maxus shotgun, yes.

5    Q.    I just want to finish up, Mr. Cook.  You -- you

6    obviously know a lot about the Browning Auto-5, we made that

7    clear.  And the Court has actually certified you as an

8    expert in this gun.  Did the FBI consult you when it was

9    performing patterning tests with this stand-in shotgun?

10   A.    No.

11   Q.    Did they ask your advice on how to do these patterning

12   tests?

13   A.    No.

14   Q.    Did they ask you to attend any of these patterning

15   tests in 2020 or 2021 -- 2020, 2021 and 2022?

16   A.    No.

17   Q.    And did they ever just share with you that the actual

18   Browning Auto-5 discharged through a soft case, a gun case?

19   A.    I had seen that in a -- in some of the documents that I

20   reviewed.

21   Q.    And did they ask you your opinions about that?

22   A.    I don't remember if we discussed that in detail.

23   Q.    Okay.  I just want to end by asking you -- and I

24   believe you were very honest about this on direct -- that

25   you said that even knowing this is a well-manufactured gun,

1424

REDIRECT - COOK

1    if it is dropped, it is still possible it could go off?

2    A.    Depending on how it's dropped, yes, it's possible.

3              MS. MOSS:    Thank you, Mr. Cook.

4              THE COURT:    Any questions --

5              MR. DILL:    No questions, Your Honor.

6              THE COURT:    Any cross, Mr. Dill?

7              MR. DILL:    No, Your Honor.

8              THE COURT:    Okay.    Redirect.

9              MR. WINSTEAD:    Thank you, Your Honor.

10                       REDIRECT EXAMINATION

11   BY MR. WINSTEAD:

12   Q.    Just a couple follow-up questions, sir.    On those --

13   you were asked about some -- a recall from 2017 of a Sig

14   pistol, I believe.    Do you recall that?

15   A.    Yes.    I recall the question.

16   Q.    Okay.    Do you know if that recall related to a trigger

17   inertia problem?

18   A.    I don't know.

19   Q.    Okay.    And I'm sure Sig standards are way below

20   Brownings; is that --

21   A.    I don't know about their in-house standards.

22   Q.    Just kidding.

23   A.    I don't know.

24   Q.    Okay.    Modifications.    You were asked about

25   modifications.    Does Browning sell some modern shotguns that

REDIRECT - COOK

1    are customizable?

2    A.    Yes.

3    Q.    What does that mean?

4    A.    Well, it -- customizable, it could be a couple of

5    things.  It could be where you purchase after-market parts

6    and add it onto the shotgun; or you could change the length

7    of the stock.  If you had shorter arms you could customize

8    is it in that way, for a couple of examples.

9    Q.    Is that part of the design for some modern long guns?

10   A.    We do try to account for after-market possibilities,

11   but I wouldn't say that drives the design necessarily.

12   Q.    Do you know if the Browning Auto-5 was sold as a

13   customizable weapon in the same way that the ones you were

14   just talking about are?

15   A.    I have seen after-market parts that people sell as a --

16   as a way to adapt their personal shotgun.

17   Q.    And that's true for the Auto-5 specifically?

18   A.    I have seen -- well, for example, I've seen a magazine

19   tube extension that is available for an Auto-5.

20   Q.    Okay.  Is it meant to be -- have easily interchangeable

21   parts like the barrel or the mechanism for customization?

22   A.    If we compare the Auto-5 -- the Browning Auto-5 to

23   other firearms on the market, it is less conveniently

24   customized.  There are other guns that are more specifically

25   adapted towards after-market parts than the Auto-5 was.

1426

REDIRECT - COOK

1    Q.    You were asked a bunch of questions about the manual.

2    Regardless how safe a firearm might be, is it always a good

3    idea to treat it carefully?

4    A.    Yes.

5    Q.    Is there really any upside to not treating a firearm

6    carefully?

7    A.    I don't think there would be any upside to treating it

8    not carefully, no.

9    Q.    So is there any reason why your manual would not be

10   very careful to over-emphasize safety?

11   A.    All of our manuals emphasize the safety regardless of

12   the particular design because we want our users to be as

13   safe as possible.

14   Q.    You were asked about whether you were able to inspect

15   or do any tests on the original shotgun.  And you said no,

16   right?

17   A.    I was asked that and I said no, yes.

18   Q.    If there were anything out of the ordinary about the

19   original shotgun, would examination of that shotgun reveal

20   anything about the original shotgun?

21   A.    If there were anything out of the ordinary that was

22   common to the production of both guns, it may have been

23   evident here, but if it was specific to the use or

24   maintenance of the gun after production, then it wouldn't

25   necessarily be applicable to both guns.

REDIRECT - COOK

1  Q.    And with regard to that production, as far as the

2  controls that you have in place on the design and auditing,

3  are those designs to ensure that batches of production and

4  things similar are ensured to be within standards?

5  A.    Yeah, the processes are maintained to make it as

6  consistent as possible throughout a production batch.

7  Q.    Okay.  You were -- I think you had a little bit

8  additional explanation you wanted to give about your patent

9  about the magazine plug.  Can you tell us just a little bit

10  more about that.

11  A.    Yeah, the patent really -- it applies to two aspects of

12  installing or removing a magazine plug.  The first portion

13  of the patent has to do with how the forearm is physically

14  attached to the gun.  You saw on this one I had to unscrew

15  the magazine plug in order to access -- or unscrew the

16  magazine cap in order to access the magazine plug.

17       This patent defined a latch system that was on the

18  forearm so you could unlatch it and simply slide the forearm

19  out without unscrewing the cap.  The other difference is

20  some of our other shotguns, the magazine plug is contained

21  inside the magazine behind a retainer piece, and so it's a

22  little bit more of a hassle to get the plug out.

23       In the patent, the shape of the head of the plug is

24  designed so that you can use your car key and it pushes it

25  down and twists it so that it's contained in there but

1428

REDIRECT - COOK

1   allows you to get it out without special tooling.  It's a
2   convenience feature.
3   Q.   You said that you designed a shotgun in the early
4   2000s.  Have there been any recalls on that shotgun?
5   A.   No, there were not.
6   Q.   Have there been any, to your knowledge, on the Auto-5?
7   A.   Not to my knowledge, no.
8   Q.   Is that something you and John Browning have in common?
9   A.   Yes.
10   Q.   All right.  Then just two more questions.  If you know
11   about a shotgun that the trigger weight feels normal, the
12   firearm fires, cycles, and reloads normally, does that tell
13   you anything about whether the trigger system and the sear
14   system is working properly?
15   A.   Yeah.  Those are very good indications that everything
16   is -- is the correct geometry and working properly.
17   Q.   And if after an incident a firearm fires normally and
18   is described as in perfect working condition, does that tell
19   you anything about whether there was some sort of
20   catastrophic mechanical failure of the device, or whether
21   that was likely?
22   A.   Yeah, that would be an indication that the -- there
23   wasn't significant damage during the incident if it is again
24   performing properly after the incident.
25   Q.   Thank you.  No further questions.

1429

REDIRECT - COOK

1    THE COURT:  All right.  May this witness be excused

2    for the Government?

3         MR. WINSTEAD:  Yes, Your Honor.

4         THE COURT:  For the defendants?

5         MS. MOSS:  Yes, Your Honor.

6         MR. DILL:  Yes, Your Honor.

7         THE COURT:  All right.  Thank you.

8         Mr. Cook, thank you so much for your testimony.

9    You're excused.  You may step down.

10        Ms. Guerra, before we call the next witness, you

11   want to return the shotgun to its prior location.

12        COURTROOM DEPUTY:  I will, Your Honor.

13        THE COURT:  All right, Government may call its next

14   witness.

15        MR. WINSTEAD:  Your Honor, the Government calls

16   Ryan Jibson.

17        THE COURT:  All right.

18        COURTROOM DEPUTY:  If you'll raise your right hand

19   for me.

20        RYAN JIBSON, GOVERNMENT WITNESS, SWORN

21        COURTROOM DEPUTY:  Thank you.  Please be seated and

22   remove your mask for us.  And then state your full name for

23   the record and spell your first and last name for us.

24        THE WITNESS:  My name is Ryan Jibson.  It's

25   R-y-a-n, last name J-i-b-s-o-n.

1430
REDIRECT - COOK

1    THE COURT:  You may proceed, counsel.

2    MR. WINSTEAD:  Thank you, Your Honor.

3    And I would, real quick, move for admission of

4    Government's Exhibit 401 -- that's the other invoice.  We

5    previously admitted one.  I believe there's no objection

6    from defense counsel.

7    THE COURT:  Is there any objection?

8    MS. MOSS:  No, Your Honor.

9    MR. DILL:  No, Your Honor.

10   THE COURT:  All right.  There being no objection,

11   Government Exhibit 401 is admitted into evidence and may be

12   published to the jury.

13   (Government's Exhibit 401 received)

14   MR. WINSTEAD:  Thank you.

15                    DIRECT EXAMINATION

16   BY MR. WINSTEAD:

17   Q.   Sir, can you tell me where you work.

18   A.   I work for Browning.

19   Q.   What's your job?

20   A.   My title is vice president and general counsel.

21   Q.   What are your duties?

22   A.   I manage all legal affairs for the company.

23   Q.   Do you manage compliance issues?

24   A.   Yes.  So our -- as a firearms company we're heavily

25   regulated.  All of the compliance issues fall under legal,

1431

REDIRECT - COOK

1    so I manage regulatory compliance issues.

2    Q.    Employment?

3    A.    Yes.

4    Q.    What about legal complaints and claims?

5    A.    Yes, I manage those as well.

6    Q.    Okay.  I'd like to ask you:  Were you contacted by the

7    FBI in this case?

8    A.    Yes, we were.

9    Q.    What did they ask you?

10   A.    They asked us for documents related to the subject

11   firearm.

12   Q.    All right.  Can you bring up what's now been admitted

13   as Government's Exhibit 401.

14          Can you tell me what this is.

15   A.    That is an invoice.

16   Q.    Where did this invoice come from?

17   A.    We retain it in our records.  It's an invoice to the

18   National Wild Turkey Federation.

19   Q.    Now this is -- can you tell me real quick what the --

20   and can you highlight this part right here -- what is the

21   serial number reflected on this invoice?

22   A.    The serial number is WT-15100116.

23   Q.    Thanks.  Is that the serial number that the FBI gave

24   you?

25   A.    Yes, it is.

REDIRECT - COOK

1    Q.    Okay.    Now we're going to try to get fancy.    Can you

2    put up Government -- this one on the left and Government's

3    Exhibit 10, page 19, on the right.    That's fine.    You're

4    good.    And then Government's Exhibit 10, page 19 on the

5    other side, which has already been admitted.

6         All right.    And then can you see right above that

7    line, is that the same serial number?

8              THE COURT:    Can we blow up these sections, please?

9              MR. WINSTEAD:    Yes, sir.    Can you blow up this part

10   right here.

11             THE WITNESS:    Yes.    It appears to be the same

12   serial number.

13   BY MR. WINSTEAD:

14   Q.    It's right next to the highlight.    Yup, there you go.

15   Nope -- yup.

16        All right.    So you said WT-15100116

17   A.    Correct.

18   Q.    Okay.    Thank you.    You can take both of these down.

19   Or -- or and bring up the 401 just on the main screen again.

20   All right.    So if you can zoom in -- so you don't need to do

21   the whole page.    If you can zoom in just, please, on this

22   upper half.

23        All right.    So can you tell me, what information

24   about the original shotgun is on this form?

25   A.    There's quite a bit from a specification standpoint.

REDIRECT - COOK

1    If you look above the serial number --

2    Q.    And what you can do is, if you don't mind, grab the

3    little stylus and you can just draw on the screen for each

4    part that you're talking about.

5    A.    Okay.  I'll move this a little closer.  So the

6    information I was referring to A-5 -- oh, that just kind of

7    redded it out.  Sorry.  That stands for Auto-5, which is the

8    model of firearm.  12 would be the gauge of the firearm.

9    MAG stands for Magnum, which would indicate that it's a

10   Magnum firearm, meaning that it takes a 3-inch chamber.  26

11   would be a reference to the barrel length.  INV is for

12   invector, which would specify the choke tube system that it

13   comes with.  And NWTF is a reference to the National Wild

14   Turkey Federation.

15   Q.    All right.  And then down below that a little bit, what

16   does it say right there?

17   A.    It says, "Here is the 1991 NWTF shotgun of the year

18   proudly presented by Browning."

19   Q.    And then what does that say?

20   A.    So issue No. 116, so that would be a reference to --

21   well, let me back up just a little bit.  So this firearm,

22   itself, it would have been part of a -- what we call an SMU

23   or a Special Make-up, which would be a special edition of

24   firearms that would be built for -- specifically for the

25   National Wild Turkey Federation.  So where it says No. 116,

1434

REDIRECT - COOK

1    that would be indicating that it's No. 116 of a batch of 500

2    units that were part of that SMU.

3    Q.    Is that what the 116 at the end of the serial number

4    means?

5    A.    Correct.

6    Q.    Okay.  What's the date up here?

7    A.    August 2d, 1991.

8    Q.    And what -- what date does that reflect?

9    A.    That date's -- that's the reflection date of when we

10   actually would have submitted this invoice to the NWTF and

11   then subsequently shipped the firearm.

12   Q.    All right.  Can you zoom out again.  And can you show

13   me -- actually, I think that's fine.

14             Any other important information on here before we

15   move on to the next invoice?

16   A.    Potentially the product code number --

17   Q.    Oh, yeah, yeah, yeah, yeah.

18   A.    -- which --

19   Q.    Can you zoom in on that middle section again.

20   A.    Just to the right of the description.  You can see

21   underneath where it says "product code" right here.

22   1501SE2.  That would be a reference to the specific SMU, or

23   the Special Make-up, this production for the NWTF.

24   Q.    All right.  Thank you.  You can take this down.  And

25   next I'm going to ask you to do 401 and 402 next to each

                              REDIRECT - COOK

1    other, so if you want to get that set up.

2              So at some point did the FBI contact you again

3    about another shotgun serial number?

4    A.    Yes, they did.

5    Q.    What was the context for that?

6    A.    My understanding was they were trying to find a firearm

7    that most closely -- was most closely similar to the subject

8    firearm at issue in the case.

9    Q.    All right.  So on the right is Government's Exhibit 401

10   that we were just looking at.  On the left, can you tell me

11   what that is?  That's Government's Exhibit 402.  What is

12   it?

13   A.    So it's a similar invoice only dealing with a different

14   unit number within that same NWTF Special Make-up.

15   Q.    So --

16   A.    So dealing with serial number WT-15100242.

17   Q.    All right.  So can you show me a blowup of just that

18   middle on that side.

19             All right.  Now before you were telling us that

20   this line contains some specifications.  Does this have

21   identical specifications to the one we were just looking at?

22   A.    Yes, it does.

23   Q.    Is it the same product code number?

24   A.    It is.

25   Q.    Does that section read the same where it says, "Here's

1436

REDIRECT - COOK

1    the 1991," et cetera?

2    A.    Yes, it does.

3    Q.    And this one says -- what does that say, issue number

4    what?

5    A.    Issue No. 242.  So that would be specifying, again, the

6    unit number within that 500-unit production.

7    Q.    So were they from the same 500-unit production?

8    A.    Yes.

9    Q.    Okay.  And zoom out again for me.

10          Can you tell me what the date is up here.

11   A.    November 27th, 1990.

12   Q.    Do you know why these have relatively different dates?

13   A.    Yes.  So we would have received those from the factory

14   in a very similar time frame.  And I can go into that if

15   you'd like.  However, when we're shipping these out,

16   oftentimes when it's to a conservation group, which is what

17   the NWTF is, they oftentimes don't want us to send all 500

18   firearms in one batch because these are typically used for

19   chapter banquets, special purchase opportunities for the

20   members, those types of things.  So they will invoice those

21   separately and ship them when needed.

22          And so at the end of the day, this one, you know,

23   would have shipped nine months earlier, but it's just

24   because it was pulled off of the shelf sooner at our

25   warehouse.

1437

REDIRECT - COOK

1    Q.    Do you happen to know whether these two firearms were

2    manufactured at about the same time?

3    A.    Yes.  They were both manufactured in June of 1990 at

4    our factory partner in Japan by the name of Miroku,

5    M-i-r-o-k-u.

6    Q.    All right.  And would it be possible to have

7    Government's Exhibit 3 provided briefly to the witness.

8           And, sir, you're surrounded by people, so if you

9    could avoid pointing it at anyone, that will be ideal.

10   A.    I'll do my best.

11          COURTROOM DEPUTY:  I'll hand this to you.  That was

12   taken out by the previous person.

13   BY MR. WINSTEAD:

14   Q.    Can you see the serial number on it?  And can you --

15   zoom in right here.

16   A.    Yes.  The serial number is WT-15100242.

17   Q.    Okay.  Thanks.

18          How do you know that it's a lot of 500?

19   A.    We know that -- well, it indicates it on the firearm,

20   for one, as well as we -- you know, we had some sales and

21   inventory sheets that showed that product code number, the

22   15101SE2 that we were able to confirm that 499 of them were

23   sold in that batch.

24   Q.    Where does it say it on the shotgun?

25   A.    Sorry.  Was on the wrong side.  So on the -- sorry.  On

1438

REDIRECT - COOK

1    the right side behind the bolt slide, it looks like there's

2    two acorns, and it says 242 and next to it, 500.

3    Q.    Do you still make Auto-5s at Browning?

4    A.    No, we do not.

5    Q.    Why did you discontinue them?

6    A.    It had been around for a long time.  You know, it was

7    an original JM Browning design actually from 1898.  Sales

8    began right around the turn of the century, and we

9    discontinued them in the late '90s.  The last ones I have

10   record of were in the year 2000 when we sold a limited batch

11   of -- kind of final tribute special edition Auto-5s.  But as

12   you can imagine, they've been around for nearly a hundred

13   years so due to sales dropping with the product, due to

14   manufacturing increases and cost, as well as just from a

15   performance technical standpoint, we offered new products,

16   you know.  For example, this was only offered in a 3-inch

17   chamber where it had become industry standard to offer a

18   3 1/2-inch chamber in a lot of waterfowl guns, including

19   some we sold at that point, so it had lived its life.

20   Q.    How does it compare in weight to some of the modern

21   guns?

22   A.    It's a little heavier.

23   Q.    Did you discontinue it because of any safety concerns

24   about it?

25   A.    No, not to my knowledge.

1439

REDIRECT - COOK

1  Q.   Do you have any records of safety problems with the
2  Auto-5?
3  A.   I do not.
4  Q.   Okay.  As far as recalls, do you have any records of
5  recalls for the Auto-5?
6  A.   No.  I reviewed our recall records and I couldn't find
7  anything discussing the Auto-5.
8  Q.   How --
9  A.   So to my knowledge, there was never a recall.
10  Q.   How long do you keep recall records?
11  A.   We keep recall records indefinitely.
12  Q.   Are you aware of any systemic design or manufacturing
13  problems with the Auto-5 over the course of the hundred
14  years it was made?
15  A.   No, I am not.
16        MR. WINSTEAD:  May I have a moment, Your Honor?
17        THE COURT:  You may.
18        MR. WINSTEAD:  Nothing further.  Thank you, Your
19  Honor.
20        THE COURT:  All right.  Thank you.
21  Cross-examination.
22                    CROSS-EXAMINATION
23  BY MS. MOSS:
24  Q.   Good morning, Mr. Jibson.
25  A.   Good morning.

CROSS - JIBSON

1   Q.    It sounds like you're here to tell us that the make and

2   model of these two firearms is the same; is that right?

3   A.    Correct.

4   Q.    They're both Browning Auto-5 shotguns?

5   A.    Correct.

6   Q.    And they are -- you said belong to this special edition

7   of 500 shotguns that were manufactured in 1990; is that

8   right?

9   A.    That's correct.

10  Q.    And were you around at that time?

11  A.    No, I was not.

12  Q.    And so following the years after 1990, was Browning

13  able to track in the next 26 years what happened to these

14  guns and how they were used?

15  A.    We track it only through the first sale to a dealer, to

16  an FFL, a Federal Firearms Licensee.

17  Q.    Okay.  And anything past that, you're not able to

18  track?

19  A.    Correct.

20  Q.    So this first sale that you're talking about we saw on

21  those invoices, do you recall who the first sale was made to

22  of these two models?

23  A.    I know they are both billed to the National Wild Turkey

24  Federation.  I believe they were both shipped to different

25  addresses, which would have been either dealers or

1441

CROSS - JIBSON

1   potentially local chapters of NWTF.

2   Q.    Okay.  So they're either dealers or chapters of the

3   National Wild Turkey foundation?

4   A.    Yes.  Who would also have been FFLs, or Federal

5   Firearms Licensees.

6   Q.    And that's who purchased this shotgun --

7   A.    Correct.

8   Q.    -- at the 1990 -- or '91?

9   A.    Yeah, so it would have been purchased by NWTF, but the

10  shipping entity may have been different.

11  Q.    Okay.  And you keep saying NWTF, and that's National

12  Wild Turkey Foundation.

13  A.    Yup.

14  Q.    Okay.  So Dr. Larry Rudolph was not one of the people

15  that initially bought this firearm?

16  A.    I don't know that.  From a standpoint of after it was

17  sold from Browning, I don't -- we didn't sell it directly

18  from --

19  Q.    Correct.

20  A.    -- Mr. Rudolph -- Dr. Rudolph.

21  Q.    So Browning did not sell the one particular shotgun to

22  Dr. Rudolph.

23  A.    I have no reason to believe that we did, correct.

24  Q.    Okay.  And it -- his name was not on the invoice,

25  correct?

1442

REDIRECT - JIBSON

1    A.    Correct.

2    Q.    And so you don't know when the shotgun came into the

3    possession of Dr. Rudolph.

4    A.    No, I do not.

5    Q.    Or how it came into his possession.

6    A.    No, I do not.

7    Q.    Or whether anything happened before it went into his

8    possession and after he possessed it; is that correct?

9    A.    Correct.

10            MS. MOSS:   Thank you, Mr. Jibson.

11            THE COURT:   Any --

12            MR. DILL:   No questions, Your Honor.

13            THE COURT:   Thank you, Mr. Dill.   Redirect.

14            MR. WINSTEAD:   Just one quick clarification.

15                    REDIRECT EXAMINATION

16   BY MR. WINSTEAD:

17   Q.    Could you pull up 401, please.   And you don't have to

18   do the whole thing, just do this top part.   All right.   You

19   were sort of explaining, and it was a little confusing.   You

20   said it was billed to the National Wild Turkey Federation?

21   A.    Yeah.   So I guess if you look at the invoice, it

22   actually says sold to National Wild Turkey Federation, and

23   then below shipped to B & M Sports Center.   So the invoice

24   would have been with National Wild Turkey Federation; they

25   would have paid for it.

1443

REDIRECT - JIBSON

1   Q.   Now, are you allowed to ship firearms to a non-FFL in

2   another state?

3   A.   No.

4   Q.   Why is that?

5   A.   That's the law, right?  So I guess it would be the Gun

6   Control Act that's governed by the ATF, mandates that all

7   firearms are transported from one FFL to another FFL.

8   Q.   And so --

9   A.   So we have no private sales directly to private

10  individuals.

11  Q.   So if a -- if a individual or an organization that's

12  not an FFL wants to buy a firearm from you, what do they

13  have to arrange?  Do they have to arrange for it to be

14  shipped to someone?

15  A.   Yes, we have to arrange for it to ship to an FFL.  And

16  then the FFL is who then does the background check and goes

17  through that whole process.

18          MR. WINSTEAD:  Sure.  One moment, Your Honor.

19          THE COURT:  Okay.

20          MR. WINSTEAD:  Nothing further.  Thank you, Your

21  Honor.

22          THE COURT:  All right.  May this witness be excused

23  for the Government?

24          MR. WINSTEAD:  Yes, sir.

25          THE COURT:  For the defendants?

1444
REDIRECT - JIBSON

1    MS. MOSS:  Yes, Your Honor.

2    MR. DILL:  Yes, Your Honor.

3    THE COURT:  Mr. Jibson, thank you so much for your

4    testimony.  You're excused.  You may step down.

5    THE WITNESS:  Thank you.

6    THE COURT:  Government may call its next witness.

7    MR. FIELDS:  Thank you.  The United States calls

8    Paul Babaz.

9    MR. MARKUS:  Subject to our previously made

10   objection, Your Honor.

11   THE COURT:  Right.  Actually, Mr. Fields, have you

12   had an opportunity to talk with this witness about my prior

13   ruling?

14   MR. FIELDS:  I am aware of your prior ruling, Your

15   Honor, and I won't be asking any questions that would

16   elicit --

17   THE COURT:  Well, but sometimes we have witnesses

18   volunteer things that -- why don't you take 60 seconds and

19   talk to him about it.

20   MR. FIELDS:  Thank you very much.

21   (Pause)

22   PAUL BABAZ, GOVERNMENT WITNESS, SWORN

23   COURTROOM DEPUTY:  Thank you.  Please be seated and

24   remove your mask for us.  State your full name for the

25   record and spell your first and last name for us.

DIRECT - BABAZ

1    THE WITNESS:  Paul Babaz.  P-a-u-l, last name

2    B-a-b-a-z.

3    THE COURT:  You may have a seat, sir.  Thank you.

4    Why don't you pull the mic towards you and scoot up your

5    chair a little bit.  There you go.

6    THE WITNESS:  Yes, sir.

7    THE COURT:  All right, Mr. Fields.

8    MR. FIELDS:  Thank you, Your Honor.

9                    DIRECT EXAMINATION

10   BY MR. FIELDS:

11   Q.   Mr. Babaz, do you know a man named Lawrence Rudolph?

12   A.   Yes, sir.

13   Q.   How did you meet him?

14   A.   Met him through Safari Club International, a group we

15   were involved with.

16   Q.   What's Safari Club International?

17   A.   A hunter advocacy organization.

18   Q.   Approximately when did you first meet him?

19   A.   I couldn't tell you; probably early 2000s.

20   Q.   Are you familiar with a lawsuit he brought against

21   Safari Club International?

22   A.   Yes, sir.

23   Q.   Generally speaking, what were the allegations in that

24   lawsuit?

