1609

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF COLORADO

2

3    Criminal Action No. 22-cr-0012-WJM

4    UNITED STATES OF AMERICA,

5    Plaintiff,

6    vs.

7    LAWRENCE RUDOLPH,
     LORI MILLIRON,

8    Defendants.

9    ------------------------------------------------------------

10              REPORTER'S TRANSCRIPT
                (Jury Trial, Day 9)

11   ------------------------------------------------------------

12

13       Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

14   Judge, United States District Court for the District of

15   Colorado, commencing at 8:52 a.m., on the 21st day of July,

16   2022, in Courtroom A801, United States Courthouse, Denver,

17   Colorado.

18                    APPEARANCES

19       BRYAN D. FIELDS, E. GARRETH WINSTEAD, III, J. BISHOP
     GREWELL, Assistant U.S. Attorneys, 1801 California Street,
20   Suite 1600, Denver, Colorado 80202, appearing for the
     plaintiff.
21
         DAVID O. MARKUS, A. MARGOT MOSS, LAUREN L. DOYLE,
22   Markus Moss PLLC, 40 NW Third Street, Penthouse 1, Miami,
     Florida 33175, appearing for the defendant Rudolph.
23
         JOHN W. DILL, John W. Dill P.A., 941 West Morse
24   Boulevard, Winter Park, Florida 32789, appearing for the
     defendant Milliron.

25

1     **MARY J. GEORGE, FCRR, CRR, RMR**
     **901 19th Street, Denver, Colorado 80294**
2   **Proceedings Reported by Mechanical Stenography**
     **Transcription Produced via Computer**
3      **P R O C E E D I N G S**

4   **(In open court outside the presence of the jury at 8:52**

5 **a.m.)**

6     THE COURT:  I understand counsel have a matter or

7 matters they wish to raise with me.

8     MR. DILL:  No, Your Honor.  I don't.

9     MR. MARKUS:  Your Honor, just really quickly, I

10 think I've worked this out with the Government, I hope the

11 Court is okay with it.  One of our witnesses, an expert

12 witness named Lucien Haag, has -- was just informed of a

13 medical condition and needs to fly back home by Tuesday

14 evening to have surgery on Wednesday morning.  I've spoken

15 to the Government.  They believe they're going to rest

16 Monday afternoon.  So we could call Mr. Haag as our first

17 witness Tuesday morning.

18     If for some reason they haven't rested by Monday

19 afternoon, the parties would jointly request to the Court

20 that we be permitted to take him out of turn on Tuesday

21 morning.

22     THE COURT:  All right.  Is that the Government's

23 position?

24     MR. FIELDS:  Yes, Your Honor.  Mr. Haag is

25 cross-designated so we have no objection to that.

1    THE COURT:  All right.  We'll -- we can handle

2    that.

3    MR. MARKUS:  Thank you, Your Honor.

4    THE COURT:  I have a -- thank you, Mr. Markus.

5    Mr. Fields, if you'll take the lectern.  I

6    wanted -- what I wanted to raise at this point was, given

7    where we have five days left on the trial calendar here,

8    give me a sense of how you think the Government's case is

9    going and when you think you might be resting.

10    MR. FIELDS:  Your Honor, I think we're actually a

11    little bit ahead of schedule.  As Mr. Markus indicated, if

12    we sort of stay on the current course, I think the

13    Government is on track to rest probably Monday afternoon.

14    THE COURT:  Okay.  Sounds good.  Hopefully let's do

15    that.  Let's keep all the examinations focused and efficient

16    and we shouldn't have any trouble.

17    All right.  Let's bring in the jury.

18    (In open court in the presence of the jury at

19    8:54 a.m.)

20    THE COURT:  Good morning, ladies and gentlemen of

21    the jury.  Welcome back to day 9 of our jury trial.

22    The Government may call its next witness.

23    MR. FIELDS:  Thank you, Your Honor.  The United

24    States calls Adam Howard-Davies.

25    THE COURT:  All right.

DIRECT - HOWARD-DAVIES

1           COURTROOM DEPUTY:  If you'll raise your right hand

2      for me.

3           ADAM HOWARD-DAVIES, GOVERNMENT'S WITNESS, SWORN

4           COURTROOM DEPUTY:  Please be seated and remove your

5      mask for me.  Please state your full name for the record and

6      spell your first and last name for us.

7           THE WITNESS:  It's Adam Howard-Davies, A-d-a-m,

8      H-o-w-a-r-d D-a-v-i-e-s.

9           THE COURT:  You may proceed, counsel.

10          MR. FIELDS:  Thank you, Your Honor.

11                     DIRECT EXAMINATION

12     BY MR. FIELDS:

13     Q.   Good morning, Mr. Howard-Davies.

14     A.   Good morning.

15     Q.   Did you work as a professional hunter between

16     approximately 1997 and 2013?

17     A.   I did.

18     Q.   Where did you lead hunt?

19     A.   I got it in South Africa in Mozambique, Zambia,

20     Liberia, Sudan, and maybe Botswana, yea.

21     Q.   During that time --

22          THE COURT:  Excuse me, counsel.  Sir, can you pull

23     the microphone a little bit closer to you and push the chair

24     a little bit closer --

25          THE WITNESS:  Sorry, I'll just sit closer.

1613

DIRECT - HOWARD-DAVIES

1           THE COURT:  -- and keep your voice up.

2           THE WITNESS:  Okay, will do.

3           MR. FIELDS:  Thank you, sir.

4   BY MR. FIELDS:

5   Q.   During that time, were Dr. Lawrence Rudolph and his

6   wife, Bianca Rudolph clients of yours?

7   A.   Yes, they were.

8   Q.   Did Bianca ever hunt solo with you?

9   A.   Yes, she did.

10   Q.   Are you prepared to tell the jury about your hunts with

11   her?

12   A.   I am.

13   Q.   Where are you from?

14   A.   I'm from Durban, South Africa.

15   Q.   And in South Africa, what's the process for becoming a

16   professional hunter?

17   A.   Generally you attend a college-type situation.  Then

18   you do a practical exam and a -- written exams, yeah.

19   Q.   As a result of your training and experience, are you

20   proficient with firearms?

21   A.   Yes, I am.  Yeah.

22   Q.   When you were with a client in the field, do you follow

23   rules of hunter safety?

24   A.   Yes, we do.  Yeah.

25   Q.   What are the rules?

DIRECT - HOWARD-DAVIES

1    A.    Just general safety practices around firearms.  You

2    know, obviously instruct your client how to handle firearms

3    and -- yeah, just safety is first, yeah.

4    Q.    What are the rules of safe firearms handling?

5    A.    Yeah, just the firearms remain unloaded until the

6    client is told otherwise.  You know, just basic -- never

7    point firearms at somebody, at yourself.  Yeah, guns

8    unloaded is the main thing, yeah, until told otherwise.

9    Q.    Now did you stop being a professional hunter in 2013?

10   A.    Yes, I --

11   Q.    Why?

12   A.    Because I have two children, yeah.  And just being away

13   from home for too long.

14   Q.    When did you first meet Lawrence Rudolph?

15   A.    I first met Larry, it would have been in Zambia in

16   about August of 1999.

17   Q.    Was Bianca with him?

18   A.    Yes, she was.

19   Q.    Were you apprenticing at the time?

20   A.    Yes, I was an apprentice PH at that time.

21   Q.    Under whom were you apprenticing?

22   A.    Douglas Scandrol.

23   Q.    How would you describe Dr. Lawrence Rudolph?

24   A.    Larry was nothing but kind and generous towards me.  I

25   personally had no issues with Larry.

DIRECT - HOWARD-DAVIES

1    Q.    Was he good with firearms?

2    A.    Yes, he was.  Yeah.

3    Q.    What makes you say that?

4    A.    He was experienced.  You could generally tell from a

5    client whether they are comfortable handling weapons.  And,

6    yeah, in my opinion Larry was competent and proficient,

7    yeah.

8    Q.    Was he a good shot?

9    A.    Yes, he was, yeah.

10   Q.    During your career, did you end up hunting with the

11   entire Rudolph family?

12   A.    I did, yes.

13   Q.    How many times?

14   A.    I believe twice.

15   Q.    Did you hunt with Dr. Rudolph alone?

16   A.    I did, yes.

17   Q.    How many times?

18   A.    Again, I believe it was twice I hunted with Larry by

19   himself, yeah.

20   Q.    What about Bianca?  How many times did you hunt with

21   her alone?

22   A.    Yeah, I did one safari with Bianca by herself.

23   Q.    Did you go out on a hunt with Dr. Rudolph in Mozambique

24   in 2005?

25   A.    Yes, I did.

1616

DIRECT - HOWARD-DAVIES

1    Q.   Who was he with for that hunt?

2    A.   He had a companion with him, a lady, yes.

3    Q.   What was her name?

4    A.   I recall it was Lori.  I don't recall her -- her last

5    name -- her surname, yeah.

6    Q.   How would you describe her?

7    A.   Middle-aged, medium height, blond, slender lady, yeah.

8    Q.   Did you have any advanced notice that she was coming

9    along?

10   A.   I did not, no.

11   Q.   What did you observe between Lori and Dr. Rudolph on

12   this hunt?

13   A.   It was apparent to me that they were together, yeah.

14   Q.   Did that surprise you?

15   A.   It did, yes, yeah.

16   Q.   Why?

17   A.   Because of my -- I knew Bianca and the family, yeah.

18   Q.   Now you say you went hunting with Bianca alone.  When

19   was that?

20   A.   That would have been around May of 2012.

21   Q.   How would you rate her experience level?

22   A.   She was -- Bianca was what -- she was experienced and

23   she was competent, yeah.

24   Q.   Was she a good shot?

25   A.   Yes, she was.  Yeah.

1617

DIRECT - HOWARD-DAVIES

1    Q.   Did you get to observe her handling firearms?

2    A.   Yes, many times, yeah.

3    Q.   What did you see when you saw her handling firearms?

4    A.   Again, Bianca, in my opinion, was very competent.   I

5    had no issues with her handling firearms and the safety

6    procedures, yeah, she was fine.

7    Q.   Did you ever see her packing firearms into a case?

8    A.   I did -- I can recall one incident where she loaded a

9    rifle into a soft case, yeah.

10   Q.   What did you see her do when she did that?

11   A.   She was standing at the passenger door of a Land

12   Cruiser we had driven to an area to hunt.   And so we had the

13   rifles in the front of the cab.   And when we finished, I do

14   recall her standing at the passenger door.   The rifle was

15   already safe.   She had the soft case on the passenger seat

16   and then she slid the rifle in, zipped it up, and then

17   placed it inside the cab of the Land Cruiser.

18   Q.   Where did she point the muzzle when she did that?

19   A.   Downwards -- well, it was lying flat on the -- on the

20   passenger seat, and then she slid it barrel first into the

21   soft case.

22   Q.   How would you rate Bianca's muzzle awareness?

23   A.   Yeah, yes, she was absolutely fine.   Just basic

24   standard procedure.   You never point an arm at anyone.   Yup.

25   She was very competent in that regard.

DIRECT - HOWARD-DAVIES

1    Q.    Was she safety conscious?

2    A.    Yes.  Yeah.

3    Q.    What makes you say that?

4    A.    Again, I never had any issues with her in terms of her

5    safety.  She was fastidious, I guess would be the word I

6    would use, yeah.  Very conscious and respectful, I guess

7    would be how I would describe it.

8    Q.    Did you ever see her point a firearm at herself?

9    A.    No, I did not.

10   Q.    Did you ever see her point a firearm at anyone else?

11   A.    No, I did not.

12   Q.    Did you ever get to observe her on the last day of

13   hunting trips?

14   A.    Yes, just in general.

15   Q.    Was she particularly nervous on the last day of

16   trips?

17   A.    No, not at all.  I don't recall her being nervous, no.

18   Q.    Are you familiar with the hard cases that are used to

19   transport firearms on a flight?

20   A.    Yes, I am, yeah.

21   Q.    What are those called?

22   A.    We just use a generic term of Tuffpak, yeah.

23   Q.    Approximately how tall are those?

24   A.    I wouldn't know feet, but sort of that would come up to

25   about my chest height.

DIRECT - HOWARD-DAVIES

1    Q.    While you're standing or while you're sitting --

2    A.    Sorry, while I'm standing, yeah.

3    Q.    If you don't mind, sir, could you stand up and --

4    A.    Yes, sir.

5    Q.    -- tell us approximately how tall they are.

6    A.    Yeah, they would be about this high.

7    Q.    And you say you don't know feet very well; is that

8    because you use meters?

9    A.    Yeah, meters.

10   Q.    Approximately how many meters tall would that be?

11   A.    Oh, about 1.2, 1.3, somewhere around there.  But, yeah,

12   I -- yeah.  I -- don't quote me on that.

13   Q.    How are firearms loaded into those Tuffpacks?

14   A.    Generally they will be placed inside of a soft case and

15   then put barrel down into the -- the Tuffpak.  They normally

16   have like a soft casing on the inside so the firearms don't

17   move once they are placed inside there.

18   Q.    When you're loading a firearm into that case, where do

19   you point the muzzle?

20   A.    Down, yeah.  It goes barrel first.

21   Q.    And going back to loading firearms into soft cases, can

22   you describe how that's done.

23   A.    Yeah, generally barrel first.  It's much the same

24   principle as putting a sock on your foot.  You know, there's

25   really only one logical way it can go in, yeah.  So barrel

1620

DIRECT - HOWARD-DAVIES

1  first and then zip it up.

2  Q.   You said you went hunting with Bianca.  And where was

3  it?

4  A.   That was in the Eastern Cape in South Africa.

5  Q.   Approximately what year?

6  A.   2012.

7  Q.   Was Dr. Rudolph there for that hunt?

8  A.   No, he was in the country at the time, but he wasn't

9  with Bianca and myself.  He was hunting elsewhere.

10  Q.   So it was just the two of you?

11  A.   Just the two of us, that's correct.

12  Q.   Did you get to know Bianca pretty well?

13  A.   Yes, I did.  I've been on safaris.

14  Q.   During that hunt, did Bianca ask you any questions?

15  A.   Yes, I do recall once -- one incident where she asked

16  me some questions.

17  Q.   What did she ask you?

18          MR. MARKUS:  Objection.  Hearsay, Your Honor.

19          MR. FIELDS:  Your Honor the questions are not

20  assertions, therefore they're not statements and not

21  hearsay.  That's *United States v. Jackson*, 88 F.3d 845, the

22  pin cite is 848.

23          THE COURT:  So you're asking him for a question

24  that Ms. Rudolph asked him?

25          MR. FIELDS:  Correct.

CROSS - HOWARD-DAVIES

1    THE COURT:  All right.  I'm going to allow it.

2    Overruled.

3    BY MR. FIELDS:

4    Q.    What questions did she ask you?

5    A.    She asked me about safaris that I'd done with Larry and

6    if he had any companions with him -- female companions on

7    those safaris.

8    Q.    What kind of companions?

9    A.    Female companion.

10   Q.    How many times did she ask you about that?

11   A.    Just the one occasion I recall clearly.

12            MR. FIELDS:  May I have a moment, Your Honor?

13            THE COURT:  You may.

14            MR. FIELDS:  Your Honor, I have no further

15   questions.  Thank you.

16            THE COURT:  All right.  Cross-examination.

17            MR. MARKUS:  Good morning, ladies and gentlemen.

18   Good morning, counsel.  Good morning, Your Honor.

19            THE COURT:  Good morning.

20                         CROSS-EXAMINATION

21   BY MR. MARKUS:

22   Q.    Good morning, Mr. Howard-Davies.  How are you, sir?

23   A.    Very well.  Thanks.  How are you?

24   Q.    I'm good.  Thank you.  My name is David Markus.  I'm

25   one of Dr. Rudolph's lawyers and I would like to ask you a

1622

CROSS - HOWARD-DAVIES

1    few questions if I might.

2    A.    Yes.

3    Q.    So have you ever heard of the expression, "The devil

4    loads the firearms"?

5    A.    To be honest with you, no, I have not.

6    Q.    Never heard that before?

7    A.    No.   No.

8    Q.    Okay.   Let me ask you:   When you're loading a firearm

9    into a soft case, take with me a hypothetical that the soft

10   case isn't zipped all the way around on the bottom.   Are you

11   with me?

12   A.    Yes.

13   Q.    If someone were lifting that soft case with the -- with

14   it not zipped all the way and putting it into the hard case,

15   could you see a situation where the shotgun might slip out

16   and hit the floor?

17   A.    Generally the -- on a soft case, the zips start from

18   the bottom and go -- work their way up.

19   Q.    So you haven't seen it where the barrel is at the top

20   of the soft case and the butt is at the bottom and it's not

21   zipped all the way?

22   A.    Yes, that is possible that that could happen, yeah.

23   Q.    Okay.   Now I want to talk to you about this man, Doug

24   Scandrol.   Can you tell us who Doug Scandrol is, please.

25   A.    Doug Scandrol was -- owned the company that I hunted

CROSS - HOWARD-DAVIES

1    for, so Swanepoel & Scandrol Safaris.

2    Q.    So you worked for a man named Doug Scandrol.  And which

3    Swanepoel did you work for?

4    A.    Pieter Swanepoel was his partner.

5    Q.    Okay.  And did you know Mark Swanepoel also?

6    A.    Yes, I did know Mark.

7    Q.    Did you ever work for Mark?

8    A.    I did not work for Mark.  At the time when I was there,

9    Mark was an apprentice and a professional hunter.  He wasn't

10   involved in the business outside of just guiding, yeah.

11   Q.    Okay.  And how many hunts did you say you went on with

12   Larry Rudolph?

13   A.    In total, I would say about four or -- four safaris, at

14   least.

15   Q.    And what about Bianca?

16   A.    About three.  Yeah, three safaris.

17   Q.    And you're aware that Doug Scandrol, Pieter Swanepoel,

18   and Mark Swanepoel took many, many more than that with the

19   Rudolphs --

20   A.    Yes, sir, I am aware of that, yeah.

21   Q.    So would you agree with me that they know the Rudolphs

22   much better than you do?

23   A.    Yes.  Yeah.  Yeah.

24   Q.    Okay.  When you -- did you ever email Doug Scandrol,

25   use his email address?

1624

CROSS - HOWARD-DAVIES

1    A.    Yes, I did.

2    Q.    Are you aware that he used an email address Swanscan1?

3    Are you aware of that?

4    A.    Yes, Swanscan1 was Doug's email address, yeah.

5    Q.    And are you aware that Doug Scandrol was having An

6    affair with Bianca Rudolph?

7    A.    No, I wasn't aware of that.

8    Q.    Are you aware that Doug Scandrol and Bianca Rudolph

9    were using secret emails to communicate?

10   A.    No, I was not aware of that.

11   Q.    Are you aware that Bianca Rudolph would take hunts

12   without Dr. Rudolph in Africa so that she could continue the

13   affair with Doug Scandrol?

14   A.    No, I wasn't aware of that.

15   Q.    Did Bianca Rudolph discuss that with you?

16   A.    No, she did not.

17         MR. MARKUS:  Your Honor, I'd like to show the

18   witness an exhibit that's not in evidence yet.  If we could

19   put on the screen --

20         THE COURT:  For what purpose?

21         MR. MARKUS:  To show him these emails between

22   Bianca Rudolph and Doug Scandrol about the affair, Your

23   Honor.

24         THE COURT:  He's just stated that he was not aware

25   of them.

1625

CROSS - HOWARD-DAVIES

1     MR. MARKUS:  Right.  I'd like to show that he was

2  not aware of something that was going on to show that he

3  didn't know everything about Bianca and Larry Rudolph's

4  relationship.

5     THE COURT:  Is there an objection?

6     MR. FIELDS:  Yes, Your Honor.  He's never seen

7  these.

8     THE COURT:  Yeah.  Sustained.

9  BY MR. MARKUS:

10  Q.    Would you agree with me that Bianca Rudolph was a

11  strong woman?

12  A.    Yes, I would, yeah.

13  Q.    Fiery woman?

14  A.    I wouldn't describe her as fiery.  I would just say she

15  had a strong character, yes, sir.

16     THE COURT:  Sir, I missed.  Did you say you would

17  or would not consider her --

18     THE WITNESS:  I would not consider her fiery, no.

19  Sorry.

20  BY MR. MARKUS:

21  Q.    And I think you said Larry Rudolph was kind and

22  generous, correct?

23  A.    That's correct, yeah.

24     MR. MARKUS:  Okay.  I have nothing further.  Thank

25  you, Your Honor.

CROSS - HOWARD-DAVIES

1      THE COURT:  Mr. Dill, any cross?

2      MR. DILL:  Yes, Your Honor.

3      THE COURT:  All right.

4                         CROSS-EXAMINATION

5    BY MR. DILL:

6    Q.    Good morning, sir.

7    A.    Good morning.

8    Q.    Just kind of want to orient the time here.  The time

9    that you saw the woman named Lori -- in Mozambique, was

10   it --

11   A.    That's correct.

12   Q.    -- Larry?  That was in the year 2005.

13   A.    Yes.  I believe so.

14   Q.    Okay.  And that's -- she was his companion on the hunt.

15   A.    Yes, correct.

16   Q.    And it was apparent to you that they knew each other?

17   A.    Yes.

18   Q.    And your impression was they were together on the

19   hunt?

20   A.    Absolutely, yeah.

21   Q.    And so then as far as when Ms. Rudolph started

22   questioning you or questioned you about women on hunts, that

23   was in the year 2012.

24   A.    That's correct, yeah.

25   Q.    Okay.  So obviously after 2010, 2011, now in 2012, she

CROSS - HOWARD-DAVIES

1    was asking you a question.

2    A.    That's correct, yeah.

3    Q.    And did you tell her -- did you respond or -- to her

4    question?

5    A.    Yes, I did.

6    Q.    What did you say --

7         MR. MARKUS:  Objection, Your Honor.  I'm sorry to

8    object, but I'm going to object as to hearsay.

9         THE COURT:  He's in court, right?

10        MR. MARKUS:  He's asking what Bianca Rudolph said

11   to him.

12        THE COURT:  No, I thought he asked what he said to

13   her.

14        MR. DILL:  I'll --

15        THE COURT:  Maybe I got that question wrong.

16        MR. DILL:  I'll withdraw because it's confusing.

17        THE COURT:  Okay.

18        MR. DILL:  I apologize.

19   BY MR. DILL:

20   Q.    Nonetheless, the conversation -- or the question,

21   rather, that was asked of you, that was when -- it was you

22   and Bianca were together in the year 2012, right?

23   A.    Yes.

24   Q.    Okay.  I just want to clarify on that.

25        So now you're asked some questions about seeing

1628

CROSS - HOWARD-DAVIES

1    Ms. Rudolph put guns into cases or -- did you ever see her

2    put a gun into a Tuffpack?

3    A.    No, I did not.

4    Q.    Okay.  And you have a specific memory of, I guess, a

5    gun in the back of the Range Rover at one point in time?

6    A.    Yeah.  It's -- it was a Land Cruiser, yeah.  She --

7    Q.    And I think you told us before, as far as the way that

8    the bag that was involved in this -- in this accident, the

9    way that zipped -- you haven't seen the actual bag, have

10   you, sir?

11   A.    No, I have not.

12   Q.    Okay.  And, again, I think you told us she's about --

13   well, rather the case comes up to about your chest?

14   A.    Yes, correct.

15   Q.    Bianca was about what, 5-4, 5-5?

16   A.    Yeah, she was medium height.

17   Q.    Medium height.  And you have no idea how she would have

18   put the gun, or attempted to put the gun, into the case at

19   the time that the firearm discharged.  You don't know about

20   that.

21   A.    No, I don't know.

22   Q.    Okay.  And, again, if you're going to put it butt down,

23   a person that size would have to reach up and put it over

24   this way if it was butt down, correct?

25   A.    Correct.  Yeah.

CROSS - HOWARD-DAVIES

1    Q.    Rather if it was muzzle down, you would have to reach

2    up and put it over, right?

3    A.    That's correct, yeah.

4    Q.    And then of course if they were to try to put it butt

5    down, you already talked to my colleague about if the zipper

6    was down at the bottom, the gun could fall out as well?

7    A.    Yes, it could.

8    Q.    Okay.  Thank you.

9              THE COURT:  All right.  Redirect.

10             MR. FIELDS:  Yes, Your Honor, very briefly.

11             THE COURT:  All right.

12                      REDIRECT EXAMINATION

13   BY MR. FIELDS:

14   Q.    Sir, do you remember being asked on cross-examination

15   about these questions that Bianca was asking you?

16   A.    Yes.

17   Q.    Without getting into anything further, how would you

18   describe Bianca's demeanor while she was asking you these

19   questions?

20   A.    She was -- she was quiet.  And disappointed would be

21   my -- that was my observation.  Yeah.

22             MR. FIELDS:  No further questions, Your Honor.

23             THE COURT:  All right.  May this witness be excused

24   for the Government?

25             MR. FIELDS:  Yes, Your Honor.

1630

DIRECT - ANDERS

1        THE COURT:  For the defendants?

2        MR. MARKUS:  Yes, Your Honor.

3        THE COURT:  Mr. Dill?

4        MR. DILL:  Yes, sir.

5        THE COURT:  Mr. Howard-Davies, thank you so much

6   for your testimony.  You're excused.  You may step down.

7   And safe travels back to your country.

8        THE WITNESS:  Thank you, sir.

9        THE COURT:  Government may call its next witness.

10        MR. FIELDS:  Thank you, Your Honor.  The United

11   States calls Rachel Anders.

12        COURTROOM DEPUTY:  Raise your right hand for me.

13         RACHEL ANDERS, GOVERNMENT WITNESS, SWORN

14        COURTROOM DEPUTY:  Please be seated and remove your

15   mask for us.  State your full name for the record and spell

16   your first and last name for us.

17        THE WITNESS:  Rachel Marie Anders, R-a-c-h-e-l,

18   A-n-d-e-r-s.

19        MR. FIELDS:  May I proceed, Your Honor?

20        THE COURT:  You may, counsel.

21                   DIRECT EXAMINATION

22   BY MR. FIELDS:

23   Q.   Ms. Anders, just make sure you're in the front of the

24   microphone so we can all hear you.

25   A.   Yes.

1631

DIRECT - ANDERS

1    Q.    Ms. Anders, do you know Lori Milliron?

2    A.    Yes, sir.

3    Q.    How do you know her?

4    A.    I dated her son and have a child to him.

5    Q.    Do you see her in the courtroom here today?

6    A.    Yes, sir.

7    Q.    Where do you see her?

8    A.    To my right-hand side.  She has a greenish-tan mask on

9    and glasses.

10    Q.    And what is she wearing?

11    A.    A brown top and it looks -- a brown cardigan and looks

12    like a plaidish top.

13         MR. FIELDS:  Your Honor, at this time I'd like the

14    record to reflect the in-court identification of

15    Ms. Milliron.

16         THE COURT:  The record will so reflect.

17    BY MR. FIELDS:

18    Q.    Do you also know Dr. Lawrence Rudolph?

19    A.    Yes, sir.

20    Q.    How do you know him?

21    A.    Through Lori.

22    Q.    Have you personally met him?

23    A.    Yes, sir.

24    Q.    Do you see him in the courtroom here today?

25    A.    Yes, sir.

DIRECT - ANDERS

1    Q.    Where do you see him?

2    A.    Sitting behind the gentleman with -- he has a blue mask

3    on and looks like a --

4            MR. MARKUS:    Judge, no objection to the

5    identification.

6            THE COURT:    All right.    The record will reflect the

7    witness's identified the defendant.

8            MR. FIELDS:    Thank you, Your Honor.

9    BY MR. FIELDS:

10   Q.    Did you ever hear Lori talk about Larry's wife?

11   A.    Yes, sir.

12   Q.    Did you overhear any arguments between Lori and Larry?

13   A.    Yes, sir.

14   Q.    Are you prepared to tell the jury about those

15   conversations here today?

16   A.    Yes, sir.

17   Q.    You know someone named Adam Moroz?

18   A.    Yes, sir.

19   Q.    Who is he?

20   A.    That's my son's father.

21   Q.    And who is his mom?

22   A.    Lori.

23   Q.    So your -- who is your son's grandmother?

24   A.    Lori Milliron.

25   Q.    When did you first meet Adam?

1633

DIRECT - ANDERS

1    A.    I met him August of 2008.

2    Q.    Approximately how old were you at the time?

3    A.    I was 20 years old.

4    Q.    How long were you in a relationship with Adam?

5    A.    Off and on for six years.

6    Q.    When did you first meet Lori?

7    A.    The day I actually went on a date with Adam to her

8    house; we watched movies.

9    Q.    Where did Lori live at that time?

10   A.    313 Orlando Drive, New Castle, Pennsylvania.

11   Q.    Besides Adam, who lived in that house?

12   A.    Stephanie Moroz and Jessica Moroz and Lori Milliron.

13   Q.    And Stephanie Moroz and Jessica Moroz, who are they?

14   A.    They are Lori's daughters; Adam's sister.

15   Q.    At some point did you move in with Adam?

16   A.    Yes, sir.

17   Q.    At what address?

18   A.    313 Orlando Drive.

19   Q.    Let's look at Government's Exhibit 92, which is already

20   in evidence.

21         What is that?

22   A.    That's a house -- Lori's house.

23   Q.    The one at 313 Orlando Drive?

24   A.    Yes, sir.

25   Q.    We can take that down.

1634

DIRECT - ANDERS

1    How long did you live in Lori's house?

2    A.    I am going to say for a little over a year and a half,

3    almost two years.

4    Q.    During that period of time, how often would you see

5    Lori?

6    A.    Almost every day unless she was out of the country with

7    Larry.

8    Q.    Now you say you lived at that house for -- you say

9    about a year and a half or two years?

10    A.    A little over a year and a half, almost two years, yes,

11    sir.

12    Q.    Why did you move out?

13    A.    I ended up getting pregnant with Mason and she was

14    selling the house to move to Green Tree.

15    Q.    So after that, where did you go?

16    A.    Stayed with Adam's dad, Steve Moroz.

17    Q.    With Adam?

18    A.    Yes, sir.

19    Q.    So during that period of time when you were living with

20    Adam and his dad, how often would you see Lori?

21    A.    We would try to go down every Sunday unless she was --

22    had prior obligations, traveling and whatnot.

23    Q.    How long did you live with Adam and his dad at Adam's

24    dad's house?

25    A.    I would say almost -- probably a little over a year and

DIRECT - ANDERS

1   a half, two years.

2   Q.   During this period of time, did you have some struggles

3   with alcohol?

4   A.   Yes, sir.

5   Q.   What were they?

6   A.   I was diagnosed with postpartum depression.  Instead of

7   actually seeking help I decided to drink instead of going to

8   counseling and getting on the correct medication.

9   Q.   How much were you drinking around this time?

10  A.   I was more of a binge drinker; I wasn't an everyday

11  drinker.  But when I would drink, I would say three times a

12  week, it was a -- the excess where I would pass out.

13  Q.   Did you eventually seek treatment?

14  A.   Yes, sir.

15  Q.   When was that?

16  A.   That was right after the Cabo trip.  So I want to say

17  April of 2011, in that general area.

18  Q.   Did you eventually move out of Adam's dad's house?

19  A.   Yes, sir.

20  Q.   Where did you move after that?

21  A.   We got a -- Adam, Mason, and I got a condo in the

22  Neshannock Township.

23  Q.   Just for the benefit of the court reporter, Neshannock,

24  how do you spell that?

25  A.   N-e-s-h-a-n-n-o-c-k.

DIRECT - ANDERS

1    Q.    And during that period of time, when you -- after you

2    moved out of Adam's dad's house, how often would you see

3    Lori?

4    A.    Pretty much every Sunday unless she had prior

5    obligations.   Sometimes more, sometimes less.   We'd

6    sometimes go down for shopping trips or out to eat or she'd

7    come up to see the baby sometimes.

8    Q.    While you were with Adam, did you get to know Lori

9    pretty well?

10   A.    I felt like she was a second mom to me.

11   Q.    Did you get along with her?

12   A.    For the most part.

13   Q.    And you say eventually your relationship with Adam

14   ended?

15   A.    Yes, sir.

16   Q.    Did it end on good terms?

17   A.    No.   Not most break-ups do.

18   Q.    Do you dislike Adam?

19   A.    No.   He's a great father.

20   Q.    In this particular case, did you go to the FBI with

21   information or did they come to you first?

22   A.    I contacted them.

23   Q.    Why?

24   A.    Morally it's the right thing to do, knowing the

25   information that I do know about the situation.

1637

DIRECT - ANDERS

1    Q.    When you first met Lori, where did she work?

2    A.    At Dr. Stone's office at a dental practice in

3    New Castle, Pennsylvania.

4    Q.    How far away was that from her house?

5    A.    I know sometimes she would walk because she's very

6    active with keeping up fitness-wise, so I am going to say

7    less than a mile from the house.

8    Q.    What did she do there?

9    A.    She was a dental hygienist.

10   Q.    Did she later get a job somewhere else?

11   A.    Yes, sir.

12   Q.    Where?

13   A.    At Three Rivers Dental in Green Tree.

14   Q.    I think you said at one point in time she moved out of

15   that house on Orlando Avenue.

16   A.    Yes, sir.

17   Q.    To where did she move?

18   A.    She moved to a townhouse in Green Tree.

19   Q.    Did you visit her there?

20   A.    Yes, sir.

21   Q.    How would you describe that house?

22   A.    Beautiful.

23   Q.    Was it nicer than the house she had at Orlando

24   Avenue?

25   A.    Yes, sir.

1638

DIRECT - ANDERS

1    Q.   Do you know who paid for that new house?

2    A.   Larry.

3    Q.   How do you know that?

4         MR. DILL:  Objection, Your Honor.  Foundation.

5    Calls for hearsay.

6         THE COURT:  Mr. Fields.

7         MR. FIELDS:  I'll lay the foundation, Your Honor.

8         THE COURT:  Okay.

9    BY MR. FIELDS:

10   Q.   Did Lori ever talk about how she got that house?

11   A.   Yes, sir.

12   Q.   Did you hear --

13        MR. MARKUS:  Objection, Your Honor.  Hearsay for --

14   as to Dr. Rudolph.

15        THE COURT:  Are you suggesting this is the time I

16   should read the limiting instruction?

17        MR. MARKUS:  Yes, Your Honor.

18        THE COURT:  All right.  Objection from the

19   Government?

20        MR. FIELDS:  No objection, Your Honor.

21        THE COURT:  All right.  One second.

22        MR. MARKUS:  And, Your Honor, just for the record,

23   we would, of course, preserve our prior objections and

24   motion for severance.

25        THE COURT:  Right.  You've made a record on that.

DIRECT - ANDERS

1    Ladies and gentlemen of the jury, I'm going to read

2    you the following limiting -- or the law refers to it as a

3    curative instruction.

4    You may consider the statement of Lori Milliron

5    only in the case against her and not against Dr. Rudolph.

6    You may not consider Ms. Milliron's statement in any way

7    when you are deciding if the Government has proved beyond a

8    reasonable doubt its case against Dr. Rudolph.

9    You may proceed, Mr. Fields.

10    MR. FIELDS:  Thank you, Your Honor.

11    BY MR. FIELDS:

12    Q.    Ms.  Anders, did Lori Milliron talk about how she was

13    able to afford that house?

14    A.    Yes, sir.

15    Q.    Did you personally hear it?

16    A.    Yes, sir.

17    Q.    Who did she say got that house for her?

18    A.    Larry was paying for it.  He wanted her to be closer to

19    the practice.

20    Q.    So during the time you knew Lori, did she have a

21    boyfriend?

22    A.    Yes, sir.

23    Q.    Who was he?

24    A.    Mr. Lawrence Rudolph.

25    Q.    Do you know where he worked?

DIRECT - ANDERS

1   A.    He was the owner of dental practices.  He wasn't

2   allowed to practice dentistry anymore.

3   Q.    Which dental practices did he own?

4   A.    The ones I knew about were the Three Rivers Dental

5   Group.

6   Q.    Would Lori talk about Larry in front of you and Adam?

7   A.    Yes, sir.

8   Q.    How did you first hear about Larry?

9   A.    He was extremely generous.  He -- in my personal

10  opinion, he's a very --

11          MR. DILL:  Objection as her personal opinion, Your

12  Honor.

13          THE COURT:  Well, I think it's an appropriate lay,

14  nonexpert opinion.  I think she can go into this.

15  Overruled.

16          You may complete your answer, ma'am.

17          THE WITNESS:  I --

18  BY MR. FIELDS:

19  Q.    Yeah, you may finish your answer.

20  A.    Very good business mindset.  And that he was married

21  and she was in a relationship with him even though he was

22  married.

23  Q.    Would -- was Larry a frequent topic of conversation?

24  A.    Yes.

25  Q.    After Lori started to see Larry, did Lori's lifestyle

1641

DIRECT - ANDERS

1   change?

2   A.   Absolutely.

3   Q.   How so?

4   A.   She received lavish gifts, went on trips.  Her kids

5   were more financially taken care of.  She kind of was living

6   the dream from what the two -- typical New Castle

7   Pennsylvania, dream was.

8   Q.   Did she start to travel more?

9   A.   Yes, sir.

10  Q.   Where did she go?

11  A.   Oh, God, where didn't she go?  I would say the trips I

12  knew about for her:  Alaska, Arizona, Cabo, Africa.  I know

13  they went to the Super Bowl together; California.  They

14  traveled pretty much everywhere that you could imagine

15  people wanting to travel to.

16  Q.   Now you mentioned these -- these dental offices, Three

17  Rivers.  Did you ever go to those offices?

18  A.   I've been to the Green Tree and the Greensburg office.

19  Q.   Why?

20  A.   Green Tree, we went down when they first opened.  I had

21  taken one -- I provided the practice with a Malkin hockey

22  jersey they had signed up there --

23  Q.   A what jersey?  Let me stop you.

24  A.   It's a hockey player for the Pittsburgh Penguins.

25  Q.   Okay.

1642

DIRECT - ANDERS

1    A.    Lori cleaned my teeth there.  Adam and I painted the

2    Greensburg office.  But we would frequent -- sometimes when

3    Lori would be working, we would just stop by; and we would

4    end up going to Olive Garden that was right down the road as

5    well.

6    Q.    Did you hear any conversations between Lori and Larry

7    while you were at the dental practices?

8    A.    Yes, sir.

9    Q.    What did you hear?

10    A.    Well, one was a discussion about painting the

11    Greensburg office, that he would be paying Adam and I; and

12    what colors they wanted done and how quick it needed to be

13    done.

14            And then others was Lori would be on the phone with

15    Mr. Rudolph, and she would need money and she would then go

16    back to the safe that was somewhere in the back of the

17    facility and get the money that she needed.

18    Q.    Did Larry help you and Adam out financially?

19    A.    Yes, sir.

20    Q.    What did he do?

21    A.    He paid for our condo in the Neshannock Township.

22    Q.    Did Lori talk about Larry helping out Adam's siblings

23    financially?

24    A.    Yes, sir.

25    Q.    What did he -- or what did she say about that?

1643

DIRECT - ANDERS

1    A.    I know that he's provided money to get the three

2    children plastic surgery.  He knew a big donor for Texas A&M

3    where Stephanie went.  The gentleman had put in a good word

4    to get Stephanie into Texas A&M.

5          And Jessica, he paid for her to go to Elk Hill

6    Academy when she was in high school.

7    Q.    Did Adam sometimes tease his mom about the money?

8    A.    Yes.

9    Q.    What did he say to her?

10        MR. DILL:  Objection to the hearsay, Your Honor.

11        THE COURT:  Sustained.

12        MR. FIELDS:  Your Honor -- okay.

13   BY MR. FIELDS:

14   Q.    What was Lori's response to the teasing?

15   A.    She was more embarrassed; would get angry.  I don't

16   think she felt it was a laughing matter by the -- her

17   demeanor.

18   Q.    During the course of the time you knew Lori, did you

19   learn anything about whether Larry was married?

20   A.    Yes, sir.

21   Q.    How did you find that out?

22   A.    She brought it up multiple times and made statements

23   about his wife.

24   Q.    Did Adam sometimes tease Lori about dating a married

25   man?

1644

DIRECT - ANDERS

1    MR. MARKUS:  Objection --

2    THE WITNESS:  Yes.

3    MR. MARKUS:  -- hearsay, Your Honor.

4    THE COURT:  Not so far.  Overruled.  Let's see what

5    the next question is.

6    THE WITNESS:  Yes, sir.

7    BY MR. FIELDS:

8    Q.    How did she respond?

9    A.    Angry.  Pretty much needs to mind your own business.

10   It's her life, not his.

11   Q.    Do you remember Lori saying anything specific about

12   Larry's wife?

13   A.    Yes, sir.

14   Q.    What did she say?

15   A.    Am I allowed to cuss?

16   Q.    Please tell us exactly what she said.

17   A.    "She's a stupid, ugly Italian bitch."

18   Q.    Did she say anything about what she hoped Larry would

19   do?

20   A.    Divorce her.

21   Q.    Did Lori describe any long-term plans with Larry?

22   A.    Them building their dream home out west together.

23   Q.    What else did she say about her long-term plans with

24   Larry?

25   A.    That they were eventually just going to fully retire

1645

DIRECT - ANDERS

1    and travel the world.

2    Q.    Did you ever hear Lori discussing the topic of divorce?

3    A.    Yes, sir.

4    Q.    What did she say?

5    A.    That Larry can't get divorced from his wife because

6    she -- she knew that they were together and he would lose

7    everything that he had.

8    Q.    When you say she knew they were together, who are you

9    talking about?

10    A.    Mr. Rudolph's wife.

11    Q.    And if she had known, what would happen?  What did Lori

12    say?

13    A.    That he would lose everything, including his practices,

14    all his wealth.  He wouldn't have anything.

15    Q.    Did you ever hear about Lori going to Mexico?  I think

16    you mentioned that earlier.

17    A.    Yes, sir.  We actually went on a trip together.

18    Q.    How often would she go?

19    A.    I would say two, three, four times a year.

20    Q.    You say you were invited to go.  Where?

21    A.    To Cabo San Lucas.

22    Q.    Who invited you on that trip?

23    A.    Lori did.

24    Q.    Who paid for that trip?

25    A.    Larry did.

1646

DIRECT - ANDERS

1  Q.   How long was the trip?

2  A.   I stayed a week.

3  Q.   Do you remember approximately when it was?

4  A.   It was March of 2011.

5  Q.   Let's look at Government's Exhibit 91, which is already

6  in evidence.

7           What is this?

8  A.   A picture of me and Mason in the pool.  Mason being my

9  son.

10  Q.   Lori's grandson?

11  A.   Yes, sir.

12  Q.   And what's in the background there?

13  A.   The mansions and then the ocean.

14  Q.   Take that down.

15           Did Adam go on that trip?

16  A.   No, sir.

17  Q.   What was he doing at the time?

18  A.   He was in Arizona for a Department of Corrections

19  training that he missed.

20  Q.   Was Dr. Rudolph there?

21  A.   No, sir.

22  Q.   Did Lori say anything about whether he was going to

23  come?

24  A.   He was coming after me, Jessica, Stephanie, and Mason

25  had left.

1647

DIRECT - ANDERS

1  Q.   All right.  So is it fair to say that you heard about

2  Larry a lot from Lori?

3  A.   Yes, sir.

4  Q.   When did you meet him in person for the first time?

5  A.   At my son's baptism.  I would say it was December of

6  '09 or January of 2010 when we got him baptized.

7  Q.   How did Lori introduce him to you?

8  A.   "This is my boyfriend, Larry."

9  Q.   What happened after the baptism?

10 A.   We -- my family threw a party for Mason.  They had went

11 back to her townhouse and Adam, me, and Mason had went and

12 had dinner with them.

13 Q.   When you say "with them," with who?

14 A.   Lori and Larry.

15 Q.   At some point that evening, did you become aware of a

16 discussion between Lori and Larry?

17 A.   Yes, sir.

18 Q.   Were you in the townhouse at this time?

19 A.   I was in the living room, which is off the dining

20 room/kitchen area.

21 Q.   Where was Adam?

22 A.   Sleeping on the couch.

23 Q.   Where was Lori?

24 A.   In the -- she was either in the dining room or kitchen.

25 They were cleaning up and putting stuff away; doing dishes

DIRECT - ANDERS

1    and putting food away.

2    Q.    Where was Larry?

3    A.    In that same general vicinity as her.

4    Q.    How would you describe the tone of the discussion

5    between Lori and Larry?

6    A.    Not good.

7    Q.    What was the topic of discussion?

8    A.    His wife.

9    Q.    Larry's wife?

10   A.    Yes, sir.

11   Q.    What did you hear Lori say during that discussion?

12          MR. MARKUS:    Judge, objection.    Can we have a time

13   frame for this?

14   BY MR. FIELDS:

15   Q.    Was this the day of the baptism?

16   A.    Yes, sir.

17          THE COURT:    Okay.    Objection's overruled.    I've

18   given a limiting instruction.

19   BY MR. FIELDS:

20   Q.    And you previously told us when the baptism took place.

21   A.    Yeah.    I would say December of '09 or January of 2010.

22   It could be roughly a couple of months later, but we had him

23   baptized -- pretty much in the Catholic faith you do it

24   right after a couple of months of them being born.

25   Q.    Let's go back to the topic of discussion.    What did

DIRECT - ANDERS

1    Lori say during this argument?

2    A.    She didn't understand why she -- he was still with her

3    and they just need to move on with their lives together.

4    Q.    What else did she say?

5    A.    That she wanted him to divorce her.  And that's when

6    she made the name calling of his wife.

7    Q.    How did Larry respond?

8    A.    He wasn't happy about it and said, "This is something

9    we shouldn't be talking about right now."

10              And then that's when I was like this is just

11   escalating more, so I woke Adam up and got the baby ready

12   and . . .

13   Q.    Do you remember him saying anything in particular?

14   A.    No, sir.

15   Q.    You don't remember him saying any particular --

16   anything in particular during this discussion?

17              MR. MARKUS:  Objection.  Asked and answered, Your

18   Honor.

19              THE COURT:  Overruled.

20   BY MR. FIELDS:

21   Q.    Do you remember -- do you remember him uttering any

22   phrases that were particularly memorable?

23              MR. MARKUS:  Objection.  Asked and answered now

24   three times.

25              THE COURT:  He -- your objection interrupted the

DIRECT - ANDERS

1    second answer so let's get -- we'll allow the question to be

2    asked one more time and we'll see what the witness says.

3    BY MR. FIELDS:

4    Q.    Do you remember him uttering anything that was

5    memorable to you?

6    A.    Not at this time, sir, no.

7    Q.    Now this conversation between Lori and Larry, that

8    occurred about 10 years ago?

9    A.    Yes, sir.

10   Q.    How can you remember that far back?

11   A.    I've never encountered someone who's willingly able to

12   date someone so openly that has a wife and being in a full

13   committed relationship with someone that is married.

14   Q.    And was this the period of time where you were drinking

15   pretty heavily?

16   A.    Yes, sir.

17   Q.    So if you were drinking heavily and this occurred

18   almost 10 years ago, how can you remember it so well?

19   A.    Because it's -- I've never had to deal with anything

20   like that before.  And it was just one of those things where

21   you, like wow, this is what people actually do.

22   Q.    Now this argument between Lori and Larry, what stood

23   out about it to you that you remember it 10 years later?

24         MR. MARKUS:  Objection.  Asked and answered, Your

25   Honor.

1651

DIRECT - ANDERS

1    THE COURT:  Overruled.

2    THE WITNESS:  Do I answer that?

3    BY MR. FIELDS:

4    Q.   Yes.

5    A.   Oh.  Because one, they're having a conversation

6    between -- in front of other people; and, two, that it's --

7    they're both admitting to the affair right there.

8    Q.   Do you remember what Lori did after that discussion?

9    A.   No, she --

10   THE COURT:  Hold on, hold on.  What do we think

11   that is?  Ms. Guerra?

12   MR. WINSTEAD:  My computer shut down.  I'm very

13   sorry.  I forgot to mute it.

14   BY MR. FIELDS:

15   Q.   Ms. Anders, do you remember what Lori did after that

16   discussion?

17   A.   She kind of shut down; you could tell getting upset.

18   We gave her a hug and then as far as I'm aware she went

19   upstairs.

20   Q.   Do you remember what Larry did after that

21   conversation?

22   A.   He had -- he had left.  He followed us -- I know when

23   we were leaving, I saw him walking outside.

24   Q.   What did you do?

25   A.   We just went home.  We didn't really talk about it even

1652

DIRECT - ANDERS

1    on the way home.

2              MR. FIELDS:  Your Honor, may I have a moment?

3              THE COURT:  You may.

4              MR. FIELDS:  Thank you, Your Honor.  I have no

5    further questions.

6              THE COURT:  All right.  Cross-examination.

7              MR. MARKUS:  No questions for Dr. Rudolph, Your

8    Honor.

9              THE COURT:  All right.  Mr. Dill, any

10   cross-examination?

11             MR. MARKUS:  Your Honor, can we have a moment to

12   confer?

13             THE COURT:  Sure.

14             MR. MARKUS:  No questions for Dr. Rudolph.

15             MR. DILL:  No questions, Your Honor.

16             THE COURT:  All right.  May this witness be excused

17   for the Government?  Mr. Fields?  There was no cross; may

18   this witness be excused for the Government?

19             MR. FIELDS:  Yes, Your Honor.  Then no redirect.

20   Thank you.

21             THE COURT:  If there's no cross, there's no

22   redirect.  May this witness be excused for the defendants?

23             MR. MARKUS:  Yes, Your Honor.

24             MR. DILL:  Your Honor, I just -- there is one

25   question I want to ask, if that's okay.

1653

CROSS - ANDERS

1    THE COURT:  All right.  Well, you just handed

2    Mr. Fields his redirect.  Go ahead.

3    MR. DILL:  Okay.

4    CROSS-EXAMINATION

5    BY MR. DILL:

6    Q.   Good morning, ma'am.  I think you started this out by

7    saying Lori's your -- was like a second mom to you.

8    A.   Yes, sir.

9    Q.   Have you, in fact, referred to her, according to the

10    FBI, as a "money hungry bitch"?

11    A.   Absolutely.

12    Q.   So she's a second mom to you but a money hungry bitch?

13    A.   It's the truth.

14    Q.   Okay.  So -- all right.  So when -- it's fair to say

15    you have some issues with Ms. Milliron because she basically

16    raised your son; isn't that right?

17    A.   She doesn't raise him.

18    Q.   Okay.  When's the last time you saw your son?

19    A.   Eight years ago.

20    Q.   Because you lost custody to her son?

21    A.   No, I did not.

22    Q.   You didn't lose custody?

23    A.   We had an agreement but I never got mailed the

24    paperwork.

25    Q.   Okay.  Let's talk about that.  There was a court

CROSS - ANDERS

1    proceeding, correct?

2    A.    Yes, sir.

3    Q.    Where her son was awarded custody.

4    A.    Yes, sir.

5    Q.    And you're saying you weren't mailed the paperwork?

6    A.    It -- when I initially went to court, when I took Adam

7    to court, went through a master, I was awarded custody.

8    When we went -- he went and filed his own paperwork months

9    later.  The paperwork was not mailed to me.  I believe he

10    did an emergency custody order.  I did not receive -- I

11    received the paperwork after the actual court date.

12    Q.    And when was that?

13    A.    Oh, eight years -- eight years ago.

14    Q.    Last time you saw your son, about eight years ago,

15    right?

16    A.    Yes, sir.

17    Q.    Okay.  And one of the reasons that he was taken away

18    from you is because of abuse, correct?

19    A.    From drinking?

20    Q.    Yes.  From drinking.

21    A.    Yeah, but not abuse.

22    Q.    Okay.  There was never an issue with the grandson as

23    far as cigarette burns on his back because you'd pass out

24    drinking and he was burned?

25    A.    No, sir.

1655

CROSS - ANDERS

1  Q.   That never happened?

2  A.   No, sir.

3  Q.   Did you ever see these photographs?

4  A.   No, sir.

5  Q.   Would that remind you or refresh your recollection?

6  A.   You can.

7  Q.   Okay.  Okay, I just wanted to make sure before I show

8  you these, that you have no recollection of your son, who

9  was raised by Adam Moroz, and you haven't seen him in eight

10  years.  You have no recollection of a situation where you

11  passed out drunk and burned his back with a cigarette?  You

12  don't remember that at all?

13  A.   I wouldn't do that.

14  Q.   Okay.  Well --

15  A.   Adam also smoked, so who can say if I did it or he did

16  it?

17  Q.   Okay.  Well, so -- all right.  Did you go to the

18  custody hearing and say "I treated this kid perfectly fine;

19  I deserve custody," or did you --

20  A.   Did you understand that I told you that I was not given

21  the paperwork --

22          THE COURT:  Ma'am, ma'am, ma'am, the way it works

23  is that the attorney asks the question --

24          THE WITNESS:  Yes, Your Honor.

25          THE COURT:  Let him finish asking the question then

CROSS - ANDERS

1    you get your chance to answer.

2              You may proceed, Mr. Dill.

3              MR. DILL:   Thank you.

4    BY MR. DILL:

5    Q.   My question to you is:  You have no recollection of a

6    situation where your son -- and how long did you have him

7    before he was taken away from you?

8    A.   Three and a half, almost four years.

9    Q.   Okay.  So during that time period, you have no

10   recollection of passing out drunk and cigarette burns

11   appearing on his back?  That's something you don't remember.

12   A.   No, sir.

13   Q.   Okay.  Probably because you were drinking so much back

14   then?

15   A.   No, sir.

16   Q.   Okay.  Now you told us that your -- you got treatment

17   in 2011; is that right?

18   A.   I believe it's somewhere around that time frame.

19   Q.   You've been sober since then, ma'am?

20   A.   No, sir.

21   Q.   Okay.  As a matter of fact, when you called the FBI,

22   you had been drinking that day, hadn't you?

23   A.   No, the night prior.

24   Q.   The night prior.  It was -- you were drinking so much

25   the night prior that they found you passed out in front

1657

CROSS - ANDERS

1    of -- an Applebee's, was it?

2    A.    It wasn't the same day that I talked to them, no,

3    sir.

4    Q.    Okay.  When was the Applebee's -- passed out in front

5    of Applebee's situation?

6    A.    I don't know.  You would have to tell me the date.

7    Q.    Okay.  You don't remember, right?

8    A.    I don't remember the exact date, no, sir.

9    Q.    But that was in March of 2022.

10   A.    I wouldn't say you're lying, but I don't know the exact

11   date, no, sir.

12   Q.    Okay.  Actually, you've had situations where you get

13   drunk at 10:00 in the morning.

14   A.    I have, yes, sir.

15   Q.    Okay.  And there's been times when you have gotten

16   drunk at 10:00 in the morning and you've told family members

17   that a cousin of yours had been shot.  Do you remember that?

18   A.    That's not true.

19   Q.    You never -- you never said to a family member that a

20   cousin of yours had been shot and you were very concerned

21   because your cousin was shot?

22   A.    No, sir.

23   Q.    Your cousin was never shot, though, was he?

24   A.    Not -- not that I'm aware of.  None of my cousins have

25   been shot, no, sir.

CROSS - ANDERS

1    Q.    All right.  Well, didn't you tell Josh that your cousin

2    had been shot?

3    A.    No, sir.

4    Q.    Who's Josh?

5    A.    My fiancé.

6    Q.    Okay.  Would there be any reason why your cousin --

7    your fiancé would be texting your father, Charles Douglas,

8    saying, "Rachel's been drunk since 10:00 a.m. and she's

9    saying her cousin was shot"?

10   A.    I guess you would have to ask him.

11   Q.    Well, would the text messages from your fiancé to your

12   father refresh your recollection on that?

13   A.    I have no idea because I was not with them.

14   Q.    I just want to know.  That incident about you coming up

15   with the -- was a story.  It didn't happen, did it?

16   A.    I have no idea.  Not that I'm aware of, none of my

17   cousins have ever been shot, sir.

18   Q.    Okay.  So if you were telling people -- telling family

19   members that your cousin had been shot, that would be a

20   story that was made up.

21   A.    I didn't tell them that, so . . .

22   Q.    And so, again, who's Charles Douglas?

23   A.    That's my dad.

24   Q.    All right.  Any reason for him to say that your

25   reputation for truthfulness is very poor?

CROSS - ANDERS

1    A.    I don't know.  You'd have to ask him.

2    Q.    Okay.  Let me ask a couple other questions.  So you

3    agree that you said this about Lori being a money hungry

4    bitch.  You have an understanding that you obviously lost

5    custody of this child.  You lost custody of your other two

6    children as well, didn't you?

7    A.    Actually, no.  I signed agreements with their fathers

8    actually.  It's never been through a judge.

9    Q.    Okay.  So -- and isn't it true, in fact, that your

10   father and their fathers actually are the ones that are in

11   communication, but you're not in communication with those

12   other two children, are you?

13   A.    I talked to them this morning, sir.

14   Q.    The other two children?

15   A.    Yes.  Jude and Emma.

16   Q.    Didn't you, as far as seeing Adam -- or rather Mason,

17   isn't it true that you had texted Adam and said, "I want to

18   write a letter to Mason about how alcohol took over my life

19   and destroyed it"?

20   A.    Absolutely.

21   Q.    Okay.  And -- but, ma'am, isn't it fair to say that

22   alcohol is still paying a pretty large role in your life?

23   A.    No, sir.

24   Q.    Okay.  Even though you were passed out drunk and

25   hospitalized in March?

CROSS - ANDERS

1   A.    I wasn't hospitalized.  They took me to the hospital

2   and released me.

3   Q.    For being drunk.

4   A.    I don't think you can get released for being drunk.

5   But that's why they initially took me.

6   Q.    Because you were passed-out-in-public drunk, ma'am?

7   A.    Yes.

8   Q.    Thank you.

9           THE COURT:  Are you done, Mr. Dill?

10          MR. DILL:  I am, sir.  I said thank you.  I'm

11  sorry.

12          THE COURT:  All right.  Redirect.

13          MR. FIELDS:  No redirect, Your Honor.

14          THE COURT:  All right.  May this witness be excused

15  for the Government?

16          MR. FIELDS:  Yes, Your Honor.

17          THE COURT:  For the defendants?

18          MR. MARKUS:  Yes, Your Honor.

19          MR. DILL:  Yes, Your Honor.

20          THE COURT:  All right.  Ms. Anders, thank you so

21  much for your testimony.  You're excused.  You may step

22  down.

23          Government may call its next witness.

24          MR. FIELDS:  Thank you, Your Honor.  The United

25  States calls Anna Grimley.

DIRECT - GRIMLEY

1    COURTROOM DEPUTY:  If you'll raise your right hand

2    for me.

3    ANNA GRIMLEY, GOVERNMENT'S WITNESS, SWORN

4    COURTROOM DEPUTY:  Thank you.  Please be seated and

5    remove your mask for me.  Please state your full name for

6    the record and spell your first and last name for us.

7    THE WITNESS:  Anna Grimley.  Spelling is A-n-n-a,

8    G-r-i-m-l-e-y.

9    THE COURT:  You may proceed, counsel.

10    MR. FIELDS:  Thank you, Your Honor.

11    DIRECT EXAMINATION

12    BY MR. FIELDS:

13    Q.    Ms. Grimley, did you make a report to law enforcement

14    in 2017?

15    A.    Not 2017.  Oh, it had to be '16.

16    Q.    Who did you call?

17    A.    I called the police department at Pittsburgh.  Then

18    they told me when I was giving them information that it was

19    out of their jurisdiction, so then I got in contact with the

20    FBI in December.

21    Q.    Where had you been working before you made those calls?

22    A.    Pardon me?

23    Q.    Where had you been working before you made those calls?

24    A.    I moved from Pittsburgh and I was working with a

25    Dr. Steers in Las Vegas.

DIRECT - GRIMLEY

1    Q.    When you were working in Pittsburgh, where did you

2    work?

3    A.    At Three Rivers Dental Group, Jennerstown.

4    Q.    Who owned Three Rivers Dental Group at Jennerstown

5    while you were there?

6    A.    Larry Rudolph.

7    Q.    While you were there, did you meet a woman named Lori

8    Milliron?

9    A.    Yes, I did.

10   Q.    Let's back up a little bit.  What do you do for a

11   living?

12   A.    I am a manager, always been for years.  So I manage a

13   practice right now for two years.

14   Q.    You said "manage a practice," what kind of practice?

15   A.    Right now I'm in a group practice, so I manage two

16   offices.

17   Q.    Group practice of?

18   A.    Corporation.  Of dental right now.

19   Q.    How long have you been in the dental industry?

20   A.    Oh, wow.  It's got to be a good 30 years.

21   Q.    Were you working for a dentist in Arizona in 2014?

22   A.    Yes, I was.

23   Q.    Where in Arizona were you working?

24   A.    In Peoria, Arizona.

25   Q.    What was the name of the practice?

DIRECT - GRIMLEY

1    A.    It was -- he had two offices, one in Beverly Hills and

2    one in Peoria.  Dr. Zacar.

3    Q.    While you were there, did you meet a young dentist who

4    was just starting her career?

5    A.    Yes.  At the time she was a dental assistant waiting to

6    take her boards.

7    Q.    Who was that?

8    A.    Ana Rudolph.

9    Q.    Did she get to know you?

10   A.    Yeah.

11   Q.    At some point did she introduce you to her dad?

12   A.    Yes.

13   Q.    Why did she introduce you to her dad?

14   A.    He was looking for a management position to overrun

15   three of his offices, so sort of like a regional director.

16   Q.    Did you take her up on that offer?

17   A.    We had an interview with Bianca Rudolph in Arizona, and

18   that was around June.  And the same month I went to

19   Arizona -- not Arizona -- Pittsburgh to look at the offices.

20   Q.    You said that you met with Bianca.  Did you also meet

21   with Dr. Rudolph?

22   A.    Yes, I did.

23   Q.    Did you get that job after your first interview?

24   A.    No.

25   Q.    Where did you go then?

DIRECT - GRIMLEY

1   A.   I worked with a doctor, Dr. Steers at the time.

2   Q.   Did you interview again?

3   A.   So in August of 2014, I was re-asked to go ahead and

4   join the team as a dental -- as an assistant manager, which

5   I turned down the offer due to its pay and the position.

6   And then again in January 2015 was asked again and went to

7   Pittsburgh and seen all three of the offices.

8   Q.   Asked again by who?

9   A.   By Dr. Rudolph.

10  Q.   To do what?  What were you asked to do?

11  A.   To go ahead and run three of the practices again.  But

12  it turned out it was just for one location.

13  Q.   So the name of these dental practices, what was the

14  name?

15  A.   All three of them, Three Rivers Dental Group.

16  Q.   You say there were three of them.  Where were they?

17  A.   Jennerstown, Greensburg, and Green Tree.  And --

18  Q.   So I just want to make sure I have this clear.  It

19  sounds like there were two interviews.  There was one in

20  Arizona.  Was there a second interview in Pennsylvania?

21  A.   Yes.

22  Q.   Who was at that interview?

23  A.   I went only to Green Tree and was with a guy named Dan

24  at the time that was working with them.  When I came back in

25  January, he was no longer working there.

DIRECT - GRIMLEY

1    Q.   At that time, had you been living in Arizona or where

2    were you living at the time?

3    A.   In Las Vegas.

4    Q.   In Las Vegas?

5    A.   Yeah.

6    Q.   Why were you willing to move all the way across the

7    country for this job?

8    A.   So friends with Ana, I felt sort of like I wanted to

9    help her out with her dad.  The pay was good.  So I decided

10   I might as well just give it a shot.

11   Q.   How quickly after the interview did you start working

12   there?

13   A.   I interviewed in January, and February 5th I took the

14   job.  I was actually working in the office February 5th.

15   Q.   Did you keep your place in Las Vegas?

16   A.   Yes, I did.

17   Q.   So where were you living when you first got to

18   Pittsburgh?

19   A.   So they set me up with a room for probably about like

20   three to four weeks in a hotel until I found a location,

21   which I did.

22   Q.   What happened the second week after you arrived in

23   Pennsylvania for that job?

24   A.   I was told I was going to run the Jennerstown office.

25   Q.   Something happened to your fiancé shortly after you

DIRECT - GRIMLEY

1    arrived?

2    A.    Yes.

3    Q.    What happened?

4    A.    He passed away.

5    Q.    How did Dr. Rudolph respond to that?

6          MR. MARKUS:  Objection, Your Honor.  Relevance.

7          THE COURT:  Overruled.  You may answer, ma'am.

8          THE WITNESS:  I may answer it?

9          THE COURT:  You may answer.

10          THE WITNESS:  Well, Mrs. -- Bianca actually set up

11    a limousine for me to go to the airport and their house, so

12    I went to their house in Pittsburgh.  From there, they flew

13    me back to Vegas.  And I was only there for about a week; I

14    had to come back.  I only needed a week, he said.

15    BY MR. FIELDS:

16    Q.    So at that period of time, was Dr. Rudolph generous to

17    you?

18    A.    Yes.  By -- yeah, taking care of the flight and the

19    limo ride.

20    Q.    Now when you came back, which office were you managing?

21    A.    Jennerstown.

22    Q.    What were your responsibilities at the Jennerstown

23    office?

24    A.    Basically to take care of patient care, to make sure

25    everything's scheduled correctly.  A lot of things.  It was

DIRECT - GRIMLEY

1    just going to management.

2    Q.    Did you get to know the managers in the other

3    offices?

4    A.    Yes, I did.

5    Q.    Who was there?

6    A.    Levi Weaver and Marcus.

7    Q.    Who was your direct supervisor?

8    A.    Dr. Rudolph.

9    Q.    Approximately -- did you say you started in about

10   February 2015?

11   A.    Yes.

12   Q.    At some point did you decide that you didn't want to

13   work there anymore?

14   A.    The following year -- I had tenants that were only

15   going to be there for a year.  I was giving Pittsburgh a

16   year's time.  So at the time I -- they were leaving and

17   Dr. Steers asked for me to come back to work with her, so I

18   was ready to go back home.

19   Q.    So did you tell them you were quitting?

20   A.    I did -- I did let Lori know that I was leaving two

21   days before.  I was called into one of -- the Greensburg

22   office to meet Trish and she at that point terminated me.

23   Q.    Who was Trish?

24   A.    Was a new manager at that office.

25   Q.    And why did Trish terminate you?

DIRECT - GRIMLEY

1    A.    She never gave me a reason.  She said it was -- they

2    don't have to give a reason.  It's a right-to-will state to

3    work.  But at that point it really didn't matter to me

4    because I already had the plans of moving.  I already knew I

5    was leaving.  That's why I gave Lori that information.

6    Q.    Were you mad about being terminated?

7    A.    No, because I was ready to go home.

8    Q.    Is Three Rivers Dental Group practice a special kind of

9    dentistry?

10   A.    Yes.  So they did sedation sleep with their patients.

11   Q.    What does that mean?

12   A.    Sedation is like the patient's not awake for the

13   procedures, so if they do a full-on long procedure,

14   fillings, extractions, crowns, they do it in one visit.

15   It's under sedation so the patient's not awake for it.

16   Q.    Who were the dentists at Jennerstown?

17   A.    Dr. Van Martino.

18   Q.    Did you get to know the dentists in the other offices?

19   A.    Not real -- there was a Dr. Swick, and one other doctor

20   that I don't really remember that flew in.

21   Q.    So this practice that did sedation dentistry, did the

22   dentists actually do the sedations?

23   A.    No, never.

24   Q.    Who did?

25   A.    So we had a contract with another anesthesiologist

DIRECT - GRIMLEY

1  group and that's what they did.  They came in with their

2  supplies, with everything.  And one other guy did the same

3  thing that was not part of that group.  So they would only

4  bring in their supplies or drugs, everything else.

5  Q.   These people who would bring in the supplies.  Were

6  they anesthesiologists?

7  A.   Yes.

8  Q.   While you were at Three Rivers Dental Group, did

9  Dr. Rudolph actually practice dentistry?

10  A.   Yes, I did see him under -- a person under sedation.

11  Q.   How frequently?

12         MR. MARKUS:  Objection, Your Honor.  Relevance.

13         THE COURT:  How's this relevant, Mr. Fields?

14         MR. FIELDS:  Your Honor, this is going to the

15  propofol issue that we'll get to later today.

16         THE COURT:  Okay.  Overruled.

17  BY MR. FIELDS:

18  Q.   How often would you see Dr. Rudolph practicing?

19  A.   I would say two times in Jennerstown.

20  Q.   So these anesthesiologists -- well, let me ask this a

21  different way.  Who actually had the anesthesia drugs?

22  A.   The anesthesiologist.

23  Q.   As a manager, did you have any role in ordering the

24  drugs?

25  A.   No.  But I overlooked -- there was a person that we

DIRECT - GRIMLEY

1    would get to keep the ordering down to a low percentage.  So

2    we were able to see what we ordered, but we didn't actually

3    put the order in.  The assistants did.

4    Q.    Where were the drugs kept?

5    A.    We didn't have drugs in the office.

6    Q.    Did Dr. Rudolph ever ask you to order drugs?

7    A.    No.

8    Q.    Do you know a woman named Sherry Houck?

9    A.    Yes, I do recall her working at Green Tree.

10   Q.    What was her job?

11   A.    Not too sure if she was an assistant or hygienist, to

12   be honest with you.

13   Q.    So as a manager at Three Rivers, did you sometimes have

14   to order general supplies?

15   A.    We ordered it, but the -- actually the assistant, but

16   we get to see what they were ordering and see the amount

17   that was being placed.

18   Q.    Did you ever have access to a Three Rivers Dental Group

19   credit card?

20   A.    Never.

21   Q.    Were you ever allowed to charge personal expenses to

22   Three Rivers Dental Group?

23   A.    No.

24   Q.    Did some Three Rivers Dental patients pay in cash?

25   A.    Yes.

DIRECT - GRIMLEY

1    Q.    Approximately what percentage would you say?

2    A.    I would say anywhere from 60 percent.

3    Q.    Did you ever receive cash as payment?

4    A.    From patients?  Yes.

5    Q.    Well, let me back up a little bit.  What about for your

6    personal salary?  Did you ever receive cash?

7    A.    Once.

8    Q.    For what purpose?

9    A.    Lori and Dr. Rudolph came into Jennerstown together,

10   took the cash out of the safe.  And as she was leaving, she

11   goes, "Here you go," and she gave me a $100 bill.

12   Q.    Did she say why?

13   A.    No.  Just was being generous.

14   Q.    Where was the cash kept at Jennerstown?

15   A.    It was in a big safe in the -- the breakroom.

16   Q.    Who had access to that safe?

17   A.    Dr. Rudolph and Lori.

18   Q.    So you mentioned Lori.  When did you first meet her?

19   A.    In January she drove around to show me the offices with

20   Dr. Rudolph.

21   Q.    How was she introduced to you?

22   A.    She didn't have a title so I never knew what her title

23   was.

24   Q.    What was her role at Three Rivers Dental Group?

25   A.    To be honest, the only time I saw her do any type of

DIRECT - GRIMLEY

1    work was working with insurance and inputting data into

2    Dentrix, which is a type of software we used.

3    Q.    Type of software you used?  I'm sorry, I cut you off.

4    A.    Yes.

5    Q.    What -- did she work at a particular office?

6    A.    No.

7    Q.    Did she ever come into the office?

8    A.    Yes.

9    Q.    How often would she come to your office at

10   Jennerstown?

11   A.    So Dr. Rudolph would fly back and forth from Arizona to

12   Pittsburgh whenever he came into my office in Jennerstown.

13   It could be once a month, it could be twice a month.

14   Q.    When she would come, could you see her pull into the

15   parking lot?

16   A.    Yes.

17   Q.    Who would she drive in with?

18   A.    Dr. Rudolph.

19   Q.    Did you ever see her come into the office alone?

20   A.    No.

21   Q.    Who was she with?

22   A.    Dr. Rudolph.

23   Q.    What would they do when they arrived?

24   A.    She would work on the computer a little bit and then

25   they would go back and shut the door and get the money out

DIRECT - GRIMLEY

1    of the safe, put it in a big envelope.

2    Q.   What impressions did you get when you saw Lori and

3    Larry together?

4    A.   In the beginning, I didn't think anything about it.

5    But was wondering why they were so much together coming in

6    together to pick up the cash.  Heard rumors but they're

7    rumors, so I wasn't quite sure of the relationship.

8    Q.   Okay.  And we're not going to get into those rumors, so

9    please don't.

10   A.   Okay.

11   Q.   During the time you worked at Three Rivers Dental

12   Group, were you ever given instructions on what to say if

13   anyone called and asked for Lori?

14            MR. MARKUS:  Objection, Your Honor.  Hearsay.

15            MR. FIELDS:  Instructions are not hearsay, Your

16   Honor.  They're not assertions or statements.

17            THE COURT:  Who -- are you asking instructions

18   given by a particular person or just in general?

19            MR. FIELDS:  This first question was just:  Were

20   you given instructions?

21            THE COURT:  Okay.  So far overruled.

22            You may answer, ma'am.

23            THE WITNESS:  I may answer?

24            THE COURT:  You may answer.

25            THE WITNESS:  Okay.  Can you repeat the question.

1674

DIRECT - GRIMLEY

1    BY MR. FIELDS:

2    Q.    I can repeat the question.

3    A.    I'm sorry.

4    Q.    During the time you worked at Three Rivers Dental

5    Group, were you ever given instructions on what to say if

6    anyone called and asked for Lori?

7    A.    No.

8    Q.    During the time you were working at Three Rivers Dental

9    Group, did you get to know Lori?

10   A.    Yes.

11   Q.    Now you said earlier when you first moved there, you

12   were living in a hotel.

13   A.    Yes.

14   Q.    Did you eventually find a more permanent place?

15   A.    Yes.

16   Q.    Did you tell Lori you had found a place?

17   A.    Yes.

18   Q.    And what happened after you told her that?

19   A.    Well, I left all my furniture in Las Vegas so I needed

20   to get furniture.  And I had a dresser that I couldn't put

21   together or pick up with my vehicle, so I had to put it

22   together.  And I explained to her I have no tools and I

23   thought maybe there would be some tools at the office.

24        And she said, "No, I have a whole bag of tools.

25   I'm more than happy to help you out."  And she offered to

DIRECT - GRIMLEY

1   help me on Saturday, not the day of working.

2   Q.   Did she actually come over to your house?

3   A.   Yes.

4   Q.   Did anyone come with her?

5   A.   No.

6   Q.   Do you remember the approximate month where this

7   happened?

8   A.   Approximately April.

9   Q.   And what time of day did she arrive?

10  A.   Mid-afternoon.

11  Q.   Did she bring anything with her?

12  A.   Her tools and a bottle of wine.

13  Q.   How long do you think she stayed at your house?

14  A.   Probably about three hours.

15  Q.   Was it a difficult dresser to put together?

16  A.   It was one that was, yeah, difficult.

17  Q.   How much of that wine was consumed?

18  A.   Not the whole bottle.  I would say maybe a glass and a

19  sip out of mine.  Not a fan of red wine.

20       MR. FIELDS:  Your Honor, we're about to get into a

21  conversation, I understand the defendants may have an

22  instruction they'd like to give.

23       MR. MARKUS:  Your Honor, so we renew our motion for

24  severance.  And in the alternative request the limiting

25  instruction, the specific one regarding Ms. Grimley.

DIRECT - GRIMLEY

1    THE COURT:  I think we discussed before that the

2    severance motion I would treat as a standing objection to

3    which I've previously ruled.  And I agree, this would be the

4    appropriate time to read the instruction pertaining to this

5    witness.

6    So, ladies and gentlemen of the jury, this witness

7    may testify that Lori Milliron made certain statements to

8    her in 2015.  When evaluating the case against Ms. Milliron,

9    it is for you to decide whether she made any statement and,

10   if so, what weight to give whatever statement she made.

11   However, any statement Ms. Milliron may have made to

12   Ms. Grimley are to be considered only in regards to the

13   charges against Ms. Milliron.

14   With regard to the charges against Lawrence

15   Rudolph, you cannot consider these alleged statements at

16   all.  In other words, as far as the charges against

17   Dr. Rudolph are concerned, you cannot consider any

18   statements Ms. Milliron may have made to Ms. Grimley.

19   You may proceed, counsel.

20   MR. FIELDS:  Thank you, Your Honor.

21   BY MR. FIELDS:

22   Q.   During this conversation with -- or during this time

23   that you were with Lori, did you talk about Lori's

24   background?

25   A.   She talked about she had two children.

1677

DIRECT - GRIMLEY

1    THE COURT:  Ma'am, can you --

2    THE WITNESS:  Oh.

3    THE COURT:  You've got to keep your voice up.  And

4    when you lean that far back, we can't pick up your voice.

5    THE WITNESS:  I'm sorry.

6    THE COURT:  All right.  So stay close to the mic.

7    THE WITNESS:  Okay.  She talked about her two

8    children in Texas.

9    BY MR. FIELDS:

10   Q.   And during this meeting where you were putting that

11   dresser together, did she open up a bit about her

12   relationship with Larry?

13   A.   Yes.

14   Q.   What did she say about it?

15   A.   So she asked me if I knew if they were together.   I

16   just told her I just heard a little bit of things from other

17   people, but I really didn't know if that was factual.  And

18   then she continued to tell me that they were together.

19   Q.   Did she say how long she'd been with him?

20   A.   For, I would say, approximately -- she said around 10

21   years.  8 to 10 years.

22   Q.   Did she say where she met him?

23   A.   She met him as a hygienist at a different practice.

24   Q.   Did she talk about Larry helping her out financially?

25   A.   Yes, with that townhouse.

1678

DIRECT - GRIMLEY

1   Q.   What did she say about that?

2   A.   That he paid for it.

3   Q.   Did she talk about the cash practices at Three Rivers?

4   A.   She did talk to me about they picked up all the cash

5   with each individual office, and there was a plan to do

6   something with that cash.

7   Q.   What was the plan?

8   A.   So the plan in the beginning was to take the cash, sell

9   the practice, and move out of the country, but that didn't

10  happen.  So she revisited it with Dr. Rudolph and gave him

11  an ultimatum, basically, to -- that he had to get rid of

12  Bianca and then continue to taking the cash and moving and

13  going from there.

14  Q.   Who was Bianca?

15  A.   His -- Dr. Rudolph's wife.

16  Q.   What did Lori say about her?

17  A.   That she basically was somebody that she felt was

18  entitled to everything.

19  Q.   What else did she say during this conversation?

20  A.   She talked about that they were not going to let

21  anybody know where they move out of the country.  And I

22  asked her, "Not even your children?"  Which sort of shocked

23  me as a mom.  And she said they were well taken care of

24  financially.  Their college was paid off.  That's about

25  it.

DIRECT - GRIMLEY

1    Q.    What did she say about the time frame for when this

2    would occur?

3    A.    She said it had to be done in 2016, she was giving him

4    that time, or she'd leave.

5    Q.    Now this conversation happened almost seven years ago?

6    A.    Uhm-hum.

7    Q.    How do you remember it so clearly here today?

8    A.    Because it was shocking to me, to be honest with you.

9    It was something that I wasn't expecting to hear.  Also

10    knowing Ana, it threw me back.

11    Q.    How long had you known Lori before this conversation

12    took place?

13    A.    Oh, at that time, about six months.  Approximately six

14    months.

15    Q.    If you'd only known her for about six months, why would

16    she confide something like this in you?

17              MR. DILL:  Speculation, Your Honor.  Objection.

18              THE COURT:  I think this calls for appropriate lay

19    opinion as to -- you can -- overruled.

20              You can answer in terms of what you believed at the

21    time.

22              THE WITNESS:  So what I believed at the time, Lori

23    did not have friends.  She didn't have family to talk to.

24    And I felt like she was just reaching out to vent about

25    certain things that she hadn't had anybody else to talk to.

1680

DIRECT - GRIMLEY

1   BY MR. FIELDS:

2   Q.   Did you have any other discussions like this with Lori

3   while you were at Three Rivers?

4   A.   No.

5   Q.   Why not?

6   A.   Prior or after?

7   Q.   After.

8   A.   Oh, yes.  The only time I did say something to her, I

9   asked her if Dr. Rudolph knew about our conversation and she

10  said no.

11  Q.   Now you say you left the practice in approximately

12  2016?

13  A.   That is correct.

14  Q.   Did you have any other conversations with Lori after

15  you left?

16  A.   Prior to leaving I let her know that I was leaving a

17  couple of days before I was terminated.  After that, there

18  was no conversation with anybody.

19  Q.   You said you were -- you were friends with Ana?

20  A.   Yes.

21  Q.   Who's Ana?

22  A.   Ana Rudolph, the daughter of Dr. Rudolph and Bianca

23  Rudolph.

24  Q.   Did you ever tell AnaBianca about this?

25  A.   The only thing I asked Ana --

DIRECT - GRIMLEY

1    MR. MARKUS:  Objection.  Hearsay, Your Honor.

2    THE COURT:  Let me -- before we start talking about

3    what was asked and not asked, let me read the question on

4    the screen here and then I'll . . .

5    Overruled.  The question's asking this witness,

6    who's present in the courtroom, as to her statement.

7    You may answer.

8    THE WITNESS:  The only thing I asked Ana if she

9    believed there was something going on with Lori and her dad

10   because I was afraid that was going to come to her, and

11   Ana's frail.  So I decided not to let her know, but I did

12   call her right after I was let go to let her know that if

13   she gets some information later on, that she could always

14   reach me, but she will be hearing some things probably in

15   the future.

16   MR. FIELDS:  Your Honor, may I have a moment?

17   THE COURT:  You may.

18   MR. FIELDS:  No further questions for this witness,

19   Your Honor.

20   THE COURT:  All right.  Cross-examination.

21   MR. MARKUS:  Your Honor --

22   THE COURT:  Which one of you are going to go first?

23   MR. MARKUS:  Because of this witness relating to

24   Ms. Milliron, we're going to switch the order.

25   THE COURT:  Okay.  That's fine.  Cross-examination,

CROSS - GRIMLEY

1    Mr. Dill.

2                         **CROSS-EXAMINATION**

3    BY MR. DILL:

4    Q.    Good morning, ma'am.

5    A.    Good morning.

6    Q.    Okay.  So I just want to talk a little bit about some

7    of the things that you said.  I -- you said that this -- the

8    conversation you had with Ms. Milliron was at your

9    apartment, was it?

10   A.    House.  Yes.

11   Q.    And what -- just so we're -- what town are we talking

12   about?

13   A.    Greensburg.

14   Q.    Okay.  And so she -- she offered to you, and she said,

15   "I'm -- I have tools.  I can help you put together this

16   dresser."

17   A.    That is correct.

18   Q.    Okay.  And so she came over.  And this is the first

19   time you really had any chitchat with her about who she was,

20   where she was from, that type of thing.

21   A.    Correct.

22   Q.    Okay.  Now you said that she had two children and they

23   were in Texas; is that what you recall?

24   A.    That's what I believe, sir.

25   Q.    Okay.  And it was your -- did she say, "Hey, I'm from

CROSS - GRIMLEY

1    Texas"?

2    A.    Trying to recall that.  I'm not a hundred percent

3    positive on that that she's from Texas.

4    Q.    Okay.

5    A.    But I believe, if I can remember.

6    Q.    Well, if, in fact, she's from the Pittsburgh area, that

7    would --

8    A.    No.  No, she wasn't from Pittsburgh.

9    Q.    She wasn't from Pittsburgh?

10    A.    (Shook head)

11    Q.    Okay.  So you believe she said she was from Texas.  Did

12    she talk with a Texas accent?

13    A.    No, she did not.

14    Q.    All right.  So you're assuming she's not from

15    Pittsburgh, but you really don't know.

16    A.    Not positive, no.

17    Q.    Okay.  And as a matter of fact, she didn't have two

18    children, she has three children.  Were you aware of that?

19    A.    No, I was not.

20    Q.    Okay.  And did she ever mention the fact that while

21    in -- living in Greensburg, that she would drive 80,

22    90 miles to go help raise her grandson?  Did she mention

23    that?

24    A.    No, she did not.

25    Q.    Okay.  Now are you familiar with the geography there in

CROSS - GRIMLEY

1    the Pittsburgh area as to where Greensburg was in relation

2    to, let's say, New Castle?

3    A.    New Castle -- at the time we -- there was only three

4    offices at that time.

5    Q.    Okay.  Do you know where New Castle is in relation

6    to --

7    A.    Yeah.  Yeah.  I pretty much know where that's at.

8    Q.    Okay.  It's a good ways away from Greensburg.

9    A.    Yeah.  Yeah.  That's correct.

10   Q.    So if she had a grandson that she was having to travel,

11   you know, 50, 60, 70, 80, 90 miles to go see, even after the

12   day you talked to her, she didn't mention that --

13   A.    No, she did not.

14   Q.    -- right?  Now, did she tell you that she'd actually --

15   out in the Greensburg area, that she'd signed a year lease

16   out at her condo?  Did she mention that to you?

17   A.    She did not mention that to me.

18   Q.    So you recall something about a year, but frankly,

19   ma'am, it's fair to say you don't recall the exact

20   conversation that took place?

21   A.    I -- I know the conversation that took place.

22   Q.    Okay.  So -- and, again, I think you told us before it

23   was shocking and you wouldn't forget it.

24   A.    I would not forget that conversation.

25   Q.    Now isn't it true, though, what -- then when you first

CROSS - GRIMLEY

1    talked to the FBI, and they recorded it, that you said you

2    don't recall a lot of it.  You don't recall a lot of it.

3    Isn't that true?  Isn't that what you said?

4    A.    At the -- no.  It's not that I don't recall a lot of

5    the conversation.  There was dates that I did not recall;

6    certain dates.  But everything was done on my email.

7    Everything that was put down from that office was through my

8    personal email.

9    Q.    Okay.  Maybe I'm confused, and I apologize.

10   A.    Yeah.

11   Q.    I want to talk about the conversation that you've been

12   talking about here today with Ms. Milliron.

13   A.    Okay.

14   Q.    And just to orient us, you were working there in

15   2015 --

16   A.    Uhm-hum.

17   Q.    -- correct?

18           You say you left voluntarily at the beginning of

19   2016 --

20   A.    Correct.

21   Q.    -- right?

22           And you know you had written warnings threatening

23   termination before that, right?

24   A.    Never.

25   Q.    Okay.  We'll talk about that in a moment.

CROSS - GRIMLEY

1   A.   Okay.

2   Q.   Just so I make sure, you never signed a written

3   employee warning that the consequences of failure to follow

4   protocol would result in termination?  That never happened?

5   A.   I don't recall that.  There was only one time that he

6   was upset with me in the office regarding a Care Credit.

7   That's the only thing I remember that he was upset about.

8   Q.   Okay.  Well, let's just -- I want to make sure.  Did

9   Trish Vanmeter -- you know Trish?

10  A.   I know Trish.

11  Q.   Okay.  Didn't she give you an -- an employee warning

12  notice with your name, Anna Grimley, on 1-9-16, and the

13  consequences of further infractions would result in

14  immediate termination?  Do you remember that?

15  A.   She gave me a paper that I was being terminated, but it

16  never said what the termination was about.

17  Q.   Actually, she gave you a paper in January of 20- --

18  sorry, January 19th, 2016 of the final warning of violation

19  of company policies, and that the consequences of further

20  infractions would be immediate termination.  Isn't that

21  true?

22  A.   She called me into her office the day she was

23  terminating me, and that was around January 18th.  And

24  that's when I signed the paper of termination.

25  Q.   Okay.  So the warning where it says, "Further

CROSS - GRIMLEY

1    infractions would result in immediate termination," you're

2    saying that was the actual termination?

3    A.    Yeah.

4    Q.    Okay.  Well, you actually signed one prior to that in

5    January -- on January 2d, and that was about the Care Credit

6    issue?

7    A.    The Care Credit issue, there was --

8    Q.    And -- I'm sorry, ma'am.

9    A.    There was a warning about the Care Credit, but there's

10    some explanation on that, too.  So that was discussed with

11    him and I.

12    Q.    Okay.  But just so I make sure I understand --

13    A.    Right.

14    Q.    -- you told us that you just were leaving voluntarily.

15    A.    I was.

16    Q.    Okay.  Well, ma'am, you did have, in fact, a written

17    warning for violation of company policies, failure to follow

18    protocol, and you were warned that consequences of further

19    infractions would result in termination.  You remember that.

20    A.    So to have one written up for one thing, that would

21    mean I would have to repeat that again.

22    Q.    Ma'am, that wasn't my question.

23    A.    Well, honestly if I signed something that was a

24    write-up --

25              THE COURT:  Ma'am.  Ms. Grimley, the way it works

CROSS - GRIMLEY

1   here is that the attorney asks you a question, you wait for

2   him to finish the question --

3               THE WITNESS:  Okay.

4               THE COURT:  -- and then you answer the question

5   posed.

6               THE WITNESS:  Okay.

7               THE COURT:  He'll wait for you to complete your

8   answer before he asks the next question.

9               THE WITNESS:  Your question.

10  BY MR. DILL:

11  Q.   Yes, ma'am.  I just want to -- and on January 2d, 2016,

12  you were given a written warning for violation of company

13  policies, specifically failure to follow protocol, and the

14  consequences of further infractions would result in

15  termination.  Isn't that true?

16  A.   Possibly.  Yes.

17  Q.   Okay.

18  A.   I don't remember everything that was written in that

19  letter.

20  Q.   Now we're talking how many years later?  It's hard to

21  recall exactly what happened when; is that fair to say?

22  A.   Pretty much.  Sometimes it is.

23  Q.   All right.  But let's go on back.  So at your -- I

24  think you told us before that this was very -- something you

25  wouldn't forget, and specifically about the question about

CROSS - GRIMLEY

1    this conversation about what was going to happen in the

2    future with Ms. Milliron and Dr. Rudolph.

3              When asked about that by the FBI, you said you did

4    not recall a lot of it, but by the next year they're going

5    to be done.  Isn't that what you told them?

6    A.    Repeat that.

7    Q.    Sure.  Didn't you say, when asked about the

8    conversation now --

9    A.    Uhm-hum.

10   Q.    -- "I don't recall a lot of it -- of that part of it,

11   but by next year, they were going to be done."  Isn't that

12   what you said?

13   A.    No.  Not in those exact words.

14   Q.    Okay.  Play clip 3 of your -- and you're audio-recorded

15   in that, weren't you, ma'am?

16   A.    Uhm-hum.

17   Q.    Clip 3 of Anna Grimley, please.

18              COURTROOM DEPUTY:  Sir, what exhibit is this?

19              MR. DILL:  It's an audio recording, so --

20              THE COURT:  Yeah, but we still need an exhibit

21   number to --

22              MR. DILL:  Okay.

23              THE COURT:  Here, let's do this.  Why don't we take

24   our morning recess and we can figure out this exhibit thing

25   and we will go from there.  We'll be in recess for 15

1690

CROSS - GRIMLEY

1    minutes.

2         (Jury left the courtroom at 10:24 a.m.)

3         THE COURT:  Ms. Grimley, hold on, hold on.  All

4    right.  Ms. Grimley, you're in the middle of your testimony

5    and I direct you not to speak with any of the lawyers during

6    the recess.

7         THE WITNESS:  Okay.

8         THE COURT:  You're free to go to the lobby outside

9    the building if you want.  I need you back in the witness

10   stand in 15 minutes.

11        THE WITNESS:  Okay.

12        MR. MARKUS:  Your Honor, before we break can I make

13   one record, or would you rather we do that after the break?

14        THE COURT:  Let's do that.

15        MR. MARKUS:  Thank you, Your Honor.

16        (Recess taken 10:25 a.m.)

17        (In open court outside the presence of the jury at

18   10:45 a.m.)

19        THE COURT:  Mr. Markus, you wanted a quick matter

20   to raise.

21        MR. MARKUS:  Real quickly, Your Honor.  Thank you.

22        THE COURT:  Everyone can be seated.

23        MR. MARKUS:  I know we briefed this issue pretrial

24   about the severance and about Ms. Grimley, but I just wanted

25   to supplement the record based on what's happened in court

CROSS - GRIMLEY

1   and the Government's theory in this case.

2          So the Government has opened on the fact that there

3   was this ultimatum by Ms. Milliron to Dr. Rudolph, and now

4   we have a witness explaining that ultimatum to the Court.

5   The Court has told the jury not to consider it, but it goes

6   right to the main theory of prosecution against Dr. Rudolph.

7   They all were taking notes about it.  It's a very dramatic

8   witness and testimony.  And I'm at -- I have both hands tied

9   behind my back.  I can't cross-examine about it, I can't

10  call Ms. Milliron to refute it.  And this is the

11  prototypical example of severance.

12         And so I would just renew my motion.  Of course I

13  know the Court has said it's preserved, but based on what's

14  happened in court, it's much more dramatic than even we had

15  anticipated on the papers.  And so I think I would ask the

16  Court to reconsider its ruling and order a severance at this

17  time.

18         THE COURT:  Mr. Dill, do you wish to be heard?

19         MR. DILL:  I have no position, Your Honor, other

20  than I joined previously on the severance for --

21         THE COURT:  Right, you have.  You've made your

22  record.

23         Can I hear from the Government.

24         MR. FIELDS:  I'm sorry, your notes are up here,

25  John.  Do you mind?

CROSS - GRIMLEY

1    MR. DILL:  Go ahead.

2    MR. FIELDS:  Your Honor, I would just say that, as

3  far as the opening goes, the instruction was given during

4  the opening.  In terms of this motion, nothing that's

5  happened here in court is different than what's on the

6  papers.  Defense counsel's characterized it as dramatic but

7  nothing surprising.  There's been no changes to the law; no

8  changes to the facts.  There's nothing under this sort of

9  standard for a motion for reconsideration that would warrant

10  revisiting the Court's prior rulings here.

11    And with regard to cross-examination, the statement

12  is not testimonial, Your Honor; it's very clear.  So, you

13  know, all those cases cited in our briefing about the

14  admissibility of nontestimonial statements and not raising

15  any constitutional issues, the case law there is very clear

16  that a curative instruction is sufficient.  And so for all

17  those reasons, and all the reasons we've stated in our

18  briefs before, we do not believe that there is anything

19  warranting severance here.

20    THE COURT:  All right.  Thank you, Mr. Fields.

21    I agree with the Government.  I think the only

22  thing that's changed here is defense counsel's

23  characterization of the testimony as "dramatic and primary

24  and not what we've expected."  It's actually exactly what I

25  expected.  And I have taken all these matters into

CROSS - GRIMLEY

1    consideration when I originally ruled on the motion for

2    severance, and I see no reason to reconsider that decision,

3    either any change in the law or any material change in the

4    facts, as I understood they would be coming in.

5            So the motion for me to reconsider my prior ruling

6    on severance on -- on the motion for severance is denied.

7            Let me just clarify one thing.  When I say

8    "cross-examination," obviously I knew that Mr. Dill was

9    going to go first.  I think I mentioned this at the 10:30

10   session way back on the first day, whoever of the two of

11   you, Mr. Markus, Mr. Dill, are going to be taking the

12   primary load on the cross-examination, just come up and go

13   first, and then I'll give the other counsel the opportunity

14   to go second.  All right?

15           Okay.  Let's bring in the jury.

16        (In open court in the presence of the jury at 10:49

17   a.m.)

18           THE COURT:  Ms. Grimley, I remind you that you

19   remain under oath.

20           Mr. Dill, you may resume your examination.

21           MR. DILL:  Thank you, Your Honor.

22   BY MR. DILL:

23   Q.   Ms. Grimley, I just want to orient us again.  You were

24   working there until the beginning of 2016, correct?  Working

25   at Three Rivers.

1694

CROSS - GRIMLEY

1   A.   '15.  You said '16?

2   Q.   When did you start?

3   A.   In '15.

4   Q.   When did you work there until?

5   A.   '16.

6   Q.   Okay.  Then you made a call -- an anonymous call to the

7   FBI in January of 2017, correct?

8   A.   No.  The call wasn't in January '17.

9   Q.   When was the call?

10  A.   It was -- my belief it was December, but it's -- it

11  could have been -- I just thought it was December 16th.

12  Q.   Okay.  If it -- if the report says --

13  A.   One month -- yeah, okay.

14  Q.   I'm not trying to trip you up.  I'm trying to figure

15  out the time.

16  A.   Okay.

17  Q.   You made an anonymous call to the FBI --

18  A.   Yes.

19  Q.   -- in -- let's say it's January 2017, correct?  Isn't

20  that right?

21  A.   Yes.

22  Q.   And at that point, you didn't mention anything to the

23  FBI, the person you talked to, about there being an

24  ultimatum.  That word was never used, was it?

25  A.   I don't recall.  I do know that conversation was talked

CROSS - GRIMLEY

1  to them.  I don't know if it was in person or if it was on

2  the phone.

3  Q.   Okay.  Well, if it was on the phone, if it's not

4  reflected anywhere the term "ultimatum," would you have any

5  reason to think now you did say, "I know about this

6  ultimatum," or can we agree it probably wasn't brought up?

7  A.   I know the conversation was talked to them about it.

8  Whether it was on the phone or in person, I don't know which

9  time it was.

10  Q.   Okay.  And in that call, you said that Ms. Milliron

11  told you that Larry was planning on divorcing Bianca, right?

12  A.   Yes.

13  Q.   Okay.  So in the call in January, you said he's

14  planning on divorcing her.  Okay.  Now just for time --

15  time-wise, you also spoke to the FBI in person in February

16  of 2017.  Do you recall that?

17  A.   Yes.

18  Q.   Okay.  And it -- and would you agree, ma'am, in the

19  statement -- the notes -- the statement doesn't mention

20  anything about there being an ultimatum and getting rid of

21  anybody; isn't that true?  Do you recall what you said?

22  A.   I recall a conversation with them.  Once more, I don't

23  know if it was a phone conversation or it was after.

24  Q.   Okay.  But just -- I'm sorry, ma'am.

25  A.   I just don't recall which time, if it was the January,

CROSS - GRIMLEY

1    February.  But it was mentioned.

2    Q.    Okay.  Well, going back again to what -- what was said

3    when and what -- exactly what was said, now we're going on,

4    as we agreed, several years, so it's difficult --

5    A.    Correct.

6    Q.    -- to say what was said exactly and what was said when;

7    is that fair to say?

8    A.    Yeah.  A month or two apart, yes.

9    Q.    Okay.  Now, you talked to the FBI then, in person, and

10   I believe -- do you recall the gentleman over to my right

11   here, and the agent who's next to him?  Do you recall

12   meeting them in person?

13   A.    If that is Peterson and, yes, another female was with

14   him.

15   Q.    Okay.  Mr. -- Agent Peterson --

16   A.    Yes.

17   Q.    -- right?

18         And that was an in-person interview, correct?

19   A.    Yes, it was.

20   Q.    And as we -- as we've gone through, you knew it was

21   being recorded, right?

22   A.    That is correct.

23   Q.    Okay.  And once again, I'll just say, you -- at that

24   point in time when you first talked to them about it, you

25   didn't recall a lot of the conversation, but "by next year

1    they were going to be done."  I think you said no, that

2    didn't take place?

3    A.   Can you repeat that?

4    Q.   Sure.  My question to you is:  Did you say to them when

5    they asked you about it, you said, "I don't recall a lot of

6    the conversation."  Is that something you told them?

7    A.   I don't recall saying that.

8    Q.   Okay.  Clip 3, please.

9              MR. FIELDS:  Your Honor --

10             MR. DILL:  And for the record, that's TPS 3 of A-G.

11             MR. FIELDS:  Your Honor, I would object to the

12   playing of just snippets of an out-of-court conversation --

13             THE COURT:  The Government's free to play whatever

14   part of the recording it chooses to.  Overruled.

15        (Audio played)

16   BY MR. DILL:

17   Q.   So, again, when asked specifically by Agent Gilbert,

18   you said you didn't really recall.  We just heard that.  Was

19   that your voice, ma'am?

20   A.   That is my voice.

21   Q.   Okay.  And then as far as you used the term today,

22   "ultimatum," isn't it true when you first called the FBI,

23   you never used the word "ultimatum"?  When they came and

24   they met with you, you never used the term "ultimatum" in

25   '17, and it was actually the agents that suggested that term

1698

CROSS - GRIMLEY

1    to you; isn't that correct?

2    A.    It's possible he used and asked it in a form of, "Did

3    you" -- "Did she" -- because I did make a phone call prior

4    to that and spoke to FBI.  So it's a possibility that he

5    might have said, "Did she give him an ultimatum?"  Because

6    in even that clip it talks about her going to leave.

7    Q.    But just that word, we've heard that word a lot --

8    A.    Okay.

9    Q.    -- "ultimatum."

10   A.    Yes.

11   Q.    It was the FBI agent who said, "Would you call it --

12   would you characterize it as an ultimatum?"

13   A.    Right.

14   Q.    Right?

15   A.    Yes.

16   Q.    And that's the term that -- when you appeared in front

17   of the grand jury that you used, right?

18   A.    Yes.

19   Q.    Here today, you've used, correct?  "Ultimatum."

20   A.    That is correct.

21   Q.    Okay.  And when talking to the national media, that's

22   also the term you are using.

23   A.    That is probably correct.

24   Q.    Okay.  So -- but just so we're clear, that's not your

25   word that you brought to this conversation, it was the FBI's

CROSS - GRIMLEY

1    suggestion to you that that's what we should call it.

2    A.    She did say the word "ultimatum."

3    Q.    Okay.  She said ultimatum now.  All right.  Now this is

4    something you wouldn't forget.  Tell me exactly what she

5    said to you.

6    A.    She said she gave him an ultimatum that he would have

7    to -- that they were going -- she was going to break it off

8    if he did not get rid of her and go from there.  Saying the

9    word "get rid of," that's what threw me off.  I didn't know

10   if it was divorce; I didn't know what she completely meant

11   by that at that time.

12   Q.    So I just want to say, "Ms. Milliron" -- even though

13   you're saying here you couldn't recall the conversation, now

14   you recall she said, "I gave him an ultimatum to get rid of

15   her" --

16   A.    Yes.

17   Q.    -- do you recall that specifically?

18   A.    Yes, I do.

19   Q.    Wasn't it just the other day that when you talked to

20   the FBI, you didn't remember if it was she was going to give

21   an ultimatum or whether she had given an ultimatum?

22   A.    I think that the questioning -- it threw me off.  I

23   knew that it was given.  And just because I took notes

24   myself when I have a conversation, so I did go back on my

25   notes and it was she gave him an ultimatum.

CROSS - GRIMLEY

1    Q.    Where are those notes?

2    A.    I have them on my phone.

3    Q.    Okay.  Did you turn them over to the Government when

4    you met with them?

5    A.    No, I have not.

6    Q.    Okay.

7    A.    I can turn it over to the Government.  I have no

8    problem doing that.

9    Q.    Okay, ma'am.  So you took the notes -- you're saying

10   you took notes back in 2015 when you had this

11   conversation --

12   A.    With --

13   Q.    -- in 2015.

14   A.    2015.  I'm trying to -- I don't -- I have the date

15   written down, but I don't recall the date, the exact date --

16   the month.

17   Q.    Once again, memory, right?

18   A.    Well, the -- it would be in 2015.

19   Q.    Correct.  So let's go to your conversation with them on

20   June 27th of 2022, just a few days ago, ma'am.  And AUSA

21   Fields, Mr. Fields here, asked you if she had said she had

22   given the ultimatum or if she said she was planning on

23   giving the ultimatum?  You remember that?

24   A.    Yes, I do.

25   Q.    And then first you said, "planning on giving the

CROSS - GRIMLEY

1    ultimatum."  And then you thought about it when they were

2    there talking to you and you said, "No, she had already

3    given the ultimatum."  Isn't that what happened just the

4    other day?

5    A.    That -- that is correct.

6    Q.    Okay.  So you weren't sure a few days ago if she said

7    she was going to do it or if she had done it, and then you

8    had to think about it and, "Yeah, I think she said she had

9    already done it," right?

10   A.    So --

11   Q.    Ma'am, just -- is that what happened or not?

12   A.    Yes.  Can I answer with an explanation?

13   Q.    Let me just get straight on the facts, and obviously if

14   you need to explain --

15   A.    Okay.

16   Q.    -- counsel --

17   A.    Okay.

18   Q.    -- will come up and explain.  I just want to make sure

19   I understand the facts.

20          You say now you recall specifically in 2015 she

21   used the word "ultimatum."

22   A.    Yes.

23   Q.    You never mentioned the ultimatum in any of the other

24   interviews until the FBI agent uses the word "ultimatum,"

25   or -- correct so far?

CROSS - GRIMLEY

1    A.    Okay.

2    Q.    Then just a few days ago, when they're asking you,

3    "Well, did she say she was going to do it or did she say she

4    did it," you had to think about it, correct?

5    A.    Correct.

6    Q.    Okay.  Now going back now as far as what Lori said to

7    you, you would agree she never said anything -- any hateful

8    things to you about Bianca, correct?

9    A.    No.

10   Q.    Okay.

11   A.    Just Ana.

12   Q.    About Bianca Rudolph --

13   A.    Yeah.

14   Q.    -- she didn't say anything --

15   A.    Other than the fact -- other than the fact that she --

16   that --

17   Q.    Ma'am --

18   A.    I'm trying to think of the word.  That she needed more

19   than she deserved as far as . . .

20   Q.    Okay.  But as far as --

21   A.    Hatred?  No.

22   Q.    I'm sorry.  One at a time, I apologize.

23   A.    Okay.

24   Q.    I'm not trying to cut you off.

25   A.    I know.

CROSS - GRIMLEY

1  Q.   As far as hateful words saying like -- you know, like
2  bitch or F-ing or any of that, she never said anything like
3  that to you, did she?
4  A.   No.
5  Q.   Now just far as memory, isn't it true that at the time
6  you talked to the FBI, you didn't even know her last name.
7  A.   She went with different names on her emails.  But yes,
8  I do recall afterwards because there was different email
9  names with her.
10 Q.   Okay.  Well, this is somebody you said that you worked
11 with and you knew her and that she confided in you.  And
12 when you talked to the FBI and they recorded you, you said
13 "I don't remember her last name"?
14 A.   At that moment, yes, because I was thinking of her
15 email.
16 Q.   So what was her email?
17 A.   It was "Get It Done," and she went by "Charlie B."
18 Q.   Okay.  How about around the office; she was known as
19 Lori?
20 A.   Lori.
21 Q.   It's fair to say, you didn't know her too well.
22 A.   No.
23 Q.   Didn't know her too well because certainly if she had
24 children living in Pennsylvania and she had a grandchild,
25 you --

1704

CROSS - GRIMLEY

1    A.    That --

2    Q.    That never came up?

3    A.    Was unaware of that.  We weren't buddy friends; we were

4    just coworkers.

5    Q.    And so, again, you're saying you have a specific

6    recollection now today of exactly what she said -- tell me

7    again what it was.

8    A.    Which part?  About the ultimatum?

9    Q.    What did she say?

10   A.    She said that he was supposed to have been done with

11   Bianca a year before.  They were supposed to take the cash

12   and leave the country.  And then it came down that he didn't

13   do it and then she gave him an ultimatum to go ahead and get

14   rid of her and go with their plan on moving.

15   Q.    Okay.  So he was supposed to do something a year before

16   now?

17   A.    It didn't happen.

18   Q.    And then she was giving him another year; is that what

19   you are saying --

20   A.    Basically she was giving him another year to -- yes.

21   Q.    Ma'am, you understand if this was so shocking that you

22   couldn't forget it, why is it you're having difficulty

23   remembering what she even said?

24   A.    I'm not having difficulty.

25            MR. DILL:    Okay.    Just a moment, Your Honor.

CROSS - GRIMLEY

1    THE COURT:  All right.

2    MR. DILL:  No further questions.

3    THE COURT:  Okay.  Cross-examination.

4    MR. MARKUS:  Your Honor, we would just request that

5    you reread the instruction -- the limiting instruction

6    regarding Dr. Rudolph.  I have no questions.

7    THE COURT:  What's the Government's position on me

8    rereading the limiting instruction?

9    MR. FIELDS:  I don't think it's necessary, Your

10   Honor, but we have no objection.

11   THE COURT:  All right.  This is -- I'm only doing

12   it because the Government doesn't have an objection.

13   Ladies and gentlemen of the jury, this witness just

14   testified that Ms. Milliron made certain statements to her

15   in 2015.  When evaluating the case against Ms. Milliron, it

16   is for you to decide whether she made any statement and, if

17   so, what weight to give whatever statement she made.

18   However, any statements Ms. Milliron may have made to

19   Ms. Grimley are to be considered only with regard to the

20   charges against Ms. Milliron.

21   With regard to the charges against Lawrence

22   Rudolph, you cannot consider these alleged statements at

23   all.  In other words, as far as the charges against

24   Dr. Rudolph are concerned, you cannot consider any

25   statements Ms. Milliron may have made to Ms. Grimley.

REDIRECT - GRIMLEY

1     Redirect.

2     MR. FIELDS:  Thank you, Your Honor.

3     REDIRECT EXAMINATION

4     BY MR. FIELDS:

5     Q.   Just two questions, Ms. Grimley.

6     A.   Okay.

7     Q.   You were asked about that Care Credit issue.  Do you

8     remember that?

9     A.   Yes.

10    Q.   And you said you wanted to give an explanation but you

11    weren't able to give one.  Could you describe the Care

12    Credit situation for us.

13    A.   So I was supposed to get -- when we did a refund or

14    have a dispute, I gave it to Dr. Rudolph and I gave it to

15    Lori on the dispute.  It was never answered in a timely

16    manner.  So Care Credit then decided to go ahead and pull

17    that account, or -- threatened to pull the account.

18    Q.   Then you were asked about questions you received about

19    whether or not the -- you know, this conversation, whether

20    Lori had already told Dr. Rudolph, or whether she was going

21    to.  Do you remember those questions?

22    A.   Yes.

23    Q.   And you said you wanted to give an explanation.  What's

24    the explanation that you wanted to give?

25    A.   So talking right after work and being honest, when

REDIRECT - GRIMLEY

1    you're doing a 12-hour shift as a manager, there's a lot

2    going on.  So talking at the end of the day, I'm already

3    exhausted, and hearing anything at that time of the hour, it

4    just -- I was thrown off.

5         But I knew the answer.  I mean -- I know the

6    answer.  So when I said it to whoever I spoke to, I would

7    be -- honestly to say at that moment, I was just thrown off

8    on my mind, like that brain freeze thing.  And it just threw

9    me off for a moment.  I wasn't hearing everything at that

10   moment.

11   Q.   You're saying conversation after the end of a 12-hour

12   shift, what do you mean by that?

13   A.   My hours at work, I worked two dental practices in

14   Las Vegas, so I'm doing a lot of multi-tasking constantly

15   and you don't have a break, so --

16   Q.   When you were asked these questions by the

17   Government --

18   A.   At the end of the day.

19   Q.   Was that at the end of your shift?

20   A.   Yeah.  Yeah.

21        MR. FIELDS:  Your Honor, at this time I have no

22   further questions and the Government would release this

23   witness.

24        THE COURT:  All right.  May this witness be excused

25   for the defendants?

DIRECT - HOUCK

1    MR. DILL:  Yes, Your Honor.

2    THE COURT:  All right.  Ms. Grimley, hold on.

3    Thank you so much for your testimony.  You're excused and

4    you may step down.

5    THE WITNESS:  Thank you.

6    THE COURT:  Government may call its next witness.

7    MR. FIELDS:  Thank you, Your Honor.  The United

8    States calls Sherry Houck to the stand.

9    THE COURT:  All right.

10   COURTROOM DEPUTY:  If you'll remain standing,

11   ma'am, and raise your right hand.

12   SHERRY HOUCK, GOVERNMENT'S WITNESS, SWORN

13   COURTROOM DEPUTY:  Thank you.  Please be seated and

14   take your mask off for us.  And then state your full name

15   for the record and spell your first and last name for us.

16   THE WITNESS:  Sherry Lee Houck.  S-h-e-r-r-y,

17   H-o-u-c-k.

18   DIRECT EXAMINATION

19   BY MR. FIELDS:

20   Q.   Ms. Houck, you just make sure you step forward -- or

21   come forward a little bit and make sure the microphone is

22   right there.

23   Ms. Houck, have you worked with Dr. Lawrence

24   Rudolph?

25   A.   Yes.

DIRECT - HOUCK

1   Q.   Have you also worked with Lori Milliron?

2   A.   Yes.

3   Q.   Did they ask you to do something out of the ordinary in

4   2016?

5   A.   Yes.

6   Q.   Are you prepared to tell the jury more about it?

7   A.   Yes.

8   Q.   What's your educational background?

9   A.   I went to Ivanhoe Institute for Dental Assisting and

10  got an EFDA as an expanded functions dental assistant.

11  Q.   EFDA, E-F-D-A?

12  A.   Yeah.

13  Q.   What is an expanded functions dental assistant?

14  A.   It's just a dental assistant that can do a little more

15  in the dental office, like fillings and more expanded

16  functions.

17  Q.   How long have you been working in the dental industry?

18  A.   Close to 30 years.

19  Q.   At some point did you work at a place called Three

20  Rivers Dental Group?

21  A.   Yes.

22  Q.   Approximately when did you start there?

23  A.   2014.

24  Q.   Who did you interview with to get that job?

25  A.   Dr. Rudolph and Lori.

1710

DIRECT - HOUCK

1    Q.    When did you leave that job?

2    A.    Last year.

3    Q.    When you had that interview with Lori and Larry, how

4    did they describe their respective roles at the company?

5    A.    I knew he was the owner.  I wasn't sure what Lori's

6    role was.

7    Q.    Were you hired?

8    A.    Yes.

9    Q.    What were your responsibilities?

10   A.    I originally was in the Greensburg office as a lead

11   assistant.

12   Q.    Did you work in other offices over time?

13   A.    Yeah.

14   Q.    Where?

15   A.    Cranberry, Jennerstown, Washington, and Green Tree.

16   Q.    And you say you left that job last year?

17   A.    Yes.

18   Q.    Why did you leave?

19   A.    I got another job with another doctor about 10 minutes

20   from my house for about five more dollars an hour.

21   Q.    Was anything about Three Rivers Dental Group different

22   from practices you had worked at previously?

23   A.    Well, the practice is a sedation practice so it was a

24   lot different.

25   Q.    What makes sedation dentistry different?

DIRECT - HOUCK

1    A.    We would do the patient's work all at once while they

2    were under.

3    Q.    Who performed the sedations?

4    A.    When I first started, AAA Anesthesia Associates.

5    Q.    Did that change over the course of your time there?

6    A.    Yes.

7    Q.    And was it different in different offices?

8    A.    No.

9    Q.    Did you have any role in performing the sedations?

10   A.    My only role was to keep the airway open; help, you

11   know, maintain the patient's breathing; and the dentistry.

12   Q.    What was the dentist's role in the sedation?

13   A.    Originally they just did dental work.

14   Q.    Did you ever see Dr. Lawrence Rudolph treating patients

15   at Three Rivers?

16   A.    The only time I saw him was when he helped his

17   daughter.

18   Q.    Did he have any involvement with the sedations?

19   A.    No.

20   Q.    Do you know if Dr. Rudolph was married?

21   A.    Yeah.

22   Q.    Who was his wife?

23   A.    Bianca Rudolph.

24   Q.    Did she ever come to the office?

25   A.    Never.

1712

DIRECT - HOUCK

1    Q.   Now you mentioned that Lori was in your interview.

2    A.   Yes.

3    Q.   Do you know what her last name was?

4    A.   Milliron.

5    Q.   Did she work at Three Rivers the entire time you worked

6    there?

7    A.   Yes.

8    Q.   And which offices?

9    A.   She came in and out of all the offices.

10    Q.   What were her responsibilities?

11    A.   I sent my orders to her for approval, and I think she

12    handled a lot of stuff with the front desk.

13    Q.   Did she have a title?

14    A.   I thought it was maybe like CEO or something.

15    Q.   Remind us, so which offices did you work in and which

16    year, if you can remember?

17    A.   I originally started in the Greensburg office in 2014;

18    I worked there.  And then I, over the years traveled, to the

19    different offices.  Mostly Green Tree, Cranberry, and then

20    more recently last year Washington.

21    Q.   Which office did Lori work in?

22    A.   As far -- Lori just traveled to -- usually would see

23    her maybe in Green Tree or Greensburg.

24    Q.   When would she come to the office?

25    A.   She always came with Dr. Rudolph.

DIRECT - HOUCK

1    Q.    How did she get to the office?

2    A.    Most of the time they came together.

3    Q.    Do you remember what they drove?

4    A.    They were either in his red Toyota or her black Toyota.

5    Q.    What would they do when they got to the office?

6    A.    They both just came in and usually set their stuff

7    down, and I -- talked to people.

8    Q.    Did you observe them together?

9    A.    Yes.

10   Q.    What impression did you get?

11   A.    That they were somewhat a couple.

12   Q.    What made you think that?

13   A.    Just different things I saw.

14   Q.    What did you see?

15   A.    At one point Dr. Rudolph and Lori went in the same room

16   and he changed clothes while she was in there, so that was

17   one thing.

18   Q.    Remember while you were working at Three Rivers, was

19   there ever a period of time where Lori was working from

20   home?

21   A.    Yes.

22   Q.    When was that?

23   A.    I -- a lot of times it was through email I talked to

24   her, so I just thought she was working from home.  It would

25   be throughout the whole time.

DIRECT - HOUCK

1   Q.    Were you ever given instructions on what to say if

2   someone called Three Rivers and asked for her?

3   A.    Yes.

4   Q.    Who gave you those instructions?

5   A.    Levi Weaver.

6   Q.    Who was he?

7   A.    He was my manager in Greensburg.

8   Q.    What were the instructions?

9            MR. MARKUS:  Objection.  Hearsay, Your Honor.

10           MR. FIELDS:  Your Honor, these are the statements

11  of the agent of the defendant who was an employee of Three

12  Rivers which he owned.

13           THE COURT:  Mr. Markus.

14           MR. MARKUS:  Your Honor, they're asking for an

15  out-of-court statement by a different person.  I expect that

16  that person is going to be a witness so we can cross-examine

17  him, but it's improper through this witness.

18           THE COURT:  Yeah, the practice is not a party to

19  this action, so sustained.

20  BY MR. FIELDS:

21  Q.    While you were working at Three Rivers Dental Group,

22  where did Dr. Rudolph live?

23  A.    Arizona.

24  Q.    Did he live there the whole time you worked there?

25  A.    I thought he did.

1715

DIRECT - HOUCK

1    Q.    How often would he come to the office?

2    A.    Sometimes it was sporadic; monthly or every couple of

3    months.  It was just random.

4    Q.    Did he ever come to the office alone?

5    A.    Once in a while.

6    Q.    Who was he with most of the time?

7    A.    Lori.

8    Q.    Did Three Rivers Dental Group have business credit

9    cards?

10   A.    I would have no idea.

11   Q.    Were you ever given a credit card?

12   A.    No.

13   Q.    Were you ever allowed to charge personal expenses on

14   Three Rivers' accounts?

15   A.    No.

16   Q.    Did you know anyone at Three Rivers named Anna Grimley?

17   A.    Yes.

18   Q.    What office did she work in?

19   A.    Jennerstown.

20   Q.    What were her responsibilities?

21   A.    She was a manager there.

22   Q.    Did you ever see her with Lori?

23   A.    Yes.

24   Q.    When?

25   A.    When I was in Jennerstown.

1716

DIRECT - HOUCK

1    Q.    What were they doing?

2    A.    Lori was, like, teaching her manager stuff and showing

3    her just how we do things at Three Rivers and helping her

4    with stuff.

5    Q.    Now we talked a little bit earlier about Three Rivers

6    and sedation dentistry.  Do you know what kind of drugs were

7    used for the sedation?

8    A.    Yes.

9    Q.    What drugs?

10   A.    They would use propofol and some other just normal

11   drugs that you would use to sedate somebody.

12   Q.    Do you know what those drugs do?

13   A.    Yes.

14   Q.    What do they do?

15   A.    They relax a person so that they can be treated for

16   their dental work.

17   Q.    I want to focus on the period of fall of 2016.  Which

18   office were you working in at that time?

19   A.    Greensburg.

20   Q.    Who was performing the anesthesia at that time?

21   A.    AAA Anesthesia Associates.

22   Q.    Where were the anesthesia drugs kept?

23   A.    With AAA Associates.

24   Q.    Generally who ordered the drugs?

25   A.    Only people from AAA; only their doctors.

1717

DIRECT - HOUCK

1  Q.   Do you know how they were ordered?

2  A.   No.  We didn't have anything to do with their -- with

3  having any kind of those drugs in our offices.  They handled

4  all that.

5  Q.   Yeah.  Up until 2016, had you ever been asked to order

6  an anesthesia drug?

7  A.   Never.

8  Q.   Were you once asked to be involved?

9  A.   I was not asked to order it, but I was told it was

10  ordered.

11  Q.   Who told you?

12  A.   Lori Milliron.

13  Q.   How did that come up?

14  A.   She called me on the phone to let me know that --

15          MR. MARKUS:  Objection, Your Honor.  Hearsay.

16          THE COURT:  Do we need for me to read the limiting

17  instruction again?

18          MR. FIELDS:  Yes, Your Honor.  If the defendants

19  would request it, we have no objection.

20          THE COURT:  Mr. Markus or Mr. Dill?  Is that

21  what -- your preference?

22          MR. MARKUS:  Yes, Your Honor.

23          THE COURT:  All right.  All right, members of the

24  jury, I'm instructing you once again:  You may consider the

25  statement of defendant Lori Milliron only in the case

DIRECT - HOUCK

1    against her and not against -- not in the case against

2    Dr. Rudolph.  You may not consider Ms. Milliron's -- let me

3    start that sentence again.

4              You may not consider Ms. Milliron's statement in

5    any way when you are deciding if the Government has proved

6    beyond a reasonable doubt its case against Lawrence Rudolph.

7    BY MR. FIELDS:

8    Q.   So you were talking about this order.  What was the

9    order for?

10   A.   She had ordered propofol and let me know that it would

11   be coming and to set it in the back, and that Dr. Rudolph

12   will be picking it up.

13   Q.   Approximately when did this conversation take place?

14   A.   In fall of 2016.

15   Q.   Was this request unusual?

16   A.   Yes.

17   Q.   Why?

18   A.   Just -- we never had anything like that before at the

19   office.

20   Q.   Did you ask her why she had ordered this drug?

21   A.   No.  I never ask questions, I just did what I was told.

22   Q.   Did the package eventually arrive?

23   A.   Yes.

24   Q.   Did you open it?

25   A.   Yes.

1719

DIRECT - HOUCK

1    Q.    What was inside?

2    A.    Propofol.

3    Q.    Describe it to us.

4    A.    It's a white, milky substance that's used for sedation.

5    Q.    Approximately how big was the -- what kind of container

6    was it in?

7    A.    Glass container.

8    Q.    Approximately how big was it?

9    A.    Like that big.

10   Q.    So that's -- how many -- if your -- you're holding up

11   your hands, maybe --

12   A.    Maybe like 10 milliliters.  I'm not sure.

13   Q.    Was there an invoice inside the package?

14   A.    Yes.

15   Q.    Would you have seen that invoice?

16   A.    Yes.

17         MR. FIELDS:  Your Honor, at this time I'd move for

18   the admission of Government's Exhibit 57.  I understand

19   there's no objection.

20         MR. DILL:  No objection, Your Honor.

21         THE COURT:  All right.  There being no objection,

22   Government Exhibit 57 is admitted into evidence and may be

23   published to the jury.

24       (Government's Exhibit 57 received)

25   BY MR. FIELDS:

1720

DIRECT - HOUCK

1   Q.    If we could zoom in.  Let's just zoom in on the top

2   there.

3           Whose name is on the invoice?

4   A.    Larry Rudolph's.

5   Q.    Now if we could go -- what's the date on the invoice?

6   Do you see the invoice date?

7   A.    Yeah.  7-6-16.

8   Q.    And what's the due date for the invoice?

9   A.    8-5-16.

10  Q.    Okay.  If we could zoom out.

11          And then this first order here, what does it say

12  there?

13  A.    "Propofol."

14  Q.    And the -- if we zoom back out.

15          And the second item there, what is that?

16  A.    Narconaloxazine [sic].

17  Q.    Do you remember another item being in this package?

18  A.    I don't know why, but I don't remember it.

19  Q.    You can take that down.

20          Were you given instructions on what to do after

21  getting the propofol?

22  A.    I was just supposed to leave it in the back for

23  Dr. Rudolph.

24  Q.    Did Dr. Rudolph come to get it?

25  A.    Yes.

1721

DIRECT - HOUCK

1    Q.    Approximately when?

2    A.    Not too long after.

3    Q.    Do you know the approximate month in 2016?

4    A.    It was probably August or September.

5    Q.    What did he ask when he arrived?

6    A.    Just if I had a package for him.

7    Q.    What did you tell him?

8    A.    Yes.

9    Q.    And then what did he do?

10   A.    I gave it to him.

11   Q.    What did he say about it?

12   A.    He said that it was for in case of an accident.

13   Q.    An accident while doing what?

14   A.    When he was on his trip.

15   Q.    Did he describe the trip?

16   A.    All I remember is him saying it was in case of an

17   accident.

18   Q.    All right.  At some point while you were working at

19   Three Rivers, did you find out that Larry's wife had died?

20   A.    Yes.

21   Q.    When did you find that out?

22   A.    About a week after.

23   Q.    How did you find out?

24   A.    I was -- I was at the house and watching their dogs.

25   Q.    Whose dogs?

1722

DIRECT - HOUCK

1    A.    Ana, their daughter.

2    Q.    Are you okay, Ms. Houck?

3    A.    I'm fine.

4    Q.    Approximately how long before you find out about

5    Bianca's death were you given the propofol?

6    A.    I don't understand the question.  I'm sorry.

7    Q.    Yeah.  The timing of when you found out about Bianca's

8    death, does that help you remember when you received the

9    propofol?

10   A.    You mean at the Greensburg office when it came in?

11   Q.    Yeah.

12   A.    Oh, I'm sure it came, you know -- I -- I'm sure it came

13   right before -- not too -- I don't -- I'm sorry.  I remember

14   receiving it probably a month before or -- you know,

15   approximately.  Maybe a little more before.

16   Q.    Before what?

17   A.    Before her -- her passing.

18   Q.    Did Larry come to the office after his wife died?

19   A.    After some time.

20   Q.    Were you ever given instructions about whether or not

21   you could talk about the death?

22   A.    Yeah.

23   Q.    What were the instructions?

24   A.    That we weren't allowed to talk about it.

25   Q.    After Bianca's death, did Larry come to the office more

1723

DIRECT - HOUCK

1    frequently than he had before, or less frequently?

2    A.    I really can't say.  I -- it was sporadic when he came,

3    so . . .

4    Q.    Who did he come with?

5    A.    Lori.

6    Q.    Did Larry -- or Dr. Rudolph sometimes come into the

7    areas where you were working?

8    A.    Yeah.

9    Q.    What would he do when he came into your area?

10   A.    He would just make small talk sometimes.

11   Q.    Would he sometimes say things and then just leave?

12   A.    Yeah.

13   Q.    Like what?

14   A.    Sometimes he would just say "cats and dogs" or say

15   like -- just frustration, you know.

16   Q.    What is an operatory?

17   A.    It's where we treat our patients.

18   Q.    Did you have any responsibilities with regard to the

19   operatories?

20   A.    I had to clean them and stock them; make sure

21   everything was neat and ready for patients.

22   Q.    Do you remember Larry telling you something while you

23   were cleaning one of those operatories?

24   A.    Yes.

25   Q.    Approximately when?

1724

CROSS - HOUCK

1   A.    Approximately summer 2020.

2   Q.    What did he say?

3   A.    He just randomly mentioned that he was probably going

4   to go to prison.

5   Q.    Did you ask him what he meant?

6   A.    No.

7   Q.    Why not?

8   A.    I was used to him saying just off-the-wall things

9   sometimes.

10          MR. FIELDS:  Your Honor, may I have a moment?

11          THE COURT:  You may.

12          MR. FIELDS:  No further questions, Your Honor.

13          THE COURT:  All right.  Cross-examination.

14                    CROSS-EXAMINATION

15   BY MR. DILL:

16   Q.   Good morning, ma'am.  I just want to ask you a few

17   questions.  Let me start on that last point.  You said he

18   would say things like "cats and dogs."  Larry's big on

19   quoting movies, wasn't he?

20   A.    Yeah.

21   Q.    Okay.

22   A.    Yeah.  A movie quote.

23   Q.    I'm sorry?

24   A.    It's a movie quote.

25   Q.    Right, from Ghost Busters.

CROSS - HOUCK

1    A.    Yeah.

2    Q.    Dogs and cats living together, that type of thing?

3    A.    Yes.

4    Q.    Okay.  He'd also say things like "it isn't rocket

5    science," right?

6    A.    A hundred percent.

7    Q.    Okay.  Quote different movies, some you probably

8    haven't seen.  Would he quote Shawshank Redemption, for

9    instance?

10   A.    I don't recall that.

11   Q.    Okay.  Probably would be some you may not have even

12   seen, went over your head; that fair to say?

13   A.    Could be.

14   Q.    Okay.  Now I want to talk about the anesthesia because

15   you were -- thought this was out of the ordinary, but let me

16   just understand.  There was a time period when AAA was doing

17   the anesthesia, right?

18   A.    Yes.

19   Q.    And then that changed and then there -- the practice

20   actually hired CRNAs to work for the practice that did the

21   anesthesia, right?

22   A.    Yeah.

23   Q.    And then there was during that time period -- obviously

24   a great deal of propofol was ordered, correct?

25   A.    After.  Years later.

1726

CROSS - HOUCK

1    Q.   Okay.  Well, you don't really know, obviously, what the

2    supply was of propofol in the office.  That wasn't your

3    area, right?  You were in charge of assisting during the

4    procedure, correct?

5    A.   I -- I always received any packages that came in.

6    Q.   Okay.  And the packages that came in, there would be

7    Halcion, correct?

8    A.   Yeah.

9    Q.   Quite a bit of different dental drugs, correct?

10   A.   Yes.

11   Q.   Antibiotics?  --

12   A.   Just Amoxicillin and clindamycin, yeah.

13   Q.   Soboxillin [phonetic], is that amoxicillin?

14   A.   Amoxicillin and clindamycin.

15   Q.   Clindamycin.  And he had -- you know that the

16   clindamycin actually Dr. Rudolph had taken that on his trips

17   as well in case something happened, correct?

18   A.   I have no idea.

19   Q.   Okay.  Really, he didn't really tell you a whole lot

20   about his travels or that type of thing, correct?

21   A.   Not too often.

22   Q.   Pretty private person in the office, right?  Is pretty

23   much all business; is that correct?

24   A.   Yeah.  I mean, sometimes he would -- yeah, but I mean

25   he also talked to me.

CROSS - HOUCK

1    Q.    Okay.  I mean, obviously he's doing movie quotes, so

2    it's not all business but, nonetheless, you would describe

3    him as somebody who was mindful of his business.  He had

4    protocols and procedures and that type of thing; is that

5    right?

6    A.    Yes.

7    Q.    Now I just want to talk about the propofol.  You've

8    worked in the operating suite when that's being used,

9    correct?

10   A.    Yes.

11   Q.    Hand the anesthesiologist a bag and they administer by

12   IV; isn't that right?

13   A.    Yeah.

14   Q.    Okay.  Now as far as this order, let me just -- can we

15   pull up Government's --

16          MR. REYES:  57?

17          MR. DILL:  Yes, whatever it was.  57.  Sorry.

18   BY MR. DILL:

19   Q.    Okay, let's pull this up.  I want to talk a little bit

20   more about this.

21          Harry -- Henry Schein, that's the medical supplier,

22   correct?

23   A.    Yeah.

24   Q.    And it's my understanding you -- when you were first

25   speaking with the Government, you hadn't seen this invoice,

CROSS - HOUCK

1    right?  Let me rephrase that because it's confusing.

2            When you first talked to them outside of the court,

3    when you first were interviewed by the FBI, I mean -- and

4    they brought up this subject, you had not seen this invoice

5    at that point in time, correct?

6    A.    I usually see the invoices, so I thought if I opened

7    the package I saw the invoice.

8    Q.    Okay.  Well, let's take a look at it again.

9            Let's -- Mr. Reyes, how about the top part,

10   including the date, as well as the order numbers.  Okay.

11           Now, you would receive -- or the offices would

12   receive many, many, many different packages from Harry --

13   Henry Schein, including all the dental supplies and that

14   type of thing; is that right?

15   A.    Yeah.

16   Q.    Okay.  And, again, just so we're sure here, the

17   customer number -- or above that, the invoice date -- so

18   that's in July.  We agree with that?

19   A.    Yeah.

20   Q.    Now you said this was in the fall, but likely this

21   package arrived close in time to when it was ordered; is

22   that fair to say?

23   A.    Yeah.  I -- it probably came in August or around there.

24   Q.    Okay.  Well, if the invoice date was in July, I mean,

25   were these sent by FedEx, were they sent by courier?  How

1729

CROSS - HOUCK

1      did they get to the office?

2      A.    They usually came by UPS.

3      Q.    Okay.  So although UPS can sometimes delay things, if

4      it was ordered in July, probably got there in July; fair to

5      say?

6      A.    It says "Due date, August 5th."

7      Q.    Right.  The due date --

8      A.    So --

9      Q.    I'm sorry.  The due date for the invoice, right?

10     A.    Yeah.

11     Q.    Okay.  So the $380, that was due August 5th, right?

12     A.    Yeah.

13     Q.    Okay.  So -- and, again, let's -- you said that you

14     received instructions from Ms. Milliron.  Originally you

15     told the Government that you'd received an email.  You

16     didn't receive an email from her, did you?

17     A.    No, I usually received emails from her.  I couldn't

18     think whether it was an email or a phone call, but it

19     definitely was a phone call.

20     Q.    Okay.  Let's go on down further in the invoice, please.

21            Now highlight for me the propofol section, please,

22     Mr. Reyes.

23            Okay.  You -- you described -- you said that there

24     was a bottle of propofol?

25     A.    Yeah.

CROSS - HOUCK

1    Q.    Okay.  Now look over here under "Unit Size."

2    A.    Yeah.

3    Q.    Okay.  Can you highlight "RX."

4          So there's actually five in the box; isn't that

5    correct?  It's a box of five?

6    A.    Yes, I see that.

7    Q.    Okay.  So, memory-wise now -- and, again, we're going

8    back in time and trying to recall what happened.  It's a box

9    of five of the propofol, not a single vial that just

10   appeared out of nowhere.  It's a box of five; is that

11   correct?

12   A.    That's what it says, yeah.

13   Q.    Okay.  And the Narcan that was obviously ordered, too,

14   right?

15   A.    Yeah.

16   Q.    From time to time, it's pretty clear there would be

17   drugs that would be ordered that you may not recognize; is

18   that fair to say?

19   A.    Repeat your question.

20   Q.    Sure.  Don't recognize why they -- why Narcan was being

21   ordered, but that's if someone has a heroin overdose, you

22   give them the --

23   A.    Yeah, I know what it is.  All the drugs were always

24   ordered in the Greensburg office because that's where his

25   license was and that's where I worked.

1731

CROSS - HOUCK

1     Q.    His license.  Because -- you can't just order up

2     Schedule 1 drugs like the Halcion --

3     A.    Yeah.

4     Q.    There's a license involved in that, right?

5     A.    Yeah.

6     Q.    Okay.  So this particular order, he comes in and he

7     tells you before he goes away -- and likely it's July --

8     "Hey, I need this in case there's an accident"?

9     A.    Yes.

10    Q.    Right.  Okay.  And do you know how many times he went

11    over to Africa during that time period?  Was it once, was it

12    twice, or do you know?

13    A.    I only know of once.

14    Q.    Okay.  Now just as far as with Ms. Milliron, I just

15    want to make sure:  You didn't -- it's fair to say you had

16    some issues with her as a manager?

17    A.    Not really.

18    Q.    Okay.  Who's Little Jordan?

19    A.    She was a girl that came on to help us out.

20    Q.    Okay.  She was what, 19 -- 17, 18, 19, at the time?

21    A.    She was 19.

22    Q.    A friend of your daughter's?

23    A.    Yeah.

24    Q.    And Lori actually said, "She's not qualified, we can't

25    have her working here," and told her to go home, right?

1732

CROSS - HOUCK

1    A.    Yeah.    Yeah.

2    Q.    You were upset about that a little bit, weren't you,

3    ma'am?

4    A.    At the time, but not -- not now.

5    Q.    Okay.    At the time -- you were saying "at the time."

6    Didn't you continue to have issues about that incident,

7    about Little Jordan many years later in your text messages

8    to AnaBianca Rudolph?

9    A.    Well, that was just last summer.

10   Q.    Right.    Okay.    So when -- okay.    And when you had this

11   issue just last summer, did you not say to AnaBianca

12   Rudolph, "Lori separated us and you were my only reason for

13   staying.    OMG.    After she did that, I was done.    Plus I hate

14   her.    She caused all this."    Do you remember that text?

15   A.    I'm -- Ana and I had a lot of texts.

16   Q.    Right.    Well, ma'am, if this is your text message to

17   Ana Rudolph, are you denying you typed that text?

18   A.    No.    No.

19   Q.    Now just as far as when you actually mentioned the

20   situation about the propofol, that wasn't until after all

21   this was on the news in 2021, or 2022 -- or sorry, 2022;

22   isn't that right?

23   A.    No.    I have been thinking about this for years.

24   Q.    Okay.    Thinking about it for years, you continued to

25   work at the practice for all those years on and off,

1733

CROSS - HOUCK

1    right?

2    A.    On and off, yeah.

3    Q.    Okay.  Frankly, there were times that you had had some

4    issues at work as far as showing up on time and

5    reporting --

6    A.    I -- I had two hip replacements and a shoulder

7    surgery --

8    Q.    But --

9    A.    -- yeah, I did.  Yeah.

10   Q.    Even beyond that, ma'am, it was like -- you recall over

11   Memorial Day you had an issue that your car had broken down

12   and you told Ana, "Hey, my car's broken down again."  Do you

13   remember that?

14   A.    I -- yeah, I did have car issues.  I had a lot of

15   surgeries.  There was a lot of issues.  I -- I should have

16   been off a lot more than I was.

17   Q.    The fact is, though, if this -- this is something you

18   said that it bothered you, you continued to work with the

19   company, you continued to work with Dr. Rudolph, and you

20   told Ana and everybody else it's a great place to work,

21   didn't you?

22   A.    I -- I liked sedation dentistry.  I liked treating the

23   patients.  I liked making over smiles.  I could do a lot

24   more for people at that office.

25   Q.    I understand.

1734

CROSS - HOUCK

1    A.    And like, you know, that was my passion, so it was

2    really important to me to be there, and I liked working with

3    Ana.

4    Q.    Okay.  But I just want to -- the time you actually said

5    something -- or volunteered to say something to the FBI

6    about this thing that you're saying was out of the ordinary,

7    was after all this was on the news and you had read reports;

8    isn't that right?

9    A.    Yeah.  I mean, this is something that's been on my

10   shoulders for years.

11   Q.    Ma'am, my question, though, is:  When you go and you

12   talk to the FBI and they interviewed you, the first time you

13   did that was after you had read this on the news --

14   A.    It was after Dr. Rudolph was arrested.

15         THE COURT:  Ma'am, ma'am, ma'am, ma'am.  The way it

16   works here is the attorney asks the questions.  Let him

17   finish the question.  You'll answer.  He'll wait for you to

18   complete your answer and then he'll ask you the next

19   question.

20         THE WITNESS:  Okay.

21         THE COURT:  All right.

22   BY MR. DILL:

23   Q.    Ma'am, the first time that you had said this to anybody

24   in the authorities was after you had read all the reports

25   that were in the media; isn't that true?

1735

CROSS - HOUCK

1  A.    Yes.

2  Q.    Okay.  And on that point in the media, you, yourself,

3  had appeared on TV.

4  A.    Yeah.

5  Q.    Okay.  Now -- and that was on, what, 48 Hours?

6  A.    Yes.

7  Q.    Okay.  Now the family didn't ask you to go be their

8  spokesperson on 48 Hours, did they?

9  A.    No.

10 Q.    Okay.  Matter of fact, they were upset with you for

11 going on 48 Hours and talking to them, right?

12 A.    AnaBianca was.

13 Q.    Okay.  It wasn't just 48 Hours.  You've talked to

14 national magazines, right?

15 A.    Yes.

16 Q.    Okay.  Talked to somebody named Matt Sullivan --

17 A.    Yes.

18 Q.    -- right?

19       And you talked to them off the record, but you

20 still talked to them, right?

21 A.    Yes.

22 Q.    You read the article, right?

23 A.    Yes.

24 Q.    Okay.  So -- and then I assumed you had never been on

25 national TV prior to this, have you, ma'am?

CROSS - HOUCK

1    A.    No, I have.    I've been in movies.

2    Q.    Okay.    You've been -- -- all right.    But just as far as

3    we're -- you're identified as you, Sherry Houck, this isn't

4    a normal thing for you to be on CBS on a Saturday night,

5    correct?

6    A.    No.

7    Q.    Okay.    And that's not the only media outlet you've

8    talked to, ma'am, is it?

9    A.    No.

10    Q.    Okay.    ABC also --

11    A.    Yeah.

12    Q.    -- right?

13          Did you already film with them?

14    A.    Yeah.

15    Q.    Okay.    So you -- and where was that, where you filmed

16    with them?

17    A.    In New York.

18    Q.    Okay.    And you live where?

19    A.    Greensburg.

20    Q.    Okay.    So did you go there on your own dime to New

21    York, or did they put you up somewhere?

22    A.    No, they paid for my hotel.

23    Q.    Okay.    And downtown Manhattan, right?

24    A.    Yeah.

25    Q.    I assume that it was a pretty special trip to go to

CROSS - HOUCK

1  downtown Manhattan?

2  A.   It was a quick trip.

3  Q.   Well, but it was fun, wasn't it, to go to downtown

4  Manhattan?

5  A.   I've been there before.

6  Q.   Didn't you post on Facebook pictures of you at the JW?

7  A.   Yeah.

8  Q.   Okay.  So, again, you may have been there before, but

9  now you've appeared on one media outlet.  Did they offer you

10  some money to appear?

11  A.   Absolutely not.

12  Q.   Okay.  But they did pay for your trip, right?  Put you

13  up in the hotel?

14  A.   Yes.

15  Q.   Also they -- when they film these things, where's --

16  and it was -- with 48 Hours, they -- they take you in a room

17  and they put on -- they give you make-up, right?

18  A.   Not all of them, no.

19  Q.   Okay.

20  A.   But they did for 48 Hours.

21  Q.   48 Hours, they gave you make-up, and it's special

22  lighting and all that type of thing, right?

23  A.   Yes.

24  Q.   Okay.  And I assume when that was on, your family all

25  turned it on and watched it?

CROSS - HOUCK

1    A.    Absolutely not.  I haven't even seen it.  And no one in

2    my family has.

3    Q.    Nobody in your family's seen the national TV show that

4    you were on and you knew you were going to be on?

5    A.    No.  My daughter and my husband and I have not watched

6    it.

7    Q.    Okay.  So although this is a fairly special occasion,

8    and now you've been -- they've come up to Pittsburgh to film

9    you, they do make-up, you never told anybody about that and

10   you never heard from anybody that, "Hey, I saw you on TV"?

11   A.    I've heard that from a couple of people, but I didn't

12   even know it was going to be filmed -- or shown before the

13   trial --

14   Q.    What --

15   A.    And I didn't know it was going to be shown when it was

16   shown.

17   Q.    You certainly knew when you sat down and they put a

18   microphone on you that people were going to see it, right?

19   A.    I thought I would have to sign something that it would

20   be shown later -- like, because it wasn't going to be shown

21   until after the trial.

22   Q.    But --

23   A.    I wasn't sure.

24   Q.    All right.  Are you saying that they showed this

25   network show without your permission?

CROSS - HOUCK

1    A.    I never signed anything.  But from what I know now they

2    didn't need any kind of signature.  So I wasn't going to be,

3    I guess, privy to when it was shown.

4    Q.    This is something you did voluntarily because you

5    wanted to, right?

6    A.    I sort of developed a relationship with a reporter

7    and -- yeah, I ended up talking to her.  Yeah.

8    Q.    Was this an Elaina?

9    A.    Yeah.

10   Q.    From 48 Hours?

11   A.    Uhm-hum.

12   Q.    Right.  So -- but you certainly knew -- you weren't

13   forced to do it; you did it voluntarily, right?

14   A.    Yeah.

15   Q.    All right.

16   A.    Yeah.

17   Q.    You were -- no other member of the practice, nobody

18   else that worked at Three Rivers went on TV, but you did.

19   Did you know that?

20   A.    No, I know that.

21   Q.    Okay.  And you know that because you heard that or you

22   watched that?

23   A.    I didn't watch it.

24   Q.    Okay.  But, nonetheless, of all the people who worked

25   there, you're the one who's on TV, even though you knew the

1740

CROSS - HOUCK

1    family was not cool with that, right?

2    A.    I did go -- I go on there and I did do that, but I

3    didn't know it was going to be shown before the trial.

4    Q.    And so then certainly when you talked to the media,

5    Matt Sullivan, ABC, NBC, all these different things, you're

6    doing that voluntarily so you can be on TV?

7    A.    No.  No.

8    Q.    That has nothing to do with it?

9    A.    Hhm-uhm.

10   Q.    Okay.

11            MR. DILL:  Just a moment, Your Honor.

12            THE COURT:  All right.

13            MR. DILL:  No further questions, Your Honor.

14            MS. MOSS:  Your Honor, may we have --

15            THE COURT:  I'm not hearing what you're saying.

16   Pull the mic towards you.

17            MS. MOSS:  Your Honor, may we go sidebar very

18   briefly, please?

19            THE COURT:  Sure.

20        (Discussion at sidebar)

21            MS. MOSS:  I apologize for interrupting.  For some

22   reason I am starting to feel a little bit nauseous.  Do you

23   mind if I excuse myself for a couple of minutes.

24            THE COURT:  Sure.  Is that why you wanted to come

25   here?

CROSS - HOUCK

1    MS. MOSS:  Yes.  Yes.

2    THE COURT:  Do you want me to say anything to the

3    jury?

4    MS. MOSS:  No, no, no, no.  That's okay.  And

5    Mr. Markus will cover the witness if I could just --

6    THE COURT:  No, you can -- what time is it?  I

7    mean, if you want -- if it will be better for you to stay

8    away during the lunch hour, that's fine, too.

9    MS. MOSS:  Okay.

10    THE COURT:  I don't need -- if you're not going to

11    be -- if you're not responsible for this witness, I don't

12    need you to be there.

13    MS. MOSS:  All right.  Thank you.

14    MR. DILL:  Sorry I had that effect on her.

15    THE COURT:  Okay.

16    (End of discussion at sidebar)

17    THE COURT:  One second, Mr. Markus.  Ladies and

18    gentlemen of the jury, because I know the jurors notice

19    everything in the courtroom, you've just noticed that

20    Ms. Moss left.  It has no significance whatsoever, and don't

21    be asking yourself why did she leave.  There's no reason for

22    it that you need to know about and it's not important to

23    anything we're considering.

24    Mr. Markus.

25    MR. MARKUS:  Thank you.  Thank you, Your Honor.

1742
CROSS - HOUCK

1                        **CROSS-EXAMINATION**

2    **BY MR. MARKUS:**

3    Q.   Good afternoon, ladies and gentlemen.  Good afternoon,

4    counsel -- not afternoon, still morning.

5          Good morning, Ms. Houck.  My name is David Markus.

6    I represent Dr. Rudolph and I'm going to ask you a couple of

7    questions, if I might.  Is that okay?

8    A.   Yeah.

9    Q.   Okay.  I think Mr. Dill was asking you about all the

10    media you've spoken to.  One person that you would not agree

11    to speak to is me, right?

12    A.   My lawyer made that decision.

13    Q.   And you have a lawyer in this case?

14    A.   Yeah.

15    Q.   And when I asked to speak with you, you and your lawyer

16    told me no, correct?

17    A.   My lawyer answered for me before I even knew you

18    emailed me.

19    Q.   Okay.  So did he make the decision or did you --

20    A.   He made the decision.

21    Q.   Okay.  Well, I'd like to speak to you now because the

22    prosecutor said that this was out of the ordinary, the

23    ordering of propofol.  And I can see it's been weighing on

24    you, right?

25    A.   Yeah.

1743

CROSS - HOUCK

1   Q.   I'd like to have a little discussion with you because

2   it's not out of the ordinary at all.  I'm going to ask you a

3   couple of questions about it, okay?  Is that all right?

4   A.   Yes.

5   Q.   Now we talked about how this was ordered in the summer

6   of 2016, remember that?

7   A.   Yeah.

8   Q.   Are you aware that at the time Dr. Rudolph and Bianca

9   Rudolph were preparing to go on two different hunts in

10  Africa?  Are you aware of that?

11  A.   I wasn't -- no.

12  Q.   Are you aware that there had been an accidental

13  shooting in Africa where a leopard had charged them and they

14  had shot a tracker in Africa?  Are you aware of that?

15  A.   No.

16  Q.   Are you aware that Dr. Rudolph freaked out after that

17  accident and ordered body armor?  Are you aware of that?

18  A.   No.

19  Q.   Are you aware that he ordered a baseball helmet?

20  A.   No.

21  Q.   Are you aware that he ordered sutures and bandages?

22  A.   You mean for his personal use?

23  Q.   No, to take to Africa because he had freaked out about

24  this leopard attack.  Are you aware of that?

25  A.   No.

1744

CROSS - HOUCK

1  Q.   Are you aware that he ordered Lidocaine?

2  A.   We always had Lidocaine there, so -- no.

3  Q.   Are you aware that he brought all of these things along

4  with the propofol to Africa?

5  A.   No.

6  Q.   Would it ease your concern and ease this weight on your

7  shoulders to know that he brought all of these things not

8  for any nefarious reason but because he was afraid of this

9  leopard attack?  Would that help you at all in this?

10  A.   I have no idea.

11  Q.   Okay.  Because you're aware that he told you that this

12  was in case of an accident that he was bringing this

13  propofol, right?

14  A.   Yeah.

15  Q.   Okay.  And are you aware, when he was referring to

16  that, he was referring to this leopard incident?

17  A.   He didn't say that.  When he told me it was in case of

18  an accident, I got him some bandages and tape and -- to give

19  him along with the package, and that  . . .

20  Q.   Okay.  Are you aware that he always brought a medical

21  kit with him to Africa?

22  A.   I would not know what he took to Africa.

23  Q.   Okay.  Now I think you mentioned that in some time in

24  2020, he made a statement to you about being arrested.  Do

25  you remember saying that?

1745

CROSS - HOUCK

1   A.   No.

2   Q.   You don't remember saying that on direct?

3   A.   I didn't say that.  I said he mentioned that he might

4   go to jail.

5   Q.   Okay.  Are you aware that at the time he made the

6   statement to you, he had learned that the FBI was

7   investigating him?

8   A.   No.

9   Q.   Are you aware that after he heard that, he didn't flee

10  the country, he didn't run away?  He hired a lawyer to fight

11  the case, right?

12  A.   I guess.

13  Q.   Yeah.  I mean, you didn't hear about him running away

14  or anything like this after he found out that the FBI was

15  investigating, correct?

16  A.   No.

17  Q.   In fact, what you heard was that he was fighting this

18  case because he believes he's innocent, correct?

19  A.   At that time I didn't know anything about this.

20  Q.   Okay.  Thank you, ma'am.  I have nothing further.

21          THE COURT:  All right.  Redirect.

22                      REDIRECT EXAMINATION

23  BY MR. FIELDS:

24  Q.   You were just asked whether Dr. Rudolph said anything

25  about his innocence.

REDIRECT - HOUCK

1    A.    Yeah.

2    Q.    What did he say to you?

3    A.    He said that he was probably going to be going to jail.

4    Q.    Is that the same as innocence?

5    A.    What?

6    Q.    Is that the same as innocence?

7    A.    No.

8    Q.    You were also asked about propofol and leopard attacks.

9    Do you remember those questions?

10   A.    Yes.

11   Q.    What is propofol used for?

12   A.    It's a -- it can -- it sedates a person.

13   Q.    Puts them to sleep?

14   A.    Pretty much.

15   Q.    Can you think of any situations where that would be

16   useful if you're being attacked by a leopard?

17   A.    No.

18   Q.    You were also asked a lot of questions about the media.

19   Do you remember those questions?

20   A.    Yeah.

21   Q.    Why did you decide to talk to the media?

22   A.    I thought I was protecting Ana.

23   Q.    How so?

24   A.    Just if somebody else talked and said not so nice

25   things, you know.  And I was proud of working there and our

REDIRECT - HOUCK

1   treatment.  That's all.

2   Q.   So you mentioned "nice things."  What do you mean about

3   "nice things"?

4   A.   I mean, just that I liked working there and I respected

5   them and -- you know, it wasn't all terrible.

6   Q.   You mentioned also -- or you were asked on cross about

7   this text message about Lori.  Do you remember those

8   questions?

9   A.   Yeah.

10  Q.   Do you hate Lori?

11  A.   No.  No.

12          MR. FIELDS:  Your Honor, I have no further

13  questions.  The Government would release this witness.

14          THE COURT:  All right.  May this witness be excused

15  for the defendants?

16          MR. MARKUS:  Yes, Your Honor.

17          MR. DILL:  Yes, Your Honor.

18          THE COURT:  All right.  Ms. Houck, ma'am.

19          THE WITNESS:  I'm --

20          THE COURT:  Thank you for your testimony.  You're

21  excused and you may step down.

22          The Government may call its next witness.

23          MR. FIELDS:  Thank you, Your Honor.  The United

24  States calls Levi Weaver.

25          COURTROOM DEPUTY:  Step up to the witness stand.

DIRECT - WEAVER

1    Raise your right hand.

2                LEVI WEAVER, GOVERNMENT'S WITNESS, SWORN

3                COURTROOM DEPUTY:  Please be seated and remove your

4    mask for me.  Please state your name for the record and

5    spell your first and last name for us.

6                THE WITNESS:  Levi Weaver.  L-e-v-i, W-e-a-v-e-r.

7                MR. FIELDS:  May I --

8                THE COURT:  You may proceed, counsel.

9                         DIRECT EXAMINATION

10   BY MR. FIELDS:

11   Q.    Mr. Weaver, have you worked with Dr. Lawrence Rudolph?

12   A.    Yes.

13   Q.    Have you also worked with Lori Milliron?

14   A.    Yes.

15   Q.    Did you observe the two of them together?

16   A.    Yes.

17   Q.    Are you prepared to tell the jury about what you

18   observed?

19   A.    Yes.

20   Q.    What's your educational background?

21   A.    I have an associate's in science degree in dental

22   hygiene.

23   Q.    And what's been your career?

24   A.    I was a hygienist for a little while and then

25   management of dental practices.

1749

DIRECT - WEAVER

1    Q.    When did you first meet Dr. Lawrence Rudolph?

2    A.    At The Dentistry.

3    Q.    What was The Dentistry?

4    A.    The Dentistry was a group dental practice in

5    Pittsburgh.

6    Q.    Do you remember approximately when you first met him?

7    A.    It was approximately either late winter or early spring

8    of 2006.

9    Q.    What was his position at The Dentistry?

10   A.    He was the dentist and an owner.

11   Q.    What was your position when you first started?

12   A.    Dental hygienist.

13   Q.    Did your position change?

14   A.    It did.

15   Q.    To what?

16   A.    Office manager.

17   Q.    What were your responsibilities there as a manager?

18   A.    The manager manages staff, talked to patients about

19   treatment.  Helped out with insurance, posting insurance

20   payments.  Just a little bit of everything with the

21   practice.

22   Q.    Now you also mentioned you know Lori Milliron?

23   A.    I do.

24   Q.    When did you first meet her?

25   A.    Approximately the same time.

1750

DIRECT - WEAVER

1    Q.    Where was she working?

2    A.    At The Dentistry.

3    Q.    What was her position?

4    A.    Her position was dental hygienist.

5    Q.    While you were a manager, were you her supervisor?

6    A.    You could say that, yes.

7    Q.    Did you see Dr. Rudolph and Ms. Milliron interact

8    while -- with one another while you were at the dentistry?

9    A.    Yeah, a little bit.  You know, they had a -- what

10   seemed to be a pretty good relationship.

11   Q.    Do you know whether Dr. Rudolph was married during that

12   time?

13   A.    I do.

14   Q.    Who was his wife?

15   A.    Bianca Rudolph.

16   Q.    Did she ever come to The Dentistry?

17   A.    I don't recall seeing her.

18   Q.    At some point, did Dr. Rudolph leave The Dentistry?

19   A.    He did.

20   Q.    Approximately when was that?

21   A.    I can't give a really good, solid answer for that.  I

22   would say probably approximately 2008 or 2009, but I'm not

23   positive.

24   Q.    What about Lori?  How long did she work there?

25   A.    She left not long after he was gone.

1751

DIRECT - WEAVER

1   Q.   Before -- after he left?

2   A.   After he left.

3   Q.   Did you keep working at The Dentistry?

4   A.   I did.

5   Q.   When did you stop working there?

6   A.   Approximately the winter of 2013.  I think it was

7   February, maybe.

8   Q.   Why did you stop working there?

9   A.   I was fired.  I was accused of taking money.

10   Q.   What happened as a result of that accusation?

11   A.   I was charged.  I was not convicted.

12   Q.   What happened in terms of you -- you know, you were

13   charged.  What happened?

14   A.   I was arrested and we went -- I had to get an attorney

15   and at the end I was given ARD and a small amount of

16   restitution.

17   Q.   You said you had no conviction?

18   A.   No conviction.

19   Q.   After you were fired from The Dentistry, did you find

20   another job?

21   A.   I did.

22   Q.   Where?

23   A.   At Dr. Dee Bartelow's office.  It was a dental office

24   in Bridgeville.

25   Q.   How long did you work there?

1752

DIRECT - WEAVER

1    A.    I was there about four or five months.

2    Q.    And where did you work after that?

3    A.    Three Rivers Dental Group.

4    Q.    What was Three Rivers Dental Group?

5    A.    That was a dental group in Pittsburgh that Larry

6    Rudolph owned.

7    Q.    Where were its offices?

8    A.    There was an office in Green Tree, one in Greensburg,

9    and then one in Jennerstown.

10   Q.    Who did you interview with to get that job?

11   A.    Dr. Rudolph.

12   Q.    Were you asked why you left The Dentistry?

13   A.    Yes.

14   Q.    What did you tell them?

15   A.    I told them what happened.  And he had already known

16   about it.

17   Q.    Did you get the job anyways?

18   A.    I did.

19   Q.    Which office did you work in?

20   A.    I worked in all three, but I started in the Green Tree

21   office.

22   Q.    What was your position?

23   A.    Manager.

24   Q.    As a manager, what were your responsibilities?

25   A.    Managing the -- the staff, insurance payments,

DIRECT - WEAVER

1    presenting treatment plans to the patients.  About the same.

2    Q.    Over what period of time, approximately, did you work

3    at Three Rivers?

4    A.    I was at Three Rivers for -- in total, I think it was

5    probably August of 2013 and then until -- let me think --

6    approximately four years.  I think the winter of 2017.

7    Q.    Did you leave on good terms?

8    A.    I was terminated.

9    Q.    What was the stated reason for the termination?

10   A.    Performance was one and then I was accused of sexual

11   harassment a few months before that, and that seems to be in

12   conjunction with the termination.

13   Q.    Let's go back to when you first started.  Were you the

14   only former Dentistry employee at Three Rivers?

15   A.    I was not.

16   Q.    Who else was there?

17   A.    Lori Milliron.

18   Q.    What were her responsibilities?

19   A.    She was in charge of the managers and all operations,

20   really.  Like an operations manager, I guess you could say.

21   Q.    Now while you were at Three Rivers Dental Group, were

22   you friends with another dentist?

23   A.    Yes.

24   Q.    What was his name?

25   A.    Dr. Van Martino.

1754

DIRECT - WEAVER

1    Q.    Did you work on a business opportunity with him?

2    A.    We did.

3    Q.    What was the opportunity?

4    A.    It -- the opportunity was Dr. Rudolph was interested in

5    selling Three Rivers Dental as a whole.  And over a couple

6    of years of us both working, Dr. Rudolph decided that

7    Jennerstown would be an opportunity that Dr. Van Martino

8    could purchase as a franchise.

9    Q.    It was a franchise?

10   A.    Uhm-hum.

11   Q.    Were you involved in those discussions?

12   A.    A little bit.  Dr. Van Martino and I talked mostly

13   about, you know, the final, you know --

14              MR. MARKUS:  Objection, Your Honor.  Hearsay.

15              THE COURT:  Sustained.

16   BY MR. FIELDS:

17   Q.    Let's talk about:  Did you have direct conversations

18   with Dr. Rudolph about selling the business?

19   A.    In the beginning, the -- in between him and Dr. Van

20   Martino when all three offices were for sale.

21   Q.    What value did Larry put on his businesses at that

22   time?

23   A.    In the beginning, I think it was 1.7 million.

24   Q.    Did he eventually sell one of those businesses?

25   A.    He did.

DIRECT - WEAVER

1    Q.    Which one?

2    A.    The Jennerstown office.

3    Q.    For how much?

4    A.    It was approximately 650,000.

5    Q.    Now at Three Rivers Dental Group, did patients

6    sometimes pay in cash?

7    A.    They did.

8    Q.    Approximately what percentage do you think paid in

9    cash?

10   A.    Not a huge percentage.  I don't think I could give a

11   good percentage, really.  I mean, there was a good bit.

12   Q.    Where was the cash kept?

13   A.    In a safe in the office.

14   Q.    Did you ever see Lori Milliron around the safe?

15   A.    Not exactly around the safe, but I did see her go into

16   the rooms where the safe was kept.

17   Q.    What would she do?

18   A.    She would go into the room and then sometimes she would

19   just leave the office.

20   Q.    Were you ever given a cash bonus during your time at

21   Three Rivers?

22   A.    I was.

23   Q.    How much?

24   A.    Anywhere between 200 and a thousand, if I recall

25   correctly.

1756

DIRECT - WEAVER

1    Q.    How frequent was that?

2    A.    Fairly sporadic.

3    Q.    While you were at Three Rivers, did you meet someone

4    named Anna Grimley?

5    A.    Yes.

6    Q.    What office did she work in?

7    A.    She worked in the Jennerstown office.

8    Q.    What were her responsibilities?

9    A.    She was the manager.

10   Q.    All right.  Three Rivers Dental Group, did they have

11   business credit cards?

12   A.    I'm sure they did.

13   Q.    Were you ever given a credit card?

14   A.    I was not.

15   Q.    Did you have any perks at Three Rivers?

16   A.    Not really, no.

17   Q.    Larry and Lori at Three Rivers, did they work there the

18   entire time you worked there?

19   A.    Yes.

20   Q.    Did Lori Milliron have a title?

21   A.    Yes.  Executive administrator, I think it was.

22   Q.    Was she your boss?

23   A.    She was.

24   Q.    Would Lori come to the offices?

25   A.    She would.

DIRECT - WEAVER

1    Q.    When?

2    A.    There was no set schedule.

3    Q.    Your workspace was in Greensburg?

4    A.    So I worked out of all three at one point.  I was in

5    Green Tree first, and then went to Greensburg for a while,

6    and then sporadically in Jennerstown.

7    Q.    Let's talk about Green Tree.  Could you see the parking

8    lot from your workspace in Green Tree?

9    A.    In the original office, you could see the parking lot.

10   Once we moved, though, you really -- you could see an upper

11   parking lot, but there was also one underneath the --

12   Q.    What about at Greensburg?

13   A.    Greensburg had windows in the front; you could see the

14   parking lot.

15   Q.    When Lori came to work, who would she come with?

16   A.    Usually Dr. Rudolph.

17   Q.    How did she get to work?

18   A.    Usually they drove together.

19   Q.    Was she there all the time?

20   A.    No.

21   Q.    Where did she usually work?

22   A.    She went to all the offices.  I would assume more from

23   home.

24   Q.    Did she come to the office by herself?

25   A.    She would sometimes, but normally she was accompanied

1758

DIRECT - WEAVER

1    by Dr. Rudolph.

2    Q.   Did you ever socialize with Lori and Larry?

3    A.   I had.

4    Q.   Describe some of those social occasions.

5    A.   Drinks --

6              MR. MARKUS:  Objection, Your Honor.  Relevance.

7              MR. FIELDS:  He's going to talk about his

8    observations of them together, Your Honor.

9              THE COURT:  Okay.  Overruled.

10             You may answer, sir.

11             THE WITNESS:  Thank you.  We would have drinks

12   sometimes after work.  Sometimes there would be meetings

13   and, you know, occasionally just drinks together after work.

14   BY MR. FIELDS:

15   Q.   What impression did you get?

16   A.   They had a good relationship.

17   Q.   Was there once an office meeting at a hotel in

18   Greensburg?

19   A.   Yes.

20   Q.   Were Lori and Larry there?

21   A.   Yes.

22   Q.   What did you observe at that meeting at the hotel?

23   A.   After the meeting, you know, we had drinks all

24   together, and we all stayed there.

25   Q.   Where did Lori and Larry stay?

DIRECT - WEAVER

1    A.    I would assume there.

2    Q.    At some point did Dr. Rudolph move to Arizona?

3    A.    Yes.

4    Q.    Approximately when was that?

5    A.    I can't answer with a good date.  I can't -- I can't

6    recall exactly.

7    Q.    Do you remember how long you'd been working there

8    before that happened?

9    A.    Probably -- probably approximately two years, I

10    think.

11    Q.    After he moved, did he come to the practice less

12    frequently or just as frequently?

13    A.    Less frequently.

14    Q.    Even though he came to the office less frequently, who

15    would he come in with?

16    A.    Normally Lori Milliron.

17    Q.    During your time at Three Rivers, were you ever given

18    instructions on what to do if someone called to ask if Lori

19    worked there?

20    A.    Yes.

21    Q.    What was the instruction?

22            MR. MARKUS:  Objection, Your Honor.  Who gave the

23    instruction, I think, because it may call for hearsay.

24            MR. FIELDS:  Your Honor --

25            THE COURT:  Go ahead.

DIRECT - WEAVER

1       MR. FIELDS:  Instructions are not hearsay.  It's

2  *United States v. Cesareo-Ayala*, 576 F.3d 1120, and the pin

3  cite is 1127.  That's Tenth Circuit 2009.

4       THE COURT:  Mr. Markus.

5       MR. MARKUS:  It's a statement out-of-court offered

6  for the truth, Your Honor.

7       MR. FIELDS:  They're given for their effect on the

8  listener, Your Honor, not for the truth.

9       THE COURT:  Is where you're going with this is to

10 describe what he did in response?

11      MR. FIELDS:  Yes.  And what instructions were

12 given.

13      THE COURT:  All right.  I'll allow it.  Overruled.

14 BY MR. FIELDS:

15 Q.   What was the instruction?

16 A.   The instruction that she does not work there any

17 longer.

18 Q.   Did you ever carry out that instruction?

19 A.   I don't recall.  I don't recall then.

20 Q.   Did you give other people that instruction?

21 A.   Yes.

22 Q.   Did you ever observe Larry and Lori having arguments?

23 A.   I had seen that before.

24 Q.   What happened after one of those arguments?

25 A.   She was -- they were both in the Jennerstown office and

DIRECT - WEAVER

1    there was an argument.  And they had rode up together and he

2    had left and I took her home.  I had to take her home back

3    to her house.

4    Q.    Because she didn't have her own car there?

5    A.    Correct.

6    Q.    While you worked at Three Rivers, did you know anyone

7    named Sherry Houck?

8    A.    Yes.

9    Q.    What was her job?

10   A.    Dental assistant.

11   Q.    Did she place orders for medical supplies?

12   A.    Dental supplies, yes.

13   Q.    Would she interact with Lori?

14   A.    Uhm-hum.

15   Q.    How?

16   A.    Yes.  The way I -- the way everyone else did.  I mean,

17   Lori would come in the offices and, you know, just normal

18   day-to-day.

19   Q.    Did she have any responsibilities with regard to

20   packages coming to the office?

21   A.    Sherry?

22   Q.    Yeah.

23   A.    Yeah.  So the dental assistants would unpack dental

24   supplies.

25   Q.    Did Three Rivers Dental Group practice something called

DIRECT - WEAVER

1    sedation dentistry?

2    A.    Yes.

3    Q.    What is that?

4    A.    That is when a patient comes in that is fearful of the

5    dentist, and they get their treatment done while they're

6    sedated.

7    Q.    Who performed the anesthesiology?

8    A.    Ambulatory Anesthesia.  And then later on the dentists

9    were -- took classes to get an extra restrict -- or like a

10   extra piece to their license so that nurse anesthetists

11   could come in and give anesthesia as well.

12   Q.    Do you remember approximately when that happened?

13   A.    So I think Jennerstown started using them, I think

14   right after COVID, if I'm not mistaken.  We were last to hop

15   on board with nurse anesthetists in Jennerstown.

16   Q.    I forgot to ask you:  Back when we were talking about

17   this instruction you were given, do you remember

18   approximately when you were given that instruction?

19   A.    I do not.

20   Q.    While you were at Three Rivers, did you see

21   Dr. Lawrence Rudolph actually treating patients?

22   A.    I had seen him a couple of times, yes.

23   Q.    Did he have any role in the anesthesia?

24   A.    Not while I was there.

25   Q.    In your role as a manager there, did you become

DIRECT - WEAVER

1    familiar with the kinds of drugs that were used for

2    anesthesia?

3    A.    Not -- I mean, the -- there's a couple that I can

4    recall, but not -- I mean, there's a bunch of different ones

5    so, no, not really.  That was up to the doctor and the nurse

6    anesthetist.

7    Q.    Which ones do you recall?

8    A.    Versed, propofol.  All that I can think of right now.

9    Q.    Who was in charge of ordering those anesthesia drugs

10   while you were a manager at Three Rivers?

11   A.    So in Jennerstown when the nurse anesthetists were

12   there, the nurse anesthetist would do an inventory, and

13   Dr. Van Martino and the nurse anesthetist would have to

14   order the drugs.

15   Q.    While you were at Three Rivers Dental Group, were you

16   ever asked to get propofol for a dentist?

17   A.    No.

18              MR. FIELDS:  Your Honor, may I have a moment?

19              THE COURT:  You may.

20              MR. FIELDS:  No further questions, Your Honor.

21              THE COURT:  All right.  Thank you.

22   Cross-examination.

23                         CROSS-EXAMINATION

24   BY MR. DILL:

25   Q.    Just briefly.  Now -- how are you doing?  I'm John

DIRECT - WEAVER

1    Dill.

2              I've asked this, but I just want to clarify.  The

3    offices are kind of spread out; is that right?

4    A.    Yes.

5    Q.    And you would see Dr. Rudolph and Ms. Milliron, they

6    would go between the offices to check up and see what was

7    going on?

8    A.    Uhm-hum.

9    Q.    Is that correct?

10   A.    Yes, that's correct.

11   Q.    Sometimes she would come alone, sometimes she would

12   work remotely; is that right?

13   A.    Yes, correct.

14   Q.    Now as far as -- again, I think that you felt she was

15   above you.  You don't know what her compensation arrangement

16   was with the company?

17   A.    No.

18   Q.    Okay.  As far as payroll and all that, who -- who was

19   in charge of payroll?  Would that be Ms. Dancer?

20   A.    Yes.

21   Q.    Okay.  Theresa Dancer is in charge of payroll?

22   A.    Uhm-hum.

23   Q.    You haven't seen those types of things, correct?

24   A.    Correct.

25   Q.    There's some things called Dentrix.  Dentrix is the --

CROSS - WEAVER

1    what is Dentrix?

2    A.    Software.  It's the dental software program.

3    Q.    And that's where accountings would be made as to what

4    money comes in, how it's treated --

5    A.    Everything, uhm-hum.

6    Q.    Credit card, checks, all those types of things; is that

7    right?

8    A.    Yes.

9    Q.    That's all I have.  Thank you, sir.

10                        CROSS-EXAMINATION

11   BY MR. MARKUS:

12   Q.    Hello, Mr. Weaver.

13   A.    Hello.

14   Q.    You were talking about the sale of the Jennerstown

15   office for, what was it, 650,000 --

16   A.    I think it was approximately 650,000.

17   Q.    Are you aware that Dr. Rudolph was getting a franchise

18   fee of 170- -- 17,000 a month for that franchise?

19   A.    There was a franchise fee.  There was a payment for the

20   note and then a marketing fee.

21   Q.    The prosecutor didn't ask you about all that, so

22   Jennerstown was worth a lot more than 650-, wasn't it?

23   A.    I don't believe it was.

24   Q.    Well, he was getting paid for it.

25   A.    Sure.

REDIRECT - WEAVER

1    Q.    Yeah.  So it's worth whatever people are willing to pay

2    for it, right?

3    A.    Sure.

4    Q.    And he was getting paid a lot more than 650- because he

5    was getting 17 grand a month plus other things, right?

6    A.    Yes.

7    Q.    And that was just one of the many offices that Three

8    Rivers had, correct?

9    A.    Correct.

10   Q.    You don't know the value of the entire business, do

11   you?

12   A.    No.

13   Q.    Okay.  Thank you.  Nothing further.

14            THE COURT:  Redirect.

15                    REDIRECT EXAMINATION

16   BY MR. FIELDS:

17   Q.    Mr. Weaver, didn't you testify on direct that there

18   were negotiations to purchase the entire group?

19   A.    Yes.

20   Q.    What valuation did Dr. Rudolph put on the entire group

21   during those negotiations?

22   A.    1.7 million.

23            MR. FIELDS:  No further questions, Your Honor.

24            THE COURT:  All right.  May this witness be excused

25   for the Government?

REDIRECT - WEAVER

1    MR. FIELDS:  Yes, Your Honor.

2    THE COURT:  For the defendants?

3    MR. MARKUS:  Yes, Your Honor.

4    MR. DILL:  Yes, Your Honor.

5    THE COURT:  All right.  Mr. Weaver, thank you so

6  much for your testimony.  You're excused.  You may step

7  down.

8    THE WITNESS:  Thank you.

9    THE COURT:  All right, folks, instead of starting a

10  new witness, we'll take a slightly early lunch recess.

11  We'll be in recess until 1:20.

12    (Recess taken 12:18 p.m.)

13                      AFTERNOON SESSION

14    (In open court in the presence of the jury at 1:23

15  p.m.)

16    THE COURT:  The Government may call its next

17  witness.

18    MR. WINSTEAD:  Thank you, Your Honor.  The United

19  States calls Tom Griffin.

20    THE COURT:  Okay.

21    COURTROOM DEPUTY:  Please raise your right hand.

22     TOM GRIFFIN, GOVERNMENT'S WITNESS, SWORN

23    COURTROOM DEPUTY:  Thank you.  Please be seated and

24  remove your mask for us.  And then state your full name for

25  the record and spell your first and last name for us.

1768
DIRECT - WEAVER

1        THE WITNESS:  Good afternoon.  My name is Tom

2    Griffin.  T-o-m, G-r-i-f-f-i-n.

3        THE COURT:  You may proceed, counsel.

4        MR. WINSTEAD:  Thank you, Your Honor.

5                    DIRECT EXAMINATION

6    BY MR. WINSTEAD:

7    Q.    Good afternoon, sir.

8    A.    Good afternoon, sir.

9    Q.    Can you tell us where you work.

10   A.    I'm a private forensic consultant working out of

11   Colorado.

12   Q.    What do you consult in?

13   A.    I consult in forensic cases, crime scene cases, and

14   teaching of classes around the country.

15   Q.    What is the name of your organization you work for?

16   A.    The company is Bevel, Gardner Associates based in

17   Oklahoma.

18   Q.    What does that company do?

19   A.    The officers and partners conduct classes around the

20   country; and also taking cases from prosecution, defenses,

21   and law enforcement agencies to work.

22   Q.    What sort of background do the people that work there

23   have?

24   A.    Most of the people currently are retired law

25   enforcement personnel.  My background is from a forensic

DIRECT - WEAVER

1   laboratory and crime scene investigation.

2   Q.   What forensic disciplines do you regularly consult and

3   train in?

4   A.   Primarily crime scene investigation, bloodstain pattern

5   analysis, and crime scene reconstruction.

6   Q.   Were you -- did you consult in this case about

7   bloodstain pattern analysis?

8   A.   Yes.

9   Q.   Are you prepared to tell the jury about your

10  conclusions?

11  A.   Yes.

12  Q.   I'd like -- if you wouldn't mind, could you briefly

13  describe your educational history.

14  A.   I have a bachelor's degree in chemistry and left a

15  graduate program in chemistry to work for the Greeley,

16  Colorado, Police Department.

17  Q.   With -- sorry, when was that?

18  A.   That was 1978 to 1982.

19  Q.   What did you do when you were at Greeley PD?

20  A.   Crime scene investigation, fingerprint processing and

21  comparison, pattern analysis.

22  Q.   When did you start doing bloodstain pattern?

23  A.   Essentially around 1982, after completing my first

24  40-hour, or what's often called a basic course.

25  Q.   Did you go to a different law enforcement organization

1770

DIRECT - WEAVER

1    after Greeley PD?

2    A.    Yes, sir.

3    Q.    Where did you go?

4    A.    I went to the Colorado Bureau of Investigation out of

5    their Denver office from 1982 to 2009 when I retired.

6    Q.    What did you do at CBI?

7    A.    Originally as a forensic chemist for various chemical

8    analyses.  And then as occasion arose, bloodstain pattern

9    analysis, and eventually heading up crime scene

10   investigation teams.

11   Q.    You said you retired from there in 2009?

12   A.    Yes, sir.

13   Q.    When did you start working with Bevel, Gardner?

14   A.    That was 2008.

15   Q.    Okay.  Do your core areas at Bevel, Gardner include

16   bloodstain pattern analysis?

17   A.    Yes, sir.

18   Q.    Have you received any certifications in forensic

19   science?

20   A.    With respect to blood stains, yes, sir.

21   Q.    Can you tell me about those.

22   A.    One is a certification as a bloodstain pattern analyst

23   which I tested for and received in 1999.  Another was a

24   senior crime scene analyst which I tested for in 1990.  And

25   for both of those certifications I test for and renew my

DIRECT - WEAVER

1    certification every five years.

2    Q.    What body issues those certifications?

3    A.    It's an organization known as the IAI, the

4    International Association for Identification.

5    Q.    Is that one of many or is -- tell me what that -- what

6    role that body plays in forensic sciences generally.

7    A.    It's the largest association in forensic science and it

8    covers topics including fingerprints, footwear impressions,

9    photography, crime scene investigations, stain pattern

10   analysis, and holds annual training conferences.

11   Q.    Is it pretty common -- you described the three

12   certifications that you have.  Is it pretty common for

13   people to have all three of those certifications?

14   A.    Technically so far I only did two, counselor.

15   Q.    Oh, sorry.  Tell us what the third one is.  I missed

16   it.

17   A.    I was also certified for 10 years as a crime scene

18   reconstructionist until March of this year when the program

19   was suspended.

20   Q.    So those three, was it pretty common to have all three

21   of those certifications?

22   A.    No, sir, it wasn't.

23   Q.    About how many people had all three of those?

24   A.    Four or five of us in the U.S.

25   Q.    What about just the bloodstain pattern analysis

DIRECT - WEAVER

1    certification?  How many people have that in the country,

2    would you say?

3    A.    Currently approximately 50 to 55 individuals.

4    Q.    What goes into getting the certification in bloodstain

5    pattern analysis?

6    A.    Studying selected textbooks and then taking a four-part

7    examination.  The first part is based on the textbooks; the

8    second part is based on practical application in terms of

9    identification of bloodstain patterns; the third part,

10   another practical, involves determining what we call an area

11   of origin, or a source where blood stain originated to

12   create a pattern.

13         And then, finally, an analysis portion in which we

14   examine photos and answer specific blood stain questions on

15   those photos.

16   Q.    Have you -- aside from just getting certifications,

17   have you been involved with the IAI in any other capacity?

18   A.    Yes, sir.

19   Q.    What is that?

20   A.    Since the year 2000, I've taught workshops in

21   bloodstain pattern analysis, primarily to attendees at the

22   conference, with the exception of two years since then.  And

23   I've also served on two of the IAI certification boards.

24   Q.    Are you a member of any professional affiliations

25   related to bloodstain pattern analysis?

DIRECT - WEAVER

1    A.    Yes, sir.

2    Q.    What's that?

3    A.    The primary one is IABPA, the International Association

4    for Bloodstain Pattern Analysts.

5    Q.    Did you hold -- hold any roles with that?

6    A.    Yes, sir.  I served on various committees and also

7    served as president of that organization in 1993-1994.  And

8    was honored as a distinguished member in 2011.

9    Q.    Have you testified as an expert before?

10   A.    Yes, sir.

11   Q.    Specifically in bloodstain pattern analysis?

12   A.    Yes.

13   Q.    In federal or state court?

14   A.    In both.

15   Q.    In federal court, where was that?

16   A.    That was here in Denver.

17   Q.    Do you remember approximately the time frame that that

18   was?

19   A.    It was 2007 and then 2008.

20   Q.    You said earlier you are a consultant; is that right?

21   A.    Yes, sir.

22   Q.    Are you being paid?

23   A.    Yes, sir.  As a consultant I'm paid for casework and

24   teaching.

25   Q.    Are you being paid for this case?

DIRECT - WEAVER

1   A.   For my time, yes, sir.

2   Q.   Has anyone told you what to say?

3   A.   No, sir.

4   Q.   In your consultant work, do you work for both

5   prosecution and defense?

6   A.   Yes.

7        MR. WINSTEAD:  At this time I move for his

8   qualification as a bloodstain pattern analyst.

9        THE COURT:  Any objection from defendants?

10       MS. MOSS:  No objection.

11       MR. DILL:  No, Your Honor.

12       THE COURT:  All right.  There being no objection,

13  Mr. Griffin is qualified under Federal Rule of Evidence 702

14  to provide expert opinion testimony in the field of

15  bloodstain pattern analysis.

16       MR. WINSTEAD:  Your Honor, at this time we're going

17  to be going through some scene photographs again, so I

18  wanted to provide notice to anyone in the courtroom that

19  that will -- that will be starting shortly, if anyone wants

20  to leave.

21       THE COURT:  All right.  Thank you for the notice.

22  BY MR. WINSTEAD:

23  Q.   Sir, did you look at scene photographs in this case?

24  A.   Yes, sir.

25  Q.   And is there -- are there blood stains evident in those

DIRECT - WEAVER

1    scene photographs?

2    A.    Yes.

3    Q.    All right.  I'd like to take you through those and ask

4    you some questions about them.

5            Could you please bring up Exhibit -- what's been

6    admitted as Government's Exhibit 16, page 11.

7            Can you tell me if you see blood stains in this

8    photograph.

9    A.    Yes, sir, I do.

10   Q.    Are these the blood stains that you conducted an

11   analysis on?

12   A.    Yes, sir.

13   Q.    Okay.  So if you wouldn't mind, could you give me an

14   overview of the different kinds of bloodstain patterns you

15   see in this photograph and briefly explain what each one is.

16   A.    May I use the --

17            THE COURT:  Excuse me, Mr. Griffin, there's a

18   stylus right next to your monitor that you can use.  And if

19   you want -- if you want --

20            THE WITNESS:  Thank you, Your Honor.

21            MR. WINSTEAD:  Sorry, Your Honor.

22            THE COURT:  That's okay.

23   BY MR. WINSTEAD:

24   Q.    If you want to we can zoom in on a particular area, so

25   just draw on the stylus which one you want to talk about and

DIRECT - WEAVER

1    then we'll zoom in on it.

2    A.    There are several patterns present, and for orientation

3    purposes, I identified different sections of the floorings

4    as W for Wood, and C for concrete.  And I sequentially

5    numbered those starting at the bottom of the screen and

6    going up to where the deceased is.

7         Among the blood stains --

8    Q.    So don't do it yet.  Don't do it yet.  Okay.  All

9    right, go ahead, sir.  Sorry, he was about to zoom in on one

10   before you were done with the overview.  So you go ahead.

11   You can describe what you circled.

12   A.    Oh.  Excuse me.  What I've circled are identified as

13   either projected blood stains, or gush/splashes.  The

14   gush/splash is a term that brings together based on physical

15   characteristics to type of events that create patterns such

16   as they're showing on the screen.

17        The gushes are a result of projected blood coming

18   out of a blood source, and the splash is -- refers to blood

19   that has been allowed to fall downward.  And their physical

20   characteristics are essentially similar.  And it's often

21   difficult to differentiate a gush from a splash, so I

22   combined those in a conservative fashion.

23   Q.    And so if you wouldn't mind -- if we can zoom in on

24   this one down here -- can you tell us what you're looking

25   for in order to tell if it's a gush or a splash.

DIRECT - WEAVER

1    A.    Yes.  As a gush/slash, we have a large volume of blood.

2    We have an irregular margin.  And by that, I mean instead of

3    being smooth, we have spines that are coming out from that

4    pattern.  There's also a portion of the pattern here and

5    here that appears to have been disturbed or altered in some

6    fashion.  And that's an unknown event.

7            And what limitation in doing the bloodstain pattern

8    analysis in this case was not knowing the nature of the

9    surfaces involved, such as texture, absorption, slope,

10   smoothness.  Primarily those.

11   Q.    Okay.  So can you zoom back out.  And can you now zoom

12   in on this area right there.

13   A.    Could you repeat, please.

14   Q.    Can you tell -- can you tell me what you see in this

15   part of the photograph.

16   A.    More projected blood gush/splashes, both on the

17   concrete portion and on the wooden portion.

18   Q.    Based on their shapes, can you tell anything about the

19   direction the blood was likely moving when it impacted the

20   floor?

21   A.    For the stains that are on the wood, no.  I don't feel

22   comfortable doing a directionality because I don't know any

23   absorbing nature that might be present in the wood.  On the

24   concrete, the stains that I'm identifying as gushes/splashes

25   are both coming from generally overhead -- or above the

1778

DIRECT - WEAVER

1    flooring.  And depending on any degree of elongation, some

2    of these could be coming from a slight direction downward.

3    I'm unable to do more than that because of the limitation on

4    the nature of the photos that were supplied.

5    Q.   All right.  Can you zoom out, please.

6         All right.  Are there any other kinds of patterns

7    that you'd like to tell us about in here.

8    A.   Yes, sir.

9    Q.   Okay.  Can you show us where they are and we'll zoom

10   in.  All right.

11   A.   This pattern I classified as a smear.  It has also --

12   or could also be referred to as a transfer pattern.  And

13   depending on the determination for motion involving that

14   pattern, it might be further classified from a smear to go

15   as a swipe or a wipe, both of which involve movement of

16   blood.

17   Q.   All right.  Zoom out.

18        Anything else in this picture before we move on to

19   the next one?

20   A.   Yes, sir.  There are multiple smaller stains.  And by

21   smaller, I mean smaller in size than the projected stains

22   that are here.  Based on the appearance of these stains,

23   they appear to be what I call spatter stains, or stains that

24   have been created by blood drops that have been airborne for

25   some reason and then, in this case, strike the concrete or

1779

DIRECT - WEAVER

1   the wood.

2   Q.   All right.  Any others?

3   A.   Is it possible to show more of that rug, please?

4   Q.   So can you just show the whole rug.  Start right there.

5   Yeah.

6   A.   I referred to this as a throw rug, and what an unknown

7   limitation on this particular item is, again, any texture

8   and absorbency that may be inherent in the rug, itself.  And

9   any types of treatments the rug may have received.

10          I both zoomed in on this image and then worked with

11  software to try to enhance the image to see if I could

12  visualize blood stains for their presence as well as

13  physical characteristics.  And in some of these areas, such

14  as I've marked on the screen, I referred to as apparent

15  blood stains and that their pattern -- or classification

16  would be as spatter stains -- or possible spatter stains,

17  excuse me.

18          What I put in the rectangular box was an area that

19  appeared to be blood that is spread out over a portion of

20  the rug such that it's not apparent to be individual blood

21  drops or spatter stains, so the general classification for

22  those types of stains I did as nonspatter stains.

23          And further to the lower right of the rug as it

24  shows in this image, it appeared there were possibly other

25  blood stains, but nothing that I felt comfortable

DIRECT - WEAVER

1    identifying other than just saying "possible."

2    Q.    Now you mentioned "spatter" and "nonspatter."  Can you

3    explain what spatter is.

4    A.    Using physical characteristics of the blood stains,

5    there is a -- often called decision map or chart that I use

6    to go down, look at physical characteristics, and use those

7    characteristics to identify patterns and individual stains.

8    The beginning of that process involves looking for circular

9    to elliptical stains which would be the result of, again,

10   airborne drops in flight, and those are spatter stains.

11            Any pattern having any blood -- bloodstain present

12   that's not just solely the spatter is a general

13   classification of nonspatter.

14   Q.    What causes spatter?

15   A.    When some type of energy in an event or a mechanism

16   comes in contact with -- forcefully with a source of blood,

17   that blood can break up into sheets of blood or further into

18   individual drops, which then strike a target or a surface.

19   Target's the generic term we use.  And then create -- or

20   result in a particular shape, circular to oval if it's a

21   blood drop that struck a relatively smooth, nonabsorbing

22   surface.

23   Q.    All right, sir.  Can you zoom out.

24            I'd like to show you some photos of Mrs. Rudolph.

25   Could you please bring up Exhibit 14, page 15.  Can you tell

DIRECT - WEAVER

1    me if you can see any blood stains here.

2    A.    Yes.

3    Q.    And describe anything of consequence.

4    A.    The description -- or descriptions are slightly limited

5    in that I'm presuming what I'm going to show as blood stains

6    to be blood stains based on their appearance, their color,

7    their location, and my experience.

8         On each of her feet there are blood stains.  They

9    may be individual drops or they may be larger patterns.

10   Based on the photo supplied, that was a type of

11   classification I could not go to.  And on her right foot

12   there appears to be a blood flow coming down from the top of

13   her foot towards the sole or the bottom of her foot.

14        Also blood stains on her dark garments, primarily

15   the pants.  And the orientation of at least the upper

16   portion of this stain area would appear to be under or below

17   the gunshot entrance wound.  And without looking at the

18   clothing and seeing its texture, its construction, there's a

19   limit on what can be said from a bloodstain pattern analysis

20   other than we have distribution of blood down the front of

21   her body.  There may be flow -- flowing that has occurred

22   and that extends from midchest down towards the crotch and

23   then blood stains that are also present on the inner aspect

24   of her lower thighs.

25   Q.    Do you see any blood on her arms in this photograph?

1782
DIRECT - WEAVER

1    A.    No, I did not.

2    Q.    Could you please bring up Exhibit 14, page 14.

3          How about in this photograph?

4    A.    No.  With this photograph and subsequent ones, I wasn't

5    able to identify anything that I felt I could report as

6    apparent blood.

7    Q.    Okay.  Can you please just bring up -- we'll bring up

8    two more.  Exhibit 14, page 6.

9          Is this one of the other photographs you looked at?

10   A.    Yes, it is.

11   Q.    And Exhibit 15, page 3.

12         Is this another one?

13   A.    It is.

14   Q.    On any of these photographs, do you observe anything

15   that appears to be blood on her inner arms?

16   A.    I did not.

17   Q.    Can you bring up Exhibit 15, page 9.

18         Is there anything of consequence in this

19   photograph?

20   A.    Yes, sir.  There appears to be a blood stain on the

21   back of her left calf -- excuse me, on her right heel, and

22   some type of discoloration on her lower pant legs that I

23   simply described as discoloration; not knowing -- or not

24   having enough information to report it as blood.

25         And the bottom of her right shoe -- or I think it's

1783

DIRECT - WEAVER

1    a sandal, was a dark area that I simply described as a dark

2    area differing in appearance than the rest of the sole.

3    Q.    Okay.  Can you go back to Exhibit 16, page 11.

4            Is there a general shape to these blood stains?

5    And if so, could you describe it.

6    A.    The two general shapes would be the circular or

7    elliptical stains.  The others are the larger blood stains,

8    some of which have volume associated with them such as the

9    gush/splash, or projected blood.  And then the shape of

10   stains that I described as smears is an irregular shape.

11   And unknown surface texture again coming into play there.

12   Q.    All right.  Thank you, sir.  If you could take that

13   down.

14           We'll come back to any conclusions that you drew

15   from those photographs.  But I'd like to move to this past

16   April.  Did you travel to Phoenix?

17   A.    Yes, sir.

18   Q.    Why did you do that?

19   A.    I went to Phoenix to examine a soft shot -- a soft case

20   for a shotgun.

21           MR. WINSTEAD:  And may I have just a moment, Your

22   Honor?

23           THE COURT:  You may.

24   BY MR. WINSTEAD:

25   Q.    All right.  Then I'd like -- could you please pull up

1784

DIRECT - WEAVER

1    Exhibit 208, please, which has already been admitted.

2             What is this a series of photos of?  Have you seen

3    this exhibit before?

4    A.    I'm sorry, what?

5    Q.    Have you seen this exhibit before?

6    A.    Yes, I have.

7    Q.    What is this series of photos documenting?

8    A.    It's a series of photos that were taken at my request.

9    The photos were taken by Special Agent DeFrance of the FBI,

10   and these photos were taken as I was doing my visual

11   examination of the inside and outside of the soft -- soft

12   shell shotgun case, with the yellow scales as reference

13   points.

14            And then I used the label B, as in boy, to indicate

15   a reddish brown stain that I would test later.

16   Q.    All right.  So before we get into the actual exam, what

17   were you looking for when you looked at the evidence case?

18   A.    I was looking for the presence of any blood, tissue,

19   bone, that could be associated with a gunshot wound.

20   Q.    When you're doing this initial inspection -- and we'll

21   look at the photographs in a moment -- I guess I assumed

22   that.  What sort of inspection were you doing?

23   A.    I did a visual inspection.  I used three different

24   light sources or a combination of those.  The first was

25   natural sunlight.  The second was a series of floodlamps

DIRECT - WEAVER

1    that were on a photo stand.  And the third was a hand-held

2    flashlight.  And I used some or all of those at some point

3    during my examination.

4    Q.    Is -- did you feel you had adequate lighting for an

5    accurate examination?

6    A.    Yes.

7    Q.    Have you done visual examinations on evidence items

8    like this before?

9    A.    Yes, sir.

10   Q.    Do you feel confident that you identified any potential

11   visible blood that could have been identified on the case?

12   I can ask it more simply.

13   A.    That's a little confusing, sir.

14   Q.    Sure.  You identified some potential areas of blood; is

15   that right?

16   A.    Yes.

17   Q.    Do you feel as though, in conducting your exam, you

18   identified -- do you feel confident you identified all of

19   the potential blood on the case?

20   A.    Yes, sir.

21   Q.    Okay.  All right.  And I think you said you'd marked

22   this particular one with the letter B.  Did you mark every

23   potential visible blood stain with the letter during your

24   exam?

25   A.    Either the blood stain, yes, or in a couple of cases

DIRECT - WEAVER

1    areas where I thought there might be blood but in too small

2    a degree to see visually.

3    Q.    Okay.  All right.  Then can you tell me -- let's go to

4    the next page.  This is still Government's Exhibit 208,

5    page 2.

6          Why did you mark this particular spot?

7    A.    Right below the letter B was a reddish-brown area.

8    Q.    Okay.  Did you start with B?

9    A.    As in labeling, yes, sir.

10   Q.    Why is that?

11   A.    The kit of adhesive labels that I use, I've used up all

12   the letter A's, so I start with B.

13   Q.    All right.  Can you go to page 3.  All right.  Thanks.

14   All right.  Next page, please.  Next page.  Next page.  Next

15   page.  Next page.  Next page.

16          All right, now we just looked at a bunch of

17   photographs -- and this is -- now we're looking at page 9 --

18   why was the light changing on those previous photographs?

19   A.    The light -- the lighting would change depending on if

20   the floodlight was being used as a light source or if a

21   light attached to, or synced in with the camera, was used.

22   Q.    What did you mark here with the C, D, and E stickers?

23   A.    There were three areas along that portion of the strap

24   that appeared to be different in appearance, or not uniform.

25   And it's a black surface which is going to make finding

1787
DIRECT - WEAVER

1    blood tougher.  So based on the difference in the appearance

2    on the strap, I marked those three areas to be tested

3    subsequently.

4    Q.    All right.  Could you please go to 208, page 20.

5          What were you looking at here?

6    A.    This is the muzzle end of the soft case.  There is

7    damage to both the interior, exterior, and zipper portion of

8    the case.  And I was looking in both -- or on both the

9    lining and the foam beneath it for possible blood stains.

10   Q.    All right.  And could you go to the next page, page 21.

11         What did you do here?

12   A.    While examining the interior of the case, I noticed a

13   reddish appearance -- faint reddish appearance on the

14   underside of the soft case.  I didn't know if that was

15   something inherent in the case or an area where blood had

16   accumulated, so I cut a portion, as shown in this image, and

17   peeled it back to show clean area on the foam and the

18   brownish-reddish tinge to the underside of the lining.

19   Q.    All right.  Could you go to 208, page 32.

20         Did you mark certain areas?

21   A.    Yes, sir.

22   Q.    With an F and an H, it looks like.

23   A.    Yes.

24   Q.    Could you go to the next page.  And the next.  This is

25   now page 34.

DIRECT - WEAVER

1       What were you marking with H?

2       A.    H was the front portion of the muzzle end of the soft

3       case where damage had occurred and where blood stains might

4       have come to rest.  So the general area, primarily the piece

5       of foam above the label identified as H.

6       Q.    Sorry.  I wrote down the wrong page and I want to show

7       you G, so I've got to find it real quick.  There it is.  All

8       right.  That is page 31.  That would have been easy.  31,

9       please.  Page 31 of 208.

10            Okay.  And then you marked a G sticker.

11      A.    Correct.  That's the area outlined in the silver,

12      roughly, square.

13      Q.    Okay.  So did you mark any areas that you thought were

14      possible visual blood stains with those labels B through H?

15      A.    Yes, sir.

16      Q.    So once you had identified those and marked them -- you

17      can take that down -- did anyone bring a chemical test kit?

18      A.    Yes, sir.  Special Agent Steven DeFrance brought a

19      presumptive -- a kit that's a presumptive test for blood.

20      Q.    What -- so what does the kit do?

21      A.    The kit is a multi-component -- actually three sets of

22      chemicals that are part of a procedure to do a preliminary

23      test for blood.  It's preliminary because it doesn't mean

24      positively that it's blood; it's reacting and has a strong

25      possibility to be blood.

DIRECT - WEAVER

1    Q.    How do you use the kit?

2    A.    There are -- I take clean sterile swabs, usually

3    wooden-shafted cotton-tipped swabs that I take out of their

4    wrapper so I know they're sterile.  Then put a drop or two

5    of water, usually sterile -- or sterile water, distilled,

6    onto that swab.  And then take the swab and, depending on

7    the surface and extent of staining that's present, I may

8    take the swab and spin it or I may take the swab and

9    actually rub across an area.  The purpose being to remove

10   any possible blood that can then be tested.

11   Q.    Before you did any testing on the bag, did you make

12   sure the kit was working?

13   A.    Yes, sir.

14   Q.    How did you do that?

15   A.    I did what we call running positive and negative

16   controls.  The negative control is the same series of tests.

17   A new sterile swab, one or two drops of water, and then this

18   sequence of dropping reagents that are part of the kit.  And

19   a negative test is the absence of any pink color.  I then

20   did a known control.  The known control is a sample of my

21   blood that I rubbed onto a swab after it was dampened, and

22   then conducted the three-step series and obtained the

23   pinkish color that's an indicator for presumptive presence

24   of blood.

25   Q.    Did the test give -- like did the -- did the results of

DIRECT - WEAVER

1   that show that the test was working?

2   A.   Yes.   Functioned as it's designed to, yes.

3   Q.   For the sample you were talking about, is that dried

4   blood?

5   A.   Yes.

6   Q.   Do you know if the tests would still work if the dried

7   blood is old?

8   A.   Yes.

9   Q.   How do you know that?

10   A.   The known control I use is a bloody handkerchief that I

11   kept and take with me.   And it's 10 to 15 years old.

12   Q.   All right.   So once you made sure the test kit was

13   working, did you use it to test all of the possible blood

14   stains you identified on the case?

15   A.   Yes, sir, all seven of those areas labeled.

16   Q.   What results did you get?

17   A.   The results were negative, so there was no indication

18   of the presence of blood.

19   Q.   You said you were also looking for things like human

20   tissue and bone.   Did you find anything on the case

21   consistent with either of those things?

22   A.   No, sir.

23   Q.   All right.   I'd like to ask you about whether you were

24   able to come to any conclusions based on both your

25   examinations of the scene and the case.   First of all, if

1791

DIRECT - WEAVER

1    you could bring up Exhibit 14, page 15.  And, wait, before

2    you bring it up, actually.

3            MR. WINSTEAD:  So the -- sorry, Your Honor, I'm

4    again going to be showing some scene photographs, so I just

5    wanted to make sure if anyone had come in, they'd take an

6    opportunity --

7            THE COURT:  Right.  Thank you again for the notice.

8    BY MR. WINSTEAD:

9    Q.   All right.  Could you bring up Exhibit 14, page 15.

10           Can you tell me if you can make any conclusions

11   about what position Mrs. Rudolph may have been when she was

12   shot or after she was shot?

13   A.   Yes.  At some point after receiving the gunshot wound,

14   Mrs. Rudolph would have to be in a somewhat standing erect

15   or slightly bending forward posture so that not only would

16   there be flow along her garments, but to also deposit the

17   blood stains that are on her feet and ankles.

18   Q.   All right.  And are you certain about that conclusion?

19   A.   That's the best explanation.  I can't think of any

20   other.

21   Q.   Okay.  All right.  Could you bring up page 6 -- or

22   Exhibit 16, page 11.

23           Can you tell me from these pattern of blood stains,

24   is there anywhere where you believe Mrs. Rudolph may have

25   been when she was shot?

DIRECT - WEAVER

1   A.    Yes, sir.

2   Q.    Can you use your stylus and explain that.

3   A.    Based on what we call scene context, or what is present

4   on the scene and where it is, we have the shotgun that's on

5   the throw rug.  And with the available photos, the primary

6   portion of the floor that I first see as being stained

7   starts along here by the throw rug, and then we have the

8   stains that are on the concrete and the wood portions of the

9   floor.  And stains that are what I described as apparent

10  blood on portions of the rug.

11          Based on those factors, the best explanation I have

12  for Mrs. Rudolph's position at the time of the gunshot wound

13  is in this area of the floor and carpet, which is

14  essentially at or near the foot of the bed.

15  Q.    Could there be other possible scenarios for where she

16  was?

17  A.    Yes, sir.

18  Q.    How would you characterize this conclusion?

19  A.    Based on the available data, that I believe is the best

20  explanation suggested by the evidence and the scene context

21  for her to be at the foot of the bed -- at or near.

22  Q.    Can you tell me anything about -- bring up, please,

23  Exhibit 14, page 14.

24          Does the absence of blood on the insides of her

25  arms tell you anything about the possible orientation of her

DIRECT - WEAVER

1    arms?

2    A.    There are different possibilities here based on

3    different factors involved in the case.   The absence of

4    blood on her hands and arms -- first of all, I would expect

5    if she had had her hands -- or arms in contact with her

6    wound or the blood on her clothing, there to be blood on her

7    hands or arms.   And the absence of blood is -- and

8    particularly a type of blood stain we call "back spatter,"

9    could mean either there was no blood or tissue coming out of

10   the entrance wound, or Mrs. Rudolph's hands and arms were

11   not in a position to receive that back spatter, or it was

12   blocked in some fashion.

13   Q.    All right.   And then lastly -- you can take that down.

14   Thank you.

15          Does the absence of blood on the soft case tell you

16   anything?

17   A.    First of all, there was -- the absence of blood would

18   mean there is no -- there are no back spatter stains that

19   are on the soft case anywhere, including the muzzle end of

20   the soft case.   There are several possibilities there as to

21   why there may not be blood on the case.

22   Q.    Can you tell me what those possible explanations might

23   be.

24   A.    One explanation is that the soft case was far enough

25   away from the entrance wound that it did not receive any

DIRECT - WEAVER

1    back spatter.  Another possibility is there might have

2    been -- or there could be an intermediate object between the

3    entrance wound and the muzzle end of the shotgun and shotgun

4    case that would block back spatter.  It may be that back

5    spatter was somewhat limited based on the nature of

6    Mrs. Rudolph's upper clothing.  That would be a limitation

7    in any bloodstain pattern analysis for not being able to

8    look at her clothing for the presence or absence of

9    particular types of blood stains.

10                And the last comes to mind would be the orientation

11   of the case, the shoft -- soft shell.  I'm sorry, that's

12   tough to get out -- of the case.  That if it were below

13   Mrs. Rudolph's entrance wound at the time she received the

14   entrance wound, particularly if it were a contact or

15   near-contact wound, those would be situations that I would

16   expect to find back spatter.

17   Q.    And would -- what about gushes or splashes?

18   A.    The same can hold for the gushes and splashes,

19   depending on the volume of blood and when it projects from

20   the body.  That -- the absence of -- those type of stains

21   aren't as significant unless, again, the soft shell case and

22   shotgun are below the entrance wound where gravity could

23   also assist in having blood fall.

24               MR. WINSTEAD:  Okay.  Thank you.  May I have a

25   moment, Your Honor?

CROSS - GRIFFIN

1    THE COURT:  Yes.

2    MR. WINSTEAD:  Nothing further.  Thank you, Your

3    Honor.

4    THE COURT:  All right.  Cross-examination.

5    CROSS-EXAMINATION

6    BY MS. MOSS:

7    Q.    Thank you, Your Honor.  Good afternoon, Mr. Griffin.

8    How are you today?

9    A.    I'm fine.  Good afternoon, ma'am.

10   Q.    Nice to see you again.

11   A.    Likewise.

12   Q.    Mr. Griffin, you spoke on -- several times on direct

13   examination about limitations that you had in this case; is

14   that correct?

15   A.    Yes.

16   Q.    And there were some serious limitations, were there

17   not, in this case?

18   A.    Indeed.

19   Q.    And just so we're clear, you were not able to actually

20   go to the scene and physically view the scene yourself; is

21   that right?

22   A.    That's correct.

23   Q.    Okay.  And the photographs that you were given in this

24   case to look at for the bloodstain pattern analysis, would

25   you say that those photographs were suboptimal?

1796

CROSS - GRIFFIN

1   A.    Tactfully, yes.

2   Q.    I mean, you would want good photographs in order to do

3   an analysis; is that fair to say?

4   A.    Good photographs, proper orientation, focus, yes.

5   Q.    Okay.  You talked about focus.  You want in-focus

6   photographs.

7   A.    Yes.

8   Q.    You want photographs that have some sort of measurement

9   scales so you can see the size of things; is that right?

10  A.    Definitely.

11  Q.    You would like evidence to be collected in the scene,

12  perhaps, so that you could examine; is that right?

13  A.    Yes, examine for trace evidence or, in bloodstain

14  analysis, for blood stain.

15  Q.    And in addition to collecting the evidence, we talked

16  about the clothing, Mrs. Rudolph's clothing.  And I believe

17  that you said that it was also a limitation for you because

18  you don't know the construction of the fabric or the

19  absorbency of the fabric; is that correct?

20  A.    That's correct.

21  Q.    And this particular scene was not properly preserved.

22  Are you aware of that?

23  A.    Yes.

24  Q.    So you were aware that an individual named Spencer

25  Kakoma actually took the shotgun and the shotgun case out of

CROSS - GRIFFIN

1    the cabin and then later brought it back; is that right?

2    A.    Yes.

3    Q.    And so we're -- we have no way of knowing whether it

4    was placed exactly in the location where it originally was;

5    is that right?

6    A.    I personally don't.  That's correct.

7    Q.    Okay.  You also talked about not knowing the -- I think

8    you said it was the texture of the surface involved; is that

9    right?

10    A.    Yes, ma'am.

11    Q.    And that's something that could be important to you.

12    A.    To any bloodstain analyst, yes.

13    Q.    And I believe you talked about you would like to know

14    the absorption of that surface; is that right?

15    A.    The absorption, how rough it is.

16    Q.    The texture, and also I think you talk about sloping.

17    A.    Yes.

18    Q.    Now even in this case, you didn't even know the

19    directions.  You didn't know what was north, what was south,

20    what was east or west; is that right?

21    A.    That's correct.

22    Q.    Okay.  And it seems like the only way that you had to

23    actually analyze the bloodstain patterns was to enlarge the

24    photographs or -- I think you said you used PhotoShop on

25    some of the photographs to kind of adjust the photos.

CROSS - GRIFFIN

1    A.    Yes, to -- as a means of enhancement.

2    Q.    Now given all those serious limitations, you have given

3    us some opinions today and I just want to make sure I'm

4    correct about these.  You said that you were able to

5    determine that the blood sort -- blood source had to be

6    above the patterns; is that right?  Generally overhead, I

7    think you said.

8    A.    For the -- some of the stains, yes, ma'am.

9    Q.    And, again, based on the limitations that you had, you

10   thought that it was possible that the gunshot wound

11   occurred -- and I think you said -- below -- I'm sorry,

12   between the throw rug or between the base of the bed and

13   this hard case; is that -- that was there; is that right?

14   A.    I didn't reference the hard case, but it would be at or

15   near the foot of the bed in the area of the throw rug is my

16   best explanation.

17   Q.    Okay.  And I think you also said that she could have

18   been at some point, after the discharge of the shotgun,

19   standing up or she could have been bent forward; is that

20   right?

21   A.    That's correct.

22   Q.    Now, Mr. Griffin, am I correct that you don't see any

23   footprint patterns in the blood stains?

24   A.    That's correct.

25   Q.    So you don't see any footprint patterns consistent with

CROSS - GRIFFIN

1    a man's shoe -- man's size shoe in the blood patterns?

2    A.    That's correct.

3    Q.    And did you see any blood or what may have looked like

4    blood on the bottom of Dr. Rudolph's shoes?

5    A.    I did not see pictures of the shoes or examine them.

6    Q.    Let me ask if we could show one photograph, and this is

7    a scene photograph, just so everyone knows, but I believe

8    Mrs. Rudolph is covered.  And this is going to be Government

9    exhibit page 1, which is 16-1, Mr. Reyes.

10          Mr. Reyes [sic], do you see a gentleman that is

11    leaning over Mrs. Rudolph there?

12    A.    Yes.

13    Q.    And I realize again this is not the best photo, but do

14    you see anything on the bottom of the gentleman's shoes that

15    resembles blood to you?

16    A.    Thank you.

17    Q.    Thank you.

18    A.    Nothing that is obvious in the photo or the zoomed-in

19    aspect of that photo.

20    Q.    Okay.  Thank you.  Thank you, Mr. Reyes.

21          And you wrote a report about your conclusions in

22    this case; is that right?

23    A.    Yes, ma'am.

24    Q.    And actually you wrote two reports; is that right?

25    A.    Yes.

CROSS - GRIFFIN

1    Q.    And in your first report, you said that ultimately the

2    bloodstain pattern analysis was inconclusive as to

3    determining if Mrs. Rudolph's fatal wound was or was not

4    self-inflicted.  Was that your conclusion for that report?

5    A.    That is accurate, yes.

6    Q.    Okay.  Now if you believe that the -- the gunshot

7    incident occurred between the base of the -- well, let's

8    just say in the area of the throw rug at the base of the

9    bed, can you also see from the photographs that that's not

10   where Mrs. Rudolph's body ends up?

11   A.    Yes.

12   Q.    And from the limitations that we have and the

13   suboptimal photographs we have, does it appear that

14   Mrs. Rudolph may have walked some short distance towards the

15   bathroom before she collapses on the floor?

16   A.    That's a possibility.

17   Q.    And is it your understanding that the entry to the

18   cabin is to the left of what we have seen in the

19   photographs?

20   A.    Yes.

21   Q.    Okay.  Now you're aware that Dr. Rudolph has said that

22   he was in the bathroom when he heard a gunshot and a scream,

23   correct?

24   A.    Yes.

25   Q.    So if we, you know, take that as fact that Dr. Rudolph

1801

CROSS - GRIFFIN

1    was in the bathroom when the shotgun discharged, that is in

2    the direction that Mrs. Rudolph is going towards; is it not?

3    A.    That would be the direction that she possibly could --

4    moved or was moved, yes.

5    Q.    So, in other words, she -- you don't see any sort of

6    bloodstain pattern to see -- to show that she was heading

7    towards the exit to go out of the cabin to escape.

8    A.    I can't judge escape as that's intent.  But I didn't

9    see in the photos any blood stains heading that way.

10    Q.    Fair enough.  Let me ask you about this other

11    examination that you did.  You prepared a second report in

12    this case; is that right?

13    A.    Yes.

14    Q.    And this was after you had the opportunity to examine

15    the soft gun case in, I think it was, April of this year?

16    A.    Yes.  April 28th in Phoenix.

17    Q.    Now, Mr. Griffin, you were able to look at this gun

18    case and examine the gun case, and you've told us about your

19    testing, right?

20    A.    Yes.

21    Q.    And you were able to do this because the defense

22    provided the soft gun case to you; is that true?

23    A.    That was my understanding, yes.

24    Q.    Okay.  And I was there, right?

25    A.    You were.

CROSS - GRIFFIN

1  Q.   And I brought the soft gun case to you, didn't I?

2  A.   Yes.

3  Q.   Okay.  So we offered it to you so that you could test

4  it.

5  A.   Yes.

6  Q.   So we gave it to the prosecution and gave it to an

7  expert so that they could actually test this piece of

8  evidence; is that right?

9  A.   That's right.

10  Q.   So we did not hide it from you, in other words.

11  A.   Correct.  It was not hidden.

12  Q.   And you talked about how you cut or you manipulated

13  part of that soft gun case; do you recall that?

14  A.   I do.

15  Q.   And before doing that, you asked for permission whether

16  you could do that.

17  A.   I did.

18  Q.   And we gave you permission to do that, right?

19  A.   Immediately, yes, ma'am.

20  Q.   Now let's talk about the testing.  You tested -- and

21  I'm not going to say this properly, but I think it's

22  phenolphthalein testing?

23  A.   The reagent is correct.  It's phenolphthalein, spelling

24  is p-h-e-n-o-l-p-h, as in Paul Henry, t-h, as in Tom Henry,

25  a-l-e-i-n.  Phenolphthalein.

CROSS - GRIFFIN

1    Q.    And I believe that you said that you were looking for

2    obvious red or reddish-brown spots on the gun case; is that

3    right?

4    A.    Reddish-brown or discoloration, yes.

5    Q.    And that's what you tested.

6    A.    Yes, ma'am.

7    Q.    And based on the presumptive testing that you

8    performed, you said that you were not able to -- I guess the

9    test indicated negative for blood; is that right?

10   A.    Correct.  No indication of blood.

11   Q.    Now were you able to see from the scene photographs

12   that the end of the gun case was blown off when it

13   discharged?

14   A.    Yes.  Between the rug and where Mrs. Rudolph was.

15   Q.    And was any of that part of the gun case collected for

16   you so that you could test it?

17   A.    I had -- I was not given any of that.

18   Q.    And do you know whether the police collected that and

19   preserved any of that?

20   A.    My understanding is they did not.

21   Q.    Okay.  Now, I want to take a little detour for a

22   second.  You looked at the interior of the soft gun case; is

23   that right?

24   A.    Yes.

25   Q.    And I noticed in your report that you said that you

1804

CROSS - GRIFFIN

1    noticed defects within the interior of the case.

2    A.    Correct, ma'am.   Four.

3    Q.    And defects, which included some things that were like

4    tears or maybe little openings; is that right?

5    A.    That's -- yes.

6    Q.    And you also noticed when you look at the inside of the

7    soft gun case this generally oval defect, this round hole --

8    round-ish hole?

9    A.    The muzzle end, yes.

10   Q.    Can we pull up RA-20, please, which is admitted in

11   evidence.   And let's start with INV 7796, which is page 1.

12   Nope, that's not it.   Okay.   Go ahead and take that down.

13            Do you recall seeing, when the Government showed

14   you photographs, that there was this generally oval defect

15   towards the top of the front of the shotgun case?

16   A.    Yes.

17   Q.    And when you saw that, you presumed that to be the

18   result of the discharge of the shotgun within the soft case?

19   A.    I did.

20   Q.    Now I'd like to go back to your bloodstain pattern

21   analysis.   In your bloodstain pattern analysis, you

22   reference a sourcebook a number of times, don't you?

23   A.    Yes, I do.

24   Q.    And that is the book called Bloodstain Pattern Analysis

25   by Tom Bevel and Ross Gardner; is that right?

CROSS - GRIFFIN

1    A.    It is, yes, the 3d Edition.

2    Q.    And those are your partners in your business?

3    A.    Yes.

4    Q.    And they are also well-versed and very knowledgeable

5    and experienced in identifying bloodstain patterns?

6    A.    Yes.

7    Q.    And this is the only source that you cite; is that

8    right?

9    A.    Yes.

10   Q.    Okay.  Would you agree that this is an authoritative

11   source on bloodstain pattern analysis?

12   A.    No, I would not say authoritative.  It is one of

13   bloodstain texts that I refer to.

14   Q.    And do you believe that it is a reliable source?

15   A.    Reliable in --

16   Q.    Do you agree with what they say?

17   A.    In most sections, yes, I do.

18   Q.    Okay.  Fair enough.  I want to talk to you about

19   something that you've spoke about a lot in direct, which is

20   called "back spatter."  Do you recall that?

21   A.    Yes.

22   Q.    And I just want to make sure that we're clear about

23   what back spatter is.  Now does back spatter refer to blood

24   exiting the entrance wound in the direction that's opposite

25   of the impact?

CROSS - GRIFFIN

1   **A.    Nearly.   The blood -- upon impact of a projectile,**

2   **blood -- any blood or -- that comes back towards or out of**

3   **the entrance wound is referred to as back spatter, and it**

4   **comes out in a cone often called a dispersion cone.  And the**

5   **center of that cone is essentially perpendicular to the**

6   **surface of the entrance wound.**

7   **Q.    Okay.   So you said a number of things there and I'd**

8   **like to break it down, if we could.**

9          **So back spatter, again, when we see a --**

10          **MR. FIELDS:   Apologies.**

11          **MS. MOSS:   That's okay.**

12   BY MS. MOSS:

13   **Q.    -- A shotgun discharging a number of pellets and they**

14   **go forward; is that right?**

15   **A.    Yes.**

16   **Q.    And back spatter is something that you will see --**

17   **which is blood -- coming back generally in the direction of**

18   **the source or the shotgun?  Does that make sense?**

19   **A.    It does if, again, we're looking at the blood ejecting**

20   **out perpendicularly to the skin surface.  So that would be**

21   **dependent on where the shotgun was.**

22   **Q.    Okay.  Got it.  And so, again, you're saying that the**

23   **blood -- back spatter will often be perpendicular to the**

24   **source.**

25   **A.    It -- not necessarily perpendicular, but could be at an**

1807

CROSS - GRIFFIN

1    angle.

2    Q.    Okay.  All right.  And -- but am I right that when you

3    say "back spatter," again, it's not going forward, it's

4    coming back.

5    A.    Correct.  Out of an entrance wound.  Yes, ma'am.

6    Q.    Okay.  All right.  That's what I was trying to get.

7    And the presence of spatter resulting from a gunshot wound,

8    that can't always be predicted; would you agree with that?

9    A.    Yes.

10   Q.    And in some instances, spatter can be extremely limited

11   or can be nonexistent; isn't that correct?

12   A.    The back spatter, yes.

13   Q.    So sometimes back spatter, you're not going to find

14   that at all.

15   A.    That's correct.

16   Q.    And we spoke about clothing before.  I believe that you

17   said clothing can also impact the presence or the absence of

18   back spatter; is that right?

19   A.    Yes, it could have an effect.

20   Q.    So depending on what the texture or the makeup of the

21   clothing or the absorbency of the clothing, that could

22   prevent back spatter as well, correct?

23   A.    Prevent or limit, yes.

24   Q.    Now you talked about some conclusions that you made in

25   this case about maybe expecting to find blood on the gunshot

CROSS - GRIFFIN

1    case if it was below Mrs. Rudolph; is that correct?

2    A.    Yes.

3    Q.    Now in your report, you include that there are certain

4    factors that can affect projected blood; would you agree

5    with that?

6    A.    Yes.

7    Q.    And I believe what you include is that the orientation

8    of the individual, obviously, could infect -- could

9    affect --

10   A.    Yes.

11   Q.    -- the presence of back spatter.  Nature of the

12   clothing, which we've talked about, correct?

13   A.    Correct.

14   Q.    The movement of the individual could affect --

15   A.    Correct.

16   Q.    -- whether there's blood flow?

17   A.    Yes.

18   Q.    So if the individual is moving very quickly back, you

19   may not necessarily see something directly below them.

20   A.    That's possible, yes.

21   Q.    And also another factor could be the movement of the

22   firearm; is that right?

23   A.    Yes.

24   Q.    So, in other words, if a firearm is free-fired and has

25   a recoil to it such that it is thrown backwards, then you

REDIRECT - GRIFFINI

1    may not necessarily see any blood deposits on that firearm

2    or the shotgun case; is that correct?

3    A.    As a back spatter?

4    Q.    Yes.

5    A.    That's possible.

6    Q.    And is it also possible in terms of the other types of

7    blood stains that you were talking about?

8    A.    Such as their projected stains?

9    Q.    Yes.

10   A.    Yes, that's possible.

11   Q.    Thank you very much, Mr. Griffin.

12   A.    Thank you, ma'am.

13            THE COURT:  Cross-examination, Mr. Dill.

14            MR. DILL:  Just could I have a moment, Your Honor?

15            THE COURT:  Yeah.

16            MR. DILL:  No questions, Your Honor.

17            THE COURT:  All right.  Redirect.

18                         REDIRECT EXAMINATION

19   BY MR. WINSTEAD:

20   Q.    Thank you, Your Honor.

21            Sir, you were asked about writing an initial report

22   that was inconclusive; is that right?

23   A.    Inconclusive in what respect, please?

24   Q.    That didn't have all of the conclusions that you

25   ultimately came to; is that right?

1810
REDIRECT - GRIFFINI

1    A.    I used -- yes, there would be instances where lack of

2    the information would allow no conclusion or an inclusion,

3    yes.

4    Q.    In coming to your final conclusions in your second

5    report, what additional piece of evidence did you have?

6    A.    That was the soft case.

7    Q.    And so is the absence of blood on the soft case

8    important to your conclusions?

9    A.    It's a factor that comes in, yes.

10   Q.    Okay.  You were asked about whether or not if -- if a

11   person were moving or if a firearm were moving, that could

12   affect the deposits of blood on it; do you remember that?

13   A.    Yes.

14   Q.    Just so we're clear, how -- how fast does back spatter

15   move from a gunshot?  Is it slow or is it quite fast?  Can

16   you sort of describe what kind of speed we're talking about.

17   A.    I don't believe the -- or am not aware of any reference

18   where speed has been determined; however, in looking at

19   high-speed videos of bullet impacts into bloodied objects,

20   the back spatter starts -- appears to start essentially at

21   the time of -- or just after the immediate time of the

22   projectile entering the wound.

23   Q.    And on those high-speed videos, relatively speaking is

24   the back spatter moving at a similar speed to the

25   projectile?

REDIRECT - GRIFFINI

1    A.    I don't have hard numbers for that, but looking at --

2    remembering the videos, the blood is moving slower than the

3    projectile.

4    Q.    Significantly slower or a little slower?

5    A.    I wouldn't say significant without being able to put

6    numbers to it.  So I can only say slower.

7    Q.    Okay.  All right.  And just, again, to -- because

8    the -- when we were discussing it earlier, it may not have

9    been clear:  If you have a person who is bending over and is

10   located generally above the soft case, in that sort of a

11   situation would you expect to see blood stains on the soft

12   case?

13   A.    Yes, I would.

14   Q.    And if someone were reaching forward and holding

15   something on either side of a wound, would you expect to see

16   blood stains on the inside of their arms?

17   A.    There are multiple factors in there, so I couldn't --

18   wouldn't say "expect" but it is a possibility I would look

19   for.

20   Q.    Okay.

21            MR. WINSTEAD:  Thank you.  One moment, Your Honor.

22            THE COURT:  All right.

23            MR. WINSTEAD:  Nothing further.  Thank you, Your

24   Honor.

25            THE COURT:  May this witness be excused for the

1812
REDIRECT - GRIFFINI

1   Government?

2           MR. WINSTEAD:  Yes, sir.

3           THE COURT:  For the --

4           MS. MOSS:  Yes, sir.

5           MR. DILL:  Yes, Your Honor.

6           THE COURT:  All right.  Mr. Griffin, thank you for

7   your testimony.  You're excused and you may step down.

8           THE WITNESS:  Thank you, Your Honor.  Thank you,

9   ladies and gentlemen.

10          THE COURT:  All right, the Government may call its

11  next witness.

12          MR. WINSTEAD:  Your Honor, the United States calls

13  Special Agent Donald Peterson.

14          THE COURT:  Okay.

15          DONALD PETERSON, GOVERNMENT'S WITNESS, SWORN

16          COURTROOM DEPUTY:  Please be seated.  And state

17  your full name for the record and spell your first and last

18  name for us.

19          THE WITNESS:  Good afternoon.  My name is Donald

20  Peterson.  D-o-n-a-l-d, P-e-t-e-r-s-o-n.

21          THE COURT:  You may proceed, Mr. Winstead.

22          MR. WINSTEAD:  Thank you, Your Honor.  I'm sorry, I

23  forgot something over here.

24                      DIRECT EXAMINATION

25  BY MR. WINSTEAD:

1813

DIRECT - PETERSON

1  Q.  All right, good afternoon, sir.

2  A.  Good afternoon.

3  Q.  Can you tell me where you work.

4  A.  Yes, I'm a special agent for the FBI.

5  Q.  What do you do there?

6  A.  I am assigned to the Denver Violent Crime Task Force.

7  Q.  Do you have any collateral duties?

8  A.  I do.

9  Q.  What are those?

10 A.  I am the alpha team leader for the Denver division's

11 Evidence Response Team.

12 Q.  Can you tell me how you first became involved in this

13 case.

14 A.  Yes.  In late summer of 2019, my supervisor assigned me

15 to be a member of the Rudolph investigative team.

16 Q.  Do you know when that case was opened?

17 A.  Yes.

18 Q.  When was that?

19      MR. MARKUS:  Objection, Your Honor.  Hearsay.

20      THE COURT:  Just your understanding, Special Agent.

21 Overruled.  Your understanding.

22      THE WITNESS:  Yes.  I know that the Denver division

23 case was opened in July of 2019.

24 BY MR. WINSTEAD:

25 Q.  When you first joined it, can you give me a brief

DIRECT - PETERSON

1    description of your understanding of the facts.

2             MR. MARKUS:  Objection, Your Honor.  Relevance.

3             THE COURT:  Overruled.

4             THE WITNESS:  Yes.  Initially after reviewing case

5    materials, I was able to determine that Bianca Rudolph died

6    on October 11th, 2016, as a result of being shot with a

7    shotgun.

8    BY MR. WINSTEAD:

9    Q.    Why did you begin investigating it?

10   A.    The Denver division opened an investigation in the

11   summer of 2019 after Agent Dahlstrom did a review of a

12   number of suspicious death cases.

13   Q.    And had anyone contacted the FBI?

14   A.    Yes.

15   Q.    What was that about?

16   A.    The FBI and the Embassy in Zambia had received

17   telephone calls from friends and family of Bianca Rudolph.

18   Q.    In general are you aware if the FBI receives calls from

19   concerned citizens fairly frequently?

20             MR. MARKUS:  Judge, objection.  401 and 403.

21             THE COURT:  Overruled.

22             THE WITNESS:  Yes.  The FBI does receive telephone

23   calls on a daily basis from concerned citizens.

24   BY MR. WINSTEAD:

25   Q.    So at that point, had you decided that because what you

1815

DIRECT - PETERSON

1  knew in the case then that this was likely a homicide?

2          MR. MARKUS:  Judge, objection.

3          THE COURT:  Yes, sustained.

4  BY MR. WINSTEAD:

5  Q.    Okay.  All right.  Nevertheless, did you decide that

6  you wanted to do some follow-up investigation?

7  A.    Yes.

8  Q.    Has there been an investigation in Zambia?

9  A.    Yes, there had been.

10 Q.    What did they conclude about whether it was an

11 accident?

12 A.    There were conflicting conclusions in the case file.

13 Zambian officials had determined that it was an accident for

14 the most part, but there were reports that listed suicide as

15 a possible manner of death.

16 Q.    Were you also aware of an insurance investigation?

17 A.    Yes.

18 Q.    What did that investigation conclude?

19 A.    The Diligence reports concluded that the police had

20 unresolved or outstanding questions at the conclusion of

21 their investigation.

22 Q.    After reviewing both of those, why did you decide it

23 was worth further investigation?

24 A.    I thought that the circumstances surrounding the death

25 of Bianca Rudolph were suspicious.  I thought that the

1816

DIRECT - PETERSON

1    Zambian investigation --

2            MR. MARKUS:  Objection, Your Honor.

3            THE COURT:  Hold on.  Hold on.  Yes.

4            MR. MARKUS:  Relevance as to his -- what he thought

5    about the Zambian investigation and why he continued.

6            THE COURT:  Overruled.

7            THE WITNESS:  I thought that the Zambian

8    investigation was insufficient and, likewise, I thought the

9    Diligence investigation was insufficient.

10   BY MR. WINSTEAD:

11   Q.   Were there any theories of how the accident may have

12   occurred in the materials you received?

13   A.   Yes.

14   Q.   What were they?

15   A.   There were theories provided through an interview with

16   Mark Swanepoel that Bianca Rudolph was leaning over the

17   shotgun to --

18           MR. MARKUS:  Objection.  Hearsay, Your Honor.

19           THE COURT:  Sustained.  Why don't we try to

20   rephrase the question so that it doesn't elicit hearsay.

21   BY MR. WINSTEAD:

22   Q.   Were there any theories about how the accident may have

23   happened that you decided to try to confirm or deny?

24   A.   Yes.

25   Q.   What were those theories or scenarios?

1817

DIRECT - PETERSON

1   A.    Some of the theories related to a possible accident

2   leading to Bianca Rudolph's death.  Those included that she

3   was leaning over the shotgun case and trying to zip it in a

4   downward motion when she activated the trigger causing the

5   discharge.

6          There was also information -- or a theory that she

7   was banging the soft-sided case and the firearm on the

8   ground in an attempt to get the weapon to fit inside the

9   soft-sided case.

10  Q.    So did you do anything to test the feasibility of

11  either of those theories?

12  A.    Yes.

13  Q.    What sorts of testing did you decide to do?

14  A.    There were kind of two avenues that we were pursuing

15  simultaneously.  One was we needed to get information

16  related to Bianca Rudolph, specifically her static arm

17  measurement and dimensions so that we could test the

18  theories or the viability of an accident occurring here.

19         The other avenue we wanted to engage with experts

20  who could help us with photogrammetry, pathological

21  examinations, reach studies, as we moved forward in the

22  investigation.

23  Q.    Okay.  Did you also pursue any avenues of -- to try to

24  see whether it could be determined how far away the muzzle

25  was from the wound?

1818

DIRECT - PETERSON

1    A.    Yes.

2    Q.    Okay.    So in pursuing those lines of inquiry, what did

3    you have to get ahold of or what did you have to find in

4    order to do them?

5    A.    We started off by trying to locate and obtain the items

6    that were involved in the death of Bianca Rudolph,

7    specifically being the gun case, the shotgun, and the

8    ammunition.

9    Q.    Were you ever able to obtain the original shotgun?

10   A.    No.

11   Q.    Did the Zambian police take custody of it after Bianca

12   died?

13   A.    Yes, they did.

14   Q.    Did they conduct testing on it?

15   A.    Yes, they did.

16   Q.    And could you bring up Exhibit 10, page 19, please,

17   which has already been admitted.    And zoom in on those three

18   paragraphs right there.    This is Exhibit 10.

19        MR. MARKUS:    10?

20        MR. WINSTEAD:    Yes.

21   BY MR. WINSTEAD:

22   Q.    Can you read those paragraphs to me and tell me what

23   they meant to you in your -- in the progress of your

24   testing.

25   A.    Yes.    The first paragraph under the heading of Suicide

DIRECT - PETERSON

1    says:  On 12th October 2016 Officer Malama of the Mumbwa

2    Police Station, CID, submitted to our forensic science

3    laboratories one firearm with serial No. WT 1510016, two

4    cartridges, one cartridge case, and two plastic wads alleged

5    to have been extracted from a deceased body.  This was for

6    the purpose of a forensic ballistics analysis.

7         Under the heading Forensic Ballistics Analysis, It

8    says:  I have fully identified and analyzed the

9    above-mentioned exhibit in all aspects of forensic

10   ballistics analysis.

11        The exhibit firearm is a semi-automatic Browning

12   shotgun manufactured in Japan.  It was designed to chamber

13   cartridges of a caliber 18.5 millimeters, 12 bore.  The

14   mechanisms of the exhibit shotgun is perfect as both its

15   cocking and firing mechanism are in good condition.  This

16   was arrived at when I test-fired the exhibit by loading and

17   discharging two cartridges, and obtained cartridges cases

18   from the purpose of a comparison analysis.  Therefore, it is

19   capable of loading, discharging, and ejecting cartridges of

20   the same caliber.

21   Q.   All right.  Would you please pull up Exhibit 28, which

22   has been admitted.

23        What did the Zambian police do with the shotgun?

24   A.   Officer Malama returned the shotgun to Mr. Lawrence

25   Rudolph.

DIRECT - PETERSON

1    Q.    All right.   If we could take that down.

2              Did you ever find anything else about the location

3    of the original shotgun?

4    A.    No.

5    Q.    Did you conduct any searches of records to see if the

6    shotgun had been transferred from the defendant to anyone

7    else?

8    A.    There was an ATF eTrace done to look at the

9    transactions related to the subject shotgun.

10   Q.    Did it give you anything useful in finding the shotgun?

11             MR. MARKUS:   Objection, Your Honor.   Hearsay.

12             THE COURT:   Overruled.

13   BY MR. WINSTEAD:

14   Q.    Did that eTrace give you anything useful in finding the

15   shotgun?

16   A.    No.

17             THE COURT:   The objection, for the record, was

18   overruled.   Next question.

19   BY MR. WINSTEAD:

20   Q.    Were you aware of any other records you can search to

21   find if a firearm had been transferred from the defendant to

22   another person?

23   A.    No.

24   Q.    Throughout the case, have you continued to pursue any

25   opportunities to try to find the original shotgun?

DIRECT - PETERSON

1    A.    Yes.

2    Q.    Since you couldn't find the original, did you try to

3    find a duplicate?

4    A.    Yes, I did.

5    Q.    Did you have the serial number of the original?

6    A.    I did.    I had the serial number as listed here in the

7    forensic ballistics report.

8    Q.    What did you do with that?

9    A.    I provided that serial number to the legal department

10   of Browning Firearms and asked them for information in

11   identifying that specific shotgun.

12   Q.    Did they tell you information about it?

13   A.    Yes, they did.

14   Q.    And were you able to locate a duplicate shotgun?

15   A.    Yes.

16   Q.    How did you do that?

17   A.    I conducted online research in an effort to locate a

18   Browning Auto-5 1991 Wild Turkey Federation Commemorative

19   Shotgun of the Year.    I found one that was available for

20   sale at Steve Barnett's Fine Guns in West Point,

21   Mississippi.

22   Q.    Once you found that one, did you confirm with Browning

23   that it was a match?

24   A.    Yes, I did.    I provided, again, the serial number of

25   the subject shotgun, as well as the serial number of the

DIRECT - PETERSON

1    shotgun that I intended to purchase, and asked them if those

2    were, in fact, matching make and model shotguns, if they

3    were both manufactured as part of that limited series of 500

4    commemorative shotguns.

5    Q.    Were they a match?

6    A.    Yes, they were.

7    Q.    So did you buy that one?

8    A.    I did.

9    Q.    What about the case?  What did you do to try to

10    replicate the case?

11    A.    We used scene photographs to identify the type of case

12    as well as the manufacturer of the case.

13    Q.    And then what did you do?

14    A.    We went to the Allen Company here in Colorado,

15    conducted interviews, showed them specific scene images, and

16    asked them to confirm if it was, in fact, a case that they

17    had manufactured.

18    Q.    Was it?

19    A.    It was.

20    Q.    So what did you do then?

21    A.    We asked Allen Company to provide us with a number of

22    cases to be used for testing.

23    Q.    Did they do that?

24    A.    Yes, they did.

25    Q.    Can you tell me, were there any -- any issues with that

1823

DIRECT - PETERSON

1    process?

2    A.    There was one issue.  I think we obtained three sets of

3    cases, and one of those sets of cases was the incorrect

4    design.  It actually had an extra piece of material sewn

5    over the nose of the case as a reinforcement, so we returned

6    those cases and asked for more cases that matched the

7    subject case.

8    Q.    How many, about, did they manufacture for you?

9    A.    Manufactured over a hundred.  We kept and used between

10   65 and 75.

11   Q.    Okay.  All right.  And we've seen Government's

12   Exhibit 4.  Is that -- and we don't need to get it; it's

13   okay.  But is that the last intact case that you have from

14   them?

15   A.    I believe that is the last intact case we have, yes.

16   Q.    Okay.  What about ammunition?

17   A.    I utilized images of the shotshells, both the exemplary

18   shotshell as well as the two shotshells used in the forensic

19   examination in Zambia, as well as the headstamp images and

20   provided those to our partners at Federal Ammunition and

21   asked them to identify the specific make and model of the

22   ammunition for us for testing purposes.

23   Q.    Did they identify a make and model?

24   A.    They did.

25   Q.    What -- do you remember what it was?

1824

DIRECT - PETERSON

1  A.   Yes.  It was a premium 158 three-inch shotshell

2  double-aught.

3  Q.   Did they provide some of that ammunition to you?

4  A.   Yes, they did.

5  Q.   About how many?

6  A.   We did it in two rounds.  Overall, they ended up

7  providing us with approximately 70 rounds.

8  Q.   So later -- I think this is what you were referring to

9  as several rounds -- later did you find out additional

10 details about the ammo from the incident?

11 A.   Yes.

12 Q.   And did you provide that additional information to

13 Federal?

14 A.   Yes, I did.

15 Q.   Did they provide a second batch of ammunition?

16 A.   Yes, they did.

17 Q.   So once you had the shotgun, the cases, and the

18 ammunition, what did you do?

19 A.   Well, we wanted to do a number of things.  We wanted to

20 conduct pattern testing; we also wanted to conduct a reach

21 study to see if someone with the dimensions of Bianca

22 Rudolph would be able to reach the trigger of that specific

23 shotgun inside a soft-sided case.

24 Q.   So first let's talk about the patterning.  Why did you

25 want to do patterning?

DIRECT - PETERSON

1    A.    We wanted to conduct patterning testing so that we

2    could provide those patterns to a pathologist, in this case

3    Dr. Cina, for his analysis.  We wanted him to compare those

4    patterns to the wound on Bianca Rudolph to see if he could

5    make any determination related to likely muzzle-to-target

6    distance.

7    Q.    Why did you care about muzzle-to-target distance in

8    your investigation?

9    A.    I think it's important when you're looking at a

10   shooting death that possibly is an accident, a suicide, or a

11   homicide, to determine the likely muzzle-to-target distance

12   as part of that investigation.

13   Q.    All right.  Then let's -- tell me about the reach

14   study.  Why did you do that?

15   A.    We conducted the reach study because we wanted to

16   determine if someone with Bianca Rudolph's dimensions was

17   capable of reaching the trigger of this shotgun while inside

18   the soft-sided case.

19   Q.    So what did you decide to do to try to figure that out?

20   A.    We designed a three-phase reach study that consisted of

21   collecting measurements, asking individuals to place the

22   weapon inside the bag and zip it up, and then asking

23   individuals, while keeping the shotgun approximately

24   perpendicular to their heart, if they were able to zip the

25   bag and reach the trigger.

DIRECT - PETERSON

1    Once we designed the study, we set about recruiting

2    volunteers.  We were able to recruit 15 volunteers from the

3    FBI and from the Lakewood Police Department for the initial

4    round of the study.

5    Q.   Now as far as those volunteers, did you want to know

6    anything about Bianca first?

7    A.   We wanted to know what Bianca's -- what Bianca

8    Rudolph's static arm measurement was.

9    Q.   Why did you want to know that?

10   A.   Because we thought it was important to determine a

11   static arm measurement and look at how that relates to reach

12   potential.

13   Q.   What did you do to try to figure that out about Bianca?

14   A.   I contacted Richard Vorder Bruegge in the FBI

15   laboratory.  I had already been working with him on an

16   unrelated death investigation so I was familiar with the

17   concept of photogrammetry.  So I contacted him and asked him

18   what he would need from me to conduct a photogrammetry

19   analysis to give us a static arm measurement for Bianca

20   Rudolph.

21   Q.   And what did you need?

22   A.   I had provided him with the photo of Valerie Wood and

23   Bianca Rudolph together and asked him how we could use this

24   photo to conduct this analysis.  He asked us to travel to

25   Arizona to meet with Ms. Wood, see if she had any of the

DIRECT - PETERSON

1    same materials that she was wearing, hat, bracelets,

2    necklace, shoes, dress, in that photo.

3           And he asked us to take digital images of her with

4    the scale on a parallel plane to her arm and to the dress so

5    that he could use that for his photogrammetry project.

6    Q.    And did you obtain all of that information for him?

7    A.    Yes.

8    Q.    Was he able to give you some data about Bianca?

9    A.    Yes, he was.

10    Q.    All right.  Once he did that, did you conduct the reach

11    study you were telling me about earlier?

12    A.    Yes.

13    Q.    How many people did you use?

14    A.    We used 15 volunteers.

15    Q.    Okay.  And were you looking for women that were

16    somewhat comparable to Bianca?

17    A.    Yes, we were.

18           THE COURT:  Mr. Winstead, why don't we pause there

19    for our afternoon recess.  All right.  Ladies and gentlemen

20    of the jury, we'll be in recess for 15 minutes.

21           (Recess taken 3:09 p.m. to 3:28 p.m.)

22           THE COURT:  Agent Peterson, I remind you that you

23    remain under oath.

24           THE WITNESS:  Yes, Your Honor.

25           THE COURT:  You may resume your examination,

DIRECT - PETERSON

1    Mr. Winstead.

2            MR. WINSTEAD:    Thank you, Your Honor.

3    BY MR. WINSTEAD:

4    Q.    All right.    Sir, so very briefly, could you just tell

5    me -- finish up talking about the reach study you conducted.

6    What were the three phases?

7    A.    The first phase was to collect measurements from each

8    of the 15 volunteers.    We wanted to determine their height,

9    their right static arm measurement, their left static arm

10   measurement, and their reach potential.

11           The --

12   Q.    What was reach potential?

13   A.    Reach potential was defined as the distance that a

14   person could reach from the area right over their heart,

15   reaching directly forward, onto a yardstick.

16   Q.    All right.    And why were you trying to measure that on

17   the volunteers?

18   A.    I wanted to see the relationship between an

19   individual's static arm measurement and their reach

20   potential.

21   Q.    Why did you care about that?

22   A.    I wanted to be able to determine if a person had a

23   static arm measurement, say, of 28 inches, if that meant

24   that their reach potential or the distance they could reach

25   is less than that, at that, or greater than that.    And if it

DIRECT - PETERSON

1    was less than or greater than, I wanted to determine a

2    distance or an average of that measurement.

3    Q.    What did that matter for figuring out what may have

4    happened in this case to you?

5    A.    If Bianca Rudolph had the shotgun inside the case up

6    against her chest and she was reaching over it or down and

7    she was zipping it or she was manipulating it in any way, I

8    wanted to determine if she would be able to reach the

9    trigger with that reach potential.

10    Q.    Okay.  After you did those measurements, did you find

11    out whether reach potential was generally more, the same, or

12    less than static arm measurement?

13    A.    Surprisingly to me, and I think a lot of other people,

14    the reach potential was actually less than the static arm

15    measurement.

16    Q.    Did you go on to do additional phases?

17    A.    Yes.

18    Q.    What were they?

19    A.    The second phase, we gave the volunteers a very brief

20    instruction.  Let them know that they were going to be

21    handed a shotgun and a soft-sided case and we asked them to

22    place the shotgun into the case and zip the case closed.

23    Q.    Why did you do that?

24    A.    Based on some of the information in the early

25    investigation, I wanted to determine if it was, in fact,

DIRECT - PETERSON

1    difficult to fit the shotgun inside the Allen Company 46

2    case.

3    Q.    And what was the third phase?

4    A.    The third phase is the volunteers were instructed,

5    while keeping the muzzle of the shotgun against their chest,

6    and maintaining approximately a 90-degrees angle to their

7    torso, to try and zip the bag and see if they were able to

8    reach the trigger while zipping the bag.

9    Q.    I noticed in the videos that we were watching before

10   there was always a table in the near vicinity of the person.

11   Why did you have that set up there?

12   A.    We placed the table there near the participants to

13   replicate the bed that was in the room where Bianca Rudolph

14   died to see if any of the volunteers would use that flat

15   surface to place the gun inside the bag.

16   Q.    And did any?

17   A.    I believe one or more did, yes.  Some used the floor,

18   some did it in front of them, and some used the flat

19   surface.

20   Q.    In that study, did you find that anyone had trouble

21   getting the shotgun into the bag?

22        MR. MARKUS:  Judge, objection.  Cumulative.  We've

23   seen the videos and we've heard from the witnesses already

24   on this.

25        THE COURT:  I'll let it go for now.  Overruled.

DIRECT - PETERSON

1      THE WITNESS:  No.

2  BY MR. WINSTEAD:

3  Q.    It's okay, we can move on.

4  A.    Okay.

5  Q.    All right.  After you'd done the reach study, did you

6  decide to do additional inquiry along those lines?

7  A.    Yes.

8  Q.    What did you do?

9  A.    I wanted to engage with someone who was an expert in

10  the field to determine if our reach study was performed

11  appropriately, if it's something that an expert could adopt,

12  or if it's something that an expert would completely

13  disregard and conduct their own study to answer those

14  questions for us.

15  Q.    Okay.  And did he conduct -- or did he believe that it

16  was a valuable inquiry?

17  A.    Yes, he did.

18  Q.    Did he conduct additional tests similar to yours?

19  A.    Yes, he did.

20  Q.    I'd like to ask you -- actually, may the witness be

21  provided with what I've marked for identification as

22  Government's Exhibit 94.

23      Sir, can you tell me what that is.

24  A.    Yes.  This is a chart that is labeled Unintentional

25  Firearm Deaths with Wounds to the Thorax by Type of Firearm.

DIRECT - PETERSON

1    But data compiled by the CDC.

2    Q.    Did you reach out to the CDC to try to get

3    statistics?

4    A.    Yes, I did.

5    Q.    What were you trying to find out?

6    A.    I wanted to determine how common it was for a person to

7    accidentally shoot themselves in the area of the heart with

8    a shotgun.

9    Q.    And what were you hoping to find out when you requested

10   statistics from the CDC?

11   A.    Just that.  I wanted to know how common it was.  If I

12   was able to identify a series of cases, I would have located

13   the police reports or the investigative material related to

14   those to try and either compare or distinguish those from

15   the circumstances that we were looking at.

16   Q.    That exhibit that you've got, is that what you received

17   back from the CDC?

18   A.    Yes.  It's part of what they said and what they gave

19   us, yes.

20        MR. WINSTEAD:  Your Honor, at this point I'd like

21   to move for admission of Government's Exhibit 94, and it was

22   not previously on our exhibit list.  We're moving it in

23   because we believe it's become relevant based on other

24   discussion of the CDC statistics.

25        THE COURT:  All right.  So you're telling me it

DIRECT - PETERSON

1    wasn't on your original exhibit list?

2            MR. WINSTEAD:  No, sir.

3            THE COURT:  Did you have gaps in the numbering?

4            MR. WINSTEAD:  Yes, sir.  So --

5            THE COURT:  Oh, I see.  Do you have -- well, first

6    of all, have you provided a copy to defense counsel?

7            MR. WINSTEAD:  We have, and we understand that

8    defense counsel objects.

9            THE COURT:  Do you have a copy for me?

10           MR. WINSTEAD:  Oh, I'm sorry, sir.

11           MR. MARKUS:  He can have my copy.  I wrote on it,

12   though.  There's some of my writing on it, Ms. Guerra.

13           THE COURT:  Already some handwritten notations that

14   I will disregard.  Okay.  Is there an objection to

15   Government 94?

16           MR. MARKUS:  Yes, Your Honor.

17           THE COURT:  Go ahead.

18           MR. MARKUS:  This is very limited and incomplete

19   data, Your Honor, so we would object to it.

20           THE COURT:  Do you have an objection, Mr. Dill?

21           MR. DILL:  I have no objection, Your Honor.

22           THE COURT:  Your response, Mr. Winstead.

23           MR. WINSTEAD:  Simply that this is the -- this is

24   the information that this special agent received in inquiry

25   from the CDC, and it's -- it doesn't purport to be all

DIRECT - PETERSON

1    firearm deaths, it's firearm -- accidental firearm deaths

2    from wounds to the torso.

3            THE COURT:  All right.  I don't believe that the --

4    you have something else you want to put on the record?

5            MR. MARKUS:  Yes, Your Honor.  This is only from a

6    very small number of states during a very small amount of

7    time as well.

8            THE COURT:  All right.  I don't believe that the

9    basis of counsel's objection goes to the admissibility of

10   this document.  I think it's more appropriately handled as a

11   basis for cross-examination.  The objection's overruled.

12   Government Exhibit 94 is admitted into evidence and may be

13   published to the jury.

14           (Government's Exhibit 94 received)

15           MR. WINSTEAD:  Thank you, Your Honor.  And may I

16   retrieve the original from the witness and put it up on the

17   Elmo to display.

18   BY MR. WINSTEAD:

19   Q.   Now can you tell me what statistics you received back.

20   A.   This chart shows the unintentional firearm deaths with

21   wounds to the thorax by type of firearm from 2003 through

22   2017.

23   Q.   How many total deaths are reflected at the bottom?

24   A.   603.

25   Q.   And of those deaths, how many were attributable to

DIRECT - PETERSON

1     semi-automatic shotguns?

2     A.   Eight.

3     Q.   Now was there anything that you found to not be

4     specific enough about this data for your purposes?

5     A.   Yes.   I didn't choose to cite this or rely on this data

6     in any meaningful way because the CDC was not able to

7     distinguish or differentiate for me if they were shot in the

8     front of the thorax, torso, in the back; and the data I was

9     looking for specifically was for self-inflicted, so I

10    specifically wanted to know how common it was for

11    individuals to have a self-inflicted, not just an

12    unintentional, firearm death to -- to the upper torso --

13    front, upper torso.

14    Q.   Thank you.   So after conducting those parts of the

15    investigation, looking at the statistics and doing the

16    study, did you believe that it were -- it warranted further

17    investigation?

18    A.   Yes.

19    Q.   Now you had -- you've been talking about ways in which

20    you were trying to confirm or deny the feasibility of it

21    being an accident.   Did you look into whether it could have

22    been suicide?

23    A.   Yes.

24    Q.   What investigation did you do to try to determine

25    whether it could be a suicide?

1836

DIRECT - PETERSON

1    A.    We conducted a number of interviews in an effort to

2    determine Bianca Rudolph's mindset at the time immediately

3    leading up to her death to see if there were any indications

4    that she was, in fact, suicidal.

5    Q.    Were there any indications?

6    A.    None.

7    Q.    Were there contraindications?

8    A.    Yes.

9    Q.    What were those?

10   A.    Several individuals talked to us about the fact that

11   Bianca Rudolph was offered the opportunity to extend her

12   trip.  She opted not to do that.  She was very insistent on

13   getting back to New York to --

14          MR. MARKUS:  Judge, I'm sorry, I have to object.

15   This is hearsay.

16          THE COURT:  Mr. Winstead.

17          MR. WINSTEAD:  That's fine, Your Honor.  We'll move

18   on.

19          THE COURT:  Okay, sustained.

20   BY MR. WINSTEAD:

21   Q.    All right.  Now once you decided to continue

22   investigating beyond the ideas of an accident or a suicide,

23   did you -- who did you think it made sense to investigate

24   that it might be a potential homicide?

25   A.    Oh, Lawrence Rudolph.

1837

DIRECT - PETERSON

1    Q.    Why him?

2    A.    Because by all accounts, he was the only other person

3    that was present in the hunting cabin at the time of Bianca

4    Rudolph's death.

5    Q.    Did you take steps to try to determine whether he may

6    have had a motive?

7    A.    Yes.

8    Q.    Did you obtain financial records for him?

9    A.    Yes.

10    Q.    Did you also determine in your investigation that he

11    was -- that he had a relationship with Defendant Milliron?

12    A.    Yes.

13    Q.    Did you also obtain financial information about her?

14    A.    Yes.

15    Q.    What about travel records?

16    A.    We obtained those as well.

17    Q.    Any other kind of records?

18    A.    Hunting importation records were obtained.

19    Q.    Who did you give all those records to?

20    A.    We provided those to Erin Newton.

21    Q.    Who's she?

22    A.    She's a forensic accountant with the FBI.

23    Q.    All right.  I'd like to ask you about a couple other

24    documents.  All right.  I'd like to display for you what has

25    already been admitted as Government's Exhibit 55, please.

1838
DIRECT - PETERSON

1    All right.  No, you don't have to pull that up.  Can you

2    actually go to the next page.  And the next page.

3         All right.  So this is page 3 of Government's

4    Exhibit 55.  And if you could zoom in just on this section

5    down here.

6         Can you tell me what this is.

7    A.   This is an email from Lawrence Rudolph's gmail account.

8    Q.   What does it say?

9    A.   It says, "Karen, who in your opinion is the very best

10   counsel to manage life insurance claims?  Thanks.

11   Dr. Rudolph."

12   Q.   Can you see the date on that email?

13   A.   Yes.  The date is October 19th, 2016.

14   Q.   Do you recall the date that Bianca Rudolph was

15   cremated?

16   A.   Yes.

17   Q.   What was it?

18   A.   She was cremated on the 14th of October.

19   Q.   Okay.  Can you take that down, please.

20        I'd like to show you another exhibit -- this one

21   has not been admitted yet.

22        MR. WINSTEAD:  Its authenticity has been stipulated

23   to, and I don't believe there's an objection to it, so I

24   would move to admit Government's Exhibit 121.

25        MR. MARKUS:  What is it --

1839

DIRECT - PETERSON

1    MR. WINSTEAD:  It's the email to Andi Murphy.

2    THE COURT:  So is this not in the exhibit binder?

3    MR. WINSTEAD:  It is in the exhibit binder.

4    THE COURT:  Oh, okay.  Let me take a look at it.

5    Do you have -- is it available to put on the monitor?

6    MR. WINSTEAD:  Oh, yeah.  Perfect -- may I please

7    have the monitors aside from the jury.  And could you bring

8    that up, please.  Exhibit 121.

9    BY MR. WINSTEAD:

10    Q.    Can you tell me what this is.  Is it an email chain?

11    A.    Yes.

12    Q.    Can you tell me -- if you can actually go to page 5 of

13    it.  Do you see on the bottom there -- nope, sorry, you got

14    to get the header for him.

15    What is that?

16    A.    This is a message with a subject of Mark Swanepoel

17    contact.

18    Q.    And do you know who Andi Murphy is?

19    Here, go ahead and zoom out.  Can you highlight up

20    here.

21    A.    Here Andi Murphy is of Murphy Investigations, Inc., in

22    Scottsdale, Arizona.

23    Q.    Do you know if she was the investigator for Diligence?

24    A.    Yes.

25    Q.    Okay.  And can I -- do you want me to go into any more?

1840

DIRECT - PETERSON

1    MR. MARKUS:  I have no objection, Your Honor.

2    THE COURT:  All right.  Mr. Dill, any objection?

3    MR. DILL:  No, Your Honor.

4    THE COURT:  All right.  There being no objection,

5  Government's Exhibit 121 is admitted into evidence and may

6  be published to the jury.

7       (Government's Exhibit 121 received)

8    MR. WINSTEAD:  Okay, thank you.

9  BY MR. WINSTEAD:

10  Q.   Can you zoom out again and get the bottom section here.

11       All right, can you tell me what this is.

12  A.   Yes.  This is a message with the subject line of:  Mark

13  Swanepoel contact.  Addressed to Andi.

14  Q.   And go ahead and read the email.

15  A.   "Andi, professional hunter in Zambia was Mark

16  Swanepoel.  His cell phone number" --

17  Q.   You don't need to read the number, just read the rest.

18  A.   "He resides in South Africa which is eight hours later

19  than AZ time so you would need to call him in the a.m.

20  He was the only one present in camp that was not local,

21  tribal, Zambian.  Those people do not have any means to

22  contact them.  Let me know if you need anything else."

23  Q.   All right.  Thank you.  You can take that down.

24       Do you know if Andi Murphy interviewed Dr. Rudolph

25  during the Diligence investigation?

DIRECT - PETERSON

1    A.    He was interviewed.

2    Q.    Can you bring up what's already been admitted as

3    Government's Exhibit 120.

4          What's this?

5    A.    This is a list of documents provided to MetLife on

6    December 22d, 2016.

7    Q.    Does it have the -- generally speaking the Zambian

8    police documentation of the case in the list?

9    A.    Yes.

10   Q.    Does it have the ballistics report that you were

11   reading from us from -- earlier?

12   A.    No, it does not.

13   Q.    Okay.  You can take that down, please.

14         During your investigation, did you hear from a

15   witness that Dr. Rudolph had ordered propofol at some point?

16   A.    Yes.

17   Q.    Do you know what propofol is?

18   A.    Generally, yes.

19   Q.    What is it?

20   A.    It's a sedative used for a sleep aid during medical

21   procedures.

22   Q.    Did you think anything of that?

23   A.    I think what was significant to me about it was just

24   the fact that it was only done one time.

25   Q.    Did you follow up to request records on the orders of

DIRECT - PETERSON

1    propofol?

2    A.    Yes.

3    Q.    And did you receive any records?

4    A.    We received one invoice and email correspondence.

5    Q.    Was that the only record that you received pursuant to

6    your request for all those records?

7    A.    Yes.

8    Q.    Okay.

9          THE COURT:  Let me interject.  Special Agent, to

10   whom was the request made?

11         THE WITNESS:  Henry Schein, which is a --

12         THE COURT:  You need to speak into the mic.

13         THE WITNESS:  I'm sorry, it's -- the request was

14   made to Henry Schein, a company that provides medical drugs.

15         THE COURT:  All right.

16   BY MR. WINSTEAD:

17   Q.    And if you could pull up what was admitted earlier

18   today as Government's Exhibit 57.

19         Is this the record you received back?

20   A.    Yes, it is.

21   Q.    And was this the only record of the order of propofol?

22   A.    This was the only record that Henry Schein reportedly

23   had regarding Larry Rudolph ordering propofol, yes.

24   Q.    All right.  You can take that down.

25         Did you receive -- did you receive the

1843

DIRECT - PETERSON

1    documentation of the Rudolph Trust that was established in

2    April of 2016?

3    A.    Yes.

4         MR. WINSTEAD:  Your Honor, at this time I'd like to

5    also move to admit Government's Exhibit 93.  And this one I

6    believe the -- there's no objection to, and I've got a copy

7    for the Court if you'd like to see it.

8         THE COURT:  So is this also in that range of --

9         MR. WINSTEAD:  That --

10        THE COURT:  -- the gap --

11        MR. WINSTEAD:  The reserved yesterday.

12        THE COURT:  And you provided copies to defense

13   counsel?

14        MR. WINSTEAD:  They have copies.

15        MR. DILL:  We have it, Your Honor.  No objection.

16        THE COURT:  Do you have a copy for me?

17        MR. WINSTEAD:  Yes, sir.

18        THE COURT:  And for the witness?

19        MR. WINSTEAD:  We're just admitting it.  We won't

20   be further discussing it.  Parts of it have been discussed

21   before.  This is just the full document.

22        THE COURT:  You're just putting it in the record.

23   All right.  So you're moving its admission?

24        MR. WINSTEAD:  Yes, sir.

25        THE COURT:  Any objection to 93 from the

DIRECT - PETERSON

1    defendants?

2            MR. MARKUS:  No, Your Honor.

3            MR. DILL:  No, Your Honor.

4            THE COURT:  There being no objection, Government

5    Exhibit 93 is admitted into evidence.  And if you choose to,

6    at some time, at some point, can be published to the jury.

7            (Government's Exhibit 93 received)

8            MR. WINSTEAD:  Thank you, Your Honor.

9    BY MR. WINSTEAD:

10   Q.    Sir, did you travel to Africa this past spring?

11   A.    Yes, I did.

12   Q.    Where did you go to?

13   A.    Initially we landed in Johannesburg, South Africa, and

14   then we traveled up to Lusaka, Zambia, and drove out to the

15   Chinyembe hunting camp.

16   Q.    Why did you go there?

17   A.    We went there to conduct witness interviews for trial

18   preparation purposes and to collect a FARO scan of the scene

19   where Ms. Bianca Rudolph died.

20   Q.    What is a FARO scan?

21   A.    FARO is an acronym.  It stands for Frasier, with an S,

22   and Raab, R-a-a-b, Orthopedics, which is a company that

23   produces laser scanners.

24   Q.    Did you operate the device?

25   A.    Yes, I did.

DIRECT - PETERSON

1    Q.    How did you know how to do that?

2    A.    I'm a certified laser scanner operator for the FBI.    I

3    first attended a 16-hour orientation in November of 2018.    I

4    was later selected to be one of the first two agents to be

5    certified on the scanner in December of 2018.    And I

6    returned for recertification in October or November of 2021.

7    Q.    So when you're talking about FARO, is that what we were

8    looking at with pictures of the scene that you could sort of

9    move around?

10   A.    Yes.

11   Q.    How does that work?

12   A.    The FARO scanner is a portable noncontact measurement

13   instrument that uses an infrared laser to collect data

14   points to create a three-dimensional representation of the

15   environment of which it's placed.

16        So you have a small instrument that's approximately

17   the size of a shoe box that sits on a tripod, and that

18   instrument spins on a horizontal axis.    Inside the device is

19   a mirror that simultaneously spins on a vertical axis.    A

20   laser is projected from the instrument, deflected off of the

21   rotating mirror, to collect data points X, Y, Z, Cartesian

22   coordinates, millions of data points of the environment in

23   which it's placed.

24        That scanner is then used to create a

25   three-dimensional representation of that environment.

1846

DIRECT - PETERSON

1    Q.    So I've seen like house tours and things like that that

2    seem to have a similar thing.  Is this pretty much like

3    that?

4    A.    Very similar, without the underlying data point cloud.

5    Q.    So what do you mean by the underlying data point cloud?

6    And what are you able to do with that?

7    A.    So the device first collects these points of the

8    environment, the X, Y, Z coordinates repeatedly for the

9    environment in which it's placed.  That is used to build a

10   data point cloud of all those data points that it's

11   collected.  At the end of the cycle, the machine collects

12   three-dimensional photographs of the environment.

13        The device, when you register those scans

14   together -- say we were doing this room and we take four

15   different scans.  Once it was done, we would register those

16   scans together to create one project of this overall room.

17        Now you have the underlying data point cloud with

18   the three dimensional images laid over the top.  So when you

19   create a scene-to-go product, which is what we were looking

20   at in court, it's very pretty because you're looking at

21   three-dimensional images.  Under those images you have kind

22   of the raw, less-refined point cloud that is the underlying

23   data.

24   Q.    And so does that allow you to, once you have that data,

25   make measurements inside that 3D model?

1847

DIRECT - PETERSON

1   A.   Yes.

2   Q.   How do you know if you've gotten an accurate model?

3   A.   There's a registration report which is created post

4   registration.

5   Q.   And does that show if there were any errors in data

6   collection?

7   A.   It wouldn't show errors in data collection *per se*, but

8   it would show if those scans did not accurately register

9   together.

10  Q.   Did this one register and everything checked out?

11  A.   Yes.

12  Q.   All right.  So we've talked about other aspects of your

13  investigation.  At any point in the investigation, did you

14  attempt to contact Julian Rudolph?

15  A.   Yes, we did.

16  Q.   Who is he?

17  A.   Julian Rudolph is the son of Lawrence and Bianca

18  Rudolph.

19  Q.   Why did you want to speak to him?

20  A.   Julian Rudolph is someone who we had learned was close

21  to Lawrence and Bianca Rudolph.  We wanted to interview him

22  regarding the circumstances surrounding his mother's death

23  and hopefully to obtain additional information for our

24  investigation.

25  Q.   Were you trying to obtain information about family

1848

DIRECT - PETERSON

1    documents or anything like that?

2    A.    Part of it, yes.

3    Q.    Can you explain that.

4    A.    Because we believed that Julian Rudolph was close to

5    his mother at the time of her death, we thought that he may

6    have information related to her wishes regarding burial and

7    cremation.

8    Q.    When did you try to speak with him?

9    A.    We first contacted Julian Rudolph on August 9th of

10   2020.

11   Q.    How did you approach him?

12   A.    We went to his residence fairly early on a Sunday

13   morning.

14   Q.    Why did you do that?

15   A.    We chose to go on a Sunday morning and go to his

16   residence in the interest of protecting his privacy.  We

17   didn't want to contact him in public and we didn't want to

18   go to his place of employment.

19   Q.    Did you speak with him?

20   A.    We did.

21   Q.    Were you able to obtain any information of substance

22   about the investigation in those conversations?

23   A.    No.

24   Q.    Did he agree to cooperate with the investigation?

25   A.    No.

DIRECT - PETERSON

1   Q.   After you spoke with Julian, were you contacted by any

2   defense counsel?

3          MR. MARKUS:   Judge, I'm going to object under

4   relevance and 403.   This is improper.

5          MR. WINSTEAD:   I can explain, Your Honor.

6          THE COURT:   Please.

7          MR. WINSTEAD:   It shows knowledge of awareness --

8          THE COURT:   Should we have a sidebar?

9          MR. WINSTEAD:   Oh, sure.

10          (Sidebar at bench)

11          THE COURT:   Wait a second.   Overall, give me like a

12   high-level perspective of why any discussions with the son

13   has any relevance to the charges.

14          MR. WINSTEAD:   Yes, sir.   So it shows that at that

15   point, Dr. Rudolph was aware of the investigation and --

16          THE COURT:   How does attempting to interview the

17   son show what the father knew or didn't know?

18          MR. WINSTEAD:   Because when defense counsel

19   contacted Special Agent Peterson they said that they

20   represented Dr. Rudolph and that he had become aware of the

21   investigation.

22          THE COURT:   Okay.

23          MR. WINSTEAD:   So that's it.   It shows that --

24          THE COURT:   All right.   So what do you want to

25   accomplish?   Where do you want to go with this line of

DIRECT - PETERSON

1   questioning?

2           MR. WINSTEAD:  Just that.  It -- that was it.  That

3   was the last question, just to show --

4           THE COURT:  All of this to show that Dr. Rudolph

5   was aware of the investigation?

6           MR. WINSTEAD:  Yes, sir.

7           MR. MARKUS:  We object, Your Honor.

8           THE COURT:  That's already gotten in.  I think

9   there's other ways to do it.

10          MR. WINSTEAD:  Well, other ways to show when he

11  became aware of the investigation?

12          THE COURT:  I thought you just said that he was

13  aware.  Now you're saying you're trying to pinpoint the

14  time.

15          MR. WINSTEAD:  Right.

16          THE COURT:  Okay, well, that's different.

17          MR. WINSTEAD:  Yes, sir.  I'm sorry.

18          THE COURT:  You didn't say that.  Okay.  And why

19  is -- I think I know how you're going to answer but let me

20  ask you, again:  Why is the point in time that the

21  defendant's aware of the investigation material to the

22  issues in this trial?

23          MR. WINSTEAD:  Well, for a number of reasons, Your

24  Honor.  First of all, Defendant Milliron's awareness of

25  the -- of the charges against Dr. Rudolph is one of the

DIRECT - PETERSON

1    subjects of her grand jury testimony, and so this explains

2    that timeline.  And the timeline of what his awareness was

3    is very important to several aspects of the case.

4           THE COURT:  Well, give me an example.

5           MR. WINSTEAD:  Well, one of them is Defendant

6    Milliron said that she learned of the case when Dr. Rudolph

7    told her about it after the FBI had contacted Julian.  For

8    one thing, the witness earlier today said that the statement

9    that Dr. Rudolph made that he was probably going to go to

10   prison happened around the same time in August of 2020, and

11   so that explains and corroborates that witness.

12          THE COURT:  I see.  Mr. Markus.

13          MR. MARKUS:  Judge, unfortunately by doing this,

14   Mr. Winstead is making me a witness because we were aware of

15   the investigation before that point.  This is the first time

16   I chose to contact Mr. Peterson because he took the step of

17   knocking on the son's door, which I thought was

18   inappropriate.  And so now the jury's going to be left with

19   the misleading information that this is the first time we

20   became aware of it when we were aware of it much before this

21   time.

22          MR. WINSTEAD:  But he's going to be a witness.

23          MR. MARKUS:  I know, but this is -- you can ask him

24   then, but you're misleading the jury by asking this witness

25   about it -- about that date that I called because it's

DIRECT - PETERSON

1  leaving the impression that's when I first became aware of

2  it, which is not true.

3          THE COURT:  Well, but if the question doesn't ask

4  for when was the -- to establish that point in terms of the

5  first time he was aware of it, I think it leaves open the

6  question in the jury's mind as to when they were first --

7  when he was -- first learned of the investigation as opposed

8  to -- which I think is a different matter, is that as of

9  this August of 2020, that he was aware.

10         It doesn't preclude the possibility that he was

11  aware of it before --

12         MR. WINSTEAD:  And separately that he was aware the

13  FBI had contacted Julian as well.

14         THE COURT:  Right.  Okay, I'm going to overrule the

15  objection.

16      (End of discussion at sidebar)

17         THE COURT:  All right.  You may proceed, counsel.

18         MR. WINSTEAD:  Thank you, Your Honor.

19  BY MR. WINSTEAD:

20  Q.   After you had had that conversation with Julian, were

21  you contacted by defense counsel?

22  A.   Yes, I was.

23  Q.   And did that defense counsel state who they

24  represented?

25  A.   Yes, they did.

DIRECT - PETERSON

1    Q.    Who was it?

2    A.    They were representing Lawrence Rudolph.

3    Q.    And were they contacting you about your conversation

4    with Julian?

5    A.    I think in part that was the purpose of the contact.

6    Q.    Okay.  All right.  Thank you.  Did you also attempt to

7    speak with AnaBianca Rudolph?

8    A.    Yes.

9    Q.    Who is she?

10   A.    AnaBianca Rudolph is the daughter of Lawrence and

11   Bianca Rudolph.

12   Q.    When did you attempt to speak with her?

13   A.    We went to her residence on September 8th of 2020.

14   Q.    How did you approach her?

15   A.    We went to her residence after hours.  It wasn't late,

16   maybe 5:00 or 6:00, somewhere around dinner time, and we

17   knocked on her door.

18   Q.    Why did you go then?

19   A.    We knew that she was working as a dentist so, again, we

20   wanted to contact her at her residence in the interest of

21   protecting her privacy.

22   Q.    Was she there?

23   A.    She was reportedly not there.

24   Q.    What did you do?

25   A.    We left our contact information with the person we

DIRECT - PETERSON

1   spoke with at the door.

2   Q.   Were you ever contacted by AnaBianca to speak with you?

3   A.   No, we were not.

4   Q.   Okay.  Were you ever able to do an interview or speak

5   with Julian or AnaBianca?  You, personally.

6   A.   I participated in an interview of AnaBianca Rudolph.

7   Q.   Okay.  Did agents attempt to talk to Ms. Milliron?

8   A.   Yes.

9   Q.   When was that?

10  A.   May 26th of 2021.

11          MR. DILL:  Objection.  Relevance.

12          THE COURT:  Hold on.

13          MR. DILL:  Relevance, Your Honor.  403.

14          THE COURT:  You need to use --

15          MR. DILL:  I'm sorry, Your Honor.  Objection, 401

16  and 403.

17          THE COURT:  Overruled.

18  BY MR. WINSTEAD:

19  Q.   Why did you want to speak with her?

20  A.   At that point in the investigation, we knew she had a

21  close, intimate relationship with Lawrence Rudolph and we

22  wanted to speak with her regarding her knowledge of the

23  death of Bianca Rudolph.

24  Q.   Did you know whether or not she had begun living with

25  Dr. Rudolph after Bianca died?

DIRECT - PETERSON

1   A.    Yes.

2   Q.    I'd like to bring up what's already been admitted as

3   Government's Exhibit 74.  Can you tell me what this document

4   is.

5   A.    Yes.  This is a vehicle decal and gate pass request for

6   property occupied by Lawrence Rudolph.

7   Q.    And what's the date on the top left?

8   A.    The date is April 17th, 2017.

9   Q.    Who are the residents listed?

10  A.    They are listed as Lori Milliron and Larry Rudolph.

11  Q.    All right.  You can take that down.

12        How was Lori approached?

13  A.    Two of the co-case agents went to her residence on the

14  morning of May 26th, 2021.  They knocked on her door a few

15  times in an attempt to contact her.

16  Q.    Did she speak with them?

17  A.    She did not.

18  Q.    Did you find out if she was at home?

19        MR. DILL:  Objection, Your Honor.  403 and other

20  issues.  I can approach.

21        THE COURT:  Do we really need another sidebar?

22        MR. DILL:  I would object to the relevance of this,

23  but --

24        THE COURT:  Well, if all you got is relevance and

25  403, it's overruled.  Go ahead.

1856

DIRECT - PETERSON

1    MR. WINSTEAD:  Thank you, Your Honor.

2  BY MR. WINSTEAD:

3  Q.    Did you find out if she was at home?

4  A.    She was at home at the time of the attempted contact,

5  yes.

6  Q.    Did investigators see her going anyplace afterwards?

7  A.    Yes.

8  Q.    What did they see?

9  A.    They observed her utilizing a car service to go to the

10  airport.

11  Q.    Do you know if she knew the agents were from the FBI?

12    MR. DILL:  Objection.  Calling for speculation,

13  Your Honor.

14    THE COURT:  You're asking if he knew.  Overruled.

15  BY MR. WINSTEAD:

16  Q.    Do you know if she knew -- if she knew that they were

17  agents from the FBI?

18  A.    Yes, she did know.

19  Q.    How do you know that?

20  A.    I know from her grand jury transcript.

21  Q.    Okay.  All right.  Did you eventually learn about a

22  will in this case?

23  A.    I did.

24  Q.    And I guess we'll loop back to the context where you

25  learned about it, but was it provided by the defense?

DIRECT - PETERSON

1  A.    Yes, it was.

2  Q.    In it, did it discuss Bianca's wishes for cremation?

3  A.    Yes, it did.

4  Q.    Could you pull up Government's Exhibit 56, page 6.  Let

5  me just make sure it's been admitted.

6         COURTROOM DEPUTY:  56 has been admitted.

7  BY MR. WINSTEAD:

8  Q.    Okay.  Yes.  Can you please pull up page 6 of Exhibit

9  56.  And can you zoom in for me right there on that section.

10        Can you read what that says.

11  A.    Section 7.03, Cremation Instructions.  "I wish that my

12  remains be cremated according to any known instructions left

13  by me, whether left in writing or expressed orally, to any

14  family member.  If I have failed to leave instructions

15  regarding the cremation of my remains, I wish that my

16  remains be cremated and my ashes dispersed" by my

17  personal -- "dispersed as my personal representative sees

18  fit."

19  Q.    All right.  Thank you.  And if you could zoom out and

20  then go to -- you're good -- 56 page 9, I believe.

21        Did you do any investigation to figure out whether

22  the will was genuine?

23  A.    Yes.

24  Q.    Were you able to determine anything about that?

25  A.    Yes.

1858

DIRECT - PETERSON

1    Q.    How did you determine that?

2    A.    In researching and speaking with the notary, it was

3    determined that it was valid.

4    Q.    Okay.  So before seeing the will --

5          You can take that down.  Thank you.

6          -- had anyone told you that Bianca would not have

7    wanted to be cremated?

8    A.    Yes.

9    Q.    And so before seeing the will, did you think that the

10   fact of her cremation against her wishes was potentially

11   suspicious?

12   A.    Yes.

13   Q.    Once you saw the will, did that change the way you

14   thought about her cremation?

15   A.    Yes.

16   Q.    What -- how did it change?

17   A.    Based on the fact that this appeared to be a valid will

18   for Bianca Rudolph and it expressed that she wished to be

19   cremated, it seemed to me like it was likely or possible

20   that these were, in fact, her wishes.

21   Q.    Did you continue to have any concerns about the process

22   of cremation in this case?

23          MR. MARKUS:  Objection, and improper opinion.

24          THE COURT:  Overruled.

25   BY MR. WINSTEAD:

1859

DIRECT - PETERSON

1     Q.    I'm sorry, was that --

2              THE COURT:    Overruled.

3              MR. WINSTEAD:    Thank you, Your Honor.

4     BY MR. WINSTEAD:

5     Q.    So I asked:  Did you continue to have any concerns

6     about the process of cremation in this case?

7     A.    Yes.

8     Q.    What were those?

9     A.    I was concerned at the speed at which the cremation

10    occurred.  I was also concerned by the fact that the

11    cremation was done prior to the notification of any family

12    members.

13    Q.    Are there potential innocent explanations for those

14    things, though?

15    A.    Sure.

16    Q.    All right.  Did you become aware of another document

17    which -- it's  -- it's Defense Exhibit RW, I believe that

18    it's been admitted as well, but I didn't bring that up.

19             COURTROOM DEPUTY:    RW has been admitted.

20             MR. WINSTEAD:    Okay.

21    BY MR. WINSTEAD:

22    Q.    Would you please display, if you can, RW.

23             Did you become aware of a postnuptial agreement?

24    A.    Yes.

25    Q.    Can you tell me what the date at the top of that

DIRECT - PETERSON

1    agreement is.

2    A.    Yes.    The date is the 25th of August, the year is 2000.

3    Q.    And can you go, please, to page 26.

4         What's on this page?

5    A.    This is -- appears to be the signature of Lawrence

6    Rudolph listed as husband; the signature of Bianca Rudolph

7    listed as wife, with a blank line to the left of the

8    Lawrence Rudolph signature for attorney Gary Gentile, a

9    blank attorney signature, and name identification line to

10   the left of the Bianca Rudolph signature, and a witness

11   signature dated August 25th of 2000 at the bottom of the

12   page.

13   Q.    Were you able to identify who the witness was on this

14   page?

15   A.    I do not know who that is.

16   Q.    As far as Gary Gentile, were you ever able to determine

17   if he was available to be interviewed?

18   A.    He was not available; he's deceased.

19   Q.    Okay.    Could you go to page 30 of this exhibit, please.

20        What's on this page?

21   A.    This is a list of parties that are authorized to be

22   contacted regarding this agreement, listed as an accountant,

23   broker, attorney, insurance representative, and attorney.

24   Q.    Did you attempt to find out if any of these individuals

25   were aware of this document?

DIRECT - PETERSON

1     A.    Yes.

2     Q.    Were any?

3          MR. MARKUS:    Judge, objection, hearsay.    They're

4     asking for conversations he had with these individuals.

5          THE COURT:    Overruled.

6          THE WITNESS:    We were not able to determine that

7     any of these individuals listed here were aware of this

8     postnuptial agreement.

9     BY MR. WINSTEAD:

10    Q.    Did you conduct any investigation to determine if

11    Bianca's signature on that signature line was genuine?

12    A.    Yes.

13    Q.    Did you submit it to the FBI lab?

14    A.    Yes, I did.

15    Q.    What was the lab's conclusion?

16    A.    They concluded that the signature on the postnuptial

17    agreement matched known signatures of Bianca Rudolph.

18    Q.    All right.    I'd like to ask you about the process in

19    this case.    So at some point did you obtain a criminal

20    complaint for Defendant Rudolph?

21    A.    Yes.

22    Q.    What is a complaint?

23    A.    A criminal complaint is a charging instrument in the

24    federal system.    From my experience, an agent provides an

25    affidavit detailing probable cause to a magistrate judge.

1862

DIRECT - PETERSON

1    That magistrate judge, if they agree, then the complaint is

2    issued and an arrest warrant is --

3            MR. MARKUS:  Objection, Your Honor.  Relevance

4    about whether a magistrate agrees with the criminal

5    complaint or not.

6            THE COURT:  He's just describing the process.

7    Overruled.

8    BY MR. WINSTEAD:

9    Q.   And did you write the affidavit for the complaint?

10   A.   Yes.

11   Q.   And was a criminal complaint issued?

12   A.   Yes, it was.

13   Q.   Okay.  When you got Defendant Rudolph's travel records,

14   did you see that he was traveling anywhere in December of

15   2021?

16   A.   Yes.

17   Q.   Was anyone traveling with him?

18   A.   Yes.

19   Q.   Who was that?

20   A.   He was traveling to Cabo with Lori Milliron.

21   Q.   Okay.  Did -- did the defendant then fly back to

22   Colorado?

23   A.   Yes.

24   Q.   And once he arrived in Colorado, did you arrest him?

25   A.   I did.

1863

DIRECT - PETERSON

1    Q.    Where did you arrest him?

2    A.    At the Denver International Airport.

3    Q.    Do you know what day that was?

4    A.    I believe it was December 22d of 2021.

5    Q.    Did Lori return with the defendant?

6    A.    No, she did not.

7    Q.    Did she return later?

8    A.    Yes.

9    Q.    Was she served -- actually, if I could pull up -- let

10   me just make sure -- if I could pull up what's been admitted

11   as Government's Exhibit 70.

12          What is this?

13   A.    This is a subpoena to testify before the grand jury

14   issued for Lori Milliron.

15   Q.    And could you go to page 4.

16          Was this -- was this subpoena served on Lori

17   Milliron?

18   A.    Yes.   This is proof of service that showed that Lori

19   Milliron was served with the subpoena on December 27th of

20   2021 by an agent of the FBI.

21   Q.    Could you go back to page 2 of this exhibit.  Can you

22   zoom in on that.  Can you read that to us, please.

23   A.    "The following advice of rights is provided you in

24   connection with the subpoena.

25          "One, the grand jury is conducting an investigation

DIRECT - PETERSON

1   of possible violations of federal criminal laws involving

2   mail and/or wire fraud in violation of 18 U.S.C. Sections

3   1341 and 1343 for a murder in violation of 18 U.S.C.

4   Sections 1119 and 1111.

5          "Two, you may refuse to answer any questions if a

6   truthful answer to that question would tend to incriminate

7   you.

8          "Three, anything that you do say may be used

9   against you by the grand jury or in a subsequent legal

10  proceeding.

11         "Four, if you have retained counsel, the grand jury

12  will permit you a reasonable opportunity to step outside the

13  grand jury room to consult with counsel if you so desire."

14  Q.   All right.  Thank you.  So I'd like to go -- to just

15  ask you one more question.  When the defendant was arrested

16  in Colorado, what charge was he arrested on?

17  A.   When he was arrested, he was -- he was arrested for the

18  mail fraud and the foreign murder.

19  Q.   Are those the same charges that are at issue in this

20  case?

21  A.   Yes.

22  Q.   All right.  On January 4th, 2022, was there a hearing?

23  A.   Yes.

24  Q.   Do you know if Defendant Milliron was present at that

25  hearing?

DIRECT - PETERSON

1   A.   She was, in fact, present.

2   Q.   How was she introduced at the hearing?

3   A.   She was introduced as Lawrence Rudolph's significant

4   other.

5   Q.   Did the Government ask that she be sequestered?

6   A.   Yes.

7   Q.   What does that mean?

8   A.   That she would be excluded from attending the hearing.

9   Q.   And was there a request that she be allowed to remain

10  in the courtroom?

11  A.   Yes.

12  Q.   Was she in fact allowed to remain in the courtroom?

13  A.   Yes, she did remain inside the courtroom.

14  Q.   And so was she present during the presentation of

15  evidence and argument in the hearing?

16  A.   Yes, she was.

17  Q.   Did you testify in the hearing?

18  A.   I did.

19  Q.   What -- did you give a summary of the investigation?

20  A.   Yes.

21  Q.   Similar to what you've stated here today?

22  A.   Yes.

23  Q.   How long did you testify, do you know?

24  A.   Felt like days.  Maybe a few hours.

25  Q.   After you had discussed some of the summary of the

DIRECT - PETERSON

1   investigation, did you discuss motives --

2   A.    Yes.

3   Q.    -- that the defendant -- that Defendant Rudolph may

4   have had to commit the murder?

5   A.    I apologize.  Yes, I did.

6   Q.    What was the very first topic that you discussed?

7   A.    Lawrence Rudolph's relationship with Lori Milliron.

8   Q.    Did you discuss evidence that they were having an

9   affair?

10  A.    Yes.

11  Q.    Did you discuss any witness statements about that

12  affair?

13  A.    Yes, I did.

14  Q.    Can you tell me what sorts of witness statements you

15  had described in that hearing.

16  A.    I described witness statements that provided

17  information to us regarding the fact that Lawrence Rudolph

18  and Lori Milliron were engaged in a long-term romantic

19  affair starting back as far as 2004; that Lawrence Rudolph

20  was supporting Lori Milliron financially; that he was paying

21  for her residence, her vehicle, also college expenses for

22  one or more of her children.  And I also discussed the

23  ultimatum described by Anna Grimley.

24  Q.    Did you then discuss the life insurance on Bianca's

25  life?

DIRECT - PETERSON

1    A.    Yes, I did.

2    Q.    How much -- how much money did you describe that as

3    being?

4    A.    Approximately $4.8 million.

5    Q.    Now during the hearing, were there any arguments made

6    on the defense side characterizing the strength of the

7    Government's case?

8    A.    Yes.

9    Q.    How was the Government's case characterized?

10   A.    I believe it was described as one of the weakest murder

11   cases ever.

12            MR. MARKUS:    No objection.

13            MR. WINSTEAD:    Thought so.

14   BY MR. WINSTEAD:

15   Q.    Was Defendant Milliron present during those arguments?

16   A.    Yes, she was.

17            MR. WINSTEAD:    May I have just a moment, Your

18   Honor?

19            THE COURT:    You may.

20   BY MR. WINSTEAD:

21   Q.    During a break in the hearing, did you overhear any

22   comments being made by the defense to Lori Milliron?

23   A.    Yes.

24   Q.    What was that?

25   A.    Defense counsel said, "That's it.    That's all they've

1868

DIRECT - PETERSON

1    got."

2    Q.   At the hearing, is that when you found out about the

3    will for the first time?

4    A.   Yes, it was.

5    Q.   And is that when you heard mention of the postnuptial

6    agreement for the first time?

7    A.   Yes.

8    Q.   At the hearing, was that the first time you heard

9    mention that Dr. Rudolph and Bianca allowed one another to

10   have extramarital affairs?

11   A.   Yes.  I had never heard that prior to that hearing.

12   Q.   And so did you hear about that in any of the interviews

13   you had conducted up to that point?

14            MR. MARKUS:  Objection, Your Honor.  Hearsay.

15            THE COURT:  Overruled.

16            THE WITNESS:  No.  I had not heard that in any of

17   the interviews that I have conducted in this case.

18   BY MR. WINSTEAD:

19   Q.   What does the term "open marriage" mean to you?

20            MR. MARKUS:  Objection, Your Honor, what it means

21   to him is irrelevant.

22            THE COURT:  Well, it goes to his understanding of

23   what was -- what he interviewed folks about.  Overruled.

24            THE WITNESS:  An open marriage to me means that the

25   two spouses are allowed to have intimate relationships with

1869

DIRECT - PETERSON

1    other people outside the marriage freely.  And that it's

2    known and accepted by each of the consenting parties.

3    BY MR. WINSTEAD:

4    Q.    Okay.  I'd like to ask a couple of questions about the

5    further investigation.  Did you become aware of whether a

6    person named Cassandra Olmstead might have information

7    relevant to the case?

8    A.    Yes.

9    Q.    Did Mrs. Olmstead contact the FBI?

10   A.    Yes.

11   Q.    Are you sure?

12   A.    She was in contact with the FBI, yes.

13   Q.    So -- but did she reach out first to the FBI or --

14   A.    Oh, no, she did not contact us.  We contacted her.

15   Q.    Okay.  Thank you.  Actually, I won't -- did she give

16   you -- well, let's put up what's already been admitted as

17   Government's Exhibit 90.

18         Can you tell me what this exhibit is.

19   A.    This is a message for a -- email travel reservation for

20   July 10th for Milliron.

21   Q.    Do you know if this is --

22         THE COURT:  Can we leave it blown up.

23         MR. WINSTEAD:  Yes, sir.  And I'm not referencing

24   the content of this particular page, I'm asking him in

25   general about the exhibit.

1870

DIRECT - PETERSON

1    THE COURT:  I don't understand.  You're asking him

2    in general about the exhibit, but you don't want to go into

3    the content?

4    MR. WINSTEAD:  Oh, at this point, Your Honor.  I

5    was going to reference the actual content later.  I was just

6    trying to establish the circumstances of how the FBI came

7    into possession of this exhibit.

8    THE COURT:  All right.

9    BY MR. WINSTEAD:

10   Q.    Did Ms. Olmstead give you the materials in this

11   exhibit?

12   A.    Yes.

13   Q.    Okay.

14   MR. WINSTEAD:  Your Honor, at this time, I'd like

15   to move to admit Government's Exhibit 84, which is the

16   response to interrogatories in the defendants' civil suit.

17   And I can explain the reason why I think --

18   THE COURT:  I think you can anticipate the

19   objection and give me the hearsay exception --

20   MR. WINSTEAD:  Well --

21   THE COURT:  -- or whatever grounds you want to --

22   MR. WINSTEAD:  Yes, sir.

23   THE COURT:  -- state.

24   MR. WINSTEAD:  I believe that the Court's intention

25   was to allow its admission on -- at a later time, and so

DIRECT - PETERSON

1    this is a time when discussing it would be appropriate, and

2    so I just wanted to move that --

3              THE COURT:  What statement are we talking about?

4              MR. WINSTEAD:  This is the defendant's response to

5    interrogatories in his civil SCI suit that was discussed

6    earlier.

7              THE COURT:  All right.  Mr. Markus.

8              MR. MARKUS:  Your Honor, we resolved this earlier,

9    that this was going to come in through Dr. Rudolph when he

10   testified, not now.

11             THE COURT:  You wish to be heard on this, Mr. Dill?

12             MR. DILL:  Same objection.  Hearsay.

13             THE COURT:  Okay.  Didn't we discuss this at length

14   at the very, very lengthy sidebar we had yesterday?

15             MR. WINSTEAD:  We did, Your Honor.  The only reason

16   I was moving for it now is that it would be relevant to

17   comparing the email address in the interrogatories.  And so

18   if we have to wait to introduce it, that's fine, but since

19   it's --

20             THE COURT:  I'm just concerned about the opening of

21   the door, paving the way for trial -- a mini trial within a

22   trial discussion we had yesterday.  So let's leave this --

23   let's handle this in the manner we all agreed to in the

24   sidebar.

25             MR. WINSTEAD:  Okay.  Thank you, Your Honor.

1872

DIRECT - PETERSON

1    BY MR. WINSTEAD:

2    Q.   Did you become aware that a person named Brian Loveless

3    might have relevant information in the case?

4    A.   Yes.

5    Q.   Did he contact the FBI or did someone else?

6    A.   Brian Lovelace did not contact the FBI; one of his

7    co-workers contacted the FBI.

8    Q.   And then did you contact him?

9    A.   I did.   I contacted his coworker first, conducted an

10   interview, and then contacted Mr. Brian Lovelace.

11   Q.   All right.   All right.

12             MR. WINSTEAD:   May I have a moment, Your Honor?

13             THE COURT:   You may.

14             MR. WINSTEAD:   All right, sir, I'd like to talk to

15   you about the grand jury testimony you were referencing

16   earlier.   So I'm going to ask you about this grand jury

17   testimony and we're going to focus on certain topics in it.

18             I'm warning you that it's going to be a lot of

19   reading, so if you need to take a sip of water, please do

20   so.

21             And then could I please have what's been admitted

22   as Government's Exhibit 71, page 3.   And if you could blow

23   up lines 10 to 25.

24             All right, sir -- sir, did Defendant Milliron

25   testify before the grand jury in this case?

1873

DIRECT - PETERSON

1    A.    Yes, she did.

2    Q.    Can you please read the portion that's blown up here.

3    A.    Question:  Good afternoon, Ms. Milliron.

4          Answer:  Hello.

5          Question:  Can you please state and spell your name

6    for the members of the grand jury.

7          Answer:  It's Lori Milliron.  Spelled.

8          Question:  Ms. Milliron, before we get started, I

9    want to make sure you understand your rights.

10         Answer:  Okay.

11         Question:  The grand jury is conducting an

12   investigation of possible violations of criminal laws

13   involving mail fraud and aiding and abetting mail fraud, 18

14   United States Code Sections 2 and 1341, and foreign murder

15   in violation of 18 United States Code Section 1119.  Do you

16   understand this is a criminal investigation?

17         Answer:  Yes, I do.

18   Q.    Could you go to the next page, please.

19         MR. MARKUS:  Judge, while he's doing this, I would

20   object and ask the instruction to be read.  We object on

21   hearsay.  Obviously this is inadmissible against

22   Dr. Rudolph.

23         THE COURT:  You think it's necessary for me to

24   read -- to read it again?  Is that your request?

25         MR. MARKUS:  Absent a severance, yes, Your Honor.

DIRECT - PETERSON

1    THE COURT:  All right.

2    MR. WINSTEAD:  No objection.

3    THE COURT:  Okay.  I was going to see if the

4   Government wanted to get its position on -- okay, folks,

5   here we go again.

6        You may consider the statement of Defendant Lori

7   Milliron only in the case against her and not in the case

8   against Dr. Rudolph.  You may not consider Defendant Lori

9   Milliron's statement in any way when you are deciding if the

10  Government has proved beyond a reasonable doubt its case

11  against Lawrence Rudolph.

12        Go ahead, counsel.

13    MR. WINSTEAD:  All right.  Thank you.

14  BY MR. WINSTEAD:

15  Q.   Yes, would you please highlight lines 1 to 17.

16        Go ahead.

17  A.   Question:  You may refuse to answer any question if a

18  truthful answer to the question would tend to incriminate

19  you.  Do you understand that right?

20        Answer:  I do.

21        Question:  Anything that you do say in the grand

22  jury may be used against you by the grand jury or in a

23  subsequent legal proceeding.  Do you understand this?

24        Answer:  Yes.

25        Question:  If you have retained an attorney, the

1875

DIRECT - PETERSON

1    grand jury will permit you a reasonable opportunity to step

2    outside to talk to your attorney if you want to.  Do you

3    understand this?

4              Answer:  I understand.

5              Question:  Have you retained an attorney?

6              Answer:  I have not.

7    Q.    Thank you.  And would you actually go back to page 3,

8    and highlight just the top two lines.

9              What day was this testimony occurring on?

10   A.    This occurred on January 5th of 2022.

11   Q.    Is that the day after the evidentiary hearing we're

12   just discussing?

13   A.    Yes.

14   Q.    Okay.  Thank you, sir.  So I'd like to go through some

15   of the sections about where Ms. Milliron worked.  So if you

16   could take me to page 5, please, and highlight lines 11 to

17   12.

18   A.    Question:  You said working for us.  Where do you work?

19              Answer:  I work for Three Rivers Dental Group.

20   Q.    All right.  If you could go to the next page and

21   highlight lines 10 to 21.

22   A.    Question:  You mentioned Three Rivers.  Before that did

23   you ever work at a place called The Dentistry?

24              Answer:  Yes, I did.

25              Question:  Where was that?

1876

DIRECT - PETERSON

1    Answer:  That was in Pittsburgh.

2    Question:  Who owned that practice?

3    Answer:  That was owned by Larry Rudolph and John

4    Tienno.

5    Question:  When did you start working there?

6    Answer:  I think it was, like, 2002 or '3.

7    Question:  What was your role there?

8    Answer:  I was a dental hygienist.

9    Q.   Thank you.  Could you go to the next page.  And

10   highlight 8 to 11.

11   A.   Question:  And you said you worked at Three Rivers.

12   When did you start at Three Rivers?

13   Answer:  I think maybe -- I think 2009 maybe.  I'm

14   not sure of the exact date.

15   Q.   And then if you could highlight lines on that same

16   page, 18 to 25.

17   A.   Question:  What was your first position there?

18   Answer:  I was a dental hygienist.

19   Question:  Who hired you?

20   Answer:  Larry Rudolph.

21   Question:  What was your starting salary

22   approximately?

23   Answer:  It's hard to remember.  I think it was,

24   like, $23 an hour.

25   Q.   All right.  And could you go to the next page, page 8.

DIRECT - PETERSON

1    And highlight 1 through 21.

2    A.    One continuing from the previous page:  "Are the owners

3    of Three Rivers?"  Question.

4              Answer:  Larry Rudolph.

5              Question:  You started off as a hygienist.  Did you

6    eventually adopt another role at Three Rivers?

7              Answer:  Yes.  I moved into a management role.

8              Question:  Approximately when was that?

9              Answer:  I don't remember.

10             Question:  What were your responsibilities as a

11   manager?

12             Answer:  Scheduling patients, kind of overseeing

13   staff.

14             Question:  Who was your direct supervisor as a

15   manager?

16             Answer:  That would be Larry Rudolph.

17             Question:  Are you still employed at Three Rivers?

18             Answer:  Yes.

19             Question:  Has your salary gone up while you worked

20   at the practice?

21             Answer:  Yeah, it's gone up.

22             Question:  What is your current salary?

23             Answer:  I don't know the exact amount.  I think

24   it's, like, $60,000.

25             Question:  Who determines what your salary is?

DIRECT - PETERSON

1    Answer:  Larry Rudolph would.

2    Q.    All right.  I'd like to have you read some portions

3    that describe Ms. Milliron's relationship with Mr. Rudolph.

4    Could you please go to page 18 and highlight lines 16

5    through 24.

6    A.    Question:  Ms. Milliron, were you in a relationship

7    with Larry Rudolph?

8    Answer:  Yes.

9    Question:  What was the relationship?

10   Answer:  Well, we had a working relationship, and

11   we also had a personal relationship.  We would travel

12   together.

13   Question:  What was the nature of the personal

14   relationship?

15   Answer:  We were friends.

16   MR. DILL:  Objection.  Rule of completeness, Your

17   Honor.

18   THE COURT:  You'll be -- on cross-examination be

19   able to examine the witness on any other portion of the

20   transcript.  Overruled.  Keep going.

21   BY MR. WINSTEAD:

22   Q.    All right.  Thank you.  Could you get out of that and

23   could you bring back up Exhibit 90, and go to page 2.  And

24   if you could highlight just that top half there.

25   What are these?

DIRECT - PETERSON

1    A.    This is an email at the top from an address associated

2    with Lawrence Rudolph to an address associated with Lori

3    Milliron dated July 18th, 2010.

4    Q.    Can you read the top email there.

5    A.    The top email says, "I can't wait.  I want love,

6    affection, romance and attention.  BB, BB."

7    Q.    Are you familiar with this email address?

8    A.    Yes.

9    Q.    Whose email address is that?

10   A.    It's Lawrence Rudolph's.

11   Q.    And what about this one?

12   A.    That's an address associated with Lori Milliron.

13   Q.    All right.  Would you please go to page 8.  And if you

14   can -- so all of these are email chains, so they read

15   backwards.  So if you could start with this one and then

16   read the top one.  So if you can -- yeah, just highlight the

17   first -- the top half.

18   A.    So starting with the bottom email dated August 1st,

19   2010, it says, "That is a great picture.  I miss you more

20   than you can imagine Lar'.  I am sending Jessica to Texas

21   Tuesday morning.  She is going to visit her sister.  I used

22   miles to pay for the ticket.  I must travel more to get free

23   tickets.  I am feeling better this morning after your email.

24   I love you, baby.  Always will.  Can't resist you.  Love.

25   Sexy.  PS, maybe we can spend the night together when you

1880

DIRECT - PETERSON

1  get back?  I am crazed for you."

2  Q.   And then could you read the top email.

3  A.   The top email dated August 1st, 2010, 8:06 a.m., "Baby,

4  no one loves you more.  We will make a plan soon.  I might

5  stay Tuesday night.  You love me today," question mark,

6  Larry."

7  Q.   Could you go to page 10, please.

8          Could you read that sentence.

9  A.   The sentence says, "You better miss me.  It's been two

10  weeks since we've been together, but who is counting?"

11  Q.   And then page 11.  The top email.

12  A.   Email dated August 1st, 2010, at 6:15 p.m.  It says,

13  "Lori Ann, love of my life."

14  Q.   Could you go to page 12, please.

15          Can you read those?

16  A.   From the bottom?

17  Q.   Yes.

18  A.   Bottom email dated August 2d, 2010, subject line:

19  Monday morning.  Reads, "Why are Monday mornings so bad?  I

20  miss you.  Can't wait to see you.  Lori."

21          Top email dated August 2d, 2010, 5:01 a.m., subject

22  line:  Reply to the Monday morning.  "I might be home

23  tonight Betty" -- "I might be home tonight.  Betty will call

24  you about 6 tonight from Canada.  Home about 11.  Will you

25  be too tired for crazy sex?"

1881

DIRECT - PETERSON

1    Q.    All right.  If you could go to page 30.  Page 30.  And

2    can you first do the bottom half.

3    A.    Starting with the bottom email, dated March 4th, 2011,

4    time's 2142.  Says, "You look skinny but I see tan lines.

5    Need to get rid of those.  You must be drinking.  You sent

6    it three times.  Glad you're happy.  Sexy.  L."

7    Q.    And then you can zoom out.

8    A.    Top email dated March 4 --

9    Q.    That's okay, you don't need to read that one.

10   A.    Starting from the bottom --

11   Q.    From the bottom?

12   A.    Email dated March 4th, 2011, time is 2149.  Says, "You

13   look beautiful and I miss you.  What dates are kids there?

14   I forget.  Trying to make a plan.  Weather looks great."

15         Top email dated March 4th, 2011, at 2155 reads, "It

16   is gorgeous here.  Too many Mexican gardeners everywhere,

17   LOL.  I have to hide sometimes.  LOL.  The kids are coming

18   down Sunday to Sunday March 6th to 13th.  They would love to

19   see you, but we would have to have sex on the beach.  Not a

20   bad thing.  LOL.  I miss you.  BB."

21   Q.    Could you go to page 35, please.

22         And could you start with the bottom half.

23   A.    Bottom email, dated March 10th, 2011.  The time is 2:52

24   p.m.  Says, "Chubby, you're in Mexico.  It doesn't get any

25   better."

DIRECT - PETERSON

1          Top email, March 10th, 2011, time's 1154, reads,

2    "It doesn't get any better than this.  Going out to get more

3    sun.  Watching whales from the house.  It's so cool.  Lori

4    Milliron."  Three Rivers Dental Group, cell phone number.

5    Q.   Okay.  Zoom out, please.  And now top.

6    A.   Bottom email, dated March 10th, 2011 at 3:03 p.m.

7    That's -- it reads, "That's better.  You didn't answer my,"

8    question mark.

9          Moving up, top email.  March 10th, 2011, time is

10   1336.  Reads, "I don't get your emails instantly because I

11   don't have a phone.  I have to -- I have to log onto my

12   laptop.  That's why I don't answer right away.  LU."

13   Q.   All right.  And then can you go back one to page 34.

14   Bottom half.

15   A.   Bottom email on the page, excuse me, dated March 10th,

16   2011, 4:37 p.m. reads, "Yeah, yeah, it's the boyfriend.  Are

17   you having fun with the DODs?"

18         Top email, March 10th, 2011, the time is 1343,

19   reads, "Yes, it is fun.  They love it here and don't want to

20   leave.  They say this house is like something they have seen

21   on the show Cribs.  It definitely is set up for partying

22   except we aren't having parties.  I absolutely love it here.

23   I don't think I could ever get tired of this."  Same Lori

24   Milliron signature block.  Okay.

25   Q.   Could you go to page 53, please.  Just the very top

DIRECT - PETERSON

1    portion here.

2    A.    Top portion date is March 22d, 2011, time is 9:42 p.m.

3    Reads, "Pudgy, we need to use the email as the texts will be

4    money on my phone."

5    Q.    All right.  Could you zoom out and go one page back to

6    52.

7          What's the signature line on that email you were

8    just reading?

9    A.    The header information?

10    Q.    Yes.

11    A.    Is from Larry Rudolph's Yahoo account to Lori

12    Milliron's Yahoo account.

13    Q.    All right.  Thank you.  Could you go to page 67,

14    please.

15    A.    Starting from the bottom email, dated March 27th, 2011,

16    1634 hours.  Subject line, Dinner Tonight.  Reads, "The

17    neighbor owner came by to put his stuff back in the house.

18    He is leaving very early in the morning.  He asked me if I

19    would like to have dinner tonight?  I said okay.  We are

20    going to have sushi.  I hope that doesn't bum you out.  I

21    won't have sex or anything.  Love you BB."  Same Lori

22    Milliron signature block.

23          Moving up to the top email, dated March 27th, 2011,

24    at 5:20 p.m. reads, "Have fun.  It's good to have some

25    company.  I am busy doing paperwork, bummer.  If you do have

DIRECT - PETERSON

1    sex, please use a condom.  Love you.  L."

2             MR. MARKUS:  Garreth, what page is that?

3             MR. WINSTEAD:  That's page 67.  Zoom out real

4    quick.  Yeah, page 67.

5             MR. MARKUS:  Thank you, sir.

6    BY MR. WINSTEAD:

7    Q.   All right, could you go to page 124, please.  And if

8    you could zoom in just on the top.  This -- this email right

9    here.  What does the email address suggest to you about who

10   Aaron Wesselink is?

11   A.   Appears to be someone who's in real estate or rental

12   property.

13   Q.   Where do you think?

14   A.   In Cabo San Lucas, Mexico.

15   Q.   Okay.  All right.  Could you go to, then, page 123.

16   And if you could highlight this part.

17             What does this say?

18   A.   This is the email dated July 7th, 2011, time is 3:23

19   p.m.  Subject is:  Response to home number 32, El Encanto.

20   Reads, "Aaron, I hope your dad doesn't think I'm stalling

21   him.  I wouldn't do that.  I know how busy he is too.  The

22   offer is good.  I am confused though.  Are you saying use

23   the fourth bedroom as the casita?  I was hoping to make the

24   casita the office.  Lori really wants four bedrooms.  What

25   can we do?  Larry."

1885

DIRECT - PETERSON

1    Q.   Do you know what this email is part of a long -- a

2    larger conversation about?

3    A.   It's about purchasing property in Cabo.

4    Q.   Okay.  All right.  So I'd like to go back to

5    Exhibit 71.

6            MR. MARKUS:  Judge, just before he does that, and I

7    know we're getting close to the end of the day, there's one

8    issue I'd like to raise at sidebar before you discharge the

9    jury today if I could.  It doesn't have to be now, just at

10   some point before the end --

11           THE COURT:  How lengthy of a sidebar do you think

12   that will entail?

13           MR. MARKUS:  30 seconds, Your Honor.

14           THE COURT:  Okay.  Keep going, Mr. Winstead.  I

15   want -- I don't want to break up your examination.

16           MR. WINSTEAD:  Okay.  Thank you, Your Honor.

17   BY MR. WINSTEAD:

18   Q.   So we're back at Exhibit 71, and can you go back to

19   page 18.  And highlight lines 16 through 25.

20   A.   Question:  Ms. Milliron, were you in a relationship

21   with Larry Rudolph?

22           Answer:  Yes.

23           Question:  What was the relationship?

24           Answer:  Well, we had a working relationship, and

25   we also had a personal relationship.  We would travel

1886

DIRECT - PETERSON

1   together.

2           Question:  What was the nature of the personal

3   relationship?

4           Answer:  We were friends.

5           Question:  Were you ever anything more than

6   friends?

7   Q.   Could you go to page 19.  Line 1 through 5.

8   A.   Continued from the previous page.

9           Answer:  Yes.  We traveled mostly.

10          Question:  When did that relationship begin?

11          Answer:  Shortly -- well, I don't know if it was

12  shortly -- after I started working for him.  It was probably

13  back in 2003 or '4.

14  Q.   All right.  If you could zoom out and then highlight

15  lines 8 to 9 on this page.

16  A.   Question:  Were you having a sexual relationship with

17  him?

18          Answer:  We did occasionally.

19  Q.   Could you go to page 20, please.  And pull up 6 through

20  15.

21  A.   Question:  When you say you 'traveled with him,' where

22  did you travel?

23          Answer:  We went to Africa.

24          Question:  When did you do that?

25          Answer:  I think 2004, something like that, started

DIRECT - PETERSON

1    traveling.

2              Question:  Did you also go to Cabo in Mexico?

3              Answer:  Yes.

4              Question:  How many times?

5              Answer:  I don't know how many times.  A number of

6    time.

7    Q.    Please go to page 21, lines 14 through 22.

8    A.    Question:  Did you want to be married to him?

9              Answer:  I had been married for 16 years.  I had

10   been divorced for 26.  I had no desire to remarry.

11             Question:  Did he ever talk about living to another

12   country and living with you there?

13             Answer:  No, not that I recall.

14             Question:  During the course of your relationship

15   with him, did you ever consider leaving him?

16             Answer:  Not that I recall.

17   Q.    Could you go to page 27, lines 6 through 25.

18   A.    I'm assuming the top is a question starting at line 6.

19   Says:  While you were in Pittsburgh, where did you live or

20   while you were working at Three Rivers, where did you live?

21             Answer:  I lived in Moon Township and I lived in

22   Greensburg, PA, and I lived in Cranberry, PA.

23             Question:  Did Mr. Rudolph help you with your rent

24   while you were living at those locations?

25             Answer:  Yeah, he did.

DIRECT - PETERSON

1    Question:  Did he stay at any of those residences?

2    Answer:  Maybe a few times.  I don't remember.

3    More recently than before.

4    Question:  Before the death did he ever stay

5    overnight with you at any of those locations?

6    Answer:  Not that I recall.  Maybe when he went to

7    the airport or something.  The one house that I lived in was

8    close to the airport.  If he had an early flight or

9    something, I think he may have stayed one night.

10    Question:  So your testimony before the members of

11    the grand jury is that you were in a relationship with

12    Mr. Rudolph where he was giving you thousands of dollars --

13    Q.  And can you go to the next page and highlight lines --

14    or pull up lines 7 through 14.  Oh, nope.  Sorry.  I must

15    have missed that.  Sorry.  No, can you go back up.  And go 1

16    through line through 6.

17    A.  Continuing question from the previous page line one

18    says:  And he only stayed overnight with you a few times?

19    Answer:  At my house, yes.

20    Question:  Where else would you stay?

21    Answer:  In hotels if we were on a trip.

22    Question:  Did you ever stay in hotels in

23    Pennsylvania?

24    Answer:  I don't recall that.

25    Q.  All right.  And if you could zoom out, and this time

DIRECT - PETERSON

1   do -- give me 7 through 14 on this page.

2   A.   Question:  Did you ever go into work with Mr. Rudolph?

3            Answer:  What time period are we talking about?

4            Question:  Before the death.  So let's go between

5   approximately 2007 and 2016.

6            Answer:  I don't believe so.

7            Question:  Would you leave work together with him

8   frequently?

9            Answer:  I don't remember leaving work.

10  Q.   All right.  Now could you go to page 49 and pull up 24

11  through 25 at the bottom.

12  A.   Grand juror question:  "Did Larry Rudolph ever

13  introduce you to any of his children prior to his wife's

14  death?"

15  Q.   All right.  And can you go to the next page, please,

16  and bring up 1 through 7.

17  A.   The Witness, Answer:  His daughter, Ana Rudolph, is a

18  dentist at his practice.

19           Grand Juror:  Okay.  And do you have any knowledge

20  as to whether she knew about your relationship with

21  Mr. Larry Rudolph?

22           Witness answer:  I don't believe so.  We kept it

23  private.

24  Q.   All right.  Could you please go to page -- oh, no, on

25  that same page, pull up lines 10 through 12.

DIRECT - PETERSON

1    A.    Continued question; Were you saying you kept it

2    private?

3         Answer:  We kept it private.  I think he kept it

4    from his children.

5    Q.    All right.  Now could you go to page 52, and bring up

6    lines 12 through 16.

7    A.    And Question:  If you believe that it was an open

8    marriage on his part, why was there the need to keep the

9    relationship secret and private?

10         "Witness answer:  Maybe just not to upset them and

11   their family life.  It was no business of anybody's."

12   Q.    All right.  Now could you go back to page 22.  And

13   highlight -- or pull -- expand line 1 through 9.

14   A.    Question:  Did you tell anyone else about your

15   relationship with Mr. Rudolph?

16         Answer:  My family knew, and my coworkers at my

17   other office knew.

18         Question:  Which coworkers knew?

19         Answer:  The coworkers that worked with me in

20   New Castle.

21         Question:  Did you have any particularly close

22   friends at that office?

23         Answer:  No, not really.

24   Q.    All right.  Now could you go to lines on that same page

25   13 through 25.

DIRECT - PETERSON

1  A.    Question:  At some point did you find out that

2  Mr. Rudolph's wife died?

3             Answer:  Yes, I did.

4             Question:  When did you find that out?

5             Answer:  I don't remember when I found out.

6             Question:  Do you know approximately how long after

7  the death it would have occurred?

8             Answer:  I'm not sure.

9             Question:  Who told you?

10             Answer:  Larry did.

11             Question:  What did he tell you about it?

12             Answer:  He said there was a terrible accident.

13             Question:  What kind of accident?

14  Q.    Next page.  And can you do 1 through 14.

15  A.    Answer:  He didn't specify.

16             Question:  Did you ask him?

17             Answer:  I asked him if he was okay, and he said

18  yes.

19             Question:  Did you ask him what kind of accident

20  could have killed his wife?

21             Answer:  No.  I didn't know.

22             Question:  Why not?

23             Answer:  He didn't tell me.

24             Question:  Why didn't you ask?

25             Answer:  Because he was away.

DIRECT - PETERSON

1    Question:  Well, where was he?

2    Answer:  He was in Africa.

3    Question:  He was in Africa when he told you about

4    the death?

5    Q.    All right.  Could you zoom out, and then highlight 15

6    and the rest of the way down.

7    A.    Answer:  He just texted me.

8    Question:  Do you still have those text messages?

9    Answer:  I don't.

10    Question:  What happened to them?

11    Answer:  Probably deleted.  I don't keep text

12    messages that long.

13    Question:  Do you recall what he told you in the

14    text message?

15    Answer:  Just about an accident, I believe.

16    Question:  And why didn't you text him back, 'What

17    happened'?

18    Answer:  I don't know.

19    Q.    Okay.  Could you zoom out for a second.  And just

20    highlight 11 through 15.

21    A.    Question:  You --

22    Q.    You don't have to read it again.  I want to ask you

23    about it.

24    In your investigation, were you able to figure out

25    whether Defendant Rudolph told anyone else about Bianca's

1893

DIRECT - PETERSON

1    death while he was still in Africa?

2    A.    He didn't tell Bianca's brothers or his children.

3    Q.    Okay.  Thank you.  Can you zoom out, please.

4         THE COURT:  Mr. Winstead, I'm going to ask you to

5    figure out when in the next up to five minutes you think

6    would be a good time to break.

7         MR. WINSTEAD:  Yes, sir.  It will be in just a few

8    seconds, Your Honor.

9    BY MR. WINSTEAD:

10   Q.    Can you go to, please, page 24.  And then highlight the

11   first four lines.

12   A.    Question:  Were you curious?

13         Answer:  I don't recall.

14         Question:  How did you feel about his wife's death?

15         Answer:  I don't know.  I didn't know her.

16         MR. WINSTEAD:  Thank you.  And, Your Honor, I'm

17   about to turn to a different subject so this is perfect

18   timing.

19         THE COURT:  Excellent.  Counsel, approach, please.

20        (Discussion at sidebar)

21         MR. MARKUS:  Thank you, Your Honor.  Your Honor, I

22   know it's been a long two weeks and I know I must have

23   gotten on your nerves a number of times, but I have to say

24   that the comment to the jury about "Here we go again," I

25   felt was inappropriate and --

DIRECT - PETERSON

1          THE COURT:  Can you lower your voice.

2          MR. MARKUS:  Sure.  It suggested to the jury that

3    the defense has been doing something wrong by objecting and

4    asking for that jury instruction to be read.  This is a

5    very, very important jury instruction because it's our

6    position that this jury instruction is very important when

7    the statements come in, and the jury even laughed when you

8    made that comment, Your Honor.  So I would just ask the

9    Court before the end of the weekend to instruct the jury

10   that that comment was inappropriate and that there's nothing

11   wrong with the defense objecting and asking for instructions

12   like that to be read.  In fact, it's proper and necessary in

13   this case.

14          THE COURT:  Mr. Fields.

15          MR. FIELDS:  Your Honor, I didn't take that comment

16   that way.  I think that the Court's instructions have always

17   been somberly given and I have no reason to think that the

18   jury is not going to follow them every time the defense asks

19   for them.  I do think that the defense has asked for a

20   standing objection and the fact that they keep asking for

21   this instruction over and over again is a strategic decision

22   on their part, Your Honor.  But it's not one that should be

23   given any more or less deference than anything else.

24          THE COURT:  Right.  And were you going to cite me

25   some law that said I cannot rely on a standing objection on

DIRECT - PETERSON

1  severance?

2       MR. MARKUS:  I've spoken to the appellate lawyers

3  on the Government's side and we agree that when there is a

4  hearsay statement that comes in I have to make a

5  contemporaneous statement about that hearsay.  The

6  Government and I agree on this, Your Honor.  And it's

7  important that that instruction be given when a hearsay

8  statement comes in.

9       Government and I have agreed that there can be a

10  standing objection to severance, but not to hearsay

11  statements.  And Mr. Grewell and I have spoken about this at

12  length.

13       THE COURT:  All right.  Well, the -- Mr. Dill,

14  you --

15       MR. DILL:  Yes, Your Honor.  And, again, just to

16  point out, earlier when I made objections under 401 and 403

17  and the additional matter and asked for a sidebar, the Court

18  said, "You really need to come to sidebar again?"  I didn't

19  want to say in front of the jury, "Fifth Amendment of the

20  Constitution," which is what the issue was.

21       But, in any event, for the record, my objection was

22  commenting on the defendant's right to remain silent or the

23  defendant's silence, and to -- for them to draw something

24  from that.  So that would be the basis of my objection for

25  the record.

DIRECT - PETERSON

1       THE COURT:  All right.  That objection's overruled.

2       I will say something to the jury.  I'm not going to

3  tell them that I think my comment was inappropriate.  What

4  I'm trying to do is interject -- and maybe I'm not doing a

5  good job -- interject some little bit of levity in this

6  trial every so often because this has been a heavy trial,

7  there's been some gruesome photos shown.  I can feel the

8  tension from the jury.  And all I was trying to do is add

9  some levity.  But I will explain that to them, and I will

10  reiterate, that it's an important instruction and to take it

11  seriously.

12       I would like you during the weekend, though, to

13  consider along -- we're not going to have trial tomorrow --

14  whether there is, in fact, binding Tenth Circuit authority

15  that says that I cannot rely on a standing objection for

16  severance and for the limiting instruction on the

17  introduction of a hearsay statement against one defendant

18  and not the other.  Because I think that Mr. Fields has a

19  point that at some point, once we say it 5, 10 times, the

20  jury's going to start to wonder why is this one instruction

21  given so much emphasis to the exclusion of others?

22       One of the things I've done in all my time on the

23  bench is I make a real effort when I give them -- put

24  together a set of jury instructions that I don't repeat

25  certain phrases or certain -- state certain concepts just

1    there different ways because I know having talked to jurors,

2    as I do after every single one of my trials -- and I get a

3    sense this jury's not going to be any different -- there are

4    some folks there that notice everything.  They pick up on

5    emphasis on here and key emphasis on that.  And questions

6    will start coming, "Well, why did the judge keep talking

7    about causation?  Why did he keep" -- so that's -- so my

8    point is if -- I'd like you to tell me Monday morning, and

9    represent to me, that you've looked into the issue and that

10   there's no alternative but that I continue to read this

11   instruction.

12          MR. MARKUS:  Your Honor, I completely appreciate

13   the Court's concerns.  This is the doing of the Government,

14   not the defense, by bringing these two defendants together

15   and bringing in hearsay statement after hearsay statement.

16   I don't know what I'm supposed to do because these

17   statements are critical in the case; they shouldn't be

18   coming in against our client.  So I don't know how to keep

19   the jury informed as to what a hearsay statement is and

20   what's not.

21          These are statements that are inadmissible against

22   Larry Rudolph, so I really don't know the alternative.

23          THE COURT:  I think the alternative is for you to

24   rely on the standing objection as to both grounds unless

25   there's some binding Tenth Circuit, or Supreme Court

DIRECT - PETERSON

1    authority, that says that I'm -- you would be waiving some

2    kind of argument by failing to do so.  And if there is such

3    authority, tell me about it, point it out, on Monday morning

4    and then I will continue to read this instruction every time

5    necessary.  But if you don't give me that authority, then

6    I'm going to -- I'm not going to continue to read this

7    instruction.  And I'm going to, as I've said before, note on

8    the record that you've made a standing objection and -- on

9    both grounds, on the hearsay as to the codefendant and the

10   denial of severance and the denial of the reconsideration,

11   and we're going to leave it at that.

12            MR. MARKUS:  Sure, Your Honor.  The -- I understand

13   preserving it for the appeal.  My problem is making sure the

14   jury understands what they can and can't consider against

15   Dr. Rudolph.  Because the Government --

16            THE COURT:  You don't think after I've read it now

17   five times -- these are intelligent people -- that they

18   understand the concept here?

19            MR. MARKUS:  They understand the concept; they

20   don't know when to apply it.  So when the statement comes

21   in, they don't know:  Is this one of the statements that I

22   can consider against both defendants or one defendant?  And

23   that's the problem.  I agree with you.  It's ridiculous that

24   we keep having to go through it over and over again, but

25   it's not my doing.  This is the problem with trying these

DIRECT - PETERSON

1    two people together with all this inadmissible evidence

2    against one of the defendants.

3         THE COURT:  All right.  Okay.  I've made my ruling.

4    I'm going to ask you first thing Monday morning if you have

5    such authority.  And if you don't, I'm going to proceed the

6    way that I said.  Thank you.

7         (End of discussion at sidebar)

8         THE COURT:  Thank you for your patience, ladies and

9    gentlemen.  You've earned the day off tomorrow.  I'll tell

10   you that.  I'm sure you noticed from the hall calendar,

11   reminded you, of the statement and commitment I made to you

12   on day 1 of the trial that we were going to have a free day

13   tomorrow.

14         I've learned over the years that when you have

15   three-week or longer trials you have to take a day off or

16   else -- so.  But before we go, let me say a couple of

17   things.  One is it's been -- you know, this has been a

18   heavy-duty trial and you've seen some gruesome photographs.

19   There have been times when there's been tension in the

20   courtroom and a lot of emotion and a lot of grief.  I feel

21   some tension in the box sometimes.  I've tried, maybe

22   unsuccessfully at some points, to interject some levity into

23   the trial.  I think I've -- based on your reactions, I think

24   I have been successful a couple of times, maybe not so

25   successful at others.

DIRECT - PETERSON

1        I want to bring up the point, when I read the

2   instruction that I've now read to you about three or four

3   times and I said, "Here we go again," it was not to suggest

4   in any way that you should diminish that -- the importance

5   of that instruction; that I thought that it was

6   inappropriate for me to give that instruction.  It's very

7   appropriate.  It was -- I was just trying to interject some

8   levity, and don't read anything else into my comment.

9        Secondly, we've now heard specific reference to --

10  references in the testimony today to specific media coverage

11  of this trial, including a television episode, the coverage

12  by other media.  I know that with three days off you're

13  going to have maybe a little bit more temptation to check up

14  on that.  Once this trial's done, you can read about this

15  trial -- this case and this trial and everyone involved to

16  your heart's content.  Just hold off a little bit longer;

17  another week.  It's imperative that you wall yourself off

18  from all of the other extraneous noise out there in the

19  world so that you decide the case solely on the evidence

20  presented.

21       All right.  We will resume at the same time on

22  Monday morning.  Please be in the jury deliberation room by

23  8:35 on Monday morning.  We will be in recess until Monday

24  at 8:45.

25       (Proceedings concluded at 5:14 p.m.)

DIRECT - PETERSON

INDEX

| Item | PAGE |
|------|------|

**GOVERNMENT'S WITNESSES**

ADAM HOWARD-DAVIES
Direct Examination by Mr. Fields ........... 1612
Cross-examination by Mr. Markus ........... 1621
Cross-examination by Mr. Dill ........... 1626
Redirect Examination by Mr. Fields ........... 1629

RACHEL ANDERS
Direct Examination by Mr. Fields ........... 1630
Cross-examination by Mr. Dill ........... 1653

ANNA GRIMLEY
Direct Examination by Mr. Fields ........... 1661
Cross-examination by Mr. Dill ........... 1682
Redirect Examination by Mr. Fields ........... 1706

SHERRY HOUCK
Direct Examination by Mr. Fields ........... 1708
Cross-examination by Mr. Dill ........... 1724
Cross-examination by Mr. Markus ........... 1742
Redirect Examination by Mr. Fields ........... 1746

LEVI WEAVER
Direct Examination by Mr. Fields ........... 1748
Cross-examination by Mr. Dill ........... 1764
Cross-examination by Mr. Markus ........... 1765
Redirect Examination by Mr. Fields ........... 1766

TOM GRIFFIN
Direct Examination by Mr. Winstead ........... 1768
Cross-examination by Ms. Moss ........... 1795
Redirect Examination by Mr. Winstead ........... 1809

DONALD PETERSON
Direct Examination by Mr. Winstead ........... 1813

**GOVERNMENT'S EXHIBITS**

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| 57 | 1719 | 1719 | | |
| 84 | 1873 | -- | | |

1902

DIRECT - PETERSON

1    **GOVERNMENT'S EXHIBITS**

2    **EXHIBITS:**        **Offered**      **Received**    **Refused**      **Stipulated**

3    93                1843          1844

4    94                1832          1834

5    121               1838          1840

6

7                    *        *        *        *        *

8                    **REPORTER'S CERTIFICATE**

9        I certify that the foregoing is a correct transcript

10   from the record of proceedings in the above-entitled matter.

11       Dated at Denver, Colorado, this 13th day of September,

12   2023.

13

14

15

16

17       MARY J. GEORGE, FCRR, CRR, RMR

18

19

20

21

22

23

24

25