1903

1    IN THE UNITED STATES DISTRICT COURT
      FOR THE DISTRICT OF COLORADO
2
     Criminal Action No. 22-cr-0012-WJM
3
     UNITED STATES OF AMERICA,
4
       Plaintiff,
5
     vs.
6
     LAWRENCE RUDOLPH,
7    LORI MILLIRON,
8    Defendants.
9    ------------------------------------------------------------
10            REPORTER'S TRANSCRIPT
               (Jury Trial, Day 10)
11   ------------------------------------------------------------
12        Proceedings before the HONORABLE WILLIAM J. MARTINEZ,
13   Judge, United States District Court for the District of
14   Colorado, commencing at 8:49 a.m., on the 25th day of July,
15   2022, in Courtroom A801, United States Courthouse, Denver,
16   Colorado.
17                        APPEARANCES
18        BRYAN D. FIELDS, E. GARRETH WINSTEAD, III, J. BISHOP
     GREWELL, Assistant U.S. Attorneys, 1801 California Street,
19   Suite 1600, Denver, Colorado 80202, appearing for the
     plaintiff.
20
          DAVID O. MARKUS, A. MARGOT MOSS, LAUREN L. DOYLE,
21   Markus Moss PLLC, 40 NW Third Street, Penthouse 1, Miami,
     Florida 33175, appearing for the defendant Rudolph.
22
          JOHN W. DILL, John W. Dill P.A., 941 West Morse
23   Boulevard, Winter Park, Florida 32789, appearing for the
     defendant Milliron.
24
25

MARY J. GEORGE, FCRR, CRR, RMR
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer
P R O C E E D I N G S

1
2
3
4     (In open court outside the presence of the jury at 8:49

5     a.m.)

6         THE COURT:  A couple of things I wanted to deal

7     with on the record before we bring in the jury.  I'm in

8     receipt of Defendant Rudolph's written renewed objection to

9     exclude alleged hearsay statements made by Defendant -- by

10    decedent Bianca Rudolph to Cassandra Olmstead.  Let me ask

11    the Government, when do you anticipate calling Ms. Olmstead?

12        MR. FIELDS:  Your Honor, it depends on how long

13    some of the testimony takes, but the order this morning is

14    we're going to finish with Special Agent Peterson, Peterson,

15    and we're going to have Allan Smith, he's a relatively short

16    witness.  I think his direct will be no more then a half

17    hour.  And then after that Mr. Padish talking about divorce

18    law, probably another half hour, and then Ms. Olmstead.  So

19    it could happen before the lunch break.  More likely

20    probably after the lunch break.

21        THE COURT:  All right.  Thank you for that summary,

22    Mr. Fields.  I'll be suitably prepared to make a ruling

23    before she takes the stand.  All right.

24        Let me ask defense counsel, whoever wants to go

25    first, as I promised I would at the sidebar we had after

1  5:00 on Friday, let me -- I have two questions for defense

2  counsel.  First of all, do you have any authority to cite to

3  me which requires me to continue to accept serial renewed

4  motions for separate trials?

5        MR. MARKUS:  Judge, I've been discussing the matter

6  with Government counsel throughout the weekend and I think

7  we have a joint proposal as to how to handle this for the

8  rest of the trial that I think will be acceptable to the

9  Court.

10        THE COURT:  And "this" being what?

11        MR. MARKUS:  That the severance -- that the defense

12  request for severance can be a standing objection, so

13  there's no need for us to continue to object on severance

14  grounds.

15        THE COURT:  Good.  What about the 801(d)(2)

16  objection?

17        MR. MARKUS:  As to the hearsay objection, Your

18  Honor, the Government and I agree that that still needs to

19  be made on a statement-by-statement basis; however, we

20  believe that that's only going to come up one last time

21  through Agent Peterson this morning with the transcripts.

22  So we believe that a short reminder to the jury that they

23  should not consider the grand jury transcript of

24  Ms. Milliron against Dr. Rudolph is sufficient and that will

25  be the last time it needs to be discussed with the jury.

1906

1        So I think the Government and the defense would

2    propose that to the Court.  If by chance some other

3    statement comes up again, we'll deal with it, but neither

4    side believes that it will.

5        Finally, Your Honor --

6        THE COURT:  I'm heartened to hear that.  That's a

7    fairly painless resolution of what's been a very painful

8    issue for two weeks.

9        MR. MARKUS:  It's been very painful for two weeks,

10    Your Honor, I agree, so I'm glad that we were able to

11    resolve it.

12        The only last issue that I would point out to the

13    Court regarding the two filings on Cassandra Olmstead this

14    weekend, I just want to point out from the defense's point

15    of view, we listed some of the statements that we do believe

16    are hearsay and not admissible under the forfeiture by

17    wrongdoing exception.  It's our position that the entire

18    conversation between Ms. Olmstead and Bianca Rudolph is

19    hearsay.  And I've been discussing with Government counsel,

20    I don't want to be popping up for each objection if the

21    Court determines that it can come in.

22        So if the Court finds by a preponderance that some

23    of those statements come in, it's still our position that

24    the other statements the Government references are hearsay

25    and so we would just like a standing objection to those --

1  to the entire conversation between Rudolph and Olmstead as

2  hearsay, so that I'm not interrupting the flow or bothering

3  the Court.

4           THE COURT:  All right.  Well, first -- so two

5  things.  One, I will accept this as an oral motion to modify

6  your written -- or oral -- yeah, oral motion to modify your

7  renewed written objection filed at 231 to include a request

8  depending on my ruling that the objection be a standing

9  objection that encompasses all of the alleged statements

10 made to Ms. Olmstead.

11          As I've mentioned to Mr. Fields, I am going to make

12 a ruling before Ms. Olmstead takes -- yeah, Ms. Olmstead

13 takes the stand, so there won't be any question about what

14 that ruling is and what you will need to do or not do in

15 response.

16          MR. MARKUS:  Thank you, Your Honor.

17          THE COURT:  Okay.  Let me ask Mr. Dill, are you in

18 agreement with the proposal that was described by

19 Mr. Markus --

20          MR. DILL:  Yes, Your Honor.

21          THE COURT:  All right.  Mr. Fields, is the

22 Government in agreement?

23          MR. FIELDS:  Yes, Your Honor, we are.

24          THE COURT:  All right.  Great.  All right.  Let's

25 bring in the jury.

DIRECT - PETERSON

1    (In open court in the presence of the jury at 8:55

2    a.m.)

3    THE COURT:  Good morning, ladies and gentlemen of

4    the jury.

5    THE JURORS:  Good morning.

6    THE COURT:  Welcome back to day 9 of our -- or day

7    10 -- day 10 of our jury trial.  I trust you had an

8    enjoyable three days off.

9    All right, Mr. Peterson -- or, Agent Peterson, you

10   may resume the witness stand.  And, Agent Peterson, I remind

11   you you remain under oath.

12   THE WITNESS:  Yes, Your Honor.

13   THE COURT:  All right.  Mr. Winstead, you may

14   resume the examination.

15   MR. WINSTEAD:  Thank you very much, Your Honor.

16   DIRECT EXAMINATION (Continued)

17   BY MR. WINSTEAD:

18   Q.   Good morning, sir.

19   A.   Good morning.

20   Q.   All right.  So this morning I have a couple things I

21   want to loop back into and get just a little bit more detail

22   about before jumping back into this transcript.

23   Okay.  So a couple quick things.  First of all, in

24   your investigation, did you research whether the defendant

25   Lawrence Rudolph and Bianca Rudolph were U.S. citizens?

DIRECT - PETERSON

1   A.   Yes, we did.

2   Q.   Did you obtain their birth certificates?

3   A.   Yes.

4   Q.   So you confirmed that they were U.S. nationals?

5   A.   Yes, we did.

6   Q.   Okay.  Do you know where Julian and AnaBianca lived in

7   October of 2016?

8   A.   I believe Julian Rudolph lived in Miami, Florida; and

9   AnaBianca Rudolph lived in Pittsburgh, Pennsylvania.

10  Q.   There was some discussion in a defense opening of a

11  woman that Defendant Rudolph traveled to Las Vegas with

12  shortly after Bianca's funeral.  Were you ever able to

13  interview her?

14  A.   No, we were not.  She is deceased.

15  Q.   Okay.  So we went through the investigation, but there

16  was one additional point that I wanted to ask you about.

17  Did you at some point do an undercover operation?

18  A.   We did.

19  Q.   When, about, was that?

20  A.   It was over the course of several months, but I believe

21  most significantly at the beginning of 2021.

22  Q.   Okay.  And can you give me just like the super short

23  summary of what that was.

24  A.   Sure.  We developed an undercover operation that was

25  designed to introduce two people to Larry Rudolph and Lori

DIRECT - PETERSON

1   Milliron.  And the purpose -- or the objective of the

2   operation was to develop a friendship so that we would be

3   able to have conversations with them to develop evidence

4   related to this investigation.

5   Q.   Did -- were those undercovers introduced to the

6   defendants?

7   A.   Yes.

8   Q.   Why did you want to try to have a conversation with

9   them like that?

10  A.   During the course of the investigation, we had learned

11  that Lori Milliron had previously confided in associates,

12  and we knew that they were associates that she didn't have

13  particularly close relationships with.  So we believed that

14  if we were able to develop a -- any type of relationship,

15  close or relatively superficial, that we would have an

16  opportunity to engage in conversations that would give us

17  evidence related to this investigation.

18  Q.   Were you also trying to potentially find out anything

19  about the shotgun?

20  A.   Yes.

21  Q.   Explain that.

22  A.   We thought through these relationships, we might have

23  an opportunity to observe what firearms Lawrence Rudolph had

24  possession of and potentially be able to determine the

25  location of the subject shotgun in this case.

1911

DIRECT - PETERSON

1    Q.    Did you end up getting anything particularly useful

2    from the undercover operation?

3    A.    No.

4    Q.    All right.  You also said yesterday -- or last week

5    that your FBI investigation was opened in the summer of

6    2019.  Had there been a previous FBI case that was opened?

7    A.    Yes.

8    Q.    Can you tell me about when that started being active

9    and when it stopped being active.

10   A.    Yes.  There was a case opened by our LEGAT, which is

11   the Legal Attache Office of the FBI in Pretoria, and that

12   case was opened November first of 2016.

13   Q.    And do you know when the investigation basically ended

14   in that case?

15   A.    The investigation continued through June of 2017, at

16   which point it became a pending inactive status.  There was

17   approximately a two-year period until Agent Dahlstrom

18   started working the case in May of 2019.  So a two-year

19   period where the case was basically inactive.

20   Q.    Okay.  During that 2017 case, do you know if Defendant

21   Rudolph was ever contacted by the FBI?

22   A.    Yes, he was contacted.

23   Q.    Do you know about when that was?

24   A.    I believe it was April 26th of 2017.

25   Q.    Okay.  All right.  Now I'd like to, again, get a little

1912

DIRECT - PETERSON

1    bit more detail about Defendant Rudolph's arrest.  So when

2    you found out he was traveling to Mexico, did you contact

3    Mexican officials?

4    A.    Yes, we did.

5    Q.    What type of officials, or what organization did you

6    contact?

7    A.    We worked with Mexican immigration officials.

8    Q.    Did you inform them about the complaint against

9    Defendant Rudolph?

10   A.    Yes, I did.

11   Q.    And did you make any requests to them?

12   A.    Yes.

13   Q.    What was that?

14   A.    I requested that they detain and deport Mr. Rudolph

15   from Cabo directly to Denver based on our criminal

16   complaint.

17   Q.    Did they do that?

18   A.    They did.

19   Q.    And is that when you arrested him in Denver?

20   A.    I arrested him at the airport here in Denver the

21   following day.

22   Q.    Okay.  And so, again, just to reiterate, when you

23   arrested him, was he charged with a complaint?

24   A.    Yes.

25   Q.    And was that complaint -- did that complaint charge the

1913

DIRECT - PETERSON

1    same two charges he's charged with in this trial?

2    A.    Yes, it did.

3    Q.    All right.  Was that the -- was that the -- when you

4    arrested him, was that the first time he had been arrested

5    on that complaint?

6    A.    Yes.  It was.

7    Q.    Okay.  All right.  And then, again, getting back into

8    the transcript, we were talking about Defendant Milliron's

9    grand jury testimony.  And I just want to make --

10            MR. MARKUS:  I don't mean to interrupt.  I think

11    this would be the appropriate time for the last instruction,

12    Your Honor, to remind the jury.

13            THE COURT:  Do you agree, Mr. Winstead?

14            MR. WINSTEAD:  Sure.

15            THE COURT:  Do you or --

16            MR. WINSTEAD:  Yes, sir, that's fine.

17            THE COURT:  Okay.  Ladies and gentlemen of the

18    jury, you may consider the statement of Defendant Lori

19    Milliron only in the case against her and not against

20    Defendant Lawrence Rudolph.  You may not consider

21    Ms. Milliron's statement in any way when you are deciding if

22    the Government proved beyond a reasonable doubt its case

23    against Lawrence Rudolph.

24            MR. WINSTEAD:  Thank you, Your Honor.

25            THE COURT:  You may proceed, counsel.

DIRECT - PETERSON

1  MR. WINSTEAD:

2  Q.    Okay.  And so I just want to make sure that the

3  timeline is clear about what was happening with the charges

4  when she testified and then we'll jump back into the

5  transcript.

6         So when she testified in front of the grand jury,

7  was that the day after the evidentiary hearing that we

8  discussed last week?

9  A.    Yes.  The evidentiary hearing was January 4th, and

10 grand jury was the following day, January 5th.

11 Q.    At that point, had Defendant Rudolph been indicted?

12 A.    He had --

13 Q.    Or did that happen after her testimony?

14 A.    It was after her testimony.  He had been arrested on

15 the complaint initially.

16 Q.    Okay.  And was the grand jury that Defendant Milliron

17 was testifying to the same grand jury that was considering

18 that first indictment against Defendant Rudolph?

19 A.    Yes.

20 Q.    Did that indictment include any proposed charges

21 against Defendant Milliron at that time?

22 A.    The grand jury on January 5th was not considering

23 charges against Lori Milliron.

24 Q.    Were you -- were you investigating her or planning on

25 charging her at that point?

DIRECT - PETERSON

1    A.    No.  Well, I should say investigating.  She was part of

2    the investigation.  We were not planning on charging her at

3    that point.

4    Q.    Now, after -- after the indictment was returned on

5    Defendant Rudolph, was that same grand jury later -- did

6    that same grand jury later return an indictment against both

7    Defendant Rudolph and Defendant Milliron?

8    A.    Yes, there was a superseding indictment on

9    February 9th, so approximately a month after the first grand

10   jury presentation.

11   Q.    And is that the indictment that is at issue in trial

12   here?

13   A.    Yes.

14   Q.    Okay.  Okay.  So let's go back into the transcripts.

15   Last week we were discussing Lori's testimony about her

16   relationship with Larry and so I'd like to just briefly

17   touch on that so that we remember that whole subject.

18         I could bring up Exhibit 71, page 18.  And if you

19   could highlight line 16 to 25.  Down at the bottom -- no,

20   I'm sorry, when I say "highlight," I never mean it; I mean

21   can you blow it up.

22   A.    Question:  Ms. Milliron, were you in a relationship

23   with Larry Rudolph?

24         Answer:  Yes.

25         Question:  What was the relationship?

DIRECT - PETERSON

1    Answer:  Well, we had a working relationship, and

2    we also had a personal relationship.  We would travel

3    together.

4    Question:  What was the nature of the personal

5    relationship?

6    Answer:  We were friends.

7    Question:  Were you ever anything more than

8    friends?

9    Q.    And if you could go to the next page and highlight

10    lines 1 through 9.

11    THE COURT:  You mean blow up.

12    MR. WINSTEAD:  I do.  I'm not going to be able to

13    say it right, Judge.

14    A.    Answer continued from the question on the previous

15    page:  Yes.  We traveled mostly.

16    Question:  When did that relationship begin.

17    Answer:  Shortly -- well, I don't know if it was

18    shortly after I started working for him.  It was probably

19    back in 2003 or '-4.

20    Question:  Were these payments part of that

21    relationship?

22    Answer:  I don't know how to answer that.

23    Question:  Were you having a sexual relationship

24    with him?

25    Answer:  We did occasionally.

DIRECT - PETERSON

1    Q.    All right.  So I'd like to go back to the emails.  And

2    I'm not -- don't think I'm going to make you read any more

3    rude parts, so you don't need to be embarrassed, but there

4    are a couple of points that I want to highlight in regards

5    to that description of the relationship.

6              Could you bring up Exhibit 90 at page 146, please.

7    All right.  So at the bottom here, I'd like to ask you -- so

8    the bottom email here, if you could blow up just that bottom

9    email.

10             Is this an email from Dr. Rudolph to someone named

11   Stacey Armel?

12   A.    Yes.

13   Q.    All right.  You don't need to read the whole thing, but

14   is it something where he's directing her business-related

15   things?

16   A.    Yes.

17   Q.    And I guess this is on the next page.  Could you go to

18   the next page, please.  And then right -- yeah, that right

19   there.  All right.

20             So is there something that needs to be turned on so

21   I can draw on the -- sorry about that.  Oh, I guess it was

22   working.  Okay.  Can you just read that line.

23   A.    "We are both in agreement that we are going to have a

24   two- to four-month trial plan to see how this position works

25   out for you."

1918

DIRECT - PETERSON

1    Q.    So does that seem like she's relatively new to the

2    team?

3    A.    Yes.

4    Q.    Okay.  So if you could zoom out of that and go back to

5    the previous page.  So this is page 146.  All right.

6          So I'd like you to read -- if you could blow up and

7    then read that email.

8    A.    The email reads -- well, dated Tuesday, November 15th,

9    2011 at 1536 hours.

10         "I am aware of both already.  Problem.  Too many

11   people working on same issues.  Ninny hiring.  Lori placing

12   ads, me doing the same.  The company structure is going to

13   implode on itself, title, slash, responsibilities all

14   overlap.  Sorry.  Gonna make it all come together but please

15   listen to the expert.  I'd never tell you how to do a crown.

16   LOL.  Love ya, Charlie."

17   Q.    All right, zoom out.  No, actually, I'm sorry, if you

18   could zoom back into there.

19         So is this an email from Nikki to Defendant

20   Milliron's email address?

21   A.    Yes.

22   Q.    Okay.  So now zoom out.  All right.  Can you highlight

23   that top one.

24         All right.  So who is this from?

25   A.    Defendant Milliron.

1919

DIRECT - PETERSON

1    Q.    And you can just say what it says there.  We'll look at

2    what the email address is later, but who does it say it's

3    to?

4    A.    Has the initial "R."

5    Q.    All right.  And read that one, please.

6    A.    "What kind of message is this?  She is aware of both?

7    How is she not to be talking to Vinny.  You need to copy me

8    if you are emailing people if you want real help please.

9    What is 'I love you, Charlie'?  She sounds like a smart ass

10   to me."

11   Q.    Okay.  Now if you could zoom out.  And I'd like you to

12   go to -- so, in other words, does it appear that Defendant

13   Milliron forwarded that previous email chain to Defendant

14   Rudolph?

15   A.    That is a forward, yes.

16   Q.    Okay.  So I'd like you to go to page 148 -- no, this is

17   148.  Yeah, 148, please.  All right.

18           Now is this the same email that you read before?

19   A.    Yes.

20   Q.    And that was what was forwarded to Dr. Rudolph in the

21   previous chain?

22   A.    Correct.

23   Q.    Okay.  So now if you could blow up that one.

24           Is this an email replying to Nikki?

25   A.    Yes, it is, from Defendant Milliron.

DIRECT - PETERSON

1   Q.   Yeah.  Can you read that, please.

2   A.   "I placed the ads before you came along.  I know Three

3   Rivers Dental Group policy and procedures.  I wrote them"

4   --

5   Q.   Actually, I'll pause you.  So you can just skip to the

6   end.  What does it say there?

7   A.   Underlined line reads, "Love you, Charlie," question

8   mark.  "I don't get it."

9   Q.   All right.  Zoom out, please.  And now if you could

10  highlight that -- or blow up that one.  All right.

11       Can you read that, please.  And tell me who it's

12  from and who it's to.

13  A.   This is from the Nikki Yahoo address on November 15th

14  of 2011 to Defendant Milliron.  It reads:  "Lori, the way

15  the email came to my phone it looked as if it was sent from

16  Dr. R's Blackberry, not you.  Charlie is a nickname.  I took

17  care of many issues over the weekend already.  He replied:

18  Love you, Betty -- a nickname also -- in an email at 2:00

19  a.m. his time.  I am just getting started and already

20  getting conflicting information.  He said to focus on

21  staffing and to hire for -- hire for T.L. for Greentree,

22  et cetera."

23  Q.   And I'll pause you there.  So you don't need to read

24  the rest, all right?  Zoom out.  All right.  Now just the

25  top email.

DIRECT - PETERSON

1      Is this a forward of that previous email chain to

2   Dr. Rudolph?

3   A.    Yes.  From Defendant Milliron.

4   Q.    Can you read it.

5   A.    It reads:  "I guess you have nicknames for all your

6   girlfriends.  Read below."

7   Q.    All right.  Zoom out.  Now could you go to page 150.

8   Okay.

9      What's the date and time on this one?

10  A.    This one is dated Tuesday, November 15th, 2011 at 9:26

11  a.m.

12  Q.    All right.  So this is a little while after that

13  previous one we were just looking at?

14  A.    Yes.

15  Q.    What does it say?

16  A.    It reads:  "How can I be okay with this bullshit?  You

17  two have pet names for each other?  You are fucking killing

18  me here.  What else can you throw at me?"

19  Q.    And who sent this -- so I think actually you already

20  said that, but just to make sure, who sent this email?

21  A.    Defendant Milliron.

22  Q.    Who does she send it to?

23  A.    Defendant Rudolph.

24  Q.    And does this have a different subject line than the

25  previous ones?

1922

DIRECT - PETERSON

1    A.    Yes, this doesn't have the forward or the reply.    It

2    says:    Stacey.

3    Q.    Okay.    Zoom out.    And could you go to 151.

4            And who's this from and to?

5    A.    This is from Defendant Milliron to Defendant Rudolph on

6    November 15th, 2011, at 10:04 a.m.

7    Q.    Is that about 30 minutes after the last one we just

8    looked at?

9    A.    Yes.

10   Q.    What's the subject line here?

11   A.    "Love you."

12   Q.    And can you read it?

13   A.    It reads:  "Love you, Charlie.  Love you, Betty.

14   That's how you and your future operations manager talk to

15   one another?  That is not a professional relationship.  I am

16   a real idiot, huh?"

17   Q.    Does she seem pretty mad about that?

18   A.    She does.

19   Q.    Maybe a little jealous?

20   A.    Yes.

21   Q.    Can you go to Exhibit 90, page 12.

22           Can you read just the top email.  To say who it's

23   from and then just read the --

24   A.    Yes.  This is an email from Defendant Rudolph's Yahoo

25   account to Defendant Milliron on August 2d, 2010, at 5:01

DIRECT - PETERSON

1    a.m.  Subject is:  A reply to Monday morning.

2         It reads:  "I might be home tonight Betty will call

3    you about 6 tonight from Canada.  Home about 11."

4    Q.   And you can stop there.  So you read that with a

5    certain cadence.  Is there any punctuation there?

6    A.   There's no punctuation until after the word "Canada."

7    Q.   If you read it as though there was a comma after Betty,

8    how would you read it?

9    A.   I would read it:  "I might be home tonight, Betty.

10   Will call you about 6 tonight from Canada."

11   Q.   All right.  Thanks.  So then can you go to Exhibit 90,

12   page 43.

13        All right.  And read that bottom one.

14   A.   The bottom is from Defendant Milliron to Defendant

15   Rudolph March 15th, 2011, at 8:48 hours.  Reads:  "GMOB,

16   what's going on?  When are you coming down?  I chilled a

17   bottle of champaign for us.  Love, Betty."

18   Q.   And then just that line from the reply from

19   Dr. Rudolph.

20   A.   Yes.  The reply, March 15th, 2011, at 1928 hours,

21   reads:  "Better chill more than one bottle, Betty."

22   Q.   Does it seem like Betty is a nickname they use for

23   Lori?

24   A.   Yes.

25   Q.   All right.  And then if you can go to -- I think I

DIRECT - PETERSON

1    might -- we'll come back to that.  All right.  So let's now

2    transition to talking about money.

3             So could we go back to Exhibit 71, page 10.  All

4    right.  So if you could highlight line 5 to 18.

5    A.   Question:  How did you receive your wages?

6             Answer:  An electronic check.

7             Question:  Were you ever paid in cash?

8             Answer:  For wages, no, I don't believe so.  I

9    don't remember.

10            Question:  Did you ever deposit cash from the

11   practice into your personal bank account?

12            Answer:  I don't recall ever doing that.

13            Question:  At the time you were working at Three

14   Rivers, did you have any other substantial source of cash

15   income?

16            Answer:  I don't recall.

17            Question:  Do you recall making -- well, how

18   frequently do you think you deposited cash into your

19   personal account?

20            Answer:  I don't know.  I couldn't say.

21   Q.   All right.  Then could you zoom out and go down to just

22   line 25.  And then we'll be following on to the next page.

23   A.   Question:  Is this the signature card -- signature card

24   for your personal --

25   Q.   And actually don't go to the next page yet.  Sorry.  I

1925

DIRECT - PETERSON

1    should have had him read the line before that.  So can you

2    do 22 to 25.

3    A.    "What has been marked as Exhibit 1, do you see that

4    binder there?"

5          Answer:  Yes.

6          Question:  Is this the signature card for your

7    personal . . .

8    Q.    And down to the next page.  Yup, and the first lines.

9    A.    Continuing from the question on the previous page

10   being:  "Is this the signature card for your personal bank

11   account?"

12         Answer:  Yes.  I believe so.

13   Q.    All right.  Now can you bring up Government's

14   Exhibit 72, which is already in evidence.

15         Government's Exhibit 72, is this the signature card

16   from the bank account that she was being shown in the grand

17   jury?

18   A.    Yes.

19   Q.    Okay.  So let's go back to Exhibit 71.

20         And if you could go to page 11 and blow up line 13

21   to 23.

22   A.    Question:  Would it surprise you to learn that there

23   were substantial cash deposits into this account?

24         Answer:  I'm not sure.

25         Question:  Take a look at Exhibit 2.  This is an

DIRECT - PETERSON

1    analysis of cash deposits into your PNC Bank account.  Do

2    you recall depositing approximately $20,000 in cash into the

3    account in 2014?

4              Answer:  No, I don't.

5              Question:  $60,000 in 2015?

6              Answer:  No, I don't.

7    Q.   All right.  And so could you now pull up Government's

8    Exhibit 73.  Is this what she was being shown for these

9    questions?

10   A.   Yes.

11   Q.   So this is what is referred in the transcript as grand

12   jury Exhibit 2?

13   A.   Correct.

14   Q.   Okay.  All right.  Then I'd like to go back to

15   Exhibit 71, page 12.  Line 1 to 14, please.

16   A.   "If we go to Exhibit 6.  If you could please just sort

17   of start in sequential order in 2014 all the way up to 2021.

18   Please just browse through the first ten or so."

19              Answer:  Okay.

20              Question:  Are those the deposit slips --

21              Answer:  Yes, they are.

22              Question:  -- for cash into your account?

23              Answer:  Yes.

24              Question:  Let's go to -- were those multiple

25   deposits generally for a couple of hundred dollars at a

DIRECT - PETERSON

1    time?

2          Answer:  Yeah.  They seem to vary, but that's about

3    right.

4          Question:  Do you recall the source of that cash?

5          Answer:  That would have been from Larry Rudolph.

6    Q.   All right.  Now if you could take us to page 17.  And

7    we're going to -- why don't you do the first half down to 14

8    and then we will do the second half in a minute.

9    A.   Question:  Let's look -- if you go to Exhibit No. 4.

10   If you go to -- you'll see at the bottom all numbered in

11   sequential order.  If you'll go to page 135.  Do you see

12   that?

13         Answer:  Yes, I see it.

14         Question:  Do you remember him giving you $4,000 on

15   February 18th, 2016?

16         Answer:  No, I do not.

17         Question:  Would you agree that $4,000 is a lot of

18   money?

19         Answer:  Yes, that's a lot of money.

20         Question:  Do you remember what you used it for.

21         Answer:  I don't remember.

22         Question:  Why did he give you $4,000?

23         Answer:  I don't remember why he did.

24   Q.   All right.  Next -- yeah, 15 down.

25   A.   Question:  That was on February 18th.  If you go down,

1928

DIRECT - PETERSON

1    again, to February 20th, 2018.  Now we're on page 137.  Do

2    you see that?

3             Answer:  Yes.

4             Question:  So he gave you $4,000 on February 18th,

5    2016, and then $3400 on February 20th, 2016; is that right?

6             Answer:  I don't know when he gave it to me.

7             Question:  But that's when you deposited it?

8             Answer:  That's when it was deposited.

9             Question:  When you got these cash deposits, did

10   you deposit them immediately or did you hold on to it for

11   a . . .

12   Q.   Let's go to the next page and do 1 through 12.

13   A.   Continuing from the previous page:  Did you hold on to

14   it for a little bit?

15            Answer:  I don't remember.

16            Question:  So in total, though, you deposited

17   approximately $7400 in this span of three days?

18            Answer:  Yes.

19            Question:  If you go to the next one on page 138,

20   do you see that?

21            Answer:  Yes.

22            Question:  Two days after that did you deposit

23   $3,460?

24            Answer:  I don't remember.

25            Question:  All told, that's a lot of money, right?

DIRECT - PETERSON

1            Answer:  Yes.

2    Q.    All right.  Could you go to page 13, line 10 to 18,

3    please.

4    A.    Question:  So now let's go to Government's Exhibit 2.

5    That's the chart there.  Do you see that in 2015 there was

6    approximately $60,000 in cash deposited into your account?

7            Answer:  Yes, I do.

8            Question:  Did that come from Larry Rudolph?

9            Answer:  It would have, yes.

10           Question:  And $75,450 in 2016?

11           Answer:  Yes.

12   Q.    All right.  Then could you go to page 14.  Yup.  Two to

13   7.

14   A.    Question:  So in 2015 you received approximately double

15   your salary -- or your salary again, but all in cash?

16           Answer:  Yes.

17           Question:  And in 2016 you received a little bit

18   more than your salary in cash?

19           Answer:  Yes.

20   Q.    All right.  Could you go to page 15.

21   A.    Question:  How would he decide how much to give you?

22           Answer:  I don't recall.

23           Question:  Where would he give you the money?

24           Answer:  I don't recall that.

25           Question:  You don't recall him giving you cash?

                            DIRECT - PETERSON

1     Answer:  No.  Where he would?  I don't.

2     Question:  Do you recall how he would give it to

3   you?

4     Answer:  Hand it to me.

5     Question.  Was it in an envelope?

6     Answer:  Sometimes I think it was.

7     Question:  Did he do it at the office?

8   Q.   And then same thing, let's do the first half down to

9   13.  There we go.

10  A.   Answer:  I really don't remember.

11    Question:  Were there other people present when he

12  gave you the cash?

13    Answer:  I don't think so.

14    Question:  Was it after business hours?

15    Answer:  I don't really remember.  It probably

16  would be.

17    Question:  Did he ever give you cash outside the

18  office?

19    Answer:  I don't really recall that.

20    Question:  What's the largest sum you ever remember

21  receiving?

22    Answer:  I don't know.

23    Question:  Could you have received more than

24  $1,000?

25    Answer:  Yes, I believe so.

DIRECT - PETERSON

1   Q.   All right.  And page 16.  Yeah, bottom.

2   A.   Question:  More than $3,000?

3           Answer:  I believe so.

4           Question:  Did you have to ask him for money before

5   he gave it to you?

6           Answer:  Yes, I would ask.

7           Question:  When would you approach him to ask for

8   money?

9           Answer:  I don't recall that.

10          Question:  What would you ask him for money for?

11          Answer:  Anything.  Trips, vacations, clothes.

12          Question:  Did he give you the money right away

13  when you asked or was there a delay?

14          Answer:  Usually there was a delay.

15  Q.   All right.  And page 20, line 1 through 5.

16  A.   Question:  Would he give you money when you asked for

17  it?

18          Answer:  Yes.

19          Question:  Was there ever a time that you asked for

20  money that he refused?

21          Answer:  No, I can't remember him refusing.

22  Q.   All right.  So let's look at her testimony about the

23  purposes of this cash and why it was given to her.  So could

24  you go to page 12, lines 15 through 25.

25  A.   Question:  Why was he giving you money?

DIRECT - PETERSON

1    Answer:  He would help me out.

2    Question:  For what?

3    Answer:  Expenses.

4    Question:  What kind of expenses?

5    Answer:  A variety of things.

6    Question:  Can you provide some examples?  What did

7    you use the cash for?

8    Answer:  To pay for bills, education.

9    Question:  Were you already receiving a salary?

10    Answer:  Yes.

11   Q.   And the next page, 1 through 9.

12   A.   Question:  Why was Larry paying you this additional

13   money if you already had a salary for those things?

14    Answer:  Because he wanted to help me.

15    Question:  Did he explain why?

16    Answer:  He was very generous.

17    Question:  Do you know if he gave this money to

18   anyone else at the practice?

19    Answer:  I know he has helped a lot of people out

20   over the years.

21   Q.   All right.  Page 14, line 8 through 25.

22   A.   Question:  Why was Larry so generous to you?

23    Answer:  I don't know why.  But, like I said, he

24   would give others -- staff members, he would buy them

25   washers and dryers.  He would give them cash if they needed

1933

DIRECT - PETERSON

1    it, a whole variety of things.

2            Question:  So your testimony before the members of

3    the grand jury today is that you don't know exactly why he

4    gave you $60,000 in 2015?

5            Answer:  I don't know exactly why.

6            Question:  Did he tell you why he was being so

7    generous to you?

8            Answer:  He helped me with, you know, bills, kids'

9    college, you know, things like that.  Expenses.

10           Question:  Did he give money to your daughter to

11   pay for college?

12           Answer:  Yes, he did.

13           Question:  How much?

14           Answer:  I don't recall how much.

15   Q.   And the next page, just the first three lines.

16   A.   Question:  Do you know if he gave money to anyone

17   else's children for college?

18           Answer:  Not that I know of

19   Q.   All right.  Now page 18, line 13 through 15.

20   A.   Question:  Do you remember why Larry gave you all that

21   money?

22           Answer:  I don't remember

23   Q.   Now if you could go to page 19, line 6 to 7.

24   A.   Question:  Were these payments part of that

25   relationship?

1934

DIRECT - PETERSON

1            Answer:  I don't know how to answer that.

2    Q.    All right.  Now page -- yup, yup, lines 10 through 25.

3    A.    Question:  Was he supporting you financially?

4            Answer:  You could say that.

5            Question:  These cash payments, was that part of

6    his supporting you?

7            Answer:  I would say so.

8            Question:  While you were in a relationship with

9    him?

10           Answer:  Yes.

11           Question:  And the payments to your daughter, was

12   that also part of the relationship?

13           Answer:  Yes.

14           Question:  So earlier, when you said you didn't

15   know why he was giving you all this money, do you now have a

16   better understanding of why he might have been giving you

17   this money?

18           Answer:  Well, I did know why he gave me the money.

19   I just don't know specifically each one, what it was for.

20   Q.    All right.  Then if you could go to page 30, lines 23

21   through 25.

22   A.    Question:  He was giving you a lot of cash?

23           Answer:  Yes.

24           Question:  Do you know whether he ever discussed

25   this with his --

DIRECT - PETERSON

1  Q.    And then the next page, 1 through 20.

2  A.    Continuing from the previous page:  . . . -- wife

3  giving you that amount of cash?

4         Answer:  No, I don't know.

5         Question:  Did he ever tell you that he needed to

6  keep the cash secret?

7         Answer:  No.

8         Question:  Did you ever ask him whether his wife

9  was upset about the amount of money he was giving to you?

10         Answer:  I did not.

11         Question:  Why not?

12         Answer:  I just did not.

13         Question:  Were you ever concerned that she might

14  get upset and that the money flow would stop?

15         Answer:  No, I wasn't.

16         Question:  Why not?

17         Answer:  I just wasn't concerned.

18         Question:  Did you ever wonder why his wife would

19  allow him to pay you thousands of dollars?

20         Answer:  Well, it was his business.

21         Question:  But he was married to Bianca?

22         Answer:  Yes, he was married to Bianca.

23  Q.    All right.  So I'd like to go back to some of those

24  denials and admissions.  So if you could go back to page 19,

25  line 20 through 25.  Okay.  Can you remind us what that

DIRECT - PETERSON

1    says.

2    A.    Read this?

3    Q.    Sure.

4    A.    Question:  So earlier when you said you didn't know why

5    he was giving you all this money, do you now have a better

6    understanding of why he might have been giving you this

7    money?

8          Answer:  Well, I did know why he gave me the money.

9    I just don't know specifically each one, what it was for.

10   Q.    All right.  So I'd like to look at what may have been

11   meant there, "I didn't know specifically for each one."

12         So this is on page 19.  Could you go back to two

13   pages before that, page 17.

14         And we don't need to read this whole thing, but --

15   because you read it before, but is this where she's being

16   asked about specific days and specific amounts?

17   A.    Yes, she is.

18   Q.    And then go to page 18, please.

19         Is this -- are those questions continuing?

20   A.    Yes, they are.

21   Q.    All right.  And then could you blow up lines 11 through

22   15.  And read that.

23   A.    Question:  All told, that's a lot of money, right?

24         Answer:  Yes.

25         Question:  Do you remember why Larry give you all

DIRECT - PETERSON

1   that money?

2          Answer:  I don't remember.

3   Q.    Okay.  So go back to page 19, line 20 through 25.  So

4   shortly before she gives this answer, was she discussing

5   specific amounts?

6   A.    Yes.

7   Q.    And was she asked why she received those specific

8   amounts?

9   A.    Yes.

10  Q.    And she said she doesn't know?

11  A.    Correct.

12  Q.    Okay.  So on -- read this last part again.

13  A.    Part of the answer says:  "I just don't know

14  specifically each one, what it was for."

15  Q.    Okay.  So now I want to go all the way back earlier to

16  page 13, line 1 through 9.  All right.  Can you read this

17  again, please.

18  A.    Question:  Why was Larry paying you this additional

19  money if you already had a salary for those things?

20          Answer:  Because he wanted to help me.

21          Question:  Did he explain why?

22          Answer:  He was very generous.

23          Question:  Do you know if he gave this money to

24  anyone else at the practice?

25          Answer:  I know he has helped a lot of people out

DIRECT - PETERSON

1    over the years.

2              MR. DILL:  Objection, cumulative.  Document speaks

3    for itself.

4              THE COURT:  Overruled.

5              MR. DILL:  It's been introduced.

6              THE COURT:  Overruled.  Go ahead.

7    BY MR. WINSTEAD:

8    Q.   All right.  And then if you could go to page 14 and

9    just lines 8 through 9.

10   A.   Question:  Why was Larry so generous to you?

11             Answer:  I don't know why.  But, like I said --

12   Q.   Yeah, that's good.  We don't need to read the rest of

13   it.  So in this question, is she being asked about specific

14   amounts?

15   A.   No.

16   Q.   Okay.  So this is page 14.  And at the end of page 19,

17   as you read before, she says:  "Well, I did know why."

18             I'd like to look at what happened in the middle.

19   So if you could go to page 19 and so down here is:  "Well, I

20   did know why he gave me the money."  Could you read 6 to 14.

21   A.   Question:  Were these payments part of that

22   relationship?

23             Answer:  I don't know how to answer that.

24             Question:  Were you having a sexual relationship

25   with him?

1939

DIRECT - PETERSON

1    Answer:  We did occasionally.

2    Question:  Was he supporting you financially?

3    Answer:  You could say that.

4    Question:  These cash payments, was that part of

5    his supporting you?

6    Answer:  I would say so.

7    Q.  All right.  So that happened in the middle.

8    A.  Correct.

9    Q.  All right.  Could you now go to page 15, line 4 through

10   10.

11   A.  Question:  Would there be any other source of cash

12   deposits in your account except for Lawrence Rudolph?

13   Answer:  I can't think of any.

14   Question:  Ms. Milliron, if you'll notice, there

15   was $75,000 in 2016 with 33,350 in 2017.  Do you see that?

16   Answer:  Yes.

17   Q.  All right.  Could you go to page, now, 35.  16 through

18   23.

19   A.  Question:  Where do you currently live?

20   Answer:  I'm living with him in Arizona.

21   Question:  When did you move to Arizona?

22   Answer:  I think it was sometime in 2017, but I

23   still kept a place in Pennsylvania.  I go back and forth.

24   Question:  Did you start living with him in

25   approximately January of 2017?

DIRECT - PETERSON

1    Answer:  I don't recall the exact date.

2  Q.   All right.  Would you please pull up Exhibit 74.  Can

3  you tell me what this is.

4  A.   Yes.  This is the vehicle decal and gate pass request.

5  I think we looked at it back on Thursday.  It's dated April

6  17th of 2017, and it lists Lori Milliron and Larry Rudolph

7  as the residents of 4141 East Lakeside Lane.

8    MR. WINSTEAD:  Your Honor, at this time --

9  actually, if I could have -- if I could show an exhibit that

10  has not yet been admitted.  Could you pull up Government's

11  Exhibit 95, please.  Oops.  That's all right, I've got

12  physical copies.

13    Can I have one provided to the witness?

14    THE COURT:  So, Mr. Winstead, we don't have 95 in

15  electronic form?

16    MR. WINSTEAD:  We don't have it.  It looks like

17  it's not loaded into our software right now.  But we will

18  have it.

19    THE COURT:  All right.  I was just wondering why

20  we're doing it the old-fashioned way.

21    MR. WINSTEAD:  Yes, sir.  It looks like we had a

22  little computer problem on that one.

23    THE COURT:  Okay.

24  BY MR. WINSTEAD:

25  Q.   Sir, can you tell me what this exhibit is.

DIRECT - PETERSON

1    A.    Yes.    Exhibit 95 is a series of photographs of the

2    property at 4141 that was previously referenced in that

3    decal request.

4            MR. WINSTEAD:    At this time, Your Honor, I would

5    move for admission of Government's Exhibit 95.    I believe

6    that there are objections.

7            THE COURT:    All right.    Let me hear the objections.

8            MR. DILL:    Just object to the relevance as to my

9    client, Your Honor.

10            THE COURT:    All right.    Mr. Markus.

11            MR. MARKUS:    Your Honor, I would also object under

12    401 and 403 to pictures of Dr. Rudolph's house as to

13    relevance and under 403 as well.

14            THE COURT:    Let me just have you put on the record

15    what you believe is the relevance of these photos.

16            MR. WINSTEAD:    Yes, Your Honor.    This is the house

17    that Defendant Milliron moved into in 2017 and so it goes to

18    her motive.

19            THE COURT:    Her motive to?

20            MR. WINSTEAD:    Her motive to lie in the grand jury

21    and also her motive as there's been previous testimony to

22    give Dr. Rudolph an ultimatum.

23            THE COURT:    All right.    I'm going to overrule the

24    objections.    Exhibit 95 is admitted into evidence and may be

25    published to the jury.

1942

DIRECT - PETERSON

1    **(Government's Exhibit 95 received)**

2          MR. WINSTEAD:  All right.  Thank you, Your Honor.

3    I guess I'll do it via the Elmo, if that's possible.

4    BY MR. WINSTEAD:

5    Q.   All right.  Is this the residence?

6    A.   Yes.

7    Q.   All right.  Thank you.  All right, if I could go back

8    to Exhibit 71, please.  And could you bring up page 37,

9    lines 19 through 25.

10   A.   Question:  Did Mr. Rudolph add you to his American

11   Express card in 2017?

12          MR. WINSTEAD:  Oh, sorry, we've got --

13          THE JURORS:  We're good.

14          THE WITNESS:  Starting from the beginning.

15   Question:  Did Mr. Rudolph add you to his American Express

16   card in 2017?

17          Answer:  I don't remember the date, but, yes, I do

18   have a card.

19          Question:  Do you remember we looked at -- if

20   you'll look at Government's Exhibit 2.  He gave you

21   approximately 75,450 in 2016, and in . . .

22   Q.   If you could go to the next page.  And just do -- yup.

23   Through 15, maybe.  There we go.

24   A.   Continuing from the previous page:   . . . 2017 he gave

25   you $33,350.  I believe your testimony earlier was that you

DIRECT - PETERSON

1    weren't sure why he gave you less in 2017.  Do you now

2    remember why he might have given you less in 2017?

3         Answer:  No.  I don't know why.

4         Question:  Was it because at that point you were on

5    his American Express card?

6         Answer:  No.  The card was basically part of my --

7    it's a Three Rivers Dental card.  It was part of my perks, I

8    guess.

9         Question:  What did you use it for?

10        Answer:  Instead of paying more, I -- paying me

11   more, he gave me that to use.

12        Question:  Only in 2017?

13        Answer:  I don't remember when he got me the card.

14   Q.   All right.  And then the rest of the page.

15   A.   Question:  How many cards of this have you ever -- how

16   many cards of his have you ever been on?

17        Answer:  I believe just that one.

18        Question:  So if you were added to a card in 2017,

19   it would have been that card?

20        Answer:  I believe so.

21        Question:  Was that card used for business expenses

22   or personal expenses?

23        Answer:  Mine was personal.

24        Question:  And who was -- and who paid the balance

25   on that card?

1944

DIRECT - PETERSON

1          Answer:  The accountant did.

2  Q.  And the next page, just the first six lines.

3  A.  Question:  Who is the accountant?

4          Answer:  The accountant that paid the bills for the

5  office.

6          Question:  Who would that accountant have taken

7  directions from?

8          Answer:  Larry Rudolph.

9  Q.  And if you could go to page 39.  And blow up 7 through

10  25.

11  A.  Question:  Was it Larry Rudolph's money that paid the

12  American Express card that you are using to pay your

13  personal expenses?

14          Answer:  Yes, I believe so.

15          Question:  After he added you to the American

16  Express card, did he give you any cash?

17          Answer:  I believe so.

18          Question:  Why?

19          Answer:  He wanted to.

20          Question:  And in 2018 you got even less cash,

21  $18,100.  And do you see in 2019 and 2020 it was only 3,000

22  and only 2,000?

23          Answer:  Yes, I see that.

24          Question:  Is that because you were using the

25  American Express card for your personal expenses?

1945

DIRECT - PETERSON

1      Answer:  I don't recall.

2      Question:  Did he continue paying your salary at

3   Three Rivers Dental?

4      Answer:  Yes.

5   Q.   And then the first nine lines of this page.

6   A.   Question:  Did he put any limitations on what you could

7   charge to the American Express card?

8      Answer:  I think it had a monthly limit of $2,200.

9      Question:  As long as you stayed below that limit,

10  you were okay?

11     Answer:  Uh-huh.

12     Question:  Did he continue to help you with rent in

13  Pennsylvania?

14     Answer:  Yes, I would say so.

15  Q.   All right.  I'd like to talk about a couple things --

16  I'd like to go through a few things that the defendant, when

17  she was testifying, didn't remember.  So if you could go to

18  page 8, line 3 to 7.

19  A.   Question:  You started off as a hygienist.  Did you

20  eventually adopt another role at Three Rivers?

21     Answer:  Yes, I moved into a management.

22     Question:  Approximately when was that?

23     Answer:  I don't remember.

24  Q.   All right.  Page 10, lines 13 through 18.  Yup.

25  A.   Question:  At the time you were working at Three

1946

DIRECT - PETERSON

1    Rivers, did you have any other substantial source of cash

2    income?

3              Answer:  I don't recall.

4              Question:  Do you recall making -- well, how

5    frequently do you think you deposited cash into your

6    personal account?

7              Answer:  I don't know.  I couldn't say.

8    Q.   Page 11, 19 through 23.

9    A.   Do you recall depositing approximately $20,000 in cash

10   into that account in 2014?

11             Answer:  No, I don't.

12             Question:  $60,000 in 2015?

13             Answer:  No, I don't.

14   Q.   All right.  Now go to page 22, line 13 through 20.

15   A.   Question:  At some point did you find -- let me start

16   over.

17             Question:  At some point did you find out that

18   Mr. Rudolph's wife died?

19             Answer:  Yes, I did.

20             Question:  When did you find that out?

21             Answer:  I don't remember when I found out.

22             Question:  Do you know approximately how long after

23   the death it would have occurred?

24             Answer:  I'm not sure.

25   Q.   All right.  And then page 26.  14 through 25.

DIRECT - PETERSON

1   A.   Question:  When you saw him close to the election, did

2   you ask him how his wife died?

3            Answer:  I don't remember the conversation.  I

4   think he told me.

5            Question:  What did he say?

6            Answer:  That there had been an accident with a

7   gun.

8            So this time he said it was with a gun?

9            Answer:  I believe so.

10           Question:  Did you ask him what kind of accident?

11           Answer:  I can't remember that conversation.

12           Question:  Do you remember how it came up?

13           Answer:  No, I don't remember that.

14   Q.   That's enough.  Thank you.  Okay.  And then page 35,

15   line 16 through 25.

16   A.   Question:  Where do you currently live?

17           Answer:  I'm living with him in Arizona.

18           Question:  When did you move to Arizona?

19           Answer:  I think it was sometime in 2017, but I

20   still kept a place in Pennsylvania.  I go back and forth.

21           Question:  Did you start living with him in

22   approximately January of 2017?

23           Answer:  I don't recall the exact date.

24           Question:  Do you remember celebrating New Years'

25   with him in 2017?

1948

DIRECT - PETERSON

1    Q.    All right.  Next page.  Just line 1.

2    A.    Answer:  I don't.

3    Q.    All right.  And then same page, can you do 7 through

4    13.

5    A.    Question:  When did you start spending the majority of

6    your time in Arizona?

7          Answer:  I would say sometime in '17.  I'm still a

8    Pennsylvania resident.

9          Question:  First quarter of 2017?  So January,

10   February, March, or was it summer, spring?

11         Answer:  I can't recall.

12   Q.    All right.  And then page 50, line 13 -- 13 through 22.

13   A.    Question:  When was the first time you were introduced

14   to his children as his girlfriend?

15         Answer:  I think they came to visit.  They were

16   doing something in Scottsdale, and we went out for dinner.

17   I think that was several years ago.  I don't recall.

18         Question:  Was it the year after Bianca's death?

19         Answer:  I don't recall.

20         Question:  Two years after her death?

21         Answer:  I don't recall.  I think it was a couple

22   years ago.

23   Q.    All right.  So those that you've just been reading, she

24   doesn't remember when she changed from being a hygienist to

25   a manager, right?

1949

DIRECT - PETERSON

1  A.    Correct.

2          MR. DILL:  Object to the leading, Your Honor, and

3  also cumulative.

4          THE COURT:  I think he's just introducing the

5  question.  I don't even know what the question is.

6          MR. WINSTEAD:  It's okay.  I was going to summarize

7  those different points so that we can move into the next

8  passage, but --

9          THE COURT:  All right.  If you're --

10          MR. WINSTEAD:  I'll just move to the next one.

11          THE COURT:  All right.  Mr. Dill?

12          MR. DILL:  Oh, I'm sorry.

13          THE COURT:  Counsel said he's just going to move

14  on.

15          MR. DILL:  Okay, I'm sorry.

16  BY MR. WINSTEAD:

17  Q.    So let's talk about some things that she does remember.

18  So if you could go to page 20 -- wait -- line 16 through 25.

19  A.    Question:  While you were in this relationship with

20  Mr. Rudolph, do you know whether he was married?

21          Answer:  Yes, he was married.

22          Question:  Who was his wife?

23          Answer:  Pardon me?

24          Question:  Who was his wife at the time?

25          Answer:  Bianca Rudolph.

1950

DIRECT - PETERSON

1   Question:  Do you know whether he told his wife

2   about his relationship with you?

3   Answer:  Yes.  I know she was aware.

4   Q.   Next page.  1 through 11.

5   A.   Question:  How do you know that?

6   Answer:  Because I questioned -- when he wanted to

7   go out with me, I said, 'Aren't you married?'  And he said,

8   'We have an open marriage; we do our own thing.'

9   Question:  Did he ever express dissatisfaction with

10  his marriage to Bianca?

11  Answer:  No, he didn't.  Question:  Did he ever

12  discuss leaving Bianca?

13  Answer:  No, he didn't.

14  Question:  Did he ever talk about divorce?

15  Answer:  No, he didn't.

16  Q.   All right.  So -- so she says this conversation

17  happened when they began their affair.  So I'd like to just

18  remember when that happened, so could you take us to page

19  19, line 2 through 5.

20  A.   Question:  When did that relationship begin?

21  Answer:  Shortly -- well, I don't know if it was

22  shortly -- after I started working for him.  It was probably

23  back in 2003 or '-4.

24  Q.   All right.  And then could you go to page 30, line 9

25  through 22.

DIRECT - PETERSON

1   A.    Question:  Did he talk about leaving his wife in July

2   of 2016?

3              Answer:  No, he did not.

4              Question:  Have you discussed any problem with his

5   marriage with Bianca in July of 2016?

6              Answer:  I don't remember.  I don't recall that.

7              Question:  Your testimony earlier was that he told

8   you that it was an open marriage?

9              Answer:  Yes, he did.  I questioned that.

10             Answer:  You did question that?

11             I messed that all up.  Question:  You did question

12  that?

13             Answer:  Yes.

14             Question:  How did you question that?

15             Answer:  Before we started going out together, I

16  questioned that because he was married.

17  Q.    And now go to page 32, lines 16 through 25.

18  A.    Question:  You indicated that you had concerns about

19  Larry telling you that he was in an open marriage, right?

20  When he first told you he was in an open marriage, you

21  questioned that, I think was your testimony; is that

22  correct?

23             Answer:  I questioned him because I had heard that

24  he was married.

25             Question:  When he told you, 'We have an open

DIRECT - PETERSON

1    marriage,' when you first heard that, do you take that at

2    face value and say okay and then you began dating him or did

3    he --

4    Q.    And the next page.  1 through 13.

5    A.    Answer:  Yes.

6          Continued question:  -- have to convince you?

7          Answer:  I think so.  No.  He -- let me think.  He

8    said that they were in an open marriage and they did their

9    own thing.  She had affairs with men and he had affairs with

10   women.

11         Question:  When he told you that, you were okay

12   with that, and you started dating him and seeing him --

13         Answer:  Yes.

14         Question:  -- in a manner more than professional?

15         Answer:  Yes.

16         Question:  It only took one conversation?

17         Answer:  I don't remember.  That was almost 20

18   years ago.

19   Q.    So the one thing she remembers from the conversation 20

20   years ago is that they had an open marriage?

21         MR. DILL:  Object to the leading, Your Honor.

22         THE COURT:  Sustained.

23         MR. WINSTEAD:  That's fine.

24   BY MR. WINSTEAD:

25   Q.    All right.  I'd like to ask you about another thing

DIRECT - PETERSON

1   that she remembers.  Page 31, line 21 through 25.

2   A.   Question:  Do you know whether they had any agreements

3   regarding their marriage, any written agreements?

4            Answer:  I believe they did.

5            Question:  What is the basis for that belief?

6            Answer:  I believe Larry told me they did.  I don't

7   know --

8   Q.   And then the next page.  1 through 9.

9   A.   Continuing from the previous page:  I don't know all

10  the details.

11           Question:  Approximately when did he tell you that?

12           Answer:  I don't recall.

13           Question:  What exactly did he tell you?

14           Answer:  That they had a postnuptial agreement.

15           Question:  How did that come up?

16           Answer:  I don't remember how it came up.

17           Question:  Did you ask him about it?

18           Answer:  No.  I don't remember how it came up.

19  Q.   Now because we talked about the evidentiary hearing

20  last week, can you remind me, did the fact of the open

21  marriage and the fact of the postnup feature prominently in

22  the defense arguments at that hearing?

23  A.   Yes.

24  Q.   Okay.  All right.  I'd like to go to her testimony

25  about the ultimatum.  Could you go to page 24, line 5

DIRECT - PETERSON

1    through 12.

2    A.    Question:  Before that hunt, had you ever given him an

3    ultimatum that he needed to leave his wife?

4              Answer:  I don't believe so.

5              Question:  You don't believe so or you did not?

6              Answer:  I don't think I did.

7              Question:  Could he have -- well, did you ever

8    threaten to break off the affair?

9              Answer:  I don't remember.

10   Q.    All right.  And then on that same page, if you could go

11   13 to the end.

12   A.    Question:  Would you consider yourself pretty close to

13   Mr. Rudolph?

14             Answer:  Yeah, I would say we're close.

15             Question:  Is your relationship with him important

16   to you?

17             Answer:  Yes.

18             Question:  So would you say you remember some of

19   the ups and downs of the relationship?

20             Answer:  Yeah.  I think there's ups and downs in

21   every relationship.

22             Question:  Were there any downs where you

23   threatened to break it off?

24             Answer:  I don't recall.

25             Question:  When was the last down period in the --

DIRECT - PETERSON

1   Q.    And then the next page, 1 to 10.

2   A.    -- continuing from the previous page:  When was the

3   last down period in the relationship?

4            Answer:  I don't recall.

5            Question:  What were some of the things that caused

6   down periods in your relationship?

7            Answer:  Fatigue, working.

8            Question:  Anything aside from that?

9            Answer:  I couldn't say.  I don't think so.

10           Question:  Have you ever been angry with him?

11           Answer:  I can't remember the last time I was angry

12   at him.

13   Q.    All right.  Now that same page, 11 through 14.

14   A.    Question:  So you said you don't think you could have

15   given an ultimatum.  Ms. Milliron, yes or no, did you ever

16   give him an ultimatum?

17           Answer:  No.

18   Q.    All right.  So previously when she was asked these

19   questions, did she say that she couldn't remember or -- or

20   that she wasn't sure?

21   A.    Yes.

22   Q.    Now this question, does she deny giving an ultimatum?

23   A.    She does.  She answers with the word, "No."

24   Q.    All right.  So same page, please, 15 through 25.

25   A.    Question:  Did you ever threaten to leave him?

DIRECT - PETERSON

1     Answer:  No.

2     Question:  Have you ever thought that you were

3  threatening to leave him?

4     Answer:  No.

5     Question:  Did you ever imply that you would leave

6  him?

7     Answer:  No.

8     Question:  Did you ever tell anyone at the office

9  you were thinking about leaving -- it says Ms. --

10  Mr. Rudolph?

11     Answer:  No.

12     Question:  Did you ever tell anyone at the office

13  that you --

14  Q.   And then the next page, first three lines.

15  A.   -- that you had given Mr. Rudolph an ultimatum that he

16  needed to leave his wife?

17     Answer:  No, I did not

18  Q.   All right.  So the first questions that I was -- that

19  you read were from page 24.  This is all from page 25.  I'd

20  like to go after this to page 29, and if you could do the

21  first half of the page.  Yeah.  Yeah, it's to either --

22  that's good enough.

23  A.   Question:  You mentioned traveling with Mr. Rudolph.

24  Did you go to Houston with him in September of 2016?

25     Answer:  I don't recall.  It was five-plus years

DIRECT - PETERSON

1    ago.

2          Question:  Did you go to Cabo with him in July of

3    2016?

4          Answer:  Yeah, that's a long time ago.  I don't

5    recall.

6          Question:  Do you remember traveling with

7    Mr. Rudolph before his wife died in October of 2016?

8          Answer:  No, I don't recall.

9          Question:  Would tickets help refresh your

10   recollection?

11         Answer:  I don't think it would help.  It's a

12   ticket, but I don't remember.

13         Question:  If there was a ticket booked for you to

14   go to Houston in September of 2016, would that have been a

15   trip --

16   Q.    15 down.  Yeah, perfect.

17   A.    -- Houston in September of 2016, would that have been a

18   trip with Mr. Rudolph?

19         Answer:  It may have been to visit my daughter.

20   She lives in Houston.

21         Question:  What about Cabo in the summer of 2016,

22   July?

23         Answer:  We may have.

24         Question:  Would you have gone to Cabo with anyone

25   except for Mr. Rudolph?

1958

1    Answer:  I've gone there with my children before.

2    Question:  Did you go there with your children in

3    July of 2016?

4    Answer:  I don't remember, but I don't think so.

5    Q.    The next page, first eight lines.

6    A.    Question:  If you didn't go with your children, who

7    would you have gone with?

8    Answer:  I would have went with Larry.

9    Question:  And this was in July of '16.  His wife

10   died in October 2016?

11   Answer:  I believe so.

12   Question:  Did you give him an ultimatum in July of

13   2016?

14   Answer:  No, I don't remember that.

15   Q.    So now this is after the previous questions.  Does she

16   say that she doesn't remember here?

17   A.    She does.

18   Q.    Okay.  All right, I'd like to move to her testimony

19   about her -- some conversations with Defendant Rudolph.

20   Could you go to page 26.  And could you bring up line 4

21   through 25.

22   A.    Question:  Let's go back to the notification of

23   Ms. Rudolph's death.  When did Mr. Rudolph return after that

24   trip?

25   Answer:  I'm not sure.

DIRECT - PETERSON

1    Question:  When did you see him after that trip?

2    Answer:  I think it was right after the election.

3    Question:  In November?

4    Answer:  Uh-huh.

5    Question:  Do you know when Ms. Rudolph's funeral

6    was?

7    Answer:  No, I don't.

8    Question:  When you saw him close to the election,

9    did you ask him how his wife died?

10    Answer:  I don't remember the conversation.  I

11    think he told me.

12    Question:  What did he say?

13    Answer:  That there had been an accident with a

14    gun.

15    Question:  So this time he said it was with a gun?

16    Answer:  I believe so.

17    Question:  Did you ask him what kind of accident?

18    Answer:  I can't remember that conversation.

19    Question:  Do you remember how it came up?

20    Answer:  No, I don't remember that.  I just know he

21    was --

22    Q.  And then the first four lines of the next page.

23    A.  Continuing from the previous page:  He was depressed,

24    and we just kind of hung out together for a couple days.

25    Question:  Did he say anything more about the

DIRECT - PETERSON

1    death?

2              Answer:  No.  He didn't talk about it

3    Q.    All right.  And now page 47.  And why don't you do 1

4    through 13 to start.

5    A.    Question:  How did you feel when you found out

6    Mr. Rudolph was under investigation?

7              Answer:  I felt bad for him.

8              Question:  Did he try to put you at ease?

9              Answer:  No.  It was just -- it was just an

10   investigation.

11             Question:  Did he say anything about the merits of

12   an investigation?

13             Answer:  I don't recall.

14             Question:  Did he say anything about whether it was

15   an accident?

16             Answer:  No.  He had told me previously it was an

17   accident.

18   Q.    And then the rest of the page.

19   A.    Question:  Did he complain about the investigation?

20             Answer:  I don't recall.

21             Question:  Did he proclaim his innocence?

22             Answer:  He probably did.  I don't really recall

23   that.

24             Question:  What do you recall?

25             Answer:  I really don't recall.

DIRECT - PETERSON

1    Question:  As you sit here today with the members

2  of the grand jury, you don't recall a conversation with

3  Mr. Rudolph about an FBI investigation?

4    Answer:  There has been conversation about that,

5  but I think he was aggravated.  I can't give you the

6  specifics.

7    Question:  Can you give me generalities?

8  Q.  Next page.  First 8 lines.

9  A.  Answer:  Irritated that there was an FBI investigation

10  because he felt he was innocent.

11    Question:  Did he ever tell you that he was just

12  going to go and speak with the FBI?

13    Answer:  No.

14    Question:  Have you heard Mr. Rudolph discussing

15  Bianca's death with anyone else?

16    Answer:  No, I have not

17  Q.  All right.  I'd like to go now to discuss the visit

18  from the FBI.  So could you go to, please, page 43, and --

19  yeah maybe -- we can do the whole -- why don't you do the

20  first half because otherwise it doesn't expand very much.

21  A.  Question:  Did you hear anyone knock on your door on

22  Wednesday, May 26th, 2021?

23    Answer:  I'm sorry, did I what?

24    Question:  Hear anyone knock on your door on

25  Wednesday, May 26, 2021?

DIRECT - PETERSON

1    Answer:  I'm not sure of the date.

2    Question:  Did you hear anyone knocking on your

3  door last spring?

4    Answer:  Yes.  One early morning I remember.

5    Question:  What did you hear?

6    Answer:  I heard pounding on my door.

7  Q.    All right.  Can you go now 14, the rest of the way

8  down.

9  A.    Question:  Did you answer the door?

10    Answer:  No.

11    Question:  Did whoever was pounding identify

12  themselves?

13    Answer:  No, they did not.

14    Question:  Why didn't you open the door?

15    Answer:  I was wary of opening the door.

16    Question:  Did you look out the window to see who

17  it might be?

18    Answer:  Yes.  I saw a man and a woman standing

19  there.

20    Question:  How were they dressed?

21    Answer:  I don't remember what their clothes were.

22    Question:  Did they knock on your door several

23  times that --

24  Q.    And the next page, why don't you do -- yeah, 1 through

25  12.  Perfect.

1963

DIRECT - PETERSON

1    A.    Did they knock on your door several times that morning?

2              Answer:  Yes, they did.

3              Question:  At 10:45 that day, did you take a flight

4    from Pittsburgh?

5              Answer:  Yes, I did.

6              Question:  Had you previously planned to fly that

7    day?

8              Answer:  No, I booked the flight that morning.

9              Question:  You booked it that morning?

10             Answer:  Uh-huh.

11             Question:  After hearing the knocks or before

12   hearing the knocks?

13             Answer:  Yes.

14   Q.    And then the -- yeah, down to 23.  Perfect.

15   A.    Question:  After hearing the knocks?

16             Answer:  After hearing the knocks.

17             Question:  Why did you book the flight?

18             Answer:  Well, we had heard that there was an

19   investigation.  The FBI was talking to people and I didn't

20   want to talk to them.

21             Question:  You were trying to evade the FBI?

22             Answer:  I didn't want to speak with them.

23             Question:  Did you think that these two agents

24   might be from the FBI?

25             Answer:  That was my guess.

Case No. 1:22-cr-00012-WJM    Document 456    filed 10/31/23    USDC Colorado    pg
62 of 284

1964

DIRECT - PETERSON

1    Q.    All right.  Now could you go to page 45.  And go 12 to

2    the bottom.

3    A.    Question:  Why didn't you want to talk to the FBI?

4              Answer:  I don't think I have to.

5              Question:  Did you have any indication of what they

6    might want to talk about?

7              Answer:  I'm not sure.

8              Question:  You didn't know what they wanted to talk

9    to you about?

10             Answer:  No, I would have no idea what they would

11   want to talk to me about.

12             Question:  Did Mr. Rudolph tell you why the FBI

13   might want to talk to you specifically?

14             Answer:  Because we had an affair.

15             Question:  Did he explain how that might be

16   relevant to an FBI investigation?

17   Q.    All right.  Now 46.

18   A.    Question, on line 2:  Did you have a conversation with

19   Mr. Rudolph about the FBI's investigation?

20             Answer:  Yes, we did.

21             Question:  What did he say?

22             Answer:  I believe that there was an investigation

23   on the death of his wife.

24             Question:  Did you ask him why the FBI might be

25   investigating the death of his wife?

DIRECT - PETERSON

1    　　　　　Answer:  I don't know.

2    　　　　　Question:  You don't know whether you asked him

3    that question?

4    　　　　　Answer:  Well, I don't know.  It was -- I don't

5    know.

6    Q.   14 down.

7    A.   I guess because the FBI thought it wasn't an accident.

8    　　　　　Question:  Did he tell you that?

9    　　　　　Answer:  I don't remember.

10   　　　　　Question:  Were you living with him at the time?

11   　　　　　Answer:  Yes, I believe so.

12   　　　　　Question:  Was this conversation in person or over

13   the phone?

14   　　　　　Answer:  I can't remember.

15   　　　　　Question:  Did you have any concerns that this

16   person that you were living with was under investigation by

17   the FBI?

18   　　　　　Answer:  What do you mean "concerns"?

19   　　　　　Question:  I mean concerns.

20   Q.   And the next page, lines 1 through 9.

21   A.   How did you feel when you found out that Mr. Rudolph

22   was under investigation?

23   　　　　　Answer:  I felt bad for him.

24   　　　　　Question:  Did he try to put you at ease?

25   　　　　　Answer:  No.  It was just -- it was just an

DIRECT - PETERSON

1    investigation.

2            Question:  Did he say anything about the merits of

3    the investigation?

4            Answer:  I don't recall.

5            MR. WINSTEAD:  May I have just a moment, Your

6    Honor?

7            THE COURT:  You may.

8    BY MR. WINSTEAD:

9    Q.    Just to make sure that we've got the timeline here, can

10   you remind me again, what was the date of this testimony?

11   A.    Defendant Milliron's grand jury testimony was on

12   January 5th of this year.

13   Q.    Okay.  All right, sir, you are done reading

14   transcripts.

15   A.    Whew.

16   Q.    So I just have a couple other questions and then we'll

17   wrap up.  You said previously that Defendant Rudolph was

18   initially charged by complaint, right?

19   A.    Yes.

20   Q.    And that you told us a little bit about what a criminal

21   complaint is.  Can a person be taking -- taken to trial on a

22   criminal complaint?

23   A.    No.

24   Q.    Do they have to be indicted in order to go to trial?

25   A.    Yes.

CROSS - PETERSON

1   Q.   So if someone is charged by complaint, how long does

2   the Government have in order to obtain an indictment?

3   A.   The Government has 30 days from the time the complaint

4   was issued to indict an individual before those charges

5   basically expire.

6   Q.   If a grand jury doesn't return an indictment within

7   those 30 days, what happens to the complaint?

8   A.   The complaint is dismissed and the charges are dropped.

9           MR. WINSTEAD:  May I have just one more moment,

10  Your Honor?

11          THE COURT:  Yes.

12          MR. WINSTEAD:  Okay, no further questions.  Thank

13  you, Your Honor.

14          THE COURT:  All right.  I think we'll take our

15  morning recess before cross-examination.  We'll be in recess

16  for 15 minutes.

17      (Recess taken 10:17 a.m. to 10:40 a.m.)

18          THE COURT:  Mr. Markus, cross-examination.

19                      CROSS-EXAMINATION

20  BY MR. MARKUS:

21  Q.   Thank you, Your Honor.  Good morning, ladies and

22  gentlemen.  Good morning, counsel.  Your Honor.

23          Agent Peterson, hello.

24  A.   Good morning, sir.

25  Q.   Good morning.  For the past few hours today, and the

CROSS - PETERSON

1   last few hours on Thursday, which seemed like a million

2   years ago, you were talking about transcripts with

3   Mr. Winstead.  But before that, you were talking about

4   evidence related to Dr. Rudolph, and so I'd like to focus on

5   that beginning part of your testimony, if that's okay.

6   A.   Yes, sir.

7   Q.   All right.  So I'd like to start with last night.  Last

8   night you and I had a meeting with Mr. Winstead and a man

9   named Luke Haag, right?

10  A.   Yes, we did.

11  Q.   Luke Haag is an expert on guns, right?

12  A.   I believe he is.

13  Q.   And we met at our conference room, right?

14  A.   Yes, sir.

15  Q.   We made him available to you and Mr. Winstead, right?

16  A.   That is correct.

17  Q.   And Mr. Winstead asked questions of Mr. Haag about guns

18  and other things, right?

19  A.   Yes, that is correct.

20  Q.   Did we stop Mr. Winstead during his questions and say,

21  "You can't ask that," and, "Mr. Haag, don't answer that"?

22  A.   No, you did not.

23  Q.   We made him freely available to the prosecution, right?

24  A.   Yes, you did.

25  Q.   And one of the things that Mr. Winstead asked about was

1969

CROSS - PETERSON

1   this soft case, right?

2   A.   Yes, sir.

3   Q.   This is the original soft case which is in evidence as

4   Exhibit -- Government Exhibit 201, correct?  You may not

5   know the number but --

6   A.   Yes, sir.

7   Q.   -- the original soft case?

8   A.   Yes.

9   Q.   And when a witness like that is made available to both

10  sides and answer questions, that's what an objective witness

11  does, right?  He doesn't hide from one side or the other,

12  correct?

13  A.   I would say he was being objective at our conversation,

14  yes.

15  Q.   And you've had experiences with subjective witnesses,

16  right?  People who have an axe to grind, let's say?

17  A.   Sure.

18  Q.   One of those witnesses in this case is -- is Cassandra

19  Olmstead.  She -- when we tried to call her, she hung up the

20  phone on us, right?

21  A.   I know that she did not agree to speak with you.

22  Q.   You know she hung up the phone and then called Agent

23  Dahlstrom and said she hopes to bury Dr. Rudolph.  Do you

24  remember that?

25          MR. WINSTEAD:  Objection.  Hearsay.

CROSS - PETERSON

1    THE COURT:  Sustained.

2    BY MR. MARKUS:

3    Q.    Needless to say, you're aware that she doesn't like

4    Dr. Rudolph all that much, right?

5    A.    It seems like she does not.

6    Q.    Okay.  Now you've interviewed lots and lots of

7    witnesses in this case, right?

8    A.    Yes, sir.

9    Q.    Here in the United States, right?

10   A.    Yes.

11   Q.    Over in Africa, right?

12   A.    That is correct.

13   Q.    And you interviewed a woman named Leeanne Rom, correct?

14   A.    Yes, we.

15   Q.    She's Mark Swanepoel ex-wife's, correct?

16   A.    That is correct.

17   Q.    And she was present during portions of the safari in

18   October of 2016, correct?

19   A.    Yes, sir.

20   Q.    Now you've heard the prosecutors talk about this

21   ballistics report that we've seen a number of times,

22   Government Exhibit 36, that said the gun was operating

23   correctly and could fire correctly, right?

24   A.    Yes, sir.

25   Q.    That's not what Leeanne Rom told you, right?

CROSS - PETERSON

1      MR. WINSTEAD:  Objection.  Hearsay.

2   BY MR. MARKUS:

3   Q.   Well, you have gathered evidence that contradicts what

4   that report says, correct?

5   A.   Ms. Rom provided information that contradicts that

6   report, yes.

7   Q.   In fact, what she told you is that the gun repeatedly

8   jammed on that safari, correct?

9      MR. WINSTEAD:  Objection, Your Honor --

10      THE COURT:  Yeah, sustained.

11   BY MR. MARKUS:

12   Q.   You also interviewed a man named Spencer Kakoma,

13   correct?

14   A.   Yes.

15   Q.   He's the person that entered the room with Mark

16   Swanepoel within a few seconds of the gun going off,

17   correct?

18   A.   That is correct.

19   Q.   Now, unlike Ms. Rom, Mr. Kakoma's statement is in

20   evidence, correct?

21   A.   Correct.

22   Q.   We have his written statement that the jurors have seen

23   before, right?

24   A.   Yes, sir.

25   Q.   Now in that written statement, he said, just like Mark

1972

CROSS - PETERSON

1    Swanepoel, that when he came in, Dr. Rudolph was in the

2    doorway of the bathroom; remember that?

3    A.    I do remember that.

4    Q.    And he also said that he moved the gun, correct?

5    A.    Yes.

6    Q.    Before any pictures were taken that gun was moved,

7    right?

8    A.    I believe it is likely the case, yes.

9    Q.    That's what he said, right?

10   A.    Yes.

11   Q.    Okay.  He also said that the body was moved outside of

12   the cabin, correct?

13   A.    He did say that, yes.

14   Q.    Yeah.  This is a witness you have not brought to

15   testify, correct?

16   A.    That's correct.

17   Q.    Okay.  He also said in his statement that he was

18   worried about Larry Rudolph trying to take his own life

19   because he was so upset; do you remember that?

20   A.    I do remember that.

21   Q.    Now, in your investigation, someone who wanted to take

22   his own life, that's not consistent with murdering someone

23   for money or murdering someone to be with a girlfriend,

24   correct?

25   A.    I don't know if that is correct.  I wouldn't make that

1973

CROSS - PETERSON

1    assumption.  I would assume someone who killed someone is

2    likely upset.

3    Q.    Okay.  And would you assume that someone who is killing

4    someone for money or killing someone to be with a girlfriend

5    would try to take their own life?

6    A.    I don't know.

7    Q.    Okay.  Is it your testimony that it's consistent with

8    murder for someone to be upset and for someone to be not

9    upset, both ways?

10   A.    Sure.

11   Q.    So, I mean, how can Dr. Rudolph win here?  Either way

12   you're going to find that suspicious, right?

13   A.    I don't know that I put really any weight on his

14   response at the time in a cabin, either way.

15   Q.    Would you -- would you agree with me that if he had

16   been stoic afterwards, or had no emotion, that would be

17   something that would be pretty suspicious and something you

18   would feature prominently to the jury?

19   A.    I think more people would take notice of that and

20   report it to us if he did respond in a stoic manner, sure.

21   Q.    Sure.  You also interviewed a man named Kennedy -- I

22   always have problems with the last name, but you know who

23   I'm talking about?  The porter.

24   A.    Yes, sir.  You're good referring to him as Kennedy.

25   Q.    Okay.  Good.  Thank you.  This is the guy who came by

1974

CROSS - PETERSON

1    the room early that morning, right?

2    A.    Correct.

3    Q.    Before the gun went off, right?

4    A.    Yes.

5    Q.    And he was the one who came by to help the Rudolphs

6    with their luggage, right?

7    A.    Right.

8    Q.    Okay.  And I think the prosecutors mentioned before

9    that he's also not here to testify; correct?

10   A.    He is not here.

11   Q.    Okay.  Let's -- let's talk for a moment, to back up,

12   about that Zambia ballistics report, that Exhibit 36 that's

13   in evidence.  This was signed by a man named Chibesa.  V.R.

14   Chibesa, correct?

15   A.    Yes, Vincent Chibesa is the examiner.

16   Q.    And he's also not here to testify, correct?

17   A.    That is correct; he is not here.

18   Q.    So all we have is that one report from him, correct,

19   that's been admitted to the jury?

20   A.    Correct.  I don't know if his follow-up interview has

21   been admitted or not.  So --

22   Q.    Okay.  Fair enough.  Now we've all seen that report --

23   I'm not going to put it on the screen again, Agent

24   Peterson -- where it says "suicide" at the top, right?

25   A.    Yes, sir.

CROSS - PETERSON

1  Q.    There's been a lot of discussion in this trial about

2  that, right?

3  A.    Yes.

4  Q.    Can you and I at least agree that the rest of that

5  report doesn't have anything about suicide?

6  A.    I think that's fair.  There is no discussion of suicide

7  in that report.

8  Q.    Okay.  And certainly in the conclusion part of that

9  report, Government Exhibit 36, there's no discussion about

10 suicide, right?

11 A.    No, the conclusions are based strictly on the

12 performance of the firearm.

13 Q.    Fair enough.  And I want to ask you specifically:  Are

14 you asking the jury to rely on that ballistics report?

15 A.    Yes.  I think the ballistics report is accurate, yes.

16 Q.    Okay.  So is it fair to say, Agent Peterson, that it's

17 the Government's position that some Zambian reports are

18 reliable and others are not?  Is that your position?

19 A.    I think some Zambian reports are more detailed and some

20 Zambian reports were completed by individuals who conducted

21 extensive investigation and had experience to do those types

22 of exams and some were not.

23 Q.    But we don't have Mr. Chibesa here to ask him about

24 that, do we?

25 A.    He is not here.

CROSS - PETERSON

1   Q.   So -- so basically what we have are a bunch of Zambian

2   reports, right?  And you're asking the jury:  Take some and

3   put them as credible and disregard others, right?  That's --

4   I mean, that's what you're asking them to do.

5   A.   I think some are more valuable and -- than others, yes.

6   Q.   Okay.  And because we don't have Mr. Chibesa here, we

7   just sort of have to take your word for it, right?

8   A.   Well, we have his report as well.

9   Q.   That's all we have, right, is his report?

10  A.   Right.

11  Q.   Okay.  By the way, regarding that shotgun, we had an

12  exemplar shotgun in court with all those Browning people

13  doing demonstrations to the jury, right?

14  A.   Yes.

15  Q.   And do you remember when the -- I think it was

16  Mr. Winstead -- it's amazing Mr. Winstead and Ms. Moss have

17  become quite good at firearms --

18  A.   Very impressive.

19  Q.   Yeah.  One of the things that Mr. Winstead asked one of

20  the Browning folks to do was to -- I think he used the word

21  "gonk" the gun, right?

22  A.   I do remember that.

23  Q.   And do you remember the shell moved from the magazine

24  into the chamber, right?

25  A.   Yes, it did.

CROSS - PETERSON

1  Q.    Now that wasn't based on some human moving it

2  intentionally into the chamber, right?  It was based on the

3  gonk.

4  A.    Yes.  It was based on the firearm impacting a surface

5  and that momentum causing the shell to move from the

6  magazine up into the chamber.

7  Q.    Okay.  Now you've discussed investigative efforts

8  you've taken into this case.  I want to talk to you for a

9  moment about what steps the FBI took to obtain the firearm,

10  this soft case here, and the hard case.  Okay?

11  A.    Okay.

12  Q.    Because the prosecutor asked you some questions about

13  that, but I just want to follow up.  Did you ever seek a

14  search warrant for Dr. Rudolph's home or his business or his

15  storage units?

16  A.    No.

17  Q.    Okay.  A search warrant is where you ask a judge to

18  say, "Hey, we'd like permission to go look at these places,"

19  right?

20  A.    That is correct.

21  Q.    Now are you aware that the soft case, the hard case,

22  and the gun were in Dr. Rudolph's garage from 2016 to 2018?

23  A.    No, I am not aware of that.

24  Q.    If you had executed a search warrant, that might have

25  revealed that to you, right?

1978

CROSS - PETERSON

1   A.   If we had requested and been authorized a search

2   warrant for that location, and it was there, then that would

3   have revealed it to us.

4   Q.   And the first time you saw this hard case is when we

5   gave it to you, of course, right?

6   A.   That is correct.

7   Q.   The first time you saw the actual hard case was last

8   night when you were in our conference room, right?

9   A.   That is correct.

10  Q.   Now you've discussed innocent explanations with the

11  jury before about certain things in this case that you found

12  suspicious, you now acknowledge that there's innocent

13  explanations for, correct?

14  A.   I said there could be innocent explanations for some

15  things, yes.

16  Q.   And would you agree with me that there could be

17  innocent explanations for the gun not being present?

18  A.   Not being present in court today?

19  Q.   Yeah.

20  A.   I guess there could be.  I can't think of one offhand,

21  but I guess there could be.

22  Q.   Well, I guess we'll wait to hear from Dr. Rudolph,

23  then, and he can talk to the Government about that.

24  A.   That will be great.

25  Q.   Okay.  You also -- by the way, when you got this soft

CROSS - PETERSON

1    case, that was the first time you were able to see that the

2    measurements of this actual soft case were slightly

3    different than the ones you had the Allen Company make,

4    correct?

5    A.    Yes.    That is the first time we saw that the widest

6    part of the open case was slightly different than the cases

7    we used.    Yes, sir.

8    Q.    So if we hadn't provided this to you, the jury would be

9    left with incomplete information, correct?

10   A.    They would have less information, yes.

11   Q.    And, in fact, that whole first round of patterning that

12   you did before you had the soft case, you did that

13   patterning with the gun shooting half an inch from the top,

14   correct?

15   A.    That is correct.    The muzzle was a half-inch from the

16   end of the soft case.

17   Q.    But after you got the soft case, your expert said, "Now

18   after examination, our testing of half an inch is

19   incorrect."    They moved it back to 1.8 inches, correct?

20   A.    That is correct.

21   Q.    So that whole first round of testing that you had done

22   was invalidated, correct?

23   A.    I think it's less useful, yes.    There is important data

24   I think that came from it, but we were able to refine the

25   process and conduct additional tests.

1980

CROSS - PETERSON

1    Q.    And if we hadn't provided you the soft case, you may

2    not have done that additional testing, correct?

3    A.    Without the soft case, we had -- we would not have

4    known that the muzzle was 1.8 inches from the end of the

5    case at the time of discharge.

6    Q.    So the jury would be left with testing at half an inch

7    back, right?

8    A.    That's correct.

9    Q.    So is it fair -- would you agree with me that the

10   defense has provided you with important information to help

11   get testing, right?

12   A.    In terms of the soft case, absolutely I would agree

13   with that.

14   Q.    We're going to talk about other things in a moment, but

15   it's not just the soft case, right?  We've given you the

16   will -- we'll go through it -- but the defense has given you

17   information in this case that, without it, would have left

18   the jury with the wrong impression; is that fair?

19   A.    I think we were able to refine the process after you

20   provided the soft case, that is fair.

21   Q.    Okay.  Now, the other investigative efforts that you've

22   done in this case, Agent, you've done -- I think the

23   prosecutor was saying undercover activities; remember that?

24   A.    I do.

25   Q.    Okay.  He didn't ask you about all the undercover

CROSS - PETERSON

1   activities that were done in this case, did he?

2   A.    There was only one undercover operation in this case.

3   Q.    Was there one on a plane to Dallas?

4   A.    Yes.

5   Q.    Okay.  That's a different one than the one he was

6   asking you about, right?

7   A.    It's the same undercover operation.

8   Q.    Oh --

9   A.    Different event.

10  Q.    A different event.  He didn't ask you about that event,

11  right?

12  A.    That is correct.

13  Q.    Now, the timing of that event is very important, which

14  we can talk about in a moment.  But I want to establish for

15  the jury that that event where the undercover agent was on

16  the plane with Dr. Rudolph and Lori, that was on the way to

17  the Dallas convention, correct?

18  A.    That's correct.

19  Q.    When was that?

20  A.    I believe it was in January of 2021; may have been in

21  2020.

22  Q.    It was January 2020, wasn't it?  Right before the

23  pandemic.

24  A.    Okay.  Fair enough.

25  Q.    Okay.  And then there was a separate event where an

1982

CROSS - PETERSON

1    undercover agent met with Dr. Rudolph and Lori Milliron in

2    Jackson Hole, correct?

3    A.    That is correct.

4    Q.    Okay.  You also did surveillance of Dr. Rudolph and

5    Lori Milliron at the various conventions, correct?  Maybe

6    not Lori Milliron, but of Dr. Rudolph.

7    A.    I think when we were there, we probably saw him.  I

8    wouldn't call it surveillance, but we did see him.

9    Q.    Did you take some pictures?

10   A.    I did not.  I can't think of any pictures, but someone

11   could have.

12   Q.    Did someone take some pictures of Mark Swanepoel at

13   those conventions?

14   A.    Not that I know of.

15   Q.    Okay.  Now, there was some discussion about the

16   children in this case, Julian and AnaBianca, who are here in

17   court.  Do you remember answering some questions from the

18   prosecutor about Julian and AnaBianca?

19   A.    Yes, I do.

20   Q.    Now you view them as victims in this case, right?  Is

21   that fair to say?

22   A.    Yes, they are victims in this case.

23   Q.    And you said to the jury that the reason you knocked on

24   Julian's door at -- what was it, 7:00 a.m. on a Sunday

25   morning?

1983

CROSS - PETERSON

1  A.    It was early on a Sunday morning.

2  Q.    Was to respect Julian's privacy.  Do you remember

3  telling the jury that?

4  A.    Yes, I absolutely remember that.

5  Q.    Okay.  That's not really what it was about, is it, Dr.

6  -- is it, Agent?

7  A.    That's absolutely what it was about.

8  Q.    Well, if you were really wanting to respect their

9  privacy, did you pick up the phone and call Julian and say,

10  "Hey, I'd like to speak with you"?

11  A.    No.

12  Q.    Did you email Julian Rudolph and say, "Julian, I'm

13  Agent Peterson.  I'd like to interview you"?

14  A.    I did not reach out to him by telephone or email.

15  Q.    That would be a better way to respect someone's

16  privacy; would you agree with me on that?

17  A.    In my experience making a phone call from the FBI

18  rarely works.  People don't believe you're the FBI.  It

19  doesn't work very well.  Kind of puts people in an

20  uncomfortable situation, so I prefer not to call if I have

21  the option.

22  Q.    Do you think showing up with two other armed agents at

23  7:00 a.m. on a Sunday morning puts someone in a comfortable

24  position?

25  A.    We did the best we could to respect his privacy.

1984

CROSS - PETERSON

1    Q.   Okay.  So it's fair to say you and two other armed

2    agents showed up to Julian's apartment on 7:00 a.m. on a

3    Sunday morning in order to respect his privacy; that's your

4    testimony to the jury.

5    A.   Yes.  And I would say I don't know that Mr. Julian

6    Rudolph would have known that any of us were armed at the

7    time.

8    Q.   But you were armed.

9    A.   Absolutely we were.

10   Q.   Okay.  And you also mention that I reached out to you

11   shortly after that knock on the door, right?

12   A.   Yes.  Approximately two weeks after that.

13   Q.   Okay.  Now obviously you can't tell the jury when I was

14   brought into the case or hired into the case or anything

15   like that, right?

16   A.   I do not know that.

17   Q.   All right.  This is just the first time that I had

18   reached out to you, right?

19   A.   Yes, sir.

20   Q.   Now, do you remember that I had communicated to you and

21   asked for the names and numbers of these prosecutors?

22   A.   I do remember you asking me that, yes.

23   Q.   Because all I had was your contact information at that

24   point, right?

25   A.   That's correct.

CROSS - PETERSON

1    Q.    And you did not provide those to me, did you?

2    A.    I did not.

3              MR. WINSTEAD:  Objection.  Relevance.

4              THE COURT:  What's the relevance, counsel?

5              MR. MARKUS:  It goes to the investigation and our

6    willingness to provide information, but they refused to

7    meet -- they refused to give us even their names and

8    numbers.

9              THE COURT:  Well, I don't know that the fact that

10   you -- that the defendants provided some information makes

11   how the Government acted in that regard relevant.

12   Sustained.

13             MR. MARKUS:  Okay.

14   BY MR. MARKUS:

15   Q.    Fair to say that after we finally learned who the

16   Government was after the arrest in this case, we provided

17   information to them?

18   A.    Yes, you did.

19   Q.    Okay.  And one of your suspicions -- you talked about

20   your complaint in this case.  This was a lengthy complaint,

21   correct?  Let's see how many pages.  It was 21 pages.

22   A.    I'll take your word for that.

23   Q.    Okay.  And one of the major suspicions that you had,

24   Agent, when you drafted this complaint, was that Dr. Rudolph

25   had Bianca cremated, correct?

CROSS - PETERSON

1    A.    That was something that I was interested in, yes.

2    Q.    It's more than interested.  You mentioned it 18 times

3    in this complaint, did you not?

4    A.    If you counted them, then I'll take your word for it.

5    Q.    Okay.  This was -- that was the major part of your

6    complaint, was the fact that he cremated the body.  That was

7    mentioned more than any other topic in this complaint,

8    correct?

9    A.    Again, I don't know.  I'll --

10   Q.    Well, one of the reasons that you mentioned it so

11   frequently in your complaint was that you had spoken to

12   friends and family of Bianca who -- who told you she

13   wouldn't have wanted to be cremated, right?

14   A.    That is correct.

15   Q.    And that's what had you suspicious about the cremation.

16   A.    It was one of the aspects, yes.

17   Q.    And, of course, you've admitted that subsequent to that

18   we gave you the will, correct?

19   A.    You did provide the will, yes.

20   Q.    The will explained that Bianca's wishes were that she

21   wanted to be cremated, correct?

22   A.    Yes.

23   Q.    This was an important piece of information that you did

24   not have when you arrested Dr. Rudolph, correct?

25   A.    That is correct.

CROSS - PETERSON

1    Q.    And even after we provided it to you, you still had

2    your suspicions about that document, right?

3    A.    Yes.

4    Q.    Because you went and called the notary that was on that

5    will, correct?

6    A.    Yes.

7    Q.    Because you wanted to make sure that when it was

8    presented to the jury that it was true and accurate,

9    correct?

10   A.    Yes.

11   Q.    And when you interviewed that notary, she told you she

12   was there and notarized Bianca signing it, correct?

13   A.    That is correct.

14   Q.    And she told you that she even discussed cremation with

15   Bianca, correct?

16   A.    I don't recall that part, but she did validate the

17   signature.

18   Q.    And so at that point, you had to concede, "Man, this

19   initial suspicion that was throughout my complaint is gone,"

20   correct?

21   A.    I think there was evidence that Bianca did sign that

22   will with those expressed desires for cremation, yes.

23   Q.    So then you switched the suspicion -- because you don't

24   mention speed, but -- of cremation, but now you switch,

25   after we give you the will.  Now the suspicion is:  Look how

CROSS - PETERSON

1    fast Dr. Rudolph cremated her, right?

2    A.    I wouldn't say we switched.  I would say that there

3    were multiple concerns related to the cremation.  It's not

4    something we just came up with after you showed me the will.

5    Q.    Sure.  But the focus switched from the act of cremation

6    to the speed of cremation, right?

7    A.    It was, again, one of the factors that we considered.

8    Q.    But you've conceded -- I just want to be fair with the

9    jury, Agent Peterson.  You've conceded that the speed of

10   cremation -- I want to use your words and the prosecutor's

11   words -- there are innocent explanations for this concern,

12   right?

13   A.    I believe there could be, yes.

14   Q.    Okay.  And in a criminal case, would you agree with me

15   that the jury has to give the benefit of the doubt to the

16   defendant, right?

17   A.    Yes, sir.

18   Q.    Okay.  So if there's an innocent explanation and a

19   noninnocent explanation, you, as an agent, and everyone

20   else, should take which one?

21   A.    I think we should investigate both.

22   Q.    Fair enough.  And you -- you've investigated in this

23   case the reasons for the speed of the investigation, right?

24   A.    Yes.

25   Q.    Okay.  And one of the things you found out is that to

CROSS - PETERSON

1    take a body back to the United States is time-consuming and

2    expensive, correct?

3    A.    It does take time and it does cost money.  I don't know

4    that it was any more time consuming than the other process.

5    And I don't think it was prohibitively expensive.

6    Q.    Fair enough.  We can talk more about that in a minute.

7    But I mean, fair to say, there are additional hurdles

8    involved; would you agree with me on that?

9    A.    Yes.

10   Q.    Very good.  Another one of your suspicions at the time

11   of the arrest in this case was Larry Rudolph not wanting --

12   I want to use your words  -- not lose all of his money in a

13   divorce.  Do you remember saying that?

14   A.    Sounds like something I would have said.

15   Q.    That was another part of the -- you say "concerns," I

16   put "suspicions," but whatever, we're talking about the same

17   thing.

18   A.    Suspicions is fair.

19   Q.    Okay.  And so, again, when you had those suspicions,

20   you didn't have all of the information; is that fair?

21   A.    Yes.

22   Q.    You didn't have the postnup?

23   A.    Right, we did not know of a postnuptial agreement.

24   Q.    We had to give it to you, right?

25   A.    You did provide it.

CROSS - PETERSON

1    Q.    After you had Dr. Rudolph arrested and after the

2    prosecutors hadn't provided me their names or numbers to

3    have a free-flow of information, right?

4    A.    Well, it was provided after you knew the names of the

5    prosecutors.

6    Q.    Fair enough.  Fair enough.  And what you've learned

7    since that time with the postnup -- of course, we saw

8    Mr. Fields call the document examiner.  We've learned that

9    the FBI examiner and the defense examiner say that that's

10   her signature on the postnup, correct?

11   A.    That is correct.

12   Q.    We've learned -- I should say you have learned about

13   the law firm that was hired to draft that postnup, right,

14   out in Pennsylvania, right?

15   A.    Yes.

16   Q.    You've seen records from that law firm, correct?

17   A.    I have.

18   Q.    And in this postnuptial, she would -- Bianca would get

19   $2 million plus some other things, correct?

20   A.    That is correct.

21   Q.    And can you agree with me that if the postnup is valid,

22   that would ease your suspicions about a divorce ruining

23   Dr. Rudolph, correct?

24   A.    I guess we would have to talk about what "valid" means.

25   Valid as in she entered into the agreement or the agreement

CROSS - PETERSON

1   is legally binding.

2   Q.   Fair enough.  Let's assume both.  Would that ease your

3   concern about a divorce committing financial ruin on

4   Dr. Rudolph?

5   A.   It would seem that if both of those were true, that he

6   would have some legal protection against losing a

7   significant amount of his money.

8   Q.   Okay.  Now you showed the jury this Exhibit 95.  I'm

9   not going to put it on the screen.  These are the pictures

10  of the house.  You all remember this a few minutes ago.

11  Pretty nice house, right?

12  A.   It's a very nice house.

13  Q.   This was Dr. Rudolph's house before he received any

14  insurance proceeds, correct?

15  A.   That is correct.

16  Q.   You would agree with me that Dr. Rudolph was doing

17  pretty well financially before he received any of the life

18  insurance proceeds, correct?

19  A.   I would say so, yes.

20  Q.   Okay.  I want to speak to you for a moment about the

21  arrest in Denver.  The prosecutor had a bunch of questions

22  about the arrest in Denver, remember that?

23  A.   Yes, sir.

24  Q.   Now there was mention of Mexico.  Would you agree with

25  me that Dr. Rudolph wasn't fleeing to Mexico, right?

1992

CROSS - PETERSON

1    A.    He was not fleeing to Mexico; he was going on

2    vacation.

3    Q.    Sorry to cut you off.  This was a prepaid vacation

4    trip, right?

5    A.    Yes, I believe it was a vacation trip.

6    Q.    And, in fact, Dr. Rudolph had known about your

7    investigation for some time before the arrest, correct?

8    A.    Yes.  He was aware of the investigation, I believe,

9    prior to his arrest.

10    Q.    And he never fled or packed up all his stuff or pulled

11    out all his money and moved to another country, did he?

12    A.    He did not move to another country.

13    Q.    He hired a lawyer, right?

14    A.    Apparently, yes.

15    Q.    Yeah.  And, and over those years, you and I had some

16    discussions -- again, no discussions with the prosecutor --

17    but he wanted to stay here and deal with whatever

18    investigation was going on; fair to say?

19    A.    I didn't speak with Mr. Rudolph, so I don't know what

20    his perception was, but you and I had conversations, yes.

21    Q.    Fair to say he didn't run away or flee the country,

22    right?

23    A.    No.

24    Q.    This was, as I said, a prepaid vacation trip, right?

25    A.    Yes.  To Cabo, yes.

1993

CROSS - PETERSON

1    Q.    Okay.  And speaking of that, Agent, at the time

2    Dr. Rudolph was living in Phoenix, correct?

3    A.    Yes.

4    Q.    And you knew -- you had your criminal complaint drafted

5    and signed off before Dr. Rudolph took that trip to Mexico,

6    correct?

7    A.    We had the initial criminal complaint signed before he

8    left, yes.

9    Q.    And you knew that if you executed that complaint, if

10   you had him arrested in Phoenix, where would the case be

11   prosecuted?

12   A.    In Phoenix.

13   Q.    And so you made a decision in this case, did you not,

14   that you wanted to let him go to Mexico so that you could

15   arrange for him to be brought here to Denver, right?

16   A.    That is correct.

17   Q.    And the reason you did that is not for any legal

18   reason.  You wanted to do it because this is where the

19   prosecutors and you live, right?

20   A.    Right.  This is the venue where the investigative team

21   and the prosecution team lived and worked, yes.

22   Q.    Okay.  So you made a decision, "I'm not going to arrest

23   Dr. Rudolph in Phoenix because that would be inconvenient to

24   me, Agent Peterson, and inconvenient to the prosecutors,"

25   right?

1994

CROSS - PETERSON

1    MR. WINSTEAD:  Objection.  Relevance.

2    MR. MARKUS:  Goes to the venue element, Your

3    Honor.

4    THE COURT:  Yeah.  Overruled.  You may answer.

5    THE WITNESS:  It would be much more challenging to

6    prosecute the case in Phoenix for us, yes.

7    BY MR. MARKUS:

8    Q.   And so you made a decision about the venue of this case

9    based on convenience to the prosecutors and to yourself.

10   A.   I wouldn't say it was strictly based on convenience,

11   but we did make the decision to have it investigated and

12   prosecuted here in Denver, yes.

13   Q.   What other reasons were there?

14   A.   We had a robust investigative team here who was already

15   engaged in the investigation.  We had the institutional

16   knowledge about the case.  We thought it would be best to

17   have individuals who had already conducted interviews and

18   were familiar with the case continue for purposes of

19   continuity.

20   Q.   That's convenience.

21   A.   Continuity, convenience.

22   Q.   Okay.  Sounds like we're on the same page, then.  You

23   wanted it in Denver because it would be more helpful and

24   easy to the prosecution team, correct?

25   A.   I think it would be more helpful, yes.  We could do a

CROSS - PETERSON

1   more thorough investigation by maintaining continuity and

2   keeping it with the investigative and the prosecution team

3   as opposed to handing off a complex, complicated case to

4   someone who didn't have buy-in to the case and wasn't

5   familiar with the facts.

6   Q.   Well, you wouldn't have had to give it to someone else;

7   you could have kept the case even if it was in Phoenix,

8   right?

9   A.   That would be a question for people beyond my pay

10  grade; but that would be a tough sell, yes.

11  Q.   Fair enough.  Fair enough.  Let's talk about those

12  reach studies for a moment.  The reach studies that the

13  prosecutor asked you about and that we heard about from

14  those witnesses, those were done to rule out suicide,

15  correct?

16  A.   No.

17  Q.   That's one of the purposes, to see that she couldn't

18  reach the trigger, right?

19  A.   Right.  The purpose of the reach test was to determine

20  if someone of Bianca Rudolph's dimensions could reach that

21  trigger.

22  Q.   And you wanted to use the reach studies to rule out, A,

23  that she committed suicide, right?

24  A.   In part.

25  Q.   And, B, the other part was that she didn't accidentally

CROSS - PETERSON

1   pull the trigger, right?

2   A.   Right.

3   Q.   Those were the two reasons you did the reach studies.

4   A.   Right.  Like I said, the over-arching objective was to

5   determine if someone of Bianca Rudolph's dimensions could

6   reach the trigger of that shotgun inside that soft-sided

7   case.

8   Q.   Now we heard Dr. Cina testify that he thought it was,

9   quote, highly unlikely based on those reach studies that she

10  could have accidentally pulled the trigger.  Do you remember

11  that?

12  A.   Yes.

13  Q.   Those were the words he used, "highly unlikely,"

14  correct?

15  A.   I don't recall his specific -- the words he used, but

16  he did express that.

17  Q.   Okay.  And -- and, therefore, he concluded homicide,

18  remember?  He used those words on the stand?

19  A.   He did say homicide, yes.

20  Q.   Now, he said it was homicide because she couldn't

21  accidentally pull the trigger; do you remember that?

22           MR. WINSTEAD:  Objection.  Calls for commentary on

23  another witness's testimony.

24           MR. MARKUS:  That was the whole direct on Thursday,

25  so I'm just following up on those questions.

1997

CROSS - PETERSON

1    THE COURT:  All right.  I'm going to overrule it.

2   I'll let the witness answer.  The jury will have its own

3   recollection of what Dr. Cina said or didn't say.

4   BY MR. MARKUS:

5   Q.   Fair to say, Agent, that Dr. Cina is not an expert on

6   firearms, right?

7   A.   I don't know if he's an expert or not on firearms, but

8   he is a forensic pathologist.

9   Q.   Right.  He didn't give an opinion about whether the gun

10  could have accidentally discharged.  Now that's why we heard

11  from all those Browning folks, right?

12  A.   Dr. Cina did not provide an opinion regarding if the

13  firearm could have accidentally discharged.

14  Q.   Okay.  So I want to ask you, then, since you did those

15  reach studies to rule out that she accidentally touched the

16  trigger or committed suicide, did you do any studies to see

17  how a 5-foot-3 woman would take the soft case and put it

18  into a hard case?

19  A.   We did not.

20  Q.   Did you do any studies to see how a 5-foot-3 woman --

21  well, I guess I asked that already.

22       So, instead, what you did was you looked at some

23  CDC records to see if accidental discharge happens, correct,

24  of a shotgun?

25  A.   As I said on Thursday, I obtained CDC records, but I

CROSS - PETERSON

1    didn't use them in any meaningful way.  I don't think the

2    statistics were particularly helpful.

3    Q.   What the statistics showed -- the prosecutor admitted

4    them, so I'd like to ask you just a few questions about

5    them.  He asked you whether there were eight accidental

6    deaths to the thorax from a shotgun.  Do you remember that

7    question?

8    A.   I think it was a semi-automatic shotgun.

9    Q.   Semi-automatic shotgun.  That's the heart area, the

10   thorax, right?

11   A.   When I spoke with the CDC and I asked them specifically

12   to define the thorax or the torso, they said in their

13   records they didn't define it as frontal or side or rear,

14   and that was one of my issues with the statistics.

15   Q.   The statistics were admittedly very limited; would you

16   agree with me?

17   A.   Yes.

18   Q.   Because those statistics are only, A, from the United

19   States, right?

20   A.   Yes.

21   Q.   Only from a limited number of states, I think 27, that

22   report, correct?

23   A.   That is correct.

24   Q.   It doesn't include accidental deaths to other parts of

25   the body like the head, correct?

CROSS - PETERSON

1    A.    No, that was specifically related to the thorax.

2    Q.    And that number of eight related to the semi-automatic

3    shotguns, there was also a category for unknown type of

4    shotgun, correct?

5    A.    I believe so.

6    Q.    And there were 63 deaths to -- accidental deaths to the

7    thorax with an unknown type of shotgun, correct?

8    A.    I'm not looking at it, but if you're reading from it I

9    will take your word for it.

10   Q.    And if we add up all the different types of accidental

11   shotgun deaths in that CDC report from those years, the

12   number would be over a hundred, correct?

13   A.    Based on those numbers.

14   Q.    So it does happen, there's accidental deaths with

15   shotguns, right?

16   A.    There are accidental deaths with shotguns, yes.

17   Q.    Now you've heard the prosecutors ask a bunch of

18   witnesses over the course of the past two weeks:  "Have you

19   ever seen a accidental discharge with a muzzle pointed

20   through a soft case?"  Do you remember hearing those

21   questions?

22   A.    Yes, sir.

23   Q.    And, you know, the answers, of course, were, "No, not

24   before this case I haven't seen that before."  Do you

25   remember that?

CROSS - PETERSON

1    A.    Yes, I'm not aware of anyone who has seen this type of

2    death prior.

3    Q.    Right.  But to be fair, you've never seen a murder

4    through a soft case either, right?

5    A.    I have not seen a murder through a soft case prior to

6    this one.

7    Q.    And I want to go through with you the questions that

8    the prosecutor was asking those witnesses about:  "Have you

9    ever seen an accidental death through a -- through a soft

10   case?"  Because that's a logical flaw that was presented to

11   the jury, right?  Just because you've never seen something

12   before doesn't mean it hasn't happened, right?

13   A.    Right.

14   Q.    I mean, it's rare to win the lottery but someone wins

15   every week, right?

16   A.    Except this one, it's continuing week to week, but yes.

17   Q.    Somebody's going to win it, right, at some point?

18   A.    Certainly, yes.

19   Q.    It would be wrong to think, well, since nobody's won

20   the last few weeks no one will ever win the lottery, right?

21   A.    Right.

22   Q.    That's a logical flaw that we can sometimes fall victim

23   to, correct?

24   A.    I'm following you.

25   Q.    And so if I were to ask you, for example, a question:

2001
CROSS - PETERSON

1    Have you ever seen a stingray jump out of the water and hit

2    someone through the heart and kill them, that would be a one

3    in a billion shot, right?

4    A.    Very, very rare.

5    Q.    But it happened to the Crocodile Hunter.

6    A.    I think he was in the water, but, yes, to --

7    Q.    It happened, right?

8    A.    Yes.

9    Q.    So before that happened, if we were to ask people if it

10   could happen, everybody would say that's impossible, right?

11   A.    I don't think so.  I think biologists would probably

12   warn about the possibility of that happening, so I don't

13   think anyone would say that was impossible.

14   Q.    Okay.  How about an accidental discharge of a firearm

15   by an FBI agent who is dancing in Denver?  Is that something

16   that would be nearly impossible?

17   A.    I've only seen it happen once.

18   Q.    Okay.  It happened to one of your colleagues here,

19   right?  He was dancing on the dance floor, his gun fell

20   down, and it shot someone, right?

21   A.    That did happen.

22   Q.    Now before --

23   A.    And to clarify, his gun didn't shoot someone; he shot

24   someone.

25   Q.    So before that happened, we would have said that could

CROSS - PETERSON

1    never happen, an FBI agent would never exercise that kind of

2    gun safety -- unsafety, right?  I mean, before that

3    happened, the thought of an FBI agent doing a backflip with

4    the gun going off and discharging, that would be unheard of.

5    A.    I would like to think that would be very, very rare.

6    Q.    But it happened, right?

7    A.    It did, in fact, happen.

8    Q.    And you've seen the YouTube video called "I shot my hat

9    off," right?

10   A.    I -- I can't recall.

11   Q.    Do you remember the guy who was shooting the shotgun

12   and it -- he shoots it a couple of times and then he shoots

13   it and it doesn't go off and he takes the barrel and looks

14   down and it shoots his hat right off?

15   A.    I have not seen it, but I believe it is probably on

16   YouTube, yes.

17   Q.    Okay.  And there's -- I can give lots of instances of

18   things that seem impossible, like an award-winning actor,

19   Alec Baldwin, shooting someone on the set, and with a live

20   round, would seem impossible before it happened, but it just

21   happened, right?

22   A.    It's happened previously in movies.

23   Q.    So -- so the thought that something is rare or may not

24   happen doesn't mean that it couldn't happen, right?  Would

25   you agree with me on that?

2003

CROSS - PETERSON

1    A.    I think that's fair.

2    Q.    And, in fact, in your reach studies, Agent, that you

3    did, 14 women, when they lifted this case up, the gun fell

4    off and hit the ground, right?  14 of those women did

5    that?

6    A.    Several of them had the gun drop out of the bottom of

7    the case, yes.

8    Q.    That wasn't even what you are testing for, correct?

9    A.    It was not at all what we were testing for.

10   Q.    And -- and yet the gun fell out and hit the floor.

11   A.    There were instances where it fell out and hit the

12   floor, yes.

13   Q.    Including with women that were trained law enforcement

14   personnel, correct?

15   A.    That's correct.

16   Q.    People who knew how to use firearms and were

17   comfortable with firearms, right?

18   A.    Yes.

19   Q.    And who knew the 10 Commandments of firearms that we

20   heard of, right?

21   A.    I would assume they would know those, yes.

22   Q.    And even the Browning guy, who's the most familiar with

23   gun safety, pointed the gun at poor Judge Martínez when he

24   was on the stand, right?

25   A.    He did.

CROSS - PETERSON

1    Q.    So things that we would think wouldn't happen, happen

2    all the time, right?

3    A.    Rare occurrences happen, yes.

4    Q.    Okay.  I'm on my last area, so we're getting there.

5    A.    Okay.

6    Q.    I did use less time than Mr. Winstead.

7    A.    And I appreciate that.

8    Q.    Okay.  Good.  Let's talk about the emails that you went

9    through with Lori and Larry.  Now I'm not going to put all

10   of them up on the screen again.  I'm going to save you from

11   reading those emails, okay?

12   A.    Thank you, sir.

13   Q.    You got it.  These were all emails, can we agree, from

14   2010 and 2011?  Yes?

15   A.    Yes, the ones I read were.

16   Q.    Well, the ones you have are all from that time period,

17   correct?

18   A.    I believe so, yes.

19   Q.    You don't have any emails from 2012, '13, '14, '15, or

20   '16, do you?

21   A.    No.

22   Q.    I guess I have to ask you about one email.  Okay.  Do

23   you remember the one that Mr. Winstead showed you where

24   Larry tells Lori to use a condom if she was going to be with

25   someone else?

CROSS - PETERSON

1   A.   I do remember the email.

2   Q.   Okay.  So they weren't exclusive, correct?

3   A.   Didn't sound like it.

4   Q.   Yeah.  Now, in addition to -- by the way, did you get a

5   search warrant to get more recent emails of Dr. Rudolph and

6   Lori Milliron?

7   A.   There was not a search warrant for additional emails.

8   Q.   You did obtain emails from Bianca Rudolph detailing her

9   affairs, correct?

10  A.   Yes, I have seen those.

11  Q.   Okay.  And, again, I'm going to spare you --

12  A.   Thank you.

13  Q.   -- from reading the emails to the jury.  But can we

14  agree for now that those emails are every bit as salacious

15  as the emails you read between Lori and Larry?

16  A.   I would say the emails are equally intimate.

17  Q.   Okay.  So can we agree that Bianca Rudolph had equally

18  intimate emails with men that she was having affairs with?

19  A.   It appears so, yes.

20  Q.   I think that's going to be it, but let me just check

21  with my colleagues to make sure I didn't forget anything.

22              MR. MARKUS:  May I have a moment, Your Honor?

23              THE COURT:  You may.

24              MR. MARKUS:  Thank you, sir.

25              THE WITNESS:  Thank you, sir.

2006

CROSS - PETERSON

1    MR. MARKUS:  Nothing further.

2    THE COURT:  Cross-examination, Mr. Dill.

3    MR. DILL:  Yes, Your Honor.

4                    CROSS-EXAMINATION

5    BY MR. DILL:

6    Q.    Good morning, Agent.  How are you?

7    A.    Good morning, Mr. Dill.  I'm doing well.

8    Q.    All right.  Before going -- I'm not going to go page by

9    page over the grand jury testimony.  I just want to focus on

10   a couple things.  First and foremost, you say that FBI

11   agents went to Ms. Milliron's house.  And when was that?

12   A.    That was May 26th of 2021.

13   Q.    Okay.  And just to clarify, that house that they went

14   to was in Pennsylvania, right?

15   A.    That is correct.

16   Q.    Okay.  So she had actually maintained a residence in

17   Pennsylvania, and she was also spending time in Arizona,

18   correct?

19   A.    I think that's fair.

20   Q.    All right.  So -- and she -- but she admitted in the

21   grand jury that she had moved in with Dr. Rudolph, she

22   thought, sometime in 2017, right?

23   A.    Yes.

24   Q.    Okay.  So she didn't mislead or lie about whether she

25   was living in Dr. Rudolph's house, correct?

2007

CROSS - PETERSON

1    A.    She did say that she had moved into his Arizona house

2    in 2017.

3    Q.    Okay.  But even then you know that you went in -- or

4    was it you that went to her house or was it somebody else?

5    A.    I did not go to her house.

6    Q.    Okay.  So agents went to her house and knocked on her

7    door.  We saw in her grand jury testimony that she didn't

8    know who they were and she didn't want to answer the door,

9    right?

10   A.    Yes.  She believed it was the FBI, but she did not

11   speak with them or identify them.

12   Q.    Well, actually, they -- she said they did not identify

13   themselves, right?

14   A.    She did say that.

15   Q.    Okay.  But just so we understand here, she doesn't have

16   to talk to the FBI, does she?

17   A.    Absolutely not.

18   Q.    Okay.  Just so we understand, in the United States if

19   the FBI comes and knocks on your door and you don't want to

20   talk to them, you don't have to --

21   A.    That is true.

22   Q.    -- right?

23         Okay.  However, when somebody gets a grand jury

24   subpoena, they're supposed to come in front of the grand

25   jury, right?

2008

CROSS - PETERSON

1   A.    Yes.

2   Q.    Okay.  So just to kind of give us the timeline, you

3   told us before that the arrest took place in Mexico.

4   Ms. Milliron was served with a grand jury subpoena.  We saw

5   that, correct?

6   A.    Yes, sir.

7   Q.    All right.  And she -- you have an understanding that

8   after she got that -- that was around, what, December

9   27th?

10  A.    It was on December 27th, yes.

11  Q.    Okay.  You have an understanding, don't you, that she'd

12  had communications with Dr. Rudolph's lawyer during that

13  time period in between, correct?

14  A.    I believe that is true.

15  Q.    Okay.  Well, let's see what's already been stipulated

16  into evidence as MC-1.  Okay.  I show -- I think it's

17  already in evidence, Your Honor.  Can I display it to the

18  jury?

19          THE COURT:  Yeah, go ahead.

20          MR. DILL:  All right, thank you.

21  BY MR. DILL:

22  Q.    Now, sir, just to give us a time frame, obviously this

23  text message from Lori Milliron to David Markus would be

24  before she came in front of the grand jury, but after she'd

25  already been subpoenaed to the grand jury, correct?

2009

CROSS - PETERSON

1    A.    It appears to be the case, yes.

2    Q.    Okay.  And obviously Mr. Markus is representing

3    Dr. Rudolph.  And as we've already established, there's been

4    an ongoing investigation going back to 2016, it sounds like,

5    by the FBI, right?

6    A.    Yes.  The first FBI case was opened in November 1st,

7    2016.

8    Q.    Well, the FBI and the FBI; it's the same FBI, right?

9    And --

10   A.    The FBI is the FBI.

11   Q.    Okay.  So there's an investigation by the FBI going

12   back to 2016 and, as you know, Mr. Markus' representing

13   Dr. Rudolph and has been for some period of time by the time

14   he's arrested, right?

15   A.    Yes, I was aware of that.

16   Q.    Okay.  And you understand -- just so you understand how

17   the grand jury works, is it in a room like this?

18   A.    Yes.  Very similar.

19   Q.    There's -- the prosecutor is there, Mr. Fields, for

20   instance, correct?

21   A.    Yes.

22   Q.    There are members of the grand jury, right?

23   A.    Yes, sir.

24   Q.    Okay.  No defense lawyers are allowed in the grand

25   jury, correct?

2010

CROSS - PETERSON

1    A.    That is correct.

2    Q.    And if somebody has a lawyer for the grand jury, the

3    person would have to say, "Hold on a second.  Let me go

4    outside and speak to my lawyer outside the door," right?

5    A.    That is accurate.

6    Q.    Okay.  And so here we see that Ms. Milliron is asking

7    Mr. Markus, and he -- about getting a lawyer.  "Totally up

8    to you whether you want a lawyer.  Let me know and I'll give

9    you some names."  And what does she say in response to that?

10   A.    She wrote, "I don't want to say the wrong thing."

11   Q.    And what does Mr. Markus tell her in response to

12   that?

13   A.    He responded, "Just tell the truth."

14   Q.    Okay.  You can take that down.

15         So, again -- so this is in December, the December

16   time period.  You're also aware that during the time

17   that Mr. -- or, sorry, Dr. Rudolph is in -- is -- is being

18   detained, there are recordings between -- recordings that

19   you've heard between the two of them; is that right?

20   A.    Are you talking about detained in Mexico or

21   arrested --

22   Q.    No, I'm sorry, detained.  Detained prior to the --

23   prior to her grand jury testimony.  Were there recordings

24   that you heard?

25   A.    I have heard recordings between the two of them.

2011

CROSS - PETERSON

1    Q.    And you actually heard her tell Dr. Rudolph, "I'm going

2    to go in and be honest and tell the truth"?  Do you recall

3    that?

4    A.    I didn't hear that, but if it's on the recording I

5    trust you.

6    Q.    Okay.  So now she's telling the lawyer, "I don't know

7    if I need the lawyer, I don't want to say the wrong thing."

8    He's -- the lawyer for Dr. Rudolph is saying, "Just tell the

9    truth."  She tells Dr. Rudolph, "I'm just going to go in

10   there and tell the truth."  That's all before coming into

11   the grand jury, right?

12   A.    I believe so.  Again, I didn't listen to all of the

13   recordings, but there are three investigators; the

14   recordings were broken up amongst the three of us.

15   Q.    Okay, sir.  Well, would you think it would be important

16   to listen to what was being said?

17   A.    I don't think any one investigator could cover

18   everything in this type of investigation.

19   Q.    Okay.  So if the lawyers listened to it, that --

20   obviously you're saying there's things out there that you

21   don't know about and you haven't looked at?

22   A.    I say there are parts of this investigation that were

23   conducted by the co-case agents that they're probably more

24   familiar with than I am, absolutely.

25   Q.    So just assume for me that we have her being advised,

CROSS - PETERSON

1    "Just tell the truth."  We have her statement that, "I'm

2    going to go in there and tell the truth."

3         She has a right to have a lawyer, correct?

4    A.   Yes, she does.

5    Q.   And more important than that, she has the right to take

6    something called the Fifth Amendment, doesn't she?

7    A.   She could, yes.

8    Q.    In fact, we saw it.  You know, "You don't have to

9    answer a question if it might incriminate you," right?  We

10   saw that on the transcript?

11   A.    That's fair.

12   Q.    Okay.  So knowing those things, she says, "I'm going to

13   go to -- come in and tell the truth."  She is asked

14   questions, and we went through a lot of them -- kind of

15   jumping around but we went through a lot of the questions

16   and answers, correct?

17   A.    Yes, sir, we did.

18   Q.    Did she ever say, "I'm not answering that question"?

19   A.    She did not use those words, no.

20   Q.    Okay.  And as a matter of fact, we went through a lot

21   of questions and answers here.  You understand that she

22   never denied having an affair with Dr. Rudolph, did she?

23   A.    She said that they were engaged in an affair, yes.

24   Q.    Okay, the question is:  Did she ever deny having an

25   affair with Dr. Rudolph?

2013

CROSS - PETERSON

1    A.    I think when she said that they were just friends, that

2    was untrue.  I think that was a way of denying the nature

3    and scope of their relationship.

4    Q.    Okay, well, let's talk about this, sir.  And, again, it

5    wouldn't be fair to cherrypick just one sentence out and

6    look at it and say, "Look, there's a lie," correct?  Is that

7    right?

8    A.    Sure.  I think the entire transcript speaks for itself.

9    Q.    Okay.  And we should really look at what she's actually

10   saying in response to the questions, correct?  Sir, my -- I

11   want to go through the grand jury thing on that point.  When

12   you say that she said they were just friends, that wasn't

13   the extent of what her answers were, was it, sir?

14   A.    No, she provided multiple answers.

15   Q.    No, sir, she didn't provide multiple answers.  She

16   answered the questions that were asked her about the

17   relationship, correct?

18   A.    Yes, she answered multiple questions with multiple

19   answers.

20   Q.    Okay.  One question was:  "What was the nature of your

21   relationship?"  And she said:  "We were friends.  We

22   traveled mostly."

23        That was one of the questions, right?

24   A.    Yes.

25   Q.    Okay.  Subsequent to that she was asked:  "Did you have

CROSS - PETERSON

1    a sexual relationship with him?"

2         Right?  Right after that.

3    A.   She was asked that, yes.

4    Q.   Okay.  So that's not a -- that's not some new different

5    answer.  She's asked:  "We were friends.  We traveled

6    mostly.  We occasionally had sex.  He paid for my kids'

7    school and college.  He paid my expenses."

8         Right?

9    A.   She did say that, yes.

10   Q.   Did she ever say, "I don't know Dr. Rudolph.  I've

11   never had an affair with him.  I don't know what you're

12   talking about"?

13   A.   She did not say that, no.

14   Q.   And when she said she had an affair, that was -- she

15   actually volunteered it.  Towards the end she said, "We had

16   an affair," right?

17   A.   She said they had an affair.  I'd have to look at it in

18   the context of the question to answer your question, but --

19   Q.   Right.

20   A.   -- she did say that.

21   Q.   We just went through the questions and the answers.  My

22   first question to you is:  Did she ever deny having an

23   affair?

24   A.   She did not say, "We did not have an affair."

25   Q.   Okay.  Did she ever deny getting money from

CROSS - PETERSON

1    Dr. Rudolph?

2    A.    She did not deny getting money from Dr. Rudolph.

3    Q.    And just to be fair, the first questions that she was

4    asked about:  "Do you recall" -- and I think it was my

5    colleague, Mr. Fields who asked the question:  "Do you

6    recall depositing $60,000 in cash in 2015?"

7          Do you remember that?

8    A.    I do remember that question.

9    Q.    But in fairness, she had not been shown the bank

10   statements at that point, right?

11   A.    I think the bank statements were shown later, yes, sir.

12   Q.    Okay.  So if you were to ask somebody out of context

13   and say, "Do you recall depositing $60,000 in cash in a

14   certain year," and they say, "No."  Somebody may say, "Wow,

15   how do you not remember putting a big stack of $60,000 in

16   the bank," right?

17   A.    I would say yes, yes.

18   Q.    But, in fairness, then they brought out all the deposit

19   slips, correct?

20   A.    Some of the deposit slips, yes.

21   Q.    Well, just to make sure, are you -- are you saying she

22   wasn't a subject of the investigation?

23   A.    I said that she was part of the investigation, but we

24   were not considering charges on her at that time.

25   Q.    Okay.  But she was a subject of the investigation,

2016

CROSS - PETERSON

1    wasn't she, sir?

2    A.    I think she was part of the investigation.  We were

3    hoping that she would be a witness.

4    Q.    Okay.  Do you generally gather entire bank statements

5    from people's personal bank accounts just for witnesses?

6    A.    Sure.  Sometimes.

7    Q.    Okay.  Sometimes.

8    A.    Yeah.

9    Q.    But in this case, you knew who she was because in your

10   complaint you talk about "girlfriend" in the complaint.  You

11   knew who Ms. Milliron was, correct?

12   A.    Yes, we knew who she was.

13   Q.    You subpoenaed her to the grand jury.  She appears

14   voluntarily, correct?

15   A.    She was compelled to testify in front of the grand

16   jury, yes.

17   Q.    When you say "compelled," she didn't fight the

18   subpoena, did she?

19   A.    Not that I'm aware of, no.

20   Q.    And she didn't refuse to testify.

21   A.    Not to my knowledge, no.

22   Q.    So basically the "compelling" was she got a subpoena

23   and she showed up from Arizona to Denver, correct?

24   A.    That is correct.  She did travel from Arizona to Denver

25   to testify.

2017

CROSS - PETERSON

1   Q.   You didn't take her from Arizona to Denver, did you,

2   sir?

3   A.   We did not.

4   Q.   Okay.  So she traveled from Arizona to Denver, says

5   she's going to tell the truth, has been advised to tell the

6   truth, and now when we get to the bank statements, when she

7   starts looking through, she says the source of those funds

8   was Larry Rudolph, correct?

9   A.   That is what she said, yes.

10  Q.   Okay.  She never lied about the source of the funds,

11  did she?

12  A.   No, she said those cash payments were from Larry

13  Rudolph.

14  Q.   Okay.  And she said -- "Why would you ask him for

15  money?"

16       Answer:  Anything.  Trips, vacations, clothes.

17       Right?

18  A.   She did say that, yes.

19  Q.   Truthful answers, correct?  Truthful?

20  A.   I assume she did use some of the money for that, yes.

21  Q.   Okay.  And, again, just to be clear, if we're going to

22  go back -- let's go to page 18 of the grand jury -- I'm not

23  going to try to hop back and forth, I'm going to try to go a

24  little bit chronologically if we can.

25  A.   Okay.

CROSS - PETERSON

1    Q.    Page 18 -- 71, page 18, yes.  Okay, let's go down to

2    the bottom here.

3          And in fairness, sir, this is what I was asking

4    about a moment ago where it says:  "What was the nature of

5    the relationship?"

6          "We were friends."

7          That's what you just told me, right?

8    A.    Yes.  We had discussed this question, yes, sir.

9    Q.    Okay.  And then -- but just to keep things in context

10   and to be fair, she's asked more questions about it here,

11   right?

12   A.    Yes --

13   Q.    Next page, 19, all the way down to the bottom.  19,

14   please.  Thank you.

15         "When did the relationship begin?"

16         I'm sorry, sir.  My fault.  The top.  Let's just

17   start at the top.

18         "When did the relationship begin?"

19         "Probably back 2003, 2004."

20         Correct?

21   A.    That is what she said, yes.

22   Q.    A truthful statement, correct?

23   A.    I believe that's accurate.

24   Q.    Yeah.  When asked if payments were part of the

25   relationship, she says:  "I don't know how to answer that."

CROSS - PETERSON

1          But then she's asked:  Were you having a sexual

2     relationship with him?

3          Answer:  We did occasionally.

4          Correct?

5     A.    That is what she said, yes.

6     Q.    That's truthful, correct?

7     A.    I believe that he did engage in a sexual relationship.

8     Q.    Well, just -- the reason I'm asking that is because the

9     other day we had the "friends" thing and then we hopped up

10    with the emails from 2010, 2011, correct?

11    A.    Yes, sir.

12    Q.    But in reality, she never denied having an affair with

13    him, having a sexual relationship with him.  It's right here

14    in the answers, correct?

15    A.    She did provide those answers that they were involved

16    in a sexual relationship, yes, sir.

17    Q.    And also that she was being supported by him

18    financially, correct?

19    A.    She did say that.

20    Q.    And that was truthful, was it not?

21    A.    She was being supported by him financially.

22    Q.    And let's go down a little bit further.  And even more

23    specifically, starting at line 12 -- let's go to line 12,

24    please.

25          "These cash payments, was that part of his

2020

CROSS - PETERSON

1    supporting you?"

2              "I would say so."

3              Right?

4    A.    That is what she said, yes.

5    Q.    Truthful answer, correct?

6    A.    I believe the cash was part of him supporting her, yes.

7    Q.    While she was in a relationship with him, right?

8    A.    Yes, sir.

9    Q.    Also the payments to the daughter, part of that

10   relationship, correct?

11   A.    Yes.

12   Q.    Okay.  So she's not lying about the nature of their

13   relationship in front of the grand jury, is she, sir?

14   A.    I think she was inconsistent in her answers.  She gave

15   vague answers.  She gave different answers, but these that

16   you're highlighting here, she says that the payments were

17   part of her relationship and I believe that to be true.

18   Q.    Show me the inconsistent answer where she's saying that

19   she wasn't in a relationship with him.

20   A.    I think when she said she was friends with him and that

21   she went on to say that they had a sexual relationship, I

22   think those are --

23   Q.    Okay, she was asked:  "Were you friends?"

24              "Yes."

25              "Were you anything more than friends?"

CROSS - PETERSON

1        "Yes.  We had sex."

2        Right?

3   A.   She wasn't asked if "you were friends."  She was asked

4   about the nature and she answered:  "We were friends."

5   Q.   Okay.  Well, she was also asked:  Were you ever more

6   than friends?

7        And she said:  Yes.

8        I mean, we're not going to quibble about whether

9   people are going to be friends and also more than friends,

10  are we, sir?

11  A.   I agree that she provided both those answers, yes, sir.

12  Q.   Okay.  But the question is:  Is she lying about it?

13  She's telling the truth about the cash payments.  She's

14  telling the truth about the relationships she's had with

15  him.  She's telling the truth about the affair.  She's

16  telling the truth about the source of the payments; isn't

17  that correct?

18  A.   Yes.

19  Q.   Okay.  Also I want to ask you -- you were asked a lot

20  of questions about -- you can take that down -- about when

21  they got together and the open marriage.  She was questioned

22  about that and she responded:  We -- that Dr. Rudolph told

23  her he and his wife did their own thing, correct?

24  A.   That is what she said, yes.

25  Q.   And you know from your investigation Bianca Rudolph had

CROSS - PETERSON

1    affairs, correct?

2    A.    I believe she likely had at least one affair, yes.

3    Q.    You know there's more than that, though, sir.

4    A.    I don't know that.  I believe as I sit here today that

5    she had at least one affair, yes.

6    Q.    With Doug Scandrol?

7    A.    Yes.

8    Q.    What year was that?

9    A.    I don't remember the years of those emails but some

10   time ago.

11   Q.    It was right before the postnup was drafted, isn't it?

12   A.    Right.  Yes.

13   Q.    Okay.  Have you taken the position that's a fake

14   postnup, sir?

15   A.    Fake in what regard?

16   Q.    Is it fake?  Is it real or is it fake?

17   A.    It's on real paper.  It's a real document, yes.

18   Q.    All right.  Did somebody forge that?  Did somebody

19   forge that postnup?

20   A.    I don't have any indication that anyone forged the

21   postnup, no.

22   Q.    To the contrary, you have somebody from the FBI lab who

23   came in here and said it's not a forgery, correct?

24   A.    That is what they said, yes.

25   Q.    Okay.  And, again, as a special agent in the FBI, you

2023

CROSS - PETERSON

1   would tend to believe that, wouldn't you, sir?

2   A.   I do believe that those signatures match, yes, sir.

3   Q.   So she also -- my client says that she had heard about

4   the postnup, correct?

5   A.   Yes.

6   Q.   And that Dr. Rudolph had told her that, correct?

7   A.   That is what she said, yes.

8   Q.   So in the year 2000 when the postnup is written,

9   Mrs. Rudolph had had affair -- at least one affair that you

10  know of, correct?

11  A.   Yes, sir.

12  Q.   There's a postnup.  And then in 2003, when she meets

13  Dr. Rudolph, Dr. Rudolph tells her, "We do our own thing,"

14  and it comes out in here that Mrs. Rudolph had affairs with

15  men and he has affairs with women, correct?

16  A.   That is what she said, yes.

17  Q.   And you know those things to be true, correct?

18  A.   That they both had affairs?

19  Q.   Yes.

20  A.   Yes.

21  Q.   Okay.  And on that point, you were -- mentioned

22  something about the plane ticket.  I just wanted to talk

23  about that a little bit.  Just to remind us here and make

24  sure we're on the same page, Mrs. -- Ms. Milliron was asked

25  in front of the grand jury:  Were you aware that a ticket

2024

CROSS - PETERSON

1  was purchased for you to go to Las Vegas after Mrs. Rudolph,

2  Bianca Rudolph's, funeral?

3          Right?

4  A.    Right.

5  Q.    And she said:  No, I wasn't aware of that.

6          Right?

7  A.    Right.

8  Q.    But you never said, at any time in this -- well, did

9  you know he actually flew another person to Las Vegas the

10 day after the funeral?

11 A.    That's correct.

12 Q.    Okay.  And then -- I mean, if we're looking at if

13 somebody killed their wife to be with their long-term

14 mistress, don't you think the fact that there's been now a

15 flight of some person -- who's not the mistress or

16 Ms. Milliron -- to Las Vegas where they hang out for several

17 days, don't you think that would be inconsistent with that?

18 A.    That was a complicated question.

19 Q.    I'll ask this:  If somebody's going to murder their

20 wife to be with somebody else, they generally don't fly

21 another woman to Las Vegas in between seeing them, correct?

22 A.    I wouldn't ascribe to that.  I don't -- I don't know

23 generally if people fly other mistresses after a homicide or

24 not.  I don't know.

25 Q.    It doesn't make a lot of sense, though, if in fact that

CROSS - PETERSON

1    he was doing this to be -- live openly with Ms. Milliron,

2    but now he's flying somebody else to Las Vegas in between,

3    doesn't make a lot of sense as an FBI agent, does it, sir?

4    A.    As an FBI agent, I think it's perfectly logical.

5    Q.    Okay.  So perfectly logical, consistent with somebody

6    who has a motive to be -- to live with somebody, to kill

7    their wife for somebody, that there's another person being

8    flown in between the time when this accident happened or the

9    death happens and when he sees her, in between he's flying

10   somebody else to Las Vegas.

11   A.    Yes, Dr. Rudolph was having multiple affairs.  I'm not

12   surprised by that at all.

13   Q.    Okay.  So, again, so we're talking about multiple

14   affairs, but how about this person, Tiffany Joy Reedman.

15   You never talked to her is what you're saying, correct?

16   A.    No, she's deceased.

17   Q.    When did she die?

18   A.    I don't remember the date.

19   Q.    Didn't she live in Pittsburgh?

20   A.    Yes.

21   Q.    Didn't she move to Aurora, Colorado?

22   A.    She did at one point.

23   Q.    Okay.  And isn't she still listed as living in Aurora,

24   Colorado, sir?

25   A.    I don't know.  She's deceased, so I don't know where

CROSS - PETERSON

1   she's listed as living.

2   Q.    Bottom line is you never talked to her.

3   A.    That is correct.

4   Q.    Okay.  Let me ask a couple other questions.  You were

5   asked about the -- about Cabo and -- Cabo San Lucas and

6   about purchasing a house.  Remember those emails that they

7   went through?

8   A.    Yes.

9   Q.    When was the Cabo condo -- that Dr. Rudolph was flying

10  to in Mexico -- when was that purchased?

11  A.    I don't remember the year of the purchase.  Within the

12  last three or four years.

13  Q.    If it was in 2021, sound about right?

14  A.    I would not be surprised by that.

15  Q.    2020, 2021?

16  A.    Sure.

17  Q.    Certainly not back when we're talking about whatever

18  emails he was sending to whoever in 2010 and 2011.

19  A.    Correct.  Two different time periods, yes.

20  Q.    Now on the 2010-2011 time period, we went through those

21  emails, correct?

22  A.    Yes, sir.

23  Q.    The FBI also analyzed all of the emails sent between my

24  client and Dr. Rudolph for many, many years.  You had the

25  data for that, right?

2027

CROSS - PETERSON

1    A.    That's correct.

2    Q.    And you understand that there -- from 2012 through

3    2016, there is a downward trend of emails between the two,

4    correct, sir?

5    A.    Yes.

6    Q.    And what I talked about in opening, that came from the

7    FBI's analysis, that in 2016 there were just two emails, two

8    emails, between Dr. Rudolph and Lori Milliron, correct?

9    A.    Between those accounts that we knew of, yes.

10   Q.    And zero direct emails between the two of them,

11   correct?

12   A.    Correct.

13   Q.    Now, again, you said before -- I think you said on

14   direct that part of the reason you had this undercover

15   investigation was because you wanted -- you believed that

16   Ms. Milliron confided in associates about the nature of her

17   relationship, right?

18   A.    That is true, yes.

19   Q.    And you're talking about Ms. Grimley, who came in here

20   the other day?

21   A.    Yes.

22   Q.    Yeah.  Ms. Grimley, who you heard her -- me question

23   her about what was exactly said?  That same Ms. Grimley?

24   A.    That is her, yes.

25   Q.    Okay.  So when you're talking about associates, that

2028

CROSS - PETERSON

1    is -- that's who we're talking about, right?

2    A.    Yes.  Ms. Grimley.

3    Q.    All right.  You're also -- a lot of these questions in

4    the grand jury testimony are about $4,000 being a lot of

5    money, or $4500 deposits being a lot of money, correct?

6    A.    I remember those questions, yes.

7    Q.    And just to be clear -- and, again, you may not know

8    the bank statements, but you've seen them, $1500 deposit

9    here, a transfer of a certain amount over time, right?

10   Basically monthly, correct?

11   A.    I think more frequently than monthly, but yes, they

12   were spread out over time.

13   Q.    Totaling up to, in 2015, the $60,000 --

14   A.    Right.

15   Q.    -- right?

16       Okay.  And just the $60,000 being a lot of money,

17   we also heard the testimony that the hunting trips that

18   Dr. Rudolph would take would be 60 grand apiece just for the

19   trip itself, right?

20   A.    Sure.  Some of them were very expensive.

21   Q.    And at least two of them in 2016.

22   A.    Yes, he did.

23   Q.    And that's just for the cost of the trip, forget about

24   the flight and hotels and the meals and all that, right?

25   A.    Very expensive, yes.

2029

CROSS - PETERSON

1    Q.    And the amount of money that -- you've looked at

2    Ms. Milliron's accounts, right?

3    A.    Yes.

4    Q.    Okay.  And you see that she was spending that money on

5    rent, Chile's, some groceries.  There was not any exorbitant

6    spending going on in those accounts, was there, sir?

7    A.    Sure, fair.

8    Q.    And also she testified truthfully in front of the grand

9    jury that he was helping her with her rent when she was

10   living there -- living at the various locations in

11   Pennsylvania, correct?

12   A.    That is correct.

13   Q.    Okay.  And I just want to ask you:  You asked about the

14   testimony -- or rather her testimony in front of the grand

15   jury.  The grand jury is -- was presented evidence about

16   Anna Grimley's testimony about an ultimatum, correct?

17   A.    Yes.

18   Q.    One of the grand jurors actually asked my client:  If

19   somebody came in here and were to say that you gave an

20   ultimatum, would that be true or false or a lie?

21         She goes:  No, that didn't happen.

22         Right?

23   A.    Correct.

24   Q.    Grand jury heard all of that testimony, everything

25   we've talked about today, about what is in here, right?

CROSS - PETERSON

1    A.    Yes.

2    Q.    The grand jury, after that, did not indict my client,

3    did they?  That grand jury did not indict my client in

4    January?

5    A.    The January 5th grand jury --

6    Q.    Right?

7    A.    -- did not indict Defendant Milliron.

8    Q.    And as you know, there was an indictment returned on

9    Dr. Rudolph from January 5th?

10   A.    That is correct, yes.

11   Q.    Now one of the things that you said about the perk, one

12   of the -- one of the counts in the complaint is about the

13   AmEx perks.  Do you recall that?

14   A.    Yes.  She referred to it as a perk, yes.

15   Q.    Okay.  But -- and you, yourself, testified in front of

16   the grand jury in the February grand jury, right?

17   A.    I did, February 9th of this year.

18   Q.    Okay.  And you were asked by my colleague, Mr. Fields,

19   if that was a -- if the -- her being on the AmEx was in fact

20   a perk, right?  Do you recall that?

21   A.    I don't recall the specific question, but I know we

22   talked about it, yes.

23   Q.    Okay.  Well, if you want me to refresh your

24   recollection about the question and the answer, sir?

25   A.    Sure.

2031

CROSS - PETERSON

1    Q.    Okay.  Give me a second.  Sorry.  Just a moment.  Okay.

2         I'll just generally ask you, were you asked the

3    question as to whether this was a perk of her employment at

4    Three Rivers Dental Group?  Do you recall responding:  No,

5    Julian Rudolph was not an employee of TRDG.

6         Do you recall that?

7    A.    I don't recall it, but it's probably what I said, yes.

8    Q.    Okay --

9    A.    I don't argue with you that I said that.

10   Q.    All right.  Well, you have an understanding because you

11   talked to Theresa Dancer that there were other employees

12   that had been on the credit card as well, including somebody

13   named Chelsey?

14   A.    I'm not aware of that.  I just know the two of them.

15   Q.    Okay.  So let's go to 2017.  Ms. Milliron is on the

16   payroll in 2017, correct?

17   A.    Yes, sir.

18   Q.    Julian Rudolph is also on the payroll in 2016 and 2017,

19   correct --

20   A.    I did not know he was being paid by Three Rivers.

21   Q.    Well, did you ever pull the payroll of Three Rivers

22   Dental Group to find out if he was an employee or not before

23   you went in front of the grand jury and said, "No, he's not

24   an employee"?

25   A.    I did not see the payment -- the employee records prior

CROSS - PETERSON

1    to that, no.

2    Q.    Did you ever go and ask for them, sir, in all these

3    years that we've been investigating this crime -- alleged

4    crime?

5    A.    I haven't.  But I'm sure some of that was done as part

6    of the financial investigation.  I haven't done it.

7    Q.    You've seen them now, right?

8    A.    The employee records?

9    Q.    Yes.

10   A.    I've seen part of them, yes.

11   Q.    You would agree in 2016, in 2017, Julian Rudolph was an

12   attorney and he was on the payroll for Three Rivers Dental

13   Group, correct?

14   A.    He was being paid by Three Rivers, yes.

15   Q.    Okay.  And he was also on the credit card, correct?

16   A.    He was on the credit card, yes.

17   Q.    My client, Ms. Milliron, was on the payroll and she was

18   also on the credit card, correct?

19   A.    That is correct.

20   Q.    All right.  So when you told the grand jury that the

21   basis for it not being a perk was that Julian was not on the

22   payroll, that's not accurate.

23   A.    I did not believe he was on the payroll at the time.

24   Q.    But now you know.

25   A.    I do know.

2033

REDIRECT - PETERSON

1    Q.    Right.   And so it's not accurate testimony, sir, when

2    you said that.

3    A.    It was not accurate at that time, correct.

4              MR. DILL:   Just a moment, Your Honor.

5              THE COURT:   All right.

6              MR. DILL:   No further questions.   Thank you.

7              THE WITNESS:   Thank you, sir.

8              THE COURT:   Redirect.

9                       REDIRECT EXAMINATION

10   BY MR. WINSTEAD:

11   Q.    All right.   Just a couple follow-up questions.   So you

12   were asked about, I think, four witnesses.   Leeanne Rom,

13   Spencer Kakoma, Kennedy, and Chibesa.

14             As far as Leeanne Rom, did you ask her to come and

15   testify?

16   A.    We did talk to her about coming to testify.

17   Q.    Where does she live?

18   A.    She lives in Dubai.

19   Q.    Were you able to arrange it that she could come to be

20   here for the trial?

21   A.    No.

22   Q.    What about Kennedy, did you try to get him here?

23   A.    We did.

24   Q.    Why couldn't you get him here?

25   A.    Why --

2034

REDIRECT - PETERSON

1   Q.   Why couldn't you get him here?

2   A.   We couldn't get the documents put together in time for

3   him to travel from Zambia to the United States.

4   Q.   Sir, are you aware:  Can defendants in criminal cases

5   subpoena witnesses that they -- if they want them?

6   A.   Yes.

7           MR. MARKUS:  Objection, Your Honor.  Not from

8   Africa we can't.

9           MR. DILL:  Same objection.

10          THE COURT:  Mr. Winstead.

11          MR. WINSTEAD:  That will be a follow-up question.

12          THE COURT:  All right.  Overruled for now.  Go

13   ahead and answer.

14          THE WITNESS:  The defense can subpoena witnesses

15   for trial, yes.

16   BY MR. WINSTEAD:

17   Q.   And can they ask the Court for a diplomatic request to

18   foreign authorities for foreign witnesses?

19   A.   Yes.

20   Q.   Okay.  All right.  Just you were asked about some

21   pictures at the convention.  Is it possible that the FBI

22   took photos of the Rudolphs at the convention?

23   A.   It is possible.

24   Q.   Okay.  And possible they took photos of Mark Swanepoel?

25   A.   It's possible.

REDIRECT - PETERSON

1    Q.   Okay.  All right.  You were asked a couple of questions

2    about the postnup.  No, actually, that was fine.  Your

3    answers were fine.

4         All right.  You were asked about the arrest of the

5    defendant in Denver.  Was there already venue for the wire

6    fraud in Denver?

7    A.   Yes, there was.

8    Q.   Okay.  You were asked about the various Zambian

9    reports, and, you know, whether some were more valuable than

10   others.  Were some more valuable to you or useful to you in

11   your investigation than others?

12   A.   Absolutely, yes.

13   Q.   Why?

14   A.   There were some reports that were done by experts,

15   pathologists, or forensic firearms experts.  People who had

16   been trained around the world in their field who provided

17   reports related to the work they did.  Those were important

18   and valuable to our investigation.

19        Conversely, there are some reports where

20   individuals provided very superficial information that were

21   less valuable.

22   Q.   You were asked about getting a search warrant for the

23   defendant's house or garage.  Did you ever get a search

24   warrant?

25   A.   No, we did not.

REDIRECT - PETERSON

1    Q.    Why didn't you get a search warrant?

2    A.    Well, for a search warrant, we have to articulate to

3    the judge a specific location that we want to search, and we

4    have to articulate specific items that we are looking for,

5    and both of those have to be satisfied.

6              Of course in this case we knew what we were looking

7    for, but we didn't have probable cause to show the location

8    of specific items.

9    Q.    Specifically for the shotgun?

10   A.    Correct.

11   Q.    Was one of the things that you were trying to develop

12   throughout your investigation probable cause for the

13   location of the shotgun?

14   A.    Absolutely.

15   Q.    In fact -- no, that's okay.  We can skip that.  Okay.

16             All right.  You were asked about the statistics and

17   you said that they weren't very useful.  Did those

18   statistics just include situations where people shot

19   themselves?

20   A.    No.  Those statistics related to unintentional deaths,

21   so that could be an individual shot themselves or they could

22   have been shot by someone else.

23   Q.    And did those statistics separate out situations where

24   the trigger was pulled and situations where the gun went off

25   without the trigger being pulled?

REDIRECT - PETERSON

1    A.    No.

2    Q.    Okay.    The FBI dancer.    Do you remember -- you were

3    asked about that, right?

4    A.    I was.

5    Q.    Do you remember how the gun went off, if you do?

6    A.    I do.

7    Q.    How did it go off?

8    A.    His handgun came out of his holster, it fell on the

9    floor, and when he went to grab it, he activated the trigger

10   as he picked up the handgun and it fired and shot someone in

11   the bar.

12   Q.    So he activated the trigger.    Did he pull it with his

13   finger?

14   A.    Yes.

15   Q.    Yeah.    So it didn't go off when it hit the ground?

16   A.    It did not.

17   Q.    You were asked about emails from Bianca related to an

18   affair.    Do you know when those emails were from?

19   A.    I don't remember the year --

20   Q.    Okay.

21   A.    -- as I sit here.

22   Q.    Okay.    All right.    And then you were asked about a

23   call -- a recorded call where Defendant Rudolph and

24   Defendant Milliron were talking about being honest in the

25   grand jury, right?

REDIRECT - PETERSON

1    A.    I was asked about it, yes.

2    Q.    At the beginning of that call, is there a recorded

3    advisement that plays?

4            MR. MARKUS:  Your Honor, I'm going to object to

5    this.  And maybe this may have to go sidebar on this.

6            MR. WINSTEAD:  Okay.

7            THE COURT:  All right.  Counsel, approach.

8        (Discussion at sidebar)

9            MR. MARKUS:  Your Honor, here's another issue where

10   I'm put in a difficult position about questions that my

11   colleague brought up.  He brought up a recording that was

12   made while Dr. Rudolph was in custody.  Again, not a call

13   that would have come out in a separate trial against

14   Dr. Rudolph.  And now the Government's going to ask about an

15   advisement that recordings from the jail are tape-recorded.

16   And so I would object because the jury's going to be left

17   with the impression that Dr. Rudolph was detained.

18           THE COURT:  First of all, what are we talking?

19   When did this conversation take place?

20           MR. WINSTEAD:  It was before her grand jury

21   testimony, so it was before he was indicted.

22           THE COURT:  All right.  He was being held where?

23           MR. WINSTEAD:  At the Denver Detention Center.

24           THE COURT:  Okay.  All right.  Your response.

25           MR. WINSTEAD:  Sir, what -- all I was planning on

REDIRECT - PETERSON

1   eliciting was that there's a warning that says the call is

2   going to be recorded.  I wasn't going to have him make any

3   reference to where it was or anything like that.  As far

4   as -- as far as the implication -- you know, the

5   implications that the defendant stayed -- you know, was

6   detained.  There's testimony that he was arrested, and

7   basically that there was some period of time when he was

8   detained.

9        I don't think that that is -- would lead the jury

10  to believe that he's still detained at this time.  I think

11  that everyone knows you get arrested and you're detained

12  briefly, at least.  And that should --

13       THE COURT:  I think the testimony was that the

14  witness arrested him at DIA on the 22d of December and her

15  testimony with the grand jury was January 5th, so that's 16

16  days.  So you think jurors should know what?

17       MR. WINSTEAD:  Oh, I was just saying there's no

18  reason why the jurors should believe that he was eventually

19  detained in the case or is detained or anything like that.

20       THE COURT:  First of all, I mean, isn't it obvious

21  that he's detained if he had a pre-recorded warning?  He's

22  in some kind of detention, right?

23       MR. WINSTEAD:  Yes, sir.

24       THE COURT:  And I think that's the --

25       MR. MARKUS:  That's the objection.  And --

REDIRECT - PETERSON

1          THE COURT:  -- the defendant's concern.

2          MR. MARKUS:  Exactly.  Why is it relevant that he

3    was advised that it would be recorded?  It's out there that

4    the recording was made.  It's out there what they both said.

5    There's also a relevance objection as to why it was

6    recorded.

7          MR. WINSTEAD:  It --

8          THE COURT:  Go ahead.

9          MR. WINSTEAD:  Oh, it's relevant because the reason

10   why Mr. Dill brought it out in the first place was as

11   evidence that she had an intention to be truthful.  And so

12   the fact that -- the fact that they knew that it was being

13   recorded is pretty relevant to whether or not that -- you

14   know, there was a reason for them to say that even if that

15   wasn't what she intended to do.

16         THE COURT:  Well, what about the prejudice of a

17   jury inferring from the recording that the Defendant Rudolph

18   is in detention?

19         MR. WINSTEAD:  Well -- well, Mr. Dill brought out

20   that that was a recording.  I think that there's nothing --

21   there's no added prejudice by saying that they would know

22   that it was recorded.  Otherwise it's kind of deceptive to

23   the jury.

24         THE COURT:  I see what you're saying.  It's already

25   been -- it's already in evidence that there was a recording.

REDIRECT - PETERSON

1          MR. WINSTEAD:  Right.

2          THE COURT:  What about that?

3          MR. MARKUS:  Of course none of that -- again, this

4     is the problem, but none of that is admissible against my

5     guy, and so now I'm dealing with a fight between these two

6     that's -- that they're trying to bring out additional facts

7     that are spilling over -- inadmissible facts that are

8     spilling over against Dr. Rudolph.

9          I think we have, you know, substantial 403 concerns

10    as Your Honor raised about the prejudice of the detention.

11    I think it's out there about the recording.  And I don't

12    think we need to go further, Your Honor.

13         MR. WINSTEAD:  Would it be possible if I, instead

14    of asking about the specific advisement, just ask:  Would

15    they have a reason to, you know -- "You've already said that

16    the call was recorded.  Are you aware if they would have had

17    reason to know that it was recorded?"

18         MR. MARKUS:  Same objection.

19         MR. WINSTEAD:  Instead of leading specifically to

20    the advisement.

21         THE COURT:  Instead of the fact of the recording,

22    there's -- I don't know what other inference the jury can

23    draw but that he's being detained, because these kind of

24    warnings don't get placed on telephone calls just between

25    private individuals.

2042

REDIRECT - PETERSON

1          MR. WINSTEAD:  Well --

2          THE COURT:  Okay.  Well, it's a close question but

3    I think Mr. Markus raises sufficient grounds.  I'm going to

4    sustain the objection.

5          (End of discussion at sidebar)

6          THE COURT:  You may proceed, counsel.

7          MR. WINSTEAD:  All right.  Thank you, Your Honor.

8    BY MR. WINSTEAD:

9    Q.   All right, so you were asked a number of times about

10   statements in Defendant Milliron's grand jury testimony that

11   were -- that fit the facts; that were true statements,

12   right?

13   A.   That is correct.

14   Q.   Throughout -- as we laboriously went through --

15   throughout her testimony, would you say that she initially

16   would deny or avoid certain facts?

17         MR. DILL:  Object to the opinion testimony, Your

18   Honor.

19         THE COURT:  Overruled.

20         THE WITNESS:  Yes.

21         THE COURT:  You may answer.

22   BY MR. WINSTEAD:

23   Q.   And eventually did she admit some of those things?

24   A.   She did.

25   Q.   You were asked about the emails and whether you were

REDIRECT - PETERSON

1    able to find emails between the defendants in 2016.  Are you

2    aware of whether or not they may have had other email

3    accounts than what you searched?

4    A.    I don't know if they had additional email accounts.

5    Q.    Okay.  Okay.  You were asked about Julian Rudolph being

6    on the credit card.  Is he related to Defendant Rudolph?

7    A.    Yes, he is.

8              THE COURT:  Is there another question?

9              MR. WINSTEAD:  Yes, I'm sorry, Your Honor.

10   BY MR. WINSTEAD:

11   Q.    Do you -- I -- all right.

12             MR. WINSTEAD:  May I have just a moment, Your

13   Honor?

14             THE COURT:  You may.

15   BY MR. WINSTEAD:

16   Q.    All right, you were asked whether or not Defendant

17   Milliron was advised to just tell the truth, right?

18   A.    Yes.

19   Q.    Now, you said this before, but how did she first

20   characterize her relationship with Rudolph?

21   A.    In her grand jury testimony?

22   Q.    Yes, sir.

23   A.    That they were just friends.

24   Q.    Did she eventually admit that they were more than just

25   friends?

2044

REDIRECT - PETERSON

1    A.    Yes, she went on to say that they had a sexual

2    relationship.

3    Q.    What did she first say about whether she was getting

4    cash?  Did she admit at first that she remembered getting

5    large amounts of cash?

6    A.    I don't remember her response to those questions.

7    Q.    Did she eventually admit that she was getting large

8    amounts of cash?

9    A.    Yes, she did.

10   Q.    Do you know what she first said about the reasons why

11   she got that money?

12   A.    She said that Mr. Rudolph was generous.

13   Q.    And did she say when she was asked why he was generous,

14   what -- do you remember what she said?

15   A.    I don't recall specifically her response.

16   Q.    What about when she was asked about conversations with

17   the man she'd been seeing for 15 years about the death of

18   his wife?  What was her most common response?

19   A.    That she didn't remember.

20   Q.    How was her memory generally throughout the testimony?

21               MR. DILL:  Objection, Your Honor.

22               THE COURT:  Overruled.

23               MR. DILL:  Improper foundation.

24               THE COURT:  Overruled.  You may answer.

25               THE WITNESS:  I would say there was a lot of

2045

REDIRECT - PETERSON

1   information and detail she couldn't remember.

2   BY MR. WINSTEAD:

3   Q.   And did she remember some things very specifically?

4   A.   There were some things she remembered clearly.

5   Q.   Did those include things that were highlighted in the

6   defense arguments the day before?

7   A.   Yes, specifically the open marriage and the postnuptial

8   agreement.

9   Q.   All right.  Thank you.  No further questions.

10             THE COURT:  All right.  Special Agent Peterson,

11   thank you for your testimony.  You're excused.  You may step

12   down.

13             THE WITNESS:  Thank you, Your Honor.

14             THE COURT:  The Government may call its next

15   witness.

16             MR. FIELDS:  Thank you, Your Honor.  The United

17   States calls Joseph Allen Smith.

18             THE COURT:  All right.

19             COURTROOM DEPUTY:  If you'll raise your right hand.

20             JOSEPH SMITH, GOVERNMENT'S WITNESS, SWORN

21             COURTROOM DEPUTY:  Please be seated and remove your

22   mask for us.  And state your full name for the record and

23   spell your first and last name for us.

24             THE WITNESS:  Joseph, J-o-s-e-p-h, Smith.

25             MR. FIELDS:  May I begin, Your Honor?

DIRECT - SMITH

1       THE COURT:  You may.

2                   DIRECT EXAMINATION

3   BY MR. FIELDS:

4   Q.   Mr. Smith, did you once consider yourself a friend to

5   Dr. Lawrence Rudolph?

6   A.   Yes.

7   Q.   Did you have personal discussions with him about his

8   romantic relationships?

9   A.   Yes.

10  Q.   And did you have discussions with him about the topic

11  of divorce in particular?

12  A.   I did.

13  Q.   Are you prepared today to tell the jury about those

14  discussions?

15  A.   Sure.

16  Q.   Before we start, let's find out a little bit more about

17  you.  What do you do for a living?

18  A.   I'm retired, but I do still write books and manage real

19  estate.

20  Q.   What are your hobbies?

21  A.   Hunting, fishing, outdoors.

22  Q.   How often do you go hunting?

23  A.   Nowadays, about 150 days a year.

24  Q.   Are you familiar, then, with the rules of hunter

25  safety?

DIRECT - SMITH

1    A.    Sure.

2    Q.    What are the rules?

3    A.    With firearm safety?

4    Q.    Yeah.

5    A.    Not pointing a gun at someone.  Making sure it's empty

6    when you're handling it.  The list goes on, you know.

7    Q.    In your experience, are those rules followed when

8    you're out on these hunts?

9    A.    Say that again.

10   Q.    In your experience, are these rules followed when

11   you're on hunts?

12   A.    Oh, sure.  Yeah.

13   Q.    Have you been on hunts overseas?

14   A.    Yes.

15   Q.    Are the rules of hunter safety different when you're

16   overseas than they are here in the United States?

17   A.    No, the basics are all the same.

18   Q.    Have you ever loaded a gun into a soft case?

19   A.    Sure.

20   Q.    How --

21   A.    Yes.

22   Q.    -- do you do that?

23   A.    You check and make sure the firearm is empty; nothing

24   in the magazine.  And you load it barrel first into the

25   soft -- soft case typically has a zipper, unzip the bottom,

DIRECT - SMITH

1    you put it in pointing it in a safe direction, loading it in

2    like that.

3    Q.    Have you ever seen someone point a gun at themselves

4    while packing it away?

5    A.    No.

6    Q.    When you go on these trips, do you take a medical

7    kit?

8    A.    Yes.

9    Q.    What kind of things do you have in that kit?

10   A.    Bandages, tape.  I carry sutures, typically for, you

11   know, small cuts, things like that.  Novocaine cream, once

12   in a while, you know, for -- you know, if you get a bad cut

13   or something.  But -- ointments.  A little bit of -- a

14   little bit of everything.  Anbesol if you get a bad tooth.

15   That kind of thing.

16   Q.    A little bit of everything.  Have you ever taken

17   anesthesia drugs with you?

18   A.    No.  I don't think it's legal to carry them or hall

19   them, so . . .

20   Q.    Have you ever seen someone put under anesthesia out in

21   the bush?

22   A.    No.

23   Q.    Have you ever been to Zambia?

24   A.    Yes.

25   Q.    What about Kafue National Park?

DIRECT - SMITH

1    A.    Yes.

2    Q.    Could you describe it for us, what's it like?

3    A.    It's a gorgeous area; teeming with wildlife.  Probably

4    one of the prettiest places in Africa.  Has all kinds of

5    different kinds of game, some unique species are found

6    there.  And it's a great hunting destination around the

7    edges of the park.

8    Q.    Where's the closest city?

9    A.    Of any consequence, Lusaka.

10   Q.    Is it easy to communicate with anyone else while you're

11   in Kafue?

12   A.    When I was there, no.  I haven't been there for several

13   decades.  But I'm not sure if they've got cell service

14   nowadays or -- you know, typically we travel with a sat

15   phone, so it doesn't matter if there's cell service or not

16   or internet.

17   Q.    Now you told us earlier that you once counted Larry

18   Rudolph as a friend.  How did you meet him?

19   A.    Through the hunting organizations.  Safari Club, and

20   Conklin, and other ones that we're involved in.

21   Q.    Approximately when do you think you first met him?

22   A.    2006-ish, I would guess.  That bracket.

23   Q.    What was the occasion?

24   A.    I have no idea.

25   Q.    After that first meeting, did you interact with him a

DIRECT - SMITH

1    lot more?

2    A.    Yeah, we kind of grew into a relationship, I would say,

3    you know, by being active in the same organizations.    We

4    overlapped a lot.

5    Q.    Can you describe for us how that relationship grew.

6    A.    Being involved in different boards for conservation

7    organizations and hunting organizations.    You know, you

8    would meet, you have like-minded hobbies, specifically

9    hunting, the outdoors and things like that.    So I would say

10    it's one that evolved over the years.

11    Q.    You mentioned that organization, Safari Club

12    International.    Who was the president of it between 2009 and

13    2011?

14    A.    Larry Rudolph.

15    Q.    Was Larry Rudolph married?

16    A.    Yes.

17    Q.    At some point, did you get to meet his wife?

18    A.    I did.

19    Q.    What was her name?

20    A.    Bianca.

21    Q.    What were your interactions with her?

22    A.    Met her through the various events when they -- she did

23    attend with Larry.    And then I was writing a novel and I

24    needed a woman's perspective on some parts that were in

25    there and Bianca had a -- I believe a degree in literature

DIRECT - SMITH

1    and so she was very helpful in doing editing for me and

2    doing some proofreading.  And so we had a lot of

3    correspondence through email and that, and discussions

4    about, you know, "I wouldn't put this part in, I would

5    change it this way," that kind of a thing, so . . .

6    Q.    Did you ever go to shooting events with Bianca and

7    Dr. Rudolph?

8    A.    We attended a couple.  We were at one that I recall at

9    Nemacolin.

10   Q.    What's Nemacolin?

11   A.    It's a resort in southern Pennsylvania I want to say.

12   Q.    Did you personally observe Bianca handling a shotgun?

13   A.    No.  We were there with a group and we were all at the

14   event, you know.  People were all there getting ready to go

15   out and do shooting and so . . .

16   Q.    Was Bianca one of the shooters?

17   A.    Yes.  She was one of the crowd that was there.

18   Q.    So did you see her with a shotgun?

19   A.    No, I did not see her with a shotgun.

20   Q.    Now you said that you once counted Larry as a friend,

21   so without going into details is it fair to say that at some

22   point you stopped wanting to be friends with him?

23   A.    Yes.  After 2012, our relationship, in a nutshell, just

24   devolved.  We, you know, he quit coming to the events.  He

25   was having some issues with a different organization.  And

DIRECT - SMITH

1   we never really had any cross words or anything, it was more

2   just we quit, you know -- he quit being there and, you know,

3   you move on.

4   Q.   Do you have a grudge against him?

5   A.   No.

6   Q.   Why did you agree to testify in this trial?

7          MR. MARKUS:  Objection, Your Honor --

8          THE COURT:  Overruled.

9          MR. MARKUS:  -- relevance.

10         THE COURT:  You may answer, sir.  You may answer.

11         THE WITNESS:  The FBI called me and asked me

12  questions and here I am.

13  BY MR. FIELDS:

14  Q.   So you mentioned sort of the way your relationship

15  grew.  Did you and Larry socialize together?

16  A.   Yes.

17  Q.   Did he bring up his romantic life?

18  A.   Yeah.

19  Q.   Who was he involved with?

20  A.   Besides his wife?

21  Q.   Yeah.

22  A.   Lori and -- there was other girls that were, you know,

23  here and there, I guess would be the best way of putting it.

24  Q.   Did he talk about how he was able to balance being

25  married with having these other girls?

DIRECT - SMITH

1    A.    Not really.  I mean, I don't know any specifics to give

2    you a . . .

3    Q.    Did he describe going on trips with Lori?

4    A.    Did he?

5    Q.    Yeah.

6    A.    No.  Not anything specific other than the one occasion

7    where, you know, I met him at a place where she was at.

8    Q.    Where was that?

9    A.    That was in Miami.

10   Q.    Approximately when?

11   A.    I'm going to say roughly 2008-ish, that bracket.  I'm

12   not sure.  Before 2012.

13   Q.    How did he introduce her?

14   A.    As his girlfriend.

15   Q.    Who else was there?

16   A.    My date, my girlfriend at the time.

17   Q.    Now when you were friends with Dr. Rudolph, were you

18   married?

19   A.    No.  No.

20   Q.    When had you gotten divorced?

21   A.    2005.

22   Q.    So during this time, you were -- you were a bachelor?

23   A.    Correct.

24   Q.    Did you have conversations with Dr. Rudolph about

25   divorce?

DIRECT - SMITH

1    **A.    Yes.    One time he called me and -- you know, he wasn't**

2    **happy with his marriage and wanted to talk about divorce,**

3    **and knowing that I had gone through one was asking me for**

4    **advice regarding financial parts of it.    And, you know, what**

5    **happens, "What happened in your divorce" kind of thing.**

6    **Like asking questions like that.**

7         **So my advice to him was, for starters, don't get**

8    **divorced.    You know, the grass isn't always greener on the**

9    **other side.    And, you know, if you do get a divorce, you're**

10    **going to lose half your money minimum, typically, in a**

11    **divorce, and probably more than that, so you better be**

12    **really -- you must really want to get a divorce if you're**

13    **going to do that.**

14    **Q.    How did he respond when you said he might lose half his**

15    **money?**

16    **A.    Well, his words were to the effect of, "Well, I can't**

17    **live on half the money that I've got so I certainly got to,**

18    **you know -- I can't afford to get a divorce."**

19         **And I said, "Well, then, sounds good.    You should**

20    **stay married and, you know, make it right and do what you**

21    **got to do" kind of a thing.**

22         **And also with him having kids, you know, and it's**

23    **the mother of his children, at some point you got to take**

24    **care of, you know, your ex-wife one way or the other,**

25    **so . . .**

DIRECT - SMITH

1    Q.    After that phone call, did he call you again to get

2    advice on the same topic?

3    A.    Yes.  We talked a day or two later regarding prenuptial

4    agreements.  And I'd mentioned when we were talking the

5    first time about my divorce and that I'd had a prenuptial

6    agreement which made it a fairly simple cut-and-dried

7    divorce, that the documentation was all done in advance.

8          And he said, well, you know, he didn't have one

9    because of their -- the way they had gotten married and that

10   kind of a thing.  And he asked me if I knew anything about

11   postnuptial agreements.  And I said no, never even heard of

12   one.  He said, you know, "I'm thinking about getting one and

13   that that would help, you know, clarify in case anything

14   happens down the road."

15         And I just recall saying something to the effect

16   of, you know, "If you can get somebody to sign a postnuptial

17   agreement after the fact and after you you've been married a

18   long time, good luck."  So is --

19   Q.    How did he respond to that?

20   A.    Yeah, it was sloughed off, perhaps, laughed along.  You

21   know, it wasn't like an argument.  There's not much to say

22   after a statement like that, I guess.

23   Q.    Do you remember approximately when these conversations

24   occurred?

25   A.    It would have been before 2012 because that was kind of

DIRECT - SMITH

1    the end of our relationship, so.  2010-ish, maybe, I'm

2    really not sure.

3    Q.    So if these conversations happened over 10 years ago,

4    how do you remember them so well?

5    A.    The conversation about the postnup, I remember because

6    it's probably the whackiest I ever heard, you know, as far

7    as relationships go.  You know, that I'd never heard of it,

8    haven't heard of it since.  I'm sure they exist in some

9    fashion, but to me it seems like it will be awful hard to

10   get one done.

11             MR. FIELDS:  Your Honor, may I have a moment?

12             THE COURT:  You may.

13   BY MR. FIELDS:

14   Q.    One other topic.  So going back to the discussions that

15   you had with Larry while you were socializing --

16   A.    Uhm-hum.

17   Q.    Would he bring up the topic of other women?

18   A.    Between him and I?

19   Q.    Yeah.

20   A.    Sure.

21   Q.    At any point during those discussions, did he describe

22   having an open marriage?

23   A.    No.

24   Q.    What, if anything, did he say about sort of the

25   position of these girls he was seeing and Bianca?

DIRECT - SMITH

1  A.   I'm not sure how you mean, but, I mean, if you mean if

2  you're going out with somebody or going to have a affair, if

3  you want to call it that, or whatever, you would, you know,

4  have to do it somewhere else, be secret.  You don't want

5  your wife to find out.

6  Q.   What did he say exactly about that?

7  A.   Bianca, you know -- you don't want to make a wife, you

8  know, not happy.  So I don't remember specific like, you

9  know, she -- is she going to be mad?  Sure.  You know, not

10  sure what you want to --

11  Q.   Did he talk about how he was able to prevent her from

12  getting mad about seeing these other women?

13  A.   Keep it off her radar, you know.  Not let her know

14  there was anything going on.

15  Q.   What were some of the means he used to keep it off her

16  radar?

17  A.   I would say going somewhere else.  You know, not --

18  obviously not doing it at home where your -- or your

19  hometown would be one of them.  You know, if you meet

20  somewhere else, that would be a way to avoid that

21  happening.

22  Q.   Did Dr. Rudolph travel quite a bit?

23  A.   Yes.

24  Q.   So was his travel schedule one of the ways he could

25  accomplish that?

CROSS - SMITH

1    A.    I would assume it could be, you know.  If you're on the

2    road, it gives you the opportunity.  I don't know a lot of

3    specifics about who, when and where.

4    Q.    When you met Lori -- and it was Miami --

5    A.    Uhm-hum.

6    Q.    -- in 2008?  Where was Bianca at the time?

7    A.    At home, I assume.

8         MR. FIELDS:  No further questions, Your Honor.

9         THE COURT:  All right.  Let me get a sense of how

10   long cross-examination we're looking at.

11        MR. MARKUS:  I think very short, Your Honor.

12        THE COURT:  All right.  Mr. Dill?

13        MR. DILL:  I don't believe I have any, Your Honor.

14        THE COURT:  Sorry?

15        MR. DILL:  I'm sorry, I don't expect to have any.

16        THE COURT:  Okay.  And -- all right.  Let's see if

17   we can finish this witness, so Mr. Dill doesn't have to --

18   or Mr. Smith doesn't have to come back in an hour.

19        MR. MARKUS:  I get the right-before-lunch cross,

20   but I'll try to be quick.

21                      CROSS-EXAMINATION

22   BY MR. MARKUS:

23   Q.    You mentioned -- hi, Mr. Smith.  I'm David Markus, I

24   represent Dr. Rudolph.  I want to try to keep this really

25   quick, okay?

CROSS - SMITH

1    A.    Let's do it.

2    Q.    Let's do it.  So, by the way, when you -- when you and

3    the prosecutor were using the word "girl," you mean women,

4    right?

5    A.    You mean from an age standpoint?

6    Q.    Yeah.

7    A.    I'm sorry, yes.  Yeah.

8    Q.    Okay.  You mentioned that you had a prenuptial

9    agreement.  Do you remember that?

10   A.    I do.

11   Q.    Okay.  That was an agreement that you and your wife

12   signed, right?

13   A.    Yes.

14   Q.    No lawyer signed that, correct?

15   A.    Yes, they did.

16   Q.    You want to see it?

17   A.    You might not have all the pages.

18   Q.    Was it notarized, sir?

19   A.    Sure.

20   Q.    You think it was notarized and signed by lawyers?

21   A.    Uh-huh.

22   Q.    Okay.  Would you remember it being a four-page

23   agreement?

24   A.    I don't remember the exact count, but if you have them

25   in order and there's an end to it, I can confirm it for you,

CROSS - SMITH

1    but it's not that big -- this is back in --

2    Q.    Sure --

3    A.    -- I don't know, what's the date?

4    Q.    1986.

5    A.    Okay, there you go.

6    Q.    1986.  All right.  We'll pause there for a second.  You

7    talked about medical kits for small cuts.  Do you remember

8    that?

9    A.    Uhm-hum.

10   Q.    If somebody brought a medical kit to Africa and had

11   an -- and also brought body armor, that would be weird,

12   right?

13   A.    Body armor as in, like, Army body armor or the drink?

14   Q.    Yeah -- body armor like wearing body armor --

15   A.    Yeah, that would be weird as hell.

16   Q.    That would be really weird, right?

17   A.    It's called a dangerous game for a reason, but it's not

18   that dangerous.

19   Q.    Okay.  And if someone brought a baseball helmet because

20   they were afraid of a leopard, that would be really weird,

21   right?

22   A.    Actually, let's back up.  If you're going in after a

23   wounded leopard, I have seen PHs, professional hunters, that

24   will put on body armor and a helmet --

25   Q.    Okay.

CROSS - SMITH

1    A.    -- because if the leopard comes when he's wounded and

2    jumps on you, it gives you a degree of protection.

3    Q.    So if somebody --

4    A.    But if you're talking about the hunter itself showing

5    up . . .

6    Q.    What about one of the guests with those things?

7    A.    (Shook head)

8    Q.    It would be pretty weird for a guest to show up with

9    body armor, baseball helmet, cup, and some of the drugs that

10   the prosecutor talked to you about, right?

11   A.    Uhm-hum.

12   Q.    Yeah.  Okay.

13        THE COURT:  You have to answer yes or no, sir.

14        THE WITNESS:  I'm sorry, yes, it would be weird.

15   BY MR. MARKUS:

16   Q.    You said you got to know Dr. Rudolph because you guys

17   were on different boards and things like this back in the

18   2008, '-9 and '10 period; do you remember that?

19   A.    Uhm-hum.

20   Q.    You have to say yes --

21   A.    Yes.

22   Q.    Would you consider Larry Rudolph a private person?

23   A.    I'm not sure how you mean by that.

24   Q.    Well, I'm asking you for your opinion.  Do you consider

25   him an open person or a private person?

CROSS - SMITH

1   A.    Larry's a outgoing guy and been, you know, leader of

2   various organizations and that.  So I suppose in private he

3   would be a personal person, but he's very outgoing and, you

4   know, out there in front of everybody.

5   Q.    You said you got to know Bianca Rudolph.  Was she a

6   private person or was she like open with her --

7   A.    Private.

8   Q.    She was private.

9   A.    Uhm-hum.

10  Q.    Did she tell you that she had a number of affairs?

11  A.    No.

12  Q.    Did you have an affair with her?

13  A.    No.

14  Q.    I'm sorry?

15  A.    No, I did not.

16  Q.    Okay.  You spent a lot of time with her reviewing your

17  book?

18  A.    On the phone.  She lived in Pennsylvania and I lived in

19  Seattle.

20  Q.    Did you meet with her in person?

21  A.    No.

22  Q.    Okay.  You said that the whackiest thing you ever heard

23  was a postnuptial agreement.  Do you remember saying that?

24  A.    Uh-huh -- yes.

25  Q.    Now are you aware that in this case there's a

2063

CROSS - SMITH

1    postnuptial agreement that an FBI examiner has said was

2    signed by Bianca Rudolph?

3    A.    I am not aware of that.

4    Q.    Okay.  That would be whacky to you?

5    A.    Yup.

6    Q.    Okay.  Would it be whacky if you learned that the

7    postnup was signed after Bianca Rudolph was cheating with a

8    hunter named Doug Scandrol, and then instead of getting

9    divorced, Larry Rudolph and Bianca Rudolph agreed to sign

10   this postnup?

11   A.    What was the question in that?

12   Q.    Do you think that would be whacky or could you

13   understand why a couple might do that?

14   A.    No.

15   Q.    You don't understand that?

16   A.    No, I don't.

17   Q.    Okay.  Do you know who Doug Scandrol is?

18   A.    Sure, yes, I do.

19   Q.    Do you know that he had an affair with Bianca Rudolph?

20   A.    I heard rumors of it, but I don't know that for a

21   fact.

22   Q.    Okay.  Did Bianca Rudolph ever mention to you that she

23   wanted to get divorced?

24   A.    No.

25              MR. MARKUS:  I have nothing further, Your Honor.

REDIRECT - SMITH

1          THE COURT:  All right.

2          MR. DILL:  No questions, sir.

3          THE COURT:  All right, thank you, Mr. Dill.

4     Redirect?

5          MR. FIELDS:  Very brief, Your Honor.

6          THE COURT:  All right.

7                    REDIRECT EXAMINATION

8     BY MR. FIELDS:

9     Q.   Do you remember these questions about leopard hunts and

10    body armor?

11    A.   Yes.

12    Q.   On leopard hunts, in your experience will people

13    sometimes carry shotguns?

14    A.   Yes, for sure.

15    Q.   For what purpose?

16    A.   Shotgun throws a bigger pattern, and if a leopard

17    charges, it gives you a bigger kill zone.  A rifle would

18    only shoot one bullet, which would -- you'd have to be a

19    very good shot, especially typically a leopard's going to

20    come from the jury box to here, so if you got to get off a

21    quick shot and you've got a open-choke shotgun, you're going

22    to have a bigger pattern and a better chance of killing it.

23    Q.   And have you actually been on these leopards hunts?

24    A.   Yes.

25    Q.   Have you -- and on those hunts was a shotgun taken?

2065
REDIRECT - SMITH

1  A.   Yes.

2  Q.   When you had the shotgun on those hunts, did you make

3  sure it was reliable?

4  A.   Yes.

5  Q.   Why?

6  A.   If a leopard comes, you get one chance, and if the

7  shotgun doesn't go off somebody's going to need some

8  stitches, at a minimum.

9  Q.   Would you take a shotgun that was malfunctioning?

10 A.   No.

11 Q.   Would you take a shotgun that you were unfamiliar with?

12 A.   No, absolutely not.

13         MR. FIELDS:  No further questions, Your Honor.

14         THE COURT:  May the witness be excused for the

15 Government?

16         MR. FIELDS:  Yes, Your Honor.

17         THE COURT:  All right.  For the defendants.

18         MR. MARKUS:  Yes, Your Honor.

19         MR. DILL:  Yes, Your Honor.

20         THE COURT:  All right.  Mr. Smith, thank you so

21 much for your testimony.  You're excused and you may step

22 down.

23         THE WITNESS:  Thank you.

24         THE COURT:  All right.  Ladies and gentlemen of the

25 jury, we're going to take our lunch recess.  We'll be in

REDIRECT - SMITH

1    recess for one hour.

2         (Recess taken 12:36 p.m.)

3                    **AFTERNOON SESSION**

4         (In open court outside the presence of the jury at 1:40

5    p.m.)

6              THE COURT:  All right, before we bring back the

7    jury, I want to follow up with a discussion we put on the

8    record that, during the lunch recess, counsel had a

9    discussion with my law clerk, Susan Jacoby.  And what I want

10   to do is have Government counsel put on the record what they

11   informed Ms. Jacoby.  So I don't know who will speak for the

12   Government.

13             Mr. Winstead, if you'll take the lectern.  I'd like

14   you to articulate for me how, in the Government's view, the

15   factual statements set forth in the last paragraph of page 6

16   that concludes on the top of page 7 have been established.

17             MR. WINSTEAD:  And that's of document --

18             THE COURT:  Oh, I'm sorry --

19             MR. WINSTEAD:  -- 232; is that right?

20             THE COURT:  I'm sorry.  I'm sorry -- I was

21   referencing loose pages out here.  Document ECF 232, the

22   Government's response to Lawrence Rudolph's renewed

23   objection related to Cassandra Olmstead.

24             MR. WINSTEAD:  All right.  Thank you, Your Honor.

25   So the discussion that we had was that the Government would

REDIRECT - SMITH

1    request that the Court take judicial notice of some of those

2    legal documents that have not yet been entered into evidence

3    in this case, and that's specifically -- well --

4              THE COURT:  Entered and just not shown to the jury

5    or they're not even in evidence?

6              MR. WINSTEAD:  So the complaint is in evidence.

7              THE COURT:  Right.

8              MR. WINSTEAD:  The interrogatories was one of

9    those -- one of the Government's exhibits that has yet been

10   admitted and that the Court contemplated admitting when the

11   defendant testifies.

12             THE COURT:  Right.

13             MR. WINSTEAD:  So -- but that is an interrogatory

14   transcript -- or an interrogatory filed in the same case as

15   the complaint and, therefore, we would ask that the Court

16   take judicial notice of that for purposes --

17             THE COURT:  Of a document that's -- that's an

18   exhibit that the Government has endorsed for admission at

19   trial?

20             MR. WINSTEAD:  Yes, Your Honor.

21             THE COURT:  All right.  Go ahead.

22             MR. WINSTEAD:  All right.  The transcript of the

23   deposition, the video of that transcript, is admitted as

24   Exhibit 80, and so that contains the false statements by the

25   defendant referenced in that paragraph.  There's also an

REDIRECT - SMITH

1    excerpt of the transcript for that -- well, the transcript

2    is also a Government exhibit that was offered but hadn't

3    been admitted because it was duplicative of the video

4    deposition.  But the excerpt referenced here was attached to

5    Government's Exhibit 162.

6            And so for the Court's convenience, that's the

7    transcript of the same deposition that the video has been

8    admitted as evidence here --

9            THE COURT:  All right.

10           MR. WINSTEAD:  -- that contains those statements.

11           We would request that the Court take judicial

12   notice that the litigation in that case was ongoing in 2016,

13   and we provided the citation for the case in Government's

14   Exhibit 162.  Before we call Ms. Olmstead, we will be

15   calling Mr. Padish --

16           THE COURT:  Is he your next witness?

17           MR. WINSTEAD:  I'm sorry?

18           THE COURT:  Is he your next witness?

19           MR. WINSTEAD:  He is our next witness, yes, Your

20   Honor.  And he will be testifying about the possible results

21   in a divorce proceeding that's relevant to the Court's

22   determination and so we would ask that the Court rely on

23   that testimony.

24           THE COURT:  Okay.

25           MR. WINSTEAD:  So we would also request that the

REDIRECT - SMITH

1    Court take notice of the timing of both Bianca's deposition

2    and Lori Milliron's deposition.  Lori Milliron's deposition

3    was not admitted in this trial because of earlier

4    evidentiary rulings.  Nevertheless, those were both

5    depositions in the proceedings and so we would ask that the

6    Court take judicial notice that the timing of those

7    depositions is as the Government represents in both 162, and

8    I believe it's also referenced in 232.

9         Then, finally, the only other factual proffer is

10    obviously the statement overheard by Brian Lovelace in

11    Steak 44.  He will be called afterwards, and so we would

12    proffer that statement for the Court's consideration in

13    making its determination.

14         THE COURT:  Hold on.  State 44?

15         MR. WINSTEAD:  Steak 44 is the restaurant, Your

16    Honor, where he was bartending.

17         THE COURT:  Oh, Steak 44.

18         MR. WINSTEAD:  And I would note for the Court that

19    neither defendants are disputing that that statement was

20    made, and so again we would proffer that as to testimony

21    that we anticipate coming out.

22         And then with regard to Ms. Olmstead's statements

23    themselves, both Government's filing at 162 and at 232

24    summarize what we anticipate Ms. Olmstead's testimony will

25    be, and so we would proffer those statements for the Court's

REDIRECT - SMITH

1    consideration in making the determination.  Only some of

2    those statements obviously have to do with the particular

3    80- -- 804(b)(6) determination.  The other ones we do

4    anticipate that that testimony will be elicited from

5    Ms. Olmstead.

6         And I believe that's all of -- that covers all of

7    the facts that either we are requesting judicial notice

8    about or making a proffer.

9         THE COURT:  But how is it that -- I mean, this

10   entire exercise is centered in the main on the applicability

11   of 804(b)(6) here, and the -- in the context of the

12   defendant's now renewed objection to Ms. Olmstead's

13   testimony.  So how is it that -- and -- well, No. 1.

14        No. 2, this is one of those unique objections that

15   requires me, for purposes of resolving and ruling on the

16   objection, to make findings -- factual findings of the Court

17   with respect to certain matters, on a preponderance burden,

18   of course, but still making those findings.

19        So how is it that I can rely -- in order to make

20   the decision as to whether evidence comes in in the first

21   place, how can I rely on the evidence that's being objected

22   to which, if I were to grant the -- or sustain the

23   objection, would not be coming in?  It's credibly circular,

24   don't you think?

25        MR. WINSTEAD:  So I don't believe it is circular,

REDIRECT - SMITH

1      Your Honor.  This is an evidentiary ruling, and so the rules

2      of evidence don't apply to what the Court can consider in

3      order to make the evidentiary ruling.  And that's -- that's

4      well-established.  And probably --

5                  THE COURT:  104 --

6                  MR. WINSTEAD:  Yes, Your Honor.

7                  THE COURT:  Under 104 --

8                  MR. WINSTEAD:  And so I think --

9                  THE COURT:  So you're saying that I can rely on

10     your proffer under 104, even though it's not evidence that's

11     been admitted, to make the decision of whether the -- that

12     evidence is admissible in the first place in terms of on its

13     merits in the trial?

14                 MR. WINSTEAD:  Yes, Your Honor.  So I don't think

15     that -- obviously it's contested that -- whether or not the

16     evidence is admissible under the rules of evidence, but I

17     don't think there's any -- any contesting by the parties

18     that that is going to be the testimony that Ms. Olmstead

19     gives.  And so, again, it's proper to rely on a proffer for

20     her testimony.

21                 That's -- and the only other fact that's being

22     proffered is, again, the Brian Lovelace statement, which the

23     Government anticipates is going to come out, and the parties

24     don't dispute, and so -- so yes, it's the Government's

25     position that the Court relying on the proffer from the

REDIRECT - SMITH

1    Government about what Ms. Olmstead's testimony will be is

2    proper in making a determination under the rules of evidence

3    whether that -- whether that preponderance standard is met.

4              THE COURT:  All right.  I understand.  All right,

5    thank you.

6              Mr. Markus, if you'll take the lectern.  Let me

7    just set some limit on this.  I know it's your motion --

8    your renewed motion.  I did not intend, by asking the

9    Government to make this clarification of the evidence it

10   believes supports its factual contentions in the subject

11   paragraph, to be an entree into a full-fledged oral argument

12   on the motion.  I mean, the parties have not only briefed

13   this in writing on the second go-around, because it's a

14   renewed motion, but briefed it extensively on the first

15   go-around so.  I would like you to limit your response to

16   the specific question I posed to Mr. Winstead and his

17   response.

18             MR. MARKUS:  Yes, Your Honor.  And I'll be very

19   brief.  The -- to rely on the Olmstead statements is, as

20   Your Honor said, circular.  And the reason it's circular is

21   because the whole question about these statements is whether

22   these are credible and trustworthy statements.  And what is

23   the greatest engine for finding out whether something is

24   trustworthy or not:  cross-examination.  And I won't be able

25   to cross-examine the Bianca statements.  That's the whole

REDIRECT - SMITH

1    point of keeping them out is I have no ability to

2    cross-examine Bianca Rudolph.  And so that's why the rule

3    has been set up to say:  It has to be a murder to keep the

4    witness from testifying in one of those proceedings.

5            THE COURT:  But, I mean, doesn't that point out one

6    of the things that makes this question difficult in this

7    case, in that it's entirely atypical of how this issue

8    usually comes up, right?

9            MR. MARKUS:  Yes, Your Honor.

10           THE COURT:  Usually it comes up in the murder of a

11   trial witness who -- and there's no underlying trial going

12   on, right?  This is a radically different situation.

13           MR. MARKUS:  I couldn't agree more with the Court.

14   And that's one of the reasons why I think it shouldn't come

15   in.  They're trying to shoehorn in a statement that if you

16   look at the cases, it never comes in like this.  This is all

17   speculative.  And I won't go into all the arguments we

18   raised, but that's exactly the reason I don't think it

19   should come in, Your Honor.

20           Just regarding the Brian Lovelace statement, the

21   prosecutor's right that we agree that -- to a portion of

22   that statement coming in, but Mr. Lovelace will testify that

23   he did not hear what was said right beforehand, as I said in

24   my opening.  So the context of that statement does not

25   support what the Government is saying.

2074

REDIRECT - SMITH

1           And, of course, Brian Lovelace can't say anything

2    about a pending proceeding or anything like that.  The

3    statement was made in 2020 with Mr. Lovelace.  So -- so,

4    Your Honor, I -- this is one of the areas where courts

5    actually do get reversed on evidentiary rulings on this

6    804(b)(6) issue.  And so I would just ask the Court to be

7    very cautious here because, trust me, none of us want to

8    come back on this case, and so I would just ask the Court to

9    be cautious in this area.

10           THE COURT:  I appreciate the caution.  It's noted.

11           All right.  Thank you.  Let's bring in the jury.

12       (In open court in the presence of the jury at 1:53

13    p.m.)

14           THE COURT:  Government may call its next witness.

15           MR. GREWELL:  Your Honor, the United States calls

16    James Padish.

17           THE COURT:  All right.

18           COURTROOM DEPUTY:  If you'll raise your right hand.

19            JAMES PADISH, GOVERNMENT'S WITNESS, SWORN

20           COURTROOM DEPUTY:  Thank you.  Please be seated for

21    me and then state your full name for the record and spell

22    your first and last names for us.

23           THE WITNESS:  My name is James Padish.  P, as in

24    Peter, a-d, as in David, i-s-h.

25           THE COURT:  You may proceed, counsel.

DIRECT - PADISH

**DIRECT EXAMINATION**

BY MR. GREWELL:

Q.    Good afternoon, Mr. Padish.

A.    Good afternoon.

Q.    What do you do for a living?

A.    I'm a retired judge of the Superior Court of Arizona.
I've returned to private practice.  I have a firm in
Scottsdale, along with my daughter and two other retired
judges.  We focus on mediation, arbitration, and primarily
family law matters, although I do also delve into some other
litigation matters.

Q.    How long have you been practicing in family law
matters?

A.    In family law alone, 22 years, including the time that
I served on the family court bench while a judge, and the
last 18 years that I've been in private practice.

Q.    And what are your day-to-day activities in private
practice?

A.    We have a small shop.  We don't do a high volume of
cases.  We're fortunate enough to be able to handle mostly
high-end divorce cases.  I get hired rather frequently as a
mediator or arbitrator in divorce cases.  My two partners,
who are also retired judges, focus exclusively on mediations
and arbitrations.  In family law one of my partners is the
former presiding judge in the family court.

DIRECT - PADISH

1    Q.    Can you tell the jury a little bit about your

2    educational background.

3    A.    Sure.    I'm a graduate of Indiana University.    I

4    graduated with a bachelor of science degree in 1978.    I

5    graduated from what was then known as the John Marshal Law

6    School in Chicago.    It's now merged with the University of

7    Illinois and it's called the University of Illinois Chicago

8    School of Law.

9          When I was a judge, I attended the National

10   Judicial College in Reno on several occasions, the Arizona

11   Judicial College, and numerous continuing legal education

12   events.

13   Q.    So you do coursework to stay up on family law?

14   A.    Yes.    We're required in Arizona to do 15 hours of

15   community -- of continuing legal education.    And I try to do

16   at least half of that in family law matters.

17   Q.    And when you're talking about family law, are you

18   predominantly talking about divorce cases?

19   A.    Yeah.    When I began practicing, it was known as

20   domestic relations.    It's evolved into being called family

21   court now, but it's divorce cases.    Divorce cases have a

22   couple of different common issues; they're either custodial

23   or financial.

24   Q.    And approximately how many divorce cases would you say

25   you've been involved with over the years?

DIRECT - PADISH

1    A.    As a judge, and the last two years -- approximately two

2    years of my career was on the family court -- I handled 1800

3    cases a year.   Since then, we probably handle 50 to 75 cases

4    times 18 years, so I don't know.   You can do the math.   It's

5    probably north of 4,000.

6    Q.    Are all of those cases Arizona cases?

7    A.    Yes.   I need to put an asterisk by that.   Arizona

8    remains a state where most of our population was born

9    somewhere else or moved from somewhere else, so many of our

10   cases have some different issues regarding the -- which law

11   is to be applied in a particular divorce.   But they're all

12   in Arizona.

13   Q.    Have you testified as an expert on Arizona family law

14   before?

15   A.    Yeah, I have in deposition.   None of the cases that I

16   have been hired as an expert witness in actually proceeded

17   to trial.

18   Q.    Have you ever been excluded as an expert?

19   A.    No.

20        MR. GREWELL:   Your Honor, at this time I'd move

21   under 702 to have Mr. Padish qualified in family law and

22   divorce in Arizona generally, and the application of that

23   law to the facts of this case, including how Arizona courts

24   would resolve the application of the alleged postnuptial

25   agreement in this case.

DIRECT - PADISH

1          THE COURT:  Is there any objection from the

2    defendants?

3          MR. MARKUS:  No objection.

4          MR. DILL:  No, Your Honor.

5          THE COURT:  All right.  There being no objection,

6    Mr. Padish is qualified under Federal Rule of Evidence 702

7    to provide expert opinion testimony in the field generally

8    of family law, divorce in Arizona, and specifically the

9    application of that law to the facts of this case.  And I

10   guess, even more specifically, to the issue of how Arizona

11   courts would resolve the application of the alleged

12   postnuptial agreement in this case.

13         MR. GREWELL:  Thank you, Your Honor.

14   BY MR. GREWELL:

15   Q.   Mr. Padish, I want to discuss with you what a divorce

16   between Bianca and Larry Rudolph would have looked like in

17   2016.

18         First of all, what court system would have had

19   jurisdiction over any 2016 divorce proceedings between the

20   Rudolphs?

21   A.   The Superior Court of Arizona in and for Maricopa

22   County would have had jurisdiction as it was their state of

23   domicile as I saw in the materials that I reviewed,

24   including their depositions.

25   Q.   And in the absence of a valid postnuptial agreement,

DIRECT - PADISH

1    how would their estate have been divided in 2016?

2    A.    I'm going to back into this one if I may.  When we were

3    in law school, we learned in law school 101 that much of the

4    law evolved over the common law.  Even though it was 41

5    years ago, I remember the case of:  If a hunter was hunting

6    a deer and the deer went onto the King's property and he

7    killed the deer, then who owned the deer?  The King or that

8    person?  I've not had a law of ferae naturae in recent time,

9    but most of our law evolved from the common law.

10           There's nothing like that for divorce.  Divorce is

11   a creature of statute.  The only jurisdiction any court has

12   is that which is given to it by the legislature in their

13   statutes.  Arizona is a community property state, which

14   means all property that's acquired in the course of the

15   marital community is considered to be community property,

16   and in the absence of some compelling reason to be allocated

17   50-50.  Arizona's also a no-fault state.  If you want to get

18   divorced in Arizona and your spouse doesn't, you're still

19   going to get divorced.  And if somebody tried to prove that

20   "my husband was a jerk" or "my wife was a spendthrift," it

21   would be objection sustained because we don't care; it's a

22   no-fault state.  So community property, no-fault.

23   Q.    So you mentioned no-fault.  Would allegations of

24   infidelity at all affect your analysis of how the community

25   property would have been divided?

DIRECT - PADISH

1    A.    Yeah.    Yes.    Like many things in the law, there's

2    always an exception to the rule.    Fault is not the way we

3    describe what you've described, Bishop.    Rather, it's a

4    concept called waste, w-a-s-t-e.    And the idea is this:    All

5    of the income that's earned in the course of a marital

6    community is supposed to be spent for the benefit of the

7    marital community.

8          Now, when I go play golf, that makes me a happier

9    man and a better husband, and that's for the benefit of the

10   marital community.    When my wife gets her nails done or her

11   hair done, it's the same thing.    But if you're spending

12   community money for other purposes -- and typically it's

13   extramarital affairs or gambling -- then that's considered

14   to be a waste of community assets and in those instances,

15   the -- the nonresponsible spouse is entitled to be

16   reimbursed one-half of the wasted amount.

17         So if $200,000 was spent in pursuit of some

18   extramarital affair, then the noncheating spouse would be

19   entitled to 100,000.

20   Q.    I'd like to bring up Defense Exhibit R-X, which I

21   believe has already been admitted.

22         Did you review this alleged postnuptial agreement

23   between the Rudolphs?

24   A.    I did.

25   Q.    What law would govern for an Arizona court deciding

DIRECT - PADISH

1    whether this agreement is authentic in the first place?

2    A.    Arizona law.

3    Q.    Okay.  And if Mrs. Rudolph had sought to challenge the

4    document's authenticity, how would she have done so?

5    A.    Because Mrs. Rudolph would be the one challenging

6    whether this is a bona fide agreement or not, that is,

7    whether it really exists, she would have the burden of proof

8    by a preponderance of the evidence that it is not authentic.

9    So she would have the initial burden of proof of showing

10   that this isn't a legitimate agreement.

11   Q.    And what sort of things would a court consider in

12   deciding whether it was in fact an authentic agreement?

13   A.    Well, I mean, you first look to see if people signed

14   it.  That would be the starting point.  I do a fair number

15   of premarital agreements and postnuptial agreements -- and

16   both in Arizona and Pennsylvania.  Prenuptial agreements and

17   postnuptial are treated identical.  A postnuptial agreement

18   is just what it seems to say, it's an agreement that was

19   entered into after the marriage rather than a prenuptial

20   before the marriage.  In the prenups, and rare postnuptial

21   agreements that we do, we always make sure that both sides

22   have an attorney and that the attorneys sign a certification

23   on it as well saying that they explained everything in it.

24        So those are the sort of things that are typically

25   looked at in determining initially whether or not it's an

DIRECT - PADISH

1    authentic agreement.

2    Q.    Could I have page 26, please.

3          Do you see a witness signature on the agreement?

4    A.    I see what you've highlighted.

5    Q.    Yeah.  If that witness could not be identified, would

6    that be a factor into a court's analysis of authenticity?

7    A.    Yes.

8    Q.    And do you see signature lines for attorneys on this

9    page?

10   A.    Sort of.  In -- let me explain why I qualify that

11   answer.  I see a signature line for an identified attorney,

12   Gary Gentile, Esquire.  And then I see a blank line, comma,

13   Esquire.  Esquire's just an antiquated term that some

14   lawyers use to show that we're really special.

15   Q.    Would the lack of attorneys' signatures on those lines

16   be something that the Arizona courts would consider in an

17   authenticity analysis?

18   A.    Sure would.

19   Q.    Could I have page 30, please.

20         What does this page of the postnup appear to be?

21   A.    It -- typed authorization for what appears to be a

22   Lawrence Rudolph and Bianca Rudolph, permission to talk to

23   the individuals who were identified on this page.

24   Q.    Would it factor into a Arizona court's analysis of the

25   agreement's authenticity if these people were not aware of

DIRECT - PADISH

1    the agreement?

2    A.    Yes, it would.

3    Q.    And if the agreement was not found to be authentic, how

4    would the estate then be divided?

5    A.    This postnuptial agreement provides that Pennsylvania

6    law is to control how things go.  But before you get there,

7    you have to first determine whether or not this is an

8    authentic agreement.

9         If the Arizona court found -- and I believe there's

10   considerable evidence from which it could find -- that this

11   agreement is not authentic, then Arizona law would apply,

12   which is community property law.

13   Q.    And so would we be back to a 50-50 split?

14   A.    Yes.

15   Q.    All right.  Let's now assume that the agreement was

16   found to be authentic by the Arizona courts.  What law would

17   the Arizona courts apply in enforcing it?

18   A.    Pennsylvania law.

19   Q.    And would the Arizona courts then be able to actually

20   handle the case if it involved Pennsylvania law?

21   A.    Sure, we do it all day, every day.

22   Q.    Once the agreement was found to be authentic, then,

23   would there be any way for Bianca Rudolph to challenge it or

24   attempt to get it nullified under the applicable

25   Pennsylvania law?

DIRECT - PADISH

1    A.    Yes.    Because each state's divorce law is unique

2    because of their own statutes.    The Pennsylvania courts have

3    interpreted their statutes in a way that says that if Bianca

4    Rudolph wished to challenge this agreement, if it was found

5    to be authentic, that she would have the burden of proving

6    that -- by clear and convincing evidence, that it didn't

7    make reasonable provision for her; that there was inadequate

8    disclosure of the community assets; and that she did not

9    knowingly waive any of the rights that she had.

10           And if she was able to establish that, then the

11   agreement would not be enforced by an Arizona court and

12   Arizona law would once again apply.

13   Q.    What would her -- what would be her burden of proof?

14   A.    Clear and convincing.

15   Q.    Clear and convincing.    So how would she accomplish the

16   first of those tasks, showing that there was no reasonable

17   provision for a spouse?

18   A.    The operative time that you look at in determining

19   whether reasonable provision was made, which is just another

20   way of saying, "Is she getting enough in the agreement," is

21   when the agreement was signed.    Not years later if a divorce

22   were to occur, but the time that this was signed, which

23   purportedly was in August of the year 2000.

24           So in August of 2000, in the materials that were

25   provided to me that I reviewed, it appears that the Rudolphs

DIRECT - PADISH

1    had a marital estate that was specified in their agreement

2    of about -- between -- I think it was about 95 --

3    $9.5 million.  So of that $9.5 million, if Arizona were to

4    allocate the assets, she would get half of it.  The

5    postnuptial agreement provided, however, that she would only

6    receive $2 million in cash, securities or stocks in

7    Mr. Rudolph's sole discretion how it wanted to pay it out to

8    her.  Her own IRA, which I think was about $58,000, her

9    jewelry -- and typically it's the engagement ring -- half of

10   the pots and pans and couches and chairs, and the car she

11   was driving.

12           So what an Arizona court, where applying

13   Pennsylvania law, would do, was look at what she's getting

14   under the postnuptial agreement; 2 million, 58,000 IRA, pots

15   and pans, jewelry, car, compared to what she would otherwise

16   have been entitled to receive under Pennsylvania law.

17           Pennsylvania is not a community property state;

18   it's an equitable distribution state.  What I've learned is

19   not to be confused by the difference between the two.  Most

20   of the time, applying the statutory factors, it comes out

21   the same.

22           There's some other things that a Pennsylvania court

23   can look at in determining how much somebody's going to

24   get -- and they treat waste differently.  Rather the judge

25   in Pennsylvania under Pennsylvania law is entitled to

DIRECT - PADISH

1    consider waste in determining how much is going to go to the

2    nonoffending spouse but, on balance, you're looking at

3    what's she's getting under the postnuptial agreement and

4    what would she otherwise get as measured by the point in

5    time the agreement was signed.

6            So just on the face of that alone, it appears that

7    the provision that was made for her in the postnuptial

8    agreement is just a fraction of what she may have otherwise

9    been awarded had there been no postnuptial agreement.  It

10   also provided for no spousal maintenance.  Spousal

11   maintenance, alimony, are synonymous terms.  There's nothing

12   in there for her to receive any spousal maintenance.

13   Q.   So the sheer numbers here would be evidence that it

14   wasn't a reasonable provision for Mrs. Rudolph?

15   A.   It would be, I think, significant evidence that a judge

16   would give considerable weight to.

17   Q.   All right.  The second factor you mentioned, what would

18   she need to do to show that there was not a full and fair

19   disclosure of the net worth in this case?

20   A.   Attached to the postnuptial agreement is a list of

21   assets, and that's sort of the alpha and the omega of what

22   assets were disclosed.  I found it curious that there was no

23   description of -- of Mr. Rudolph's dental practice.  It's my

24   understanding that there was an entity called The Dentistry

25   that was in existence, of which he was the owner, and it was

DIRECT - PADISH

1    not listed among the assets.  So that would appear to me to

2    be a rather glaring omission or lack of disclosure that

3    would satisfy the second element of the test that the Court

4    would apply in determining whether or not this postnuptial

5    agreement, even if authentic, should be enforced.

6    Q.    And if he didn't in fact actually own The Dentistry at

7    that time, is there anything else that the Court would have

8    considered as not a full disclosure of assets?

9    A.    Yeah.  Pennsylvania law's different than Arizona law in

10   that we value goodwill.  A lot of the divorces that we

11   handle are professional practices:  doctors, lawyers,

12   accountants, dentists, veterinarians.  In Arizona, we

13   consider goodwill to be part and parcel of the

14   professional's livelihood.  Pennsylvania parses it out a

15   little differently.  It does not recognize goodwill with an

16   individual, but it recognizes enterprise goodwill.  And

17   there are some blending of the two.

18        So I don't have enough information to tell you

19   whether or not there was some enterprise good value or not

20   associated with Mr. Rudolph's dental practice --

21   Q.    And --

22   A.    -- whatever form it was in.

23   Q.    And -- but if there were and it was not disclosed here,

24   that would be something that would go to the second

25   factor?

DIRECT - PADISH

1    A.    Yes.

2    Q.    Now let's turn to the last thing that she would need to

3    show:  the knowing waiver of statutory rights.  What would

4    Ms. Rudolph have needed to show that there wasn't a knowing

5    waiver?

6    A.    Mrs. Rudolph would be unable to satisfy that burden, I

7    believe if a lawyer had signed off on her behalf.  We're

8    very careful in the pre- and postnuptial agreements that we

9    do to have each side represented by counsel.  And typically

10   there's a provision in these agreements that's an attorney's

11   certification, where the attorney certifies, "I explained

12   everything to my client.  I told them everything.  I told

13   them these are all the assets that they have.  If they want

14   to know more, they can find out more, and I'm satisfied that

15   they know what they're doing."

16        The absence of not only such an attorney

17   signature -- certification, but any signature by an attorney

18   here, I think would be found by an Arizona court to be

19   considerable evidence that she may not have knowingly waived

20   any statutory rights that she had.

21   Q.    So in reviewing all the materials that we've discussed

22   so far, did you then arrive at an expert opinion on the

23   likelihood of her success in challenging the postnuptial

24   agreement in 2016?

25   A.    I don't believe it's appropriate for me to guess what

DIRECT - PADISH

1    another judge would do if presented this evidence.  But I

2    will tell you that based upon my review of this matter,

3    there would be considerable evidence from which an Arizona

4    trial judge could find that this agreement should not be

5    enforced.

6    Q.   And if you could remind the jury what her share of the

7    marital estate would have been in the absence of a valid

8    postnuptial agreement.

9    A.   Oh, half of 9.5 million, plus or minus a couple

10   100,000, her waste claim, and she would be entitled to

11   alimony or spousal maintenance as well.  She was, to my

12   understanding, not employed primarily during the marriage.

13   It's a marriage of significant duration.  She was at an age

14   where the likelihood of gainful employment was pretty dim.

15          Conversely, Mr. Rudolph was a good earner, so she

16   would have been in line for spousal maintenance.  I mean,

17   I -- if this was an Arizona case, I would peg her at a

18   minimum of being awarded between 7500 to 9500 a month for at

19   least 48 months.  If you take the top end of that 9500 over

20   48 months, that's a little north of $450,000.

21   Q.   And that would be in addition to half the marital

22   estate?

23   A.   Yes.

24   Q.   And would giving her half of the marital estate include

25   an equal share in Dr. Rudolph's dentistry practices?

DIRECT - PADISH

1    A.    Yeah.

2    Q.    So if the estate here were, say, even valued at

3    $15 million, would she get half of that, then?

4    A.    Approximately.  I mean, you're not allowed to double

5    dip.  So if you're getting spousal maintenance, the idea is,

6    well, you don't get half the value of the practice that's

7    generating that money and then a full boatload of spousal

8    maintenance.  So you may take less for your award of the

9    professional practice and more in spousal maintenance or

10   more spousal -- or vice versa.

11   Q.    And I just have one last question for you, Mr. Padish:

12   Let's assume one last scenario.  Let's assume that the

13   Arizona courts decide to enforce the postnuptial agreement.

14   How would the marital estate have been divided at that

15   point?

16   A.    In -- referring to 2016?

17   Q.    Yes.

18   A.    From the materials that I reviewed in 2016, the

19   marital -- the overall value of the marital estate had

20   shrunk to a little north of $5 million.  I mean, it's not a

21   bad problem to have, but it shrunk to about 5 million.

22         The postnuptial agreement provides that she's to

23   get $2 million plus what I previously mentioned.  So, I

24   mean, math isn't my strong point but I think that's about 40

25   percent of the overall value of the estate would be awarded

CROSS - PADISH

1    to her if the postnuptial agreement was enforced.  Again,

2    she would get no spousal maintenance.

3    Q.   So regardless of the value of the estate, she would

4    have received $2 million?

5    A.   Yes.

6            MR. GREWELL:  No further questions, Your Honor.

7            THE COURT:  All right.  Thank you.

8    Cross-examination.

9                    CROSS-EXAMINATION

10   BY MR. MARKUS:

11   Q.   Good afternoon, ladies and gentlemen.  Counsel.  Your

12   Honor.

13           Mr. Padish, I'm David Markus.  I represent

14   Dr. Rudolph and I'm going to ask you a couple of questions,

15   if I might.

16   A.   Yes, sir.

17   Q.   Just to start off, you said an Arizona court could find

18   something or it could not find something, right?

19   A.   No, I said it could.  I didn't say it couldn't.

20   Q.   Well, your opinion is it might find something, but it

21   might not, right?

22   A.   Yes.

23   Q.   Okay.  And the prosecutors asked you -- the

24   prosecutors -- this prosecutor asked you to make a bunch of

25   assumptions, right?  He asked you to assume that Bianca

CROSS - PADISH

1    wanted a divorce.  Assumption No. 1, correct?

2    A.    No.

3    Q.    Of course, we don't get into divorce court unless

4    someone files for divorce, right?

5    A.    Correct.

6    Q.    So assumption No. 1, the whole purpose of you

7    testifying is assuming she wants a divorce.  She files for

8    divorce, right?  That's assumption No. 1.

9    A.    You're asking me to make that assumption?

10   Q.    That's what he asked you to make in your whole

11   testimony here is assuming there was a divorce proceeding,

12   right?

13   A.    I'm not assuming Mrs. Rudolph or Mr. Rudolph was the

14   petitioner.  I'm just assuming that a divorce was pending.

15   Q.    Fair enough.  You're assuming a divorce is pending.

16   Somebody filed for a divorce, right?  Somebody had to file

17   that divorce, correct?

18   A.    Yes.

19   Q.    Assumption No. 2 that the prosecutor asked you to make

20   is that someone challenged the postnuptial agreement.  The

21   only person who would do that is Bianca Rudolph, correct?

22   A.    Well, either of them could.

23   Q.    The prosecutor asked you to assume that she was the one

24   challenging.  Remember, you said the burden of proof would

25   be on her by a preponderance and other things?  Do you

2093

CROSS - PADISH

1    remember that?

2    A.    Right.

3    Q.    So the prosecutor asked you to assume that she would be

4    challenging the agreement, correct?

5    A.    Well, implicitly he did, I guess, but that wasn't the

6    question.

7    Q.    Okay.  He also asked you to assume that she would be

8    saying she didn't sign the agreement, correct?  That it

9    wasn't authentic, right?

10   A.    I don't recall him asking me to assume that she would

11   testify that she did not sign it.  I did understand that he

12   asked me to assume that it was unsigned.

13   Q.    Okay.  The prosecutor asked you about some of the

14   evidence in this case that you would consider if you were

15   determining whether the postnup was valid or not.  One thing

16   he didn't ask you or mention to you is whether you would

17   take into account that an FBI expert that was qualified by

18   the Government said that it was her signature.  Is that

19   something you would consider?

20   A.    Sure.

21   Q.    Would you consider that --

22   A.    Let me rephrase that.  I'm sorry, Mr. Markus.  I

23   believe that any Arizona family court trial judge would

24   consider that.  And I would, too, if I were still on the

25   bench.

2094

CROSS - PADISH

1    Q.    Would you consider that an expert for Dr. Rudolph

2    corroborated that finding -- so that experts on both sides

3    said it was Bianca Rudolph's signature -- is that something

4    any Arizona judge would consider?

5    A.    Yes.

6    Q.    Because that's pretty powerful evidence when two sides'

7    experts agree on something, right?

8    A.    I don't know that I can answer that question out of

9    context.

10   Q.    Do you think it's powerful when two sides' experts

11   agree on a fact?  Is that typically a fact that a judge

12   might say, "You know, if both sides' experts agree, I'm not

13   going to get in the way of that"?

14   A.    Sure.

15   Q.    You mentioned that under Arizona law, the burden of

16   proof would be on the person challenging the postnup by a

17   preponderance of the evidence.  Do you remember saying that?

18   A.    Challenging the authenticity of the agreement --

19   Q.    Challenging the authenticity --

20   A.    -- rather than the enforceability.

21   Q.    Would be a preponderance of the evidence, correct?

22   A.    Yes.

23   Q.    Now, there's lots of different burdens of proof in our

24   justice system.  One is preponderance of the evidence,

25   right?

CROSS - PADISH

1    A.    That's one.

2    Q.    That means more likely than not, correct?

3    A.    Yes.

4    Q.    In other words, tipping the scales in your favor,

5    that's what you have to prove, correct?

6    A.    Yes.

7    Q.    So in this case, the person challenging it would have

8    to prove that the two experts got it wrong, correct?

9    Because, as you said, a judge would consider those two

10   expert opinions, correct?

11   A.    I'm trying to catch up with you, Mr. Markus.  Would

12   you -- which question do you want me to answer?

13   Q.    I'd like you to answer that if you were to prove

14   something by a preponderance of the evidence, you would have

15   to show that those two experts got it wrong.

16   A.    Yes.

17   Q.    Okay.  And so --

18            THE COURT:  One second, counsel.  Mr. Jackson, we

19   need you to stay with us, please.

20            THE JUROR:  I'm . . .

21            THE COURT:  All right.  Go ahead.  Go ahead,

22   counsel.

23   BY MR. MARKUS:

24   Q.    So that's under the preponderance of the evidence

25   standard.  Now, if we could put up R-W, which is already in

CROSS - PADISH

1    evidence, please -- the very first page of it.  Okay.

2            This is the agreement that we were just discussing,

3    right, Mr. Padish?  Do you see it there on your screen?

4    A.   Yes, I do.

5    Q.   Okay.  If we could go to page 2, which is LR-88.  If we

6    could zoom in on that area there, Mr. Reyes, of the

7    agreement.

8            Do you see where it says:  It is the intention of

9    the parties hereto that the laws of Pennsylvania shall

10   apply?

11   A.   Yes.

12   Q.   Okay.  That's what we call a choice-of-law provision;

13   right?

14   A.   Correct.

15   Q.   And under Pennsylvania law, courts presume the validity

16   of a postnuptial agreement, right?

17   A.   Of an authentic postnuptial agreement, yes.

18   Q.   Okay.  They presume the validity of a -- if the Arizona

19   court has said it's authentic, they presume the validity of

20   the Pennsylvania agreement, yes?

21   A.   Yes.

22   Q.   Okay.  And to get rid of this agreement -- in other

23   words to invalidate it -- you mentioned to the jury the next

24   level of proof, which is clear and convincing evidence,

25   right?

CROSS - PADISH

1   A.    Correct.

2   Q.    Now, clear and convincing evidence is higher than

3   preponderance, right?

4   A.    Yes.

5   Q.    It's a tougher burden of proof to meet, correct?

6   A.    Yes.

7   Q.    So if someone wanted to invalidate this agreement, they

8   would have to get past the preponderance standard of proof

9   and get to the clear and convincing evidence, right?

10  A.    That's correct.

11  Q.    And the Supreme Court has defined clear and convincing

12  evidence as, quote, the evidence is highly and substantially

13  more likely to be true than untrue.  In other words, the

14  factfinder must be convinced that the contention is, quote,

15  highly probable.  You know that, correct?

16  A.    I accept that is an explanation of the standard, yes.

17  Q.    That's the Supreme Court of the United States, *Colorado*

18  *v. New Mexico*.  You're familiar with that case, right,

19  sir?

20  A.    Well, sure.  State courts follow their own case law in

21  regard to clear and convincing standards, but you've in all

22  regards adequately described it.

23  Q.    Okay.  That's not --

24        THE COURT:  One second, counsel.  Mr. Padish, can

25  you move a little closer to your mic and pull the mic

CROSS - PADISH

1    towards you.

2              THE WITNESS:  Sure.

3              THE COURT:  Thank you, sir.

4              THE WITNESS:  You're welcome.

5    BY MR. MARKUS:

6    Q.    Mr. Padish, that's not me describing it; that's the

7    Supreme Court of the United States defining "clear and

8    convincing evidence."  Do you have any argument with that

9    definition?

10   A.    No, absolutely not.

11   Q.    Great.  If we could pull out of this one.  And we can

12   take that down for a second.

13             So for beyond preponderance, beyond clear and

14   convincing, there's only one level of proof that's higher

15   than that in our system.  What level of proof is that, sir?

16   A.    Proof beyond a reasonable doubt.

17   Q.    And that's a really, really high standard of proof,

18   right?

19   A.    It's the highest standard of proof known in American

20   jurisprudence.

21   Q.    Very good.  Let's talk about Pennsylvania law for a

22   moment about postnuptial agreements.  If we could go to

23   LR-88 and the bottom of that page.  The very last "whereas"

24   on that page.

25             You see where it says:  There has been a full,

CROSS - PADISH

1    complete, and fair disclosure of the financial worth,

2    property, estate, income, and liabilities as reasonably

3    practicable?

4    A.    Yes.

5    Q.    Now under Pennsylvania law, that's all that's required

6    is that the parties acknowledge that there's been a full,

7    complete, and fair disclosure, correct?

8    A.    I don't think that's entirely correct.

9    Q.    Are you familiar with the case *Paroly v. Paroly* at 876

10   Atlantic 2d 1061, 2005, which says, quote, If an agreement

11   provides that full disclosure has been made, a presumption

12   of full disclosure arises?

13   A.    I'm not familiar with the case, but I'm -- I don't

14   quarrel with that.

15   Q.    Very good.  Let's pull out of that page, then, and go

16   to LR-92.

17        And do you see where it says in the middle of the

18   page, "legal advice acknowledgment"?

19   A.    Yes.

20   Q.    And if we could zoom in on that section.

21        Do you see where it says:  The wife acknowledges

22   that she has had an opportunity to fully and completely

23   discuss each and every term and provision set forth in this

24   agreement with an attorney of her choosing prior to the

25   execution hereof?  Do you see that?

CROSS - PADISH

1    A.    I do.

2    Q.    And under Pennsylvania law, that acknowledgment is

3    presumed valid, correct?

4    A.    That term as an acknowledgement is presumed valid and

5    it's coupled with the signature of the attorney who is

6    referred to.

7    Q.    You haven't spoken to the attorneys in this case that

8    drafted and retained this postnuptial, have you?

9    A.    No.

10   Q.    That would be relevant evidence if you were sitting and

11   trying to determine whether this agreement was valid.  You

12   would want to hear from the attorneys who drafted it, what

13   they said to the parties, and so on, wouldn't you?

14   A.    If the enforceability of the agreement was being

15   challenged, yes.

16   Q.    And you haven't spoken to them, have you?

17   A.    No.

18   Q.    And you've made an opinion without knowing all of the

19   facts in this case?

20   A.    Well, that's kind of like asking me if I stopped

21   beating my wife, Mr. Markus.

22   Q.    I hope you have, but is it fair to say you haven't --

23   you don't know all the facts in this case; is that fair?

24   A.    No, that's absolutely true.

25   Q.    And in fact, the first opinion that you reached months

CROSS - PADISH

1    ago, you reached before knowing that two document examiners

2    said this was a valid agreement, right?

3    A.    Yes.

4    Q.    You only came to your second conclusion after being

5    provided more information, correct?

6    A.    That's correct.

7    Q.    And you haven't spoken to the attorneys in this case,

8    right?

9    A.    No.

10   Q.    Did you know that there is a whole file of

11   correspondence between Dr. Rudolph and his attorneys

12   providing for the hiring of an attorney for Mrs. Rudolph?

13   A.    No, but that wouldn't factor into my thoughts about

14   whether Mrs. Rudolph consulted with an attorney or was

15   adequately advised.

16   Q.    You'd want to know whether an attorney was retained for

17   her, right?

18   A.    Sure.

19   Q.    Are you aware that Dr. Rudolph sent money to his

20   attorney so that they could have Bianca Rudolph represented

21   during this postnuptial agreement?

22   A.    I do recall seeing documentation that Mr. Rudolph sent

23   money to his lawyer, yes.

24   Q.    Okay.  Fair to say that you have no idea what the

25   Pennsylvania lawyer advised Dr. Rudolph about the validity

CROSS - PADISH

1    of this agreement, right?

2    A.    Yeah, that's fair.

3    Q.    Okay.  By the way, under a case called *Simeone*,

4    S-i-m-e-o-n-e, no legal counsel is required to either advise

5    a spouse before signing a postnup or to sign a postnup,

6    correct?

7    A.    That's correct, both in Pennsylvania and in Arizona.

8    Q.    So just to be clear for the jury, no lawyer was

9    required to advise either spouse before signing the postnup

10   for it to be valid, correct?

11   A.    Yes.

12   Q.    And no lawyer was required to sign the postnup for it

13   to be valid, correct?

14   A.    Well, not required by statute or case law.

15   Q.    Well --

16   A.    But in good practice, yes, one would be required.

17   Q.    Okay.  But we're not talking about good practice here,

18   we're talking about what's required under the law.  Let me

19   ask you:  Postnuptial agreements are just like any other

20   contract, right?

21   A.    They're interpreted pursuant to contract law.  I think

22   it's an over-reach to say they're like any other contract.

23   Q.    Are you aware that under Pennsylvania law, the cases

24   for -- all the way to the Supreme Court say that postnuptial

25   agreements shall be interpreted just like any other

CROSS - PADISH

1    contract?  Are you aware of that?

2    A.    Sure, that's what I said.

3    Q.    Okay.  And we sign contracts all the time without legal

4    counsel, correct?

5    A.    I don't.

6    Q.    You don't?  You don't sign a contract with a painter,

7    let's say, without having your lawyer look it over?

8    A.    I'm an attorney, sir.  So I'm looking at the contract

9    before I sign it.

10    Q.    Okay.  You're a lawyer.  But the rest of us who may not

11    be lawyers, when they sign a contract, they don't need to go

12    to a lawyer to have it signed, right?

13    A.    Well, I guess it depends how much money's at stake.

14    Q.    Fair enough.  Fair enough.  In other words, sometimes

15    you may want to see a lawyer, right?

16    A.    I would hope so.

17    Q.    But under Pennsylvania law, there's no requirement of

18    it, and postnuptial agreements get validated and approved

19    all the time without lawyers either advising or signing it,

20    correct?

21    A.    I don't know.

22    Q.    Because you're not a Pennsylvania lawyer, right?

23    A.    Nor am I familiar with what goes on every day in the

24    Pennsylvania court.

25    Q.    Very good.  If we could call up LR-93, please.

CROSS - PADISH

1          You see in the bottom section there, No. 4, "full

2     disclosure of assets"?

3     A.    Yes.

4     Q.    You're aware that under Pennsylvania law, this section

5     here, "full disclosure of assets," means that the Court in

6     Pennsylvania will presume that there was a full disclosure

7     of assets?  You're aware of that, correct?

8     A.    Yes.

9     Q.    And you're aware that under Pennsylvania law under a

10    case called *Stoner v. Stoner*, 527 Pennsylvania 665, 2003,

11    Pennsylvania Supreme Court case, it said that courts in

12    Pennsylvania will expressly reject an approach which would

13    allow the Court to inquire into the reasonableness of the

14    bargain or the parties' understanding of the rights they

15    were relinquishing.  You're aware of that case, are you not?

16    A.    Generally, yes.

17    Q.    And that's a correct statement of the law by the

18    Pennsylvania Supreme Court, right?

19    A.    It is.

20    Q.    And what they're saying there is that courts in

21    Pennsylvania are not going to dive into the contract or the

22    postnup to determine whether it's reasonable or not, right?

23    A.    I think that's too broad a reading of that case.

24    Q.    Well, it says:  "We expressly reject an approach which

25    would allow any court to inquire into the reasonableness of

CROSS - PADISH

1    the bargain."

2           Do you quibble with that language from the

3    Pennsylvania Supreme Court?

4    A.    No, that's consistent with what I have said in regard

5    to the burden of proof that Mrs. Rudolph would have had if

6    she chose to contest the enforceability of the agreement,

7    which requires the Court to look at whether a reasonable

8    provision was made.  So I think you have to read that in

9    harmony with the rest of the statutes.

10   Q.    And what the Court said in *Simeone*, S-i-m-e-o-n-e, is

11   that other states may take a paternalistic view where

12   they're going to try to see if the woman understood all the

13   factors of the postnup, but in Pennsylvania, the Court said

14   that, quote, A paternalistic requirement of reasonableness

15   is no longer supported since the law has advanced to

16   recognize the equal status of men and women in our society.

17   Women don't need to be protected anymore from the terms of

18   the agreement.

19           Are you familiar with that case, sir?

20   A.    I am.  Remind me of the year of that case.

21   Q.    1990, sir.

22   A.    Thank you.

23   Q.    And what that case is saying, is it not, Mr. Padish, is

24   that the courts are going to presume that the people who

25   sign an agreement know what they're signing.

2106

CROSS - PADISH

1   A.   Yes.

2   Q.   And that we're going to presume the validity of the

3   agreement, correct?

4   A.   Yes.

5   Q.   And, in fact, that case overruled the case that you

6   cited in your report, *Estate of Geyer*, a case from three

7   years prior, 1987, that case, *Simeone*, said *Geyer's* no

8   longer good law.  Are you aware of that, sir?

9   A.   In regard to the specific provision that you cite to,

10  yes.

11  Q.   Very good.  Did you note in your report that that case,

12  *Estate of Geyer*, was overruled by a later case, *Simeone*?

13  A.   I don't believe I did.

14  Q.   Okay.

15  A.   Because the proposition I state -- I cited it for still

16  stands as good law.

17  Q.   If we could turn to -- that's okay.

18       You agree with me that the marital estate in 2000,

19  when this postnup was signed, was about 9 million; is that

20  what you said?

21  A.   I seem to recollect 9 1/2 million, but I won't quibble

22  with you.

23  Q.   Okay.  And so regardless of when a hypothetical divorce

24  proceeding would start, whether it's in 2000 or in 2016,

25  under Pennsylvania law, no matter how much the estate had

2107

CROSS - PADISH

1    risen or declined, she would get the 2 million, plus what

2    was in the postnuptial agreement, correct?

3    A.    That's true.

4              MR. MARKUS:  Okay.  One moment, Your Honor.

5              THE COURT:  All right.

6    BY MR. MARKUS:

7    Q.    And just let me know:  Have you had a chance to review

8    the law firm file regarding the family law matter between

9    Dr. and Mrs. Rudolph?

10   A.    I saw some documents.  I don't know that it constitutes

11   the entire file or just a portion of it.  I presumed it was

12   from the -- an attorney's file.

13   Q.    Are you -- do you remember reading in the file that

14   Dr. Rudolph initially saw the family lawyers in Pennsylvania

15   because he, himself, wanted a divorce?  Do you remember

16   that?

17   A.    I don't.

18   Q.    Do you remember that he initially retained the divorce

19   firm in Pennsylvania because he asked them to draw up

20   divorce papers?

21   A.    I don't recall that.

22   Q.    And are you aware, sir, that shortly after that

23   Dr. Rudolph and Bianca Rudolph reconciled?

24   A.    Well, I'm aware of it just because of subsequent

25   events.

CROSS - PADISH

1    Q.    And are you aware that as part of the reconciliation,

2    Dr. Rudolph informed the lawyers that his wife would agree

3    to a postnuptial agreement?

4    A.    I don't recall.

5    Q.    Have you had a chance to look at the billing records

6    for the law firm where they say after reconciliation,

7    they're going to start to draft the postnuptial agreement

8    that Dr. Rudolph and Bianca Rudolph agreed that they would

9    sign?

10   A.    I may have.  I don't have a specific recollection of

11   it.

12   Q.    Do you have a specific recollection of letters going

13   back and forth between the law firm and Dr. Rudolph about

14   this reconciliation and the postnup and his assets and how

15   to disclose those assets as an attachment to the postnup?

16   A.    No.

17   Q.    Okay.  Would all of those facts -- the prosecutor asked

18   you what facts would you take into account in trying to

19   determine whether this was a valid postnup.  Are those the

20   kinds of facts that you would also consider in addition to

21   the two document examiners?

22   A.    By "valid postnuptial agreement," do you mean an

23   enforceable postnuptial agreement or an authentic

24   postnuptial agreement?

25   Q.    Both, sir.

CROSS - PADISH

1   A.   Well, there's two different answers.  If it's --

2   whether it's authentic, the answer is no, that wouldn't

3   affect me at all.

4   Q.   It wouldn't affect you to know that Dr. Rudolph was

5   asking his lawyers to stop the divorce proceeding and to

6   have them draw up a postnup because he and his wife decided

7   to reconcile?  That wouldn't have any effect on you?

8   A.   As to whether or not this particular exhibit is an

9   authentic document.

10  Q.   Yes, sir.

11  A.   No.  If it did, it would be minimal.

12  Q.   Okay.  The prosecutor also asked you -- last area,

13  Mr. Padish.  The prosecutor also asked you to assume this

14  hypothetical divorce proceeding.  Are you aware that Bianca

15  Rudolph was deposed in July of 2016?

16  A.   Yes.

17  Q.   Are you aware that she said under oath:  "I am not a

18  long-suffering wife.  I've never been a long-suffering wife.

19  My husband and I have been married for, at the time, 30-some

20  years happily married"?

21        Are you aware that she testified to that under

22  oath?

23  A.   I read her deposition transcript and --

24  Q.   Doesn't sound like divorce, does it?

25  A.   Well, in -- my world's different than yours because

REDIRECT - PADISH

1  often that's the calm before the storm.

2  Q.    Thank you, sir.

3          THE COURT:  Any cross, Mr. Dill?

4          MR. DILL:  No, Judge.

5          THE COURT:  All right, redirect.

6                    REDIRECT EXAMINATION

7  BY MR. GREWELL:

8  Q.    Mr. Padish, Arizona courts, would they have to

9  determine the document's authenticity before you would get

10  to the Pennsylvania law -- choice-of-law provision?

11  A.    Yes.  Yeah.  Yes.

12  Q.    So you wouldn't get to Pennsylvania law until the

13  document has been confirmed authentic by the Arizona courts?

14  A.    That's true.

15  Q.    Is handwriting analysis infallible?

16  A.    No.

17  Q.    Would any handwriting analysis be considered in the

18  context of other evidence?

19  A.    It -- yes.  You -- part of the challenge in rendering

20  opinion testimony like this is -- I don't know what you've

21  heard before I came in here.  I don't know all of the other

22  evidence.  The judge does and the judge would consider all

23  of the evidence in toto rather than just cherrypicking out a

24  particular piece of evidence and holding it up to be the

25  end-all of resolution of the issue at hand.

REDIRECT - PADISH

1    Q.    Would handwriting analysis necessarily be given more

2    weight than witnesses testifying that something's a forgery?

3    A.    Yeah, it depends.  I can't say.

4    Q.    And you testified that even if it was authentic,

5    Mrs. Rudolph would still have evidence to challenge the

6    document's enforcement; is that correct?

7              MR. MARKUS:  Leading, Your Honor.

8              THE COURT:  Sustained.

9    BY MR. GREWELL:

10   Q.    If the document here was considered authentic, would

11   Mrs. Rudolph still have grounds to challenge it under

12   Pennsylvania law?

13   A.    As I indicated earlier, I believe that there would

14   be -- there is considerable evidence that she could rely

15   upon to challenge its enforceability.  Whether at the end of

16   the day the judge would find it to be in force or not is not

17   for me to say.

18   Q.    Do you recall being asked about a provision regarding

19   whether there was a full and complete disclosure in the

20   post- -- in the postnup agreement?

21   A.    I did.  I do.

22   Q.    Sorry.  And do you recall being asked about a

23   disclosure suggesting that the parties had been advised by

24   attorneys?

25   A.    Yes.

REDIRECT - PADISH

1    Q.    And in both those, you were asked if those statements

2    would be given a presumption under Pennsylvania law,

3    correct?

4    A.    Yes.

5    Q.    Is a presumption the end of a legal question?

6    A.    No.    It's the starting off point rather than -- if it

7    were a race, both runners being lined up at the start, one

8    runner starts with a head start.    That's what the

9    presumption gives them.

10   Q.    And so parties can provide other evidence to overcome

11   that presumption.

12   A.    Yes.

13   Q.    Are you aware that Mr. Gentile, the lawyer that's

14   identified in the postnup, is no longer alive?

15   A.    No.

16   Q.    The inquiry about the reasonableness of the spousal

17   provision, does that only protect women?

18   A.    No.

19   Q.    Did you rely on *Estate of Geyer* for any overruled

20   propositions?

21   A.    No.    *Geyer* continues to be cited for that proposition

22   that's contained in my report.

23   Q.    And is the absence of a lawyer's signature on the

24   agreement something that would affect its authenticity?

25   A.    Yes.

REDIRECT - PADISH

1    Q.    Is the absence of any advice from lawyers something
2    that would go to the factors considered to nullify a
3    postnuptial agreement?
4    A.    It's one of the factors that I think a trial court
5    would give considerable weight to.
6    Q.    And if several million dollars were at stake, would you
7    expect there to be lawyers advising a party on a postnuptial
8    agreement?
9    A.    Let me answer it this way:  In the higher-end prenups
10   and few postnups that we do, in order to make sure that --
11   in law school they call it belt and suspenders; make sure
12   your pants don't fall down.  We have a court reporter there,
13   and often we have a videographer there.  And we go through
14   the agreement, allow people the opportunity to ask any
15   questions they have so that we have completely nailed shut
16   the door of whether or not somebody has knowingly and
17   voluntarily and intelligently entered into an agreement.
18            So the lack of an attorney's signature's the
19   opposite of that.
20            MR. GREWELL:  May I have one moment, Your Honor?
21            THE COURT:  You may.
22            MR. GREWELL:  Your Honor, Government has no further
23   questions and is fine with the witness being excused.
24            THE COURT:  All right.  May this witness be excused
25   for the defendants?

2114

REDIRECT - PADISH

1          MR. MARKUS:  Yes, Your Honor.

2          MR. DILL:  Yes, Your Honor.

3          THE COURT:  Mr. Padish, thank you so much for your

4     testimony.  You're excused.  You may step down.

5          Mr. Fields, is the Government's next witness the

6     witness that's the subject of the renewed motion by

7     Defendant Rudolph?

8          MR. FIELDS:  It is, Your Honor.

9          THE COURT:  All right.  All right, folks, this is

10    early for our afternoon recess, but in addition to the

11    afternoon recess, there's a matter that the lawyers and I

12    have been in discussion about for quite a while now and I

13    have to make a ruling on that.  We have to finalize it and

14    there's some other discussions.

15          So what I'm trying to tell you is that we're going

16    to take our afternoon recess early and it will be longer

17    than 15 minutes.  All right?  So you're free to leave the

18    building for a little bit if you wish.  For now, the jury is

19    excused for the duration of the recess.

20          (Jury left the courtroom at 2:52 p.m.)

21          THE COURT:  All right, heads-up to the attorneys.

22    As you just heard me tell the jury, we're going to take our

23    afternoon recess now.  At some point that I can't tell you

24    right now, I will come back on the bench and I will make my

25    ruling on the Defendant Rudolph's renewed motion with

REDIRECT - PADISH

1    respect to the exclusion of the testimony of witness

2    Olmstead.

3         So lawyers can leave the courtroom for 15 minutes

4    because we're going to have a minimum of that.  And then

5    after that, I'm directing you to be back in the courtroom.

6    All right, we'll be in recess.

7         (Recess taken 2:53 p.m. to 3:36 p.m.)

8         THE COURT:  All right, I am prepared to rule on the

9    renewed objection filed by Defendant Rudolph related to the

10   anticipated testimony of Cassandra Olmstead, filed at ECF

11   231.

12        The Court notes that Rudolph previously moved to

13   exclude the hearsay statements that Bianca Rudolph allegedly

14   made to Ms. Olmstead.  The Court denied the motion without

15   prejudice, stating that, quote, Rudolph may raise these

16   arguments again as an objection at trial, if appropriate,

17   given the evidence that has or has not been introduced at

18   that point in the trial and before Olmstead testifies, end

19   quote.

20        The Government plans on calling Olmstead to elicit

21   testimony from her regarding Bianca's alleged statements

22   regarding divorce and whether the Rudolphs signed a

23   postnuptial agreement dividing their assets.  The Government

24   argues that these hearsay statements satisfy Federal Rule of

25   Evidence 804(b)(6), the forfeiture by wrongdoing and

REDIRECT - PADISH

exception, because Rudolph killed Bianca to keep her from
testifying about the postnuptial agreement in a future
divorce proceeding, or from testifying further in the 2012
civil defamation action.

By contrast, Rudolph argues there's no evidence
that Bianca threatened Rudolph with divorce or that Rudolph
killed Bianca to keep her from testifying in a future
divorce proceeding.  Further, Rudolph argues there's no
proof that Rudolph tried to prevent Bianca from testifying
in the civil defamation lawsuit he brought against SCI.
Instead, Rudolph points out that Bianca was deposed in
connection with the lawsuit against SCI and provided
testimony favorable to him, thus, according to Rudolph,
there was no need for Rudolph to kill Bianca to make her
unavailable for her deposition.

Rule 804 provides for exceptions to the rule
against hearsay when the declarant is unavailable as a
witness.  Under Rule 804(b)(6), a statement offered against
a party that wrongfully caused, or acquiesced in wrongfully
causing, the declarant's unavailability as a witness, and
did so intending that result, is not excluded by the rule
against hearsay if the declarant is unavailable as a
witness.

The Court must answer two factual questions to
decide whether Bianca's challenged statements to Olmstead

REDIRECT - PADISH

1    are admissible under Rule 804(b)(6).  The first:  Did

2    Rudolph cause Bianca's unavailability by killing her?  And,

3    two, did he do so with the intention of making her

4    unavailable as a witness?

5            Although the parties' reasoning appears to differ,

6    they agree that based on the advisory committee notes

7    regarding Rule 804(b)(6), and Tenth Circuit precedent, the

8    Court must make preliminary factual findings on these two

9    questions under the preponderance of the evidence of the

10   evidence standard.  See *Davis v. Washington*, United States

11   Supreme Court opinion, and *United States v. Cherry*, a

12   decision from our circuit.

13           As an initial matter, the Court finds that it need

14   not hold an evidentiary hearing to rule on Rudolph's

15   objection to Olmstead's future testimony.  Although courts

16   in the Tenth Circuit usually conduct an evidentiary hearing

17   in cases in which this issue arises, this case is unique.

18   Here, the unavailable declarant in this case is also the

19   victim and, therefore, the evidence elicited at trial is the

20   same evidence the Court would hear at an evidentiary hearing

21   to address Rudolph's objections to Olmstead's testimony.

22           The Court also notes that Rudolph has not

23   explicitly requested an evidentiary hearing in his brief or

24   in his discussions with the Court on the record, though he

25   does cite cases in his brief in which evidentiary rulings

REDIRECT - PADISH

1    were held.  As a result, the Court concludes that there is

2    no need to conduct a separate evidentiary hearing.

3        Additionally, before addressing the substance of

4    the statements the Government wishes to introduce, the Court

5    examines other statements to which Rudolph did not object in

6    his brief.

7        The Court agrees with the Government that Rudolph

8    did not specifically renew his challenges to many of

9    Bianca's alleged statements to Olmstead.  In its brief, the

10   Government nonetheless explains the reasons for which these

11   statements are not hearsay, and the reasons for which they

12   are offered, none of which come within Rule 804(b)(6).

13   Therefore, the Court need not address each of these numerous

14   statements at this time.

15       For the following reasons, the Court finds that the

16   Government has established by a preponderance of the

17   evidence that Rudolph caused Bianca's unavailability by

18   killing her:

19       Several witnesses testified that Rudolph told them

20   that when Bianca was shot in their hunting cabin, she was in

21   the -- he was in the adjoining bathroom.  There has been

22   testimony that the muzzle of the shotgun was approximately 1

23   to 3 feet from Bianca's chest when she was shot.  Mark

24   Swanepoel testified that when packing the gun in a soft

25   case, one would normally point the barrel toward the ground,

REDIRECT - PADISH

1    not towards one's own body, when pushing it into the case.

2           And other witnesses testified that a basic safety

3    precaution gun owners take is to avoid pointing the barrel

4    of a gun at one's self or another person.  Dr. Musawa, who

5    conducted Bianca's autopsy, opined that she was shot by a

6    projectile moving in a slightly downward direction.  Coupled

7    with the testimony of Dr. Stephen Cina, who testified that

8    if Bianca's death were involved -- if her death involved an

9    accidental discharge of the weapon, the shot would likely

10    have had an upward trajectory, two pieces of evidence that I

11    have considered.

12           There's also been evidence presented by the

13    Government that Rudolph attempted to hinder the

14    investigation into Bianca's death.  Casius Mwiinga testified

15    that Rudolph offered him money to cancel the postmortem

16    examination of Bianca's body.  Additionally, Otto Westhassel

17    testified that Rudolph asked that he destroy all images of

18    Bianca's dead body, and he also inquired as to how quickly

19    Bianca's body could be cremated.

20           There's also been additional testimony that I've

21    relied on, which I would hasten to add is not exhaustive.

22    Mark Swanepoel has testified that Bianca was always very

23    careful when using firearms and he never saw her using a

24    firearm in an unsafe manner.  Wildlife Officer Musese

25    testified that Rudolph told him that he was in the shower at

REDIRECT - PADISH

1    the time that he heard the shot, which is completely

2    inconsistent with the defendant's statements he made to

3    other witnesses that he was on the toilet.

4        When that discrepancy apparently became apparent to

5    both Mr. -- or Officer Musese and Rudolph, Officer Musese

6    testified that although he made repeated efforts to inquire

7    further of Rudolph, that Rudolph intentionally avoided

8    answering any further questions from him.

9        Testimony of several witnesses have stated and have

10   proven, in my view, by a preponderance of the evidence, that

11   shotgun pellet patterns on Bianca's body, the size of the

12   entry -- the size of the entry wound, the lack of gunshot

13   residue on her body, all supported the conclusion that the

14   shotgun was discharged 1 to 3 feet from Bianca's body,

15   which, if accepted by the jury, would eliminate intentional

16   suicide as a possible manner of death.

17       Finally, I'll just note for purposes of this ruling

18   the testimony of Sherry Houck who testified that, in the

19   summer of 2020, Rudolph told her that he was possible -- he

20   was probably going to jail.

21       There's been additional evidence concerning

22   Rudolph's significant financial motive to kill Bianca and

23   collect proceeds from at least seven life insurance policies

24   issued on Bianca's life.  Rudolph also stood to benefit

25   financially if Bianca died as opposed to going through a

REDIRECT - PADISH

1    costly divorce in which he might have lost a significant

2    amount of assets.

3         There's also been evidence that Rudolph had

4    numerous affairs, including with Ms. Milliron, which

5    supports the Government's position that Rudolph killed

6    Bianca so he could be free to be with other women, including

7    Milliron.

8         The foregoing evidence supports the Court's

9    conclusion that the Government has shown by a preponderance

10   of the evidence that Rudolph caused Bianca's unavailability

11   by killing her.

12        Next, the Court addresses whether preponderance of

13   the evidence supports that Rudolph murdered his wife with

14   the intent of making her unavailable as a witness.  The

15   Government relies on Rule 804(b)(6) for the following

16   statements:

17        First, Bianca's assertion that Rudolph often signed

18   her name on documents.  Second, her assertion that he was

19   good at it.  Third, her assertion that he had written up an

20   agreement at their kitchen table in which she would get

21   nothing in a divorce and had -- and then had her sign her

22   name to it.  Her assertion that she tried to find the

23   agreement for years and was worried about it.  Fifth, her

24   assertion that she later confronted Rudolph with the affair

25   and he denied it, but then he later admitted it when

REDIRECT - PADISH

confronted with emails.  And, sixth, her assertion that he

agreed to break off the affair with Milliron and fire her.

To support its Rule 804(b)(6) argument, the

Government requests that the Court take judicial notice of

the following:  The complaint in the SCI lawsuit, which is

Government Exhibits 83 -- Exhibit 83; Rudolph's answers to

interrogatories filed in the SCI lawsuit, which have not

been admitted into evidence as yet; excerpts of Rudolph's

video deposition in the SCI lawsuit, which is Government

Exhibit 80; the fact that the SCI litigation was ongoing in

2016; and the timing of Bianca's deposition and Milliron's

deposition in the SCI lawsuit, which are Exhibits 162 and

232 -- or which are referenced in those two exhibits.

The Court hereby judicially notices the

aforementioned evidence.  However, the Government also

requests that this Court consider the statements of Brian

Lovelace and Ms. Olmstead in making this ruling.  The

Government points out, and Rudolph does not dispute, that

the Federal Rules of Evidence do not apply to what the Court

can consider in order to make the evidentiary rulings at

issue.  Concerning Lovelace's testimony, although the

parties agree on some of the words that Lovelace allegedly

overheard Rudolph say, they dispute the context in which

Lovelace heard them.  Because of these factual disputes, the

Court has determined not to rely on Lovelace's possible

REDIRECT - PADISH

1   future testimony in ruling on the admissibility of Bianca's

2   statement to Olmstead.

3       Concerning Olmstead's testimony, the Government

4   also requests that the Court consider the evidence the

5   Government summarizes in ECF Nos. 162 and 232 in ruling on

6   Rudolph's objection.  The parties discussed on the record

7   the propriety of considering Olmstead's statements and

8   ruling on those same statements -- on those same statements'

9   admissibility under Rule 804(b)(6).

10      While the Government contends such consideration is

11   proper, the Court has reservations about the circular nature

12   of the Government's reasoning and the appropriateness of

13   relying on Olmstead's statements in determining whether

14   those very statements are, in the first instance,

15   admissible.  Therefore, in making this ruling, I wish to

16   make it clear on the record that the Court is not relying on

17   Ms. Olmstead's statements.

18      The Court now proceeds to the substance of the

19   second factual finding it must make.  Did Rudolph kill

20   Bianca with the intention of making her unavailable as a

21   witness?

22      Rudolph argues that there was no divorce proceeding

23   and no evidence presented about a possible divorce

24   proceeding in 2016.  Moreover, Rudolph argues that there's

25   not been any evidence that Rudolph killed Bianca to keep her

REDIRECT - PADISH

1    from testifying about a divorce proceeding.  He states that

2    even if the Rudolphs had initiated a divorce proceeding,

3    Rudolph, quote, Would not have any reason to kill Bianca to

4    keep her from testifying about his infidelity because

5    Arizona is a no-fault divorce state, end quote, and marital

6    infidelity would be of no relevance.

7          Despite Rudolph's arguments, the Court finds by a

8    preponderance of the evidence that such evidence establishes

9    that Rudolph killed Bianca in part to make her unavailable

10   to offer statements about the postnuptial agreement in a

11   divorce proceeding.  The Court agrees with the Government's

12   position that Rudolph caused Bianca's death to prevent her

13   from offering testimony in a divorce proceeding to show that

14   the postnuptial agreement was fraudulent, which could

15   potentially nullify the alleged postnuptial agreement

16   between her and Rudolph.

17         To make this determination, the Court relies on the

18   testimony of Rachel Anders, which demonstrates that Rudolph

19   was worried about the cost of a divorce long after the

20   postnuptial agreement was allegedly signed.

21         Additionally, as we heard today, Joseph Smith

22   testified that Rudolph was also asking concerned questions

23   about postnuptial agreements around 2010, long after the

24   postnuptial agreement was allegedly signed in 2000.

25         Jim Padish, former Arizona judge, testified that

REDIRECT - PADISH

1    Rudolph had reason to be worried about whether an Arizona

2    court would find the postnuptial agreement authentic or, I

3    would add, authentic or enforceable.

4          The jury has also heard testimony from Anna Grimley

5    that Milliron gave Rudolph an ultimatum to, quote, get rid

6    of Bianca, end quote.

7          Based on the foregoing evidence elicited by the

8    Government at trial, the Court finds that the Government has

9    established by a preponderance of the evidence that, by

10   killing Bianca, Rudolph extricated himself from testifying

11   at a future divorce proceeding regarding the authenticity

12   and enforceability of the postnuptial agreement.  Therefore,

13   statements 1 through 4 are admissible under Rule 804(b)(6).

14         I'll next address the admissibility of statements 5

15   and 6, those being the fifth statement, Bianca's assertion

16   that she later confronted Rudolph with the affair and he

17   denied it, but that he then admitted it when confronted with

18   the subject emails.  And, sixth, Bianca's assertion that he

19   had agreed to break off the affair with Milliron and fire

20   her.

21         Rudolph argues that he had no reason to kill Bianca

22   to keep her from testifying in the civil defamation lawsuit

23   because she had already testified favorably for him.

24   Despite Rudolph's arguments, the Court finds that by a

25   preponderance of the evidence that such evidence establishes

REDIRECT - PADISH

1    that Rudolph killed Bianca in part to prevent her from

2    making statements 5 and 6 in a divorce proceeding as well as

3    in his lawsuit against SCI.

4         As the Government points out at the time that

5    statements 5 and 6 were made, Rudolph had filed a complaint

6    alleging SCI's allegations of adultery were damaging to his

7    marriage, had lied about the nature of his relationship with

8    Milliron and the position in the SCI lawsuit, and filed

9    answers to interrogatories that both falsely asserted that

10   he did not communicate with Milliron via email account or

11   other web-based communications between 2006 and 2013; and

12   that he carefully admitted the -- omitted the email account

13   he used to send salacious emails to Milliron in response to

14   a direct question asking him to list his accounts.

15        The Government emphasizes that those very emails

16   were what Bianca had gained access to and Rudolph knew that

17   she had obtained access to those emails.  Therefore, while

18   it is true that Bianca had previously testified favorably

19   for Rudolph in a July 2016 deposition, she only did so

20   believing that he was leaving Milliron and firing her.

21        I believe there's -- by a preponderance of the

22   evidence, the evidence supports that statement.  Once she

23   discovered the truth, Bianca could provide damaging

24   testimony in the SCI lawsuit or, as the Government puts it,

25   quote, Blow up his whole SCI lawsuit by coming forward to

REDIRECT - PADISH

1    expose the truth in that ongoing case, end quote.

2            Therefore, Rudolph was motivated to kill her to

3    prevent her from providing such damaging testimony in the

4    ongoing SCI litigation.

5            For the reasons stated on the record, the Court

6    finds by a preponderance of the evidence that Rudolph caused

7    Bianca's unavailability with the intent to make her

8    unavailable to testify with regard to the six Rule 804(b)(6)

9    statements discussed on the record.  Therefore, the Court

10   overrules Rudolph's renewed objection relating to Cassandra

11   Olmstead filed at ECF 231.

12           Olmstead may testify, and specifically the

13   Government may elicit the six challenged statements that

14   Bianca allegedly made to Olmstead.

15           All right.  Let's bring in the jury.

16           MR. MARKUS:  Your Honor, for the record we can have

17   our standing objection to all Bianca's statements so that we

18   don't need to be popping up?

19           THE COURT:  I think that's implicit in our numerous

20   discussions and sidebars, but thank you for making it

21   explicit and you are right and that's how I will treat it.

22           MR. MARKUS:  Thank you, Your Honor.

23       (In open court in the presence of the jury at 3:56

24   p.m.)

25           THE COURT:  Thank you, ladies and gentlemen of the

DIRECT - OLMSTEAD

1    jury, for your patience.  The parties, the lawyers and I,

2    greatly appreciate it.

3              Government may call its next witness.

4        (In open court in the presence of the jury at 3:56

5    p.m.)

6              MR. WINSTEAD:  Thank you, Your Honor.  The

7    Government calls Cassandra Olmstead.

8              COURTROOM DEPUTY:  Raise your right hand for me.

9          CASSANDRA OLMSTEAD, GOVERNMENT'S WITNESS, SWORN

10             COURTROOM DEPUTY:  Thank you.  Please be seated and

11   remove your mask for me.  State your full name for the

12   record and spell your first and last name for us.

13             THE WITNESS:  Cassandra Olmstead.

14   C-a-s-s-a-n-d-r-a, O-l-m-s-t-e-a-d.

15             THE COURT:  You may proceed, counsel.

16             MR. WINSTEAD:  Thank you, Your Honor.

17                       DIRECT EXAMINATION

18   BY MR. WINSTEAD:

19   Q.   Good afternoon, ma'am.

20   A.   Hi.

21   Q.   Can you tell us what sort of work you do.

22   A.   I'm a corporate event planner and an executive

23   administrator.

24   Q.   How did you first meet Lawrence Rudolph?

25   A.   He and Bianca were a member of a club called Shikar

DIRECT - OLMSTEAD

1    Safari Club, and we did their annual events.

2    Q.    Did you meet Bianca at that time as well?

3    A.    Yes.

4    Q.    At some point, did you begin a business relationship

5    with Mr. Rudolph?

6    A.    Yes.

7    Q.    Can you tell me what that was.

8    A.    May of 2010.

9    Q.    And can you tell me what the relationship was.

10   A.    He was beginning his second year as president of SCI,

11   and he wanted an assistant to help him handle all of his

12   travel and the board meetings and that kind of stuff.

13   Q.    What is SCI?

14   A.    Safari Club International.

15   Q.    And so did you play the executive administrator role

16   for him?

17   A.    Yes.

18   Q.    Can you tell me what that involved.

19   A.    Well, the first year it involved a lot of board

20   meetings and some travel arrangements, taking care of all of

21   his emails and his -- answering a lot of phone calls.

22   Q.    Did you interact with him pretty regularly?

23   A.    Yeah, probably at least every other day.

24   Q.    At some point, while you were working with him, did he

25   finish his term as president of SCI?

DIRECT - OLMSTEAD

1    A.    He did.  He was in for another year, so May of 2011.

2    But he began as president of Weatherby International in

3    January of 2011, so they overlapped.

4    Q.    Did you work with him also in this capacity as

5    president of Weatherby?

6    A.    Yes.

7    Q.    Did he -- once he stopped being president, did he take

8    on a new role at SCI?

9    A.    Yes.  Starting in, I think it was June or July of 2011,

10   so as soon as his term as president ended at Safari Club

11   International, he became their communications officer.

12   Q.    Did your duties in assisting him change when he changed

13   roles?

14   A.    Yes.  I had no more board meetings that I needed to

15   attend and I just mostly did travel arrangements for him.  I

16   continued doing his emails and his phone calls.  But I also

17   helped him -- he wanted -- to be the communications officer,

18   he needed to be able to make appointments with media

19   personnel and things like that, so I did a lot of planning.

20   Q.    When you say you did his emails, did you manage some of

21   his email accounts?

22   A.    Yes.

23   Q.    At some point, did he have a conflict with SCI?

24   A.    He did.

25   Q.    And at that point, did he have to stop having the

2131

DIRECT - OLMSTEAD

1    communications role with SCI?

2    A.    He did.

3    Q.    Do you remember about when that was?

4    A.    I would have to say it was six months or so after he

5    was put in.

6    Q.    So do you remember what year, approximately?

7    A.    Well, he was put in in July of -- I think it was July

8    of 2011, so that -- January to June of the following year.

9    Q.    Okay.  Did you continue working with him?

10   A.    I did.

11   Q.    In what capacity?

12   A.    I became more of a personal assistant for he and

13   Bianca.

14   Q.    And how often would that involve contact with him?

15   A.    Oh, at least once a month.  Every two to four weeks,

16   probably, if something came up.

17   Q.    You said you met Bianca before you began working with

18   Larry.  Once you were working with him, did you continue to

19   interact with her?

20   A.    Yes.

21   Q.    Can you tell me what those interactions were like.

22   A.    Well, the first year when he was president of Safari

23   Club International, a part of his responsibility was to host

24   all of the IPs at their annual banquet and to have an

25   after-party.  So Bianca and I worked closely that first year

2132

DIRECT - OLMSTEAD

1   with invitations and table settings and that type of thing.

2   Q.   And then after his term as president expired, did you

3   continue interacting with her?

4   A.   Yes.

5   Q.   How?

6   A.   Mostly as a personal assistant.

7   Q.   Would you say you came to know her relatively well?

8   A.   We became friends.  Not typically close friends but

9   friends, yes.

10  Q.   Would you meet Larry and Bianca, or one or the other of

11  them, for breakfast or lunch sometimes?

12  A.   Yes.

13  Q.   After Larry completely left SCI and it was more of a

14  personal assistant role, how often would you say you

15  interacted with Bianca?

16  A.   Oh, several times a month.

17  Q.   Did Larry and Bianca buy a house in Phoenix?

18  A.   Yes.

19  Q.   Do you remember about when that was?

20  A.   It seems like it was the first part of 2012.  Their

21  first house.  They had -- I believe they had two.

22  Q.   And when they first bought that house did they start

23  spending all their time in Phoenix, or did that happen

24  later?

25  A.   Oh, probably happened more and more over the next year

DIRECT - OLMSTEAD

1    or two.

2    Q.    Did you see her more often after they moved to Phoenix?

3    A.    Yes.  For sure.

4    Q.    Did you help her with any personal projects over the

5    years?

6    A.    I did.

7    Q.    What were those?

8    A.    She was trying to write a book and so I helped her with

9    the layout, the grammatical part of it, the critiquing.

10    Giving her suggestions and that type of stuff.  That was one

11    of the big projects.

12          Another big project was a presentation that she was

13    doing for, I believe it was Safari Club International

14    Pittsburgh, I think.  I don't really recall for sure, but it

15    was a PowerPoint presentation and a speech that she wanted

16    to give.  And so we did a lot of work on that.

17    Q.    I'd like to ask you about a particular conversation

18    that you had with Bianca.  Can you tell me, did Bianca

19    approach you at some point to discuss Larry having an

20    affair?

21    A.    Yes.

22    Q.    Do you remember when, approximately, that conversation

23    happened?

24    A.    To the best of my recollection, which could be off, but

25    I -- I've thought about this a lot.  I believe it was spring

2134

DIRECT - OLMSTEAD

1    of 2016.

2    Q.    Why -- what -- what was the weather like when the

3    conversation happened?

4    A.    That's the only part of it that I do remember, is it

5    was just a little warm for that time of year, and I remember

6    thinking that as I walked from the car to our meeting place.

7    Q.    And so in relationship to her death, how long before

8    her death do you think it was, approximately?

9    A.    Well, if we met in the spring of 2016, she was -- she

10   died in October of 2016.

11   Q.    Okay.  And where were you?

12   A.    I'm sorry?

13   Q.    Where were you?

14   A.    When we met?

15   Q.    Yes.  For that meeting, where were you?

16   A.    We were -- we went and met at a place -- gosh, I can't

17   remember the name of the shopping center, but it's a

18   shopping center -- it was kind of halfway between her house

19   and mine.  And --

20   Q.    In what city?

21   A.    Tempe.

22   Q.    Okay.

23   A.    It was northern part of Tempe, Arizona.  And it has

24   a -- it's a big complex, and there's a movie theater there,

25   and there's an outdoor seating area with couches and chairs

DIRECT - OLMSTEAD

1    and stuff, so we sat out there.

2    Q.   So you met in person?

3    A.   Pardon me?

4    Q.   It was in person?

5    A.   Yes.

6    Q.   When you met together initially, what was Bianca's

7    demeanor?

8    A.   Well, she was normal when we walked in.  We met at --

9    we kind of got there at the same time so we walked in

10    together.  She was a little ahead of me and saw me and

11    back -- and waited for me.  She seemed fine, but she had

12    said there was something on her mind she wanted to talk

13    about, so I could tell she was a little hesitant.

14    Q.   Once the conversation had started, did she tell you

15    that she had found something?

16    A.   Yes.

17    Q.   What was that?

18    A.   She told me she had found a hair clip in her bed that

19    did not belong to her.

20    Q.   What was her demeanor when she began telling you that

21    part?

22    A.   She became emotional.  She was trying to hold back the

23    tears in the very beginning.

24    Q.   Did she say if that -- did she say what she was afraid

25    of because she had found that?

DIRECT - OLMSTEAD

1    A.   Yes.  She said she was worried that Larry was having an

2    affair.

3    Q.   Did she ask you if Larry was having an affair?

4    A.   She did.

5    Q.   What did you tell her?

6    A.   I took a deep breath and said yes.

7    Q.   Did she ask you if you knew who he was having an affair

8    with?

9    A.   Yes, she did.

10   Q.   What did you -- how did you respond?

11   A.   I said, "Yes, I do."  And I told her it was Lori.

12   Q.   What did she do then?

13   A.   She broke down in sobs.

14   Q.   How did you know that Larry was having an affair with

15   Lori?

16   A.   Because they were not exactly discreet.  They had --

17   from the first couple months that I started working for him,

18   there were emails back and forth between them all the time.

19   Q.   And how did you see those emails?

20   A.   Because I -- that was part of my responsibilities was

21   to read his emails and respond to the ones that he wanted me

22   to do something with.

23   Q.   Was there ever an incident involving a hotel related to

24   your knowledge?

25   A.   Yes.

2137

DIRECT - OLMSTEAD

1    Q.    Can you tell me briefly what happened in that

2    situation.

3    A.    I had made a reservation for him at a hotel, and I

4    cannot remember what city it was in, there was so much

5    travel involved, but I had made it for him.  And around

6    3:00, 4:00 in the afternoon I got a phone call from the

7    front desk, and they said that Mrs. Rudolph was there and

8    that I had not added her to the reservation, and they wanted

9    to know if it was okay to give her a key.

10              And I said, "Well, Mrs. Rudolph is not there,"

11   because I knew Bianca was not going with him.  She didn't

12   travel with him that trip.  And so I said, "I don't know who

13   that is, but no, you may not give her a key."

14   Q.    Did you ask for a description of the person that was

15   there?

16   A.    Well, the front desk clerk that called me, it kind

17   of -- kind of surprised him that -- my response, and so he

18   didn't really know what to do.  So he said, "Let me get my

19   manager."  So he put his manager on the phone and the

20   manager asked me the same question.  And I explained the

21   situation.  I said, "Mrs. Rudolph is not there, so I don't

22   know who this woman is."  I said, "Can you describe her?"

23              And he said, "She's" --

24              MR. DILL:  Objection.  Hearsay.

25              THE COURT:  Sustained.

2138

DIRECT - OLMSTEAD

1    BY MR. WINSTEAD:

2    Q.   All right.   Thank you.   Did you -- in that situation,

3    did you have suspicion about who it may have been?

4    A.   Yes.

5    Q.   Who?

6    A.   Lori.

7    Q.   Did you tell Larry about that call and discussion with

8    the hotel?

9    A.   Yes.

10   Q.   What did he say?   Did he admit that it was Lori?

11   A.   He immediately denied it and said he couldn't believe I

12   would accuse him of something like that and said it was

13   somebody who he knew from Zambia that was in town and needed

14   a place to put their luggage because they had missed their

15   plane or their plane was late or something.   I don't

16   remember the exact response.

17   Q.   Did he say anything about whether he would ever cheat

18   on Bianca?

19   A.   Yes.   He said, "I would hope that you would think that

20   I would never do that."

21   Q.   Going back to the conversation that you were having

22   with Bianca, did she tell you about her general attitude

23   towards divorce?

24   A.   Yes.

25   Q.   What was it?

2139

DIRECT - OLMSTEAD

1    A.    That she didn't believe in divorce.  That when she took

2    her vows out, she meant them, and that she would do anything

3    she could to save her marriage.

4    Q.    During the conversation, did she tell you that despite

5    that, she was potentially considering divorce?

6    A.    Yes, to some extent.  She was kind of -- she was very

7    emotional.  That conversation went for four hours.  And so

8    you can imagine over a four-hour period of time, there was a

9    lot said.  And she said she was going to do everything she

10   could to save her marriage.

11         And we discussed what other alternatives she had.

12   And she said she would take into a possibility that if it

13   didn't stop, that she would have to file for divorce.

14   Q.    Did she tell you anything about what she would be

15   afraid of in the case of divorce?

16   A.    Yes.

17   Q.    What was that?

18   A.    Part -- that was a big part of the conversation.

19   Q.    What was she afraid of?

20   A.    Larry divorcing her and not giving her any money and

21   she would be without for the rest of her life.

22   Q.    I'd like to talk to you about why she said she was

23   afraid she would get nothing.  Did Bianca tell you during

24   the conversation whether she had ever had an affair herself?

25   A.    Yes, she did.

DIRECT - OLMSTEAD

1    Q.    What did she tell you about that?

2    A.    She said she'd had an affair and that she was ashamed

3    of it and that she felt extremely guilty about it and that

4    she had admitted it to Larry, and that at that point he drew

5    up a document at their kitchen table and asked her to sign

6    it stating that, because she had been unfaithful in their

7    marriage, she understood that she -- if they ever divorced

8    that she would not be getting any financial aid.

9    Q.    Did she say around a time frame of when that happened?

10   A.    She did not.  She didn't tell me who it was or when.

11   Q.    From the conversation, did you surmise that it was

12   really recent or was it --

13   A.    No.  She made it sound like it was -- you know, I mean,

14   I surmised it was 5 to 10 years.

15   Q.    So you said that Larry drew up that document.  Did

16   Bianca say whether she signed it?

17   A.    She said she did not sign it.  I asked her

18   specifically, "Did you sign it?"

19         And she said, "I did not, but Larry signed my

20   name."

21   Q.    Did she say whether he had ever done that before?

22   A.    Yes, she said he signed her name quite often and that

23   he was very good at it.

24   Q.    Did Bianca know where he kept that document?

25   A.    No.  She said she looked at -- she looked for it for

DIRECT - OLMSTEAD

1    months trying to find it so she could destroy it and she

2    couldn't ever find it.

3    Q.    And did she say whether, over time, that document

4    continued to worry her?

5    A.    It was still worrying her that night.

6    Q.    During that conversation, did Bianca mention any other

7    agreements between her and Larry that would affect the

8    divorce?

9    A.    No, that was the only one.  And we talked about it for

10    probably 30 minutes at least.

11    Q.    Did she ever mention having a prenuptial agreement?

12    A.    No.

13    Q.    And did she ever talk about having a postnuptial

14    agreement?

15    A.    No, that was the only document she said that -- that

16    they had discussed.

17    Q.    From the topics of conversation and the context, would

18    you have expected something like that to come up in your

19    conversation?

20    A.    It was the perfect opportunity.  When you spend 30

21    minutes discussing something, you would think that would be

22    the time.

23    Q.    Did you discuss with Bianca whether she should confront

24    Larry about the affair with Lori?

25    A.    Yes.

2142

DIRECT - OLMSTEAD

1    Q.    Did she decide that she was going to do that?

2    A.    Yes.  She said she would have to confront him if their

3    marriage was to survive, and she was going to have to figure

4    out a way to tell him that she knew.

5    Q.    During the conversation, did the two of you rehearse

6    how that would go?

7    A.    Yes, we role played.

8    Q.    Did you discuss if Bianca was going to make any demands

9    of Larry?

10   A.    Yes.  She said she was going to tell him that he would

11   need to stop seeing Lori and that he would have to fire her

12   and that they were going to have to try marriage counseling.

13   Q.    Did you discuss with her the scenario where Larry might

14   refuse to leave Lori?

15   A.    Yes.

16   Q.    What was Bianca going to threaten him if he did refuse

17   to leave Lori?

18   A.    To divorce.  She was going to tell him if he didn't

19   agree to her terms, that she was going to file for divorce.

20   Q.    In this conversation or any other times that you were

21   speaking to her, did Bianca ever tell you that they had

22   an -- that she and Larry had an open marriage?

23   A.    No.

24   Q.    Did -- has -- did anyone ever tell you that?

25   A.    No.

DIRECT - OLMSTEAD

1    Q.    When Bianca was telling you about the affair she had

2    had, did she seem to feel bad about it?

3    A.    Yes.  She said she felt very guilty.

4    Q.    Based on your knowledge and friendship with Bianca, do

5    you think she would have agreed to have an open marriage

6    with Larry?

7         MS. MOSS:  Objection, Your Honor.  Calls for

8    speculation.

9         THE COURT:  Mr. Winstead.

10        MR. WINSTEAD:  It's just an opinion about someone

11   she considered a friend.  I think that's a valid lay

12   opinion.

13        THE COURT:  Overruled.  You may answer.

14        THE WITNESS:  Can you restate the question, please.

15   BY MR. WINSTEAD:

16   Q.    Based on your knowledge and friendship with Bianca, do

17   you think she would agree to have an open marriage?

18   A.    No.  Considering how she reacted to the news that

19   night, absolutely not.

20   Q.    Did you tell Bianca about Larry's emails that -- with

21   Lori that showed he was having an affair?

22   A.    Yes.  She asked me how I knew.

23   Q.    Did she ask you to give her those emails?

24   A.    She did.

25   Q.    And did you agree to?

2144

DIRECT - OLMSTEAD

1    A.    No.

2    Q.    Why not?

3    A.    I just didn't feel it was ethical since I was still

4    working for both of them.  I felt like it was putting me in

5    a position that I didn't want to be in.

6    Q.    Did she eventually get access to them?

7    A.    We -- I explained to her that she would have to go to

8    his emails herself, and she said she didn't know the

9    passwords.  And I explained to her that, if she thought

10   about them hard enough, she could figure them out because

11   they both used the same passwords or a combination of

12   passwords for pretty much everything.

13        And so she said, "I don't know that I could do

14   this."  And I said, "You -- you just keep trying.  We'll --

15   I'll help you through it if we need help," and so we did it

16   that way.

17   Q.    Are you familiar with the email address

18   lprsci@yahoo.com?

19   A.    Yes.

20   Q.    Was that one of Larry's email addresses?

21   A.    Yes.

22   Q.    And was that one that you had access to?

23   A.    Uhm-hum.

24   Q.    Was that one that she was trying to gain access to?

25   A.    Yes.  He had several.

DIRECT - OLMSTEAD

1    Q.    After that in-person conversation, did you have another

2    phone call with Bianca about gaining access to the emails?

3    A.    Yes.  We went home late that night, and I don't

4    remember if it was the next day, the next night, I -- I

5    can't remember exactly, it wasn't very long, she called me

6    and said that she had tried a couple of times, couldn't get

7    in.  And so we had a conversation, I said, "Think.  Think

8    about your passwords.  Think about Larry's passwords."

9            And so she kept trying combinations, and she

10   finally figured out -- I don't remember which one, but she

11   figured out the first one.  She figured out a couple of

12   them.  And on the third -- third or fourth one, I had to

13   help her.  She knew part of it, she was guessing part of it,

14   but she couldn't figure out the last.

15   Q.    Once she gained access to the emails, did she ask you

16   how to find the ones about the affair?

17   A.    Yes.

18   Q.    She --

19   A.    She was not very technically savvy so I kind of had to

20   walk her through it.  I said, you know, "You're -- hit

21   control F and it will take you to a Find screen, type in

22   Lori's name."  I said, "That's going to bring up

23   everything," because they also used those emails for work.

24   So I said, "It's going to take a while, right?  You're going

25   to have to just search through them."  And I told her, I

DIRECT - OLMSTEAD

1    said, "These emails are going to probably upset you, so be

2    careful."

3    Q.    All right.  So I'm going to loop back to talk about the

4    context.  But at some point did she give you paper copies of

5    emails between Larry and Lori?

6    A.    A packet, yes.

7    Q.    Would you bring up, please, Government's Exhibit 90.

8          Have you seen Government's Exhibit 90 before?

9    A.    Yes.

10   Q.    Are these the emails that Bianca gave you?

11   A.    Yes.

12   Q.    And you can see her lprsci@yahoo.com.  Is that one of

13   the email addresses we were discussing?

14   A.    Yes.

15   Q.    Are you familiar with this email address,

16   lamilliron@yahoo.com?

17   A.    I -- it's Lori's.

18   Q.    Okay.  All right.  Thank you.  You can take that down.

19         When you were looking through Government's

20   Exhibit -- well, when you looked through the emails that

21   Bianca had printed out and gave to you, did you recognize

22   them from when you saw them directly in Larry's email

23   account?

24   A.    I didn't look at them right away.  I don't recall her

25   actually handing them to me.  She called me and said she was

DIRECT - OLMSTEAD

1    going to bring over a packet, and I don't recall actually

2    getting them.  The more I thought about it, she -- she

3    brought over a lot of things over the months and years,

4    right, but I don't remember that because I think I would

5    have asked her, "Are you okay?"  And we didn't have that

6    conversation.

7              So I have clients dropping things off at the house

8    all the time, and so I'm assuming she gave it to my staff or

9    my husband or somebody, and I put it in the safe.

10   Q.    All right.  Do you know about how long it was after

11   your initial in-person conversation that she dropped those

12   emails off for you?

13   A.    I can surmise it was within the -- a week or so,

14   because she was getting ready to go to Pittsburgh.  So she

15   was going back to Pennsylvania and she wanted me to have

16   them before she left because she didn't want Larry to find

17   them.

18   Q.    All right.  Could you bring up Government's Exhibit 90

19   again and go to page 145.  All right.

20             So you can see on some of the emails at the very

21   end of the stack, is that your name at the top left?

22   A.    It is.

23   Q.    Are those emails to a Gmail account of Larry's instead

24   of the Yahoo one we were looking at before?

25   A.    I can't tell just from the R, But --

DIRECT - OLMSTEAD

1    Q.    So go ahead and zoom out, please.  And could you go to

2    the next page.  Can you zoom in on this middle one.

3    A.    Oh, yes, that was his lpr7 email.  Uhm-hum.

4    Q.    Okay.  Now zoom out.

5          So these say your name at the top of the paper.  Do

6    you think that you might have printed out these emails from

7    your access to your account?

8    A.    I printed emails out all the time from him -- or for

9    him.  I noticed that the one we were looking at was about

10   Lori's son.  Larry was trying to help him get a job, and I'm

11   assuming I printed it out as part of something that I did

12   for him.  The only thing I can surmise is the way those got

13   in is I printed out a lot of documents that had to do with

14   SCI's lawsuit and other things.  They were in a file on my

15   desk.  And I was cleaning out my desk one day, and I

16   remember taking everything and putting it in the safe with

17   those other emails.

18         When I made a copy for you, I must have copied some

19   of the ones that were -- had to do with the -- not with what

20   Bianca printed out.  If you remember, I told you there were

21   documents in there about the lawsuit and that kind of stuff,

22   and we removed those, and I probably just didn't see these.

23   Q.    Okay.  Thank you.  All right.  So after that, was

24   Bianca going to confront Larry?

25   A.    Yes, she said she was going to do it when she went

DIRECT - OLMSTEAD

1    home.

2    Q.   Did she, in fact, confront him?

3    A.   She told me she did.

4    Q.   When did she tell you that she had confronted him?

5    A.   It was a few weeks.  I was getting a little worried.  I

6    wasn't sure she had actually confronted him or not, but it

7    was, I don't know, two, three weeks later.

8    Q.   Did you meet in person or was this a phone call?

9    A.   That was a phone call.  She was still in Pittsburgh.

10    Q.   What did she tell you had happened?

11    A.   She said she initially confronted him and he denied it

12    and tried to say that it wasn't happening.  And she said she

13    told him that she had seen the emails, and at that point he

14    admitted the affair.

15    Q.   And did he -- did she say whether she had given him her

16    ultimatum to leave Lori?

17    A.   She definitely said she gave him the ultimatum that he

18    had to leave her and that he had to end the affair and he

19    had to fire her.  Those were her -- the things that she told

20    me that she -- that she told him.

21    Q.   And what did Larry say in response to that demand?

22    A.   Other -- I mean, she didn't give me the whole drawn-out

23    conversation, but the end result was that he agreed to end

24    the affair and to fire her.

25    Q.   Was she -- did she seem happy about that?

DIRECT - OLMSTEAD

1    A.    I don't know that she seemed happy.  She was still

2    pretty emotionally upset about the whole thing.

3    Q.    Okay.  Did you ever find out any information confirming

4    whether Lori was fired after that phone call?

5    A.    Yes.  It was a few months later, and I was working with

6    the staff at his office on an email issue that they were

7    having.  And I called the office and I asked the gal that

8    answered the phone, I told her who I was, I said, "Is Lori

9    in?"

10              MR. DILL:  Objection.  Calls for hearsay.

11              THE COURT:  Ma'am, let's give an answer to -- in

12   which you don't repeat what other people told you.  Let's

13   just discuss what you saw --

14              THE WITNESS:  Okay.

15              THE COURT:  -- and have personal knowledge of.

16              MR. WINSTEAD:  And, Your Honor, if I might respond

17   to that.  There are statements from employees to

18   Ms. Olmstead that I would like to ask her about.  The

19   relevance of them is not for the matters that they asserted,

20   but that they are circumstantial evidence about whether Lori

21   had been fired.  And so I believe that they're offered for a

22   nonhearsay purpose.

23              THE COURT:  Mr. Dill?

24              MR. DILL:  I disagree.  Out-of-court statement

25   offered for the truth of the matter asserted.  There's no

DIRECT - OLMSTEAD

1    exception.

2            THE COURT:  Well, you are offering to establish

3    that certain facts happened, right?  And from that, she

4    inferred that Ms. Milliron was still employed.

5            MR. WINSTEAD:  Yes.  But --

6            THE COURT:  Can't you come at this a different way?

7            MR. WINSTEAD:  So, Your Honor -- so they are --

8    I -- they are statements that the individuals made.  For one

9    thing, they are statements of agents and employees of

10   Dr. Rudolph, and it relates to --

11           THE COURT:  They're employees of his dental

12   practice?

13           MR. WINSTEAD:  Yes, sir.

14           THE COURT:  The dental practice is not a party to

15   this action.

16           MR. WINSTEAD:  That's true, Your Honor, but, again,

17   the point is that it's not what they told her that is

18   relevant.  It's the -- in other words, they're going to say

19   things about where Lori is, and that's not relevant.  It

20   doesn't matter.  But the point is that that -- the fact that

21   they answered that way is circumstantial evidence that she

22   had not, in fact, been fired.  And so that's why it's

23   offered for a nonhearsay purpose.

24           THE COURT:  I have to sustain the objection.  I --

25   can't you just ask her did she come to conclude that

DIRECT - OLMSTEAD

1    Ms. Milliron was still employed with the practice?

2              MR. WINSTEAD:  Yes, Your Honor.

3    BY MR. WINSTEAD:

4    Q.    After you spoke with people at the practice, did you

5    understand that Lori had not, in fact, been fired?

6    A.    Yes.

7    Q.    And did you get a sense during that conversation that

8    there was hesitancy on their behalf to talk about Lori?

9    A.    Yes.

10   Q.    Okay.  After that, did you have any other conversations

11   with Bianca about whether Larry had followed through on her

12   ultimatum?

13   A.    Yes, just one.

14   Q.    What was that?

15   A.    We had gone to breakfast, and I asked her how things

16   were going.  And she said that Larry was trying harder and

17   that they were working on their marriage.  And I said, "I

18   need to make sure that you know that Lori was not fired,

19   that she is just working from home."

20             And she said, "I know."  She said, "He told me that

21   it was going to take a little bit of time to be able to fire

22   her because he had made her a partner in the dental

23   practice."

24   Q.    In the -- during that fall, were you helping Bianca

25   plan anything for when they got back from their last Africa

DIRECT - OLMSTEAD

1    hunt?

2    A.    Yes.

3    Q.    What was that?

4    A.    She had relatives coming in from Italy, her family that

5    had never seen -- had never been to Arizona, had never seen

6    the house.  And she was very excited about them coming.  And

7    so we planned a lot of activities and get-togethers, places

8    that she could take them in Arizona when they came.  She was

9    very happy and very excited.

10   Q.    Did she ever express any suicidal ideations to you?

11   A.    No.

12   Q.    Did Larry ever talk to you about Bianca's death?

13   A.    No.

14   Q.    Did you attend the funeral?

15   A.    No.

16   Q.    Were you notified about it?

17   A.    No.

18   Q.    Have you spoken to Larry since then?

19   A.    I seem to recall one conversation about a year later.

20   He called and wanted a table for Weatherby International,

21   which is another one of our clients.  And I did find a text

22   message in August of 2017 from him where he sent me his

23   credit card information so that he could purchase the table.

24   And that's the only text or email that I have had from him.

25   Q.    Did you think that it was odd that, other than that

CROSS - OLMSTEAD

1   occasion, he never spoke to you again?

2          MS. MOSS:  Objection.  Relevance, Your Honor.

3          THE COURT:  Overruled.

4          You may answer, ma'am.

5          THE WITNESS:  Yes, I thought it was extremely

6   strange.  We had -- I had worked for him for six years and

7   he didn't call me to tell me that she had died or that they

8   are having a funeral.

9          MR. WINSTEAD:  May I have a moment, Your Honor?

10         THE COURT:  You may.

11         MR. WINSTEAD:  No further questions, Your Honor.

12         THE COURT:  Cross-examination.

13         MS. MOSS:  Thank you, Your Honor.

14                     CROSS-EXAMINATION

15  BY MS. MOSS:

16  Q.   Ms. Olmstead, you said that you were friends with

17  Bianca; is that right?

18  A.   Yes.

19  Q.   You said that you were close enough friends that she

20  would disclose very personal things to you; is that right?

21  A.   That was a surprise, but yes.

22  Q.   That was a surprise that she would disclose personal

23  things to you?

24  A.   She was a very private person.

25  Q.   She was a very private person; is that right?

CROSS - OLMSTEAD

1   A.   Yes.

2   Q.   You didn't know a lot of things that were happening in

3   her life.

4   A.   Obviously I didn't know a lot of things that were

5   happening in her life.   That's correct.

6   Q.   You didn't know a lot of things that were happening

7   between Bianca and between Larry; isn't that right?

8   A.   I'm sure I didn't know a lot of things.

9   Q.   And so even though you said that you were close enough

10  for her to disclose these very personal things to you, you

11  just told the prosecutor that you did not go to her funeral;

12  is that right?

13  A.   I didn't know they were having a funeral.

14  Q.   And you didn't know because her children, AnaBianca and

15  Julian, didn't reach out to you and invite you to the

16  funeral; isn't that right?

17  A.   I don't believe it would have been her -- them that

18  invited me, but no, they did not.

19  Q.   Well, do you know that it was Julian and AnaBianca and

20  Larry that were planning the funeral and doing the

21  invitations?

22  A.   No.   I didn't hear anything about it until the day

23  before.

24  Q.   And Julian and AnaBianca, they knew who you were,

25  didn't they?

2156

CROSS - OLMSTEAD

1    A.    Yes.   I had never met either of them, I don't believe.

2    Q.    You may not have met them, but you had communicated

3    with them before, hadn't you?

4    A.    Yes.

5    Q.    You had emailed them before.

6    A.    Yes.

7    Q.    So they knew that you were around, that you were an

8    executive assistant for Larry and Bianca.

9    A.    Yes.

10   Q.    But no one reached out to you and invited you to the

11   funeral.

12   A.    No.

13   Q.    And you weren't told about the funeral at all.

14   A.    No.

15   Q.    And the reception after the funeral, you were not

16   invited to that as well?

17   A.    No.

18   Q.    No one from the family told you about Bianca's

19   funeral --

20   A.    No.

21   Q.    -- and about her reception?

22   A.    No.

23   Q.    And no one told you, from Bianca's family, about her

24   death.

25   A.    No.

CROSS - OLMSTEAD

1    Q.    You found out about her death from J. Allen Smith;

2    isn't that right?

3    A.    Correct.

4    Q.    And what Mr. Smith had told you, he notified you from

5    Africa, didn't he?

6    A.    Yes.

7    Q.    And he notified you from Africa and said you -- "Just

8    look it up," right?

9    A.    He said there's an article on the internet.

10   Q.    So you looked up that article on the internet, didn't

11   you?

12   A.    Yes.

13   Q.    And you saw that there was an article in an African

14   paper that detailed Bianca's passing.

15   A.    Correct.

16   Q.    Now, Ms. Olmstead, you have obviously spoken to the

17   prosecutors and to the FBI agents in this case, have you

18   not?

19   A.    Yes.

20   Q.    You've done that multiple times.

21   A.    Correct.

22   Q.    You've done that on the phone?

23   A.    Yes.

24   Q.    You've done it in person, haven't you?

25   A.    Yes.

CROSS - OLMSTEAD

1    Q.    You've done it by email?

2    A.    Yes.

3    Q.    You've done it by text message, haven't you?

4    A.    Yes, I think.

5    Q.    You've done it by videoconferencing, haven't you?

6    A.    Yes.

7    Q.    And you've done that over a period of many months;

8    isn't that correct?

9    A.    A few.

10   Q.    Well, let's talk about that.  So in March, the FBI

11   reached out to you, did they not?

12   A.    THE COURT:  March of what year?

13           MS. MOSS:  March of 2022.  March 16th, to be exact,

14   2022.

15           THE WITNESS:  I don't have anything in front of me

16   that would tell me that date but I'm assuming you do.

17   BY MS. MOSS:

18   Q.    And would you agree that if I tell you it's March 16th,

19   2022, that that's when they reached out to you?

20   A.    Okay.  I --

21   Q.    Do you agree with that?

22   A.    That seems reasonable.  That's about the time.

23   Q.    And in April, you also spoke with them many times in

24   April, didn't you?

25   A.    I have spoken with them several times.  I don't know

CROSS - OLMSTEAD

1    when exactly, but --

2    Q.    Let's say when you say "several times," you spoke with

3    them at least six different times in April, did you not?

4    A.    I can't confirm that.

5    Q.    Well, did you speak with them on April 19th when they

6    came to your home and they recorded you and they interviewed

7    you for two hours?

8    A.    Yes, they did.

9    Q.    Did you reach out to Agent Dahlstrom and text him?

10   A.    That -- that day?  When?

11   Q.    On April 20th.

12   A.    I have texted him a few times, yes.  I could not tell

13   you what dates.

14   Q.    You texted him several times during that month, did you

15   not?

16   A.    I don't know.

17   Q.    You also emailed with Agent Dahlstrom, didn't you?

18   A.    Yes.

19   Q.    And when you were emailing with Agent Dahlstrom, you

20   sent him a number of documents, didn't you?

21   A.    Yes.

22   Q.    Not just emails, but you did send him a big batch of

23   emails, did you not?

24   A.    Yes.

25   Q.    You also sent him a number of photographs, didn't you?

CROSS - OLMSTEAD

1   A.   Yes.

2   Q.   You sent him, I believe it was, 163 photographs.  Do

3   you recall that?

4   A.   Yes.

5   Q.   And these are photographs that you got from looking at

6   Bianca and Larry's information and accounts?

7   A.   No.   These were pictures that were on my computer.

8   Q.   And so you sent those to the FBI?

9   A.   Yes.

10  Q.   And you also sent them your QuickBooks summaries and

11  invoices?

12  A.   Yes.   Statements.

13  Q.   And not only speaking with them in April, you also

14  spoke with them again in May of this year, did you not?

15  A.   Maybe.   I don't have anything in front of me again.

16  Q.   Do you recall texting Agent Dahlstrom May 8th and May

17  10th?

18  A.   Not unless you can give me some idea of what they were

19  about.   I don't know what day.

20  Q.   Okay.   Well, we'll get to what they're about.

21       What about in June?  You spoke to the FBI and to

22  the prosecution team at least five times in June, did you

23  not?

24  A.   I can't tell you how many times I spoke to them.   I did

25  speak with them in June.   I cannot tell you how many times.

CROSS - OLMSTEAD

1    Q.    Was it more than one time?

2    A.    Yes.  I would have to say yes, it was.

3    Q.    It was multiple times, was it not?

4    A.    Yes, if it wasn't -- if it was more than one, it was

5    multiple times.

6    Q.    And also in July; isn't that correct?

7    A.    Yes.

8    Q.    So you've spoken to the FBI and to the prosecution

9    team, it sounds like, well over a dozen times; maybe up to

10   20 or 30 times?

11   A.    No.

12   Q.    Are you disagreeing with that?

13   A.    20 to 30 times seems excessive for over the times that

14   we've spoken.

15   Q.    How about over 12 times?

16   A.    I don't know.  I'm not understanding the logic behind

17   this questioning.  I do not have anything in front of me

18   that I could confirm what you're trying to say.

19   Q.    Well, would you agree that you spoke to them a number

20   of times?

21   A.    I said yes, I have.

22   Q.    Okay.  And you don't recall the number right now.

23   A.    No.

24   Q.    So did you keep track of the number of times that you

25   spoke with them?

2162

CROSS - OLMSTEAD

1    A.    No, I did not.

2    Q.    And every time they wanted to speak to you, you spoke

3    to them; is that right?

4    A.    Yes.

5    Q.    And sometimes they would reach out to you and sometimes

6    you would reach out to them; is that correct?

7    A.    Correct.

8    Q.    Now, you also -- in addition to speaking to the FBI any

9    time that they wanted to speak to you, you also followed

10   this case on the media; did you not?

11   A.    Yes.

12   Q.    You read the papers?

13   A.    Yes.

14   Q.    You watched TV about it.

15   A.    I don't have television.  No.

16   Q.    But you read the papers.  You have the internet,

17   correct?

18   A.    I have the internet.  I do not get newspapers.

19   Q.    And so you read about this case, again, Ms. Olmstead;

20   is that right?

21   A.    I said yes.

22   Q.    And you told the prosecutors that you were reading

23   about this case in the media.

24   A.    Possibly.

25   Q.    Is it "possibly," or did you tell them that you were

2163

CROSS - OLMSTEAD

1    reading about the case in the media?

2    A.    Let me think if I can recall a conversation.  I -- yes,

3    I would have to say yes, I did.  I read -- yes, I did tell

4    them that.

5    Q.    And the prosecutors and agents never told you, "Don't

6    read anything about this case," did they?

7    A.    No.

8    Q.    You were also contacted by reporters in this case,

9    weren't you?

10   A.    Yes.

11   Q.    And you told the agents again that you were contacted

12   by reporters in this case.

13   A.    Yes.

14   Q.    And so not only are you speaking with the FBI, speaking

15   with the prosecution team, learning information from the

16   internet, you've -- you learned information about things

17   that you did not know before; is that right?  Is that fair

18   to say?

19   A.    Probably.

20   Q.    Probably or yes, for sure?

21   A.    Well, I cannot recall off the top of my head, sitting

22   right here, exactly what I have read and if there was

23   something that I didn't know prior to.  But I would have to

24   assume that yes, there were lots of articles out there, and

25   I would have to assume that I learned something new.

CROSS - OLMSTEAD

1    Q.    And you read those articles.

2    A.    Yes.

3    Q.    And, in fact, when you read about something in

4    particular in the internet, you read about the prosecution

5    had talked to a bartender, you reached out to Agent

6    Dahlstrom, did you not?

7    A.    About that specifically?

8    Q.    Yes.

9    A.    I don't know why I would reach out to him specifically

10   about that, but possibly.  I mentioned it to him.

11   Q.    Would it refresh your recollection to take a look at

12   the text that you sent to Agent Dahlstrom?

13   A.    Sure.

14   Q.    If we could pull up just for the witness, this is not

15   admitted into evidence yet, INV 32752.  It's not an exhibit.

16   INV 32752.

17            MR. REYES:  It's not in the system.

18            MS. MOSS:  And, again, this is just for the witness

19   and for counsel.  Do I need to press this button?

20            COURTROOM DEPUTY:  Yes, please.

21   BY MS. MOSS:

22   Q.    Ms. Olmstead, your telephone number is 480-319-08-?

23   And I'll leave out the last two numbers.

24   A.    Yes.

25   Q.    And you were texting with Agent Dahlstrom at

CROSS - OLMSTEAD

1    720-437-09-.  And I'll leave out those last two numbers as

2    well?

3    A.    I don't have his number memorized.  I'm sorry.

4    Q.    Well, let me see if I can bring this up here.

5          Do you see on this document --

6    A.    Yes.

7    Q.    -- the number that I circled there?

8    A.    Yes.

9    Q.    Is that -- that's your phone number, isn't it, 480 --

10   A.    Yes.

11   Q.    -- 319-08-?  And I'll leave out the last two numbers.

12   A.    Yes.

13   Q.    And you see this number.

14   A.    Yes.

15   Q.    And Agent Dahlstrom's number; is that correct?

16   A.    I don't know that, but I'm going to take your word for

17   it since this is a text message.

18         THE COURT:  Hold on, Ms. Moss.  Is there an

19   objection?

20         MR. WINSTEAD:  I'm sorry, nothing.  I was just

21   going to say we'll agree that that's his number.

22         MS. MOSS:  That's the correct number?  Thank you

23   very much.

24   BY MS. MOSS:

25   Q.    Now, do you see the highlighted portion?

CROSS - OLMSTEAD

1    A.    Yes.

2    Q.    And this is a text that you sent to Agent Dahlstrom; is

3    that correct?

4    A.    A portion of the text, yes.  It was in response to him

5    texting me originally.

6    Q.    Correct.  And the portion of the response that I'm

7    referring to is the one where you're referencing where you

8    say, "Where you got a witness from the bar to testify."  Do

9    you see that?

10   A.    Yes, I see that.

11   Q.    And then what you -- again, you testified -- or, I'm

12   sorry, what you texted to Agent Dahlstrom is, "That made my

13   day," exclamation point.  Do you see that?

14   A.    Yes.

15   Q.    So you did text with Agent Dahlstrom when you learned

16   about new information about this case, did you not?

17   A.    Yes, I did.

18   Q.    And so not only did you read about it, you commented

19   about it to the prosecution and told them that you knew

20   about it.

21   A.    Is there a problem with that?

22   Q.    My question is:  You knew about it --

23   A.    Yes.

24   Q.    -- you texted them.  You read new information, and you

25   even commented about it.

2167

CROSS - OLMSTEAD

1    A.    Yes.

2    Q.    Now, we've talked about all the times that you have

3    texted with the FBI, that you have met with the FBI, called

4    the FBI, had virtual meetings with the FBI.  Now, when

5    Mr. Markus and I reached out to you on May 10th, you refused

6    to speak with us; isn't that correct?

7    A.    That is correct.

8    Q.    In fact, you hung up the phone on us.

9    A.    That is correct.

10   Q.    And immediately after that happened, again you texted

11   Agent Dahlstrom and said that you had hung the phone up on

12   us; isn't that right?

13   A.    I don't recall, but I would have no problem doing that.

14   Q.    Well, let me try to refresh your recollection again,

15   then.  Referring to your text messages -- your numerous text

16   messages with Agent Dahlstrom, do you see this highlighted

17   portion on May 10th?

18   A.    I do.

19   Q.    And, again, this is -- these are text messages between

20   you and between Agent Dahlstrom; is that right?

21   A.    Yes, it is.

22   Q.    And, again, you are telling Agent Dahlstrom here,

23   "Larry's attorneys reached out to me this morning by phone.

24   Asked if I would be willing to talk to them.  I said no and

25   hung up."

CROSS - OLMSTEAD

1          Do you see that?

2    A.    Uhm-hum.

3    Q.    I need you to answer yes or no, ma'am.

4    A.    Yes.

5    Q.    So, again, you texted with Agent Dahlstrom.  You told

6    him what happened after you hung up the phone on us; isn't

7    that right?

8    A.    Yes.  You left out the last part of the sentence,

9    though.

10   Q.    Well, let's read the last part of the sentence, so

11   we're not leaving anything out.  The last part of that

12   sentence, after you say, "I said no and hung up," then you

13   asked, "Do I eventually have to speak to them?"

14   A.    Correct.  That was the purpose of the text, to find out

15   if I eventually had to speak to you.

16   Q.    Okay.  But that's not all that you had -- you'd agree

17   that that's not all you asked on that text; isn't that

18   correct?  You didn't say, "Do I have to speak to the defense

19   attorneys, or eventually have to speak to the defense

20   attorneys?"  You say, "They called me and I hung up."

21   A.    Okay.

22   Q.    And Agent Dahlstrom said, "No, you do not."

23   A.    Correct.  When I asked if I had to speak to you, he

24   said no, I do not.

25   Q.    We're here speaking today, though, aren't we,

CROSS - OLMSTEAD

1    Ms. Olmstead?

2    A.    Yes.  I knew that was going to eventually happen.

3    Q.    Now, even though Mr. Markus and I called you, we just

4    wanted to find out what happened.  You just refused to speak

5    with us -- one word with us.

6    A.    That was my decision.

7    Q.    And that was your decision in order to be fair in this

8    case?

9    A.    I didn't know that that was my job, to be fair.

10   Q.    Did you think it was your job to be objective in this

11   case?

12   A.    My job is to tell you my part in this, and that was my

13   relationship with Larry and Bianca.

14   Q.    And when you found out that the prosecutors had shared

15   with us what you told them, you again texted -- or spoke

16   with Agent Dahlstrom and you said, "That makes me sick."

17   Didn't you?

18   A.    Yes, I didn't think it was right.

19   Q.    And you said, at the time -- and, again, this is going

20   to the -- those May 8th texts that you said you didn't

21   remember before -- on May 8th, you texted with

22   Agent Dahlstrom and you learned that Agent Dahlstrom was in

23   Africa, did you not?

24   A.    Yes.  There was one time when I did and he said he was

25   there.

CROSS - OLMSTEAD

1    Q.    And what you said to Agent Dahlstrom over texts again,

2    you said, "I'm glad you're in Africa, and I hope you're

3    finding the proof that you're looking for."

4    A.    Okay.

5    Q.    Isn't that what you said, Mrs. Olmstead?

6    A.    I don't have perfect recall.  It would not surprise me

7    if I said that.

8    Q.    Let me show you again from the numerous texts you had

9    with Agent Dahlstrom.  Do you see the highlighted portion on

10   your text here?

11   A.    Yes, I do.

12   Q.    Do you see the last sentence where it says, "Glad you

13   are in Africa, and I hope you find the proof you're looking

14   for"?

15   A.    Yes.

16   Q.    Do you also see in that same text where it says, "makes

17   me sick"?

18   A.    Yes.  It's a true statement.

19   Q.    You're still sick here today, aren't you, Ms. Olmstead?

20   A.    That they had to share that information with you?  Yes.

21   Q.    Yes.  Now, you've testified about a lot of things that

22   you say Bianca told you six or seven years ago.  Did you

23   write any of these things down?

24   A.    No.

25   Q.    Did you put them in a journal to try to remember what

CROSS - OLMSTEAD

1    she said to you?

2    A.    No.

3    Q.    Do you send an email to yourself or to anyone else

4    about this?

5    A.    No.

6    Q.    Did you write any notes whatsoever about this

7    conversation you've told us about today?

8    A.    No.

9    Q.    Now let's talk about this conversation.  Now, this is a

10   lengthy conversation that you said -- I believe you

11   testified on direct occurred in Tempe, Arizona.

12   A.    Correct.

13   Q.    And at first you had told the prosecution when they

14   were interviewing you that this conversation occurred in

15   late spring, early summer, probably June; isn't that

16   correct?

17   A.    Possibly, yes.

18   Q.    Possibly, or that's correct?

19   A.    I told them late spring, or -- yes, late spring, early

20   summer.  I don't remember the part about possibly June.  But

21   it's close enough.

22   Q.    And the prosecution tried to narrow down that date with

23   you, did they not?

24   A.    Yes.

25   Q.    And so the agent asked you -- and again this is

CROSS - OLMSTEAD

1   referring to Agent Dahlstrom asked you if it was before or

2   after Bianca's deposition in the SCI lawsuit.  And you said

3   it was after that your conversation -- your long

4   conversation with her was after.

5   A.    Yes.  Because I thought she had been deposed earlier.

6   Q.    So you thought she -- you thought she had been deposed

7   actually a year earlier; isn't that right?

8   A.    Earlier.  Couldn't tell you exactly when.

9   Q.    Okay.  But then the agent corrected you and said, "No,

10  she was deposed in 2016."  Didn't he do that?

11  A.    Yes.

12  Q.    And then at another time, you said that maybe the long

13  conversation had happened in January.

14  A.    Okay.

15  Q.    Do you recall saying that?

16  A.    You can ask me this question 50 times, but my memory is

17  not going to get any better as to when it was.

18  Q.    And because your memory is not going to get better, you

19  said today it was in spring, you said to the agents and the

20  prosecutor that it could have been in January, you also said

21  that it was, at one time, in the fall of 2015, didn't you?

22  A.    I said it was possible.  I cannot pinpoint the night

23  that she and I spoke.

24  Q.    And so today you're saying it was in the spring?

25  A.    If you recall, I said to the very best of my ability I

CROSS - OLMSTEAD

1    think that is when it happened.

2    Q.    Now let me ask you, Ms. Olmstead, when you were popping

3    around saying it could have been in the fall, it could have

4    been in January, it could have been in the spring, it was in

5    June, did the prosecution threaten you with perjury charges

6    because your memory's not correct?

7    A.    No.

8    Q.    Now, during this long conversation that you have told

9    us about, you said that Bianca had told you for the first

10   time -- or Bianca was told for the first time that Larry was

11   having an affair with Lori and that she was sobbing and she

12   was very upset.  Is that correct?

13   A.    I don't know that it was the first time.  It was the

14   first time she had ever asked me, and it's the first time I

15   ever told her.

16   Q.    And so you're telling us that, during this long

17   conversation, it's the first time she ever asked you?

18   A.    Yes.

19   Q.    And you told her, "Yes, he's having an affair with

20   Lori"?

21   A.    Correct.

22   Q.    Now, are you aware that -- and, again, right now you're

23   saying to the best of your recollection that this happened

24   in spring of 2016.  Do you have a month in spring?

25   A.    No.  I have no idea.  I do not -- I cannot give you a

CROSS - OLMSTEAD

1    definite date.

2    Q.    Well, are you aware that Bianca spent a great deal of

3    time with her best friend, Helen Meyer, in May and June of

4    2016, and she never told her best friend anything about

5    finding a hair clip in bed or about Larry having an affair?

6    A.    It's entirely possible that she just knew I would

7    probably have the information she was looking for.

8    Q.    And then she did not disclose any of that information

9    that you claim you shared with her to her best friend Helen

10   Meyer?

11   A.    I don't know who her best friend is.

12   Q.    You don't know who her best friend is?

13   A.    I do not.

14   Q.    You don't know who any of her friends are?

15   A.    She would mention them, but I've never met them.  I've

16   never spoken to them.

17   Q.    And are you aware that her brother had visited her and

18   Larry at their home in Arizona in 2016 and said that they

19   both seemed happy and never mentioned anything about

20   affairs; Bianca never mentioned anything about it.

21   A.    I remember him coming.  That's all I can tell you.  I

22   wasn't there.

23   Q.    Now, you've talked about some things that you say

24   Bianca said about divorce, and some of that includes that

25   Bianca at first was saying that she couldn't get a divorce

CROSS - OLMSTEAD

1    because she was Catholic.  Do you recall that?

2    A.    Yes.

3    Q.    Now, you've also told us that she said that she was

4    afraid to get divorced because she didn't want to be alone?

5    A.    She didn't want to be broke.

6    Q.    Okay.  So that's another one, that she was afraid that

7    if she were to get divorced, that she wouldn't have any

8    money.

9    A.    Correct.

10   Q.    And then you also said, "Then she decided she's going

11   to threaten to get divorced and confront Larry with that."

12   A.    Yes.

13   Q.    Now, again, we're talking about this long conversation

14   that you are now saying to the best of your recollection

15   occurred in spring.  Are you aware that Bianca and Larry, in

16   May, traveled together and went on vacation together to

17   St. Thomas, to the U.S. Virgin Islands?

18   A.    I was aware of the trip.  I couldn't have told you when

19   it was.

20   Q.    Are you aware that they traveled together in May to go

21   together to Miami?

22   A.    They traveled together a lot.

23   Q.    They traveled together a lot.  And so even after spring

24   of 2016, in May and June they traveled together to

25   Pittsburgh, didn't they?

CROSS - OLMSTEAD

1    A.    Do you remember me telling you she said she was going

2    to do anything she could to save her marriage?

3    Q.    I do.

4    A.    Okay.

5    Q.    And she traveled again with him to St. Thomas in June,

6    with Larry.

7    A.    Okay.

8    Q.    Do you know that?  Are you aware of that?

9    A.    I do not recall exactly when they traveled.  There was

10   a lot of trips every year.

11   Q.    And after you're saying that she confronted him about

12   the marriage and about threatening to divorce him, are you

13   aware that they traveled together to Jackson Hole in July?

14   A.    Yes.

15   Q.    So you're aware of that one?

16   A.    Yes.

17   Q.    You're aware that they traveled, obviously, together to

18   Africa for two weeks.

19   A.    Yes.

20   Q.    And then in September they traveled again together to

21   Pittsburgh.

22   A.    Well, they lived in Pittsburgh.

23   Q.    I thought you told us that they lived in Arizona.

24   A.    They had homes in both places.

25   Q.    So you're saying in 2016 they had a home in Pittsburgh?

CROSS - OLMSTEAD

1    A.    I know they sold it.  I don't remember exactly when.

2    Q.    So are you saying they lived in Pittsburgh then, or

3    they didn't live in Pittsburgh then?

4    A.    They had a place to stay in Pittsburgh.  I couldn't

5    tell you if they owned it or if they rented it or if it was

6    an Airbnb, could not tell you.  But they went back and forth

7    quite often because of his practice.

8    Q.    And, again, this is the same woman who you said was

9    sobbing and was threatening to divorce Larry, was traveling

10   with him all over in May, June, July, August, and September.

11   A.    Bianca would have done anything to save her marriage.

12   Q.    And does that include -- so after you claim that you

13   had this conversation with her in spring, that she gave a

14   deposition after this and she claimed in that deposition --

15   she testified actually under oath, giving sworn testimony,

16   that she was not a long-suffering wife and that accusation

17   was not true and it was ridiculous?

18   A.    Yes, I am aware of that.

19   Q.    And you're aware, then, that in that same deposition

20   when she was asked about Larry having an affair with a woman

21   named Ann McCoy, Bianca said, "You're going to have to

22   define 'affair' because in my mind, that's a vague term that

23   means many different things to many different people."

24   A.    No, I never heard that.

25   Q.    You've never heard that.  So you're not aware of

CROSS - OLMSTEAD

1    everything that happened in this deposition.

2    A.    No.

3    Q.    You're aware in this deposition that she said that --

4    repeatedly, again, "I am not a long-suffering wife.  My

5    husband and I have been married for 30-some years, happily

6    married."

7    A.    I know Bianca would say anything to make sure that her

8    marriage survived.  That's all --

9    Q.    So are you saying that Bianca was lying under oath?

10    A.    I'm telling you that there -- she either told a story

11    to me or she told a story to them.

12    Q.    So she either told a story to you or she told a story

13    to them.

14    A.    Yes, it couldn't be both.

15    Q.    Is that what you're saying?

16    A.    Can't be both.  But I will tell you that, after six

17    years, I don't believe she lied to me.

18    Q.    And under oath in a sworn deposition, are you aware

19    that she said, when she's asked if she has any knowledge of

20    Dr. Rudolph having any affairs with individuals over the

21    course of her marriage, she answered, "Again, you're going

22    to have to define 'affair.'"

23    A.    No.

24    Q.    Now, when you spoke with Bianca, did she ask you to

25    define "affair"?

CROSS - OLMSTEAD

1    A.    No.

2    Q.    Now, Ms. Olmstead, you've talked to us about another

3    statement that you claim Bianca made to you about this

4    document that Larry drew up at the kitchen table.  Do you

5    recall speaking to the prosecutor about that?

6    A.    Yes.

7    Q.    And you said that he just wrote up that document at the

8    kitchen table and it said she would get nothing.

9    A.    That's what she told me.

10   Q.    And you said that Larry signed her name for her?

11   A.    I said that's what she told me.  I was not there.

12   Q.    That's what she told you.  So you were not there.  You

13   don't know if that happened or not?

14   A.    No, I do not.  That's just what she told me.

15   Q.    So, again, being friends with Bianca, so close that she

16   would disclose very personal things to you, are you aware

17   that a well-respected divorce attorney in Pennsylvania

18   drafted a postnuptial for the Rudolphs in 2000?

19   A.    No.

20   Q.    And you spoke about Bianca having an affair.  Were you

21   aware that Bianca had multiple affairs?

22   A.    No, she told me she had one.

23   Q.    So she didn't tell you about the other affairs?

24   A.    No, she did not.

25   Q.    And 2000 is long before you knew her; isn't that right?

CROSS - OLMSTEAD

1    A.    Correct.

2    Q.    And are you aware that Bianca signed this postnuptial

3    agreement, and she signed it because she wanted to stay in

4    the marriage?

5    A.    I have no idea.

6    Q.    Are you aware that a handwriting expert from the FBI

7    laboratory in Quantico has come to court and confirmed that

8    that was Bianca's signature on that postnuptial agreement?

9    A.    Again, no.

10   Q.    You're not aware that another handwriting expert has

11   also confirmed that that signature on the postnuptial was

12   Bianca's signature?

13   A.    No.

14   Q.    And that these handwriting experts were confident that

15   the signature was not forged.  Are you aware of that?

16   A.    No.

17            THE COURT:  Ms. Moss, give me a sense of how much

18   more cross -- I'm not trying to cut you off.  I just want to

19   get a sense if you're almost done or we need to pause here

20   and you can continue in the morning.

21            MS. MOSS:  I'm hoping 10 minutes, Your Honor.

22            THE COURT:  I think that will be a bit stretching

23   it.  And you lawyers never stick to what your estimate is.

24   So we'll call it a day there.

25            Thank you, Ms. Moss.

 1          MS. MOSS:  Thank you.

 2          THE COURT:  All right, ladies and gentlemen of the

 3   jury, we're going to pause here.  Just as we've done already

 4   at 10 mornings, tomorrow morning please be back in the jury

 5   deliberation room by 8:35.  I'm going to ask the lawyers to

 6   stay present because we have to discuss some scheduling

 7   issues.  But in addition to that, again, I have to remind

 8   you, please do not do any independent research into or

 9   discuss with anyone the facts, the law, or the persons

10   involved in this suit.

11          All right.  The jury is released until 8:45

12   tomorrow morning.

13          (Jury left the courtroom at 5:04 p.m.)

14          THE COURT:  All right, Ms. Olmstead, two things.

15   One is, since you're in the middle of your testimony, I

16   direct you not to speak with any of the lawyers during the

17   recess.  And I ask you to be back in the witness stand here

18   by 8:40 tomorrow morning.  All right?

19          THE WITNESS:  Okay.

20          THE COURT:  You may leave at this time.

21          THE WITNESS:  Okay.  Thank you.

22          THE COURT:  Thank you.  All right, everyone else,

23   please be seated.

24          All right, Mr. Markus, you wanted to raise a

25   scheduling point.

1          MR. MARKUS:  Yes, Your Honor.  Thank you.  Sorry, I

2     was lost in space there.  Your Honor, as I mentioned last

3     week, we have an expert witness named Luke Haag.  He's our

4     gun expert.

5          THE COURT:  Right.

6          MR. MARKUS:  He's scheduled for a procedure on

7     Wednesday morning, so I've spoken to the Government about

8     calling him tomorrow.  I think we can finish Ms. Olmstead,

9     and then I would request that we just take him out of turn.

10    My understanding is the Government has two witnesses left;

11    one is their summary financial person.  That would probably

12    take a couple of hours is my guess, and then one brief

13    witness, the bartender, Lovelace.  So I think if we finish

14    Olmstead in the morning, maybe within a half an hour, then

15    we could put Mr. Haag on in the morning and he could be free

16    and then we could finish the Government's case, Your Honor.

17         THE COURT:  But it's my understanding that -- what

18    he needs to do is testify tomorrow.  It's not like he's

19    having surgery tomorrow afternoon, right?

20         MR. MARKUS:  Correct.  He needs to fly out tomorrow

21    evening, Your Honor.

22         THE COURT:  All right.  First, let me get -- let me

23    hear from the Government, their position on this.

24         MR. FIELDS:  Your Honor, we have no opposition.

25    And, in fact, he's cross-designated so if they didn't call

1    him we would call him in our case in chief.

2          THE COURT:  Oh, he is cross-designated?

3          MR. MARKUS:  I didn't see that, Your Honor, but it

4    doesn't -- I don't think it matters.

5          THE COURT:  All right.  So what -- Mr. Fields,

6    which would be the most -- or the least confusing to the

7    jury point for us to pause and interject this witness?

8          MR. FIELDS:  I think if we have this witness after

9    Ms. Olmstead, that's not going to break up the presentation

10   too much, Your Honor.  I think that's perfectly fine and

11   appropriate.

12         THE COURT:  All right.  So we'll do that.  We'll

13   conclude with Ms. Olmstead and then we'll call -- even

14   though he's cross-designated, he has to be on the record as

15   being called to testify by one of the two of you.  He's

16   called by the defendants, or at least a Defendant Rudolph,

17   so we'll go with him.  He's cross-designated, so there will

18   be recross and then we'll resume -- did Mr. Markus represent

19   the remainder of your case accurately, Mr. Fields?

20   Ms. Newton and Mr. Lovelace would be the remaining

21   witnesses?

22         MR. FIELDS:  He did, Your Honor.  I think

23   Ms. Newton's direct will last about an hour and

24   Mr. Lovelace's direct is maybe 20 minutes.

25         THE COURT:  All right.  And let me ask you:  When

1    we're -- after the Government rests, is there going to be a

2    motion from Defendant Rudolph?

3          MR. MARKUS:  Of course, Your Honor, yes.

4          THE COURT:  Yeah.  Just -- I need to ask -- I need

5    to ask this:  Is there going to be a motion from Defendant

6    Milliron?

7          MR. DILL:  Yes, Your Honor.

8          THE COURT:  All right.  All right, I think we have

9    sketched out tomorrow pretty well.  Anything else you wanted

10   to say, Mr. Fields?

11         MR. FIELDS:  No, Your Honor.

12         MR. MARKUS:  Your Honor, I think the motion may be

13   pretty short based on your ruling on Ms. Olmstead earlier on

14   part 1 of it.  But I guess the only other thing I would add,

15   Your Honor, is we have another expert witness who has flown

16   in -- we had expected the Government to rest today.  I think

17   we'll get to him in the afternoon.  Dr. Baden, he's our

18   forensic pathologist.  I would request, even if we have to

19   stay a few minutes extra tomorrow to get him off, that we

20   could -- he's turning 88 this week, Your Honor, and he's

21   scheduled to fly out early Wednesday morning.  So I would

22   just ask the Court's indulgence if we can get him on and off

23   tomorrow afternoon after the Government --

24         THE COURT:  I'll work with you on that.  It's

25   always a fine line between how long we keep the jury beyond

1    what they expect to be here, because then they start getting

2    upset and losing attention and -- so -- but I'll work with

3    you on that, Mr. Markus.

4              MR. MARKUS:  Thank you, Your Honor.

5              THE COURT:  All right, we'll be in recess until

6    tomorrow morning at 8:45.

7         (Proceedings concluded at 5:09 p.m.)

8                             INDEX

9    <u>Item</u>                                         <u>PAGE</u>

10                   <u>GOVERNMENT'S WITNESSES</u>

11         DONALD PETERSON (Continued)
           Direct Examination by Mr. Winstead (Cont'd)   1908
12         Cross-examination by Mr. Markus               1967
           Cross-examination by Mr. Dill                 2006
13         Redirect Examination by Mr. Winstead          2033

14         JOSEPH SMITH
           Direct Examination by Mr. Fields              2045
15         Cross-examination by Mr. Markus               2058
           Redirect Examination by Mr. Fields            2064
16
           JAMES PADISH
17         Direct Examination by Mr. Grewell             2074
           Cross-examination by Mr. Markus               2091
18         Redirect Examination by Mr. Grewell           2110

19         CASSANDRA OLMSTEAD
           Direct Examination by Mr. Winstead            2128
20         Cross-examination by Ms. Moss                 2154

21                   <u>GOVERNMENT'S EXHIBITS</u>

22    <u>EXHIBITS</u>:        <u>Offered</u>    <u>Received</u>  <u>Refused</u>    <u>Stipulated</u>

23    95               1941       1941

24

25

1                          **REPORTER'S CERTIFICATE**

2          I certify that the foregoing is a correct transcript

3     from the record of proceedings in the above-entitled matter.

4          Dated at Denver, Colorado, this 13th day of September,

5     2023.

6

7

8                    MARY J. GEORGE, FCRR, CRR, RMR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25