2186

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 22-cr-0012-WJM

UNITED STATES OF AMERICA,

Plaintiff,

vs.

LAWRENCE RUDOLPH,
LORI MILLIRON,

Defendants.

---------------------------------------------------------------

REPORTER'S TRANSCRIPT
(Jury Trial, Day 11)

---------------------------------------------------------------

Proceedings before the HONORABLE WILLIAM J. MARTINEZ, Judge, United States District Court for the District of Colorado, commencing at 8:52 a.m., on the 26th day of July, 2022, in Courtroom A801, United States Courthouse, Denver, Colorado.

APPEARANCES

BRYAN D. FIELDS, E. GARRETH WINSTEAD, III, J. BISHOP GREWELL, Assistant U.S. Attorneys, 1801 California Street, Suite 1600, Denver, Colorado 80202, appearing for the plaintiff.

DAVID O. MARKUS, A. MARGOT MOSS, LAUREN L. DOYLE, Markus Moss PLLC, 40 NW Third Street, Penthouse 1, Miami, Florida 33175, appearing for the defendant Rudolph.

JOHN W. DILL, John W. Dill P.A., 941 West Morse Boulevard, Winter Park, Florida 32789, appearing for the defendant Milliron.

MARY J. GEORGE, FCRR, CRR, RMR
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer

P R O C E E D I N G S

(In open court outside the presence of the jury at 8:52

a.m.)

THE COURT:  I understand counsel has a matter to

raise before we bring in the jury.

MR. MARKUS:  Yes, Your Honor.  Good morning.

THE COURT:  Good morning.

MR. MARKUS:  Two issues.  One is I've been working

with the Government in terms of scheduling and Mr. Haag, the

witness we wanted to take out of turn.  His flight isn't

until this evening so we think the Government can rest this

morning and we can call Mr. Haag right out of lunch and keep

everything in order.

THE COURT:  All right.  Good.

MR. MARKUS:  So that works out nicely.  The other

thing, Your Honor, is the Government's witness after

Ms. Olmstead is a expert named Erin Newton.

THE COURT:  Right.

MR. MARKUS:  As the Court knows, she was asked to

provide two opinions to the jury.  One is the net worth and

one is outflows of cash.  And the Court excluded net worth,

but allowed discussion of outflow of cash.  In speaking with

the Government last night, I learned for the first time that

1        they want to introduce tracing evidence to try to figure out

2        where the insurance proceeds were spent.  That was not a

3        opinion that was disclosed to the defense before trial.

4        It's not in any of her reports.

5                  So I would object to any qualification of her as a

6        tracing expert and any evidence regarding her analysis of

7        what -- of how the insurance money was spent, Your Honor.

8                  THE COURT:  Well, I'll hear from the Government,

9        but is it your argument, or your contention, that she's

10       going to offer opinion testimony regarding tracing or

11       fact-based investigation type of evidence regarding the

12       tracing?

13                 MR. MARKUS:  I think she's going to offer expert

14       opinion as a forensic accountant that she has -- she's an

15       expert in tracing and that she looked at the accounts and

16       tried to trace the insurance proceeds.  And the problem with

17       that, Your Honor, is, you know, if that was going to be an

18       opinion, we should have been put on notice of that before

19       trial.

20                 THE COURT:  Okay.  Thank you.  Let me hear from the

21       Government.

22                 MR. FIELDS:  Thank you, Your Honor.  Our expert

23       notice specifically stated that Ms. Newton would be giving

24       just percipient fact testimony about her observations of

25       documents.  She's -- doesn't need to be qualified as a

1    tracing expert.  I'm not even sure that there is so-called

2    expertise in tracing.  Really what it requires is looking at

3    the documents and just saying, "Okay, here's this bank

4    account, this bank statement, here's this check, here's this

5    other bank account."  It's fact testimony that any witness

6    could give.

7              Ms. Newton has particular sort of knowledge because

8    she's reviewed thousands and thousands of documents, but

9    that doesn't make her an expert, it just means that she's

10   aware of a lot of facts.  So we think that it's lay

11   testimony, and it's going to be based very much on documents

12   that she's physically observed and seen, so that makes it

13   lay testimony, in our opinion.

14             THE COURT:  That's what I anticipated by my

15   questions of Mr. Markus.  To the extent Mr. Markus' comments

16   can be construed as a objection to this testimony, it's

17   overruled, to the extent the Government holds to its

18   representation that this will not be opinion testimony but,

19   rather, percipient fact-related testimony.  All right.

20   Let's bring in the jury.

21        (In open court in the presence of the jury at 8:56

22   a.m.)

23             THE COURT:  Good morning, ladies and gentlemen of

24   the jury.

25             THE JURORS:  Good morning.

2190

CROSS - OLMSTEAD

1    THE COURT:  Welcome back to day 11 of our jury

2    trial.

3    Ms. Olmstead, I remind you that you remain under

4    oath.

5    Ms. Moss, you may resume your cross-examination.

6    MS. MOSS:  Thank you, Your Honor.

7    CROSS-EXAMINATION (Continued)

8    BY MS. MOSS:

9    Q.    Ms. Olmstead, we left off yesterday when you were

10   telling us that Larry had presented Bianca with a document

11   that he handwrote and showed to her at their kitchen table.

12   You recall testifying to that?

13   A.    Yes.

14   Q.    And that you had said that this document, according to

15   you, would leave Bianca nothing should they get divorced.

16   A.    According to Bianca, yes.

17   Q.    And that instead of Bianca signing it, she claims that

18   Larry signed it for her.

19   A.    Correct.

20   Q.    Now, we also talked yesterday about how you were not

21   aware that there was a postnuptial agreement, correct?

22   A.    Correct.

23   Q.    Bianca never told you about a postnuptial agreement.

24   A.    No.

25   Q.    And you were not aware that not just one, but two

CROSS - OLMSTEAD

1    handwriting experts have looked at that postnuptial

2    agreement and have confidently confirmed that Bianca did, in

3    fact, sign that postnuptial.  You were not aware of that.

4    A.    No.

5    Q.    And so even though you say that Bianca had told you

6    that a divorce would leave her with nothing, you're not

7    aware, and she didn't tell you, that she would actually get

8    $2 million if there were a divorce, and that she would get

9    furniture and jewelry and retirement.

10   A.    No.

11   Q.    You didn't know any of those things.

12   A.    No.

13   Q.    And, again, fair to say that you didn't know a lot

14   about Larry and Bianca.

15   A.    That's correct.  You asked me that yesterday.

16   Q.    And so you were also not aware -- and, again, you

17   testified yesterday that this conversation you, had you

18   believe was in the spring, right?

19   A.    To the very best of my ability.

20   Q.    And so you were not aware in the spring of 2016 that

21   the Rudolphs were redoing their wills together --

22   A.    No.

23   Q.    -- isn't that right?

24        And you were not aware that in 2016, that the

25   Rudolphs were working together with lawyers to do estate

CROSS - OLMSTEAD

1    planning, were you?

2    A.    No.

3    Q.    So you weren't aware that in the spring of 2016, they

4    were working on planning their future together.

5    A.    No.

6    Q.    She never told you any of those things?

7    A.    No.

8    Q.    And as you said yesterday, they were very private

9    people.

10    A.    Yes.

11    Q.    Now, you also testified yesterday to this breakfast

12    that you say happened where you told Bianca that Lori didn't

13    stop working at Three Rivers Dental.  Do you recall that?

14    A.    Yes.

15    Q.    And you told her that, and you told her that, "So Larry

16    didn't do what you may have asked him to do."

17    A.    Correct.

18    Q.    And you had originally told the FBI and the prosecution

19    in the case that this breakfast meeting occurred on July

20    22d.

21    A.    I had on my time sheet a breakfast on July 22d and so I

22    made that assumption, but I was incorrect.

23    Q.    And that was an assumption that you made based on some

24    calendar entry in your notebook; is that right?

25    A.    On my time sheet, yes.

CROSS - OLMSTEAD

1    Q.    And you were incorrect about that.

2    A.    I was correct that we were at breakfast, but I was not

3    correct that it was one that Bianca was at.  Just Larry was

4    there.

5              THE COURT:  Ms. Moss, Ms. Moss, what year are we

6    talking about?

7              MS. MOSS:  2016, Your Honor.

8              THE COURT:  All right.

9    BY MS. MOSS:

10   Q.    And you know it's not correct because the FBI informed

11   you that July 22d, 2016, is when Bianca was deposed.

12   A.    That's correct.  That's when I started looking for more

13   information on that meeting.

14   Q.    And you also told the FBI and the prosecution just last

15   week, again, that you were wrong about that.

16   A.    About the date, yes.

17   Q.    Yes?

18   A.    It was six years ago.  My memory is not perfect.

19   Q.    And your memory is not perfect because it was a long

20   time ago; isn't that --

21   A.    Correct.

22   Q.    Now, I want to talk to you about some of these emails

23   that was discussed yesterday.  You testified that you have

24   had access to Larry's email, correct?

25   A.    Correct.

CROSS - OLMSTEAD

1    Q.    So you saw his emails.

2    A.    Correct.

3    Q.    You read his emails.

4    A.    Every day.

5    Q.    You read all of his emails, didn't you?

6    A.    Yes, I would assume so.

7    Q.    You would assume so.  Well, didn't you tell the FBI

8    that you had read all of them?

9    A.    All of them from the first day I started working until

10   the end?

11   Q.    Yes.

12   A.    I don't think I ever made that statement.  I don't know

13   that I didn't miss some along the way.  But yes, I read his

14   emails on a consistent basis.

15   Q.    And so from reading his emails, you saw that he was

16   having a relationship with Lori, didn't you?

17   A.    Correct.

18   Q.    And you saw that he was seeing other women on occasion.

19   A.    Correct.

20   Q.    And that sickened you, didn't it?

21   A.    I don't know that I would use that term, but I was

22   definitely disappointed.

23   Q.    And you testified yesterday that when you were speaking

24   with Bianca in this conversation, that you told us you

25   didn't think it was ethical for you to pull those emails for

CROSS - OLMSTEAD

1    her.  Isn't that what you said?

2    A.    Correct.

3    Q.    And so even though you did not think it was ethical for

4    you to pull those emails, it was ethical for you to tell her

5    that, "You used the same passwords or combination of

6    passwords."  You told her that, didn't you?

7    A.    Yes.

8    Q.    And so it was ethical for you to tell her that, you

9    know, if you can't do it, I'll help you do it.

10   A.    Yes, I guess I did tell her that I would help her

11   through the process.

12   Q.    And it was ethical for you to then eventually have to

13   help her because she couldn't figure one of them out all the

14   way; isn't that right?

15   A.    Correct.

16   Q.    And so it was ethical for you to walk her through the

17   process to pull these emails, but not ethical for you to

18   pull them.

19   A.    I was putting those responsibilities and those ethical

20   boundaries on myself.  There was no -- there's no rule that

21   says I couldn't have given her all the passwords and helped

22   her in any way.

23   Q.    So some things were ethical to you, some things were

24   unethical to you.

25   A.    I don't know that I would word it that way.

CROSS - OLMSTEAD

1    Q.    Well, you thought it was ethical to tell her, "If you

2    want to search the emails, press control F."

3    A.    I don't think that's an ethics concern.

4    Q.    You told her that, didn't you?

5    A.    Yes, I did.

6    Q.    Now, when you press control F, that just searches

7    within one email; isn't that right?

8    A.    No.

9    Q.    So that if you press control F in your email, that will

10   search all of your emails.

11   A.    If you're in your email account, there are commands,

12   depending on the different email program that you're using,

13   that will help you to search.

14   Q.    And so did you instruct her and help her to search?

15   A.    I told her how I search.  I don't know what she ended

16   up doing.

17   Q.    And did you do that with the purpose of helping her to

18   search?

19   A.    For sure.

20   Q.    Now you say that Bianca printed up these emails and

21   then brought them back to you.  Do you recall that?

22   A.    Yes.

23   Q.    And did she give them to you in an envelope?

24   A.    Yes, they're in a manila envelope.

25   Q.    Did she write anything on the envelope?

2197

CROSS - OLMSTEAD

1   A.   My name.

2   Q.   Do you have that envelope?

3   A.   No.

4   Q.   Did you give that envelope to the FBI?

5   A.   No.

6   Q.   Do you still have that envelope?

7   A.   I don't think I do.  I took it out, I wrote -- I put

8   all my other emails in there with it and wrote "Bianca" on

9   the front of the envelope so that -- because when I was

10  cleaning out my safe, I did not -- I found this envelope.

11  I'd forgotten I had it.  And so I put her name on the top of

12  the envelope.

13  Q.   So it sounds like you still have this envelope.

14  A.   The one with Bianca's name on it, yes.

15  Q.   Did you think that was an important piece of evidence

16  to give to the FBI, along with all these emails that you

17  claim she pulled?

18  A.   No.

19  Q.   Well, let's take a look at some of those emails.

20       I'd like to go to Exhibit 90, page 145.  And this

21  is INV 27819.  And can we pull out the very top of the

22  email, please.

23       Now, this is an email that the prosecution showed

24  you on direct.  Do you recall that?

25  A.   Yes.

CROSS - OLMSTEAD

1    Q.    And do you see your name there at the top?

2    A.    Yes.

3    Q.    And that means you printed this email, right?

4    A.    From my computer, yes.

5    Q.    So somehow this email got into the stack of emails that

6    you claim Bianca gave you.  Is that what you're saying?

7    A.    Correct.  I explained yesterday that I put other emails

8    in that packet -- or other documents in that packet,

9    including the SCI lawsuit documents.

10   Q.    So you wanted to keep a packet of the emails that

11   Bianca gave you, but you just decided to go ahead and add

12   extra things to it?

13   A.    Yes.  Six years ago I did not expect to be sitting

14   here.  It wasn't an issue.

15   Q.    And we'll talk about that in just a second.  Let's put

16   just another one.  Exhibit 90, page 148, which is INV 27822.

17   And if we can go to the top, again, of this email.

18         Do you see your name printed there at the top?

19   A.    Correct.

20   Q.    And what that shows, again, is that you printed this

21   email from your computer.

22   A.    Correct.

23   Q.    Can we go to the next page of this, which is 27823.

24   And if we could call out the top third of that document,

25   please.

CROSS - OLMSTEAD

1    And do you see there that this is an email from

2    Larry, and he's using the email address lpr7mma@gmail.com?

3    A.    Correct.

4    Q.    These are the emails, again, that you admitted that you

5    printed out, correct?

6    A.    Correct.

7    Q.    Can we go to Exhibit 90, page 3, which is INV 27677.

8    And can we pull out just the top of that.

9         Now we see this is a different email address that

10   belonged to Mr. -- Dr. Rudolph.  Do you see that?

11   Lprsci@yahoo.com?

12   A.    Correct.

13   Q.    And do you see -- at the top of this email, do you see

14   the name Bianca Rudolph showing that Bianca Rudolph printed

15   out these emails?

16   A.    I don't think her name appears on any of these

17   documents.

18   Q.    Not in any of them showing that she printed them out,

19   correct?

20   A.    I don't remember them.

21   Q.    And have you looked at them?

22   A.    Years ago, yes.

23   Q.    Have you looked at them in anticipation of your

24   testimony here today?

25   A.    Before I met with the FBI for the first time, I pulled

CROSS - OLMSTEAD

1    them out to review what was in them, but I just scanned

2    them.

3    Q.    And when you scanned them, did you see "Bianca Rudolph"

4    printed at the top of any of these emails that you're

5    claiming she printed?

6    A.    No.    Not that I remember.    I didn't pay any attention,

7    honestly.

8    Q.    And these are -- thank you, Mr. Reyes.

9            These are emails from 2010 and 2011; isn't that

10    correct?

11    A.    Yes.

12    Q.    Now, you said that Bianca printed these in 2016.    So

13    when she's doing this search, those are the first emails

14    that are going to come up; isn't that correct?    2016 emails?

15    A.    I couldn't tell you that.

16    Q.    Well, are there any 2016 emails in this pack?

17    A.    I did not review the entire document so I couldn't -- I

18    could assume that; but in a conversation that I had with the

19    prosecutors, we talked about the fact that it was 2010,

20    2011, 2012.

21    Q.    Well, there's no emails from 2012, are there?

22    A.    I don't know.    Do you want me to go through every page

23    and review it?

24    Q.    I don't want you to take the jury's time today to do

25    that, but did you do that before you came here today?

2201

CROSS - OLMSTEAD

1   A.   No, I did not.

2   Q.   Now, did you see any emails in there from 2013?

3   A.   Again, I didn't review the dates.  I didn't pay any

4   attention.

5   Q.   Do you -- and do you remember -- well, let me just ask

6   you:  Do you recall any emails from 2013?

7   A.   No, not specifically.

8   Q.   Any emails -- any emails from 2014?

9   A.   Again, I did not review it since I gave the packet to

10  the FBI months ago.  I have not looked at the packet.

11  Q.   And I understand that your memory is in question here

12  and this is a long time ago, but I'm asking if you recall.

13  Do you recall any emails in there from 2014, '15, or '16?

14  A.   I don't recall.

15  Q.   Isn't it true that the only emails that are in there

16  are from 2010 and 2011?

17  A.   I can't say yes or no to that.

18  Q.   If we -- would you take my word for it that I have

19  reviewed the emails and they are only emails from 2010 and

20  2011?

21  A.   Okay.

22  Q.   And isn't it true, Ms. Olmstead, that you were the one

23  that printed out those emails?

24  A.   No.

25  Q.   And that you're the one that printed out those emails

CROSS - OLMSTEAD

1    to hold them over Larry's head for a 2012 lawsuit that he

2    filed?

3    A.   No.   I had nothing to do with that lawsuit.

4    Q.   Now, Ms. Olmstead, you -- you're again saying that

5    these were emails that Bianca printed out in 2016.   They're

6    just for 2010 and 2011.   And you found out in October of

7    2016 that Bianca passed away, didn't you?

8    A.   Correct.

9    Q.   And so, Ms. Olmstead, you must have been beside

10   yourself, and so you must have immediately gone to the FBI

11   in 2016, didn't you?

12   A.   No.

13   Q.   Did you go to the FBI in November of 2016?

14   A.   No, I never reached out to the FBI.

15   Q.   So in 2016, 2017, 2018, 2019, 2020, 2021, you never

16   reached out to the FBI.

17   A.   No.

18   Q.   Did you reach out to Bianca's son, Julian Rudolph?

19   A.   No.

20   Q.   You didn't reach out to Bianca's daughter, AnaBianca

21   Rudolph?

22   A.   No.

23   Q.   You didn't contact anyone about life insurance?

24   A.   No.

25   Q.   Now, you found out that he had been arrested --

CROSS - OLMSTEAD

1   Dr. Rudolph had been arrested in this case in December of

2   2021?

3   A.    Correct.

4   Q.    So did you immediately go to the FBI then after that?

5   A.    No.

6   Q.    So the FBI and the prosecution are the ones that had to

7   reach out to you, right?

8   A.    Correct.

9   Q.    And once the FBI reached out to you, you did everything

10  that you could to try to help them; isn't that right?

11  A.    Hopefully.  Yes.

12  Q.    And you helped them because you didn't like Larry was

13  having an affair with Lori, did you?

14  A.    I don't know that I would word it that way, no.  I

15  think -- I told you I was disappointed in him, but he is not

16  the only client I have ever had that has had affairs.

17  Q.    You didn't like that Larry had spent a lot of money on

18  Lori, did you?

19  A.    That's none of my business.

20  Q.    You didn't like that Larry had affairs with other

21  women, did you?

22  A.    Again, none of my business.

23  Q.    You didn't like that Larry sometimes caught you in the

24  middle of those affairs, such as that example when the hotel

25  called you?

CROSS - OLMSTEAD

1    A.    That is a correct statement; I did not like that.

2    Q.    And you were, you said, disappointed?

3    A.    Yes.

4    Q.    You disapproved.

5    A.    Yes.  I would say I was -- I disapproved.

6    Q.    This went against your faith and your morals, and you

7    did not like it, did you?

8    A.    I try not to get involved in other people's personal

9    lives.

10   Q.    And you told the FBI and the prosecutors multiple times

11   that you don't like Larry for these reasons; didn't you?

12   A.    I don't know that I worded it that way, no.

13   Q.    You said you didn't like Larry, didn't you?

14   A.    I had nothing against Larry until after Bianca died.

15   Q.    Are you saying that you -- you didn't tell the FBI that

16   you didn't like Larry?

17   A.    A few months ago?  I don't remember that conversation.

18   Q.    And we talked yesterday about being fair.  Now, what

19   you told the FBI is, "I hope you can bury both of them."

20   A.    I probably said that.

21   Q.    Probably, or you did say that, Ms. Olmstead?

22   A.    I cannot recall exactly using those words.

23   Q.    Can we please play TPS 1, which is clip 17, please.

24         THE COURT:  Is this in evidence?

25         MS. MOSS:  It is not.  It's for refreshing

CROSS - OLMSTEAD

1     recollection, Your Honor, and impeachment.

2              THE COURT:  Is there an objection?  Let me ask

3     this:  Do we have a transcript of this so there's some way

4     this can be played without the jury hearing it or I can find

5     out what the contents are before we just -- I understand

6     that you're trying to refresh recollection, but --

7              MS. MOSS:  Right.

8              THE COURT:  -- obviously given that it's an audio

9     clip as opposed to a document, it presents different issues.

10              MS. MOSS:  A different issue, Your Honor?  I'm

11     sorry?

12              THE COURT:  Well, with a document, the witness --

13     it's not in evidence.  The witness can look at it, refresh

14     her recollection, turn it over and testify.  The jury never

15     sees it.  Audiotape, they're going to hear what's on the

16     tape, and it's not in evidence.

17              MS. MOSS:  Well, Your Honor, it's being used for

18     impeachment, so I think it is fair for the jury to hear what

19     she said.

20              THE COURT:  Mr. Winstead?

21              MR. WINSTEAD:  I think if it's refreshing

22     recollection or impeachment, I don't think she denied it,

23     and so I don't think extrinsic evidence would be admissible.

24     I don't know if there's a way to, like, have headphones or

25     something like that she could hear --

2206

CROSS - OLMSTEAD

1          THE COURT:  All right.  It's going to -- let me ask

2    you this, counsel:  Is it worth our time for me to ask the

3    jury to go to the deliberation room while we hear this tape,

4    refresh her recollection, and then bring them back in?  If

5    you tell me that it's worth the time to do that, we'll do

6    it.

7          MS. MOSS:  No, I don't think it's worth this jury's

8    time to have to go back out and come back in, Your Honor.

9          THE COURT:  All right.  Then let's do it a

10   different way.

11   BY MS. MOSS:

12   Q.   So let me ask it this way, Ms. Olmstead:  There was a

13   recording when you spoke to the FBI in April of 2022, was

14   there not?

15   A.   Were we on a Zoom call?

16   Q.   No.  They were in your home --

17   A.   Oh.

18   Q.   -- Mr. Winstead --

19   A.   Yes.

20   Q.   -- Mr. Dahlstrom --

21   A.   Yes.

22   Q.   -- and they recorded you?

23   A.   He did.

24   Q.   And if I told you that I have listened to this

25   recording and you said, "I hope you can bury both of

CROSS - OLMSTEAD

1    them" --

2    A.    Okay.

3    Q.    -- would you have any reason to distrust that?

4    A.    No.

5    Q.    And you -- so you said that, "I hope you can bury both

6    of them."

7    A.    You're telling me you listened to it and that's what I

8    said, so I'm willing to take your word for it.

9    Q.    And what you also said is, "If I had any evidence that

10    would put this man away for life and bury him and maybe even

11    give him the death penalty, I could promise you I would be

12    on the FBI's doorstep."

13    A.    Okay.

14    Q.    You said that as well, didn't you?

15    A.    I do not recall saying that, but I may have.

16    Q.    But you didn't go to the FBI in 2016, did you?

17    A.    No, I didn't believe I had anything that would truly

18    help them.

19          MS. MOSS:  I have nothing further, Your Honor.

20          THE COURT:  All right.  Any cross, Mr. Dill?

21          MR. DILL:  No, sir.

22          THE COURT:  All right.  Redirect.

23          MR. WINSTEAD:  No redirect, Your Honor.

24          THE COURT:  No redirect?  May this witness be

25    excused for the Government?

CROSS - OLMSTEAD

1          MR. WINSTEAD:  Yes, Your Honor.

2          THE COURT:  All right.  For the defendants?

3          MR. DILL:  Yes, Your Honor.

4          MS. MOSS:  Nothing further, Your Honor.

5          THE COURT:  All right.  Ms. Olmstead, thank you for

6     your testimony.  You're excused, and you may step down.

7          THE WITNESS:  Thank you.

8          THE COURT:  Government may call its next witness.

9          MR. FIELDS:  Thank you, Your Honor.  The United

10    States calls Erin Newton.

11         THE COURT:  All right.

12         COURTROOM DEPUTY:  Please step up.  Raise your

13    right hand for me.

14          ERIN NEWTON, GOVERNMENT'S WITNESS, SWORN

15         COURTROOM DEPUTY:  Thank you.  Please be seated and

16    remove your mask for us.  Then state your full name for the

17    record and spell your first and names for us.

18         THE WITNESS:  My name is Erin Newton.  It's spelled

19    E-r-i-n, N-e-w-t-o-n.

20         MR. FIELDS:  May I begin, Your Honor?

21         THE COURT:  Yes, you may, counsel.

22         MR. FIELDS:  My understanding is there is no

23    objection to Government's Exhibits 300, 305, 309 to 327, and

24    500 to 505 so at this point in time I'd move to admit those

25    exhibits, Your Honor.

DIRECT - NEWTON

1          THE COURT:  All right.  One second.  Any objection

2     by the defendants?

3          MR. MARKUS:  No objection, Your Honor.

4          MR. DILL:  No objection, Your Honor.

5          THE COURT:  All right.  Given that there's no

6     objection, the following Government exhibits are admitted

7     into evidence and may be published to the jury:  300, 305,

8     309 through 327, and 500 through 505.

9          (Government's Exhibits received)

10         MR. FIELDS:  Thank you, Your Honor.

11                    DIRECT EXAMINATION

12    BY MR. FIELDS:

13    Q.   Ms. Newton, where do you work?

14    A.   I work for the FBI in Denver, Colorado.

15    Q.   Did you review financial records for Lori Milliron?

16    A.   Yes.

17    Q.   Did you review financial records for Lawrence Rudolph

18    and Bianca Rudolph?

19    A.   Yes.

20    Q.   And travel records for all three of those

21    individuals?

22    A.   Yes.

23    Q.   Are you prepared today to tell the jury what you found?

24    A.   Yes.

25    Q.   Did financial records show expenses for Bianca's

DIRECT - NEWTON

1    funeral?

2    A.    Yes.

3    Q.    Approximately how much did the funeral cost?

4    A.    Approximately $1900.

5    Q.    Did those records show the date of the funeral?

6    A.    Yes.  It was on October 22d, 2016.

7    Q.    Did you look at the financial transactions by Rudolph

8    the day after that funeral?

9    A.    Yes.

10   Q.    Let's look at Government's Exhibit 316.

11         What is this?

12   A.    This is a copy of the credit card statement for

13   Dr. Rudolph's AmEx ending 3004; the closing date November

14   13th, 2016.

15   Q.    So let's look at page 4.  And if we could, let's blow

16   up down here, this bottom section.

17         Do you see what's the transaction -- the second

18   from the bottom there?

19   A.    That's a hotel reservation at the Aria Resort and

20   Casino in Las Vegas for $513.23.

21   Q.    When was that transaction made?

22   A.    October 23d, 2016.

23   Q.    Is that where -- what -- how is that in relation to the

24   funeral?

25   A.    That's the day after Bianca's funeral.

2211
DIRECT - NEWTON

1    Q.    And if we go to the next page.  And if we look up there
2    sort of at the top again.
3          Does that show the date of the check-in for the
4    hotel?
5    A.    Yes.  It shows the check-in date was October 26th, 2016
6    and the departure date was October 28th, 2016.
7    Q.    Let's look at Government's Exhibit 315.
8          What is this?
9    A.    This is a copy of Dr. Rudolph's Three Rivers Dental
10   Group credit card ending 9989, and the ending date is
11   November 14th, 2016.
12   Q.    Can we look at page 3, please.
13         Do you see -- and let's see if we can zoom in --
14   that transaction for $480.20.  What is that?
15   A.    That is a passenger ticket on American Airlines for
16   Dr. Rudolph going from Phoenix to Las Vegas and it's a round
17   trip, so Phoenix to Las Vegas and Las Vegas to Phoenix.
18   Q.    What is the date on that transaction?
19   A.    The transaction was executed on October 23d, 2016.
20   Q.    Did you look for a corresponding plane ticket and
21   records provided by American Airlines?
22   A.    Yes.
23   Q.    So let's look at Government's Exhibit 319.
24         Is this the ticket?
25   A.    Yes, it is.

2212

DIRECT - NEWTON

1    Q.    If we could go to page 3.

2          Can you tell from these records, if we start

3    looking down here at the bottom, approximately what time in

4    the day he started the process of booking this ticket?

5    A.    On October 23d, 2016, at 2:16 p.m.

6    Q.    Were you able to see if Rudolph booked airplane tickets

7    for anyone to join him in Las Vegas on that trip?

8    A.    Yes.

9    Q.    Let's look at Government's Exhibit 316.  And now if we

10   could go to page 4 again.  And let's zoom in on the third

11   transaction up from the bottom.

12         What is that?

13   A.    This is a Southwest Airlines passenger ticket for

14   Ms. Lori Milliron to go from Pittsburgh to Phoenix.

15   Q.    What was the date of that transaction?

16   A.    That was on October 23d, 2016.

17   Q.    Again, the day after the funeral?

18   A.    Yes.

19   Q.    Did you look to see if you could find a corresponding

20   plane ticket and records provided by Southwest Airlines?

21   A.    Yes.

22   Q.    Let's look at Government's Exhibit 318.

23         Is this that ticket?

24   A.    Yes.

25   Q.    What does it show?

1    A.    It shows that this ticket was canceled on October 23d,

2    2016, at 8:16 p.m.

3    Q.    So the ticket was booked and then it was canceled?

4    A.    Yes.

5    Q.    So now let's go back to Government's Exhibit 316, that

6    credit card statement.  And if we go to page 3.

7          So after canceling the ticket -- well, let's see.

8    What do you see there on October 24th?

9    A.    October 24th, the credit card was credited for a refund

10    of that ticket.

11    Q.    Now let's go to page 4 of the same exhibit.  All right,

12    so if we go to the fourth transaction up from the top.

13          After canceling Ms. Milliron's ticket and getting a

14    refund, what else happened on October 23d, 2016?

15    A.    Another airline ticket was purchased on Southwest

16    Airlines for Tiffany Joy Raymond to leave Pittsburgh on

17    October 26th, 2016, and arriving in Las Vegas, Nevada.

18    Q.    Let's look at Government's Exhibit 317.

19          What is this?  I'm sorry --

20    A.    This is --

21    Q.    Sorry.

22    A.    Sorry.  This is a ticket purchased for 149 -- or

23    $191.89 going from Pittsburgh to Phoenix on October 24th,

24    2016, and then going back to Phoenix on October 27th, 2016.

25    Q.    Let's look at Government's Exhibit 317 -- or, sorry,

DIRECT - NEWTON

1    we're already . . .

2              Yup.  Now let's go back to 316.  This is that

3    credit card statement.  Let's go to page 5.

4              All right, so after booking the ticket for

5    Ms. Raymond, after having previously canceled the ticket for

6    Lori Milliron, what do you see there on October 24th, 2016?

7    A.    October 4th, another passenger ticket was booked for

8    Ms. Milliron from Pittsburgh to Phoenix departing on October

9    31st, 2016.

10   Q.    So this is a different ticket from the one that we saw

11   earlier?

12   A.    Yes.

13   Q.    What's the date of departure for this one?

14   A.    October 31st, 2016.

15   Q.    Did you look to see if you could find a corresponding

16   plane ticket and records provided by American Airlines?

17   A.    Yes.

18   Q.    So let's look at Government's Exhibit 320.

19             Is this that plane ticket?

20   A.    Yes, it is.

21   Q.    Now if you look at page 3.  When did Dr. Lawrence

22   Rudolph book a ticket for Lori Milliron to join him in

23   Phoenix?

24   A.    On October 24th, 2016 at 6:16 p.m.

25   Q.    How many days after the funeral was that?

2215

DIRECT - NEWTON

1    A.    Two days.

2    Q.    Could you tell if this was a one-way ticket or a

3    round-trip ticket?

4    A.    It was a one-way ticket.

5    Q.    From where to where?

6    A.    From Pittsburgh to Phoenix.

7    Q.    We can take that down, please.   Thank you.

8          Did you look in any more detail at the travel

9    records for Dr. Lawrence Rudolph, Bianca Rudolph, and Lori

10   Milliron between 2015 and 2017?

11   A.    Yes.

12   Q.    When did Bianca Rudolph die?

13   A.    She died on October 16th -- or, excuse me,

14   October 11th, 2016.

15   Q.    Did you notice anything about patterns of travel after

16   Bianca's death?

17   A.    Yes.

18   Q.    What did you notice?

19   A.    I noticed that Dr. Rudolph and Ms. Milliron spent more

20   time together; they traveled together more often.

21   Q.    So let's look at Government's Exhibit 501, which is now

22   in evidence.   Oh, right.   So let's look at -- this is

23   page 1.   Now let's look at page 2.   Okay.   So let's go back

24   to page 1.

25          So, first of all, this is an exhibit that's many

DIRECT - NEWTON

1    pages.  Describe to the members of the jury just what this

2    is.

3    A.    So I took the flight records from Delta, United,

4    American, and Southwest Airlines, as well as the credit card

5    statements, and I created a month-by-month calendar showing

6    where Bianca was, where Larry was, and where Lori were,

7    based on the departure location and the arrival location.

8            So the top line that you'll see on the calendar

9    is --

10   Q.    Let's go to page 2, just to illustrate.

11   A.    Sorry.

12   Q.    Okay.

13   A.    So the top line will be Bianca; the middle line is

14   Larry; and the bottom line is Lori.  So each color

15   represents a different city.  And I also included the

16   airline prefix or the -- not suffix -- abbreviation code for

17   each of the arrival locations just to show where they

18   departed from, where they arrived at and when.

19   Q.    All right.  So let's use this -- this is Government's

20   Exhibit 501, page 2, as an example.  Can you tell us in

21   January of 2015 where Lori Milliron spent most of her time?

22   A.    She spent most of her time in Pittsburgh, Pennsylvania.

23   Q.    And how can you tell that?

24   A.    Because the line is green.  It says Pittsburgh.  And

25   based on her travel records and where she was living at that

DIRECT - NEWTON

1    time.

2    Q.    So, again, she's the bottom line there?

3    A.    She's the bottom line; she's the green bottom line.

4    Q.    Let's look at the next page.  Where does she spend most

5    of her time in February?

6    A.    Pittsburgh.

7    Q.    Now the next page.  March 2015.

8    A.    Pittsburgh.

9    Q.    But in March of 2015, do you see down there at the

10   bottom, where did she get to go?

11   A.    She went to San Jose del Cabo.

12   Q.    With who?

13   A.    With Dr. Rudolph.

14   Q.    And how can you tell that she was with Dr. Rudolph?

15   A.    You see on March 30th, there's the line starts -- is

16   pink there and it says SJD.  That indicates travel to Mexico

17   on that day.

18   Q.    He's that middle line?

19   A.    Uhm-hum.  Yes.

20   Q.    Where was Bianca at that time?

21   A.    Bianca was in Miami, Florida.

22   Q.    All right.  Now let's go to April.  After spending that

23   time in Cabo, where did Lori Milliron go?

24   A.    She traveled to Pittsburgh.

25   Q.    All right.  Next month.

2218

DIRECT - NEWTON

1          Where did she spend most of May?

2    A.    Most of May she was in Pittsburgh.

3    Q.    And next month.

4          In June, where did Lori Milliron spend most of her

5    time?

6    A.    Pittsburgh.

7    Q.    July.

8    A.    Pittsburgh.

9    Q.    Now let's go to -- in August, where did she spend most

10   of her time?

11   A.    Pittsburgh.

12   Q.    And September 2015.

13   A.    Pittsburgh.

14   Q.    October.

15   A.    Pittsburgh.

16   Q.    November.

17   A.    Pittsburgh.

18   Q.    December.

19   A.    Pittsburgh.

20   Q.    Approximately what percentage of the year did she spend

21   in Pittsburgh?

22   A.    93 percent.

23   Q.    Did she spend any time in Arizona?

24   A.    No.

25   Q.    Did you similarly look at her travel in 2016?

2219

DIRECT - NEWTON

1      A.    Yes.

2      Q.    Approximately what percentage of that year did she

3      spend in Pittsburgh?

4      A.    88 percent.

5      Q.    Let's go specifically to March 2016, so that's

6      Government's Exhibit 501, page 17.

7            Where did she get to go for the very first time

8      that month?

9      A.    Phoenix, Arizona.

10     Q.    Where do you see that?

11     A.    On March 28th, 2016.

12     Q.    Who was there with her?

13     A.    Dr. Rudolph.

14     Q.    Where was Ms. Rudolph?

15     A.    Ms. Rudolph was in Pittsburgh.

16     Q.    Let's go to the next month.

17           So in April 2016 where did she go back to?

18     A.    She traveled back to Pittsburgh.

19     Q.    Okay.  So she was in Phoenix until when?

20     A.    Until April 4th, 2016.

21     Q.    Who did she fly back to Pittsburgh with?

22     A.    Dr. Rudolph.

23     Q.    So they spent time together in Phoenix together, then

24     they were in Pittsburgh.  When did Dr. Rudolph return to

25     Phoenix?

DIRECT - NEWTON

1    A.    He returned to Phoenix on April 11th, 2016.

2    Q.    Who arrived the next day?

3    A.    Bianca Rudolph.

4    Q.    Was that the first time she had been back in Phoenix

5    after Lori Milliron had been there?

6    A.    Yes.

7    Q.    Now let's -- for the rest of April, 2016, where was

8    Ms. Milliron?

9    A.    She was in Pittsburgh.

10   Q.    Let's go to May, page 19.

11         Where was Ms. Milliron?

12   A.    Pittsburgh.

13   Q.    And in June?

14   A.    Pittsburgh.

15   Q.    Let's go to July.

16         Where did she get to go in July 2016?

17   A.    She went to Cabo on July 6th.

18   Q.    With who?

19   A.    With Dr. Rudolph.

20   Q.    Then where did they travel back to?

21   A.    Pittsburgh.

22   Q.    All right.  Now August, page 23.  Where did -- sorry,

23   page 22.  I'm sorry.

24         Where did Ms. Milliron spend most of her time in

25   August?

DIRECT - NEWTON

1    A.    She spent most of the month in Pittsburgh.

2    Q.    And September, where did she spend most of her time?

3    A.    Pittsburgh.

4    Q.    And now the first part of October 2016, where did she

5    spend most of her time?

6    A.    Pittsburgh.

7    Q.    Now on October 11th, 2016, there's sort of a red box

8    there.  What does that indicate?

9    A.    That indicates the date of Bianca's death.

10   Q.    And so after that, is that top line blank?

11   A.    Yes.

12   Q.    And then what do you see between August 26th and

13   August 28th, 2016?

14   A.    The portion of the line that's orange for those dates

15   indicates Dr. Rudolph's travel to Las Vegas.

16   Q.    That's the trip you referenced earlier?

17   A.    Yes.

18   Q.    Now in October 2016, did Lori get to go to Phoenix?

19   A.    Yes.

20   Q.    When?

21   A.    October 31st, 2016.

22   Q.    That's the one-way ticket you referenced earlier?

23   A.    Yes.

24   Q.    Now let's look at November.

25         Where did Lori spend most of her time in November?

DIRECT - NEWTON

1    A.    Most of her time was spent in Pittsburgh.

2    Q.    Who was she with the entire month of November, one

3    month after Bianca's death?

4    A.    Dr. Rudolph.

5    Q.    And you see that -- it's sort of, I guess, a dusky

6    orange I would call it.  JAC, what is that?

7    A.    That's the abbreviation for Jackson Hole, Wyoming,

8    airport.

9    Q.    What's significant about Jackson Hole?

10   A.    Jackson Hole is the airport that you would fly into if

11   you were going to visit areas around there, including

12   Victor, Idaho, where Dr. Rudolph has a property, a house.

13   Q.    So November of 2016 -- so, well, just tell us.  So from

14   Saturday, November 5th until Saturday, November 10th, who

15   was in -- or who flew into Jackson?

16   A.    Dr. Rudolph and Ms. Milliron.

17   Q.    Had Ms. Milliron been able to go to Jackson in 2015?

18   A.    No.

19   Q.    Yeah, so if we can go back to page 7 of this exhibit,

20   before Ms. Rudolph died.

21            Who spent time together -- who got to spend time

22   together in Jackson?

23   A.    Dr. Rudolph and Mrs. Rudolph.

24   Q.    So we looked a little bit at -- well, let's actually

25   look at page 28.  So this is 2017.

2223

DIRECT - NEWTON

1          That's the -- so 2017 is the year after Bianca

2     died?

3     A.    Yes.

4     Q.    Did you analyze travel for that year, 2017?

5     A.    Yes.

6     Q.    After Ms. Milliron spent approximately 88 percent of

7     her time in Pittsburgh in 2016, where did she get to spend

8     most of her time in 2017?

9     A.    Phoenix.

10    Q.    Now let's look at Grand Jury Exhibit No. -- sorry,

11    Government's Exhibit No. 71, which is that grand jury

12    transcript.  And now let's look at page 35, lines 21 through

13    25.

14    A.    Question:  Did you start living with him in

15    approximately January 2017?

16          Answer:  I don't recall the exact date.

17          Question:  Do you remember celebrating New Year's

18    with him in 2017?

19    Q.    Next page.  Let's go to lines 1 through 13, please.

20    A.    Answer:  I don't.

21          Question:  To the best of your recollection, as you

22    sit here today, when did you move all of your stuff there to

23    Arizona to be with him?

24          Answer:  I never moved my stuff.  I kept my house

25    in Pennsylvania.

DIRECT - NEWTON

1    Question:  When did you start spending the majority

2    of your time in Arizona?

3    Answer:  I would say sometime in '17.  I'm still a

4    Pennsylvania resident.

5    Question:  First quarter of '17?  So January,

6    February, March, or was it summer, spring?

7    Answer:  I can't recall.

8    Q.   Let's go back to Government's Exhibit 501.  If we could

9    go to page 27 -- or page 28.  Now let's go to page 29.

10    So in February 2017 who did Ms. Milliron spend most

11    of her time with?

12    A.   Dr. Rudolph.

13    Q.   And at the end of February where did she and

14    Dr. Rudolph go?

15    A.   They went to Cabo.

16    Q.   All right.  And if we could, let's start counting the

17    full days.  So in February 2017, how many full days did they

18    spend in Cabo?

19    A.   Two.

20    Q.   And if we go to the next month.

21    Okay, and if you could just count the full days for

22    us in Cabo, please.

23    A.   Another 10 days.

24    Q.   That's a total of 12 days?

25    A.   12 days, yeah.

2225

DIRECT - NEWTON

1   Q.   Now let's go back to page 21.

2        While Bianca was still alive, how many days did she

3   get to spend in Cabo with Dr. Rudolph?

4   A.   Four full days.

5   Q.   So a third as much time?

6   A.   Yes.

7   Q.   Let's go back to April 2017.  This is page 31 of

8   Government's Exhibit 501.

9        Where did Ms. Milliron and Dr. Rudolph spend most

10  of their time that month?

11  A.   Phoenix.

12  Q.   And next month, May, page 32.

13       That month, what did they do?

14  A.   They spent the first portion in Phoenix and then

15  Mr. Rudolph -- or Dr. Rudolph traveled back to Pittsburgh

16  after Lori traveled back to Pittsburgh.  And then he took a

17  trip to Johannesburg, through Johannesburg and Ms. Milliron

18  stayed in Pittsburgh.  And then on the 23d she went back to

19  Phoenix.

20  Q.   When Dr. Rudolph got back from his hunting trip on

21  May 31st, 2017, who was there to greet him?

22  A.   Ms. Milliron.

23  Q.   Now if we go to the next page.

24       What do you see in this month?

25  A.   Dr. Rudolph and Ms. Milliron spent the majority of the

2226

DIRECT - NEWTON

1    beginning of the month in Phoenix and then traveled within a

2    couple of days of each other back to Pittsburgh, and then

3    back to Phoenix together on the 24th, and then flew into

4    Jackson Hole on the 27th.

5    Q.    Now if we look at July.

6          Where did Dr. Rudolph and Ms. Milliron get to spend

7    all of July?

8    A.    Jackson Hole, Wyoming.

9    Q.    Next page, page 35.

10         Did they go back to Phoenix together?

11   A.    Yes.

12   Q.    Now let's go to page 37.  This is October 2017.

13         Where did they get to go in October 2017?

14   A.    They traveled from Las Vegas back to Phoenix on the

15   1st, and then traveled together on the 7th back to

16   Pittsburgh.  And then within a day of each other, on the

17   20th and 21st, traveled back to Phoenix.  And then on the

18   22d flew to Cabo.

19   Q.    How long did they get to spend in Cabo this time?

20   A.    Nine full days in October.

21   Q.    All right.  We can take that down.  Now I want to go to

22   Government's Exhibit 90.  So these are the emails.  And

23   let's look at page 83, please.  All right, and if we could,

24   let's blow up this email on April 3d, 2011.

25         And if you could please read that for us.

DIRECT - NEWTON

1    A.    "When you meet me at the airport I want you to wear

2    something very sexy.  I am thinking tight jeans, black

3    pumps, black bikini top, baseball cap, and sunglasses.  My

4    first fantasy.  L" -- or L.

5    Q.    Who -- what email address was that sent from?

6    A.    It was sent from -- it was sent from

7    lprsci@yahoo.com.

8    Q.    To who?

9    A.    To Lori Milliron at lamilliron@yahoo.com.

10   Q.    Okay.  Let's zoom out.  And now if we could go to this

11   next email.

12          So just for the record, when was this email sent?

13   A.    This email was sent Sunday, April 3d, 2011.

14   Q.    At what time?

15   A.    At 12:33 Pacific time, it looks like.

16   Q.    From who?

17   A.    From Lori Milliron.

18   Q.    To who?

19   A.    To lprsci@yahoo.com.

20   Q.    Read what I've underlined there, please.

21   A.    Okay.  "GMOB, okay.  I will wear that.  Here is a blog

22   I read today from Jim Shockey about you and Bianca hunting

23   there.  I thought you would like to read it.  It's nice."

24   Q.    Now, let's zoom out.  And now let's look at the next

25   response.

DIRECT - NEWTON

1          Who is this from?

2    A.    This is from lprsci@yahoo.com.

3    Q.    To who?

4    A.    To Lori Milliron.

5    Q.    What day?

6    A.    The same day, April 23d -- or, excuse me, April 3d,

7    2011.

8    Q.    And what time?

9    A.    3:36 p.m.

10   Q.    What did Dr. Rudolph say to Lori Milliron?

11   A.    "The old lady is not here.  Was on the visa list but I

12   with Brussels.  It saved me.  L."

13   Q.    Did you look at travel records to determine whether

14   what Dr. Rudolph said about Bianca being in Brussels was

15   true?

16   A.    Yes.

17   Q.    Let's look at Government's Exhibit 501.  And now let's

18   go to page 40.  Let's brace ourselves a little bit.  Okay.

19          There's a lot of rows here, right?

20   A.    Yes.

21   Q.    Okay.  So this part of Government's Exhibit 501, was

22   this reviewing slightly different records?

23   A.    Yes.

24   Q.    What records did you review to make this part of

25   Government's Exhibit 501?

DIRECT - NEWTON

1    A.    So these were records from department of, like,

2    U.S. Department of Customs and Border Patrol.  It shows

3    entry and exit into the United States at -- the points of

4    entry -- the dates of the points of entry.

5    Q.    All right.  So we're definitely going to have to zoom

6    in on this one.  Let's zoom in on item No. 27 there.  And

7    actually let's just do this partial so it will zoom in

8    nicely.  All right.

9          So you see item No. 27 there?

10   A.    Yes.

11   Q.    All right.  And you have these color coded.  What does

12   the light blue mean?

13   A.    The light blue means trips where Bianca and Larry

14   traveled together.

15   Q.    So according to the travel records, where was Bianca

16   Rudolph on this trip?

17   A.    She was in -- she arrived in Accra Ghana.

18   Q.    So her first port of departure was not Brussels?

19   A.    Correct.

20   Q.    Let's go back to Government's Exhibit 90, page 83.

21         So based on the travel records, when Dr. Rudolph

22   said, "The old lady is not here.  Was on the visa list, but

23   I with Brussels, that saved me," was that true?

24   A.    No.

25   Q.    Okay.  Now if we look at the response from Lori

DIRECT - NEWTON

1    Milliron on Government's Exhibit 90, what -- how did Lori

2    Milliron respond to Dr. Rudolph's statement that Bianca was

3    in Brussels?

4    A.    On April 3d, 2011, at 7:41 p.m., Lori responded, "Why

5    would he say you showed up today with your wife?  I believe

6    you."

7    Q.    Okay.  And now let's look at the final response at the

8    top.  How did Larry Rudolph respond to that?

9    A.    On April 3d, 2011 at 12:46 p.m. Dr. Rudolph responded,

10   "I give up."

11   Q.    All right.  So let's take that down.

12         Were you asked to look for checks from life

13   insurance companies?

14   A.    Yes.

15   Q.    Did you find them?

16   A.    Yes.

17   Q.    Where did you find them?

18   A.    I found them in the financial records from Vanguard,

19   for Lawrence Rudolph's Vanguard accounts.

20   Q.    Now let's look at Government's Exhibit 310 on the left

21   side of the screen, if we can.  This is slightly more

22   complicated.  And on the other side of the screen, let's

23   look at Government's Exhibit 312.

24         So generally speaking, what are these documents?

25   A.    These are Vanguard deposit slips.

DIRECT - NEWTON

1   Q.    All right.  So the one over on the right, Government's

2   Exhibit 310, into which Vanguard account did Dr. Rudolph

3   deposit insurance checks?

4   A.    Dr. Rudolph deposited approximately $2.8 million into

5   Vanguard account ending 5266.

6   Q.    And did he deposit other insurance proceeds in a

7   different Vanguard account?

8   A.    Yes.

9   Q.    Which Vanguard account is that?

10  A.    That's 9515, sub account 0030.

11  Q.    We talk about Vanguard.  What is Vanguard?

12  A.    It's an investment company.

13  Q.    Did you add up the total amount received as a result of

14  the policies insuring the life of Bianca Rudolph?

15  A.    Yes.

16  Q.    Let's look at Government's Exhibit 504.  We can put it

17  on -- yeah, thank you.

18        What is this?

19  A.    This is a summary of the life insurance payments.

20  Q.    What was the total amount of life insurance?

21  A.    $4,877,744.93.

22  Q.    And when you looked at the actual checks, which are

23  Government's Exhibits 300 through 308, and the deposit

24  slips, which are 309 to 312, did you see signatures on the

25  backs of those checks?

DIRECT - NEWTON

1   A.   Yes.

2   Q.   In what name?

3   A.   Lawrence Rudolph.

4   Q.   Who ultimately got that $4,877,744.93?

5   A.   Lawrence Rudolph.

6   Q.   And those two Vanguard accounts we were looking at, who

7   had control over those accounts?

8   A.   Lawrence Rudolph.

9   Q.   We can take that down.

10          Were you able to see what he did with that life

11   insurance money?

12   A.   Yes.

13   Q.   What did he do with that money in approximately August

14   2017?

15   A.   In 2017, Dr. Rudolph wired approximately $1.1 million

16   to a title company for the purchase -- for the down payment

17   and closing costs on the purchase of a property at 7000

18   North 39th Place, Paradise Valley, Arizona.  The purchase

19   price of that property was peremptorily $3.8 million.

20   Q.   Did he do anything else with the insurance money in

21   August 2017?

22   A.   Yes.  Around the same time he transferred --

23          MR. MARKUS:  Judge, I'm sorry, I have to object.

24   He keeps saying with the insurance money.  He hasn't

25   established that that was the only money in the account, and

1      I would object to improper foundation.

2                 THE COURT:  Mr. Fields.

3                 MR. FIELDS:  I can lay the foundation, Your

4      Honor.

5                 THE COURT:  All right.  Go ahead.

6      BY MR. FIELDS:

7      Q.   That Vanguard account, approximately when were all

8      those insurance proceeds deposited into that account?

9      A.   So originally, as we saw with the deposit slips,

10     Dr. Rudolph deposited approximately $1.7 million into the

11     Vanguard account 5266.  He deposited 2.1 million in Vanguard

12     account 9515, subaccount 30.  In April 2017, he transferred

13     all the funds in 5266 into Vanguard account 9515, subaccount

14     30.

15                So all of the life insurance proceeds, the total

16     $4.8 million, are sitting in this account.  There was an

17     existing balance in this account of just a little under

18     $400,000, so the life insurance proceeds are commingled with

19     the existing balance of about 400,000.

20     Q.   But what constituted the vast majority of the money in

21     that account?

22     A.   So the vast majority of the over $5 million balance in

23     that account were life insurance proceeds.

24     Q.   Okay.  So we were talking about what happened in August

25     2017.  And you said that the -- well, I guess I said --

DIRECT - NEWTON

1    let's go back a little bit.

2              What was done with the life insurance proceeds in

3    that Vanguard account in August 2017?

4    A.    So, like I said before, $1.15 million was

5    transferred -- or was wired from that account to a title

6    company for the down payment and closing costs on that

7    property in Paradise Valley.  Additionally, $3 million was

8    wired from that Vanguard 91 -- or 9515, subaccount 30, to a

9    new Bank of New York Melon account ending in 1000.

10   Q.    That Bank of New York Melon account, who are the

11   signatories on that account?

12   A.    Lawrence Rudolph.

13   Q.    And that $3 million, did that come from the life

14   insurance proceeds from Bianca's death?

15   A.    Yes.

16   Q.    What did Dr. Rudolph do with that $3 million?

17   A.    So that $3 million was used as the collateral on a

18   $2.5 million construction loan on the 7000 North 39th Place

19   property in Paradise Valley, Arizona.  Additionally, he

20   transferred -- in late September 2020, he wired $200,000

21   from that account to another account in the name of Three

22   Rivers Dental Management Group, which he had control over.

23   Those funds were used in part for the 4- -- almost $400,000

24   down payment and closing costs on another property at

25   103 Morningside Drive in Cranberry Township, Pennsylvania.

DIRECT - NEWTON

1          Additionally, in January 2021, he wired $100,000 to
2     Global -- a Global Services escrow account, which is a --
3     this company specialized in international real estate
4     transactions.  And in the description of the wire, it says
5     "for condo purchase."
6     Q.   Where was that condo?
7     A.   Cabo, Mexico.
8     Q.   All right.  Now let's -- we were talking about the BNY
9     Melon account.  Let's go back to the Vanguard account.  You
10    mentioned the lot.  What else was purchased from that
11    account?
12    A.   So in March 2018, Dr. Rudolph purchased a 2018 Aston
13    Martin DB11 for $239,000.  From the Vanguard 9515,
14    subaccount 30 account, he paid -- he wrote a check for
15    $125,000 to Bentley of Scottsdale for the down payment on
16    that vehicle.
17         Additionally, in September 2020, he wired $150,000
18    from that Vanguard account to the Three Rivers Dental
19    Management Systems account that I discussed earlier.  That
20    $150,000 was also used in part to pay the down payment and
21    closing costs on the 103 Morningside Drive property in
22    Cranberry Township, Pennsylvania.
23         Then in April 2- -- April 2021, he wrote a check
24    from that Vanguard account for $150,000 to Camelback
25    Consulting Management, which is his consulting --

DIRECT - NEWTON

1    Dr. Rudolph's consulting business, for $150,000.  The memo

2    line on the check said Bentley Bentayga.  That money was

3    deposited into his Wells Fargo -- his Camelback Consulting

4    Wells Fargo 9749 account.  And a couple of days later --

5    after  -- or within a day or two of that money being

6    deposited in that account, Dr. Rudolph wrote a check for

7    $162,000 for a -- I think it was two -- if I recall

8    correctly, it's Bentley of Scottsdale for a Bentley Bentayga

9    vehicle.

10   Q.    That's a car?

11   A.    It's a car, yeah.

12   Q.    So you referenced this property.  There was a lot and

13   there was construction costs as well?

14   A.    Correct.

15   Q.    Now let's look at Government's Exhibit 71.  This is the

16   grand jury transcript.  And let's go to page 36, lines 14

17   through 25, please.

18         What did Milliron say there?

19   A.    Question:  When you first moved in with him, where was

20   he living?

21         Answer:  He had a house in Clearwater Hills.

22         Question:  Is that the same house where he lived

23   with Bianca?

24         Answer:  Yes.

25         Question:  At some point did he sell that house?

DIRECT - NEWTON

1    Answer:  Yes, he did.

2    Question:  Why did he sell that house?

3    Answer:  We just wanted to have a fresh start.  We

4    didn't like being in that house any longer.

5    Question:  Did you buy a new house?

6    Q.  And the next page, 37.  And let's read lines 1 through

7    11, please.

8    A.  Answer:  We're in the process of building a house.

9    Question:  Building a house.  Okay.

10    Answer:  We live in a condo right now.

11    Question:  Where is that condo?

12    Answer:  It's in Scottsdale, Arizona.

13    Question:  The house that's being built, where is

14    that?

15    Answer:  It's nearby, too.

16    Question:  Approximately how much did -- does that

17    house cost?

18    Answer:  I want to say it was like 2 1/2 million.

19    Q.  Can you tell from the financial information whether

20    that house has actually been built?

21    A.  Yes.

22    Q.  And based on your review of the documents, what money

23    is funding the construction of that house?

24    A.  The -- the payments on the construction loan are being

25    paid out of Bank of New York Melon 1000, or another bank of

DIRECT - NEWTON

1    New York Melon.  I don't recall the last four digits, but

2    Dr. Rudolph transferred approximately $150,000 from that 100

3    account into that new account.  And about -- approximately

4    from 2017 to about 7- -- until about September 2021, about

5    $124,000 has been paid on the construction loan from those

6    two accounts.

7    Q.    What financed those accounts?

8    A.    Life insurance proceeds.

9    Q.    Now let's look at the -- let's -- we can take that

10   down.

11         Did you look for other insurance claim checks in

12   approximately the same time frame as the life insurance

13   checks?

14   A.    Yes.

15   Q.    What did you find?

16   A.    I found one from State Farm.

17   Q.    Let's look at Government's Exhibit 313.  Let's zoom in

18   on the top.

19         So what is this

20   A.    This is a check from State Farm Fire and Casualty

21   Company to Bianca T. Rudolph and Lawrence P. Rudolph in the

22   amount of $15,000 -- $15,044.  And the date of loss is

23   October 11th, 2016.

24   Q.    And what was the loss on October 11th, 2016?

25   A.    I'm sorry, could you repeat that?

DIRECT - NEWTON

1    Q.    What was the loss on October 11th, 2016?

2    A.    It was for earrings that Bianca was wearing.

3    Q.    All right.  We can take that down.

4          Did you look in the financial records for hunting

5    expenses?

6    A.    Yes.

7    Q.    Did you check those expenses against records showing

8    import of animals into the United States?

9    A.    Yes.

10   Q.    Did Bianca Rudolph import animals into the United

11   States?

12   A.    Yes.

13   Q.    Let's look at Government's Exhibit 502.  All right.

14         Generally just orient us to this.  What is it?

15   A.    So this is a summary of information from U.S. Fish and

16   Wildlife and it -- it details the animals imported by Bianca

17   Rudolph from, you know, approximately 2014 to 2017, or at

18   least imported in her name.

19         The left side is the declared date and then the two

20   right columns are the name of the animal, what type of

21   animal it was.

22   Q.    We can take that down.

23         Were you able to determine not just the animals

24   imported, but the total amount of money the Rudolphs spent

25   on hunting in the years before Bianca's death?

2240

DIRECT - NEWTON

1    A.    Yes.

2    Q.    How did you evaluate whether an expense was related to

3    hunting?

4    A.    Well, I read the description on the credit card

5    statements or checks written on the bank statements.  And

6    it's -- and then did research to see, you know, what -- I

7    mean, some of it's self-explanatory because it's either

8    taxidermy or outfitters or safari, or, you know,

9    hunting-equipment related.  But with research I was able to

10   determine what was hunting related and what was not.

11   Q.    When you did that, approximately how much did they

12   spend on hunting between 2012 and 2016?

13   A.    A little over a million dollars.

14   Q.    What was the yearly average?

15   A.    A little over $200,000 or about $200,000.

16   Q.    Do the bank records and the credit reports list home

17   addresses for Lori Milliron?

18   A.    Yes.

19   Q.    Let's look at Government's Exhibit 327.

20            What is this?

21   A.    These are Barkley card credit card applications for

22   Ms. Milliron.

23   Q.    All right.  And on page 1 there, what do you see as the

24   email address?

25   A.    Lamilliron@yahoo.com.

2241

DIRECT - NEWTON

1    Q.    Is that the same email address we looked at in that

2    earlier exhibit, Government's Exhibit 90?

3    A.    Yes.

4    Q.    And what's the address listed there?

5    A.    313 Orlando Avenue, Newcastle, Pennsylvania.

6    Q.    Let's go to page 2.

7            Is there a new address listed there?

8    A.    Yes.

9    Q.    What's that address?

10    A.    It's 623 North Allerton Court, Moon Township,

11    Pennsylvania.

12    Q.    And on page 4, what's the address there?

13    A.    7000 North 39th Place, Paradise Valley, Arizona.

14    Q.    That 7000 North 39th Place, what's significant about

15    that?

16    A.    That's the property that's under construction in

17    Paradise Valley that Mr. Rudolph closed on in August of

18    2017.

19    Q.    All right.  So there were those two addresses,

20    313 North Orlando Avenue and the one -- if we could go back

21    to page 2 -- that 1623 North Allerton Court.  Were you able

22    to find other addresses for Ms. Milliron --

23    A.    Yes.  I found another address at 602 Tree Dot Court,

24    greensburg, Pennsylvania.  And then another address at

25    1024 Wealdstone Road, Cranberry Township, Pennsylvania.

DIRECT - NEWTON

1    Q.    All right.  So let's take that down.  Let's go back to

2    Government's Exhibit 71.  And if we go to page 14, please.

3    And let's look at lines 21 through 25.

4            What does that say?

5    A.    Question:  Did he give money to your daughter to pay

6    for college?

7            Answer:  Yes, he did.

8            Question:  How much?

9            Answer:  I don't recall how much.

10   Q.    Did you look at Rudolph's financial records to show any

11   payments to relatives of Lori Milliron?

12   A.    Yes.

13   Q.    Which relatives were you looking for?

14   A.    I was looking for her children:  Adam, Stephanie and

15   Jessica Moroz.

16   Q.    What did you find?

17   A.    I found two checks to Jessica Moroz and -- totaling

18   $11,000, and one check to Stephanie Moroz for approximately

19   $2300.

20   Q.    And those payments to Lori's relatives, what account

21   was used to make those transactions?

22   A.    The first two accounts -- or, I'm sorry, the first two

23   payments to Jessica Moroz were out of his Morgan Stanley

24   account ending 234.  And those were written in 2013.

25   Q.    When those payments were made, who was the signatory on

DIRECT - NEWTON

1    that Morgan Stanley account ending 234?

2    A.    Lawrence Rudolph.

3    Q.    Did Bianca have access to that account at the time?

4    A.    No.  Dr. Rudolph was the only authorized user on that

5    account.

6    Q.    Did you look to see if Dr. Lawrence Rudolph was

7    similarly generous to the relatives of other Three Rivers

8    Dental employees?

9    A.    Yes.

10   Q.    What did you find?

11   A.    I did not find comparable payments to other employees'

12   relatives.

13   Q.    Now let's look at Government's Exhibit 325.

14            What is this?

15   A.    This is a signature card for three PNC bank accounts

16   used by Jessica Moroz and Lori Milliron.

17   Q.    Zoom in a little bit.

18            Yeah, just to orient us, who are the signatories on

19   this card?

20   A.    Jessica Moroz and Lori Milliron.

21   Q.    And just so we have it, what are the last four digits

22   on the account numbers?

23   A.    The first account is 3697, the second account is 3718,

24   and the third account is 3726.

25   Q.    And of those three accounts, which one was the most

2244

DIRECT - NEWTON

1    active?

2    A.    3697.

3    Q.    Did Lori Milliron confirm that this was her signature

4    card in the grand jury?

5    A.    Yes, she did.

6    Q.    Let's look at Government's Exhibit 326.

7           Is this another Lori Milliron signature card?

8    A.    Yes.

9    Q.    For what account?

10   A.    This is for account 4123.

11   Q.    All right.  Now let's look at Government's Exhibit 500.

12          So what is this?

13   A.    This is a very detailed chart showing sources of funds

14   to Lori Milliron by month, including income from Three

15   Rivers Dental Group and cash deposits.

16   Q.    And let's just scroll down to page 2.

17          Okay, so what is this on page 2?

18   A.    This is the same data from the first chart, but it's

19   summarized by year.

20   Q.    Now page 3.

21   A.    This is another monthly chart of total sources of funds

22   to Ms. Milliron, but this time it includes Three Rivers

23   Dental Group income, cash deposits, as well as expenditures

24   on her Three Rivers Dental Group AmEx.

25   Q.    And, finally, page 4.

DIRECT - NEWTON

1    A.    This is the same data as the graph before, just

2    summarized by year.

3    Q.    All right.  So before we go into this in detail, let's

4    go back to Government's Exhibit 71.  If we go to page 4.

5         And let's read lines 22 to the end, please.

6    A.    Question:  Do you have any children?

7         Answer:  Yes.  I have three children.

8         Question:  Who are they?

9         Answer:  Did you say who are they are -- who are

10   they?

11   Q.    And next page, this is page 5.  Let's read lines 1 to

12   20, please.

13   A.    Question:  Yeah, who are they?

14        Answer:  Adam Moroz, Stephanie Moroz, and Jessica

15   Moroz.

16        Question:  Where does Jessica live?

17        Answer:  She's in Charlotte, North Carolina.

18        Question:  What does she do for a living?

19        Answer:  She's been working for our office as a new

20   patient coordinator remotely.

21        Question:  When did she start doing that?

22        Answer:  I think it was middle of 2020.

23        Question:  You said "working for us."  Where do you

24   work?

25        Answer:  I work for Three Rivers Dental Group.

DIRECT - NEWTON

1          Question:  Does she also work for Three Rivers

2     Dental Group?

3          Answer:  Yes.

4          Question:  Was that a yes?

5          Answer:  Yes.

6          Question:  Before 2020, had she ever worked at

7     Three Rivers Dental Group?

8          Answer:  I don't believe so.

9     Q.   And now let's go to page 10, and just lines 5

10    through 6.

11    A.   Question:  How did you receive your wages?

12         Answer:  An electronic check.

13    Q.   And lines -- well, let's actually go back to

14    Government's Exhibit 500.  And let's go to the next page,

15    page 2.

16         So there are two different sort of colors there.

17    What are the different colors?

18    A.   So the top of the column, the green, represents cash

19    deposits into Ms. Milliron's bank accounts.  The orange

20    portion of the column represents deposits into her account.

21    "ACH" is electronic checks from Three Rivers Dental Group.

22    Q.   Those ACH deposits, what's an ACH deposit?

23    A.   It's like an electronic check.  So when you get paid,

24    the funds are automatically deposited into your account via

25    an ACH electronic transfer.

DIRECT - NEWTON

1  Q.   Why did you attribute those ACH payments to Lori

2  Milliron?

3  A.   Because in her grand jury testimony she testified that

4  even though she is, you know -- that her daughter, Jessica,

5  did not work for Three Rivers Dental Group until 2020 and I

6  saw deposits from Three Rivers Dental Group prior to that --

7  into an account that she held with Jessica, so I attributed

8  those solely to Lori.

9  Q.   Let's go back to Government's Exhibit 71, page 10.  And

10 we're going to just look at a couple of lines, 13 through

11 15.

12      What does that say?

13 A.   Question:  At the time you were working at Three

14 Rivers, did you have any other substantial source of cash

15 income?

16      Answer:  I don't recall

17 Q.   Back to Government's Exhibit 500, page 4, please.

18      Did you find substantial cash deposits into Lori

19 Milliron's account?

20 A.   Yes.

21 Q.   How much did she get into 2014?

22 A.   2014, she got a little over $20,000.

23 Q.   In 2015?

24 A.   $60,320.

25 Q.   In 2016.

DIRECT - NEWTON

1    A.    $75,450.

2    Q.    2016 did she get more in cash or more in salary?

3    A.    She received more in salary.

4    Q.    Or more in salary or more in cash in 2016?

5    A.    Oh, I'm sorry, in 2016, she received more in cash

6    deposits than she did in salary.

7    Q.    Let's go back to Government's Exhibit 71, page 15.

8    Lines 7 through 12, please.

9    A.    Question:  Ms. Milliron, if you'll notice, there was

10   $75,000 in 2016 with 33,350 in 2017.  Do you see that.

11              Answer:  Yes.

12              Question:  Why would he give you less in 2017?

13              Answer:  I don't know why.

14   Q.    Back to Government's Exhibit 500, page 4.

15              Did the source of Ms. Milliron's income change

16   between 2014 and 2021?

17   A.    Yes.

18   Q.    What was the change?

19   A.    She was added to Dr. Rudolph's Three Rivers Dental

20   Group American Express card.

21   Q.    When?

22   A.    Around the first quarter of 2017.

23   Q.    Was that before or after Bianca's death?

24   A.    It was after.

25   Q.    Was Lori spending more or less time with Dr. Lawrence

DIRECT - NEWTON

1    Rudolph in 2017?

2    A.    More.

3    Q.    All right.  Let's take that down.

4          Did you look at the bank account records for the

5    Three Rivers Dental practices?

6    A.    Yes.

7    Q.    What bank was used for those accounts?

8    A.    PNC Bank.

9    Q.    Was there any cash deposited into Three Rivers Dental

10   accounts at PNC Bank in -- between 2014 and 2021?

11   A.    Yes.

12   Q.    How much?

13   A.    It varied year from year.  Between 2014 and 2020 cash

14   deposits did not exceed $5,000 a year.  In 2021 they were a

15   little over $30,000.

16   Q.    Were there some years where there were no cash deposits

17   from Dr. Lawrence Rudolph's dental practices into the PNC

18   Bank accounts?

19   A.    Yes, there were some years where I couldn't identify

20   any cash deposits.

21   Q.    All right, Government's Exhibit 71, page 37.  Page 37,

22   please.  Lines 19 through 25.

23   A.    Question:  Did Mr. Rudolph add you to his American

24   Express card in 2017?

25          Answer:  I don't remember the date, but yes, I do

DIRECT - NEWTON

1    have a card.

2           Question:  Do you remember we looked at -- if

3    you'll look at Government's Exhibit 2.  He gave you

4    approximately 75,450 in 2016, and in . . .

5    Q.   Next page.  And now we're going to read this whole page

6    so let's start with the top.  Let's just do the first half

7    and then we'll do the second half.

8    A.   Okay.  2017 he gave you $33,350.  I believe your

9    testimony earlier was that you weren't sure why he gave you

10   less in 2017.  Do you now remember why he might have given

11   you less in 2017?

12           Answer:  No.  I don't know why.

13           Question:  Was it because at that point you were on

14   his American Express card?

15           Answer:  No.  The card was basically part of my --

16   it's a Three Rivers Dental card.  It was part of my perks, I

17   guess.

18   Q.   Read the rest of the page.

19   A.   Question:  What did you use it for?

20           Answer:  Instead of paying more, I -- paying me

21   more, he gave me that to use.

22           Question:  Only in 2017?

23           Answer:  I don't remember when he got me the card.

24           Question:  How many cards of his have you ever been

25   on?

2251

DIRECT - NEWTON

1          Answer:  I believe just that one.

2          Question:  So if you were added to a card in 2017,

3     it would have been that card?

4          Answer:  I believe so.

5          Question:  Was that card used for business expenses

6     or personal expenses?

7          Answer:  Mine was personal.

8          Question:  And who paid the balance on that card?

9          Answer:  The accountant did.

10    Q.    Now a little bit more, page 39, lines 1 through 10,

11    please.

12    A.    Question:  Who is the accountant?

13         Answer:  The accountant that paid the bills for the

14    office.

15         Question:  Who would that accountant -- or

16    question:  Who would that accountant have taken directions

17    from?

18         Answer:  Larry Rudolph.

19         Question:  Was it Larry Rudolph's money that paid

20    the American Express card that you were using to pay your

21    personal expenses?

22         Answer:  Yes, I believe so.

23    Q.    Let's look at Government's Exhibit 321.

24         Generally speaking, what is this?

25    A.    This is a credit card statement.

DIRECT - NEWTON

1    Q.    Let's go to page 3.  Who are listed as the users on the

2    card up at the top?

3    A.    Lawrence Rudolph and Julian Rudolph.

4    Q.    Who's Julian Rudolph?

5    A.    Julian Rudolph is Dr. Rudolph's son.

6    Q.    Let's look at Government's Exhibit -- if we can, let's

7    do the left-right thing.  Government's Exhibit 23 on the

8    left and Government's Exhibit 324.

9          What are these?

10   A.    These are emails sent from the American Express to

11   Dr. Rudolph.  The one on the left is the approval of his --

12   of the card application for Ms. Milliron, and the right is

13   the -- just the -- the opening of the AmEx card, the email

14   he received to set up an account online.

15   Q.    All right.  So back to Government's Exhibit 321.

16          So I missed this.  What's the date on this bank

17   statement?

18   A.    The closing date is April 24th, 2017.

19   Q.    All right.  And, again, page 3.

20          So on that April 2017, who were the users?

21   A.    The users are Lawrence Rudolph and Julian Rudolph.

22   Q.    Now let's go to 322 -- Government's Exhibit 322.

23          Is this the American -- another American Express

24   statement?

25   A.    Yes, this is the same card as the previous statement.

2253

DIRECT - NEWTON

1    The closing date is May 25th, 2017.

2    Q.   So that's just the next month?

3    A.   Yes.

4    Q.   Okay.  Now if we go to page 3 on this one.  Sorry --

5    yup.  And now who are the users on the card now?

6    A.   The users are Lawrence Rudolph, Julian Rudolph, and

7    Lori Milliron.

8              THE COURT:  Mr. Fields, would this be a good time

9    for us to take our morning recess?

10             MR. FIELDS:  It would, Your Honor.

11             THE COURT:  All right.  All right, ladies and

12   gentlemen of the jury, we'll take our morning recess.

13             We'll be in recess for 15 minutes.

14        (Jury left the courtroom at 10:24 a.m.)

15             THE COURT:  Ms. Newton, since you're in the middle

16   of your testimony I direct you not to speak with any of the

17   lawyers during the recess.

18        (Recess taken 10:24 a.m. to 10:45 a.m.)

19             THE COURT:  Ms. Newton, I remind you you remain

20   under oath.  Mr. Fields, you may resume your examination.

21             MR. FIELDS:  Thank you, Your Honor.

22   BY MR. FIELDS:

23   Q.   Ms. Newton, we were talking about credit cards.  Did

24   you look at the card account statements for cards issued to

25   Bianca Rudolph and Lori Milliron?

DIRECT - NEWTON

1    A.    Yes.

2    Q.    Let's look at Government's Exhibit 505.

3          Is this another one of your summaries?

4    A.    Yes.

5    Q.    What does this summary show?

6    A.    So this summarizes Bianca Rudolph's spending on all of

7    her personal and business credit cards from approximately

8    beginning of 2014 through her death in October of 2016.

9    Q.    And the next page.

10         Pie chart with the same data?

11   A.    Yes.  This is the same data, but it's categorized by

12   purchase type or expenditure type.

13   Q.    And now the next page.

14         What is this?  This is page 3.

15   A.    This is the same data -- type of data for Ms. Milliron.

16   This is the spending on her personal and Three Rivers Dental

17   Group credit cards.

18   Q.    So there are three different colors on these bars.

19   What are the three different colors?

20   A.    The yellow is personal spending on a personal credit

21   card.  The green is what I could potentially attribute to

22   business-related expenses.  And then the orange is personal

23   spending on the Three Rivers Dental Group credit card.

24   Q.    What credit cards did Lori Milliron have in 2014

25   through 2016?

DIRECT - NEWTON

1    A.    Just her personal credit cards.

2    Q.    What happened in 2017?

3    A.    She was added to Dr. Rudolph's Three Rivers Dental

4    Group American Express card.

5    Q.    Now according to the records of deposit, was

6    Ms. Milliron working at Three Rivers Dental Group between --

7    all the way between 2014 and 2021?

8    A.    Yes.

9    Q.    What changed between 2016 and 2017?

10   A.    Bianca Rudolph died.

11   Q.    Now let's look again at Government's Exhibit 71.  We're

12   going to go to page 10.  And line 16 through 18, please.

13   A.    Question:  Do you recall making -- well, how frequently

14   do you think you deposited cash into your personal account?

15         Answer:  I don't know.  I couldn't say.

16   Q.    Did you look at deposit slips to determine how

17   frequently Ms. Milliron was making cash deposits into her

18   personal bank accounts?

19   A.    Yes.

20   Q.    Let's look at Government's Exhibit 503.  This one might

21   take a -- yeah, a little bit to get to.  All right.  So

22   let's click once.  Okay.

23         So orient us to this summary that you prepared.

24   A.    So this is a summary of all cash deposits into

25   Ms. Milliron's personal bank accounts by calendar month.  So

2256

DIRECT - NEWTON

1   if you see a light green square, that means that she made

2   one cash deposit.  If you see a dark green square, that

3   means she made two cash deposits on that day.  If there's no

4   color, just a white square, then no cash deposits were made.

5   Q.   So this is June 2014.  Let's clear.  Okay.  July 2014.

6   August.  Okay.  Now let's go all the way to August of 2015.

7   There we go.  All right.

8        So do you see two cash deposits there on

9   August 4th, 2015?

10  A.   Yes.

11  Q.   When you went through the deposit slips, could you see

12  where she was depositing the money?

13  A.   Yes.

14  Q.   How could you see that?

15  A.   So when the bank provided records, there's a deposit

16  slip that Ms. Milliron fills out.  But then there's also a

17  second piece of paper that shows the cash deposit.  It shows

18  the time, and the branch location where the funds were

19  deposited.

20  Q.   So on August 24th, 2015, what locations did she deposit

21  the money?

22  A.   So on the 24th, she deposited -- one deposit was made

23  at the PNC branch at Greengate Center, and then a second

24  deposit was made about an hour later at East Gate,

25  Greensburg.  And they're about six miles apart, about a

DIRECT - NEWTON

1    10-minute drive apart.

2    Q.    So she would have to travel between two different

3    branches to make those deposits?

4    A.    Yes.

5    Q.    All right.  Let's -- I think now the exhibit is fully

6    working, so now do you see over there on the right, what is

7    that over on the right there?

8    A.    That's a deposit slip.

9    Q.    So what is a deposit slip?

10   A.    So a deposit slip is what Ms. Milliron fills out at the

11   bank when she's depositing physical cash.  So she writes

12   what account she wants it to go to, the date, her name,

13   whether it's a checking or savings account, and then the

14   amount of cash, and then the total.

15   Q.    So here we are in August 2015.  If you could also

16   orient us into your exhibit.  What's up there at the top?

17   A.    So at the top of each month, there's the total cash

18   deposits that were made to Ms. Milliron's accounts, and the

19   second line is the number of cash deposits.

20   Q.    Just as an example, how much did she deposit in cash

21   into her account in August 2015?

22   A.    She deposited $9100 and she made six separate deposits.

23   Q.    Okay.  Now let's keep just clicking through this

24   exhibit until we get to October 2016.  Let's stop here for a

25   second.

DIRECT - NEWTON

1          So in February of 2016, how much in cash did she

2     deposit?

3     A.   10,000.

4     Q.   What was the largest amount she deposited in that

5     month?

6     A.   $4,000.

7     Q.   That was in cash?

8     A.   Yes.

9     Q.   Let's keep going.  We can stop there.

10          So after you put these calendars together,

11     approximately how frequently was she depositing cash into

12     her personal bank accounts?

13     A.   Weekly or a little bit more often than weekly.

14     Q.   Let's look at Government -- let's go back to

15     Government's Exhibit 71.  It will take us a little while to

16     transition out of here.  Can we go back to Government's

17     Exhibit 71.  Thank you.  And if we go to page 18, lines 13

18     through 24.

19     A.   Question:  Do you remember why Larry gave you all that

20     money?

21          Answer:  I don't remember.

22          Question:  Ms. Milliron, were you in a relationship

23     with Larry Rudolph?

24          Answer:  Yes.

25          Question:  What was the relationship?

DIRECT - NEWTON

1          Answer:  Well, we had a working relationship, and

2     we also had a personal relationship.  We would travel

3     together.

4          Question:  What was the nature of the personal

5     relationship?

6          Answer:  We were friends.

7     Q.   When you looked through all of these financial records,

8     did you see any other similar payments to friends of

9     Lawrence Rudolph?

10    A.   No.

11    Q.   All right.  We can take that down.  Let's --

12         MR. DILL:  Objection.  Rule of completeness on that

13    exhibit.

14         THE COURT:  You're free to cross-examine with any

15    other portion of the transcript.

16         MR. DILL:  Thank you, Your Honor.

17         THE COURT:  Overruled.

18    BY MR. FIELDS:

19    Q.   Ms. Newton, let's talk about a different part of the

20    credit cards.  So we've been talking a lot about the period

21    up to 2017.  From 2017 up to the end of 2021, could you

22    identify Ms. Milliron's primary sources of income?

23    A.   Yes.

24    Q.   What were her primary sources of income?

25    A.   They were mainly funds from Three Rivers Dental Group,

DIRECT - NEWTON

1    the same ACHs that she was receiving prior, cash deposits

2    but to a lesser scale, and then also her ability to use the

3    Three Rivers Dental Group AmEx.

4    Q.    Aside from entities controlled by Dr. Lawrence Rudolph,

5    did she have any independent sources of income?

6    A.    No, not that I could identify.

7    Q.    Were you able to look for credit card transactions at a

8    steakhouse in the Phoenix area?

9    A.    Yes.

10   Q.    What was the steakhouse?

11   A.    Steak 44.

12   Q.    What did you find?

13   A.    I found from approximately June 2014 through September

14   2021, Lawrence Rudolph made 44 transactions on his personal

15   and business credit cards at Steak 44.  Prior to her death,

16   Bianca made two transactions to Steak 44, and Lori made thee

17   credit card transactions on her Three Rivers Dental AmEx at

18   Steak 44.

19   Q.    Those were just the credit card transactions?

20   A.    Yes.

21   Q.    What about cash transactions, were you able to find

22   any?

23   A.    Those aren't going to show up on a bank statement or

24   credit card statement.

25   Q.    Why not?

DIRECT - NEWTON

1   A.   Because cash doesn't leave a trail.

2   Q.   All right.  So let's move on to a completely different

3   topic area.  What is your title at the FBI?

4   A.   I'm a forensic accountant.

5   Q.   Where did you go to college?

6   A.   I went to Barry College in Rome, Georgia.

7   Q.   What did you study there?

8   A.   I studied accounting and finance.

9   Q.   After that, did you obtain any accounting licenses?

10  A.   Yes.  I'm a certified public accountant, a CPA; and I'm

11  also a certified fraud examiner, CFE.

12  Q.   Did you have any accounting jobs before you joined the

13  FBI?

14  A.   Yes.  I began my career in public accounting doing

15  mainly financial statement audits, internal control audits.

16  I also did taxes for businesses and individuals and

17  nonprofits, as well as reviewed financial statements,

18  compiled financial statements for our -- for individuals and

19  for businesses.

20       And then after that, I spent five years with the

21  Department of Defense auditing defense contracts;

22  specifically high-risk proposals, as well indirect cost

23  proposals and indirect rate proposals.  Just basically

24  making sure that all of the proposals and money that was

25  spent, made sure that there was no fraud, waste, and abuse,

2262

DIRECT - NEWTON

1    and that it complied with governmental accounting standards.

2    Q.    Did you have any experience putting together something

3    called a cash flow analysis?

4    A.    Yes.

5    Q.    What is your experience putting together a cash flow

6    analyses?

7    A.    We put together cash flow analyses for businesses,

8    which, you know, categorize source -- you know, what makes

9    your cash move during the year.

10          For individuals, it's the same concept.  You're

11   looking at cash and cash equivalent accounts.  So cash is

12   like the money in your checking and savings account.  Cash

13   equivalents are usually like marketable securities that can

14   be converted into cash pretty quickly.

15          And what a cash flow statement does, it takes, you

16   know, your beginning cash at the beginning of the period,

17   usually like the beginning of the year, and what made

18   that -- those accounts move?  What cash came in?  How did

19   the cash go out?  Like how did you use your money?  Where

20   did you get it from?

21          And at the end, you either have a cash inflow,

22   meaning that your cash on hand went up, your liquidity went

23   up, or you have a cash net outflow meaning that your

24   liquidity went down, your current assets, your liquid assets

25   went down.

1    MR. FIELDS:  Your Honor, for just this subsequent

2    portion of Ms. Newton's testimony, I'd move that she be

3    certified as an expert particularly in the area of cash flow

4    analyses.

5         THE COURT:  Any objection?

6         MR. MARKUS:  No objection, Your Honor.

7         THE COURT:  Any objection, Mr. Dill?

8         MR. DILL:  No, Your Honor.

9         THE COURT:  All right.  There being no objection,

10   Ms. Newton's qualified under Federal Rule of Evidence 702 to

11   provide expert opinion testimony in the field of cash flow

12   analysis.

13        MR. FIELDS:  Thank you, Your Honor.

14   BY MR. FIELDS:

15   Q.   Did you perform a cash flow analysis of the Rudolph's

16   financial records between January 2014 and December 2016?

17   A.   No.  No, my analysis was only from June 2014 through

18   the end of December 2016.

19   Q.   Thank you.  Ms. Newton, what records did you use to do

20   that cash flow analysis?

21   A.   I used bank records, investment account records, and I

22   also had credit card records as well.

23   Q.   What did you learn about their cash flow between 2014

24   and 2016?

25   A.   I noted that they had a net cash outflow for those

DIRECT - NEWTON

1    three periods.

2    Q.    What does that mean?

3    A.    That means that at a very high level, the balances in

4    their cash and cash flow accounts went down.  So they had

5    less -- they used more money -- or they spent, used, you

6    know, moved out -- or used more money than they brought in

7    that year -- or that period.

8    Q.    When you looked at the Rudolph's financial records and

9    documents, who had control over the Rudolph's financial

10   accounts, for the most part?

11   A.    For the most part, looking at who the authorized users

12   on all the accounts, who were the signers on bank accounts

13   and investment statements, Lawrence Rudolph had a majority

14   of the control over their finances based on that.

15   Q.    So who would have been directing the financial

16   transactions resulting in that cash outflow?

17   A.    Lawrence Rudolph.

18   Q.    Did Lawrence Rudolph's cash flow change in 2017?

19   A.    Yes.

20   Q.    What happened?

21   A.    He received $4.8 million in life insurance proceeds

22   from Bianca's death.

23            MR. FIELDS:  Your Honor, may I have a moment?

24            THE COURT:  You may.

25            MR. FIELDS:  No further questions for this witness,

CROSS - NEWTON

1    Your Honor.

2              THE COURT:  All right.  Cross-examination.

3              MR. MARKUS:  Good morning, ladies and gentlemen.

4    Good morning, counsel.  Your Honor, good morning.

5                        CROSS-EXAMINATION

6    BY MR. MARKUS:

7    Q.    Ms. Newton, good morning.

8    A.    Good morning.

9    Q.    My name's David Markus.  We've never met before.  I

10   represent Dr. Rudolph.  And I'm going to ask you a couple of

11   questions, okay?

12   A.    All right.

13   Q.    All right.  Let's start with this outflow -- cash

14   outflow idea.  I think you corrected the prosecutor that

15   your analysis started like halfway through '14, right?

16   A.    Right.  It starts -- so it's like the seven months

17   ending December 31st, 2017.

18   Q.    So you didn't analyze the first half of 2014, 2013, or

19   2012, right?

20   A.    That's correct.

21   Q.    And -- and when you're looking at outflow -- well,

22   let's back up a second.  I'm not an accountant so bear with

23   me, okay?

24              Between 2011 and 2016, would you agree with me that

25   the Rudolphs had liquid assets between 5.58 million and

2266

CROSS - NEWTON

1    7.81 million?

2    A.    Liquid assets?

3    Q.    Liquid assets.

4    A.    That sounds a little high, but I don't recall

5    exactly.

6    Q.    Okay.  And you're aware that those liquid -- when we

7    talk about liquid assets, we're not talking about property,

8    business, those types of things, we're talking about --

9    well, why don't you tell the jury what a liquid asset is.

10   A.    A liquid asset is cash equivalents, money you have in

11   your checking or savings account, or cash flow that's

12   something that could be converted into cash relatively

13   quickly.

14   Q.    Like a stock, maybe, or --

15   A.    Stock, bonds, certificates of deposits.

16   Q.    So when we look at liquid assets between 2011, 2016,

17   you were looking at basically cash assets or stocks,

18   investment, you weren't looking at properties, businesses,

19   et cetera, right?

20   A.    Correct.

21   Q.    Okay.  And let's assume for a moment that cash outflow

22   exceeded inflow by a few hundred thousand.  You would agree

23   with me that the Rudolphs had the money, right?

24   A.    I'm sorry, what do you mean "had the money"?

25   Q.    In other words, if we're looking even just at the

2267

CROSS - NEWTON

1    liquid assets -- let's take out the property, let's take out

2    the value of his business, just liquid assets that he had

3    between '11 and '16 -- you would agree with me that if the

4    outflows were more than the inflows by a couple hundred

5    thousand dollars, he had that money at hand, that liquid

6    asset at hand, right?

7    A.    Yes.

8    Q.    Okay.  And would you agree with me, ma'am, that as

9    people get older, it's quite normal for outflows to outweigh

10   inflows?

11   A.    Yes.

12   Q.    That's the whole point of working hard throughout your

13   life, is that you make a bunch of money and then you can

14   spend it when you get older, right?

15   A.    Correct.  Yes.

16   Q.    I mean, it doesn't do any good to die with all that

17   money, right?

18   A.    Correct.

19   Q.    So, I mean, when the prosecutor was asking you about

20   spending the few years before Bianca's death, that's quite

21   normal for you to see as an accountant for a couple in their

22   60s to be spending a little bit more than they're making,

23   right?

24   A.    Yes.

25   Q.    There's nothing, like, nefarious about that, right?

CROSS - NEWTON

1    A.    No.

2    Q.    Okay.  Now some of the outflows that you identified,

3    would you agree with me that that's -- you defined "outflow"

4    as, I think you said, using, moving money, spending money.

5    There's all kind of things that are defined as an outflow,

6    right?

7    A.    Correct.

8    Q.    And in your analysis, you identified some outflows as

9    paying off debt, right?

10   A.    Yes.

11   Q.    So let's explain that -- what that means to the jury.

12   So if he had debt -- if the Rudolphs had debt and they paid

13   it off, you counted that in your outflow category, right?

14   A.    Yes.

15   Q.    But paying off debt's a good thing, right?

16   A.    Yes.

17   Q.    And it's really just moving money from the right pocket

18   to the left pocket, right?

19   A.    I don't think I would describe it like that.

20   Q.    Okay.  Would you agree with me that -- let's take 2015

21   for a moment, where I think there was a net outflow of a

22   couple hundred thousand, right?

23   A.    Correct.

24   Q.    That's the year before Bianca's death, right?

25   A.    That's the year of Bianca's -- or 2015?  Yes, that's

CROSS - NEWTON

1    the year before, sorry.

2    Q.    The year before.  And you would agree with me that you

3    saw the Rudolphs paying down debt in 2015, right?

4    A.    Yes.

5    Q.    That might be something that they were doing as part

6    of, like, estate planning or at the advice of an accountant

7    like yourself, right?

8    A.    Sure, yeah.

9    Q.    Right.  Because I think as we established, paying off

10   debt is a good thing, right?

11   A.    Yes.

12   Q.    Okay.  And are you aware that in 2015, when the

13   outflows were about a couple hundred thousand for paying off

14   debt and other things, that their net worth actually

15   increased in 2015?  Are you aware of that?

16   A.    Yes.

17   Q.    Okay.  It increased by 173,000 and change in 2015,

18   right?

19   A.    I don't recall.

20   Q.    Okay.  Fair to say that when you're looking at

21   someone's financial picture, it would be misleading to only

22   look at cash outflow, right?

23   A.    I don't think it would be misleading; I think it would

24   be incomplete.

25   Q.    Okay.  Fair enough.  Let's use that word.  It would be

CROSS - NEWTON

1    incomplete because you have to look at the whole picture,

2    right?

3    A.    Correct.

4    Q.    And when the prosecutor only asked you about outflow,

5    he didn't ask you about the increase in the net worth,

6    paying down debt; any of those things that we just talked

7    about he didn't ask you about, correct?

8    A.    No, he didn't talk about it.

9    Q.    Okay.  By the way, in 2015, as part of the net outflow

10   that you talked about, the Rudolphs bought property, right?

11   A.    I don't recall.

12   Q.    Would you agree with me that buying property would be

13   considered an outflow in your analysis, right?

14   A.    Yes.

15   Q.    But that's, again, not losing money when you buy

16   property; that's something you have, right?

17   A.    No, it is losing liquid assets, it's losing money, but

18   it's gaining illiquid asset, an asset that is not as easy to

19   convert to cash.

20   Q.    Fair enough.  So you might lose some liquidity, but you

21   gain a property.

22   A.    Yes.  Yeah.

23   Q.    So if the prosecutor was trying to suggest that by

24   outflow that they were somehow losing money, that wouldn't

25   be complete, as you say, because they were actually buying

2271

CROSS - NEWTON

1    property that year, right?

2    A.    Right.

3    Q.    Okay.  Now let's talk about the balances to Three

4    Rivers Dental Group bank accounts.  You're aware that in

5    2015 and 2016, the balances to those accounts actually go

6    up, correct?

7    A.    Correct.

8    Q.    Okay.  That's another part of the financial picture

9    that you have to look at when looking at a couple like the

10   Rudolphs, right?

11   A.    Yes.

12   Q.    So, in other words, we have outflow, which is the one

13   thing the prosecutor asked you about.  But then we have

14   properties, paying down debt.  And now we also have --

15   looking at the Three Rivers Dental Group bank accounts, that

16   actually increased in '15 and '16, correct?

17   A.    Correct.

18   Q.    And to be fair, when we're talking with the jury, you

19   didn't take into account money before 2014, correct?

20   A.    Correct.

21   Q.    So -- but you're aware, in looking at the various bank

22   accounts, investment accounts, all the things you looked at,

23   there was a large increase in liquid assets in 2013.  I have

24   it as 1.554 million.  Are you aware of that?

25   A.    I don't recall exactly.  I didn't have bank statements

2272

CROSS - NEWTON

1    prior to June 2014, so I wasn't able to look at those

2    records.

3    Q.   You didn't have all the bank records but you had some,

4    right?

5    A.   I had investment records, investment account records.

6    I didn't have any bank statements.

7    Q.   And are you aware that in the investment account

8    records, his liquidity -- when I say "his," it's actually

9    their liquidity -- Bianca and Larry's liquidity goes up by

10   over a million and a half bucks.

11   A.   Yes, that sounds correct.

12   Q.   Okay.  So in 2013, the year before the prosecutor's

13   asking you about outflows of a couple hundred thousand, his

14   liquidity went up by a million and a half bucks.  That more

15   than covers the outflows, right?

16   A.   I guess.  My analysis didn't really -- was incomplete

17   for that period, so I can't really speak to that.

18   Q.   Fair enough.  Are you aware that the balance in their

19   investment and retirement accounts at the end of 2012 was

20   5.5 million?

21   A.   I don't recall exactly what the balance in those

22   accounts were.

23   Q.   Are you aware that in 2013, it went up to 6.95 million?

24   A.   Again, I don't -- I don't recall exactly the balances

25   in those accounts.

CROSS - NEWTON

1    Q.    Fair enough, Ms. Newton.  But if we don't take into

2    account the inflows into those accounts, then we're not

3    giving the jury a complete picture of their financial

4    picture, to use that word twice, right?

5    A.    Sure.  Yes.

6    Q.    Fair enough.  Now, I'm going to move away from outflows

7    for a second.  I'm going to talk to you about the spending

8    of cash after Bianca dies, okay?  Would you agree with me

9    that cash is fungible?

10   A.    Yes.

11   Q.    Okay.  Can you explain that, what fungibility, or what

12   cash is fungible means to the jury?

13   A.    Sure.  Like I said earlier, like, cash doesn't leave a

14   trail.  Cash, once it comes out of your bank account, or

15   once you receive it, there's not going to be really much of

16   a record of what you use.

17         You know, independent of a few other reporting

18   regulations for cash transactions, there's really not going

19   to be much of a trail.  You can kind of use it for whatever

20   you want.  Nobody would really know.

21   Q.    And when we're talking about a bank account where we

22   can see what goes in and out, the difference between $12

23   versus another dollar, those dollars are fungible, right?

24   A.    What do you mean?

25   Q.    Sure.  Sure.  Let's say I have -- I put $50 into an

CROSS - NEWTON

1    account on Monday and another $50 into an account on

2    Tuesday.  We have a hundred dollars in the account.

3    A.    Right.

4    Q.    Okay.  If I spend $25 from that account, we don't know

5    which dollars were spent, correct?

6    A.    Well, no.  There are various methods to trace what

7    funds are used to pay that.  There's different methods that

8    you can use to trace those funds, to attribute that spending

9    to which dollars.

10   Q.    Let's say the account on Sunday is worth zero.

11   A.    Right.

12   Q.    Monday I put 50 bucks of cash in.

13   A.    Uhm-hum.

14   Q.    Tuesday I put another 50 bucks of cash in.  We have

15   $100 in there?

16   A.    Okay.

17   Q.    On Wednesday, I write a check to Domino's Pizza for

18   $25, okay.  Where did the -- which -- did it come from the

19   Monday $50 or the Tuesday $50?

20   A.    It depends.

21   Q.    Okay.  Explain that.

22   A.    So if the -- let's just say, for instance, if the $50

23   came from your paycheck on Monday and then Tuesday you got a

24   $50 check from your aunt for your birthday, so you could use

25   the method saying, you know -- you know, first in, first

CROSS - NEWTON

1    out.  So the first money that came in is the first money

2    that's going to go out.

3           So in that case, that $50 would be related to your

4    paycheck.  If you use last in, first out, meaning that the

5    last money that came in is the first money that you used,

6    then that $50 would be attributable to your birthday check.

7    Q.   Or there's a third way:  If you just combine the money

8    and you could say half from the first, half from the second,

9    right?

10   A.   Like a pro rata share.

11   Q.   Pro rata share.  So these are all different accounting

12   methods for determining how to attribute that $25, right?

13   A.   Correct.

14   Q.   Okay.  When you were discussing the purchases of

15   property that Dr. Rudolph made after Bianca died, the

16   prosecutor didn't ask you about the sale of his previous

17   properties, right?

18   A.   No.

19   Q.   In other words, before he bought the home in 2018, he

20   sold the prior one, right?

21   A.   Which prior property?

22   Q.   The Arizona property.

23   A.   No.

24   Q.   Are you aware that he sold that to -- that Arizona

25   property around the same time as the --

CROSS - NEWTON

1    A.    He -- but it was after he purchased the 7000.

2    Q.    Okay.  What happened to that money that he -- where he

3    sold that home?  It went --

4    A.    I'm sorry.

5    Q.    No, you go.

6    A.    If I recall correctly, that money went into one of his

7    Morgan Stanley investment accounts.

8    Q.    Back into the accounts that are governed by the Rudolph

9    Trust, correct?

10   A.    Correct.

11   Q.    Okay.  Now there are a number of different accounts

12   under the Rudolph Trust, correct?

13   A.    Correct.

14   Q.    Can you tell the jury which accounts are under the

15   Rudolph Trust.

16   A.    In approximately August 2016, all of Dr. Rudolph's

17   investment accounts and the Bianca Rudolph's investment

18   accounts were transferred under the Bianca -- Lawrence

19   Rudolph and Bianca Trust.

20   Q.    So, again, to -- I just wanted to give the jury a

21   complete picture, Ms. Newton.  The money that goes out from

22   that umbrella of the trust to buy the house in 2018, the

23   prosecutor asked you about that, correct?

24   A.    I'm sorry, can you repeat that?

25   Q.    Sure.  There was a house purchased in 2018, correct, in

2277

CROSS - NEWTON

1    Arizona?

2    A.    Correct.

3    Q.    Okay.  The money used to purchase that house was from

4    one of the accounts under the Rudolph Trust, correct?

5    A.    Correct.

6    Q.    When he sold the previous house, the money that was

7    sold from the -- the money that was a result from that sale

8    goes into one of the accounts in the Rudolph Trust, correct?

9    A.    Correct.

10   Q.    Okay.  Same with the cars, correct?  The prosecutor

11   asked you about purchase of cars.  Those purchase of cars

12   were made from an account in the Rudolph Trust, correct?

13   A.    Yes.

14   Q.    He also sold cars before he bought those cars, correct?

15   A.    I don't recall seeing any proceeds from the sale of

16   vehicles.

17   Q.    Are you aware that those -- well, did you see the sale

18   of those cars go back into the Rudolph Trust?

19   A.    Again, I don't recall seeing any of the proceeds from

20   the sale of vehicles.

21   Q.    Fair enough.  Do you remember that the insurance

22   proceeds that the prosecutor asked you about get deposited

23   into the Rudolph Trust -- well, let me ask you:  When do

24   they get deposited?

25   A.    March 2017.

CROSS - NEWTON

1    Q.    And the purchases that the prosecutor were talking to

2    you about, those come in 2018, some in '19, right?

3    A.    Uhm-hum.   Yes.

4    Q.    And are you aware that some of the purchases are made

5    not with the corpus of the insurance, but with the capital

6    appreciation of the insurance?

7    A.    Yes.

8    Q.    Okay.   Let's explain that to the jury, because this is

9    really important.   The prosecutor asked you, "Were insurance

10   proceeds used?"

11         When you -- when he asked you that, he was assuming

12   corpus and appreciation, correct?

13   A.    Yes.   I think so.

14   Q.    Because the -- the insurance proceeds were put into

15   investment vehicles, right?

16   A.    Yes.

17   Q.    And those investment vehicles -- and I know the

18   market's tanking now and nobody wants to talk about it --

19   but at the time it was on fire, wasn't it?

20   A.    Yes.

21   Q.    So the insurance proceeds were invested and they go way

22   up, right?

23   A.    Yes.

24   Q.    And so what Dr. Rudolph does is he uses the

25   appreciation from those insurance proceeds to buy some of

CROSS - NEWTON

1    the things we were talking about, correct?

2    A.    No.

3    Q.    Are you aware that Dr. Rudolph used some capital

4    appreciation to purchase the 2018 home?

5    A.    It depends on how you trace those funds.

6    Q.    Ah.  Just like we talked about before with the $25,

7    right?

8    A.    Right.

9    Q.    So if you use a particular tracing formula that uses

10   first in, first out, you might say it comes from the corpus,

11   right?

12   A.    Correct.

13   Q.    If you use last in, first out, you might say it's

14   coming from the appreciation, right?

15   A.    Yes.

16   Q.    Okay.  So it depends what formula we use.

17   A.    Yes.

18   Q.    Now, I want to talk to you for a second about the need

19   for the insurance proceeds, because the prosecutor didn't

20   ask you about the need for the insurance proceeds to buy

21   these materials.

22         Do you remember sending the prosecutor an email

23   shortly before the charges in this case saying, "I don't

24   think I can say that Larry wouldn't have been able to

25   maintain his lifestyle without the life insurance money"?

CROSS - NEWTON

1    A.    Yes.

2    Q.    Okay.  And are you also aware that when you reviewed

3    his total financial picture, if you strip out the insurance

4    proceeds, he still had plenty of liquidity to do all the

5    things he was doing, correct?

6    A.    I don't know.

7    Q.    Let's go through it, then.  In 2016, if you strip

8    away -- well, there was no insurance proceeds in 2016, so

9    are you aware that at the end of 2016 before the receipt of

10   insurance proceeds, he had total liquidity of

11   $$6.708 million?

12   A.    That sounds -- that sounds correct.

13   Q.    Okay.  So at the very end of '16 before he receives a

14   dime of the insurance -- I'm not even talking about real

15   estate, value of the business, anything else, I'm just

16   talking about liquid assets -- he's got 6.7, right?

17   A.    Sure, yes.

18   Q.    Okay.  In 2017, if you strip away the insurance

19   proceeds, you don't look at them, at the end of 2017, would

20   you agree with me that he is still liquid?  Again not

21   looking at property, any of the other things, just liquid

22   assets, he's still liquid of 5.99 million?

23   A.    I don't know how you get that amount.

24   Q.    Have you reviewed Mitch Hoffman's record?

25   A.    I have.

CROSS - NEWTON

1    Q.    And have you reviewed his schedules about stripping out

2    the insurance proceeds for each of those years '16, '17,

3    '18, '19, and '20?

4    A.    Yes.

5    Q.    Okay.  And did you see that under his analysis -- he's

6    a CPA like you, right?

7    A.    Right.

8    Q.    Did you see under his analysis that at the end of '17,

9    if you strip away the insurance proceeds, Dr. Rudolph still

10   had liquidity, again not including all his other stuff, of

11   5.9 million?

12   A.    So the difference is that Mr. Hoffman took the market

13   value of these accounts and he subtracted the exact amount

14   of life insurance proceeds.  And like you said, those

15   accounts were gangbusters, like '17, '18, '19, '20, '21,

16   until now.  So Mr. Hoffman's analysis does not take into

17   consideration the appreciation of those funds, because you

18   can't -- you can't exclude the corpus from the

19   appreciation.

20   Q.    Great point.  I agree.  So let's explain that point to

21   the jury.

22          What Hoffman was doing, and what I'm asking you, is

23   if you take out the 4.8 million corpus, and what are you

24   left with, right?  That was what he was trying to figure

25   out, correct?

CROSS - NEWTON

1    A.    Correct.

2    Q.    And what you're saying is that if you look at the

3    appreciation, that was included in his analysis, right?

4    A.    The appreciation is included in the number that he has

5    at the bottom line.  So market value less the corpus of the

6    life insurance proceeds is what number Mr. Hoffman had.

7    Q.    And it wasn't just appreciation from the life insurance

8    proceeds; Dr. Rudolph had lots of different investment

9    accounts that were all going gangbusters at the time, right?

10   A.    Yes.

11   Q.    And, in fact, we see his liquidity shoot up, without --

12   again, without the corpus of the life insurance, from '18,

13   '19, and '20, the liquidity, based on that appreciation, is

14   going way up, correct?

15   A.    Yes, it goes up.

16   Q.    Okay.  So would you agree with me that if we take out

17   the corpus of the life insurance -- and when I say "corpus"

18   I'm talking about 4.8 million of the life insurance -- that

19   Dr. Rudolph's liquidity is going up in '17, '18, '19, and

20   '20.

21   A.    Yes.

22   Q.    I think that's all I got.  Let me just check with my

23   colleagues and I'll be right back.

24          MR. MARKUS:  Thank you.  Nothing further,

25   Ms. Newton.  Nice to meet you.

2283

CROSS - NEWTON

1        THE WITNESS:  Thank you.

2        THE COURT:  Any cross, Mr. Dill?

3        MR. DILL:  Yes, Your Honor.

4                    CROSS-EXAMINATION

5   BY MR. DILL:

6   Q.   Good afternoon.  I'm John Dill.  I want to ask you a

7   few questions about some of the charts that you put

8   together.

9        Can we look at Government Exhibit 500 and go to

10  page 4, please.

11       Okay.  So it's my understanding this looks like the

12  source of funds was from 2014 through 2021, correct?

13  A.   Correct.

14  Q.   Okay.  And even if you break it down into the amount of

15  cash or AmEx or TRDG income, Ms. Milliron's income was less

16  in 2017, '18, '19, '20 and '21 than it had been back in 2015

17  and 2016; isn't that right?

18  A.   Yes.

19  Q.   Okay.  And just as far as the cash deposits you were

20  talking about, the cash deposits -- even though the

21  PowerPoint we looked at the cash deposits stopped on the

22  PowerPoint, but cash deposits continued in 2017, 2018, 2019,

23  some in 2020 and 2021, correct?

24  A.   Yes.

25  Q.   Okay.  We talked about the AmEx bills.  Each of these

CROSS - NEWTON

1   down at the bottom in the gray, that was the Three Rivers

2   Dental Group AmEx, correct?

3   A.    Yes.

4   Q.    And she testified that that was a perk of her

5   employment; you recall that --

6   A.    Yes.

7   Q.    -- right?

8         And she also said there was a limit on it, correct?

9   A.    I don't recall that.

10  Q.    Okay.  Well, assume for me she testified to that.

11  Doesn't it appear that it never goes above 22,529 in one

12  year there, does it?

13  A.    Yes.

14  Q.    Okay.  So -- and as far as whether it was a perk of her

15  employment or not, you didn't look at that.  You're just

16  looking and saying she's on the -- she's on the credit card

17  statement at some point in time, and that was your analysis,

18  correct?

19  A.    Correct.

20  Q.    But you remember the questions you were asked about:

21  At one point in time, Julian was on the credit card

22  statement and she was not, and then she was on the credit

23  card statement --

24  A.    Yes.

25  Q.    -- right?

CROSS - NEWTON

1          And you don't have any information about Julian's

2     employment or whether he was employed there?

3     A.    No.

4     Q.    Okay.  But that wouldn't make any difference as far as

5     your analysis.  You're just telling us what appears on the

6     statements, correct?

7     A.    Yes.

8     Q.    Okay.  Now, let me talk a little bit about:  You were

9     asked some questions about travel.  And it looks like the

10    travel that you analyzed started in what year?

11    A.    So depends on which analysis you're looking at.  So

12    like the calendars with the lines on it, those records go

13    from 2015, I think, to the end of 2017.

14    Q.    Okay.

15    A.    And then if you look at the other big spreadsheet with

16    all the little tiny lines, those are the U.S. Customs and

17    Border Patrol, and I think those go to like the mid-2000s to

18    present.  So those are two different, like, data sets.

19    Q.    Okay.  So mid-2000, what, '-6, '-7, '-8 time period?

20    A.    I think so, yeah.

21    Q.    Okay.  So based upon your review of just even that time

22    period, and not even a little bit before, you're asked a lot

23    of questions about how Ms. Milliron, you know, got to go to

24    certain places.  You recall those questions?

25    A.    Yes.

CROSS - NEWTON

1    Q.    And now you have an understanding that in the 2004,

2    '-5, '-6, '-7, '-8, '-9 time period, Dr. Rudolph and Lori

3    Milliron were getting to go all over the world together,

4    right?

5    A.    I'm sorry?  What was that again?

6    Q.    Didn't you see all the travel records from 2004 to

7    2009?

8    A.    I did, yeah.

9    Q.    And did you see the travel that they made all over the

10    world during that time period together?

11    A.    There wasn't -- there wasn't a considerable amount of

12    international travel with Ms. Milliron and Dr. Rudolph.

13    Q.    Okay.  Are you certain about that?  Or are you looking

14    at all the records or just at the return records?

15    A.    So what those records show, the earlier ones, those

16    show like the entry and exit point from the United States.

17    So they're not going to show travel domestically, and it's

18    not going to show travel between other countries.

19    Q.    Right.  So, in other words, if they fly out of the

20    country and then they fly to Mozambique, South Africa,

21    Zambia, Australia, or any of those places, you're not going

22    to see those on your records that you have, correct?

23    A.    Correct.

24    Q.    But assume there's testimony that they were traveling

25    quite a bit during that time period.  You wouldn't have any

CROSS - NEWTON

1    reason to disagree with that?

2    A.   I have no reason to -- I don't know.

3    Q.   And certainly you didn't see any -- a great deal of

4    international travel with Ms. Milliron and Dr. Rudolph in

5    the time periods that you did analyze in the 2015, '16 and

6    '17.

7    A.   Correct.

8    Q.   Okay.  We saw Cabo, right?  But it's not the same thing

9    as flying all over to Africa, et cetera?

10   A.   Correct.

11   Q.   However, Dr. Rudolph and Bianca Rudolph were flying

12   quite a bit internationally during that time period, weren't

13   they?

14   A.   Yes.

15   Q.   Okay.  And including several trips to Africa, other

16   areas overseas; they were traveling together during that

17   time period, correct?

18   A.   Yes.

19   Q.   Okay.  You were asked some questions about a -- the

20   March trip to Phoenix.  I don't know if you recall the

21   questions about when she first got to go to Phoenix.  I

22   think that is what he asked:  When did Lori Milliron get to

23   go to Phoenix?  And you talked about March of 2016.

24        Do you recall those questions, because it's on your

25   chart?

2288
CROSS - NEWTON

1    **A.    I do recall.  Are you sure it was March?**

2    **Q.    March or April.  I mean, it's whatever's on your chart.**

3    **A.    Yes, I do know what you're talking about.**

4    **Q.    Now, you also looked through Ms. Milliron's credit card**

5    **statements, didn't you?**

6    **A.    Yes.**

7    **Q.    And you saw, did you not, that often she would pay for**

8    **the travel for herself, correct?**

9    **A.    Sometimes, yes.**

10   **Q.    All right.  Well, for instance, the trip to Phoenix,**

11   **she paid for that on her Juniper credit card, didn't she?**

12   **A.    I don't recall.**

13   **Q.    Okay.  Well, let's look at BARC 279 and 280.**

14        **COURTROOM DEPUTY:  What exhibit is this, counsel?**

15        **MR. DILL:  Oh, I'm sorry.  I apologize.  It's --**

16   **this is not an exhibit.  It's my understanding this is stuff**

17   **that -- these are documents she's relied upon so I can**

18   **identify it as BARC 279 and 280.**

19        **Do you want me to lay the predicate for this, Your**

20   **Honor?  I'm happy to.**

21        **THE COURT:  Are you using it to refresh**

22   **recollection --**

23        **MR. DILL:  Underlying data, Your Honor.  She's**

24   **testified as to the summary -- to summary charts, and this**

25   **is the underlying data she's relied upon.**

CROSS - NEWTON

1          THE COURT:  Does the Government oppose?

2          MR. FIELDS:  If he's actually offering it as an

3    exhibit, we have no opposition.

4          THE COURT:  All right.  Why don't we do it that

5    way.

6          MR. DILL:  We can identify it as an exhibit.

7    That's fine, Your Honor.

8          THE COURT:  All right.  So is it labled now as an

9    exhibit?

10          MR. DILL:  No.  This is just like an INV, but for

11    purposes -- I can label it as an exhibit for the record

12    subsequent -- I'm just really trying to refresh her

13    recollection on it at this point, Your Honor.

14          THE COURT:  All right.  Why don't we do that.  And

15    you don't have to introduce it into evidence if you don't

16    want to.  If all you want to do is refresh her recollection

17    why don't we just pull it up on the screens.  The jury

18    doesn't have to see it, Ms. Newton can review the document

19    on the screen, we'll take it down from the screen, and

20    she'll testify from her refreshed recollection.

21          MR. DILL:  Yes, sir.  That's a better way to do it.

22    I agree.

23    BY MR. DILL:

24    Q.   Let's put up 279 and 280.  Okay.

25          And, ma'am, just -- is this the -- take a look at

CROSS - NEWTON

1    this and see if this refreshes your recollection as to the

2    credit card statements of Ms. Milliron.

3    A.    Sure.    This is Ms. Milliron's Juniper credit card

4    ending 9014.

5    Q.    I'm sorry, go ahead.

6    A.    I'm sorry.    Ending date April 5th, 2016.

7    Q.    All right.    And without just reading it out to me,

8    based upon that, do you see she purchased airline tickets?

9    A.    Yes.

10   Q.    Okay.    And you also see, based upon that, that there

11   was a charge at a place called the Phoenician Retail in

12   Scottsdale, Arizona?

13   A.    Yes.

14   Q.    And you know the Phoenician to be a hotel in

15   Scottsdale, Arizona, correct?

16   A.    I don't know.

17   Q.    Okay.    Well, assume for a moment that's a hotel, and

18   Phoenician Retail is from the hotel in Scottsdale, Arizona.

19   You don't have any reason to disagree with that, do you?

20   A.    No reason.

21   Q.    Thanks.    You can take that down.

22         Now, you were also asked some questions about

23   addresses and -- I assume you took the addresses from the

24   credit reports.

25   A.    No, I took them from her bank statements.    So I saw --

2291

CROSS - NEWTON

1    like when the address changed on her bank statement.

2    Q.   So it looked like -- correct me if I'm wrong on this --

3    looked like she lived at Orlando Avenue at one point in

4    time, up in Pennsylvania.

5    A.   Yes.

6    Q.   Then moved to a place called Moon Township?

7    A.   No.

8    Q.   Well, Moon Township being the town.

9    A.   Yes.

10   Q.   Okay.

11   A.   Yes.

12   Q.   Then to Duck Court, which I think is in Greentree.

13   A.   No.

14   Q.   Right?  You don't know?

15   A.   It's in Greensburg.

16   Q.   Greensburg.  Okay.  What's in Greentree?  Did she have

17   an address there?

18   A.   No.  Not that I recall.

19   Q.   Okay.  At least not on the credit card statements that

20   you saw.

21   A.   No, I didn't see a Greentree address.

22   Q.   Now, let me talk about -- you talked about the -- her

23   PNC Bank account.  I want to talk about that just briefly

24   here.

25           You were able to see what money was deposited into

CROSS - NEWTON

1   the PNC Bank accounts over a number of years for

2   Ms. Milliron; is that correct?

3   A.   Yes.

4   Q.   Okay.  And then I think you told us the source of that

5   income was coming in through TRDG, partially.  And then also

6   the cash we talked about, correct?

7   A.   Yes.

8   Q.   All right.  Can we pull up -- and, again, let me ask

9   you, as you refreshed your recollection, do you recall what

10  that money was spent on by looking at the bank statements?

11  A.   Generally I remember, yes.

12  Q.   Okay.  Well, let's be more specific.  Let's say on --

13  did you recall that it was spent on essentially rent,

14  Amazon, you know, Chili's.  Just no exorbitant purchases; is

15  that correct?

16  A.   That's correct.

17  Q.   All right.  And certainly not even a stockpiling of

18  money or anything like that.  Looks like she was -- the

19  money was coming in and was pretty much being spent on

20  living expenses and some other things; is that fair to say?

21  A.   Yes.

22  Q.   Okay.  And now you're also aware -- you were asked

23  questions about colleges and that type of thing.  You said

24  that there were some checks written to, I guess, Jessica

25  Moroz and Stephanie Moroz.  Weren't there also checks

CROSS - NEWTON

1    written directly to different educational places?  Did you

2    see that?

3    A.    Not that I recall, no.

4    Q.    Do you recall seeing a check written to Texas A&M on

5    the actual joint bank account involving Bianca Rudolph?  Do

6    you recall that in your analysis?

7    A.    No, I don't recall that check.

8    Q.    Okay.  Nonetheless, certainly you're aware from

9    Ms. Milliron's Exhibit -- Government Exhibit 71, which we've

10   looked at a little bit today, that she said that Dr. Rudolph

11   had paid for education for her children and that type of

12   thing.  She responded to that in the grand jury, correct?

13   A.    Yes.

14            MR. DILL:  Just a moment, Your Honor.

15            THE COURT:  Sure.

16   BY MR. DILL:

17   Q.    Oh, I know.  There was a question about a one-way

18   ticket to Phoenix.  Do you recall that, about a one-way

19   ticket to Phoenix of -- sometime after Bianca's funeral?

20   A.    Yes.

21   Q.    And in reality, the ticket went to Phoenix and then

22   there was a flight to Jackson Hole and then back to -- she

23   went back -- Ms. Milliron went back to Pittsburgh; isn't

24   that right?

25   A.    Yes.

REDIRECT - NEWTON

1    Q.    Okay.  So it wasn't like, "I got a one-way ticket" and

2    she went to Phoenix and never returned.  That's not

3    accurate, is it?

4    A.    That's not accurate.

5    Q.    Okay.  Thank you, ma'am.

6    A.    Thanks.

7              MR. DILL:  That's all I have, Your Honor.

8              THE COURT:  All right.  Redirect.

9                       REDIRECT EXAMINATION

10   BY MR. FIELDS:

11   Q.    Ms. Newton, let's talk about the insurance proceeds.

12   Approximately when did those get deposited into the Vanguard

13   account?

14   A.    Which Vanguard account?

15   Q.    Well, when did the insurance proceeds get deposited

16   into Rudolph's accounts?

17   A.    They were deposited initially in March 2017.

18   Q.    Into what accounts?

19   A.    So 1.7 was deposited into Vanguard account 5266.  And

20   then 2.1 was deposited into Vanguard 9515, subaccount 30.

21   Q.    And that was approximately March you said?

22   A.    Yeah, it was in March.

23   Q.    And then did you say at some point they got merged

24   together?

25   A.    Yeah.  In April 2017, all the funds in -- and every

REDIRECT - NEWTON

1    penny in 5266 were transferred into the Vanguard 9515,

2    subaccount 30 account.

3    Q.    And you were asked about Dr. Rudolph's selling his

4    existing home and the purchase of the new home.  Do you

5    remember that?

6    A.    Yes.

7    Q.    The purchase of the new home and the lot, when did that

8    happen?

9    A.    That happened in August 2017.

10   Q.    When did he sell that house at 4141?

11   A.    I don't recall exactly.  It was after August 2017,

12   though.

13   Q.    So it was after?

14   A.    Yes.

15   Q.    Is it easier or harder to finance the purchase of a

16   $3.5 million home with $4.8 million in life insurance

17   proceeds?

18   A.    It's much easier if you have $4.8 million life

19   insurance proceeds.

20   Q.    And 4.8 -- you were asked all these questions about

21   sort of outflows and lifestyle and -- do you remember all

22   those questions?

23   A.    Yes.

24   Q.    Is it easier or harder to maintain a lifestyle with

25   $4.8 million in liquid cash?

REDIRECT - NEWTON

1    A.    It's easier.

2    Q.    You were also asked about sort of capital appreciation

3    and whether that could have been used to finance the new

4    home.  Do you remember that?

5    A.    Yes.

6    Q.    Capital appreciation on what?

7    A.    On the corpus of the life insurance proceeds, on that

8    $4.8 million.

9    Q.    So no matter what, the life insurance proceeds were

10   financing that new home?

11   A.    Yes.

12   Q.    You were also asked -- let's pull up Government's

13   Exhibit 501, please.  Let's go to page 17.

14         So what do you see there on March 28th, 2016?

15   A.    I see Larry and Lori traveling to Phoenix.

16   Q.    Together?

17   A.    Yes.

18   Q.    March 2016, what season is that?  Is that winter,

19   spring, summer or fall?

20   A.    It's like -- in Phoenix, it's -- you know, it's spring,

21   yeah.

22   Q.    And you were asked these questions about a retail

23   transaction at the Phoenician.

24   A.    Yes.

25   Q.    The earlier hotel transaction that you looked at, do

REDIRECT - NEWTON

1    you remember those hotel transactions at the Aria in

2    Las Vegas?

3    A.    Yes.

4    Q.    Did they get a check-in date?

5    A.    Yes.

6    Q.    Did they have other information about sort of hotel

7    transactions, room service, that sort of thing?

8    A.    I don't recall exactly.  I do remember there was a

9    couple different transactions at the Aria.

10   Q.    That transaction that Mr. Dill showed you at the

11   Phoenician, what did it say it was for?

12   A.    Retail.

13   Q.    Is that the same as the actual hotel?

14   A.    No.

15   Q.    You were also asked about sort of travel between 2015

16   and 2017.  Do you remember those questions?

17   A.    Yes.

18   Q.    Did Ms. Milliron get to spend more time with Lawrence

19   Rudolph after Bianca's death or before Bianca's death?

20   A.    After Bianca's death.

21   Q.    And when they took trips together after Bianca's death,

22   did they get to spend more time at their destinations or

23   less time than before Bianca died?

24   A.    More time.

25   Q.    You were also asked about Ms. Milliron's income and

1    whether or not it was less in 2017.  Do you remember those

2    questions?

3    A.    Yes.

4    Q.    And you were also asked questions about how she got

5    less cash in 2017.  Do you remember those questions?

6    A.    Yes.

7    Q.    What changed in Ms. Milliron's life between 2016 and

8    2017?

9    A.    She was spending more time with Dr. Rudolph.

10            MR. FIELDS:  No further questions, Your Honor.

11            THE COURT:  May this witness be excused for the

12    Government?

13            MR. FIELDS:  Yes.

14            THE COURT:  For the defendants?

15            MR. MARKUS:  Yes, Your Honor.

16            MR. DILL:  Yes, Your Honor.

17            THE COURT:  Agent Newton, thank you so much for

18    your testimony.  You're excused.  You may step down.

19            Government may call its next witness.

20            MR. WINSTEAD:  Thank you, Your Honor.  The United

21    States calls Brian Lovelace.

22            COURTROOM DEPUTY:  Raise your right hand for me.

23            BRIAN LOVELACE, GOVERNMENT'S  WITNESS, SWORN

24            COURTROOM DEPUTY:  Thank you.  Please be seated and

25    remove your mask for us.  Then state your name for the

2299

DIRECT - LOVELACE

1    record and spell your first and last name for us.

2              THE WITNESS:  Brian Lovelace.  B-r-i-a-n,

3    L-o-v-e-l-a-c-e.

4              THE COURT:  You may proceed, counsel.

5              MR. WINSTEAD:  Thank you, Your Honor.

6                        DIRECT EXAMINATION

7    BY MR. WINSTEAD:

8    Q.   Good morning, sir.

9    A.   Good morning.

10   Q.   I'd like to ask you a couple of questions about your

11   work history.  In 2020, where did you work?

12   A.   At Steak 44.

13   Q.   Where is that?

14   A.   It's in Arcadia in Arizona.

15   Q.   What sort of a place is that?

16   A.   It's a high-end steakhouse.

17   Q.   What was your role there when were you working there?

18   A.   I was a bartender.

19   Q.   Can you tell me generally what time frame you worked

20   there.

21   A.   Let's see.  I believe it was maybe 2018 to 2021.

22   Q.   Okay.  And were you a bartender the whole time?

23   A.   Yes, I was.

24   Q.   When you were working there, did you know someone named

25   Larry?

2300

DIRECT - LOVELACE

1    A.    Yes.

2    Q.    Is that what you referred to him as?

3    A.    I knew a couple of Larrys, yes.

4    Q.    Did you know someone that you referred to as Dr. Larry?

5    A.    Yes, I knew someone named Dr. Larry.

6    Q.    Okay.  I'd like to ask you about a couple of questions

7    about him.  Did he come to the bar there often?

8    A.    Yes.

9    Q.    Would you call him a regular?

10   A.    Yeah, definitely.

11   Q.    And I'm going to ask you about a conversation that you

12   overheard, but first I'd like a little context.  Before

13   hearing that over -- overhearing that conversation, what did

14   you know about Larry?

15   A.    Larry came in maybe a couple of times a month.  Really

16   nice guy.  Just -- just positive person, always happy.

17   Shook my hand.  Didn't know much about him and what he --

18   you know, any of his back story, I didn't know at that time

19   what he did for a living.  I learned later that he was a

20   dentist.  Yeah, that's about it.

21   Q.    Did you know his last name at that point?

22   A.    No, I did not.

23   Q.    Okay.  Did you know someone named Lori?

24   A.    Yes.

25   Q.    Who was that?

DIRECT - LOVELACE

1    A.    She came in with Larry.  I've only seen them together,

2    I've never seen either of them without each other.

3    Q.    Sir, I'd like to ask you:  Do you see Larry in the

4    courtroom today?

5    A.    Yes.

6            MR. MARKUS:  Stand up.  This is Larry right here.

7    No objection.

8            MR. WINSTEAD:  It's okay.  Then may the record

9    reflect the identification?

10           THE COURT:  The record will so reflect.

11   BY MR. WINSTEAD:

12   Q.    And do you see Lori in the courtroom today?

13   A.    Yes.

14   Q.    Can you just describe, what color shirt is she wearing?

15   A.    Maroon?  Or brown.

16           MR. WINSTEAD:  May the record reflect that

17   identification as well, Your Honor.

18           THE COURT:  The record will so reflect.

19   BY MR. WINSTEAD:

20   Q.    Okay.  When they came into the bar, how did they treat

21   you?

22   A.    Very well.  Larry, every time always shook my hand, was

23   very kind, a slight hug.  Asked me how my day was going, my

24   weekend, always pleasant.

25   Q.    Were they good customers?

2302

DIRECT - LOVELACE

1    A.    Yes.  Yes, they were.

2    Q.    How did they usually pay?

3    A.    Usually Larry paid.  And actually I think Larry always

4    paid.  He paid in cash.

5    Q.    How often would you say they came in around that time

6    period?

7    A.    Maybe -- maybe twice a month or every three weeks,

8    something around . . .

9    Q.    When they were in the bar together, did they usually

10   get along?

11   A.    Yes.  Usually, yes.

12   Q.    Sometimes did you see them argue?

13   A.    Sometimes I'd see, you know, maybe an uncomfortable

14   conversation.  You can tell when someone's having an

15   uncomfortable conversation.

16   Q.    Do you recall ever hearing the subject of any of their

17   arguments?

18   A.    I mean, I maybe overheard little something about money

19   or something, but nothing -- no details specific.  Just kind

20   of like, you know, under the breath.

21   Q.    Okay.  All right.  Sir, I'd like to talk about the

22   particular conversation relevant to this case that you

23   overheard.  Are there two bars in Steak 44?

24   A.    Yes, there are.

25   Q.    Was this conversation -- which bar was this

DIRECT - LOVELACE

1    conversation at?

2    A.    There's a back bar that's called the Arcadia Room.

3    Q.    Could I bring up what's been admitted as Government's

4    Exhibit 60.

5          Is this the back bar?

6    A.    It is.

7    Q.    This is page 1.  And would you go to page 2 of

8    Exhibit 60, please.

9          What is this a picture of?

10   A.    That's the back bar as well.

11   Q.    Okay.  In this photo, can you see the place where Larry

12   and Lori -- I guess I should back up a second.

13         For the conversation that we're about to discuss,

14   did Larry and Lori come into the bar?

15   A.    Yes, they did.

16   Q.    And did they sit at the back bar?

17   A.    Yes.

18   Q.    Can you show us on here -- is it possible to see where

19   they were sitting?  And there's -- you've got a little pen

20   on the side there, you can draw on the screen.

21   A.    Well, there's typically another seat here, and this is

22   pushed over.  So there was a seat here and then here and

23   here is where they were sitting.  But this was closer to

24   there.

25   Q.    So they were on either side of the corner of the bar on

DIRECT - LOVELACE

1    the left side of this picture?

2    A.   That's correct.

3    Q.   Was there anyone else sitting at the bar at that time?

4    A.   Yes.  There were other people scattered across the bar.

5    Q.   Was it -- was there anyone -- and I guess I don't know

6    if you told me already -- you said they were sitting here

7    and here.  Do you remember where Lori was sitting and where

8    Larry was sitting?

9    A.   Yes.  Larry was here, Lori was here.

10   Q.   Was there anyone sitting next to Lori?

11   A.   There was another couple and a teenage daughter.

12   Q.   Were they in the seats sort of next to Lori, moving

13   away in the picture?

14   A.   Right -- right here.

15   Q.   Okay.  And was the bar relatively full that night?

16   A.   I mean, it was -- there was also people back here and

17   on the corner here.  So it was relatively full.

18   Q.   Okay.  Was there music playing?

19   A.   Yes.  There's always music.

20   Q.   Was it -- was it live music or was it playing over the

21   speakers?

22   A.   Speakers.

23   Q.   How loud is it in the back bar?

24   A.   It's -- it's the quiet section.  The front bar's

25   extremely loud, so most people that want to have a

DIRECT - LOVELACE

1    conversation or have a quiet dinner, they sit at the back

2    bar.  So it's just a normal restaurant style music back

3    there, opposed to the front which is more, you know,

4    aggressive.

5    Q.    All right.  So at some point that evening, did you

6    notice that Larry and Lori were arguing?

7    A.    I know they were having an uncomfortable conversation.

8    Q.    Could you hear what they were arguing about?

9    A.    No.

10   Q.    Before we talk about what you could hear, do you

11   remember about when this occurred?

12   A.    The date or time?

13   Q.    The date.

14   A.    That's -- not exactly sure.  I was -- between January

15   and March.  Maybe I think January, February.

16   Q.    Of what year?

17   A.    2019?

18   Q.    Was it -- do you remember where it was --

19   A.    It was pre-pandemic.

20   Q.    Okay.  Was it immediately before the pandemic or was it

21   like years before the pandemic?

22   A.    No, it was close.  It was close in that.  It wasn't --

23   it wasn't -- the pandemic wasn't that next month.

24   Q.    So, I'm sorry, you said the pandemic was or was not?

25   A.    Was not.  Yeah, so it wasn't that and then pandemic.

**DIRECT - LOVELACE**

1    Because we were closed down for a little while, so it was a

2    couple of months before.

3    Q.    Before the pandemic?

4    A.    Correct.

5    Q.    Okay.  Got it.  So does that mean it was in -- when you

6    said January, February, was that in 2020?

7    A.    I think that's '20, yes.  Sorry.

8    Q.    Great.  After you reopened after the pandemic, were

9    there seating restrictions --

10   A.    Yes, there were very strict seating restrictions.

11   Q.    And that was not in place when this particular

12   conversation happened?

13   A.    No.  You had to be at least two seats between parties.

14   And so as you can see, you would not be able to have other

15   people sitting like a three-top over there with the people

16   in the corner, so you're not allowed to do that.

17   Q.    All right, sir.  Where were you when you saw them

18   having an uncomfortable conversation?

19   A.    The service well right here.

20   Q.    And at some point did you hear a memorable phrase said

21   by Defendant Rudolph?

22   A.    Yes, I did.

23   Q.    What did you hear?

24   A.    He said, "I killed my F-ing wife for you."

25   Q.    And did he say "F-ing" or did he actually say the word?

DIRECT - LOVELACE

1    A.    He said the word, but I don't want to disrespect the

2    Court.

3    Q.    Sure.  What was the tone of his voice when he said

4    that?

5    A.    Explanatory.  So it was very firm.

6    Q.    And so would you said -- was it like a conversational

7    tone or was it more of a harsh tone?

8    A.    More of a harsh tone.

9    Q.    Okay.  Who was he speaking to when he said that?

10    A.    Lori.

11    Q.    Was the music playing when you heard that phrase?

12    A.    The music changes, you know, between songs, so it was

13    just right at that exact moment that the music changed and

14    that's why I could catch the explanatory.  It was a little

15    bit louder only because the music stopped for a moment.  So

16    he wasn't yelling by any means.

17    Q.    How clearly did you hear him say that?

18    A.    It was clear.

19    Q.    Do you remember what his facial expression was?

20    A.    He was upset.

21    Q.    Did it appear to be mid-argument?

22    A.    I don't recall if it was mid-argument.

23    Q.    When you heard that, did you think that he might be

24    joking?

25    A.    No, it didn't -- it didn't seem like a joke.  It just

2308

DIRECT - LOVELACE

1    was an odd thing to say.  But he wasn't in a happy mood, he
2    wasn't laughing, by any means.
3    Q.    And just from your sort of common sense, was it said in
4    a way that would lead you to believe it was something that
5    he meant?
6    A.    I -- I don't even know if I could wrap my head around
7    that.  I just -- it was an odd thing to hear.  I didn't even
8    process it, whether or not he meant it.  I just know that he
9    said it.
10   Q.    Okay.  You told us the phrasing, "I killed my F-ing
11   wife for you."  How certain are you about your memory of
12   that phrasing?
13   A.    I'm certain.  I spoke about it, the other people heard
14   it as well, so we kind of had a quick conversation about
15   it.
16   Q.    Who -- which other people?
17   A.    The family that was sitting next to them.
18   Q.    Okay.
19   A.    We just had a quick conversation.
20   Q.    So going back before that, as soon as he said it, did
21   Dr. Rudolph appear to have noticed that you would have
22   overheard it?
23   A.    No, he didn't really appear.  I just knew that they
24   were in an uncomfortable situation and I -- he was ready to
25   leave so by all means he was just, you know, apologetic to

DIRECT - LOVELACE

1    the situation of having to leave abruptly because, you know,

2    they wanted to leave, so, which was fine, obviously.

3    Q.    So let's loop back to that.   Immediately when you heard

4    that, what was Lori's reaction?

5    A.    She just put her head down and she grabbed her purse

6    and she walked out.

7    Q.    Did you notice from her reaction whether she appeared

8    mad?

9    A.    She seemed more maybe embarrassed.

10   Q.    Did she react like a person would if they heard

11   something that they didn't understand?

12   A.    I believe so.

13   Q.    Did it seem to you apparent that she -- that she heard

14   the phrase?

15   A.    Oh, yes.

16   Q.    And did she -- did she look surprised or did she look

17   embarrassed?

18   A.    She didn't look surprised, she looked more embarrassed

19   and didn't want to have that conversation, whatever the

20   conversation was, at that particular time, so . . .

21   Q.    Did she ask any questions in response to that?

22   A.    She did not.

23   Q.    What was Dr. Rudolph's reaction after he said it?

24   A.    Well, I immediately knew when she left that I was

25   assuming that he wanted to leave as well, so I just ran and

**DIRECT - LOVELACE**

1  grabbed his check for him really quick that I already had

2  prepared.  That way, you know, he could leave and, you know,

3  further the conversation, to speak.  So he just was

4  apologetic and said, you know, "I'm sorry for the -- leaving

5  abruptly."  I said, "No problem.  Don't worry about it,

6  Larry.  That's fine.  No big deal."  And he paid and left.

7  Q.   Did he take the food they ordered?

8  A.   No, they had already eaten, so I packed up some of the

9  rest of it, but he said he didn't -- he didn't want it.  I'm

10 sure he wasn't in the mood to -- he wasn't worried about his

11 food.

12 Q.   How fast was it between when he said it and when he

13 left, would you say?

14 A.   We spoke briefly.  I mean, 30 seconds.

15 Q.   Now you had mentioned that the other people there that

16 you spoke to them afterwards.  Did they seem to have heard

17 the phrase as well?

18 A.   Just the three people that were next to him.

19 Q.   Okay.  Do you remember when you saw Larry next?

20 A.   It was a couple of months later.  Not sure exactly.  It

21 was a little bit of time.  A little longer than usual.

22 Q.   Did he come in with Lori?

23 A.   He did.

24 Q.   Did they make any reference to that comment?

25 A.   No, absolutely not.  He was the same Larry.  Nice

DIRECT - LOVELACE

1    and -- no change in his -- how he treated me or anyone else.

2    He was completely normal.

3    Q.    Thank you.

4          MR. WINSTEAD:  May I have just a moment, Your

5    Honor?

6          THE COURT:  You may.

7    BY MR. WINSTEAD:

8    Q.    When you heard Dr. Rudolph say the phrase talking about

9    his wife, at that point what did you believe the

10   relationship between Dr. Rudolph and Lori was?

11   A.    I didn't -- I thought Lori was his wife.  I didn't

12   know -- and I just -- assumption.  I didn't believe -- think

13   it about it.  There was no reason to think that except I

14   only seen them together.  And most people that come together

15   are man and wife, usually, or long-term relationships.  So I

16   just thought Lori was his wife.

17   Q.    And so when you heard that phrase that he said, was

18   that confusing to you?

19   A.    Yes.

20   Q.    At that point, did you know that he had had a wife that

21   had previously died?

22   A.    No.

23         MR. WINSTEAD:  Sorry, Your Honor, one more

24   question.

25         THE COURT:  All right.

2312
CROSS - LOVELACE

1    BY MR. WINSTEAD:

2    Q.   All right, just one more question.  I think you already

3    said this, but just to be clear:  The conversation

4    immediately before the music stopped and you heard that

5    phrase, did you hear anything about what they were saying?

6    A.   I did not.

7    Q.   Okay.

8              MR. WINSTEAD:  Thank you, Your Honor.

9              THE COURT:  Thank you.  Cross-examination.

10                        CROSS-EXAMINATION

11   BY MR. MARKUS:

12   Q.   Hi Mr. Lovelace.  How are you doing?

13   A.   I'm well.  How are you.

14   Q.   I'm David Markus.  I'm going to ask you a couple of

15   questions about the conversation of Dr. Rudolph if I might.

16   A.   Of course.

17   Q.   So I think you said Larry's a really good guy.

18   A.   Yes.  What I know of Larry, he's a great guy.

19   Q.   Positive?

20   A.   Very positive.

21   Q.   Generous?

22   A.   Very generous.

23   Q.   Friendly?

24   A.   Friendly.

25   Q.   And I think you told Mr. Winstead, the prosecutor, that

CROSS - LOVELACE

1    you only heard what was said after the music cut off, right?

2    A.    That's correct.

3    Q.    And what was said beforehand might change the context

4    of what he said, correct?

5    A.    That's correct, it could.

6    Q.    And I think you said that you saw that they were sort

7    of not getting along great that evening, correct?

8    A.    At that particular moment, not the entire evening.

9    Q.    Right.  And previously you had said you had overheard,

10   on other occasions, them having some disagreements about

11   money.

12   A.    Some -- yeah, a little bit.

13   Q.    Now could they have been having one of those

14   disagreements about the spending of money that evening that

15   you just didn't hear about?

16   A.    It could have been anything.  I only heard one thing;

17   so anything they said previous I did not hear.

18   Q.    And is it fair to say you didn't hear the words

19   immediately preceding that phrase that you told the jury

20   about?

21   A.    That is correct.

22   Q.    And so is it possible that Dr. Rudolph said, "They're

23   saying I killed my F-ing wife for you"?

24   A.    Can you please rephrase that?

25   Q.    Sure.  You told the jury you heard the phrase, "I

2314

CROSS - LOVELACE

1    killed my F-ing wife for you," right?

2    A.    Correct.

3    Q.    And that's when the music cuts off, correct?

4    A.    Right.

5    Q.    Is it possible that right before the music cut off, he

6    used the words, "They're saying" and then "I killed my F-ing

7    wife for you"?

8    A.    That's definitely possible.  Any -- he could have said

9    anything before.  I did not hear any of it.

10   Q.    In fact, that wouldn't surprise you, would it, if he

11   had said, "They're saying I killed my F-ing wife for you"?

12   A.    Would it surprise me?

13   Q.    Yeah.

14   A.    I -- everything is surprising to me.

15   Q.    You didn't expect to be in a federal courtroom years

16   later, did you?

17   A.    Right.  Right.

18   Q.    Yeah.  No, I imagine this is quite crazy, no?

19   A.    It is.

20   Q.    Yeah.  Let me ask you something that I think would be

21   very surprising to you.  Would you be surprised if Larry

22   Rudolph actually murdered his wife?

23   A.    I would be surprised.  From what I know of Larry, yes,

24   that would be surprising.

25   Q.    Thank you, sir.  I have nothing further.

1              THE COURT:  Any cross, Mr. Dill?

2              MR. DILL:  No, sir.

3              THE COURT:  All right.  Redirect.

4              MR. WINSTEAD:  No redirect.  Thank you, Your

5    Honor.

6              THE COURT:  All right.  May this witness be excused

7    for the Government?

8              MR. WINSTEAD:  Yes.

9              THE COURT:  For the defendants?

10             MR. DILL:  Yes, sir.

11             MR. MARKUS:  Yes, Your Honor.

12             THE COURT:  Mr. Lovelace, thank you so much for

13   your testimony.  You're excused and you may step down.

14             THE WITNESS:  Thank you, Your Honor.

15             THE COURT:  Government may call its next witness.

16             MR. FIELDS:  Your Honor, at this time, the

17   Government would rest.

18             THE COURT:  All right.  Okay, ladies and gentlemen

19   of the jury, there is a matter that I need to deal with the

20   lawyers that the law requires be done outside your presence.

21   My guesstimate is that it will be about 30 minutes or so.

22   So we'll just tack that onto the lunch hour recess.  So

23   you'll -- you'll have a recess of 90 minutes, so you have a

24   longer lunch.  You can relax a little more during your

25   lunch.  I ask you to be back in the jury deliberation room

2316

1    at 1:30.

2              All right, the jury is released until 1:30.

3         (Jury left the courtroom at 12:04 p.m.)

4              THE COURT:  All right, let me first ask:  Is there

5    a motion by Defendant Rudolph?

6              MR. MARKUS:  Yes, Your Honor.

7              THE COURT:  All right.

8              MR. MARKUS:  At long last, we have come to the

9    close of the Government's case.  I think we've gone

10   through -- what is it, 49 witnesses, guys?  And if you

11   believe every -- well, let me back up.

12              I move for a Rule 29 on both counts as to each

13   element of each offense, Your Honor.

14              THE COURT:  All right.

15              MR. MARKUS:  And I'll just make a very brief

16   argument.  If you believe every word of every witness in

17   this case, there's -- you can still find Dr. Rudolph not

18   guilty.  It's the first trial I've ever been a part of where

19   literally every single witness could be believed and you

20   could still find Dr. Rudolph not guilty.  The evidence is

21   equally on one side as the other.  And as the agent I think

22   truthfully, very truthfully, said on cross-examination,

23   there are innocent explanations for just about everything in

24   this case.  And he truthfully said, "You got to give the

25   benefit of the doubt to Dr. Rudolph."

1           And I know Your Honor went through yesterday the

2      evidence in a way that doesn't account for those innocent

3      explanations, but I would ask the Court to consider those in

4      the Rule 29, especially as it relates to premeditation.

5      There is simply nothing there; no evidence there.

6           And so even the Government's experts say it's --

7      it's possible that this was an accident, the Browning folks,

8      the autopsy folks, everybody.  So we would move for Rule 29

9      on both Counts 1 and 2 as to each element of each offense,

10     Your Honor.

11          THE COURT:  Let me ask you something before you

12     leave the lectern.  I'll start with your first comment that

13     there's evidence that could go both ways on a lot of things,

14     and including the elements of the two counts.  Isn't that

15     precisely the recipe for me to deny your motion because of

16     your burden under the rule that -- to demonstrate to me that

17     no reasonable juror could conclude that the elements of

18     these two counts have been proven beyond a reasonable doubt

19     when, coupled with the fact that the case law interpreting

20     the rule, requires me to view the facts in the light most

21     favorable to the nonmovant, in this case the Government?

22          MR. MARKUS:  Right, Your Honor.  I guess the point

23     is whether a reasonable juror could find it beyond a

24     reasonable doubt if the evidence is in equipoise, as the

25     Tenth Circuit uses that word, then no reasonable juror could

1    find it.

2              So in a civil case, perhaps, you know, a juror

3    could find this way or this way that the scale tips one way

4    or the other because there's evidence on both sides.  But a

5    reasonable juror could have to find it beyond a reasonable

6    doubt in this case.  And when there are innocent

7    explanations for every single item that the Government has

8    presented, literally every single item an innocent

9    explanation --

10             THE COURT:  But innocent explanations that the jury

11   could reject.

12             MR. MARKUS:  But not beyond a reasonable doubt,

13   Your Honor.  That's the point.

14             THE COURT:  Well, that's your argument, I

15   understand it; I respect it.  But I have to find that as a

16   matter of law --

17             MR. MARKUS:  Yes, Your Honor.

18             THE COURT:  -- for purposes under the rule to grant

19   the motion.

20             MR. MARKUS:  Yes, Your Honor.

21             THE COURT:  All right.  Thank you.

22             MR. MARKUS:  Thank you.

23             THE COURT:  Mr. Dill, just one second.  Obviously

24   you'll be given your opportunity to make your motion.  I

25   think it will be better for me and my law clerk if we -- if

1    I hear the response from the Government to this motion first

2    and then I'll hear the motion by Defendant Milliron.

3           MR. FIELDS:   Thank you, Your Honor.   I'll be

4    equally brief.   I just want to point out that the standard

5    is actually the -- as Your Honor pointed out, it's the

6    opposite of what Mr. Markus was just saying.   The standard

7    requires that at this stage, again just for purposes of Rule

8    29, all the inferences actually be drawn in favor of the

9    Government.   Once you do that, the evidence isn't an

10   equipoise.   All the evidence here suggests that this --

11   Bianca Rudolph was killed from a shotgun blast fired from 1

12   to 3 feet away at a perpendicular angle.

13          All things in this universe are possible, Your

14   Honor, but I think rules out the drop scenario they keep

15   talking about.   The reach study show that she didn't do this

16   to her.   All the evidence shows it was done from a shotgun

17   from a distance elevated from 1 to 3 feet away.   From that

18   evidence, a jury could conclude that Dr. Rudolph, who's the

19   only other person in that cabin, murdered his wife.

20          And then you add on top of that all the evidence of

21   motive, almost $5 million windfall, and the fact that he's

22   able to move in with his mistress almost immediately.   And

23   all of that is evidence from which the jury could find

24   beyond a reasonable doubt that Larry Rudolph murdered his

25   wife.

1              THE COURT:  What specifically is the evidence the

2     Government's pointing to on premeditation?

3              MR. FIELDS:  The evidence of premeditation would be

4     the propofol purchase, Your Honor.  The only time he'd ever

5     done that before he went on the trip.  Propofol, as Dr. Cina

6     testified, is a drug that can be used to cause -- it's a

7     relaxant or it's a depressant, so it causes the nervous

8     system to just stop functioning.  On top of that, you also

9     have the remote location that the defendant, we would argue,

10    chose to commit this crime.  That way he could be assured

11    that there would not be a thorough investigation.  It would

12    be Zambian investigators with extremely limited resources

13    who could not perform all these functions.

14              While he's surrounded by people under his employ,

15    like Mark Swanepoel and everyone at the camp staff who's

16    dependant on them.  Then you have the circumstances itself,

17    Your Honor, where the shotgun is fired from a soft case.

18    That in and of itself is evidence that the defendant

19    intended to make this look like an accident.  All of that I

20    think goes towards premeditation and that's all evidence

21    from which the jury could find beyond a reasonable doubt

22    that Mr. Rudolph planned this trip to Zambia, the perfect

23    place to commit a murder, and that's where it was carried

24    out.

25              THE COURT:  Your argument so far was focused on

1    Count 1.  I'd like you to address Count 2 for a little

2    bit.

3              MR. FIELDS:  Yes, Your Honor.  On that same point,

4    if the jury can conclude a -- well, if there's sufficient

5    evidence for them to conclude that it was in fact the

6    defendant who committed the murder, then they can find that

7    he misrepresented that to them.  Numerous life insurance

8    witnesses testified that Dr. Rudolph always represented this

9    as an accident.

10             There's also evidence that the defendant made a

11   material omission by not including the ballistics report

12   that says "suicide."  Granted, that report in its body

13   doesn't talk about suicide, but numerous life insurance

14   witnesses said that that word right there in bold on the

15   document would have caused them to make different decisions

16   which goes towards materiality and towards deception.

17             And the body of that report, too, is not favorable

18   to the defendant in terms of an accident scenario because it

19   describes the trigger in perfect working condition.

20   Ms. Wagner at Great West specifically looked at that, like,

21   "Yeah, that would have changed our assessment as to whether

22   or not an experienced hunter shot herself in the chest with

23   a long gun in Zambia."

24             So all of that is evidence from which the jury

25   could conclude that Dr. Rudolph misrepresented the

1    circumstances of the accident, that he intended to do so

2    because he had that ballistics report, as Boyd Malama and

3    Otto Westhassel testified.

4         And that as far as the mailing goes Debra Wagner

5    says that the letter that was sent that's the substantive

6    count for Count 2 was sent via Federal Express, so

7    interstate commercial carrier, so from all that evidence the

8    jury could conclude there's sufficient evidence here to find

9    beyond a reasonable doubt that the defendant committed mail

10   fraud.

11        THE COURT:  Mr. Markus, I'll give you an

12   opportunity for a brief reply if you'd like to take it.

13        MR. MARKUS:  Your Honor, I don't have much to add

14   because I don't want to give away my whole closing argument

15   here, but all I will say is that, you know, they try to spin

16   every fact in a -- such a negative way.  You know, that

17   Zambia trip, for instance, that was planned a year in

18   advance.  I mean, it's just absurd to say that he chose it

19   for murder.  The propofol, we heard the reasons about the

20   propofol.

21        They have these blinders on.  And now we are

22   getting into closing, so I won't say anything else.  So --

23   so I think the Court knows my argument at this point.

24        THE COURT:  ALL right.  Thank you.

25        MR. MARKUS:  Thank you.

1          THE COURT:  Is there a motion from Defendant
2    Milliron?
3          MR. DILL:  Yes, Your Honor.
4          THE COURT:  All right.
5          MR. DILL:  Take the lectern?
6          THE COURT:  Mr. Dill, if you'll take the lectern.
7          MR. DILL:  Thank you.  Your Honor, Defendant
8    Milliron would move for Rule 29 on all counts against her.
9    The basis of the argument is that Ms. Milliron's charges all
10   stem from alleged false statements before the grand jury.
11         The accessory count, there is no overt act or
12   accessory after the fact.  There's no act that's been
13   alleged or has been presented that she did anything other
14   than testify untruthfully before the grand jury, along with
15   the obstruction count as well.
16         The reason it's important now to break down:  What
17   are they alleging that her lies were?  And the evidence says
18   that she in fact was truthful in front of the grand jury.
19   So although Count 3 is accessory after the fact, Count 4 is
20   obstruction, essentially.
21         We have -- I'd like to take each of the following
22   counts in order.  Count 5, the -- what was charged in the
23   indictment was the questions which we believe were
24   fundamentally ambiguous, but also in the context of what was
25   actually said in the grand jury were truthful answers.

1           Count 5 in the indictment, they claim that this was

2   a knowingly false statement which was material.

3           Question:  At the time you were working at Three

4   Rivers, did you have any other substantial source of cash

5   income?

6           Answer:  I don't recall.

7           "Do you recall making -- well, how frequently do

8   you think you deposited cash into your personal account?"

9           "I don't know.  I couldn't say."

10          And then as we know what the context of what

11  happened next is:  "Take a look at Exhibit 2.  This is an

12  analysis of cash deposits into your PNC account.  Do you

13  recall depositing approximately $20,000 in cash into that

14  account in 2014?"

15          Answer:  No, I don't.

16          "60,000 in 2015?"

17          "No, I don't."

18          The questions she were asked -- she was asked in

19  front of the grand jury had to do with the summary chart,

20  Exhibit 2.  Subsequent to those questions, which were not

21  included in the indictment, was when she was shown the

22  deposit slips and she said:  "I don't recall exactly which

23  one -- each one of these was for, but I do recall making

24  these deposits."

25          She never denied it.  So I believe to prove -- or

1    to show that she intentionally misled the grand jury by this

2    snippet is not what the actual evidence in the case is.  In

3    fact, I questioned Agent Peterson at length:  truthful

4    answer after truthful answer.  She recalled making the

5    deposits.  She recalled the source of the income was

6    Lawrence Rudolph.  She recalled and volunteered that they

7    had had an affair.  She volunteered that he paid for her

8    children's school.  He paid for expenses.  This was all part

9    of that.

10           There is nothing in Count 5 in those questions

11   which shows there's an intent to mislead the grand jury.

12   Additionally, certainly not a material misrepresentation,

13   even if it is a misrepresentation, because she explains it.

14   The grand jury indicts Dr. Rudolph; hears the same

15   information, does not indict her.

16           But I believe we don't even have to get to

17   materiality, Your Honor.  There is no evidence that this was

18   an intentional false statement before the grand jury in

19   Count 5.

20           Count 6 --

21           THE COURT:  Before you go on, Mr. Dill.

22           MR. DILL:  Yes, sir.

23           THE COURT:  The answer -- her first answer on --

24   with respect to whether she had other -- your client,

25   Ms. Milliron, had other substantial sources of cash income,

1    was:  "I don't recall."

2           So I would have to find, if I were to grant your

3    motion with respect to Count 5, that no reasonable jury

4    could conclude, even given her subsequent follow-up

5    responses, that she -- that that statement was false.  That

6    no juror could conclude that no reasonable, sane, sentient

7    person could possibly not recall having this other source of

8    income from Dr. Rudolph.  Wouldn't that -- so two questions.

9    Two questions.

10          MR. DILL:  Yes.

11          THE COURT:  Is it your argument that as a matter of

12   law I can find on this record that no reasonable juror --

13   jury could conclude that this original response, "I don't

14   recall if I have had any other substantial source of

15   income," was false?  No. 1.

16          No. 2:  Do you have any authority for me that says

17   an initially false response or statement to the grand jury

18   is somehow cured by subsequent explanatory responses later

19   on?  And that we can't -- I can't look and the jury can't

20   look to the initially alleged false response?

21          MR. DILL:  I guess the issue becomes, then, what

22   was the initial question?  The initial question before being

23   shown this document of cash income was a general question

24   of:  "During your time at Three Rivers, do you recall a

25   substantial -- other substantial source of cash income?"

1           Keep in mind, the income that she was receiving

2    from Dr. Rudolph and the income she's receiving from Three

3    Rivers is from the same source, okay?

4           So clearly what -- they asked a general question:

5    Do you remember -- and it was not a specific question, it

6    was a general question, and an ambiguous question at that.

7    When it's narrowed down specifically, she says:  "I don't

8    recall that."  Okay?  So they would have to show that she

9    did in fact recall that; that she intentionally did not

10   reveal it.

11          And the case law is -- which we've cited in our

12   prior papers about an ambiguous question and answer that is

13   truthful or partially truthful or can be interpreted as

14   truthful is not an intentional misleading.  So this is the

15   problem I would suggest of cherry-picking out one section

16   and saying, "Ah-ha, that could be interpreted as false,"

17   when we look at not only the question, which itself is

18   ambiguous, and then it's explained when there's further

19   questioning.

20          Remember, the burden is on the questioner to elicit

21   further follow-up, not on the person who's being questioned

22   to say, "Let me clarify things for you."  The burden is on

23   the questioner to do follow-up questions, follow-up answers

24   to make it more narrow.  This is an extremely general

25   question.  And no interpretation of how she responds to the

1    next question says, "Oh, well, therefore, she was misleading

2    the grand jury at that point in time."

3            THE COURT:  Well, you know, cherry-picking is

4    always -- or can be a concern in a certain context.  But in

5    the context like Count 5 and some of the similar counts, by

6    necessity there has to be a cherry-picking in the sense that

7    the Government has to convince the grand jury to indict with

8    respect to the falsity of a specific statement.  And so

9    that's cherry-picking to the extent that there's a statement

10   being cherry-picked, if you will, from her testimony that

11   the Government alleges the grand jury indicted on is false.

12           So in that respect, the cherry-picking argument is

13   quite different and needs to be dealt with quite different

14   in this context.  Don't you think?

15           MR. DILL:  Your Honor, I would agree, but let's not

16   forget Counts 4 and 3 are that she intentionally misled the

17   grand jury altogether.

18           THE COURT:  All right.  We're talking about

19   Count 5.

20           MR. DILL:  Yes, sir, we're talking about Count 5.

21   But, again, there's not some other statement that forms

22   Count 5.  Count 5 is specifically:  "Do you recall

23   depositing this cash in 2014 and 2015?"

24           She says:  "I don't recall."

25           THE COURT:  Oh, well, one of the statements Count 5

1     references is her allegedly false statement that she did not

2     recall having any other substantial source of cash income

3     while working at Three Rivers Dental Group.

4              MR. DILL:  Which I would respond:  What is the

5     evidence that she did in fact recall it?  It's an -- again,

6     "I don't know," and "I don't recall" under the case law.

7              THE COURT:  But that was my initial question.  Can

8     I, on this record, make a finding that no reasonable jury

9     could conclude, could infer, from all the other evidence,

10    the totality of the evidence, and their own common sense --

11    which I'm going to instruct them that they should apply --

12    that given the amount and source of this other income, that

13    the answer, "I do not recall," is false?

14             MR. DILL:  Your Honor --

15             THE COURT:  Because how could someone not recall

16    receiving tens of thousands of dollars in a source other

17    than their own paycheck?  And it's not -- you know, given

18    the burden -- the burden is very high on the movant, as you

19    know, and on a Rule 29.  I -- it's not whether I can

20    conclude, it's whether -- I have to say that no jury could

21    conclude that adultery -- that could sit back there in the

22    deliberation room and say, "Well, there's no way that it

23    could be true that she didn't recall."

24             MR. DILL:  Which -- I'm sorry, Your Honor.

25             THE COURT:  Go ahead.

1          MR. DILL:  Not to -- assume that -- assume for

2     argument that's true.  Then how is that a material

3     misrepresentation?  If she did not recall it -- because they

4     have to show not only an intentional misrepresentation, that

5     it was material, how can you say -- or how can one say that

6     her saying she did not recall another source of income was

7     material to the outcome to the grand jury?

8          Clearly it wasn't because she explains further on

9     even in Count 5 that she didn't know.  So how is that

10    statement a material misrepresentation to the grand jury?

11         THE COURT:  Well, I would have to find, because of

12    the posture that I'm put in, in considering the rule, I have

13    to find that no reasonable jury could conclude that it's

14    material; that that misstatement not only was false, but

15    also was material.

16         MR. DILL:  Well, Your Honor, I believe materiality

17    is the question of law, you know, if you look at the case

18    law under 1623 and otherwise.  Materiality would, in fact,

19    be a question of law.  So it's not what the jury finds is

20    material, the question would be:  Is her saying, "I don't

21    recall if I had another substantial source of cash income

22    over an unidentified time period," which apparently is about

23    15 to 16 years, her not recalling another substantial

24    source, that that in fact is a material false statement to

25    the grand jury?

1              So that's why the knowing and intentional false

2    statement and the materiality have to go hand in hand.  I

3    believe the Court can make a determination on materiality,

4    even in an interpretation that a jury may say, "How can

5    somebody not remember that?"

6              THE COURT:  Well, but its materiality is the fourth

7    element of the count.  It's an element that, if this count

8    goes to the jury, they will have to find as a matter of

9    fact.  And I can only preclude or prevent that analysis from

10   taking place if I conclude as a matter of law that no

11   reasonable juror could possibly conclude that the false

12   statement was material.  I think that's --

13             MR. DILL:  I think --

14             THE COURT:  That's how it plays out.

15             MR. DILL:  I understand.  Just for the record, the

16   question of "substantial" and the ambiguity of

17   "substantial," I think also goes into it.  This is an

18   ambiguous question, not only as to time, but as to

19   substance.  What does "substantial" mean?  "Substantial"

20   obviously to one person may be a hundred dollars; a million

21   dollars to another person.  That's an ambiguous statement on

22   its face, with an ambiguous response or a truthful response.

23             So where I would tend to agree, if the only

24   evidence in the case was her saying, "I don't remember

25   depositing $20,000 at once in cash," I would agree that a

1    reasonable juror could say, "You would probably remember

2    that."  But that ambiguous question of "substantial" as to

3    an undetermined time period and a response of "I don't

4    recall," how can a reasonable jury infer from that that that

5    is, one, guilt that she's knowingly lying about it; and,

6    two, that that material -- is a material statement, which

7    we're not even sure what it means.

8          THE COURT:  All right.  I think we've spent enough

9    time on Count 5.

10         MR. DILL:  I'll be quick, Your Honor.

11         THE COURT:  Let's move on and ask you to be a

12   little briefer --

13         MR. DILL:  I will.  I apologize.

14         THE COURT:  -- with respect to the other counts.

15         MR. DILL:  These are a little bit more easy, I

16   believe, to look at and see the problems.

17         "Why was Larry paying you this additional money if

18   you already had a salary for those things?"

19         Answer:  Because he wanted to help me.

20         Question:  Did he explain why?

21         "He was very generous."

22         So in 2015, you received approximately double your

23   salary or your salary again, but all in cash?

24         Answer:  Yes.

25         "And in 2016, you received a little bit more than

1    your salary in cash?"

2              Answer:  Yes.

3              And here's the crux and the problem with this --

4    and if this was a civil depo we would say, "Object to the

5    form, calling for speculation."

6              "Why was Larry so generous to you?"

7              They're asking her to comment on the intent of

8    another person or what the other person's mindset in fact

9    is.

10             And she said:  "I don't know why.  But like I said,

11   he would give staff members, other people, washers and

12   dryers.  He would give them cash if they needed it for a

13   whole variety of things."

14             And then, again:  "So your testimony before the

15   members of the grand jury today is that you don't know

16   exactly why he gave you $60,000 in 2015?"

17             Answer:  I don't know exactly why.

18             The problem with this question is, it's asking her

19   to comment on another person's intent.  It will be different

20   if -- it would be different if it were about her intent and

21   what she knew.  But just by the way it's asked, it's calling

22   for speculation.  And how can she know exactly the reasons

23   why he did it?  Was it to keep her happy?  Was it to keep

24   her because it was his girlfriend?  Was it some other

25   reason?  Was it financial or otherwise?

1          If she -- if there's no evidence as to she knows

2     exactly why he did it, now she's being asked to comment on

3     the mindset of another.

4          THE COURT:  I understand.  Let's keep moving along.

5          MR. DILL:  No. 7 -- and, again, this is -- I spent

6     some time on Count 7, and this has to do with the American

7     Express.  The Court has it, and it's similar, about the same

8     amount of money.

9          "Ms. Milliron, if you'll notice there was 75,000 in

10    2016 with 33,500 in 2017.  Do you see that?"

11         Answer:  Yes.

12         "Why would he give you less in 2017?"

13         Answer:  I don't know why.

14         Okay, so, again, why is Dr. Rudolph doing

15    something?  Why is his mindset to do something?

16         And then they asked again, I believe:  "Have you --

17    he gave you approximately 75,450 in 2016 and in 2017 he gave

18    you 33,350.  I believe your testimony was that you weren't

19    sure why he gave you less in 2017.  Do you now remember why

20    he might have given you less in 2027?"

21         Answer:  No, I don't know why.

22         "Was it because at that point you were on his

23    American Express card?"

24         "No.  The card was basically a perk of my -- it's a

25    Three Rivers Dental Group card.  It was part of my perks, I

1    guess."

2         And, again, the basis for that count -- and that's

3    what I asked Detective Peterson -- the basis for the count

4    that he -- that the Government presented before the grand

5    jury was that Julian Rudolph was also on the AmEx account

6    and that Julian Rudolph was not an employee of Three Rivers

7    Dental Group.  He -- but the evidence is -- and you know,

8    Mr. Peterson conceded it -- "I didn't realize that he, in

9    fact, was an employee being paid as an attorney in 2016 and

10   2017.  So, therefore, I did not know that."

11        So not only are you asking in this count to comment

12   on somebody else's mindset, the fundamental underlying issue

13   as to why it was done, there's no evidence to the contrary

14   that it was in fact a perk of her employment.  So what --

15        THE COURT:  What about the evidence that --

16        MR. DILL:  -- reasonable jury can infer outside of

17   that?

18        THE COURT:  What about the evidence that no other

19   employee had such an American Express cards as part --

20        MR. DILL:  I would say it's not true, Your Honor.

21   Julian Rudolph was an employee and he had it as well.

22        THE COURT:  Let me just make one comment on an

23   argument you've made now with respect to two of the counts,

24   which is the questions asking your client to comment on

25   someone else's state of mind.  But states of mind aren't

1    necessarily kept secret in the mind of the person who has

2    that thought or intent.  Those states of mind can be

3    communicated to other people.

4              And I -- to take this count away from the jury

5    based on that argument, I would have to conclude that no

6    reasonable jury could find from the facts and infer from the

7    facts that this -- the state of mind of Dr. Rudolph was, in

8    fact, known to Ms. Milliron given statements and actions and

9    conduct of his.

10             MR. DILL:  Two points to that, Your Honor.  What is

11   the evidence that he communicated to her -- any evidence in

12   the case that he communicated to her that she was put on the

13   AmEx for some other reason?  There is no such evidence and

14   there is no interpretation of the evidence unless the jury

15   starts speculating about things.

16             And that's why it also dovetails to what she's

17   testified to truthfully:  that he was supporting her, that

18   he was taking care of her, that she had an affair with him.

19   So, again, I would urge the Court, we have to look at what

20   the evidence in the case is, and what has actually been

21   presented and proven, and not just what is written here.

22   There is zero evidence that's been presented that

23   Dr. Rudolph told her, "You're on the AmEx card because some

24   other reason than being an employee."  And that's why --

25             THE COURT:  But like I said, statements or conduct.

1        Conduct and actions or inactions, omissions, that a state of

2        mind can be communicated.  We're spending too much time on

3        this.  Let's move on to the other counts, Mr. Dill.

4               MR. DILL:  Yes, sir.  And, again, this is Count 8,

5        it's based upon -- we would argue it's based upon truthful

6        responses.

7               "Before the hunt, had you ever given him an

8        ultimatum that he needed to leave his wife?"

9               "I don't believe so."

10              "You don't believe so or you did not?"

11              "I don't think I did."

12              "Could he have -- well, did you ever threaten to

13       break off the affair?"

14              "I don't remember."

15              "So you said that you don't think you've given him

16       an ultimatum?  Yes or no, did you ever give him an

17       ultimatum?"

18              "No."

19              "Did you ever tell him at the office you were

20       thinking about it?"

21              "No."

22              "Did you ever tell anyone at the office you gave

23       Mr. Rudolph an ultimatum to leave his wife?"

24              "No, I did not."

25              And this -- again, Your Honor, the ultimatum and

1    Anna Grimley -- this ultimatum is the only ultimatum that is

2    being spoken of; it was Anna Grimley.

3         THE COURT:  Right.

4         MR. DILL:  I asked Ms. Grimley three separate times

5    to describe for us what Ms. Milliron said to her.  And three

6    separate times, in addition to the other times when she said

7    she didn't recall, she could not identify the statement.

8    She -- one time she said, "She was going to do something in

9    a year."  Another time was, "I think it might have been she

10   was going to give an ultimatum or maybe she said she had

11   given him an ultimatum."  And then finally, she said, "Yeah,

12   I think she gave an ultimatum a year before, but

13   subsequently gave one."

14        If they can't identify the so-called ultimatum that

15   was allegedly given, how can she lie about an ultimatum -- a

16   word that was injected in this by the FBI -- how, in fact,

17   could a jury say, "Yes, I believe she gave an ultimatum, I

18   don't know what it was.  It might have been more than three

19   things or maybe it didn't happen at all and therefore she

20   lied about it."  I would say the evidence is not sufficient

21   to sustain the conviction on that and, therefore, a directed

22   verdict's required on this count.

23        THE COURT:  All right.

24        MR. DILL:  And finally, Judge, Count 9 -- and,

25   again, I -- the Court has it, but just so -- for the record

1    I'll be brief.

2            "Did he say anything about the merits of an

3    investigation?"

4            "I don't recall."

5            "Did he say anything about whether it was an

6    accident?"

7            "No, he told me previously it was an accident."

8            "Did he proclaim his innocence?"

9            "He probably did.  I don't really recall that."

10           "What do you recall?"

11           "I really don't recall."

12           "As you sit here today, with the members of the

13   grand jury, you don't recall a conversation with Mr. Rudolph

14   about an FBI investigation?"

15           Answer:  There had been a conversation about that

16   but I think he was aggravated.  I can't give you specifics.

17           "Can you give me generalities?"

18           "Irritated that there was an FBI investigation

19   because he felt he was innocent."

20           And, again, where is -- where is the proof that

21   this conversation of him being irritated, him feeling he was

22   not -- he was innocent, did not take place?  I suppose

23   they're going to say that Mr. Lovelace -- so therefore

24   Mr. Lovelace overhearing a snippet of a conversation shows

25   that actually Mr. Rudolph said that he in fact was guilty.

1    But the evidence in the case can't infer that just from

2    these answers because this count, itself, she's charged with

3    lying before the grand jury about him being irritated that

4    there was an FBI investigation because he felt he was

5    innocent.

6         So, again, we have to -- not only what the

7    allegation is, but what the evidence in the case is.

8    There's no evidence to the contrary that Mr. Rudolph --

9    Dr. Rudolph, rather, was irritated by the FBI investigation

10   and that he felt he was innocent.  That's essentially

11   obviously all the counts against my client, all comes to the

12   same thing:  There's no evidence that she intentionally lied

13   before the grand jury, Your Honor.

14        THE COURT:  I mean, you went straightaway to

15   Count 5.  Did you want to address 3 and 4?

16        MR. DILL:  Yes, sir.  Count 3 -- and I think Count

17   3 is accessory, unless I have them backwards.  Count 3 is

18   accessory.  Count 3 would be accessory after the fact.

19   That, in other words, knowing that a crime had been

20   committed.  And, again, that would be an important thing.

21   All of the case law on accessory is that a person knows that

22   a crime in fact has been committed.  What evidence is there

23   that Ms. Milliron knew a crime in fact had been committed in

24   Africa?

25        No evidence that she knew anything about the

1    circumstances of it.  No evidence that she was aware of it
2    and somehow hid it.  So there's no evidence from -- that a
3    reasonable jury could find guilt about, no evidence that she
4    knew a crime had even taken place.  After that, her alleged
5    false statements, which I've already gone through, are in
6    fact the basis for the accessory after the fact.
7         And, again, we know that he was indicted
8    nonetheless following that first grand jury testimony, okay?
9    There was nothing in her statements which affected that
10   outcome.  And it certainly hasn't affected anything in this
11   trial, okay?  And so that's why I kind of started with 5 and
12   6 because it all stems from the same thing, the alleged
13   false statements before the grand jury and nothing else.
14        And so obstruction, again, the same thing:  Count
15   4, that she intentionally misled the grand jury.  Once
16   again, now we have to look at the entire grand jury
17   testimony.  Looking at the entire grand jury testimony:
18   Volunteered that they'd had an affair, volunteered that he
19   was supporting her, volunteered that they had -- or answered
20   that she had a sexual relationship with him.  That they
21   would travel together.  That Bianca was aware of it.  That
22   Dr. Rudolph had affairs and Ms. -- Ms. Rudolph had affairs.
23        So how could we look at the grand jury testimony
24   and point out, "Here's the lie.  This isn't true."  So if
25   she's not lying and she's not obstructing, and these

1    statements that she's making in front of the grand jury are

2    not false, how can there be an accessory after the fact

3    charge or an obstruction charge?  That's why I started with

4    the 5, 6, 7, 8, 9.

5              THE COURT:  All right.

6              MR. DILL:  Thank you, Your Honor.

7              THE COURT:  I'll hear from the Government.

8              MR. FIELDS:  Thank you, Your Honor.  I want to be

9    brief.  And I want to be brief not because I'm taking -- I'm

10   not taking Mr. Dill's argument seriously.  I am.  It's just

11   that many of them have already been addressed in the

12   pretrial briefing.

13             And so I would ask the Court to incorporate by

14   reference a lot of the arguments made in the Government's

15   submissions ECF 140 and 141.  Those were about the

16   sufficiency of the perjury counts and there the parties sort

17   of hashed out:  Can you actually figure out what else is

18   happening in someone's mind?  The ambiguity stuff, all of

19   that stuff has been decided by the Court, so I don't think I

20   need to address those arguments.

21             THE COURT:  I agree.

22             MR. FIELDS:  Regarding actual sufficiency of the

23   evidence, I think just sort of big picture here, what you

24   have here is a witness who, when initially asked questions,

25   would make false statements, who's then confronted with sort

1    of mountains of evidence, deposit statements, the bank

2    records, everything.  And who at that point starts to

3    backtrack and admit just as much as she needs to in the

4    grand jury.  But those initial statements are false.  And

5    there is sufficient evidence from which the jury could

6    conclude that.

7         So let's start with the substantial source of cash

8    income.  One of the cases cited in the Government's briefs

9    back in ECF 140 and 141, over a hundred years old.  But

10   that's because common sense doesn't go away in the span of a

11   hundred years.  It was Judge Learned Hand sitting on the

12   bench, the District Court bench in SDNY.  He's confronted

13   with a statement from a witness who says, "I don't remember

14   depositing $940."  Keep in mind that is in 1913 and $940

15   then is $25,000 today.

16        THE COURT:  Right.  I get it.

17        MR. FIELDS:  And Judge Hand holds him in contempt

18   and says, "I know you said 'I don't remember,' but that's

19   the sort of thing any reasonable person remembers."

20        And I think that the jury, I expect, if the judge

21   gives one of the joint stipulated instructions, is going to

22   be asked to use their reason and common sense.  And the

23   evidence here is sufficient to show that someone getting

24   $75,000 in cash would remember that sort of thing.

25        On the obstruction count, there's other parts to

1    that, too.  It's, "How frequently were you making those

2    deposits?"

3            And she says:  "I don't recall."

4            But it's almost biweekly.  She has to go to

5    different ATMs and different bank branches.  That's a

6    substantial amount of sort of work to actually, like, get

7    that cash into a deposit.  It's a normal deviation from your

8    schedule.  That's the sort of thing people remember doing.

9    And I think the jury has sufficient evidence to render those

10   verdicts.

11           On the accessory charge, evidence that she knew a

12   crime was being committed, first you have Lovelace's

13   testimony that the defendant said, "I F-ing killed my wife

14   for you," before she went to the grand jury.  So the jury

15   could conclude from that evidence that she did know that the

16   defendant had, in fact, killed his F-ing wife for her.

17           The defendant, Ms. Milliron, is not charged as an

18   aider and abetter, but there's substantial evidence that she

19   actually may have helped him carry out the murder and plan

20   it.  And in that regard, I would point to the propofol

21   evidence where the testimony was that Ms. Milliron helped

22   the defendant procure that propofol, which, again, could

23   have been used as a poison.

24           And there's substantial evidence that the --

25   Ms. Milliron was the first person that Lawrence Rudolph told

1    about his wife's death while he was over in Africa.  He

2    didn't tell his brother-in-law, he didn't tell his children.

3    Ms. Milliron in the grand jury said, "He texted me while he

4    was over in Africa."  I think all that is sufficient

5    evidence from which the jury could conclude that

6    Ms. Milliron knew that Larry Rudolph has killed his wife to

7    be with her and that's, in fact, what happened when she

8    moved in with him in the span of a couple of weeks.

9         So I think from all that evidence, the jury could

10   conclude that she's an accessory after the fact, that she

11   tried to obstruct the grand jury's proceeding after hearing

12   about all the evidence regarding her involvement in his life

13   at that evidentiary hearing, and that she committed specific

14   acts of perjury to carry out that obstruction.

15        THE COURT:  All right.  Thank you.

16        Mr. Dill, I'll give you a very brief opportunity

17   for reply if you wish to take it.

18        MR. DILL:  Yes, sir.  Again -- again, Your Honor,

19   also in evidence is the -- her statement that she intended

20   to go to the grand jury and tell the truth.  That is in

21   evidence.

22        Also her statement was unrebutted on

23   cross-examination that she had spoken to Dr. Rudolph, that

24   she intended to go in front of the grand jury and tell the

25   truth.

1                 Mr. Fields' argument is that there was initial

2        false statements and then when confronted, she changed her

3        testimony.  So what would the initial false statement be?

4        Again:  "I don't know.  I don't remember."

5                 And then when given more information, then she

6        remembers.  That's not the same thing as a false statement

7        and now being confronted or impeached.  That's quite

8        different.

9                 On the point of Judge Hand, I would agree because

10       if it was $25,000 at once, just like what Judge Hand said,

11       you would remember that, that would be different.  But in

12       this case, it's $500 here, $1100 there, $800 there.  We saw

13       the deposits over time, which are regular bimonthly.  But

14       there's never anything about she should remember that amount

15       of cash.  The Learned Hand example is a perfect example.  He

16       should have remembered depositing the equivalent of $25,000

17       at once --

18                 THE COURT:  But I would have to -- if I were to

19       grant the motion on this point, I'd have to conclude that

20       just like no reasonable person could not recall depositing

21       25- or 75,000 at once, that no reasonable person could

22       forget that they've gotten dozens -- that they had to make

23       and go physically to banks on dozens of times over the

24       course of the time period we're talking about, to make these

25       cash deposits, which are not her salary, but were additional

1    cash income.  And that it would be false -- I would have to

2    find that no reasonable juror could conclude that to say

3    that "I don't remember receiving all those additional cash

4    payments" to be false.

5            MR. DILL:  I think you're bringing out my exact

6    point, Your Honor.  She was not asked:  "Do you remember

7    making all of these cash deposits," and she said, "I don't

8    remember making those cash deposits."

9            When she was asked not about the full amount for

10   the year, but about the actual cash deposits, she said:  "I

11   remember making the deposits.  I see the deposit slips.  I

12   don't remember what each one specifically was for."

13           So there was no lying about not remembering making

14   multiple cash deposits.

15           The question was:  "Do you remember" -- it's

16   somewhat of a gotcha question -- "Do you remember in 2015

17   depositing" X amount of dollars?

18           And she said:  "I don't remember that."

19           But then specifically each one about the deposits

20   she replies truthfully.  That's the difference, Your Honor,

21   I would suggest.

22           THE COURT:  Well, but she's charged in Count 5 of

23   making the false statement that she did not recall having

24   another substantial source of cash income while working at

25   Three Rivers Dental Group, which I think covers a lot of

1    what we're talking about here.

2              MR. DILL:  Your Honor, I rest on my prior argument.

3    Obviously I would just say that's an ambiguous question as

4    to "substantial" and to "time frame."

5              THE COURT:  Let me ask you to comment on

6    Mr. Fields' response to your argument that there's no

7    evidence that your client was aware of a crime, given

8    Mr. Lovelace's testimony earlier today that we heard.  I

9    don't have to summarize it for you.

10             Isn't that sufficient to meet that aspect of the

11   element of the count?

12             MR. DILL:  I would disagree, Your Honor, because of

13   the -- the -- all of his testimony -- keep in mind, he said

14   that she responded as -- as if she was embarrassed at that

15   time.  And then most importantly, they came back into the

16   restaurant subsequently.

17             So, again, if this is a big confession that now

18   he's overheard, why are they coming back to the restaurant

19   like as business as usual?

20             THE COURT:  No, no, the point -- I think the point

21   is this comment according to the witness, Mr. Lovelace, was

22   made in January or February of 2020; her testimony to the

23   grand jury was in January of 2022.  So approximately two

24   years after there's testimony that she has heard from the

25   codefendant that he murdered his wife.  Isn't that

1    sufficient for the jury to find -- reasonably find that

2    there's evidence that she was aware of the crime?

3        MR. DILL:  Well, again, we're extrapolating

4    "murdered" into this.  What they're -- what the statement

5    was that "I killed my wife for you."  And, again, we know

6    the circumstances for that.  However, if you look at the

7    totality of what he said and what was said around it, what

8    is -- what, from that, can we infer she was aware, one, that

9    a crime had been committed, and, two, now she's going to

10    mislead and lie to the grand jury, that becomes --

11        THE COURT:  Again with the burden on -- under

12    Rule 29 I would have to find as a matter of law that no

13    reasonable juror could conclude that she was aware that the

14    crime was committed.  They might reject that.  I understand

15    that.  They might reject it.  But I think I've made my

16    point.

17        Anything else you wish to --

18        MR. DILL:  Just the last two things.  Aider and

19    abetter, obviously that's not charged conduct.  The issue --

20        THE COURT:  Right.

21        MR. DILL:  -- with propofol, and I will point out

22    on something that's in the record, but hasn't been seen

23    here, when Ms. Milliron responds to:  "Where was he texting

24    you from?"  She says:  "Africa," question mark.

25        The court reporter put down question mark.  So a

1    reading of that would be "Africa?"  You know, again, there's

2    no evidence that she knew he was in Africa or otherwise.  In

3    fact, the transcript itself has a question mark on her

4    response.  So I would say that would also tend to show that

5    even though she may have contacted him, she's questioning

6    when and where he contacted her and what -- at what time

7    period it was.

8                THE COURT:  All right.  Thank you.

9                MR. DILL:  Thank you, Your Honor.

10               THE COURT:  I'm prepared to rule on the two

11   motions.  This matter is before me on Defendants Lawrence

12   Rudolph and Lori Milliron's mid-trial motions for judgment

13   of acquittal under Federal Rule of Criminal Procedure 29(a).

14               For the reasons that follow, Lawrence Rudolph's

15   motion is denied in full and Lori Milliron's motion is

16   denied in part and taken under advisement in part.

17               In considering a Rule 29(a) motion, the Court is

18   required to consider the evidence presented in the light

19   most favorable to the Government and may enter a judgment of

20   acquittal only if no reasonable jury could find guilt beyond

21   a reasonable doubt.

22               In making its determination, the Court is not

23   permitted to weigh conflicting evidence or consider the

24   credibility of witnesses, as those are the provinces of a

25   jury.  *United States v. White*, a decision of our circuit

from 1982.  *United States v. White*.  The Government bears
the burden of establishing each element of the crime charged
beyond a reasonable doubt.  Let me take up Defendant
Rudolph's motion first.

Count 1 of the indictment charges Lawrence Rudolph
with a violation of 18 United States Code 1119, which makes
it a crime for one United States national to unlawfully kill
with malice aforethought another United States national
outside the United States, but within the jurisdiction of
another country.  The Government must prove each of the
following beyond a reasonable doubt:

First, Lawrence Rudolph caused the death of Bianca
Rudolph; second, Lawrence Rudolph killed Bianca Rudolph with
malice aforethought; third, the killing was premeditated;
fourth, the killing took place outside the United States,
but within the jurisdiction of another country; fifth,
Lawrence Rudolph was a national of the United States; and,
sixth, Bianca Rudolph was a national of the United States.

With regard to the first element, several witnesses
testified that Lawrence Rudolph told them that when Bianca
Rudolph was shot in their hunting cabin bedroom he was in
the adjoining bathroom.  Mark Swanepoel and Mwene Casiuss
Banda testified when they entered the cabin shortly after
they heard the gunshot, they saw Rudolph over Bianca's body.
Further, several witnesses testified that Bianca was killed

1    by a close-range shot to the chest.  Both Doctors Stephen

2    Cina, an expert in general forensic pathology, and

3    Dr. Masawahu, who conducted the autopsy, opined that the

4    muzzle of the shotgun was between 1 to 3 feet away from

5    Bianca's chest when she was shot.

6         As I discussed at length in my ruling earlier

7    denying the Rudolph's renewed objection relating to

8    Cassandra Olmstead, the Government's provided significant

9    evidence from firearm experts which, if accepted by the

10   jury, rules out intentional suicide.

11        Moreover, the Government's put on evidence that

12   Bianca's death was likely not an accident.  Mark Swanepoel

13   testified that, when packing a gun in a soft case, one would

14   normally point the barrel towards the ground while pushing

15   it into the bag.  Several witnesses with experience handling

16   firearms, including Adam Howard-Davies and Pieter Swanepoel,

17   testified that one of the most basic safety precautions gun

18   owners take is to avoid pointing the barrel of the gun at

19   oneself or anyone else.

20        The Government has also put on evidence that could

21   support the inference that Rudolph attempted to hinder the

22   investigation into Bianca's death.  For example, Cassius

23   Mwiinga testified that Rudolph offered him money to cancel

24   the postmortem examination of Bianca's body.  And Otto

25   Westhassel testified that Rudolph requested that he destroy

1        all images of Bianca's dead body and inquired as to how

2        quickly a cremation could take place.

3                Finally, there's evidence today -- and I don't mean

4        this to be exhaustive summary, but in addition to what I've

5        already said, I'm noting there is the testimony today of

6        Brian Lovelace who testified that he personally heard

7        Rudolph state to Milliron that he killed Bianca for her.

8                In the face of this evidence, the Court cannot rule

9        as a matter of law that a reasonable jury could not conclude

10       that Rudolph caused the death of Bianca.

11               As to the second element, to kill with malice

12       aforethought means either to kill another person

13       deliberately and intentionally, or to act with callous and

14       wanton disregard for human life.  In determining whether the

15       killing was deliberate, the jury may consider the matter in

16       which the death was caused.  For the reasons discussed

17       above, a reasonable jury could find that Rudolph shot Bianca

18       in the chest.  Such an act would likely require him to pick

19       up the gun, aim it, and pull the trigger.  Thus, based on

20       the nature of the act, itself, a reasonable jury could find

21       beyond a reasonable doubt that he acted intentionally.

22               With regard to the third element, a killing is

23       premeditated when it is the result of planning or

24       deliberation.  The Government put on a significant amount of

25       evidence that Rudolph killed Bianca as part of a

1    long-planned scheme to collect the proceeds of her numerous

2    life insurance policies.  Bianca's life was insured by

3    policies worth at least $2.5 million, and Lawrence Rudolph

4    was the beneficiary of those policies.

5          Peter Milnes, an expert in insurance customs and

6    practices, testified that there are 10 common scenarios in

7    which people invest in life insurance policies.  After a

8    review of Rudolph's finances and the terms of Bianca's life

9    insurance policies, Mr. Milnes concluded that none of these

10   10 scenarios explained Rudolph's investment in such a large

11   amount of life insurance for Bianca.  He went on to opine

12   that the policies seemed to be taken out with the idea that

13   the insured, quote, may not be around for a long period of

14   time and, therefore, a windfall would be created, end quote.

15   Based on all the above testimony, I find that a reasonable

16   jury could find that the killing was premeditated.

17         Finally, the parties have stipulated that at all

18   relevant times Rudolph and Bianca were United States

19   nationals and that there's been ample evidence that the

20   killing occurred in Zambia.  Therefore a reasonable jury

21   could find that the Government has proven beyond a

22   reasonable doubt the fourth, fifth, and sixth elements.

23   Because a reasonable jury could find Rudolph guilty on Count

24   1, the defendant's motion is denied as to Count 1.

25         With respect to Count 2 of the indictment, Rudolph

is charged with violating 18 United States Codes Section 1341, which makes it a crime to use the mail in carrying out a scheme or a scheme to obtain money or property by means of false or fraudulent pretenses, representations or promises. Government must prove each of the following beyond a reasonable doubt:

First, Lawrence Rudolph devised or intended to devise a scheme to defraud life insurance companies, identified during this trial, by making false and fraudulent representations, that the death of Bianca was an accident to obtain life insurance proceeds; second, Rudolph acted with specific intent to defraud; third, Rudolph caused another person to mail something through a private or commercial interstate carrier for the purpose of carrying out the scheme; and, fourth, the scheme employed false or material pretenses, representations, or promises that were material.

The mailings in Count 2 were related to Rudolph's alleged life insurance scheme. As alleged in the superseding indictment, the objective of this scheme was to obtain life insurance proceeds from Bianca's death. Rhonda Lossle testified that in 2016 she worked as a claims adjuster for Ameritas Life Insurance Company. She testified that in December of that year, Ameritas received an insurance claim sent in the mail on behalf of Rudolph. She testified that the claim included a claimant statement that

1    was signed by Rudolph and notarized.

2          In the claimant's statement, Rudolph represented

3    Bianca's cause of death to have been an accident.  Further,

4    Ms. Lossle testified that had Rudolph indicated that her

5    cause of death was intentional homicide by him, he would not

6    have been entitled to the proceeds of those -- of those

7    insurance policies.  As discussed above, a reasonable jury

8    could find that Rudolph intentionally killed Bianca.

9    Therefore, based on Ms. Lossle's testimony, a reasonable

10   jury could find that Rudolph misrepresented the cause of

11   Bianca's death on the insurance claim, and a reasonable jury

12   could find that he employed this false representation in

13   order to intentionally defraud Ameritas Life Insurance

14   Company.

15         Because a reasonable jury could find Rudolph's --

16   Rudolph guilty on Count 2, the defendant's motion is denied

17   as to Count 2, and for all those reasons the Rule 29 motion

18   by Defendant Rudolph is denied in full.

19         Turning to Milliron's Rule 29 motion, the Court

20   considers Counts 5 through 9 first, and then will turn to

21   Counts 3 and 4.  With respect to Counts 5 and 9 of the

22   superseding indictment, they each charge Ms. Milliron with a

23   separate violation of 18 United States Code Section 1623(a),

24   which makes it a crime for anyone under oath to make a false

25   material statement in a proceeding before a United States

1    grand jury.

2              For each count the Government must prove each of

3    the following beyond a reasonable doubt:

4              First, Milliron made the statement while under oath

5    in a grand jury proceeding as charged; second, such

6    statement was false in one or more of the respects charged;

7    third, Milliron knew such statement was false when she made

8    it; and, fourth, the false statement was material to the

9    grand jury proceeding.

10             As to the first element, FBI Agents Donald Peterson

11   and Erin Newton read portions of a transcript of Milliron's

12   grand jury testimony that correspond to the statements

13   alleged in the superseding indictment.  Based on this

14   testimony, a reasonable jury could find that the Government

15   has proved the first element of Counts 5 through 9 of -- of

16   Counts 5 through 9.

17             As for the remaining elements, the Court considers

18   each count separately.  With respect to Count 5, Milliron is

19   charged with making false statements when she testified,

20   one, that she did not recall having any other substantial

21   source of cash income while working at Three Rivers Dental

22   Group; second, that she did not recall depositing

23   approximately $20,000 in cash into her PNC Bank account in

24   2014; and, third, that she did not recall depositing $60,000

25   in cash into her PNC Bank account in 2015.

1              Upon further questioning before the grand jury,

2       Milliron admitted that she had received $60,000 in cash

3       payments in 2015 and she testified that those payments came

4       from Rudolph.  She also testified that $60,000 represented

5       approximately the equal of her salary.  Based on her

6       conflicting testimony, the large amounts of money relative

7       to her salary, a reasonable jury could conclude that her

8       initial testimony was knowingly false.  Additionally, a jury

9       could find that Agent Newton's analysis of Milliron's bank

10      records established that Milliron had a substantial source

11      of cash income in 2015.  Therefore, a reasonable jury could

12      find that the Government has proven the second and third

13      elements of Count 5 beyond a reasonable doubt.

14              As to the fourth element, the grand jury was

15      deciding whether to charge -- as to the fourth element, the

16      grand jury was deciding whether and considering whether to

17      charge and indict Rudolph for murdering Bianca, and

18      Milliron's relationship with Rudolph was being used as

19      evidence of his motive.  Thus a reasonable jury could find

20      that information about the financial relationship between

21      Milliron and Rudolph was material to the grand jury's

22      investigation.

23              Because a reasonable jury could find Milliron

24      guilty of Count 5, the defendant's motion is denied as to

25      Count 5.

1              With respect to Count 6, that count alleges

2     Milliron committed perjury when she testified, first, that

3     she did not know why Rudolph was so generous in giving her

4     cash in 2015 and 2016; and, second, that she does not know

5     exactly why he gave her $60,000 in 2015.  Rachel Anders

6     testified that after Milliron started seeing Rudolph, her

7     life changed.  She testified that Rudolph helped Milliron

8     buy a house and helped support her children financially.  A

9     reasonable jury could find that Rudolph gave Milliron her

10    cash because they were in an intimate relationship and that

11    Milliron knew that their relationship was the reason for his

12    generosity.  Therefore, a -- I find that a reasonable jury

13    could find that the Government has proven the second and

14    third elements of Count 5 beyond a reasonable doubt.

15             The fourth element, in my view, is satisfied for

16    the same reasons discussed regarding Count 6.  Large -- or

17    Count 5.  Large cash payments from Lawrence Rudolph to

18    Milliron, given because of their romantic relationship,

19    could be considered to be material to the grand jury's

20    investigation because those payments support the

21    Government's theory that Rudolph killed his wife to be with

22    Milliron.  Because a reasonable jury could find Milliron

23    guilty on -- of Count 6, the defendant's motion is denied as

24    to Count 6.

25             Count 7 alleges that Milliron committed perjury

1    when she testified that she was given an American Express

2    card as part of her perks as an employee at Three Rivers

3    Dental Group.  Sherry Hawk and Levi Weaver both testified

4    that although they worked at Three Rivers Dental with

5    Milliron, they were not given American Express cards.  Based

6    on this testimony and the testimony of Rachel Anders

7    discussed above, that Rudolph helped Milliron buy a house, a

8    reasonable jury could find that Milliron was given an

9    American Express card because of her intimate relationship

10   with Rudolph and not as an employee perk.  Therefore, a

11   reasonable jury could find that the Government has proven

12   the second and third elements of Count 6 beyond a reasonable

13   doubt.

14          The fourth element is satisfied in my view for the

15   same reasons as Counts 5 and -- Count 5 discussed

16   previously.

17          Because a reasonable jury could find Lori Milliron

18   guilty on Count 7, the defendant's motion is denied as to

19   Count 7.

20          Count 8 alleges that Milliron made false statements

21   when she testified first that she never gave Rudolph an

22   ultimatum that he needed to leave his wife; second, that she

23   does not remember ever threatening to break off her affair

24   with Rudolph; third, that she never told anyone at the

25   office that she was thinking of leaving Rudolph; and,

1    fourth, that she had never told anyone at the office that

2    she had given Rudolph an ultimatum that he needed to leave

3    his wife.

4         With regard to the second element, falsity, Anna

5    Grimley testified that Milliron told her that she had given

6    Rudolph an ultimatum that he needed to leave his wife in

7    2016.  This is in direct contradiction to Milliron's

8    testimony.  A reasonable jury could find Ms. Grimley to be

9    credible on this point and, based on her testimony alone, a

10   reasonable jury could find that the Government has proven

11   the second element beyond a reasonable doubt.  Of course it

12   is possible that Milliron simply forgot about her

13   conversation with Ms. Grimley, in which case the third

14   element would not be satisfied.  But viewing the facts in

15   the light most favorable to the Government, as I am required

16   to do in the context of a Rule 29 motion, I find that a

17   reasonable jury could conclude that Milliron would not

18   forget such an important statement and that she knowingly

19   lied to the grand jury.  Therefore, a reasonable jury could

20   find that the Government has proven the third element of

21   Count 8 beyond a reasonable doubt.

22        The fourth element is satisfied for the same

23   reasons as the previous perjury counts.  Whether or not

24   Milliron gave Rudolph an ultimatum that he needed to leave

25   his wife goes directly to whether Rudolph had a motive to

2362

1    kill his wife.  Thus a reasonable jury could find Milliron's

2    testimony was material to the grand jury's investigation.

3    Because a reasonable jury could find Milliron guilty of

4    Count 8, the defendant's motion is denied as to Count 8.

5         Count 9 alleges that Milliron made false statements

6    when she testified, first, that Rudolph probably proclaimed

7    his innocence to her, but she does not recall; and, second,

8    that Rudolph generally told her that he was irritated with

9    the FBI investigation of his wife's death because he felt he

10   was innocent.

11        Pursuant to Rule 29(b), the Court will submit the

12   case to the jury subject to the Court's later decision

13   regarding the sufficiency of the evidence supporting Count

14   9.

15        Count 3 of the indictment charges Milliron with a

16   violation of 18 United States Code Section 3, which makes it

17   a crime for anyone, knowing that a crime against the United

18   States has been committed, to obstruct justice by giving

19   assistance to another person who committed that crime in

20   order to hinder or prevent that person's apprehension or

21   punishment.

22        In this case, Milliron is not charged with actually

23   committing the crime of foreign murder charged in Count 1 of

24   the superseding indictment, instead, she is charged with

25   helping codefendant Rudolph try to avoid being arrested,

1    prosecuted or punished for that crime.  The Government must

2    prove each of the following beyond a reasonable doubt:

3         First, Rudolph committed the crime of foreign

4    murder at -- foreign murder alleged in Count 1, which is an

5    offense against the United States; second, Milliron knew

6    that Rudolph had already committed the crime of foreign

7    murder committed in Count 1; third, Milliron then helped

8    Rudolph to try to avoid being arrested, prosecuted or

9    punished; and, fourth, Milliron did so with the intent to

10   help Rudolph avoid being arrested, prosecuted or punished.

11        With regard to the first element, the Court has

12   already ruled that a reasonable jury could find Rudolph

13   guilty of Count 1.

14        With regard to the second element, Brian Lovelace

15   testified that Rudolph told Milliron that he killed his wife

16   for her.  Based on this testimony, a reasonable jury could

17   conclude that Milliron knew Rudolph had committed the crime

18   of foreign murder.

19        With regard to the third and fourth elements on

20   January 4th, 2022, Milliron attended Rudolph's detention

21   hearing where she heard a detailed account of the evidence

22   and disputes between the parties.  Among other things, she

23   heard that her relationship with Rudolph was being used as

24   evidence of his motive for murdering his wife.  Agent

25   Peterson testified that when Milliron testified before the

1    grand jury, Rudolph was being held on a criminal complaint.

2    Agent Peterson explained that the Government has only 30

3    days from the time the complaint is issued to indict an

4    individual before those charges expire.  Thus if the grand

5    jury had not decided to return an indictment within those 30

6    days, the criminal complaint would have been dismissed and

7    the charges would have been dropped.

8         Thus I conclude that Milliron's testimony could

9    have resulted in Rudolph's release from custody because her

10   testimony might well have convinced the grand jury not to

11   return an indictment and, as a consequence, could have

12   delayed or prevented Rudolph from standing trial and facing

13   punishment.

14        Based on the above, a reasonable jury, I find,

15   could find that Milliron's statement to the grand jury

16   helped Rudolph try to avoid being arrested, prosecuted or

17   punished.  Therefore, a -- I find a reasonable jury could

18   find that the Government has proved the third element of

19   Count 3.

20        Finally, with regard to the fourth element, a jury

21   could find that Milliron had a motive to keep Rudolph from

22   facing punishment based on the evidence introduced by the

23   Government that she benefited greatly from her relationship

24   with Rudolph after Bianca's death.  Agent Newton testified

25   that after Bianca's funeral, Milliron and Rudolph began to

spend a significant more time together.  Milliron lived with
Rudolph in luxurious homes in Phoenix, Pennsylvania, and
Cabo San Lucas.  She enjoyed frequent vacations with him,
and she was presumably driven around in Rudolph's newly
acquired Aston Martin and Bentley vehicles.

A reasonable jury could find that Milliron was
motivated to mislead the grand jury in the hope that they
would choose not to indict Rudolph and she could continue to
enjoy her up-scale lifestyle with Rudolph.

Based on that evidence, a reasonable jury, I find,
could conclude that Milliron's testimony before the grand
jury was intended to help Rudolph escape punishment for the
murder of Bianca.  Thus a reasonable jury could find that
the Government has also proved beyond a reasonable doubt the
fourth element of Count 3.  Thus, defendant's motion is
denied as to that count.

With respect to Count 4 of the indictment, Milliron
is charged with a violation of 18 United States Code Section
1503(a), which makes it a crime for anyone corruptly to
endeavor to influence, obstruct, or impede the due
administration of justice in connection with a pending
judicial proceeding.  The Government must prove each of the
following beyond a reasonable doubt:

First, there was a proceeding pending before a
federal grand jury; second, Milliron knew of the pending

1    proceeding before the grand jury and endeavored to

2    influence, obstruct, or impede the due administration of

3    justice in that proceeding; and, third, Milliron's act was

4    done corruptly; that is, she acted knowingly and dishonestly

5    with the specific intent to subvert or undermine the due

6    administration of justice.

7         Agent Peterson testified that Milliron testified

8    before a federal grand jury to the statements alleged in

9    Counts 4 through 9.  Thus a reasonable jury could find that

10   the Government has proved the first element of this count.

11        Further, Agent Peterson testified that prior to her

12   testimony, Milliron was fully informed of the nature of the

13   proceedings.  And I have already ruled that, based on the

14   evidence presented by the Government, a reasonable jury

15   could conclude that Milliron intentionally obstructed the

16   grand jury's investigation.  For the same reasons, a

17   reasonable jury, I find, could conclude that the Government

18   has proved the second and third elements of Count 4.

19        Because a reasonable jury could find Milliron

20   guilty of Count 4, the defendant's motion as to Count 4 is

21   denied.

22        Thus for the reasons stated above, Milliron's

23   Rule 29 motion is taken under advisement with regard to

24   Count 9 and denied in all other respects.

25        All right.  Before we take our lunch break, let me

1    ask defense counsel a couple of questions.  Give me a sense,

2    Mr. Markus, of how much time you think your case will take.

3            MR. MARKUS:  Thank you, Your Honor.  And just

4    before we get there, I just wanted to note that regarding

5    Count 1, you didn't mention the element of venue and, of

6    course, we filed extensive pretrial motions on venue and a

7    motion to dismiss on it.  And we obviously preserve our

8    Rule 29 on the venue element, as well, of Count 1.

9            Regarding our case, we have three witnesses present

10   this afternoon.  We've informed the Government that we will

11   likely get to all three today.  It's 1:15 now.  Assuming we

12   have a few minutes just to take a break and eat something,

13   we'll get to Mr. Haag; Dr. Baden; and Paulette Sutton, our

14   blood spatter expert.  I don't think we'll get beyond her

15   today.  Tomorrow we have a few additional experts, and then

16   we would move to our client, Dr. Rudolph.

17           I have no idea how long the cross-examination of

18   Dr. Rudolph will be.  I expect the direct will be a couple

19   of hours.  So assuming that the cross is about the same, I

20   think that would take all afternoon for Dr. Rudolph and then

21   we would rest, Your Honor.

22           THE COURT:  All right.  Mr. Dill, let me ask you:

23   Does your client intend to introduce any evidence in this

24   case?

25           MR. DILL:  Yes, Your Honor.  However, I don't think

1    it's going to be very long.  I would say a few hours at

2    most.

3            THE COURT:  Well, a few hours can mean a lot of

4    things.  Can you be a little more specific?

5            MR. DILL:  I can't at this time, Your Honor.  You

6    know, the question is whether my client testifies; whether

7    she does or does not, that will affect it.  Otherwise, we'll

8    probably have one additional witness.

9            THE COURT:  All right.  All right.  I have a couple

10   other matters I need to attend to in this break so I can't,

11   unfortunately, break it too short, but we'll take our recess

12   now.  We'll resume at 10 minutes after 2:00.

13       (Recess taken 1:17 p.m.)

14                    AFTERNOON SESSION

15       (In open court outside the presence of the jury at 2:16

16   p.m.)

17           THE COURT:  I've been handed a stipulation,

18   Mr. Markus.  You want to tell me what this is about?

19           MR. MARKUS:  Sure, Your Honor.  We've been working

20   with the Government to try to streamline the defense case.

21   One of the defense experts that we were going to call is the

22   second document examiner that you've heard a lot about.

23   We've reached a stipulation with the Government that our

24   document examiner, named Diane Flores, reached the same

25   conclusion as FBI forensic document examiner Rachel Clay,

1    and it explains that she did it with the methodologies and

2    so on.

3              THE COURT:  All right.  Well, usually -- and you

4    want me to read this to the jury as opposed to just having

5    it in the final set of instructions?

6              MR. MARKUS:  I think that's the procedure we used

7    with the Government's stipulation, if I remember correctly.

8    The Government read a stipulation at the beginning of its

9    case, so I think we should just use the same procedure.

10             THE COURT:  Well, I usually only read an

11   instruction to the jury if it's a curative or limiting

12   instruction as opposed to just a stipulation.  But if you're

13   telling me that if I don't read it to the jury you're going

14   to call this expert, then I'll read it.

15             MR. MARKUS:  I'm not calling her either way, Your

16   Honor, but I think just because it's two sentences, the same

17   way that we read those, you know, at the beginning of the

18   Government's case, it will take 20 seconds to read it.

19             THE COURT:  Okay.  I didn't bring it out here with

20   me.  Do you have an extra copy?

21             MR. MARKUS:  Sure, Your Honor.

22             THE COURT:  Why don't you hand it to Ms. Guerra.

23   All right.  Anything else?

24             MR. MARKUS:  No, Your Honor.

25             THE COURT:  All right.  Mr. Markus, I'm longing for

1    the day that I can just come out here and say, "Let's bring

2    in the jury" without you interjecting something for us to

3    consider, but maybe for naught.  Let's bring in the jury.

4         (In open court in the presence of the jury at 2:18

5    p.m.)

6         THE COURT:  Thank you for your patience, ladies and

7    gentlemen of the jury.

8         All right, we're going to start the case to be

9    presented by Defendant Rudolph.  Before he calls his first

10   witness, I'm going to read a stipulation to you.  It will be

11   included in your final set of jury instructions.

12        The United States of America and Defendant Lawrence

13   Rudolph stipulate and agree that the forensic document

14   examiner retained by Defendant Lawrence Rudolph, Diane

15   Flores, reached the same conclusion as FBI forensic document

16   examiner Rachel Clay.  Using the same methodology described

17   during Ms. Clay's testimony, as well as additional testing,

18   each independently concluded that the signatures on Defense

19   Exhibits RW and RX, originals of the postnuptial agreement,

20   were signed by Bianca Rudolph.

21        All right, Defendant Rudolph may call his first

22   witness.

23        MS. MOSS:  Your Honor, the defense calls Lucien

24   Haag.

25        THE COURT:  Okay.  Over there.

2371
DIRECT - HAAG

1    COURTROOM DEPUTY:  If you'll step up for me and

2    raise your right hand.

3        LUCIEN HAAG, DEFENSE WITNESS, SWORN

4    COURTROOM DEPUTY:  Thank you.  Please be seated and

5    remove your mask for us.  Then state your name for the

6    record and spell your first and last name for us.

7    THE WITNESS:  Lucien C. Haag.  H-a-a-g.

8    THE COURT:  You may proceed, counsel.

9    MS. MOSS:  Thank you, Your Honor.

10    DIRECT EXAMINATION

11    BY MS. MOSS:

12    Q.    Good afternoon, Mr. Haag.

13    A.    Good afternoon.

14    Q.    Mr. Haag, we've already heard your name a few times in

15    this trial.  Can you tell the jury what you do for a living.

16    A.    Yes.  At the present time, I'm self-employed as a

17    criminalist and forensic firearms examiner specializing in

18    the reconstructive aspects of shootings.

19    Q.    And do you have your own company, Mr. Haag?

20    A.    I do.

21    Q.    Can you tell us what that is.

22    A.    Forensic Science Services, Carefree, Arizona.

23    Q.    And, Mr. Haag, how long have you worked in this field?

24    A.    I started in June of 1965.

25    Q.    So is that 56 years?

**DIRECT - HAAG**

1    A.    I think it's around 53, 54.

2    Q.    A long time.

3    A.    It seems to have gone very quickly.

4    Q.    In this case, were you asked to render an opinion on

5    the shooting reconstruction and the firearms in order to

6    reach a conclusion how this shooting may have occurred?

7    A.    That was the original request or purpose I received

8    about two years ago.

9    Q.    And did you write a report in this case?

10   A.    Yes, I did.  Ultimately.

11   Q.    And before we get to your findings, can you tell the

12   jury about your educational background.

13   A.    Sure.  Most criminalists, myself included, will have a

14   degree in one of the physical sciences.  Mine is in basic

15   chemistry.  After that I took specialized coursework in

16   criminalistics, clinical chemistry, math, statistics, other

17   coursework for two more years.  I graduated with my

18   chemistry degree from the University of California at

19   Berkeley in 1963.  Spent two more years at California State

20   College in Long Beach.  Later some more coursework at our

21   local university, Arizona State University.  So those are

22   the actual educational institutions.

23        There have been other organizations with which I

24   received training.

25   Q.    And can you tell us about some of that specialized

1   training that you've received in this field.

2   A.   Yes.   For the purpose I'm here today, the most useful

3   and important are an organization called AFTE, stands for

4   the Association of Firearm and Toolmark Examiners.   It's a

5   worldwide organization of people almost all of which work in

6   Government crime labs that deal with firearms evidence.

7   Also an organization called the American Academy of Forensic

8   Sciences.   There's one in Europe with which I'm associated.

9   The other organization is, of course -- well, you're

10  probably well aware is the FBI laboratory.   I've done some

11  consulting work or participated in programs at the FBI lab

12  when it was in Washington, D.C., and it's now located in

13  Quantico, Virginia.

14         And the others would deal with manufacturers of

15  specialized equipment used in my field.

16  Q.   We're going to talk a little bit more about

17  organizations in a second, but before we get to that can you

18  tell us about your employment history in this field.

19  A.   Yes.   After I took additional work in criminalistics,

20  two years at Cal State College in Long Beach, California, I

21  acquired a position -- entry-level position at the Phoenix

22  Police Crime Laboratory in, well, 1965.   I worked there

23  through the various levels until I became the technical

24  director of the crime lab.   That was in the mid-1970s.

25         When I went there, my going there made it a two-man

**DIRECT - HAAG**

1    laboratory.  So timing was perfect, I got to work in all the

2    different units as the laboratory grew.  When I left in

3    March of 1982 to go into full-time consulting, I think the

4    laboratory staff was probably 20, 25 people.

5            I stayed involved with Government laboratories, but

6    my private business, which I was allowed to have while I

7    still worked at Phoenix, became my full-time employer.  I

8    built a laboratory, an indoor shooting range -- really, it's

9    not a shooting range in the sense you would think, it's for

10   test-firing guns, recovering bullets.  Built that in the

11   early '90s.  And it's affixed to my residence.

12           So my laboratory and office are now where I live

13   out near Carefree, Arizona.  And that -- I moved there in

14   '92.

15   Q.    And have you been there ever since?

16   A.    Yes.

17   Q.    And the organizations that you mentioned just a few

18   minutes ago including AFTE, did you hold any positions in

19   those organizations or were you a member of any special

20   committees?

21   A.    Yes, a number of them.  One, when I became the

22   president of that organization for two years, 1985 and '86.

23   I've been in several positions before that.  I set up a

24   committee for the scientific advancement of the field.  It

25   still exists.  Became a Key Member of the Year on about

**DIRECT - HAAG**

1    three different occasions.  That's for presentations and

2    peer-reviewed journals which they publish.

3         The other organization that I didn't mention

4    earlier is the California Association of Criminalists.

5    Although I'm an Arizona resident it takes in outsiders.

6    It's the largest regional organization in the United States.

7    Received a number of awards from the California association.

8    They all deal with firearms in some way, or exterior

9    ballistics, or wound ballistics.

10        I'm a member of the European Network of Forensic

11   Science Institutes.  The association -- American Academy of

12   Forensic Scientists.  I'm a fellow in that organization.

13   And, again, have appeared and given papers there over the

14   years.

15   Q.   And you mentioned awards.  Have you received awards as

16   being part of these organizations?

17   A.   Yes.  I mentioned several of them.  There are some -- I

18   could go on, but I've covered enough.

19   Q.   Okay.  You also mentioned peer-reviewed journals.  Can

20   you -- well, let me ask you:  Have you published in --

21   articles in peer-reviewed journals?

22   A.   Yes.  Most of them have appeared in the AFTE, the

23   Association of Firearm and Toolmark Journal, because it's

24   right on topic and that's a peer-reviewed journal.  I've

25   also published in several forensic medical journals for

**DIRECT - HAAG**

1    forensic pathologists where it has to do with either

2    exterior or the physical or chemical aspects of wound

3    ballistics.  In other words, what an injury might look like

4    at different distances or different kinds of projectiles.

5    Q.    And just so we're all familiar, would you tell us what

6    does that mean, peer-reviewed?

7    A.    That means there are people in that organization with

8    similar or even superior credentials that look at an article

9    before it's published to see if it's correct and supported

10   by testing.  Data that they can look at and review or even

11   duplicate if they wish.  And then if it survives peer

12   review, it goes back to the editor and whatever that journal

13   might be, and ultimately gets published.  And then the final

14   word is Letters to the Editor.  So if even the audience,

15   they -- people who get the journal see some problem with it,

16   there's an opportunity to write to the editor and then for

17   the author to respond.

18   Q.    And in addition to articles have you also written a

19   book?

20   A.    Yes, actually several of them.  Probably one of the

21   most useful one is called Shooting -- unimaginative, but

22   Shooting Incident Reconstruction.  It's now in its third

23   edition.  I've also put together a booklet that's in video

24   and CD form on basic firearms evidence.  And another one

25   for -- it's a hand-out basically for forensic pathologists.

**DIRECT - HAAG**

1  Q.   And have you also given presentations in your field?

2  A.   Many times.

3  Q.   And I don't want to ask you to go through them, but I

4  believe we have your resume, your CV, that has about -- I

5  don't know, 20 to 30 pages of presentations.  So have you

6  done a lot of those?

7  A.   I have.  I like giving presentations.  I think it's

8  important and I encourage my colleagues to do the same.  So

9  over these last 50 years I think the number is over 200 now,

10  many of which have resulted in publications.

11  Q.   And do you also teach in this field?

12  A.   Yes.  I'm a certified instructor in my state in

13  criminalistics.  I taught for 11 years at two colleges while

14  I was still working at the Phoenix crime lab.

15  Q.   Now, Mr. Haag, this may be a silly question, but have

16  you fired firearms before?

17  A.   Many, many times.  Almost -- almost daily.

18  Q.   And does that include shotguns?

19  A.   Yes, it does.

20  Q.   Now, I hope you don't mind me asking this, but when I

21  saw that you were sworn in, I noticed something about your

22  right hand.

23  A.   Yes, I'm missing part of a digit.

24  Q.   And is that due to a firearm injury?

25  A.   No, I crushed it beyond repair about 12 years ago.  So

2378

DIRECT - HAAG

1    I did not shoot my finger off, as has been suggested by

2    some.

3    Q.    Thank you.  Have you performed pattern testing in your

4    years of experience?

5    A.    As it deals with shotguns, yes.

6    Q.    And do you own shotguns?

7    A.    I think I have seven in my present collection,

8    including my childhood shotgun from the late 1940s.

9    Q.    And in addition to shotguns, do you own other firearms

10    as well?

11    A.    Yes.  Most of my firearms, of course, because of their

12    prevalence in crimes and misadventures of firearms are

13    handguns and then long guns, and shotguns are at the end of

14    the list.

15    Q.    And can I ask you briefly:  How did you acquire a lot

16    of the firearms that you have in your collection?

17    A.    Well, I have a federal firearms license, which allows

18    me to purchase and transfer firearms.  So some of them I've

19    purchased because they're necessary for my work.  Not

20    necessarily just in criminal cases, but in civil instances.

21    Other instances, manufacturers who are defendants in cases

22    where firearms have been used or misused send me exemplar

23    guns and I just keep them because I either use them or abuse

24    them or both.

25            And, finally, a small percentage of them are from

**DIRECT - HAAG**

1    tragedies, basically suicides or accidents where a family

2    member has died and the family never wants to see the

3    firearm again, so they just sign it over to me and it's in

4    my reference collection.

5    Q.    Now, Mr. Haag, have you been qualified as an expert

6    before in court?

7    A.    Many times.

8    Q.    Do you know how many times?

9    A.    No, I haven't kept a log, but before I left the crime

10   lab, it seemed like it was almost daily or weekly.  Now

11   it's, because I'm semi-retired, three or four times a year.

12   Q.    And where have you testified as an expert?

13   A.    Well, in most states of the United States, a number of

14   foreign countries, northern Ireland, Canada.  Federal

15   courts, state court, county courts.  All related to some

16   sort of events with a firearm.

17   Q.    Have you ever been excluded as an expert?

18   A.    No.

19   Q.    And when you testify as an expert, who normally hires

20   you and presents you as an expert?

21   A.    In criminal cases, it's usually the prosecution.  I'm

22   hired by county attorneys or U.S. attorneys.  In civil

23   cases, it's more often the defense, law firms that are

24   representing an ammunition company or a firearm company or

25   both.

**DIRECT - HAAG**

1    Q.    Now, Mr. Haag, because you have your own company, are

2    you being paid for your time?

3    A.    Of course.

4    Q.    And have you been paid for your time no matter what

5    result you reach?

6    A.    Yes.  It's not on a contingency basis, it's for my

7    analysis and reporting of what I found or not found.

8    Q.    And have you been asked to reach a certain result?

9    A.    I can remember in years past someone trying to get me

10    to say something and, no, I don't respond well to that kind

11    of request.

12    Q.    And when you say you don't respond well, is there some

13    sort of ethical code that you abide by?

14    A.    Yes.  The California Association, the American Academy

15    of Forensic Sciences, and most of all AFTE, the group I

16    mentioned several times, has a very detailed, very strict

17    ethical code about how you perform casework, how you report

18    your results, and so on.

19          MS. MOSS:  Your Honor, at this time, we would move

20    to qualify Mr. Haag under Rule 702 as a forensic firearms

21    expert, a forensic ballistics expert, to include internal,

22    external, and terminal ballistics, and as a shooting

23    reconstruction expert.

24          THE COURT:  Any objection by the Government?

25          MR. WINSTEAD:  No objection, Your Honor.

2381

**DIRECT - HAAG**

1          THE COURT:  All right.  Mr. Dill, any objection?

2          MR. DILL:  No, Your Honor.

3          THE COURT:  All right.  There being no objection,

4    Mr. Haag is qualified under Federal Rule of Evidence 702 to

5    provide expert opinion testimony in the fields of forensic

6    ballistics, to include internal -- internal, external, and

7    terminal ballistics, and as a shooting reconstruction

8    expert.

9    BY MS. MOSS:

10   Q.   Now, Mr. Haag, in this case, did you review a number of

11   materials?

12   A.   Yes, I did.

13   Q.   Can you give us a brief overview of some of the things

14   that you reviewed.

15   A.   Yes.  Starting in the fall of 2020, two years ago, a

16   local firm in Phoenix, Arizona, sent me some photographs

17   from the scene of this incident and some documents, some

18   reports, an autopsy report, a crime lab or ballistics

19   report, some statements by a man named Mark Swanepoel, and

20   several others whose names momentarily escape me.  But the

21   main important things that I received, and still looked at,

22   are those scene pictures; limited, but there are a number of

23   scene pictures, and those reports.

24   Q.   Did you also receive a number of photographs of pattern

25   testing that was performed and cases -- gun cases?

2382

**DIRECT - HAAG**

1    **A.   Yes.   These came later, more recently from your firm.**

2    **Q.   And what else did you review from items that were**

3    **received more recently?**

4    **A.   Well, I looked at, again, a large number of test-firing**

5    **patterns by Special Agent Steve DeFrance, who you probably**

6    **met.   I don't see him here today, but I met him in Phoenix.**

7    **A report by a Dr. Cina, C-i-n-a.**

8    **Q.   Did you see --**

9    **A.   And I ultimately saw a tangible item, the gun case**

10   **involved in this incident.**

11   **Q.   Did you also see reports by a Steven Rogers and a Ryan**

12   **Cook?**

13   **A.   Yes, a man from Browning and a man from Federal**

14   **Ammunition Company, I did.**

15   **Q.   Now since you had the opportunity to review some of the**

16   **scene photographs, were you aware that the shotgun and the**

17   **shotgun case had been moved from its original position and**

18   **placed back in a position in the photographs that you**

19   **reviewed?**

20            **MR. WINSTEAD:   Objection --**

21            **THE WITNESS:   Yes.**

22            **MR. WINSTEAD:   -- leading.**

23            **THE WITNESS:   Sorry, didn't give you a chance.**

24            **THE COURT:   Next question.**

25   **BY MS. MOSS:**

**DIRECT - HAAG**

1    Q.    Were you aware that the shotgun had been moved?

2    A.    Yes.

3    Q.    And would knowing the original location, original

4    orientation, and the condition of the gun and shotgun case,

5    including the zipper, would that be important to you in an

6    effort to reconstruct this fatal incident?

7    A.    Yes.  It's part of the very starting point in looking

8    at the scene.

9    Q.    So I'd -- I'm sorry?

10    A.    The position orientation, location of a firearm.  In

11    this case, a firearm and a gun case.

12    Q.    I wanted to break that down a little bit.  One of the

13    things that I just mentioned was the zipper; the positioning

14    of the zipper.  Why would that be important to you?

15    A.    Yes, well, if for -- if -- I don't know this is the

16    case, but if the gun case was completely zipped up, then the

17    trigger can't be reached.  So a self-inflicted injury or

18    firing the gun at the hands of another, someone actually

19    pulling the trigger, and the only other choice is the

20    woman's husband.  It's my understanding there's only two

21    people in this cabin, so that would be important.

22          If it were fully zipped up and we see the gun

23    protruding out of the gun case, and that's really the way

24    the game fellow found it, then the zipper should be torn at

25    that area.  The exact amount of protrusion, what I can see

DIRECT - HAAG

1    in the pictures, is the gun butt, it's called, the back

2    part, is protruding some unknown distance.  But that can be

3    useful.

4            What's immediately around the gun -- and we know --

5    we probably know there's a blood trail that can be clearly

6    seen.  So where the gun case is and with the gun in it, and

7    related to that trail of blood has useful reconstructive

8    value to test hypotheticals, hypotheses.  Could this have

9    happened?  And can we test that or rule it out?  So that's

10   the starting point.

11           Once the gun is removed or the zipper placed so we

12   can now open up the gun case, looking at the position of the

13   safety; whether the action -- that's the bolt part that goes

14   back and forth -- whether it's locked back or it's cycled

15   forward, or it's somewhere in between.  Those are all

16   useful, important things.

17           The orientation of the gun and the gun case.  You

18   could put it in there two different ways.  One's more

19   favored than the other.  So just right there, there's about

20   six or seven things that would be of interest.  I mean, I'll

21   always lead to a solution, but one needs to know them to

22   progress further.

23   Q.    So you mentioned six or seven things there.  What about

24   knowing whether the safety was on or not on that shotgun?

25   A.    Sure.  That's an example, because if we're dealing with

DIRECT - HAAG

1      a firearm that's been compromised since it left the factory,

2      that's a classic example.  I -- it's not involved in this

3      case, but:  "I touched the trigger and it went off."  Went

4      off?  If it's on safety, it shouldn't do that.

5      Q.   What about whether there's a spent shotgun shell that's

6      within the case or within the shotgun or in the surrounding

7      area?

8      A.   Absolutely.  I later have seen pictures of the spent

9      shotgun shell outside the gun case, but the question I can't

10     answer here today, and never could, was it inside the gun

11     case before that?  Is that where it ended up from the event?

12     Was it trapped in the mechanism of the shotgun and removed?

13     Had it been forced back in the firing chamber?  Was it

14     completely extracted and ejected but still inside the gun

15     case?  Those are about four different permutations that,

16     again, because the scene was disturbed, I can't answer.

17     Q.   And do you feel like all those things are important to

18     you as a forensic firearm expert and a shooting

19     reconstruction expert?

20     A.   Sure.  Goes to the very crux of:  How does the gun

21     work?  How did it work in this case, or not?

22     Q.   And based on your review of the scene photographs and

23     the reports that were done in this case, Mr. Haag, what do

24     you think of the documentation of the scene?

25     A.   It's basically nonexistent.  I'm limited to the

**DIRECT - HAAG**

1   pictures in 2020, and I'm still limited by those pictures

2   here today.

3   Q.   And because you are limited, how does that affect your

4   ability -- or anyone's ability to do an accurate

5   reconstruction?

6   A.   I can only answer for myself.  It -- again, it

7   compromises or limits me to, yes, I can see that the gun in

8   those photographs is in the nonnormal position, but I don't

9   know that that's the way it was when it went off.  I can see

10  it's protruding a certain amount, but not by how much and

11  whether that's the way it was immediately after the

12  discharge.

13          And, of course, how the shell came to be -- the

14  spent shot shell came to be on the floor of the cabin.

15  Q.   Now I want to ask you about the shotgun that was part

16  of this fatal incident and the spent shotgun shell.  But

17  before I do that, I just want to, again, ask you:  Are you

18  personally and professionally familiar with shotguns?

19  A.   Yes, I -- I shoot them fairly constantly.  I've got a

20  project now, unrelated to this case, that's a research

21  project.  I used to be an avid hunter of small game so as a

22  young boy I was in the field with a gun.  I still have

23  a .20-gauge.  I have one semi-automatic.  I tend to prefer

24  pump guns, so most of my shotguns are pump guns.  Most of

25  them are in 12-gauge, which is the gauge we're dealing with

DIRECT - HAAG

1    here.

2    Q.   And I think you mentioned that you have one

3    semi-automatic, so are you familiar also with the

4    functioning and the -- the basic production of a

5    semi-automatic shotgun?

6    A.   Yes.   They basically operate the same as far as any of

7    you would see if we were out on a shooting range.   They're

8    going to extract, eject the spent shell automatically if

9    they're working correctly, and load another shell in -- if

10   there are live shells -- in what's called a tubular

11   magazine, which looks like another barrel underneath the

12   actual barrel.

13   Q.   Now I want to ask you, actually, right -- about that.

14   We have heard a lot about this Browning Auto-5 12-gauge

15   shotgun.   Is this a semi-automatic shotgun that has a

16   tubular magazine under the barrel which holds the shotgun

17   shells?

18   A.   Yes, it does.

19   Q.   And does that magazine -- or can that magazine have a

20   plug?

21   A.   Yes.   In fact, normally they -- for sporting purposes,

22   in this country they would be plugged.

23   Q.   Can you remove the plug?

24   A.   Yes.

25   Q.   Can you tell us the effect of removing the plug.   Does

**DIRECT - HAAG**

1   that have any effect on the gun or on the feeding of the

2   shells?

3   A.    Well, first of all, it increases the number of shells

4   you can put in the gun.  So with the Auto-5 I think you can

5   increase it, with the 3-inch shell, up to five shells now

6   instead of three.  It also changes the pressure.  It's a

7   spring, a long tube, that has a spring and a thing called a

8   follower.  And so you put one shell, two shell, three shell

9   and you keep compressing that spring.  So the shell -- if

10  you've fully loaded it, the shell that's next to be removed

11  from the magazine is under the greatest spring pressure, and

12  it's being held by a small component called a stop latch,

13  L-a-t-c-h.

14         As you keep firing the gun, there's less and less

15  back pressure holding the shell and that may, in some

16  instances, be important if we've got a gun that's tired,

17  it's been used a lot and it's not performing quite up to

18  original performance as it left the factory.

19  Q.    So if the plug is removed and we're getting further and

20  further into the final shells, could that cause possibility

21  of a failure to feed?

22  A.    You can find a point where the pressure trying to force

23  the shell out is reduced or the latch is not working well,

24  or a combination of the two, where it does not regularly

25  remove the shell from the magazine tube and put it in the

2389

DIRECT - HAAG

1    chamber.

2            In fact, one of my guns has that very -- I won't

3    call it a defect, it's just been around a long time.

4    Q.    So have you personally experienced that?

5    A.    Yes.

6    Q.    And when I said "failure to feed," does that mean going

7    from the magazine up into the chamber of the shotgun?

8    A.    Yes.

9    Q.    Okay.  I want to talk to you about spent shotgun

10   shells.  I have a hard time saying that.

11           What happens to spent shotgun shells when the

12   shotgun is fired?

13   A.    The first and most obvious thing is the firing pin

14   strikes the primer.  It's the piece right in the center of

15   the head.  Some people call it the base, but the proper term

16   is the head of the shell.  So you're going to have a firing

17   pin impression.  That has some useful reconstructive value.

18           The next thing that's going to happen is that shell

19   will be literally blown out of the chamber, pulled out of

20   the chamber very quickly.  A lot of energy.  Almost faster

21   than the eye can see.

22           And it will hit a piece -- if this is the back of

23   the shotgun shell, it's usually down around 8 or 9:00 and

24   that piece strikes the shell, it knocks it clear of the gun.

25           When that shell -- before it was fired -- went into

**DIRECT - HAAG**

1    the gun, depending on how it went into the gun, there's a

2    component called an extractor.  So we have the ejector, we

3    have the firing pin.  The extractor is there to remove the

4    shell, fired or unfired, from the gun.  If it comes from the

5    magazine tube, the shell's rim -- it's back here -- will

6    generally rise up behind the extractor.

7         If a shell is put in manually, in other words the

8    action is wide open, there's no shell in it anywhere, and

9    one manually puts a shell in, the extractor will quite often

10   strike the head of the shell, ride up over the rim, and snap

11   forward.

12        Those events all leave subtle toolmarks.  They

13   usually can't be seen with the unaided eye.  You need to

14   look at it -- other than the firing pin impression, that

15   one's easy.  So you need to look under the microscope to see

16   these other marks, but they have interpretive value.

17        If a cartridge is not well extracted from a gun, if

18   the bolt has been impeded in some way, you may have no

19   ejector mark at all.  If it's normally fired and we do

20   test-firing to verify we got a nice deep ejector mark, that

21   has diagnostic value.

22        And the last thing is:  If we have a situation

23   where there's any interference with the normal working of

24   the gun, which is clearly a possibility when a firearm goes

25   off in a gun case, the shell may have never made it out of

**DIRECT - HAAG**

1    the gun.  There won't be an ejector mark.  The shell may be

2    part way in and part way out.  It's called a stovepipe jam.

3    Well, now the cartridge is caught in the mechanism and there

4    are marks that get -- like bite marks on the sides of the

5    shell.

6         On the other hand, if it's extracted later, there

7    may be ways to look at those marks and figure out, well, I

8    can rule this out.  This shell came the normal route, came

9    out of the magazine tube.  It has a normal looking ejector

10   mark.  Firing pin impression is typical depth.  So those are

11   some of the interpretations and the marks that the shell has

12   a story to tell.

13   Q.   And I've asked a lot of people in this case about those

14   toolmarks.  And you've now explained those to us.  And just

15   like you say, do all those marks on a spent shotgun shell

16   tell a story?

17   A.   They have a story to tell by those who know the

18   language of a gun.

19   Q.   And does that story sometimes include:  Was a shell

20   loaded into the chamber or was a shell loaded into the

21   magazine and then it came up into the chamber?

22   A.   Yes.  I tried to explain that.  But, yes, the extractor

23   mark is the place to look for that -- the differentiation

24   between those two choices.

25   Q.   Could that be really important in this case?

**DIRECT - HAAG**

1    A.    Absolutely.

2    Q.    And could you explain to us why.

3    A.    Again, these are called hypotheticals.  Imagine that

4    the firearm had a shell in the magazine tube.  And for

5    whatever reason, the bolt got pulled back and let go.  It's

6    going to load that shell.  It's likely going to load that

7    shell into the chamber.  Now, you've got a gun that's in the

8    red, or the hot, condition.  If the safety is off and

9    anything pulls or depresses the trigger, it's going to fire.

10   On the other hand -- so that will be sort of a misadventure;

11   I failed to see the shell in the magazine tube, I worked the

12   bolt, put it in the case, or dry-fired it, or I thought I

13   dry-fired it, and it goes off.

14          The other choice is more sinister.  I looked at the

15   gun, the action's open and I manually put a shell in because

16   I know I want one in there.  Close it up, pull the trigger.

17   So those are kind of at the two extremes.  A misadventure --

18   a negligent handling of a gun that's got a potential problem

19   or not -- and a deliberate shooting of the gun while in a

20   gun case.

21   Q.    So that sounds like it's pretty important in this case.

22   A.    Yes.  As I understand this case, absolutely.

23   Q.    And the marks that we're talking about that you've been

24   talking about for the last few minutes, are those marks that

25   you can see with the naked eye normally?

DIRECT - HAAG

1    A.    You can see the firing pin impression.  And if there

2    are folks on the jury who are shooters, I think they all

3    easily see that.  The other marks are much more subtle and

4    you need to have some training and experience.  I could

5    probably tell you, yeah, it looks like there's something,

6    but I'd still want to bring it to the laboratory and get it

7    under, not only the proper microscope, but lighting is

8    really important.

9    Q.    And is the FBI laboratory in Quantico able to examine

10   marks on a spent shotgun shell to try and figure out what

11   happened?

12   A.    Sure.  That's a fairly routine examination.  All those

13   marks are known to examiners, and they have some -- some of

14   them are personal friends that have got long experience in

15   looking at marks on cartridges.

16   Q.    Have you seen any sort of documentation or photographs

17   or any kind of report to show that was ever done in this

18   case?

19   A.    I never saw any.

20   Q.    Is that testing that you think the FBI laboratory

21   should have done?

22   A.    If I was involved in the investigation, yes, either I

23   would like to do it or I would say, "Let's get this to the

24   Bureau, since it's a Government case, and let them look at

25   these marks; see if they are there."

**DIRECT - HAAG**

1    Q.    Have you ever had the experience or seen anybody that

2    would forget that there was ammunition in the magazine?

3    A.    Yes.

4    Q.    Can -- and you say that a little hesitantly.  Can you

5    tell us about that?

6    A.    I've done it myself.  I haven't hurt myself or anyone,

7    but I have a large number of guns, as you heard earlier.

8    And there are times that they're not loaded but the magazine

9    has still got a cartridge in it.  Somehow I left one behind.

10            And I recently read something:  A very skilled

11   person with the industry that put one in a gun safe and

12   tripped the cock -- the loading lever -- and put a round in

13   the chamber and, again, decocking it -- by that I mean I

14   don't want to leave the gun stored with the internal hammer

15   cocked, it's weakening the spring; so pull the trigger and

16   should hear the resounding click.  And if you loaded a round

17   in the chamber and the safety's off, you're going to hear a

18   very loud bang.

19   Q.    And in your 53 years of experience, do you think it's

20   possible that even very experienced and knowledgeable people

21   about firearms could accidentally leave ammunition in the

22   magazine?

23   A.    I know it's true.  Some of the civil cases I work,

24   that's how they all started.  And I've mentioned that at

25   least twice in my life I can remember being very

**DIRECT - HAAG**

1    embarrassed, and glad no one was around.  But you asked me a

2    question and I'm under oath; I've done it at least twice,

3    with no consequences other than embarrassment.

4    Q.    I'd like to move to another subject now, Mr. Haag.  I'd

5    like to talk to you about Mrs. Rudolph's clothing.  Now,

6    could you see from the limited scene photographs that were

7    taken in this case that Mrs. Rudolph was wearing a shirt and

8    a bra?

9    A.    Yes.

10   Q.    And in your 53 years of experience as a firearms

11   expert, can clothing sometimes be even more important than

12   the entry wound on a body?

13   A.    It can be.

14   Q.    Can you explain that to us.

15   A.    Yes.  In situations where there's what I would call a

16   close-range discharge, everything from contact to a few feet

17   away, there's a lot of physics and chemistry that occur with

18   any gun, whether it's a rifle, a handgun, or a shotgun.  And

19   the clothing is the first things that's struck.  Skin is not

20   an ideal medium for determining the size of a bullet hole or

21   a wound from a shotgun.  It's elastic.  It can stretch, and

22   does, during the process.  And it can change over time.

23         The clothing is -- does not have this problem.  So

24   if the question's about pellet group size, the size of the

25   group of pellets when it first struck this woman, the

**DIRECT - HAAG**

clothing's the place to look.  Not only that, it's the place
to look for powder residues, unburned powder particles,
soot, that's carbon material.  And in this particular
ammunition, the Federal ammunition, there's yet another
parameter that's very useful; it's called buffer material.
It's a white, plastic, granular material that Federal, and a
couple other American manufacturers, put in their shotgun
shells to improve the performance of the pellets, to keep
them from deforming.  That goes out the muzzle of the gun as
well.  And it has very predictable flight characteristics.
It fans out very quickly in a cone, like shining the
flashlight against a wall.  It loses velocity very fast, but
it can be reproduced.

         And so between powder, the shape of the hole, the
buffer material, soot.  And, finally, there's a thing called
a shot cup in this particular ammunition.  It has four
petals, they have aerodynamic purpose.  They open up like a
badminton birdy going backwards and release pellets.

         Over a certain distance, if I have that ammunition
and a comparable gun, I can tell you:  How far does it take
for these petals to open up?  And they can strike the
clothing and leave a chemically identifiable trace.

         So all of those things could be very useful in
refining the range of fire if we don't have some intervening
object and we've got more of the ammunition and either the

**DIRECT - HAAG**

1    gun or a gun -- in the case of a shotgun, same barrel

2    length, same choke, same gauge.

3    Q.   And when you say "range of fire," does that mean

4    distance?

5    A.   Yes.

6    Q.   One other thing that I don't think you mentioned, but I

7    want to ask you about:  If you're looking at the clothing

8    that's been fired to, can that also help you determine the

9    original size of the defect?

10   A.   Yes.  I tried to cover that, the hole.  We've basically

11   got a round hole in this woman, left breast.  But a more

12   representative size would be the clothing.

13   Q.   And is it routine in these kinds of cases that a

14   forensic pathologist in a crime lab would have the clothing

15   and look at it and examine it for those types of things?

16   A.   The pathologists I'm familiar with, and the reports I

17   read in this country, at least, they insist upon it, and for

18   good reason.  The pathologist wants to see the defects in

19   the clothing.  It's a $10 word for bullet holes, of course.

20   And then relate that to the wound.

21        Some clothing may have multiple holes in it, only

22   one of which is a bullet hole, and it is coordinated with

23   the actual injury.  So pathologists typically get the

24   clothing laid out, then it goes to the crime lab.  They get

25   it first -- they, forensic pathologists, get it first, and

**DIRECT - HAAG**

1    finally the laboratory gets it, if it's going to be testing

2    that I described

3    Q.    And, Mr. Haag, do you believe that all of these factors

4    that you've talked about are important factors to consider

5    in doing a shooting reconstruction?

6    A.    Absolutely if there are questions, as there are in this

7    case, about distance, accident, intentional, and so on.

8    Q.    And in the absence of those things, how does that

9    affect the validity of any sort of reconstruction that takes

10   place?

11   A.    Well, it certainly compromises it at the very

12   beginning.  And it may prevent one from actually

13   reconstructing.  And I should say reconstructing ideas.

14   What are the possibilities in not trying to prove something

15   happened but trying to disprove?

16          So if you got two possibilities, if you can

17   disprove A, then B has to be the truth of the matter.  And

18   then start looking for support and the evidence for

19   proposition B in my example.

20   Q.    Is that what you call the scientific method?

21   A.    It is.  It comes from -- actually Arthur Conan Doyle

22   expresses it in three of the Sherlock Holmes stories, but

23   there's a more rigorous description of the scientific

24   method.  That's basically it.  What are the choices?  Can we

25   rule them out and leave only one standing?

DIRECT - HAAG

1    Q.    And that would be your conclusion?

2    A.    That would be --

3    Q.    If you --

4    A.    -- the person in the crime lab's conclusion.  I can

5    say, "This is not so.  This is not so.  This is the choice.

6    And here's the physical evidence that now supports that."

7    Q.    I'd like you -- to ask you to take a look at an exhibit

8    now.  And this is going to be Exhibit 36, which is INV 592.

9    And it's going to show up on your screen there.

10            Do you see that on your screen?  Does everyone see

11   that?

12   A.    Yes, I can.

13   Q.    This has been admitted.  I don't know if -- okay.  All

14   right.  If we could call up paragraph 3 of this exhibit.

15   Mr. Reyes, which starts -- yes.  That's it.

16            Now we've seen this exhibit many, many, many times

17   in this case.  And I want to point you to, let's say, the --

18   starting with the second paragraph of this exhibit where it

19   says, "The working mechanism of the exhibit shotgun is

20   perfect as both its cocking and firing mechanism are in good

21   condition."  Do you see that, Mr. Haag?

22   A.    I do.

23   Q.    He then goes on to say that he test-fired two

24   cartridges.  And then in the last sentence, he says, "It is

25   capable of loading, discharging and ejecting cartridges."

2400

**DIRECT - HAAG**

1    MR. WINSTEAD:  Objection, leading.

2    THE COURT:  Sustained.

3    BY MS. MOSS:

4    Q.   So I won't read any more, but do you see what's

5    described there, Mr. Haag?

6    A.   Yes, I've read it before.

7    Q.   And does this give you enough information to tell you

8    about the condition and the working function of that

9    firearm?

10   A.   No.  It's a starting point, but it's certainly not an

11   ending point.

12   Q.   Can you tell us why.

13   A.   Well, two test firings, a gun can be -- have a problem,

14   but you're not going to detect it by normal test-firing.

15   If, for example, we've got a compromised -- called fire

16   control system, it's basically the internal hammer and the

17   sear, if it's been compromised in some way, it may work fine

18   until you elect to do some impactive testing, or jar-off

19   test, if that's one of the potential explanations.

20        So there are other reasons, but just two test

21   firings, normal shells, is clearly not enough.

22   Q.   Now does it say anything about loading?

23   A.   Well, he describes -- to the extent the person says he

24   test-fired it by loading.  So right now I have to assume --

25   and that's a bad thing to do, I suppose -- that he loaded

2401

**DIRECT - HAAG**

1    them into the tubular magazine.  The other choice is just

2    put them in the chamber and fire the gun twice.  But it's

3    not elaborated.  I don't have any notes from this examiner

4    or any further documentation.

5    Q.    Okay.  Thank you, Mr. Reyes.

6          Now you said something just a second ago that I'd

7    like to follow up on.  Is it possible for a firearm to

8    accidentally discharge and then fire normally afterwards

9    when you pull the trigger?

10   A.    Yes.

11   Q.    Do you know --

12   A.    I just finished a case like that.

13   Q.    So do you have personal experience with that?

14   A.    Yes.  Not one of my personally owned guns, it was

15   something submitted where it was alleged that it went off

16   upon dropping and, sure enough.  But it takes about 10 tries

17   to get it to happen twice.

18   Q.    And so another point:  Is it possible that -- for a

19   firearm to discharge when it's dropped one way and not

20   discharge when it's dropped another way?

21   A.    Absolutely.

22   Q.    Or maybe not discharge all the time when you drop it,

23   but sometimes it will?

24   A.    That's also a clear possibility in past experience.

25   Q.    So you have past experience where you've seen that

DIRECT - HAAG

1    happen?

2    A.    Yes.

3    Q.    Now, in a case where an accidental discharge was

4    suspected, what would you do as a forensic firearms expert?

5    What would you look for?  What would you test?  What would

6    you do?

7    A.    That's, of course, first of all, just documenting the

8    firearm, you know; when it was made, the usual things of

9    serial number, how it generally works.  But if there's

10   some -- any suggestion that it has a problem, starting to

11   look at the choices.

12           I talked a little bit about the magazine tube and

13   the latch where you don't have a shell that always comes up.

14   So looking at how well the latch does or does not work with

15   a full magazine tube or just one shell in it.

16           And before any screws are taken out or anything is

17   disassembled, my preference would be, and in an alleged

18   accidental discharge, a CT scanning of the firearm.  Nothing

19   destructive or consumptive is done.  There's several places

20   where it's basically a big x-ray machine for nonliving

21   entities.  And the firearm is put in there, and it takes

22   about an hour for the scan to go around.

23           Now you have a 3D model where you can -- like

24   flying through a scene, you can go inside the gun, look at

25   the sear engagement, how much purchase, how much grip it has

**DIRECT - HAAG**

1    on the hammer.  Missing or broken parts.  Trapped debris in

2    the mechanism.  And after all that, we might start thinking

3    about taking a side plate off or opening up, taking out the

4    mechanism.

5         Along down the line comes test-firing with

6    comparable ammunition, to start looking at what sort of

7    marks does this firearm, when I load it, the normal way

8    versus when I talked about earlier, or manually loading it,

9    and starting to interpret what the shell now in combination

10   with the gun can tell us.

11   Q.   And are there testing -- tests that can be done to

12   test -- to test the propensity of a particular shotgun to

13   accidentally discharge?

14   A.   Yes.

15   Q.   And we've heard a lot about SAAMI, this organization.

16   Do they have specific methods and procedures for carrying

17   out this type of testing?

18   A.   Yes, they do.  Quite involved and elaborate.

19   Q.   And are you able to do that sort of testing?

20   A.   Yes.  I have the equipment to do it and I'm also on the

21   SAAMI committee, one of their members.

22   Q.   I'm going to start asking you about something else.

23   And at this point I would ask, Ms. Guerra, if you could hand

24   Mr. Haag Exhibit 201, please.

25         Mr. Haag, you have there what's been admitted as

**DIRECT - HAAG**

1    Exhibit 201.  Can you tell us what that is.

2    A.    Yes.  It's a cloth or soft gun case that I received

3    some months ago, I think in February or March, with certain

4    identifying marks that were already on it when I received

5    it.  It appears to be, from looking at the documents, a case

6    number from Zambian authorities.  I recognize it from those

7    marks and, of course, the damage to the front end of it,

8    which I put a plastic bag around.

9    Q.    And I don't think there's any question that that was

10   the gun case that was used in this fatal incident.  I'm just

11   wondering if you could hold it up just so the members of the

12   jury can take a look at it, please.

13   A.    As received or with the --

14   Q.    As received to start with.

15            Thank you.  Now because that's a little far away, I

16   want to show some photographs on the screen.  If we could

17   pull up RA-24, page 4, which is 24-4.  And can we pull out

18   the photograph.

19            Mr. Haag, what is this?

20   A.    I'm sorry, your question?

21   Q.    Can you see the photograph --

22   A.    Yes.  Yes, I can.

23   Q.    Can you tell us:  What's in that photograph?

24   A.    Yes.  The upper gun case, it says Gander Mountain,

25   abbreviated, is the gun case that's here today and that was

2405

**DIRECT - HAAG**

1    sent to me.  And from looking at the scene pictures, it's

2    clearly the gun case involved in this fatal incident.

3            The lower one is an exemplar gun case made by the

4    same company, essentially the same design and basically the

5    same dimensions but undamaged, and in new condition.

6    Q.    Now I want to ask you about something particular on the

7    exemplar gun case.

8    A.    All right.

9    Q.    Do you see what I've circled there?

10   A.    I do.

11   Q.    Can you tell us what that is.

12   A.    Sure.  It's a hanging loop.  So if you're storing this

13   gun case and you're -- in your closet or your gun case or in

14   a range, that's a convenient way, without a gun in it, to

15   hang it up.  It's just a loop.  So like a hook, just hang it

16   there for future use.

17   Q.    And this hanging loop with the steel rivet, did you see

18   that on the actual evidence gun case?

19   A.    No, it's missing.  It's been blown away.

20   Q.    And were you able to examine it all around and inside

21   and out to see whether it was there?

22   A.    I did, and it is not.

23   Q.    And was there any special significance to you that the

24   hanging loop and that steel rivet were missing from the

25   actual evidence gun case?

**DIRECT - HAAG**

1    A.    Yes.

2    Q.    Can you tell us what that is.

3    A.    It becomes a missile.  These pellets leave the muzzle

4    and go through the end of this evidence gun case at about

5    1100 feet per second; that's 750 miles an hour.  They've

6    blown away this steel rivet and this loop, so it becomes a

7    missile in its own right.  There's a satellite injury in the

8    deceased woman's right breast.  It's not carefully measured,

9    but it looks like it's maybe 3, 4 inches away from the

10   actual entry wound.

11          Since the -- it's a thing called a shot cup that

12   held the pellets, and the over-powder wad, those are the two

13   plastic components besides the shot, are inside the body,

14   that satellite injury has to be due to something.

15          And in my opinion, the only choice is this, that

16   the hanging loop and its rivet got blown away, became a

17   missile in their own right, and had enough energy and mass

18   to make that satellite injury.

19   Q.    And so we've all seen those post-autopsy photos.  And I

20   don't want to pull them up now, but you had a chance to look

21   at them also, Mr. Haag?

22   A.    I've looked at them in the past, yes.

23   Q.    And, again, just so I'm clear, it was a satellite

24   injury on Mrs. Rudolph's right breast; is that right?

25   A.    Yes.

2407

**DIRECT - HAAG**

1    Q.    Okay.   Thank you.

2              Mr. Haag, I'd like to ask you -- start asking you

3    about your examination of the inside of the gun case.  And

4    the first thing I want to do is I want to bring up another

5    exhibit.  And this is RA-36, page 1, which is 36-1.  Is

6    there a way to flip that?  And now can we zoom in on the

7    photo.

8              Mr. Haag, what do we see in this photograph RA-36,

9    page 1?

10   A.    This is a defect or a rent or a rip, trying to -- kind

11   of three words for the same thing -- in the interior liner

12   of the evidence gun case.  And that's my ruler in my

13   laboratory.  As near as I'll ever know, it's about 24.75, or

14   24 and three-quarters inches, from what I've described as

15   the blast hole that I'm sure you'll see later.

16             So the direct distance from the rearward edge of a

17   blast hole to this defect, this L-shaped, or upside down

18   L-shaped defect, pretty close to 25 inches, somewhere

19   between 24 and 25.

20   Q.    Now, this is obviously a close-up of that.  Let me see

21   if I can show you a farther-away photo.  Can we pull up --

22   and by the way, RA-36 has been admitted, I believe.  Can we

23   take a look at Government Exhibit 206, page 13, which is

24   INV-27598.

25             Now, is this picture taken from a little farther

2408

**DIRECT - HAAG**

1   away?

2   A.   Yes.  But it's before it's been flagged or marked.

3   Q.   And do you see that L-shaped defect in the interior of

4   the gun case in this photograph --

5   A.   Not in this photograph.  You'll need to find another

6   one where it's been circled.

7   Q.   Can I ask you to take a look at that.

8   A.   Looking better.  I just like the one where I can find

9   it quickly.

10   Q.   Do you see the L-shaped defect now?

11   A.   Yes, I do.  Again, it's an L upside down and turned the

12   other way.  It's got a right angle to it.

13   Q.   But the reason I wanted to give us a farther-away photo

14   is because I wanted to ask you:  From the photographs that

15   you saw of the scene, could you tell the position of the

16   shotgun at the scene, how it was placed in this case?

17   A.   If it had been put back the way it was when it

18   discharged, and the answer is yes.  But I'm trusting to the

19   man's correctness in replacing it in the gun case.

20   Q.   So let's just assume that that was correct for now.

21   A.   Right.

22   Q.   If it was in that gun case in that orientation, would

23   that L-shaped defect be on the side of the operating handle?

24   A.   Yes, it would.

25   Q.   Okay.  Are you sure about that?

**DIRECT - HAAG**

1   **A.   Yes.**

2   **Q.   Now, knowing that, did you have any thoughts about what**

3   **could have caused this L-shaped tear?**

4   **A.   Yes.   I wasn't able to answer it, but there's a**

5   **possibility.   A clear possibility.**

6   **Q.   Can you tell us what that clear possibility is.**

7   **A.   Yes.   At some point, the operating handle, which is**

8   **sort of spoon-shaped, or like my bent thumb, if it's going**

9   **in, it's like my fingernail going that direction.   If it --**

10   **if it, the operating handle, moves rearward, that's a more**

11   **of a gliding action.   So it could -- I don't know that it**

12   **is, it could be from the operating handle getting snagged at**

13   **some point, some previous time, that day.   Again I will**

14   **never know, but snagging the operating handle trying to put**

15   **the gun in, but not taking it out and not a consequence of**

16   **the discharge.**

17        **Because the operating handle, again, is going in**

18   **the nondigging or nondragging direction, if we consider the**

19   **gun going off.**

20   **Q.   So, for example, if someone's trying to shove the**

21   **shotgun into the case, could that cause that L-shaped tear?**

22   **A.   I cannot exclude it and that's -- again, as I told you,**

23   **you try to do that scientifically.   I can't exclude it so I**

24   **can't take it off the table.**

25   **Q.   Okay.   And let me ask you to assume just a little**

2410
**DIRECT - HAAG**

1   further:  If someone is shoving that shotgun into that case

2   that causes that tear, and pulls that operating handle back,

3   and then if the gun is jarred, can that chamber a round from

4   the magazine?

5   A.   Or if it comes loose, but it also has to have a shell

6   in the magazine tube and the snagging pulls the cocking

7   lever far enough back.  No different than if a human pulled

8   it, to let the shell into the carrier or lifter and, as the

9   bolt goes forward, chamber it.  So that's a possibility.

10  How remote that is or not, I can't tell you.

11  Q.   Let me show you another defect to the interior of the

12  shotgun case.  Can we please pull up Exhibit RA-25, which

13  has been admitted.  And I believe this is INV 27596.

14       Mr. Haag, I'm going to draw a circle on this

15  photograph.  Do you see another defect in the interior of

16  this shotgun case that you can tell us about?

17  A.   Yes.  It is a major defect, in addition to all the

18  destruction we can see to the viewer's right to that circle.

19  But, yes, there's a main defect.  You can see the yellow

20  polyurethane foam where the missing liner is gone.  And

21  right now next to it, if your vision is good, there is a

22  small defect, much smaller defect.  Again it would be -- I

23  guess I'm able to mark on this, right?

24  Q.   Yes, you can, I'm sorry.  I'll remove my mark.

25  A.   I didn't do a very good job.  I need to -- somebody

2411

**DIRECT - HAAG**

1    needs to move the red arrow up a little bit, but there's a

2    little white dot there and I consider that interesting and

3    potentially important.

4    Q.    Okay.  So we're going to talk about that now.  Did you

5    want to know what caused the large hole defect and that

6    little holey defect --

7    A.    Yes, but especially the large one.

8    Q.    Okay.  So tell us what you did to determine what that

9    was.

10   A.    First of all, I examined it just visually under room

11   light, and later under a instrument called a stereo

12   microscope --

13   Q.    And I am going to pause you for one second because I

14   want to show some more photographs.  Can we please pull up

15   RA-26-1, page 1.  Can you flip this one, please.

16            MR. REYES:  Upside down?

17            MS. MOSS:  Yes, upside down, please.  And can we

18   focus in on the photograph.

19   BY MS. MOSS:

20   Q.    Now, Mr. Haag, I'm sorry that I interrupted you.  Can

21   you go ahead and explain to us the testing that you did and

22   what this photograph is, please.

23   A.    Yes.  These are two photographs through a stereo

24   microscope, it's just a microscope like you might see in a

25   jewelry store where you look at objects; not transmitted

**DIRECT - HAAG**

1    light but direct light.  And this is some of the fibers, the

2    synthetic fibers, along the side of that hole that would be

3    toward the back of the gun.

4           And what I noted that was important -- especially

5    important there, is some of these synthetic fibers have --

6    are molten on their ends.  There's one, there's one, there's

7    one.  Here's one here.  So on the side of the defect -- this

8    is the more interesting side to me, some of this material

9    has sustained through degradation, just very momentarily

10   high temperatures at the muzzle when the gun fires.  And

11   this is synthetic fibers, it's not cotton, so it's a blast

12   hole.  It's the effect of the gun discharged right at the

13   muzzle.

14          So in this view, the muzzle would be something like

15   that.  And the front end, the blown-out end of the gun case

16   is toward those arrows about 4 inches away.

17   Q.   Okay.  And just so the jury's clear, and I'm clear

18   actually, are these two separate photos?

19   A.   They're the -- yes, they're of a similar area, but I

20   had to change the depth of field because I'm at a high

21   enough power where everything's not in the same plane.  And

22   I've just selected some of the thermally degraded fibers for

23   this -- these two photographs.

24   Q.   And when you say you had to change the depth of field,

25   does that mean that you would be unlikely to see this with

**DIRECT - HAAG**

1    the naked eye?

2    A.    Oh, definitely you're not going to see it with the

3    naked eye.

4    Q.    Okay.  Mr. Reyes, can we please pull up RA-26-2.  And

5    can we also flip this upside down, please.  I'm sorry that I

6    got them upside down.

7              Mr. Haag, can you tell us what you see in this

8    photograph.

9    A.    Yes.  This is down range of that hole that I've

10   described as a blast hole.  And, again, it's part of the

11   lining that was once intact when the gun discharged.  And it

12   looks all crinkly and black because, there again, it's

13   degraded because of heat.  So if you were to feel this or

14   touch it, it would feel hard.  If you went a few inches away

15   and found the same liner, it would be soft.  So, again, it's

16   a thermal event around the margins of this large hole.

17   Q.    And before we move on, just so the jury has a chance,

18   could you show us the hole within the actual gun case,

19   Exhibit 201, please.

20   A.    Sure.  Am I allowed to stand?

21             MS. MOSS:  May he stand, Your Honor?

22             THE COURT:  Sure.

23             THE WITNESS:  There's the defect.  The fibers you

24   saw are down in this side.  The material you're looking at

25   now was up in this area.

2414

**DIRECT - HAAG**

1    BY MS. MOSS:

2    Q.    Thank you, Mr. Haag.

3            Mr. Reyes, can we please pull up RA-26-3.

4            Mr. Haag, what does this photograph show?

5    A.    This is in black and white because this is a photograph

6    taken with infrared light.  This is a light that we cannot

7    see but certain cameras can.

8            And so the lining of this gun case is black, and

9    gunshot residue, which has carbon in it, is also black.  If

10   the black color of this lining is something other than

11   carbon, the liner would look white in this picture and I

12   would be able to see more clearly gunshot residue.

13           I can still see the effects of the blast and it

14   extends -- it's a lightening of that gray color almost

15   symmetrically around the hole.  So this liner -- this

16   synthetic liner's been subjected to a very brief intense

17   blast.  And heat effects pretty much symmetrically around

18   this.  This one's probably the more subtle of the testing I

19   did on this, but I viewed it as important.

20           The only disappointment was -- is the liner of this

21   case also has carbon in it, so it still looks black.

22   Q.    Did you still do the test anyway?

23   A.    I'm sorry.

24   Q.    Did you still perform the test --

25   A.    Absolutely.  You don't know until you take the picture

2415

**DIRECT - HAAG**

1    and look at it.

2    Q.    And are all these tests that we've looked at so far

3    because you were trying to identify and scientifically show

4    what that round defect was?

5    A.    Yes.  I wanted to look at different ways to evaluate:

6    Is this a blast effect or is it from some other event?  And

7    there's about five or six ways to do that.  You've heard

8    three of them so far.

9    Q.    Okay.  We'll get to the last one in a second.  In this

10   photograph, you had talked about that smaller defect just

11   below it.  Do you see it in this photograph?

12   A.    Yes, it's right there.  Oops.  That didn't work out

13   very well.

14   Q.    Let me try to reverse that.  Can you circle it with the

15   stylus?  You should have a pen on your --

16   A.    Ah.

17   Q.    -- screen.

18          And can you describe what you circled there.

19   A.    A much smaller defect, a rip basically, not a blast

20   hole.

21   Q.    And what do you think caused that?

22   A.    The front sight.  This firearm, and most shotguns, have

23   a bead, a plastic -- a plastic -- a brass sight.  And it's

24   about that far back from the muzzle.  So if you imagine your

25   mind's eye this gun upside down with the muzzle right about

2416

DIRECT - HAAG

1   in there, when it goes off, however it got fired, it's going

2   to try to move back.  And the front sight is about the only

3   thing that can snag it.  The barrel, itself, is nice and

4   smooth.

5         So that, again, is another test of:  Is this some

6   defect, a rip or a tear, or is this big hole from the

7   discharge of the gun?  So it's yet another way to look at

8   resolving those choices.

9   Q.   And let's take a look at one last test that you

10  performed, which is at RA-26-4, please.  And if we can focus

11  in on the photograph on this, please.

12        Mr. Haag, can you tell us what this test is.

13  A.   Yes.  It's a lift, a transfer, on a special type of

14  filter paper and a test for vaporous lead.  The ammunition

15  in this case has a compound called lead styphnate in the

16  primer.  And it's the last thing to come out with all the

17  blast, and it goes out in a cloud downrange.

18        So the white paper with the pink, the pink is the

19  response for vaporous lead.  And I keep adding emphasis of

20  that, but it's a little tricky to understand because you're

21  looking at a -- a lift that was down against this object,

22  this gun case, then I took it away and turned it over.

23        So if you're trying to make sense out of it, this

24  area there is that area there.  So I'm getting a positive

25  response for gunshot residue that is blossoming or blooming

**DIRECT - HAAG**

1     out beyond, again, what I've described as the blast hole.

2     Q.    Okay.  And thank you, Mr. Reyes.

3           And before I talk further about this, I just want

4     to ask you:  Are you aware whether the FBI laboratory has

5     the capability of conducting these tests?

6     A.    Yes, it's a well-known, long established test.  In

7     fact, one of their examiners wrote, I think, the definitive

8     article that's called The Sodium Rhodizonate Test probably

9     30 years ago.

10    Q.    And are you surprised that this case was never

11    submitted to the FBI laboratory to do this kind of testing?

12    A.    I really expected to turn it over to them the day we

13    all got together in Phoenix in April.

14    Q.    So would you have expected them to do this kind of

15    testing?

16    A.    If there's some dispute or question about just where

17    the gun was in this gun case when it discharged, yes.

18    Q.    You mentioned a snag, and you wanted to rule out a

19    snag.  Were you able to rule out that that round circular

20    defect in the interior of the gun case was a snag?

21    A.    Yes.

22    Q.    And tell us why.

23    A.    Well, I've described to you a number of reasons, but

24    there's even more.  The fabric on the side toward the gun

25    has been stressed.  You can almost see through it if you get

**DIRECT - HAAG**

1     the light on it correctly.  Again, that's an effect of

2     blast.  And on the other direction, toward the blown-out

3     end, it's permanently bunched up.  I -- like a V toward the

4     front end of the gun.  It's almost like a -- a permanent

5     press.  It's still there.  You can feel it.  And it will not

6     go back to its original position and it's piled up as the

7     shot and material -- the shot cup and so forth exited the

8     muzzle and headed toward the end.  So when I say in total I

9     think there's about six ways to test whether this is a blast

10    hole or something else, and all of them say it's a blast

11    hole.

12    Q.    And what does that mean, that it's a blast hole?

13    A.    All that knowing where the muzzle was inside this gun

14    case is potentially of great value because it has to do

15    with -- we have to consider that as for how far away the gun

16    case and gun -- so even if the gun case is, let's say, 2

17    inches away, then you have to add about 4 inches to that

18    distance.

19          It also tells us something about whether that scene

20    picture is meaningful with the stock sticking out because we

21    could then take an exemplar gun -- just so we make sure it's

22    the same make, model and barrel length -- and put it in

23    there -- in the -- in a gun case, 4 inches back, and look at

24    how far does the stock stick out?

25          But the problem is we don't have a measurement from

2419

DIRECT - HAAG

1    the scene.  So that was an idea that it failed.  But when we

2    go on and start looking at the effect of a gun -- one of

3    these guns with this ammunition going off in a gun case, the

4    starting point is with the muzzle 4 inches back.

5    Q.    Okay.  And so that blast hole, is that blast hole what

6    tells us that the muzzle was 4 inches back when it went off,

7    when it discharged in that gun case?

8    A.    Yes.

9    Q.    And do you have any doubt about that?

10   A.    I do not.

11   Q.    And is that your opinion to a scientific certainty?

12   A.    Yes, it is.

13   Q.    Now I'm going to ask you about the pattern testing that

14   the FBI conducted in this case.  Have you examined a number

15   of photographs of pattern testing that took place in 2020,

16   2021, and again twice in 2022?

17   A.    Yes, I have.

18   Q.    And have you also looked at a number of photographs of

19   soft gun cases that were utilized during that pattern

20   testing?

21   A.    Yes to that as well.

22   Q.    Now before I move on, I want to ask you a question:  Do

23   you agree that a basic requirement of shooting

24   reconstruction is that you must replicate, as near as

25   possible, the actual facts and the conditions of the

DIRECT - HAAG

1    incident that you are trying to reconstruct?

2    A.   Yes, of course.

3    Q.   And if your reconstruction utilized facts or conditions

4    that were different from the actual evidence or facts, how

5    does that affect the results that you reach?

6    A.   They become invalid.

7    Q.   Now, are you aware that testing took place in December

8    of 2020 and July of 2021 by the FBI?

9    A.   Yes.

10   Q.   Now, do you know what the position of the shotgun was

11   in the shotgun case that the FBI utilized for that testing?

12   A.   According to Special Agent Steve DeFrance's notes and

13   some photographs, it was half an inch from the front end of

14   the closed -- at least closed in the area, gun case, one

15   shot per gun case.

16   Q.   And is half an inch from the end a fact or condition

17   that was something that actually took place in this

18   particular incident?

19   A.   No.

20   Q.   No.  And that's what we just talked about?

21   A.   Yes, it is.

22   Q.   Okay.  So what does that tell you about all of that

23   pattern testing that took place with the shotgun half an

24   inch from the end of the shotgun case?

25   A.   I would consider it invalid.  You're not going to learn

**DIRECT - HAAG**

1    much from it because it doesn't replicate the incident.

2    Q.    Let me ask you about pattern testing that took place

3    this year on June 15th, 2022.  Do you know the position of

4    the shotgun in the gun case in the FBI test on that day?

5    A.    I do.

6    Q.    What was it?

7    A.    According to -- again, stating Steve DeFrance's notes,

8    1.8 inches.

9    Q.    Now do you agree with Agent DeFrance's conclusion

10    regarding the position of the shotgun in the shotgun case on

11    June 15th, 2022?

12    A.    No, I don't.

13    Q.    And so, again, what does that tell you about the

14    pattern testing and the cardboard targets on that day of

15    testing?

16    A.    It -- it basically renders them invalid.  You're not

17    going to learn much that relates to the injury in this woman

18    by positioning it in the wrong -- positioning it, the

19    exemplar gun in an exemplar gun case in the wrong position.

20    Q.    Can we rely on any of those tests, then?

21    A.    Only to the limited extent -- even though the position

22    was wrong, the presence of the gun case causes the patterns

23    to become erratic, unpredictable, unreproducible.  But I'd

24    still want to do it at 4 inches.  It's only going to get

25    worse.  "It" being the variations in patterns.

DIRECT - HAAG

1  Q.   So you -- and you just brought up the word

2  "reproducible."  Is it important to you, when you're doing

3  pattern testing, or any kind of scientific testing, to have

4  multiple repetitive testing to make sure that you are

5  achieving reproducible results?

6  A.   Absolutely.  You've got to have something that

7  reproduces it before you can attach some importance to it

8  and then apply it to a case situation.  So shotgun norm --

9  normal shotgun patterning, that's one of the things all of

10  us do, and we need to look at knowing the material.  What do

11  the patterns look like at 1 foot, 2 foot, 3 feet, 5, 10?

12  And you can even graph that out.  And you do something like

13  10 shots at each distance and satisfy yourself with no

14  intervening material that this firearm and ammunition

15  combination leaves pellet patterns or powder patterns, or

16  plastic buffer patterns that are useful to go back to the

17  clothing or the wound and attempt to interpret the distance

18  that was involved.

19  Q.   Now I know you disagree with this, Mr. Haag, but I'd

20  like you to just assume for one moment that the position of

21  the shotgun in the case was 1.8 inches back.  Now if you

22  assume that, do you recall how many times the FBI performed

23  a pattern test at a distance of 1 foot?

24  A.   It was either two or three.

25  Q.   And is two or three shots enough to ensure that the

**DIRECT - HAAG**

1    pattern results are reproducible and reliable and accurate?

2    A.   It's a starting point, but it certainly isn't the end

3    point.  And as you will later see, I'm not sure there is an

4    end point because of the gun case.  But I'll stand where

5    it's a starting point.  You can learn a little bit from

6    that, but if you've got something that's reproducible, I

7    wouldn't want to rely on just two tests.

8    Q.   What about the test that the FBI performed at a

9    distance of 3 feet?  How many times did they do that on

10   June 15th?

11   A.   I think there were three there.

12   Q.   I believe there's one for the 3-foot?

13   A.   Did you say 3 feet or 2 feet?

14   Q.   I said 3 feet.  I skipped to 3 feet.

15   A.   You lost me.  I said at 3 feet there was one test shot,

16   with the muzzle at 1.8 inches back.

17   Q.   Now you just said two to three times is not enough.

18   What about one time?  Is one shot, one and only shot, enough

19   testing to ensure that the pattern results are reproducible,

20   reliable, and something that we can count on as being valid?

21   A.   Well, it becomes a moot point because reproducibility

22   means you've got to do something multiple times.  If you

23   only do something once, it's a starting point, but a long

24   ways from an ending point.

25   Q.   So if we just take a look at that one pattern and let's

2424

**DIRECT - HAAG**

1   say the one pattern looks pretty good, can we say -- can we

2   stop there and say, "This one looks good," can we stop?

3   A.   By "looks good" means it compares it with the injury,

4   no, definitely it will be foolhardy to stop there,

5   especially when we learn what the gun case does to patterns.

6   Q.   What if the prosecution were to say, "Well, we didn't

7   have enough ammunition to do more"?  What would you say to

8   that?

9   A.   I think they're mistaken.  It's a question of:  What do

10  they mean by the same ammunition?  I know -- probably all

11  know -- there was a change, two types of propellant, the gun

12  powder in these cartridges, and a thing called the

13  over-powder wad.  But the important parts are the pellets,

14  the shot cup, the plastic material, and whatever the powder

15  was does the same pressure and velocity achieved.  That's

16  the important point in this case because we don't have

17  powder particles to deal with, so that ammunition still

18  exists.  I bought 80-some dollars worth of it a couple --

19  about a month ago or so, so it's still on the market.

20         The recreated ammunition may be a more difficult

21  matter if that's what they're talking about.

22  Q.   And so are you saying that for either type of

23  ammunition, if the velocity and the pressure was the same,

24  are the external ballistics the same for those two different

25  types of ammunition?

2425

**DIRECT - HAAG**

1    A.    Yes.

2    Q.    Now, I'm going to take a pause here for a second.    I

3    want to ask you about something a little bit different, and

4    this has to do with terminal ballistics.    I want to ask you

5    about the wound in this case.

6              Now, over the last 53 years that you have been

7    practicing and working in this field, have you had an

8    occasion -- or have you had many occasions to look at

9    autopsy photos?

10   A.    Regularly.    If there's a death involved and, if not,

11   hospital pictures, although they're usually pretty grim,

12   pretty poorly done.    But autopsy pictures are routine.    I

13   want to see the documents first before I even open an item

14   of evidence.

15   Q.    And are autopsy photos something that you consider in

16   determining distance?

17   A.    Absolutely.

18   Q.    And are autopsy photos something that's important in

19   doing your reconstruction?

20   A.    It is.    If there are questions about range, you know,

21   stable bullet or unstable bullet, or, in this case, shotgun

22   evidence, shotguns generate a lot of very useful materials

23   beyond what a handgun or a rifle does and they're all useful

24   for reconstruction.    "They" being the shot cup, the pellets,

25   the buffering material.

**DIRECT - HAAG**

1    Q.    And can you tell us, when you're looking at autopsy

2    photos and looking at a shotgun wound, what are you looking

3    for?

4    A.    Well, first of all, its size and appearance.  Are we

5    looking at a single-entry wound?  A round wound?  As the

6    distance gets greater, there will be what's called

7    scalloping, where the pellets start to spread out, and now

8    they're making little scallops.  And, finally, if we go

9    further for a particular gun and ammunition, we'll have

10   satellite pellets where we've got a main entry hole with

11   pellet strikes around it.  And ultimately distances like,

12   you know, 10, 15, 20 feet, we've got a pattern of pellets.

13   And the shot cup may make a separate injury; it may be on

14   the ground somewhere.

15        The buffer material will never get that far,

16   neither will the powder particles.  But now we have a

17   pattern we can deal with if the gun and ammunition

18   reproducibly create patterns that we can relate then to the

19   pathologist's good photographs with a scale included and

20   that pathologist's description of the injury dimensions.

21   Q.    And does that relate to what you do in terms of

22   firearms?

23   A.    Right.  I get the work from the pathologist,

24   photographs, reports, sometimes talk to them, and then take

25   it from there with test-firing of the gun and ammunition.

2427

**DIRECT - HAAG**

1    Q.    So in this case, Mr. Haag, did you have an opportunity

2    to look at autopsy photos?

3    A.    No.

4    Q.    Did you have a chance to look at some post-autopsy

5    photos?

6    A.    Yes.

7    Q.    And what did you think of the quality of those photos?

8    A.    Meager, poor, minimal.

9    Q.    Even given that they were not good photographs, were

10    you able to see the wound in those post-autopsy

11    photographs?

12    A.    Yes.

13    Q.    Did you see any scalloping?

14    A.    I did not.

15    Q.    Did you see any scattered satellite pellet impacts?

16    A.    No, I did not.

17            THE COURT:  Ms. Moss, I think we should pause

18    there.  I know we're sort of off kilter here in our schedule

19    because of the long legal argument, but let's pause there.

20            Folks, we're -- because of the lengthy lunch recess

21    and the legal argument I had with counsel, we're going to

22    just take a 10-minute afternoon recess.  And be advised

23    we're going to go until 10 after 5:00 today.  We'll be in

24    recess.

25            (Jury left the courtroom at 3:36 p.m.)

**DIRECT - HAAG**

1          THE COURT:  Mr. Haag, it's going to be a short

2     recess, but I still direct you not to speak with any of the

3     lawyers during the recess since you're in the middle of your

4     testimony.

5          THE WITNESS:  I understand.

6          (Recess taken 3:36 p.m. to 3:47 p.m.)

7          THE COURT:  Mr. Haag, I remind you that you remain

8     under oath.

9          Ms. Moss, you may resume your examination.

10          MS. MOSS:  Thank you, Your Honor.

11     BY MS. MOSS:

12     Q.   Mr. Haag, did you learn the FBI also conducted more

13     testing on July 5th, 2022?

14     A.   Yes, I am.

15     Q.   And can you tell us what they did during that testing.

16     A.   It was some shots with, again, exemplar gun cases.  And

17     an exemplar Browning AR -- A-5 with the muzzle set back at

18     4 inches from the opening of the front end of the gun case.

19     Q.   And do you recall how many times they actually tested

20     it during that testing?

21     A.   I think at least four -- I'm sorry to anticipate, I

22     think at least four.

23     Q.   I think that's right, four times.  And during that

24     testing, were they able to replicate what the interior of

25     the actual gun case looked like?

**DIRECT - HAAG**

1    A.    No.

2    Q.    Now, they did this time put the shotgun 4 inches back

3    from the end of the case --

4    A.    Yes.

5    Q.    -- so why didn't it replicate what the actual case

6    looked like?

7    A.    We have a limited number of choices.  The actual gun

8    case has been used so the fabric is not as strong as a

9    virgin, new gun case.  That's one choice.  But more

10   important, from some limited testing I did, just how close

11   the muzzle is against, or not, against the fabric of the

12   liner.

13        1 inch away, for example, you'll get no blast hole

14   in the fabric that I used.  If it's touching -- "it" being

15   the muzzle -- you get a big blast hole.  So I'm never going

16   to know exactly.  Too many parameters and up and down and

17   right and left, plus the age of the actual evidence item,

18   that I would ever be able to recreate it.

19        They certainly weren't able to -- to include the

20   4-inch shots.  They blew the gun cases apart, of course, it

21   goes almost without saying.  But we never saw a blast hole

22   in any of the tests including the more recent ones at

23   4 inches.

24   Q.    And does that affect your conclusion about that still

25   being a blast hole?

**DIRECT - HAAG**

1    A.    No.

2    Q.    It's -- do you still believe it was the blast hole?

3    A.    In my -- it's stronger than a belief.  In my opinion,

4    it is a blast hole.

5    Q.    Okay.  Fair enough.  And during that July 5th testing,

6    do you know whether they did pattern testing?  Did they fire

7    into targets?

8    A.    My understanding, from what I saw, they did not.

9    Q.    And would that have been helpful to you?

10    A.    Yes, to the extent we might, although just four shots,

11    get an idea how much more egregious of the intervening

12    effect of the gun case would be, because now the pellets,

13    the shot cup, and the buffer have an even greater distance

14    to move through intermediate barrier materials than all the

15    previous tests.  That would be about the only thing we might

16    learn with witness panels.

17    Q.    So you could have learned something from that?

18    A.    Could have expanded our knowledge, but it's headed

19    toward a situation where we have something that's not

20    particularly reproducible.

21    Q.    And, Mr. Haag, I've been talking a lot about blast hole

22    and you've been talking about positioning the shotgun

23    4 inches back from the end of the gun case.  I mean, are

24    those the only things that we are considering here?

25    A.    No.  You're considering putting -- trying to put it

**DIRECT - HAAG**

1   together, the shape of the wound, the question of distance,

2   of whether certain things, such as self-inflicted suicide,

3   can be ruled out.  That one was pretty easy.  But the other

4   three choices never made any progress given the erratic,

5   chaotic nature of the pellet shot cups going through gun

6   cases, whatever the distance is -- the distance in the gun

7   cases.

8   Q.   Okay.  So a lot of things to consider.  So, Mr. Haag,

9   what's going on here?  What happened?

10  A.   I have to tell you, I don't like being here in this

11  kind of situation.  I like to solve cases.  I never got much

12  farther than the day your office contacted me or when the

13  first law firm contacted me.  I can list three choices, but

14  I can't advance one over the other.  I can rule out

15  self-inflicted.  She can't reach the trigger.

16  Q.   Okay.  So you rule out -- it sounds like we're

17  ultimately four choices, and you rule out one; is that

18  right?

19  A.   One of four are off the table as far as I'm concerned.

20  Q.   Okay.  What other -- what are the three other

21  possibilities?

22  A.   You have a misadventure, a gun that jarred off by some

23  sort of impact.  A partial drop, rapping it against the

24  headboard trying to get it in the gun case.  So there the

25  gun has failed in some way.

2432

**DIRECT - HAAG**

1          Handling by another person.  The only other person

2    would be the husband trying to get it in the gun case,

3    thinking it's empty and lowering the hammer.  The way you do

4    that is pull the trigger and getting a terrible surprise and

5    not willing to admit to it, given where he was.

6          And, of course, the third chase -- third choice is

7    why I think we're all here -- of an intentional homicide.

8    Q.   So it sounds like you've talked about accident, a

9    negligent handling of the gun, perhaps --

10   A.   Yes.

11   Q.   -- and an intentional homicide?

12   A.   Yes.

13   Q.   Now, so those are the three choices that we have left.

14   In your expert opinion, your 53 years of experience, your

15   numerous testing of shotguns and examination of shotguns,

16   and your consideration of this case, of those three choices

17   is one more likely than the other?

18   A.   I cannot tell you that.  I cannot answer that.

19   Q.   Why?

20   A.   Because of the -- starting with a compromised disturbed

21   scene, the lack of the actual firearm, no examination by me

22   of the spent cartridge case.  Most of all, when we do get --

23   when we -- the forensic community, in this case Special

24   Agent DeFrance, gets to the matter of looking at what

25   happens when you fire this gun -- this type of gun and

CROSS - HAAG

1    ammunition and the gun case, there was also becoming

2    chaotic, irreproducible.

3         And if you don't have something that you can

4    reproduce, it becomes very limited.  I can't get beyond -- I

5    can tell you it's close.  The satellite injury says it's not

6    contact, but beyond that, it's still close enough that,

7    despite the gun case, we have a nice round -- basically,

8    according to the pathologist who did the original work --

9    about 6 centimeters in diameter entry wound with no

10   scalloping.

11   Q.   And using that scientific method again, where you --

12   you talk about ruling out different things, can you rule out

13   definitively any of those three choices?

14   A.   I cannot.  I wish I could, but I cannot.

15             MS. MOSS:  Thank you, Mr. Haag.

16             THE COURT:  Cross-examination.

17             MR. WINSTEAD:  Thank you, Your Honor.

18             THE COURT:  You may proceed, counsel.

19             MR. WINSTEAD:  Thank you, Your Honor.

20                     CROSS-EXAMINATION

21   BY MR. WINSTEAD:

22   Q.   Good afternoon, sir.

23   A.   Good afternoon.

24   Q.   It's good to speak with you again.  I really appreciate

25   you speaking with me on Sunday.

CROSS - HAAG

1    A.    My pleasure.

2    Q.    All right.  So I apologize, this is probably going to

3    be slightly less organized than you're used to.  We don't do

4    cross-examination very well, so you'll have to bear with me.

5         So I just wanted to cover a couple of things that

6    you talked about on direct.  So, first of all, you looked at

7    the presence of that satellite wound on the right breast,

8    correct?

9    A.    Yes.

10   Q.    And you think that that's most likely from the little

11   metal rivet at the front of the case?

12   A.    And/or the loop.  That's the only real choice.

13   Q.    Sure.  And from that, do you have sort of a minimum

14   range that you think the front of the case was from the --

15   from the wound?

16   A.    Not in any hard numbers.  It's got to be at least

17   4 inches because that's how far it is in the gun case.  And

18   some distance, in addition, to allow that loop, which is

19   right at the very front end of the gun case, to be blown

20   away and create a satellite injury.

21        So I'm back to -- as we discussed for both of you,

22   can't be contact.  So we have to have some start of

23   stand-off distance that allows a round hole and for that

24   satellite injury to occur.  But it wasn't something that was

25   ever really replicated.

CROSS - HAAG

1    Q.    Sure.  And then as far as the furthest distance, I

2    think you mentioned before that both the waddings in the

3    wadding system were inside the body.  And so does that mean

4    it can't have been so far that the wadding was separating

5    from the shot column?

6    A.    Oh, no.  It just means it followed all of those 15

7    pellets through the -- through the clothing and through the

8    skin and into the victim.

9    Q.    Right.  And so I'm meaning, if the shot was taken from

10   so far away that the over-powder wad and the shot cup were

11   separating from the shot column --

12   A.    Okay.

13   Q.    -- it can't have been that far away, right?

14   A.    It cannot be that far away, whatever that is.

15   Q.    Right.  So basically you have a range -- and do you

16   remember on our tests about how -- I guess -- I'm used to

17   not asking leading questions, I'll just tell you.

18           Would you believe me if I said that at 4 feet and

19   5 feet, all of the tests had signs of the over-powder wads

20   separating from the shot column?

21   A.    I don't remember that -- I don't dispute it.  I don't

22   remember that but, more importantly, we now have a pellet

23   pattern, not a hole.

24   Q.    Right.  So it sounds like from your opinion, it was

25   somewhere between -- some number of inches away, far enough

2436

CROSS - HAAG

1    that that rivet could make its way all the way over to the

2    other breast --

3    A.    Yes.

4    Q.    -- and about 4-ish feet or so?

5    A.    I'm sorry, 4-inch feet?

6    Q.    About 4 feet or so?

7    A.    No, I don't think we can get out to 4 feet.

8    Q.    Right.  But I'm saying that you can't be probably

9    farther than 4 feet?

10   A.    I would clearly rule out 4 feet.  Even though the

11   pattern's terribly erratic, once we get past 2 or 3 feet,

12   you've got scalloping or patterns that are -- I know it

13   isn't going to show up on the record, but 3 or 4 inches

14   across or greater.

15   Q.    Okay.  Great.  Then let's see.  Oh, I wanted to ask you

16   about this.  You didn't mention this, but you tested the

17   case -- the soft case with Luminol, right?

18   A.    Yes, I did, after -- the man you probably heard from,

19   Mr. Griffin, tested it at the FBI facility in Phoenix.

20   Q.    Right.  Yeah, I have heard of Mr. Griffin.  I was there

21   with you when --

22   A.    Yes, I remember that.

23   Q.    Right, right.  So what does Luminol do?

24   A.    Luminol is another reagent for traces of blood.  And it

25   gives a glowing -- literally glowing response where there's

CROSS - HAAG

1    been blood.  And it's good for blood stains that have been

2    around for a long time.

3         So after Mr. Griffin, who was working for you, the

4    Government, did his testing, then I thought I'll just

5    Luminol the entire gun case to see if there's anything that

6    wasn't visible to him that might have been missed.  And

7    there wasn't.  I found no Luminol response.

8    Q.   So it seems like that confirms that there was no -- no

9    discoverable blood on the case, as far as you know?

10   A.   None that survived.  If it was there at one time, it's

11   no longer there.

12   Q.   Okay.  Okay.  And then you said before you think that

13   the pellets entered in the wound in an intact column,

14   right?

15   A.   En masse would be the way to describe it where they

16   haven't separated far enough to make individual injuries.

17   Q.   Gotcha.  And you said that that's because you looked at

18   the post-autopsy photos, right?

19   A.   Yes.

20   Q.   And --

21   A.   No, they -- I never saw autopsy photos.  I saw the

22   post-autopsy photos.

23   Q.   Right.  And when you looked at them, you didn't see any

24   scalloping at the edge of the wound, right?

25   A.   I did not.

2438

CROSS - HAAG

1    Q.   All right.  And as we talked about on Sunday, as far as

2    actual wound interpretation, someone like a medical

3    examiner, they're sort of the main expert on that kind of a

4    question, right?

5    A.   I would normally leave that to them, but I know pretty

6    much what scalloping looks like and the satellite injuries

7    because I've looked at a lot of them after the pathologists

8    have documented them.

9    Q.   Sure.  But, again, like we talked about on Sunday,

10   ultimately you would defer to an expert like Dr. Baden or

11   Dr. Cina for the wound interpretation part, right?

12   A.   The one man I know.  I don't know Dr. Cina, but I've

13   known Dr. Baden for many, many years and he's very familiar

14   with gunshot wounds.

15   Q.   Do you have any reason to doubt Dr. Cina's, or you just

16   don't know him?

17   A.   I just don't really have a chance to talk to him, get a

18   sense of his experience, or know if he's seen satellite or

19   scalloping or not.  I haven't seen his testimony.

20   Q.   Okay.  Thank you.  Okay.  All right, I'd like to ask

21   you a couple questions about sort of normal conditions.  And

22   I know that part of your opinion has to do with some of the

23   less normal aspects of this particular reconstruction

24   problem.  But I wanted to ask you:  In -- so you mentioned

25   your book, which I think has a very fine title, it's very

CROSS - HAAG

1    clear.

2    A.    I told you it's not imaginative.  What can I do?

3    That's what I do.

4    Q.    And in that, you have a chapter on shotgun shootings

5    and evidence, right?

6    A.    Chapter 13 in the current edition, yes.

7    Q.    At the end of that chapter, you've got other articles

8    and resources and things like that that it references for

9    further information on the subject.

10    A.    That's why I think there's a list of references there.

11    Q.    Right.  And one of those articles that you referenced

12    is called Shotgun Wound Patterns, by Dr. Rudiger

13    Breitenecker.

14    A.    Yes.  1969, I think.  It goes way back.

15    Q.    Yes, sir.  All right.  And so, again, for normal

16    conditions, right?  When you don't have something that's

17    interfering with the pattern or the shotgun pellets or

18    anything like that, normally, when you're looking at a

19    close-range entry wound that's from contact up to about 12

20    inches, you're going to be expecting to see a single-round

21    wound like you -- like you were sort of describing before,

22    and the size of that is going to be about three-quarters

23    inches to 1 inch size, right?

24    A.    For a typical shotgun entry wound where the pellets are

25    all en masse, it doesn't sound at all unreasonable.

CROSS - HAAG

1    Q.    And that's because that's about the size of the end of

2    a shotgun barrel.

3    A.    Yes.  Or the shot cup still holding all the pellets

4    very close to the muzzle upon exit.

5    Q.    Right.  And that when you're talking about short-range,

6    which would be up to about 3 feet, you're going to -- you're

7    going to expect to see a little bit bigger, a little bit of

8    maybe scalloping?

9    A.    Yes.  Just little loops around the margin of the entry

10    wound and skin.

11    Q.    All right.  And then when you get out to about 4 feet,

12    you're looking to see an entry wound that's about a

13    half-inch to 2 inches in diameter.

14    A.    Again, from past experience, that doesn't sound at all

15    unreasonable.

16    Q.    Sure.

17    A.    But now we should be seeing some satellite pellets that

18    actually have gone beyond the entry wound and made their own

19    defects in the skin.

20    Q.    Sure.  All right.  And just going back to the diameter

21    of the shot -- the internal diameter of the shotgun, do you

22    happen to know what the interior diameter of a full choke

23    is?

24    A.    Well, the interior diameter of a 12-gauge shotgun is

25    about point 73 inches, a little less than three-quarters of

CROSS - HAAG

1    an inch.   The choke, it's a constriction at the muzzle; it's

2    very small, but it does affect the pattern, the spread of

3    the shot, but only after we get some distance -- I mean,

4    we're talking about feet or yards.

5    Q.    All right.  And so there's a sort of occasional problem

6    in this case with conversion between different kinds of

7    measurements.   But do you happen to know off the top of your

8    head how many inches 6 centimeters is?  And if you don't,

9    would you have any reason to distrust me if I said it was

10   about 2.3 inches?

11   A.    Sounds about right.  I didn't bring my pocket

12   calculator, but I won't dispute it with you; seem like an

13   honest guy.

14   Q.    And so that's about three times the internal diameter

15   of that shotgun muzzle?

16   A.    Yes.

17   Q.    Okay.  All right.  I had another couple questions I

18   wanted to -- oh, actually, first, you didn't really talk

19   about this, but you mentioned, in relationship to the soft

20   case, you saw some fibers that were heat-damaged and things

21   like that.  And you mentioned that it can be very hot right

22   at the muzzle of a shotgun when it discharges; is that

23   right?

24   A.    For a very brief moment in time, yes; very hot.

25   Several thousand degrees.

2442

CROSS - HAAG

1  Q.   And is that the -- so are gases expelled following the

2  actual shot column?

3  A.   A huge amount of gas is expelled.

4  Q.   Is it pretty hot?

5  A.   It is, but the important thing that people don't really

6  understand, I think, is how brief it is.  So yes, it is very

7  hot, but, for example, you could put a -- hang a newspaper

8  in front of the gun, it's not going to set it on fire.  But

9  if you get these delicate fibers that I talked about, it's

10 long enough that they start to melt; they don't catch on

11 fire.

12 Q.   Sure.  What about skin?  If skin comes in contact with

13 those gases really close to the muzzle, will it cause --

14 well, first of all, would there be like soot deposits and

15 some things like that that you can see?

16 A.   The soot at very close range is something that would be

17 in my area of interest --

18 Q.   Okay.

19 A.   -- and I would look for in the autopsy report,

20 especially if we don't have intervening clothing.

21 Q.   Sure.

22 A.   Now you know the rest of the problem on that in this

23 case.

24 Q.   Right, right, right.  How -- and so do the -- so you

25 were talking about the shot column.  The shot column comes

CROSS - HAAG

1    pretty much straight out and slowly starts to expand, right?

2    A.    Yes.   The petals open up, the shot cup falls away like

3    a booster rocket, if you've seen pictures of satellites

4    going up.   And the pellets are all together and they

5    gradually keep moving out because they have a angular

6    velocity that's very stable if they hadn't been interrupted,

7    and then they run into something.

8    Q.   And then the buffer material expands a little bit

9    faster than the pellets; is that right?

10   A.    Absolutely.   It's just particles.   Pretty lightweight,

11   plastic particles.

12   Q.   And the gases expand even a little bit wider and faster

13   than even that, right?

14   A.    Yes.

15   Q.   And so is that why sometimes, for relatively

16   close-range shots, in your book you talk about you'll see

17   the wound, and then around that you'll see stippling and

18   pseudo-stippling, is that right, sometimes?

19   A.    It will be stippling if it's from powder particles.   It

20   would be pseudo-stippling if it's from something other,

21   namely, the plastic buffer.   That would qualify as

22   pseudo-stippling, but the effect and the phenomena is the

23   same and the reconstructive value is the same.   It gives you

24   range -- range-of-fire information.

25   Q.    Right.   And then even a little bit wider than that --

CROSS - HAAG

1    if it's at the right closeness, you're going to see some

2    powder deposits, you know, things like that; is that right?

3    A.   If not all of the powder burns -- and we did -- "we,"

4    the FBI examiner and myself, Mr. Griffin, back in April --

5    found a few unburned powder particles in the actual gun

6    case.  So that was potentially useful material.  But I

7    reiterate, if we had the clothing, that's not going to make

8    it to the victim's skin -- or not likely to make it to her

9    skin.

10    Q.   Sure.  So if that -- if that cloud of gases, right,

11    is -- if that encounters skin, can it leave sort of

12    blackening or deposits or something like that?

13    A.   It's not the gas, it's the carbonaceous material.  The

14    gunpowder's an organic material and it makes sooty material.

15    If you shot it against white powder or cardboard, it would

16    be very visible.  If you shot it against your jacket or

17    mine, we're going to need infrared photography to see it.

18    Q.   Right.  Great.  Okay.  Okay.  So you talked a lot about

19    some of the things that we don't have in this case.  I think

20    it's probably very fair to say that the law enforcement that

21    responded to the scene didn't necessarily meet all the

22    standards that we would have in the United States; would

23    you -- that seems like an uncontroversial --

24    A.   Yes, I definitely agree.

25    Q.   And so that sort of thing seems like it would be very

CROSS - HAAG

1    likely to happen in regions of the world that have a lot

2    fewer resources; is that --

3    A.    I think that's reasonable.  And I have looked at other

4    foreign country cases and they're often not nearly up to

5    what we do in this country.

6    Q.    And so especially a country like Zambia and Africa,

7    you'd pretty much expect to see certain things that they do

8    not be up to American law enforcement standards; is that

9    fair?

10   A.    It's probably not unfair, but I haven't really looked

11   at other cases from Zambia or other African countries.

12   South Africa, yes, but not that come to mind.

13   Q.    And so basically a crime committed in a place that has

14   a lot less law enforcement resources seems like it would be

15   less likely to get really thoroughly investigated.

16   A.    It's going to depend upon the question.  If the

17   question is:  This is the firearm, the firearm's ID is

18   pretty straightforward.  That wasn't an issue here.  But

19   when it comes to reconstruction, yes, all the things I've

20   been asked about are of critical importance to try to

21   resolve the three choices I talked about earlier.

22   Q.    Right.  Now you talked about some of the things that

23   you did look at with regard to that prior investigation.

24   You talked a little bit about, you know, questions about

25   where the case and the firearm were and whether in the

CROSS - HAAG

1    photos that's representative of where they actually were

2    during the incident, right?

3    A.    Yes.

4    Q.    And that is something that you would consider pretty

5    important, right?

6    A.    Certainly has the potential.

7    Q.    Did you ever review any statements by a person named

8    Mwene Banda?

9    A.    Not that I personally recall.

10   Q.    And so if his information was that the zipper was

11   zipped to halfway during the incident, would that be

12   something that would be important to you?

13   A.    If his recollection is reliable and, hopefully

14   documented, yes, that could help explain whether the

15   cartridge on the floor is -- it got there by coming out of

16   the gun case or not.

17   Q.    And --

18   A.    And, of course, the ability to reach the trigger.

19   Q.    And, likewise, if he said that the case and the gun in

20   the photographs was where they were after the actual

21   incident, would that also be something that you would take

22   into account in your reconstruction?

23   A.    If that means before it was relocated, yes.  But I'd

24   still wish we'd have a measurement of how far it's sticking

25   out of the gun case.

CROSS - HAAG

1    Q.    Sure.  Were you aware of the -- you were asked

2    questions about the ballistics examination in Zambia.  You

3    looked at that report.  Were you aware that that examiner

4    from Zambia was interviewed several times?

5    A.    I believe so, yes.

6    Q.    And so did you review those reports of his interviews?

7    A.    I probably did, but I don't have a clear recollection

8    of them.

9    Q.    Okay.  If you didn't review them, would those

10   interviews be important to your ability to reconstruct the

11   scene?

12   A.    It depends upon what he said, of course, and whether he

13   documented it as a firearms examiner.

14   Q.    Right.  So were you aware that that particular person

15   did his training in ballistics at Moscow State University?

16   A.    I don't recall that.  I think I would remember that

17   because I've been there.  Moscow University, not Zambia.

18   Q.    Sure.  And were you aware that he had done hundreds of

19   cases?

20   A.    No.

21   Q.    Did you know that in this case, he actually did several

22   drop tests of the firearm?

23   A.    I seem to recall a statement that he had done several,

24   quote, drop tests, but saw no further details of how they

25   were done or what surface or from what height.

CROSS - HAAG

1    Q.    And so this was after the incident, right?

2    A.    Of course.

3    Q.    Yeah.  And so if he did several drop tests onto rubber

4    mats and saw no failures, would that be something that you

5    would take into account in your reconstruction?

6    A.    Well, it's of interest but, again, I would really like

7    to see it documented, you know, videotaped, so I know he set

8    the drop test up, what the surface was, how the gun behaved,

9    or not.  And how many tests he did at any particular

10   orientation.

11   Q.    All right.  Okay.  Now, so we -- well, in this case, as

12   you know, and as has been discussed many times, we did not

13   have the original shotgun, right?

14   A.    Right.  I've never seen it, so it's not available as

15   far as I know.

16   Q.    Sure.  And so there's -- in this sort of a situation,

17   it's -- it's perfectly reasonable to use an exemplar

18   shotgun, right?

19   A.    It depends on what the purpose of your test is.  But

20   for patterning purposes, as long as it's the same barrel

21   length and at close-range choke really doesn't matter, but

22   same barrel length, of course same gauge, and the same

23   ammunition I would have no problem with doing patterning in

24   that situation.

25           Obviously drop testing or failures of the latch and

CROSS - HAAG

1    the tubular magazine, those questions that I answered isn't

2    going to help to do it on an exemplar.

3    Q.    Sure.  So -- and I'm not trying to trick you here.  So

4    I'm, again, looking at your -- your book.  And I'm looking

5    at a -- it says "A real life example," which I'm presuming

6    was an example of testing that you did where you used an

7    exemplar firearm.  This is the Taurus judge, if you remember

8    that one.

9    A.    Actually, I don't, but I know the gun and I've shot

10   them a number of times.  It's a handgun that shoots .410

11   shotgun shells, as well as real cartridges.

12   Q.    And so I'm going to the part where you were asked about

13   how many shots you would want to do at each distance and you

14   were talking about, well, you'd want to see 10 shots or

15   whatever.

16         So in this particular one in your book, you talked

17   about doing shots in triplicate at each distance, right?

18   A.    Yes.

19   Q.    Okay.  And so three shots at a distance is not

20   unreasonable.

21   A.    Not if we have very reproducible patterns at each

22   distance that when we put it on the graph gives a nice

23   straight-line equation.

24   Q.    Right.  All right.  And so we'll come back to the

25   reproducibility, but just in general, when you're doing

2450

CROSS - HAAG

1    patterning testing, three -- three shots at a distance is

2    pretty much what you want to do, right?

3    A.    It depends on what I see, but I tried to explain that.

4    If they're quite reproducible, a tenth of an inch, no

5    difference.  The shot cups behave the same way.  And then

6    it's going to depend on what is the question that's posed to

7    me.  But I could, and I have, stopped at three shots at each

8    distance.

9    Q.    Right.  And one of the other things that you reference

10   in your chapter is an article called Graphical Analysis of

11   the Shotgun Shell Performance Envelope and Distance

12   Determination Cases --

13   A.    Yes.

14   Q.    -- you remember that one?  That's also relatively old.

15   It's from '89, I think, right?

16   A.    I think you're right.  Yes.

17   Q.    And so they -- they're talking specifically about doing

18   distance determinations and doing patterning testing so that

19   you can make that sort of determination, right?

20   A.    I believe you're right.  Yes.

21   Q.    And it -- and they say as a practical matter, three

22   shots are normally sufficient.

23   A.    If you, again, have very reproducible results and they

24   plot out to make a nice straight line, get a nice equation

25   tightly, I would stop there.  And then it's finally going to

CROSS - HAAG

1   be:   What is the question posed to the laboratory?

2   Q.   Right.   Okay.   All right.   So you talked a lot about

3   the testing -- actually, before we go into the testing

4   process, I wanted to ask you a little bit about toolmarks.

5   So you mentioned a bunch of the toolmarks that can be found

6   on shotgun shells.   And --

7   A.   Yes.

8   Q.   Right?

9   A.   Yes, I did.

10   Q.   And some of them are from the firing and cycling

11   process, right?

12   A.   Yes.

13   Q.   And I think you said there was an extractor mark -- an

14   extractor mark and -- I'm mixed up now.   There's the little

15   hook that holds it and then there's the little thing that

16   hits it.   What are those called?

17   A.   The first one is the extractor.   It's a claw-like piece

18   about 3:00.   And the firearm is viewed from behind.   And the

19   ejector does just what it says, it ejects the spent

20   cartridge.   And it's usually at about 8:00, sometimes the

21   9:00 position, in a semi-automatic or, for that matter, a

22   pump-action shotgun.

23   Q.   And so those sorts of marks, am I right that those are

24   often used to determine the identity of the firearm that the

25   shell was fired from, right?

2452

CROSS - HAAG

1   **A.    They can be, although the firing pin impression in**
2   **what's called the breach face marks, the marks around the**
3   **firing pin impression, that's the first place to go.**
4   **Ejector mark would be next.  And the extractor has more to**
5   **do with loading the cartridge in the gun.  So that doesn't**
6   **establish that it was necessarily fired in the gun, sort of**
7   **a close runner up.  But I'd look at the other things first.**
8   **Q.    Right.  Okay.  So -- so the -- okay.  So you're saying**
9   **the extractor mark and the magazine latch marks are more**
10  **showing the process by which the shell was loaded?**
11  **A.    Yes.**
12  **Q.    And you said that you can either have a shell in the**
13  **magazine and then you cycle it and it gets loaded, right?**
14  **A.    Yes.**
15  **Q.    Or you can put it directly into the --**
16  **A.    Chamber.**
17  **Q.    -- into the chamber in front of the slide and close the**
18  **slide.**
19  **A.    Right.**
20  **Q.    Right.  So if you look on a shell and it's got the**
21  **magazine latch mark, you know it was in the magazine.**
22  **A.    If it pro- -- if the firearm produces a latch mark --**
23  **not all do, but if it produces one, yes, that shell came out**
24  **of the magazine at some point in time before it was loaded**
25  **and fired in the gun.**

CROSS - HAAG

1    Q.    Now, I'm assuming that that means if a shell was

2    repeatedly loaded and unloaded, in theory each time it hit

3    that magazine latch mark, it would have a mark, so you'd

4    have a lot of marks on there?

5    A.    Yes.  And if it got further, you might see multiple

6    extractor marks.

7    Q.    So if you've got a shell that hasn't ever been put into

8    the gun and it gets loaded in one of the two other ways,

9    then you can sort of deduce where it was at some point,

10   right?

11   A.    Right.

12   Q.    If it's been repeatedly loaded and unloaded, would that

13   make it really difficult to tell much from those marks?

14   A.    No, not necessarily, because it's a spatial

15   relationship.  The extractor -- I know it's not going to

16   show up on the record -- but here 8:00, the extractor here

17   at 3:00.  Those are imminently tied together.  And the

18   breach face marks, the marks that get printed in the primer

19   at discharge, for example, if they're parallel in the 6:00

20   or 12:00, now I've got multiple reference points.  But now

21   if I start seeing extractor marks down at 6:00 and up at

22   12:00, this thing's been dis- -- this cartridge has been

23   worked through a gun, possibly this gun, multiple times

24   before it ultimately got fired.  So they all have

25   interpretive value --

2454

CROSS - HAAG

1  Q.   Sure.

2  A.   -- if they're there.

3       And, again, the language -- the term I like to use:

4  If you know the language of the gun, the gun you're dealing

5  with.

6  Q.   Let's talk about that for a second.  So what is the gun

7  we're dealing with here?

8  A.   It's made by Browning.  It has a long, illustrious

9  history, starting almost a hundred years.  19- -- 190- -- I

10 made a note somewhere -- 1902 it was introduced.  And

11 they've discontinued it in 1999.

12       Basically stayed pretty much the same.  There are

13 some small variations, gauges, and accoutrements, but the

14 design by a famous man, John Browning, was a great design.

15 Q.   So pretty amazing shotgun; isn't it?

16 A.   He's a pretty amazing man who invented a lot of

17 firearms; this just being one of them.

18 Q.   Right.  And if I recall when we spoke, you would say

19 that you're familiar with it but not necessarily an expert

20 specifically in the Auto-5; is that fair to say?

21 A.   If you were to ask me, "Tell me the internal mechanics

22 and what are the specifications," I wouldn't be able to tell

23 you that.  I haven't have seen one and handled one for a

24 number of years.  If basically how it can work, I can answer

25 that question.  What would I expect to see?  Where is the

2455

CROSS - HAAG

1    extractor and ejector?  I've looked at at least one -- two

2    or three exemplars in a gun store.  And one that was

3    produced here we looked at the other night.

4        But beyond that, I'd have to say I'm going to have

5    to go and get one and take it apart.

6    Q.   Sure.  Okay.  So do you know how you load the Auto-5?

7    A.   Yes.  If you're going to load it in the traditional

8    way.

9    Q.   Yeah.  How would you load it the traditional way?

10   A.   I would turn it upside down, push the shells in the

11   magazine tube -- which is now on top -- push them far enough

12   the latch captures them so they don't come right back out.

13   Turn it over, pull the cocking handle back, let it go.  That

14   loads a shell in.

15       And if I want to top it off, I might put another

16   one back in the magazine tube, so I've got one in the

17   chamber, gun hopefully on safe, and two in the magazine tube

18   if it's a plugged gun.  In other words, set up for bird

19   hunting for example --

20   Q.   So --

21   A.   -- in this country.

22   Q.   So you wouldn't load it through the ejection port?

23   A.   Could be done.  I could open it up and drop one in the

24   chamber, close it up, and put two more in the magazine, too.

25   Q.   Are you familiar with the speed-loading function of the

CROSS - HAAG

1   Auto-5?

2   A.    To a limited extent.

3   Q.    Do you -- what's your understanding of it?

4   A.    Well, as you -- if you've got one or more cartridges in

5   the magazine tube, and it's working, pull the bolt back with

6   the charging handle, and it will let that first cartridge

7   out, the one next up for shooting, onto then called the

8   lifter.  As you let the bolt go forward, it chambers it.

9   Now that's all going to happen automatically with a

10  semi-automatic when you fire it, almost faster than the eye

11  can see.

12  Q.    So that's not actually what the speed-loading feature

13  is.  That's just normal loading, right?

14  A.    Yes.  You didn't get into the latch that gives you an

15  alternative method.

16  Q.    What's that?

17  A.    On the left side -- forward left side, what's called

18  the receiver, there's a lever that you can move to either

19  rearward position or a forward position -- and it's been a

20  while since I've read or used that -- but that can be set up

21  so the cartridges stay in the magazine tube when you fire it

22  and you're going to manually load the shell after each shot.

23        And then when you decide I need the other

24  ammunition, for whatever reason, flip that lever and now

25  he's back to the traditional way of semi-auto shotgun

CROSS - HAAG

1  functions.

2  Q.  All right.  And that's the magazine cutoff switch?

3  A.  Yes.

4  Q.  So -- but that's not what I'm talking about the speed

5  loading.  So I'm meaning -- well, so the speed-loading

6  function, right, that was added like in the -- I forget if

7  it was '50s or the '60s.

8  A.  I don't know because I am no longer familiar with that.

9  I once was.  I've lost it.

10  Q.  So the speed-loading function means that when it's

11  open -- well, do you know, does it lock back when there's no

12  longer any magazine -- any ammo --

13  A.  There's no cartridges in it.  You pull the bolt all the

14  way back, it should stay back; or if you fire the very last

15  shot, the bolt should stay back.

16  Q.  So the speed-loading feature means if you throw a shell

17  into the magazine when it's locked back, that will

18  automatically feed and load into the magazine.  Are you

19  familiar with that?

20  A.  I don't know.  I don't recall.

21  Q.  So if that was -- and that's -- that was obviously

22  introduced because that's an easy way to be loading the

23  magazine, right?  You don't have to do two different things,

24  right?

25  A.  From what you've described.  But, again, you're beyond

2458

CROSS - HAAG

1  my recollection of how the Auto-5 -- what the choices are in

2  loading it.

3  Q.   Sure.  And so if you're loading it that way, you're not

4  going to be putting anything into the ejection port,

5  right?

6  A.   It doesn't sound like it.  But, again, you're beyond my

7  present knowledge of how this firearm works, so --

8  Q.   Sure.

9  A.   -- I guess I need to disqualify myself on that

10  particular subject.

11  Q.   Well, no, I mean -- and all I'm trying to get at is:

12  If that's kind of the normal way to load it, and to put one

13  in the chamber, does that mean you wouldn't be able to

14  figure out whether it had been in the magazine, you know,

15  before it was being loaded or whether it had -- I mean, in

16  other words, you won't be able to distinguish whether it had

17  just been loaded or whether it had been sitting in the

18  magazine; is that fair to say?

19  A.   I don't know if it's fair or unfair.  I need to see

20  this done with some cartridges -- live cartridges that are

21  virgin, that don't have marks already on them.  So not much

22  off than I was with the last question.

23  Q.   Fair enough.  Okay.  So that -- well, that brings

24  another question up.  So you do toolmark examinations of

25  shotgun shells, right?

**CROSS - HAAG**

1   **A.    Yes, basically firearms identification are just**

2   **toolmarks as they are created in a firearm.  No different**

3   **than a jimmy mark on a door or a toolmark on the side of a**

4   **window or car door.  They are hard objects making leading**

5   **marks in softer objects.**

6   **Q.    And that's one of the things that your company does?**

7   **A.    Yes.**

8   **Q.    And so you've got your lab set up like you said, I**

9   **think.**

10  **A.    Yes.**

11  **Q.    And you do all kinds of -- do you do like x-rays of it,**

12  **or do you just do visual examinations of toolmarks?**

13  **A.    I go to a special facility either in California or in**

14  **Minnesota if we're going to look at this 3D -- 3 tomography,**

15  **3D scanning, in an alleged defective gun.**

16        **But otherwise everything I talked about today is**

17  **either measurements, pressure, velocities.  I have**

18  **chronographs, doppler radar.  I can pattern guns through the**

19  **drop tests.  I have the SAAMI, S-A-A-M-I, drop mat, and**

20  **their procedures.  So it's only some of them do I have to go**

21  **somewhere else to accomplish a mission.**

22  **Q.    Sure.  So -- and, again, I'm not trying to trick you**

23  **here.  You didn't look at the shell casings in this case --**

24  **A.    I did not.  I have never seen it, except in**

25  **photographs.**

2460

CROSS - HAAG

1    Q.   Sure.  Why didn't you examine them?

2    A.   It was not submitted to me.

3    Q.   Did you request it?

4    A.   I talked about what could be done and that's where that

5    discussion ended.

6    Q.   Did you talk about that with us or what -- what are you

7    meaning you talked --

8    A.   I'm sure I talked about it with the law firm that hired

9    me.

10   Q.   Okay.  All right.  Now I wasn't clear on one point.  I

11   wasn't clear on one point, and I think it's time to get into

12   that.  Oh, just one more point while we're talking about the

13   Auto-5.  So you were talking about that you would -- you

14   would take a look at the original firearm and do a pretty --

15   sounds like a very high-speed -- sorry, that's an idiom -- a

16   very fancy examination of it, like 3D model, all that kind

17   of stuff?

18   A.   In this case one of the issues is a jar-off of some

19   kind or a slam firing -- don't think we've talked about

20   that -- then yes, it will be much more than just firearms

21   identification.  In fact, identifying this as the

22   responsible gun, which was basically the mission of the guy

23   in Zambia, was pointless -- there was no point to it.  It's

24   going to be stipulated.  This is the gun.  How did it get

25   fired?

CROSS - HAAG

1    Q.    Right.

2    A.    So it's a reconstruction, not a firearms identification

3    case.

4    Q.    And obviously if we'd had the original firearm, we

5    could have done those sorts of things, right?

6    A.    The Bureau could do that, I could do that, another

7    firearms examiner for the state lab here in Colorado could

8    have worked for you.  There are several labs here in this

9    state that have firearms units.

10   Q.    You said that one of the things you'd be looking for is

11   whether there was some sort of damage to the sear at the

12   hammer and trigger engagement.

13   A.    Yes, this is inside the gun.  Think of it like a hook

14   and claw, holding the hammer back; that's called a sear.

15   Q.    Oh, we're familiar with that.  So -- all right.  And so

16   you'd be looking because if there was some kind of damage to

17   that, so that it wasn't engaging very well, that would

18   obviously be a really big point in deciding whether it would

19   be possible it was a jar-off or -- right?

20   A.    Yes.

21   Q.    Or a drop fire?

22   A.    Yes.

23   Q.    Do you distinguish -- some people use the -- it

24   interchangeably.  Do you distinguish between those two

25   terms?

CROSS - HAAG

1    A.    I do make a distinction.  A drop fire's truly that;

2    you've lost control of it and gravity takes over and it

3    strikes something.  But a jar-off, if I use the court

4    reporter's construction there, and I'm trying to pound it

5    in, foolishly, but trying to drive it in, that's an

6    opportunity for a jar-off, because the forces are different.

7    They're acting in different direction.

8    Q.    Right.  Okay.  That makes sense.  And so if you had

9    information that the sear engagement was working just fine,

10   would that be something that would go into your analysis

11   about the likelihood of a jar-off or a drop fire?

12   A.    It certainly is going to minimize it, absolutely, if we

13   had -- if that's a finding on the actual firearm.

14   Q.    Okay.  Okay.  Let's see.  And, likewise, if you had

15   information about whether there was some sort of -- because

16   firearms are just mechanical devices, right?

17   A.    Absolutely.

18   Q.    And any mechanical device can break.

19   A.    Or gradually wear out or fail or get compromised in

20   some way.

21   Q.    Or have debris in there.

22   A.    Yes.

23   Q.    Yeah.  And I think you mentioned a slam fire.  You

24   could get a slam fire if there was some sort of debris that

25   made the firing pin not retract, right?

CROSS - HAAG

1    A.    Right.  Although I don't think I got asked about it,

2    but you're right, something that causes the firing pin to

3    stick out and not get retracted.  When that bolt goes

4    closed, if it's sticking out far enough, you're going to

5    have a discharge without pulling the trigger.

6    Q.    Right.  So are you aware of any design features of the

7    Auto-5 that relate to the slam-fire scenario?

8    A.    I'm unaware of any complaints or litigation in the

9    past --

10   Q.    Okay.

11   A.    -- for that make and model of gun.

12   Q.    So I'm -- that's a fair answer.  Does that mean that

13   you're not specifically aware of any design features related

14   to that?

15   A.    I've never heard of real criticism of the Auto-5.

16   Q.    Okay.  Okay.  Great.  So now I've got to clarify

17   something about the 4 inches.  So, first of all, I wasn't

18   totally clear on direct.  You said that that was important

19   but mostly it seemed like you thought it was important

20   because it tells you how much stand-off you're going to have

21   to have from the actual -- between the wound and the barrel;

22   is that right?

23   A.    You're partially right.  It's certainly a

24   consideration.  So you've -- you automatically got 4 inches,

25   even if the front of the gun case was touching the victim at

2464

CROSS - HAAG

1    the moment of discharge.  But it becomes really important if

2    we're going to try to reproduce the entry wound with

3    test-firing through exemplar cases.  That's your starting

4    point.

5    Q.    Okay.  So that's what I want to clarify.  But just to

6    go to close the book on that first answer, you're saying

7    you've got enough distance so that that little tip can get

8    sent off sideways, whatever that is --

9    A.    The hanger -- the loop hanger --

10    Q.    Right.

11    A.    -- and rivet, yes.

12    Q.    And then you add 4 inches to that?

13    A.    Yes.

14    Q.    So if -- if Mr. DeFrance -- or Special Agent DeFrance

15    is right, you take that same distance here and you add

16    1.8 inches to it.

17    A.    You add what?

18    Q.    1.8 inches to it?

19    A.    No.

20    Q.    I'm saying if Mr. -- if --

21    A.    Oh, I'm sorry.

22    Q.    -- Special Agent DeFrance was right?

23    A.    Yes, if he's right.

24    Q.    So it makes a difference about two inches of how far

25    the muzzle would be to the wound, right, from that

CROSS - HAAG

1    perspective?

2    A.    Well, now you've confused me.

3    Q.    Oh.

4    A.    You can't be both 4 inches and 1.8 inches.  I wouldn't

5    add those two together.  He's either right or I'm right.

6    Q.    I'm saying the difference as far as that part of the

7    opinion is, you've got whatever the difference is from the

8    tip of the case to the wound?

9    A.    We'll call that X.

10   Q.    X.  And then you've got -- either you've got 4 inches

11   in your version or you have 2 inches in his version,

12   basically?

13   A.    1.8, yes.

14   Q.    So there's about 2 inches of difference there.

15   A.    Okay, yes, you're right.  I'm finally caught up with

16   you.

17   Q.    Okay.  Good.  So now let's turn to the patterning

18   shooting.  So I was really trying to figure out if you were

19   saying -- because it seemed like when you were talking about

20   Special Agent DeFrance's patterns, you said that the bags

21   introduced a level of chaos that meant the patterns just

22   weren't reproducible, right?

23   A.    That -- not only that, but you can't trust -- you can't

24   trust them to be useful in determining range of fire.

25   Q.    Right.  Because you've got -- you've got some that are

CROSS - HAAG

1   really small, right?

2   A.   Yes.  If we keep everything else the same, the gun, the

3   ammunition, whether we put it in a exemplar gun case and

4   blow it apart and look at the pattern, it quickly becomes

5   apparent that there's no reproducibility; we have patterns

6   that are all over the witness panel.

7   Q.   And you said if it was 4 inches, you would expect it to

8   be even more chaotic, right?

9   A.   Yes.  It's got -- if the pellets, the shot cup, have

10  more of a journey through intervening material to make than

11  they did through either of Special Agent DeFrance's

12  testing.

13  Q.   So it sounds like in your opinion, once you put a bag

14  over the barrel, there's not really any point doing

15  patterning testing.

16  A.   I think I would have stopped much sooner when I saw the

17  wild variability and chaotic nature.  We're wasting your

18  money, guys, on buying more gun cases.  You kept the Allen

19  Company in business for a while.

20  Q.   That's right.  Okay, so basically there wasn't

21  really -- as soon as you realize the patterns are too

22  chaotic, there's not really any reason to continue testing.

23  A.   I wouldn't have.

24  Q.   Okay.  Right.  So, in other words, if it was 4 inches

25  or if it was 1.8 inches, it ultimately doesn't matter in

CROSS - HAAG

1    your opinion as far as the patterning goes?

2    A.    Only if others attempt to apply meaning to Special

3    Agent DeFrance's patterns whether it was 1.8 or 5 inches.

4    Sorry, in my view they're all meaningless --

5    Q.    Right.  And that's --

6    A.    -- applied to the entry wound in the victim.

7    Q.    And so it would have been the same if they had been at

8    4 inches, right?

9    A.    It would have been just as chaotic, probably more so.

10   Q.    Right.  So this -- in your opinion, this is just a case

11   where patterning isn't --

12   A.    Hopeless cause.

13   Q.    Right.

14        THE COURT:  All right, Mr. Winstead, you recall our

15   discussion we committed to concluding Mr. Haag today for

16   reasons we've discussed.  And I advised the jury we're going

17   to be here until 10 after 5:00, so we have 30 minutes left.

18   I'm going to stop your cross-examination in 15 minutes --

19   you don't have to take all 15 minutes -- and then to leave

20   Ms. Moss 15 minutes for redirect.

21        MR. WINSTEAD:  Okay.

22        THE COURT:  Go ahead.

23   BY MR. WINSTEAD:

24   Q.    All right.  Sir, I just wanted to clarify, because I

25   wanted to see whether or not your determination about where

CROSS - HAAG

1   the muzzle was and the 4 inches and all that ultimately

2   seems to matter.  And it sounds like it doesn't really in

3   your opinion.  So I will skip it.

4           But I did want to bring up one thing.  You said you

5   did -- you did, like, heat testing on the lines of the bags

6   or something like that?

7   A.   I'm sorry, I did what sort of testing?

8   Q.   What sort of testing -- you mentioned you did testing

9   on the lining of the bags like with heat or something like

10  that.  Testing if it would melt?

11  A.   No.  I saw the melted fibers I showed you earlier

12  around the -- toward the butt of the gun area of that blast

13  hole.  I used infrared, which is a form of heat, to look at

14  it.  I did some testing with my own gun, which has the same

15  gauge and barrel length and some fabric, just to look at how

16  sensitive the muzzle stand-off from fabric was to make a

17  blast hole.

18          And I think I testified when it was touching, I

19  could create one very similar to the evidence.  When it was

20  an inch away it just thermally degraded the acrylic

21  fibers -- or polyester.

22  Q.   Did you provide any information about testing to the

23  defense?

24  A.   Yes.  It's one of, I think, 26 PowerPoints I created in

25  this case and I sent that one to them.

CROSS - HAAG

1    Q.    Okay.  Was that disclosed to the Government, do you

2    know?

3    A.    I don't know.  I sent it to the people that hired me,

4    and what happened to it after that, I don't know.

5              MR. WINSTEAD:  Can we have a brief sidebar, Your

6    Honor?

7              THE COURT:  All right.

8         (Discussion at sidebar)

9              MR. WINSTEAD:  So that testing wasn't disclosed to

10   the Government, unless I'm mistaken.  Is it -- was it?

11             MS. MOSS:  No, it was not disclosed.  It was part

12   of the work product of different tests that people formed.

13   Everything that is relevant to the case that was questioned

14   about, has been included within his report and produced to

15   the Government.

16             MR. WINSTEAD:  So the testing wasn't, and he

17   testified about it.  So I believe that's a discovery

18   violation.

19             THE COURT:  What do you want me to do?

20             MR. WINSTEAD:  Would it be possible to have just a

21   limiting instruction to disregard that part of his

22   testimony?  Because it wasn't disclosed to the Government or

23   something like that.  I don't know if you have particular --

24             THE COURT:  Wait, let me -- one at -- one

25   attorney --

2470

CROSS - HAAG

1           MR. WINSTEAD:  Sorry.

2           THE COURT:  Ms. Moss.

3           MS. MOSS:  I don't think any instruction to the

4    jury is necessary.  I didn't specifically ask him any

5    questions about that.  This was not something that he

6    considered relevant to his report.  It's not something he

7    included in his report.  It's something that -- he used a

8    different firearm and for that reason we didn't even want to

9    bring it up because it didn't even use the same type of

10   firearm.  So I don't think it's necessary, Your Honor.

11          THE COURT:  So he didn't reference the same --

12          MS. MOSS:  No, he did not.

13          THE COURT:  And your position is that he hasn't

14   based any of his testimony on this point --

15          MS. MOSS:  That is correct.

16          THE COURT:  Well, I don't believe a discovery

17   violation has occurred and I'm denying the request for a

18   limiting instruction.

19          MR. WINSTEAD:  Okay.  Thank you, Your Honor.

20       (End of discussion at sidebar)

21          MR. WINSTEAD:  All right.  Thank you very much,

22   Your Honor.

23   BY MR. WINSTEAD:

24   Q.   Sir, I'd like to wrap up by talking about your three

25   theories.  So, first of all, you are certain that this was

CROSS - HAAG

1    not a self-inflicted wound, right?

2    A.    By a normal trigger depression or pull, yeah, if we're

3    talking about arm reach and not some special tool.    If

4    there's no evidence of that to depress the trigger, then I

5    ruled that out.

6    Q.    So in your opinion, you are certain that Bianca did not

7    shoot herself?

8    A.    That's right.

9    Q.    Okay.  And you talked about that one of the

10   possibilities, according to the forensic evidence, is that

11   Dr. Rudolph was holding the case and pointing it at Bianca

12   and that he depressed the trigger but it was an accident and

13   he shot her --

14   A.    That's one of the three choices, the negligent

15   mischarge, mishandling of a loaded gun.

16   Q.    And the third one is that he took the shotgun, put the

17   case over it to make it look like an accident, and shot her

18   intentionally.

19   A.    That's the third choice.

20   Q.    Okay.  So the first choice you said was a misadventure

21   with a firearm.

22   A.    Yes.

23   Q.    Now I asked you about this when we spoke on Sunday.  If

24   you -- if you knew that the wound path was perpendicular or

25   slightly angled down towards the wound, how would that

CROSS - HAAG

1   affect your opinion about the misadventure with regard to

2   whether you thought it could be a dropped firearm?

3   A.   It reduces the range of possibilities, the geometry.

4   You can't, for example, be standing directly over it and

5   have the gun pointing straight up.  Not enough room.

6        But if you move the gun out -- again, I use the

7   side of the court reporter's counter -- there's a headboard

8   or baseboard, and it's being rapped against that because

9   it's not going in very well, now all those things can be

10  met.  And somewhere in between, where it's not a straight

11  down drop, but a drop where it hits the butt at an angle, so

12  a gun about a 45 degree angle, a person going after it, or

13  trying to control it, I think you could fit those things in,

14  if we really knew the distance between the front of the gun

15  case and the entry wound, which I don't.

16  Q.   Right.  So I guess you're trying -- so I guess what

17  you're saying is on Sunday, you said that you think the

18  angle of the wound likely rules out a drop.

19  A.   A drop as I just tried -- not tried, I did describe it.

20  I don't know if I did very good Sunday night, but where it's

21  again straight down and the person's over it.  You can't

22  accomplish that from my understanding of her stature.

23  Q.   So it would somehow have to be out in front of her; is

24  that right?

25  A.   Yes.

2473

CROSS - HAAG

1   Q.   Or I think you were saying she was holding it and

2   banging it into something.

3   A.   Yes.

4   Q.   Is that a --

5   A.   Same idea.

6   Q.   Is that a possibility that you --

7   A.   I can't rule that out.  And there's choices when you

8   look at the scene pictures, limited as they are, of placing

9   where one could attempt to do that.

10  Q.   So if someone were to be holding it and just drop it,

11  that's what you're saying is ruled out?

12  A.   I think so, yes.

13  Q.   All right.  And when you're doing your scene

14  reconstruction, you're basing your opinion on forensic

15  evidence, right?

16  A.   Physical evidence that can be interpret- -- examined

17  and interpreted, yes.  And of course the input of others,

18  such as a well-done autopsy.

19  Q.   So you're not taking into account any of the other

20  evidence in the case, just about motive or things like that,

21  right?

22  A.   Absolutely not.

23  Q.   So you're -- when you're saying you can't rule out that

24  she was bonking it on something, or that she somehow dropped

25  it way out in front of her, you're not taking into account

CROSS - HAAG

1    any evidence about whether Bianca had just given an

2    ultimatum to leave his mistress?

3    A.    None of those things are important from a physical

4    evidence standpoint.

5    Q.    Right.

6    A.    The evidence becomes a sounding board to test those

7    theories -- really they're not theories, hypotheses from a

8    science standpoint.   Theories are from a lawyer's

9    standpoint.   There's a difference.

10   Q.    That makes sense.  And you also don't take into account

11   whether the defendant was afraid if he went to divorce, he

12   could -- would lose more money than he could afford?

13   A.    None of that matters to me.

14   Q.    And you don't take into account whether he told Bianca

15   he would leave and fire his mistress and then told his

16   employees not to confirm the mistress still worked at his

17   business?

18   A.    I know of none of that and care about none of it.

19   Q.    Yup.  And you don't take into account whether he had

20   been seen unloading the shotgun the night before?

21   A.    That's of greater interest, but I'd like to know more

22   about what that person's skill level is --

23   Q.    Sure.

24   A.    -- and what they saw.

25   Q.    Okay.  What about evidence that the soft case had been

CROSS - HAAG

1    completely zipped closed the night before?

2    A.    Then we're back to I'd sure like to see pictures of it

3    at the scene back there where the butt's sticking out,

4    because it can't be totally zipped and have that -- the butt

5    stock protruding out the back of the gun case, as shown in

6    the scene picture.

7    Q.    And so you're not going to take into account that

8    Bianca was very careful with firearms?

9    A.    No.  No, because a lot of people who are careful still

10   have a lapse of memory, get complacent, and do things that

11   get them hurt or killed.

12   Q.    Right.  And so you're also not going to take into

13   account that the defendant was also very careful and

14   competent with firearms.

15   A.    That's my understanding, but it still leaves room for a

16   failure, a lapse of memory, a careless moment.

17   Q.    You're not taking into account evidence about whether

18   the defendant was always the one to load firearms into cases

19   and, again, the only one that would handle firearms in the

20   camp?

21   A.    I'm not prepared to take that into account or to

22   dismiss it.  But we're back to fingerprinting the shotgun

23   shell might have been an interesting idea, then, if her

24   prints were on it and not his.  That's, again, just what's

25   called a hypothesis, what you can find at the laboratory

2476

CROSS - HAAG

1  level.

2  Q.   Sure.  And you're not taking into account if the

3  defendant said he was in the bathroom to some people, taking

4  a shower to other people, outside the cabin to other people,

5  during the incident?

6  A.   I am interested in that, but we know that his -- or I

7  know his clothing wasn't impounded.  It should have been.

8  Q.   And so you're not going to take into account evidence

9  that the defendant tried to get the autopsy canceled?

10 A.   I don't know anything about that, but it doesn't matter

11 to me.

12 Q.   You're not going to take into account if the defendant

13 tried to get the photos of the post-autopsy destroyed?

14 A.   Again, I don't know anything about that and it's for

15 these folks over here to think about.

16 Q.   You're not going to take into account that the

17 defendant didn't tell his family about the death until after

18 the cremation?

19 A.   Doesn't matter to me.  None of these things do.

20 Q.   And you're not going to take into account that he

21 started applying for Bianca's life insurance within a week

22 of her cremation?

23 A.   Again, means nothing to me.

24 Q.   And that that was before her funeral.  That doesn't

25 matter to you, right?

2477
CROSS - HAAG

1    A.    I don't even know about it, but it wouldn't matter.

2    Q.    And you wouldn't care about the -- the fact that less

3    than three weeks after Bianca's death the defendant went on

4    a long trip with his mistress?

5    A.    No.

6    Q.    And even if that was the same mistress that Bianca had

7    told him to leave?

8    A.    Again, it wouldn't matter to me as a physical-evidence

9    person.

10   Q.    And you also wouldn't care if you knew that within

11   three months of the death, that mistress moved into Bianca's

12   house?

13   A.    Again, doesn't matter to me.

14   Q.    And you don't take into account that when the

15   defendant's son was contacted by the FBI, the defendant said

16   to one of the employees that he was probably going to jail?

17   A.    Doesn't matter.

18   Q.    Or if you knew that in an argument with his mistress he

19   was overheard saying, "I killed my fucking wife for you"?

20   A.    Again, of no importance to me.

21   Q.    Okay.  So when you give us your opinion about the

22   options, you don't take any of that into account.

23   A.    I do not.

24   Q.    Okay.

25         MR. WINSTEAD:  No further questions, Your Honor.

2478

REDIRECT - HAAG

1    THE COURT:  Redirect.

2                    REDIRECT EXAMINATION

3    BY MS. MOSS:

4    Q.   Mr. Haag, I'll try to be quick so we can get everybody

5    out of here.

6         You were just asked a lot of questions at the very

7    end of this cross-examination of things that you don't take

8    into account.  Do you recall all those things?

9    A.   I do.

10   Q.   Do you look at cases that you consider from the

11   standpoint of science?

12   A.   I do.  Physical science.

13   Q.   Physical science.  And so physical science, is that

14   something that, unlike witnesses who have memory problems

15   and people who forget about things, people who have biases,

16   those are things that don't come into play when you are

17   looking at scientific evidence; is that right?

18   A.   Not for me.

19   Q.   And so when we're talking about not taking things into

20   account, you don't take into account assumptions, do you?

21   A.   No.

22   Q.   You don't take into account evidence that can have very

23   innocent explanations, correct?

24   A.   I do not.  I wait for others to ask about it, and:  Can

25   it be tested through the physical evidence?

REDIRECT - HAAG

1    Q.    And you don't take into account emotion.

2    A.    Right.

3    Q.    Or that a person has consistently said, and other

4    people have testified, Dr. Rudolph was in the bathroom.

5    A.    Again, the only time that gets of interest to me would

6    have been the husband's clothing which, is my understanding,

7    not collected.

8    Q.    Okay.  Now you were also asked to make some assumptions

9    about maybe how far the zipper was zipped on the case, the

10   location of the gun.  Again, are these assumptions?

11   A.    They're a starting point to do an analysis; but to

12   assume that that is a fact, no, I don't do that.

13   Q.    And is there any way for us to know whether that was a

14   fact or not a fact?

15   A.    I can't tell you whether it's fact or not.

16   Q.    Now, another assumption that the prosecutor asked you

17   to make is that this shotgun discharged at a 90-degree

18   angle.  Do you know that the shotgun discharged at a

19   90-degree angle?

20   A.    Relative to the decedent, no, I do not.  And I saw no

21   way to determine that or verify it.

22   Q.    And you have no way to determine that or verify that;

23   is that right?

24   A.    I do not from any of the things your firm and the

25   previous firm provided me.

2480

REDIRECT - HAAG

1    Q.    And when you were asked questions on cross about the

2    dropping of the firearm -- and I believe what the prosecutor

3    demonstrated is if the firearm were to just drop straight in

4    front of the person, do you remember that?

5    A.    I do.  That was the one I excluded.

6    Q.    And you excluded that because, again, we're talking

7    about assuming a 90-degree angle, right?

8    A.    You -- the wound path -- if it really is 90 degrees in,

9    they're locked together.  So whatever you do with the

10   decedent's standing, bent completely over, those two things

11   go together, if that description of the wound path is

12   correct.

13   Q.    And, again, that's assuming that wound path is correct.

14   A.    Yes.

15   Q.    Does that exclude that the gun could drop at an angle?

16   A.    No, because you can follow it down and have the butt

17   stock hit out in front of you some distance.  And I think

18   you can fit everything in with the reminder that I still

19   don't know and I never will know just how far the front part

20   of the gun case is from the entry wound.

21   Q.    You were also asked some questions on cross about

22   toolmarks.  Do you remember those?

23   A.    Yes.

24   Q.    And whether you performed some sort of toolmark

25   analysis.  Do you recall those questions?

2481

**REDIRECT - HAAG**

1   A.   I was prepared to and, then again, he covered -- I

2   think went even beyond what you asked me about.

3   Q.   In criminal cases, what is your understanding,

4   Mr. Haag, of who has the burden of proving that a crime even

5   ever occurred?

6   A.   Of course in this country, it's the government.   The

7   county attorney, the state's attorney, the government's

8   federal attorney, U.S. Attorney.

9   Q.   And you were also asked about three shots and

10  reproducible patterns.  And I think that was from your book.

11  Do you recall that?

12  A.   Yes.

13  Q.   Now were those referencing three shots taken through a

14  gun case at a target?

15  A.   No.  No, they were not.

16  Q.   And so if you take out that interfering object of the

17  gun case, would three shots normally be enough if they

18  were -- you saw that they were producing a predictable

19  pattern?

20  A.   The more important thing is reproducible patterns at

21  each distance, yes.  And I would be satisfied in many cases

22  with three shots.

23  Q.   Now, you also were asked questions about this Zambian

24  ballistic examiner.  Now, that person hasn't come here

25  today, but let me ask you this:  If you were to perform drop

REDIRECT - HAAG

1   tests, rotation tests, jar-off tests, tests to determine the

2   propensity of a gun to accidentally discharge, would you

3   document those things?

4   A.   Oh, absolutely.  And typically set up a video camera,

5   and I usually have a second one that does slow motion

6   because it all happens pretty fast on this particular device

7   SAAMI dictates one uses.

8   Q.   And would you do that so that we know you actually did

9   that test and did it correctly?

10  A.   Or not.  Yes.  Right.

11  Q.   Or not.  Now you also spoke on cross about all this

12  pellet patterning that the FBI did.  And I believe what

13  Mr. Winstead was talking to you about is:  Do the pellets

14  pattern -- pellet patterns even matter?  And you spoke about

15  how this gun case introduces chaos.

16  A.   Yes.  In the patterning, and any effort to establish

17  the wound size with the patterns.

18  Q.   Now, what I think you -- I heard you say is that the

19  patterns do matter if others are trying to apply meaning to

20  them.

21  A.   Yes.  Absolutely.

22  Q.   So if someone, say a doctor or a forensic pathologist,

23  was trying to apply meaning to those patterns and reach

24  conclusions based on those patterns, then do the patterns

25  matter to you?

## REDIRECT - HAAG

1    A.    They still matter to me, and it's great concern to me

2    if such a person attempts to interpret them and apply them

3    in this woman's wound.

4    Q.    Thank you very much, Mr. Haag.

5            THE COURT:  All right.  May this witness be excused

6    for the Defendant Rudolph?

7            MS. MOSS:  Yes, Your Honor.

8            THE COURT:  All right.  For the Government?

9            MR. WINSTEAD:  Yes, Your Honor.

10           THE COURT:  All right.  Mr. Haag, thank you so much

11   for your testimony.  You're excused.  You may step down.

12           All right, straight up 5:00.  Folks, we're going to

13   call it a day.  Just like we've been doing, please be back

14   in the deliberation room by 8:35 tomorrow morning.

15           I know you really are tired of hearing me say this,

16   but I don't have a choice.  Please do not do any independent

17   research into or discuss with anyone the facts, the law, or

18   the persons involved in this case.

19           We'll be in recess until 8:45 tomorrow morning.

20       (Proceedings concluded at 5:01 p.m.)

21                            INDEX

22   Item                                              PAGE

23                    GOVERNMENT'S WITNESSES

24       CASSANDRA OLMSTEAD (Continued)
         Cross-examination by Ms. Moss (Cont'd)        2190
25

2484

REDIRECT - HAAG

| Item | PAGE |
|------|------|

**GOVERNMENT'S WITNESSES**

ERIN NEWTON
Direct Examination by Mr. Fields          2209
Cross-examination by Mr. Markus          2265
Cross-examination by Mr. Dill            2283
Redirect Examination by Mr. Fields       2294

BRIAN LOVELACE
Direct Examination by Mr. Winstead       2299
Cross-examination by Mr. Markus          2312

**DEFENDANT'S WITNESSES**

LUCIEN HAAG
Direct Examination by Ms. Moss           2371
Cross-examination by Mr. Winstead        2433
Redirect Examination by Ms. Moss         2478

**GOVERNMENT'S EXHIBITS**

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| 300 | 2208 | 2209 | | |
| 305 | 2208 | 2209 | | |
| 309 | 2208 | 2209 | | |
| 310 | 2208 | 2209 | | |
| 311 | 2208 | 2209 | | |
| 312 | 2208 | 2209 | | |
| 313 | 2208 | 2209 | | |
| 314 | 2208 | 2209 | | |
| 315 | 2208 | 2209 | | |
| 316 | 2208 | 2209 | | |
| 317 | 2208 | 2209 | | |
| 318 | 2208 | 2209 | | |

2485

REDIRECT - HAAG

1                            GOVERNMENT'S EXHIBITS

2      EXHIBITS:          Offered      Received   Refused

3      319                2208         2209

4      320                2208         2209

5      321                2208         2209

6      322                2208         2209

7      323                2208         2209

8      324                2208         2209

9      325                2208         2209

10     326                2208         2209

11     327                2208         2209

12     500                2208         2209

13     501                2208         2209

14     502                2208         2209

15     503                2208         2209

16     504                2208         2209

17     505                2208         2209

18     RULE 29(a) ARGUMENT:                           2316
       THE COURT:    Finding                          2350
19                         REPORTER'S CERTIFICATE

20         I certify that the foregoing is a correct transcript from
       the record of proceedings in the above-entitled matter.
21         Dated at Denver, Colorado, this 14th of September, 2023.

22

23

24     _____
       MARY J. GEORGE, FCRR, CRR, RMR
25