2486

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 22-cr-0012-WJM

UNITED STATES OF AMERICA,

Plaintiff,

vs.

LAWRENCE RUDOLPH,
LORI MILLIRON,

Defendants.

-----------------------------------------------------------

REPORTER'S TRANSCRIPT
(Jury Trial, Day 12)

-----------------------------------------------------------

Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

Judge, United States District Court for the District of

Colorado, commencing at 8:51 a.m., on the 27th day of July,

2022, in Courtroom A801, United States Courthouse, Denver,

Colorado.


APPEARANCES

BRYAN D. FIELDS, E. GARRETH WINSTEAD, III, J. BISHOP
GREWELL, Assistant U.S. Attorneys, 1801 California Street,
Suite 1600, Denver, Colorado 80202, appearing for the
plaintiff.

DAVID O. MARKUS, A. MARGOT MOSS, LAUREN L. DOYLE,
Markus Moss PLLC, 40 NW Third Street, Penthouse 1, Miami,
Florida 33175, appearing for the defendant Rudolph.

JOHN W. DILL, John W. Dill P.A., 941 West Morse
Boulevard, Winter Park, Florida 32789, appearing for the
defendant Milliron.

MARY J. GEORGE, FCRR, CRR, RMR
901 19th Street, Denver, Colorado 80294
Proceedings Reported by Mechanical Stenography
Transcription Produced via Computer
P R O C E E D I N G S

1

2

3

4          (In open court outside the presence of the jury at 8:51

5     a.m.)

6               THE COURT:  I'll wait for Mr. Markus to get ready

7     here.

8               MR. MARKUS:  Thank you, Your Honor.  Sorry.

9               THE COURT:  No.  Can you take the lectern.  I want

10    to start off -- I have a question for all counsel, but start

11    with you.

12              MR. MARKUS:  Sure.  Good morning, Your Honor.

13              THE COURT:  Good morning.  Given that we're now on

14    day 12, tell me from your perspective, what does today look

15    like?

16              MR. MARKUS:  Today looks like, Your Honor, we're

17    going to start with pathologist named Michael Baden.  I'm

18    expecting about -- I'm terrible at this, but I think about

19    30 minutes of direct.  And I've spoken to Government

20    counsel, I think no more than 30 minutes of cross.  So we're

21    looking at around 10:00 to end by him.  And then we have two

22    additional experts, a blood spatter expert, Paulette Sutton,

23    and a forensic accountant named Mitch Hoffman.  These are

24    both short witnesses.  I'm hoping that we can finish all

25    three by the lunch hour.

1            THE COURT:  Okay.

2            MR. MARKUS:  And then we're going to turn to

3    Dr. Rudolph after lunch and then we would rest, Your

4    Honor.

5            THE COURT:  All right.  All right.  Thank you.

6            MR. MARKUS:  Sure.

7            THE COURT:  Let me ask Mr. Dill to take the

8    lectern.  Can you update me on what your case is looking

9    like.

10           MR. DILL:  I think our case will be brief.

11   Probably just -- obviously I haven't made the final

12   decision, but I believe I can represent to the Court that

13   we'll just be calling Ms. Milliron's daughter, which should

14   be 5 to 10 minutes.

15           THE COURT:  That's it?

16           MR. DILL:  Yes, Your Honor.

17           THE COURT:  Okay.  Fine.

18           Mr. Fields, I understand you have something to

19   raise with me.

20           MR. FIELDS:  Thank you, Your Honor.  Yes.  It's

21   actually an issue that we raised very briefly in one of our

22   briefs, so if you'll recall in one of the motions *in limine*,

23   there was -- Mr. Dill moved to prevent any allegations of

24   healthcare fraud.  We responded by saying that we did not

25   plan to get into any allegations of healthcare fraud unless

1    the issue of the value of the business came up.  I've

2    discussed this with Mr. Markus extensively.

3            Today I expect they're going to have an accountant

4    take the stand to testify that the business was worth

5    approximately $5 million.  We don't think it was worth

6    $5 million.  In fact, some of the testimony was that

7    Dr. Rudolph would have been willing to sell it for

8    1.7 million.  And from our perspective there's a good reason

9    that he would want to sort of sell it for a lot less, and

10   that has to do with allegations of healthcare fraud in the

11   business.  Specifically multiple employees, some of whom

12   have already testified, but who didn't testify about this on

13   direct obviously, would be prepared to testify that the

14   business sort of routinely, while patients were under, would

15   drill holes in teeth, take x-rays, submit those to insurance

16   companies and then claim that these sort of drilled holes

17   were tooth decay and now the patient needs a root canal, or

18   that the business was sort of systematically overbilling for

19   root canals, doing unnecessary root canals, root canals on

20   teeth that were going to get crowned later, or that the

21   business was sort of intentionally not giving patients

22   fillings, that way the teeth would get worse and they would

23   need a root canal because that's where the money is.  All of

24   these allegations would go towards devaluing the business.

25           So I think there are a couple of ways to deal with

1      this.  One would be to just exclude that portion of the

2      expert's testimony under 403 because it's going to result in

3      sort of a trial within a trial over healthcare fraud.  The

4      other option would be to let me cross-examine --

5                  THE COURT:  Exclude what part of the expert's --

6                  MR. FIELDS:  So his valuation of the business at

7      $5 million.

8                  THE COURT:  All right.  Go ahead.

9                  MR. FIELDS:  The other option would be to let me

10     cross-examine the witness about the scope of his knowledge,

11     because my understanding is that the defense did not give

12     him those reports with the allegations of healthcare fraud.

13     I think if he had had those reports, he would have admitted

14     that that would go into valuation of the business.  And when

15     I cross the expert, I don't need to say, you know, these

16     allegations are true, it's just there are rumors; there are

17     witnesses who've said this, and that devalues a business.  I

18     mean, I'll use an extreme example, sort of Enron, right?

19     Before anyone knew there was an actual fraud, there were

20     certainly rumors of a lot of fraud and the stock price

21     starts, you know, going way down.  Rumors, allegations of

22     fraud, that affects the value of the business.

23                  And so that all goes towards this sort of, I guess,

24     sort of mini-skirmish here over whether or not Dr. Rudolph

25     needed $5 million in insurance proceeds because, you know,

1    he's so rich he doesn't need any more money.

2            There are other ways to sort of attack this

3    argument but fundamentally if the defense wants to put that

4    at issue, the valuation of the business, I think we should

5    be allowed to attack on cross and then potentially call back

6    several witnesses, several people at the business, who will

7    be able to testify to their percipient knowledge of fraud

8    going on.

9            We don't really want to do that, Your Honor, again,

10   because it's sort of a trial within a trial, but I raise it

11   for the Court's consideration.  So the two options would be

12   just exclude the testimony so we don't get into it, or let

13   me cross on these allegations of healthcare fraud.

14           THE COURT:  Well, the other alternative would be

15   for me to hold the Government to what was represented to me

16   previously and what I entered in my order.

17           MR. FIELDS:  Just to be clear, Your Honor, I think

18   our representation was that we wouldn't raise it on direct,

19   which we did not.  But we very explicitly said in our filing

20   that if the issue came up, that issue of the business, that

21   we would seek to rebut it, and that's exactly the situation

22   we're in now.

23           THE COURT:  Let me hear from defense counsel.

24           MR. MARKUS:  Your Honor, you're right.  The

25   prosecutor gave you two options, but there's a third which

1    is:  Don't let him cross on rumors and innuendo, and that's

2    the appropriate resolution here.  We're going to call a

3    accountant to talk about how valuation of business is done,

4    and what the value of the business is, because the

5    Government has raised in its opening that Dr. Rudolph needed

6    the insurance money, which he clearly did not.

7         To let them cross on rumors is, I think, under 401

8    and 403, and even 404(b), not permissible, Your Honor.  This

9    is -- they're trying to bring in another bad act without

10   even any proof of it.  So I think the Government is right

11   that if they raise this allegation of a rumor on cross, it

12   will lead to a mini trial because then we will need to prove

13   there was no fraud.

14        So I would ask the Court to exclude any

15   cross-examination on rumors or allegations that have no

16   backing and that there's been no testimony of in this trial.

17        THE COURT:  Rumors and allegations regarding

18   Medicare fraud specifically?

19        MR. MARKUS:  Correct, Your Honor.

20        THE COURT:  All right.  Mr. Dill, do you wish to be

21   heard on this?

22        MR. DILL:  Just briefly, Your Honor.

23        THE COURT:  All right.

24        MR. DILL:  Again, Your Honor, I guess the danger

25   becomes they have heard testimony from Ms. Grimley, for

1    instance, about cash and that type of thing, about my

2    client.  Obviously we have not raised net worth of the

3    business in any way, so the concern would be any splash-over

4    as to my client just by the questioning about quote-unquote

5    rumors.

6         I would agree my counsel did the best --

7    co-counsel, the best method would be to exclude rumors

8    altogether.  There's no substantiation of any of this.

9         THE COURT:  All right.  I'm going to go with the

10   defendants on this issue.  Let me just put on the record

11   that had the Government not represented in its briefing that

12   it was not going to raise this issue on direct, I would have

13   granted the motion *in limine* in the first instance.  Not

14   only would this get us into a protracted trial within a

15   trial on the penultimate day of the trial, I have serious

16   concerns about going into this with the arrows in the

17   Government's quiver being rumors and speculation.

18        I mean, had there been some kind of administrative

19   finding by a Department of Human Services or some kind of

20   criminal judgment, something concrete, I would be seriously

21   thinking otherwise.  I have concerns about the potential for

22   this being indeed 404(b) testimony and have concerns under

23   403 as well.

24        So for all of those reasons, the Government will be

25   precluded from raising the issue of Medicare fraud on

2494

                          DIRECT - BADEN

 1    cross-examination.

 2              Let's bring in the jury.

 3         (In open court in the presence of the jury at

 4    9:00 a.m.)

 5              THE COURT:  Good morning, ladies and gentlemen of

 6    the jury.

 7              THE JURORS:  Good morning.

 8              THE COURT:  Welcome back to day 12 of our jury

 9    trial.  All right, Defendant Rudolph may call his next

10    witness.

11              MR. MARKUS:  Thank you, Your Honor.  We call

12    Dr. Michael Baden.

13              COURTROOM DEPUTY:  Raise your right hand for me.

14              MICHAEL BADEN, DEFENSE WITNESS, SWORN

15              COURTROOM DEPUTY:  Thank you.  Please be seated and

16    remove your mask for us.  State your full name for the

17    record and spell your first and last name for us.

18              THE WITNESS:  Michael -- Michael Meyer Baden,

19    B-a-d-e-n.  M-i-c-h-a-e-l.

20                          DIRECT EXAMINATION

21    BY MR. MARKUS:

22    Q.   Good morning, Dr. Baden.

23    A.   Good morning.

24    Q.   Good morning, ladies and gentlemen, counsel, Your

25    Honor.

2495
DIRECT - BADEN

1    A.    I'm sorry.

2    Q.    You're good.  You're good.

3    A.    Thank you.

4    Q.    So let me start by wishing you a happy 88th birthday.

5          THE COURT:   Wow.

6    BY MR. MARKUS:

7    Q.    I'm sure this is not the way you wanted to spend your

8    88th birthday.

9    A.    And I usually think of myself as a little younger.

10   Thank you.

11   Q.    We all do.

12   A.    Thank you.

13   Q.    Now we heard from Mr. Haag yesterday.  He's been doing

14   his job for 53 years.  You have a couple of years on him.

15   A.    I do.

16   Q.    Yeah.  What do you do for a living?

17   A.    I'm a physician, federal -- a forensic pathologist.

18   Q.    And let's back up all the way to the beginning.  Where

19   did you get your education?

20   A.    I received a bachelor of sciences degree from the City

21   College of New York, a medical degree from NYU Medical

22   School in New York City.  I was then intern, resident, chief

23   resident, and -- first in internal medicine, then in

24   pathology at Belleview Hospital Medical Center in New York

25   City.

DIRECT - BADEN

1          While a resident doctor at Belleview, I had a

2    moonlighting job with the medical examiner's office in

3    New York City, going to scenes of death and doing autopsies

4    on weekends and things.  And in -- when I finished my

5    residency program, I became a full-time medical examiner for

6    the City of New York.

7    Q.   And as a medical examiner for the City of New York

8    you've probably seen it all, no?

9    A.   Well, we have a complete population.

10   Q.   Are you board certified in anything?

11   A.   Yes.  I'm board certified in three areas of pathology:

12   Anatomic pathology, which has to do with the anatomy of the

13   body; clinical pathology, which has much to do with the

14   chemistry of the body; and forensic pathology, which has to

15   do with unnatural conditions that affect the body:  injuries

16   and deaths.

17   Q.   Now, Dr. Baden, over the course of your career -- bless

18   you -- after the course of your career, how many autopsies

19   have you, yourself, conducted?

20   A.   Well, in the course of my career, more than 20,000

21   autopsies.

22   Q.   Okay.  And have you taught pathology, how to do

23   autopsies, and those types of things?

24   A.   Yes.

25   Q.   Have you been a teacher --

2497

DIRECT - BADEN

1    A.    I've been a professor or adjunct professor at a number

2    of medical schools.  New York Law School, John Jay School of

3    Criminal Justice, and NYU Columbia and Albert Einstein

4    School of Medicine.

5    Q.    Have you been a consultant to the FBI, ATF, and the

6    Department of Justice?

7    A.    Yes.

8    Q.    Okay.  Have you been hired by prosecutors to examine

9    cases and examine autopsy reports?

10   A.    Yes.

11   Q.    And have you been hired by prosecutors to do autopsies?

12   A.    Yes.

13   Q.    Have you actually been in this building before?

14   A.    Yes.

15   Q.    Tell us and the jury about that.

16   A.    In 2007 I testified in this building for the Government

17   in a murder case against an inmate who killed another inmate

18   in the Florence Maximum Prison in Denver, and I was a -- the

19   forensic pathology witness for the Government.

20   Q.    Okay.  So you've been on both sides, defense and

21   Government, correct?

22   A.    Yes.

23   Q.    Okay.  Were you the chairman of the forensic pathology

24   panel on the committee on the assassinations of John F.

25   Kennedy and Martin Luther King, Jr.?

DIRECT - BADEN

1   A.   Yes.  That was the end of 1977, '78, '79 when the House

2   of Representatives, U.S. Congress, reinvestigated the deaths

3   of President John F. Kennedy and Dr. Martin Luther King.

4   And I was the forensic path- -- chairman of the forensic

5   pathology unit of that department.

6   Q.   I'm not going to ask you who killed JFK.  We'll -- let

7   me  --

8   A.   We don't determine who did -- does the -- forensic

9   pathologists determine what happens:  cause of death, manner

10  of death, but not who done it.

11  Q.   Very good.  Have you written articles about how to do

12  autopsies and forensic pathology and the like?

13  A.   Yes.  I've had to -- about 80, 85 articles, and a few

14  books published on forensic pathology, aspects of forensic

15  pathology.

16  Q.   Okay, Dr. Baden.

17          MR. MARKUS:  At this time, Your Honor, under

18  Rule 702, I'd like to request to certify Dr. Baden as an

19  expert in forensic pathology, autopsies, crime scene

20  reconstruction, and cause and manner of death.

21          THE COURT:  Any objection?

22          MR. MARKUS:  How about I'll withdraw the crime

23  scene reconstruction if Bishop doesn't like that one.  We'll

24  do forensic pathology, autopsies, and cause and manner of

25  death.

2499
DIRECT - BADEN

1          THE COURT:  All right.

2          MR. GREWELL:  No objection, Your Honor.

3          THE COURT:  All right.  There being no objection,

4    Dr. Baden is qualified under Federal Rule of Evidence 702 to

5    provide expert opinion testimony in the field of forensic

6    pathology, autopsies, and cause and manner of death.

7          MR. MARKUS:  Thank you, Your Honor.

8          THE WITNESS:  Thank you.

9    BY MR. MARKUS:

10   Q.   Dr. Baden, I want to start with some questions about

11   autopsies.  When you conduct an autopsy, can you tell the

12   jury:  What are the most important things you do in terms of

13   documenting, taking pictures, and the like?

14   A.   Well, before we get to the autopsy, we have to get

15   information to whatever sources are available -- family or

16   police, neighbors -- of the death.  We examine the scene of

17   death to look for any evidence that might be important in

18   further exploring at the autopsy; medications, and other

19   things.

20          The -- we also take measurements of the body and --

21   that are appropriate to determine the time of death.  And

22   then when we do the autopsy, we first take photographs of

23   the body with the clothing on, if there's clothing; then

24   with the clothing off; and do an external examination and

25   internal examination.  Documenting everything that we see or

DIRECT - BADEN

1    find by dictation, by -- by creating an autopsy report.  The

2    purpose of which is so that others years later, weeks later,

3    months later, can review it and make their own decision as

4    to the cause and manner of death in legal proceedings of all

5    kinds.

6    Q.   So you mentioned a couple of things there that I'd like

7    to just break down for a second.  One is the autopsy report,

8    itself.  When you do an autopsy report, how important is it

9    to be accurate and detailed in what you write?

10   A.   That's what an autopsy consists of.  To the best

11   ability of the person doing the autopsy, dictating and

12   creating -- or writing, sometimes without dictating, a

13   complete examination as to the external and internal

14   findings that one makes a conclusion as to cause and manner

15   of death, but that permits others to make their own

16   independent conclusions.

17   Q.   Have you had an opportunity to review the autopsy

18   report in this case?

19   A.   I did.

20   Q.   Okay.  I'm going to put it on the screen now.  It's

21   Government Exhibit 35, which is INV 590.

22           And let's just take a look at it for a second with

23   the jury, Dr. Baden.

24           If we could zoom that in a little bit, Mr. Reyes.

25           And do you see this here -- this is Government

DIRECT - BADEN

1    Exhibit 35 -- the so-called autopsy report in this case?

2    A.    Yes.

3    Q.    Have you had an opportunity to review this,

4    Dr. Baden?

5    A.    Yes.

6    Q.    My first question to you is:  Would you even consider

7    this an autopsy report?

8    A.    No.

9    Q.    And can you explain to the jury why you wouldn't

10   consider this an autopsy report?

11   A.    An autopsy report has to include the description of the

12   decedent, with its -- externally and then internally.

13   There's no description, or very little.  It consists of

14   what's called -- what's been called an autopsy report

15   consists of 77 words, including the signature of the doctor.

16   And --

17   Q.    Excuse me one second, Dr. Baden.  One of the jurors has

18   an issue.  Can -- it's not showing up there?  Okay.  One

19   second while they get the screens working, Dr. Baden.  Thank

20   you.

21        (Pause)

22            MR. MARKUS:  She's a magician.  Thank you,

23   Ms. Guerra.

24            COURTROOM DEPUTY:  You're welcome.

25            MR. MARKUS:  Thank you, ladies and gentlemen.

DIRECT - BADEN

1    BY MR. MARKUS:

2    Q.    Okay, Dr. Baden, we're back to the report.  Do you see

3    the two-page report there?

4    A.    Yes.

5    Q.    And you were explaining to the jury why this doesn't

6    satisfy you as an autopsy report.

7    A.    Yes.  On the left side of each page is a list of the --

8    of organs.  The description is on the right side.  But the

9    right side, as I say, is 77 words.  It doesn't describe

10   anything.  It -- and especially the victim here was shot

11   with 15 buckshot, .32 -- equivalent of .32 caliber bullets.

12   An autopsy has to trace each bullet track.  There's no

13   mention except -- except the very last notation at the

14   bottom of the cause of death, it says, "gunshot injury."

15   But everybody knew that before the incision was made.

16         The autopsy -- the document here doesn't add

17   anything to what police and investigators knew, that she'd

18   been shot with buckshot in the left chest, and would have

19   known that information even without the procedure that was

20   accomplished here.

21         So what I would answer your original question, it

22   looks externally like it's an autopsy, but it really doesn't

23   contain any information that is supposed to be listed and

24   examined.  And normally there would be -- the autopsy in

25   this case would be thousands of words with many photographs

DIRECT - BADEN

1    taken before and during the autopsy.  The only photographs

2    taken in this instance were after the autopsy was completed

3    and the body was -- the incision was sewn together without

4    any examination or -- or documentation with what the heart

5    looked like -- I mean, saying here that the heart was

6    macerated is not a pathological term.  The heart would have

7    bullets going through the heart and bullets make

8    transections through the skin, through the heart, through

9    the lungs.  Each one not only to be described, but each

10   bullet -- each pellet to be removed.

11   Q.    And let me stop you there, Doc.  Why is it so important

12   to trace the pellets and to remove them?  Can you explain

13   that to the jury.

14   A.    Yeah.  The -- the track tells you the directions that

15   the discharge went inside the body.  You can't tell from the

16   outside -- from the outside perforation on the left side of

17   the chest what direction it's going:  up, down or sideways.

18   And each track -- this goes for every gunshot-wound death --

19   has to be traced to show the direction, which may or may not

20   be important in later investigation.  But what is important

21   is to remove every bullet.

22          The bullet that's -- or the pellet that's left

23   behind might come from a different weapon.  Now, even though

24   we have police who come and say, "We saw this and that," and

25   we do an autopsy and occasionally one of the bullets came

2504

DIRECT - BADEN

1    from another shooter at the same time, and the medic -- the

2    person doing the autopsy can't just adopt what he or she is

3    told.  If that's all that's going to happen, then you don't

4    need an autopsy.

5         And I think in this instance, tracking each of the

6    bullet tracks through the heart, through the lung, go --

7    whether it goes up or down or going in different directions,

8    because they bump into each other as they go through the

9    skin, would be what's -- be considered to be necessary in

10   the autopsy.  Plus, plus, the description of the clothing,

11   of the brassiere, of the blouse, which tells a lot about the

12   discharge of a shotgun.  The powders and the material that

13   come out of the muzzle often are filtered out by the

14   clothing.

15   Q.   And let me ask you to go back to tracing the pellets.

16   One of the issues in this case is the angle of the shot.

17   Can you tell from this autopsy report anything at all about

18   angle of entry?

19   A.   We can tell the place of entry, the left chest area,

20   but not the angle, no.

21   Q.   Okay.  Now we heard that there were no pictures taken

22   at the time.  And you've discussed that a little bit.  What

23   about x-rays?  Is x-ray -- are x-rays something that you do

24   during an autopsy?

25   A.   Yeah.  X-rays should always be taken, especially in

2505

DIRECT - BADEN

1    shotgun wounds, to show where all the pellets are before an

2    incision is made, because as we make incisions and do

3    dissection, it can change the place of where pellets or

4    bullets landed.

5            And the x-ray is not only valuable for the medical

6    examiner to know what to look for, how many pellets there

7    are or how many bullets there are, and where they are, but

8    also they are very good documents, black-and-white

9    documents, that can be preserved for all the other parties

10   that may be concerned to document what happened, where the

11   pellets were, and that have to even rely on totally on just

12   the autopsy report.

13   Q.   So the doctor that did this autopsy report, his name is

14   Dr. Maswahu.  He said the autopsy took him about 25 minutes.

15   Let me ask you, if you were doing this autopsy, how long

16   would it have taken you to do this autopsy?

17   A.   No autopsy can be done in 25 minutes.  Just removing

18   the skull to look at the brain takes 20 minutes to 25

19   minutes to do it carefully without destroying the brain.

20           No -- so No. 1, it does -- 25 minutes would be

21   indicative that he made the incision -- a single incision

22   from the neck to the pubic area, that we could see in this

23   sutured post-mortem x-ray.  I can also see that he did some

24   dissection of the -- of the bullet perfor- -- or the shotgun

25   perforation for reasons I can't understand.  He removed some

DIRECT - BADEN

1     of the edges of the shotgun pellets that went through the

2     skin.   The way a bullet or pellets go through the skin

3     becomes important because they leave abrasions -- they rub

4     against the skin and leave abrasion marks around the

5     entrance wound that can be important in evaluating the path

6     of the pellets.

7              These were removed and that's -- that's all I could

8     see that was done.  He may have looked at the -- at the

9     internal organs.  He may have flayed the outside of the skin

10    to be able to look at the ribs and perhaps the heart and

11    lung, which, itself, distorts the appearance of the gunshot

12    perforation and the ability to determine how widely spread

13    the pellets were going through, which has to do with

14    distances of the muzzle from the skin.

15    Q.   So how long would it have taken you to do the autopsy

16    in this case?

17    A.   15 -- this autopsy, essentially 15 .32-caliber bullet

18    wounds, for the forensic pathologist.  This would have

19    taken -- it's an all-day procedure.  It would take five, six

20    hours to do everything and to take x-rays, to photograph, to

21    look at the clothing.

22             It's -- it would be a -- if a person is shot once

23    or twice, a certain amount of time there, this would take 15

24    times more than just an ordinary single gunshot wound which

25    itself would take a couple of hours --

DIRECT - BADEN

1    Q.    So --

2    A.    -- for a single gunshot.

3    Q.    And one of the things that the autopsy guy said in this

4    case is that he stuck a ruler through the wound.  Is that a

5    normal procedure?  Is that something you would do?

6    A.    That -- that's forbidden procedure because --

7    Q.    Forbidden, is that what you said?

8    A.    Forbidden.

9    Q.    Got it.

10   A.    Because the probe has to put -- to put a probe through,

11   it has to have some strength.  It's usually a metal probe

12   that we could have with our autopsy material.  But there's a

13   danger of creating additional tracks with the probe.  It was

14   discovered and written up a lot in earlier days:  When

15   probes are inserted they'll often make an additional pathway

16   that's further confusing because the probes are inserted

17   sight unseen.  The probe is inserted without any feeling for

18   it.  It's while the skin is still intact.

19        So although the idea of a probe might be

20   interesting, probes shouldn't be done because they only

21   confuse what the traject- -- the pathway of the bullet is.

22   Q.    Now one of the things that the -- Dr. Maswahu said in

23   this case -- if you see here on the autopsy where I'm

24   highlighting on the screen -- he said the blast defect was

25   in the seventh, eighth, and ninth ribs.  And he also said

DIRECT - BADEN

1    that he could see the blast defect in the seventh, eighth,

2    and ninth ribs just by looking into the wound itself.

3            Doc, let me ask you:  Is it possible to see the

4    seventh, eighth, and ninth ribs just by looking through a

5    wound like that?

6    A.    No.  No.  That's not possible to look into a wound.

7    All you'd see is bloody material.  What he may have meant is

8    that after making the incision and separating the margins of

9    skin, he looked in and saw the fractures, but that takes

10   time.  Remember, there's muscle, there's fatty tissue around

11   the ribs.  To be able to see a fracture itself would take

12   half an hour to remove the normal tissue around the ribs to

13   find the fracture, and to see if there's any blood around

14   it.  There are -- and to make sure you're not describing an

15   old fracture.

16           An old fracture will have callus around it.  A new

17   fracture would have blood around it.  But in order to do

18   that, to make that observation, it takes time.  It can't be

19   done in 25 minutes

20   Q.    So what ribs are -- is the heart behind?

21   A.    It's around the third, fourth ribs, on the left

22   chest.

23   Q.    If the shot was at a 90-degree angle, would the third

24   and fourth ribs be hit by those bullets?

25   A.    No.  The -- the heart is an inch -- an inch or two

DIRECT - BADEN

1    below the skin.  I mean, there's a heart, there's muscle,

2    there are ribs -- I mean, there's skin, muscle, ribs, and

3    heart.  A blast -- a blast of shotgun pellets coming in

4    would automatically fracture the ribs below it.  Those --

5    those ribs would be fractured, third, fourth ribs, fifth

6    rib, from the pellets coming in, even if some of them went

7    up or some of them went down.  But -- and that also would

8    take time to see.

9    Q.    Sure.

10   A.    They would have to still remove the skin and the muscle

11   from the rib in order to see the fractures and to evaluate

12   the fractures.  And all of these things should also have

13   photographs taken so that later on we don't have -- the

14   other people don't have to rely on what the person said.

15            Supposing I do an autopsy, I do everything, but I

16   don't take photographs.  Maybe I'm describing things

17   incorrectly and the other forensic pathologists on the other

18   side should be able to look at those same injuries and

19   decide for himself or herself --

20   Q.    And do you --

21   A.    -- whether that person agrees.

22   Q.    And do you see in the report here any discussion of the

23   third, fourth, and fifth ribs?

24   A.    No.

25   Q.    Okay.  One of the things --

                              DIRECT - BADEN

1    A.    Those are the one -- if you looked in, and magically

2    the blood and all would be taken away, those are the ones he

3    would see.

4    Q.    Sure.  Now one of the things that Dr. Maswahu said is

5    that he didn't have a official camera but that he had a cell

6    phone that could take pictures.  Would the cell phone

7    pictures be better than nothing?

8    A.    Oh, No. 1 --

9          MR. GREWELL:  Objection, Your Honor.  I don't

10   believe Dr. Maswahu testified to that.

11         THE COURT:  I don't recall that testimony.

12   BY MR. MARKUS:

13   Q.    Would it be fair to say that cell phones from 2016 have

14   cameras in them?

15   A.    Are you asking me?

16   Q.    I'll pass on it, Doc.  It's okay.

17   A.    That much I know.

18   Q.    Okay.  I'll pass on that.

19         Let me ask you this -- actually, maybe this is a

20   good time to turn to the post-autopsy pictures.

21         MR. MARKUS:  Your Honor, this is just a short

22   warning for those in the audience that I'm going to show a

23   post-autopsy picture right now.

24         THE COURT:  All right.  Thank you for the notice.

25   BY MR. MARKUS:

DIRECT - BADEN

1   Q.    And I'll try to be brief with this, Dr. Baden.

2          I'd like to call up Government Exhibit 17, page 4.

3   17-4.

4          Now, Doc, can you tell us what we're looking at in

5   this picture?

6   A.    Yes.   There -- that is the torso of Mrs. Rudolph, which

7   shows a line going from 12 noon to about 5:00.   That line is

8   the after-autopsy sutures, stitching up, of the skin after

9   the examination, the autopsy, was completed.   So that's --

10  Q.    Let me stop you there.   Would that incision affect the

11  size of the wound?

12  A.    Yeah.   Yes, it would affect the shape of the wound.

13  The -- the incision wouldn't, but the dissection along --

14  under the incision to be able to peel the skin back and to

15  look at the underlying ribs and heart and lung would all

16  change the shape of the -- of the wound of entry.

17         The wound entrance is in the left upper part of the

18  left breast.   The surrounding discoloration is partially due

19  to decomposition changes after this was done.

20  Q.    And let me stop you there.   Does decomposition affect

21  the size of the wound?

22  A.    Not the size, but the shape -- but the color of the

23  wound.   The color of the wound.

24  Q.    Okay.

25  A.    And then in all photographs taken in an autopsy, there

DIRECT - BADEN

1    should be some measuring device, a ruler present to be able

2    to know the size.  In this country, we use inches; in other

3    countries, they use the metric system.  But there's always a

4    ruler present, usually at the margins so it doesn't

5    interfere with the photograph, to measure whatever is being

6    photographed.

7    Q.    Now this picture and the others are from a couple days

8    after Mrs. Rudolph died.  When you look at the wound there,

9    the main wound, what do you notice about the edges?

10   A.    The edges are -- are sharp and not abraded; they're not

11   rubbed.  The edges aren't rubbed by the entering pellets.

12   On the -- let's see, the left -- the right side, the right

13   side nearest to the incision -- sutured incision, one could

14   see a straight line.  That's caused by a scalpel cutting

15   into that tissue --

16   Q.    Let me stop you, Doc.  There's a little stylus on the

17   screen there.  You can take it and draw on the screen itself

18   to show the jury what you're talking about.  If you look on

19   the screen to the right, there's a little pen there.  Do you

20   see it?

21   A.    Thank you.

22   Q.    Sure.  Can you show us where the sharp is.  There you

23   go.  And what was that sharp edge caused by?

24   A.    By a scalpel cut, not by -- not by the pellets going

25   through.  The pellets going through would create a circular

DIRECT - BADEN

1   defect with an abrasion collar or abrasion ring around it.

2   There's another photograph that shows it even more clearly.

3   But there's also, on the left side, similarly, a straight

4   mark.  It's hard to evaluate the upper margin because

5   there's still some bloody fluid present there that obscures

6   the edges.

7        But there's another photograph just like -- taken

8   at the same time that -- where that's been wiped away and it

9   shows that the top part of that wound could also be

10  straight.

11  Q.   So let's go to 17-5.

12       Is that the photo?

13  A.   Yes.  This would be the upper one.  And that's a

14  straight line.  So for whatever reason, the doctor cut

15  around the wound which destroys the abrasion collar and also

16  enlarges the wound, and the measurements were then taken two

17  days -- the photographs were then taken two days later in

18  this fashion.

19       So one cannot tell the -- to answer your question,

20  there's some viscera, which looks like it could be

21  intestinal loops, that are bulging through the -- the

22  defect, the entrance wound.  And that's because when he made

23  the -- the incision, straight incision, and tease back the

24  chest wall to be able to look at the ribs and whatever, some

25  intestinal material from the abdomen would have become

2514

DIRECT - BADEN

1    bloated with three days -- bloated and expanded to -- into

2    the chest area postmortem, after death.  And we're seeing

3    some of that now coming up because of the postmortem

4    creation of gas by the bacteria that are there.  And that's

5    what makes it look -- it didn't look that way when she

6    passed away.

7    Q.    So from these pictures that we have, is there anything

8    that you could tell the jury, or is it impossible to tell

9    the jury, the size of the wound before the autopsy was done?

10   A.    No.

11   Q.    Is it fair to say that the wound was smaller than what

12   we're seeing here at the time the autopsy was done?

13   A.    That's correct.

14   Q.    Okay.  Can we tell anything about angle of entry from

15   the pictures that we have here?

16   A.    No.  This is -- there's no internal description and --

17   of the organs or the pathway or removal of any of the

18   pellets, so I can't tell which way the pellets went.

19   Q.    Okay.  The other pictures that I want to show you,

20   we're going to look at a couple more pictures.  These are

21   pictures where witnesses have put little dots around where

22   they said they saw pellet entries.  I'm going to show you

23   those pictures.  They're in as 17-1 and 17-2 and I would

24   like for you to tell the jury if these are pellet entry

25   wounds or not.  Let me show you first --

DIRECT - BADEN

1          COURTROOM DEPUTY:  Mr. Markus, if you'll press that

2     little button for me.

3     BY MR. MARKUS:

4     Q.    I know these aren't as clear as the photos I was just

5     showing to you, but do you see where those little red dots

6     are?

7     A.    Yes.

8     Q.    In your examination of the post-autopsy pictures, would

9     you describe where these red dots are as separate pellet

10    entries?

11    A.    No.  No.  No. 1, I've not seen this photograph before.

12    I've seen the photograph, but not with the red dots on it.

13    Q.    Right.

14    A.    And there are no pellet entries around the perforation,

15    and no pellet mark -- pellet marks, you know, not entries,

16    but impact sites and no impacts of any of the granular

17    filler material that came out with the muzzle on the

18    photographs that I've seen of those areas without the red

19    dots on them.

20    Q.    Let me show you -- this is another witness that made

21    these red dots.  Are those red dots pellet marks --

22    A.    You know, some of the -- as I recall, some of them are

23    just normal skin -- skin -- skin freckles; freckle kinds of

24    normal lesions.  In this -- in this photograph, actually,

25    one can see up -- I'll make a mark here, about here -- where

DIRECT - BADEN

1    there are a lot of these little brown marks, which are

2    normal discoloration -- normal skin discolorations,

3    especially as we get older.

4           And that, as I recall, the -- many of those smaller

5    red dot marks would be on those kind of flat-surface

6    discolorations.  Not indented.  And are more in the freckle

7    family than in any kind of trauma.

8    Q.   Thank you, Doctor.  Yesterday we heard from Mr. Haag

9    that the -- that the patterning with the gun that the

10   Government did was unpredictable and unreliable.  I want to

11   ask you:  The post-autopsy photos and the autopsy report

12   itself, is that something that we can rely on to determine

13   size of the wound or angle of the wound?

14   A.   No.  I mean, he does have a measurement as to size,

15   which I don't think is accurate because it measures

16   6 centimeters in the photographs, but -- which he says it

17   was, but it was smaller than that because some of the

18   margins, A, have been removed, dissected away; and, two, the

19   photos are taken when there's -- decomposition has already

20   set in, creating gases, even, and expanding the skin.  The

21   skin gets bloated.

22          That skin has gas in it that -- together with the

23   gas in the intestines that are pushing against it.  So that,

24   A, we can't tell angle, there's nothing in the autopsy to

25   describe an angle; but that the measurement, itself, I feel

DIRECT - BADEN

1    is bigger than the actual wound was.

2    Q.    Okay.  Now when you're writing an autopsy report, do

3    you list manner of death on the autopsy report?

4    A.    Yes.  It -- as a medical examiner, we list cause and

5    manner of death.  In the coroner system -- in the coroner

6    system, which we have in the United States, coroner -- half

7    the United States the -- the deaths are investigated by

8    coroners and half by medical examiners.  In the coroner's --

9    which we inherited from England.

10         In the coroner system, the doctor does the autopsy

11   and then the coroner will determine the cause of death.  The

12   coroner may or may not be a doctor, but -- and/or may be a

13   funeral -- most coroners are funeral directors in this

14   country because coroners are elected.  But if --

15   Q.    Let me ask you this:  What are the five different

16   manners of death that, as a medical doctor, you could write

17   on an autopsy report?

18   A.    Yeah.  The coroner can also.

19   Q.    Okay.

20   A.    Natural, number 92 percent deaths' natural.  Accident,

21   suicide, homicide, and if we can't fit it into any one,

22   sometimes undetermined.  Those are the five manners of death

23   for medical examiners and for coroners.

24   Q.    And what percentage of cases would you say are

25   undetermined or undecided?

2518

**CROSS - BADEN**

1    A.    It -- naturally it comes down to 1 or 2 percent.  Often

2    they are like skeletal remains that are found in the woods

3    and nobody can identify who the person is or what happened,

4    so the cause of death may be listed as undetermined.  But

5    usually when full autopsies are done, less than 1 percent

6    would there be undetermined.

7    Q.    And in this case, based on all the information you've

8    looked at, the pictures, the reports, everything you've

9    looked at, Dr. Baden, what would you say is the manner of

10   death in this case?

11   A.    I would -- I would say that there isn't enough to --

12   well, I could exclude things.  Of the five, it's not

13   natural; it's not self- -- it's not suicide.  I can't

14   distinguish homicide from accident on the basis of the

15   material that I've had to review.

16   Q.    So would you mark it as undecided or undetermined?

17   A.    I would put undetermined, yes.

18   Q.    Thank you, Doctor.  No further questions.

19            THE COURT:  Cross-examination.

20                        CROSS-EXAMINATION

21   BY MR. GREWELL:

22   Q.    Good morning, Dr. Baden.

23   A.    Good morning, sir.

24   Q.    May I wish you a happy birthday as well.

25   A.    Thank you.

CROSS - BADEN

1    Q.    Honor to be here with you on your birthday.

2            So you mentioned you've done 20,000-some autopsies

3    in your life.  When was the first one that you did?

4    A.    First one?

5    Q.    Yeah.

6    A.    In 1960.

7    Q.    And when was the last time that you personally

8    conducted an autopsy?

9    A.    About a week ago.

10   Q.    Okay.  What kind of autopsy was that?

11   A.    It was an exhumation of a death that was -- for cause

12   of death -- that the cause of death hadn't been

13   determined.

14   Q.    So were you doing the cutting in that case, then?

15   A.    I was doing the dissection, yes.

16   Q.    Have you ever done an autopsy in Africa?

17   A.    Yes.

18   Q.    Have you ever done one in Zambia?

19   A.    I've done one in -- next door in Zimbabwe.  I was in

20   Zimbabwe.  Did five autopsies for the Justice Department on

21   a doctor who poisoned people.  But not in Zambia, but I did

22   in Zimbabwe.

23   Q.    Are you aware of what autopsy reports in Zambia look

24   like?

25   A.    Not fully.  I've -- no, I don't see -- I'm not familiar

CROSS - BADEN

1    with Zambia autopsies.

2    Q.    Okay.  You mentioned, I believe earlier, a little bit

3    of your -- you have a number of peer-reviewed publications,

4    correct?

5    A.    Yes.

6    Q.    When was the last time you had a peer reviewed

7    publication?

8    A.    I think last year.

9    Q.    What journal --

10   A.    Concerning the death of Medgar Evers that was published

11   in a surgical journal.

12   Q.    Is it correct that the majority of your publications

13   have been -- the majority of your peer-reviewed publications

14   have been related to drugs and alcohol?

15   A.    Yes.  Yes.

16   Q.    When was the last time you had a peer-reviewed

17   publication about shotgun injuries?

18   A.    I haven't really published papers on gunshot

19   injuries -- tracking injuries?

20   Q.    Any peer-reviewed publication about shotgun injuries.

21   A.    No, I have not done -- issued research articles on

22   tracking injuries.

23   Q.    Am I correct that, for your report in this case, you

24   relied on a treatise for some of your conclusions?

25   A.    I referred to the Dr. DiMaio's book, who used to work

CROSS - BADEN

1    as a student at -- I supervised in autopsies, but he --

2    excellent book.  I did refer to his article on gunshot -- on

3    shotgun wounds.

4    Q.    So would it be the chapter in this book, Gunshot

5    Wounds --

6    A.    Yes.

7    Q.    -- edition?

8    A.    Yes.  Yes.

9    Q.    Your report seemed a little bit critical of Dr. Maswahu

10   for not visiting the scene; is that correct?

11   A.    I -- I think I was critical in that -- of many things.

12   That -- the photographs, I think I mentioned -- I don't know

13   if I mentioned scene.  I wouldn't have expected him to visit

14   the scene, but he should have consulted -- or had somebody

15   who could have visited the scene.

16        Let's see.  If you could -- I don't recall.  But

17   he -- I think I mentioned that he didn't visit the scene,

18   not that he had to visit the scene, because that may not

19   have been part of his job in Zambia.  Just that the scene

20   wasn't visited, the clothing wasn't looked at.  He may have

21   had nothing to do with the removal of the clothing, for

22   example.

23        So I wasn't criticizing him for those lapses

24   because, as you suggest, in Zambia, that may all be done by

25   the police, or not.

**CROSS - BADEN**

1    Q.    And so if in Zambia they -- the people doing autopsies

2    only do cause of death, not manner of death, it wouldn't

3    surprise you for him not to visit the scene?

4    A.    Well, he may not have been able to, but he has to know

5    about the scene.  You know, he has to have information.  In

6    his report -- in his report, he -- if I may look at the --

7    that autopsy -- he determines the cause of death; he doesn't

8    indicate the manner of death.

9         But when he's asked about it, I think when he's --

10   when the FBI discussed it with him, he says in the interview

11   that he couldn't exclude accident because he does that in

12   collaboration with the police.  So the way he worded his

13   statement was he didn't think it was homicide or suicide,

14   and he couldn't exclude accident.  And then when he

15   discussed it with the FBI, his opinion is that it is a

16   suicide.

17   Q.    Do you do a full autopsy in every case?  You mentioned

18   full autopsies versus --

19   A.    Yeah, in -- almost always, 95 percent.  Sometimes when

20   the families are concerned about the head examination, if

21   it's not a critical aspect of the case, there's no gunshot

22   wound there, we may not do the brain examination, and that

23   would not be a full autopsy.

24        But that -- apparently it sounds like Dr. Maswahu

25   did have the brain cut -- the brain was cut because he

CROSS - BADEN

1   describes -- he says the brain was normal.  But I -- I

2   don't -- I don't include that as part of -- that doesn't

3   make it a full autopsy.

4   Q.   If there's no dispute about the manner of death in a

5   case, would you do a full autopsy?

6   A.   Yes.  Yes.  I mean, when medical examiners do

7   autopsies, 95 percent of the autopsy, 90 percent, would be

8   complete autopsies.  Whatever the reason we're doing the

9   autopsy, documenting what all of the organs look -- look

10   like, have any injury or have any disease, have any

11   arteriosclerosis may be part of the autopsy report.

12          So the brain is looked at, even if the person's

13   found sleeping in bed, even if there's no evidence of an

14   injury, the forensic -- medical examiner would do it.  So

15   would a hospital pathologist do full autopsies.

16   Q.   So --

17   A.   Normally.  Normally.

18   Q.   So do we do an autopsy every time someone dies?

19   A.   Pardon me?

20   Q.   Do we do an autopsy every time someone dies?

21   A.   Oh, no, no, no.

22   Q.   Why not?

23   A.   Autopsies in the United States have to be -- the

24   majority of autopsies have to be consented to by family

25   members.  So that -- there are two places that autopsies are

CROSS - BADEN

1    done.  When people die in hospitals and then all hospital

2    autopsies can only be done on natural deaths and have to be

3    consented to by the family.

4         The forensic pathologists, the medical examiners,

5    get involved when the death is thought to be -- might be not

6    natural.  Natural deaths, cancers, heart disease,

7    Alzheimer's:  the job of hospital pathologists.  Accidents

8    at home, suicide, drug overdoses:  forensic pathologists.

9         So when a case is reported to us that may involve

10   not natural cause of death, then we have to do -- we do a

11   complete autopsy.  If we think that, from all the

12   information available, the person died of a natural disease,

13   because when people die outside of hospitals they are often

14   reported to medical examiner's office.  They don't know

15   natural or unnatural.

16        And if we -- medical examiner determines from past

17   history, from doctors, from family, that the person had

18   severe heart disease and that the circumstances indicate

19   that's a natural death, then an autopsy is often not done.

20   But if there's any concern of -- by police or family that

21   the person may have been poisoned or ill-treated in a prison

22   or in a hospital, then we would do a complete autopsy.

23   Q.   And you stated, I think a little earlier, that you've

24   never done one in Zambia, correct?

25   A.   I'm sorry?

CROSS - BADEN

1    Q.    You've never done an autopsy in Zambia, correct?  You

2    stated that just a little bit ago?

3    A.    I'm sorry, I --

4    Q.    Never done an autopsy in Zambia.

5    A.    That's correct.

6    Q.    And so you don't know whether it might be reasonable in

7    Zambia for a medical person doing an autopsy who's been told

8    by the police, "This is an accident," not to do a full-day

9    autopsy?

10   A.    That may be the technique -- the procedure in Zambia.

11   And if it is -- if it is the procedure, you can't call it an

12   autopsy.  You can say it's a partial examination or external

13   examination, but to call it an autopsy -- I've

14   done autopsies in a couple of dozen countries around the

15   world -- Russia, Canada, Arab countries -- and any -- and

16   the doctors in all those countries that are pathologists,

17   and anybody who does an autopsy, follows the rules of

18   where -- an autopsy is universal.  It was developed in

19   Germany.  It was spread in England.  It came to the United

20   States.

21         So that autopsies, in all countries, are done

22   similarly.  And the only difference between an African, say

23   Zimbabwe, autopsies and the American is they make a single

24   incision from the throat to the pelvis, as was done here,

25   whereas the United States, we usually make a Y-shaped

2526

CROSS - BADEN

1   incision to get a better look at the heart and lungs and

2   all.

3           So otherwise, the investigation, examination of the

4   organs, examination of bullets, are the same in all

5   countries that I'm familiar with.

6   Q.   Would you agree with -- you sat in on Mr. Haag's

7   testimony --

8   A.   I did, thank you.

9   Q.   Would you agree with him that the photographs that we

10  see in Exhibit 17 are of poor quality?

11  A.   The photographs?

12  Q.   The photographs in Exhibit 17, the ones you were -- of

13  the post-autopsy photos, would you agree they are --

14  A.   The ones I just looked at?

15  Q.   Yeah.  Would you agree those are poor quality?

16  A.   Yes.

17  Q.   So would you also agree, then, that the best evidence

18  in this case of the wound size would actually be

19  Dr. Maswahu's measurements before the photographs were

20  taken?

21  A.   Yeah, but -- even when the best autopsy -- even when --

22  I've done an autopsy, I've done the best I can, I

23  photographed it.  Another person may look at the same

24  photographs and have a different opinion.  And I -- I hate

25  to say this, but forensic pathologists are not infallible.

2527

CROSS - BADEN

1    We make mistakes.  And -- and that's always better to have a

2    second opinion.  Surgeons do.  You know, they want to get

3    the operation -- abdominal operation's always best to get a

4    second opinion just to make sure that is -- same thing with

5    medical examiners.  We do an autopsy.  I welcome a second

6    examination, second autopsy, a second review and opinion

7    and, hopefully, they will agree, but they don't always

8    agree.

9           So that, in this instance, you can't say that a

10   25-minute examination of the body is a full autopsy.

11   That -- that's -- so I -- I'm not -- unfortunately, I'm not

12   impressed with the way Dr. -- the doctor uses his terms.  He

13   addresses this as an autopsy, but -- but it isn't.  And it

14   doesn't include the type of examination that would make it

15   an autopsy.

16   Q.   Are you aware that he actually testified it was 45

17   minutes, not 25 minutes?

18   A.   No, I --

19           MR. MARKUS:  Objection, Your Honor --

20           THE COURT:  One second, Doctor.  What?

21           MR. MARKUS:  Objection, Your Honor.  That was not

22   the testimony.

23           THE COURT:  Actually, I don't recall that, but

24   hopefully one or more of the members of the jury do, and

25   they'll take that into consideration.  Next question.

CROSS - BADEN

1    BY MR. GREWELL:

2    Q.   If I could go back to the question before this one,

3    just so I can get an answer.  All right.

4         Would you agree that the best evidence of the size

5    of the wound is the measurement that was taken before the

6    autopsy was conducted?

7    A.   No.  No.

8    Q.   You would not agree that that's the best evidence?

9    A.   I didn't see such a measurement.  I'm not sure what

10   measurement we're talking about.  I know that there wasn't a

11   measurement in the photograph, and I don't know -- no, I

12   wouldn't automatically agree, because the rest of the

13   doctor's work I think is not impressive at all.  And just

14   because he says it, doesn't make it true.  And I would not

15   adopt just what he says without any normal documentation of

16   that opinion.

17   Q.   So to be clear, I think you just said that there is no

18   measurements in the photo, correct?

19   A.   There's no measurement in the photographs we looked at.

20   Q.   Because I thought on direct examination you said that

21   you could tell that after it was about 6 centimeters --

22   A.   Oh, no, because I --

23   Q.   -- post --

24   A.   I took out a ruler and using the various photographs I

25   measured -- there was someplace along -- there were a number

CROSS - BADEN

1    on the photographs that I was able to measure it on one of

2    the photographs and, it turned out to be about

3    2-point-something inches, 6 centimeters by that measurement.

4    But -- but these are all measurements taken after -- this

5    was taken after the body had been sewn up, as we see here.

6    Q.    Again on the quality of these photographs, if -- you

7    know, you were asked about those little red dots on the

8    exhibit --

9    A.    Yes.

10   Q.    -- around.  Poor quality photos, right?

11   A.    Well, to start with, to have a proper quality

12   photograph, you have to have something in the photograph

13   that measures it and gives the name or number of the person

14   that's being photographed so this photograph doesn't get

15   mixed in with somebody else.

16        There's nothing on that photograph -- these

17   photographs to identify who it is.  Presumably it's the

18   victim.  And there's nothing in the photographs I just saw

19   that -- a measurement.  And also they're taken without the

20   blood being taken off.  There's -- there's blood -- blood

21   smears, blood droplets, on the photographs.  It's all right

22   to take it before and after, but one has to have a

23   photograph of what the skin looked like after.  And these

24   photographs I looked at were taken a few days away when

25   there's already been decomposition changes.  The green-ish

CROSS - BADEN

1   discoloration, the facial discoloration on the photographs,

2   is green from the gases and the decomposition changes that

3   impair the quality of the photograph.

4   Q.   Is the lighting particularly good in the photographs?

5   A.   I'm sorry?

6   Q.   Is the lighting particularly good in the photographs?

7   Just a yes or no will do.

8   A.   The what?

9   Q.   Is the lighting particularly good in the photographs?

10  Yes or no is sufficient.

11  A.   Not particularly, no.

12  Q.   So there could be pseudo-stippling that you can't see

13  in the photographs, correct?

14  A.   Stippling by -- by -- by the granule material --

15  Q.   Correct.

16  A.   -- that -- I don't know what I don't see, but that's

17  possible if there was just the slight impact with the -- one

18  of the little granules that are mixed in with the -- I think

19  with the pellets to -- before the discharge.

20          MR. GREWELL:   Your Honor, if I could have the Elmo

21  just for a demonstrative, a picture of pseudo-stippling.   I

22  believe Mr. Markus doesn't have an objection.   I did not get

23  a chance to ask Mr. Dill, so I'll . . .

24          MR. MARKUS:   Knock yourself out.

25          THE COURT:   All right.

2531

CROSS - BADEN

1        MR. DILL:  No objection.

2        THE COURT:  Go ahead.

3        MR. GREWELL:  And since it's a demonstrative,

4    could I have it shown to the jury?

5        THE COURT:  Sure.

6    BY MR. GREWELL:

7    Q.   Is this a picture of what pseudo-stippling would look

8    like from that fine granular material that you --

9    A.   Yes.  Yes.

10   Q.   And so if you had two different witnesses to the body

11   within two days of seeing it that there were little marks

12   like that around the wound, that could be the case?

13       MR. MARKUS:  Objection, Your Honor.  That is not

14   what the testimony was.  No witness said there were marks

15   like stippling.

16       MR. GREWELL:  I believe Dr. Maswahu, after he was

17   shown the little white granules, said that could be what the

18   small marks were.  And Otto Westhassel also testified that

19   there were little marks around the wound like that, Your

20   Honor.

21       THE COURT:  I believe that's accurate.  Overruled.

22       You may answer, Doctor.

23       THE WITNESS:  First of all, I don't think somebody

24   from the consulate who isn't a physician, the other person,

25   would know what stippling is, No. 1.  That's what -- most

CROSS - BADEN

1    doctors don't know about stippling.  But the stippling in

2    the photograph, very good photograph of stippling that you

3    did show, they're dents in the -- they're not just flat

4    surfaces, they're dents in the skin caused by the impact of

5    the little granules.  And the size -- the size of them look

6    like could be freckle marks on the body.  But I think that

7    the lighting was good enough to distinguish some of those

8    freckle marks -- freckle marks on the breast areas of

9    Mrs. Rudolph that were brownish and is freckle-like and

10    flat.  They were flat.  They weren't dents in the skin.

11    BY MR. GREWELL:

12    Q.   So now the lighting is good enough to tell if there's

13    stippling in the photos?

14    A.   There's --

15    Q.   Is --

16    A.   There's some things that could be seen.  I circled what

17    I thought could be the freckle marks in one of the

18    photographs.  But, in general, my answer -- the lighting

19    isn't very good, but it is good enough for -- to see some of

20    the victim's skin surface.

21    Q.   Even if a lay witness can't identify something as

22    stippling, do you agree the lay witness could identify

23    little holes in the skin?

24    A.   If they were holes in the skin, yes.

25    Q.   Do you know how prevalent cell phones with cameras were

CROSS - BADEN

1    in Africa in 2016?

2    A.    No.  I could say in 2007 they began to be popular in

3    this country.  I don't know how available -- they would have

4    been available in Zambia, but I don't know how available it

5    would have been to somebody like Dr. Maswahu.

6    Q.    They're generally expensive, too, aren't they?

7    A.    Yes, I would imagine they're very expensive.

8    Q.    You mentioned what you said were scalpel cuts around

9    the wound, correct?

10   A.    Yes, sir.

11   Q.    So because of those scalpel cuts in the photo, you

12   can't actually tell if there was scalloping at the time of

13   the wound or not, right?  Because you don't see the edges

14   around it?

15   A.    That's correct.

16   Q.    Are you aware that the text that you relied upon says

17   that stippling can occur from a muzzle to target distance of

18   2 to 3 meters away?

19   A.    I -- I am aware it could be from a distance.  Stippling

20   can impact the skin from a distance, yes.

21   Q.    And you said in your report that photographs of the

22   entrance wound are necessary to determine the weapon

23   distance; is that correct?

24   A.    Yes.

25   Q.    And do you believe they are also necessary to determine

CROSS - BADEN

1    the size?

2    A.    Well, to determine -- I don't hear some of your words.

3    The side?

4    Q.    Yeah, the size of an entrance wound.  Do you think

5    photos are required for someone to actually be able to

6    determine the size?

7    A.    Yes, before the autopsy is done, not after the autopsy,

8    because the autopsy changes the size.  But yes, a proper

9    photograph taken before the autopsy with the name of the

10   person and the -- and the measurement, they're usually

11   combined, is necessary to be -- should be taken.

12   Q.    So if DiMaio says, "In all shotgun deaths the size of

13   the pattern on the body" -- sorry.

14         If Mr. DiMaio says in his book, "In all shotgun

15   deaths, the size of the pattern on the body should be

16   measured and recorded, photographs of the wound pattern are

17   recommended," do you disagree because you think they're

18   required?

19   A.    Photograph -- can you repeat that?  I'm sorry, say --

20   Q.    Do you think photographs are required even though

21   DiMaio just says they're recommended?

22   A.    Nothing is required.  There's no rule that requires it.

23   But it's recommended by National Association of Medical

24   Examiners, by persons during -- in teaching programs.  But

25   it's not required, no.  It's not required.  But it's

CROSS - BADEN

1    recommended, yes.  It should be done if you want to document

2    those injuries.

3    Q.    I want to ask you about something you said on direct

4    because it actually confused me a little bit.

5         Did you say that you could not determine the angle

6    in this case?

7    A.    That's correct.

8    Q.    But in your report, I think you said the opposite on

9    page 3, did you not?  I'm reading from your report now.

10   Didn't you say:  The photographs show the entrance

11   perforation in the left upper chest at the level of the

12   fourth rib.  Dr. Maswahu describes it as being associated

13   with an 8-centimeter diameter blast defect in seventh,

14   eighth, and ninth ribs, end quote, the trajectory of the

15   shotgun blast is, therefore, front-to-back and downward to

16   the body?

17   A.    Yes.  That's -- if Dr. Maswahu's description of the

18   blast effect -- which I don't understand what that means --

19   on the -- on the ribs that are fractured -- that he says are

20   fractured, if that's true, then it's downward.  The entrance

21   has to be -- part of it has to be straight in, going

22   backward.  And in this instance, the other part of it would

23   be going downward, if he's correct.

24   Q.    And so your report didn't say anything about "if he's

25   correct."  You actually said the trajectory is downward,

CROSS - BADEN

1   didn't you?

2   A.    Yeah, in that comment -- in that section I was assuming

3   that he's correct, then it's a downward trajectory.

4   Q.    And you didn't need an x-ray to say that, did you?

5   A.    I'm just adopting what Dr. -- I don't know how

6   Dr. Maswahu arrived at that -- at that opinion.  It's a

7   bizarre opinion because you have to describe the injury

8   path, not say that there's a blasting or -- I forget the

9   adjectives he uses.  He didn't photograph it.  And it would

10  take more than 45 -- 25 or 45 minutes to do all that, to

11  make the proper dissection and exposure to -- to make the

12  observations of the three different fractures.  Hard to

13  distinguish ribs and to make all the fractures.

14          So, yes, what you're saying is my opinion going

15  downward is -- is not -- may not be a correct opinion

16  because I don't adopt that if Dr. Maswahu didn't do the

17  proper dissections to make that judgment.  And I see that

18  there's no evidence to indicate that he did a proper

19  dissection.

20  Q.    So is it your opinion that we can't rely at all upon a

21  UK-trained forensic pathologist in Zambia?

22  A.    Not if they all do autopsies like Dr. Maswahu.  I've

23  seen lots of UK-trained forensic pathologists.  A lot of

24  them coming to the United States, a lot of pathologists go

25  to the UK.  And we do -- we do the exact same things that I

CROSS - BADEN

1    was describing.  UK or in England or in United States.

2          But I'm saying that in this particular case as

3    that -- it wasn't done properly.

4    Q.    Let's talk about something I think we agree on.  You

5    said that the wound here was not self-inflicted, correct?

6    A.    Was not?

7    Q.    Not self-inflicted.

8    A.    Yes.

9    Q.    And what makes you sure it was not self-inflicted?

10   A.    Well, in seeing many different shotgun and rifle

11   wounds, that the trigger could not have been pulled to

12   make -- the distance was too far that -- to make it

13   self-inflicted would have required some kind of an add-on

14   mechanism, a string or rope, or there are ways to press the

15   trigger that can't be reached by thumb.  So I think that the

16   distances involved would exclude her ability to be able to

17   discharge the weapon.

18   Q.    Another thing I think we agree on, but I guess you'll

19   let me know:  Do you agree that it was not a direct contact

20   wound?

21   A.    Yes, I'll agree with that.  Yes.

22   Q.    And I want to turn to your opinion on the

23   muzzle-to-target distance.  And my understanding is your

24   opinion is that the muzzle was within a few centimeters of

25   her skin or clothes; is that correct?

2538

CROSS - BADEN

1          MR. MARKUS:  Judge, objection.  I didn't ask him

2    about this on direct and it's beyond the scope.

3          THE COURT:  Sustained.  Next question.

4          MR. GREWELL:  Yup.  One moment, Your Honor.

5    BY MR. GREWELL:

6    Q.   I want to turn, I guess, finally to your opinion here.

7    I believe you said, "It is my opinion to a reasonable degree

8    of medical certainty," based on education, training, the

9    things you've reviewed.  We're not talking about the

10   distance, so let's go to your final thing that -- that

11   Mrs. Rudolph's death could have -- could have been caused by

12   an accidental discharge.  That's your opinion; is that

13   correct?

14   A.   Yes.  Could have been done by an accident, could have

15   been done by a nonaccident, but my opinion was that I

16   couldn't exclude accidental discharge.

17   Q.   And what's the standard that you believe a medical

18   expert applying -- rendering opinions should use?  What's

19   the standard by which you offer opinions?

20   A.   The -- talking about the standard or forensic

21   pathologist giving opinions would be, in my opinion, in a

22   cause of death more than 90 percent.

23   Q.   Is that the reasonable degree of medical certainty with

24   which --

25   A.   A lot of my colleagues use 51 percent to be reasonable.

CROSS - BADEN

1    If I think that I'm wrong 49 percent of the time in making a

2    cause of death, then I've sent a lot of people to jail that

3    shouldn't be there.

4    Q.    And --

5    A.    So I -- I required higher than the -- in my opinion

6    higher than what you might say would be the average.

7    Q.    And I want to be clear to make sure that I don't

8    misrepresent what your opinion is.  So are you testifying to

9    a reasonable degree of medical certainty that the wound here

10   was the result of an accidental discharge or that it could

11   have been the result of an accidental discharge?

12   A.    Could have been.

13   Q.    Okay.  You testified in the O.J. Simpson trial,

14   correct?

15            MR. MARKUS:  Objection.  Relevance, Your Honor.

16            THE COURT:  What's the relevance?

17            MR. GREWELL:  His opinion on whether possibilities

18   and could-have-beens are actually proper, appropriate matter

19   of testimony is what he was discussing in that trial.  I

20   think he just said the opposite here, Your Honor.

21            THE COURT:  Sustained.

22            MR. GREWELL:  Okay.

23   BY MR. GREWELL:

24   Q.    Do you agree -- did you learn in medical school that

25   anything and everything is possible?

2540

CROSS - BADEN

1   A.    No.

2   Q.    The vast majority of your 20,000 autopsies were done

3   while you were in the New York City Medical Examiner's

4   Office, correct?

5   A.    That's correct.

6   Q.    And you left that office over 40 years ago, correct?

7   A.    In 1985.

8   Q.    Okay.  And you were, for 11 months, the chief medical

9   examiner, correct?

10  A.    I was.

11  Q.    And you were not retained for that position, correct?

12  A.    That's correct.

13  Q.    And part of that was a report from the Manhattan DA who

14  had claimed, among other things, that your office lost the

15  fingernail clippings of a victim in a homicide case where it

16  was needed to determine if she scratched the assailant,

17  correct?

18          MR. MARKUS:  Objection, Your Honor.  Relevance.

19  From 1960?

20          MR. GREWELL:  No.

21          MR. MARKUS:  '70.  Whatever it was.  Objection,

22  Your Honor.

23          THE COURT:  How long ago was it?

24          MR. GREWELL:  When he was chief medical examiner, I

25  believe it would be '79.  He's talked about the use of

CROSS - BADEN

1    clothing here and that not being available.  I think it's

2    relevant to his credibility on these matters, Your Honor.

3          THE COURT:  How much time do you anticipate

4    spending on this?

5          MR. GREWELL:  Very little.

6          THE COURT:  All right.  Overruled.  You may

7    proceed.

8          THE WITNESS:  That -- that was -- my office, that

9    was lost when the previous medical examiner were there.  I

10   found it, but it was lost -- it was not found by the

11   previous office there, but the reason I was -- that

12   Dr. Mithimora [phonetic] said that he was opposing me to

13   be -- continue as medical examiner is I because wasn't

14   cooperative enough with his District Attorneys.  And he

15   cited a specific case of a murder of a bad guy, that his

16   office charged rape/homicide, and I said there was no

17   evidence of rape.  And so he was angry that I wasn't

18   cooperative and I was demoted.

19         And I think I did the right thing and I think I

20   would stand by my opinion that -- in that case that the

21   medical examiners -- you're correct, often are too

22   cooperative with the police and they -- the police and

23   District Attorneys try to get them removed because they're

24   not part of the team or -- forensic pathologists should not

25   be part of a team.

2542

CROSS - BADEN

1      We're forensic scientists trying to work with

2  politicians, for good or bad.  And we can't just adopt what

3  the -- what the police -- the theory of the police or the

4  case.  And that was why I was demoted.

5      MR. GREWELL:  Your Honor, I have only four more

6  questions.  One on this and three more and I will be done.

7      THE COURT:  All right.

8  BY MR. GREWELL:

9  Q.   Your response to that allegation from the Manhattan DA

10  was that you described them only after the assistant who

11  inspected them, quote, saw no value in studying them

12  further, so you were able to get rid of them because your

13  office determined there was no further value, correct?

14  A.   No, no.  You're saying something that -- from what I

15  understand is not correct.  Say that slowly.

16  Q.   You wrote a letter responding to the DA's allegations,

17  right?

18  A.   Correct.

19  Q.   And your response was that the fingernail clippings

20  were discarded only after the assistant who inspected them,

21  quote, saw no value -- no value in studying them further,

22  end quote.

23  A.   If you're reading that, then that's correct, yes.

24  Q.   In 2007, you testified in the trial of record producer

25  Phil Spector, correct?

                          CROSS - BADEN

1              MR. MARKUS:  Objection, Your Honor.  Relevance.

2              MR. GREWELL:  I have two more questions.  Again, it

3      goes to his --

4              THE COURT:  It's not a matter of how many questions

5      you have; it's a matter of relevance --

6              MR. GREWELL:  It goes to his credibility, Your

7      Honor.

8              THE COURT:  Do you know what he's trying to get

9      into?

10             MR. MARKUS:  I don't, Your Honor.

11             THE COURT:  All right.

12             MR. MARKUS:  I'll let him do it.  I'll withdraw.

13             THE COURT:  Okay.

14             MR. MARKUS:  Go for it.

15             THE COURT:  Okay, go ahead.

16     BY MR. GREWELL:

17     Q.   You testified in that trial, correct?

18     A.   In the first trial, yes.

19     Q.   And when asked whether you had a conflict of interest

20     in the case, you said, quote, Not that I can think of,

21     correct?

22     A.   That's correct.

23     Q.   But shortly after it was revealed that your wife was on

24     Mr. Spector's defense team, correct?

25     A.   No, it wasn't revealed.  It was known right along.  And

CROSS - BADEN

1    Mr. Spector had -- I was on first.  There was -- I was

2    called.  There was a death.  I was involved in the

3    examination of Phil Spector.

4        Two years later when Phil Spector was coming to

5    trial and choosing various lawyers, one of the lawyers was

6    my wife.  Had nothing to do with what I did.  And it was

7    Phil Spector wanted it.  He knew that.  There was --

8    everybody knew that on both sides that -- but I -- my

9    testimony had nothing to do with what she did two years

10    later.

11        MR. GREWELL:  No further questions, Your Honor.

12        THE COURT:  All right.  Redirect.

13        MR. MARKUS:  Well, that wasn't a very nice birthday

14    question, Bishop.

15                    REDIRECT EXAMINATION

16    BY MR. MARKUS:

17    Q.    Let's talk about your wife, if that's what the

18    prosecution wants to talk about.  Did we hire your wife in

19    this case?

20    A.    No.

21    Q.    Okay.  Have I ever met your wife?

22    A.    No.

23    Q.    Okay.  I'm not going to talk about Phil Spector or any

24    of these things that the prosecutor wants to talk about.  I

25    want to talk about this case, okay, Dr. Baden?

2545

CROSS - BADEN

1              Let's look at the picture that the prosecutor

2    showed you about stippling.  If I could put up the picture.

3    Here we go.

4              You remember looking at this picture that the --

5    A.    I did, yes.

6    Q.    -- showed you from the book?  Now do you see any actual

7    blast wound in this picture?

8    A.    No.

9    Q.    Okay.  So this is a very different kind of shot than

10   the one we have in this case, isn't it?

11   A.    Yes.

12   Q.    Okay.  And by the way, in our case -- in the picture we

13   have here, would he have had clothes on over his face, a

14   bra, and a shirt, or would it -- or was this just directly

15   to the skin?

16   A.    This was directly to the skin.

17   Q.    And in this case, was it a shot through a shotgun case?

18   A.    If it was --

19   Q.    In our case, don't we have a shot that happens through

20   a soft case?

21   A.    Right.

22   Q.    Okay.

23   A.    Who was not --

24   Q.    So we have a soft case, a bra and a shirt.  In this

25   picture, we have none of those things, right?

CROSS - BADEN

1    A.    Yes.

2    Q.    I'm sorry -- in that picture we have none of those --

3    A.    That's correct.

4    Q.    The prosecutor asked you about scalloping.  Is there

5    anything in Dr. Maswahu's report that discusses scalloping?

6    A.    No.

7    Q.    The prosecutor asked you about the downward angle

8    that -- where you were assuming that Dr. Maswahu was correct

9    that there were blast wounds to the seventh, eighth, and

10   ninth ribs.  Remember those questions, Dr. Baden?

11   A.    Yes.

12   Q.    Okay.  Would you say that Dr. Maswahu was correct in

13   saying he could see blast wounds by looking through that

14   hole and seeing damage to the seventh, eighth, and ninth

15   ribs?

16   A.    He could not look through the entrance wound and see

17   damage to those ribs.  Absolutely not.

18   Q.    Okay.  So to assume a downward angle, would we have to

19   assume that Dr. Maswahu's report was adequate in that

20   regard?

21   A.    It was not adequate.

22   Q.    Yeah.  Was there anything adequate about that two-page

23   report that we reviewed with the jury?

24   A.    No.  But as the attorney points out, if I adopt the

25   little that's said, if I adopt that the -- there was a

CROSS - BADEN

1    downward discharge fracturing the lower left ribs, then I

2    would have to assume that it was a downward trajectory.  But

3    that's an assumption that -- I can't say that to a

4    reasonable degree of certainty.  That's assuming that what

5    somebody else did was accurate, which I have doubts very

6    much about the accuracy of that report.  It may be correct

7    or not correct, but I can't adopt it.

8    Q.   And whether it was 25 minutes or 45 minutes, as the

9    prosecutor said, was the autopsy in this report accurate,

10   reliable, and complete?

11   A.   It is not.

12   Q.   Okay.  In any normal autopsy, would you have expected

13   the pathologist to have tracked the pellets in this case?

14   A.   Well, part of the job of the forensic pathologist who

15   does these autopsies, who's trained to do these autopsies,

16   would be to track every bullet -- every bullet path.  When

17   he can track it, hopefully with x-rays, one can then confirm

18   the tracking with the autopsy.

19        But they would be tracked and photographed and then

20   used to see whether they could be helpful in answering any

21   of the questions that the autopsy was meant to answer.

22   Q.   Now I know the report doesn't mention where the pellets

23   were found.  Are you aware, Dr. Baden, that Dr. Maswahu

24   testified that he did not find one of the 15 pellets in the

25   body?

2548

CROSS - BADEN

1    **A.    I am -- I've been advised of that, yes.  And it's --**

2    **and the autopsy report -- he doesn't reflect -- he did find**

3    **some of the wadding and it was given to police, which is**

4    **helpful.  So he did find the wadding that Mr. Haag described**

5    **yesterday that I heard, in the shotgun entrance area, which**

6    **was helpful, and -- to the investigators.**

7    **Q.    Now, the prosecutor asked about x-rays and pictures.**

8    **Putting aside whether the phone that Dr. Maswahu had had a**

9    **camera, if he was looking in the body in an appropriate**

10   **fashion, could he have found the pellets?**

11   **A.    Yes.  And if I may, I think the -- my criticism of the**

12   **autopsy includes the lack of proper photographs.  I'm not --**

13   **I shouldn't imply that the photographs had to be taken by**

14   **Dr. Maswahu -- I'm mispronouncing his name, I apologize --**

15   **that they should have been taken by him or by the police or**

16   **a photographer -- a proper photographer.**

17          **So the failure to take photographs I'm not saying**

18   **is blamed on Maswahu, but I think it's part of an inadequate**

19   **autopsy --**

20   **Q.    And put --**

21   **A.    And those photographs should have been taken by the**

22   **police who always have cameras.**

23   **Q.    And putting away -- putting aside the cameras and the**

24   **x-rays and all those things, even if you're just doing a**

25   **physical examination, if he had taken the time to do it,**

CROSS - BADEN

1    could he have tracked those pellets?

2    A.    Oh, yes.  Oh, yes.  The autopsy, itself, would have

3    considered in dissecting through the organs and the autopsy

4    tissues along the trajectory, because each pellet breaks

5    capillaries and blood vessels.  So the trajectory of a

6    bullet in a living person -- I say that because if a dead

7    person is shot, you could have a trajectory but there will

8    be no blood around it -- but in a living person, a

9    trajectory from any bullet or pellet will have a hemorrhagic

10   line going through the bullet track.

11          The bullet will go through a lung or heart or liver

12   or brain and expand the tissue as it goes through, and then

13   the tissue would then come back together, but there will be

14   blood in that pathway.

15          So the blood from the -- all of the little

16   capillaries that are broken would allow the medical examiner

17   to track each bullet and know the direction of each bullet,

18   or pellet.  And when I say bullet and pellet, it's -- a

19   pellet is a .32-caliber bullet.  So there's -- the same kind

20   of track would be created.

21   Q.    And, sir, I know you -- I know you said that pictures

22   aren't required, but they're recommended.  Is it -- is it

23   the reason they're recommended because if you want to prove

24   your case beyond a reasonable doubt, you need adequate

25   pictures to take a look at?

**CROSS - BADEN**

1    **A.**   Well, I think that the person in the autopsy sees what

2    he or she sees.  In order for other people to see what he or

3    she sees, there have to be photographs taken.  And not only

4    other pathologists; doctors need them to make an independent

5    judgment.  But so would the police, the attorneys, and --

6    whether to decide to -- the strength of the case that

7    they're developing are all necessary to see how much the

8    photographs document and confirm or not confirm what the

9    person who did the autopsy says -- wrote.

10    **Q.**   Thank you, Dr. Baden.  I appreciate you.  And have a

11    good birthday, sir.

12    **A.**   Thank you.

13          THE COURT:  May this witness be excused,

14    Mr. Markus?

15          MR. MARKUS:  Yes, Your Honor.

16          THE COURT:  For the Government?

17          MR. GREWELL:  Yes, Your Honor.

18          THE COURT:  Dr. Baden, thank you so much for your

19    testimony.  Happy birthday again.

20          THE WITNESS:  Thank you very much, Your Honor.

21          THE COURT:  You're excused and you may step down.

22          THE WITNESS:  Thank you.  Thank you, all.

23          THE COURT:  All right, we're going to take our

24    morning recess, folks.  We'll be in recess for 15 minutes.

25          (Recess taken 10:33 a.m. to 10:51 a.m.)

2551
DIRECT - SUTTON

1      THE COURT:  All right, Defendant Rudolph may call

2  his next witness.

3      MS. MOSS:  Your Honor, the defense calls Paulette

4  Sutton.

5      THE COURT:  All right.

6      COURTROOM DEPUTY:  If you'll raise your right hand

7  for me.

8          PAULETTE SUTTON, DEFENSE WITNESS, SWORN

9      COURTROOM DEPUTY:  Thank you.  Please be seated and

10  remove your mask for us.

11      THE WITNESS:  Thank you.

12      COURTROOM DEPUTY:  And state your full name for the

13  record and spell your first and last names for us.

14      THE WITNESS:  Sure.  My name is Teresa,

15  T-e-r-e-s-a, Paulette, P-a-u-l-e-t-t-e, Sutton, S-u-t-t-o-n.

16      THE COURT:  You may proceed, counsel.

17      MS. MOSS:  Thank you, Your Honor.

18                  DIRECT EXAMINATION

19  BY MS. MOSS:

20  Q.   Good morning, Ms. Sutton.

21  A.   Good morning.

22  Q.   How are you doing?

23  A.   I'm well.  Thank you.

24  Q.   Ms. Sutton, what do you do for a living?

25  A.   I am happily retired from the University of Tennessee

DIRECT - SUTTON

1    in Memphis.  I worked there for 30 years and now I consult.

2    Q.   And so what is your occupation?

3    A.   I'm a forensic scientist with a specialty in bloodstain

4    pattern analysis.

5    Q.   And, Ms. Sutton, I detect a little bit of an accent

6    there.  Are you from Tennessee?

7    A.   I am from Tennessee.

8    Q.   And what did you do at the University of Tennessee?

9    A.   I worked with -- I was assigned to the medical

10   examiner's office.  And in that capacity I helped with the

11   investigations going out to the crime scenes and/or

12   examining clothing.  Our laboratory, the laboratory that I

13   also directed, identified the blood stains or semen stains

14   or saliva stains, whatever kind of body fluid.  We did the

15   DNA analysis as well.  University, I also did research.  I

16   also taught.

17   Q.   And how long have you been working as a private

18   consultant?

19   A.   Since 2006.

20   Q.   And is your specialty bloodstain pattern analysis?

21   A.   That and crime scene reconstruction, but primarily

22   bloodstain pattern analysis.

23   Q.   And how long have you been working in the field of

24   bloodstain pattern analysis?

25   A.   Since 19- -- around early '80s.  1980.

2553

DIRECT - SUTTON

1    Q.   So sounds like about 30 to 40 years.

2    A.   Yes.

3    Q.   Okay.  Let me ask you if you can tell us about your

4    educational background, please.

5    A.   Yes.  I have a bachelor's degree in medical technology.

6    Those are the folks that analyze your blood in the hospital

7    or at your doctor's office, whatever.  And I went from that

8    to the medical examiner's office where I had -- I'm so old,

9    they trained us on the bench.  There were only like one or

10   two formal programs in the country in forensic science.

11         Our medical examiner had never employed anyone in

12   the serology lab that was not a medical technologist because

13   his opinion was we needed to be able to do all of the

14   analysis we would have done in a hospital setting plus learn

15   forensic analysis.

16         I also trained at the FBI academy once formal

17   training became a little more common, and at the Northwest

18   Louisiana Crime Lab.  I also have a master's degree in

19   engineering from the University of Arkansas.

20   Q.   Now have you written any articles or books on the

21   subject of bloodstain pattern analysis?

22   A.   Yes, I have.

23   Q.   Can you tell us a little bit about that.

24   A.   I think there's like 31 articles or books in bloodstain

25   pattern analysis, or forensic serology; what is now called

DIRECT - SUTTON

1    forensic biology or the study of body fluids in the forensic

2    matter.

3    Q.    And were your publications peer-reviewed?

4    A.    Yes, they were.

5    Q.    Now, have you taught or lectured in the field of

6    bloodstain pattern analysis?

7    A.    Yes, I have.  I've been fortunate enough to teach all

8    over the United States.  I worked with the National Forensic

9    Academy out of -- University of Tennessee.  Tennessee is

10   real long.  I was in Memphis.  I was in the southwest part

11   of the state.  The main campus is on the other end of the

12   state, in the eastern part.  And I was part of the National

13   Forensic Academy that the main campus developed.

14   Q.    And also in addition to lecturing and teaching, are you

15   a member of any professional organizations related to this

16   field that we've been talking about?

17   A.    Yes.  I'm a member -- a distinguished member of the

18   International Association of Bloodstain Pattern Analysts.  I

19   am also -- what a long name.  I am also a member of the

20   American Academy of Forensic Science and the International

21   Association for Identification.

22   Q.    And when you say you're a distinguished member and

23   distinguished faculty, are those types of awards that are

24   given out by these organizations?

25   A.    Yes, they are.

2555

DIRECT - SUTTON

1    Q.    Now, during your career -- and this is a silly

2    question -- but have you had the chance to perform

3    bloodstain pattern analysis?

4    A.    Yes.  Yes, I have.

5    Q.    Okay.  On many occasions?

6    A.    Yeah, many occasions.  Yes.

7    Q.    Okay.  Have you testified as an expert in this area

8    before?

9    A.    Yes, I have.

10   Q.    And where and when have you testified?  You don't have

11   to list them --

12   A.    Okay.  Without listing them, I think there are about 16

13   different states and six federal courts.  And, of course,

14   while I was working in Memphis, I did hundreds of

15   testimonies there.

16   Q.    Now you testified that you are now doing consulting?

17   A.    Yes.

18   Q.    Who would you say you normally testify for in those

19   many, many years of testifying as an expert in cases?

20   A.    Well, when I was working at the medical examiner's

21   office, the vast majority would have been for the state or

22   for the prosecution.  But we were kind of a different entity

23   there in that we were -- part of our funding came from the

24   county and because of that, the Public Defender's Office was

25   just as free to use our services as the Attorney General's

**DIRECT - SUTTON**

1    Office or the prosecutor's office was to use our services.

2    Q.    And now that you're doing consulting, do you still do

3    work for both the prosecution and occasionally the defense?

4    A.    Yes.  And actually it's about 50-50.

5    Q.    Okay.  Now knowing that you were a consultant, are you

6    paid for your time?

7    A.    Yes.

8    Q.    And have you been paid to reach any particular

9    conclusions in this case?

10   A.    No, ma'am.  I'm -- I'm not easily -- I'm not that easy

11   to get along with, I guess.  No.  I don't -- my conclusions

12   are not for sale.

13        MS. MOSS:  Your Honor, at this time, we would move

14   to qualify Ms. Sutton as an expert under Rule 702 in the

15   field of bloodstain pattern analysis and crime scene

16   reconstruction.

17        THE COURT:  One second.  Any objection?

18        MR. WINSTEAD:  May I have just a moment, Your

19   Honor?

20        THE COURT:  Sure.

21        MS. MOSS:  Your Honor, we're going to restrict it

22   to bloodstain pattern analysis.

23        MR. WINSTEAD:  No objection to that, Your Honor.

24        THE COURT:  All right.  There being no objection,

25   Ms. Sutton is --

2557

DIRECT - SUTTON

1        THE WITNESS:  Yes.

2        THE COURT:  -- qualified under Federal Rule of

3   Evidence 702 to provide expert opinion testimony in the

4   field of bloodstain pattern analysis.

5   BY MS. MOSS:

6   Q.   Ms. Sutton, can you tell us -- and you can just

7   summarize what materials you reviewed in this case in order

8   to perform an analysis.

9   A.   Yes, ma'am.  One of the first things that I would look

10  at would be the autopsy report, because I want to see what

11  sort of injuries were involved.  Crime scene photographs I

12  examined as well.  Both those taken by the witness and those

13  taken by the police department upon their arrival.  The

14  police report, the ballistics report from Zambia.  Also the

15  two reports of Tom Griffin.

16  Q.   Now, in reviewing all those reports and photographs

17  that you just spoke about, did you find that you had any

18  limitations to your analysis?

19  A.   Yes, ma'am, I think so.  Yes.

20  Q.   Can you tell us about that, please.

21  A.   Well, I think it's probably, as has been said many

22  times here, the number and the quality of the photographs

23  were very poor, so it was hard to do the kind of examination

24  I would like to have been able to do because of those

25  limitations.

DIRECT - SUTTON

1          Some things are difficult to photograph, but they

2    can be documented.  You can write notes about them or you

3    can do sketches, and that kind of information was also

4    sorely lacking in this case.  The other thing that disturbed

5    me, I guess I would say, is evidence that I feel like should

6    have been collected that were not collected.  Notably, the

7    clothing of both parties should have been maintained in a

8    proper fashion and then collected for later examination.

9          As I said, there are some things that are hard to

10   photograph, but there are also some things at a crime scene

11   that are hard to move; the end of the bed being a perfect

12   example.  That's something that it would have been helpful

13   had that been examined closely and the results of that

14   examination been documented.

15          The floor.  It's a very unique floor, and had that

16   been examined closer at the scene and documented, that could

17   very well have been helpful as well.

18   Q.   Now let's just jump right in.  And I probably should

19   have asked you this earlier, but what is bloodstain pattern

20   analysis?

21   A.   Bloodstain pattern analysis is a field of study where

22   we examine the static aftermath of events.  Most of the time

23   it has to do with an assault or with a crime.  We look at

24   the blood stains and, by applying the principles of physics,

25   mathematics, and biology, we back-extrapolate the kinds of

DIRECT - SUTTON

1      activity or activities that might have created this stain.

2      And by looking at the shape of this stain, we can determine

3      where that stain originated or where that pattern

4      originated.

5              Looking at the appearance, the biology, we can tell

6      if it's been altered.  Say someone has tried to clean up the

7      scene, or perhaps coagulation, a normal event, has occurred

8      as well.

9      Q.   And I don't think we need to get into too much detail,

10     but are there different names for different types of blood

11     stains?

12     A.   Oh, yes.

13     Q.   Can you talk about that just a little bit.

14     A.   Well, if -- if I were preparing dinner and I cut my

15     finger, the blood would begin to accumulate on my finger.

16     It would stay attached because of its cohesive properties,

17     but also because of a property called -- called surface

18     tension.  That tries to make it assume -- the fluid, the

19     blood, assume the smallest shape or the most compact form

20     that it possibly can.  Eventually there will be enough blood

21     accumulate that surface tension will be overcome because of

22     the combination of the weight of the drop and also gravity

23     is pulling it away.

24              Once that drop falls, it will create what we call a

25     drip.  That's a drip stain.  That's just if I were to take

2560

DIRECT - SUTTON

1    an eye dropper and drop a drop of blood onto this platform,

2    this desk, that would be a drip.

3           If I had a series, someone is dripping blood and

4    they are walking through an area, we call that a drip trail.

5           Now, because of surface tension, that drop will

6    stay together until, as I said, weight and gravity pull it

7    free or something acts on that drop.

8           And that's what we're involved with a lot of the

9    time:   an impact or an applied force; a beating, a stabbing,

10   a shooting.  All of those things add energy to the system,

11   and they can break surface tension as well.

12          And when they break it, they become not drops now,

13   They become smaller, and they're what we call spatters.  The

14   harder I hit it, the smaller the spatters are that will be

15   created because I've added more energy.  So I've broken it

16   up more.

17          Once that drop becomes airborne, if it's big, it

18   can travel a pretty good distance away.  Depends on the

19   drop, depends on the energy, so the best I can tell you is a

20   distance.  A small drop, once it becomes airborne, is

21   building up friction in the form of air resistance, so it

22   can't travel very far away.

23          Best example is take a can of air freshener and

24   squirt the air freshener out, it comes out in a cone.  And

25   that's the next characteristic I'm going to describe.  But

DIRECT - SUTTON

1    it will come out in a cone and, if you watch it, it's like

2    it almost stops in mid-air and then drifts down.  That's

3    because those -- those little aerosol droplets are so small

4    they can't go very far.  That's what happens with the very

5    small drops.  The cone-like distribution is a characteristic

6    that we look for.

7         We look at the size, we look at the shape, but we

8    also look at the distribution of the pattern.  And if we see

9    that cone-like distribution, then we know this small stain

10   resulted because of an impact, because of a stabbing,

11   because of the beating, because of the gunshot, that kind of

12   activity.

13   Q.   Now, Ms. Sutton, I'd like to show you a photograph to

14   see if you can identify some of those types of patterns that

15   we looked at.

16        And I would just like to give a warning again to

17   the jury and to the gallery that we are going to look at

18   some scene photographs.

19        THE COURT:  Thank you, counsel, for the notice.

20   BY MS. MOSS:

21   Q.   If we can please pull up Exhibit 16, page 11.  16-11.

22   And, Mr. Reyes, can we just focus on the bottom part of

23   this, please, so we can cover up the top part, please.

24        Now, Ms. Sutton, have you seen this photograph

25   before?

2562

DIRECT - SUTTON

1    A.    Yes, ma'am, I have.

2    Q.    Okay.  And can you identify some of those different

3    types of bloodstain patterns in this photograph.

4    A.    Yes, ma'am.

5    Q.    And can you tell us a little bit about what you see

6    here.

7    A.    Well, let's start with the first ones that I talked

8    about, drip stains.  These two guys here, they're in

9    approximately the size range of a passively falling drop.

10    Q.    And let me stop you there.  When you say "these two

11    guys here," can you draw -- or did you draw?  I'm sorry.

12    A.    I did, but let me make it a little bit bigger.

13    Q.    Oh, I didn't realize it was yellow.  Okay, that's fine.

14    Go ahead.

15    A.    I'm not sure why it's yellow.

16    Q.    That's fine.  That's fine.

17    A.    It just is.

18    Q.    Okay.  I'm sorry, I interrupted you.  Go ahead.

19    A.    No, no.  Those are -- those are drip-type stains.  When

20    you start to see several of them in a line -- and these

21    have -- these have diffused into that wooden part of the

22    floor, but this is consistent with a trail of drops, or a

23    drip trail.  Something that is bleeding, and blood is

24    dripping away, and the object of origin is in movement.

25          Now, this stain here is a great example of a

DIRECT - SUTTON

1    projected stain.  And there are more of those here, here,

2    here, these as well.  Okay.  Projected stain is defined in

3    my field as blood that is leaving the body with an applied

4    force behind it, or -- or usually a hydraulic pressure,

5    which is a real fancy way of saying something is forcing

6    that blood out faster than it can move on its own.

7            And in this instance, considering what we know in

8    this case, these are consistent with what we call arterial

9    gushes.  Because our heart -- we have pressure inside of our

10   circulatory system.  That's why they take your blood

11   pressure at the doctor's office, okay?  And that high

12   pressure pushes that blood out and it's exiting under force.

13   And when it strikes a surface, we will see a projected

14   stain.  How we know it is projected is we look for the

15   spines -- I may have so much drawn that you can't tell

16   anything -- but we look at the spiny-like stains coming

17   away.  But we look at the margins of the original stain, the

18   margins that are real jagged and torn.  That tells us that

19   this was moving faster than maximum terminal velocity;

20   faster than it could on its own.  And it impacted this

21   surface with some force, and that caused the skin around it

22   to be torn and jagged.  So that's a projected stain.

23           Some of these -- this one is kind of projected, but

24   it's kind of splashed.  And it -- and in this instance, it's

25   not a lot of difference.  Splash is when a large quantity is

2564

DIRECT - SUTTON

1    released and it strikes a surface, and in this instance, we

2    may be seeing large accumulations of blood exit that don't

3    have that highest pressure of the arterial system, but they

4    still got enough to force it out.  So it's really just blood

5    that's being dropped out onto the surface; doesn't have that

6    extra energy applied to it.

7            These stains here, because they're light, we would

8    simply describe them as diffused.  Diffused into that

9    concrete, into the wood itself.

10   Q.   Now you've identified for -- there's obviously blood

11   there and different types of patterns --

12   A.   Uhm-hum.

13   Q.   -- and different types of stains.  Can you assign any

14   value to what you are seeing here?

15   A.   Any value?

16   Q.   Well, so let me ask you this:  Can you tell whether

17   these stains may have occurred during or after a wound was

18   created?

19   A.   Okay.  Okay.  I see what you're saying now.  These

20   stains are consistent with what occurred after the wound was

21   afflicted -- or inflicted; after the gunshot occurred.

22   Remember, I told you that if I'm -- if I impact the source

23   of blood, the human, with a large force, I can get very

24   small spatters.  And those are the kinds of stains, in this

25   instance what we would call back spatter, because there is

DIRECT - SUTTON

1    no exit, there's only an entrance wound.  And blood that is

2    coming from the wound back towards the shooter is what is

3    called back spatter.

4           Now, very small stains are what we are looking for

5    with back spatter to be able to say this is where the

6    gunshot occurred.  Now, it can be intermixed with large

7    stains, but I got to find the small ones to say that's where

8    the gunshot occurred.  All of this is aftermath.  And the

9    victim in this instance obviously moved across that floor,

10   or was moved.

11   Q.   Now, Ms. Sutton, I'd like to show you another

12   photograph now.  And this is also going to be a scene

13   photograph.  This is Exhibit 16, page 1.  16-1.  And again,

14   Mr. Reyes, can we cut out this portion, please.  Or at least

15   up to here.

16   A.   Okay.

17   Q.   Now, Ms. Sutton, in this photograph, do you see some

18   items on that floor there that's helpful to your analysis

19   other than blood?

20   A.   Yes, ma'am.

21   Q.   And can you tell us about that, please.

22   A.   Well, the main thing would be this right -- this item

23   right here.  And that appears to be the end of that soft

24   case.  That particular item, the end of the case, would have

25   been what was closest to the shot when it occurred.  So it

2566

DIRECT - SUTTON

1    would have been crucial to be able to examine that item for

2    back spatter.  That would have helped us immeasurably to be

3    able to say if back spatter did or did not reach that soft

4    case.

5         Then these things appear to be -- and I thought

6    there was another -- but that is consistent with the foam

7    liner inside of that case.

8  Q.   And, again, what you said, I believe, is you think it's

9    crucial that those things be collected?

10  A.   Yes.

11  Q.   And did I hear you correctly that that would be your

12   defining evidence to tell whether there was actually back

13   spatter?

14  A.   Yes.  In this instance, the end of the case, this --

15   this object right here, was what we know was closest to the

16   wound, and that would have helped us if we could examine

17   that.  Had it been collected and we could examine it, I

18   think we could answer the question of whether back spatter

19   was, in fact, created and whether or not it reached the gun

20   case in this instance.

21  Q.   Thank you, Mr. Reyes.

22        Ms. Sutton, I'd like to ask you about some other

23   blood stains and -- I'd like to avoid showing the photograph

24   if I could.

25  A.   Okay.

DIRECT - SUTTON

1    Q.    So I'd like to ask you about blood stains that you

2    detected on Mrs. Rudolph, herself.  And if you could just

3    talk about it, if that's okay.

4    A.    Okay.  Sure.  Mrs. Rudolph had what we describe as a

5    flow pattern, which simply means blood running down in the

6    direction of gravity.  A continuous pattern from the area of

7    the wound all the way down to her left knee.  So down the

8    left side continuously to the left knee.  Because it is a

9    continuous pattern and the source is the -- is the gunshot

10   wound, then I know that Mrs. Rudolph had to be upright for a

11   period of time after the injury was sustained because of

12   that continuous distribution.

13        She also had an area of flow staining on the medial

14   orientations, the inside aspect, of her right thigh.  That,

15   because it's not a continuous pattern, could have occurred

16   from dripping from the wound.

17   Q.    Now, Ms. Sutton, I'd like to jump to another area that

18   you talked about before and this has to do with back

19   spatter.

20        Are you aware that Tom Griffin performed -- I think

21   it's called phenotheline testing on the soft gun case.

22   A.    Yes, I am.

23   Q.    And do you know what the results of that testing was?

24   A.    The phenotheline testing that Mr. Griffin conducted,

25   the results were negative.

2568

DIRECT - SUTTON

1   Q.   Now, I know you spoke about back spatter before.  Could

2   you tell us again, please, what back spatter is.

3   A.   Back --

4   Q.   We --

5   A.   I'm sorry.

6   Q.   That's okay.  Go ahead.

7   A.   Back spatter is the spatter -- again, in the category

8   of an impact spatter, the spatter that is created as the

9   result of an entrance gunshot wound, or shotgun wound in

10  this case.

11  Q.   Now, if you find back spatter, is that good evidence

12  that the gun case was in close proximity to Mrs. Rudolph?

13  A.   Yes.  The rule of thumb is that because the stains are

14  so small and -- and I want to emphasize, if you find the

15  very small 1 to 2 millimeter stains, they're so small that

16  they only travel 3 to 4 feet horizontally from the source of

17  the gunshot.  So finding back spatter at a crime scene is

18  very good evidence to tell us where the individual was at

19  the time the shot occurred.

20       Finding back spatter requires a diligent search.

21  And I tried to enlarge these photographs to see as much as I

22  could.  And they're just of such poor resolution or such

23  small resolution that when I tried to enlarge it, I just

24  can't -- it pixelates.  I can't see anything.

25  Q.   So what you're talking about now, though, is that back

**DIRECT - SUTTON**

1    spatter at the scene?

2    A.    Yes.

3    Q.    Okay.  Now, you just answered the question about

4    whether back -- finding back spatter is good evidence that

5    the case is in close proximity to Mrs. Rudolph.  Is the

6    opposite of that statement true also, that if there is no

7    back spatter, does that mean the gun case could not have

8    been in close proximity to Mrs. Rudolph?

9    A.    No, the reverse is not a valid conclusion because not

10   every case produces back spatter; not every gunshot does.

11   So I can't say because I don't find back spatter that the

12   case was not there.  And there are a lot of other reasons

13   why it might not reach that far as well.

14   Q.    So I'd like to talk about some of those reasons.

15   A.    Okay.

16   Q.    Can you go through some of those reasons with us,

17   please.

18   A.    Well, in this instance, I think one reason is that we

19   don't know, and can't establish from the blood stains, where

20   the case might have been.  So we can't get a region that

21   way.  We can't get the orientation of the case because it

22   doesn't seem to be clear the trajectory of the shot as well.

23        The simple fact is not every gunshot creates back

24   spatter.  The back spatter that is produced may be trapped

25   by clothing, hair, if there's an intermediate object.  But

DIRECT - SUTTON

1      in this instance, clothing would be the area of concern, and

2      we don't have the clothes to examine to see if we see back

3      spatter or we don't.

4      Q.    Ms. Sutton -- I'm sorry, I don't want to interrupt you.

5      A.    I'm sorry.  You have a question?

6      Q.    Well, Ms. Sutton, when we're talking specifically about

7      the gun case and about the shotgun, what about the movement

8      of the shotgun or the case away from the body?  Is that a

9      reason why you may not see back spatter?

10     A.    Sure.  If the shotgun was unsupported at the time that

11     it was fired -- not firmly held -- the recoil alone can move

12     the gun.  And since the gun was in the gun case, the gun

13     case as well, away from the area of the back spatter

14     production, if it did, in fact, occur.

15           Mrs. -- Ms. Rudolph may have also reflexively

16     pulled or moved the gun case --

17     Q.    Do you mean like she might have hit it or --

18     A.    I'm sorry?

19     Q.    Meaning she may have hit it somehow or --

20     A.    She could have hit it, she could have jerked at the

21     last minute.  She could have heard something, a sound she

22     didn't like.  Any of those things.  A reflexive action of

23     moving the gun case away.

24     Q.    What about -- so you just described the movement of the

25     gun case.  What about the movement of Mrs. Rudolph?  Could

DIRECT - SUTTON

1    that affect whether you find back spatter on the gun case?

2    A.    Yes.    That -- well, and I include that in the reflexive

3    type actions.    But if there was purposeful movement and she

4    was holding the gun case, certainly that could move it as

5    well.

6    Q.    I want to ask you about a couple other reasons.    Does

7    just air itself -- and I think you talked about spraying the

8    aerosol can.    Does air affect back spatter?

9    A.    It does.    And it affects it in a couple of ways.

10   Because these things are so small, there have been reports

11   of the back spatter drying in mid-air and not being wet

12   enough that it actually attaches to a surface by the time

13   that it reaches the surface.

14          You have to be careful as well because they go back

15   into that ball formation once they're in the air, same

16   reason, surface tension.    It wants to be compact.    And if

17   they do adhere to a surface, they're not adhered very

18   strongly, and so they're easily lost when things are moved

19   around, disturbed, such as that.

20          Air has another effect in that if we see

21   circulation of air, that can certainly move the small

22   droplets away.

23          And in this instance, the photograph that was taken

24   by the police department -- or a photograph taken by the

25   police department did show a fan to be running in the room.

2572

DIRECT - SUTTON

1    Q.    And so could that current of air created by the fan,

2    could that affect the presence or absence of back spatter?

3    A.    Yes.

4    Q.    Now, I want to ask you a little bit about timing with

5    the back spatter.  Can you tell us a little bit about that.

6    A.    If there is not -- well, let me start over.

7              A gunshot enters the body and it creates what we

8    call a permanent cavity, and that is the wound track that

9    you heard Dr. Baden speaking about this morning.  But it

10   also creates a temporary cavity, a mushrooming out, due to

11   the kinetic energy of that bullet traversing the body.

12             And when that temporary cavity -- it's stretching

13   of the tissue is what it is -- when that temporary cavity

14   collapses, that -- by the experimental designs that we have

15   in our field, that's when the back spatter is created.

16   That's when the back spatter is ejected from the entrance

17   wound.

18             The experimental data -- and it's been done at the

19   Armed Forces Institute of Pathology is where it has been

20   done -- shows that that temporary cavity does not collapse

21   until after the exit wound has been created.  So that tells

22   you, as quick as it is -- and it's very quick, certainly --

23   but there is a time lapse from the time the gunshot enters

24   the body until the temporary cavity collapses and back

25   spatter's created.

2573

DIRECT - SUTTON

1    Q.    And are there some cases where you -- there's just no

2    back spatter produced?

3    A.    Absolutely.

4    Q.    Now --

5    A.    In a lot of cases, frankly, from my experience, we

6    don't find back spatter more often than we do.

7    Q.    I'd like to go to your conclusions --

8    A.    Okay.

9    Q.    -- in this matter.

10          Can you tell us whether you have any conclusions

11   about the orientation and location of the soft case at the

12   time of the shot?

13   A.    I cannot tell you where the case was at the time of the

14   shot from the information that I have.

15   Q.    And we just talked a lot about the lack of blood or

16   tissue on the soft case.  Does that have any relevance or

17   meaning to you in determining whether this accident was an

18   accident or intentional?

19   A.    No, it does not.  Because of all the reasons that we

20   just discussed, I might not find back spatter.

21   Q.    When you reviewed Mr. Griffin's report, Mr. Griffin

22   also made a conclusion about whether the -- he could

23   determine whether the gunshot was self-inflicted.  Is that

24   something you can agree with?

25   A.    I think in this instance, you can rule out a

DIRECT - SUTTON

1    self-inflicted, I -- in -- such as a suicidal-type

2    infliction.  Self-inflicted, if you want to call that an

3    accident, I think is certainly on the table.

4    Q.   Okay.  So -- but we rule out suicide.

5    A.   Yes.

6    Q.   Now, in your 30-plus years of experience and going to

7    many incident scenes or maybe doing analysis after the fact,

8    in some of those cases can you form an opinion based on

9    bloodstain pattern analysis regarding whether an act was

10   intentional or an accident?

11   A.   Yes, absolutely.  In fact, that's one of the jobs that

12   I performed at the medical examiner's office was to go to

13   the scene and examine the scene and to bring back

14   information to help the medical examiner make that ruling.

15   Q.   And you worked in conjunction or you would give

16   information to each other?

17   A.   Yes.

18   Q.   Now, in this case, based on your review, your analysis,

19   your expertise, do you have an opinion based on your

20   bloodstain pattern analysis regarding whether this was an

21   accident or whether it was intentional?

22   A.   I cannot make the distinction.

23   Q.   Thank you, Ms. Sutton.

24           THE WITNESS:  Yes, ma'am.

25           THE COURT:  Cross-examination.

2575
CROSS - SUTTON

1          MR. WINSTEAD:  Thank you, Your Honor.

2          THE COURT:  You may proceed, counsel.

3          MR. WINSTEAD:  Thank you, Your Honor.

4                        CROSS-EXAMINATION

5    BY MR. WINSTEAD:

6    Q.    Good morning, ma'am?

7    A.    Good morning.

8    Q.    I will tell you that the first thing Tom Griffin told

9    me when we got your report was how much he respected you and

10   how great it was to have you on this case.

11   A.    Well, thank you.  I appreciate that.

12   Q.    So I'm understanding your report basically as you can't

13   tell nothing about nothing; is that fair to say?

14   A.    Well, perhaps you can come over to -- give me a little

15   more credit than that.  But I can't -- I can't tell you if

16   this is a homicide or an accident.

17   Q.    Sure.  All right.  So, well, I would like to start off

18   talking about some of the things we can't know nothing

19   about.  So you remarked in your report that you saw a dark

20   stain on Mrs. Rudolph's shoe in one of the photos.  If

21   you --

22   A.    Yes.

23   Q.    -- recall that?

24   A.    Yes.

25   Q.    And you said it's possible that that may be blood, but

2576

CROSS - SUTTON

1   it wasn't -- it wasn't tested, right?

2   A.   The shoes were not collected.  Another -- yes.

3   Q.   And so it may have been blood, it may have been dog

4   poop or something of that nature.  I guess elephant poop in

5   Zambia.  Right?

6   A.   I guess.  Yes.

7   Q.   All right.  And looking at the stains in the room, I

8   think you remarked two places where you saw there was a wipe

9   or a swipe or -- I can't remember exactly the word.

10  A.   Uhm-hum.

11  Q.   Is that right?

12  A.   I don't remember the number, but there are some wipes

13  and there are some swipes.  Difference being swipe is if I

14  have blood on my hand and I deposit it on this desk, that's

15  a swipe.  If I took a cloth and removed it, that's a wipe.

16          MR. WINSTEAD:  And, Your Honor, I, too, will be

17  showing some scene photos so I'd like to pull up one right

18  now.  But I'll just again give that warning to the

19  courtroom.

20          THE COURT:  All right, thank you for the notice.

21  BY MR. WINSTEAD:

22  Q.   Ma'am, I'd like to pull up Exhibit 16, page 5.  Oh,

23  that's not the right one.  Sorry.  Can you bring up 16,

24  page 1.  There we go.

25          So if I recall from your report, I think you noted

CROSS - SUTTON

1    that was a wipe, and that was a swipe, or something like

2    that.  Does that seem familiar?

3    A.   This is a wipe, yes.  Right here.  I think I put this

4    one as swipe or wipe, that I couldn't tell.

5    Q.   Sure.

6    A.   Yes.

7    Q.   And otherwise, you -- I don't believe in your report

8    you identified any other in the rest of the photo -- any

9    other wipes or swipes that you could see; is that right?

10   A.   Not that I recall.

11   Q.   Okay.  And so as far as those two, it's hard to tell if

12   that was Mrs. Rudolph or if that was someone else that

13   caused those, right?

14   A.   That's correct.

15   Q.   And I think in -- just in general, you said that you

16   can't really assign a sequence to all of the different blood

17   stains in this photo, right?

18   A.   I -- that's correct.  I cannot.

19   Q.   Okay.  So other than those swipes, you don't see any

20   other evidence of the blood being obviously disturbed.

21   A.   No.

22   Q.   Okay.  And, of course, I'm sure you reviewed the

23   reports.  You're aware that people were walking all over the

24   area in the immediate aftermath of the shot, right?

25   A.   Yes, sir.

2578
CROSS - SUTTON

1   Q.   So I'd like to ask you, then -- if you can zoom in for

2   me just right here.

3            Do you see any blood on Mr. Rudolph's shoes?

4   A.   There is one darkened area right there that I don't

5   know what -- what that is.  But as overall, no, other than

6   that one darkened area.

7   Q.   And as far as that darkened area --

8   A.   I don't know.  Again, if we had the evidence, if we

9   could test it, but . . .

10  Q.   So that also could be elephant poop?

11  A.   I'm sorry?

12  Q.   That could be elephant poop, too.

13  A.   Oh, it could be, yes.

14  Q.   What sort of tread do you see on his shoes?

15  A.   It looks like a Merrell tread.

16  Q.   Wow, I wasn't expecting to get that.  So --

17  A.   Well -- I've gotten old enough I've gotten into the

18  real comfortable footwear, so . . .

19  Q.   Great.  Would you call it a relatively aggressive

20  tread?

21  A.   I think I need you to define what you --

22  Q.   Fair enough.

23  A.   It's tracking or -- or hiking type tread.

24  Q.   Right.  Okay.  And so would it be pretty hard to tell

25  from a photograph definitively whether or not there is blood

2579

CROSS - SUTTON

1    on the shoes?

2    A.    It would depend on how much.

3    Q.    Right.  Right.

4    A.    Sure.

5    Q.    So you can at least tell that there wasn't like a blood

6    flow going down the soles or something?

7    A.    There is not, no.

8    Q.    Okay.  So if you could go back to the full photograph.

9         In reviewing the reports, did you know that the

10   witnesses describe that Mr. Rudolph did walk right over the

11   area of the blood twice in the immediate aftermath of the --

12   of the shot?

13        MS. MOSS:  Objection, Your Honor.  I don't believe

14   those are the facts that have come into evidence in this

15   case.  I don't recall anyone testifying to Mr. Rudolph

16   walking through the blood.

17        THE COURT:  I don't recall that either.

18        MR. WINSTEAD:  I'm happy to explain, Your Honor.

19        THE COURT:  Go ahead.

20   BY MR. WINSTEAD:

21   Q.    Okay.  Can you bring up Exhibit 16, page 5.

22        All right.  So are you aware that witnesses

23   reported Mr. Rudolph was in the entrance to the bathroom

24   when he was first seen when they arrived?

25   A.    I believe that is in one of the reports, yes.

2580

CROSS - SUTTON

1    Q.    And do you recall that the Rudolphs' bags were on the

2    front porch outside this door right here?

3    A.    I've seen a photograph that seems to depict bags on the

4    porch.  I don't know who they belong to, but it could have

5    been the Rudolphs'.

6    Q.    And so do you recall witnesses reporting that

7    immediately after the shot, Mr. Rudolph ran to the bags to

8    get the medical kit and then ran back?

9    A.    I do not.  I thought I recalled the guide bringing a

10   medical kit, so that's -- that's where --

11   Q.    That's your recollection of the reports you reviewed?

12   A.    I'm sorry?

13   Q.    That's your recollection of the --

14   A.    That is my recollection.  The guide brought or had the

15   kit brought.

16   Q.    Okay.  Thank you.  Now, if the defendant were standing,

17   say, on the rug, and then walked to the bathroom, do you

18   think he would have any difficulty avoiding stepping on the

19   blood, just from this photograph?

20   A.    No.

21   Q.    Okay.  When you -- you can take that down, please.

22         When you were reviewing the photographs, I believe

23   you noted that there was no blood visible on Mrs. Rudolph's

24   arms and wrists; is that right?  Do you recall?

25   A.    I don't recall any on her arms or wrists, but I

CROSS - SUTTON

1    questioned the right palm.

2    Q.    On the hands.

3    A.    Yes.

4    Q.    Okay.  Do you recall seeing any dark material or any

5    soot or anything like that on her arms or wrists?

6    A.    I do not.

7    Q.    Okay.

8    A.    Or I guess I should say I did not see anything that I

9    would identify as that.

10   Q.    Sure.  As far as the drip on the body, you were asked

11   about the blood trail going down her chest, right?

12   A.    Yes, sir.

13   Q.    Did you also see the blood trail continue down on her

14   leg below her chest?

15   A.    On her leg?  It continued -- there were drips on her

16   feet.  Is that -- but it continued from her chest down her

17   torso and down the left thigh.

18   Q.    Yeah.  Okay.  And so can you make any conclusions about

19   how she was postured during that?

20   A.    She had to be upright because that was a continuous

21   trail, and it would have -- it is not consistent with

22   somebody sitting, somebody kneeling, because you would not

23   see the continuous distribution.

24   Q.    And so if someone were bent over and then somehow fell

25   down, would that explain why you would have a continuous

CROSS - SUTTON

1    distribution down their torso?

2    A.    It would not because, bent over, the blood -- again,

3    gravity wins.  The blood would drip down and -- and if that

4    person then fell over, that would not account for the

5    continuous flow line down the body.

6    Q.    I'd like to talk about the case -- the soft case.

7    A.    Yes.

8    Q.    You mentioned that Tom Griffin did a visual exam on the

9    case, right?

10    A.    Yes.

11    Q.    And did some chemical testing on any areas he

12    identified as possible blood stains?

13    A.    Correct.

14    Q.    And those were negative?

15    A.    Those were negative.

16    Q.    Did you know that -- I'm sure -- well, you may have

17    known:  Did you know that the crime scene reconstructionist,

18    Luke Haag, did a Luminol test on the soft case?

19    A.    Yes.

20    Q.    Okay.  And that was negative.

21    A.    And that was negative as well.

22    Q.    Are those Luminol tests pretty -- pretty good as far as

23    detecting any significant blood on a material or is there a

24    question?

25    A.    Well, Luminol has more false positives than

CROSS - SUTTON

1    phenotheline does.  So it can give you a reaction when it's

2    not blood.  It's more sensitive than the phenotheline.  So I

3    don't know exactly how to answer your question as to which

4    one's better.

5    Q.   Sure.  So if it didn't give you a positive, does it

6    have a lot of false negatives?

7    A.   Luminol?

8    Q.   Yes.

9    A.   Not really, no.

10   Q.   Okay.  And so if it was negative in this case, that's a

11   pretty good sign that there wasn't, in fact, any blood on

12   the case?

13   A.   The way we -- we reported it in my laboratory was that

14   that indicated there were no traces of blood present within

15   our detection limits at this time.

16   Q.   Okay.  So I want to talk a little bit about the reasons

17   why there might not be blood on the case.

18   A.   Okay.

19   Q.   First of all, just to be clear what we're talking about

20   here, in -- and I -- I was reading through sections of your

21   book, and I believe you said with respect to things like

22   shotguns and high-powered firearms, a greater quantity of

23   back spatter would be expected especially when the weapon is

24   discharged at close or contact range.  And I -- right?

25   A.   Yes.  That is in our book and that is what is expected,

CROSS - SUTTON

1    but it's not always what happens.

2    Q.    Right.  And when you are saying "a greater quantity,"

3    that's -- I'm sorry.

4              MR. WINSTEAD:  I didn't hear if you said anything.

5              THE COURT:  I didn't say anything.

6    BY MR. WINSTEAD:

7    Q.    When you're talking about "a greater quantity" you're

8    talking about a shotgun as opposed to a smaller caliber

9    firearm or something like that.

10   A.    Yes, yes.

11   Q.    And you also said back spatter may be completely absent

12   with considerable muzzle-to-target distance, right?

13   A.    Correct.

14   Q.    And so that's obviously the first reason why there

15   might not be blood on the case is, like you said, back

16   spatter only goes about 3 feet, right?

17   A.    3 or 4 feet is the general rule.  I've seen it where I

18   think I could confirm it was back spatter maybe in the 5 or

19   6 feet range; but general rule, 3 to 4.

20   Q.    Sure.  And you talked about several reasons why that

21   might be.  Another obvious reason is there might be an

22   intervening object, right?

23   A.    Correct.

24   Q.    And so that could be the end of the case like you were

25   discussing, right?  That little piece that was on the

CROSS - SUTTON

1   ground?

2   A.    The piece that was on the ground, yeah.  That's a --

3   that's so crucial.  That's what we know had to be closest.

4   Q.    And on that, did you -- could you see how big that

5   piece was that was on the ground?

6   A.    Well, it was hard to tell in the photographs, but

7   looking at the photographs that were taken later of the

8   damaged case I think gives a better indication of the size

9   of the piece.

10  Q.    Have you looked at the damaged case?

11  A.    No, I have not.

12  Q.    Well, if I told you that most of the tip of the case is

13  actually still attached, would you doubt me or would you --

14  and if you'd like, we've got it right behind you, you're

15  welcome to take a look.

16  A.    I -- I have no reason to doubt you.

17  Q.    Okay.  Fair enough.

18          So if it's a pretty small part of it that's

19  missing, do you think that that small piece would

20  necessarily block all of the blood spatter coming out, or

21  was there a different reason why that would --

22  A.    Oh, I don't think it would block it.  I just think that

23  if -- if I'm looking for something that I know doesn't

24  travel a great distance, I want to get as close as I -- as I

25  can before I start.

2586

CROSS - SUTTON

1    Q.    Do you know how fast the pieces of the front of the

2    case move when the shotgun's fired in a soft case?

3    A.    As far as giving you a quantifiable speed, I cannot.

4    It's fast.

5    Q.    So just for -- relatively speaking, do you know how

6    fast the pellets come out of the end of the shotgun?

7    A.    I believe it's like 1100 feet per second.

8    Q.    Exactly right.

9    A.    Is that right?  Hey.  I read it a very long time ago.

10   Q.    Perfect.  So if the pieces of the front of the case are

11   being accelerated by those pellets, would you think that

12   they're probably moving at a similar speed, at least

13   initially?

14   A.    They're -- they're moving close to that speed.  Maybe

15   not quite that speed.

16   Q.    And so you had said before in order for blood spatter

17   to be produced, the projectile has to hit the wound, right?

18   A.    Correct.

19   Q.    And then the tissues have to collapse.

20   A.    Uhm-hum.

21   Q.    And then the blood spatter comes out.

22   A.    Correct.

23   Q.    So if the tip of the case is likely moving a similar

24   speed as the pellets, do you think it might be gone by the

25   time blood spatter comes back out?

2587

CROSS - SUTTON

1    A.    It could be.

2    Q.    Okay.

3    A.    We don't know.

4    Q.    And I've got some videos of the cases, but I think

5    that's -- that's fine.

6          Okay.  And then we talked about the shirt.  So we

7    know she was wearing a shirt, right?

8    A.    Correct.

9    Q.    Do you -- do you never get blood spatter coming from

10   wounds underneath clothing, or is it just hard to tell

11   whether you're going to or not?

12   A.    It's highly variable; but clothing can block it, but

13   doesn't always.

14   Q.    Okay.  All right.  Then you talked about air currents.

15   A.    Uhm-hum.

16   Q.    Like if the air is moving, right?

17   A.    Correct.

18   Q.    In order for that one to apply, there would have to be

19   at least some distance so that the blood spatter could

20   interact with the air; is that right?

21   A.    Some distance?

22   Q.    Between --

23   A.    From what?

24   Q.    Between the wound and whatever object is not receiving

25   blood spatter because of the air currents.  So in other

CROSS - SUTTON

1    words --

2    A.   Okay.  For the air currents to travel through, so yes,

3    yes, I think I see.

4    Q.   Likewise with the blood spatter drying, there would

5    have to be some amount of distance for that to apply,

6    right?

7    A.   Yes, sir.

8    Q.   And then as far as human reactions to things -- well,

9    actually, so the whole category of recoil, of human

10   movement, of things like that, do you know how the relative

11   speeds of like the -- the back spatter particles and like

12   how fast humans react to things and things like that, or is

13   that just more of an estimate?

14   A.   I couldn't give you a number.  It's more than an

15   estimate.

16   Q.   So it's more sort of just the common sense, like if

17   things are moving, you might not get the back spatter; is

18   that right?

19   A.   Sure.

20   Q.   Does back spatter move pretty fast?

21   A.   Yes.

22   Q.   So I'd like to -- well, actually before we go to this,

23   you mentioned if there's an angle, back spatter usually

24   comes out perpendicular to the wound, right?

25   A.   Correct.

2589

CROSS - SUTTON

1    Q.    So even if you got shot from the side, the back

2    spatter's going to come straight out?

3    A.    Correct.

4    Q.    And so if -- if the angle was also perpendicular, that

5    one wouldn't apply, right?

6    A.    That --

7    Q.    If the angle of the shot -- or of the object was

8    perpendicular to the wound, that wouldn't apply, right?

9    A.    Yes, it still comes out in a cone perpendicular to the

10   body, to the wound.

11   Q.    Okay.  Then just a quick question on the unsupported

12   guns.  What do you mean by an unsupported gun?

13   A.    If the gun was dropped and fired, it would -- certainly

14   recoil would move the gun itself.  If someone did not have a

15   good hold on the gun and it fired, recoil would be a factor

16   in the movement of that gun.

17   Q.    And so if the gun moved backwards, why would the case

18   also move backwards?

19   A.    The photographs I saw, the gun was in the case as if

20   it -- and it -- the end of the case being blown away would

21   indicate that the shot occurred while the gun was in the

22   case.

23   Q.    If the -- if the case was opened in the back, do you

24   think that the recoil would instead just pull the shotgun

25   out of the case?

CROSS - SUTTON

1    **A.    It would depend on how much that case was open.**

2    **Q.    Sure.  And so if it was open enough to slide out in --**

3    **A.    If it were open enough to slide out, it could slide**

4    **out.  But the first photograph shows it's still in the case.**

5    **Q.    Right.  Right.  Okay.**

6         **Now, but same question:  Do you know how -- what**

7    **the relative speed of recoil as opposed to blood spatter**

8    **movement would be, or is that just sort of an estimate?**

9    **A.    I couldn't give you a number.  The videos that I've**

10   **watched put the weapon moving before the back spatter comes**

11   **out, before it's produced or travels a significant amount**

12   **such that it might hit the end of the shotgun, but to tell**

13   **you a number, I cannot.**

14   **Q.    Okay.  So then what I'd like to do is show you some**

15   **videos, which I'm sure you will have seen before, and I**

16   **think will illustrate a little bit that I -- that we've been**

17   **talking about, and some questions that I'd like to talk**

18   **about.  These are not yet admitted.  Could I please show,**

19   **then, not to the jury, and bring up Exhibit 498, please.**

20        **All right.  So these are from the Midwest Forensic**

21   **Resource Center --**

22   **A.    Yes.**

23   **Q.    Yeah, you know --**

24   **A.    I'm familiar with those.**

25   **Q.    Okay.  So I've got some of the .22-caliber ones from**

CROSS - SUTTON

1    different distances.

2    A.    Okay.    Sure.

3    Q.    Okay.    So are these videos helpful to sort of visualize

4    what blood spatter looks like and how things work from

5    different distances?

6    A.    Sure.

7          MR. WINSTEAD:    Your Honor, at this time, I would

8    move to admit Government's Exhibit 494, 495, 496, 497, and

9    498.

10         THE COURT:    Any objection, Ms. Moss?

11         MS. MOSS:    No objection, Your Honor.

12         THE COURT:    There being no objection, Exhibits 494

13   through 498 are admitted into evidence and may be published

14   to the jury.

15       (Government's Exhibits 494 thru 498 received)

16         MR. WINSTEAD:    Okay, thank you very much.

17   BY MR. WINSTEAD:

18   Q.    So if you could please play this one from the

19   beginning.

20         And tell us, ma'am, what we're looking at.

21       (Video played)

22         THE WITNESS:    Well, yeah, .22-caliber.    On this

23   side, here's this cone -- oops.

24   BY MR. WINSTEAD:

25   Q.    Oh, sorry.    Can you play it again.

2592

CROSS - SUTTON

1    A.    Sorry.

2          (Video played)

3    BY MR. WINSTEAD:

4    Q.    And just pause it right when the back spatter comes

5    out.

6    A.    Okay, there.  This is the back spatter that is

7    traveling away from the entrance.  You can see the bullet

8    traveling forward.  And if this would be the exit side, and

9    you see the cone shape of what we -- we would classify as

10   forward spatter, or the spatter that is produced by the

11   exiting bullet.  In this instance, we're not -- we don't

12   have an exit wound so we're only concerned with the back

13   spatter.

14   Q.    Great.  And so in this -- as this is paused, it looks

15   like the bullet has moved about that far and the back

16   spatter has moved about that far --

17   A.    Okay.

18   Q.    So would you say it's moving relatively close to the

19   speed of the bullet, at least initially?

20   A.    It's moving quickly.  I don't know -- I don't know that

21   I could say it's moving at the same speed.

22   Q.    Well, so the bullet hit, right?

23   A.    Okay.

24   Q.    And then there's a delay, like you said, where --

25   A.    Uhm-hum.

CROSS - SUTTON

1    Q.    -- the -- you know, the sponge collapses.

2    A.    Right.

3    Q.    And --

4    A.    Well --

5    Q.    And it comes out --

6    A.    The sponge is not the same material, though, as a human

7    body, nor is this the same thickness of a human body.

8    Q.    Of course.

9    A.    So we've got those factors.  And I was not referring to

10   what had been observed in sponges as opposed to shooting in

11   ballistic gelatin -- the closest -- we don't have people

12   volunteer to get shot for studies so we have to replicate as

13   closely as we can.  And these studies that I was referring

14   to from AFIP, Armed Forces Institute, were conducted by

15   Dr. Marty Fackler.  And Dr. Fackler is the one that has made

16   these publications about the collapses of that internal

17   temporary cavity.

18   Q.    Right.

19   A.    What was done in this series of videos, and I'm

20   familiar with -- I don't know if I've looked at all of the

21   ones that Michael and Bart and Terry did, but I've looked at

22   a bunch of them -- is the same thing I did when I was

23   teaching a class.  When I'm teaching a class, I'm not trying

24   to produce a little back spatter, I wanted to give them a

25   lot, okay?  So I give them a bloody sponge to shoot, and I

CROSS - SUTTON

1   give them -- I actually wet it with blood and then I added a

2   little water to it as well to -- to pump up the amount of

3   back spatter that they would see.

4           And that's exactly what has been done in this

5   series of videos.  So, yeah, it's back spatter, but I don't

6   know exactly how it equates to a real human body.

7   Q.   Right.  And, of course, all these are generally

8   illustrating the principles that you've been discussing

9   about --

10  A.   Yes.  And back spatter's created very quickly, to

11  answer your original question.  I got off on a tangent.

12  Q.   That's all right.  Appreciate it.  Okay.  So then let's

13  go to Exhibit 494.

14          All right.  So if you could go back to the

15  beginning on there.  So before you push play, so this is

16  centimeter distance, right?

17  A.   Uhm-hum.

18  Q.   Okay.  Fire it.

19       (Video played)

20  BY MR. WINSTEAD:

21  Q.   All right.  So on this one, did you see the gases kind

22  of come out and get out of the way and then the back spatter

23  starts coming out?

24  A.   Right.  And there, that's that time lapse.

25  Q.   Right.  Exactly.

CROSS - SUTTON

1    A.    Exactly.

2    Q.    All right.  Then could you go to the next one, 495.

3              So this one is from 15 centimeters.  Oh.  All

4    right.  So 15 centimeters away.

5         (Video played)

6    BY MR. WINSTEAD:

7    Q.    Now on this one, it looks like the gases are coming out

8    following the projectile and they just smack all the blood

9    spatter back down onto the sponge; is that right?

10   A.    Yes.  And there was a study that came out just this

11   month that talks about that very thing, about the

12   movement -- because those are air currents as well, and the

13   movement of the gases can push the back spatter.

14   Q.    Great.  And then if you could bring up Exhibit 496.

15   All right.  Yeah, start that one again, please.

16        (Video played)

17   BY MR. WINSTEAD:

18   Q.    All right.  So this one is from 30 centimeters.  Go

19   ahead.

20        (Video played)

21   BY MR. WINSTEAD:

22   Q.    Okay.  You can really see it there, right?

23   A.    Yeah, really see it.

24   Q.    The gases come in and just blow those little particles

25   all over the place?

2596

CROSS - SUTTON

1    A.    Yeah.

2    Q.    Pretty much pushes them all back.

3    A.    Uhm-hum.  And I think you also see the lapse -- the

4    time lapse that I was addressing.

5    Q.    Right.  Right.  And then 497, please.  Okay.  This is

6    from 50 centimeters.  And so now the gases are coming in,

7    but, you know, the back spatter's sort of gotten out to some

8    degree, and some of it's getting pushed, right?

9    A.    Right.  Took longer for the gases to traverse the

10   distance.

11   Q.    Right.  So -- and I don't recall you mentioning in this

12   report, but another reason there might not be back spatter

13   on the soft case is -- is if it's one of a similar distance

14   to this, those gases might just push that back spatter right

15   onto the wound, right?

16   A.    That is correct, yes.

17   Q.    And -- and I'm -- you know, we talked about the amount

18   of back spatter.  This is a .22, which is really small,

19   right?

20   A.    Yes.  In comparison, yes.

21   Q.    In comparison.  And so the 12-gauge buckshot, that's

22   going to, in general, create a lot more back spatter than a

23   .22 would, right?  In -- and obviously setting aside --

24   A.    Yeah.

25   Q.    -- a back spatter pattern, it's going to likely -- the

REDIRECT - MOSS

1    wound is likely to create more blood coming out.

2    A.    The wound is larger so there's a better incidence, I

3    guess you might say.

4    Q.    Right.  And also you'd expect to see a lot more gases

5    coming out than a .22, right?

6    A.    Yeah.

7    Q.    And so if the gun was 1-foot, 2-foot, sort of in that

8    range, would you basically expect those gases are going to

9    hit that back spatter?

10   A.    They could.  Certainly, yeah.

11              MR. WINSTEAD:  May I have a moment, Your Honor?

12              THE COURT:  You may.

13              MR. WINSTEAD:  No further questions.  Thank you

14   very much, ma'am.  It was a pleasure.

15              THE WITNESS:  Yes, sir.

16              THE COURT:  Redirect.

17                     REDIRECT EXAMINATION

18   BY MS. MOSS:

19   Q.    Ms. Sutton, we just watched a number of videos there.

20   And I'm a little nerdy so I think that's fascinating stuff,

21   but I don't want the jury to have the impression that that's

22   what happened in this case.  So I want to ask you:  In that

23   first video that you saw where you see some very obvious

24   back spatter coming back -- I'm sorry this is really a long

25   question -- I think you said that when you teach, you do

2598

REDIRECT - MOSS

1   demonstrations like that as well.

2   A.   Yes.

3   Q.   Okay.  And when you do that, do you use a sponge?

4   A.   We do.

5   Q.   And do you kind of fill that sponge with blood so that

6   you make sure you can see a lot of back spatter?

7   A.   Yes.

8   Q.   And do you also -- I think you said you added water to

9   the sponge.

10  A.   I do.

11  Q.   And does that change the viscosity of the blood and

12  like that thickening that you talked about on direct?

13  A.   Yes, it does.  I'm doing everything that I can think of

14  to maximize the amount of back spatter the students will

15  see.

16  Q.   And when you do that -- and in the video we saw -- is

17  the sponge similar to skin?  Does it react the same as if

18  the bullet had gone through skin?

19  A.   No, it's not.  It doesn't -- it doesn't have as much

20  ability to stretch as skin does.  Skin is really crazy

21  surfaces.  You know, we've got collagen tissues going this

22  way, and then when it injures, it stretches, and yeah.

23  Sponge is not the same.

24  Q.   So they have different characteristics?

25  A.   Yes, they do.

REDIRECT - MOSS

1   Q.   And in the video, and when you do this, do you

2   typically put layers of clothing over the sponge that might

3   capture the back spatter?

4   A.   We -- we do later to show them that how much clothing

5   is present is a factor to be considered.  But when we are

6   doing the initial shots, no, there's no clothing over the --

7   over the sponge.

8   Q.   Okay.  Now I want you to make a crazy assumption for a

9   second.  Let's just assume that someone was holding a gun up

10  in front of Mrs. Rudolph, and we've heard testimony that it

11  might have been 1 to 2 feet away.  I think you testified on

12  cross that -- what's the distance that back spatter can

13  travel?

14  A.   Rule of thumb is 3 to 4 feet.  I've seen it 5 to 6.

15  Q.   So, again, if someone's holding something stationary in

16  front of Mrs. Rudolph and the wound, and is holding it

17  stationary within a foot, possible that you get back spatter

18  on that object?

19  A.   Sure.

20  Q.   Now, again, assume for a second that someone shot her

21  and she's backing up and somebody is trying to go in the

22  same direction that she's going --

23            MR. WINSTEAD:  Objection.  Leading.

24            THE COURT:  Well, we haven't heard the question.

25            MR. WINSTEAD:  Oh.

2600

REDIRECT - MOSS

1    BY MS. MOSS:

2    Q.    Do you follow me so far?

3    A.    So far.

4    Q.    Okay.  Is it possible that those people could have

5    connected with each other and there would be blood on the

6    other person?

7            MR. WINSTEAD:  Objection.  Leading.

8            THE COURT:  Sustained.

9    BY MS. MOSS:

10   Q.    Well, my question is:  Is it possible that there would

11   be blood on the other person?

12   A.    Yes.

13   Q.    And is it possible that there could be back spatter on

14   that person?

15   A.    Yes.

16   Q.    Now are you aware that, in this case, no one saw any

17   blood on Mr. Rudolph's clothing or collected any clothing to

18   analyze for blood?

19   A.    I did not see any reference to someone seeing blood and

20   there's no indication the clothing was collected.

21   Q.    Now, I want to clarify one other thing that you

22   testified to on cross.  And I believe you said at some point

23   for the flow pattern that you see on Mrs. Rudolph's pants

24   and shirt, that she had to be upright --

25   A.    Correct.

2601

REDIRECT - MOSS

1    Q.    -- is that right?

2    A.    Correct.

3    Q.    At other points, and maybe perhaps even at the moment

4    of impact, could she have been bent over?

5    A.    Sure.  And then -- and then subsequently straightened

6    up.  Sure.  All I know is that at some point after bleeding

7    starts she had to have been upright long enough for the flow

8    to begin from the wound and travel all the way down her body

9    and her upper thigh on the left side.

10   Q.    Thank you, Ms. Sutton.

11   A.    Yes.

12            THE COURT:  May this witness be excused, Ms. Moss?

13            MS. MOSS:  Yes, Your Honor.

14            THE COURT:  For the Government?

15            MR. WINSTEAD:  Yes, Your Honor.

16            THE COURT:  Ms. Sutton, thank you so much for your

17   testimony.

18            THE WITNESS:  Yes, sir.  Thank you.

19            THE COURT:  And you're excused and you may step

20   down.

21            THE WITNESS:  Thank you.

22            THE COURT:  Defendant Rudolph may call his next

23   witness.

24            MR. MARKUS:  Your Honor, at this time we would call

25   Mitch Hoffman.

2602

DIRECT - HOFFMAN

1          COURTROOM DEPUTY:  Raise your right hand for me.

2         MITCHELL HOFFMAN, GOVERNMENT'S WITNESS, SWORN

3          COURTROOM DEPUTY:  Thank you.  If you'll be seated

4    and remove your mask for us.  And state your full name for

5    the record and spell your first and last name for us.

6          THE WITNESS:  My full name is Mitchell Stanley

7    Hoffman.  Mitchell is spelled M-i-t-c-h-e-l-l, Hoffman,

8    H-o-f-f-m-a-n.

9          MR. MARKUS:  May I proceed, Your Honor?

10         THE COURT:  You may proceed, counsel.

11                     DIRECT EXAMINATION

12   BY MR. MARKUS:

13   Q.   Thank you.  Good afternoon, Mr. Hoffman.

14   A.   Good afternoon.

15   Q.   Can you tell the ladies and gentlemen of the jury what

16   you do for a living.

17   A.   I'm a certified public accountant.  I've been -- I have

18   been practicing in the area -- in certified public

19   accounting since the early 1980s.  Prior to 1990, I had a

20   fairly traditional practice doing audit and tax preparation

21   work.  Beginning in 1990, I was ushered into the world of

22   forensic accounting, and since 1990, I've been practicing in

23   the area of business valuation, commercial and intellectual

24   property damages and cash tracing.

25   Q.   And where did you go to school, Mr. Hoffman?

DIRECT - HOFFMAN

1    A.    I graduated from the United States Naval Academy in

2    1976 with a degree in -- bachelor of science degree in

3    analytical management, which is a focus on using

4    mathematical models for problem solving and decision-making.

5         At that point, I was commissioned as a second

6    lieutenant in the United States Marine Corps where I served

7    as an infantry officer for the next five years.  I served

8    both stateside and overseas.

9         While I was stationed in San Diego, I had the

10   opportunity to go to graduate school at night and get my

11   master's degree in business administration with emphasis in

12   finance and accounting.

13   Q.    And can you tell the jury what professional

14   certifications you have.

15   A.    I have the certified public accountant license and, in

16   conjunction with that, or in addition to that, I have had

17   the ABV, or accredited in business valuation accreditation.

18   That's given by the American Institute of Certified Public

19   Accountants.

20   Q.    And do you ever teach accounting and other sorts of

21   similar courses?

22   A.    Yes.  Many years ago I taught for the University of

23   Phoenix.  I taught accounting.  Much more recently I've been

24   teaching in the area of business valuation.  I was amongst

25   the first of the -- of CPAs to be granted the ABV

DIRECT - HOFFMAN

1    accreditation by the American Institute of Certified Public

2    Accountants.  And upon receiving that accreditation the

3    AICPA tasked me with teaching business valuation in various

4    states.  I taught in -- for the state societies of Colorado,

5    New Hampshire and New York.  I also teach every year just as

6    a guest lecturer on business valuation at the University of

7    Denver Daniel School of Business.

8    Q.   And without going through all the awards that you've

9    won, have you won a number of awards for your business or

10   your practice?

11   A.   Yes.  Years ago when the business valuation profession

12   was becoming more codified, if you will, the AICPA appointed

13   me to an international task force that developed a glossary

14   of business valuation terms.  And for that work, I was among

15   the -- I was the first recipient to receive the business

16   valuation Volunteer of the Year award from the AICPA at

17   their national convention.

18   Q.   And do you practice here in Colorado?

19   A.   I do.

20        MR. MARKUS:  Your Honor, at this time under

21   Rule 702, I'd move to qualify Mr. Hoffman as an expert in

22   accounting, business valuation, determining net worth, and

23   cash flow.

24        THE COURT:  Any objection?

25        MR. FIELDS:  No objection, Your Honor.

DIRECT - HOFFMAN

1    THE COURT:  All right.  There being no objection,

2    Mr. Hoffman is qualified under Federal Rule of Evidence 702

3    to provide expert opinion testimony in the fields of

4    accounting, business valuation, determining net worth, and

5    cash flow.

6    MR. MARKUS:  Thank you, Your Honor.

7    BY MR. MARKUS:

8    Q.   Mr. Hoffman, is it fair to say you've reviewed lots and

9    lots of bank accounts, spreadsheets, numbers, and the things

10   that you accountants look at?

11   A.   That's more than fair.

12   Q.   Okay.  And did you also have a look at Erin Newton's

13   work and her reports and spreadsheets and so on?

14   A.   I did.

15   Q.   Okay.  Have you written a lengthy report in this case?

16   A.   I did.

17   Q.   Okay.  I want to just talk to you about your three

18   conclusions.  And I'd like to just touch upon each of them

19   and do it as quickly as we can for the jury.

20        The first one is net worth, which we've heard about

21   in this trial.  We didn't hear about it from Ms. Newton, but

22   did you in this case determine the net worth of Dr. Rudolph

23   in 2016?

24   A.   Yes.  I determined the net worth of -- actually Dr. and

25   Mrs. Rudolph as of September 30th, 2016.

DIRECT - HOFFMAN

1    Q.    And can you just briefly describe to the jury:  How do
2    you determine net worth?
3    A.    Well, I largely built on the work of Ms. Newton.
4    Ms. Newton did analyses regarding bank accounts and
5    investment and retirement accounts that Dr. Rudolph and
6    Mrs. Rudolph held.  She also did analyses that had indicated
7    real estate that he had owned.
8         I said that I built on it because there were a
9    number of assets that she did not include in her analyses.
10   For example, she didn't include the value of his dental
11   practice.  Understandably why, she mentioned in her report
12   she's not qualified to render such an opinion.  That is my
13   specialty so I -- at the request of Mr. Markus, I appraised
14   the value of Mr. -- or Dr. Rudolph's dental practice.
15        I also included in the net worth analysis cash
16   surrender value of a life insurance policy that he had.
17   That added about another $586,000 to the net worth
18   calculation.  I also included real estate limited liability
19   companies in which he had passive ownership interest.  It's
20   like a partnership that owned -- that develops and owns real
21   estate.  In this particular instance, he had ownership
22   interest, as I recall, in four or five real estate limited
23   liability companies that were properties in the state of
24   Georgia, including condos, included shopping malls, some raw
25   land.  And as I recall, that was about another $368,000 of

DIRECT - HOFFMAN

1    net worth added.

2            We had also requested retrospective appraisals of

3    the real estate that the Rudolphs had owned at that time.

4    Although Ms. Newton had included those properties in her

5    analysis, they were at the price at which the Rudolphs had

6    paid for them, so it didn't include the appreciation -- the

7    appreciated value.  So counsel had commissioned real estate

8    appraisals, retrospectively, to determine the value of those

9    properties.  Those added additional value to the net worth.

10           And then in addition to that, there were taxidermy

11   mounts.  Dr. Rudolph was a collector of game trophies and it

12   seemed to me that there was sufficient number of trophies of

13   the type that might warrant a value estimate.  So Mr. Markus

14   had commissioned an estimate of those game trophies that

15   added approximately another $250,000 to the net worth

16   analysis.

17   Q.   And based on your review of the business, liquid

18   assets, illiquid assets, real estate, all the things that

19   you accountants look at, can you tell the jury how much the

20   Rudolphs were worth, what their net worth was, in September

21   of 2016?

22   A.   Slightly over $15 million.  To be exact was 15,010,000.

23   Q.   Okay.  The next conclusion I wanted to talk to you

24   about is cash flow.  Did you review Ms. Newton's spreadsheet

25   and conclusions about cash flow for the Rudolphs leading up

2608

DIRECT - HOFFMAN

1    to October 2016?

2    A.    Yes.

3    Q.    And we heard from Ms. Newton that the cash flow was

4    negative for part of '14, '15, and part of '16.  Do you

5    remember seeing that in her report?

6    A.    Yes.

7    Q.    Now, Ms. Newton conceded, when she testified, that cash

8    flow is not a complete picture of somebody's financial

9    portfolio.  Would you agree with her on that?

10   A.    In and of itself, I would -- yes, it's not.

11   Q.    Okay.  Do you think the negative cash flow of a couple

12   hundred thousand leading up to 2016 is significant in any

13   way?

14   A.    No, not at all.

15   Q.    Okay.  Can you explain to the jury some of the reasons

16   why a couple hundred thousand in negative cash flow is not

17   significant?

18   A.    Well, the reason it isn't significant is because of the

19   amount that he started with.  Ms. Newton's analyses didn't

20   take that into account.  And the -- and he had started -- I

21   had actually gone back a little earlier in the time frame

22   than she did.  And he had, at that point in time, something

23   between 5- and $6 million of liquid assets.  There were

24   slight decreases in the next two -- in the next two years,

25   but then increases in the following years.

DIRECT - HOFFMAN

1    So taking into account that which was -- which he

2    started with, it simply wasn't significant in the grand

3    scheme.

4    Q.    Is it fair to say that before she looked at the cash

5    flow, which is halfway through 2014, that for 2013 and 2012,

6    cash flow was positive?

7    A.    Yes, it was.  As a matter of fact, in 2013 there was,

8    as I recall, a favorable cash inflow of a million -- about a

9    million and a half thousand dollars, and I certainly believe

10   that that is significant.  It's significant to the jury to

11   consider, in my opinion, because by not looking at the

12   information prior to, in this case June of 2014, in my

13   opinion it provides a skewed perspective to the triers of

14   fact.

15   Q.    And when looking at cash flow, did Ms. Newton

16   characterize outflows of cash even when the Rudolphs were

17   paying off debt or buying property?

18   A.    Sure.  In other words, she was showing outflow if a

19   piece of real estate were acquired, for example.  Or

20   certainly it is reasonable to say that it's an outflow when

21   debt is paid off, but clearly that's a favorable impact on

22   one's net worth.

23   Q.    So in looking at somebody's financial picture, if

24   somebody was paying off debt or buying real estate, even

25   though it might show up as negative cash flow, does that

DIRECT - HOFFMAN

1     improve someone's financial picture?

2     A.    It can, yes.

3     Q.    Okay.  That was conclusion No. 2.  Let's talk about

4     conclusion No. 3, which is whether Dr. Rudolph needed the

5     insurance money in this case.  You've been provided

6     materials.  Have you seen the -- after Mrs. Rudolph died,

7     there were about $4.8 million of insurance proceeds in this

8     case?

9     A.    Correct.

10    Q.    Let me start with the conclusion.  Did Dr. Rudolph need

11    that money?

12    A.    No.

13    Q.    Can you explain to the jury how you came to that

14    conclusion.

15    A.    Well, I came to that conclusion, again, by observing

16    lifestyle prior to the receipt of that money.  There are

17    actually two ways that I looked at it.  One was to do an

18    analysis where I just stripped out the roughly $4.88 million

19    of the insurance proceeds to show how his wealth continued

20    to increase during that period of time.  But I also looked

21    at his lifestyle prior to the time that those insurance

22    proceeds were received.

23            And I observed that given the amount that -- of

24    liquid assets that Dr. Rudolph already had, he was able to

25    maintain a very lavish lifestyle during that time with the

DIRECT - HOFFMAN

1    amounts that were necessary -- that -- or the amounts, I

2    should say, he had prior to the receipt of those insurance

3    proceeds.  And one of my exhibits shows that particularly.

4    Q.    Let me ask you, Mr. Hoffman:  Did the Rudolphs -- I'm

5    going to refer to "nest egg."  What is a "nest egg"?

6    A.    Your net worth would -- or your retirement fund's

7    sometimes more focused, but I would say your net worth is

8    your nest egg.

9    Q.    Did the Rudolphs' nest egg or net worth increase from

10   2011 to 2016?

11   A.    It did.

12   Q.    Is that one of the things you took into account in

13   determining whether Dr. Rudolph needed any insurance money?

14   A.    It is, yes.

15   Q.    And do you remember how much his net worth increased

16   from 2011 to 2016?

17   A.    Not without referring to my schedule.  I don't have

18   those numbers memorized.

19   Q.    Okay.  Would it -- would you trust me if I told you

20   that it increased, from your schedules, over $800,000?

21   A.    I'll accept that, yes.

22   Q.    Okay.  One of the things that Ms. Newton -- when we

23   were talking about this the other day, she said, "But he did

24   use the capital gains from the insurance."  And so she was

25   saying to the jury, "Look, he did use some of the

2612

DIRECT - HOFFMAN

1    appreciation from the insurance."

2            How would you respond to Ms. Newton's claim about

3    that?

4    A.    Well, I would respond to that by, again, referring to

5    another schedule that I had prepared, looking at what

6    Dr. Rudolph had started with years before the receipt of the

7    life insurance proceeds and how the net worth -- his net

8    worth continued to increase even without -- even without the

9    insurance proceeds.  In other words, he was able to maintain

10   his lifestyle -- which the Government argues is a lavish

11   lifestyle -- he was able to live that lifestyle with the

12   amount of money he already had.  He continued that lifestyle

13   year after year after year and proved he could live that

14   lifestyle with the money that he already had.  Therefore,

15   when I say if that lifestyle continued, he was able to do it

16   before, he didn't need it now.

17   Q.    So if the prosecutors argued that one of the motives in

18   this case was that Dr. Rudolph needed the insurance money,

19   how would you respond to that?

20   A.    It's not true.

21           MR. MARKUS:  Thank you.  I have nothing further,

22   Your Honor.

23           THE COURT:  Cross-examination.

24           MR. FIELDS:  Thank you, Your Honor.

25                        CROSS-EXAMINATION

`                                                                    2613
                        CROSS - HOFFMAN

1   BY MR. FIELDS:

2   Q.   Good morning, Mr. Hoffman.

3   A.   Good morning -- or afternoon.

4   Q.   Is it?  It is already the afternoon.  Thank you.

5        So let's start with this:  So your objective was

6   trying to figure out Dr. Rudolph's net worth in 2016?

7   A.   Yes.

8   Q.   Is it possible you missed a few things here and there?

9   A.   Things are always possible.

10  Q.   So one of the bank accounts you looked at was PNC bank

11  account 10-324-0548.

12  A.   I'm sorry, say that again.  I'm having a hard time

13  hearing you.

14  Q.   That's okay.  This might be an unfair question; we

15  could look at your schedule.  But do you remember that you

16  looked at several PNC bank accounts?

17  A.   Yes.

18  Q.   Did one of those end in 0548?

19  A.   I don't recall.

20  Q.   Okay.  Let's -- would your report help you remember?

21  A.   I'm sorry?

22  Q.   Would your report help you remember?

23  A.   No, because it doesn't list the individual bank

24  accounts.  I used the same accounts that Ms. Newton did.

25  Q.   Okay.  Well, it does list the individual bank accounts.

`
2614
CROSS - HOFFMAN

1    If I told you that would that -- do you think it would help

2    you remember?

3    A.    If you showed me her Newton 1, I could -- and point me

4    to that bank account, yes.

5    Q.    So let's look at -- it's Government's Exhibit 663,

6    which is not yet in evidence.

7         For defense counsel, this is Mr. Hoffman's report,

8    which you have.  This is Mr. Hoffman's report.

9         If we could go to page 13.  And this is pretty

10   small, so let's zoom in for Mr. Hoffman up there at the top.

11   Yup.  There we go.

12        Okay.  Do you see one of those PNC bank accounts?

13   A.    I see a number of PNC bank accounts, yes.

14   Q.    And do you see the one that you reviewed ending 0548?

15   A.    I'm sorry, could you point to that one?  Okay.  I see

16   it.

17   Q.    Okay.  So you said in your report that it had a

18   value -- well, what did you list as the value of that

19   account?

20   A.    Correct.

21   Q.    What did you list as the value?

22   A.    71,370.54.

23   Q.    Okay.  But now let's look -- we can put this on the

24   left side of the screen for Mr. Hoffman.  And on the right

25   side of the screen, let's look at what's just been marked

`
CROSS - HOFFMAN

1    for identification, but is not yet in evidence, as

2    Government's Exhibit 666.  Okay.  And if we could, for

3    Mr. Hoffman, just because it is really small, can we blow up

4    the PNC bank accounts over on the right hand.  There you go.

5    Okay.  And now let's see if we can swipe them over so it's a

6    little bit out of the way.  Well, so let's stop here just

7    for a second.

8            So, Mr. Hoffman, the value that you put on that

9    0548 account in 2016 was, again -- remind us, what value did

10    you put on it?

11    A.    71,370.54.

12    Q.    Okay.  Now take that out.  Okay.  And if we look at

13    Government's Exhibit 666, let's see if we can blow up this

14    section.

15            What amount do you see there as listed as the

16    ending balance?

17    A.    71,370.54.

18    Q.    Okay.  But if you -- if you go to the top of

19    Government's Exhibit 366 --

20    A.    I'm sorry --

21    Q.    Let's zoom out.  Let's look at the top.

22            Do you see the period for that bank statement?  Do

23    you see that right there?

24    A.    8-30 through 9-30 of 2014.

25    Q.    So am I correct in saying that your report accidentally

`                                                                    2616
                        CROSS - HOFFMAN

1     listed the 2014 value of the account instead of the 2016

2     value of the account?

3     A.    It appears that might be the case.

4     Q.    So that means that your analysis is slightly off

5     already just a little bit, right?

6     A.    It appears that way.

7     Q.    Okay.  But that was a small mistake, right?

8     A.    Yes.

9     Q.    I mean, it's not material in the grand scheme of a

10    $15 million estate, right?

11    A.    Correct.

12    Q.    Were you pretty thorough with everything else?

13    A.    I'm sorry?

14    Q.    Were you pretty thorough with everything else?

15    A.    I tried to be.

16    Q.    So you don't think you would have missed any big

17    assets, right?

18    A.    Not that I'm aware of.

19    Q.    Or any sort of big liabilities?

20    A.    Not that I'm aware of.

21    Q.    Anything more than like a million dollars?

22    A.    Not that I'm aware of.

23    Q.    Because a million dollars would be a pretty big error?

24    A.    Perhaps, yes.

25    Q.    So if the Rudolphs have an outstanding loan balance of

```
                              `                    2617
                        CROSS - HOFFMAN
```

1   $1.2 million as of September 2016, would that have affected

2   your analysis?

3   A.   Yes.

4   Q.   But you don't think you would have missed something

5   like that?

6   A.   It's -- anything is possible, counsel.

7   Q.   So let's look at Government's Exhibit 665, which is not

8   yet in evidence.  All right.

9        Did you review a lot of Morgan Stanley bank

10  accounts?

11  A.   I see -- I see it, yes.

12  Q.   And this one is for the period September 2016, right?

13  A.   Would you point that, please.  It's kind of small --

14  Q.   Yeah, sorry.  It is really small.  Thanks.

15       Do you see that up on the top?

16  A.   Can you blow it up a little bit?

17  Q.   Yeah, we can -- if we could.  Sometimes the software --

18  yeah, I'll -- yeah, there we go.

19       Do you see what period that is for?

20  A.   Says September 30th, 2016.

21  Q.   Okay.  And now if we go to page 4 of this exhibit.  And

22  let's just -- yup.  Let's blow up, yeah, just this corner

23  right there.

24       What do you see there for Total Other Liabilities?

25  A.   It's -- the total liabilities associated -- the

                                    `
                        CROSS - HOFFMAN

1    liabilities associated with it is 1,235,481.

2    Q.   Did you account for that in your analysis?

3    A.   If you would show me again the -- my analysis, the

4    schedule.

5    Q.   Let's go to Government's Exhibit 663, page 13.  And if

6    we look at -- let's look at the next page.  Okay.  And now

7    zoom in here.

8         Did you list it among the liabilities?

9    A.   No, it doesn't appear that it is listed there.

10   Q.   So does that mean that your perspective might be a

11   little bit skewed towards the trier of fact?

12   A.   Yes.  If that was in fact outstanding as of

13   September 30th, it should be included there.

14   Q.   So let's -- we can take that down.

15        If among the items that you valued were

16   taxidermy --

17        THE COURT:  Excuse me, sir.  Mr. Fields, let me

18   jump in.  It's 12:35.  Before you go into a new subject

19   area, I think we can take our lunch break.

20        MR. FIELDS:  Thank you.

21        THE COURT:  Ladies and gentlemen of the jury, we

22   will be in recess for one hour.

23        (Jury left the courtroom at 12:34 p.m.)

24        THE COURT:  Mr. Hoffman, since you're in the middle

25   of your testimony, I direct you not to speak with any of the

`
                          CROSS - HOFFMAN

1    lawyers during the lunch break.  You're free to go wherever

2    you want for lunch.  I ask you to be back in the witness

3    stand at 1:30.

4              THE WITNESS:  1:30, okay.

5              THE COURT:  Thank you.

6         (Recess taken 12:35 p.m.)

7                      AFTERNOON SESSION

8         (In open court in the presence of the jury at 1:37

9    p.m.)

10             THE COURT:  Mr. Hoffman, I remind you that you

11   remain under oath.

12             Mr. Fields, you may resume your examination.

13             MR. FIELDS:  Thank you very much, Your Honor.

14                   CROSS-EXAMINATION (Continued)

15   BY MR. FIELDS:

16   Q.   Mr. Hoffman, we were talking about that portfolio loan

17   agreement for $1.2 million.

18   A.   I'm sorry?

19   Q.   We were talking about that portfolio loan agreement for

20   $1.2 million.

21   A.   Yes.

22   Q.   Okay.  So let's go back and mark this for

23   identification.  I think I said 663 before, but it's

24   actually 660.  So let's pull that up again --

25             THE COURT:  So what's 660?  Is that his report?

`                                        2620
                    CROSS - HOFFMAN

1          MR. FIELDS:  It's his report, Your Honor.  It's not

2    in evidence, it's just used to talk to the witness.

3          THE COURT:  All right.  So one second.  So we had

4    earlier 663, 665, and 666.  Are those numbers still

5    accurate?

6          MR. FIELDS:  The 663 number is not accurate, Your

7    Honor.  I'm sorry.

8          THE COURT:  Okay.  That's all right.  665, 666.

9    Okay.  Go ahead.

10   BY MR. FIELDS:

11   Q.   All right.  And let's go to page 13.  Sorry, page 14.

12   All right.  So let's blow that up again.

13          So in your schedule, you didn't include that

14   $1.2 million.  Do you see that there?

15   A.   Correct.

16   Q.   But it was included in Ms. Newton's analysis?

17   A.   Yes.

18   Q.   And these lines of credit, that's -- well, let's pull

19   up that exhibit.  What was it marked as -- the new exhibit?

20   What did I mark that as?  633 for identification.

21          Did you actually -- did you see this document when

22   you were conducting your analysis?

23   A.   Yes.

24   Q.   So this is a -- well, you tell us.  What is a portfolio

25   loan agreement?

`
                                                                    2621
                              CROSS - HOFFMAN

1    A.    Well, it sets the terms for the loan that would be

2    available for borrowing.

3    Q.    So it's a loan secured by Dr. Rudolph's assets?

4    A.    That was my recollection, yes.

5    Q.    So if you -- and you can -- it's sort of a rotating

6    line of credit, right?  You can take out money whenever

7    you'd like?

8    A.    Yes.

9    Q.    But when you take out that money, that is a liability,

10   right?

11   A.    Correct.

12   Q.    And you didn't include that in your balance sheet?

13   A.    No, my recollection was that it hadn't been taken out

14   until December, but I see from the document that you have

15   produced earlier that perhaps it was earlier than that.

16   Q.    Okay.  So now let's go and let's talk about these

17   taxidermy mounts.  Do you remember talking about those on

18   your direct?

19   A.    Yes.

20   Q.    Do you remember, did Dr. Rudolph have 117 different

21   mounts?

22   A.    That sounds right, yes.

23   Q.    He had 10 lions.

24   A.    I don't remember the exact number, but yes.  I remember

25   that he had lions.

`                                                                      2622

CROSS - HOFFMAN

1    Q.    Five leopards and two leopard rugs?

2    A.    Yes.

3    Q.    Six sets of elephant tusks?

4    A.    I'll accept your representation.  I don't remember all

5    of them.

6    Q.    He had a white rhino?

7    A.    Yes.

8    Q.    He also had a polar bear, right?

9    A.    Yes.

10   Q.    Was there an issue with valuing the polar bear?

11   A.    Well, the -- I know there was -- the only issue, as I

12   recall, was that there was a period of time at which they

13   can't be imported into the United States or sold or

14   something.  But I -- as I recall, the estimator had taken

15   that into account.

16   Q.    So that wasn't included in your analysis?

17   A.    What, the polar bear?

18   Q.    Yeah.

19   A.    I'd have to review my schedule again, but that's my

20   recollection, yes.

21   Q.    Okay.  Dr. Rudolph also had a black bear?  He had a

22   black bear?

23   A.    Yes.

24   Q.    And a brown bear?

25   A.    I think so.

`                                                            2623
CROSS - HOFFMAN

1    Q.    And two zebra rugs?

2    A.    Counsel, I really have to review my schedule, if you

3    wanted to go item by item.  I don't have it memorized.

4    Q.    Okay.  But you included all of his mounts in your

5    analysis, right?

6    A.    I included all of the mounts that had been represented

7    as being owned by him.

8    Q.    But were you aware that some of those were only in his

9    possession after your valuation?

10   A.    No.

11   Q.    So were you aware that he didn't bring in one of those

12   Impalas from Tanzania until November of 2016?

13   A.    No.

14   Q.    Were you aware that he didn't bring back that sitatunga

15   until November of 2016?

16   A.    No.

17   Q.    Were you aware that he didn't bring back the honey

18   badger, the African buffalo, the klipspringe, two leopards,

19   a wart hog, or a zebra or a lion until May of 2018?

20   A.    No, it was my understanding that all of those were in

21   possession as of the date of valuation.

22   Q.    So then you also weren't aware that he brought back a

23   Siberian Ibex from Pakistan in October of 2018?

24   A.    No, I wouldn't have been.

25   Q.    Weren't aware that he brought back a zebra from Chad in

`

2624

CROSS - HOFFMAN

1    May 2020?

2    A.    No.

3    Q.    You weren't aware he brought back a red-fronted gazelle

4    also in May 2020?

5    A.    No.

6    Q.    So you'd agree that all of these mounts only in his

7    possession after your evaluation need to be removed from

8    your evaluation, correct?

9            MR. MARKUS:    Objection.    Assumes facts not in

10    evidence, Your Honor.

11            THE COURT:    Overruled.

12            You may answer, sir.

13            THE WITNESS:    If, in fact, that they weren't -- if,

14    in fact, they weren't in his possession as of September 30th

15    of 2016, they should be removed, yes.

16    BY MR. FIELDS:

17    Q.    So that's another instance where your analysis would be

18    wrong?

19    A.    That would change, yes.

20    Q.    That's another instance in which your perspective or

21    your analysis would be skewed towards the trier of fact?

22    A.    Yes.

23    Q.    And another reason the analysis is wrong is because you

24    just didn't have that information, right?

25    A.    Didn't have what information?

`                                                                    2625

CROSS - HOFFMAN

1    Q.    The information about when those mounts came in.

2    A.    Correct.

3    Q.    And that's because your perspective or your analysis

4    was dependent on what the defendant provided to you,

5    right?

6    A.    With regards to that list, yes.

7    Q.    Okay.  And with regard to the other documents you

8    reviewed, right?  Those all came from the defendant?

9    A.    No.  Many of the documents had been provided by the

10   Department of Justice or directly from his accountants with

11   regards to the financial statements that I had reviewed.

12   Q.    So you got some from the financial -- or some of that

13   financial information from the Department of Justice,

14   Ms. Newton, right?

15   A.    I'm sorry, say that again.

16   Q.    You got some of your information from the Department of

17   Justice, right?

18   A.    Much of it, yes.

19   Q.    Some of it was from Ms. Newton?

20   A.    Yes.

21   Q.    But other documents, especially related to the

22   business, you had to go to the defendant's employees to get

23   that information, right?

24   A.    No, I actually received those directly from his

25   accountant -- his outside accountants.

`

CROSS - HOFFMAN

1    Q.    His -- his employees, right?  Or the people that he's

2    paying.

3    A.    No, I received them directly from his outside

4    accountant; it was not an employee of him.

5    Q.    Okay.  So outside accountant.  Someone that he is

6    paying?

7    A.    Yes.

8    Q.    Okay.  Someone that he is giving instructions to?

9    A.    Presumably, yes.

10   Q.    Someone that he is providing instructions to provide

11   you with certain documents, right?

12   A.    Yes.  And these documents, of course, were all provided

13   prior to a -- prepared prior to the alleged incident here.

14   These go back to prior to 2016 and the date of death.

15   Q.    Oh, yeah.  No, that's right.  But you only got the

16   documents that the defendant instructed his accountant to

17   give to you, right?

18   A.    No.  That I had asked the accountant to provide to me,

19   yes.

20   Q.    Okay.  But if that accountant didn't have certain

21   documents, you wouldn't have those, right?

22   A.    Clearly no.

23   Q.    So if the defendant didn't give those documents to his

24   accountant, then you wouldn't have them, right?

25   A.    He wouldn't, but I don't feel that I was missing any

1    documents that I needed with regards to the financial

2    analysis of his business.

3    Q.    Well, didn't you just say you didn't have the

4    information about those mounts?

5    A.    No, I said about his business.  I didn't get that

6    information from his accountant.

7    Q.    Okay.  But certain information you didn't have because

8    the defendant didn't give it to you; isn't that right?

9    A.    Yes.

10   Q.    Now let's talk about the business valuation.  So in

11   your report, you define "fair market value" as the price

12   expressed in terms of cash equivalence at which property

13   would change hands between a hypothetical willing and able

14   seller acting at arm's length in an open and unrestricted

15   market when neither is under compulsion to buy or sell and

16   when both have reasonable knowledge of the relevant facts.

17        Do you agree -- you agree with that definition?

18   A.    Yes.

19   Q.    Would you also agree that the owner of the business is

20   usually in the best position to get information about that

21   business?

22   A.    To get information about his business?  Of course.

23   Q.    And you're aware, probably from business school, the

24   concept of "caveat emptor"?

25   A.    Let's explain that.

```
                                    `                         2628
                            CROSS - HOFFMAN
```

1    Q.    Yeah, let's talk about it.    What is it?

2    A.    No, I'm asking you to explain it.

3    Q.    Well, have you -- did you hear that concept in business

4    school?

5    A.    I've heard the terminology, but I don't have a working

6    definition of it.

7    Q.    Okay.    In business school, did you learn about the

8    concept of asymmetrical information between two parties?

9    A.    No.

10   Q.    Well, let's illustrate the concept a little bit.    Let's

11   say -- well, what are your hobbies?    What are your hobbies?

12   What do you like to do?

13   A.    Woodworking and fly fishing.

14   Q.    And fly fishing.    Okay.    Well, you know, fly fishing

15   rods, some of those can be really expensive, right?

16   A.    They can be.

17   Q.    So let's say, you know, someone comes to you and

18   they've got a fly fishing rod that you know is worth, you

19   know, around $10,000.    It's a rare fly fishing rod.    It's

20   really, really excellent.    And they come up to you.    You

21   know the rod is worth $10,000 but they offer to sell it to

22   you for $1,000.    Do you take that deal?

23   A.    If I knew for certain it was worth 10,000, I would

24   certainly consider buying it for 1,000, yes.

25   Q.    But if someone offered it to you for 1,000, $9,000

`
CROSS - HOFFMAN

1    below what you know it's worth, what would you think about

2    the condition of the rod?

3    A.    I'd have to inspect it, of course.

4    Q.    Let's say he says, "I'll give it to you, but you don't

5    get to inspect it; you just have to take my word for it"?

6    A.    In that -- in those instances, no.

7    Q.    Why not?

8    A.    Well, because the definition of "fair market value"

9    requires reasonable knowledge, not absolute knowledge, or

10    reasonable knowledge of relevant facts.  So the situation

11    that you're describing doesn't meet the definition of fair

12    market value.

13    Q.    Okay.  And what's unfair there?

14    A.    Well, what's not fair is if -- I wouldn't have

15    reasonable knowledge of relevant facts if I don't have the

16    ability to look at the fly rod that I would be contemplating

17    purchasing.

18    Q.    And when someone owns a business, just like someone who

19    owns a fly rod, they're going to be the person who knows the

20    most about it?

21    A.    Certainly about their particular business, yes.

22    Q.    They're going to know the most about its history and

23    where it's been?

24    A.    Sure.

25    Q.    And so, you know, to stick with our fly rod example,

`
CROSS - HOFFMAN

1    if, say, that fly rod had been, you know, snapped in two on

2    a previous occasion, but they were able to sort of glue it

3    back together in a way that looks really great, only the

4    seller would know about that prior accident, right?

5    A.    Well, again, clearly I wouldn't have reasonable

6    knowledge of relevant facts in that situation.

7    Q.    Okay.  So in this particular case, you valued the

8    defendant's business at around $5 million?

9    A.    Yes.

10   Q.    So if a witness testified in this courtroom that

11   Dr. Rudolph had offered to sell all of those practices for

12   only $1.7 million, how would that affect your valuation?

13   A.    Well, I would certainly have to know the terms under

14   which that were offered.  I would have to know whether there

15   was some degree of compulsion involved because of financial

16   situations or something like that.

17         But it's facts and circumstances driven, so it

18   would require that I would look at the facts and

19   circumstances that might explain that disjunct.

20   Q.    Okay.  But there would be a disconnect there, right?

21   A.    A disjunct?

22   Q.    A disjunct.  So you call it a disjunct, that's --

23   A.    I call it a disjunct.  In other words, there's this

24   large difference between the two that, on its face, is

25   unexplainable.  So I have to peel back the onion, so to

1    speak, to understand what would account for that difference.

2    Q.    Okay.  But just like, you know, sort of our fly rod

3    example, the person who has a $10,000 fly rod, they're

4    willing to sell it for $1,000, that would make you a little

5    bit suspicious about the condition of the fly rod?

6    A.    Certainly.

7    Q.    Now are businesses that use cash, a lot of cash, can

8    they be harder to value?

9    A.    No, not necessarily.  There are -- there are ways

10   around that -- around those circumstances.  In fact, most --

11   a lot of businesses report on a cash basis as opposed to an

12   accrual basis.  So the types of -- many businesses that I'm

13   used to working with are on a cash-reporting basis anyway.

14   Q.    Okay.  But now you're talking about sort of accounting

15   treatment.  I'm talking about the actual cash.  If a

16   business is generating sort of only cash -- let's assume a

17   hypothetical only-cash business, can those be a little bit

18   harder to value?

19   A.    No, I don't consider it harder to value.  The

20   principles are the same.  The -- if there's -- clearly

21   there's a reliance upon the presentation.  I don't do audits

22   when I value businesses, I accept their financial statements

23   as presented, so it doesn't make them harder to value.

24   Q.    Can they be a little bit harder to audit when they're

25   only using cash?

CROSS - HOFFMAN

1    A.    I wouldn't even say it's harder to audit because CPAs

2    deal with that all of the time, that -- cash businesses.

3    Liquor stores are prime examples of that.  So it's not an

4    unusual situation at all.

5    Q.    When a CPA is, you know, evaluating a cash -- a

6    hypothetical cash business, do they have to rely on the

7    business owner actually recording those cash transactions?

8    A.    Yeah, sure.  And if -- for example, the situation that

9    you present, typically if cash is underreported, then you

10   run the possibility of undervaluing the business.  So the --

11   in the circumstances that you describe, it militates towards

12   undervaluing the business typically as opposed to

13   overvaluing it.

14   Q.    Let's say there's a business and it's cash and the CPA

15   realizes that a lot of that cash isn't being reported.

16   So --

17   A.    And what?

18   Q.    That a lot of the cash isn't being reported.

19            MR. MARKUS:  Judge, I'm going to object per your

20   prior ruling.

21            MR. FIELDS:  Your Honor, I believe -- I'm sorry.

22            THE COURT:  I'm going to overrule for now.  I don't

23   think we're quite to that line, but counsel's aware of that

24   line and I'm sure he won't intentionally cross it.

25            MR. FIELDS:  Yes, Your Honor.  And in my mind the

`                                                            2633

CROSS - HOFFMAN

1    cash is a different topic area entirely from my previous --
2              THE COURT:   I agree.   I agree.
3    BY MR. FIELDS:
4    Q.   So we're talking about sort of a cash business, right?
5    So you said, you know, a cash business, if they're not
6    recording all the cash, you might undervalue the business,
7    right?
8    A.   Yes.
9    Q.   But let's say, again -- and we're talking in
10   hypotheticals here -- let's say employees in the business
11   are embezzling a lot of the cash, okay?   Would that indicate
12   that the business didn't have very good accounting controls?
13   A.   It could.   But even -- even top corporations that have
14   very good accountants are subject to such embezzlement, so
15   it's not necessarily -- it's not unique to businesses, even
16   businesses that have well-in-placed accounting systems.
17   Q.   Yeah, that wasn't exactly my question, Mr. Hoffman.   My
18   question was:   If you have a business -- and let's not talk
19   about a giant corporation, let's talk about the liquor store
20   you mentioned earlier.   So a liquor store, relatively small
21   to medium-sized business, probably, right?
22   A.   Yes.
23   Q.   And let's say one of the employees in the store is
24   skimming, you know, let's say 40 percent of the cash off the
25   business.   Would that indicate a lack of accounting

`                                                     2634
                        CROSS - HOFFMAN

1    controls?

2    A.    It could, yes.

3    Q.    And would the lack of accounting controls, and sort of

4    this problem in the business, would that potentially

5    represent some problems in valuing that business?

6    A.    Well, potentially.  But I would have to have -- I would

7    have to know that there's a fact of embezzlement as opposed

8    to innuendo that there's such embezzlement.

9    Q.    Absolutely.  This is a hypothetical, right?

10   A.    Sure.

11   Q.    So in the hypothetical, assume the fact --

12   A.    Well, in a situation like that, if I knew for a fact

13   that such embezzlement were taking place, I would simply

14   choose not to engage in that valuation.

15   Q.    So you -- in this particular case, did you actually

16   look at the bank statements for the dental practices or just

17   the ledgers?

18   A.    Just the ledgers.  And in some cases bank statements

19   because we had to look at balances at certain points in

20   time.  But I didn't go line item by line item through the

21   bank statements, no.

22   Q.    Okay.  So if an accountant went through each of the

23   bank statements for each of the defendant's dental practices

24   in 2016 and found no cash demonstrates from any patients,

25   what conclusions would you draw from that fact?

CROSS - HOFFMAN

1    A.    Well, what I would do is look to see whether the

2    deposits had been -- whether the demonstrates had been

3    made -- held and then deposited at a later point in time.

4    That's certainly one possibility.

5    Q.    Let's assume that the next year also had no cash

6    demonstrates.

7    A.    That the next month --

8    Q.    Next year.  2017.  No cash demonstrates from a dental

9    practice.

10   A.    Well, at that point, I don't know, counsel, because now

11   you're beyond the range of time in which I was looking at

12   the financial statements of the company.

13   Q.    I didn't mean to fight you, Mr. Hoffman.  You were

14   talking about, you know -- I believe you responded that

15   maybe there were no cash demonstrates in 2016 because they

16   are just time-shifting it, right?

17   A.    That's a possibility, yeah.

18   Q.    Okay.  And so just sort of work with me here.  If --

19   you know, one explanation is time-shifting, but if there's

20   no cash demonstrates in all of 2017, that would tend to say

21   they're probably not time-shifting, right?

22   A.    If that were the case, yes.

23   Q.    And what if witnesses told you that Dr. Rudolph and

24   Lori Milliron kept a lot of cash from the practices in safes

25   in the back of each office?

`

CROSS - HOFFMAN

1    A.    I'm sorry, repeat that question.  A little slower,

2    please.

3    Q.    Yeah.  No problem.  I'm sorry if I'm speaking too fast.

4    There's a big audience, it makes you a little nervous.

5         Let's say that you've got a witness who testified

6    that these dental practices generated cash and kept it in

7    safes in the back of each office.  So now you know that

8    these practices are generating cash, but there's no cash

9    demonstrates in the bank accounts.  What would that do to

10   your evaluation?

11   A.    Well, again, if they are actually reporting the income

12   on the financial statements, even though they're not

13   depositing it, it wouldn't have an impact on my financial

14   statements because they're representing collections that

15   is -- drives the economic value of the business, whether

16   it's deposited or not.  That wouldn't impact my valuation.

17   Q.    Well, let's -- you remember looking at the ledgers that

18   were provided by the business?

19   A.    No, I was primarily looking at the financial

20   statements.  In some cases I looked at the ledgers just to

21   look at individual expense accounts, but that was the extent

22   of my work -- review of the ledgers.

23   Q.    If those ledgers also showed no cash deposits for the

24   Three Rivers Dental practices, what would that do to your

25   valuation?

`                                                                2637

CROSS - HOFFMAN

1    A.    Well, certainly it would cause me to ask questions, to

2    inquire as to the situation as to why.

3    Q.    And let's say in 2016, again, there's no cash

4    demonstrates in the PNC dental business accounts, but Lori

5    Milliron, one of the employees of the business, is

6    depositing thousands of dollars into her personal bank

7    account on a biweekly basis.  And -- what would that do to

8    your valuation of the business?

9              MR. DILL:  Objection.  Assumes facts not in

10   evidence.

11             THE COURT:  Overruled.

12             THE WITNESS:  I'm sorry, repeat the question then,

13   please.

14   BY MR. FIELDS:

15   Q.    That's okay.  Now let's assume in 2016, again, no cash

16   demonstrates in any of the dental practice bank accounts,

17   but an employee named Lori Milliron is depositing thousands

18   of dollars on a weekly or biweekly basis into her personal

19   bank account, what would that do to your valuation of the

20   business?

21   A.    What I interpret that to be is that the business is

22   collecting patient revenue and it's a fair representation of

23   the revenue of the business.  It's simply not being

24   deposited into a business bank account, perhaps some other

25   bank account.  But that wouldn't impact my valuation because

`
CROSS - HOFFMAN

1    my valuation is based on the patient revenue that it

2    generates.

3    Q.    You're saying that your valuation of the business would

4    depend not at all on the conduct of the employees running

5    that business?

6    A.    Well, in and of itself depositing it into an account

7    that's not owned by the business when the business is a sole

8    owner, so if -- as an example, if I'm -- if I own a

9    business, I have -- and I collect money in that business, I

10   can deposit it in the business checking account and then

11   take it out and put it into a personal account, or I can put

12   it directly into my personal account.  There's no difference

13   there.  The difference without a distinction -- or

14   distinction without a difference.

15   Q.    Well, when you're running your CPA business, right, do

16   most business owners provide you with a business account?

17   A.    Well, in the work that -- in the work that I do, I'm

18   provided with financial statements and I rely on those

19   financial statements.  And in terms of what bank accounts

20   the money is deposited into, I'm generally indifferent to

21   that.

22   Q.    Okay.  Let's move on.  So in your report, you conclude

23   that it is your expert opinion that it cannot reasonably be

24   alleged that Dr. Rudolph needed $4.8 million in life

25   insurance proceeds, right?

`

CROSS - HOFFMAN

1   A.   Yes.

2   Q.   Is it fair to say that in your practice, you

3   represented some high net worth individuals?

4   A.   Sometimes, yes.

5   Q.   Even when you're representing people with a lot of

6   money, do they sometimes want even more money?

7   A.   I think you've described everybody.

8   Q.   Okay.  So some people might not need the money but they

9   still might want it, right?

10  A.   Everybody wants money, counsel.

11  Q.   And here if Dr. Rudolph didn't need $4.8 million, did

12  you think about why he would spend money on term life

13  insurance proceeds or term life insurance policies to

14  generate $4.8 million in life insurance?

15  A.   Sure.  Perfectly reasonable.

16  Q.   Even if he didn't need the money?

17  A.   Well, I think you're misrepresenting the need for

18  money.  If insurance proceeds are purchased, that is with an

19  eye towards estate planning and paying estate taxes.  So

20  therein lies the need there for insurance proceeds to pay

21  estate taxes.

22  Q.   Well, so, you know -- do you know a lot about estate

23  planning?

24  A.   Not a lot.  I am involved in it frequently just because

25  for valuation -- for estate planning often I'm asked to do

`
CROSS - HOFFMAN

1   valuation services, so I have some knowledge of it.  I don't

2   claim to be an expert in it.

3   Q.   And estate taxes can be pretty high?

4   A.   They can be.

5   Q.   So something generally people try to avoid?

6   A.   Of course.

7   Q.   Yeah.  And there are vehicles that people can use to

8   avoid estate planning -- or estate taxes, right?

9           MR. MARKUS:  Objection.  Beyond the scope and

10  beyond the expertise that I called him for.

11          THE COURT:  What about the scope objection?

12          MR. FIELDS:  Your Honor, he didn't ask about it,

13  but this witness, during the cross, is trying to explain the

14  need for life insurance proceeds and just said it might be

15  estate planning.  So I think it's appropriate to sort of

16  probe his knowledge regarding that.

17          THE COURT:  All right, I agree.  Overruled.

18  BY MR. FIELDS:

19  Q.   There are vehicles that people can use to avoid paying

20  estate taxes, right?

21  A.   Sure.

22  Q.   And most clients that you represent, high net worth

23  individuals, would take advantage of those vehicles if they

24  have a large estate, right?

25  A.   Well, they do, but they also take advantage of life

`

CROSS - HOFFMAN

1    insurance.  That's quite common for clients.

2    Q.    Well, but if we're talking about 5 -- almost $5 million

3    in life insurance, if that just flows directly into the

4    estate without any sort of protection, that just means the

5    value of the estate is higher and the taxes are more, right?

6    A.    You lost me there.  Repeat the question.

7    Q.    So $5 million, that's a lot of money, right?

8    A.    Sure.

9    Q.    If that just flows into the estate without any sort of

10   estate planning, now the value of the estate has increased

11   by $5 million, right?

12   A.    Well, now you are getting outside of my expertise

13   because with regards to life insurance I'm not quite certain

14   how all of that works.

15   Q.    Well, Mr. Hoffman, didn't you respond to one of my

16   questions about the need for life insurance proceeds here by

17   saying you thought it might be for estate planning?

18   A.    Sure, to pay estate taxes.  So --

19   Q.    But now you're saying that your answer about estate

20   planning is outside the scope of your expertise?

21   A.    No, there are certain aspects of it that I'm

22   knowledgeable about and certain aspects that I'm not.  I do

23   know that clients will frequently engage in -- through their

24   advisors, they're advised to purchase a life insurance

25   policy by those who are experts in such events.

`
CROSS - HOFFMAN

1          So I know that those circumstances exist that life

2     insurance is frequently purchased with an eye towards estate

3     taxes.

4     Q.   Okay.  But it sounds like you're also saying that

5     you're not an expert in estate taxes.

6     A.   Not in all aspects of it, no.

7     Q.   All right.  And -- but you are an expert -- it sounds

8     like your expert opinion was that he didn't need this money,

9     right?

10    A.   He didn't need the money for the lifestyle that was

11    alleged here; but it was a tool for estate planning.

12    Q.   Well, how do you know that?  Didn't you just tell us

13    that you don't know much about estate planning?

14    A.   I told you that I know certain aspects of estate

15    planning and I know that life insurance is used as a tool in

16    estate planning.

17    Q.   All right.  And in terms of the $5 million in life

18    insurance planning, if one of the brokers involved in

19    selling Dr. Rudolph, and advising him on this life

20    insurance, said that $5 million was an abnormal amount,

21    would you take that into account in your opinion as to how

22    much he needed?

23    A.   Well, "abnormal" to me is a relative term.  I don't

24    know, you know, with regards to his total estate, that's

25    roughly one-third of what his estate was, so . . .

                                    `
                          CROSS - HOFFMAN

1    Q.    So you say it's relative to you and that's because

2    you're not an expert in life insurance?

3    A.    Yeah.  I -- I mean, counsel, it's not unusual for me,

4    with the clients I deal with, to have millions of dollars in

5    life insurance proceeds on their spouses.  It just isn't.

6    Q.    And so "need" is relative.

7    A.    Well, certainly.

8    Q.    All right.  And so we're talking about this sort of

9    need here.  Even if Dr. Rudolph didn't need $5 million,

10   don't you think that most of your clients would appreciate

11   having an almost $5 million windfall?

12   A.    It's not a windfall.  Of course they're paying for

13   the -- they're paying for that privilege of the receipt of

14   life insurance, so it's not exactly a windfall.

15   Q.    Well, how would you define a windfall?

16   A.    Well, I would define a windfall as an unexpected -- an

17   unexpected return on a -- on an asset, put virtually nothing

18   into it and yet they have a huge amount back.  In the case

19   of life insurance, there's a fair premium paid for a fair

20   amount paid out upon the death of the individual.

21   Q.    So if someone, again hypothetically, intentionally

22   brings about the condition that causes the $5 million to be

23   paid, is that a windfall?

24          MR. MARKUS:  Judge, objection.  This is an

25   inappropriate question.

1           THE COURT:  Overruled.

2           THE WITNESS:  I wouldn't call it a windfall, no.

3   BY MR. FIELDS:

4   Q.   All right.  So even if someone doesn't need almost

5   $5 million, it's something a person might actively desire?

6   A.   Say again.

7   Q.   Even if someone doesn't need approximately $5 million,

8   getting approximately $5 million is something that someone

9   might desire or want?

10  A.   As I testified earlier, counsel, everybody wants

11  money.

12  Q.   All right.  And so you say that Dr. Rudolph wouldn't

13  have needed almost $5 million in life insurance.  If that's

14  true, then he also wouldn't have needed only $15,000 on an

15  insurance claim for jewelry, right?

16  A.   That he wouldn't have needed insurance claims?

17  Q.   So he didn't -- he didn't need $5 million, right?

18  A.   He didn't need it to maintain his lifestyle.  That was

19  my -- that was the -- in my report and my testimony.

20  Q.   Okay.

21  A.   Okay.

22  Q.   So -- but it sounds like your expert opinion -- so we

23  can talk about lifestyle, but he didn't need it, right?  He

24  didn't need $5 million?

25  A.   Not to maintain the lifestyle that he was living at

`

CROSS - HOFFMAN

1    that time, no.

2    Q.    So if he didn't need $5 million, he also probably

3    didn't need just $15,000, right?

4    A.    It depends what the source of the $15,000 is from.    If

5    it's something that is owed to him, certainly he would

6    collect it.

7    Q.    Yeah.    Even if he didn't need it, he might still want

8    the $15,000, right?

9    A.    Well, I think we all want what's owed to us, so if it

10   were owed to him -- I don't know the context in which this

11   $15,000 is taking place, but it's something that is owed to

12   him and he has a right to it, he should certainly collect it

13   whether he needs it to maintain a lifestyle or not.

14   Q.    All right.    Now let's look at Government's Exhibit 90.

15   And let's go to page 53.    This is already in evidence.    And

16   let's zoom in up on the top.

17          So your testimony is that Dr. Rudolph didn't need

18   $5 million to maintain his lifestyle, right?

19   A.    At that point in time, correct.

20   Q.    So that means he also didn't need to be worried about

21   some measly texts on his phone, did he?

22   A.    I don't understand your connection -- we need to use

23   the email.    I'm not --

24   Q.    Yeah.    So let's read it out.    "So pudgy, we need to use

25   the email as the texts will be" dollar sign "on my phone."

REDIRECT - HOFFMAN

1          Do you see that email?

2     A.    I see it, yes.

3     Q.    Does that to you indicate a concern with spending money

4     on text messages?

5     A.    Well, what I understand it to be perhaps is he's being

6     a prudent businessman if the -- trying to control costs

7     within a business.  Certainly any prudent reasonable

8     business person would do that.  Just because they don't need

9     the money doesn't mean they shouldn't be prudent business

10    people.

11    Q.    Okay.  So even though they don't need the money, they

12    might still try to get more money, right?

13    A.    Of course.

14         MR. FIELDS:  I have no further questions, Your

15    Honor.

16         THE COURT:  Redirect.

17                  REDIRECT EXAMINATION

18    BY MR. MARKUS:

19    Q.    Let's clear up some things, Mr. Hoffman.  And let's

20    start where the prosecutor ended.  Rich people all the time

21    are going to try to be prudent, as you say, correct?

22    A.    That's how they get rich.

23    Q.    Yeah.  I imagine so.  Let me start off turning to the

24    line of credit issue.  Back in 2016, were interest rates at

25    an all-time low?

REDIRECT - HOFFMAN

1    A.    Yes.

2    Q.    So could people take out lines of credit basically for

3    free?

4    A.    Yes.  For very low -- very low interest rates, yes.

5    Q.    Very low.  And was that especially true with investment

6    accounts at like Morgan Stanley where this line of credit

7    came from?

8    A.    Yes.

9    Q.    So just so the jury understands, when you take out a

10   line of credit with an investment company where you have

11   stocks and other investments, will -- will those outfits

12   like Morgan Stanley basically say, "You can have a line of

13   credit for an almost zero interest rate"?

14   A.    Yes.

15   Q.    And the purpose of that line of credit is to make cash

16   available to the person to make further investments,

17   correct?

18            MR. FIELDS:  Objection, Your Honor.  This is

19   leading.

20            THE COURT:  Sustained.

21            MR. MARKUS:  Fair enough.

22   BY MR. MARKUS:

23   Q.    What is the purpose of outfits like Morgan Stanley

24   giving people lines of credit for almost nothing?

25   A.    Well, as you stated, I mean, typically they understand

REDIRECT - HOFFMAN

1    that reinvestments will be made, but, I mean, it's really

2    a -- it's really a simple matter that -- an example that I

3    frequently use before triers of fact:  If I have a million

4    dollars in an investment account that's earning

5    hypothetically 10 percent, and the investment advisor will

6    lend me a million dollars at 1 percent, because I would like

7    to spend that money or invest that money, perhaps buy a

8    house.

9           So the question is:  Should I take that million

10   dollars out of my investment fund where I'm earning

11   10 percent?  Or would I be better off to borrow it at 1

12   percent and keep it in my investment account earning

13   10 percent?

14   Q.    Ah.

15   A.    That's what happens.

16   Q.    Exactly.  And is that what happened in this case?

17   A.    That's exactly what happened in this case.

18   Q.    And when the prosecutor started out his examination

19   about this line of credit, he didn't ask you the follow-up

20   question about whether that money was invested.  Was it

21   invested?

22   A.    No, he didn't.

23   Q.    And was that money invested?

24   A.    Yes, it was.  Yes.

25   Q.    Okay.  And so was that money basically making money on

REDIRECT - HOFFMAN

1    itself?

2    A.    Yes.

3    Q.    Thank you.  Let me show you the -- if I could use the

4    Elmo, Ms. Guerra.  I'm going to show -- did you put the

5    report in, Mr. Fields?  You didn't?  Okay.  This is not in

6    evidence, Ms. Guerra.

7         But I'm going to show you some schedules that the

8    prosecutor showed you.  Do you remember looking at this

9    schedule with the prosecutor?

10   A.    Yes.

11   Q.    Now the prosecutor asked you about some lines on that

12   schedule, Mr. Hoffman.  I want to ask you about some other

13   lines on the schedule.

14        Is it fair to say that in some cases that the

15   prosecutor asked you about, you valued something more than

16   the Department of Justice?  Do you remember that one case

17   where he showed you that you looked at an account from 2014

18   instead of 2016 and you were about $20,000 off?

19   A.    Yes.

20   Q.    Are there other instances where the Department of

21   Justice values accounts significantly higher than what you

22   valued them?

23   A.    Yeah.  And, of course, here the difference has to do

24   with the time frames.  I was looking at bank balances as of

25   the end of September, whereas the Department of Justice was

2650
REDIRECT - HOFFMAN

1    looking at them as of the end of December.

2    Q.    And the prosecutor agreed that $20,000 wouldn't be

3    material, right?

4    A.    Yes.

5    Q.    And we see some instances where it flips, where the

6    Department of Justice might value something -- I'm showing

7    you one where it's $60,000 more.  Let's assume that's not

8    material, okay?

9    A.    Okay.

10   Q.    Is there one where the Department of Justice values

11   something $550,000 more than you do?

12   A.    Yes.

13   Q.    Okay.  So there are instances where -- like in the line

14   of credit, a million dollars may have gone in Dr. Rudolph's

15   favor, but in this case that I'm showing you here, is this

16   an example of where over $500,000 went in the Department of

17   Justice's ledger side?

18   A.    Yes.

19   Q.    Okay.  Let me get to the bottom line.  Does any of this

20   affect your valuation of Dr. Rudolph's final net worth being

21   somewhere around $15 million?

22   A.    No.  I mean, okay, I can't explain that $1.2 million

23   difference.  My recollection was that that was a line of

24   credit and that it was taken out in December.  I can't

25   explain why it's zero on our amount.  But, okay, so per my

REDIRECT - HOFFMAN

1    calculation, based on the balances at that point in time,

2    we're probably looking at 13 1/2 million.

3    Q.   But if I just showed you that the Department of

4    Justice's calculation gave him more than $500,000, that

5    takes us halfway back up, doesn't it?

6    A.   Well, it does, but, again, counsel, to be fair, we need

7    to recognize that one balances as of September, the other is

8    balances as of December.

9    Q.   Okay.  A couple of months different.

10   A.   Right.

11   Q.   Fair enough.  In any event, are we talking about a man

12   and his wife in September of 2016 worth -- if we take the

13   Government's numbers, around 14 million, and if we take our

14   number's, worth about 15 million?

15   A.   Actually if you look at the Government's number it's

16   more like 7 million because they didn't include --

17   Q.   Well, they didn't include the properties and the

18   valuation of the business.  I'm talking about taking

19   everything into account.

20   A.   Correct.  Correct.

21   Q.   Is that fair to say?

22   A.   Yes.

23   Q.   So if we take the Government's subtraction of the

24   million and if we take even that into account, we're at

25   about 14 million?

REDIRECT - HOFFMAN

1   A.   14 -- 13 1/2 perhaps.

2   Q.   Okay.  And so Dr. Rudolph and his wife, if that money

3   is making money on money, that even if we don't account for

4   that 13 1/2, 14, 15, they're worth a lot of money, correct?

5   A.   Correct.

6   Q.   Does that change your analysis on whether he needed the

7   life insurance money?

8   A.   No.

9   Q.   Okay.  Let me ask you about this fly fishing rod that

10  the prosecutor talked to you about.  I've never heard of a

11  rod worth 10,000 but I'm not a fly fisherman, but -- but

12  let's talk about the reason for his example.

13           He asked you:  When valuing a business, if somebody

14  offered -- if a business owner offered 1.7 million, that

15  would be something you would take into account, right?

16  A.   Yes.

17  Q.   But the prosecutor didn't ask you about all the other

18  aspects of that statement by the witness.  Are you aware

19  that it wasn't just 1.7 million, there were franchise fees

20  associated with those three offices?

21           MR. FIELDS:  Objection, Your Honor.  I think the

22  testimony was different.

23           THE COURT:  I can't hear you.

24           MR. FIELDS:  I think the testimony was different,

25  Your Honor, so I object.

REDIRECT - HOFFMAN

1       THE COURT:  Overruled.  I'll let it go forward.

2   BY MR. MARKUS:

3   Q.   The witness -- sir, are you aware that the witness said

4   that just for one of the offices, there was a

5   $17,000-a-month franchise fee just for one office in

6   Jennerstown?

7   A.   Yes, I recall that.

8   Q.   And would that be something you take into account --

9   it's not just 1.7, it's how much franchise fees would be

10  associated a month, correct?

11  A.   Sure.  Frequently when businesses are sold, there's an

12  amount of cash down and then it will be paid out over time.

13  In this particular circumstance, it's paid out, in theory,

14  to perpetuity at $17,000 a month, or $204,000 a year.

15  Q.   So to use the fly fishing rod example, if the fly

16  fisherman said, "You can have my rod for $1,000, but you

17  also have to pay me $500 a month for many years," that might

18  make it sound a little bit more fair, correct?

19  A.   Much more fair.

20  Q.   Okay.  So if the prosecutor left that out when he was

21  questioning you about how much the rod was worth, that

22  wouldn't be complete in taking into account how much the rod

23  was worth, is it?

24  A.   Correct.

25  Q.   Okay.  Let's talk about cash for a moment.  If somebody

REDIRECT - HOFFMAN

1    was pulling cash out of the business and not reporting it,

2    would that make the business be worth more or less?

3    A.    It would militate towards less because clearly when an

4    owner is looking to sell his business, the cash flow, the

5    earnings, will drive the value.  So if he is underreporting

6    them, it would militate towards a lower value of the

7    business.

8    Q.    So if you were given information that there was

9    actually cash being generated by this business, would that

10   increase or decrease the value of the business in your mind?

11   A.    Well, if there was additional cash being generated that

12   I was not aware of, that would militate towards a higher

13   value.

14   Q.    Higher value.  So if you were unaware of the cash that

15   the prosecutor was telling you about -- deposits into

16   Ms. Milliron's account -- if you knew about that cash being

17   generated, the value of the business might be more than

18   $5 million.

19   A.    Correct.

20   Q.    Okay.  The mounts that the prosecutor talked to you

21   about, the mounts, that value -- the total value was

22   $250,000.  Was that a significant part of the Rudolphs'

23   estate?

24   A.    No, not in terms of the 13-, 14-, $15 million, no.

25   Q.    So let's even cut it in half and give the prosecutor

REDIRECT - HOFFMAN

1    the benefit of the doubt here and say it's worth 125,000.

2    Would that make any material difference on your conclusions

3    in this case?

4    A.    No.

5    Q.    Okay.  And, finally, the prosecutor was asking you

6    hypotheticals about if somebody intentionally murdered

7    somebody and got $5 million, it would be a windfall.  If

8    somebody's wife -- if somebody's wife accidentally died, is

9    any amount of money worth that?

10   A.    No.

11              MR. MARKUS:  I have nothing further.

12              THE COURT:  May this witness be excused,

13   Mr. Markus?

14              MR. MARKUS:  Yes, Your Honor.

15              THE COURT:  Mr. Fields?

16              MR. FIELDS:  Yes, Your Honor.

17              THE COURT:  All right, Mr. Hoffman, thank you for

18   your testimony.  You're excused.  You may step down.

19              THE WITNESS:  Thank you.

20              THE COURT:  All right, Defendant Rudolph may call

21   his next witness.

22              MR. MARKUS:  Your Honor, at this time we'll call

23   Dr. Larry Rudolph, please.

24              THE COURT:  All right.

25              COURTROOM DEPUTY:  Raise your right hand for me.

DIRECT - RUDOLPH

1          LAWRENCE RUDOLPH, DEFENDANT RUDOLPH'S WITNESS, SWORN

2                COURTROOM DEPUTY:  Thank you.  Please remove your

3    mask and take a seat for me.  Please state your full name

4    for the record and spell your first and last name for us.

5                THE WITNESS:  Lawrence Rudolph.  L-a-w-r-e-n-c-e,

6    R-u-d-o-l-p-h.

7                THE COURT:  You may proceed, counsel.

8                MR. MARKUS:  Thank you, Your Honor.

9                     DIRECT EXAMINATION

10   BY MR. MARKUS:

11   Q.  Dr. Rudolph, I know you've been waiting a long time for

12   this moment.

13   A.  Yes, sir.

14   Q.  I'd like for you to just take a moment and look at the

15   jury and answer this question:  Did you shoot your wife?

16   A.  No, sir.  I absolutely did not shoot my wife.

17   Q.  Did you murder your wife to get paid insurance money in

18   this case?

19   A.  No, sir.  I did not murder my wife for insurance money.

20   Q.  Did you murder Bianca so that you could be with Lori

21   Milliron?

22   A.  No, sir.  I did not murder my wife to be with Lori

23   Milliron or anyone else.

24   Q.  Okay.  Let's take a step back for a moment and start at

25   the very beginning.  I want to ask you if your children are

DIRECT - RUDOLPH

1    here in court today.

2    A.    Yes, they are.

3    Q.    Who are your children?

4    A.    My son, Julian, and my daughter, AnaBianca.

5    Q.    Do you have anything you'd like to say to them?

6    A.    Yes, sir.

7    Q.    Go ahead.

8    A.    Guys, I'm sorry you have to go through this.  I'm

9    really sorry.

10   Q.    Okay, Dr. Rudolph.  Tell -- let's take a deep breath.

11   Let's tell the jury what you do for a living.

12   A.    Right now I own Three Rivers Dental Group, and I have a

13   consulting firm that does managing and marketing for dental

14   services.

15   Q.    And before you were owning Three Rivers, before you had

16   children, did you meet a woman named Bianca Rudolph?

17   A.    Yes, sir, I did.

18   Q.    How did you meet Bianca?

19   A.    I was in dental school in 19- -- oh, Lord, now -- in

20   1978, and she was an undergrad at Pitt, and we met in the

21   school cafeteria.

22   Q.    And did you guys end up getting married?

23   A.    We did.

24   Q.    How long had you been married when she died?

25   A.    34 years.

2658

DIRECT - RUDOLPH

1    Q.    Did the marriage have ups and downs?

2    A.    Yes, sir.

3    Q.    At some point in the late '90s, did you learn that

4    Bianca was having an affair?

5    A.    Yes, sir.

6    Q.    At that point did you go visit an attorney?

7    A.    I did.

8    Q.    Did you discuss your options with the attorney?

9    A.    Yes, sir.

10   Q.    Okay.  I'm not going to get into that right now, but

11   did you decide to stay in the marriage even after visiting

12   with that lawyer?

13   A.    I did.

14   Q.    Okay.  Did you then learn in 2000 that Bianca was

15   having another affair?

16   A.    Yes, sir.

17   Q.    Did you go visit with the attorney again?

18   A.    I did.

19   Q.    Now, before we get into the attorney file, I'd like to

20   discuss with you how you found out about that affair.  Who

21   told you about the affair?

22   A.    The first one or second one?

23   Q.    Let's start with the first.

24   A.    Well, the first one she told me about.

25   Q.    Okay.

DIRECT - RUDOLPH

1   A.    I could note some changes in her personality, and one

2   day she called me from work, told me she had to speak with

3   me.   I came home from work, which I hardly ever did.   I had

4   to leave my patients.   Sat me down on the couch and

5   proceeded to tell me that she was in love with somebody

6   else.   She'd been seeing this person for several months, was

7   contemplating divorce, and had already spoken to her

8   brother, who was an attorney, and was trying to seek counsel

9   for that divorce.

10  Q.    Okay.   And then what about the second affair in 2000?

11  How did you learn about that affair?

12  A.    Well, that was -- that was different.   And that -- that

13  instance my daughter came to me and said, "Dad, you need to

14  see what Mom's been doing on the computer."

15       When I go into her office, she turns it around real

16  quick, and I think there's something wrong.   So she had her

17  mother's password.   We went into the office and we found

18  many emails between her and her new lover.

19  Q.    Did you print those out?

20  A.    Yes, sir.

21       MR. MARKUS:   Your Honor, at this time, I'd move in

22  RA.   These are the emails that were printed out between

23  Bianca Rudolph and Doug Scandrol that Larry Rudolph

24  printed.

25       THE COURT:   Do I have copies of that?

DIRECT - RUDOLPH

1          MR. MARKUS:  Yes, Your Honor.

2          THE COURT:  RA?

3          MR. MARKUS:   RA.  It's the first exhibit.

4          THE COURT:  All right.  Mr. Fields.

5          MR. FIELDS:  Your Honor, the content aside, it's

6    hearsay, and there's no objection -- or there's no exception

7    that would allow it in.

8          THE COURT:  All right.  Let me hear from Mr. Dill.

9    You might have something to say about this.

10         MR. MARKUS:  He wants to know if you have an

11   objection.

12         MR. DILL:  I have no objection.

13         MR. MARKUS:  Your Honor --

14         THE COURT:  Hold on.

15         MR. MARKUS:  Sorry.

16         THE COURT:  We're talking about what, 40 pages of

17   emails?

18         MR. MARKUS:  Yes.

19         THE COURT:  First, how do you get around the

20   hearsay?

21         MR. MARKUS:  Judge, these aren't hearsay for two

22   separate reasons.  They are not offered for the truth,

23   they're offered for two separate nonhearsay reasons.  One,

24   Bianca's state of mind at the time under 803(3); and,

25   second, for the effect on the listener, Dr. Rudolph, what

DIRECT - RUDOLPH

1    happened when he saw and read these emails.

2            So they're admissible for both -- from both ends.

3    They're not offered for the truth, obviously, of what's in

4    them.   They're offered for Bianca's state of mind and

5    Dr. Rudolph's state of mind after he read them.

6            THE COURT:  I'm going to take a moment to look at

7    this.   Isn't 803(3) pertaining to future intent?

8            MR. MARKUS:  It goes to state of mind, Your Honor.

9    If I can just call it up.

10           MR. FIELDS:  And, Your Honor, may I be heard

11   briefly?

12           THE COURT:  Yeah.  Definitely I'll give you an

13   opportunity.

14           MR. MARKUS:  This goes to a statement of the

15   declarant's then-existing state of mind.

16           THE COURT:  All right.

17           MR. MARKUS:  Or emotional sensory condition, which

18   is exactly what these are.

19           THE COURT:  Mr. Fields.

20           MR. FIELDS:  Your Honor, first as to state of mind,

21   or -- or, actually, let's talk about effect on the listener.

22   He can testify to the effect on the listener.  He's up

23   there.   They don't need to be there for that purpose.

24           And as for Bianca's then-existing mental state, I

25   would point the Court to *United States v. Joe*, it's 8 F.3d

DIRECT - RUDOLPH

1    1488 in the Tenth Circuit.  What the Tenth Circuit said in

2    that case is that you can say that, let's say -- let's use

3    the example someone -- the testimony could be someone was

4    afraid.  Explaining why they were afraid gets beyond 803(3).

5    And the commentary to the rule talks about that.  The

6    exception there is extremely narrow.

7        Also, I don't think defense counsel has sort of

8    identified -- these emails span a wide span of time.  What

9    state of mind is he trying to get in at; one?  And if it's

10   just that she was having an affair, we concede that, Your

11   Honor, and the defendant can testify about that.  But

12   getting the -- Bianca's personal emails into the evidentiary

13   record here without a hearsay exception we believe is

14   unwarranted.

15        MR. MARKUS:  Your Honor -- oh, I'm sorry.

16        THE COURT:  Give you one last word on this.

17        MR. MARKUS:  Sure.  Couple of things.  One, *Joe*

18   clearly supports the defense because it goes exactly as to

19   what these emails -- or the similar types of things were

20   admitted in that case, *Joe*.  They are not a wide variety of

21   time.  These 40 pages were the hot and heavy email of a

22   one-week period in August right before he goes to the

23   attorney to discuss it.

24        The effect on the listener is extremely important

25   here.  It's not enough to just say, "What did you do after

DIRECT - RUDOLPH

1    you read them?"

2          It's important for the jury to see exactly the

3    depth and the state of Bianca's state of mind when she was

4    going through these and what the doctor -- how he -- how he

5    viewed them.  We -- the Government has introduced exactly

6    the same type of emails on the other side between

7    Ms. Milliron and Dr. Rudolph.  What's good for the goose --

8          THE COURT:  Yeah, but that's -- those are

9    statements of a party under 801(d)(2).

10         MR. MARKUS:  Understood, Your Honor.  And these are

11   not offered for the truth.  They're not hearsay statements.

12   If you go through any line in this email, I'm not offering

13   them to show, for example, Bianca's --

14         MR. FIELDS:  Your Honor, I object to him reading

15   the --

16         MR. MARKUS:  All right.

17         THE COURT:  Okay.  Let's -- let's dial it down a

18   couple of degrees.  Go ahead.

19         MR. MARKUS:  Yes, Your Honor.  I don't need to read

20   them, but Your Honor can flip to any page of the email and

21   look at any one line.  I'm not offering them for the truth.

22   I'm offering them to show what both parties in this marriage

23   were going through at the time.

24         THE COURT:  All right.  I'm going to sustain the

25   objection.  I think the principle purpose of these emails

DIRECT - RUDOLPH

1    is, as Mr. Markus points out, to show the reason for, the

2    basis for, the state of mind of the witness on the witness

3    stand and what his reaction was to these emails and their

4    contents.  And I think he can -- since he's here in court in

5    the witness stand, he can testify to that live, subject to

6    cross-examination, and we don't have to have 40 pages of

7    hearsay come into the record.  So the objection's sustained.

8    BY MR. MARKUS:

9    Q.   Well, let me ask you this, then, Dr. Rudolph:  Did you

10   review the emails that you printed out?

11   A.   Yes, sir.

12   Q.   Were they salacious?

13   A.   Very salacious.

14   Q.   Were they detailing intimate -- an intimate affair that

15   your wife was having?

16   A.   Yes, sir.

17   Q.   Who was the affair with?

18   A.   A man named Doug Scandrol.

19   Q.   Was Mr. Scandrol a fellow hunter?

20   A.   Yes, sir.

21   Q.   Was he the person that we heard of that was a partner

22   with Pieter Swanepoel?

23   A.   Yes, sir.

24   Q.   And after reviewing these emails, did you come to learn

25   that your wife said she was in love with another person?

2665

DIRECT - RUDOLPH

1          MR. FIELDS:  Objection, Your Honor.  This is

2     leading.

3          THE COURT:  Sustained.

4     BY MR. MARKUS:

5     Q.   What did you come to learn from reading these emails

6     about your wife and Mr. Scandrol?

7     A.   She had been having a pretty lengthy affair.  And she

8     expressed her love, amongst other things, to Mr. Scandrol.

9     Q.   Did she say in here whether she wanted to stay with you

10    or not?

11         MR. FIELDS:  Objection.  Leading.

12         THE COURT:  No, it's not.  Overruled.

13         THE WITNESS:  She did.  She didn't want to stay

14    with me.

15    BY MR. MARKUS:

16    Q.   And after you read the -- these emails -- by the way,

17    did they also detail a physical affair?

18    A.   Very much so.  Very salacious.

19    Q.   After reviewing the emails -- by the way, were these

20    emails during August of -- August of 2000?

21    A.   I believe so, yes.

22    Q.   After reviewing the salacious emails where your wife

23    said she didn't want to stay with you, did you go visit with

24    the lawyers again?

25    A.   I did.

DIRECT - RUDOLPH

1    Q.    What did you ask the lawyers to do?

2    A.    To begin to draft and prepare divorce paperwork,

3    process.

4    Q.    And did they start to do that?

5    A.    Yes, sir.

6    Q.    Now, there's a series of letters with you and your

7    lawyers.

8          MR. MARKUS:  Let me ask Government counsel if they

9    have objections to the lawyer letters.

10         MR. FIELDS:  No objection, Your Honor.  We can

11   cross-examine the defendant on these.

12         THE COURT:  All right.  Have these been labeled as

13   exhibits?

14         MR. MARKUS:  Yes, Your Honor.  I'll move them in

15   now, if I may.  I'd move in Defense Exhibit RB, RF, RG, RH,

16   RI, RL, RM, RN, RO, RP, RQ and RR, RS, and RT.

17         THE COURT:  Just to confirm, Mr. Fields, now that

18   you know precisely which exhibits are being offered, you

19   still have no objection?

20         MR. DILL:  No objection.  I'm sorry.  Did you ask

21   me, Your Honor, or Mr. Fields?

22         THE COURT:  I was asking -- I thought I was asking

23   Mr. Fields.

24         MR. DILL:  My apologies.

25         MR. FIELDS:  Your Honor, so long as I can admit on

2667

DIRECT - RUDOLPH

1    cross some of the letters that are not being admitted now, I

2    have no objection.  Otherwise I'd ask for all --

3              THE COURT:  I'm sorry, pull the mic --

4              MR. FIELDS:  I'm sorry, Your Honor, the mask.

5              So there are several letters between the defendant

6    and the law firm.  I have no objection to all of them coming

7    in.  It sounds like only some of them are coming in.  So

8    subject to my ability to introduce the ones that are not

9    being introduced now on cross-examination, I have no

10   objection.

11             THE COURT:  All right.  My question to you is:  Now

12   that you know it's RB through RT that's being moved into

13   evidence, you have no objection?

14             MR. FIELDS:  No objection.

15             THE COURT:  Okay.  And your contingency is noted,

16   but RB through RT are all admitted into evidence and may be

17   published to the jury.

18             MR. MARKUS:  Your Honor, I'm sorry, I missed one,

19   which is RU, which is the billing records from the law firm

20   as well.

21             THE COURT:  Okay.  So it will -- RB through RU,

22   correct?

23             MR. MARKUS:  Correct, Your Honor.

24             THE COURT:  Okay.

25             MR. FIELDS:  Sorry, Your Honor, no objection.

DIRECT - RUDOLPH

1           THE COURT:  No objection.  Okay.  Just so we're

2       clear on the record, RB through RU are all admitted into

3       evidence.

4           MR. MARKUS:  Your Honor, there was one -- one

5       exhibit that we don't agree on which I'll get to in a

6       second, which is RB.  The rest we have an agreement on.  But

7       RB we'll have to wait one moment on.

8           THE COURT:  Wait.  I'm confused now.

9           MR. MARKUS:  All the exhibits that I just mentioned

10      are the law firm records.  I made one -- I mentioned one out

11      of turn, which is RB, which is a separate letter that

12      Mr. Fields and I would like to discuss in a moment when we

13      get to it.

14          THE COURT:  All right.

15          MR. MARKUS:  Sorry about that.

16          THE COURT:  Okay.  Just so it's clear -- let's --

17          MR. MARKUS:  Sorry.  I apologize.  It's RF --

18          THE COURT:  It's now clear as mud.  Okay.

19          MR. MARKUS:  It's RF through --

20          THE COURT:  Hold on.  Let me talk.  You're not

21      offering RB at this time; is that correct?

22          MR. MARKUS:  Correct, Your Honor.

23          THE COURT:  All right.  So the accurate description

24      of what's been moved in is RF through RU?

25          MR. MARKUS:  Correct.  I apologize.

DIRECT - RUDOLPH

1          THE COURT:  Okay.  RF through U -- RU are admitted

2    into evidence and we'll deal with RB in a few moments.

3          MR. FIELDS:  Your Honor, I'm sorry.  It's not a

4    complete series.  There's some missing from that gap between

5    RF and RU.  So I know it's painful, but I think we need to

6    go exhibit by exhibit --

7          THE COURT:  No, thank you for pointing that out.  I

8    thought we were talking about a straight sequence of

9    exhibits.  It gets a little more difficult to track when

10   we're dealing with letters instead of numbers.  Let me go

11   through it one by one.  You can correct me, Mr. Markus, if I

12   get any of this wrong.

13         RF, RG, RH, RI, RL, RM, RN, RO, RP, RQ, RR, RS, RT,

14   and RU.

15         MR. MARKUS:  Yes, sir.

16         THE COURT:  All right.  Those are admitted into

17   evidence.

18       (Defendant's Exhibits received).

19         THE COURT:  Let's move on.

20         MR. MARKUS:  Thank you.  I apologize.

21   BY MR. MARKUS:

22   Q.   Before I get to the lawyer letters, did Bianca Rudolph

23   tell you that you would never satisfy her sexually?

24   A.   Yes, sir.

25   Q.   Was that part of the issues in the emails between her

DIRECT - RUDOLPH

1    and Doug Scandrol?

2    A.    Yes, sir.

3    Q.    Okay.  Let's go through some of these letters.  Let's

4    start with RF, if we could, which is LR 202.  Is this the

5    law firm that you had retained to help you with divorce back

6    in 1999?  Do you see the date at the top?

7    A.    Yes, sir.

8    Q.    Okay.  And was this after the first or the second

9    affair that your wife had, in '99?

10   A.    That would be the second.

11   Q.    Okay.  In the attachment to this letter, if we go to

12   the next page, LR 203, did your lawyer start to tell you

13   what would be involved in a divorce?

14   A.    Yes, he did.  Started outlining it for me.

15   Q.    If you look at the first paragraph there, did they also

16   tell you what would make sense from -- well, did you provide

17   them with your accounting information?

18   A.    Yes, sir.  I believe so.

19   Q.    And do you see here where it talks about estate

20   planning?

21   A.    Correct.

22   Q.    Did you always rely on attorneys for your estate

23   planning?

24   A.    Very much so.

25   Q.    If we go to the third page of this memo, LR 205.  Do

2671
DIRECT - RUDOLPH

1    you see this paragraph here that we could call out?

2    A.    Yes.

3    Q.    Is this talking about estate planning and avoiding

4    taxes if your wife were to die?

5    A.    Correct.

6    Q.    Or if you were to die?

7    A.    Correct.

8    Q.    And do you see here where they're talking about the

9    amount of death taxes could be coordinated with life

10   insurance?

11   A.    I do.

12   Q.    Okay.  This is all the way back in what year?

13   A.    '99.  1999.

14   Q.    Okay.  Thank you.  There are a string of letters -- we

15   don't need to go through them now -- back from '99.  And

16   then do you go see them again in 2000 after you see these

17   emails?

18   A.    Correct.

19   Q.    Let's call up RL, which is at LR 212.  Do you see the

20   date at the top, August 16th, 2000?

21   A.    I do.

22   Q.    Okay.  If we could call -- pull back and -- was your

23   lawyer a man named Gary Gentile?

24   A.    Yes, sir.

25   Q.    Do you see where he's talking about how much your

DIRECT - RUDOLPH

1   estate was worth back in 2000?

2   A.   Yes, sir.

3   Q.   How much was it worth?

4   A.   Approximately 8- to 9 million.

5   Q.   Did your estate grow over time?

6   A.   It did.

7   Q.   Okay.  Do you see in the first sentence where your

8   lawyer's talking about that, "In the past where Dr. Rudolph

9   first visited my office, I recently met with him again and

10  he is of the opinion that his marriage is not salvageable."

11          Do you see that?

12  A.   I do.

13  Q.   Did you intend to go speak with Bianca about whether

14  the marriage was salvageable?

15  A.   Yes, sir.

16  Q.   And what were you planning -- what were you planning on

17  telling her?

18  A.   Following the review of the emails and knowing she'd

19  had a previous affair, I just assumed the marriage was

20  finished and we would have to begin to discuss divorce

21  proceedings.

22  Q.   Okay.  You can pull that down.

23          Did you then have discussions with Bianca Rudolph?

24  A.   I did.

25  Q.   Now, even though you had spoken about divorce with your

DIRECT - RUDOLPH

1    lawyers, did you and Bianca decide to stay together?

2    A.    We did, yes, sir.

3    Q.    And can you tell the jury a little bit about that.

4    A.    Why we decided to stay together?

5    Q.    Yes, sir.

6    A.    I gave it some thought.  Actually had consultation with

7    my father.  He was a great guy, very rational.  World War II

8    veteran.  And we sat down, and he and I talked about it

9    before I met with my wife.  And he said to me, "I'm with

10   you.  You do what you need to do, son.  But you know you

11   have two young kids, they're 10 and 14 years old.  You know

12   they're going to be damaged.  Have you thought that

13   through?"

14        I said, "Well, of course I have, Dad.  I just don't

15   know if there's an alternative here."

16        And after I met with him and I thought about it, I

17   came up with the idea that maybe we could do a postnuptial.

18   Try to save the marriage one more time; give it one last

19   shot.  If nothing else, for the sake of my family and my

20   children.  So I went back to see my attorney and I proposed

21   that idea to them.  I said, "Mr. Gentile, I'd like to try to

22   do a postnuptial with my wife."

23        He looked right at me and he said, "Why do you want

24   to be a cuckold?"

25   Q.    A what?  I'm sorry?

2674

DIRECT - RUDOLPH

1    A.    A cuckold.

2    Q.    What is that?

3    A.    I had to go home and look it up.  It's a man that

4    allows his wife to be involved with other women -- other

5    men, excuse me.  That hurt.  That didn't feel good.  But I

6    prevailed.  I asked him to create the document.  I didn't

7    know if it was going to work.  But, again, I was going to

8    give it one last try.

9    Q.    Let me show you what's in evidence as RN.  Which is LR

10   216.  Sorry.

11          Do you see the date of this letter, which is a few

12   days later, August 22d, 2000?

13   A.    Yes, sir.

14   Q.    Is this the letter from your lawyer?

15   A.    Yes, sir.

16   Q.    And do you see -- can you read the first line to us.

17   A.    "I represent Dr. Rudolph who intends to enter into a

18   postnuptial agreement with his wife, although they do not

19   intend to separate or divorce at this time."

20   Q.    Okay.  And the next line there is talking about if

21   Mrs. Rudolph is asking for a referral for evaluation

22   purposes, your lawyer, Gentile, is going to give

23   Mrs. Rudolph this other lawyer's name.  Is that what's

24   happening there?

25   A.    Yes, sir.

DIRECT - RUDOLPH

1    Q.    So were you prepared to pay for a lawyer for

2    Mrs. Rudolph to review that postnup?

3    A.    Of course.

4    Q.    Okay.  And do you know whether your lawyer,

5    Mr. Gentile, made a number of recommendations for

6    Mrs. Rudolph for different lawyers?

7    A.    I believe so.

8    Q.    Let's call up RO, which is at LR 217.

9          Do you see this as a letter to a different lawyer

10   from Mr. Gentile also expressing the same thing?

11   A.    Yes, sir.

12   Q.    Very good.  Let's pull up RP, which is LR 218.  Sorry.

13   I keep forgetting the second part.

14         Do you see this is a letter with a $2500 check to

15   retain a lawyer for your wife?

16   A.    Yes, sir.

17   Q.    So were you going to pay for a lawyer to review that

18   postnuptial agreement?

19   A.    Yes, sir.

20   Q.    Okay.  Did you -- you can take that down.  Thank you.

21         Did you have an opportunity to discuss the future

22   of the marriage, the postnup, and other issues with

23   Mrs. Rudolph?

24   A.    We did.

25   Q.    Did Mrs. Rudolph write to you, on handwritten towels,

DIRECT - RUDOLPH

1    her feelings at the time?

2    A.    Yes, sir, she did.

3    Q.    Did you keep that handwritten note?

4    A.    I did.

5         MR. MARKUS:  At this time, Your Honor, we'd move in

6    the handwritten note, which is RB.  It's in the notebook as

7    a copy, but we have the original if the Court would like to

8    see it.

9         THE COURT:  Is there an objection?

10        MR. FIELDS:  Same objection as the emails, Your

11   Honor.

12        MR. MARKUS:  This is -- can I be heard on this,

13   Your Honor?

14        THE COURT:  Sure.

15        MR. MARKUS:  This is obviously very different than

16   the email.  This goes to Mrs. Rudolph's state of mind about

17   the marriage exactly under 803(3).  She explains her

18   feelings as to the marriage, she explains why she signs the

19   postnuptial agreement, she explains why she stays in the

20   marriage, and she explains her state of mind and feelings,

21   Your Honor.

22        THE COURT:  Tell me why the decedent's state of

23   mind at that time is relevant.

24        MR. MARKUS:  It's critically important to this

25   case, Your Honor, because it shows what they decide to do in

DIRECT - RUDOLPH

1   their marriage going forward, which is something the

2   Government has contested for the entire trial.  It goes to

3   show her state of mind as to why she wanted to sign the

4   postnup, which has been contested by the Government the

5   entire trial.  This is an extremely critical piece of

6   evidence for the defense, Your Honor.

7            THE COURT:  All right.  I do see a difference

8   between -- go ahead.

9            MR. FIELDS:  Sorry, Your Honor.  Because it's so

10  important, may I be heard on --

11           THE COURT:  Sure, go ahead.

12           MR. FIELDS:  They are affirmatively, just as

13  Mr. Markus said, trying to enter this in -- to the truth of

14  the matter regarding her signature.  So that is hearsay.

15  And *United States v. Joe* -- I can quote from it -- the state

16  of mind exception does not permit the witness to relate any

17  of the declarant's statements as to why he had the

18  particular state of mind or why he might have believed that

19  would have induced the state of mind.

20           The state of mind exception is extremely narrow,

21  Your Honor.

22           THE COURT:  Right.  But if Mr. Markus'

23  representations -- I haven't read it -- are to -- are

24  accurate, I don't hear him saying that this statement is an

25  explanation of her as to why she has the state of mind.

DIRECT - RUDOLPH

1  It's just a reflection of her state of mind at that time.

2          MR. FIELDS:  He said affirmatively, Your Honor,

3  that he intends to admit this to show that she signed the

4  postnup.  That is a particular action, the truth of the

5  matter that's actually asserted in there, not a state of

6  mind, not for the effect on the listener.  That's a classic

7  hearsay purpose prohibited by the rule.

8          THE COURT:  I don't think I heard Mr. Markus say

9  that, but clarify what your intent is.

10          MR. MARKUS:  Your Honor, we can go through the

11  letter but the letter basically explains her feelings about

12  why she stays in the marriage, her feelings as to why she

13  decided to go forward and sign the postnup.  These are "why"

14  reasons, her state of mind about explaining how she wants to

15  stay in the marriage for the children, other things like

16  that.  It goes all to 803(3) reasons; the same reasons that

17  the Government's been using throughout the trial to admit

18  similar items.

19          This is, again, a very short letter, handwritten.

20  And also, Your Honor, I would argue not only is -- it goes

21  to state of mind, it's also, under 807, the residual

22  exception, trustworthy.  There's -- they admit that this is

23  authentic.  This is a trustworthy document written at the

24  time by Dr. Rudolph's wife.

25          THE COURT:  All right.  I'm going to overrule the

DIRECT - RUDOLPH

1    objection.  I find a material difference between this and

2    the 40 pages of email.  I do believe that Ms. Rudolph's

3    state of mind at that time is relevant to some of the issues

4    in this case.  And this is a reflection of her state of

5    mind.

6              Mr. Fields, I'm -- I've ruled.

7              MR. FIELDS:  I understand, Your Honor.  May I

8    preserve objections as to the particular statements that are

9    being used within the letter?  Because it is an extensive

10   letter, and there are multiple statements.

11             THE COURT:  No.  You've made your objection.

12   You've preserved that issue for later purposes and I ruled.

13   The objection's overruled.

14             Exhibit RB is admitted into evidence and may be

15   published to the jury.

16        (Defendant's Exhibit RB received)

17             MR. MARKUS:  Thank you.  Your Honor, we would call

18   up the first page of the Exhibit RB, LR 42, please.

19   BY MR. MARKUS:

20   Q.   Now, this is a little hard to read so I'm going to ask

21   Mr. Reyes if we can zoom in on the first four or five lines,

22   please.

23             Now, Dr. Rudolph, can you see what that says there?

24   A.   Yes, sir.

25   Q.   Can you read that up to -- up to here, please.

DIRECT - RUDOLPH

1    A.    "What can I say to you to express my deepest sorrow and

2    regret for all I have done and put you through.  You deserve

3    so much better because you are a really good person."

4    Q.    Thank you, Mr. Reyes.  If we could zoom out.  And zoom

5    in on this section here.

6          Can you start reading where it says the word "But."

7    A.    "But I have done things, lies, deceit, selfishness,

8    that I didn't know I was capable of.  It is very frightening

9    to see yourself in this light, to have the ones you love to

10   see you in this way, to lose the respect of your spouse,

11   your child, your friends."

12   Q.    If we could zoom out, Mr. Reyes.  And go to the bottom

13   of that page from here to the end.

14          And if you could start reading, sir, from here,

15   just the -- that sentence.

16   A.    "I did it all by myself and now I'm trying to face

17   myself and you and put the pieces of our lives back together

18   and this has left me feeling very frightened and hopeless."

19   Q.    Okay.  Thank you, Mr. Reyes.  If we go to the next

20   page, LR 43.  And if we could zoom in on the top couple of

21   lines.  Do you see here where it says, "Just trying to find

22   some hope that I can fix this, take away the pain from you

23   somehow, when I say I wish I could erase it all"?

24          Do you see that part?

25   A.    Yes, sir.

DIRECT - RUDOLPH

1    Q.    Is -- what was your understanding of what she was

2    trying to tell you there?

3    A.    I believe at that point she was trying to not only

4    apologize and ask for forgiveness, but work on a way forward

5    using the postnuptial.

6    Q.    We'll go to the postnuptial in a second.

7          Mr. Reyes, you can zoom out.  Can we zoom in on

8    this section here.  Do you see where she says, "I can tell

9    you that I love you and say I'm sorry, which I do and I am,

10   but the value of those words can only come with time, with

11   deeds to back them up."

12         Do you see that?

13   A.    Yes, sir.

14   Q.    Okay.  Now, I'm not going to go through all of the

15   lines where she apologizes, but is it fair to say that

16   that's the import of this letter?

17   A.    Correct.

18   Q.    After seeing this letter, do the two of you decide to

19   move forward in your marriage?

20   A.    We did.

21   Q.    Now, we'll get to the postnuptial in a second, but more

22   importantly, did you have an understanding with her and did

23   you discuss with her the issue that I had raised earlier

24   with you about sexuality?

25   A.    That and a couple other issues, yes, sir.

DIRECT - RUDOLPH

1    Q.    Tell the jury about how you and Mrs. Rudolph were going

2    to go forward regarding the sexuality in the marriage.

3    A.    Well, after the first affair, she told me I did not

4    please her.  And I tried my very best.  I bought some books,

5    bought a few sex toys, and gave it everything I had.  I

6    thought we were doing okay.  And then when the second affair

7    came in and she told me it didn't work, she was very frank

8    with me.  She said basically, "You turn me off.  I've tried

9    to repress these feelings, but I'm tired of faking it."

10   Q.    Let's call up page 4 of that letter, LR 45.

11         Do you see at the top of that letter where she's

12   talking about "the kind of person that you see at their

13   worst, lowest, most self-absorbed, and you still want them

14   and love them"?

15         Do you see that part?

16   A.    I do.

17   Q.    And do you think -- and do you see where she says, "I

18   think maybe you're just trying to hold us together for the

19   kids"?

20   A.    I do.  I see that.

21   Q.    Was that what you were doing?

22   A.    I still love my wife.  I always have, always will.  But

23   yes, of course, my children factored into it.

24   Q.    At the very bottom of that page -- you can take that

25   part down -- do you see where she says, "I want to be worthy

DIRECT - RUDOLPH

1    of a man like you"?

2    A.    I see that.

3    Q.    Did she feel guilty about what she had done?

4    A.    Yes, sir, I think she was genuine with her guilt.

5    Q.    And I was talking to you about sexuality moving forward

6    in the marriage.  What did you and Bianca decide would be

7    best to preserve the marriage, preserve going forward?

8    A.    Well, that part of our marriage, let's call it the

9    sexual dynamic, was over.  There wasn't going to be sex in

10   our lives, and we both were frank about that.  So we decided

11   that we would pursue relationships outside of the marriage.

12   She could do what she wanted to do, I would do what I wanted

13   to do, with two caveats.  One, we wouldn't embarrass each

14   other.  We would try to keep it as secret and confidential

15   and private as we possibly could.  We term that as a

16   don't-ask-don't-tell.

17   Q.    Did -- going forward, did you have those kinds of

18   relationships with other women?

19   A.    I did.

20   Q.    Did Ms. Rudolph know about them?

21   A.    Some.

22   Q.    Did she know, without the particulars of the people,

23   that you were engaged in these types of relationships?

24   A.    I believe so.

25   Q.    Did she have other affairs going forward in the

DIRECT - RUDOLPH

1    marriage?

2    A.    She did.

3    Q.    Okay.  Let's go to the next page of that exhibit -- do

4    you need the page number?

5              MR. REYES:  LR 26?

6              MR. MARKUS:  Yeah.  If we can zoom in on this

7    section here.

8    BY MR. MARKUS:

9    Q.    Do you see the -- beginning with "Perhaps," where she

10   says, "Perhaps it begins with recognizing this, taking

11   responsibility for my mistakes, and offering love and

12   sacrifice to everyone I have wronged and hurt.  I have

13   admitted I need help.  I tried to begin some responsibility

14   with signing the paper and I'm trying to love you and make

15   it up to you."

16             Do you see that?

17   A.    I do.

18   Q.    What paper is she referring to there when she says that

19   she's taking responsibility with signing the paper?

20   A.    That would be the postnuptial.

21   Q.    Let's call up what's in evidence as RQ, LR 219.  If we

22   could zoom in on the date first.

23             Do you see that the date of this letter from your

24   lawyer is a couple of weeks later in September 2000?

25   A.    Yes, sir.

DIRECT - RUDOLPH

1    Q.    Okay.  If we could zoom back out.  And if we could zoom

2    in on the actual content of the letter there.

3          Do you see Mr. Gentile is informing the other

4    lawyers that he's been told that the parties have

5    reconciled -- be advised that the parties have reconciled

6    and they have entered into a postnuptial agreement setting

7    forth the terms of any future separation and divorce.  Do

8    you see that, sir?

9    A.    I do.

10   Q.    And had you entered into a postnuptial agreement with

11   your wife at that point?

12   A.    I did, yes, sir.

13   Q.    Let's -- we've seen that postnuptial agreement a number

14   of times in this trial.  Let's just call it up for one

15   second.  It's Exhibit RW at LR 87.

16         Is this the postnuptial agreement that Mrs. Rudolph

17   signed?

18   A.    Yes, sir.

19   Q.    Now, do you see at the top it's August 25th, 2000?

20   A.    Yes, sir.

21   Q.    Is that shortly after you met with the lawyers and

22   first talked about divorce?

23   A.    Yes, sir.

24   Q.    And then you had this discussion with Mrs. Rudolph?

25   A.    That's correct.

1    Q.    Now, Dr. Rudolph, I'm going to -- I know these are very

2    personal questions, but when you took this -- the sexuality

3    requirement, or part, of the marriage out with Mrs. Rudolph,

4    did the marriage get better?

5    A.    Slowly.

6    Q.    Okay.  Did it -- did it help to release the tension and

7    the controversy in the marriage?

8    A.    It did.

9    Q.    Can you explain that to the jury.

10   A.    Well, when the tension from the sexual issues went away

11   and we focused on positive things for the family, for the

12   kids, slowly with time we came back together.

13   Q.    Let's go back to the last page of that letter, RB --

14   Exhibit RB, which is -- the Bates number is LR 47.  And if

15   we could zoom in on this section here.

16          Do you see where she says, "The only thing that I

17   feel certain about is that I don't want to be without you.

18   You're the best friend I've ever had.  I've hurt you

19   terribly and miraculously you still want me.  I'll spend the

20   coming months showing you my gratitude in giving me one last

21   chance"?

22          Do you see that?

23   A.    I do, sir.

24   Q.    And did you and Bianca make the most of that one last

25   chance going forward?

2687

DIRECT - RUDOLPH

1    A.    We did.

2    Q.    Did you start to travel together and do those sorts

3    of -- take the safaris that we've heard about?

4    A.    We did.  We traveled and . . .

5    Q.    Did the marriage improve?

6    A.    It did.

7    Q.    Let's just look at the last part of this letter and

8    then we'll be done with it.  Down here.

9          And do you see where she says, "And through the

10   months ahead, perhaps I can be your best friend"?

11         Do you see that?

12   A.    I do.

13   Q.    And did you guys become best friends after this?

14   A.    Yes, sir, we did.  Once you take the sexual tension

15   out, we did.

16   Q.    "Cheer you up when you are down, show you in small ways

17   and large that you are an exciting, funny, silly, strong

18   sweet man with whom I want to share my life and dreams.

19   That's the thing about dreams is that they can change and we

20   can plan ours as we go."

21         Do you see that?

22   A.    I do.

23   Q.    And did you and Bianca Rudolph change the type of

24   marriage that you had at this critical part?

25   A.    Yes, sir.

DIRECT - RUDOLPH

1          THE COURT:  All right, Mr. Markus, why don't we

2     pause there for our afternoon recess.

3          MR. MARKUS:  Thank you, Your Honor.

4          THE COURT:  All right, ladies and gentlemen of the

5     jury, we'll be in recess for 15 minutes.

6          (Recess taken 3:12 p.m. to 3:30 p.m.)

7          THE COURT:  All right, Mr. Markus, you may resume

8     your examination.

9          MR. MARKUS:  Thank you.  Good afternoon, ladies and

10     gentlemen.  Good afternoon, Dr. Rudolph.

11     BY MR. MARKUS:

12     Q.   I want to pick up where we left off going forward with

13     the marriage and the postnuptial agreement.  We saw that

14     postnuptial agreement was signed on August 25th, 2000.  I

15     want to show you some of the billing records from the law

16     firm.  Let's start with Exhibit RU, which is in evidence, at

17     LR 117.  And if we could zoom in on these bottom entries

18     here.

19          Now, Dr. Rudolph, do you see a few days before the

20     agreement was signed on 8-21-2000, the law firm bills you

21     for a telephone conference and researching the draft

22     agreement?

23     A.   I do.

24     Q.   And can you tell us what happens the next day on August

25     22d, 2000.  What do they bill you for?

DIRECT - RUDOLPH

1    A.    Draft agreement, conference, legal services.

2    Q.    Okay.  And if we turn to the next page, LR 118, if we

3    look at the top three entries there, do we see more of the

4    same revisions to the agreement on the days leading up to

5    her signing it?

6    A.    Yes, sir, I do.

7    Q.    Now a couple of days after she signs it and you sign it

8    on August 30th, do you see that there's a telephone

9    conference with Frank Langell?

10   A.    Yes, sir.

11   Q.    Who is Frank Langell?

12   A.    Frank Langell at the time was my business manager,

13   regional manager, for the dentistry.  My former business.

14   Q.    And is he the person who witnesses that postnuptial

15   agreement?

16   A.    Yes, sir.

17   Q.    Okay, we can take that down.  Let's look at -- and,

18   Dr. Rudolph, the reason I want to go through some of these

19   documents with you is there's some question about who --

20   about whether Bianca Rudolph signed this agreement.  Did she

21   sign it?

22   A.    She did.

23   Q.    Did you sign it?

24   A.    I did.

25   Q.    And is this the agreement that was prepared by the law

2690

DIRECT - RUDOLPH

1    office?

2    A.    Yes.

3    Q.    Okay.  Let's look at RS, the following year in August

4    of 2001.  If we look at RS, LR 223.

5              Now, if we look at the very, very top, that fax up

6    there, can you make out the date of that fax?

7    A.    Looks like August 15th, 2001.

8    Q.    Okay.  So is that about a year after the postnup was

9    signed?

10   A.    Yes, sir.

11   Q.    And is this a memo from you to your lawyer, Gary

12   Gentile?

13   A.    Yes, sir.

14   Q.    And what are you asking for here?

15   A.    I wanted a copy of my postnuptial.

16   Q.    Okay.  Did the law firm retain the original of the

17   postnuptial agreement?

18   A.    I believe they did.

19   Q.    And so are you asking for a copy of it here?

20   A.    I am.

21   Q.    We can take that down.  And turn to RT, which is LR 55.

22             Do you see this letter dated August 16th, 2001?

23   A.    I do.

24   Q.    And is this a letter right after you had written that

25   memo asking for your postnuptial agreement?

2691

DIRECT - RUDOLPH

1    A.    Correct.

2    Q.    And what is Mr. Gentile sending you here?

3    A.    Copy of the postnuptial.

4    Q.    Okay.  Is there any question about whether you and

5    Bianca Rudolph signed this postnuptial agreement?

6    A.    None.  Zero.

7    Q.    Okay.  You can take that down.

8          Let's fast-forward now to what's going on in the

9    marriage.  After you take out the sexual tension and you

10   guys become best friends, do you start to travel on safaris?

11   A.    We do.

12   Q.    Is that one of the hobbies that you love?

13   A.    Yes.  Yes, it is and was.

14   Q.    Tell me who Mark Swanepoel is.

15   A.    Mark Swanepoel is the son of Pieter Swanepoel.  I

16   started out with Pieter way back in the early '90s, and as

17   Pieter got older and his son took over the business and

18   became a professional hunter, we began hunting with Mark.

19   Q.    And tell us -- I mean, we've heard a lot about hunting

20   in this trial and a lot about safaris.  But when you would

21   go on these safaris, would you spend a lot of time with the

22   people you were with?

23   A.    Full-time.  Other than sleeping, full-time.

24   Q.    Okay.  And did -- how many times a year would you and

25   Bianca go on these safaris?

DIRECT - RUDOLPH

1    A.    Oh, it would vary.   On average, twice a year, sometimes

2    even three.

3    Q.    Now, just for a moment I'm going to fast-forward to

4    2016.   How many safaris did you go on that year with Bianca?

5    A.    Two.

6    Q.    When you're on a safari with someone, would you be

7    going with someone that you didn't like, not getting along

8    with, anything like that?

9    A.    No, sir.

10   Q.    Is that possible on a safari?

11   A.    No.

12   Q.    Yeah.   Were you, Bianca, and the Swanepoels close?

13   A.    Yes, sir.

14   Q.    All right.   Now, I did hear through the trial that

15   sometimes you would take safaris without Bianca and

16   sometimes she would take safaris without you.   Is that

17   true?

18   A.    That's true.

19   Q.    Now, do you know whether she was having affairs when

20   she was on these safaris?

21   A.    I couldn't confirm it, no.

22   Q.    Did you care?

23   A.    No, sir.

24   Q.    Was that part of the arrangement?

25   A.    That's correct.

2693

DIRECT - RUDOLPH

1    Q.    And are you telling this jury that you had no problem

2    with your wife flying halfway across the world to Africa to

3    go on a safari when you weren't even there?

4    A.    No problem.

5    Q.    And I know we've gone over this a little bit, but

6    explain to the jury why you had no problem with that.

7    A.    It was the nature of our relationship.  If she wanted

8    to take a trip and made those arrangements, I would pay for

9    them and she would go.  Same for me.  We didn't ask, and we

10   didn't get into the details.

11   Q.    You mentioned before don't-ask-don't-tell.  Is this an

12   example of it, where she would go on a safari and would you

13   ask and would she tell?

14   A.    That's correct.

15   Q.    Okay.  Now I have to say, Dr. Rudolph, I mean, it does

16   sound a little weird, the marriage.  I mean, that's not what

17   most people think of as marriage, where you're letting the

18   other spouse travel to Africa or you're letting them have

19   different affairs.  Can you explain why you -- why you would

20   want to be in a marriage like that?

21   A.    It's the arrangement we made.  It was working.  It's

22   not ideal.  It's not how I viewed marriage.  My parents were

23   married for 70 years, and I always thought I would end up

24   the same way.

25        So at the end of the day, it was working for us.

DIRECT - RUDOLPH

1    We were managing it.  And we were reasonably happy.

2    Q.    I want to now discuss something that's come up:  This

3    SCI lawsuit.  What does SCI stands for?

4    A.    Safari Club International.

5    Q.    Were you a prominent player in Safari Club

6    International?

7    A.    I was.  Yes, sir.

8    Q.    Tell the jury about your positions and what you were

9    with Safari Club.

10   A.    Oh, boy.  Well, I was involved with Safari Club, as was

11   my wife, for over 25 years.  I slowly got involved into the

12   organization.  Ran for offices and ultimately ended up as a

13   two-term president of the organization and its foundation.

14   And also had a position as the chief communications officer.

15   Q.    Now, Dr. Rudolph, did things end up a little ugly with

16   you and Safari Club International?

17   A.    That's mild, yes, sir.

18   Q.    It's mild?  I don't want to get into all the details,

19   but did it get so ugly that you had to file a lawsuit?

20   A.    I did.

21   Q.    Okay.  The lawsuit has been moved in evidence.  I don't

22   want to go through it in detail, but was part -- did you sue

23   SCI for a number of different things?

24   A.    Correct.

25   Q.    And were there at least 10 different items that you

2695

DIRECT - RUDOLPH

1    sued them for?

2    A.    That's correct.

3    Q.    Was one of the items dealing with an affair with a

4    woman in Atlanta?

5    A.    Yes, sir.

6    Q.    During your time as president?

7    A.    Yes, sir.

8    Q.    Okay.  Why would you sue for that if you had this

9    don't-ask-don't-tell marriage?  Why are you suing about an

10   affair?

11   A.    Well, number one, I didn't have an affair with her.

12   Q.    Okay, let's stop there.  Was the -- were the folks in

13   SCI saying that you had an affair with a woman in Atlanta?

14   A.    Correct.

15   Q.    Did -- was that true?

16   A.    No.

17   Q.    Okay.  Now, to be fair to the prosecutors, you were

18   deposed in the case, right?

19   A.    Yes, sir.

20   Q.    And you answered -- your lawyers answered

21   interrogatories, correct?

22   A.    That's correct.

23         MR. FIELDS:  Your Honor, I object.  This is

24   leading.

25         THE COURT:  Sustained.

DIRECT - RUDOLPH

1          MR. MARKUS:  Okay.

2     BY MR. MARKUS:

3     Q.   I was trying to -- well -- were you -- let me ask you

4     this:  Were you asked about Lori Milliron?

5     A.   I was.

6     Q.   Were you honest in your deposition when you were asked

7     about Lori Milliron?

8          MR. FIELDS:  Objection, Your Honor.  Leading.

9          THE COURT:  No, overruled.

10         THE WITNESS:  No, sir.

11    BY MR. MARKUS:

12    Q.   Why weren't you honest?

13    A.   I didn't want to embarrass my wife.  She was also a

14    member of the organization, fairly prominent herself.

15    Looking back on it, it was a mistake, but I didn't want to

16    embarrass my wife.

17    Q.   Okay.  Are you aware that your wife was also deposed?

18    A.   Yes, sir.

19    Q.   Now, was she asked about Lori Milliron?

20    A.   I believe so, yes, sir.

21    Q.   And do you remember whether she was giving answers

22    about, "Well, what is the definition of 'affair,'" and

23    things like this?

24    A.   Yes, sir.

25    Q.   I'm going to ask you point-blank:  Did Bianca Rudolph

2697

DIRECT - RUDOLPH

1   know you were having an affair with Lori Milliron when she

2   was deposed?

3   A.   Yes, sir.

4   Q.   Okay.  Now, we saw emails that Ms. Olmstead -- remember

5   Cass Olmstead testified?

6   A.   Oh, yeah.

7   Q.   And do you remember her saying that she and your wife

8   spoke in 2016?

9   A.   Yes, sir.

10  Q.   And that Bianca then went and printed out emails from

11  your account?

12  A.   That's correct.

13  Q.   Do you remember what years those emails were that

14  the -- that the prosecutor showed the jury?

15  A.   I believe they were 2010 and '11.

16  Q.   Okay.  2010, 2011.  What year was the SCI lawsuit

17  filed?  Do you remember?

18  A.   2012, I believe.

19  Q.   Okay.  And so was -- when you filed the lawsuit,

20  shortly after that, was there lots of commotion and

21  back-and-forth between you and SCI?

22  A.   Yeah, it started.  Yes, sir.

23  Q.   Okay.  Do you think that's when Cass Olmstead printed

24  these emails from 2010, 2011, when this dispute came up with

25  you and SCI, in that time period?

DIRECT - RUDOLPH

1   A.   I believe so, yes, sir.

2   Q.   Okay.  Are there any emails that Cass Olmstead printed

3   from 2012, '13, '14, '15, or '16?

4   A.   None I've ever seen.

5   Q.   Okay.  And did you see Cass Olmstead's name printed at

6   the top of those emails?

7   A.   Yes, sir.

8   Q.   Okay.  All right, let's move to the safaris.  I want to

9   talk to you about a 2015 safari that we've heard about where

10  there was an injured leopard.  Do you remember hearing about

11  that safari?

12  A.   Oh, yes, sir.

13  Q.   Okay.  Can you tell the jury about that 2015 safari

14  with the injured leopard.  First of all, where was the

15  safari?

16  A.   It was in Zambia in Luangwa Valley.

17  Q.   Uh-oh, you better spell that for our court reporter.

18  Well, can you spell it?

19  A.   Oh, boy.  L-u-a-n-g-w-a.

20  Q.   Thank you.  And was that a safari with Mark

21  Swanepoel?

22  A.   It was.

23  Q.   Can you tell the jury about what happened with the

24  leopard?

25  A.   Well, it was a combination hunt.  We were going to hunt

DIRECT - RUDOLPH

1    lion and leopard.  And that was a previous year.  We ran out

2    of time.  So in '15 we were hunting the leopard.  It was

3    Bianca's hunt.  It was for her.  And when we went there, she

4    wounded the leopard.  It's about the third one she wounded.

5    And she tracked the wounded leopard.  It was myself, Mark

6    Swanepoel, and Pieter Swanepoel, and two trackers.

7            When you're tracking a wounded leopard, you spread

8    out a little bit.  I was to the left; Mark was in the

9    center, he had the shotgun; Pieter's on the right side.  And

10   as Mark had talked to you about, we spent all morning doing

11   this.  Went back for lunch; had a little break.  Pretty much

12   thought we weren't going to find this leopard.  Went back

13   one more time.  We found a little bit of fresh blood.  And

14   the blood led right back to a big bush.  It's called a

15   kasaka bush.  And we had gone around that bush several times

16   that day.

17           We lead up to the bush.  We're looking in.  I get

18   down on my -- squat down and look under the darn bush

19   looking for this thing.  Walk a few more feet, and out the

20   leopard comes, and he charges.  The tracker who was in front

21   of Mark panicks, runs backward into Mark just as he's ready

22   to fire.  And unfortunately almost at point-blank range Mark

23   shoots him in the upper right thigh.  But originally we

24   didn't know he shot him.

25           The guy's in pain.  So we take his pants down and

DIRECT - RUDOLPH

1   you see a long gash about 4 inches, a little bit -- about

2   three inches wide in his thigh.  I thought the leopard had

3   gotten him, right?  Had scratched him.  So I get my medical

4   kit.  They bring up the medical kit, and I start to attend

5   to this guy -- excuse me, this tracker.

6           And he's saying something in Yanga the whole time.

7   I can't pronounce it right.  He says "Futsie, futsie.

8   [phonetic]."  And Mark looks at me, keeps -- the tracker

9   keeps saying "Gun, gun."  What's he mean, "gun"?

10          So after I treated that wound, which is pretty

11  bad -- double-helix sutures, lavage, the whole thing -- we

12  roll the poor man over, look at -- pull his pants down

13  further, and his buttocks on both sides are full of

14  buckshot.  Buckshot went through his leg.  The majority

15  buckshot was in his left butt, and it was a few rounds in

16  his right butt.

17          And as it turns out later, his femur was actually

18  cracked.  But when we rolled him over, Pieter Swanepoel

19  looks at me and he says, "Can you take the buckshot out of

20  his backside?"

21          I can do some pretty advanced first aid, but I'm

22  not prepared to start scalping out buckshot out of a

23  person's rear end, especially when they've already lost a

24  lot of blood.  So I chose not to do that.  But I recognized

25  at the time, you know, if -- you're going to have to do that

DIRECT - RUDOLPH

1    in the future, right?

2            So anyhow, the poor man, I -- I loaded him up with

3    Lidocaine, did everything I could, antibiotic.  We had to

4    get a charter plane, fly him out, and he almost died.  He

5    almost bled to death.

6    Q.   I want to unpack a couple of the things you said there,

7    Dr. Rudolph.  First, after Bianca had injured the leopard,

8    when you guys went to go track it, did she come with you to

9    track it, or no?

10   A.   No, sir.  We left her in the vehicle.

11   Q.   Why did you leave her in the vehicle?

12   A.   Safety.

13   Q.   I mean, this is just a year before the prosecutors say,

14   you know, you intentionally murdered her.  If you wanted to

15   do something, why not let her be out there with you in

16   unsafe conditions?

17   A.   I suppose one could conceive that; but that wasn't what

18   I would do.

19   Q.   Yeah.  You also mentioned having this guy airplaned out

20   or whatever.  What did you say?

21   A.   I called it medivac, medicine airplane, special

22   airplane.

23   Q.   Who paid for that?

24   A.   I did.

25   Q.   Were you obligated to pay for that?

DIRECT - RUDOLPH

1    A.    No, sir.  But it's the right thing to do.

2    Q.    You also mentioned that you used a medical kit.  Do you

3    bring a medical kit with you on these safaris?

4    A.    Every time.

5    Q.    Why?

6    A.    Well, if you're in a remote part of the world, not just

7    Africa, but a lot of my trips took me to Russia, the Middle

8    East, there are no medical services.  Zero.  So if you get

9    hurt, you have to be prepared to do something, whether it's

10   yourself or a friend, or in this case a tracker, or you

11   might not make it out.  So routinely I carried a medical kit

12   with a lot of medical supplies.

13   Q.    One of the things you mentioned is Lidocaine and that

14   you said you pumped him full of Lidocaine.  What is

15   Lidocaine?

16   A.    A common term for that would be Novocaine.  It's a

17   local anesthetic.

18   Q.    So even on that hunt, you had with you a local

19   anesthetic?

20   A.    I had that, I had demerol, I had a lot of drugs.

21   Q.    Was Bianca shaken up after this hunt?

22   A.    Oh, very much so.

23   Q.    Did she want to go back and continue hunting for

24   leopard, or did she want to stop?

25   A.    She wanted to quit hunting altogether.

DIRECT - RUDOLPH

1    Q.    So tell us about that.  What happened?  Because you

2    guys did go on future hunts.  How did those future hunts

3    happen after that?

4    A.    Well, after the initial shock wore off, both Mark and

5    Pieter and I talked to my wife.  He was very good with her.

6    He explained to her, look, you know, a lot of people wounded

7    leopards and this is one of the things that happens when you

8    hunt dangerous game.  It wasn't intended.  It wasn't her

9    fault.  So she recovered.  Not completely, but she

10   recovered.

11          And we made a plan to go back the next year, get

12   her back on the horse, so to speak, so she wouldn't quit

13   hunting.

14   Q.    And did you plan those two safaris well in advance

15   in -- we're talking about two safaris in 2016.  Did you plan

16   those well in advance?

17   A.    Yeah, you have to.  Yes, sir.

18   Q.    Okay.  I want to talk about the cabin that you and

19   Bianca stayed at in Zambia.  Is that a cabin that was

20   personal to you both?

21   A.    Very much so.

22   Q.    Tell the jury a little bit about that and what your

23   plans were with that cabin.

24   A.    Well, we'd been going to Zambia to that particular

25   location twice a year.  And although they had nice tents, I

DIRECT - RUDOLPH

1    wanted to do something nice for my wife.  And we decided

2    we'd build her a little cabin.  In that cabin she would have

3    more amenities.  She would have a little vanity for her

4    makeup and she could have a hair dryer and a proper shower

5    and a comfy bed and doors that actually closed to keep the

6    bugs and critters out.  So we made a plan to do that.

7         Mark worked on it with me.  I paid for most of it.

8    And he built a really pretty cabin.

9    Q.    And did Bianca go shopping for that cabin?

10   A.    She did.

11   Q.    What did she buy for it?

12   A.    She went crazy.  She outfitted the whole inside, and

13   decorations and candles and furniture for the outside.  And

14   she -- it was like a vacation home.  She wanted it to be

15   personal.

16   Q.    Now, I know, again, this is odd, but during all this

17   time when you're going on these trips with Mrs. Rudolph,

18   were you and Mrs. Rudolph having affairs?

19   A.    Yes, sir.

20   Q.    Were you and Mrs. Rudolph having a sexual relationship?

21   A.    No, sir.

22   Q.    So were you -- but you were married?

23   A.    Yes, sir.

24   Q.    How would you describe the marriage if there wasn't sex

25   in the marriage?

DIRECT - RUDOLPH

1    A.    Marriage without sex.  It was asexual.

2    Q.    Were you guys best friends?

3    A.    Very good friends, yes, sir.

4    Q.    Let's fast-forward to the 2016 hunts.  Was there a 2016

5    safari in the summer?

6    A.    Yes.  August.

7    Q.    Tell us about that one.

8    A.    That was the hunt in the Luangwa Valley.  That was the

9    combination hunt; I misspoke before.  The lion and the

10   leopard.  We were -- I was supposed to do the lion, Bianca

11   was going to do the leopard.

12         But the lion took too long.  We spent, probably of

13   the 21 days, 15, 16 on the lion.  So in consultation with

14   Mark, we didn't think we'd have enough time to move back to

15   Mumbwa -- which is the best leopard hunting -- and

16   accomplish what we needed to do there with the restricted

17   time, so we talked about it and we decided we'd make a plan

18   to come back at the end of the season in October strictly

19   for her, strictly for the leopard.

20   Q.    All right.  Before we get to the October one, we've

21   seen a receipt for a July purchase of propofol.  Was that

22   July purchase of propofol before you go on the August hunt?

23   A.    Yes, sir.

24   Q.    And we've also heard Mark Swanepoel talk about body

25   armor and helmets and cups and everything.  Can you tell the

DIRECT - RUDOLPH

1    jury why you brought the body armor, the baseball helmet,

2    the cup, and the propofol on the 2016 hunts.

3    A.    Well, you got to back up a little bit because me,

4    personally, and with B, this was the fourth wounded leopard

5    I'd been involved with.  And this last one, it was bad.  I

6    mean, obviously the man was shot, but I had been poking my

7    head in this bush about 6 feet from this thing.  So if he

8    gets you at 6 feet, he's going to hurt you bad.  So I was

9    shaken up.

10           So Mark and I were going back and forth.  Some of

11   the other guys that were hunting previously would bring U.S.

12   military flak vests.  And I talked to him about that, and he

13   said, "No, here's what we're going to do.  We're going to

14   get motocross vests."  I added on the helmet, and I got a

15   big hockey protector.

16   Q.    Don't have to describe it as big.  You got a hockey

17   protector?

18   A.    Sorry.

19   Q.    Keep going.

20   A.    As protection.  Just in case after No. 4, the odds are

21   getting slim here.  I don't want to get bit, he doesn't want

22   to get bit.  So I bought all this protective gear.  He got

23   some, too.  And I ordered some propofol because I thought if

24   I have to do something serious on somebody in the bush,

25   maybe I could use it.

2707

DIRECT - RUDOLPH

1    Q.    Now, the prosecutors have said you ordered the propofol

2    to sedate your wife before you would kill her.  Is that why

3    you bought the propofol?

4    A.    It's an impossibility.  Propofol has to be administered

5    IV.  So how do you give somebody an IV without them being

6    aware of it?

7    Q.    Well, it could also -- you could put it in a syringe,

8    right, and grab her arm and jab it in?  Why couldn't you do

9    that?

10   A.    Doesn't work.

11   Q.    Tell the jury about that.

12   A.    It's a drug used in sedation, but it's administered

13   through an IV.  We use it in our dental practice,

14   anesthesiologists do.  They hang a bag, they put the saline

15   in, they put the IV needle in, and they administer it.  They

16   drip it in, but it has to be done carefully.

17   Q.    So when you say "IV," does that mean it has to be in a

18   vein?

19   A.    Correct.

20   Q.    Okay.  So if you needed to administer it, if something

21   went wrong in Africa with a leopard, could you -- could you

22   administer it in a vein with someone who was willing with a

23   syringe?

24   A.    Possibly.  It would be -- it would be challenging to do

25   it, but I thought, what the heck, throw it in my bag.

DIRECT - RUDOLPH

1    Q.    Okay.   Let's move to the October hunt now.   First of

2    all, let me ask you:   How are things with Bianca Rudolph and

3    you headed into that October hunt?

4    A.    Great.   Great.

5    Q.    We've heard from Mark Swanepoel that he didn't hear any

6    fighting, disagreements, arguments.   Were you and Bianca

7    fighting or having arguments at that time?

8    A.    Not at all, sir.

9    Q.    Why did you go back so quickly after August on the

10   October hunt?

11   A.    He had an opening, and it was not an atypical time for

12   us to go.   We typically went May, October, every year.

13   Q.    Okay.   And did you and Bianca decide you wanted to go

14   looking for that leopard?

15   A.    Yes, we did.

16   Q.    Who was going to be hunting for the leopard?

17   A.    That was Bianca's leopard.

18   Q.    Okay.   So who was the primary hunter on that trip?

19   A.    She was.

20   Q.    How long was that trip?

21   A.    12, 13 days.

22   Q.    Okay.   Again, the prosecutor says -- the prosecutors

23   say that you were going on that trip intending to murder

24   your wife.   Is that true?

25   A.    No, sir.

2709

DIRECT - RUDOLPH

1   Q.   I mean, let's talk about the night before, then, on

2   October 10th.  Was that the last day of the safari?

3   A.   It was.

4   Q.   Had you guys found the leopard at that point?

5   A.   No.

6   Q.   Let me back up for just a moment.  Did you bring a

7   shotgun on that trip?

8   A.   I did.

9   Q.   Can you explain to the ladies and gentlemen of the jury

10  why you brought a shotgun.

11  A.   Going back to 2015 with the wounded leopard, myself,

12  Pieter and Mark, he only had the one shotgun in that camp.

13  He and I were using rifles, Pieter and myself.  You don't

14  want to use a rifle with a wounded leopard.

15       So after that accident, that shotgun went into

16  someone else's possession.  When I talked about -- to Mark

17  about the hunt, I said, "Now you're going to have two

18  shotguns in camp, right, just in case?"

19       He said, "No, I only have one."

20       I said, "Well, that's not going to work.  Can you

21  get another one?"

22       He said, "No."

23       In Zambia, to purchase a gun, any gun, it's two

24  years.  Takes that long to get a permit.

25       I said, "Okay, how about I bring one?  We'll use

DIRECT - RUDOLPH

1    mine if we need it as a backup, and I'm going to leave it

2    for you so you -- if you can get the permit, take it.  You

3    can have it."

4    Q.    Tell us about the shotgun that you brought.

5    A.    Oh, the shotgun.  It's an old shotgun.  I won it at a

6    raffle at the National Wild Turkey Federation back in the

7    early '90s.  It's a conservation dinner.  You contribute

8    money, get a ticket.  And I won the shotgun.  Put it in my

9    gun safe, never used it.  And I thought this would be a good

10   gun to bring with me.  I never used the darn thing, and I'll

11   leave it with Mark.

12   Q.    The hunt is in October 2016.  When did you win that

13   shotgun?

14   A.    I believe it was 1991.

15   Q.    So you had it, what, 25 years or something like this?

16   A.    Yes, sir.

17   Q.    Had you ever shot it before?

18   A.    Never.

19   Q.    Ever used it before?

20   A.    Never.

21   Q.    Okay.  Let's get back to October 10th, the day before.

22   Now, you and Bianca have been on this safari for over 10

23   days now?

24   A.    Yes, sir.

25   Q.    Had you found the leopard?

DIRECT - RUDOLPH

1   A.    No, sir.

2   Q.    On that last day, was there discussion about extending

3   the trip?

4   A.    A couple of days before, but yes, we wanted to stay.

5   Mark and I tried to talk her into it.

6   Q.    And why were you trying to stay?

7   A.    Well, we had a leopard feeding but he wasn't coming at

8   the appropriate time, so if we stayed long enough, we felt

9   very confident we'd get him.

10  Q.    Did Bianca want to stay?

11  A.    No, sir.

12  Q.    Why not?

13  A.    Well, the -- she was very, very excited and planning

14  for this wedding and family reunion that we had scheduled,

15  and she was not going to listen to staying any longer on

16  this hunt.

17  Q.    So did you guys keep the plans to go back on October

18  11th?

19  A.    We did.

20  Q.    All right.  So on October 10th -- can you tell the

21  jury, what time does the hunt end typically?

22  A.    Dark.  A little before, a little after.

23  Q.    Did you guys stay a little after that day because you

24  were hoping that the leopard would appear?

25  A.    We did.

2712

DIRECT - RUDOLPH

1    Q.    All right.  Are you supposed to do that?

2    A.    No, sir.

3    Q.    Why not?  Can you tell the jury why you're not supposed

4    to stay late on a hunt.

5    A.    Well, technically you can't hunt past -- I call it

6    sundown or dark.  But sometimes if you're desperate for a

7    leopard, or you know you have one feeding, and he's coming

8    in maybe a half hour later, you got a little bit of

9    moonlight, you stay longer.  And we've collected a few by

10   moonlight.

11   Q.    Okay.  Now it's getting dark.  The -- you haven't seen

12   the leopard.  It's time to go back to your cabin.  Tell the

13   jury what happens with that shotgun.  Do you know who

14   unloads it?

15   A.    I don't remember.

16   Q.    Could it have been you?

17   A.    It may have been.

18   Q.    And tell us, as best as you can, if -- well, let me ask

19   you this:  Why do you think it could have been you?

20   A.    Well, we were taking turns on any hunt.  Sometimes Mark

21   would unload the firearms, sometimes it was Banda, sometimes

22   it was Maybin, sometimes it was me.  So I've wracked my

23   brain since that day trying to think, was it me?  And I've

24   agonized over if it was, did I leave a shell in the damn

25   chamber?

DIRECT - RUDOLPH

1   Q.   Tell the jury, when you are unloading a shotgun like

2   that, if you unload four shells and accidentally don't

3   unload the fifth, where does the fifth end up?

4   A.   In the chamber.

5   Q.   Okay.  Regardless of whether you or someone else

6   unloaded it, was it put back into the soft case?

7   A.   Yes, sir.

8   Q.   All right.  What time do you and Bianca get back to the

9   cabin?

10  A.   It was a little later.  I'm going to say 8-ish.

11  Q.   Okay.  Do you eat dinner at that point, or what do you

12  do?

13  A.   We have a light dinner because it is late.

14  Q.   Okay.  Now, the next morning, what time do you need to

15  get up to travel that morning?

16  A.   Well, it was an early wake-up.  We prepared to get up

17  at 4:00 a.m., and the previous evening we decided not to do

18  anything; no packing.  We were just going to enjoy the camp,

19  have a few drinks, so we got up at 4:00 because our plans

20  were to pack, get everything ready, and leave for the

21  airport in Lusaka.

22  Q.   And we've heard that Bianca Rudolph is a little nervous

23  on the morning of travel.  Can you tell the jury a little

24  about that.

25  A.   My wife was -- was a very nervous traveler.  I'd use

DIRECT - RUDOLPH

1    the word "frenetic."  Didn't matter where we were going.  It

2    could be a local flight, an international flight.  In fact

3    my kids and I gave her a nickname, we called her "Forrest,"

4    because she'd run through the airport all the time.  "Run

5    Forrest, run."  So she was -- she was nervous.

6    Q.    Yeah.  By the way, I heard you refer to her earlier as

7    B.  Is that how you would refer to Bianca?

8    A.    I called her B.  Yeah.

9    Q.    And was -- that morning on October 11th, was she as she

10   usually was, a nervous and frenetic traveler?

11   A.    More so.

12   Q.    Why do you say "more so"?

13   A.    Because this wedding was super important to her.

14   Q.    And I think we've heard from the prosecutors how far

15   everything is from this camp and how remote.  How long does

16   it take to get to the airport from the camp in Zambia?

17   A.    Camp to airport, four and a half, five hours.

18   Q.    And so did you need to get on the road early that

19   morning?

20   A.    We did.

21   Q.    Okay.  So let's talk about the morning, then.  You wake

22   up at 4:00.  Did anybody come in to your cabin that morning?

23   A.    Yes, sir.

24   Q.    Tell us about the first person who came in.

25   A.    The first person's the assistant waiter who always

DIRECT - RUDOLPH

1    brings coffee.  It's a coffee, slash, wake-up.

2    Q.    So what time do you -- you wake up at 4:00.  What time

3    does he come to the cabin?

4    A.    It's about 4:00, maybe a little after.

5    Q.    Okay.  And while you're drinking -- while you guys are

6    having your coffee, are you packing up?

7    A.    I wasn't.  I slept in a little bit.

8    Q.    Okay.  Was Bianca up and packing?

9    A.    Yes, sir.

10   Q.    All right.  I want to talk about the next person who

11   comes to the cabin.  Who's that?

12   A.    It would be one of the cabin attendants, the porter, I

13   call him.

14   Q.    And what's the porter's job?

15   A.    He collects the luggage and takes it to the Land

16   Cruiser for the trip to Lusaka.

17   Q.    Now, we've heard Mark Swanepoel say that he heard

18   Bianca shoo the porter away.  Can you tell the jury whether

19   that was accurate or not?  Did Bianca shoo the porter

20   away?

21   A.    That's only half accurate.  She'd given more than a

22   shoo.

23   Q.    Okay.  Was -- were you guys ready for the bags to be

24   packed up at that point?

25   A.    No, sir.

DIRECT - RUDOLPH

1    Q.    Did the porter leave the french doors open?

2    A.    I did.  I opened them.

3    Q.    Okay.  Tell the jury about that.

4    A.    Well, I got up about maybe 4:15, 4:20.  Had my coffee.

5    And I opened the doors wide open so I could go out and look

6    at the river one more time.  The river was only maybe 20

7    meters away.  Kind of a last look.

8    Q.    And as Bianca's packing, are the doors left open?

9    A.    Yes, sir.

10   Q.    How quiet is it in that camp?

11   A.    At 4:30 in the morning?  Very quiet.

12   Q.    We -- I mean, we heard Mark Swanepoel was in the

13   kitchen area.  Could he hear -- could you hear him and could

14   he hear you from that cabin?

15   A.    I could hear him a little.  He was talking to Spencer

16   about the licenses.

17   Q.    Okay.  Now we're going to get into what happened, okay?

18   Where do you go with your coffee as Bianca is packing?

19   A.    My second cup of coffee I went into the bathroom, sat

20   on the toilet with my coffee so that I could make things

21   go --

22   Q.    Okay.

23   A.    I'm sorry.

24   Q.    Does Bianca say anything to you while you're in the

25   bathroom?

DIRECT - RUDOLPH

1    A.    Yes.

2    Q.    What does she say?

3    A.    Tells me to hurry up.  And then later I hear her say,

4    "Come here and help me."

5    Q.    Okay.  Is she asking for help packing things?

6    A.    I believe so.

7              MR. MARKUS:  Okay.  I want to get an exhibit -- a

8    physical exhibit that's in the back of the courtroom, Your

9    Honor.  Can I just -- it's the hard case.  Can I just roll

10   it up to the podium here?

11             THE COURT:  Have you given the prosecutors an

12   opportunity to inspect the exhibit?

13             MR. FIELDS:  We have, Your Honor.  We have no

14   objection.

15             THE COURT:  You have no objection?  All right.

16   Sure.  Go ahead.

17             COURTROOM DEPUTY:  By you or --

18             MR. MARKUS:  Put it by him, by the marshal.

19   BY MR. MARKUS:

20   Q.    We've heard a lot about soft cases and hard cases in

21   this trial, Dr. Rudolph.  Is that the hard case in this

22   case?

23   A.    Yes, sir, it looks like it.

24   Q.    Okay.  And to put a gun in there, it's pretty tall.

25   A.    Yes, sir.

DIRECT - RUDOLPH

1    Q.    We didn't see in any of the pictures, the rifle.  Do

2    you know whether Bianca Rudolph put the .375 rifle in that

3    hard case?

4    A.    She'd had to.

5    Q.    Okay.  Did you put it in there?

6    A.    I did not.

7    Q.    Is it typical for Bianca to be packing guns into the

8    hard case?

9    A.    No, sir.

10   Q.    Why do you think she put the rifle in the hard case?

11   A.    In a hurry.

12   Q.    Why were you taking so long in the bathroom?

13   A.    Sometimes it takes me a while.

14   Q.    Was she telling you to hurry up?

15   A.    She was.

16   Q.    What's the next thing you hear?

17   A.    I hear a shot.

18   Q.    What do you do?

19   A.    I pull my pants up, go to the door and look outside the

20   door, and she's laying on the floor with a -- with her arms

21   over her head and blood on her chest.  I didn't know what

22   happened.

23   Q.    What do you do?

24   A.    I stood there in shock for a few seconds.  I don't know

25   how long.  And Mark and Spencer came in, and we ran over to

DIRECT - RUDOLPH

1    her.

2    Q.    Do you guys try to -- try to revive her?

3    A.    Yes, sir.

4    Q.    Tell us what happens.

5    A.    Well, Mark was attempting to do some CPR or do

6    something with her.  I'm panicking.  Somebody said, "Get the

7    medical kit and bring the medical kit in."

8         I opened it up because I'm looking for those -- I

9    had blood-clotting material.  I was opening them out of

10   there, little white packs.  I thought maybe we could put

11   them on there.  And it wasn't too long after he did that

12   that he said to me, "There's nothing we can do."  And I -- I

13   broke down.

14   Q.    We've seen pictures where you're bent over her.  How

15   long after the shot were those pictures taken?

16   A.    I'm not sure.  It was a little while.  They -- they

17   took me outside at first and Banda and Maybin restrained me.

18   Q.    Why did they restrain you?  Were you -- we've heard

19   things about you maybe trying to get to the gun or get to

20   the river.  Is that the reason they restrained you?

21   A.    I was hysterical, Mr. Markus.  I -- I was acting crazy.

22   Q.    And tell us what happens next.

23   A.    At some point, Mark covered her with a zebra blanket

24   and took me out of the room, and I believe he closed the

25   cabin.  He got everybody out of there and just shut it

2720

DIRECT - RUDOLPH

1    off.

2    Q.    Did you and Mr. Swanepoel and others go to the police

3    station that day?

4    A.    Mark and I -- he took me.  He said, "We have to go to

5    the police station."

6    Q.    Did you say, "No, I'm going to -- I've got to fly home

7    and get out of here and I'm not talking to any police and

8    forget everything"?

9    A.    No, sir.

10            MR. FIELDS:  Objection, Your Honor.  Leading.

11            THE COURT:  Sustained.

12    BY MR. MARKUS:

13    Q.    When you went to the police, did they ask you to give

14    an interview?

15    A.    They did.

16    Q.    Did you give one?

17    A.    Yes, sir.

18    Q.    Now, we've seen that written statement.  It's in

19    evidence.  Who actually wrote out the statement?

20    A.    I believe it was the -- the -- it was a Mumbwa police

21    officer.  I don't know if it was the head guy or one of the

22    others.

23    Q.    Okay.  We've also heard that before you went into the

24    police station, in the parking lot the park ranger

25    approached you and asked you where you were, and he said on

2721
DIRECT - RUDOLPH

1    the stand that you said, "I was in the shower."

2            Did you ever tell him that?

3    A.    I have no recollection of -- of the first time I saw

4    the guy was here.  The park ranger.

5    Q.    Okay.  Did you ever tell anybody that you were in the

6    shower?

7    A.    No, sir.

8    Q.    We've seen the statements and everything from the

9    police and from other folks where it says "bathroom."  Is

10   there any reason why you would tell some park ranger that

11   you were in the shower?

12   A.    Not at all.

13   Q.    Have you always told everybody where you were?

14   A.    Yes, sir.

15   Q.    And where was that?

16   A.    In the bathroom.

17   Q.    Is that what you told the police?

18   A.    Yes.

19   Q.    Okay.  There's also been -- well, let me -- let me

20   pause here for a second.  Did you ever bribe a police

21   officer?

22   A.    No, sir.

23   Q.    Did you ever give money to anybody in this case as a

24   bribe?

25   A.    Absolutely not.

DIRECT - RUDOLPH

1    Q.    Okay.  Were you scared that the Zambians might put you

2    in a Zambian prison?

3    A.    It didn't hit me at the time, but later on, yes, sir.

4    Q.    The prosecutors have talked about how remote this place

5    is.  If you were put in a Zambian prison, would you have had

6    access to a U.S. lawyer?

7    A.    Zero.

8    Q.    Would you have had access to basic human rights?

9    A.    Zero.

10   Q.    But the Zambian police who interviewed you, what did

11   they determine happened in this case?

12   A.    They deemed it an accident.

13   Q.    Is that what it was?

14   A.    Yes, sir.

15   Q.    Okay.  Now, we've heard about this fellow, Otto

16   Westhassel.  Do you remember him?

17   A.    I certainly do.

18   Q.    When is the first time you spoke to Otto Westhassel?

19   A.    Mark and I got back into Lusaka later on the -- I

20   believe it was the 11th.  And along the drive, he said to

21   me, "You're going to have to contact somebody from the

22   Embassy."

23         So he got a phone number for me.  I believe we

24   either called from the funeral home or someplace else; I

25   can't remember.  But he was right next to me.  So I call the

DIRECT - RUDOLPH

1    Embassy, ask for the ambassador.  What do I know?  And they

2    made some calls and connections and took a minute or two.

3    And Mr. Westhassel answers the phone and introduces himself.

4    Q.   Okay.  Can you tell us about that discussion.

5    A.   Yes, sir.  So I very briefly explained to

6    Mr. Westhassel who I was.  I gave him my name, that we were

7    on safari, there had been a terrible accident, and my wife

8    had been killed.  That brief.

9         And Mr. Westhassel says to me, "This is worse than

10   Cecil the lion, and it's going to be bad for Zambian

11   tourism."

12   Q.   Did you tell Mark Swanepoel about that conversation?

13   A.   A hundred percent.  He's sitting right next to me.

14   Q.   Were you guys shocked?

15   A.   Beyond shocked.

16   Q.   Is that how your relationship with this man, Otto

17   Westhassel, started?

18   A.   It was the beginning.

19   Q.   How did you feel about the guy?

20   A.   I didn't know how to feel.  I mean, I'm in shock

21   anyhow, and now I got to hear about Cecil the lion.  It

22   wasn't a good first conversation.

23   Q.   Now, you mentioned that Mark Swanepoel was next to you

24   at the time.  Was Mark Swanepoel with you over the course of

25   the next few days, always?

DIRECT - RUDOLPH

1    A.    Yes, sir.

2    Q.    Was he with you when you went to the funeral home?

3    A.    Yes, sir.

4    Q.    Was he with you when you went to drop the body off?

5    A.    Correct.

6    Q.    Was he with you when you went to the police?

7    A.    Correct.

8    Q.    Okay.  Let's talk about the order of things.  We've

9    seen Bianca died on October 11th, right?

10   A.    Yes, sir.

11   Q.    You then go to the police.

12   A.    Yes, sir.

13   Q.    Is the next place you go to the hospital with the body?

14   A.    No, sir.  There's a interim morgue -- sorry, that they

15   call a morgue in Mumbwa.  And I believe it was due to the

16   late hour that we had to place my wife there overnight.

17   Q.    So that's on October 11?

18   A.    Yes, sir.

19   Q.    Okay.  On October 12, do you go back to that facility

20   and get the body?

21   A.    Yes, sir.

22   Q.    Who's with you?

23   A.    Mark.

24   Q.    Where do you go?

25   A.    Well, I asked him to go into the morgue for me.  I

DIRECT - RUDOLPH

1    didn't have the courage to do it.  He went in.  And they

2    brought B out in a -- on a gurney in a body bag, and the

3    gurney was covered in blood.  I threw up.  And they put her

4    in an ambulance to take her to Lusaka.

5    Q.    Why to Lusaka?

6    A.    To go to the University Teaching Hospital.  That's what

7    we were told to do, where they -- the pathologist -- the

8    coroner was.

9    Q.    Did you try to stop the autopsy?

10   A.    No, sir.

11   Q.    Did you try to stop the pathologist from looking at

12   Bianca?

13   A.    No, sir.

14   Q.    Okay.  Was Mark with you during that time?

15   A.    He was.

16   Q.    So that's now October 12th we're at?

17   A.    Yes, sir.

18   Q.    When did you go to the funeral home to discuss

19   cremation?  Was that on October 12th or October 13?

20   A.    I believe it was later that day on the 12th.

21   Q.    Okay.  Had the -- had you already taken Bianca's body

22   to the hospital?

23   A.    I helped deliver her body to the hospital.

24   Q.    So that had been done before you got to the funeral

25   home?

                        DIRECT - RUDOLPH

1    A.    Yes, sir.

2    Q.    Okay.  We saw that the cremation actually occurs on the

3    14th, two days later.  Do you remember that?

4    A.    I do.

5    Q.    Okay.  Did you meet with the people from the funeral

6    home the next day on the 13th?

7    A.    Yes, sir.

8    Q.    And did you talk about trying to get the cremation done

9    as quickly as possible?

10   A.    I did.

11   Q.    Now, a lot has been made about the speed of the

12   cremation in this case.  Why were you trying to go so

13   quickly?

14   A.    Two reasons.  The primary one is I wanted to get home

15   to my children and tell them in person what had happened to

16   their mother.  But equally important, this was my wife's

17   wishes, her stated wishes.  She did not want to be in a box.

18   She did not want to be buried.  She insisted that she be

19   cremated.

20   Q.    And would it have made any sense at all to take the

21   body back to the United States and then have it cremated?

22   A.    No, sir.

23   Q.    What was involved in taking a body back to the United

24   States?

25   A.    My understanding was that you have to arrange for a

DIRECT - RUDOLPH

1    special coffin, casket.  I was given the term lead-lined,

2    zinc-lined.  And they don't have those, to my understanding,

3    in Zambia.  They would have to bring them in from Germany or

4    some other country.

5    Q.   Okay.  Now, we've seen some horrific pictures of the

6    body starting to decompose and things like this.  And I'm

7    sorry to raise this with you, but with -- is that something

8    that you would have wanted your kids and Bianca's family to

9    even see?

10   A.   It's a nightmare.  No, sir.

11   Q.   All right.

12   A.   No, sir.

13   Q.   You've talked about informing your kids and your

14   family.  The prosecutor says it doesn't make sense that you

15   wouldn't call them.  Why didn't you immediately call them on

16   October 11th?

17   A.   I didn't want to call my children from 8,000 miles away

18   and tell them their mother had died.  I wanted to do it in

19   person.  I had wanted to hold them and hug them and grieve

20   with them.

21   Q.   One of the things that Otto Westhassel says that you

22   were raising things about media and social media and things

23   like this; is that -- was that one of your concerns?

24   A.   Yes, sir.

25   Q.   Now, did you end up seeing that an article was

DIRECT - RUDOLPH

1    published about your wife's accident?

2    A.    I did.

3    Q.    After you saw that article, did you actually call

4    Julian Rudolph?

5    A.    That internet article stole my ability to be able to

6    talk to my kids in person.  And when I saw the internet

7    article, I figured this is going to be everywhere.  So as I

8    was leaving Johannesburg I called my son, Julian.

9    Q.    All right.  Let's go to October 13th, then.  Were you

10   informed by the funeral home that Otto Westhassel had shown

11   up at the funeral home?

12   A.    Yes, I got a call.

13   Q.    And what did they tell you?

14   A.    They told me that the -- they used the term "Embassy

15   official" and one of his people were previously at the

16   funeral home and had taken photographs of my wife.

17   Q.    How did that make you feel?

18   A.    Angry.

19   Q.    The prosecutor said that you wanted to destroy photos

20   and destroy evidence.  Is that why you were upset,

21   Dr. Rudolph?

22   A.    No, sir.

23   Q.    Tell the jury why you were angry and upset.

24   A.    They took her clothes -- her cover off.  She's dead,

25   and they exposed her.  They took her dignity from her for no

DIRECT - RUDOLPH

1    reason.  No one told me; they just did it on their own.

2    Took all these pictures.

3            And so I said to Mr. Westhassel, "What are you

4    going to do with these pictures?  Where are they going to

5    go?  Are they going to end up on some internet site, some --

6    some requests for information and next thing you know my

7    children or somebody's going to see my -- my wife's naked

8    body dead?"

9            He couldn't satisfy me with an answer.

10   Mr. Westhassel -- yeah.  Sorry.

11   Q.   Did you -- did you get angry with him?

12   A.   I did.

13   Q.   He says it was a one-way conversation.  Was it?

14   A.   Partially.

15   Q.   Yeah.  You mentioned that that was the -- that your

16   wife wanted to be cremated.  Let me just take a moment and

17   put up RA-3, I believe this is DEF-1.

18           Is this Bianca Rudolph's will?

19   A.   Yes, sir.

20   Q.   And in this will, is this where she explains that she

21   wanted to be cremated?

22           COURTROOM DEPUTY:  Counsel, this is RA-3 you said,

23   but it's marked as Government's Exhibit 56.  Is that the

24   same --

25           MR. MARKUS:  Same one.  I apologize.  It's in

2730

DIRECT - RUDOLPH

1    evidence.  Government Exhibit 56.

2              COURTROOM DEPUTY:  Okay, thank you.

3              MR. MARKUS:  Thank you, Ms. Guerra.

4    BY MR. MARKUS:

5    Q.    If we could turn to DEF-6.

6              Do you see there 7.03, Cremation Instructions?

7    A.    I'm sorry?

8    Q.    Do you see those cremation instructions there?

9    A.    Yes, sir.

10   Q.    Is that what Mrs. Rudolph wanted?

11   A.    Yes, sir.

12   Q.    Now, we heard --

13             THE JUROR:  Our screens.

14             MR. MARKUS:  Oh, the screens.  Thank you all for

15   letting me know.  You probably could memorize this one

16   anyway.

17        (Pause)

18             MR. MARKUS:  Okay.  So thank you, Ms. Guerra.

19             COURTROOM DEPUTY:  You're welcome.

20   BY MR. MARKUS:

21   Q.    We're looking now at the will.  Does this express in

22   writing what Bianca Rudolph's wishes were?

23   A.    Yes, sir.

24   Q.    Okay.  Now, we mentioned -- you can take that down.

25   Thank you so much.

DIRECT - RUDOLPH

1    We've mentioned informing Julian.  Bianca Rudolph's

2    brothers are here, and we've heard from them that they

3    weren't informed about their sister until you came back and

4    after the wedding.  And we saw, if you remember, that email

5    that you sent saying you wouldn't make the wedding.  Do you

6    remember all that?

7    A.   I do.

8    Q.   Why didn't you tell Bianca's brothers from Africa what

9    had happened?

10   A.   I made a judgment.  The judgment was if I told Ralph,

11   her brother, and Vince just before his son's wedding, that I

12   thought it would destroy the wedding.  I thought waiting

13   another couple of days was the right thing to do.

14   Q.   Okay.  Now, we've also heard that there's a text

15   message from you to Lori from Africa.  We haven't seen any

16   text messages.  Did you text Lori from Africa?

17   A.   I texted her that there had been an accident.  That's

18   all.

19   Q.   Why did you do that?

20   A.   She's managing my business, and I figured I wasn't

21   going to be home for a long time, or not available for a

22   long time.

23   Q.   Okay.  Now let me take you to the funeral.  Why was the

24   funeral in Phoenix?

25   A.   Well, we lived in Phoenix, and the church we attended

DIRECT - RUDOLPH

1    is in Phoenix, and that was our residence.

2    Q.    But Dr. Rudolph, her friends testified that it should

3    have been in Pennsylvania.  Why not have the funeral in

4    Pennsylvania?

5    A.    My children and I sat down and we put a list together

6    of the friends that she would want to be at her service, and

7    we invited them and they came.  But, more importantly, her

8    cousins were here.  They were supposed to get together at

9    the reunion.  The cousins are from Italy and from France, so

10   they were to end up at our house after the reunion, so it

11   made sense to have it in Phoenix with the people that she

12   felt most loving towards.

13   Q.    I'd like to put in -- to call up Government Exhibit 47,

14   which is already in evidence, which was the eulogy you

15   wrote.  If we could call up Government Exhibit 47.

16        Do you see here, Dr. Rudolph, what you had written

17   before the -- before the funeral for you to read?

18   A.    Yes, sir.

19   Q.    All right.  Now if we could zoom in on the very top

20   part.  Could you read to us that section.

21   A.    "To everyone gathered here today, thank you for being

22   here with me, Ana and Julian on this sorrowful day.  To

23   Father Bill, thank you for opening your parish and offering

24   a mass for Bianca."

25   Q.    Let me stop you, Dr. Rudolph.  Take a deep breath.

DIRECT - RUDOLPH

1    A.    Yeah.

2    Q.    I want to stop you because I want to ask you:  There's

3    been much made about whether this was a religious service or

4    not.  Was Father Bill at the service?

5    A.    He is an ordained priest, yes, sir.

6    Q.    Where was the service?

7    A.    It was at the Franciscan Center where we went to

8    church, but the church was under renovations.  We were able

9    to get a little chapel off to the side.  Father Bill was

10   there.  We had a service.  It wasn't a complete mass because

11   there was no altar, there were no pews, but we did the best

12   we can with what was offered.

13   Q.    I'm not going to have you read this whole thing, but

14   did you read it at the funeral?

15   A.    Yes, sir.

16   Q.    Who else spoke at the funeral?

17   A.    My children.  I believe Vince and -- and Ralph and

18   Anthony spoke.  I don't remember if anybody else did.

19   Q.    We can zoom out of that.  If we could zoom in on the

20   bottom section there.  Starting, "As much."  Yeah.

21         I'm not going to have you read it because I just

22   know how emotional it will be, but just let's take a second

23   and read that exhibit.

24         And, sir, is that how you felt about your wife?

25   A.    Yes, sir.

2734

DIRECT - RUDOLPH

1    Q.    And you ended it with, "I love you, B."

2              Is that how you ended conversations with your wife

3    A.    All the time.  Sorry.

4    Q.    Did you also have a prayer card and note for the

5    children at the funeral?

6    A.    We did.

7    Q.    I'm going to show you what's in evidence as RA-5, which

8    is LR 229.  Now, we've seen the prayer card but we haven't

9    seen this one before.  Is this a poem that you had printed?

10   A.    Yes, sir.

11   Q.    I want to go to the second page of this poem, which is

12   LR 230.  And if we could zoom in on the left-hand side of

13   the page.

14             Is this a note that you gave to your daughter with

15   the poem?

16   A.    It is.

17   Q.    Could you read it, please.

18   A.    AnaBianca, live every day with these words, words that

19   your mother would approve and love.  Keep this card and

20   Mom's daily memory alive."  Sorry.  "She would want that.

21   Love, Dad."

22   Q.    Okay.  You can take that down.

23             I want to talk about moving forward after the

24   funeral because I'm going to be honest with you, Doc, we've

25   seen some pretty terrible things after the funeral.  Okay?

DIRECT - RUDOLPH

1    A.    Yes, sir.

2    Q.    We saw a trip to Las Vegas after the funeral.

3    A.    Yes, sir.

4    Q.    I have to say, it looked bad.

5    A.    Yes, it did.

6    Q.    Can you tell the jury about that trip to Vegas.

7    A.    Well, after everybody left, I was alone in that house.

8    And I looked around and what I see, flowers, baskets of

9    fruit, leftover food and photos -- big photos of Bianca and

10   the kids.  Sad reminders of better days.  I had to get out

11   of the house.  I just wanted to escape for a couple of days.

12   Made no sense.  I just did it.

13   Q.    And when you were in Vegas -- I mean, you must have

14   gone out partying and celebrating and drinking.  What --

15   what did you do in Vegas?

16   A.    It was terrible.  I went for walks; went to the bar.

17   But it made things worse.

18   Q.    Did you -- did you sit in your room and drink?

19   A.    No.

20   Q.    What did you do?

21   A.    Well, I took walks, went to the bar.

22   Q.    We've also seen calendars where you start to spend more

23   time with Lori Milliron.

24   A.    Yes, sir.

25   Q.    Did you start to spend more time with Lori Milliron?

2736

DIRECT - RUDOLPH

1    A.    Yes, sir.

2    Q.    Tell us about that.

3    A.    Well, same type of thing.  I have no close personal

4    friends in Phoenix.  We've been there four years.  A couple

5    of acquaintances.  My children.  They went back home.

6    They're 1800 hundred miles away with their life partners.

7    They're grieving on their own.  My two best male friends

8    live in South Africa.  So I turned to one of my best

9    friends.  I called Lori and I said, "Would you come stay

10   with me for a while?  Keep me company."

11           She agreed to.

12   Q.    Now, I want to ask you point-blank:  Did Lori Milliron

13   ever make an ultimatum to you in 2015 that you had a year to

14   leave your wife?

15   A.    Never.

16   Q.    How long had you been dating Lori on and off for at

17   that time?

18   A.    10 years, give or take.

19   Q.    Was there any reason for her to make you an ultimatum?

20   A.    None.  None whatsoever.

21   Q.    And did you say your wife knew about her?

22   A.    She did.

23   Q.    Let me ask you:  Did Bianca Rudolph ever make you an

24   ultimatum in 2016 that you had to call things off with Lori?

25   A.    No.

2737

DIRECT - RUDOLPH

1   Q.   Okay.  Were you and Bianca in a good place on those two

2   safaris in 2016?

3   A.   Very good place.  Yes, sir.

4   Q.   Okay.  Now, the prosecutors have brought out these

5   trips, but I wanted to bring out something else that you did

6   after Bianca died.  Do you know what Bianca's Buy is?

7   A.   Yes, sir.

8   Q.   Can you tell the jury about that.

9   A.   Well, that was a very memorable hunt we had where

10  Bianca was the hunter and we went to the Republic of Congo.

11  I was -- it was myself, my wife, and Mark.  And she wanted

12  this particular animal called a dwarf buffalo, and we

13  finally found one, and she missed it.  So Mark gave this

14  location, which is a buy, is like a small, like full of

15  weeds and grass.  So he named it Bianca's Buy for her.

16       Damn it.  Sorry.  So it was a good memory

17  Q.   And after Bianca died, did you and Mark have

18  conversations about that location?

19  A.   Yes, sir.

20  Q.   And what did you discuss?

21  A.   We wanted to go back and honor her and have some

22  closure.

23  Q.   Did you go back?

24  A.   I did.

25  Q.   Did you hunt while you were back?

DIRECT - RUDOLPH

1   A.    I did.

2   Q.    Now, after you hunt and catch an animal, what's the

3   tradition on hunts when you -- when something like that

4   happens?  Is there a celebration typically after, singing

5   and things --

6   A.    Typically, yes, sir.

7   Q.    Did you -- after you did that, were you guys

8   celebrating?

9   A.    No, we both cried.

10  Q.    And where was that again?

11  A.    The Republic of Congo.

12  Q.    What year did you go?

13  A.    2017.

14  Q.    And tell us about Bianca's leopard.  Did you ever go

15  back and start looking for Bianca's leopard?

16  A.    I did.

17  Q.    Who did you go with?

18  A.    With Mark.

19  Q.    And where did you go?

20  A.    Back to Mumbwa.

21  Q.    Did you ultimately find it?

22  A.    We did.

23  Q.    Did that give you some closure?

24  A.    Yes.

25  Q.    Did you and Mark plan to put up a plaque in Zambia?

DIRECT - RUDOLPH

1    A.    Yes, sir.    Yes, I wanted to have a plaque on the

2    outside of the cabin with our names, "Bianca and Larry," and

3    the year it was built.

4    Q.    Now, when you went to Bianca's Buy, or when you went to

5    look for Bianca's leopard, did you take Lori on those

6    trips?

7    A.    I did not.

8    Q.    Let me talk to you now about the insurance claims,

9    because the prosecutors have talked a lot about that in this

10   trial.    One thing that Mr. Winstead said yesterday when

11   questioning Luke Haag -- of course Mr. Haag knew nothing

12   about this, but Mr. Winstead asked about, you know:    Would

13   making a claim within a certain amount of time be suspicious

14   to you?

15        What was your understanding of when you needed to

16   make the insurance claims after Bianca died?

17   A.    I understood that they had a death notification period

18   anywhere from 20 to 30 days.    And if you didn't notify

19   within that 20- or 30-day period, your claim would be, I

20   thought, invalid.

21   Q.    Is that why you made them so quickly?

22   A.    That's what it said.

23   Q.    Did you inform your insurance agent, William Gorman,

24   about Bianca dying?

25   A.    I sent him an email, yes, sir.

2740

DIRECT - RUDOLPH

1    Q.    I think we saw those documents, I don't need to put

2    them up again, but did you also hire a lawyer?

3    A.    I did.

4    Q.    Why did you hire a lawyer?

5    A.    Two reasons.  I wanted to keep an emotional boundary

6    away from this.  I didn't want to be filling out forms.  I

7    wanted to be away from the whole process.

8          And, secondly, I wanted to make sure they were done

9    timely, accurately, providing the documents that were

10   required.  If there's phone calls, correspondence, I knew it

11   would get done without my presence.

12   Q.    Did you give all the documents you had to the lawyer?

13   A.    Yes, sir.

14   Q.    Now, we've seen that the lawyer did not include all of

15   the documents, including that ballistics report.  Did you

16   have anything to do with that decision?

17   A.    No.  Whatever they gave me in Zambia, I gave to the

18   lawyer.

19   Q.    And are you aware, sir, that that ballistics report was

20   in all of the Diligence files anyway?

21   A.    I wasn't aware of that.

22   Q.    Okay.  So were you aware that the insurance companies

23   had that document that the prosecutors say you didn't

24   provide?

25   A.    I do now.

2741

DIRECT - RUDOLPH

1    Q.    Yeah.  Let's talk about the amount of insurance on

2    Bianca's life.  Again, the prosecutors have made much of the

3    fact that there was $4.8 million on her life.  How much did

4    you have on your life?

5    A.    A little over 5.

6    Q.    Okay.  I think we've seen 4 -- it was a little over 4.

7    But in any event, did you end up having heart surgery?

8    A.    Yes, sir.

9    Q.    When --

10   A.    I had -- well, I've had a number of cardiac procedures;

11   quite a few.

12   Q.    When did you have the pacemaker put in?

13   A.    My first one?

14   Q.    Yes, sir.

15   A.    2000.

16   Q.    And then?

17   A.    Another one in 2010, and my last one was 2021.

18   Q.    And when you got the pacemaker put in, could you get

19   more life insurance on your life?

20   A.    No, sir.  I was deemed essentially uninsurable.

21   Q.    So you had life insurance on your life at that point.

22   Did your net worth continue to rise?

23   A.    Yes, sir.

24   Q.    What did you think about whether you and Bianca needed

25   more insurance?

DIRECT - RUDOLPH

1    A.    Well, we were making estate plans.  We had taxes to

2    consider, and we decided what did we want ultimately for our

3    children to have in their trust in the event both of us died

4    as well.

5    Q.    Okay.  And we also heard about this second-to-die

6    policy.  Did Mr. Gorman ever tell you about a second-to-die

7    policy?

8    A.    No.

9    Q.    Did you know about a second-to-die policy?

10   A.    Until this proceeding, I never heard of it.

11   Q.    Okay.  So what kind of policies did you get for Bianca?

12   A.    It was a mixture.  There was some whole life, a lot of

13   term.  Term represented a decent value at the time.

14   Q.    Now, I have to say when I say, "When you got for

15   Bianca," was she involved in the process?

16   A.    Completely.

17   Q.    Did she know about the insurance?

18   A.    Absolutely.

19   Q.    Did she sign the forms?

20   A.    Yes, sir.

21   Q.    Did she get checked by the medical people?

22   A.    Yes, sir.

23   Q.    Was she in agreement with getting this life insurance?

24   A.    Absolutely.

25   Q.    And I think we've also seen there was $4.8 million

DIRECT - RUDOLPH

1   years before the October 2016 accident.  Did you have

2   that -- did you and Bianca have that $4.8 million in place

3   at least two years before?

4   A.    I believe so.

5   Q.    Okay.  I want to ask you -- the prosecutor talked

6   about, you know, a windfall in this case.  Did you need

7   $4.8 million?

8   A.    No, sir.

9   Q.    I think we've seen pictures of your house and so on.

10  Were you doing well?

11  A.    Not only did I have assets, but my annual income was

12  pretty good as well.

13  Q.    Yeah, we haven't heard about your income yet in this

14  trial.  How much were you making a year?

15  A.    End of day, all in, about a million dollars a year.

16  Q.    Okay.  There's been talk about the soft case, the hard

17  case, and the shotgun.  Who provided the prosecution in this

18  case the soft case?

19  A.    I did.

20  Q.    Who provided that hard case right next to you?

21  A.    I guess I did.

22  Q.    And now the shotgun, there's been a lot about the

23  shotgun in this case.  Did you try to leave the shotgun in

24  Zambia after the accident?

25  A.    I did.  That was our original plan, to leave it with

DIRECT - RUDOLPH

1    Mark.  And then after the accident, I don't want the damn

2    thing.  But at that point, he didn't want it either.  So

3    under Zambian law, I couldn't leave the country unless I

4    brought it home.

5    Q.    Did you bring it home?

6    A.    Had to.

7    Q.    Okay.  Where did you put it?

8    A.    Left it in that tough pack and put it in my garage and

9    that was it.

10   Q.    How long did it sit there?

11   A.    Over two years.

12   Q.    Now, when -- after 2016 when you came back, when is the

13   next time you came across it?

14   A.    I had decided to sell my house in Phoenix and was

15   preparing to put it on the market with the real estate agent

16   and move into a condo.  So to get the house ready I was

17   packing, throwing out things.  And after I first got home

18   from Zambia, I never touched that and I never touched her

19   duffel bag; never opened them.

20         I had to put the firearms in a locker storage, so I

21   opened it up, and there's the shotgun and the rifle.

22   Q.    What year are we in?

23   A.    Late 2018.

24   Q.    Did you think you were under investigation at that

25   point?

2745

DIRECT - RUDOLPH

1    A.    No, sir.

2    Q.    I mean, had you already submitted yourself to an

3    investigation in Zambia?

4    A.    I had.

5    Q.    Had you given them the gun and everything else they

6    wanted to look at?

7    A.    Everything they asked for I gave them.

8    Q.    Did they give it back to you?

9    A.    Yes, sir.

10   Q.    Did you submit yourself to an insurance investigation

11   where the insurance company came and interviewed you?

12   A.    Yes, sir.

13   Q.    Okay.  Had everything been done at that point?

14   A.    I thought so, yes.

15   Q.    Had the insurance companies paid on all the claims?

16   A.    Oh, yes, sir.

17   Q.    Had you thought in 2018 when you came across that

18   shotgun that this case was over?

19   A.    I did.

20   Q.    Did you want to keep that shotgun around?

21   A.    Hell, no.

22   Q.    Why not?

23   A.    I didn't want to look at it.  What was I going to do

24   with it?

25   Q.    So did you get rid of it?

2746

DIRECT - RUDOLPH

1    A.    I did.

2    Q.    Okay.  If you thought there was an investigation

3    pending, or that the FBI was looking at you, would you have

4    given them the shotgun?

5    A.    Absolutely.

6    Q.    Okay.  We've heard that the FBI didn't start their

7    investigation until 2019.  Had they come to you in 2018 when

8    you saw it and said, "We'd like this A-5, along with the

9    soft pack and the hard pack," would you have given it to

10   them?

11   A.    Yes, sir.

12   Q.    And did you, in fact, give them the soft pack and the

13   hard pack when they asked for it?

14   A.    Yes, sir.

15   Q.    Okay.  Let's talk about Steak 44.  Remember

16   Mr. Lovelace testified.

17   A.    I did.

18   Q.    Now, tell the jury -- well, let's back up before Steak

19   44 for a second.

20         In January of 2020 -- January 2020, was there a

21   convention in Dallas?

22   A.    Yes, sir.  Dallas Safari Club.

23   Q.    Who did you go to that convention with?

24   A.    I took Lori.

25   Q.    Okay.  When you were on the plane in January of 2020,

2747

DIRECT - RUDOLPH

1    tell us what happened.

2    A.   We were flying to Dallas from Phoenix and sitting there

3    chatting away about going to the convention and, you know,

4    what we might do there.  And there was a lady sitting next

5    to us and out of the blue she just kind of started to talk

6    to us.  Interjected herself in our conversation.  It seemed

7    a little weird, but, you know, people talk on planes.

8    Q.   Did that stick in your head for a little bit?

9    A.   Yes, it did.

10   Q.   And then at the convention in Dallas in January 2020,

11   did you have a conversation with Mark Swanepoel?

12   A.   I did.

13   Q.   What did he tell you, if anything, about things going

14   on in Africa?

15   A.   He had told me that the FBI had been to Zambia and

16   interviewed people there and I guess started an

17   investigation.

18   Q.   Is this the first time that you were hearing that the

19   FBI was actively looking at you?

20   A.   Yes, sir.

21   Q.   What did you do -- did you make any phone calls after

22   you had that conversation with Mark?

23   A.   Yes, sir.  I -- I called his dad.  His dad wasn't at

24   the convention, so I called him to verify it.  I said, "Do

25   you know what's going on?"

2748

DIRECT - RUDOLPH

1    He pretty much told me the same thing.

2    Q.    And did they tell you -- did -- you're talking about

3    Pieter Swanepoel?

4    A.    I'm sorry, Pieter Swanepoel, yes, sir.

5    Q.    Did Pieter Swanepoel tell you that they were looking at

6    whether you had killed your wife for Lori Milliron?

7    A.    I don't recall that.

8    Q.    Okay.  Do you recall whether they were poking around

9    Africa?

10   A.    Yes.

11   Q.    Okay.  Did that make that conversation on the plane

12   in -- on the way to the convention more meaningful to you?

13   A.    A little bit.

14   Q.    Okay.  Was there another convention shortly after that?

15   A.    Yes.  That would have been the Safari Club convention.

16   Q.    And when was that?

17   A.    Oh, two weeks later.

18   Q.    Okay.  When you went to that convention, who was there?

19   A.    Actually, I didn't go to that convention.

20   Q.    Okay.  Who went to that convention?

21   A.    Well, that would have been --

22   Q.    Other folks from the hunting community?

23   A.    Yes.  Yes, sir.  Mark and Pieter.

24   Q.    After that convention, did you hear anything about an

25   investigation?

2749

DIRECT - RUDOLPH

1    A.    I did.  And can I stop you for a second?

2    Q.    Of course.

3    A.    The -- well, the Dallas was first, you're right, and

4    then it was the SCI convention.  I apologize.  You were

5    correct.  My timeline.

6    Q.    It's okay.  Between those two conventions and your

7    calls to Pieter and your discussions with Mark, at that

8    point had you become aware that the FBI had reactivated

9    their investigation?

10   A.    I did.  Yes, sir.

11   Q.    Okay.  Now let's go to Steak 44.  Does that happen

12   shortly after those conventions?

13   A.    Yes, sir.

14   Q.    Okay.  Were you and Lori drinking that evening?

15   A.    Yes, sir.

16   Q.    Were you in any disagreements that evening?

17   A.    We were.

18   Q.    Can you tell the jury about the disagreement.

19   A.    Well, the disagreement started in the car on the way to

20   Steak 44.  It was late February, I'm guessing, early March.

21   And we had been told by the State of Pennsylvania this was

22   the beginning of the COVID.  And as you know, we had dental

23   businesses, dental practices.  And there was all this

24   discussion and debate that they were going to close our

25   businesses down.  Full close.  Which would have created an

DIRECT - RUDOLPH

1    economic hardship.  Nobody was talking about government

2    subsidies at that point.

3         Lori brought up the fact that I had been helping my

4    son, Julian, with some of his expenses for his legal firm.

5    He just got started, maybe 14-, $15,000 a month.  And she

6    thought that perhaps we should conserve our funds and cut

7    those places we could in case we got shut down.  And she

8    suggested that we consider not covering Julian's legal

9    expenses.

10        Well, that was a nonstarter.  I don't need those

11   funds from the business to pay my son's expenses in his

12   early days.  I could do it on my own.  So we had a brief

13   argument in the car.  It ended.  We went into the

14   restaurant.

15   Q.   And what happened -- did you continue those discussions

16   in the restaurant?

17   A.   Later.

18   Q.   Okay.  And were there discussions about money?

19   A.   That was part of it, yes.

20   Q.   And was -- I'm sorry -- Ms. Milliron, but was she

21   starting to get on your nerves about it?

22   A.   Yeah.

23   Q.   Okay.

24   A.   We'd had a couple of cocktails and she was pressing me.

25   Q.   Did you have bigger concerns on your mind than the

DIRECT - RUDOLPH

1    money to your son?

2    A.    Several.

3    Q.    What was the number one concern after those two

4    conventions and hearing about what was going on?

5    A.    I was being investigated by the FBI.

6    Q.    And after Ms. Milliron kept bringing this up with you,

7    how did you react?

8    A.    I got angry.

9    Q.    And what did you tell her?

10   A.    I said, "Stop pressing me.  Now they're saying I killed

11   my F-ing wife for you."

12   Q.    Mr. Lovelace said he could only hear the part of the

13   conversation where the music cut off.  Do you remember that?

14   A.    He did.

15   Q.    So he only heard part of that conversation?

16   A.    Correct.

17   Q.    Dr. Rudolph, I mean, after all, this seems kind of

18   silly, but did you ever confess to killing your wife?

19   A.    No, sir.

20   Q.    Have you always said exactly what this was?

21   A.    A hundred percent.

22   Q.    What was this?

23   A.    This was an accident.

24   Q.    Dr. Rudolph, take a look -- one last look at this jury,

25   this is your chance.  Did you murder your wife?

DIRECT - RUDOLPH

1    A.    I did not murder my wife.  I could not murder my wife.

2    And I would not murder my wife.

3              MR. MARKUS:  Thank you.  I have nothing further,

4    Your Honor.

5              THE COURT:  All right.  I think we're going to

6    pause there for the day.  We'll start cross-examination in

7    the morning.

8              Ladies and gentlemen of the jury, I know Ms. Guerra

9    has already given you a warning that this might happen, but

10   given how things are going, and in the interest of justice,

11   I've not cut off the lawyers and testimony, I'm not going to

12   cut off the Government tomorrow in its cross-examination, so

13   I think the odds are pretty high we're going to go into

14   Friday.  So I'm telling you that now so that you can make

15   whatever personal and business arrangements you need to do.

16             So other than that, it's the same message as I've

17   been giving you every evening.  Please be back in the jury

18   deliberation room by 8:35.  I need to cover some matters

19   with the lawyers so all of you hold tight.  But -- and then

20   before I release you, again, I have to tell you, please do

21   not do any independent research into or discuss with anyone

22   the facts, the law, or the persons involved in this lawsuit.

23             The jury is released until 8:45 tomorrow morning.

24             (Jury left the courtroom at 4:59 p.m.)

25             THE COURT:  Dr. Rudolph, you can return to counsel

DIRECT - RUDOLPH

1  table.

2          All right.  Counsel, I think we've got to figure

3  out how the next two days are shaping up.  Mr. Fields, give

4  me your best guess -- I'm not going to hold you to it -- of

5  how long your closings -- or your closing -- your

6  cross-examination.

7          MR. FIELDS:  Thank you, Your Honor.  It can always

8  be tough on cross, but I think probably two or three

9  hours.

10         THE COURT:  All right.  Mr. Markus, what would you

11  speculate -- I know it's nothing much more than speculation

12  at this point -- that your redirect will take?

13         MR. MARKUS:  I plan on being short, Your Honor.

14  I'd say half an hour.

15         THE COURT:  All right.  And is your client your

16  last witness?

17         MR. MARKUS:  Yes, Your Honor.

18         THE COURT:  All right.  Mr. Dill, can you give me

19  any further enlightenment as to what your plans are

20  tomorrow?

21         MR. DILL:  I would say the same line I said -- as I

22  said earlier.  I don't believe I'm going to call my client

23  at this point, but --

24         THE COURT:  But you --

25         MR. DILL:  -- never wanted to say never, but other

DIRECT - RUDOLPH

1    than that, it would just be a very short witness.

2              THE COURT:  You've not committed to that.  Okay.

3              Mr. Fields, does the Government at this point

4    anticipate calling any rebuttal witness?

5              MR. FIELDS:  Your Honor, I don't know the answer to

6    that question right now.  I need to confer with the agents

7    and with co-counsel.  I should be able to give the Court an

8    answer early in the morning.

9              THE COURT:  All right.  That's fine.  Let me -- you

10   can have a seat.

11             Let me just tell you what my view on rebuttal

12   evidence is.  Rebuttal evidence in this courtroom is

13   evidence on a matter that could not have been anticipated in

14   this case by the Government to put on in its case in chief;

15   that there was in fact some surprise by testimony that's

16   come in in the defense's case such that you can reasonably

17   argue it was not something that you would have anticipated

18   having the need to put into your case.  All right?  So, in

19   other words, I have a fairly high bar for what's rebuttal

20   evidence.

21             Beyond that, let's talk about closing because for

22   sure we're going to do closings tomorrow.  If you had to --

23   if you had the ability to set how much time you want for

24   closing, I don't mean to anticipate who among you -- the

25   three of you is going to be doing closing, but how much

DIRECT - RUDOLPH

1    would you want for closing?

2          MR. FIELDS:  Your Honor, it will be Mr. Winstead.

3    We previously had discussions with defense counsel and our

4    position was we want to make sure defense counsel has as

5    much time as they need jointly.  So, you know, I hate to

6    throw the ball over into their court but I think that that

7    matters.  I don't know how long they're going to have.  We

8    think it would take two hours on our side.

9          THE COURT:  Wow.  Mr. Markus, same question to you.

10         MR. MARKUS:  I think two hours is too long for the

11   Government, Your Honor.  They opened in less than 30

12   minutes.  I would ask for myself an hour.  I think an hour

13   for the Government is fine.  And I know Mr. Dill needs some

14   time, but --

15         THE COURT:  Let's let Mr. Dill speak for himself.

16         MR. DILL:  Thank you.  Thank you.  If it's an hour,

17   an hour, I can do it in 45 minutes or less, but considering

18   there's the seven counts against my client, it kind of

19   dictates it, so I would ask for 45.  40 to 45.  I won't go

20   beyond that.

21         THE COURT:  All right.  I don't believe it's -- it

22   would be fair for me to hold the Government to the same

23   amount of time just that I'm giving to Defendant Rudolph

24   because the Government has to deal with the case against two

25   defendants while each of the defense counsel just has to

DIRECT - RUDOLPH

1      deal with their own respective clients.  So I'm going to

2      give it some thought in the next hour or so and then I'm

3      going to have Ms. Guerra email -- because I think it's -- I

4      should tell you this evening how much time you're going to

5      have so you can plan your closings.  So be on the lookout in

6      your email.  She'll let you know before 6:00 how much time

7      we're allocating for closings.

8              All right.  Beyond that, anything else we need to

9      address today?

10             MR. FIELDS:  Your Honor, two things.  One, jury

11     instructions.  When do we want to handle that?

12             THE COURT:  Right.

13             MR. FIELDS:  And then, two, in terms of the cross.

14     Tomorrow -- I wanted to advise the Court tomorrow I did plan

15     to get into the crocodile attack.  So we would not be

16     getting any intrinsic evidence in through 404(b), but it's

17     impeachment, Your Honor.  It goes to his knowledge of the

18     camp site; it goes to the resources available there for

19     investigating.  And he also made several false statements to

20     the insurance companies about the disability claims

21     regarding his sort of -- his functionality and whether or

22     not he was actually disabled.  All of that stuff I think is

23     fair grounds for cross-examination.  It goes to his

24     credibility, it goes to his knowledge, it goes to his

25     intent.

DIRECT - RUDOLPH

1        THE COURT:  Well, I'll -- I won't prejudge my --

2   what my ruling's going to be in the morning.  I'll let you

3   make your record and make your argument, I'll hear

4   Mr. Markus, but effectively what I hear you putting before

5   me -- or will put before me tomorrow morning is a motion for

6   reconsideration, something that I don't grant with much

7   frequency.

8        In terms of the charging conference -- well,

9   there's nothing magical.  This is how I've done it for

10  11 1/2 years:  When we're done with all the evidence, I'll

11  take a recess.  My law clerks and I will put the finishing

12  touches on the court's proposed set of jury instructions.

13  We'll bring two sets out for each side.  We'll give counsel

14  15 minutes to review the jury instructions and then I'll

15  come out on the bench and we'll have our charging

16  conference.

17       And then after the charging conference, depending

18  on how many -- if any of the objections, comments,

19  corrections, typos, that defense and Government counsel find

20  in the Court's set of instructions, that will determine how

21  long it will take before I -- we have a final final set for

22  counsel, which will be the final set without the annotations

23  at the bottom.

24       The purpose of that being that counsel will then

25  have a set of instructions that they may use in closing if

2758

DIRECT - RUDOLPH

1    they choose to do so.  So obviously from what I just said, I

2    will read the instructions and charge the jury first and

3    then we'll have closing arguments after that.

4              THE COURT:  Mr. Markus.

5              MR. MARKUS:  Your Honor, the Government mentioned

6    that they would inform the Court and counsel in the morning

7    about any rebuttal case.  They will obviously make a

8    decision tonight.  For our preparation, I would ask the

9    Court to order the Government to let us know by dinner

10   tonight so that we can plan accordingly.

11             THE COURT:  What about that, Mr. Fields?

12             MR. FIELDS:  Your Honor, one thing we couldn't

13   reasonably anticipate, he said he got rid of the shotgun.

14   He didn't say who.  I plan on exploring that on

15   cross-examination, and depending on how he got rid of it, or

16   what happened, there are means at the FBI's disposal for

17   tracking that down.  That would be rebuttal, Your Honor.  I

18   can't anticipate that.  That's going to require a little bit

19   of work.  Because of the way the direct was structured and

20   because there was a lot of leading questions, we didn't get

21   an answer to that.  It was very vague, it was evasive.

22             Also Mr. Langell for the first time was identified

23   as a witness to that postnup.  Otherwise that signature is

24   inscrutable.  We would like the opportunity to try to talk

25   to Mr. Langell.  That's going to take some time as well.  We

DIRECT - RUDOLPH

1   have the resources available, we're going to look into it,

2   but those are the two big things.  And then I need to

3   consult with the FBI about its resources in terms of some of

4   the other things.

5           THE COURT:  All right.  I think you've actually

6   pointed to two matters that I do think is appropriate for --

7   or are appropriate for rebuttal evidence.  We've yet to hear

8   in this entire case, since its inception, of what happened

9   to this shotgun.  So I agree with the Government that you

10  cannot have anticipated whatever is going to be the answer

11  on cross-examination.  And also this is the first time we've

12  heard about one of these attorneys being a witness to the

13  postnuptial agreement.

14          So for planning purposes, Mr. Markus, you can

15  assume that I will permit the Government to put on rebuttal

16  testimony as to those two matters.

17          I do think it's a fair and equitable request,

18  Mr. Fields, that beyond those two, if you come to the

19  conclusion that you are going to request additional subject

20  matter for rebuttal, I direct you to let defense counsel

21  know so that they can prepare accordingly.  That, of course,

22  does not mean that -- and I don't obligate myself to agree

23  to it.  But whatever you're contemplating asking of me by

24  way of rebuttal, let the defense counsel know this evening.

25          Anything else that we need to address today before

DIRECT - RUDOLPH

1   we recess?

2          MR. MARKUS:  No, Your Honor.  Thank you so much.

3          THE COURT:  All right.  Mr. Dill?

4          MR. DILL:  No, sir.

5          THE COURT:  Mr. Fields?

6          MR. FIELDS:  No, Your Honor.  Thank you.

7          THE COURT:  All right.  We'll be in recess until

8   8:45 tomorrow morning.

9        (Proceedings concluded at 5:10 p.m.)

10                         INDEX

11   **ITEM**                                        **PAGE**

12                  **DEFENDANT'S WITNESSES**

13      MICHAEL BADEN
        Direct Examination by Mr. Markus              2494
14      Cross-examination by Mr. Grewell              2518
        Redirect by Mr. Markus                        2544
15
        PAULETTE SUTTON
16      Direct Examination by Ms. Moss                2551
        Cross-examination by Mr. Winstead             2575
17      Redirect Examination by Ms. Moss              2597

18      MITCHELL HOFFMAN
        Direct Examination by Mr. Markus              2602
19      Cross-examination by Mr. Fields               2613
        Redirect Examination by Mr. Markus            2646
20
        LAWRENCE RUDOLPH
21      Direct Examination by Mr. Markus              2656

22                  **GOVERNMENT'S EXHIBITS**

23   **EXHIBITS:**      **Offered**    **Received**  **Refused**    **Stipulated**

24   494            2591        2591

25   495            2591        2591

DIRECT - RUDOLPH

**GOVERNMENT'S EXHIBITS**

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| 496 | 2591 | 2591 | | |
| 497 | 2591 | 2591 | | |
| 498 | 2591 | 2591 | | |

**DEFENDANT'S EXHIBITS**

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| RA | 2659 | | 2664 | |
| RB | 2676 | 2679 | | |
| RF | 2666 | 2669 | | |
| RG | 2666 | 2669 | | |
| RH | 2666 | 2669 | | |
| RI | 2666 | 2669 | | |
| RJ | 2666 | 2669 | | |
| RL | 2666 | 2669 | | |
| RM | 2666 | 2669 | | |
| RN | 2666 | 2669 | | |
| RO | 2666 | 2669 | | |
| RP | 2666 | 2669 | | |
| RQ | 2666 | 2669 | | |
| RS | 2666 | 2669 | | |
| RT | 2666 | 2669 | | |
| RU | 2666 | 2669 | | |

                    *       *       *       *       *

2762

DIRECT - RUDOLPH

1          REPORTER'S CERTIFICATE

2          I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.

4          Dated at Denver, Colorado, this 15th day of September,

5    2023.

6

7

8

9

10          MARY J. GEORGE, FCRR, CRR, RMR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25