2763

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 22-cr-0012-WJM

UNITED STATES OF AMERICA,

Plaintiff,

vs.

LAWRENCE RUDOLPH,
LORI MILLIRON,

Defendants.

------------------------------------------------------------

REPORTER'S PARTIAL TRANSCRIPT
(Jury Trial, Day 13)

------------------------------------------------------------

Proceedings before the HONORABLE WILLIAM J. MARTINEZ, Judge, United States District Court for the District of Colorado, commencing at 8:48 a.m., on the 28th day of July, 2022, in Courtroom A801, United States Courthouse, Denver, Colorado.

APPEARANCES

BRYAN D. FIELDS, E. GARRETH WINSTEAD, III, J. BISHOP GREWELL, Assistant U.S. Attorneys, 1801 California Street, Suite 1600, Denver, Colorado 80202, appearing for the plaintiff.

DAVID O. MARKUS, A. MARGOT MOSS, LAUREN L. DOYLE, Markus Moss PLLC, 40 NW Third Street, Penthouse 1, Miami, Florida 33175, appearing for the defendant Rudolph.

JOHN W. DILL, John W. Dill P.A., 941 West Morse Boulevard, Winter Park, Florida 32789, appearing for the defendant Milliron.

2764

CROSS - RUDOLPH

1      **MARY J. GEORGE, FCRR, CRR, RMR**
       **901 19th Street, Denver, Colorado 80294**
2      **Proceedings Reported by Mechanical Stenography**
       **Transcription Produced via Computer**
3                   **P R O C E E D I N G S**

4          (In open court in the presence of the jury at 8:48

5      a.m.)

6              THE COURT:  Good morning, ladies and gentlemen of

7      the jury.

8              THE JURY:  Good morning.

9              THE COURT:  Welcome back to day 13 of our jury

10     trial.  We probably caught you a little off guard bringing

11     you in right at 8:45, right?  We haven't done that for a few

12     days.

13             All right.  Mr. Fields, you may resume your

14     examination.

15             Dr. Rudolph, I remind you that you remain under

16     oath.

17             MR. FIELDS:  Thank you, Your Honor.

18                      **CROSS-EXAMINATION**

19     BY MR. FIELDS:

20     Q.    Good morning, Dr. Rudolph.

21     A.    Good morning, sir.

22     Q.    We're going to be discussing some things that I think

23     will be pretty hard for you today, so if you need any time

24     at all, please take it.  If you need a glass of water or

25     anything.

CROSS - RUDOLPH

1    A.    I thank you.   I appreciate that.

2    Q.    What time did you wake up the morning that Bianca died?

3    A.    About 4:15.

4    Q.    What did you hear in the dining room that morning?

5    A.    Voices.

6    Q.    Whose voices?

7    A.    Mark's and Spencer.

8    Q.    So you could hear them?

9    A.    A little bit, yes, sir.

10   Q.    And you think they could hear you?

11   A.    I'm not sure.   Perhaps.

12   Q.    Well, if you could hear them, do you think it's likely

13   that they were able to hear you in the cabin?

14   A.    I don't know.

15   Q.    You don't know whether it's likely?

16   A.    Well, it could be.   We're inside of a cabin, they were

17   in the outside of the dining room, which is open.

18   Q.    Well, but the sound would have to travel from the

19   dining room through the cabin just like the reverse,

20   right?

21   A.    Yes, sir.

22   Q.    Mark's hearing any worse than yours?

23   A.    Sometimes.

24   Q.    Spencer's?

25   A.    I don't know about his hearing.

CROSS - RUDOLPH

1   Q.   Do you remember Mr. Haag's testimony?

2   A.   Yes, sir.

3   Q.   And you probably saw his report.

4   A.   No, I just heard his testimony.

5   Q.   Okay.  You never saw his report?

6   A.   No, I never read it.

7   Q.   Well, do you remember during his testimony he had three

8   choices -- three possibilities for the cause of Bianca

9   Rudolph's gunshot wound?

10  A.   Yes, sir.

11  Q.   Do you remember what those three possibilities were?

12  A.   Can you refresh me, please?

13  Q.   Sure.  Government's Exhibit 663, if we can.  Oh, there

14  we go.

15       Not in evidence, by the way.  Sorry.

16       And now if we can go to page 8.  And don't know if

17  the screen is working.  Let's see.  Ms.  Guerra, the screen,

18  I can't get the annotations to work.  Oh, there we go.

19  Sorry.  It blipped out for a second, so let's go back to it.

20  All right.

21  A.   Okay.

22  Q.   So do you -- do you now remember possibility No. 2 that

23  Mr. Haag talked about?

24  A.   Yes, sir.

25  Q.   What was possibility No. 2?

CROSS - RUDOLPH

1    A.    A mishandling of the shotgun by Mr. Rudolph.

2    Q.    So that would be you?

3    A.    Yes, sir.

4    Q.    So that would be an accident where you were -- you were

5    packing the shotgun into the case and it accidentally went

6    off, right?

7    A.    Yes, sir.

8    Q.    Now, understand from your testimony yesterday, you're

9    saying that's not what happened.

10   A.    Correct.

11   Q.    And it would make sense, right, you wouldn't want to

12   admit that while you're in Zambia because that would put you

13   with the shotgun, right?

14   A.    I would only admit it if it was true.

15   Q.    Yeah.  And even if it was an accident, that would look

16   really bad, right?

17   A.    I'm not sure how to answer that.

18   Q.    Well, do you think it would have looked bad if -- let's

19   assume that it was an accident and you had been loading the

20   shotgun and it went off, and so you're holding the shotgun,

21   but it was an accident.  It would look bad, right?

22   A.    It would be the truth.  And if it had happened, that's

23   what I would have told them.

24   Q.    Even though it would have looked bad?

25   A.    Yes, sir.

2768

CROSS - RUDOLPH

1   Q.   And even though you were concerned about ending up in a

2   Zambian jail?

3   A.   Well, probably wouldn't have even crossed my mind at

4   that time.

5   Q.   Even though you were concerned about sort of you said

6   Zambian human rights, not having access to human rights?

7   A.   Correct.

8   Q.   But we can -- we can rule out option No. 2 of

9   Mr. Haag's theory, right?

10  A.   Yes, sir.

11  Q.   Okay.  So that leaves option No. 1.  What was his first

12  option?

13  A.   You want me to read it?

14  Q.   No, because it's not in evidence.  Just to -- as you

15  remember Mr. Haag's testimony, what do you remember one of

16  his other options being?

17  A.   An accident of some sort.  In some way she was trying

18  to force the gun in the soft gun case.  Perhaps she dropped

19  it out of the soft gun case putting it into the Tuffpack.

20  He gave a couple variations of possibilities.

21  Q.   So that would mean at some point the shotgun hit the

22  ground, perhaps?

23  A.   Perhaps.

24  Q.   Or perhaps someone was banging it against something?

25  A.   I believe that's what he thought.

2769

CROSS - RUDOLPH

1    Q.    Do you remember -- you can take that down, please.

2    Thank you.

3              Do you remember Mr. Swanepoel testifying about

4    hearing the shot?

5    A.    Yes, sir.

6    Q.    Do you remember, was he able to hear anything

7    immediately after the shot?

8    A.    I'm not sure.  He might have said he heard a muffled

9    noise or scream.  I can't recall.

10   Q.    So maybe the air leaving Bianca's body?

11   A.    I couldn't say.

12   Q.    If he heard that -- that sound after the gunshot, do

13   you think he would have heard the shotgun falling on the

14   floor before the gunshot?

15   A.    I don't know, sir.

16   Q.    You would have been able to hear him in the cabin -- or

17   while you were in the cabin, you'd have been able to hear

18   him in the dining hall, right?

19   A.    Somewhat, yes, sir.

20   Q.    And if someone had been banging the shotgun against the

21   floor or the headboard, do you think Mr. Swanepoel would

22   have been able to hear that?

23   A.    I don't know, sir.

24   Q.    Now, you testified on direct that you didn't want the

25   consulate to be notifying your children, right?

CROSS - RUDOLPH

1    A.    That's correct.

2    Q.    You didn't want to do it from 8,000 miles away, right?

3    A.    I wanted to personally contact my children, yes, sir.

4    Q.    And remind us, why did you want to personally contact

5    your children?

6    A.    I wanted to do it face-to-face.  I didn't want to do it

7    by phone.

8    Q.    Because I think you said yesterday you wanted to hug

9    them?

10   A.    Sorry?

11   Q.    Because I think you said yesterday you wanted to hug

12   them?

13   A.    Yes, sir.

14   Q.    You wanted to hold them?

15   A.    And grieve with them, yes, sir.

16   Q.    So you wouldn't want to have a conversation like that

17   over the phone, right?

18   A.    No, sir.

19   Q.    In 2016, where did your son live?

20   A.    Miami.

21   Q.    And where did your daughter live?

22   A.    Pittsburgh.

23   Q.    So I want to look now at an exhibit -- it's not in

24   evidence -- it's Government's Exhibit 607.  If we could zoom

25   in on what I've highlighted there.  I don't know if the zoom

CROSS - RUDOLPH

1    helped us all that much.

2          But do you see here -- let's see -- do you see that

3    number right there?

4    A.    Yes, sir.

5    Q.    What number do you think that is, or do you recognize

6    it?

7    A.    Are you asking me about the flight?

8    Q.    Yeah.

9    A.    Atlanta to Johannesburg.

10   Q.    Yeah.  And this number there, is that your Delta Sky

11   Miles card?

12   A.    I don't know.

13   Q.    So do you think if -- well, let's look at -- let's put

14   this exhibit over on the left, please.  Do you think there's

15   probably some documents that would refresh your recollection

16   as to your Delta Sky Miles number?

17   A.    If you're telling me it's my sky miles, I'll accept

18   that.

19   Q.    Okay.  So now let's look at -- well, so if you'll

20   accept that, does this look like sort of the flight from

21   Atlanta to -- or from Johannesburg to Atlanta?

22   A.    Can I see the date again, sir?

23   Q.    Sure.

24   A.    Okay.  Thank you.

25   Q.    Is that -- do you think that's your flight?

CROSS - RUDOLPH

1    A.    Yes, sir.

2              MR. FIELDS:   Your Honor, at this time I'd move to

3    admit Government's Exhibit 607 as a business record under

4    the business records exception.   It's been authenticated

5    pursuant to an affidavit pursuant to a custodian of records

6    and produced to defense counsel.

7              THE COURT:   Any objection?

8              MR. MARKUS:   No objection, Your Honor.

9              THE COURT:   All right.   There being no objection,

10   Government Exhibit 607 is admitted into evidence and may be

11   published to the jury.

12        (Government's Exhibit 607 received)

13   BY MR. FIELDS:

14   Q.    So let's look at, now, on the right side of the

15   screen -- I know it's super tiny, I promise we'll blow it

16   up -- let's look at Government's Exhibit 316, which is

17   already in evidence.   And now let's go to page 4, please.

18   And if we could zoom in there up on the top.

19              So remind us, Dr. Rudolph, when were you originally

20   scheduled to leave from Lusaka?

21   A.    The 11th of October 2016.

22   Q.    Now after -- after Bianca died, you would have had to

23   change your flight, right?

24   A.    Yes, sir.

25   Q.    And so based on this -- if you look at that -- do you

2773

CROSS - RUDOLPH

1  see here on this document what -- what date is listed there?

2  Can you --

3  A.    10-13.

4  Q.    So that's two days after your wife died?

5  A.    Yes, sir.

6  Q.    And now if we look at Government's Exhibit 607.  And

7  now let's zoom in on this -- this line right there.  Those

8  two lines.  Okay.  It's still a little bit tiny.

9          But does that also show you changing your ticket on

10  October 13th, 2016?

11  A.    The 13th, yes, sir.

12  Q.    And when you changed your ticket two days after your

13  wife's death, you didn't change your ticket so you could fly

14  to Miami, did you?

15  A.    That's correct.

16  Q.    And you didn't change your ticket so you could fly to

17  Pittsburgh, did you?

18  A.    Correct.

19  Q.    So you didn't change your ticket so that you could

20  visit your children in person, right?

21  A.    Well, at the time I didn't really --

22  Q.    Sir.  We'll get to that.

23  A.    Oh, sorry.

24  Q.    Is that right?

25  A.    Say again, sir.

CROSS - RUDOLPH

1    Q.    So when you changed your ticket, you didn't change it

2    so you could visit them in person; isn't that right?

3    A.    That's correct.

4    Q.    Okay.  So you knew on October 13th, two days after your

5    wife's death, that you weren't going to notify your children

6    in person, right?

7    A.    No, sir.

8    Q.    All right, explain.

9    A.    I didn't know what I -- my plans were.  Maybe I would

10   have Julian come to Phoenix, maybe I would fly to

11   Pittsburgh.  I just set a destination because I was

12   originally supposed to go to New York City, then to Taos,

13   and every place else, so I just made a Phoenix destination.

14   And after that I didn't know what my plans were going to

15   be.

16   Q.    All right.  But on October 13th, 2016, in Phoenix, you

17   knew that you won't be able to notify them in person from

18   Phoenix, right?

19   A.    From Phoenix?  No, sir.

20   Q.    You would have had to notify them by phone no matter

21   what, right?

22   A.    Perhaps.

23   Q.    And I believe your testimony yesterday was that you

24   only changed your plans when you saw that article in

25   Johannesburg, right?

CROSS - RUDOLPH

1    A.    I only changed my plans to visit them in person after I

2    saw the internet article.  That's correct.

3    Q.    You said -- so you did have plans to visit them in

4    person?

5    A.    Yes, sir.

6    Q.    Even though you were flying to Phoenix and not to

7    Miami?

8    A.    Well, again, I didn't have a final plan or a

9    destination.

10   Q.    Okay.  So let's go to Government's Exhibit 501.

11         THE COURT:  Mr. Fields, excuse me, sorry to

12   interrupt.  Ms.  Guerra.

13         (Pause)

14         THE COURT:  All right, we're back in business.  I

15   think we're pulling up the exhibit now.

16         MR. FIELDS:  Thank you, Your Honor.

17   BY MR. FIELDS:

18   Q.    So let's go to page 24 of this, right?  So, again, as I

19   understand it, Dr. Rudolph, you wanted to notify your

20   children in person.

21   A.    That's correct.

22   Q.    And you say you changed your plans when you were in

23   Johannesburg because you saw an article?

24   A.    At some point, yes, sir.

25   Q.    Now, that flight from Johannesburg to Atlanta, it's a

2776

CROSS - RUDOLPH

1    pretty brutal flight, isn't it?

2    A.    Almost 19 hours.

3    Q.    Yeah.  So if you arrived in Phoenix on the 17th, when

4    would you have had to leave Johannesburg?

5    A.    16th, I believe.  15th, 16th.

6    Q.    All right.

7    A.    I'm not sure.

8    Q.    So you say on the 16th you had to change your plans,

9    but on the 13th, you had already booked your ticket to fly

10   to Phoenix, right?

11   A.    Yes, sir.

12   Q.    You had already booked your ticket to a place where

13   your children were not located, right?

14   A.    Correct.

15   Q.    So your plans didn't change when you were in

16   Johannesburg, did they?

17   A.    Well, again, I was supposed to go to New York and

18   follow that program back to Phoenix.

19   Q.    But you didn't do that either, right?

20   A.    No, sir.

21   Q.    You didn't go to New York where it would have been easy

22   to then get to Pittsburgh.

23   A.    To get what, sir?

24   Q.    You didn't go to New York where it would have been easy

25   to catch a connecting flight to Pittsburgh.

2777

CROSS - RUDOLPH

1    A.    No, sir.

2    Q.    And you didn't go to New York where it would be pretty

3    easy to catch a connecting flight down to Miami.

4    A.    I didn't make that plan, no, sir.

5    Q.    So when you told Otto Westhassel that you didn't want

6    him to do the notifications because you wanted to tell them

7    in person, as of October 13th, 2016, you didn't have any

8    plans to notify them in person, did you?

9    A.    As of that date, that's correct, yes, sir.

10   Q.    And you didn't want to do any notifications until after

11   the cremation; isn't that right?

12   A.    No, sir.

13   Q.    Now, you booked your ticket on October 13th, 2016,

14   right?

15   A.    Yes, sir.

16   Q.    So you knew at that point that you weren't actually

17   going to be able to see your children in person, right?

18   A.    On that date, yes, sir.

19   Q.    You knew you weren't going to be able to hug them.

20   A.    On that date, yes, sir.

21   Q.    Okay.  And on October 13th, 2016, that was the same day

22   the Embassy was able to take the photographs you were so

23   angry about; isn't that right?

24   A.    I don't recall that exact date, no, sir.

25   Q.    All right.  So on October 13th, 2016 you already knew

2778

CROSS - RUDOLPH

1   that you weren't going to be able to make an in-person

2   notification.

3   A.    That's correct.  On that date, yes, sir.

4   Q.    But you told us yesterday that you were able to call

5   your business manager while you were over in Africa, right?

6   A.    I just sent a text message.

7   Q.    Okay.  It was a text message?

8   A.    Yes, sir.

9   Q.    Remind us, when you say "business manager," who was

10  that?

11  A.    That would have been Lori.

12  Q.    So why did you send a text message to your business

13  manager?

14  A.    Well, I anticipated that they would think I was coming

15  back at a certain date and I just wanted to make an alert.

16  That's all.

17  Q.    Well, hadn't you planned to be with the relatives who

18  were coming to visit down in Arizona?

19  A.    We did.

20  Q.    So they would already not have been expecting you,

21  right?

22  A.    Right then.  But I didn't know how long things were

23  going to take.

24  Q.    So you thought that while you were still over in

25  Africa, you needed to notify your business manager right

CROSS - RUDOLPH

1    away that you might not be there for another two weeks?

2    A.    Correct.

3    Q.    Why?

4    A.    I thought it was prudent.

5    Q.    And your business manager, Lori Milliron, so you texted

6    her that you wouldn't be there.  So you were concerned about

7    your business while you were over in Africa.  Were you

8    concerned about --

9    A.    I wasn't concerned about the business, just an alert.

10   Q.    So is it fair to say that you texted Lori in 2016?

11   A.    At what date, sir?

12   Q.    In the year 2016, did you text her?  Were you in text

13   communication with her?

14   A.    At all?

15   Q.    Yeah.

16   A.    Yes, sir.

17   Q.    Did you email Ms.  Milliron in 2016?

18   A.    Probably.

19   Q.    So if there's, you know, evidence, if the FBI sort of

20   looked at the accounts and they don't see very many emails

21   between you and Ms.  Milliron, why might that be the case?

22   A.    I don't know, sir.

23   Q.    Now, let's -- here we are on in Government's Exhibit

24   501 on page 24.  What was your first full day back in the

25   United States?

2780

CROSS - RUDOLPH

1    A.    I would assume the 17th.

2    Q.    Well, so you arrived on the 17th, right?

3    A.    Oh, sorry.  I would say the 18th.

4    Q.    Oh, yeah, so that was your first full day back?

5    A.    Yes, sir.

6    Q.    And remind us, I think yesterday you said you thought

7    there was a period of time in which you needed to file the

8    life insurance claims, right?

9    A.    I discovered that afterwards, but yes.

10   Q.    What did you think the time frame was for filing life

11   insurance claims?

12   A.    At what point, sir?

13   Q.    At this point on October -- you know, as soon as you

14   landed, what did you think your deadline was for filing life

15   insurance claims?

16   A.    I wasn't sure.  I knew it was short, but I wasn't sure.

17   Q.    Didn't you say yesterday that you thought it was 20

18   days?

19   A.    I found out that exact date later.  I had a

20   recollection that it was short, but I didn't know the exact

21   time at that point.

22   Q.    Who told you that it was 20 days?

23   A.    I looked at the one and it was 20 days, and then I

24   assumed all the rest would be the same.

25   Q.    When you say "the one," which one?

CROSS - RUDOLPH

1    A.    I don't remember.

2    Q.    All right.  And you say you found out about that later.

3    When did you find out about that?

4    A.    I don't recall, sir.

5    Q.    But you say that on October 18th, you thought you had a

6    short time frame for making the life insurance claims?

7    A.    I'm not sure if it was the 18th.  It may have been.  I

8    don't know.

9    Q.    Okay.  Do you -- have you been able to look at the life

10   insurance documents that were produced in discovery?

11   A.    Actually, no.

12   Q.    Before -- before this proceeding, were you able to look

13   at those life insurance documents?

14   A.    No.

15   Q.    So you never looked at them?

16   A.    No, sir.

17   Q.    But didn't you say just a little bit ago that you were

18   looking at the one and it said that there was a timeline for

19   getting your insurance claims within 20 days?

20   A.    Perhaps a cover page or two, but thoroughly read each

21   one, no, sir.

22   Q.    So if none of those insurance documents actually say

23   that, that would mean your recollection is mistaken?

24   A.    Yes, sir.

25   Q.    So your first full day back was October 18th, 2016.

2782
CROSS - RUDOLPH

1        Let's look at Government's Exhibit 55.  Do you

2   remember seeing this exhibit during the trial?

3   A.   Yes, sir.

4   Q.   And now let's go to page 3.  And now let's look down

5   there at the bottom.  Yup.

6   A.   Yes, sir.

7   Q.   Did you send that email on October 19th, 2016?

8   A.   I did.

9   Q.   What time did you send that email?

10  A.   8:28 in the morning.

11  Q.   So pretty early in the morning your second day back

12  from Africa?

13  A.   Yes, sir.

14  Q.   And if we look at page 1 -- and then let's look at this

15  email here.  Was that email from Whitney?

16  A.   Yes.  Whitney from Richman Law, yes, sir.

17  Q.   What did she tell you in that first sentence there?

18  A.   "I still don't understand the problem that requires an

19  attorney."

20  Q.   Now, attorneys, they can be pretty expensive.

21  A.   Of course.

22  Q.   And you had a long-term professional relationship with

23  Bill Gorman, right?

24  A.   I did.

25  Q.   He'd helped you get a bunch of the life insurance

2783

CROSS - RUDOLPH

1    policies?

2    A.    Some, yes, sir.

3    Q.    And he could have helped you file your life insurance

4    claims, right?

5    A.    Well, he could have, but I had enough that were not

6    purchased through him that I thought it would be better to

7    use one source.

8    Q.    Yeah.  He'd only sold you some of the policies,

9    right?

10   A.    Correct.

11   Q.    So let's look at Government's Exhibit 504.  So he

12   didn't know about the policy from Fidelity, right?

13   A.    I don't know which ones he knew of, sir, and which he

14   did not.

15   Q.    He didn't know about the policy at Jenworth?

16   A.    I don't know, sir.

17   Q.    He didn't know about the policy at AAA?

18   A.    I don't know, sir.  Probably not.

19   Q.    And he didn't know about the policy at TransAmerica.

20   A.    I'm assuming he didn't, but I'm not sure.

21   Q.    Well, do you recall his testimony in court?

22   A.    Yes.

23   Q.    Do you remember him testifying that he wasn't aware of

24   those policies?

25   A.    Yes, sir.

CROSS - RUDOLPH

1    Q.    So you didn't ask him to do it because you didn't want

2    him to know how much life insurance you were claiming; isn't

3    that right?

4    A.    No, sir.

5    Q.    Because he would have thought it was abnormal, right?

6    A.    No, sir.

7    Q.    So he's wrong about it being abnormal?

8    A.    No, I didn't use Bill because he was, at that time, in

9    Pittsburgh; I was in Phoenix.  And he had obtained a

10   position that I would call semi-retired.  He had a lot of

11   health problems.  So I choose to use somebody new from the

12   Phoenix area where I lived.

13   Q.    Well, but don't you remember the email that was

14   introduced in trial on November 1st where you contacted Bill

15   Gorman about your policies?

16   A.    Sure.

17   Q.    So you knew he was still available to help.

18   A.    Slightly.

19   Q.    So he wasn't that retired, was he?

20   A.    He was mostly retired.

21   Q.    And a lot of these policies were at insurance companies

22   all over the country, right?

23   A.    Yes, sir.

24   Q.    So they would have had to have been mailed no matter

25   what?

CROSS - RUDOLPH

1    A.    Yes, sir.

2    Q.    And you could pick up the phone and you could call

3    someone in Pennsylvania just as easily in Arizona, right?

4    A.    Well, again, Bill wasn't being quite as responsive to

5    me as he had been in previous years.  He had turned me over

6    to his assistant rather than handling my claims personally.

7    And, again, I felt more comfortable doing it in Phoenix.

8    Q.    Well, so his assistant could have helped you, then,

9    right?

10   A.    She wasn't quite as good.

11   Q.    She would have been a lot cheaper, right?

12   A.    Well, that wasn't first and foremost on my mind.

13   Q.    Now let's turn back to the shotgun.  So first of all,

14   going back to Mr. Haag's theories, and the drop, I'll just

15   ask you:  Did you -- did you hear anything before the shot

16   went off?

17   A.    Nothing specific.  She was packing.  I heard things

18   moving.  But nothing I could say specifically.

19   Q.    Did you hear a heavy thud to the floor?

20   A.    No, not really.

21   Q.    Did you hear her banging the gun against the headboard

22   of the bed, maybe?

23   A.    I couldn't tell.

24   Q.    Did you hear her banging the shotgun on the floor?

25   A.    Again, I couldn't tell.

CROSS - RUDOLPH

1   Q.    Why don't you think you could tell?  Don't you think

2   that would make a lot of noise?

3   A.    I don't know.  I was in the bathroom with the door

4   closed.

5   Q.    But you could still hear people at the dining hall

6   several, you know -- what was it, 40 meters away?

7   A.    Not from the bathroom.

8   Q.    Okay.  Let's talk about the shotgun.  So you testified

9   on direct about the shotgun that was on that hunt, right?

10  A.    Yes, sir.

11  Q.    You said you didn't want to see that shotgun.

12  A.    That's correct.

13  Q.    Remind us, please:  What did you do with that shotgun

14  when you got back to the United States?

15  A.    I left it in the Tuffpack along with the duffel bag,

16  and I put it in a corner of my garage.

17  Q.    When did you discover it again?

18  A.    Say again?

19  Q.    When did you discover it again?

20  A.    Discover it?

21  Q.    Yeah.

22  A.    It just sat out there the whole time.

23  Q.    Yeah, but I thought on direct you said there was a time

24  where you found it again or you opened up the Tuffpack

25  again?

CROSS - RUDOLPH

1    A.    Oh, yes, sir.  There was a time when I opened it up

2    when I was preparing to put my house up for sale.

3    Q.    Approximately when was that?

4    A.    Sometime in late 2018.

5    Q.    And when you found it in the Tuffpack, what did it look

6    like?

7    A.    Looked like the shotgun.

8    Q.    Was it still in the soft case?

9    A.    No, sir.

10   Q.    Where was the soft case?

11   A.    The soft case eventually we found in Bianca's duffel

12   bag.

13   Q.    Where was Bianca's duffel bag?

14   A.    In the garage.

15   Q.    So it was -- so I just want to make sure I understand

16   exactly what was in the garage from the trip.

17   A.    Well, her duffel bag was; I never opened that.  And the

18   Tuffpack.

19   Q.    So when you brought the shotgun back to the United

20   States, how did you put it in the Tuffpack?

21   A.    I just put it in there.  Actually, excuse me, I

22   misspoke.  I did not put it into the Tuffpack.  Someone else

23   packed that, as well as our luggage.

24   Q.    Without putting it in a soft case first?

25   A.    Correct.

1    Q.    And so when you opened it up, you took -- what happened

2    when you opened up the Tuffpack?  What did you do first?

3    A.    Well, it was a flood of emotion.  It brought everything

4    back to me.

5    Q.    I'm sure.  So what did you do after you opened up

6    the -- we'll call it almost like a time capsule -- what did

7    you do?

8    A.    Closed it back up.

9    Q.    I -- did you go back to it at any point?

10   A.    Eventually.

11   Q.    When did you go back to it?

12   A.    I can't quite recall.

13   Q.    Do you remember how many weeks after that sort of time

14   in late 2018?

15   A.    A few weeks maybe.

16   Q.    What caused you to go back out there to look at it?

17   A.    Well, I had to organize and put my firearms in

18   storage -- all my other firearms.  So in that Tuffpack along

19   with that shotgun, was my rifle.  And I had organized those

20   things so that I could clean out the house, put them in

21   storage, and put the house up for sale.

22   Q.    What did you do with the shotgun at that point?

23   A.    Well, I didn't want to see it anymore so I took it out

24   of the case.  And along with a lot of other things I was

25   disposing of at the time, clothes, gear, everything else, I

CROSS - RUDOLPH

1    separated the shotgun, put it into two separate boxes,

2    wrapped it up, put it out in my driveway for the guy to

3    come, and he took all the garbage along with that.  Put it

4    in the dumpster somewhere.

5    Q.    And you say it was in something, what was it in?

6    A.    Cardboard box.

7    Q.    It wasn't in a case of any kind?

8    A.    No, sir.

9    Q.    So you just put it in the -- you put a shotgun -- it

10   was still a functioning shotgun?

11   A.    No, sir.  It was separated, barrel from receiver.

12   Q.    Oh, how did you separate it?

13   A.    That's easy.  You just unscrew it and it comes apart.

14   Q.    And then you put both of those pieces in a cardboard

15   box?

16   A.    Separate.

17   Q.    Separate.  Separate cardboard boxes?

18   A.    Yes, sir.

19   Q.    And then trash -- someone from the -- from Arizona just

20   came and took it into the trash?

21   A.    It was a private guy that would come and take away

22   volumes of garbage at the same time.  The waste management

23   people would only take two bags, so I had another guy come.

24   Q.    And at that point, had you found the original soft case

25   as well, the one that was in Bianca's bag?

2790

CROSS - RUDOLPH

1    A.    No, sir.

2    Q.    When did you find that?

3    A.    Oh, later, much later.  I couldn't give you an exact

4    date.  But I never opened it for a long time.

5    Q.    You -- so you don't remember the -- was it around the

6    time you were moving?

7    A.    No, sir.

8    Q.    Can you approximate it at all?

9    A.    No, actually, I can't.  It was quite a ways after.

10   Quite a bit of time.

11   Q.    Had you moved already, or were you still in the old

12   house?

13   A.    I was in a condo that I was renting at the time when my

14   house was under construction.

15   Q.    So you weren't at 4141 anymore?

16   A.    No.  That house had been sold.

17   Q.    So you were at the condo.  So do you remember, did you

18   go back to -- so was the soft case in the garage at 4141?

19   A.    Well, eventually when I did discover it, it was in

20   that -- in her duffel bag, which was in the garage, that's

21   correct.

22   Q.    Do you remember why you went back to look inside that

23   duffel bag?

24   A.    I do.

25   Q.    Why?

CROSS - RUDOLPH

1   A.    I needed the duffel bag.  That's the only reason I

2   opened it.

3   Q.    When you discovered the soft case inside that duffel

4   bag, what did you do with it?

5   A.    Put it back in the duffel bag.  My one that was broken,

6   I just put it in there.

7   Q.    Why did you put it back in the duffel bag?

8   A.    I don't know.  I just did.

9   Q.    So that -- we'll come back to that.

10        So I think you also said that -- on direct that, if

11  you had known you were under investigation, when you found

12  that shotgun you would have given it over to the FBI?

13  A.    Yes, sir.

14  Q.    Because you wanted to be helpful?

15  A.    I would do what my counsel told me, yes, sir.  I'd be

16  helpful.

17  Q.    Well, in 2018 you didn't have a lawyer, right?

18  A.    Oh, no, sir.

19  Q.    All right.  So you would have turned it over just

20  because it was the right thing to do?

21  A.    In 2018?  I wasn't aware, I don't think, I was under

22  investigation then.

23  Q.    Well, that's right.  But you said that if you had

24  known, you would have turned it over, right?

25  A.    Oh, if I had known?

CROSS - RUDOLPH

1    Q.    Yeah.

2    A.    Probably.

3    Q.    But you were given an opportunity to talk to the FBI in

4    April of 2017; isn't that right?

5    A.    I received a phone call, yes, sir.

6    Q.    It was an agent named Sherry Rice?

7    A.    I'll take your word for it.  I don't remember.

8    Q.    Sherry Rice called you in 2017 and asked if you could

9    come in to talk, right?

10            MR. MARKUS:  Judge, objection under the Sixth

11   Amendment.

12            THE COURT:  Mr. Fields.

13            MR. FIELDS:  The Sixth Amendment?

14            MR. MARKUS:  I'm sorry, Fifth and Sixth.

15            MR. FIELDS:  Your Honor, I don't understand the

16   Sixth Amendment objection.  As far as the Fifth Amendment

17   objection goes, he has waived that by taking the stand.

18            THE COURT:  That's correct.  What about the -- can

19   you articulate your objection about the Sixth Amendment.

20            MR. MARKUS:  Just a Fifth Amendment, Your Honor.

21   My fault for confusing.  It's been a long night.

22            THE COURT:  So are you -- is your objection based

23   only on the Fifth Amendment?

24            MR. MARKUS:  Yes, Your Honor.

25            THE COURT:  All right.  Counsel is correct, and the

CROSS - RUDOLPH

1    objection's overruled.

2    BY MR. FIELDS:

3    Q.    Special Agent Sherry Rice called you in April of 2017

4    and asked if you'd come in to talk, right?

5    A.    She did.

6    Q.    She said you could come in whenever it was convenient

7    for you, right?

8    A.    She did.

9    Q.    She said that only you could fill in a few blanks about

10   Bianca's death, right?

11   A.    My recollection, Mr. Fields, is she said to me, "We'd

12   like you to come down and talk to us so you can help us

13   prevent this type of accident from happening again."

14   Q.    Okay.  And you responded to her, "Why would I want to

15   do that?"

16        Right?

17   A.    Part of that response was, "I'm still grieving.  I'm

18   still mourning.  Do I have to come down and give you an

19   interview?"

20        And she emphatically told me no.

21   Q.    But your testimony is that in 2018, if you had known

22   you were under investigation, you would have given the FBI

23   the shotgun?

24   A.    Well, the first phone call that your agent gave to me,

25   she specifically said I was not under investigation and I

CROSS - RUDOLPH

1    did not have to come talk to her.

2    Q.    Yeah, but you could have given the shotgun to help with

3    the FBI's investigation into the circumstances of Bianca's

4    death, right?

5    A.    She did not ask me, sir.

6    Q.    But I thought you said if you had known you were under

7    investigation, you would turn over that shotgun because it

8    would help the authorities, right?

9    A.    Well, she presented her call to me, sir, as very

10   cursory.   "Can you come down and just talk to us so this can

11   prevent another accident."

12        It was not implied there was an investigation at

13   that point.

14   Q.    Well, even if there wasn't an investigation, or even if

15   they were sort of looking into the circumstances of the

16   accident, you could have volunteered that shotgun to help

17   them understand the circumstances, right?

18   A.    Didn't cross my mind.

19   Q.    And Special Agent Rice asked if you had any documents

20   related to the incident, didn't she?

21   A.    I'm sorry, sir, can you say that again?

22   Q.    Special Agent Rice, didn't she ask if you had any

23   information or documents you might be able to turn over?

24   A.    Oh, I don't recall that.

25   Q.    Didn't you tell Special Agent Rice that you would have

CROSS - RUDOLPH

1   your estate planning attorney send over some documents?

2   A.   Again, I don't recall that.

3   Q.   You never did send any documents over to the FBI, did

4   you?

5   A.   I don't recall, sir.  I don't think so.

6   Q.   And then in 2018, when you found the shotgun, that's

7   not that long after getting a call from the FBI, you didn't

8   think about taking it to the Phoenix field division of the

9   FBI?

10  A.   No, sir.

11  Q.   But didn't you say that if you knew the FBI was

12  interested, that you would turn it over?

13  A.   Well, if they were interested in investigating.  But,

14  again, that first agent gave me no inclination upon my

15  specific question, "Am I -- do I have to come down?"

16       If she had said to me, "Yes," I would have come.

17  Q.   So your testimony is that if there's an investigation

18  and it's sort of more serious, then you're more likely to

19  turn over the shotgun?

20  A.   Well, had she presented that to me in that case, I

21  would have gone down.  Had she said anything about that I

22  would have fully cooperated.

23  Q.   But when the FBI called you in 2017 and said, "Oh,

24  maybe this is a misunderstanding, maybe it's an accident,"

25  you weren't willing to give them the shotgun at that point

2796

CROSS - RUDOLPH

1   in time?

2   A.   Are you talking about the first call?

3   Q.   Yeah.

4   A.   I don't think she presented herself in that -- in that

5   fashion, sir.  She simply said, "We're voluntarily asking

6   you to come down and speak to us so that we can maybe

7   prevent this from happening again."

8        That's all she said.

9   Q.   And you declined to do that.

10  A.   Correct.

11  Q.   Now, you knew that the shotgun was an item of interest

12  to investigators, right?

13  A.   At that point?

14  Q.   Well, to investigators generally, right?  You know that

15  shotgun is important.

16  A.   At some point, yes, sir.

17  Q.   Well, the Zambians took it from you during their

18  investigation, didn't they?

19  A.   Correct.

20  Q.   So -- and you knew that they had a forensic ballistics

21  examiner take a look at it, right?

22  A.   Yes, sir.

23  Q.   So you knew that that was an item of interest to law

24  enforcement, right?

25  A.   Actually, I did not because the Zambians had ruled it

2797

CROSS - RUDOLPH

1    an accident and I assumed that there was no further
2    investigation.  There were no further issues with this.
3    Q.   So let's talk about that.  So you -- the Zambians
4    determined it was an accident?
5    A.   Yes, sir.
6    Q.   But that's because you told them it was an accident,
7    right?
8    A.   In the course of their investigation, that was my
9    assumption.  That's what we thought.  And that's what I told
10   them.  They did their investigation and ruled it an
11   accident.
12   Q.   Well, as far as their investigation goes, they weren't
13   able to contact anyone in the United States, right?
14   A.   I have no idea, sir.
15   Q.   And you knew that while they were over there.  They
16   didn't -- they didn't check you for gunpowder residue?
17   A.   At that time, sir, I wasn't thinking very much about
18   anything.
19   Q.   Do you think, given your concerns about sort of Zambian
20   jail, you would have remembered if they checked you for
21   gunpowder residue?
22   A.   If they had, I would remember.
23   Q.   Yes.
24   A.   Yes, sir.
25   Q.   So they didn't, right?

2798

CROSS - RUDOLPH

1   A.   No, sir.

2   Q.   And they didn't fingerprint you?

3   A.   No, sir.

4   Q.   They -- the interview that they did with you, how long

5   did that last?

6   A.   With me?

7   Q.   Yeah.

8   A.   Best of my recollection, over an hour.  Maybe more.

9   Q.   How long did it take them to rule that it was an

10  accident?

11  A.   A day or two.

12  Q.   So you thought that was a pretty thorough

13  investigation; in a day or two they were able to determine

14  it was an accident?

15  A.   Mr. Fields, at that point I wasn't giving anything a

16  consideration other than taking care of my wife.

17  Q.   But you knew that that shotgun was something that law

18  enforcement in Zambia was interested in.

19  A.   They took the shotgun, yes, sir.  I voluntarily gave it

20  to them, yes, sir.

21  Q.   And they examined it.

22  A.   Yes, sir.

23  Q.   Yeah.  You voluntarily gave it to them so they could

24  take a look at it?

25  A.   Yes, sir.

CROSS - RUDOLPH

1    Q.    Because it was important to their investigation?

2    A.    I would assume so, yes, sir.

3    Q.    But when Sherry Rice, the FBI in the United States,

4    with all of its resources, called you in 2017, you didn't do

5    the same thing, did you?

6    A.    She never asked me for a shotgun.  She never asked me

7    for specifics.  She just said to me, "Please come down and

8    talk to us so we can prevent another accident."

9    Q.    But if you wanted to be helpful, there was nothing

10   stopping you from volunteering that shotgun, right?

11   A.    I wasn't being unhelpful, I was simply responding to

12   her request.

13   Q.    Well, don't you think it's a little bit unhelpful not

14   to tell her that you've got the original shotgun that killed

15   your wife?

16   A.    That I did what, sir?

17   Q.    Don't you think it was a little bit unhelpful not to

18   tell her that you had the original shotgun that had killed

19   your wife?

20   A.    She never asked me, sir.

21   Q.    I understand that.  But there was nothing stopping you,

22   knowing that it's important to Zambian law enforcement, from

23   volunteering it to the FBI, right?

24   A.    Well, I never -- I never considered that after her

25   phone call, or during it, that I should do A, B, or C.  I

CROSS - RUDOLPH

1    was responding to what she asked me.

2    Q.    In 2018, when you say you found the shotgun and if you

3    knew you were under investigation, you would have been

4    helpful, right?

5    A.    Yes.  If I was under investigation, yes, sir.

6    Q.    So in 2017 when you get a call from the FBI, you don't

7    think that that's part of an investigation?

8         MR. MARKUS:  Judge, objection.  Asked and answered

9    now four times, I think.

10        THE COURT:  Sustained.

11    BY MR. FIELDS:

12    Q.    So the shotgun, you knew that it was an item of

13    interest to law enforcement because the Zambians had taken a

14    look at it.  You also knew it was probably of interest

15    because Otto Westhassel asked you about it, didn't he?

16    A.    I don't recall what Otto asked me.

17    Q.    And the original shotgun, as we've heard throughout

18    this trial, is the one that would have made toolmarks on the

19    shot shell that was found at the scene?

20    A.    I apologize, say that again, sir.

21    Q.    The -- you remember all the testimony we've heard

22    during this trial about toolmarks?

23    A.    Yes, sir.

24    Q.    That original shotgun is the shotgun that would have

25    made toolmarks on the cartridge that was found at the scene,

2801
CROSS - RUDOLPH

1    right?

2    A.   I would suppose so.

3    Q.   And that original shotgun could have been examined by

4    an expert here in the United States.

5    A.   I suppose so, yes, sir.

6    Q.   And it could have been test-fired.

7    A.   Yes, sir.

8    Q.   Now the -- the soft case, I think it's Government's

9    Exhibit 201, is it -- is it over there, Ms.  Guerra?  May I

10   see -- may I see it?  Up here, if you don't mind.

11            So, Mr. Rudolph, this is the -- this is the

12   original case, right?

13   A.   Yes, sir.

14   Q.   This is the one you found in the -- Bianca's duffel

15   bag?

16   A.   Her duffel bag, yes, sir.

17   Q.   And when you found it, it was completely ruined, right?

18   The end was destroyed?

19   A.   Yes, sir.

20   Q.   Would you want to use this again?

21   A.   No, sir.

22   Q.   So you had no use for it.

23   A.   No, sir.

24   Q.   But when you had the shotgun -- when you found the

25   shotgun, it was a perfectly functional shotgun when you

2802

CROSS - RUDOLPH

1    found it, right, in 2018?

2    A.    I don't know if it was perfectly functional, but it was

3    there.

4    Q.    You threw that away, right?

5    A.    Yes, sir.

6    Q.    But you kept this case with the end blown out that

7    can't be used at all?

8    A.    I did, yes, sir.

9    Q.    And you gave this to investigators, right?

10   A.    I did.

11   Q.    Because you thought it might be good to turn something

12   over, right?

13   A.    No, sir.  I was asked about this and I -- from counsel,

14   and I produced it.

15   Q.    This -- the original shotgun, how much was that worth?

16   A.    I don't know.  Guess, maybe 6-, $700.

17   Q.    It was a limited edition, right?  Only 500 like it in

18   the world.

19   A.    Yes, sir.

20   Q.    And in 2016, by that point in time, Browning had

21   stopped making those, right?

22   A.    I had no idea.

23   Q.    It was a nice shotgun?

24   A.    I have -- I'm not a gun guy.  I assume it could be

25   called that, but yeah.

CROSS - RUDOLPH

1    Q.    You're not a gun guy?

2    A.    I'm not a firearms collector, no.

3    Q.    But you know firearms can be valuable, right?

4    A.    Sure.

5    Q.    They can be bought and they can be sold?

6    A.    Yes, sir.

7    Q.    Why didn't you just sell it?

8    A.    I wanted it out of my sight.  I didn't want to look at

9    it.  I didn't want to deal with it.

10   Q.    Yeah, but you could have accomplished that by selling

11   it, right?

12   A.    Mr. Fields, I didn't need the money and I wasn't going

13   to go through the process.

14   Q.    So instead of selling it, you threw it in the trash.

15   A.    Correct.

16   Q.    And putting it in a dump kind of looks like you're

17   hiding evidence, doesn't it?

18   A.    No, sir.

19   Q.    Now, this 2017 call from Special Agent Rice, at that

20   point in time you knew that the FBI at least was interested

21   in asking you some questions.

22   A.    They didn't say "questions."  They wanted to find out

23   about the way we could prevent another accident.  That's how

24   it was presented to me.

25   Q.    So the FBI calls you.  And you know, as you've learned

CROSS - RUDOLPH

1    throughout this trial, that it's important to preserve

2    evidence?

3    A.    Well, at the time I didn't know it was a subject of

4    evidence.

5    Q.    Did you ever, at any point in time, preserve all of

6    your emails with Lori?

7    A.    Preserve them?

8    Q.    Yeah.

9    A.    I didn't delete any, so yes, sir.

10   Q.    And you've preserved all of your texts with Lori?

11   A.    I can't be positive, no, sir.

12   Q.    Do you routinely delete them?

13   A.    Routinely.

14   Q.    Did you check your phone?  How many texts do you have

15   from that time period?

16   A.    Oh, I don't know.  I routinely would delete emails and

17   text messages.

18   Q.    How routinely?

19   A.    Sorry?

20   Q.    How routinely?

21   A.    Weekly.

22   Q.    So FBI calls -- sounds like we dispute exactly what

23   they told you about -- but you get a call from the FBI, you

24   don't think to preserve all of your emails from that time

25   period?

2805

CROSS - RUDOLPH

1    A.    No, sir.

2    Q.    You don't think to preserve all of your text messages?

3    A.    No, sir.

4    Q.    Instead, you preserve this crusty gun case that's blown

5    out and useless?

6    A.    I just left it in the storage, that's all.

7    Q.    And you provide the Government with this gun case, but

8    you don't provide your emails with Lori.

9    A.    If they were asked for and I had them, I'm sure counsel

10   would have provided them, yes.

11   Q.    So you would only volunteer specifically what you were

12   asked for?

13   A.    Yes, sir.

14   Q.    Why not volunteer anything more than that to show your

15   innocence?

16   A.    Well, again, I didn't think I was a subject of an

17   investigation, sir.

18   Q.    Well, now we're talking about, like, in the course of

19   this litigation, you turned over this shotgun case, right?

20   A.    Yes, sir.

21   Q.    Why didn't you turn over your emails with Lori?

22   A.    I don't recall being asked for them.

23   Q.    Do you remember -- recall being specifically asked

24   about the shotgun case?

25   A.    No, sir.

CROSS - RUDOLPH

1    Q.    Okay.  So you weren't asked specifically about the

2    shotgun case, but you turned that over.

3    A.    When it was requested of me, yes, sir.

4    Q.    Okay.  So now you think it was specifically

5    requested?

6    A.    The case, I believe so.  Yes, sir.

7    Q.    All right.  So we've also heard a lot about clothing in

8    this case.  After you were contacted by the FBI in 2017, did

9    you save the clothes you had been wearing in Zambia?

10   A.    I apologize, did I what, sir?

11   Q.    Did you save the clothes you had been wearing in

12   Zambia?

13   A.    My clothes?

14   Q.    Yeah.

15   A.    I couldn't recall that, sir.

16   Q.    What about the shoes you were wearing in Zambia?  Did

17   you save those?

18   A.    I may have.  I'm not sure.  I may have.

19   Q.    Where are they?

20   A.    I don't know.

21   Q.    So, again, you turned over this gun case that's not

22   very useful for holding a gun, but you didn't turn over the

23   shoes that have been talked about in court here for the past

24   three weeks?

25   A.    No one asked me for shoes, sir.

2807

CROSS - RUDOLPH

1    Q.    Let's look at Government's Exhibit 16, page 1.  Let's
2    zoom in on the shoes.
3             You remember your attorneys asking about the blood
4    on your shoes?
5    A.    Yes, sir.
6    Q.    Now, those soles are pretty dark, right?  The soles of
7    your shoes?
8    A.    Yes, sir.
9    Q.    This photograph, it was taken after you had called out
10   for Mark's help and after you had left the cabin, right?
11   A.    Yes, sir.
12   Q.    So you probably walked through that blood a couple of
13   times?
14   A.    I don't know if I walked through it or around it.  I
15   have no memory of that, sir.
16   Q.    But by the time this photograph had been taken, you'd
17   walked back and forth on the floor a couple of times?
18   A.    I could have.  It's possible.  I remember they took me
19   outside of the cabin and restrained me for a good bit of the
20   time, too.
21   Q.    So it's possible to walk across that floor without
22   getting any blood on your shoes?
23   A.    I suppose.
24   Q.    Let's take that down.
25             Now I think -- well, you tell us.  So you took your

CROSS - RUDOLPH

1   morning coffee that morning and you went to the bathroom?

2   A.   My second cup, yes, sir.

3   Q.   And that's when you heard the shot?

4   A.   Yes, sir.

5   Q.   What did you do after you heard the shot?

6   A.   Well, I got up off the toilet and opened the door and

7   found my wife, saw her there.

8   Q.   Yeah.  You pulled up your pants, too, right?

9   A.   Yes, sir.

10  Q.   And I think, you know, you said you stood there in

11  shock for a little while?

12  A.   Yeah, I did.

13  Q.   What was your mental state like at that time?

14  A.   Gone.

15  Q.   So you probably weren't really thinking too much,

16  right?

17  A.   Probably what, sir?

18  Q.   You probably weren't thinking very clearly?

19  A.   No, sir, I was in a little bit of shock.

20  Q.   Do you think it was like a pretty frantic time?

21  A.   I don't know.  I couldn't -- I still replay that in my

22  head.

23  Q.   Let's look back at Government's 16, page 1.  Let's zoom

24  in up here at the top.

25          So it sounds like you heard the shot, you quickly

CROSS - RUDOLPH

1    pulled up your pants, and then you were pretty frantic.  But

2    then you had the peace of mind to tuck in your shirt

3    perfectly for this photograph of you over your dead wife?

4    A.    I don't know at what point I tucked my shirt in,

5    Mr. Fields.

6    Q.    All right.  We can take that down.

7              So let's talk about this -- this flight in 2020.

8    Do you remember talking about that?

9    A.    I apologize again, I'm not --

10   Q.    It's okay, I'm not talking directly into the mic,

11   so --

12   A.    Which flight, sir?

13   Q.    Do you remember the flight you were talking about?  It

14   was in 2020, to, I believe it was, the Dallas convention.

15   A.    Yes.  Yes.

16   Q.    And remind us, what happened with the lady next to you

17   on that night.

18   A.    Well, Lori was with me, and we were just chitchatting

19   about going to convention and hunting and related things.

20   And the lady next to her kind of interjected into our

21   conversation, and she began to talk to us about hunting.

22   Q.    And I think you testified on direct that that

23   conversation had a little bit more salience in your mind

24   based on subsequent events?

25   A.    Yeah.  At the time I thought it was a little strange

CROSS - RUDOLPH

1   she would inject herself about hunting into our

2   conversation.

3   Q.   And what were the subsequent events that caused that

4   conversation to have a little bit more sort of -- make it

5   more memorable for you?

6   A.   In that conversation, she went on to tell me that

7   her -- I believe boyfriend, husband, was interested in a

8   lion hunt and did I know anything about that.

9   Q.   So -- but I'm -- I think based on -- so what happened

10  at the convention?  What did you learn at the convention?

11  A.   Well, I learned that the FBI had been to Zambia

12  sometime in 2019, interviewed staff, and I guess were doing

13  an investigation.

14  Q.   So at that point in time, we can agree you were under

15  investigation?

16  A.   On -- not formally, no.  I knew -- other than them

17  telling me about it I hadn't been notified of anything.

18  Q.   Well, but it sounds like Mark told you that they were

19  investigating.

20  A.   He said they were there in Zambia, yes, sir.

21  Q.   And that's what you remember him telling you in --

22  at -- in January of 2020?

23  A.   Yes, sir.  January -- yeah, it was January.

24  Q.   So at that point did you take the soft case over to the

25  FBI?

CROSS - RUDOLPH

1    A.    No, sir.

2    Q.    Why not?

3    A.    Didn't think about it.

4    Q.    Did you go to the FBI and tell them that you'd put a

5    shotgun in the trash?

6    A.    No, sir.

7    Q.    Why not?

8    A.    I didn't think about it.

9    Q.    Didn't you say when you found the original shotgun in

10   2018, if you had known you were under investigation you

11   would have turned it over?

12   A.    If they'd contacted me and said, "Can we have your

13   shotgun," yes.

14   Q.    All right.  And was it -- based on those subsequent

15   events, Mark telling you that you were under investigation,

16   is that what made the conversation on the airplane more

17   memorable?

18   A.    It was a bit of it, yes, sir.  At the time, it didn't

19   click, but later on it did.

20   Q.    When -- what clicked, and when?

21   A.    Well, I talked to the dad, too.  I called Pieter.

22   Pieter was partners with the guy that -- excuse me, the man

23   that owned the camp, and he also told me of that scenario as

24   well.  And I just -- I thought, okay, but I quickly put it

25   aside.

CROSS - RUDOLPH

1    Q.    What scenario?

2    A.    That the FBI was in Zambia talking to staff.

3    Q.    Oh, okay.  But I still don't understand exactly why is

4    it that these conversations at the Safari Club convention,

5    did those make the conversations on the airplane stand out?

6    A.    Well, it's very strange -- in the hunting world, people

7    are very private, quiet.  Most of us don't even talk about

8    hunting with strangers, for obvious reasons.  We don't know

9    what their bias is, what their likes and dislikes are.  So

10   we avoid talking to people that we don't know about hunting.

11          She didn't seem to have that in her.  She was --

12   she was more engaged than I remember most people being.

13   Q.    So what did you think about those people on the

14   airplane after January 2020?

15   A.    I didn't connect it that much, not really.

16   Q.    But I think you've been saying that it stood out to

17   you.  So what stood out to you about it?  Why?

18   A.    Well, because she -- she was just so open about

19   hunting, and I thought that in and of itself was a little

20   weird; a little strange.

21   Q.    Okay.  And what conclusion did you draw from the fact

22   that that was weird?

23   A.    Conclusion?

24   Q.    Yeah.

25   A.    Maybe she was a little rude.  I don't know.

CROSS - RUDOLPH

1    Q.    So even though you thought she was a little rude, did

2    you meet with her again?

3    A.    Yes.

4    Q.    When?

5    A.    Yes.  Oh, I believe it was -- I'm thinking July.

6    Sometime in the summer.

7    Q.    Of 2020?

8    A.    I believe so, yes, sir.

9    Q.    If I told you it was August 2020, do you think that's

10   probably about right?

11   A.    Sure.

12   Q.    So even though she was weird and even though she was

13   rude, you met with her again?

14   A.    Yes.  She told me she would bring her -- I believe

15   fiancé with her and they were interested in talking about

16   hunting.

17   Q.    Why did you meet with them again even though it was

18   weird and even though these people didn't seem to abide by

19   sort of the code you talked about about --

20   A.    Well, they seemed to have a genuine interest at that

21   point in pursuing a lion hunt specifically.

22   Q.    Did you draw any connection between these people on the

23   plane and the investigation?

24   A.    No, sir.  Not really, no.

25   Q.    All right.  So you gave a statement to the police in

CROSS - RUDOLPH

1   Zambia, right?

2   A.    I did.  Yes, sir.

3   Q.    Would you agree Zambia's a relatively poor country?

4   A.    Yeah, by African standards it's average, but by our

5   standards it's a poor country.

6   Q.    That police station in Mumbwa is pretty small, isn't

7   it?

8   A.    Yes, sir.

9   Q.    There's a hand pump outside for people to get their

10   water?

11   A.    Probably.

12   Q.    And it's a pretty busy station, right?

13   A.    I couldn't comment on how busy they are.

14   Q.    Well, when you got there, were there a lot of people

15   milling around?

16   A.    I don't recall.

17   Q.    Now, Mark told you you needed to go to the police to

18   make a statement, right?

19   A.    He did.

20   Q.    You knew you couldn't just leave without reporting it,

21   right?

22   A.    Correct.

23   Q.    So you did give them a statement, right?

24   A.    I did, sir.

25   Q.    And I think you said during your direct that you gave a

2815

CROSS - RUDOLPH

1  statement, but someone else was writing it down?

2  A.    The what, sir?

3  Q.    You gave the statement but someone else was writing it

4  down?

5  A.    I believe so, yes, sir.

6  Q.    Did you sign it?

7  A.    I think so, yes, sir.

8  Q.    Let's go to Government's Exhibit -- page 2,

9  Government's Exhibit 18.

10          Do you see your signature on that page?

11  A.    Yes, sir.

12  Q.    And what were you doing by signing it?

13  A.    Affirming the statement, agreeing to it.

14  Q.    We can take that down.

15          Now, you know from your time in Safari Club that

16  wildlife crimes are taken pretty seriously in these

17  countries, right?

18  A.    Yeah, they can be.  Yes, sir.

19  Q.    Because poaching is a pretty big concern?

20  A.    Different areas, different concerns.

21  Q.    Yeah, but in Kafue, the areas around the national

22  parks, there's poaching?

23  A.    Somewhat, yes, sir.

24  Q.    And the money from all the hunting and all the sort of

25  resources put into it will sometimes give those wildlife

CROSS - RUDOLPH

1    investigators a bit more resources, right?

2    A.    I don't know how the money's transferred to wildlife

3    investigators or anti-poaching.  I just have a little

4    knowledge of what happens inside the game management area.

5    Q.    So -- but you know from your time at SCI sort of what

6    sort of conservation efforts are done in these countries,

7    right?

8    A.    Generally.  Not specifically.

9    Q.    And you know about the anti-poaching efforts?

10   A.    In some countries, a little.

11   Q.    Did you know anything about them in Zambia?

12   A.    Not really, no.

13   Q.    Did you know that sometimes these wildlife

14   investigators, they actually get trained here in the United

15   States?

16   A.    I had no idea.

17   Q.    Or they can get training from anti-poaching NGOs,

18   nongovernmental organizations?

19   A.    Again, I'm not aware of that.

20   Q.    And one of those investigators was in the parking lot

21   when you got to the police station; isn't that right?

22   A.    At the time, I'm -- I wasn't aware he was a wildlife

23   investigator, no, sir.

24   Q.    And I think you said on direct that you didn't

25   recognize Musese?

CROSS - RUDOLPH

1    A.    Correct.

2    Q.    But as the president of SCI, you met with a lot of

3    wildlife officials, right?

4    A.    Actually, no.

5    Q.    You never met with wildlife officials in your capacity

6    as president of Safari Club International?

7    A.    Very rarely.

8    Q.    So if Musese said he met you before through your

9    capacity at SCI, he would be wrong?

10    A.    Oh, I never met that gentleman through SCI or at SCI,

11    no, sir.

12    Q.    So the first time you recognized him was here in court?

13    A.    Yes, sir.

14    Q.    Did you recognize Francis Jani?

15    A.    Yes, sir.

16    Q.    Did you recognize Boyd Malama?

17    A.    Yes, sir.

18    Q.    How many investigators were there working on your

19    wife's death?

20    A.    At what point, Mr. Fields?

21    Q.    While they went out to the scene to actually look at

22    the body.

23    A.    At the camp?

24    Q.    Yeah.

25    A.    I recall somewhere around a dozen.

2818

CROSS - RUDOLPH

1    Q.    Okay.

2    A.    Maybe 13.

3    Q.    Do you recognize them all?

4    A.    No, sir.

5    Q.    So the fact that you don't recognize Musese doesn't

6    mean very much, right?

7    A.    Well, I wasn't really in a very sharp frame of mind

8    that day, Mr. Fields.

9    Q.    Yeah.  Right.  So the fact that you didn't recognize

10   him here in court today doesn't mean very much then, right?

11   A.    I could -- yeah, that's correct.

12   Q.    Now Musese, you remember when he testified he said he'd

13   been trained in the United States, right?

14   A.    Yes, sir, I heard that.  Yes, sir.

15   Q.    So he had a little bit more training than some of the

16   Zambian police officers, right?

17   A.    I can't make that comment, sir.

18   Q.    And he was the one investigator that you didn't want to

19   talk to, right?

20   A.    No, that's not accurate.

21   Q.    You evaded his questioning?

22   A.    No, sir.

23   Q.    You made sure that you didn't have to give him a very

24   direct statement?

25   A.    No, sir.

CROSS - RUDOLPH

1    Q.    Now, we've already talked about this.  The FBI has way

2    more resources than Zambia investigators, right?

3    A.    I would assume so, yes, sir.

4    Q.    They can conduct really thorough investigations?

5    A.    Say again.

6    Q.    They can conduct really thorough investigations?

7    A.    I believe so, yes, sir.

8    Q.    And they have access to evidence in the United States.

9    A.    I apologize.

10   Q.    It's okay.  I'm -- I'll try to do a better job talking

11   into the microphone.

12   A.    It's not you, it's me.

13   Q.    They can gather evidence that's in the United States.

14   A.    In the United States?

15   Q.    Yeah.

16   A.    Yes, sir.

17   Q.    And so you didn't want to talk to them either in 2017,

18   right?

19   A.    Again, Mr. Fields, I was asked voluntarily to come down

20   and speak with them about preventing another accident, and I

21   declined that voluntary request.

22   Q.    Insurance companies, they can have a lot of resources,

23   too, right?

24   A.    I would assume so.  That they have resources?

25   Q.    Yeah.

2820

CROSS - RUDOLPH

1    A.   I would assume so.

2    Q.   Millions of dollars, right?

3    A.   I would assume so.

4    Q.   They can hire investigators.

5    A.   They do, yes, sir.

6    Q.   And they did hire private investigators here, right?

7    A.   I believe so, yes, sir.

8    Q.   Do you remember an investigator named Andi Murphy

9    calling you in December of 2016?

10   A.   I remember the name; I don't remember the date.

11   Q.   And when she called, you picked up the phone, right?

12   A.   Yes, sir.

13   Q.   She identified herself as an investigator, right?

14   A.   Yes, sir.

15   Q.   And then you hung up on her, right?

16   A.   I don't recall hanging up on the woman.  If you say I

17   did, I did, but I was not trying to avoid her.

18            I didn't know what she was an investigator for.  I

19   don't know, Mr. Fields.

20   Q.   And then she had to leave you a voicemail?

21   A.   I guess so.  Probably.

22   Q.   So you didn't have to talk to her directly, right?

23   A.   That was not my intention, no, sir.

24   Q.   You didn't have to give her a direct statement?

25   A.   That was not my intention, no, sir.

CROSS - RUDOLPH

1   Q.   Just like you didn't have to give Special Agent Sherry

2   Rice a direct statement.

3   A.   Not my intention --

4           MR. MARKUS:   I'm going to object again.  He's now

5   asked -- nine times he's asked about Sherry Rice.

6           THE COURT:   Ask another question.

7   BY MR. FIELDS:

8   Q.   Now, the U.S. Embassy in Lusaka also has a lot of

9   resources, right?

10  A.   You're asking me if they do?

11  Q.   Yeah.

12  A.   In Lusaka?

13  Q.   Yeah.

14  A.   I don't know what their capacity is, Mr. Fields.

15  Q.   Well, you saw the U.S. Embassy in Lusaka when you were

16  there on the sort of fence with Otto, right?

17  A.   From the outside.

18  Q.   It's a pretty imposing building.

19  A.   It's a government building, yes, sir.

20  Q.   Yeah.   Looks a lot nicer than a lot of the other

21  buildings in Lusaka, right?

22  A.   I never noticed that, sir.

23  Q.   Sort of a symbol of American prosperity?

24  A.   I would assume so, but, again, at that stage of the

25  time I didn't notice architectural design.

CROSS - RUDOLPH

1    Q.    The Embassy would have investigators who were trained

2    in the United States, right?

3    A.    I have no idea.

4    Q.    The Embassy could have contacted the FBI, right?

5    A.    I suppose.  I don't know.

6    Q.    They could have used their resources to potentially

7    help the Zambian authorities, right?

8    A.    Again, I suppose.  I have no way of knowing that

9    directly.

10   Q.    You waited as long as you could before contacting them,

11   right?

12   A.    Contacting who, sir?

13   Q.    The Embassy.

14   A.    As long as I could?

15   Q.    Yeah.

16   A.    I think it was either that day or the next day.

17   Q.    When you got to Mumbwa and you had cell phone

18   reception, you didn't call the Embassy?

19   A.    I remember calling the Embassy.  I believe it was

20   either the same day of my wife's death or the next day.

21   Q.    Yeah.  It was much later that evening, right?

22   A.    I can't remember, but I'll take your word for it.

23   Q.    You didn't call them before you went back out to the

24   scene with all the Zambian investigators?

25   A.    No, sir.  We were still -- we were still out in Mumbwa

2823

CROSS - RUDOLPH

1   at that point.

2   Q.   Because if you had called the Embassy while you were in

3   Mumbwa, the Embassy could have gotten involved in the

4   investigation, right?

5   A.   I -- I don't know.  Again, that wasn't foremost on my

6   mind at that point.  My wife was still lying dead in a

7   cabin.  I hadn't considered calling the Embassy, sir.

8   Q.   You don't think the Embassy might have been helpful

9   during your interview at the Zambian police?

10  A.   I didn't ask for the Embassy or counsel.  I just gave

11  them a voluntary interview.

12  Q.   Didn't you say yesterday you were a little bit

13  concerned about ending up in a Zambian jail?

14  A.   Well, at the end of the day, yes, sir.  But not about

15  that.

16  Q.   Not about what?

17  A.   Well, you can end up in a Zambian jail for just about

18  anything, but that wasn't going through my mind.

19  Q.   So you're saying that that wasn't your testimony on

20  direct yesterday, that you weren't concerned about going to

21  Zambian jail because of your wife's death?

22  A.   Always a concern.  But that wasn't first and foremost

23  on my mind.  That's what I'm saying.

24  Q.   And you said you were, like, so concerned because you

25  think Zambia, you know, you wouldn't get basic human rights

2824

CROSS - RUDOLPH

1    in Zambia.

2    A.    That's true.

3    Q.    So that would be pretty disturbing.

4    A.    If you went inside a Zambian jail, it would be bad,

5    yes, sir.

6    Q.    So you didn't think to call the Embassy for help before

7    walking into a Zambian police station to give an interview

8    about your wife's death?

9    A.    No, sir.

10   Q.    Now let's talk about this call with Otto Westhassel.

11   Remind us again what happened on that first call.

12   A.    I was using Mark's phone because I don't have Zambian

13   cell service, and I called the Embassy.  I -- again, I think

14   I asked for the ambassador.  I didn't know who else to ask

15   for.  And they routed me to Otto Westhassel.

16   Q.    What happened on the call?

17   A.    Well, it was a very short call.  I explained to him

18   very briefly that there had been an accident in a safari

19   camp and my wife had been killed and I didn't know what to

20   do.  I didn't know how to proceed and could he help me.

21         And his first words to me were, "This is worse than

22   Cecil the lion, and it's going to be bad for Zambian

23   tourism."

24   Q.    Did he explain why, as an American official in consular

25   affairs providing services to Americans, he would be

CROSS - RUDOLPH

1    concerned about Zambian tourism?

2    A.    Exactly.

3    Q.    Did he explain why he was concerned about Zambian

4    tourism?

5    A.    No, sir.

6    Q.    Did you ask him?

7    A.    No, sir.

8    Q.    Does it strike you as a little bit odd that he might

9    say something like that?

10   A.    Past odd.

11   Q.    And you didn't say on direct.  Did you actually ask him

12   about cremation on that first call?

13   A.    Say again, sir.

14   Q.    You didn't say anything about this on direct.  Did you

15   ask him during that first phone call about cremation?

16   A.    I don't recall that.  It was a very short call.

17   Q.    Is it fair to say that you wanted Bianca to be cremated

18   as quickly as you could?

19   A.    Yes, sir.  I wanted to get home to my kids and take

20   care of my wife according to her last wishes.

21   Q.    And you wanted help from Otto getting your wife

22   cremated.

23   A.    At some point I probably did ask him how the process

24   could be facilitated; who to talk to.

25   Q.    And you wanted her cremated before it could be examined

CROSS - RUDOLPH

1    by anyone, right?

2    A.    No, sir.

3    Q.    And you found out eventually that American

4    investigators were able to take photographs, right?

5    A.    I don't know if they were investigators, but they --

6    yes, they took photographs of my wife in the mortuary.

7    Q.    And you called immediately after you found out.

8    A.    I -- quickly, yes.

9    Q.    And you asked for those photographs to be destroyed.

10    A.    I asked the -- Mr. Westhassel where those photographs

11    would be maintained; who had access to them.  Could they be

12    requested?  Could they end up on the internet?

13            My wife's privacy and her dignity had been

14    violated, and I didn't know what he was going to do with

15    them.

16    Q.    Did you ask him to destroy them?

17    A.    That I don't recall.

18    Q.    Did you ask him to remove them from government

19    repositories?

20    A.    I don't recall that, no, sir.

21    Q.    Now, the American Embassy isn't TMZ, is it?

22    A.    I'm sorry?

23    Q.    The American Embassy, it's not TMZ?

24    A.    TMZ?

25    Q.    Yeah.  Do you remember the questions about sort of TMZ

2827

CROSS - RUDOLPH

1   or the --

2   A.   The television program?

3   Q.   Yeah.

4   A.   Well, in perspective, Mr. Fields, I wouldn't think the

5   American Embassy would ask me about Cecil the lion either.

6   Q.   That's not my question, Mr. Rudolph.  My question was:

7   Did you think the American Embassy was like TMZ or the

8   National Enquirer?

9   A.   I had no idea.

10  Q.   Did you have any reason to think that an Embassy

11  official would post photos -- autopsy photos of your wife on

12  the internet?

13  A.   I had no idea.

14  Q.   You thought that was possible?

15  A.   Yes, sir.

16  Q.   During that call, you tried to intimidate Otto, didn't

17  you?

18  A.   No, sir.

19  Q.   You had looked up his background?

20  A.   Mark and I looked up his background because when he

21  made the Cecil the lion comment and the Zambian tourism, the

22  only thought we had was he must be an active anti-hunter.

23  Q.   You knew where he'd previously been posted?

24  A.   Just what was on Facebook.

25  Q.   When you called him, you wanted him to know who he was

CROSS - RUDOLPH

1    dealing with, right?

2    A.    No, sir.

3    Q.    Someone with the resources to know his entire

4    background, right?

5    A.    I don't know if Facebook is resources, but yes, sir.

6    Q.    And after that, you sent him a LinkedIn invitation?

7    A.    I think it was Mark.  I don't know how to use LinkedIn

8    very well.

9    Q.    Mark using your account?

10   A.    Yes, sir.

11   Q.    So that way Otto would know that you were keeping tabs

12   on him, right?

13   A.    I was receiving what, sir?

14   Q.    That way Otto would know you were keeping tabs on him.

15   A.    Oh, no, that was not my intention.

16   Q.    You wanted him to be afraid of you, didn't you?

17   A.    No, sir.

18   Q.    You wanted to intimidate him?

19   A.    No, sir.

20   Q.    To stop him from investigating you?

21   A.    No, sir.

22   Q.    And when you met with him on -- at Ambassador

23   St. Ann's, he asked you a lot of questions?

24   A.    I -- I suppose a few.  I can't recall a lot.

25   Q.    And when you met with him, you tried to conceal

2829

CROSS - RUDOLPH

1    information about that shotgun, right?

2    A.   Not that I -- no, sir, not that I'm aware of.

3    Q.   You told him that the shotgun you had been carrying on

4    that hunt for 12 days was a shotgun that you didn't

5    remember.

6    A.   Perhaps I meant that I never used.

7    Q.   You wouldn't tell him what the make or model of that

8    shotgun was?

9    A.   I don't know if he asked me, sir.

10   Q.   You tried to tell him that it was an antique.

11   A.   That never happened.

12   Q.   Because the shotgun -- I mean, it wasn't a

13   muzzle-loader, right?

14   A.   No, sir.

15   Q.   And you also tried to convince Otto that maybe Bianca

16   had committed suicide?

17   A.   I did not, sir.

18   Q.   You implied that she had other issues that she was

19   dealing with.

20   A.   No, sir.

21   Q.   And you were invited to go into the Embassy multiple

22   times, right?

23   A.   Not that I recall, sir, no.

24   Q.   But you never went inside?

25   A.   The only time I met Mr. Westhassel near the Embassy, he

CROSS - RUDOLPH

1  insisted we meet him in the courtyard downstairs outside of

2  the Embassy.

3  Q.   All right.  So we've talked about this original shotgun

4  a lot.   I think your testimony on direct was that you wanted

5  to leave it in Zambia?

6  A.   Yes, sir.

7  Q.   And so what was the original plan for leaving it in

8  Zambia?

9  A.   Well, because Mark only had one shotgun available to

10  him, when we made our plans to go back I told him I had a

11  shotgun, I would bring it over.  If he could arrange for

12  permitting, I would just leave it with him.  He could have

13  another one.  And he said fine.

14  Q.   And I think you testified on direct that you really

15  didn't want to take that shotgun back with you to the United

16  States, right?

17  A.   No, sir.

18  Q.   Well, remind us why.

19  A.   Well, again, I didn't want it.  I wanted to leave it

20  with Mark.  That was the original plan.

21  Q.   But you couldn't, right?

22  A.   No.  Because he didn't get the permit I had to take the

23  gun home.

24  Q.   Why didn't you ask the Embassy if they could take it

25  for you?

2831

CROSS - RUDOLPH

1     A.    Never thought about it.

2     Q.    Now Bianca's brother, Ralph, is a lawyer, right?

3     A.    Yes, sir.

4     Q.    So is your cousin, Anthony?

5     A.    Yes, sir.

6     Q.    They're both partners at big law firms?

7     A.    I believe so, yes, sir.

8     Q.    They have a lot of resources.

9     A.    I would assume so, yes, sir.

10    Q.    And they have pretty extensive connections with other

11    professionals?

12    A.    I would assume so, yes, sir.

13    Q.    And they're both really smart.

14    A.    Smarter than me.

15    Q.    They're both very diligent?

16    A.    Yes, sir.

17    Q.    And you promised Ralph at the memorial service you

18    would tell him anything he wanted to know, right?

19    A.    I believe I did, yes, sir.

20    Q.    And he did ask you for more information, right?

21    A.    He did.

22    Q.    Because he was Bianca's brother?

23    A.    Yes, sir.

24    Q.    And he wanted closure.

25    A.    Yes, sir.  I believe he did.

CROSS - RUDOLPH

1    Q.    And you probably felt like you owed him a little bit of

2    closure.

3    A.    Well, I felt that since I told him it was an accident,

4    that that should have been accepted as my word.  To see it

5    in writing, which he could have had seen it, it would have

6    confirmed what exactly I told him.

7    Q.    Well, let's pull up Government's Exhibit 44, page 2.

8    And now let's look at the bottom email there.

9          Did you send that email?

10   A.    Yes, sir.  Yes, sir.

11   Q.    Who did you send it to?

12   A.    Ralph.

13   Q.    And you said at the time that you were in Jackson Hole?

14   A.    That's correct.

15   Q.    Who were you in Jackson Hole with?

16   A.    I assume Lori.

17   Q.    And you said, "I will follow up with the documentation

18   you requested."

19   A.    That's what the email says, yes, sir.

20   Q.    But he had to follow up with you about a month later,

21   right?

22   A.    He did.

23   Q.    Then he had to follow up with you a few weeks after

24   that.

25   A.    He did.

CROSS - RUDOLPH

1   Q.   And a few weeks after that.  He had to follow up with

2   you three times.

3   A.   I'll take your word for it, yes, sir.

4   Q.   Even though you told him in July that you'd send the

5   document -- let's -- actually, let's zoom out of this a

6   little bit.  So let's zoom in here.  Let's go back to page

7   1.  And now if we look here -- let's look at the top email

8   there.

9        Did you send that email to Ralph?

10  A.   Yes, sir.

11  Q.   So you had told him in July in one of these earlier

12  emails that you would send him documents, right?

13  A.   That's correct.

14  Q.   And you had told him at the funeral you would tell him

15  anything that he wanted to know.

16  A.   That's correct.

17  Q.   But here you told him, "I will not release any

18  documents that for any reason may ultimately become public."

19       Right?

20  A.   That's correct.

21  Q.   Is it fair to say that, you know, Ralph was family?

22  A.   Ralph and I were never close.

23  Q.   Well, but he was -- he was your wife's brother, right?

24  A.   Yes, sir.

25  Q.   So he was -- he was grieving.

CROSS - RUDOLPH

1    A.    Yes, sir.  So was I.

2    Q.    Probably trying to figure out everything that was

3    happening.

4    A.    Well, I suppose, yes, sir.

5    Q.    And you refused to give him those documents that you

6    had promised him, right?

7    A.    I didn't want to give him the documents, sir.

8    Q.    You didn't give them to him.

9    A.    I did not.

10   Q.    Were you concerned that Bianca's brother would post

11   them on the internet?

12   A.    That wasn't a big concern; not really.

13   Q.    So let's look at Government's Exhibit 18.

14         This is your statement to the Zambian police?

15   A.    Yes, sir.

16   Q.    Now, I think we've already confirmed that you signed

17   this, right?

18   A.    Yes, sir.

19   Q.    Let's zoom in -- let's zoom in there, if we can.

20         Ms.  Guerra, while we're here, may I give you this

21   soft case back?

22         All right, so you told the Zambian authorities, is

23   it right, that you went to the bath?

24   A.    Yeah, I'm -- I apologize, I'm -- okay, there you go.  I

25   have a little trouble reading his writing.  "I went to

CROSS - RUDOLPH

1    bath."

2             I don't know what the next word says.

3    Q.    If you want to keep reading, please go ahead.

4    A.    I'm sorry?

5    Q.    If you want to keep reading.

6    A.    Yeah, what's it say after "bath"?  I can't read that.

7    Q.    Some parts of it are a little bit hard to make out.

8    But you did tell them that you went to the bath, right?

9    A.    I told them I was in the bathroom, yes, sir.

10   Q.    That's not what you told Ralph, right?

11   A.    That's his statement.  I believe I may have misspoke

12   that day at the funeral.  I wasn't exactly sharp that day.

13   My kids and I were in a great deal of pain, so I may have

14   misspoke to him.  Not to mislead him.

15   Q.    And that's what Anthony remembers, too, right?

16   A.    I'm sure he does.

17   Q.    So you didn't tell them that you were in the bathroom,

18   did you?

19   A.    Not that I recall, no, sir.

20   Q.    You put yourself as far away from the scene of their

21   sister's death as you could, right?

22   A.    No, sir.

23   Q.    And you didn't want Ralph to have documents about your

24   sister's death, right?

25   A.    That's true.

CROSS - RUDOLPH

1    Q.   Because he had the resources to get more information,

2    right?

3    A.   No, sir.

4    Q.   He could have hired his own investigator?

5    A.   Didn't think about that, no, sir.

6    Q.   He could have talked to cousin Anthony to get an

7    investigator in Africa.

8    A.   Never thought about that.

9    Q.   Because cousin Anthony actually did a lot of work in

10   Africa.

11   A.   I wasn't aware of that, no, sir.

12   Q.   So let's talk more about the shotgun.  Now, the -- I

13   think -- well, instead of me sort of summarizing, where did

14   you get that original shotgun?

15   A.   The original shotgun I won in a raffle at the National

16   Wild Turkey fundraiser.  They have an annual event.

17   Q.   And then where -- what did you do with it?

18   A.   Took it home.

19   Q.   And where did you put it?

20   A.   Oh, 1991.  A gun safe in Pittsburgh.

21   Q.   And when was the next time you took it out of the gun

22   safe?

23   A.   When I did what, sir?

24   Q.   When was the next time you took it out of the gun

25   safe?

CROSS - RUDOLPH

1    A.    When I moved to Phoenix.

2    Q.    When was the first time you took it on a hunt?

3    A.    The Zambian hunt.

4    Q.    Now, from my perspective, I thought one of the most

5    detailed answers you gave on direct was about that 2015

6    leopard hunt.  Do you remember talking about that?

7    A.    Yeah, I remember that.

8    Q.    You said the leopard was in a kasaka bush.

9    A.    Yes, sir.

10   Q.    And it sounds like that hunt was pretty scary.

11   A.    Yes, sir.  It was challenging.

12   Q.    And so you wanted to have a shotgun on the next hunt.

13   A.    Correct.

14   Q.    Why did you want a shotgun on the next hunt?

15   A.    That's the preferred weapon when you're following a

16   wounded leopard.

17   Q.    Because you were scared that a leopard might charge

18   your group again, right?

19   A.    Well, at some future date, if we had that same

20   circumstance, Mark and I both wanted to have shotguns, yes,

21   sir.

22   Q.    Were you scared when you went on the leopard hunts in

23   2016?

24   A.    Scared?

25   Q.    Yeah.  Or worried?

CROSS - RUDOLPH

1    A.    No.

2    Q.    You -- you weren't worried in 2016 about going on these

3    leopard hunts?

4    A.    Oh, I've been on many leopard hunts, Mr. Fields.    It

5    didn't give me any more pause for the actual hunt.    I just

6    wanted to be prepared in case the leopard charged us.

7    Q.    So that's why you brought all that body armor?

8    A.    Yes, sir.

9    Q.    And if you wanted to be prepared, that means that's why

10   you brought the shotgun?

11   A.    Yes, sir.

12   Q.    And if you wanted to be prepared, why did you bring a

13   shotgun that had been sitting unused in a safe for 25 years?

14   A.    I don't have a lot of shotguns and it fit the parameter

15   that they would want to have in Zambia.    It was a

16   semiautomatic that would hold 3-inch shells.    I knew they

17   would like that as professional hunters.    So when I left it,

18   they would have it.

19   Q.    Was the shotgun functioning properly on that hunting

20   trip?

21   A.    Well, they ran a couple of rounds through it -- two or

22   three at the shooting bench.    It seemed to function okay.

23   Q.    Yeah, because you wouldn't want to take a

24   malfunctioning shotgun on a leopard hunt, would you?

25   A.    It's happened to me once already.

CROSS - RUDOLPH

1    Q.    What's happened to you once already?

2    A.    On a previous hunt.

3    Q.    What had happened on a previous hunt?

4    A.    Shotgun malfunctions, a semiautomatic.

5    Q.    So you wouldn't want that to happen again?

6    A.    Oh, no, sir.

7    Q.    You would want to make sure you took a functioning

8    shotgun.

9    A.    Correct.

10   Q.    And you also know, you know -- well, what's one of the

11   reasons a shotgun is so effective on a leopard hunt?

12   A.    Well, when a leopard charges you, he comes from very

13   close range and very fast, so you don't have a stationary

14   target.  And you need that little bit of a pattern to try to

15   either kill him or slow him down.

16   Q.    Yeah, you don't really have to aim a shotgun very well,

17   do you?

18   A.    Well, aim is, you know -- yes, you have some reflex,

19   but you're not going to have time to take careful aim, no.

20   Q.    You just point it in the general direction and the

21   shotgun does its job?

22   A.    A bit more than that.

23   Q.    And you talked about this a little bit, but when you

24   test-fired the shotgun on that hunt, it worked just fine?

25   A.    When they test-fired it, it seemed to, yes, sir.

2840

CROSS - RUDOLPH

1    Q.    That shotgun was in fine condition as far as you know?

2    A.    Just took it out of my gun safe.  I didn't examine it

3    or look at it, no, sir.  No, I don't know.

4    Q.    You didn't examine it or look at it while you were on

5    the hunt?

6    A.    No, sir.

7    Q.    Didn't -- weren't you using the shotgun during the

8    entire hunt?

9    A.    I didn't use it during the hunt.  It was only for a

10   backup in case of a leopard -- it's -- just was there in

11   case we needed it.

12   Q.    You didn't carry it with you while you were out in the

13   bush looking for the leopard?

14   A.    Oh, no, sir.

15   Q.    Now, it was test-fired before you started.

16   A.    Yes, sir.

17   Q.    And who did the test-firing?

18   A.    It was either Mark or his dad.

19   Q.    Fair to say that either Mark or his dad, that they

20   wouldn't let you take a defective weapon on a leopard

21   hunt?

22   A.    Yeah.  If it showed defects they would not.

23   Q.    The truth is that shotgun was in perfect condition,

24   wasn't it?

25   A.    I have no way of knowing that, sir.

2841

CROSS - RUDOLPH

1   Q.   Did you test-fire it at all?

2   A.   I did not.

3   Q.   Were you the one who was going to use the shotgun, if

4   you needed it, for a leopard?

5   A.   That's correct.

6   Q.   But you didn't test-fire it?

7   A.   No, sir.

8   Q.   Even though you were really concerned about a charging

9   leopard?

10  A.   Well, yeah.  They fired it a couple of times, and

11  that's good enough for me.

12  Q.   So you were so concerned that you brought body armor,

13  you brought the shotgun, but you didn't want to practice

14  using it?

15          MR. MARKUS:  Objection.  Asked and answered.

16          THE COURT:  Overruled.

17          THE WITNESS:  No, sir.

18  BY MR. FIELDS:

19  Q.   Now, I think you testified already that that shotgun,

20  you knew, was examined by a Zambian ballistics expert?

21  A.   Yes, sir.

22  Q.   His name was Vincent Chibesa?

23  A.   I believe that's correct, yes, sir.

24  Q.   He did his training in Moscow?

25  A.   From the report, I believe.

2842

CROSS - RUDOLPH

1    Q.    And he did drop tests on that original shotgun, right?

2              MR. MARKUS:  Objection, Your Honor.  Calls for

3    hearsay.  It's not in the report at all.  They didn't call

4    this witness.

5              MR. FIELDS:  Your Honor, he's aware of it from his

6    knowledge of the discovery in this case.

7              THE COURT:  Right.  Overruled.

8              THE WITNESS:  Say the question again, please.

9    BY MR. FIELDS:

10   Q.    You're aware that the Zambian expert did drop tests on

11   that shotgun.

12   A.    Not really, no, sir.

13   Q.    Did you review the discovery in this case?

14   A.    Not really.  No, sir.

15   Q.    You didn't review any of the reports given to you as

16   part of the discovery process?

17   A.    No, sir.  Not very many.

18   Q.    Well, but you are aware of the Zambian ballistics

19   expert.

20   A.    That there was one, yes, sir.

21   Q.    He did a drop test three times.

22             MR. MARKUS:  Objection, asked and answered.  And

23   that's not correct.

24             THE COURT:  All right.  I don't believe it was

25   asked in that precise form before.  Overruled.

CROSS - RUDOLPH

1          THE WITNESS:  I don't know that, sir.

2     BY MR. FIELDS:

3     Q.   He dropped it once with its butt straight down on the

4     ground.

5     A.   I don't know what the man did.  I wasn't there.

6     Q.   He dropped it once in a horizontal position.

7     A.   Again, I don't know.

8     Q.   And you're aware from the discovery that those drop

9     tests show that the shotgun functioned as designed.

10    A.   I'm not aware of that, sir.

11    Q.   None of those tests resulted in the shotgun firing.

12    A.   Not that I'm aware of, sir.

13    Q.   And that makes sense because you wouldn't take a

14    malfunctioning shotgun on a leopard hunt, would you?

15    A.    If the gun had been a problem on the test-fire for a

16    few shots, we would have done something with it, but it

17    seemed okay.

18    Q.   Fair to say that you've been a hunter for basically

19    your whole life?

20    A.   Since I was a little boy, yes, sir.

21    Q.   Yeah.  You went hunting as a kid in Pennsylvania?

22    A.   With my dad.

23    Q.   And by 2016, you'd been hunting big game for decades.

24    A.   Yes, sir.

25    Q.   Would you say you're a good shot?

2844

CROSS - RUDOLPH

1  A.   Yeah.   That's on the outer end, yeah.   I'm a good shot.

2  Q.   Would you say you're pretty confident with firearms?

3  A.   Yes, sir.

4  Q.   And you've handled many different kinds of firearms.

5  A.   Yes, sir.

6  Q.   And it sounds like you handled firearms under pressure,

7  too, in the middle of the bush.

8  A.   Yes, sir.

9  Q.   Because you went, on that 2015, you actually went with

10  Mark and Pieter to stalk that injured leopard.

11  A.   Yes, sir.

12  Q.   They were so confident in your abilities, they let you

13  go with them?

14  A.   We knew each other's experience, yes, sir.

15  Q.   So you've fired rifles?

16  A.   Oh, yes, sir.

17  Q.   You've fired shotguns?

18  A.   Yes, sir.

19  Q.   In your lifetime you've probably fired thousands of

20  rounds.

21  A.   That's probably a bit high.   I'm just a hunter, not a

22  shooter.

23  Q.   But you know how shotguns work.

24  A.   In general, yes, sir.

25  Q.   And so as a hunter your whole life, you know hunter

CROSS - RUDOLPH

1    safety?

2    A.    Yes, sir.

3    Q.    You know you're always supposed to treat a gun like

4    it's loaded, right?

5    A.    Correct.

6    Q.    And you try to stay away from the muzzle at all times?

7    A.    If it's loaded, yes, sir.

8    Q.    And when you're handed a firearm, the first thing you

9    do is make sure that it's unloaded, right?

10   A.    If you're unfamiliar with the firearm being handed to

11   you, yes, sir.

12   Q.    You look inside the action to make sure there's no

13   bullet?

14   A.    Depending on the firearm, that's correct.

15   Q.    And you taught those rules to Bianca when you started

16   going hunting together, right?

17   A.    Basically.

18   Q.    And when you follow rules like that for basically your

19   whole life, they become habit, right?

20   A.    Yes, sir.

21   Q.    And when you're hunting in Africa, and you're with

22   these professional hunters, they wanted to make sure

23   everyone stays safe, right?

24   A.    They want to make sure it's safe?

25   Q.    Yeah.    They wanted to make sure it's safe?

CROSS - RUDOLPH

1    A.    Absolutely, for everybody's benefit, yes, sir.

2    Q.    So they also enforce those rules of hunter safety when

3    you're out in the bush.

4    A.    Yes, sir.

5    Q.    You would never point a gun at yourself, right?

6    A.    No, sir.

7    Q.    And you'd never bang a gun on the ground?

8    A.    I've done that.

9    Q.    With the muzzle pointed at yourself?

10   A.    No, sir.

11   Q.    All right.  So let's talk about modifications of

12   firearms.  Was the shotgun modified in any way?

13   A.    I'm aware they removed the plug, Pieter Swanepoel did,

14   so it would hold more rounds.  I don't know, I left after

15   they were working on it.  I don't know what else they may or

16   may not have done to it.

17   Q.    Do you think they would have modified it in any other

18   way?

19   A.    I don't think so, but I can't -- I don't have firsthand

20   knowledge.

21   Q.    Are you speculating that they might have?

22   A.    I don't know.  I don't know if they did anything to it.

23   I have no idea.  You're asking me a specific question; I

24   can't tell you if they did or not.

25   Q.    In your experience hunting with the Swanepoels for

CROSS - RUDOLPH

1    several decades, did you ever see them modify the

2    functionality of a firearm?

3    A.    Sometimes.  Trigger pull.  They've done that a couple

4    of times.

5    Q.    Would they tell you about it if they did that?

6    A.    Probably.

7    Q.    Did they tell you they did any modifications on this

8    shotgun?

9    A.    They did not.  They didn't tell me.

10   Q.    You knew that they removed the plug?

11   A.    That I was there for.  I witnessed that, yes, sir.

12   Q.    Does that do anything to the firing mechanism?

13   A.    I don't believe so.

14   Q.    So let's look at Government's Exhibit 403, page 5.

15   Okay.

16         If we look -- it says it can be very dangerous to

17   alter the trigger.  Do you remember that?

18   A.    From the manual?

19   Q.    Yeah.

20   A.    Yes, sir.

21   Q.    And do you remember this being shown during opening

22   statements?

23   A.    Yes, sir.

24   Q.    But taking the plug out of the magazine doesn't do

25   anything to the trigger, does it?

2848

CROSS - RUDOLPH

1    A.    No, sir.

2    Q.    Now, is it fair to say you're the one who introduced

3    Bianca to hunting?

4    A.    Yes, sir.

5    Q.    You took her on a lot of hunting trips?

6    A.    Yes, sir.

7    Q.    How many?

8    A.    I would need a moment.  But a guess?

9    Q.    Yeah.  Well, I don't want you to guess on the stand.

10   You're under oath.  But an estimate.

11   A.    25 to 30.

12   Q.    All over the world?

13   A.    Yes, sir.

14   Q.    And you testified on direct that you wanted her to be

15   safe?

16   A.    Yes, sir.

17   Q.    So you taught her the rules of hunter safety?

18   A.    The basic ones, yes, sir.

19   Q.    You made sure she followed them?

20   A.    Yes.

21   Q.    And she --

22   A.    If I saw her do something, I would correct her.

23   Q.    Yeah.  So she knew those rules.

24   A.    Yes, sir.

25   Q.    She knew that you always treat a firearm like it's

CROSS - RUDOLPH

1    loaded?

2    A.    Yes, sir.

3    Q.    She knew that you always stay away from the muzzle?

4    A.    Yes, sir.

5    Q.    And she had years of experience using firearms.

6    A.    She had years of experience in shooting, not so much

7    with firearms.

8    Q.    Those rules of hunter safety, they would have been

9    habit for her, just like for you, right?

10    A.    More or less.

11    Q.    I think you said sometimes, you know, especially on

12    sort of travel days or things likes that, she could be

13    nervous?

14    A.    Yes, sir.

15    Q.    And if she was nervous around firearms?

16    A.    Sometimes, yes, sir.

17    Q.    So if she was nervous around firearms, she would be

18    especially cautious, right?

19    A.    I can't say she would be especially cautious, but she

20    would represent that she was nervous.

21    Q.    She wouldn't bang a gun on the ground?

22    A.    I can't say that, sir.  I don't know.

23    Q.    She wouldn't point a gun at herself?

24    A.    I don't think so, no, sir.

25    Q.    And she wouldn't handle a gun without knowing whether

2850

CROSS - RUDOLPH

1   or not it's loaded.

2   A.   I would hope not.

3   Q.   On these hunts, what did you generally do with the soft

4   cases at night in your cabin?

5   A.   Oh, the cabin attendants would bring them into the room

6   along with the other gear and put them in a corner on the

7   floor or against the wall.

8   Q.   How were they oriented usually?

9   A.   Oriented?

10  Q.   Yeah.  Were they, like, leaning up against the wall or

11  down on the floor?

12  A.   Oh, it would vary; depends what they did with them.

13  Q.   And generally how are firearms handled when they were

14  in the camp?

15  A.   How were they handled?

16  Q.   Yeah.

17  A.   In what respect, sir?

18  Q.   So getting from the safari vehicles to the cabin,

19  getting from the cabin back to the safari vehicles, explain

20  all that to us.

21  A.   Okay.  Typically they would leave -- they would leave

22  the firearms, at the end of the hunt, in the cabin.  In the

23  morning, the cabin boy would come, the porter, he would

24  gather up our gear, take everything to the vehicle; and when

25  we were all ready we would go off on the hunt.

CROSS - RUDOLPH

1   Q.   So they were transported on the safari vehicles in the

2   soft cases?

3   A.   Yes, sir.

4   Q.   What safety precautions were taken during the hunt?

5   A.   What, sir?

6   Q.   What safety precautions were taken during the hunt?

7   A.   Safety precautions?

8   Q.   Yeah.

9   A.   Standard ones.

10  Q.   What are those?

11  A.   Well, we put the guns on the racks, and we load the

12  magazines, but we typically don't chamber a shell until

13  we're ready to go after an animal.

14           THE COURT:  Mr. Fields, why don't we pause here and

15  take our morning break.

16           All right, ladies and gentlemen of the jury, we

17  will be in recess for 15 minutes.

18       (Recess taken 10:29 a.m. to 10:49 a.m.)

19           THE COURT:  Mr. Fields, you may resume your

20  examination.

21           MR. FIELDS:  Thank you, Your Honor.

22  BY MR. FIELDS:

23  Q.   So this -- Dr. Rudolph, you all right?

24  A.   Yes, sir.

25  Q.   The shotgun, the Browning shotgun --

2852

CROSS - RUDOLPH

1    A.    Yes, sir.

2    Q.    -- have you ever fired it?

3    A.    I don't think so.

4    Q.    You took that hunt -- you took that shotgun on the hunt

5    with you in October 2016?

6    A.    Correct.

7    Q.    And I think you testified on direct that you were

8    hunting in the Luangwa Valley before then, right?

9    A.    That was -- give me a second.  I get these hunts

10   confused.  '16.  Yes.

11   Q.    August 2016?

12   A.    Yes.  Yes.

13   Q.    You took the shotgun with you on that hunt, too, right?

14   A.    I believe so.

15   Q.    Because it was a combination hunt.

16   A.    Yes, sir.

17   Q.    Yeah.  Remind us, what's a combination hunt?

18   A.    It was for two species:  A lion and a leopard.

19   Q.    And just like in all the hunts, the shotgun would have

20   been tested on that hunt, too, right?

21   A.    I don't believe so.  I don't recall it, but I'll take

22   your word for it.

23   Q.    Do you have any reason to believe it wouldn't have been

24   tested?

25   A.    I don't recall.  I really don't.

2853

CROSS - RUDOLPH

1    Q.    It was supposed to be a combination lion-leopard hunt,

2    right?

3    A.    The leopard was to be after the lion.  So I don't

4    remember them testing it because we started on the lion

5    right away.

6    Q.    Now, the shotgun, were you using the shotgun the day

7    before Bianca died?

8    A.    When you say "using it," shooting it?

9    Q.    Holding.

10   A.    Holding it?  I don't remember.  I -- no, I don't think

11   so.

12   Q.    Did you take the shotgun with you when you were in the

13   blind?

14   A.    Yes, sir.

15   Q.    Okay.  So you do remember.

16   A.    Oh, that part, yes, sir.

17   Q.    Okay.

18   A.    Yes, sir.

19   Q.    Would you take it into the blind with you each time you

20   were sitting in the blind?

21   A.    Yes, sir.

22   Q.    How many times do you think you did that?

23   A.    In the '16 Mumbwa hunt, four or five.

24   Q.    So when you took it in the blind, you would have loaded

25   it with cartridges?

2854

CROSS - RUDOLPH

1    A.    Yes, sir.

2    Q.    And when you got out of the blind, you would have

3    unloaded it with cartridges?

4    A.    Typically, yes, sir.

5    Q.    Each of those times?

6    A.    I'm sorry, I --

7    Q.    Was it -- each of those times you would have done that.

8    A.    You're asking me if I unloaded it?

9    Q.    Yeah.

10   A.    Oh, it varied.  Different people would load it and

11   unload it.

12   Q.    Yeah, I think you say -- I think you said on direct

13   that different people took turns.  So who were the people

14   that took turns?

15   A.    It would have been Mark Swanepoel, Banda, and there was

16   another tracker there named Maybin who also would be -- do

17   that from time to time.

18   Q.    Now, you heard Mark testify in this trial that he saw

19   you unloading it the night before.  Do you remember that?

20   A.    I did, yes, sir.

21   Q.    Any reason to think he was wrong?

22   A.    I don't remember unloading it.  I may have, I just

23   don't have a memory of it.

24   Q.    Sorry, Dr. Rudolph, that wasn't my question.  Is there

25   any reason to think that Mark Swanepoel would be wrong?

CROSS - RUDOLPH

1   A.   Oh, perhaps.  It's a long time ago.

2   Q.   Let's look at Government's Exhibit 10, page 4.  This is

3   in evidence.  And if we -- let's actually go back to page 3

4   so we know exactly what we're looking at.

5          Do you see that this is the interview with Mark

6   Swanepoel on March 2d, 2017?

7   A.   Yes, sir.  Yes, sir.

8   Q.   And now if we -- and so that was closer in time to the

9   hunt, right?

10  A.   Yes, sir.

11  Q.   That would have been just a few months later when it

12  was still pretty fresh in his mind?

13  A.   Yes, sir.

14  Q.   If we go to the next page.  And if we blow up this

15  paragraph.

16          Can you read that sentence there for us.

17  A.   Yes, sir.  I've seen this before.

18  Q.   What does it say?

19  A.   The first line?

20  Q.   Yes, please.

21  A.   "He told us that he had seen Mr. Rudolph unload and

22  clean the shotgun the night before."

23  Q.   So he's been pretty consistent that it was you who

24  unloaded the shotgun the night before.

25  A.   That's consistent.  But I can assure you I did not

CROSS - RUDOLPH

1    clean that shotgun.

2    Q.    But you unloaded it the night before?

3    A.    That I don't have a firm memory of, no, sir.

4    Q.    And in this trial -- we can take that down --

5    Mr. Swanepoel says that you unloaded it into the seat.  Do

6    you remember him talking about that?

7    A.    Yes, sir.

8    Q.    Is that something you would have done, unload the

9    shotgun into the seat?

10    A.    It may have been, yes, sir.

11    Q.    And Pieter, do you remember his testimony during this

12    trial?

13    A.    I apologize, who, sir?

14    Q.    Pieter.

15    A.    Oh, Pieter, yes, sir.

16    Q.    Yeah.  Do you remember that he testified that he saw

17    you loading and unloading that shotgun?

18    A.    Yes, sir.  I do.

19    Q.    And do you remember Pieter testifying that you handled

20    it just fine?

21    A.    Yes, sir.

22    Q.    Any reason to think that Pieter would be wrong in that

23    assessment?

24    A.    Really, no, sir.

25    Q.    And you'd been -- how long was that hunt?

CROSS - RUDOLPH

1    A.    Memory, 12 or 13 days, I believe.

2    Q.    And remind me again:  When you were in the blind, how

3    many times were you in the blind with the shotgun?

4    A.    I'm -- I'm guessing four or five.  I'm not sure.  We

5    only took it in there if there was a leopard feeding.

6    Q.    So you know, because you unloaded the gun, you must

7    have unloaded the gun at least a couple of times, right?

8    A.    Yes, sir.

9    Q.    And so you know when it's completely unloaded the

10   charging handle locks back?

11   A.    Yes, sir.

12   Q.    That's how you know it's empty?

13   A.    Yes, sir.

14   Q.    Now, you say you've agonized over whether or not you

15   unloaded that gun the night before.

16   A.    That's correct.

17   Q.    And you say maybe accidentally you didn't unload it all

18   the way?

19   A.    Yes, sir.

20   Q.    Even though the charging handle locks back when it's

21   done?

22   A.    Yes, sir.

23   Q.    And you say maybe it was in the magazine and it ended

24   up in the chamber.  Was that your testimony on direct?

25   A.    Yes, sir.

CROSS - RUDOLPH

1    Q.   How do you think that happened?

2    A.   I don't know.

3    Q.   Now, do you think you were the last person to actually

4    handle the shotgun that night?

5    A.   I have no idea, sir.

6    Q.   Was it put back in its soft case on the truck?

7    A.   Yes, sir.

8    Q.   And you heard Banda testify in this trial, right?

9    A.   Yes, sir.

10   Q.   Who's Banda?

11   A.   He's one of the trackers.

12   Q.   How long have you known him?

13   A.   Oh, we've been on several hunts with Banda over the

14   years.

15   Q.   Mark's pretty fond of him?

16   A.   Yeah.  He's a good guy.

17   Q.   Mark's trying to train him to be an apprentice?

18   A.   I didn't know that until he testified here.

19   Q.   But you -- so you've been on several hunts with

20   Banda?

21   A.   Yes, sir.

22   Q.   Fair to say you trusted him while you were out there in

23   the bush?

24   A.   Yes, sir.  He's a good tracker.

25   Q.   And trust matters when you're out there because

CROSS - RUDOLPH

1   there's -- it's dangerous game?

2   A.    Well, yeah, and experience, yes, sir.

3   Q.    And you heard Banda testify at this trial that he

4   zipped it all the way up.

5   A.    I heard that, yes, sir.

6   Q.    Any reason to think that Banda was wrong about that?

7   A.    No, sir.

8   Q.    So it was already packed.

9   A.    Yes, sir.

10  Q.    So there was no reason to pack it again the next

11  morning, was there?

12  A.    Yes, sir, there was.

13  Q.    If it was already zipped, what was the reason?

14  A.    I'd opened it the night before because I had personal

15  items inside that case:  my vest, my shirt, my bug spray.

16  That's where I carried them during the day.  So to go to

17  dinner, I unzipped it partially, took my vest out, and I

18  went to dinner.

19  Q.    And you say "generally."  I think you testified on

20  direct that generally you were the one who packed the

21  firearms?

22  A.    Yes, sir.

23  Q.    So it was unusual that Bianca would be packing

24  firearms?

25  A.    I agree, yes, sir.

2860

CROSS - RUDOLPH

1   Q.   And now your testimony on cross is that you unzipped it

2   that night to get some personal items out of the gun case?

3   A.   Yes, sir, a vest particularly.

4   Q.   A vest.  Inside the gun case?

5   A.   Yes.

6   Q.   How big is this vest?

7   A.   It's a little sleeveless vest.

8   Q.   And you kept it in the gun case on the hunt?

9   A.   During the day, yes, sir.

10  Q.   After you got your vest out, you didn't zip the case

11  back up?

12  A.   No.

13  Q.   Why not?

14  A.   Going to dinner, get a cocktail.  That's all.

15  Q.   How long does it take to zip up a case?

16  A.   Didn't even think about it.

17  Q.   Now, you and Bianca were the only ones in the cabin?

18  A.   Yes, sir.

19  Q.   I think you said she wanted to leave early that -- the

20  next day, right?

21  A.   Yes, sir.

22  Q.   So she would have had an incentive to get everything

23  packed the night before?

24  A.   We discussed it, and we decided we would enjoy the

25  evening that night and pack in the morning.

CROSS - RUDOLPH

1    Q.   It wouldn't take very long to zip up that case and put

2    it in the Tuffpack, would it?

3    A.   I thought I would do it in the morning.

4    Q.   Now, that cabin, it's designed to give some privacy to

5    the guests who are there at the camp, right?

6    A.   Yes, sir.

7    Q.   Because, you know, you take a shower in there.

8    A.   Yes, sir.

9    Q.   You get dressed in there.

10    A.   Yes, sir.

11    Q.   And in the morning when you wake up, you would have

12    needed to get dressed?

13    A.   Well, yes, sir.

14    Q.   Yeah.  And that's something that's done in private.

15    A.   In general, yes, sir.

16    Q.   So the curtains would have been down, right?

17    A.   I don't know that.  I'm not sure.

18    Q.   Do you think you would have left the curtains up while

19    everyone's getting dressed and undressed?

20    A.   I never really had a lot of problems with privacy.  I'm

21    in the bush, so . . .

22    Q.   We heard a lot about the doors to the cabin, those

23    french doors that open up.

24    A.   Yes, sir.

25    Q.   Those face the river, right?

2862
CROSS - RUDOLPH

1    A.    They do.

2    Q.    So no one can look directly into the cabin unless

3    they're standing by the river.

4    A.    Correct.

5    Q.    And so staff at the camp, I think you testified on

6    direct that Bianca shooed them away?

7    A.    The gentleman that came for the luggage, she was not

8    ready, so she shooed him away.

9    Q.    You said more than shooed him away.

10   A.    Well, in an Italian fashion.

11   Q.    What do you mean by that?

12   A.    "I'm not ready yet" hand motions.  That type of thing.

13   Q.    After camp staff -- I mean, they call you "Bwana,"

14   right?

15   A.    That's a general term, but yes.

16   Q.    What does that mean?

17   A.    Sir.

18   Q.    So they follow instructions from the clients?

19   A.    Mostly, yes, sir.

20   Q.    So if Bianca shooed them away, and more than shooed

21   them away, they would have followed those instructions?

22   A.    They would have left the cabin, yes, sir.

23   Q.    And they wouldn't have come back until they were told

24   to?

25   A.    Well, they would.  They linger outside.  They're very

2863

CROSS - RUDOLPH

1    attentive.  So when you're ready, they're right there.

2    Q.    Even though she shooed them away in this Italian

3    fashion, you are saying they hovered around?

4    A.    Sure.

5    Q.    And that morning, Bianca already had all the luggage

6    packed, right?

7    A.    No, she was still working on it.

8    Q.    Did you see the photographs from the scene showing the

9    luggage out on the front porch?

10   A.    Yes, sir.

11   Q.    Had that luggage been packed?

12   A.    I don't know if it was all packed.  I'm not sure if it

13   was in bags, sitting out on the porch.  I don't remember.

14   Q.    So let's look at Government's Exhibit 14.  And now

15   let's scroll until we find the one with the luggage because

16   I don't remember -- oh, sorry.  I apologize to members of

17   the gallery.  Some of these --

18           THE COURT:  Can we take it down?

19           MR. FIELDS:  Yeah.  If anyone wants to leave, now

20   will be a good time.  All right.

21   BY MR. FIELDS:

22   Q.    So let's go to Government's Exhibit 14.  And let's just

23   keep scrolling.  I apologize.

24           THE COURT:  Isn't there a way just to get to that

25   page --

CROSS - RUDOLPH

1          MR. FIELDS:  I don't --

2          THE COURT:  -- counsel, instead of having to go

3    through all this?

4          MR. FIELDS:  I'm sorry, Your Honor, I didn't have

5    the exact page with me.  So it's actually Government's

6    Exhibit 15.  Sorry.  This is the problem with cross, you

7    don't know exactly what's going to happen.

8    BY MR. FIELDS:

9    Q.   Okay.  Here we go.  So do you see -- do you see this up

10   front?

11   A.   That trunk?

12   Q.   Yup.

13   A.   That's not part of our luggage.

14   Q.   Okay.  Go to the next page.  The next page.  Next page.

15   All right.

16          Do you see some of the luggage right there?

17   A.   It looks like one of the duffel bags.

18   Q.   So things had already been packed?

19   A.   Some of them.

20   Q.   And so is it your testimony that the one thing that

21   Bianca still had to pack was the -- was the firearms?

22   A.   No, sir.  There was more luggage to be packed.

23   Q.   Okay.  Let's talk about the funeral home.  I think you

24   testified on direct that you had to go back to Mumbwa to get

25   the body.

CROSS - RUDOLPH

1    A.    Yes, sir.

2    Q.    Could you describe that for us again.

3    A.    Let me think about that for a second.  Back to Mumbwa.

4    Yes, we went back to what they call their morgue.

5    Q.    Who is -- who did you go with?

6    A.    Mark.

7    Q.    Anyone else?

8    A.    It was just Mark and I.

9    Q.    Why did you go back to the morgue?

10   A.    We had to identify my wife, and there was an ambulance

11   coming, and we were going to go to the hospital.

12   Q.    So if Boyd Malama testified that he had to actually

13   arrange to get the body, would he be wrong?

14   A.    At the interim morgue?

15   Q.    Yeah.

16   A.    Oh, I don't know.  I just was told to be there by 9:00.

17   I don't know who made the arrangements.

18   Q.    And the arrangements to get her body from Mumbwa to

19   UTH, would you have had to contact a funeral home?

20   A.    I'm not sure how that was done, Mr. Fields.  I don't

21   remember.

22   Q.    Who made the arrangements for the ambulance?

23   A.    I don't know.

24   Q.    Did you have any interaction with funeral home

25   personnel to get your wife's body from Mumbwa to Lusaka?

CROSS - RUDOLPH

1    A.    I don't recall that, no, sir.

2    Q.    So you don't recall having any interaction with funeral

3    home personnel about how to get your wife's body from Mumbwa

4    to Lusaka?

5    A.    No, I don't recall that.

6    Q.    When do you recall first interacting with funeral home

7    personnel about how to handle your wife's remains?

8    A.    I believe it was the next day.  I think so.  The 12th.

9    Q.    The same day she was transported from Mumbwa to Lusaka?

10   A.    I believe so, yes, sir.

11   Q.    Okay.  So now it sounds like you think you would have

12   contacted the funeral home that day?

13   A.    I don't have a memory of it.  I'm not saying I didn't,

14   it's just a little bit of a fog at that time.

15   Q.    To make arrangements for how to transport the body?

16   A.    Well, we -- from the interim morgue we went to the

17   hospital.

18   Q.    It sounds like -- so do you remember anything about how

19   the arrangements were made to make that happen?

20   A.    Actually, no, sir.

21   Q.    Let's go back a little bit to the original shotgun.  So

22   you say that you disassembled it, right?  You put it in two

23   separate cardboard boxes?

24   A.    Yes, sir.

25   Q.    Why did you think that would be safe?

CROSS - RUDOLPH

1    A.    Safe?

2    Q.    Yeah.

3    A.    To separate the receiver from the barrel in two

4    separate boxes would keep it safe.  You need both parts.

5    Q.    But the receiver can still be used, right?

6    A.    It could, but you would need a barrel for it.

7    Q.    What service -- what trash removal service did you use

8    at that time?

9    A.    Well, I got a local service to come help me.  My real

10   estate agent arranged it because I had so much to move, he

11   had the guy come to me.  It was a Hispanic gentleman.  And

12   he took about three loads at three different times.

13   Q.    Do you remember the name of the service?

14   A.    No, sir.

15   Q.    Had you ever used that service before?

16   A.    No, sir.  He -- the real estate agent organized it for

17   me.

18   Q.    Ever use that service after?

19   A.    I moved after that, so I don't think so.

20   Q.    How would you have paid for that service?

21   A.    Cash.

22   Q.    Why would you have used cash?

23   A.    They like cash.  Give them a $100 bill and he was happy

24   to do it.

25   Q.    And if you used cash, then there's no transaction on

CROSS - RUDOLPH

1    your credit card, right?

2    A.    Yes, sir.  I agree.

3    Q.    So there would be no way to find out exactly what trash

4    removal service you used?

5    A.    I -- yes, sir.  I don't know the man's name.  I don't

6    recall.

7    Q.    No way to sort of verify anything about this trash

8    removal?

9    A.    No, sir.

10   Q.    I want to go back a little bit.  I asked you about

11   Ralph and those documents that he requested.  Do you

12   remember those questions?

13   A.    Yes, sir.

14   Q.    I forgot to ask you:  Why didn't you give him the

15   documents?

16   A.    I think at the time it was the repetitive emotion

17   coming out of me.  Every time he asked for the documents, it

18   was like reliving it.  But I should have done it, and I know

19   Ralph's in the courtroom today -- and, Ralph, I want to

20   apologize to you.  I'm sorry I didn't do that.

21   Q.    So you say it was -- it would have been reliving it,

22   but you wanted to do it via FaceTime?

23   A.    Well, that's just me.  A little bit of a personal

24   touch, but, again, I -- I made a mistake.  I should have

25   given him the documents.

2869
CROSS - RUDOLPH

1    Q.    Why did you want to arrange for FaceTime instead of
2    giving him the documents?
3    A.    I could show him the documents on FaceTime.  He could
4    see it was an accident.  Read them and be done with it.
5    Q.    Wouldn't that have required more time spent at these --
6    looking at these documents that were difficult?
7    A.    I didn't calculate how much time, Mr. Fields.
8    Q.    Do you think it would have taken more time to do it via
9    FaceTime than just giving him the documents?
10          MR. MARKUS:  Asked and answered, Your Honor.
11          THE COURT:  I'll let it go one more time.  Go
12    ahead.
13          THE WITNESS:  I didn't think about it, Mr. Fields.
14    BY MR. FIELDS:
15    Q.    Let's talk about the SCI lawsuit.
16    A.    Okay.
17    Q.    Am I correct that you said that you were -- you were
18    not honest during that lawsuit?
19    A.    Yes, sir.
20    Q.    What were you dishonest about?
21    A.    They asked me a couple questions about -- one about
22    Lori and one about an affair.
23    Q.    And in that lawsuit, I think you said that you lied
24    because you wanted to protect Bianca, right?
25    A.    So she wouldn't be embarrassed, yes, sir.

CROSS - RUDOLPH

1    Q.    But you're the one who brought that lawsuit, right?

2    A.    Yes, sir.

3    Q.    You're the one who brought the lawsuit alleging that

4    allegations of adultery would be defamatory.

5    A.    Correct.

6    Q.    So when you brought that lawsuit, you knew that you

7    would probably be asked about it, right?

8    A.    I didn't think that far ahead, no, sir.

9    Q.    You're the one who got to choose what to make a subject

10   of that lawsuit, right?

11   A.    My counsel did, yes, sir.

12   Q.    I'm -- did you consult with counsel?

13   A.    Yes, sir.

14   Q.    So now let's talk about the lawsuit in a little bit

15   more detail.  So that suit was in federal court?

16   A.    Yes, sir.

17   Q.    Federal court in -- not exactly like this one, but kind

18   of like this?

19   A.    I never saw the inside of the courtroom.

20   Q.    And am I right that your lawsuit accused certain

21   members of SCI, and SCI itself, of something called

22   defamation?

23   A.    Correct.

24   Q.    What is defamation?

25   A.    Making false statements.

CROSS - RUDOLPH

1    Q.    So you were alleging that they had made false

2    statements about you.

3    A.    Correct.

4    Q.    Let's look at the -- it's in evidence, it's

5    Government's Exhibit 83.

6          Is this the complaint that was filed on your

7    behalf?

8    A.    Yes, sir.

9    Q.    And it's filed in federal court, right?

10   A.    Yes, sir.

11   Q.    Federal court is pretty serious?

12   A.    Yes, sir.

13   Q.    And fair to say that in your, you know, professional

14   life you've worked with lawyers quite a bit?

15   A.    Yes, sir.  Civilly, corporately.  Never in federal

16   court, though.

17   Q.    So would you say you're pretty sophisticated when it

18   comes to legal matters?

19   A.    Fair.

20   Q.    Because you'd have to be to understand sort of dental

21   franchising, right?

22   A.    Yes.

23   Q.    And you'd need to be somewhat sophisticated to

24   understand the liabilities that come with doing sedation

25   dentistry.

CROSS - RUDOLPH

1    A.    Yes, sir.

2    Q.    And so given your sophistication, you would want to

3    make sure that everything filed in your name was accurate,

4    right?

5    A.    Correct.

6    Q.    Because you wouldn't want to mislead anyone.

7    A.    That's correct.

8    Q.    And you certainly wouldn't want to make the courts make

9    decisions based on inaccurate information.

10   A.    That's correct.

11   Q.    So you reviewed this before it was filed?

12   A.    Probably not.

13   Q.    Even though we've just been talking about how important

14   all these other things are?

15   A.    That's correct.

16   Q.    And even if you didn't look at it, you knew it was

17   going to be filed on your behalf?

18   A.    Yes, sir.

19   Q.    And you would expect it to be accurate?

20   A.    Yes, sir.

21   Q.    We can take that down.

22         Now, during the civil lawsuit, did the parties get

23   to engage in discovery?

24   A.    I apologize, please?

25   Q.    Yeah.  During civil lawsuits like that, do the parties

2873

CROSS - RUDOLPH

1   get something called discovery?

2   A.   Yes, sir.

3   Q.   Did you get discovery in that case?

4   A.   I believe so, yes, sir.

5   Q.   And as part of that discovery process, you get to ask

6   questions of the other side, right?

7   A.   Right.

8   Q.   And they get to ask you questions.

9   A.   Correct.

10  Q.   And sometimes those questions are in written documents.

11  A.   Yes, sir.

12  Q.   And when -- on the other side, SCI and the people you

13  had sued, when they asked you for information, you would

14  have given it to them, right?

15  A.   Correct.

16  Q.   Because that's the fair thing to do?

17  A.   It's the process, yes, sir.

18  Q.   And you would have responded accurately?

19  A.   Yes, sir.

20  Q.   So let's look at Government's Exhibit 84.  Sorry, it's

21  not in evidence so let's make sure that's clear.

22         All right, is this an interrogatory from the

23  lawsuit?

24  A.   Yes, sir.

25  Q.   And it looks like there's a little sticker down at the

CROSS - RUDOLPH

1    bottom.  Does that have your name on it?

2    A.    Yes, sir.

3    Q.    Do you think this was an exhibit you were asked about

4    in your deposition?

5    A.    Probably, yes, sir.

6    Q.    And this response to interrogatories would have been

7    filed on your behalf?

8    A.    Yes, sir.

9            MR. FIELDS:  Your Honor, at this time I would move

10   for the admission of Government's Exhibit 84.

11           THE COURT:  Any objection?

12           MR. MARKUS:  Yes, Your Honor.  We object.  He can

13   certainly ask Dr. Rudolph about it, but there's no basis to

14   admit this under 608 and 609.  They're trying to prove up

15   other things with extrinsic evidence.  He's admitted to it,

16   and there's no basis for admission.

17           THE COURT:  I'll let Mr. Fields respond.

18           MR. FIELDS:  Your Honor, it's nonhearsay under Rule

19   801.  It's a statement of a party opponent.  It can also be

20   judicially noticed.  It's a publicly filed document on the

21   docket.

22           THE COURT:  Right.  Yeah.  Objection's overruled.

23   Exhibit 84 is admitted into evidence and can be published to

24   the jury.

25        (Government's Exhibit 84 received)

CROSS - RUDOLPH

1          MR. DILL:  Objection, just for the record.  Hearsay

2    as to my client.

3          THE COURT:  All right.

4          MR. FIELDS:  Your Honor, let's take this down.

5    Let's first go through that amended complaint.

6    BY MR. FIELDS:

7    Q.   Now let's look at page 8.  So -- sorry, that's

8    Government's Exhibit 83.  Now let's look at paragraph 58.

9          What did you accuse the defendants of in that case?

10   A.   In this paragraph?

11   Q.   Yup.

12   A.   "Statements that plaintiff was an adulterer, filed

13   false hunting claims, and cheated on his claimed expenses to

14   SCI."

15   Q.   Now, that statement about you being an adulterer, were

16   you alleging that that was defamatory?

17   A.   Yes.

18   Q.   So you were saying that that allegation about adultery

19   was false?

20   A.   Yes.

21   Q.   And let's go to the next paragraph.  Paragraph 59.

22         In that paragraph, did you accuse the defendants of

23   harming your marriage?

24   A.   I did.

25   Q.   So in this lawsuit, you were denying being an

CROSS - RUDOLPH

1    adulterer.

2    A.    Yes, sir.

3    Q.    And you're saying that the allegation of adultery would

4    hurt your marriage?

5    A.    Yes, sir.

6    Q.    And that's because presumably Bianca wouldn't know

7    about your adultery, right?

8    A.    Yes, sir.

9    Q.    So this was false?

10   A.    Yes, sir.

11   Q.    And you knew that when you filed it?

12   A.    Yes, sir.

13   Q.    Were you trying to manipulate the court system?

14   A.    No, sir.

15   Q.    Then why else would you file a false document in

16   federal court?

17   A.    Well, there were a lot of other things involved, but it

18   was a wrong thing to do.

19   Q.    Were you trying to manipulate the court system?

20   A.    Yes, sir.

21   Q.    Now let's look at -- I think that's actually enough of

22   that.    Let's go to Government's Exhibit 84.

23            So these are these interrogatories, right?

24   A.    Yes, sir.

25   Q.    And I think you testified earlier that when you were

CROSS - RUDOLPH

1    engaged in this discovery process, you want to be

2    accurate?

3    A.    As accurate as you can be, yes, sir.

4    Q.    You want to be fair to the other side?

5    A.    Yes, sir.

6    Q.    Because it's important for the process to be fair?

7    A.    Correct.

8    Q.    Let's look at that -- that first question there.  And

9    let's zoom there on it a little bit.

10         Could you please read that for us.

11   A.    "Identify each and every person whom you know, believe,

12   or contend has, or claims to have, knowledge or information

13   regarding any facts, circumstances, or issues related to the

14   allegations in your amended complaints.  With regard to each

15   person identified in your answer, describe in detail the

16   knowledge which he or she possesses or claims to possess."

17   Q.    And one of the allegations was about adultery, right?

18   A.    Yes, sir.

19   Q.    So let's go through and let's look at the answers.  So

20   we can scroll down to the next page.

21         So take a look at all those names, sir, and let me

22   know when you're done.

23   A.    Okay.  Yes, sir.

24   Q.    Let's go to the next page.

25         Please take a look at those names.  Again, let me

CROSS - RUDOLPH

1    know when you're done.

2    A.    Yes, sir.

3    Q.    And the next page.  Let's look at those names as well.

4    A.    Yes, sir.

5    Q.    And the next page.  Are we on the next page?  I may

6    have missed it.  Can we go to the next page, please.  There

7    we go.  So that's just 33, 34, and 35.

8    A.    Okay.

9    Q.    So that question asked you for information about people

10   who might know about adultery, right?

11   A.    One of the charges, yes, sir.

12   Q.    And at that time, you were committing adultery with

13   Lori Milliron, right?

14   A.    Correct.

15   Q.    Did you see Lori Milliron in that list of names?

16   A.    No, I do not.

17   Q.    Why did you withhold her information -- or her name

18   from that list?

19   A.    I don't recall, sir.

20   Q.    Did you withhold her name from that list because it

21   would have hurt your chances in the lawsuit?

22   A.    Perhaps.

23   Q.    So you hid information that -- that might be harmful to

24   you.

25   A.    Yes, sir.

2879

CROSS - RUDOLPH

1    Q.    Let's look at page 18.  And now let's look at -- let's

2    read paragraph 23 and the answer, please.

3    A.    Do you want me to read it?

4    Q.    Yes, please.

5    A.    Okay.  "Identify by full email address and service

6    provider each and every email account and web-based

7    communication service, instant messages, chat rooms, web

8    blogs, social networks, forums which you held or used from

9    2006 to the present on which you have communicated with Lori

10   Milliron."

11   Q.    What was your answer?

12   A.    Answer:  "Patient did not communicate with Lori

13   Milliron via email account or other web-based

14   communications."

15   Q.    Was that true?

16   A.    No, sir.

17   Q.    So you weren't being honest in federal court, were you?

18   A.    You're correct.

19   Q.    And you weren't being honest by hiding information that

20   was harmful to your case.

21   A.    Yes, sir.

22   Q.    Now let's go to page 9.  Question 5.

23         Did this one ask you to identify by full email

24   address all of your accounts?

25   A.    Which you held --

2880

CROSS - RUDOLPH

1    Q.    Yeah, that would be you.  You would be the plaintiff?

2    A.    Yes, sir.

3    Q.    And if we could go to the next page.

4          And did it ask you to provide all of the email

5    accounts you were using from 2006 to the present?

6    A.    Correct.

7    Q.    And just orient us -- let's go back to the last page.

8    The last page of this exhibit, if we could, just so we know

9    what the present is.

10          So the present at the time, that would have been

11   2013?

12   A.    Yes, sir.

13   Q.    Okay.  So now let's go back to page 9.  Page 10.

14          And do you see the email addresses that you listed

15   there?

16   A.    Yes, sir.

17   Q.    Let's see if we can -- let's -- and were those the

18   email addresses you were using at the time?

19   A.    Yes, sir.

20   Q.    So now let's, if we can, put this exhibit on the left

21   side.  So Government's Exhibit 84, page 10, on the left.

22   And Government's Exhibit 90 over on the right.  And if we --

23   let's go down to page 2.  All right.  And if we could, let's

24   zoom in on this top part there.

25          So what email address were you using to communicate

CROSS - RUDOLPH

1    with Lori Milliron in 2010?

2    A.    That was lprsci@yahoo.com.

3    Q.    If we go over to your answers in the interrogatories on

4    the left side there, did you list that email address?

5    A.    No.

6    Q.    Why not?

7    A.    I don't remember, but it's not listed there.

8    Q.    You don't remember why you didn't list that email

9    address?

10   A.    No, sir.

11   Q.    Well, if you had listed that email address, could they

12   have asked for information about it?

13   A.    Sure.

14   Q.    Would they have found your emails with Lori Milliron?

15   A.    Yes, sir.

16   Q.    Would that have been harmful to your lawsuit?

17   A.    Yes, sir.

18   Q.    So were you again hiding information that would be

19   beneficial to you in a legal proceeding?

20   A.    I would agree.  Yes, sir.

21   Q.    And you testified under oath in a deposition in that

22   case, right?

23   A.    Yes, sir.

24   Q.    So we can take that down.

25            You were asked about your exchange with Paul

CROSS - RUDOLPH

1   Babaz.

2   A.    Yes, sir.

3   Q.    Paul had accused you of being unfaithful, right?

4   A.    Correct.

5   Q.    And he had made that accusation in front of Bianca?

6   A.    No.

7   Q.    Well, let's -- do you remember being asked about the

8   confrontation with Paul Babaz during your deposition?

9   A.    Correct.

10  Q.    And you were asked whether Bianca credited his

11  accusation of adultery in any way.  Do you remember that?

12  A.    Credited?

13  Q.    Credited his accusation of adultery.  Do you remember

14  being asked that question?

15  A.    Yes, sir.

16  Q.    And you answered in response to whether or not Bianca

17  would have credited his accusation of adultery, "No, sir"?

18  A.    Okay.  "No, sir."

19  Q.    Yeah.  Right?

20  A.    Right.

21  Q.    Okay.  But if you really had an arrangement allowing

22  you to see other people and she to see other people, she

23  would have had every reason to credit that allegation,

24  right?

25  A.    Yes, sir.

2883

CROSS - RUDOLPH

1    Q.    She would not have been surprised?

2    A.    Bianca?

3    Q.    Yeah.

4    A.    No, sir.

5    Q.    She would not have been upset?

6    A.    No, sir.

7    Q.    But that's exactly what you were alleging in this

8    lawsuit, right?

9    A.    Correct.

10   Q.    You were also asked in the deposition whether you had

11   ever been separated or estranged from your wife.  Do you

12   remember getting asked that question?

13   A.    I don't, but I'll accept that.

14   Q.    And you answered, "No, sir," you had never been

15   separated or estranged?

16   A.    Yes, sir.

17   Q.    But when you talked to other women that you were

18   pursuing, that's not what you told them, right?

19   A.    Probably not at times.

20   Q.    So Government's Exhibit 82 is not in evidence.  I'd

21   like to show it.  And let's go to page 2.  And then page 3.

22   Page 4.  And then next page.  And the next page.

23        Is this an exhibit you were shown during your

24   deposition?

25   A.    I guess so, yes, sir.  It's a little fuzzy, but okay.

CROSS - RUDOLPH

1    Q.    Yeah, if we go to the next page, it gets a little bit

2    better.

3            Do you remember being shown these text messages?

4    Do you want to keep scrolling?  Will that help?

5    A.    I'm sorry?

6    Q.    Will it help if we keep scrolling?  Do you remember

7    these text messages?

8    A.    No, I do now.  Yes, I can read it.

9    Q.    Did you send some of these text messages?

10   A.    Yes, sir.

11           MR. FIELDS:  Your Honor, at this time I'd move for

12   the admission of Government's Exhibit 82 under Rule 801.

13           MR. MARKUS:  Objection, Your Honor.  Improper

14   impeachment.  He's admitted this.  This is an extrinsic

15   matter.  We're going way down a line now that's not relevant

16   under 401 and under 403.

17           THE COURT:  The objection's overruled, and it will

18   be admitted into evidence.  But an additional -- what

19   exhibit are we talking about?

20           MR. FIELDS:  Government's Exhibit 82, Your Honor.

21           THE COURT:  82.  82 is admitted into evidence and

22   may be published to the jury.  But in addition,

23   anticipating Mr. -- well, Mr. Dill, do you have any

24   objection here?

25           MR. DILL:  Just object -- sorry.  Objection,

CROSS - RUDOLPH

1    hearsay -- objection, hearsay, as to Ms. Milliron.

2            THE COURT: All right. That objection is

3    overruled, given the standing limiting curative instruction

4    that we have in place in this trial.

5        (Government's Exhibit 82 received)

6            THE COURT: Go ahead, Mr. Fields.

7    BY MR. FIELDS:

8    Q.   So let's look at page 14 of this exhibit, please.

9            And do you see this -- this message here at the

10   bottom, does it say, "Hi, Ann, it's Larry"?

11   A.   Yes.

12   Q.   So these are text messages to Ann McCoy?

13   A.   Yes, sir.

14   Q.   And now on page 30 -- first of all, were you trying to

15   pursue a relationship with Ms. McCoy?

16   A.   Just wanted to have sex with her. That's all.

17   Q.   And did she ask you whether or not you still live under

18   the same roof with your wife?

19   A.   Yes, sir.

20   Q.   And this -- this text is hard to make out, but at the

21   bottom there, what did you tell her?

22   A.   Just says "time."

23   Q.   Well, yeah, sorry. This one down here at the bottom

24   that I've circled. What did you tell her?

25   A.   "We have two houses, yes."

CROSS - RUDOLPH

1    Q.    And let's go to page 31.  What did you tell her about

2    your marriage with Bianca?

3    A.    "Mutual exclusion."

4    Q.    And that's -- that's not what you said in your

5    deposition, right?

6    A.    No.

7    Q.    And you didn't tell Ms.  McCoy that you had an open

8    marriage?

9    A.    No, sir.  Not directly, no, sir.

10   Q.    You didn't tell her that you had an agreement with your

11   wife where you could see other people?

12   A.    No, sir.

13   Q.    You tried to convince her that you were separated.

14   A.    Implying that, yes, sir.

15   Q.    All right.  And we can take that down.

16         You were also asked about Ms.  Milliron in your

17   deposition.  Do you remember that?

18   A.    Yes, sir.

19   Q.    And, again, you were under oath at that deposition.

20   A.    Correct.

21   Q.    You admitted that she had accompanied you on a trip to

22   Alaska in 2009, right?

23   A.    Yes, sir.

24   Q.    How did you characterize your relationship with Ms.

25   Milliron when you were asked about it in 2000 and during the

2887

CROSS - RUDOLPH

1    deposition?

2    A.    I don't recall.  I may have referenced the word

3    "medical aide."

4    Q.    She was a dental hygenist, right?

5    A.    Yeah, dental hygienist.

6    Q.    And she shared a cabin with you on that trip?

7    A.    She did.

8    Q.    When you were asked in that deposition about whether or

9    not you spent time in that cabin in a room together, what

10   did you say?

11   A.    I don't remember.

12   Q.    Did you answer that, while you were at the lodge, you

13   shared a large cabin that had multiple bedrooms?

14   A.    Yes, sir.  Correct.

15   Q.    So did you try to make it out as though you were not

16   together?

17   A.    Yes, sir.

18   Q.    Was that true?

19   A.    No, sir.  Pardon me.

20   Q.    All right.  So you testified on direct about an

21   arrangement that you and your wife had.  Do you remember

22   that testimony?

23   A.    Yes, sir.

24   Q.    And we've heard evidence from you and from others that

25   Bianca had affairs, right?

2888

CROSS - RUDOLPH

1    A.    Yes, sir.

2    Q.    Approximately when were those affairs?

3    A.    Well, the two I knew of were '98 and 2000.

4    Q.    So that's 16 years before she died?

5    A.    Correct.

6    Q.    Now knowing that Bianca had these affairs, it is

7    different than saying she was regularly seeing other men

8    after that, right?

9    A.    Say that again, please.

10    Q.    So the fact that she had these affairs in 2000, that

11    doesn't mean she was regularly seeing other men after that,

12    does it?

13    A.    I don't know.  We had a don't-ask-don't-tell

14    relationship.

15    Q.    Now, let's actually talk now about the postnuptial

16    agreement.

17    A.    Okay.

18    Q.    So your expert witness said that you were worth

19    $15 million in 2016; do you remember that?

20    A.    Yes, sir.

21    Q.    That's a lot of money, isn't it?

22    A.    Acquired over a lifetime, yes, sir.

23    Q.    Now, you married your wife in 1982?

24    A.    Yes, sir.

25    Q.    So by 2016, you'd been married for 34 years?

2889
CROSS - RUDOLPH

1    A.    Yes, sir.

2    Q.    Did she help you earn all that money?

3    A.    Yes, she contributed.   Yes, sir.

4    Q.    Because your marriage was a partnership?

5    A.    Correct.

6    Q.    She worked hard to help take care of your family?

7    A.    Yes, sir.

8    Q.    And for the most part she stayed home to take care of

9    the kids while you were at work, right?

10   A.    Yes, sir.

11   Q.    So she helped you earn all that money?

12   A.    Yes, sir.

13   Q.    So it's not in evidence, let's look at Government's

14   Exhibit 606.

15          MR. FIELDS:   This is just a demonstrative, Your

16   Honor.   I don't plan to admit it, but I'd like to show it to

17   the jury.

18          THE COURT:   Any objection?

19          MR. MARKUS:   No.   It looks like the same --

20   different colors but the same one I used in opening, so no

21   objection.

22          MR. FIELDS:   It's not the same one you used in

23   opening.   It's slightly different.

24   BY MR. FIELDS:

25   Q.    Does this pie chart show the distribution of the

CROSS - RUDOLPH

1    estate?

2              THE COURT:  Hold on.  I haven't --

3              MR. FIELDS:  Sorry.

4              THE COURT:  So that you can do it, I need

5    Mr. Markus's final answer.

6              MR. MARKUS:  This is the first time I'm seeing it.

7    Just give me one moment, Your Honor.

8              No objection.

9              THE COURT:  All right.  You may show this exhibit

10   to the jury as a demonstrative.  It's not admitted into

11   evidence.  Thank you.

12   BY MR. FIELDS:

13   Q.   So, Dr. Rudolph, if your postnup was valid, is it fair

14   to say your wife would have only gotten $2 million?

15   A.   Yes, sir.

16   Q.   And the total amount of the pie here would have been

17   $15 million?

18   A.   Yes, sir.

19   Q.   So this shows sort of what the division of assets would

20   have been like in a divorce in 2016 if the postnup was

21   valid.

22   A.   Correct.

23   Q.   Do you think you deserved that entire blue space of the

24   pie?

25   A.   At the time it was drafted, yes.  In 2016, who knows.

2891

CROSS - RUDOLPH

1    Q.    At the time it was drafted, had your wife actually been

2    contributing to the household?

3    A.    Yes, sir.

4    Q.    She had been working with you in that same partnership?

5    A.    Correct.

6    Q.    And at the time it was drafted, I believe you said your

7    wealth was approximately $7 million?

8    A.    Something like that, yes, sir.

9    Q.    And even though the total wealth between the two of you

10    was $7 million, you thought she deserved only 2 million?

11    A.    At the time, that was my advice by counsel, and I

12    agreed with it.

13    Q.    You thought that was fair?

14    A.    Considering the circumstances, yes, sir.

15    Q.    Let's get into the circumstances.  So it sounds like

16    you were -- your testimony was that you were happily married

17    until that point, right?

18    A.    Yes, sir.

19    Q.    And it sounds like you thought the two of you were both

20    being faithful to one another?

21    A.    Yes, sir.

22    Q.    So you were hurt.

23    A.    Yes, sir.

24    Q.    And she wrote you that letter.  Let's look at that.

25              So it's RB, which is in evidence.

CROSS - RUDOLPH

1           Fair to say, that in that letter, she said she felt

2    bad?

3    A.    Yes, sir.

4    Q.    She felt that she had wronged you?

5    A.    Yes, sir.

6    Q.    Is it your testimony today under oath that up until

7    that point you had been faithful to her?

8    A.    I believe so, yes, sir.

9    Q.    So the whole principle behind sort of the postnup is

10   that she's the one who committed an act of adultery?

11   A.    That was the beginning, yes, sir.

12   Q.    So she's the one who put your marriage at risk?

13   A.    Say again.

14   Q.    So she was the one who put your marriage at risk?

15   A.    She's the one that wanted a divorce, yes, sir.

16   Q.    She's the one who sort of spoiled the marital

17   happiness?

18   A.    She wanted -- she was the one that wanted the divorce,

19   yes, sir.

20   Q.    And are you telling the members of the jury that, up

21   until that point in time, you had never had any affairs?

22   A.    I may have.

23   Q.    Do you know a woman named Maryann Vermessen?

24   A.    Yes, sir.

25   Q.    What was your relationship with her?

CROSS - RUDOLPH

1   A.   She was one of my employees.

2   Q.   Did she work with you for a long period of time?

3   A.   Yes, sir.

4   Q.   Over 20 years?

5   A.   It was a long time, yes, sir.

6   Q.   And you had an affair with her, didn't you?

7   A.   We had sex.

8   Q.   That started around 1988?

9   A.   What year, sir?

10  Q.   Around 1988?

11  A.   I can't recall that far back.  No, sir.

12  Q.   Started -- can we say the '90s?

13  A.   Perhaps.

14  Q.   Before you confronted Bianca about her affair?

15  A.   Yes, sir.

16  Q.   Did you tell Bianca that you'd been having affairs?

17  A.   I did not.

18  Q.   So you made it seem like all of this was her fault?

19  A.   Yes, sir.

20  Q.   Now, your testimony is that after the divorce, you had

21  a -- I think you characterized it as a don't-ask-don't-tell

22  relationship?

23  A.   Correct.

24  Q.   And this letter that she wrote to you, was that before

25  or after you had reached that agreement with one another?

CROSS - RUDOLPH

1    A.    I think it was after.

2    Q.    So let's look at page 2.  And you'll have to bear with

3    me because sometimes it can take me a little while to find

4    this.  What did she say, starting with, "This"

5    A.    "This, too, leaves a feeling of hopelessness and

6    anguish as I want to make things better now.  I want peace

7    for us now."

8    Q.    So she said she was feeling hopelessness and anguish?

9    A.    Sir?

10   Q.    She was -- she said she was feeling hopelessness and

11   anguish?

12   A.    Yes, sir.

13   Q.    Over the fact that she'd had these affairs?

14   A.    Yes, sir.

15   Q.    And down here at the bottom it says -- she talks about

16   "the pain I have," and if you go to the next page -- "caused

17   you"?

18   A.    Yes, sir.

19   Q.    So she's talking about how harmful affairs can be?

20   A.    Correct.

21   Q.    Now let's go to page 5.  And if we look here -- oh,

22   yeah, so "Can't" -- it says, "Can't you see that I don't

23   know why I fill this void that allowed me to abandon my" --

24   and the next page -- "morals"?

25   A.    I see it, yes, sir.

CROSS - RUDOLPH

1    Q.    So those are morals she wanted to uphold?

2    A.    Correct.

3    Q.    And you're claiming that this is the woman who then

4    agreed to have extramarital affairs?

5    A.    Yes.

6    Q.    So you're saying that, even though she says in this

7    letter that affairs violate her morals, she agreed to that?

8    A.    Yes, sir.

9    Q.    And then I think on direct, you sort of implied that

10   you thought maybe she was having affairs when she was out on

11   these hunts internationally?

12   A.    Yes, sir.

13   Q.    Do you remember hearing from Adam Howard-Davies?

14   A.    Yes, sir.

15   Q.    Do you think that's the kind of man she was having

16   affairs with?

17   A.    No, sir.

18   Q.    Take this down.  Now let's look at Exhibit RC, which is

19   in evidence.

20           Is this a letter from your attorneys to you?  Or

21   it's said from you to your attorneys.

22   A.    Yes, sir.

23   Q.    And are you the one proposing a postnuptial agreement?

24   A.    Yes, sir.

25   Q.    Now, I think you said -- sorry, Ms.  Guerra.

CROSS - RUDOLPH

1      COURTROOM DEPUTY:  RC is not in evidence.

2      MR. FIELDS:  Oh, I apologize.  Let's take that

3  down.

4      Your Honor, at this time I would move for the

5  admission of Government's [sic] Exhibit RC.  It's within

6  that series of letters that were admitted on the direct

7  examination.

8      MR. MARKUS:  No objection.

9      THE COURT:  Okay.  There being no objection,

10  Exhibit RC is admitted into evidence; may be published to

11  the jury.

12      (Defendant's Exhibit RC received)

13  BY MR. FIELDS:

14  Q.    So is this an email you were asking your attorneys for

15  a postnuptial agreement?

16  A.    Correct.

17  Q.    I think on direct you were saying Bianca was having

18  these affairs with Doug Scandrol; she was the one who wanted

19  the divorce?

20  A.    Yes, sir.

21  Q.    So if she wanted a divorce, why would she agree with a

22  postnuptial agreement with only 2 million out of the

23  $7 million?

24  A.    Why?  We had a conversation about it and, cards on the

25  table, that was the option:  divorce or we can do a

CROSS - RUDOLPH

1    postnuptial.

2    Q.    Well, if she had just agreed to a divorce, she would

3    have gotten half, right?

4    A.    Correct.

5    Q.    Now let's look at -- let me check first this time.

6            MR. FIELDS:  Is RF in evidence?

7            COURTROOM DEPUTY:  RF is in evidence.

8            MR. FIELDS:  Thank you, Ms.  Guerra.

9    BY MR. FIELDS:

10   Q.    Let's look at Government's Exhibit RF.  So first of

11   all, this series of letters that we looked at yesterday,

12   these are letters from -- between you and your attorneys,

13   right?  Oh, sorry.  Thank you.

14           All right, so Government's Exhibit RF, these are

15   letters between you and your attorneys, right?

16   A.    Yes, sir.

17   Q.    You had a lawyer?

18   A.    Yes, sir.

19   Q.    And at the time in the relationship, you controlled all

20   of the finances, right?

21   A.    I can't say "all."  We had mutual accounts, yes, sir.

22   Q.    Did you control most of them?

23   A.    I don't recall.  Perhaps.  I just don't remember.

24   Q.    You were the one who had the money to buy attorneys if

25   you wanted one?

CROSS - RUDOLPH

1    A.    Well, yes, sir.

2    Q.    And if Bianca would have wanted an attorney, you would

3    have had to authorize the money for her to get one, right?

4    A.    Agreed.  Yes, sir.

5    Q.    So let's look at page 2 of this exhibit.

6          This is the memo from your lawyer?

7    A.    I -- yes, sir.  I think so.

8    Q.    I don't want you to think, Dr. Rudolph.  If you need

9    time to take --

10   A.    From CJA.  I don't recognize that initial.

11   Q.    Let's go back to the first page.

12         Could that be Chaz Avalli, Charles Avalli?

13   A.    Oh, okay.  Yes, sir.  I just didn't recognize the

14   initials.

15   Q.    So is this a memorandum you got from your attorneys?

16   A.    One of them.

17   Q.    Do you remember Chaz?  He was one of your attorneys?

18   A.    Yeah, he's on the -- on the header, yes, sir.

19   Q.    All right.  Now let's look at -- well, first of all, do

20   you see here on -- that second paragraph there, does it say

21   that you were the owner of a whole life policy of

22   $755,000 -- $755,095?

23   A.    Correct.

24   Q.    Now let's look at the next page.  But even then your

25   attorneys were calling that "such a large life insurance

CROSS - RUDOLPH

1    policy," right?

2    A.    I don't know what reference this is, sir.  I -- I

3    have -- "such a large life insurance policy."  I don't know

4    if he's referring to the amount or estate planning.  I'm not

5    sure, sir.

6    Q.    Do you think he was referring to that $755,000

7    policy?

8    A.    Yes, sir.  That policy in particular, yeah.

9    Q.    So even then this lawyer thinks that $755,000 is a

10   large amount.

11   A.    That's his opinion, yes, sir.

12   Q.    And I think you testified on direct that, when lawyers

13   give you advice, you generally take it?

14   A.    Generally, yes.

15   Q.    Especially about estate planning things, right?

16   A.    Yes, sir.

17   Q.    Because estate planning could be really complicated?

18   A.    It can be.

19   Q.    Yeah.  The estate tax and the tax code, there's all

20   these exceptions.  It's really complicated.

21   A.    It can be, yes, sir.

22   Q.    So let's look here.  And let's look -- give me just one

23   second while I play Where's Waldo?  If we look -- let's go

24   to the next page.  Oh, sorry.  Previous page.  Oh, yeah,

25   there it is.

CROSS - RUDOLPH

1          Do you see this up at the top where it starts, "I
2    believe"?
3    A.   Yes, sir.
4    Q.   What does it say?
5    A.   "I believe that the better alternative is to use an
6    irrevocable life insurance trust with the children as the
7    beneficiaries."
8    Q.   So by that time, you'd already sort of heard about an
9    irrevocable life insurance trust?
10   A.   It's in his document.  I don't know if I gave it any
11   consideration, sir.
12   Q.   You didn't give any consideration to your lawyer's
13   legal advice?
14   A.   With -- at this time, if this is all around this
15   process with my wife, I don't think I was too worried about
16   life insurance.
17   Q.   You weren't worried about estate planning as part of
18   this postnuptial arrangement?
19   A.   Well, that I was.  Not the value of the policy, but
20   yes.
21   Q.   Well -- but -- so you would have -- you would have
22   considered your attorney's advice?
23   A.   Yes, sir.
24   Q.   Okay.  And now if we look at the third paragraph there,
25   what does it say about what percentage of the assets the two

CROSS - RUDOLPH

1    of you -- what does it say about the distribution of assets

2    at the time?

3    A.    "Of the approximately 6 million of investment assets

4    owned by Dr. and Mrs. Rudolph, it appears that 90 percent of

5    them are titled jointly."

6    Q.    So 90 percent of the estate was jointly owned?

7    A.    According to this, yes, sir.

8    Q.    And your testimony is that she voluntarily agreed to

9    give up half of that?

10   A.    Yes, sir.

11   Q.    And do you see here at the end -- does it say that

12   you're going to have to induce your wife to execute a

13   postnup?

14   A.    Yes, sir.

15   Q.    Now let's look at --

16         MR. MARKUS:  That's not what it says.  I would ask

17   for it to be read so that --

18   BY MR. FIELDS:

19   Q.    Sure, let's read it.

20         MR. MARKUS:  Let's read it.

21         THE COURT:  Can we blow it up?

22         MR. FIELDS:  Yup.

23   BY MR. FIELDS:

24   Q.    Can you please read the part that starts with, "Also."

25   A.    Excuse me.  "Also the transfer of $1 million to his

CROSS - RUDOLPH

1    wife's name alone would probably be a provision of the

2    postnuptial agreement and could, in fact, be the inducement

3    to have his wife execute the postnuptial agreement."

4    Q.    So you would have to induce your wife to sign the

5    postnup?

6    A.    I'm -- he put it in this document, but that wasn't the

7    end result.

8    Q.    Okay.  And now let me ask again:  Is -- or is defense

9    Exhibit RG among the series that was admitted yesterday?

10            COURTROOM DEPUTY:  It is.

11            MR. FIELDS:  Thank you.

12   BY MR. FIELDS:

13   Q.    So let's look at Government -- or Defense Exhibit RG,

14   please.  Is this another letter from your attorneys to you?

15   A.    Correct.

16   Q.    And now let's go to the next page.

17            Is this a letter from your attorneys to you?

18   A.    Yes, sir.

19   Q.    All right.  And do you see down here at the bottom?

20   A.    I do.

21   Q.    Okay.  What does it say about the general cosmetic

22   approach?  Let's -- I don't want to phrase it.  Let's have

23   you read it.

24   A.    Okay.  "The general cosmetic approach should be husband

25   will approach brother-in-law about this game plan, as well

2903

CROSS - RUDOLPH

1    as the underlying reasons, including preservation of the

2    assets for the children and insurance against any indiscrete

3    reoccurrences on the part of the wife."

4    Q.   You can stop there, Dr. Rudolph.

5         So "brother-in-law," would that be Ralph?

6    A.   Yes, sir.

7    Q.   But you didn't actually tell Ralph about a postnuptial

8    agreement, did you?

9    A.   I -- I did not.  I don't know if Bianca did or not.

10   Q.   Well, this says "husband will approach brother-in-law,"

11   right?

12   A.   Correct.

13   Q.   And you didn't approach him.  You didn't tell him that

14   you were trying to get his sister to give you most of the

15   marital estate?

16   A.   No, I did not.

17   Q.   Because if you told Bianca's brother, who's a lawyer,

18   that you were going to take more than half of the marital

19   estate, he probably would have stopped that, right?

20   A.   Perhaps.

21   Q.   And let's look again at the memo.  Let's -- the first

22   full paragraph.  Oops.  Sorry.  Second page.  I was wrong.

23   First page is just the -- yeah.  Oops.  Next page.  Let's

24   zoom in right here, please.

25         So was it originally contemplated that there would

CROSS - RUDOLPH

1   be a 25 to 40 percent distribution?

2   A.    Yes, sir, from this document.

3   Q.    And now let's go to the last page -- or, sorry, not

4   last page -- last paragraph, down here.  All right.

5          And what does it say starting with "Lastly."  Could

6   you please read that for us, please.

7   A.    Which part, sir?

8   Q.    The part that starts with "Lastly."

9   A.    "Lastly, husband shall advise wife that if postnuptial

10  terms" -- sorry -- "cannot be agreed to, he will be forced

11  to entertain separating and seeking a divorce at this stage

12  since his exposure will be less now than it may be in the

13  future if wife precipitates a separation or divorce due to

14  her conduct."

15  Q.    So were you threatening to leave her unless she signed

16  a postnup?

17  A.    When we had our conversation, her options were, to her:

18  Would you like to have divorce or would you like to do the

19  postnup?

20  Q.    Well, this says that if she won't agree to a postnup,

21  you'll leave, right?

22  A.    There would be a divorce, yes, sir.

23  Q.    But I thought you said earlier that Bianca's the one

24  who wanted the divorce.

25  A.    She did.

CROSS - RUDOLPH

1    Q.    But you had to threaten her with divorce to get a

2    postnup?  How does that make any sense?

3    A.    Well, I didn't threaten her.  Those were her two

4    options.

5    Q.    And now let's look at -- is RH in evidence?

6            COURTROOM DEPUTY:  Yes, it is.

7    BY MR. FIELDS:

8    Q.    Let's look at RH, please.

9            Does it say, what is the status of your

10   negotiations?

11   A.    Yes, sir.

12   Q.    This is a letter from Gary Gentile?

13   A.    Correct.

14   Q.    So you had to negotiate with your wife?

15   A.    Well, that's his term.  Yes, sir.

16           MR. MARKUS:  Judge, I would object.  I would ask

17   the prosecutor to show the time of this.  This is back in

18   1999.

19           MR. FIELDS:  I think the time is on it.

20           THE COURT:  I think that's been brought to the

21   jury's attention now.

22           MR. MARKUS:  Thank you, Your Honor.

23           THE COURT:  All right.  Go ahead, Mr. Fields.

24           MR. FIELDS:  And RI, is that in evidence?

25           COURTROOM DEPUTY:  RI is in evidence.

CROSS - RUDOLPH

1     MR. FIELDS:  Could we please look at RI.

2   BY MR. FIELDS:

3   Q.   Is this another letter from a couple weeks later?

4   A.   Yes, sir.

5   Q.   And what does it say?

6   A.   "Dear Doc.  What is the status of your negotiations?

7   Give me a call."

8   Q.   So it sounds like Bianca wouldn't just agree, right?

9   A.   Well, I don't know.  I can't -- I don't think we had

10   extended negotiations.  I think she signed the day of or the

11   next day.  I'm not sure.

12   Q.   So this was in 1999.  That's before the 2000 agreement.

13   A.   1999.  Okay.

14   Q.   Is it before the 2000 agreement?

15   A.   Yes, sir.

16   Q.   Around this time, did you put your wife under

17   surveillance?

18   A.   No.

19   Q.   Did you tap her phone?

20   A.   Yes.

21   Q.   Did you hack her email?

22   A.   Well, I had access to it.

23   Q.   And at that point in time, you were the working spouse,

24   right?

25   A.   Correct.

2907

CROSS - RUDOLPH

1    Q.    So Bianca had no independent sources of money except

2    for you, right?

3    A.    Correct.

4    Q.    You controlled the bank accounts?

5    A.    We were joint, but yes, I controlled them.

6    Q.    So you exercised a lot of control over her life at that

7    point in time; isn't that right?

8    A.    I did, yes, sir.

9    Q.    And you were worried about divorce, right?

10   A.    I didn't want a divorce.

11   Q.    Yeah, because then you would have to give up half of

12   your estate?

13   A.    Well, my primary reason was watching my family fall

14   apart, yes, sir.

15   Q.    And even after this postnup, even after that, you were

16   still worried about divorce, weren't you?

17   A.    Sure.   It doesn't go away with a signature.

18   Q.    You were worried that if there was a divorce, Bianca

19   would get half of your money?

20   A.    Of course.

21   Q.    So that's why you talked to Al Smith about divorce?

22   A.    I did.

23   Q.    That's why you asked him how to find a way to avoid

24   losing half?

25   A.    At some point, yes, sir.

CROSS - RUDOLPH

1    Q.    And you actually asked him about postnuptial

2    agreements.

3    A.    I have no memory of that, but if that's what he

4    testified to, yes, sir.

5    Q.    Because you were potentially worried that this postnup

6    might not be enforceable, right?

7    A.    Oh, I can't say that.  I don't know that, sir.

8    Q.    We've already talked about MaryAnn Vermessen, right?

9    A.    Yes, sir.

10    Q.    And you said you had a relationship with her?

11    A.    Yes, sir.

12    Q.    And did you tell her that there was no way you would

13    get a divorce because Bianca would clean you out?

14    A.    No, sir.

15    Q.    So if she told that to the FBI, she was wrong?

16    A.    Yes, sir.

17    Q.    And you also had a business relationship with a dentist

18    named Rick Edmonds, right?

19    A.    Yes, sir.

20    Q.    What was his role, or what did he do?

21    A.    We were putting him in management training.  He used to

22    be my personal trainer at the gym.

23    Q.    Did he eventually become the chief operating officer at

24    the dentistry?

25    A.    I don't know that.

CROSS - RUDOLPH

1  Q.  Did he have a role at the dentistry?

2  A.  He was in management training, yes, sir.

3  Q.  Did he work there between approximately 2007 and

4  2009?

5  A.  I can't comment on that.  I think so.

6  Q.  And you talked to him about divorce, too.

7  A.  Mutually.  He was interested in a divorce as well.

8  Q.  And that would have been after the postnup was

9  supposedly signed.

10  A.  Correct.

11  Q.  And you told him that you were too old to be poor,

12  right?

13  A.  Probably.

14  Q.  Did you ever sign your wife's name on any documents?

15  A.  No, sir.

16  Q.  Not even like a credit card receipt at a restaurant?

17  A.  I don't think so.

18  Q.  Have you ever signed anyone else's name?

19  A.  Anybody else's name?

20  Q.  On a document.

21  A.  Not that I can recall.

22  Q.  Let's go back to Ms. Vermessen.  At some point did you

23  get in a dispute with her?

24  A.  A work dispute, yes.

25  Q.  You offered her six weeks of severance if she would

CROSS - RUDOLPH

1     agree not to sue you, right?

2     A.    It was a company decision suggested by counsel.

3     Q.    So then you had legal documents drafted?

4     A.    I believe so.

5     Q.    And you gave them to Ms. Vermessen?

6     A.    Sorry?

7     Q.    And you gave them to Ms. Vermessen?

8     A.    Somebody did, yes.

9     Q.    But she wouldn't sign them, would she?

10    A.    I don't remember.

11    Q.    So you forged her signature on those documents, didn't

12    you?

13    A.    No.

14    Q.    If she told that to the FBI, she would be wrong?

15    A.    Correct.

16          MR. MARKUS:    Judge, objection.    Assumes facts not

17    in evidence.    404(b), 608, 609.    This is improper.

18          THE COURT:    Overruled.

19    BY MR. FIELDS:

20    Q.    You put Lori's signature on documents, too, didn't you?

21    A.    That I can't remember either.

22    Q.    Let's look at Government's Exhibit -- it's not in

23    evidence -- Government's Exhibit 623, page 4.

24          Is this a document from the trip the two of you

25    took to Alaska?

1    A.    Yes, sir.

2    Q.    And whose name is -- well, do you see her name at the

3    top?

4    A.    Yes, Lori's.

5    Q.    Now let's go to page 6.  Is this also a document with

6    Lori Milliron's name on it?

7    A.    Yes, sir.

8    Q.    You signed her name on this document, too, didn't you?

9    A.    I just see her printed name up there.

10   Q.    Do you see the signature?

11   A.    Can you circle it for me?  I . . .

12            I put my name there.

13   Q.    That's your -- you're saying that's your name?

14   A.    Yes, sir.

15   Q.    On her behalf?

16   A.    Yes, sir.  It was a -- something about a fishing

17   tournament.  Yes, sir.  That's my name.

18   Q.    All right.  So -- we can take that down.

19            By the year 2000, you'd been married to Bianca for

20   almost 20 years.

21   A.    18.  Yes, sir.

22   Q.    So you probably had seen her sign things thousands of

23   times?

24   A.    I've seen her sign things, but that may be a high

25   number.

CROSS - RUDOLPH

1    Q.    And you were good at writing her signature, weren't

2    you?

3    A.    No, sir.

4    Q.    You put her signature on that postnup?

5    A.    No, sir.  I did not put her signature on that postnup.

6    Q.    And then you told her that you put her signature on the

7    postnup, didn't you?

8    A.    Told my wife?  No, sir.

9    Q.    And you held it over her as a form of control?

10   A.    No, sir.

11   Q.    Because the wiretap hadn't worked, right?

12   A.    No, sir.

13   Q.    And the surveillance hadn't worked.

14   A.    No, sir.

15   Q.    Let's talk about the Swanepoels.  You had a close

16   relationship with the Swanepoels.

17   A.    Yes.

18   Q.    Mark was the professional hunter on the trip you took

19   in October, right?

20   A.    Correct.

21   Q.    He was one of the witnesses to your wife's death?

22   A.    Well, yes, sir, he was on-site.

23   Q.    One of the first people to see you in that cabin.

24   A.    Correct.

25   Q.    The one you spoke to right after Bianca died?

CROSS - RUDOLPH

1    A.    Yes, sir.

2    Q.    So he would have had key information about the

3    circumstances of your wife's death?

4    A.    Yes, sir.

5    Q.    And the other people at the camp, they would have

6    followed his lead and taken his instructions, right?

7    A.    I can't answer that, sir.

8    Q.    He's not someone that you would have wanted to be

9    suspicious of you, right?

10   A.    Mark?

11   Q.    Yeah.

12   A.    I have no reason to believe he was suspicious of me.

13   Q.    Did an investigator from Diligence call you on December

14   10th, 2016?

15   A.    Yes, I'm sure they did.

16   Q.    That's the one that you hung up on?

17   A.    Well, didn't answer it.  Yes, sir.

18   Q.    Now, this is not in evidence.  Let's look at

19   Government's Exhibit page 624.

20          Do you know what this is?

21          THE COURT:  Wait, hold on.  Exhibit 624?  You

22   said --

23          MR. FIELDS:  Yes.

24          THE COURT:  You said page 624.

25          MR. FIELDS:  Oh, I apologize, Your Honor.  Exhibit

CROSS - RUDOLPH

1   624.

2               THE COURT:  Okay.

3   BY MR. FIELDS:

4   Q.   Do you recognize this?

5   A.   I do.

6   Q.   What is it?

7   A.   It is the borrowing details for a business called

8   Champaign Nails in South Africa that I became a director of,

9   and my investment amount in that business.

10  Q.   Does it have your signature on it?

11  A.   Sorry, sir?

12  Q.   Does it have your initials on it anywhere?

13  A.   On the bottom, yes, sir.

14               MR. FIELDS:  Your Honor, I move for the admission

15  of Government's Exhibit 624.

16               MR. MARKUS:  No objection.

17               THE COURT:  There being no objection, Exhibit 624

18  is admitted into evidence and may be published to the jury.

19         (Government's Exhibit 624 received)

20  BY MR. FIELDS:

21  Q.   Let's look at page 7, please.  Does that have your name

22  on it?

23  A.   Yes, sir.  And my initials, yes, sir.

24  Q.   And what's the date there?

25  A.   Help me.  I can't see it.  Can you circle it?

CROSS - RUDOLPH

1        Oh, thank you.  December 12th, 2016.

2   Q.   By signing this document, what were you promising?

3   A.   I was going to invest in their business, the business

4   Clipper and Clutch.

5   Q.   How much were you going to give to him?

6   A.   20,000.

7   Q.   So you offered to give Mark Swanepoel $20,000 two days

8   after you had been contacted by an insurance investigator?

9   A.   That's just serendipity.  It wasn't connected to an

10  insurance investigator.  He and I had been talking about

11  this business for quite a while.

12  Q.   That's right.  You had actually discussed it with

13  Bianca, right?

14  A.   Sorry?

15  Q.   You had actually discussed it with Bianca?

16  A.   I don't know that, but probably.

17  Q.   It had been something that the Swanepoels were hoping

18  about and dreaming about?

19  A.   For a number of years, yes, sir.

20  Q.   And they really wanted your help to get it going?

21  A.   No.  It -- that came -- it developed that way.  He

22  asked me for business advice, and from the sounds of it he

23  had a pretty good plan.

24  Q.   So even though you've been planning it for quite some

25  time, you didn't actually go through and give him $20,000

CROSS - RUDOLPH

1    until two days after you had been contacted by an insurance

2    investigator?

3    A.    There's no connection, Mr. Fields.

4    Q.    Now let's look at Government's Exhibit -- it's not in

5    evidence -- 647.  What is this?

6    A.    A copy of a check for the investment as director in

7    Champaign Nails.

8    Q.    This is a check that you issued?

9    A.    Yes, sir.

10            MR. FIELDS:  Your Honor, I move for the admission

11    of Government's Exhibit 647.

12            MR. MARKUS:  No objection.

13            THE COURT:  There being no objection, Exhibit 647

14    is admitted into evidence and may be published to the jury.

15        (Government's Exhibit 647 received)

16    BY MR. FIELDS:

17    Q.    This is the check you wrote to Mark Swanepoel for

18    that -- well, actually, let's take a step back.

19            So this is a check that you wrote for $20,000

20    A.    Correct.

21    Q.    Where did you put that check to?

22    A.    Where did I deposit it?

23    Q.    Yup.

24    A.    Camelback Consulting.

25    Q.    And then what did you do once it was deposited in the

CROSS - RUDOLPH

1    Camelback Consulting account?

2    A.    I don't know.  I either sent him a check or wired him

3    the money.

4    Q.    So you gave him the money?

5    A.    Yes, sir.

6    Q.    And this $20,000, did it come from the trust account

7    where you were expecting life insurance proceeds?

8    A.    Yes.  All my assets, with rare exception, were in the

9    trust account.

10   Q.    And this check, what's the date on it?

11   A.    February 21st, 2017.

12   Q.    Is that about a month before he was actually

13   interviewed by the insurance investigators?

14   A.    I don't know that.

15   Q.    Let's go back to Government's Exhibit 10.  And let's go

16   to page 4.  Page 3, please.

17            Is that the interview with Mark Swanepoel by

18   Diligence?

19   A.    Yes.  I see his name.  Yes, sir.

20   Q.    On what date?

21   A.    March 2d.

22   Q.    2017?

23   A.    Correct.

24   Q.    So -- and the check that we looked at -- it's now in

25   evidence -- you can put it over there on the right side

CROSS - RUDOLPH

1    maybe.

2              So the check that you wrote to Mark for $20,000 --

3    or eventually wrote to Mark for $20,000 was just a couple of

4    weeks before his interview with the insurance investigators?

5    A.    By calendar date, yes.

6    Q.    Now, to be fair, eventually he repaid the loan, right?

7    A.    He did not.

8    Q.    He did not repay the loan?

9    A.    He did not.

10   Q.    Didn't he discount a hunt for you?

11   A.    Not on that investment, I don't think so.

12   Q.    It was a different investment?

13   A.    Yes, sir.

14   Q.    So he never repaid this loan back to you?

15   A.    Best of my recollection, I do not think so.

16   Q.    All right, let's talk about the cancellation of -- or

17   at least, I guess, the satisfaction of another debt that you

18   had.  Did you let him pay back a loan you had given him by

19   discounting a hunt?

20   A.    Say that again, sir.  I'm sorry.

21   Q.    Did you let him pay back a loan to you by discounting a

22   hunt?

23   A.    Yes, sir.

24   Q.    So this is not in evidence.  If we could please look at

25   Government's Exhibit 625.  And now let's go to page 4.  I

CROSS - RUDOLPH

1    have my page numbers wrong.  Can we go to the next page.

2    Ah, yes, the next page after this.  Actually back up to page

3    5.  Let's keep going.  I'm sorry.  Keep going.  Next page.

4    Oops.  Go back.  Sorry.  Oh, there we go.  Oop.  Page 6.

5    Sorry.  Thank you.

6                So is this an agreement between you and the

7    Swanepoels?

8    A.    Yes, sir.  Just looking at the details, yes, sir.

9                MR. FIELDS:  Your Honor, at this time I'd move for

10    the admission of page 8 of Government's Exhibit 625.  And

11    I'm happy to admit the whole exhibit, but there's a lot of

12    loan documents.

13                MR. MARKUS:  Have I seen this before?

14                MR. FIELDS:  You provided it.

15                MR. MARKUS:  When?

16                THE COURT:  Any objection?

17                MR. FIELDS:  I don't know.  I'll have to ask.

18                MR. MARKUS:  Judge, this is the first time I'm

19    seeing this piece of paper.  Can I just have a moment to

20    look at it?  This hasn't been provided to me before.

21                THE COURT:  Sure.

22                MR. FIELDS:  It was produced by the defendant, Your

23    Honor.  I can get the exact date.

24                MR. MARKUS:  Do you have the whole exhibit?

25                MR. FIELDS:  Yeah, it should be in that binder

CROSS - RUDOLPH

1      there.

2               MR. MARKUS:  I have no objection to this page, Your

3      Honor.

4               THE COURT:  All right.  There being no objection,

5      page 8 of Exhibit 625 is admitted into evidence and may be

6      published to the jury.

7          (Government's Exhibit 625, page 8, received)

8      BY MR. FIELDS:

9      Q.   And so do you see here it describes sort of the

10     financing for this hunt?

11     A.   Yes, sir.

12     Q.   And this is, again, going to be for a hunt in which

13     country?

14     A.   Zambia.

15     Q.   And do you see here where it says, "less carried over"?

16     A.   Correct.

17     Q.   Which loan was that?

18     A.   Well, that was an investment in a hunting concession in

19     South Africa just outside of Kruger Park.  SFS stood for

20     Swanepoel Firsick and Swanepoel, so it would have been Mark,

21     Pieter and another gentleman.  And I'd asked if I could

22     invest in it, ostensibly because I could have spent a

23     considerable amount of time in South Africa, not hunting but

24     participating in the camp and just being part of the process

25     and get a small return at some point.

2921
CROSS - RUDOLPH

1    Q.    So you gave him -- looks like, you know, at this time,
2    Mark owed you $26,120?
3    A.    Yes, sir.
4    Q.    But he was going to repay that with a hunt?
5    A.    Yeah.  But they never got the rights from the South
6    Africans.  They never got the concessions.
7    Q.    For that investment?
8    A.    Sorry?
9    Q.    For that investment, is that what you're saying?
10   A.    Correct.  Yeah.
11   Q.    So are you saying you never had to -- he never had to
12   repay that loan?
13   A.    Well, he gave me the money back on this hunt.
14   Q.    Okay, so he did give back the money?
15   A.    Yes, sir.
16   Q.    So this agreement is in 2019.  Did you get to go on
17   that hunt with him in Zambia in 2019?
18   A.    Yes, sir.
19   Q.    You think you got to go on a hunt in 2019?
20   A.    I'm sorry, sir?
21   Q.    Sorry.  So you think you got to go on a hunt with him
22   in 2019?
23   A.    Yes.
24   Q.    Well, did you -- did you go on a hunt with him in 2021?
25   A.    I did.

CROSS - RUDOLPH

1    Q.    And that hunt in 2021, is that what actually canceled

2    the debt?  That's when you actually carried through on this

3    agreement?

4    A.    2021?

5    Q.    Yup.

6    A.    For SFS?

7    Q.    Yeah, because COVID hit soon after, right?  COVID was

8    in 2020.  You couldn't go on any hunts.

9    A.    You're confusing me.  I apologize.

10   Q.    No, that's okay.  So this agreement is in 2019, right?

11   A.    Yes.  And I took a hunt that year.

12   Q.    Okay.  All right.  So let's move on.

13         Let's talk about Lori Milliron.  Am I correct in

14   saying that you sent her a text while you were still over in

15   Africa?

16   A.    I did.

17   Q.    What did you say in that text?

18   A.    I believe it said, "There's been an accident."

19   Q.    What was her response?

20   A.    I don't know if I got one.  I can't remember.

21   Q.    She didn't ask whether or not you were okay?

22   A.    Not that I recall.

23   Q.    Is that because she already knew what was going to

24   happen?

25   A.    No, sir.

CROSS - RUDOLPH

1    Q.    Is it fair to say that you love Lori Milliron?

2    A.    She's one of my best friends.  Yes, sir.

3    Q.    Have had a relationship with her since at least 2003?

4    A.    '-4, '-5, somewhere in there, yes, sir.

5    Q.    In fact, in some of the emails we looked at earlier,

6    you called her the love of your life?

7    A.    One of them, yes, sir.

8    Q.    And you had a close relationship with her children,

9    right?

10   A.    No, sir.

11   Q.    Well, you told her children that you loved them, didn't

12   you?

13   A.    Personally?

14   Q.    Yeah.

15   A.    I don't recall that.

16   Q.    Let's look at Government's Exhibit 90.  Page 73.

17   A.    "To Steph."

18   Q.    Do you see up there at the top?

19   A.    Okay.

20   Q.    Is that an email from you?

21   A.    "You are so sweet" . . .

22             Yes, sir, that's from me.

23   Q.    Who is steph17892@neo.tamu.edu?

24   A.    That would be her daughter.

25   Q.    Whose daughter?

CROSS - RUDOLPH

1    A.    Oh, Lori's.

2    Q.    What's her name?

3    A.    Stephanie.

4    Q.    And this is an email from you to her?

5    A.    Yes, sir.

6    Q.    And what do you say there starting with, "You"?

7    A.    Oh, "You know I love you."  Yes, sir.

8    Q.    Take that down.  And, actually, sorry, let's go back to

9    Government Exhibit 90, page 94.  And if we look at page 92.

10   I apologize.  I just had my page numbers all wrong.  Take

11   that down.

12         Now, is it fair to say that Lori could sometimes be

13   jealous?

14   A.    Probably at times.

15   Q.    She wanted you to herself?

16   A.    Well, we weren't exclusive with one another, so I can't

17   say that.

18   Q.    But she wanted -- she wanted more of you.

19   A.    Not really.  No.

20   Q.    Your testimony is that she didn't want to spend more

21   time with you?

22   A.    We both wanted to spend more time, but not with a

23   commitment, no, sir.

24   Q.    She wasn't jealous of the time you were spending with

25   other women?

CROSS - RUDOLPH

1    A.    I can't say if she was.  Maybe occasionally, but

2    nothing serious.

3    Q.    Would she get jealous when you used nicknames with

4    other women?

5    A.    Yes.

6    Q.    Because we saw those emails earlier, right?

7    A.    I did.

8    Q.    The ones with Stacey?

9    A.    Yes.

10   Q.    Were you trying to pursue a relationship with Stacey?

11   A.    No, sir.

12   Q.    Do you call her "Betty"?

13   A.    "Betty," and I had another nickname for her but it's

14   not in the email.

15   Q.    Was it "Charlie"?

16   A.    "Rose."

17   Q.    And were you pursuing a relationship with her?

18   A.    No, sir.

19   Q.    What about the "I love you, Charlie," to Stephanie?  Do

20   you remember that?

21   A.    I do that a lot.  That's just kind of my nature.

22   Q.    You just say "I love you" to women?

23   A.    Sometimes.  And men.

24   Q.    All right.  And fair to say that you -- you liked

25   having this arrangement where you could see any woman you

CROSS - RUDOLPH

1   wanted?

2   A.    It wasn't what I wanted in life.  It wasn't ideal.

3   Q.    Lori didn't really like the fact that you pursued other

4   women; isn't that right?

5   A.    No, not necessarily.  No.

6   Q.    She didn't like it when she found out that you had said

7   "I love you, Charlie" to Stacey?

8   A.    She sent that email that, yes, expressed some

9   displeasure.  But at the end of the day, that's the way it

10  was.

11  Q.    And it must have hurt her a lot, the fact that you

12  called her "Betty," which is the same nickname you sometimes

13  gave Lori, right?

14  A.    No, I don't think so.

15  Q.    And Lori was jealous of your relationship with Bianca,

16  wasn't she?

17  A.    She understood my relationship, and from Day 1

18  understood it and accepted it.

19  Q.    Let's look at Government's Exhibit 90, page 83.

20        We've looked at these before but I want to go

21  through them with you, Dr. Rudolph.  So this email down here

22  at the bottom -- were you asking Lori to meet with you?

23  A.    Yes, sir.

24  Q.    Where was she waiting for you?

25  A.    Mexico.

CROSS - RUDOLPH

1    Q.    And what place in Mexico?

2    A.    Cabo.

3    Q.    Let's go to the next one.  And, oops, sorry, not next

4    page, next -- yeah, there we go.

5          Well, first of all, GMOB, what does that stand for?

6    A.    Oh, I think it's "good morning old boy."

7    Q.    And she said, "Okay, I will wear that.  Here's a blog I

8    read today from Jim Shockey."

9          Who's Jim Shockey?

10   A.    Oh, he's a -- quite a famous, well-known hunting TV

11   personality.

12   Q.    He had a blog and sort of various --

13   A.    TV shows, yeah.

14   Q.    And you were hunting with him and with Bianca, right?

15   A.    Actually I was hunting with Bianca there, and he was

16   unassociated with me but still there.

17   Q.    And so she sent you this blog entry and she said,

18   "Thought you would like to read it.  It's nice."

19   A.    Yes, sir.

20   Q.    Was she being sarcastic?

21   A.    I don't think so.

22   Q.    Go to the next page -- or not next page, let's go to

23   the next paragraph.  Oops.  Right -- yeah.

24         What did you respond to her in this email on April

25   3d, 2011, time stamped 3:36 p.m.?

CROSS - RUDOLPH

1    A.    Yes.   "The old lady's not here.  Was on the visa list,

2    but I with Brussels that saved me."

3    Q.    Was that true?

4    A.    No.

5    Q.    She was with you in Ghana?

6    A.    Yes, sir.

7    Q.    And just so we're clear, "the old lady," who was that?

8    A.    That's Bianca.

9    Q.    So you weren't being truthful with Ms.  Milliron?

10   A.    Correct.

11   Q.    In fact, she responded, "Why would he say you showed up

12   today with your wife?"  And then she said, "I believe you."

13           Do you think she was being sarcastic?

14   A.    I don't know.

15   Q.    Next page -- or not next page.  We're going to do a

16   little bit more of this.  Whoops.  Sorry.  Zoom out.  Should

17   be better with my stylus.  Let's do those two.

18           What did she respond?

19   A.    "Why would he say you showed up today with your wife?

20   I believe you."

21   Q.    And your response was?  "I" --

22   A.    "I give up."

23   Q.    What did you mean by that?

24   A.    Well, I don't like anybody, including Lori, to discuss

25   my hunts and my hunting trips.  I'm very paranoid about the

CROSS - RUDOLPH

1     anti-hunting forces in the world.  This is 2011.  I was

2     preparing to become the chief communications officer at SCI.

3     So I think that was my -- the gist of my answer.

4            I didn't want to be involved with anything that had

5     anything to do with hunting in an email or any publication.

6     Q.    Did Lori email -- Lori Milliron's email to you

7     reference hunting?

8     A.    I'm sorry?

9     Q.    This -- the email on April 3d, 2011, at 7:41 --

10    A.    I think it's related --

11    Q.    -- say anything about hunting?

12    A.    Oh, sorry.  I think it's related to me being in Ghana.

13    Q.    You say you're sort of paranoid about the anti-hunting

14    forces, but Jim Shockey was a very public figure, right?

15    A.    I don't want to be that kind of public figure.

16    Q.    But you were -- he was there?  You were with him?

17    A.    He was hunting unassociated with me.  I wouldn't think

18    he would tell anybody on a blog that I was there.

19    Q.    All right.  And your testimony today under oath is that

20    you were afraid that these anti-hunting forces -- were you

21    afraid they would hack your email?

22    A.    I don't know.  We just get paranoid about it.

23    Q.    So your testimony under oath is that the "I give up"

24    was about anti-hunting and not about Lori being jealous?

25    A.    Yes, sir.  I don't want to talk about hunting in any

2930

CROSS - RUDOLPH

1    way, shape or form.

2    Q.    Were you worried that Lori was going to disclose these

3    emails?

4    A.    I don't know.

5    Q.    Were you worried that Lori might have some leverage

6    over you with these emails?

7    A.    No, sir.

8    Q.    Is it fair to say that sometimes it was hard to keep

9    Lori happy?

10   A.    Sure.   Fair.

11   Q.    Sometimes it was hard to balance seeing multiple women

12   at the same time?

13   A.    Say again.

14   Q.    Sometimes it was hard to balance seeing multiple women

15   at the same time?

16   A.    Sure.

17   Q.    And that's what you told your friend Al Smith, right?

18   A.    Yeah.

19   Q.    In fact, you told him that you used your travel to help

20   prevent the women in your life from finding out about each

21   other, right?

22   A.    Correct.

23   Q.    Including Bianca?

24   A.    Correct.

25   Q.    So you didn't want Bianca to know about your

CROSS - RUDOLPH

1    relationships.

2    A.    Well, keep the embarrassment down.  Remember, we had a

3    don't-ask-don't-tell.

4    Q.    So you had to hide things from her?

5    A.    Just didn't disclose it.

6    Q.    Now, you told Lori that you wanted to live in another

7    country with her, didn't you?

8    A.    No, sir.

9    Q.    She wanted you -- she wanted more time with you, right?

10   A.    No, sir.

11   Q.    The two of you had a fantasy of running away together

12   to another country?

13   A.    Well, maybe a fantasy, but not a reality.

14   Q.    But you would talk about that fantasy?

15   A.    Teasing.

16   Q.    But you made -- I mean, you had $15 million, right?

17   A.    Sorry?

18   Q.    You had $15 million.

19   A.    Yes, sir.

20   Q.    So you, with $15 million, could make fantasy a reality

21   for some people, right?

22   A.    I suppose.

23   Q.    In fact, actually you bought Lori a house in Cabo,

24   didn't you?

25   A.    When was that, sir?

CROSS - RUDOLPH

1   Q.   Did you buy Lori a house in Cabo?

2   A.   I bought a house in Cabo in 2021 and then I put her

3   name on the title.

4   Q.   Because Cabo was a special place for you and for Lori?

5   A.   Yeah, we liked it there.  Yes, sir.

6   Q.   That was where you could go without Bianca, right?

7   A.   Bianca didn't like it there.

8   Q.   Yeah.  You only went there with Bianca once.

9   A.   Yes, sir.

10  Q.   Bianca didn't like it as much as you did.

11  A.   No, sir.

12  Q.   So that's where you decided that you could take Lori.

13  A.   Yes, sir.

14  Q.   And you could go there without Bianca.

15  A.   Correct.

16  Q.   And you could carry on your affair with Lori?

17  A.   Correct.

18  Q.   And, in fact -- I think we've looked through these

19  travel records -- you went on many trips with Lori to Cabo.

20  A.   Yes, sir.

21  Q.   Let's look at Government's Exhibit 501.  And if we

22  could, let's go to page 21.

23       And so just to orient us again to this exhibit, the

24  top line is Bianca, the middle line is you, and the bottom

25  line is Lori.

2933

CROSS - RUDOLPH

1    A.    Okay.

2    Q.    Where were the two of you between July 6th, 2016 and

3    July 11th, 2016?

4    A.    Cabo.

5    Q.    This was just a few months before Bianca's death?

6    A.    Yes, sir.

7    Q.    And you ordered the propofol on July 5th, 2016; isn't

8    that right?

9    A.    I don't recall that.  I -- if you tell me that, I'll

10   accept it, yes, sir.

11   Q.    You don't have to take my word for it, Dr. Rudolph.

12   Let's look at Government's Exhibit 57 over on the right.

13   Actually, this is fine.

14         Actually, it's a good thing you didn't take my word

15   for it.  I was wrong.

16   A.    Yes, sir.  I see it.

17   Q.    What was the invoice date?

18   A.    July 6th, 2016.

19   Q.    So that's right when you were going to Cabo with Lori?

20   A.    Yes, sir.

21   Q.    And, in fact, you worked with Lori to help you get that

22   propofol, right?

23   A.    I believe I asked her to order it through the office,

24   yes, sir.

25   Q.    And you ordered -- well, you asked her to make sure

CROSS - RUDOLPH

1    that the package got received at the office.

2    A.    Yes, sir.    That would be normal, yes, sir.

3    Q.    And you worked with Lori to make arrangements to -- so

4    that Sherry would get the package.

5    A.    That I'm not sure, but okay.

6    Q.    And you went to the office to actually get it from

7    Sherry?

8    A.    At some point, yes, sir.

9    Q.    Oh, sorry.    Actually -- so I was looking at the invoice

10   date, July 7th, 2016.    But I should know better.    Sometimes

11   I need to trust myself.

12         What was the order date there up at the top?

13   A.    Now I'm confused.

14   Q.    Yeah.    Sorry.    I didn't help things.    When did you

15   order it?

16   A.    Order date is July 5th.

17   Q.    So you ordered this propofol just before you went on

18   that trip to Cabo with Lori?

19   A.    Yes, sir.

20   Q.    And speaking of Cabo, after Bianca died, you and Lori

21   would go to Cabo for longer periods of time, right?

22   A.    We did.

23   Q.    And that's because you didn't have to worry about

24   hiding it from Bianca anymore, right?

25   A.    No, sir.

CROSS - RUDOLPH

1    Q.    With Bianca gone, it was a lot easier to spend time

2    with Lori?

3    A.    No, sir.

4    Q.    It wasn't easier?

5    A.    Well, the reflection that -- no, sir.

6    Q.    So what explains why you were able to spend so much

7    more time on these vacations in 2017 than you were in 2016?

8    A.    Because I was alone and needed a friend.

9    Q.    Because Bianca wasn't there anymore, right?

10   A.    Correct.

11   Q.    Why did you give Lori so much money?

12   A.    She's my girlfriend.

13   Q.    So that's why you gave her the cash?

14   A.    Yes, sir.

15   Q.    So if she would have testified in grand jury that you

16   gave it to her just because you were generous, that would be

17   wrong?

18   A.    I'm sorry, I -- I apologize again, I --

19   Q.    So if she testified in a grand jury --

20   A.    Yes, sir.

21   Q.    -- that you gave her the money because you were

22   generous, that would have been dishonest?

23            MR. DILL:  Objection.  Facts not in evidence.

24            THE COURT:  You're asking as a hypothetical or

25   what?

CROSS - RUDOLPH

1           MR. FIELDS:  We can look at Government's

2     Exhibit 71.

3           THE COURT:  All right.

4     BY MR. FIELDS:

5     Q.   Let's look at page 11.  And now let's go to page 12.

6     All right.

7           And so she testified in the grand jury that she was

8     giving you -- that you were giving her that money, right?

9     A.   Yes, sir.

10    Q.   And if we go to the next page.

11          And then she was asked:  Did she explain why?

12          And her answer was:  He was very generous.

13    A.   That's true.  Yes, sir.

14    Q.   But didn't you just testify you were giving her the

15    money because she was your girlfriend?

16    A.   In part.  But she also was managing my business, so

17    yes, I was generous.

18    Q.   Were you similarly generous to any of your other

19    employees?

20    A.   Not to that extent, no.

21    Q.   And you would give Lori Milliron cash, right?

22    A.   The cash was available to her, and when she needed it,

23    she would take it, yes, sir.

24    Q.   When would she take the cash?

25    A.   I don't know the dates but she would take it as it was

CROSS - RUDOLPH

1    accessible or if she needed it.

2    Q.    What instructions did you give her regarding the cash?

3    A.    I said, "Use your discretion.  And if you need some

4    cash, go ahead and take it."

5    Q.    And where was she supposed to take the cash from?

6    A.    The safe.

7    Q.    How would she take the cash?

8    A.    How?

9    Q.    Yeah.

10   A.    Open the safe.

11   Q.    She would just open the safe?

12   A.    Yes, sir.

13   Q.    So if she testified in the grand jury that she didn't

14   take cash from the safe, that would be dishonest?

15   A.    Well, she may have taken some from the safe and perhaps

16   a day of -- a patient day, but she took some from the safe,

17   I think.

18   Q.    Why did you give her cash instead of putting her on

19   your credit card?

20   A.    Well, at first in 2011 when the exposure came out to my

21   wife, my wife asked me to take her off the payroll.

22   Q.    2011?

23   A.    I think it was '11.

24   Q.    Sorry.  So exposure to your wife, can you explain that?

25   What do you mean?

CROSS - RUDOLPH

1    A.    I'm trying to remember.  At some point Bianca asked me

2    to take her off the payroll.  Oh, I know what it was.  A fax

3    came to my office, and it had an itinerary on there for a

4    trip between myself and Lori, and it -- someone from the

5    office sent it to my home.  So Bianca saw this, got very

6    upset because it was at the office.

7          And she said, "I want you to take her off the

8    payroll."

9    Q.    So your testimony now on cross-examination is that

10   Bianca found out about you and Lori in 2011?

11   A.    She knew before that.

12   Q.    And so you were giving her cash instead of putting her

13   on the credit cards.  Again, why?

14   A.    It was easier, simple.

15   Q.    To give her cash?

16   A.    Yes, sir.

17   Q.    But then she'd have to go from, you know, bank to bank

18   to make those deposits, right?

19   A.    That was her call.  I didn't know what she was doing.

20   Q.    Wouldn't it have been easier just to put her on the

21   credit cards and pay them electronically?

22   A.    Probably.  Looking back.

23   Q.    But if you had done that, there would have been a

24   record that Bianca could discover, right?

25   A.    Probably.

1    Q.    So if you paid her in cash, that was another way you

2    could conceal the relationship from Bianca.

3    A.    Correct.  And avoid embarrassment.

4    Q.    That was also a way that the cash payments couldn't be

5    tracked, right?

6    A.    Apologize.

7    Q.    The cash payments wouldn't leave a paper trail, right?

8    A.    Well, that's true.

9          THE COURT:  Mr. Fields, are you getting to a good

10   place to pause?  We can go a few more minutes if it will be

11   a more natural break.

12         MR. FIELDS:  I think this is fine, Your Honor.

13         THE COURT:  Okay.  All right, members of the jury,

14   we will take our customary one-hour lunch recess at this

15   time.

16        (Jury left the courtroom at 12:32 p.m.)

17         THE COURT:  Mr. Fields, you estimated your cross at

18   three hours, we're at about that now.  Wait -- or how long

19   have we gone, Heidi?

20         COURTROOM DEPUTY:  We started at 8:51, took a break

21   at 10:29, picked up at 10:51 and it's now 12:31, so it's

22   been the entire morning.

23         THE COURT:  Yeah.  Okay.  I'm not -- it's -- I'm

24   not going to press you too hard on this, but I would

25   definitely like to start closings today.  We still have,

CROSS - RUDOLPH

1   potentially, rebuttal, we have to have our charging

2   conference, we have to go through the exhibits that have

3   been admitted.  How much more do you have?

4           MR. FIELDS:  Your Honor, there's several more topic

5   areas that I need to cover.  We haven't gotten to the

6   insurance, we haven't gotten to the use of the insurance

7   proceeds.  I think it may be another hour and half to two

8   hours.

9           THE COURT:  Okay.  Yes.

10          COURTROOM DEPUTY:  It's already been three hours

11  and 18 minutes of cross.

12          THE COURT:  Okay.  All right.  What are you

13  thinking on your rebuttal case?

14          MR. FIELDS:  We don't have a rebuttal case at this

15  point.

16          THE COURT:  Oh, you're not going to?

17          MR. FIELDS:  No.

18          THE COURT:  All right.  I'm going to ask you during

19  the lunch recess to do what you can to refine and reduce

20  your outline as much as you can.  What you've got to put on

21  you have to put on, but let's cut the fat from the

22  examination and let's see what we can get done today.

23          MR. FIELDS:  Understand, Your Honor.

24          MR. MARKUS:  Your Honor, just for planning purposes

25  on the redirect, Mr. Fields has gone into a number of areas

CROSS - RUDOLPH

1    that were not brought up on direct, and it's going to take

2    some time for me to redirect Dr. Rudolph.  So I said

3    yesterday a half an hour, but it's going to be quite a bit

4    longer than that.

5            THE COURT:  All right.  You can have a seat.

6            MR. MARKUS:  Thank you.

7            THE COURT:  Yeah, this is the situation I don't

8    like to be put in because now, you know, I represented to

9    the jurors way back on July 11th -- it seems like a year

10   ago -- that they would be done today.  Then they're hearing

11   yesterday that we're going to go most likely into tomorrow,

12   and now it's a certainty we're going to go into tomorrow.

13   And now I'm having some concerns as to even if we get them

14   the case tomorrow, it may be late enough such that, given

15   that they have to plow through instructions on nine counts,

16   that they won't be done tomorrow, which means they would

17   have to come back on Monday to continue their deliberations.

18           We have one juror who's had some concerns about his

19   business situation and -- has that been resolved,

20   Ms. Guerra, do you know, or has he --

21           COURTROOM DEPUTY:  I know he was waiting until

22   today to find out a little bit more.  But he would be able

23   to cancel that if needed.

24           THE COURT:  Okay.  All right.  So anyway, I don't

25   want to repeat myself.  Counsel knows where I stand on this.

CROSS - RUDOLPH

1    We'll be in recess until 1:30.

2         (Recess taken 12:35 p.m.)

3                    **AFTERNOON SESSION**

4         (In open court outside the presence of the jury at 1:35

5    p.m.)

6              THE COURT:  All right.  I want to put on the record

7    a communication my law clerk -- one of my two law clerks on

8    this case had with counsel during the lunch recess in that I

9    am going to allow the Government to have one more hour

10   cross-examination, and Mr. Markus will have 45 minutes on

11   redirect.  So we will finish with this witness before we go

12   on our afternoon break.

13             All right, let's bring in the jury.

14        (In open court in the presence of the jury at 1:36

15   p.m.)

16             THE COURT:  All right, Mr. Fields, you may resume

17   your examination.

18             MR. FIELDS:  Thank you, Your Honor.

19   BY MR. FIELDS:

20   Q.   All right, Dr. Rudolph.  We only have an hour left, and

21   hopefully I can make it a little bit shorter.

22   A.   Thank you, sir.

23   Q.   You did try to develop a relationship with Lori's

24   children?

25   A.   No, sir, not really.

2943

CROSS - RUDOLPH

1    Q.    Did you support them financially?

2    A.    To some degree, yes, sir.

3    Q.    How so?

4    A.    A little help with tuition, things like that.

5    Q.    Did you know Adam?

6    A.    Yes, I knew Adam.

7    Q.    Lori's son?

8    A.    Yes, sir.  I apologize if I sound hoarse.  I'm -- I

9    apologize.

10   Q.    That's all right.  You're doing a lot of talking.  If

11   you need to get a glass of water, please do.

12   A.    Go ahead.  I'm sorry.

13   Q.    So did you -- did you get to know Adam?

14   A.    A little bit.  Not real close, but a little bit.

15   Q.    Did you know his girlfriend, Rachel?

16   A.    No, I can't say I did.

17   Q.    Did you know Lori's grandchild, Mason?

18   A.    Oh, I think I might have met him once or twice.

19   Q.    When you talked about the support for Lori's children

20   that you mentioned earlier, did you provide financial

21   support to Adam and Rachel?

22   A.    Yes, sir.

23   Q.    And, in fact, Rachel and Adam would sometimes help you

24   paint the office at Jennerstown?

25   A.    Yes, sir.

CROSS - RUDOLPH

1    Q.    You went to Mason's baptism?

2    A.    I don't know.  I may have.  I -- I had a tough time

3    recalling that one.

4    Q.    Do you think you would have gone to show your support

5    for Lori?

6    A.    I'm not so sure.

7    Q.    And you recall Ms.  Anders and her testimony, correct?

8    A.    Yes, sir.

9    Q.    And you recall her saying that you said you wouldn't

10   divorce Bianca because you'd lose all your money?

11   A.    I have no recollection of that conversation related by

12   Ms.  Anders.

13   Q.    No recollection, but do you think it could have been

14   said?

15   A.    No, sir.

16   Q.    So Ms.  Anders was wrong?

17   A.    Correct.

18   Q.    Did you pay for Rachel to go to Cabo?

19   A.    Yes.  Indirectly, yes.

20   Q.    Now let's talk about the insurance money.

21   A.    Okay.

22   Q.    Did you spend some of that money on yourself, or did

23   you put it all into a trust for your children?

24   A.    Originally it all went into a trust, yes, sir.

25   Q.    Did you spend some of it on yourself or has it all been

CROSS - RUDOLPH

1    sitting in a trust, you haven't touched a dime and it's

2    waiting there for your kids?

3    A.    Some of it was -- that I used was capital appreciation

4    from that money and some of it may be principal.  But I

5    always returned the principal, had every intention of

6    returning the principal, or that principal sat in a

7    different account as a replacement for that principal.

8    Q.    When you spent the insurance proceeds, what did you

9    spend it on?

10   A.    Tough to recall right now.  A little bit on my

11   investment in my home for the interest on that construction

12   loan.  Some towards improvements on that home, upgrades.

13   And it actually turned out to be a good investment.  And a

14   little bit for a car -- two cars.

15   Q.    What were the two cars?

16   A.    I bought an Aston Martin DB 11.  I traded my old

17   Bentley in on that.  And got that car in 2018.

18   Q.    How much did the Aston Martin cost?

19   A.    Close to 3-.  280, 3-.

20   Q.    What was the other car?

21   A.    A used Bentayga, like a used SUV.

22   Q.    How much did that one cost?

23   A.    I think it was 130-.

24   Q.    And you mentioned this new house.  So you and Bianca,

25   in Arizona, lived at that 4141 address?

CROSS - RUDOLPH

1   A.    Yes, sir.

2   Q.    After Bianca's death, did you start to build a new

3   house?

4   A.    Not immediately after, no, sir.

5   Q.    Not immediately, but after her death, did you start

6   building a house?

7   A.    Oh, yes, sir.  Yes, sir.

8   Q.    Is that a house where you and Lori were going to live

9   together?

10  A.    Yes, sir.

11  Q.    When did Lori start living with you after Bianca's

12  death?

13  A.    Full-time, probably early '17.

14  Q.    January?

15  A.    Yeah.

16  Q.    Do you remember --

17  A.    I think --

18  Q.    Do you remember spending New Year's with her that year?

19  New Year's celebration?

20  A.    I don't, but probably.

21  Q.    When did you and Lori start looking for a new house?

22  A.    I thought about investing in a new house -- I think it

23  was '18.  2018, mid-'18.  Something like that.

24  Q.    Let's have marked -- not in evidence yet --

25  Government's Exhibit 643.

CROSS - RUDOLPH

1              Is this an email from your email account?

2     A.     Yes, sir.  Yes, sir.

3     Q.     And if we can -- do you see this email down here at the

4     bottom?  Did it have an image attached to it?

5     A.     Yes, sir.

6     Q.     And if we go to the next page.

7              Is that the image?

8     A.     Yes, sir.

9              MR. FIELDS:  Your Honor, at this time I'd move for

10    the admission of Government -- move for the admission of

11    Government Exhibit 643.

12             MR. MARKUS:  No objection.

13             THE COURT:  All right.  There being no objection --

14    there being no objection, Government Exhibit --

15             MR. FIELDS:  Oh, I'm sorry, Your Honor.  I'm so

16    sorry, Your Honor.

17             THE COURT:  Can I get this out?

18             MR. FIELDS:  Yeah.  I'm so sorry.

19             THE COURT:  There being no objection, Government

20    Exhibit 643 is admitted into evidence and may be published

21    to the jury.

22        (Government's Exhibit 643 received)

23    BY MR. FIELDS:

24    Q.     So let's look at that email down there at the bottom.

25    It's Wednesday, June 21st, 2017.

2948

CROSS - RUDOLPH

1          Can we zoom in on it?

2          Is that an email from you?

3     A.   Oh, yes, sir.  Yes.

4     Q.   To who?  To who?

5     A.   Mary Lou Reid.

6     Q.   Who is she?

7     A.   She was the -- the head of the HOA in Clearwater Hills.

8     Q.   Clearwater Hills, what was that?

9     A.   The development where I lived.

10    Q.   That's where you and Bianca had lived?

11    A.   Yes, sir.

12    Q.   And so in June of 2017, were you already looking to buy

13    a new lot?

14    A.   Oh, I was just pressing things, looking around, that's

15    all.  Interest.

16    Q.   And do you see -- you know, we mentioned this a little

17    bit.  There was an image attached.

18    A.   Yes, sir.

19    Q.   If we go to the next page.

20         Is that Lori picking out the new lot for your house

21    together?

22    A.   That's Lori.  She's looking at the address sign, it

23    looks like.

24    Q.   Yes.  So that was the lot that she liked, and you were

25    asking Mary Lou if it was available?

CROSS - RUDOLPH

1    A.    Yeah, it was just up the street from where I was and I

2    wanted to get a current evaluation of property in the area.

3    Q.    So about eight months after Bianca's death, you and

4    Lori were looking for a new house together?

5    A.    No, sir.    I was just pricing lots, getting an idea what

6    things cost.    That's all.

7    Q.    To do what?

8    A.    Eventually maybe consider it.    Just -- I'm a real

9    estate guy.    I like to look at things like that.

10   Q.    Why was Lori helping you invest in lots?

11   A.    Oh, she wasn't.    We were just taking a walk.    That's

12   all.

13   Q.    But she liked this particular lot, right?

14   A.    Not necessarily.    It was about 300 yards from my house,

15   and I thought, well, I'll get an idea of what it costs and

16   maybe -- sorry -- and have an idea, if I go to sell my

17   house, what it might be worth.    Just inventory.

18   Q.    Why did you take this picture of Lori picking out the

19   lot?

20   A.    Get the address sign.

21   Q.    Did you eventually find a lot for a new house?

22   A.    Eventually, yes, sir.

23   Q.    Was it in the gated community right next door to

24   Clearwater Hills?

25   A.    Yes, sir.

CROSS - RUDOLPH

1   Q.   It's called Paradise Reserve?

2   A.   That's correct.

3   Q.   And did you use money from the insurance to buy that

4   property?

5   A.   Correct.

6   Q.   The total cost of that property was about $3.5 million?

7   A.   Correct.  Of which 2.5 was a mortgage.

8   Q.   I think we mentioned this.  Did you -- so did you spend

9   a little over a million dollars from your Vanguard account

10  that received the insurance proceeds on the empty lot in

11  Paradise Reserve?

12  A.   I did, yes, sir.

13  Q.   And then did you transfer $3 million from the account

14  that received your insurance proceeds into a BNY Melon

15  account?

16  A.   Yes, sir, which also ended up in the trust.  Yes, sir.

17  Q.   Well, then -- that trust was your trust, right?

18  A.   Well, correct.  At that point, yes.

19  Q.   At that point, you were the sole trustee because Bianca

20  was dead.

21  A.   Yes, sir.

22  Q.   So you had complete control over that money?

23  A.   Yes, sir.

24  Q.   You could do whatever you wanted with it?

25  A.   Yes, sir.

2951

CROSS - RUDOLPH

1    Q.    And you transferred it into that BNY Melon account.

2    And then did you use that as collateral to get a

3    construction loan for the new house?

4    A.    Correct.  I got the loan through BNY, so they just used

5    that as the collateral.

6    Q.    So you used, in part, the insurance money you got from

7    Bianca's death to finance the home that you and Lori were

8    building together.

9    A.    Correct.

10   Q.    Did you also use some of that $3 million in your BNY

11   Melon account to purchase a condo in Cabo?

12   A.    Probably a little.  I don't have the figures in front

13   of me, but some, yes, sir.

14   Q.    And that was a condo in Cabo for you and for Lori?

15   A.    Correct.

16   Q.    So would it be fair to say that you didn't touch a dime

17   of the insurance money from Bianca's death?

18   A.    That's not completely fair, no.

19   Q.    And you remember Mr. Hoffman, who testified yesterday,

20   right?

21   A.    Yes, sir.

22   Q.    He testified that you didn't need 4.8 million?

23   A.    That's correct.

24   Q.    That's because you had a lot of liquid assets, right?

25   A.    That's his testimony, yes, sir.

CROSS - RUDOLPH

1   Q.   But it helped to have that money to build the new

2   house, didn't it?

3   A.   It wasn't necessary, but I utilized it.

4   Q.   Yeah.  Did it help?

5   A.   Sure.

6   Q.   And you heard Mr. Gorman say that $4.8 million in life

7   insurance was abnormal?

8   A.   I did.

9   Q.   You could have put that money -- that life insurance

10  money into an irrevocable life insurance trust, right?

11  A.   I could have.  Yes, sir.

12  Q.   As we saw earlier, you had been advised by your

13  attorneys way back in 2000 that an irrevocable life

14  insurance trust can be a good idea, right?

15  A.   Well, I didn't recognize it at the time.

16  Q.   But if you put it into an irrevocable life insurance

17  trust, you would have had to appoint an independent trustee,

18  right?

19  A.   I believe that's correct.

20  Q.   Could have been someone like Bianca's brother, Ralph?

21  A.   Sure.  A banker or somebody from BNY, anybody.

22  Q.   Or maybe someone like Bianca's cousin, Anthony?

23  A.   Well, yes, sir.

24  Q.   But an irrevocable life insurance trust with an

25  independent trustee, someone like, say, Ralph or Anthony,

CROSS - RUDOLPH

1    you wouldn't have had as much control over the insurance

2    money, right?

3    A.    I suppose that's true, yes, sir.

4    Q.    And the second-to-die policies, do you remember

5    Mr. Gorman -- are you okay?

6    A.    Yeah, it's just my back.  Sorry.

7    Q.    Do you remember Mr. Gorman's testimony about

8    second-to-die policies?

9    A.    I do.

10   Q.    Do you remember that he testified that he told you

11   about second-to-die policies?

12   A.    He may have said that.  But in my recollection,

13   Mr. Gorman never said a word to me about second-to-die.

14   Q.    So he was wrong, too?

15   A.    Correct.

16   Q.    But Mr. Gorman was extremely experienced, wasn't he?

17   A.    He had a lot of years in the insurance industry.

18   Q.    He was extremely knowledgeable.

19   A.    I would say so, yes.

20   Q.    He knew a lot about insurance?

21   A.    Yes, sir.

22   Q.    And do you think he was doing his best to advise you?

23   A.    At the time, sure.

24   Q.    So if he was doing his best to advise you, do you think

25   he would have told you about second-to-die policies that

CROSS - RUDOLPH

1    would have allowed you to get more insurance?

2    A.    Had he advised me, I would have recalled it and perhaps

3    looked into it.  But that never occurred.

4    Q.    Well, but with the second-to-die policy after Bianca's

5    death, you wouldn't have gotten those insurance proceeds in

6    your pocket, right?

7    A.    Well, that's true.

8    Q.    Because the proceeds would only get paid out after your

9    passing.

10    A.    Correct.

11    Q.    So a second-to-die policy, that would have been a

12    policy that would have helped your children?

13    A.    Down the road, yes, sir.

14    Q.    All right.  So we talked a little bit about the period

15    up to the postnuptial agreement.  After that, during your

16    marriage to Bianca, were you still the primary income

17    earner?

18    A.    Yes, sir.

19    Q.    Did you keep control over the bank accounts?

20    A.    When you say "control," what do you mean?

21    Q.    Were you the sole signatory on the primary accounts?

22    A.    I don't remember.  I think they were joint accounts.  A

23    couple of them.

24    Q.    Let's look at Government's Exhibit 610.  Not in

25    evidence.

CROSS - RUDOLPH

1          Is this the application for your Morgan Stanley

2     account?

3     A.    Oh, yeah.  Yes, sir.  2008.

4          MR. FIELDS:  Your Honor, at this time I move for

5     the admission of Government's Exhibit 610.

6          THE COURT:  Any objection?

7          MR. MARKUS:  No objection.

8          THE COURT:  There being no objection, Government

9     Exhibit 610 is admitted into evidence and may be published

10    to the jury.

11        (Government's Exhibit 610 received)

12    BY MR. FIELDS:

13    Q.    For a while, was this your primary investment account?

14    A.    Yes, sir.

15    Q.    If we go to page 11.

16          Who are the signatories on this account?

17    A.    It was just me.  Just myself.

18    Q.    So Bianca wasn't a signatory?

19    A.    No, sir, I don't see it.  No, sir.

20    Q.    So she wouldn't have had access, right?

21    A.    You're correct.

22    Q.    Now let's look at Government's Exhibit 612.  Oops,

23    sorry.  Not in evidence.  Thank you.

24          Is this another account that you had at Morgan

25    Stanley?

CROSS - RUDOLPH

1    A.    Yes, sir.

2         MR. FIELDS:  Your Honor, at this time I move for

3    the admission of Government's Exhibit 612.

4         MR. MARKUS:  No objection.

5         THE COURT:  There being no objection, Government

6    Exhibit 612 is admitted into evidence and may be published

7    to the jury.

8         (Government's Exhibit 612 received)

9         COURTROOM DEPUTY:  One second, Your Honor.

10        MR. FIELDS:  It's mine, Ms.  Guerra.  I'm very

11   sorry.  I apologize, Your Honor.  Apologize to the Court.

12        THE COURT:  Apology's accepted.  Please continue.

13   BY MR. FIELDS:

14   Q.   So we're looking at Government's Exhibit 612.  Could we

15   also go to page 11 on this one.

16        Who's the signatory on that account?

17   A.   Lawrence Rudolph.

18   Q.   Now, this is another exhibit I want to show you -- not

19   in evidence -- Government's Exhibit 613.

20        Actually, before I go away from 612:  So Bianca

21   wouldn't have had access to that account either, right?

22   A.   I don't think so.  I -- no, she wouldn't.  No.

23   Q.   Now let's look at Government's Exhibit 613.  Is this

24   another account of Morgan Stanley?

25   A.   Yes, sir.

CROSS - RUDOLPH

1    Q.    And let's look at Government's Exhibit 614.    Another

2    account at Morgan Stanley?

3    A.    Correct.

4    Q.    And Government's Exhibit 615.

5            Is this an IRA agreement?

6    A.    Yes, sir.

7    Q.    So this is another account of yours from Morgan

8    Stanley?

9    A.    Correct.

10            MR. FIELDS:    Your Honor, at this time I'd move for

11    the admission of Government's Exhibits 613 to 615.

12            THE COURT:    Any objection?

13            MR. MARKUS:    No, Your Honor.

14            THE COURT:    There being no objection, Government

15    Exhibits 613, 614, and 615 are admitted into evidence and

16    may be published to the jury.

17        (Government's Exhibits 613, 614 and 615 received)

18    BY MR. FIELDS:

19    Q.    Let's look at Government's Exhibit 616.    Not in

20    evidence.

21            Is this your account at Citizens Bank?

22    A.    Yes, sir.

23    Q.    Let's look at Government's Exhibit 617.

24            Is this your account at PNC Bank?

25    A.    Yes, sir.

2958

CROSS - RUDOLPH

1    Q.    Let's look at Government's Exhibit 618.

2              Is this another one of your accounts at PNC Bank?

3    A.    Yes, sir.   These are the corporate agreement, yes, sir.

4              MR. FIELDS:   Your Honor, at this time I move for

5    the admission of Government's Exhibit 616 through 618.

6              MR. MARKUS:   No objection.

7              THE COURT:   All right.   There being no objection,

8    Government Exhibits 616, 617, and 618 are admitted into

9    evidence and may be published to the jury.

10             (Government's Exhibits 616, 617 and 618 received)

11   BY MR. FIELDS:

12   Q.    Now, if you'd like, Dr. Rudolph, you can go through

13   each of these agreements but --

14   A.    No, it's --

15   Q.    -- would you accept my representation that you're the

16   only signatory on each of these accounts?

17   A.    Yes, sir.

18   Q.    So that would be all the exhibits that we have talked

19   about, 610, 612, and then 613 through 618?

20   A.    Yes.

21   Q.    So Bianca did not have access to those accounts?

22   A.    No, sir.

23   Q.    But that started to change in 2016, didn't it?

24   A.    Sir?

25   Q.    Bianca's access to bank accounts, that started to

CROSS - RUDOLPH

 1    change in 2016; isn't that right?

 2    A.    Help me.  In which way, sir?

 3    Q.    Well, did she start to push for a little bit more

 4    control over her financial sort of independence in 2016?

 5    A.    I don't recall that.

 6    Q.    Let's look at Government's Exhibit 501.  And if we

 7    could go to page 517.  Let's go to page 17 -- oh, thank you.

 8         So this is -- this is March 2016, right?

 9    A.    Yes, sir.

10    Q.    And just to orient you again, Bianca's the top line,

11    you're the middle line, and Lori's the bottom line.  Do you

12    understand?

13    A.    Yes, sir.

14    Q.    Did Lori come and visit you in Phoenix in March 2016?

15    A.    Yes, sir.

16    Q.    Is that the first time she'd come to visit you?

17    A.    In Phoenix?

18    Q.    Yes.

19    A.    I don't recall.  Maybe.

20    Q.    Did she stay at the Phoenician?

21    A.    I believe so.  Either the JW Marriott or the

22    Phoenician; one of those two.

23    Q.    She didn't stay with you?

24    A.    Not in the house, no, sir.

25    Q.    Why would she come to Phoenix and not stay with you?

CROSS - RUDOLPH

1    A.    Just the way we had it.  That's the way it was.

2    Q.    Even though Bianca was away?

3    A.    Correct.

4    Q.    And if there was only one transaction at the Phoenician

5    and no others indicating sort of a long stay, what would you

6    say about that?

7            MR. DILL:  Objection.  Facts not in evidence.

8            THE COURT:  Are you intending to put this into

9    evidence?

10           MR. FIELDS:  It's already been shown into evidence

11   by Mr. Dill.  If we want to admit that exhibit into

12   evidence, I'm fine with that.

13           THE COURT:  All right.  So I recall those receipts.

14   And that's for this time period, Mr. Fields?

15           MR. FIELDS:  Yes, Your Honor.

16           THE COURT:  All right.

17           MR. FIELDS:  Mr. Dill, what is that -- what was

18   that -- is it marked as an exhibit?

19           MR. DILL:  It was during Erin's cross.  I can't

20   remember the exhibit number.  I refreshed it with her.

21           MR. FIELDS:  If you could get me those numbers

22   and --

23           MR. DILL:  Okay.  I'll try.  No problem.

24           THE COURT:  All right.  I recall the hotel receipt,

25   Mr. Fields, so if you're representing to me that it

CROSS - RUDOLPH

1    corresponds to these dates, we don't have to pull those up

2    again.  And based on that, the objection's overruled.

3    BY MR. FIELDS:

4    Q.    Mr. Rudolph, if you remember looking at that

5    transaction, did it refer to the Phoenician Retail?

6    A.    Oh, that one.  Yes, sir.

7    Q.    Yeah.  Because the Phoenician's a pretty big place?

8    A.    Yes, sir.

9    Q.    There's a spa?

10   A.    Uhm-hum.

11   Q.    There's sort of shopping outlets?

12   A.    Correct.

13   Q.    But your testimony is that Lori came all the way to

14   Phoenix and she stayed there for -- let's count the days.

15   So March 29th is the first full day:  One, two, three --

16   next page -- four, five, six.

17            She stayed there for six days but she was never in

18   your house?

19   A.    No, sir.

20   Q.    And then the two of you flew back to Pittsburgh?

21   A.    Yes, sir.

22            THE COURT:  Mr. Fields, sorry to interrupt.

23            Ms.  Guerra.

24            COURTROOM DEPUTY:  Mr. Fields, story to

25   interrupt.

CROSS - RUDOLPH

1            THE COURT:  We're back in business.  I'll add five

2      minutes to your time, Mr. Fields, so you're not penalized

3      for that interruption.

4            MR. FIELDS:  Thank you very much, Your Honor.

5      BY MR. FIELDS:

6      Q.   Dr. Rudolph, isn't it true that Bianca only started

7      getting added to your financial accounts after Lori's trip

8      to Phoenix in March and April of 2016?

9      A.   Unaware to me, Mr. Fields.

10     Q.   Remember we looked at all those accounts where she was

11     not a signatory?

12     A.   Correct.

13     Q.   Now let's look at Government's Exhibit 611.  Not in

14     evidence.  And if we could go to page 11.  Page 11, please.

15     Oh, the page before.  There we go.

16            Is this another account at Morgan Stanley?

17     A.   Yes, sir.  What's the date on this?

18     Q.   If you look up at the top, it looks like there's a fax.

19     A.   Oh, 6-29.  Yes, sir.  I see it now.  Thank you.

20     Q.   Is this what -- is this your account at Morgan Stanley?

21     A.   Yes, sir.  I am trying to remember back, but this may

22     have been correlated with our forming of our new trust.

23            MR. FIELDS:  Okay.  Your Honor, at this time I'd

24     move for the admission of Government's Exhibit 611.

25            THE COURT:  Any objection?

CROSS - RUDOLPH

1    　　　　MR. MARKUS:  No objection.

2    　　　　THE COURT:  There being no objection, 611 --

3    Exhibit 611 is admitted into evidence and may be published

4    to the jury.

5    　　　(Government's Exhibit 611 received)

6    BY MR. FIELDS:

7    Q.　Now, this account at Morgan Stanley Bank, would you

8    accept my representation that you were the only signatory on

9    this account before 2008 and 2016?

10   A.　Yes, sir.

11   Q.　When was Bianca added to the account?

12   A.　September 12th, 2016.

13   Q.　That's about a month before she died?

14   A.　Yes, sir.

15   Q.　And that's after that trip by Lori to Phoenix?

16   A.　Well, calendar-wise, but it's not related to her trip.

17   But this document has to do with us forming our new trust.

18   Q.　Fair to say that after that trip that Lori made, that's

19   when Bianca started getting added to the bank accounts?

20   A.　No, sir.  No, sir.

21   Q.　So Bianca started to take a little bit more control

22   over your financials, right?

23   A.　No, sir.  This is our agreement that we formed when we

24   did our trust.

25   Q.　But you liked keeping control.  That's why you had sole

CROSS - RUDOLPH

1    signatory authority on all the primary financial accounts

2    between 2008 and 2016, right?

3    A.    That's inaccurate, sir.

4    Q.    And at this point when you started to lose control over

5    your finances, you didn't like that, did you?

6    A.    No, sir, that's inaccurate.

7    Q.    After that trip by Lori to Phoenix, Bianca confronted

8    you, didn't she?

9    A.    No, sir.

10   Q.    She had found a hair clip in her bed?

11   A.    Never confronted me with any hair clips, no, sir.

12   Q.    She told you that you needed to fire Lori?

13   A.    No, sir.

14   Q.    But you didn't want to fire Lori, didn't you?

15   A.    She didn't ask me to.

16   Q.    And you gave instructions to Levi to make it look like

17   Lori had been fired, right?

18   A.    No, sir.

19   Q.    You gave instructions to him to make sure that, if

20   someone called one of the dental practices and asked for

21   Lori, they were supposed to say she wasn't there, right?

22   A.    I did give him that instruction, yes, sir.

23   Q.    Okay.  So you admit you gave him that instruction.

24   A.    Yes.  I don't know why, but I did give him that

25   instruction.

CROSS - RUDOLPH

1    Q.    You don't know why you would give him that instruction?

2    A.    No, sir.

3    Q.    All right.  Two more topics.  Let's -- Government's

4    Exhibit 501.  We can go back to that same page.  It's page

5    17.  Or, actually, sorry, it's -- let's go -- fast-forward

6    to October, please.

7              So you returned to Phoenix on October 17th, 2016?

8    A.    Yes, sir.

9    Q.    When was your wife's funeral?

10   A.    20th -- 21st.  I'm sorry.

11   Q.    When do you think it was?  The funeral.

12   A.    The 20th.

13   Q.    You think it was on a Thursday?

14   A.    Thursday or Friday.

15   Q.    Let's look at Government's Exhibit 120, which is

16   already in evidence.  Page 13.

17             Is this the receipt for that funeral?

18   A.    Yes, sir.  21.  Yes, sir.

19   Q.    Now, do you think you would have paid for the funeral

20   before it took place?

21   A.    Honestly don't remember.  Probably.

22   Q.    How much did you spend on the funeral?

23   A.    $1,890.

24   Q.    And the very next day you booked a ticket for Lori to

25   come visit you; isn't that right?

2966

CROSS - RUDOLPH

1    A.    I did, yes, sir.

2    Q.    You canceled that ticket?

3    A.    I did.

4    Q.    Why?

5    A.    I didn't want to have to talk to anybody that I knew

6    that might ask me how I felt right away.  I just wanted to

7    make another plan.

8    Q.    And hadn't you already texted Lori while you were in

9    Africa?

10   A.    Yes, sir.

11   Q.    So you texted Lori in Africa while you're still there,

12   and it's only a couple of days after your wife's death but

13   you didn't want to talk to her about a week later?

14   A.    No, sir.

15   Q.    And this trip to Las Vegas, remind us, what did you do

16   while you were in Las Vegas?

17   A.    Oh, very little.  Took long walks; spent a little bit

18   too much time at the bar.  That type of thing.

19   Q.    After you canceled that ticket for Lori, did you book a

20   ticket for someone else?

21   A.    Yes.

22   Q.    Who?

23   A.    I can't remember her name.  Tammy.  Tiffany.

24   Q.    Tiffany?

25   A.    Sorry.

CROSS - RUDOLPH

1   Q.   Who was Tiffany?

2   A.   Someone I had known from Pittsburgh.

3   Q.   How did you meet her?

4   A.   I was in -- having dinner in Pittsburgh with some

5   associates the previous summer, that summer, and we got to

6   know one another.

7   Q.   How did you get to know her?

8   A.   Just chatting.

9   Q.   Did you have a sexual relationship with her?

10  A.   I had not.  Nothing.

11  Q.   And you'd known her only for about a year, you said?

12  A.   Oh, less than that.

13  Q.   How frequently would you get to see her?

14  A.   I think we had dinner maybe three, four times.

15  Q.   So only three or four times.  But that's the person

16  that you booked a ticket to spend with you in Las Vegas?

17  A.   It was kind of serendipitous.  I think she texted me

18  and I decided okay, let's go.  Get me out of the house.

19  Q.   Did you share a hotel room with her?

20  A.   I did.

21  Q.   And so when you mentioned sort of walking around and

22  hanging out at the bars, who was with you?

23  A.   I was by myself.

24  Q.   What did Tiffany do?

25  A.   I don't know.  Went gambling, did something else.

2968

CROSS - RUDOLPH

1   Q.   Why did you pay for Tiffany to come join you in

2   Las Vegas if you weren't going to spend time with her?

3   A.   Wanted to get out of my home, get away from that scene,

4   and it was a person to be with.  That's all.

5   Q.   But it sounds like you weren't with anyone.

6   A.   Pretty much.

7   Q.   So, again, why did you spend that money for her to come

8   stay with you in Las Vegas in your hotel room?

9   A.   Probably would have gone with a mailman at that point.

10  Q.   But you didn't have the mailman.

11  A.   What I'm trying to say is I just needed some escape

12  from my house.

13  Q.   All right.  Last topic.  In 2012, you filed that

14  lawsuit, right?

15  A.   Yes, sir.

16  Q.   No one forced you to file that lawsuit.

17  A.   No, sir.

18  Q.   That was all you?

19  A.   Correct.

20  Q.   And during that lawsuit, again you were deposed, right?

21  A.   Correct.

22  Q.   And you took an oath?

23  A.   Yes, sir.

24  Q.   To tell the truth?

25  A.   Yes, sir.

CROSS - RUDOLPH

1    Q.    The whole truth?

2    A.    Correct.

3    Q.    Nothing but the truth?

4    A.    That's correct.

5    Q.    Same oath you're taking here in -- today?

6    A.    Yes, sir.

7    Q.    Do you take that oath seriously?

8    A.    I do.

9    Q.    Why?

10   A.    Because it's very, very important to live by your word.

11   Q.    Would you say you're a man who lives by your word?

12   A.    I try.

13   Q.    So when you told Ralph that you'd give him those

14   documents and then you didn't do it, were you standing by

15   your word?

16            MR. MARKUS:    Judge, objection.    Asked and

17   answered.

18            THE COURT:    Overruled.

19            THE WITNESS:    Change of heart, Mr. Fields.

20   BY MR. FIELDS:

21   Q.    Why didn't you give him those documents?

22   A.    I was -- at that point in my life, I didn't want to

23   replay and replay and replay.    I had told Ralph what

24   happened; that should have been sufficient.

25   Q.    Even if you didn't have to take an oath, would you say

CROSS - RUDOLPH

1    it's important to tell the truth?

2    A.    Yes, sir.

3    Q.    Even without an oath, why is telling the truth

4    important?

5    A.    It just is.

6    Q.    All right.  This argument that you had between you and

7    Lori at Steak 44, do you remember that?

8    A.    Yes, sir.

9    Q.    What was the argument about?

10   A.    Over Julian's -- my contribution, my assistance to

11   Julian for his overhead for his law firm.

12   Q.    And how much was that?

13   A.    About 15,000 a month.

14   Q.    But didn't we hear from Mr. Hoffman that you had almost

15   $15 million?

16   A.    Yes, sir.

17   Q.    Were you really worried about $14,000 a month?

18   A.    I wasn't.

19   Q.    Now, you heard Brian Lovelace testify, right?

20   A.    I did.

21   Q.    Do you have any reason to think he was incorrect about

22   his testimony?

23   A.    No, sir.

24   Q.    You've known that he would testify for about four

25   months now, right?

CROSS - RUDOLPH

1    A.    Yes, sir.

2    Q.    Because you get the discovery in this case?

3    A.    Very little.

4    Q.    You knew what he was going to say?

5    A.    Yes, sir.

6    Q.    So you had four months to think about what your

7    testimony would be in this case, right?

8    A.    I've had a lot of time to think about a lot of things,

9    Mr. Fields.

10   Q.    You've had four months to come up with something that

11   explains away why that statement might be harmful to your

12   case?

13   A.    No, sir.

14   Q.    And what he heard you saying -- again, what -- only

15   what he heard you saying was, "I killed my fucking wife for

16   you."

17   A.    He heard part of what I said.

18   Q.    That was the woman you called "the old lady"?

19   A.    At times.

20   Q.    That was the woman that Lori was jealous of?

21   A.    At times.

22   Q.    That was the woman whose death brought you

23   $4.8 million?

24   A.    Brought my estate of my children $4.8 million.

25   Q.    Now, at that deposition after you took that oath in

CROSS - RUDOLPH

1    that civil lawsuit, you've testified that you were not

2    honest; you broke that oath.

3    A.    I did it that one time.

4    Q.    You lied?

5    A.    I did.

6    Q.    And you were good at it, right?

7    A.    I don't think so, but I did.

8    Q.    The only time anyone has ever known that you lied in

9    that suit is here today, right?  Because you admitted it?

10   A.    I suppose.

11   Q.    You don't want to go to jail, do you, Dr. Rudolph?

12   A.    No, sir.

13   Q.    So if you lie here on the stand and the jury believes

14   you, you could be acquitted, right?

15   A.    I'm not going to lie.  I wouldn't lie.  My counsel told

16   me if I ever lie --

17   Q.    You can stop there.

18   A.    Oh.

19   Q.    You don't have to tell us anything that you

20   communicated --

21            MR. MARKUS:  No, I have no objection.  He can

22   answer, Mr. Fields.

23            THE COURT:  Well, it's the witness's privilege.

24   Are you waiving it?  Waiving your -- Dr. Rudolph, over here.

25            THE WITNESS:  I'm sorry, sir.

CROSS - RUDOLPH

1    THE COURT:  There's attorney-client privilege that
2    I'm sure you're aware of.
3    THE WITNESS:  Oh, yes.
4    THE COURT:  So you have to waive that privilege to
5    discuss this.
6    THE WITNESS:  Is that a one-time waiver or is it
7    forever?
8    THE COURT:  I'm not going to give you legal advice.
9    MR. FIELDS:  Your Honor, this is one topic where he
10   might want to converse with counsel about the scope of the
11   waiver.
12   THE COURT:  All right.
13   MR. MARKUS:  I'll say let's just move on,
14   Mr. Fields.
15   THE COURT:  Mr. Markus, you don't want to take a
16   minute to consult with your client?
17   MR. MARKUS:  No, I don't need to, Your Honor.  I
18   think Mr. Fields and I can agree to move on.
19   THE COURT:  All right.  Well, I don't know if
20   Mr. Fields is ready to move on.  I think he wants an answer
21   to his question.  The record will reflect that the witness's
22   response to the Court, I find that he has voluntarily waived
23   the attorney-client privilege, at least with respect to this
24   question.
25   Go ahead, Mr. Fields.

CROSS - RUDOLPH

1    BY MR. FIELDS:

2    Q.    So if you lie on the stand and the jury believes you,

3    you might get acquitted, right?

4    A.    I wouldn't lie, but to answer your question, yes.

5    Q.    And if you lied on the stand and you get convicted, you

6    can't get punished any more than you already are getting

7    punished for murder, right?

8    A.    Yeah, you can get punished more.

9    Q.    You have nothing to lose by lying, do you,

10    Dr. Rudolph?

11    A.    Yes, I do.

12    Q.    And when you lied in 2016 during your deposition on a

13    civil suit, the stakes were pretty low, weren't they?

14    A.    Correct.

15    Q.    They were much lower than they are here today?

16    A.    I would say so.

17            MR. FIELDS:  Your Honor, may I have a moment?

18            THE COURT:  You may.

19            MR. FIELDS:  No further questions, Your Honor.

20            THE COURT:  All right.  Redirect.

21            I think you've left some files up there,

22    Mr. Fields.

23            MR. FIELDS:  Oh, sorry.

24            MR. MARKUS:  May I proceed, Your Honor?

25            THE COURT:  You may.

2975
REDIRECT - RUDOLPH

1      MR. MARKUS:  Thank you.  Good afternoon, ladies and

2   gentlemen and jury, counsel.

3                    REDIRECT EXAMINATION

4   BY MR. MARKUS:

5   Q.   Good afternoon, Dr. Rudolph.

6   A.   Good afternoon, sir.

7   Q.   Seems like a long time since I was up here to ask you a

8   few questions.

9   A.   I feel a little fuzzy, but I'm okay.

10  Q.   Okay.  Good.  The prosecutor asked you a bunch of

11  questions about whether you've told the truth today and

12  yesterday.  Have you told the truth to this jury?

13  A.   100 percent, yes, Mr. Markus.

14  Q.   When you were in front of -- doing that deposition with

15  SCI, were you in front of a jury like this?

16  A.   No.

17  Q.   Were you in front of people that could judge whether

18  you were telling the truth or not?

19  A.   No, sir.

20  Q.   Who's going to be able to judge you yesterday and today

21  about whether you were telling the truth?

22  A.   The jury.

23  Q.   Is that up to Mr. Fields?

24  A.   No, sir.

25  Q.   Okay.  And have you been telling the truth?

2976

1    A.    All along.

2    Q.    Let's talk about -- we have a bunch of topics.  I'm

3    going to try to go through them as quickly as we can.

4              This postnup that we keep talking about, let's talk

5    about that for a moment.  I'd like to call up Defense

6    Exhibit RB, which is in evidence.  And I'd like to go to LR

7    46.

8              Do you remember this note that we've been talking

9    about that Mrs. Rudolph wrote to you?

10   A.    Yes, sir.

11   Q.    Let's zoom in on this section in the middle here.  Now

12   do you see, Dr. Rudolph, where Bianca says, "I have admitted

13   I need help"?

14   A.    I do.

15   Q.    "I tried to begin some responsibility with signing the

16   paper."

17   A.    Yes, sir.

18   Q.    Who signed the paper?

19   A.    Say again?

20   Q.    What paper is she talking about?

21   A.    Oh, the postnuptial.  I apologize.

22   Q.    And who signed it?

23   A.    She did.  Bianca.

24   Q.    Now, are you aware that, after you mentioned Frank

25   Langell's name yesterday as signing the postnup, the

REDIRECT - RUDOLPH

1    prosecutor sent all of their FBI agents to try to get in

2    touch with Mr. Langell?  Are you aware of that?

3    A.    No, sir.

4    Q.    Are you aware that they actually spoke with

5    Mr. Langell's lawyer?

6    A.    No, sir.

7    Q.    Are you aware that Mr. Langell's lawyer told the FBI

8    that Mr. Langell witnessed Bianca signing that agreement?

9    A.    That doesn't surprise me.

10   Q.    Why doesn't it surprise you?

11   A.    Because he signed the agreement.

12   Q.    So all of this stuff by the prosecutor trying to

13   suggest that you were some master forger that could trick

14   two document examiners, last night they tried to disprove

15   that with Frank Langell.  Do you know they fell flat with

16   that?

17   A.    I do now.

18   Q.    Okay, Dr. Rudolph, the prosecutor asked you some

19   questions about whether you had an affair prior to the year

20   2000.  Do you remember those questions?

21   A.    I do.

22   Q.    Now, I think you mentioned that you had sex with a

23   woman, Vermessen, or something like this?

24   A.    Yes, sir.

25   Q.    Is that different than what Bianca was doing with Doug

2978

REDIRECT - RUDOLPH

1    Scandrol?

2    A.    Yes, sir.

3    Q.    Okay.  You had sex with a woman.  Having reviewed those

4    emails that Bianca and Scandrol wrote to each other, had you

5    seen that they basically said that they were in love?

6    A.    Not basically; they said they were in love with each

7    other.

8    Q.    Did they make plans to get married?

9    A.    Yes, sir.

10   Q.    Did they make plans for their future together?

11   A.    They did.

12   Q.    When you saw that -- this is the second time she had

13   had such an affair, correct?

14   A.    Correct.

15   Q.    When you saw that, what did you decide to do?

16   A.    Well, I went to see my attorney, Mr. Gentile, and asked

17   him to begin the process of drafting up divorce papers.

18   Q.    And that was in 2000 -- in August of 2000?

19   A.    Yes, sir.

20   Q.    Now, the prosecutor showed you some emails back from

21   '99.  Was that from the first affair?  When -- the letters

22   with your lawyers.  Did you go see your lawyers after the

23   first affair?

24   A.    I did.  Yes, sir.

25   Q.    All right.  Let's call up RF, please, which is already

REDIRECT - RUDOLPH

1    in evidence.  And I'd like to turn to LR 204.

2            This is the memo the prosecutor was showing you.

3    Do you remember that?

4    A.    Yes, sir.

5    Q.    If we could zoom in on the first paragraph there.  Now,

6    I'd like to show you some portions that the prosecutor

7    neglected.  Do you see here where it says, "The ownership of

8    the policy should either be transferred to his wife or to an

9    irrevocable life insurance trust"?  Do you see that?

10   A.    I do.

11   Q.    Okay.  And let's go down to this sentence that starts,

12   "Ordinarily."

13   A.    Ordinarily -- do you want me to read that?

14   Q.    Sure, go ahead.

15   A.    "Ordinarily such a large life insurance policy is

16   acquired either in the spouse's name or by the irrevocable

17   trust."

18   Q.    Is that memo -- which, by the way is an internal

19   memo -- is it giving two different choices there?  Either in

20   the spouse's name or by the irrevocable trust?

21   A.    Correct.

22   Q.    Okay.  If we could zoom out, please.  And let's go to

23   this bottom paragraph.

24            Can you just read the portion that says, "I would

25   suggest."

REDIRECT - RUDOLPH

1    A.    "I would suggest that Dr. Rudolph execute an estate

2    plan which has two trusts."

3    Q.    Okay.  So this internal memo here is, in each

4    paragraph, giving different ideas for how to execute your

5    estate?

6    A.    Correct.

7    Q.    And what year was this?

8    A.    Sorry?

9    Q.    What year was this?  Was it 1999?

10    A.    I believe so.  Yes.

11    Q.    Okay.

12    A.    Yes.

13    Q.    We can zoom out of that.  Thank you.

14          Now, the prosecutor also tried to suggest some

15    nefarious actions by you in redoing your trust in 2016 with

16    Bianca.  Do you remember that?

17    A.    I do.

18    Q.    Were you and Bianca planning for your future?

19    A.    We were.  We had a specific reason -- or several

20    reasons to do that.

21    Q.    Can you explain that to the jury.

22    A.    Well, 2016 was the 10-year anniversary of my first

23    open-heart surgery.  I had an aortic valve placed at the

24    Cleveland Clinic in 2006.  The surgeon told me at the time I

25    had 10 to 12 years on that valve, so we were coming up on

REDIRECT - RUDOLPH

1    the 10-year point, and we both felt it would be prudent,

2    considering I was looking at a second open-heart surgery,

3    and our old wills were from '97, we should put a plan

4    together before that surgery date.

5    Q.   Now, the prosecutor said "after certain dates," and he

6    referenced the spring of 2016.  Do you remember that?

7    A.   Yes.

8    Q.   Do you remember that your wife, Bianca, was deposed

9    after the spring of 2016?

10   A.   Correct.

11   Q.   And she gave answers about affairs and about Lori and

12   about all kinds of things, correct?

13   A.   She did.

14          MR. MARKUS:  Your Honor, at this time we'd move in

15   Defense Exhibit RA 19, which is portions of Bianca Rudolph's

16   deposition, which goes directly to the questions that the

17   prosecutor was asking about.

18          THE COURT:  RA 19?  I don't know if I have -- oh, I

19   do have it up here.

20          MR. MARKUS:  Yes, Your Honor.

21          THE COURT:  One second.  Let me look at it.

22          COURTROOM DEPUTY:  Your Honor, RA 19 has already

23   been admitted.

24          MR. MARKUS:  Oh.

25          THE COURT:  Oh, okay.

REDIRECT - RUDOLPH

1          MR. DILL:  No objection.

2          THE COURT:  That makes it easy.

3          MR. MARKUS:  That's a lot of drama for nothing.

4     BY MR. MARKUS:

5     Q.   Let's look at some of Bianca Rudolph's answers.  If we

6     can call up first INV 14456.  Actually, I'm sorry, can we go

7     to the page before, which is 14455.  Sorry about that,

8     Mr. Reyes.  Now if we can zoom in on lines 5 through 10,

9     please.

10          Do you see here where Bianca's asked:  And when

11    Mr. Anderson informed your husband as to the rumors that

12    Mr. Babaz said and that you were, quote, a long-suffering

13    wife, how did you react to that?

14          What did your wife say?

15    A.   "I felt pretty much like I felt now because it wasn't

16    true.  It was ridiculous."

17    Q.   Okay.  This is after the spring conversation that the

18    prosecutor was asking about, correct?

19    A.   Yes, sir.

20    Q.   Okay.  If we could go to the next page, 14456.  Let's

21    zoom in on the 2 through 8 lines.  I'm sorry, 2 through 12.

22          Now, do you see here that your wife, Bianca's,

23    being asked about whether you had an affair with Ms.  McCoy?

24    A.   Yes, sir.

25    Q.   And how does -- whoop, we lost it there.  2 through 12,

2983

REDIRECT - RUDOLPH

1   please.

2           And how does -- on line 4, how does Bianca answer?

3   A.   "You're going to have to define 'affair' because in my

4   mind, that is a vague term that means many different things

5   to many different people."

6   Q.   Now, you had explained a don't-ask-don't-tell agreement

7   that you and Bianca had reached back in 2000.  Is this why

8   she's giving that kind of answer?

9   A.   Yes, sir.

10  Q.   Let's go to the next question.

11          "What does 'affair' mean to you?"

12          What did she say?

13  A.   "I cannot define that for you because I believe that

14  every situation, such as the one we're describing, or others

15  of a similar nature, are different in their circumstances.

16  And I -- I can't say that I think this would be, and that

17  would be" definitely -- "definitively" -- excuse me, "and

18  that would be definitively."

19  Q.   If we could go to page 14464.  And if we could zoom in

20  on 18 through 25.

21          And do you see here where Bianca's asked:  So do

22  you think you would have acted differently in this situation

23  knowing that your husband had, in fact, at least interacted

24  with Ms.  McCoy?

25          How did she answer?

2984

REDIRECT - RUDOLPH

1    A.    "No."

2    Q.    Was she -- did Bianca seem concerned about your

3    interactions with Ms.  McCoy?

4    A.    Zero.

5    Q.    Okay.  And if we could go to the bottom -- well, you

6    see there on the bottom -- that last line, "I would not have

7    acted any differently because I" -- let's turn to the next

8    page, INV 14465.  And how did she answer at the top of that

9    page 1 through 7?

10   A.    "I considered the exchange between, as I later found

11   out, my husband and Ms.  McCoy to be brief.  And although

12   not something I was happy about, I would not characterize it

13   as a long-term affair.  I was not a long-suffering wife.

14   I've never been a long-suffering wife.  My husband and I

15   have been married for, at that time, 30 some years.  Happily

16   married."

17   Q.    If we could go to the next paragraph, lines 8 through

18   14.  She continues, Dr. Rudolph.  Can you read how she

19   continues when it gets called out here, lines 8 through 14.

20   A.    "And I think it was highly reckless and inappropriate

21   for Mr. Babaz to make remarks about another couple's

22   marriage publicly.  That's where the insult comes from and

23   the anger comes from.  And anything that happened between my

24   husband and Ms.  McCoy would be -- would be between him and

25   I.  We discussed it.  We resolved it.  We moved on.  It's

REDIRECT - RUDOLPH

1   done."

2   Q.   Is that answer in line with your understanding with

3   Bianca?

4   A.   Correct.

5   Q.   Okay.  Were you guys private about that

6   understanding?

7   A.   Extremely private.

8   Q.   All right.  I'm not going to go through the entire

9   deposition with you, but let's just look at one last page.

10  INV 14493.  Let's look at lines 3 through 15.

11  A.   So -- sorry.

12  Q.   That's okay.  Do you remember Bianca being asked

13  questions about Lori Milliron?

14  A.   Yes, sir.

15  Q.   And at this point -- this is now after this

16  conversation that the prosecutor keeps pointing to.  Do you

17  see there that your -- she's asked about whether she knew

18  about an event in 2009 in Alaska?

19  A.   Yes, sir.

20  Q.   And do you see the question on line 11:  Do you know if

21  he took anyone with him on that trip?

22  A.   Yes, sir.

23  Q.   Bianca says, "Yes.  He took a medical aide"?

24  A.   Yes, sir.

25  Q.   Question:  And what is that medical aide's name?

2986
REDIRECT - RUDOLPH

1           What did she say?

2     A.    "I believe it was Lori Milliron."

3     Q.    Let's look at the last two lines of that page 24 and

4     25.

5           And question:  And you said she's Dr. Rudolph's

6     medical aide?

7           Answer:  I wouldn't say she's Dr. Rudolph's medical

8     aide.

9           Did Bianca know what was going on between you and

10    Lori?

11    A.    She did.

12    Q.    Okay.  Thank you.  You can take that down.

13          The prosecutor also asked you whether you knew

14    about affairs after 2000.  Did you know -- did you ever see

15    Bianca packing items that might lead you to believe she was

16    going on a trip to be with another man?

17    A.    I did.

18    Q.    What did you see her pack?

19    A.    Well, I snooped a couple of times when she was packing

20    for a trip and told me she was going with girlfriends,

21    whatever.  And in the luggage there was several times very

22    sexy lingerie, and one time a set of pink furry handcuffs,

23    so I really didn't think she was going with the girls.

24    Q.    Let me ask you, now to switch topics for a moment,

25    Dr. Rudolph.  The prosecutor asked you about after Bianca

REDIRECT - RUDOLPH

1    died, informing the children.  And he showed you some plane

2    tickets on -- that you made on October 13th to Phoenix.  Do

3    you remember that?

4    A.    Yes, sir.

5    Q.    Were you at that point trying to figure out how to meet

6    with the children or just to get back to the United

7    States?

8    A.    A little bit of both.  I -- I really hadn't put a firm

9    plan together to meet with either one of my children, and I

10   couldn't recall -- I believe Julian was going to the

11   wedding.  I think there was some discussion he was going to

12   join us in Phoenix for the end reunion.  So I just made a

13   Phoenix reservation and figured I'd sort it out once I

14   landed.

15   Q.    Were you thinking straight?

16   A.    No, sir.

17   Q.    Now I want to talk to you for a moment about how you

18   informed Julian.  Did you inform him from Africa?

19   A.    I had to.

20   Q.    Tell the jury why you had to.

21   A.    I was planning on coming home, and I wanted to meet

22   with my son first, and then we would meet with my daughter.

23   But an internet article came out at some point.  It was

24   shown to me at some point, and I felt that if it was in one

25   place, that article was going to be published all over the

REDIRECT - RUDOLPH

1    media, so just as I'm ready to leave I call my son from the

2    airport in Johannesburg, and I had to tell him about the

3    loss of his mother.

4    Q.   Tell the jury about that conversation.

5    A.   It was a terrible conversation.  I had to call my son

6    and tell him what happened to his mother.  And then 10-,

7    15-minute conversation, I got to hang up and my son has to

8    think about this for the next 36 hours by the time I get

9    home.

10        That's not what I wanted.  That damn article --

11   sorry -- robbed me of my opportunity to see my son first.

12   Q.   I'm going to talk now about that hard case, Tuffpack,

13   the one over your right shoulder there.  Do you see that?

14   A.   Yes, sir.

15   Q.   That's the hard case from that October trip, right?

16   A.   Yes, sir.

17   Q.   It's a pretty tall hard case.

18   A.   I'd say so.  I'd say so, yes, sir.

19   Q.   Now, how do you generally put a gun into that hard

20   case?  We've heard some people say they put the butt in

21   first, we've heard some people put the muzzle in first.  How

22   did you put guns into the hard case?

23   A.   I always put the muzzle in -- or, excuse me, the

24   barrel -- help me -- the butt end in first.

25   Q.   Why would you put the butt end in first?

REDIRECT - RUDOLPH

1    A.    That goes all the way back to my days when I would

2    travel to places like Russia, remote places.  You had two

3    bags you could bring, certain amount of weight.  Unlike a

4    domestic flight you would take here, you'd get a $50 fine.

5    When you get to those countries and if you're overweight or

6    have too many bags, $500, $1,000.  So you take the Tuffpack

7    you put the butt in first, the barrels are at the top, and

8    we would use the Tuffpack to store other luggage:  boots,

9    heavy equipment, binoculars.

10              If you have the butt end up first, you're tight for

11   space.  If you go with the barrels, you got more space.

12   Q.    Now, the prosecutor asked a bunch of questions about

13   whether Mark Swanepoel could hear if Bianca was banging the

14   gun or if it dropped.  If the shotgun dropped as she was

15   trying to put it in and it hit the ground and the shot went

16   off as it hit the ground at the same time, would Mark have

17   heard a bump on the ground first or would it have -- would

18   the shot have gone off at the exact time it hit?

19   A.    It would have gone off at the same time it hit.

20   Q.    So would there have been some thud, as the prosecutor

21   put it, first for anybody to hear?

22   A.    It is the exact same moment.

23   Q.    Let's talk about Sherry Rice for a minute.  You got

24   asked a lot of questions about Sherry Rice.  Do you remember

25   that?

REDIRECT - RUDOLPH

1    A.    Yes, sir.

2    Q.    Now, at that point when Sherry Rice called you, did she

3    tell you that you were under any investigation?

4    A.    No, she did not.

5    Q.    When you found out from Agent Peterson and this table

6    back here, and this table here, that you were under

7    investigation, did you hire a lawyer?

8    A.    Two firms, yes, sir.

9    Q.    Okay.  Did I ask you for all of the materials in the

10   case?

11   A.    Correct.

12   Q.    When I got those materials, did I give them over to the

13   Government?

14   A.    Yes, sir.

15   Q.    Did they have the soft case?

16   A.    Sorry?

17   Q.    Did they have that soft case?

18   A.    Yes, sir.

19   Q.    When I -- did they have it before I gave it to them?

20   A.    Oh, no, sir.

21   Q.    Okay.  Do you know whether we allowed our expert

22   witness, Luke Haag, to meet with Mr. Winstead before he

23   testified?

24   A.    That's my understanding.

25   Q.    Now, unlike our witnesses that were willing to meet

2991

REDIRECT - RUDOLPH

1    with the prosecution, do you remember Cass Olmstead

2    testifying?

3    A.    I sure do.

4    Q.    How did she treat the defense when we wanted to talk to

5    her?

6    A.    She won't speak to you.

7              MR. FIELDS:    Objection, Your Honor.    I don't think

8    he has special knowledge.

9              MR. MARKUS:    I'll withdraw it.

10   BY MR. MARKUS:

11   Q.    Now, Sherry told you she wasn't investigating you; is

12   that right?

13   A.    Correct.

14   Q.    The people who were investigating you, for example, the

15   Zambian police, did you meet with them?

16   A.    Yes, sir.

17   Q.    Did you go with a lawyer?

18   A.    No, sir.

19   Q.    Did you meet and answer all their questions?

20   A.    Every one.

21   Q.    Did you give a written statement?

22   A.    I did.

23   Q.    Did you meet with the insurance company?

24   A.    I did.

25   Q.    Did you give them a statement?

2992

REDIRECT - RUDOLPH

1   A.    I did.

2   Q.    Did you answer all their questions?

3   A.    Yes, sir.

4   Q.    Did you give them all the documents they wanted?

5   A.    Everything I had.

6   Q.    Let's talk about the shotgun for a second.  Did the

7   Zambians take the shotgun from you?

8   A.    Yes.

9   Q.    Did they do an investigation with the shotgun?

10              MR. FIELDS:  Objection, Your Honor.  All of this --

11              THE COURT:  Can't hear you.

12              MR. FIELDS:  Objection.  All of this is pretty

13   leading.

14              THE COURT:  Sustained.

15   BY MR. MARKUS:

16   Q.    After the Zambians did their investigation with the

17   shotgun, what did they do with it?

18   A.    They gave it back to me.

19   Q.    Did they tell you that the investigation was over?

20              MR. FIELDS:  Objection, Your Honor.  Leading.

21              THE COURT:  Sustained.

22   BY MR. MARKUS:

23   Q.    What did they tell you about the investigation at that

24   point?

25   A.    They told me the investigation was over and they ruled

REDIRECT - RUDOLPH

1    it an accident, gave me back my firearm and told me I was

2    free to go home.

3    Q.   Did you do that?

4              MR. FIELDS:  Objection, Your Honor.  Leading.

5              THE COURT:  Sustained.

6    BY MR. MARKUS:

7    Q.   Did you -- well, let's talk about Otto Westhassel.  Did

8    Mr. Westhassel ever ask you for the gun?

9              MR. FIELDS:  Objection, Your Honor.  Leading.

10             THE COURT:  One second.  I don't believe that's

11   leading.  Overruled.

12             THE WITNESS:  Can I answer?

13             THE COURT:  You may answer.

14   BY MR. MARKUS:

15   Q.   Yes.

16   A.   No, sir, he never asked me for the firearm.

17   Q.   If Mr. Westhassel had asked you for the gun, what would

18   you have done?

19   A.   I would have shown it to him.

20   Q.   And did he ever try to stop you from leaving the

21   country?

22   A.   No, sir.

23   Q.   Did he let you leave the country with the gun?

24   A.   And the documents, yes, sir.

25   Q.   All right.  Let's talk about this fellow that the

2994

REDIRECT - RUDOLPH

1    prosecutor talked to you about:  Vincent Chibesa.

2            If we could call up Government Exhibit 36.

3            COURTROOM DEPUTY:  Exhibit 36, Mr. Markus?

4            MR. MARKUS:  Sorry about that.  If we could call up

5    INV 592.  And we can put next to it INV 593.

6    BY MR. MARKUS:

7    Q.    Do you see here this report by this fellow, Chibesa?

8    A.    I do.

9    Q.    Okay.  The prosecutor has asked a bunch of questions

10   about Mr. Chibesa.  Did he testify in this trial?  Do you

11   remember?

12   A.    He did not.

13   Q.    Okay.  Now, we've looked at this report many, many

14   times.  Did Mr. Chibesa -- do you know whether he wrote any

15   other reports in this case?

16   A.    None that I'm aware of.

17   Q.    Okay.  Do you see anything, anything in this report,

18   Dr. Rudolph, about a drop test?

19   A.    No, sir, I don't.

20   Q.    Do you know why the prosecutors wouldn't bring this man

21   to testify in trial?

22            MR. FIELDS:  Objection, Your Honor --

23            THE COURT:  Sustained.

24            MR. MARKUS:  We can take that down.  Thank you.

25   BY MR. MARKUS:

REDIRECT - RUDOLPH

1    Q.    The prosecutor asked you about when you first reached

2    out to the Embassy.  Do you remember those questions?

3    A.    I do.

4    Q.    Do you know when you first reached out to the Embassy?

5    Was it on October 11th?

6    A.    I believe so, yes, sir.

7    Q.    So let's just map out that very day that Bianca died

8    for a second.  After she died, where did you and Mark

9    Swanepoel go?

10   A.    We went to the Mumbwa police station.

11   Q.    Okay.  So the first thing you do is go to the police?

12   A.    Yes.

13   Q.    Who's with you?

14   A.    Mark.

15   Q.    Okay.  After you give your statements to the police,

16   did you call the Embassy?

17   A.    I don't think so.

18   Q.    Do you remember whether it was that night?

19   A.    I think it was later that day.

20   Q.    Okay.  That's what I was after --

21   A.    Oh, I'm sorry.  Okay.  Sorry.

22   Q.    And I want to ask about these photos that happened a

23   couple of days later.  I think we've established you were

24   upset, right?

25   A.    Very much so.

REDIRECT - RUDOLPH

1    Q.    Okay.  The prosecutor said:  Did you think that the

2    Embassy was going to release them?

3            Did you -- do you remember Otto Westhassel talking

4    about you demanding to know about FOIA?

5    A.    Correct.

6    Q.    What was your understanding about FOIA?

7    A.    FOIA's an abbreviation for Freedom of Information Act.

8    And my layman's understanding of that is any American

9    citizen can request a Federal government's document if it's

10   not classified, and have access to it.  That was my

11   understanding.

12           So my concern was a media person, anybody, finds

13   out about my wife's death, contacts the Government, puts in

14   an FO- -- Freedom of Information Act, and there you go,

15   there's my wife's body on some damn internet article.

16   Q.    I want to talk to you for a moment about Mark

17   Swanepoel.  The prosecutor asked you a bunch of questions

18   about investments that you made with Mr. Swanepoel.  Do you

19   remember that?

20   A.    Yes, sir.

21   Q.    Do you remember whether the prosecutor ever asked Mark

22   Swanepoel those questions about the investments?

23   A.    I don't recall that, no, sir.

24   Q.    Okay.  Now, do you remember whether Mr. Swanepoel was

25   interviewed by the Zambian police?

REDIRECT - RUDOLPH

1   A.    Yes, he was.

2   Q.    Did he give that statement before or after your

3   investments?

4   A.    Before.

5   Q.    Okay.  And was that statement that he made to the

6   police the same or different that he made to the insurance

7   company months later?

8   A.    I'd say it's pretty much the same.

9   Q.    Okay.  Had you and Bianca been planning on investing in

10  Mark's business before Bianca ever died?

11  A.    We talked about it for a long time.

12  Q.    Okay.  And do you remember what Mr. Swanepoel told the

13  police, the insurance company, and this jury about whether

14  this was an accident or not?

15  A.    Each and every time Mark Swanepoel confirmed that he

16  felt it was an accident.

17  Q.    I wanted to talk to you about finances for a moment.

18  The prosecutor asked you about spending money that was in

19  the trust.  Do you remember those questions?

20  A.    Yes, sir.

21  Q.    And he asked you whether the insurance money helped

22  with some of the things you bought.  Do you remember him

23  using that word?

24  A.    I do.

25  Q.    Did you need the insurance money, sir?

REDIRECT - RUDOLPH

1    A.    No, sir.

2    Q.    Okay.  I want to ask you:  At the time that you bought

3    the new house in 2018, could you afford that house without

4    the insurance money?

5    A.    Times two.

6    Q.    Okay.  After you sold the previous house, where did

7    that money go?

8    A.    Back into the trust.

9    Q.    So after you sold the house, was the trust made whole?

10   A.    Correct.

11   Q.    Did the trust have more money or less money in it at

12   that time than when -- when you got the insurance money?

13   A.    At that point, more.

14   Q.    Okay.  And I -- this is really important, Dr. Rudolph.

15   When you were arrested in 2021, December, did the trust have

16   more money in it or less money in it if you strip away the

17   insurance money?

18   A.    My trust was probably up at that point, somewhere

19   between 30 and 40 percent at that time.

20   Q.    So had you touched any of the insurance money?

21   A.    That core principle insurance money is there for my

22   children and always will be for my children there.

23   Q.    I want to talk to you about the SCI deposition.  Did

24   you lie in that deposition?

25   A.    Yes, sir.

2999

REDIRECT - RUDOLPH

1   Q.   Was that the right thing to do or the wrong thing to

2   do?

3   A.   Wrong thing.

4   Q.   Have you led a perfect life?

5   A.   Far from.

6   Q.   Have any of us?

7   A.   Probably not.

8   Q.   Yeah.  I want to talk for a moment about your

9   relationship with Lori.  Remember the prosecutor asked you a

10  bunch of questions about whether she would get jealous?

11  A.   Yes, sir.

12  Q.   If we could turn to Government Exhibit 90, which is --

13  and the INV number is 27741.  If we could zoom in.

14          Now, the bottom email is from Lori to you; do you

15  see that?

16  A.   Yes, sir.

17  Q.   Can you read that to the jury, please.

18  A.   "The neighbor owner came by to put his stuff back in

19  the house.  He's leaving very early in the morning.  He

20  asked me if I would like to have dinner tonight.  I said

21  okay.  We're going to have sushi.  I hope that doesn't bum

22  you out.  I won't have sex or anything.  Love you.  BB."

23  Q.   How did you respond at the top?

24  A.   I said to her, "Have fun.  It's good to have some

25  company.  I'm busy doing paperwork.  Bummer.  If you do have

3000
REDIRECT - RUDOLPH

1    sex, please use a condom.  Love you."

2    Q.   It doesn't sound like you and Lori were exclusive

3    there.

4    A.   No, sir, we were not exclusive.

5    Q.   Did you care if she had sex with another man?

6    A.   No, sir.  That was her business.

7    Q.   Okay.  You can take that down.  Thank you, sir.

8         In 2012, where did you and Bianca move?

9    A.   We moved from Pittsburgh to Phoenix.

10   Q.   And who was still living in Pittsburgh at the time?

11   A.   Lori.

12   Q.   Okay.  I want to talk for a moment about the insurance

13   guy, Gorman.  Remember him?

14   A.   I sure do.

15   Q.   Now, do you remember -- the prosecutor asked you

16   questions about the second-to-die policy.

17   A.   Yes, sir.

18   Q.   Did Mr. Gorman ever recommend a second-to-die policy

19   for you?

20   A.   Never.

21   Q.   Do you remember him testifying that he didn't utilize

22   that policy?

23   A.   Correct.

24   Q.   And do you remember the expert testifying for the

25   Government, a guy named Milnes?

REDIRECT - RUDOLPH

1    A.    Yes.

2    Q.    Do you remember him testifying that he was surprised

3    that Gorman didn't know of or didn't use those policies?

4    A.    He did testify to that.

5    Q.    Do you remember a park ranger who testified, this

6    Musese?

7    A.    Yes, sir.

8    Q.    That was the guy who said he could use his powers to

9    look into people's eyes.  Do you remember that?

10   A.    Yes, sir.

11   Q.    The prosecutor asked you questions about whether he got

12   training in the United States.  Do you remember those

13   questions?

14   A.    I do.

15   Q.    Do you know whether his training was in parks and

16   recreation and wildlife or whether it was in trying to

17   detect how to do law enforcement interviews?

18   A.    My assumption would be parks and wildlife.

19   Q.    Okay.  Would you be surprised to learn that a parks and

20   wildlife officer may not like a hunter?

21   A.    Not at all.

22   Q.    Sorry, I'm bopping around a little bit, but I want to

23   now talk about October 12th of 2016.  That's the day after

24   Bianca dies.

25   A.    Yes, sir.

3002

REDIRECT - RUDOLPH

1    Q.    Do you remember who took Bianca's body that morning to

2    the hospital?

3    A.    It was an ambulance, followed by myself and Mark

4    Swanepoel in another vehicle.

5    Q.    Did you guys make sure that it was being delivered to

6    the hospital?

7    A.    Yes, sir.

8    Q.    And what was the reason that you were having a body

9    delivered to the hospital?

10   A.    We were to meet with the forensic pathologist and

11   discuss with him the details of Bianca, and he was going to

12   perform the autopsy.

13   Q.    Did you know he was going to be performing an autopsy?

14   A.    Yes, sir.

15   Q.    Did you try to stop it?

16   A.    No, sir.

17   Q.    Had you even met with anybody from a funeral home at

18   that point?

19   A.    No, sir.

20   Q.    Okay.  So after you dropped the -- Bianca's body off to

21   have the autopsy and postmortem done, was there anything you

22   could do at that point to stop the autopsy?

23   A.    No.  It's part of the investigation and it's going to

24   be done.  No questions.

25   Q.    Did you ever try to stop it?

REDIRECT - RUDOLPH

1   A.    No, sir.

2   Q.    Dr. Rudolph, we're reaching the end here.  I want to

3   ask you:  Did you love Bianca Rudolph?

4   A.    Yes, sir.

5   Q.    I'd like to call up Government Exhibit 47.  I'd like to

6   call up starting from the word, "As."

7   A.    Do you want me to read that?

8   Q.    Just give it a second to get called out.

9         Is this the eulogy you gave?

10  A.    Sir?

11  Q.    Is this the eulogy you gave?

12  A.    Yes, sir.

13  Q.    Prosecutor tried to suggest that you're being

14  untruthful.  Was this your eulogy from the heart?

15  A.    Yes, sir.

16  Q.    Was it true?

17  A.    Yes, sir.

18  Q.    Can you read it to the jury, please.

19  A.    "As" -- "As much as I will miss our adventures, travel,

20  and special occasions, in the end I will miss the routine

21  and rhythm and magic of our everyday life.  Even 34 years

22  on, at the end of a long day, when I'd see her face again,

23  my heart will still skip a beat.

24        "And now sadly that time together has ended.  My

25  hope today was that, in some way, to show how special she

REDIRECT - RUDOLPH

1    was as a daughter, a mother, a wife and friend.

2             "Julian and AnaBianca, your mother will always

3    watch over you.  Talk to her every day.  Pursue your lives

4    and dreams with the same passion and courage that she" --

5    "she will keep a watchful eye on you like she always did,

6    but now from heaven.  And always, always remember, your

7    family is here for you.

8             "Bianca was beautiful and loving.  She is with God

9    now.  And I will end with the simple and true words she

10   never tired of hearing:  I love you, B."

11   Q.    Okay.

12   A.    Sorry.

13            COURTROOM DEPUTY:  Five-minute warning, counsel.

14   BY MR. MARKUS:

15   Q.    Dr. Rudolph, I want you to look at the jury in the eye.

16   I'm going to ask you one last time:  Did you murder your

17   wife?

18   A.    I did not murder my wife.  I absolutely did not murder

19   my wife.

20   Q.    Are you innocent?

21   A.    I am innocent.  I never did anything.  I'm completely

22   innocent of this crime.

23            MR. MARKUS:  Thank you.

24            THE COURT:  Mr. Fields, is there a request for

25   recross?

1          MR. FIELDS:  No, Your Honor.  No recross, but I

2    would like to make sure that Mr. Dill gets the opportunity

3    to confront the witness if he so desires.

4          MR. DILL:  No questions.

5          THE COURT:  All right.  Well, thank you for that.

6          Dr. Rudolph, you may resume your seat at counsel

7    table.

8          THE WITNESS:  Thank you, Your Honor.

9          THE COURT:  Defendant Rudolph may call his next

10   witness.

11         MR. MARKUS:  Your Honor, at this time the defense

12   rests.

13         THE COURT:  All right.  Defendant Milliron may call

14   her first witness.

15         MR. DILL:  May I take the lectern, Your Honor?

16         THE COURT:  Yes, you may.

17         MR. DILL:  Your Honor, for the record, before --

18   before I answer that response, Defendant Milliron would like

19   to admit some exhibits that have been stipulated to.  What

20   is marked as Defendant MA -- is there an MA?

21         COURTROOM DEPUTY:  MA has already been admitted.

22         MR. DILL:  That was stipulated into evidence

23   already?

24         COURTROOM DEPUTY:  Yes.

25         MR. DILL:  Okay, thank you.  And can I confirm that

1    MC is also admitted into evidence?

2              COURTROOM DEPUTY:  MC-1 and 2.

3              MR. DILL:  Thank you, ma'am.  And then

4    additionally, Defendant Milliron would admit MG-4, MG-7, and

5    MG-9.  They are stipulated to.

6              THE COURT:  Are they in, Ms.  Guerra?

7              COURTROOM DEPUTY:  MG-4, -7, and -9 are not

8    admitted yet.

9              THE COURT:  All right.  Is there any objection?

10             MR. FIELDS:  None from the Government, Your

11   Honor.

12             THE COURT:  All right.  Seeing that there's no

13   objection, Exhibits MG-4, MG-6 -- no, let me start over.

14   MG-4, MG-7 and MG-9 are admitted into evidence and may be

15   published to the jury.

16        (Defendant's Exhibits MG-4, MG-7, MG-9 received)

17             MR. DILL:  That's correct, Your Honor.  With that,

18   Defendant Milliron will rest.

19             THE COURT:  Okay.  All right, I think this will be

20   a good time for our afternoon recess.  Folks, we're going to

21   take 20 minutes today because I have a few matters I want to

22   discuss with the lawyers.  So we will be in recess for 20

23   minutes.

24        (Jury left the proceedings at 2:59 p.m.)

25             THE COURT:  Mr. Fields, is the Government going to

1    have any rebuttal evidence?

2            MR. FIELDS:  No, Your Honor.  The Government has no

3    rebuttal witnesses and would rest.

4            THE COURT:  All right.  All right.  So we have a

5    decision to make in terms of what we're going to do with the

6    jury.  What we still have to do is go through the exhibits.

7    Ms. Guerra will state for the record her record of what has

8    been admitted; we'll make sure everybody agrees.  Then we'll

9    take a recess and within a few minutes we will bring out the

10   Court's final set of proposed -- the final set of

11   instructions.  I give counsel 15 minutes to review and then

12   I'll come out on the bench and then we'll have our charging

13   conference.

14           I want to get input from counsel as to whether we

15   should make an effort to start and at least get in the

16   initial portion of the Government's closing argument today

17   or whether we should let the jury go home and have them come

18   back and have closing tomorrow morning.  I'll give you an

19   opportunity to consult with each other if you want.  One

20   second, Mr. Fields.  All right, let me hear from the

21   Government first.

22           MR. FIELDS:  Your Honor, I have to confess I don't

23   remember your usual practice, but I think if we can maybe

24   finish the jury instructions today, we could charge the jury

25   today, and then our preference would be to do closings

1    tomorrow in the morning.

2              THE COURT:  So what is it that you don't recall

3    about my --

4              MR. FIELDS:  I don't know if you do jury

5    instructions before or after the closing.

6              THE COURT:  Didn't I mention yesterday that I do it

7    before and then you can then use the jury instructions in

8    your closings?

9              MR. FIELDS:  You did, Your Honor.  I -- I'm firing

10   on all cylinders today.  I apologize.

11             THE COURT:  No, I hear you.  I've been in your

12   situation.  14-day jury trial can take a lot out of you.

13             MR. FIELDS:  Thank you.  So that will be -- our

14   preference would be to close tomorrow, Your Honor.

15             THE COURT:  All right.  One thing about doing it

16   the way you suggested is we would have the jury sit out

17   there until we do everything with the exhibits, you have the

18   opportunity to review the jury instructions after 15

19   minutes, I come out, we do the charging conference, and then

20   that's when I would charge them.  Or I could charge them

21   tomorrow morning and do closings.

22             Now one thing we have to -- other thing we have to

23   factor into all this is that you got the email from

24   Ms. Guerra yesterday evening in terms of the amount of time

25   I was going to allow each party for closing, so 200 minutes

1    is three hours and 20 minutes.  Ms. George will get very mad

2    at me if I read the jury instructions too fast, so we're

3    looking probably close to four hours just in charging and

4    closing arguments before the jury gets the case today.  So

5    we just have to balance whether we think the jury will be

6    upset if there's -- if they wait for an hour and a half to

7    be told that -- or be told that they have to wait an hour

8    and a half to be charged.  So that's why I'm asking for

9    input.

10             Mr. Markus, give me your input.

11             MR. MARKUS:  Yes, Your Honor.  I like Mr. Fields'

12    idea.  I hate to agree with him, but --

13             THE COURT:  You guys have agreed on a couple of

14    things.

15             MR. MARKUS:  Yeah, we have.  We have.

16             THE COURT:  You've had all of two factual

17    stipulations.  Which is amazing in my civil trials, we

18    sometimes have 10, 15, 20 stipulated facts, and I had to

19    push you to get two stipulated facts -- or three.  I forgot

20    about the late-filed stipulation.  But go ahead.

21             MR. MARKUS:  So, Your Honor, what I think what

22    might be the best use of time is if we could do the charging

23    conference, instruct the jury tonight, and then do the

24    exhibits with Ms. Guerra after the jury's charged.  That way

25    we're not wasting the jury's time while we -- while we do

1      the exhibits with Ms. Guerra.  So we could do the charging

2      conference now.  I don't think there's a lot of dispute.  I

3      think there's two instructions, so --

4                    THE COURT:  I think there are three disputed --

5                    MR. MARKUS:  Three disputed.  So I think we can get

6      through that with the Court relatively quickly.  We can

7      charge the jury, send them off, and then do the exhibits

8      with Ms. Guerra.  Of course, for the record, I'm renewing my

9      Rule 29 now on all counts and all elements, but --

10                   THE COURT:  I was going to get to that, but --

11                   MR. MARKUS:  Yeah.

12                   THE COURT:  -- having this discussion now.

13                   MR. MARKUS:  So that's all, Your Honor.  The only

14     other thing I would add about closings tomorrow -- and I

15     know the amount of time the Court sent on the email -- I

16     have no problem doing my closing in an hour, even though

17     this was a very long trial.  I think I would ask the Court

18     to think about reducing the Government's time.  This is a

19     murder trial.  I totally get that there's a second defendant

20     here, but giving the Government 40 extra minutes over the

21     lead defendant I think puts me at a little bit of a

22     disadvantage.  So I would ask for a little lower time for

23     the Government, and we can get the jury the case a little

24     quicker tomorrow.

25                   I have no problem doing mine in an hour.  I think

1    Mr. Dill could probably do his in less than 40 minutes.    I

2    don't want to speak to him -- for him, but I would ask that

3    the Government have less than a hundred minutes.

4            THE COURT:    Well, okay, but you call it a murder

5    trial, which it is, but it's also a mail fraud trial, it's a

6    perjury trial, there's eight other counts other than the

7    foreign murder count.    So your request that I reduce the

8    Government's closing argument a ton is denied.    I'm already

9    giving them 20 minutes less than what they thought they

10   needed, so -- which they should probably thank me for.

11           MR. FIELDS:    We do.    Thank you.

12           MR. MARKUS:    I guess my only point, Your Honor, is

13   that there's no way they're going to use 40 minutes on

14   Ms. Milliron, so I would just say that the -- they should

15   only be able to discuss Dr. Rudolph for the amount of time

16   that we are discussing Dr. Rudolph, so they should be

17   limited on Counts 1 and 2 to 60 minutes.

18           THE COURT:    No, I'm not going to do that.    I've

19   never interjected myself to the level of telling counsel how

20   much time they can allocate to which arguments in their

21   closing arguments and I'm not going to start.

22           Mr. Dill, let me hear from you.

23           MR. DILL:    Your Honor, my only question is:    As far

24   as charging the jury, does the Court provide copies of the

25   jury instructions for them during the charging which they

1    can then keep, or are you just going to read it to them and

2    then -- I'm not familiar with the Court's procedures.

3              THE COURT:   Okay.   So what we do is I charge the

4    jury orally, but they will have 12 sets of the written

5    instructions during their deliberations.   All right.

6              So what are you -- what's your recommendation to

7    how we should proceed?

8              MR. DILL:   I agree with counsel.   I think we

9    could -- with Ms. Guerra, I think we have -- I don't think

10   there's a dispute on any of the exhibits.   I think it's just

11   making sure they're all there, so we shouldn't waste the

12   jury's time with that.

13             THE COURT:   I think that's a good idea.

14             COURTROOM DEPUTY:   Your Honor, I don't mind after

15   the jury charge then doing the exhibits just so they can

16   pare them down to get those exhibits to the jurors as fast

17   as possible tomorrow.

18             THE COURT:   Okay.   I think that's a good idea.

19   Before we forget, so let me -- we'll get on the record:   Are

20   there any motions from the defendants?   Start with Defendant

21   Rudolph.

22             MR. MARKUS:   Your Honor, we would renew our Rule 29

23   motion on both counts as to each element, including all of

24   the arguments we made -- was it two days ago now?   I can't

25   keep track of time either.

1          THE COURT:  Right.

2          MR. MARKUS:  And all of the pretrial motions that

3    we made, we would preserve those and reassert those at this

4    time.

5          THE COURT:  Is there a motion from Defendant

6    Milliron?

7          MR. DILL:  Yes, Your Honor.  We would also renew

8    our Rule 29 motion based upon the same arguments made

9    previously.

10          THE COURT:  All right.  Does the Government

11    incorporate its prior arguments made in opposition to the

12    original 29 motions?

13          MR. FIELDS:  We do, Your Honor.

14          THE COURT:  All right.  So I will rule as follows:

15    With respect to Defendant Rudolph's Rule 29 motion, it is

16    denied, and I incorporate by reference specifically the

17    findings and conclusions of my ruling at the first instance

18    the motion was presented to me.

19          With respect to Defendant Milliron, as I did

20    before, I'm denying the motion with respect to Counts 3

21    through 8.  With respect to Count 9, I am taking it under

22    advisement and will rule on the motion subsequent to a

23    return by the jury of their verdict.

24          With respect to that motion, I'm also specifically

25    incorporating my findings and conclusions that I made on the

3014

1    record when the motion was first presented to me two days

2    ago.

3         One other housekeeping thing before we take a

4    recess.  And you're going to have to -- Ms. Guerra, you're

5    going to have to tell the jury that it's actually going to

6    be much longer than 20 minutes because we're going to have

7    our charging conference and all that.

8         COURTROOM DEPUTY:  I will as soon as we're on

9    recess.

10        THE COURT:  Yeah.  Who's going to do the closing --

11   or are you going to split the closing for the Government?

12        MR. FIELDS:  We're going to split the closing, Your

13   Honor.  Mr. Winstead will be doing first close and I'll be

14   doing rebuttal close.

15        THE COURT:  All right.  Have you decided how much

16   time you're going to allocate to the two segments?

17        MR. FIELDS:  May I have a moment, Your Honor?

18        THE COURT:  Yeah.  Just let me say, obviously a

19   hundred minutes isn't divisible by three, at least to whole

20   numbers.  It's 33-1/2.  But I'll -- because it's only a

21   minute and a half, you can reserve up to 35 minutes for

22   rebuttal.

23        MR. FIELDS:  Thank you, Your Honor.

24        Your Honor, we'll reserve the 35 minutes for

25   rebuttal.

1            THE COURT:  All right.  Sometime either before you

2      leave today or first thing in the morning, please all three

3      parties inform Ms. Guerra how much of a warning you want for

4      your respective closing arguments.  For the Government,

5      obviously you need to give us how much time you want as a

6      warning for the two segments of your closing argument.

7            All right.  We'll be in recess, then we will bring

8      out the Court's set of jury instructions.

9         (Recess taken 3:12 p.m. to 3:44 p.m.)

10            THE COURT:  All right, the record will reflect that

11      counsel has had slightly more than 15 minutes to review the

12      Court's final set of jury instructions.  All instructions

13      submitted to me by the -- by counsel and the parties that

14      were not included in the final set of instructions have

15      either been rejected in whole or in part.

16            What I'm going to do first is read from a table

17      that I've prepared which summarizes my actions and decisions

18      with respect to all the instructions.

19            With respect to the stipulated proposed jury

20      instructions, S1, the statement of the case was rejected

21      because I already read the statement of the case at the

22      beginning of the trial during voir dire.  And in my view,

23      it's not necessary to include it in the final set of

24      instructions.

25            S2 was adopted.  Actually, S2 through S8 was

1    adopted.  S9, expert witnesses, was modified to reflect the

2    fact that Ms. Clay was added; Mr. DeFrance and Peterson were

3    removed because they testified as lay witnesses.  Also

4    Caruso was removed because he did not testify.

5            10 -- S-10 was adopted.  S11 was rejected.  S12

6    through S24 were all adopted.  S25 was modified.  S26 was

7    adopted.  S27 was adopted.

8            With respect to disputed jury instructions, Rudolph

9    disputed instruction 1, presumption of innocence, burden of

10   proof, was rejected.  The Court will instead use the Tenth

11   Circuit pattern instruction which was proposed by the

12   Government.

13           With respect to the Government's disputed

14   instruction, disputed instruction -- Government disputed

15   instruction 1 was adopted.  Government disputed instruction

16   2 was rejected.  And on -- as to this instruction, I want to

17   make a more complete record as to why I rejected it.  The

18   Court rejects the Government's proposed instruction

19   regarding evaluation of defendant's statements.  Having

20   reviewed both parties' arguments on balance, the Court

21   agrees with Defendant Rudolph that this instruction has the

22   potential to confuse the jury and wrongfully lead them to

23   believe that Rudolph made false statements that he must be

24   guilty of the charged conduct.

25           In particular, the Court finds persuasive Rudolph's

1    citation in the Tenth Circuit's reasoning in *United States*

2    *v. Durham*, 139 F.3d 1325, a 1985 decision from our circuit,

3    which stated, quote, The only way the jury could find that

4    the statements at issue in this case were false would be to

5    conclude that Durham -- the defendant in that case -- was a

6    member of Montgomery's cocaine distribution conspiracy.

7    That conclusion would necessarily render irrelevant

8    consciousness of guilt.  This circularity problem recurs

9    whenever a jury can only find an exculpatory statement falls

10   if it already believes other evidence directly establishing

11   guilt.  Under such circumstances, it is error to give a

12   false exculpatory statement instruction, end quote.

13        With respect to Government's disputed instruction

14   4, that was modified.  Government instruction No. 5 that was

15   submitted to us this morning was rejected only because I

16   already have my own version of the same instruction that

17   counsel sees in the set that was provided to you.

18        The joint proposed verdict form was adopted without

19   any change.  And I will assume there is no objection to the

20   verdict form unless counsel informs me otherwise because it

21   was submitted as a joint stipulation -- stipulated verdict

22   form which I adopted without modification.

23        All right.  Are there any objections to the Court's

24   final set of jury instructions from the Government?

25        MR. FIELDS:  No, Your Honor.

1           THE COURT:  All right.  Are there any objections to

2       the Court's final set of jury instructions from Defendant

3       Rudolph?

4           MR. MARKUS:  Just very briefly, Your Honor.  Would

5       you like --

6           THE COURT:  Would you take the lectern, please.

7           MR. MARKUS:  Yes.  Yes, sir.  Your Honor, on page

8       10, the instruction, "All available witnesses need not be

9       produced," I don't believe the Government proposed that

10      instruction and we would object to it.

11          THE COURT:  The Government did not propose it.

12      It's a instruction I generally include in my set of

13      instructions if I believe that it's appropriate to do so.

14      Your objection's noted and it's overruled.

15          MR. MARKUS:  The next objection, Your Honor, is

16      page 20, venue.  And I understand what the current state of

17      the law is on venue with preponderance of the evidence.  I'd

18      like to preserve my objection that venue needs to be proven,

19      like every other element, beyond a reasonable doubt.  So I

20      would preserve that here.

21          Second, Your Honor, on venue, in terms of the

22      placement of it, I think this instruction, if given, should

23      be given after the other offense instructions because it

24      seems sort of out of place to give a definition of one of

25      the elements here before the other offenses are defined.

1          THE COURT:  So where do you believe it should go?

2          MR. MARKUS:  I believe it should go after page --

3    one second, Your Honor -- after the mail fraud

4    instruction -- after the mail fraud instruction on page 30.

5    I think it should go there, between 30 and 31.

6          THE COURT:  And the reason, again.  Tell me again

7    your thinking on this.

8          MR. MARKUS:  Because this is -- Your Honor, this is

9    defining one of the elements of the offense in Counts 1 and

10   Counts 2, so I believe it should come after those offenses

11   are defined.

12         THE COURT:  Let me hear from the Government on this

13   one.

14         MR. FIELDS:  Your Honor, no objection to the

15   placement.  But I just note for the record that venue is not

16   an element and the law is very clear on that.

17         THE COURT:  Right.  If it were an element,

18   Mr. Markus, we could hardly be instructing the jury to find

19   it by a preponderance of the evidence.  Because it's not an

20   element, to save some tree branches instead of having to

21   reprint this, I'm going to -- your objection's noted and

22   it's overruled.

23         MR. MARKUS:  Yes, Your Honor.  And the only other

24   objection I have is page 24, the voluntariness of statement

25   by defendant.  I've spoken with the Government.  I don't

1    believe there's any problem with removing page 24, Your

2    Honor.

3              THE COURT:  One second.  Well, let me tell you why

4    I put it in there.  I'm surprised you're objecting to it.  I

5    put it in there because of Sherry Houck's testimony of the

6    statement made subsequent to the alleged murder attributed

7    to your client.  And I was advising the jury to treat that

8    testimony about such a statement with caution.

9              MR. MARKUS:  Ah.  You make a good point.  I -- the

10   lack of sleep might be affecting me.  Can I just have one

11   moment to speak with my colleagues?

12             THE COURT:  Sure.

13             MR. MARKUS:  Your Honor, I'm glad you caught that.

14   Thank you.  We'll leave it in.

15             THE COURT:  All right.  Any other objections?

16             MR. MARKUS:  No, Your Honor.

17             THE COURT:  Any objections to the Court's final set

18   of jury instructions from Defendant Milliron?

19             MR. DILL:  No, Your Honor.

20             THE COURT:  All right.  That was easy.  Okay.

21             We will -- oh, let me ask a couple more questions.

22   Oh, one question.

23             Do counsel agree that, as I read the jury

24   instructions, I may make those amendments which may be

25   necessary as a result of a typographical, clerical or

1    syntactical error?  For the Government?

2             MR. FIELDS:  Your Honor, I hope maybe this can be

3    the first trial that's ever not had to happen, but no

4    objection.  It happens in every trial.

5             THE COURT:  All right.  Okay.  Let me just say,

6    before I ask the defense counsel, the bar is very low as to

7    what, in my mind, is a typographical, clerical or

8    syntactical error.  Usually even an error in gender or

9    plural and singular, I will -- while I'm reading the

10   instruction, charging the jury, I will ask counsel, "Is

11   there an objection if I change X to Y?"  And so I won't go

12   beyond that.

13            Mr. Markus, any objection to that?

14            MR. MARKUS:  No, Your Honor.

15            THE COURT:  All right.  Mr. Dill?

16            MR. DILL:  No, Your Honor.

17            THE COURT:  All right.  So we'll take a brief

18   recess.  Ms. Jacoby, my law clerk, will bring out a final

19   final set for counsel that will be this set without the

20   annotations so they can be used in the event counsel wish to

21   refer to it tomorrow morning in their closing arguments.

22            All right, we will be in recess.

23        (Recess taken 3:56 p.m.)

24        (In open court in the presence of the jury at 4:08

25   p.m.)

1           THE COURT:  Again, ladies and gentlemen of the

2    jury, thank you so much for your patience.  It's greatly

3    appreciated.  At this time, I'm going to read to you the

4    Court's jury instructions that will govern your

5    deliberations.  You are each going to get a written -- your

6    own set of written instructions, so it's no need -- well,

7    there's no need to take copious notes right now, but

8    obviously you're free to do what you please with respect to

9    notes.

10          Just so you know, I'm going to read these

11   instructions today and then you'll be excused for the day;

12   the lawyers and I still have a couple other matters that we

13   have to attend to.  And then you'll come back in the morning

14   and then we'll start closing arguments at that time.

15          Members of the jury, in any jury trial, there are,

16   in effect, two judges.  I am one of the judges, and you are

17   the other.  I am the judge of the law.  You, as jurors, are

18   judges of the facts.  I presided over the trial and decided

19   what evidence was proper for your consideration.  It is also

20   my duty now at the end of the trial to explain to you the

21   rules of law that you must follow and apply in arriving at

22   your verdict.

23          In explaining the rules of law that I follow -- let

24   me start that sentence again.  In explaining the rules of

25   law that you must follow, first I'll give you some general

1   instructions which apply in every criminal case.  For

2   example, instructions about the burden of proof and insight

3   that may help you to judge the believability of witnesses.

4   Then I will give you some specific rules of law that apply

5   to this particular case and, finally, I will explain the

6   procedures you should follow in your deliberations and the

7   possible verdicts you may return.  These instructions will

8   be given to you for your use in the deliberation room, as I

9   just said.

10          You, as jurors, are the judges of the facts.  But

11   in determining what actually happened, that is, in reaching

12   your decision as to the facts, it is your sworn duty to

13   follow all of the rules of law as I explain them to you.

14          You have no right to disregard or give special

15   attention to any one instruction or to question the wisdom

16   or correctness of any rule I may state to you.  You must not

17   substitute or follow your own notion or opinion as to what

18   the law is or ought to be.  It is your duty to apply the law

19   as I explain it to you regardless of the consequences.

20   However, you should not read into these instructions, or

21   anything else I may have said or done, any suggestion as to

22   what your verdict should be.  This is entirely up to you.

23          It is also your duty to base your verdict solely

24   upon the evidence, without prejudice or sympathy.  That was

25   the promise you made and the oath that you took.

1            You must make your decision based only on the

2    evidence that you saw and heard here in court.  Do not let

3    rumors, suspicions, or anything else that you may have seen

4    or heard outside of court influence your decision in any

5    way.

6            The evidence in this case includes only what the

7    witnesses said while they were testifying under oath, the

8    exhibits that I allowed into evidence, the stipulations that

9    the lawyers agreed to, and the facts that I have judicially

10   noticed.

11           Nothing else is evidence.  The lawyers' statements

12   and arguments are not evidence.  Their questions and

13   objections are not evidence.  My legal rulings are not

14   evidence.  And my comments and questions are not evidence.

15           During the trial, I did not let you hear the

16   answers to some of the questions that the lawyers asked.  I

17   also ruled that you could not see some of the exhibits that

18   the lawyers wanted you to see.  You must completely ignore

19   all of these things.  Do not even think about them.  Do not

20   speculate about what a witness might have said or what an

21   exhibit might have shown.  These things are not evidence and

22   you are bound by your oath not to let them influence your

23   decision in any way.

24           There are, generally speaking, two types of

25   evidence from which a jury may properly determine the facts

of a case.  One is direct evidence, such as the testimony of
an eyewitness.  The other is indirect or circumstantial
evidence, that is, the proof of a chain of facts which point
to the existence or nonexistence of certain other acts.

        As a general rule, the law makes no distinction
between direct and circumstantial evidence.  The law simply
requires that you find the facts in accord with all of the
evidence in the case, both direct and circumstantial.

        While you must consider only the evidence in this
case, you are permitted to draw reasonable inferences from
testimony and exhibits, inferences you feel are justified in
light of common experience.  An inference is a conclusion
that reason and common sense may lead you to draw from facts
which have been proven.

        By permitting such reasonable inferences, you may
make deductions and reach conclusions that reason and common
sense lead you to draw from the facts which have been
established by the testimony and evidence in this case.

        The Government has the burden of proving the
defendant guilty beyond a reasonable doubt.  The law does
not require a defendant to prove his or her innocence or
produce any evidence at all.  The Government has the burden
of proving the defendants' guilt beyond a reasonable doubt,
and if it fails to do so, you must find the defendants not
guilty.

3026

1          Proof beyond a reasonable doubt is proof that

2    leaves you firmly convinced of the defendants' guilt.  There

3    are few things in this world that we know with absolute

4    certainty and in a criminal -- and in criminal cases the law

5    does not require proof that overcomes every possible doubt,

6    it is only required that the Government's proof exclude any

7    reasonable doubt concerning the defendants' guilt.

8          A reasonable doubt is a doubt based on reason and

9    common sense after careful and impartial consideration of

10   all the evidence in the case.  If, based on your

11   consideration of the evidence, you are firmly convinced that

12   Defendant Lawrence Rudolph or Defendant Lori Milliron, or

13   both, are guilty of the crimes charged, you must find him or

14   her guilty.  If, on the other hand, you find that there is a

15   reasonable possibility that he or she is not guilty, you

16   must give him or her the benefit of the doubt and find him

17   or her not guilty.

18          The evidence in this case consists of not only the

19   sworn testimony of the witnesses but also facts that have

20   been agreed to or stipulated.  When the attorneys on both

21   sides stipulate or agree to the existence of a fact, you may

22   accept the stipulation as evidence and regard the fact as

23   proved.  You are not required to do so, however, since you

24   are the sole judges of the facts.

25          In this case, as the parties -- the parties have

stipulated as follows:

1:  Lawrence Rudolph was at all times relevant to the charge of foreign murder in Count 1 of the superseding indictment, a national of the United States as required by 18 United States Code Section 1119.

Stipulation No. 2:  Bianca Rudolph was at all times relevant to the charge of foreign murder in Count 1 of the superseding indictment a national of the United States as required by 18 United States Code Section 1119.

The United States -- and stipulation 3:  The United States of America and the defendant, Lawrence Rudolph, stipulate and agree that the forensic document examiner retained by Defendant Lawrence Rudolph, Diane Flores, reached the same conclusion as FBI forensic document examiner, Rachel Clay.  Using the same methodology described during Ms. Clay's testimony, as well as additional testing, each independently concluded that the signatures on defense Exhibits RW and RX, originals of the postnuptial agreement, were signed by Bianca Rudolph.

The number of witnesses testifying for or against a certain fact does not, by itself, prove or disprove that fact.

The law does not require any party to call as witnesses all persons who may have been present at any time or place involved in the case, or who -- or who may appear

3028

1    to have some knowledge of the matters in issue at this

2    trial.  Nor does the law require any party to produce as

3    exhibits all papers and things mentioned in the evidence of

4    the case.

5         I remind you that it is your job -- your job to

6    decide whether the Government has proved guilt of the

7    defendants beyond a reasonable doubt.  In doing so, you must

8    consider all of the evidence.  This does not mean, however,

9    that you must accept all the evidence as true or accurate.

10         You are the sole judges of the credibility or

11    believability of each witness and the weight to be given to

12    each witness's testimony.  An important part of your job

13    will be making judgments about the testimony of the

14    witnesses, including Defendant Lawrence Rudolph, who

15    testified in this case.  You should think about the

16    testimony of each witness you have heard and decide whether

17    you believe all or any part of what each witness had to say

18    and how important that testimony was.  In making that

19    decision, I suggest that you ask yourself a few questions.

20         Did the witness impress you as honest?

21         Did the witness have any particular reason not to

22    tell the truth?

23         Did the witness have a personal interest in the

24    outcome of this case?

25         Did the witness have any relationship with either

1    the Government or the defense?

2            Did the witness seem to have a good memory?

3            Did the witness clearly see or hear the things

4    about which he or she testified?

5            Did the witness have the opportunity and ability to

6    understand the questions clearly and answer them directly?

7            Did the witness's testimony differ from the

8    testimony of other witnesses?

9            When weighing the conflicting testimony, you should

10    consider whether the discrepancy has to do with a material

11    fact or with an unimportant detail.  And you should keep in

12    mind that innocent misrecollection, like failure of

13    recollection, is not uncommon.

14            The testimony of Defendant Lawrence Rudolph should

15    be weighed and his credibility evaluated in the same way as

16    that of any other witness.

17            In reaching a conclusion on a particular point --

18    counsel agree that there should be an "a" in between --

19    right before "a particular point"?

20            MR. FIELDS:  Yes, Your Honor.

21            MR. MARKUS:  Yes, Your Honor.

22            MR. DILL:  Yes, Your Honor.

23            THE COURT:  Mr. Dill?

24            MR. DILL:  Yes, Your Honor.

25            THE COURT:  In reaching a conclusion on a

1    particular point, or ultimately in reaching a verdict in

2    this case, do not make any decisions simply because there

3    were more witnesses on one side than on the other.

4            During the trial, you heard the testimony of the

5    following expert witnesses:

6            Dr. Stephen Cina, concerning a forensic medical

7    examination of Bianca Rudolph.

8            Dr. Daniel Maswahu, concerning the autopsy of

9    Bianca Rudolph.

10           Dr. Bruce Bradtmiller, concerning an anthropometric

11   study.

12           Dr. Richard Vorder Bruegge, concerning a

13   photogrammetry analysis.

14           Thomas Griffin, concerning blood spatter evidence.

15           Steve Rogers, concerning the manufacture of

16   ammunition.

17           Ryan Cook, concerning the manufacture and design of

18   the Browning A-5 semi-automatic shotgun.

19           Erin Newton, concerning forensic accounting.

20           James Padish, on the law of divorce in Arizona.

21           Pieter Milnes, on life insurance policies.

22           Lucien Haag -- or Haag, concerning shotgun

23   ballistics.

24           Dr. Michael Baden, concerning a forensic medical

25   examination of Bianca Rudolph's death.

1              Paulette Sutton, concerning blood spatter evidence.

2              Rachel Clay, concerning forensic document analysis.

3              And, Mitchell Hoffman, concerning forensic

4    accounting.

5              In some cases, such as this one, scientific

6    technical or other personalized knowledge may assist the

7    jury in understanding the evidence or in determining a fact

8    in issue.  A witness who has knowledge, skill, experience,

9    training, or education, may testify and state an opinion

10   concerning such matters.

11             You are not required to accept such an opinion.

12   You should consider opinion testimony just as you would

13   consider other testimony in this trial.  Give opinion

14   testimony as much weight as you think it deserves,

15   considering the education and experience of the witness, the

16   soundness of the reasons given for the opinion, and other

17   evidence in the trial.

18             Defendant Lori Milliron did not testify and I

19   instruct you that you cannot consider her decision not to

20   testify as evidence of guilt.  You must understand that the

21   Constitution of the United States grants to a defendant the

22   right to remain silent.  That means the right not to testify

23   or call any witnesses.  That is a constitutional right in

24   this country, it is very carefully guarded, and you must not

25   presume or infer guilt from the fact that a defendant does

not take the witness stand and testify or call any
witnesses.

        You have heard the testimony of one or more
witnesses who, before this trial, made statements that may
be different from their testimony here in trial -- in court.

        These earlier statements are brought to your
attention only to help you decide how believable these
witnesses' testimony was in the trial.  You cannot use these
statements as proof of anything else.  You can only use them
as one way of evaluating their testimony here in court.

        You are here to decide whether the Government has
proved beyond a reasonable doubt that Defendant Lawrence
Rudolph or Defendant Lori Milliron, or both, are guilty of
the crimes charged.  The defendants are not on trial for any
act, conduct, or crime not charged in the superseding
indictment.

        It is not up to you to decide whether anyone who is
not on trial in this case should be prosecuted for the
crimes charged.  The fact that another person also may be
guilty is no defense to a criminal trial -- criminal charge.

        The question of the possible guilt of others should
not enter into your thinking as you decide whether these
defendants have been proved guilty of the crimes charged.

        If you find Defendant Lawrence Rudolph or Defendant
Lori Milliron, or both, guilty, it will be my duty to decide

3033

what the punishment will be.  You should not discuss or
consider the possible punishment in any way while deciding
your verdict.

An indictment is only a formal method used by the
Government to accuse a defendant of a crime.  It is not
evidence of any kind against the defendants.  Defendant
Lawrence Rudolph and Defendant Lori Milliron are presumed to
be innocent of the crimes charged.

Defendant Lawrence Rudolph and Defendant Lori
Milliron have pleaded not guilty to the superseding
indictment.  Therefore, each denies being guilty of the
charges contained in the superseding indictment.

The events presented at trial happened in various
places.  There is no requirement that all the acts making
up -- making up a crime happen in the District of Colorado.
However, the law imposes certain limits on where the
Government can charge and try a defendant, and you must find
that those limits were respected in this case for each
individual count.

In a case where the alleged crime was committed
outside the United States, such as that charged in Count 1,
venue is proper in any district where the accused is
arrested or first brought in connection with the offense
charged.

In the case of mail fraud, such as that charged in

3034

Count 2, venue is proper in any district where the
particular piece of mail at issue was sent, passed through,
or was received.

For the alleged crime of accessory after the fact
charged in Count 3, venue is proper in any district where
the accused comforts or assists an offender in order to
hinder or prevent his trial or punishment.

For the alleged crime of obstruction charged in
Count 4, venue is proper in any district where the accused
endeavors to influence, obstruct, or impede the due
administration of justice.

For the alleged crime of perjury before a grand
jury charged in Counts 5 through 9, venue is proper in the
district where the grand jury was convened.

Unlike all the other elements of the crime that I
will describe for you, venue is a fact that the Government
only has to prove by a preponderance of the evidence which
is a lower standard than proof beyond a reasonable doubt.
The preponderance of the evidence standard means the
Government only has to convince you that it is more likely
than not that venue is proper.  If you find that venue is
improper for any count, you must acquit the defendant of
that charge.  If you find that it is more likely than not
that venue is proper, you should continue to determine
whether all of the other elements of the crimes I will

1  describe for you have been proven beyond a reasonable doubt.

2        In certain instances, evidence may be admitted only

3  concerning a particular party or only for a particular

4  purpose and not generally against all parties or for all

5  purposes.  For the particular -- for the limited purpose for

6  which the evidence has been received, you may give it such

7  weight as you feel it deserves.  You may not, however, use

8  this evidence for any other purpose or against any party not

9  specifically mentioned.

10        Anna Grimley testified that Defendant Lori Milliron

11  made certain statements to her in 2015.  When evaluating the

12  case against Defendant Lori Milliron, it is for you to

13  decide whether she made any statement and, if so, what

14  weight to give whatever statement she made.  However, any

15  statement Defendant Milliron may have made to Anna Grimley

16  are to be considered only with regard to the charges against

17  Defendant Lori Milliron.

18        With regard to the charges against Defendant

19  Lawrence Rudolph, you cannot consider these alleged

20  statements at all.  In other words, as far as the charges

21  against Defendant Lawrence Rudolph are concerned, you cannot

22  consider any statements Defendant Lori Milliron may have

23  made to Anna Grimley.

24        With respect to Paul Babaz, you may consider the

25  allegations in the amended complaint you heard Mr. Babaz

 1   read from in this case only against Defendant Lawrence

 2   Rudolph and not against Defendant Lori Milliron.  You may

 3   not consider the statements that you saw on your exhibit

 4   monitor screens and Mr. Babaz's testimony in any way when

 5   you are deciding if the Government has proved beyond a

 6   reasonable doubt its case against Defendant Lori Milliron.

 7       Defendant -- or, sorry.  Start the sentence again.

 8   Rachel Anders testified that Defendant Lori Milliron made

 9   certain statements to her.  You may consider the statements

10   of Defendant Lori Milliron only in the case against her and

11   not against Defendant Lawrence Rudolph.  You may not

12   consider Defendant Lori Milliron's statements in any way

13   when you are deciding if the Government has proved beyond a

14   reasonable doubt its case against Defendant Lawrence

15   Rudolph.

16       Sherry Lee Houck testified that Defendant Lori

17   Milliron made certain statements to her.  When evaluating

18   the case against Defendant Lori Milliron it is for you to

19   decide whether she made any statement and -- I need counsel

20   to approach.

21       (Discussion at sidebar)

22       THE COURT:  I'm wondering if -- did Sherry Houck

23   make some other -- testify about a statement that Lori

24   Milliron made, or just the one that I was thinking of that

25   we talked about in the charging conference that she said --

1    when she was handing the package of the propofol that

2    Defendant Rudolph allegedly told her that he's probably

3    going to -- and so, in other words, do we have this

4    backwards?

5              MR. DILL:  I agree with you, Your Honor.  I think

6    it's backwards.

7              MR. FIELDS:  I agree, Your Honor.  I'm sorry I

8    didn't catch it earlier.

9              THE COURT:  Okay.

10             MR. DILL:  Sorry I didn't catch that.

11             THE COURT:  Do you agree, Mr. --

12             MR. MARKUS:  I think she made statements about both

13    defendants, so -- let me just see how this is worded.  One

14    second.

15             This is a tricky one because I think she made

16    statements about Lori and statements about Dr. Rudolph.

17             THE COURT:  What were the statements that she

18    made --

19             MR. MARKUS:  That Lori -- that Lori called her to

20    order the propofol.

21             MR. FIELDS:  Not to order it, but to receive a

22    package --

23             MR. MARKUS:  To receive a package, yeah.  I don't

24    have any problem if we just delete this paragraph.

25             MR. DILL:  I agree.

1          THE COURT:  We could do that.

2          MR. FIELDS:  If defendants agree to it, we have no

3    objection, Your Honor.

4          THE COURT:  All right.  Or otherwise I would have

5    to -- we would have to basically repeat this paragraph a

6    second time and flip the defendants.  If you're all in

7    agreement about that, let's do that.  Okay.

8          (End of discussion at sidebar).

9          THE COURT:  All right, FBI Agent Donald Peterson

10   and FBI forensic accountant Erin Newton read portions of

11   Defendant Lori Milliron's grand jury testimony.  You may

12   consider the statements of Defendant Lori Milliron only in

13   the case against her and not against Defendant Lawrence

14   Rudolph.  You may not consider these statements in any way

15   when you are deciding if the Government proved beyond a

16   reasonable doubt its case against Defendant Lawrence

17   Rudolph.

18          Evidence has been presented about a statement

19   attributed to Defendant Lawrence Rudolph alleged to have

20   been made after the commission of the crimes charged in this

21   case, but not made in court.  Such evidence should always be

22   considered by you with caution and weighed with care.  You

23   should give any such statement the weight you think it

24   deserves after considering all of the circumstances under

25   which the statement was made.

1          In determining whether any such statement is

2     reliable and credible, consider factors bearing on the

3     voluntariness of the statement.  For example, consider the

4     age, gender, training, education, occupation, physical and

5     mental condition of the defendant and any evidence

6     concerning his treatment while under interrogation if the

7     statement was made in response to questioning by Government

8     officials, and all the other circumstances in evidence

9     surrounding the making of the statement.

10         After considering all this evidence, you may give

11    such weight to the statement as you feel it deserves under

12    all the circumstances.  If you determine that the statement

13    is unreliable or not credible, you may disregard the

14    statement entirely.

15         The lawyers for both sides objected to some of the

16    things that were said or done during the trial.  Do not hold

17    that against either side.  The lawyers have a duty to object

18    whenever they think something is not permitted by the rules

19    of evidence.  Those rules are designed to make sure that

20    both sides receive a fair trial.  Do not interpret my

21    rulings on their objections as any indication of how I think

22    the case should be decided.  My rulings were based on the

23    rules of evidence and not on how I feel about this case.

24         That concludes the part of my instructions

25    explaining your duties and the general rules that apply in

1       every criminal case.  Now I will explain the elements of the

2       crimes with which the defendants are charged in this case.

3               Foreign murder.  Defendant Lawrence Rudolph is

4       charged in the first count of the superseding indictment

5       with a violation of 18 United States Code Section 1119.

6       This law makes it a crime for one United States national to

7       unlawfully kill with malice aforethought another United

8       States national outside the United States but within the

9       jurisdiction of another country.  Any kind of willful,

10      deliberate, malicious, and premeditated killing is murder in

11      the first degree.

12              To find Lawrence Rudolph guilty of this crime, you

13      must be convinced that the Government has proved each of the

14      following beyond a reasonable doubt:

15              First:  Lawrence Rudolph caused the death of Bianca

16      Rudolph.

17              Second:  Lawrence Rudolph killed Bianca Rudolph

18      with malice aforethought.

19              Third:  The killing was premeditated.

20              Fourth:  The killing took place outside the United

21      States but within the jurisdiction of another country.

22              Fifth:  Lawrence Rudolph was a national of the

23      United States, and

24              Sixth:  Bianca Rudolph was a national of the United

25      States.

1          To kill with malice aforethought means either to

2     kill another person deliberately or intentionally or to act

3     with callous or wanton disregard for human life.  To find

4     malice aforethought, you need not be convinced that the

5     defendant hated the person, or felt ill will toward the

6     person at the time.

7          In determining whether the killing was with malice

8     aforethought, you may consider the use of a weapon or

9     instrument, and the manner in which death was caused.

10         A killing is premeditated when it is the result of

11    planning or deliberation.  The amount of time needed for

12    pre- -- for premeditation of a killing depends on the person

13    and the circumstances.  It must be long enough for the

14    killer, after forming the intent to kill, to be fully

15    conscious of that intent.

16         You should consider all of the facts and

17    circumstances preceding, surrounding, and following the

18    killing, which tend to shed light upon the condition of the

19    defendant's mind before and at all -- and at the time of the

20    killing.

21         A person is a national of the United States if he

22    or she is a citizen of the United States.  A person born in

23    the United States is a citizen.

24         Mail fraud.  Count 2 of the superseding indictment

25    charges Defendant Lawrence Rudolph with violating Title 18

1    United States Codes Section 1341.

2              This law makes it a crime to use the mails in

3    carrying out a scheme to defraud or a scheme to obtain money

4    or property by means of false or fraudulent pretenses,

5    representations, or promises.

6              To find that Defendant Lawrence Rudolph committed

7    the crime of mail fraud you must be convinced that the

8    Government has proved each of the following beyond a

9    reasonable doubt:

10             First:  Lawrence Rudolph devised or intended to

11   device a scheme to defraud the life insurance companies

12   identified during this trial by making false and fraudulent

13   representations that the death of Bianca Rudolph was an

14   accident to obtain life insurance proceeds.

15             Second:  Lawrence Rudolph acted with specific

16   intent to defraud.

17             Third:  Lawrence Rudolph caused another person to

18   mail something through a private or commercial -- counsel,

19   that -- should that be "interstate" or is that --

20             MR. FIELDS:  It should be "interstate," Your Honor,

21   yes.

22             THE COURT:  The statute does -- okay.  All right.

23   Defense counsel agree that "interstate" should -- substitute

24   for "in-state"?

25             MR. MARKUS:  Yes, Your Honor.

1          MR. DILL:  Yes, Your Honor.

2          THE COURT:  All right.  Okay.  We're making these

3    changes so in the final set of the written instructions,

4    folks, you'll get -- all these corrections will be

5    reflected.

6          Let me read that third element again.

7          Lawrence Rudolph caused another person to mail

8    something through a private or commercial interstate carrier

9    for the purpose of carrying out the scheme.

10         Fourth:  The scheme employed false or fraudulent

11   pretenses, representations, or promises that were material.

12         A scheme to defraud is conduct intended to or

13   reasonably calculated to deceive persons of ordinary

14   prudence or comprehension.

15         The intent to defraud means an intent to cheat

16   someone out of money or property by means of deception.

17         A representation is false if it is known to be

18   untrue or is made with reckless indifference as to its truth

19   or falsity.  A representation would also be false when it

20   constitutes a half truth or effectively omits or conceals a

21   material fact provided it is made with intent to defraud.

22         A false statement is material if it has a natural

23   tendency to influence or is capable of influencing the

24   decision of the person or entity to which it is addressed.

25         What must be proven beyond a reasonable doubt is

that the defendant devised or intended to devise a scheme to
defraud that was substantially the same as the one alleged
in the superseding indictment, and that the use of the mails
was closely related to the scheme in that the defendant
either mailed something or caused it to be mailed in an
attempt to execute or carry out the scheme.  To cause the
mails to be used is to do an act with knowledge that the use
of the mails will follow in the ordinary course of business
or where such use can reasonably be foreseen even though the
defendant did not intend or request the mails to be used.

The word "knowingly" means that -- means an act was
done voluntarily and intentionally and not because of
mistake or accident.

Accessory after the fact.  Count 3 of the
superseding indictment charges Defendant Lori Milliron with
violating 18 United States Code Section 3.  This law makes
it a crime for anyone, knowing that a crime against the
United States has been committed, to obstruct justice by
giving assistance to another person who committed the
crime -- who committed that crime in order to hinder or
prevent that person's apprehension or punishment.  A person
who does this is called an accessory after the fact.

In this case, Defendant Lori Milliron is not
charged with actually committing the crime of foreign murder
charged in Count 1.  Instead, she is charged with helping

1    Codefendant Lawrence Rudolph try to avoid being arrested,

2    prosecuted, or punished for that crime.

3            To find Lori Milliron guilty of this crime, you

4    must be convinced that the Government has proved each of the

5    following beyond a reasonable doubt:

6            First:  Lawrence Rudolph committed the crime of

7    foreign murder alleged in Count 1, which is an offense

8    against the United States.

9            Second:  Lori Milliron knew that Lawrence Rudolph

10   had already committed the crime of foreign murder committed

11   in Count 1.

12           Third:  Lori Milliron then helped Lawrence Rudolph

13   try to avoid being arrested, prosecuted or punished.

14           Fourth:  Lori Milliron did so with the intent to

15   help Lawrence Rudolph avoid being arrested, prosecuted or

16   punished.

17           Obstruction.  Defendant Lori Milliron is charged in

18   Count 4 with a violation of 18 United States Codes Section

19   1503(a).  This law makes it a crime for anyone corruptly to

20   endeavor to influence, obstruct, or impede the due

21   administration of justice in connection with a pending

22   judicial proceeding.

23           To find Lori Milliron guilty of this crime, you

24   must be convinced that the Government has proved each of the

25   following beyond a reasonable doubt:

1      First:  There was a proceeding pending before a

2   Federal grand jury.

3      Second:  Lori Milliron knew of the pending

4   proceeding before the grand jury and endeavored to

5   influence, obstruct, or impede the due administration of

6   justice in that proceeding; and

7      Third:  Lori Milliron -- Lori Milliron's act was

8   done corruptly, that is, she acted knowingly and dishonestly

9   with the specific intent to subvert or undermine the due

10  administration of justice.

11      It is not necessary to show that Lori Milliron was

12  successful in achieving the forbidden objective, only that

13  she corruptly tried to achieve it in a manner which she knew

14  was likely to influence, obstruct, or impede the due

15  administration of justice as the natural and probable effect

16  of her actions.

17      Perjury.  Defendant Lori Milliron is charged in

18  counts 5 through 9 with a violation of 18 young Section

19  623(a).  This law makes it a crime for anyone under oath to

20  make a false material statement in a proceeding before a

21  United States grand jury.  To find the Defendant Lori

22  Milliron guilty of these crimes, you must be convinced that

23  the Government has proved each of the following beyond a

24  reasonable doubt with respect to each count:

25      First:  Lori Milliron made the statement while

1    under oath in a grand jury proceeding as charged.

2            Second:  Such statement was false in one or more

3    respects charged.

4            Third:  Lori Milliron knew such statement was false

5    when she made it, and

6            Fourth:  The false statement was material to the

7    grand jury proceeding.

8            As I instructed you with regard to mail fraud, a

9    false statement is material if it has a natural tendency to

10   influence, or is capable of influencing, the decision

11   required to be made.  The statement need not actually have

12   influenced the decision so long as it had the potential or

13   capability of doing so.

14           In reviewing the statement alleged to be false, you

15   should consider such statement in the context of the

16   sequence of questions asked and answers given.  You should

17   give the words used their common and ordinary meaning unless

18   the context clearly shows that a different meaning was

19   mutually understood by the questioner and Lori Milliron.

20           If you find a particular question was ambiguous and

21   Lori Milliron truthfully answered one reasonable

22   interpretation of the question under the circumstances

23   presented, then such answer would not be false.  Similarly,

24   if you find the question was clear, but the answer was

25   ambiguous, and one reasonable interpretation of such answer

1    would be truthful, then such answer would not be false.

2         Count 7 charges Defendant Lori Milliron with making

3    one false statement.  But Counts 5, 6, 8, and 9 of the

4    superseding indictment each charge Defendant Lori Milliron

5    with making more than one false statement.

6         Specifically, Count 5 of the superseding indictment

7    alleges that she made false statements when she testified:

8         First:  That she did not recall having any other

9    substantial source of cash income while working at Three

10   Rivers.

11        2:  That she did not recall depositing

12   approximately $20,000 in cash into her PNC Bank account in

13   2014, and

14        Third:  That she did not recall depositing $60,000

15   in cash into her PNC Bank account in 2015.

16        Count 6 alleges that she made false statements when

17   she testified:

18        First:  That she did not know why Lawrence Rudolph

19   was so generous in giving cash to her in 2015 and 2016; and

20        Two:  That she does not know exactly why he gave

21   her $60,000 in 2015.

22        Count 8 alleges that she made false statements when

23   she testified first that she never gave him an ultimatum

24   that he needed to leave his wife.

25        Second:  That she doesn't remember ever threatening

3049

1       to break off her affair with Lawrence Rudolph.

2                    Third:   That she never told anyone at the office

3       that she was thinking of leaving Lawrence Rudolph, and

4                    Fourth:   That she never told anyone at the office

5       that she had given Lawrence Rudolph an ultimatum that he

6       needed to leave his wife.

7                    Count 9 alleges that she made false statements when

8       she testified:

9                    First:   That Lawrence Rudolph probably proclaimed

10      his innocence to her, but she does not recall, and

11                   Second:   That Lawrence Rudolph generally told her

12      that he was irritated with the FBI investigation of his

13      wife's death because he felt he was innocent.

14                   The Government does not have to prove all of the

15      false statements within those perjury counts for you to

16      return a guilty verdict on those counts.  If you reach a

17      unanimous finding that the Government has proved even one of

18      the particular instances of false testimony charged in

19      Counts 5, 6, 8, and 9, then you should convict Lori Milliron

20      on that particular count.  But to return a guilty verdict on

21      any perjury count, all of you must agree on at least one

22      specific statement in that count that has been proved false.

23                   All right, that concludes the part of my

24      instructions explaining the law that applies in this case.

25      Now let me finish up by explaining some things about your

1     deliberations in the jury room and your possible verdicts.

2              Whoa.  We're fine.  I just misread the page number.

3     If you conclude that Defendant Lawrence Rudolph is not

4     guilty of Count 1 charging foreign murder, then you should

5     also conclude that Lori Milliron is not guilty -- I see why

6     I'm confused.

7              Counsel, do we think that the instruction that's

8     now on page 39 should be in part 2 and, therefore, before

9     page 38?  Or was it our intent to keep it -- to have it in

10    part 3?

11             MR. FIELDS:  Your Honor, I remember it being in

12    part 3.  I think it could go into either place and the

13    Government takes no position on it.

14             THE COURT:  Defense.

15             MR. MARKUS:  I find myself agreeing with Mr. Fields

16    again, so no objection to that.

17             THE COURT:  All right.

18             MR. DILL:  No objection.

19             THE COURT:  Mr. Dill -- okay.  All right.  So we'll

20    leave it in the order in which it now appears in the set.

21    All right.  Let me start this instruction again.

22             If you conclude that Defendant Lawrence Rudolph is

23    not guilty of Count 1 charging foreign murder then you

24    should also conclude that Defendant Lori Milliron is not

25    guilty of Count 3 for being an accessory after the fact to

1  foreign murder because one cannot be an accessory to a crime

2  that did not occur.

3         However, if you conclude that Defendant Lawrence

4  Rudolph is guilty of Count 1 charging foreign murder, then

5  you can also conclude that the first element of the crime of

6  being an accessory after the fact charged in Count 3 has

7  been met because you will have concluded that someone else

8  committed a crime.

9         The defendants in this case are charged with

10 separate crimes in each count of the superseding indictment.

11 Except for Count 3 charging Defendant Lori Milliron with

12 accessory after the fact, you must separately consider the

13 evidence against each defendant on each count and return a

14 separate verdict for each defendant.  Except as I instructed

15 you earlier regarding the relationship between Counts 1 and

16 3, your verdict as to any one defendant or count, whether it

17 is guilty or not guilty, should not influence your verdict

18 as to any other defendant or counts.

19        Counsel, you agree that I can change the first

20 paragraph to, "In a moment a bailiff will" to "tomorrow

21 morning"?

22        MR. FIELDS:  Yes, Your Honor.

23        MR. MARKUS:  Yes, Your Honor.

24        THE COURT:  Defense counsel?  All right.

25        Tomorrow morning, after the closing arguments, a

bailiff will escort you to the jury room and provide each of
you with a copy of the instructions that I have just read.
Any exhibits admitted into evidence will also be placed in
the jury room for your review.  When you go to the jury
room, you should first select a foreperson who will help to
guide your deliberations and will speak for you here in the
courtroom.

        The second thing you should do is review the
instructions.  Not only will you -- not only will your
deliberations be more productive if you understand the legal
principles upon which your verdict must be based, but for
your verdict to be valid you must follow the instructions
throughout your deliberations.  Remember, you are the judges
of the facts, but you are bound by your oath to follow the
law stated in the instructions.

        To reach a verdict, whether it is guilty or not
guilty, all of you must agree.  Your verdict must be
unanimous on each count of the superseding indictment.  Your
deliberations will be secret.  You will never have to
explain your verdict to anyone.

        You must consult with one another and deliberate in
an effort to reach agreement if you can do so.  Each of you
must decide the case for yourself, but only after an
impartial consideration of the evidence with your fellow
jurors.  During your deliberations do not hesitate to

1    re-examine your own opinions and change your mind if you are

2    convinced that you were wrong.  But do not give up your

3    honest beliefs solely because of the opinions of your fellow

4    jurors, or for the mere purpose of returning a verdict.  You

5    must decide whether the Government has proved Defendant

6    Lawrence Rudolph or Defendant Lori Milliron, or both, guilty

7    beyond a reasonable doubt.

8            The Court has prepared a verdict form for your

9    convenience.  And it reads as follows:

10           Count 1:  We, the jury, upon our oaths, do

11   unanimously find the defendant, Lawrence Rudolph, in Count 1

12   of the superseding indictment charging foreign murder, and

13   lines to indicate the decision of the jury of not guilty or

14   guilty.

15           Count 2:  We, the jury, upon our oaths, do

16   unanimously find the defendant, Lawrence Rudolph, in Count 2

17   of the superseding indictment charging mail fraud either not

18   guilty or guilty.

19           Count 3:  We, the jury, upon our oaths, do

20   unanimously find the defendant, Lori Milliron, in Count 3 of

21   the superseding indictment, charging accessory after the

22   fact to the foreign murder charge in Count 1, and spaces

23   for -- or lines for the jury to indicate a decision of not

24   guilty or guilty.

25           Count 4:  We, the jury, upon our oaths, do

1    unanimously find the defendant, Lori Milliron, in Count 4 of

2    the superseding indictment charged -- charging obstruction

3    of a grand jury proceeding, either not guilty or guilty.

4         Count 5:  We, the jury, upon our oaths, do

5    unanimously find the defendant, Lori Milliron, in Count 5 of

6    the superseding indictment charging perjury before a grand

7    jury, either not guilty or guilty.

8         Count 6:  We, the jury, upon our oaths, do

9    unanimously find the defendant, Lori Milliron, in Count 6 of

10   the superseding indictment charging perjury before a grand

11   jury, either not guilty or guilty.

12        And to save us some time, I can tell you the exact

13   same words for Count 7, Count 8, and Count 9 since they're

14   all perjury counts.

15        The verdict form ends with a page that has a space

16   for the foreperson to sign the verdict form and to indicate

17   the date of the verdict.

18        The foreperson will write the unanimous answer of

19   the jury in the space provided for each count of the

20   superseding indictment, either guilty or not guilty.  At the

21   conclusions of your deliberations, the foreperson should

22   date and sign the verdict.

23        If you want to communicate with me at any time

24   during your deliberations, please write down your message or

25   question and give it to the bailiff who will bring it to my

attention.  I will respond as promptly as possible either in
writing or by having you return to the courtroom so that
I -- so that I can address you orally.  I caution you,
however, that with any message or question that you might
send, that you should not give me any details of your
deliberations or indicate how many of you are voting in any
particular way on any issue.

Let me remind you again that nothing that I have
said in these instructions nor anything that I have said or
done during the trial was meant to suggest to you what I
think your decision should be.  That is your exclusive
responsibility.

The superseding indictment is reproduced below --
meaning in this set of instructions -- for your convenience.
You will note that the superseding indictment charges that
crimes were committed on or about specific -- specified
dates.  The Government must prove beyond a reasonable doubt
that the defendants committed the crimes reasonably near
those dates.

Some counts of the superseding indictment may
accuse the defendants of violating the same statute in more
than one way.  In other words, the superseding indictment
may allege that the statute in question was violated by
various acts which are in the superseding indictment joined
by the conjunction "and," while the statute and the elements

of the offense are stated in the disjunctive using the word

"or."  In these instances, it is sufficient for a finding of

guilt if the evidence establishes beyond a reasonable doubt

the violation of the statute by any one of the acts charged.

In other words, you should apply the language of the

elements of the offense which uses "or."  In order for you

to return a guilty verdict, however, all 12 of you must

agree that the same act has been proven.

Remember, the superseding indictment is not

evidence.  You may not rely on anything said in the

superseding indictment to find the defendants guilty on any

charge.  And you must not let the superseding indictment

influence your weighing of the evidence.  You are receiving

the superseding indictment simply to help you understand

what you are deliberating about when you consider each

count.

Because the superseding indictment is lengthy, I

will not read it to you now but, like I said, it will be

included in your set of jury instructions.

All right.  So, oh, good timing, five after 5:00.

Folks, you're done today.  The lawyers and I still have a

few other things to attend to, but I'm going to release you

for the evening.  Since you've just heard me drone on for

40-some minutes, I will relieve you of repeating the same

admonition I've given you every evening.  I think you've

1    memorized it by now.

2           Please be back in the jury deliberation room by

3    8:35 tomorrow morning.  We'll endeavor to start promptly at

4    8:45.  I don't see really any -- or any reason why we should

5    be delayed much beyond that time at which time we will start

6    the closing arguments in this case.

7           The jury is released until 8:45 tomorrow morning.

8           (Jury left the courtroom at 5:04 p.m.)

9           THE COURT:  All right.  Ms. Guerra will now read

10   into the record what she has on her -- in her file, in her

11   records, as to the exhibits that have been admitted into

12   evidence in this case.  We'll start with plaintiff --

13   Government's plaintiff's exhibit.

14          COURTROOM DEPUTY:  I apologize ahead of time.

15   Because we're going one by one, not in blocks, so bear with

16   me.

17          Plaintiff's exhibits that have been admitted into

18   evidence:  Exhibit No. 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11,

19   12, 13, 14, 15, 16, 17, 17-1, 17-2, 18, 19, 20, 21, 22, 23,

20   24.  25, although it's considered reserved but it was

21   admitted.  Counsel, any comment on that one for me before we

22   continue?

23          MR. FIELDS:  I think that was likely the result of

24   me running through a series on exhibits and just talking

25   about sort of X through X, without considering the fact that

3058

1    it was reserved.  The Government agrees that there's no

2    exhibit there.

3            COURTROOM DEPUTY:  Okay.  Excellent, thank you.

4            Exhibit 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36,

5    37, 38, 39, 40, 43, 44, 45, 46, 47, 48, and 49.  Counsel,

6    are we in agreement that that is still a reserved again?

7            MR. FIELDS:  Agreed.

8            COURTROOM DEPUTY:  All right, thank you.  Exhibit

9    50, Exhibit 51, 52, 53, 54, 55, 56, 57, 60, 70, 71, 72, 73,

10   74, 80, 82, 83, 84, 90, 91, 92, 93, 94, 95, 100, 101, 110,

11   111, 112, 113, 120, 121, 130, 131, 140, 141, 142, 150, 151,

12   152 160, 161, 162, 180, 200, 201, 202, 203 --

13           MR. FIELDS:  Ms. Guerra.

14           COURTROOM DEPUTY:  Yes.

15           MR. FIELDS:  Sorry.  I have 170, -71, -2, -3, -4,

16   and -5 is also received.

17           COURTROOM DEPUTY:  My apologies, counsel.  Yes.  So

18   that was starting back at the beginning of page 10 of the

19   exhibit list:  161, 162, then 170, 171, 172, 173, 174, and

20   175.  Then 180, then 200, 201, 202, 203, 204, 205, 206, 207,

21   208, 209, 210, 211, 212, 213, 214, 215, 217.

22           To not bore us, I apologize, guys, we're on page 13

23   of the exhibit list, it's 220 to 231.  Page 14, 232 to 243.

24   Page 15, 244 to 255.  Page 16 is 256 to 267.  Page 17, 268

25   through 273.  Then 300, 301, 302 and 303.  Page 18, Exhibits

1    305 through 316.

2            MR. FIELDS:  Ms. Guerra, I have 304 as also being

3    admitted.

4            COURTROOM DEPUTY:  No, I am -- that was not

5    admitted.

6            THE COURT:  What are -- what do defendants' records

7    indicate?

8            MS. DOYLE:  Your Honor, we agree with Ms. Guerra.

9    It's -- we don't have it marked down as admitted.

10            THE COURT:  All right.

11            MR. FIELDS:  I stand corrected then, Your Honor.

12            THE COURT:  Okay.  Mr. Dill, what are your records?

13            MR. DILL:  I don't have it as admitted, but --

14            THE COURT:  You don't have it?  All right.

15            MR. DILL:  Okay.

16            THE COURT:  So it won't go in.  All right.

17            COURTROOM DEPUTY:  Moving on -- somebody has a hot

18    spot or something near a microphone for me.  Okay.

19            So page 18, Exhibits 305 through 316.  Page 19, 317

20    through 327.  Then 401, 402, 403.  415 through 423.  424

21    through 430, 434.  Continuing on to page 23, to 447.  Page

22    24, 448 through 449.  Then 460 through 469.  473, 492, 493,

23    494, 495, 496, 497, 498, 500 through 505.  607, 610, 611,

24    612, 613 through 615, 616 through 618, 624.  Page 8 of

25    Exhibit 625.  Exhibit 647.  And that was final.

1          THE COURT:  Is that it, Ms. Guerra, for plaintiff?

2          COURTROOM DEPUTY:  Yes.  647 was the final exhibit

3     admitted into evidence for plaintiffs.

4          THE COURT:  Okay.  Does this comport with the

5     Government's records?

6          MR. FIELDS:  Yes, Your Honor.

7          THE COURT:  All right.  For Defendant Rudolph?

8          MS. DOYLE:  Yes, Your Honor.

9          THE COURT:  For Defendant Milliron?

10         MR. DILL:  Yes, Your Honor.

11         THE COURT:  All right.  Anything else we need to

12    address today before we recess?

13         COURTROOM DEPUTY:  Your Honor, we have to do --

14         THE COURT:  Oh, my gosh, yeah.  14 days --

15    Mr. Fields, you're not the only one that's been affected by

16    this.  Oh, my Lord.  Let's go through Defendant Rudolph's

17    exhibits next.

18         COURTROOM DEPUTY:  Defendant Rudolph's exhibits

19    that have been admitted into evidence are RB, RC, RF, RG,

20    RH, RI, RL, RM, RN, RO, RP, RQ, RR, RS, RT, RU, RV, RW, RX,

21    RY, RZ, RA-1 through RA-10, RA-11, RA-14 through RA-24,

22    RA-25 through RA-29, RA-36, RA-37, RA-39.  And this was the

23    final.

24         THE COURT:  Does that comport with the Government's

25    records?

3061

```
 1              MR. FIELDS:  It does, Your Honor.
 2              THE COURT:  All right.  Defendant Rudolph?
 3              MR. DILL:  Yes, Your Honor.
 4              THE COURT:  I asked for Defendant Rudolph.
 5              MR. DILL:  I'm sorry.
 6              MS. DOYLE:  I may have missed it, but did you call
 7    out RL?  I have that --
 8              COURTROOM DEPUTY:  Yes, RL was -- yup.
 9              MS. DOYLE:  Okay, great.  Yes, Your Honor.
10              THE COURT:  Okay, Mr. Dill.
11              MR. DILL:  Yes, Your Honor, I agree.
12              THE COURT:  All right.  Exhibits for Defendant
13    Milliron.
14              COURTROOM DEPUTY:  Defendant Milliron's exhibits
15    that have been admitted into evidence are MA, MB, MC-1 and
16    -2, ME, MF, MG-4, MG-7, and MG-9.
17              THE COURT:  Does that comport with the Government's
18    records?
19              MR. FIELDS:  It does, Your Honor.
20              THE COURT:  Defendant Rudolph?
21              MS. DOYLE:  Yes, Your Honor.
22              THE COURT:  Defendant Milliron?
23              MR. DILL:  Just a moment, Your Honor.
24              THE COURT:  Okay.
25              MR. DILL:  That's correct.
```

3062

1          COURTROOM DEPUTY:  Excellent.

2          THE COURT:  Okay.  All right.  All right, now I

3     should be asking:  Any other matter we need to address

4     before we recess for the day?

5          MR. FIELDS:  Nothing from the Government, Your

6     Honor.

7          THE COURT:  All right.  Defense counsel?

8          MR. MARKUS:  No, Your Honor.  Thank you for a good

9     trial, and we'll see you tomorrow.

10         THE COURT:  Okay.

11         MR. DILL:  Nothing, Your Honor.  Thank you.

12         THE COURT:  We will be in recess until 8:45

13    tomorrow morning.

14         (Recess taken at 5:18 p.m.)

15                           INDEX

16    **Item**                                         **PAGE**

17                  **DEFENDANT'S WITNESSES**

18    LAWRENCE RUDOLPH (Continued)
      Cross-examination by Mr. Fields                 2764
19    Redirect Examination by Mr. Markus              2975

20                  **GOVERNMENT'S EXHIBITS**

21    **EXHIBITS**:        **Offered**   **Received** **Refused**   **Stipulated**

22    82                 2884      2885

23    84                 2874      2874

24    607                2772      2772

25    610                2955      2955

1                              **GOVERNMENT'S EXHIBITS**

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| 611 | 2963 | 2963 | | |
| 612 | 2956 | 2956 | | |
| 613 | 2957 | 2957 | | |
| 614 | 2957 | 2957 | | |
| 615 | 2957 | 2957 | | |
| 616 | 2958 | 2958 | | |
| 617 | 2958 | 2958 | | |
| 618 | 2958 | 2958 | | |
| 624 | 2914 | 2914 | | |
| 625, pg. 8 | 2919 | 2920 | | |
| 643 | 2947 | 2947 | | |
| 647 | 2916 | 2916 | | |

                               **DEFENDANT'S EXHIBITS**

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| RC | 2896 | 2896 | | |

RULE 29(a) RENEWAL:                           3012

RULING ON RULE 29(a) RENEWAL:                 3013

CHARGING CONFERENCE                           3015

READING OF JURY INSTRUCTIONS                  3022

                    *        *        *        *        *

1                        **REPORTER'S CERTIFICATE**

2          I certify that the foregoing is a correct transcript

3    from the record of proceedings in the above-entitled matter.

4          Dated at Denver, Colorado, this 15th of September,

5    2023.

6

7

8                       MARY J. GEORGE, FCRR, CRR, RMR

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25