3067

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 22-cr-0012-WJM

UNITED STATES OF AMERICA,

Plaintiff,

vs.

LAWRENCE RUDOLPH,
LORI MILLIRON,

Defendants.

------------------------------------------------------------

REPORTER'S PARTIAL TRANSCRIPT - CLOSING ARGUMENTS
(Jury Trial, Day 14)

------------------------------------------------------------

Proceedings before the HONORABLE WILLIAM J. MARTINEZ,
Judge, United States District Court for the District of
Colorado, commencing at 8:50 a.m., on the 29th day of July,
2022, in Courtroom A801, United States Courthouse, Denver,
Colorado.

APPEARANCES

BRYAN D. FIELDS, E. GARRETH WINSTEAD, III, J. BISHOP
GREWELL, Assistant U.S. Attorneys, 1801 California Street,
Suite 1600, Denver, Colorado 80202, appearing for the
plaintiff.

DAVID O. MARKUS, A. MARGOT MOSS, LAUREN L. DOYLE,
Markus Moss PLLC, 40 NW Third Street, Penthouse 1, Miami,
Florida 33175, appearing for the defendant Rudolph.

JOHN W. DILL, John W. Dill P.A., 941 West Morse
Boulevard, Winter Park, Florida 32789, appearing for the
defendant Milliron.

1       MARY J. GEORGE, FCRR, CRR, RMR
        901 19th Street, Denver, Colorado 80294
2       Proceedings Reported by Mechanical Stenography
        Transcription Produced via Computer
3              P R O C E E D I N G S

4          (In open court in the presence of the jury at 8:50

5    a.m.)

6              THE COURT:  Good morning, ladies and gentlemen of

7    the jury.

8              THE JURORS:  Good morning.

9              THE COURT:  Welcome back to day 14 of our jury

10   trial.  So as I promised you at the end of the day

11   yesterday, we're going to go into closing arguments

12   straightaway.  A couple of things I want to mention to you.

13   First is, so you understand what will be going on:  Because

14   the Government has the burden of proof, the law allows the

15   Government to split its closing argument to an opening

16   segment and a rebuttal segment, all right?  The defendants

17   do not get that opportunity because they do not have the

18   burden of proof.  So they have to give -- their lawyers have

19   to give their closing arguments in one fell swoop.

20             The way we're going to do this is the Government

21   will give us their initial, or opening, portion of their

22   closing argument.  We'll hear from Defendant Rudolph's

23   counsel closing argument, then we'll take our morning

24   recess.  We'll come back and then we'll hear closing

25   argument from counsel for Defendant Milliron, and then the

1    Government's rebuttal closing argument.

2              A few things after that.  A few housekeeping things

3    before that -- after that, and then the case will be yours.

4              All right.  Closing argument for the Government.

5              MR. WINSTEAD:  Thank you, Your Honor.

6              THE COURT:  Mr. Winstead, one thing I neglected to

7    mention to the jurors, excuse me.

8              I've mentioned this before, but I think this is the

9    appropriate time to repeat it.  I remind you that nothing

10   that you're going to hear this morning is evidence.

11             All right.  You may proceed, counsel.

12             MR. WINSTEAD:  Thank you, Your Honor.

13             Bianca Rudolph was shot straight through the heart

14   from 1 to 3 feet away.  Her husband, Lawrence Rudolph, shot

15   her at point-blank range.  And then Lori Milliron, the love

16   of his life, tried to help him get away with it by trying to

17   deceive a grand jury so it wouldn't indict him.

18             I'd like to begin at the end.  In this case,

19   Defendant Rudolph testified, and after his testimony,

20   there's no reasonable doubt about his guilt.  An example of

21   that is one of the main themes of the defense is that while

22   things might look bad in this case, there's always an

23   innocent explanation.  And one of the most important ones

24   is:  Why did the defendant rush through the cremation?  And

25   the innocent explanation:  Because he was hurrying home so

1   that he could meet his children in person as fast as

2   possible.  And that's what he said on direct.  There were no

3   equivocations.  The reason why he was hurrying to cremate

4   his wife was so that he could hug his children as quickly as

5   possible.

6          But, of course, he'd forgotten about when he booked

7   that ticket, and on cross-examination you heard him admit,

8   "Well, I didn't have a plan to go straight to my children

9   and see them in person.  I was going to get home and then I

10  was going to figure it out."

11         But that's not what he said on direct, right?  What

12  he said on direct is not consistent with that, and that

13  means it's deceptive.  And it was only when he was

14  confronted with evidence that he admitted the actual truth.

15  And he also admitted it wasn't the first time -- it wasn't

16  the first time that he had lied under oath.  He lied under

17  oath in a federal lawsuit right around the same time of

18  these events.

19         And what he said on direct was, in the deposition,

20  "I had to lie about the affairs because I didn't want to

21  embarrass Bianca."

22         But on cross-examination, what he admitted was that

23  it wasn't that he had to lie to protect Bianca, he chose to

24  lie when he brought the suit.  No one was forcing him to

25  bring the suit.  No one was forcing him to include the

falsity of allegations of having affairs.  He chose to do
that and he put those lies in the actual documents that he
filed.

Of course those aren't the only important facts in
the case.  There's a ton of important facts.  And I'd like
to go through them in chronological order because the timing
of many of them are very important.

And the first particularly important fact is a
trip.  And it's not a trip to Zambia, it's a trip to
Phoenix.  So the setup back in 2004:  Larry and Lori get
together.  Not as -- as was said in Lori's opening, an
off-and-on relationship since 2009, but 2004.

In 2005, Larry and Lori go together to Mozambique
with Adam Howard-Davies.  In 2009 Larry takes Lori to Alaska
and says in his SCI lawsuit she was a medical aide.  2010,
2011, that's the period of those emails that we went
through.  Those emails that have confessions of love, plans.

In 2012, that's when Bianca asks Adam Howard-Davies
about that 2005 trip.  And she sadly learns that Larry had
taken Lori on that trip.

By 2014 and '15, Lori is receiving large amounts of
cash.  $20,000 in 2014; $60,000 in 2015.  Clearly the
supportive relationship that Larry is giving to Lori is
increasing.

But in 2015, Lori gets to go to Cabo once, a brief

1    visit to Houston with Larry, and Bianca goes to Camaroon,

2    Uganda, Italy, Tanzania, Greece and France with Larry.  But

3    then something changed.

4            In 2016, Lori goes to Phoenix for the first time.

5    And you've seen these charts.  Bianca's the top line,

6    Larry's the middle, Lori is the bottom.  You see here Lori,

7    other than a trip to Houston, is in Pittsburgh.  The same in

8    February.  And then in March, March 28th, her first trip to

9    Phoenix.

10           Now you heard from the defendant that even though

11   Bianca was out of town and even though his mistress was

12   finally coming to his home, he put her up in a hotel,

13   apparently without any credit card receipts.

14           But that's not what happened.  She stayed in

15   Bianca's bed, and that's the first important fact in this

16   timeline.  Because then in April, after Lori left, Bianca

17   returned.  And you heard what happened.  She returns to

18   Phoenix and she finds Lori's hair clips in her bed.

19           Not that long later Bianca signs a will and some

20   trust documents.  And you've heard about those.  Now one of

21   the provisions of the trust document is that if Bianca were

22   to die and Larry were to remarry these would require a

23   prenuptial agreement.  And you'll notice it says the

24   prenuptial must be in writing and signed by the surviving

25   trustmaker and the surviving trustmaker's fiancé with each

3073

1    having been represented by independent legal counsel.  And

2    that the new fiancé waives any right to the share of the

3    trust.

4         And in the will, there's a pour-over provision that

5    incorporates all of the terms of that trust.  Now we'll come

6    back to this, but it's very important that those documents

7    have those provisions.

8         In May, just a little while later, that's when

9    Larry testifies falsely in his SCI suit that he was not

10   having an affair with Lori Milliron.  And meanwhile, some

11   time in May, Bianca goes to Cass Olmstead and tells her the

12   story about the hair clips.  They rehearse what she's going

13   to do.

14        And what they rehearse is Bianca is going to give

15   Larry an ultimatum.  She's going to say, "You need to leave

16   Lori and fire her or else I'm going to seek a divorce."

17        And she confirmed to Cass Olmstead that that

18   conversation happened.

19        Now thinking of this ultimatum, remember the

20   details.  She finds the hair clip, she reads the emails, she

21   confronts Larry.  And he denies it at first.  But then she

22   says, "I've seen all the emails.  The hair clips are real.

23   The travel records are obvious."

24        Ms. Olmstead would have no reason to know that just

25   before that conversation happened was the first time Lori

1    slept in Bianca's bed.  And the defendant's explanation, ask

2    yourselves if it's plausible.

3         Now, the defendant is very likely to attack

4    Ms. Olmstead's credibility because her facts are so

5    important.  And so when you're thinking about that, think

6    about the defendant's explanation for those emails.  He said

7    on the stand in direct, Cass Olmstead printed those in 2012

8    because of the SCI suit.  But how could he possibly know

9    that?  That's nothing more than a suspicion that he

10   testified is in his knowledge.  What he did is he just

11   adopted the defense theory in his testimony.

12        Now before we talk about the cruise, I'd like to

13   mention the postnup in this case.  The postnup is mostly a

14   side show.  The defendant has made a really big deal about

15   it and the defense has and will likely argue the postnup is

16   real, the Government is being very strange about it, trying

17   to challenge it, trying to challenge these experts.  But

18   frankly, the postnup really doesn't matter.

19        There's two defense arguments that rely on the

20   postnup.  First, that Larry wasn't afraid of divorce because

21   he had this postnup that protected him financially.  But he

22   said on the stand he was still afraid of divorce.  He was

23   still afraid that he might lose everything.  And you heard

24   from an expert that said there's a real possibility, even if

25   that postnup were valid, it would not be upheld.  And a

1    great reason that he would know that is they had just signed

2    those trust documents and it was contemplating a new prenup

3    and specifies in there, "If you want the prenup to be valid,

4    you've got to make sure both sides have an attorney."

5         So, again, the postnup is irrelevant to whether or

6    not Larry was afraid of divorcing Bianca financially.

7         Second, if the postnup is real, then Cass Olmstead

8    must be lying.  But it was Bianca, not Olmstead, that talked

9    about the forged signature.  And it's difficult to tell

10   whether Bianca signed it or not.  Some things show that it

11   might have been signed, some things that maybe it wasn't, or

12   maybe there was some sort of compulsion.  It's very

13   difficult to tell.  But the point is, Bianca may have

14   forgotten about it, she may have been speaking unclearly and

15   Cass Olmstead misunderstood about the document that she

16   mentioned.  She did say it was something that Larry wrote up

17   right then and had her sign, which would be inconsistent

18   with the postnup.  She may have been talking about a

19   different document.  But the point is, the validity of the

20   postnup has nothing to do with Cass Olmstead's credibility.

21        You saw her testify and you make the credibility

22   assessment about whether she was telling the truth about

23   that conversation or not.

24        So to continue the timeline.  Larry and Bianca

25   then, shortly after this confrontation and reconciliation,

1    go on a cruise together.  Bianca's happy.  She tells Cass

2    they're putting their marriage back together.  Meanwhile,

3    Lori orders propofol for Larry.  And it's the only time that

4    he's ordered it.  And the next day Larry takes Lori to Cabo.

5         After that, the employees at Three Rivers Dental

6    Group are instructed not to discuss Lori working there.  And

7    the defendant admitted that.  And why did he say he did

8    that?  "I don't know why I did that," he said.  Was it

9    because he had been confronted by his wife and he wanted a

10   temporary period of time where Bianca would believe he was

11   doing what she had asked?

12        Cass Olmstead finds out.  She calls the office and

13   she finds out that Lori is still working there and that the

14   employees are hesitant to talk about it.  She tells Bianca,

15   and Bianca says, "Well, Larry said it's a little more

16   complicated to fire her, so she hasn't been fired quite

17   yet."

18        And then on July 22d, Bianca covers for Larry.  She

19   knows he's going to do the right thing and she's going to

20   stand by her man.

21        They go on the August hunt for a lion.  And for a

22   leopard if they have time, but they run out of time.  While

23   they're on the hunt, Bianca's happy.  She's in the process

24   of winning back her husband.  She's getting on a more equal

25   footing.  She's in the process of getting access to accounts

1    and she's excited about the upcoming wedding and the Arizona

2    trip with her family.

3            And then the October hunt.  Now at the beginning of

4    the October hunt, the professional hunters make sure to test

5    those firearms.  In his testimony, Larry says he didn't

6    shoot it.  And he said they may have fired two or three

7    shots through it.  But you heard Mark and you heard Pieter.

8    Both of them said they fired lots of shots.  They wanted to

9    make really thorough sure -- be very thorough to make sure

10   that it was working, and Larry fired.

11           They took the magazine plug out and otherwise it

12   was in perfect condition.  Why would Larry say he didn't

13   fire it?  And why would he say, "I'm not sure if they did

14   any significant modifications to it.  I'm not sure if maybe

15   they changed the trigger and they didn't tell me, but, you

16   know, anything could happen."

17           That -- is that at all plausible?  Right?  You

18   heard their testimony.  They -- this is their job, and they

19   remember it clearly.  Why would Larry say that?  Is that

20   just an opportunity to leave a little room for doubt?

21           No.  His version is not true.  He did shoot it.

22   And he was familiar with it.  And the shotgun worked

23   normally, had a normal trigger pull.  And you heard from

24   Mr. Cook, that's direct evidence that all of the mechanisms

25   that go into preventing a discharge were working.

1           And on the hunt, Bianca's happy.  She's getting
2     along very well with Larry who she believes has finally
3     decided to be faithful to her.  The last day of the hunt
4     ends and they have not been able to find a leopard.  It's a
5     half hour after sunset.  Now Larry says they kept hunting in
6     the dark.  Did they really do that?  Did they really do that
7     after Bianca had already wounded leopards because she had so
8     much difficulty seeing them?  Would they continue hunting
9     past when it's legal, or is that another example of trying
10    to leave a little room for doubt?
11          Larry's gun handling was described by the
12    professional hunters as beyond a hundred percent; absolutely
13    competent.  Except apparently that when he's in trial, he's
14    not a gun guy.  He can't remember whether he unloaded it.
15    He's gotten back and forth, but he can't remember.  He can't
16    remember if he carried it with him on the hunt.
17          At one point he said he didn't carry it, at one
18    point he said, "Oh, I did have it in the blind," right?
19          But in the blind he's not sure whether he loaded
20    it, whether someone else loaded it for him -- as though
21    someone else would load the shotgun for him in the blind.
22          He doesn't remember if he unloaded it that night.
23    And he said he's thought about it for years.  But he does
24    remember unzipping the case that same evening in order to
25    get some things out of it.

1           Well, if he remembered unloading it, that would be

2   inculpatory.  But unzipping the case, that's actually a good

3   explanation because there was testimony it was fully zipped

4   when it was taken by the porters.

5           No, Mark and Banda remembered seeing him unload it.

6   And when asked whether there was any reason to doubt their

7   memory, he didn't have a good answer for that.

8           And this type of shotgun locks back when it's

9   empty.  It tells you when it's empty.  And we've heard lots

10  of stories about leaving a round in the chamber, but the

11  design of the -- of the weapon and how you unload it matters

12  in those types of stories.

13          The next morning, he was up at 4:15 and they were

14  packing.  And Bianca was a nervous traveler.  There was a

15  bag on the porch and there were lots of things that were

16  still to be packed.  Everyone says that the staff there was

17  very deferential to guest privacy.  The attendants had been

18  sent away.  And although the doors were open, this is the

19  view.  And you heard that there's no reason for anyone to

20  walk past here until they're called to help.

21          At this point, this is the last possible chance for

22  Larry to do what he plans to do.  The guns are about to be

23  packed and at that point he's missed the opportunity.  This

24  is the do-or-die time.

25          Now, the defense theory is Bianca was a nervous

1    traveler.  Larry's in the bathroom, and she just starts

2    packing the guns.  You heard that that was not something

3    that she normally did.  And this is very key:  Larry told

4    you there were lots of things still to be packed.  Why on

5    earth would she pack the guns, which is something she never

6    did, when she could have been packing tons of the other

7    stuff that also needed to be packed before they could leave?

8         Now in order for this plan to work, it has to look

9    like an accident.  So Larry put it in the case.  Now, the

10   defense theory on that:  Who would ever try to shoot a

11   shotgun in the case?  But of course if he had shot her with

12   it not in the case, that would have been immediately

13   suspicious.  In the case, it looks like an accident.  And in

14   fact, Luke Haag thought that was a perfectly acceptable

15   theory.  It makes sense.  You want to make it look like an

16   accident, you put the case over it.

17        Now it's easy to aim from short range.  That's the

18   whole point of these shotguns.  That's why you take them on

19   leopard hunts.  You do a quick shot, and it's going to do

20   incredible damage.  It does not have to be precise.  After

21   all, Mark trusted Larry to be able to shoot a leopard if

22   they were tracking a wounded one.

23        But what about an alibi?  It's hard to have an

24   alibi with an in-person murder like this.  So the best

25   effort was to say, "I was in the bathroom."  But that alibi

1   doesn't do any good if you don't have a witness to it.  Does

2   it seem strange that Larry's in the bathroom, and 15 seconds

3   later, when Mark gets there, he's still standing in the door

4   to the bathroom?  He hasn't moved around his wife to try to

5   help her?  Well, he had to wait there to be seen in the door

6   of the bathroom.

7           Now, it's time to talk about propofol.  And there's

8   been lots of discussion, lots of questions about it.  What's

9   the deal with it?  It's used to put people to sleep in

10  anesthesia.  The defense clearly views it as a -- an

11  unlikely theory that it would be related to the murder.  But

12  it was so out of the ordinary that Sherry Houck remembered

13  it clearly and was bothered by it while she was testifying.

14          Now, Larry told you what he was going to do with

15  it.  He was going to use it to sedate someone in the bush if

16  there was an injury.  The year before, he'd had to do some

17  stitches.  Boy, wouldn't it be great if you could just make

18  somebody go to sleep when you're going to do that?

19          That is incredibly dangerous and reckless.  And

20  Larry couldn't even come up with a straight story for it,

21  right?  He said, "Oh, you -- you do it with an IV.  You

22  can't do it without an IV."

23          But then of course since he was planning on doing

24  something with it, "Oh, I would have tried to inject it into

25  a vein or something like that."

1              That doesn't really make sense.  But what does make

2      sense is that it could be used for two things.  No. 1, if

3      something happened that gave Bianca some sort of a severe

4      injury -- you know, it could be an accidental discharge, it

5      could be, you know, a leopard, something like that -- then

6      an overdose of propofol would be a very plausibly deniable

7      way to capitalize on that opportunity.

8              And, more importantly, if you were trying to kill

9      her and she didn't die right away, if he shot her but his

10     aim wasn't as accurate as it ended up being and she was

11     severely injured but not dead, it's his backup plan.  It's

12     the way he could plausibly inject it into her and make sure

13     she couldn't live to tell about it.

14             It's very unlikely to be forensically detected.

15     And, again, even if it were, there's lots of plausible

16     deniability.  It's not a whacky theory, it's smart.  It's

17     the Plan B.

18             And the defendant even laid the groundwork for it

19     when he picked it up.  He said, "I'm taking it in case

20     there's an accident."

21             Now the scene.  They're packing.  They've delayed

22     packing the shotgun.  What does he do?  He puts a shell into

23     the chamber and quietly closes the slide.  He puts the case

24     over it.  And you heard that the gap from the front of the

25     case to the muzzle, 1.8 inches, is exactly where it would be

3083

1    with the -- with the butt even with the back of the case

2    where you pressed it if you rested the butt on your arm or

3    your shoulder.

4          He shot her in the heart at close range.  You've

5    heard a lot of testimony about that and we'll talk about

6    that in a moment.  The blood spatter shows that it likely

7    happened near the foot of the bed, and then he runs to the

8    door of the bathroom and waits to be seen.