25   A.   Specifically there were several allegations.  I guess

                                DIRECT - BABAZ

1    you could say, you know, misconduct, things like that.

2    Q.   Were there allegations that he had had an affair?

3    A.   Yes, sir.

4    Q.   What did he say about those allegations in his lawsuit?

5    A.   Well, he denied them.

6    Q.   At some point in time, did he personally confront you

7    about these allegations of an affair?

8    A.   Yes, sir.

9    Q.   When did that happen?

10   A.   It was during convention, 2012.  I think it was 2012.

11   Q.   Where was that convention?

12   A.   Las Vegas.

13   Q.   What was the confrontation?

14   A.   Larry approached me, and Bianca were there.  I was

15   waiting to meet a friend of mine.  I was coming to dinner to

16   the evening event.  This was a evening event.  I was waiting

17   for a friend.  I had his tickets with me.  Larry approached

18   me and asked me to come off to the side in a hallway to

19   speak to him.

20        And he was upset that he had heard from another

21   board member about an alleged affair that he was having.

22   Q.   Was he denying having an affair?

23   A.   Yes, sir.

24   Q.   How was he going about denying that?

25   A.   Well, he was upset.  A lot of yelling and screaming.

1447

DIRECT - BABAZ

1    Q.    After that confrontation, is that when he brought the

2    lawsuit?

3    A.    Yes, sir.

4    Q.    Were you on the board of SCI at that time?

5    A.    Yes, sir, I was.

6    Q.    So as a board member, did you review the papers related

7    to that lawsuit?

8    A.    Yes, sir.

9    Q.    All right.  So let's look at Government's Exhibit 83,

10   which is not yet in evidence.

11          Is this the amended complaint?

12   A.    Yes, sir, I believe so.

13   Q.    And a complaint -- who filed this complaint?

14   A.    It looks like Larry Rudolph did.

15   Q.    And who is it against?

16   A.    Safari Club International, Ralph Cunningham, Larry

17   Higgins, Scott Chapman, Joyce Hanley, David Small, and John

18   Whipple.

19   Q.    Who were those other people?

20   A.    There were -- well, a couple of people were board

21   members, past presidents.  Joe Hanley, David Small -- I

22   think Joe was a board member at the time, but they were part

23   of the Board of Inquiry.

24          MR. FIELDS:  Your Honor, at this time I move for

25   the admissions of Government's Exhibit 83.

1448

DIRECT - BABAZ

1    THE COURT:  Any objection?

2    MR. MARKUS:  Objection, Your Honor, under 401, 403,

3    and hearsay.

4    THE COURT:  Any objection from Defendant Milliron?

5    MR. DILL:  I join.

6    THE COURT:  All right.  The objections are

7    overruled.  Exhibit 83 is admitted into evidence and may be

8    published to the jury.

9    (Government's Exhibit 83 received)

10   BY MR. FIELDS:

11   Q.   Let's look at page 4, please.  And let's blow up

12   paragraphs 27 through 29, down there near the bottom.

13   Mr. Babaz, what did Lawrence Rudolph in his

14   complaint allege there?

15   A.   Do you want me to read this?

16   Q.   Yes, please.

17   A.   I'm sorry.  "During and before this convention SCI

18   member Paul Babaz circulated false rumors about

19   plaintiff" --

20   Q.   Let me stop you there.  What were the false rumors?

21   What was the allegation of the false rumors?

22   A.   That he was seeing a woman.

23   Q.   Okay.  Next one.

24   A.   "Babaz falsely stated, plaintiff was having a long-term

25   affair with a woman in Atlanta under the pretext of

DIRECT - BABAZ

1   conducting SCI business and was using his title as president

2   of SCI to seduce his mistress."

3   Q.    And 29.

4   A.    Babaz stated "'This wasn't the first time'" that the

5   plaintiff had engaged in this kind of conduct."

6   Q.    So "it wasn't the first time," that conduct being

7   having affairs?

8   A.    You're asking me or --

9   Q.    Yes.

10  A.    According to this, that's what he was claiming, I

11  guess.

12  Q.    Let's go to page 9, and paragraph 63 through 67.  What

13  did he allege in those paragraphs?

14  A.    On line 63, "The BOI knew the plaintiff and his wife

15  were married and in residence in Pennsylvania."

16          THE COURT:  Sir, let me stop you.  What is BOI?

17          THE WITNESS:  Oh, I'm sorry, the Board of Inquiry.

18  It was like a SCI committee.

19          THE COURT:  Go ahead.

20          MR. FIELDS:  Thank you, Your Honor.

21          THE WITNESS:  In --

22  BY MR. FIELDS:

23  Q.    If we could, actually -- so do the rest of these

24  paragraphs describe some portions of divorce law in Arizona?

25  Or, sorry, in Pennsylvania?  I have the wrong state.

DIRECT - BABAZ

1    A.    Yes, sir.

2    Q.    So is he making an allegation that these -- was he

3    alleging that the allegations of an affair could have led to

4    divorce?

5              MR. MARKUS:   Objection.   Leading, Your Honor.

6              THE COURT:   Sustained.   Let's rephrase.

7    BY MR. FIELDS:

8    Q.    Let's just read the rest of these paragraphs.   Could

9    you please read paragraphs 64 through 67.

10   A.    "It is actually" -- okay, line 64, "It is axiomatic

11   that Pennsylvania has a strong interest in plaintiff's

12   marriage inasmuch as it is regulated by Pennsylvania as a

13   social contract."

14             Line 65, "The Divorce Code of Pennsylvania, at

15   Section 3102, states that 'The family is the basic unit in

16   society and the protection and preservation of the family is

17   of paramount public concern.'"

18             Line 66, "Pennsylvania has a manifest concern to

19   hold persons accountable for threatening the preservation of

20   a marriage and the family it has created."

21             And line 67, "Pennsylvania has an interest in the

22   marriages it sanctions under its laws in light of the

23   support obligations owed between spouse and the property

24   owned by married couples."

25   Q.    Did Dr. Rudolph claim that the allegations of adultery

DIRECT - BABAZ

1    threatened his marriage?

2              MR. MARKUS:  Objection.  Leading, Your Honor.

3              THE COURT:  Overruled.  You may answer, sir.

4              THE WITNESS:  It -- in this, I guess so.

5    BY MR. FIELDS:

6    Q.   Let's look at page 11, and paragraph 77.  And,

7    actually, sorry, let's go to the previous page.

8              So Defendant Cunningham -- who is Cunningham?

9    A.   Ralph Cunningham was a past-president of SCI; he was a

10   board member.  At the time I believe Ralph was actually

11   chairman of the Board of Inquiry.

12   Q.   And this says that he published defamatory statements.

13   What are defamatory statements?

14   A.   I'm sorry, one more time.

15   Q.   What are defamatory statements?  Or what's the

16   allegation here?

17   A.   It says here, "Adultery, making false statements in a

18   campaign video, using intellectual property without

19   authority, spelling a member's name wrong."

20   Q.   Let's go to the next page.  One of those was adultery?

21   One of those was adultery?

22   A.   Yes, sir.  According to the statement.

23   Q.   Okay.  And then let's read paragraphs -- let's read

24   paragraph 78, please.

25   A.   Line 78, "The statements made relevant to the

1452

DIRECT - BABAZ

1   plaintiff's referenced" --

2   Q.    Let me stop you there for a second.   The plaintiff, is

3   that Dr. Rudolph?

4   A.    Yes, sir, I believe it is.

5   Q.    Okay.   Keep going, please.

6   A.    "The statements made relevant to the plaintiff's

7   reference in paragraph 75 herein were of a defamatory

8   character, understood by the audience to contain a

9   defamatory meaning and to apply to the plaintiff, and caused

10  special harm to the plaintiff by injuring his reputation and

11  marriage."

12  Q.    Now let's look at the next page.   And let's look at

13  paragraph 84, please.

14         What does that one say?

15  A.    Line 84, "The BOI," the Board of Inquiry, "and the

16  individual members of the same, were fully cognizant of the

17  consequences to plaintiff's marriage of alleging plaintiff

18  was an adulterer, i.e., that the plaintiff would be"

19  reviewed "members of the hunting and business community as a

20  deceitful spouse --"

21         THE COURT:   Slow down, slow down.

22         THE WITNESS:   Sir?

23         THE COURT:   Slow down, sir.

24         THE WITNESS:   Okay.   "That the plaintiff would be

25  viewed members of the hunting and business community as a

1453

DIRECT - BABAZ

1    deceitful spouse who breached his duty to be faithful to his

2    wife, and that the plaintiff's Pennsylvania marriage were

3    regarded as being wrought with trouble."

4    BY MR. FIELDS:

5    Q.    Now let's look at paragraph 86.  And that one, please.

6    A.    Paragraph 86, "The BOI," Board of Inquiry, "and

7    individual members of the same, were aware, at the time they

8    chose to allege that the plaintiff was an adulterer, that

9    they were directing a devastating assault on the plaintiff's

10   Pennsylvania marriage, their illegal acts knowingly and

11   intentionally being directed towards a marriage that

12   Pennsylvania regulates."

13   Q.    So these were all allegations that Dr. Rudolph was

14   making against the Board of Inquiry?

15   A.    Yes, sir.  It appears so here.

16   Q.    Was Dr. Rudolph deposed during that lawsuit?

17   A.    Yes, sir, I believe he was.

18   Q.    Now have you reviewed that deposition before your

19   testimony, or at least portions of it?

20   A.    I believe so, yes, sir.

21   Q.    Was he asked about accusations that he had been

22   unfaithful to his wife?

23        MR. MARKUS:    Objection, Your Honor.  Leading and no

24   firsthand knowledge.  He was not present during the

25   deposition.

DIRECT - BABAZ

1    THE COURT:  Mr. Fields.

2    MR. FIELDS:  Your Honor, the deposition is a video.

3    He was -- he did have firsthand knowledge of the lawsuit

4    against SCI as he testified earlier, and he reviewed that

5    video for his testimony.

6    THE COURT:  Why don't we just watch the video?

7    MR. FIELDS:  That's what I'm getting -- leading up

8    to, Your Honor.

9    THE COURT:  Okay.  Let's go straightaway to that.

10    MR. FIELDS:  Your Honor, at this time I'd move for

11    the admission of Government's Exhibit 80.

12    MR. MARKUS:  Objection for various reasons, Your

13    Honor, that I've stated before, and also under 401, 403; no

14    firsthand knowledge, and this isn't the proper witness.

15    MR. DILL:  Your Honor, object under hearsay as to

16    my client.

17    THE COURT:  All right.  80 is what again,

18    Mr. Fields?

19    MR. FIELDS:  It's clips from the deposition of

20    Lawrence Rudolph related to this lawsuit.

21    THE COURT:  In the lawsuit that we just -- that 83

22    is the amended complaint --

23    MR. FIELDS:  Correct.

24    THE COURT:  Okay.  Objections are overruled.

25    Exhibit 80 is admitted into evidence and may be published to

1455

DIRECT - BABAZ

 1    the jury.

 2         (Government's Exhibit 80 received)

 3         MR. FIELDS:  Your Honor, I'd also move for the

 4    admission of Government's Exhibit 81, which is the

 5    corresponding transcript to that deposition.

 6         MR. MARKUS:  Same objection.

 7         THE COURT:  Why are we going to do a -- Mr. Dill,

 8    do you join in that objection?

 9         MR. DILL:  Yes, sir.  And I have a matter to bring

10    to the Court's attention.

11         THE COURT:  Mr. Fields, why do we need a transcript

12    if we're going to watch a video --

13         MR. FIELDS:  For ease of reference, Your Honor.

14    It's not critical, but sometimes people can find it easier

15    to read than to listen.

16         THE COURT:  Let's have counsel come forward and we

17    can deal with Mr. Dill's issue.

18         (Discussion at sidebar)

19         THE COURT:  Go ahead.

20         MR. DILL:  Yes, Your Honor.  As my objection was

21    before, this is hearsay being admitted against my client.  I

22    would move for a severance of my client at this point in

23    time.  These are out-of-court statements by somebody other

24    than my client being offered in this case.  This evidence

25    against her -- we have a right to a fundamental fair trial

DIRECT - BABAZ

1    as her own trial as the defendant is being impacted.  So I

2    would object to the admission of this as it is against my

3    client and move for a severance.

4              THE COURT:  Mr. Fields.

5              MR. FIELDS:  Your Honor, I believe that a curative

6    instruction would be appropriate in these instances, and we

7    have no objection to a curative instruction.  Also if

8    Dr. Rudolph takes the stand, Mr. Dill's going to have the

9    opportunity to cross-examine inasmuch as he would like

10   regarding this hearsay statement.

11             THE COURT:  Do you wish to be heard?

12             MR. MARKUS:  Yes, Your Honor.  I also just want to

13   say that I'm going to now have to, based on Mr. Fields'

14   questioning about the complaint, get into the defense of the

15   complaint as I warned the Court before, even though the

16   woman --

17             THE COURT:  Why do you have to do that?

18             MR. MARKUS:  Because the allegations aren't true,

19   Your Honor, in there.  He successfully defended that

20   defamation suit and won -- successfully prosecuted that

21   defamation suit and won.  Those allegations in that

22   complaint are false.  And so now I'm in a position where I

23   have to get up there and show that the paragraphs that

24   Mr. Fields read are false and I have to defend it.  And this

25   is exactly what I was warning the Court about.  And

DIRECT - BABAZ

1    Mr. Fields has crossed the line and I am now having to

2    defend it.

3              THE COURT:  Mr. Fields, your response.

4              MR. FIELDS:  Your Honor, there were allegations of

5    adultery in that lawsuit, including adultery with Lori

6    Milliron, so we're going to get into that.  It's the second

7    response to interrogatories where they specifically asked

8    Dr. Rudolph about Lori Milliron and he says he had no emails

9    with her.  He -- the parties have stipulated that there were

10   actually lots of emails describing their affair in detail.

11   These allegations that Dr. Rudolph is saying -- so

12   Dr. Rudolph brings a suit saying that these allegations of

13   adultery are false.  He doesn't defend it by saying he has

14   an open marriage or anything like that.  He says they're

15   false.  That's not true, Your Honor.  And so it goes to this

16   issue of an open marriage and it goes to his motive

17   regarding concealing Lori Milliron's involvement in the

18   lawsuit and everything and related to the Cass Olmstead

19   order that the Court gave.

20             So one of the reasons that we're alleging that

21   Larry would have had a motive to kill Bianca is to prevent

22   her from actually revealing that the basis for this lawsuit

23   was false, Your Honor.  The defendant was bringing a false

24   lawsuit under false pretenses.

25             THE COURT:  Okay.  But I think in one respect your

DIRECT - BABAZ

1    answer just confirmed what Mr. Markus said.  He's saying the

2    allegations are false; you say that the allegations were

3    true; the allegations made by this society -- whatever the

4    name is -- members.  I think to a certain limited extent I'm

5    going to have to allow evidence and testimony in to rebut

6    those statements.

7              MR. MARKUS:  It's not too late to stop this, Your

8    Honor.  I would ask that the Court strike the testimony and

9    let's move on.  Otherwise it's going to be a full show and

10   mini trial.  It's not as simple as just --

11             THE COURT:  Lower your voice.

12             MR. MARKUS:  I'm sorry.  It's not as simple as just

13   going back and forth.  This lawsuit has not -- no mention of

14   Lori Milliron.  This lawsuit is about an Atlanta woman, Your

15   Honor.  And --

16             THE COURT:  Right.

17             MR. MARKUS:  And so it has nothing to do with Lori

18   Milliron.  And so we're now going to have to get into this

19   Atlanta woman and all the other allegations in it.  The

20   adultery allegation regarding the Atlanta woman is one of 10

21   points of defamation.

22             So I would ask the Court to reconsider this witness

23   and strike what's been said.  We don't have to get into

24   this.  It's not too late to fix this, Judge.

25             MR. DILL:  Your Honor, I'm sorry.

1459

DIRECT - BABAZ

1      THE COURT:  Go ahead.

2      MR. DILL:  I would echo the sentiments, Your Honor.

3  The truth here -- in fact Dr. Rudolph has not yet taken the

4  stand.  This is going to be a rebuttal case on that issue

5  depending on what he's asked.  But at this point in time,

6  from my client's perspective, these are out-of-court

7  statements now being offered against her, and ostensibly to

8  try to impeach her now somehow.

9      So I would agree that the time for this would be

10  after Dr. Rudolph, if, in fact, he does testify, as opposed

11  to begin with now in this case.

12      MR. MARKUS:  They can cross Dr. Rudolph with all

13  the depos that they want, they will come in that way.  But

14  to bring it in through a lawsuit is going to require us to

15  now defend the lawsuit.  I have no problem with them

16  crossing Dr. Rudolph with the deposition and the

17  interrogatories, Your Honor.  That's a separate, easy issue.

18  But now with the lawsuit it's going to create a whole

19  hornet's nest.

20      THE COURT:  Mr. Fields, I asked you this question

21  earlier this morning so I'll ask it again, and now that

22  you've heard these additional arguments:  Is it still the

23  Government's position that cross-examination of the

24  defendant on these issues will not be sufficient for the

25  Government to put on its evidence on this matter?

DIRECT - BABAZ

1    MR. FIELDS:  Your Honor, playing the deposition now

2    will certainly make that cross-examination a lot easier

3    because the jury will have already seen it.  So we're going

4    to play it one way or another.

5         There's no guarantee the defendant's going to take

6    the stand.  I know they said that.  I've actually had

7    another case where defense kept making that promise in

8    opening and didn't follow through with it.

9         So one way or another, the jury should hear the

10   evidence.  It goes directly to the allegation that there is

11   an open marriage.  There wasn't.  Dr. Rudolph is explicitly

12   denying having an open marriage in these -- in the

13   complaint.

14        MR. DILL:  I'm sorry --

15        THE COURT:  The -- are you representing to me as an

16   officer of the Court that you are going to call your client?

17        MR. MARKUS:  100 percent, Your Honor.  And if I

18   don't, I will stipulate to the admission of these

19   depositions, interrogatories, and the rest of it.  But I am

20   calling Dr. Rudolph.

21        THE COURT:  All right.  I do have a concern that I

22   voiced this morning, and I reiterate, that one of the

23   reasons that I granted the motion *in limine* with -- or

24   the -- yeah, the motion *in limine* with respect to the

25   crocodile incident, because I don't want to go off on these

1461

DIRECT - BABAZ

1   paths that we really -- first of all, take a lot of time,

2   and we're all concerned about whether we're going to finish

3   in time.  I think it will confuse the jury.

4           I'm going to take Mr. Markus at his word that the

5   defendant is going to be called.  I will say, however, if

6   for some reason he is not called, I will allow Mr. Babaz --

7   is he local?

8           MR. FIELDS:  No, he flew in from Atlanta, Your

9   Honor.

10          THE COURT:  Okay.  So he wouldn't be available

11  for -- to be recalled on a rebuttal.

12          MR. FIELDS:  He could, but it would be just a

13  little difficult.

14          THE COURT:  All right.  So what do we do if your

15  client doesn't take the stand?

16          MR. MARKUS:  I'll stipulate to the admission of the

17  deposition video and interrogatories and the complaint if he

18  doesn't take the stand.  But I'm representing to the Court

19  that he's taking the stand.  I'm telling the Court.

20          THE COURT:  All right.  I will accept that

21  representation and I will hold you to your commitment that

22  all these other items are going to be coming into evidence

23  under stipulation.  So for right now, 80 and 81 will not go

24  into those -- there's a number of things here.  So let's

25  take them one at a time.

DIRECT - BABAZ

1          With respect to Mr. Dill's motions, I'm going to

2    deny them -- the motion for severance at this time for

3    essentially the same reasons we discussed in our prior

4    rulings denying severance.  I do believe, I agree with the

5    Government, that a curative limiting instruction would be

6    sufficient to cure the information -- or the possible

7    prejudice to your client.

8          We're not going into these other matters now.  Do

9    you still wish me to read this instruction given the --

10         MR. DILL:  I do.

11         THE COURT:  -- testimony that's been elicited so

12   far?

13         MR. DILL:  Yes, Your Honor.

14         THE COURT:  All right.  Okay.  So I will do that --

15   let's see how we'll -- well, but there's not been -- I don't

16   know if we've reached a point yet -- I mean, if I'm going to

17   agree with Mr. Markus and terminate the examination of this

18   witness on this issue at this point, I don't know that we

19   yet heard -- other than reading of allegations on the

20   amended complaint, we have not heard a statement that I

21   think would be subject to this limiting instruction.

22         MR. DILL:  Just to clarify, Your Honor, are we

23   striking what has already been presented or is it being left

24   open?  If it's being left open for him to be called in

25   rebuttal, I would request the instruction.  If it's being

1463

DIRECT - BABAZ

1  stricken, I agree with the Court that it's not necessary at

2  this point.

3          THE COURT:  Okay.  No, I'm not going to strike

4  what's been -- what's already been put on the stand.  What

5  I'm going to do is limit this line of questioning at this

6  point and stop it at this point.  And do you agree,

7  Mr. Fields, that a limiting instruction, given the fact that

8  I'll not strike what's been testified up to now, if proven,

9  then should be made at this time?

10         MR. FIELDS:  I do, Your Honor.

11         THE COURT:  All right.  So that's what I'm going to

12  do.  I'm going to give that instruction, and deny the motion

13  for severance.

14         I have addressed, Mr. Markus, your issues about

15  what my expectations are with respect to your client taking

16  the stand and what are the consequences if he does not.

17         MR. MARKUS:  Yes, Your Honor.

18         THE COURT:  And of course I would say, if I'm in

19  your shoes, you made such a commitment to the jury --

20         MR. MARKUS:  Yeah, I'm following --

21         THE COURT:  And your -- I would not want to be in

22  your shoes if you then say, "Well, oh, by the way, Jurors, I

23  know I told you that and I said it very strongly, but now

24  I'm going back on it and I'm not going to produce him."

25         MR. MARKUS:  I'm not going to do that, Your Honor.

1464

DIRECT - BABAZ

1    THE COURT:  I think we can rely on that.  Anything

2    else we need to discuss?

3    MR. MARKUS:  Your Honor, if the Court is not

4    striking this testimony that's in so far, I'm in a little

5    bit of an awkward position because the jury has heard about

6    this complaint.  So I think the -- I would ask the Court to

7    just strike it so that I'm not in a position of this

8    testimony being in about the complaint and not being able to

9    respond to it.

10    THE COURT:  All right.  But you -- hhm.

11    Mr. Fields.

12    MR. FIELDS:  Your Honor, he's said his client's

13    going to take the stand.  He can, of course, respond to it

14    then.  It's going to be on cross.  And actually my issue is

15    sometimes courts can allow the Government to admit exhibits

16    through cross.  I planned on admitting these exhibits

17    anyway, so I would offer them through admission now.

18    We can always submit them and then I can use them

19    on cross-examination of Dr. Rudolph.

20    THE COURT:  I think it will be less confusing to

21    the jury if you admitted them during your cross.

22    MR. FIELDS:  Okay.

23    THE COURT:  I think Mr. Fields is right.  I think

24    you can handle -- whatever rebuttal -- let's call it that --

25    if you think that's necessary in your client's interest to

DIRECT - BABAZ

1    address Mr. Babaz's testimony up to now, I think you can

2    address that when your client takes the stand.

3              Anything else before we break up the sidebar?

4              MR. FIELDS:  No, Your Honor.  Thank you.

5              THE COURT:  All right.

6         (End of discussion at sidebar)

7              THE COURT:  Members of the jury, before we proceed

8    any further, I want to read an instruction that is necessary

9    for me to read at this point.

10             You may consider the allegations in the amended

11   complaint that you heard this witness read from in this case

12   only against Defendant Dr. Rudolph and not against Defendant

13   Lori Milliron.  You may not consider these statements --

14   that you just saw on your exhibit monitor screens and this

15   witness's testimony -- you may not consider those statements

16   in any way when you're deciding if the Government has proved

17   beyond a reasonable doubt its case against Defendant Lori

18   Milliron.

19             Mr. Fields, it's 12:25 now.  Would this be a good

20   time to take our lunch break?

21             MR. FIELDS:  It would be, Your Honor.  But I have

22   no further questions for this witness, so I don't know how

23   long cross will be, but we might be able to finish him very

24   quickly.

25             THE COURT:  All right, that's a good point.  Would

1466
DIRECT - BABAZ

1  we be able to finish cross in a few minutes and then this

2  witness can be excused?

3          MR. MARKUS:  Can I have 10 seconds, Your Honor?

4          THE COURT:  Sure.  Go ahead.

5          MR. MARKUS:  Thank you.

6          Your Honor, I would ask if we could just take the

7  lunch break now.

8          THE COURT:  All right.  All right, folks, we're

9  going to take our lunch recess.  We'll be in recess until

10  1:30.

11      (Jury left the courtroom at 12:26 p.m.)

12          THE COURT:  Mr. Babaz, since you're in the middle

13  of your testimony, I direct you not to speak with any of the

14  lawyers during the lunch recess.  You're free to go wherever

15  you wish for lunch or wherever else you want to go.  I ask

16  you to be back in that witness stand by 12:25 -- or 1:25,

17  all right?

18          THE WITNESS:  Yes, sir.

19          THE COURT:  Thank you.

20      (Recess taken 12:27 p.m.)

21                    AFTERNOON SESSION

22      (In open court in the presence of the jury at 1:33

23  p.m.)

24          THE COURT:  All right, Mr. Babaz, I remind you you

25  remain under oath.

1467

CROSS - BABAZ

1  THE WITNESS:  Yes, Your Honor.

2  THE COURT:  Cross-examination.

3  CROSS-EXAMINATION

4  BY MR. MARKUS:

5  Q.   Thank you, Your Honor.  Good afternoon, ladies and

6  gentlemen, good afternoon, counsel.

7  Mr. Babaz, my name is David Markus.  I represent

8  Dr. Rudolph.  And I'm going to ask you a couple of

9  questions, okay, sir?

10  A.   Yes, sir.

11  Q.   The prosecutor read to you selected portions of a

12  lawsuit.  I want to ask you:  That lawsuit was between

13  Dr. Rudolph and SCI and its board members, correct?

14  A.   Correct.

15  Q.   You weren't a party to the lawsuit, correct?

16  A.   No, sir.

17  Q.   In other words, you weren't one of the named

18  defendants, were you?