9          The argument about blood on the shoes from

10   openings, that's a red herring and the defense expert

11   agrees.  Hard to tell if there was blood.  Hard to tell if

12   there would have been blood.  The -- Mark testified that

13   Larry went out to get the medical bag.  People were walking

14   around in the blood.  And you don't even have to walk over

15   the blood in order to get from the mat to the bathroom.

16   But, the tucked-in shirt is inconsistent with his version.

17   Because what he says is he was in the bathroom, he pulls up

18   his pants in a rush when he hears this shot, and then

19   afterwards he's distraught.

20         People think he's going to throw himself in the

21   river.  They take the shotgun away.  They are -- he's

22   falling over in the room.  At what point during that process

23   does he pause to tuck in his shirt?  No, it's consistent

24   with exactly what happened.  He was ready and he shot her

25   intentionally.

3084

1              Now the shell fell out and you heard from several

2     witnesses, if the bag were closed, the shell would have

3     failed to eject and it would have been locked in the case

4     with the shotgun.  But it fell out, which shows you the

5     shotgun -- the case was unzipped and the defendant's hand

6     was holding the side open so the shotgun could fall out --

7     the shell could fall out.

8              You heard that the shotgun in the photos is in the

9     place it was during the incident.  You heard that from Mark,

10    who remembers stepping over it on the way in from the door;

11    and you heard it from Banda, who you know saw it before it

12    was moved because the whole reason why Spencer Kakoma moved

13    the shotgun was because so many people were in the room and

14    there was a commotion.  And then it was outside until Mark

15    started putting the scene back together at the end.  Banda

16    came in before that, he saw the shotgun, he said it was

17    exactly where it is in the photos.

18             There's lots of fighting in this case about testing

19    and forensics.  Ultimately there's not that much at stake.

20    The muzzle-to-target distance, it might be this much, it

21    might be this much.  Either way, it's not self-inflicted.

22    That -- that has been taken off the table and that's the

23    main context where the muzzle-to-the-target distance

24    matters.

25             There's no way she pulled the trigger.  It's not

3085

1    self-inflicted.  Mr. Haag agreed with that.  In fact, Luke

2    Haag's three scenarios were:  It was a murder, made to look

3    like an accident; or it was the exact same scenario but it

4    was an accident -- was an accident, he pulled the trigger

5    and didn't know there was a round and shot her -- and the

6    defendant clearly said that is not what happened; or it was

7    some sort of a misadventure with a shotgun.

8          But he did say because of the wound angle, it

9    wasn't a drop.  There wasn't a drop.  We'll talk more about

10   the scenarios in a moment.

11         So Mark puts the scene together.  He takes

12   photographs.  And they drive to Mumbwa.  And Mark is

13   mystified.  They come up with two scenarios because they

14   have such a hard time figuring out how this could have

15   happened.  Was she closing the case?  Was she banging it on

16   the ground?  Why would they come up with such strange

17   scenarios?  Because of the wound location.  It's in the

18   heart from 1 to 3 feet away perpendicular or from slightly

19   above.  That's not consistent with an accident.  It is

20   consistent with a person a little bit taller than her

21   shooting her in the heart.

22         Now the drops.  You saw all -- videos of women who

23   were told to try to replicate this accident, and many of

24   them ended up hitting the shotgun on the ground or dropping

25   it.  But what you'll notice is when they drop it fast, when

 1    they turn it up and it falls out and they drop it fast, they

 2    don't react.  It happens too quickly for them to try to grab

 3    the shotgun.  Or some of them, they're messing with it and

 4    it over-balances and they're trying to grab it, but what

 5    you'll notice on those is it's moving slowly and so it does

 6    not hit the ground hard.

 7           As to wound angle, Maswahu was clear on it, and

 8    Cina agreed, and Baden didn't disagree, he just said it

 9    wasn't a thorough process.

10           Now as far as Mr. Baden goes, he said that he's

11    done about 20,000 autopsies in his career, mostly 40 years

12    ago when he was a medical examiner.  And he said this was

13    such a sloppy autopsy because autopsies are supposed to take

14    all day.  But 20,000 autopsies, if they took all day, would

15    take 54 years to do with no days off.  So ask yourselves

16    whether maybe he was exaggerating a little bit and trying to

17    maximize his criticisms of Dr. Maswahu.

18           So the defense scenarios:  If she didn't drop it as

19    Haag says, did it slide out of the case?  Well, we know it

20    didn't because when it went off it was very close to the tip

21    of the case, so the whole thing must have been dropped in

22    order to cause a jar-off with that position.

23           If she was carrying the case to the hard case, it

24    would have been low.  If she were lifting it into the hard

25    case, she would have been facing the hard case.  And if she

1    were to somehow drop it, in order to get that angle it would

2    have to be 4, 5 feet away from her.  So essentially she

3    would have to throw it, turn, and dive after it to present

4    her chest for the wound that we see in this case.

5         And, of course, that's not even to go into all of

6    the safety features that prevent Auto 5s from discharging at

7    low drops like that.

8         So the Zambian investigation concludes it's an

9    accident, but they took the defendant's word for it.  The

10   gun testing showed that it was not broken, but was in

11   perfect working condition afterwards, which Mr. Cook told

12   you is a great piece of evidence that you know something

13   catastrophic didn't happen to the firearm to cause it to

14   discharge.

15        The defendant puts his plan into place.  He's

16   moving fast.  The police defer to him.  He doesn't have a

17   plan to see his children.  He's furious with Otto Westhassel

18   about the photos.  And what about those explanations?  If

19   all he did was research Otto in order to see if he was an

20   anti-hunter, why did he tell Otto that he knew all these

21   things about him?  He said it wasn't to intimidate Otto.

22   But why would he tell him?  And what about saying Mark used

23   Larry's LinkedIn account to send an invite?  That makes no

24   sense.  If things don't add up in the defendant's story, who

25   do you think is telling the truth?

1        Going back to the timeline.  Bianca dies on October

2    11th.  The autopsy and shotgun testing happened the next

3    day.  The next day, the angry call to Westhassel.  And Larry

4    books the flight back to Phoenix.  And then the following

5    day is the cremation.  On the 16th, Larry's on his way home.

6    On the 18th, according to Mark is when he called Julian.  If

7    you'll recall, Mark said he messaged Larry after Larry had

8    gotten back and Larry said, "I haven't told my kids yet.  I

9    got home.  I was tired and I took a pill."

10        And the next day he begins the process of life

11   insurance claims, October 19th, first thing in the morning,

12   first thing on the to-do list.

13        Later that week is the memorial service.  And the

14   following day he books a trip to Las Vegas.  First for Lori,

15   then for another woman.  October 31st, 20 days after

16   Bianca's death, Lori flies to Phoenix.  And the first

17   insurance claim goes out.  Larry goes to Jackson Hole with

18   Lori.

19        By November 14th, all of the life insurance claims

20   have been sent and by December 30th, 2016 Lori is with Larry

21   permanently.

22        And you heard that the -- the insurance

23   investigator contacted Larry.  And shortly after he gave a

24   loan to Mark Swanepoel and then told her Mark was the only

25   one she could talk to, those people do not have any means to

3089

1        contact them.

2                They begin their new life.  No more cash.  No

3        divorce.  No risk Bianca exposes his lies in his civil suit.

4        4.8 million in life insurance.  A fast cremation.

5        Discouraging investigation.  Keeping all of the information

6        as close as he could.  And he had all the insurance by

7        March.

8                Now the timeline for the investigation which

9        subsequently happened is crucial.  So Larry was called by

10       the FBI in 2017 and he said he thought nothing of it.  Then

11       the FBI opened a case in 2019 and began interviews.  They

12       were interviewing people.  They put a UC on a plane in early

13       2020.  And Larry said he thought they were acting a little

14       strange but, if anything, he was worried they might be

15       anti-hunting people.  He didn't put two and two together

16       that that could be related to the investigation.

17               And then the FBI contacted Julian Rudolph and that

18       set off a flurry of activity.  Defense counsel reaches out

19       to the FBI.  Rudolph calls Mark Swanepoel and Mark tells him

20       about the FBI contact that had happened back at the Dallas

21       convention.  And you heard Mark testify about that.  He said

22       he did not tell Lawrence about the FBI contact in January of

23       2020 and he said, "Because I didn't want to be in the middle

24       of it."  He said, "I told Lawrence Rudolph about the FBI

25       when he called me and told me his son had been contacted by

the FBI."

Around that time, the defendant tells Sherry Houck
he's probably going to jail.  And a little bit thereafter,
Luke Haag was hired.  But what happened before all of that?
The statement at Steak 44.  The statement where the
defendant gives no plausible explanation for why he would
have been aware of or thinking about an FBI investigation.
He says Mark told him at the Dallas convention, but Mark
said very clearly he did not.

"The FBI is saying I killed my wife for you"?  Why
would he say that?  On direct, the defendant admitted even
in his version of what Mark told him, Mark didn't tell him
about Lori.  He said that on direct.  There was no reason
for him to be thinking the FBI is tying the murder to Lori.

The main most obvious motive anyone would think of
was the money.  And why the phrasing?  The phrasing was
memorable to Lovelace.  If he was worried about the
investigation and he was a bereaved husband, why would he
say "I killed my fucking wife"?  That's not what the
argument was about.  The argument was about the murder, and
Lori knew about it.  Now the defendant was arrested in
Denver after being deported from Mexico.  And that was where
he was first arrested on the charges, and so venue is proper
here.

And as to the mail fraud, you heard evidence that

1   one of those claims was mailed to Colorado and so venue is

2   proper here.

3          The defendant was charged by complaint and there

4   were 30 days to indict, and then he was indicted.  So Count

5   1, very quickly, the elements are relatively simple:

6   Lawrence Rudolph caused the death of Bianca Rudolph; with

7   malice aforethought and it was premeditated.  All of those

8   final ones:  Outside the United States, U.S. Nationals,

9   those are not disputed.

10          And as far as mental state, malice aforethought

11  means essentially to kill another person deliberately and

12  intentionally.  And you've got all these instructions,

13  you'll have copies.  And a kill is premeditated when it's

14  the result of planning or deliberation.

15          What is the evidence of that here?  Ordering

16  propofol.  Loading the shotgun that morning.  Putting the

17  shotgun in the case.  Those all show that it was

18  premeditated.

19          And as far as Count 2, mail fraud, the defendant

20  devised a scheme to defraud the life insurance companies by

21  making false and fraudulent representations.  Super simple.

22  He said it was an accident when he knew it was murder.

23          Intent to defraud -- scheme to defraud.  He's

24  intending to deceive them.  Intent to defraud, he's

25  intending to get money from them by that deception.

1           And a material -- it has to be material.  A

2    material fact is something that would change the process.

3    And you heard the life insurance carriers talking about how

4    it would have changed the process if he had in fact admitted

5    that it was murder.

6           Now, turning to Lori, there was still a chance to

7    help him before he got indicted.  She had been second fiddle

8    while Bianca was alive.  And the relationship started back

9    in 2003 or 2004.  It was not on-again-off-again.  It was

10   filled with love, commitment.  Never considered leaving him.

11   And cash.  She was with him less than three weeks after

12   Bianca's death and she moved in with him less than three

13   months afterwards.

14          Now you heard the sequence of events but about two

15   weeks after Defendant Rudolph was arrested, she went to a

16   hearing.  And that's very important context for his

17   testimony -- her testimony.  So the subject of the hearing

18   in -- was the affair with Rudolph, him giving Lori money,

19   Lori giving the ultimatum, and that was the subject of the

20   questions that she was asked the very next day.  And the

21   defense arguments at the hearing:  open marriage, postnup,

22   those are the same facts that she volunteered the very next

23   day.

24          She starts with accessory after the fact and

25   obstruction, and perjury.  All of them relayed to her

1    testimony and the falsehoods and lies she tells in her

2    testimony.  But because the perjury are the most clear

3    examples of lies, let's start there.

4         So the perjury counts.  The perjury elements.  Made

5    a statement while under oath.  Uncontested that she was

6    under oath.  The statement was false.  She knew it was

7    false.  And it was material.

8         So as far as materiality, she was asked about the

9    affair, the money, the change in Lifestyle after Bianca's

10   death, the ultimatum, the confession.  All key aspects to

11   the case against Lawrence Rudolph.  And another important

12   consideration is the fact that if you tell a lie, you can

13   admit the truth later but that doesn't undo the fact that

14   when you told that lie, you committed a crime.  And, in

15   fact, if you admit later that the truth is something

16   different, you're admitting that you committed that crime.

17        Now reason and common sense, as you've been

18   instructed, and you'll have available to you, reason and

19   common sense are incredibly important.  How do you tell if

20   someone is lying in real life?  It's something that you draw

21   on your experience of interacting with people and your

22   common sense.

23        I have two daughters that sometimes fight.  And a

24   little time before trial, they had a fight.  It was bedtime

25   and they were brushing their teeth.  And my older daughter

1    came up -- she's eight -- and she said that her sister had

2    kicked her in the stomach.  And I said, "Well" -- because I

3    know her -- "Well, what did you do to get her to kick you?"

4            And she said, "I didn't do anything."

5            And I said, "Well, why would she kick you?"

6            "I didn't do anything.  I was just standing there."

7            And I thought to myself what sometimes was a

8    subject of conflict and I said, "Did you push her off the

9    stool while she was brushing her teeth?"

10           And she said, "I didn't.  She was hitting me

11   beforehand."  Right?  And so that's important, right?  She

12   gave me some information I wasn't asking for that sort of

13   justifies her.

14           So I asked her again, "Tell me, honey, did you push

15   her off the stool?"

16           And she goes, "Well, I got on the stool."

17           "Well, was she on the stool when you got on it?"

18            "Yes."  Right.

19           "Well, why did you tell me you didn't push her

20   off?"

21           "Well, I thought you meant push with your hands and

22   I used my shoulder."  Right?

23           Happens all the time in my household.  But all of

24   those sorts of things are things that you would look for in

25   your everyday life to tell whether someone's telling the

1    truth or not.

2          So Count 5, this is the first one.  Do you have --

3    did you have any substantial source of cash income?

4          I don't recall.

5          Do you recall depositing 20,000?

6          No, I don't.

7          60,000?

8          No, I don't.

9          Now this is what she was looking at when she was

10   asked those second two questions.  And so if she wants to

11   argue, "I was wondering" -- "I thought you meant a briefcase

12   full of $60,000," this is clearly an annual summary.  And so

13   that's not plausible.

14         What she was doing was she was trying to find a way

15   out to not admit this.

16         No one could forget depositing this much cash in a

17   year.  More than their income.  And you can look in 2016,

18   significantly more than her annual income from her work.

19         Count 6.  Now this one, the sequencing matters.  So

20   on page 14, she was asked:  Why was Larry so generous to

21   you?

22         I don't know why.

23         You don't know exactly why he gave you 60,000?

24         I don't know exactly why.

25         Now, down on page 19:  So earlier when you said you

1    didn't know why, do you now have a better understanding?

2    After she's admitted he was supporting her financially

3    because of their relationship.

4              She says:  Well, I did know why he gave me money.

5              And that right there is an admission that on page

6    14 she lied.

7              But she clarifies:  I just don't know specifically

8    each one, what it was for.  So what was she talking about

9    there?  Well, in the middle on page 17, there's a long

10   discussion about specific amounts.  4,000, 3500.  Continues

11   on to page 18.

12             And then she's asked at the end:

13             Do you remember why Larry gave you all that money?

14             I don't remember.

15             That's what she's talking about when she says:

16             I just don't know specifically each one, what it

17   was for.

18             But:  Well, I did know why he gave me money is

19   directly contrary to:

20             Why was Larry so generous to you?

21             I don't know why.

22             Count 7.  This is the discussion about why she

23   would get less after Bianca's death.  And she says:

24             I don't know why.

25             But after Bianca's death, and she's added to the

1    credit card, the cash plummets.  And so when she's asked

2    about the card and whether that played into why she got so

3    much less cash, she says:

4            No, the card was part of my perks.

5            Count 8.  The ultimatum.  Now this one Anna Grimley

6    testified that she did.  And you'll be called upon to make a

7    credibility assessment.  Was Anna making that up?  On

8    cross-examination she was asking:

9            Did she make it up to try to get on the news?

10           Ask yourself if that's plausible.  And ask

11   yourself -- look what Lori says here.  She doesn't say no.

12   She says:

13           I don't believe so.

14           I don't believe so?  Could you forget if you gave

15   the person you were having an affair with an ultimatum to

16   leave his wife right before she dies?

17           But she's being tentative here because she's

18   already been confronted with some stuff and had to change

19   course.  So when she's finally asked to double-down, she

20   says no.

21           No, I didn't give an ultimatum.

22           So when she said before:

23           I don't believe so, or I don't think I did.

24           That wasn't -- that wasn't the same answer here.

25           And then, finally, after that:

1          Did you give him an ultimatum in July of 2016?

2          No, I don't remember that.

3          This is after she's already said:

4          No, I never gave an ultimatum.

5          She goes back to being tentative because she's

6  worried about what evidence we have that she's lying.

7          Count 9:  Did he say anything about the merits of

8  an investigation?

9          I don't recall.

10          Did he say anything about whether it was an

11  accident?

12          No, he told me previously it was an accident.

13          Did he proclaim his innocence?

14          He probably did.  I don't really recall.

15          Now this one comes down to the Steak 44, because if

16  that conversation happened and if they were having an

17  argument where he was holding over her the fact that he had

18  murdered his wife, this is obviously a lie.

19          Now that point of knowledge plays into the

20  accessory after the fact and the -- that accessory after the

21  fact count, and so let's discuss that a little bit.

22          Accessory after the fact means that Lawrence

23  Rudolph committed the crime of foreign murder.  She knew

24  that he had, and she helped him try to avoid being

25  prosecuted or punished.  And that's exactly what she did.

1    And you know -- she had reason to believe she could help him

2    because in the hearing the very previous day, all the

3    argument was:  This is a very weak case.  She would have had

4    every reason to believe that if she could just undermine

5    some of the aspects of his motive, he might be released.  He

6    might not be indicted.

7            And then obstruction is:  She was testifying in

8    front of the grand jury and she endeavored to influence,

9    obstruct, or impede the due administration of justice.  Now

10   this is important to distinguish:  Both the accessory after

11   the fact and the obstruction counts are not limited to the

12   perjury counts.  They're not limited to just those lies that

13   are charged in the perjury counts because, of course, you

14   can say things that mislead the grand jury that aren't

15   technically lies.  You can give omissions, right?  You can

16   have partial answers.  You can have evasive answers or

17   deceptive answers; tentative denials.  Reversals.

18           All of those sorts of things play into the -- the

19   deception and the attempt to impede the grand jury's

20   investigation.  And so let's look at some of those

21   statements.

22           Are you in a relationship?

23           Yes.  We were friends.

24           Did he stay at any of those residences?

25           Maybe a few times.  I don't remember.  Maybe once

3100

1    when he went to the airport.

2            Did you ever go into work with him?

3            I don't think so.

4            What about leaving work?

5            No, I didn't leave work with him.

6            Why was he generous?

7            He was generous.

8            Do you know if he gave this money to anyone else?

9            I know he helped a lot of people out over the

10   years.

11           That's a deceptive answer.  She knows he does not

12   do anything like that to anybody else.

13           When did you move to Arizona?

14           Can't even remember what part of the year she moved

15   to be with Larry.  Doesn't remember celebrating New Years,

16   which she did.

17           First quarter?  January, February, March, summer?

18           Can't recall.

19           COURTROOM DEPUTY:  10-minute warning, counsel.

20           MR. WINSTEAD:  Thank you.

21           And then there's the cash.

22           Did Three Rivers provide incentives for patients to

23   pay in cash?

24           To pay in full, I believe.

25           Doesn't want to talk about the cash.

3101

1          Did the practice generate a lot of cash?

2          You mean income?

3          No, cash.

4          There was some.  No idea what percentage of

5    patients paid in cash.