19  A.   No, sir.

20  Q.   This lawsuit was brought back in 2012, correct?

21  A.   I believe so, yes, sir.

22  Q.   And this was a lawsuit -- what we lawyers call

23  "defamation lawsuit," and the prosecutor asked you a couple

24  of questions about that, right?

25  A.   Yes, sir.

1468

CROSS - BABAZ

1  Q.    Now, the defamation related to Dr. Rudolph's time as
2  president, correct, of SCI?
3  A.    No, sir, I don't believe he's president at the time.
4  Q.    No, no, not at the time he brought the lawsuit, but
5  related to false statements about him when he was president.
6  A.    Yes, sir.
7  Q.    Okay.  And the prosecutor read to you a couple
8  paragraphs.  The paragraph that actually dealt with the
9  actual defamation claim listed a number of different false
10  statements that Dr. Rudolph alleged that SCI and its board
11  members made, right?
12  A.    Can you repeat that?  I'm sorry.
13  Q.    Sure.  This wasn't just about adultery with an Atlanta
14  woman, was it?
15  A.    No, sir.
16  Q.    There were a number of allegations and false statements
17  that this lawsuit related to, correct?
18  A.    Yes, sir.
19  Q.    And the part about the adultery that the prosecutor did
20  not read to you -- and this is from the exact paragraph on
21  defamation -- listed all those things, and also said, quote,
22  Engaged in inappropriate relationships with women while on
23  SCI business.  Do you remember that?
24  A.    I -- if it was on the statement.  I don't recall seeing
25  it, but maybe so.

1469

CROSS - BABAZ

1   Q.   Okay.  And so if you take my word for it that that's

2   what the complaint says, this dealt -- this lawsuit, the

3   part -- the small part of it that dealt with adultery, dealt

4   with whether Dr. Rudolph was having an inappropriate

5   relationship with an Atlanta woman while on SCI business,

6   correct?

7   A.   Yes, sir.

8   Q.   Okay.  And the Atlanta woman -- by the way, that was a

9   woman by the name of Ann McCoy, correct?

10  A.   Yes, sir.

11  Q.   Not Lori Milliron, correct?

12  A.   No, sir.

13  Q.   And without getting into it and all the specifics, you

14  know that Bianca Rudolph was also deposed in this case,

15  correct?

16  A.   I don't know that for sure.

17  Q.   Okay.  You do know that at some point SCI and its board

18  members settled the lawsuit and paid Dr. Rudolph, correct?

19  A.   There was a settlement, yes, sir.

20          MR. MARKUS:  Okay.  I have nothing further, Your

21  Honor.

22          THE COURT:  All right.  Any cross, Mr. Dill?

23          MR. DILL:  No, sir.

24          THE COURT:  All right.  Redirect.

25                  REDIRECT EXAMINATION

REDIRECT - BABAZ

1   BY MR. FIELDS:

2   Q.   Sir, you were asked about the allegations in the

3   complaint.  Do you remember that?

4   A.   Yes, sir.

5   Q.   Was one of the allegations also related to

6   Dr. Rudolph's relationship with Lori Milliron?

7   A.   I don't recall specifically.

8        MR. FIELDS:  No further questions, Your Honor.

9        THE COURT:  All right.  May this witness be excused

10  for the Government?

11       MR. FIELDS:  Yes, Your Honor.

12       THE COURT:  For the defendants?

13       MR. MARKUS:  Yes, Your Honor.

14       MR. DILL:  Yes, Your Honor.

15       THE COURT:  All right.  Mr. Babaz, thank you for

16  your testimony.  You're excused and you may step down.

17       THE WITNESS:  Thank you, Your Honor.

18       THE COURT:  Government may call its next witness.

19       MR. WINSTEAD:  Thank you, Your Honor.  The United

20  States calls Steve Rodgers.

21       COURTROOM DEPUTY:  If you'll raise your right hand

22  for me.

23       STEVEN RODGERS, GOVERNMENT'S WITNESS, SWORN

24       COURTROOM DEPUTY:  Please be seated and remove your

25  mask for us.  And then state your name for the record and

DIRECT - RODGERS

1    spell your first and last name for us.

2              THE WITNESS:  Steven James Rodgers.  S-t-e-v-e.

3    Rodgers, R-o-d-g-e-r-s.

4              THE COURT:  You may proceed, counsel.

5              MR. WINSTEAD:  Thank you, Your Honor.

6                         DIRECT EXAMINATION

7    BY MR. WINSTEAD:

8    Q.    Good afternoon, sir.

9    A.    Good afternoon.

10   Q.    Can you tell us where you work.

11   A.    I work for Vista Outdoor.

12   Q.    Is that a parent company of Federal?

13   A.    Correct.

14   Q.    What's -- and what's the full name of Federal?

15   A.    Federal Cartridge Company.

16   Q.    What does Federal make?

17   A.    Federal cartridge makes a wide variety of ammunition.

18   Q.    How long have you been at Vista Outdoor?

19   A.    Well, I started at Federal Cartridge Company over 20

20   years ago, so it's been 20 years.

21   Q.    Are there other ammunition companies besides Federal

22   under the Vista Outdoor parent company?

23   A.    Yes.  We have CCI Speer Operation, and then Remington

24   as well.

25   Q.    So you said you started at Federal about 20 years ago?

1    A.    A little longer than -- when I was in college I was a

2    summer temp on the factory floor, and then after college, I

3    got a full-time job there.

4    Q.    So that was in about 2000?

5    A.    Correct.

6    Q.    Okay.  What were you doing once you got a full-time

7    job?

8    A.    I was in the marketing department.  We would set up

9    demonstrations for our dealer network, product

10    differentiation, trying to show that our product was

11    superior to our competitors.

12    Q.    When you say "set up demonstrations," would you do

13    actual, like, firing demonstrations?

14    A.    Yeah.  We would do gel-block testing, different sort

15    of -- some would be on-range, some would be in-house

16    reloading.  We did reloading demonstrations with our

17    products.

18    Q.    Just so I understand, when you say gel-block testing,

19    what -- just describe the scene that I would see if you were

20    doing that.

21    A.    Sure.  A gel block is -- it's basically like dense

22    Jell-O, and it's meant to capture the projectile in flight

23    so you can see its penetration and expansion and

24    performance.

25    Q.    And so are you setting up like test firings into that?

DIRECT - RODGERS

1    A.    Yes.

2    Q.    Okay.  How long were you in that marketing position?

3    A.    About three years.

4    Q.    So what position did you transition to after that?

5    A.    After that I went to the product service group, which

6    is our technical support group for our customers in law

7    enforcement.

8    Q.    What was your position when you were there?

9    A.    Answering questions, taking complaints, firearm damage,

10   injury complaints that would come in from our products being

11   used externally.

12   Q.    What did you do with those complaints?

13   A.    Tried to solve them best we could.

14   Q.    How would you solve them?

15   A.    Negotiate with the customer.  Investigate first in

16   trying to determine what the root cause of the problem was

17   and then either if it was something internal, set up

18   corrective action to fix that problem and then work with the

19   customer for a resolution.

20   Q.    So when you're talking about investigating, what would

21   you -- what would you do in a typical sort of a situation?

22   A.    An example would -- to say a firearm was damaged, we

23   would get the ammunition back, the firearm back, and then we

24   would test-fire the ammunition, look at old data records,

25   make sure it was manufactured properly.  Disassemble the

DIRECT - RODGERS

1    firearm, see if we can't determine what the cause was.

2    Q.    Did that involve doing like firearm testing set-ups and

3    things like that?

4    A.    Sometimes.  It could be an accuracy complaint where we

5    get the firearm in and test it for accuracy and see if we

6    could determine the problem.

7    Q.    Do you -- in that role, did you do anything with law

8    enforcement?

9    A.    We would take law enforcement inquiries and problems

10   that they encounter in the field as well, yes.

11   Q.    Like what?

12   A.    Could be anything.  Crime scene evidence at a crime

13   scene.  Identify bullet, projectiles.  A lot of times ATF

14   would request interstate nexus to show the ammunition

15   crossed state lines.  So it would be a wide variety of

16   requests we would get.

17   Q.    Did -- in answering those law enforcement requests,

18   would you ever set up shooting scenarios in order to try to

19   recreate things?

20   A.    Yes.

21   Q.    Tell me about that.

22   A.    We've done pattern testing.  What are some of the

23   others?  A lot of in-depth bullet analysis, toolmark

24   inspection, projectiles of a bullet of a victim, and we're

25   trying to identify toolmarks and tie it to that round.

DIRECT - RODGERS

1    Gel-block testing, barrier testing to see how a product

2    performs after it goes through a barrier, then into the gel

3    block.

4    Q.    I think you said something about patterning testing,

5    but did that type of your duties involve patterning

6    shotguns?

7    A.    It has, yes.

8    Q.    What about when you were marketing?

9    A.    We would do some long-range pattern testing with

10   different chokes and different loads, yes.

11   Q.    What was your actual title after you left the marketing

12   division to be doing what you were just describing?

13   A.    Product safety rep -- or product service

14   representative.

15   Q.    All right.  Did you ever change jobs?

16   A.    Yes.  Then I started taking more of the injury

17   complaints and I moved over to our legal department and

18   became our product safety manager for a wider -- more

19   brands.

20   Q.    In that job, do you still have oversight over the same

21   functions that you were doing previously?

22   A.    Yes.

23   Q.    And are you still involved in those functions?

24   A.    Yes.  It's -- there's an escalation process.  If it's

25   severe enough, it gets escalated up, correct.

DIRECT - RODGERS

1    Q.    At any point did you become a senior product safety

2    manager?

3    A.    Yes.  After a few years, I became the senior products

4    manager.

5    Q.    What does that mean?

6    A.    Just more responsibility.  We added some new companies,

7    acquisitions, so I acquired some more brand responsibility.

8    Q.    When you were in these positions -- we've talked about

9    identification and re-creation.  Did you also have any

10   oversight of affirmative testing in the product development

11   cycle?

12   A.    Worked very closely with the product development and

13   new products.  We'd look at things we've seen in the past,

14   corrective actions, reconnaissance that we investigated, and

15   try and apply what we learned from those cases into our new

16   products.

17   Q.    And so when you're talking about new products, do you

18   make shotgun shells?

19   A.    Yes.

20   Q.    So are you familiar with the performance, the testing,

21   and the design of shotgun shells?

22   A.    Yes.

23   Q.    What about the manufacturing process and quality

24   control process?

25   A.    Work very closely with engineers on the floor and our

1477

DIRECT - RODGERS

1    QA department understanding how the manufacturing process

2    occurs.

3    Q.    Over the years when you're -- when you've been in these

4    progressive roles, how did you learn your -- how did you

5    learn how to do your job?

6    A.    On-the-job training.  Hopefully there are people there

7    that had some knowledge before me that I could learn from

8    along the way.

9    Q.    And when did you begin your current job?

10   A.    I've been doing the senior product manager for four or

11   five years now.

12   Q.    Okay.  So as far as your specialized knowledge and

13   expertise, can you tell -- can you tell me about fields you

14   have knowledge about and that you can tell us about today.

15   A.    Just overall ballistics with shotshell, rifle, pistol.

16   Internal ballistics, external ballistics, and terminal

17   ballistics.

18   Q.    What are those different types of ballistics?

19   A.    Internal ballistics is what happens once a round is

20   fired.  Basically the pressure builds, the projectile is

21   moving down the barrel.  External ballistics is then the

22   bullet is in flight.  And terminal ballistics is the impact

23   of the bullet on a target.

24   Q.    Okay.  How did you develop expertise in those types of

25   ballistics?

DIRECT - RODGERS

1   A.   On-the-job training.  A lot of different testing and

2   working with product development.

3   Q.   Has your job over the last 20 years involved regular

4   exercise of knowledge in those fields?

5   A.   Yes.

6   Q.   What about shotshell component identification?

7   A.   We are asked to identify shotshell components probably

8   weekly in different criminal matters.

9   Q.   Okay.  And you've been doing that since you -- since

10  you left marketing?

11  A.   Correct.

12  Q.   Okay.  About how long is that?

13  A.   15 years.

14  Q.   Do you use specialized equipment and tools in your

15  work?

16  A.   We do.  We have a lot of acoutstics Ehler systems that

17  basically tracks a bullet in flight --

18  Q.   And just a sec.  So you said acoustic -- what was the

19  next word?

20  A.   It's all the same.  It's an Ehler acoustic system that

21  captures the bullet in flight that we use to, you know, make

22  sure ballistics are under specification.

23  Q.   How do you spell Ehler?

24  A.   E-h-l-e-r.

25  Q.   All right.  What does that do?

1479

DIRECT - RODGERS

1  A.    It measures the  -- basically listens -- we have

2  underground alleys in our facilities and we have these

3  microphones set up and it will basically track the bullet in

4  flight at a 200-yard underground alley.

5  Q.    Anything else?

6  A.    Chronographs, and then pressure-and-velocity testing.

7  Every round -- or every batch of ammunition that gets

8  released has pressure and velocity testing done on it -- on

9  that batch to make sure that ammunition is within the

10  specification.  Basically it's a test barrel that measures

11  how much pressure is inside that chamber.

12  Q.    Do you have different kinds of targets to test terminal

13  ballistics?

14  A.    Lots of different targets.  Gel, barrier testing,

15  patterning boards.

16  Q.    I'd like to ask a little bit more about your pattern

17  testing.  What context do you generally do shotgun

18  patterning testing?

19  A.    The most previous one was for a criminal case where we

20  were asked to try and duplicate something that happened at a

21  crime scene where we were basically measuring the pattern at

22  different distances for a local law enforcement department.

23  Q.    Do you also do product development?

24  A.    Yes.  A lot of our waterfowl loads, we have a 30-inch

25  circle and we try and get a 90-percent pellet count in at 40

DIRECT - RODGERS

1    yards.  So definitely trying and keep the pattern as tight

2    as possible.

3    Q.    What's your personal familiarity with shotguns?

4    A.    I used to shoot quite a bit of skeet and sporting clays

5    and some trap.  I was in a league.  I shot for our ATK, was

6    our previous parent company.  I shot their sporting clays

7    team.  And then I also hunt ducks and pheasants, turkeys.

8    Q.    When you were on the ATK team, did you attend

9    competitions?

10   A.    Yes.

11   Q.    Can you give me an example.

12   A.    We were -- it's changed.  It used to be the

13   Congressional Sportsman's Association Shoot, when we would

14   go to Washington, D.C. and shoot with the Congressmen and

15   the Senators.  And I was on one of three or four people from

16   our company that was on our team.

17          The first day used to be the initial challenge

18   where we would shoot against other industry teams, a lot of

19   professional shooters.

20   Q.    And when you say "industry teams," what are you

21   meaning?

22   A.    Beretta, Browning; different companies would fill the

23   team.  So the first day you shot against the other industry

24   teams.

25   Q.    And you said that some of the other teams had

DIRECT - RODGERS

1    professional shooters?

2    A.    Yes.

3    Q.    Are you a professional shooter?

4    A.    No.

5    Q.    How did you do in those competitions?

6              MS. MOSS:  I just object as to the relevance now.

7              THE COURT:  What is the relevance?

8              MR. WINSTEAD:  He's -- we're going to be asking

9    that he's qualified as an expert in shotgun handling,

10   function, and weapons safety, and so I think this is

11   relevant.

12             THE COURT:  All right, I'll allow it.  Go ahead.

13   BY MR. WINSTEAD:

14   Q.    How did you do in those competitions?

15   A.    Those shoots we had a lot of pressure.  We were

16   supposed to place first, second or third.

17   Q.    And did you?

18   A.    And we did, yes.

19   Q.    All right.

20             MR. WINSTEAD:  Well, at this point, Your Honor, I

21   would like to -- I would like to move for -- that

22   Mr. Rodgers be qualified as an expert in shotgun patterning,

23   in the function of shotguns, the use and handling of

24   shotguns, the function and design of shotgun shells, and the

25   process of shotgun testing.

THE COURT: Any objection?

MS. MOSS: No objection.

MR. DILL: No, Your Honor.

THE COURT: All right. There being no objection, Mr. Rodgers is qualified under Federal Rule of Evidence 702 to provide expert opinion testimony in the fields of shotgun patterning, functions of shotguns, use and handling of shotguns, function and design of shotgun shells, and the process of shotgun testing. You may proceed.

MR. WINSTEAD: Thank you, Your Honor.

BY MR. WINSTEAD:

Q. Sir, how did you first become involved in this case?

A. One of our product service reps was contacted by the FBI to identify some shotshelling issue. And he then escalated the case to me.

Q. When you were first contacted, were you asked to identify shotgun shells from photographs?

A. Correct.

Q. Were you able to make a determination of the type of shotgun shells in the photographs?

A. Yes, we were.

Q. Do you remember what type it was?

A. It was a 12-gauge, 3-inch buckshot, and our internal load was P-158 double-aught.

Q. Is that -- how would you describe that simply? What

1483

DIRECT - RODGERS

1    type of ammunition is that?

2    A.    12-gauge, 15-pellet buckshot load, 3-inch, feet per

3    second of 1100.

4    Q.    And is that on the spectrum of cheaper to nicer --

5    A.    It's nicer, it's premium.  The P stands for premium.

6    It has a lot of high-end components in it.

7    Q.    Okay.  So I'd like to ask you more about that

8    ammunition, but first I'd like to ask just a couple simple

9    questions about shotguns.  What's the difference between a

10   shotgun and a rifle?

11   A.    A shotgun typically shoots a shotshell that has

12   multiple projectiles that come out of the barrel, where a

13   rifle will shoot traditionally one projectile.

14   Q.    Does shot expand once it comes out of the barrel?

15   A.    Yes.

16   Q.    Why?

17   A.    On a mission, they're set back.  All the pellets in a

18   shotshell kind of contract.  Before they're pushed out the

19   barrel, there's a lot of back pressure.  These pellets are

20   traveling down that barrel at high rates of speed.  It's

21   very condensed.  And as soon as it clears the barrel, it

22   starts opening the -- the pattern starts opening.

23   Q.    Okay.  So let's say you have some ammunition and you

24   fire 10 shells of the same ammunition out of the same

25   firearm, and you get patterns from each one.  Are they going

1484

1   to be perfectly identical?

2   A.    No, there's going to be some variation.

3   Q.    How much variation are you going to see from one

4   pattern to the next when everything else is pretty much the

5   same?

6   A.    It depends.   What the usage is and kind of what we're

7   looking for on that round on target.   Every load that we

8   make has kind of a optimum performance range that we're

9   aiming for.

10  Q.    So given that variation, is the expansion of shot

11  relatively predictable?

12  A.    Relatively, yes.

13  Q.    And when you were saying earlier that this particular

14  ammunition was premium ammunition, are there things you can

15  do to a shotgun shell to make it behave in a more

16  predictable way?

17  A.    Yes.   The pellets -- these pellets have -- are

18  copper-plated, so it has a harder coating to prevent

19  deformation down the barrel.   The more round the pellet, the

20  truer it's going to fly.   We also add a granular plastic, a

21  buffer material, inside with the shot to help prevent the

22  pellets from deforming while traveling down the barrel,

23  again to keep them spherical as possible.

24  Q.    So if that's what the pattern is like, when -- you

25  know, once you shoot it and it travels a distance through

DIRECT - RODGERS

1   the air, as you move closer to the barrel, does the

2   pattern -- does some of that variation decrease?

3   A.   Yes.

4   Q.   And so if you were looking at a pattern that was just

5   right at the barrel, would you expect to see a ton of

6   variation?

7   A.   No.

8   Q.   What's a choke?

9   A.   A choke is the constriction at the muzzle of a shotgun.

10  Traditionally the -- the shotgun barrels used to be fixed,

11  so you had one barrel as a certain choke.  But recently in

12  the last 20 or 30 years, the recon removable choke tubes,

13  it's basically a threaded tube, so one shotgun can shoot

14  different choke sizes or constriction sizes depending on the

15  usages.

16  Q.   Does choke make a big difference on pattern size?

17  A.   It can.

18  Q.   What is on -- on the smaller end of the spectrum of

19  chokes?

20  A.   Tighter?

21  Q.   Yes.

22  A.   A full choke.

23  Q.   Is there anything more full than a full?

24  A.   Oh, there's some extra full turkey chokes.  Some

25  companies are coming out with different -- different

1486

DIRECT - RODGERS

1    exceedingly tight chokes, yes.

2    Q.    What's the other end of the spectrum?

3    A.    A cylinder choke.

4    Q.    Does that have the same internal diameter that the

5    barrel would ordinarily?

6    A.    Very close, yes.

7    Q.    All right.  I'd like to ask you about the components of

8    a shotgun shell.  You were telling us about a couple of

9    them, but I'd like to go to the shotgun shells that you

10   provided in this case.  And we'll -- again, we'll talk about

11   the two different batches, but I'd like to pull up, just so

12   we can talk about the components, Exhibit 273, which has

13   been admitted already.

14         All right.  Can you go forward and I'll tell you

15   when to stop.  Okay.  So stop.

16         What are we looking at here?

17   A.    That is the profile of a shotgun shell.  The plastic

18   hull and the brass-plated -- it's actually steel, but

19   brass-plated steel head.

20   Q.    All right.  Next picture.

21         So this is -- sorry, that was page 2.  This is

22   page 3.  And go to the next one.  Okay.  Now we're at page 4

23   of Government's Exhibit 273.

24         Can you see any other components here?

25   A.    Yeah.  It's, again, the brass-plated steel head with

1487

DIRECT - RODGERS

1    the head stamped "12-gauge," "Made in the USA."  And then

2    inside of that is the primer.

3    Q.    What does the primer do?

4    A.    That's what starts the ignition process into the

5    gunpowder, the propellant.

6    Q.    So you've got the brass head and the polymer hole.  Why

7    don't you make the whole thing out of polymer?  Why do you

8    need metal at the base?

9    A.    Again during setback and the heat, there's a lot of

10   heat that builds up, so we keep where the ignition process

11   is in the powder out.

12   Q.    Okay.  Next page, please.

13         What's this?  This is page 5.

14   A.    That's the crimp end of the shotshell where the pellets

15   will come out of.

16   Q.    Okay.  Next.  This is page 6.

17         What are we looking at here?

18   A.    Cut away of a profile.  Inside you can see the little

19   bit of the over-powder wad with the orange disk.  The shot

20   cup -- the slit shot cup, or wad.  And then the granular

21   plastic and part of the buckshot pellets.

22   Q.    Okay.  Next page.  Next.  All right.  This is page 8.

23         What do you see here?

24   A.    Same thing, just this one shows some of the granular

25   plastic, the buffers in the port.  You can see the pellets.

1488

DIRECT - RODGERS

1  Q.  Now I think you mentioned this before, but what part is

2  this white, sort of clear-ish plastic?

3  A.  That is what we call our W-6 shot cup.

4  Q.  What is that for?

5  A.  It contains the pellets during travel down the barrel.

6  Q.  Why do you need that?

7  A.  It just helps control the pattern as it exits.  And,

8  again, helps prevent collision between pellets.

9  Q.  Does -- if the pellets are colliding with each other,

10  does that make the pattern get larger faster?

11  A.  Definitely, yes.

12  Q.  Next page, please.  This is page 9.

13      What can you see here?

14  A.  That is the over-powder wad -- our W-1 over-powder wad.

15  Q.  What is that for?

16  A.  Helps seal the expanding gases inside the shotshell so

17  they don't escape over into the shot column, trying to

18  reduce it as much as possible.

19  Q.  What would happen if the gases escape into the shot

20  column?

21  A.  There's always going to be some so we are just trying

22  to limit as much as possible, but, again, more erratic

23  pattern.  And not as consistent of a burn.  Probably

24  pressure would change a little bit.  Not enough to really

25  change the velocity, but a little bit.

1489

DIRECT - RODGERS

1    Q.    All right, next.  This is page 10.

2          What are we looking at here

3    A.    That is our propellant, the gunpowder.

4    Q.    Next.

5          All right, so you had talked, I think, previously,

6    about why these were premium.  Can you explain that again.

7    A.    Yeah.  They're copper-plated.

8    Q.    And so what does that help prevent?

9    A.    Deformation during travel down the barrel and during

10   setback.

11   Q.    What's inside the copper?

12   A.    There's a lead core in there.

13   Q.    Is lead pretty soft?

14   A.    Yes.

15   Q.    Next page.  Next.

16         And you said this is buffer material?

17   A.    Buffer, correct.

18   Q.    Page 13.

19         Is it hard or is it kind of squishy?

20   A.    It's a little malleable, squishy.

21   Q.    Okay.  Next.  Next.  All right.  This is page 15.

22         Is this the shot cup you were talking about?

23   A.    Correct.

24   Q.    Why does it have slits in it?

25   A.    To help the shot cup petals expand when it comes out

DIRECT - RODGERS

1    and pull off of the shot column.

2    Q.   Why do you want it to do that?

3    A.   Basically so it doesn't interfere with the pellet

4    flight.

5    Q.   Next.  This is page 16.

6         Is this -- well, tell me what this is.

7    A.   That's the over-the-powder wad, or W-1 over-powder wad.

8    Q.   Just to be clear, do both of those wads come out of the

9    end of the barrel when it's fired?

10   A.   Yes.

11   Q.   Okay.  Next page.  Next.  This is page 18.

12        Why is the powder shaped like that?

13   A.   That is a extruded cut-flake propellant.

14   Q.   What does that mean?

15   A.   Basically it's extruded in a tube and there's a blade

16   that comes through.  It's -- sorry -- as the propellant is

17   made, there's a blade that comes through and cuts to the

18   size that they're looking for.

19   Q.   Okay.  So I'd like to talk about the wadding.  So if

20   you could actually go next.  Next.  Yeah, there we go.  All

21   right.  So this is page 20.

22        So looking at those two pieces of wadding, do you

23   happen to know if they come out of the barrel with enough

24   energy to penetrate a wound?

25   A.   Depends on the range of target.

DIRECT - RODGERS

1    Q.    Tell me what you mean.

2    A.    Going back to some previous testing that we've done, we

3    set up a patterning board and then plastic gelatin which is

4    there to equate a human body.  And under 10 feet, you would

5    see some penetration of wad in the gel.

6    Q.    Okay.  So if it's beyond 10 feet, probably not going to

7    penetrate?