6          The -- did the office have a safe?  What was kept

7    in the safe?

8          Drugs.

9          What about cash?

10          Yeah.  Cash.

11          Oh, sorry.  Were you ever paid in cash?

12          No.  Don't remember.

13          Did you ever deposit cash from the practice into

14    your personal bank account?

15          I don't recall ever doing that.

16          And you heard on the stand Larry said she did

17    regularly.

18          Now, let's talk for a moment about Lori's

19    knowledge.  So in Steak 44, he's yelling at her, "I killed

20    my wife for you."

21          Why did he seem to be blaming her?  Was it maybe

22    because she asked him to do it?  She gave Larry an

23    ultimatum.  She helped him order and get propofol.  She

24    agreed to work from home and hide from Bianca.

25          Larry texted her that an accident had happened and

1      she didn't ask for any clarification.  Is that because she

2      knew what happened?

3              Regardless of that, at the very least, she did know

4      about the murder at Steak 44.  How do you know that she

5      wasn't talking about the FBI investigation at Steak 44?

6              Who told you that there was an FBI investigation?

7              I think I heard it from -- I think it was when the

8      FBI knocked on Julian Rudolph's door, and he told his dad.

9              And who told you?

10             Larry, I guess.

11             What did he say?

12             That they had knocked on Julian's door.

13             She found out about the FBI investigation after

14     Julian Rudolph was contacted six months after Steak 44.

15     Why -- why would she lie?  Why would she -- why would she do

16     all of this to help the defendant in the grand jury?

17     Because she had been taken from this life to this life and

18     she didn't want to go back.

19             Reasonable doubt.  You have an instruction about

20     it.  It's proof that leaves you -- oh, I'm skipping that

21     because I'm running out of time.

22             Proof that leaves you firmly convinced.  Not beyond

23     any possible doubt, but it's a reasonable doubt based on

24     reflection and common sense.  And that's why it's not just

25     called a doubt.

1          You heard in sum during the trial of the idea of

2     the lottery, right?  Very unlikely to win the lottery but

3     someone always does.  If someone wins the lottery, it might

4     be unlikely that he won it but he did and someone has to win

5     it, right?

6          Well, but what if you found out that the person who

7     won it a couple of months later transferred a million

8     dollars to the director of the lottery?  It's still just the

9     same chance.  What if you found out that his ticket did --

10    the store where he purchased it, it was the only ticket

11    they'd ever sold?  And it was owned by his brother-in-law.

12    Right?  The chances haven't changed.  It's perfectly

13    possible that despite all of those things, he just won it.

14    But reason and common sense tell you there is no doubt that

15    there was something funny going on, right?

16         Now in the opening argument for Defendant Rudolph

17    and during the direct, they said repeatedly, "Oh, that -- it

18    sounds bad."  Right?  "That looks bad."

19         And it's true.  There is a lot of stuff in this

20    case that looks bad.  It looks bad that Larry hurried to

21    cremation before any family members knew of the death.  It

22    looks bad that he deceived her family about the reason for

23    the delay.  It looks bad that he researched the personal

24    information of Otto Westhassel, tried to intimidate him, and

25    demanded the only close pictures of Bianca's wounds be

1    destroyed.

2        It looks bad that Larry asked Cassius Mwiinga if
3    there was a way to avoid the autopsy.  It looks bad that
4    Larry started pursuing Bianca's life insurance before her
5    funeral.  It looks bad that at the funeral he lied to put
6    himself as far away from the cabin as possible.  And then
7    stonewalled his wife's brothers to prevent them from
8    learning more.

9        It looks bad that the day after the funeral, he was
10   taking advantage of his bachelorhood with a trip to
11   Las Vegas with a strange woman.  It looks bad that when a
12   life insurance investigator called him for the first time,
13   he hung up so that he wouldn't have to explain himself.  It
14   looks bad that Larry provided all of the African documents
15   to the insurance companies and Diligence except the document
16   that said the firearm was working perfectly.

17       It looks bad that Larry was together with Lori
18   within three weeks of Bianca's death and that she was living
19   with him within a couple of months.  It looks bad that
20   Larry, when he found out about the renewed FBI
21   investigation, told Sherry Houck he was probably going to
22   jail.  It looks bad that Lori pretended not to remember
23   about huge amounts of cash, taking money from the safe, and
24   not knowing why Larry gave her her money.

25       And, finally, as the defense noted, in the early

3105

1     spring of 2020, it looks bad that the defendant said to

2     Lori, "I killed my fucking wife for you."

3          Those facts do a lot more than just look bad.  They

4     prove the defendant murdered his wife by shooting her in the

5     heart with a shotgun and that Defendant Milliron lied to try

6     to help him get away with it.  I would ask you once you've

7     considered the evidence to return a verdict of guilty on all

8     counts.  Thank you.

9          THE COURT:  Thank you, Mr. Winstead.

10         Closing argument for Defendant Rudolph.

11         MR. MARKUS:  Your Honor, may I have a moment to set

12    up.

13         THE COURT:  Sure.  You may proceed, counsel.

14         MR. MARKUS:  Larry Rudolph is innocent.  He did not

15    murder Bianca Rudolph.  There's been so much noise in this

16    case, ladies and gentlemen:  affairs, cash, whether the

17    funeral was nice enough, cremation, SCI lawsuits, propofol,

18    Vegas, life insurance.  But this is a murder trial.

19         And "something funny going on," Mr. Winstead, is

20    not proof beyond a reasonable doubt.

21         And as I told Agent Peterson way back when we first

22    met in this case, "This is the weakest case I have ever

23    seen."

24         I was speaking from the heart with Agent Peterson

25    when I first met him and I'm going to speak from the heart

1    with you all today because I have an innocent man sitting

2    with me at this table.

3        And I will admit, the prosecutors have gossip,

4    innuendo, but we have the facts.  And when the Government,

5    when the prosecutors, couldn't get around the science, they

6    started asking the scientists about the noise.  Do you

7    remember that?  Remember when Luke Haag was on the stand?

8    Literally the No. 1 gun scientist in the world and

9    Mr. Winstead couldn't crack it.  Couldn't make a dent in his

10   testimony.  So what did he have to do?  The same thing he

11   did in his closing.  He started asking him:  What if you

12   knew Larry only spent $1900 on the funeral?

13       I mean, are you kidding me?  Remember all those

14   questions that he asked Mr. Haag that had nothing to do with

15   the science?  Now I get it.  I really do get it.  When you

16   can't attack the science, you have to go to speculation.

17   You have to go to innuendo.  You have to go to gossip.

18   They're hoping that all of this noise is going to distract

19   you from the facts, from the proof, from the science.

20       One of the very first instructions that Judge

21   Martínez read to you is that you're not permitted to rely on

22   rumors, you're not permitted to rely on suspicion.  You can

23   only base your decision on the actual evidence in the case.

24   Do not speculate, Judge Martinez told you.

25       And the prosecutors have admitted there's no

1    physical evidence in this case; there are no eyewitnesses in

2    this case.  So what do they try to do?  They try to make

3    their case with motive, with noise, and with experts.  But

4    when you examine the theories on motive, when you examine

5    the experts, none of it supports what they're saying.

6         Now I get it, human nature.  We all have it.  We

7    want to solve things.  You heard from Luke Haag.  He was

8    disappointed in this case that he couldn't solve it, right?

9    And the prosecutors know they can't solve it.  So they're

10   hoping that you fill in the blanks here.  They're hoping

11   that speculation trumps science.  But we're still in a court

12   of law; this is not a court of speculation; this is not a

13   court of gossip or innuendo.

14        And way back at the beginning of this case, three

15   weeks -- it seems like, what, three months ago that we've

16   all been sitting here -- you all promised, you took an oath,

17   to look at the evidence, not to base your verdict on

18   speculation.

19        Now let me just take a moment and thank you all

20   because it's not easy sitting here for three weeks away from

21   your family, friends, work.  I get it.  And this is a really

22   important job that you all are doing.  It's literally the

23   most important civic service that you can do other than

24   serving in the military in a time of war.  Sitting on a

25   jury.  It's an incredible service that you all are doing.

1    The prosecutor thanks you, we thank you, the Court thanks

2    you for your service.  It's really important.

3         I'd like to get into the witnesses in this case

4    because the witnesses are so important.  The first one, the

5    most important witness, is Mark Swanepoel.  Now he describes

6    the witnesses -- he describes Dr. and Mrs. Rudolph in this

7    case, and the two safaris in 2016.  They were happy.  They

8    weren't fighting.  Nothing to suggest there was any problem.

9    They had future plans to come to Zambia.  Shopping for

10   things.

11        And, remember, there were open doors, open windows.

12   Mark Swanepoel could hear everything.  He heard the man with

13   the coffee come and bring them coffee that morning.  He had

14   the porter come and try to help them with their luggage and

15   Bianca shoo them away.

16        Now we also heard that Bianca was a nervous and

17   frantic traveler.  She was up early that morning; she was

18   packing.  Now I think I heard Mr. Fields yesterday say,

19   Wouldn't that make her more careful with guns?  But he

20   ignores human nature and common sense.

21        I thought of, you know, how many times Judge

22   Martínez warned everybody not to put those gruesome pictures

23   on the screen, right?  But sometimes the tech folks made

24   mistakes, and it was a mistake, they put them up on the

25   screen.

1          Now I want you to imagine Mr. Fields crossing his

2    own tech folks on that.  "You were warned not to put that on

3    the screen and yet you did it anyway.  You were warned many

4    times not to put it on the screen and you did it anyway.

5    You didn't take them down right away."

6          He would make his own tech person look so guilty if

7    they were on the stand for putting those pictures on the

8    screen.  But I know it was a mistake.  It happens.  But he's

9    a skilled and excellent and clever cross-examiner.

10          Mark Swanepoel told you that this was an accident.

11    Do you remember that three weeks ago?  Their very first

12    witness got on the stand and told you this was an accident.

13    He said Larry's emotions were genuine.  He was the first

14    person on the scene.  He saw Larry in the doorway of the

15    bathroom.  No blood on Larry's hands or body.  And he

16    described how Larry was:  frantic, upset, crying,

17    hysterical.  Shouting for help.  "Help me.  Help me."  They

18    both tried to save her life.

19          And now if I'm hearing the prosecution table

20    correctly, they tried to impeach Mark Swanepoel yesterday

21    through Larry.  Do you remember that, when they started

22    asking about the investment in the business?  They can't

23    accept for a moment that their first witness was telling the

24    truth because if a fact is good for the defense, they're

25    going to spin it.  They're going to spin it.  If a witness

1    is good for the defendant, nope, that witness must be lying.

2         Their own witness, Mark Swanepoel, got on the stand

3    and said, "This was an accident.  Larry was authentic."

4         And he saw the wound.  He saw it before the

5    autopsy.  He saw it before the body decomposes.  And he's

6    the one who said it was a single-entry wound from very

7    close.

8         He also explained the leopard incident.  Remember

9    the year before, there was this incident with the leopard

10   charging and it was injured and they shot a person and Larry

11   had his medical kit.  Now Larry freaked out the next year,

12   he brought his body armor, a helmet, a cup, a shotgun, and

13   propofol.  So what do they try to do?  They try to spin the

14   propofol into something evil.  Now that's pure speculation

15   on that part -- on their part.  There's no actual evidence

16   of something evil here.  The evidence points the other way.

17   So they are hoping that you -- with this innuendo and gossip

18   in today's society, they're hoping that that's enough.

19         If Larry Rudolph wanted to kill Bianca, there was

20   plenty of opportunity on those hunts when they're out with

21   the shotgun.  But he wanted to protect her.  He wanted to

22   keep her back, safe.  They were in a more remote area on

23   that August hunt.  Remember Mark Swanepoel told you about

24   that?

25         Now we're hearing about plan B.  That propofol may

 1    have been used afterwards?  Where is this coming from?

 2    These are wild theories that they're throwing up against the

 3    wall and hoping something sticks with you.  There is not a

 4    single piece of evidence to suggest that propofol was

 5    anything other than what the body armor, helmet, cup, those

 6    things were brought forward.

 7         And we heard from Mark Swanepoel:  The devil loads

 8    the gun.  Remember that?

 9         Accidents happen all the time.  People don't follow

10    the rules all the time.  Their own Browning guy pointed the

11    gun at Judge Martínez's head.

12         The prosecutor asked Mark Swanepoel on the stand:

13    Have you ever seen a gun discharge without pulling the

14    trigger?  He was hoping the answer would be no.  He got

15    caught.  Remember that?  He caught you.

16         And the answer was:  Yes, I've seen it.  And he was

17    kind of surprised by that.

18         We all have seen and heard about incidents like

19    this over the years.  Your colleague dropped the gun on the

20    dance floor doing the backflip.

21         We know the rules of gun safety.  They're put into

22    our heads.  And yet over and over again, these things

23    happen.  That YouTube video, somebody looks down into a

24    shotgun and shoots his hat off.

25         They want you to buy into this logical flaw that if

1    something is rare or it never occurs, it means it will never

2    occur.  And that's just wrong.

3          We know Alec Baldwin shot somebody dead on the set

4    of a movie called Rust because he had a live round instead

5    of a fake round.  The Crocodile Hunter, this is the guy that

6    does this for a living.  A stingray jumped out of the ocean

7    and stung him right through the heart.  What is that, a

8    10-billion-to-1 shot?  It happens.

9          And in this case, accidental discharges aren't

10   nearly as rare.  The agent pulled the CDC records and saw

11   that these things happen.  There are accidental discharges

12   where people die with shotguns every year.  But that didn't

13   fit the theory.  Didn't fit their theory.  So we're going to

14   put that CDC record in the trash.  We had to bring that out

15   to you.

16         But remember we don't need to prove anything to

17   you.  We didn't need to say a word.  They have the burden of

18   proof beyond a reasonable doubt.  And they can't say how

19   this happened.  They cannot.  They're saying now that Larry

20   loaded the gun that morning and quietly closed that handle,

21   but you saw when the Browning guy pushed that button when he

22   put a shell in there, it was loud.

23         They haven't explained how you close that slide

24   quietly.  It's a -- you push that button, and you hear it.

25   Bianca would have heard it if he was loading a gun that

3113

1    morning in that one-room cabin.  They can't explain how this

2    happened, and that's why we have the scientific method.

3    Because the scientific method is used to rule things out.

4        The prosecutor's job is to prove this beyond a

5    reasonable doubt.  They have not ruled out an accident.

6        Let me pause here to talk about that shell that the

7    prosecutor talked about.  We don't know where that shell was

8    found because Spencer Kakoma came back in after taking the

9    gun out and clearing it, put the shell back.  We don't know

10   if the shell was in that case or not.

11       Notice how he kind of went around that and didn't

12   discuss it?  We know the gun was put back hopefully in a

13   similar place, but we never heard any testimony about that

14   shell.  We don't know if the shell was found in the bag or

15   out of the bag.  We also know that they didn't test the

16   shell for toolmarks.  They said, "Well, why didn't you test

17   it, defense?"  Remember when they asked Mr. Haag, "Why

18   didn't you test it?"

19       It's amazing.  They have the burden of proof.  They

20   have the best FBI laboratory in the world.  They could have

21   sent it to Quantico.  They could still send it.  They don't

22   want to send it because they don't want to see how those

23   marks were made.  They spent money on Bradtmiller,

24   70-whatever thousand dollars to do a test about whether she

25   could reach it when we said she can't reach it.  But they

1    won't send the shell to Quantico?  Come on.

2              Swanepoel told you they went to the police that

3    day.  In the car Larry was beside himself; upset.  Trying to

4    figure out what happened.  And now I couldn't believe what I

5    heard yesterday when Mr. Fields was cross-examining Larry

6    Rudolph.  He said, "Why didn't you call the Embassy first?"

7              It's amazing, Dr. Rudolph goes to the police and

8    they're complaining about it because any fact that helps us

9    they're going to spin.  It doesn't fit with their theory.

10   "Why didn't you call the Embassy first?"

11             Now imagine if he had called the Embassy first?

12   What would the prosecutor say?  "Look, he was looking for

13   protection before he went to the police.  He called the

14   Embassy.  How dare he."  We can't win.

15             Remember Mark Swanepoel said he was always with

16   Larry Rudolph.  Didn't pay anybody off.  They went to the

17   funeral home after they delivered Bianca's body to the

18   hospital.  That timing is critical.  Mark Swanepoel said he

19   was always with Larry Rudolph and he didn't bribe anybody.

20             What about Otto Westhassel?  On that first call,

21   you heard Mark Swanepoel say, Cecil the Lion was mentioned.

22   Larry got very upset.  And the pictures, it's not that Larry

23   got upset that Otto was going to start posting them on

24   social media.  No, that's not the point we were making.

25   Dr. Rudolph was asking about FOIA, Freedom of Information

1    Act.  The problem is when the Government has information,

2    people can file these claims and then the pictures become

3    public, and they end up on places like TMZ, just like all

4    those other autopsy photos that have been out there.  It's

5    terrible.  And we know they're private people.  He did not

6    want those pictures of his wife to be shown to his kids.

7    And I'm sorry that you've had to see those in court.  It's

8    terrible.

9         You heard Larry talk about the dignity that was

10    destroyed with those pictures.  Her naked body.  And

11    remember, if Larry was concerned about what was going on, he

12    could have just gotten on a plane out of there.  You heard

13    from Otto Westhassel he didn't have to wait for him.  There

14    would have been no innocent explanation for that if he

15    bolted.  But he didn't.  He waited until he got all the

16    forms, until Otto told him, "You can go."

17         "The innocent flee when no man pursueth.  The

18    righteous stand bold as a young lion."  Larry Rudolph never

19    fled.  He met with the police; he gave them a statement.  He

20    met with the insurance company; he gave them a statement.

21    He took that stand and answered all of their questions.

22         You heard about future hunts; how Larry was

23    reluctant at first.  But then he went for closure to

24    Bianca's bye, just Mark and Larry.  And he was sad.  He

25    wasn't the same person.  He wanted a plaque for Bianca at

1    that cabin.  They went for closure.  Lori wasn't there.  Who

2    else was there on October 11th?  Spencer Kakoma, the porter,

3    and the coffee guy.  None of them called.  Now Kakoma is a

4    critical witness, ladies and gentlemen.  How was Larry?

5    Where was the gun?  How much was the bag zipped?  Was the

6    body really moved as Spencer Kakoma put in his statement?

7            The Government wants you to believe some reports

8    and not others.  Did the shell actually come out or was it

9    found on the floor or was it in the bag?  Only Spencer

10   Kakoma who took that bag out could answer it.  They didn't

11   bring him.

12           Now they asked their FBI agent, "What about the

13   porter and the coffee guy?"

14           "They didn't want to come."

15           But critically, remember, he didn't ask --

16   Mr. Fields did not ask Agent Peterson, "Why didn't you bring

17   Spencer Kakoma?"

18           And we're going to talk about it in a second.  "Why

19   didn't you bring Vincent Chibesa?"

20           Now the judge has instructed you yesterday that,

21   you know, no party's required to bring any witness.  It's up

22   to the parties who to call.  And that's true.  But if they

23   don't call them and they want to prove their case beyond a

24   reasonable doubt, you all can ask why.  And this is the

25   critical why:  When you go back into that jury room ask

1    yourselves, why didn't they bring Vincent saw, the guy who

2    wrote the firearms report?

3         Now, remember the prosecutor's questions to

4    witnesses are not evidence.  So you can look at that report

5    and see no drop-test was done.  They wanted to ask, "Well,

6    did you know he actually did a drop test?"  Why -- what?

7    It's not in the report.  And they didn't call the witness.

8         There are two explanations for not calling the

9    witness.  One is he had something bad to say, and they

10   didn't want you to hear it.  The second reason they didn't

11   call Vincent Chibesa is because he would have said that what

12   was in his report didn't actually happen.  He didn't

13   actually perform those tests.