8    A.    It's going to depend a little bit on the load but,

9    yeah, the plastic polymer material loses its energy and

10   sometimes flies off target.

11   Q.    Okay.  All right, so you said earlier you identified

12   shells for the FBI.  In that first batch did you provide

13   some to the FBI?

14   A.    Yes.

15   Q.    Then did you receive additional information about the

16   particular components in this case?

17   A.    Correct.

18   Q.    Can you tell me what information you received.

19   A.    Additional photos of recovered wads.  And we were able

20   to determine that the wad was the W-1 over-powder wad as

21   opposed to our W-12, which is our current loading.

22   Q.    And you're talking about the over-powder wad?

23   A.    Yes.

24   Q.    Okay.  And anything about the powder?

25   A.    The powder was identified as an Alliant 485 and -- as

1492

DIRECT - RODGERS

1  opposed to an OBP-50, I believe was the other powder that we

2  were loading currently.

3  Q.   And so this -- these shells right here that are

4  constructed in the second batch, do they match the powder

5  that was -- that was given to you in that second round?

6  A.   Yes.

7  Q.   Okay.  So did those components vary over time in the

8  same P-158 premium ammunition?

9  A.   We will improve products with different components.

10  The W-12 is a newer, a little bit more robust, over-powder

11  wad.  Powder changes kind of according to availability.

12  That being said, they're all loaded the same pressure specs,

13  so the performance downrange is going to be the same.  Even

14  though they're different powders, we just are going to load

15  a different amount.

16  Q.   So, in other words, from the components in the first

17  batch you gave and the components that we see here, would

18  you expect there to be a really significant difference in

19  patterns produced from those different -- those two ammos?

20  A.   No.

21  Q.   All right.  I'd like to ask you -- let's see -- well, I

22  guess I'll just ask you real quick.  In 2005 -- well, you

23  said that you test ammunition to -- to pressure and velocity

24  specifications; is that right?

25  A.   Yes.

DIRECT - RODGERS

1   Q.   Can you tell me what that means.

2   A.   Yeah, every round is going to have a specification.

3   The pressure that we test in our pressure barrels, for a

4   shotshell 12-gauge it's roughly 8,000 to 12,000 PSI.  And we

5   kind of aim for that 10,000 mark.  And then accordingly,

6   depending on the pay load that's pushing, we try and get

7   different velocities for the usage of that product.

8   Q.   What velocity are you aiming for with the P-158

9   ammunition?

10  A.   1100 feet per second.

11  Q.   Okay.  Back in 2005, did you make any internal changes

12  to the velocity you were looking for?

13  A.   We did.  The -- we had a -- I don't know how many SKUs

14  were involved, probably over 30 SKUs that had a FPS of 1200

15  feet per second cataloged.  And we did a recalibration and

16  realized that we weren't really hitting that mark across the

17  fields.  We -- very little change to the product, but we

18  reduced the catalog feet per second to 1100 for that

19  batch -- for those SKUs.

20  Q.   Okay.  So I'd like to ask you:  How do you make sure

21  your ammo, from one batch to the next, meets those pressure

22  and velocity specifications?

23  A.   So every batch, before it leaves one of our facilities,

24  is batch-tested and every lot is tested.

25  Q.   How is it tested?

1494

1    A.    Our ballistics department will grab a random sample

2    during a shift, bring it down to the ballistic alleys, put

3    it inside the test barrels, and shoot a 10-round group.

4    Q.    What's a shift?

5    A.    It varies, depending on the department.  Shotshell is

6    usually an eight-hour shift.

7    Q.    And so is that one person for eight hours?

8    A.    Yes.

9    Q.    Okay.  So they grab random samplings from each person's

10   daily work?

11   A.    Yes.

12   Q.    How many shells do they test from each shift?

13   A.    It's usually a warmer and then a 10-round group.

14   Q.    What's a warmer?

15   A.    Basically warm the barrel up, so it's not shooting down

16   a cold barrel.  More important in a fire or pistol than a

17   shotshell, but they do it nonetheless.

18   Q.    So for this ammunition, how did you -- did you have it

19   lying around or did you have to make it?

20   A.    This batch, we no longer used the W-1 over-the-powder

21   wad.  One of our ballisticians that runs our custom shop was

22   able to find some and he loaded what we had.

23   Q.    How many did you have?

24   A.    I want to say -- I don't remember.  I think it was

25   30-plus.  I don't recall.

DIRECT - RODGERS

1    Q.    And so did he hand-load those 30 into these shells?

2    A.    Yes.

3    Q.    Did you provide all 30 to the FBI?

4    A.    Yes.

5    Q.    Did you do any testing?

6    A.    No -- much -- oh, yeah, we did our standard 10-shot

7    group that we would do for any batch that leaves our

8    facility.

9    Q.    So you shot 10 of my 30 rounds?

10   A.    Yes.

11   Q.    When you did that testing, did these shells conform to

12   the specifications that you were looking for?

13   A.    Yes, they were very -- very tight specs.

14   Q.    Why do you say they're very tight specs?

15   A.    There's very little variation in the feet per second of

16   these rounds.

17   Q.    How much variation do you normally allow in feet per

18   second?

19   A.    We have a 50-feet-per-second window on each side of the

20   spec.

21   Q.    Were these well within that?

22   A.    Yes.

23   Q.    What about pressure?  Were they close to 10,000?

24   A.    Yes, the pressure was good.  There was a little bit

25   more variation in pressure but, yeah, they were well within

1496

DIRECT - RODGERS

1    specification.

2    Q.    Okay.  All right.  Could I bring up what's been

3    admitted as Exhibit 266.  And could you go to the next page,

4    please.  Next.  Okay, this is page 3.  And you can also see

5    page -- yeah, that's good.  Page 3 of 266.

6          Have you seen these pictures of this testing setup

7    before?

8    A.    Yes.

9    Q.    Is this similar to the way you do shotgun testing in

10   your job?

11   A.    Very similar, yes.

12   Q.    Do you have a vice like that for the firearm?

13   A.    A sled, yes.

14   Q.    And does this conform with your understanding of how

15   you do pattern testing with shotguns?

16   A.    Yes.

17   Q.    Okay.  All right.  I'd like to ask you to please look

18   at some physical targets, if possible.  And I can -- there's

19   five of them.  They're -- and those should be in order, so

20   the first one should be 223.  224 -- Exhibit 224.  I can

21   tell you the numbers that would be easier to find.  It's

22   3-0 --

23          COURTROOM DEPUTY:  Thank you.

24          MR. WINSTEAD:  3-1, 3-2, 3-3 and 3-4, so the first

25   five.  And I'll read, just for the purposes of the record,

DIRECT - RODGERS

1    the exhibit numbers of those are 223, 224, 227, 230, and

2    233.  And, ma'am, if I might ask one more favor.  There's --

3    in the box with the shotgun, there should be a little ruler.

4    Could he get that as well.

5              COURTROOM DEPUTY:  There is not.

6              MR. WINSTEAD:  There is not?

7              COURTROOM DEPUTY:  Do you want this?

8              MR. WINSTEAD:  Oh, that will be great.

9    BY MR. WINSTEAD:

10   Q.   All right, sir, can you grab what says Exhibit 223,

11   which should say 3-0.  All right.  Tell me what you're

12   looking at there.

13   A.   Pattern spray.

14   Q.   Can you tell me approximately how big that pattern is.

15   A.   Can I measure?

16   Q.   With the measure -- yes.

17   A.   Roughly a little over 8 inches.

18   Q.   Okay.  So is that bigger than 6 inches?

19   A.   Pardon me?

20   Q.   That's bigger than 6 inches?

21   A.   Yes.

22   Q.   If you discount some of the fliers there, is it -- are

23   most of the pellets within a 6-inch circle?

24   A.   Yes.  Very close.

25   Q.   Okay.  Is this consistent with what you would expect to

1498

DIRECT - RODGERS

1    see from a premium round, a full choke, at 30 feet?

2    A.    Yes.

3    Q.    Okay.  All right.  Thank you.  Is a 6-inch diameter

4    pattern pretty good for buckshot?

5    A.    Yes.

6    Q.    Okay.  Can you make it any tighter than that with new

7    developments?

8    A.    Our new flight control wad is -- delivers -- flight

9    control wad, it's a different technology where the petals

10   are actually on the base of the wad, so as that clears the

11   barrel, the fins open up and drags the wad off the shot

12   column later downrange, so the wad actually holds the

13   pellets tighter downrange.

14   Q.    If with the older ammunition that we've been discussing

15   that you produced for us -- I'm sorry, you can take that

16   exhibit down.

17          With the older ammunition, if a shotgun had a more

18   open choke like a cylinder choke, would you expect to see a

19   bigger pattern?

20   A.    Yes.

21   Q.    All right.  Do you know what approximately the diameter

22   of a full -- the internal diameter of a full choke is?

23   A.    The constriction varies a little bit by manufacturer,

24   but roughly point 695 of an inch.

25   Q.    All right.  Could he please get Exhibit 224.

1499

DIRECT - RODGERS

1           And can you try to measure the middle of that hole,

2 please and tell me how big it is.

3 A.   A little less than an inch.

4 Q.   Okay.  Is that pretty similar to the end of the barrel

5 size?

6 A.   Yes.

7 Q.   All right.  Could you bring up Exhibit 220, page 5.

8           Is that the hole that you were just measuring on

9 the screen?

10 A.   Yes.

11 Q.   Okay.  All right.  Next one, Exhibit 227.

12           Could you please measure that one for me.

13           You can take that down -- and, actually, if you

14 could bring up -- well, if you could bring up 220, page 7.

15 Okay.

16           Can you measure that for me and tell me how big it

17 is.

18 A.   A little bit over an inch.

19 Q.   Now on this one, looking at the screen, does it appear

20 that the shot column is intact here?

21 A.   Yes.  The column's intact and you can see some pellet

22 marks starting to open up.

23 Q.   Can you show me -- you should have -- if you can kind

24 of zoom in and make sure to include that hole on the left.

25 Yeah.  All right.

1500

DIRECT - RODGERS

1           You should have a pen on your screen.  Can you show

2     me what you mean where you see pellets starting to open up.

3     A.    Here would be one.  There would be another.  And up

4     here as well.

5     Q.    Okay.  What do you think -- what does that look like to

6     you?

7     A.    A strike of some object.  Maybe the wad.  But it's hard

8     to say.

9     Q.    Okay.  All right.  Let's see here.  Can you please

10    bring up 220, page 8.  Yeah, zoom in right there.

11          Same question here:  Does it look as though the

12    shot column is intact here?

13    A.    Yes.

14    Q.    Okay.  And is that -- does that look like a similar

15    hole to what we were just looking at?

16    A.    Yes.

17    Q.    Do you -- what do you think this might have come from?

18    A.    Some foreign object or a -- maybe a wad, but it doesn't

19    really look like a wad strike.

20    Q.    Okay.  And 220, page 13, please.  All right.  Zoom in

21    on that.  That's okay.  All right.

22          Same question here:  Is the shot column pretty

23    intact?

24    A.    Yes.

25    Q.    And you see -- what does that look like?

DIRECT - RODGERS

1    A.    That is another object undetermined.

2    Q.    All right.  I'd like to go to some of the 2-feet

3    targets.  Could he please look at Exhibit 230, which is the

4    physical target.

5          And measure it for me.  And would you pull up 220,

6    page 16, which is a picture of it.  How big is that?

7    A.    Looks to be around 2 inches.

8    Q.    All right.  Thank you.  We're done with the physical

9    one.

10         So on the last one, that was at a foot.  What --

11   what changed?  What changed here?

12   A.    Hard to say.  There's a -- definitely a few fliers on

13   the outside of that shot column, opening up quicker.

14   Q.    Is that the sort of pattern you are expecting to see at

15   2 feet from the muzzle?

16   A.    No.

17   Q.    And you're familiar with the testing and stuff.  You

18   knew there was a soft case over the butt muzzle here?

19   A.    Yes.

20   Q.    So why do you think that this shot column started

21   opening up so much?

22   A.    It's hard to say.  Maybe the case had some impact on

23   the wad, started tilting the wad; back pressure.

24   Q.    What's back pressure?

25   A.    During ignition, the hot gases that come out in front

DIRECT - RODGERS

1    of the payload are going to hit that barrier and there's

2    going to be some back pressure from that.

3    Q.    What about actual physical contact with parts of the

4    case?  Would that have an effect?

5    A.    Definitely.

6    Q.    Okay.  Do you think that that's probably why this is

7    such a big pattern?

8    A.    Could be.  The flier, too, came out a little erratic

9    after it hit the object.

10   Q.    Okay.  Can you get -- could I get 220, page 20, please.

11   All right.

12            Here's another one at 2 feet.  Now what on earth

13   happened here?

14   A.    Same thing.  There's a flier up at the top.

15   Q.    Is that a pretty big spread?

16   A.    Yes.

17   Q.    Surprising at 2 feet?

18   A.    Yes.

19   Q.    Okay.  Same question:  Do you think that the bag may

20   have had an impact in creating this pattern?

21   A.    Definitely could have.

22   Q.    If you just shot one of your shotguns at 2 feet, would

23   you be very surprised if you saw this pattern?

24   A.    Exceedingly.

25   Q.    All right.  On any of these -- oh, sorry, one more.

DIRECT - RODGERS

1    220, page 23.  Here's the last shot at 2 feet.  So actually,

2    you can -- you can lose that top right.  Can you just zoom

3    in on the actual -- yeah.  There we go.  All right.

4            Same phenomena here?

5    A.   A little tighter, still has a flier, but yes.

6    Q.   All right.  So on any of these three that we've looked

7    at, would you say that the shot column is intact?

8    A.   No.

9    Q.   Okay.  And is that out of the ordinary for the normal

10   predictable action of shot out of premium buckshot like

11   we've been talking about?

12   A.   Yes.

13   Q.   Okay.  All right.  Could you please measure

14   Exhibit 233, which is at 3 feet.  And would you bring up

15   Exhibit 220, page 27.

16           How big is that?

17   A.   Under 2 inches.

18   Q.   Under 2 inches he said.

19           And if we can go next.  Do you want to try

20   unplugging it real quick.  If not, we'll take you up on

21   that.

22           UNIDENTIFIED MAN:  What was the page number?

23   BY MR. WINSTEAD:

24   Q.   It is 220, page 27.

25           All right.  Now this is from 3 feet.  That's a foot

1504

DIRECT - RODGERS

1    farther than those ones we were just looking at.  Why on

2    earth is the pattern so much smaller than those?

3    A.    Unknown, but this is what I would typically expect.

4    Q.    So is this a relatively intact shot column?

5    A.    Yes.

6    Q.    And is this the sort of pattern that you would expect

7    even in the absence of a bag?

8    A.    Yes.

9    Q.    Okay.  So from these shots, does it appear to you that

10    the effect of having the bag over the muzzle is

11    unpredictable?

12    A.    Yes.

13    Q.    And so if you were to describe a spectrum of shots that

14    we've been looking at, would you say you could -- you could

15    say on one end of the spectrum are shots where the bag

16    doesn't seem to have much of an effect?

17    A.    Definitely.

18    Q.    And is this one that apparently is on that end of the

19    spectrum?

20    A.    I would agree, yes.

21    Q.    And then are there shots on the other end of the

22    spectrum where the bag has an incredibly wild effect?

23    A.    Yes.

24    Q.    Now when you were describing what causes shots to

25    expand, I think you said at some point that you're trying to

1505

DIRECT - RODGERS

1    minimize the chaos in the shot column; is that right?

2    A.    Yes.

3    Q.    Explain to me what you mean by that.

4    A.    It is -- those pellets want to get out, they are

5    pushing against each other traveling down that metal tube,

6    and there's just a lot of pressure on them and as soon as

7    they get out, they're going to start opening up.

8    Q.    And so the more chaos you introduce to the shot column,

9    does that tend to open up the patterns?

10   A.    Yes.

11   Q.    Are many of the design features that you all are trying

12   to do aimed at minimizing that chaos?

13   A.    Yes.

14   Q.    All right.  I'd like to show you just a couple more

15   photographs.  Could you bring up 220, page 33.  All right.

16   So this is a shot from 4 feet.  Can you zoom in on it,

17   please.

18          Compared to the really wild ones, is this shot

19   column still relatively intact?

20   A.    Mostly, yes.

21   Q.    Do you see any fliers starting to come out?

22   A.    Two to the left, and then what also stands out is the

23   base-wad puncture in the --

24   Q.    So what do you think that is?  Is that what you were

25   just describing?

1506

DIRECT - RODGERS

1   A.    Yeah, the base wad.

2   Q.    And what about this right here?  Hard to tell?

3   A.    Hard to tell.

4   Q.    Okay.  And then when you said two are coming out on the

5   left, is it those little dots?

6   A.    Correct.

7   Q.    Okay.  All right.  Could you bring up 220, page 35.

8   All right.

9           This is another one from 4 feet.  Can you tell me

10   what I'm looking at here.

11   A.    Same thing.  The few pellets starting to break free of

12   the shot cup and then the puncture of the over-powder wad at

13   the 6:00 position.

14   Q.    So this hole down here, that's the over-powder wad?

15   A.    Yes.

16   Q.    Next.  220, page 38.

17           There's the last one at 4 feet.  Is this relatively

18   similar?

19   A.    Yes.

20   Q.    What do you think that is?

21   A.    Looks like the over-powder wad.

22   Q.    Otherwise the shot column is still pretty intact but

23   expanding?

24   A.    Yes.

25   Q.    Okay.  All right.  I'd like to show you a couple from 5

DIRECT - RODGERS

1    feet and then we'll be done.  220, page 43.

2            What do you see here?

3    A.   Very similar, starting to open up even more.  See where

4    the shot cup goes through the center and then the

5    over-powder wad at the 6:00 again.

6    Q.   Is that the hole from the over-powder wad?

7    A.   Yes.

8    Q.   Okay.  220, page 47.  Another one from 5 feet.  Could

9    you just leave it zoomed in?  All right.

10           What is this down here?

11   A.   Looks like the over-powder wad again.

12   Q.   And do you see the shots starting to separate out?

13   A.   Yes.

14   Q.   Okay.  And then last one on this series, 220, page 51.

15           What do you see here?

16   A.   Again, same thing, pellets and then the over-powder wad

17   punching the paper.

18   Q.   What's that right there, do you think?

19   A.   That's the over-powder wad.

20   Q.   Relatively intact shot column?

21   A.   Yes.

22   Q.   Okay.  So in all of the ones from 4 and 5 feet, do you

23   start to see separation of the wadding?

24   A.   Yes.

25   Q.   Okay.  Is that a normal distance you would expect to

1508

DIRECT - RODGERS

1    see that?

2    A.    Yes.    A two-piece wad system like that, yes.

3    Q.    All right.    You can take that down, please.

4              MR. WINSTEAD:    May I have just a moment, Your

5    Honor?

6              THE COURT:    You may.

7    BY MR. WINSTEAD:

8    Q.    All right.    I'd like to change topics real quick to

9    weapons handling.    So you used to be a professional shotgun

10   shooter in your spare time.    What are the weapon safety

11   rules?

12   A.    Oh, they're -- commandments change over time, but I

13   don't know if we can look at all of them.    Keep the muzzle

14   pointed in a safe direction.    Don't load a firearm until

15   you're ready to use it.    Don't rely on the firearm safety.

16   Be sure what your target is and what's beyond it.    Use the

17   correct ammunition.    There's some dangerous combinations out

18   there, so you want to use the right ammunition for the right

19   firearm.    The -- wear eye and ear protection.    Make sure the

20   barrel's not obstructed.    That would -- a lot of shooters

21   get mud and snow in there, so we want to make sure the

22   barrel is clear.

23             Keep your gun in good working condition, well

24   maintained.    And understand the mechanical and handling

25   characteristics of that firearm.

1509

DIRECT - RODGERS

1    Q.   Do hunters learn those rules when they go through

2    hunter safety courses?

3    A.   Yes.

4    Q.   And in the hunting community, do people generally pride

5    themselves on safe weapons handling?

6    A.   Yes.

7    Q.   When you hand firearms to other people, are you

8    supposed to check whether the chamber's empty?

9    A.   Yes.

10   Q.   Okay.  Does removing the plug in a shotgun magazine

11   make a shotgun unsafe?

12   A.   No.

13   Q.   Do you know why there are plugs in shotgun magazines?

14   A.   Federal waterfowl rules allow only three rounds for

15   waterfowl hunting, so manufacturers put a plug in there to

16   keep the consumer within the law.

17        MR. WINSTEAD:  All right.  At this point, I would

18   like to do the demonstration, if possible.  So, Your Honor,

19   I'm going to ask the witness to please show me the process

20   of loading and unloading a shotgun.  I've provided dummy

21   rounds.  They haven't yet been admitted but I would move at

22   this point to admit Government's Exhibit 267, which is five

23   dummy rounds.

24        THE COURT:  Are we sure they're dummy rounds?

25        MR. WINSTEAD:  And I was going to follow up, Your

1510
DIRECT - RODGERS

1   Honor, after the process of admission, and first note to the

2   Court that the marshals have previously inspected them and

3   ask, if possible, if the marshals could inspect them here in

4   court.

5           THE COURT:   That would be wise.   Is there an

6   objection?

7           MS. MOSS:   No objection.   And I have also inspected

8   the dummy rounds, Your Honor.

9           THE COURT:   Okay.   Mr. Dill?

10          MR. DILL:   No objection.

11          THE COURT:   All right.   First, Exhibit 267 is

12  admitted into evidence and may be published to the jury.

13       (Government's Exhibit 257 received)

14          THE COURT:   And, Marshal, if you can look at that

15  ammo.

16          MR. WINSTEAD:   And, Your Honor, if I might request

17  one additional thing.   May I please instruct the case agent

18  to remove the lock that's on the gun so that the -- it can

19  go through the functions.

20          THE COURT:   Okay.

21          COURTROOM DEPUTY:   Agent Peterson.

22  BY MR. WINSTEAD:

23  Q.   And, sir, while they're doing that, obviously it's

24  going to be a little awkward surrounded by people to not

25  point it at anybody.   It might be a little bit awkward, but

DIRECT - RODGERS

1    if you wouldn't mind, if you could just keep it pointed up

2    while you do each of the processes.

3    A.   Okay.

4            COURTROOM DEPUTY:  If you need to, you can stand.

5    BY MR. WINSTEAD:

6    Q.   All right.  So if you -- all right.  Do you have the

7    dummy rounds?

8    A.   I do.

9    Q.   Okay.  Great.  So what I'd like you to do, just because

10   we've seen videos of this but we haven't seen it actually

11   happen, can you show me how you would fully load that with

12   those dummy shells.

13   A.    There's a few different ways to do.  There's a few

14   different ways to do it.  Some people load through the

15   magazine tube.  I put one in the chamber, then first I close

16   the bolt.  And then from there, I fill up the magazine tube

17   with the remaining rounds.

18   Q.   All right.  Now if you could show me how you would

19   fully unload the shotgun.  And -- and just so that they're

20   not rattling around everywhere, could you try to unload them

21   onto your seat, if you can.

22           Now did the shotgun lock open after that last one?

23   A.   Yes, it did.

24   Q.   Did you have to do anything in the process of

25   unloading, other than pull the charging handle back

DIRECT - RODGERS

1    repeatedly?

2    A.    No.

3    Q.    Now looking at it, what would you do if you were trying

4    to make sure that the shotgun had been completely unloaded?

5    A.    I would do a visual of the chamber and of the magazine

6    tube.  And then depending on -- check it with a finger to

7    make sure there wasn't a round in the chamber.

8    Q.    What do you mean "a visual of the magazine tube"?

9    A.    The magazine tube, at the bottom there where the extra

10   shells were, you would be able to see a head stamp instead

11   of the follower if there was a round in the magazine tube.

12   Q.    All right.  Now would you mind loading it again.  You

13   are going to have to collect them.  I'm sorry, the plan

14   didn't work.

15   A.    Two of them did.

16   Q.    All right.  Can you load it up again.

17   A.    Yes.

18   Q.    All right.  Now this time can you flip the magazine --

19   or the -- oh, no, I have forgotten the name of it -- the

20   magazine lever -- the cutoff.  Flip the cutoff.

21         All right.  Now could you please go through the

22   process of unloading it.  And you can do it however you want

23   because my idea didn't work.

24   A.    It's probably the best.

25   Q.    Now one came out.  Where are the other rounds?

1513

DIRECT - RODGERS

1    A.    They're still in the magazine tube because the magazine

2    lock was in place.

3    Q.    Can you go ahead and flip that cutoff off.

4    A.    Yes.   It will chamber a round.

5    Q.    Okay.   Now could you -- let's see, there's four left.

6    Could you please -- let's see -- unload two normally.   And

7    then do this one super slow.   All right.   Now pick it up.

8          And if you can look at the shotgun for me.   All

9    right.   Is it locked back?

10   A.    Yes.

11   Q.    Is there still a round in there?

12   A.    Yes.

13   Q.    Can you see it right there when you look in?

14   A.    Yes, it's on the carrier.

15   Q.    Okay.   Can you see whether the shell is moved all the

16   way down to the bottom of the carrier or is it a little bit

17   up?

18   A.    A little bit up, still slightly recessed in the tube.

19   Q.    I would like you, if you wouldn't --

20         MR. MARKUS:   Well, with the Court's permission, can

21   he just bonk it a little bit on the side of the box there

22         THE COURT:   What about the floor instead of

23   damaging our witness stand?

24   BY MR. WINSTEAD:

25   Q.    You can probably just shake it.   Can you just shake it

DIRECT - RODGERS

1    in the air.  No, down like that.  Okay.  You have to bonk

2    it.  Can you bonk it on the ground?  Just pretty gently.  A

3    little more.  There we go.  What just happened?

4    A.    The bolt closed.

5    Q.    Did the bonking make the shell finish its little trip

6    down to the bottom, as far as you can tell?

7    A.    Yes, it did.

8    Q.    Okay.  All right.  Let's see.

9          MR. WINSTEAD:  May I have just a moment, Your

10   Honor?

11         THE COURT:  You may.

12   BY MR. WINSTEAD:

13   Q.    All right.  Sir, if you can please take that last dummy

14   round out and then I can ask the case agent to go back up

15   and replace the lock.  I think we're finished with that

16   demonstration.