14        Now by the way, even if he performed the tests in

15   the report, I -- I'm begging you guys to read this report.

16   What does it say?  He fired the gun twice.  So that's

17   supposed to tell us that the gun was fully operational?  You

18   heard from the gun experts that the prosecution called that

19   just because a gun fires doesn't mean it didn't have an

20   accident.

21        What about the family and friends?  And I know the

22   brothers and the cousin are here.  And I feel for you all.

23   Have gotten to know you over the course of the last three

24   weeks.  And I acknowledge all of you.

25        They didn't know that Bianca wanted to be cremated.

1    They didn't know a lot of the facts.  And so the Government,

2    when they brought this case, thought she did not want to be

3    cremated.  We had to provide them the will.  They talked

4    about the funeral, the Government.  They put up evidence of

5    the funeral not being good enough.

6         You know, I'm sorry, how dare they say that?  How

7    dare they say that?  These children put together a funeral

8    for their mother in Phoenix where they lived, at the church

9    where they went to with Father Bill, and they're going to

10   complain?

11        It reminds me of a story my dad used to tell me

12   about how to look at life.  There's two ways to look at

13   life, ladies and gentlemen.  One is through dirty windows.

14   When you look at life through dirty windows, everything

15   looks dirty, everything looks bad.  If you look at life

16   through clean windows, my dad would tell me, you can see

17   what's good and what's bad.

18        They've chosen to look at every single thing in

19   this case through dirty windows.  They looked at the funeral

20   through dirty windows.  They looked at the eulogy, the

21   daughter to -- the note that Larry wrote to AnaBianca.  Even

22   the Zambian investigation that said this was an accident.

23   They don't give any possibility to the fact that the

24   Zambians got it right.  The Government doesn't allow for

25   this possibility.  Even when their own experts come back

1    with results that are the exact opposite of what they want

2    to hear.  Even when there are videos of women dropping the

3    gun over and over and over again, they never doubt

4    themselves.

5         But that's what you all are for.  That's why we

6    have juries.  That's why our founding fathers put the jury

7    system in the constitution twice.  You all are here to put

8    the brakes on that sort of thinking; on-the-blinders sort of

9    thinking.

10        So when a witness gets up there and says, "Yes,

11   Rudolph tried to bribe me," but the timing cannot be

12   possible because Dr. Rudolph and Mark Swanepoel brought the

13   body to the hospital the morning of the 12th and didn't go

14   to the funeral home until afterwards, they discount the

15   timing.

16        When Larry says he wants to get home quickly and

17   out of Zambia and speed up the cremation, they view that as

18   guilty when there's a perfectly innocent explanation, as

19   even Agent Peterson said.  So what do they do?  They call a

20   park ranger.  Park ranger said he was suspicious of Larry.

21        Now I told you all when I started the opening in

22   this case that the prosecution has chosen fact over fiction

23   and speculation over science.  What I should have said is

24   that the prosecution has chosen suspicion.

25        Remember the park ranger got up there and said, "I

1    could see through his eyes."  Remember this?  And he's

2    trained and he can figure out when somebody's lying.  But

3    this is a federal murder investigation and trial.  We need

4    actual proof.  Suspicion is not enough.

5         Now I can understand why a park ranger might not

6    like a hunter like Larry.  I get it.  And I'm going to say

7    something that my team might kill me for.  But if this was a

8    likeability contest in the whole courtroom, Mr. Winstead,

9    you might win?  Okay.  He might win the likeability contest.

10        Many of you may not like Larry like that park

11   ranger.  He's had affairs, he lied in a deposition, he went

12   to Vegas, he was a hunter.  But this isn't about whether you

13   like Larry or not.

14        And I could see during some of the questioning, I

15   might have done something that upset you.  And I apologize

16   if I have.  But I'm fighting with everything I have for

17   Larry Rudolph because I have an innocent man sitting next to

18   me.

19        So I agree we may not win the likeability contest,

20   but I'm asking you to focus on the evidence because, as

21   Judge Martinez said:  You all are the judges of the facts.

22   You know, there's a German word for this called schadenfroh.

23   I don't know if you've ever heard this word.  It means

24   people get joy in other people's pain.  It's crazy, right?

25   We see it every day on the TV.  It's one of the reasons we

1    have so much of the media here because there's this human

2    instinct, and studies have shown that when you see others in

3    pain, sometimes you get joy out of it.

4            So there's this desire to punish someone who had

5    affairs, a desire to punish someone who hunts, a desire to

6    punish someone who went to Vegas.  I'm asking you not to

7    convict on schadenfroh, on that German word.  I'm asking you

8    to look at the evidence.

9            So let's take a look at the insurance witnesses.

10   The insurance witnesses all came in and all said the same

11   thing.  They hired Diligence.  Diligence is the best.

12   Diligence went to Africa twice.  They wrote a huge report.

13   Interviewed lots of people, including Swanepoel, Rudolph,

14   the Zambians.  And they found these claims should be paid.

15           Now the prosecutor said, "Well, they're in the

16   business of paying."

17           Excuse me?  We've all dealt with insurance

18   companies.  They're in the business of paying?  Please.  Let

19   me just say this really quickly.  Dr. Rudolph is charged in

20   two counts:  the murder count and the insurance count.  He's

21   not guilty of both.  Don't compromise and say, Well,

22   Winstead's likeable so we're going to give him a count, but

23   the evidence supports Rudolph so we're going to give him a

24   count.

25           No, no, no, no, it's all or nothing here.  If he

did not murder his wife, which he didn't, then he's not
guilty on both counts.  So the insurance expert, Peter
Milnes.  This was amazing.  I don't know if you all remember
this cross.  It seems like, again, ages ago.  But they
called an expert on insurance, and what did he say?  He said
that based on Dr. Rudolph's -- the trust -- that traditional
trust that Dr. Rudolph had, that Dr. Rudolph actually needed
more insurance than he had.

Now remember, Larry Rudolph could not get more
insurance on himself; he had a pacemaker and that heart
condition.  He had about 4 million.  So what did they do?
They raised Bianca's insurance, which was totally
reasonable.  She was involved in the process, she knew every
step of the way.  She got exams, she signed up.  She knew
what the insurance was.  And all of it was accomplished
before 2014, two years before.

As the net worth goes up, their expert told you,
insurance should go up.  Now he said, "Well, he should have
had a second-to-die policy."

But he reviewed all of the files and saw that Bill
Gorman never recommended a second-to-die policy and he was
shocked by that.  Gorman also testified -- remember the
pros- -- this was a critical moment.  The prosecutor asked
him, "Do you find it abnormal and suspicious?"

What did Gorman say?  "I found it abnormal."  He

3123

would not give the prosecutor that it was suspicious.  Why?
Because it was high.  That's a lot of insurance to have.
But it's not evidence of guilt because they had reasons for
it.  He had a bad heart, they traveled to dangerous places
and their net worth had skyrocketed.  The trust that they
had was a very common trust vehicle.

And this is a really important point, ladies and
gentlemen:  Remember there was more money in that trust in
2021 when this case was brought than in 2017 when the
insurance proceeds were paid.  There was more money for
those children when this case was brought; not less.  He
didn't squander or spend any of that money.

So let's talk about the testing in this case.  So
the first testing that was done was the reach study.  Now
this is, again, the classic, what we call strawman argument
because we said right in opening statement, we're not
claiming she pulled the trigger or committed suicide.  And
that was ruled out by the scientific method.

By the way, it was only ruled out by our expert
because of the 4 inches back.  If it was 1.8 inches back,
she could have still reached, but we acknowledge it was 4
inches back and that's why she couldn't reach it.

Now, I'd like to show you some slides real quick
from that reach study because they're really important.  Do
you remember the FBI -- I'm sorry, the woman who was packing

1    up who had law enforcement and firearms training?  Watch

2    what she does when she tries to pack it.

3        (Video played)

4            MR. MARKUS:  Whoop.  The gun fell out.  This is a

5    woman with firearms training.  She just forgot to zip the

6    end of the case.  Okay.  It happens.

7            Then when we showed these, the expert tried to

8    wiggle it around, "Well, the case is pointing over the

9    shoulder, it was never pointing at the heart."  Remember

10   that?

11           Well, look at some of the actual pictures from

12   their own study.  This is their reach study.  That firearm

13   is right at the heart.  Right at the heart when it falls

14   out.  Right at the heart when it falls out.  Yes, the case

15   is over the shoulder, but look at the angle of the shotgun.

16   Case is over; shotgun is at the body.

17           So what do they do?  They have three things that

18   they look at:  the autopsy report, the post-autopsy photos,

19   and patterning.  Those are three things they're trying to

20   use to determine distance and angle.  But each one of these

21   are flawed.  The autopsy report is not a real autopsy

22   report.  The post-autopsy photos don't help us.  And the

23   patterning doesn't help us much.

24           Let's talk about it.  I'm going to try to go

25   through this quickly.  So first we heard from Dr. Cina that

1    these were suboptimal photos.  Now why are they suboptimal?

2    First, we know the accident occurred on October 11th; the

3    photos were taken days later.  In between, the wound was

4    compressed.  The autopsy occurred.  That messes with the

5    wound itself.  Remember the pictures were taken after the

6    autopsy.  After she's cut open, after Maswahu cuts into the

7    wound and puts the ruler into the wound.  That's that one.

8    I jumped ahead.  And the body starts to decompose.

9         So to use these autopsy pictures to try to compare

10   doesn't do us any good.  Their own expert told us that.  Now

11   just for a moment on Maswahu, this wasn't a real autopsy

12   report.  25 minutes or 45 minutes, it doesn't matter.  He

13   needed many hours.

14        Now Winstead -- Mr. Winstead said, "Well, 20,000

15   autopsies that Dr. Baden did, each one couldn't have taken

16   five hours."  That's not what Dr. Baden said.  No, no, no,

17   no.  Dr. Baden said when you're doing a shotgun autopsy, and

18   you want to track the pellets, it's going to take a long

19   time to track each one.  Maswahu didn't track one pellet.

20   He didn't track or find one pellet.  He cut the wound.  Oh,

21   and I -- remember this, he said he looked right at the wound

22   and could see the seventh, eighth, and ninth ribs.  The

23   wound to the heart, he could see the seventh, eighth and

24   ninth ribs.

25        Come on, guys.  He didn't even mention the third,

1    fourth or fifth ribs.  Didn't include angle in his report.

2    I wanted to use that little direction, Mr. Winstead, but he

3    didn't -- no, it's okay, it's okay.

4            He didn't say anything about angle in his report.

5    There's no way to determine angle after you stick a ruler

6    through after you don't find any pellets.  This is not an

7    autopsy report.

8            So they said, "Well, he didn't have a camera.  He

9    didn't have x-rays."

10           Did he have a piece of paper and a pen to write it

11    down, to track it?

12           We know that they didn't do a number -- a good

13    enough number of test fires.  Even their expert said it

14    wasn't sufficient.  They did one shot at 3 feet.  One shot?

15    And now they're going to come up here and tell you that the

16    shot was 3 feet away when they did one shot from 3 feet.

17           And even if they did a number -- good enough number

18    of test fires, we know that the test fires are unpredictable

19    and incredibly wild.  Their own experts testified to this.

20           We know that they didn't use the right firing angle

21    because even if we had accurate photos and enough test fires

22    to try to avoid the unpredictability, we don't know what the

23    angle of entry was because that report that Maswahu wrote

24    can't be relied on, seventh, eighth, and ninth ribs.

25           We used different cases with different measuring --

 1    different measurements.  And this is an important one.  The

 2    case wasn't positioned the right way.  Now, remember, we had

 3    to tell them that that 1.8 inches wasn't right.  We made our

 4    expert, Luke Haag, available.  Mr. Winstead came and spoke

 5    to him.  It's amazing to me because when we -- when their

 6    experts make a mistake, we tell them about it.  We give them

 7    the information.  We say, "Hey, look, this 1.8 inches isn't

 8    right.  And it's 4 inches back.  Look at the blast hole.

 9    Look at the -- look at all the evidence that Mr. Haag

10    discussed."

11         But if our expert makes a mistake, it's a gotcha

12    moment.  They wouldn't tell us beforehand.  Remember when

13    the accountant had that mistake?  It didn't matter for

14    anything at the end of the day, but he wanted his gotcha

15    moment on the stand.  He wanted to get up there and

16    embarrass the guy.  We didn't do that.  We told them about

17    their 1.8 mistake.

18         What about the position of the case when they did

19    the firing?  They had to leave the case all the way open

20    like that, remember -- with the clamp on it?  Because that's

21    not how the case was.  And the most -- this is the 1.8

22    inches versus the 4 inches and the blast hole, they still

23    have no explanation for it.

24         But the most important thing, ladies and gentlemen,

25    is they didn't do any testing -- not one test -- to rule out

an accidental discharge or drop.  They didn't ask the women
to try to put it into a hard case.  They didn't do any
testing to see if this could have been an accident.

And you're going to have a chance to touch and feel
that gun if Judge Martínez gives you -- if you ask and Judge
Martínez gives you that opportunity.  Feel how heavy that
gun is.  Feel how heavy that gun is when you're trying to
put it into a case that's as tall as you.  And that's why it
would drop at an angle.  They said Luke Haag said the angle
was wrong.  Well, yes, if you drop the gun with the
hypothetical just straight down, yes, of course the shot's
going to go in the air.  But when you're trying to put it in
the case and it slips out, that's what happens.

But they didn't do any testing about that.  They
didn't ask those women, the 50 people they had trying to see
what would happen if they put it into a soft -- a hard case.

Now they did have a big moment in court when they
asked Dr. Cina, "How would you rule that this happened?"

And he said, quote, It was highly unlikely that she
accidentally pulled the trigger.

Remember those words, "highly unlikely"?  But we're
never saying that she pulled the trigger.  We did not say
that.  He did not consider drop.  The prosecutors did not
ask him to consider drop.  And of course he kept changing
his opinion all over the place anyway every time they did

 1    new test fires.  He admitted that they didn't have all the

 2    information.

 3         And this is where reasonable doubt comes in, ladies

 4    and gentlemen.  I want to talk to you for a moment.  The

 5    prosecution must prove beyond a reasonable doubt that Larry

 6    Rudolph murdered his wife.

 7         So I want to show you -- because this may be the

 8    most important thing I show you in my whole closing.  What

 9    does a not guilty verdict include?  It includes, first:  If

10    you believe that Larry didn't murder his wife.  Obviously

11    you'd find him not guilty, right?  That's an easy one.  If

12    you found that he most likely did not murder his wife, that,

13    too, is not guilty.  If you find likely that he did not

14    murder his wife, not guilty.

15         Maybe he did, maybe he didn't.  If you're back in

16    the jury room wondering, "I could go either way," that's a

17    not guilty verdict under the law.

18         If you go back to the jury and say -- go back into

19    the jury room and think, you know, I think he probably did

20    it, I think he probably did it, that's a not guilty verdict

21    under the law.  If you think he probably murdered his wife,

22    that's a not guilty verdict under the law.

23         If you think it's highly likely that he murdered

24    his wife, that's a not guilty verdict under the law.  The

25    only time you can find him guilty is if there's proof beyond

1    a reasonable doubt.

2              So remember when Cina said it was highly unlikely

3    that she accidentally pulled it -- even if we were saying

4    that that was the way -- which we're not -- what would that

5    be in this case?  What would that be?

6              Even Dr. Cina had reasonable doubt.  He said

7    although the pictures were suboptimal, although the autopsy

8    didn't meet the standards, it was his opinion that it was

9    highly unlikely this was an accident caused by Ms. Rudolph

10   pulling the trigger.  That highly unlikely standard is

11   reasonable doubt.

12             He admitted he did not consider whether this could

13   have been a drop by an accident.  He wasn't even asked to

14   consider it.  And he admitted on cross-examination that he

15   has seen death by shotgun accident when no one pulled the

16   trigger.

17             What about the gun witnesses?  How many people did

18   it take to make sure that that gun was safe before they

19   started playing around with it?  Do you remember the marshal

20   looked at it, the gun people looked at it, the agent was up

21   there.  I think there were three or four people up there

22   making sure it was safe.  And of course we want to make sure

23   it was safe.  We have to be extra careful.

24             Why do we have to be extra careful?  The shotgun

25   manual tells us:  Dropping a loaded gun can cause an

1    accidental discharge.  Don't believe me; believe the

2    Browning folks.  And remember when Ms. Moss, who -- you

3    know, I know Mr. Winstead and Ms. Moss learned more about

4    shotguns in this case, it was incredible -- but she asked

5    them:  Would you do a drop test with a loaded gun in this

6    courtroom?  No way.  No way.  Because that thing can go off.

7         She -- Ms. Moss also asked the Browning guy on

8    cross-examination about dropping the A-5 and he said, quote,

9    It's possible that if you drop this Auto 5, it could go off.

10        And at this point when I'm talking about guns, I

11   have to remember one more story with my dad.  My dad was a

12   lawyer like me.  I used to follow him around everywhere and

13   he was a lawyer like -- reminded me when I was watching Haag

14   and Baden, you know, around forever.  That was my dad.  And

15   as a little kid I would follow him around.

16        And I remember driving on the countryside with him

17   one summer, we were going to a trial.  I'd follow him around

18   to his trials.  And we saw on the side of a road a house and

19   a barn, and there was a 12-year-old kid there with a gun.

20   And as we drove by we saw these targets on the side of the

21   barn.  And each target had a bull's eye.  The kid had shot

22   right through the bull's eye.  My dad and I pulled over.  He

23   walked up to the kid, he said, "You got to show me how

24   you're such a good shot.  12 years -- how are you shooting

25   like that?"

1           So the kid took out the gun, was as big as him, he

2   was holding it up, and he shot into the side of the barn.

3   And he took out a little piece of chalk, walked up to the

4   bullet hole on the side of the barn and circled around it.

5           That's what the prosecutors have done in this case.

6   They've put a circle around Dr. Rudolph.  Anything that --

7   any fact that comes out they're going to spin in their

8   favor.  And the perfect one is Cass Olmstead.  Look at Cass

9   Olmstead.  This isn't a close friend of Bianca.  She didn't

10  call the police after all this happened.  She had an axe to

11  grind.  She said on tape, knowing she was tape-recorded with

12  Agent Dahlstrom, "I hope you bury him.  If I had anything

13  that would send him to the death penalty, I'd be knocking on

14  your door."

15          Who thinks like that?  Who talks like that?  It's a

16  woman with an axe to grind.  And the judge is going to tell

17  you how to evaluate witnesses.  And I want you to look at

18  what she actually said and what she actually did.  First of

19  all, she got caught, right?  Remember those emails were all

20  from 2010 and 2011.  That's how she got caught the first

21  time because if this happened in 2016 and she's telling

22  Bianca to print the emails, you'd have seen emails from '16,

23  '15, '14, '13, '12.  You don't see any.  But she got caught

24  in another way, really bad.  It was like a Perry Mason

25  moment.  She -- when she printed these emails, not Bianca,

her name was on the top.  Because when you print emails,

sometimes that's what happens.  And she had to fix that.

And so she put those all together when this SCI lawsuit was

happening, right around the same time in 2012, and there was

this rift and she didn't like Larry, and she held on to

that.

So they have witnesses like Cass Olmstead to try to

prove their case.  We have witnesses like Luke Haag.  Luke

Haag is the best gun expert in the world.  They cite to him

in their expert reports.  Even their own expert, Tom

Griffin, said that that was a blast hole 4 inches away.  And

the scientist said he cannot rule out an accident.  The

truth is they never considered it.  They just drew the

circle around Larry.

And what's the best example of that, ladies and

gentlemen?  This was an amazing moment I have never, ever

seen before in a court of law in a trial.  Prosecutor says

the postnup is no big deal.  Remember that?  No big deal.

Doesn't bother us at all, this postnup.  That's pretty

interesting because they sent it to Quantico, Virginia.