17         THE COURT:  Yes, let's do that.

18         MR. WINSTEAD:  All right.  Thank you very much,

19   Your Honor, for allowing the demonstration.

20         Sir, thank you for being a good sport.

21   BY MR. WINSTEAD:

22   Q.    Just one last question about ejection.  When you're

23   racking that back, is that a similar thing that happens to

24   the slide when it fires and -- and you're operating it?  In

25   other words, does it eject the shell out the ejection

DIRECT - RODGERS

1    port?

2    A.    Yes.

3    Q.    If you were to cover that ejection port when it's

4    trying to eject, what do you think would happen?

5    A.    Depends where the block was, but it would probably jam

6    the firearm.

7    Q.    Okay.  Now you were talking about the firearm safety

8    rules.  Are you always supposed to treat weapons with

9    respect?

10   A.    Yes.

11   Q.    Are they very dangerous?

12   A.    Yes.

13   Q.    Would you -- I think you said one of the rules -- do

14   you treat firearms as if they're loaded even if they aren't?

15   A.    Yes.

16   Q.    Now in reality, does that mean that a gun could just go

17   off at any second?

18   A.    No.

19   Q.    Okay.  What's the cost/benefit ratio on not being

20   careful with firearms?

21   A.    Tragic accidents.

22   Q.    Is there any real upside to being cavalier with

23   firearms?

24   A.    No.

25   Q.    In fact, is the whole point of firearms safety rules to

DIRECT - RODGERS

1    overemphasize safety?

2    A.    Yes.

3    Q.    Okay.  Have you seen people who aren't very careful

4    with firearms?

5    A.    Absolutely.

6    Q.    Do they sometimes have accidents?

7    A.    Pardon me?

8    Q.    Do they sometimes have accidents?

9    A.    Yes.

10   Q.    But by and large, have you seen people get away with a

11   lot of firearms unsafe handling?

12   A.    Yes.

13   Q.    Is part of your job reviewing firearm accidents?

14   A.    Yes.

15   Q.    And do you know other people who use shotguns?

16   A.    Lots.

17   Q.    Are you part of networks and forums and things like

18   that for shotgun users?

19   A.    Not really.  Just different shoots and hunts that I

20   attend.

21   Q.    When you're reviewing accidents or when you're speaking

22   with other shotgun hunters or shotgun shooters, have you

23   ever heard of an experienced hunter shooting themselves in

24   the heart with a shotgun?

25   A.    No.

CROSS - RODGERS

1    MR. WINSTEAD:  Thank you, Your Honor.

2    THE COURT:  Cross-examination.

3                    CROSS-EXAMINATION

4    BY MS. MOSS:

5    Q.    Thank you, Your Honor.

6          Good afternoon, Mr. Rodgers.

7    A.    Hello.

8    Q.    I'm also going to follow up and ask you questions, if

9    that's okay.

10   A.    Yes.

11   Q.    Now the Court has qualified you here as an expert in

12   shotgun patterning.  Have you done a lot of shotgun

13   patterning?

14   A.    Yes.

15   Q.    Fair to say, you've done maybe hundreds or even

16   thousands of shotgun patterning tests?

17   A.    Yes.

18   Q.    And I believe you spoke on direct about when you're

19   doing shotgun patterns -- patterning, you have used -- I

20   think you called it gel blocks.

21   A.    Yes.

22   Q.    Is that ballistic gelatin?

23   A.    Exactly.

24   Q.    And you do that, obviously, instead of shooting into a

25   body, correct?

CROSS - RODGERS

1   A.    Yes.

2   Q.    And is the ballistic gelatin an item that's supposed to

3   replicate shooting into a body?

4   A.    Yes.

5   Q.    And is that why you do it?

6   A.    Yes.

7   Q.    Now, you were showed a photograph on direct of the

8   setup that the FBI used when they did patterning.  Do you

9   recall that?

10  A.    Yes.

11  Q.    Now you had said on direct that that was similar to the

12  way that you do it.  Do you remember that?

13  A.    Yes.

14  Q.    Is it fair to say that it's similar to the way that you

15  do it except you don't put a case over the top of your

16  shotgun when you're patterning?

17  A.    Right.  We shoot through different barriers.  We've

18  never done a shotgun case.

19  Q.    Okay.  And since you are such an expert in shotgun

20  patterning, you've done this hundreds of thousands -- or

21  thousands of times, did the FBI consult you when they were

22  doing their shotgun patterning test?

23  A.    I knew it was happening but I wasn't consulting.

24  Q.    Did you have any firsthand participation in the test

25  firings and pellet patterning carried out by Agent DeFrance

1519

CROSS - RODGERS

1    in 2020?

2    A.    No.

3    Q.    Or 2021?

4    A.    No.

5    Q.    Or 2022?

6    A.    No.

7    Q.    So did you ever attend the testing?

8    A.    No.

9    Q.    Were you able to observe the testing through video

10   or -- or Facetime?

11   A.    I was sent the videos after, but not during the

12   testing.

13   Q.    Okay.  And the videos you were sent, those were

14   high-speed videos?

15   A.    Yes.

16   Q.    And fair to say, high-speed videos are supposed to

17   actually really slow down the process?

18   A.    Yes.

19   Q.    Maybe these aren't the greatest high-speed videos,

20   would you say?

21   A.    We have a high-speed camera that we use for our

22   internal testing as well.

23   Q.    Okay.  Now, over your many years of practical and

24   professional experience with shotguns, and shotgun

25   ammunition performance, you said that you've seen and

CROSS - RODGERS

1    conducted pellet patterning with a variety of shotshell

2    ammunition; is that right?

3    A.    Yes.

4    Q.    And does that include buckshot?

5    A.    Yes.

6    Q.    And does that include the Federal P-158 double O

7    ammunition?

8    A.    Yes.

9    Q.    And so would you say, again, for this type of

10   ammunition, have you fired it maybe hundreds or thousands of

11   times?

12   A.    Probably not this particular load.  We have hundreds

13   and hundreds of SKUs.

14   Q.    Would you say you've fired a lot of it?

15   A.    Yes.

16   Q.    Okay.  And I believe that you said that if it's fired

17   into a target that's right at the barrel, you're not going

18   to have much variation in the pattern; is that right?

19   A.    Correct.

20   Q.    And if you fire it at close muzzle-to-target distances,

21   such as a few inches to maybe 2 or 3 feet, do you also

22   expect the pellets in the buck -- buckshot loads to stay

23   together in flight so that they form a single hole?

24   A.    One to 2 feet is usually where the wad starts coming

25   off and the pellets start expanding.

CROSS - RODGERS

1    Q.    So even at 1 to 2 feet, the wad can start coming off

2    and form a different hole?

3    A.    The shot cup, no; but the base wad, yes.

4    Q.    Okay.  What we're talking about is -- I believe you

5    called it the over-powder wad, or the OP wad?

6    A.    Yes.

7    Q.    So even at 1 to 2 feet, you would expect to see a

8    different hole created by that over-powder wad?

9    A.    They're going to separate at some point.  I -- I would

10   be guessing.  But usually at -- that 1- or 2-foot range is

11   when the shot cup starts opening up and the pellets starts

12   giving, and then that base wad, the over-the-powder wad,

13   starts drifting off of the main payload.

14   Q.    Okay.  In terms of the pellets that are coming out of

15   the barrel of the shotgun, would you expect at between a few

16   inches and 1 to 2 feet that they will stay pretty close

17   together and create a single hole?

18   A.    Fairly, yes.

19   Q.    And do you expect that that's the way it would

20   pattern -- I don't know, a hundred out of a hundred times?

21   A.    There's always different factors that can --

22   Q.    Okay.  That's fair.  So -- but most of the time, then,

23   would you say that's how it patterns?

24   A.    Yes.

25   Q.    Now, let's say about 10 times, if you fire it 10 times

CROSS - RODGERS

1    at this close range -- and again I'm talking about a few

2    inches to maybe 2 to 3 feet -- would you expect it to have a

3    similar pattern?

4    A.    Yes.

5    Q.    Now if you're firing and you're trying to do shotgun

6    pellet patterning, is firing a minimum of 10 shots something

7    that you would do for statistical reasons to make sure that

8    you're getting an accurate read on the pellet pattern?

9    A.    No.   For patterning testing we would use more.

10   Q.    You would use more than 10 shots.   Okay.   How many

11   more?

12   A.    It depends what we were trying to recreate and what the

13   usage was.

14   Q.    Okay.   And the reason that you use more is you wanted

15   to try to reproduce some sort of predictability in your

16   results, right?

17   A.    Yes.

18   Q.    You want to be able to say that if you're testing

19   shotgun patterning that you can rely on the results that you

20   find.

21   A.    Yes.

22   Q.    And so in order to be able to testify confidently about

23   the patterning, you would test it more than 10 times; is

24   that right?

25   A.    Yes.

CROSS - RODGERS

1   Q.   And it's important to have multiple repetitive testing,

2   again to make sure your results are accurate?

3   A.   Yes.

4   Q.   Make sure your results are reliable.

5   A.   Yes.

6   Q.   And I believe you testified that at Vista when you're

7   actually testing, I believe you said, velocity and pressure

8   of ammunition, that you also do it multiple repetitive

9   times; is that right?

10  A.   That's usually a 10-shot group for batch testing.

11  Q.   Okay.  But it's more than one shot, right?

12  A.   Yes.

13  Q.   It's more than two shots, right?

14  A.   Yup.

15  Q.   More than three shots?

16  A.   Yup.

17  Q.   10 shots?

18  A.   10 shots.

19  Q.   For you to be able to rely and have confidence in the

20  results of the velocity and pressure of that shell --

21  cartridge.

22  A.   Yes.

23  Q.   Okay.  I want to look at some more photographs and we

24  looked at these, so I'll go through them more quickly.  If

25  we can pull up Exhibit 220, page 16, which is INV-29590.

CROSS - RODGERS

1    Do you recall seeing this on direct?

2    A.    Yes.

3    Q.    Okay.  And so this, again, was fired at a distance of

4    2 feet.  And I believe that you said on direct that this is

5    not what you would expect to see at a distance of 2 feet

6    from a shotgun; is that right?

7    A.    I think this is the one where the -- some of the

8    pellets were expanding quicker than I thought they should

9    be.

10   Q.    Right.  And so I'm going to draw some circles.

11   Do you see the pellets starting to spread out there

12   and there?

13   A.    Yes.

14   Q.    If we could go now to Exhibit 220, page 19, which is

15   INV-29652.

16   Now, this, again, is fired from a distance of

17   2 feet.  And do you recall seeing this on your direct

18   examination?

19   A.    Yes.

20   Q.    And would you say that this pattern looks different

21   from the pattern that we just saw?

22   A.    Yes.

23   Q.    And how is it different in your opinion?

24   A.    Again, there's some fliers to the bottom, and one up

25   high.

1525

CROSS - RODGERS

1    Q.    Okay.  And just -- in my lay opinion, does it just look

2    different?

3    A.    Yes.

4    Q.    If we could take a look at Exhibit 220, page 22, which

5    is INV-297 15.

6          And, again, here we see -- do you recall seeing

7    this on direct examination?

8    A.    Yes.

9    Q.    And so, again, this is a target that was fired at from

10   2 feet -- a distance of 2 feet away.  And, again, does this

11   look different from the first two that we saw?

12   A.    Yes.

13   Q.    And why is that?

14   A.    Well, again, there's separate fliers in different areas

15   of the pattern.

16   Q.    And it looks like in this one you've got many more

17   fliers.  Fliers means satellite pellets that aren't part of

18   that main defect?

19   A.    Yes.

20   Q.    And I think you called it shot column before?

21   A.    Yes.

22   Q.    Okay.  And we see many more of those in this picture;

23   is that right?

24   A.    Yes.

25   Q.    Thank you, Mr. Reyes.

1526

CROSS - RODGERS

1        So we've seen three shots at 2 feet.  Would you

2   agree that they were all -- they were all variable in pellet

3   spread.

4   A.    Yes.

5   Q.    And variable in pattern size as well.

6   A.    Yes.

7   Q.    Now, you testified before that three shots for you

8   would not be enough to assure yourself of reproducible and

9   reliable results; is that right?

10  A.    Yeah, if we were doing product development, we would

11  test more.

12  Q.    You would test more?  Okay.  And I think you also said

13  you wouldn't expect to see this big of a difference in

14  patterns from 2 feet away.

15  A.    That was surprising, yes.

16  Q.    Let me show you Exhibit 220, page 26.  And this is

17  INV-296 13.

18        Do you recall seeing this on direct?

19  A.    Yes.

20  Q.    Now this was, again, a target that was fired at from a

21  distance of 3 feet.  And this is the only test shot that

22  Agent DeFrance performed from 3 feet.  Now I believe you

23  testified on direct that here you do see the shot column is

24  pretty much one hole; is that right?

25  A.    The pellets are starting to expand but yes, it's --

CROSS - RODGERS

1    Q.    Starting to expand.  Okay.  But fair to say, this looks

2    different from the other three that we saw before?

3    A.    Yes.

4    Q.    But let me ask you, Mr. Rodgers -- and I keep wanting

5    to call you Captain America, but I'll say Mr. Rodgers.

6    This -- there's only one example of this from 3 feet.  Now,

7    if you wanted to have confidence that this pattern is

8    reproducible and reliable, would you have done more than one

9    shot at 3 feet?

10    A.    Yes.

11    Q.    Now -- thank you, Mr. Reyes.

12          Would Federal ever release rounds to the FBI -- or

13    to the public after only testing it one time?

14    A.    I don't understand the question.

15    Q.    Would you ever -- if you're trying to create ammunition

16    and you want to make sure that it is at a specific velocity

17    and meets your standards, would you only test it one time?

18    A.    Well, every batch is tested and -- before it leaves the

19    facility with a 10-round group.

20    Q.    Okay.  And when we talked about batch testing, I

21    believe you said that was a 10-round test.  You do 10

22    tests?

23    A.    Yeah, we do 10 rounds.

24    Q.    And that's per production shift, right?

25    A.    Yes.

1528

CROSS - RODGERS

1    Q.    And so one production shift is one employee, one

2    machine, right?

3    A.    Yes.

4    Q.    So you would do that for each employee and each

5    production shift, right?

6    A.    Yes.

7    Q.    Now we've seen a lot of variation here, and the

8    prosecutor talked to you about spectrum.  Does having this

9    soft bag case create a lot of unpredictability?

10   A.    Yes.

11   Q.    And so if you want to, again, have more reliability and

12   more confidence in results, do you need to do a lot more

13   testing?

14   A.    Yes.

15   Q.    I'd like to ask you some questions about the wadding

16   and the shot cup.  Do you remember talking about those?

17   A.    Yes.

18   Q.    And is it fair to say you've had a lot of experience

19   with how a wad and a shot cup come out of the barrel of a

20   firearm?

21   A.    Yes.

22   Q.    And the -- the shot cup that we saw here -- and when I

23   say here, we're talking about the P-158 double O buckshot

24   ammunition -- is that a front petal style shot cup?

25   A.    Yes.

1529

CROSS - RODGERS

1    Q.    Can you explain what that means, please.

2    A.    Basically the shot cup is split -- or sliced into four

3    petals, so when it exits the barrel, the petals open up and

4    pull the wad off of the shot column.

5    Q.    Okay.  And you talked about, I think, internal

6    ballistics, external ballistics, and terminal ballistics.

7    Do you remember that?

8    A.    Yes.

9    Q.    Now, do shot cups also have certain ballistics --

10   ballistic characteristics?

11   A.    Yes.

12   Q.    Okay.  And so I saw the confusion.  So let me try to

13   explain myself.

14           When the shot cup comes out of the barrel of the

15   shotgun, we see that it's almost cupping and holding those

16   pellets, right?

17   A.    Yes.

18   Q.    Now as -- and the pellets are heavier than the shot

19   cup, correct?

20   A.    By far, yes.

21   Q.    By far.  And so when those pellets, shot cup, and

22   wadding come out of the barrel, they eventually hit some air

23   resistance; isn't that right?

24   A.    Yes.

25   Q.    And so the air resistance will cause the pellets to go

CROSS - RODGERS

1    even faster and will slow the shot cup down.

2    A.    Yes.   It definitely slows the shot cup down quicker

3    than the pellets.

4    Q.    Okay.   And normally is it the -- it's the pellets

5    followed by the buffer, followed by the shot cup, followed

6    by the wadding; is that normally how it proceeds?

7    A.    Yes.

8    Q.    And with the shot cup, does the shot cup begin to

9    spiral as it's heading out of that barrel of the shotgun?

10   A.    It's a smooth bore.   So there's usually some sort of

11   rotation as it comes out.

12   Q.    Okay.   And then does it also begin to open up the

13   farther it gets from the shotgun?

14   A.    Yes.

15   Q.    And that's the petal cup that I'm talking about.

16   A.    Yes.

17   Q.    And then does it also eventually spin around so that

18   it's facing the opposite direction that it started in?

19   A.    It can tumble.   We've seen it both ways.

20   Q.    Okay.   Now, let me show you another exhibit.   This is

21   RA-22, page 1, INV-6002.   And can we blow this up a little

22   bit more, please, Mr. Reyes.

23         Have you heard of something called a petal strike?

24   A.    Yes.

25   Q.    And does this look to you like it's possibly an example

CROSS - RODGERS

1    of a petal strike?

2    A.    The large hole could be the petals ripping through the

3    cardboard.

4    Q.    Do you think that you could use your -- well, let me

5    see if I can draw it.

6              MR. WINSTEAD:    Wait.

7              MS. MOSS:    Oh, sorry.

8         (Pause)

9              THE COURT:    You may proceed, counsel.

10   BY MS. MOSS:

11   Q.    So going back again to the petal strike, do you see

12   this shape right here?

13   A.    Yes.

14   Q.    And could that be an example of the shot cup opening up

15   so that it's -- the petals start to open and striking the

16   cardboard?

17   A.    Yes.

18   Q.    Okay.    Thank you.    And does that sometimes tell you --

19   or is it possible to tell you the distance how far that shot

20   cup may have traveled?

21   A.    Possibly.    I'm confused by the question.    It --

22   Q.    Well, let me ask it this way.    Thank you, Mr. Reyes.

23              We know that the shot cup -- we talked about the

24   shot cup having certain ballistic properties as it travels

25   through the air.    Does the final orientation of that shot

1532

CROSS - RODGERS

1    cup tell you anything?

2    A.    Again, it's always variable.  They can rotate

3    downrange.  Once a petal strikes something, all bets are

4    off; deforms the wad.

5    Q.    Okay.  Fair enough.  Now I want to ask you about the

6    ammunition that Vista made for the FBI in this case.  All

7    right?  Now, you testified that Federal -- well, first of

8    all, were you aware that there was testing that was done in

9    this case in 2020 and 2021?

10   A.    Was I familiar with it?

11   Q.    Yes.

12   A.    Yes.

13   Q.    That it happened?

14   A.    Yes.

15   Q.    And was it your understanding that the ammunition that

16   was used during those first two years of testing was perhaps

17   not the right ammunition?

18   A.    Yes.

19   Q.    So that's when the FBI contacted Federal and asked you

20   to make new ammunition; is that right?

21   A.    Yes.

22   Q.    And so we talked about the difference in the components

23   of the shotshell for the new ammunition.  And I believe that

24   you said that instead of -- I think it's flake powder, you

25   could have disk powder, or there's some difference in the

CROSS - RODGERS

1    powder; is that right?

2    A.   There was, yes.

3    Q.   And there's also a difference in the over-powder wad?

4    A.   Yes.

5    Q.   Does that make any difference in the ballistic

6    properties of the ammunition as far as you're concerned?

7    A.   The over-powder wad may.  I mean, we went to the new

8    W-12 because it seals better; it's a more robust over-powder

9    wad.

10   Q.   Okay.  And how many shotshells did you make?  I think

11   you said 30, but is it 31?

12   A.   I think it was 31.

13   Q.   And before you were willing to give those shotshells to

14   the FBI, I believe you said you test-fired them 10 times.

15   A.   Yes.

16   Q.   So that means you used up 10 of those shells?

17   A.   Yes.

18   Q.   And so what went to the FBI was 21 cartridge shells; is

19   that right?

20   A.   Yes.

21   Q.   And could you have made more for the FBI?

22   A.   No.

23   Q.   No?  That's it.  That's all that existed in this whole

24   world?

25   A.   That's all we had at our facility.  And our plastic

1534

CROSS - RODGERS

1    supplier -- that plastic supplier is gone.

2    Q.    Okay.  So that's it.  We're done with that ammunition.

3    A.    Well, things turn up; it's a hundred-year-old factory.

4    But that's what we could find.

5    Q.    All right.  Let me ask you about another area,

6    Mr. Rodgers.  Are you an expert in identifying toolmarks on

7    expended cartridge cases?

8    A.    I've been qualified as an expert on toolmarks in

9    projectiles.  I can't recall --

10   Q.    You've been qualified --

11            THE COURT:  Let him finish his answer.

12            MS. MOSS:  I'm sorry.  Go ahead.

13            THE WITNESS:  Yes, I've been -- in different

14   criminal matters, I've been qualified as an expert on

15   toolmarks on recovered projectiles.  And I don't know if it

16   involved -- that was 10 years ago.  I don't remember if it

17   involved the cases.

18   BY MS. MOSS:

19   Q.    Were you qualified as an expert in regards to bunter

20   marks?

21   A.    Yes.

22   Q.    And bunter marks, can you tell us what bunter marks

23   are.

24   A.    Bunter marks are the head stamp.  In this case, it says

25   "12-gauge," "Made in the USA."  The bunter mark is the tool

CROSS - RODGERS

1    that comes down and stamps that on the head stamp.

2    Q.    Okay.  So that's something that's stamped onto the head

3    of the cartridge case by another machine, right?

4    A.    Yes.

5    Q.    That's not created by the firearm.

6    A.    Correct, it's --

7    Q.    All right.

8    A.    -- made at our facility.

9    Q.    Did you ever see the actual shotgun involved in this

10   incident?

11   A.    I don't remember if -- in the photographs if there was

12   a photo of the shotgun there or not.

13   Q.    Did you ever examine it?

14   A.    No.

15   Q.    Just a couple of questions about -- we saw this display

16   of you loading and unloading the shotgun.  You referenced a

17   magazine cutoff.  The magazine cutoff -- what does the

18   magazine cutoff do?

19   A.    So the A-5 is unique.  It has a magazine cutoff so you

20   flip the switch and then it stops.  Once the bolt is open,

21   it stops the remaining rounds from being cycled.

22   Q.    Okay.  So it wouldn't continue to cycle into the

23   chamber or eject them.

24   A.    Correct.

25   Q.    Okay.  And I believe you also demonstrated that if you

CROSS - RODGERS

1    pull that bolt or operating handle back slowly, it's

2    possible that it would stay open and there still could be a

3    round in the magazine or kind of between the magazine and

4    the chamber.

5    A.    Yes.

6    Q.    And I don't think this is the technical word, but when

7    you bunk it, did that chamber the round?

8    A.    Yes.

9    Q.    And when the round is chambered, does that mean it's

10   ready to fire or it could be?

11   A.    Yeah.  If the safety's off, yes.

12   Q.    The last thing I want to ask you about, Mr. Rodgers, is

13   you were asked about some safety rules.  Do you recall that?

14   A.    Yes.

15   Q.    And they included some things like, you know, be

16   careful where you point a shotgun; make sure you have a

17   weapon that's in good working condition.  Do you recall

18   that?

19   A.    Yes.

20   Q.    Also includes never point a shotgun at a federal judge.

21            THE COURT:   Good advice.

22   BY MS. MOSS:

23   Q.    Fair to say, Mr. Rodgers, that you have seen people

24   violate these rules?

25   A.    Yes.

CROSS - RODGERS

1    Q.    And fair to say, Mr. Rodgers, that even though you are

2    very well versed in shotguns, that you have violated these

3    rules?

4    A.    Yes.

5    Q.    Now the prosecutor asked you about whether you've seen

6    a hunter shoot themselves in the heart.  Do you recall that

7    question?

8    A.    Yes.

9    Q.    Now, what we have seen is we've seen shotgun accidents

10   that happen every year, right?

11   A.    Yes.

12   Q.    And are you aware that the Centers for Disease Control,

13   just in 2015, in the United States, in 27 states, found that

14   there were, I believe, 193 unintentional shotgun deaths --

15   unintentional discharges that resulted in shotgun deaths?

16   Are you aware of that?

17   A.    No.

18   Q.    And have you ever seen an example of someone being shot

19   through a soft gun case?

20   A.    No.

21   Q.    If -- you testified about participating in a lot of

22   hunting competitions, didn't you?  Hunting competitions?

23   A.    Yes.

24   Q.    And that you did very well in these hunting

25   competitions?

1538

CROSS - RODGERS

1    A.    I used to.

2    Q.    If you put a soft case over your shotgun and tried to

3    fire it, do you think you might have a hard time hitting

4    your target?

5    A.    It would ruin the sight picture first thing.

6    Q.    What's that?

7    A.    It would ruin the sight picture.  And then, secondly,

8    it may have an effect on the wad system, yes.

9    Q.    So if you wanted to be absolutely accurate when you're

10   shooting a shotgun, that you try to make sure you don't have

11   a soft case over it?

12   A.    Yes.

13   Q.    Thank you very much, Mr. Rodgers.

14              THE COURT:  Any cross, Mr. Dill?

15              MR. DILL:  Just a couple questions, Your Honor.

16              THE COURT:  All right.

17                         CROSS-EXAMINATION

18   BY MR. DILL:

19   Q.    Just I want to clarify something on the mechanism of

20   the primer.  Is the primer what is -- ignites the shot?

21   A.    Yes.  So the firing pin strikes the primer, that's the

22   true explosive material.  You may have a chemical compound,

23   and that then ignites the propellant.

24   Q.    Okay.  So the primer in this shell is a center-strike

25   primer; is that right?

1539
REDIRECT - RODGERS

1    A.    Yes.

2    Q.    Okay.  So what we're talking about is when there's

3    pressure put on that center-strike primer, that ignites it

4    and that will fire it forward, correct?

5    A.    Correct.

6    Q.    You said on the last question there, as a shooter you

7    want to make sure the barrel's never obstructed as well,

8    correct?