They didn't sent the shell to Quantico.  They

didn't send any of their testing to Quantico, but they sent

this postnup to Quantico because this destroys Cass Olmstead

and it destroys one of their motives.  So they asked Rachel

Clay, a decorated FBI official, to look at this.  She gives

them their opinion.  And they don't like it because it's not
in that hole.  Imagine if she had come back and said that
wasn't Bianca's handwriting?  They would be -- how big would
that be blown up for everybody in this case?  Then it would
have been a big deal, I bet.

It's the one time both sides' expert agree on
something.  Why are they so afraid of the postnup?  Because
it devastates their claim that he couldn't get divorced if
he wanted to.  But by the way, there's no evidence that
either one of them ever wanted to get divorced.  So all of
this talk about divorce --

COURTROOM DEPUTY:  15-minute warning counsel.

MR. MARKUS:  Uh-oh, okay.  Thank you, Ms. Guerra.

There's no evidence of that.  But if there was, the
postnup crushes it.  They tried to cast doubt on the
handwriting expert.  This is quite ironic because in their
view, there's doubt about whether this postnuptial agreement
is valid, even though two experts say it's valid, even
though there's law firm records, even though they sent the
FBI to Frank Langell's house after he testified -- after
Larry Rudolph testified on the stand and he said it was
legitimate.

If they think there's reasonable doubt in that
situation about the postnup, how is there not reasonable
doubt in this case?  If they're trying to cast doubt on a

 1    postnup where everybody agrees she signed it?  If that's

 2    reasonable doubt, please, we're way beyond it here.

 3            Let me show you for a moment what -- the prosecutor

 4    put reasonable doubt a couple of lines from the instruction

 5    on the stand.  This is the whole instruction.  There's a lot

 6    of words there.  I'll just read the first paragraph to you:

 7    The Government has the burden of proving the defendant

 8    guilty beyond a reasonable doubt.  The law does not require

 9    a defendant to prove his innocence or produce any evidence

10    at all.  The Government has the burden of proving the

11    defendant guilty beyond a reasonable doubt, and if it fails

12    to do so, you must find the defendant not guilty.

13            The very last line:  You must give him the benefit

14    of the doubt.  And that's what I'm asking you all to do

15    here.  Give Dr. Rudolph the benefit of the doubt as the law

16    requires.  He didn't do this.

17            So how do we know what reasonable doubt is?

18    There's lots of different ways.  I like this example.  So

19    there's -- we all know horse races, right?  We all have seen

20    horse races win by a nose.  That's not proof beyond a

21    reasonable doubt.  So if there's a horse race and somebody

22    wins by a little bit, not enough.  What is reasonable doubt

23    in a horse race?  Remember Secretariat in the Triple Crown

24    winning by 30 lengths?  That's what they have to do to win

25    their case.  That's reasonable doubt.  They're not even

1    close to that.

2           What about the blood experts?  Well, the blood

3    experts mostly agreed that she could have been bent over

4    when the shot went off because blood went down on her shoes.

5    That there may not be back spatter on the gun case because

6    it could have recoiled.

7           And this is important:  That she was backing

8    towards the bathroom where Larry was.  Now, if the

9    prosecution's theory is right and Larry shot her, what would

10   she try to do?  She'd try to get out those open doors.

11   That's where the blood trail would go.  But instead, Larry's

12   back to the bathroom; she's going for help.  Both blood

13   experts show that that's where the trail went, to the

14   bathroom where he was.

15          What about the forensic experts?  Well, both

16   forensic accountants agree that the Rudolphs were very, very

17   wealthy and didn't need the money.  So what does the

18   prosecutor try to do here?  He went from saying they needed

19   the money way back at the beginning of this case, now

20   saying, well, everybody wants money.  Well, of course

21   everybody wants money.  That's not the point.

22          So what are the four pillars of the prosecution's

23   case?  One, that she did not want the cremation.  Well,

24   again, we had to give them the will.  Larry couldn't afford

25   a divorce.  That was the second point they've mentioned.  He

3137

1    needed the insurance money.  And he wanted to be with Lori

2    Milliron.  Each of these pillars get destroyed.

3          First, Bianca's will called for cremation.  That

4    one doesn't hold up.

5          Bianca knew about Lori and many of the others.  We

6    know about that from Bianca's deposition.

7          Larry needed the insurance money.  His net worth

8    was 15 million, or as the Government says, 13 1/2, 14,

9    whatever it was.  He didn't need the insurance money.

10          He couldn't afford a divorce.  Well, we know about

11    the postnup with 2 million.

12          All of their pillars get destroyed because they

13    have no evidence.

14          What about Brian Lovelace?  This is where the

15    prosecutor started his opening, ended his opening, ended

16    their case, ended their closing.  They need Brian Lovelace

17    to win this case.  They have wrapped their arms around the

18    bartender to win this case because they know the science

19    isn't there, they know the proof isn't there, so they need

20    this statement.  But we know from Mr. Lovelace that he

21    didn't hear the whole statement.  He said it himself.  He

22    said he didn't hear the words right beforehand.  And we know

23    the timing lines up because the investigation was restarted

24    in 2019 and the FBI was in Africa poking around.  We know

25    that from the Swanepoels.

3138

1              Now what Mark Swanepoel said on the stand was that

2       he didn't tell Larry about him being interviewed until

3       August.  But he did tell him, Mark said and Larry said,

4       about them poking around in Africa.  And you heard Larry

5       said -- say that he spoke to Pieter Swanepoel about it at

6       that Dallas convention in early 2000, right after the FBI

7       reactivates their investigation.  This is critical.

8              And what does their witness say?  He said he didn't

9       think Larry did it.  Remember Brian Lovelace said that on

10      the stand?  Brian Lovelace said he didn't believe Larry did

11      this; that Larry's a good guy.  But they say it looks bad.

12             Well, it looks bad that the FBI didn't do a drop

13      test.  It looks bad that the FBI never tested the shell.  It

14      looks bad that the FBI didn't test the case.  It looks bad

15      that the FBI hung on to 1.8 inches instead of 4.  Want to go

16      back and forth with what looks bad?  I can do that every

17      single way.  But they have to prove their case.  They can't

18      say things like "bad" as proof.

19             And, Agent Peterson, thank you for being honest on

20      the stand about that, because there are innocent

21      explanations for every single thing in this case.

22      Cremation:  We have Bianca's will.  The speed of cremation.

23      Larry needed to get home.  What is he supposed to do, stick

24      around in Zambia?

25             The propofol -- by the way, as to the speed of

1    cremation for a second, Larry had to call Julian and tell

2    him about it because that article came out.  He didn't want

3    to have to do that.  He had to pick up the phone and call

4    him a few days afterwards.

5         The propofol, this is the -- I mean this is crazy.

6    You heard about the explanation from Mark and everybody else

7    about the propofol.

8         The funeral in Phoenix.  They tried to spin that

9    the wrong way.  But the Rudolphs lived in Arizona and that's

10   where the family was going to be on the trip afterwards.

11        Okay.  This is one that Mr. Winstead didn't talk

12   about, but I'd like to talk about for a second.  The

13   shotgun.  Remember, there was no investigation -- the

14   Zambians gave it back to him, Otto gave it back to him.  We

15   can't win here.  We gave them the soft case, the hard case,

16   our experts.

17        Larry, in 2018, when he comes across that gun in

18   the garage, who would want it?  Yes, he got rid of it.

19   There was no investigation at the time.

20        You heard Luke Haag say that he has many guns from

21   when people have accidents and they want to get rid of it

22   and they give it to him.  There's no reason Larry would keep

23   that gun.  If he was under investigation, when we found out

24   they wanted things, we gave them everything we had.  Even if

25   it -- Larry could have gotten rid of that, too.  I could

Case No. 1:22-cr-00012-WJM    Document 460    filed 10/31/23    USDC Colorado    pg
74 of 134

3140

have called Larry and said, "Hey, they want this soft gun
case."  Gone.  If they want to prove their case, they should
have done a search warrant in '17 or '18 and they would have
had this gun, but they didn't.

What about the amount of insurance?  Well, we heard
that Larry wasn't insurable.  His net worth was rising.

The affairs.  This was the arrangement the Rudolphs
had.  We've heard a lot about that.  You saw Bianca's letter
yourself -- please read that letter when you're back
there -- to Larry.

The jewelry.  The jewelry went missing.

The bartender.  You herd Lovelace say he didn't
hear the whole sentence.

The truth is, ladies and gentlemen, there's direct
and circumstantial evidence.  The judge told you that you
should weigh them equally.  There is no direct evidence in
this case.  So who does the circumstantial evidence support?
It supports the defense.  The windows and doors were open.
They were getting along.  Larry was standing in the
bathroom.  His reaction was authentic.  There's no blood on
his hands, clothes or shoes.  There's no fingerprints, DNA,
or residue linking Larry to the shooting.

The Swanepoels think it's an accident.  The
Zambians think it was an accident.  The insurance companies
paid the claims.  Larry gave interviews with the police,

3141

1    insurance, and here in court.  Larry's kids are here

2    supporting him.

3         Both experts say the postnup was legitimate.  The

4    circumstantial evidence is with us; not with them.

5         What about Larry testifying?  He didn't have to

6    testify.  He didn't have to get on the stand and subject

7    himself to five hours of cross-examination by this clever

8    prosecutor who tried to make things look bad; who tried to

9    catch him.  You saw Larry.  You can judge him for yourself.

10   It's not up to them, it's up to you all.  He was honest with

11   you.  He told you where he messed up.  He told you when he

12   lied.

13       For Larry to have done this, he would have to be the

14   greatest actor of all time, both at the time and on the

15   stand.  He would have to be the greatest forger of all time.

16   He would have to be the greatest shot of all time shooting

17   through a case.

18       You know, they blame him for not talking to Sherry Rice

19   in 2017.  But they also blame him for testifying here.  Did

20   you see that?  Mr. Fields said, "You've had all this time to

21   think about your testimony."

22       I can't win with the guy.  If you don't talk, you're

23   guilty.  If you talk, you're guilty.  Heads I win, tails you

24   lose.  It's amazing.  Put that circle right around you.

25       They've made much of the fact that Dr. Rudolph went

1    to Vegas, went off with Lori Milliron.  Everyone grieves in

2    different ways, ladies and gentlemen.  And, yes, I will be

3    the first to admit it doesn't look good that Larry went off

4    after Bianca died.  After a tragedy we all need to pick up

5    the pieces and get through it any way we can.  Lori was

6    there for Larry and he turned to her.  He didn't have

7    friends to turn to.  But this is not proof of murder.

8         Imagine if the opposite happened.  Imagine if he

9    had just gone into hiding.  They would have said, "See, he's

10   trying to distance himself from Lori because it looks bad.

11   That's guilty."  Heads I win, tails you lose.  You can't

12   win.  Look at this case through clean windows, not through

13   dirty windows.

14        The prosecutor says they're having estate planning

15   in 2016.  That must mean he's guilty.  They're setting up a

16   trust in 2016, that must mean he's guilty.  They have an

17   argument for every single fact because they assume guilt.

18   They refuse to acknowledge any other possibility.

19        Uh-oh, there's a will.  Let's turn to speed of

20   cremation.  Uh-oh, he needed to get home.  Let's look at

21   when he set up that trip.  Of course he set it for Phoenix,

22   where -- what else is he going to do?  He didn't know where

23   he was going to go yet.  But you all know how dangerous this

24   can be.

25        Have you all heard the expression:  There are none

3143

1    so blind as those who will not see?  There are none so blind

2    as those who will not see.

3              COURTROOM DEPUTY:  Two-minute warning, counsel.

4              MR. MARKUS:  The prosecution is blind to any

5    possibility except the one it wants to see.  But just

6    because these prosecutors refuse to look at everything

7    doesn't mean that you all can't.

8              When there are innocent explanations, give the

9    benefit of the doubt to an innocent man here.  Don't

10   compromise back in that jury room.

11             I've only got a few seconds left.  I'm going to sit

12   down and I'm going to pull my hair out, what's left of it,

13   because I know I'm going to forget some things I wanted to

14   say.  And you're going to see me during Mr. Fields' closing

15   wanting to jump out of my chair and respond.  I'm not able

16   to.  This is it.  This is all I got.

17             But I think over these three weeks you've gotten to

18   know me a little bit.  You know the arguments that me and

19   Ms. Moss and Ms. Doyle would make.  So when Mr. Fields is up

20   there making his pitch, think about what we would say

21   because you know I would be jumping up and responding to

22   every one if I could.

23             Like I said when I started, I want to thank you

24   guys.  It's not easy to sit through this.  It's not easy to

25   see those pictures.  It's not easy to feel the pressure from

3144

1    everybody here.  This is -- this is tough.  But this is the

2    most important thing you can do.

3            One of the things my dad used to tell me is, you

4    know, don't live with regret.  Try to -- if you regret

5    something, go live your life and fix it.  And I've tried to

6    live my life that way.  With your jury service, there's no

7    coming back.  There's no coming back.  If you have doubt in

8    a week, you can't come back and say, "Judge Martinez, I need

9    to fix this."  This is it.

10           Ladies and gentlemen, we're way beyond reasonable

11   doubt here.  Larry Rudolph is innocent.  I'm telling you:

12   He's innocent.  He did not do this.  He took that stand and

13   told you, he opened himself up to you.  He's innocent.  He

14   did not shoot his wife.  I'm asking you all from the bottom

15   of my heart to send him home to his children, Julian and

16   AnaBianca.  Please, do the right thing here.  He's not

17   guilty and I'm asking you to follow the law, follow your

18   common sense, and follow what's right.  Thank you.

19           THE COURT:  Thank you, Mr. Markus.  All right,

20   we're going to take our morning recess.  We will be in

21   recess for 15 minutes.

22           (Recess taken 10:58 a.m. to 11:17 a.m.)

23           THE COURT:  All right, closing argument for

24   Defendant Milliron.

25           MR. DILL:  Well, hello again.  Want to start out as

3145

1    I first talked to you about thanking you obviously for being

2    here, taking this time out of your lives.  And, again, it

3    really goes beyond just thanking you like, "Oh, we're happy

4    you're here."  This is really about now, at the end of the

5    day, about you.  And remember when I talked to you at the

6    beginning in voir dire, this wasn't the case for everybody.

7    And a lot of folks said, "You know what, infidelity, things

8    happening to animals, all the other noise that -- this isn't

9    the right case for me because of that."

10        But each one of you -- when we talked about it,

11   each one of you took an oath and you promised the prosecutor

12   and you promised us that you'd judge this case on the law

13   and the facts.  And as the judge read to you yesterday and

14   you're going to have it written here, there are two judges

15   here.  He's the judge of the law and you judge the facts.

16        And, again, what I want to talk to you about today

17   is the facts that you've seen.  And we've noticed that when

18   the facts come up in this case, when you hear actual facts

19   and evidence and not speculation, we see how engaged every

20   one of you are.  And there's a reason that we have the jury

21   system in America.

22        You know, it's interesting, my colleague said, when

23   he was talking about the Embassy in Lusaka, and he said,

24   "Well, did you see that monument to American greatness

25   there?"  And you -- honestly, if it gets right down to it,

1    there's really -- the thing that makes America truly great

2    is this:  it's you.  It's this system.  Because we don't

3    take away people's freedoms just on the whim of a prosecutor

4    or a cleric or the press.  Citizens come together, 12 of you

5    come together, and you talk to each other.  As I said at the

6    beginning, you talk to each other about the facts and what

7    you've heard and apply it to the law.  It's kind of like

8    when 12 people get together, you're obviously 12 times

9    smarter than everybody here because not only do you look at

10    the law, you look at your life's experiences, you look at

11    what makes sense to you.  You said, "Hhm, that seems funny.

12    That doesn't make sense to me.  That's a reasonable doubt

13    that I have about something.  Let me challenge it."

14         So your job in this case, your job in a few

15    moments, is going to be to talk to each other about what the

16    judge read to you yesterday, all of that evidence and this

17    verdict form that you're going to have.  And there's

18    questions here.  And there will be -- I'll talk to you about

19    the verdict form not just yet, and there's questions, and

20    the judge mentioned it yesterday, and you need to go through

21    each count and you're going to talk to each other, and --

22    about how you feel about each count.

23         And, again, that's the time when if somebody says,

24    Well, you know what, this is awfully fishy.  This is

25    strange.  I'm -- that's suspicious to me.

3147

1            Remind them, say, "Now we have to decide not on

2       suspicion, not on whether we like the lawyers or the

3       defendants, we have to decide on whether the Government has

4       proven their theory, their theory, beyond every reasonable

5       doubt."

6            It isn't, "Hey, I'm not really sure what happened.

7       You guys figure it out," which appears to be the case here

8       on the part of the Government.  Because, amazingly, I

9       haven't heard once, not this morning, not this entire three

10      weeks, how they think this happened.  We heard a lot of,

11      "Oh, well, maybe.  Maybe it was this.  Maybe it was that."

12           We're the ones who say it looks like an accident.

13      But guess what?  They have to prove it wasn't an accident.

14      It isn't incumbent upon the defendant to come in and say

15      this was an accident.  They have to prove it was not.  And

16      when they don't have the proof, what do they turn to?  The

17      same tired tropes that we've heard all along.  The movie

18      they want you to see of the villainous, greedy dentist, and

19      the femme fatale ice queen, the jealous one; they said

20      playing second fiddle.  That's the movie they want you to

21      see.  But what's reality?

22           And we tried to dig through what is real and what

23      is noise in this case.  And, again, you heard it this

24      morning about:  Lori wanted to move from this house to this

25      house.  Because, after all, don't all women just want to be

3148

1    in a big house?  Isn't that what everybody wants?  Really?

2    I mean, truly?  Is that what we've come to?  We look at what

3    they're casting my client, Lori Milliron, as, as a second

4    fiddle who would do anything to preserve her lifestyle.

5         Forget about the fact that she raised three

6    children by herself.  Forget about the fact that she's

7    basically running a multi-million dollar company.  Forget

8    about all that.  She wants the money.

9         Guess what, wow, that's the type of thing you look

10   at, you might pass on the internet, and it might get your

11   attention.  But let's not forget this saying, which is by

12   Christopher Hitchens, and they call it a razor.  Not like

13   Harry's razors, but they call it Hitchens' razor.  And this

14   is true in the law and it's true in life:  What can be

15   asserted without proof can be dismissed without proof.

16        If somebody makes an argument to you that the

17   Illuminate run the Government or this is all a simulation,

18   just remember, "Well, prove it."

19        The same thing here.  They think that Dr. Rudolph

20   is a murderer and my client knew about it and lied to

21   protect him?  Prove it.  Show us the proof.  There is no

22   proof.  There's a lot of maybes.  We heard a lot of maybes

23   from Mr. -- my colleague, Mr. Winstead.

24        Well, maybe when they went to Phoenix, maybe that's

25   when she went and slept in the bed, and maybe that is when

1    the hair pins were there.  And so maybe that is when Cass

2    found out about it and maybe that's when somebody got mad.

3    That's just the purest of speculation.  It was interesting,

4    I saw where they were going with that with the -- with the

5    trip in March.  And you may recall that when they said

6    what -- "Didn't she get to go to Phoenix in March?"  Because

7    they were setting up the whole -- oh, she must have slept in

8    the house and left the hair pins there.  Right?  That's kind

9    of their timeline and theory here.

10            And I asked Ms. Newton, "Well, isn't there a credit

11   card bill from my client when she paid for her own flights?

12   Isn't there a credit card bill at the Phoenician Hotel?"

13            She's like, "Uh, yeah, there sure is."

14            And of course my colleague Mr. Fields says, "Well,

15   she didn't pay for it."  Well, of course, Dr. Rudolph paid

16   for it.  But why would my client be at this house and drive

17   out to the hotel just to go to the gift shop?  Does that

18   make any sense?  That makes no sense at all.  That's not

19   what happened.  She was staying at the hotel, the

20   Phoenician, just like Dr. Rudolph said.

21            But pay no attention to that, it's the prosecutor's

22   timeline here.  That that was the start of all this plot.