9    A.    Yes.

10              MR. DILL:  Thank you.

11              THE COURT:  Redirect.

12                    REDIRECT EXAMINATION

13   BY MR. WINSTEAD:

14   Q.    Sir -- okay, just a couple questions about this.  Can

15   you tell me what intuitive shooting is.

16   A.    Intuitive?

17   Q.    Yeah.

18   A.    Snap shooting.

19   Q.    So like with a shotgun, what's -- you said the sight

20   picture.  What do you use the sight picture for?

21   A.    Acquiring the target, determining your lead, and

22   shooting.

23   Q.    For shotgun target -- so what were you talking about

24   before about snap shooting?

25   A.    Well, that's kind of intuitive.  A lot of trick

REDIRECT - RODGERS

1    shooters -- just intuitive.  They -- it's a difference

2    between how they view their sight picture.  What you're

3    supposed to -- like center fire rifle, pistol, your eyes are

4    supposed to be on your sights.  Shotgun, your eyes are on

5    your targets.  So all these trick shooters, they snap shoot,

6    just intuitively shoot after practice after practice after

7    practice.

8    Q.    When you're shooting sporting clays, for instance, are

9    you looking at the sights or are you looking at the target?

10   A.    Hopefully the target.

11   Q.    How far away are the targets when you're shooting them

12   usually?

13   A.    They can be really close to 70, 80 feet.

14   Q.    When they're really close, do you have a long time to

15   react to be able to shoot them?

16   A.    No, you got to move quick.

17   Q.    The only other question I had -- I finally found my

18   ruler -- and I was really hoping to -- not going to ask you

19   to do all those measurements again, I just want the one

20   target, it's 233, which is the 3-foot target.  Could you --

21   could you measure in centimeters for me.

22   A.    Yeah.  Almost exactly 4 centimeters.

23   Q.    4 centimeters.  Okay.  Thank you.  No further

24   questions.

25            THE COURT:  Recross, Ms. Moss?

1541
REDIRECT - RODGERS

1     MS. MOSS:  No, Your Honor.

2     THE COURT:  Any recross, Mr. Dill?

3     MR. DILL:  No, sir.

4     THE COURT:  All right.  May this witness be excused

5  for the Government?

6     MR. WINSTEAD:  Yes, Your Honor.

7     THE COURT:  For the defendants?

8     MS. MOSS:  Yes, Your Honor.

9     MR. DILL:  Yes, Your Honor.

10     THE COURT:  All right.  Mr. Rodgers, thank you so

11  much for your testimony.  You're excused and you may step

12  down.

13     THE WITNESS:  Thank you, Your Honor.

14     THE COURT:  All right, folks, we're going to take

15  our afternoon recess.

16     We will be in recess for 15 minutes.

17     (Recess taken 3:17 p.m. to 3:37 p.m.)

18     THE COURT:  Government may call its next witness.

19     MR. WINSTEAD:  Thank you, Your Honor.  The

20  Government calls Gilbert Morlock.

21     COURTROOM DEPUTY:  If you'll raise your right hand

22  for me.

23     GILBERT MORLOCK, GOVERNMENT'S WITNESS, SWORN

24     COURTROOM DEPUTY:  Thank you.  Please be seated and

25  remove your mask for us.  Then state your full name for the

1542

REDIRECT - RODGERS

1    record and spell your first and last name for us.

2            THE WITNESS:  My name is Gilbert Morlock.  And it's

3    spelled G-i-l-b-e-r-t.  Last name Morlock, M-o-r-l-o-c-k.

4    And I apologize, my mask fell apart.

5            THE COURT:  I think we have extras right there.

6            COURTROOM DEPUTY:  There's one for you.

7            THE WITNESS:  Thank you.

8            THE COURT:  You may proceed, counsel.

9            MR. WINSTEAD:  Thank you, Your Honor.

10                      DIRECT EXAMINATION

11   BY MR. WINSTEAD:

12   Q.    Good afternoon, sir.  Sir, can you tell me, what do you

13   do for a living now?

14   A.    I am part of a group called Bahi Dental.  And what we

15   do is we purchase dental practices and we manage them.

16   Q.    What's your role?

17   A.    My role is to find practices and to evaluate the

18   practices and also play a role in operations.

19   Q.    What was your profession before your current job?

20   A.    I was in dental -- I've been in dentistry for 43 years.

21   Q.    In what --

22   A.    Every capacity basically, except for practicing

23   dentistry.

24   Q.    Did you ever work at Three Rivers Dental Group?

25   A.    Yes, sir, I did.

REDIRECT - RODGERS

1   Q.   Before you worked there, did you do similar work in
2   dental practices?
3   A.   Yes.   I was the CEO to a group called United
4   Healthcare, blending -- what we did is we provided funding
5   for dental practices and provided guidance for doctors who
6   wanted to purchase practices.
7   Q.   All right.   I'd like to ask you a couple of questions
8   about Three Rivers Dental Group.   Do you know who was the
9   owner of that company?
10  A.   Yes, sir.   Dr. Larry Rudolph.
11  Q.   And did you -- when did you start working there?
12  A.   I started approximately in June 5th of 2015.
13  Q.   Can you tell me briefly:   How did you get hired?
14  A.   In April I saw an ad -- excuse me -- I saw an ad for --
15  there was an ad.   Someone was looking for a regional
16  manager.   And it was Dr. Larry Rudolph's ad.   So I answered
17  the ad and we connected and towards -- we went back and
18  forth, discussing things about dentistry.   You know, of
19  course he was trying to vet me and I was answering his
20  questions.   And we finally met for breakfast at First Watch
21  on Scottsdale Road, and that was towards the end of April.
22  Q.   While you were in that hiring period, did you ever meet
23  Dr. Rudolph's wife?
24  A.   Yes, sir, I did.   The second time that we had something
25  to eat was at lunch and that was at Houston's and

1544

1    Mrs. Rudolph came in.  And Dr. Rudolph was with me and she

2    came in and we just talked, chitchatting, had lunch.

3    Q.    What city was that in?

4    A.    Scottsdale.  And location was Houston's on Scottsdale

5    Road.

6    Q.    Was Three Rivers Dental group in Scottsdale?

7    A.    No, sir.

8    Q.    Where was that?

9    A.    Three Rivers Dental Group is in Pennsylvania, but

10   Dr. Rudolph had a home in Scottsdale and he traveled back

11   and forth.

12   Q.    When did you start working at Three Rivers Dental?

13   A.    Where or when?

14   Q.    When?  Can you tell me again.

15   A.    Yes, I started around June 5th of 2015.

16   Q.    What was your position?

17   A.    Initially I was playing the role of consultant.  And

18   Dr. Rudolph wanted me to basically work on a operations

19   manual for him and build the operations manual and to kind

20   of observe the practices.  Dr. Rudolph is a very

21   detail-oriented person and he is very focused on every

22   single detail of the practice; therefore, it helped in the

23   process of trying to put together a manual.

24   Q.    Did at some point you stop being a consultant and

25   take --

1545

REDIRECT - RODGERS

1   A.    Yes.

2   Q.    -- a direct role?

3   A.    Yes, sir.

4   Q.    About when was that?

5   A.    Probably about a couple months, I'd say.

6   Q.    What role did you take on then?

7   A.    I was more of a regional manager.

8   Q.    You mentioned that Dr. Rudolph was detail oriented.

9   Was -- would you characterize his management style as more

10  on the hands-off or more on the -- in -- deeply involved in

11  the business?

12              MR. MARKUS:  Objection.  Relevance, Your Honor.

13              THE COURT:  Overruled.

14  BY MR. WINSTEAD:

15  Q.    Was it more hands off or was it more --

16  A.    No, he was very involved in every detail of the

17  practice.  And that made him very unique because usually

18  owner's practices that have multiple practices are not as

19  focused.  The -- I mean, he knew everything from how you

20  greet a patient to how you dismiss a patient.  So it was --

21  there was a lot of detail in the process.

22  Q.    Were there multiple offices?

23  A.    Yes, sir.

24  Q.    Where were they?

25  A.    One was in Jennerstown, one was in Pittsburgh, and the

1546

REDIRECT - RODGERS

1    other one was in Greensburg.

2    Q.    Are those all in Pennsylvania?

3    A.    Yes, sir.

4    Q.    Where did you primarily work?

5    A.    All of them.  I travel.  I could be in Greensburg one

6    day and then be in Jennerstown another day and be in

7    Pittsburgh.

8    Q.    Did each of those three offices have an office manager?

9    A.    Yes, sir, they did.

10   Q.    And so what was your role in relation to the office

11   managers?

12   A.    I was coaching the managers and helping out.  There

13   were times when our -- the office managers were not

14   available, or if we did not have an office manager -- let's

15   say the office manager left the practice, then I would jump

16   in and take part at -- take a role as the office manager --

17   interim office manager.

18   Q.    Did you know someone named Anna Grimley?

19   A.    Yes, sir.

20   Q.    Where did she work?

21   A.    She worked in Jennerstown.

22   Q.    What was her role there?

23   A.    She was the manager for Jennerstown.

24   Q.    Was she the manager for Jennerstown the whole time you

25   were working for Three Rivers?

REDIRECT - RODGERS

1  A.  Yes.  I only worked for Three Rivers Dental for about

2  5 1/2, almost 6 months.

3  Q.  So when did you stop working there?

4  A.  I was terminated on the 25th of November, 2015.

5  Q.  What led to that termination?

6  A.  The termination -- what led to the termination was that

7  I did not meet the standards.  You have to look at this from

8  an owner's perspective, okay?  If I was the owner and I had

9  someone that did not meet the standards, meaning that they

10  weren't doing everything that I expected them to do, I would

11  have no other choice but to terminate him.  So I -- even

12  though I was very disappointed I understood where

13  Dr. Rudolph was coming from.

14  Q.  Okay.  All right.  I'd like to ask you about your pay.

15  Generally how were you paid?

16  A.  I was paid biweekly.

17  Q.  In what form?

18  A.  Oh, direct deposit.

19  Q.  Okay.  Did you ever get checks?

20  A.  Yes, sir.  I -- I think at the very beginning I did.

21  I -- this has been a while back.  But it was limited until I

22  went to direct deposit.

23  Q.  Did you ever receive any large cash payments for your

24  salary?

25  A.  Yes, I did.  And it was in lieu of my salary.  And the

1548

REDIRECT - RODGERS

1    reason why was that I lived in Scottsdale.  And to travel to

2    Pennsylvania and move my household goods was going to be

3    rather costly at the time.  And Dr. Rudolph had offered

4    to -- we kind of negotiated back and forth and we agreed

5    upon that I would take the money off my regular pay, which

6    was a sum of $10,000.

7    Q.    And did you get that in cash or was this a check?

8    A.    Check.

9    Q.    Was that at the beginning of your employment?

10   A.    Yes, sir.

11   Q.    And did you get a check at the end of your employment?

12   A.    Yes, sir, I did.  I got a severance pay.

13   Q.    Do you remember how much that was?

14   A.    That was approximately $2500.

15   Q.    Other than those two checks in your direct deposit, did

16   you ever get actual cash --

17   A.    No, sir.

18   Q.    -- for pay?

19   A.    There was no reason for that.

20   Q.    If you're aware, are you aware of whether any other

21   employees received their pay in cash or --

22   A.    No, sir.

23   Q.    Okay.  Did you have visibility on payroll matters?

24   A.    No, sir.

25   Q.    Do you know who did?

REDIRECT - RODGERS

1    A.    I believe that Ms. Milliron, she handled the payroll.

2    Q.    Why do you think that?

3    A.    Because the -- sheets were sent to her.  And I didn't

4    know if we had a payroll service or not.  My focus was

5    basically on the operations -- day-to-day operations of the

6    business, and payroll was not one of them.

7    Q.    When you say "Ms. Milliron," what's her full name?

8    A.    Lori Milliron.  And, again I'm just speculating on that

9    because I have no specifics on that.

10   Q.    During the time that you were at Three Rivers, where

11   did Dr. Rudolph primarily work?

12   A.    He actually visited the offices randomly.  And he

13   didn't have a specific spot where he went to work every day.

14   He could be here at Pittsburgh one day or he could be at

15   Jennerstown another day.  So he would kind of not see

16   patients but just come in to see how everything was running,

17   and for him and I to sit down and go over operational

18   concerns or anything of nature.

19   Q.    And did you say at this time his primary residence was

20   in Arizona?

21   A.    No, I didn't say that.  I said that he had a residence

22   in Arizona.  I -- I did not know where -- exactly where he

23   lived because our relationship is very unique in the sense

24   that I spent a lot of hours working so I had to be there an

25   hour before everything started and then I would normally

1550

REDIRECT - RODGERS

1    sometimes be there until 8:00 at night, making sure that all

2    the other managers would turn in their reports.

3            So when Dr. Rudolph and I talked, we always talked

4    about business; we didn't pal around or socialize much.  It

5    was more a very focused relationship on the practices.

6    Q.   So I think your previous answer assumed this, but did

7    Lori Milliron work at Three Rivers while you were there?

8    A.   Yes, sir.

9    Q.   Did she have a particular office she worked out of?

10   A.   No, she -- she sometimes worked from home, but she

11   worked wherever she was needed.  Lori was the go-to person

12   as far as some of the technicals of Three River Dental.  For

13   example, the software, she was very good at software.  And

14   if there were any questions, she would be the person that I

15   would call to get answers from because, again, she was also

16   very involved in the -- in the practice.

17   Q.   Do you know what her job description was at that time?

18   A.   No, sir, I didn't.  But she helped out with all kinds

19   of jobs and stuff.  If we needed help, she was there.

20   Q.   Did she work closely with Dr. Rudolph?

21   A.   Yes, he was her supervisor.

22   Q.   When Dr. Rudolph would visit practices, would

23   Ms. Milliron sometimes accompany him?

24   A.   Yes, sir.

25   Q.   Sometimes --

1551

REDIRECT - RODGERS

1    A.    Sometimes.

2    Q.    Sometimes or most times?

3    A.    No, sometimes.

4    Q.    Would she fill in other duties if necessary?

5    A.    Working the front desk, you know, helping out with the

6    practice, yes.

7    Q.    Okay.  So even though you had oversight of the offices,

8    were you her supervisor?

9    A.    I never saw myself as her supervisor because she never

10    fell into the chain of command of the people that I

11    supervise.

12    Q.    Was she full-time at Three Rivers?

13    A.    Yes, sir, I believe so.

14    Q.    When you joined Three Rivers Dental Group, did you

15    learn that Dr. Rudolph and Ms. Milliron had a romantic

16    relationship?

17    A.    No.  I had not learned that.  And it was so ironic

18    because I lived right across from Ms. Milliron, and it took

19    maybe a month and a half to two months to realize that she

20    was living there.  And, again, I go back to -- to myself,

21    and I can only speak for myself.  I would work a lot of

22    hours, and then on the weekends I would go traveling

23    throughout Pennsylvania because that's what I wanted to do.

24          And when I wasn't doing that, one of my hobbies is

25    art.  I painted for 30-something years, so I would be in my

1552

REDIRECT - RODGERS

1    art studio painting into the middle of the night.  So my

2    neighbors -- I didn't even know my next-door neighbor for

3    about eight months -- or not eight months but the period

4    that I was there, actually.

5    Q.    So you said you lived next to Ms. Milliron.  Can you

6    describe --

7    A.    Not next to, across -- across catty-corner.  At

8    about -- if you stepped out of my driveway and looked at

9    about a 45-degree angle to my right, her apartment was

10   there.

11   Q.    Okay.

12   A.    And, again, because I was gone a lot, I did not realize

13   that.  And then one day I saw her and go, oh, okay, that's

14   where she lived, you know.

15   Q.    Did you ever see Dr. Rudolph at Lori's residence?

16   A.    A couple of times.

17   Q.    Can you tell me about that.

18   A.    He just came in and drove in there and that was it.

19   Q.    So tell me a little more specifically.  How did you --

20   how did you first notice --

21   A.    I was -- I think I was outside or I was -- yeah, I was

22   outside and I saw him pull up and he just drove to her house

23   and the garage door opened and he went in.  And then I

24   thought, oh, okay.

25               Again, I -- I'm not the kind of person that likes

REDIRECT - RODGERS

1    to be nosy and try to, you know -- for me, it was no big

2    deal.  I didn't see anything out of the normal, you know.  I

3    did tell him one day I said, "Hey, neighbor."  And he said,

4    "Just drop it," and that was it.  You know, and I did.

5    Because I respect the man.  I respected him quite a bit.

6    And I thought okay, it's not my business.

7    Q.   Did you see him any other times at Ms. Milliron's

8    house?

9    A.   There -- it was about two or three times, and that was

10   it.

11   Q.   Did you -- so tell me the circumstances of each time

12   you saw the truck drive or -- you know, tell me, like, where

13   you were, how you happened to see it.

14   A.   I think one time I was in my living room and I saw the

15   vehicle come in.  And the other time I was outside and I saw

16   the vehicle come in, you know.  And then I saw Dr. Rudolph

17   and Ms. Milliron at a restaurant in Greensburg one night,

18   and that was it.  And this was after I was terminated.  And

19   they were eating -- or he was getting ready to eat and I was

20   not going to bother him, so we just got through eating and

21   left.

22   Q.   Now when you saw Dr. Rudolph there -- did you often sit

23   in the afternoons in your living room looking out the

24   window?

25   A.   No.  No.  It was by chance.  I -- like I said, I don't

1554

REDIRECT - RODGERS

1    have time to sit around much.  I either worked really late

2    or on the weekend I was gone and/or I was in my studio

3    downstairs painting.  I also shoot a lot at competitive

4    shooting and I would spend some time out at the range

5    shooting.

6         So, like I told you, I didn't even know my neighbor

7    next door to me until I had an injury one day and my hand --

8    and found out that he was a doctor.  So I didn't know the

9    neighbors at all.

10   Q.   So was it on weekends or after hours that you happened

11   to see Dr. Rudolph at Ms. Milliron's apartment?

12   A.   I believe it was on the weekends.

13   Q.   While you were working there, did you ever see

14   Dr. Rudolph, Ms. Milliron, and Dr. Rudolph's wife all

15   together at one time?

16   A.   No, sir.  I only saw Mrs. Rudolph one time when I was

17   in Greensburg and she had come by the office.  I was in the

18   Pittsburgh office and it was a new office and she came on a

19   tour.  I said hello to her and that was it, you know.  She

20   left and -- that was the only time that I saw her there.

21   Q.   So other than that time, did you ever see her or know

22   of her to come to Three Rivers Dental Group offices?

23   A.   No, sir.

24   Q.   Did the staff at Three Rivers talk about the fact that

25   Dr. Rudolph and Ms. Milliron were in a romantic

1555
REDIRECT - RODGERS

1    relationship?

2              MR. MARKUS:  Objection.  Hearsay, Your Honor.

3              THE COURT:  Well, I don't think it's asking for

4    hearsay.  So right now, so far he's just asking whether

5    there was discussion.  Overruled.

6              You may answer.

7              THE WITNESS:  They would not say that to me

8    because, again, my focus --

9              MR. MARKUS:  Well, now I would object, Your Honor,

10   to what the others --

11             THE COURT:  Let me instruct Mr. Morlock.

12             THE WITNESS:  Yes, sir.

13             THE COURT:  Please refrain from -- in your answer

14   from repeating what anyone else said.  Just talk about what

15   you know from personal knowledge and what happened.

16             THE WITNESS:  Thank you.

17             No, sir.

18   BY MR. WINSTEAD:

19   Q.   Okay.  When you saw them together, were they physically

20   affectionate with one another?

21   A.   No, sir.

22   Q.   Were they always together?

23   A.   No.

24             MR. WINSTEAD:  May I have a moment, Your Honor?

25             THE COURT:  You may.

1556

CROSS - MORLOCK

1    BY MR. WINSTEAD:

2    Q.   Sir, we asked -- I asked about your compensation.   Did

3    you ever have a Three Rivers Dental Group credit card

4    account?

5    A.   No.

6    Q.   Okay.   Nothing further.

7                MR. WINSTEAD:   Thank you, Your Honor.

8                THE COURT:   Thank you.   Cross-examination.

9                MR. MARKUS:   No cross from Dr. Rudolph, Your Honor.

10               THE COURT:   All right.   Mr. Dill.

11               MR. DILL:   Yes, sir.   Just a moment.

12                            CROSS-EXAMINATION

13   BY MR. DILL:

14   Q.   Good afternoon, Mr. Morlock.   How are you?

15   A.   Good afternoon.

16   Q.   I think I tried to call you and then we missed each

17   other's call.

18   A.   Yes.   I texted you back, but I assume that you were not

19   available.

20   Q.   Yeah.   That was just yesterday, but I appreciate it.   I

21   just want to talk a little bit about -- again, it looks like

22   you came to the business -- were asked to come to the

23   business around the June time period of 2015 --

24   A.   Yes.

25   Q.   -- is that right?

CROSS - MORLOCK

1    And then for reasons that it didn't work out for

2    you, you left around, when, November?

3    A.    November 25th was my termination date.

4    Q.    Okay.  And just for those of us not familiar with the

5    area, I just want to kind of establish where the offices

6    were --

7    A.    Okay.

8    Q.    -- if you don't mind.  And kind of give us -- do you

9    have an idea about how far apart they were and where the

10    distances were?

11    A.    I lived in Greensburg, so the Greensburg office was

12    probably about six miles from where I lived.  And then the

13    Pittsburgh office -- and I'm just taking a guess, it's

14    probably around 40-something miles, one way.

15    Q.    Okay.  And then Jennerstown --

16    A.    Jennerstown is probably about 28 miles.

17    Q.    Further on away from --

18    A.    No, it was in the opposite direction.

19    Q.    From Pittsburgh.

20    A.    Yeah -- no, no, from Greensburg.  I live in Greensburg,

21    so I'm referring to the distances based on where my home is.

22    Q.    Okay.  And then are you familiar with National Hoback

23    Township?  Do you know where that is?

24    A.    No, sir.

25    Q.    And are you familiar with areas -- suburban areas north

CROSS - MORLOCK

1  of Pittsburgh?  Have you been up there at all?

2  A.    No.    On my off time I went to Pittsburgh, but I don't

3  know if I went to the northern part of Pittsburgh.

4  Q.    It's a pretty fair distance, though, as far as a drive

5  from Greensburg to Pittsburgh, itself; is that correct?

6  A.    Uhm-hum.    I believe so.

7  Q.    Yeah.    And how about Newcastle?    Do you know where that

8  is?

9  A.    No, sir.

10  Q.    Okay.    So I think you told us that you went from office

11  to office.    Your understanding is that Ms. Milliron also

12  would work remotely and go office to office --

13  A.    Uhm-hum.

14  Q.    -- as well?

15  A.    Yes, sir.

16  Q.    Okay.    As far as the office managers, down in

17  Jennerstown, you mentioned somebody named Anna Grimley.    Do

18  you recall that?

19  A.    Yes.

20  Q.    Okay.    So she was an OM, or office manager.

21  A.    Yes.

22  Q.    All right.    And you told us before that Dr. Rudolph was

23  very hands-on, even though he was living sometimes in

24  Arizona, up in Pittsburgh, but he was hands-on and

25  intimately involved in the practice.

1559

CROSS - MORLOCK

1    A.    Right.

2    Q.    Okay.  One of the sources of the way that patients

3    would get services is something called Care Credit.  Do you

4    remember that?

5    A.    Yes.

6    Q.    Okay.  And Care Credit is -- would be if a patient

7    wanted to get, let's say, implants, they would finance --

8    there would be a finance for that; is that right?

9    A.    Right.

10    Q.    And is it your understanding there were certain

11    procedures for Care Credit that had to be followed or else

12    Care Credit would no longer -- no longer be a vendor for

13    Three Rivers?  Were you aware of that?

14    A.    The only procedure was that they had -- the patient had

15    to fill out the application form.

16    Q.    Okay.  Wasn't there a situation -- do you recall

17    receiving emails about deposits for Care Credit and whether

18    the deposit, or reservation, whether that could actually be

19    financed?  Do you recall that?

20    A.    No, sir, I don't recall that.

21    Q.    Okay.  Do you recall Anna Grimley being counseled about

22    violating that procedure?  Do you ever recall that

23    happening?

24    A.    No, sir.

25    Q.    She was terminated, was she not?

CROSS - MORLOCK

1    A.    That happened after I had left.

2    Q.    But you became aware that she was terminated, didn't

3    you?

4    A.    Yes.

5    Q.    Okay.  And did you become aware she was terminated for

6    basically misconduct concerning that, or do you not --

7    A.    No, sir, I do not know any details about her

8    termination.  I just knew that she was terminated.

9    Q.    Okay.  Did you speak with her about her termination?

10    A.    A while back.  She said, "I was terminated."  And --

11            MR. WINSTEAD:  Objection.  Hearsay.

12            THE COURT:  Sustained.

13    BY MR. DILL:

14    Q.    Did you speak about, or were you aware about -- about

15    her termination, whether she was happy about it, sad about

16    it, or otherwise?

17    A.    No, she -- I did speak to her and she was excited

18    because she was headed towards Las Vegas.

19    Q.    Okay.

20    A.    She had a home in Las Vegas.

21    Q.    All right.  So did you know that -- in fact that she

22    was terminated for cause?  Did you not know that?

23            MR. WINSTEAD:  Objection.  Asked and answered.

24            THE COURT:  Sustained.

25    BY MR. DILL:

1561

CROSS - MORLOCK

1    Q.    You actually spoke to her, though, in January of 2017,

2    did you not?

3    A.    Probably.  We stayed in touch --

4    Q.    Right.

5    A.    -- because in my new job I was looking for office

6    managers and I was always looking for practices to purchase.

7    Q.    Okay.

8    A.    She was a good source.

9    Q.    Now as far as Ms. Grimley, I'll pause on that.  You

10   talked about where you lived.  Did Dr. Rudolph recommend a

11   place for you to live that was close to the office?

12   A.    No, I chose it myself.

13   Q.    All right.  And when you saw him there, obviously you

14   saw him come and go, what, a couple of times you said?

15   A.    Uhm-hum.  Yes.

16   Q.    All right.  And it appeared to you when you spoke to

17   him, you said, "Hey, neighbor," he was private about it and

18   just said, "Drop it"; is that right?