23   So I guess he's going to argue, "Well, they had to know that

24   maybe somebody will find the hair pin, so she went to the

25   Phoenician Hotel to throw them off the scent."

1           Because if you look at every fact in this case, it

2    always goes back to the most nefarious spin.  Again, if all

3    you have is a hammer, everything is a nail.  Everything that

4    my client does is nefarious and bad and it has to fit with

5    their story.  But let's look through what the actual facts

6    are here.

7           And as I said before, when we hear the pitch, when

8    we were here the other day -- and my colleague did an

9    excellent job in opening and told us about a restaurant

10   called Steak 44 in Phoenix, and that day, "I killed my F-ing

11   wife for you."

12          Well, that will get your attention.  But I suggest

13   that we've encountered this attention-grabbing technique

14   before.  All the time.  You see something and you say, "Wow,

15   that's interesting.  Dentist murdered his wife for insurance

16   money to run away with mistress?"  Let me click on that.

17   And we see it all the time.  We see it on the internet.  I

18   see -- we see clickbait, which is what the Government's case

19   is, all the time.  And inevitably with every one of these,

20   it's interesting at first and sounds pretty crazy.  It's

21   like, God, I got to dig into this and find out what this

22   means.

23          And just like in this case, by the time you go

24   through and you scroll through and you get a bunch of ads

25   and pop-ups and you get to the bottom, there's nothing.  And

1   here, what they're saying is, "Well, we're not really sure

2   what happened, if he murdered his wife or if Lori Milliron

3   lied about it, but figure it out yourself."

4       But that's not proof.  It's not grabbing on to the

5   headline and getting your attention and saying, "Wow."

6       Your job in this case is to hold them to their job.

7   Have they proved every element, every element, of all of

8   these counts?  And there's seven against my client, seven.

9   We'll go through that in a moment.  Have they proved every

10  element of each count beyond a reasonable doubt?  And,

11  again, we heard from my colleague and friend, Mr. Markus,

12  that this is an important case.  But I would suggest it's an

13  even more important case than something the media's

14  interested in.  This case is about whether we still believe

15  in reasonable doubt and whether we hold the Government to

16  that burden or whether that's just a word we hear on cop

17  shows, because the Government has not proven this case

18  against my client and, I suggest to you, and I suggest the

19  evidence has showed, against Dr. Rudolph, either, beyond and

20  to the exclusion of every reasonable doubt.

21      Now, I've talked about these texts a few times

22  because the Government's theory is my client is on a mission

23  to go in and keep Dr. Rudolph from being indicted.  Okay?

24  Remember the timeline.  They're saying she went to a hearing

25  and she heard some things and so, therefore, she was going

1    to go in and keep the grand jury from indicting Dr. Rudolph.

2    Okay?  But we know also the context of her mindset

3    beforehand.  We saw it.  "Do I need to get a lawyer?  I just

4    don't want to say the wrong thing."  And as Mr. Markus told

5    her, "Just tell the truth."

6          Well, unfortunately, if it's not the truth the

7    Government digs, then she's got a problem, okay?  So if

8    she's guilty of anything in this case, it's being naive

9    about what was really happening, what the purpose of her

10   going in front of the grand jury was.

11         We see here, we just heard it this morning from

12   my -- from Mr. Winstead, she never said anything about

13   anybody else being generous.  Well, this text is before she

14   testified.  Again, she's trying to tell Mr. Markus, "Hey, in

15   this hearing coming up, it's really important for everybody

16   to understand how generous Larry is."

17         But they're trying to spin that by one line of one

18   sentence out of her grand jury testimony.  Now the

19   interesting thing about the grand jury testimony reminded

20   me:  Has anybody gone to a movie and seen the preview and

21   the preview is, "Wow, man, I can't wait to see that;

22   that's -- that's going to be amazing."  But then you go to

23   the movie and you're like, wait a second.  This is pretty

24   terrible.  The scenes -- they took just the good scene --

25   one or two good scenes and then they chopped them up and all

3153

1      around.

2              Did you notice when Agent Peterson was on the stand

3      and instead of looking at Exhibit 71, which is my client's

4      grand jury testimony, and going through it the way it was --

5      came together:  Go to page 70, go to page 15, now cut out

6      this paragraph here.  Cutting and pasting different things

7      to make it look like my client is lying.

8              But when I asked Agent Peterson:

9              Wasn't she truthful about this, about she had an

10     affair?

11             Yes.

12             Wasn't she truthful that he supported her?

13             Yes.

14             Wasn't she truthful that the money came from Larry

15     Rudolph?

16             Yes.

17             Okay, so where -- where's the lie?  The lies, I

18     suggest to you, didn't come from my client, but let's talk

19     about the evidence that they brought against her.  And not

20     the chopping up the grand jury testimony going back and

21     forth and saying, "Ah-ha, looky here."

22             Anna Grimley.  Remember Anna Grimley, who came in

23     and said that my client was from Texas?  And had two kids?

24     And didn't remember her last name?  Okay.  Anna Grimley who

25     said, "Oh, I just left because I wanted to.  I left Three

1    Rivers Dental group because I wanted to."

2            But, interestingly, turns out that she was

3    disciplined and fired and -- we went through all of that.

4    But most importantly, most importantly, she said to you,

5    "Oh, I'll never forget what Lori Milliron said.  I'll always

6    remember it."

7            And I asked her three separate times, what did she

8    say?  And I submit to you when it's something you'll never

9    forget, it's just that.  It's not like, "Well, I don't

10   really remember the conversation," which is what she said

11   first, and on tape.  It's not, "Oh, she said in a year

12   something was going to happen."  And it's not the third

13   time, "Oh, she told me she had given an ultimatum the year

14   before and then she had a year and now he had another year."

15           So is that the type of evidence that firmly

16   convinces you that my client lied in front of the grand jury

17   about the ultimatum?  I mean, look at your notes and talk to

18   each other about what Anna Grimley said because that's the

19   cornerstone of why they say she's a liar.  This woman who

20   can't even remember her last name; and doesn't remember what

21   she said.  And I suggest to you, if you're going to convict

22   somebody on words, if you're going to prosecute somebody on

23   words, words are important.  And look at what -- the words

24   that Anna Grimley said when you look at your notes and talk

25   to each other about these counts.

1           Sherry Houck.  Again, remember Ms. Houck came in

2    here very timid, "Oh, I'm sorry I don't really . . ."

3           Well, right out of the box:  You hate Lori, don't

4    you?

5           Well, no, I didn't hate her.

6           Well, didn't you send a text message that you hate

7    Lori?

8           And isn't it interesting that she's looping Lori

9    into this story that they want to make nefarious about the

10   propofol, the plan B?  I have two words for the propofol

11   theory:  Come on.  Honestly, so Lori -- there's propofol

12   that's ordered in July, among all the other things.

13   Dr. Rudolph has said what it was for.  We heard from

14   Dr. Cina that there was no, "Hey, get away from me with that

15   needle."

16          It's almost laughable, but yet this is the evidence

17   they're bringing in here?  Sherry Houck, who attributes

18   movie quotes wrongly to something evil.  He used to say

19   things like, "Cats and dogs."  Well, then we find out that's

20   from Ghost Busters.  He used to say things like, "It's not

21   rocket science."  Talks about going inside, I submit to you.

22   And she didn't remember Shawshank.  But Dr. Rudolph did.

23   He's talking to her.  Is he really going in there and

24   saying, "I'm going to prison"?  I mean, honestly?  Just out

25   of the blue?  That's what they wanted you to believe.

1    They're saying, "Ah-hah, look here."

2    And, finally, Rachel Anders.  Who honestly came in

3    here and all she had to really say was that Lori allegedly

4    said bad things about Bianca.  Well, that didn't happen.

5    Remember, Dr. Rudolph doesn't even know who she is and now

6    they've got her in there watching, listening to their

7    conversations.  Was he really saying in front of Rachel

8    Anders, "I -- you know, I don't want to get divorced."

9    We've seen the evidence on this.  And so she used

10    the term saying that my client called somebody a bitch.  I

11    mean, you think that really happened?  It was interesting.

12    Remember when she got up, it was like, "She's like a second

13    mom to me."

14    Then I said, "I thought she's a money hungry

15    bitch."

16    "She is."

17    Well, maybe it had something to do with her obvious

18    drinking problem, passing out drunk in front of the

19    Applebee's the night before she talks to the FBI.  Having

20    not one, not two, but three kids from three different

21    fathers taken away from her.  Maybe it has something to do

22    with:  Instead of raising her son, her son's being raised by

23    Lori.

24    She hasn't seen this -- her son, Rachel Anders'

25    son, in eight years.  And why would somebody have an axe to

3157

1    grind against Lori?  You think she's really coming in and

2    doing like she said, "I needed to do the moral thing."

3    Well, the moral thing like putting cigarettes on your son's

4    back?  Like that?  That type of morality?  This is the

5    quality of the evidence that they're bringing against my

6    client?

7           And, again, maybe there's just a little bit of

8    jealousy.  Rachel Anders isn't getting the Mother's Day

9    card; Lori is.  So when you're weighing out the evidence,

10   when you're looking at it, does this prove -- to firmly

11   convince me beyond a reasonable doubt that these things

12   happened, or maybe, just maybe, does somebody have an axe to

13   grind?

14          Again, where are the lies?  That's a -- that's

15   really what it comes down to.  You're accusing her of lying.

16   Show me the lies.  And, again, not something out of context;

17   not a cherry-picked sentence.  Again, it's pretty easy to

18   cherrypick things and say, "Aha, look, see.  This is a lie

19   and then later they got caught on it."

20          Well, that didn't happen.  Read the grand jury

21   transcript from front to back.  71.  Did she say, "Now you

22   caught me?"

23          No.  And understand, my client who's come in there

24   voluntarily, okay, doesn't fight the subpoena, doesn't run,

25   doesn't hire a lawyer, doesn't take the Fifth Amendment,

1    naively thinks I'll just go in and tell the truth.  And of

2    course they're, "Well, we're just investigating, gathering

3    information on this crime."

4         Well, gathering what information?  They've already

5    arrested Dr. Rudolph.  They've already been working on it

6    for six years.  They just so happened to have all her

7    financial records sitting right there in front of her.  Was

8    this really to gather information or was it to trip her up

9    for future use?  Because take a look at the question.  And

10   again, you've heard my colleague, and he's an excellent

11   questioner, he's the one doing the questioning in the grand

12   jury testimony.  Okay?  And I submit his tone at times can

13   be a bit, shall we say, accusatory.  And listen to how the

14   questions come.

15        Do you remember in 2015 depositing $20,000 in cash?

16        No, I really don't remember that.

17        Do you recall in 2016 depositing $160,000 in cash?

18        Well, no, I don't remember.  I don't recall that.

19        Well, that's before he shows her the materials.

20   How many times did we sit here and refresh recollection when

21   somebody didn't recall something?

22        Agent Peterson, I counted up 16 times in this

23   courtroom said, "I don't recall.  Let me look at the

24   documents."

25        Do you think he was lying?  Was that lies?  But,

1     no, they want you to believe that my client, when she didn't

2     recall, really did recall and is lying.  And why is that?

3     Why is that?  Because they've charged her saying that she's

4     a liar.

5               Now here's a cherry they did not pick and show to

6     you.  Remember in opening my colleague said, "She went in

7     front of the grand jury and denied having an affair."

8               Well, hold up.  What?

9               Why did they want to talk to you?

10              Because we had an affair.

11              We didn't hear that theory now.  Now it's like,

12    well, maybe she was -- maybe not answering truthful here and

13    maybe later.  That's not their charges against her.  They're

14    saying she came in and intentionally lied in front of the

15    grand jury, and she did not.

16              Remember "just friends"?  And, heck, we even had it

17    now, taking things out of context.

18              What was your relationship?

19              We were friends.

20              Aha.  See.  See.  You're guilty.  And then they

21    tried to spin it.  Detective Peterson -- sorry, Agent

22    Peterson was, "Oh, they said they were just friends."

23              Okay, well let's take -- again, context is

24    everything, okay?  Because if you're going to charge

25    somebody for lying, you need to look at what they actually

3160

1    said:

2           What was the nature of the personal relationship?

3           We were friends.

4           And, of course, they spin that into "Aha."

5           Well, were you ever anything more than friends?

6           You know what the lie would be?  The lie would be

7    no.  But what was the answer?

8           Yes, we traveled.

9           Did you have a relationship?

10           Yes.

11           Were you having a sexual relationship?

12           Yes.

13           Was he supporting you financially?

14           Yes.

15           Where's the lie?  Point it out to me.

16           These cash payments, was that part of his

17    supporting you?

18           I would say so.

19           While you were in the relationship?

20           Yes.

21           And the payments to your daughter?

22           Yes.

23           And, again:  Well, now that I've shown you the

24    deposits after the gotcha question, all these things down

25    here:

3161

1          I did know why he gave the money.  I don't know why

2    specifically each deposit was for.

3          Okay?

4          That's exactly what we saw in this courtroom.  "I

5    don't remember exactly."  "Show me the documents."  "Yeah,

6    okay, I see it."

7          She never denied it once.

8          Count 5 -- and, again, the reason I'm talking about

9    counts, because they got -- these are the counts against

10   her.  Count 5.  What's the allegation?  Take a look at this

11   indictment.  It's attached to the back.  The underlying

12   things are where they're saying she's lying:

13         At the time you were working at Three Rivers, did

14   you have any other -- any other substantial source of cash

15   income?

16         I can't recall.

17         They're like, who doesn't remember another source

18   of cash income?  Well, let's not -- how does she not

19   remember this cash in addition to her salary?

20         Again, you see here, take a look at Exhibit 2.

21   There's an analysis of cash deposits, not the deposits.

22         Do you remember $20,000 in cash going into the

23   account?

24         No, I don't.

25         $60,000 in cash.

1              Making it sound like it's a big lump sum.

2              I don't remember that.

3              Then when they go through it:

4              Yes, I remember.

5              But how about the substantial source of other

6      source of income?  Gosh, everybody would know that, okay?

7              He says here:

8              These are deposit slips for cash into your account.

9      Who was the source of it?

10             Larry Rudolph.

11             True.

12             For what things?

13             Expenses.  Bills.  Tuition.

14             Where's the lie?  They accused her of being a liar.

15     Where's the lie?

16             This is the thing on substantial source of income.

17     Let's not forget we heard it.  She was taken off the

18     official payroll sometime around 2010 because the fax had

19     been sent to the office about a cruise and that had

20     embarrassed Bianca because that fax then got over to the

21     house.  So he did take her off the payroll but that doesn't

22     mean that he wasn't still paying her.  They put it together,

23     the TRDG income, in 2014, 2015, 2016, 2017, and the cash

24     deposits.

25             Well, TRDG and Larry Rudolph are one and the same.

1    They -- it isn't like she had some side hustle that they're

2    getting a gotcha on.  It's all coming from him.  The

3    income's from him.  And she even says:

4         I didn't get it for my wages but he paid me

5    otherwise.

6         So where's the lie?  This other substantial source

7    of income, it's all from the same place.  That's not a lie.

8    That's not perjury.

9         We see here, January 10th, this is in evidence.

10    The payroll from January 10 to March 2022.  And, again, she

11    goes back on the payroll now in September, a year later.

12    Right around the same time that she gets put on the AmEx,

13    okay?

14         So where is she at the time she's working there at

15    substantial other sources of cash income?  And even in 2017

16    she's still getting cash from Dr. Rudolph, just like she's

17    getting income from Three Rivers, just like she was all

18    along.

19         This is Count 6.  So I submit to you Count 5, not

20    proven.  Not guilty.  She didn't lie.

21         Count 6:  Why was he so generous to you?

22         I don't know why.

23         See, again, pulling things out of context,

24    cherry-picking a statement, to make it look like she's

25    trying to hide something.  Well, how was she hiding

1    something when she's saying he's supporting her?  It doesn't

2    work like that.  You don't come in and say, "Yeah, we're

3    having an affair, we were having sex."

4            He was paying for things.

5            And why was he so generous?

6            Well, at the end of the day, remember he said,

7    "She's my girlfriend but also she's my manager.  She's

8    running my business."

9            Okay?  Again, why was Larry exactly doing it?

10   Larry's the one who makes the decisions.  Again, and -- but

11   yet they're asking her to say it, "Tell me exactly why.

12   Speculate on the exact reason he did."

13           And she goes, "I don't know the exact reason."  But

14   she admits she was his girlfriend, she admits she got cash

15   from him.  How can this be a lie?

16           Count 6, I submit to you that they have to prove

17   that it's an intentional misrepresentation which was

18   material to the grand jury.  Grand jury that ended up -- did

19   exactly what they wanted them to do, which was return an

20   indictment against Larry Rudolph.

21           Again:  I know why he gave me money.  I didn't know

22   specifically each one, what it was for.

23           And I submit there's nothing in these instructions

24   that says to you:  Hey, if somebody says something and it

25   looks fishy and then later they clarify it, they're guilty

1    of the looking fishy thing.

2            It's incumbent upon the questioner to ask the

3    questions and she can only answer what she knows.  This was

4    not a lie.  She was not misleading them.

5            AmEx, Count 7.  Again, the whole theory on that

6    was:  This wasn't a perk.  How could it be a perk?  Because

7    the low-level dental hygienist, they weren't on the card so,

8    therefore, it must be something else.  Well, we know she

9    went back on the payroll.  We know she's basically second in

10   command.  We know also that Julian, who was the attorney for

11   the company, was also on the payroll and he was also

12   signatory.

13           And what are the amounts on this?  I mean, again,

14   as she said:

15           They're saying this was a lie.  This was part of my

16   Three Rivers Dental card.  It was part of my perks, I guess.

17           Well, look at the income here.  She said she had a

18   limit.  It's about $22,000 a year?  2500 a month.  And

19   notice that her salary is lower.  In fact, it's interesting:

20   She's making less money after this so-called murder that she

21   knew about, she's making less money afterwards.  That

22   doesn't -- that's not consistent with somebody who

23   supposedly knows and has done all this to run away with the

24   money.  That's not what the facts are.

25           Ultimatum.  Again, we talked about that.

1              I don't think I gave him an ultimatum.  I don't

2      remember.

3              Did you ever tell anyone you were thinking about

4      that?

5              No.

6              And they are basing that on one and only thing, and

7      that's Anna Grimley, and who doesn't know if the ultimatum

8      was given and doesn't even know if that's her word or the

9      FBI word.

10             So she's lying here?  Is this a intentional

11     misrepresentation?  No.  Not guilty.  Not proven on 6, not

12     proven on 7, not proven on 8.

13             And then finally on 9:  irritated.

14             Did he proclaim his innocence?

15             He probably did.  I don't really recall that.

16             Well, guess what, if she's going in there to hook

17     him up, isn't she saying:  Absolutely, I know he was

18     innocent.  I -- let me help you.  You know, let me help him.

19     Let me tell you all kinds of things.

20             She's answering honestly here.  She was irritated

21     there was an FBI investigation because he felt he was

22     innocent.

23             And remember, even under their theory, their theory

24     that this was a confession in Steak 44, even under that

25     theory, he didn't say, "The FBI's launching an investigation

3167

1       against me."

2               What he said was, "They're saying I killed my f'ing

3       wife for you."  That's what she heard.  And so they said,

4       well, no, it was later so therefore -- later she found out

5       that it was the FBI, so therefore she's lying.  "Therefore

6       we win."  That's not true.

7               And let's talk about Steak 44.  And my colleague

8       hit on this but I just want to talk about it in context.

9       Okay.  We heard from Brian Lovelace but let's just talk

10      about the statement itself, okay?  It's -- is Dr. Rudolph --

11      assuming he did do it, is he really going to say to her, the

12      only person that has this alleged confession, is he really

13      going to say, "Hey, by the way, I killed my wife for you"?