19   A.    Yeah.

20   Q.    Okay.  Now going back to Ms. Grimley, you -- did you

21   know that in January of 2017 -- did you speak with her about

22   the situation that had happened about Ms. Rudolph passing

23   away?

24   A.    She had told me about that.

25   Q.    Okay.  And she told you, did she not --

1562

CROSS - MORLOCK

1    MR. WINSTEAD:  Objection.  Hearsay.

2    THE COURT:  Well, let's hear the question and then

3  you can make the objection.

4  BY MR. DILL:

5  Q.   Did you become aware in the January time period that

6  Ms. Grimley, after being terminated, made an anonymous call

7  to the FBI?

8    MR. WINSTEAD:  Objection --

9    THE WITNESS:  No.

10    THE COURT:  Hold on, hold on.

11    MR. WINSTEAD:  Sorry.  It appears to call for

12  hearsay.

13    THE COURT:  He's asking if he's aware of a phone

14  call; he's not asking for the content of the -- I don't

15  believe that's what you're asking for, or where you're

16  headed.

17    MR. DILL:  No, sir, you're right.  You're

18  correct.

19    THE COURT:  Okay.  Overruled.

20  BY MR. DILL:

21  Q.   Were you aware of that?

22  A.   No.  But I was contacted by the FBI.

23  Q.   Okay.  When -- you were contacted by the FBI, what, in

24  2019?

25  A.   I believe so.

1563

CROSS - MORLOCK

1    Q.    But I'm talking back in January --

2    A.    No, sir.

3    Q.    -- were you aware of that, one way or another?

4    A.    No, sir.

5    Q.    Just as far as weekends, I thought I understood you to

6    say on the weekends it looks like you would either be

7    painting or you would also go sport shooting on the weekend?

8    A.    Yeah.  Yeah.

9    Q.    Okay.

10   A.    I was very, very active.  When you're as busy as I was

11   during the week, to travel and release -- you know, just to

12   be able to do something other than work was great for me.  I

13   would be up, you know, 5:00 in the morning ready to go on

14   Saturday morning.

15   Q.    Right.  5:00 to get out and see Pennsylvania --

16   A.    Yeah.

17   Q.    -- and go shooting.

18   A.    Yeah.  Absolutely.

19   Q.    You were also asked some questions about the payroll.

20   Did you ever hear the name Theresa Dansler -- Dancer?

21   A.    Not that I can recall.

22   Q.    And I think you told us you don't really know who was

23   in charge of payroll or who was on the payroll or anything

24   like that.

25   A.    Sure.  Yes, sir.

1564

CROSS - MORLOCK

1    Q.    Okay.

2              MR. DILL:  Thank you, sir.  One moment.

3              That's all I have.  Thank you, Your Honor.

4              THE COURT:  All right.  Redirect.

5              MR. WINSTEAD:  Nothing further.  Thank you, Your

6    Honor.

7              THE COURT:  All right.  May this witness be excused

8    for the Government?

9              MR. WINSTEAD:  Yes, sir.

10             THE COURT:  For defendants?

11             MR. MARKUS:  Yes, Your Honor.

12             MR. DILL:  Yes, Your Honor.

13             THE COURT:  Mr. Morlock, thank you so much for your

14   testimony.  You're excused.  You may step down.

15             THE WITNESS:  Okay, sir.

16             THE COURT:  Government may call its next witness.

17             MR. FIELDS:  Thank you, Your Honor.  The United

18   States calls Rachel Clay.

19             THE COURT:  All right.

20             COURTROOM DEPUTY:  Please raise your right hand for

21   me.

22              RACHEL CLAY, GOVERNMENT'S WITNESS, SWORN

23             COURTROOM DEPUTY:  Please be seated and remove your

24   mask for me.  And state your full name for the record and

25   spell your first and last name for us.

1565

DIRECT - CLAY

1    THE WITNESS:  My name is Rachel Clay.  First name

2    spelled R-a-c-h-e-l, last name spelled C-l-a-y.

3    THE COURT:  You may proceed, counsel.

4    MR. FIELDS:  Thank you, Your Honor.

5    DIRECT EXAMINATION

6    BY MR. FIELDS:

7    Q.   Ms.  Clay, are you a forensic document examiner with

8    the FBI?

9    A.   Yes, I am.

10   Q.   Did you compare signatures on an alleged postnuptial

11   agreement with known signatures of Bianca Rudolph?

12   A.   Yes, I did.

13   Q.   Are you prepared today to tell the jury about your

14   conclusions?

15   A.   Yes, I am.

16   Q.   Let's talk about what it takes to become a forensic

17   document examiner with the FBI.  What's your educational

18   background?

19   A.   I have a bachelor of science in criminal justice and a

20   master of science in forensic sciences.

21   Q.   What did you do before you joined the FBI?

22   A.   I worked for the United States Secret Service.

23   Q.   Doing what?

24   A.   I analyzed counterfeit currency in order to determine

25   its authenticity or origin.

1566

DIRECT - CLAY

1    Q.    When did you start working for the FBI?

2    A.    2013.

3    Q.    At the FBI, what kind of training have you received in

4    examining questioned documents?

5    A.    I spent my first two years in a full-time, everyday

6    comprehensive training program where I received daily

7    lectures, went through practical problems, read literature

8    throughout, several questioned document books.  I completed

9    quizzes and exams and did oral boards in front of panels of

10   experts, and moot courts as well.

11   Q.    When we talk about questioned documents analysis, what

12   is that?

13   A.    So that's an analysis of an item that's submitted to me

14   where I don't know its authenticity or its origins.  So

15   there's some type of question related to it where they want

16   me to determine the answer.

17   Q.    Have you previously been certified as an expert in

18   forensic document analysis in federal court?

19   A.    Yes, I have.

20         MR. FIELDS:  Your Honor, at this time, I would

21   tender Ms. Clay's testimony under Federal Rule of Evidence

22   702 on the subject of forensic document analysis.

23         THE COURT:  Any objection?

24         MR. MARKUS:  No objection.

25         MR. DILL:  No objection.

1567

DIRECT - CLAY

1    THE COURT:  All right.  There being no objection,

2  Ms. Clay is qualified under Federal Rule of Evidence 702 to

3  provide expert opinion testimony in the field of forensic

4  document analysis.

5  BY MR. FIELDS:

6  Q.    What kind of examination was requested in this case?

7  A.    I was given three questioned signatures and several

8  known signatures, specifically 11 known signatures, to

9  compare.  And I was asked to determine whether the known

10  signatures that were written by Bianca Rudolph were

11  prepared -- were used -- I'm sorry, if the known signatures

12  were the same as the questioned signatures, so whether she

13  had prepared the questioned signatures.

14  Q.    So let's talk about signatures.  Individual -- how do

15  individuals develop their signatures?

16  A.    So if you think back to grade school when you're first

17  learning how to write, there's oftentimes the banners at the

18  top of the board with an upper case A and a lower case A and

19  then upper case B and lower case B.  So it's the same for

20  handprinting in cursive.  So that's a copybook format and

21  you're taught how to write and form your letters that

22  specific way.  You're even given sometimes special paper

23  that has lines on it and then you're supposed to write

24  within those lines.  And so you're graded in trying to make

25  those letters appear the same way.

1568

DIRECT - CLAY

1    So as you are writing, you're focusing with a great

2    deal on how you're forming those letters, and you're writing

3    slowly.  But over the years, you start to mature in your

4    writing and your skill and you slowly start to stray away or

5    diverge from that copybook format.  So you start to impart

6    some of your own individual characteristics.  For example,

7    you might like a special flourish at the end of a letter or

8    you might like to slant all of your letters to the right or

9    to the left, or you might like to write really big or really

10   small.  So these are your individual characteristics.

11   And that straying away from the copybook is how

12   we're able to identify writing back to you, so with

13   handprinting and with the signature, it's the same way.

14   Signature can start off with cursive writing, which is very

15   slow and where you're thinking about it, and then gradually

16   over time you start to develop your signature.  In your

17   early, mid-teens, you might start to write your signature

18   sometimes.  But as you get a little bit older, especially in

19   your early 20s, that's when your signature really becomes

20   more solidified and more -- more set in its ways because

21   that's when you start your formal signature.

22   So after that, there can be some changes in your

23   signature, but oftentimes it's relatively set.

24   Q.   Let's talk about the process of doing a questioned

25   documents analysis.  What's the process?

DIRECT - CLAY

1    **A.    So whenever I do a questioned document examination,**

2    **specifically in this case with the signature, I used a**

3    **process known as ACE plus V.  So that's an acronym for**

4    **Analysis Comparison Evaluation and Verification.**

5            **So during my analysis stage, what I first do is I**

6    **look at the questioned writing or the questioned signatures**

7    **and the known signatures.  And I use sufficient lighting and**

8    **I use my magnification.  So I'm looking at these signatures**

9    **to determine whether they are original or photocopy.  So if**

10   **they're original, that's going to be like on paper, and I'm**

11   **looking to see if they're suitable for comparison.  So do I**

12   **see anything that might indicate tracings or simulations?**

13   **Do I see speed to the signature?  Are there flowing stops**

14   **and starts?  So these are the things that I'm looking at.**

15   **That's with the analysis.**

16           **Once I determine that it is free and natural and**

17   **suitable for comparison, I move into the comparison stage.**

18   **So with my comparison, I'm then putting the items side by**

19   **side and I'm looking to see whether I see any similarities,**

20   **differences, or characteristics that I can't account for**

21   **between the two documents.  In my specific unit and my**

22   **exams, I use arrows to annotate what I'm seeing.**

23           **After my comparison stage, I move into an**

24   **evaluation stage.  So that's where I'm looking at all of my**

25   **arrows and all of the notes that I've made.  I'm looking to**

DIRECT - CLAY

1    see what significance they have.  I'm looking to see if

2    there are any limitations, things I couldn't find.  Were

3    they photocopies?  Was it just too hard to tell?  So I'm

4    weighing all of those similarities and differences and

5    characteristics.  And that's where I formulate my opinion

6    and I write my report.

7            And then in the final stage, that's verification.

8    So my notes and the original evidence in my report move to

9    another examiner.  That examiner then ensures that the

10   correct opinion has been arrived at, that the correct

11   methodologies has been followed, that we've answered the

12   correct questions that have been asked of us, and that we

13   have taken everything into account such as:  Does my notes

14   support my conclusion?

15   Q.   Did you apply that process to certain documents in this

16   case?

17   A.   Yes, I did.

18   Q.   So let's look at defense exhibits -- let's look at

19   Defense Exhibit RW, which is already in evidence.  And then

20   let's go to the last page, please.

21            IT PERSON:  Do you have a page number?

22            MR. FIELDS:  Keep going, you'll get there.  There

23   you go.

24   BY MR. FIELDS:

25   Q.   So this is page 26.  Was this one of the questioned

1571
DIRECT - CLAY

1   documents?

2   A.   I believe that it was -- is this item 1?

3   Q.   Yes.

4   A.   Yes, then this is.

5   Q.   Now let's look at Defense Exhibit RX.  Let's go to page

6   27.  Next page.  Next page.  Next page.  And then finally at

7   the end.

8          Was this another one of the questioned documents?

9   A.   Yes, it is.

10  Q.   All right.  And now let's go to page 25.  Oh.

11         THE JUROR:  Are we supposed to be seeing this?

12         MR. FIELDS:  This is in evidence.  Sorry,

13  Ms. Guerra.  This is my fault.

14         THE COURT:  If you want to go back to the prior

15  exhibit, you can.

16         MR. FIELDS:  We will, Your Honor.  Thank you.

17  Thank you.

18  BY MR. FIELDS:

19  Q.   Let's go back to the first exhibit, RW.  And let's go

20  to page 26.

21         Is that one of the questioned documents?

22  A.   Yes, it is.

23  Q.   And by "questioned documents," you're trying to figure

24  out if the signature of Bianca Rudolph here matches known

25  signatures of Bianca Rudolph?

1572

DIRECT - CLAY

1    A.    Correct.

2    Q.    Okay.  Now let's go to Government's Exhibit R -- or

3    sorry, not Government's Exhibit -- Defense Exhibit RX, which

4    is already in evidence.  Okay.  Let's go to page 26 on this

5    one.

6          Is this another one of the questioned documents?

7    A.    Yes, if this is item 2.

8    Q.    And then page 31.

9          Is this the third questioned document?

10   A.    Yes.

11   Q.    Now I've been referring to these as "questioned

12   documents."  What's a "questioned document"?

13   A.    So the questioned document was -- in this particular

14   case, it's these documents that have some type of question

15   on it.  So my question was:  Did Bianca Rudolph sign these

16   signatures on the bottom?

17   Q.    What signatures did you compare, you know, so -- these

18   signatures -- you see a signature there in the bottom right.

19   What signatures did you compare signatures like that to to

20   do your analysis?

21   A.    So I was only looking at the Bianca Rudolph signatures

22   on these questioned documents, and I was comparing them to

23   known signatures submitted that were known writing of Bianca

24   Rudolph.

25   Q.    Based on your examination, as well as your experience

DIRECT - CLAY

1    and training, what was your expert opinion after comparing

2    Bianca's signature on these questioned documents to known

3    signatures?

4    A.    It was my opinion that Bianca Rudolph wrote the

5    questioned signatures on these documents.  So I reached an

6    opinion of source identification.  And by that, I mean that

7    I saw a significant quantity and quality of similarities

8    between both items, both the questioned and the known, to

9    where I wouldn't expect any other individual to be able to

10   have that same combination of characteristics.

11          Also I didn't have any significant similarities --

12   I'm sorry, any significant dissimilarities or limitations.

13   Q.    So let's take that down.  And now this is a document

14   that's not in evidence, it's Government's Exhibit 493.  Can

15   we turn that?  There we go.

16          What is this?  Could you describe it for us.

17   A.    This is one of the pages of my notes that I was talking

18   about earlier.  I have the questioned signatures on the top

19   and then below that I have the known signatures that I was

20   comparing them to.  And then the red notations on them are

21   the arrows that I was using to demonstrate similarities and

22   characteristics I was finding.

23   Q.    Would you be able to help use this to describe your

24   analysis?

25   A.    Yes.

1574
DIRECT - CLAY

1    MR. FIELDS:  Your Honor, at this time I'd move for

2  the admission of Government's Exhibit 493.

3    THE COURT:  Any objection?

4    MR. MARKUS:  No objection.

5    MR. DILL:  No objection, Your Honor.

6    THE COURT:  All right.  There being no objection,

7  Government Exhibit 493 is admitted into evidence and may be

8  published to the jury.

9    (Government's Exhibit 493 received)

10  BY MR. FIELDS:

11  Q.   All right.  So orient us.  What's on the top?

12  A.   The very top three signatures are the questioned

13  signatures that we previously looked at on those full

14  documents.  I cropped them out and placed them on this one

15  document here.

16  Q.   And what's on the bottom?

17  A.   The bottom are 11 known signatures that were submitted

18  to me for comparison.

19  Q.   So let's zoom in on those top signatures, if we can.

20  All right.

21    Can you describe for us what notations you're

22  making here and sort of how you went about doing your

23  analysis.

24  A.   Sure.  So I treat each item or each signature

25  individually.  Some of the first things that I look at -- I

DIRECT - CLAY

1   mean, are the beginning of the signature.  So I'll point

2   some of the characteristics out.

3           So, for example, the very first letter, "B," for

4   Bianca.  Normally back when you're taught how to write,

5   you're taught to write your "B" on a straight line.  It can

6   be a written line or it can be an invisible line, but you're

7   taught to write all of your writing on that straight line.

8           And in this particular instance -- on all three

9   signatures, actually, the left edge of that "B" descends

10  below the line and it starts off further down than the

11  top -- or then the bottom right edge; it kind of slants

12  upward.  And so that's the significant characteristic that I

13  observed that was in common between the questioned

14  signatures and the known signatures.

15          Also with the letter "B," typically you round it

16  out at the bottom -- so you've got a round circle in the top

17  and a round circle in the bottom -- and in these three

18  instances none of the "B"s close on the bottom.  It actually

19  looks like the letter "R."  And so that's another

20  significant similarity that I observed.

21          Another similarity I observed in the same name, the

22  very next letter, is the letter "I."  So there what I'm

23  notating is the spacing between the "B" and the "I."  So

24  typically when you're taught to write, you're taught to put

25  in a certain amount of space between each letter.  So

DIRECT - CLAY

1    whenever you stray away from that, or start to put your

2    letters together closer, that becomes more significant.  So

3    that was another similarity that I observed between the

4    questioned signatures and the known signatures.

5            Another one with that same letter "I," they don't

6    have the "I" dot on the top.  So, again, whenever you're

7    writing the letter "I," typically you're going to put a dot

8    on the top.  So that was observed in common between both the

9    questioned and the known signatures.

10           With the -- with the name "Rudolph," another

11   significant characteristic that I observed was what's called

12   height relationship.  And that's the way that certain

13   letters are compared to other certain letters.  How high

14   they are, how tall they are.

15           So for "Rudolph," what I'm actually showing in the

16   image is a line going down from the top of the "R," down to

17   a lower "D," and then down to a lower "L," and then back up

18   to a high "H."

19           So when you're taught to write that copybook

20   format, all of the tops of those letters should be written

21   pretty much in the same height and level.  So this is a

22   significant characteristic -- multiple significant

23   characteristics because you're seeing that same height

24   relationship to each of the letters in the questioned and

25   the known writing.

1577

DIRECT - CLAY

1    Q.    So you talked about this handwriting analysis.    Is

2    there an error rate associated with handwriting analysis?

3    A.    So there's not an error rate for the whole field

4    because it's incredibly difficult to do that.    Handwriting

5    is always varying, always changing.    We're not machines, so

6    handwriting is not always going to be the same every time.

7              We do have error rates for specific studies that we

8    can do on signature analysis, but that's typically where an

9    error rate would lie is specifically with that study.

10   Q.    What is the error rate in those studies?

11   A.    So there's multiple studies.    There's -- and they have

12   varying degrees of error rate.    Typically -- I mean, I think

13   that one of them, specifically, that I can think of was a

14   study conducted on detection of genuine and simulated

15   signatures, and that was done in 2001.    And in that one, the

16   error rate on an examiner calling -- or not catching a

17   simulated signature when it truly was, and calling it

18   genuine, it was a point 49 percent error rate.    So less than

19   1 percent.

20   Q.    When you're conducting your analysis can you ever be

21   absolutely certain?

22   A.    Can you define "absolutely certain"?

23   Q.    Let's remove the "absolutely."    Can you ever be certain

24   about your analysis?

25   A.    So I take every step possible to be as certain as I

DIRECT - CLAY

1    can.  I don't identify somebody if I believe that they have

2    not prepared something.  We go through verifications where

3    other examiners look at things to compare it as well.

4    Q.    Have you ever been wrong?

5    A.    In casework?  So we don't really call it "wrong."  What

6    we do is we have that verification process where we -- if

7    there is any type of -- something that wasn't noticed, there

8    will be a discussion between both examiners and, let's say,

9    "Hey, did you consider this?"  You know, "Is this signature

10   too -- too simple?"  "Is it too complex?"  "Did you consider

11   photocopy?"

12           So we'll have that discussion going back and forth,

13   and then we'll proceed from that discussion.  So there's

14   never an instance where somebody's ever come to me and said,

15   "You've reached the wrong opinion."

16   Q.    How would you evaluate whether someone reached the

17   wrong opinion or the correct opinion?

18   A.    So what -- I mean, what we can do is there's like --

19   there's not always a ground-truth answer.  What we have is

20   all of our methodologies that we follow, all the steps that

21   we take, all of the verification processes that we reach.

22   Everything we do possible to try to ensure that we're

23   reaching the correct answer.

24           But oftentimes even if an individual admits to

25   having written something, you can sometimes trust that, and

1579

DIRECT - CLAY

1   sometimes you can't depending on the circumstances.  So

2   there's not always a ground-truth answer.

3   Q.   Ideally how many known signatures do you like when

4   you're comparing to questioned documents?

5   A.   So every case is going to be dependent on the

6   questioned signature, itself.  If we haven't seen the

7   questioned signature, oftentimes we'll start off with basic

8   instructions asking for anywhere from 25 to 50 signatures

9   for comparison.  But that's not a requirement for something

10  we must have.

11       If we can find the characteristics that we're

12  looking for in a smaller number of signatures, then that's

13  completely sufficient.

14  Q.   How many signatures do you have here, known

15  signatures?

16  A.   I had 11.

17  Q.   Was there a variation in the last name "Rudolph" on the

18  known signatures between 2006 and 2016?

19  A.   Yes, there was.

20  Q.   Was that variation narrow or wide?

21  A.   There was wide variation.

22  Q.   How did that affect your analysis?

23  A.   I'm sorry, let me explain.  There was wide variation

24  between the original 2016 signatures and the last signatures

25  in 2016.  So the signatures from 2016 did not have a wide

1580

DIRECT - CLAY

1    variation, so it was really comparing the early signatures

2    to the late signatures that had the wide variation.

3    Q.    And -- but there was wide variation there?

4    A.    Yes.

5    Q.    How did that affect your analysis?

6    A.    It was -- it didn't affect it too greatly.   So

7    especially in the name "Bianca," that was very consistent

8    all the way from 2006 all the way to 2016.   The portion that

9    I did see a wide range of variation was in the last name.

10   And that can be expected and okay because there's been a

11   long time frame between them.

12          So the questioned documents were written in 2000,

13   and my first known document was written in about 2006.   And

14   then several of the other known signatures I had were from

15   2016.   So, again, because we're not robots and we're not

16   always writing exactly the same way, there can be variation

17   there, especially over a greater time period.   But this wide

18   range of variation did not limit my conclusion because,

19   within the signatures, I found similarities that I needed to

20   state source identification.

21   Q.    You said you had 11 known signatures?

22   A.    That I was allowed to use, yes.

23   Q.    Were two of those driver's license signatures?

24   A.    Yes.

25   Q.    Were those of very high quality?

DIRECT - CLAY

1   A.    They were sufficient quality for me to be able to use.

2   They were not as good as a genuine ink-on-paper signature.

3   Q.    So in terms of those ink-on-paper signatures, how many

4   of those did you have?

5   A.    I had two.

6   Q.    And of those two high-quality sort of wet signatures,

7   when were they written?

8   A.    One of the -- they were both passport signatures.  And

9   the first one was prepared in 2006 and the other, I believe,

10  was in 2016.

11  Q.    And the 2016 signature, was that 16 years after these

12  questioned documents?

13  A.    Yes.

14  Q.    How does that affect the analysis?

15  A.    So it's the same way.  As long as I'm seeing the

16  characteristics that I need to see between the questioned

17  and the known, then it doesn't affect the analysis.

18  Q.    And if you look on the -- on your notes here, some of

19  your arrows have these little circles at the end of them.

20  Do you see that?

21  A.    Yeah.

22  Q.    What does that mean?

23  A.    So those are characteristics that are very similar to

24  what were in the known writing, but aren't -- they're within

25  the range of variation.  So, again, going back to an

1582

DIRECT - CLAY

1    individual doesn't write exactly the same way every single

2    time, variation is normal and expected.

3           And so some of those examples in there that I have,

4    perhaps the size of one of the letters is a little bit

5    bigger or a little bit smaller, maybe the slant of it's a

6    little bit more different, but they're not significant

7    characteristics because I have observed that they are within

8    the known or within the range of the ability of that person

9    doing them.  And I have so many other significant

10   similarities that I see there.

11   Q.   So -- so let me just make sure I'm clear.  So what does

12   the circle mean on the little -- on your notes there, if

13   it's got a circle in front of the arrow?

14   A.   So those are characteristics that had some type of

15   variation to it, or were similar, but they weren't exactly

16   seen within the known writing.

17   Q.   So you call those unexplained characteristics?

18   A.   Unexplained characteristics, unexplained variations, or

19   they could be accidental as well.

20   Q.   Okay.  So how many unexplained characteristics did you

21   see here in these signatures?

22   A.   So I treat each signature separately.  The first one

23   had -- looks like two, the third one had three, and the last

24   one had four.

25   Q.   When you have these unexplained characteristics, how

DIRECT - CLAY

1    many unexplained characteristics do you have in a signature

2    before it starts to affect your analysis?

3    A.    So there's no set number.  It's not like once I've

4    reached three unexplained characteristics then that's done;

5    that's too big of a limitation.  What really matters is the

6    significance of those characteristics that you're not

7    observing.

8          So, for example, on the first signature with the

9    word "Rudolph," I have a -- an arrow with a circle at the

10   top.  And so what I'm pointing to there is that the "O" in

11   "Rudolph" has a loop on the top, which is something I did

12   see in the known writing.  But that "O" on the top is a

13   little bit flatter and wider than those I saw on the known

14   signatures.  So it would have been more significant had I

15   not seen, within any of the known signatures, an "O" with

16   the loop on the top.  That's when it becomes significant.

17         But when it's just something that's very similar,

18   the formation is the same, but the height of it might be a

19   little bit off, or it might be a little bit more narrow,

20   then it's not as significant.

21   Q.    What are the rules or standards you use to determine

22   what's significant and what's not significant?

23   A.    So all of that is based off of my training and

24   education and experience.

25   Q.    So what are you trained in terms of rules or standards

DIRECT - CLAY

1   for evaluating what is or is not significant?

2   A.    So we're trained with -- with knowing about the

3   copybook format.  We're trained with knowing about

4   variation, and what's typically an acceptable range of

5   variation.  We're trained that if somebody can do something

6   really big and really small, that anything within that range

7   is acceptable.  And we're trained to look at the skill level

8   and see whether that individual has the ability to do that.

9   And if we feel comfortable with all of that, then that is

10  where I'm able to make those determinations.

11  Q.    You also mentioned your experience, so how do you

12  evaluate -- what standards do you use, based on your

13  experience, to determine what's significant versus what's

14  not significant?

15  A.    I'm sorry, can you repeat the question.

16  Q.    You mentioned now what's significant and what's not

17  significant based on your training and your experience.  You

18  talked about your training.  What, in your experience -- how

19  do you evaluate what's significant or not significant?

20  A.    So a lot of the significance is determined by the

21  questioned signature and the known signature itself.  If --

22  like I said, if the formation of the whole letter is

23  completely off or missing, then that's significant.  It's

24  significant if it's in that signature, and I have numerous

25  other known signatures and I don't see it.