14              Is that his trump card now?  As they said in

15      opening, that's his trump card.  That doesn't make sense.

16      If he really did it, he's just going to tell somebody?  A

17      person who now knows?  That doesn't make sense.  And from

18      her perspective, too.  Like I said, is that the type of

19      thing that any person says, "Oh, you shouldn't have gone to

20      Jared."  I mean, that's not what people say.

21              And more importantly, let's not forget this:  If

22      this was a Bonnie and Clyde moment that Bonnie and Clyde are

23      confessing and they -- the bartender overhears the crime, do

24      they really come back the next week for calamari?  I mean,

25      honestly, if they were so busted about the confession, are

1    they really coming back into the same place and saying,

2    "Hey, what's going on?"

3           No, it was an embarrassing thing that was overheard

4    out of context.  Nothing more than a joke maybe overheard

5    when the music slows down and stops.  It's not the

6    cornerstone of everything.  It's not -- again, taken out of

7    context like everything else.  It's not proof beyond a

8    reasonable doubt.  It is what it is.  And you heard Brian

9    Lovelace himself saying, "I just heard what I heard."

10          So we heard a lot about trapping leopards, that

11   type of thing.  But in this case, Government wasn't hunting

12   a leopard, wasn't -- that wasn't the trophy.  The Government

13   was hunting an equal and valuable trophy:  the high-profile

14   defendant.  And, again, how do they -- what can they do?

15   They have a case that's not very strong; not a lot of

16   evidence, you know.  Wouldn't it be great if we could get

17   somebody to come in and maybe leverage against him a little

18   bit?  Come in front of the grand jury and answer some

19   questions.  Of which we already knew the answers, by the

20   way.  And now we have this Brian Lovelace thing.

21          She wasn't indicted by that grand jury.  Now they

22   come back later and pile up, not one, not two, not three,

23   not four, five -- six counts against her.  Now if only they

24   could get somebody to make their case just a little bit

25   easier.  Maybe it will be a little bit easier if somebody

1    would say, "Yeah, that was a confession," maybe that would

2    be helpful.  So take a look at what was really operating

3    here, why my client is here.  Ask yourself those questions:

4    Why?

5         Now, the Government has a job to do.  Okay?  And

6    remember the Government's job is not to throw it out there

7    to you and say, "You figure it out."  It's not to say, "This

8    seems suspicious and fishy.  You decide."

9         It's to prove to you so you do not have any

10   hesitation.  You have a firm conviction about:  This

11   happened.  That:  I could picture it in my mind.  This is

12   what happened.  I can picture it in my mind firmly that the

13   client -- my client lied.  The best they've come up with is,

14   "Yeah, it's suspicious."  Okay?

15        And it wouldn't be fair for me to paint them as

16   cartoon villains.  I mean, honestly, you know, it's the

17   Government.  We think of the FBI, we think of this monolith.

18   But it's a human institution; it's a human institution.  And

19   people get caught up.  Were they -- did they believe what

20   they wanted to believe?  Did they look at only the things to

21   confirm their theory?

22        I mean, when I asked Agent Peterson, "Did you

23   listen to the tapes of my client saying, 'I'm going to go in

24   there and tell the truth'"?

25        He says, "Oh, somebody must have."

1           Well, if he doesn't know it, he didn't listen to

2    it.  That's, I would submit, not premier police work.  But

3    if he did, if they did and they did hear that, that's even

4    worse.  And, again, because this is -- because blinders are

5    on, because they want to focus on only what they want to

6    hear, that they disregard everything else and now they hope

7    you'll disregard it all, too.

8           Remember, Government's job is to prove this case so

9    you look at it and you say without hesitation, beyond a

10   reasonable doubt, yes, yes, yes, yes.  Not maybe.  Not look

11   at the suspicion.  Not say this thing seems fishy.  I don't

12   really like these type of people.  I'll help them out and

13   I'll return a verdict for them because, after all, it is the

14   Government, it is the FBI.

15          But you can't convict on suspicion.  You can't

16   convict on suspicion.  You have to convict on proof.  From

17   proof beyond a reasonable doubt.  That's what they have to

18   do.  Okay?  What happens when someone convicts on suspicion?

19          And my colleague mentioned it here:  It's not a

20   couple of days later, what is it?  Five years from now, 10

21   years from now, they think, "You know what, I shouldn't have

22   fallen for the noise.  I have the suspicion.  I convicted on

23   suspicion, but I have a reasonable doubt now.  I need to go

24   back.  I need to go back to the jury room."

25          But it's too late.  It's too late then.  So when

they ask you to convict on suspicion, when they say:  Use
suspicion and rumor and innuendo and the spin instead of
proof, they haven't done their job.  And if you want to
blame somebody, blame the Government.  Blame the Government
for making you -- or asking you to do their job for them,
for bringing you suspicion instead of proof.  For bringing
you information that's spun like, for instance, Bianca
Rudolph.  Remember her testimony?  They're saying she didn't
know about Lori.  My colleague put it up there yesterday.
"I'm not a long-suffering wife."

Oh, and they asked her, "When Lori went on the trip
in 2009 was she a medical aide?"

And she said, "I know she was not a medical aide."

But pay no attention to all that, according to the
Government.  My colleague's going to get up here and tell me
how I'm wrong and go back about all these other things.

But, again, we talked about the law and the Judge's
instructed you on the law, but at the end of the day -- and
this is why this is about you, it's not about us out here --
the end of the day, you are the law here.  You make the
decision, okay?

Again, the law isn't the flag, it's not this giant
courthouse.  I mean, those are symbols of the law, right?
Those are symbols of it.  But really what it is, it's us,
you, doing the right thing.  Doing what you're supposed to

3172

1    do.   Looking at the evidence.   And at the end of the day

2    doing -- looking in your heart and saying, "No, they have

3    not proven their case."

4         I like to believe that we all have justice in our

5    hearts.   And I know you do, too.   And I ask you to return a

6    verdict of not guilty on all the counts against my client.

7         Thank you, Your Honor.

8         THE COURT:   Thank you, Mr. Dill.

9         Rebuttal closing argument for the Government.

10        MR. FIELDS:   Thank you, Your Honor.   May I begin?

11        THE COURT:   You may.   Mr. Fields.

12        MR. FIELDS:   Ladies and gentlemen, I'm going to end

13   this trial where we started almost three weeks ago.   I'm

14   going to end at the back bar of that high-end steakhouse in

15   Phoenix, Arizona.   "I killed my fucking wife for you."

16        Mr. Grewell said that you didn't need to take the

17   Government's word for that; you could take Larry Rudolph's

18   word for it.   And now, after seeing the evidence and after

19   seeing that man testify, you know what kind of person he is.

20   You saw and heard what he told you about this incident.   And

21   you know whether that's consistent with the evidence.

22        On October 11th, 2016, Larry took his wife to

23   Africa.   He was pretending that he was going to reconcile

24   with her.   She had given him an ultimatum after being

25   confronted by Bianca about the fact that he was having an

1    affair.  She was pushing him for a little bit more control

2    over their finances.  She was pushing him to finally get rid

3    of Lori, to start their marriage, to really be together.

4              She had all those emails.  Emails that would have

5    scuttled his lawsuit against his SCI rivals.  He was losing

6    control.

7              But Larry knew firearms.  He knew hunting.  He knew

8    Zambia.  He knew it was his chance to take back control.  So

9    he did it.  He took that shotgun, and he shot her straight

10   through the heart.  He murdered her.

11             He took the jewelry off her corpse as a trophy and

12   he filed an insurance claim to collect $15,000.  He took

13   control of the narrative.  He told the Zambian authorities

14   it was an accident, because that was consistent what he

15   planned.  That was consistent with what was within his

16   control.  When he risked losing control because the Embassy

17   officials weren't as compliant as the Zambian authorities,

18   he responded with threats and intimidation, or he used his

19   wealth trying to bribe Cassius Mwiinga or give a loan to

20   Mark Swanepoel.

21             He knew that Zambia was the perfect place to commit

22   the crime because he could control the narrative.  He could

23   control the evidence at the campsite he had literally helped

24   build.  When he got back he had control over the evidence.

25   He could withhold whatever was harmful.  He could give what

1    might be helpful and try to manipulate the court system the

2    same way he had admitted he'd done that in 2012 with his SCI

3    lawsuit.  That's exactly what he did back then; that's

4    exactly what he thought he could do in this courtroom.  Turn

5    over the bag.  Say you're cooperative.  Throw away the

6    murder weapon.

7         And when he started to lose control here, when

8    things weren't going according to plan, he took that stand

9    and he lied to you.  The one thing defense counsel did not

10   dwell upon in closing arguments was that man's testimony.

11   You need to assess it for yourself.  Is it consistent with

12   the evidence?  Or is it consistent with a man who has

13   nothing to lose and is ready to say anything he needs to say

14   to cast that doubt?

15        This is a case about the defendant's loss of

16   control.  It's about a man who was running out of ways to

17   control his wife, to control his mistress, to control his

18   social relationships, to control his future.  It's the case

19   of a man who thought he could get back that control by

20   murdering his wife in the remote vastness of a game

21   management area on the borders of Kafue, which was the

22   perfect place he thought he could get away with it.

23        Now, ladies and gentlemen, you know beyond a

24   reasonable doubt that this is the kind of defendant who

25   would destroy evidence and try to manipulate the court

1    system, because he confessed to doing exactly that.  He told

2    you he threw away the murder weapon after getting contacted

3    by the FBI in 2017.  Now there are lots of problems with

4    the, "I found the shotgun and I decided to disassemble it

5    and put it in two cardboard boxes and just let the

6    garbageman take it away," but breaking it down exposes the

7    techniques that the defendant has used for a long time to

8    hide, conceal, control, and manipulate.

9         First, he makes sure that the story isn't

10   verifiable.  He told you he threw it away but no name for

11   the trash company.  And it's cash, of course, so there's no

12   trace, so it can't be verified.

13        Second, he puts an intermediary between him and the

14   sources of information that might help expose the lie.  So

15   here he says, "Oh, actually, it was the realtor.  They're

16   the one who recommended the trash service."

17        Doesn't name the realtor.  And, again, provides

18   plausible deniability.  It's not him.  He can deflect.

19        Third, include enough detail to make someone want

20   to believe.  So there you -- there was definitely this trash

21   service.  "I was moving.  I put it in two cardboard boxes."

22   But, again, vague enough that you can't really pin down any

23   of the details.  It was sometime in 2018.  Can't remember

24   exactly when.  Can't remember the trash service.  Again,

25   again, enough vagueness there.

1              Fourth, blame whose ever's questioning the story

2     for any confusion.  He would have provided the shotgun to

3     the FBI in 2017; they just didn't ask for it.  It's their

4     fault.

5              And, fifth, appear to be helpful.  Appear to want

6     to tell the truth by clarifying, but always keep control of

7     the information.  Never reveal more than necessary.

8     Basically admit what you can't deny and deny what you can't

9     admit.

10             And this, ladies and gentlemen, is exactly what he

11    did on the stand.  It's exactly what he did with the

12    insurance companies.  He sent them some initial letters with

13    a lot of vague information:

14             My wife has died.

15             Where?  Doesn't say.

16             How?  Doesn't say.

17             Keep control.  Only provide as much information as

18    necessary.  Have an intermediary, a lawyer, to blame when

19    someone asked about things.  "I didn't give them the -- I

20    gave my attorneys all of those documents.  They're the ones

21    who didn't turn over that one document that says 'suicide'

22    that might cause the insurance companies to be like, 'Oh,

23    this is weird.'"

24             Or the one document that says, the shotgun, in

25    an -- you know, what he's claiming to be an accident -- is

in perfect condition.  Have someone to blame.

And, finally, as confronted here in court, blame
the companies, right?  They didn't get the ballistics report
he hid from them.  They didn't hire the right investigators.
It was their job.  It's their fault for believing that he
has integrity.

He did that with the insurance companies, he did
that with the SCI lawsuit, and he's doing that in this case.

He got rid of the murder weapon.  He did spend the
money on himself.  He lied under oath.  He blamed his wife
for the divorce and for the postnup.  He said, "I'm so sorry
that you're -- you know, making me get this postnup for
you."

That story made absolutely no sense.  The idea here
is that Bianca wants to run away with Doug Scandrol and
start something, and so she wants a divorce is what he says.
But then in his testimony it's, "No, I was going to threaten
her with the divorce and I wanted a postnup," so basically
she threatens divorce and he is threatening her back and
says, "I'll give you a divorce or a postnup where you get
even less"?  None of that is plausible.  None of that makes
any sense.

But here, ladies and gentlemen, here's how you
should respond:  First, you should ask yourself what the
source of information is.  If the source of the information

3178

1    is the defendant, you can immediately discount it.  He's

2    committed perjury for a lot less.

3          Second, you should ask yourself if there are

4    multiple pieces of evidence, each independently supporting

5    the same fact.  So we'll talk about this.  The satellite

6    wound on the right breast.  That's one that supports

7    distance.  This crime did not happen in close contact.

8          The wound size.  How about the fact that it was the

9    defendant who was unloading the shotgun?  That's what

10   Mr. Swanepoel has said consistently.  That's what Banda

11   heard.

12         How about Bianca being experienced with firearms?

13   Everyone that you heard talked about that, said that.  Even

14   the defendant was -- couldn't deny that.

15         And, third, when there's conflicting evidence, ask

16   yourself if that's the defendant trying to deflect, blame an

17   intermediary, blame someone else, raise a side issue.

18   That's the postnup, right?

19         The postnup is not a central issue in this case.

20   You should consider it, you should look at it, you should

21   evaluate it like any of the other evidence.  You should

22   decide for yourself whether that undermines his motive or

23   whether this is a defendant who, even if the postnup was

24   valid, would have been really worried about losing

25   $2 million to his wife.

3179

1           That's one thing he was willing to admit.

2   Supposedly even after this postnup, he said, "Yeah, I did

3   have those conversations with Al Smith.  Yeah, I was worried

4   about the divorce."

5           And, finally, ask yourself if the information is

6   from a source that was open and transparent or whether it

7   was one -- from one that could be easily manipulated like

8   the defendant giving the soft case but throwing away the

9   gun.

10          Now, ladies and gentlemen, you've seen in this case

11  exactly what the defendant tried to prevent from ever

12  getting into this courtroom.  You saw those photographs that

13  were taken by the state department folks.  You've seen how

14  federal agents did what the defendant knew the Zambians

15  couldn't:  They interviewed Larry's closest friends.  They

16  were able to review thousands of pages of bank documents and

17  insurance documents, and consult with renowned forensic and

18  ballistics experts.

19          And now you've actually heard those witnesses

20  describe what the defendant wanted to keep so hidden and so,

21  "Oh, I'm a very private person."

22          You've heard about fantastic possibilities:  of

23  winning the lottery, stingrays that stabbed someone in the

24  heart, actors firing live guns on movie sets.

25          But this isn't a movie.  It's a courtroom and you

1    will decide whether all of the defendant's fantastical

2    scenarios, magic bullets that happen to pierce the heart

3    straight on, front to back, so as to leave the defendant

4    with the freedom and control to see whoever he wants, and be

5    with almost $5 million, whether that's reasonable.

6           But I submit to you there are key facts you can

7    readily conclude are true beyond a reasonable doubt.  So you

8    know beyond a reasonable doubt, Larry was the only other

9    person in that cabin.  You know beyond a reasonable doubt

10   that that shotgun was in perfect condition.  Mark Swanepoel

11   and Pieter Swanepoel test-fired it.  And Larry would not

12   have taken a malfunctioning shotgun on a leopard hunt,

13   especially when they needed it because they might need it to

14   save their lives.

15          You know beyond a reasonable doubt that this wound

16   was not self-inflicted.  It's not a contact wound.  The

17   wound was probably fired from 1 to 3 feet away.  Far enough

18   for that rivet on the bag so that they could travel --

19   remember, if you look -- I'm not going to show it again --

20   but Government's Exhibit 17 is those photographs, not

21   reasonably in dispute that there's a primary entrance wound

22   on the heart and then another satellite wound over here on

23   the breast.

24          It's going to take some distance for that rivet to

25   have enough room to spread.  You know that this happened

1    from a distance.  The experts, all of them, said that this

2    was not self-inflicted.  Mr. Haag said that, Mr. Cina said

3    that.  That's not reasonably in dispute.

4         What about a drop?  The shotgun wasn't dropped,

5    ladies and gentlemen.  Mr. Haag told you that the wound

6    angle rules that out.  Now, maybe -- we'll get to the wound

7    angle in a second, but Dr. Cina told you the same thing.

8    That's why he ruled the manner of death was a homicide.

9         You know beyond a reasonable doubt that Bianca was

10   an exceptionally experienced hunter who had a lifetime of

11   hunter safety drilled into her.  That doesn't mean people

12   can't momentarily make bad decisions, right?  But truly, can

13   there be any reasonable doubt that even if she was being

14   somewhat careless, that she wouldn't put the muzzle straight

15   at her chest?  Or that she was pointing the gun at herself

16   while loading it into the case?

17        You know beyond a reasonable doubt that Larry's

18   first full day back in the United States was October 18th.

19   He told his kids from a distance.  It's not that he wanted

20   to be there to hug them, to hold them, to grieve with them.

21   That was a lie.  He knew that on October 13th, 2016, before

22   he got to Johannesburg, he knew that when he was telling

23   Otto Westhassel, "Don't contact my children."  He knew that

24   when he told Mark Swanepoel, "I want to tell them in

25   person."

1           He had no intention of actually looking his

2   children in the eye and telling them what had happened.  He

3   had a small, sad little gathering without much notice; no

4   obituary, and he had a short eulogy.  And he woke up the

5   next day and he started thinking about Lori and what he was

6   going to do.  He booked a ticket for her.  And then he

7   booked a ticket to Las Vegas with a stranger, and consider

8   that story.

9           Do you really think that Larry Rudolph went to

10  Las Vegas and he's sort of sad Larry sitting at the bar by

11  himself, but he's bought this ticket for this woman named --

12  at first he said, "Oh, Tammy."  She's a stranger.  He booked

13  a ticket to have -- to celebrate the fact that he had his

14  freedom.  That's what he was doing in Las Vegas, ladies and

15  gentlemen.

16          And then he moved in with Lori.  He executed the

17  plan they had been talking about.  They immediately start

18  looking for their dream house.  She's picking out the lot

19  where they're going to build it, with the money that they

20  got from Bianca's death.  And in the meantime, he actively

21  evades questioning from Bianca's family, who just want

22  closure.  "I can't give you those documents."

23          Doesn't have a good answer for why he didn't do

24  that.  He tried to keep control by selectively deciding

25  when, where, and how he would cooperate, working to

1    manipulate the information to his maximum advantage.  Let's

2    talk about some of the things that were raised in the

3    defense closing.

4         So Mr. Haag, right?  He's asked all these questions

5    about sort of the circumstances.  You know what his response

6    to all of that is?  He says, ladies and gentlemen, that's

7    for you to decide.  That's not noise; that's the evidence.

8    What the defense counsel is calling noise is evidence and

9    the volume of that noise, the volume of that evidence, is

10   loud and clear.  It is that the defendant shot his wife in

11   the heart with a shotgun.

12        There's also this, you know, Mark could hear

13   everything while he was over in the -- in the dining area,

14   right?  He didn't hear a drop.  He didn't hear any banging.

15   There's no reasonable doubt that Bianca was -- she wasn't

16   banging the gun to get it into a case.  Basically the only

17   remaining possibility except for murder is a drop, right?

18        It is the Government's burden, make no doubt about

19   that.  We have to prove that this was not an accident.  The

20   shotgun wasn't dropped.  The wound angle rules that out.

21   There's -- it's not reasonable to think that Bianca died of

22   a shotgun wound that destroyed her left ventricle and

23   atrium, right, with no damage to the right lung, so it's

24   straight on, slightly downward, and that that was a drop.