1585

DIRECT - CLAY

1    And so in my training and education and experience,

2    I'm looking at both -- like the questioned signatures and

3    the known signatures and treating them separately and

4    determining the significance based off of that.  There's no

5    one set answer.  It's really about the questioned signature

6    and the known signatures, and the combination of those

7    characteristics together.

8    Q.    So are these standards subjective or objective?

9    A.    The standards?  The known signatures?

10   Q.    Yeah.  Or the -- when you're evaluating these

11   unexplained characteristics, the factors that you use to

12   evaluate them, are they subjective or are there sort of

13   objective standards in the field?

14   A.    So they're subjective based off of objective analysis

15   using that ACE plus V comparison that we do.  So I would

16   expect that any other examiner following the same

17   methodologies would reach a similar conclusion.

18   Q.    Subjective based on objective standards.  What are the

19   objective standards for evaluating these unexplained

20   characteristics?

21   A.    So the objective standards are ensuring that we're

22   following the correct procedures, following them, learning

23   about the standard copybook format, knowing about what the

24   variation is.  We have literature that talks about variation

25   being acceptable.  And so it's the subjectivity of that

DIRECT - CLAY

1    examiner who is looking at all of that and taking it all

2    into account to place the significance on things.

3    Q.    So even though the process is objective, the opinion is

4    really subjective?

5    A.    Yes.

6    Q.    So depends on each particular examiner?

7    A.    Yes.  But I would expect anybody following a similar

8    methodology to reach a similar conclusion.

9    Q.    Well, would different examiners have different --

10   different decision-making matrices for deciding what is or

11   is not a significant variation?

12   A.    It's possible.  Not within our specific unit and not

13   trained the same way that I have been; but other private

14   examiners, I'm not certain.

15   Q.    So how -- you know, there's several unexplained

16   characteristics here.  What process did you use for

17   discounting or sort of evaluating those unexplained

18   characteristics?

19   A.    So what I do is I look at them and determine -- and

20   actually many of these are unexplained variations, so what

21   that is is just the variation.  Does this person have the

22   skill to do this?  Do they have a similar character in it?

23   So when I gave that example of the letter "O," does the

24   letter "O" within the known writing, is it there and is

25   there a loop on top?  And so that's what's going to show me

1587

DIRECT - CLAY

1   the significance.  That's where I'm going to say, Okay, I do

2   see it.  I do know that there's variation writing.  I don't

3   expect it to be exactly the same every time, so this is an

4   okay variation -- unexplained variation.

5   Q.   When you conducted this examination, were you given any

6   other information from the case about the documents you were

7   reviewing?

8   A.   We did receive an incoming request letter from our

9   agent advising of the request that they wanted, and some

10  additional -- some preliminary background information.

11  Q.   What was the background information?

12  A.   I can't recall the specifics offhand.  It was one or

13  two paragraphs.  I believe it presented that there were

14  questioned documents and known documents for comparison.  I

15  believe it stated that there was a case involving a murder

16  and the location and that there was a private examiner who

17  had done a handwriting analysis by the defense -- hired by

18  the defense prior to us receiving the evidence.

19  Q.   Do you know anything about Bianca's husband?

20  A.   No.  Very little.

21  Q.   Do you know how long he was married to her?

22  A.   No.  It may have been in one of the first pages of one

23  of the documents I analyzed, but I'm not sure.

24  Q.   If someone practices enough, can they become proficient

25  at copying someone else's signature?

1588

DIRECT - CLAY

1    **A.    It's incredibly difficult to simulate or copy**

2    **somebody's signature.  And so I want to explain why that is.**

3    **So whenever you simulate someone's signature, you have to**

4    **look beyond just the overall pictorial signature.  You have**

5    **to recognize what those individual characteristics are that**

6    **the person makes and then you have to suppress -- know what**

7    **your own handwriting characteristics are, suppress those**

8    **characteristics, and then have the skill to be able to write**

9    **that other individual's characteristics in a fluid and**

10   **speedy manner without showing any signs of simulation.  So**

11   **it's incredibly difficult to do.**

12   **Q.    Are you saying there -- it's -- is it possible?**

13   **A.    Anything could be possible, but it is incredibly**

14   **difficult to do.  We've -- I've looked at signatures that**

15   **were conducted that were highly skilled simulations, but**

16   **even then were able to determine that they're simulations.**

17   **Q.    So are you saying forgery is impossible?**

18   **A.    A perfect forgery I would never really know about, but**

19   **multiple forgeries I have seen and detected simulations on.**

20   **Q.    When you say "a perfect forgery," what do you mean by**

21   **that?**

22   **A.    That would be a forgery that's devoid of -- so a**

23   **forgery would be where all of those things that I just**

24   **talked about with the simulation were overcome.  The**

25   **individual characters were there, the skill was there, the**

DIRECT - CLAY

1    speed was there.  So all of that would have to be there for
2    a perfect forgery.
3    Q.   So are you saying that the FBI would always be able to
4    detect a forgery?
5    A.   I'm saying that the first thing I do is I look for
6    indications of simulation and tracing.  And I find them
7    very, very often.  Even from signatures that have been
8    completed by highly skilled forgers, I've looked at them and
9    I've been able to see areas where there are simulation.
10            So I can't say in every single case possible, is it
11   possible, you know, that a forgery, a perfect forgery, would
12   ever come in?  It's possible.
13   Q.   But you're saying the FBI would always detect it?
14   A.   No, I'm saying that we would look for all of those
15   characteristics and -- and do our best.  And so if we're not
16   seeing those characteristics there and everything's in
17   alignment with a known, then we're going to give it the best
18   answer we can.
19            MR. FIELDS:  May I have a moment, Your Honor?
20            THE COURT:  You may.
21            MR. FIELDS:  No further questions, Your Honor.
22            THE COURT:  All right.  Cross-examination.
23            MR. MARKUS:  Good afternoon, everybody.  Good
24   afternoon, Your Honor, counsel.
25                      CROSS-EXAMINATION

1590

CROSS - CLAY

1    BY MR. MARKUS:

2    Q.    Ms. Clay, hi.  I'm David Markus.  I represent

3    Dr. Rudolph.  Nice to meet you.

4    A.    Thank you.  Nice to meet you.

5    Q.    We've never spoken before, have we?

6    A.    No, we haven't.

7    Q.    I'm a little confused because it seemed for a while the

8    prosecutor was trying to question you -- he was the one who

9    hired you, right?

10   A.    Correct.

11   Q.    To do this analysis, correct?

12   A.    Correct.

13   Q.    And to determine whether this was Bianca Rudolph's

14   signature, right?

15   A.    Yes.

16   Q.    And you told him the answer, right?

17   A.    Yes.

18   Q.    And this wasn't a close call for you, was it?  Well,

19   let me ask you this:  You have a lot of different types of

20   identification from source identification, and then there's

21   a number of different types of identification you can have,

22   correct?

23   A.    Yes.  The -- there's a number of different type of

24   conclusions I can reach, yes.

25   Q.    Okay.  Can you just explain to the jury the types of

CROSS - CLAY

1    conclusions you can reach.

2    A.    My most definite answer is a source identification, and

3    that's what I rendered here.  Below that, if I start to have

4    numerous unexplained characteristics or limitations, I can

5    reach a common "may have been prepared," or a common source.

6    Below that I have an "inclusive" or "no conclusion."  And

7    then below that I have "may have been prepared by different

8    sources."  And then the final one would be "elimination or

9    exclusion."

10   Q.    So you can go from elimination or exclusion, which is

11   sort of the bottom, the fifth rung, all the way to the top,

12   which is your highest confidence, which is source

13   identification, correct?

14   A.    Correct.

15   Q.    And this one wasn't one of the bottom ones.  This was

16   the top most confident you could have source identification,

17   correct?

18   A.    Correct.

19   Q.    Okay.  Before we get into what goes into that, let's

20   back up for a moment and just talk about some of your

21   qualifications.

22          You've been doing this for a while now, correct?

23   Years?

24   A.    Yes.

25   Q.    This is your job, right?

1592

CROSS - CLAY

1    A.    Yes.

2    Q.    And you both get instruction on how to do it and you

3    teach others on how to do it, correct?

4    A.    Correct.

5    Q.    And I think you are the chair for the Questioned

6    Documents Section -- or you were, I guess, in 2018 and 2019,

7    correct?

8    A.    Correct.

9    Q.    You've testified in federal court before, correct?

10   A.    Yes.

11   Q.    You have done presentations at Quantico, itself,

12   correct?

13   A.    Correct.

14   Q.    Now let's talk to the jury for a moment about what

15   Quantico is.  Quantico is, would you agree with me, the

16   greatest laboratory that we have in the world, right?  I

17   know you're biased, but would you agree with me on that?

18   A.    In my biasing answer, yes.

19   Q.    And not anybody can get a job at Quantico.  It's hard

20   to get a job there, right?

21   A.    Correct.

22   Q.    You have -- you got that job, right?

23   A.    Yes.

24   Q.    And that's why the prosecution turned to you, because

25   you're the best at what you do, right?  I know you're

1593

CROSS - CLAY

1    biased, but go with me here, right?  You know what you're

2    doing with document examination, right?

3    A.    Yes, I'm well-qualified.

4    Q.    And in this case, I think you said that your procedure

5    is to go through analysis, comparison, evaluation, and

6    verification, correct?

7    A.    Correct.

8    Q.    And you do that so that there can be no doubt in your

9    mind when you render a conclusion that that is the right

10    conclusion, correct?

11    A.    Correct.  I would not issue a source identification if

12    I felt like anybody else would have written it.

13    Q.    If you had even a little bit of doubt, you would hold

14    back from source identification, right?

15    A.    Correct.

16    Q.    Okay.  Now I think you go through a lot of different

17    items here.  One is you want to make sure when you're

18    looking at something whether it's an original versus a

19    photocopy, right?

20    A.    Yes.

21    Q.    Now what the prosecutor put on the screen for you is a

22    photocopy or a digital image.  But you had the actual

23    original signatures, correct?

24    A.    Correct.

25    Q.    And you do testing to make sure that those are original

CROSS - CLAY

1    signatures, right?

2    A.    Correct.

3    Q.    You have to make sure that there's pen indented into

4    the page, right?

5    A.    Yes.

6    Q.    I know I'm not an expert but -- so correct me if I get

7    the terminology wrong -- you turn the page over to make sure

8    that it's not a cut-and-paste job, right?

9    A.    So what I do is I use magnification and look under a

10    microscope using side light and transmitted light, overhead

11    light, to make sure that I see ink on the paper, and that's

12    how I know that it's original.  It's not printed on there,

13    it's actually ink.

14    Q.    Originally when the prosecutor's asking you about

15    subjective versus objective, what we're talking about now is

16    science, right?  You know for sure that this isn't cut and

17    pasted or photocopied; you know somebody wrote it?

18    A.    Correct.

19    Q.    You also do different analysis on that signature.  Can

20    you tell the jury a little bit about the scientific analysis

21    you do on both the known and unknown signatures.

22    A.    Are you asking for like the equipment I use or the

23    process in ACE-V?

24    Q.    Both, please.

25    A.    So with these examinations, I'm following that ACE-V

CROSS - CLAY

1    methodology and that's -- I'm assuring that I'm following

2    all of the steps accurately to try to capture everything in

3    the signatures that I'm looking at.  And I'm using

4    microscopes and magnification and lighting of different

5    types to ensure that I'm seeing any possible characteristics

6    and all the characteristics that are there.

7    Q.    Good.  And do you do testing on the ink, itself?

8    A.    It can be done, but I did not do any in this particular

9    case.

10   Q.    Okay.  Could you tell whether a different pen was used

11   for Larry Rudolph's signature and Bianca Rudolph's

12   signature?

13   A.    Sometimes that can be determined.  That was not part of

14   the request for myself.  It was just for handwriting

15   comparison, so I did not do that exam.

16   Q.    Are you aware that the defense examiner did that exam

17   and determined that there were different pens used?

18   A.    I am not aware of that.  I'm not aware of the majority

19   of what the other examiner said.

20   Q.    Okay.  But you're aware that that testing can be done.

21   A.    Yes.

22   Q.    And that that testing is reliable and scientific,

23   correct?

24   A.    Correct.

25   Q.    Okay.  You also do testing to make sure that someone

CROSS - CLAY

1    didn't trace the signature, right?

2    A.    Yes, I looked for those indications.

3    Q.    You make sure that the speed of the signature is

4    normal, right?

5    A.    Yes.    That it's fluid.

6    Q.    That it's fluid.    Because if it's not fluid, that would

7    indicate some sort of -- someone trying to forge it, right?

8    A.    It could, someone trying to forge, simulate, something.

9    Q.    But there were no indications of that here, right?

10   A.    Correct.

11   Q.    Okay.    I want to talk to you about these unexplained

12   variations that the prosecutor kept questioning you about.

13   Remember those questions?

14   A.    Yes.

15   Q.    Now, Ms. Clay, the prosecutor didn't ask you, but isn't

16   it true that there are unexplained variations in every

17   single case that you examine?

18   A.    So the -- possibly ones that I don't always annotate.

19   Some things are very, very similar, some are a little bit

20   wider in the range and I would annotate those.    But yes,

21   handwriting is not robotic.    There is expected normal

22   variation within everything.

23   Q.    And that's what you saw here, right?

24   A.    Correct.

25   Q.    You didn't see anything that would make your eyebrows

CROSS - CLAY

1    go up, right?

2    A.    Correct.

3    Q.    You didn't see anything that would make you lose

4    confidence in the highest degree of source identification,

5    correct?

6    A.    Correct.

7    Q.    Okay.  You also mentioned this point 49 percent error

8    rate.  That's pretty good, right?

9    A.    Yes, it was a good study.

10   Q.    That means that 99.51 percent of the time it came out

11   right, correct?

12   A.    For the examiner, yes, detecting simulations.

13   Q.    That seems like proof beyond a reasonable doubt, right?

14   A.    It shows that it's very difficult to simulate

15   something.

16   Q.    And now I think you said you were made aware of the

17   defense examiner's conclusion before you reached yours,

18   correct?

19   A.    No.  I was made aware after.

20   Q.    After.  And so -- because you don't want to be -- you

21   don't want to know what someone else said before you reach

22   your own conclusion, right?

23   A.    Correct.  I try to remain as objective as possible.

24   Q.    And you did that in this case, correct?

25   A.    Correct.

1598

CROSS - CLAY

1    Q.    Okay.  You've been in cases where a defense examiner

2    and the Government examiner disagree, correct?

3    A.    Correct.

4    Q.    And in those cases, I guess the defense lawyer would be

5    cross-examining you trying to impeach your testimony,

6    correct?

7    A.    Correct.

8    Q.    That's not what's happening here, right?  We have an

9    agreement between the defense investigator and you, correct?

10   A.    Correct.  Yes.

11   Q.    Defense examiner, I should say, not investigator.

12   A.    Yes.  I'm not very aware of all the particulars of the

13   other exam, however.

14   Q.    Okay.  Now I think you also mentioned to the prosecutor

15   that it's incredibly difficult to simulate someone else's

16   signature, correct?

17   A.    Yes.

18   Q.    Now he asked you about the perfect forger, right?

19   A.    Yes.

20   Q.    I mean, have you seen -- well, let me back up a second.

21         It would take hundreds of hours to become the

22   perfect forger, right?

23   A.    That's difficult to say.  It's -- it would take a great

24   deal of time, a great deal of skill and ability, and

25   overcoming all those things that I've talked about.

1599

CROSS - CLAY

1   Q.   I think the prosecutor asked you whether anyone's ever

2   questioned your opinion before.  Has anyone questioned your

3   opinions in -- when you're trying to get them verified that

4   you have something wrong?  I think you said that had not

5   happened, right?

6   A.   So we'll have discussions.  I've never been told, "Hey,

7   you've reached the wrong answer here."

8        Instead we'll have discussions about, "Did you

9   observe this?  Did you look at this?"

10  Q.   And so in this case, did anybody question your source

11  identification?

12  A.   No, they did not.

13  Q.   Okay.  By the way, when you were asked about the 25

14  signatures, initially you were provided with 31 signatures,

15  correct?

16  A.   Correct.

17  Q.   It was the prosecutor who told you only look at 11 of

18  them, right?

19  A.   Correct.

20  Q.   He pulled out certain signatures for you not to look

21  at, right?

22  A.   Correct.

23  Q.   And in this case, did you feel that the 11 signatures

24  were good enough to make that source identification?

25  A.   Yes, they were.

1600

REDIRECT - CLAY

1   Q.   Did you go back and say, "Let me look at the other ones
2   that the prosecutor wouldn't let me look at"?
3   A.   No, I didn't.
4   Q.   Okay.  Someone in this case verified your conclusion,
5   correct?  At Quantico.
6   A.   Yes.
7   Q.   In other words, you reached a conclusion and then you
8   gave it to other folks at Quantico to look at and they
9   verified it, right?
10  A.   Correct.
11  Q.   And so to a reasonable degree of scientific certainty,
12  are you confident in your source identification?
13  A.   I am confident in my source identification, but I don't
14  use the phrase that you used.
15  Q.   Okay.  Maybe I used the wrong phrase.  You reached the
16  highest degree of certainty, source identification, for
17  Bianca Rudolph's signature on those two postnuptial
18  agreements, correct?
19  A.   Correct.
20           MR. MARKUS:   Thank you.  I have nothing further.
21           MR. DILL:  No questions, Your Honor.
22           THE COURT:   Okay.  Redirect.
23                   REDIRECT EXAMINATION
24  BY MR. FIELDS:
25  Q.   Why don't you use the phrase reasonable scientific

1601

REDIRECT - CLAY

1    certainty?

2    A.    So it's language that has often been confusing for

3    courts and jury members, and so we're just trying to be as

4    clear as possible.  We have established within our field

5    that we don't want to use that term.

6    Q.    It's used in other fields, right?

7    A.    I'm not certain.

8    Q.    Why isn't it used in handwriting?

9    A.    It's been decided that we would like to be as clear as

10   possible in the words that we use.

11   Q.    Well, isn't "reasonable scientific certainty," that's a

12   pretty certain phrase, right?

13   A.    So I guess it depends on how you define it.  Do I use

14   science and objective methods to reach a conclusion?  Yes.

15   Am I certain in my opinion?  Yes.

16   Q.    So you mentioned this subjective process.  When you're

17   actually looking at a signature, what are the objective

18   characteristics you're looking at?

19   A.    So I wouldn't exactly call them objective

20   characteristics.  What I'm looking at are characteristics

21   that have been established in our field, such as spacing,

22   speed, size.  These are characteristics within handwriting

23   themselves, so those are the characteristics that I'm

24   looking at.

25   Q.    And defense counsel mentioned some cases where one

REDIRECT - CLAY

1    examiner comes to one conclusion and one examiner comes to a

2    different conclusion, right?

3    A.    Correct.

4    Q.    That can happen?

5    A.    It can happen, yes.

6    Q.    So in those circumstances, is one of the examiners

7    wrong?

8    A.    So if somebody's using the same methodologies that I'm

9    using, I would expect them to reach a similar conclusion.

10   If there is not, for some reason, an agreement in

11   conclusions, then a conflict resolution can occur where a

12   third examiner who is not aware of any of the case

13   information or results can come in and they can -- they can

14   do the analysis as well.  And then typically it will go with

15   the examiners that are in agreement or the most conservative

16   opinion.

17   Q.    When you reviewed these signatures, were you aware --

18   well, actually let's go back.  So the defense counsel talked

19   about how some of the signatures were withdrawn from your

20   analysis?

21   A.    Correct.

22   Q.    Why were the signatures withdrawn?

23   A.    I was told by the prosecution that the -- some of the

24   known signatures were contested.

25   Q.    What does that mean?

REDIRECT - CLAY

1    A.    That there was some type of question as to whether

2    Bianca Rudolph had written those signatures.

3    Q.    So do you -- when you're evaluating these known

4    signatures, how do you know what counts as a known?

5    A.    What counts as a known is what I have been informed to

6    use.  So what the submitting party has told me, "This is a

7    known signature by this person."

8    Q.    What are some of the common methods used to determine

9    whether a signature is known?

10   A.    There could be investigative methods.  So that would be

11   something that would be done outside of my -- outside of my

12   job.  That would be something that an investigator could

13   look into.  There are different sources that you can get

14   known from, so you could go to banks and pull checks.  You

15   could get something that has a witness signature on it, or a

16   notary, perhaps.  There's a couple different methods that an

17   investigator can use to determine whether something has been

18   a known signature or not.  Or the individual themselves

19   could say, "I have written this signature."

20   Q.    In this particular case, was Bianca Rudolph alive to

21   verify her signature?

22   A.    No.

23   Q.    So what was the process used to determine whether or

24   not a signature -- what counted as a known versus an unknown

25   signature?

1604

REDIRECT - CLAY

1   A.   What counted as a known signature submitted to me?

2   Q.   Yeah.

3   A.   So all of that was done before it reached me.  I don't

4   have any part in that.  So whatever work the prosecution and

5   investigators have done beforehand, they determine what is a

6   known signature and submit it to me that way.

7   Q.   So you don't know anything about the dispute between

8   the prosecution and the defense over those signatures?

9   A.   No.

10  Q.   When you analyzed these signatures, do you know

11  anything about what other witnesses might have said about

12  these signatures?

13  A.   No.

14  Q.   Do you know anything about whether or not any witnesses

15  have talked about forgery?

16  A.   No.  At the time I didn't know anything about the

17  signatures except for what the prosecution had provided me

18  with.

19  Q.   So all you know is that there's a signature on a page?

20  A.   For the known signatures?

21  Q.   Yeah.

22  A.   Yes.

23            MR. FIELDS:  Your Honor, may I have a moment?

24            THE COURT:  You may.

25            MR. FIELDS:  No further questions, Your Honor.

1    THE COURT:  All right, this is a cross-designated

2    witness.  Any recross?

3    MR. MARKUS:  Yes, Your Honor.

4    RECROSS-EXAMINATION

5    BY MR. MARKUS:

6    Q.   Hi, Ms. Clay.  Just really briefly, for those contested

7    signatures that the prosecutor just asked you about, he was

8    the one -- this prosecutor here was the one who told you

9    which ones were uncontested, correct?

10    A.   Yes, he told me which ones to use.

11    Q.   He told you that there was no disagreement between the

12    parties on 11 of those signatures and you could use them,

13    correct?

14    A.   He didn't use those exact words, but he did tell me

15    that, "These are ones that we are not contesting, therefore

16    you can use them."

17    Q.   And are you aware that those were signatures that were

18    either notarized, as you say, or from banks or that were

19    witnessed or from a passport?

20    A.   Or from a driver's license, yes.

21    Q.   Or from a driver's license, right?

22    A.   Yes.

23    Q.   And those were the ones that the prosecutor agreed that

24    you could use, correct?

25    A.   Correct.

1606

RECROSS - CLAY

1    Q.    Okay.  And why would Mr. Fields ask you to do this

2    comparison if he's now saying that we shouldn't listen to

3    you?  Do you know why he asked you to do this?

4    A.    So I was informed through the incoming communications

5    that there was a private examiner who had issued a report

6    and that the prosecution wanted to see what our opinion

7    would be.

8    Q.    And now that you came with your opinion -- just because

9    someone doesn't like it doesn't mean it's not true, right?

10   A.    Correct.

11            MR. MARKUS:  Thank you, ma'am.

12            THE COURT:  Any recross, Mr. Dill?

13            MR. DILL:  No, sir.

14            THE COURT:  All right.  May this witness be excused

15   for the Government?

16            MR. FIELDS:  Yes, Your Honor.

17            THE COURT:  All right.  For the defendants?

18            MR. MARKUS:  Yes, Your Honor.  Thank you.

19            MR. DILL:  Yes, Your Honor.

20            THE COURT:  All right.  Ms. Clay, thank you so much

21   for your testimony.  You're excused.  You may step down.

22            THE WITNESS:  Thank you.

23            THE COURT:  All right, perfect timing.  You didn't

24   think I was going to start another witness, did you?  I

25   wouldn't do that to you guys.

 1          All right, folks, we're going to call it a day.

 2     Please be back in the deliberation room by 8:35.  Please do

 3     not do any independent research into or discuss with anyone

 4     the facts, the law, or the persons involved in this case.

 5          We will be in recess until 8:45 tomorrow morning.

 6     (Proceedings concluded at 5:02 p.m.)

 7                              INDEX

 8     Item                                              PAGE

 9                     GOVERNMENT'S WITNESSES

10        RYAN COOK, Continued
          Direct Examination by Mr. Winstead (Cont'd)   1339
11        Cross-examination by Ms. Moss                  1393
          Redirect Examination by Mr. Winstead          1424
12
          RYAN JIBSON
13        Direct Examination by Mr. Winstead            1430
          Cross-examination by Ms. Moss                 1440
14        Redirect Examination by Mr. Winstead          1442

15        PAUL BABAZ
          Direct Examination by Mr. Fields             1445
16        Cross-examination by Mr. Markus              1467
          Redirect Examination by Mr. Fields           1470
17
          STEVEN RODGERS
18        Direct Examination by Mr. Winstead            1471
          Cross-examination by Ms. Moss                 1517
19        Cross-examination by Mr. Dill                 1538
          Redirect Examination by Mr. Winstead          1539
20
          GILBERT MORLOCK
21        Direct Examination by Mr. Winstead            1542
          Cross-examination by Mr. Dill                 1556
22
          RACHEL CLAY
23        Direct Examination by Mr. Fields             1564
          Cross-examination by Mr. Markus              1589
24        Redirect Examination by Mr. Fields           1600
          Recross-examination by Mr. Markus            1605
25

1608

GOVERNMENT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| 80 | 1454 | 1455 | | |
| 81 | 1455 | | | |
| 83 | 1447 | 1448 | | |
| 267 | 1510 | 1510 | | |
| 401 | 1430 | 1430 | | |
| 403 | 1400 | 1401 | | |
| 492 | 1343 | 1343 | | |
| 493 | 1574 | 1574 | | |

\*       \*       \*       \*       \*

REPORTER'S CERTIFICATE

        I certify that the foregoing is a correct transcript

from the record of proceedings in the above-entitled matter.

        Dated at Denver, Colorado, this 13th day of September,

2023.


Mary J. George

_____
MARY J. GEORGE, FCRR, CRR, RMR