25        The defense counsel talked about all the witnesses

3184

1    that were not brought.  That's another deflection.  That's

2    another blaming someone else.  You heard Special Agent

3    Peterson tell you that the defendant wanted a witness here,

4    he could subpoena them.  If the defendant wanted a witness

5    here to talk to you all, he could have asked the Court for a

6    letter of request to the Zambian authorities and he could

7    have brought that witness here.  So if Kakoma was such a

8    critical witness, could have been brought here.  He had

9    control.  He could decide what witnesses he wanted to

10   present to you.  He didn't do that.

11          Chibesa.  Why wasn't he brought here?  You have his

12   report.  It was stipulated to in evidence.  The report that

13   says the shotgun's in perfect condition.

14          Let's talk a little bit about the medical examiners

15   because the medical evidence here is important.  One theme

16   of the defense case might be, "Can't know nothing about

17   nothing."  Right?  The scene photos are bad, the autopsy's

18   bad, there's no written reports.  Well, first of all, all of

19   that is why the defendant committed the murder in Zambia.

20   It's exactly what he was counting on.

21          And, again, the satellite wound.  No one, no one in

22   this case has discounted that that was probably a rivet from

23   that little hanging thing at the end of the shotgun case.

24          So, ladies and gentlemen, even if you think that

25   the Zambian autopsy here has problems, even if you think

1    that Dr. Maswahu operating with his very limited resources

2    at the time made some errors, even if all of that causes

3    some doubt, you can still be sure beyond a reasonable doubt

4    that this happened from a distance.  That's what Haag

5    concluded; that's what Cina concluded.

6         What about this criticism about the FBI shooting

7    incidents?  They're just too unreliable, right?  You know,

8    it's fired through a soft case.  You can't really know.  The

9    satellite wound.  Here again, that's completely separate

10   from all that, right?  You could find beyond a reasonable

11   doubt that you think the cardboard targets are unreliable.

12   But you could still conclude that this wound was not

13   self-inflicted.

14        What about the wound angle, right?  So the wound

15   angle here, there's been lots of, you know, can you really

16   believe Dr. Maswahu, you know?  Is he -- you know, did he

17   sort of joke that he was looking inside the wounds and

18   seeing the ribs?  Ladies and gentlemen, that's not what he

19   told you.  He opened up the wound.  It's a 6 centimeter

20   wound.  There's a blast defect that's about 8 centimeters.

21   He talked about that.

22        While he's inside the wound, he could see the ribs.

23   It's slightly downward.  That's what Dr. Cina told you.

24   Dr. Cina, a trained American pathologist, who understands

25   human anatomy and sort of knows this description of the

3186

wound matches something that would be straightforward front
to back.

The Bradtmiller videos.  You can look for yourself
and you can decide whether any of those had the shotgun
pointed right at the heart in a way that would cause the
wound to be front-to-back.

Let's talk about sort of the fantastical, right?
Steve Irvin, the crocodile guy.  He gets stabbed by a
stingray.  First of all, the stingray didn't jump out of the
water and stab him on the boat, right?  He's underneath
there.  There's all these circumstantial circumstances that
you need to conclude, "Okay, maybe that is what happened."
That's not this case.

Let's imagine you walk out one day and you find
your driver's side window, it's smashed in the parking lot.
All right.  So it's possible, possible, here in Colorado,
that the window was smashed by a moose.  It was walking by
and like one of its antlers, or was running, and it smashed
that window.  Possible.  But is it likely or reasonable?
No.  Especially when you look inside and you realize that
the jewelry in your center console was missing, right?

Context matters.  Just because something is
possible does not mean that it's reasonable.  The shotgun
here was in perfect condition.  There can be no reasonable
doubt about that.  As far as the accident goes, further

3187

1    discounting the possibility this was an accident, further

2    making it clear that there's proof beyond a reasonable doubt

3    that this wasn't an accident is the fundamental design of

4    the Browning shotgun, itself.

5            Remember that trigger mechanism.  Remember how it

6    sits there on that center pin, right?  So it's less likely

7    to sort of move and wobble.  That center mass prevents the

8    trigger from having a lot of leverage as it might on other

9    triggers.  Remember the sear mechanism and the regain and

10   how it's designed to sort of hold together?  Remember the

11   safety sear that prevents accidental firings.  Remember that

12   firing pin retraction device, right?  All of these things

13   designed to make sure that the Browning does only what it's

14   supposed to do which is fire when the trigger is pulled.

15           Also consider the possibility of what -- you know,

16   Mr. Haag would call an impacted jar-off, right?  So maybe

17   Bianca was packing the case, bangs it against something.

18   Look around in those scene photos.  What would she have been

19   banging it against, right?  If this really happened close to

20   the soft case or the bed, what would she be banging it

21   against?  Also remember that it's already in a soft case,

22   which is going to absorb some of that impact, if that's

23   really the scenario that happened here.

24           There's a carpet on the floor.  That's going to

25   absorb some of the impact.  There's a soft bed there.  None

1    of the impacted jar-off scenarios make any sense.

2            Dr. Maswahu.  Right?  Dr. Maswahu's operating over

3    in Zambia with very limited resources.  Use the credibility

4    instruction that the Court will give you to decide whether

5    or not he was trying to give you an honest recollection of

6    what he remembered here.  This case stood out to him.  How

7    could it not?  It's a white American woman with a shotgun

8    hole in her chest, so he has reasons to remember it.

9            Any reason to be dishonest with you?  Any reason to

10   shade the facts?  Any reason except to try to give you an

11   honest recollection of what he remembers that wound looking

12   like?  He wasn't making it up.  That's what he remembers.

13           Do you have any personal relationship with anyone

14   in this case?

15           No, he's from Zambia.  He's not from the United

16   States.  Not employed by the U.S. Government.  Not employed

17   by the defendant.  He has no axe to grind.

18           The wound size.  There's been some criticism of

19   that and talking about measurement.  Ask yourself if you

20   really think that this doctor, who's practiced for 18 years,

21   did his pathology training in the United Kingdom where he

22   did approximately 200 autopsies there, has seen hundreds of

23   shotgun wounds, whether you can't measure a wound.  6

24   centimeters is a large wound.  Remember the barrel of that

25   Browning shotgun, 0.7.  6 centimeters is large.  This was

1    from a distance.

2              Then start to consider all -- some of the other

3    evidence, right?  The defendant's inconsistent statements.

4    So he wants to say he was in the bathroom.  No, he told

5    Ralph and Anthony that he was outside the cabin.  He wants

6    to say, "I was in the bathroom."

7              He told Musese he was in the shower, right?

8    Consider all of those things.  Use all of this to assess

9    whether or not this was a defendant who's trying to

10   manipulate and control the information.

11             COURTROOM DEPUTY:  Counsel, 10-minute warning.

12             MR. FIELDS:  Thank you, Miss.

13             Thinking about:  What is this person in front of me

14   going to believe and sort of selectively deciding, "I'm

15   going to tell this person this because I think they'll

16   believe it.  I'm going to tell this person that because I

17   think they'll believe it.  I'm going to tell this other

18   person this other thing because they'll believe that."

19             That's manipulation, that's deception, and that's

20   what this defendant did throughout this case.

21             Also consider whether these inconsistent

22   statements, and sort of this pattern of control, does that

23   make it more likely that he's the sort of person who tried

24   to pay a bribe?  He gave Mark money.  Is it a stretch to

25   think that he offered it to Mwiinga?  Is it a stretch to

1    think that is a defendant who used his wealth and resources

2    to try to get away with it?

3         The original shotgun.  So you've heard some

4    criticism about, you know, the FBI didn't send, you know,

5    anything for testing.  The FBI didn't do all these tests.

6         That, ladies and gentlemen, is another deception.

7    And you know that because the defendant had the original

8    shotgun and he put it in a cardboard box that could be taken

9    away in the trash.  That's the shotgun that would get sent

10   to an FBI lab.  That's the shotgun that would put those

11   latch marks on the cartridges.  That's the shotgun that

12   could have been pattern-tested.  That's the shotgun that

13   could have been tested in all these other ways.

14        As you heard throughout this trial, testing the FBI

15   sort of exemplar gun doesn't do the same thing.  Mr. Haag

16   told you -- or Haag told you it's the story of the gun.  And

17   the gun, the murder weapon, that's the one the defendant had

18   control over; that's the one that he disposed of.

19        Now I want to talk about heartfelt stories from

20   fathers.  The defendant talked about how, you know, he finds

21   out that Bianca's having a divorce and he goes to his father

22   and his father says, "You know, you need to think about

23   this, son, but you know you got to do it for the children."

24        What's the defendant's response to that?  A postnup

25   to save his wealth.  Ladies and gentlemen, look at that

3191

```
 1    postnup.  30 pages.  How many provisions of it do you think
 2    are dedicated to child custody, taking care of the children,
 3    thinking about the children.  There's one about college
 4    expenses.
 5            It's not about the children.  It's always been
 6    about the defendant.  It's always been about Larry Rudolph
 7    and that's the way it was then.
 8            Let's talk about dirty windows.  This is the
 9    defendant who gets to pay the window cleaner.  This is the
10    defendant who gets to decide that he wants to dirty the
11    windows when there's something that he doesn't want people
12    to look at, but then pay to clean when there's something he
13    wants them to see.  That's this case.  That's what you saw.
14            Ms. Milliron, let's talk about her and her motives.
15    So, first of all, the texts that you saw where she's talking
16    to Mr. Markus.  First of all, she should have taken his
17    advice.  She should have told the truth.  That text she
18    says, "I don't want to say the wrong thing."  And she says,
19    "Tell me if this helps."
20            That's the text of Lori Milliron.  She's trying to
21    figure out what's going to help Dr. Rudolph in grand jury.
22    She knows what happened here and the reason she knows is
23    that she's the one who helped him get the propofol.  She's
24    the one who went with him to Cabo just before his wife died.
25    She's the one who's been intimately involved with all of
```

```
 1    this.  She's the one who gets a text message from Africa

 2    about the fact that this was an accident.  Or did it say

 3    accident?  Maybe it did.  But the text message was, "Mission

 4    accomplished."

 5          She knew about this murder from the start and then

 6    she's worked actively, just like the defendant, to try to

 7    conceal that.  That's where you get the pattern in grand

 8    jury.  So if the grand jury transcript here is clickbait,

 9    read through it, because you won't believe what you see.

10    Statement after statement that's just absolutely incredible.

11    And a tactic here of, you know, at first denying but then

12    finally -- when confronted with the evidence, finally

13    admitting it because it can't be denied anymore.  That is a

14    defendant committing obstruction; being misleading.  Saying,

15    "I didn't go into work with Dr. Rudolph."

16          Saying, "We're friends."  When asked to clarify the

17    relationship saying, "Yes, we're more than friends.  We

18    travel together mostly."

19          Does that strike you as an honest accounting of

20    their relationship?  The defendant himself said no.

21          Why did he give you so much money?

22          He was generous?

23          The defendant himself said it was obvious; she was

24    his girlfriend.  That's why she was getting all the money.

25          The conversation -- Anders, right?  Do you think
```

1     that -- you know, the conversation where Lori says something

2     bad about Bianca.  Do you think that's Anders just making it

3     up, or do you think based on the emails that you saw,

4     Government's Exhibit 90, that Lori could sometimes be

5     jealous and she was the sort of person who wanted Bianca

6     gone.

7              Was this a trap?  Why is Ms. Milliron here?  She's

8     here because she knew there was a murder.  She knew her

9     lover and primary source of income was at risk.  She could

10    have done the right thing.  She had a choice to make at this

11    point, and the choice she made was to lie.

12             Sunrise on October 11th, 2016.  This is Bianca's

13    last day on earth.  She was looking forward to seeing her

14    family at a wedding.  She was optimistic about saving her

15    marriage; taking back a little bit of control for herself.

16    Her husband had finally put her on one of the financial

17    accounts just a month before.  But a shot rang out and the

18    life drained from Bianca in a shallow scream.

19             It took Mark Swanepoel 15 seconds to run the 35

20    yards from the dining hall to the cabin.  Rudolph needs to

21    win this case by -- or the Government needs to win this case

22    by 30 lengths is what the defense counsel says.  35 yards.

23    That's 15 seconds for Dr. Rudolph to get in position for his

24    alibi and say he's sitting there in the bathroom.

25             One, two, three, four, five, six, seven, eight,

1    nine, 10, 11, 12, 13, 14, 15.

2            Mark Swanepoel got there to see Larry next to his

3    wife.  And the defendant was sobbing.  He was distraught.

4    Was the worst day of his life.  There's no reasonable doubt

5    about that either, ladies and gentlemen.  On that we agree

6    with Mr. Markus.  The defendant was distraught.  It wasn't

7    like the crocodile tears we saw yesterday.  At that moment,

8    he had killed her.  He had taken back the control that he so

9    wanted, but even Larry Rudolph recognized the gravity of

10   what he had done.

11           COURTROOM DEPUTY:  Two-minute warning, counsel.

12           MR. FIELDS:  Because it's like Mark Swanepoel told

13   you:  The devil loads the shotgun.  But it's the demons that

14   haunt the man who wields it.

15           Ladies and gentlemen, you've seen all the evidence

16   in this case, you've heard the defendant testify, and you

17   know beyond a reasonable doubt what happened here.

18           The defendant murdered his wife, collected $5

19   million, moved in with his mistress, and then they worked

20   together to obstruct, conceal, and deceive to prevent

21   justice.  It's your job to look through all of that, and

22   when you do that, the only conclusion you can reach in this

23   case is that both of these defendants are guilty on all

24   counts.  Thank you.

25           THE COURT:  Thank you, Mr. Fields.

1                All right.  The next thing I have to do is a step

2       that I don't enjoy in these criminal trials, which is I have

3       to inform the alternates who you are.

4                At this time, I'm going to have to excuse Ms. Blake

5       and Ms. Hubka.  I know you must feel very disappointed that

6       you're not going to be able to deliberate with your

7       colleagues to a final verdict in this case, but this is the

8       law and we are all duty bound to comply with it.  So in a

9       moment, you will return to the jury deliberation room with

10      your fellow jurors.  At that time, please collect your

11      belongings, turn your badge in to Ms. Guerra, and make sure

12      that she has your mobile number and then you may leave and

13      go home.

14               However, and this is critical, please continue

15      the -- the two ladies, continue to wall yourself off from

16      all media coverage of this case and continue to not speak

17      with another human being about this case.  Why?  Because

18      this has already happened in one of my criminal cases a few

19      years ago:  There is a possibility, it might be small, but

20      it has happened, like I just said, that one of the remaining

21      12 of the jurors may not be able to complete their duty for

22      health or other reasons, and especially now in the era of

23      COVID.  And in the case that I'm thinking about and

24      referring to, the jury was in their second day of

25      deliberation.  One of the jurors got a call that a family

1    member was in an extreme situation and she had to leave and

2    then we had to call one of the alternates back.  And I had

3    to examine and speak with that juror -- that alternate juror

4    to confirm that they had not spoken with anyone and not

5    consulted any other source of information.  So I hope the

6    other 12 will remain healthy and their families will be able

7    to be healthy and will stick it out, but just because

8    there's that possibility.

9        So until you receive a phone call from Ms. Guerra,

10    like I said, please continue to wall yourself off and not to

11    speak with anyone about this case.

12        On behalf of the -- I know I speak on behalf of the

13    parties and the lawyers and all of my staff when I thank the

14    two of you ladies for very much -- very much for your

15    service these past 14 days and the time and commitment that

16    you have made to this case and to our system of justice.

17        Now, for the remaining 12 jurors, in a few moments

18    you will be escorted to the jury deliberation room to begin

19    your deliberations.  You are now finally able to discuss the

20    case amongst yourselves, but please do so only when all 12

21    of you are present together at the same time.

22        To ensure that your deliberations will remain

23    private, a court security officer will serve as a bailiff

24    and he will be present outside the jury room to ensure that

25    you are not interrupted or disrupted by anyone.  Also he

1    will collect your cell phones during the time that you are

2    deliberating.

3         You will now finally be able to take your notes and

4    notepads with you to the deliberation room to consult and

5    review during your deliberations.  When you go back to the

6    jury room, you will see the 12 sets of written instructions,

7    one for each of you, for you to consult during your

8    deliberations.  And a few minutes later after that, a single

9    set of all the trial exhibits -- all but two, I'll come back

10   to that in a moment, will be -- all that have been admitted

11   into evidence will be made available to you in the

12   deliberation room for your review and consideration during

13   your deliberations.

14        What will not go back with you, and I'm sure you

15   appreciate why, even though there's a 101 precautions, the

16   shotgun and the ammunition will remain out here in the

17   courtroom.  If you wish to review and look at, hold, any of

18   those items, just let the bailiff know, who will let

19   Ms. Guerra know, and we will make arrangements for you to

20   come back into the courtroom.  She will be present in the

21   courtroom, as well as -- either one of the marshals or one

22   of the court security officers.

23        They won't talk to you.  They know that they have

24   to keep a distance from you.  And then you can review those

25   items for as long as you need to.

1           And today there is such a thing as a free lunch.

2   So lunch will be brought to the jury room so that you can

3   continue your deliberations without interruption.

4           All right, will the court security officer please

5   come forward.  Ms. Guerra, will you please administer the

6   oath to the court security officer.

7       (Court security officer sworn in)

8           THE COURT:  Officer, if you'll give this to the

9   jury in the deliberation room.

10          Members of the jury, if you'll follow the bailiff.

11      (Jury left the courtroom at 12:36 p.m.)

12          THE COURT:  All right, counsel, if you haven't

13  already, please give Ms. Guerra your mobile phone numbers so

14  that she can contact you in the event we have a question

15  from the jury or we have a verdict.  I'm directing counsel

16  to remain within 15 minutes of the courthouse so that

17  there's not any undue delay dealing with a question or in

18  reassembling for a verdict.

19          So here's what's going to happen if we don't have a

20  verdict by 5:00.  I'm not going to require counsel to return

21  to the courtroom -- counsel or the parties.  At 5:00, if the

22  jury has not yet returned a verdict, Ms. Guerra will inform

23  you that they are released to return to their homes for the

24  weekend and they will be instructed to return to the

25  courtroom at 8:35 -- or to their deliberation room by 8:35

1    on Monday morning.

2         I will bring them out here to ensure that we have a

3    record that all 12 are present and accounted for.  And then

4    they will be returning to the deliberation room to continue

5    their deliberations.  Obviously counsel and parties are

6    directed to be here by no later than 8:30 on Monday, again

7    in the event we don't have a verdict today.  With the

8    exception of one of counsel, I think who's going out of

9    state for a function that I've already given approval for.

10        I want to thank counsel for their very professional

11   and very zealous representation of their clients.  It's

12   clear that you all are very committed to the cause of your

13   clients and that kind of advocacy is very much appreciated

14   by me.

15        All right.  Is there anything that we need to

16   attend to before we go into recess?  For the Government.

17             MR. FIELDS:  No, Your Honor.  Thank you.

18             THE COURT:  All right.  For Defendant Rudolph.

19             MR. MARKUS:  No, Your Honor.

20             THE COURT:  All right, Defendant Milliron?

21             MR. DILL:  No, Your Honor.

22             THE COURT:  All right, we will be in recess until

23   there's a question from the jury or we have a verdict.

24        (Recess taken 12:39 p.m.)

25

3200

1                                     INDEX

2       **Item**                                              **PAGE**

3                          CLOSING ARGUMENTS

4          By Mr. Winstead                               3069
           By Mr. Markus                                 3105
5          By Mr. Dill                                   3145
           By Mr. Fields                                 3172
6

7                    *       *       *       *       *

8                        REPORTER'S CERTIFICATE

9          I certify that the foregoing is a correct transcript

10     from the record of proceedings in the above-entitled matter.

11         Dated at Denver, Colorado, this 18th day of September,

12     2022.

13

14

15

16

17              MARY J. GEORGE, FCRR, CRR, RMR

18

19

20

21

22

23

24

25